# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE: NAVY CHAPLAINCY | ) | 1: 07-mc-269 (RMU) |

## PLAINTIFFS' RENEWED MOTION FOR A PRELIMINARY INJUNCTION FOLLOWING REMAND ADDRESSING DEFENDANTS' DENOMINATIONAL PREFERENCE IN RETAINING CATHOLIC CHAPLAINS ON ACTIVE DUTY PAST THEIR STATUTORY SEPARATION AGES

In accord with the Court's Order consolidating all chaplain cases, all plaintiffs in the above case submit this motion renewing the *Chaplaincy of Full Gospel Churches v. Winter* and *Adair v. Winter* 2003 Motion for an Injunction following remand from the Court of Appeals in *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006). Their memorandum of points and authorities provided herein shows they are entitled to an injunction because the defendants' practice of continuing Catholic chaplains past their statutorily separation ages to enable them to qualify for retirement pay is an unconstitutional preference and contrary to statutory limitations limiting the time service personnel may remain on active military service.

In accord with Local Civil Rule 7(m), counsel for the parties discussed this motion and defendants' counsel stated they will oppose this motion.

Dated: July 10, 2007

Respectfully submitted,
  /S/ Arthur A. Schulcz, Sr.
ARTHUR  A. SCHULCZ, Sr.
D.C. Bar No. 453402
Counsel for *CFGC* and the *Adair* Plaintiffs
2521 Drexel Street
Vienna, VA 22180
703-645-4010

Of Counsel:
Douglas McKusick, Esq.
THE RUTHERFORD INSTITUTE
P.O. Box 7482
Charlottesville, VA 22906-7482

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| IN RE: NAVY CHAPLAINCY | ) | Case No. 1: 07-mc-269 (RMU) |
| | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR RENEWED MOTION FOR AN INJUNCTION PROHIBITING DEFENDANTS DENOMINATIONAL PREFERENTIAL RETENTION PRACTICE OF RETAINING CATHOLIC CHAPLAINS PAST THEIR STATUTORY SEPARATION AGES TO QUALIFY FOR RETIRED PAY**

Respectfully submitted,

Dated: July 10, 2007

    _/S/ Arthur A. Schulcz, Sr.___
ARTHUR  A. SCHULCZ, Sr.
D.C. Bar No. 453402
Counsel for *CFGC* and the *Adair* Plaintiffs
2521 Drexel Street
Vienna, VA 22180
703-645-4010

Of Counsel:
Douglas McKusick, Esq.
THE RUTHERFORD INSTITUTE
P.O. Box 7482
Charlottesville, VA 22906-7482

# INDEX

INDEX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

THE PLAINTIFFS HAVE STANDING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

RECENT OR CURRENT EVENTS BEARING ON THIS MOTION. . . . . . . . . . . . . . . . . . . 4

STANDARD FOR AN INJUNCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.      THE UNDISPUTED FACTS AND EVIDENCE SHOW DEFENDANTS HAVE BEEN
        OPERATING A SPECIAL PENSION PLAN SOLELY FOR CATHOLIC CLERGY, A
        CLEAR DENOMINATIONAL PREFERENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.     PLAINTIFFS WILL SUCCEED ON THE MERITS OF THEIR CLAIM DEFENDANTS'
        4109 PROGRAM VIOLATES THE ESTABLISHMENT CLAUSE. . . . . . . . . . . . . . . 11

        A.      Each of the 4109 Program's Three Parts Demonstrates a Denominational
                Preference.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        B.      Strict Scrutiny of the 4109 Program Is Mandated. . . . . . . . . . . . . . . . . . . . . 13

        C.      Defendants' Pension Qualification Program for Overage Catholic Chaplains Fails
                Strict Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                1.      The 4109 Program has no compelling purpose. . . . . . . . . . . . . . . . . . . 17

                2.      The 4109 Program fails strict scrutiny because it is not narrowly tailored to
                        achieve a compelling government purpose. . . . . . . . . . . . . . . . . . . . . . . 20

        D.      The Challenged Practice Violates the *Lemon* Test . . . . . . . . . . . . . . . . . . . . . 22

                1.      The 4109 Program has no valid secular purpose. . . . . . . . . . . . . . . . . . 23

|   |   | 2. | Defendants' 4109 Program fails *Lemon's* second prong by advancing the Catholic religion and inhibiting the religion of others. . . . . . . . . . . . . . . 24 |
|---|---|---|---|

|   |   | 3. | Defendants' 4109 Program unconstitutionally entangles the Navy and religion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26 |

|   | D. | The 4109 Program Fails the Reasonable Observer Test. . . . . . . . . . . . . . . . . . . 26 |

|   |   | 1. | The reasonable observer examines the 4109 Program's history and purpose. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27 |

|   |   | 2. | The reasonable observer would conclude the 4109 Program is an illegal preference designed solely to advance Catholic interests. . . . . . . . . . . . 28 |

III.  PLAINTIFFS WILL SUCCEED ON THEIR CLAIM THE CHALLENGED PRACTICE VIOLATES DUE PROCESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

IV.  PLAINTIFFS WILL SUCCEED ON THE MERITS OF THEIR CLAIM DEFENDANTS' CONTINUATION OF CATHOLIC CHAPLAINS BEYOND STATUTORY SEPARATION AGES IS WITHOUT AUTHORITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

|   | A. | The Secretary of Defense Has Limited the Secretary of Navy's Authority to Place Reservists in the Retired Reserve to Those Who Meet Specific Criteria. . . . . . . 32 |

|   | B. | DOD's Definition of the Retired Reserve Excludes the 4109s. . . . . . . . . . . . . . 34 |

|   | C. | Defendants Must Comply With DOD's Instructions . . . . . . . . . . . . . . . . . . . . . 36 |

|   | D. | The 4109s Have Been Illegally Classified and Illegally Continued on Active Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37 |

|   | E. | Title 10 Provides Limited Authority to Extend *Regular* Chaplains Eligible for Retirement Beyond Age 62 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38 |

|   | F. | Title 10 Provides No Authority to Extend *Reserve* Chaplains on Active Duty Beyond Age 67.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39 |

V.  PLAINTIFFS MEET THE OTHER INJUNCTION CRITERIA. . . . . . . . . . . . . . . . . . . 41

|   | A. | Defendants' Establishment Clause Violation Produces Irreparable Harm. . . . . . 41 |

|   | B. | Terminating Defendants' Unconstitutional Practice Poses No Burden or Injury on Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41 |

    C.    Terminating Defendants' Unconstitutional Practice Is in the Public Interest . . . . 41

    D.    There Are No Third Party Rights That must Be Addressed . . . . . . . . . . . . . . . . 44

VI.    PLAINTIFFS HAVE MET THE CRITERIA FOR AN INJUNCTION. . . . . . . . . . . . . 45

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

LIST OF EXHIBITS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

# TABLE OF AUTHORITIES

**FEDERAL CASES:**

Adair *v. England*, 183 F.Supp.2d 31 (D.D.C. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 31

*Adair v. England,* 217 F.Supp.2d 9 (D.D.C. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*American Chemical Council v. Johnson*, 406 F.3d 738 (D.C. Cir. 2005). . . . . . . . . . . . . . . . . . 40

*Anderson v. Laird*, 466 F.2d 283 (D.C. Cir.), *cert denied*, 409 U.S. 1076 (1972). . . . . . . . . 15, 16

*Board of Ed. of Kiryas Joel v. Grumet,* 512 U.S. 687 (1994). . . . . . . . . . . . . . . . . . . . . . 21, 25, 32

*Bond v. United States*, 47 Fed. Cl. 641 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

Center for Auto Safety v. Dole, 846 F.2d 1532 (D.C. Cir 1988). . . . . . . . . . . . . . . . . . . . . . . . 36

*Chaplaincy of Full Gospel Churches v. England*, ("*CFGC*"), 454 F.3d 290
    (D.C. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 5,

*Commack Self-Service Kosher Meets, Inc., v. Weiss*, 294 F.3d 415 (2d Cir. 2002), *cert denied,*
    537 U.S. 1187 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Cooney v. Dalton*, 877 F. Supp. 508 (D.Hawai'i 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Corp. of Presiding Bishop v. Amos*, 483 U.S. 327 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 26

*County of Allegheny,* 492 U.S. 573 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 22, 23, 27

*Dilly v. Alexander*, 603 F.2d 919 (D.C. Cir 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Elrod v. Burns*, 427 U.S. 347(1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Everson v. Board of Ed.*, 330 U.S.(1947). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Engel v. Vitale*, 370 U.S. 421(1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 42

*Goldman v. Weinberger*, 475 U.S. 503 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Katcoff v. Marsh*, 755 F.2d at 223 (2d Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 22

*Lac Vieux Desert Band of Lake Superior Chippewa v. Michigan Gaming Control Board*, 276 F.3d 876(7th Cir.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Larkin v. Grendel's Den, Inc*., 459 U.S. 116 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 24, 42

*Larsen v. U.S. Navy*, 486 F.Supp.2d 11 (D.D.C. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Larson v. Valente*, 456 U.S. 228 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 21, 32

*Lee v. Weisman*, 505 U.S. 577, 606 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Lemon v. Kurtzman*, 403 U.S. 602 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*McCreary Co. v. ACLU of Kentucky*, 545 U.S. 844 (2003). . . . . . . . . . . . . . . . . . . . . . . 11, 27, 28

*McGowan v. Maryland*, 366 U.S. 420(1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Miami Nation of Indians of Indiana, Inc. v. U.S. Dept. of the Interior*, 255 F.3d 342 (7th cir 2001), *cert denied*, 534 U.S. 1129 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Perrin v. United States*, 444 U.S. 37 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Poole v. Rourke*, 779 F.Supp. 1546(E.D.Cal.1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Rigdon v. Perry*, 962 F.Supp 150, 165 (D.D.C. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000). . . . . . . . . . . . . . . . . . . . . . 27

*Torcaso v. Watkins*, 367 U.S. 488 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United Christian Scientists v. First Church of Christ Scientist*, 829 F.2d 1152 (D.C. Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18

*Utah Licenced Bev. Ass'n v. Leavitt*, 256 F.3d 1061(10th Cir. 2001). . . . . . . . . . . . . . . . . . . . 43

*Wallace v. Jaffree*, 472 U.S. 38 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Wilkinson v. Legal Services Corp.*, 27 F. Supp. 2d 32 (D.D.C. 1998). . . . . . . . . . . . . . . . . . . . 43

**STATUTES:**

10 U.S.C. § 101(c)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

10 U.S.C. § 1251. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 38, 40

10 U.S.C. § 14509 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6, 39

10 U.S.C. § 14703. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 40, 41

**MISC:**

Department of Defense Instruction 1200.15, Assignment to and ... Transfer to the Retired
        Reserve.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Department of Defense Instruction 1215.06, Uniform Reserve, Training and Retirement
Categories Administration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Department of Defense Instruction 1215.19, Uniform Reserve, Training and Retirement
        Categories Administration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33-35, 37

Department of Defense Directive 1352.1, Management and Mobilization of Regular and Reserve
        Retired Military Members. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 35

Department of Defense Directive 1402.1,  Employment of Retired Members of the
        Armed Forces.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

## INTRODUCTION

All the plaintiffs in the above now consolidated case move the court for an order: (1) enjoining defendants from continuing their unconstitutional preference for Catholics manifested in their policy and practice[1] of allowing Catholic chaplains to remain on active duty past their statutory separation age for the purpose of qualifying for retired pay; 2) enjoining further violations by (a) stopping defendants' preferential retention practice and (b) requiring defendants to comply strictly with DOD instructions concerning classification of retired personnel; and (3) requiring defendants to remedy the constitutional and statutory violation by complying with the discharge statutes.  The *Chaplaincy of Full Gospel Churches v. Winter* and *Adair v. Winter*, (*CFGC /Adair*) plaintiffs renew their original motion for such relief.

Because the law of the case holds that "a party alleging a violation of the Establishment Clause per se satisfies the irreparable injury requirement of the preliminary injunction calculus", *Chaplaincy of Full Gospel Churches v. England*, ("*CFGC*"), 454 F.3d 290, 303 (D.C. Cir. 2006), this motion focuses on the other three injunction criteria.

## BACKGROUND

In 2003, defendants produced evidence in discovery establishing their practice of allowing Roman Catholic Reserve chaplains, and only Roman Catholics, to remain on active duty past the statutory separation ages for Reserve officers.  At the time, 10 U.S.C. § 14509 established the separation age for Reserve officers at 60.  Based on defendants' production of documents, plaintiffs identified 23 Reserve Catholic chaplains retained on active duty past age 60

---

[1]  Whether the course of conduct challenged here is called a practice, a pattern and practice, or a policy is immaterial.  Plaintiffs refer to the challenged conduct or actions as a "practice", one that has existed well over a decade.

1

to acquire the necessary 20 years time in service ("TIS") to qualify for retirement pay. Seven of these were LTs and LCDRs over age 67, four of whom were in their 70s. The seven chaplains over age 67 were given the status "4109", meaning Retired Reservist, although none of the 4109 chaplains met any of DOD's criteria for Retired Reserve.

In June 2003, plaintiffs filed a motion for a preliminary or structural injunction to (1) stop the above denominational preferential practice, (2) enjoin further violations and (3) require defendants to remedy the statutory violation by complying with the discharge statutes. Plaintiffs argued they met the four criteria for an injunction. First, plaintiffs would prevail on the merits of their claim because (1) the practice constituted a denominational preference subjecting it to strict scrutiny, and (2) defendants would fail strict scrutiny because the defendants ability to hire contract clergy or auxiliary chaplains if they were needed showed the practice was not narrowly tailored to meet a compelling government objective. Second, defendants' First Amendment violation, "for even minimal periods of time [] results in irreparable harm." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Third, the injunction placed no burden on defendants because they were required to follow the law and the Constitution, there were legal alternatives available to meet the needs of Catholics, and the challenged chaplains would suffer no harm because they had been commissioned with age waivers requiring them to acknowledge they would not qualify for retirement pay. Fourth, requiring the military to follow the law was in the public interest. Plaintiffs' Motion for a Preliminary and Structural Injunction and Partial Summary Judgment (the "Inj Mot"), *CFGC* Docket No. 142 (incorporated by reference).

In the alternative, plaintiffs moved for summary judgment because plaintiffs were entitled to judgement as a matter of law. *Id.*

2

The Court denied plaintiffs' Inj. Mot., holding plaintiffs had not shown irreparable harm because *Elrod* did not apply to Establishment Clause violations; Plaintiffs appealed.

On July 9, 2006, the D.C. Circuit reversed, holding that *Elrod's* rule did apply to alleged Establishment Clause violations and "a party alleging a violation of the Establishment Clause per se satisfies the irreparable injury requirement of the preliminary injunction calculus." *CFGC*, 454 F.3d at 304. The DC. Circuit remanded to the District Court the question whether plaintiffs satisfied the remaining three criteria. *Id.*

On October 20, 2006, as the parties were preparing a briefing schedule to address the remand issue, the Court stayed the *CFGC/Adair* case pending the D.C. Circuit's resolution of *Miller v. Secretary of Navy*, 476 F.3d 936 (D.C. Cir. 2007), an unrelated case. Plaintiffs moved for an order clarifying or lifting the stay because of the uncertainty as to when *Miller* would be decided and a stay was incompatible with the purpose of an injunction. *CFGC* Doc. No. 237. Defendants opposed. The Court denied the motion to lift the stay as moot, January 24, 2007, after release of the *Miller* decision. The parties proposed and the Court approved a briefing schedule on the mandate; briefing was completed May 21, 2007. Plaintiffs incorporate the *CFGC/Adair* Opening, Reply, and Sur Reply Briefs by reference.

On June 18, 2007, the Court denied the *Gibson v. U.S. Navy* plaintiffs' motion to retransfer their case to the Northern District of Florida, consolidated all the chaplain cases into a new case with the above citation, denied all pending motions without prejudice because the pending motions affected the new parties' rights, and invited the parties to resubmit their motions. *CFGC*. Doc. # 261. The *Gibson* plaintiffs now join the *CFGC /Adair* plaintiffs in moving for injunctive relief.

3

## THE PLAINTIFFS HAVE STANDING

Defendants previously argued the *CFGC/Adair* plaintiffs had no standing because no named plaintiff was on active duty. Defendants' 3/9/02 Remand Opening Brief ("DefOpBr") at 7-12, Defendants' 5/1/07 Remand Reply (#257)("Def.RR") at 5-8. Plaintiffs showed that this Court had specifically found CFGC had standing as a representational plaintiff and could seek prospective and injunctive relief. *CFGC /Adair* Remand Reply ("Pl.Rem.Reply') at 8-11.

The *Gibson* plaintiffs include active duty chaplains, *e.g.*, Gibson, Demy and Stewart. Consequently they suffer direct irreparable injury resulting from defendants' Establishment Clause violations. *See CFGC*, 454 F.3d at 304. There can be no doubt as to plaintiffs' standing.

## RECENT OR CURRENT EVENTS BEARING ON THIS MOTION

DefOpBr Exhibit 1identified six current Navy Catholic chaplains with a status of 4109, none of whom had qualified for retired pay because they did not have the required TIS. One of those, LCDR Erestain, now stationed at Bethesda Naval Hospital, will retire at the end of July at age 70, 10 years past the age at which he should have been separated. DefOpBr Exhibit 1 incorrectly shows his retirement eligibility as 2008. He makes the fourth 4109 allowed to illegally obtain a pension in their 70s since plaintiffs filed the original injunction motion in 2003.

Plaintiffs took the depositions of Mr. Thomas Bush and Mr. Samuel Wyvill, whose declarations tried to justify the "Honorary Retiree" program which allegedly allow the 4109s to be "retired" without 20 years TIS and then recalled to active duty. Both admitted: (1) the applicable Department of Defense (DOD) directives and instructions mandate the Secretary of Navy to place all Reserve personnel into Reserve Component Categories defined by DOD including the Retired Reserve; (2) DOD defines only 5 Retired Reserve categories, all of which

4

are defined in terms of eligibility for retired pay or entitlement to disability due to active service;

(3) there is no category for those not entitled to retired pay, *i.e.*, no Honorary Retiree category.

Consequently, this motion's injunctive request also seeks an order requiring the Secretary to

comply with DOD's instructions concerning retired categories.

## STANDARD FOR AN INJUNCTION

To warrant preliminary injunctive relief, the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. *E.g.*, *Mova Pharm. Corp.*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (quoting *City Fed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)) (internal quotation marks omitted).

*CFGC*, 454 F.3d at 297.  Plaintiffs have met this criteria, both in 2003 and today in 2007.

## SUMMARY OF ARGUMENT

This Memorandum shows plaintiffs have met all the criteria for an injunction.  First, plaintiffs will succeed on their Establishment and Due Process Clause violation claims because the challenged practice is a clear denominational preference for which there is no compelling purpose or narrow tailoring and does not treat all chaplains equally.  Even if such a purpose existed, defendants' pattern and practice is not narrowly tailored because alternatives exist allowing defendants to meet the free exercise needs of DON's Catholic personnel.  The challenged practice also fails the endorsement and *Lemon* tests because it communicates an unmistakable message that Catholics are preferred and have a favored place in the Navy Chaplain Corps ("CHC") and the Navy.

Second, the Court of Appeals has already held that plaintiffs have shown irreparable harm by alleging defendants have violated the Establishment Clause.  *CFGC*, 454 F.3d at 304.

5

Third, an injunction will not harm defendants or interfere with their mission of meeting free exercise needs of DON personnel because no harm results from following the Constitution and defendants have established viable alternatives that are readily available. Navy directives order commanders to hire contract clergy or auxiliary chaplains where free exercise needs exist. This option has met defendants' need for Catholic clergy and other faith group specific needs in the past when specific chaplains were not available to meet them.

Fourth, ordering the Navy to follow the Constitution is in the public interest.  The Establishment Clause's purpose is to preclude the divisiveness, animosity, factionalism and strife that follows religious favoritism preferring one religion over another.  Courts have the constitutional authority and duty to confine other branches of government within their constitutional and statutory limits.

**I.     THE UNDISPUTED FACTS AND EVIDENCE SHOW DEFENDANTS HAVE BEEN OPERATING A SPECIAL PENSION PLAN SOLELY FOR CATHOLIC CLERGY, A CLEAR DENOMINATIONAL PREFERENCE**

The Following Facts Are Undisputed

1.     In 2003, 10 U.S.C. § 14509 "Separation at age 60; reserve officers in grades below brigadier general or real admiral (lower half)", (Exhibit 1, *see* comment on 2006 amendments at page 1), stated:

> Each reserve officer of the Army, Navy, Air Force, or Marine Corps in a grade below brigadier general or rear admiral (lower half) who has not been recommended for promotion to the grade of brigadier general or rear admiral (lower half) and is not a member of the Retired Reserve shall, on the last day of the month in which that officer becomes 60 years of age, be separated in accordance with section 14515 of this title.

2.     Amendments to 10 U.S.C. § 14509 changed the age for separation from 60 to 62. *Id.*

3.    From May 1986 to 2005, SECNAVISNT 1120.4A (Exhibit 2), ¶ 6 established the "Basic

qualifications" for appointment as a chaplain, including age:

> 6.    <u>Basic qualifications.</u>  To be eligible for appointment as a Chaplain Corps
> officer in either the active-duty or Reserve components…, the applicant must
> meet the following requirements:
>       ***
>       b. Age. Must be able to complete 20 years of active commissioned service
> by age 60.  The Deputy Chief of Naval Operations (Manpower, Personnel, and
> Training) (DCNO(MPT)) may waive the age restrictions up to age 62 for
> otherwise qualified applicants for appointment on the active duty list or in the
> Reserve component in [four] instances:

4.    When plaintiffs filed their injunction motion in June 2003, defendants had a pattern and

practice allowing Catholic Reserve chaplains to remain on active duty past 10 U.S.C. § 14509's

mandatory separation from military service at age 60 for Reserve officers.

a.    At least 23 Catholic Reserve chaplains over age 60  were on active duty in June

2003, all of whom were on the active duty list ("ADL"); none were on the Reserve Active Status

List ("RASL") because the lists are mutually exclusive.  Inj Mot Exhibits 8, 12.

b..    Seven of the 23 Catholic chaplains over age 60 were 67 or older, four of whom

were in their 70s.

c.    The vast majority of chaplains allowed to stay on active duty past their statutory

separation ages are Catholics.  "Does the Data Establish that the U.S. Navy Favors Roman

Catholics?", Expert Opinion by Harald R. Leuba, PhD. (Exhibit 3) at 2 and Table 1; 6, Tables 4-

5.  No Protestant liturgical or Non-liturgical chaplains, Reserve or Regular, were allowed to

remain on active duty as a 4109.

5.    In 2003 there was no authority to extend Reserve officers on active duty beyond § 14509's

age 60 limitation.  10 U.S.C. § 14703, the only authority for extending Reserve officers who had

not failed of selection to Commander and above, applied to Reserve officers on the RASL which excludes officers on the ADL.  Inj Mot at 6 (incorporated by reference).

6.      The seven Catholic chaplains over age 67 were given the status "4109", which is a Navy personnel status code for "Retired Reserve."

7.      No 4109 had the necessary 20 years time in service ("TIS") to qualify for retired pay when given their 4109 status.  Inj Mot at 8-9 and its FACTS 2-7.

8.      No 4109 fit into any DOD defined Retired Reserve category.  Fact No. 23 *infra*.

9.      Prior to 2001, there was no statutory authority to extend or continue on active duty Reserve chaplains who had twice FOS.  *See* Inj Mot Reply at 6.

      a.      Section 632 provided for the continuation of regulars who had twice FOS;

      b.      § 14101 provided authority to continue on the RASL Reservists who had twice FOS; Inj Mot Reply, 13-15;

      c.      No statute allowed for Reservists who had twice FOS to be continued on active duty until a statutory change in 2001; *Id.*;

      d.      Defendants provided no evidence any of the Reserve chaplains retained past age 60 had ever been validly continued by a board authorized to extend Reservists on active duty.

10.     All of the 4109s, past and current, entered active duty with age waivers.  SECNAVINST 1140.7A requires persons granted age waivers acknowledge "[b]efore appointment" they "will be unable to complete 20 years of creditable service for retirement ...."  ¶ 6.b.

11.     OPNAVINST 1730.1D (Exhibit 4) requires commanders to employ civilian clergy when necessary to meet the command's free exercise needs.  This OPNAVINST replaced

SECNAVINST 1730.G as the authority to employ civilian clergy when necessary to meet the command's free exercise needs.

12.    10 U.S.C. § 1251(a) establishes 62 as the normal retirement age for Regular officers.

    a.    § 1251(c)(2)  allows the Secretary to "defer retirement under subsection (a) of an officer who was appointed or designated as a chaplain if the Secretary determines that such deferral is in the best interest of the military department concerned ....";

    b.    § 1251(c)(3)(A) limits "deferment under this subsection" to "the first of the month following the month in which the officer becomes 68 years of age", unless the exception in subsection (B) applies;

    c.    § 1251(c)(3)(B) allows the Secretary to "extend deferment under this subsection beyond the date referred to in subparagraph (A) if the Secretary determines that extension of the deferment is necessary for the needs of the military department concerned.  Such an extension shall be made on a case-by-case basis and shall be for such period as the Secretary considers appropriate."

13.    No statute allows the Secretary to authorize a chaplain to remain on active duty past age 67 for the purpose of qualifying for retired pay, *i.e.*, obtaining a pension.

14.    The challenged 4109 chaplains and other Catholics continued past their separation ages, past and present, qualify for a pension only by remaining on active duty past their statutory separation ages.

15.    Prior to 2006, few non-Catholic have been allowed to remain on active duty past their required separation age.

16.    Three of the original seven 4109s plaintiffs identified in 2003 retired with pensions while

this issue was being litigated.  Two other Catholics will reach the necessary 20 years time in service to qualify for a pension in 2007.  One, LCDR Erestain, will retire July 2007.  *See* DefOpBr Exhibit 1, p. 2.

17.     Since the Inj Mot was filed in 2003, defendants granted two new Catholic chaplains 4109 status, neither met DOD's Retired Reserve criteria since neither had the required TIS.

18.     An October 1999 (fiscal year 2000) "Study on Religious Affiliation in the Department of Navy," Exhibit 5, admitted "The Chaplain Corps has never conducted an in depth study of the religious affiliation of members in the Navy and Marine Corps," *id.* at 2 (3d page of document).

19.     Evangelical and Pentecostal/charismatic Christians form the largest non-Catholic faith communities in overseas Navy chapels where there are limited religious worship alternatives for DON personnel and their dependents.  Declaration of CAPT James Poe, CHC, USN (Ret.). ("Poe") (Exhibit 6), ¶ 14.

20.     Both types of congregations have distinct worship styles.  *Id.* at 11.

21.     Although Evangelical and Pentecostal/charismatic Christians were the largest non-Catholic Christian congregations at the Navy bases in in Naples, Italy, and Rota, Spain, the CHC has routinely ignored their needs and failed to schedule chaplains with suitable backgrounds to replace chaplains who led these distinct congregations.  *Id.* at ¶¶ 13-14.

22.     The CHC has no means or program to identify the individual Free Exercise needs of DON personnel or identify special religious communities, *e.g.*, Pentecostal/charismatic, whether in the States of overseas.  Extracts of Depositi9on of CAPT Carter, CHC (*Larsen v. U.S. Navy*), (Exhibit 7) at [31:15-33:3], [59:6-23].

23.     DOD Directives (DODD) or Instructions (DODI) define the Retired Reserve solely in

terms of entitlement to retired, retainer or disability pay.  *See* IV.B. *infra*.

## II.    PLAINTIFFS WILL SUCCEED ON THE MERITS OF THEIR CLAIM DEFENDANTS' 4109 PROGRAM VIOLATES THE ESTABLISHMENT CLAUSE

Defendants' practice maintaining Catholic chaplains on active duty past their statutory separation ages to qualify for retired pay, hereafter the "4109 Program", violates every Establishment Clause test.  This practice is and has been exclusively for Catholics since only Catholic chaplains (1) have consistently been continued past statutory separation ages and (2) are designated as 4109s to qualify them for retired pay, making the 4109 Program a per se denominational preference.

The 4109 Program has three components described below, each employing a clear denominational preference.  Each part of the 4109 Program fails strict scrutiny, the three-pronged test of *Lemon v. Kurtzman*, 403 U.S. 602 (1971)*,* and the reasonable observer test which the Supreme Court has used frequently to evaluate whether a challenged program communicates a message of favoritism or preference.  *See McCreary Co. v. ACLU of Kentucky*, 545 U.S. 844, 125 S.Ct. 2722, 2740 (2005) (defining and applying the reasonable observer test).  These tests are addressed below.  Failing these tests renders immaterial the question whether a valid statutory basis for defendants' Catholic pension system exists.

### A.    Each of the 4109 Program's Three Parts Demonstrates a Denominational Preference

The 4109 Program has three separate components enabling Catholic chaplains accessed or brought to active duty with age waivers to qualify for retired pay because they cannot reach the necessary TIS before statutory separation due to age.  The first is an illegal system to bring chaplains on active duty who cannot complete 20 years TIS before statutory separation.  This

includes illegal age waivers and recalls to active duty.

SECNAVISNT 1120.4A's ¶ 6.b established a *maximum* age of 42 for chaplain applicants providing the Deputy Chief of Naval Operations granted a waiver beyond the normal age limitation of 40.  Age 40 enabled a reservist to qualify for retired pay with 20 years TIS before § 14509 mandated his separation at age 60.  The age 42 maximum corresponded to the normal separation age for Regulars but also allowed a reservist to achieve 18 years TIS because  § 12686 allowed "Reserve or active duty within two years of retirement eligibility" to continue on active duty for an additional two years until he qualified for retired pay.  SECNAVISNT 1120.4A provided no authority to exceed the age 42 upper limit.

CARE board records and Vol. X biographical data show defendants operated an unofficial policy to grant age waivers beyond age 42 without authority to do so.  Exhibit 8 is a list of chaplains accessed and/or brought to active duty from FY86-01 at ages which will not allow them to get 18 years TIS before they had to be separated at age 60. This unofficial policy was primarily for Catholics until FY2001 when chaplain shortages forced the CHC to provide more non-liturgical clergy age waivers.

 Exhibit 9, the total number of age waivers and percentages by FGC from FY 86 to FY98-2001, shows non-Catholics are a minority (8%), non-liturgicals are a super minority (4%, one half that of Liturgical Protestants) with Catholics comprising 85-90% of the waivers.  Exhibit 9 also shows the percentage of Catholic age waivers in three categories: (a) age 42-46, -about 38% - a Catholic could get 20 years TIS without needing to become a 4109 at age 67; (b) age 47-56 - about 53% - a Catholic would spend half his 20 year career as a 4109; and (c) age 57 and above - about 7% - more than ten years as a 4109.  Over half of the Catholics accessed or brought to

12

active duty with age waivers were over age 46 requiring they be granted 4109 status to complete

20 years TIS to obtain retired pay.  This is itself a denominational preference

The second component is an illegal policy continuing Catholic Reservists on active duty

who should have been separated at age 60, now age 62.  Material defendants provided in

discovery shows only Catholic Reservists were allowed to continue on active duty past age 60.

Inj Mot Exhibits 8-12.  Many of these were LTs and LCDRs who had failed of selection and

were not qualified to be continued until age 67 under 10 U.S.C. § 14507.

The third component is the process of designating as 4109s Catholic Reservists who have

not qualified for retired pay at age 67, contrary to DOD's Directives and Instructions.  Only

Catholic Reservists *ineligible* for retired pay have been designated 4109s.

### B.    Strict Scrutiny of the 4109 Program Is Mandated

"When a denominational preference is at issue, *Larson v. Valente*, 456 U.S. 228 (1982),

supplies the analytic framework for evaluation of [plaintiffs'] contentions.  *Larson* teaches that,

when it is claimed that a denominational preference exists, the initial inquiry is whether the law

facially differentiates among religions."  *Hernandez v. C.I.R.*, 490 U.S. 680, 695 (1989);

*Children's Healthcare Is a Legal Duty, Inc. v. Min De Parle,* 212 F.3d 1084, 1090 (8th Cir.

2000), *cert denied,* 532 US 957 (2001) ("In considering appellants' facial challenge, we initially

must determine whether section 4454 discriminates among religious sects.  If so, we apply strict

scrutiny review under *Larson v. Valente,* 456 U.S. 228 (1982)").   Strict scrutiny is not limited to

alleged statutory denominational preferences.  "On the contrary we have expressly required 'strict

scrutiny' of practices *suggesting* 'a denominational preference,' *Larson,* 456 U.S. at 246, in

keeping with 'the unwavering vigilance that the Constitution requires' against any violation of

13

the Establishment Clause." *County of Allegheny,* 492 U.S. 573, 608-09 (1989)(quoting *Bowen v. Kendrick*, 487 U.S. 589, 623 (1988) (O'Connor, J. concurring) (emphasis added)).  The law of this case follows *Hernandez* and *County of Allegheny*: strict scrutiny applies to any challenged practice Plaintiffs can demonstrate "suggests a denominational preference."  *Adair v. England,* 217 F.Supp.2d 9, 14-15 (D.D.C. 2003).

Ignoring the law of the case, defendants' recent *CFGC/Adair* injunction briefing suggested a decision in *Larsen v. U.S. Navy*, 486 F.Supp.2d 11 (D.D.C. 2007), applying the relaxed standard of *Goldman v. Weinberger*, 475 U.S. 503 (1986), should apply.  Def.RR (*CFGC* Doc. No. 257) at 18.  *Larsen* is inappropriate; it did not review a denominational preference because *Larsen* found those plaintiffs did not have standing to challenge the denominational preferences established in defendants' Thirds Policy accession goals.  This Court's well reasoned analysis specifically rejected the *Goldman* standard in denying in part defendants' motion to dismiss, finding *Goldman* addressed the "Free Exercise Clause", not the Establishment Clause. *Adair v. England*, 183 F.Supp.2d 31, 50-52 (D.D.C. 2002); *see also Goldman*, 475 U.S. at 504 ("*Goldman* contends that the Free Exercise Clause ....") (cited by *Adair*, 183 F.Supp.2d at 51), 509 (same quote).  *Adair* correctly holds the Supreme Court has never allowed any reduced standard for Establishment Clause cases, 183 F.Supp.2d at 52,  following but not citing this Circuit's precedent.

The D.C. Circuit has made it clear that *Lemon* or strict scrutiny is the law of the Circuit, regardless whether Congress, the military or some other form of government is accused of violating the Establishment Clause.  "The touchstone for evaluating church-state relations under the Establishment Clause, is the test enunciated by the Supreme Court in *Lemon v. Kurtzman*."

14

*United Christian Scientists v. First Church of Christ Scientist*, 829 F.2d 1152, 1161 (D.C. Cir. 1987). No intervening decision has changed this Rule. *United Christian Scientists* is especially instructive and controlling because it reviewed a law passed under the Constitution's plenary grant of exclusive patent and copyright authority to Congress in Article 1, § 8, clause 8. The same section, clauses 11-16, contains Congress's authority to organize and regulate the Armed Forces. While courts often defer to Congress's authority in such special areas, *United Christian Scientists* did not defer, applied *Lemon* and held Congress violated the Establishment Clause by granting to one branch of the Christian Science Church exclusive control over its primary doctrinal publication. 829 F.2d at 1154, 1168, 1171.

United Christian Scientists* held *Lemon's* approach was mandated, *id.* at 1161. It then distinguished between *Larson's* strict scrutiny of facial discrimination among religions and *Lemon's* tri-part test, which was "intended to apply to laws affording a uniform benefit to all religions, not to provisions like the statute in [*Larson*] that discriminate among religions." *Id.* at 1163 n. 49 (quoting *Larson*, 456 U.S. at 252). *United Christian Scientists* applied *Lemon* rather than *Larson* only because strict scrutiny had not been briefed or raised by the parties in the district court. *Id.* It found none of Congress's proffered concerns for the law were "clearly secular," *id.* at 1165, Congress had fused civil and religious power, and placed its "official stamp of approval" on one set of religious views. *Id.* at 1165-66. If "Congress ... may not exceed the bounds of benevolent neutrality toward religion", *id.* at 1166, defendants may not do so either.

The Supreme Court has not confronted an Establishment Clause challenge to a military practice. However *Anderson v. Laird*, 466 F.2d 283 (D.C. Cir.), *cert denied*, 409 U.S. 1076 (1972), did so, reviewing the constitutionality of the Service Academies' mandatory chapel

15

requirements for all cadets and midshipmen. The District Court had deferred to the Academies' military expertise arguments, *id.* at 285 ("the court accorded great weight to the opinions and judgments of the military personnel concerned with officer training"), 290, 293 ("deference to the unique role of the military in our society"), but the D.C. Circuit rejected deference as incompatible with the Establishment Clause. *Id*. at 285 ("These regulations ... exceed the constitutionally permitted scope of governmental power."), 290 ("This principle was mistaken by the District Court"), 293 ("language of the regulations reveals" Establishment Clause violation). *Anderson* does not cite *Lemon* because *Lemon* was decided 20 days after *Anderson's* oral argument. However, *Anderson's* analysis follows *Lemon's*, as seen in the opinions by both Judges Bazelon and Leventhal, including discussion and application of the "purpose and effect test" developed in *McGowan v. Maryland*, 366 U.S. 420, 453 (1961); *Torcaso v. Watkins*, 367 U.S. 488, 489-90 (1961); Engel *v. Vitale*, 370 U.S. 421, 424 (1962), and others, *Anderson*, 461 F.2d at 291-93, and replicated in *Lemon*'s first two tests.

    *Anderson* recognized that religious issues did "not involve programs vital to our immediate national security, or even to military operations or disciplinary procedures" and held "it is for this Court to assess that decision [to require mandatory chapel participation] in constitutional terms." *Id.* at 296. Rejecting the District Court's holding "that all First Amendment rights must bend when they conflict with military interests," *Anderson* held "[t]he Supreme Court's interpretations of the Establishment Clause refer to no overriding secular interests which could ever justify a government's imposition of those religious activities which the Clause was written to abolish." *Id.* at 290. Judge Leventhal's concurrence found no military necessity justifying an establishment of religion, *id.* at 297, or a compelling government purpose,

16

*id.* at 298.  In effect, he applied a strict scrutiny analysis.  *See, e.g., id.* at 302 (various references

to the requirement the government show its "interest is compelling").

### C.    Defendants' Pension Qualification Program for Overage Catholic Chaplains Fails Strict Scrutiny

The 4109 Program, allowing Catholic chaplains whom Title 10 required and requires to

be separated to remain on active duty to qualify for retired pay, is a "denominational preference

on its face" because it has been limited to Catholics.  With the recent exception for a rabbi, well

after the Inj Mot was filed and remanded by *CFGC*, no other denomination benefitted or benefits

from defendants' challenged practice, because no other denomination has been included in

defendants' overage chaplain pension program.  Defendants' practice has clearly said, "Only

Catholics need apply."

Strict scrutiny assumes a practice is unconstitutional and places the burden on the

defendant to show the practice is narrowly tailored to achieve a compelling governmental

purpose.  *Lac Vieux Desert Band of Lake Superior Chippewa v. Michigan Gaming Control

Board*, 276 F.3d 876, 879 (7th Cir.) ("We start by presuming the statute is unconstitutional.

Detroit can overcome that presumption by proving that the ordinance is necessary to serve a

compelling state interest and narrowly drawn to achieve that interest."), *cert denied*, 536 U.S.

923 (2002).  Defendants can show neither.

### 1.    The 4109 Program has no compelling purpose

The CHC's purpose is to enable DON personnel to "exercise their right under the Free

Exercise Clause to practice [their] freely chosen religion", *Katcoff v. Marsh*, 755 F.2d at 223, 234

(2d Cir. 1985), and to avoid violating the neutrality requirement under the Establishment Clause.[2]

> [I]f the [DON] prevented [its personnel] from worshiping ... by removing them to areas where religious leaders of their persuasion and facilities were not available it could be accused of violating the Establishment Clause unless it provided them with a chaplaincy since its conduct would amount to inhibiting religion.

*Id.* at 232. The question before the Court is how does defendants' practice of allowing only Catholic chaplains to remain on active duty past their statutory separation age advance or meet the statutory and constitutional purpose for a Chaplain Corps? If defendants based this program on specific identified free exercise needs, complied with existing statutory and regulatory procedures, and made this program available to all denominations based on specific objective criteria, this case would be entirely different. Defendants have never done these things. The purpose of this challenged practice is evident in its structure and exclusivity: to prefer, advance and benefit Catholic chaplains by providing overage Catholic priests a pension program.

Defendants have produced no documents or testimony explaining why only Catholics must be continued on active duty until they acquire the necessary TIS to qualify for retired pay, well past the statutory age separation age limits Congress determined in the Defense Officer Personnel Management Act of 1980 ("DOPMA") were necessary to keep the Armed Forces fit. *See* 1980 U.S. Code and Congressional Administrative News (USCCAN ), 6333, 6337-39 (explaining DOPMA's purpose to provide for a young, fit officer corps). Defendants cannot provide a compelling purpose under either the old (pre *CFGC*) or the current regulatory scheme.

Assuming arguendo the compelling purpose is to meet Catholic religious free exercise needs, several questions must be answered to verify the veracity of the disputed claim and

---

[2] Congress established the Chaplain Corps by statute. All government branches must operate in accord with the Constitution. *United Christian Scientists*, 829 F.2d at 1162.

18

purpose. First, are DON's Catholics suffering a shortage of Catholic priests? In other words, are DON's Catholics worse off than their civilian counterparts? The answer is NO! DON's Catholics do better than civilian Catholics. Dr. Leuba's analysis, "Too Many Catholic Priests?" (Exhibit 10), comparing national civilian religious demographic data with military religious data shows DON's Catholics actually have one half the priest-parishioner ratio civilian Catholics face. Catholic priests are about 9% of all civilian clergy, but are about 25% of the CHC. Leuba at 1. The ratio of Catholic clergy to those served is also "twice as high for Catholics in the Navy as for Catholics in America at large." *Id.* at 4. Dr. Leuba's analysis is based on data produced by the annual Yearbook of American and Canadian Churches, a well recognized source of religious demographic information. Dr Leuba examined four perspectives of the issue, *id.*, 1-4, and in each case, DON's Catholics do better than their civilian counterparts.

Second, do defendants have a program that can identify and quantify DON's free exercise needs? Again the answer is NO! An October 1999 (fiscal year 2000) "Study on Religious Affiliation in the Department of Navy," (Exhibit 5) admitted "The Chaplain Corps has never conducted an in depth study of the religious affiliation of members in the Navy and Marine Corps," *id.* at 2 (3d page of document). Defendants do not identify officer faith group preferences[3], *id.* at pg.4.

Third, are there any other options or resources to meet or minimize the professed need? This question concerns or overlaps the "narrow tailoring" requirement but is also related to the

---

[3] Defendants provided some data in discovery which was supposed to be Navy officer faith group preferences, but the numbers did not add up and made no sense. Defendants were asked to explain the numbers provided but have yet to do so or provide accurate officer preference data.

"purpose" issue since other options would show there is no compelling purpose for this challenged practice. Here the answer is Yes! When the Inj Mot was filed, SECNAVINST 1730.G provided commands authority to employ contract civilian clergy or auxiliary chaplains when necessary to meet the command's free exercise needs. OPNAVIST 1730.1D (Exhibit 4) replaced SECNAVINST 1730.3G. 1730.1D's ¶ 5.e.(5), "Religious Ministry Requirements", *directs* commanders ((g) "Commanders shall") to hire contract clergy or auxiliary chaplains to provide religious services when no chaplain is available to meet a specific free exercise need. Assuming arguendo defendants had a valid secular objective, this "valid secular objective can be readily accomplished by other means." *Larkin v. Grendel's Den, Inc*., 459 U.S. 116, 123-24 (1982).

Moreover, these retained chaplains are not filling operational billets in Iraq or Afghanistan, they occupy places where civilian clergy are readily available to meet DON's Catholic needs. For example, LCDR Erestain is stationed at Bethesda Naval Hospital where many Catholic priests are available in the surrounding community.

        **2.**        **The 4109 Program fails strict scrutiny because it is not narrowly tailored to achieve a compelling government purpose**

To be narrowly tailored means that the practice or means defendants are using to achieve their compelling governmental purpose is so constructed and conducted that it does not endanger or invite any of the abuses which the Establishment Clause was designed to prohibit. Narrowly tailored also means that the procedure used is neutral, neither favoring nor disfavoring any denomination or system of beliefs. Defendants' practice cannot meet this test because it favors only one denomination and disparages others as part of its normal practice, does not treat

all religious groups equally, and there are alternatives available that do not require a practice which communicates denominational preference or provides financial support to a single denomination.  The reasonable observer, *see* E *infra*, would recognize the need to hire a religious person to perform a religious ceremony to meet a free exercise need.  The requirement to hire contract clergy under OPNAVINST 1730.1D to met free exercise needs shows the 4109 Program is not narrowly tailored because it is not focused to meet specific needs.  Instead, separating non-liturgical and Liturgical Protestant chaplains in the face of chaplain shortages, *e.g.*, plaintiffs CHs Belt and Porter-Stewart for FOS while retaining FOS Catholics who had longer to serve to get to retirement than some of those discharged, shows defendants' practice clearly communicates a preference for Catholics and hostility to non-Catholics as shown below.

> *Larson* examined the legislative history of a statute challenged under the Establishment Clause that required registration for some churches but not others.  456 U.S. at 230-34.  It found "that the italicized language [of the statute in question] would bring a Roman Catholic Archdiocese within the Act, that the legislators did not want the amendment to have that effect, and that an amendment deleting the italicized clause was passed in committee for the sole purpose of exempting the Archdiocese from the provisions of the Act."  *Id.* at 254.  The Court described this as "religious gerrymandering".  *Id.* at 255.  The statute's "express design [was] to burden or favor selected  religious denominations," and was "not closely fitted to the furtherance of any compelling governmental interest."  The Court found the statute and government were not neutral and the statute violated the Establishment Clause.  *Id.*  That is the case here.

> This case is like *Board of Ed. of Kiryas Joel v. Grumet,* 512 U.S. 687 (1994), which found the state's creation of a special school district for a village whose citizens were all Satmar

Jews violated the Establishment Clause.  Because the legislation benefitted one sect, *id.* at 704

("Here the benefit flows only to a single sect"), the Court rejected the normal presumption that

the action of a state legislature was constitutional. The Court also rejected an accommodation

defense because the "proposed accommodation singles out a particular religious sect for special

treatment," violating the Constitution's mandate of religious neutrality.  *Id.* at 706.

That is the case here.  The practice favors a single denomination.  Until very recently,

defendants never continued chaplains of any denomination past statutory separation ages except

Roman Catholic.

Defendants are currently short chaplains and they were short chaplains when they

discharged *Adair* plaintiff CH Belt and *Gibson* plaintiff CH Porter-Stewart, who were closer to

reaching their 20 years TIS than some of the continued chaplains.  Yet the only chaplains

defendants have continued on active duty are Catholic.  This is a per se preference with no

purpose except to grant Catholics special privileges.

### D.    The Challenged Practice Violates the *Lemon* Test[4]

"Under the *Lemon* analysis, a [] practice which touches upon religion, if it is to be

permissible under the Establishment Clause, must have a secular purpose; it must neither

advance nor inhibit religion in its principal or primary effect; and it must not foster an excessive

entanglement with religion."  *County of Allegheny*, 492 U.S. at 592 (citing *Lemon*, 403 U.S. at

---

[4]  *Katcoff v. Marsh*, 755 F.2d 223, 232 (2d Cir. 1985), declined to apply the *Lemon* test in
reviewing an Establishment Clause challenge to the Army Chaplain Corps because the Chaplain
Corps advanced religion and entangled the government "with religious accrediting bodies."
*Katcoff* was decided before *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327 (1987) explained
the difference between accommodation and establishment.  *Amos* shows a chaplaincy
administered in a neutral manner will pass *Lemon*'s test.

612 – 613).  Governmental action that unconstitutionally advances religion includes actions

whose purpose or effect has endorsed or advanced a specific religion or religion in general,

"attempting to convey a message that religion or a particular religious belief is favored or

preferred", or favoring religious belief over disbelief.  *Id*. at 292-93 (citing various cases and

quoting *Wallace v. Jaffree*, 472 U.S. 38, 70 (1985)).  Defendants' 4109 Program certainly

"touches upon religion" and both advances a specific religion and financially supports it.

### 1.    The 4109 Program has no valid secular purpose

On its face, the 4109 Program's only purpose is to allow Catholic chaplains whose

separation 10 U.S.C. §§ 14509 and 1251 require when the chaplains reach statutory separation

age to remain on active duty until they complete the 20 years TIS required to qualify for the

retired pay they acknowledged they were ineligible for when they were commissioned with

(illegal) age waivers.  FACT 10.  As shown above in C.1 and incorporated herein by reference,

defendants have failed to show a compelling purpose because they have not identified DON's

free exercise needs and shown DON Catholics are worse off than their civilian counterparts.

Defendants' concern for Catholic chaplains, demonstrated by the overage pension

program for Catholics which ignores the law and violates the Constitution, stands in sharp

contrast with defendants' gross failure to meet the free exercise needs of faith specific Non-

liturgical communities in overseas locations.  CAPT James Poe was the Regional

Chaplain/Religious Ministries Program Director for the Commander, Naval Region Europe

(CNRE).  Declaration of James F. Poe, CHC, USN, (Ret.) (Exhibit 6), ¶ 4.  He describes the

specific free exercise needs of two different, vibrant Non-liturgical Protestant Evangelical and

Pentecostal/charismatic communities in Naples, Italy, *id.*, ¶¶ 13, 14, and Rota, Spain, *id.*, ¶ 21.

Although he made the CHC aware of the need to provide appropriate replacement chaplains for these congregations, *id.* ¶¶ 25-26, the CHC ignored these communities' free exercise needs. *Id.*, ¶¶ 13, 15-21. Instead, they replaced the evangelical and Pentecostal chaplains at both locations with chaplains totally unsuited for those congregations' worship needs. *Id.* Defendants' efforts show they prefer Catholics contrary to the Constitution, while their different treatment of Non-liturgicals at Rota and Naples "illustrate an underlying indifference, if not hostility, to the free exercise needs of non-liturgical faith groups, especially those considered Evangelical." Poe at ¶ 23. The contrast shows the CHC's 4109 Program's purpose is to benefit Catholics, a religious purpose, rather than meet *all* of DON's free exercise needs, a secular purpose.

There can be no valid secular purpose when defendants have other options available which do not require financial support to and favoritism for one denomination. *See Larkin*, 459 U.S. at 123-24 ("valid secular objective can be readily accomplished by other means.").

### 2.    Defendants' 4109 Program fails *Lemon's* second prong by advancing the Catholic religion and inhibiting the religion of others

Defendants can not pass the second prong of *Lemon*'s criteria, *i.e.*, the 4109 Program "must neither advance nor inhibit religion." The challenged practice clearly advances Catholic interests, and benefits Catholic clergy and the Catholic Church financially. The 4109 Program provides other benefits especially important to older persons such as medical care, a burden the Catholic Church would have to bear without the 4109 Program. Defendants cannot deny they are advancing the Catholic religion because until recently, the 4109 Program had allowed only Catholics to remain on active duty to obtain pensions. As shown below, the 4109 Program communicates defendants' hostility to other religions and faith groups because their

24

chaplains are denied the same opportunities and benefits, even in the face of current chaplain shortages.  "Here the benefit flows only to a single sect", a forbidden preference.  *See Grumet,* 512 U.S. at 704.  Such hostility is not neutral and inhibits other religions.

Defendants have consistently admitted they do not collect any data on specific religious community needs like Rota and Naples.  *See, e.g.,* Carter Deposition (Exhibit 7), [32:18-23] (not concerned about non-Catholic FGCs or communities); [59:6-23].．  Defendants have demonstrated callous indifference to religious free exercise needs of Non-liturgicals, *e.g.*, the Evangelical and Pentecostal communities at Rota and Naples.  *See* Poe at ¶¶ 13-29.  They cannot argue here there is a need or legitimate purpose for retaining overage Catholic chaplains because since 2003, defendants have presented no data on Catholic or other  communities' needs.  Ms. Berto's Declaration, DefOpBr Exhibit 1, stated the 4109s met a Catholic requirement.  This is contrary to defendants' argument in *Larsen* that the CHC had no requirements for any denominations, otherwise there would have been goals.

The 4109 Program is like the provisions of New York's kosher food fraud statutes struck down by *Commack Self-Service Kosher Meets, Inc., v. Weiss*, 294 F.3d 415 (2d Cir. 2002), *cert denied,* 537 U.S. 1187 (2003).  *Commack* found the challenged provisions preferred "the dietary restrictions of Orthodox Judaism over those of other branches" and "the challenged laws discriminated in favor of the Orthodox view regarding the dietary requirements of *kashrut*."  *Id.* at 430.  This preference put the state's "imprimatur on the religious views of the one [sect] to the exclusion of others." *Id.*  The 4109 Program benefits only Catholics; no other denomination has been allowed to keep its clergy on active duty past their statutory separation ages for the purpose of qualifying for a pension.  In fact, defendants separated *Adair* plaintiff CH Belt and *Gibson*

25

plaintiff CH Porter-Stewart in March 2006 although they were younger and needed only a few years to come within the safe harbor of 18 years service, while retaining Catholics with many years left before becoming eligible for retirement and adding others to the 4109 category.

Defendants have continued the 4109 Program despite being on notice it was a religious preference, communicated a message of prejudice, and had no statutory or regulatory foundation for the practice. They have continued to defend their practice with bogus reasoning such as citing SECNAVINST 1820.2B as authority despite the fact the instruction, by its title and context, excludes active duty personnel from its coverage. *See* plaintiffs' Inj Mot Reply at 19-20.

3. **Defendants' 4109 Program unconstitutionally entangles the Navy and religion**

Defendants' unconstitutional entanglement with one specific denomination, *i.e.* Catholics, is readily apparent. The very act of providing a single program that benefits only Catholics essentially makes the government an agent for this denomination. *Commack* found the state's "imprimatur" on the Orthodox view of what is kosher entangled the state with religion. *Id.* at 430. Here, the preference exhibited by the 4109 Program is not merely symbolic; the challenged practice financially aids one denomination by providing a pension program and other benefits to members of its clergy, a benefit the Church itself would have to provide were it not for defendants' largess. Providing chaplains to meet individual free exercise needs is accommodation, but favoring one religion with an over-age pension qualification program which provides substantial financial support is forbidden establishment of religion. *See Amos,* 483 U.S. at 327.

D. **The 4109 Program Fails the Reasonable Observer Test**

26

1.    **The reasonable observer examines the 4109 Program's history and purpose**

Recent Supreme Court precedents tend to collapse *Lemon's* standard three-part test into a two-part test known as the "endorsement test."  This combines *Lemon's* second and third prongs, the result and entanglement questions, into the question whether the objective or reasonable observer would perceive the challenged governmental action as an endorsement or preference for or against religion, a specific religion, or a religious viewpoint.  For example, *Santa Fe Independent School District v. Doe*, 530 U.S. 290, 308 (2000), found an objective observer would perceive student led prayer at school athletic events was an endorsement of religion. *County of Allegheny*, 492 U.S. 573 (1989) asked whether the reasonable observer would perceive as religious endorsements the displays of (1) a crèche on the main staircase of the county courthouse and (2) a menorah in another display including other seasonal symbols.  The Court found the placement of the crèche communicated endorsement because of its location, 492 U.S. at 599-602, whereas the menorah passed constitutional review because it was merely one of several holiday symbols in a group.  *Id*. at 613-16, 620-21.  In each case the Court reached its answer after examining the message the practices communicated and the practices' context.

*McCreary County v. ACLU of Kentucky*, 545 U.S. 844 (2005), asked whether an objective observer would conclude the display of the Ten Commandments with other historic documents in two county courthouses communicated governmental endorsement of religion.  *McCreary County* held courts should analyze the purpose of the challenged practice from the viewpoint of the reasonable or objective observer.  The *McCreary* petitioners argued the Court should ignore the history of the challenged displays and only look at the last iteration of the display.  545 U.S. at

27

863-66, 871-72.  The Court rejected this argument and held the "objective observer's eyes" were to look closely at the historical facts which often revealed the purpose behind the challenged practice or statute.  *Id.* at 862.  The Court also rejected petitioner's attempt to trivialize the purpose inquiry: "The Counties would read the cases as if the purpose enquiry were so naive that any transparent claim to secularity would satisfy it, and they would cut context out of the enquiry, to the point of ignoring history, no matter what bearing it actually had on the significance of current circumstances."  *Id*. at 863-64.  "We hold that the Counties' manifest objective may be dispositive of constitutional enquiry, and that the development of the presentations should be considered when determining its purpose."  *Id.* at 850.  The Court emphasized "the purpose needs to be taken seriously under the Establishment Clause",  and courts should reject sham reasons.  *Id.* at 874.

Accordingly, plaintiffs will first address defendants 4109 Program from the reasonable observer's viewpoint, looking at its history, obvious purpose and message.  *See, e.g., id.* at 871-72 (district court found the previous iterations of the challenged display violated the Establishment Clause because those iterations had an improper purpose, the advancement of religion).

> **2.    The reasonable observer would conclude the 4109 Program is an illegal preference designed solely to advance Catholic interests**

*McCreary* held the objective or reasonable observer must take into account both the complete history and the context of the challenged practice since the purpose of a challenged practice often becomes evident in the practice's history.  545 U.S. at 866.  This means looking at the purpose for which defendants instituted their overage Catholic pension system, a purpose manifest by several factors.  First, the reasonable observer would know the defendants admitted

"The Chaplain Corps has never conducted an in-depth study of the religious affiliation of members in the Navy and Marine Corps."  Exhibit 5.

Second, the objective observer would know defendants acknowledge DON's free exercise needs have not been identified and they play no part in their chaplain accession system or in the detailing process.  FACT 22.  The objective observer would know there can be no justification for keeping chaplains of a specific faith past their statutory separation dates without an understanding and quantification of religious needs and a standard against which to measure them.  As Dr. Leuba's analysis ("Too Many Priests?" at 4 (Exhibit 10) shows, DON's Catholics do better in terms of the ratio of Catholic members to priest than do their Catholic civilian counterparts.

Third, the objective observer would know until very recently the 4109 Program was almost exclusively for Catholics.  FACT 4c.  The extension of a single rabbi for a few years cannot undo defendants' past history of Catholic exclusivity and the fact the primary beneficiaries (if not the sole beneficiaries) are Catholic chaplains and the Catholic Church.

Fourth, since the 4109 status has been limited solely to Catholics during its history, the objective observer would know the purpose of the program was to benefit Catholic chaplains.

The reasonable observer would conclude from the 4109 Program's history and the factors surrounding it that its only purpose is to benefit Catholic chaplains and thereby benefit the Catholic Church by providing a pension and continued medical benefits for some of its elderly clergy.  *See* II.B.1. above.

> [T]he Establishment Clause is infringed when the government makes adherence to religion relevant to a person's standing in the political community.  Direct government action endorsing religion or a particular religious practice is invalid under this approach because it sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying

29

> message to adherents that they are insiders, favored members of the political
> community.

*Wallace v. Jaffree,* 472 U.S., at 69, (O'CONNOR, J., concurring in judgment) (internal quotation

marks omitted).

The objective observer's analysis of defendants' practice would also conclude defendants

have established Catholicism as the Navy's preferred religion.  There is no other explanation;

despite being put on notice, defendants have closed their eyes to the law and very clear Supreme

Court precedent that denominational preferences are subject to strict scrutiny.  Any reasonable

observer would understand defendants' 4109 Program fails strict scrutiny given the history of its

practice, its limitation to one denomination, the lack of statutory authority, and defendants' failure

to identify specific religious needs and a compelling purpose.

The objective observer would also conclude defendants' practice communicates a message

of favoritism to Catholics and hostility to Non-liturgicals.  "When the government puts its

*imprimatur* on a particular religion, it conveys a message of exclusion to all those who do not

adhere to the favored beliefs."  *Lee v. Weisman*, 505 U.S. 577, 606 (1992).  This is manifest in

defendants' deliberate extension of only overage Catholic chaplains beyond their statutory age

limit, while discharging non-liturgicals such as CHs Belt and Porter-Stewart, and showing

indifference or active hostility to the Pentecostal/charismatic and evangelical Protestant

congregations in Naples and Rota, *see* Poe Declaration at ¶¶ 13-29.

The objective observer would also note the obvious message of preference the practice

communicates.  Protestant churches send their young men and women to serve as chaplains

because military service reflects Congress's desire for a young force able to endure the hardships

inherent in military service. Chaplains Belt and Porter-Stewart gave their youth to the Navy and then were discarded. The 4109 Catholics give their youth to their Church, then when they are older and not able to compete with younger chaplains, they give their old age and limited ability to the Navy. By accepting this offer, defendants communicate the message old Catholics are of more value than young non-Catholics. If defendants need priests to say Mass, they can hire contract clergy or auxiliary chaplains to replace these 4109 Program priests at minimal cost.

## III. PLAINTIFFS WILL SUCCEED ON THEIR CLAIM THE CHALLENGED PRACTICE VIOLATES DUE PROCESS

The Fifth Amendment's Due Process Clause has an equal protection component which requires defendants to treat similarly situated chaplains equally. "[T]he Fifth Amendment requires the Navy to treat non-liturgical Christian chaplains in the same manner that it treats liturgical Protestant chaplains." *Adair*, 183 F.Supp.2d at 53. This Court has noted previously, "the Supreme Court has held courts must apply strict scrutiny to any policy or practice that involves a denominational preference." *Id.* (citing *County of Allegheny*, 492 U.S. at 608-09; *Larson*, 456 U.S. at 246).

On its face, the 4109 Program does not treat all chaplains equally. It allows overage Catholics, including those with multiple FOS, to remain on active duty to accrue sufficient TIS service to qualify for a pension, while discharging Non-liturgicals. *Adair* plaintiff CH Belt and *Gibson* plaintiff CH Porter-Stewart were discharged for FOS although they were much younger and needed fewer years to come within § 12686's safe harbor of 18 years service than the Catholics with FOS who were retained. Few non-Catholics have been allowed to remain on active duty past statutory separation age and no non-Catholic has been granted 4109 status.

31

Defendants failed to identify any non-Catholic chaplain on active duty over age 62 in their 2003 interrogatory responses.  This is an example of the religious gerrymandering specifically condemned in *Larson*, 456 U.S. at 255.  The practice in this case is the same one-way government benefit to a religious group *Grumet* found offensive to the Constitution.  512 U.S. 687, 703 (1994) ("Here the benefit flows only to a single sect").  As shown in II.A above, defendants have no compelling purpose nor can they show the means they have chosen, a program until recently limited to Catholics that violates Congress's specific determination as to separation ages, is narrowly tailored to achieve any government purpose.

## IV.   PLAINTIFFS WILL SUCCEED ON THE MERITS OF THEIR CLAIM DEFENDANTS' CONTINUATION OF CATHOLIC CHAPLAINS BEYOND STATUTORY SEPARATION AGES IS WITHOUT AUTHORITY

### A.   The Secretary of Defense Has Limited the Secretary of Navy's Authority to Place Reservists in the Retired Reserve to Those Who Meet Specific Criteria

Defendants have argued 10 U.S.C. § 264 gives the Secretary of Navy authority to place in the Retired Reserve chaplains who have not qualified for receipt of Retired Pay.  DefOpBr at 15-17 and Def. Reply at 13-14.  This is false as a matter of law.  10 U.S.C. § 10141 creates only three Reserve Component Categories ("RCC"): Ready, Standby and Retired Reserve (the "RRC").  10 U.S.C. § 10154 defines the Retired Reserve as those eligible for retired pay under various statutes addressing each service in § 10154(a), and "Reserves who have been transferred to the Retired Reserve, retain their status as Reserves, and are otherwise qualified" in § 10154(b).  Title 10 does not define "otherwise qualified" but 10 U.S.C. § 113(b) gives the Secretary of Defense authority to establish regulations governing the Reserve forces including the Retired Reserve.

The Secretary of Defense has exercised that authority and has issued four DOD Directives

32

(DODD) and DOD Instructions (DODI) that cover four areas addressing all aspects of the Retired Reserve: "Uniform Reserve, Training and Retirement Categories Administration", DODI 1215.19 (dated 12/12/2000, which is relevant to the time period for the actions addressed in this motion), (Def.RR Exhibit A) (incorporated by reference), which has been replaced by DODI 1215.06 (dated 2/7/07 with the same title) (Exhibit 11);  "Assignment to and ... Transfer to the Retired Reserve", DODI 1200.15 (dated 9/18/97) (Exhibit 12); "Management and Mobilization of Regular and Reserve Retired Military Members", DODD 1352.1 (dated 7/16/05) (Exhibit 13); and "Employment of Retired Members of the Armed Forces" DODD1402.1 (dated January 21, 1982, still listed by DOD as a valid authority), (Exhibit 14).

Each of the four regulations requires defendants to comply with the DODDs and DODIs. For example, Paragraph 5.2.1 of DODI 1215.19 direct's the Secretary to "[d]esignate all Reserve Component members," including the 4109s, "in a RCC ... in accordance with criteria established in enclosures 2 and 4"; Enclosure 2, ¶ E2.2.1.4, defines five "Retired Reserve Categories" (Def.RR Exhibit A. at 30), mirroring the five categories and qualifications defined in ¶ 6.5.4.4, *see* below.  DODI 1200.15, ¶ 5.3, limits the Secretary's authority to transfer personnel to the Retired Reserve to 3 cases; the two relating to those eligible for retired pay are mandatory ("shall"), the one case addressing disability is permissive.  DODD 1352.1 states "The Secretaries of the Military Departments ... shall ensure plans for management and mobilization of military retirees are consistent with this directive", ¶ 5.3 ("RESPONSIBILITIES"), and defines the Retired Reserve, linking it to eligibility for retired pay.  These DODIs and DODDs,  by using the word "shall", make it clear the Service Secretaries must comply with the DODIs' and DODDs' provisions  They provide no room for the Secretary of Navy not to comply or discretion to do

33

anything other than what the DODI directs.  Mr. Bush testified that defendants' compliance with

the DODIs is mandatory.  Deposition of Thomas Bush (Exhibit 15) at [95:11-97:21].

### B.    DOD's Definition of the Retired Reserve Excludes the 4109s

Each DODI and DODD has defined the Retired Reserve in a uniform, historically

consistent manner, linking eligibility for or assignment to the Retired Reserve with eligibility for

retired, retainer or disability pay.[5]  A chaplain not entitled receive payment for prior active service

is not eligible for transfer to, or listing in, or inclusion in the Retired Reserve.  Five categories

constitute the Retired Reserve as defined by DOD.

The Retired Reserve consists of the following categories:

| | |
|---|---|
| 6.5.4.4.1 | Reserve members receiving retired pay under Chapter 1223 of reference(e) [Title 10]. |
| 6.5.4.4.2 | Reserve members who have transferred to the Retired Reserve after completing the requisite qualifying years creditable for retired pay under 10 U.S.C. Chapter 1223 (reference(e)), but who are not yet 60 years of age, or are age 60 and have not applied for retired pay. |
| 6.5.4.4.3 | Reserve members retired for physical disability under Sections 1201, 1202, 1204, or 1205 of reference (e). Members who have completed the requisite years of Military Service creditable for non-regular retired pay under Chapter 1223 of reference (e) or are 30-percent or more disabled and otherwise qualified under Section 1201 of (reference(e)). |
| 6.5.4.4.4 | Reserve officers and enlisted members who have retired after completion of 20, or more, years of active Military Service.  This does not include Regular enlisted members of the Navy or the Marine Corps, with 20 to 30 years of active Military Service, who are transferred to the Fleet Reserve (Navy) or the Fleet Marine Corps Reserve. |
| 6.5.4.4.5 | Reserve personnel drawing retired pay based on retirement for reasons other than age, service requirements, or physical |

---

[5] DODI 1200.15, ¶ 5.3.1 dated 9/18/1997 (DX L at 5), directed the Secretary to transfer to the Retired Reserve, in addition to those who qualified for retirement pay under Title 10, those found physically disqualified for active duty ... if more than 30% disabled, and "on application ... all personnel who belong in the categories listed in subsection F.4 of DOD Instruction 1215.19."

> disability.  This category is restricted to those who are
> retired under special conditions, as authorized by the
> Assistant Secretary of Defense for Reserve Affairs under
> legislation.[6]

DODI 1215.19, ¶ 6.5.4.4 (Def.RR Exhibit A, pg. 17-18).  DODI 1215.19's Enclosure 2 ¶ E2.2.1.4

(DX A. at 30) again defines "Retired Reserve Categories" using the five categories and

qualifications defined in ¶ 6.5.4.4 above, *e.g.,* those Reserve Members: "who have *completed the*

*requisite qualifying years creditable for non-regular retired pay* and are receiving retired pay

under 10 U.S.C. Chapter 1223."  Enclosure 4, Table 1 (Def.RR Exhibit A at 39) illustrates and

defines the five categories. The entitlement to retired pay is the common feature of all five Retired

Reserve categories.  DODI 1215.19, ¶ 6.6.4.4, "Retired Reserve" (Exhibit 12) and ¶ E5.1.3

("Retired Reserve Categories") of enclosure 5 (*id.* at 32) define five Retired Reserve categories

which duplicate DODI 1215.19's categories. DODD 1402.1 (Exhibit 14) specifically defines the

term "Retired Member of the Armed Forces" as "a member or former member of the Armed

Forces who is entitled to retired, retirement, or retainer pay."  ¶ 3.1.  The use of the term "entitled"

means that the person has met the statutory requirements to receive a benefit, creating a right to

receive the benefit, *i.e.*, To qualify for; to furnish with proper grounds for seeking or claiming."

Black's Law Dictionary 277 (Abridged 5th Ed. 1983).  "Entitlement" means "Right to benefits,

income or property which may not be abridged without due process."  *Id.*  DODD 1352.1, (Exhibit

13) ¶ E.1.1.4, defines "Military Retirees or Retired military Members" as those who retire or are

eligible for retirement under Title 10's definitions after reaching the appropriate TIS.

---

[6]  These "special conditions" exclude 4109s because this category is limited to those
"Reserve Personnel drawing retired pay" for which the 4109s are ineligible.  *See* DODI 1215.19
¶ 6.5.4.4.

DOD's definition of the Retired Reserve limits it to those Reservists entitled to retired, retainer or disability pay.  No DOD Retired Reserve Category includes personnel who are not entitled to receive pay as a result of active duty service.  DOD's regulations show it has defined § 10154's phrase "otherwise qualified" by defining what constitutes the RRC, limiting it to statutory categories consistent with the law and Congressional intent.  In doing so, the Secretary of Defense has excluded from the Retired Reserve the 4109s because they are not entitled to retired pay.

### C.    Defendants Must Comply With DOD's Instructions

The law is clear, once the Secretary of Defense has established a policy or regulation, the Armed Services must obey it completely.  Regulations promulgated by the Secretary "canalize the discretion of its subordinate officials" and restrict the discretion of subordinate Armed Services that statutes may otherwise provide.  *See Miami Nation of Indians of Indiana, Inc. v. U.S. Dept. of the Interior*, 255 F.3d 342, 348 (7th cir 2001), *cert denied*, 534 U.S. 1129 (2002); *Center for Auto Safety v. Dole*, 846 F.2d 1532, (D.C. Cir 1988); (agencies are bound by issued regulations).

The facts and competing legal theories here are similar to *Bond v. United States*, 47 Fed. Cl. 641 (2000).  Lieutenant Col. (LTC) Bond challenged a commander's classification of his duty on a two-day operational alert as active duty for training ("ADT") rather than active duty support ("ADS") which entitled him to active duty status and immediate retirement benefits.  "The case before this court involves the application of a regulation-driven classification scheme governing reserve military duty assignments", *id.* at 650, similar to this case.  The Air Force said its regulation allowed the commander complete discretion to classify LTC Bond's tour of duty any way he wanted.  *Id.* at 648-49, 659 (citing Air Force Regulation (AFR) 35-41).  The court disagreed.  The court held "the Air Force must comply with governing regulatory definitions in

36

assigning TCCs [Training Category Codes].  The TCC is not to be assigned at the convenience of

the commander." *Id*. at 659.  The court found DOD and Air Force regulations defined the TCCs

and AFR 35-41 "does not give the commander the discretion to assign duties to either TCC at will.

To allow otherwise would allow commanders to undermine the intent of the classification

scheme." *Id.*  That is exactly the case here as shown below.  Service practices that conflict with

DOD's regulations "must give way."  *Id*. at 622 (quoting *Casey v. United States,* 8 Cl. Ct. 234, 239

(1985)); *Poole v. Rourke*, 779 F.Supp. 1546, 1565-66 (E.D.Cal.1991).  Unfortunately, defendants

have not followed either the law or the DOD regulations.  They have illegally classified the 4109s

as retired reserve and allowed them to remain on active duty illegally.

> **D.    The 4109s Have Been Illegally Classified and Illegally Continued on Active
> Duty**

DOD requires defendants to legally categorize all Reservist into a RCC.  DODI 1215.19, ¶

5.2.8 ("The Secretaries of the Military Departments ... shall: Designate all RC members in a RCC

and TRC according to the criteria established in Enclosures 5 and 6.").  Prior to reaching their

statutory separation age, the 4109s were Reservists on active duty.  When they reached § 14509's

former statutory separation age of 60, these 4109s were illegally continued until they reached age

67 because § 14703 is limited to extending Reserve chaplains on the RASL to age 67, and these

chaplains were on active duty.  When they reached age 67, the 4109s were transferred into the

Retired Reserve illegally because they were not entitled to receive retired pay and therefore

ineligible for transfer to the Retired Reserve as defined by DOD.  Defendants are not free to create

new Retired Reserve Categories or disobey DOD's orders to "[d]esignate all RC members in a

RCC and TRC according to the criteria established in Enclosures 5 and 6."  Both the transfer to

and recall from the Retired Reserve was illegal because the 4109s did not meet the criteria for transfer to the Retired Reserve.

    **E.**    **Title 10 Provides Limited Authority to Extend *Regular* Chaplains Eligible for Retirement Beyond Age 62**

10 U.S.C. § 1251(a) establishes age 62 as the normal separation age for each Regular officer. "Unless retired or separated earlier, each regular commissioned officer ... [below the grade of RADM] shall be retired on the first day of the month following the month in which the officer becomes 62 years of age." The word "retired" has a specific legal meaning and is defined by statute and DOD Directives, as shown in A and B above. It means a person has accumulated at least 20 years active TIS which entitles him to a pension, the amount of which is determined by his total length of service, his time in grade, and his grade upon the date of his retirement. These factors are all established by statute. *See, e.g.,* 10 U.S.C. §§ 6321-36.

Section 1251(c) allows the Secretary to "*defer the retirement* under subsection (a) of an officer who is appointed or designated as a chaplain if the Secretary determines that such deferral is in the best interests of the military department concerned." (Emphasis added). Subsection (d), "Limitation on deferment of retirements," limits such deferments until "the first day of the month following the month in which the officer becomes 68 years of age." § 1251(d)(1). A recent change to this provision of § 1251, effective October 10, 2006, allows the Secretary to "extend the deferment under  subsection ... (c) beyond the day referred to in paragraph (1) [age 68] if the Secretary determines that extension of the deferment is necessary for the needs of the military department concerned."

A plain reading of the statute and the common understanding of the terms "defer" and the

DOD's use of the terms "retired" and "retirement" shows this subsection provides no authority to extend chaplains *who have not attained* the necessary time in service for retirement until they reach 20 years service. "Defer" means "to put off to a future time; postpone, delay." Webster's New World Dictionary 384 (1960); *see also* Black's Law Dictionary 219 Abridged 5th Ed. 1983 ("Deferral. Act of delaying, postponing or putting off."). "A fundamental canon of statutory construction is that unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). Retirement is the specific point in time when a military person becomes "retired" as defined by DODD 1402.1. To "defer the retirement" of a chaplain under § 1251 is to postpone or delay the actual day when the chaplain who is eligible for retirement, *i.e.*, has met Title 10's requirements, actually changes his or her status from active to retired. The Secretary cannot defer "retirement" of a chaplain *who does not qualify for retirement*.

### F.    Title 10 Provides No Authority to Extend *Reserve* Chaplains on Active Duty Beyond Age 67

When plaintiffs filed this motion in 2003, 10 U.S.C. § 14509 required the separation of Reserve chaplains when they reached age 60. Changes to Title 10 in 2006 changed the separation age of Reserve chaplains to age 62, making it the same age as Regulars. Section 14703(a)(2) authorizes the Secretary to "retain in active status any Reserve officer appointed ... in the Chaplain Corps" beyond age 62. However, this authority is specifically limited by two aspects. First, it excepts "officers referred to in Sections 14503, 14504, 14505 and 14506," which address Reserve officers who have not been promoted to the grade of Commander. That excludes the 4109 chaplains at issue here who are FOS LTs and LCDRs.

39

The second limitation is subsection (b) "Separation at Specified Age." "An officer *may not be retained on active status* under this section later than the date on which the officer becomes 67 years of age." (emphasis added). There is no exception similar to 10 U.S.C. § 1251(d)(2) which allows the Secretary to defer Regular chaplain retirements past age 68 for a specific need of the service. The use of the term "may not" eliminates the permissive sense normally associated with the term "may." Had Congress wished to allow the Secretary the same latitude it provided in § 1251, it knew how to do so. The fact it did grant the Secretary authority to exceed the age 68 limit for Regulars but specifically denied it for Reservists shows that is what Congress intended, a result consistent with Congress's differing treatment of Regulars and Reserves. "When Congress 'includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the separate inclusion or exclusion.'" *American Chemical Council v. Johnson*, 406 F.3d 738, 741 (D.C. Cir. 2005) (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002)).

Title 10's structure and placement of § 14703's retention authority creates additional problems for defendants' attempt to justify their illegal retention of these FOS Catholic chaplains. Congress has provided no authority within the structure of Subtitle E to allow Reserve officers to continue on active duty past the mandatory separation age. Congress placed § 14703 in Chapter 1409, Part III, Subtitle E which specifically addresses the Reserve components. Part III addresses "Promotion and Retention of Officers on the Reserve Active-Status List" and Chapter 1409 addresses "Continuation of Officers on the Reserve Active-Status List and Selective Early Removal." The clear implication is that § 14703, by its placement in Chapter 1409 and Part III, addresses only officers on the RASL. These 4109 chaplains are not on the RASL. They must be

40

carried on the ADL because they are on active duty. 10 U.S.C. § 101(c)(7) defines the RASL and excludes anyone on the ADL.  As noted above, the lists are mutually exclusive.  The fact these chaplains cannot be covered under § 14703 is consistent with and follows from DOPMA's structure and focus on producing an all Regular Active Duty force.  The recent changes to Title 10 making all entry level officers Regular officers is a further demonstration of Congress's intent that the active duty force should be regular.

There is no authority to extend these 4109 Reserve Catholic chaplains under § 14703. Congress specifically excluded those who have FOS to Commander, which addresses this group of 4109s and perhaps others, and § 14703(a), and § 14703(b) limit any such extension to the day the chaplain who is at least a Commander becomes "67 years of age."

## V.    PLAINTIFFS MEET THE OTHER INJUNCTION CRITERIA

### A.    Defendants' Establishment Clause Violation Produces Irreparable Harm

The unconstitutional 4109 Program produce irreparable harm.  *CFGC*, 454 F.3d at 303.

### B.    Terminating Defendants' Unconstitutional Practice Poses No Burden or Injury on Defendants

The Navy will suffer no harm whatsoever if the Court orders it to comply with the statutory limits on active duty chaplains.  The Navy can suffer no prejudice by ending its practice of preference for over-age Catholics.  Navy officials are charged with following the law as well as their own regulations and cannot claim prejudice if forced to do so by the Court.  OPNAVINST 1730.1D allows defendants to hire the 4109s as contract clergy if they are needed.

### C.    Terminating Defendants' Unconstitutional Practice Is in the Public Interest

A consistent  Supreme Court theme in many of the cases addressing Establishment Clause

41

challenges is that Clause's purpose was to avoid divisiveness, division, hostility and friction

resulting from the government's union and cooperation with religion. "The centuries immediately

before and contemporaneous with the colonization of America had been filled with turmoil, civil

strife, and persecutions, generated in large part by established sects determined to maintain their

absolute political and religious supremacy." *Everson v. Board of Ed.*, 330 U.S. 1, 8-9 (1947). "At

the time of the Revolution, Americans feared not only a denial of religious freedom, but also the

danger of political oppression through a union of civil and ecclesiastical control." *Larkin*, 459 U.S.

126 n. 10 (citing B. Bailyn, Ideological Origins of the American Revolution 98 – 99, n. 3 (1987)).

> By the time of the adoption of the Constitution, our history shows that there was a
> widespread awareness among many Americans of the dangers of a union of Church
> and State. These people knew, some of them from bitter personal experience, that
> one of the greatest dangers to the freedom of the individual to worship in his own
> way lay in the Government's placing its official stamp of approval upon one
> particular kind of prayer or one particular form of religious services. They knew the
> anguish, hardship and bitter strife that could come when zealous religious groups
> struggled with one another to obtain the Government's stamp of approval from each
> King, Queen, or Protector that came to temporary power.

*Engel v. Vitale,* 370 U.S. 421, 429 (1962); *accord Everson*, 330 U.S. at 8-11.

This case illustrates the very evil the Establishment Clause was designed to prevent. A

group of chaplains from various Non-liturgical faith groups is before this Court to redress the

government's alliance with and favoritism to another religious group, the Catholic Church.

Benefits are given and denied based on religious affiliation.

Confronting and forbidding the very government actions that produce "the anguish,

hardship and bitter strife that could come when zealous religious groups struggled with one another

to obtain the Government's stamp of approval" serves the public interest. Courts have held it is in

the public interest to vindicate First Amendment rights. *Rigdon v. Perry*, 962 F.Supp 150, 165

(D.D.C. 1977); *see also, e.g., Utah Licenced Bev. Ass'n v. Leavitt*, 256 F.3d 1061, 1076 (10th Cir. 2001). It is in the highest public interest to make sure our military remains neutral in matters of religion. The public has a strong interest in having a military that conducts itself fairly and according to the law. *Cooney v. Dalton*, 877 F. Supp. 508, 515 (D.Hawai'i 1995) (enjoining the discharge of a sailor). That interest is particularly evident in this case. "We ... hold that a party alleging a violation of the Establishment Clause per se satisfies the irreparable injury requirement of the preliminary injunction calculus." *CFGC*, 454 F.3d at 304. The very purpose of an injunction is to stop irreparable harm. The Navy has clearly violated Title 10, the Secretary's own instructions and the Establishment Clause. When agencies stray beyond the limits set for them by Congress, courts have a duty to require that they comply with the law. *See Dilley*, 603 F.2d at 914.

"The federal Constitution embraces and embodies the cardinal principle that this is a nation subject to the rule of law, and as such, agents of the government are bound to follow the law."[7] *Wilkinson v. Legal Services Corp.*, 27 F. Supp. 2d 32, 57 (D.D.C. 1998) (citing *United States v. Lee*, 106 U.S. 196, 220-21 (1892) and other cases). *See also Dilly v. Alexander*, 603 F.2d 919, 920 (D.C. Cir 1979) ("It is a basic tenet of our legal system that a government agency is not at liberty to ignore its own laws and that agency action in contravention of applicable statutes and regulations is unlawful") and 921 ("courts have shown no hesitation to review cases in which a violation of the Constitution ... is alleged.").

It is both absurd and seditious to argue that allowing the government to operate outside of the Constitution is in the public interest. Defendants can show no burden if they must operate their

---

[7] *Wilkinson*, 27 F. Supp. 2d at 57-64 provides an extensive discussion of the *Accardi* Doctrine, the rule government must obey the law, referring to *Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

43

chaplain management and retention programs in accord with the Constitution.  Plaintiffs have met all the criteria for an injunction.

### D.    There Are No Third Party Rights That must Be Addressed

Defendants have previously improperly argued "[a]llowing plaintiffs to go forward with a motion that requires affirmative action affecting the rights of non-party naval officers, whose own rights must be considered and respected, prior to a final judgment that plaintiffs are entitled to any relief is not justified."  Opp to Motion to Lift Stay at 9.  As shown in the Background above and here, the Catholic 4109 chaplains in question were commissioned with age waivers under SECNAVINST 1120.4A which specifically requires the applicant's written acknowledgment he will be unable to reach 20 years of service necessary for a pension and retirement under Title 10. Their situation is addressed at the very end of ¶ 6.b.  "Before appointment, applicants who will be unable to complete 20 years of creditable service for retirement [before reaching age 62] shall acknowledge the same in writing."  *See* Inj. Mot. at 7 and 10, No. 14 (quoting 1120.4A, ¶ 6.b ).

Consequently, these chaplains have no rights that must be protected should the Court order an injunction because their waivers show they had no legitimate expectation of being allowed to stay past their statutory separation age.  The SECNAVINST makes it clear they should expect to be separated at the statutory separation age.  Assuming arguendo they had such a claim due to defendants' actions, any abridgment of the challenged chaplains' expectations arising from a forbidden and illegal transaction and status that no Navy official was authorized to provide would have to be raised by them personally.  The validity of any theory under which such claims could arise is not an issue in this motion.  The injunction operates against the Navy, not these chaplains.

## VI.    PLAINTIFFS HAVE MET THE CRITERIA FOR AN INJUNCTION

44

Plaintiffs' evidence shows the 4109 Program is a denominational preference. The appropriate precedent for addressing such claims shows the 4109 Program is an unconstitutional denominational preference as shown in II-IV plaintiffs in violation of the Establishment Clause producing irreparable harm. An injunction will not harm defendants and is in the public interest. No valid third party rights are involved.

## CONCLUSION

Defendants have failed to show any compelling purpose for their challenged practice. There are no competing interests that outweigh the need to terminate the irreparable harm from defendants' violation of the Establishment Clause. Defendants can show no prejudice, whereas allowing their continued violation of the Constitution would be unprecedented.

Plaintiffs ask the Court (1) to immediately enjoin defendants from continuing only Catholics past the statutory separation age of 62; (2) to order defendants to immediately end their 4109 Program and the retention of other Catholics over the age of 62; and (3) order defendants to establish objective criteria for extending chaplains past age 62, including identifying specific religious needs and other neutral, secular and non-ideological criteria.

Respectfully submitted,

Dated: July 9, 2007     _/S/ Arthur A. Schulcz, Sr._
           ARTHUR A. SCHULCZ, Sr.
           D.C. Bar No. 453402
           Counsel for *CFGC* and the *Adair* Plaintiffs
           2521 Drexel Street
           Vienna, VA 22180
           703-645-4010

Of Counsel:
Douglas McKusick, Esq.
THE RUTHERFORD INSTITUTE
P.O. Box 7482
Charlottesville, VA 22906-7482

EXHIBIT LIST

| Exhibit No. | Description |
| --- | --- |
| 1. | 10 U.S.C. § 14509. |
| 2. | SECNAVINST 1120.4A. |
| 3. | "Does the Data Establish that the U.S. Navy favors Roman Catholics", 7/7/07 Expert Opinion by Harald R. Leuba, PhD. |
| 4. | OPNAVINST 1730.1D. |
| 5. | October 1999 Navy Chaplain Corps "Study on Religious Affiliation in the Department of Navy" |
| 6. | Declaration of CAPT James Poe, CHC, USN (Ret). |
| 7. | Extract of Deposition of CAPT Thomas Carter, CHC, USN (Ret) |
| 8. | List of Chaplains accessed or brought to active duty at age 42. |
| 9. | Total number and percentage of chaplain age waivers for applicants 42 and above. |
| 10. | "Too Many Catholic Priests?" Expert Opinion by Harald R. Leuba, PhD |
| 11. | Department of Defense Instruction 1200.15 |
| 12. | Department of Defense Instruction 1215.06 |
| 13 | Department of Defense Directive 1352.1 |
| 14 | Department of Defense Directive 1402.1 |
| 15 | Extract of Deposition of Mr. Thomas Bush |
| 16 | Declaration of Arthur A. Schulcz, Sr. |

10 U.S.C.A. § 14509

United States Code Annotated
Title 10. Armed Forces (Refs & Annos)

Subtitle E. Reserve Components

Part III. Promotion and Retention of Officers on the Reserve Active-Status List

Chapter 1407. Failure of Selection for Promotion and Involuntary Separation (Refs & Annos)

### § 14509. Separation at age 62: reserve officers in grades below brigadier general or rear admiral (lower half)

Each reserve officer of the Army, Navy, Air Force, or Marine Corps in a grade below brigadier general or rear admiral (lower half) who has not been recommended for promotion to the grade of brigadier general or rear admiral (lower half) and is not a member of the Retired Reserve shall, on the last day of the month in which that officer becomes 62 years of age, be separated in accordance with section 14515 of this title.

CREDIT(S)

(Added Pub.L. 103-337, Div. A, Title XVI, § 1611, Oct. 5, 1994, 108 Stat. 2952, and amended Pub.L. 109-364, Div. A, Title V, § 503(c), Oct. 17, 2006, 120 Stat. 2178.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1994 Acts. House Report No. 103-499 and House Conference Report No. 103- 701, see 1994 U.S. Code Cong. and Adm. News, p. 2091.

2006 Acts. House Conference Report No. 109-702, see 2006 U.S. Code Cong. and Adm. News, p. 1298.

Statement by President, see 2006 U.S. Code Cong. and Adm. News, p. S59.

Amendments

**2006 Amendments. Heading. Pub.L. 109-364, § 503(c)(2), rewrote the section heading, which formerly read: "Separation at age 60: reserve officers in grades below brigadier general or rear admiral (lower half)".**

07MC269
EXHIBIT 1

**Pub.L. 109-364, § 503(c)(1), struck out "60 years" and inserted "62 years".**

Effective and Applicability Provisions

1994 Acts. Section effective Oct. 1, 1996, except as otherwise provided, see section 1691(b) of Pub.L. 103-337, set out as a note under section 10001 of this title.


CROSS REFERENCES

Selection of officers for continuation on the reserve active-status list, see 10 USCA § 14701.

LIBRARY REFERENCES

American Digest System

Armed Services 11

10 U.S.C.A. § 14509, 10 USCA § 14509

Current through P.L. 110-6 (Excluding P.L. 110-5) approved 02-26-07

Copr. © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

**DEPARTMENT OF THE NAVY**

OFFICE OF THE SECRETARY

WASHINGTON, D.C. 20350-1000

SECNAVINST 1120.4A
OP-09G22
14 May 1986

SECNAV INSTRUCTION 1120.4A

From:  Secretary of the Navy

Subj:  APPOINTMENT OF REGULAR AND RESERVE OFFICERS IN THE
       CHAPLAIN CORPS OF THE NAVY

Ref:   (a) DODDIR 1310.2 of 24 Mar 84 (NOTAL)
       (b) DODDIR 1205.14 of 24 May 84 (NOTAL)
       (c) SECNAVINST 1000.7D
       (d) DODDIR 1205.5 of 16 May 80 (NOTAL)
       (e) DODDIR 1312.3 of 15 Oct 81 (NOTAL)
       (f) SECNAVINST 1210.5
       (g) SECNAVINST 1730.7
       (h) SECNAVINST 1420.1
       (i) SECNAVINST 5350.10A
       (j) Title 10, United States Code
       (k) SECNAVINST 5300.28A
       (l) Manual of the Medical Department (NAVMED P-117)
       (m) DODDIR 1304.19 of 1 Jun 84 (NOTAL)
       (n) SECNAVINST 1427.2
       (o) SECNAVINST 1427.1A
       (p) SECNAVINST 1920.6A

Encl:  (1) Theological Student Program                          (A

1.  Purpose.  To establish regulations governing:              (R

    a.  Appointment of officers in the Chaplain Corps, including
appointment in the Regular component under reference (a), in the
Reserve component under reference (b) and in either component
through interservice transfer from another Service under refer-
ences (c) and (d);

    b.  Voluntary recall of officers of the Chaplain Corps to
the active-duty list; and

    c.  Award of entry grade credit on appointment in the
Chaplain Corps under reference (e).

2.  Cancellation.  SECNAV Instruction 1120.4.  All other regula-  (A
tions and memoranda providing guidance governing accessions,
appointments, eligibility requirements and entry grade credit
for service in the Chaplain Corps inconsistent with this instruc-
tion are held in abeyance pending their modification or cancel-
lation.  Processing initiated before the effective date of this
instruction will be continued pursuant to policy and instruc-
tions in effect before that date.

SECNAVINST 1120.4A
1 4 MAY 1986

R)    3.  Applicability.  This instruction applies to all individuals
appointed as Regular or Reserve officers in the Chaplain Corps,
including officers from another Service, Reserve officers trans-
ferred into the Regular component, Reserve officers voluntarily
recalled to the active-duty list and officers transferred from
the line or another staff corps into the Chaplain Corps.

        a.  Additional guidance on the transfer of Chaplain Corps
officers from other Services into the Chaplain Corps of the Navy
is found in references (c) and (d).

        b.  Additional guidance on the transfer of Reserve Chaplain
Corps officers into the Regular component of the Chaplain Corps
and the transfer of Regular and Reserve between the line and the
Chaplain Corps or between another staff corps and the Chaplain
Corps is found in reference (f).

R)    4.  Policy.  The Department of the Navy will maintain authorized
strength and grade levels in the Chaplain Corps by recruiting
clergy of religious faith groups of the United States to provide
religious ministries under reference (g), to support the annual
five-year promotion plan approved under reference (h), to
provide a base for an all-Regular career force and to attain
authorized strength in the Reserve components to meet approved
mobilization requirements.

        a.  Requirements for newly appointed officers on the active-
duty list sufficient to support an all-Regular force will be
filled primarily through the Theological Student Program author-
ized in enclosure (1).  Requirements which cannot be fully met
by this source will be met by direct appointment of qualified
members of the clergy.

        b.  Requirements for officers on the active-duty list in
career grades that cannot be met by promotion will be supple-
mented by voluntary recall to active duty of Chaplain Corps
officers who have not served previously on extended active duty.

        c.  Requirements for officers on the active-duty list which
cannot be met by the preceding sources will be met by the
voluntary recall of Chaplain Corps officers who have served
previously on extended active duty and by interservice transfer
of chaplains from other Services.

        d.  Requirements for Selected Reserve and Individual Ready
Reserve officers will be filled primarily by the transfer of
officers from the active-duty list who have completed their
initial obligated service.  Requirements which cannot be met
from this source will be met by direct appointment of qualified
members of the clergy as Reserve officers of the Chaplain Corps
on inactive duty.

2

SECNAVINST 1120.4A
**1 4 MAY 1986**

e.  All initial appointments in the Chaplain Corps will be Reserve appointments, with subsequent transfer to the Regular Navy under reference (f).

5.  <u>Accession plans</u>.  The Chief of Naval Operations will develop an annual accession plan to support authorized strength in the Chaplain Corps.  There must be enough accessions to support the annual five-year promotion plans for the active-duty and Reserve components and ensure that the promotion opportunity and flow necessary to meet authorized strength-in-grade requirements are maintained.  Accession plans must support execution of Affirmative Action Plans established under reference (i).

(A

6.  <u>Basic qualifications</u>.  To be eligible for appointment as a Chaplain Corps officer in either the active-duty or Reserve components, or for voluntary recall from the Reserve component to the active-duty list, the applicant must meet the following requirements:

(R

a.  <u>Citizenship</u>.  Must be a citizen of the United States with the following exception:  a citizen of the Northern Mariana Islands who indicates in writing to a commissioned officer of the Armed Forces of the United States an intent to become a citizen of the United States may be appointed as a commissioned officer in the Regular or Reserve component.  Under reference (j), such an individual cannot serve as an officer in a vessel of the United States until legally a citizen of the United States.  This exception expires upon establishment of the Commonwealth of the Northern Mariana Islands.

b.  <u>Age</u>.  Must be able to complete 20 years of active commissioned service by age 60.  The Deputy Chief of Naval Operations (Manpower, Personnel, and Training) (DCNO(MPT)) may waive the age restrictions up to age 62 for otherwise qualified applicants for appointment on the active-duty list or in the Reserve component in the following instances:

(1) When there is a shortage against authorized strength in the active duty component which cannot be met through the Theological Student Program, direct appointments, voluntary recall from the Reserve component or by in-zone promotion under the annual five-year promotion plan.

(2) When there is a shortage against authorized strength in the Reserve component which cannot be met by transfer of officers from the active-duty list, from the Theological Student Program, in-zone promotions under the annual five-year promotion plan, or by direct procurement of qualified civilians who meet age requirements.

SECNAVINST 1120.4A
1 4 MAY 1986

      (3) When extraordinary circumstances cause such a waiver to be in the best interest of the naval service.

      (4) When a gross inequity to the applicant would otherwise result.

Before appointment, applicants who will be unable to complete 20 years of active commissioned service by age 60 will be required to acknowledge in writing that they are ineligible for Regular appointment.  Before appointment, applicants who will be unable to complete 20 years of creditable service for retirement shall acknowledge the same in writing.  DCNO(MPT) shall maintain on file written justification for each waiver granted.

    c. <u>Moral character</u>.  Must be of good moral character and of unquestioned loyalty to the United States as determined by interview and investigation.  As prescribed in reference (k), no person who is drug or alcohol dependent, who abuses drugs or alcohol, whose preservice abuse of drugs and/or alcohol indicates a proclivity to continue abuse in the Service, or who has a record of any trafficking offenses shall be permitted to enter or be retained in the Chaplain Corps.

    d. <u>Physical standards</u>.  Must meet the physical standards for service on active duty established by the Director, Naval Medicine and approved by the Chief of Naval Operations. DCNO(MPT) may grant waivers for physical defects that will not interfere with the performance of active duty within the guidelines of reference (l).

R)

7. <u>Professional qualifications</u>.  To be eligible for appointment in the Chaplain Corps, or voluntary recall from the Reserve component to the active-duty list, the applicant must meet the following minimum educational and professional requirements.

    a. <u>Education</u>

      (1) Must be a graduate of an accredited college or university with a baccalaureate degree of not less than 120 semester hours.

      (2) Must have completed three resident years of graduate professional study in theology or related subjects, validated by a Master of Divinity or equivalent degree, or 90 semester hours at an accredited seminary or graduate school of religion.

      (3) Colleges, universities, graduate schools or seminaries are considered accredited if listed in the <u>Education Directory, Colleges and Universities</u> (current edition) published

SECNAVINST 1120.4A
1 4 MAY 1986

by the U. S. Department of Education, National Center for Educa-
tion Statistics, Washington, D. C. 20202, or the Directory, ATS
Bulletin Part 4 (current edition) published by the Association
of Theological Schools, Vandalia, Ohio 45377. Foreign educa-
tional institutions not so listed may be treated as accredited
upon certification by a listed institution that the applicant's
credits are transferable at full value to the certifying
institution.

b. Ecclesiastical endorsement. Must have endorsement from
an ecclesiastical endorsing agency recognized by the Department
of Defense under reference (m).

8. Examination of professional qualifications. The profes-
sional qualifications of all applicants for appointment in the
Chaplain Corps or for voluntary recall from the Reserve com-
ponent to the active-duty list shall be examined as follows:

a. Appointments in grades of lieutenant commander and
below. The Chief of Chaplains shall examine and certify the
professional qualifications of all applicants.

b. Appointments in grades of commander and above. The
DCNO(MPT) shall appoint a Chaplain Qualifications Board (CQB)
composed of senior Chaplain Corps officers to examine the
professional qualifications of all applicants. The CQB shall
certify, subject to the concurrence of the Chief of Chaplains,
that the applicant has met fully the qualifications of paragraph
7 and certify which specific qualifications of the Table in
paragraph 9 are fully met. The CQB shall also provide an
evaluation of the quality and desirability of the candidate
based on his/her professional qualifications and experience.

c. Voluntary recall. To be eligible for voluntary recall
from the Reserve component to the active-duty list, the appli-
cant must be a fully qualified member of the clergy of a
religious faith group represented by a DOD-recognized ecclesias-
tical endorsing agency under reference (m). Recalled officers
will be recalled in the rank held as a Reserve and will not have
entry grade recomputed.

d. Examination procedure. The examining body will review
an applicant's academic performance, graduate theological
education, professional experience, professional reputation,
interviews by a recruiting officer and a chaplain, letters of
personal or professional recommendation and ensure that an
ecclesiastical endorsement has been submitted for each appli-
cant. This review must be completed before recommending the
applicant for appointment or recall and prior to recommending

SECNAVINST 1120.4.

1 4 MAY 1986

entry grade credit to be awarded on appointment.  Once the
examining body has examined and certified the applicant's
professional qualifications, DCNO(MPT) or Commander, Navy
Recruiting Command acting for DCNO(MPT) shall determine whether
the applicant is otherwise qualified for a commission as a
chaplain.  No applicant shall be appointed as a Chaplain Corps
officer without these determinations.

R)     9.  <u>Entry grade credit</u>.  Entry grade and date of rank upon
appointment in the Chaplain Corps shall be based on the number
of years of entry grade credit awarded for prior active commis-
sioned service, advanced education and professional experience
under reference (e).  Credit shall be granted subject to the
computation rules in paragraph 10 and as specified in the
following table:

ENTRY GRADE CREDIT TABLE

| Qualification | Credit |
|---|---|
| 1.  Commissioned service in any of the Uniformed Services on active duty or in an active status but not active duty other than as a theological student. | one year for each year |
| 2.  Successful completion of graduate professional study validated by a Master of Divinity or equivalent degree under the criteria of paragraph 7. | three years |
| 3.  Seven or more years of full-time practical experience in ministry following completion of the educational requirements in paragraph 7. To be credited, the applicant must have accrued the experience as a fully qualified member of the clergy of a religious faith group represented by a DOD-recognized ecclesiastical endorsing agency under reference (m).  The experience may include pastoral ministry, religious education or other form of full-time religious vocation. | one year |
| 4.  Unusual cases involving special experience or unique qualifications. | One-half year for each year |

6

SECNAVINST 1120.4A
**14 MAY 1986**

5. The Department of the Navy will not normally grant entry grade credit for special experience or unique qualifications. ASN (M&RA), considering the recommendations and supporting justification of DCNO(MPT), may waive this limitation on a case by case basis when there is a requirement that cannot be met within the guidelines of this instruction.

up to a maximum of three years of credit

10. <u>Limits and Computation of entry grade credit</u>. Entry grade credit shall be computed as follows:

    a. A period of time or a qualification shall be counted only once.

    b. Qualifying periods of less than one full year will be proportionally credited to the nearest day.

    c. Credit will not be awarded for service as a warrant officer.

    d. Graduates of the Service academies will not be awarded credit for any service performed or education, training or experience obtained before graduation from the academy concerned.

    e. Entry grade credit will not normally be awarded for education, training or experience obtained while on active duty or on inactive duty in an active status. If the officer completes advanced education specified in paragraph 7 for initial appointment in less than the normal number of years, the officer may be given constructive credit for the difference between the normal number of years and the actual number of years taken. Detailed guidance is furnished in sections 533 and 5600 of reference (j).

    f. To obtain a high level of experience in the naval chaplaincy environment before entering the career force total entry grade credit shall normally be limited to six years. ASN (M&RA), considering the recommendations and supporting justification of the DCNO(MPT), may waive this limit on a case by case basis when there is a requirement that cannot be met within the guidelines of this instruction.

    g. Because the recall of a Chaplain Corps officer from inactive duty is not an appointment, such officers are not entitled to additional entry grade credit.

7

SECNAVINST 1120.4A

1 4 MAY 1986

A)    11. <u>Entry grade credit in transition period</u>.  This instruction
provides credit to be awarded to individuals appointed in the
Chaplain Corps from the effective date of this instruction.
There shall be no retroactive changes made as a result of this
instruction to the number of years credit previously granted to
officers appointed in the Chaplain Corps before the effective
date of this instruction.

R)    12. <u>Appointments</u>.  A prospective Chaplain Corps officer will be
appointed initially as a Naval Reserve officer subject to the
following guidance governing entry grade, date of rank, prece-
dence, and application processing:

a. <u>Entry grade</u>.  A prospective Chaplain Corps officer shall
be appointed in a grade based on total entry grade credit
awarded.  The minimum entry grade credit required for each grade
is equal to the promotion flow points prescribed in the approved
annual five-year promotion plan in effect at the time of appoint-
ment.  Entry grade and date of rank of Chaplain Corps officers
transferred from other Services into the Chaplain Corps of the
Navy shall be determined under references (c) and (d).

b. <u>Date of rank</u>.  When the minimum entry grade credit
required for appointment in a given grade is granted, the date
of rank shall be the date of appointment.  When entry grade
credit is granted in excess of the minimum years required for
appointment in a given grade (but less than the amount necessary
to justify the next higher grade), the excess credit shall be
used to adjust the date of rank within grade.  The appointee's
excess entry grade credit shall be compared with the time-in-
grade of Chaplain Corps officers on the active-duty list in the
same grade.  The date of rank upon appointment shall be the same
as that of the Chaplain Corps officer on the active-duty list in
the same grade with time-in-grade most equal to, but not less
than, the appointee's excess entry grade credit.

c. <u>Assignment of precedence</u>.  Each appointee will be placed
on the active-duty list or assigned precedence as follows:

(1) Appointees ordered to active duty or retained on
active duty (other than active duty of Reserve officers as
described in Section 641(1) of reference (j)) incident to
appointment shall be placed on the active-duty list under the
provisions of reference (n).  All appointees whose placement on
the active-duty list would render them eligible for considera-
tion in zone or above zone for promotion by an active-duty
promotion selection board within one year of entering on active
duty shall be counseled regarding the option to defer eligi-
bility for consideration for promotion under reference (h), and
shall acknowledge such counsel in writing.

SECNAVINST 1120.4A
**1 4 MAY 1986**

(2) Appointees not concurrently ordered to or retained on active duty (other than active duty as described in Section 641(1) of reference (j)) shall be assigned a running mate on the active-duty list and placed on the inactive-duty precedence list in an active status under reference (o).

d. <u>Failure to complete qualifications</u>. Officers who fail to complete the Chaplain Basic Course or any required qualification in the Theological Student Program normally shall be relieved of any statutory service obligation and active-duty obligation incurred as a result of accepting an appointment into the Chaplain Corps or the Theological Student Program, and shall be separated for cause under reference (p) under the following guidelines:

(1) Officers who <u>do not have</u> pre-existing service obligations under prior appointments or enlistments shall normally have their service obligation cancelled and be discharged for cause.

(2) Officers who <u>have</u> pre-existing service obligations under prior appointments <u>shall</u> normally be reappointed in their previous competitive category to complete their initial service obligation.

(3) Officers who <u>have</u> pre-existing service obligations under prior enlistments <u>shall</u> normally be reverted to their previous enlisted status to complete their initial service obligation.

(4) The Chief of Naval Personnel may recommend, with supporting justification, retention and transfer to another competitive category when that action would be in the best interest of the naval service.

13. <u>Theological Student Program</u>. Selection and appointment for active duty in the Chaplain Corps through the Theological Student Program shall be made as required by enclosure (1) and paragraph 12.

(A

14. <u>Application Processing</u>. All qualified applicants accepted for appointment either on active duty or inactive duty shall be commissioned within 60 days following receipt of a complete application by Navy Recruiting Command. DCNO(MPT) may authorize delayed commissioning when a later time is requested by the applicant.

(A

15. <u>Responsibilities</u>

(A

a. The Chief of Naval Operations is responsible for:

SECNAVINST 1120.4A
1 4 MAY 1986

     (1) Procurement and appointment of Chaplain Corps officers in compliance with this instruction, and

     (2) Establishing the annual accession plan.

   b.  The Deputy Chief of Naval Operations (Manpower, Personnel, and Training) may approve entry grade credit and establish entry grades and dates of rank in compliance with the guidelines in this instruction.

   c.  The Chief of Chaplains/Director of Religious Ministries is responsible for certification of professional qualifications and calculation of entry grade credit based on these qualifications for the DCNO(MPT).

   d.  The Commander, Navy Recruiting Command shall determine grade and date of rank based on this calculation subject to approval of the DCNO(MPT).

James F. Goodrich
Under Secretary of the Navy

Distribution:
SNDL A1      (Immediate Office of the Secretary)
    A3      (Chief of Naval Operations)
    A5      (Bureaus)
    FJ18    (Military Personnel Command)
    FJ76    (Recruiting Command)

Copy to:
SNDL A2A    (Department of the Navy Staff Offices) (JAG, only)

Stocked:
CO, NAVPUBFORMCEN
5801 Tabor Ave.
Phila., PA  19120-5099  (100 copies)

SECNAVINST 1120.4A CH-1
3 DEC 1986

## THEOLOGICAL STUDENT PROGRAM

1. <u>Purpose.</u>  To aid in meeting future year accession requirements for chaplains on the active-duty list and in the Reserve Component.  DCNO(MPT) will conduct a Theological Student Program within the following guidelines.

2. <u>Eligibility.</u>  Candidates must meet the basic qualifications in paragraph 6 and must:

    a.  Receive a letter of approval from a religious faith group recognized under reference (m).

    b.  Have a baccalaureate degree of not less than 120 semester hours from an accredited college or university.

    c.  Be matriculated in an accredited graduate theological school in a program of professional study in theology or related subjects leading to a Master of Divinity or its equivalent.  The school is considered accredited if listed in the <u>Education Directory, Colleges and Universities</u> (current      (A edition) published by the U.S. Department of Education, National Center for Education Statistics, Washington, D.C. 20202, or if listed as accredited in the <u>Directory, ATS</u>      (R <u>Bulletin Part 4</u> (current edition) published by the Association of Theological Schools, Vandalia, Ohio, 45377.  Foreign educational institutions not so listed may be treated as accredited upon certification by a listed institution that the applicant's credits are transferable at full value to the certifying institution.

    d.  Maintain a satisfactory full time standing under the standards of the graduate theological school in which enrolled and in any training program prescribed by their religious faith group.

3. <u>Appointment.</u>  Candidates selected for the program will be appointed as a Reserve Ensign in the Unrestricted Line, Designator (1945) for inactive duty, inactive status, during the period of their professional studies, under the following conditions:

    a.  Serve without pay or allowances while in a student status except during periods of active duty for training.

Enclosure (1)

SECNAVINST 1120.4A CH-1
3 DEC 1986

b.  Complete theological education and receive a degree.

c.  Obtain an ecclesiastical endorsement under paragraph 7b.

d.  Complete Chaplains School basic course.

e.  Accept, if offered, a superseding appointment to Lieutenant (junior grade) in the Chaplain Corps, USNR, 4105, for active or inactive duty under reference (b).

f.  Total service obligation is eight years.  Service after superseding appointment in the Chaplain Corps is in active status in the Reserve.  For officers appointed to active-duty list, initial active duty obligation is three years.

4.  Disenrollment.  Theological Student Program officers may be separated from the Naval Reserve under paragraph 12d in the following circumstances:

a.  Withdrawal of the letter of approval by the student's religious faith group.

b.  Academic failure.

c.  Discontinuing professional training or withdrawal from school without prior assurance of resumption within one year.

d.  Failure to obtain a Master of Divinity or equivalent degree.

e.  Failure to obtain an ecclesiastical endorsement for superseding appointment.

f.  Failure to attend or successfully complete the Chaplain Basic Course when ordered to that school.

5.  Active Duty for Training.  Theological Student Program officers, in the discretion of the Chief of Chaplains, after the completion of Chaplain Basic Course, may be voluntarily called to active duty for training for on-the-job-training under the supervision of a chaplain.  Such assignments shall, to the extent possible, involve tasks in religious ministry programs consistent with the level of training of the officer. The assignment will be performed at a command as near the theological student's school as possible, except as may be otherwise directed by the Chief of Chaplains.

Enclosure (1)                    2

SECNAVINST 1120.4A CH-1

**3 DEC 1986**

6.  <u>Superseding Appointment in the Chaplain Corps</u>.  DCNO(MPT)
may offer to Theological Student Program officers who
successfully complete the requirements for superseding
appointment, to the extent necessary to meet current year
accession plan requirements for the active-duty list and the
Reserve Component, superseding appointments in the Chaplain
Corps, U. S. Naval Reserve.

    a.  Selection will be based on criteria established by
DCNO(MPT) and the Chief of Chaplains.

    b.  Those not offered a superseding commission, and those
who do not accept one when offered, will be honorably
discharged from the Naval Reserve under paragraph 12d.

Enclosure (1)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| )| |
| IN RE: NAVY CHAPLAINCY ) | Case No. 1: 07-mc-269 (RMU) |
| ) | |

**Does the Data Establish that the U.S. Navy favors Roman Catholics?**
A Declaration and Statistical Analysis by Harald R. Leuba, PhD.

In my 27 September 2006 Withdrawal Declaration in *Larson v U. S Navy*, which I issued because neither Dr. Siskin nor I had been analyzing accessions, <u>per se</u>, I drew attention in Appendix A, on page 48, to a statistically significant interaction between (a) a chaplain candidate's faith group cluster and (b) the probability of being given an Accession Waiver if he/she was over age 40.

Piqued by this observation, Plaintiffs' attorney has asked me to expand on my observations on page 48 and to relate them to a similar pattern between (a) a chaplain candidate's faith group cluster and (b) the probability of a chaplain being continued on Active Duty past age 62.

In both instances, Roman Catholic chaplains are the beneficiaries of disparate treatment.  And in both cases, non-Liturgical, especially non-Baptist, non-Liturgical, Chaplains suffer a loss of opportunity.

Whether this disparate treatment is de facto evidence of an institutional preference for the Catholic religion in particular, I do not opine, but I do point out that the statistical evidence supports such an inference.

**Service Past Age 62**

Federal statute [10 U.S.C § 1251(a)] requires that a serving Chaplain is supposed to be released from Active Duty when he (or she) reaches age 62.

Under extraordinary conditions, e.g.:

- when staffing levels cannot be met by other means, or
-  "for the good of the service", or
- if  a "gross inequity would otherwise result",

the Deputy Chief of Naval Operations may waive this limit and continue a Chaplain in service.

Practically speaking, the Deputy Chief of Naval Operations exercises this waiver arbitrarily; there is no paper trail relating the waiver to one of the justifications, and no record of proof that the staffing levels cannot be met by other means.

The waiver is also exercised selectively.  In a cadre of nearly 900 Chaplains, only1 or 2 % are singled out for this extraordinary waiver – but a surprising number of the Chaplains who are that valuable – are Roman Catholic.

Since 1970 there have been 72 Navy Chaplains whose utility to the Corps prompted the Navy to issue a waiver for them when they reached 62 years of age.  Over 90% of these singularly valuable Chaplains were Roman Catholic - valued, it seems,  just because they were Roman Catholic [cf Endnote 2].

The data provided in Table 1 are drawn from the Chaplain Corps History, Volumes VIII and X, and from information produced by the Navy in the Discovery Process in this litigation series.

**Table 1.**  **Number of Chaplains on Active Duty Past Age 62**

| Data Source | When | RC | LIT | NL | SW |
|---|---|---|---|---|---|
| History Vol VIII | 1970-1981 | 9 | 2 | 1 | |
| History Vol X | 1982-1993 | 11 | | 1 | |
| Discovery | 2005 | 15 | | | |
| Alpha Roster* | 10/13/2006 | 14 | | | 1 |
| Berto Affidavit** | 3/9/2007 | 16 | 1 | | 1 |
| Total | | 65 | 3 | 2 | 2 |
| Navy Pleading*** Inventory | | 149 | 269 | 372 | 40 |

\*     See Endnote 1.
\*\*    Veronica Berto 3/9/07 (see also Endnote 2)
\*\*\*   "Material Facts" as of December 2004

The probability of choosing 72 chaplains at random from the Chaplain Corp's distribution of faiths (see the typical Inventory in the last row in Table 1), and getting only 7 non-Catholics, is less than one chance in a hundred thousand million billion.

Clearly, for at least the past 35 years, and continuing to the present, the U.S. Navy Chaplain Corps' selective use of age waivers signals that they value Catholic Chaplains over all others.

**A Pattern of Preference**

This priority for Catholics over all other denominations permeates the Corps' personnel management system, creeps into its rhetoric from time to time establishing quotas and alleging "critical shortages", and leads to the appearance of the Navy's having a favorite denomination.

For example: Given that their retirement is postponed (for some of them), Catholics are much more likely to end their careers with a pension, than non-Catholics. [See Appendix A.]

For example: If they "stumble" on the way toward retirement, Catholics are much more likely to be given a medical discharge or allowed to retire on "disability" than non-Catholics. [See Appendix B.]

For example: When they retire, Catholics get larger pensions than non-Catholics, because the Catholics get proportionally much more than their "statistically fair share" of the promotions. [See Appendix C.]

For example: The rules for eligibility protect Catholics from exposure to Selective Early Retirement:  2 to 1 vs Liturgicals and  3 to1 vs non-Liturgicals.  [See Appendix D.]

For example: Continuation in Service boards give de jure[1] preference to Catholics and halt career progress for many non-Catholics.  [See Appendix E.]

And, for example, Catholics have both (a) a higher percentage of acceptance at accession than any other so-called "faith group cluster" and (b) are given more age waivers at that hurdle than any other so-called "faith group cluster":

**Age Waivers at Accession**

As noted here in the first paragraph, I have already pointed out that what the Defendants' advocates and expert are referring to as "accessions" in their *Larson* pleadings to this Court, are not what the Department of the Navy defines as "accessions".

The Secretary of the Navy identifies two components of the service, Active Duty and Reserve, and his Instructions describe the Student Program as the primary source for accessions, with Direct accession onto Active Duty being the alternate path.  [Recall is not an <u>accession</u>.]
 Among a very limited number of requirements facing a candidate for the Navy Chaplaincy, there

---

[1] The instructions to the CADRAG board, ¶3, require the board to select "within the number you are authorized to recommend, those who best meet the needs of the Navy for Chaplains."  Lest the Board misunderstand this guidance and actually pick the best qualified or highest performing chaplains, COMNAVMILPERS makes it clear in ¶4: "the Navy needs to select minority officers to assume positions of increased importance and responsibility. Your commitment to aggressively ensuring eligible officers receive full and equal consideration, particularly those from minority segments of our society, is critical to ensuring each member of the Navy achieves his or her potential." *{But to make sure that the Board does not accidentally understand this to include "minority" religious segments of our society, the next sentence is:}* "In addition, the Navy has critical needs for Chaplains who are Roman Catholics.

is an age limit.  Until 2005 this limit was 40 years old, as the Navy's Instruction[2] stated that a:

•       "Chaplain Corps appointee must be able to complete 20 years of active commissioned service by age 60."   [The 2005 Instruction changed this requirement to age  68.]

The Deputy Chief of Naval Operations "may waive these restrictions for otherwise qualified applicants for appointment on the ADL or in the Reserve Component." ...

•       "when there is a shortage against authorized strength on the ADL which cannot be met" ... by other means;
•       under extraordinary circumstance (and the best interests of the Navy); or
•       "when a gross inequity to the applicant would otherwise result".

In practice, this waiver has been disproportionately exercised for Catholic candidates, without apparent regard to the "gross inequity" which flows to un-waived candidates.


**The Student Program**

In the accessions data which Defendants provided to their expert in 2005 (and which they provided to the *Larson* Plaintiffs nine months later), there are nearly complete records of all candidates for the Chaplain Corps who were considered by the C/A/R/E board between 1986 and 2005. [C/A/R/E stands for Chaplain Accession and Recall Evaluation; not all applicants to the Chaplain Corps were considered by the C/A/R/E board, many were blocked at the recruiter level.]

Among the 3,421 C/A/R/E decisions recorded in this data base, 945 were rendered for candidates applying for <u>accession</u> under the Student Program.

Of the 945 applications which the C/A/R/E board agreed to consider, 13 were received from candidates over the age of 40; seven of those were approved, i.e. granted waivers.  Seven candidates over the age of 40 were accepted into affiliation into the Student Program, with the seeming expectation that when they graduated, and completed their leadership experience, they might be offered Active Duty appointment.

Five of those seven students were Roman Catholic.

## Table 2.  Expected vs Observed;

---

[2] OPNAV (Naval Operations) INST (Instruction) 1120.9, "Appointment of Officers in the Chaplain Corps of the Navy", 20 December 2005, provides continuing guidance that the Chaplain Corps is required to follow in recruiting Religious Ministry Professionals (RMPs) of Religious Organizations (ROs) of the United States.  (This Instruction is available on line at Http://dodssp.daps.mil/Directives/1120_9.pdf.  SECNAV Instruction 1120.4A was  the predecessor guidance.)

**Student Program: Catholic Waivers vs non-Catholic Waivers**

| Denomination | Expected* | Observed |
|---|---|---|
| Roman Catholic | 0.62 | 5 |
| non-Catholic | 6.38 | 2 |

\* Based on the labor pool, as assayed by the Yearbook of Churches (2006);
8.89% of the clergy in America are Roman Catholic.

Even though the sample size in Table 2 is small, the statistical significance is obvious. [Chi square = 26.64; p < .0001.]

The Navy has behaved here in a manner which is inconsistent with random variation;
the Navy has behaved here in a manner which suggests that Catholics get preferential treatment.

**Supercession**

The Navy does not invest much in the Student Program, other than the resources required to manage it, but their return on investment is marginal, especially for Roman Catholics.

In the past 20 years, the Navy has accessioned 791 Chaplain candidates into the Student Program; 191 of these were Roman Catholic. In the past 20 years, the Navy has harvested 222 Active Duty Chaplains from the Student Program; six of these were Roman Catholic. Clearly, the Navy's preference for Catholics is not based on their dependability as supercession candidates.

**Table 3. Student Program**
**Admitted to Program; Advanced to Active Duty List**

| Denomination | Admitted to Student Program | Recommended to Active Duty List |
|---|---|---|
| Roman Catholic | 191 | 6 |
| non-Catholic | 600 | 116 |

\* This pattern is statistically significant, Chi Square, p<.001

**Direct Accession (the D4105A Program)**

Although the Secretary of the Navy has described the Student Program as the "primary source" for additions to the Active Duty List, as Table 3 shows, the program falls far short of this goal.

Direct accessions (the D4105-A Program) make up most of the difference. [Remaining ADL requirements are met via recycling (Recall and Inter-Service Transfer.)]

In the past 20 years, where the Student Program contributed only 122 Chaplains to the Active Duty List, direct accession via D-4105-A brought in 715 Chaplains.

And, again, in order to reach as many Catholics as possible, the DCNO granted a number of age waivers.

Because there is a *possibility* of a difference in the likelihood of an age waiver as a function of the candidate's faith group cluster, as well as his or her age, and even a possible confounding in that the applicant pool suffered a relative collapse in 2001, it is useful to separate the data counts along each of these dimensions.

Table 4 provides data on the number of D4105-A candidates considered by the C/A/R/E board.

**Table 4.** Candidates considered by the C/A/R/E Board for D4105-A

| Period | AGE | RC | LIT | NL | SW |
|--------|--------|-----|-----|-----|-----|
| < 2001 | <40 | 52 | 272 | 248 | 47 |
| | 40 & 41 | 20 | 36 | 8 | 5 |
| | >42 | 89 | 10 | 6 | 2 |
| > 2000 | | | | | |
| | <40 | 10 | 25 | 94 | 6 |
| | 40 & 41 | 0 | 2 | 5 | 1 |
| | >42 | 6 | 7 | 16 | 1 |
| All Years | | | | | |
| | <40 | 62 | 297 | 342 | 53 |
| | 40 & 41 | 20 | 38 | 13 | 6 |
| | >42 | 95 | 17 | 22 | 3 |

Table 5 provides data on the number of D4105-A candidates recommended by the C/A/R/E board.

**Table 5.** Candidates recommended by the C/A/R/E Board for D4105-A

| Period | AGE | | RC | LIT | NL | SW |
|--------|--------|---|-----|-----|-----|-----|
| < 2000 | <40 | | 50 | 216 | 145 | 27 |
| | 40 & 41 | | 20 | 27 | 6 | 3 |
| | >42 | | 77 | 6 | 1 | 1 |
| >2000 | | | | | | |
| | <40 | | 10 | 19 | 81 | 6 |
| | 40 & 41 | | 0 | 1 | 4 | 1 |
| | >42 | 5 | 3 | 5 | 1 | |
| All Years | <40 | | 60 | 235 | 226 | 33 |
| | 40 & 41 | | 20 | 28 | 10 | 4 |
| | >42 | | 82 | 9 | 6 | 2 |
| | | | 162 | 272 | 242 | 39 |

These data invite multi-variate analysis.  An Analysis of Variance was applied to (a) the number of candidates considered, (b) the number of candidates recommended for accessioning (note that every candidate over the age of 40 who was recommended had to be granted a waiver), and (c) the likelihood of being recommended for accessioning; across (1) age, (2) faith group cluster, and (3) the shift at 2000/2001 in the data pool (and the Navy's alleged termination of quotas).

The primary ANOVA table is appended here as Endnote 3.

Note that across every variable here, the Navy's pattern of decisions  is statistically significantly different from even-handed with respect to denomination.

First, the number of cases considered is different than the number to be expected based on the distribution of denominations in the labor pool.  The Navy recruiters forwarded disproportionately too many Catholic applications, and far too few applications from non-Liturgicals  ($p < .001$).

Second, the number of cases recommended, even given the imbalance in the number considered, shows that Roman Catholic candidates are given waivers more frequently than any other denomination  ($p < .001$).

Third, regardless of age, Catholics were recommended for accession more often than any other denomination.

**Table 6.**   Accession Rates vs Candidate age and Faith Group Cluster

| Age Segment | Roman Catholic | Liturgical | non-Liturgical | Special Worship |
|-------------|---------------|------------|----------------|-----------------|
| < 40 | .98 | .77 | .72 | -isd- |
| 40 & 41 | -isd- | -isd- | -isd- | -isd- |
| > 41 | .85 | .51 | .24 | -isd- |

* isd = insufficient data [Sample sizes are so small that the results are unreliable.]

This preference for Catholics is particularly pronounced for the older candidates.  A 98% acceptance rate for candidates under 40 years old, with 75% of the non-Catholics being recommended for accession, turns into an 85%  acceptance rate for Catholic candidates over 41 years old, with only 33% of the older non-Catholics being recommended for accession ( $p < .001$; $p < .0004$).

Fourth, there is an interaction in selection rate, faith group cluster and the Navy's shift in quotas in 2000.

Prior to 2001, Liturgicals were preferred over non-Liturgicals; then in 2001 (when the law suits started, and the quotas were supposedly abandoned) the preference for Liturgicals vs non-

Liturgicals reversed, and non–Liturgicals were selected in preference to Liturgicals. [If one picks the time period carefully, as Dr. Siskin has done, this reversal can be averaged, leaving the (false) impression that there was no difference in selection rates.] p < .03 (one tailed test.)

C/A/R/E board action reflects the delegated DCNO determination that an age waiver is to be granted, but C/A/R/E board action is neither the beginning, nor the end, of the accession decision. Prior to the C/A/R/E boards deliberations, recruiters and recruiter centers collect applications, affirmatively seeking some, and discouraging others.  And after C/A/R/E board recommendation, assignment to active duty is contingent upon other priorities at DCNO and the availability of a billet from COMNAVCRUITCOM.

Figure 1 graphically portrays what happens across this series of hurdles, reflecting both the relationship between the candidate pools considered from the population of chaplains available to serve, as well as the actions taken post C/A/R/E board review.



Note both (1) the extreme priority placed on Roman Catholic candidates over candidates from all other denominations, at every step along the way, and (2) the systematic erosion of equity as candidates are considered, recommended and assigned to Active Duty.

This pattern of results cannot have happened by random chance, p <.000 . . . 0001.

**Certification and Oath**

I certify under the penalties of perjury, (a)  that this is my work, (b) that I am competent to analyze this data, and (c) that the conclusions represented here are mine, true, complete, accurate and scientifically certain to the best of my knowledge and belief.


_____/S/_____

Harald R. Leuba, PhD               7 July  2007
Potomac,     Maryland                        USA


**APPENDICES**

Appendix A.   Catholics are more likely to reach retirement than non-Catholics; and they get
                       bigger pensions than non Catholics..

Appendix B.   Catholics are more likely to be given medical retirement than non-Catholics.

Appendix C.   Catholics get proportionally much more than their "statistically fair share" of the
                       promotions.

Appendix D.   Catholics are protected from exposure to Selective Early Retirement:


Appendix E.   Continuation in Service Boards give de facto preference to Catholics and halt career
                       progress for many non-Catholics.

**Endnotes**

1.               Chaplains on Active Duty past age 62, based on the Alpha Roster, 10 Oct 2006.

2.               Comment of Veronica Berto's Affidavit, 3 March 2007.

3.               Analysis ov Variance Table for D4105-A Program Selection Rates

**Appendix A.**

Catholics are more likely to reach retirement than non-Catholics;
and they get bigger pensions than non Catholics.

The data in Table 7 are a summary of all the completed Chaplain careers recorded in Volumes VIII and X of the Chaplain Corps History. This is the official summary, based on Navy records, and as verified by the officers whose records are presented, of what happened to every Chaplain who served more than an incidental amount of time on Active Duty between January 1972 and December 1991. [The Navy stopped publishing the Biographical Data History volumes in 2001 after this series of lawsuits began.]

**Table 7.** Career Outcomes across Faith Group Clusters
Retired vs Released from Active Duty

| | faith group | Sample Size | << Number of | Chaplains who reached at least this rank | | | >> |
| | | | JG | LT | LCDR | CDR | CAPT | ADM |
|---|---|---|---|---|---|---|---|---|
| Chaplains | L | 166 | 166 | 162 | 88 | 23 | | |
| **Released** | NL | 134 | 134 | 133 | 66 | 14 | | |
| From | RC | 88 | 88 | 88 | 40 | 14 | 1 | |
| Active | S | 22 | 22 | 21 | 9 | 1 | | |
| Duty | Total | 410 | 410 | 404 | 203 | 52 | 1 | |
| | non RC | 322 | 322 | 316 | 163 | 38 | | |
| | | | | | | | | |
| Chaplains | L | 274 | 274 | 273 | 272 | 223 | 137 | 6 |
| **Retired** | NL | 205 | 205 | 204 | 157 | 148 | 71 | 0 |
| From | RC | 150 | 150 | 150 | 150 | 132 | 82 | 3 |
| Active | S | 12 | 12 | 12 | 11 | 8 | 4 | |
| Duty | Total | 641 | 641 | 639 | 590 | 511 | 294 | 9 |
| | non RC | 491 | 491 | 489 | 440 | 379 | 212 | 6 |

Of the more than 1,000 Chaplains who completed their careers in this 20 year period, 410 were commissioned and then released from active duty before reaching retirement. Some of these were released voluntarily, as in they decided on their own not to continue in service; some wanted to stay but were forced out of the Service, as in CADRAG boards (Chaplain's Active Duty Retention Advisory Group) used to winnow the ranks.

On the other hand, the majority (61%) of the careers whose termination is recorded in these Histories, ran full term and ended in retirement.

These data are a bottom line census; they are not a sample (except that they cover only 20 years).

This is not a distorted picture of what happens at just one small step in the overall personnel management process; these data record the final outcome of every Chaplain's enrollment into the Chaplain Corps.

The data demonstrate that in the U.S. Navy Chaplain Corps, some denominations fare much better than others.

Whether this is because the more successful, or better treated, denominations are better at doing the job, or are simply just thought to be better, or whether for incidental and irrelevant reasons, some denominations are supported and encouraged and others are not, or whether there is an underlying, subliminal mechanism expressing prejudice, the statistical conclusion is certain:

There is evidence of statistical bias here.

Roman Catholics chaplains benefit in the system, largely at the seeming expense of the more numerous, but less blessed non-Liturgical Chaplains.

Released from Active Duty is not necessarily a discharge, but it is a loss of opportunity to serve and to be rewarded for Service.

Retired Chaplains end their careers at an average of 2/3 to 7/8 of a rank higher than those who are released from active duty.

Catholics who are released from active duty (frequently because of voluntary refusal to extend their tours) end their careers about where non-Catholics end theirs: roughly half of them make it to LCDR; only about 5% of them make it to CDR.

Catholics who retire, retire at an average rank higher than non-Catholics; 55% of the retired Catholics retire at CAPT or above; for non-Catholics this is only 43%.

These ratios (the patterns are clear in Figure 2) are statistically significant (binomial and Chi Square) at beyond the .01 level (three standard deviations.)

1.  Catholic Chaplains lose a few fewer of their numbers (37%) on the path toward retirement than non-Liturgicals (40%), and the losses tend to be voluntary:

2.  Catholic Chaplains tend to drop out in the early years of their careers. [The CADRAG data show that virtually all of the Catholic Chaplains who want to continue in service are approved for continuation.]  On the other hand, non-Liturgical Chaplains tend to be forced out prior to their entrance into the promotion zone for LCDR. [Again, this can be observed in the CADRAG board decisions. (See Appendix E).]

3.  In the curtailed careers (released vs retired) the Catholic candidates achieve slightly higher average rank at the time of severance than the non-Liturgicals in particular, or indeed all the non-Catholics as a group. (See Figure 2.)

4.  When the careers are allowed to run full term, (a) all the faith groups do better, i.e. rise further, than their fellows who were dropped along the wayside (of course) but (b) the Roman Catholic candidates achieve much higher average rank at the time of retirement than the non-Liturgicals in particular, or indeed all the non-Catholics as a group. (See Figure 2.)



**Appendix B.**

Catholics are more likely to be given medical retirement than non-Catholics.

The data in Table 8 are taken from the list of all completed Chaplain careers recorded in Volumes VIII and X of the Chaplain Corps History.  (Cf Table 7, Appendix A, above, and ¶ 14 of my Compendium Declaration, June 2005).

**Table 8.**
**Comparison of Conditions of Departure for Chaplains leaving the Corps**
Number of Chaplains

| OBSERVED | Active Duty Chaplains | Medical or Disability Retirements | Retired Chaplains | Chaplains Released from Active Duty |
|---|---|---|---|---|
| Col → | (1) | (2) | (3) | (4) |
| Roman Catholic | 213 | 12 | 150 | 88 |
| Liturgical | 335 | 9 | 274 | 166 |
| Non-Liturgical and Special Worship | 648 | 6 | 217 | 156 |
| **EXPECTED** (a) | | | | |
| Roman Catholic | | 4.8 | | |
| Liturgical | | 7.6 | | |
| Non-Liturgical and Special Worship | | 14.6 | | |
| **EXPECTED** (b) | | | | |
| Roman Catholic | | 5.8 | | |
| Liturgical | | 10.9 | | |
| Non-Liturgical and Special Worship | | 10.3 | | |

Expected (a) is based on the distribution of faith group numbers over all Active Duty Chaplains in the data base. (Column 1)
Expected (b) is based on the distribution of faith group numbers over all Chaplains who were released rather than retired. (Col 4)

It may seem like a "small matter" that something fewer than six or seven (12 - 5.8 or 12 - 4.8) "extra" Catholics were retired under medical terms while four or eight (10.3 - 6 or 14.6 - 6)  non-Liturgicals failed to be granted that status.  But:

•        This is statistically significant (Chi square = 16.21; p < .003 when compared to the total population and Chi square = 8.75; p < .01 when compared to the population who were released before being eligible for retirement under non-medical conditions.)

07mc269
EXHIBIT 3

And:

- In a milieu where every issue which can be subjected to numerical analysis shows a bias which works to the advantage of Roman Catholic clergy and to the disadvantage of non-Liturgical clergy, the story being told is not just about one small impact here, and another small impact there.

The pattern that emerges is a consistent practice which has the appearance of favoring Chaplains who are Roman Catholics, and marginalizing Chaplains who are not Liturgical.

In a setting where the Roman Catholic denomination is always represented on the Promotion Board, where Roman Catholic Chaplains routinely join the Chaplain Corps at a higher rank than most other Chaplains, where Roman Catholic Chaplains are the presumptive beneficiaries of numerous "perks" of office - for example being allowed to stay in the Service past their "required" retirement age, being given "medical" retirements disproportionately more often than their peers, passing through a revolving door to the Reserves, where they earn seniority and benefit for further promotion, etc, in a setting like that, there is both the appearance of the Navy's having established a "preferred religion", and the fact of widespread resentment among those who are not the beneficiaries of such preferential treatment. [I cite as proof that there is widespread concern over religious favoritism, the statements to that effect in the CNA Study[3], in March 2000.]

It is my expert opinion in this matter that the Navy's implementation of its Chaplain Corps personnel management policies has achieved a pattern of results which is statistically incompatible with the absence of denominational bias and which is consistent with the hypothesis that the Navy has established a favorite denomination. That denomination is Roman Catholic, and the disproportionate benefits which have been given to the preferred denomination have come, to a large extent, from opportunities denied to non-Liturgical clergy, especially non-Baptist, non-Liturgical clergy.

---

[3] Smith, Karen D, Ivancovich, John S., Reese, David L. "Promotions in the Navy Chaplain Corps", Center for Naval Analyses, Alexandria, Virginia 10 March 2000 CRM D0000149.A1/SR1.

**Appendix C.**

Catholics get proportionally much more than their "statistically fair share" of the promotions.


I have visited this issue in several Declarations.

Dr. Siskin routinely rejects my analysis by (a) disparaging it as "not a promotion study" or by (b) criticizing it as "post hoc." Then he substitutes data tallies which disaggregate both the data, and the events underlying promotion to such an extent that *he* finds no evidence of differential selection rates, and provides no opportunity to see the differences which are there.

There is no necessity here, to repeat my Declarations, nor to further rebut Dr. Siskin.

When the fog of argument is blown aside, the record speaks for itself. See Figure 2, above.

When their careers are over:

1. 61% of the Roman Catholics who were commissioned, rose to CDR or above;
2. 56% of the Liturgicals who were commissioned, rose to CDR or above;
3. 48% of the non-Liturgicals who were commissioned rose to CDR or above;
4. 26% of the special Worship Chaplains who were commissioned rose to CDR or above.

Whatever the reasons for this result, whatever the justification and nuances, whatever the debates about in zone and above zone, missing chaplains, age waivers and rank waivers, the bottom line data, the anecdotal examples, and the statistical inferences converge:

- At the end of everybody's career, Catholics are 10%, 25% and 125% more likely to be promoted to CDR, for example, than Liturgicals, non-Liturgicals and Special Worship Chaplains.

Similarly:

- At the end of everybody's career, Catholics are 12%, 150% and 130% more likely to be promoted to CAPT, for example, than Liturgicals, non-Liturgicals and Special Worship Chaplains.

**Appendix D.**

Catholics are protected from exposure to Selective Early Retirement

In a Declaration published as an Appendix to my Compendium, I wrote:

"34.    Table 1 compares Catholics to Non-Catholics, in terms of (a) the number potentially eligible for consideration by the FY-95 Chaplain Commanders' SER Board versus (b) the number who were considered.  It is to be noted that there is a clear tendency for Catholics not to be brought to the attention of this SER Board.

**Table 9*.**
**Referrals to FY 1995 Chaplain Commanders' SER Board**

| Faith Group | Total Eligible | Not Referred | Referred to SER | % Referred |
|---|---|---|---|---|
| Roman Catholic | 53 | 51 | 2 | 3.8 % |
| Other | 137 | 112 | 25 | 18.3 % |
| Total | 190 | 163 | 27 | 14.2 % |

[* Table 1 in the original source.]

"35.    The statistical probability of choosing just 2 chaplains out of 53 (3.8%) for referral to a SER Board, when the average probability is 14.2% or 18.3 %, is well outside the realm of statistical likelihood and well within the standard of proof cited by Dr. Siskin (Reference 2).

"36.    Considering the seeming "mechanical" nature of the rules for SER eligibility as established in the SECNAV memorandum (Attachment 1 to Reference 4) as well as the fact that those rules controlled the establishment of 38 different SER Boards, it seems at least improbable that there was an ex-process, Faith-Based factor operating in the selection of Chaplains for consideration by the FY-95 Chaplain Commanders' SER Board.  And yet, here we have proof of bias* as shown in this statistical test (which one is invited to perform since Denomination is prominently displayed on the Lineal List.)"

My observation that there is disparate impact in the Navy's rules for determining eligibility for SER has not been challenged or rebutted by the Defendant's.  Nor have the eligibility rules been evaluated for face neutrality by them, nor has a case been made for the business reason for the disparate impact.

Compounding the denominationally discriminatory nature of the Navy's rules for determining a priori eligibility for SER (above) is the denominationally discriminatory nature of the Navy's procedure for implementing SER.

A candidate who is not selected for involuntary retirement at one convening of the SER board, may can be considered again, and again, and again, until - in the end - he is promoted out of reach, or forced into involuntary retirement by a SER board which does not value his continued service.

| **Table 10.** | % of all CDR's in the Corps | % of all CDR's said to be "eligible" for SER | Relative Likelihood of Exposure to SER Action |
|---|---|---|---|
| Roman Catholic | 24.88 | 12.43 | 49.96 % |
| Liturgical | 34.44 | 31.35 | 91.03 % |
| Non Liturgical | 35.89 | 52.43 | 146.09 % |

**Appendix E.**

Continuation in Service Boards give de jure preference to Catholics
and halt career progress for many non-Catholics.

In a recent Declaration I reported on a series of Navy documents that came to me from a FOIA request issued by a person I do not know.

These records report the existence of a Chaplain Corps personnel selection board whose **purpose** was to select for continuance on Active Duty or recommend involuntary Release from Active Duty, from among journeyman chaplains who had expressed the wish to continue on Active Duty.  This decision was made in a context which had explicit preference for Roman Catholics (see the "critical shortage" language) and at least the potential for implicit preference for Liturgicals (75% of the non-Catholic members of the CADRAG board were Liturgicals).

The net effect of these two pressures was:

1.      To retain all the Catholics who wanted to stay in service[4].

2.      Because the CADRAG board was pressed to retain the Catholics and told to select a fixed number of Chaplains for release, non-Catholics suffered under the reactive pressure to eliminate "somebody"; and

3.      Because 75% of the non-Catholic members of the CADRAG board were Liturgicals, any operation of "like, likes, like" would take a toll on the non-Liturgical Chaplains being considered.

The data analysis bore this out.


Results

The data cover CADRAG decisions made concerning 246 chaplains who were both (a) eligible for and (b) requested to be considered for, extension (or continuance) on active duty.

Table 11 summarizes the board's decisions tallied by "faith group cluster" - but I have not used the Navy's "faith groups".  Instead of using the Navy's (I) Roman Catholic, (II) Liturgical Protestant,

---

[4]  A surprising number of them drop out before their official tours are over.  Catholics lose nearly 9 times as many chaplains in their first year (5.1%) as do non-Baptist, non-Liturgicals (0.6%).  See Table K-7 in my Compendium.]

(III) Non-Liturgical Protestant and (IV) Special Worship Group, I used groups based on the Navy's de facto preference for denominations.

Recently (see "The Siskin Conjecture"), I have used an operational definition of "favored denominations". I simply look at which denominations the Navy assigns to its selection boards (promotion boards, SER boards and C/A/R/E boards) and let that distribution define the de facto preference pattern:

Tier I   The denomination(s) which is/are assigned to all or to virtually all selection boards
             This is Roman Catholics, and there is no "close second".

Tier II   The denominations which are frequently assigned to a selection board, but not "always" assigned or even almost always assigned.

|  | |
|---|---|
| This is SB[5] | (They are on about half as many boards as the Catholics) |
| ELCA | (They are on about 1/3 as many boards as the Catholics) |
| PUSA | (They are on about 1/3 as many boards as the Catholics) |
| and UM | (They are on about 1/3 as many boards as the Catholics) |

Tier III All other denominations.

**Table 11**
**Probability of Selection for Continuation**
**Candidate Denominations Tiered**

| Faith Cluster | Number Considered | Number Selected | Number Rejected | Percent Continued | Percent Rejected |
|---|---|---|---|---|---|
| Tier I | 46 | 43 | 0 | 100% | 0% |
| Tier II | 85 | 69 | 8 | 89.6% | 9.4% |
| Tier III | 115 | 86 | 18 | 82.7% | 15.7% |
| Total | 246 | 198 | 26 | 88.6% | 10.3% |

* Number Considered includes selected + rejected + alternates.

This pattern of results (even without considering that the Siskin Conjecture predicts an ordering from Tier I to Tier III) is statistically significant (using a Chi Square statistic) at $p<.001$ (more than three standard deviations.) Chance alone cannot account for this preference among the denomination-based clusters.

---

[5] SB stands for Southern Baptist; ELCA is the Lutheran Church of America; PUSA is the Presbyterian Church of the USA; and UM stands for United Methodist.

This pattern is also consistent with the results from the 1981/82 C/A/R/E.  In 1981 and 1982 the C/A/R/E Board undertook a "continuation" consideration for 27 chaplains.  Twelve of these chaplains were Roman Catholic; ten were continued.  Of the remaining 15 non-Catholic chaplains, only 3 were continued.

It is clear, based on this analysis of the FOIA data and corroborated by the analysis of the 1981/82 C/A/R/E Advisory Group continuation considerations, that there is denominational preference at work in the Corps' decision about which denominations to allow to continue.

Catholics, as usual, are preferred over non-Catholics, and the second favorite denominations (three Liturgical [ELCA, PUSA, and UM] and one non-Liturgical [SB] denomination) are preferred over everybody else.  This alone could account for the loss of non-Baptist, non-Liturgical "considers" as the promotion board lists are prepared for LCDR, CDR and CAPT. [Catholics lose 3.1% of their chaplains during the 3 years following entrance into the CDR zone; non-Baptist, non-Liturgicals lose 11.7% during these three years.[6]]

Anecdotal Support for this systematic Denominational Preference

In the roughly 250 decisions which the CADRAG issued, four were overruled by the approving authority, and one of the chaplains who had not asked to be considered for a continuation seems to have been enticed into staying.

Of the four CADRAG decisions which the Chief of Chaplains reversed, three benefitted Roman Catholics whom the CADRAG had recommended to Inactive Duty.

>Ronald Chiasson had been recommended for RAD;
>>the CoC asked that he be extended until 1994.
>>Ref 1[7] indicates that he was RAD 10/90.
>Leslie Colaco had been recommended for RAD;
>>the CoC asked that he be extended to age 60.
>>Ref 1 indicates a tour in Japan 90-92 followed by one in Iceland.
>Stanley Czarnota had been recommended for RAD;
>>the CoC asked that he be extended.
>>Ref 1 indicates a tour in Maine 90-93 followed by one in Great Lakes.

One decision for an Alternate was changed to an "out".  CADRAG had recommended
>Lyrice Marsh, a CFGC, for alternate status (in case the end strength allowance
>>provided a billet.)  The CoC changed this.
>>Ref 1 indicates Marsh was RAD 9/89.

---

[6]  See Table K-8 in my Compendium.

[7]  Reference 1 here is the Chaplain Corps' Biographical Data,  History Volume X.

**Endnote 1.**

Chaplains Serving on Active Duty past the age of 62
Based on the Alpha Roster for 13 October 2006

I have been provided with a copy of a pdf file entitled "AD Chaplains: The White Pages".

This is an 89 page alphabetical list of all the Chaplains on active duty, together with their rank, duty station, address, and telephone and FAX contact information.

The list does not include any information about the Chaplain's denomination or date of birth.

I used software to convert the pdf file to Rich Text.

I edited the text file in Word Perfect to omit everything except the Chaplain's name and rank.

I converted that file into a "paste" module for an Excel spread sheet, entered it into Defendants' accessions data base and sorted the records by name, noting the correspondence between presence on the White Pages, and that chaplain's accession record in the data base I received in July 2006.

For the names where there was a clear match, I estimated the Chaplain's age on 13 October 2006 based on his/her age in the accessions data base on the record date in the data base.

There were 14 Chaplains over the age of 62.

There were 154 chaplains in the White Paper who were not in the Accessions data base. Some of these, notably the LTJG and LT appointees and the "Pending" appointees, probably occurred after the data period covered by the accessions data base; others, may have been accessioned before the data period covered by the accessions data base.

I listed the missing names in alphabetical sequence and compared them to the Chaplain's History, Volume X. I found one name.

Here is my estimate of the Chaplains age 62 or over on Active Duty on 13 October 2006:

62   Kaprow, Maurice S.
63   Pugliese, Frank A.
63   PETRUSKA, WILLIAM MARTIN
64   Geinzer, John A
64   Scordo, Joseph A.
64   Trapani, Antonio
65   Berchmanz, Anthony
65   Neis, William P.
67   Gervacio, Adrian
68   Walsh, Francis E.

69   Erestain, Alfonso E.
69   Finley, James F.
71   D'Souza, Matthew F.
71   Mulkerin, Terrance J.
72   Welch, Bernard J.

**Endnote 2.**

Declaration of Veronica K. Berto  9 March 2007
re:
Chaplains Serving on Active Duty past the age of 62

Veronica Berto swears under oath that she has been a Program Analyst in the Force Structure Division of the Chief of Naval Chaplains' Office since December 17, 1991.

One must assume that with this experience, and distance from the top, Ms. Berto is not mistaken or uninformed.

Since she has been identified by the Defendants as a designated source witness, one must assume that she speaks for the Defendants.

Among several other paragraphs, Ms. Berto swears:

"5.  The recall of Retired Reserve chaplains described in paragraph 4 allows the Navy in general, and the Chaplain Corps in particular, to utilize personnel with, as SECNAVINST 1820.2B, SECNAVINST 1820.2C, and OPNAVINST 1820.1 all state, "critical professional skills."  In this context, the six Roman Catholic chaplains currently recalled to active duty from the Retired Reserve reflects (sic) the Chaplain Corps current shortfall of Roman Catholic chaplains to minister to the needs of Roman Catholic Sailors and Marines."

**I am shocked!**

First:  As a "reasonable man" (if I may assume that status for myself), this statement seems to be a flat contradiction to the Defendants' posture in *Larson* that they stopped using quotas in planning for accessions (by which in their use of the word they mean additions to the Active Duty List, including "Recall".)   This is a clear example, to me, of the Navy saying one thing to one Court and another thing to a different Court - but this is the *same* Judge.  And *that* Judge believed the Navy in *Larson* and found that since the Navy had stopped using quotas, the claim of discrimination based on quotas was "moot".

Second:   Regardless of the misrepresentation in their pleadings to the Court in *Larson*, Ms. Berto is here affirming that the Navy values Catholics especially, and the Navy is therefore justified in waiving requirements that apply to other denominations, just so that the Navy can have more *Catholic* chaplains.

There is no established, published, referenced standard supporting a so-called "shortfall" of Roman Catholic chaplains in the Navy.  There is only careless rhetoric, and unfounded folklore.

Third:   Ms. Berto's claim that there is a shortage of "critical professional skills" (in particular a shortage of Catholic chaplains in the Navy) may be an honest belief on her part, or an embraced mantra, but it is not an established fact.   In military manpower planning, the word "shortage", the concept of "shortfall", is not an opinion, it is a calculated result.  One compares an **approved** mission-based requirement to available resources and if there is a negative match (a shortfall), that is called a shortage.  And ameliorative action is justified.

In the present instance, the Catholic Church says that *it* has a shortage of priests - because it cannot find enough young men to go into the priesthood, or enough ordained priests to staff all the established parishes.  The Catholic Church measures need by established parishes.

The Navy does not measure need; it merely asserts that there must be a shortage, because when there was a Catholic as the Chief of Chaplains he said that there was a shortage, and the Navy {Ms. Berto?}, ever loyal, has not challenged that assertion.

According to the best measures of the availability of clergy in the market place[8] roughly 9% of the clergy persons in the USA are Roman Catholic.  And according to that source, which has published a continuing series of estimates from 1916 to today, not all churches require the same number of clergy per penitent.  The orthodox (lower case "O") denominations, including the Roman Catholic, have, on the average, 1 clergy person per 2000 church members.  The average for all other denominations is 1 clergy person per 286 church members.

The Navy has, by its own count, some 124,075[9] enlisted Sailors and Marines who identify themselves as Roman Catholic, and (see the Material Facts asserted by the Defendants, cf Table 1) there are 149 Roman Catholic chaplains.  This is a ratio of 1 priest per 832 believers, or nearly 250% more priests per Catholic penitent in the Navy than occur in the general USA public.

That is not a shortage; it is an extravagance - at the expense of the non-Liturgical Sailors and Marines who are under-served,  in a system which fixes the total number of chaplains, and arbitrarily picks *too many* Catholic Chaplains.

---

[8]  The National Council of Churches of Christ in the USA publishes the "Yearbook of American & Canadian Churches", a handbook of statistics and essays on religious practice in Canada and America, including data on church membership and the numbers of clergy in North America from 1916 to 2005.  The data in this yearbook provide recent counts of clergy in the USA totaling 546,665 - of whom 48,573 are Roman Catholic; this is 8.9%.

[9]  Data as of 12/31/2002. Statistics courtesy of the Armed Forces Chaplains Board of the U.S. Department of  Defense

**Endnote 3.**

## Analysis of Variance Applied to D4105-A data

Anova: Two-Factor With Replication; Candidate's Faith Group Cluster and Age
CARE Board action - Selection Rate

| SUMMARY | RC | LIT | NL | Total |
|---|---|---|---|---|
| *<40* | | | | |
| Count | 2 | 2 | 2 | 6 |
| Sum | 1.961538462 | 1.554117647 | 1.44637955 | 4.962035656 |
| Average | 0.980769231 | 0.777058824 | 0.72318978 | 0.827005943 |
| Variance | 0.000739645 | 0.000582007 | 0.03837135 | 0.022704863 |
| | | | | |
| *40 & 41* | | | | |
| Count | 2 | 2 | 2 | 6 |
| Sum | 2 | 1.25 | 1.55 | 4.8 |
| Average | 1 | 0.625 | 0.775 | 0.8 |
| Variance | 0 | 0.03125 | 0.00125 | 0.035 |
| | | | | |
| *>41* | | | | |
| Count | 2 | 2 | 2 | 6 |
| Sum | 1.698501873 | 1.028571429 | 0.47916667 | 3.206239968 |
| Average | 0.849250936 | 0.514285714 | 0.23958333 | 0.534373328 |
| Variance | 0.000506740 | 0.014693878 | 0.01063368 | 0.079747884 |
| | | | | |
| *Total* | | | | |
| Count | 6 | 6 | 6 | |
| Sum | 5.660040334 | 3.832689076 | 3.47554621 | |
| Average | 0.943340056 | 0.638781513 | 0.57925770 | |
| Variance | 0.005634899 | 0.023229076 | 0.07981507 | |

ANOVA

| Source of Variation | SS | df | MS | F | P-value | F crit |
|---|---|---|---|---|---|---|
| Sample | 0.313841394 | 2 | 0.15692070 | 14.4070718 | 0.001565 | 4.25650 |
| Columns | 0.457709900 | 2 | 0.22885495 | 21.0114393 | 0.000406 | 4.25650 |
| Interaction | 0.131526543 | 4 | 0.03288164 | 3.0189012 | 0.077761 | 3.63309 |
| Within | 0.098027295 | 9 | 0.01089192 | | | |
| | | | | | | |
| Total | 1.001105132 | 17 | | | | |



**DEPARTMENT OF THE NAVY**
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
2000 NAVY PENTAGON
WASHINGTON, DC 20350-2000

OPNAVINST 1730.1D
N097
06 May 2003

<u>OPNAV INSTRUCTION 1730.1D</u>

From:  Chief of Naval Operations
To:    All Ships and Stations (less Marine Corps field addressees
       not having Navy personnel attached)

Subj:  RELIGIOUS MINISTRY IN THE NAVY

Ref:   (a) SECNAVINST 1730.7B
       (b) DoD Directive 1304.19 of 18 Sep 93
       (c) NAVPERS 18068F
       (d) U.S. Navy Regulations, 1990
       (e) Title 10, United States Code
       (f) MILPERSMAN
       (g) SECNAVINST 7010.6A
       (h) SECNAVINST 1730.8A
       (i) DoD Instruction 1325.7 of 17 Jul 01 (NOTAL)
       (j) SECNAVINST 1640.9B
       (k) JOINT PUBLICATION 1-05
       (l) SECNAVINST 1730.3G
       (m) Manual for Courts-Martial, United States 1984,
           Military Rule of Evidence 503
       (n) SECNAVINST 4651.8L
       (o) DoD 5500.7-R of Aug 93 (NOTAL)
       (p) OPNAVINST 4001.1D

Encl:  (1) Religious Ministry Report Format

1.  <u>Purpose</u>.  To implement reference (a) by providing for the
free exercise of religion for all naval service members, their
families, and all other authorized personnel; establish policy
and assign responsibility for providing religious ministry within
the Navy.  This is a complete revision and should be reviewed in
its entirety.

2.  <u>Cancellation</u>.  OPNAVINST 1730.1C.

3.  <u>Applicability</u>.  This instruction applies to all members of
the Navy.

4.  <u>Definitions</u>

    a.  <u>Religious Ministry</u>.  Religious Ministry is the entire
spectrum of professional duties performed by Navy chaplains and

OPNAVINST 1730.1D
06 May 2003

Religious Program Specialists to provide for or facilitate the
free exercise of religion and accommodates the religious
practices of military personnel, their families, and other
authorized personnel.

b.  Religious Ministry Team (RMT).  A RMT consists of at
least one chaplain and one Religious Program Specialist.  Other
members may include additional chaplains and Religious Program
Specialists, lay leaders, civilian clergy, contract personnel,
civilian staff, and other assigned military personnel.

c.  Command Religious Program (CRP).  A CRP is the command's
total collection of religious ministry and activities planned and
executed within a command by the RMT under the professional
supervision of a cognizant chaplain.  The CRP requires the annual
approval and logistical support of the commander/commanding
officer, whose authorization ensures that religious ministry
tasks are adequately budgeted and implemented.

d.  Chaplain.  A Navy chaplain is a commissioned officer who
is endorsed as a religious ministry professional by an
organization that has completed all administrative requirements
of the Department of Defense for certifying chaplains for
military service.  A chaplain provides for the free exercise of
religion for all military members of the Department of the Navy
(DON), their families, and other authorized personnel in
accordance with reference (b), and serves in a noncombatant
capacity as outlined in governmentally-approved international
conventions.

e.  Religious Program Specialist (RP).  An RP is a member of
the Navy enlisted rating defined in Chapter IV of reference (c),
who supports chaplains in providing religious ministry and
implementing CRPs as described in this instruction.  RPs are
combatants.

f.  Lay Leader.  A lay leader is an authorized, trained, and
command-appointed individual who facilitates, within the
framework of the CRP, the free exercise of religion by providing
a service consistent with his or her lay status.

g.  Divine Services.  Divine Service is a traditional term
used in Article 0817 of reference (d) to refer to public worship
and faith-based services conducted afloat, in the field, or on
military bases and installations by a military chaplain.

h.  Religious Offering Fund (ROF).  A ROF is a non-
appropriated fund established by the commanding officer to
provide a means by which voluntary contributions, as acts of
religious devotion, are accounted for, safeguarded and disbursed.

OPNAVINST 1730.1D
06 May 2003

i. <u>Area Religious Ministry Coordination Team (ARMCT)</u>. The ARMCT is an administrative structure designed to ensure the delivery of religious ministry across command boundaries in a geographic area in which religious ministry requirements exceed the capability of any RMT.

j. <u>Cooperative Ministry</u>. Cooperative Ministry is a coordinated effort among RMTs to assist commanders in meeting the broad range of religious ministry requirements and needs within geographic areas and across command boundaries.

k. <u>Chief of Chaplains</u>. The President appoints the Chief of Chaplains to perform such duties as directed by the Secretary of the Navy and Federal statute in accordance with sections 5031 and 5142 of reference (e). The Chief of Chaplains is the Director of Religious Ministry for the Department of the Navy, and the principal advisor to the Chief of Naval Operations, the Commandant of the Marine Corps, and the Commandant of the Coast Guard on religious ministry requirements and matters concerning both Chaplain Corps officers and Religious Program Specialists. As head of the Chaplain Corps, the Chief of Chaplains is the spokesperson to the military and to civilian religious communities regarding professional ministry matters.

l. <u>Deputy Chief of Chaplains</u>. The Deputy Chief of Chaplains is Deputy Director of Religious Ministry in the Department of the Navy and Chaplain of the Marine Corps in accordance with reference (a).

m. <u>Deputy Chief of Chaplains for Reserve Matters</u>. The Deputy Chief of Chaplains for Reserve Matters advises and assists the Chief of Chaplains and the Chaplain of the Marine Corps in directing, administering, and leading the reserve components of the chaplain and Religious Program Specialist communities. This includes primary responsibility in advising on administration, supervision, training, and mobilization of chaplains and Religious Program Specialists in the Naval Reserve.

n. <u>Senior Enlisted Advisor (SEA)</u>. The Senior Enlisted Advisor is the principal advisor to the Chief of Chaplains on all matters pertaining to the RP rating.

5. <u>Policy</u>

a. General Requirements:

(1) Commanders/commanding officers, hereafter referred

OPNAVINST 1730.1D
06 May 2003

to as commanders, shall provide for the free exercise of religion by implementing the policy and procedures set forth in this instruction.

    (2) Religious ministry manpower requirements shall be directed by the Chief of Naval Operations (N097).

    (3) The RMT shall consist of at least one chaplain and one RP.

    (4) Commanders shall ensure the chaplain's direct access to the commander as provided in Article 1151 of reference (d). Commanders shall:

        (a) Assign the command chaplain as a principal staff officer directly under the chief of staff or chief staff officer, or as a department head directly under the executive officer, and shall maintain the chaplain's direct access to the commander.

        (b) Assign the chaplain as a director or principal staff officer to the commander in naval medical centers and as a director, department head or principal staff officer to the commander in naval hospitals.

    (5) The chaplain shall serve as the principal advisor to the commander on all matters related to religious ministry and shall advise on ethical and moral matters and issues pertaining to the command.

    (6) The CRP shall be funded and managed as an integral and essential element in command planning, programming, and budgeting activities.

    (7) In accordance with Article 1063 of reference (d), chaplains are noncombatants, shall not bear arms, and shall not participate in combatant activities that compromise noncombatant status.

    (8) RPs, as combatants, will provide physical security for chaplains as situations require.  Specific duties will include but not be limited to:  rigging and unrigging for Divine Services and other CRP events; recruiting, training, and supervising CRP volunteers; publicizing CRP programs and events; organizing, coordinating, and supporting religious education programs; serving as a bookkeeper and custodian of an ROF; providing library multi-media resource center services onboard ships; managing CRP program elements and logistical support; assisting in determining religious ministry facility requirements afloat and ashore.  Additional duties assigned to RPs shall not prevent RPs from supporting CRP activities.

OPNAVINST 1730.1D
06 May 2003

(9) In accordance with Article 1010 of reference (d), chaplains shall be designated and addressed in official communications by title of his or her grade and name.  In oral official communications, officers of the Chaplain Corps may be addressed as "Chaplain."  In other forms of communication, chaplains may be addressed by common religious titles or forms of address normally and traditionally used within particular faith groups or religious organization (e.g., Father, Imam, Pastor, Rabbi, Reverend).

b.  Religious Ministry Tasks.  Each command or unit shall have an assigned or appointed RMT to provide the religious ministry tasks described herein.  For commands and units which do not have a chaplain and RP permanently attached, a host command or the Immediate Superior In Command (ISIC) shall appoint in writing an RMT to provide religious ministry in accordance with these tasks.  All tasks performed will be subject to the approval of the respective commander and in accordance with all applicable instructions.  Religious ministry tasks are:

(1) Command Advisory Task.  Assess the command and advise the commander and other members of the command on:

(a) Religious ministry issues related to religious expression and religious ministry requirements to include personal and family spiritual readiness, religious discrimination, and cooperative ministry (internal to the command).

(b) Core values, moral, ethical and related issues.

(c) Improvements to quality of service to include issues related to quality of life, quality of work life, human values, unit enhancement, retention, personnel, and family issues.

(d) Command, personnel, and family morale issues.

(e) Cultural and religious issues (both internal and external to the command) related to unit operations.

(2) Religious Ministry and Accommodation Task:

(a) Assess, identify, and research command religious ministry requirements.

(b) Plan, schedule, prepare, conduct, and monitor worship services to include weekly, special, seasonal, and appointed occasions.

OPNAVINST 1730.1D
06 May 2003

     (c) Develop programs to facilitate individual and group religious expression and accommodation.

     (d) Participate in cooperative ministry with all RMTs to provide for the religious needs of all authorized personnel in a defined geographical area.

     (e) Plan, schedule, prepare, and conduct other religious ministry, to include funerals, memorial services, burials, sacramental acts, ordinances, rites, dedications, ceremonies, weddings, rituals, and other spiritual acts.

     (f) Develop, plan, train, coordinate and implement the Lay Leader program in accordance with Section 1730-010 of reference (f).

     (g) Plan, coordinate, train, implement and maintain the ROF where authorized by reference (g).

     (h) Plan and provide support to chapel fellowship programs.

     (i) Identify, assess, and liaise with civilian religious and community organizations to enhance religious life within the military community by identifying a broad range of religious opportunities.

     (j) Provide religious ministry to prisoners of war (POWs) and other authorized personnel.

  (3) Outreach Task:

     (a) Develop, plan, and coordinate programs to facilitate participation in religious ministries.

     (b) Provide and promote personal and spiritual growth programs to include retreats.

     (c) Identify and coordinate opportunities within the civilian community for the expression of religious and humanitarian charity by members of the military.

     (d) Prepare and publish outreach-oriented religious communications for the benefit of military members.

     (e) Participate in cooperative ministry with all RMTs to provide outreach in a defined geographical area.

  (4) Pastoral Care Task:

OPNAVINST 1730.1D
06 May 2003

(a) Provide pastoral care and counseling.

(b) Provide pastoral visitation to workspaces, hospitals, confinement facilities and residences.

(c) Provide pastoral crisis intervention.

(d) Provide proactive crisis prevention to individuals, families, and small groups.

(e) Provide spiritual direction, enhancement and mentoring.

(f) Provide pastoral support for official ceremonies.

(g) Advise, evaluate, document, and make recommendations for conscientious objection applications, or reassignment/separation for humanitarian and hardship reasons in accordance with reference (f).

(h) Participate in cooperative ministry with all RMTs to provide pastoral care for all authorized personnel in a defined geographical area.

(i) Provide pastoral care to POWs and other authorized personnel.

(5) Training and Education Task:

(a) Provide appropriate command-wide education and training opportunities from a religious perspective on ethics, cross-cultural issues, relational and life skills, personal and spiritual well-being, crisis and suicide prevention, domestic violence, values training, character development, and other moral issues.

(b) Provide religious, group-oriented education and training, and scripture studies.

(6) Supervisory and Management Task:

(a) Identify, coordinate, and monitor Naval Reserve requirements.

(b) Prepare, plan, program, and execute budgets.

(c) Provide supervision and monitor performance of all assigned personnel and volunteers.

OPNAVINST 1730.1D
06 May 2003

     (d) Plan and provide for the professional development of all RMT personnel.

     (e) Provide administrative support.

     (f) Establish contract specifications and monitor performance in coordination with Navy contracting officers for provision of religious support as needed.

     (g) Plan the use, maintenance, and enhancement of religious ministry equipment and facilities.

    c.  Area Religious Ministry Coordination Team (ARMCT). Regional Commanders may establish, support, and enable ARMCTS in geographic areas and across command boundaries to enhance the use of resources to more effectively meet religious needs.  Regional Chaplains shall coordinate ARMCTS where established.  ARMCTs shall include all RMTs assigned to U.S. Navy commands in the geographic area.  The ARMCT shall:

     (1) Promote cooperative ministry by developing strategies and programs in order to assist commanders in identifying religious ministry requirements and resources in a geographic area.

     (2) Encourage resource sharing to meet the religious ministry needs of Sailors, family members and all other authorized personnel.

     (3) Respect faith group distinctions when assessing, developing and recommending plans to meet identified needs.

    d.  Religious Accommodation.  The conduct of Divine Services and the accommodation of religious practices shall be in accordance with Article 0817 of reference (d); Section 1731-020 of reference (f); and references (h), (i), and (j).

    e.  Religious Ministry Requirements.  Commanders shall:

     (1) Provide the Command Religious Program and use all proper means to develop and strengthen the spiritual well-being and operational readiness of command personnel by providing for the religious ministry requirements of service members, their families, and other authorized personnel.

     (2) Ensure that the RMT is provided logistical support for implementing the CRP in accordance with Article 0820 of reference (d).

OPNAVINST 1730.1D
06 May 2003

(3) Supplement religious ministry resources during joint, combined, and or multinational exercises or operations, in accordance with reference (k).  The policies and restrictions of this instruction will remain in effect.

(4) Authorize resource sharing between RMTs as necessary to include participating in a Regional ARMCT where established.

(5) Employ civilian clergy and appoint lay leaders to meet religious ministry requirements for particular faith groups when those needs cannot be provided by available Chaplain Corps officers or other military chaplains in accordance with reference (l) and Section 1730-010 of reference (f).

(6) Ensure the protection of privileged and confidential communications as provided for in reference (m).

(7) Establish and maintain all ROFs in accordance with reference (g).

(8) Ensure chaplains, RPs, and religious lay leaders maintain the professional credentials, certifications, training, and military qualifications required to perform their religious ministry-related military duties.

(9) Ensure RMT personnel attend professional training (e.g., leadership courses, professional ministry seminars, Chief of Chaplains' annual Professional Development Training Courses and Workshops) to fulfill military requirements and maintain professional and ministerial credentials as authorized in reference (n).  Appropriated funds are authorized to support such training.

(10) Ensure that RMTs participate in area-wide training.

(11) Assign chaplains to perform duties related to religious ministry in accordance with Article 1063 of reference (d).  Chaplains shall not be assigned duties that violate noncombatant status or the religious practices of the chaplain's religious organization, undermine privileged communication, as defined in reference (m), or involve the management of funds other than the ROF.  Chaplains shall not be assigned to serve as a member of a court-martial or on a Family Advocacy Program Case Review Committee; coordinate or advocate in the Sexual Assault Victim Intervention program; act as treasurer, director, or solicitor of non-ROF funds; stand watches other than those of Duty Chaplain; or participate in any activity directly prohibited by approved international conventions defining the status of non-combatant.

OPNAVINST 1730.1D
06 May 2003

    (12) Ensure that chaplains comply with restrictions regarding outside employment and honoraria contained in reference (o).  Chaplains shall obtain advice from the cognizant staff judge advocate and receive permission of the commander prior to engaging in any outside employment and accepting honoraria or gifts including gifts of travel in accordance with references (o) and (p).

    (13) Issue implementing instructions regarding the storage and custody of sacramental wine in accordance with Article 1162 of reference (d).

    (14) Provide and maintain equipment, furnishings and facilities essential to religious ministries.

6.  <u>Organizational Structure and Responsibilities</u>.  The basic organizational structure and appropriate duties for the following offices are:

    a.  Chief of Chaplains.  In accordance with reference (a), the Chief of Chaplains, as the Director of Religious Ministry for the Department of the Navy, shall:

    (1) Advise the Secretary of the Navy, the Chief of Naval Operations, the Commandant of the Marine Corps and the Commandant of the Coast Guard on all matters pertaining to the free exercise of religion.

    (2) Direct Chaplain Corps officers, RPs, and auxiliary and contract clergy in accordance with reference (l), in accordance with Section 1730-010 of reference (f), and all other designated persons in the conduct of religious ministry within the Department of the Navy.

    (3) Serve as the program manager for Religious Ministry within the Navy and advise the Chief of Naval Operations on all religious ministry requirements.

    (4) Serve as program sponsor for the professional development, education and training of Chaplain Corps officers and RPs.

    (5) With respect to all duties pertaining to the procurement, distribution and support of personnel of the Chaplain Corps, report to and be supported by the Chief of Naval Personnel in accordance with Section 5142 of reference (e), and shall coordinate personnel issues with Navy Recruiting Command and Commander, Naval Reserve.

OPNAVINST 1730.1D
06 May 2003

b.  Deputy Chief of Chaplains.  As Deputy Director for Religious Ministry in the Department of the Navy and Chaplain of the Marine Corps, in accordance with reference (a), the Deputy Chief of Chaplains shall:

(1) Serve as the principal assistant to the Chief of Chaplains.

(2) As the Chaplain of the Marine Corps, supervise religious ministry in the Marine Corps.

(3) When delegated by the Chief of Chaplains, fulfill requirements as principal spiritual, moral and ethical advisor to the Commandant of the Marine Corps.

c.  Deputy Chief of Chaplains for Reserve Matters.  The Deputy Chief of Chaplains for Reserve Matters advises and assists the Chief of Chaplains and the Chaplain of the Marine Corps in all areas related to Naval Reserve chaplains and Religious Program Specialists.  The Deputy Chief of Chaplains for Reserve Matters serves in an additional duty capacity as the Force Religious Programs Officer for the Commander, Naval Reserve Force and as the Director of Religious Ministries for the Commander, Marine Forces Reserve.

d.  Senior Enlisted Advisor (SEA).  The SEA, as the primary enlisted advisor to the Chief of Chaplains, advises on all matters pertaining to the manning, utilization, training, professional development, welfare and morale of the RP community.

e.  Senior Supervisory Chaplain.  A Senior Supervisory Chaplain is the senior chaplain assigned to a fleet, force, type, bureau, or equivalent commander and shall:

(1) Advise the commander on all matters relating to religious ministry.  Advise the commander on manpower, personnel, professional development and religious facility requirements in the area of responsibility.

(2) Direct the commander's Command Religious Program.

(3) Establish the support and coordination for the delivery of religious ministry, coordinating with the appropriate Regional Chaplain for specific geographic areas.

(4) Sponsor and arrange for periodic RMT training opportunities.  Advise the commander on essential task skills and capabilities and plan for education and training as appropriate.

OPNAVINST 1730.1D
06 May 2003

f.  Regional Chaplain.  A Regional Chaplain is the senior chaplain assigned to a Navy Regional Commander or equivalent, and shall:

(1) Advise the regional commander on all matters relating to religious ministry within the region and advise the appropriate senior supervisory chaplain on manpower, personnel, professional development and religious facility requirements.

(2) Direct the Regional Commander's CRP.

(3) Encourage resource sharing between RMT's within the region's geographic area, and coordinate the delivery of religious ministry support within that area.  Coordinate ARMCTs where established by the Regional commander.

(4) Sponsor and arrange for periodic area-wide RMT training opportunities.

g.  Supervisory Chaplain.  A Supervisory Chaplain serves as senior chaplain and department head/principal staff officer/special assistant at a staff or unit level and shall:

(1) Advise the commander on all aspects of the Command Religious Program and advise the appropriate Senior Supervisory Chaplain/Regional Chaplain on manpower, personnel, professional development, and religious facility requirements.

(2) Provide Religious Ministry Tasks in accordance with this instruction.

(3) Direct and administer the CRP.

(4) As needed, coordinate resource sharing with other RMTs through the Senior Supervisory Chaplain/Regional Chaplain.

h.  Chaplain.  All Chaplains at the unit level shall:

(1) Advise the commander on religious matters within the command and advise the appropriate Supervisory Chaplain on manpower, personnel, professional development, and religious facility requirements.

(2) Administer the CRP.

(3) Provide Religious Ministry Tasks in accordance with this instruction.

(4) As needed, coordinate resource sharing with other RMTs through the Supervisory Chaplain.

OPNAVINST 1730.1D
06 May 2003

7. <u>Action</u>.  Commanders shall submit periodic religious ministry reports via the chain of command to Chief of Naval Operations (N097) in accordance with enclosure (1).  N097 shall issue guidance regarding reporting procedures and requirements.

8. <u>Report</u>.  The reporting requirement contained in enclosure (1) is symbol OPNAV 1730-1 per SECNAVINST 5214.2B.


                        V. E. CLARK
                        Admiral, U.S. Navy

Distribution:
SNDL Parts 1 and 2

OPNAVINST 1730.1D
06 May 2003

## Religious Ministry Report Format

Instructions:  N097 will issue guidance regarding report periodicity and specific religious ministry function requirements.  List only one religious ministry milestone per task.

Reporting Period_____

Command/Unit (include address):_____

_____

Command Chaplain:_____

Senior Religious Program Specialist:_____

Days deployed:_____

Days on exercises:_____

A.  CRP Activities:

1.  **Command Advisory Task:**

2.  **Religious Ministry and Accommodation Task:**

3.  **Outreach Task:**

4.  **Pastoral Care Task:**

5.  **Training and Education Task:**

OPNAVINST 1730.1D
06 May 2003

6.  **Supervisory and Management Task:**

B.  Religious Offering Fund (if applicable, include
Administrator/Custodian names and total amount of disbursements
to benevolence, and any ROF discrepancies noted during audits,
with corrective action):

_____
Signature of Commander/Commanding Officer              Date

LAR0358

# Study on Religious Affiliation in the Department of the Navy

## October 1999

EXHIBIT
18

# Outline

- Background
- Sources Used for Study
- Findings
  - Current Breakout of religious affiliation
  - Ratio of chaplain to service member per faith grouping
  - Historical Breakout of religious affiliation
- Billet Breakout
- Conclusions
- Recommendations

LAR0360

# Study on Religious Affiliation in the Department of the Navy Study

- Purpose:  To determine the faith group mix of the Chaplain Corps which provides sea service personnel the best access to religious ministry.

- Background:  Several issues have prompted the need to determine the faith group representation in the Department of the Navy:

  – The Chaplain Corps has never conducted an in-depth study of the religious affiliation of members in the Navy and Marine Corps.

  – A heightened interest in the faith group composition of the Department of the Navy from both the Department of Defense and Non-government organizations.

  – Chaplain Corps recruiters are finding it increasingly harder to access qualified clergypersons from certain faith groups.

2

# Sources Used for Study

- Navy Enlisted Information System (NEIS)
  - Data collected from enlistee at Military Entrance Processing Station (MEPS) and entered in a data field in the NEIS.
  - Enlistee chooses from a list of DOD religious faith codes which were originated years ago.
  - Enlistee verifies that all information on his Personnel Emergency Form is current at time of every PCS move. Religious affiliation is on that Form.
  - Navy Officer Information System (NOIS) has no data field in the system for religious affiliation, therefore no official religious codes are kept on officers.
- Headquarters Marine Corps Files
  - Data collected from officer/enlistee at MEPS
  - Officer/Enlistee chooses from the same DOD religious faith codes as Navy.
  - Every year USMC personnel verify religious affiliation with administrative office.

3

# Sources Used for Study

- Officer Master File (OMF)
  - Data for Chaplain Corps Officers is available from the OMF
  - Chaplains have Additional Qualification Designator (AQD) codes assigned upon entry into the Chaplain Corps
  - AQD codes are limited to 100 religious faith groups
  - AQD codes do not coincide with the DOD religious codes. The codes are Navy specific (500 series).
  - AQD codes can be entered and changed in the OMF by the Chaplain Corps Detailer
- Officer Billet File dated 31 August 1999
  - Number of activities which have funded chaplain billets

4



**Findings**

- Religious Affiliation in the Department of the Navy (USN&USMC personnel 496,485 as of 8/16/99)

LAR0364

# Findings

- Religious composition of the Chaplain Corps (30 Sep 99 -- 882)



Non-Liturgical 37%

SWC 5%

RC 21%

Liturgical 37%





# Chaplain Per Service Personnel

| Faith Group | Ratio |
|---|---|
| Baptists | 1 : 501 |
| Other Non-Lit | 1 : 132 |
| Total Non-Lit | 1 : 347 |

# Chaplain Per Service Personnel

| Faith Group | Ratio |
| --- | --- |
| Lutheran | 1: 172 |
| Methodist | 1: 258 |
| Presbyterian | 1: 73 |
| Episcopal | 1: 106 |
| Other Liturgical | 1: 33 |
| Total Liturgical | 1: 143 |

LAR03368

# Chaplain Per Service Personnel

| Faith Group | Ratio |
|---|---|
| Roman Catholic | 1: 717 |
| Jewish | 1: 105 |
| Orthodox | 1: 47 |

## Chaplain Per Service Personnel

| Faith Group | Ratio |
|---|---|
| Seventh-Day Adventist | 1 : 139 |
| Christian Science | 1 : 131 |
| Latter-Day Saints | 1 : 735 |
| Muslim | 1 : 450 |
| Buddhism | 0 : 1020 |
| Total SWC | 1 : 255 |

12

LAR0371



## Findings

- Historical Overview of Religious Affiliation in the Department of the (1979 to 1999)

|  | Sep 79 | Sep 89 | Sep 99 |
|---|---|---|---|
| No Pref. | 42% | 32% | 39% |
| RC | 25% | 27% | 26% |
| Liturgical | 13% | 13% | 9% |
| Non-Lit. | 17% | 25% | 23% |
| SWC | 3% | 3% | 3% |

13

# Findings

- Historical breakout by religious families

|  | Sep 79 | Sep 89 | Sep 99 |
|---|---|---|---|
| Baptist | 15% | 21% | 20% |
| Other Non-Lit | 2% | 4% | 3% |
| Methodist | 6% | 6% | 4% |
| Lutheran | 4% | 4% | 3% |
| Episcopal | 1% | 1% | 1% |
| Presbyterian | 2% | 2% | 1% |
| Liturgicals | .5% | .5% | .3% |

14

LAR0373

## Findings

- Historical breakout by religious families

| | Sep 79 | Sep 89 | Sep 99 |
|---|---|---|---|
| Roman Catholic | 25% | 27% | 26% |
| Jewish | .4% | .3% | .3% |
| SDA | .2% | .3% | .3% |
| CS | .3% | .2% | .1% |
| LDS | 1% | 1% | 1% |
| Muslim | .0% | .1% | .3% |
| Buddhism | .0% | .1% | .2% |

15

# Conclusions

- The largest percentage of service personnel have no religious preference (39%).

- Except for Roman Catholic, the composition of the Chaplain Corps exceeds the Department of the Navy's Faith Group Families percentages.

- The ratio per chaplain of Non-Liturgical (1:347) is twice as high as Liturgical (1:143)

- Faith groups with the highest ratio per chaplain

  – Latter-Day Saints  1: 735

  – Roman Catholic   1: 717

  – Baptists       1: 501

  – Muslim        1: 450

# Conclusions

- There are 1020 Buddhists in the Department of the Navy but not one chaplain. This makes them the highest ratio per chaplain if we had just one.

- Liturgical personnel have decreased 4% since 1979 while Non-Liturgical personnel have increased 6% since 1979.

- While the percentage of Roman Catholics has remained the same for the Navy (25%) since 1979, the U.S. Marine Corps percentage has decreased (32% to 29%) since 1979.

- There are 383 activities which have chaplains assigned.
  - 51% (194) activities have limited access to religious ministry.
  - 26% (99) activities have 3 or more billets assigned (48 of the 99 have limited access to religious ministry).

LAR03380

## Recommendations

- The composition of the Chaplain Corps reflect the following :

  – A minimum of 41% Non-Liturgical

  – A maximum of 27% Liturgical

  – A minimum of 26% Roman Catholic

  – A maximum of 6% Special Worship Category

- The FY00 recruiting aspirations be adjusted to the following:

  – 22 (26%) Roman Catholic

  – 18 (21%) Liturgicals (10 vice 20 direct)

  – 38 (44%) Non-Liturgical (27 vice 15 direct)

  – 8 (9%) SWC (6 direct vice 8 --1 J, 2 LDS, 1 Muslim, 2 Other)

22

1AR0381

## Recommendations

- No change to current methodology of assigning chaplains to billets

  – Billets are not faith group specific

  – Legally challenged if Liturgical chaplains were to be assigned to UICs that have limited access to religious ministry

  – Creates career progression problems

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

REV. CHARLES E. LARSEN, et al.,  )
             )
    v.        )  Case No. 02CV02005
             )
THE UNITED STATES NAVY, et al.  )
_____)

**DECLARATION OF CAPT. JAMES FRANKLIN POE, CHC, USN**

Pursuant to 28 U.S.C. § 1746, I, JAMES FRANKLIN POE, declare as follows:

1. My name is James Franklin Poe.  I currently live at 735 Poplar Grove Road, Springville, TN 38256.  I have personal knowledge of and am competent to testify on the matters addressed herein.

2. I retired on 1 November 2006, as a Navy chaplain at the grade of Captain when I reached the statutory retirement age.   I had over 26 years of active duty as a Navy chaplain.

3. I am endorsed by the Associated Gospel Churches, an association of Evangelical churches whose members adhere to the classic fundamental doctrines of the Christian faith.

4. From November 2001 to April 2005, I was the Regional Chaplain/Religious Ministries Program Director for the Commander, Naval Region Europe ("CNRE").  I was stationed in Naples, Italy, where I also had Religious Ministry oversight for US NATO forces assigned to the Allied Forces Southern Command (AFSOUTH).

5. My duties included responsibility for advising my Commander of Navy chaplain issues and chapel activity support within CNRE or impacting it. This included the Naval Support Activity ("NSA") in Naples, Italy, which came under CNRE.

6. I was very familiar with the chaplains and chapel activities at NSA Naples, as well as

chapel services  at AFSOUTH Headquarters.  Since NSA Naples reported to CNRE, it fell under my area of responsibility.

7.      I have been asked by Mr. Arthur A. Schulcz, Sr., to comment on the Navy's assertion that "it has determined that chaplains in each [faith group] category are generally able to meet the religious needs of personnel with needs encompassed by those categories" on page 37 of the Defendants' opposition to the Plaintiffs' motion for summary judgment in the above cited case and its follow on assertion that non-liturgical chaplains "are generally able to meet the needs of all Non-liturgical personnel", citing a statement by Chaplain Wilder on page 38.

8.      Those statements or assumptions imply that a chaplain within a faith group category can effectively minister to and meet the free exercise needs of all other personnel within that category.  My experience shows that this implication is not always true for liturgical Protestants and it is much less true for the more diverse non-liturgical faith groups.  Liturgical groups like the Missouri Synod Lutherans will not share communion with many other liturgical faith groups. Many liturgical faith groups possess different requirements for infant baptism and will not baptize infants of parents who do not hold their particular faith distinctions.  For non-liturgical faith groups, the assumption is true only in those cases when there are no basic contradictions in the different faith backgrounds.  For example a Southern Baptist can often minister to other faith groups who hold baptistic beliefs provided there are no other major theological differences.

9.      However, the statement or assumption by CH Wilder is false as a universal or even general rule among non-liturgicals because of the reality of important theological differences between non-liturgical faith groups, differences well known to the Chaplain Corps, even when basic beliefs are shared between faith groups.  Several examples below from my experience in Naples illustrate the falsity of that assumption.

10.     The non-liturgical faith group category is made up of a wide variety of faith groups, many of which hold differing theological positions and beliefs rejected by other faith groups or denominations within the non-liturgical faith group cluster.

11.     These non-liturgical faith group differences include and are often reflected in their worship and ministry styles.  For example, Pentecostal and Charismatic personnel, while believing many basic non-liturgical and Protestant beliefs and doctrines, have unique worship practices and minister and worship in ways that are rejected by other faith groups in the non-liturgical faith group cluster.

12.     Pentecostal and Charismatic worship or ministry needs cannot be met by just any non-liturgical chaplain just like a Protestant chaplain can not meet Roman Catholic needs.  At Naples, I was personally involved in this, and other ministry facts of life.

13.     A Pentecostal/Charismatic congregation brought together and molded into a faith community by Pentecostal Chaplain (LCDR) John Gordy was the largest non-Catholic congregation at NSA Naples.  During CH Gordy's leadership this congregation averaged about 160 congregants at its Sunday service.  Because no chaplain of like faith and practice who could meet this group's free exercise needs was detailed to Naples to relieve Chaplain Gordy, a Chief Petty Officer Lay Leader volunteered to assume the religious leadership responsibilities for this congregation provided it did not interfere with his regular duties.

14.     The second largest Protestant service in Naples was the non-liturgical Contemporary Worship Service lead by Chaplain (LCDR) Joseph Dufour (Evangelical).  This congregation averaged 130 congregants under Chaplain Dufour's leadership. A third non-liturgical Protestant service was held at AFSOUTH under the leadership of Chaplain (LCDR) Armando Torralva (Evangelical) which averaged 50 to 75 congregants. The only other Protestant congregation at

NSA Naples was a small liturgical congregation under the leadership of Chaplain (CDR) Pat

Hahn (Lutheran) which averaged less than 10 congregants.  This situation illustrates the well

known fact that the vast majority of Protestants serving in the Navy are Evangelical or

Pentecostal/Charismatic non-liturgicals.  Thus, the demand for detailing, especially in religiously

isolated overseas locations, is for Evangelical and Pentecostal/Charismatic non-liturgicals.

15.    But instead of detailing chaplains from Evangelical or Pentecostal non-liturgical faith

groups to Naples, the Chaplain Corps detailed three chaplains, one each, from the Church of

Christ, the Christian Churches and the Cumberland Presbyterian Church.  The Church of Christ

and Christian Churches are two almost theologically identical churches, except that the Church

of Christ denomination (with a small number of adherents compared to other faith groups) does

not believe in the use of musical instruments during their worship service; its members sing

hymns a cappella.  All three of these churches have small numbers of adherents, are not

representative of the majority of Protestants, and issue from the same geographical region and

historical religious movement.

16.    The Roman Catholic NSA Naples Command Chaplain appeared to be totally unfamiliar

with Protestant denominations or beliefs.

   A.    He initially placed a liturgical Lutheran Chaplain over the non-liturgical,

   Evangelical congregation at AFSOUTH when Chaplain Torralva transferred.  He did this

   even though Chaplain Dufour (Evangelical) requested that he be allowed to serve that

   congregation in addition to his Contemporary Worship Service at the Support Site while

   he remained in Naples.

   B.    But Chaplain Hahn could not adapt to provide for the worship needs of this

   congregation, which led to restlessness and sharp conflict between the chaplain and the

congregation.

C.      To meet the religious needs of this Evangelical, non-liturgical congregation and
to bring peace to the congregation and the NSA Chaplain's Office, I personally assumed
the religious ministry duties for this congregation bringing a heavy burden upon myself.
My regular duties required extensive travel throughout Europe for the Regional
Command and entailed arduous administrative responsibilities.  Forcing me to work
seven days a week, all that I could provide for this worthy congregation was to lead
Sunday services.

D.      This situation continued while two chaplains at NSA Naples were virtually
without jobs, having no congregations to minister to on Sundays.

17.    The Roman Catholic NSA Naples Command Chaplain also insisted that one non-
liturgical could satisfy all other non-liturgical worship needs.  He initially planned to place the
"non instrumental" chaplain in charge of the Protestant Contemporary Worship service, the
second largest Protestant congregation in Naples, when Chaplain Dufour, who was then leading
that service, rotated out of Naples.

18.    The Naples Command Chaplain's  actions required my intervention to convince the NSA
Naples Command that this would be a disaster for the Contemporary Worship Service at the
Support Site.  A "contemporary worship" service is built around the service's music ministry.
This includes effectively integrating musicians (and their instruments) who can play
contemporary Christian music into the service, making them an integral and basic part of it.

19.    Placing a chaplain in charge of the Contemporary Service who did not believe in using
musical instruments during worship would have effectively killed that service.  This would have
been a gross disservice to the members of that congregation, unnecessarily hindering and

burdening their free exercise of religion since the isolated nature of NSA Naples and the Italian culture did not provide many worship options off base for non-liturgicals.

20.    In fact, the Contemporary Worship Service at the NSA Support Site and the Evangelical Worship Service at AFSOUTH were virtually destroyed by this Chaplain Corps' detailing disaster.  After I transferred out, the service at AFSOUTH was eventually closed, suffering a slow death without a dedicated minister to provide essential ministry.  I recently learned that the Contemporary Worship Service at the Support Site, under the leadership of an Evangelical Protestant Command Chaplain who replaced the Roman Catholic Command Chaplain at NSA Naples, was experiencing renewed growth, until he was surprisingly deployed as an Individual Augmentee to the Combined Joint Task Force in Djibouti, Africa.

21.    A like adverse detailing situation existed at NAS Rota, Spain.  The two largest congregations in Rota were a Pentecostal/Charismatic service and a service which would be described as Evangelical, non-liturgical.  Instead of detailing a Pentecostal/Charismatic chaplain and an Evangelical non-liturgical chaplain to meet the ministry needs of those two large congregations, two liturgical, non-Evangelical chaplains (both United Methodist) were detailed in their place.

22.    These examples illustrate the failure of the Chaplain Corps leadership to appreciate or address the fundamental differences in beliefs and traditions within the non-liturgical faith group cluster and the fallacy of the "one non-liturgical chaplain fits all" mentality.

23.    They also illustrate an underlying indifference, if not hostility, to the free exercise needs of non-liturgical faith groups, especially those considered Evangelical.

24.    In Naples, I often commented that the failure of the Chaplain Corps leadership to adequately recognize non-liturgical free exercise needs resulted in chaplains sitting around with

nothing to do because the chaplains' worship capabilities and backgrounds did not match the Naples Chapel community free exercise needs. During one period, there were three chaplains serving in the shrinking Contemporary Worship Service at the Support Site while a part time, non-chaplain, Lay Leader ministered in the largest Protestant worship service in Naples.

25.    These failures to recognize or meet the identified free exercise needs at Naples were not accidents or mere slip ups. As part of my CNRE Regional Chaplain/Religious Ministries Program Director responsibilities, I made numerous efforts to ensure that a Pentecostal or Charismatic chaplain was detailed to replace Chaplain Gordy when he left Naples. I also made numerous appeals to detail Evangelical non-liturgical chaplains to provide for the ministry needs of the large Evangelical non-liturgical Congregations at the Support Site and at AFSOUTH.

26.    This included a personal visit with the Chaplain Corps detailer at Millington, TN while I was on leave in the States. The detailer at that time was liturgical chaplain CAPT Alan Baker, now the Deputy Chief of Chaplains/Chaplain of the Marine Corps. I endeavored to make sure he understood the necessity for a Pentecostal or Charismatic chaplain replacement for CH Gordy and for Evangelical non-liturgical chaplains to replace Chaplains Torralva and Dufour because of those congregations' impact and importance in the Naples Chapel Community.

27.    Unfortunately, my pleas and efforts with the Chaplain Corps leadership to make sure that these congregations' free exercise needs were met fell on deaf ears, and CH Gordy left Naples with no Pentecostal or Charismatic replacement, even as Chaplains Torralva and Dufour left with no like faith group replacements.

28.    These are not the only examples of Navy Chaplain Corps indifference to the free exercise needs of its non-liturgical personnel, but they clearly illustrate the false assumption I was asked to address, specifically "whether a non-liturgical chaplain can effectively minister to and meet

the free exercise needs of all other non-liturgical personnel."

29.    Having put much effort into trying to obtain the right chaplain faith group mix at Naples and Rota without success, I believe the failure to provide the necessary chaplain resources at those overseas, religiously isolated bases to match the free exercise needs of its non-liturgical personnel was not an accident but a symptom of an underlying bias against non-liturgicals.

I make this declaration under the penalty of perjury, it is true and accurate to the best of my ability, and it represents the testimony I would give if called upon to testify in a court of law.


Dated: February 22, 2007          /S/ James Franklin Poe
                                   JAMES FRANKLIN POE

1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLUMBIA

3

4    REV. CHARLES E.              )

5    LARSEN, et al.               )

6                                 )

7                                 ) CASE NO. 02CV02005

8    vs.                          )

9                                 )

10   THE UNITED STATES            )

11   NAVY, et al.,                )

12                                )

13                                )

14

15              March 21, 2006

16               9:00 a.m.

17              Macon, Georgia

18

19       This is the deposition of Thomas C.

20   Carter taken in the office of Adams, Jordan

21   & Treadwell, 577 Mulberry Street; testimony

22   is given before Diane Dorsey, Certified

23   Court Reporter, B-1708.

24   Signature to the deposition is reserved.

25

2

1  A P P E A R A N C E S

2

3  For the Plaintiffs:

4        Arthur A. Schulcz, Sr., Esq.

5        2521 Drexel Street

6        Vienna, Virginia  22180

7

8

9  For the Defendants:

10        Michael Q. Hyde, Esq.

11        U.S. Department of Justice Civil Division

12        20 Massachusetts, N.W.

13        Washington, DC  20530

14

15  Also present:  James A. Ouellette, Esq.

16

17

18

19

20

21

22

23

24

25

31

1  BY MR. SCHULCZ:

2    Q.    How were those needs communicated to you?

3    A.    Usually those needs would come from the

4  command chaplains in the field.

5    Q.    How typically would they report that to

6  you?

7    A.    In the sense that, you know, I already had

8  a good sense of it by just looking at the people who

9  were there and seeking, again, to provide a mix --

10  what I called a mix of individuals from different

11  faith groups, again depending on the size of the

12  command and how many chaplains you had would

13  determine what kind of mix you could put at any

14  particular place.

15    Q.    When you talked to the plans and policies

16  branch, did you express a need for specific chaplains

17  by denomination?

18    A.    I do not recall talking in specific terms

19  of that.  I was more interested in just the hard

20  numbers at that particular time because of the

21  shortage of chaplains and not being able to fill

22  billets, leaving them open.

23        For me it was more a matter of just hard

24  terms of numbers, regardless of the denomination or

25  faith-group mix of the chaplains.

07-mc-269
EXHIBIT 7

32

1    Q.   So you were concerned with putting a face

2    in a place?

3    A.   That would be my major concern, that's

4    correct.

5    Q.   So you provided no information to the

6    plans, policy, and accessions branch about specific

7    faith-group requirements?

8        MR. HYDE:  Objection, vague.

9    BY MR. SCHULCZ:

10    Q.   Can you answer the question?

11    A.   I can answer the question.

12        I probably provided information because of

13    the shortage of Catholic chaplains, would have

14    provided the kind of information to them that, you

15    know, there is a shortage of Catholic chaplains, and

16    we cannot get some Catholic chaplains at commands

17    where we need them.

18    Q.   Other than Catholics, you can't remember

19    any other --

20    A.   You're talking about in terms of the other

21    specific groups like liturgical and nonliturgical.

22    Q.   Yes.

23    A.   No.  From my standpoint that was not an

24    issue, again, looking at hard numbers.

25    Q.   Were there any billets that were

59

1    A.    That's correct.

2        MR. SCHULCZ:  Can we go off the

3    record?

4        (Brief break.)

5  BY MR. SCHULCZ:

6    Q.    Chaplain Carter, when you were in the

7  detailing shop, were you ever aware of specific

8  faith-group requirements for a specific religious

9  community that may have developed at a specific post?

10        Do you understand my question?

11    A.    I do, and I'm trying to think if I recall

12  any one in particular.  I don't recall one.

13    Q.    It's been reported to me, for instance,

14  there was a large charismatic congregation at Rota,

15  Spain, consistently.  Are you --

16    A.    I'm not familiar with that.

17    Q.    Nobody would tell you that you needed a,

18  let's say, a charismatic or Pentecostal or someone

19  for a contemporary service at a specific post?

20    A.    If that would have been necessary, I would

21  have expected the command chaplain to communicate

22  that with me.  I don't recall that specifically for

23  any community.

24    Q.    So the way that you would be apprised of

25  that is that the command chaplain would communicate

78

1      C E R T I F I C A T E

2

3   G E O R G I A:

4   MORGAN COUNTY:

5          I hereby certify that the foregoing

6   transcript was stenographically recorded by me, as

7   stated in the caption.  The colloquies, statements,

8   questions, and answers thereto were reduced to

9   typewriting under my direction and supervision; and

10   the transcript is a true and correct record of the

11   testimony/evidence given by the deponent to the best

12   of my ability.

13          I further certify that I am not a relative

14   or employee or attorney or counsel of any of the

15   parties, nor am I a relative or employee of such

16   attorney or counsel, nor am I financially interested

17   in the action.

18          This 3rd day of April, 2006.

19

20          _____

21          DIANE DORSEY

22          Certified Court Reporter

23          (B-1708)

24

25

NAVY CHAPLAIN ACCESSIONS
CHAPLAINS 42 AND OVER

| FY | NAME | FG | AGE | RANK | STATUS |
|---|---|---|---|---|---|
| 86 | Egan, Brennan | RC | 46 | LT | |
| | Fry, James Q. | RC | 54 | LTJG | |
| | Hernando, Henry | RC | 43 | LT | |
| | Shuppert, Wm. T. | RD | 45 | LT | |
| | Cio, Robert J. | RC | 43 | LT | |
| | Clark, Robert J. (R) | RC | 46 | LT | |
| | Colaco, Leslie | RC | 53 | LT | |
| | Gervacio, Adrian R. | RC | 53 | | |
| 87 | Erestain, Alfonso E. | RC | 50 | | |
| | Henry, James Patrick | RC | 56 | | |
| | Mulkerin, Terrence J. | RC | 52 | | |
| 88 | Czarnota, Stanley | RC | 55 | | |
| | Donlan, Paul Alfred | RC | 52 | | |
| | Flynn, John Dennis | RC | 51 | | |
| | Rosato, Robert B. | RC | 53 | | |
| 89 | D'Souza, Matthew F. | RC | 44 | | |
| | Finley, James Fulton | RC | 51 | | |
| | Labrake, John Richard | RC | 58 | | |
| | Tsau, Paul | RC | 50 | | |
| 90 | Gergel, Stephen J. | RC | 58 | LT | |
| | **Larsen, Samuel H.** | **PCA** | **42** | **LT** | |
| | Maxwell, Bruce C. | RC | 50 | LT | |
| | Tsau, Paul | RC | 50 | LT | CHI |
| | D'Aurora, Joseph | RC | 43 | LT | |
| | **Kaprow, Maurice** | **J** | **45** | **LT** | |
| | Welch, Bernard | RC | 55 | LT | |

| FY | NAME | FG | AGE | RANK | STATUS |
|----|------|-----|-----|------|--------|
| 90 | Goodrow, Robert | RC | 53 | LT | |
| | Carlos, Joseph | RC | 42 | LT | HIS |
| | Cormier, William | RC | 53 | LT | |
| | Gwinner, David | RC | 42 | LTJG | |
| | Jorden, James A. | RC | 57 | LT | |
| | Roma, Paul E. | RC | 54 | LTJG | |
| | Small, William T. | RC | 47 | LT | |
| | Soto, Charles  (R) | RC | 47 | LCDR | HIS |
| 91 | Minigan, William J. | RC | 44 | LT | |
| | Hall, Thomas P.   (R) | RC | 42 | LT | |
| | McLaughlin, Paul (R) | RC | 47 | LCDR | |
| | **Heyman, Jay B.** | **J** | **47** | **LT** | |
| | Ryan, Kenneth W. | RC | 52 | LT | |
| | Mintegui, Marc  (R) | RC | 50 | LT | HIS |
| | Hummer, Lawrence | RC | 44 | LT | |
| | Leslie, Larry B. | RC | 49 | LT | |
| | Concha, Alfonso   (R) | RC | 44 | LT | |
| 92 | Logan, Arthur H. | RC | 43 | LT | |
| | Moss, Donald R. | RC | 49 | LTJG | |
| | Panek, Robert M.  (R) | RC | 47 | LT | |
| 92 | Spanenberg, George | RC | 43 | LT | |
| | Lamb, Gary E. | RC | 42 | LT | |
| 93 | Smith, Stuart D. | RC | 43 | LT | |
| | Pugliese, Frank A.  (R) | RC | 49 | LT | |
| | **Burley, Stanley** | **ABC** | **42** | **LTJG** | **BLK** |
| | Robinson, Jerome | RC | 45 | LT | |
| | Shimburger, R. J. | RC | 43 | LT | |
| | Brown, Benedict   (R) | RC | 45 | LT | |

Accessions\42+

07mc269
EXHIBIT 8

| FY | NAME | FG | AGE | RANK | STATUS |
|----|------|-----|-----|------|--------|
| 93 | Hughes, Robert | RC | 51 | LT | |
| 94 | Csete, Ivan L. | RC | 57 | LT | |
| | Gordocki, Marian | RC | 43 | LT | |
| | Nowak, Bernard U.   (R) | RC | 45 | LT | |
| | Shaughnessy, Paul | RC | 44 | LT | |
| | Jennings, Tommie   (R) | RC | 44 | LT | BLK |
| 95 | Banken, Robert | RC | 51 | LT | |
| | Dombrowski, Stan   (R) | RC | 4? | LT | |
| | Johnson, Lawrence   (R) | RC | 46 | LT | |
| | Yossa, Kenneth   (R) | RC | 44 | LT | |
| | Berchmanz, Anthony | RC | 53 | LT | IND |
| | Tran, Quang | RC | 51 | LT | VIE |
| 95 | Deeley, Kevin J. | RC | 47 | LT | |
| | Madey, Louis | RC | 51 | LT | |
| 96 | **Russell, Randall** | **LMS** | **45** | **LT** | |
| | **Wilkes, Larry G.** | **EPIS** | **45** | **LTJG** | |
| | **Manila, John** | **LMS** | **43** | **LT** | **Api (Asian)** |
| | Vidrine, Richard   (R) | RC | 50 | LTJG | |
| | Egan, Brennan    (R) | RC | 57 | LCDR | |
| | Finley, James    (R) | RC | 59 | LT | |
| 97 | **Pickett, Clinton** | **ELCA** | **42** | **LT** | |
| | Stake, Ronald | RC | 47 | LT | |
| | Sullivan, James | RC | 44 | LT | |
| 97 | **Shuppert, Wm. T.   (R)** | **LMS** | **46** | **LCDR** | |
| | Bower, Alan   (R) | RC | 47 | LCDR | |
| 98 | Logan, Arthur (R) | RC | 49 | LT | |
| | Neis, Wm. P. | RC | 56 | LT | |

| FY | NAME | FG | AGE | RANK | STATUS |
|----|------|-----|-----|------|--------|
| 98 | Hoog, Eric R. | RC | 49 | LT | |
| | Koch, Joseph | RC | 42 | LT | API |
| | Salamoni, Vincent   (R) | RC | 48 | LT | |
| | Kalinowski, Joseph | RC | 45 | LT | |
| | Wegierski, Anthony | RC | 54 | LT | |
| | Travers, Alan F.   (R) | RC | 47 | LT | |
| 99 | **Vanderwerken, Roger** | **ABC** | **42** | **LT** | |
| | **Mercado, Robert** | **CFGC** | **44** | **LTJG** | **HIS** |
| 00 | Geinzer, John A.   (R) | RC | 58 | LT | |
| | **Pease, Edward   (R)** | **PUSA** | **44** | **LT** | |
| | Mudd, David A.   (R) | RC | 48 | LT | |
| FY | NAME | FG | AGE | RANK | STATUS |
| 00 | Hoke, John D. | RC | 50 | LT | |
| | Cain, Robert   (R) | RC | 42 | LT | |
| | House, Richard   (R) | RC | 46 | LT | |
| | **Logan, Jeffery (R)** | **EPIS** | **43** | **LT** | |
| | **Terry, Jeffrey   (R)** | **NAE** | **45** | **LT** | |
| 01 | Dermott, Wm.   (R) | RC | 47 | LT | |
| | Onuh, William | RC | 48 | LT | BLK |
| | Burnette, John | RC | 50 | LT | |
| | **Dixon, Stanley** | **SDA** | **44** | **LT** | **BLK** |
| | Karava, Norbert J. | RC | 47 | LT | |
| | **Lussi, Emory C.** | **SB** | **44** | **LT** | |
| | **Niemeyer, Patrick** | **EFCA** | **49** | **LT** | |
| | **Bye, Cynthia   (R)** | **ELCA** | **45** | **LT** | **FEM** |
| | Sullentrop, Anthony   (R) | RC | 54 | LT | |
| | **Seelinger, Shelby** | **UM** | **45** | **LT** | |
| | | | | | |

| FY | NAME | FG | AGE | RANK | STATUS |
|----|------|----|----|------|--------|
| 01 | Spencer, Robert A.   (R) | RC | 44 | LT | |
| | **Wilson, Paul** | **SB** | **42** | **LT** | |
| 02 | Lyle, John   (R) | RC | 45 | LCDR | |
| | **Bradshaw, James** | **SB** | **50** | **LT** | |
| | **Flint, Eric** | **ECA** | **42** | **LT** | |
| | **Griggs, Michael** | **UM** | **42** | **LT** | |
| | **Hager, Thomas** | **INDF UND** | **45** | **LT** | |
| | **Heckathorne, Robin** | **UCC** | **46** | **LT** | |
| | **Huffstetler, David** | **FGFCH** | **42** | **LT** | |
| | **Isinkaiye, O.** | **ICFSG** | **43** | **LT** | **AFAM** |
| | **Masterson, David** | **ECA** | **47** | **LT** | |
| | **McCrimmon, Gregory** | **UM** | **46** | **LT** | **AFAM** |
| | Kusmirek, Mark   (R) | RC | 50 | LT | |
| | **Cometa, Juan Q.** | **CBAA** | **43** | **LT** | **FIL** |
| 02 | **Hoffman, Roy   (R)** | **EPIS** | **44** | **LT** | |
| | **Low, Peggy** | **Evanc hal** | **46** | **LTJG** | **FEM** |
| | **McKinney, John E.** | **SB** | **48** | **LT** | |
| | **Slater, David** | **AGC** | **43** | **LT** | |
| | Smith, Jerome | RC | 43 | LT | |
| | Everett, Willis E.   (R) | RC | 51 | LT | |
| | Gegotek, Tadeusz    (R) | RC | 46 | LT | |
| | Kalinowski, Joseph    (R) | RC | 49 | LT | |
| | Borger, Marvin | RC | 43 | LT | |

CHAPLAINS COMMISSIONED OVER AGE 42
1986-2001

A COMPARISON BY FAITH GROUP CLUSTER AND AGES
OF WAIVERS, ACCESSIONS AND CHAPLAINS AGE 42 AND
OVER BROUGHT TO ACTIVE DUTY BASED ON CARE BOARD/ACCESSION
RESULTS AS REPORTED BY DEFENDANTS

| Categories | Thru FY98 | Thru FY99 | Thru FY00 | Thru FY01 |
|---|---|---|---|---|
| TOTALS | 82 | 89 | 92 | 101 |
| Special Worship | 2  (2%) | 2  (2%) | 2  (2%) | 3  (3%) |
| Non-liturgical | 1  (1%) | *3 (3%) | 4  (4%) | 4  (4%) |
| Liturgical Protestant | 6  (7%) | 6  (7%) | 8  (8%) | 8  (8%) |
| Roman Catholic | 78  (90%) | 78  (88%) | 83  (86%) | 86  (85%) |
| age 42-46 | 30  (38%) | | 32  (39%) | 32  (37%) |
| age 47-56 | 42  (54%) | | 44  (53%) | 47  (55%) |
| age 57 and above | 6  (8%) | | 7  (8%) | 7  (8%) |

* one Hispanic

Defendants abandoned the thirds Policy with its faith group cluster goals in FY 01 after
chaplains began litigation and the Chaplain Corps experienced continuing recruiting shortages

07-mc-269
EXHIBIT 9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CHAPLAINCY OF FULL GOSPEL CHURCHES, | ) | |
| et al., | ) | |
| *v.* | ) | Case No. 1: 99CV002945 (RMU) |
| | ) | |
| THE HON. DONALD C. WINTER, et al. | ) | |
| | ) | **Consolidated with** |
| ROBERT H. ADAIR, et al., | ) | |
| | ) | |
| *v.* | ) | Case No. 1: 00CV00566 (RMU) |
| | ) | |
| THE HON. DONALD C. WINTER, et al. | ) | |
| | ) | |

**Too Many Catholic Priests?**
A statistical analysis by Harald R. Leuba, PhD.

Is there a shortage of Catholic priests, in the world at large, in America in general, in the U.S. Navy Chaplain Corps?

As usual with such questions, the answer is "it depends". The answer depends upon whom one asks, what one means by "shortage" and what one accepts as evidence.

The purpose of this declaration is to report on an analysis of the comparative availability of clergy of different denominations (especially Roman Catholic) in the labor pool, in comparison to their density in the U.S. Navy Chaplain Corps. In the end, the data will show that whatever the situation may be in the broader community, Catholic priests are statistically over-represented in the U.S. Navy Chaplain Corps

**First Approximation**

According to the best available data[1] Roman Catholic clergy account for about 9% of all the Clergy in America, and about 25% of all clergy in the U.S. Navy Chaplain Corps.

---

[1]The National Council of Churches of Christ in the USA, "Yearbook of American & Canadian Churches", a handbook of statistics and essays on religious practice in Canada and America, including data on church membership and the numbers of clergy in North America from 1916 to 2005. The data in this yearbook provide recent counts of clergy in the USA numbering 546,665 - of whom 48,573 are Roman Catholic; this is 8.9%. Meanwhile, Defendants have offered "Material Facts" admitting that Roman Catholic priests fill roughly 22% of the new appointments to Active Duty billets, and hold nearly 33% of the ranks at and above Captain.

EXHIBIT 10

On the face of it, this is three times the Catholic's "fair share."  (The disparity in proportions is statistically significant at 8 ½ standard deviations; binomial test 48,573/546,665 vs 181/894 .)

The complicating factor here is that the number of priests per penitent is higher for Roman Catholics than for any other of the Navy's faith group clusters.

Based on data from the National Council of Churches of Christ in the USA, Yearbook:

| Navy's Faith Group Cluster | Church Membership | Number of Clergy | Percent of Membership Population | Percent of Clergy in America | Number of Members Served by One Clergy Person |
|---|---|---|---|---|---|
| Roman Catholic | 61,104,520 | 48,573 | 39.84% | 8.89% | 1257.99 |
| Liturgical | 31,244,428 | 142,364 | 20.37% | 26.04% | 219.47 |
| Non-Liturgical | 51,128,804 | 288,799 | 33.34% | 52.83% | 177.04 |
| Special Worship | 9,897,434 | 66,929 | 6.45% | 12.24% | 147.88 |

The obvious disparity here in the ratio of clergy to church-members has lead to a careless characterization of the situation as a "shortage of Roman Catholic priests".

It is transparent that Catholic priests service five to eight times as many church members as any other faith group cluster manages, but this is not proof of a shortage.  It may be nothing more nor less than a reflection of *how* they serve; it need not be (a) an absolute "shortage" and (b) even if it is said to be evidence of a shortage,  it need not be a specifically Catholic shortage.

Just as with any other profession, priests may have duties or methods which reduce workload, or leverage skills, knowledge and attention.  Maybe because of management efficiencies it just takes fewer priests to administer to a Catholic flock.

If one looks inside the Navy data, and beyond the artificial "faith group cluster" boundaries of the Navy's categorization scheme, we can observe that there are other denominations that are "like" Roman Catholic in structure (and service delivery) who are not included in the Navy's "Catholic" faith group cluster.  These denominations also have high ratios of membership to clergy.

In fact, as a group, these Catholic-like denominations here in America average nearly twice as many members per clergy person as is achieved by the Roman Catholics.  This demonstrates that (a) although the Roman Catholic church may have fewer priests than it believes are an ideal service ratio, or fewer indeed than the Navy opines that it needs, (b) the Catholic ratio of clergy to serviced-personnel is well below the limit of practical functionality - as evidenced by the survival of these other "similar" denominations.

As the table below shows, the Roman Catholic ratio of clergy to church membership is just over 1200 members per priest, but the 20 "similar" denominations (ranging from Greek Orthodox to the Apostolic Catholic Assyrian Church of the East), are spread nearly twice as thinly (or alternatively are nearly twice as efficient) with an average just over 2000 members per clergy person.

EXHIBIT 10

| Denomination | Adherents* | Clergy | Ratio |
|---|---|---|---|
| ROMAN CATHOLIC | 60190605 | 49947 | 1205.09 |
| ALBANIAN ORTHODOX ARCHDIOCESE OF AMERICA | 40000 | 25 | 1600.00 |
| AMERICAN ANGLICAN CATHOLIC CHURCH | 100000 | 68 | 1470.59 |
| AMERICAN CARPATHO-RUSSIAN ORTHODOX GREEK CATHOLIC CHURCH | 19321 | 101 | 191.30 |
| ANGLICAN ORTHODOX CHURCH | 6000 | 8 | 750.00 |
| ANTIOCHIAN ORTHODOX CHRISTIAN ARCHDIOCESE OF NORTH AMERICA | 300000 | 225 | 1333.33 |
| APOSTOLIC CATHOLIC ASSYRIAN CHURCH OF THE EAST | 35000 | 65 | 538.46 |
| ARMENIAN APOSTOLIC CHURCH, OF AMERICA | 414000 | 70 | 5914.29 |
| BULGARIAN EASTERN ORTHODOX CHURCH | 86000 | 11 | 7818.18 |
| COPTIC ORTHODOX CHURCH | 180000 | 68 | 2647.06 |
| GREEK ORTHODOX ARCHDIOCESE OF NORTH AND SOUTH AMERICA | 1950000 | 655 | 2977.10 |
| HOLY EASTERN ORTHODOX CATHOLIC AND APOSTOLIC CHURCH | 4300 | 12 | 358.33 |
| NORTH AMERICAN OLD ROMAN CATHOLIC CHURCH | 62383 | 150 | 415.89 |
| ORTHODOX CHURCH IN AMERICA | 2000000 | 792 | 2525.25 |
| PATRIARCHAL PARISHES, RUSSIAN ORTHODOX CHURCH IN USA | 9780 | 45 | 217.33 |
| POLISH NATIONAL CATHOLIC CHURCH OF AMERICA | 282411 | 141 | 2002.91 |
| ROMANIAN ORTHODOX EPISCOPATE OF AMERICA | 65000 | 81 | 802.47 |
| RUSSIAN ORTHODOX CHURCH IN THE USA PATRIARCHAL PARISHES | 51500 | 60 | 858.33 |
| SERBIAN ORTHODOX | 67000 | 82 | 817.07 |
| SYRIAN ORTHODOX CHURCH OF ANTIOCH | 30000 | 18 | 1666.67 |
| UKRAINIAN ORTHODOX CHURCH IN THE USA | 87745 | 131 | 669.81 |
| Subtotal of Catholic-like denominations | 5790440 | 2808 | 2062.12 |
| Total all denominations in America | 158294022 | 534913 | 295.92 |

* There are slight differences between this table and the earlier table because this table is based on one year, and the earlier data is an average across ten years.

If the Catholic church says that it has a shortage, that is a comment upon the Church's staffing goals. Except that the Navy is in the marketplace competing for priests, the Church's view of a shortage is neither relevant to the Navy, nor support for the Navy's preferential accession policies.

**Second approximation**

The Navy does not publish the religious demographics of its officer corps, but it has collected the data from time to time, and the DOD does collect information about the religious preferences of enlisted personnel.

According to these surveys, for example the 02-00 Defense Manpower Data Center religious preference report, the Navy had 125,892 military personnel professing preference for the Roman Catholic faith, out of 353,539 respondents with a preference. And it had, at that time, 181 Catholic chaplains. This ratio works out to one priest per 695 service members - which looks like a long-ratio when compared to the Non-Liturgical ratio of 494 chaplains per sailor. But it is twice as high as the ratio of priests per Catholic believer in the civilian population.

EXHIBIT 10

One could harbor the view that the Navy's ratio of Catholic chaplains to the population being served is twice what it should be (i.e. twice as high for Catholics in the Navy as for Catholics in America at large.)  [The binomial z here corresponds to 6 standard deviations.]

**Third Approximation**

The view that the Catholics are over-represented in the U.S. Navy Chaplain Corps is bolstered by observing that when compared to a Non-liturgical sailor, a Catholic serviceman or woman has almost five times as much chaplain support as the Navy Chaplain Corps offers to its "blue collar" sailors.   [The binomial z here corresponds to 38 standard deviations.]

| Faith Group Cluster | National Average Representation | Navy Chaplain Corps Representation | Ratio | Comparative Benefit |
|---|---|---|---|---|
| Roman Catholic | 1205 | 695 | 1.73 | 480% |
| Liturgical | 219 | 140 | 1.56 | 433% |
| Non-Liturgical | 177 | 494 | 0.36 | 100% |
| Special Worship | 148 | 233 | 0.65 | 266% |

**Summary**

Whether measured (1) on the basis of proportion accessioned from the population available to serve, or (2) on the basis of the number of clergy needed to provide the same level of benefit to those in Naval service as they had/have in civilian life, or (3) in comparison to the level of chaplain service offered to any other faith group cluster, the U.S. Navy Chaplain Corps has significantly more Catholic chaplains - two to three times more - than the operation of chance would allow.

It is my formal opinion that this finding is statistically significant beyond every standard of uncertainty.  The U.S. Navy Chaplain Corps personnel management system favors Catholic clergy and Catholic sailors over all others, and disadvantages Non-Liturgical clergy, and Non-Liturgical sailors.

**Certification and Oath**

I certify under the penalties of perjury, (a)  that this is my work, (b) that I am competent to analyze this data, and (c) that the conclusions represented here are mine, true, complete, accurate and scientifically certain to the best of my knowledge and belief.

| /S/ Harald R. Leuba, | 5 Mar '07 |
|---|---|
| Harald R. Leuba, PhD | 5 March 2007 |
| Potomac,    Maryland | USA |

EXHIBIT 10



Department of Defense

# INSTRUCTION

**NUMBER** 1200.15
September 18, 1997

ASD(RA)

SUBJECT:  Assignment to and Transfer Between Reserve Categories, Discharge from Reserve Status, Transfer to the Retired Reserve, and Notification of Eligibility for Retired Pay

References: (a) DoD Directive 1200.15, subject as above, February 16, 1973 (canceled)
            (b) Title 10, United States Code
            (c) Appendix II of title 50, United States Code, "The Military Selective Service Act"
            (d) DoD Directive 1200.7, "Screening the Ready Reserve," April 6, 1984
            (e) DoD Directive 1235.9, "Management and Mobilization of the Standby Reserve," July 8, 1986
            (f) DoD Instruction 1215.19, "Uniform Reserve, Training and Retirement Category Administration," March 14, 1997

## 1. REISUANCE AND PURPOSE

This Instruction updates and reissues reference (a) as a DoD Instruction under the authority of references (b) and (c) to clarify DoD policy and guidance to the Military Departments for the following:

     1.1. Assignment of military personnel to, and transfer between, Reserve categories and discharge from Reserve status.

     1.2. Transfer of Reserve officer and enlisted personnel who have completed the service required for a non-regular retirement to the Retired Reserve.

     1.3. Notification of members of the respective Reserve components by the Military Departments when the member has completed the years of service required for eligibility for retired pay at age 60.

2. <u>APPLICABILITY</u>

This Instruction applies to the Office of the Secretary of Defense and the Military Departments (including the Coast Guard when it is not operating as a Military Service in the Department of the Navy by agreement with the Department of Transportation), the Chairman of the Joint Chiefs of Staff, and the Combatant Commands (hereafter referred to collectively as "the DoD Components"). The term "Military Departments," as used herein, refers to the Departments of the Army, the Navy, the Air Force, and the Coast Guard when it is not operating as a Service in the Department of the Navy.

3. <u>POLICY</u>

It is DoD policy under 10 U.S.C. and Appendix II of title 50 U.S.C. Appendix (references (b) and (c)) that Reserve component members be transferred between Reserve categories, discharged, retired, and receive notification of eligibility for retired pay at age 60.

4. <u>RESPONSIBILITIES</u>

    4.1. The <u>Assistant Secretary of Defense for Reserve Affairs</u>, under the <u>Under Secretary of Defense for Personnel and Readiness</u>, shall monitor compliance with this Instruction.

    4.2. The <u>Secretaries of the Military Departments</u> and the <u>Commandant of the Coast Guard</u> shall publish guidance to implement this Instruction.

5. <u>PROCEDURES</u>

    5.1. <u>Transfer Between Reserve Categories</u>

        5.1.1. Ready Reserve membership may be attained by:

            5.1.1.1. Transfer as required on release from active duty under Sections 651 and 10145 of reference (b).

            5.1.1.2. Appointment as a Reserve officer and assignment to the Ready Reserve under Section 456(d) of reference (c) and Section 10145 of reference (b);

            5.1.1.3. Entry (appointment or enlistment) into the Army National Guard of the United States or Air National Guard of the United States, in accordance with Sections 12102, 12107, 12201, 12211, and 12212 of reference (b);

            5.1.1.4. Enlistment under Section 12103 of reference (b); or

            5.1.1.5. Appointment or enlistment of an individual into the Ready Reserve under Chapters 1203 and 1205 of reference (b).

5.1.2. Standby Reserve, without prior membership in the Ready Reserve, may be attained, in accordance with Section 10146 of reference (b).

5.1.3. <u>Transfer to the Standby Reserve</u>

5.1.3.1. Transfer to the Standby Reserve from the Ready Reserve is authorized under Section 10146(a) of reference (b)

5.1.3.2. Transfer to the Standby Reserve under the screening process, in accordance with Section 10149 of reference (b) shall be accomplished under DoD Directive 1200.7 (reference (d)).

5.1.3.3. Transfer to the Standby Reserve of members of the Army National Guard of the United States or the Air National Guard of the United States shall be subject to Section 10146(c) of 10 U.S.C. (reference (b)), which provides for the consent of the governor, or other applicable authority of the State, for such a transfer.

5.1.3.4. On transfer of a member of the Ready Reserve to the Standby Reserve, the Military Department concerned shall develop policies and procedures, in accordance with DoD Directive 1235.9 (reference (e)).

5.1.3.5. Assignment to the Inactive Status List of the Standby Reserve and retention thereon is governed by Section 10152 of reference (b), and reference (e).

5.1.4. <u>Transfer from the Standby Reserve</u>

5.1.4.1. In accordance with Section 10150 of reference (b), any member of the Standby Reserve who has not completed his or her required period of military service in the Ready Reserve may be transferred to the Ready Reserve when the reason for transfer to the Standby Reserve no longer exists, provided the member is otherwise qualified and a requirement exists.

5.1.4.2. Subject to such regulations as the Secretary of a Military Department may prescribe, a member of either the Standby Reserve or the Retired Reserve may, on the member's request, be transferred to the Ready Reserve if qualified and a requirement exists. A member of the Retired Reserve who is entitled to retired pay may not be transferred to the Ready Reserve unless the Secretary concerned makes a special finding that the member's services in the Ready Reserve are indispensable.

5.2. <u>Discharge</u>

5.2.1. Enlisted members of the Ready Reserve or the Standby Reserve not on active duty who have completed their statutory obligation or who are not otherwise subject to a military obligation shall be discharged on the completion of their obligation or on the expiration of their enlistment, as the case may be, unless they do the following:

5.2.1.1. Voluntarily reenlist to serve in the Ready Reserve or Standby Reserve; or

5.2.1.2. Where applicable, extend their enlistment to remain in the Ready Reserve or Standby Reserve; or

5.2.1.3. Request transfer to the Inactive Status List of the Standby Reserve under reference (e).

5.2.2. A Service member, on written application, may be discharged from a Reserve component of a Military Service if the Service member has become a member of the clergy and establishes as follows, that:

5.2.2.1. The ministry is his or her main primary vocation.

5.2.2.2. His or her religious faith group is recognized substantially for religious purposes.

5.2.2.3. His or her standing in the faith group is recognized as that of a minister or leader.

5.2.2.4. He or she is certified by an applicable official of the faith group to be a fully qualified member of the clergy in good standing.

5.2.3. Those commissioned officers of the Reserve who have accepted indefinite appointments under Section 12203 of 10 U.S.C. (reference (b)) shall not be subject to mandatory discharge on completion of the statutory obligation.

5.3. <u>Transfer to the Retired Reserve</u>

5.3.1. The Secretaries of the Military Departments:

5.3.1.1. Shall assign or transfer to the Retired Reserve any member of a Reserve component who is retired under Section 3911, 6323, or 8911 of reference (b).

5.3.1.2. Shall assign, on application, to the Retired Reserve all personnel who belong in the categories listed in paragraph 6.4. of DoD Instruction 1215.19 (reference (f)).

5.3.1.3. May assign or transfer to the Retired Reserve, upon application,

any member of a Reserve component who has been found physically disqualified for active duty, not as a result of the member's misconduct, regardless of total years of service if more than 30 percent disabled in accordance with Section 1201, 1202, 1204, or 1205 of reference (b).

5.3.2. Identification Cards for Retirees or Separatees. A Uniformed Services identification card shall only be issued to individuals who are assigned or transferred to the Retired Reserve under subparagraph 5.3.1., above.

5.3.3. Removal from Active Status. Reservists who have qualified for retirement under Chapter 1223 of reference (b), except for having reached 60 years of age, are required to attain 50 points annually during their anniversary year to be retained in the Ready Reserve or on the active status list, Standby Reserve. Waiver of that requirement on a one-time basis may be made under exceptional circumstances by the Secretary of the Military Department concerned.

5.4. Notification of Eligibility for Retired Pay

5.4.1. The Secretary of each Military Department shall provide a notification to each person who has met the conditions for eligibility for retired pay at age 60 under Section 12731 of reference (b), unless retired under Section 12731a of reference (b).

5.4.2. The notification shall be issued within 1 year after the person concerned has completed all eligibility requirements. Members who retire under Section 12732a of 10 U.S.C. (reference (b)) receive their notification letters after retirement.

5.4.3. After a person has been granted retired pay under Chapter 1223 of reference (b) or has been notified, in accordance with this Instruction that the member has completed the years of service required for eligibility for retired pay at age 60, that eligibility may not be denied or revoked on the basis of any error, miscalculation, misinformation, or administrative determination of years of service performed, unless it resulted directly from fraud or misrepresentation by the individual concerned.

5.4.4. The number of years of creditable service on which retired pay is computed may be adjusted to correct any error, miscalculation, misinformation, or administrative determination. When such a correction is made, Service members are entitled to retired pay, in accordance with the number of years of creditable service, as corrected, from the date they were originally granted retired pay.

5.4.5. The letter of notification shall include the provision that a member who later becomes eligible for retired pay from an Armed Force or retainer pay as a member of the Fleet Reserve or Fleet Marine Corps Reserve under any provision of law other than under Chapter 1223 of reference (b) shall not be entitled to retired pay under Chapter 1223 of reference (b).

5.4.6. Due to the restrictions on denial or revocation of eligibility for retired

pay, as stated in subparagraph 5.4.3., above, suitable controls and procedures shall be established to avoid errors, miscalculations, misinformation, and erroneous administrative determinations.

      5.4.7. The notification shall be issued in the name of an official having general responsibility for administering the controls and procedures referred to in subparagraph 5.4.6., above, and shall be authenticated by the handwritten signature of the officer or employee immediately responsible for the determination of the eligibility of the member being notified.

      5.4.8. The granting of retired pay to a person under Chapter 1223 of reference (b) is conclusive as to that person's entitlement to such pay.

6. <u>EFFECTIVE DATE</u>

This Instruction is effective immediately.

Deborah R. Lee
Assistant Secretary of Defense for
Reserve Affairs



# Department of Defense
# **INSTRUCTION**

**NUMBER** 1215.06

February 7, 2007

ASD(RA)

SUBJECT:  Uniform Reserve, Training, and Retirement Categories

References:  (a)  DoD Directive 1215.6, subject as above, March 14, 1997 (hereby canceled)
           (b)  Acting Deputy Secretary of Defense Memorandum, "DoD Directives Review – Phase II," July 13, 2005
           (c)  DoD Directive 5124.02, "Under Secretary of Defense for Personnel and Readiness (USD(P&R))," October 17, 2006
           (d)  DoD Instruction 1215.19, "Uniform Reserve, Training and Retirement Category Administration," December 12, 2000 (hereby canceled)
           (e)  through (w), see Enclosure 1

## 1.  REISSUANCE AND PURPOSE

This Instruction reissues Reference (a) as an Instruction in accordance with the guidance in Reference (b) and the authority in Reference (c) and cancels Reference (d).  This Instruction implements policy, assigns responsibilities, and prescribes procedures that pertain to:

    1.1.  Prescribing minimum training criteria for each category of the Reserve Components (RC).

    1.2.  The use of RC duty for both training and mission and operational support purposes.

    1.3.  The use of RC duty to capitalize on RC capabilities and accomplish operational requirements while maintaining RC mission readiness for domestic and overseas operations.

    1.4.  Maintaining and reporting personnel data pursuant to DoD Directive 1205.17 (Reference (e)) and DoD Instruction 7730.54 (Reference (f)).

    1.5.  The use of uniform RC categories (RCCs) and training and retired categories (TRCs) for the Ready Reserve, Standby Reserve, and Retired Reserve of the Armed Forces provided for in sections 10141, 10142, 10147, 10149, 10151, 10154, and 12774 of 10 United States Code (U.S.C.) (Reference (g)).

1.6.  Categorizing, maintaining, and reporting personnel data pursuant to References (e) and (f).

1.7.  Participation in Selective Service System (SSS) activities, civil defense activities, and Continental United States (CONUS) Defense programs by members of the Ready and Standby Reserve.


2.  <u>APPLICABILITY AND SCOPE</u>

This Instruction applies to:

2.1.  The Office of the Secretary of Defense, the Military Departments (including the Coast Guard at all times, including when it is a service in the Department of Homeland Security by agreement with that Department), the Chairman of the Joint Chiefs of Staff, the Combatant Commands, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the Department of Defense (hereafter referred to collectively as the "DoD Components"). The term "Military Departments," as used herein, refers to the Departments of the Army, the Navy, and the Air Force.  The term "Secretary concerned" refers to the Secretaries of the Military Departments and the Secretary of Homeland Security for the Coast Guard when it is not operating as a Service in the Navy.  The term "Military Services" refers to the Army, the Navy, the Air Force, the Marine Corps, and the Coast Guard.

2.2.  The use of all inactive duty (ID), inactive duty training (IDT), active duty (AD), and full-time National Guard duty (FTNGD) periods performed by all RC members not counted in Active component (AC) end strengths, or AD for Operational Support (ADOS), pursuant to Reference (g).

2.3.  The requirements for categorizing and recording of RC personnel, and the training requirements for those categories.

2.4.  All members of the total RCs to include the Ready Reserve, the Standby Reserve, and the Retired Reserve.

2.5.  The designation and official recording of all Reserve force personnel data in the Reserve Component Common Personnel Data System (RCCPDS) pursuant to References (e) and (f).

2.6.  The participation of RC members in approved programs outside the Department of Defense.


3.  <u>DEFINITIONS</u>

Terms used in this Instruction are defined in Enclosure 2.

4. <u>POLICY</u>

It is DoD policy that:

4.1.  When performing training or support duty, all RC members shall be in an ID, AD, or FTNGD status.

4.2.  All RC members not counted in AC end strengths, pursuant to Reference (g), shall be placed in one of the RCCs and TRCs described in this Instruction.  Individuals shall be assigned to RCCs and TRCs based on their obligations to meet mission requirements and training requirements.  All RC members will be reported by Service in the RCCs and TRCs pursuant to References (e) and (f).

4.3.  Terminology used in this Instruction to describe RC training and retirement categories and duty statuses shall apply to all Services.


5. <u>RESPONSIBILITIES</u>

5.1.  The <u>Assistant Secretary of Defense for Reserve Affairs</u>, under the Under Secretary of Defense for Personnel and Readiness (USD(P&R)), shall:

5.1.1.  Establish guidance for the minimum training criteria and the ID, AD, and FTNGD requirements associated with each personnel category.

5.1.2.  Establish DoD guidance for RC training and retirement categories.

5.2.  The <u>Secretaries of the Military Departments</u> and the <u>Commandant of the Coast Guard</u> shall:

5.2.1.  Ensure all implementing directives or regulations are consistent with this Instruction.

5.2.2.  Establish necessary criteria and procedures to ensure trained and qualified RC units and individuals are available for AD throughout the entire spectrum of requirements; including war or national emergency; contingency operations; military operations other than war; operational support; humanitarian operations; and at such other times as the national security may require, and that funding for RC training and operations is programmed and budgeted to adequately support these requirements.  Authorities and duty statuses, arrayed and defined at Enclosures 3 and 4, shall be utilized to facilitate this RC usage.

5.2.3.  Approve any additional IDT periods, as necessary and consistent with law. Authorizing and using additional training is subject to the categories, limitations, and controls delineated in this Instruction.

5.2.4.  Establish minimum standards for satisfactory participation at required training periods, which shall include the number and percentages of training periods for meeting the minimum standards.  Individuals attending IDT periods are required to meet those minimum training standards.  Those standards shall contain procedures for accounting for absences and excused IDT periods, as necessary.  Individuals may voluntarily attend extra IDT periods for points.

5.2.5.  Include in the budget for the AC both military personnel and operations and maintenance funds to provide AD tours for RC members on AD in support of AC programs and operational support.

5.2.6.  Ensure, through coordination with supported organizations, that RC members who serve on AD tours funded by AC resources (i.e., ADOS - AC funded) receive full pay, allowances, and entitlements appropriate for the length of the AD tour.

5.2.7.  Establish criteria for combining AD training and IDT to achieve desired readiness levels and to meet training requirements, as necessary.

5.2.8.  Designate all RC members in a RCC and TRC according to criteria established in Enclosures 5 and 6.

5.2.9.  Ensure that RC members perform duty according to the minimum criteria established for each RCC in Enclosure 6.

5.3.  The <u>Commanders of the Combatant Commands</u> shall:

5.3.1.  Exercise Combatant Command (COCOM) command authority over RC forces when mobilized or ordered to Active Duty Other than for Training (ADOT).  Command authority consists of the authority specified in section 164(c) of Reference (g) except that, unless otherwise directed by the Secretary of Defense, assigned RC forces on ADOT may not be deployed until validated by the parent Service for deployment.

5.3.2.  Exercise Training Readiness Oversight (TRO) over assigned RC forces not on AD, or on Active Duty for Training (ADT) not provided under subparagraph 5.3.1. above.  TRO is defined as the degree of authority Combatant Commanders have over assigned RC forces when not on AD, and when on ADT, unless provided under paragraph 5.3.1.  TRO includes specific authority to:

5.3.2.1.  Provide guidance to Service component commanders on operational requirements and priorities to be addressed in Military Department training and readiness programs.

5.3.2.2.  Comment on Service component program recommendations and budget requests.

5.3.2.3.  Coordinate and approve participation by assigned RC forces in joint exercises and other joint training when on ADT or performing IDT.

5.3.2.4.  Obtain and review readiness and inspection reports on assigned RC forces.

5.3.2.5.  Coordinate and review mobilization plans (including post-mobilization training activities and deployability validation procedures) developed for assigned RC forces.


6.  PROCEDURES

6.1.  Guidelines for RC Duty Categories

6.1.1.  Types of Duty.  Table 1 at Enclosure 4 shows the legal authorities, in titles 10, 14, and 32 U.S.C. (References (g) through (i)), under which RC members may perform military duty and the types of duty that can be performed.  The types of duty and their prescribed purpose are provided below.

6.1.2.  IDT.  Authorized training performed by members of an RC not on AD, and performed in connection with the prescribed activities of the RC of which they are a member.  It consists of regularly scheduled unit training periods, additional IDT periods, and equivalent training.  The primary purpose of IDT is to provide individual and/or unit readiness training.  IDT shall be used to provide structured individual and/or unit training, or educational courses, other than correspondence courses, to RC members.  Support to mission requirements, i.e., operational support, may occur as a consequence of performing IDT.

6.1.2.1.  Paid IDT periods shall not be less than 4 hours.  No more than two IDT periods may be performed in any calendar day.  Pursuant to section 206 of 37 U.S.C. (Reference (j)) and within the guidelines prescribed below, the Secretary concerned may prescribe additional standards for IDT.

6.1.2.2.  IDT periods for retirement points only (without pay) shall not be less than 2 hours, with a maximum of two points authorized in any one calendar day.

6.1.2.3.  One retirement point in any one calendar day may be granted for attendance at a professional or trade convention, with a minimum of 4 hours, pursuant to DoD Instruction 1215.7 (Reference (k)).

6.1.2.4.  Where practical, multiple IDT periods over consecutive days shall be used to maximize training effectiveness.

6.1.2.5.  IDT shall not be performed in designated Imminent Danger Areas.

6.1.2.6.  Additional IDT Periods.  A sub-category of IDT.

*DoDI 1215.06, February 7, 2007*

6.1.2.6.1.  Additional IDT periods improve readiness by providing for individuals and units the required and necessary training to attain and maintain designated readiness levels. The Secretary concerned shall establish guidance for and approve use of additional IDT periods pursuant to limits in paragraphs 6.1.2.6.3.1. through 6.1.2.6.3.3.

6.1.2.6.2.  The RC shall identify additional IDT periods separately from normal unit or individual training periods in budget documents and in internal records so that training period costs and training support costs for each type of additional training may be clearly identified, justified, and audited.

6.1.2.6.3.  Three categories of additional IDT periods are:

6.1.2.6.3.1.  Additional training periods (ATPs).  ATPs for units, components of units, and individuals are for accomplishing additional required training, as defined by post-mobilization mission requirements.  The number of those training periods shall not exceed 36 each fiscal year (FY) for any member.

6.1.2.6.3.2.  Additional flying and flight training periods (AFTPs).  AFTPs are authorized for primary aircrew members for conducting aircrew training and combat crew qualification training to attain and maintain aircrew flying proficiency and sustain required readiness.  These AFTPs shall not be in addition to the ATPs in paragraph 6.1.2.6.3.1.  The number of these training periods shall not exceed 72 each FY for any aircrew member, unless specifically authorized by the Secretary concerned, and subject to the limitations in paragraph 6.1.2.6.4.

6.1.2.6.3.3.  Readiness management periods (RMPs).  RMPs are used to support the following functions in preparing units for training: the ongoing day-to-day operation of the unit, accomplishing unit administration, training preparation, support activities, and maintenance functions.  The number of RMPs shall not exceed 36 each FY for any member. These training periods shall be used only where sufficient full-time support (FTS) personnel are not available to accomplish those duties.  These RMPs are for the use of drilling Reserve members who are not military technicians.  Not more than one RMP shall be performed by an individual in one calendar day.

6.1.2.6.4.  Except for aircrew members, the combination of ATPs and RMPs shall not exceed 72 in each FY for each person.  Combinations of ATPs, AFTPs, and RMPs for aircrew members shall not exceed 84 in a FY, with the Secretary concerned authorized to provide a waiver to a maximum of 96 additional IDT periods for an aircrew member in a FY. Training periods authorized in excess of the units presented in paragraph 6.1.2.6.3.2. shall not be used for augmenting missions and must provide bona fide training opportunities required to meet readiness levels.  This authority may not be delegated below the Secretary of the Military Department concerned.

6.1.2.7.   Reserve component members performing IDT who are covered for an injury, illness or disease incurred or aggravated in line of duty as provided under section 1074a (a)(2), (3) and (4) of Reference (g) shall also be subject to:

6.1.2.7.1.  Chapter 47 of Reference (g) for members performing IDT pursuant to Reference (g).

6.1.2.7.2.  The applicable state code, if provided under such code, for members performing IDT pursuant to Reference (i).

6.1.3.  ID.  Authorized duty, other than training, performed by members of a RC not on AD.  It consists of Muster Duty (MD) and Funeral Honors Duty (FHD).

6.1.3.1.  MD.  A special category of ID used to meet the continuous screening requirement established by section 10149 of Reference (g).  A member of the Ready Reserve may be ordered without his consent to MD one time a year by an authority designated by the Secretary concerned pursuant to section 12319 of Reference (g).

6.1.3.1.1.  MD shall be considered equivalent to IDT, except for pay, and shall include a minimum of 2 hours at the muster site.  MD shall not be performed for more than 1 day, including travel, each calendar year.  An allowance for MD shall be paid in accordance with section 433 of Reference (j) and Reference (k) at the rate determined by the DoD Per Diem Committee and included in the DoD 7000.14-R (Reference (l)).

6.1.3.1.2.  In cases where a total of more than 1 day is required to meet the MD requirement, or in other specific circumstances approved under regulations issued by the Secretary concerned, ADT may be used in lieu of MD.

6.1.3.2.  FHD.  The rendering of military funeral honors is the ceremonial paying of respect and the final demonstration of the country's gratitude to those who, in times of war and peace, have faithfully defended our Nation.  FHD includes both the preparation for and the actual performance of funeral honors functions at the funeral of a veteran as defined in section 1491 of Reference (g).

6.1.3.2.1.  Members of the Ready Reserve may perform FHD in a voluntary status pursuant to the provisions of section 12503 of Reference (g) or section 115 of Reference (i).  No more than one FHD period shall be performed in a day.  FHD shall include a minimum of 2 hours of duty during a day, including travel, for the performance of duty and/or preparation/training for duty.  Service credit for this duty shall be pursuant to section 12732(a)(2)(E) of Reference (g).  This duty may be performed in either a pay or non-pay status.  If in a pay status, an allowance for FHD shall be paid pursuant to either section 435 of Reference (j) or compensation pursuant to section 206 of Reference (j), as authorized by the Secretary concerned.

6.1.3.2.2.  Though other AD categories may be used to provide funeral honors support, the duty category in which funeral honors and the preparation for funeral honors are performed shall be determined by the Secretary concerned, and in no case may the performance of funeral honors or the preparation for such honors be considered a period of IDT.

6.1.4.  AD.  Full-time duty in the active Military Service of the United States.  It includes full-time training duty, annual training duty, and attendance, while in active Military Service, at a school designated as a Service school by law and the Secretary of the Military Department concerned.  It does not include FTNGD.  At any time, an authority designated by the Secretary concerned may order a member of the RC under his or her jurisdiction to AD or retain the member on AD with the consent of the member under the authority of sections 12301(d), 12301(h), and 12322 of Reference (g).  However, a member of the Army National Guard of the United States (ARNGUS) or Air National Guard of the United States (ANGUS) may not be ordered to AD under that authority without the consent of the Governor or other appropriate authority of the State or territory, the Commonwealth of Puerto Rico, or the District of Columbia.  For the RC, AD is comprised of the categories ADT and ADOT.  The respective authorities for AD for RC members are depicted at Enclosure 4, with specific duty categories described in paragraphs 6.1.4.1., 6.1.4.2., and 6.1.5.

6.1.4.1.  ADT.  A category of AD that shall be used to provide structured individual and/or unit training, including on-the-job-training, or educational courses to RC members.  Included in the ADT category are annual training (AT), initial ADT (IADT), and other training duty (OTD).  The primary purpose of ADT is to provide individual and/or unit readiness training.  Support to mission requirements, i.e., operational support, may occur as a consequence of performing ADT.

6.1.4.1.1.  IADT.  A category of ADT which includes basic military training and technical skill training, is required for all enlisted accessions.  Paragraph 6.6.4.1.4. provides specific guidance on IADT.

6.1.4.1.2.  AT.  The minimum period of ADT that Reserve members must perform each year to satisfy the training requirements associated with their RC assignment.  The primary purpose of AT is to provide individual and/or unit readiness training.  AT may provide support to AC missions and requirements.  AT may be required for all members of the Ready Reserve.  Members of the Selected Reserve shall perform AT.  For all members of Selected Reserve units, except for those in the National Guard, AT shall be for not less than 14 days (exclusive of travel time) each year pursuant to section 10147 of Reference (g), and not less than 12 days (exclusive of travel time) for the Coast Guard Reserve.  Individual Mobilization Augmentees (IMAs) are members of the Selected Reserve, not assigned to a Reserve unit organized to serve as a unit.  IMAs are required to perform a minimum of 12 days of AT each year pursuant to DoD Directive 1235.11 (Reference (m)).  Support to mission requirements, i.e., operational support, may occur as a consequence of performing AT.

6.1.4.1.3.  OTD.  Authorized ADT, other than IADT or AT, that provides all other structured training, to include on the job training, for individuals or units to enhance proficiency.

OTD is authorized to provide for full-time attendance at organized and planned specialized skill training, refresher and proficiency training, and professional development education programs. It shall be used to support RC members in obtaining the necessary skills and disciplines to achieve required readiness standards.  The primary purpose of OTD is to provide individual and/or unit readiness training.  Authorization for ADT shall be managed pursuant to directives established by the Secretaries concerned.  National Guard and Reserve personnel who are not employed as military technicians shall receive priority consideration for such training.  Support to mission requirements, when it also provides individual and/or unit readiness training, may occur as a consequence of performing OTD.

   6.1.4.2.  <u>ADOT</u>.  A category of AD used to provide RC support to either AC or RC missions.  It includes the categories of ADOS (formerly active duty for special work (ADSW)), Active Guard and Reserve (AGR) duty, and involuntary AD pursuant to sections 12301, 12302, and 12304 of Reference (g) and section 712 of Reference (h).  Training may occur as a consequence of performing ADOT.

   6.1.4.2.1.  <u>ADOS</u>.  Authorized voluntary AD for RC personnel funded through applicable military or Reserve personnel appropriations (ADOS-AC funded or ADOS-RC funded) to support AC or RC programs, respectively.  The purpose of ADOS is to provide the necessary skilled manpower assets to support existing or emerging requirements.  Authorization of ADOS shall be managed pursuant to Issuances established by the Secretary concerned.  To assist the Military Departments in managing ADOS tours, the following criteria are provided.

   6.1.4.2.1.1.  ADOS includes all voluntary AD performed pursuant to section 12301(d) of Reference (g), other than AGR duty.

   6.1.4.2.1.2.  ADOS includes active duty for training performed as a result of a request of an operational commander to provide support.

   6.1.4.2.1.3.  ADOS includes all AD and ADT performed as a result of reimbursable funding.

   6.1.4.2.1.4.  ADOS includes FHD performed not in an inactive duty status.

   6.1.4.2.1.5.  ADOS includes voluntary AD performed by recall of reserve retirees not receiving regular retired pay.

   6.1.4.2.1.6.  National Guard and Reserve personnel who are not employed as a military technician shall receive priority consideration for these tours.

   6.1.4.2.1.7.  The cumulative periods of AC and FTNGD performed by the member exceeding 1,095 days in the previous 1,460 days, are accountable against AD strengths (active component, or AGR end strength, consistent with pay appropriations) when the 1,095 day threshold is crossed, pursuant to section 115 of Reference (g).  A member whose order to AC or FTNGD that specifies a period of greater than 3 years shall be included in the strength

authorized, as stated above, commencing on the first day of the orders.  Additionally, these members will continue to count against the ceilings prescribed in section 115(b) of Reference (g).

6.1.4.2.1.7.1.  Each Reserve component is limited to a maximum number of personnel that may be performing Operational Support (OS) duty pursuant to section 115 (b) of Reference (g) at any time.

6.1.4.2.1.7.2.  General/Flag Officers are included in OS accountability, but are further controlled by section 526 of Reference (g) regarding limitations and accountability.

6.1.4.2.2.  <u>AGR Duty</u>.  AD performed by a member of an RC of the Army, the Navy, the Air Force, or the Marine Corps, the Coast Guard, or FTNGD performed by a member of the National Guard under an order to AD or FTNGD for a period of 180 consecutive days or more for organizing, administering, recruiting, instructing, or training the Reserve components, or to perform other duties as prescribed in sections 12310 and 10211 of Reference (g).  Personnel performing such duty are included in the FTS numbers for each RC under the collective title of AGR.

6.1.4.2.3.  Funding for personnel in uniform Reserve, training, and retirement categories shall be pursuant to procedures established in this Instruction.  The Secretary concerned is authorized to include in the budget for the AC both military personnel and operations and maintenance funds to provide AD tours for RC members on AD in support of AC programs.

6.1.5.  <u>FTNGD</u>.  "Full-time National Guard duty" means training or other duty, other than inactive duty, performed by a member of the Army National Guard of the United States or the Air National Guard of the United States in the member's status as a member of the National Guard of a State or territory, the Commonwealth of Puerto Rico, or the District of Columbia pursuant to section 316, 502, 503, 504, or 505 of Reference (i) for which the member is entitled to pay from the United States or for which the member has waived pay from the United States.

6.1.5.1.  <u>FTNGD-AT</u>.  AT is the minimum period of full-time military training that National Guard members must perform each year to satisfy the training requirements associated with their RC assignment.  The primary purpose of AT is to provide individual and/or unit readiness training.  Support to mission requirements, i.e., operational support, may occur as a consequence of performing AT.  National Guard units are required to perform full-time military training (in FTNGD status) for at least 15 days each year including travel time pursuant to section 502 Reference (i).

6.1.5.2.  <u>FTNGD-OTD</u>.  OTD is authorized full-time military training, other than IADT or AT, that provides all other structured training, to include on the job training, for individuals or units to enhance proficiency.  OTD is authorized to provide for full-time attendance at organized and planned specialized skill training, refresher and proficiency training, and professional development education programs.  It shall be used to support RC members in

obtaining the necessary skills and disciplines to achieve required readiness standards.  National Guard personnel who are not employed as military technicians shall receive priority consideration for such training.

6.1.5.3.  <u>FTNGD-OT</u>.  A category of FTNGD used to provide RC (National Guard) support to either AC or RC missions.  It includes the categories of FTNGD for operational support (FTNGD-OS) (formerly FTNGD for special work (FTNGD-SW), AGR duty, and involuntary FTNGD pursuant to section 502(f)(1) of Reference (i).  Training may occur as a consequence of performing FTNGD-OT.

6.1.5.3.1  <u>FTNGD-for OS</u>.  The purpose of FTNGD-OS is to provide the necessary skilled manpower assets to support existing or emerging requirements pursuant to section 502(f) of Reference (i).  Authorization of FTNGD-OS shall be managed pursuant to Directives established by the Secretaries of the Army and Air Force. To assist the Military Departments in managing these tours, the following criteria are provided.

6.1.5.3.1.1.  FTNGD-OS includes all voluntary FTNGD performed pursuant to section 502(f) of Reference (i), other than AGR duty.

6.1.5.3.1.2.  FTNGD-OS includes FTNGD duty for training performed as a result of a request of an operational commander to provide support.

6.1.5.3.1.3.  FTNGD-OS includes all FTNGD performed as a result of reimbursable funding.

6.1.5.3.1.4.  FTNGD-OS includes FHD performed not in an inactive duty or active duty status.

6.1.5.3.1.5.  National Guard personnel who are not employed as a military technician shall receive priority consideration for these tours.

6.1.5.3.1.6.  The cumulative periods of AC and FTNGD performed by the member exceeding 1,095 days in the previous 1,460 days, are accountable against AD strengths (active component, or AGR end strength, consistent with pay appropriations) when the 1,095 day threshold is crossed, pursuant to section 115 of Reference (g).  A member whose order to AC or FTNGD that specifies a period of greater than 3 years shall be included in the strength authorized, as stated above, commencing on the first day of the orders.  Additionally, these members will continue to count against the ceilings prescribed in section 115(b) of Reference (g).  Each Reserve component is limited to a maximum number of personnel that may be performing OS duty pursuant to section 115(b) of Reference (g) at any time.

6.2.  <u>Maximize RC Utilization</u>.  All training duty planned and performed by RC members shall capitalize on RC capabilities to accomplish operational requirements while maintaining their mission readiness for domestic and overseas operations.  RC members may be employed to support AC mission requirements as part of conducting training duty.

6.3.  RC Utilization Authorities

6.3.1.  Enclosure 4 depicts the structure and relationships of RC duty categories for ID, AD, and FTNGD under specific authorities.  The training and support categories provide the Secretaries concerned the flexibility of developing policies to maximize RC utilization as stated in paragraph 6.2.

6.3.1.1.  Training.  All RC members shall receive training pursuant to assignments and required readiness levels.  Required training shall provide for the minimum training time or number of training periods required for attaining the prescribed unit readiness status and maintaining individual proficiency.  The primary purpose of all training is the enhancement of individual skills and/or unit effectiveness.  Training may be conducted in ID, AD, or FTNGD status.  Mission support may be a key element in developing training programs, but training shall be the paramount consideration and documented for budgetary allocations.  Mission and operational support may occur as a consequence of training.  Required training is further delineated in section 6.6.

6.3.1.2.  Support.  Voluntary Duty (AD and FTNGD) may be used to achieve desired readiness levels and meet mission requirements.

6.3.1.3.  Mobilization.  Involuntary AD is used in support of military operations when the President or the Congress determines that RC forces are required to augment the AC.  It is provided for within the provisions of sections 12301 and 12302 of Reference (g) for full and partial mobilization, respectively, section 12304 of Reference (g) for Presidential Reserve Call-Up authority, and section 712 of Reference (h) for Secretary of Homeland Security Coast Guard Reserve call-ups for domestic emergencies.  For other purposes, the Secretaries concerned may order members involuntarily to AD pursuant to provisions of sections 12301(b) or 12303 of Reference (g) and section 712 of Reference (h).

6.3.1.4.  Other.  Includes FHD, a voluntary status pursuant to the provisions of section 12503 of Reference (g) or section 115 of Reference (i), that shall be considered a special category of ID, and MD, established in section 12319 of Reference (g).  It also includes voluntary AD for the purposes of medical evaluation and treatment pursuant to sections 12301(h) and 12322 of Reference (g); special circumstances to include:  voluntary AD at National Guard Bureau pursuant to section 12402 of Reference (g); members ordered to AD for unsatisfactory participation pursuant to sections 10148 and 12303 of Reference (g); RC members in a captive status, pursuant to section 12301(g) of Reference (g); members ordered to AD for disciplinary purposes pursuant to section 802(d) of Reference (g); and for Federal service due to insurrection pursuant to sections 331, 332 and 12406 of Reference (g).

6.4.  Assignment Restrictions Outside the United States

6.4.1.  A member of the RCs shall not be assigned to AD on land outside the United States, its territories and possessions, until the member has completed the basic training requirements of the member's Armed Force pursuant to section 671(a) of Reference (g).

6.4.2.  FTNGD shall not be performed on land outside the United States, its territories or possessions, because a member of the RCs must be in a status provided for in Reference (g).

6.5.  Placement of RC Members in RCCs and TRCs

6.5.1.  The uniform reserve training and retirement categories are defined in Enclosure 6.

6.5.2.  Pursuant to section 115(e) of Reference (g), each unit and member of the RCs not counted in AD end strengths pursuant to section 115 of Reference (g) shall be placed in one of the RCCs and TRCs identified.  Individuals shall be assigned to RCCs and TRCs based on their RC obligations to meet mission requirements and training requirements.

6.5.3.  Table 1 at Enclosure 6 establishes authorized RCCs and TRCs in the RCs for training and accountability purposes.  Enclosure 5 describes those categories.

6.6.  Training Participation Requirements

6.6.1.  The Secretaries concerned shall establish standards for satisfactory participation at required training periods, which shall include the number and percentages of training periods for meeting the minimum standards, pursuant to DoD Directive 1215.13 (Reference (n)).  Individuals attending IDT periods are required to meet those minimum training standards.  Those standards shall contain procedures for accounting for absences and excused training periods, as necessary.  Individuals may voluntarily attend additional IDT periods for points, if authorized by the Secretary concerned.

6.6.2.  There is no statutory maximum annual limit on required training for members of the National Guard.

6.6.3.  To ensure that trained and qualified RC units and individuals are available for AD throughout the entire spectrum of requirements, including war or national emergency, contingency operations, military operations other than war, operational support, and at such other times as the national security may require, and that funds appropriated annually for RC training and operations are adequate for meeting these requirements, the Secretary concerned shall establish necessary criteria and procedures to:

6.6.3.1.  Approve any additional IDT as necessary and consistent with law.  Authorizing and utilizing additional training is subject to the categories, limitations, and controls in paragraph 6.1.2.6.

6.6.3.2.  Ensure that all RC members receive training according to assignments and required readiness levels.  Minimum training requirements are provided for in section 10147 of Reference (g), section 502(a) of Reference (h), and further prescribed in paragraphs 6.1.2., 6.1.4., 6.1.5., and 6.6.4.

6.6.3.3.  Provide for training for the Individual Ready Reserve (IRR), Standby Reserve, and Retired Reserve in a voluntarily status according to the procedures described below.

6.6.4.  <u>Training Requirements by Personnel Category</u>

6.6.4.1.  <u>Selected Reserve</u>

6.6.4.1.1.  <u>IDT</u>.  Except as specifically provided below, members of the Selected Reserve, excluding AGRs, shall participate in 48 scheduled drills or training periods each year. This requirement applies to all members of Selected Reserve units; however, the Secretary concerned may, except in the case of the ARNGUS or the ANGUS, reallocate the number of scheduled drills within a Reserve component where warranted to achieve readiness requirements.  The Secretary concerned may reduce the number of scheduled drills of selected lower priority units and increase the scheduled drills of higher priority units by not more than 10 percent, rounded to the nearest whole number.  The aggregate number of scheduled drills within a component shall not be reduced by this reallocation (section 10147 of Reference (g) and section 502 of Reference (i)).  IDT requirements for individual Selected Reserve members not assigned to a unit organized to serve as a unit, or IMAs, shall be determined by the organization to which assigned and resourced by the appropriate Service component pursuant to Reference (m).

6.6.4.1.2.  <u>AT</u>.  AT is required for all members of the Selected Reserve, excluding AGRs.  For members of the Reserves, ADT for purposes of AT shall be for not less than 14 days, 12 days for the Coast Guard Reserve, (exclusive of travel time) each year, except as provided in paragraph 6.6.4.1.2.1.  Units of the National Guard are required to perform full-time military training for at least 15 days each year (including travel) pursuant to section 502 of Reference (i).

6.6.4.1.2.1.  AT for IMAs or other Selected Reserve members not assigned to a unit organized to serve as a unit, and in training categories ordered to AD for AT at headquarters, support organizations, or to activities not operating on Saturday, Sunday, or Federal holidays, normally is limited to 12 days excluding travel time (i.e., from Monday of the first week through Friday of the second week).  Such training may begin on any day of the week to maximize training opportunities, or to support a training event or activity.

6.6.4.1.2.2.  When required, members may be ordered to AT for longer periods than those minimum periods established in paragraphs 6.6.4.1.2. and 6.6.4.1.2.1. up to a maximum of 30 days each FY, for activities that enhance readiness or provide support to operational missions that results from the required training.  Training may begin on any day of the week to maximize training opportunities, or support a training event or activity.

6.6.4.1.2.3.  Annual training normally is performed during one consecutive period.  Split tours may be authorized for selected units or individuals, if required to meet training missions or enhance mission support associated with required training.  Any additional

*DoDI 1215.06, February 7, 2007*

costs must be fully justified.  Authorization for variations in AT lengths shall be managed pursuant to Directives established by the Secretary concerned.

      6.6.4.1.3.  <u>Periods of AD or FTNGD Performed by Members of the Selected Reserve</u>.  AD performed pursuant to sections 12301(d), 12302, 12304, and 12406 of Reference (g), or FTNGD performed pursuant to section 502(f) of Reference (i) may not be substituted for training required by section 10147 of Reference (g) or section 502(a) of Reference (i) and by paragraph 6.6.4.1.2. unless in the judgment of the Secretary concerned:

      6.6.4.1.3.1.  AD performed pursuant to sections 12301(d), 12302, 12304, or 12406 of Reference (g) or FTNGD performed pursuant to section 502(f) is equivalent to the training that might have been performed under the authority of section 10147 of Reference (g) or section 502(a) of Reference (i) and paragraph 6.6.4.1.2.

      6.6.4.1.3.2.  AD performed pursuant to sections 12301(d), 12302, 12304, or 12406 of Reference (g) or FTNGD performed pursuant to section 502(f) when combined with training required by section 10147 of Reference (g) or section 502(a) of Reference (i) and paragraph 6.6.4.1.2. constitutes an undue personal hardship.

      6.6.4.1.4.  <u>IADT</u>.  Initial AD training is a sub-category of ADT used to provide basic military training and technical skill training required for all enlisted accessions.  For non-prior service (NPS) persons who are qualified for induction for active duty in an Armed Force (generally male citizens and resident aliens between the ages of 18 1/2 and 26 years of age) and who are not under orders to report for induction under the Military Selective Service Act (50 U.S.C. App 451 et seq., Reference (o)), IADT shall be for a period as provided in section 671 of Reference (g), to commence, insofar as practical, within 270 days after the date of enlistment pursuant to section 12103 of Reference (g).  For all other enlistees and inductees, the period of IADT shall be prescribed by the Secretary concerned to commence, insofar as practical, within 360 days after entry into Service, except that in time of war or national emergency declared by Congress or the President, basic training (or its equivalent) shall be for a period of not less than 12 weeks pursuant to section 671(b) of Reference (g).  Periods of basic training or equivalent training shorter than 12 weeks may also be established by the Secretary concerned for members who have been credentialed in a medical profession or occupation and are serving in a healthcare occupational specialty pursuant to section 671(c) of Reference (g).  Enlisted members receiving stipends under the Armed Forces Health Professions Scholarship Program (AFHPSP) for Reserve Service are not required to participate in Ready Reserve training until they have completed their educational training pursuant to sections 671(b), 12103, and 16201 of Reference (g).

      6.6.4.1.5.  The Secretaries concerned may require members enlisted for service in the Selected Reserve to participate in IDT periods before completing IADT.  Those training periods shall be with pay.  Voluntary participation in IDT before completing IADT may be authorized in either a pay or non-pay status.

6.6.4.1.6.  Pursuant to section 10147(b) of Reference (g), an individual Reservist may not be required to perform a period of ADT if the first day of that period falls during the last 120 days of the member's required membership in the Ready Reserve if the member has served on AD for one year or longer.

6.6.4.2.  Individual Ready Reserve and Inactive National Guard (IRR/ING)

6.6.4.2.1.  Members of the IRR, not scheduled for mandatory or voluntary training, may be required to serve 1 day of MD each year to accomplish continuous screening requirements pursuant to sections 10149, 10204, 10205, 10206, 12319, and 12644 of Reference (g).  Exemptions from IRR screening during one FY are authorized for members who served on AD during the FY; who reside outside geographical limitations established by the Secretaries concerned or the Commandant of the Coast Guard when not operating as a Service in the Navy; who are in the grade of O-4 or higher, and have no remaining required period of membership in the Ready Reserve; or, who were successfully screened in the preceding FY.  Under no circumstances should a member serve an initial period in the IRR of more than 18 months without participating in a screening either during an annual muster day, during a period of training, or through some other means.  The Secretaries concerned are required to maintain records on the current status of each member's physical condition, dependency status, military qualifications, civilian occupational skills, availability for service, present address, and other necessary information to facilitate a call-up to active duty, as prescribed.

6.6.4.2.2.  Members of the IRR, including individuals enlisting directly into the IRR, may participate voluntarily in IDT, for points only, pursuant to the regulations of the Military Services.  Those IRR members participating in approved programs outside the Department of Defense (Enclosure 7) may participate in IDT, with pay, if that pay is reimbursable from the supported non-DoD organization to the Department of Defense.

6.6.4.2.3.  Members of the RCs, not subject to mandatory training, shall be encouraged to participate on a voluntary basis to maintain their mobilization readiness.  However, the opportunity to participate voluntarily in training, with pay, is subject to manpower and other resource limitations as determined by the Secretary concerned.

6.6.4.2.4.  Members of the ING shall muster with their assigned unit once a year to maintain their ING status and unit affiliation.  They shall not participate in any training activities in either a pay or points only status, and are not eligible for promotion.

6.6.4.3.  Standby Reserve.  The Standby Reserve consists of personnel who maintain their military affiliation without being in the Ready Reserve pursuant to sections 10141, 10150, 10151, 10152, and 10153 of Reference (g) and DoD Directive 1235.9 (Reference (p)).

6.6.4.3.1.  Active Status List.  Members of the Standby Reserve in an active status may participate voluntarily without pay in RC training for retirement points only.  This voluntary training shall not be performed in an imminent danger area.  These members may be considered

for promotion and, if selected, be promoted.  The following members of the Standby Reserve are in an active status:

6.6.4.3.1.1.  Personnel who have not fulfilled their statutory military service obligation (MSO).

6.6.4.3.1.2.  Personnel temporarily assigned to the Standby Reserve because of hardship, or other cogent reason, who intend to return to the Ready Reserve.

6.6.4.3.1.3.  Personnel retained in an active RC status pursuant to section 12646 of Reference (g).

6.6.4.3.1.4.  Members with a remaining service obligation shall be transferred from the Ready Reserve to the Standby Reserve Active Status List, after being designated as a "key employee" by the employer, and approved as such by the appropriate RC personnel management office.  Members shall remain in that Standby Reserve status for the period of time they remain designated and approved as a "key employee."  Employers who designate Ready Reserve members as "key employees" must request removal of those members from the Ready Reserve pursuant to DoD Directive 1200.7 (Reference (q)).

6.6.4.3.2.  <u>Inactive Status List</u>.  Members of the Standby Reserve Inactive Status List may not participate for points, pay, or promotion credit and may not be considered for promotion, or be promoted.  The following members of the Standby Reserve are in an inactive status:

6.6.4.3.2.1.  Members transferred to the Inactive Status List instead of separating pursuant to section 1209 of Reference (g).

6.6.4.3.2.2.  All other members transferred to the Inactive Status List pursuant to Reference (p).  Personnel enrolled in a military school course, including correspondence courses, when transferred from the Ready Reserve to the Standby Reserve Inactive Status List may continue voluntary participation in the course until completion.  Those personnel shall not be entitled to pay and allowances, travel and transportation, or earn retirement points for that training.

6.6.4.4.  <u>Retired Reserve</u>.  This category consists of all personnel transferred to the Retired Reserve and are subject to mobilization pursuant to DoD Directive 1352.1 (Reference (r)).  Retirees may voluntarily train with organizations to which they are properly pre-assigned by orders for recall to AD in a national emergency or declaration of war.  Such training shall be limited to that training made available within the resources authorized by the Secretary concerned.  The Retired Reserve consists of the following categories:

6.6.4.4.1.  Reserve members receiving retired pay pursuant to Chapter 1223 of Reference (g).

6.6.4.4.2.  Reserve members who have transferred to the Retired Reserve after completing the requisite qualifying years creditable for retired pay pursuant to Chapter 1223 of Reference (g), but who are not yet 60 years of age, or are age 60 and have not applied for retired pay.

6.6.4.4.3.  Reserve members retired for physical disability pursuant to sections 1201, 1202, 1204, or 1205 of Reference (g).  Members who have completed the requisite years of Military Service creditable for non-regular retired pay pursuant to Chapter 1223 of Reference (g) or are 30-percent or more disabled and otherwise qualified pursuant to section 1201 of (Reference (g)).

6.6.4.4.4.  Reserve officers and enlisted members who have retired after completion of 20 or more years of active Military Service.  This does not include Regular enlisted members of the Navy or the Marine Corps, with 20 to 30 years of active Military Service, who are transferred to the Fleet Reserve (Navy) or the Fleet Marine Corps Reserve.

6.6.4.4.5.  Reserve personnel drawing retired pay based on retirement for reasons other than age, service requirements, or physical disability.  This category is restricted to those who are retired under special conditions, as authorized by the Assistant Secretary of Defense for Reserve Affairs under legislation.

6.7.  <u>Voluntary Training</u>.  Members of the RCs, not subject to mandatory training, shall be encouraged to participate in voluntary training to maintain their mobilization readiness.  The opportunity to participate voluntarily without pay in training shall be limited by the manpower and resources authorized by the Secretary concerned.

6.8.  <u>Funds</u>.  Funds for personnel in uniform Reserve, training, and retirement categories shall be pursuant to DoD 7000.14-R (Reference (s)).  The Secretary concerned should include in the military personnel and operations and maintenance budgets for the AC funds to provide AD tours for Reserves on AD, including temporary duty, in support of AC and RC programs.

*DoDI 1215.06, February 7, 2007*

## 7. <u>EFFECTIVE DATE</u>

This Instruction is effective immediately.

David S. C. Chu
Under Secretary of Defense for
Personnel and Readiness

Enclosures - 7
    E1.　References, continued
    E2.　Definitions
    E3.　Duty Statuses
    E4.　Table 1, "Reserve Component Utilization Authorities"
    E5.　Uniform Reserve, Training, and Retirement Categories
    E6.　Table 2, "Authorized Reserve, Training and Retirement Categories"
    E7.　Members Participating In Approved Programs Outside the Department of Defense

E1.  ENCLOSURE 1

REFERENCES, continued

(e)    DoD Directive 1205.17, "Official National Guard and Reserve Component Personnel Data," April 30, 2004

(f)    DoD Instruction 7730.54, "Reserve Components Common Personnel Data System (RCCPDS)," August 6, 2004

(g)    Title 10, United States Code, "Armed Forces"

(h)    Section 712 of title 14, United States Code, "Coast Guard"

(i)    Title 32, United States Code, "National Guard"

(j)    Sections 206, 433, and 435 of title 37, United States Code, "Pay and Allowances of the Uniformed Services"

(k)    DoD Instruction 1215.7, "Service Credit for Reserve Retirement," September 12, 2002

(l)    DoD 7000.14-R, "Department of Defense Financial Management Regulation," Volume 7A, "Military Pay Policy and Procedures for Active Duty and Reserve Pay," February 2002

(m)    DoD Directive 1235.11, "Management of Individual Mobilization Augmentees (IMAs)," May 6, 1996

(n)    DoD Directive 1215.13, "Reserve Component Member Participation Policy," December 14, 1995

(o)    Sections 451 to 500 and the Appendix of title 50, United States Code, "Military Selective Service Act"

(p)    DoD Directive 1235.9, "Management of the Standby Reserve," February 10, 1998

(q)    DoD Directive 1200.7, "Screening the Ready Reserve," November 18, 1999

(r)    DoD Directive 1352.1, "Management and Mobilization of Regular and Reserve Retired Military Members," July 16, 2005

(s)    DoD 7000.14-R, "Department of Defense Financial Management Regulation," Volume 2A, "Presentation and Formulation," June 2000

(t)    Joint Publication 1-02, "Department of Defense Dictionary of Military and Associated Terms," 12 April 2001

(u)    Section 3101 of title 5, United States Code, "Government Organization and Employees"

(v)    DoD Directive 1000.17, "Detail of DoD Personnel to Duty Outside the Department of Defense," February 24, 1997

(w)    DoD Directive 3025.1, "Military Support to Civil Authorities," January 15, 1993

*DoDI 1215.06, February 7, 2007*

E2.  ENCLOSURE 2

DEFINITIONS

E2.1.  Active Component (AC).  That portion of the armed forces as identified in annual authorization acts as "active forces," and in section 115 of Reference (g) as those active-duty personnel paid from funds appropriated for active-duty personnel.

E2.2.  Active Status.  For the purpose of this instruction, active status is defined as all National Guard and Reserve component members, except those members who are on an inactive status list, assigned to the Inactive National Guard, or in the Retired Reserve.  Reserve members in an active status may train with or without pay, earn retirement points, and may earn credit and be considered for promotion, and promoted.

E2.3.  Annual Screening.  For the purpose of this instruction, annual screening is defined as one-day ADT or MD each year for certain IRR members that enables the Services to maintain the current status of each IRR member's physical condition, dependency status, military qualifications, civilian occupation skills, availability for service, and other information pursuant to section 10149 of Reference (g).

E2.4.  Full-Time National Guard Duty (FTNGD).  Training or other duty, other than inactive duty, performed by a member of the ARNGUS or the ANGUS in a member's status as a member of the National Guard of a state or territory, the Commonwealth or Puerto Rico, or the District of Columbia pursuant to sections. 316, 502, 503, 504, or 505 of Reference (i) for which the member is entitled to pay from the United States, or for which the member has waived pay from the United States.  FTNGD is active service pursuant to section 101(d)(3) of Reference (g).

E2.5.  Individual Mobilization Augmentee (IMA) Detachments.  (See Reference (t))

E2.6.  Inactive Status.  (See Reference (t))

E2.7.  Key Employee.  (See Reference (t))

E2.8.  Key Position.  For the purpose of this instruction, a key position is defined as a civilian position, public or private (designated by the employer pursuant to Reference (q)) that cannot be vacated during war or national emergency without seriously impairing the capability of the parent organization to function effectively.

E2.9.  Non-Deployable Account.  (See Reference (t))

E2.10.  Non-Prior Service (NPS) Personnel.  For the purpose of this instruction, non-prior service personnel is defined as individuals who have no prior military service, who have not completed IADT or its equivalent, and enlist directly into a U.S. Armed Force.

E2.11.  Operational Support (OS) Duty.  A category of voluntary duty used to provide RC support to operations and mission requirements.  It includes active duty, other than Active Guard and Reserve duty, pursuant to section 12301(d) of Reference (g); full-time National Guard duty, other than Active Guard and Reserve duty, pursuant to section 502(f) of Reference (i); and active duty for training performed at the request of an organizational or operational commander, or as a result of reimbursable funding.  It does not include AD performed as an AGR, FTNGD performed as an AGR, or FTNGD performed in support of counter-drug operations.

E2.12.  Qualifying Years of Creditable Service for Non-Regular Retired Pay.  The time National Guard or Reserve members must serve to be eligible for non-regular retired pay at age 60 years.  Individuals must have at least 20 years of service, or as otherwise provided for in law, in which they received at least 50 retirement points,

E2.13.  Reserve Components (RCs).  (See Reference (t))

E2.14.  Trained Strength in Units.  For the purpose of this instruction trained strength in units is defined as all personnel (Reserve or National Guard members, AGR and AC members) assigned to a National Guard or Reserve unit who, in the case of enlisted members, have completed IADT and are eligible for deployment overseas on land when mobilized under proper authority.  Personnel in non-deployable accounts or a training pipeline are not part of a unit's trained strength.

E2.15.  Training and Retired Categories (TRC).  (See Reference (t))

E2.16.  Training Period.  For the purpose of this instruction training period is defined as an authorized and scheduled regular IDT period.  A training period must be at least four hours.  The term was previously used interchangeably with other common terms such as "drills," "drill period," "assemblies," "periods of instruction," etc.

E2.17.  Training Unit.  (See Reference (t))

E2.18.  Unit.  (See Reference (t))

E2.19.  Voluntary Training.  For the purpose of this instruction voluntary training is defined as training in a pay or non-pay status, especially applicable to RC members of the IRR, Standby Reserve active status list, and retirees.  Participation in voluntary training may be achieved by training with Selected Reserve or voluntary training units; performing ADT; completing authorized military correspondence courses; attending designated courses of instruction; performing equivalent duty; participating in special military and professional events designated by the Military Department; or participating in authorized civil defense activities.

E2.20.  Voluntary Training Unit.  (See Reference (t))

E3.  ENCLOSURE 3

DUTY STATUSES

E3.1.  DUTY STATUSES

E3.1.1.  AD.  Full-time duty in the active military service of the United States.  It includes full-time training duty, annual training duty, and attendance, while in active military service, at a school designated as a Service school by law and the Secretary of the Military Department concerned.  It does not include FTNGD.  For the RC, AD is comprised of the categories of ADT and ADOT.

E3.1.1.1.  ADT.  A category of AD that shall be used to provide structured individual and/or unit training, including on-the-job-training, or educational courses to RC members.  Included in the ADT category are AT, IADT, OTD.

E3.1.1.1.1.  AT.  It is the minimum period of ADT that Reserve members must perform each year to satisfy the training requirements associated with their RCs assignment.

E3.1.1.1.2.  IADT.  A category of ADT which includes basic military training and technical skill training, is required for all enlisted accessions.

E3.1.1.1.3.  OTD.  Authorized ADT, other than IADT or AT, that provides all other structured training, to include on the job training, for individuals or units to enhance proficiency.  OTD is authorized to provide for full-time attendance at organized and planned specialized skill training, refresher and proficiency training, and professional development education programs.  It shall be used to support RC members in obtaining the necessary skills and disciplines to achieve required readiness standards.

E3.1.1.2.  ADOT.  A category of AD used to provide RC support to either AC or RC missions.  It includes the categories of ADOS (formerly known as ADSW), AGR duty, and involuntary AD pursuant to sections 12301, 12302, and 12304 of Reference (g) and section 712 of Reference (h).

E3.1.1.2.1. ADOS.  AD for Operational Support (ADOS) is an authorized voluntary tour of AD, other than AGR duty, performed pursuant to section 12301(d) of Reference (g) and ADT performed at the request of an organizational or operational commander, or as a result of reimbursable funding.  ADOS is funded through applicable military or Reserve personnel appropriations (ADOS-AC funded or ADOS-RC funded) to support AC or RC programs, respectively.  The purpose of ADOS is to provide the necessary skilled manpower assets to support existing or emerging requirements.

E3.1.1.2.2.  AGR Duty.  AD performed by a member of an RC of the Army, the Navy, the Air Force, or the Marine Corps, the Coast Guard, or FTNGD performed by a member

of the National Guard under an order to AD or FTNGD for a period of 180 consecutive days or more for organizing, administering, recruiting, instructing, or training the Reserve components, or to perform other duties as prescribed in sections 12310 and 10211 of Reference (g).  Personnel performing such duty are included in the FTS numbers for each RC under the collective title of AGR.

E3.1.1.2.3  Involuntary Active Duty.  AD used in support of military operations when it is determined by the President or the Congress that RC forces are required to augment the AC.  It is provided for within the provisions of sections 12301 and 12302 of Reference (g) for full and partial mobilization, respectively, section 12304 of Reference (g) for Presidential Reserve Call-Up authority, and section 712 of Reference (h) under which the Secretary of Homeland Security may call up the Coast Guard Reserve for domestic emergencies.  For other purposes, Secretaries concerned may order members involuntarily to AD pursuant to provisions of sections 802(d), 12301(b), 10148, or 12303 of Reference (g).

E3.1.2.  FTNGD.  Training or other duty, other than ID, performed by a member of the ARNGUS or the ANGUS in a member's status as a member of the National Guard of a state or territory, the Commonwealth or Puerto Rico, or the District of Columbia pursuant to sections 316, 502, 503, 504, or 505 of Reference (i) for which the member is entitled to pay from the United States, or for which the member has waived pay from the United States.  FTNGD is active service pursuant to section 101(d)(3) of Reference (g).

E3.1.2.1.  FTNGD for Operational Support (FTNGD(OS)).  FTNGD(OS) is an authorized voluntary tour of FTNGD, other than AGR duty, performed pursuant to section 502(f)(2) of Reference (i) and FTNGD for training performed at the request of an organizational or operational commander, or as a result of reimbursable funding.  The purpose of FTNGD(OS) is to provide the necessary skilled manpower assets to support existing or emerging requirements pursuant to section 502(f)(2) of Reference (i).  Authorization of FTNGD(OS) shall be managed pursuant to Directives established by the Secretaries of the Army and Air Force.

E3.1.3.  ID

E3.1.3.1.  IDT.  Authorized training performed by members of an RC not on AD or FTNGD, and performed in connection with the prescribed activities of the RC, of which they are a member.  It consists of regularly scheduled unit training periods, ATPs, and equivalent training as defined in this Instruction.

E3.1.3.1.1.  Regularly Scheduled IDT.  The regularly scheduled 48 annual periods of IDT authorized for National Guard members and RC members pursuant to section 10147 of Reference (g) or section 502(a) of Reference (i).

E3.1.3.1.2.  Equivalent Training (ET).  A sub-category of IDT.  It is IDT performed instead of regularly scheduled IDT.

E3.1.3.1.3.  <u>Additional IDT Periods</u>.  There are three categories of additional IDT periods:

E3.1.3.1.3.1.  <u>Additional training periods (ATPs)</u>.  ATPs for units, components of units, and individuals are for accomplishing additional required training, as defined by post-mobilization mission requirements.

E3.1.3.1.3.2.  <u>Additional flying and flight training periods (AFTPs)</u>.  ATFPs are authorized for primary aircrew members for conducting aircrew training and combat crew qualification training to attain and maintain aircrew flying proficiency and sustain required readiness.

E3.1.3.1.3.3.  <u>Readiness management periods (RMPs)</u>.  RMPs are used to support the following functions in preparing units for training:  the ongoing day-to-day operation of the unit, accomplishing unit administration, training preparation, support activities, and maintenance functions.

E3.1.3.2.  <u>MD</u>.  A special category of ID used to meet the continuous screening requirement established by section 10149 of Reference (g).  A member of the Ready Reserve may be ordered without his consent to MD one time a year by an authority designated by the Secretary concerned pursuant to section 12319 of Reference (g).

E3.1.3.3.  <u>FHD</u>.  A special category of ID used to prepare for, and provide honors at the funeral of military members and veterans.  Members of the Ready Reserve may perform FHD in a voluntary status pursuant to the provisions of section 12503 of Reference (g) or section. 115 of Reference (i).

*DoDI 1215.06, February 7, 2007*

E4.  ENCLOSURE 4

TABLE E4.T1.  RESERVE COMPONENT UTILIZATION AUTHORITIES

| Utilization Categories | Legal Authority | Purpose of Duty | Applies To | Type of Duty | |
|---|---|---|---|---|---|
| **Training** | | | | | |
| | 10 USC 10147 | Annual Training (AT)/Drill Requirement | Reserve Only | AD/IDT | Involuntary |
| | 10 USC 12301(b) | Annual Training | Reserve & National Guard | AD | Involuntary |
| | 10 USC 12301(d) | Additional/Other Training Duty | Reserve & National Guard | AD | Voluntary |
| | 32 USC 502(a) | Annual Training (AT)/Drill Requirement | National Guard Only | FTNGD/IDT | Involuntary |
| | 32 USC 502(f)(1) | Additional Training Duty | National Guard Only | FTNGD | Involuntary |
| | 32 USC 502(f)(2) | Additional/Other Training Duty | National Guard Only | FTNGD | Voluntary |
| **Support** | | | | | |
| | 10 USC 12301(d) | AGR Duty/Operational Support/Additional Duty | Reserve & National Guard | AD | Voluntary |
| | 32 USC 502(f)(2) | AGR Duty/Operational Support/Additional Duty | National Guard Only | FTNGD | Voluntary |
| | 32 USC 502(f)(1) | Other Duty | National Guard Only | FTNGD | Involuntary |
| **Mobilization** | | | | | |
| | 10 USC 12301(a) | Full Mobilization | Reserve & National Guard | AD | Involuntary |
| | 10 USC 12302 | Partial Mobilization | Reserve & National Guard | AD | Involuntary |
| | 10 USC 12304 | PRC | Reserve & National Guard | AD | Involuntary |
| | 14 USC 712 | Emergencies | USCGR Only | AD | Involuntary |
| | | | | | |
| **Other** | | | | | |
| | 10 USC 12503 | Funeral Honors | Reserve & National Guard | ID | Voluntary |
| | 32 USC 115 | Funeral Honors | National Guard Only | ID | Voluntary |
| | 10 USC 12319 | Muster Duty | Reserve & National Guard | ID | Involuntary |
| | 10 USC 12301(h) | Medical Care | Reserve & National Guard | AD | Involuntary |
| | 10 USC 12322 | Medical Evaluation and Treatment | Reserve & National Guard | AD | Voluntary |
| | 10 USC 802(d) | Disciplinary | Reserve & National Guard | AD | Involuntary |
| | 10 USC 10148 | Unsat Participation (up to 45 days) | Reserve & National Guard | AD | Involuntary |
| | 10 USC 12301(g) | Captive Status | Reserve & National Guard | AD | Involuntary |
| | 10 USC 12303 | Unsat Participation (up to 24 months) | Reserve & National Guard | AD | Involuntary |
| | 10 USC 12402 | Duty at National Guard Bureau | National Guard Only | AD | Voluntary |
| | 10 USC 331 | Insurrection | National Guard Only | FS | Involuntary |
| | 10 USC 332 | Insurrection | National Guard Only | FS | Involuntary |
| | 10 USC 12406 | Insurrection | National Guard Only | FS | Involuntary |

AD        - Active Duty
ID         - Inactive Duty
IDT       - Inactive Duty Training
FTNGD - Full Time National Guard Duty
FS         - Federal Service

E5.  ENCLOSURE 5

UNIFORM RESERVE, TRAINING, AND RETIREMENT CATEGORIES

E5.1.  RESERVE COMPONENT CATEGORIES (RCCs)

Categories identifying an individual's status in a RC.  There are three RCCs:  The Ready Reserve, the Standby Reserve, and the Retired Reserve.  Each member of the National Guard and Reserve is assigned within one of those categories.  (All National Guard members, including those in the ING, are in the Ready Reserve.)

E5.1.1.  Ready Reserve Categories.  The Ready Reserve is comprised of military members of the Reserve and National Guard, organized in units or as individuals, or both, and liable for involuntary order to AD in time of war or national emergency pursuant to sections 12301 and 12302 of Reference (g) and section 712 of Reference (h) in the case of members of the Coast Guard Reserve.  The Ready Reserve consists of three sub-categories: the Selected Reserve, the IRR, and the ING.

E5.1.1.1.  Selected Reserve.  The Selected Reserve consists of those units and individuals in the Ready Reserve designated by their respective Service, and approved by the Chairman of the Joint Chiefs of Staff, as so essential to initial wartime missions that they have priority over all other Reserves.  All Selected Reservists are in an active status.  They are trained as prescribed in section 10147(a)(1) of Reference (g) or section 502(a) of Reference (i), as appropriate.  In addition to the involuntary call up authorities set out in the previous paragraph, members of the Selected Reserve may also be involuntarily called to AD to augment the active forces for any operational mission pursuant to section 12304 of Reference (g).  The Selected Reserve includes the following:

E5.1.1.1.1.  Selected Reserve Units.  Units manned and equipped to serve and/or train either as operational or as augmentation units.  Operational units train and serve as units.  Augmentation units train together, but when mobilized, lose their unit identity and become part of an AC unit or activity.  Selected Reserve units include:

E5.1.1.1.1.1.  Drilling Unit Reservists.  Trained unit members participating in unit training activities on a part-time basis shall have the RCC and TRC designator of "SA."

E5.1.1.1.1.2.  Unit Full-Time Support (FTS) Personnel

E5.1.1.1.1.2.1.  AGR.  National Guard or Reserve members of the Selected Reserve serving on AGR duty assigned or attached to Selected Reserve units (to include full-time National Guard duty), as defined in section 101 of Reference (g), for the purposes of organizing, administering, recruiting, instructing, or training the RCs, who may also perform other duties as prescribed in section 12310 of Reference (g).  All such AGR members must be assigned against, or attached to, an authorized mobilization position in the unit they support.  They shall have the RCC and TRC designator of "SG."

E5.1.1.1.1.2.2. <u>Military Technician (Dual Status) (MT)</u>. A civilian employee of the Military Department concerned who is required, as a condition of civilian employment, to maintain military membership in a Reserve component and who is assigned to a position as a technician in the administration and training of such Reserve component, or in the maintenance and repair of supplies or equipment issued to such Reserve component. The military and civilian position skills of MTs must be compatible. MTs are not accounted for separately in RCC/TRC categories. Accordingly, these MTs are accounted for in Reserve end strengths as Drilling Unit Reservists (E5.1.1.1.1. of this Enclosure), and, as such, are accountable under the TRC designator of "SA." NOTE: There are certain technicians providing unit FTS who are not required to maintain military membership (i.e., non-dual status technicians) and others who are not required to hold compatible military and civilian positions.

E5.1.1.1.1.2.3. <u>Non-Dual Status Technician (NDST)</u>. NDSTs are not accounted for in RCC/TRC categories. A civilian employee employed as a technician before November 18, 1997, pursuant to any of the authorities specified in section 10217(b) of Reference (g) and is not a member of the Selected Reserve or after that date has ceased to be a member of the Selected Reserve or is employed pursuant to section 709 of Reference (i) in a position designated pursuant to subsection (c) of that section and when hired was not required to maintain membership in the Selected Reserve. NDST shall encumber only those technician positions identified by the Secretary concerned as NDST positions.

E5.1.1.1.1.2.4. <u>AC</u>. AC personnel are not accounted for in RCC/TRC categories. Members of the active forces of the Military Services, paid from AC military personnel appropriations, assigned or attached to National Guard or Reserve units to provide advice, liaison, management, administration, training, and/or maintenance support in the category of FTS pursuant to section 12501 of Reference (g). These members are not part of the Selected Reserve, but may deploy with their assigned unit, should it mobilize. AC members performing FTS are counted as part of trained strength in units, but not in the Selected Reserve strengths.

E5.1.1.1.1.2.5. <u>Civil Service Employees (CIV)</u>. CIVs are not accounted for in RCC/TRC categories. Such personnel are hired pursuant to section 3101 of 5 U.S.C. (Reference (u)) to provide administrative support to RC units. They are in the category of FTS to the RCs, but are not part of the Selected Reserve. This category is exclusive of dual-status MTs and NDSTs.

E5.1.1.1.2. <u>Full-Time Members (Special Category)</u>. Trained Selected Reserve members who are performing AD or FTNGD for more than 180 days in a fiscal year, but who are exempted from counting against the AD strengths pursuant to section 101(d)(6)(B)(ii) and (iii) of (Reference (g)). Specifically, this includes U.S. Property and Fiscal Officers and members performing duty for the purpose of interdiction and counterdrug activities. These personnel shall have the RCC and TRC of "SV."

E5.1.1.1.3. <u>Individual Mobilization Augmentees (IMAs)</u>. Individual members of the Selected Reserve assigned to an RC billet in an AC or non-DoD organization. They are trained

individuals pre-assigned to an AC or a Selected Service System (SSS) billet that must be filled to support mobilization (pre- and/or post-mobilization) requirements, contingency operations, operations other than war, or other specialized or technical requirements. IMAs participate in training activities on a part-time basis with an AC unit or SSS preparing for active service, as required. The amount of training required may vary from 0 to 48 IDT periods per year. All IMAs must perform a minimum of 12 days of AT each year. They have the RCC and TRC designator of "TB."

E5.1.1.1.4.  <u>Training Pipeline</u>.  An RCC designation "U" that identifies Selected Reserve enlisted members who have not yet completed IADT as provided in section 671 of Reference (g) and officers who are in training for professional categories or in undergraduate flying training. Pursuant to section 671 of Reference (g), all Ready Reservists shall receive training commensurate with their intended wartime assignments, and must complete the basic training requirements of the member's Service before assignment on land outside the United States, its territories or possessions. The training pipeline is synonymous with the term "non-deployable account." Personnel in the training pipeline may be mobilized, but may not always be available for deployment with their units. If otherwise eligible for mobilization and deployment, they shall be considered as mobilization assets. Training pipeline personnel are accounted for separately in the following training categories:

E5.1.1.1.4.1.  <u>Members Currently on IADT</u>.  Includes the second part of split IADT for enlisted members, which has the RCC and TRC designator of "UF."

E5.1.1.1.4.2.  <u>Enlisted Members Awaiting Second Part of Split IADT</u>.  Those members shall have the RCC and TRC designator of "UQ."

E5.1.1.1.4.3.  <u>Members Awaiting IADT Authorized to Perform IDT</u>.  Those members in the Selected Reserve serving with pay. Service performed by members while in that status is creditable toward computation of basic pay. Members in this category shall have the RCC TRC designator of "UP." This category also includes National Guard members awaiting IADT and not authorized to perform IDT. See paragraph 6.6.4.1.4. for specific criteria regarding this category.

E5.1.1.1.4.4.  <u>Other Selected Reserve Untrained Personnel in Training Programs</u>. Includes chaplain candidates, health profession students, and early commissioning program participants with the RCC and TRC designator of "UX."

E5.1.1.1.4.5.  <u>AGR Enlisted Members Currently on, or Awaiting, IADT</u>.  Includes NPS AGR personnel and has the RCC and TRC designator of "US."

E5.1.1.1.4.6.  <u>Individuals in a Simultaneous Membership Program</u>.  Senior Reserve Officers' Training Corps (ROTC) Cadets, Selected Reserve enlisted members in officer candidate programs, and Marine Corps Platoon Leader Class students who are also permitted to be members of a Selected Reserve unit. These members have the RCC and TRC designator of "UT."

E5.1.1.1.5.  <u>AGR not in Selected Reserve Units</u>.  National Guard or Reserve members of the Selected Reserve, serving on AGR duty (to include full-time National Guard duty) as defined in Chapter 1 of Reference (g), and Coast Guard Reserve AGRs, but who are not assigned or attached to Selected Reserve units.  They occupy positions in organizations, other than Selected Reserve units, for the purposes of organizing, administering, recruiting, instructing, or training the RCs, and may also perform other duties as prescribed in section 12310 of Reference (g).  They shall have the same RCC and TRC designator as AGRs in units - "SG."

E5.1.1.1.6.  <u>Civil Service Employees (CIV) not in Selected Reserve Units</u>.  CIVs are not accounted for in RCC/TRC categories.  Such personnel hired under section 3101 of Reference (u) to provide administrative support to the RCs.  They are in the category of FTS to the RCs, but are not part of the Selected Reserve.

E5.1.1.2.  <u>IRR</u>  The IRR consists of Reservists in the following categories:

E5.1.1.2.1.  IRR is a manpower pool comprised principally of individuals who have had training, have previously served in the AC or in the Selected Reserve, and have some period of their military service obligation (MSO) or other contractual obligation remaining.  Some individuals volunteer to remain in the IRR beyond their MSO or contractual obligation and participate in programs providing a variety of professional assignments and opportunities for earning retirement points and military benefits.  Members may voluntarily participate in training for retirement points and promotion, with or without pay.  IRR members are not required to meet the same AT and IDT training requirements as Selected Reserve members.  Exceptions to this training requirement restriction shall be approved by the USD(P&R).  Required training (involuntary) may not exceed 30 days a year pursuant to section 10147 of Reference (g).  IRR members may be required to perform MD as described in paragraph 6.6.4.2.1. of the main body of this Instruction.  Trained members of the IRR have the RCC and TRC designator of "RE," with the exception of those members in the category described in paragraph E5.1.1.2.2.

E5.1.1.2.2.  Within the IRR there is a category of members, as designated by the Secretary concerned, who have volunteered to be called to AD pursuant to the provisions of section 12304 of Reference (g) when needed.  This category of the IRR is provided for in section 10144(b) of Reference (g).  Members in this mobilization category shall be eligible for benefits (other than pay and training) as normally available to members of the Selected Reserve, as determined by the Secretary of Defense.  IRR members in this category have the RCC and TRC designator of "RM."

E5.1.1.2.3.  The IRR also includes some personnel participating in officer training programs or in the Armed Forces Health Professional Scholarship Program (AFHPSP).  The RCC and TRC designator "PJ" is used for officers not in the Selected Reserve but participating in officer training programs.  Included within this category are cadets of the Merchant Marine Academy.  The RCC and TRC designator "PK" is used for officers not in the Selected Reserve, but participating in the AFHPSP.  Members in that stipend program are required to perform 45 days of AD for training a year pursuant to section 2121(c) of Reference (g).

E5.1.1.2.4.  The IRR also includes enlisted members awaiting IADT (except for members of the National Guard), who are not authorized to perform IDT.  These members are assigned to units and are serving without pay.  Service performed by members in that status is not creditable toward computation of basic pay and shall have the RCC and TRC designator of "RU."  NPS enlistees between the ages of 18 1/2 and 26 years enlisting pursuant to section 12103 of Reference (g) shall commence IADT, insofar as practicable, within 270 days after the date of that enlistment.  All other enlisted members shall perform IADT, insofar as practicable, within 360 days of their enlistment.

E5.1.1.2.5.  The IRR also includes members of the Delayed Entry Program enlisted pursuant to section 513 of Reference (g).  Currently, there is no requirement to account for those untrained members of the IRR in the RCCPDS.  However, these IRR members may be coded with the RCC and TRC designator of "RH."

E5.1.1.3.  ING.  The ING consists of National Guard personnel in an inactive status in the Ready Reserve, not in the Selected Reserve, attached to a specific National Guard unit.  To remain ING members, members must muster once a year with their assigned unit, but they do not participate in training activities.  On mobilization, ING members may mobilize with their units.  Similar to IRR members, some ING members have legal and contractual obligations.  ING members may not train for points or pay and are not eligible for promotion.  Currently, the ING category is used only by the ARNG and has the RCC and TRC designator of "II."

E5.1.2.  Standby Reserve Categories.  The Standby Reserve consists of those units or members, or both, of the Reserve components, other than those in the Ready Reserve or Retired Reserve, who are liable for active duty only as provided for in sections 12301 and 12306 of Reference (g).  The Standby Reserve consists of personnel who are maintaining their military affiliation without being in the Ready Reserve, but have been designated key civilian employees, or have a temporary hardship or disability.  Those individuals are not required to perform training and are not part of units.  The Standby Reserve is a pool of trained individuals who may be mobilized as needed to fill manpower needs in specific skills.  The Standby Reserve consists of the active status list and the inactive status list categories.

E5.1.2.1.  Active Status List.  The following members of the Standby Reserve are in an active status:

E5.1.2.1.1.  Members designated as key employees pursuant to Reference (q) and transferred from the Ready Reserve to the Standby Reserve Active Status List for the period they remain designated as a key employee.  Key employees may participate voluntarily without pay in RC training for retirement points only and may be considered for promotion.  This voluntary training shall not be performed in an imminent danger area.  While there is no statutory prohibition against paying active status Standby Reservists for IDT or AD, members of the Standby Reserve who have been screened out of the Ready Reserve as key employees shall not be paid for training.  They have the RCC and TRC designator of "YC."

E5.1.2.1.2.  Personnel not having fulfilled their statutory MSO, who are temporarily assigned for a hardship reason but intend to return to the Ready Reserve, or who are retained by a RC in an active status pursuant to section 12646 of Reference (g).  These members may participate voluntarily with or without pay and may receive credit for, and be considered for, promotion.  They have the RCC and TRC designator of "YD."

E5.1.2.2.  <u>Inactive Status List</u>.  Members in the Standby Reserve who are not required to remain in an active program, but who retain Reserve affiliation in a non-participating status and whose skill may be of future use to the Armed Force concerned.  These members cannot participate in prescribed training.  While in an inactive status, Reserve members are not eligible for pay or promotion and do not accrue credit for years of service pursuant to provisions of Chapter 1223 of Reference (g).

E5.1.2.2.1.  Members transferred to the Standby Reserve Inactive Status List pursuant to section 1209 of Reference (g) instead of separating.  They have the RCC TRC designator of "YL."

E5.1.2.2.2.  All other members transferred to the Standby Reserve Inactive Status List pursuant to Reference (p).  They have the RCC TRC designator of "YN."

E5.1.3.  <u>Retired Reserve Categories</u>

E5.1.3.1.  All Reserve personnel transferred to the Retired Reserve.  Retired Reservists voluntarily may train, with or without pay.  The Retired Reserve consists of the following retired categories:

E5.1.3.1.1.  Reserve members who have completed the requisite qualifying years creditable for non-regular retired pay pursuant to Chapter 1223 of Reference (g), and who have reached the designated retirement age and are receiving retired pay.  Those members shall be assigned the RCC and TRC designator of "V1."

E5.1.3.1.2.  Reserve members who have completed the requisite qualifying years creditable for non-regular retired pay but are either not yet eligible to receive retired pay, or are eligible to receive retired pay but have not applied for such pay.  Those members shall be assigned the RCC and TRC designator of "V2."

E5.1.3.1.3.  Reserve members retired for physical disability pursuant to sections 1201, 1202, 1204, or 1205 of Reference (g).  Members have completed 20 years of service creditable for regular retired pay, or are 30-percent or more disabled and otherwise qualified pursuant to section 1201 of Reference (g).  These members shall be assigned the RCC and TRC designator of "V3."

E5.1.3.1.4.  Reserve members who have completed the requisite years of active service and are receiving regular retired or retainer pay.  These personnel shall be assigned the RCC and TRC designator of "V4."  Excluded from this category are Regular (not RC) enlisted

*DoDI 1215.06, February 7, 2007*

personnel of the Navy and the Marine Corps with 20 or more, but less than 30, years of active military service who are transferred to the Fleet (Navy) Reserve or the Fleet Marine Corps Reserve upon retirement. They remain in the Fleet Reserve or Fleet Marine Corps Reserve until they have completed a combined total of 30 years of active and retired or retainer service.

E5.1.3.1.5. Reserve personnel drawing retired pay pursuant to other than age, service requirements, or physical disability. This category is restricted for retirement under special conditions, as authorized by the Office of the Assistant Secretary of Defense for Reserve Affairs under legislation. These personnel shall be assigned the RCC and TRC designator of "V5." Also included in this RCC and TRC will be Voluntary Separation Incentive recipients who become ineligible for retention in an active or inactive status in a Reserve component because of age, years of service, failure to select for promotion, or medical disability, and who request to be placed in this category. These individuals shall be tracked separately by the appropriate Reserve personnel management office.

E5.1.3.2. All members retired for having completed the requisite years of active duty service (Regular or Reserve), regardless of the retired list where assigned, may be ordered to AD when required by the Secretary of the Military Department concerned, pursuant to section 688 of Reference (g).

E5.1.3.3. Retired Reserve members may be ordered to AD in their status as Retired Reserve members. It is not necessary to place the member in the Ready Reserve for that purpose.

E5.1.3.4. Former members having completed 20 satisfactory years of service creditable for non-regular retirement, but electing to be discharged from the RCs, are not a part of the Retired Reserve and have no military status.

ENCLOSURE 5

E6.  ENCLOSURE 6

TABLE E6.T1. AUTHORIZED RESERVE, TRAINING, AND RETIREMENT CATEGORIES

| RCC | RC SUB-CATEGORY | RCC DESIGNATOR | TRC DESIGNATOR | COMPRISED OF | MINIMUM NUMBER OF IDT PERIODS REQUIRED ANNUALLY | MINIMUM NUMBER OF DAYS OF AT REQUIRED ANNUALLY | REMARKS | ARNG | USAR | USNR | USMCR | ANG | USAFR | USCGR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| READY RESERVE | SELECTED RESERVE | S<br><br>TRAINED IN UNITS | A | INDIVIDUALS IN UNITS | 48 | RESERVE: 14 DAYS<br><br>USCGR: 12 DAYS<br><br>NATIONAL GUARD: 15 DAYS | 10 U.S.C. 10147 (REFERENCE (g)), REQUIRES 14 DAYS AT. (EXCLUDE TRAVEL) | | X | X | X | | X | X |
| | | | | | | | 32 U.S.C. 502 (REFERENCE (i)), REQUIRES 15 DAYS AT. (INCLUDE TRAVEL) | X | | | | X | | |
| | | | G | AGR | N/A | | AGR MAY BE REQUIRED TO ATTEND DRILLS. (INCLUDES USNR TARs, USCGR RPAs (14 U.S.C. 276 (REFERENCE (h)), USMCR ARs, AND ALL STATUTORY TOURS). | X | X | X | X | X | X | X |
| | | | V | USPFO & RC MEMBERS ON AD IN SUPPORT OF COUNTER-DRUG ACTIVITIES | N/A | N/A | MEMBERS ARE ON AD FOR MORE THAN 180 DAYS AND COUNT AGAINST SELRES STRENGTH , BUT DO NOT COUNT AGAINST AGR STRENGTH | X | X | X | X | X | X | X |
| | | T<br><br>TRAINED INDIVIDUALS<br><br>NON-UNIT | B | IMA | IDT VARIES BETWEEN 0 AND 48 PERIODS EACH YEAR, AS DETERMINED BY DOD POLICY | RESERVE:- 12 TO 14 DAYS (EXCLUDE TRAVEL) | UNLESS TRAINING CAN BE ACCOMPLISHED ON WEEKENDS, AT IS LIMITED TO 12 DAYS BY POLICY. | | X | X | X | | X | X |
| | | U<br><br>TRAINING PIPELINE<br><br>NON-DEPLOYABLE ACCOUNT | F | PERSONNEL CURRENTLY ON IADT | O | N/A | INCLUDES SECOND PART OF SPLIT TRAINING AND ARMY ONE-STATION UNIT TRAINING (APPLIES TO TRCs F, P, AND Q). | X | X | X | X | X | X | X |
| | | | P | PERSONNEL AWAITING IADT AND AUTHORIZED TO PERFORM IDT | MINIMUM IDT TO BE DETERMINED BY DoD COMPONENT POLICY | N/A | INCLUDES PERSONNEL WITH OR WITHOUT PAY. | X | X | X | X | X | X | X |
| | | | Q | PERSONNEL AWAITING SECOND PART OF IADT | 48 | N/A | | X | X | X | X | X | X | X |

*DoDI 1215.06, February 7, 2007*

TABLE E6.T1. AUTHORIZED RESERVE, TRAINING, AND RETIREMENT CATEGORIES, Cont.

| RCC | RC SUB-CATEGORY | RCC DESIGNATOR | TRC DESIGNATOR | COMPRISED OF | MINIMUM NUMBER OF IDT PERIODS REQUIRED ANNUALLY | MINIMUM NUMBER OF DAYS OF AT REQUIRED ANNUALLY | REMARKS | CURRENTLY USED BY | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | ARNG | USAR | USNR | USMCR | ANG | USAFR | USCGR |
| READY RESERVE | SELECTED RESERVE | U  TRAINING PIPELINE, NON-DEPLOYABLE ACCOUNT | S | AGR CURRENTLY ON, OR AWAITING IADT | DETERMINED BY DoD COMPONENT POLICY | N/A | INCLUDES NPS AGR (NAVY TAR) PERSONNEL. | | | X | | | | |
| | | | T | INDIVIDUALS IN A SIMULTANEOUS MEMBERSHIP | 48 | SAME AS TRC A | SENIOR ROTC CADETS OR MARINE CORPS PLATOON LEADER CLASS MEMBERS WHO ARE ALSO PERMITTE BE MEMBERS OF A SELECT RESERVE UNIT. | X | X | | X | X | X | |
| | | | X | PERSONNEL IN OTHER TRAINING PROGRAMS | 48 | SAME AS TRC A | SELECTED RESERVE UNTRAINED MEMBER IN OTHER TRAINING PROGRAMS INCLUDING CHAPLAINS, MEDICAL, HEALTH PROFESSIONAL STIPEND, AND EARLY COMMISSIONING.  MUST MEET THE SAME TRAINING REQUIREMENTS. AS TRC A RESERVISTS. | X | X | | X | | | |
| | IRR  and  ING | R  IRR | E | INDIVIDUAL MEMBERS OF THE READY RESERVE NOT IN SELECTED RESERVE (INCLUDES OFFICERS AWAITING AD OR SELECTED RESERVE ASSIGNMENT) | N/A | 1 | IRR MEMBERS MAY VOLUNTARILY PARTICIPATE IN TRAINING FOR RETIREMENT POINTS AND PROMOTION WITH OR WITHOUT PAY. REQUIRED TRAINING MAY NOT EXCEED 30 DAYS EACH YEAR. (10 U.S.C. 10147, REFERENCE (g)). | | X | X | X | | X | X |
| | | | M | SPECIAL CATEGORY WITHIN THE IRR SUBJECT TO INVOLUNTARY CALL TO AD IAW 10 USC 12304 (REFERENCE (g). | N/A | N/A | MEMBERS MUST VOLUNTEER FOR THIS CATEGORY, AND MAY ONLY REMAIN IN THIS CATEGORY FOR 48 MONTHS AFTER LEAVING ACTIVE SERVICE. | | X | X | X | | X | X |
| | | | H | UNTRAINED MEMBERS OF THE IRR.  (DEP) 10 U.S.C. 513, REFERENCE (g) | | | | | X | X | X | | X | X |
| | | | U | PERSONNEL AWAITING IADT | NOT AUTHORIZED TO PERFORM IDT | N/A | | | X | X | X | X | X | X |

*DoDI 1215.06, February 7, 2007*

TABLE E6.T1. AUTHORIZED RESERVE, TRAINING, AND RETIREMENT CATEGORIES, Cont.

| RCC | RC SUB-CATEGORY | RCC DESIGNATOR | TRC DESIGNATOR | COMPRISED OF | MINIMUM NUMBER OF IDT PERIODS REQUIRED ANNUALLY | MINIMUM NUMBER OF DAYS OF AT REQUIRED ANNUALLY | REMARKS | CURRENTLY USED BY | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | ARNG | USAR | USNR | USMCR | ANG | USAFR | USCGR |
| READY RESERVE | IRR And ING | P READY RESERVE TRAINING | J | PERSONNEL NOT IN THE SELECTED RESERVE - PARTICIPATING IN OFFICER TRAINING PROGRAMS | 0 | AS REQUIRED BY SPECIFIC PROGRAM | CHAPLAIN AND JUDGE ADVOCATE GENERAL (JAG) SCHOOLING, EDUCATION DELAY, ROTC ASSIGNMENT DELAY, ARMY EARLY COMMISSIONING PROGRAM, COAST GUARD DIRECT COMMISSION CANDIDATES, MARINE PLATOON LEADER CLASS, MERCHANT MARINE CADETS (USNR). | X | X | X | | | X | X |
| | | P READY RESERVE TRAINING | K | PERSONNEL NOT IN THE SELECTED RESERVE - PARTICIPATING IN THE AFHPSP | 0 | 45 DAYS | AFHPSP REQUIRES 45 DAYS AD ANNUALLY. 10 U.S.C. 2121(C) (REFERENCE (g)). | | X | X | | | X | |
| | | I ING | I | ING | 0 | 1 | MUST MEET ANNUAL MUSTER WITH ASSIGNED UNIT. MAY NOT TRAIN FOR POINTS OR PAY AND ARE NOT ELIGIBLE FOR PROMOTION. | X | | | | | | |
| STANDBY RESERVE | | Y STANDBY | C | ACTIVE STATUS LIST | 0 | 0 | KEY EMPLOYEES, ONLY, PER DoD DIRECTIVE 1200.7 (REFERENCE (q)). ACTIVE STANDBY MEMBERS MAY VOLUNTARILY TRAIN FOR POINTS WITHOUT PAY AND ARE ELIGIBLE FOR PROMOTION. | X | X | X | | | X | X |
| | | | D | ACTIVE STATUS LIST PROGRAMS | 0 | 0 | OTHER ACTIVE STATUS MEMBERS. | X | X | X | | | X | X |
| | | | L | INACTIVE STATUS LIST | 0 | 0 | MEMBERS TRANSFERRED TO INACTIVE STATUS LIST INSTEAD OF SEPARATION UNDER 10 U.S.C. 1209, CHAPTER 61 (REFERENCE (g)). INACTIVE STAND-BY MEMBERS MAY NOT TRAIN FOR POINTS WITH OR WITHOUT PAY AND ARE NOT ELIGIBLE FOR PROMOTION. | X | X | X | | | X | X |
| | | | N | INACTIVE STATUS LIST | 0 | 0 | OTHER INACTIVE STATUS MEMBERS. | X | X | X | | | X | |

*DoDI 1215.06, February 7, 2007*

TABLE E6.T1. AUTHORIZED RESERVE, TRAINING, AND RETIREMENT CATEGORIES, Cont.

| RCC | RC SUB-CATEGORY | RCC DESIGNATOR | TRC DESIGNATOR | COMPRISED OF | MINIMUM NUMBER OF IDT PERIODS REQUIRED ANNUALLY | MINIMUM NUMBER OF DAYS OF AT REQUIRED ANNUALLY | REMARKS | CURRENTLY USED BY | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | ARNG | USAR | USNR | USMCR | ANG | USAFR | USCGR |
| RETIRED RESERVE | | V  RETIRED | 1 | DRAWING NON-REGULAR RETIRED PAY UNDER 10 U.S.C. 12731 (REFERENCE (g)) | N/A | N/A | RESERVE MEMBERS WHO HAVE COMPLETED 20 QUALIFYING YEARS CREDITABLE FOR NON-REGULAR RETIRED PAY, ARE 60 YEARS, OR MORE, OF AGE, AND ARE DRAWING NON-REGULAR RETIRED PAY | X | X | X | | X | X |
| | | | 2 | NOT DRAWING NON-REGULAR RETIRED PAY, BUT ELIGIBLE AT AGE 60, UNDER SECTION 10 U.S.C. 12731 (REFERENCE (g)) | N/A | N/A | RESERVE MEMBERS WHO HAVE COMPLETED 20 QUALIFYING YEARS CREDITABLE FOR NON-REGULAR RETIRED PAY, BUT ARE NOT YET 60 YEARS OF AGE, OR ARE AGE 60 AND HAVE NOT APPLIED FOR NON-REGULAR RETIRED PAY | X | X | X | | X | X |
| | | | 3 | RESERVE MEMBERS RETIRED FOR PHYSICAL DISABILITY | N/A | N/A | RESERVE MEMBERS RETIRED FOR PHYSICAL DISABILITY UNDER 10 U.S.C. 1201, 1202, 1204, OR 1205 (REFERENCE (g)). MEMBERS WHO HAVE 20 YEARS OF SERVICE CREDITABLE FOR NON-REGULAR RETIRED PAY OR ARE 30-PERCENT OR MORE DISABLED. | X | X | X | | X | X |
| | | | 4 | RESERVE MEMBERS WHO HAVE COMPLETED 20, OR MORE, YEARS OF AD | N/A | N/A | RESERVE MEMBERS WHO HAVE COMPLETED 20, OR MORE, YEARS OF AD SERVICE AND RETIRED UNDER 10 U.S.C. 3911, 3914, 6323, 6330, 8911, OR 8914 (REFERENCE (g)). DOES NOT INCLUDE REGULAR ARMY AND AIR FORCE ENLISTED PERSONNEL WITH BETWEEN 20 AND 30 YEARS OF MILITARY SERVICE; AND REGULAR AND RESERVE NAVY AND MARINE CORPS ENLISTED PERSONNEL IN HE FLEET RESERVE (NAVY) AND FLEET MARINE CORPS RESERVE WITH BETWEEN 20 AND 30 YEARS OF SERVICE. | X | X | X | | X | X |
| | | | 5 | DRAWING NON-REGULAR RETIRED PAY UNDER OTHER THAN 10 U.S.C. 12731 (REFERENCE (g)), OR OTHER THAN REASONS OF PHYSICAL DISABILITY | N/A | N/A | RESERVE PERSONNEL RETIREMENT PAY BASED ON RETIREMENT FOR REASONS OTHER THAN AGE, SERVICE REQUIREMENTS OR PHYSICAL DISABILITY, AS AUTHORIZED BY THE ASD(RA). CERTAIN VSI RECIPIENTS INELIGIBLE FOR RETENTION IN ACTIVE OR INACTIVE RESERVE STATUS. | X | X | X | | X | X |

ENCLOSURE 6

E7.  ENCLOSURE 7

MEMBERS PARTICIPATING IN APPROVED PROGRAMS

OUTSIDE THE DEPARTMENT OF DEFENSE

E7.1.  SELECTIVE SERVICE SYSTEM (SSS)

E7.1.1.  The SSS administers the Military Selective Service Act (MSSA) (Reference (o)). The MSSA authorizes the Director of Selective Service, by delegation from the President, "...to order to active duty with their consent and to assign to the Selective Service System such officers of the selective-service section of the state headquarters and headquarters detachments and such other officers of the federally recognized National Guard of the United States or other armed forces personnel (including personnel of the reserve components thereof), as may be necessary for the administration of the national and of the several state headquarters of the Selective Service System."

E7.1.2.  The Department of Defense and the Office of the Director of Selective Service shall agree on the number of RC members assigned as IMAs to the SSS.  The SSS shall reimburse the Department of Defense for total personnel costs for IDT and AT for those members.

E7.1.3.  Additionally, agreements between the Department of Defense and the Office of the Director of Selective Service may provide for the use of IRR members of the RCs in an IDT or AD status; with or without pay.  The SSS shall reimburse the Department of Defense for all associated costs, including IDT and AT pay, for those members.

E7.1.4.  Request for assignment to the SSS in a full-time AD status must be approved pursuant to DoD Directive 1000.17 (Reference (v)).  Costs for those members shall be reimbursed to the Department of Defense.  Members shall not be assigned to a RCC or TRC, shall not be counted against RC strengths, and shall not be included in the RCCPDS files.

E7.2.  NATIONAL SECURITY EMERGENCY PREPAREDNESS PROGRAMS

E7.2.1.  The National Emergency Preparedness Program (all hazards) is an integral part of U.S. national security.  Support of emergency preparedness may be provided through RC members participating with Federal, State, and local civil agencies only when clearly furthering specifically identifiable DoD interests.  Participation shall be in an IDT, ADT, or FTNGD status.  The primary basis for RC participation is to meet DoD program requirements and therefore costs of the program are paid by the DoD Component, except when the RC members are supporting a presidentially declared emergency or disaster.  In those cases, costs are usually on a reimbursable basis from the Federal Emergency Management Agency (FEMA).  Subject to priorities and guidance in DoD 3025.1 (Reference (w)), military support of those activities is a proper mission for DoD Components.  Military planning and liaison may be provided by RC

members at selected civil government and military headquarters, and includes such tasks and responsibilities as military support to civil authorities for CONUS defense, coordinating DoD response to domestic emergencies, and physical security of key assets.

E7.2.2.  Assigning Emergency Preparedness Liaison Officers (EPLOs) in a full-time AD (other than for training) or FTNGD status in support of Emergency Preparedness Programs outside the Department of Defense must be approved pursuant to Reference (v).  The following programs are approved for such participation:

E7.2.2.1.  <u>Federal EPLOs.</u>  Reserve officers performing planning and liaison responsibilities between DoD Components and Federal Agencies, including interface with the civil sector, as directed by their DoD Component through the Military Service planning agent. Federal EPLOs function primarily in support of DoD missions.  All costs are paid by the DoD Component.  Each Military Department is authorized to assign one or more Federal EPLOs (below flag or general officer rank) at FEMA national headquarters, at the DoD Director of Military Support, and at military headquarters that serve as the DoD, Military Service, or Regional Planning Agents for domestic emergency support.  Federal EPLOs:

E7.2.2.1.1.  Provide DoD and Service liaison with Federal Agencies and organizations, and between the Military Services.

E7.2.2.1.2.  Facilitate planning, coordination, and training for military support to civil authorities and national security emergency preparedness.

E7.2.2.1.3.  Advise Federal Agencies and organizations on DoD and Service capabilities and resources.

E7.2.2.1.4.  Advocate mutual support required by the Department of Defense.

E7.2.2.1.5.  On order, augment DoD response to domestic emergency operations.

E7.2.2.2.  <u>Regional EPLOs.</u>  Reserve officers performing planning and liaison responsibilities between DoD Components and Federal regional headquarters, including interface with the civil sector, as directed by their DoD Component through the Military Service planning agent.  Regional EPLOs function primarily in support of DoD missions.  All costs are paid by the DoD Component.  Each Military Department is authorized to assign one or more EPLOs (below flag or general officer rank) at each FEMA region and at military headquarters and locations with key functions as Department of Defense, Military Service, and Regional Planning Agents for domestic emergency support.  Regional EPLOs perform the same functions described in paragraphs E7.2.2.1.1. through E7.2.2.1.5. only at the regional level.

E7.2.2.3.  <u>State EPLOs.</u>  Reserve officers performing planning and liaison responsibilities between their DoD Components and State or U.S. Territory emergency service headquarters including interface with the civil sector, as directed by their DoD Component through the Military Service planning agent.  State EPLOs function primarily in support of DoD missions.

All costs are paid by the DoD Component. Each Military Department is authorized to assign one or more EPLOs (below flag or general officer rank) at each State or U.S. territorial headquarters and shall assign such officers to functions supervised by the State Area Command. State EPLOs provide Service representation and liaison to the military and civil authorities within the State, commonwealth, U.S. possession, and other eligible jurisdiction. State EPLOs perform the same functions described in paragraphs E7.2.2.1.1. through E7.2.2.1.5. only at the State level.

E7.2.3.  All EPLOs should attend the DoD Emergency Preparedness Course presented at the FEMA Mount Weather Emergency Assistance Center as soon as possible after assignment. This will help to ensure that DoD representatives performing these vital functions are properly trained in this complex environment.

E7.3.  <u>VOLUNTARY PARTICIPATION IN PROGRAMS OUTSIDE THE DEPARTMENT OF DEFENSE</u>

Members of the IRR may participate voluntarily in programs outside the Department of Defense in an AD or IDT status, with pay or without pay. Any pay provided shall be reimbursed to the Department of Defense by the supported Agency. Members of the Standby Reserve on the Active Status List may voluntarily participate, without pay, in approved civil defense activities and receive retirement points pursuant to Reference (k).

E7.4.  <u>IRR MEMBERS PARTICIPATING IN DEFENSE SUPPORT TO CIVIL AUTHORITIES</u>

IRR members participating in Defense Support to Civil Authorities (DSCA) training activities may request ADT to attend DSCA courses. If so ordered, those Reservists shall be entitled to pay and allowances including travel allowances for such training.



Department of Defense

# DIRECTIVE

**NUMBER** 1352.1

July 16, 2005
USD(P&R)

SUBJECT:  Management and Mobilization of Regular and Reserve Retired Military Members

References (a) DoD Directive 1352.1, subject as above, March 2, 1990 (hereby canceled)
      (b) Sections 688, 6330, 12301(a), 12307, and 973 and Chapters 61, 63, 65, 1223, 367, 571, 573, and 367 of title 10, United States Code
      (c) DoD Directive 1000.17, "Detail of DoD Personnel to Duty Outside the Department of Defense," November 21, 2003
      (d) DoD Directive 1200.7, "Screening the Ready Reserve," November 18, 1999
      (e) DoD Instruction 7730.54, "Reserve Components Common Personnel Data System," August 6, 2004
      (f)  Chapters 11 and 21 of title 14, United States Code


## 1.  REISSUANCE AND PURPOSE

This Directive:

1.  Reissues reference (a).

   2.  Implements Sections 688, 973, 12301(a), and 12307 of reference (b) by prescribing uniform policy and guidance governing the peacetime management of retired Regular and Reserve military personnel preparing for their use during a mobilization.


## 2.  APPLICABILITY AND SCOPE

   1.  This Directive applies to the Office of the Secretary of Defense, the Military Departments

EXHIBIT 13

(including the Coast Guard when it is not operating as part of the Navy by  agreement with the Department of Homeland Security), the Chairman of the Joint Chiefs of Staff, the Combatant Commands, the Office of the Inspector General of the Department of  Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities in  the Department of Defense (hereafter referred to as the "DoD Components").  The term "Military

    Services," as used herein, refers to the Army, the Navy, the Air Force, the Marine Corps, and the  Coast Guard.  The term "Secretary concerned," refers to the respective Secretaries of the Military Departments and the Secretary of Homeland Security for the Coast Guard when it is not operating as part of the Navy.

    2.  This Directive also applies to non-DoD organizations that have DoD-related missions,  such as the  Department of  Homeland Security and the  Selective Service System, and non-DoD organizations that have North Atlantic Treaty Organization-related missions, under agreements with those non-DoD organizations.


3.  DEFINITIONS

The terms used in this Directive are defined in enclosure 1.


4.  POLICY

    1.  It is DoD policy that military retirees be ordered to active duty as needed to perform such duties as the Secretary concerned considers necessary in the interests of national defense as described in Sections 12301 and 688 of reference (b).

    2.  The DoD Components and the Commandant of the U.S. Coast Guard shall plan to use  as many retirees as necessary to meet national security needs.

    3.  The military retirees ordered to active duty may be used according to guidance prescribed by the Secretary concerned as follows:

        1.  To fill shortages or to augment deployed or deploying units and activities or units  in the Continental United States, Alaska, and Hawaii supporting deployed units.

        2.  To release other military members for deployment overseas.

        3.  Subject to the limitations of Section 973 of reference (b) and DoD Directive  1000.17 (reference (c)), fill Federal civilian workforce shortages in the Department of Defense,  the U. S. Coast Guard, or other Government entities.

        4.  To meet national security needs in organizations outside the Department of Defense with Defense-related missions, if the detail outside the Department of Defense is approved according to reference (c).

*DoDD 1352.1, July 16, 2005*

5. To perform other duties that the Secretary concerned considers necessary in the interests of national defense.

4. Military retirees shall be ordered to active duty with full pay and allowances. They may not be used to fill mobilization billets in a non-pay status.

5. Military retirees serving on active duty may be reassigned to meet the needs of the Military Service.


## 5. RESPONSIBILITIES

1. The Assistant Secretary of Defense for Reserve Affairs and the Deputy Under Secretary of Defense (Military Personnel Policy) (DUSD(MPP)), under the Under Secretary of Defense for Personnel and Readiness, shall provide policy guidance for the management and mobilization of DoD military retirees.

2. The Secretaries of the Military Departments and the Commandant of the U.S. Coast Guard shall ensure plans for the management and mobilization of military retirees are consistent with this Directive.

3. The Directors of the Defense Agencies, the Secretary of Homeland Security, the Director of the Selective Service System, and Heads of Federal Agencies, shall, by agreement, assist in identifying military and Federal civilian wartime positions that are suitable to be filled by military retirees. They shall also process those requirements according to Departmental policy, including any appropriate coordination under reference (c), before the positions are filled by the Military Services. The Secretary of the Military Department shall retain the right to disapprove the request if no military retiree is available.

4. The Secretaries of the Military Departments, or designees, shall:

1. Prepare plans and establish procedures for mobilization of military retirees according to this Directive.

2. Determine the extent of military retiree mobilization requirements based on existing inventories and inventory projections for mobilization of qualified Reservists in an active status in the Ready Reserve, including Individual Ready Reserve and the Inactive National Guard (when placed in an active status), or the Standby Reserve.

3. Develop procedures for identifying retiree Categories I and II and conduct screening of retirees according to DoD Directive 1200.7 (reference (d)).

4. Maintain necessary records on military retirees and their military qualifications. Maintain records for military retiree Categories I and II, including retirees who are key employees, and their availability for mobilization, civilian employment, and physical condition. Data shall be maintained on retired Reserve members according to DoD Instruction 7730.54 (reference (e)).

DoDD 1352.1, July 16, 2005

    5.  Advise military retirees of their duty to provide the Military Services with accurate mailing addresses and any changes in civilian employment, military qualifications, availability for service, and physical condition.

    6.  Pre-assign retired members, when determined appropriate and as necessary.

    7.  Determine refresher training requirements.

6.  EFFECTIVE DATE

This Directive is effective immediately.

Gordon England
Acting Deputy Secretary of Defense

Enclosure - 1
E1.  Definitions

E1.  ENCLOSURE 1

DEFINITIONS

E1.1.1.  Key Employee.  Any Reservist or any military retiree (Regular or Reserve) identified by his or her employer, private or public, as filling a key position.

E1.1.2.  Key Position.  A civilian position, public or private (designated by an  employer and approved by the Secretary concerned), that cannot be vacated during war, a  national emergency, or mobilization without seriously impairing the capability of the  parent agency or office to function effectively, while meeting the criteria for designating  key positions as outlined in reference (d).

E1.1.3.  Military Retiree Categories.

E1.1.3.1.  Category I.  Non-disability military retirees under age 60 who have been retired fewer than 5 years.

E1.1.3.2.  Category II.  Non-disability military retirees under age 60 who have been retired 5 years or more.

E1.1.3.3.  Category III.  Military retirees, including those retired for disability, other than categories I or II retirees (includes warrant officers and healthcare professionals who retire from active duty after age 60).

E1.1.4.  Military Retirees or Retired Military Members.

E1.1.4.1.  Regular and Reserve officers and enlisted members who retire from the Military Services under 10 U.S.C. Chapters 61, 63, 65, 1223, 367, 571, or 573, and 14  U.S.C. Chapters 11 and 21 (references (b) and (f)).

E1.1.4.2.  Reserve officers and enlisted members eligible for retirement under one  of the provisions of law in paragraph E1.4.1. who have not reached age 60 and who have  not elected discharge or are not members of the Ready Reserve or Standby Reserve  (including members of the Inactive Standby Reserve).

E1.1.4.3.  Members of the Fleet Reserve and Fleet Marine Corps Reserve under Section 6330 of reference (b).



# Department of Defense
# DIRECTIVE

NUMBER 1402.1

January 21, 1982

Certified Current as of December 1, 2003

Incorporating Through Change 3, November 16, 1994

ASD(MRA&L)

SUBJECT:  Employment of Retired Members of the Armed Forces

References:  (a)  DoD Directive 1402.1, "Employment of Retired Members of the
Uniformed Services," August 16, 1969 (hereby canceled)
(b)  Sections 3326, 5303, and 5532 of title 5, United States Code
(c)  Federal Personnel Manual (FPM) Bulletin No. 300-49, "Issuance of
Interim Regulations on Decentralization of Personnel Authorities,"
March 21, 1979
(d)  Public Law 95-454, "Civil Service Reform Act, 1978"
(e)  DoD 1340.12-M, "Military Retired Pay Manual," September 5, 1979
(f)  Office of Personnel Management Handbook X-118, "Qualifications
Standards," January 1975
(g)  DoD 5000.12-M, "DoD Manual for Standard Data Elements,"
December 1982

## 1.  REISSUANCE AND PURPOSE

This Directive reissues reference (a), implements references (b) and (c), and provides
policy and guidance on the employment of retired members of the Armed Forces.

## 2.  APPLICABILITY

The provisions of this Directive apply to the Office of the Secretary of Defense, the
Military Departments (including their National Guard and Reserve components), the
Organization of the Joint Chiefs of Staff, the Unified and Specified Commands, the
Defense Agencies, and the Uniformed Services University of the Health Sciences

*DODD 1402.1, January 21, 1982*

(herein referred to as "DoD Components"), including the nonappropriated fund instrumentalities of any such Component. The term "Armed Forces," as used herein, refers to the Army, the Navy, the Air Force, the Marine Corps, and the Coast Guard.

## 3. DEFINITIONS

3.1. <u>Retired Member of the Armed Forces</u>. A member or former member of the Armed Forces who is entitled to retired, retirement, or retainer pay.

3.2. <u>Position</u>. A civilian office or position (including a temporary, part-time, or intermittent position as these terms are defined by the Office of Personnel Management (OPM)) to be filled, with or without compensation, under appointment or personal service contract from appropriated or nonappropriated funds, provided an employer-employee relationship exists.

3.3. <u>Category A Positions</u>. All wage system positions paid from appropriated funds; all general schedule (GS) positions, GS-7 and below, paid from appropriated funds; and GS positions, GS-8 and above, paid from appropriated funds for which payment of travel expenses to first duty station has been authorized.

3.4. <u>Category B Positions</u>. All positions paid from appropriated funds not covered in category A, above.

3.5. <u>Attached Operating Agency</u>. The field operating agency responsible for performing civilian personnel operational functions in support of a major DoD Component headquarters, such as the Department of the Army's Civilian Personnel Center.

## 4. POLICY AND PROCEDURES

4.1. <u>Delegation of Authority</u>. The authority to approve the appointment of a retired member of the Armed Forces to a position in the Federal service, in or under the Department of Defense, during the 180 days after retirement is delegated to the Heads of DoD Components. This includes appointments that, before the issuance of FPM Bulletin No. 300-49 (reference (c)), required the prior approval of the OPM. This authority may be redelegated as follows:

4.1.1. For category A positions, at least one level above the appointing authority.

*DODD 1402.1, January 21, 1982*

4.1.2.  For category B positions, at a level not below the major DoD Component headquarters (or attached operating agency).

4.1.3.  For positions paid from nonappropriated funds, at a level not lower than the appointing authority.

4.2.  <u>General Policies</u>

4.2.1.  The basic objective in filling positions in the Department of Defense is to ensure the appointment of fully qualified employees, generally the "best qualified" under consideration, consistent with the provisions of 5 U.S.C. 3326 (reference (b)).

4.2.2.  Retired members of the Armed Forces have a right to seek and to be considered for Federal civilian employment.  Such consideration shall be extended equitably and in compliance with the merit system principle of open competition to avoid both the practice and appearance of preferential treatment.  This is essential not only in the interests of the public and of career employees, but to protect retired members from unwarranted allegations that they obtained their positions through influence based upon prior military service.

4.2.3.  The following principles shall be observed before employing retired members of the Armed Forces.

4.2.3.1.  Full consideration shall be given, in accordance with in-service placement and promotion procedures (including procedures negotiated under the Federal Service Labor Management Relations Statute (Title VII of the Civil Service Reform Act of 1978, reference (d)), to eligible and qualified DoD civilian employees.

4.2.3.2.  When appointment is in the competitive civil service and selection is from an established civil service register, retired members of the Armed Forces shall be accorded treatment consistent with regulations issued by the OPM.

4.2.3.3.  When the selection for appointment, whether in or outside the competitive civil service, is other than from an established civil service register, recruitment for the position shall be conducted in a way that ensures reasonable efforts are made to obtain applicants from all possible sources to avoid any suspicion of attempts to unduly limit competition.

*DODD 1402.1, January 21, 1982*

4.2.3.3.1.  This requires that the vacancy be well publicized; that recruitment be conducted over a sufficient period of time to give all interested candidates an opportunity to apply; and that qualification requirements for the position be written in a manner that does not give an advantage to a particular person.

4.2.3.3.2.  When selecting a retired member, it must be established that the member is better qualified than any in-service candidate.  This requirement does not necessitate special recruitment efforts or delays in selections for shortage category positions for which OPM has authorized advanced re-hiring rates.

4.2.3.3.4.  Positions may not be held open pending the retirement of a member of the Armed Forces in order to provide that person with a preferential opportunity to apply for or be appointed to the position.  Active recruitment shall be initiated when the position becomes vacant, unless suspension of recruitment can be fully justified for management reasons unrelated to the impending retirement of a member of the Armed Forces.

4.2.3.3.5.  If the position was last occupied by the proposed appointee or another military incumbent, change to civilian incumbency must meet a bona fide management need and not be to afford civilian employment to the proposed appointee.

4.3.  Appointments 180 Days After Retirement

4.3.1.  Appointments or transfers of retired members of the Armed Forces to positions in any DoD Component during the 180 days immediately following retirement may be made only when:

4.3.1.1.  The appointment is to a position for which the minimum rate of basic compensation has been increased by the OPM under the authority of 5 U.S.C. 5303 (reference (b)); or

4.3.1.2.  The appointment is to a position for which:

4.3.1.2.1.  Equally well-qualified personnel are not available among the employees being considered under applicable in-service placement and promotion procedures;

4.3.1.2.2.  Employee candidates are not available among those required to be considered in priority placement programs, or among those on applicable DoD Component Reemployment Priority Lists, or under the OPM Displaced Employee Program; and

4.3.1.2.3  Intensive external recruitment efforts have failed to produce any better qualified candidates.

4.3.2.  A proposed appointment of a retired member of the Armed Forces under subparagraph 4.3.1.2., above, requires the prior approval of the official to whom authority has been delegated under paragraph 4.1., above.  Each appointment must comply with the spirit and intent of governing legislation and this Directive.  Each appointment of a retired member during the 180-day period must be fully documented to reflect this compliance.  As a minimum, this documentation shall include the information outlined at enclosure 1.  Documentation shall be retained in the active files for 2 years from the date of appointment action.

4.4.  <u>Documentation and Notification Requirements</u>.  Under the Dual Compensation Act (5 U.S.C. 5532, reference (b)), retired or retainer pay of those retired from the Armed Forces may be subject to reduction.  Defense procedures for administering the Act are contained in DoD 1340.12-M (reference (e)).  When a civilian office or position is filled by a retired member, the personnel action shall be reported by the appointing office on Standard Form (SF) 50, "Notification of Personnel Action," or equivalent form, to the Military Department finance center responsible for administering the member's retired or retainer pay.  Implementing regulations applicable to nonappropriated fund instrumentalities shall be uniform to the maximum extent possible.

5.  <u>RESPONSIBILITIES</u>

The <u>Heads of DoD Components</u> shall ensure that the policy and guidance in this Directive are followed.

*DODD 1402.1, January 21, 1982*

6. <u>EFFECTIVE *DATE*</u>

This Directive is effective *immediately.*

Frank C. Carlucci
Deputy Secretary of Defense


Enclosures - 1
E1.  Information to Accompany Requests for Approval of Proposed Appointments
of Retired Members of the Armed Forces

E1.  <u>ENCLOSURE 1</u>

<u>INFORMATION TO ACCOMPANY REQUESTS FOR APPROVAL OF PROPOSED
APPOINTMENTS OF RETIRED MEMBERS OF THE ARMED FORCES</u>

E1.1.1.  <u>Information About the Proposed Appointee</u>

E1.1.1.1.  The effective * date (YYMMDD) of retirement from the Armed Forces.

E1.1.1.2.  Rank at time of retirement.

E1.1.1.3.  * Pay grade and Uniformed Service, at the time of retirement; whether Regular or non-Regular.

E1.1.1.4.  A current Personal Qualifications Statement (SF 171) completed by the proposed appointee.

E1.1.2.  <u>Information About the Position Involved</u>

E1.1.2.1.  * Date (YYMMDD) the position was established.

E1.1.2.2.  * Date (YYMMDD) it was last occupied.

E1.1.2.3.  Whether the position was converted from military to civilian status.

E1.1.2.4.  * Date (YYMMDD) of conversion (if converted).

E1.1.2.5.  Reason for conversion.

E1.1.2.6.  Whether the proposed appointee was the last military occupant.

E1.1.2.7.  A current position description.

E1.1.2.8.  Whether the position is continuing or temporary.

E1.1.2.9.  A copy of the qualification standards covering the position. (Alternatively, reference may be made to Handbook X-118 (reference (f)) when X-118 standards are applied without modification.)

E1.1.2.10.  Whether efforts to fill the position have been continuous since it became vacant; if not, the reasons therefor.

*DODD 1402.1, January 21, 1982*

E1.1.3.  <u>Consideration of Career Employees</u>.  To ensure that full consideration, in accordance with placement and promotion procedures of the DoD Component concerned, was given to eligible career employees, the following information shall be included:

E1.1.3.1.  A copy of any notices used to publicize the vacancy to interested career employees.

E1.1.3.2.  Documentation on how the proposed appointee is superior to all qualified employees given consideration.

E1.1.3.3.  A statement as to whether the appropriate placement and promotion procedures were followed; if these procedures were not followed, the reasons therefor.

E1.1.4.  <u>Appointment From a Civil Service Register (Information Additional to E1.1.1., E1.1.2., and E1.1.3.)</u>.  When the proposed appointee has eligibility on an appropriate civil service register and has been reached for appointment, the following additional information shall be provided:

E1.1.4.1.  A copy of the certificate of eligibles on which the proposed appointee's name appears.  The examination announcement under which the proposed appointee filed shall be identified if it is not included on the certificate itself.

E1.1.4.2.  A copy of the request for the certificate, including selective factors and names of nominees if selective certification or name request was involved.

E1.1.4.3.  A statement as to how the proposed appointee is superior to any eligibles standing higher on the certificate.

E1.1.5.  <u>Appointment From Other Than a Civil Service Register (Information Additional to E1.1.1., E1.1.2., and E1.1.3.)</u>.  When it is proposed to appoint a retired member from other than a civil service register, the following additional information shall be provided:

E1.1.5.1.  Under what authority (OPM regulation) the retired member will be appointed.

E1.1.5.2.  If temporary appointment pending establishment of register authority has been secured, a copy of the request for a certificate of eligibles, including selective factors and a copy of the authority.

ENCLOSURE 1

*DODD 1402.1, January 21, 1982*

E1.1.5.3.  If any positive recruiting efforts were made to seek out applicants for the position, the methods used (including specific dates and places), copies of any notices publicizing the vacancy, and any contacts with recruiting sources.

E1.1.6.  <u>General Note For Personnel Processing This Information</u>:  Items marked with an asterisk (*) have been registered in the DoD Data Element Program.  Data elements and coding must be as indicated in the instructions.   In cases in which specific coding instructions are not provided, reference must be made to DoD 5000.12-M (reference (g)).   Noncompliance by a DoD Component with either the coding instructions contained herein or those registered in the DoD Data Element Program shall make such DoD Component responsible for required concessions in database communication.   Cost of data conversions shall be borne by the Head of the DoD Component concerned.

ENCLOSURE 1

1

| 1 | UNITED STATES DISTRICT COURT |
| 2 | DISTRICT OF COLUMBIA |

3  CHAPLAINCY OF FULL GOSPEL        )

4  CHURCHES,                       )

5          Plaintiff,              )

6      v.                          )        No. 1:99CV002945(RMU)

7  THE HON. DONALD WINTER,         )

8  et al.,                         )

9          Defendants.             )

10  AND RELATED CASE.              )        No. 1:00CV00566(RMU)

11

12                  Washington, D.C.

13                  Wednesday, June 6, 2007

14  Deposition of THOMAS L. BUSH, called for examination

15  by counsel for Plaintiffs in the above-entitled

16  matter, the witness being duly sworn by CHERYL A.

17  LORD, a Notary Public in and for the District of

18  Columbia, taken at the offices of ARNOLD & PORTER

19  LLP, 555 12th Street, N.W., Washington, D.C., at

20  9:28 a.m., and the proceedings being taken down by

21  Stenotype by CHERYL A. LORD, RPR, CRR.

07-mc-269
EXHIBIT 15

95

1  Q.   Okay.  And 5.2.1 says, designate all RC --

2        That means reserve components.

3        Correct?

4  A.   Yes.

5  Q.   -- members in an RCC -- meaning a reserve

6  component category.

7        Correct?

8  A.   Yes.

9  Q.   -- and a TRC in accordance with criteria

10  established in enclosures 2 and 4.

11        Now, what's your understanding of the word

12  shall?

13  A.   "Shall" is an imperative.

14  Q.   So there's no wiggle room for the

15  secretary to do anything else except designate

16  reserve component members in accordance with this

17  instruction.

18        Correct?

19  A.   In accordance with the people that we want

20  to track as mobilization assets from an OSD

21  perspective.

22  Q.   That was not my question.

96

1          My question was, it says, designate all

2     reserve component members in a reserve component

3     category in accordance with criteria established in

4     enclosures 2 and 4.

5     A.    Yes.

6          MR. HYDE:  That's not a question.

7          BY MR. SCHULCZ:

8     Q.    It says that, doesn't it?

9          MR. HYDE:  Objection to the extent you're

10    characterizing the document and asking for a legal

11    conclusion.

12         MR. SCHULCZ:  I'm not asking for a

13    conclusion.

14         BY MR. SCHULCZ:

15    Q.    You agree that that's what the language

16    says, designate?

17    A.    You're reading me the paragraph and want

18    me to acknowledge that that's what you've read?

19    Q.    Paragraph 5.2.1.

20    A.    That's what you read, yes.

21    Q.    That's right.

22         And you agree that "shall" means the

97

1  imperative?

2      A.   I agreed that, yes.

3      Q.   Okay.  And so that means that the

4  secretary of the Navy must designate those members of

5  the reserve component in a reserve component category

6  in accordance with the criteria established in

7  enclosures 2 and 4; is that not correct?

8          MR. HYDE:  Objection to the extent you're

9  calling for a legal conclusion.

10          MR. SCHULCZ:  I'm asking for his

11  understanding of what that says.

12          MR. HYDE:  That wasn't what the question

13  said.

14          BY MR. SCHULCZ:

15      Q.   As the component of the document.

16          Can you answer my question?

17      A.   Yes.

18      Q.   And we've also agreed that this document

19  does not address honorary retirees.

20          Correct?

21      A.   Yes.

22      Q.   And so that if a person is going to be in

105

1         CERTIFICATE OF COURT REPORTER

2   UNITED STATES OF AMERICA    )

3   DISTRICT OF COLUMBIA        )

4         I, CHERYL A. LORD, the reporter before

5   whom the foregoing deposition was taken, do hereby

6   certify that the witness whose testimony appears in

7   the foregoing deposition was sworn by me; that the

8   testimony of said witness was taken by me in machine

9   shorthand and thereafter transcribed by

10  computer-aided transcription; that said deposition is

11  a true record of the testimony given by said witness;

12  that I am neither counsel for, related to, nor

13  employed by any of the parties to the action in which

14  this deposition was taken; and, further, that I am

15  not a relative or employee of any attorney or counsel

16  employed by the parties hereto, or financially or

17  otherwise interested in the outcome of this action.

18

19         CHERYL A. LORD

20         Notary Public in and for

21         the District of Columbia

22  My Commission expires April 30, 2011

07-mc-269
EXHIBIT 15

DECLARATION OF ARTHUR A. SCHULCZ, SR.

Pursuant to 28 U.S.C. § 1746, I, Arthur A. Schulcz, Sr., declare as follows:

1.      My name is Arthur A. Schulcz, Sr.  I am the counsel of record for plaintiffs in these cases
which have now been consolidated.  In my duties as counsel, I have collected various documents,
including depositions, declarations, and documents produced by defendants.

2.      Exhibit 1 is a copy of the relevant portions of 10 U.S.C. § 14509 obtained from
        Westlaw's Electronic Database.

3.      Exhibit 2 is a copy of the relevant portions of SECNAVINST 1120.4A obtained from the
        U.S. Navy Database.

4.      Exhibit 3 is a copy of "Does the Data Establish that the U.S. Navy favors Roman
        Catholics", 7/7/07 Expert Opinion by Harald R. Leuba, PhD.  Dr. Leuba is employed by
        plaintiffs as an expert statistician and expert operations research analyst.

5.      Exhibit 4 is a copy of the relevant portions of OPNAVINST 1730.1D obtained from the
        U.S. Navy Database.

6.      Exhibit 5 is the October 1999 Navy Chaplain Corps "Study on Religious Affiliation in the
        Department of Navy" .  It was produced by Defendants in discovery and has been
        validated by several of defendants' witnesses who testified they saw it or helped prepare
        it.

7.      Exhibit 6 is the Declaration of CAPT James Poe, CHC, USN (Ret) in *Larsen v. U.S.
        Navy*.

8.      Exhibit 7 is an extract of the Deposition of CAPT Thomas Carter, CHC, USN (Ret) in
        *Larsen v. U.S. Navy*.

9.      Exhibit 8 is a list of Chaplains accessed or brought to active duty at age 42 and over and was submitted as an exhibit in the previous Injunction Remand briefing.  It was compiled by plaintiffs from information in Vol. X of the Chaplain Corps Biographies and then accession reports by fiscal tear defendant have produced.

10.     Exhibit 9 shows the total number and percentage of chaplain age waivers for applicants age 42 and above, produced from Exhibit 9 by adding up the categories and ages.

11.     Exhibit 10 is the "Too Many Catholic Priests?" expert opinion of Harald R. Leuba, PhD., comparing the availability of Catholic priests in the Navy to the availability of Catholic priests in civilian work.

12.     Exhibit 11 is a copy of Department of Defense Instruction 1200.06.   It was obtained from the DOD Electronic Database.

13.     Exhibit 12 is a copy of Department of Defense Instruction 1215.06.   It was obtained from the DOD Electronic Database.

14.     Exhibit 13 is a copy of Department of Defense Directive 1352.1.   It was obtained from the DOD Electronic Database.

15.     Exhibit 14 is a copy of Department of Defense Directive 1402.1 (dated 1/21/82), Subjet: "Employment of Retired Members of the Armed Forces."  It was obtained from the DOD Electronic Database.

16.     Exhibit 15 is an extract of the Deposition of Mr. Thomas Bush taken in this case.

17.     Exhibit 16 is the Declaration of Arthur A. Schulcz, Sr.

_____/ S /_____

July 9, 2007                          Arthur A. Schulcz, Sr.
                                     Counsel for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE: NAVY CHAPLAINCY | ) ) ) ) | Case No. 1: 07-mc-269 (RMU) |

### [Proposed] ORDER

Before the Court is plaintiffs' Motion for an Injunction to enjoin Defendants' practice extending Catholic chaplains on active duty past their statutory separation age. This practice is a denominational preference for which Defendants have not shown a compelling purpose or that it is narrowly tailored, and accordingly it is unconstitutional. Accordingly, plaintiffs' Motion is GRANTED.

It is ORDERED that Defendants are hereby enjoined from continuing Catholic chaplains past their statutory separation age for the purpose of qualifying for retired pay and are further enjoined to immediately end their 4109 program and the retention of other Catholics over the age of 62.

Defendants are further ORDERED to establish objective criteria for extending chaplains past age 62, including identifying specific religious needs and other neutral, secular and non-ideological criteria for said extensions; to strictly comply with DOD instructions concerning classification of retired personnel; and to comply with the discharge statutes

So ORDERED this _____ day of _____, 2007.

_____
RICARDO M. URBINA
United States District Judge