# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

IN RE: NAVY CHAPLAINCY )  Case No. 1: 07-mc-269 (RMU)

## PLAINTIFFS' OPPOSITION AND MEMORANDUM
## OF POINTS AND AUTHORITIES IN OPPOSITION TO
## DEFENDANTS' RENEWED MOTION TO RECONSIDER ORDER
## DENYING APPEAL OF MAGISTRATE JUDGE'S ORDER AND FOR
## A PROTECTIVE ORDER AGAINST DISCOVERY OF SELECTIVE-EARLY RETIREMENT
## BOARD DELIBERATIONS

Dated: July 23, 2007

ARTHUR A. SCHULCZ, Sr.
D.C. Bar No. 453402
Counsel for *CFGC* and the *Adair* Plaintiffs
2521 Drexel Street
Vienna, VA 22180
703-645-4010

Of Counsel:
Douglas McKusick, Esq.
THE RUTHERFORD INSTITUTE
P.O. Box 7482
Charlottesville, VA 22906-7482

# INDEX

INDEX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.     RFRA'S APPLICATION TO § 613 SHOWS CONGRESS INTENDED DISCOVERY
       INTO SER BOARDS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       A.     RFRA's Application to Defendants' SER Board Proceedings is Incorporated into
              § 613.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

       B.     RFRA Provides These Plaintiffs a Cause of Action Including a De Novo Trial
              with Discovery. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       C.     The Proper Application of RFRA Avoids a Statutory and Constitutional Conflict
              with § 613. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

       D.     RFRA's Purpose Was to Apply the "Compelling Government Interest" Standard
              to All Military Decisions and Actions Affecting Free Exercise. . . . . . . . . . . . . 14

       E.     There Can be No RFRA Right Absent the Ability to Demonstrate a RFRA
              Violation Through Discovery. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

       F.     The Federal Rules Provide a Mechanism to Allow Discovery While Protecting
              Defendants Legitimate Interests in Board Secrecy . . . . . . . . . . . . . . . . . . . . 18

       G.     RFRA and its Inherent Statutory Right to Discovery Is in Accord with the
              Nation's Policy to Eliminate Illegal Discrimination. . . . . . . . . . . . . . . . . . . 20

       H.     Defendants Have failed to Meet Their RFRA Burden to Show RFRA Does Not
              Apply to § 613 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

II.    RECENT CHANGES TO TITLE 10 DO NOT PRECLUDE JUDICIAL REVIEW OF
       CONSTITUTIONAL CLAIMS CHALLENGING BOARD PROCEEDINGS. . . . . . . . 21

A.    Courts Review Constitutional Claims Unless Congress Provides Specific
      Language Showing its Clear and Unambiguous Intent to Preclude Judicial Review
      of *Constitutional* Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

B.     Congress Legislates in Accord with Supreme Court Decisions  . . . . . . . . . . . . 29

C.    Title 10 Does Not Specifically Bar Judicial Review of Constitutional Claims. . . 30

III.    DISCOVERY OF SER BOARD PROCEEDINGS  IS ESSENTIAL TO VINDICATE
        PLAINTIFFS' CONSTITUTIONAL CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

A.    Specific Constitutional Challenges to Defendants' SER Board Practices. . . . . . . 33

B.    The Law of the Case Concerning the Elements of Proof Required to Establish
      Plaintiffs' Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

        1.    Plaintiffs' Due Process- Equal Protection claims. . . . . . . . . . . . . . . . . . 35

        2.    Plaintiffs' Establishment and Free Exercise Clause Claims. . . . . . . . . . 37

C.    Discovery Provides the Only Avenue to Obtain Evidence Necessary to Establish
      Plaintiffs' Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

D.    There Can be No Constitutional Claim Absent the Ability to Demonstrate a
      Constitutional  Violation Through Discovery. . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

E.    The Federal Rules Provide a Means to Protect Defendants' *Legitimate* Interests in
      Board Secrecy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

F.    Statistics Show the SER Process Is Corrupt and Prejudiced. . . . . . . . . . . . . . . . 41

IV.    THE FEDERAL RULES PROVIDE NO HEIGHTENED REQUIREMENT FOR
        DISCOVERY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

LIST OF EXHIBITS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

# TABLE OF AUTHORITIES

**FEDERAL CASES:**

*Adair v. England*, 183 F.Supp.2d 31 (D.D.C 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Adair v. England*, 217 F.R.D. 7 (D.D.C. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 38, 40

*Adair v. Winter*, 451 F.Supp.2d 202 (D.D.C. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Aderand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Altman v. Minnesota Dept. of Corrections*, 251 F.3d 1199 (8th Cir. 2001). . . . . . . . . . . . . 10, 11

*American Chemistry Counsel v. Johnson*, 406 F.3d 738 (DC Cir. 2005). . . . . . . . . . . . . . . . . 30

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975). . . . . . . . . . . . . . . . . . . . . . . . . 4

*Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667 (1986). . . . . . . . . . . . . . 13,39

*Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5, 19, 21

*Carter v. Cleland*, 643 F.2d 1 (D.C. Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Chandler v. Roudebush*, 425 U.S. 840 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Chaplaincy of Full Gospel Churches v. Johnson*, 217 F.R.D. 250 (2003), *rev'd in part and remanded in part*, *In re England*, 375 F.3d 1169 (2004), *cert denied* 543 U.S. 1152 (2005). 35, 37

*City of Boerne v. Flores*, 521 U.S. 507 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9, 13, 22

*County of Sacramento v. Lewis*, 523 U.S. 833, (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Czerkies v. U.S. Dept. of Labor*, 73 F.3d 1435 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . 29

*District of Columbia Hospital Assoc. v. District of Columbia*, 73 F.Supp.2d 8 (D.D.C. 1999), *aff'd,* 224 F.3d 776 (D.C. Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Employment Division v. Smith*, 494 U.S. 872 (1990. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Lemon v. Kurtzman*, 403 U.S. 602 (1971),. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

*Ex Parte Milligan*, 71 U.S. (4 Wall.) 2 (1866). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Goldman v. Weinberger*, 475 US 503 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Gonzales v. O Centro Esprita Beneficente Uniao Do Vegetal* (hereafter "*UDV*"),
    546 U.S. 418, 126 S.Ct. 1211 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 31

*Goodyear Atomic Corp. v. Miller*, 486 U.S. 174 (1988). . . . . . . . . . . . . . 4, 23, 24, 30, 40, 42, 43

*Hackley v. Roudebush*, 520 F.2d 108 (D.C. Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Hanna v. Plumer*, 380 U.S. 460 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Herbert v. Lando*, 441 U.S. 153 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Hickman v. Taylor,* 329 U.S. 495 (1947). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re England*, 375 F.3d 1169 (D.C. Cir. 2004), *cert denied* 543 U.S. 1152 (2005). . . . . . . . 21, 35

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Johnson v. Robison*, 415 U.S. 361 (1974). . . . . . . . . . . . . . . . . . . . 14, 21, 23, 25, 26, 28, 29

*Kenmore v. Kim*, 538 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Laxalt v. McClatchy*, 809 F.2d 885 (D.C. Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Lepre v. Dept. of Labor*, 275 F.3d 59 (D.C. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . 24-28, 31

*Lucas v. Forty-fourth General Assembly of Colorado*, 377 U.S. 713 (1964). . . . . . . . . . . . . . . 22

*Matthew v. Diaz,* 426 U.S. 67(1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991). . . . . . . . . . . . . . . . . . . . . . . . 24

*National R.R. Passenger Corp. v. Nat'l Assoc. of R.R. Passengers*, 414 U.S. 453 (1971). . . . . . 14

*Northeast Florida Chapter of the Assoc. General Contractors v. City of Jacksonville*, 508 U.S.
    656 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

iv

*Philbrook v. Glodgett*, 421 U.S. 707 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Ralpho v. Bell*, 569 F.2d 607 (D.C.Cir.1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26-29

*Rasul v. Rumsfeld*, 433 F.Supp.2d 58 (D.D.C. 2006). . . . . . . . . . . . . . . . . . . . . . 5, 7, 8, 13, 14

*Saltany v. Reagan*, 886 F.2d 438 (D.C. Cir. 1989), *cert denied*, 495 U.S. 932 (1990). . . . . . . . . 18

*Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000). . . . . . . . . . . . . . . . . . . . . . 38

*Steffel v. Thompson*, 415 U.S. 452 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Touche Ross & Co. v. Redington,* 442 US 565 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Unexcelled Chemical Corp. v. United States*, 345 U.S. 59 (1953). . . . . . . . . . . . . . . . . . . . . . 6, 8

*Ungar v. Smith*, 667 F.2d 188 (D.C.Cir.1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*United States v. Reynolds,* 345 U.S. 1 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Wells*, 519 U.S. 482 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Wilson*, 290 F.3d 347 (DC Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Valentino v. United States Postal Service*, 674 F.2d 56 (D.C. Cir. 1982). . . . . . . . . . . . . . . . . . 43

*Ward v. Westland Plastics Inc.*, 651 F.2d 1266 (9th Cir. 1980) (per curium). . . . . . . . . . . . . . . 36

*Washington v. Davis*, 426 U.S. 229 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Watt v. Alaska*, 451 U.S. 259 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Webster v. Doe*, 486 U.S. 592 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19, 25, 29


**FEDERAL STATUTES:**

5 U.S.C. § 8128(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

10 U.S.C. § 612. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

10 U.S.C. § 613(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 24

10 U.S.C. § 618(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 1988(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Religious Freedom Restoration Act, 42 U.S.C. § 2000bb. . . . . . . . . . . . . . . . . . . . . . . . passim

**OTHER AUTHORITIES:**

Federal Rule of Civil Procedure 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 39

H. Rep. No. 103-88 (1993), 1993 WL 15805. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Proceedings and Debates of the 106th Congress, 146 Cong. Rec. S7991-02,
    2000 WL 125099. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

S. Rep. No. 103-111 (1993), 1993 WL 28669. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## INTRODUCTION

This Court previously found that discovery into selective early retirement (SER) boards is permissible under 10 U.S.C. § 618(f). *Adair v. Winter*, 451 F.Supp.2d 202 (D.D.C. 2006). Defendants' Motion for Reconsideration (the "Mot.") seeks reversal and a protective order due to recent statutory changes. Defendants incorrectly argue new 10 U.S.C. § 613(a) and other Title 10 changes (collectively "§ 613") addressing disclosure of selection board proceedings, enacted on October 17, 2006, preclude discovery. Mot. at 1-10. Defendants ignore controlling precedent and the nature of plaintiffs' claims.

This opposition first addresses why the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, *et seq*., applies to § 613 and not only allows discovery but compels it. Second, binding precedent requires this Court to find Congress intended discovery into the proceedings of SER boards because Congress failed to provide the specific language Supreme Court precedent requires to bar review of constitutional claims. Third, plaintiffs show why discovery is essential to enable the Court to evaluate the various constitutional claims plaintiffs raise. Fourth, plaintiffs will show that separation of powers issues arise if this Court were precluded from reviewing alleged unconstitutional conduct on the SER boards

## SUMMARY OF ARGUMENT

Defendants' argument that § 613 is an absolute bar to discovery ignores precedent and the cannons of statutory interpretation. Courts must interpret new statutory language in the context of and in accord with existing law which directly speaks to the issue, since Congress is presumed to know the law and to legislate in accordance with Supreme Court precedent. Application of this rule defeats defendants' arguments. First, RFRA directly speaks to the issue as it applies to all federal actions and laws and extends and furthers Congress's long standing objective to

identify, remedy and eliminate prejudice of any kind.  RFRA is engrafted into § 613, applies to

defendants' SER boards, and provides a cause of action with discovery for RFRA violations.

Plaintiffs have alleged a violation of their rights under RFRA.  RFRA's use of the terms "claim"

and "in a judicial proceeding" show Congress intended plaintiffs have a trial de novo and

discovery.  Defendants invite the Court to ignore the cannons of statutory construction and

RFRA's preclusive and decisive effect on this issue, *see* I below.

RFRA states it "applies to all Federal law, and the implementation of that law, whether

statutory or otherwise, and whether adopted before or after [11/16/93]."  *Id*. at 2000bb-3(a).

RFRA's "Rule of construction" specifically states: "Federal statutory law adopted after

November 16, 1993 is subject to this chapter unless such law explicitly excludes such application

by reference to this chapter."  *Id*. at 2000bb-3(b).  By its purpose, design and language, RFRA

applies to the recent amendments to Title 10, including § 613 since § 2000bb-3(b)'s language is

not found in § 613. This shows Congress intentionally placed § 613 under RFRA's reach, rights,

requirements and remedies.  Defendants are silent as to how their interpretation of § 613 can be

squared with RFRA's scope and application to every area of the government, especially to the

military.  Defendants' argument on its face is inconsistent with and contrary to one of RFRA's

stated purposes, "to provide a claim or defense to persons whose religious exercise is

substantially burdened by government", 42 U.S.C. § 2000bb(b)(2) ("Purposes").

Defendants' failure to even mention RFRA in their Motion is inexcusable.  Plaintiffs

raised RFRA's application in opposing defendants' previous motion to reconsider in

*CFGC/Adair*.  Plaintiffs' Opposition to Defendants' Motion for Reconsideration at 3-18, *CFGC*

Doc. No. 253.  Defendants' *CFGC/Adair* Reply ignored the issue, Def. Reply Doc. No. 256, and

their failure to raise it in their Motion here appears to be an admission they cannot escape RFRA's reach or meet the burden RFRA places on them. RFRA's application to § 613 shows this Court's prior decision is correct and plaintiffs are entitled to discovery.

Plaintiffs also bring constitutional claims. Supreme Court binding precedent, which this Circuit has consistently and emphatically embraced, allows discovery unless Congress provides specific language to indicate that *constitutional* claims are barred. Congress's failure to address RFRA and the Supreme Court's rule shows Congress expected plaintiffs bringing RFRA and constitutional claims be allowed discovery to vindicate those rights. *See* I and II below. The law is well established that the Federal Rules of Civil Procedure allow courts to allow discovery while protecting legitimate governmental interests from disclosure.

Defendants' argument conflicts with Supreme Court precedent and the Constitution's allocation of powers. *See* II below. As shown below, the proper interpretation of § 613 in consonance with RFRA's purpose, application and language, by law integrated into § 613, avoids both a statutory and constitutional conflict. Plaintiffs have evidence showing discovery is necessary to validate their claims of RFRA and constitutional violations. Defendants' "heightened showing" argument is an effort to rewrite RFRA and the Federal Rules to protect their misconduct.

## ARGUMENT

### I.   RFRA'S APPLICATION TO § 613 SHOWS CONGRESS INTENDED DISCOVERY INTO SER BOARDS

Defendants' argument that § 613's plain words in the recent amendments to Title 10 addressing selection board proceedings is an absolute bar of discovery into SER boards absent the Secretary of Navy's consent, Mot. at 5-9, is contrary to law. While "the language of the

statute controls where it is not ambiguous or unconstitutional," *Touche Ross & Co. v. Redington*, 442 US 565, 568 (1979), this is not such a case.  Plaintiffs allege the SER procedures and government actions during these board violates their rights under RFRA.  RFRA's provisions require incorporation of RFRA into § 613.  This produces ambiguity in § 613 because RFRA provides a cause of action with a de novo trial to vindicate RFRA's purposes and remedy its violation, and this is inconsistent with § 613's alleged bar of judicial review.   The application of standard cannons of statutory interpretation eliminate the inconsistency and show Congress intended § 613 to allow discovery.

Courts "generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184-85 (1988) (citing *Director, OWCP v. Perini North River Associates*, 459 U.S. 297, 319-320 (1983)).  This presumption, which defendants have failed to address or show it does not apply, is particularly applicable to this case because it shows that Congress intended courts to allow discovery of selection board proceedings.  RFRA specifically creates a cause of action for aggrieved plaintiffs allowing them to challenge government action that violates plaintiffs' RFRA's rights

> We quite agree that if Congress had legislated the elements of a private cause of action for damages, the duty of the Judicial Branch would be to administer the law which Congress enacted; the Judiciary may not circumscribe a right which Congress has conferred because of any disagreement it might have with Congress about the wisdom of creating so expansive a liability.

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 748 (1975).

Section 613's provisions and scope, as interpreted by defendants, bring it into direct conflict with the RFRA, 42 U.S.C. § 2000bb, as explained herein, and the Constitution as explained in II below.  Section 613's language as interpreted by defendants is ambiguous, a fact

4

they should be well aware of given RFRA's scope and reach.  The incorporation of RFRA into §

613 shows that Congress intended discovery into SER proceedings to expose misconduct.

> ### A.    RFRA's Application to Defendants' SER Board Proceedings is Incorporated into § 613

Congress is presumed to legislate its changes to Title 10 in accordance with its existing

laws and intend the changes be interpreted in light of the applicable law.  *Cannon v. Univ. of*

*Chicago,* 441 U.S. 677, 699 (1979) ("It is not only appropriate but also realistic to presume that

Congress is thoroughly familiar with these unusually important precedents from this and other

federal courts and that it expected its enactment to be interpreted in conformity with them.").

Congress included every area of federal activity in RFRA's reach, including the military.

RFRA's "restrictions apply to every government agency and official ... and to all statutory or

other law." *City of Boerne v. Flores*, 521 U.S. 507, 509 (1997).  RFRA excludes no class of

plaintiffs from its protection.  Judge Urbina held in *Rasul v. Rumsfeld*, 433 F.Supp.2d 58, 62-67

(D.D.C. 2006) that even suspected terrorist detainees at Guantánamo, Cuba, are covered by

RFRA's protection.

RFRA "applies to all Federal law, and the implementation of that law, whether statutory

or otherwise, and whether adopted before or after [11/16/93]."  42 U.S.C. § 2000bb-3(a).  Thus,

RFRA applies to the old and new Title 10 provisions.  RFRA's "Rule of construction", §

2000bb-3(b), clearly states "Federal statutory law adopted after November 16, 1993 is subject to

this chapter unless such law explicitly excludes such application by reference to this chapter."

When Congress passed its 2006 changes to Title 10, it knew that RFRA applied to those changes

as a matter of law unless it affirmatively and specifically expressed its clear intent to exclude its

Title 10 changes from RFRA's reach.  Title 10 is silent concerning the exclusion of any section

from RFRA, showing Congress did not intend to limit RFRA's reach over or its incorporation into § 613. "[W]hen Congress . . . has used language which plainly brings a subject matter into a statute, its word is final - save for questions of constitutional power which have not even been intended here." *Unexcelled Chemical Corp. v. United States*, 345 U.S. 59, 64 (1953).

*Gonzales v. O Centro Esprita Beneficente Uniao Do Vegetal* (hereafter "*UDV*"), 546 U.S. 418, 126 S.Ct. 1211 (2006), specifically addressed RFRA's application to a restrictive federal statute similar to § 613. *UDV* respondents were members of a church. Receiving communion by drinking *hoasca*, a tea brewed from plants unique to the Amazon Rainforest containing DNT, a forbidden hallucinogen listed as on Schedule I of the Controlled Substances Act (the "CSA"), was central to their faith. 126 S.Ct.. at 1217. *UDV* sought and attained an injunction under RFRA against the Justice Department's enforcement of the CSA against its members. *Id.* at 1217-18. Similar to the government's arguments here, the government argued in *UDV* the CSA (1) allowed no exceptions to the DNT ban to accommodate the UDV and (2) established a closed regulatory scheme "that prohibits all use of controlled substances except as authorized by the act itself" which "cannot function with its necessary rigor and comprehensiveness if subjected to judicial exceptions." *Id.* at 1220 (the CSA "simply admits of no exceptions.").

The Court rejected this "no exception" argument. First, it emphasized the Court's duty to critically examine the asserted compelling interest. "RFRA, and the strict scrutiny test it adopted, contemplate an inquiry more focused than the Government's categorical approach", requiring the Court to "scrutinize[] the asserted harm of granting specific exceptions to particular religious claimants." *Id.* Congress's determination to list DNT "under Schedule I simply does not provide a categorical answer that relieves the Government of the obligation to

6

shoulder its burden under RFRA." *Id.* at 1221.  The Court found the CSA's provision for the

Attorney General to grant exceptions to the Act's general ban showed Congress did not intend an

absolute ban.  *Id.*  "RFRA ... plainly contemplates that *courts* would recognize exceptions- that is

how the law works." *Id*. at 1222 (citing and quoting 2000bb-1(c) ("A person whose religious

exercise has been burdened in violation of this section may assert that violation as a claim or

defense in a judicial proceeding and obtain appropriate relief against a government"))" .

   Secondly, the Court rejected the government's argument that the CSA "establishes a

closed regulatory system that admits of no exceptions under RFRA." *Id.*  The Court held,

"RFRA operates by mandating consideration, under the compelling interest test, of exceptions to

'rule[s] of general applicability.'" *Id.* at 1223 (citing 2000bb-1(a)).  The Court then found the

Government had not shown that granting the UDV an exception "would cause the kind of

administrative harm recognized as a compelling interest" and its "bold argument" of no

exceptions and invocation of general interests were not enough.  *Id.* at 1224.  The Court also

rejected the Government's argument the CSA's purposes overrode RFRA's, finding Congress

had "legislated 'the compelling interest test' as the means for the courts to strike sensible

balances between religious liberty and competing prior governmental interests." *Id.* at 1225.

Defendants have failed to show RFRA does not apply to § 613, and in the face of *UDV*'s

analysis of RFRA's reach and authority, could not do so.

### B.    RFRA Provides These Plaintiffs a Cause of Action Including a De Novo Trial with Discovery

One of RFRA's purposes is "to provide a claim or defense to persons whose religious

exercise is substantially burdened by government."  42 U.S.C. § 2000bb(b)(2) ("Purposes"); *see*

*Rasul*, 433 F.Supp.2d at 66 n.7 (citing RFRA's purposes).  Congress specifically authorizes

aggrieved persons to bring a "claim ... in a judicial proceeding and obtain appropriate relief against a government." *Id*. at § 2000bb-1(c) ("Judicial relief").   Plaintiffs include those who challenge the SER process and proceedings which led to their alleged unlawful separation and claim the SER proceedings and actions therein violated their rights under RFRA.   Analysis of Congress's words shows Congress intended plaintiffs to have a de novo trial with discovery as a means to vindicate their RFRA Rights.

RFRA established both (1) a duty for defendants to act in ways that do not burden a persons free exercise of religion unless specific limited conditions are met, and (2) a government employee's right not to have his free exercise burdened.

 "Claim" is defined as "to demand as one's own or as one's right; ... Cause of action. Means by or through which claimant obtains possession or enjoyment of privilege or thing." Black's Law Dictionary 128 (Abridged 5th Ed. 1983).  "A cause of action is created when there is a breach of duty owed the plaintiff."  *Unexcelled Chem.,* 345 U.S. at 65.  Proceeding means "the form and manner of conducting juridicial business before a court or judicial officer.  Regular and orderly progress in form of law, including all possible steps in an action from its commencement to the execution of judgement."  Black's at 629.   To provide a cause of action without means of proving the case is inconsistent with the requirements for a judicial proceeding and with RFRA's purpose of providing a remedy and addressing the government's burdening of religious exercise. *See* § 2000bb-1(c).  It is also inconsistent with the normally accepted understanding of those terms, *e.g.*, trial, and their application as judicial principles in American jurisprudence.

Although Congress made RFRA applicable to the federal government under its Article I powers, it drafted RFRA in the context of its extensive legislation in the area of Civil Rights.

8

*See Boerne*, 521 U.S. at 516 ("Congress relied on its Fourteenth Amendment enforcement power...."). This is evident in RFRA's provision for attorney fees in 42 U.S.C. § 1988(b) for successful RFRA litigation, *i.e.*, bringing an "action" in its legal context. Congress's terms "claim", "judicial action" and "action" show RFRA provided litigants the right to a trial de novo. *Chandler v. Roudebush*, 425 U.S. 840, 862 (1994) held that federal employees had a right to a trial de novo of their employment discrimination claims under Title VII. The Court agreed with the D.C. Circuit's holding in *Hackley v. Roudebush*, 520 F.2d 108, 121 (D.C. Cir. 1975), that a contrary interpretation "would require a strained and unnatural ruling" of Title VII's provisions. 425 U.S. at 848. Examination of Title VII's language, legislative history and precedent, *id.* at 846-862, showed Congress meant its term "action" to be a trial de novo, *id.* at 862. Defendants have not shown RFRA intended a different meaning.

The terms and concept Congress used in RFRA, *i.e.* "claim", "judicial proceeding" and "action" (§ 1988(b)) all show Congress intended RFRA plaintiffs to have a trial de novo. That means the right to discovery because the Federal Rules of Civil Procedure govern all federal judicial proceedings and provide for discovery. As a practical matter, there is no other way to obtain the necessary evidence to show that a plaintiff's free exercise was burdened by governmental action.[1] "The Court has more than once declared that the deposition-discovery

---

[1]    If Congress were to limit a federal district judge's authority to order discovery according to the interest of the [government], the ability of a federal court to perform its most basic function of deciding "cases and controversies" under Article III of the Constitution would be notably impaired. Courts cannot fairly decide cases if they cannot have access to the information needed for a fair, objective decision. Even when National Security is at stake, federal courts still review documents to determine whether disclosure is warranted. *See* 18 U.S.C.App. §§ 1-16 (1994) (Classified Information Procedures Act).

*In re Bankers Trust*, 61 F.3d 465, 472-73 (Merrit, C.J., concurring), (6th Cir. (1995 ), *cert denied*, 517 U.S. 1205(1996)

rules are to be accorded a broad and liberal treatment to effect their purpose of adequately informing the litigants in civil trials." *Herbert v. Lando*, 441 U.S. 153, 176 (1979) (citing *Schlagenhauf v. Holder*, 379 U.S. 104 114-115 (1964) and *Hickman v. Taylor*, 329 U.S. 495, 501, 507 (1947)). "Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession." *Hickman*, 329 U.S. at 507.

Plaintiffs allege the Defendants' SER system and its procedures violated their RFRA rights. For example, *Adair* plaintiff George Linzey is from a Pentecostal denomination. Declaration of CAPT Georg Linzey, Exhibit 1, ¶ 7. He was selected for SER by the FY 98 SER board. *Id*. ¶¶ 2, 9. Within both liturgical and non-liturgical faith groups, there are denominations which specifically reject and hold in contempt pentecostal/charismatic beliefs. *See* Declaration of Rev. Dr. Jim Ammerman (*Larsen v. U.S. Navy*), ¶¶ 15-16 (Exhibit 2). Whether his identification as a Pentecostal was a factor in his pre-selection for involuntary early retirement, *see* Linzey ¶¶ 4-7, can only be determined by an examination of the proceeding's actual discussions resulting in his selection.

Defendants maintain their SER proceedings, which selected *Adair* plaintiff Linzey and *Gibson* plaintiffs Byrum, Klapach and Prince, must be frank and open. They in effect argue this includes the right to discuss a candidate's faith group and its practices, especially since this information was provided to the board. But selection of Linzey or other plaintiffs on those grounds burdens their free exercise. "One type of burden occurs when government 'conditions receipt of an important benefit such as employment upon conduct proscribed by a religious faith, or ... denies such a benefit because of conduct mandated by religious belief.'" *Altman v.*

10

*Minnesota Dept. of Corrections*, 251 F.3d 1199, 1204 (8th Cir. 2001) (quoting *Thomas v. Review Board*, 450 U.S. 707, 717-18 (1981)).

CH Linzey alleges he was pre-selected for SER. He was specifically visited in the spring of 1997 by RADM Koeneman, USN, Ret., a former Chief of Chaplains, months before the SER board. *Id*. ¶ 4. RADM Koeneman told him "Get your resume ready, George. There comes a time when we all have to leave active duty." *Id.* ¶¶ 4-5. RADM Koeneman suggested a church that could use CH Linzey's musical skills. *Id.* ¶¶ 7. This is not merely a case of challenging the actions of a board member. RADM Koeneman was not on the board, but his message strongly suggests the Chaplain Corps leadership decided who was going to be SERB'd prior to the board meeting, a decision implemented through the actions of the chaplain board members of the SER board which acted as defendants' agent. If that was done, it can only be established by testimony of board personnel. If defendants' decision selecting CH Linzey for SER is in any way related to his Pentecostal practices, it is a governmental action that has burdened his free exercise, a clear violation of RFRA. "RFRA defines 'exercise of religion' as any exercise of religion, whether or not compelled by, or central to, a system of religious beliefs." *Rasul*, 433 F.3d at 68 (citing 42 U.S.C. § 2000cc-5(7)(A)).

In *Rasul*, the Court identified a number of alleged "governmental actions" against detained Moslem alleged terrorists which the Court found "falls comfortably within the conduct prohibited from government action by RFRA." *Id*. at 69 [citations omitted]. "The plaintiffs allege that representatives of the United States government perpetrated blatant and shocking acts against them on account of their religion", *id*. at 71, including placing "the Koran in the toilet", *id.* at 69. Those actions, if true, demonstrate manifest government prejudice and hostility to

Rasul's religion and his free exercise thereof.  In *Rasul*, the government committed its alleged

RFRA violations openly against its alleged victims.  Here, the government did its burdening of

free exercise behind a veil of secrecy which RFRA authorizes lifting.  Linzey claims defendants

manifested the same hostility to him and his free exercise as they did to Rasul.

Selecting CH Linzey for SER because he is a Pentecostal is a forbidden governmental

action.  It carries with it continuing consequences far longer than the alleged "blatant and

shocking acts" against the suspected terrorists in *Rasul, see id.* at 71. Selecting CH Linzey

illegally reduced his retirement pay, a damage that continues every time he is paid.  In both cases,

RFRA empowers the Court to right the wrong with a remedy.

Plaintiffs have alleged defendants' challenged actions and practices, including those

applicable to SER boards, violate RFRA.  *See Adair* Third Amended Complaint (the Complaint)

at 51, ¶¶ 108 – 09 (Count 13).  RFRA defines "demonstrated" as "meet the burdens of going

forward with the evidence and a persuasion." 42 U.S.C. § 2000bb-2(3).  This is an impossibility

without discovery because only discovery can produce the evidence necessary to show a

burdening of one's free exercise.  *See* note 1 *supra*.

### C.    The Proper Application of RFRA Avoids a Statutory and Constitutional Conflict with § 613

 "Congress is presumed to preserve, not abrogate, the background understandings against

which it legislates."  *United States v. Wilson*, 290 F.3d 347, 356 (DC Cir. 2002) [citations

omitted].  Congress's failure to exclude RFRA from its recent amendments to Title 10 show

Congress intended RFRA to apply to Title 10.   Congress knew that RFRA provides a cause of

action for any aggrieved plaintiff: "Any law [or government action] is subject to challenge at any

time by any individual who alleges a substantial burden on his or her free exercise of religion."

*Boerne*, 521 U.S. at 509.   Congress also knew (1) there is a presumption of judicial review for executive actions and decisions, because barring judicial review raises serious constitutional questions, *see, e.g., Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 670-673 (1986) (discussing "the strong presumption that Congress intends judicial review of administrative actions."); (2) once a suit is brought the Federal Rules of Civil Procedure (the "Rules") apply and allow for discovery; (3) discovery is a necessity to both prove RFRA violations and furnish the factual background to enable courts to provide remedies for those same violations, s*ee* note 1 *supra*.; (4) the Rules provide courts the means to protect material from disclosure to the public through such mechanisms as protective orders when it is appropriate, while at the same time allowing discovery; and (5) the Supreme Court requires specific language to bar constitutional claims, *see* II A.

Defendants' interpretation of § 613 eviscerates RFRA's words, purpose, and ability to provide effective remedies, and makes RFRA's provisions and remedy a nullity, something courts may not do in interpreting statutes.  *Rasul,* 433 F.Supp.2d at 64 (rejecting government's argument that would have made a RFRA "phrase meaningless."); *Philbrook v. Glodgett*, 421 U.S. 707, 713-14 (1975) (no statutory provision should be construed to be entirely redundant). Section 613's brief legislative history shows no awareness or concern for RFRA's impact on selection board proceedings and practices.  Courts cannot assume Congress merely forgot such an important detail, particularly in light of RFRA's reach, application to the military (*see* below) and the specific language Congress must employ to exempt or avoid its application.  *Rasul,* 433 F.Supp.2d at 66 ("the court will not interpret words out of the statute for what the government thinks Congress wanted.").  When Congress provides a specific procedure to be followed, it

13

precludes the use of all others. *National R.R. Passenger Corp. v. Nat'l Assoc. of R.R. Passengers*, 414 U.S. 453, 458 (1971) (citing *Botany Mills v. United States*, 278 U.S. 282, 289 (1929). Courts are not free to ignore Congress's clear command. *Id.* Congress's failure to exclude § 613 from RFRA's reach is particularly significant here because RFRA's purpose was to include military personnel under its reach, apply its compelling interest standard to military restrictions on free exercise, and provide a cause of action to vindicate a RFRA violation.

### D.    RFRA's Purpose Was to Apply the "Compelling Government Interest" Standard to All Military Decisions and Actions Affecting Free Exercise

Although the language of the statute is the starting point in every case involving statutory construction, *Watt v. Alaska*, 451 U.S. 259, 265 (1981), legislative history is reviewed to determine whether there is clear indication of contrary intent. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 433 n.12 (1987). Although the Court "will not look to legislative history to replace a plain reading of an unambiguous statutory provision", *Rasul*, 433 F.Supp.2d at 66 (citing *BedRoc Ltd. v United States*, 541 U.S. 176, 183 (2004)), defendants' "plain language" argument excludes the application of RFRA and its statutory right to bring a cause of action to § 613. Defendants seek a result inconsistent with Congress's clearly expressed intent in RFRA; they seek to extinguish the very right which RFRA grants, the opportunity to vindicate plaintiff's rights. Section 613's "plain language" as articulated by defendants is ambiguous because RFRA applies.

Legislative intent is appropriate when evaluating a claim that Congress intended to preclude or restrict judicial review or discovery because the Supreme Court requires "clear and convincing evidence" of Congressional intent to do so. *Johnson v. Robison*, 415 U.S. 361, 373-74 (1974) (discussed below). In such cases, the Supreme Court has often looked at the legislative history of the statute in question to confirm Congress's clear intent. *Id.* at 368-74

14

(discussing "scant" legislative history); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 142 ("a study of the legislative history shows ..."), 145 ("no support in the legislative background ...") (1967). Because defendants have failed to bring RFRA and its implication to the Court's attention, plaintiffs must anticipate defendants' belated attempt to show that Congress: (1) did not intend for RFRA to apply to the military, (2) was not concerned with the military's restrictions on religious rights of military personnel, or (3) intended to restrict discovery, the only means available to vindicate the rights which RFRA grants and is an integral and necessary means of proving a cause of action under the Federal Rules.

RFRA's legislative history clearly shows bringing the military within RFRA's protection was one of Congress's RFRA goals. "Pursuant to the Religious Freedom Restoration Act, the courts must review claims of ... *military personnel* under the compelling governmental interest test." H. Rep. No. 103-88 (1993), 1993 WL 158058 (emphasis added). RFRA's legislative history shows one of its purposes was to bring both the military and prisoners under the protection of RFRA's "compelling governmental interest" standard of judicial review when courts were faced with free exercise issues. RFRA sought to reverse the judicial standard of substantial deference to the military in religious matters articulated in *Goldman v. Weinberger*, 475 US 503 (1986). *Goldman* held the Free Exercise Clause's compelling interest test did not apply in a military context and rejected a Jewish serviceman's constitutional claim he was entitled to wear a yarmulke while in uniform. Congress drafted RFRA to reverse that holding, change the standards the Supreme Court applied in *Goldman* and *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987) which addressed the religious rights of prisoners, and make the compelling interest test a standard in all judicial decisions related to religion in the military and other areas of

government.  "Under the unitary standards set forth in the act, courts will review the free exercise

claims of military personnel under the compelling governmental interest test."  S. Rep. No. 103-

111 (1993), 1993 WL 286695, at *8-9.  *See also id.* at *9-12 (discussing the need to change the

deferential standard of *Goldman* and *Shabazz*), and H. Rep. No. 103-88 (1993) (RFRA requires

courts to review military personnel claims "under the compelling governmental interest test.").

    RFRA's legislative history shows some influential congressmen clearly understood

RFRA's purpose, reach and impact on the military.  They opposed RFRA's mandatory

application to military affairs because it was an incursion into what had been a  privileged area.

For example, Senator Thurmond acknowledged RFRA rejected *Goldman*'s approach and "put

the courts in the business of deciding what religious activities should be permitted in the

military," which he felt was a "serious mistake."  Proceedings and Debates of the 106th Congress,

146 Cong. Rec. S7991-02, 2000 WL 1250992 (statement of Senator Thurmond)

    RFRA's legislative history confirms what its words say and shows there is no contrary

intent to allow the military to hide what RFRA will expose, the burdening of one's religious

exercise.  Congress corrected what it perceived to be a judicial failure to articulate the proper

federal standard for evaluation of free exercise rights through RFRA's statutory mechanism.

While addressing the perceived change in free exercise constitutional law the Supreme Court

articulated in *Employment Division v. Smith*, 494 U.S. 872 (1990), the legislative history clearly

shows that Congress was specifically concerned with the judiciary's failure to apply a compelling

governmental interest test to military and prisoner free exercise cases.  RFRA rejected the

Supreme Court's deferential standard to government officials and their policies when military or

prisoner free exercise issues were before it.  Congress intended RFRA to apply to all aspects of

16

military decisions involving potential burdening of free exercise.

      **E.**    **There Can be No RFRA Right Absent the Ability to Demonstrate a RFRA Violation Through Discovery**

RFRA is a remedial statute; courts have a duty to ensure that Congress's remedial objectives are not frustrated. Failure to allow discovery to vindicate the cause of action RFRA clearly establishes undermines the statute, and frustrates Congresses's remedial purpose of eliminating religious oppression arising from governmental actions.

If military victims, including those who allege the SER process violates RFRA, are denied the opportunity to prove their claims by obtaining the necessary discovery, there will be no incentive to report or pursue violations. The lack of reporting and effective remedies will serve as an incentive and encouragement to do exactly what RFRA prohibits, burden free exercise of religion, exactly as plaintiffs allege in this case. This would increase FFRA violations and unravel Congress's specifically designed enforcement scheme. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175-180 (2005) (holding Title IX implicitly provided a private right of action because Congress was familiar with the Court's prior rulings, and not allowing a private right would undermine Title IX's objective and its "enforcement scheme would unravel."). Furthermore, it would do so only for military personnel, raising significant equal protection issues. Defendants provide no indication in either RFRA's language or its legislative history that Congress intended such a result, nor do they provide any indication in § 613's short legislative history or its words that Congress intended or even considered such an extraordinary, discriminatory and unreasonable result, contrary to RFRA's purpose. RFRA's history and language show Congress was interested in ending governmental actions burdening religion and free exercise; defendants' argument perpetuates and encourages what RFRA forbids.

Defendants argue, Mot. 9-11, as they have in the past, the inability to produce evidence does not prevent the Court from reviewing the claim, here a RFRA violation. This is absurd because without proof there can be no claim and such a rule would frustrate RFRA's remedial purpose and raise constitutional issues as shown below in II. When Congress creates a right of action, it is implied that the right of action includes the means to prove it. That is the function of the Federal Rules and Procedures. "They shall be construed and administered to secure the just, speedy, and inexpensive determination of every action." Fed.R.Civ.P. 1. *See Hanna v. Plumer*, 380 U.S. 460, 471 (1965) (when situation is covered by the Federal Rules, the court must apply them unless the Rule transgresses the Rules Enabling Act or the Constitution).

The purpose of the Federal Rules is to allow and regulate the production of evidence to both establish and defend causes of action, *i.e.*, claims. To argue a litigant has a right to bring a claim when there is no means to vindicate it, as defendants do, Mot. at 10-11, is to encourage a violation of Rule 11, not to mention malpractice. *See, e.g.*, *District of Columbia Hospital Assoc. v. District of Columbia*, 73 F.Supp.2d 8, 16-17 (D.D.C. 1999) (counsel violated Rule 11 by presenting "totally baseless legal position"), *aff'd*, 224 F.3d 776 (D.C Cir. 2000). *Saltany v. Reagan,* 886 F.2d 438, 440 (D.C. Cir. 1989), *cert denied*, 495 U.S. 932 (1990), held an attorney violated Rule 11 by filing an action which "offered no hope whatsoever of success," clearly the situation if § 613 provides no opportunity to obtain evidence necessary to prove a RFRA claim.

### F.    The Federal Rules Provide a Mechanism to Allow Discovery While Protecting Defendants' Legitimate Interests in Board Secrecy

Congress found no conflict between allowing discovery under RFRA and § 613's restrictions because the law allows both. Congress is presumed to know the Federal Rules

provide protections for the Central Intelligence Agency ("CIA") while at the same time allowing

discovery into its personnel decisions. *Webster v. Doe*, 486 U.S. 592, 604 (1982). Congress

knows similar protective measures will protect candid and frank discussions in board

deliberations. "Congress expects its statutes to be read in conformity with this Court's

precedents." *United States v. Wells*, 519 U.S. 482, 495 (1997). *See also Cannon*, 441 U.S. at

696-97 ("It is not only appropriate but also realistic to presume that Congress is thoroughly

familiar with these unusually important precedents from this and other federal courts and that it

expected its enactment to be interpreted in conformity with them."). Congress is presumed to be

aware of *Webster* and its rationale addressing discovery related to constitutional claims.

 *Webster* addressed and explained the flexibility of the Federal Rules to allow for

discovery of illegitimate and forbidden actions while protecting legitimate government interests.

*Webster* found that language which prohibited statutory claims against the CIA did not bar

constitutional claims. *Id*. at 603; *see* II.A *infra*. Recognizing the allowance of a claim also

established the right to prove the claim through discovery; the CIA objected. It argued allowing

discovery necessary to prove the constitutional claim would expose the CIA's workings and

secrets to discovery, endangering national security. *Webster* rejected that argument and

specifically pointed to the discretion of district courts and the flexibility of the Federal Rules to

shape protective measures which would not endanger the CIA's mission or practices.

  Petitioner complains that judicial review even of constitutional claims will
entail extensive 'rummaging around' in the agency's affairs to the detriment of
national security. [Citation to oral argument]. But petitioner acknowledges that
Title VII claims attacking the hiring and promotion policies of the agency are
routinely entertained in federal court [citation to pleadings and oral argument] and
the inquiry and discovery associated with those proceedings would seem to
involve some of the same sort of rummaging. Furthermore, *the District Court has
the latitude to control any discovery process which may be instituted so as to*

> *balance respondent's need for access to proof which would support a colorable*
> *constitutional claim against the extraordinary needs of the CIA for confidentiality*
> *and the protection of its methods, sources, and mission.  See Kerr v. United States*
> *District Court*, 426 U.S. 394, 405 (1976); *United States v. Reynolds*, 345 U.S. 1
> (1953).

*Id.* at 604 (emphasis added).

The CIA's concern over discovery and its possible implications reflected the government's awareness of the plaintiff's right under the Rules to every man's evidence, a fundamental principle in our courts of law, *see* note 1 *supra*.  The Supreme Court's response in *Webster* showed its awareness of that same right, *i.e,* no discovery means no claim, and pointed to the flexibility of the Rules to allow vindication of the plaintiff's claim while protecting the CIA's legitimate needs for secrecy.  Congress's failure to exempt § 613 from RFRA's reach and its specific grant in RFRA of the right to bring suit to vindicate the government's violation of plaintiffs rights under RFRA shows Congress was comfortable with *Webster*'s approach and the ability of the courts to provide appropriate security to protect legitimate governmental concerns during discovery.  The *CFGC/Adair* Court's original order allowing discovery of SER board proceedings provided that procedure.  Defendants are not satisfied with that safeguard because discovery will show they have been hiding misconduct and condoning prejudice contrary to their obligations to follow the law and uphold the Constitution.

**G.    RFRA and its Inherent Statutory Right to Discovery Is in Accord with the Nation's Policy to Eliminate Illegal Discrimination**

RFRA's clear words and its legislative history show it was a well-defined  congressional statement of the nation's contempt for religious prejudice.  It fits into the larger context of the nation's policy to eliminate illegal discrimination in any form, evidenced in the nation's Civil Rights laws, *e.g.*, Title VII, Title IX, and their history.  "Since the Civil War, the Federal

Government and the federal courts have been the 'primary and powerful reliances' in protecting citizens against [invidious] discrimination." *Cannon,* 441 U.S. at 708 (quoting *Steffel v. Thompson*, 415 U.S. 452, 464 (1974)). Defendants' argument asks this Court to ignore that role and abdicate and reverse the historic role of federal courts in "vindicating every right given by the Constitution" or other statutes. *See Steffel*, 415 U.S. at 463-64.

### H.    Defendants Have failed to Meet Their RFRA Burden to Show RFRA Does Not Apply to § 613

As mentioned above, defendants have been on notice that RFRA provides a right of action, its provisions are engrafted in to § 613 because Congress did not follow RFRA's exclusion provisions, and RFRA's harmonization with § 613 and Supreme Court precedent shows Congress intended discovery of SER boards. Defendants, aware of RFRA's plain words and reach, have not shown RFRA does not apply to § 613. They have failed to meet their RFRA burden and prejudiced plaintiffs by preventing them from addressing any contrary arguments defendants might raise.

Defendants cite *In re England*, 375 F.3d 1169 (D.C. Cir. 2004), for contrary authority, Mot. at 5-8, 10-12, but *In re England* did not address RFRA and the parties did not address it. The issue in *In re England* was whether this Court had properly interpreted *Laxalt v. McClatchy*, 809 F.2d 885, 889 (D.C. Cir. 1987), *see In re England* 375 F.3d at 179-90 (discussing case).

Congress's changes to Title X without excluding § 613 from RFRA's reach shows that Congress intended RFRA to apply, including its provision for trial de novo.

## II.    RECENT CHANGES TO TITLE 10 DO NOT PRECLUDE JUDICIAL REVIEW OF CONSTITUTIONAL CLAIMS CHALLENGING BOARD PROCEEDINGS

"The Constitution of the United States is a law for rulers and people, equally in war and

in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances." *Ex Parte Milligan,* 71 U.S. (4 Wall.) 2, 120 (1866). All individuals in the United States - citizens and aliens alike - are protected by the Due Process Clause of the Constitution. *Matthew v. Diaz,* 426 U.S. 67, 77 (1976). The Due Process Clause applies to the federal government. *Aderand Constructors, Inc. v. Pena*, 515 U.S. 200, 204 (1995). Despite these well settled principles, defendants argue Congress intended § 613 to hide and shield unconstitutional misconduct from judicial review and deny plaintiffs their fundamental rights, including the right to petition for redress and protection from establishment of religion. Binding Supreme Court and Circuit precedent, in addition to RFRA, preclude absolute bars to discovery when a plaintiff brings a constitutional claim.

Plaintiffs' claims relating to defendants' SER process and practices involve legal and constitutional questions. The underlying questions are who determines whether those challenged practices, actions and processes conform to the Constitution and can plaintiffs gather the necessary evidence to show they do not. Defendants say Congress can bar judicial review of those proceedings, Mot. 9-11, and delegate to the Secretary of Navy the responsibility to determine if its practices are constitutionally sufficient. Plaintiffs argue precedent holds otherwise: "Courts sit to adjudicate controversies involving alleged denials of constitutional rights," *Lucas v. Forty-fourth General Assembly of Colorado*, 377 U.S. 713, 736 (1964), because "[t]he power to interpret the Constitution, in a case or controversy, remains in the Judiciary." *City of Boerne v. Flores*, 521 U.S. 507, 524 (1997). This judicial duty to declare the law and the constitution requires courts to control the evidence and address alleged violations of the Constitution. It is well settled, "judicial control over the evidence cannot be abdicated to the

caprice of executive officers." *United States v. Reynolds,* 345 U.S. 1, 9-10 (1982). The Rules allow access to the facts to support both claims and defenses so they can be presented to the courts for application of the law. *See* note 1 *supra.*

> A.   **Courts Review Constitutional Claims Unless Congress Provides Specific Language Showing its Clear and Unambiguous Intent to Preclude Judicial Review of *Constitutional* Claims**

The Supreme Court has addressed squarely the specific issue before this Court: can Congress preclude the court's review of constitutional claims involving agency procedures or actions? "This Court has held that 'where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear.'" *Kenmore v. Kim*, 538 U.S. 510, 517 (2003) (quoting *Webster v. Doe*, 486 U.S. 592, 603 (1988) and citing *Johnson v. Robison*, 415 U.S. 261, 367 (1974)). The Supreme Court also has made it clear that such evidence must be "clear and convincing", including specific language showing that Congress intended to bar judicial review of constitutional claims. *Webster*, 486 U.S. at 603; *Johnson*, 415 U.S. at 367; *see also Kim,* 538 U.S. at 517 (Court requires "a particularly clear statement" that Congress intends to bar habeas review and citing cases "refusing to find bar to habeas review" without specific mention of intent to bar such).

*Webster* addressed the question whether a statutory bar against judicial review in the National Security Act ("NSA") precluded judicial review of a plaintiff's constitutional claim. The Court found the NSA barred statutory claims but lacked the specific language necessary to shown Congress intended to preclude review of constitutional claims.

> We do not think § 102(c) may be read to exclude review of constitutional claims. We emphasized in *Johnson v. Robison,* 415 U.S. 361 (1974), that where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear. *Id.* at 373-374. In *Weinberger v. Salfi,* 422 U.S. 749 (1975),

23

>we reaffirmed that view. We require this heightened showing in part to avoid the "serious constitutional question" that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim. *See Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 681, n. 12 (1986).

486 U.S. at 603. *Accord McNary v. Haitian Refugee Center, Inc*., 498 U.S. 479, 495-96 (1991)

(affirming finding of unconstitutional INS practices despite provision limiting review and citing

constitutional problems if persons were denied meaningful review).

This Circuit has embraced both the holding and the rationale behind *Webster* and *Johnson*

and, before precluding judicial review, requires specific language showing that Congress clearly

intended to bar *constitutional* claims.  A mere general statement that courts may not review a

government decision, action, or proceeding is not sufficient; the language must specifically point

to Congress's intent to preclude ***constitutional*** claims.

This Circuit made clear its adherence to the *Webster - Johnson* rule and its underlying

rationale in *Lepre v. Dept. of Labor*, 275 F.3d 59 (D.C. Cir. 2001).  There, the Court of Appeals

reversed the district court's holding that a court had no jurisdiction to hear a federal employee's

petition seeking review of a decision by the Employees Compensation Appeals Board because 5

U.S.C. § 8128(b) barred judicial review.  *Id.* at 61.  Section 8128(b) is similar to the statute in

question here.  Like 10 U.S.C. § 613(a), "the language of §8128(b) is uncompromising" in terms

of reviewability by courts, *id.* at 64.  Section 8128(b) provides:

>The action of the Secretary or h[er] designee in allowing or denying a payment under this subchapter is -
>(1) final and conclusive for all purposes and with respect to all questions of law and fact; and
>(2) not subject to review by another official of the United States or by a court by mandamus or otherwise.

*Id.* (quoting 5 U.S.C. § 8128(b) (1994)).

24

In addressing the question of reviewability on appeal, the D.C. Circuit held "we have significant guidance from the Supreme Court and the law of this Circuit." *Id.* at 64. *Lepre*'s discussion of that guidance and the issue, and its analysis of this Circuit's precedents is lengthy, comprehensive, and conclusive as to the issue presently before this Court. *Lepre*'s words speak for themselves and plaintiffs cannot improve on them. They remain the controlling precedent in this Circuit.

> In interpreting § 8128(b)'s scope, we have significant guidance from the Supreme Court and the law of this circuit. In *Johnson v. Robison,* 415 U.S. 361 (1974), the Supreme Court addressed whether 38 U.S.C. § 211(a) barred judicial review of a facial challenge to the Veterans' Readjustment Benefits Act of 1966, on the ground that by denying educational benefits to conscientious objectors who had completed alternative civilian service, the statute unconstitutionally discriminated against them and infringed upon their religious freedom. Section 211(a) provided that:
>
> > [§ 211(a)'s language - omitted here]
>
> Because construing the review provision to foreclose judicial review of constitutional claims "would ... raise serious questions concerning the constitutionality of § 211(a)," the Court looked to see whether Congress intended such an interpretation. *Id.* at 366. Finding that "neither the text nor the scant legislative history of § 211(a)" sufficed to furnish the requisite clear and convincing evidence of congressional intent to prohibit judicial review of constitutional challenges to the statute, the Court construed the statute to permit judicial review of the claim. *Id.* at 373-74.
>
>   The Supreme Court has remained faithful to *Robison*'s teachings. In *Webster v. Doe,* 486 U.S. 592, 603, (1988), applying the "heightened showing" required by *Robison,* the Court held that colorable constitutional challenges to a discretionary decision of the Director of the CIA to terminate an employee were judicially cognizable while other challenges to the termination were precluded. *See id.* at 600, 603. So too in *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667 (1986), the Court rejected the notion that statutory authorization of judicial review of some acts suffices to support an inference of exclusion as to others. *See id.* at 672. Finding that the legislative history of 42 U.S.C. §§ 1395ff and 1395ii revealed an intent to preclude judicial review only of the amounts of benefits awarded under Part B of the Medicare Act, *see Bowen,* 476 U.S. at 676-77, the Court held there was no bar to judicial review of constitutional and statutory challenges to agency regulations. *See id.* at 680. Thereafter, in *Traynor v. Turnage,* 485 U.S. 535 (1988), the Court took note of *Robison's* reasoning, that

"the prohibitions [of § 211a] would appear to be aimed at review only of those decisions of law or fact that arise in the administration by the Veterans' Administration of a statute providing benefits for veterans," 415 U.S. at 367, in concluding that judicial review was not barred by a challenge to a Veteran's Administration regulation as violative of § 504 of the Rehabilitation Act. *Traynor,* 485 U.S. at 543, 545.

Meanwhile, following the instruction in *Robison,* this circuit, in the so-called *Ralpho* trilogy, has required, when confronted with similarly worded statutory review provisions, special clarity of congressional intent to bar federal courts from adjudicating the merits of constitutional challenges. In *Ralpho v. Bell,* 569 F.2d 607, 612-13 (D.C.Cir.1977), the court was confronted with a challenge, not that a statute was unconstitutional, but that the agency implementing the statute had violated due process by relying on secret valuation data in ruling on a claim for compensation for destruction of a private residence. It was also confronted with claims of nonconstitutional error. A provision of the Micronesian Claims Act of 1971, 50 U.S.C. §§ 2018-2020b (Supp. II 1972), provided that claims determinations "shall be final and conclusive for all purposes, notwithstanding any other provision of law to the contrary and not subject to review." *Id.* § 2020. The court rejected the argument that a challenge to the constitutionality of agency action was sufficient to distinguish the case from *Robison.*

> [I]f legislation by Congress purporting to prevent judicial review of the constitutionality of its own actions is itself constitutionally suspect, legislation that frees an administrative agency from judicial scrutiny of its adherence to the dictates of the Constitution must pose grave constitutional questions as well. Not only is it daring to suggest that Congress, though subject to the checks and balances of the Constitution, may create a subordinate body free from constraints; it also beggars the imagination to suggest that judicial review might be less crucial to assuring the integrity of administrative action than it is to make certain the Congress will operate within its proper sphere. If the courts are disabled from requiring administrative officials to act constitutionally, it is difficult to see who would perform that function. *Ralpho,* 569 F.2d at 620.

The court applied the standards of *Robison, id.* at 621, reviewing the legislative history to determine if Congress intended to cut off judicial review of constitutional claims, and concluded that Congress "took such a drastic step ... with marked silence as to its purpose." *Id.* In the one instance that "might suggest such a legislative purpose," the court noted, Congress had addressed concerns about Commission positions becoming "posh sinecures" through dilatory behavior by instructing the Commission to wind up its work within three years. The court declined to "assume that Congress courted a constitutional confrontation merely to facilitate Commission adherence to a timetable, which is ... merely directory." *Id.* at 620. However, the court also found "clear evidence of congressional concern

for the due process rights of claimants under the Act." *Id.* at 621. Hence, consistent with a duty to avoid construing a statute in a manner that would bring it into conflict with the Constitution, the court held that "challenges of constitutional stature impugning action by the [agency] are cognizable in the federal courts." *Id.* at 621-22.

The two other parts of the trilogy, *Griffith v. Federal Labor Relations Auth.,* 842 F.2d 487 (D.C.Cir., 1988), and *Ungar v. Smith,* 667 F.2d 188 (D.C.Cir.1981), reaffirmed the *Ralpho* analysis. In *Griffith,* the court observed that "[e]ven though constitutional attacks on a statute carry much less risk of trammelling other administrative system than do claims that a particular act of an agency was unconstitutional, we have extended this 'particularly rigorous' style of interpretation into the latter, more treacherous area." 842 F.2d at 487. The court held that it had jurisdiction to review an as-applied due process challenge under the Civil Service Reform Act of 1978, 5 U.S.C. §§ 7122-23 (1982). An Internal Revenue Service employee who took the denial of a within-grade increase to arbitration succeeded in securing a retroactive pay increase under the Back Pay Act, 5 U.S.C. § 5596 (1982). The Federal Labor Relations Authority rescinded the award on the ground that the arbitrator had erred in applying the terms of the Back Pay Act. The employee filed suit, contending (among other things) that the Authority's failure to remand to the arbitrator deprived her of "property" in the form of the pay increase, thereby infringing on her due process rights. *Id.* at 490. The Civil Service Reform Act provided for judicial review by "[a]ny person aggrieved by any final order of the Authority other than an order under [ ] section 7122 ... (involving an award by an arbitrator), unless the order involves an unfair labor practice under section 7118." 5 U.S.C. § 7123(a). The court found no specific evidence that Congress intended to preclude judicial review of constitutional claims and addressed the merits of the as-applied due process challenge. *Id.* at 495- 501.

In *Ungar,* the court held that it had jurisdiction of an as-applied constitutional challenge to a denial of a request under the Trading with the Enemy Act, 22 U.S.C. § 1631o (1976), for the return of assets owned by a Hungarian pharmaceutical company that had been seized during World War II. Although § 1631o(c) provided that claims determinations were to be "final" and "not ... subject to review by any court," the court reiterated that "only the clearest evocation of congressional intent to proscribe judicial review of constitutional claims will suffice to overcome the presumption that the Congress would not wish to court the constitutional dangers inherent in denying a forum in which to argue that government action has injured interests that are protected by the Constitution." *Ungar,* 667 F.2d at 193. A review of the legislative history of § 1631o(c) uncovered no reference to the proscription of judicial review. *See id.* at 194. Looking to the history of related statutes, the court found at most "scant assistance," *id.,* and "failed to discover anything that might be considered a clear expression of Congress' desire to prevent courts from passing on constitutional claims of those seeking return of vested assets." *Id.* at 196. The court remanded

the case for the Justice Department to establish procedures, consistent with due
process, that provided adequate time for the preparation and examination of
whatever probative evidence was submitted to it in support of a claim. *See id.* at
198.

*Lepre*, 275 F.3d at 64-67.

    *Lepre* is one of a long series of consistent D.C. Circuit holdings rejecting a cramped or

narrow interpretation of the guidance of *Webster* and *Johnson* or confining those decisions to

their facts and/or specific circumstances.

    Some courts have limited *Johnson* to its facts: allegations that the statutes
underlying veterans' benefits programs are unconstitutional. *See Anderson v.
Veterans Administration*, 559 F.2d 935 (5th Cir. 1977); *Mulvaney v. Stetson*, 470
F.Supp. 725 (N.D.Ill.1979). Others, however, have applied the Supreme Court's
analysis in *Johnson* more broadly and have held that section 211(a) does not
preclude review of the constitutionality of the VA's procedural policies. *See
Devine v. Cleland*, 616 F.2d 1080 (9th Cir. 1980); *Moore v. Johnson*, 582 F.2d
1228, 1232 (9th Cir. 1978); *Plato v. Roudebush*, 397 F.Supp. 1295 (D.Md.1975);
*Taylor v. United States*, 385 F.Supp. 1034 (N.D.Ill.1974), *vacated and remanded
on other grounds*, 528 F.2d 60 (7th Cir. 1976). These courts have reasoned that
such cases do not necessitate review of a decision "under" any law as defined by
the Supreme Court in *Johnson*-that is, an interpretation or application of a
veterans' benefits statute to a particular set of facts. *See* 415 U.S. at 367.
Moreover, the two purposes behind section 211(a)'s restriction of review are not
threatened by courts' consideration of a single, nonfactual and strictly legal,
constitutional issue. *See Plato*, 397 F.Supp. at 1302-03. *This court has agreed
that the import of Johnson extends beyond its specific facts and that its analysis is
appropriate in determining whether a statute precludes judicial review of
constitutional challenges to agency procedures. See Ralpho v. Bell*, 569 F.2d 607,
620 (D.C.Cir.1977).

*Carter v. Cleland*, 643 F.2d 1, 10 (D.C. Cir. 1980) (emphasis added).

    The D.C. Circuit is not unique in its requirement that Congress must provide specific

language showing its clear and unambiguous intent to preclude judicial review of constitutional

claims, and a demonstration of its awareness that it was considering and weighing the competing

issues. "The circuits are in agreement: door-closing statutes do not, unless Congress expressly

provides, close the door to constitutional claims, provided that the claim is colorable and the

claimant is seeking only a new hearing or other process rather than a direct award of money by

the district court." *Czerkies v. U.S. Dept. of Labor*, 73 F.3d 1435, 1439 (7th Cir. 1996). These

plaintiffs' claims are colorable, they attack defendants' processes, procedures, and practices, and

plaintiffs are not seeking "a direct award of money by the district court." The *Webster* and

*Johnson* line of cases implicitly reinforce the role of the courts to declare the Constitution and the

law when plaintiffs allege unconstitutional government action, a function and competency which

the Constitution does not give to the executive branch.

> We do not think that the only kind of constitutional challenge not barred by a
> door-closing statute is a challenge to a statute or regulation, the kind of challenge
> involved in *Johnson v. Robison,* 415 U.S. 361 (1974). Among points emphasized
> in *Johnson* and equally applicable to the present case was the fact that the
> Veterans Administration was not competent to decide constitutional issues and
> that the history of the statute revealed no intention to foreclose constitutional
> challenges. The Supreme Court has read *Johnson* to stand for the broad principle
> that "where Congress intends to preclude judicial review of constitutional claims
> its intent to do so must be clear ... in part to avoid the 'serious constitutional
> question' that would arise if a federal statute were construed to deny any judicial
> forum for a colorable constitutional claim." *Webster v. Doe,* 486 U.S. 592, 603
> (1988)

*Czerkies* 73 F.3d at 1440; *accord Ralpho*, 569 F.2d at 620.

## B.    Congress Legislates in Accord with Supreme Court Decisions

Defendants' argument that Congress may establish privileges, Mot. 9-11, is only a half

truth. Congress may not remove a citizen from the Constitution's protections through a statutory

privilege, nor may it "create a subordinate body free from [constitutional] constraints." *Ralpho*,

569 F.2d at 620. Courts are not free to disregard the rule that Congress is presumed to know the

law as reflected by Supreme Court and courts of appeal decisions in interpreting a statute. "We

generally presume that Congress is knowledgeable about existing law pertinent to the legislation

it enacts." *Goodyear Atomic*, 486 U.S. at 184-85. Once the Supreme Court has established a requirement in terms of the way it interprets congressional enactments, particularly when they involve constitutional issues, the courts interpreting subsequent legislation presume that the legislation is passed in accordance with Supreme Court decisions unless Congress makes it clear it wishes another results. *Cannon* at 696-97. *Webster* and *Kim* are such examples where the Supreme Court has applied its consistent holdings to find Congress did not intend to remove the judiciary's role as the final authority on the Constitution, as is *Lepre* and the precedent it cites. That is the case here.

C.    **Title 10 Does Not Specifically Bar Judicial Review of Constitutional Claims**

The new language in Title 10 addressing review of board proceedings does not specifically address constitutional claims. These cases have been pending in the courts for over seven years, and Congress can be presumed to know: (1) they contain constitutional claims, and (2) *Webster's* holding. Congress made no specific mention of its intent that these constitutional claims be barred. There are no hearings or other evidence that Congress intended to take the unusual step to bar military officers from raising constitutional claims arising from misconduct or prejudice in selection board proceedings, a step which would be a significant departure from its Title VII and RFRA legislation.

The Court cannot presume this is mere inadvertence, given Congress's extensive legislation against prejudice in the Civil Rights Acts, *e.g.*, Title VII, which establishes a uniform federal policy prohibiting unconstitutional discrimination, racial, religious and/or gender. "Congress does not generally hide elephants in mouseholes", *American Chemistry Counsel v. Johnson*, 406 F.3d 738, 743 (DC Cir. 2005) (citing *Whitman v. American Trucking Associations*,

30

531 US 457, 468 (2001)).  If defendants' argument is correct, § 613 is *the only place Congress statutorily denies government employees a remedy for unconstitutional prejudice.*  Given Congress's extensive and consistent legislation against unconstitutional prejudice, *e.g.*, Titles VII and IX, it would not have hidden such an elephantine departure from Congress's pursuit of prejudice in the mouse hole of  § 613.  Congress is well aware that courts presume that it knows the law and legislates in accordance with long-standing holdings of the courts.  Nothing in either § 613's language or legislative history shows Congress intended to change the Supreme Court's requirements in *Webster- Johnson* or this Circuit's consistent rulings articulated by *Lepre,* 275 F.3d at 64-67 (citing *Ralpho, Griffith* and *Unger*), requiring specific language to show Congress intended to restrict the judiciary's constitutional responsibility to declare the law and measure government actions against the Constitution's standard.

Defendants' argument there is only one "express exception" to § 613's procedures, Mot. at 5, is incorrect as a matter of law.  RFRA is incorporated into § 613 and provides a judicial exception allowing a plaintiff to obtain a judicial determination of defendants' challenged SER board proceedings, procedures and practices, and other actions associated with the SER process. Because Congress knew there were other exceptions both statutory and judicial, *e.g,* RFRA and *Webste*r, it can not be said Congress provided an express limitation showing its intention to preclude all others.  *See UDV*, 126 S.Ct. at 1221-22 (providing an exception in the face of an known exemption shows Congress did not intend an absolute bar).  Had it wanted an absolute bar excluding RFRA and *Webster*, Congress knew how to do so and knew it was required to do so. Congress chose not to.

## III.    DISCOVERY OF SER BOARD PROCEEDINGS  IS ESSENTIAL TO VINDICATE PLAINTIFFS' CONSTITUTIONAL CLAIMS

A detailed analysis of plaintiffs' constitutional claims as they relate to SER board proceedings shows discovery is a necessary element of judicial review in order to vindicate their claims. These claims are presented in detail for two reasons. First, defendants argue: (1) Section 613a ... [does] not deny plaintiffs any information essential to proving their claims," Mot. at 10, and (2) plaintiffs remain free to raise their claims, they just can't get discovery to prove them. Mot. at 10-11. This is a dishonest argument. "Mutual knowledge of all the relevant facts ... is essential to proper litigation." *Hickman,* 329 U.S. at 507. Second, the fact that an alternative claim may address some aspect of plaintiffs' claims does not allow the court to ignore the totality of these individual claims. If the Court eventually finds the defendants' practice of reserving board memberships for Catholics is unconstitutional, that does not resolve the plaintiffs' allegations that (1) consistently allowing the Chief of Chaplains or his Deputy to be president of the boards violates the Establishment Clause because they have improperly exerted influence; and (2) the identification of a chaplain's faith group designation to the board members violated the Fifth Amendment's Equal Protection component. Integral to the plaintiffs' relief is the request for declaratory and injunctive relief because that is the only way to insure those practices found to be unconstitutional or illegal are prohibited in the future.

Although defendants terminated their practice of identifying chaplains' denominations to the board *after* this litigation began, absent injunctive relief nothing prevents them from reinstituting the practice at a later date, just as there is no guarantee that defendants will not return to their practice of stacking boards with chaplains. *See Northeast Florida Chapter of the Assoc. General Contractors v. City of Jacksonville*, 508 U.S. 656 (1993) (a defendant's voluntary cessation of a challenged practice does not deprive a federal court of jurisdiction to determine the

constitutionality of the practice).  Even if defendants were to institute regulating changes, that would not deprive the Court of jurisdiction because the past unconstitutional practice produced an injury the Court can remedy.

While plaintiffs challenge defendants' past SER board practices, defendants have announced plans to hold SER boards for Commander and Captain.  If plaintiffs are successful and return to active duty, defendants may seek to reinstitute the SER boards in an attempt to show the board selections would not change.  Therefore, plaintiffs need a declaration as to the constitutionality of those challenged practices and injunctive relief.

A.    **Specific Constitutional Challenges to Defendants' SER Board Practices**

Plaintiffs specifically challenge the identification of each candidate's three-digit faith group identifier (called an Additional Qualification Designator or AQD) to the board members. Complaint ¶¶ 44-45.  Plaintiffs also challenge the fact (1) the Chief of Chaplains or his Deputy have served and may continue to serve unless enjoined, as president of SER boards, (2) their participation on those boards, and (3) their role in selecting and determining past board members. *E.g., CFGC* Complaint ¶¶ 46, 49.  Plaintiffs also challenge the use of religious criteria in the selection process, which is related to the improper use of the AQD, but is also a specific element of plaintiffs' allegations challenging defendants' unconstitutional use of the Thirds Policy as a Chaplain Corps (CHC) management tool.

The *Gibson* plaintiffs specifically challenge the constitutionality of 10 U.S.C. § 612 as applied to chaplain selection boards.  The statute requires a minimum of five selection board members, one of whom must be from the category under consideration.   The *Gibson* plaintiffs allege this violates the Establishment Clause because this delegates discretionary civic power in

33

the award of government benefits to denominational representatives, *i.e.*, persons defined by their

religious identity, the very characteristic for which they were hired.  Plaintiffs allege statistics and

evidence from chaplain promotion board investigations shows chaplains act in accord with the

purpose for which they were hired, *i.e.*, denominational representatives, and those denominations

whose members were most often board members do statistically significantly better.  *See, e.g.,*

Exhibit 3.

    In *CFGC/Adair*, the Court held chaplains serve on boards as naval officers, not

denominational representatives.  *Adair v. England*, 183 F.Supp.2d 31, 60-62 (D.D.C  2002).

Plaintiffs include this claim here because it is in the *Gibson* Complaint and to preserve the issue,

if necessary for appeal.

    Plaintiffs constitutional claims arise under the First and Fifth Amendments.  "Since the

time of our early explanations of due process, we have understood the core of the concept to be

protection against arbitrary action", *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998),

the underlying issue here.   "We have emphasized time and again that 'the touchstone of due

process is protection of the individual against arbitrary action of government,' whether the fault

lies in a denial of fundamental procedural fairness, or in the exercise of power without any

reasonable justification in the service of a legitimate governmental objective."  *Id.* at 845-46

[internal quotations and citations omitted].  This is exactly what plaintiffs challenge.

### B.    The Law of the Case Concerning the Elements of Proof Required to Establish Plaintiffs' Claims

    The above claims allege violations of both the First and Fifth Amendments.  This Court

has established as the law of the case the requirement that, for Plaintiffs to prevail on their Fifth

Amendment claim concerning the use of AQDs, plaintiffs must show defendants "*used those*

codes to discriminate on the basis of religion." *Adair v. England*, 217 F.R.D. 7, 13 (D.D.C.

2002) (citing Defs.'s Mot. at 25) (emphasis added). The law of the case requires plaintiffs

produce evidence that can only come from board members, evidence the Court has already found

is material to plaintiffs' claims. *Chaplaincy of Full Gospel Churches v. Johnson ("CFGC")*, 217

F.R.D. 250, 256 (2003), *rev'd in part and remanded in part*, *In re England*, 375 F.3d 1169

(2004), *cert denied* 543 U.S. 1152 (2005).

### 1.      Plaintiffs' Due Process- Equal Protection claims

To establish a Fifth Amendment claim of unequal treatment, the plaintiffs must

demonstrate that they were, in fact, subjected to unequal treatment through the board procedures,

processes and governmental actions. *Washington v. Davis*, 426 U.S. 229, 239-40 (1976). The

use of statistics alone for SER boards is questionable for several reasons. First, Due Process

claim precedent requires a higher standard of proof than Title VII and statistics alone are not

sufficient. "The Court has also recently rejected allegations of racial discrimination based solely

on the statistically disproportionate racial impact of various provisions of the Social Security Act

because '(t)he acceptance of appellants' constitutional theory would render suspect each

difference in treatment among the grant classes, however lacking in racial motivation and

however otherwise rational the treatment might be.'" *Id*. at 240-41. The type of evidence

showing motive or intent, *e.g.*, use of AQDs or denomination, can only come from board

personnel.

Second, plaintiffs bring claims of individual discrimination as well as class

discrimination. These are two separate claims with different standards of proof. Individual

discrimination is equivalent or analogous to disparate treatment in Title VII litigation.

"Regardless of how devastating or reliable the statistics may look, the issue remains in [disparate treatment] cases whether a particular isolated historical event was discriminatory." *Ward v. Westland Plastics Inc.*, 651 F.2d 1266, 1270 (9th Cir (1980)(per curium). They allege the SER process, practices and action allows illegal factors to influence the boards, depriving them of equal protection and treatment, and these factors included religion.

The plaintiffs' disparate treatment is particularly evident in the FY 96 SER board results (Exhibit 4). The Secretary's criteria emphasized future potential for further service. Exhibit 5. This means potential for promotion and years of useful service remaining. The board retained six of seven chaplains with 3 or more failures of selection (FOS), including those who had the most FOS, Palmer (8), Pyrch (6), and McCreary (6), and fewest years left. The board selected plaintiffs Byrum who had not been considered for CAPT and had 16 years of service left, and Adair who had one FOS to CAPT and 12 years of service left until mandatory retirement.

The defendants' SER board results appear to be gerrymandered, retaining older chaplains within the respective categories with more FOS while separating younger chaplains with greater potential for future service. The Due Process Clause protects against arbitrary treatment, of which this is an example. The obvious explanation is these plaintiffs were more evangelical.

*Gibson* plaintiff Klapach was a Catholic Navy enlisted man who converted to Assembly of God, a pentecostal (non-liturgical) denomination. His Catholic chaplain at the time he converted, who was upset by his conversion, was a member of his first Commander board which failed to select him. A Catholic was also a board member of the SER board that selected him. Klapach has a right to know if the same ill will toward former Catholics which he believes prevented his first selection to Commander was a factor in his non-selection for retention by his

SER board.  These answers can only come from SER board personnel who were present at the proceedings.

Third, the statistics address a small number of boards and the relatively small number of results.  Dr. Leuba's statistical analysis of the SER process addressed in F below shows it is designed to protect Catholics and impacts Non-liturgicals in a prejudicial manner.  However, how that prejudice is manifested in the board proceedings is dependent on testimony from board members.

### 2.    Plaintiffs' Establishment and Free Exercise Clause Claims

Plaintiffs' Establishment and Free Exercise Clause claims also depend on the same requirement for proof of actual prejudice or bias by board members, by the Chief or his Deputy, or the Chaplain Corps.  The first test under *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971), addresses the challenged practice's purpose.  For example, the plaintiffs' claim concerning improper influence of the Chiefs or Deputies depends upon evidence that they did, in fact, use their position to improperly influence selections.  *See, e.g.*, *CFGC* Complaint ¶ 49.a, (Chief informed "one board of his personal list of who he believed constituted 'the future of the Navy'").  CH Linzey claims he was pre-selected by the Chaplain Corps.  How did  RADM Koeneman know CH Linzey needed to find other employment?  Only board members can tell if there is a link between  RADM Koeneman's warning and the SER board results.

Under *Lemon*'s second test, plaintiffs must demonstrate the purpose and effect of the challenged practice was to either advance or hinder specific religions.  403 U.S. at 612.  This requires evidence of the actual effect flowing from the practices and actions plaintiffs' challenge.  Strict scrutiny, an alternative standard of review of Establishment Clause claims, is applicable if

the board showed a denominational preference or bias.  Such a showing depends on evidence that

the challenged practice, in fact, allowed preference for specific denominations.  Another

Establishment Clause standard of review, the reasonable observer standard of review, *see, e.g.,*

*Santa Fe Independent School District v. Doe*, 530 U.S. 290, 308 (2000), requires the reasonable

observer know the facts, including the results, and the context concerning the challenged

practice.  This can only come from testimony about what actually occurred during the board

proceedings.  In *Santa Fe*, the plaintiffs challenged the practice of allowing prayers at high

school events.  Here plaintiffs challenge the various practices and government actions involved

in the SER process.

Free Exercise claims require plaintiffs show a burden, only possible through discovery.

### C.    Discovery Provides the Only Avenue to Obtain Evidence Necessary to Establish Plaintiffs' Claims

As shown above, the law of this case, consistent with Supreme Court precedent, *e.g.*,

*Davis*, 426 U.S. at 239-41; *Lemon*, 403 U.S. at 613, requires plaintiffs to provide evidence of

actual misconduct and prejudice in the board proceedings.  The testimony of board personnel is

the only source of this evidence.  "It is hard to argue that the testimony of former selection-board

personnel with direct knowledge of board proceedings is not 'relevant' and 'reasonably

calculated to lead to the discovery of admissible evidence' regarding alleged Navy discrimination

against non-liturgical chaplains in those very proceedings."  *CFGC,* 217 F.R.D. at 256 [citations

omitted].

For example, CH Linzey, a pentecostal, testifies he was pre-selected.  He knows this

because he was specifically visited by former Chief of Chaplains RADM Koeneman months

before the SER board met.  RADM Koeneman told CH Linzey to prepare for civilian ministry

and suggested a church that RADM Koeneman thought suitable for CH Linzey. Statistics cannot determine if CH Linzey was preselected or whether his identification, practice, and endorsement as a Pentecostal was a factor in his selection or pre-selection for SER. That can only be determined by an examination of the actual discussions that resulted in his selection. The fact that he was warned does not establish, as a matter of law, the violation of his constitutional rights. The actual evidence that he was pre-selected or his Pentecostal or non-liturgical identity played a part in his situation can only come from the testimony of his SER board personnel. There are no other alternatives available to CH Linzey to establish and attack his pre-selection or prejudicial selection.

### D.    There Can be No Constitutional Claim Absent the Ability to Demonstrate a Constitutional Violation Through Discovery

Defendants argue, as they have in the past, the inability to produce evidence does not prevent the Court from reviewing the claim. Mot. 10-11. This is just as absurd for constitutional claims as it is for RFRA, as argued in I above, which is incorporated here. A constitutional right implies that the right may be vindicated and enforced; without such ability the concept of a remedy is illusory. "All agree that Congress cannot bar all remedies for enforcing federal constitutional rights." *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 681 n.12. (1986) (citing *Gunther*), Congressional Power to Curtail Federal Court Jurisdiction: An Opinionated Guide to the Ongoing Debate, 36 Stan. L. Rev. 895, 921 n.113 (1984)). Remedies depend on facts, *see* note 1 *supra*, which depends on the ability of the parties to obtain evidence.

When Congress creates a right of action, it is implied that the right of action includes the means to prove it. That is the function of the Rules. "They shall be construed and administered to secure the just, speedy, and inexpensive determination of every action." Fed.R.Civ.P. 1.

39

E.      **The Federal Rules Provide a Means to Protect Defendants' *Legitimate* Interests in Board Secrecy**

Defendants argue here again that board secrecy is necessary to provide frank discussions in the selection process, and any disclosure destroys this vital and compelling government interest.  This is fabrication, deceit, and a red herring.  Nowhere do they explain (1) why protective orders are insufficient to protect legitimate concerns, (2) how previous investigations into the FY 97 and 98 Commander and FY00 Captain chaplain promotion boards inhibited such discussion or undermined the process, or (3) why discussion of forbidden criteria is a compelling interest.  The Court has recognized there are legitimate concerns that must be protected and ordered the parties to agree to appropriate measures to protect them.  *See CFGC*, 217 F.R.D. at 260-61.  As explained in I.E. above, *Webster* held that protective measures were sufficient to safeguard the CIA's interests in rejecting the government's argument that failure to bar discovery in pursuing constitutional claims would "entail extensive 'rummaging around' in the CIA's affairs to the detriment of national security."  *Webster*, 486 U.S. at 604.

Despite the overwhelming importance of protecting national security interests (not at issue in this case), the Supreme Court did not shy away from allowing discovery which it recognized was necessary to establish the constitutional claim which it allowed despite words barring statutory claims.  The Supreme Court found the District Court had sufficient latitude to shape and control discovery so it could protect national security interests of the CIA.  Here, we are not dealing with matters of national security.  Instead we are dealing with matters that would be open to discovery if this were a Title VII case.  This Court can protect whatever legitimate interests defendants have in their secret board proceedings, which are far less important than CIA procedures and practices.  Defendants have no legitimate interest in discussions concerning race

40

or religion.  Defendants' argument that a national catastrophe will occur if plaintiffs are allowed

to discover what really occurred on the boards, despite the opportunity to protect legitimate

interests, can only indicate its fear of the truth or its doubt of this Court's ability to protect its

interests.  Neither is acceptable as a matter of law.

F.    **Statistics Show the SER Process Is Corrupt and Prejudiced**

Defendants' argument that statistics show the SER process is fair, Mot. at 12, is incorrect.

After plaintiffs were able to correlate board members' denominations with board results,

plaintiffs' statistics demonstrate that in every decision process which uses chaplains to award or

deny government benefits, the board member's denomination becomes a factor in who receives

the benefit.  Those denominations whose members served as board members most often have the

highest favorable award percentages and those denominations with the lowest number of board

members have lower percentages.  The differences between the groups are statistically

significant.  Exhibit 5, "1977 thru 2002 Denominational Appearance as Promotion Board

Members", lists in four tiers defined by frequency of board memberships, those denominations

by faith group clusters whose chaplains served as board members on chaplain commander

promotion boards from 1977 through 2002.  The differences between the tiers is statistically

significant and shows that denomination influences a board's results and this influence cuts

across the faith group categories.  For example, non-liturgical Southern Baptists in Tier II with

the third highest number of board appearances, have a statistically significant higher percentage

of promotions than non-Baptist non-liturgical denominations in Tier IV whose members have

had few or no promotion board memberships.  Liturgical denominations in Tier III and IV do

significantly worse than liturgical denominations in Tier II.  Although the number of SER boards

41

with chaplain board members is small, the same influence and impact is apparent through

statistical analysis.

Dr. Leuba's new and complete analysis of the SER process, "Selective Early Retirement

Boards (SER) Compound Religious Discrimination in the U.S. Navy Chaplain Corps", Exhibit 6,

examines chaplain SER boards and concluded there were:

> 2.1     statistically significant differences in *exposure* rates across denominations –
> regardless of who is appointed to the selection panels (disparate impact);
>
> 2.2     statistically significant differences in *selection* rates across denominations –
> because of differences in exposure rates, regardless of who is appointed to the selection
> panels (disparate treatment);
>
> 2.3     statistically significant differences in *outcomes* across denominations when
> Chaplains are involved in making retirement decisions about other Chaplains (religious
> discrimination);

and

> 2.4     when Chaplains are appointed to SER boards, they have demonstrated a
> statistically significant tendency to go beyond the written record in recommending whom
> to retain and whom to force into retirement (denominational contamination.)

P. 1, ¶¶ 2.1-.4.  Dr. Leuba found the list of chaplains eligible for SER is "not random across

denominations nor random across faith group clusters."  *Id.* at ¶ 12 and Table 1 (p.4).  Catholics

are shielded from the process, *i.e.*, a denominational preference, *id.* at ¶¶ 15-23, 37, 41, 42.  The

underlying prejudice motivating defendants' SER system mechanisms by which this occurs,

related to defendants' accession and recall policies, is relevant to the question of what happens in

the SER board process because the same bias resulting in preference for some denominations

also infects the SER board process.

Dr. Leuba's analysis shows Admirals, not hired as denominational representatives, make

different SER decisions than chaplain board members who are hired as denominational

representatives.  *Id.* at ¶¶ 48-91; *see* Tables 5 and 6.  Admirals retained "more than 90% of the

42

officers who were exposed to SER more than once", *id.* ¶ 68, and tended to retain those with the greatest future potential in accord with the precept instructions. Chaplains did not do this, retaining "barely two-thirds of the officers who survived earlier SER review, *id.* ¶ 69. "The difference is statistically significant beyond three standard deviations." *Id.* at ¶ 70. Dr. Leuba concluded "chaplains who sat on SER boards did not judge on the basis of the value of each officer before them." *Id.* at ¶ 73. He found plaintiffs Adair and Byrum, selected by the FY96 SER board, "were abused by erratic, arbitrary and inept (and contaminated) decisions which [their boards] rendered." *Id.* at ¶ 89.

Analyzing the impact of board members' denominations on the board results, *id.*, ¶¶ 92-127, Dr. Leuba concluded "the denominational mix on chaplain membered SER boards influences decision of those boards (four standard deviations; p<.001), *id.*, ¶ 127, and "having a matching denomination on the SER board was, on the average, worth three steps (rank orders) away from being selected." *Id.*, ¶ 126. The lesson is having an advocate on the board helps, but this appears to be contrary to the Establishment Clause.

Dr. Leuba's analysis and conclusions show denomination improperly influences SER decisions. In Title VII cases, "Even when the statistical proof is so compelling that it might, in itself, satisfy the plaintiffs' initial burden, the prima facie case is bolstered and the court's evaluation is aided by testimony recounting personal experiences of class members. Such testimony may '(bring) the cold numbers convincingly to life.'" *Valentino v. United States Postal Service*, 674 F.2d 56, 69 (D.C. Cir. 1982) (quoting *International Bd. of Teamsters v. United States*, 431 U.S. 324, 338-39 (1977)). However this is not title VII and, as shown above, anecdotal evidence is necessary in a Due Process and First Amendment claims. SER board

personnel have relevant, necessary and critical testimony as to what actually happened on the boards, especially relevant since defendants will undoubtedly challenge Dr. Leuba's analysis.

## IV.    THE FEDERAL RULES PROVIDE NO HEIGHTENED REQUIREMENT FOR DISCOVERY

Faced with the possibility that RFRA and Supreme Court precedent may result in discovery into their SER board proceedings, defendants seek to block discovery of misconduct through another stratagem, a heightened requirement for discovery. Mot. at 11-13. Defendants argument asks the court to rewrite RFRA, the Constitution and the Federal Rules of Civil Procedure. Defendants provide no authority for such a novel theory. As shown in I.E and III. E, *Webster* found the Federal Rules granted courts the authority to take necessary steps to protect *legitimate* governmental interests, there National Security. Defendants have not shown why SER boards require a higher threshold than the Cental Intelligence Agency operations and procedures.

## CONCLUSION

Defendants' argument that § 613 bars discovery into SER board proceedings fails to withstand careful analysis in the light of RFRA, Supreme Court and D.C. Circuit precedent. RFRA bars burdening one's free exercise, specifically provides a right of action enabling those whose RFRA's rights are violated to seek judicial review, and applies to every piece of federal legislation unless Congress specifically excludes its application by citing a specific paragraph of RFRA. Section 613 has no such language exempting RFRA's application and therefore, RFRA is incorporated within § 613. This incorporation provides a right of action which includes the right to discovery. Not allowing military plaintiffs to vindicate their RFRA rights would be contrary to Congress's clear intent and RFRA's history.

Supreme Court precedent is also clear a constitutional claims may not be barred absent

44

clear language in the statute alleged to bar such claims. Section 613 has no such language.

Without discovery, plaintiffs are unable to vindicate their statutory and constitutional rights, a situation which would raise grave constitutional concerns in and of itself.  Without discovery, the Court is unable to fashion a remedy or address plaintiffs' request for declaratory and injunctive relief.   The Federal Rules of Civil Procedure  provide sufficient procedures and guarantees to protect any legitimate concerns of defendants arising from SER board proceedings.

Consequently, the Court should find there is no legal or statutory impediment to discovery of SER board proceedings and deny defendants' Motion for Reconsideration and a Protective Order. The Court should also order defendant Secretary of the Navy to release SER board personnel from their oath of secrecy.

Respectfully submitted,


Dated: July 23, 2007                    /S/ Arthur A. Schulcz, Sr.
                                       ARTHUR A. SCHULCZ, Sr.
                                       DC Bar No. 453402
                                       Counsel for *CFGC* and *Adair* Plaintiffs
                                       2521 Drexel Street
                                       Vienna, VA 22180
                                       703-645-4010

Of Counsel:
Douglas McKusick, Esq.
THE RUTHERFORD INSTITUTE
P.O. Box 7482
Charlottesville, VA 22906-7482
434-978-3888


45

**EXHIBIT LIST**

Exhibit No.    Description

1.             Declaration of CAPT George Linzey, CHC, USN, Ret.

2.             Declaration of Rev. Dr. Jim Ammerman in *Larsen v. United States*

3.             Chart showing 1977 Thru 2002 Denominational Tiering Reflected by
               Denominational  Appearances as Promotion Board Members and Percentage of
               candidates selected to Commander

4.             Excerpt of Precepts for FY95 and 96 SER boards specifying Secretary's retention
               criteria

5.             List of FY96 SER Board candidates Ranked by Failures of Selection and Time
               Remaining in Service

6.             Expert Declaration of Dr. Leuba,  "Selective Early Retirement Boards (SER)
               Compound Religious Discrimination in the U.S. Navy Chaplain Corps", dated
               7/18/07

7.             Expert Declaration of Dr. Leuba in *Larsen v. U.S. Navy*, 02cv2005, "Siskin
               Conjecture: The Pattern of Denominations Assigned to U.S. Navy Chaplain Corps
               Selection Boards Biases the Decisions Which Flow From Those Boards,
               dated12/1/06

8.             Declaration of Arthur A. Schulcz, Sr.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 23, 2007, I electronically filed the foregoing **Plaintiffs'**

**Opposition and Memorandum Of Points and Authorities in Opposition to Defendants'**

**Renewed Motion to Reconsider Order Denying Appeal of Magistrate Judge's Order and**

**for A Protective Order Against Discovery of Selective-early Retirement Board**

**Deliberations** with the Clerk of the Court to be served by the Court's CM/ECF system on the

following:

       Michael Q. Hyde
       Attorney, Civil Division
       U.S. Department of Justice
       20 Massachusetts Ave., NW
        Room 7322
       Washington, D.C. 20001

                                /s / Arthur A. Schulcz, Sr.
                                ARTHUR A. SCHULCZ, SR.
                                Counsel for *CFGC and Adair* Plaintiffs
                                D.C. Bar No. 453402
                                Counsel for *CFGC* and the *Adair* Plaintiffs
                                2521 Drexel Street
                                Vienna, VA 22180
                                703-645-4010

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHAPLAINCY OF FULL GOSPEL CHURCHES,<br>et al., | )<br>)<br>) | |
| v. | ) | Case No. 1: 99CV002945 (RMU) |
| | ) | |
| THE HON. GORDON R ENGLAND, et al. | )<br>) | **Consolidated with** |
| ROBERT H. ADAIR, et al., | )<br>) | |
| v. | ) | Case No. 1: 00CV00566 (RMU) |
| | ) | |
| THE HON. GORDON R ENGLAND, et al. | )<br>) | |

## DECLARATION OF GEORGE W. LINZEY

Pursuant to 28 U.S.C. § 1746, I, George W. Linzey, declare as follows:

1.      I, George W. Linzey, live at 3910 Julie Ln., La Mesa, CA 91941.  I have

personal knowledge of and am competent to testify on the matters addressed herein.

2.      From 1977 to 1998, I was an active duty Navy chaplain.  Although I was the youngest

Navy chaplain to make the rank of Captain, I was selected for involuntary early retirement by the

fiscal year 1998 chaplain selective early retirement board (SERB).

3.      In 1996, I was stationed at the Naval Hospital Great Lakes, IL.

4.       In the Spring of 1997, RADM Al Koeneman, the Navy's retired Chief of Chaplains,

drove to the Great Lakes Naval Hospital from his home in Iowa to give me a message: "Get your

resume ready, George.  There comes a time when we all have to leave active duty.  There's a fine

church with a good music program, needing a new Minister of Music.  It's the Covenant

Presbyterian Church of West Lafayette, Indiana.  You'd do well there."

5.      I asked him, "Are you telling me something?"  RADM Koeneman replied, "Yes, get your

resume ready."

6.      I took that to mean that I was going to be selected for early retirement (SERBed) the

following year which, in fact, I was.

7.      It was not unusual that RADM Koeneman, a liturgical, would recommend me, a non-

liturgical Pentecostal, for a job with a liturgical congregation because he knew that I had been

trained in liturgical music and had performed and ministered in music in liturgical churches..

8.      Because I was convinced if the veracity of RADM Koeneman's warning, I visited

Covenant Presbyterian Church in October 1997 to evaluate it for a possible job when RADM

Koeneman's prophecy later came true.  I later decided to retire in the San Diego area.

9.      On January 2, 1998, while on leave in San Diego, I received a message to call RADM

Kevin Greene, the Commander of Naval Training Center Great Lakes, Ill., where I was stationed.

When he answered the phone, I said "ADM Greene, this is Chaplain Linzey returning your call.  I

have been SERBed, haven't I?"  He replied, "Well, as a matter of fact you have been SERBed."

I said, "RADM Koeneman prepared me for it in advance last year, and asked me to get my

resume ready.  I'll be alright."

10.     This experience confirmed something I had been told when I attended the Advanced

Course of the Navy Chaplain School, in 1986-87.  We were told that "About 80% of all selection

board decisions are decided before the boards even convene in Washington."

11.     No liturgical Protestants were SERB'd the year I was selected; there were three other

non-liturgical chaplains and a Catholic priest, CAPT Ron Madden.

12.     CAPT Madden was the Catholic board member on the FY98 Commander Chaplain board

whose actions guaranteed liturgical chaplain (CH) Stan Aufderheide (Lutheran, Missouri Synod)

99cv2945 & 00cv 566
EXHIBIT 1

failed of selection (FOS) to Commander.  CH Aufderheide's FOS resulted in several

investigations that were embarrassing to the Navy and the Chaplain Corps.  Other deposition

testimony alleges CH Madden bragged to a group of chaplains in San Diego whom he was

briefing on the promotion board process that he was instrumental in getting CHs Cuddy and

Clark, two Catholics with terrible records as shown by the subsequent investigations, selected

from above zone by the FY 98 Commander board.

13.     The Chief during the FY98 Chaplain Commander promotion board was liturgical RADM

Muchow who, like Aufderheide, was a Lutheran, Missouri Synod.  The Chief of Chaplains

(Chief) during the FY98 SER board was liturgical RADM Holderby, also a Lutheran (ELCA)

who was the Deputy Chief when the FY 98 Commander Chaplain promotion board convened.

14.     I believe that CH Madden was preselected for SER like me; in his case as punishment

because his vendetta against CH Aufderheide resulted in investigations showing the promotion

system was corrupt and manipulated by bias.

        The above declaration is true and accurate to the best of my ability and is made under

penalty of perjury.


5/14/06                          _____/S/_____
                                 CAPT GEORGE W. LINZEY, CHC, USN (Ret)

99cv2945 & 00cv 566
EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| REV. CHARLES E. LARSEN, et al., | ) | |
| | ) | |
| v. | ) | Case No. 02CV02005 (RMU) |
| | ) | |
| THE UNITED STATES NAVY, et al. | ) | |
| | ) | |

**DECLARATION OF REV. DR. JIM AMMERMAN
CHAPLAIN (COLONEL), U.S. ARMY RETIRED**

Pursuant to 28 U.S.C. § 1746, I, Jim Ammerman, declare as follows:

1.      My name is E. H. Jim Ammerman.  The E. H. stands for Elmer Harmon, a family name,

but I have always been called Jim and "Jim Ammerman" is the name I use and am known by.  I

live at 2721 Whitewood Dr., Dallas, Texas. 75233-2713.  I have personal knowledge of and am

competent to testify on the matters and material addressed herein.

2.      I am the Director of Chaplaincy Full Gospel Churches ("CFGC"). I have been the

endorser for CFGC since it became a DOD recognized endorsing agency in 1984.

3.      I make this declaration to address the Navy's argument on page 37-38 of its Opposition to

the Larsen plaintiffs' Summary Judgment Motion implying that a non-liturgical chaplain can

meet the free exercise needs of all other non-liturgical personnel.  That is flat wrong and reflects

the same sort of Navy prejudice that led CFGC to file suit to defend and vindicate the rights of its

chaplains and the service personnel they serve.

4.      It is possible for CFGC chaplains to minister to other non-liturgical faith groups.  CFGC

chaplains have conducted liturgical services, General Protestant services and contemporary or

general non-liturgical services.  Some CFGC chaplains have come from liturgical churches, *e.g*.,

United Methodist.  However, some personnel could be uncomfortable with a CFGC chaplain

99cv2945 & 00cv 566
EXHIBIT 2

depending on the ministry situation and what the person believes concerning Charismatics.

5.      Non-liturgical chaplains who are not charismatic or Pentecostal are not able to meet or minister to Pentecostal/charismatic free exercise needs, particularly if the chaplain belongs to a faith group which rejects or condemns charismatic/Pentecostal beliefs and practices.  For such a chaplain to participate in or conduct a charismatic service could result in his endorsement being terminated.

6.      My personal history as a chaplain and endorser support these conclusions.

7.      I began my military career During World War II when I enlisted in the U.S. Navy (the "Navy") on July 20, 1942.  After serving on destroyers for about a year, I was selected for Naval aviation school.  I completed pilot training in 1945 and was honorably discharged from the Navy in November 1945.

8.      Returning to civilian life, I started college, completed my undergraduate degree in 1949, enrolled in Southwestern Theological Seminary in Forth Worth, Texas and graduated with a Masters of Divinity (a 3 year degree) in 1954.

9.      In 1946 while still in college, I was ordained as a Southern Baptist minister and began pastoring a church in the Southern Baptist denomination.  I continued to pastor Southern Baptist churches, even while in college and seminary, until I went into the Army in 1954.

10.     After graduating from seminary in 1954, I was commissioned as a chaplain in the U.S. Army.  The Southern Baptist Convention endorsed me during my 23 years as an active duty Army chaplain.  I retired in 1977 at the grade of Colonel.

11.     While pastoring various churches before entering the Army, I experienced what some people refer to as the "full gospel" or "Pentecostal phenomenon" where God, in response to the

prayers of ordinary Christians, displays his power through the Holy Spirit, performing such things as healings and miracles, and things which cannot be explained by circumstance or reason.

12.    In the Army, I came in contact with and participated in what was called the "Charismatic Movement", a Pentecostal type experience that touched many churches and denominations, both liturgical and non-liturgical, and was similar to the Pentecostal phenomenon I had already experienced in my ministry.

13.    The Charismatic Movement had a distinct type of worship with no fixed liturgy and a distinct type of personal ministry.  It is distinct in the sense it is different from the usual liturgical and non-liturgical Protestant services.

14.    The Charismatic Movement Many led to the formation or establishment of many new churches not affiliated with a denomination.

    A.    I started the CFGC in 1982 to provide an endorsing agency for charismatic clergy from these charismatic non-denominational churches so their clergy could become military chaplains and serve the needs of the many charismatic service personnel.

    B.    CFGC became a DOD recognized endorsing agency in 1984.

    C.    CFGC currently represents over 8.5 million charismatic Christians, the second largest non-liturgical faith grouping after the Southern Baptist Convention.

    D.    The Navy has not provided a means by which its personnel who come from the churches under CFGC's umbrella can identify themselves as charismatic.  In the early 90s, after the First Gulf War, the Navy vetoed an Armed Forces Chaplain Board proposal which would have allowed this.  This is one of the issues in *CFGC v. Winter*.

15.    Many Southern Baptists strongly reject and condemn the Charismatic Movement and its

99cv2945 & 00cv 566
EXHIBIT 2

Pentecostal/charismatic beliefs and practices. I know this from personal experience, many Southern Baptist pastors have lost their jobs when they have become "baptized in the Spirit." Other non-liturgical and liturgical faith groups or denominations also strongly reject Pentecostal/charismatic beliefs and practices.

16.    CFGC Navy chaplains have reported to me very prejudicial comments by their command chaplains addressed to them or CFGC, such as "You belong to a splinter sect" and "People who worship like this (meaning charismatics) shouldn't be allowed on base and their chaplains should not be allowed in the Navy."

17.    This illustrates some of the types of prejudice directed against CFGC because of its charismatic beliefs and practices. For example, although the Armed Forces Chaplain Board recognized CFGC as an endorsing agency in 1984, the Air Force did not accept CFGC chaplains until 1990 after I threatened to initiate a DOD IG investigation.[1]

18.    In 1997 I wrote a letter to Navy Chief of Chaplains RADM Byron Holderby complaining about the Navy's treatment of CFGC chaplains, particularly in promotions.

19.    I informed RADM Holderby that I had stopped recommending chaplain candidates consider the Navy as a viable career option several years earlier because of the Navy's prejudicial treatment of charismatic chaplains.

20.    If a candidate requested the Navy, I would counsel them on the difficulties they would face because the evidence and experience showed the Navy did not treat CFGC chaplains fairly. CFGC processed those candidates who still asked to go in the Navy.

21.    CFGC chaplains have done well in all services except the Navy. Four of the CFGC

---

[1] Since that time, CFGC chaplains have done well in the Air Force.

99cv2945 & 00cv 566
EXHIBIT 2

chaplain plaintiffs in the *CFGC* case were not allowed to continue in the Navy and went into the Army Chaplain Corps.  All have been promoted to the rank of Major and two were selected for post-graduate schooling at Army expense.

22.    Despite my letter to RADM Holderby, the prejudice against CFGC chaplains in promotions and accessions has continued.  Since there was no other way to convince the Navy to treat CFGC fairly and operate on a level playing field, CFGC filed suit to seek redress through the courts.

23.    Many liturgical faith groups share common beliefs and worship practices.  While the same is true of some non-liturgical faith groups, there are many distinct differences among them.  As I mentioned above, many liturgical and non-liturgical faith groups disagree with and some condemn charismatic/Pentecostal beliefs and practices.

24.    As I stated above, my experience and the experience of CFGC chaplains, it is possible for to minister to many non-liturgical faith groups.  However, Non-liturgical chaplains who are not charismatic or Pentecostal are not able to meet  Pentecostal/charismatic free exercise needs.

25.    On February 2, 2007, the Navy6 Chief's Office informed us the Navy needed 66 chaplains in order to fill its quota for this year.

I make this declaration under penalty of perjury, it is true and accurate to the best of my ability, and it represents the testimony I would give if called upon to testify in a court of law.


Dated 2-8-07                    /S/  E.H. Jim Ammerman
                                Rev. Dr. Jim Ammerman

**1977 thru 2002 Denominational Appearance as Promotion Board Members**
and Denominational Percentage Selected to Commander
( )= total number of appearances

| Col 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| Faith Group Cluster → | Roman Catholic | Liturgical Protestant | Non-Liturgical Protestant | Special Worship | % Selected to CDR* |
| Tier I - 100% | RC (102) | | | | **48.34 %** |
| Tier II - 25 to40% | | PUSA (43) ELCA (29) UM (21) LMS (15) ABC (12) UCC (10) CC/DC (10) | SB (37) | SDA (11) | **45.07 %** |
| Tier III - 7 to15% 4 to 8 seats in 25 years | | AME (8) RCA (7) EPIS (7) | NBCUS (7) PNBC (7) | J (6) | **36.12 %** |
| Tier IV - 0 - 5% 0 to 3 seats in 25 years | 5 Others (0) | CRC (3) ECCA (3) CME (2) 53 Others(0-2) | BGC (5) GARB (4) CGIC (3) 109 Others (0-2) | LDS (4) ORTH (3) CS (1) 10 Others (0) | **27.00 %** |

Columns 1-5 from Table 1 (page9) - "Faith and Promotion Board Decisions" from "The Siskin Conjecture: The Pattern of Denominations Assigned to U.S. Navy Chaplain Corps Selection Boards Biases the Decisions which Flow from those Boards (Exhibit 7), by Harald R. Leuba, PhD, dated 12/1/2006 in *Larsen v. U.S. Navy*, 02cv2005 (D.D.C.)

Column 6 from "The Siskin Conjecture", ¶ 48 (page 14)
 * As reported in Biographies, Chaplain Corps History, Volume X.

"The pattern of figures above is statistically significant (Chi Square <.001; which is beyond the three standard deviations level of significance.). **Conclusion 3:** This supports the Siskin Conjecture.  Denominations faring the best in terms of getting a seat o a promotion board, are also those which are the most likely to rise to the rank of CDR.
*Id.* at ¶ 49 (page 14).

**FY 96 SERB ELIGIBILITY ANALYSIS**

| NAME | FG | AGE 12/95 | Years CHC | Prior Service | CDR | FOS 1 | FOS ≥2 | Comments |
|---|---|---|---|---|---|---|---|---|
| Palmer | SB | 60 | 20 | | 1/85 | | 8 | |
| Pyrch | ORTH | 57 | 20 | | 4/87 | | 6 | |
| McCreary | CHCCC | 56 | 16 | N - 5 years | 10/91 | | 6** | ** to CDR |
| Jensen, S.L. | ELCA | 48 | 19 | | 3/85 | | 5 | |
| *Rowland, R.G. | UM | 55 | 15 | N - 4+ yrs | 9/87 | | 4 | |
| Leverette | UM | 43 | 19 | | 1/89 | | 3 | |
| Klapach | AG | 46 | 12 | 3+ | 11/90 | | 3 | 1fos CDR |
| | | | | | | | | |
| Stanfield | UM | 47 | 17 | N-3 yrs | 12/90 | X | | Inzone 96 |
| Bennett, Wm.T. | SB | 49 | 15 | N - 8 years | 4/91 | X | | Inzone 96 |
| *Adair | SB | 46 | 16 | N - 3+ yrs | 6/91 | X | | Inzone 96 |
| Newhouse | SB | 48 | 16 | AF - 8 yrs | 6/91 | X | | Inzone 96 |
| *Simonelli | ABC | 51 | 16 | MC - 4 yrs | 7/91 | X | | Inzone 96 |
| | | | | | | | | |
| Umbaugh, R.D. | AG | 51 | 16 | AF - 8 yrs | 8/91 | | | BZ 96 |
| Durham | UM | 50 | 16 | AF - 7 yrs | 9/91 | | | BZ 96 |
| *Metzger | CGCT | 48 | 16 | AF - 4+ yrs | 9/91 | | | BZ 96 |
| Tumlin, G | SB | 49 | 16 | MC- 11 yrs | 3/92 | | | BZ 96 |
| *Aven | PCA | 48 | 15 | AF- 4+yrs | 92 | | | BZ 96 |
| Siegel | J | 51 | 15 | | 9/92 | | | BZ 96 |
| Burt, R. F. | OBSB | 47 | 14 | 6+ | 3/93 | | | |
| *Byrum, G. | PB | 46 | 14 | 6+ | 93 | | | |
| Brown, N. | CR | 48 | 14 | N - 7 years | 93 | | | |
| Nixon | NBCUS | 51 | 14 | N - 3+ yrs | 4/93 | | | |
| Simons | UM | 57 | 13 | N - 10+yrs | 5/93 | | | |
| *Morgan, J.P | EC | 49 | 12 | MC -7+ yrs | 94 | | | |

\* - indicates selected for SER

**SER PRECEPTS PROVIDING RETENTION CRITERIA**

EXTRACT 11/28/94 Secretary of Navy Memorandum to RADM Byron Holderby, Subj:
PRECEPT CONVENING THE FY 95 SELECTION BOARD TO RECOMMEND
COMMANDERS, CHAPLAIN CORPS FOR SELECTIVE EARLY RETIREMENT

5.      The major criterion for the Navy's success is its ability to conduct prompt and sustained
combat operations.   A balance of skills among the Navy's leaders is key to maintaining this
ability.  Excellence in operational environments and during arduous, demanding deployments is
an important measure of the qualities the Navy requires.  Officers may have demonstrated
leadership, skill, integrity and resourcefulness in other difficult and challenging joint  and in-
service assignments.  You must ensure the officers retained posses the qualities to excel in
positions of responsibility and authority appropriate to their grade.  You must consider each
officer's potential for future contributions in both traditional and more specialized assignments
and retain those who have the highest potential for significant future service.   ***
(emphasis added)

See Bates No. A 02672; W502-03


EXTRACT -- 11/17/95 Secretary of Navy Memorandum to RADM Donald K. Muchow, Subj:
PRECEPT CONVENING THE FY 96 SELECTION BOARD TO RECOMMEND
COMMANDERS, CHAPLAIN CORPS FOR SELECTIVE EARLY RETIREMENT

5.      The major criterion for the Navy's success is its ability to conduct prompt and sustained
combat operations.   A balance of skills among the Navy's leaders is key to maintaining this
ability.  Excellence in operational environments and during arduous, demanding deployments is
an important measure of the qualities the Navy requires.  Officers may have ALSO demonstrated
leadership, skill, integrity and resourcefulness in other difficult and challenging joint  and in-
service assignments.  Just as you must carefully consider positive outstanding performance, you
must carefully consider documented incidents of misconduct and substandard performance,
which are included in an officer's official service record, in deermining those officers who are
best qualified for retention. You must ensure the officers retained posses the qualities to excel in
positions of responsibility and authority appropriate to their grade.  You must consider each
officer's potential for future contributions in both traditional and more specialized assignments
and retain those who have the highest potential for significant future service.   ***
(emphasis added)

Bates No. A02718

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

———————————————————— )
IN RE: NAVY CHAPLAINCY              )       Case No. 1: 07-mc-269 (RMU)
————————————————————)——————

## Selective Early Retirement Boards (SER)
## Compound Religious Discrimination
## in the U.S. Navy Chaplain Corps

### A Statistical Analysis and Declaration by Harald R. Leuba, PhD[1]

**Summary:**

1     Selective (Involuntary) Early Retirement may be an appropriate management tool when used by the U.S. Navy in general, if the number of Active Duty Officers has to be reduced faster than may occur via voluntary retirement.

2     But when the U.S. Navy Chaplain Corps uses this tool, religious exploitations come to play which lead to:

-    `2.1` statistically significant differences in *exposure* rates across denominations – regardless of who is appointed to the selection panels (disparate impact);

-    `2.2` statistically significant differences in *selection* rates across denominations – because of differences in exposure rates, regardless of who is appointed to the selection panels (disparate treatment);

-    `2.3` statistically significant differences in *outcomes* across denominations when Chaplains are involved in making retirement decisions about other Chaplains (religious discrimination); and

-    `2.4` when Chaplains are appointed to SER boards, they have demonstrated a statistically significant tendency to go beyond the written record in recommending whom to retain and whom to force into retirement (denominational contamination.)

---

[1] I am a U.S. Citizen living at 9555 Persimmon Tree Road, Potomac, Maryland 20854. I am competent to testify on, and have personal knowledge of and involvement with the matters addressed and methods used in this declaration. The conclusions I state here are statistically tested, scientifically certain, and independently arrived at. (My *c.v.* is attached.)

## The SER Protocol

3    When the Secretary of the Navy determines that:

> "the Navy is currently faced with the need to increase the number of retirements of commanders [*e.g.*] beyond the number of approved voluntary and involuntary retirements"[2],

a selective early retirement board is convened, and guidance (a "Precept") is issued which appoints a president, identifies members of the board, establishes the place, date and time for the board to meet, and directs the board to select to retain, all but:

- •      3.1 a specified number of officers (in this case eight),
- •      3.2  whose early retirement, "in the opinion of the majority of the board, is in the best interest of the Navy".

4    Federal law, 10 USC §638, §638a, and §611(b), establishes facially neutral objective rules for determining SER eligibility, and the Chief of Naval Personnel is charged with producing the list of eligible candidates as of the date the board convenes.

5    The precept states:

> "The major criterion for the Navy's success is its ability to conduct prompt and sustained combat operations.  A balance of skills among the Navy's leaders is the key to maintaining this ability.  Excellence in operational environments and during arduous, demanding deployments is an important measure of the qualities the Navy requires.  Officers may also have demonstrated leadership, skill, integrity, and resourcefulness in other difficult and challenging joint and in-service assignments. You must ensure the officers retained possess the qualities to excel in positions of responsibility and authority appropriate to their grade. \ You must consider each officer's potential for future contributions in both traditional and more specialized assignments and retain those who have the highest potential for significant further service.  When determining whom to retain, you should also give consideration to the resources expended by the Navy in preparing officers for particular assignments, and the needs of the Navy in managing billets with long training pipelines."[3]

6    The precept specifies that the "board will consider only those official records provided by the Chief of Naval Personnel, as well as written communications from eligible officers".

---

[2] This quotation comes from the Secretary of the Navy's "Precept Convening the FY-95 Selection Board to Recommend Commanders in the Chaplain Corps for Selective Early Retirement."  Reference 1.

[3] Ibid, ¶ 5.

7    Board members are required to sign an oath of strict compliance with the precept and absolute impartiality in their decisions.

8    In the example at hand, the Secretary appointed:

> RADM Anderson B. Holderby, Jr.[4]

and

> RADM Edward Moore, Jr. USN
> CAPT Michael H. Kennedy, CHC, USN
> CAPT George C. Paul, CHC, USNR and
> CAPT William P. Dillon, Jr., CHC, USN as members.

9    In the eight years between 1991 and 1998, there were five SER boards for CAPT selection and seven SER boards for CDR selection. There was no CAPT board in 1993, 1994, and 1995, and no CDR board in 1992.

10    All of the SER boards for CAPT, and the 1991-1993 SER boards for CDR, were staffed with (a) the Chief of Chaplains as President, and four Admirals from other communities as members.  The 1994 SER for CDR's had Admirals as board members, including a line officer as the President. The 1995, 1996, 1997 and 1998 SER Boards for CDR's were staffed with the Chief of Chaplains as the President with three subordinate Chaplains and a line officer as board members.

## Disparate Impact

11    The rules for determining eligibility for SER seem both objective and facially neutral, dealing with total years of experience, time in grade, eligibility for current voluntary retirement or imminent mandatory retirement (at age 62), presence on a promotion list, etc.  The rules governing eligibility for SER, as interpreted by the office to which the Chief of Naval Personnel has delegated that task, supposedly apply to both Regular and Reserve active duty officers, but there is either some discretion in terms of inclusion, or some flexibility in interpretation with respect to temporary assignments, duty stations, or reserve status.  When the Defendants reconstructed the eligibility lists for Discovery in *Wilkins*, they reported uncertainties, some of which they "resolved" by reference to biographical data in Volume X of the Chaplains History and phone calls to endorsers, and some of which they were not able to resolve.   (See Reference 2.)

12    Objective or not, replicable or not, facially neutral they may be, but the list of Chaplains eligible for SER is not random across denominations, nor random across faith group clusters.

13    Column (1) of Table 1 shows the number of  CDR's who were on Active Duty (according to the biographical data in Volume X of the Chaplain Corps History, Reference 3) on 9/30/90 when the SER season started.

---

[4]  When the Board actually met RADM Holderby sat as president.

14    This number is not the SER eligibles for 1991, and it is certainly not the SER eligibles for 1992, 1993, and so forth – as new promotions, and unexpected retirements happen, or as Chaplains move into and out of the Reserves, either on their own petition, or by action of the Community Manager – to protect a Chaplain, or to meet or evade an administrative requirement (*a la* Berto, 2007; Reference 4.)

15    All of these inventory changes, and others, can affect the moving total number of Chaplains at CDR and CAPT, but whatever changes happen should be random across denominations, unless there is denominational preference being exercised in the changes  –  which could be its own cause for disparate impact.

**Table 1**
**Comparison by "Faith Group"**
**of Commanders on Active Duty vs**
**Commanders Exposed to SER Board Action**

|  | Active Duty (Ref 3) | SER Eligible (Ref 5) | SER Eligible count* | Percent Eligible (3)/(1) | Relative Percent by FG | Ratio of Exposure vs Catholic |
|---|---|---|---|---|---|---|
| Col #: | (1) | (2) | (3) | (4) | (5) | (6) |
| Roman Catholic | 66 | 23 | 17 | 26% | 15% | 1 |
| Lit. Protestant | 64 | 60 | 37 | 58% | 32% | 2.1 |
| Non-Liturgical | 63 | 100 | 59 | 94% | 51% | 3.4 |
| Special Worship | 6 | 4 | 2 | 33% | 2% | .1 |

* Corrected for multiple exposure.

Column (2) is from data the Defendants gave the Court. (See Fact 25, Reference 5.)

Column (3) corrects the data in Column (2) to adjust for repeated exposures; it is certainly true, for example, that CDR Klapach was exposed to SER four times (and selected for retirement once), and that CDR Umbaugh was exposed to SER six times, and selected for retention all six times, etc. Clearly, for these two CDR's,  the probability of being selected for retirement is not once in ten exposures, it is once in two Chaplains.  The Navy's tabulation of the number of *occasions* of SER exposure, rather than the number of different Chaplains exposed to SER, distorts both exposure rates and selection rates across faith group clusters (see below) .
(Also see Endnote 1.)

Column (4) is Column (3) divided by Column (1), with the result expressed as a percentage. This is

the percentage of all chaplains on Active Duty (in that faith group cluster) who were exposed to SER at least one time.

Column (5) is the relative percent of all the CDR's in Column (3) represented by each Faith Group. This is the "share" of the total exposure, borne by each faith group cluster.

Column (6) converts the shares in Column (5) into a relative ratio. Note that Liturgicals are more than twice as likely to be exposed to SER as Roman Catholics. Non-Liturgicals are more than three times as likely to be exposed to SER.

16    I conclude that something in the implementation of the eligibility rules for SER is having a disparate impact – to protect Catholic Chaplains and to overexpose non-Liturgical Chaplains.

17    The Chi square here, comparing (a) Roman Catholic exposure to SER to (b) non-Catholic exposure to SER, is statistically significant beyond three standard deviations; p < .0004.

18    Table 2 presents for Captains, what Table 1 presented for Commanders.

**Table 2**
**Comparison by "Faith Group"**
**of All Captains on Active Duty vs**
**Captains Exposed to SER Board Action**

|  | Active Duty (Ref 3) | SER Eligible (Ref 5) | SER Eligible count* | Percent Eligible (3)/(1) | Relative Percent by FG | Ratio of Exposure vs Catholic |
|---|---|---|---|---|---|---|
| Col #: | (1) | (2) | (3) | (4) | (5) | (6) |
| Roman Catholic | 30 | 44 | 34 | 113% | 25% | 1 |
| Lit. Protestant | 47 | 72 | 55 | 106% | 40% | 1.6 |
| Non-Liturgical | 32 | 54 | 43 | 134% | 31% | 1.2 |
| Special Worship | 3 | 8 | 5 | 166% | 4% | .2 |

* Corrected for multiple exposure.

19    All the columns in Table 2 are defined like the corresponding column in Table 1, except that the data in Table 2 address Captains rather than Commanders. The explanation for why the percentages in Column (4) in Table 2 are larger than the similar numbers in Table 1 is that Captains have, on average 7.5 years more experience than CDR's, and a greater proportion at the higher rank are likely to be entrained by SER rules based on years of experience. The average Captain was

promoted 19.3 years after being commissioned.

20    The results in Table 2 are not statistically significant, but they are in the same direction as the results from Table 1 – indicating again that something in the way the SER eligibility rules are interpreted in the Chaplain Corps is protecting Catholics CAPT's from exposure to SER.

21    The way the Chaplain Corps implements SER, Catholics get a "pass",  a "Get Out of Jail Free" card if you will; for CDR's and CAPT's combined, only 51% of the Active Duty Catholics get exposed to the risk of Involuntary Retirement versus 93% for the non-Catholics.

22    Catholics alone do not suffer full cohort exposure to Involuntary Retirement.

23    There is an interpretational framework for evaluating workplace discrimination which does not require pointing at a particular *cause*, but which allows for an assessment of what happened, and then infers that whatever happened, happened for a reason.  If the impact is statistically significant, the presumption of no bias is called into question, and the burden of explanation shifts to the Defendants.  However ....

**An example of how this *could* happen.**

24    I am not saying that the following example is *the* nexus of the benefit that Catholics receive *vis a vis* SER exposure.  I am saying that this is an illustration of how a set of  superficially innocuous protocols can lead to religious preference.

25    The SECNAV instruction which applies to all Selective Early Retirement boards, not just those for the Chaplain Corps, specifies, (among other conditions) that eligible Officers are, *e.g.*, in FY95:

> "- Commanders (O-5).  Officers who have completed at least one year Time-In-Grade and nineteen years of Active service as of 1 Jul 94, and who are senior to the junior officer named in paragraph 4 for their respective competitive categories."

26    The superficial reason for restricting eligibility consideration to Officers with 19 years of Active service, is so that each Officer's value to the Navy can be compared to their peers on the basis of comparable records of performance in their chosen disciplines.

27    For most elements of the Navy, this is straight forward and unbiased.  Most Navy Officers are commissioned at the bottom rung of the chain of command and work their way up.

28    For the Chaplain Corps this focus on years of Active service can introduce distortions.  Some Chaplains come to their "callings" later in life; they may have served in the ranks before "taking the cloth".  This gives those particular Chaplains time in Active Duty which is not comparable to general "Chaplain duty" time.  On the other hand, many, in fact most, Catholic Chaplains are brought into

07mc269 (RMU)
EXHIBIT 6

the Service at a higher rank than their non-Catholic peers, and many recycle through the Reserves; both of these practices can give Catholic Chaplains less Active Duty time than their rank peers.

29    I do not know, and do not opine, on whether it is "right" to compare Chaplains on the basis of general Active Duty time or on the basis of time in grade.

30    I do know that it is possible for these seemingly innocuous provisions to have the effect of "protecting" Catholic Chaplains from exposure to SER.

## Disparate Treatment

31    If exposure to SER were just a military designation, with no practical consequence, it would not matter that as administered by the Chaplain Corps, Catholics were protected from it, and that non-Liturgicals in particular received more than their fair share of the designation.

32    But SER exposure happens in a context where the SER board is *ordered* to <u>select out</u>, i.e., mark for forced retirement, a pre-specified, fixed number of Chaplains for involuntary removal from Active Duty.  If the subsequent action is equitably administered, exposure to SER makes every designated candidate equally vulnerable to an adverse action.

33    Tables 1 and 2 provided data on the results of SER eligibility which demonstrated that the process had an uneven, a disparate, impact upon Catholics and non-Catholics.

34    Tables 3 and 4 provide the data which indicate what happened once the exposure began, *i.e.*, what happened during the execution process.

35    In Tables 3 and 4:

Col(1) is the same data as was presented in Table 1; this is not the total number of CDR's exposed to SER, but it is an unbiased estimate of the number who could have been exposed to SER, but for the denominational discrimination inherent in the determination of eligibility.

Col(2) is the same data as was presented in Table 1; this is the number of different *times* a Chaplain of this faith group cluster was considered by some SER board.  These data are quoted from information the Defendants provided to the Court.  (See Reference 5.)

Col(3) is the same data as was presented in Table 1; this is the actual count of the number of different Chaplains from this faith group cluster who were considered by some SER board.  These data only became available when the Navy, via discovery, produced the *names* of all the candidates (not just their denominations) before every SER board, and the identification of which Chaplains were considered and which were selected became visible to the Plaintiffs.  (See Reference 7.)

Col(4) is the actual count of the number of Chaplains who were selected for SER from this faith group cluster. These figures also come from the data the Defendants provided to the Court, and, but for a few changes in faith group cluster assignment[5], are identical to those figures. [There is no need in this column to correct for double counting; although he (or she) may be exposed to SER several times, a Chaplain is only *selected* for SER once[6].]

**Table 3**
**Comparison by "Faith Group"**
**of Commanders Exposed to SER Board Action**

| | Active Duty (Ref 3) | SER Eligible (Ref5) | SER Eligible count | Number from Col(3) Selected | Relative Exposure Col(2)/(3) | Percent Selected Col(4)/(1) |
|---|---|---|---|---|---|---|
| Col #: | (1) | (2) | (3) | (4) | (5) | (6) |
| Roman Catholic | 66 | 23 | 17 | 4 | 1.4 | 6% |
| Lit. Protestant | 64 | 60 | 37 | 20 | 1.6 | 31% |
| Non-Liturgical | 63 | 100 | 59 | 17 | 1.7 | 27% |
| Special Worship | 6 | 4 | 2 | 1 | 2.0 | 17% |

Col(5) is the ratio of exposures by for each faith group cluster, Col(2) divided by Col(3).

Col(6) is the ratio of selections for each faith group cluster, Col(4) divided by Col(2).

36    The data in Table 3 show, that for CDR's:

•    36.1    not only is the Chaplain Corps' administration of SER more likely to expose non-Catholics than Catholics to involuntary retirement, and

---

[5] The Chaplain Corps has been inconsistent in its allocation of denominations to the various faith group clusters. (See Endnote: "Faith Group Cluster as a proximal cause of denominational bias in the U.S. Navy Chaplain Corps".)

[6] Perhaps this belabors the obvious, but one needs to read what is said about SER selection carefully. The SER board is told to <u>select for retention</u> the best qualified, most promising Officers, but it is also ordered to <u>select for SER</u> (i.e., to select for Selective Early Retirement) a specific *number* of Officers. This is sometimes referred to as "being serbed" (spelled: SERB'd).

-   36.2   not only does the Chaplain Corps' administration of SER expose non-Catholics more often than Catholics, but also:

-   36.3   at the end of the process, non-Catholics are much more likely than Catholics (five times more likely) to be selected for involuntary retirement.

37   The Chaplain Corps' policy and practice with respect to SER administration has a statistically significant impact which, at least with respect to CDR's, benefits Catholic Chaplains and disadvantages all other denominations. [The binomial z, testing 4/66 vs 74/133, is nine and a half standard deviations, p < .0001.]

38   Table 4 is unto Table 3 as Table 2 was unto Table 1, i.e., Table 4 looks at what happened to Captains in the Chaplain Corps, once the SER process was underway.

**Table 4**
**Comparison by "Faith Group"**
**of Captains Exposed to SER Board Action**

|  | Active Duty (Ref 3) | SER Eligible (Ref 4) | SER Eligible count | Number from Col(3) Selected | Relative Exposure Col(2)/(3) | Percent Selected Col(4)/(1) |
|---|---|---|---|---|---|---|
| Col #: | (1) | (2) | (3) | (4) | (5) | (6) |
| Roman Catholic | 30 | 44 | 34 | 7 | 1.3 | 23% |
| Lit. Protestant | 47 | 72 | 55 | 13 | 1.3 | 28% |
| Non-Liturgical | 32 | 54 | 43 | 13 | 1.3 | 41% |
| Special Worship | 3 | 8 | 5 | 1 | 1.6 | 33% |

39   As with Table 2 (for Captains) compared to Table 1 (for Commanders); the data in columns 5 and 6 in Table 4 (unlike the data in Table 3), do not rise to the level of statistical significance [binomial z = 1.0], but the difference is again (still) in the direction of benefit for Catholics and disadvantage for non-Liturgical Chaplains.

40   We know, from Table 3 at least, although the result is corroborated by the data in Table 4, that non-Liturgical Chaplains were at a statistically significant disadvantage in the SER boards.

41   The non-Liturgical cohort in the Chaplain Corps lost five times as many CDR's to SER, both absolutely and proportionally, as did the Catholic cohort. And the non-Liturgicals lost virtually twice as many CAPT's as the Catholics.

42    So far, the analysis has shown that:

      `42.1`    The Chaplain Corps, as an institution, administers the SER eligibility rules in a manner which benefits Catholics and disadvantages non-Liturgicals.

      `42.2`    Once a Chaplain is swept up into the SER eligibility system, the Chaplain Corps, as an institution, executes the SER implementation in a manner which is less likely to expose Catholic Officers to repeated SER consideration.

And

      `42.3`    When the SER process has run its course, Catholics suffer smaller cohort losses than non-Catholics.

43    One might well wonder if these effects are fully attributable to bias in SER exposure, or repeated exposure, or if something else is also operating here.

44    Could the Chaplain Corps' declared ( Reference 4) "critical shortage of Catholic Priests", which does not in fact exist in the Chaplain Corps, account for any part of how well the Catholics fared during SER, and if so how much pressure was applied to the non-Liturgicals, instead?

Or,

45    Could it be that some of the difference in the loss rate at CDR vs the loss rate at CAPT may be explained by the fact that all the CAPT evaluations were undertaken by Admirals, where half of the CDR evaluations were undertaken by Admirals, and half were in the hands of other Chaplains?

46    If this latter explanation applies, then Chaplains judging other Chaplains distorted the results to a measured extent (the difference between what happened to CAPT's and what happened to CDR's), and the balance of the bias here can be attributed to (a) the way the Chaplain Corps determined eligibility, and (b) the way the Admirals responded, with the Chief of Chaplains as the Board President, to: (i) the alleged shortage of Catholic priests, or mayhaps (ii) "the needs of the Navy in managing billets with long training pipelines" (Catholics take more time to graduate from seminary).

47    Because the Chaplain Corps chose to use SER boards composed entirely of Chaplains on some occasions, and on other occasions used SER boards composed largely of line officers (Admirals), we can look at the outcomes (sometimes dealing with the *same* candidates) across these two different configurations.

## Chaplains on Selection Boards make Decisions which reflect their own Religious Preferences.

### Admiral Membered Boards vs Chaplain Membered Boards

48    All the Captain SER boards had Admirals as board members.  The Commander SER boards

had Admirals as board members for 1991 to 1994.  In 1995, 96, 97 and 98, the Commander SER boards had Chaplains as members, including the Chief of Chaplains as the President of the board. 49    Here is the data behind Tables 1 to 4 separated into "Chaplain Decisions" and "Admiral Decisions":

**TABLE 5**
**Total Number and Selection Rate**
**of Commander and Captain Chaplains Eligible and Selected for**
**Early Retirement for FY 91-98, Broken Out by Faith Group Category***

|  | Commander | | | Captain | | | All Ranks | | |
|---|---|---|---|---|---|---|---|---|---|
|  | Elig. | Sel. | % Sel | Elig. | Sel. | % Sel | Elig. | Sel. | % Sel |
| **Admirals** |  |  |  |  |  |  |  |  |  |
| Roman Catholic | 11 | 1 | 9.1% | 34 | 7 | 20.6% | 45 | 8 | 17.8% |
| Lit. Protestant | 18 | 7 | 38.9% | 54 | 13 | 24.0% | 72 | 20 | 27.8% |
| Non-Liturgical | 31 | 6 | 19.4% | 43 | 13 | 30.2% | 74 | 19 | 25.7% |
| Baptist | 25 | 4 | 16.0% | 28 | 8 | 28.6% | 53 | 12 | 22.6% |
| Non-Baptist | 6 | 2 | 33.3% | 15 | 5 | 33.3% | 21 | 7 | 33.3% |
| Special Worship | 1 | 0 | 0% | 5 | 1 | 11.1% | 6 | 1 | 16.7% |
| **Chaplains** |  |  |  |  |  |  |  |  |  |
| Roman Catholic | 6 | 3 | 50.0% |  |  |  |  |  |  |
| Lit. Protestant | 18 | 13 | 72.2% |  |  |  |  |  |  |
| Non-Liturgical | 25 | 11 | 44.0% |  |  |  |  |  |  |
| Baptist | 15 | 6 | 40.0% |  |  |  |  |  |  |
| Non-Baptist | 10 | 5 | 50.0% |  |  |  |  |  |  |
| Special Worship | 1 | 1 | 100% |  |  |  |  |  |  |

*  Defendants' Data (Reference 5) corrected for double counting and faulty Faith Group assignment.

50    Clearly, Chaplains approach these decisions differently than Admirals.

51    The differences are statistically significant.  It is logically possible, of course, that some of the difference is due to a change in the target percentages.  The Chaplains may have had instructions to select (out) a higher percentage of the eligibles than the Admirals were required to select - but while that would alter the absolute percentages forced into retirement, it should not change the relative

pattern.

52    As opposed to Admirals, Chaplains[7] were "harder" on Liturgicals than they were on Baptists and other non-Liturgicals.   The difference with respect to the non-Liturgicals is significant at the .10 level; the difference between the rate for Baptists and the rate for Liturgicals is statistically significant at the .05 level, two standard deviations, (binomial z.)

53    Note, though, that even here the non-Baptist, non-Liturgicals lose half of their Officers when their careers are in the hands of other Chaplains, and only (sic) a third of their Officers when their careers are in the hands of mostly non-Chaplains.

54    No matter who sat on the SER Boards, the non-Baptist, non-Liturgicals lost more that "their fair share" of their Officers –  and (see my Compendium, "The Cream Effect"; Reference 6) it should have been otherwise on purely objective grounds.   That is, there is statistical evidence that the screening process that selects Commanders in the Chaplain Corps, because it is so stringent for non-Liturgicals, selects non-Liturgical Officers who are, on the average, of higher quality than their Liturgical and Catholic rank peers.

55    This relative preference in the Chaplain membered boards' outcomes may be *due* to their denominational prevalence on the board, note that Baptists had five seats on these four boards; non-Liturgicals (including Baptists) had seven seats.  Catholics (who did rather less well than usually, had only four seats.  In promotion boards, where denomination has been shown to influence decisions (see my Compendium [op.cit.], p 66), the usual pattern (97% of the time) was a majority White collar on the board; here we had 50% of the boards with 50% Blue collar.

56   The instant case is not proof of the contamination introduced by putting denominations on selection boards, but it is close.  With only four boards, and a statistical sample of just six Catholics and ten Evangelicals, one can't prove much out of a 50/50 split.

57   Maybe one or more of this set of four boards were renegade to the traditional, moderately pro-Liturgical pattern, and instead of adopting that preference, they introduced their own.

58    We can show that the Chaplain membered boards were not respecters of either precedent or authority.

59    In addition to their choosing an unusually large percentage of  Liturgical Chaplains to "drum

---

[7] The differences in the board composition are not as stark as the nomenclature suggests. In every case but one, the president of the board is a Chaplain, in fact the Chief of Chaplains.  In a board with only four other members, the four line officers on the Admiral staffed boards may be assumed to have more organizational independence than the subordinate Chaplains on the all Chaplain boards.  The Chief of Chaplain's vote is important in both compositions, but it might be relatively more important in the boards composed of subordinate Chaplains.

out of the Corps", the Chaplain membered SER boards marched to a conspicuously independent beat.

60    Table 6 shows how the Chaplain membered boards evaluated Officers who were being reprised for SER, compared to how the Admiral membered boards evaluated Officers who were being reprised for SER action. [This Table is based on Lists produced by the Navy, Reference 7.]

**TABLE 6**
**Comparison of SER Board Decisions**
**Chaplains as Members vs Admirals as Members**
**Repeated Exposure to SER**

| Number of Appearances | Chaplains on Board | | | Admirals on Board | | |
|---|---|---|---|---|---|---|
| | Number of Chaplains | Number Selected | Selection Rate | Number of Chaplains | Number Selected | Selection Rate |
| 1 | 50 | 10 | 20.0 % | 136 | 30 | 22.1% |
| 2 | 26 | 9 | 34.6% | 37 | 4 | 10.8% |
| 3 | 19 | 5 | 26.3% | 5 | 0 | 0.0% |
| 4 | 3 | 3 | 100% | | | |
| 5 | 4 | 1 | 25.0% | | | |
| 6 | 1 | 0 | - | | | |
| more than 1 | 53 | 18 | 34.0% | 42 | 4 | 9.5% |

61    The U.S. Navy Chaplain Corps is not a tiny organization; it has nearly 1000 members, but the number of Officers at the higher ranks is reasonably small (see Tables 1 & 2); after 20 years on Active duty it is not unreasonable to assume that most Chaplain Captains know or know of most Commanders, so a Commander's career record and experience level may well be known to SER board members, when those members are Chaplains and may not be known to the board members when those members are Admirals (only one of whom is a Chaplain.)

62    For Chaplain members or Admiral members, the SEC NAV Instructions are the same  –  the board is supposed to retain the Officers with the greatest potential for future service, bearing in mind the Navy's primary mission.  Each Officer is supposed to be evaluated on the written record.

63    One need not assume that Admirals know more about the Navy than Captains, but such an assumption would be reasonable.  One need not assume that Line Officers would understand the Navy's primary mission better than Chaplains, but such an assumption would be reasonable.

64    One needs only to assume that each board member made a good faith effort to review each Candidate's record and ~~selected~~ retained those officers with the greatest future potential.

65    Since an officer's potential may change, especially as the officer gains experience (or ages) or as he or she gains skills, one need not think of an Officer's potential future value as a static measure. And since the judgment within each set of eligibles must be perforce, *relative* merit, it is always possible that in a different pool of eligibles an Officer might be let go who had been retained on an earlier occasion.

66    However,  these apologia aside, an officer who has withstood a SER evaluation ought to be "better" on the average than a new entrant to the pool of eligibles.  The new entrant would be, *a priori*, average and would have, by the rules of SER eligibility one less year of experience - but not necessarily one more year of useful career until retirement than the reprised candidate.

67    Therefore, one might expect the percent selected out to decrease as the number of appearances before SER boards rises.  Outstanding officers would continue to be outstanding, and would be promoted (out of this SER pool).

68    It is not surprising then, that when Admirals judged Chaplain Officers who have been evaluated by a SER before, and been retained, the retained Officers tended to be retained again.  The Admirals kept more than 90% of the Officers that were exposed to SER more than once.

69    On the other hand, it is surprising that the Chaplains retained on Active Duty, barely two-thirds of the Officers who has survived earlier SER reviews (see Table 6.)

70    This difference is statistically significant beyond three standard deviations; $p < .01$.

71    What did the Chaplain members of these SER boards see in these eligible officers which the earlier judgments missed?  Maybe nothing; maybe something outside the written record.

72    If repeated consideration of the <u>same</u> officers before <u>different</u> boards leads to different decisions, it is the <u>Boards</u> who are unreliable and arbitrary, not the pool of candidates who are erratic in terms of skill.

73    Table 6 supports the conclusion that the Chaplains who sat on SER boards did not judge on the basis of the value of each Officer before them.  In coming to this conclusion I am NOT substituting my judgment for theirs; I am using all the other SER boards who judged these Officers as my bench mark.

## Bias within Chaplain Membered Boards

74    The conclusion flows that Chaplains, *per se*, collectively, do not really vote independently of their own denomination.  They may be trying to be independent, but, as we shall see, the data is

inconsistent with the absence of faith-based bias when Chaplains are calling the shots in SER.

75    One may well wonder what is going on here.

76    It is clear in the data, clear statistically, that these four Chaplain membered boards are behaving (a) differently than both the Admiral membered boards, and (b) differently than the 73 Chaplain membered promotion boards which I reported on at length in Appendix G of my Compendium.

**First,  look at the 1995 CDR SER Board.**

77    The 1995 CDR SER board was the first SER board which had Chaplains as board members instead of Admirals, and it looks as though they "seized the moment."

78    This board's decisions have a "vigilante" tone, as though they were bent on correcting some of the decisions they "inherited" from the Admirals.

79    This board looked at 10 CDR's who were before their first SER, and it retained nine of them (*i.e.*, keeping 90%); then it looked at 17 CDR's who had been "judged" and retained in the service, by one or two Admiral boards - and this board rejected 7 of them - named  them for  Involuntary Retirement (keeping only 59%).

80    Even if the *a priori* random probability of selecting a Chaplain for involuntary retirement was the **same** for (a) a newly arrived on the list Chaplain as it is for (b) a previously retained Chaplain, this parsing of 1 from 10 and 7 from 17; instead of 3/10 and 5/17 has a one tailed likelihood of .07 - on the threshold of statistical significance - a threshold which is crossed if we consider at all that the previously judged and retained Chaplains are (or were in the opinion of that/those Admiral membered boards) "better than average."[8]

81    This disparity in 1995, when combined with the pattern of decisions from the 1996 board, is

---

[8]  In Table 6, the Admiral membered boards had a 22% chance of selecting for SER a candidate who had not been before a previous SER board, and 9.5% chance of selecting for SER a candidate who had been evaluated by a previous board – that is a more than 50% decrease in likelihood.  The Chaplains, at their first board, began with a requirement to select for SER 8 out of 27, or 30%; had the Chaplains simply used that percentage on all candidates they would have picked three from the de novo group and five from the repeaters; had they adjusted the *a priori* 30% probability at all, giving the 17 candidates who had all been recommended for retention by the Admirals, last year, or the year before, a single candidate advantage and let one more of them than a coin toss selection stay in the service  –  a 4/10 and 4/17 split is statistically significantly different from a 1/10 and 7/17 split.  The Chaplains did not ignore the Admirals decisions, they reversed them.

both statistically significant (and statistically indefensible) within the pools before these two boards; it is also statistically different than the decision patterns of either (a) the other two Chaplain membered CDR SER boards (1997 and 1998) or (b) the Admiral membered boards (1991 to 1994). (See Reference 9a.)

**Both the 1995 and 1996 Boards ignored their charter and the facts**

82    These Chaplain membered boards made decisions which were arbitrary and inconsistent with the objective facts – as determined by their superiors – the Admirals.  See above.

83    Let's look at how these boards did at making decisions which were consistent with their peers' view of these *same* Officer's potential future value – results from  promotion boards.

84    Table 7 highlights the inconsistency between the relative value of the SER candidates when they were up for promotion (and being evaluated by Chaplains sitting on promotion boards) and the relative value assigned by the Chaplains sitting on these two (the 1995 and 1996) SER boards.

**TABLE 7**
**Inconsistency between Failure of Select and Selection for SER**
**1995 and 1996 CDR SER Boards'**
**Judgments of Candidates Before Them**

|  | Good Officers per Others (Passed Over never or once) | Bad Officers per Others (Passed Over 2 or more times) |
|---|---|---|
| Rejected (*i.e.*, Selected for SER) | 8 | 7 |
| Retained (*i.e.,* Not Forced into Retirement) | 23 | 13 |

85    Look at Row 1.  These are the 15 eligible Officers which these two SER boards chose to reject. Clearly, there is no difference in these two columns –  and that is the point.  These boards made SER decisions which bore no relationship to the quality judgments made by their peers.

86    If the 1995 and 1996 SER boards were following the rules and "subjecting an officer who had two or more Failures of Selection to involuntary retirement", or if their judgments were based on the same criteria as their peers used in judging future potential in the promotion venue, when these *same* candidates were judged in the past, then the data would look like Table 8 (see page 17), which is statistically significantly different than what happened. (Chi square, three standard deviations, p > .001.)

87    The conclusion is that in comporting to neither the previous-retention value decisions of the SER Admirals, nor the previous future-potential decisions of the promotion panels, the FY 1995 and

1996 Chaplain membered SER boards for Commanders made judgments which were obviously contaminated by something other than a balanced review of the criteria which they were ordered to use to govern their deliberations.

**TABLE 8**
**Had the Decisions been Consistent**
**Between Failure of Select and Selection for SER**
**Candidates before the 1995 and 1996 CDR SER Boards**

|  | Good Officers per Others (never Passed Over) | Bad Officers per Others (Passed Over 2 or more) |
|---|---|---|
| Rejected (*i.e.*, Selected for SER) | 0 | 15 |
| Retained (*i.e.,* Not Forced into Retirement) | 31 | 5 |

88    Whether these boards were distracted by retribution or retaliation (against the Admirals, or against the person of Commander Wilkins), or whether (as an uncommon near majority of non-Liturgicals) they were trying to "get even" with respect to years and years of Catholic and Liturgical dominance of the system, or whether they were simply too new at the business of sitting on SER boards to understand what their mission was, it is statistically certain that these two boards did not make judgments that bore a systematic relationship to any objective criteria.

89    Chaplains such as Wilkins and Ware from the 1995 pool and Adair, Aven, Byrum, Metzger and Morgan from the 1996 pool, all of whom were judged as promotable by senior officers, and none of whom were "subject to involuntary separation by reason of having been passed over two or more times" were abused by the erratic, arbitrary and inept (and contaminated) decisions which these two boards rendered.

90    We know that in making their decisions the Chaplains on the 1995 and 1996 SER Boards considered something *other* than (a) the letter of the SECNAV's instructions and (b) only the written record in front of them.  Among the other things which they might have considered is (a) their own knowledge of each candidate's "reputation", and (b) the conformance between their own denomination *vis a vis* the denomination of the candidates before them.  One might assume that the 1995 board was influenced by CDR Wilkins' litigation, and that both boards were vulnerable to what I have called "like, likes, like".

91    I find that it is possible to tease an answer to this question out of the data we have.


**SER Board decisions are influenced by the Board members' Denominations**

92    Here is the proof, for Chaplain membered SER boards, that the denomination of the board members interacts with the denomination of the candidates – to the detriment of the candidates who are not fortunate enough to have a denominational match on the board.

93    At least as far back as the thirteenth century (McLean, Reference 8) mathematicians have pondered how to merge, combine, or integrate rank order assessments from several judges.  It is easy to examine alternative summation schemes and deduce some logical bounds on what rule-complying judges or panel members may decide.  For example: if one candidate within the pool is objectively ranked first on every dimension of quality that the judges are permitted to consider, then no matter how the different dimensions of quality are weighed by the different board members, that candidate has to be the group's first choice.

94    Similarly, if there is in the pool of candidates a pair, say $A$ and $B$, and if $A$ ranks higher than $B$ on every dimension of quality that may be considered, then no matter how each board member weighs the various dimensions, even ignoring some of them, in the Board's final ranking of all the candidates, *B has* to be rated below $A$.

95    Without treading into the deliberations of a SER board's review, without trying to second guess or predict what the Board *should* decide, it is possible to put some logical bounds on what arithmetic will *let* them decide if they obey these two essential rules: (1) Consider only the criteria which are specified, and (2) Weigh each candidate's record impartially.  If the board members obey those two rules then the *general rule of rank order bounds* applies:

> **The rule is that it is generally impossible (*i.e.*, inconsistent and contrary to logic) for the selection board to rate any candidate in sum in a position that is lower than the lowest position (Rmax) which that candidate held on any underlying dimension.**

96    In Table 9 (on the following page) I have provided a carefully formatted summary of the public record for the first (1995) panel of Chaplains who sat to select CDR's for involuntary retirement.

97    The rows in this table are the candidates before this board.

98    The central columns in the table [from (2) to (7)] are criteria which the board could consider.

99    The entries in the cells of those columns are not measurements on the criteria, but are instead each candidate's relative rank order on the criterion listed in that column (with ties posted at the top of the range.)

100    Columns (8) and (9) post alternative stand-ins for Rmax.

101   In Column (8) I have entered the highest rank order (lowest perceived value) that each candidate achieved over all the dimensions listed.   Since "everybody" was lowest on something (and thus Rmax did not differentiate),

102   In Column (9) I posted the highest rank order achieved on all the dimensions except:

- 102.1  *Valor* (because Chaplains, as non-combatants, might not be judged on valor) and

- 102.2  *Faith* (because although correlated to success in the Chaplain Corps, denomination is not "supposed" to be relevant in selection).

**Table 9.  1995 SER Candidates Ranked on Dimensions of Quality**

| Col:  (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
|---|---|---|---|---|---|---|---|---|---|---|
| Dimensions of Quality | Medals for | Failure of Selection | Years Exp @ | Years to | Prior SER | | Rmax | Rmax | Board's | ERROR w/o |
| Candidate's NAME | Valor RANK | to CAPT RANK | CDR RANK | Retire RANK | Quality RANK | Faith RANK | all Dim RANK | w/o Faith or Valor | SER RANK | Faith or Valor |
| Byrum | 27 | 15 | 1 | 1 | 27 | 27 | 27 | 27 | 19 | |
| Burt, R F | 27 | 15 | 2 | 2 | 27 | 27 | 27 | 27 | 19 | |
| Simons | 27 | 15 | 3 | 24 | 27 | 12 | 27 | 27 | 19 | |
| Tumlin, G L | 27 | 15 | 4 | 6 | 17 | 20 | 27 | 17 | 19 | |
| Morris, D A Sr | 27 | 15 | 5 | 12 | 27 | 12 | 27 | 27 | 19 | |
| Bankhead | 27 | 15 | 6 | 10 | 27 | 12 | 27 | 27 | **27** | |
| Bennett, W T | 27 | 15 | 7 | 12 | 10 | 20 | 27 | 15 | 19 | |
| Newhouse, E A | 27 | 15 | 9 | 10 | 10 | 20 | 27 | 15 | 19 | |
| Harwood | 27 | 15 | 9 | 4 | 17 | 20 | 27 | 17 | 19 | |
| Umbaugh, R D | 27 | 15 | 10 | 18 | 10 | 27 | 27 | 18 | 19 | |
| Durham, R W | 27 | 15 | 13 | 10 | 10 | 12 | 27 | 15 | 19 | |
| Wilkins, R G | 1 | 15 | 13 | 19 | 10 | 27 | 27 | 19 | **27** | **ERROR?** |
| Metzger D L | 27 | 15 | 13 | 10 | 27 | 27 | 27 | 27 | 19 | |
| McCreary, S H | 27 | 15 | 14 | 21 | 10 | 27 | 27 | 21 | 19 | |
| Stanfield | 27 | 15 | 16 | 6 | 27 | 12 | 27 | 27 | 19 | |
| Klapach, F S | 27 | 16 | 15 | 4 | 17 | 27 | 27 | 17 | 19 | |
| Erb | 27 | 18 | 17 | 16 | 27 | 27 | 27 | 27 | 19 | |
| Ware, N M | 27 | 18 | 18 | 16 | 17 | 12 | 27 | 18 | **27** | **ERROR?** |
| Pyrch (NMN) | 27 | 22 | 19 | 24 | 27 | 12 | 27 | 27 | 19 | |
| Rowland, R G | 27 | 22 | 20 | 20 | 10 | 12 | 27 | 22 | 19 | |
| Jayne, B C | 27 | 22 | 21 | 16 | 10 | 20 | 27 | 22 | **27** | |
| De Long | 27 | 22 | 22 | 24 | 10 | 12 | 27 | 24 | **27** | |
| Palmer, H D | 27 | 24 | 23 | 26 | 27 | 20 | 27 | 27 | 19 | |

| Kincl, R L | 27 | 24 | 25 | 18 | 17 | 2 | 27 | 25 | **27** |
| Bunce | 27 | 27 | 24 | 25 | 17 | 20 | 27 | 27 | **27** |
| Clark, L S | 27 | 27 | 26 | 16 | 17 | 12 | 27 | 27 | **27** |
| Bertrand | 27 | 27 | 27 | 27 | 10 | 2 | 27 | 27 | 19 |

103   Column (10) posts the rank assigned to the candidate by the 1995 SER board; and

104   Column (11) notes instances of a potential "inconsistency" between the board's collective decision and Rmax.

105   There could be an argument here about whether my listing and ranking of the criteria the Secretary of the Navy directed the board to consider is accurate or complete.

106   As we shall see, any such complaint is a red herring.  What will unfold here is a mathematical **model** of how the board makes it decisions.  The board undoubtedly does not keep little running sums:

$$\sum J_i (W_{i,j} * C_{j,k})$$

Where J refers to Judge "i"
$W_{i,j}$ refers to the Weight Judge i applies to dimension j
$C_{i,j}$ refers to the Rank Candidate k has on dimension j,

but it is useful to conceive of the problem as a linear regression. [Much as a race track tout would read a racing form and mentally tick: gate, track condition, jockey weight, horse's time in the last three meets, etc, and then "add it all up" and compare it to all the other horses in the race, we may think of the challenge facing the SER board members in this paradigm.]

107   The SER board members do whatever they do, and arrive at a conclusion.  If they were told, as they were in 1995, to select eight candidates out of 27 to get rid of, keeping the best, then we know at least that the candidates selected out were judged lower (ranked higher) than position 19.

108   **The construct here is that:**  Although board members may not consciously use little linear regression formulae to give a *score* for each candidate, whatever they do, it can be modeled as an integration of weighted assessments of performance or value on a fixed, common set of dimensions of quality.  It is true (a) that the general rank order theorem is generally true (perhaps because of internal correlations between measures on various dimensions of quality), but it is also true (b) that one can construct "curiosities" or inversions, where the general rule does not work.  The conclusion one should draw from this observation is not that the general rule is limited in its usefulness, but that if the general rule is violated in any particular evaluation, that violation needs to be explained, one way or another.

109   **The contention here is that:**  Whether one accepts Table 9's dimensions, valences, and ranks or not, the structure of the table informs our view and circumscribes the board's permissible decision space. Any selection panel decision which violates the general bound constraints is likely to have

violated one or more of the conditions governing its deliberations. (Either one or more board members introduced an extraneous variable, or they weighed the objective record inconsistently across the candidates.)

110   In the selection board results illustrated in this table, the board failed its responsibility!

111   This selection board went outside the rules to select Commanders Wilkins and Ware. The general bound rule applied to the rankings in Table 9 shows that the decisions to retire Wilkins and Ware *could not* have been arrived at with any set of consistently applied weights.

112   There must have been something else operating beyond this table (and outside the written record on the board's conference table) which *explains* these decisions.

113   The point demonstrated here is NOT that the board did something "wrong"; the point is that the general bound rule identifies these particular decisions as *needing* something else to explain them.  Let's explore what this "something else" might be.

114   Table 10 shows what I found after assembling a data base with (a) status (Chaplain or Admiral) for every member of every SER board, (b) denominational data for every chaplain who served on every SER Board, (c) objective data (date of birth, failure of selection on the way to CDR or when considered for CAPT, years of experience, years until age 62, prior SER exposure, and denomination[9]) for every candidate before every SER board, and (d) each SER board's decisions.

**Table 10**
**The Benefit of Having a Denominational Match on a SER Board**

| Admirals | | | | Rmax Delta | | |
|---|---|---|---|---|---|---|
| no match | Considered | SERB'd | ???* | Total | Ave | sd |
| Captains | 167 | 32 | 2 | 188 | 5.88 | 5.95 |
| Commanders | 87 | 13 | 2 | 49 | 3.77 | 4.14 |
| Chaplains | | | | Rmax Delta | | |
| Commanders | Considered | SERB'd | ??? | Total | Ave | sd |
| no match | 80 | 21 | 7 | 37 | 1.76 | 4.16 |

---

[9]  I was able to obtain this level of detail by using the names produced in Discovery for SER candidates (Reference 7), and looking those names up in (a) the Chaplain Corps History Vol X (Reference 3), and (b) the promotion data base I developed from the precepts and records produced by the Navy. (Appendix D in my Compendium Declaration.)

| match | 29 | 7 | 0 | 33 | 4.71 | 1.38 |

\* ??? Denotes a suspicious decision, *i.e.*, a decision identified by the Rmax theorem, which suggests that for the affected candidate, the board either judged the criteria inconsistently or introduced an extraneous variable. As we shall see, there is strong evidence that these decisions were contaminated by the board members' denominations. [The "Total, Average, and standard deviation" columns in this table are based on all the Officers who were SERB'd, *i.e.*, selected for Involuntary Retirement, not just, and not without, the selections identified as questionable.]

115   I compared each candidate's *RmaxDelta* (the difference between Rmax and the threshold[10] rank for selection by that SER board) for candidates with a denominational match on their SER board to the *RmaxDelta* for candidates who did not have a denominational match on the SER board which evaluated them.

116   There is no importance to be attached to the difference between the SER selection rates for CDR's by Admirals versus those for CDR's by Chaplains; (13/87 = 15 percent versus 28/109 = 25 percent.) Although the Chaplains chose twice as many CDR candidates for involuntary retirement as did the Admirals, the number of candidates to be chosen was not set by the SER boards, but was, in every case, part of the specific instructions to them.

117   The difference in the proportion of questionable decisions between the Admirals and the Chaplains (4/45 = 9 percent versus 7/28 =25 percent) does not rise to the level of statistical significance (perhaps because the numbers are so small), but it is meaningful.

118   It is meaningful because any questionable decision is interesting; but it is also meaningful because the Chaplains were four times as likely to reach outside the rules as the Admirals. (The Admirals had four curious decisions with 254 candidates [1.6%]; the chaplains had seven questionable decisions with 109 candidates [6.4%].)

119   Within the Chaplain decisions, the probability of being selected for involuntary retirement *seems* not to have been influenced by whether the candidate chosen did or did not share a denomination with some member of the Board (21/80 = 26 percent versus 7/29 = 24 percent). It would be speculation to argue that this is because the Chaplain membered boards were trying to keep their faith-group numbers politically correct, but the data (and an argument about specious consistency) could be used to support such an hypothesis by anyone who harbored that view.

120   **The important finding here**, the shocker, is that all of the Chaplains' questionable decisions (those marked "???") occurred in cases where there was no denominational match on the board – where, in effect, there was no one to *stand up for* the candidate. The sample size is small (just seven

----

[10]   The "threshold" rank is the largest integer which can be assigned to a candidate's performance without forcing him into Involuntary Retirement. In this case, under the rule of "ties posted at the maximum", all the retained candidates are ranked "19", and all the candidates forced into retirement are ranked "27". The threshold is 19. Higher than that is retired.

cases), but even so, with a one tailed binomial test this is still statistically significant at the level of two standard deviations (p<.01).

121    Moreover, when one calculates the average RmaxDelta, and then tests the average RmaxDelta for (i) the candidates who had a denominational match versus the average RmaxDelta for (ii) candidates who did not have a denominational match on the board, the result is that the two samples differ by nearly four standard deviations; this is statistically significant at $p < .0001$.  (Student's $t$, Dawis,1987 Reference 11.)

122    Having a denominational match on the SER board "protected" a candidate at the "margin".

123    No questionable-decision-candidate had a matching denomination on the board!

124    When a candidate with a denomination match was at the margin, or even just below it, the denominations present on the Board switched to an "other" (someone not like themselves) and chose to retain their own kind.

125    The candidates who were selected for forced retirement and had a denominational match were, on the average, five ranks over threshold. The candidates who were selected for forced retirement, but did not have a denominational match were, on the average, two ranks over threshold.

126    Thus, having a matching denomination on the SER board was, on the average, worth three steps (rank orders) *away from being selected*.

127    The analysis here demonstrates that the denominational mix on chaplain membered SER boards influences the decisions of those boards,  (four standard deviations; $p <.0001$.)


**This is a result which was invisible to Defendants' analytic approaches.**

128    Parsing the SER board on denomination, and then applying the Rmax general bound rule to a mathematical model of the SER board's decisions, illuminated the religious component of these decisions.  We do not have to argue that the Rmax model is a high fidelity representation of what the SER board actually considered.  All that we have to point out is it is a rational, objective, repeatable calculation and when tested it shows there are denomination-based departures from chance evident in the SER board decision made by Chaplains!

129    We have demonstrated earlier (here) that Chaplains sitting on SER boards do not make decisions "like" Admirals make when sitting on SER boards.  The Chaplain community may well have nearly 900 members, but it does not have 900 Commanders.

130    It is likely that Chaplains sitting on selection boards (whether SER boards, promotion boards or continuation in service boards) will know, or know of, many of the individual candidates before them.  The evidence here is that Chaplains sitting on boards allow, or are unable to avoid allowing,

factors outside the written record to influence their decisions.  Among the "ex parte" facts which may come into play are the board member's own denomination and the candidate's "reputation".

131   I would expect Interviews with SER board members to further illuminate this issue.

**Summary**

132   The Navy's "statistical analysis" of SER data is incomplete, misleading, unreliable and counter-productive.  It is contradicted by the facts (when analyzed with proper statistical methods) and it deserves no credence.

133   The U.S. Navy Chaplain Corps personnel selection board system (including all Chaplain membered boards - Accession, Promotion, CADRAG and SER) is corrupted through and through with denomination-based religious-bias.  Every aspect of personnel management which can be subjected to statistical analysis shows (a) religion-based bias, (b) subtle and not so subtle preference for Catholics, and (c) institutional disaffection for what could be broadly called "evangelicals and charismatics".

134   The  evangelical and charismatic beliefs and worship content (or style) may not be what some Christians think of as suitably traditional, but aren't their religious expressions Constitutionally protected?

**CERTIFICATION**

135   I certify under the penalties of perjury that: (a) this is my work, (b) I am competent to analyze this data, and (c) the conclusions represented here are both (i) independently arrived at and (ii) true, complete, accurate and scientifically certain to the best of my knowledge and belief.


  /S/ Harald R. Leuba          7/18/07
Harald R. Leuba                July 18,  2007

**References:**

1.    Memo dated 28 November 1994, "PRECEPT CONVENING THE FY-95 SELECTION BOARD TO RECOMMEND COMMANDERS IN THE CHAPLAIN CORPS FOR SELECTIVE EARLY RETIREMENT", From Secretary of the Navy to RADM Anderson B. Holderby.

2.    Berto, Veronica K. (2003)  "Declaration"; In the matter of Ronald G. Wilkins  vs The United States of America, et al., 30 September 2003.

3a.    Halley, Michael D. Editor  <u>United States Navy Chaplains 1982-1991: Biographical and Service Record Sketches of Chaplains on Active Duty During the Period I January 1982 - 21 December 1991</u> Volume X in the History of the Chaplain Corps United States Navy, Chaplain Resource Board, Norfolk, Virginia, June 1993.

3b.    Martin, H. Lawrence , Editor <u>United States Navy Chaplains 1972-1981: Biographical and Service Record Sketches of Chaplains on Active Duty During the Period 1 January 1972 - 31 December 1981</u>  Volume VIII in the History of the Chaplain Corps United States Navy, NavPers 15507, Navy Publications and Forms Center, Philadelphia, PA.

4.    Berto, Veronica K. (2007)  "Declaration"; In Re. Navy Chaplains, 9 March 2007.

5.    Defendants' proposed "Material facts as to which there is no genuine issue in support of their motion for summary judgment" in Ronald Wilkins vs United States of America, et al., Feb 2005.

6.    Leuba, Harald R.  June 2005; Compendium Declaration, "Statistical Analysis: The Question of Religious Preference in the Operation and Management of The U.S. Navy Chaplain Corps" in *Adair v Navy* combined with *Chaplaincy of Full Gospel Churches v Navy* 1:99CV0028945(RMU).

7a.    Grayson, Kristy L. (2003) Attachment 3 99cv1579, Exhibit 5 PAGE 0395 to 0426, CHC Selective Early Retirement Board, lists by SER of Eligibles (by denomination) and list of Selectees (by denomination).

7b.    Discovery product (2005), DEFW 705 ff, CHC Selective Early Retirement Board, lists by SER of Eligibles (by name) and list of Selectees (by name).  7/19/05

8.    McLean, I. 1990. The Borda and Condorcet principles: Three medieval applications. In *Social Choice and Welfare* 7(2):99-108.

9a.    Leuba, Harald R., (2005) "Supplemental Declaration: Statistical Analysis of the SER Process in the U.S. Navy Chaplain Corps and the 1995 and 1996" , United States District Court for the

District of Columbia, 1:99CV0028945(RMU) consolidated with 1:00CV00566(RMU), in the matter of Chaplaincy of Full Gospel Churches v U.S. Navy and with Robert H. Adair v U.S. Navy. 21 July 2005.

9b.    Leuba, Harald R., (2005c) "Appendage Declaration: The Question of Denominational Preference in U.S. Navy Chaplain Corps' Accessions: An Extension to a prior Statistical Examination", United States District Court for the District of Columbia, Case No. 02CV02005 in the matter of Rev. Charles E. Larsen, et al., v The United States Navy, et al. 24 November 2005.

10.    Leuba, Harald R., (2006a) "Allonge Declaration", United States District Court for the District of Columbia, Case No. 02CV002945 (RMU) in the matter of Chaplaincy of Full Gospel Churches v. the Hon Gordon R. England, et al 14 February 2006.

11.    Dawis, Rene V.1 987. Scale Construction. *Journal of Counseling Psychology* 34(4): 481-489.

12.    Hyde, Michael and Hall, Christopher, "Defendants' Reply in Support of Their Cross Motion to Dismiss, or in the Alternative for Partial Summary Judgment". United States District Court for the District of Columbia, Case 1:99cv-02945-RMU-JMF Document 231 August 11, 2006.

Endnote:

## Faith Group Cluster as a Proximal Cause of Denominational Bias in the U.S. Navy Chaplain Corps

136   The following text and figure were originally published in my September 2006 Withdrawal Declaration, correcting my error in understanding what an accession was, and cataloguing the Defendants' Expert's errors and misrepresentations in *Larsen.*

137   The purpose of that material (Appendix FG in that Declaration) was to demonstrate the mischief that flows from the Chaplain Corps use of their faith group cluster system.

138   The Navy's faith group cluster system (see Figure 1) is based upon <u>stereotypes</u> of what "other" religions must be like, from a Roman Catholic perspective.

139   Thus, the first "cluster" is set aside for Roman Catholic; no other denomination is included. No other denomination is managed as it own cluster.  All the 200 other denominations are clumped into three alternatives to Catholic:  Liturgical, Protestant and Other.

140   The second "cluster" is most (but not all) of the denominations which sprang out of the Protestant Reformation, or still have an historic connection to that source.  The denominations (as diverse, and mutually conflicted as they are) include the American Anglican Catholic Church, Evangelical Presbyterian Church, Cumberland Presbyterians, Reformed Presbyterians, Presbyterian Church of the USA, Korean Presbyterian, Presbyterian Church of America, Bible Presbyterian Church, Orthodox Presbyterian, African Methodist Episcopal Zion, Charismatic Episcopal, etc, but not the Reformed Church of America, or the American Orthodox Church, or the Congregational Church.  Further, the "Liturgical" cluster includes some denominations who think of themselves as non-Liturgical, *e.g.*, the Church of the Nazarene and the Moravians.  I recite this partial litany to make two points:

  •    140.1   First, the variety of denominations lumped into the first non-Catholic cluster is diverse, and includes sects which have almost as many, or at least as fervently felt a set of, differences between their "spin offs" as they may have with the Catholics.

  •    140.2   Second, the careless manner in which, even a few denominations, are misassigned demonstrates an Official (institutional) lack of sensitivity to the belief structures of denominations other than Catholic.

141   This singling out of Catholic for its own cluster, careless sorting of denominations across self reported distinctions, and co-clustering of individual denominations which have separated from each other over differences profound enough to cause a schism - demonstrates a singular disregard for any denominational differences among *Others*.

142   In the Navy Chaplain Corps faith group cluster system, Catholic is the focus, and everybody else is an afterthought.

**Figure 1:** The Navy's Faith Group Cluster system is Cathocentric:



## APPENDIX FG
### Faith Group Categories
### (and the humbug[11] they cause)

FG1   This Appendix is the first part of a two part expose of the Faith Group Category humbug*.

FG2   In Part I  Logic will show

- FG2.1   The faith group category system is not necessary.

  It is defended as "necessary" so that chaplains from different faith group categories or different clusters of denominations and groups[12] may be assigned to different (somehow uniquely relevant) posts where they are to serve "personnel's religious needs, irregardless of religious views.[13]"  That practice is both unnecessary and patently self-contradictory.

- FG2.2 The faith group category system is Roman Cathocentric.

  There is one "cluster" for *Roman* Catholics alone, and all other Catholics and all other denominations are "grouped" into categories or clusters based, not on *their* common beliefs and practices (which are often fractious and volatile within "cluster"), but on the basis of how far removed the so-called category is from Roman Catholic beliefs. This devalues, in some proportion or other, every other denomination on the face of the earth.

---

[11] * I chose the word "humbug" carefully; it is not as strident as "hoax" and it allows for an interpretation of both gentle good will, and a backfired practical joke.  Whatever the motivation when it was set up, the Navy's faith group category (or faith group cluster) system has harmed the Navy and the Chaplains who serve it, regardless of their so-called "Category."

[12] I am informed that although neither "denomination" nor "faith group" are terms of art in normal parlance, one and not the other is a pitfall when speaking of or to what some of the uninitiated (myself included) might otherwise call a "denomination".  Some entities, endorsers, believers, dislike the name "denomination".  I won't try to explain why, or get into this any further, but it does highlight (as though the situation needed attention) that individual faith is very important to the affected parties.  Meaning no offense to the populations of believers, however they are subdivided, and whatever they call themselves, and with no malice toward the Navy, I shall try to discuss so-called "faith group categories",  or "faith group clusters" as an administrative construct, and will continue to refer (imprecisely, ineloquently, and only in the service of communication in this venue) to the elements of those clusters as denominations (with a lower case "d".)

[13] Yes, I strung these words together, but they are in the same sequence and syntax as in the original, Navy pleading in Case 1:99cv-02945-RMU-JMF Document 231;  August 11, 2006.

- `FG2.3` The faith group category system empowers or facilitates the expression of intra-denominational and inter-denominational prejudice within Categories.

`FG3`    Because the Chaplain Corps is alert to the possibility of religious discrimination, the Navy monitors personnel selection-board performance in terms of faith group cluster (faith group category) results[14], on the basis of faith group category.  That means that any discrimination or prejudice which may take place within the boundaries of a cluster or category is "underneath the radar".

`FG4`    In Part two (See Appendix QE) data analysis will show:

- `FG4.1`    The Quota system, however well intentioned, has been too coarse a tool.

  `FG4.1.1`  If one had a legitimate business reason for needing 25 Catholic Chaplains for every 5000 sailors or if one had a legitimate business reason for asserting that exactly 22 of every 100 new Chaplains had to be a Catholic, one could not justify "lumping" all the remaining requirements into amorphous, internally conflicted, non-Catholic "categories". The result would be (and is), (a) a forced culling of applicants to fit under predesignated limits, and (b) competition within cluster or category for limited opportunities to serve.

And, again:

- `FG4.2`    The faith group category system has empowered or facilitated the expression of intra-denominational and inter-denominational prejudice within the co-called Faith Group Categories.


**PART I - logic**

**Issue One** - the logical case for/against management by faith group category.

`FG5`    Articulated in a variety of carefully worded ways, the Navy says that it needs to manage by faith group category, because the religious needs of its personnel come in a "variety of flavors" and if the Navy is to fulfill its obligation to them (the served population), then the Chaplain Corps needs to be able to dispatch, distribute, make available, an appropriate mix of RMP's (Religious Ministry Professionals).

`FG6`    Mr Hyde has put it this way:

---

[14]  For proof that the Navy monitors in fgc terms, see the fgc summary tallies on the Reports of individual Promotion Boards and the on the C/A/R/E work Sheets which the Navy has Produced in this series of litigations.

"The Navy has a strong, compelling interest in maintaining a broad mix of chaplains from each faith group category at all ranks, so that chaplains from each faith group category may be properly detailed throughout the Navy's nearly 500 duty stations to meet personnel's religious needs." p. 3, ref 12.

FG7    Of course the Navy wants to provide "chaplain services" to its personnel, but why are those services related to "faith group category"?

FG8    Mr Hyde answers that in this way:

"Thus, the assignment of Roman Catholics to a different faith group, and the assignment of [all] Non-liturgical Protestant chaplains to the same faith group is based upon the judgment that chaplains within the same faith group category can generally meet the needs of personnel encompassed by that category and can be managed, utilized and deployed in similar fashion." last sentence, p. 5, ref. 12.

FG9    Thus, it is the Navy's judgment (I do not think Mr. Hyde is arrogant enough to be saying this on his own), it is the *Navy's **judgment*** that the purpose of the faith groups is to facilitate *matching* a chaplain flavor to a duty station need.

FG10   Again:

"Further, the faith group categories reflect a logistical tool used by the Navy to utilize, deploy, and manage the limited resources of the Chaplain Corps ..."
p.1, ref. 12.

FG11   And:

"Because the differences in the manner in which each faith group category is managed, ..."
p1, ref 12.

FG12   And finally:

"Utilization of faith group categories leads to differences in the manner in which chaplains from each faith group category are managed, utilized and deployed, irrespective of the differences between respective chaplains' religious views".
p. 4, ref 12.

FG13   As a person who trades on inference, this series of assertions strikes me as circular on the one hand, and self contradictory on the other.

FG14   First, the Navy is saying that it needs different faith group clusters because it deploys them differently, and then, because it deploys them *differently*, it needs them.

FG15    Second, the Navy is saying that it deploys Chaplains and uses them "irrespective of religious views", but it assigns them to faith group clusters or categories, based on religious views.

FG16    Maybe the Navy needs a variety of Chaplains to serve the variety of religious views among its service personnel, but their logic doesn't prove that they need *THIS* taxonomy of faith groups.

FG17    Furthermore, (a) the judgment behind the faith-group clustering is not borne out by denominational realities, and (b) it is overtaken by the Chaplains' oath (if not the Chaplains "motto".)

- FG17.1  Chaplains from the Roman Catholic cluster (sic) can surely serve service personnel who are Catholic.

  FG17.1.1 Can they also serve:  Episcopals? Methodists? Apostolic Catholics? Greek Orthodox?

  FG17.1.2  We do not need to exhaust the list, nor fill in the details to know that the answer is: "Yes", and "sometimes", and  "it depends", and  "under extreme conditions" and "only over my dead body."]

- FG17.2    Chaplains from the Liturgical Cluster can surely serve service personnel who are - what?

  FG17.2.1 Can any Episcopal serve any Methodist or Church of Christ or Presbyterian?

  FG17.2.2 The answer runs across the same range as above, for Catholics, but it distributes differently; there are Episcopalian Clergy who will (and those who will not) serve with female clergy who are also Episcopal, and the new data the Navy just gave me shows that there are now a growing number of Charismatic Episcopals; the Presbyterians have already divided into the Presbyterian Church of America and the Presbyterian Church of the USA; there are splinters and factions throughout the "Liturgical Community".  Mispeak, the Liturgical community is not a "community" in the same sense that the Liturgical Faith group Category is not a "Category". It is a bag full, with no cohesion; they are simply placed in the same "bag."  The cohesion is imagined; there are factions and frictions within what outsiders see as the "same" denomination. Yes, there are frictions between Catholics and Protestants (the "Irish Troubles".)   But there are also frictions between Muslims and Jews, and they "belong" to the same faith group category. We do not need to reach across so-called faith group categories to be reminded that some of man's most bitter religious conflicts are between virtual kin, cf the situation in Iraq vis a vis Shia vs Sunni, both of whom the Navy's faith group cluster system co-locates in "Special Worship", and manages as generic muslim.

FG18     The "judgment" that the "Religious Ministry Professionals" from a given cluster are "better" at serving the members of *their* (sic) category (sic) is either:

FG18.1     (a) a fiction which can be held only by an outsider who sees all "other" religions as equal, or it is

FG18.2     (b) belied by an oath-based accommodation which is TRUE regardless of whether the served party belongs to *my* "Category" or some other one.

FG19     Except perhaps for Roman Catholics[15], it seems that either it does not matter which faith group cluster you belong to:

•     FG19.1     conflict with other denominations in "your" cluster is nearly as inevitable as conflict with denominations in other clusters, if not more so[16], or

•     FG19.2     the ability to provide Chaplain support, undertaken in the oath, is straightforward with respect to denominations different than your own, whether those denominations are designated, not joined, "members" of "your" Faith Group Category or whether they are just, coincidentally, "members" of some other Faith Group Category.

FG20     I know that the language there is more convoluted than the logic.  (I would not want to have to diagram that sentence.)  Here is the point:

FG21     If you are a Chaplain, and you are not a Roman Catholic, then it does not matter to *you* (even if it does matter to the Chaplain Corps) whether you are in a post where most of the service personnel you have to service are or are not your denomination, whether they are simply not your so-called "faith group category", or in it with you, but not "of" your particular denomination. Your *faith group category* is the "irregardless" in terms of your ability to serve.

FG22     If you need help with an Orthodox wedding, or a Bris, you know where to get help.

FG23     Otherwise, you do what you have sworn to do:

"abide by applicable laws, and all applicable regulations, directives, and instructions of the Department of Defense ....[including] ...a "willingness to function in a

---

[15]  I am in danger of getting ahead of myself here.  Let us note and harken back to this point later.

[16]  a la Cain and Able?

pluralistic environment and to ***support, both directly and indirectly, the free exercise of religion by all members of the Naval service,*** their family members, and other persons authorized to be served by the chaplaincy"   [OPNAVINST 1120.9, Ref 21, emphasis added.]

FG24   Or, as the Chaplain Corps motto has it: "Provide for your own, facilitate for others, care for all".[17]

FG25   And, [see (b) above] thus, the differentiation implied in the judgment that says the Navy needs (these) different faith group clusters is inconsistent with the oath the Navy requires every Chaplain to affirm before undertaking Service.

FG26   Either (a) any Chaplain can provide ministry (facilitate) with respect to any service personnel's needs, or (b) that chaplain has violated his oath of office.

FG27   There are no other logical options.

**Issue Two** - the argument that the Navy's faith group category system is Roman Cathocentric.

FG28   First, a note to Mr. Hyde and Mr. Hall:  No, I am not about to represent myself as an "expert" on comparative religion.  On that score I know no more than is encompassed by a "reasonable man" standard.  But I am an expert on Taxonomy.  (I was the senior scientist, a vice president, at the Smithsonian Institution, for what was then the largest scientific data base in the world.  We "indexed" all the research projects in the world which used U.S. funds.)  Taxonomy is a fancy word for classification, and classification and coding are fundamental, if mundane and under-rated, tools used by statisticians (among others.)  There are **rules** for taxonomies; even Dr. Bernard Siskin knows this; he describes some rules for data classification in his books on elementary statistics.]

FG29   Second, let's begin with a look at the "Faith Group Cluster" cosmos, as the USN Chaplain Corps defines it. [My drawing here (Figure 1) does not prove anything, it simply illustrates where we are going:]

---

[17]   The "official" version of this motto incorporates the "faith group category" concept into the motto:  "We provide for those of our own faith group, we facilitate ministry for those of other faith groups, and we care for all".  I took the quote in the text here from a press story about a Unitarian/Universalist Chaplain.

FG30   For now, this drawing merely illustrates what I mean by Roman Cathocentric[18].

FG31   What follows is the proof for the drawing (Figure 1.):

FG32   The Navy separates all "denominations" into four so-called clusters or categories:

•     Roman Catholic
•     Liturgical Protestant
•     Non-Liturgical Protestant, and
•     Special Worship Group

FG33   Roman Catholics (and only *Roman*[19] Catholics) are "grouped" (sic) assigned to Category 1. All other denominations are spread into one of three other "Categories", which are distinguished from each other in terms of how different their fundamental polity is from Roman Catholic.

FG34   Thus, the denominations which grew out of the "Protestant reformation" are called "Liturgical"; the denominations which grew out of "individual responsibility" vs faith through an intermediary are called Protestant-Non-Liturgical, and all the other denominations (or endorsers), notably including the Orthodox who are both "close" historically to Catholic and parties to the Great Schism, all these others are lumped into the most distant Category: "Special Worship Group".

---

[18] "Cathocentric" signifies that Roman Catholic is the signal center of the Navy's classification system.  It would not "matter" how the Navy classified denominations but for (a) putting "Roman Catholic" at the center (and if that is not ceded, then putting Roman Catholic in its own single- denomination "group", and providing that distinction for no other denomination, elevates Roman Catholicism to a separate plateau of recognition and distinction and signifies for both Roman Catholics and all other denominations, that in the Navy, "Roman Catholics have special status."  In addition, how the Navy classifies denominations into "faith group categories" matters because the Navy manages the categories differently.  Assignments, duty stations, participation as members of selection boards, and accession quotas are all admitted to be based on faith group category. Statistical analysis demonstrates that promotions, separations, medical benefit retirement, recruitment past age 40, continuance in Service past age 62, student support, and sufferance with respect to continuance in service after FOS are all demonstrably different for different faith group categories - and more importantly, the Navy's monitoring of those actions by faith group category alone permits different treatment for different denominations within each faith group category.

[19] There are other Catholics: *e.g.*, Reformed Catholics, Apostolic Catholics, Old Holy Catholic Church, etc. listed in the Navy's data base of denominations (See Appendix DL - FG codes).  None of these other Catholics are assigned to the "Roman Catholic" faith group cluster; they are all distributed to Special Worship or Liturgical. [And only one of them was assigned to Active Duty. That practice is both practically and statistically significant.]

- `FG34.1`  The denominations which were either the first to split from Catholicism, or which were never part of the "Christian" system - are placed as far distant from Category One as possible, in "Other", Category four, which was initially Jews, the Orthodox and the Latter Day Saints, but which has evolved to include the Reformed Jews, and the Reformed Latter Day Saints, and a host of "special" denominations/faiths/endorsers - Muslim, Jehovah's Witnesses, Seventh Day Adventist, Christian Science, Unitarian, Buddhist, and lately the "Orthodox Catholic: and the "Old Holy Catholic Church" (see Data Set FG).

- `FG34.2`  Denominations which had their origins in the second split with Roman Catholicism, are placed closest to Roman Catholic, in Category two.  These are the Episcopalians (and the Charismatic Episcopalians), the Lutherans (and the Evangelical Lutherans) together with the Presbyterians (in half a dozen varieties), the United Church of Christ, the Methodists and the Methodist Episcopal's, as well as the  Congregational's (oops, the Navy puts the Congregational's in with the Non-Liturgicals and the Nazarenes in with the Liturgicals), etc. All these non-Catholics are part of the Liturgical Protestant Category.

- `FG34.3`  All the other denominations (or Endorsers), from Baptist to Pentacostal, from Assembly of God to Christian Missionary Alliance, and from the Chaplaincy of Full Gospel Churches to the New Life Christian Fellowship; all these are lumped together into "Non-Liturgical, Protestant", in Category three.

**Summary:**

`FG35`  There is one "cluster" (sic) for Roman Catholics; everybody else is one of three "categories" which (a) are defined in terms of difference from Roman Catholic, and which (b) are not internally cohesive.

`FG36`  That demonstrates "Roman Cathocentricity."

`FG37`  The Navy's faith group category system, characterizes all "other" denominations in terms of Roman Catholic theology and practice.

`FG38`  The "category" or "cluster" system ignores differences which are more important to many other people than life and death (since they deal with everlasting life and eternal damnation, extending even unto the third generation).  Denomination *matters* to the Navy only if your denomination is Roman Catholic.  If you believe something else, then here's a one of three sizes fits all solution.

**The Navy's faith group Categories are not "Religion" neutral.**

FG39   The Navy begins its latest defense (Reference 12, page 1, ¶ 1, sentence 1) with:

> "Religion is not, and has not been, a proper consideration permitted by the Navy in determining a chaplain's merit for promotion or selective early retirement (SER)."

FG40   Without being too pedantic, I note that this is either (or perhaps all):

FG40.1   a backhanded admission that Religion has been an *improper* consideration permitted (at least as in "suffered and endured") in determining a chaplain's merit ....; or

FG40.2   a diversionary statement, thought to be true, but leaving out that Religion, while not a dimension in judging *merit*, is a dimension in judging *eligibility* (based on quotas) – as here, in protecting Catholics from eligibility for SER; or maybe this is

FG40.3   an incomplete statement, in that Religion is permitted to operate as a dimension of *distinction*, if not one of *merit* in other decisions of Chaplain Corps personnel management, *e.g.,* accessions, duty assignments, service on selection boards; etc.

FG41   If we exercise just a tiny bit of semantic discipline here, we can see that "religion" is an umbrella word, sometimes equated with faith group cluster, and not isomorphic to denomination.

FG42   If we follow the Navy's lead and discourse about faith group categories, we might argue that denominational distinctions do not matter to the Navy Chaplain Corps.

FG43   One would/could base that conclusion on the fact that the Navy insists on "managing by (their) faith group Categories" and they hardly ever mention "denominations".   [I do not think that this muteness is because they are concerned about the sensitivities of, *e.g.*, the Christian Scientists, who might take umbrage at being referred to as a "Denomination", nor is the Navy's "stick in your eye" remark that CFGC is an Endorser and not a Denomination, a counter example.]

FG44   Close reflection on the irrelevance-or-unimportance-of-denomination- premise (and examination of the faith group categories themselves [See Appendix DL - Data Set FG.]) reveals:

FG45   The Navy Chaplain Corps is in fact unconcerned about denominational differences – except for the Roman Catholic denomination.

FG46   Roman Catholics are the only denomination given their own faith group cluster (sic).

FG47   That, again, is a demonstration of Roman Cathocentricity.

**Issue Three** - the faith group category system facilitates denominational prejudice.

FG48  Because the Navy Chaplain Corps is explicitly focused on faith group categories, and is implicitly unconcerned with denominational distinctions, they express quotas (when they have them), counts (when they publish them) and EEO type monitoring (when they take their own performance measures for some personnel actions) in faith group cluster terms.

FG49  This has at least three distorting effects.

FG50  First, the Navy's public emphasis on category and de-emphasis on denomination surely supports (and may be intended to support) the impression that "we are all in this boat together". "Our differences are not nearly as important as our mission."  But it also sends the signal, that *YOUR* differences are not as important as *my* classification system.

FG51  Second, as a practical matter, not collecting data by denomination makes personnel management decision information based on denomination invisible.  That invisibility (a) deprives the Navy of a management tool, and (b) limits (or is used in an attempt to limit) discovery in this litigation, and (c) it permits denominational preferences to be expressed by those who are being monitored for "religious bias", but only being monitored with respect to faith group bias, to express their preferences within the context of faith group.  Baptists do "better" than non-Baptists (even though, or because?, they are in the same cluster); PUSA does better than PCA (even though, or because?, they are in the same cluster), and so forth: Presbyterians and Episcopals do better than Methodists.  And, of course,  Catholics do much better than everybody else (because there is nobody else in their cluster with whom they have to compete?)

FG52  Third, focus on faith group categories provides a shield or shelter, or "excuse" for denominational preferences to be expressed by the Navy itself in assigning Chaplains to personnel selection boards.

FG53  The Navy may *say* they are even handed, insofar as possible, in assuring that all the faith group clusters are represented on the various personnel selection boards, but in the way the Navy does this, the representation by faith group cluster in neither denominationally balanced (on average) nor randomly assigned.

FG54  Preferred denominations within faith group categories are given the vast majority of the available seats, and most denominations, most of the denominations which represent many chaplains, are never given an opportunity to serve.

FG55   "Yes", the Navy may say, but Board Members are entitled to the presumption of regularity and I may not assume that just because there is a disparate balance of denominations there will be a disparate balance in the selections made by those denominations.  I do not make that assumption, but I do test it.  The Navy fails the test.  (See Appendix LL.)

FG56   However, my focus in this section of this appendix has not been on the fact of denominational preference, it has been on the fact that the faith group category system facilitates denominational preference and all of the above is an explanation of how that happens.

FG57   This facilitation is systemic.  It flows from the focus on faith group categories. Some of the discrimination which we will see in Part II could not happen if the faith group categories were not used.

FG58   Without faith group categories providing "cover",

•     FG58.1   the Navy would know what these data show, on a denomination by denomination basis how biased their personnel management system has become, and

•     FG58.2   the affected Chaplains would not be both (a) discriminated against and (b) unawares of how grossly they have been treated.

FG59   The Table below illustrates what I mean by denomination-by-denomination bias.

FG60   My decision to use non-*Roman* Catholic as one of my examples here is motivated by my curiosity about what happens to the *Catholics* who are not allowed into the Navy's Roman Catholic cluster; my decision to use CFGC as the other example here is motivated, of course, by the fact that they are the complaining "denomination" in this litigation.

FG61   Although this Appendix is not a data analysis appendix, and I have already presented some analyses above and will present more below, this is an opportune place to illustrate what I mean by denominational differences in the data are being concealed (obscured) by the Navy's insistence on presenting everything in "Faith Group Category" terms:

| Percent of Applicants Who | Roman Catholic | Other Catholic | Chaplaincy of Full Gospel Churches |
|---|---|---|---|
| Are Granted 1945 Accession* | 97.9 % | 0.0 % | 84.0 % |
| Are Assigned to Active Duty* | 93.4 % | 25.0 % | 35.9 % |
| Are Promoted to CDR** | 45.4 % | 0.0 % | 0.0 % |
| Are Promoted to CAPT** | 19.4 % | 0.0 % | 0.0 % |

\*   Based on Data here - see Data File CC-EF
\** Based on data from the Chaplains History (Vol VIII & X) 1970-1991

FG61   The Faith Group Category system may not have been "set up to benefit a particular denomination or harm others: but it has had that effect. [See also Appendix QE the Quota Effect.]

**APPENDIX CV**
**Relevant Education and Experience**
**Harald R. Leuba, PhD**

**Education:**

| | | |
|---|---|---|
| 1958 | B.S. Mathematics and Physics | New Mexico State University, Las Cruces, NM |
| 1960 | Graduate Study - Mathematics | University of Washington, Seattle, WA |
| 1963 | M.S. Psychology and Statistics | George Washington University, Washington, D.C. |
| 1964 | M.A. Psychology | Johns Hopkins University, Baltimore, MD |
| 1965 | PhD Psychology and | Johns Hopkins University, Baltimore, MD |
| | Operations Research | Johns Hopkins University, Baltimore, MD |
| 1966 | Post Doctoral Research - | Johns Hopkins University, Baltimore, MD |
| | Quantification of Human Performance | National Science Foundation Fellowship |
| 1971 | National Security Seminar | Industrial College of the Armed Forces, |
| | | Fort McNair, Washington, DC |
| 1972 | Resident Executive Program | Federal Executive Institute, Charlottesville, VA |

**Experience:**

| | | |
|---|---|---|
| 1954-1958 | Co-op Engineer | **White Sands Missile Test Facility**, White Sands NM |
| 1958-1960 | Junior Engineer | **Boeing Airplane Company**, Seattle, WA |
| 1958-1960 | Instructor, Statistics | **Seattle University**, Seattle, WA |
| 1960-1967 | Mathematician | **ARINC Research Corporation**, Wash, D.C |
| | Human Factors Engineer | |
| | Operations Research Engr | ditto |
| | Group Supervisor | |
| | Senior Scientist/OpsRes | ARINC Research Corporation, Annapolis, MD |
| 1964-1967 | Associate Professor | **Johns Hopkins University**, Baltimore, MD |
| | Human Engineering | |
| | Statistics & Experimental Design | |
| 1967-1975 | Operations Research Analyst | **Office of the Secretary of Defense**, Arl'ton, VA |
| | Manpower Analyst | |
| | NATO Analyst | |
| | Director, Support Utilization Division | ditto |
| | Director, Nuclear Weapons and Planning | |
| 1970-71 | Congressionally Required Study | |
| | Leader,  Analysis of Navy | |
| | Training Activities in Culebra | |
| | and Vieques, PR | |
| 1973-1974 | Presidential Executive Interagency Detail | |
| | Leader- Task Force on | **U.S. Civil Service Commission** |
| | Performance Evaluation | |

| 1975-1976 | Program Manager<br>Smoking & Health | **Enviro Control Incorporated,** Prime Contractor<br>to **National Cancer Institute**, Rockville, MD |
|---|---|---|
| 1976-1977 | Vice President<br>Science Information Exchange | **Smithsonian Institution**, Washington, DC |
| 1977-1979 | Vice President, Energy | **Evaluation Research Corp.**, Falls Church, VA |
| 1979-1992 | Director, Resource<br>Development | **Jack Faucett Associates**, Bethesda, MD |
| 1980-1981 | Senior Scientist | **Doty Associates**, Rockville, MD |
| 1980-Present | President/CoFounder<br>Consultant/Expert Witness<br>Environmental Analysis<br>Data Validation and Statistical Analysis<br>for | **CONTEXT**, Washington, DC |

                                          **Superfund Response Management**
                                          **The US Navy**
                                          **The US General Accounting Office**
  **The US Department of Commerce**
  **Edison Electric Institute**
  **Logistics Management Institute**
  **Oak Ridge National Laboratory**
  **Federal Mine Safety and Health Review Comm.**
  **Consumer Product Safety Commission**
  **National Bureauy of Standards**
  **National Paint and Coatings Association**
  **National Bottled Water Association**

| Licensed General Contractor<br>Remodeling<br>Endless Pools<br>Four Seasons Sunrooms | **The House Doctor**<br>Maryland,<br>Virginia and the<br>District of Columbia |
|---|---|

**Minor Legal Experience**

| Plaintiff and Defendant in Civil Court | Montgomery County |
|---|---|
| Jury Duty | Alexandria City |
| | Montgomery County |
| Expert Witness re Navy Training Activities | Puerto Rico |
| Expert Witness re Superfund Activities | Acme Solvent Recovery |
| | Lowry Landfill (Denver, Colorado) |
| | Smith Farm (Louisville, Kentucky) |
| Indexer for Administrative Law Decisions of | Federal Mine Safety and Heath Review<br>Commission. |
| Member and Chair | Montgomery County Animal Matters<br>Hearing Board |

**Major projects of relevance to this Litigation:**

Manpower Requirements studies in the Pentagon (including Navy Manpower)
Special Project Officer - re Marine Chaplains in Vietnam
Headquarters and Command and Control studies in the Pentagon
    (Including a review for the Secretary of Defense of ALL headquarters world wide)
Data Validation studies for Department of Energy and Oak Ridge National Laboratories
    of all Federal Data systems related to US Energy supply, use and conservation
Data Forensics (circumstance reconstruction) for Litigation Attorneys in Superfund PRP groups
Performance Evaluation Task Force with US Civil Service Commission (one platform was a Navy
    facility)
Officer Efficiency Report review in the Pentagon - for DOC Cooke
Reviewing and Indexing the Decisions of the Federal Mine Safety and Health Review Commission
Information Theory applications to data uncertainty, and reconstruction of information sets based on
    data structure and number rules.
Regression and statistical analysis of aircraft reliability and maintainability (ARINC)
Statistical analysis of aircraft accidents (for Boeing Airplane Company)
Data collection and statistical analysis for all energy production, world wide (DOD)


**Expert Declarations in Navy Chaplains matter:**

A.    Declaration of Harald R. Leuba, in The United States District Court for the District of
    Columbia, Case Number 1:99CV002945(RMU), in the matter of Chaplaincy of Full Gospel
    Churches v The Honorable Richard J. Danzig, et. al., ~~to~~ 15 June 2000.

B.    Declaration of Harald R. Leuba, in The United States District Court for the District of
    Columbia, Case Number 1:99CV002945(RMU), in the matter of Chaplaincy of Full Gospel
    Churches v The Honorable Gordon R. England, 12 May 2002.

C.    Declaration of Harald R. Leuba, United States District Court, Southern District of California,
    Case No. 99cv2272-TW (LSP) in the matter of Lieutenant Patrick M. Sturm v The United
    States Navy, 18 May 2002.

D.    Declaration of Harald R. Leuba, United States District Court, Southern District of California,
    Case No. 99cv1579 in the matter of Ronald Wilkins v United States of America, et. al., 29
    April 2003.

E.    Supplemental Expert Opinion of Harald R. Leuba, United States District Court, Southern
    District of California, Case No. 99cv1579 in the matter of Ronald Wilkins v United States of
    America, et. al., 12 October 2003.

F.    Addendal Declaration of Harald R. Leuba, United States District Court, Southern District of California, Case No. 99cv1579 in the matter of Ronald Wilkins v United States of America, et. al., 17 February 2005.

G.    Addendal Declaration of Harald R. Leuba, United States District Court for the District of Columbia,  Case No. 99cv0028945(RMU)  in the matter of Chaplaincy of Full Gospel Churches v The Honorable Gordon R. England, 31 March 2005.

H.    Reclama of Harald R. Leuba, United States District Court, Southern District of California, Case No. 99cv1579 IEG (BLM) in the matter of Ronald Wilkins v United States of America, et. al., 7 April 2005.

I.    Compendium Declaration of United States District Court, Southern District of California, Case No. 99cv1579 IEG (BLM) in the matter of Ronald Wilkins v United States of America, et. al., 9 June 2005

J.    Predicting Board Decisions from the Navy's Board Assignments - an Information Theory Supplement to - the Compendium Declaration of Harald R. Leuba, PhD in the United States District Court for the District of Columbia,  Case No. 99cv0028945(RMU)  in the matter of Chaplaincy of Full Gospel Churches v The Honorable Gordon R. England, 5 August 2005

K.    Codicil Declaration, A Further Look at the Correlation between the Denomination of Promotion Board Members and the Promotion Probabilities of Candidates with "Matching" Denominations, in the United States District Court for the District of Columbia,  Case No. 99cv0028945(RMU)  in the matter of Chaplaincy of Full Gospel Churches v The Honorable Gordon R. England, 12 August 2005

L.    Leuba, Harald R., <u>Declaration: The Question of Denominational Preference in U.S.Navy Chaplain Corps' Accessions</u>, United States District Court for the District ofColumbia,  Case No. 02CV02005  in the matter of Rev. Charles E. Larsen, et al., v The United States Navy, et al. 3 October 2005.
[Withdrawn, see item O. below.]

M.    Leuba, Harald R., <u>Appendage Declaration: The Question of Denominational Preference in U.S. Navy Chaplain Corps' Accessions: An Extension to a prior Statistical Examination</u> United States District Court for the District of Columbia,  Case No. 02CV02005  in the matter of Rev. Charles E. Larsen, et al., v The United States Navy, et al. 24 November 2005.

N.    <u>Rebuttal, Reproval and Reconciliation - Explicating the Apparent Conflicts Between Dr. Siskin's Data Presentations and Mine</u>, Declaration of Harald R. Leuba, PhD in the United States District Court for the District of Columbia,  Case No. 99cv0028945(RMU)  in the matter of Chaplaincy of Full Gospel Churches v The Honorable Donald C. Winter, et al. 21 June 2006.

O.    <u>Declaration Withdrawal, and Correction</u>, Declaration of Harald R. Leuba, PhD in the United States District Court for the District of Columbia, Case No. 02CV02005 in the matter of Rev. Chas E. Larsen, et. al., v U.S. Navy, et.al., 27 September 2006.

P.    <u>The Siskin Conjecture: The Pattern of Denominations Assigned to U.S. Navy Chaplain Corps Selection Boards Biases the Decisions which Flow from those Boards</u>, Declaration of Harald R. Leuba, PhD in the United States District Court for the District of Columbia, Case No. 02CV02005 in the matter of Rev. Chas E. Larsen, et. al., v U.S. Navy, et.al., December 1, 2006.

Q.    Declaration of Harald R. Leuba, in the United States District Court for the District of Columbia, Case No. 06-01832 (HHK) in the matter of Chaplain Gordon James Klingenschmitt, v. Donald C. Winter in his Official Capacity as Secretary of the Navy., 1 December 2006.

R.    <u>Reply, Rebuttal and Recalculation</u>, Declaration of Harald R. Leuba, PhD in the United States District Court for the District of Columbia, Case No. 02CV02005 in the matter of Rev. Chas E. Larsen, et. al., v U.S. Navy, et.al., 14 Feb 2007

S.    <u>Too Many Catholic Priests?  A statistical analysis</u>, Declaration of Harald R. Leuba, PhD in the United States District Court for the District of Columbia, Case No. 99CV002945(RMU) combined with 00CV00566 (RMU) in the matter of Chaplaincy of Full Gospel Churches, et. al., v The Honorable Donald C. Winter and Robert H. Adair, et. al., v. The Honorable Donald C. Winter,  5 March 2007.

T.    <u>Does the Data Establish that the U.S. Navy favors Roman Catholics?</u>  Declaration of Harald R. Leuba, PhD in the United States District Court for the District of Columbia, Case No. 07-mc-269 (RMU) in Re: Navy Chaplaincy, 7 July 2007.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

REV. CHARLES E. LARSEN, et al.,    )
                             )
           v.                   )     Case No. 02CV02005
THE UNITED STATES NAVY, et al.   )
                             )

**The Siskin Conjecture:**
**The Pattern of Denominations Assigned to U.S. Navy Chaplain Corps Selection Boards**
**Biases the Decisions which Flow from those Boards**

An Expert Witness Declaration by:  Harald R. Leuba, Ph.D.

Pursuant to 28 U.S.C. Section 1746, and under the penalty of perjury, I declare as follows:

## EXECUTIVE SUMMARY

Old data, recently acquired from the Navy;
a FOIA response discovered in an attorney's files; and
an unintentional conjecture from Dr. Siskin:

enable a broad understanding of how the Navy Chaplain Corps' personnel management system institutionalizes preference for Catholics, and limits opportunity for career growth and service for a disenfranchised group of shunned denominations, predominantly Non-Baptist, Non-Liturgicals.

The "old data" is records for nearly 5,000 "accession" decisions about chaplain candidates and Chaplains; this volume of data is so extensive (covering an estimated 97% of all Chaplain Corps applicants for the past 20 years) that it enables dispositive statistical analysis:

- The Navy has a statistically significant preference for Catholic Chaplains, over all other denominations - for participation in the Chaplain Candidate Program (accession), for assignment to Active Duty Service (misnomered as "accession"), for retention against involuntary reduction (whether in Selective Early Retirement or in Continuation in Service), and for promotion.

The FOIA response is the first data from the Navy that provides a window on what happens to a Chaplain's career prior to consideration for promotion.

- CADRAG Boards systematically screened journeyman Chaplains who volunteered for continuation in service, accepting virtually all the Catholic Chaplains, but rejecting a

statistically significant proportion of the Non-Baptist, Non-Liturgical Chaplains. [This is *"What happened to all the Non-Liturgicals"*.]

The Siskin Conjecture posits that a correlation exists between the likelihood of a denomination being assigned to a selection board, and the likelihood that candidates from that denomination will fare better than average before the board.

Statistical analysis of nearly 2000 Navy selection-board assignments demonstrates a statistically significant pattern of denominational preference; five out of more than 120 denominations account for a majority of the seats on *all* boards.

- Dr. Bernard Siskin is right, on this point: this *de jure* preference for *some* denominations cascades through the boards' decisions and alters the mix of denominations who are accessioned, those who are given an opportunity to serve on Active Duty, those who are allowed to continue to serve once involved, and those who are promoted when their "turns" come.

**INTRODUCTION**

1.  Dr. Bernard Siskin and I have been exchanging opinions, reservations and low grade accusations in the "Chaplains' Matter" for nearly six years.

2.  Recently I was provided with data he has had for nearly a year;

    (a)    This new (old) data improves illumination on the terrain we have been disputing, and

    (b)    A conjecture of his has provided a testable hypothesis which does not impugn the motives of Chaplain members of selection boards when recommending career management decisions about other Chaplains and chaplain candidates.

**The "new" (old) data.**

3.  Sometime  around October 2005, the Navy copied a collection of works sheets and decision memoranda which had been prepared by their C/A/R/E Advisory Group.  These documents address roughly 97% of all candidates considered by that board from FY1985 through FY2005 for accession into the U.S. Navy Chaplain Corps, or assignment to active duty therein.

4.  The Navy used the C/A/R/E Advisory Group decision memoranda to prepare an electronic database for Dr. Siskin.  He used that data to prepare his December 21, 2005 declaration in this matter (Siskin, 2005.)  I was given a copy of this Navy/Siskin database on 27 July 2006.

5.  I have compared the Navy/Siskin electronic database to the paper records it was derived from; I have corrected the database as necessary, and augmented it with:

> (a)    data from the C/A/R/E Advisory Group work sheets;

and

> (b)    information from the face of some of the decision memoranda about the C/A/R/E Advisory Group's membership which the Navy and Dr. Siskin failed to capture[1].

6.   "My" database has been provided to the Defendants, with highlights indicating which data entries I changed, and references to the "Bates Number" of each hard copy record I used to verify a data entry error.

**The Siskin Conjecture - Part I.**

7.   In his December 21, 2005 declaration (op cit) Dr. Siskin hypothesized[2] something like this:

> The likelihood of a candidate's being selected by a board is correlated to the likelihood that the board contains a panel member with the same denomination as the candidate.

8.   Although he attributes this formulation to me, his hypothesis is not exactly what I had hitherto been testing.  In the past I drew the inference in the other direction:  The *fact* of a denominational match between a board member and a candidate improved the candidate's chances of being selected (by that board.)

9.   Here, Dr. Siskin is suggesting that an actual match on a particular board is not necessary; what marks the nexus, in the Siskin conjecture, is not the actual "co-incidence" (co-occurrence of a candidate's denomination and a board member's denomination) but an underlying similarity *per se,* for which a surrogate measure is the *likelihood* of the match in the first place.

---

[1]  Both Dr. Siskin in his declaration, and the Navy in preparing their database for Dr. Siskin, ignored, overlooked, or simply set aside, the C/A/R/E Advisory Group work sheets. "Ignored" carries a connotation of disapproval, and while such an inference may be justified, my point here is that neither the Navy nor Dr. Siskin entered any data from the work sheets into their database, nor was information from the work sheets reflected in Dr. Siskin's declaration. The missing or overlooked or "ignored" information includes: (a) records for four score of candidates who do not appear in the decision memoranda, (b) thousands of bits of data dealing with faith group cluster and denominational quotas, (c) evidence within the pattern of entries on the work sheets which reflects pre-screening, as well as (d) post facto decision alterations. " My" database also included information from the decision memoranda which identified the C/A/R/E Board members, information which I used later to identify board member denominations.

[2]  I am not sure that Dr. Siskin meant this as a particular hypothesis.  I suspect rather that he was setting up a straw man so that he could denigrate my analysis.  But motivations aside, (a) his words were to this effect and (b) the hypothesis has scientific merit. (See Part II here.)

10.   This is, or could be, a manifestation of the "like, likes, like" hypothesis which was introduced to this dialogue first by LCDR McCreary (1992), deferred to by the Center for Naval Analysis (Smith et al, 2000), and relied upon heavily in my work, especially in my Allonge (Leuba, 2005), but it is significantly different with respect to the source of "intent".

**The Siskin Conjecture - Part II.**

11.   Where some observers of the "like, likes like" affinity model interpret that model as requiring that board members consciously (or almost consciously) favor those "like" themselves who appear before the board, the more general formulation proffered here can be seen as both more subtle and less of an invitation to presume bias.  It is mathematically similar; it may even be psychologically similar in its theoretical underpinnings and its mechanism of expression.  But, it is profoundly different in the etiology of intent.

12.  Sacco, et al (2003a) reminded us that in a traditional personnel-panel selection context, the interviewer brings demographic information to the table just as surely as does the interviewee, and that this is a recipe for both (a) the opportunity for discrimination to occur and (b) an opportunity for that discrimination to be undetected if the data analysis is incomplete[3].

13.  Dr. Siskin's conjecture is more indirect than this explicit awareness of the potential for blatant discrimination.  His formulation suggests that the concatenation is removed (i.e. distant) from the obvious superficiality of both the interviewer and the interviewee being of the same race or gender or even denomination.  They are more fundamentally (more deeply) *similar* than that.  The connection is still "like, likes, like", but the basis for that likeness is more resonant than a simple "single dimension" similarity.[4]  This is not less inherent, or less intrinsic, but it is (or may be) less "one on one."

14.   If the theory is right, then a candidate who was fundamentally "like" the members of a selection board might be selected even though he or she was "different", or partially dissimilar, on one or more of the superficial demographic variables.

15.  Building from the general principles of "affinity", one need not allege, suspect, or even decry "prejudice and corruption", to notice:  If you walk into a board room, a cafeteria, a PTA meeting,

---

[3]  The data analysis issue is, of course, that since discrimination is a two party transaction, if one does not collect and analyze data from both sides of the transaction, one cannot observe the interaction (if any)  between the demographics of the selection panel constituency and the demographics of the candidates recommended by those panels.

[4]  I am reminded of a comment I was privileged to hear from Caspar "Cap"  Weinberger in August 1972.   In response to a question about working in the White House, Mr. Weinberger told us:  "You do not get to be on the President's staff because you have learned what his positions are; you get to be one of the President's men because you think the way he thinks."

or indeed any place where people get together regularly, you will notice clustering based on similarity.  It may be as blatant as racial aggregation, or gender separation, or even those with and without children, or canes, or uniforms.  We (all of us) tend to be more comfortable in "familiar" surroundings. [*Birds of a feather* do *flock together.*[5]]

16.   What if, in the Chaplain Corps, the same sort of thing happens?   Personnel selection boards convene and (a) because some of the members have served together before (on boards or off), they recognize each other, (b) maybe they even like each other, (c) maybe they even understand where "the other guy is coming from".

>>> Or maybe, they were selected because they have something in common. <<<

17.   It would not be amiss to staff a selection board with people who were already successful at doing the job the candidates being considered were applying for.

18.   Board members who were "good at the job" being applied for might be able to estimate the potential in others to do that job well, or they might be able to look around the board table at their peers and recognize common ground which they could then seek within the candidates. This subjective process might be conscious or unconscious; but it is prima facie valid  –

>>>  unless the common denominator among the board correlates to an irrelevant or proscribed variable. <<<

19.   The risk here is that the evaluation is totally subjective, and the board membership is not as "representative" of the denominations being evaluated as the Navy says it is.

(a)      The evaluation is *totally* subjective because the objective factors, qualifications to *be* a chaplain and time in grade to be eligible for promotion, are the same for all candidates[6].  The candidates can be distinguished only on the basis of their (subjective) Officer Efficiency Reports (as interpreted by the board members) and their AQD. ("Additional Qualification Designator").   The Navy says that AQD is

---

[5]  In this understanding of "similarity" we need to maintain perspective on who or what or how similarity is established - by those in the group - not by the anthropologists or bird watchers outside the group. Sometimes, the bird who looks different to us, from outside the flock, is just as much "one of the crowd" as any other member.

[6]  To avoid cluttering up the discussion at this point, I have illustrated the selection process for promotion; the logic remains the same for accession decisions, decisions about whom to add to the Active Duty list, SER decisions, and continuation in service decisions.  As we shall see, the consequences are the same in all these different contexts: Boards composed to a *pattern* of "the ideal chaplain" tend to select candidates who share some underlying dimensions which correlate to the definition of "ideal" - whether that definition of "ideal" is correct or not!

used "to identify each officer's particular skill sets."  But for *Chaplains*, the AQD is "a three digit numeric code that corresponded to the religious endorsing agency for each officer." (Kagle 2006.)

**Risky Behavior 1:**   After qualifications are established, the primary dimension which sets the candidates apart in the record is their individual religious sponsorship or endorser.

> (b)      Selection board membership is not nearly as "representative" of the affected denominations as the Navy alleges. Although board membership has recently become reasonably balanced across faith group clusters (sic), in the past selection board membership was largely limited to a small number (five) of "favorite" denominations.

20.    Sacco, et al (2003b) have addressed how this common background could contaminate the board's decisions, based on:

> "... Schneider's (1987) Attraction-Selection-Attrition (ASA) theory.  This approach postulates that people are attracted, selected, and retained (or decide to remain on the job) based on similarity between the individual's personality and those of the organizational members.  Because people may make judgments about their co-workers' personalities or other relevant attributes based on demographics, or to the extent that demographics are important determinants of similarity judgments, the ASA framework provides additional support for relational and organizational demography perspectives."

21.    Quite clearly, if the "Organization" routinely staffs its selection panels with members of a *de jure*[7] "clique", whatever those "insiders" have in common becomes the implicit *de facto* template for "success" in the organization.

21.    **Risky Behavior 2:** If the *same* denominations judge candidates for continuation in the Service as judge the candidates for promotion, then it is both predictable and proscribe-able that

---

[7]  The Navy may say that I have misused this comparison; *de jure* and *de facto* contrast (a) what is true or is "supposed to be true", based on the rules of the Organization, and (b) what the "facts on the ground" are as those rules are followed (or ignored.)  The Navy will say that it has no *de jure* favorite denominations; they may argue that whatever statistically significant uneven denominational distribution which may be occurring is incidental or accidental (if one controls for relative numbers).  It is my opinion here that the data demonstrate an historic pattern and practice (a *de jure* **intention**) of placing Roman Catholic on all and Presbyterian (USA), Lutheran (ELCA), United Methodist and Southern Baptist denominations on most, selection boards, with a smattering of other "acceptable" denominations added from time to time for appearances' sake - but always with the invidious* *intention* of supporting "mainstream" denominational influence in general and Catholic influence in particular (*cf footnote 25).

the individual denominations barred from participation in the selection panels will also be the denominations who suffer both the most "loss on the way to being considered for promotion" and the least success in promotion when they are given an opportunity to be considered for promotion [cf "Revisiting the Missing Non-Liturgicals" below, and Appendix F.]

22.    Hart (2005) has highlighted this concern:

"As one court has explained it, 'when the evaluation is to any degree subjective and when the evaluators themselves are not members of the protected minority, the legitimacy and nondiscriminatory basis of the articulated reason for the decision may be subject to particularly close scrutiny'."[8]

**Testing the Siskin Conjecture:**

23.  The data tell me (see Appendix A) that whoever is or was assigning chaplains to the Promotion Boards, and the SER Boards, and even the C/A/R/E Advisory Group, was not making those assignments at random.  The Navy's advocates have told us that there was an effort to "balance" the boards by faith group cluster, but this "balance" came late to the process (after 2000) and was never achieved in denominational terms.

24.  There were undoubted availability concerns and logistic concerns that affected selection board staffing patterns.  "As long as you have to be in the building for the 05 Board, can you handle the 04 Board too?  You are the Deputy xxx; it's your job to sit on one of these boards. Hey, John, can you do this when you come by?"

25.  But, there may also have been, although I do not allege it in particular it has to be *considered*, some measure of favoritism being acted out.  As diligent as the Navy may have been to be sure that the selection panels were "balanced" with respect to gender and minority status, the Chaplain Corps' faith group category sub text enabled five denominations to fill the <u>majority</u> of the seats on all the selection panels.  Appendix A presents this phenomenon in detail as it operated for promotion boards.  Appendix B compares the denominational participation patterns for promotion boards to those for SER Boards and C/A/R/E Boards.

26.  Dr. Siskin's conjecture suggests that one does not need an exact match between the denomination of the candidate and a denomination on a particular board, if the board in general is composed of "like minded" officers.  Their like-mindedness will resonate with, and they will tend to select, copacetic candidates.

27.  We can use Siskin and Weinberger (footnote 4) to extract an "operational definition" of the Navy's "ideal" Chaplain (or favorite denominations), from the Navy's patterns and practice re the staffing of selection boards.

---

[8]Page v. Bolger, 645 F.2d 227, 230 (4th Cir. 1981).

28.  All I have to do is make a list of all the Chaplains the Navy assigned to personnel selection boards over a statistically significant period of time, and then point to that list and say: "the Navy's 'ideal', *the Navy's de jure preferred,* Chaplain is embodied by that composite".

29.  To the extent that any candidate "matches" or "looks like" that composite he or she will fare well in the selection deliberations because he or she will "look right".

30.  This paradigm is not just the "like, likes" like" I have been belaboring (although one flows from the other); this is a profoundly different insight which we have Dr. Siskin to thank for.

a.  Three Time periods

31.  The Chaplain Corps' "pattern and practice" regarding the assignment of denominations to promotion boards can be divided into three periods, bounded by litigation events. (For further detail, see the pie charts, graphs and tables in Appendix A and "Change Point" in Leuba 2006b.)

32.  Prior to 1986/87, the Chaplain Corps placed two Roman Catholics on every promotion panel, and filled out the rest of panel with a majority of Liturgical Chaplains (drawn from three "favorite" denominations).  Accessions at this time were managed by faith group cluster, and there was an effort to align the pattern of accessions to the rank and file's pattern of faith group cluster preferences.

33.  After 1986/87, in what seems to be a response, if not a settlement, to then pending litigation charging undue Catholic influence, the Navy changed the pattern of Chaplains on promotion boards from (a) two Roman Catholics to (b) one Roman Catholic and one line officer, and although a few more Non-Liturgical Chaplains were allowed to sit on a promotion board after 1987, the overall effect was not a substantial change in their representation.  Furthermore, concomitant with this change, the Corps abandoned its "matching pattern" for accessions, and adopted a quota system, which has come to be known as "the thirds policy." [9]

34.  In 2000 another change point occurred; new law suits filed in 1999 and 2000 raised concerns again about imbalances in the selection panels - and consequential imbalances in the decisions

---

[9]  July 31, 1986, CAPT Donald Muchow, later Chief of Chaplains, but here Chief of the Plans, Policy and Programs Branch, wrote a memorandum which was approved by the Chief of Chaplains: "Revised FY87 Accession Goals".  This memo shows the Corps abandoning its objective criteria for accessions and substituting subjective criteria as the basis for its goals and quotas.  "The Chief of Chaplains has determined that the faith group category mix that best meets the needs of the Navy is 35% liturgical Protestant, 35% non-liturgical Protestant, and 30% other," (of which 25% was to be Catholic, with the remaining 5% being Jewish, Orthodox and Mormon).  With this stroke, the Corps exchanged (1) a practice of aligning the proportion of Chaplains by faith group cluster to the proportion of the rank and file professing an affinity for that cluster, for (2) an arbitrary ratio that is nominally 1/3, 1/3, 1/3.

which flowed from those panels.  The Navy (a) broadened denominational representation on the promotion panels, (b) increased the number of line officers on the panels from one, to two (and eventually to five), and it abandoned the use of quotas as a planning guide for accessions.

b.    Favorite Denominations

35.  In order to test the Siskin Conjecture, we need a measure of  "the likelihood of a denomination being on a selection board."

•      We have no data for membership on Continuation in Service (CADRAG) boards.

•      We have SER Board data for only four boards staffed with Chaplains.

•      We have data for only five years of C/A/R/E Advisory Group boards.

•      But we have nearly complete promotion board membership data for LCDR, CDR, and Capt boards for more than 25 years. [See Appendix A.]

36.  We can rank this promotion board denomination-incidence data by time period (divided by Change Points) and faith group cluster, and establish a set of "frames" for comparing selection rates for pools of similarly situated candidates:

Table 1.
Denominational Likelihood on Promotion Boards
(Each denomination's total number of appearances from 1977 thru 2002 is noted in parenthesis)

| Faith Group Cluster    → | Roman Catholic | Liturgical Protestant | Non-Liturgical Protestant | Special Worship |
|---|---|---|---|---|
| Tier I - 100% | RC (102) | | | |
| Tier II - 25 to40% | | PUSA (43) ELCA (29) UM (21) | SB (37) | |
| Tier III - 7 to15% | | LMS (15) UCC (10) AME (8) RCA (7) EPIS (7) | ABC (12) CC/DC (10) NBCUS (7) PNBC (7) | SDA (11) J (6) |
| Tier IV - 0 - 5% | | CRC (3) ECCA (3) CME (2) | BGC (5) GARB (4) CGIC (3) | LDS (4) ORTH (3) CS (1) |
| | 5 Others (0) | 36 Others(0-2) | 60 Others (0-2) | 10 Others (0) |

37.   Table 1 does not separate the denominational appearances by time period; it does separate them by faith group cluster.

•       There are substantial and potentially interesting differences across the time periods, to which we will return.

•       The separation by faith group cluster serves to highlight the inequity in denominational representation across the so-called clusters, and it facilitates a discussion of:

c.   <u>Core Values vs Corps Values</u>

38.   Presumably, the U.S. Navy shares our country's core values, among which are a National commitment to plurality and the "separation of Church and State".  The evidence in Table 1 and Appendix A suggests that within the Navy, the Chaplain Corps marches to a different drummer, and seems to value Roman Catholicism ahead of all other denominations.

•       Prior to 1988 the Corps placed two Roman Catholics on every selection panel, and harvested the benefits of that system - reporting to itself at the time that 38% of all the Commanders in the Corps were Roman Catholic, while only 23% of the total Corps was Roman Catholic.  [This 150% over-representation at CDR is more than just statistically significant.][10]

•       When the Corps dropped the "two Catholics on every promotion board" policy, it simultaneously changed its accession policy from parity with the rank and file, to the 35%, 35%, 30% cited above.  This quota policy not only facilitated accessioning for Catholics in particular (since their quota was so far above the probable percentage Catholic of applicants), but it also provided a pretext "justification" for rejecting Non-Liturgical Protestant candidates - since the ceiling that the quota levied on them was so much lower than their pool of applicants.

**Hypotheses:**

39.   All other things being equal, the probability of being selected by a Chaplain Corps selection board ought to be independent of the candidate's denomination.  (Cf Siskin, 2005, page 9.)

---

[10]   In a set of briefing charts entitled "Roman Catholic Chaplains: Overview" [see LAR0382 to LAR0399], the Navy reports (to itself) that as of 15 April 1991, 34% of the CDRS were Roman Catholic, while only 12% of the LTJGs were Roman Catholic.  To my knowledge, no other *denomination* has been singled out within the Navy for this kind of "status report" attention.  This is data from the Navy's own files, four years after the Change Point.  I read this data as corroborating the earlier information, consistent with my own examination of the records in the Chaplain's History (Halley 1993), and as demonstrating an historic, reliable, statistically significant, and in my opinion the consequence of - an intentional preference for Catholics.

That is, in the absence of perturbing bias:

> our best estimate for the percentage of candidates of denomination X who are selected for decision Y should be statistically the same as the percentage of *all* candidates considered who are selected for decision Y.[11]

40.   The imposition of quotas perturbs that relationship for the faith group clusters which have to be "culled", requiring the reformulation:

> Our best estimate for the percentage of candidates of denomination X who are selected for decision Y should be statistically the same as the percentage of all candidates belonging to the same faith group cluster as denomination X who are selected for decision Y.

41.   A board composed of people who are good at their jobs, who know what "good" looks like, who measure candidates against their own templates and the templates of valued peers, will select:

> (a)   Candidates who are qualified,
> (b)   Candidates who comport to the ideal, and
> (c)   Candidates who "look like" themselves (collectively.)

42.   This may be the same mathematics and nearly the same statistical analysis as "like, likes, like", but the Siskin Conjecture does not require a denominational match on the board, nor does it imply that board members consciously (or unconsciously) violate their oath to be impartial - it only requires a "likeness" between the "kind of person the candidate is" and the "kind of person" the board is seeking, which, in transitive social mathematics[12], is "the kind of person the board is composed of."

**Here is what the data tell us:**

a.   <u>From the distribution of denominations on the selection panels</u>

43.   **Conclusion 1:** The Chaplain Corps has an explicit pattern for the Chaplains it wants, which we can extract from the implications of their practices.  See Appendix A and B.  Furthermore:

---

[11] This is the proper *a priori* statistical assumption.  If we suspect bias, the proper test is to compare the selection rate for denomination X to the selection rate for all *other* (i.e., non-X) denominations, or, alternatively, to compare X's selection rate (or X's faith group's selection rate) to the selection rate for the presumptively favored denomination, or faith group. See OFCCP Compliance Manual - Chapter 7 (11/13/2005).

[12]   Although applicable here, not all social mathematics is transitive.

- Look at how the Navy defines its faith group clusters, so that it can manage them that way, with Catholics set aside in their own group, with *all* the other denominations stereotyped[13] into amorphous, internally conflicted "groups".

- Look at how the Navy has populated its selection panels, with Catholics on every board, and a limited range of "mainstream" denominations used to achieve a voting majority on virtually every board, of every type.   (See Appendix B.)

- Or look at what the Chaplain Corps calculated for its "ideal mix" of denominations, once it adopted quotas. (See Appendix C.)

- Or look at the "bottom line" denominational mix it has orchestrated among its higher ranks, Commander and Captain.  (See footnote 10, again.)

44.  **Conclusion 2:** There are statistically significant departures from denominational parity in the Navy's planning documents, in the staffing patterns it employs for its selection boards, and in the results of the decisions of those boards as they are reflected in published data.

45.  We may infer from what they say, as well as from what they have done (see Appendix A) that when the Navy assembles a selection panel it considers at least these three factors:

First, is the proposed panel member a Chaplain in good standing of the appropriate rank.

Second, does the proposed panel member add intended balance to the panel.  Balance is or has been defined to include gender and racial minority balance, but the obvious controlling concern has been "representation" from one of the three "major" faith group categories, with a *de jure*[14] limit that the board must have a Catholic and may not have a majority of what I have referred to as "blue collar" clerics.

The third factor is "between the lines" in the lists of approved selection panel members.  Of course they have to be available, but they also have to be "acceptable."

A psychiatrist, or an executive "headhunter", or perhaps even an FBI profiler, might be able to read their personnel files or interview the Chaplains selected for this duty and write a precis or dossier which captured significant characteristics which the Chaplains had in common.

I can do much the same thing in a "black box" kind of way by simply saying whatever mix of denominations fit into *this* box (the actual list of preferences), that *mix* contains, embodies, the collateral characteristics the Navy wants.

---

[13]  Stereotyping is the foundation for prejudice and discrimination, see Footnote 24.

[14]  Compare to footnote 7.

46. The successful candidate may *be* a Catholic more often than he is a Unitarian, but it is the boards' perception of his likeness to them, not his Catholicity, which leads to his selection.[15]

47. If one needs to assign motivation to the denominational discrimination which flows through the Chaplain Corps personnel management system, the duty officer who "packs the selection board" is the party with "intent."  And the defenders of the selection board staffing patterns are collaborators.

b.  <u>From the decisions made by the selection panels</u>

48. Observing the patterns in Appendix A and B, we may posit what the Navy's "favorite" denominations are.

If:

> (a) these favorite denominations are tiered, based on the level or degree of favoritism, as measured by their likelihood of being assigned to a promotion board,

and also if

> (b) all candidates before those boards are sorted into matching denominational cohorts (data clusters which parallel the favorites' tiers with respect to denomination and share a similar "level" of likelihood of having their denomination assigned to a promotion board),

then we can

> (c) test the Siskin Conjecture.

---

[15]  I wrote this characterization to help the Navy's advocates distinguish between the confrontation with "regularity" which they see in my use of the "like, likes, like" theory, and the more indirect process which unfolds in this Siskin Conjecture based, template model . But, frankly, I think that any such distinction is an intellectual deceit, if it is not hair splitting.  One does not have to impugn the board member's motivations or conscientiousness to be concerned about the possibility of distortion in their judgments.

Deductive reasoning may allow the *Board* to believe that they are picking the best qualified candidate, but if they pick candidates who are disproportionately their own denomination more than any other denomination, then the Navy has to justify the pattern of denominations they place on the boards.  The Navy has to do better than argue "intended balance"; they have to do better than adopt this "general" similarity to a template explanation.  The *Navy* has to have a ***reason*** for preferring one set of religious beliefs (for assignment to selection boards) over another - or else they have to show how a person with "those religious beliefs" is more likely to posses this  (???) (whatever it is)  ***required*** skill.

For Selection to Commander, we find:

| The Navy's Explicit Favorites: | Percent Selected to CDR* |
|---|---|
| Tier I   Roman Catholic<br>    - a faith group cluster composed of one denomination<br>    - There was at least one Roman Catholic on every CDR Promotion Panel | 48.34 % |
| Tier II  PUSA, SB,  ELCA, UM , LMS, ABC, CC(DC), UCC & SDA<br>    - Double digit representation on Promotion boards | 45.07 % |
| Tier III  EC, AME, NBCUS, PNBC, RCA, etc<br>    - Non-trivial participation on Promotion Boards (4 to 8 seats<br>     In 25 years) | 36.12 % |
| Tier IV CGIC, CR, ORTH, CHCCC, N, PCA, GAGB, CFGC etc.<br>    - Minimal participation, or no participation on Promotion Boards<br>    (0 to 3 seats in 25 years) | 27.00 % |

\* As reported in Chaplain Corps History, Volume X.

49.    The pattern of figures above is statistically significant (Chi Square <.001; which is beyond the three standard deviations level of significance.)  **Conclusion 3:**  This supports the Siskin Conjecture.  Denominations faring best in terms of getting a seat on a promotion board, are also those which are the most likely to rise to the rank of CDR.

50.    However, this is over the whole 25 years and does not take into account that the "favorite denominations" as *measured* by the likelihood of being assigned to a promotion board, changed (at least the probability of assignment to a promotion board changed) in 1988 and again in 2000.

One might wonder if:

    (a) the **likelihood of selection** for promotion for the preferred or favorite denominations changed along with

    (b) their Change Point driven change in **likelihood of selection** for assignment to a promotion board.

An examination along this line would not only test the Siskin Conjecture *per se*, it would

    (a) replicate the test we just passed (at least in a split halves sense) and

    (b) it could begin to assay the sensitivity of the correlation underpinning the Conjecture.

51.   Table 2 presents the data for the first period, 1977-1987.

**Table2.**
Testing the Siskin Conjecture
Promotions to Commander 1977-1987
Denominations on Selection Panels ↓

| Faith Group Cluster    → | Roman Catholic | Liturgical Protestant | Non-Liturgical Protestant | Special Worship |
|---|---|---|---|---|
| Tier I - 100% | RC (59) | PUSA (29)* | | |
| Tier II - 25 to40% | | ELCA (16) UM (12) | SB (18) | |
| Tier III - 7 to15% | | AME (7) EPIS (7) | ABC (7) CC/DC (4) | ORTH (3) SDA (2)  J (2) |
| Tier IV - 0 - 5% | Others (0) | CRC (1) CME (0) 40 Others(0-2) | BGC (0) N (3) 63Others (0-2) | LDS (0) CS (0) 11 Others (0) |

Number of Candidates Considered/Selected and Percent Selected ↓ (including Above Zone Selections)

| Faith Group Cluster    → | Roman Catholic | Liturgical Protestant | Non-Liturgical Protestant | Special Worship |
|---|---|---|---|---|
| Tier I - 100% | 120/103    86% | 14/11    79% | | |
| Tier II - 25 to 40% | | 42/31    74% | 71/56    79% | |
| Tier III - 7 to15% | | 11/11    100% | 27/21    78% | 7/4    57% |
| Tier IV - 0 - 5% | | 41/36    87% | 34/16    47% | 4/3    75% |

*Along with two Catholics, one Presbyterian Church of the USA (PUSA) was on 100% of these promotion boards.
Data for 1981 to 1987 from Precepts produced by USN; 1977-1980 estimated from Chaplains' History, Halley 1993.

**Conclusion 4:** The Siskin Conjecture is confirmed (and replicated with different data[16]).

•     Tier I, the denominations which are most likely to be assigned to a promotion board in the
      1977-1987 period (Roman Catholic and Presbyterian USA), are also the denominations
      which are the most likely to be promoted. [Binomial test for 114 selections out of 134
      considers for Tier I vs 178 selections out of 237 considers for all other Tiers, has z = 2.4
      standard deviations, p<.05.]

_____

      [16]  Virtually all the *selections* in Table 2 were also included in the data in paragraph 48,
but the counts of *considered* here in Table 2 are based on the Precepts and Navy flow points, not
mere presence on the ADL list at some time in the decade. (cf the missing candidates - Appx F.)

- Tier II denominations fare better than the denominations which are even less likely to be assigned to a promotion board (although one has to combine the small samples in the Tier III and Tier IV categories to "see" this advantage, and even though consistent with the hypothesis, the difference is not statistically significant. There are 87 selections out of 113 considers for Tier II and 91 out of 124 for Tier III + Tier IV; $z = 0.64$.)

- Tier IV for the Non-Liturgicals fares worst in terms of appearance on a promotion board, and also worst (as predicted) in terms of promotion to CDR - suffering pressure from the incipient quota. This difference is statistically significant $p < .001$ @ 3.6 std devs, testing the binomial: 16 selections out of 34 considers for NL Group IV vs 266 selections out of 337 considers for all others.

52. Table 3 presents the data for the second period, 1988-1999.

53. For Table 3, I aligned the "favorite denominations" with the denominational assignment incidence data for this second time period, after the first Change Point, but one could also stay with the pattern which was "established" from the whole time period.

After all, the issue in any given instance is not the presence or not of any particular denomination on that board, but rather the overall likelihood of each denomination's having a chance to be on a selection board.

**Table 3.**
Testing the Siskin Conjecture
Promotions to Commander 1988-1999
Denominations on Selection Panels ↓

| Faith Group Cluster → | Roman Catholic | Liturgical Protestant | Non-Liturgical Protestant | Special Worship |
|---|---|---|---|---|
| Tier I - 100% | RC (35) | | | |
| Tier II - 25 to 40% | | PUSA (11) ELCA (13) UM (8) | SB (17) | |
| Tier III - 7 to 15% | | LMS (12) UCC (7) RCA (7) | CC/DC (6) NBCUS (5) PNBC (5) BGC (5) | SDA (6) J (4) |
| Tier IV - 0 - 5% | Others (0) | CRC (2) ECCA (0) CME (2) 38 Others(0-2) | ABC (3) GARB (2) CGIC (3) 60 Others (0-2) | LDS (1) ORTH (0) CS (1) 10 Others (0) |

Table 3. (1988-1999) continued
Number of Candidates Considered/Selected and Percent Selected ↓ (In Zone Selections only )

| Faith Group Cluster → | Roman Catholic | Liturgical Protestant | Non-Liturgical Protestant | Special Worship |
|---|---|---|---|---|
| Tier I - 100% | 64/40      62% | | | |
| Tier II - 25 to40% | | 74/41      55% | 42/26      62% | |
| Tier III - 7 to15% | | 19/11      58% | 18/10      56% | 15/8      53% |
| Tier IV - 0 - 5% | | 28/15      54% | 60/31      52% | 11/6      55% |

Data from Kagle Declaration (2006) and Appendix 3 to Siskin (2005) report.

54.   The data for this time period are consistent with the hypotheses: (a) Tier I fares better than Tier II; (b) Non-Liturgicals lose more proportionately as the Tiers increase than do the Liturgicals (as predicted by quota pressure).  However, only some of the differences here are statistically significant , notably Tier I vs Tier IV, and Tier II vs Tier IV for Non-Liturgicals.

**Conclusion 5:** Overall, the Siskin Conjecture is confirmed in principle again, as is the effect of the quota pressure on the "late Tier" Non-Liturgicals.

55.   Table 4 finishes this look at what happened to CDR promotions as the staffing pattern for selection boards changed with the Change Points.

**Table4.**
Testing the Siskin Conjecture
Promotions to Commander 2000-2002
Denominations on Selection Panels ↓

| Faith Group Cluster → | Roman Catholic | Liturgical Protestant | Non-Liturgical Protestant | Special Worship |
|---|---|---|---|---|
| Tier I - 100% | RC (8) | | | |
| Tier II - 25 to40% | | | | |
| Tier III - 7 to15% | | PUSA (3) UCC (3) PCA (2) | SB (2) ABC (2) AGC (2) ECCA (2) | SDA (3) LDS (3) |
| Tier IV - 0 - 5% | Others (0) | 44 Others(0-1) | 64 Others (0-1) | Others (0) |

Table 4. (2000-2002) continued
Number of Candidates Considered/Selected and Percent Selected ↓ (In Zone Selections only )

| Faith Group Cluster → | Roman Catholic | Liturgical Protestant | Non-Liturgical Protestant | Special Worship |
|---|---|---|---|---|
| Tier I - 100% | 32/15    47% | | | |
| Tier II - 25 to40% | | | | |
| Tier III - 7 to15% | | 12/7    58% | 29/13    45% | 3/1    33% |
| Tier IV - 0 - 5% | | 26/11    42% | 32/12    38% | 7/3    43% |

Data from Appendix 3 to Siskin (2006) report.

56.   Table 2 dealt with the "two Catholics on every Board" period; Table 3 applied to the change to one Catholic and one line officer (as well as the imposition of quotas); Table 4 turns to the recent shift to (a) two line officers and (b) a broader range of denominations.

The data in the various cells in Table 4 do not differ from each other, statistically.  But, if the sample sizes were larger, one might be able to conclude that:

•       Catholics were still being given too many board seats (100%),
and
•       Tier IV Non-Liturgicals were still receiving too few promotions (38%).

57.   Finding no statistical significance is not a "failure" to confirm the Siskin Conjecture, rather it is what the conjecture would predict, in this time period.  In this time period, 2000 to 2002, there is (**by design and intention**) supposed to be no statistically significant difference in the likelihood of any denomination's appearing on a selection panel,  so *if that were true*, the conjecture would predict no significant differences in promotion rates.

c.   Interim Summary

58.   The data in paragraph 48 verified the validity of the Siskin Conjecture with respect to selection panels considering candidates for promotion to Commander.  That paragraph used the overall profile of denominational

**A Caution**: One should not assume that just because "things" seem to be working smoothly *now*, they will continue to do so.

Although the promotion board actions *seem* to have risen above denominational prejudice - under the current board staffing regimen,

(1) The current system rests on the shifty foundation of promotion consideration based on results from the continuation in service boards, 2-FOS decisions, and Indef Ext Bd decisions;  if the denominational bias in those processes is not corrected, no long lasting equity or parity can be achieved.  (See Appendix F.)

(2) Whatever the Navy is allowed to do "on its own" (to mitigate litigation complication, cf Change Points) it may undo voluntarily once vigilance is distracted.

Regularization should be ordered now, so that it may be assured in the future.

preferences in selection panels in the U.S. Navy Chaplain Corps from 1977 to 2002 to form cohorts of denominations which were "similarly likely" to have one of their own assigned to a promotion panel.  The evidence was clear and statistically significant well beyond three standard deviations.

 Dr. Siskin was right in this instance:

> The likelihood of a candidate's being selected by a board *is* correlated to the likelihood that the board contains a panel member with the same denomination as the candidate.

59.  Tables 2, 3 and 4 analyzed the data for Commander promotion boards across the time periods, 1977-1987, 1988-1999, and 2000-2002.  The pattern of results showed that (a) as the composition of the selection panels changed (reducing the exaggerated preference for some few denominations on selection panels), (b) the distortions in the likelihood of promotion reduced - exactly to the degree, and among the denominations, that the conjecture forecast.

> At least with respect to promotion to Commander, prejudiced patterns in selection board staffing led to, leads to, parallel prejudices in the decisions made by those boards.

d.   What about other kinds of selection panels?

Involuntary Retirement via SER Board decision

|  |  | Percent lost to SER* |
|---|---|---|
| The Navy's Explicit Favorites: |  |  |
| Tier I   Roman Catholic | | 1.72 % |
| | - a faith group cluster composed of one denomination | |
| | - There was at least one Roman Catholic on every SER Panel | |
| Tier II   SB,  ELCA, UM , LMS, NBCUS, BGC, CC(DC)  & SDA | | 6.29 % |
| | - Significant representation on Promotion boards | |
| | - Representation on at least one SER Board | |
| Tier III  EC, AME, PUSA, ABC, UCC, PNBC, RCA, etc | | 3.43 % |
| | - Significant representation on Promotion boards | |
| | - NO representation of SER Boards | |
| Tier IV CGIC, CR, ORTH, CHCCC, N, PCA, etc. | | 8.70 % |
| | - Minimal or no participation on Promotion Boards | |
| | - NO representation on SER Boards | |

\* Based on data in Grayson (2005) Declaration compared to CDR inventory in Chaplains History (Halley 1993)

60.  Of course, when making a SER decision, one selects the chaplains who do *not* match the template; one should not be surprised when the closest match (the Catholics) lose the fewest chaplains and the most distant match (the denominations who are so undervalued that they are "never" given a seat on any selection board) lose the most chaplains - proportionately 5 times as many as the most favored denomination.  [This is statistically significant, p <.001.]

**Conclusion 6:**  The Siskin Conjecture is confirmed in the context of SER decisions.

The process underlying the Siskin Conjecture is appropriately asymmetric when the selection decision is an adverse action.   Denominations with the greatest likelihood of being assigned to a selection board, lose the fewest chaplains and the denominations with the least presence on selection boards lose the most chaplains.

<u>Accessions</u>

61.  The new "old" data (paragraph 4 above) contain records for virtually all the candidates considered for accession into the Chaplain Corps between 1985 and 2005.  This included  nearly 1000 applicants for admission into the Chaplain Corps Officer Program (akin to an ROTC program for seminary students).   Because these are candidates who were located (and perhaps encouraged or discouraged) by recruiters who had both quotas and incentives for meeting those quotas, this population was pre-screened; they were all qualified.

62.  Even so, they were screened again, by the C/A/R/E Advisory Group and some (but not all) of them were recommended to the Chief of Chaplains

63.  We have membership information for the C/A/R/E Advisory Group for five years.  We can identify each Chaplain member's denomination in the Chaplain Corps History volume, and these can be compared to the "favorite" denominations as expressed by selection board membership.

| The Navy's Explicit C/A/R/E Board Favorites: | Percent Recommended for Accession* |
|---|---|
| Tier I   Roman Catholic | 96.40% |
|    - a faith group cluster composed of one denomination | |
|    - There was at least one Roman Catholic on every Promotion Panel | |
|    - There was at least one Roman Catholic on every SER Panel | |
|    - There was at least one Roman Catholic on most CARE Panels | |
| | |
| Tier II   SB,  ELCA, UM , LMS, NBCUS, BGC, ABC, CS  & SDA | 85.45 % |
|    - Significant representation on CARE Advisory Group | |
| | |
| Tier III  EC, AME, NBCUS, PNBC, RCA, etc | 79.71 % |
|    - Minimal or No representation of CARE Advisory Group | |

* Data from Navy's electronic data base, 27 July 2006

Additions to the Active Duty List (*aeda*)

64.   The new "old" data also contained requests from some 2,000 chaplains seeking assignment to active duty (*aeda*) .  These applications, like those for participation in the Student Program, were reviewed by the C/A/R/E Advisory Group.

| The Navy's Explicit C/A/R/E Board Favorites: | Percent Recommended to Active Duty* |
|---|---|
| Tier I   Roman Catholic | |
| - a faith group cluster composed of one denomination | 93.89% |
| - There was at least one Roman Catholic on every PromotionPanel | |
| - There was at least one Roman Catholic on every SER Panel | |
| - There was at least one Roman Catholic on most CARE Panels | |
| | |
| Tier II   SB,  ELCA, UM , LMS, NBCUS, BGC, ABC, CS  & SDA | 72.26 % |
| - Significant representation on CARE Advisory Group | |
| | |
| Tier III  EC, AME, NBCUS, PNBC, RCA, etc | 62.48 % |
| - Minimal or No representation of CARE Advisory Group | |

* Data from Navy's electronic data base, 27 July 2006

## Summary Conclusions I

65.   **Conclusion 7:** These patterns are all statistically significant well beyond one chance in several million - in the region of seven standard deviations.  There can be "no statistical doubt" that the selection boards are picking "people like us" to add to the Corps, and rejecting "people who are different".  And since the only differentiating dimension visible in the records is denomination, it follows that this is religious discrimination.  It may be unwitting on the part of the individual chaplain board members, it may even be unwitting on the part of the subordinate assignment officer who decided whom to suggest for a role on the selection panels, but it was not *institutionally* innocent and it cannot be unwitting to defend it in the face of this data.

66.   **Conclusion 8:** The <u>moment of intent</u> is memorialized in the Navy's pleadings in this matter. In their "Reply in Support of their Cross Motion to Dismiss, or in the Alternative for Partial Summary Judgment" (Adair, 8/11/2006), Defendants describe the stream of logic and the reason for their selection of a pattern of faith group clusters on personnel selection boards: (1) faith group cluster is one of the factors used in assigning chaplains to duty locations, (2) a chaplain's efficiency report will reflect differences due to duty assignments, (3) placing chaplains with a mix of experience on promotion boards the Navy "expects" ... "at least one member ..to understand the manner in which each faith group category was logistically managed and how the differences in utilization, administration and deployment may inform board evaluations of chaplain fitness reports" (p. 4.)

67.   The Navy put this *mix* of Chaplains on the selection boards with the intention of influencing the board's recommendations.

The *mix* was *chosen*:

(a) at least one Catholic was assigned to every promotion board,

(b) at least one Liturgical Chaplain was assigned to every promotion board, and

(c) when one looks at the underlined denominations that were *chosen* to "represent" the Liturgical and the Non-Liturgical faith group clusters, the pattern there:

    (1) is biased, i.e. it has *de jure* favorites; and it

    (2) matches the pattern of denominations who benefitted from the Boards' actions.

    (3) The denominations that are never assigned to selection panels (or virtually never assigned) are the same denominations that are:

        (i) under-promoted vis a vis their peers,
        (ii) forced into involuntary retirement most often,
        (iii) under accessioned and
        (iv) shunned from active duty by the operation of quotas.

68.   Defendants declare an FY2003 shift from (a) staffing promotion boards with five chaplains and two non-chaplains to (b) now staffing promotion boards with two chaplains and five non-chaplains [see Notice of Motion ( 2/28/05 Wilkins)].  Defendants argue that this shift is not an admission that the former policy was flawed.  They aver that the change is an exercise of military discretion - and admit that the pattern of faith group clusters used in 1985 to 2002 was also a military judgment - i.e. an *intention*.

**Epilogue**

69.  We do not have any data that tell us what the denominational participation was in CADRAG (the continuation in service) boards, but IF, i.e., *if*, the pattern of preference there was like the pattern on promotion boards, and SER boards, and C/A/R/E boards, then we know:

•      something interesting about the Continuation in Service Boards and

•      something important about some chaplains who have been missing from (missing out on) consideration for promotion.

70.   First, about four weeks ago I have received a copy of a FOIA response provided by the Department of the Navy to Mr. Laurence W. Jones, on or about October 3, 2002.

71.   I received this data from Mr. Schulcz, attorney for the Plaintiffs.  I do not know who Mr. Jones is, nor what his relationship is or may be with respect to this case.  I was given this data because after noticing that some old data from the C/A/R/E Advisory Group for 1981 dealt with "Indefinite Extension", I asked Mr. Schulcz if he had anything else that dealt with this sort of decision.

a.   The "Extension/Continuation in Service" process.

72.   After a newly accessioned Naval Officer has served on active duty for nearing three years, the first "re-up" window occurs.   He (or she) is asked if they wish to continue in Active Duty Service.

73.   In the Chaplain Corps most serving chaplains (but not all of them) opt to be considered for extension, and most of those who request an additional tour of active duty (but not all of them) are recommended for further service.

74.   These two decisions:

(1) the individual Chaplain's decision to ask for continuation, and
(2) the Navy's decision on whether to extend that Chaplain's service,

interact to impact the denominational mix of the Corps as experience levels increase.

75.   Whatever self-selection or filtering which may be taking place at this juncture, its compound effect may explain (a) the disproportionate loss of Non-Liturgical candidates for "consideration" for promotion to LCDR, CDR and CAPT[17] and (b) it may comment upon the pattern of denominational preferences within the Chaplain Corps.

---

[17]   When the Navy publishes promotion statistics the reports are based on the number of promotions with respect to the number of candidates who are considered.  "Considered" in this context has a term of art quality.  First, a candidate is only "considered" if his or her name is put on the list, and it only counts as a consider on the first occasion it is there.  A candidate who is not selected on his first opportunity is said to be FOS (Failed of Selection), and if he is FOS two times for the same rank up to an including CDR, he *may* be "selected out" by the CADRAG, or a CARE or Indefinite Extension board.  On the other hand, if such a candidate is not selected out, he remains on the promotion list and may be selected for promotion - which has the effect of re-starting the FOS count.  The first time I looked at the Navy's promotion data I wondered why the number of "considers" at each higher rank showed a "faith group cluster" effect that seemed to evidence "missing" (Non-Liturgical) candidates as rank increased.  The answer may be here. [See further in Appendix F.]

b.  The Data

76.  The FOIA data are neither as "tidy" nor as complete as one might hope.

•        They deal with a limited sampling of time periods, 1987, 88, 89, 90, 92 and then 1996.

•        The data from each end of this period (i.e.1987 and 1992 &1996) are not useful.

     •        The data for 1987 is illegible and
     •        The data for 1992 and 1996 do not show what decision was made.
     •        Only the data for 1990 lists the eligibles who did not request continuation.

77.  Even so, we can glean some statistically significant information from this data.

78.  The inferences therefrom can support other findings or encourage further discovery.

79.  Appendix DF is a copy of the FOIA response.  Appendix DB is a database transcribed from the FOIA response.  The database provides one line for every name listed in the FOIA response, for 1988 to 1990.  I captured the denomination associated with each Chaplain in the FOIA lists, and I recorded the decision.  I captured the Chaplain's name only for  chaplains who were (a) not selected,  (b) whose decisions were changed by the approving authority (the Chief of Chaplains?), or (c) for the six chaplains who were noted in the May 1990 list as eligible for continuance who did not request consideration.

80.  I used the Chaplains History Volume X (Halley 1993) to verify each chaplain's denomination and to "look up" what happened to the chaplains whose names I recorded - i.e. the rejected, the "changed" and the six who chose not to continue.

c.  Results

81.  The data cover CADRAG decisions made concerning 246 chaplains who were both (a) eligible for and (b) requested to be considered for, extension (or continuance) on active duty. In order to analyze the CADRAG board's decisions in light of the Siskin Conjecture, we need some basis for "cohorting" the denominations, but we have no direct information on the denominational make up of the CADRAG boards.

82.  **Conclusion 9:** Instead of defaulting to the Navy's (I) Roman Catholic, (II) Liturgical Protestant, (III) Non-Liturgical Protestant and (IV) Special Worship Group[18], I  looked at which denominations the Navy assigned to its other selection Boards (promotion Boards, SER Boards and C/A/R/E Boards) and I let that distribution define the *de jure* preference pattern:

---

[18] This would be tantamount to assuming a "level playing field" on a faith group cluster basis, a circumstance at clear variance with the data in Appendix A for this time period.

Tier I   The denomination(s) which is/are assigned to all or to virtually all selection Boards.

> This is Roman Catholics, and there is no "close second".

Tier II   The denominations which are frequently assigned to a Selection Board, but not "always" assigned or even almost always assigned.

| | |
|---|---|
| This is SB | (They are on about half as many boards as the Catholics) |
| ELCA | (They are on about 1/3 as many boards as the Catholics) |
| PUSA | (They are on about 1/3 as many boards as the Catholics) |
| and  UM | (They are on about 1/3 as many boards as the Catholics) |

Tier III All other denominations.

83.   In the earlier (pre-epilogue) analyses in this declaration, I break this third tier into two subgroups: IIIa which is those denominations who have had more than incidental presence on some selection boards and IIIb, those denominations who have never had a seat on a selection board, or almost never.  I also explore the possibility that the "favorites" may change over time, or from context to context.  In the present instance, however, we do not know who was on these CADRAG boards, and we only have 246 decisions to parse, so I will simply use this generalized, operationally defined, sequence of favorites.

84.   Table 5 presents the CADRAG decisions cohorted according to the *de jure* favorite denominations defined above (see Conclusion 9, ¶ 82 and Appendix A and B).

**Table 5**
Probability of Selection for Continuation in Service
Candidate Denominations Tiered

| Faith Cluster | Number Considered | Number Selected | Number Rejected | Percent Continued | Percent Rejected |
|---|---|---|---|---|---|
| Tier I | 46 | 43 | 0 | 100% | 0% |
| Tier II | 85 | 69 | 8 | 89.6% | 9.4% |
| Tier III | 115 | 86 | 18 | 82.7% | 15.7% |
| Total | 246 | 198 | 26 | 88.6% | 10.3% |

* Number Considered includes selected + rejected + alternates.

85.   The pattern of results in Table 5(even without considering the fact that the Siskin Conjecture predicts an ordering from Tier I to Tier III) is statistically significant (using a Chi Square statistic) at p<.001 (more than three standard deviations.)  Chance alone cannot account for this preference among these "favorite-denomination" based clusters.

86.   This pattern is also consistent with the results from the 1981 C/A/R/E board mentioned earlier. In 1981 and 1982 the C/A/R/E Board undertook a "continuation" consideration for 27 chaplains.  Twelve of these chaplains were Roman Catholic; ten were continued.  Of the remaining 15 chaplains, only 3 were continued.

87.   It is clear, based on this analysis of the FOIA data and corroborated by the analysis of the 1981-82 C/A/R/E Advisory Group continuation considerations:

•       **Conclusion 10:** The Siskin Conjecture (using the *de jure* favorites) is verified in the CADRAG context,

and

•       **Conclusion 11:** There is denominational preference at work in the Corps' decision about which denominations to allow to continue on Active Duty.

88.   **Conclusion 12:** Catholics, as usual, are preferred over everybody else, and the second favorite denominations (three Liturgical [ELCA, PUSA, and UM] and one Non-Liturgical [SB]) are preferred over all the others.  **Conclusion 13:** This alone could account for the loss of "considers" as the promotion board lists are prepared for LCDR, CDR and CAPT. [See Appendix F.]

d.   Anecdotal Support for this systematic Denominational Preference within CADRAG

89.   In the roughly 250 decisions which the CADRAG issued, four were overruled by the approving authority, and one of the chaplains who had not asked to be considered for a continuation seems to have been enticed into staying.

90.   Of the four CADRAG decisions which the Chief of Chaplains reversed, three were for Roman Catholics that the CADRAG had recommended to Inactive Duty.

Ronald Chiasson had been recommended for RAD[19];
        the CoC asked that he be extended until 1994.
        Ref 1 indicates that Chiasson was RAD 10/90.

Leslie Colaco had been recommended for RAD;
        the CoC asked that he be extended to age 60.
        Ref 1 indicates a tour in Japan 90-92, followed by one in Iceland.

_____

[19]   RAD stands for "Released from Active Duty".  This may be, as here, an "adverse action" imposed by the CADRAG Board and approved by the Chief of Chaplains, or it may be a neutral administrative implementation following upon the affected Chaplain's desire to leave Active Duty when his (or her) tour is finished.

Stanley Czarnota had been recommended for RAD;
> the CoC asked that he be extended.
> Ref 1 indicates a tour in Maine 90-93 followed by one in Great Lakes.

91.   One decision for an Alternate was changed to an "out".

CADRAG had recommended:

> Lyrice Marsh, a CFGC, for alternate status
> > (in case the end strength allowance provided a billet);
> > the CoC changed this.  Ref 1 indicates Marsh was RAD 9/89.

92.   These four CoC interventions favored a Catholic chaplain on three occasions, and disadvantaged a CFGC on the remaining occasion.  **Conclusion 14:** Because this is on the close margin of statistically significant[20] one may accept the anecdotal evidence as supportive of both institutional and management (the Chief of Chaplains) pro Catholic and anti CFGC bias.

93.   Finally, it may be interesting to note that of the six chaplains who (we know) were eligible for continuance but who are not recorded here as having requested it, one "changed his mind" or was "enticed" by an attractive assignment.

> Rabbi Jon Cutler was listed in the FOIA documents as not having asked for consideration
> > for continuance.
> > Ref 1 indicates that he stayed for one more tour, in Okinawa.

e.   Revisiting "What Happened to all the Non-Liturgicals?"

94.   The FOIA data indicate that chaplains can be "lost" from Active Duty in the Corps "voluntarily" as well as involuntarily.  They can be lost voluntarily via not requesting continuation.  They can be lost involuntarily by having their requests for continuation denied.

95.   When one looks at the Chaplains History (Halley, 1993) to see if there is any visible distinction between those chaplains lost from further consideration because they did not volunteer for extension when it was available (the other five chaplains we know about in the FOIA records) and those who wanted to stay and were rejected, we see that both are coded "RAD", released from active duty.  The Chaplains History cannot help us differentiate withdrawals from rejections.

---

[20]   Following the logic Dr. Siskin used for his coin tossing stranger, here we have the Chief of Chaplains overruling the CADRAG board four times - each time in a direction which is consistent with preference for Catholics or against CFGC.  In a one tailed test, the statistical likelihood of this set of outcomes is 1/16, which, at 6%, is close to the 5% associated with two standard deviations beyond chance expectation.

96.   But, in conjunction with the FOIA data we can make some relevant inferences:

•       Since CADRAG (and subsequent CoC direction/intervention) suggests that virtually all Catholics who want to extend their tours will be approved, one might make the assumption that most of the "early (Catholic) losses" evidenced in the Chaplains History are voluntary.

        Catholics lose nearly 9 times as many chaplains in their first year (5.1%) as do Non-Baptist, Non-Liturgicals (0.6%).[21]

•       Since CADRAG (and subsequent CoC action) suggests that Non-Baptist, Non-Liturgical chaplains are least likely (Tier III) to be continued in the service when they want to stay, one might make the assumption that most of the late losses (those on the threshold of consideration for CDR, for example) are rejections rather than voluntary withdrawals.

        Catholics lose 3.1% of their chaplains during the 3 years following entrance into the CDR zone; Non-Baptist Non-Liturgicals lose 11.7% during these three years.[22]

97.   I believe that it has been disingenuous in the extreme for Defendants to feign skepticism in the past when I have opined that *some* underlying Chaplain Corps practice has been removing Non-Liturgicals from the pool of those to be considered for promotion.  The Navy is full well aware of the operation of its Continuance in Service Boards and has avoided providing the Court (or the Plaintiffs) with any information concerning these actions.

98.   The inferences drawn in the two bullet points above (in paragraph 96) could be verified very easily (or in the alternative, dispelled) by reference to Navy records.

99.   **Conclusion 15:**  It is my opinion that the data demonstrate that Non-Liturgical, Non-Baptist candidates were being systematically deprived of the opportunity to be considered for promotion to Commander.  The mechanism for this deprivation was the CADRAG board; the cause was the pattern of denominational staffing on that board, as expressed through the operation of "like, likes, like" or the Siskin Conjecture.

**Summary Conclusions II**

100.   The Siskin Conjecture is verified -

        putting some denominations on selection boards, and leaving others off,  correlates to the outcome that candidates from those denominations experience before those boards, in

_____

[21]   See Table K-7 in my Compendium.

[22]   See Table K-8 in my Compendium.

every known context: Promotion Boards, SER Boards, C/A/R/E Boards and even the
CADRAG Boards (because the *de jure* denominations in the other boards predict the
results of the CADRAG boards).

This outcome may be the result of relational demographics operating through a generic "ideal" (a
la the Siskin Conjecture or the Weinberger Assertion), affinity considerations (a la "like, likes,
like"), some sort of "old boys" network working its will within the Chaplain Corps, any
combination of the above - or, in fact, all of the above.

Which denominations are placed on the Chaplain selection boards matters!

**Certification and Oath**

101.   I certify under the penalties of perjury, (a)  that this is my work, (b) that I am competent to
analyze this data, and (c) that the conclusions represented here are mine, true, complete, accurate
and scientifically certain to the best of my knowledge and belief.

/S/ Harald R. Leuba            12/1/06
Harald R. Leuba, PhD        1 December 2006
Potomac,    Maryland                      USA

**References:**

Gastwirth, Joseph L. (1984) <u>Statistical Methods for Analyzing Claims of Employment Discrimination</u>, *Industrial and Labor Relations Review*, Vol 38, No. 1 (October 1984) Cornell University 0019-7939/84/3801

Gastwirth. Joseph L., (2000)  <u>Statistical Science in the Courtroom</u>, Springer, New York, 2000.

Grayson, Kristy L. (2005) Declaration, Attachment 3, Wilkins v United States of America, United States District Court, for the Southern District of California, Case Number 99cv1579. Exhibit 5

Halley, Michael D. Editor, (1993)  <u>United States Navy Chaplains 1982-1991: Biographical and Service Record Sketches of Chaplains on Active Duty During the Period I January 1982 - 21 December 1991</u>  Volume X in the History of the Chaplain Corps United States Navy, Chaplain Resource Board, Norfolk, Virginia, June 1993.

Hart, Melissa (2005) "Subjective Decision Making and Unconscious Discrimination", *Alabama Law Review*, Vol. 56:3:741

Hyde, Michael (2005) "Material facts as to which there is no genuine issue", Wilkins v United States of America, United States District Court, for the Southern District of California, Case Number 99cv1579.

Hyde, Michael and Hall, Christopher, (2006) "Defendants' Reply in Support of Their Cross Motion to Dismiss, or in the Alternative for Partial Summary Judgment", in Chaplaincy of Full Gospel Churches v. The Honorable Donald C. Winter consolidated with Adair v The Honorable Donald C. Winter, United States District Court for the District of Columbia, Case 1:99cv-02945-RMU-JMF Document 231, August 11, 2006.

Kagle, Kilian (2006) "Declaration", in Chaplaincy of Full Gospel Churches v. The Honorable Donald C. Winter consolidated with Adair v The Honorable Donald C. Winter, United States District Court for the District of Columbia, Case 1:99cv-02945-RMU, Defendants' Exhibit 8, 24 May 2006.

Krieger, Linda Hamilton (1995) "The Content of Our Categories: A Cognitive Bias Approach to Discrimination and Equal Employment Opportunity", Stanford Law Review, Vol. 47:1161

Leuba, Harald R., (2005a)  <u>Declaration: The Question of Denominational Preference in U.S. Navy Chaplain Corps' Accessions</u>, United States District Court for the District of  Columbia, Case No. 02CV02005  in the matter of Rev. Charles E. Larsen, et al., v The United States Navy, et al. 3 October 2005.

Leuba, Harald R., (2005b) Appendage Declaration: The Question of Denominational Preference in U.S. Navy Chaplain Corps' Accessions: An Extension to a prior Statistical Examination, United States District Court for the District of Columbia, Case No. 02CV02005 in the matter of Rev. Charles E. Larsen, et al., v The United States Navy, et al. 24 November 2005.

Leuba, Harald R., (2006a) Allonge Declaration, United States District Court for the District of Columbia, Case No. 02CV002945 (RMU) in the matter of Chaplaincy of Full Gospel Churches v. the Hon Gordon R. England, et al 14 February 2006.

Leuba, Harald R., (2006b)  Declaration Withdrawal and Correction, in the United States District Court for the District of Columbia,  Case No. 02CV02005 in the matter of Rev. Charles E. Larsen, et al., v The United States Navy, et al. 27 September 2006.

Martin, H. Lawrence, (1982) Editor United States Navy Chaplains 1972-1981: Biographical and Service Record Sketches of Chaplains on Active Duty During the Period 1 January 1972 - 31 December 1981  Volume VIII in the History of the Chaplain Corps United States Navy, NavPers 15507, Navy Publications and Forms Center, Philadelphia, PA.

McCreary, Stanley H., (1992) A Study of Faith Group Affiliation and Promotions to Captain and Commander in the U.S. Navy Chaplain Corps, A dissertation submitted to the United States International University, San Diego, California.

Morris, Scott B. and Russell Lobsenz (1998)  Significance Tests and Confidence Intervals for the Adverse Impact Ratio. 13th Annual Conference for the Society for Industrial and Organizational Psychology, Dallas, Texas. April.

Muchow, D.K., Deputy Chief of Chaplains. (1986)  "Note concerning FY87 Accession Goals" Document DA 7359 Copy attached to Reference Leuba, October 2005.

OFCCP Compliance Manual - Chapter 7 (11/13/2005) - *Identification & Remedy of Employment Discrimination*. U.S. Department of Labor, Employment Standards Administration, Office of Federal Contract Compliance Programs. http://www.dol.gov/esa/regs/compliance/pfccp/how2/ofcpch7.htm.

OPNAV Instruction 1120.9, (2005) Appointment of Officers in the Chaplain Corps of the Navy, 20 December 2005.  (Available on line at Http://dodssp.daps.mil/Directives/1120_9.pdf) and SECNAV See also: Instruction 1120.4A, the predecessor guidance.

Oyer, Paul & Scott Schaefer (2002) Sorting, Quotas, and the Civil Rights Act of 1991: Who Hires When it's Hard to Fire?, *Journal of Law and Economics*, Vol XLV (April).

Peterson, David W. and John M. Conley (2001) "Of Cherries, Fudge, and Onions: Science and its Courtroom Perversion"  *Law and Contemporary Problems*, Vol 64: No 4.

Sacco, Joshua M.; Scheau, Christine R.; Ryan, Ann Marie & Schmitt, et al. (2003a)  An Investigation of Race and Sex Similarity Effects in Interviews: A multilevel Approach to Relational Demography, paper presented at 15th Annual Conference for the Society for Industrial and Organizational Psychology, New Orleans, Louisiana. July 2000, published in 2003: *Journal of Applied Psychology*, Vol. 88. No. 5. 822-86 5.  Available on line (11/25/2006): http://iopsych.msu.edu/Schmitt/interviewer%20similarity.doc.

Sacco, Joshua, & Neal Schmitt (2003b) A multilevel longitudinal study of demographic misfit and diversity effects on turnover and profitability, paper presented at the 18th annual SIOP conference in Orlando, Florida, May.

Siskin, Bernard R. (2005)  "Declaration" in Larsen v. U.S. Navy, District Court for the District of Columbia, Case No. 02 CV 02005, 21 December 2005.

Siskin, Bernard R. (2006) "Statistical Analysis of Promotions and Early Retirement Selections in the United States Navy Chaplain Corps" in the matter of Chaplaincy of Full Gospel Churches v. the Hon Gordon R. England, et al in United States District Court for the District of Columbia, Case No. 02CV002945 (RMU) May 2006.

Smith, Karen D., Ivanovich, John S. & Reese, David L. (2000)  "Promotions in the Navy Chaplain Corps", Center for Naval Analysis, Alexandria, VA,10 March 2000.  CRM D0000149.A1/SR1.

Seidel, Marc-David L. (2000)  Friends in High Places: The Effects of Social Networks on Discrimination in Salary Negotiations, *Administrative Science Quarterly*, June.  On line (10/18/2006) http://www.findarticles.com/p/articles/ml_m4035/is_2_45/al_64705571/print

Washington Post, Military Faith Groups and Chaplains, Tuesday 30 August 2005

**Appendix A**
Denominational Preferences on Chaplain Corps Selection Boards

A1    In its pleadings in this matter, the Navy's advocates have repeatedly represented:

"The Navy composed its selection boards, from approximately FY 1988 through FY 2002, such that the faith group category mix on the board, like the composition of the Chaplain Corps generally, reflected to the extent possible each of the faith group categories, in compliance with SECNAVINST 1401.3 ¶¶ 4(a) and 5." [23]

A2    This statement is misleading, and it may even be intentionally deceptive.

A3    This statement is misleading because it posits that "faith group category" is somehow the measure of composition of the "Corps generally" which is to be "reflected" in the selection boards.

A4    However:  first, if one looks at the "faith group categories" through the prism of this litigation, then both the social science concept of stereotyping[24] and the Supreme Court's *presumption of invidious intent*[25] argue that the faith group cluster "system" is a pretext for

---

[23] See e.g., 1:99-cv-02945-RMU-JMF Document 224 filed 05/24/06 pages 99, 100 and 101 of 109.

[24] Krieger (1995) writes "the assumption that statements reflecting stereotyped views betoken discriminatory animus makes sense if one understands discrimination as resulting from prejudice and further understands prejudice as comprising a cognitive component (stereotypes), an affective component (aversion or dislike), and a behavioral component (discrimination aimed at creating or enforcing social distance.)  If we assume (as does social psychology theory) that these components necessarily function as inseparable parts of an integrated whole, then the presence of one can be assumed to evidence the others."   And what is true of "statements" must be true of articulated policy - the faith group clusters which establish "Roman Catholic" as its own "group" and define all other denominations (very very broadly) in terms of distance from Catholic (see page 1174.)

[25] Krieger (Ibid, p 1181) cites the "presumption of invidiousness" as "first articulated by the Supreme Court in Furnco Construction Corp. V. Waters.  The Court in Furnco stated: "[W]e know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting.  Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, whom we generally assume acts only with *some* reason, based his decision on an impermissible consideration such as race."

And here, we infer, from the data, that that impermissible consideration is religion!

concealing Roman Catholic preference, providing beneficial terms of consideration to Roman Catholics in particular, and facilitating discriminating against a broad range of denominations who are *buried* in collections of dissimilar belief structures which are proxied (in a biased manner) with a favored set of "representatives" (namely Southern Baptist, Presbyterian Church of the USA (not the Presbyterian Church of America), the Evangelical Lutheran Church of America (moreso than the Lutheran Missouri Synod) and the United Methodists (moreso than the American Methodist Episcopals).

A5  Second, The Navy's general statement about how it composes selection boards is more than misleading; it is baldly incorrect. The SECNAVINST 1401.3 says nothing about "faith group clusters".  In fact, ¶ 4(a) says that:

> "... Exclusion from board membership by reason of gender, race, ethnic origin, or religious affiliation is prohibited."

> ¶5 says:

> "Guidance on selection board representation in this instruction is not to be used to sponsor any single interest, but is used to enhance the knowledge, experience, and understanding of each board as a whole."

A6  The Navy's pattern of staffing selection boards is not comporting with this Instruction; it is not even compliant with this Instruction; it violates it.

A7  One cannot populate selection boards, year after year for thirteen years (1988-2002), for promotions to LCDR, CDR and Captain, and *always* get at least one Catholic on every board, without considering religious affiliation - without contriving to include *one* Catholic.

A8  More than 25% of the selection board seats from 1977 to 2002 were given to a Roman Catholic - thus appearing to use the Board staffing pattern to "sponsor a single interest", in apparent violation of both the SEC NAV instructions and a Constitutional prohibition on the government's adopting a position which endorses or facilitates one pattern of religious beliefs over all others.

A9  Furthermore, one cannot  populate selection boards, year after year for thirteen years, for promotions to LCDR, CDR and Captain, choosing from more than 120 different denominations and

> •  Use just five denominations (Roman Catholic, Lutheran Church of America, Presbyterian Church, USA, Southern Baptist, and United Methodist) to fill more than 60% of all  board seats,

and

> •  never get even one chaplain from more than 80 disenfranchised denominations.

A10    Random variation or chance[26] cannot explain the Corps' manifest preferences:

(1) to include one Roman Catholic on every Selection Board,

(2) to form a *majority* on every board with Catholics plus chaplains from a favored subset of denominations (PUSA[27], LCA, UM, and SB) and

(3) to limit participation for all other denominations to either token involvement, or no involvement at all.

A11    One denomination (Roman Catholic) averages more than one seat per board - for Promotion Boards, C/A/R/E Boards, and SER Boards[28]. Four denominations (PUSA, LCA, UM, and SB) average between 3/4 and 1/3 of a seat per board. Five denominations average between 1/4 and 1/7th seats per board, while twenty seven denominations are given between a 10% chance of being on a board and no chance of serving. Eighty four other denominations have no participation in any Promotion Board - and endure more disadvantage than just exclusion.

A12    The statistical fact of bias in the Navy's choice of which denominations to place on Selection Boards is important for two reasons.

First, the pattern of preference for Roman Catholics, and to a lesser extent, for what might be called four "mainstream" denominations, signals to members of those denominations inside and outside the Navy that the Chaplain Corps is "sympathetic" to (only) those belief structures - no wonder the data show that applications for Service in the Navy Chaplain Corps are declining.

Second, as we have seen before (Leuba, Allonge 2005), and we shall see here in "the Siskin Conjecture" (in the body of this declaration), the choice of which denominations to place on the selection panels influences the decisions of those panels.

---

[26]  The odds against these patterns of bias are billions to one against. This cannot have happend by chance; it cannot have "changed" by chance; it reflects intention. Is it not a violation of both the SECNAV Instructions and a common sense reading of the U.S. Constitution?

[27]  PUSA is the Navy's code for the Presbyterian Church of the United States; ELCA is the code for the Evangelical Lutheran Church of America; UM stands for United Methodist, and SB for Southern Baptist.

[28]  Although the Navy has produced some Continuation in Service Board decisions, in response to a FOIA request (see Appendix D here). They have not produced in discovery, or in the FOIA response, any information about board composition. It seems likely, in view of the pattern across selection boards, SER boards, and C/A/R/E boards, that Catholics and the "favorite" denominations would also have a majority of the seats on the Continuation Boards.

A13    The following "pie charts", graphs and appearance tables provide a view of:

(a) exactly how biased the Navy's selection of denominations for service on its Promotion Boards has been

and

(b) they also show how this pattern has changed, in what may look like a cynical attempt to deal with "appearances" without actually addressing the core issues.

A14    This is the "two Catholic" period.  ↓



There were two Roman Catholics on every promotion Board, and two or three Liturgicals. The Catholics and the Liturgicals, combined,  had virtually all the votes.

A15    In 1987 the promotion panel staffing pattern was "voluntarily" changed, as part of a settlement. "Two Catholics" on every board was changed to one Catholic and one Line Officer.



Note that after this, change, even in "faith group cluster" terms, the *representation* was still uneven.

Liturgicals continued to be over represented - at the expense of Non Baptists and Special Worship Chaplains who remained under represented.

A16    When the current litigation began (in CY1999), and concerns were raised *again* about religious preference on Chaplain Corps Promotion Boards, the Navy broadened its representation - *somewhat*.  Line Officers became "major" participants in the process (counter-balancing or even diluting the Chaplains' influence)  and the faith groups became more evenly represented:



Note that the cohort (a) most ill treated in terms of selection by these boards, the NON-BAPTIST NON-LITURGICALS, is **still** (b) the cohort which is the most ill-treated in terms of representation (i.e. having a "slice" of the action) on these Boards.

A17    While participation "spread" on a faith group cluster basis, most <u>denominations</u> still did not benefit from the increased seating opportunities: ↓





Leuba Declaration - the Siskin Conjecture, page 37          Exhibit 7



A18    The charts above and the tables below demonstrate:

(1) The Chaplain Corps *chose* to maximize Catholic influence on its promotion boards (and in Appendix B we will see that this preference held for SER[29] Boards, and C/A/R/E Boards, and presumably CADRAG Boards. These preference patterns were not "accidental" nor the result of chance. They were intentional. Their manifest purpose was to institutionalize Roman Catholic "influence" in the personnel management matters of the U.S. Navy Chaplain Corps.

(2) When challenged (in 1986/87), the Chaplain Corps *chose* to maintain as much Roman Catholic preference and control as possible. Instead of reducing Catholic influence from 33% (when there were two Catholics on a six Chaplain board) to 16% (by having only one Catholic chaplain on a six Chaplain Board) the Navy kept Catholic influence as high as possible, at 20% of the religious vote (with one Catholic and one Line Officer on a six member board.)

(3) When confronted with the same "constitutional" argument again, in 1999, the Corps adjusted its policies to minimize the "appearance" of undue (faith group) influence, but explicitly reserved the "discretion" to assign Chaplains to Selection Boards ad lib - including ex officio membership by the Chief of Chaplains on Promotion Boards, and Community Division leaders on C/A/R/E and CADRAG boards.

A19    As we have seen before (Leuba, Compendium 2005) and report again (here, in the body of this declaration), these are "practices and policies" which directly color the decisions made by those boards.

---

[29]    SER = Selective Early Retirement Boards, C/A/R/E = Chaplain Accession and Recall Evaluation Boards; CADRAG = Chaplain Active Duty Extension Boards

# DENOMINATIONAL ASSIGNMENTS FOR LIEUTENANT COMMANDER BOARDS

| | 77 | 78 | 79 | 81 | 82 | 83 | 84 | 85 | 86 | 87 | 88 | 89 | 90 | 91 | 92 | 93 | 94 | 95 | 96 | 97 | 98 | 99 | O0 | O1 | O2 | TI Seats |
|---|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----------|
| RC | XX | XX | XX | XX | XX | XXX | XX | . | XX | XX | XX | X | . | X | X | X | X | X | X | X | X | XX | X | X | . | 37 |
| PUSA | X | X | . | . | X | XX | X | . | XX | XX | . | . | . | . | X | . | . | X | . | . | . | X | X | X | . | 16 |
| SB | . | X | X | X | . | . | X | . | X | X | X | X | . | . | . | X | XX | . | X | . | . | . | . | . | . | 14 |
| UM | X | . | . | X | X | . | . | . | . | . | X | . | X | X | X | . | . | . | X | X | . | . | . | . | . | 8 |
| ELCA | X | . | . | . | . | X | . | . | . | XX | X | . | X | . | . | . | . | . | . | X | . | . | . | . | . | 7 |
| LMS | . | . | . | . | . | . | X | X | . | . | . | . | . | X | . | X | X | . | . | XX | . | . | . | . | . | 7 |
| SDA | . | . | . | . | . | . | X | . | . | . | . | . | . | X | . | X | . | . | . | . | X | . | X | . | 5 |
| ABC | X | . | . | . | . | . | . | . | . | . | X | . | . | . | X | . | . | . | . | . | . | . | . | X | 4 |
| UCC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | XX | . | . | . | . | X | . | . | . | X | . | 4 |
| AME | . | X | . | X | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | . | . | . | . | . | . | 3 |
| DC | . | X | . | . | . | . | . | . | . | X | X | . | . | . | . | . | . | . | . | . | . | . | . | . | . | 3 |
| NBCUS | . | . | . | . | . | . | . | . | . | X | . | X | . | . | . | . | . | . | X | . | . | . | . | . | 3 |
| PNBC | . | . | . | . | . | . | . | X | . | X | . | X | . | . | . | . | . | . | . | . | . | . | . | . | . | 3 |
| BGC | . | . | . | . | . | . | . | . | . | . | . | . | X | . | X | . | . | . | . | . | . | . | . | . | 2 |
| CGIC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | X | . | . | . | 2 |
| CRC | . | . | . | . | X | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | . | . | . | 2 |
| E | . | . | X | . | . | . | . | X | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | 2 |
| J | X | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | . | . | . | 2 |
| LDS | . | . | . | . | . | . | . | . | . | . | X | . | . | . | . | . | . | . | . | . | . | . | . | X | 2 |
| AGC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | . | 1 |
| CHCCC | . | . | . | . | . | . | . | . | . | X | . | . | . | . | . | . | . | . | . | . | . | . | . | . | 1 |
| CME | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | . | . | . | 1 |
| ECCA | . | . | . | . | . | . | . | . | X | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | 1 |
| N | . | . | X | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | 1 |
| OBSC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | 1 |
| PCA | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | 1 |
| PHC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | . | . | 1 |
| **RCA** | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | . | . | . | . | . | . | . | . | 1 |
| 93 Other Denominations | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | 0 |

## DENOMINATIONAL ASSIGNMENTS
## FOR COMMANDER BOARDS

| | 77 | 78 | 79 | 81 | 82 | 83 | 84 | 85 | 86 | 87 | 88 | 89 | 90 | 91 | 92 | 94 | 95 | 96 | 97 | 98 | 99 | O0 | O1 | O2 | TI Seats |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RC | XX | XX | XX | XX | XX | XX | XX | XX | XX | X | X | X | X | X | X | X | X | X | X | XX | X | X | X | X | 34 |
| SB | . | X | X | X | X | X | . | X | . | X | . | . | . | X | X | X | X | . | X | X | XX | . | . | . | 15 |
| UM | X | X | X | X | . | X | . | . | . | . | . | X | . | . | X | X | . | . | . | X | . | . | . | . | 9 |
| ELCA | X | . | . | . | X | X | . | . | X | X | X | . | X | X | X | . | . | . | X | . | . | . | . | . | 10 |
| PUSA | X | . | . | . | X | X | X | . | X | X | X | . | . | . | . | . | . | X | . | . | . | . | X | . | 9 |
| LMS | . | . | . | X | . | . | . | . | . | . | . | X | . | . | . | X | . | X | . | X | . | . | . | . | 5 |
| ABC | X | X | . | . | X | X | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | 5 |
| NBCUS | . | . | . | . | . | . | . | . | . | . | . | X | . | . | . | . | X | . | X | . | . | . | X | . | 4 |
| GARB | . | . | . | . | X | . | . | . | X | . | . | X | . | . | . | . | . | . | . | . | . | . | . | . | 3 |
| AME | . | . | . | X | . | . | X | . | . | X | . | . | . | . | . | . | . | . | . | . | . | . | . | . | 3 |
| RCA | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | X | X | . | . | . | . | . | . | . | 3 |
| UCC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | X | . | . | . | . | X | . | 3 |
| E | . | . | X | . | . | . | . | X | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | 2 |
| N | . | . | X | . | . | . | . | . | . | X | . | . | . | . | . | . | . | . | . | . | . | . | . | . | 2 |
| DC | . | . | . | . | . | . | . | . | . | . | X | . | X | . | . | . | . | . | . | . | . | . | . | . | 2 |
| SDA | . | . | . | . | . | . | . | X | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | 2 |
| J | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | X | . | . | . | . | . | . | . | 2 |
| PNBC | . | . | . | . | . | . | . | . | . | . | X | . | . | X | . | . | . | . | . | . | . | . | . | . | 2 |
| ORTH | . | X | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | 1 |
| BGC | . | . | . | . | . | . | . | . | . | . | X | . | . | . | . | . | . | . | . | . | . | . | . | . | 1 |
| CGIC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | . | . | . | . | 1 |
| CMA | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | 1 |
| CME | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | . | . | 1 |
| CP | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | . | . | . | . | . | . | . | . | . | 1 |
| CRC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | . | . | . | 1 |
| ECCA | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | 1 |
| LDS | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | 1 |
| PCA | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | 1 |
| 93 Other Denominations | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | 0 |

DENOMINATIONAL
ASSIGNMENTS FOR CAPTAIN
BOARDS

| | 77 | 78 | 79 | 81 | 82 | 83 | 84 | 85 | 86 | 87 | 88 | 89 | 91 | 92 | 94 | 95 | 96 | 97 | 98 | 99 | O0 | O1 | O2 | TI Seats |
|---|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----------|
| RC | XX | XX | XX | XX | X | XX | XX | XX | XX | XX | X | X | X | X | X | X | X | X | X | X | X | X | X | 32 |
| PUSA | X | X | X | XX | X | X | XX | X | X | XX | X | . | X | X | X | X | . | . | . | . | . | . | . | 18 |
| ELCA | X | . | . | X | X | X | X | X | . | X | . | X | X | . | X | . | X | X | . | . | . | . | . | 12 |
| SB | . | . | X | X | X | . | . | . | . | . | X | X | X | . | . | . | . | . | . | . | X | X | . | 8 |
| UM | . | X | X | . | X | X | . | . | . | . | X | X | . | . | . | . | . | X | . | . | . | . | . | 8 |
| DC | . | X | . | . | . | . | . | . | X | . | . | XX | . | . | X | . | . | . | . | . | . | . | . | 5 |
| SDA | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | X | . | . | X | . | . | X | . | 4 |
| ABC | . | . | . | . | . | . | X | . | X | . | . | . | . | . | . | . | . | X | . | . | . | . | . | 3 |
| E | . | X | X | . | . | . | X | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | 3 |
| LMS | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | X | . | . | X | . | . | . | . | 3 |
| RCA | . | . | . | . | . | . | . | . | . | . | X | . | . | X | X | . | . | . | . | . | . | . | . | 3 |
| UCC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | X | . | X | . | 3 |
| AME | . | . | . | . | . | X | . | . | X | . | . | . | . | . | . | . | . | . | . | . | . | . | . | 2 |
| BGC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | X | . | . | . | . | 2 |
| J | . | . | . | . | . | . | . | . | X | . | . | . | . | . | . | . | . | . | . | X | . | . | . | 2 |
| ORTH | X | . | . | . | X | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | 2 |
| PNBC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | X | . | . | . | . | . | 2 |
| AGC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | 1 |
| CGIC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | . | . | . | . | . | 1 |
| CP | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | . | . | . | . | . | . | . | . | 1 |
| CS | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | . | . | . | . | . | . | 1 |
| ECC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | 1 |
| GARB | . | . | . | . | . | X | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | 1 |
| LDS | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | 1 |
| NBCUS | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | . | . | 1 |
| 96 Other Denominations | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | 0 |

**APPENDIX B**
**Favorite denominations**
**i.e. the denominations assigned to personnel selection boards**

| Denom | <----------- Seats on Selection Boards ----------> | | | |
| | Promotion | SER | CARE (1)* | CARE (2)* |
|---|---|---|---|---|
| AGC | 1 | 0 | 1 | 0 |
| AME | 8 | 0 | 0 | 0 |
| BGC | 4 | 1 | 1 | 0 |
| CC(DC) | 4 | 1 | 2 | 0 |
| CGCT | 0 | 0 | 43 | 0 |
| CGIC | 3 | 0 | 0 | 0 |
| CHCCC | 2 | 0 | 0 | 0 |
| CMA | 1 | 0 | 0 | 0 |
| CN | 1 | 0 | 0 | 0 |
| CR | 3 | 0 | 0 | 0 |
| DC | 5 | 0 | 0 | 0 |
| EC | 8 | 0 | 29 | 0 |
| ELCA | 29 | 2 | 24 | 0 |
| GARB | 4 | 0 | 0 | 0 |
| IFCA | 1 | 0 | 0 | 0 |
| LDS | 4 | 0 | 0 | 0 |
| N | 2 | 0 | 0 | 0 |
| NACCC | 1 | 0 | 0 | 0 |
| NBCUS | 8 | 2 | 0 | 0 |
| OBSC | 1 | 0 | 0 | 0 |
| ORTH | 3 | 0 | 0 | 0 |
| PCA | 2 | 0 | 0 | 0 |
| PCG | 0 | 0 | 37 | 0 |
| PHC | 1 | 0 | 0 | 0 |
| PNBC | 7 | 0 | 0 | 0 |
| RCA | 7 | 0 | 6 | 0 |
| SDA | 12 | 1 | 32 | 0 |
| UCC | 10 | 0 | 0 | 0 |
| UM | 25 | 1 | 4 | 0 |
| J | 6 | 0 | 1 | 2 |
| ECCA | 2 | 0 | 42 | 5 |
| GAGB | 0 | 0 | 5 | 5 |
| EPC | 1 | 0 | 8 | 7 |
| CP | 2 | 0 | 15 | 20 |
| CME | 2 | 0 | 21 | 22 |
| LMS | 15 | 2 | 33 | 22 |
| PUSA | 43 | 0 | 57 | 31 |

| | | | | |
|-----|-----|-----|-----|-----|
| OP | 0 | 0 | 90 | 36 |
| CS | 1 | 0 | 75 | 38 |
| RC | 104 | 4 | 119 | 55 |
| ABC | 13 | 0 | 80 | 71 |
| SB | 38 | 2 | 124 | 91 |
| | | | | |
| Total | 384 | 16 | 849 | 405 |
| | | | | |
| Eighty Other Denominations | 0 | 0 | 0 | 0 |

\* CARE (1) is the records LAR01010 to LAR01123
  CARE (2) is the records LAR01421 to LAR01951

**Appendix C**
**The Navy's "Ideal" mix of Denominations 1985-1993**

Denomination Inventory Mix acdu and "ideal"
        on date closest to 4 May 1990

1.  Start reconstruction/estimate with Work Sheets for the period.
2.  Use the entry dated closest to May 4, 1990 to capture acdu and "ideal"
    on that date.
3.  If there were no accession considerations for any given denomination in that
    period, look back at 1989 (and then forward to 1990+)
4.  Check Chaplain History Volume X for active duty service surrounding the 1989-
1991 period for inventory in the period.

| Reference | Denomination | Faith Group | 1990 acdu | 1990 "Ideal" | 1989 acdu | 1989 Ideal |
|---|---|---|---|---|---|---|
| 1993 | AACC | L-CATH | 1 | 0 | | |
| 1989 | ABA | NB-ABA | 2 | 0 | | |
| LAR01611 | ABC | NB-ABC | 28 | 13 | | |
| VOL X | ACC | NB-OTHER | 1 | 0 | | |
| LAR01593 | AG | N-AG | 22 | 18 | | |
| LAR01579 | AGC | N-AG | 7 | 9 | | |
| LAR01584 | AME | L-METH | 5 | 18 | | |
| VOL X | ARP | L-OTHER | 2 | 0 | | |
| VOL X | BBF | NB-OTHER | 2 | 0 | | |
| LAR01620 | BGC | NB-BGC | 5 | 1 | | |
| | BMA | NB-OTHER | 4 | 0 | | |
| 1986 | CB | N-CB | 2 | 6 | | |
| 1989 | CC | N-CC | 5 | 13 | | |
| 1989 | CCCC | NE-CONG | 6 | 0 | | |
| LAR01611 | CFGC | N-CFGC | 15 | 18 | | |
| VOL X | CGAI | N-CG | 5 | 0 | | |
| LAR01619 | CGIC | N-CG | 10 | 31 | | |
| | CGCT | N-CG | 13 | 4 | | |
| VOL X | CGP | N-CG | 2 | 0 | | |
| 1989 | CHCCC | N-CC | 15 | 9 | | |

| Reference | Denomination | Faith Group | 1990 acdu | 1990 "Ideal" | 1989 acdu | 1989 Ideal |
|---|---|---|---|---|---|---|
| LAR01619 | CMA | N-CMA | 6 | 2 | | |
| 1989 | CME | L-METH | 5 | 6 | | |
| 1991 | CP | L-PRESBY | 5 | 1 | | |
| 1995 | CR | L-OTHER | 6 | 0 | | |
| 1989 | CS | SW-CS | 3 | 0 | | |
| 1989 | DC | N-DC | 20 | 9 | | |
| LAR01610 | ECC | NE-CONG | 2 | 0 | | |
| LAR01578 | EFCA | N-OTHER | 3 | 1 | | |
| LAR01600 | ELCA | L-LUTH | 55 | 44 | 63 | 98 |
| 1989 | EPIS | L-EPIS | 29 | 23 | | |
| LAR01593 | FGC | N-OTHER | 9 | 18 | | |
| VOL X | FMNA | L-METH | 2 | 0 | | |
| LAR01578 | GARB | NB-GARB | 1 | 1 | | |
| 1989 | GO | SW-ORTH | 9 | 16 | | |
| | ICCC | N-OTHER | 0 | 0 | | |
| LAR01610 | ICFSG | N-ICFCG | 1 | 2 | | |
| 1989 | IFCA | N-IFCA | 5 | 1 | | |
| LAR01610 | J | SW-J | 17 | 49 | | |
| LAR01610 | LBF | NB-LBF | 1 | 0 | | |
| LAR01611 | LDS | SW-LDS | 11 | 32 | | |
| LAR01610 | LMS | L-LUTH | 33 | 22 | 40 | 65 |
| VOL X | LUTH BRETH | L-LUTH | 0 | 0 | | |
| VOL X | MISS | N-MISS | 1 | 0 | | |
| VOL X | MORAVIAN | L-OTHER | 1 | 0 | | |
| VOL X | MUSLIM | SW-MUS | 0 | 0 | | |
| LAR01619 | N | LE-NAZ | 5 | 4 | | |
| VOL X | NACCC | NE-CONG | 2 | 0 | | |
| LAR01620 | NBC A | NB-NBC | 5 | 22 | 16 | 45 |
| LAR01579 | NBC U | NB-NBC | 19 | 46 | | |
| LAR01586 | NTAIBC | NB-OTHER | 0 | 0 | | |
| VOL X | OBSC | N-OTHER | 2 | 0 | | |
| LAR01610 | OCA | SW-ORTH | 9 | 24 | | |
| VOL X | OP | L-PRESBY | 5 | 0 | | |
| VOL X | PB | N-OTHER | 3 | 0 | | |

| Reference | Denomination | Faith Group | 1990 acdu | 1990 "Ideal" | 1989 acdu | 1989 Ideal |
|---|---|---|---|---|---|---|
| | TableContinues | | | | | |
| LAR01584 | PCA | L-PRESBY | 20 | 2 | | |
| VOL X | PHC | N-PENT | 3 | 0 | | |
| LAR01590 | PNBC | NB-NBC | 8 | 4 | | |
| LAR01586 | PNCC(!) | N-OTHER | 0 | 0 | | |
| LAR01610 | PUSA | L-PRESBY | 60 | 25 | | |
| LAR01605 | RC | C-RC | 271 | 285 | | |
| 1986 | RCA | NE-RCA | 3 | 6 | | |
| VOL X | RJ | SW-J | 1 | 0 | | |
| LAR01610 | SB | NB-SB | 160 | 122 | | |
| LAR01588 | SDA | SW-SDA | 16 | 6 | | |
| LAR01590 | UCC | L-UCC | 21 | 14 | | |
| LAR01596 | UM | L-METH | 113 | 77 | | |
| 1993 | UPC1 | N-PENT | 1 | 0 | | |
| LAR01619 | UU | SW-UU | 1 | 1 | | |
| LAR01598 | W | L-W | 5 | 1 | | |

| | | | | |
|---|---|---|---|---|
| Totals | | | 1110 | 1006 |

| Reference | Denomination | | | acdu |
|---|---|---|---|---|
| LAR0161 | End Strength | | FY 91 | 1110 |
| | | RC | | 263 |
| | | Lit | | 404 |
| | | Non-Lit | | 383 |
| | | Jewish | | 18 |
| | | Orthodox | | 10 |
| | | SDA, LDS, CS | | 32 |
| | | | | |
| LAR0693 | End Strength | | FY 93 | 1080 |
| | | RC | | 242 |
| | | Lit | | 365 |
| | | Non-Lit | | 415 |
| | | Jewish | | 16 |
| | | Orthodox | | 13 |
| | | SDA, LDS, CS | | 29 |

| | | acdu | Ideal |
|---|---|---|---|
| SUBTOTALS | (from list above) | | |
| | Roman Catholic | 271 | 285 |
| | Liturgical | 373 | 237 |
| | Non-Liturgical | 399 | 356 |
| | Special Worship | 67 | 128 |

Leuba Declaration - the Siskin Conjecture, page 46          Exhibit 7

|  | Total | 1110 | 1006 |
|---|---|---|---|
| Percentages | (from list above) | acdu | Ideal |
| | Roman Catholic | 24.4% | 28.3% |
| | Liturgical | 33.6% | 23.6% |
| | Non-Liturgical | 35.9% | 35.4% |
| | Special Worship | 6.0% | 12.7% |

Note:  Whether the "ideal" was achieved or not, this indicates that:

(a) the numbers on the Work Sheets were more than simple acdu inventory, and

(b) the Community Manager was basing his faith group cluster quotas on a denomination by denomination calculation.

**Appendix DF**

CADRAG FOIA request received circuitously in October 2006; copy provided under separate cover.

**Appendix DB**

**Database Transcription of the CADRAG FOIA request**

| Denom | fgc | Select | Non-Select | Alternate | % Sel | % Rejected | Strict % |
|---|---|---|---|---|---|---|---|
| AME | Lit | 1 | 1 | | 50% | 50% | 50% |
| ARP | Lit | 1 | | | 100% | 0% | 100% |
| BPC | Lit | 1 | | | 100% | 0% | 100% |
| CME | Lit | 1 | | | 100% | 0% | 100% |
| CN | Lit | 3 | | | 100% | 0% | 100% |
| CP | Lit | 1 | | | 100% | 0% | 100% |
| CR | Lit | 1 | | | 100% | 0% | 100% |
| ELCA | Lit | 13 | 1 | 1 | 93% | 7% | 87% |
| EPIS | Lit | 4 | | 2 | 100% | 0% | 67% |
| LMS | Lit | 7 | | 1 | 100% | 0% | 87% |
| OP | Lit | 1 | | | 100% | 0% | 100% |
| PCA | Lit | 3 | 1 | | 75% | 25% | 75% |
| PUSA | Lit | 12 | 3 | 3 | 80% | 17% | 67% |
| RCA | Lit | 1 | 1 | 1 | 50% | 33% | 33% |
| RPCNA | Lit | 1 | | | 100% | 0% | 100% |
| UCC | Lit | 3 | 1 | 1 | 75% | 20% | 60% |
| UM | Lit | 16 | 3 | 2 | 84% | 14% | 76% |
| W | Lit | 2 | | | 100% | 0% | 100% |
| | | 72 | 11 | 11 | 87% | 12% | 77% |
| | | | | | | | |
| ABC | NB | 3 | 1 | | 75% | 25% | 75% |
| BBF | NB | 1 | | | 100% | 0% | 100% |
| BGC | NB | 1 | 1 | | 50% | 50% | 50% |
| BMAA | NB | 0 | 1 | | 0% | 100% | 0% |
| NABC | NB | 0 | 1 | | 0% | 100% | 0% |
| NBC | NB | 2 | | 1 | 100% | 0% | 67% |
| NBCUS | NB | 1 | | | 100% | 0% | 100% |
| PNBC | NB | 2 | 1 | | 67% | 33% | 67% |
| SB | NB | 28 | 1 | 2 | 97% | 3% | 90% |
| | | 38 | 6 | 3 | 86% | 13% | 81% |

| Denom | fgc | Select | Non-Select | Alternate | % Sel | % Rej | Strict % |
|-------|-----|--------|------------|-----------|-------|-------|----------|
| AG | NN | 6 | 1 | | 86% | 14% | 86% |
| AGC | NN | 2 | 1 | 1 | 67% | 25% | 50% |
| CB | NN | 1 | | | 100% | 0% | 100% |
| CBC | NN | 1 | | | 100% | 0% | 100% |
| CC(DC) | NN | 2 | | 1 | 100% | 0% | 67% |
| CCCC | NN | 2 | 1 | | 67% | 33% | 67% |
| CCCU | NN | 0 | 1 | | 0% | 100% | 0% |
| CFGC | NN | 0 | 1 | | 0% | 100% | 0% |
| CGCT | NN | 6 | | 2 | 100% | 0% | 75% |
| CHCCC | NN | 2 | 2 | | 50% | 50% | 50% |
| CMA | NN | 1 | | | 100% | 0% | 100% |
| DC | NN | 2 | | | 100% | 0% | 100% |
| EFCA | NN | 2 | | | 100% | 0% | 100% |
| FGBC | NN | 2 | | | 100% | 0% | 100% |
| ICCC | NN | 1 | | | 100% | 0% | 100% |
| IFCA | NN | 4 | 1 | | 80% | 20% | 80% |
| NACCC | NN | 1 | | | 100% | 0% | 100% |
| PB | NN | 1 | | 1 | 100% | 0% | 50% |
| Subtotal | | 36 | 8 | 5 | 82% | 16% | 73% |
| fgc Total | | 74 | 14 | 8 | 84% | 15% | 77% |
| RC | RC | 40 | | 3 | 100% | 0% | 93% |
| CS | SW | 1 | | | 100% | 0% | 100% |
| LDS | SW | 3 | | | 100% | 0% | 100% |
| ORTH | SW | 1 | | | 100% | 0% | 100% |
| SDA | SW | 4 | | | 100% | 0% | 100% |
| TOTAL | | 415 | 64 | 49 | 87% | 12% | 79% |

Changed
Recommendations

|  |  |  |  |  | Outcome |  |
|---|---|---|---|---|---|---|
| **From Alt to IRAD** | | (1 out of 23) | | | | |
| Oct-88 | CF | GC | Non Select | Lyrice Marsh | RAD 9/89 | |
| | | | | | | |
| **From Non Select to retain** | | (3 out of 28) | | | | |
| May-90 | | RC | Til 94 | Ronald Chiasson | RAD 10/90 | |
| Oct-88 | | RC | Til age 60 | Lelslie Colaco | Japan 90-92 | Iceland 92-eof |
| Oct-90 | | RC | … | Stanley Czarnota | Maine 90-93 | Great Lakes 93-eof |
| **From Did not request Continuance to Stayed** | | (1 out of 6) | | | | |
| May-90 | | J | Did not Request - Granted RAD | Jon Cutler | RAD 7/92 | (Okinawa) |

**Appendix E**
**Development of Accession Plans**

Military manpower planning begins with the "top" announcing to the "bottom" that it is about time to report collective needs.

The President's office informs the Secretary of Defense that the budget is to be submitted to Congress on such and so a date.

The Secretary of Defense passes the information on to the Civilian leaders of the Services (e.g. the Secretary of the Navy.)

The Service Secretaries pass the schedule to the Service Departments (providing references to: (a) current overall change guidance and (b) last year's FYDP [Five Year Defense Plan].)

The Chief of Naval Operations (e.g.) alerts the Branches, Divisions, "communities", that the cycle is underway.

The communities (e.g. the Chaplain Corps) begin with last year's approved plan[30]. They examine the implications of approved program changes (what drives requirements?)  This informs the Corps of how many additional, or fewer, chaplains they will require.  Then they examine the current inventory to estimate continuance and losses.

The Chaplain Corps keeps a larger proportion of its current cadre than does the average Navy Community.[31]

In the Chaplain Corps, some losses:

-       are involuntary, but identifiable (e.g. statutory retirements)
-       are involuntary and estimable (accidents, transfers, resignations, voluntary retirements)
-       are discretionary (e.g. SER and Involuntary Retirement or not imposed on Officers who have been passed over for promotion twice [See LAR0524]), and
-       some are statutorily driven (but can be waived with SecNav approval), e.g. retirement at age 60 (or 62, or 68).

---

[30] Typically the FYDP (the five year defense plan) is simply rolled forward by using last year's plan as a basis and adjusting this year with "pluses and minuses".  The last time, that I know of, that the FYDP was looked at *de novo*, was when President Carter introduced "zero based budgeting" in 1976.

[31] "The Chaplain Corps has the highest retention rate in the Navy (92%) and the highest continuation rate at the 6 to 11 year mark (67%) – 25% higher than the entire Navy."  All Navy continuation at this point was 42%. [See LAR00524.]

The Chaplain Corps community manager reviews the then current Active Duty List.  This is no more burdensome a task that when a small university Registrars Office reviews the current list of students to anticipate graduation rates and allowances for the incoming class.  There are fewer than 1000 records to review and they could be clustered by "year group".

However, in planning accessions, the Chaplain Corps community manager does not review the current Active Duty List by year group and rank based on career progression, he looks for losses from the Active Duty List by Faith Group Cluster.   (Career progression is planned collaterally.)

Losses are counted[32] by faith group cluster.

Every community manger estimates current accession requirements as:

> Losses are tallied by Faith Group Category.
> ☞   The Navy manages Inventory by Faith Group Category.

Gains = OPA - (BS ADL) - Losses.

Where:          Gains is the number of new acquisitions which the Community Manager will recommend "up" the chain of command.

OPA is the Officer Programmed Authorization (the number of billets which will be funded on 30 September in the new fiscal year);

BS ADL is the Begin Strength on the Active Duty List for this fiscal year, and

Losses is the forecast or projected total loss anticipated for the coming fiscal year.

The Chaplain Corps community manager does his calculations in faith group cluster terms and recommends a total number of acquisitions back up the chain of command, presenting faith group cluster breakdown to the Chief of Chaplains[33], who then submits the total (without faith group cluster detail) to the Chief of Naval Operations, who then combines all the community requirements and provides total manpower requirements estimates to the Secretary of the Navy, and then to the Secretary of Defense. [When I worked for the Secretary of Defense/Systems Analysis/Manpower I reviewed these submissions and made recommendations up my "chain of command" on how to allocate or reallocate or count or estimate losses so as to minimize cost and maximize management flexibility.]

---

[32]  The accession planning documents which have been produced show counts for anticipated losses;  DEFA00301 and DEFA00302 show actual tallies (tick marks in blocks of 5), by faith group cluster for FY 93 and FY 94.

[33]  See LAR0211.

Leuba Declaration - the Siskin Conjecture, page 52          Exhibit 7

Following internal Department of Defense review, the budget is submitted to the President (where it is reviewed by the Office of Management and Budget - it may be changed, or questioned there) and then it is submitted to the Congress - where it may be further changed, by percentages or specific increments.

After passage by the Congress and signature by the President, the authorizations are provided to the Secretary of Defense, who informs the Services: (a) what their authorizations are and (b) what their flexibilities are (or are not.)  The Service Secretaries dis -aggregate the guidance they have been given and the Chief of Naval Operations (e.g.), and then the Chiefs of the branches are informed of their authorized end strength.  When the authorization returns to the Chief of Chaplains it is not identified by faith group or denomination.  Those dimensions are reintroduced when the guidance passes back down his chain of command to the community manager.

The guidance or "end strength" that comes back down to the community manager is not necessarily the same figure as was sent up.  The community manager makes adjustments to the plan he originally submitted, to keep his/her totals in line with what was approved.

The Chaplain Corps community manager then drafts memoranda for the Chief of Chaplains to sign and send to the "Commander Navy Recruiting Command" concerning how many chaplain candidates to recruit, "with denomination/gender requirements as follows:" [See e.g. LAR0214.]

| | | |
|---|---|---|
| e.g. | Roman Catholic | 8 |
| | Liturgical Protestant | 12 |
| | Non-Liturgical Prot. | 8 |
| | Jewish | 1 |
| | Orthodox | 1 |
| | | |
| | Female | 4 |
| | Male | 26 |

The Chief of Chaplains thus "tasks" the Navy Recruiting Command to seek out a specified total number of candidates, (a) for direct addition to the ADL (Active Duty List) , (b) for entrance into the CCPO (Chaplain Candidate Program), and (c) for recruitment into the IRR (Individual Ready Reserve), but the totals are:

- subdivided by program
- subdivided by "denomination" and "gender"

and even

- subdivided by recruiting area
  "to enable CNRC
  (Commander, Naval
  Recruiting Command) to
  execute the tasking..."
  [See LAR0214.]

> The Chief of Chaplains orders replacements by "denomination and gender." [ See LAR0214.]

When the Chief of Chaplains orders six regional recruiters to collectively recruit, e.g. 66 Chaplains, one should not be surprised if each area thinks of its own goal as "11" [cf LAR01960-2047].

Similarly, if the requirement for the IRR is 12 Liturgicals, each Area will think of itself as "on the hook" for 2 candidates.  My point here is not: "which among these areas accepts responsibility for recruiting the 1 Orthodox?"   My point here is that the recruiters are told that there are quotas in effect.

Should we think the recruiters ignore this instruction when we use the distribution of denominations submitted to the C/A/R/E Board as the baseline distribution of those "available to serve"?   My own opinion here is that the "population available to serve" is the population which presented itself to the recruiters. What they pass along to the C/A/R/E group is already screened by the recruiters - based on the (quota) instructions they received from the Chief of Chaplains.

Not only does the C/A/R/E Advisory Group receive quotas as figures against which they monitor their collective recommendations, but the recruiters also receive quotas to guide them in their efforts.  This is a two stage, quota-based culling.

The Chaplain Corps community manager:

• Uses faith group and denomination to count losses, and then
• Uses faith group and denomination to establish accession goals
and then

• Manipulates those goals so that the mix of denominations and faith groups which end up in the Chaplain Corps is specifically different than the mix of denominations and faith groups which presented themselves for Service.

(1) The quotas are set, percentage wise, so that the percentages designated/allowed for Catholics and Liturgicals are in excess of the percentages of those available to serve who are Catholic and Liturgical (maximizing their likelihood of selection), while the quota percentage designated/allowed for Non-Liturgicals is well below the percentage of those available to serve who are Non-Liturgical (curtailing every Non-Liturgical's likelihood of Selection).[34]

(2) The quotas change over time to increase Liturgical representation and decrease Non-Liturgical participation in the Corps.  Under normal "community" manpower planning,

---

[34]  If the applicant pool is 26.9% Liturgical, a quota set at 35% guarantees that no qualified candidate will be rejected; on the other hand, if the applicant pool is 44% Non-Liturgical, a quota set at 35% guarantees that 20% of the applicants will be rejected, simply by operation of the quota.

each year's manpower requirements are based on mission changes to a base line and replacements for those who leave Active Duty. But in the Chaplain Corps, there is a systematic, insidious drift in the planned accessions [see LAR0018 to LAR00023]:

| | Roman Catholic | | Liturgical | | Non-Liturgical | |
|---|---|---|---|---|---|---|
| FY | Number to Accession | Percent of End Strength | Number to Accession | Percent of End Strength | Number to Accession | Percent of End Strength |
| 91 | 22 | 23.7 | 20 | 36.4 | 17 | 34.5 |
| 92 | 19 | 23.8 | 17 | 36.3 | 13 | 34.1 |
| 93 | 18 | 23.7 | 13 | 36.5 | 13 | 34.0 |
| 94 | 20 | 24.1 | 17 | 36.4 | 13 | 33.6 |
| 95 | 18 | 23.2 | 14 | 36.8 | 13 | 33.8 |

This is not maintenance of the status quo; it is planned control of the denominational distribution of the chaplains on Active Duty[35] - to favor both Roman Catholics and Liturgicals in excess of their availability in the population of those offering themselves for Service, and to the detriment of Non-Liturgicals presenting themselves for service as Navy Chaplains.

The specific effect of the Chaplain Corps community manager's faith group cluster quotas, and their manipulation, has been to place an impediment in the path of Non-Liturgical candidates in particular with respect to service in the Chaplain Corps. The general effect of the quotas has been to facilitate within cluster denominational discrimination for both the Liturgical and the Non-Liturgical candidates.

Note that (a) even if these plans were not carried out, or could not be carried out because there were too few well qualified applicants, (b) it is still the case (1) that this is what the plans *were* and (2) that the Corps as a whole has been successful at "preferring" Catholics and Liturgicals and marginalizing Non-Liturgicals.

---

[35] The Chaplain Corps' input to the FYDP puts twice the pressure (quota) on Non-Liturgicals that it does on Roman Catholics. The average RC *gain* programmed for this period (1990 to 1997) is 147% of the losses; for Non-Liturgicals it is just 76% of the losses. This is a formula for increasing, and evidence of an intention to increase, or at least maintain the Roman Catholic "share" of the Corps and to reduce the Non-Liturgical "share".

## Appendix F
## "Promotion"  is NOT Accurately Characterized in Navy Pleadings

F.1    Defendants (a) couch their data in terms of faith group clusters (which conceals within cluster discrimination) and (b) they ignore their own decisions to curtail the pool of candidates to be considered for promotion.

F.2    Plaintiffs have repeatedly drawn attention to Non-Liturgical candidates <u>missing</u> in the Navy's pattern of promotion data[36]:

From the CNA Study (Smith, et al 2000) Table 2:

|  | Number of Candidates | |
|---|---|---|
|  | Considered | Promoted to LCDR |
| Liturgical | 326 | 256 |
| Non-Liurgical | 327 | 260 |
| ratio | **.997** | **.985** |

From the CNA Study (Smith, et al 2000) Table 3:

|  | Number of Candidates | |
|---|---|---|
|  | Considered | Promoted to CDR |
| Liturgical | 382 | 275 |
| Non-Liurgical | 364 | 252 |
| ratio | **1.05** | **1.09** |

From the CNA Study (Smith, et al  2000) Table 5:

|  | Number of Candidates | |
|---|---|---|
|  | Considered | Promoted to CAPT |
| Liturgical | 298 | 176 |
| Non-Liurgical | 242 | 129 |
| ratio | **1.23** | **1.36** |

F.3    At each step up the promotion ladder, the ratio of Liturgical to Non-Liturgical candidates being considered systematically increases, from parity at LCDR to 105% at CDR and 123% at CAPT - favoring the Liturgical Candidates. This pattern is statistically significant (p<.001).

---

[36] This data originates from the Navy.  They provided it to the Center for Naval Analysis (CNA) and used it in an Exhibit, #28 (copy attached).  Plaintiffs quote the data from the CNA study (Smith et al, 2000).  Defendants point to the *percent selected* at the promotion board stage, but do not address changes in the likelihood of being *considered for promotion*. Plaintiffs point to (1) a statistically significant preference for Catholic selection at the CDR level and (2) the systematic loss of Non-Liturgical candidates at every increase in rank.

F.4    The *selection rates*, among those *considered*, based of faith group clusters, may seem on a par across ranks, if one looks only at the Promotion Board action, but the CADRAG[37] Board action is a precursor event; if one wishes to be *considered* for promotion with one's peers, it is first necessary that one be *allowed* to continue to serve on Active Duty.

F.5    Defendants have belittled Plaintiffs concern about chaplains missing from the pools of those considered for promotion.  They even disingenuously (since they had the CADRAG data) suggested in open court that "maybe they (the Non-Liturgicals) have family issues"[38].

F.6    In their pleadings, Defendants have brushed aside Plaintiffs' concerns about missing candidates, suggesting that because Plaintiffs did not explain (to the Navy's satisfaction) why or how the Non-Liturgicals were disappearing, that the issue was a red herring.[39]

F.7    Such brusque and dismissive representation may be "understood" in some quarters as merely over zealous advocacy (Peterson and Conley, 2001), but given what the Navy must know about its own system, the defense strategy here strikes me as deceptive.  The Navy knows where these missing Non-Liturgical candidates have gone.  A Freedom of Information Request has located them (see above.)  They are being systematically refused an opportunity to stay in the Corps.

F.8    It is well established in employment discrimination litigation that the whole pathway between putting ones name into the hat and being promoted is the proper domain to examine, and that focus on only one narrow step in the entire process is frequently (intentionally) misleading.

F.9    A defendant may not rebut allegations of discrimination in promotion by quoting statistics about who is promoted, while ignoring data about who is *considered* for promotion.

> The Navy pretends that flow points and facially neutral objective time in grade requirements determine eligibility for promotion consideration, but the Navy ignores (conceals, "forgets", fails to acknowledge or discuss) that prior to establishing the lists of who will and will not be "considered" for promotion, a selection panel convenes to decide who will and will not be allowed to stay on Active Duty.

---

[37] CADRAG is the acronym for the Chaplain Corps Active Duty Retention/Release Advisory Group - a board which considers whether or not to allow continuation on active duty of chaplains who wish to stay in service.

[38] I heard Mr. Hyde make this representation in Federal Court in San Diego on May 13, 2005.

[39] See page 21, in Defendants' 5/24/06 Memorandum in Opposition to Plaintiffs' Motion for Declaratory Judgment and/or Partial Summary Judgment and in Support of their Cross-Motion to dismiss or in the Alternative for Partial Summary Judgment.

F.10    The Navy's advocates look at Plaintiff summarized, Navy data:

**Table F.1**
**Denominational Density at Mileposts on the Path to Promotion**

| Denomination | Recruited | Commissioned | Considered for CDR | Promoted to CDR | Percent who rose to CDR (to date) |
|---|---|---|---|---|---|
| column: | (1) | (2) | (3) | (4) | (5) |
| Roman Catholic | 202 | 476 | 199 | 232 | 48.5 % |
| Lutheran Church Amer | 40 | 115 | 40 | 55 | 47.8 % |
| Southern Baptist | 109 | 293 | 132 | 127 | 43.3 % |
| Chaplaincy of Full Gospel Churches | 26 | 19 | 4 | 0 | 0.0 % |

Data Source: (1) Navy C/A/R/E Data 1986 to 2005; (2) & (4) Chaplain's History 1982 to 1991; (3)  Discovery - See Appendix D- CDRs 1988 to 2001 in Compendium (Leuba 2005); (5) = (4)/(2).  The data periods are not identical; but all the Chaplains are "similarly situated" cohorts and all ratios are commensurable.

and comment (a) that this in not a "promotion study" and then (b) feign wonderment at the number of chaplains (they) lost (Column 2-Column 3) for "consideration."

F.11    This is standard statistical information for employment discrimination.  The "feeder group" (column 1) is a central factor in determining "similarly situated" candidates for promotion.

F.12    The probability of "promotion" for these similarly situated candidates may be estimated as:

$$P_{Promotion,i} = P_{CARE,i} * P_{CADRAG,i} * P_{Selection|Consideration,i}$$

Where:

| | |
|---|---|
| $i$ | is an index for a denomination under consideration |
| $P_{Promotion,i}$ | is the probability that an applicant from denomination i will be promoted (eventually) |
| $P_{CARE,i}$ | is the probability of C/A/R/E approval for denomination i |
| $P_{CADRAG,i}$ | is the probability of CADRAG approval for denomination i. |

and

| | |
|---|---|
| $P_{Selection|Consideration,i}$ | is the likelihood of Selection for Promotion for denomination i, if denomination i is considered for promotion. |

F.13    Table F.2 uses Navy Data to present results for a representative sample of denominations. The "distinguishing factor" between (i) the denominations: Catholic, Presbyterian Church USA, and Southern Baptist on the one hand and (ii) Presbyterian Church of America and Chaplaincy of Full Gospel Churches on the other hand, is that denominations in (i) are allowed to sit on the promotion and selection boards and denominations in (ii) are not.

**Table F.2**
**Denominational Disparity along the Pathway to Promotion**

| Denomination | $P_{CARE}, i$ | $P_{CADRAG}, i$ | $P_{Selection|Consideration}, i$ | $P_{Promotion}, i$ |
|---|---|---|---|---|
| Column | (1) | (2) | (3) | (4) |
| Roman Catholic | 94.0 % | 100 % | 54.6 % | 51.3 % |
| Presbyterian USA | 91.4 % | 80 % | 77.3 % | 56.5 % |
| Southern Baptist | 79.8 % | 97 % | 50.0 % | 38.7 % |
| Presbyterian America | 50.0 % | 75 % | 40.0 % | 15.0 % |
| Chaplaincy of Full Gospel Churches | 84.6 % | 0 % | 0.0 % | 0.0 % |

Data Sources: (1) C/A/R/E data base, CC-EF, CCPO program; (2) Table 2, Appendix D below; (3) Dr. Siskin's CDR Tables, his Declaration of May 2006; (4) = (1) * (2) * (3).

**Conclusion**

F.14    Clearly, denomination affects a Chaplain candidate's opportunities for and likelihood of promotion.

F.15    Not only does $P_{selection|Consideration}, i$ vary with denomination -

even in Dr. Siskin's data for 1992 to 2002, when one removes the obfuscation and discrimination facilitation inherent in the faith group cluster system,

but the denominations also suffer differential continuation rates, CADRAG, as well as quota controlled Accession opportunities, CARE.

F.16    To represent that <u>Promotion decisions are not contaminated by denominational consideration</u> is a material distortion of the facts, and a willful disregard of data known to (or which should have been known to) the Navy's advocates:

(a) accession rates as measurable from the CCPO program in the data base the Navy prepared for their expert, Dr. Bernard Siskin,

(b) the differential continuation in service rates evident in the results of the Continuation in Service Board records the Navy produced in response to a FOIA request,

and

(c) the line-by-line, denomination by denomination promotion data the Navy provided to their expert, Dr. Bernard Siskin, as Appendix 3 for his May 2006 Declaration.

## DECLARATION OF ARTHUR A. SCHULCZ, SR.

Pursuant to 28 U.S.C. § 1746, I, Arthur A. Schulcz, Sr., declare as follows:

1.     My name is Arthur A. Schulcz, Sr.  I am the counsel of record for plaintiffs in these cases which have now been consolidated.  In my duties as counsel, I have collected various documents, including depositions, declarations, and documents produced by defendants.

2.     Exhibit 1 is the Declaration of CAPT George Linzey, CHC, USN, Ret.  He is a plaintiff in *Adair.*

3.     Exhibit 2 is the Declaration of Rev. Dr. Jim Ammerman provided in *Larsen v. U.S. Navy.*

4.     Exhibit 3 is a Chart showing 1977 Thru 2002 Denominational Tiering Reflected by Appearances as Promotion Board Members and Percentage of candidates selected to Commander.  This chart is extracted from Dr. Leuba's "Siskin Conjecture" (Exhibit 7) produced in *Larsen v. United States Navy*.  It combines his Table 1 and the percentages of denominational candidates promoted to Commander which he reports in ¶ 48.

5.     Exhibit 4 is Excerpt s of precepts for FY95 and 96 SER boards produced by defendants in discovery in *Wilkins v. United States* (S.D. Cal.) and *CFGC/Adair*.  It references the appropriate Bates numbers.

6.     Exhibit 5 is a List of FY96 SER Board candidates Ranked by Failure of Selection and Time Remaining in Service compiled by Dr. Leuba from information provided by defendants and the Chaplain Corps Biographies, Vol. X.  This was produced by Dr. Leuba in *Wilkins v. United States* and submitted as a declaration and used in various proceedings.

7.     Exhibit 6 is the Expert Declaration of Dr. Leuba, "Selective Early Retirement Boards (SER) Compound Religious Discrimination in the U.S. Navy Chaplain Corps."  This is based on

information provided by defendants in discovery.

8.      Exhibit 7 if the Expert Declaration of Dr. Leuba in *Larsen v. U.S. Navy*, 02cv2005,

"Siskin Conjecture: The Pattern of Denominations Assigned to U.S. Navy Chaplain Corps

Selection Boards Biases the Decisions Which Flow From Those Boards", 12/1/06.  This work is

based on information provided by defendants in discovery.

9.      Exhibit 8 is the Declaration of Arthur A. Schulcz, Sr.

        The foregoing is rue and accurate to the best of my ability and represents the testimony I

would give under oath in a court of law.


                                        ___/ S / Arthur A. Schulcz, Sr._____

July 23, 2007                           Arthur A. Schulcz, Sr.


                                                                07mc269 (RMU)
                                                                EXHIBIT 8

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

)
IN RE: NAVY CHAPLAINCY                    )          Case No. 1: 07-mc-269 (RMU)
)
)

## [Proposed] ORDER

Before the Court is Defendants' Renewed Motion for Reconsideration of the Court's previous ruling denying thier appeal of the Magistrate Judge's Order that Title did not bar selective early retirement (SER) board discovery, due to recent legislative changes to 10 U.S.C. § 613.  Plaintiffs oppose because §613 does not bar RFRA claims and does not contain the specific language Congress requires to bar claims of constitutional misconduct and § 613.  For the reasons stated in Plaintiffs' Opposition,  Defendants' Motion IS DENIED.

Defendants are hereby ordered to release SER board personnel from their oaths of secrecy immediately.  The parties are further ordered to present to the Court a plan for protecting privileged information from public disclosure.  Parties will submit their plan to the Court within ___ days.

So ORDERED this  ____ day of ___, 2007.


_____
RICARDO M. URBINA
United States District Judge