**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

IN RE:                                                :
NAVY CHAPLAINCY                          :
                                                           :      Misc. Action No. 07mc269 (RMU)
                                                           :
_____:

**DEFENDANTS' MEMORANDUM OPPOSING PLAINTIFFS' RENEWED**
**MOTION FOR A PRELIMINARY INJUNCTION AND ADDRESSING**
**MANDATE BY COURT OF APPEALS**

Dated: July 25, 2007                          Respectfully submitted,

                                                           PETER D. KEISLER
                                                           Assistant Attorney General

                                                           JEFFREY A. TAYLOR
                                                           United States Attorney

                                                           VINCENT M. GARVEY
                                                           Deputy Branch Director

                                                           _____/S/_____
Of Counsel:                                       MICHAEL HYDE
Lieutenant Katherine Pasieta              CHRISTOPHER HALL
Lieutenant Sergio Sarkany                  DANIEL BENSING
Office of the Judge Advocate General  Trial Attorneys
Department of the Navy                      Federal Programs Branch, Civil Division
Washington Navy Yard, Bldg. 33        U.S. Department of Justice
1322 Patterson Ave., S.E., Suite 3000  P.O. Box 883
Washington, D.C.  30274-5066           20 Massachusetts Ave., N.W., Room 7132
                                                           Washington, D.C. 20044
                                                           Telephone: (202) 514-2205
                                                           Attorneys for Defendants

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.      PLAINTIFFS IMPROPERLY RELY ON ALLEGATIONS THAT ARE
        NOT "UNDISPUTED FACTS." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.     PLAINTIFFS FAIL TO SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS. . . . . . . . . . . . . 7

        A.      The Court Lacks Subject-Matter Jurisdiction to Grant
                the Preliminary Injunctive Relief Requested by Plaintiffs
                because They Lack Standing under Article III and Prudential
                Standing Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                1.      Plaintiffs' Lack Standing to Seek a Preliminary Injunction
                        Against any Allegedly Improper Retention of Chaplains in
                        The Past. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

                2.      Plaintiffs Lack Article III Standing to Challenge the Current
                        Retention of Chaplains Over Age 62. . . . . . . . . . . . . . . . . . . . . . . . . 10

                3.      Even if Plaintiffs Satisfy Article III Standing Requirements,
                        they Lack Standing under the Doctrine of Prudential Standing. . . . . . 15

        B.      Title 10 Authorizes the Secretary to Retain Chaplains on Active
                Duty Past Age 62. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                1.      The Navy Is Authorized to Retain Chaplains from the
                        Regular Navy on Active Duty Past Age 62. . . . . . . . . . . . . . . . . . . . . 18

                2.      The Navy Is Authorized to Retain Chaplains from the
                        Retired Reserves on Active Duty Past Age 62. . . . . . . . . . . . . . . . . . . 20

                        a.      Title 10 Authorizes the Navy to Transfer Chaplains
                                to the Retired Reserves Even Though They Are
                                Not Eligible for Retirement Pay or Benefits. . . . . . . . . . . . . . 20

b.    Title 10 Authorizes the Navy to Retain the
Targeted Officers from the Retired Reserves on
Active Duty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

c.    The Department of Defense Does Not Prohibit
the Navy from Transferring the Targeted Chaplains
to the Retired Reserves for Retention on Active Duty. . . . . . . 26

3.    Retention of Chaplains on Active Duty Past Age 60 Was
Proper When Plaintiffs Brought their Motion in 2003. . . . . . . . . . . . . 30

C.    Retention of Roman Catholic Chaplains Whom the Navy Has
Determined Will Provide Necessary Services Does Not Violate
the Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

III.    PLAINTIFFS FAIL TO SHOW THAT A MANDATORY PRELIMINARY
INJUNCTION WILL NOT CAUSE HARM TO OTHER PARTIES AND WOULD
SERVE THE PUBLIC INTEREST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

# TABLE OF AUTHORITIES

## **FEDERAL CASES**

Adair v. England,
    183 F. Supp.2d 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Adair v. England,
    217 F.Supp.2d 1 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Adair v. England,
    217 F. Supp.2d 7 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Adair v. Winter,
    451 F. Supp.2d 210 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Albuquerque Indian Rights v. Lujan,
    930 F.2d 49 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Allen v. Wright,
    468 U.S. 737 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 12, 30

American Bankers Ass'n v. Nat'l Credit Union Admin.,
    38 F. Supp.2d 114 (D.D.C.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

American Bankers Ass'n v. Nat'l Credit Union Admin.,
    271 F.3d 262 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Americans United for Separation of Church and State v. Reagan,
    786 F.2d 194 (3d. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Antonuk v. United States,
    445 F.2d 592 (6th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Arizona Pub. Serv. Co. v. EPA,
    211 F.3d 1280 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Bender v. Williamsport Area Sch. Dist.,
    475 U.S. 534 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Benten v. Kessler,
    505 U.S. 1084 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Bois v. Marsh,
 801 F.2d 462 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Bond v. United States,
 47 Fed. Cl. 641 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

Bowen v. Kendrick,
 487 U.S. 589 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

CBS, Inc. v. F.C.C.,
 453 U.S. 367 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CFGC v. England,
 454 F.3d 290 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 7

Chevron U.S.A. v. N.R.D.C.,
 467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

City of Los Angeles v. Lyons,
 461 U.S. 95 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd.,
 15 F. Supp. 2d 1 (D.D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Cutter v. Wilkinson,
 544 U.S. 709 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 36

District 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.,
 412 F.2d 165 (D.C. Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Dorfmann v. Boozer,
 414 F.2d 1168 (D.C. Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Elk Grove Unified Sch. Dist. v. Newdow,
 542 U.S. 1 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

In re England,
 375 F.3d 1169 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 31

Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.,
 28 F.3d 1268 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Flast v. Cohen,
        392 U.S. 83 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

Gilligan v. Morgan,
        413 U.S. 1 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35, 38, 44

Goldman v. Weinberger,
        475 U.S. 503 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

Gonzales v. Oregon,
        546 U.S. 243, 126 S. Ct. 904 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14, 27

Guerra v. Scruggs,
        942 F.2d 270 (4th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

Hein v. Freedom from Religion Found.,
        127 S. Ct. 2553 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10, 13

Katcoff v. Marsh,
        755 F.2d 223 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34, 39

Kay v. F.C.C.,
        443 F.2d 638 (D.C. Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

Kosnik v. Peters,
        31 F. Supp.2d 151 (D.D.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35, 38, 44

Lance v. Coffman,
        127 S. Ct. 1194 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10, 14, 15, 30

Larsen v. Navy,
        Slip op., No. 1:02cv2005 (D.D.C. April 30, 2007) . . . . . . . . . . . . . . . . . . .  34, 35, 37, 38

Larson v. Valente,
        456 U.S. 228 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

Lemon v. Kurtzman,
        403 U.S. 602 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

Locke v. Davey,
        540 U.S. 712 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

Lujan v. Defenders of Wildlife,
        504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

Mazurek v. Armstrong,
        520 U.S. 968 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 45

McConnell v. FEC,
        540 U.S. 93 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

McCreary Cty. v. ACLU,
        545 U.S. 844 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 36

Morgan Stanley DW Inc. v. Rothe,
        150 F. Supp.2d 67 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 45

National Mining Assoc. v. Dept. of Interior,
        251 F.3d 1007 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Northeastern Fla. Chapter, Assoc. Gen. Contractors of Am. v. Jacksonville,
        508 U.S. 656 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

O'Shea v. Littleton,
        414 U.S. 488 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Orloff v. Willoughby,
        345 U.S. 83 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 35, 39, 44

Phillips Petroleum Co. v. Shutts,
        472 U.S. 797 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

Prairie Band of Potawatomi Indians v. Pierce,
        253 F.3d 1234 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Raines v. Byrd,
        521 U.S. 811 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Saunders v. Caldera,
        193 F.Supp. 2d 1 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Schlesinger v. Reservists Comm. to Stop the War,
        418 U.S. 208 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

Sebra v. Neville,
    801 F.2d 1135 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 44

Selland v. Aspin,
    832 F. Supp. 12 (D.D.C. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Singleton v. Wulff,
    428 U.S. 106 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Stanley v. Univ. of S. Cal.,
    13 F.3d 1313 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 0, 45, 46

Taylor v. Resolution Trust Corp.,
    56 F.3d 1497 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Thomas Jefferson Univ. v. Shalala,
    512 U.S. 504 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

United States Dep't of Treasury v. Galioto,
    477 U.S. 556 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

United States v. Stanley,
    483 U.S. 669 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 44

Valley Forge Christian Coll. v. Americans United for Separation of Church and
    State, Inc.,
    454 U.S. 464 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Veitch v. England,
    471 F.3d 124 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

Warth v. Seldin,
    422 U.S. 490 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

Weinstein v. Air Force,
    468 F. Supp.2d 1366 (D.N.M. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

Whitmore v. Arkansas,
    495 U.S. 149 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

Wilkins v. United States,
    Slip op., Case No. 99-1579 (S.D. Cal. Dec. 16, 2002) . . . . . . . . . . . . . . . . . . . . . . . 34

Winkler v. Gates,
        481 F.3d 977 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

## **STATUTES**

10 U.S.C. § 532 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

10 U.S.C. § 611 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

10 U.S.C. § 620 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 25

10 U.S.C. § 632 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

10 U.S.C. § 637 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19, 32

10 U.S.C. § 638 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

10 U.S.C. § 641 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

10 U.S.C. § 1251 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18, 19

10 U.S.C. § 5150 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

10 U.S.C. § 10141 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 25

10 U.S.C. § 10154 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20, 21, 23, 28

10 U.S.C. § 12301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7, 24, 25, 29

10 U.S.C. § 14001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

10 U.S.C. § 14002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7, 25

10 U.S.C. § 14503 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

10 U.S.C. § 14504 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

10 U.S.C. § 14505 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25, 32

10 U.S.C. § 14506 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

10 U.S.C. § 14509 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7, 17, 24, 32

10 U.S.C. § 14702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

10 U.S.C. § 14703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 31, 32

## <u>OTHER AUTHORITIES</u>

Pub. L. 103-337 § 377, 108 Stat. 2663, 2737 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Pub. L. 104-106 § 1501, 110 Stat. 186, 500 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Pub. L. 109-364, § 503(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

The Ronald W. Reagan National Defense Authorization Act for Fiscal
        Year 2005, Pub. L. No. 108-375 § 501, 188 Stat. 1811, 1872 . . . . . . . . . . . . . . . . . . . 17

U.S. Const. art. III, § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**INTRODUCTION**

Defendants file this memorandum to renew and supplement their opposition to plaintiffs' motion for a mandatory preliminary injunction against the retention of Roman Catholic chaplains over age 62 and to address the issues remaining after the D.C. Circuit's remand of plaintiffs' original motion to this Court. On appeal, the D.C. Circuit determined that Establishment Clause claims constitute an irreparable injury, affirmed this Court's denial of a structural injunction, and found that it lacked jurisdiction to review this Court's denial of partial summary judgment. CFGC v. England, 454 F.3d 290 (D.C. Cir. 2006). Thus, the only issue before the Court is whether plaintiffs satisfy the remaining requirements for a preliminary injunction against the retention of Roman Catholic chaplains serving on active duty over age 62. See id. Plaintiffs fail to do so.

As to the likelihood of success on the merits, plaintiffs lack standing to bring their challenge to the retention of Roman Catholic chaplains. No plaintiff has shown a personal stake or particularized injury resulting from such retention. Instead, plaintiffs argue only that the Navy is not following the law, nothing more. The Supreme Court has repeatedly held that such claims do not satisfy Article III's limitation of the Judiciary's jurisdiction to actual cases or controversies. The lack of any personal stake also justifies denial of their claims under the prudential standing doctrine.

Even if the Court were to find that plaintiffs have standing, plaintiffs cannot show a likelihood of success on the merits because, as was the case when they filed their original motion, Title 10 grants the Navy discretion to retain chaplains on active duty over age 62. Because this retention furthers the Chaplain Corps' mission to accommodate the free exercise rights of Navy personnel, such retention does not violate the Establishment Clause.

Further, entry of the requested injunction would significantly harm non-parties, the Navy, and

-1-

therefore the public interest.  Plaintiffs seek the discharge of non-party chaplains who are currently

serving the free exercise needs of Navy personnel.  Plaintiffs provide no justification for requiring

the discharge of these chaplains or for reducing the number of chaplains available to meet the

religious needs of Navy personnel prior to final resolution of their claims.  Given the lack of any

personal stake in this litigation, plaintiffs' purported interest in a mandatory preliminary injunction

does not outweigh this significant harm such an injunction would cause to third parties, the Navy,

and the public interest.

## BACKGROUND

This case consolidates three pending cases: CFGC v. Winter, No. 99-2945 (RMU), Adair v.

Winter, No. 00-566 (RMU), and Gibson v. United States Navy, No. 06-1696 (RMU).  Because this

Court is well aware of the background of these cases, see Adair v. Winter, 451 F. Supp.2d 210, 212

(D.D.C. 2006) (dispensing with detailed recitation of background in light of publication of nearly

a dozen opinions in these cases), defendants limit their background discussion to matters relevant

to this motion.  In 2003, plaintiffs sought a preliminary and structural injunction and partial summary

judgment, alleging that the Navy improperly retained Roman Catholic chaplains from the Naval

Reserve in violation of statutory age limits and the Establishment Clause.  See generally Pls.' Mot.

for Prelim. and Structural Inj. and Partial Summ. J. and memorandum in support thereof [CFGC

docket no. 142] ("Pls.' 2003 Mem.").[1]  The Court denied the motion on February 7, 2005, [CFGC

---

[1] Defendants refer to the parties' prior briefing as follows: to plaintiffs' first memorandum
filed in support of their motion in 2003 [CFGC docket no. 142] as "Pls.' 2003 Mem."; to defendants'
opposition thereto [CFGC docket no. 159] as "Defs.' 2003 Opp."; to plaintiffs' reply in support of
their motion [CFGC docket no. 166] as "Pls.' 2003 Reply"; to the parties' March 9, 2006, briefing
in response to the mandate by the Court of Appeals [CFGC docket nos. 248, 249] as "Pls.' Mandate
Mem." and "Defs.' Mandate Mem."; to plaintiffs' reply to Defs.' Mandate Mem. [CFGC docket no.
255] as "Pls.' Mandate Reply"; and to defendants' reply to Pls' Mandate Mem. [CFGC docket no.

docket no. 184], finding that plaintiffs had failed to demonstrate an irreparable injury and denying the motion for partial summary judgment. Plaintiffs filed an interlocutory appeal.

On July 7, 2006, the D.C. Circuit reversed and remanded the Court's denial of plaintiffs' injunction motion. See CFGC, 454 F.3d at 305. The Court found that an injury alleged to result from a violation of the Establishment Clause is irreparable and remanded to allow this Court to consider the remaining prongs of the preliminary injunction analysis. See generally id. at 298-304, 305. The D.C. Circuit affirmed the denial of a structural injunction and found that it lacked jurisdiction to review the denial of partial summary judgment. See id. at 296 & n.6, 305. By Order dated February 13, 2007 [CFGC docket no. 245], this Court permitted the submission of supplemental briefing to address the issues remanded by the D.C. Circuit.

On June 18, 2007, this Court issued an order consolidating Adair, CFGC, and Gibson into this miscellaneous matter. See Order dated June 18, 2007 [In re Navy Chaplaincy docket no. 1]. The Court also denied without prejudice all pending motions and granted leave to re-file them in this action. See id. Plaintiffs' renewed motion followed that order.

## ARGUMENT

Plaintiffs seek not just an injunction against Navy conduct, but a mandatory injunction ordering the Navy to change its policy to their liking. See, e.g., Pls.' Mem. Support Renewed Mot. for Injunction [docket no. 3] ("Pls.' Renewed Mem.") at 1 (requesting injunction to order defendants to take affirmative steps to comply with plaintiffs' interpretation of regulations, statutes, and Constitution). Mandatory preliminary-injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."

---

257] as "Defs.' Mandate Reply."

Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (emphasis in original) (internal quotation marks and citation omitted); Dorfmann v. Boozer, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (power to issue " a preliminary injunction, especially a mandatory one, should be 'sparingly exercised'" (citation omitted)).  To obtain a preliminary injunction, plaintiffs must demonstrate:  (1) that they are substantially likely to succeed on the merits of their suit; (2) that in the absence of an injunction, they will suffer irreparable injury for which there is no adequate legal remedy; (3) that the injunction would not substantially harm other parties; and (4) that the public interest favors the grant of relief. See Taylor v. Resolution Trust Corp., 56 F.3d 1497, 1505 (D.C. Cir. 1995); Adair v. England, 217 F.Supp.2d 1, 3 (D.D.C. 2002).

    If the movant "makes a particularly weak showing on one factor, . . . the other factors may not be enough to 'compensate.'"  Morgan Stanley DW Inc. v. Rothe, 150 F. Supp.2d 67, 72-73 (D.D.C. 2001).  But, a movant must establish irreparable harm and a likelihood of success on the merits.  District 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am., 412 F.2d 165, 167 (D.C. Cir. 1969); see also Morgan Stanley, 150 F. Supp.2d at 72 (stating that court may issue preliminary injunction "only when the movant demonstrates" existence of four requirements set forth above).  Indeed, "[i]t is particularly important for the movant to demonstrate a substantial likelihood of success on the merits . . . . [A]bsent a 'substantial indication' of likely success on the merits, 'there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review.'"  Adair, 217 F. Supp.2d at 5 (citing Benten v. Kessler, 505 U.S. 1084, 1085 (1992) (per curiam), and quoting American Bankers Ass'n v. Nat'l Credit Union Admin., 38 F. Supp.2d 114, 140 (D.D.C.1999))

    Similarly, heightened showings of irreparable harm and likelihood of success on the merits

should be required where plaintiffs seek injunctive relief against the military because of the deference properly afforded to military judgment by the Judiciary.  See Selland v. Aspin, 832 F. Supp. 12, 14 (D.D.C. 1993); see also Sebra v. Neville, 801 F.2d 1135, 1139 (9th Cir. 1986) ("[T]he test for injunctive relief is much more stringent for a government military employee than the normal test for an injunction").  "Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters."  Orloff v. Willoughby, 345 U.S. 83, 93-94 (1953).

## I.    PLAINTIFFS IMPROPERLY RELY ON ALLEGATIONS THAT ARE NOT "UNDISPUTED FACTS."

Plaintiffs' latest arguments rely on allegations of "undisputed facts," see Pls.' Renewed Mem. at 6-11, that are disputed or are for the most part plaintiffs' interpretation of the law.  First, plaintiffs incorrectly raise the specter of illegal denominational bias by stating "[n]o Protestant liturgical and no Non-liturgical were allowed to remain on active duty" in the Retired Reserves and  "[n]o statute allows the Secretary to authorize a chaplain to remain on active duty past age 67 for the purpose of qualifying for retired pay, i.e., obtaining a pension." Pls.' Renewed Mem. at 7 (plaintiffs' statement of fact 4); id. at 14 (plaintiffs' statement of fact 14).  Plaintiffs merely assume that non-liturgical Protestant chaplains have sought but been denied the opportunity to serve past the ages listed by statute.  Plaintiffs have not developed any evidence of a pattern of requests by non-liturgical Protestant chaplains or chaplains of any other faith group category, much less denials of such requests.  Absent a showing of a pattern of such requests and denials, plaintiffs have not supported their implication that only Roman Catholics are permitted to remain on active duty past age 62 while non-liturgicals are not.  Further, two chaplains currently serving on active duty past age 62, a Jewish chaplain and a liturgical Protestant chaplain, were not Roman Catholic.  See Decl. of Capt. Stephen

T. Gragg (attached at Ex. 26) ("Gragg Decl.") at ¶ 3 (listing chaplains retained on active duty despite having reached age 62); see also Decl. of Veronica Berto (Ex. 1 to Defs.' Mandate Mem) (attached at Ex. 1) ("Berto Decl.") at ¶2 (same, as of March 9, 2007).

Further, that most chaplains serving over age 62 are Roman Catholic is not a result of denominational preference but a shortage of a certain type of chaplain necessary for the Chaplain Corps' legitimate mission to accommodate religious free exercise in the Navy. See, infra, Part II.C; Defs.' 2003 Opp. at 16, 18-19; Defs.' Mandate Mem. at 20-22. Plaintiffs present no evidence that the Secretary has ever retained a chaplain on active duty for the sole purpose of allowing that chaplain to obtain a pension.

Second, most of what plaintiffs present as facts are actually their own conclusions of law. See, e.g., Pls.' Renewed Mem. at 7-9 (statements 5, 9, 11-13 interpreting statutes and regulations as undisputed facts). Although plaintiffs label these statements as "undisputed," Pls.' Renewed Mem. at 6, defendants disputed plaintiffs' legal analysis and conclusions in all their prior briefing, see generally Defs.' Opp. Mem.; Defs.' Mandate Mem; Defs.' Mandate Reply, and do so herein.

Third, plaintiffs state that all the chaplain reservists serving over age 60 when plaintiffs brought their original motion were serving on the Active Duty List. See Pls.' Renewed Mem. at 7 (plaintiffs' statement of fact 4(a)). This is incorrect. As defendants stated in their original opposition, many of the Reservists were recalled from the Retired Reserves. See Defs.' 2003 Opp. at 13. Because officers in the Retired Reserve are in retired status, see 10 U.S.C. § 10141(b), they are not included on the Active Duty List or the Reserve Active-Status List ("RASL"). Specifically, the Active Duty List does not include officers described in 10 U.S.C. § 641, see 10 U.S.C. § 620(a), and section 641 includes "Retired officers on active duty." 10 U.S.C. § 641(4). The RASL includes

-6-

only those officers "in an active status." 10 U.S.C. § 14002(a). As defendants have previously

explained, this distinction is important, because, for example, officers from the Retired Reserves are

not subject to the age limitation contained in 10 U.S.C. § 14509, see Defs.' Mandate Mem. at 17-18,

and may be voluntarily recalled indefinitely under 10 U.S.C. § 12301(d). See id. at 17-18; Defs.'

2003 Opp. at 15; see also, infra, Part II.B.2.b.

## II.    PLAINTIFFS FAIL TO SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS.

### A.    The Court Lacks Subject-Matter Jurisdiction to Grant the Preliminary Injunctive Relief Requested by Plaintiffs because They Lack Standing under Article III and Prudential Standing Requirements.

Whether plaintiffs have standing to raise the Establishment Clause claim alleged in their

motion remains to be determined; in deciding that an injury based on the Establishment Clause is

irreparable, the D.C. Circuit did not decide that plaintiffs had standing, it merely assumed standing.

See CFGC, 454 F.3d at 304 n.8. That a properly alleged Establishment Clause injury would be

irreparable does not mean that all litigants are the proper parties to assert such injury. As shown in

defendants' prior memoranda, see, e.g., Defs.' Mandate Mem. at 4-12; Defs.' Mandate Reply at 5-8,[2]

and below, plaintiffs still lack standing to assert the Establishment Clause violation they allege and

therefore cannot show a likelihood of success on the merits of their claims.

Article III of the Constitution limits the role of federal courts to the resolution of cases and

controversies. U.S. Const. art. III, § 2. An "essential and unchanging part" of that case-or-

controversy requirement is the doctrine of standing. Lujan v. Defenders of Wildlife, 504 U.S. 555,

560 (1992). Among other functions, the standing requirement assures that the federal courts

"exercise power only in the last resort, and as a necessity," Allen v. Wright, 468 U.S. 737, 752

---

[2]  See also Defs.' 2003 Opp. at 19-23.

(1984), and that "the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." <u>Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.</u>, 454 U.S. 464, 472 (1982).

To establish standing, plaintiffs must show (1) an "injury in fact," (2) a causal relationship between the injury and the challenged activity, and (3) that a favorable court ruling will redress the injury. <u>Northeastern Fla. Chapter, Assoc. Gen. Contractors of Am. v. Jacksonville</u>, 508 U.S. 656, 663 (1993). Because standing is jurisdictional, plaintiffs bear the burden of establishing each element with the manner and degree of proof required at each stage of litigation. <u>Lujan</u>, 504 U.S. at 561; <u>see also</u> <u>Whitmore v. Arkansas</u>, 495 U.S. 149, 155 (1990) (litigant must "clearly and specifically set forth facts sufficient to satisfy" standing requirements).

To satisfy the injury-in-fact requirement, plaintiffs must demonstrate a concrete and particularized injury that is actual or imminent, not conjectural or hypothetical. <u>Lujan</u>, 504 U.S. at 560. A particularized injury is one that directly affects a plaintiff "in a personal and individual way." <u>Id.</u> at 561 n.1; <u>see also</u> <u>Raines v. Byrd</u>, 521 U.S. 811, 819 (1997) (plaintiff "must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to him."); <u>Bender v. Williamsport Area Sch. Dist.</u>, 475 U.S. 534, 543-44 (1986) (no standing where plaintiff has "no personal stake" in outcome of suit). Plaintiffs fail to satisfy this requirement.

1.    <u>Plaintiffs' Lack Standing to Seek a Preliminary Injunction Against any Allegedly Improper Retention of Chaplains in the Past.</u>

Because a preliminary injunction is a prospective remedy, the Court cannot grant a preliminary injunction as to alleged past retentions of Roman Catholic chaplains. To obtain

prospective injunctive relief, it is not enough that a plaintiff may have suffered a past injury. City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983); O'Shea v. Littleton, 414 U.S. 488, 495–96 (1973) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects."); Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp., 28 F.3d 1268, 1274 (D.C. Cir. 1994) (plaintiff has no standing to challenge past practices absent probability of future injury). Rather, plaintiffs must show that they are "immediately in danger of sustaining some direct injury as the result of the challenged official conduct." Lyons, 461 U.S. at 102 (internal quotation marks and citation omitted); accord McConnell v. FEC, 540 U.S. 93, 226 (2003). The threatened injury must be "certainly impending" to satisfy the standing requirements for prospective relief. Whitmore, 495 U.S. at 158 (emphasis added).

In addition, to the extent that chaplains are no longer retained or changes in the law authorize retention, see, infra, Part II.B, plaintiffs' request for a preliminary injunction is moot. See United States Dep't of Treasury v. Galioto, 477 U.S. 556, 559-60 (1986) (repeal of challenged regulation rendered case moot); Arizona Pub. Serv. Co. v. EPA, 211 F.3d 1280, 1295-96 (D.C. Cir. 2000) (challenge to EPA rule moot where agency issued clarification modifying challenged provision); see also American Bankers Ass'n v. Nat'l Credit Union Admin., 271 F.3d 262, 274 (D.C. Cir. 2001) (dismissing claim as moot where agency "eliminated the allegedly unlawful provision and there is no indication [it] will revert to its past [policy]" (internal quotes omitted)); National Mining Assoc. v. Dept. of Interior, 251 F.3d 1007, 1011 (D.C. Cir. 2001) (challenge to regulations was moot where agency adopted new regulations eliminating challenged provisions).

Thus, because plaintiffs cannot show an ongoing injury from any past retention or that

-9-

prospective relief will redress any alleged improprieties in past retentions, plaintiffs lack standing to seek a preliminary injunction against the past retention of chaplains. See Weinstein v. Air Force, 468 F. Supp.2d 1366, 1375 (D.N.M. 2006) (plaintiff who alleged past violation of Establishment Clause by Air Force lacked standing to seek injunctive relief because allegation of past violation failed to satisfy requirement that he show threat of future harm).

      2.      Plaintiffs Lack Article III Standing to Challenge the Current Retention of Chaplains Over Age 62.

It is not enough for plaintiffs to point to an alleged violation of law to demonstrate standing. The Supreme Court has "'consistently held that a plaintiff raising only a generally available grievance about government – claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large – does not state an Article III case or controversy.'" Lance v. Coffman, 127 S. Ct. 1194, 1196 (2007) (per curiam) (quoting Lujan, 504 U.S. at 573-74, and citing DaimlerChrysler Corp. v. Cuno, 126 S. Ct. 1854, 1862 (2006)); see also Hein v. Freedom from Religion Found., 127 S. Ct. 2553, 2562 (2007) (federal courts may not invalidate governmental acts where question is raised by party without standing).

That plaintiffs bring an Establishment Clause claim does not exempt them from Article III's standing requirements. A plaintiff alleging a violation of the Establishment Clause must still show a particularized injury. See Valley Forge, 454 U.S. at 487 ("[A] claim that the Government has violated the Establishment Clause does not provide a special license to roam the country in search of governmental wrongdoing and to reveal [such] discoveries in federal court."); id. at 486 ("[S]tanding is not measured by the intensity of the litigant's interests or the fervor of his

advocacy."). Even where "a rather troubling constitutional question" under the religion clauses of the First Amendment is involved, plaintiff must have standing. See Veitch v. England, 471 F.3d 124, 131-32 (D.C. Cir. 2006) (Navy chaplain lacked standing to raise constitutional claims related to his naval service where he voluntarily resigned from Navy).

Here, plaintiffs fail to articulate any personal injury particularized to them. Many of the individual plaintiffs are no longer on active duty. See Berto Decl. at ¶6. These plaintiffs cannot allege any injury from the continued presence of another chaplain on active duty, including those challenged by plaintiffs. See Veitch, 471 F.3d at 131-32 (chaplain who voluntarily resigned from Navy lacks standing to bring First and Fifth Amendment claims against policies related to Chaplain Corps). Further, given that Adair is no longer a class action and no class has been certified in Gibson, plaintiffs should not be permitted to cite alleged injuries that may be suffered by chaplains who are not named as plaintiffs.

In support of their argument that they have standing, plaintiffs cursorily cite their allegation that some of the Gibson plaintiffs are currently serving on active duty. See Pls.' Renewed Mem. at 4. The mere fact that some plaintiffs serve on active duty is insufficient to grant them standing because none have demonstrated that they are eligible for and were denied retention over age 62. See Weinstein, 468 F. Supp.2d at 1373-74 (finding that plaintiffs challenging alleged Establishment Clause violations at Air Force Academy lacked standing because they did not currently attend Academy and failed to allege "a real and immediate threat that they will have personal contact with the alleged Establishment Clause violations . . . ," even where some plaintiffs were on active-duty in Air Force (internal quotation marks omitted)); see also Bois v. Marsh, 801 F.2d 462, 466 (D.C. Cir. 1986) (civilian employee of Army who resigned before suit filed cannot seek equitable relief).

-11-

None of the plaintiffs have proven or even alleged that they are over age 62, requested continued retention despite the statutory age limit, and were denied such retention.  See Veitch, 471 F.3d at 131-32 (where chaplain's separation from Navy not linked to Navy conduct, chaplain lacked standing to bring First and Fifth Amendment claims against policies related to Chaplain Corps); Americans United for Separation of Church and State v. Reagan, 786 F.2d 194, 201 (3d. Cir. 1986) (in context of Establishment Clause claim, noting that stigmatizing injury "accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct" (citing Allen, 468 U.S. at 765) (internal quotation marks omitted); Saunders v. Caldera, 193 F.Supp. 2d 1, 5 (D.D.C. 2001) (retired Army officer lacked standing to seek prospective relief against promotion policies because "'ideological interest'" in issue insufficient for standing (internal quotation marks and citation omitted) (quoting Albuquerque Indian Rights v. Lujan, 930 F.2d 49, 55 (D.C. Cir. 1991)).  Because plaintiffs do not argue that they were denied the benefits they challenge, they lack standing to seek injunctive relief.

Plaintiffs also cite the treatment of plaintiffs Belt and Porter-Stewart, see, e.g., Pls.' Renewed Mem. at 21-22, who were discharged in 2006 under different circumstances and in compliance with statutory directives not at issue here.  These chaplains' experiences do not support plaintiffs' standing because, again, they are not similarly situated to the chaplains currently on active duty past age 62.  Belt and Porter-Stewart were discharged as required by 10 U.S.C. § 632(a)(1) because they were lieutenants who failed to select for promotion twice, were not subject to any exemptions to that requirement, and could not be retained on active duty because they were not selected by a continuation board.  See generally, Defs.' Opp. to Mot. Prelim. Inj. [Adair docket no. 145] at 9-10, 11-12.  Further, chaplains that are similarly situated to Belt and Porter-Stewart were treated in a

similar manner.  When Belt and Porter-Stewart were discharged, a total of 23 chaplains at the rank

of lieutenant who had also twice failed to select for promotion were scheduled for discharge,

including 10 Liturgical Protestants and 5 Roman Catholics, assuming plaintiffs' categorizations of

denominations into the faith group categories.  Id. at 15.  Unlike Belt and Porter-Stewart, who could

not be retained under the governing statutes, the chaplains currently serving on active duty past age

62 were retained pursuant to statutory authority.  See, infra, at II.B.

In reply, plaintiffs may argue that CFGC and Associated Gospel Churches ("AGC") have

associational standing to raise any injuries to chaplains these organizations have endorsed.  See Pls.'

Mandate Reply at 8-10 (arguing CFGC has associational standing).  Although the Court found that

CFGC possessed associational standing, it did so only in the most general terms, did not rule that

CFGC had standing to challenge the specific practice at issue here, and correctly tied such standing

to the standing that each individual CFGC-endorsed chaplain would have to challenge the alleged

conduct.  See generally Order and Opinion dated August 17, 2000 [CFGC docket no. 30] at 11-15,

17-20.  As with their own numbers, plaintiffs have not shown that any chaplain endorsed by CFGC

or AGC ever sought or was denied retention after age 62 such that they would have standing in their

own right.

Finally, plaintiffs may argue that they have standing as taxpayers.  See Pls.' Mandate Reply

at 11-12 (arguing taxpayer standing).  The Supreme Court has consistently limited taxpayer standing

to Establishment Clause challenges of Congress's exercise of its taxing and spending power.  See

Hein, 127 S. Ct. at 2566 (finding plaintiffs asserting taxpayer status lacked standing where they do

not challenge specific congressional action, appropriation, or creation of legislative program); Flast

v. Cohen, 392 U.S. 83, 102 (1968) (recognizing taxpayer standing to bring Establishment Clause

-13-

claims, but stating that such standing extends "only [to] exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution"); see also DaimlerChrysler, 126 S. Ct. at 1864 (stating that taxpayer standing limited to claim that congressional action under taxing and spending clause is in derogation of Establishment Clause); Bowen v. Kendrick, 487 U.S. 589, 619 (1988) (although taxpayer had standing to challenge constitutionality of statute allowing disbursement of funds, taxpayer lacked standing to challenge Executive's expenditure of funds in course of administering or executing regulatory statute); Valley Forge, 454 U.S. 464 (rejecting taxpayer standing to challenge Executive decision to transfer federal property to religious college).

Plaintiffs do not have taxpayer standing because they challenge specific decisions by the Executive in administering the military, not congressional appropriations permitting the Navy to operate the Chaplain Corps or enactment of any congressionally-created program. See Hein, 127 S. Ct. at 1566 (taxpayer standing does not extend to expenditures of funds resulting from executive discretion). In Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208 (1974), the Supreme Court found that taxpayers lacked standing to challenge the Executive's retention of Members of Congress in the military reserves, id. at 227-28, a situation not unlike the retention of the chaplains targeted here. Further, even if they were challenging congressional conduct, taxpayers do not have standing to challenge congressional exercises of the Constitution's Military Clauses, an authority separate from Congress's power to tax and spend. See Winkler v. Gates, 481 F.3d 977, 985-88 (7th Cir. 2007) (finding taxpayers lacked standing to challenge statutes enacted under Military Clauses and Property Clause).

At base, plaintiffs seek only to challenge conduct they claim is unlawful, not to rectify a wrong that they personally suffered. As in Valley Forge, plaintiffs only "claim that the Constitution

has been violated, but they claim nothing else." 454 U.S. at 485. Thus, plaintiffs have not alleged an "injury sufficient to confer standing under Art. III." Id.; see also Lance, 127 S. Ct. at 1198 (plaintiffs lacked standing to challenge alleged violation of Constitution's Elections Clause where "[t]he only injury plaintiffs allege is that the law . . . has not been followed").[3]

### 3.    Even if Plaintiffs Satisfy Article III Standing Requirements, they Lack Standing under the Doctrine of Prudential Standing.

Further, even if plaintiffs did have Article III standing, the Court should apply the doctrine of prudential standing to prohibit them from seeking relief on behalf of third-parties or on the basis of generalized grievances. See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 804 (1985); Warth v. Seldin, 422 U.S. 490, 499 (1975). Even where a plaintiff satisfies the prerequisites for constitutional standing, prudential standing requirements may still preclude the exercise of jurisdiction. See Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11-12 (2004). These additional limitations on standing are based on the principle that the Judiciary should "avoid deciding questions of broad social import where no individual rights would be vindicated" and are designed to "limit access to the federal courts to those litigants best suited to assert a particular claim." Phillips Petroleum, 472 U.S. at 804; see also Elk Grove, 542 U.S. at 12 (without prudential standing limitations, "'the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the

---

[3] Plaintiffs may also cite the possibility that some chaplains may be subjected to involuntary retirement by selective early retirement ("SER") boards in the future. See Pls.' Mandate Reply at 22. This possibility is entirely speculative, as there is no evidence that the Navy will hold any chaplain SER boards. In any event, such chaplains are not similarly situated to the targeted chaplains because involuntary retirement by a SER board applies to a different category of officers under different statutory authority not challenged in this motion. See 10 U.S.C. §§ 611(b), 638.

questions and even though judicial intervention may be unnecessary to protect individual rights"' (quoting <u>Warth</u>, 422 U.S. at 500)).

The specific requirements of prudential standing include that a party "assert his own legal interests rather than those of third parties," <u>Phillips Petroleum</u>, 472 U.S. at 804, and that a claim not be a "generalized grievance" shared in substantially equal measure by all or a large class of citizens, <u>Warth</u>, 422 U.S. at 499. The doctrine of prudential standing and deeply rooted principles of constitutional avoidance counsel against adjudicating a matter unless and until the actual proponents of the rights asserted are properly before the Court. <u>See Singleton v. Wulff</u>, 428 U.S. 106, 113 (1976); <u>see also Schlesinger</u>, 418 U.S. at 222 ("To permit a complainant who has no concrete injury to require a court to rule on important constitutional questions in the abstract would create the potential for abuse of the judicial process, distort the role of the Judiciary in its relationship to the Executive and the Legislature and open the Judiciary to an arguable charge of providing 'government by injunction.'"). This is particularly so where the Court is asked to decide constitutional questions of "wide public significance." <u>Warth</u>, 422 U.S. at 500.

Under the prudential standing doctrine, chaplains who may not have been treated in similar fashion to those whose retention is challenged here, not plaintiffs, are in the better position to determine whether they need to seek relief from any alleged favoritism of Roman Catholic chaplains over age 62. <u>See Singleton</u>, 428 U.S. at 113. The prudential standing doctrine therefore applies, and the Court should deny plaintiffs' request for a preliminary injunction.

**B.    Title 10 Authorizes the Secretary to Retain Chaplains on Active Duty Past Age 62.**

If the Court concludes that plaintiffs have standing, it should nevertheless find that the Navy

has complied with all statutory and regulatory requirements. Retention of chaplains over age 60 – the governing statutory age at that time[4] – was proper under applicable statutes and regulations when plaintiffs first brought their motion in 2003. See Defs.' 2003 Opp. at 9-19; infra, Part II.B.3. Changes in the governing law since then continue to authorize the Navy's retention of chaplains over age 62. Unlike the time when plaintiffs brought their first motion, when many chaplains on active duty were from the Reserves, all of the targeted chaplains on active duty are either in the Regular Navy or in the Retired Reserves. Chaplains who are not retired but who are retained on active duty are no longer in the Navy Reserves.[5]

Currently, the only chaplains serving on active duty past their 62nd birthdays were in two categories: (1) eight chaplains from the Regular Navy with ages ranging from 62 to 65 (specified by designator code 4100), and (2) six chaplains voluntarily recalled from the Retired Reserves with ages ranging from 70 to 73 (specified by designator code 4109). Gragg Decl. at ¶3. Each group will be addressed in turn.

---

[4] When plaintiffs filed their motion, the age limit for the reserves contained in 10 U.S.C. § 14509 was age 60. Congress subsequently changed the limit for reserve officers to 62, as reflected in the current version of 10 U.S.C. § 14509. Pub. L. 109-364, § 503(c); Notes at 10 U.S.C. § 14509.

[5] The Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375 § 501, 188 Stat. 1811, 1872 (codified as amended at 10 U.S.C. § 532), eliminated the requirement for officers to be initially commissioned as members of the Naval Reserves upon entering active duty, and 10 U.S.C. § 532(d)(1) exempts chaplains from any requirement that they be able to complete 20 years of active duty prior to age 62 to receive a regular commission. As amended, 10 U.S.C. § 532 made all new active duty officers who came onto active duty after May 1, 2005, regular officers, and all eligible reserve officers were transferred to the regular officer force by May 1, 2006. Berto Decl. at ¶7.

-17-

1.     The Navy Is Authorized to Retain Chaplains from the Regular Navy on
       Active Duty Past Age 62.

As to the first group – chaplains in the Regular Navy with designator code 4100 – Title 10

provides for separation from active duty of those serving in the Regular Navy at age 62, except

where separation is deferred under prescribed statutory conditions.  See 10 U.S.C. § 1251(a).

However, Title 10 specifically authorizes the Secretary to retain chaplains in the Regular Navy past

age 62 if the Secretary determines in his discretion that retention is in the Navy's best interest:

> Deferred retirement of chaplains. – The Secretary of the military department
> concerned may, subject to subsection (d) defer the retirement [at age 62 required]
> under subsection (a) of an officer who is appointed or designated as a chaplain if the
> Secretary determines that such deferral is in the best interest of the military
> department concerned.

10 U.S.C. § 1251(c).  Although any deferment under the provision cited above may not extend

beyond a chaplain's 68th birthday, 10 U.S.C. § 1251(d)(1), the Secretary retains discretion to retain

the officer after age 68 under separate statutory authority:

> The Secretary of the military department concerned may extend a deferment under
> subsection . . . (c) beyond [the chaplains' 68th birthday] if the Secretary determines
> that extension of the deferment is necessary for the needs of the military department
> concerned.  Such an extension shall be made on a case-by-case basis and shall be for
> such period as the Secretary considers appropriate.

10 U.S.C. § 1251(d)(2).[6]  Thus, Title 10 authorizes the retention of all eight chaplains from the

Regular Navy serving on active duty over age 62.

Further, none of the Regular chaplains are subject to Title 10's prohibition against retaining

regular officers at the ranks of lieutenant or lieutenant commander on active duty if they have twice

failed to promote to the next higher rank.  See 10 U.S.C. § 632 (mandating discharge or retirement

---

[6]  Currently, no chaplains from the Regular Navy (signified by designator code 4100) are
serving past age 68.  See Gragg Decl. at ¶3.

-18-

of lieutenants and lieutenant commanders serving on the Active Duty List who have twice failed to promote to the next higher rank, absent application of specified exceptions).  None of the chaplains from the Regular Navy (signified by designator code 4100) on active duty over age 62 hold the rank of lieutenant.  See Gragg Decl. at ¶3.  Further, of the two that hold the rank of lieutenant commander, one has not twice failed to promote to commander, and the second, although he failed to promote multiple times, is not required to be separated under 10 U.S.C. § 632 because he was selected for continuation by a board held pursuant to 10 U.S.C. § 637.  Berto Decl. at ¶3 (describing promotion and continuation history for chaplain as of March 2007); Gragg Decl. ¶5 (updating same).  Thus, none of the targeted chaplains are retained in violation of Title 10 after twice failing to promote.[7]

To the extent plaintiffs challenge the retention of chaplains in the Regular Navy, they argue that where section 1251(c) allows deferral of a chaplain's retirement, the chaplain must have already reached sufficient time in service to obtain a paid retirement at the time of the deferral.  See Pls.' Renewed Mem. at 38-39 (arguing that term "defer" means that subsection (c) "provides no authority to extend chaplains *who have not attained* the necessary time in service for retirement until they reach 20 years service" (italics in original)).  The plain language of section 1251 does not support plaintiffs' interpretation.  Section 1251 requires that an officer (below the rank of rear admiral) reaching age 62 "shall be retired," unless exceptions apply.  10 U.S.C. § 1251(a) (emphasis added).  This plain language qualifies the officer for retirement, and it is that retirement that may be deferred under subsections (c) and (d).  Id. § 1251(c) (allowing deferral of retirement required by section

---

[7]  Further, the regular chaplain selected by a continuation board despite having multiple failures to promote to commander, see Berto Decl. ¶ 3, is not similarly situated to Belt and Porter-Stewart, who served at a lower rank for which no continuation board was held prior to their discharge.  See Defs.' Opp. to Mot. Prelim. Inj. [Adair docket no. 145] at 11-12.

1251(a)); see also In re England, 375 F.3d 1169, 1177 (D.C. Cir. 2004) ("It is well established that when the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." (quotation marks and citations omitted)). Plaintiffs' argument would lead to the absurd conclusion that no officer not qualified for a pension would be subject to mandatory retirement, because he would not qualify for the retirement contemplated by subsection (a) for the same reasons he would not qualify for deferral under subsection (c).

Given the statutory authorization described above, plaintiffs cannot show a likelihood of success on the merits of any claim that the Navy's retention of Roman Catholic chaplains from the Regular Navy on active duty past age 62 is not authorized by law.

> 2.    The Navy Is Authorized to Retain Chaplains from the Retired Reserves on Active Duty Past Age 62.

As to the second group – chaplains in the Retired Reserves with designator code 4109 – Title 10 permits the retention of officers from the Retired Reserves, first by authorizing transfer of officers to the Retired Reserves and, second, by authorizing recall of such officers to active duty.

> a.    *Title 10 Authorizes the Navy to Transfer Chaplains to the Retired Reserves Even Though They Are Not Eligible for Retirement Pay or Benefits.*

Although the targeted 4109 chaplains are not eligible for retirement pay or benefits, Title 10 specifically contemplates that officers in the Retired Reserves are not limited to those eligible for retirement pay; section 10154 states that the Retired Reserves consists of two categories of officers: (1) officers eligible for retirement after a number of years of service authorized by statute, 10 U.S.C. § 10154(1); and (2) officers "otherwise qualified" for transfer to the Retired Reserves.  Id. §

10154(2). The military is empowered to interpret reasonably the term "otherwise qualified" in 10 U.S.C. § 10154(2), see Chevron U.S.A. v. N.R.D.C., 467 U.S. 837, 842-43 (1984) (where statute is silent or ambiguous, issue is whether agency's interpretation is based upon permissible construction of statute), and has determined that the transfer of reservists not qualified for retirement pay may be authorized under certain circumstances. See Declaration of Samuel Wyvill (Ex. 4 to Defs.' Mandate Mem.) (copy attached at Ex. 4) ("Wyvill Decl.") at ¶¶2-4 (describing process of transferring Reservists from active-duty to Retired Reserves); Chief of Naval Operations Instruction ("OPNAVINST") 1820.1, Encl. 1 ¶ 6(b)(1) (attached at Ex. 3); Bush Decl. ¶¶ 4, 7-8, 10.

Under the governing Navy regulation, eligible officers may transfer to the Retired Reserves regardless of whether they have completed twenty years of service. Currently, OPNAVINST 1820.1 authorizes transfer of officers "who are not qualified for retired pay at age 60, and are required by law to be retired or discharged from the Navy Reserve" when they "possess critical professional skills which are identified by" the Chief of Naval Personnel "as necessary to be retained in the inventory . . . ." OPNAVINST 1820.1, Encl. 1 ¶¶ 6(b), 6(b)(1).[8] To accomplish this transfer, an officer is first removed from active duty and then becomes eligible for transfer to the Retired Reserves. See Wyvill Decl. at ¶¶2-4 (describing process of transferring Reservists from active-duty to Retired Reserves). The six chaplains with designator code 4109 serving beyond age 62 all

---

[8] In 2003, when the Court first considered plaintiffs' motion, the operative instruction was Secretary of the Navy Instruction ("SECNAVINST") 1820.2B. See Defs.' 2003 Opp. at 14-15, Ex. C. That Instruction was replaced by SECNAVINST 1820.2C (attached as Ex. 2) on January 25, 2005, which in turn was replaced by the current instruction, OPNAVINST 1820.1, on December 24, 2005. All of these instructions permitted the transfer of officers not eligible for retirement pay to the Retired Reserves. Compare OPNAVINST 1820.1, Encl. 1 ¶ 6(b)(1) with SECNAVINST 1820.2C, Encl. 1 ¶ 6(b) and with SECNAVINST 1820.2B, Encl. 1 ¶ 5(b).

-21-

transferred to the Retired Reserves under this or a similar provision of prior instructions.[9]  Berto Decl. at ¶¶4-5; Gragg Decl. ¶5 (updating same and showing no change in identities of 4109 chaplains).

Plaintiffs' implications to the contrary notwithstanding, the power to transfer Reservists ineligible for retirement benefits to the Retired Reserves is not limited to the Roman Catholic chaplains at issue here; the Navy has retained in OPNAVINST 1820.1 the power to transfer similarly-situated officers from throughout its ranks to the Retired Reserves, not just chaplains. See Wyvill Decl. at ¶7; OPNAVINST 1820.1, Encl. 1 ¶6(b)(1).  Further, the Navy has transferred officers who are not chaplains to the Retired Reserves even when not eligible for retirement pay. See, e.g., Supp. Decl. of Samuel Wyvill (Ex. H to Defs.' Mandate Reply) (copy attached at Ex. 9) ("Supp. Wyvill Decl.") at ¶4 (Navy transferred merchant marines to Retired Reserves).  Because the Navy authorizes transfer to the Retired Reserves of similarly-situated officers from all components by a general instruction publicly available, not just chaplains pursuant to some allegedly secret program as plaintiffs imply, the mere transfer of the targeted chaplains to the Retired Reserve does not evidence religious bias.

---

[9] Plaintiffs have implied that OPNAVINST 1820.1 does not authorize transfer of the targeted chaplains to the Retired Reserves.  First, they have argued that defendants changed their explanations of authority to retire the targeted chaplains by citing past references to their retirement as honorary and as transfer to the Retired Reserves.  See Pls.' Mandate Reply at 17-18.  Transfer to the Retired Reserves is also called "honorary retirement" – the two terms refer to the same thing.  See Decl. of Thomas Bush (Ex. G to Defs.' Mandate Reply) (copy attached at Ex. 5) ("Bush Decl.") at ¶¶3, 4.  Second, plaintiffs have argued that the Navy engaged in "a series of sham transactions" in transferring the targeted chaplains to the Retired Reserves by first removing them from the Active Duty List and then transferring them.  See Pls.' Mandate Reply Ex. C at 7.  On the contrary, the Navy followed the proper procedures, first removing the chaplains from active duty such that they were eligible under OPNAVINST 1820.1.  See Wyvill Decl. at ¶¶2-4; Berto Decl. at ¶¶4-5.  That the Navy undertook these steps in close temporal proximity does not evidence a "sham."

Past Department of Defense and congressional action is consistent with this interpretation of section 10154 and OPNAVINST 1820.1.  The Department of Defense interprets 10 U.S.C. § 10154(2) as authorizing transfer to the Retired Reserves through honorary retirement.  See Bush Decl. at ¶¶ 4, 7.  Moreover, the Department of Defense previously recognized such honorable retirement for certain officers not eligible for retirement pay.  See Bush Decl. ¶4; Department of Defense Directive ("DODDIR") 1215.6 (9/22/1987) (attached at Ex. 12) at ¶E.6.d.(6); DODDIR 1200.15 (2/16/1973) (attached at Ex. 13) at ¶II.C.2.a(4).

Further, Congress has by its conduct demonstrated approval of transfers to the Retired Reserves of officers ineligible for retirement based upon years of service or for retirement pay.  For example, Congress passed laws in 1994 and 1996 regulating the issuance of identification cards and eligibility for commissary and exchange benefits for those transferred to the Retired Reserves "without having completed the years of service required under section 1331(a)(2) of [Title 10] for eligibility for retired pay under chapter 67 of [Title 10]."  Pub. L. 103-337 § 377, 108 Stat. 2663, 2737 (1994) (relevant pages attached at Ex. 7); see also Pub. L. 104-106 § 1501, 110 Stat. 186, 500 (1996) (relevant pages attached at Ex. 8) (replacing reference to Retired Reserves in repealed 10 U.S.C. § 274 with correct citation to 10 U.S.C. § 10154(2)); Bush Decl. at ¶7.  These congressional acts evidence knowledge and approval of the military's practice of transferring officers not eligible for retirement pay to the Retired Reserves.  See Kay v. F.C.C., 443 F.2d 638 (D.C. Cir. 1970) (consistent administrative interpretation of statute brought to attention of Congress and not changed by it is almost conclusive evidence of congressional approval); see also CBS, Inc. v. F.C.C., 453 U.S. 367, 384-85 (1981).

-23-

   b. *Title 10 Authorizes the Navy to Retain the Targeted Officers from the Retired Reserves on Active Duty.*

Once transferred to the Retired Reserves, chaplains may be retained on active duty at the Secretary's discretion with the officer's consent. First, the age limitation for reserve officers contained in section 14509 (and cited by plaintiffs) specifically states that it only applies to officers who are "not a member of the Retired Reserves . . . ." 10 U.S.C. § 14509. Second, Title 10 authorizes the Secretary to recall chaplains in the Retired Reserves to active duty:

> At any time, an authority designated by the Secretary concerned may order a member of a reserve component under his jurisdiction to active duty, or retain him on active duty, with the consent of that member.

10 U.S.C. § 12301(d). This provision contains no age limitation; the only limitations provided are that the officer be a member of a reserve component and consent to serve on active duty.[10]

Plaintiffs address only 10 U.S.C. § 14703 in discussing statutory authorization for retaining Reservists on active duty past age 62 and argue that this section limits retention of any Reservist on active duty to those under age 67, precluding retention of the targeted 4109 chaplains. See Pls.' Renewed Mem. at 39; see also Pls.' Mandate Mem. at 31-33. Plaintiffs' argument ignores the

---

  [10] Plaintiffs have argued that the Secretary limited recalls from the Retired Reserve to no more than 180 days, citing SECNAVINST 1811.4E (copy included with Defs.' 2003 Opp. at Ex. G). See Pls.' 2003 Mem. at 9. That Instruction was canceled on January 24, 2005, and is therefore no longer in effect. See ALNAV Message dated Jan. 24, 2005 (attached at Ex. 6) at 3 (listing canceled instructions, including SECNAVINST 1811.4E). Further, as defendants demonstrated in their original opposition, see Defs.' 2003 Opp. at 17-18, the Secretary had explicitly authorized the recall and retention of such officers for periods longer than 180 days under certain, prescribed circumstances. See, e.g., SECNAVINST 1811.4E ¶¶ 4.d, 5; MILPERSMAN 1811-010 (copy included with Defs.' 2003 Opp. at Ex. F) at ¶ 3f ("Recall or retention for a period greater than 180 days is authorized by SECNAV."); Memorandum for Chief of Naval Personnel and Chief of Naval Personnel, Commandant of the Marine Corps, dated May 28, 2003 (copy included with Defs.' 2003 Opp. at Ex. H) at ¶ 1 (delegating authority to approve such recalls to Assistant Secretary of the Navy for Manpower and Reserve Affairs (ASN (M&RA)) and Chief of Naval Personnel); see also SECNAVINST 1811.4E at ¶ 5(a).

statutory authority applicable to retention of chaplains from the Retired Reserves and misinterprets the limitation contained in section 14703. First, as explained above, chaplains from the Retired Reserves serve on active duty under 10 U.S.C. § 12301(d), which allows the Secretary to order any member of any reserve component to active duty. Thus, plaintiffs' citation to section 14703 is inapposite. Second, although section 14703 limits authority to retain officers to those under age 67, that limitation applies only to retention under section 14703. See 10 U.S.C. § 14703(b) ("An officer may not be retained in active status under this section later than the date on which the officer becomes 67 years of age." (emphasis added)). Because the Retired Reservists at issue here are serving on active duty under separate statutory authority – 10 U.S.C. § 12301(d) – the age limitation contained in section 14703(d) does not apply.

Plaintiffs also argue that Retired Reservists at the rank of lieutenant and lieutenant commander who have twice failed to promote may not be retained on active duty under 10 U.S.C. § 14703. Pls.' Renewed Mem. at 39, 41; see also Pls.' Mandate Mem. at 32. Again, section 14703 does not apply to the Retired Reservists at issue. To the extent it could apply, it does not prohibit retention of chaplains from the Retired Reserves. Officers in the Retired Reserves serve in retired status rather than active status, see 10 U.S.C. § 10141(b), and therefore do not qualify for either the Active Duty List or the RASL. See, supra, Part I (Active Duty List does not include retired officers on active duty, 10 U.S.C. §§ 620(a), 641(4), and RASL includes only officers "in an active status," 10 U.S.C. § 14002(a)). The statutory requirements plaintiffs cite for officers who have failed to promote apply only to officers on the RASL. Specifically, section 14505 applies to "a lieutenant on the reserve active-status list of the Navy who has failed of selection for promotion to the next higher grade for the second time . . . ." 10 U.S.C. § 14505 (emphasis added). Likewise, section 14506

requires only that lieutenant commanders who have twice failed to promote "if not earlier removed

from <u>the reserve active-status list</u> . . . be <u>removed from that list</u> . . . .".  10 U.S.C. § 14506 (emphasis

added).  Section 14506 only requires removal from the RASL and says nothing of removal from

active duty.  Because officers in the Retired Reserves do not serve on the RASL, these provisions

do not apply.[11]

       c.      *The Department of Defense Does Not Prohibit the Navy from Transferring the Targeted Chaplains to the Retired Reserves for Retention on Active Duty.*

Finally, plaintiffs argue that chaplains with the designator code 4109 were improperly

transferred to the Retired Reserves before their retention on active duty, relying upon various

Department of Defense Instructions ("DODI") to argue that the Department of Defense has

prohibited the Navy from transferring officers ineligible for retirement pay or benefits to the Retired

Reserves.   <u>See, e.g.</u>, DODI 1215.06 (attached at Ex.10) at 17 ¶6.6.4.4 (defining Retired Reserves

as including those eligible for retirement based upon years of service and those eligible for statutory

retirement benefits or pay); <u>see also</u> DODI 1215.19 (attached at Ex.11) at 17-18 ¶6.5.4.4.  As stated,

prior Department of Defense regulations recognized the honorary retirement of officers ineligible

for retirement benefits, such as the targeted 4109 chaplains, by transfer to the Retired Reserves.  <u>See</u>

Bush Decl. ¶4; DODDIR 1215.6 (9/22/1987) at ¶E.6.d.(6); DODDIR 1200.15 (2/16/1973) at

¶II.C.2.a(4).   Although the Department of Defense later determined that it would no longer track

---

[11] Further, because retired officers are not on the Active Duty List, the statutory requirement that, under certain circumstances, officers at the ranks of lieutenant or lieutenant commander on the Active Duty List who have twice failed to promote and have not been selected for continuation by a selection board must be discharged, 10 U.S.C. § 632, does not apply to them.  <u>See</u> 10 U.S.C. § 632(c) (applying separation requirement to Navy lieutenants and lieutenant commanders "on the active duty list").

-26-

officers with honorary retirement, Bush Decl. ¶¶5-6, the Department does not interpret DODI 1215.06 – the currently operative instruction[12] – to prohibit the Navy's transfer of additional officers to the Retired Reserves, Bush Decl. ¶ 8, 10, and the Court should give substantial deference to the Department's interpretation of its own instruction. <u>See</u> <u>Goldman v. Weinberger</u>, 475 U.S. 503, 509-10 (1986) (refusing to consider evidence to rebut military determination that regulation challenged under First Amendment is necessary); <u>see also</u> <u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504, 512 (1994); <u>Gonzales v. Oregon</u>, 546 U.S. 243,  126 S. Ct. 904, 914 (2006) ("An administrative rule may receive substantial deference if it interprets the issuing agency's own ambiguous regulation."). Thus, plaintiffs' citation to a statement by a Defense Department official that the Navy must comply with Department of Defense regulations, see Pls.' Renewed Mem. at 34 (citing Dep. of Thomas Bush (Pls.' Ex. 15) at 95:11 – 97:21) is inapposite; the Navy is not violating Department of Defense regulations.

The Department of Defense has consistently held to this interpretation since the governing regulation was changed.  The Department of Defense informed the Navy at the time the policy was changed that the Navy could continue to transfer officers to the Retired Reserves where needed, even if they did not meet the descriptions in the Department of Defense's regulation, and has continued to do so since.  <u>See</u> Bush Decl. at ¶10; Dep. of Samuel Wyvill (cited pages attached at Exhibit 22) at 71:14-24, 80:10-19.  Further, the Navy had approximately 38,000 officers in honorary retirement when the Department of Defense regulations were first changed.  Wyvill Dep. at 51:14-22.  The Department of Defense did not require the Navy to transfer these officers out of the Retired Reserves

─────────────────────

[12]  DODI 1215.19 is the predecessor to DODI 1215.06 and was in effect between December 12, 2000, and February 6, 2007.

even though they did not fit within the new regulations' categories, see Wyvill Dep. at 66:5-13, 71:14-24, and the Navy still has approximately 24,000 such officers in the Retired Reserves. Supp. Wyvill Decl. at ¶3. The Department of Defense also permits the Navy to categorize officers receiving statutory voluntary separation incentive pay[13] as members of the Retired Reserves, so that they maintain their statutorily required affiliation with the military, even though such officers do not fit any of the descriptions used by the Department of Defense in its instructions. See Wyvill Supp. Decl. at ¶3; Wyvill Dep. at 54:20 – 55:15, 84:19-25.

Finally, there is no specific prohibition against the Navy's creation of additional categories for the Retired Reserves. Section 10154 does not limit authority to create retirement categories solely to the Department of Defense; thus the Navy may also do so where not prohibited. See 10 U.S.C. 10154(2); see also Bush Decl. ¶7. Further, the Department of Defense included no provision in DODI 1215.06 that prohibits the Navy from creating different categories of officers for the Retired Reserves under 10 U.S.C. § 10154(2). Indeed, the Department rejected the inclusion of such language and permitted the Navy to maintain its statutory authority to transfer officers to the Retired Reserves. Bush Decl. ¶8.

Plaintiffs cite Bond v. United States, 47 Fed. Cl. 641 (2000), to argue that the Navy lacks authority to create categories of officers for the Retired Reserves not defined by Department of Defense regulations. In Bond, plaintiff argued that governing military regulations required that his tour of duty be classified in a certain manner and that the Air Force ignored the governing regulation in classifying his tour of duty differently. 47 Fed. Cl. at 643, 659-62. This is not the same situation

---

[13] In the exhibits accompanying this opposition, voluntary separation incentive pay may be referred to as "VSI."

as that presented here. The Navy does not dispute that, where the Department of Defense requires that an officer be classified in a certain manner, the Navy must do so. Here, though, chaplains granted an honorary retirement and transferred to the Retired Reserves do not fit any of the categories defined by the Department of Defense's regulations. Thus, unlike Bond, the Navy is not refusing to apply the definitions used by the Department of Defense to officers who meet those definitions.

Plaintiffs also cite DODI 1352.1 and 1402.1, which contain definitions of officers in the Retired Reserves based upon eligibility for retirement pay. See Pls.' Renewed Mem. at 33; Pls.' Mandate Mem. at 28-30. These Instructions do not support plaintiffs' argument. DODI 1352.1 was issued to implement, among other statutes not at issue here, 10 U.S.C. § 12301(a). DODI 1352.1 (attached at Ex. 14) at 1 ¶1.2. Because the chaplains from the Retired Reserves are not retained pursuant to section 12301(a), and DODI 1352.1 does not implement the section under which they were retained, 10 U.S.C. § 12301(d), the Instruction does not apply to them. Similarly, DODI 1402.1 applies to the employment of those eligible for retirement pay in civilian office. See DODI 1402.1 (attached at Ex. 15) at ¶¶ 1, 3.2, 4.1. It is not surprising that the Department of Defense regulates the employment of officers receiving retirement pay seeking a civilian position that also pays a salary. That situation does not apply to the targeted chaplains.

Even if the targeted chaplains' transfer to the Retired Reserves was not authorized by the Department of Defense, any such lack of authority does not entitle plaintiffs to a mandatory injunction under these circumstances. First, plaintiffs' theory of standing relies not on the transfer of officers to the Retired Reserve, but on the recall of certain chaplains from the Retired Reserves to active duty, which they claim was based upon and evidences denominational bias in favor of

-29-

Roman Catholics and against non-liturgical Protestants like themselves. Further, none of plaintiffs allege that they have sought, much less been denied, transfer to Retired Reserves. Plaintiffs can show no injury from transfers of other officers to the Retired Reserves solely based upon their claim that it is not authorized by the governing law or regulation. See Lance, 127 S. Ct. at 1198; Allen, 468 U.S. at 754; Valley Forge, 454 U.S. at 483. Plaintiffs therefore lack standing to challenge the transfer of the targeted chaplains to the Retired Reserves. See also, supra, Part II.A (plaintiffs must articulate injury particular to them and lack standing to challenge conduct based only on claim that conduct is unlawful).

Second, regardless of the circumstances surrounding the transfer to the Retired Reserves, the recall of the targeted chaplains from the Retired Reserves once they were transferred to it was proper under the statutory authority described above. Because the relief plaintiffs seek is a mandatory preliminary injunction, granting interim injunctive relief based on an alleged violation of regulations with at most a tangential relationship to the injury plaintiffs allege, if any, is not justified at this stage of the litigation.

Given the statutory discretion afforded the Secretary to retain the chaplains currently on active duty past age 62, plaintiffs cannot show a likelihood of success on the merits of their challenge to such retention.

3.  Retention of Chaplains on Active Duty Past Age 60 Was Proper When Plaintiffs Brought their Motion in 2003.

Plaintiffs imply that the past retentions of chaplains was not authorized under prior law. See Pls.' Renewed Mem. at 7 (alleging that "[i]n 2003, there was no authority to extend Reserve officers on active duty beyond" age 60); id. at 37 (arguing that chaplains in Retired Reserves were illegally

retained, citing 10 U.S.C. § 14703). Even if the past retention of chaplains could be reviewed, plaintiffs fail to show a likelihood of success on the merits. At the time, chaplains serving at ranks lower than commander were part of the Reserves, not the Regular Navy. As defendants showed in their original opposition, see Defs.' 2003 Opp. at 9-13, Title 10 grants the Secretary discretion, with exceptions not applicable here, to retain on active duty certain consenting reserve officers, including chaplains, until the officer reaches age 67, notwithstanding the age limitations contained in Title 10, Part III, chapter 1407. See 10 U.S.C. § 14703(a)(2), (b). The only statutory exception to this discretion is for reservists in the ranks of lieutenant and lieutenant commander serving on the RASL who have twice failed to promote to the next higher rank. See 10 U.S.C. § 14702(a) (excepting officers referenced in 10 U.S.C. §§ 14503, 14504, 14505, 14506 from authority to retain on active status); id. §§ 14505, 14506. Because the reserve chaplains serving between ages 62 and 67 targeted by plaintiffs' original motion served on the Active Duty List, the Secretary was authorized to retain them under section 14703. See Defs.' 2003 Opp. at 11.

Plaintiffs presented several rebuttal arguments that are inconsistent with the plain language of the relevant statutes. First, plaintiffs argued that section 14703 applies only to officers on the RASL, citing the titles of the part and chapter in which section 14703 is located. See Pls.' Mandate Mem. at 32-33; Pls.' 2003 Reply at 10-11, 20; see also Pls.' Renewed Mem. at 37. On the contrary, chapter 1409 applies to "all reserve officers." 10 U.S.C. § 14001 (emphasis added). Likewise, section 14703 applies to "any reserve officer," not just those on the RASL. See 10 U.S.C. § 14703(a)(2) (emphasis added). A judicial interpretation of these statutes finding them limited to the RASL would contradict this plain language. See In re England, 375 F.3d at 1177 (court must apply statutes' plain language without reinterpretation or creation of judicial exemptions).

-31-

Indeed, if plaintiffs were correct, then the age limitation upon which they relied would only apply to those on the RASL, not those on the Active Duty List and therefore not the chaplains aged 60-67 targeted in 2003. Plaintiffs cited 10 U.S.C. § 14509 for their contention that reservists must be separated at age 60 (as of 2006 amendments, age 62). See Pls.' 2003 Mem. at 6. Like section 14703, section 14509 is contained in Title 10, Part III, which plaintiffs argued applies only to those on the RASL. See Pls.' 2003 Reply at 10-11; Pls.' Mandate Mem. at 32-33. If plaintiffs' were correct, then section 14509 would also apply only to officers on the RASL, and the chaplains whose retention plaintiffs challenged would not have been subject to the age limitation cited, because they were on the Active Duty List. Plaintiffs cannot have it both ways.

Second, plaintiffs argue that Title 10 required discharge of the targeted Reserve officers if they twice failed to promote. See 10 U.S.C. §§ 14505 and 14506, cited in Pls.' Renewed Mem. at 8, 39; Pls.' Mandate Mem. at 7. These statutes apply only to officers on the RASL and therefore not the chaplains targeted at the time. Because the chaplains under age 67 retained at that time were on the Active Duty List and those in the Retired Reserves were not on either the Active Duty List or the RASL, these statutes did not apply to them. In any event, the targeted chaplains with multiple failures to promote were retained either under governing regulations prior to FY 2003, as was plaintiff Belt, see Defs.' Opp. to Mot. Prelim. Inj. [Adair docket no. 145] at 10-11, 12, or by a continuation board as required after FY 2003 in 10 U.S.C. § 637. See Supp. Decl. of Veronica Berto (Ex. I to Defs.' Mandate Reply) (copy attached at Ex. 16) ("Supp. Berto Decl.") at ¶¶3-5.

Acceptance of plaintiffs' interpretation of these statutes would ignore and contradict Congress's intentional decision, spelled out in clear, unambiguous language, to authorize the Secretary to retain reservists serving on the Active Duty List aged 62-67 under 10 U.S.C. § 14703.

**C.    Retention of Roman Catholic Chaplains Whom the Navy Has Determined Will Provide Necessary Services Does Not Violate the Constitution.**

Plaintiffs repeatedly argue, though they lack credible evidence, that the Navy's intent in retaining Roman Catholic chaplains over age 62 is solely to provide Roman Catholic chaplains with pensions. See, e.g., Pls.' Renewed Mem. at 18, 23; Pls.' 2003 Mem. at 1; Pls.' 2003 Reply at 15-17. First, the Navy does not limit its retention of chaplains over the age of 62 to Roman Catholic chaplains. Gragg Decl. at ¶3 (listing chaplains retained on active duty past age 62 and their denomination, including one liturgical Protestant and one Jewish chaplain); see also Berto Decl. ¶2 (same, as of March 2007). Second, as defendants set forth in their original opposition, see Defs.' 2003 Opp. at 16, 18-19, the shortage of Roman Catholic chaplains faced by the Chaplain Corps justifies the retention of Roman Catholic chaplains over age 62. See id. at 18. As shown below, because the Navy now faces a worsening shortage of Roman Catholic chaplains, it may properly choose to retain Roman Catholic chaplains over age 62 with the purpose of meeting the religious needs of the Navy's personnel.

The Supreme Court has held that "[t]here is room for play in the joints" between the Free Exercise and Establishment Clauses. See Cutter v. Wilkinson, 544 U.S. 709, 713-14 (2005) (quoting Locke v. Davey, 540 U.S. 712, 718 (2004)). The Chaplain Corps represents a permissible accommodation of religion intended to enable military personnel to freely exercise their religious beliefs. See McCreary Cty. v. ACLU, 545 U.S. 844 (2005) ("[S]pending government money on the clergy looks like establishing religion, but if the government cannot pay for military chaplains a good many soldiers and sailors would be kept from the opportunity to exercise their chosen religions."). Accordingly, it is inappropriate to subject every decision made by the Navy in managing its Chaplain

Corp to strict scrutiny, because in accommodating the free exercise rights of Navy personnel, it is expected that management decisions would touch upon religion to some degree. Cf. Wilkins v. United States, Case No. 99-1579, slip op. at 7 (S.D. Cal. Dec. 16, 2002) (copy included as Ex. 17) (recognizing that in providing chaplains to accommodate religious needs, government "must become directly involved in religious activity to a limited extent").

Plaintiffs compare these cases to cases not found to involve legitimate accommodations of religious exercise. However, as this Court and the Katcoff Court found, traditional tests for Establishment Clause challenges are not appropriate. See Katcoff v. Marsh, 755 F.2d 223, 232, 235 (2d Cir. 1985) (finding analysis in Lemon v. Kurtzman, 403 U.S. 602 (1971) to be inappropriate in deciding facial challenge to Army Chaplaincy); Larsen v. Navy, No. 1:02cv2005, slip op. at 25-26 (D.D.C. April 30, 2007) (Urbina, J.) (attached at Ex. 18). Instead, the proper standard for reviewing decisions regulating the Chaplain Corps is the relaxed scrutiny applied by the Supreme Court in Goldman. Larsen, slip op. at 34 (citing Goldman).[14] Under that standard, the Court "assesses whether 'legitimate military ends are sought to be achieved' and whether the program 'is designed to accommodate the individual right to an appropriate degree.'" Id. In applying this standard, the Court must defer to judgments by military officers about the necessity of military conduct. See Goldman, 475 U.S. 503 at 509-10 (refusing to consider evidence to rebut military determination that regulation challenged under First Amendment is necessary); Larsen, slip op. at 27-28; see also United States v. Stanley, 483 U.S. 669, 681-82 & n.6 (1987) (distinctive element of Constitution's

---

[14] Plaintiffs argue that this Court's decision in Larsen does not apply here, because no denominational preference was at issue in Larsen. On the contrary, Larsen applied the standard enunciated by the Supreme Court in Goldman, which reviewed government conduct that, in the civilian sector, would have been subjected to strict scrutiny. Under Goldman, and as applied in Larsen, Navy determinations related to military necessity are not subject to strict scrutiny.

treatment of military is "specificity" of "grant of power" and "insistence (evident from the number of Clauses devoted to the subject) with which the Constitution confers authority over the [military] upon the political branches"); Gilligan v. Morgan, 413 U.S. 1, 10 (1973) (Constitution vests "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force" exclusively in legislative and executive branches); Kosnik v. Peters, 31 F. Supp.2d 151, 158 (D.D.C. 1998) ("It would be damaging to shift the decision [as to the composition, training, equipping, and control of a military force] from trained military professionals to a non-specialist judiciary." (citation omitted)); cf. Orloff, 345 U.S. at 90 (commissioning of officers "is a matter of discretion within the province of the President as Commander in Chief.").

The Establishment Clause does not prohibit the Navy from utilizing available statutory tools to retain chaplains on active duty where the Navy has determined that their services are necessary to better enable the Chaplain Corps to carry out its mission. Further, plaintiffs improperly invite this Court to review the Navy's decisions about the necessity of service by certain officers. The Navy's determination that it has a shortage of certain chaplains justifying retention as authorized by statute and regulation is not subject to judicial review. See Goldman, 475 U.S. at 509-10 (refusing to consider evidence to rebut military determination that regulation challenged under First Amendment is necessary); Gilligan, 413 U.S. at 10; Orloff 345 U.S. at 93; Larsen, slip op. at 27-28 (applying Goldman and finding that in assessing Navy's justification for chaplain accession practices, court must "take[] the Navy at its word").[15]

_____

[15] Plaintiffs have, in past briefing, cited Orloff for the proposition that the Judiciary may review whether the military is authorized by statute to undertake certain conduct. See Pls.' Mandate Reply at 6. That is not the issue here, where the Navy is evaluating the military necessity of retaining certain categories of officers on active duty. Determinations as to military necessity are not subject to review by the Judiciary. Goldman, 475 U.S. at 509-10 (refusing to consider evidence to rebut

Even if the Court could accept plaintiffs' invitation, the Navy has ample justification for retaining these chaplains. Retention of the targeted Roman Catholic chaplains addresses an identified shortage of chaplains and does not reflect a government intent to favor one religious view over others. The number of Roman Catholic chaplains on active duty has steadily decreased in recent years. Specifically, in 2002, Roman Catholic chaplains numbered 171 out of 854 total chaplains on active duty, representing 20.02% of active-duty chaplains. See Declaration of Killian Kagle (Ex. 7 to Defs.' Mandate Mem.) (copy included at Ex. 19) ("Kagle Decl.") at ¶5. By January 2007, the total number of Roman Catholic chaplains on active duty had decreased to 125 of 836 total, representing 17% of active-duty chaplains. Id. This shortage has also manifested itself in an inability to assign Roman Catholic chaplains to some command religious programs where needed. See Dep. of Thomas Carter (cited pages attached as Ex. 20) at 32:12-17 (shortage of Roman Catholic and Jewish chaplains in individual commands). Thus, plaintiffs' argument that the Navy has no basis for determining that a shortage of Roman Catholic chaplains exists, see, e.g., Pls.' Renewed Mem. at 18-19 (arguing that Navy does not quantify religious needs); Pls.' Mandate Mem. at 22 (same), is contradicted by the record.

The purpose of retaining these chaplains is the same as the purpose for retaining any other chaplain – to accommodate religious free exercise by Navy personnel – and such a purpose is proper under the First Amendment. See Cutter, 544 U.S. at 713-14 (accommodation of religious exercise is valid government purpose); McCreary Cty., 545 U.S. at 875 (chaplaincy example of permissible accommodation of religion). Plaintiffs provide no reason why retention on active duty of Roman Catholic chaplains over age 62 is any different than service of Roman Catholic clergy under age 62,

_____

military determination that challenged regulation is necessary).

-36-

where all such chaplains are retained via statutory authority to meet the religious needs of Navy personnel. Because the Navy retains the targeted chaplains to further the Chaplain Corps' legitimate mission, such retention serves a legitimate military end and does not violate the Establishment Clause. Cf. Larsen, slip op. at 33-34 (chaplain accession policies serve legitimate military end).

Relying upon the conclusions of their expert, plaintiffs argue that there is no shortage of Roman Catholic chaplains. See Pls.' Renewed Mem. at 19. This argument is based on the faulty assumption that the only way to measure the need for chaplains is to measure overall religious demographics and compare them to the demographics of the Chaplain Corps. Decisions as to need and deployment of chaplains encompass multiple other factors that must also be considered. For example, consistent with a 1987 Department of Defense report to Congress, see Dept. of Defense, Study of Representation of Religious Faiths in the Armed Forces (originally filed as Ex. 9 to Defs.' Cross Mot. Partial Summ. J. [CFGC docket nos. 87, 91]) (cited pages attached at Ex. 23) ("DOD Study") at I-6 (religious needs are not tied solely to the overall number of a denomination's adherents), the Navy has determined that the need for chaplains is measured against numerous factors plaintiffs ignore, including the needs of over 500 duty stations worldwide. See, e.g., Decl. of Rear Admiral Barry Black (originally filed as Ex. 1 to Defs.' Cross Mot. Partial Summ. J. [CFGC docket nos. 87, 91]) (copy attached at Ex. 24) at ¶¶3-10; DOD Study at I-6 – I-7. Because each duty station may be expected to have religious needs from all the faith group categories, the Navy has determined that accommodation of religious free exercise requires a large pool of chaplains from all faith group categories, so that the Navy can better provide command religious programs with access to a mix of chaplains from each faith group category, either by directly assigning chaplains to the command or by assigning a mix to neighboring commands. See Decl. of Stephen Rock (originally

-37-

filed as Ex. 5 to Defs.' Opp. to Pls.' Mot. Decl J. and Cross Mot. Partial Summ. J. [CFGC docket nos. 223-24]) (copy attached at Ex. 25)  at ¶13.

Plaintiffs also imply that the Navy may not retain Roman Catholic chaplains unless it also retains non-liturgical Protestant chaplains.  Plaintiffs cite the stationing of chaplains at two Navy facilities in Rota, Spain, and Naples, Italy, to imply that a shortage of non-liturgical Protestant chaplains exists.  See Pls.' Renewed Mem. at 23-24.  On the contrary, while the numbers of Roman Catholic chaplains have steadily decreased, the numbers of non-liturgical Protestant chaplains on active duty have increased, reaching 39.58% in 2002 and increasing to 49.6% in January 2007. Given the numbers of non-liturgical Protestant chaplains on active duty, the Navy may reasonably determine that alternative methods of retention used for Roman Catholic chaplains are not necessary to maintain a sufficient number of non-liturgicals on active duty, thereby accommodating individual rights to an appropriate degree.  Cf. Larsen, slip op. at 36-37 (current Navy chaplain accession practices accommodate individual rights to appropriate degree).[16]

Plaintiffs also argue that regardless of whether there is a shortage of chaplains, the Navy may address the shortage only by hiring civilian priests to perform Roman Catholic mass and must ignore other statutorily-authorized remedies.  See Pls.' Renewed Mem. at 19-20.  The option to hire contract chaplains does not require the Navy to ignore the availability of Roman Catholic chaplains where Congress has authorized the Secretary to retain them; it is for the Navy to choose among alternatives and decide how best to staff the Chaplain Corps.  Gilligan, 413 U.S. at 10; Kosnik, 31 F. Supp.2d

---

[16]    Further, the Navy accommodated religious needs at the stations cited by deploying chaplains to directly minister to the cited services when available, see Pls.' Renewed Mem. Ex. 6 at ¶¶ 13, 14 (congregation previously led by chaplains), and using alternative methods when a chaplain was unavailable.  See id. (lay leader); id. at ¶ 16 (senior chaplain provides assistance).

at 158; see also Goldman, 475 U.S. at 509-10 (refusing to consider evidence and expert testimony to rebut military determination that regulation challenged under First Amendment is necessary because "desirability" of military regulations and conduct "is decided by the appropriate military officials and they are under no constitutional mandate to abandon their considered professional judgment"); Orloff, 345 U.S. at 93-94 ("[J]udges are not give the task of running the [military])."

Moreover, plaintiffs' proposed alternative is inferior to the Navy's retention of available and willing military officers. Congress has determined that the religious needs of military personnel and their dependents are best met by military officers serving as chaplains. See 10 U.S.C. § 5150 (establishing Chaplain Corps); id. § 5142 (same); see also Katcoff, 755 F.2d at 237 (detailing history of congressional consideration and rejection of abolishing military chaplaincy in favor of civilian chaplaincy). The use of military officers has significant advantages over the use of civilian clergy, including the ability to rely upon officers subject to military discipline, training, and deployment. See Katcoff, 755 F.2d at 236-37. Further, there is no evidence in the record that civilian clergy would be available to assist with the increased shortage that would result from discharging the targeted Roman Catholic chaplains or that the military could rely on the continued availability of civilian clergy in the future. See id. at 236 (rejecting challenge to existence of Army chaplaincy based upon availability of civilian clergy, in part because military could not rely upon civilian chaplaincy without enforceable commitments from civilian churches).

Plaintiffs also do not explain why it should be constitutional to hire Roman Catholic clergy from civilian churches, but should be unconstitutional to retain available Roman Catholic chaplains on active duty where authorized by statute. Indeed, plaintiffs would presumably not fault the Navy if they hired the same challenged chaplains as civilian contractors rather than retaining them on

active duty.  Absent any logical reason to conclude that the Establishment Clause prohibits the Navy from using available military officers to meet religious needs protected by the Free Exercise Clause but allows the Navy to use civilian clergy to meet those same needs, the decision of which method is preferable and how best to compose the Chaplain Corps should be left to the Navy.

Plaintiffs also argue that the Navy's actions should be subject to strict scrutiny.  On the contrary, because the Navy has retained these chaplains after determining that their service on active duty would contribute to the Chaplain Corps' mission, the practice is nothing like the government conduct subjected to strict scrutiny in Larson v. Valente, 456 U.S. 228 (1982).  In Larson, the Supreme Court applied strict scrutiny where it was faced with evidence that a state government had singled out one religious sect for preferential treatment and another sect for disfavorable treatment with the intent to apply onerous reporting requirements to the disfavored sect.  See id. at 254.  Here, there is no credible evidence that the Navy wishes to treat Roman Catholics as a favored sect and disfavor other denominations.  Instead, as shown above, the targeted chaplains are retained by operation of neutral standards related to the need for officers, chaplain and non-chaplain, with skills the Navy has determined are necessary.  Further, in the case of these chaplains, their retention serves to increase the number of chaplains on active duty, thereby contributing to the Chaplain Corps' ability to accommodate the free exercise of religion by Navy personnel.  See also Berto Decl. at ¶5; Wyvill Decl. at ¶4-7.  Thus, even if strict scrutiny could apply to certain management decisions related to the composition of the Chaplain Corps, it does not apply here – plaintiffs cannot demonstrate that the Navy's retention of the targeted chaplains rather than non-liturgical Protestant chaplains is based on denominational preference rather than an accommodation of religious free exercise by Navy personnel, given the identified need for Roman Catholic clergy to accommodate

-40-

the free exercise of religion by Navy personnel and the lack of any shortage of non-liturgical Protestant chaplains.  See Adair v. England, 217 F. Supp.2d 7, 13-14 (D.D.C. 2002) (plaintiffs bear burden to show application of strict scrutiny by first showing a denominational preference); Adair v. England, 183 F. Supp.2d 31, 57 n.24 (noting issue of whether plaintiffs must demonstrate that the Navy's conduct evidences an intentional effort to prefer one denomination over others).

In any event, retention of Roman Catholic chaplains past age 62 satisfies strict scrutiny.  The shortage of Roman Catholic chaplains and the determination that military officers serving as chaplains contributes to the Chaplain Corps' ability to meet religious needs satisfies any burden to show that retention of such chaplains is narrowly tailored to a compelling governmental interest.

Plaintiffs' cursory argument that the Navy is violating the Due Process Clause, see Pls.' Renewed Mem. at 31-32, which relies upon arguments similar to their Establishment Clause claims, fails for the reasons described above.  Further, plaintiffs do not cite any of their number that was denied retention after they reached age 62 and therefore do not show they were treated differently than the targeted chaplains.  See, supra, Part I.A.  Plaintiffs' citation to the experiences of plaintiffs Belt and Porter-Stewart does not show differential treatment.  As previously stated, see, supra, Part I.A, unlike the chaplains targeted here, Belt and Porter-Stewart were discharged as required by statutes not at issue in this motion, no statutory exceptions applied, and chaplains that were similarly situated were also discharged, including liturgical Protestant and Roman Catholic chaplains.  See generally, Defs.' Opp. to Mot. Prelim. Inj. [Adair docket no. 145] at 9-10, 11-12, 15.  Finally, as described above, the retention of the targeted chaplains mitigates a growing shortage of Roman Catholic chaplains, contributing to the Chaplain Corps' legitimate mission, and no similar shortage of non-liturgical chaplains exists.

Because the Navy has properly retained Roman Catholic chaplains past age 62 to meet the religious needs of its personnel and to remedy a shortage of such chaplains, and because such retention does not violate the Constitution, plaintiffs cannot succeed on the merits of their claim that the retention of Roman Catholic chaplains past age 62 is unconstitutional.

## III.    PLAINTIFFS FAIL TO SHOW THAT A MANDATORY PRELIMINARY INJUNCTION WILL NOT CAUSE HARM TO OTHER PARTIES AND WOULD SERVE THE PUBLIC INTEREST.

As defendants demonstrated in their original opposition, see Defs.' 2003 Opp. at 27-30, plaintiffs also fail to satisfy the third and fourth prongs of the preliminary injunction analysis – whether the injunction will substantially harm other parties and whether the public interest favors the grant of a preliminary injunction. Moreover, to the extent the plaintiffs have presented any support or justification for their position, their interest in a mandatory preliminary injunction at this stage of the litigation does not outweigh the harm that would be inflicted on the targeted chaplains, the Navy, and the public interest.

Defendants have demonstrated that the requested injunction would do significant harm to the targeted chaplains, who are not parties to this case. See Defs.' 2003 Opp. at 27. Plaintiffs do not dispute that the mandatory preliminary injunction they seek would require the Navy to separate from active duty 12 Roman Catholic chaplains currently assisting the Chaplain Corps in serving the religious needs of Roman Catholic personnel. See Gragg Decl. at ¶3 (listing chaplains retained on active duty past age 62 and their denomination). Further, accepting plaintiffs' interpretation of Title 10 and the Establishment Clause would call into question the service of chaplains from other faith group categories who are also on active duty past age 62 and are assisting with the service of the religious needs of other personnel. See id. (same). Plaintiffs have not provided any convincing

-42-

justification for requiring the discharge of these chaplains before final resolution of the merits of their claim, despite the harm these chaplains would suffer from such discharge.

Plaintiffs argue that the targeted chaplains have no legitimate interest in continuing their careers because they must have acknowledged that there was no guarantee they would reach sufficient time in service to earn a pension. See Pls.' Renewed Mem. at 44. The Instruction upon which plaintiffs rely merely required that the chaplains acknowledge they have no right to expect to complete 20 years creditable service. See SECNAVINST 1120.4A ¶ 6.b (attached at Ex. 21). This Instruction does not limit the Secretary's ability to retain chaplains when available, nor does it preclude the award of service credit when chaplains do serve. Whether or not these third parties had any expectation when they began their careers, they were continued and are entitled to benefits authorized by law. See Defs.' 2003 Opp. at 12-13.

In addition to the harm to third parties, the discharge of these chaplains would harm the Navy's ability to meet its personnel's religious needs and thus would not serve the public interest. See Defs.' 2003 Opp. at 28-30. Plaintiffs argue that the public interest would be served by ceasing the Navy's "absurd and seditious" operation outside the Constitution. See, e.g., Pls.' Renewed Mem. at 43. Putting aside plaintiffs' inflammatory rhetoric, the Navy's purpose is to provide for the free exercise needs of personnel with religious views that can be served by the targeted chaplains, not to ignore the Constitution or to create divisiveness among its chaplains or personnel. See, supra, Part II.C. For example, by discharging 12 Roman Catholic chaplains, the Navy's current shortage of Roman Catholic chaplains would worsen. Plaintiffs provide no justification for reducing the Navy's ability to meet Roman Catholic religious needs.

Further, Congress's and the Navy's interest in regulating the military would be harmed by

-43-

entry of the requested injunction, which would interfere with the "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force" delegated by the Constitution to the legislative and executive branches. <u>Gilligan</u>, 413 U.S. at 10; <u>Kosnik</u>, 31 F. Supp.2d at 158 (same). Courts have repeatedly stressed the importance of avoiding interference with the internal operations of the armed forces. <u>See, e.g.</u>, <u>Stanley</u>, 483 U.S. 669, 681-82 & n.6 (1987) (describing strength of constitutional delegation to political branches of authority to manage military); <u>Goldman</u>, 475 U.S. at 509-10 (refusing to consider evidence and expert testimony to rebut military determination of actions necessary in managing military); <u>Orloff</u>, 345 U.S. at 93-94 ("[J]udges are not given the task of running the [military]"); <u>Guerra v. Scruggs</u>, 942 F.2d 270, 275 (4th Cir. 1991) (in discussing substantial harm to military from preliminary injunction, stating that "second-guessing the military . . . 'would be a disruptive force as to affairs peculiarly within the jurisdiction of the military authorities'" (citation omitted)); <u>Sebra</u>, 801 F.2d at 1139 (elevated showing of harm is necessary for preliminary injunctive relief in military cases, and harm must be "weighed against the hardship to the military of judicial scrutiny of every military personnel decision" (citation omitted)); <u>Antonuk v. United States</u>, 445 F.2d 592, 594 (6th Cir. 1971) (in balancing harms, stating that "governmental interest in raising an army has, without exception, been considered by the courts to be paramount . . . . Thus, the ordinary balancing tests are rendered almost irrelevant by the transcendent importance of the war power" (citation omitted)). The public interest is best served by allowing the Navy to exercise its considerable military judgment in determining which officers to retain on active duty.

Finally, plaintiffs' arguments are insufficient to justify entry of a mandatory preliminary injunction when weighed against the interests of the targeted chaplains, the Navy, and the public

interest.  See Morgan Stanley, 150 F. Supp.2d at 72-73 n.5 (where movant "makes a particularly weak showing on any one factor, . . . "the other factors may not be enough to compensate").   Here, plaintiffs bear a higher burden because they seek not to preserve the status quo pendente lite, but instead to change that status quo before final resolution of their claims on the merits by requiring discharge of the targeted chaplains and a change in the current composition of the Chaplain Corps. Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd., 15 F. Supp. 2d 1, 4 (D.D.C. 1997) (when moving for mandatory preliminary injunction, "moving party must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious' damage will result from the denial of the injunction"); see also Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234, 1247 & n.4 (10th Cir. 2001); Stanley v. Univ. of S. Cal., 13 F.3d 1313, 1320 (9th Cir. 1994).

Bearing this heightened burden in mind and given the legitimate government purpose and statutory authority outlined above, especially where the injunction requested is a mandatory injunction that must be supported with a "clear showing" of entitlement, Mazurek, 520 U.S. at 972, plaintiffs' arguments on their likelihood of success do not outweigh the harm to the Navy, the targeted chaplains, or the personnel benefitting from these chaplains' service on active duty.  See Morgan Stanley DW Inc., 150 F. Supp.2d at 73 (if movant "makes a particularly weak showing on one factor, . . . the other factors may not be enough to 'compensate.'").

## CONCLUSION

For the reasons stated herein and in defendants' original opposition, defendants request that the Court deny plaintiffs' motion for a mandatory preliminary injunction.

**CERTIFICATE OF SERVICE**

I hereby certify that on July 25, 2007, I caused a true and correct copy of Defendants' Memorandum Opposing Plaintiffs' Renewed Motion for a Preliminary Injunction and Addressing Mandate by Court of Appeals, accompanying exhibits, and a proposed Order to be served by the Court's ECF system on the following:

Arthur A. Schulcz, Sr., Esq.
2521 Drexel Street
Vienna, VA 22180
Counsel for Plaintiffs

_____/S/_____
Michael Q. Hyde

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHAPLAINCY OF FULL GOSPEL CHURCHES, et al., | ) ) ) | |
| v. | ) ) | Civil Action No. 1:99cv2945 (RMU) |
| THE HONORABLE DONALD C. WINTER, Secretary of the Navy, et al., | ) ) ) ) | |
| ROBERT H. ADAIR, et al., | ) ) | **Consolidated with** |
| v. | ) ) | Civil Action No. 1:00cv566 (RMU) |
| THE HONORABLE DONALD C. WINTER, Secretary of the Navy, et al., | ) ) ) ) | |

## DECLARATION OF VERONICA K. BERTO

Pursuant to 28 U.S.C. § 1746, I, Veronica K. Berto, declare as follows:

1. I am a civilian employee of the Department of the Navy. I currently serve as a Program Analyst (GS-12) in the Force Structure (N971) division in the Chief of Navy Chaplains' Office. I have served in this position since December 17, 1991. In that role, I am familiar with the current composition and manning of the Navy Chaplain Corps, to include the status (e.g., Regular Navy, Naval Reserve, Retired Reserve) and designator (e.g., 4100, 4105, 4109) assigned to each Chaplain Corps officer.

2. As a result of this litigation, I was asked by defendants to provide information regarding any chaplains who are 62 years of age or older and serving on active duty as of the date of this

declaration. Based on my review of the relevant records on file in the Chief of Navy Chaplains'

Office, the following data is responsive:

| Name | Rank | Designator | Age | Faith Group | Retirement Eligible |
|------|------|-----------|-----|-------------|---------------------|
| Welch, Bernard J. | LT | 4109 | 72 | Roman Catholic | 2006 |
| Dsouza, Matthew F. | LT | 4109 | 71 | Roman Catholic | 2009 |
| Mulkerin, Terrence J. | LT | 4109 | 71 | Roman Catholic | 2008 |
| Erestain, Alfonso E. | LCDR | 4109 | 69 | Roman Catholic | 2008 |
| Walsh, Francis E. | LT | 4109 | 69 | Roman Catholic | 2009 |
| Finley, James F. | LT | 4109 | 69 | Roman Catholic | 2011 |
| Brown, Lewis E. | CAPT | 4100 | 65 | Roman Catholic | 2005 |
| Berchmanz, Antony | LCDR | 4100 | 65 | Roman Catholic | 2015 |
| Moss, Donald R. | LCDR | 4100 | 64 | Roman Catholic | 2010 |
| McCormick, Patrick J. | CDR | 4100 | 64 | Roman Catholic | 2010 |
| Scordo, Joseph A. | CDR | 4100 | 64 | Roman Catholic | 2008 |
| Trapani, Anthony M. | CDR | 4100 | 64 | Roman Catholic | 2007 |
| Pugliese, Frank A. | CAPT | 4100 | 64 | Roman Catholic | 2007 |
| Petruska, William M. | CAPT | 4100 | 63 | Roman Catholic | 2004 |
| Holcomb, Jr., Norman D. | CAPT | 4100 | 62 | United Methodist | 2001 |
| Kaprow, Maurice S. | CDR | 4100 | 62 | Jewish | 2010 |

3. I was also asked for information regarding whether any Regular Navy chaplains in the

paygrades of Lieutenant (O-3) or Lieutenant Commander (O-4), and over the age of 62 years,

have been considered for promotion. As detailed in the table above, no Regular Navy chaplains

– signified by the designator of 4100 – over the age of 62 years currently hold the rank of

Lieutenant (O-3). Two Regular Navy chaplains over the age of 62 years hold the rank of

Lieutenant Commander (O-4). One, LCDR Antony Berchmanz, has not failed to promote to the

next higher paygrade, Commander (O-5), because he has not yet been considered for promotion.

The other, LCDR Donald Moss, has failed to promote to the next higher paygrade, Commander

(O-5), three times. However, my records indicate that LCDR Moss was recommended and

approved for continuation on active duty by a continuation board convened pursuant to 10

U.S.C. § 637 until April 1, 2010.


4. I was also asked to describe the process by which the six chaplains over the age of 62 years

and assigned the designator "4109" remain on active duty. Those chaplains were formerly

Reserve chaplains (designator "4105") serving on the Active Duty list. Under the provisions of

OPNAVINST 1820.1 (dated December 24, 2005), and before that, SECNAVINST 1820.2B

(dated March 1, 1999) and SECNAVINST 1820.2C (dated January 25, 2005), those 4105

chaplains were released from active duty on the last day of the month and transferred to the

Retired Reserve. Then, at their request, on the first day of the next month after their transfer to

the Retired Reserve, each of them was recalled to active duty.


5. The recall of Retired Reserve chaplains described in paragraph 4 allows the Navy in general,

and the Chaplain Corps in particular, to utilize personnel with, as SECNAVINST 1820.2B,

SECNAVINST 1820.2C, and OPNAVINST 1820.1 all state, "critical professional skills." In

this context, the six Roman Catholic chaplains currently recalled to active duty from the Retired

Reserve reflects the Chaplain Corps current shortfall of Roman Catholic chaplains to minister to

the needs of Roman Catholic Sailors and Marines.

6. I was also asked to review the following list of names to determine whether any of them are on active duty:

| | | | |
|---|---|---|---|
| Adair, Robert H. | Belt, Michael | DeMarco, Gregory R. | Harkness, Furniss |
| Lavell, Michael | Linzey, George W. | Nall, Timothy D. | Rush, Thomas |
| Weibling, James M. | Hamme, Richard | Wright, Michael A. | Blair, William C. |
| Farrell, Larry | Quiles, Rafael J. | Swanson, Lyle | Tomlin, Ronald |
| Wilder, David S. | Purser, Robert D. | Carson, Martha | Johnston, Mark R. |
| Kitchen, Jr., Klon K. | Merritt, Denise Y. | Roysden, Daniel E. | Spalding, Mary H. |
| Wilson, Barby E. | | | |

As of the date of this declaration, of the 25 individuals listed in this paragraph, only Ronald Tomlin is on active duty in the U.S. Navy.

7. I was also asked to describe the effect on the Chaplain Corps of 10 U.S.C. § 532. As a result of that statute, all eligible Chaplain Corps officers with the designator "4105" were transferred to the regular officer force by May 1, 2006, and their designators were changed from "4105" to "4100."

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Arlington, Virginia, this _____ day of March, 2007.

VERONICA K. BERTO



**DEPARTMENT OF THE NAVY**
OFFICE OF THE SECRETARY
1000 NAVY PENTAGON
WASHINGTON, DC 20350-1000

SECNAVINST 1820.2C
PERS-491B
25 January 2005

SECNAV INSTRUCTION 1820.2C

From:   Secretary of the Navy
To:     All Ships and Stations

Subj:   VOLUNTARY RETIREMENT OF MEMBERS OF THE NAVY AND MARINE
        CORPS RESERVE NOT ON THE ACTIVE-DUTY LISTS (INCLUDING
        NAVY AND MARINE CORPS RESERVISTS ON ACTIVE DUTY IN FULL
        TIME SUPPORT (FTS), AND MARINE CORPS ACTIVE RESERVE (AR))

Ref:    (a)  10 U.S.C.
        (b)  DODI 1200.15 of 18 Sep 97
        (c)  SECNAVINST 1920.6B
        (d)  SECNAVINST 1910.4B
        (e)  SECNAVINST 1850.4E
        (f)  SECNAVINST 1811.3M

Encl:   (1)  Retirement of Inactive Duty and FTS
             Personnel – General
        (2)  Voluntary Retirement of Officers of the Navy Reserve
             and Marine Corps Reserve
        (3)  Voluntary Retirement of Enlisted Members of the Navy
             Reserve and Marine Corps Reserve
        (4)  Definitions

1.  Purpose

    a.  To provide policy governing voluntary retirement of
inactive duty officers and enlisted members serving in the Navy
Reserve and Marine Corps Reserve and those Navy and Marine Corps
reservists on active duty in the Full Time Support (FTS) program.

    b.  To incorporate applicable provisions of reference (a) and
address recent changes in law and Department of Defense (DOD)
policy.  This instruction is a major revision and should be
reviewed in its entirety.

2.  Cancellation.  SECNAVINST 1820.2B.

SECNAVINST 1820.2C
25 January 2005

3.  Applicability

    a.  This instruction applies to all inactive duty officers
and enlisted members of the Navy Reserve and Marine Corps Reserve
components and all FTS officers and enlisted members not on the
Active Duty List who qualify for retirement per references (a)
and (b).  Enclosures (1) through (4) provide specific guidance
and definitions regarding qualifications for voluntary
retirements.

    b.  Involuntary separation of officers for cause is covered
in reference (c).  Involuntary separation of enlisted members
for cause is covered in reference (d).

    c.  Disability retirement is covered in reference (e).

    d.  Retirement of Reserve Officers on the Active Duty List
of the Navy and Marine Corps and transfer of Reserve enlisted
members on active duty to the Fleet Reserve or Fleet Marine
Corps Reserve, other than FTS personnel, are covered by
reference (f).

4.  Responsibilities.  Chief of Naval Personnel (CHNAVPERS) and
Deputy Chief of Staff for Manpower and Reserve Affairs D/CS
(M&RA) are responsible for:

    a.  Establishing and implementing procedures to accurately
determine eligibility and to notify, within 1 year following
eligibility, each person qualified for retired pay at age 60 per
paragraph 2 of enclosure (1) to this instruction.  Additionally,
notification of available survivor benefit options per the
Reserve Component Survivor Benefit Plan (RCSBP) will be included
with the Notification of Eligibility (NOE).  Included in this
responsibility are periodic audits of the process.

    b.  Maintaining for Secretary of the Navy (SECNAV) a retired
list of members in the Retired Reserve, per section 12774(a) of
reference (a).

    c.  Maintaining for SECNAV a retired list of members
entitled to retired pay, per section 12774(b) of reference (a).

2

SECNAVINST 1820.2C
25 January 2005

    d.  Maintaining instructions on how to apply for retirement.

5.  <u>Form</u>. DD 108 (7/02), "Application for Retired Pay Benefits,"
S/N 0107-LF-131-3400, is available on the Naval Inventory
Control Point using requisitioning procedures contained in
CD-ROM NAVSUP PUB (NLL) 600 or online at
<u>http://forms.daps.dla.mil</u>.  This form is used by the member to
request retired pay at age 60.


                     William A. Navas Jr.
                     Assistant Secretary of the Navy
                     (Manpower and Reserve Affairs)

Distribution:
SNDL Parts 1 and 2
MARCORPS PCN 71000000000 and 71000000100

3

SECNAVINST 1820.2C
25 January 2005

### RETIREMENT OF INACTIVE DUTY AND FTS PERSONNEL - GENERAL

1.  <u>Retirement of Inactive Duty Reservists Qualified for Retired Pay</u>.  CHNAVPERS or D/CS (M&RA) may transfer to the Retired Reserve inactive duty reservists O6 and below who complete the requirements specified in section 12731 of reference (a).  Transfers shall be conducted upon member request, if eligible.  CHNAVPERS or DC/S M&RA may also transfer eligible members to the Retired Reserve, when no request is received following notification of required separation per references (c) or (d).  Eligibility criteria include the following:

    a.  Member has performed at least 20 years of qualifying service computed under section 12732 of reference (a), or is a Selected Reserve (SELRES) member with 15-20 years of qualifying service and is medically disqualified or meets requirements of any other authorized Early Retirement Program.

    b.  Member who has earned 20 or more years of qualifying service before 25 April 2005 must perform the last 6 years of qualifying service in a Reserve component of the Armed Forces or a component listed in section 12732(a)(1) of reference (a).  A member who completes 20 years of qualifying service on or after 25 April 2005 is exempt from this requirement.

    c.  Member is not entitled, under any other provision of law, to retired pay from an armed force or retainer pay.

    d.  Member does not meet any of the exclusions listed in section 12731(c) of reference (a).

2.  <u>Notice of Eligibility (NOE) for Retired Pay for Reservists Not on Active Duty</u>.  Reservists not on active duty who become eligible for retirement with pay at age 60 will be notified of their eligibility per section 12731 of reference (a).  Upon reaching age 60, such members are entitled, upon application, to receive retired pay.  CHNAVPERS or D/CS (M&RA) shall send a NOE for retired pay to the member within 1 year of completing qualifying service.  Additionally, advisement of available survivor benefit elections per the RCSBP shall be included in the NOE.  Once an NOE is issued, a member's eligibility for retired pay may not be revoked on the basis of error, misinformation, miscalculation or administrative determination of years of

Enclosure (1)

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 2
Page 4 of 13

SECNAVINST 1820.2C
25 January 2005

service unless it resulted directly from fraud or
misrepresentation of that error.

3. <u>Voluntary Retirement of FTS and Qualified SELRES Personnel</u>.
CHNAVPERS or D/CS (M&RA) may transfer FTS and qualified SELRES
personnel to the Fleet Reserve, Fleet Marine Corps Reserve and
Retired Reserve per sections 6323, 6330, and 6331 of reference
(a), if they meet the following qualifications:

a. Officers. Officers must have 20 years of active service
of which at least 10 years was service as a commissioned
officer.

**Note:** During drawdown periods active commissioned service time
may be temporarily reduced as authorized by law.

(1) Years of service are computed by adding all years of
active service in the Armed Forces.

(2) Years of service as a commissioned officer are
computed by adding all years of active service under temporary
or permanent appointment in grades above warrant officer, W1.

b. Enlisted Members. Per section 6330 of reference (a),
enlisted members must have completed 20 years of active service
in the Armed Forces.

(1) A completed minority enlistment shall be counted as
4 years of active service as provided for in section 6330 of
reference (a).

(2) An enlistment terminated less than 3 months before
the end of the term of enlistment shall be counted as active
service for the full term as provided for in section 6330 of
reference (a).

4. <u>Voluntary Retirement of Flag and General Officers</u>. Flag and
general officers will be considered for voluntary retirement on
the basis of service needs reflected in the annual promotion and
continuation plans approved by SECNAV and the merits of the
individual case as required by section 1370 of reference (a).
All retirements of flag and general officers require SECNAV
approval.

2                          Enclosure (1)

SECNAVINST 1820.2C
25 January 2005

5.  <u>Former Members</u>.  Members of the Navy Reserve or Marine Corps
Reserve who become eligible for non-regular retired pay at or
after age 60 by meeting the service requirements of reference
(a), section 12731, and who are subsequently discharged are
referred to as "Former Members."  Having been discharged, these
individuals no longer hold any military status.  They are
however entitled to receive benefits approved per reference (a),
chapter 54, but compensation at age 60 will necessarily be
adjusted to account for their earlier separation from their
military component

6.  <u>Retirement of Reservists Not Qualified for Retired Pay</u>

    a.  Reference (b) no longer addresses the "Honorary Retiree"
program.  Members previously transferred to the Retired Reserve
in an honorary status will maintain their retired status.

    b.  Reservists who possess special qualifications or
critical professional skills, or are required by law to maintain
status, are not eligible for non-Regular service retired pay,
and are subject to mandatory removal from an active status, may
be transferred to Retired Reserve status in lieu of discharge as
approved by CHNAVPERS or D/CS (M&RA).

3                         Enclosure (1)

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 2
Page 6 of 13

SECNAVINST 1820.2C
25 January 2005

## VOLUNTARY RETIREMENT OF OFFICERS OF THE NAVY RESERVE AND MARINE CORPS RESERVE

1.  <u>Authority to Approve Requests for Transfer to the Retired Reserve</u>.  CHNAVPERS or D/CS M&RA, acting for SECNAV, is authorized to approve requests for retirement.  This authority may not be further delegated.  CHNAVPERS and DC M&RA will normally deny, for SECNAV, requests for retirement that do not satisfy the policy and eligibility criteria established by this instruction.

2.  <u>Retirement Requests</u>.  Retirement requests from officers will only be approved when all the requirements for retirement contained in reference (a) and this instruction have been met. Officers selected for promotion after 1 October 1996 and who have accepted promotion to the next higher grade must meet the applicable minimum time-in-grade requirement in paragraph 3 of this enclosure or request retirement in their previously held grade.  Frocking does not constitute acceptance of a promotion.

3.  <u>Retired Grade Determination for Commissioned Officers in Pay Grades O1 and Above</u>

   a.  Retirement from Active Duty

      (1) For grades O1 through O4, a minimum of 6 months of active duty must be served in grade to retire in that grade.

      (2) For grades O5 through O8, a minimum of 3 years of active duty must be served in grade to retire in that grade.

      (3) Time-in-grade requirements may be reduced from 3 years to 2 years as provided by section 1370(a) of reference (a). Reduced time-in-grade retirements for O5 and O6 officers to retire in current grade may be approved by CHNAVPERS or DC M&RA. O7 and O8 retirements in current grade require Under Secretary of Defense for Personnel and Readiness approval.

      (4) Once notified by CHNAVPERS or D/CS (M&RA) of their required separation from active duty without their consent, members who request retirement are considered to have retired involuntarily.  Involuntary retirement requires only 6 months of active duty service in grade to retire in that grade.

Enclosure (2)

SECNAVINST 1820.2C
25 January 2005

(5) Officers requesting retirement for reasons prescribed in chapter 60 of reference (a) are considered to have retired voluntarily.

b. Retirement from Inactive Duty (Non-Regular Retirement under chapter 1223 of reference (a)).

(1) Unless entitled to a higher grade under any provision of reference (a), Reserve commissioned officers in the grade of O1 and above who request voluntary retirement shall be retired in the highest grade satisfactorily served upon completion of the following time-in-grade requirements:

(a) Inactive duty officers in the grades of O1 through O4:  6 months.

(b) Inactive duty officers in the grades of O5 and above:  3 years.

(c) Time-in-grade requirements may be reduced from 3 years to 2 years as provided by section 1370(d) of reference (a).  Reduced time-in-grade retirements for O5 and O6 officers to retire in current grade may be approved by CHNAVPERS or D/CS (M&RA).  O7 and O8 retirements at current grade require Under Secretary of Defense for Personnel and Readiness approval.

(2) Unless entitled to a higher grade under any other provision of reference (a), Reserve commissioned officers who are separated because of age or years of service may retire in the grade in which they are satisfactorily serving, so long as such service has been for a period of not less than 6 months.

(3) For non-Regular retirees, the time-in-grade requirements listed above must be served in an active status (i.e., the Ready Reserve or the Standby Reserve-Active). Additionally, CHNAVPERS or D/CS (M&RA) shall, for SECNAV, make determinations of satisfactory service taking into consideration any misconduct or moral or professional dereliction which results in courts-martial or separation for cause.

(4) Inactive duty members not meeting the requirements for non-Regular retirement per chapter 1223 of reference (a), but allowed to retire under paragraph 6b of enclosure (1), must

2                          Enclosure (2)

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 2
Page 8 of 13

SECNAVINST 1820.2C
25 January 2005

also meet time-in-grade requirements listed in paragraph 3 of this enclosure.

   c.  An officer whose length of time in the highest grade held does not meet the above service-in-grade requirements shall be retired in the next lower grade in which service was satisfactorily performed.

   d.  Reference (c) provides further guidance regarding determination of satisfactory performance in a particular pay grade.

4.  Warrant Officers.  Unless entitled to a higher grade under any provision of reference (a), warrant officers shall be retired in the grade held on the day before the date of retirement or in any higher warrant officer grade they served in satisfactorily on active duty, as determined by SECNAV, for a period of more than 30 days per section 1371 of reference (a).

3                          Enclosure (2)

Defs.' Opposition to Pls.' Renewed Motion for Preliminary Injunction
Ex. 2
Page 9 of 13

SECNAVINST 1820.2C
25 January 2005

**VOLUNTARY RETIREMENT OF ENLISTED MEMBERS OF THE NAVY RESERVE AND
MARINE CORPS RESERVE**

1.  Authority to Approve Requests for Transfer to the Retired
Reserve.  CHNAVPERS and D/CS (M&RA), acting for SECNAV, will
establish procedures for, and are authorized to approve, requests
for transfer of enlisted members to the Retired Reserve.  This
authority may not be further delegated.

2.  Retirement Requests

    a.  Retirement requests from enlisted members will only be
approved when all of the requirements for retirement contained
in reference (a) and this instruction have been met.  Enlisted
members, upon assignment or transfer to the Retired Reserve,
shall be retired in the highest pay grade in which they have
served satisfactorily as described in this paragraph, or in
the highest grade eligible under any provision of reference
(a).  CHNAVPERS or D/CS (M&RA) shall, make determinations of
satisfactory service for SECNAV.  Factors used in making this
determination are:

        (1) Time served in current or higher pay grade.

        (2) Any report of misconduct, moral or professional
dereliction, conduct not in the interest of national security, or
conviction by courts-martial.

        (3) The nature and severity of any misconduct.

    b.  If CHNAVPERS or D/CS (M&RA) determines that the member's
service was not satisfactory in the highest grade, the retired
grade will be the next lower pay grade in which satisfactory
service was performed.

    c.  Advancement to E7, E8, or E9 requires the completion of
24 months of service in the new pay grade as a member of the
Ready Reserve or Standby Reserve-Active.  Enlisted personnel who
accept advancement must meet time-in-grade requirements prior to
transfer to the Retired Reserve, the Fleet Reserve or Fleet
Marine Corps Reserve.  Frocking does not constitute acceptance of
advancement.  Members who do not complete the time-in-grade
requirement will normally submit their request in the previously

Enclosure (3)

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 2
Page 10 of 13

SECNAVINST 1820.2C
25 January 2005

held pay grade.  Members who through no fault of their own are
unable to complete time-in-grade requirements may request a
waiver from CHNAVPERS or D/CS (M&RA) to permit retirement or
transfer to the appropriate Fleet Reserve at the higher pay
grade.  Additionally, during times when early retirement is being
offered due to force shaping initiatives, time-in-grade
requirements may be waived by CHNAVPERS or D/CS (M&RA) for
inactive duty Reservists.  Members involuntarily retired will be
permitted to retire in the highest pay grade satisfactorily
served as defined in paragraph 2a of this enclosure.

3.  Qualification for Voluntary Retirement of Enlisted FTS
Personnel.  Per sections 6330 and 6331 of reference (a), FTS
enlisted personnel shall, upon application, be transferred to
the Fleet Reserve or Fleet Marine Corps Reserve, if qualified,
after completion of at least 20 years of active service in the
Armed Forces.  After completing 30 years of service, members of
the Fleet Reserve, Navy and Marine Corps Reservists on active
duty in the FTS Reserve or Fleet Marine Corps Reserve shall be
transferred to the Retired Reserve.  Years of active service in
the Armed Forces are computed as defined in enclosure (1) of
this instruction.

2                          Enclosure (3)

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 2
Page 11 of 13

SECNAVINST 1820.2C
25 January 2005

## DEFINITIONS

1.  <u>Active Commissioned Service</u>.  Service on active duty as a
commissioned officer or commissioned warrant officer.

2.  <u>Active Reserve (AR)</u>.  Members of the Marine Corps Selected
Reserve ordered to full-time active duty but not on the
Active-Duty List, designated for organizing, administering,
recruiting, instructing/training the Marine Corps Reserve.  Under
Department of the Navy (DON) policy, AR Marines are authorized
continuous active duty on a career basis.

3.  <u>Active Service</u>.  Service on active duty.

4.  <u>Active Status</u>.  Service as a member of the Naval or Marine
Corps Reserve on the Reserve Active-Status List, or on the
Active-Duty List.  Includes FTS personnel.

5.  <u>Full Time Support (FTS)</u>.  Reserve component personnel
assigned to assist in organizing, administering, recruiting,
retention or training of Reserve component personnel.  For the
purposes of this instruction FTS members of the Marine Corps are
SELRES ordered to active duty with their consent for organizing,
administering, recruiting, instructing, or training Marine Corps
Reserve component units.  FTS personnel in DON include Naval
Reserve members formerly known as TARs, Marine Corps Reserve
ARs, Canvasser Recruiters (CANRECs), and personnel on Active
Duty for Special Work (ADSW) for periods greater than 179
consecutive days.

6.  <u>Inactive Duty</u>.  Service performed by reservists not on active
duty (SELRES or IRR).

7.  <u>Individual Ready Reserve (IRR)</u>.  Ready Reservists who are in
a non-drill pay status or in a non-drill status.

8.  <u>Involuntary Retirement</u>.  Reserve officers on active duty who
are notified of being released from active duty without their
consent, and thereafter request transfer to the Retired Reserve
under section 3911, 6323 or 8911 of 10 U.S.C. and are retired
per that request, are considered to have retired involuntarily.

Enclosure (4)

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 2
Page 12 of 13

SECNAVINST 1820.2C
25 January 2005

9.  Qualifying Service.  Accumulation of a minimum of 50
retirement points in an anniversary year is considered a
"qualifying year" (satisfactory Federal service) for retirement
purposes.

10.  Ready Reserve.  The SELRES and the IRR, consisting of units
and individuals liable for immediate recall to active duty in
time of war or national emergency declared by Congress,
proclaimed by the President or when otherwise authorized by law.

11.  Secretary of the Navy (SECNAV).  SECNAV, with respect to
matters concerning Navy, Marine Corps, and Coast Guard when it is
operating as a service in the Navy.

12.  Selected Reserve (SELRES).  That part of the Ready Reserve
consisting of Reserve units, as designated by SECNAV, and of
individual Reservists, in pay status, required to participate in
IDT periods and annual training.  SELRES also includes Active
Guard and Reserve and Individual Mobilization Augmentee (IMA)
personnel.

13.  Standby Reserve, Active Status List (USNR-S1).  Reserve
members transferred to the Standby Reserve but remaining in an
active status who are liable for active duty only in time of war
or national emergency declared by the Congress or when otherwise
authorized by law.

14.  Voluntary Retirement.  Retirement based on a voluntary
request from an individual for transfer to the Retired Reserve
which has not been the result of notification action requiring
involuntary separation from active duty.

2                                    Enclosure (4)

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 2
Page 13 of 13



**DEPARTMENT OF THE NAVY**
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
2000 NAVY PENTAGON
WASHINGTON, DC 20350-2000

OPNAVINST 1820.1
PERS-49
24 Dec 05

OPNAV INSTRUCTION 1820.1

From:  Chief of Naval Operations

Subj:  VOLUNTARY RETIREMENT OF MEMBERS OF THE NAVY RESERVE NOT ON
       THE ACTIVE DUTY LIST (ADL) (INCLUDING NAVY RESERVISTS ON
       ACTIVE DUTY IN FULL TIME SUPPORT (FTS))

Ref:   (a) 10 U.S.C.
       (b) DOD Instruction 1200.15 of 18 Sep 97
       (c) SECNAVINST 1920.6B
       (d) DOD Directive 1332.14 of 21 Dec 93
       (e) SECNAVINST 1850.4E
       (f) OPNAVINST 1811.3

Encl:  (1) Retirement of Inactive Duty and FTS Personnel –
           General
       (2) Voluntary Retirement of Officers of the Navy Reserve
       (3) Voluntary Retirement of Enlisted Members of the Navy
           Reserve
       (4) Definitions

1.  Purpose

    a.  To provide policy governing voluntary retirement of
inactive duty officers and enlisted members serving in the Navy
Reserve and those Navy Reservists on active duty in the Full Time
Support (FTS) program.

    b.  To incorporate applicable provisions of reference (a) and
address recent changes in law and Department of Defense (DOD)
policy.

2.  Cancellation.  SECNAVINST 1820.2C.

3.  Applicability

    a.  This instruction applies to all inactive duty officers
and enlisted members of the Navy Reserve and all FTS officers and
enlisted members not on the Active Duty List (ADL) who qualify

OPNAVINST 1820.1
24 Dec 2005

for retirement per references (a) and (b). Enclosures (1) through (4) provide specific guidance and definitions regarding qualifications for voluntary retirements.

b. Involuntary separation of officers for cause is covered in reference (c). Involuntary separation of enlisted members for cause is covered in reference (d).

c. Disability retirement is covered in reference (e).

d. Retirement of Reserve Officers on the ADL of the Navy and transfer of Reserve enlisted members on active duty to the Fleet Reserve, other than FTS personnel, are covered by reference (f).

4. Responsibilities. The Chief of Naval Personnel (CHNAVPERS) is responsible for:

a. Establishing and implementing procedures to accurately determine eligibility and to notify, within 1 year following eligibility, each person qualified for retired pay at age 60 per paragraph 2 of enclosure (1) to this instruction. Additionally, notification of available survivor benefit options per the Reserve Component Survivor Benefit Plan (RCSBP) will be included with the Notification of Eligibility (NOE). Included in this responsibility are periodic audits of the process.

b. Maintaining for Secretary of the Navy (SECNAV) a retired list of members in the Retired Reserve, per reference (a), section 12774(a).

c. Maintaining for SECNAV a retired list of members entitled to retired pay, per reference (a), section 12774(b).

d. Maintaining instructions on how to apply for retirement.

5. Form. DD 108 (7/02), Application for Retired Pay Benefits, S/N 0107-LF-131-3400, may be obtained using requisitioning procedures contained in Navy Forms Online at

2

OPNAVINST 1820.1
24 Dec 2005

http://forms.daps.dla.mil.   This form is used by the member to
request retired pay at age 60.

/s/
J. C. HARVEY, JR.
Vice Admiral, U.S. Navy
Deputy Chief of Naval Operations
(Manpower, Personnel, Training
and Education)

Distribution:
Electronic only via Navy Directives Web site
http://neds.daps.dla.mil/

3

OPNAVINST 1820.1
24 Dec 05

**RETIREMENT OF INACTIVE DUTY AND FTS PERSONNEL - GENERAL**

1.  <u>Retirement of Inactive Duty Reservists Qualified for Retired Pay</u>.  CHNAVPERS may transfer to the Retired Reserve inactive duty reservists O6 and below who complete the requirements specified in reference (a), section 12731.  Transfers shall be conducted upon member request, if eligible.  CHNAVPERS may also transfer eligible members to the Retired Reserve, when no request is received following notification of required separation per references (c) or (d). Eligibility criteria include the following:

    a.  Member has performed at least 20 years of qualifying service computed under reference (a), section 12732, or is a Selected Reserve (SELRES) member with 15-20 years of qualifying service and is medically disqualified or meets requirements of any other authorized Early Retirement Program.

    b.  Member who has earned 20 or more years of qualifying service before 24 April 2005 must perform the last 6 years of qualifying service in a Reserve component of the Armed Forces or a component listed in reference (a), section 12732(a)(1).  A member who completes 20 years of qualifying service on or after 24 April 2005 is exempt from this requirement.

    c.  Member is not entitled, under any other provision of law, to retired pay from an armed force or retainer pay.

    d.  Member does not meet any of the exclusions listed in reference (a), section 12731(c).

2.  <u>Notice of Eligibility (NOE) for Retired Pay for Reservists Not on Active Duty</u>.  Reservists not on active duty who become eligible for retirement with pay at age 60 will be notified of their eligibility per reference (a), section 12731.  Upon reaching age 60, such members are entitled, upon application, to receive retired pay.  CHNAVPERS shall send a NOE for retired pay to the member within 1 year of completing qualifying service.  Additionally, advisement of available survivor benefit elections per the RCSBP shall be included in the NOE.  Once an NOE is issued, a member's eligibility for retired pay may not be revoked on the basis of error, misinformation, miscalculation or

Enclosure (1)

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 3
Page 4 of 13

OPNAVINST 1820.1
24 Dec 2005

administrative determination of years of service unless it
resulted directly from fraud or misrepresentation of that error.

3. <u>Voluntary Retirement of FTS and Qualified SELRES Personnel</u>.
CHNAVPERS may transfer FTS and qualified SELRES personnel to the
Fleet Reserve and Retired List per reference (a), chapter 571, if
they meet the following qualifications:

a. Officers. Under section 6323 of reference (a), an
officer must have 20 years of active service of which at least
10 years was service as a commissioned officer.

**Note:** During drawdown periods active commissioned service time
may be temporarily reduced as authorized by law.

(1) Years of service are computed by adding all years of
active service in the Armed Forces.

(2) Years of service as a commissioned officer are
computed by adding all years of active service under temporary
or permanent appointment in grades above Chief Warrant Officer,
W1.

b. Enlisted Members. Per reference (a), section 6330, an
enlisted member must have completed 20 years of active service
in the Armed Forces. In determining a member's eligibility for
transfer to the Fleet Reserve:

(1) A completed minority enlistment shall be counted as
4 years of active service as provided for in reference (a),
section 6330 if that service was creditable to the member before
31 December 1977.

(2) An enlistment terminated less than 3 months before
the end of the term of enlistment shall be counted as active
service for the full term as provided for in reference (a),
section 6330 if that service was creditable to the member before
31 December 1977.

4. <u>Voluntary Retirement of Flag Officers</u>. Flag officers will
be considered for voluntary retirement on the basis of service
needs reflected in the annual promotion and continuation plans
approved by SECNAV and the merits of the individual case as

2                          Enclosure (1)

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 3
Page 5 of 13

OPNAVINST 1820.1
24 Dec 2005

required by reference (a), section 1370.  All retirements of
flag officers require SECNAV approval.

5.  Former Members.  Members of the Navy Reserve who become
eligible for non-regular retired pay at or after age 60 by
meeting the service requirements of reference (a), section
12731, and who are subsequently discharged are referred to as
"Former Members."  Having been discharged, these individuals no
longer hold any military status.  They are however entitled to
receive benefits approved per reference (a), chapter 54, but
compensation at age 60 will necessarily be adjusted to account
for their earlier separation from the naval service.

6.  Retirement of Reservists Not Qualified for Retired Pay

    a.  Reference (b) no longer addresses the "Honorary Retiree"
program.  Members previously transferred to the Retired Reserve
in an honorary status will maintain their retired status.

    b.  Reservists who are not qualified for retired pay at age
60, and are required by law to be retired or discharged from the
Navy Reserve, may be transferred to Retired Reserve status in
lieu of discharge when:

        (1) They possess critical professional skills which are
identified by CHNAVPERS as necessary to be retained in the
inventory, or

        (2) They are required by law to maintain military status
to receive separation pay (i.e., VSI recipients).  Members
transferred to Retired Reserve status per this paragraph, retain
their military status but are not entitled to carry the DOD ID
card or receive retired pay and benefits at age 60, unless they
are recalled to active duty in a retired status and qualify for
such at a later date.

3                      Enclosure (1)

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 3
Page 6 of 13

OPNAVINST 1820.1
24 Dec 05

## VOLUNTARY RETIREMENT OF OFFICERS OF THE NAVY RESERVE

1. <u>Authority to Approve Requests for Transfer to the Retired Reserve</u>. CHNAVPERS, acting for SECNAV, is authorized to approve requests for retirement. This authority may not be further delegated. CHNAVPERS will normally deny, for SECNAV, requests for retirement that do not satisfy the policy and eligibility criteria established by this instruction.

2. <u>Retirement Requests</u>. Retirement requests from officers will only be approved when all the requirements for retirement contained in reference (a) and this instruction have been met. Officers selected for promotion after 1 October 1996 and who have accepted promotion to the next higher grade must meet the applicable minimum time-in-grade requirement in paragraph 3 of this enclosure or request retirement in their previously held grade. Frocking does not constitute acceptance of a promotion.

3. <u>Retired Grade Determination for Commissioned Officers in Pay Grades O1 and Above</u>

    a. Retirement from Active Duty

        (1) For grades O1 through O4, a minimum of 6 months of active duty must be served in grade to retire in that grade.

        (2) For grades O5 through O8, a minimum of 3 years of active duty must be served in grade to retire in that grade.

        (3) Time-in-grade requirements may be reduced from 3 years to 2 years as provided by reference (a), section 1370(a). Reduced time-in-grade retirements for O5 and O6 officers to retire in current grade may be approved by CHNAVPERS. O7 and O8 retirements in current grade require Under Secretary of Defense for Personnel and Readiness (USD (P&R)) approval.

        (4) Once notified by CHNAVPERS of their required separation from active duty without their consent, members who request retirement are considered to have retired involuntarily. Involuntary retirement requires only 6 months of active duty service in grade to retire in that grade.

Enclosure (2)

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 3
Page 7 of 13

OPNAVINST 1820.1
24 Dec 2005

(5) Officers requesting retirement for reasons prescribed in reference (a), chapter 60, are considered to have retired voluntarily.

b.  Retirement from Inactive Duty (Non-Regular Retirement under reference (a), chapter 1223).

(1) Unless entitled to a higher grade under any provision of reference (a), Reserve commissioned officers in the grade of O1 and above who request voluntary retirement shall be retired in the highest grade satisfactorily served upon completion of the following time-in-grade requirements:

(a) Inactive duty officers in the grades of O1 through O4:  6 months.

(b) Inactive duty officers in the grades of O5 and above:  3 years.

(c) Time-in-grade requirements may be reduced from 3 years to 2 years as provided by reference (a), section 1370(d). Reduced time-in-grade retirements for O5 and O6 officers to retire in current grade may be approved by CHNAVPERS.  O7 and O8 retirements at current grade require USD (P&R) approval.

(2) Unless entitled to a higher grade under any other provision of reference (a), Reserve commissioned officers who are separated because of age, years of service, or physical disability, may retire in the grade in which they are satisfactorily serving, so long as such service has been for a period of not less than 6 months.

(3) For non-Regular retirees, the time-in-grade requirements listed above must be served in an active status (i.e., the Ready Reserve or the Standby Reserve-Active). Additionally, CHNAVPERS shall, for SECNAV, make determinations of satisfactory service taking into consideration any misconduct or moral or professional dereliction which results in courts-martial or separation for cause.

(4) Inactive duty members not meeting the requirements for non-Regular retirement per reference (a), chapter 1223, but allowed to retire under paragraph 6b of enclosure (1), must also

2                          Enclosure (2)

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 3
Page 8 of 13

OPNAVINST 1820.1
24 Dec 2005

meet time-in-grade requirements listed in paragraph 3 of this enclosure.

   c.  An officer whose length of time in the highest grade held does not meet the above service-in-grade requirements shall be retired in the next lower grade in which service was satisfactorily performed.

   d.  Reference (c) provides further guidance regarding determination of satisfactory performance in a particular pay grade.

4.  <u>Chief Warrant Officers</u>.  Unless entitled to a higher grade under any provision of reference (a), warrant officers shall be retired in the grade held on the day before the date of retirement or in any higher warrant officer grade they served in satisfactorily on active duty, as determined by SECNAV, for a period of more than 30 days per reference (a), section 1371.

3

Enclosure (2)

OPNAVINST 1820.1
24 Dec 05

**VOLUNTARY RETIREMENT OF ENLISTED MEMBERS OF THE NAVY RESERVE**

1.  Authority to Approve Requests for Transfer to the Retired
Reserve.  CHNAVPERS, acting for SECNAV, will establish procedures
for, and is authorized to approve, requests for transfer of
enlisted members to the Retired Reserve.  This authority may not
be further delegated.

2.  Retirement Requests

    a.  Retirement requests from enlisted members will only be
approved when all of the requirements for retirement contained
in reference (a) and this instruction have been met.  Enlisted
members, upon assignment or transfer to the Retired Reserve,
shall be retired in the highest pay grade in which they have
served satisfactorily as described in this paragraph, or in
the highest grade eligible under any provision of reference
(a).  CHNAVPERS shall make determinations of satisfactory
service for SECNAV.  Factors used in making this determination
are:

        (1) Time served in current or higher pay grade.

        (2) Any report of misconduct, moral, or professional
dereliction, conduct not in the interest of national security, or
conviction by courts-martial.

        (3) The nature and severity of any misconduct.

    b.  If CHNAVPERS determines that the member's service was not
satisfactory in the highest grade, the retired grade will be the
next lower pay grade in which satisfactory service was performed.

    c.  Advancement to E7, E8, or E9 requires the completion of
24 months of service in the new pay grade as a member of the
Ready Reserve or Standby Reserve-Active.  Enlisted personnel who
accept advancement must meet time-in-grade requirements prior to
transfer to the Retired Reserve or the Fleet Reserve.  Frocking
does not constitute acceptance of advancement.  Members who do
not complete the time-in-grade requirement will normally submit
their request in the previously held pay grade.  Members who
through no fault of their own are unable to complete time-in-
grade requirements may request a waiver from CHNAVPERS to permit

Enclosure (3)

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 3
Page 10 of 13

OPNAVINST 1820.1
24 Dec 2005

retirement or transfer to the Fleet Reserve at the higher pay grade. Additionally, during times when early retirement is being offered due to force shaping initiatives, time-in-grade requirements may be waived by CHNAVPERS for inactive duty Reservists. Members involuntarily retired will be permitted to retire in the highest pay grade satisfactorily served as defined in paragraph 2a of this enclosure.

3. Qualification for Voluntary Retirement of Enlisted FTS Personnel. Per reference (a), sections 6330 and 6331, FTS enlisted personnel shall, upon application, be transferred to the Fleet Reserve, if qualified, after completion of at least 20 years of active service in the Armed Forces. After completing 30 years of service, members of the Fleet Reserve, Navy Reservists on active duty in the FTS Reserve shall be transferred to the Retired List. Years of active service in the Armed Forces are computed as defined in enclosure (1) of this instruction.

2                                    Enclosure (3)

OPNAVINST 1820.1
24 Dec 05

## DEFINITIONS

1.  Active Commissioned Service.  Service on active duty as a commissioned officer or commissioned warrant officer.

2.  Active Service.  Service on active duty.

3.  Active Status.  Service as an officer of the Navy Reserve on the Reserve Active Status List (RASL), or on the Active Duty List (ADL).  Service of an enlisted member in the Ready Reserve or Standby Reserve-Active.  Includes FTS personnel.

4.  Full Time Support (FTS).  Reserve component personnel assigned to assist in organizing, administering, recruiting, retention or training of Reserve component personnel.  FTS personnel in DON include Navy Reserve members formerly known as TARs, Canvasser Recruiters (CANRECs), and personnel on Active Duty for Special Work (ADSW) for periods greater than 179 consecutive days.

5.  Inactive Duty.  Service performed by reservists not on active duty (SELRES or IRR).

6.  Individual Ready Reserve (IRR).  Ready Reservists who are in a non-drill pay status or in a non-drill status.

7.  Involuntary Retirement.  Reserve members on active duty who are notified of being released from active duty without their consent, and thereafter request transfer to the Retired Reserve under reference (a), section 6327, and are retired per that request, are considered to have retired involuntarily.

8.  Qualifying Service.  Accumulation of a minimum of 50 retirement points in an anniversary year is considered a "qualifying year" (satisfactory Federal service) for retirement purposes.

9.  Ready Reserve.  The SELRES and the IRR, consisting of units and individuals liable for immediate recall to active duty in time of war or national emergency declared by Congress, proclaimed by the President or when otherwise authorized by law.

10.  Secretary of the Navy (SECNAV).  SECNAV, with respect to

Enclosure (4)

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 3
Page 12 of 13

OPNAVINST 1820.1
24 Dec 2005

matters concerning Navy, Marine Corps, and Coast Guard when it is operating as a service in the Navy.

11.  Selected Reserve (SELRES).  That part of the Ready Reserve consisting of Reserve units, as designated by SECNAV, and of individual Reservists, in pay status, required to participate in IDT periods and annual training.  SELRES also includes Active Guard and Reserve and Individual Mobilization Augmentee (IMA) personnel.

12.  Standby Reserve, Active Status List (USNR-S1).  Reserve members transferred to the Standby Reserve but remaining in an active status who are liable for active duty only in time of war or national emergency declared by the Congress or when otherwise authorized by law.

13.  Voluntary Retirement.  Retirement based on a voluntary request from an individual for transfer to the Retired Reserve which has not been the result of notification action requiring involuntary separation from active duty.

2                        Enclosure (4)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHAPLAINCY OF FULL GOSPEL CHURCHES, et al., | ) ) ) | |
| v. | ) ) | Civil Action No. 1:99cv2945 (RMU) |
| THE HONORABLE DONALD C. WINTER, Secretary of the Navy, et al., | ) ) ) ) | |
| | | **Consolidated with** |
| ROBERT H. ADAIR, et al., | ) ) | |
| v. | ) ) | Civil Action No. 1:00cv566 (RMU) |
| THE HONORABLE DONALD C. WINTER, Secretary of the Navy, et al., | ) ) ) ) | |

## DECLARATION OF SAMUEL A. WYVILL

Pursuant to 28 U.S.C. § 1746, I, Samuel A. Wyvill, declare as follows:

1. I am a civilian employee of the Department of the Navy. I currently serve as a Deputy Director (GS-12) in the Navy Reserve Personnel Branch (PERS-491B) in the Navy Personnel Command, Millington, Tennessee. I have served in this position since August 1988. Prior to that, I served for 22 years on active duty in the United States Navy, retiring as a Commander (O-5). During my years of service with the Navy, both on active duty and as a civilian employee, I have extensive experience in personnel matters, including in-depth familiarity with the statutes, regulations, and instructions that affect the management of the Navy's Reserve force.

2. As a result of this litigation, I was asked by defendants to describe the process whereby a

Reserve Officer, designator 4105, could be transferred to the "Retired Reserve and retained on active duty" after acquiring the designator 4109. For these officers, this is a four-step process. First, a Reserve Officer (designator 4105) serving on the Active Duty list would be released from active duty on the last day of a given month and secondly he would be transferred to the Individual Ready Reserve. Then, on the next day, (the 1st day of the next month), the officer would be transferred to the Retired Reserve list and assigned a 4109 designator. Finally, the officer's orders would be modified at his request to recall him to active duty in a retired status. This all can happen seamlessly, when the individual's continued services are needed at the end of a period of active duty in which removal from the Ready Reserve component is required by law.

3. The statutory authority under which the Navy takes the steps outlined above is 10 U.S.C. § 12301(d), which allows the Secretary of the Navy to "order a member of a reserve component under his jurisdiction to active duty, or retain him on active duty, with the consent of that member."

4. The Navy has had several instructions that address the transfer and recall of Retired Reserve personnel. The current governing instruction is OPNAVINST 1820.1 (dated December 24, 2005). Before that instruction was in effect, the governing instruction was SECNAVINST 1820.2C (dated January 25, 2005) and before that, SECNAVINST 1820.2B (dated March 1, 1999). Each of those instructions provided for the transfer of Reservists not qualified for retired pay to the Retired Reserve when they possess "critical professional skills" that the Chief of Naval Personnel has determined to be "necessary to be retained in the inventory."

5. The utilization of members of the Retired Reserve in this manner gives the Navy flexibility to meet Force requirements. More specifically, it provides an "on-ramp" for personnel with highly specialized skills to be brought onto active duty quickly in order to meet the Navy's needs, and an "off-ramp" for those personnel to leave active duty after the Navy's needs have been met, or there is no longer a requirement for an individual's special skills.

6. The Secretary of the Navy recently signed the Fiscal Year 2007-2008 Navy Reserve Officer Retention and Continuation Plan, Attachment A, which notes that "Voluntary retention on, or recall to, active duty of Retired Reserve Officers will allow continued use of qualified officers to meet specific skill sets not readily available on the active-duty list (ADL) or RASL. Section 12301 of title 10, U.S. Code authorizes voluntary retention/recall of such members." In enclosure (2) of Attachment A, the Commander, Navy Personnel Command, is delegated the authority to direct the recall or retention of officers who volunteer for such service, who "possess skill sets in short supply needed by the active component," and who have been "identified to fill active component requirements."

7. An example that I am personally familiar with is a recalled-to-active-duty line Commander who was required to be separated per 10 USC 14507 and was needed for an extended period of time to complete a study for the Secretary of the Navy. He was retired per statute and recalled to active duty in a retired status for a period of 6 months because he possessed unique skill sets needed by the Secretary of the Navy. The Chaplain Corps' use of Retired Reserve (4109) Roman Catholic priests is a similar example of how this flexibility serves the Navy's needs. The 4109 Roman Catholic chaplains fill a "critical professional skill" or "skill set in short supply" based on

their ability to provide religious ministry to Roman Catholic Navy and Marine Corps personnel who, as I understand it, have unique requirements for religious ministry that cannot be met by religious professionals from other faiths.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed at Millington, Tennessee, this _7th_ day of March, 2007.

SAMUEL A. WYVILL



**DEPARTMENT OF THE NAVY**
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
2000 NAVY PENTAGON
WASHINGTON, D.C. 20350-2000

IN REPLY REFER TO

## ACTION MEMO

FOR: SECRETARY OF THE NAVY

*Mike Mun* 12-19-06

FROM: ADM M. G. MULLEN, Chief of Naval Operations

SUBJECT: FY-07/08 Navy Reserve Officer Retention and Continuation Plan

- Mr. Secretary, recommend you approve the FY-07/08 Navy Reserve Officer Retention and Continuation Plan, TAB A.

- The plan fosters the Navy Reserves' ability to retain and continue Reserve inventory in critical specialties, ensures equitable promotion and retirement opportunities, fills critical individual augmentation requirements, and allows greater use of Reservists to meet increased mobilization demands.

- The FY-07/08 plan supersedes the FY-06/07 Navy Reserve Officer Retention and Continuation Plan, TAB B. The FY-07/08 plan establishes policy guidance for the voluntary recall of a limited number of Retired Reservists, which was lost with the cancellation of SECNAVINST 1811.4E. TAB C is a summary of changes from TAB B.

- The plan conforms to all title 10, U.S. Code requirements and DoD and Navy policy.

RECOMMENDATION: SECNAV approve plan by initialing as appropriate:

Approve ___*(initialed)*___ Disapprove _____

DEC 2 1 2006

COORDINATION: TAB D

ATTACHMENTS:
As stated

Prepared By: LCDR K. Bowers, PERS 49, (901) 874-4501

## FY-07/08 NAVY RESERVE OFFICER RETENTION POLICY

1. <u>General</u>.  The retention of certain Reserve officers on the Reserve active-status list (RASL) will permit the optimum use of qualified officer personnel to meet the skill sets and manpower mobilization requirements of the Navy.  Section 14703 of title 10, U.S. Code authorizes the retention on the RASL of any Reserve officer in the Medical Corps, Dental Corps, Nurse Corps, Chaplain Corps, or Medical Service Corps if designated to perform as a veterinarian, optometrist, podiatrist, allied health officer, or biomedical sciences officer.

   a. <u>Eligibility</u>

     (1) Retention of any Reserve officer specified in paragraph 1 who is selected for promotion to, or currently holding the grade of rear admiral (lower half) or rear admiral will be contained in the appropriate fiscal year Navy Reserve Flag Officer Promotion Plan.

     (2) Any Reserve officer specified in paragraph 1 who is subject to removal from the RASL for maximum years of commissioned service (YCS) and who consents in writing, may be retained, provided the officer's designator, or designator and specialty designation in the case of Medical Service Corps officers, is contained in the FY-07/08 Navy Reserve Officer Retention Plan, enclosure (2).

   b. <u>Period of Retention</u>.  Retention approved under the FY-07/08 Navy Reserve Officer Retention Plan may continue until the last day of the month in which the officer reaches the age limits specified in section 14509 of title 10, U.S. Code. Retention beyond these age limits is addressed in paragraph g.

   c. <u>Start Date of Retention</u>.  Retention starts on the first day of the month following the month in which the officer:  (1) completes 28 YCS if in the grade of commander, (2) completes 30 YCS if in the grade of captain, or (3) reaches age limits specified in section 14509 of title 10, U.S. Code, whichever occurs first.

   d. <u>Notice of Opportunity of Retention on the RASL</u>.  Based on the approved FY-07/08 Navy Reserve Officer Retention and Continuation Plan, Commander, Navy Personnel Command will notify eligible officers by letter of the opportunity for retention.

e.  <u>Notification of Retention</u>.  Reserve officers who are eligible and consent to be retained on the RASL shall be notified of the period of their retention by Commander, Navy Personnel Command.

f.  <u>Voluntary Declination of Retention</u>.  A Reserve officer offered retention on the RASL under the FY-07/08 Navy Reserve Officer Retention and Continuation Plan may decline retention. In such a case, the officer shall be removed from the RASL per section 14514 of title 10, U.S. Code.

g.  <u>Retention Beyond Age Limits Specified in Section 14509 of Title 10, U.S. Code</u>.

(1) Captains and commanders:  Reserve Medical Corps (2105), Dental Corps (2205), Nurse Corps (2905), and Medical Service Corps (2305) officers in pay grades O-5 and O-6, who are identified by Commander, Navy Personnel Command as possessing certain critical medical skills required during a mobilization, may be retained on the RASL beyond the age limits specified in section 14509 of title 10, U.S. Code by Commander, Navy Personnel Command.  Any other O-5 or O-6 officer eligible for retention per section 14703 of title 10, U.S. Code, must be specifically approved for retention by the Chief of Naval Personnel and will only be considered for retention if the member possesses specific skills needed for mobilization which cannot be found elsewhere in the Navy Reserve.  No Reserve officer is allowed to remain on the RASL beyond the officer's 67th birthday.

(2) Lieutenant commanders:  Reserve Medical Corps (2105), Dental Corps (2205), Nurse Corps (2905), and Medical Service Corps (2305) officers in pay grade O-4, not subject to the attrition provisions of section 14506 of title 10, U.S. Code, who are identified by Commander, Navy Personnel Command as possessing certain critical medical skills required during a mobilization and could otherwise be removed from the RASL per section 14509 of title 10, U.S. Code, may be considered for retention per section 14703 of title 10, U.S. Code.

2.  <u>Retired Reserve Officers</u>.  Voluntary retention on, or recall to, active duty of Retired Reserve Officers will allow continued use of qualified officers to meet specific skill sets not readily available on the active-duty list (ADL) or RASL. Section 12301 of title 10, U.S. Code authorizes voluntary

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 4
Page 7 of 16

retention/recall of such members.  Officers who meet specific
requirements in enclosure (2), paragraph 2, may be
recalled/retained on active duty in a retired status as directed
by Commander, Navy Personnel Command.

3

Enclosure (1)

FY-07/08 NAVY RESERVE OFFICER RETENTION PLAN

1.  As authorized in the FY-07/08 Navy Reserve Officer Retention Policy, enclosure (1), Reserve officers on the Reserve active-status list (RASL) in the following grades and designators are approved for retention, provided they are physically qualified and consent to retention on the RASL.

   a.  Captains in the Medical Corps (2105), Dental Corps (2205), Medical Services Corps (2305) or Nurse Corps (2905) who are identified by Commander, Navy Personnel Command as possessing certain critical medical skills required during a mobilization, and who would otherwise be removed from the RASL in FY-07/08 under section 14507 of title 10, U.S. Code.  The period of retention may extend until the last day of the month in which the officer reaches the age limit specified in section 14509 of title 10, U.S. Code.

   b.  Commanders in the Medical Corps (2105), Dental Corps (2205), Medical Services Corps (2305) or Nurse Corps (2905) who are identified by Commander, Navy Personnel Command as possessing certain critical medical skills required during a mobilization, and who would otherwise be removed from the RASL in FY-07/08 under section 14507 of title 10, U.S. Code.  The period of retention may extend until the last day of the month in which the officer reaches the age limit specified in section 14509 of title 10, U.S. Code.

2.  As authorized in the FY-07/08 Navy Reserve Officer Retention Policy, enclosure (1), Retired Reserve members may be retained on, or recalled to, active duty to meet specific skill sets not readily available in the active duty and Ready Reserve inventories.  Commander, Navy Personnel Command is authorized to recall/retain on active duty in a retired status, Reserve officers who volunteer for such service and:

   a.  are qualified and needed to fill mobilization and Individual Augmentation requirements; or

   b.  possess skill sets in short supply needed by the active component; and

   c.  have been identified by active component commands to fill immediate active component requirements.

Enclosure (2)

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 4
Page 9 of 16

FY-07/08 NAVY RESERVE OFFICER CONTINUATION POLICY

1.  General.  Reserve officers who must be removed from the Reserve active-status list (RASL) may be considered for continuation by Commander, Navy Personnel Command based upon a determination of needs for certain designators, qualifications, or special skills.  Section 14701 of title 10, U.S. Code provides for the selection of officers for continuation and specifies the limitations of such continuation on the RASL.  FY-07/08 mobilization manpower requirements and special skill needs on which continuation will be based are contained in the FY-07/08 Navy Reserve Officer Continuation Plan, enclosure (4).

2.  Eligibility.  Only those Reserve officers specified in the FY-07/08 Navy Reserve Officer Continuation Plan, enclosure (4), are eligible to be considered for continuation.

3.  Notice of Opportunity for Continuation on the RASL.  Based on the approved FY-07/08 Navy Reserve Officer Retention and Continuation Plan, Commander, Navy Personnel Command will notify eligible officers by letter of the opportunity for continuation.

4.  Notification of Continuation.  Commander, Navy Personnel Command will review eligible members and notify Reserve officers approved for continuation on the RASL of the period of their continuation.

5.  Period of Continuation.  Continuation approved under the FY-07/08 continuation policy is for the period specified below, unless otherwise indicated in the FY-07/08 Navy Reserve Officer Continuation Plan, enclosure (4).

   a.  In the grade of lieutenant, continuation is for the period specified in the FY-07/08 Navy Reserve Officer Continuation Plan, enclosure (4).  Cumulative continuation periods shall not extend beyond the last day of the month in which the officer completes 20 years of commissioned service (YCS) or reaches the age limits specified in section 14509 of title 10, U.S. Code.

   b.  In the grade of lieutenant commander, continuation is for a period not to extend beyond the last day of the month in which the officer completes 24 YCS or reaches the age limits specified in section 14509 of title 10, U.S. Code, whichever occurs first.  Commander, Navy Personnel Command may terminate the period of continuation if the officer has performed at least

Enclosure (3)

20 years of qualifying service and a need for the officer no longer exists.

    c. In the grade of commander, continuation is for a period not to extend beyond the last day of the month in which the officer completes 33 YCS, or reaches the age limits specified in section 14509 of title 10, U.S. Code, or completes the period of continuation specified in the FY-07/08 Navy Reserve Officer Continuation Plan, enclosure (4), whichever occurs first.

    d. In the grade of captain, continuation is for a period not to extend beyond the last day of the month in which the officer completes 35 YCS, reaches the age limits specified in section 14509 of title 10, U.S. Code, or completes the period of continuation specified in the FY-07/08 Navy Reserve Officer Continuation Plan, enclosure (4), whichever occurs first.

6. <u>Start Date of Continuation Period</u>. Continuation starts on the first day of the month after the month in which the officer completes 20, 28 or 30 YCS for the grades of lieutenant commander, commander, or captain respectively. In the grade of lieutenant, continuation starts on the first day of the seventh month after the month in which the report of the board which considered and did not select the officer for promotion for the second time is approved.

7. <u>Voluntary Declination of Continuation</u>. A Reserve officer offered continuation under the FY-07/08 Navy Reserve Officer Retention and Continuation Plan may decline continuation on the RASL. In such a case, the officer shall be removed from the RASL as provided for in section 14513 or 14514 of title 10, U.S. Code, as applicable.

8. <u>Removal from Continuation</u>. Commander, Navy Personnel Command may vacate an officer's continuation if the need for certain designators, qualifications, or special skills no longer exists, or the member does not remain an active participant. In such a case, the officer shall be removed from the RASL as provided for in section 14513 or 14514 of title 10, U.S. Code, as applicable.

9. <u>Effect of Non-Selection for Continuation</u>. Any officer who is subject to removal from the RASL and is not approved for continuation will be removed from RASL as provided for in section 14513 or 14514 of title 10, U.S. Code, as applicable.

2

Enclosure (3)

twice failed of selection for promotion and having completed 20 YCS per section 14506 of title 10, U.S. Code. The period of continuation shall not extend beyond the last day of the month in which the officer completed 24 YCS. All eligible 2105, 2205, 2305, 2905, 1135, 1605, 1635, 3105, and 5105 designated officers may be continued.

(2) In all designators, except those listed in paragraph 2d(1) above, who, on the day prescribed for removal from the RASL by section 14506 of title 10, U.S. Code, possess at least 16 but less than 18 years of qualifying service. The period of continuation shall not extend beyond the last day of the month in which the officer completes 24 YCS.

(3) For all Full-Time Support (FTS) officers in the designator xxx7, who, on the day prescribed for removal from the RASL by section 14506 of title 10, U.S. Code, possess at least 16 but less than 18 years of active service, the period of continuation may not extend beyond the time the member completes 20 years of active service.

e.  In the grade of lieutenant:

(1) All FTS officers in the designator xxx7, who were considered twice for selection to lieutenant commander but twice failed of selection on the RASL, may be continued on the RASL following release from active duty. Continuation will be for one year.

(2) In all designators, who were considered twice for selection to lieutenant commander but twice failed of selection on the RASL, may be continued on the RASL. Continuation will be for one year. Continuation is not authorized for any lieutenant who has three or more failures of selection to lieutenant commander on the RASL.

f.  In the grades of captain, commander, lieutenant commander, and lieutenant:

(1) In all designators who, on the prescribed day, if removed from the RASL, have sufficient service to qualify for retirement but lack the necessary years in a Reserve component per section 12731(a)(3) of title 10, U.S. Code. Continuation will be offered, within the parameters of section 14701 of title 10, U.S. Code, only if necessary to afford the member the opportunity to meet this requirement.

FY-07/08 NAVY RESERVE OFFICER CONTINUATION PLAN

1.  A continuation review will be conducted at Navy Personnel Command for the purpose of approving Reserve officers for continuation on the Reserve active-status list (RASL).  This may be a standing panel for FY-07/08 to enable timely review of all eligible officers being considered for continuation.

2.  As authorized in the FY-07/08 Navy Reserve Officer Continuation Policy, enclosure (3), only Reserve officers in the following grades and designators, who are eligible and apply, shall be considered for selection for continuation on the RASL:

    a.  In the grade of captain, commander, lieutenant commander, and lieutenant, in all designators, who are subject to attrition per sections 14505, 14506, 14507 and 14704 of title 10, U.S. Code, and who are serving on active duty under mobilization or other active-duty orders in direct support of the Global War on Terrorism at the time of required separation. Continuation may be extended for the length of the active-duty orders.

    b.  In the grade of captain.  In the Unrestricted Line Special Warfare (1135), who would otherwise be removed from the RASL in FY-07/08 for completing 30 years of commissioned service (YCS) per section 14507 of title 10, U.S. Code.  The period of continuation shall not extend beyond the last day of the month in which the officer completes 35 YCS.  All eligible 1135 designated officers may be continued.

    c.  In the grade of commander.  In the Unrestricted Line Special Warfare (1135), who would otherwise be removed from the RASL in FY-07/08 for completing 28 YCS per section 14507 of title 10, U.S. Code.  The period of continuation shall not extend beyond the last day of the month in which the officer completes 33 YCS.  All eligible 1135 designated officers may be continued.

    d.  In the grade of lieutenant commander:

        (1) In the Medical Corps (2105), Dental Corps (2205), Medical Services Corps (2305), Nurse Corps (2905), Special Warfare community (1135), Special Duty Officer (Information Professional) (1605), Special Duty Officer (Intelligence) (1635), Supply Corps (3105), and Civil Engineer Corps (5105) who would otherwise be removed from the RASL in FY-07/08 for having

Enclosure (4)

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 4
Page 13 of 16

(2) In all designators who, on the prescribed day, if removed from RASL, have sufficient service to qualify for retirement, but lack the necessary six months time in grade required by section 1370(d)(3)(B) of title 10, U.S. Code, to retire in the highest grade for which selected or held. Continuation will not exceed the minimum time required to retire in the highest grade held.

3                                    Enclosure (4)

Summary of Changes Made to Navy Reserve Officer Continuation and Retention Plan

## Enclosure (1)

1. Removed reference to "age 60" and replaced it with "age limits specified in section 14509 of title 10, U.S. Code" to incorporate amendments to title 10 that changed the maximum age for Reserve active-status list (RASL) retention from 60 to 62 years.

2. Changed approval authority from the Secretary of the Navy (SECNAV) to Chief of Naval Personnel for age waivers pursuant to section 14703 of title 10, U.S. Code, which are not specifically addressed in the Continuation Plan (i.e. Chaplain Corps members).

3. Opened up consideration for retention to all 2305 officers authorized in section 14703 of title 10, U.S. Code.

4. Addressed a new retire/retain/voluntary recall policy to allow Commander, Navy Personnel Command (NPC) to issue active duty orders to Retired Reservists pursuant to section 12301 of title 10, U.S. Code, to meet Global War on Terrorism (GWOT) and Individual Augmentee (IA) requirements.

## Enclosure (2)

1. Removed reference to "age 60" and replaced it with "age limits specified in section 14509 of title 10, U.S. Code."

2. Amplified enclosure (1) retire/retain/voluntary recall policy to allow NPC to direct active-duty orders for IAs or mobilization of Reservists possessing specific skill sets to meet active component immediate needs.

## Enclosure (3)

1. Removed reference to "age 60" and replaced it with "age limits specified in section 14509 of title 10, U.S. Code."

2. Added "Removal of Continuation" authority to NPC in cases where members who have been continued, subsequently fail to maintain participation standards or meet mobilization demands.

## Enclosure (4)

1. Added lieutenant commanders (LCDRs) and lieutenants to list of officers authorized continuation if on active-duty or mobilization orders in direct support of GWOT.

2. Added ability to continue members on orders in direct support of GWOT for the length of the orders. Changed approval authority from SECNAV to NPC.

3. Added 1605, 1635, 3105, and 5105 LCDRs to the list for automatic consideration for continuation to 24 years of commissioned service.

4. Expanded consideration for continuation to all 2305 LCDRs, regardless of skill set. Previous continuation plan limited continuation to only those with biomedical skills.

<u>COORDINATION PAGE</u>

CAPT David Montgomery, PERS-49, (901) 874-4469                    8 Aug 06

RDML Daniel Holloway, PERS-4, (901) 874-3537                     11 Sep 06

RADM Dave Gove, NPC, (901) 874-3000                             14 Sep 06

RADM Michael A. Lefever, N13, (703) 695-6406                    25 Oct 06

Mrs. Betsy Fitzgerel, Dep Dir OCNR, (703) 614-4830              5 Oct 06

VADM J. C. Harvey, Jr., (703) 614-1101                         14 Nov 06

VADM Ann Rondeau, DNS, (703) 692-9084                          H / S

ADM Bob Willard, VCNO, (703) 697-8347                          H / S

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHAPLAINCY OF FULL GOSPEL CHURCHES, et al., | ) ) ) | |
| v. | ) ) | Civil Action No. 1:99cv2945 (RMU) |
| THE HONORABLE DONALD C. WINTER, Secretary of the Navy, et al., | ) ) ) ) | |
| ROBERT H. ADAIR, et al., | ) ) | **Consolidated with** |
| v. | ) ) | Civil Action No. 1:00cv566 (RMU) |
| THE HONORABLE DONALD C. WINTER, Secretary of the Navy, et al., | ) ) ) | |

## DECLARATION OF THOMAS L. BUSH,
## PRINCIPAL DIRECTOR FOR MANPOWER AND PERSONNEL IN THE
## OFFICE OF THE ASSISTANT SECRETARY OF DEFENSE FOR RESERVE AFFAIRS

Pursuant to 28 U.S.C. § 1746, I, Thomas L. Bush, make the following declaration. I am aware that this declaration will be used in litigation and that this declaration is the legal equivalent to a statement under oath.

1.     I am the Principal Director for Manpower and Personnel in the Office of the Assistant Secretary of Defense for Reserve Affairs. Our office is located in the Pentagon, Washington, DC. I am a federal civil service employee in the Senior Executive Service. I have served as the Principal Director since January 2005. Prior to being selected for the Principal Director position and appointment as an SES, I served as the Staff Director for the Manpower and Personnel Deputate from September 1994 to January 2005. For the first four years of that period, I was on

active duty in the Unites States Navy, and upon my retirement in May 1998, I was hired into Staff Director position as a GS-15, when the position was converted from a military position to a federal civilian employee position. I served on active duty for over 27 years and retired as a Captain in the Navy. For 23 of my 27 years of active duty, I served in the Navy's Training and Administration of the Reserve program (now called full-time support by the Navy).

2.     The Office of the Assistant Secretary of Defense for Reserve Affairs has oversight responsibility for all matters pertaining to the reserve components within the Department of Defense. The reserve components as named in title 10 of the United States Code are the Army National Guard of the United States, the Army Reserve, the Navy Reserve, the Marine Corps Reserve, the Air National Guard of the United States, the Air Force Reserve and the Coast Guard Reserve. This office also has policy oversight responsibility for the Army National Guard and the Air National Guard, which are those parts of the organized militias of the several states that are federally recognized but are not in a federal status. The Manpower and Personnel deputate is the proponent within the Department of Defense for DoD Instruction 1215.06, which was recently consolidated from two DoD issuances: DoD Directive 1215.6; "Uniform Reserve, Training, and Retirement Categories" and DoD Instruction 1215.19; "Uniform Reserve, Training and Retirement Category Administration." This office is also the proponent within the Department of Defense for DoD Instruction 1200.15, "Assignment to and Transfer Between Reserve Categories, Discharge from Reserve Status, Transfer to the Retired Reserve, and Notification of Eligibility for Retired Pay." All three of these DoD issuances are relevant to the evolution of the honorary retiree issue.

3.      Based upon my research and information that I have learned and acquired in the normal course of my employment, I understand that honorary retiree lists were first established by the Naval Reserve Act of 1938- well before reserve retired pay or most other reserve retiree benefits were available. The term "honorary retiree" refers to individuals placed on the retiree list without being eligible to receive retired pay or other retiree benefits. The Armed Forces Reserve Act of 1952 transferred these service members to the Retired Reserve automatically, and DoD maintained these individuals on the Retired Reserve list as the subset "honorary retirees."

4.      I am aware that DoD issued several instructions addressing the Retired Reserve list and included categories of individuals eligible to be placed on the list. The various manpower categories were used as a manpower management tool to track the status and availability of retired reservists who could be used as mobilization assets in the future. Furthermore, not all individuals on the Retired Reserve list were entitled to benefits, and the categories were used to delineate the distinctions in status and benefits. For example, the September 22, 1987, issuance of DoD Directive 1215.6 included the category of honorary retiree; paragraph E.6.d.(6): "Personnel not eligible for retirement pay, but having requested placement on the Honorary Retired List under Section 274 [now section 10154] of reference (d) [Title 10, United States Code] and under DoD Instruction 1200.15." [The issuance that was in effect at that time was actually DoD Directive 1200.15; February 16, 1973]. DoD Directive 1200.15 prescribed the eligibility criteria for assignment or transfer to the Retired Reserve. Specifically, honorary retirees were the category of retirees described in Paragraph II.C.2.a., which stated that the appropriate Secretary of a Military Department:

>   (4)  May also assign or transfer to the Retired Reserve, upon application, any member of
>        a Reserve Component who, having attained the age of 37 years:

(a) has completed a minimum of eight years of service described in section 1332(a)(2) of reference (b) [now section 12732 of Title 10 of the U.S. Code]; or
(b) has completed a minimum of eight years of service described in section 1332(a)(1) of reference (b), (including at least six months of honorable service on active duty in time of war or national emergency), except that the service may have been performed before or after July 1, 1949; or
(c) has consistently supported the Armed Forces in an outstanding manner, when the Secretary concerned determines that such action is warranted.

5.    Based upon my research, I understand that over the next four decades after the Naval

Reserve Act of 1938, confusion about the status of members in the various Retired Reserve

categories led to many honorary retirees obtaining an identification card that provided them

access to benefits to which they are not entitled. After additional benefits and privileges were

authorized in law during recent years for members of the Retired Reserve who have qualified for

retired pay at age 60, but who are not yet 60, including unlimited exchange privileges, at the time

limited commissary privileges, and morale, welfare and recreation activity privileges, the Sixth

Quadrennial Review of Military Compensation (6th QRMC) (August, 1988) recommended the

honorary retiree category be eliminated (Volume 1B, page 8-10). The Report recommended that

only members who are or will be eligible for retired pay be placed into the Retired Reserve in the

future. Existing lists would be reduced by attrition and then discontinued. In the interim, it was

recommended that measures be taken to prevent the inadvertent issuance of retiree ID cards to

honorary retirees.

6.    As a result of the 6th QRMC, paragraph (6) of DoD Directive 1215.6, discussed in

paragraph 4 above, was deleted. The December 18, 1990, reissuance of that directive removed

reference to honorary retirees. However, DoD Directive 1200.15 continued to carry that

category until that directive was reissued as a DoD Instruction on September 18, 1997. I was

involved in rewriting DoD Instruction 1200.15. The rationale for deleting this section was twofold. First, the Office of the Secretary of Defense ("OSD") wanted to permanently stop the practice of issuing identification cards to honorary retirees, which was the key to accessing benefits that are available to reserve retirees who are eligible for retired pay. Thousands of honorary retirees were not eligible for these benefits, but were often being issued the same DoD identification cards that allowed them to access benefits such as Fitness Centers, Exchanges, and Commissaries. We agreed with the 6th QRMC that removing these individuals from the Retried Reserve list would ensure that they were not inadvertently issued a DoD identification card. Second, because DoD maintained the Retired Reserve list and created categories within this list as a manpower management tool, the continued tracking of honorary retired reservists was not in keeping with this purpose. Typically, honorary retirees were not mobilization assets but rather individuals who simply enjoyed their continued association with the military without performing any duty. It was therefore not necessary to continue maintenance of the category honorary retirees on the Retired Reserve list as a manpower management tool.

7.      While DoD no longer recognized honorary retirees as a manpower category in DoD Directive 1215.6, section 10154 of title 10, United States Code, to this day, contains the same language that permitted the Department to establish and use the honorary retiree category. As this office was rewriting DoD Instruction 1200.15 to remove reference to honorary retirees in that issuance as well, I had several discussions with Navy Reserve personnel managers about honorary retirees. Specifically, the Navy Reserve uses this category to retain certain officers who could no longer be retained in the Ready Reserve or Standby Reserve because of statutory age limitations. The Navy placed this small number of officers on the Retired Reserve list as

honorary retirees so that they could be brought back onto active duty to meet manpower shortages. Although the Navy Reserve informally requested that OSD retain this category in our directive, we no longer found it prudent to account for the Navy's small population of honorary retirees serving on active duty in our manpower systems.

8.    Although DoD no longer desired to account for honorary retirees, I acknowledged that the Navy Reserve had a valid purpose for these honorary retirees to meet manpower shortages. However, there was no need to include honorary retirees in the DoD instructions just to accommodate the Navy because section 10154 of title 10 continued to authorize the Navy Reserve to place individuals in the retired reserve who did not meet the criteria specified in our directive for transfer to the retired reserve. Furthermore, I considered specifically stating in DoD Directive 1200.15 that honorary retirees could **not** be placed in the retired reserve. But following my discussions with the Navy Reserve, I found that they had a valid need to continue to use the honorary retiree category and did not include such a restriction. The only restriction in the directive is found in paragraph 5.3.2., which states that a Uniformed Service identification card shall only be issued to individuals who are assigned or transferred to the Retired Reserve under paragraph 5.3.1. Paragraph 5.3.1. prescribes those individual who shall be transferred to the retired reserve and who may be transferred to the retired reserve as a manpower asset tracked by OSD and managed by the Services in accordance with regulations prescribed by OSD. But that paragraph is not intended to bar the Navy Reserve from placing honorary retirees in the retired reserve, if the Secretary of the Navy desires to use the retired reserve to retain certain honorary retirees. The Navy's practice of transferring service members, who are not eligible for retirement benefits, on the Retired Reserve list is not prohibited by DoD Instructions 1200.15

and 1215.06, and the Navy's underling purpose for placing honorary retirees on the Retired Reserve list does not conflict with DoD's rational for removing honorary retirees from their manpower tracking system.

9.     The Navy's use of honorary retirees is also consistent with section 377 of the National Defense Authorization Act for Fiscal Year 1995 (P. L. 103-337—October 5, 1994).  That provision specifically authorized the Secretary of the Navy to issue a military identification card to a member of the retired reserve who has not completed the years of service to qualify for retired pay under chapter 67 [now chapter 1223] of title 10—these are the so-called honorary retirees.  The only restriction is that the color and format shall not be similar to the color and format of the identification card issued to other military members in order to ensure they did not have access to commissary and exchange benefits.

10.     At the time DoD Directive 1200.15 was revised to remove reference to honorary retirees, I knew the Navy Reserve was using that category to retain certain chaplains who they otherwise would have had to separate from the Navy Reserve, and planned to continue to use that category because of the age limit prescribed in law (section 14703 of title 10, United States Code).  I advised the Navy manpower managers that OSD would no longer track honorary retirees, and that the Navy would have to track and manage them as a separate category within the Navy manpower systems.

I declare under penalty of perjury that the foregoing is true and correct.
Executed in Washington, D.C., this 1st day of May, 2007.

THOMAS L. BUSH

```
PRECEDENCE TO: ROUTINE      DTG: 242241Z JAN 05
PRECEDENCE CC: ROUTINE
TYPE: AUTODIN
FROM PLA: SECNAV WASHINGTON DC
SUBJECT: CANCELLATION OF SECRETARY OF THE NAVY INSTRUCTIONS//
TEXT:
RAAUZYUW RUERMFU2189 0242232-UUUU--RUENAVY RUENCGU RUHQCNU.
ZNR UUUUU
R 242241Z JAN 05
FM PTC EMAIL SYSTEM WASH DC
TO RUENAVY/CNO EMAIL CUSTOMER//NAVINSGEN WASHINGTON DC//
INFO RUENAVY/CNO EMAIL CUSTOMER//NAVCOSTCENARLINGTONVA/NAVY IPO/
     NAVAUDSVC/CNOONIPRDA//
R 242232Z JAN 05 PSN 134547K24
FM SECNAV WASHINGTON DC
TO ALNAV
ZEN/ALNAV @ AL ALNAV(UC)
INFO ZEN/CNO CNO
ZEN/CNO SECNAV
BT
UNCLAS SECTION 1 OF 2
SUBJ: CANCELLATION OF SECRETARY OF THE NAVY INSTRUCTIONS//
PASS TO OFFICE CODES:
FM SECNAV WASHINGTON DC
TO ALNAV
     BT
ALNAV 007/05
UNCLAS
MSGID/GENADMIN/SECNAV WASHINGTON DC/-/JAN//
SUBJ/CANCELLATION OF SECRETARY OF THE NAVY INSTRUCTIONS//
REF/A/MSG/SECNAV/011140ZOCT2004//
REF/B/MSG/SECNAV/011953ZNOV2004//
REF/C/MSG/SECNAV/030253ZDEC2004//


PAGE 02 RUERMFU2189 UNCLAS
NARR/REF A IS ALNAV 081/04. REF B IS ALNAV 088/04. REF C IS ALNAV
093/04//
RMKS/1.  SECNAV INSTRUCTION REVIEWS ARE NOW COMPLETED. REFS A,
B AND C, AND THIS ALNAV DOCUMENT THE PROGRESS MADE TO IMPROVE
THE EFFECTIVENESS AND EFFICIENCY OF THE DEPARTMENT.  INCLUDING
THESE LISTED BELOW, OUR REVIEWS HAVE IDENTIFIED OVER 150
INSTRUCTIONS FOR CANCELLATION FROM THE INITIAL LIBRARY OF 550.
2. I HEREBY CANCEL THESE OUTDATED AND NO LONGER RELEVANT
INSTRUCTIONS:
SECNAVINST 1740.3A    DON CONSUMER AFFAIRS PROGRAM
SECNAVINST 3400.3     SAFETY PROGRAM FOR CHEMICAL AGENTS AND WEAPONS
                      SYSTEMS
SECNAVINST 3900.8A    THE TECHNICAL COOPERATION PROGRAM (TTCP)
SECNAVINST 4410.20B   IDENTIFICATION, CONTROL AND UTILIZATION OF
                      SHELF- LIFE ITEMS
SECNAVINST C4900.42B  CONTINENTAL UNITED STATES SUPPORT OF US-FEDERAL
                      REPUBLIC OF GERMANY LOGISTIC PROGRAMS (U)
SECNAVINST C4900.43A  UNITED STATES-FEDERAL REPUBLIC OF GERMANY
                      LOGISTIC PLANNING (U)
SECNAVINST 5000.28E   DEFENSE SYSTEMS MANAGEMENT COLLEGE (DSMC)
```

PAGE 03 RUERMFU2189 UNCLAS
SECNAVINST 5200.36A   DEPARTMENT OF THE NAVY POLICY ON PRODUCTIVITY
                      GAIN SHARING
SECNAVINST 5300.25    SUGGESTIONS FROM RETIREES FOR IMPROVING THE
                      ACQUISITION PROCESS
SECNAVINST 5510.29A   CHEMICAL AGENT SECURITY PROGRAM
SECNAVINST 5510.33    PROTECTION OF CLASSIFIED NATIONAL SECURITY
                      COUNCIL AND INTELLIGENCE INFORMATION
SECNAVINST 5511.36A   AUTHORITY OF MILITARY COMMANDERS UNDER
                      INTERNAL SECURITY ACT OF 1950 TO ISSUE SECURITY
                      ORDERS AND REGULATIONS FOR THE PROTECTION OR
                      SECURITY OF PROPERTY OR PLACES UNDER THEIR
                      COMMAND
SECNAVINST 5527.1A    DOD INVESTIGATIVE MANAGEMENT INFORMATION SYSTEM
SECNAVINST 5710.20B   COORDINATION WITHIN THE NAVY DEPARTMENT
                      REGARDING OFFICIAL VISITS TO THE UNITED NATIONS
                      OR ATTENDANCE AT OTHER INTERNATIONAL
                      CONFERENCES, ORGANIZATIONS, MEETINGS, AND
                      NEGOTIATIONS
SECNAVINST 8500.1     UNDERWATER EXPLOSION TESTING IN NAVIGABLE
                      WATERS OF THE CHESAPEAKE BAY REGION


PAGE 04 RUERMFU2189 UNCLAS
3. ADDITIONALLY, THE FOLLOWING INSTRUCTIONS ARE CANCELED SINCE
INFORMATION THEY CONTAIN IS ALREADY COVERED BY OTHER SECNAV
OR SERVICE INSTRUCTIONS:
SECNAVINST 1421.7B    PROMOTION AND SELECTIVE RETENTION OF WARRANT
                      AND CHIEF WARRANT OFFICERS ON INACTIVE
                      DUTY IN THE NAVAL RESERVE
SECNAVINST 1730.3G    EMPLOYMENT OF CIVILIAN CLERGY
SECNAVINST 1900.10A   ADMINISTRATIVE SEPARATION OF CHAPLAINS UPON
                      REMOVAL OF PROFESSIONAL QUALIFICATIONS
SECNAVINST 2093.1     NAVY-MARINE CORPS MILITARY AFFILIATE RADIO
                      SYSTEMS (MARS)
SECNAVINST 4045.1A    DON POLICY FOR NATO LOGISTICS
SECNAVINST 4101.1     SECRETARY OF THE NAVY ENERGY CONSERVATION
                      AWARDS PROGRAM
SECNAVINST 4860.44F   COMMERCIAL ACTIVITIES
SECNAVINST 5061.12C   HONORARY AWARDS TO PRIVATE CITIZENS AND
                      ORGANIZATIONS
SECNAVINST 5090.5     MANAGEMENT AND ELIMINATION OF OZONE
                      DEPLETING SUBSTANCES
SECNAVINST 5290.1B    NAVAL IMAGING PROGRAM (NAVIMP)


PAGE 05 RUERMFU2189 UNCLAS
SECNAVINST 5510.13B   SECURITY EDUCATION AND TRAINING
SECNAVINST 5510.25A   SECURITY REVIEW OF DEPARTMENT OF THE NAVY
                      INFORMATION; RESPONSIBILITY FOR
SECNAVINST 5580.1     NAVY AND MARINE CORPS SUBMISSION
                      PROCEDURES FOR SUSPECT FINGERPRINT CARDS AND

```
                         FINAL DISPOSITION REPORTS
SECNAVINST 5760.16       DEPARTMENT OF THE NAVY (DON) STARBASE-ATLANTIS
                         PROGRAM
SECNAVINST 7220.38E      REMISSION OF INDEBTEDNESS OR WAIVER OF THE
                         GOVERNMENT'S CLAIM ARISING FROM ERRONEOUS
                         PAYMENTS MADE TO OR ON BEHALF OF MEMBERS OF THE
                         NAVAL SERVICE
SECNAVINST 7220.52B      WAIVER OF RECOVERY OF PAY ADVANCED TO
                         PERSONNEL WHOSE DEPENDENTS ARE EVACUATED FROM A
                         DANGER AREA
4. I AM ALSO CANCELING THE FOLLOWING INSTRUCTIONS SINCE DOD
DIRECTIVES GOVERNING THESE ACTIVITIES PROVIDE SUFFICIENT POLICY
TO GUIDE OUR DEPARTMENT:
SECNAVINST 1200.1A       FULL-TIME SUPPORT (FTS) PERSONNEL IN THE
                         NAVAL AND MARINE CORPS RESERVE


PAGE 06 RUERMFU2189 UNCLAS
SECNAVINST 1571.2        DEPARTMENT OF DEFENSE (DOD) INNOVATIVE
                         READINESS TRAINING ACTIVITIES IN SUPPORT OF
                         ELIGIBLE ORGANIZATIONS AND ACTIVITIES OUTSIDE
                         OF THE DEPARTMENT OF DEFENSE
SECNAVINST 1811.4E       VOLUNTARY RECALL/RETENTION OF RETIRED
                         OFFICERS TO/ON ACTIVE DUTY
SECNAVINST C2300.1       CONSOLIDATION OF TELECOMMUNICATIONS
                         CENTERS INVOLVING DEFENSE SPECIAL SECURITY
                         COMMUNICATIONS SYSTEM AND GENERAL SERVICES
                         COMMUNICATIONS (U)
SECNAVINST 3062.1B       WARTIME MANPOWER PLANNING POLICIES AND
                         PROCEDURES
SECNAVINST 3403.1        RULES GOVERNING THE USE OF RIOT CONTROL
                         AGENTS AND CHEMICAL HERBICIDES IN WAR
SECNAVINST 3820.2D       INVESTIGATIVE AND COUNTERINTELLIGENCE

UNCLAS FINAL SECTION OF 2
SUBJ: CANCELLATION OF SECRETARY OF THE NAVY INSTRUCTIONS//
                         COLLECTION AND RETENTION GUIDELINES
                         PERTAINING TO THE DON
SECNAVINST 4950.5        THE DEFENSE INSTITUTE OF SECURITY
                         ASSISTANCE MANAGEMENT
SECNAVINST 5410.116B     SINGLE MANAGER FOR MILITARY EXPLOSIVE
                         ORDNANCE DISPOSAL TECHNOLOGY AND TRAINING
                         (EODT&T)
SECNAVINST 5500.33       OBTAINING INFORMATION FROM FINANCIAL
                         INSTITUTIONS
SECNAVINST 5510.27       DISCLOSURE OF CLASSIFIED MILITARY INFORMATION
                         TO NATO NATIONS


PAGE 02 RUERMFU2190 UNCLAS
SECNAVINST 5520.4B       DEPARTMENT OF THE NAVY POLYGRAPH PROGRAM
SECNAVINST 5710.8A       INTERNATIONAL INTERCHANGE OF PATENT RIGHT AND
                         TECHNICAL INFORMATION
SECNAVINST 5711.9A       POLICY ON RATIONALIZATION OF NATO AND NATO
                         MEMBER TELECOMMUNICATION
```

SECNAVINST 7010.7    DEPARTMENT OF THE NAVY (DON) PROCEDURES
                     FOR IMPLEMENTING PUBLIC-PRIVATE VENTURES
                     (PPVS) FOR MORALE, WELFARE
                     AND RECREATION (MWR) CATEGORY C REVENUE-
                     GENERATING ACTIVITIES
SECNAVINST 12990.1   ACTIVE SERVICE DETERMINATIONS FOR CIVILIAN OR
                     CONTRACTUAL GROUPS
5. ADDITIONALLY, WE IDENTIFIED 79 INSTRUCTIONS TO BE DELEGATED
TO LOWER ECHELON COMMANDS.  THE ASSOCIATED SECNAV
INSTRUCTIONS WILL BE CANCELLED ON PUBLICATION OF THE
APPROPRIATE REPLACEMENT. AS PART OF THIS EFFORT, WE HAVE
INITIATED A NEW DELEGATION OF AUTHORITY DATABASE, DESIGNED TO
CAPTURE AND DOCUMENT THESE AND OTHER DELEGATIONS OF
AUTHORITIES WITHIN THE DEPARTMENT. WE EXPECT TO WEB-PUBLISH
THIS DATABASE IN MARCH, USING TECHNOLOGY TO MORE EFFECTIVELY


PAGE 03 RUERMFU2190 UNCLAS
EMPOWER THE ORGANIZATION.
6. THE REVIEW ALSO IDENTIFIED OVER 250 SECNAV INSTRUCTIONS FOR
CONSOLIDATION AND REVISION. SPONSORS HAVE ALREADY BEGUN
WORK TO MEET MY GOAL OF COMPLETING THESE BEFORE OCTOBER OF
THIS YEAR.
7. I APPLAUD ALL EFFORTS TO STREAMLINE SECNAV INSTRUCTIONS AND
TO MAKE THEM USEFUL AND CURRENT. WE HAVE ALREADY
ACCOMPLISHED A GREAT DEAL. I KNOW I CAN COUNT ON YOU TO
MAINTAIN MOMENTUM TO COMPLETE THIS WORTHWHILE EFFORT.
8. RELEASE AUTHORIZED BY THE SECRETARY OF THE NAVY.//
BT

NAVINSGEN WASHINGTON DC...ACT                                    0
NAVCOSTCENARLINGTONVA...INFO                                     0
NAVY IPO...INFO                                                  0
NAVAUDSVC...INFO                                                 1


NNNN

U.S. DEPARTMENT OF JUSTICE
CIVIL LIBRARY - RM. 822
901 E ST., N.W.
WASHINGTON, D.C. 20530

# UNITED STATES CODE
# CONGRESSIONAL AND
# ADMINISTRATIVE NEWS

## 103rd Congress—Second Session
## 1994

---

Convened January 25, 1994

Adjourned December 1, 1994

## Volume 2

PUBLIC LAWS 103–306 to 103–355

[108 Stat. pages 1608 to 3409]

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 7
Page 1 of 3

Case 1:07-cv-01031-RBW    Document 7-8    Filed 07/05/2007    Page 2 of 3

PUBLIC LAW 103–337 [S. 2182]; October 5, 1994

## NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 1995

*For Legislative History of Act, see p. 2091.*

An Act to authorize appropriations for fiscal year 1995 for military activities of the Department of Defense, for military construction, and for defense activities of the Department of Energy, to prescribe personnel strengths for such fiscal year for the Armed Forces, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

National
Defense
Authorization
Act for
Fiscal Year 1995.

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "National Defense Authorization Act for Fiscal Year 1995".

**SEC. 2. ORGANIZATION OF ACT INTO DIVISIONS; TABLE OF CONTENTS.**

(a) DIVISIONS.—This Act is organized into three divisions as follows:

(1) Division A—Department of Defense Authorizations.
(2) Division B—Military Construction Authorizations.
(3) Division C—Department of Energy National Security Authorizations and Other Authorizations.

(b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title.
Sec. 2. Organization of Act into divisions; table of contents.
Sec. 3. Congressional defense committees defined.

DIVISION A—DEPARTMENT OF DEFENSE AUTHORIZATIONS

TITLE I—PROCUREMENT

Subtitle A—Authorization of Appropriations

Sec. 101. Army.
Sec. 102. Navy and Marine Corps.
Sec. 103. Air Force.
Sec. 104. Defense-wide activities.
Sec. 105. Reserve components.
Sec. 106. Chemical demilitarization program.

Subtitle B—Army Programs

Sec. 111. Multiyear procurement authority for Army programs.
Sec. 112. Transfer to Marine Corps of M1A1 tanks replaced by M1A2 upgrades.
Sec. 113. Transfer of M1A1 tanks to the Marine Corps.
Sec. 114. Exception to mandatory retirement of OV-1 aircraft for aircraft deployed in Korea.
Sec. 115. Small arms industrial base.
Sec. 116. Bunker defeat munition acquisition program.
Sec. 117. Procurement of helicopters.

Subtitle C—Navy Programs

Sec. 121. Nuclear aircraft carrier program.

108 STAT. 2663

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 7
Page 2 of 3

)peration of Armed
rope: limitation

subsection (b), funds
may not be used to
Europe.

t apply to the use of
rty maintenance, and
States.".

sections at the begin-
lding at the end the

Forces Recreation Center\

)RALE, WELFARE, AND
INSTALLATIONS.

, United States Code,
new section:

ad recreation funds
tation

nappropriated morale,
installation of a mili-
ecessary to meet cash
excess of that amount
-wide nonappropriated
the military depart-

sections at the begin-
t the end the following

ds by military installations:

RSION.—Section 371(a)
for Fiscal Year 1994
U.S.C. 7604 note) is
and inserting in lieu

-Section 371(d) of such
ke effect on the date
pletes the conversion
in lieu thereof "shall

GE AND COMMISSARY
FORT WORTH, JOINT
LD.

e for the operation by
e, until December 31,
issary store located at
serve Center, Carswell

M OPERATION OF THE

s Code, is amended—

(1) in subsection (a)—
    (A) by striking out "(a)"; and
    (B) in the first sentence, by striking out "and the Academy dairy" and inserting in lieu thereof "the Academy dairy, and the Academy laundry"; and
(2) by striking out subsection (b).

SEC. 377. AUTHORITY TO ISSUE MILITARY IDENTIFICATION CARDS TO SO-CALLED HONORARY RETIREES OF THE NAVAL AND MARINE CORPS RESERVES.    10 USC 10154 note.

(a) AUTHORITY.—The Secretary of the Navy may issue a military identification card to a member of the Retired Reserve described in subsection (b).

(b) COVERED MEMBERS.—A member of the Retired Reserve referred to in subsection (a) is a member of the Naval Reserve or Marine Corps Reserve who transferred to the Retired Reserve under section 274(2) of title 10, United States Code, without having completed the years of service required under section 1331(a)(2) of such title for eligibility for retired pay under chapter 67 of such title.

(c) EFFECT ON COMMISSARY AND EXCHANGE BENEFITS.—The issuance of a military identification card under subsection (a) to a member of the Retired Reserve does not confer eligibility for commissary and exchange benefits on that member.

(d) LIMITATION ON COLOR AND FORMAT.—The Secretary shall ensure that the color and format in which a military identification card is issued under subsection (a) is not similar to the color and format in which a military identification card is issued by the Department of Defense to individuals other than members described in subsection (b).

SEC. 378. REPEAL OF ANNUAL LIMITATION ON EXPENDITURES FOR EMERGENCY AND EXTRAORDINARY EXPENSES OF THE DEPARTMENT OF DEFENSE INSPECTOR GENERAL.

Section 127(c) of title 10, United States Code, is amended—
(1) by striking out "(1)" after "(c)"; and
(2) by striking out paragraph (2).

SEC. 379. TRANSFER OF CERTAIN EXCESS DEPARTMENT OF DEFENSE PROPERTY TO EDUCATIONAL INSTITUTIONS AND TRAINING SCHOOLS.

(a) AUTHORITY TO TRANSFER.—Subparagraph (G) of section 2535(b)(1) of title 10, United States Code, is amended to read as follows:

    "(G) notwithstanding title II of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 481 et seq.) and any other provision of law, authorize the transfer to a nonprofit educational institution or training school, on a nonreimbursable basis, of any such property already in the possession of such institution or school whenever the program proposed by such institution or school for the use of such property is in the public interest.".

(b) TREATMENT OF PROPERTY LOANED BEFORE DECEMBER 31, 1993.—Except for property determined by the Secretary of Defense to be needed by the Department of Defense, property loaned before December 31, 1993, to an educational institution or training school under section 2535(b) of title 10, United States Code, or section 4(a)(7) of the Defense Industrial Reserve Act (as in effect before    10 USC 2535 note.

Defs.' Opposition to Pls.' Renewed Motion for Preliminary Injunction
Ex. 7
Page 3 of 3

U.S. DEPARTMENT OF JUSTICE
CIVIL LIBRARY - RM. S22
901 E ST., N.W.
WASHINGTON, D.C. 20530

# UNITED STATES CODE
# CONGRESSIONAL AND
# ADMINISTRATIVE NEWS

## 104th Congress—Second Session
## 1996

Convened January 3, 1996

Adjourned October 4, 1996

# Volume 1

PUBLIC LAWS 104–90 to 104–92,
104–94,
and 104–99 to 104–134
[110 Stat. pages 1 to 1321–381]

WEST GROUP
ST. PAUL, MINN.

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 8
Page 1 of 9

Feb. 10

Sec. 114. Report
Sec. 115. Requir
    thori

Sec. 131. Nuclea
Sec. 132. Resear
Sec. 133. Cost li
Sec. 134. Repeal
Sec. 135. Arleigh
Sec. 136. Acquis
Sec. 137. T-39N
Sec. 138. Pionee

Sec. 141. B-2 ai
Sec. 142. Procur
Sec. 143. MC-1

    S
Sec. 151. Repeal
    chen
    Utah
Sec. 152. Destru
Sec. 153. Admir

TITLE II—

Sec. 201. Autho
Sec. 202. Amou
Sec. 203. Modifi
    gran
Sec. 204. Defen

Subtitle E

Sec. 211. Space
Sec. 212. Tactic
Sec. 213. Joint
Sec. 214. Devel
Sec. 215. Navy
Sec. 216. Space
Sec. 217. Defen
Sec. 218. Count
Sec. 219. Nonle
Sec. 220. Feder
    atec
Sec. 221. Joint
Sec. 222. Hydr
Sec. 223. Limit
    soli
Sec. 224. Repor
Sec. 225. Advan
Sec. 226. Demi
Sec. 227. Defer

Sec. 231. Short
Sec. 232. Findi
Sec. 233. Ballis
Sec. 234. Thea
Sec. 235. Prohi
    cen
Sec. 236. Balli
Sec. 237. ABM
Sec. 238. Repe

    Sul
Sec. 251. Balli
Sec. 252. Testi

PUBLIC LAW 104–106 [S. 1124]; February 10, 1996

### NATIONAL DEFENSE AUTHORIZATION
### ACT FOR FISCAL YEAR 1996

*For Legislative History of Act, see p. 238.*

An Act to authorize appropriations for fiscal year 1996 for military activities of the Department of Defense, for military construction, and for defense activities of the Department of Energy, to prescribe personnel strengths for such fiscal year for the Armed Forces, to reform acquisition laws and information technology management of the Federal Government, and for other purposes.

National Defense
Authorization
Act for Fiscal
Year 1996.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SECTION 1. SHORT TITLE.

This Act may be cited as the "National Defense Authorization Act for Fiscal Year 1996".

SEC. 2. ORGANIZATION OF ACT INTO DIVISIONS; TABLE OF CONTENTS.

(a) DIVISIONS.—This Act is organized into five divisions as follows:

(1) Division A—Department of Defense Authorizations.
(2) Division B—Military Construction Authorizations.
(3) Division C—Department of Energy National Security Authorizations and Other Authorizations.
(4) Division D—Federal Acquisition Reform.
(5) Division E—Information Technology Management Reform.

(b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title.
Sec. 2. Organization of Act into divisions; table of contents.
Sec. 3. Congressional defense committees defined.
Sec. 4. Extension of time for submission of reports.

DIVISION A—DEPARTMENT OF DEFENSE
AUTHORIZATIONS

TITLE I—PROCUREMENT

Subtitle A—Authorization of Appropriations

Sec. 101. Army.
Sec. 102. Navy and Marine Corps.
Sec. 103. Air Force.
Sec. 104. Defense-wide activities.
Sec. 105. Reserve components.
Sec. 106. Defense Inspector General.
Sec. 107. Chemical demilitarization program.
Sec. 108. Defense health programs.

Subtitle B—Army Programs

Sec. 111. Procurement of OH–58D Armed Kiowa Warrior helicopters.
Sec. 112. Repeal of requirements for armored vehicle upgrades.
Sec. 113. Multiyear procurement of helicopters.

110 STAT. 186

Feb. 10

f the United
and
congressional
(as the case
ate on which
has entered

ans an arms
control agree-

international
ot authorized
e Senate has

ittees" means

the Commit-
in Appropria-

telations, the
Committee on
s.

ONS.—Section
of 1992 (title
is amended
lear weapons

COUNTRIES.—
g "to acquire
"to acquire".
CE.—Subpara-
d to read as

ssistance Act
gent humani-

ITCR Proce-
Act (22 U.S.C.

erting in lieu
ne Committee
Committee on
rational Rela-

inserting in

# TITLE XV—TECHNICAL AND CLERICAL AMENDMENTS

## SEC. 1501. AMENDMENTS RELATED TO RESERVE OFFICER PERSON-NEL MANAGEMENT ACT.

(a) PUBLIC LAW 103–337.—The Reserve Officer Personnel Management Act (title XVI of the National Defense Authorization Act for Fiscal Year 1995 (Public Law 103–337)) is amended as follows:

(1) Section 1624 (108 Stat. 2961) is amended—    10 USC 620.
  (A) by striking out "641" and all that follows through "(2)" and inserting in lieu thereof "620 is amended"; and
  (B) by redesignating as subsection (d) the subsection added by the amendment made by that section.

(2) Section 1625 (108 Stat. 2962) is amended by striking    10 USC 12320.
out "Section 689" and inserting in lieu thereof "Section 12320".

(3) Section 1626(1) (108 Stat. 2962) is amended by striking    10 USC 741.
out "(W–5)" in the second quoted matter therein and inserting in lieu thereof ", W–5,".

(4) Section 1627 (108 Stat. 2962) is amended by striking    10 USC 12645.
out "Section 1005(b)" and inserting in lieu thereof "Section 12645(b)".

(5) Section 1631 (108 Stat. 2964) is amended—
  (A) in subsection (a), by striking out "Section 510"    10 USC 12102.
and inserting in lieu thereof "Section 12102"; and
  (B) in subsection (b), by striking out "Section 591"    10 USC 12201.
and inserting in lieu thereof "Section 12201".

(6) Section 1632 (108 Stat. 2965) is amended by striking    10 USC 12203.
out "Section 593(a)" and inserting in lieu thereof "Section 12203(a)".

(7) Section 1635(a) (108 Stat. 2968) is amended by striking    10 USC 3853
out "section 1291" and inserting in lieu thereof "section    note.
1691(b)".

(8) Section 1671 (108 Stat. 3013) is amended—
  (A) in subsection (b)(3), by striking out "512, and 517" and inserting in lieu thereof "and 512"; and
  (B) in subsection (c)(2), by striking out the comma    10 USC 113.
after "861" in the first quoted matter therein.

(9) Section 1684(b) (108 Stat. 3024) is amended by striking    10 USC 14310
out "section 14110(d)" and inserting in lieu thereof "section    note.
14111(c)".

(b) SUBTITLE E OF TITLE 10.—Subtitle E of title 10, United States Code, is amended as follows:

(1) The tables of chapters preceding part I and at the beginning of part IV are amended by striking out "Repayments" in the item relating to chapter 1609 and inserting in lieu thereof "Repayment Programs".

(2)(A) The heading for section 10103 is amended to read as follows:

"§ 10103. Basic policy for order into Federal service".

(B) The item relating to section 10103 in the table of sections at the beginning of chapter 1003 is amended to read as follows:

"10103. Basic policy for order into Federal service.".

(3) The table of sections at the beginning of chapter 1005 is amended by striking out the third word in the item relating to section 10142.

(4) The table of sections at the beginning of chapter 1007 is amended—

(A) by striking out the third word in the item relating to section 10205; and

(B) by capitalizing the initial letter of the sixth word in the item relating to section 10211.

(5) The table of sections at the beginning of chapter 1011 is amended by inserting "Sec." at the top of the column of section numbers.

(6) Section 10507 is amended—

(A) by striking out "section 124402(b)" and inserting in lieu thereof "section 12402(b)"; and

(B) by striking out "Air Forces" and inserting in lieu thereof "Air Force".

(7)(A) Section 10508 is repealed.

(B) The table of sections at the beginning of chapter 1011 is amended by striking out the item relating to section 10508.

(8) Section 10542 is amended by striking out subsection (d).

(9) Section 12004(a) is amended by striking out "active-status" and inserting in lieu thereof "active status".

(10) Section 12012 is amended by inserting "the" in the section heading before the penultimate word.

(11)(A) The heading for section 12201 is amended to read as follows:

"§ 12201. Reserve officers: qualifications for appointment".

(B) The item relating to that section in the table of sections at the beginning of chapter 1205 is amended to read as follows:

"12201. Reserve officers: qualifications for appointment.".

(12)(A) The heading for section 12209 is amended to read as follows:

"§ 12209. Officer candidates: enlisted Reserves".

(B) The heading for section 12210 is amended to read as follows:

"§ 12210. Attending Physician to the Congress: reserve grade while so serving".

(13)(A) The headings for sections 12211, 12212, 12213, and 12214 are amended by inserting "the" after "National Guard of".

(B) The table of sections at the beginning of chapter 1205 is amended by inserting "the" in the items relating to sections 12211, 12212, 12213, and 12214 after "National Guard of".

(14) Section 12213(a) is amended by striking out "section 593" and inserting in lieu thereof "section 12203".

(15) The table of sections at the beginning of chapter 1207 is amended by striking out "promotions" in the item relating to section 12243 and inserting in lieu thereof "promotion".

(16) The table of sections at the beginning of chapter 1209 is amended—

l SESS.       Feb. 10

inning of chapter 1005

ord in the item relating

inning of chapter 1007

ord in the item relating

etter of the sixth word

inning of chapter 1011

: top of the column of

4402(b)" and inserting
d
" and inserting in lieu

inning of chapter 1011
lating to section 10508.
striking out subsection

y striking out "active-
ve status".
inserting "the" in the
ord.
01 is amended to read

s for appointment".

. in the table of sections
nded to read as follows:

09 is amended to read

erves".

0 is amended to read

ngress: reserve grade

12211, 12212, 12213,
"the" after "National

inning of chapter 1205
ems relating to sections
· "National Guard of".
y striking out "section
1 12203".
inning of chapter 1207
s" in the item relating
u thereof. "promotion".
inning of chapter 1209

---

(A) in the item relating to section 12304, by striking out the colon and inserting in lieu thereof a semicolon; and

(B) in the item relating to section 12308, by striking out the second, third, and fourth words.

(17) Section 12307 is amended by striking out "Ready Reserve" in the second sentence and inserting in lieu thereof "Retired Reserve".

(18)(A) The table of sections at the beginning of chapter 1211 is amended by inserting "the" in the items relating to sections 12401, 12402, 12403, and 12404 after "Army and Air National Guard of".

(B) The headings for sections 12402, 12403, and 12404 are amended by inserting "the" after "Army and Air National Guard of".

(19) Section 12407(b) is amended—

(A) by striking out "of those jurisdictions" and inserting in lieu thereof "State"; and

(B) by striking out "jurisdictions" and inserting in lieu thereof "States".

(20) Section 12731(f) is amended by striking out "the date of the enactment of this subsection" and inserting in lieu thereof "October 5, 1994,".

(21) Section 12731a(c)(3) is amended by inserting a comma after "Defense Conversion".

(22) Section 14003 is amended by inserting "lists" in the section heading immediately before the colon.

(23) The table of sections at the beginning of chapter 1403 is amended by striking out "selection board" in the item relating to section 14105 and inserting in lieu thereof "promotion board".

(24) The table of sections at the beginning of chapter 1405 is amended—

(A) in the item relating to section 14307, by striking out "Numbers" and inserting in lieu thereof "Number";

(B) in the item relating to section 14309, by striking out the colon and inserting in lieu thereof a semicolon; and

(C) in the item relating to section 14314, by capitalizing the initial letter of the antepenultimate word.

(25) Section 14315(a) is amended by striking out "a Reserve officer" and inserting in lieu thereof "a reserve officer".

(26) Section 14317(e) is amended—

(A) by inserting "OFFICERS ORDERED TO ACTIVE DUTY IN TIME OF WAR OR NATIONAL EMERGENCY.—" after "(e)"; and

(B) by striking out "section 10213 or 644" and inserting in lieu thereof "section 123 or 10213".

(27) The table of sections at the beginning of chapter 1407 is amended—

(A) in the item relating to section 14506, by inserting "reserve" after "Marine Corps and"; and

(B) in the item relating to section 14507, by inserting "reserve" after "Removal from the"; and

(C) in the item relating to section 14509, by inserting "in grades" after "reserve officers".

110 STAT. 497

(28) Section 14501(a) is amended by inserting "OFFICERS BELOW THE GRADE OF COLONEL OR NAVY CAPTAIN.—" after "(a)".

(29) The heading for section 14506 is amended by inserting a comma after "Air Force".

(30) Section 14508 is amended by striking out "this" after "from an active status under" in subsections (c) and (d).

(31) Section 14515 is amended by striking out "inactive status" and inserting in lieu thereof "inactive-status".

(32) Section 14903(b) is amended by striking out "chapter" and inserting in lieu thereof "title".

(33) The table of sections at the beginning of chapter 1606 is amended in the item relating to section 16133 by striking out "limitations" and inserting in lieu thereof "limitation".

(34) Section 16132(c) is amended by striking out "section" and inserting in lieu thereof "sections".

(35) Section 16135(b)(1)(A) is amended by striking out "section 2131(a)" and inserting in lieu thereof "section 16131(a)".

(36) Section 18236(b)(1) is amended by striking out "section 2233(e)" and inserting in lieu thereof "section 18233(e)".

(37) Section 18237 is amended—

(A) in subsection (a), by striking out "section 2233(a)(1)" and inserting in lieu thereof "section 18233(a)(1)"; and

(B) in subsection (b), by striking out "section 2233(a)" and inserting in lieu thereof "section 18233(a)".

Effective date.
10 USC 101 note. (c) OTHER PROVISIONS OF TITLE 10.—Effective as of December 1, 1994 (except as otherwise expressly provided), and as if included as amendments made by the Reserve Officer Personnel Management Act (title XVI of Public Law 103–360) as originally enacted, title 10, United States Code, is amended as follows:

(1) Section 101(d)(6)(B)(i) is amended by striking out "section 175" and inserting in lieu thereof "section 10301".

(2) Section 114(b) is amended by striking out "chapter 133" and inserting in lieu thereof "chapter 1803".

(3) Section 115(d) is amended—

(A) in paragraph (1), by striking out "section 673" and inserting in lieu thereof "section 12302";

(B) in paragraph (2), by striking out "section 673b" and inserting in lieu thereof "section 12304"; and

(C) in paragraph (3), by striking out "section 3500 or 8500" and inserting in lieu thereof "section 12406".

(4) Section 123(a) is amended—

(A) by striking out "281, 592, 1002, 1005, 1006, 1007, 1374, 3217, 3218, 3219, 3220, 3352(a) (last sentence),", "5414, 5457, 5458, 5506,", and "8217, 8218, 8219,"; and

(B) by striking out "and 8855" and inserting in lieu thereof "8855, 10214, 12003, 12004, 12005, 12007, 12202, 12213(a) (second sentence), 12642, 12645, 12646, 12647, 12771, 12772, and 12773".

(5) Section 582(1) is amended by striking out "section 672(d)" in subparagraph (B) and "section 673b" in subparagraph (D) and inserting in lieu thereof "section 12301(d)" and "section 12304", respectively.

(6) Section 641(1)(B) is amended by striking out "10501" and inserting in lieu thereof "10502, 10505, 10506(a), 10506(b), 10507".

110 STAT. 498

Feb. 10          DEFENSE AUTHORIZATION ACT          P.L. 104–106
Sec. 1501

FFICERS
—" after

nserting

is" after

inactive

:hapter"

:er 1606
striking
"

section"

ut "sec-
131(a)".

"section

"section
"section

2233(a)"

:cember
icluded
1anage-
nacted.

it "sec-

:hapter

n 673

673b"

1 3500
12406".

; 1007,
ance),",
,"; and
in lieu
12202,
12647,

section
agraph
section

10501"
506(b),

(7) The table of sections at the beginning of chapter 39 is amended by striking out the items relating to sections 687 and 690.

(8) Sections 1053(a)(1) and 1064 are amended by striking out "chapter 67" and inserting in lieu thereof "chapter 1223".

(9) Section 1063(a)(1) is amended by striking out "section 1332(a)(2)" and inserting in lieu thereof "section 12732(a)(2)".

(10) Section 1074b(b)(2) is amended by striking out "section 673c" and inserting in lieu thereof "section 12305".

(11) Section 1076(b)(2)(A) is amended by striking out "before the effective date of the Reserve Officer Personnel Management Act" and inserting in lieu thereof "before December 1, 1994".

(12) Section 1176(b) is amended by striking out "section 1332" in the matter preceding paragraph (1) and in paragraphs (1) and (2) and inserting in lieu thereof "section 12732".

(13) Section 1208(b) is amended by striking out "section 1333" and inserting in lieu thereof "section 12733".

(14) Section 1209 is amended by striking out "section 1332", "section 1335", and "chapter 71" and inserting in lieu thereof "section 12732", "section 12735", and "section 12739", respectively.

(15) Section 1407 is amended—

(A) in subsection (c)(1) and (d)(1), by striking out "section 1331" and inserting in lieu thereof "section 12731"; and

(B) in the heading for paragraph (1) of subsection (d), by striking out "CHAPTER 67" and inserting in lieu thereof "CHAPTER 1223".

(16) Section 1408(a)(5) is amended by striking out "section 1331" and inserting in lieu thereof "section 12731".

(17) Section 1431(a)(1) is amended by striking out "section 1376(a)" and inserting in lieu thereof "section 12774(a)".

(18) Section 1463(a)(2) is amended by striking out "chapter 67" and inserting in lieu thereof "chapter 1223".

(19) Section 1482(f)(2) is amended by inserting "section" before "12731 of this title".

(20) The table of sections at the beginning of chapter 533 is amended by striking out the item relating to section 5454.

(21) Section 2006(b)(1) is amended by striking out "chapter 106 of this title" and inserting in lieu thereof "chapter 1606 of this title".

(22) Section 2121(c) is amended by striking out "section 3353, 5600, or 8353" and inserting in lieu thereof "section 12207", effective on the effective date specified in section 1691(b)(1) of Public Law 103–337.    *Effective date.*

(23) Section 2130a(b)(3) is amended by striking out "section 591" and inserting in lieu thereof "section 12201".

(24) The table of sections at the beginning of chapter 337 is amended by striking out the items relating to section 3351 and 3352.

(25) Sections 3850, 6389(c), 6391(c), and 8850 are amended by striking out "section 1332" and inserting in lieu thereof "section 12732".

(26) Section 5600 is repealed, effective on the effective    *Effective date.*
date specified in section 1691(b)(1) of Public Law 103–337.

110 STAT. 499

LAWS OF 104th CONG.—2nd SESS. Feb. 10

(27) Section 5892 is amended by striking out "section 5457 or section 5458" and inserting in lieu thereof "section 12004 or section 12005".

(28) Section 6410(a) is amended by striking out "section 1005" and inserting in lieu thereof "section 12645".

(29) The table of sections at the beginning of chapter 837 is amended by striking out the items relating to section 8351 and 8352.

(30) Section 8360(b) is amended by striking out "section 1002" and inserting in lieu thereof "section 12642".

(31) Section 8360 is amended by striking out "section 524" in subsections (a) and (b) and inserting in lieu thereof "section 12011".

(32) Sections 8819(a), 8846(a), and 8846(b) are amended by striking out "sections 1005 and 1006" and inserting in lieu thereof "sections 12645 and 12646".

(33) Section 8819 is amended by striking out "section 1005" and "section 1006" and inserting in lieu thereof "section 12645" and "section 12646", respectively.

(d) CROSS REFERENCES IN OTHER DEFENSE LAWS.—

10 USC 2466 note.

(1) Section 337(b) of the National Defense Authorization Act for Fiscal Year 1995 (Public Law 103–337; 108 Stat. 2717) is amended by inserting before the period at the end the following: "or who after November 30, 1994, transferred to the Retired Reserve under section 10154(2) of title 10, United States Code, without having completed the years of service required under section 12731(a)(2) of such title for eligibility for retired pay under chapter 1223 of such title".

10 USC 12321 note.

(2) Section 525 of the National Defense Authorization Act for Fiscal Years 1992 and 1993 (Public Law 102–190; 105 Stat. 1363) is amended by striking out "section 690" and inserting in lieu thereof "section 12321".

(3) Subtitle B of title XLIV of the National Defense Authorization Act for Fiscal Year 1993 (Public Law 102–484; 10 U.S.C. 12681 note) is amended—

106 Stat. 2714.

(A) in section 4415, by striking out "section 1331a" and inserting in lieu thereof "section 12731a";

106 Stat. 2714.

(B) in subsection 4416—

(i) in subsection (a), by striking out "section 1331" and inserting in lieu thereof "section 12731";

(ii) in subsection (b)—

(I) by inserting "or section 12732" in paragraph (1) after "under that section"; and

(II) by inserting "or 12731(a)" in paragraph (2) after "section 1331(a)";

(iii) in subsection (e)(2), by striking out "section 1332" and inserting in lieu thereof "section 12732"; and

(iv) in subsection (g), by striking out "section 1331a" and inserting in lieu thereof "section 12731a"; and

106 Stat. 2717.

(C) in section 4418—

(i) in subsection (a), by striking out "section 1332" and inserting in lieu thereof "section 12732"; and

(ii) in subsection (b)(1)(A), by striking out "section 1333" and inserting in lieu thereof "section 12733".

(4) Title 37, United States Code, is amended—

110 STAT. 500

—2nd SESS.      Feb. 10

: striking out "section 5457
lieu thereof "section 12004

·d by striking out "section
ection 12645".

e beginning of chapter 837
ns relating to section 8351

id by striking out "section
ection 12642".

y striking out "section 524"
cing in lieu thereof "section

and 8846(b) are amended
1006" and inserting in lieu

· striking out "section 1005"
lieu thereof "section 12645"

FENSE LAWS.—
ɔnal Defense Authorization
w 103–337; 108 Stat. 2717)
ɔeriod at the end the follow-
4, transferred to the Retired
itle 10, United States Code,
s of service required under
r eligibility for retired pay

Defense Authorization Act
(Public Law 102–190; 105
ɔut "section 690" and insert-

of the National Defense
1993 (Public Law 102–484;

:riking out "section 1331a"
ction 12731a";

· striking out "section 1331"
f "section 12731";

or section 12732" in para-
:hat section"; and
"or 12731(a)" in paragraph
a)";
2), by striking out "section.
eu thereof "section 12732";

·, by striking out "section
eu thereof "section 12731a";

ɣ striking out "section 1332"
f "section 12732"; and
(A), by striking out "section
eu thereof "section 12733"
·, is amended—

500

---

(A) in section 302(f)(b), by striking out "section 673c
of title 10" in paragraphs (2) and (3)(A) and inserting
in lieu thereof "section 12305 of title 10"; and

(B) in section 433(a), by striking out "section 687 of
title 10" and inserting in lieu thereof "section 12319 of
title 10".

(e) CROSS REFERENCES IN OTHER LAWS.—
(1) Title 14, United States Code, is amended—
(A) in section 705(f), by striking out "600 of title 10"
and inserting in lieu thereof "12209 of title 10"; and
(B) in section 741(c), by striking out "section 1006
of title 10" and inserting in lieu thereof "section 12646
of title 10".
(2) Title 38, United States Code, is amended—
(A) in section 3011(d)(3), by striking out "section 672,
673, 673b, 674, or 675 of title 10" and inserting in lieu
thereof "section 12301, 12302, 12304, 12306, or 12307 of
title 10";
(B) in sections 3012(b)(1)(B)(iii) and 3701(b)(5)(B), by
striking out "section 268(5) of title 10" and inserting in
lieu thereof "section 10143(a) of title 10";
(C) in section 3501(a)(3)(C), by striking out "section
511(d) of title 10" and inserting in lieu thereof "section
12103(d) of title 10"; and
(D) in section 4211(4)(C), by striking out "section
672(a), (d), or (g), 673, or 673b of title 10" and inserting
in lieu thereof "section 12301(a), (d), or (g), 12302, or 12304
of title 10".
(3) Section 702(a)(1) of the Soldiers' and Sailors' Civil Relief
Act of 1940 (50 U.S.C. App. 592(a)(1)) is amended—
(A) by striking out "section 672 (a) or (g), 673, 673b,
674, 675, or 688 of title 10" and inserting in lieu thereof
"section 688, 12301(a); 12301(g), 12302, 12304, 12306, or
12307 of title 10"; and
(B) by striking out "section 672(d) of such title" and
inserting in lieu thereof "section 12301(d) of such title".
(4) Section 463A of the Higher Education Act of 1965
(20 U.S.C. 1087cc–1) is amended in subsection (a)(10) by strik-
ing out "(10 U.S.C. 2172)" and inserting in lieu thereof "(10
U.S.C. 16302)".
(5) Section 179 of the National and Community Service
Act of 1990 (42 U.S.C. 12639) is amended in subsection (a)(2)(C)
by striking out "section 216(a) of title 5" and inserting in
lieu thereof "section 10101 of title 10".
(f) EFFECTIVE DATES.—
(1) Section 1636 of the Reserve Officer Personnel Manage-   10 USC 12213
ment Act shall take effect on the date of the enactment of   note.
this Act.
(2) The amendments made by sections 1672(a), 1673(a)   10 USC 10001
(with respect to chapters 541 and 549), 1673(b)(2), 1673(b)(4),   note.
1674(a), and 1674(b)(7) shall take effect on the effective date
specified in section 1691(b)(1) of the Reserve Officer Personnel
Management Act (notwithstanding section 1691(a) of such Act).
(3) The amendments made by this section shall take effect   10 USC 113 note.
as if included in the Reserve Officer Personnel Management
Act as enacted on October 5, 1994.

110 STAT. 501

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHAPLAINCY OF FULL GOSPEL CHURCHES, et al., )<br><br>v. )<br><br>THE HONORABLE DONALD C. WINTER, Secretary of the Navy, et al., ) | Civil Action No. 1:99cv2945 (RMU) |
| | **Consolidated with** |
| ROBERT H. ADAIR, et al., )<br><br>v. )<br><br>THE HONORABLE DONALD C. WINTER, Secretary of the Navy, et al., ) | Civil Action No. 1:00cv566 (RMU) |

<u>**SUPPLEMENTAL DECLARATION OF SAMUEL A. WYVILL, II, DEPUTY DIRECTOR NAVY RESERVE PERSONNEL ADMINISTRATIVE BRANCH, NAVY PERSONNEL COMMAND**</u>

Pursuant to 28 U.S.C. § 1746, I, Samuel A. Wyvill, II, make the following declaration. I am

aware that this declaration will be used in litigation and that this declaration is the legal

equivalent to a statement under oath.

1.      I am a civilian employee of the Department of the Navy. I currently serve as the Deputy

Director of the Navy Reserve Personnel Administration Branch of Navy Personnel Command,

Millington, Tennessee. I have been in this position since September 1988, and prior to that date,

while on active duty as a Commander (paygrade O-5) in the Navy, I served as branch head for

the Reserve Officer Status Branch from March 1980 until August 1984.

2.    My job entails oversight of the Navy Reserve Personnel Administration Branch functions, including but not limited to: accessions into the Navy Reserve; gains into the IMAPMIS data systems; enforcements of all the laws, rules and regulations regarding status of Reserve personnel; transfers between Reserve categories; and attrition from the Navy Reserve. During my 41 years of service with the Navy, both on active duty and as a civilian employee, I have had extensive experience in personnel matters, including in-depth familiarity with the statutes, regulations, and instructions that control the management of the Navy's Reserve force.

3.    In Aug 1988, Navy Reserve inventory included some 52,377 members who were in the Retired Reserve and had not attained eligibility for retired pay and benefits at age 60. Today that number is about 26,000. Included in that number are: (1) approximately 2000 members in all rates and designators who are receiving Voluntary Separation Incentive ("VSI") payments; (2) some 24,000 in all rates and designators who were previously transferred to the Retired Reserve when DOD regulations provided for such; and (3) a few members who were not receiving VSI payments, but were transferred because they possessed "critical professional skills" or "skill set in short supply" that the Navy needed to maintain in its inventory.

4.    Regarding the third category above, these few members were transferred to the Retired Reserve in the past 10 years (per OPNAVINST 1820.1 and previous versions of SECNAVINST 1820.2 series) because their talents or skill sets were unique. Based upon the information that I have learned and acquired in the normal course of my employment, I understand that these service members included Catholic Chaplains that the Navy needed due to the severe shortage of Catholic priests, and Merchant Marine officers, who by virtue of their jobs, promote and

progress through the Navy Reserve system, but do not earn sufficient points to earn qualifying years of service and a non-regular retirement at age 60.   As I have previously stated, if officers have unique talents that the Navy needs, and the different Navy communities have expressed those needs, Navy Personnel Command has the authority to transfer these individuals, who are otherwise subject to mandatory attrition, to the retired Reserve instead of honorably discharging them.  Within the last two to three years, we have transferred some Merchant Marine officers, who were not eligible for retirement pay, to the Retired Reserve.  Merchant Marine officers are unique in many ways.  They graduate from Maritime Academies which are not part of the Naval service, but they are required to take Navy Reserve appointments.  They do not have active duty obligations because these members sail merchant vessels.  Because they sail around the world for most of their careers, they do not, for the most part, have time to earn years of qualifying service.  However, they are recognized experts in their field of merchant sailing, and the Navy promotes them based on their unique skill sets.  When attrition per 10 USC is required, many Merchant Marine officers lack the time per 10 USC 12731 to qualify for retired pay and benefits, and they, therefore, must be attrited.  Navy Personnel Command has transferred some of these officers to the Retired Reserve vice honorably discharging them.  As with the Chaplains, keeping certain skilled Merchant Marine officers in the Navy's inventory is important so that, should a need arise, the Navy can utilize them.  Regarding the Chaplains who have been similarly retired, six are serving on active duty per 10 U.S.C. § 12301(d) because the Navy currently needs their services.

      I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.
Executed at Millington, Tennessee, this 1st day of May, 2007.

SAMUEL A. WYVILL, II



# Department of Defense
# **INSTRUCTION**

**NUMBER** 1215.06

February 7, 2007

ASD(RA)

SUBJECT:  Uniform Reserve, Training, and Retirement Categories

References:  (a)  DoD Directive 1215.6, subject as above, March 14, 1997 (hereby canceled)
　　　　　　(b)  Acting Deputy Secretary of Defense Memorandum, "DoD Directives Review – Phase II," July 13, 2005
　　　　　　(c)  DoD Directive 5124.02, "Under Secretary of Defense for Personnel and Readiness (USD(P&R))," October 17, 2006
　　　　　　(d)  DoD Instruction 1215.19, "Uniform Reserve, Training and Retirement Category Administration," December 12, 2000 (hereby canceled)
　　　　　　(e)  through (w), see Enclosure 1

1. <u>REISSUANCE AND PURPOSE</u>

This Instruction reissues Reference (a) as an Instruction in accordance with the guidance in Reference (b) and the authority in Reference (c) and cancels Reference (d).  This Instruction implements policy, assigns responsibilities, and prescribes procedures that pertain to:

　　1.1.  Prescribing minimum training criteria for each category of the Reserve Components (RC).

　　1.2.  The use of RC duty for both training and mission and operational support purposes.

　　1.3.  The use of RC duty to capitalize on RC capabilities and accomplish operational requirements while maintaining RC mission readiness for domestic and overseas operations.

　　1.4.  Maintaining and reporting personnel data pursuant to DoD Directive 1205.17 (Reference (e)) and DoD Instruction 7730.54 (Reference (f)).

　　1.5.  The use of uniform RC categories (RCCs) and training and retired categories (TRCs) for the Ready Reserve, Standby Reserve, and Retired Reserve of the Armed Forces provided for in sections 10141, 10142, 10147, 10149, 10151, 10154, and 12774 of 10 United States Code (U.S.C.) (Reference (g)).

1.6.  Categorizing, maintaining, and reporting personnel data pursuant to References (e) and (f).

1.7.  Participation in Selective Service System (SSS) activities, civil defense activities, and Continental United States (CONUS) Defense programs by members of the Ready and Standby Reserve.


2. <u>APPLICABILITY AND SCOPE</u>

This Instruction applies to:

2.1.  The Office of the Secretary of Defense, the Military Departments (including the Coast Guard at all times, including when it is a service in the Department of Homeland Security by agreement with that Department), the Chairman of the Joint Chiefs of Staff, the Combatant Commands, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the Department of Defense (hereafter referred to collectively as the "DoD Components"). The term "Military Departments," as used herein, refers to the Departments of the Army, the Navy, and the Air Force.  The term "Secretary concerned" refers to the Secretaries of the Military Departments and the Secretary of Homeland Security for the Coast Guard when it is not operating as a Service in the Navy.  The term "Military Services" refers to the Army, the Navy, the Air Force, the Marine Corps, and the Coast Guard.

2.2.  The use of all inactive duty (ID), inactive duty training (IDT), active duty (AD), and full-time National Guard duty (FTNGD) periods performed by all RC members not counted in Active component (AC) end strengths, or AD for Operational Support (ADOS), pursuant to Reference (g).

2.3.  The requirements for categorizing and recording of RC personnel, and the training requirements for those categories.

2.4.  All members of the total RCs to include the Ready Reserve, the Standby Reserve, and the Retired Reserve.

2.5.  The designation and official recording of all Reserve force personnel data in the Reserve Component Common Personnel Data System (RCCPDS) pursuant to References (e) and (f).

2.6.  The participation of RC members in approved programs outside the Department of Defense.


3. <u>DEFINITIONS</u>

Terms used in this Instruction are defined in Enclosure 2.

Defs.' Opposition to Pls.' Renewed Motion for Preliminary Injunction
Ex. 10
Page 2 of 40

*DoDI 1215.06, February 7, 2007*

4. <u>POLICY</u>

It is DoD policy that:

    4.1.  When performing training or support duty, all RC members shall be in an ID, AD, or FTNGD status.

    4.2.  All RC members not counted in AC end strengths, pursuant to Reference (g), shall be placed in one of the RCCs and TRCs described in this Instruction.  Individuals shall be assigned to RCCs and TRCs based on their obligations to meet mission requirements and training requirements.  All RC members will be reported by Service in the RCCs and TRCs pursuant to References (e) and (f).

    4.3.  Terminology used in this Instruction to describe RC training and retirement categories and duty statuses shall apply to all Services.

5. <u>RESPONSIBILITIES</u>

    5.1.  The <u>Assistant Secretary of Defense for Reserve Affairs</u>, under the Under Secretary of Defense for Personnel and Readiness (USD(P&R)), shall:

        5.1.1.  Establish guidance for the minimum training criteria and the ID, AD, and FTNGD requirements associated with each personnel category.

        5.1.2.  Establish DoD guidance for RC training and retirement categories.

    5.2.  The <u>Secretaries of the Military Departments</u> and the <u>Commandant of the Coast Guard</u> shall:

        5.2.1.  Ensure all implementing directives or regulations are consistent with this Instruction.

        5.2.2.  Establish necessary criteria and procedures to ensure trained and qualified RC units and individuals are available for AD throughout the entire spectrum of requirements; including war or national emergency; contingency operations; military operations other than war; operational support; humanitarian operations; and at such other times as the national security may require, and that funding for RC training and operations is programmed and budgeted to adequately support these requirements.  Authorities and duty statuses, arrayed and defined at Enclosures 3 and 4, shall be utilized to facilitate this RC usage.

        5.2.3.  Approve any additional IDT periods, as necessary and consistent with law. Authorizing and using additional training is subject to the categories, limitations, and controls delineated in this Instruction.

5.2.4.  Establish minimum standards for satisfactory participation at required training periods, which shall include the number and percentages of training periods for meeting the minimum standards.  Individuals attending IDT periods are required to meet those minimum training standards.  Those standards shall contain procedures for accounting for absences and excused IDT periods, as necessary.  Individuals may voluntarily attend extra IDT periods for points.

5.2.5.  Include in the budget for the AC both military personnel and operations and maintenance funds to provide AD tours for RC members on AD in support of AC programs and operational support.

5.2.6.  Ensure, through coordination with supported organizations, that RC members who serve on AD tours funded by AC resources (i.e., ADOS - AC funded) receive full pay, allowances, and entitlements appropriate for the length of the AD tour.

5.2.7.  Establish criteria for combining AD training and IDT to achieve desired readiness levels and to meet training requirements, as necessary.

5.2.8.  Designate all RC members in a RCC and TRC according to criteria established in Enclosures 5 and 6.

5.2.9.  Ensure that RC members perform duty according to the minimum criteria established for each RCC in Enclosure 6.

5.3.  The <u>Commanders of the Combatant Commands</u> shall:

5.3.1.  Exercise Combatant Command (COCOM) command authority over RC forces when mobilized or ordered to Active Duty Other than for Training (ADOT).  Command authority consists of the authority specified in section 164(c) of Reference (g) except that, unless otherwise directed by the Secretary of Defense, assigned RC forces on ADOT may not be deployed until validated by the parent Service for deployment.

5.3.2.  Exercise Training Readiness Oversight (TRO) over assigned RC forces not on AD, or on Active Duty for Training (ADT) not provided under subparagraph 5.3.1. above.  TRO is defined as the degree of authority Combatant Commanders have over assigned RC forces when not on AD, and when on ADT, unless provided under paragraph 5.3.1.  TRO includes specific authority to:

5.3.2.1.  Provide guidance to Service component commanders on operational requirements and priorities to be addressed in Military Department training and readiness programs.

5.3.2.2.  Comment on Service component program recommendations and budget requests.

5.3.2.3.  Coordinate and approve participation by assigned RC forces in joint exercises and other joint training when on ADT or performing IDT.

5.3.2.4.  Obtain and review readiness and inspection reports on assigned RC forces.

5.3.2.5.  Coordinate and review mobilization plans (including post-mobilization training activities and deployability validation procedures) developed for assigned RC forces.


6.  <u>PROCEDURES</u>

6.1.  <u>Guidelines for RC Duty Categories</u>

6.1.1.  <u>Types of Duty</u>.  Table 1 at Enclosure 4 shows the legal authorities, in titles 10, 14, and 32 U.S.C. (References (g) through (i)), under which RC members may perform military duty and the types of duty that can be performed.  The types of duty and their prescribed purpose are provided below.

6.1.2.  <u>IDT</u>.  Authorized training performed by members of an RC not on AD, and performed in connection with the prescribed activities of the RC of which they are a member.  It consists of regularly scheduled unit training periods, additional IDT periods, and equivalent training.  The primary purpose of IDT is to provide individual and/or unit readiness training.  IDT shall be used to provide structured individual and/or unit training, or educational courses, other than correspondence courses, to RC members.  Support to mission requirements, i.e., operational support, may occur as a consequence of performing IDT.

6.1.2.1.  Paid IDT periods shall not be less than 4 hours.  No more than two IDT periods may be performed in any calendar day.  Pursuant to section 206 of 37 U.S.C. (Reference (j)) and within the guidelines prescribed below, the Secretary concerned may prescribe additional standards for IDT.

6.1.2.2.  IDT periods for retirement points only (without pay) shall not be less than 2 hours, with a maximum of two points authorized in any one calendar day.

6.1.2.3.  One retirement point in any one calendar day may be granted for attendance at a professional or trade convention, with a minimum of 4 hours, pursuant to DoD Instruction 1215.7 (Reference (k)).

6.1.2.4.  Where practical, multiple IDT periods over consecutive days shall be used to maximize training effectiveness.

6.1.2.5.  IDT shall not be performed in designated Imminent Danger Areas.

6.1.2.6.  Additional IDT Periods.  A sub-category of IDT.

*DoDI 1215.06, February 7, 2007*

6.1.2.6.1.  Additional IDT periods improve readiness by providing for individuals and units the required and necessary training to attain and maintain designated readiness levels. The Secretary concerned shall establish guidance for and approve use of additional IDT periods pursuant to limits in paragraphs 6.1.2.6.3.1. through 6.1.2.6.3.3.

6.1.2.6.2.  The RC shall identify additional IDT periods separately from normal unit or individual training periods in budget documents and in internal records so that training period costs and training support costs for each type of additional training may be clearly identified, justified, and audited.

6.1.2.6.3.  Three categories of additional IDT periods are:

6.1.2.6.3.1.  <u>Additional training periods (ATPs)</u>.  ATPs for units, components of units, and individuals are for accomplishing additional required training, as defined by post-mobilization mission requirements.  The number of those training periods shall not exceed 36 each fiscal year (FY) for any member.

6.1.2.6.3.2.  <u>Additional flying and flight training periods (AFTPs)</u>.  AFTPs are authorized for primary aircrew members for conducting aircrew training and combat crew qualification training to attain and maintain aircrew flying proficiency and sustain required readiness.  These AFTPs shall not be in addition to the ATPs in paragraph 6.1.2.6.3.1.  The number of these training periods shall not exceed 72 each FY for any aircrew member, unless specifically authorized by the Secretary concerned, and subject to the limitations in paragraph 6.1.2.6.4.

6.1.2.6.3.3.  <u>Readiness management periods (RMPs)</u>.  RMPs are used to support the following functions in preparing units for training: the ongoing day-to-day operation of the unit, accomplishing unit administration, training preparation, support activities, and maintenance functions.  The number of RMPs shall not exceed 36 each FY for any member. These training periods shall be used only where sufficient full-time support (FTS) personnel are not available to accomplish those duties.  These RMPs are for the use of drilling Reserve members who are not military technicians.  Not more than one RMP shall be performed by an individual in one calendar day.

6.1.2.6.4.  Except for aircrew members, the combination of ATPs and RMPs shall not exceed 72 in each FY for each person.  Combinations of ATPs, AFTPs, and RMPs for aircrew members shall not exceed 84 in a FY, with the Secretary concerned authorized to provide a waiver to a maximum of 96 additional IDT periods for an aircrew member in a FY. Training periods authorized in excess of the units presented in paragraph 6.1.2.6.3.2. shall not be used for augmenting missions and must provide bona fide training opportunities required to meet readiness levels.  This authority may not be delegated below the Secretary of the Military Department concerned.

6.1.2.7.   Reserve component members performing IDT who are covered for an injury, illness or disease incurred or aggravated in line of duty as provided under section 1074a (a)(2), (3) and (4) of Reference (g) shall also be subject to:

6.1.2.7.1.  Chapter 47 of Reference (g) for members performing IDT pursuant to Reference (g).

6.1.2.7.2.  The applicable state code, if provided under such code, for members performing IDT pursuant to Reference (i).

6.1.3.  <u>ID</u>.  Authorized duty, other than training, performed by members of a RC not on AD.  It consists of Muster Duty (MD) and Funeral Honors Duty (FHD).

6.1.3.1.  <u>MD</u>.  A special category of ID used to meet the continuous screening requirement established by section 10149 of Reference (g).  A member of the Ready Reserve may be ordered without his consent to MD one time a year by an authority designated by the Secretary concerned pursuant to section 12319 of Reference (g).

6.1.3.1.1.  MD shall be considered equivalent to IDT, except for pay, and shall include a minimum of 2 hours at the muster site.  MD shall not be performed for more than 1 day, including travel, each calendar year.  An allowance for MD shall be paid in accordance with section 433 of Reference (j) and Reference (k) at the rate determined by the DoD Per Diem Committee and included in the DoD 7000.14-R (Reference (l)).

6.1.3.1.2.  In cases where a total of more than 1 day is required to meet the MD requirement, or in other specific circumstances approved under regulations issued by the Secretary concerned, ADT may be used in lieu of MD.

6.1.3.2.  <u>FHD</u>.  The rendering of military funeral honors is the ceremonial paying of respect and the final demonstration of the country's gratitude to those who, in times of war and peace, have faithfully defended our Nation.  FHD includes both the preparation for and the actual performance of funeral honors functions at the funeral of a veteran as defined in section 1491 of Reference (g).

6.1.3.2.1.  Members of the Ready Reserve may perform FHD in a voluntary status pursuant to the provisions of section 12503 of Reference (g) or section 115 of Reference (i).  No more than one FHD period shall be performed in a day.  FHD shall include a minimum of 2 hours of duty during a day, including travel, for the performance of duty and/or preparation/training for duty.  Service credit for this duty shall be pursuant to section 12732(a)(2)(E) of Reference (g).  This duty may be performed in either a pay or non-pay status. If in a pay status, an allowance for FHD shall be paid pursuant to either section 435 of Reference (j) or compensation pursuant to section 206 of Reference (j), as authorized by the Secretary concerned.

6.1.3.2.2.  Though other AD categories may be used to provide funeral honors support, the duty category in which funeral honors and the preparation for funeral honors are performed shall be determined by the Secretary concerned, and in no case may the performance of funeral honors or the preparation for such honors be considered a period of IDT.

6.1.4.  <u>AD</u>.  Full-time duty in the active Military Service of the United States.  It includes full-time training duty, annual training duty, and attendance, while in active Military Service, at a school designated as a Service school by law and the Secretary of the Military Department concerned.  It does not include FTNGD.  At any time, an authority designated by the Secretary concerned may order a member of the RC under his or her jurisdiction to AD or retain the member on AD with the consent of the member under the authority of sections 12301(d), 12301(h), and 12322 of Reference (g).  However, a member of the Army National Guard of the United States (ARNGUS) or Air National Guard of the United States (ANGUS) may not be ordered to AD under that authority without the consent of the Governor or other appropriate authority of the State or territory, the Commonwealth of Puerto Rico, or the District of Columbia.  For the RC, AD is comprised of the categories ADT and ADOT.  The respective authorities for AD for RC members are depicted at Enclosure 4, with specific duty categories described in paragraphs 6.1.4.1., 6.1.4.2., and 6.1.5.

6.1.4.1.  <u>ADT</u>.  A category of AD that shall be used to provide structured individual and/or unit training, including on-the-job-training, or educational courses to RC members.  Included in the ADT category are annual training (AT), initial ADT (IADT), and other training duty (OTD).  The primary purpose of ADT is to provide individual and/or unit readiness training.  Support to mission requirements, i.e., operational support, may occur as a consequence of performing ADT.

6.1.4.1.1.  <u>IADT</u>.  A category of ADT which includes basic military training and technical skill training, is required for all enlisted accessions.  Paragraph 6.6.4.1.4. provides specific guidance on IADT.

6.1.4.1.2.  <u>AT</u>.  The minimum period of ADT that Reserve members must perform each year to satisfy the training requirements associated with their RC assignment.  The primary purpose of AT is to provide individual and/or unit readiness training.  AT may provide support to AC missions and requirements.  AT may be required for all members of the Ready Reserve.  Members of the Selected Reserve shall perform AT.  For all members of Selected Reserve units, except for those in the National Guard, AT shall be for not less than 14 days (exclusive of travel time) each year pursuant to section 10147 of Reference (g), and not less than 12 days (exclusive of travel time) for the Coast Guard Reserve.  Individual Mobilization Augmentees (IMAs) are members of the Selected Reserve, not assigned to a Reserve unit organized to serve as a unit.  IMAs are required to perform a minimum of 12 days of AT each year pursuant to DoD Directive 1235.11 (Reference (m)).  Support to mission requirements, i.e., operational support, may occur as a consequence of performing AT.

6.1.4.1.3.  <u>OTD</u>.  Authorized ADT, other than IADT or AT, that provides all other structured training, to include on the job training, for individuals or units to enhance proficiency.

OTD is authorized to provide for full-time attendance at organized and planned specialized skill training, refresher and proficiency training, and professional development education programs. It shall be used to support RC members in obtaining the necessary skills and disciplines to achieve required readiness standards.  The primary purpose of OTD is to provide individual and/or unit readiness training.  Authorization for ADT shall be managed pursuant to directives established by the Secretaries concerned.  National Guard and Reserve personnel who are not employed as military technicians shall receive priority consideration for such training.  Support to mission requirements, when it also provides individual and/or unit readiness training, may occur as a consequence of performing OTD.

6.1.4.2.  <u>ADOT</u>.  A category of AD used to provide RC support to either AC or RC missions.  It includes the categories of ADOS (formerly active duty for special work (ADSW)), Active Guard and Reserve (AGR) duty, and involuntary AD pursuant to sections 12301, 12302, and 12304 of Reference (g) and section 712 of Reference (h).  Training may occur as a consequence of performing ADOT.

6.1.4.2.1.  <u>ADOS</u>.  Authorized voluntary AD for RC personnel funded through applicable military or Reserve personnel appropriations (ADOS-AC funded or ADOS-RC funded) to support AC or RC programs, respectively.  The purpose of ADOS is to provide the necessary skilled manpower assets to support existing or emerging requirements.  Authorization of ADOS shall be managed pursuant to Issuances established by the Secretary concerned.  To assist the Military Departments in managing ADOS tours, the following criteria are provided.

6.1.4.2.1.1.  ADOS includes all voluntary AD performed pursuant to section 12301(d) of Reference (g), other than AGR duty.

6.1.4.2.1.2.  ADOS includes active duty for training performed as a result of a request of an operational commander to provide support.

6.1.4.2.1.3.  ADOS includes all AD and ADT performed as a result of reimbursable funding.

6.1.4.2.1.4.  ADOS includes FHD performed not in an inactive duty status.

6.1.4.2.1.5.  ADOS includes voluntary AD performed by recall of reserve retirees not receiving regular retired pay.

6.1.4.2.1.6.  National Guard and Reserve personnel who are not employed as a military technician shall receive priority consideration for these tours.

6.1.4.2.1.7.  The cumulative periods of AC and FTNGD performed by the member exceeding 1,095 days in the previous 1,460 days, are accountable against AD strengths (active component, or AGR end strength, consistent with pay appropriations) when the 1,095 day threshold is crossed, pursuant to section 115 of Reference (g).  A member whose order to AC or FTNGD that specifies a period of greater than 3 years shall be included in the strength

authorized, as stated above, commencing on the first day of the orders. Additionally, these members will continue to count against the ceilings prescribed in section 115(b) of Reference (g).

6.1.4.2.1.7.1. Each Reserve component is limited to a maximum number of personnel that may be performing Operational Support (OS) duty pursuant to section 115 (b) of Reference (g) at any time.

6.1.4.2.1.7.2. General/Flag Officers are included in OS accountability, but are further controlled by section 526 of Reference (g) regarding limitations and accountability.

6.1.4.2.2. <u>AGR Duty</u>. AD performed by a member of an RC of the Army, the Navy, the Air Force, or the Marine Corps, the Coast Guard, or FTNGD performed by a member of the National Guard under an order to AD or FTNGD for a period of 180 consecutive days or more for organizing, administering, recruiting, instructing, or training the Reserve components, or to perform other duties as prescribed in sections 12310 and 10211 of Reference (g). Personnel performing such duty are included in the FTS numbers for each RC under the collective title of AGR.

6.1.4.2.3. Funding for personnel in uniform Reserve, training, and retirement categories shall be pursuant to procedures established in this Instruction. The Secretary concerned is authorized to include in the budget for the AC both military personnel and operations and maintenance funds to provide AD tours for RC members on AD in support of AC programs.

6.1.5. <u>FTNGD</u>. "Full-time National Guard duty" means training or other duty, other than inactive duty, performed by a member of the Army National Guard of the United States or the Air National Guard of the United States in the member's status as a member of the National Guard of a State or territory, the Commonwealth of Puerto Rico, or the District of Columbia pursuant to section 316, 502, 503, 504, or 505 of Reference (i) for which the member is entitled to pay from the United States or for which the member has waived pay from the United States.

6.1.5.1. <u>FTNGD-AT</u>. AT is the minimum period of full-time military training that National Guard members must perform each year to satisfy the training requirements associated with their RC assignment. The primary purpose of AT is to provide individual and/or unit readiness training. Support to mission requirements, i.e., operational support, may occur as a consequence of performing AT. National Guard units are required to perform full-time military training (in FTNGD status) for at least 15 days each year including travel time pursuant to section 502 Reference (i).

6.1.5.2. <u>FTNGD-OTD</u>. OTD is authorized full-time military training, other than IADT or AT, that provides all other structured training, to include on the job training, for individuals or units to enhance proficiency. OTD is authorized to provide for full-time attendance at organized and planned specialized skill training, refresher and proficiency training, and professional development education programs. It shall be used to support RC members in

obtaining the necessary skills and disciplines to achieve required readiness standards.  National Guard personnel who are not employed as military technicians shall receive priority consideration for such training.

6.1.5.3.  <u>FTNGD-OT</u>.  A category of FTNGD used to provide RC (National Guard) support to either AC or RC missions.  It includes the categories of FTNGD for operational support (FTNGD-OS) (formerly FTNGD for special work (FTNGD-SW), AGR duty, and involuntary FTNGD pursuant to section 502(f)(1) of Reference (i).  Training may occur as a consequence of performing FTNGD-OT.

6.1.5.3.1  <u>FTNGD-for OS</u>.  The purpose of FTNGD-OS is to provide the necessary skilled manpower assets to support existing or emerging requirements pursuant to section 502(f) of Reference (i).  Authorization of FTNGD-OS shall be managed pursuant to Directives established by the Secretaries of the Army and Air Force. To assist the Military Departments in managing these tours, the following criteria are provided.

6.1.5.3.1.1.  FTNGD-OS includes all voluntary FTNGD performed pursuant to section 502(f) of Reference (i), other than AGR duty.

6.1.5.3.1.2.  FTNGD-OS includes FTNGD duty for training performed as a result of a request of an operational commander to provide support.

6.1.5.3.1.3.  FTNGD-OS includes all FTNGD performed as a result of reimbursable funding.

6.1.5.3.1.4.  FTNGD-OS includes FHD performed not in an inactive duty or active duty status.

6.1.5.3.1.5.  National Guard personnel who are not employed as a military technician shall receive priority consideration for these tours.

6.1.5.3.1.6.  The cumulative periods of AC and FTNGD performed by the member exceeding 1,095 days in the previous 1,460 days, are accountable against AD strengths (active component, or AGR end strength, consistent with pay appropriations) when the 1,095 day threshold is crossed, pursuant to section 115 of Reference (g).  A member whose order to AC or FTNGD that specifies a period of greater than 3 years shall be included in the strength authorized, as stated above, commencing on the first day of the orders.  Additionally, these members will continue to count against the ceilings prescribed in section 115(b) of Reference (g).  Each Reserve component is limited to a maximum number of personnel that may be performing OS duty pursuant to section 115(b) of Reference (g) at any time.

6.2.  <u>Maximize RC Utilization</u>.  All training duty planned and performed by RC members shall capitalize on RC capabilities to accomplish operational requirements while maintaining their mission readiness for domestic and overseas operations.  RC members may be employed to support AC mission requirements as part of conducting training duty.

6.3.  <u>RC Utilization Authorities</u>

6.3.1.  Enclosure 4 depicts the structure and relationships of RC duty categories for ID, AD, and FTNGD under specific authorities.  The training and support categories provide the Secretaries concerned the flexibility of developing policies to maximize RC utilization as stated in paragraph 6.2.

6.3.1.1.  <u>Training</u>.  All RC members shall receive training pursuant to assignments and required readiness levels.  Required training shall provide for the minimum training time or number of training periods required for attaining the prescribed unit readiness status and maintaining individual proficiency.  The primary purpose of all training is the enhancement of individual skills and/or unit effectiveness.  Training may be conducted in ID, AD, or FTNGD status.  Mission support may be a key element in developing training programs, but training shall be the paramount consideration and documented for budgetary allocations.  Mission and operational support may occur as a consequence of training.  Required training is further delineated in section 6.6.

6.3.1.2.  <u>Support</u>.  Voluntary Duty (AD and FTNGD) may be used to achieve desired readiness levels and meet mission requirements.

6.3.1.3.  <u>Mobilization</u>.  Involuntary AD is used in support of military operations when the President or the Congress determines that RC forces are required to augment the AC.  It is provided for within the provisions of sections 12301 and 12302 of Reference (g) for full and partial mobilization, respectively, section 12304 of Reference (g) for Presidential Reserve Call-Up authority, and section 712 of Reference (h) for Secretary of Homeland Security Coast Guard Reserve call-ups for domestic emergencies.  For other purposes, the Secretaries concerned may order members involuntarily to AD pursuant to provisions of sections 12301(b) or 12303 of Reference (g) and section 712 of Reference (h).

6.3.1.4.  <u>Other</u>.  Includes FHD, a voluntary status pursuant to the provisions of section 12503 of Reference (g) or section 115 of Reference (i), that shall be considered a special category of ID, and MD, established in section 12319 of Reference (g).  It also includes voluntary AD for the purposes of medical evaluation and treatment pursuant to sections 12301(h) and 12322 of Reference (g); special circumstances to include:  voluntary AD at National Guard Bureau pursuant to section 12402 of Reference (g); members ordered to AD for unsatisfactory participation pursuant to sections 10148 and 12303 of Reference (g); RC members in a captive status, pursuant to section 12301(g) of Reference (g); members ordered to AD for disciplinary purposes pursuant to section 802(d) of Reference (g); and for Federal service due to insurrection pursuant to sections 331, 332 and 12406 of Reference (g).

6.4.  <u>Assignment Restrictions Outside the United States</u>

6.4.1.  A member of the RCs shall not be assigned to AD on land outside the United States, its territories and possessions, until the member has completed the basic training requirements of the member's Armed Force pursuant to section 671(a) of Reference (g).

*DoDI 1215.06, February 7, 2007*

6.4.2.  FTNGD shall not be performed on land outside the United States, its territories or possessions, because a member of the RCs must be in a status provided for in Reference (g).

6.5.  Placement of RC Members in RCCs and TRCs

6.5.1.  The uniform reserve training and retirement categories are defined in Enclosure 6.

6.5.2.  Pursuant to section 115(e) of Reference (g), each unit and member of the RCs not counted in AD end strengths pursuant to section 115 of Reference (g) shall be placed in one of the RCCs and TRCs identified.  Individuals shall be assigned to RCCs and TRCs based on their RC obligations to meet mission requirements and training requirements.

6.5.3.  Table 1 at Enclosure 6 establishes authorized RCCs and TRCs in the RCs for training and accountability purposes.  Enclosure 5 describes those categories.

6.6.  Training Participation Requirements

6.6.1.  The Secretaries concerned shall establish standards for satisfactory participation at required training periods, which shall include the number and percentages of training periods for meeting the minimum standards, pursuant to DoD Directive 1215.13 (Reference (n)).  Individuals attending IDT periods are required to meet those minimum training standards.  Those standards shall contain procedures for accounting for absences and excused training periods, as necessary.  Individuals may voluntarily attend additional IDT periods for points, if authorized by the Secretary concerned.

6.6.2.  There is no statutory maximum annual limit on required training for members of the National Guard.

6.6.3.  To ensure that trained and qualified RC units and individuals are available for AD throughout the entire spectrum of requirements, including war or national emergency, contingency operations, military operations other than war, operational support, and at such other times as the national security may require, and that funds appropriated annually for RC training and operations are adequate for meeting these requirements, the Secretary concerned shall establish necessary criteria and procedures to:

6.6.3.1.  Approve any additional IDT as necessary and consistent with law.  Authorizing and utilizing additional training is subject to the categories, limitations, and controls in paragraph 6.1.2.6.

6.6.3.2.  Ensure that all RC members receive training according to assignments and required readiness levels.  Minimum training requirements are provided for in section 10147 of Reference (g), section 502(a) of Reference (h), and further prescribed in paragraphs 6.1.2., 6.1.4., 6.1.5., and 6.6.4.

6.6.3.3.  Provide for training for the Individual Ready Reserve (IRR), Standby Reserve, and Retired Reserve in a voluntarily status according to the procedures described below.

6.6.4.  <u>Training Requirements by Personnel Category</u>

6.6.4.1.  <u>Selected Reserve</u>

6.6.4.1.1.  <u>IDT</u>.  Except as specifically provided below, members of the Selected Reserve, excluding AGRs, shall participate in 48 scheduled drills or training periods each year. This requirement applies to all members of Selected Reserve units; however, the Secretary concerned may, except in the case of the ARNGUS or the ANGUS, reallocate the number of scheduled drills within a Reserve component where warranted to achieve readiness requirements.  The Secretary concerned may reduce the number of scheduled drills of selected lower priority units and increase the scheduled drills of higher priority units by not more than 10 percent, rounded to the nearest whole number.  The aggregate number of scheduled drills within a component shall not be reduced by this reallocation (section 10147 of Reference (g) and section 502 of Reference (i)).  IDT requirements for individual Selected Reserve members not assigned to a unit organized to serve as a unit, or IMAs, shall be determined by the organization to which assigned and resourced by the appropriate Service component pursuant to Reference (m).

6.6.4.1.2.  <u>AT</u>.  AT is required for all members of the Selected Reserve, excluding AGRs.  For members of the Reserves, ADT for purposes of AT shall be for not less than 14 days, 12 days for the Coast Guard Reserve, (exclusive of travel time) each year, except as provided in paragraph 6.6.4.1.2.1.  Units of the National Guard are required to perform full-time military training for at least 15 days each year (including travel) pursuant to section 502 of Reference (i).

6.6.4.1.2.1.  AT for IMAs or other Selected Reserve members not assigned to a unit organized to serve as a unit, and in training categories ordered to AD for AT at headquarters, support organizations, or to activities not operating on Saturday, Sunday, or Federal holidays, normally is limited to 12 days excluding travel time (i.e., from Monday of the first week through Friday of the second week).  Such training may begin on any day of the week to maximize training opportunities, or to support a training event or activity.

6.6.4.1.2.2.  When required, members may be ordered to AT for longer periods than those minimum periods established in paragraphs 6.6.4.1.2. and 6.6.4.1.2.1. up to a maximum of 30 days each FY, for activities that enhance readiness or provide support to operational missions that results from the required training.  Training may begin on any day of the week to maximize training opportunities, or support a training event or activity.

6.6.4.1.2.3.  Annual training normally is performed during one consecutive period.  Split tours may be authorized for selected units or individuals, if required to meet training missions or enhance mission support associated with required training.  Any additional

costs must be fully justified.  Authorization for variations in AT lengths shall be managed pursuant to Directives established by the Secretary concerned.

      6.6.4.1.3.  <u>Periods of AD or FTNGD Performed by Members of the Selected Reserve</u>.  AD performed pursuant to sections 12301(d), 12302, 12304, and 12406 of Reference (g), or FTNGD performed pursuant to section 502(f) of Reference (i) may not be substituted for training required by section 10147 of Reference (g) or section 502(a) of Reference (i) and by paragraph 6.6.4.1.2. unless in the judgment of the Secretary concerned:

        6.6.4.1.3.1.  AD performed pursuant to sections 12301(d), 12302, 12304, or 12406 of Reference (g) or FTNGD performed pursuant to section 502(f) is equivalent to the training that might have been performed under the authority of section 10147 of Reference (g) or section 502(a) of Reference (i) and paragraph 6.6.4.1.2.

        6.6.4.1.3.2.  AD performed pursuant to sections 12301(d), 12302, 12304, or 12406 of Reference (g) or FTNGD performed pursuant to section 502(f) when combined with training required by section 10147 of Reference (g) or section 502(a) of Reference (i) and paragraph 6.6.4.1.2. constitutes an undue personal hardship.

      6.6.4.1.4.  <u>IADT</u>.  Initial AD training is a sub-category of ADT used to provide basic military training and technical skill training required for all enlisted accessions.  For non-prior service (NPS) persons who are qualified for induction for active duty in an Armed Force (generally male citizens and resident aliens between the ages of 18 1/2 and 26 years of age) and who are not under orders to report for induction under the Military Selective Service Act (50 U.S.C. App 451 et seq., Reference (o)), IADT shall be for a period as provided in section 671 of Reference (g), to commence, insofar as practical, within 270 days after the date of enlistment pursuant to section 12103 of Reference (g).  For all other enlistees and inductees, the period of IADT shall be prescribed by the Secretary concerned to commence, insofar as practical, within 360 days after entry into Service, except that in time of war or national emergency declared by Congress or the President, basic training (or its equivalent) shall be for a period of not less than 12 weeks pursuant to section 671(b) of Reference (g).  Periods of basic training or equivalent training shorter than 12 weeks may also be established by the Secretary concerned for members who have been credentialed in a medical profession or occupation and are serving in a healthcare occupational specialty pursuant to section 671(c) of Reference (g).  Enlisted members receiving stipends under the Armed Forces Health Professions Scholarship Program (AFHPSP) for Reserve Service are not required to participate in Ready Reserve training until they have completed their educational training pursuant to sections 671(b), 12103, and 16201 of Reference (g).

      6.6.4.1.5.  The Secretaries concerned may require members enlisted for service in the Selected Reserve to participate in IDT periods before completing IADT.  Those training periods shall be with pay.  Voluntary participation in IDT before completing IADT may be authorized in either a pay or non-pay status.

6.6.4.1.6.  Pursuant to section 10147(b) of Reference (g), an individual Reservist may not be required to perform a period of ADT if the first day of that period falls during the last 120 days of the member's required membership in the Ready Reserve if the member has served on AD for one year or longer.

### 6.6.4.2.  Individual Ready Reserve and Inactive National Guard (IRR/ING)

6.6.4.2.1.  Members of the IRR, not scheduled for mandatory or voluntary training, may be required to serve 1 day of MD each year to accomplish continuous screening requirements pursuant to sections 10149, 10204, 10205, 10206, 12319, and 12644 of Reference (g).  Exemptions from IRR screening during one FY are authorized for members who served on AD during the FY; who reside outside geographical limitations established by the Secretaries concerned or the Commandant of the Coast Guard when not operating as a Service in the Navy; who are in the grade of O-4 or higher, and have no remaining required period of membership in the Ready Reserve; or, who were successfully screened in the preceding FY.  Under no circumstances should a member serve an initial period in the IRR of more than 18 months without participating in a screening either during an annual muster day, during a period of training, or through some other means.  The Secretaries concerned are required to maintain records on the current status of each member's physical condition, dependency status, military qualifications, civilian occupational skills, availability for service, present address, and other necessary information to facilitate a call-up to active duty, as prescribed.

6.6.4.2.2.  Members of the IRR, including individuals enlisting directly into the IRR, may participate voluntarily in IDT, for points only, pursuant to the regulations of the Military Services.  Those IRR members participating in approved programs outside the Department of Defense (Enclosure 7) may participate in IDT, with pay, if that pay is reimbursable from the supported non-DoD organization to the Department of Defense.

6.6.4.2.3.  Members of the RCs, not subject to mandatory training, shall be encouraged to participate on a voluntary basis to maintain their mobilization readiness. However, the opportunity to participate voluntarily in training, with pay, is subject to manpower and other resource limitations as determined by the Secretary concerned.

6.6.4.2.4.  Members of the ING shall muster with their assigned unit once a year to maintain their ING status and unit affiliation.  They shall not participate in any training activities in either a pay or points only status, and are not eligible for promotion.

6.6.4.3.  Standby Reserve.  The Standby Reserve consists of personnel who maintain their military affiliation without being in the Ready Reserve pursuant to sections 10141, 10150, 10151, 10152, and 10153 of Reference (g) and DoD Directive 1235.9 (Reference (p)).

6.6.4.3.1.  Active Status List.  Members of the Standby Reserve in an active status may participate voluntarily without pay in RC training for retirement points only.  This voluntary training shall not be performed in an imminent danger area.  These members may be considered

*DoDI 1215.06, February 7, 2007*

for promotion and, if selected, be promoted.  The following members of the Standby Reserve are in an active status:

6.6.4.3.1.1.  Personnel who have not fulfilled their statutory military service obligation (MSO).

6.6.4.3.1.2.  Personnel temporarily assigned to the Standby Reserve because of hardship, or other cogent reason, who intend to return to the Ready Reserve.

6.6.4.3.1.3.  Personnel retained in an active RC status pursuant to section 12646 of Reference (g).

6.6.4.3.1.4.  Members with a remaining service obligation shall be transferred from the Ready Reserve to the Standby Reserve Active Status List, after being designated as a "key employee" by the employer, and approved as such by the appropriate RC personnel management office.  Members shall remain in that Standby Reserve status for the period of time they remain designated and approved as a "key employee."  Employers who designate Ready Reserve members as "key employees" must request removal of those members from the Ready Reserve pursuant to DoD Directive 1200.7 (Reference (q)).

6.6.4.3.2.  <u>Inactive Status List</u>.  Members of the Standby Reserve Inactive Status List may not participate for points, pay, or promotion credit and may not be considered for promotion, or be promoted.  The following members of the Standby Reserve are in an inactive status:

6.6.4.3.2.1.  Members transferred to the Inactive Status List instead of separating pursuant to section 1209 of Reference (g).

6.6.4.3.2.2.  All other members transferred to the Inactive Status List pursuant to Reference (p).  Personnel enrolled in a military school course, including correspondence courses, when transferred from the Ready Reserve to the Standby Reserve Inactive Status List may continue voluntary participation in the course until completion.  Those personnel shall not be entitled to pay and allowances, travel and transportation, or earn retirement points for that training.

6.6.4.4.  <u>Retired Reserve</u>.  This category consists of all personnel transferred to the Retired Reserve and are subject to mobilization pursuant to DoD Directive 1352.1 (Reference (r)).  Retirees may voluntarily train with organizations to which they are properly pre-assigned by orders for recall to AD in a national emergency or declaration of war.  Such training shall be limited to that training made available within the resources authorized by the Secretary concerned.  The Retired Reserve consists of the following categories:

6.6.4.4.1.  Reserve members receiving retired pay pursuant to Chapter 1223 of Reference (g).

6.6.4.4.2.  Reserve members who have transferred to the Retired Reserve after completing the requisite qualifying years creditable for retired pay pursuant to Chapter 1223 of Reference (g), but who are not yet 60 years of age, or are age 60 and have not applied for retired pay.

6.6.4.4.3.  Reserve members retired for physical disability pursuant to sections 1201, 1202, 1204, or 1205 of Reference (g).  Members who have completed the requisite years of Military Service creditable for non-regular retired pay pursuant to Chapter 1223 of Reference (g) or are 30-percent or more disabled and otherwise qualified pursuant to section 1201 of (Reference (g)).

6.6.4.4.4.  Reserve officers and enlisted members who have retired after completion of 20 or more years of active Military Service.  This does not include Regular enlisted members of the Navy or the Marine Corps, with 20 to 30 years of active Military Service, who are transferred to the Fleet Reserve (Navy) or the Fleet Marine Corps Reserve.

6.6.4.4.5.  Reserve personnel drawing retired pay based on retirement for reasons other than age, service requirements, or physical disability.  This category is restricted to those who are retired under special conditions, as authorized by the Assistant Secretary of Defense for Reserve Affairs under legislation.

6.7.  <u>Voluntary Training</u>.  Members of the RCs, not subject to mandatory training, shall be encouraged to participate in voluntary training to maintain their mobilization readiness.  The opportunity to participate voluntarily without pay in training shall be limited by the manpower and resources authorized by the Secretary concerned.

6.8.  <u>Funds</u>.  Funds for personnel in uniform Reserve, training, and retirement categories shall be pursuant to DoD 7000.14-R (Reference (s)).  The Secretary concerned should include in the military personnel and operations and maintenance budgets for the AC funds to provide AD tours for Reserves on AD, including temporary duty, in support of AC and RC programs.

*DoDI 1215.06, February 7, 2007*

## 7. <u>EFFECTIVE DATE</u>

This Instruction is effective immediately.

David S. C. Chu
Under Secretary of Defense for
Personnel and Readiness

Enclosures - 7
    E1.  References, continued
    E2.  Definitions
    E3.  Duty Statuses
    E4.  Table 1, "Reserve Component Utilization Authorities"
    E5.  Uniform Reserve, Training, and Retirement Categories
    E6.  Table 2, "Authorized Reserve, Training and Retirement Categories"
    E7.  Members Participating In Approved Programs Outside the Department of Defense

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 10
Page 19 of 40

*DoDI 1215.06, February 7, 2007*

E1.  ENCLOSURE 1

REFERENCES, continued


(e)    DoD Directive 1205.17, "Official National Guard and Reserve Component Personnel Data," April 30, 2004

(f)    DoD Instruction 7730.54, "Reserve Components Common Personnel Data System (RCCPDS)," August 6, 2004

(g)    Title 10, United States Code, "Armed Forces"

(h)    Section 712 of title 14, United States Code, "Coast Guard"

(i)    Title 32, United States Code, "National Guard"

(j)    Sections 206, 433, and 435 of title 37, United States Code, "Pay and Allowances of the Uniformed Services"

(k)    DoD Instruction 1215.7, "Service Credit for Reserve Retirement," September 12, 2002

(l)    DoD 7000.14-R, "Department of Defense Financial Management Regulation," Volume 7A, "Military Pay Policy and Procedures for Active Duty and Reserve Pay," February 2002

(m)    DoD Directive 1235.11, "Management of Individual Mobilization Augmentees (IMAs)," May 6, 1996

(n)    DoD Directive 1215.13, "Reserve Component Member Participation Policy," December 14, 1995

(o)    Sections 451 to 500 and the Appendix of title 50, United States Code, "Military Selective Service Act"

(p)    DoD Directive 1235.9, "Management of the Standby Reserve," February 10, 1998

(q)    DoD Directive 1200.7, "Screening the Ready Reserve," November 18, 1999

(r)    DoD Directive 1352.1, "Management and Mobilization of Regular and Reserve Retired Military Members," July 16, 2005

(s)    DoD 7000.14-R, "Department of Defense Financial Management Regulation," Volume 2A, "Presentation and Formulation," June 2000

(t)    Joint Publication 1-02, "Department of Defense Dictionary of Military and Associated Terms," 12 April 2001

(u)    Section 3101 of title 5, United States Code, "Government Organization and Employees"

(v)    DoD Directive 1000.17, "Detail of DoD Personnel to Duty Outside the Department of Defense," February 24, 1997

(w)    DoD Directive 3025.1, "Military Support to Civil Authorities," January 15, 1993

ENCLOSURE 1

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 10
Page 20 of 40

E2.  ENCLOSURE 2

DEFINITIONS

E2.1.  Active Component (AC).  That portion of the armed forces as identified in annual authorization acts as "active forces," and in section 115 of Reference (g) as those active-duty personnel paid from funds appropriated for active-duty personnel.

E2.2.  Active Status.  For the purpose of this instruction, active status is defined as all National Guard and Reserve component members, except those members who are on an inactive status list, assigned to the Inactive National Guard, or in the Retired Reserve.  Reserve members in an active status may train with or without pay, earn retirement points, and may earn credit and be considered for promotion, and promoted.

E2.3.  Annual Screening.  For the purpose of this instruction, annual screening is defined as one-day ADT or MD each year for certain IRR members that enables the Services to maintain the current status of each IRR member's physical condition, dependency status, military qualifications, civilian occupation skills, availability for service, and other information pursuant to section 10149 of Reference (g).

E2.4.  Full-Time National Guard Duty (FTNGD).  Training or other duty, other than inactive duty, performed by a member of the ARNGUS or the ANGUS in a member's status as a member of the National Guard of a state or territory, the Commonwealth or Puerto Rico, or the District of Columbia pursuant to sections. 316, 502, 503, 504, or 505 of Reference (i) for which the member is entitled to pay from the United States, or for which the member has waived pay from the United States.  FTNGD is active service pursuant to section 101(d)(3) of Reference (g).

E2.5.  Individual Mobilization Augmentee (IMA) Detachments.  (See Reference (t))

E2.6.  Inactive Status.  (See Reference (t))

E2.7.  Key Employee.  (See Reference (t))

E2.8.  Key Position.  For the purpose of this instruction, a key position is defined as a civilian position, public or private (designated by the employer pursuant to Reference (q)) that cannot be vacated during war or national emergency without seriously impairing the capability of the parent organization to function effectively.

E2.9.  Non-Deployable Account.  (See Reference (t))

E2.10.  Non-Prior Service (NPS) Personnel.  For the purpose of this instruction, non-prior service personnel is defined as individuals who have no prior military service, who have not completed IADT or its equivalent, and enlist directly into a U.S. Armed Force.

E2.11.  Operational Support (OS) Duty.  A category of voluntary duty used to provide RC support to operations and mission requirements.  It includes active duty, other than Active Guard and Reserve duty, pursuant to section 12301(d) of Reference (g); full-time National Guard duty, other than Active Guard and Reserve duty, pursuant to section 502(f) of Reference (i); and active duty for training performed at the request of an organizational or operational commander, or as a result of reimbursable funding.  It does not include AD performed as an AGR, FTNGD performed as an AGR, or FTNGD performed in support of counter-drug operations.

E2.12.  Qualifying Years of Creditable Service for Non-Regular Retired Pay.  The time National Guard or Reserve members must serve to be eligible for non-regular retired pay at age 60 years.  Individuals must have at least 20 years of service, or as otherwise provided for in law, in which they received at least 50 retirement points,

E2.13.  Reserve Components (RCs).  (See Reference (t))

E2.14.  Trained Strength in Units.  For the purpose of this instruction trained strength in units is defined as all personnel (Reserve or National Guard members, AGR and AC members) assigned to a National Guard or Reserve unit who, in the case of enlisted members, have completed IADT and are eligible for deployment overseas on land when mobilized under proper authority.  Personnel in non-deployable accounts or a training pipeline are not part of a unit's trained strength.

E2.15.  Training and Retired Categories (TRC).  (See Reference (t))

E2.16.  Training Period.  For the purpose of this instruction training period is defined as an authorized and scheduled regular IDT period.  A training period must be at least four hours.  The term was previously used interchangeably with other common terms such as "drills," "drill period," "assemblies," "periods of instruction," etc.

E2.17.  Training Unit.  (See Reference (t))

E2.18.  Unit.  (See Reference (t))

E2.19.  Voluntary Training.  For the purpose of this instruction voluntary training is defined as training in a pay or non-pay status, especially applicable to RC members of the IRR, Standby Reserve active status list, and retirees.  Participation in voluntary training may be achieved by training with Selected Reserve or voluntary training units; performing ADT; completing authorized military correspondence courses; attending designated courses of instruction; performing equivalent duty; participating in special military and professional events designated by the Military Department; or participating in authorized civil defense activities.

E2.20.  Voluntary Training Unit.  (See Reference (t))

ENCLOSURE 2

E3.  ENCLOSURE 3

DUTY STATUSES

E3.1.  DUTY STATUSES

E3.1.1.  AD.  Full-time duty in the active military service of the United States.  It includes full-time training duty, annual training duty, and attendance, while in active military service, at a school designated as a Service school by law and the Secretary of the Military Department concerned.  It does not include FTNGD.  For the RC, AD is comprised of the categories of ADT and ADOT.

E3.1.1.1.  ADT.  A category of AD that shall be used to provide structured individual and/or unit training, including on-the-job-training, or educational courses to RC members.  Included in the ADT category are AT, IADT, OTD.

E3.1.1.1.1.  AT.  It is the minimum period of ADT that Reserve members must perform each year to satisfy the training requirements associated with their RCs assignment.

E3.1.1.1.2.  IADT.  A category of ADT which includes basic military training and technical skill training, is required for all enlisted accessions.

E3.1.1.1.3.  OTD.  Authorized ADT, other than IADT or AT, that provides all other structured training, to include on the job training, for individuals or units to enhance proficiency.  OTD is authorized to provide for full-time attendance at organized and planned specialized skill training, refresher and proficiency training, and professional development education programs.  It shall be used to support RC members in obtaining the necessary skills and disciplines to achieve required readiness standards.

E3.1.1.2.  ADOT.  A category of AD used to provide RC support to either AC or RC missions.  It includes the categories of ADOS (formerly known as ADSW), AGR duty, and involuntary AD pursuant to sections 12301, 12302, and 12304 of Reference (g) and section 712 of Reference (h).

E3.1.1.2.1.  ADOS.  AD for Operational Support (ADOS) is an authorized voluntary tour of AD, other than AGR duty, performed pursuant to section 12301(d) of Reference (g) and ADT performed at the request of an organizational or operational commander, or as a result of reimbursable funding.  ADOS is funded through applicable military or Reserve personnel appropriations (ADOS-AC funded or ADOS-RC funded) to support AC or RC programs, respectively.  The purpose of ADOS is to provide the necessary skilled manpower assets to support existing or emerging requirements.

E3.1.1.2.2.  AGR Duty.  AD performed by a member of an RC of the Army, the Navy, the Air Force, or the Marine Corps, the Coast Guard, or FTNGD performed by a member

of the National Guard under an order to AD or FTNGD for a period of 180 consecutive days or more for organizing, administering, recruiting, instructing, or training the Reserve components, or to perform other duties as prescribed in sections 12310 and 10211 of Reference (g). Personnel performing such duty are included in the FTS numbers for each RC under the collective title of AGR.

E3.1.1.2.3  <u>Involuntary Active Duty</u>.  AD used in support of military operations when it is determined by the President or the Congress that RC forces are required to augment the AC. It is provided for within the provisions of sections 12301 and 12302 of Reference (g) for full and partial mobilization, respectively, section 12304 of Reference (g) for Presidential Reserve Call-Up authority, and section 712 of Reference (h) under which the Secretary of Homeland Security may call up the Coast Guard Reserve for domestic emergencies.  For other purposes, Secretaries concerned may order members involuntarily to AD pursuant to provisions of sections 802(d), 12301(b), 10148, or 12303 of Reference (g).

E3.1.2.  <u>FTNGD</u>.  Training or other duty, other than ID, performed by a member of the ARNGUS or the ANGUS in a member's status as a member of the National Guard of a state or territory, the Commonwealth or Puerto Rico, or the District of Columbia pursuant to sections 316, 502, 503, 504, or 505 of Reference (i) for which the member is entitled to pay from the United States, or for which the member has waived pay from the United States.  FTNGD is active service pursuant to section 101(d)(3) of Reference (g).

E3.1.2.1.  <u>FTNGD for Operational Support (FTNGD(OS))</u>.  FTNGD(OS) is an authorized voluntary tour of FTNGD, other than AGR duty, performed pursuant to section 502(f)(2) of Reference (i) and FTNGD for training performed at the request of an organizational or operational commander, or as a result of reimbursable funding.  The purpose of FTNGD(OS) is to provide the necessary skilled manpower assets to support existing or emerging requirements pursuant to section 502(f)(2) of Reference (i).  Authorization of FTNGD(OS) shall be managed pursuant to Directives established by the Secretaries of the Army and Air Force.

E3.1.3.  <u>ID</u>

E3.1.3.1.  <u>IDT</u>.  Authorized training performed by members of an RC not on AD or FTNGD, and performed in connection with the prescribed activities of the RC, of which they are a member.  It consists of regularly scheduled unit training periods, ATPs, and equivalent training as defined in this Instruction.

E3.1.3.1.1.  <u>Regularly Scheduled IDT</u>.  The regularly scheduled 48 annual periods of IDT authorized for National Guard members and RC members pursuant to section 10147 of Reference (g) or section 502(a) of Reference (i).

E3.1.3.1.2.  <u>Equivalent Training (ET)</u>.  A sub-category of IDT.  It is IDT performed instead of regularly scheduled IDT.

E3.1.3.1.3.  <u>Additional IDT Periods</u>.  There are three categories of additional IDT periods:

E3.1.3.1.3.1.  <u>Additional training periods (ATPs)</u>.  ATPs for units, components of units, and individuals are for accomplishing additional required training, as defined by post-mobilization mission requirements.

E3.1.3.1.3.2.  <u>Additional flying and flight training periods (AFTPs)</u>.  ATFPs are authorized for primary aircrew members for conducting aircrew training and combat crew qualification training to attain and maintain aircrew flying proficiency and sustain required readiness.

E3.1.3.1.3.3.  <u>Readiness management periods (RMPs)</u>.  RMPs are used to support the following functions in preparing units for training:  the ongoing day-to-day operation of the unit, accomplishing unit administration, training preparation, support activities, and maintenance functions.

E3.1.3.2.  <u>MD</u>.  A special category of ID used to meet the continuous screening requirement established by section 10149 of Reference (g).  A member of the Ready Reserve may be ordered without his consent to MD one time a year by an authority designated by the Secretary concerned pursuant to section 12319 of Reference (g).

E3.1.3.3.  <u>FHD</u>.  A special category of ID used to prepare for, and provide honors at the funeral of military members and veterans.  Members of the Ready Reserve may perform FHD in a voluntary status pursuant to the provisions of section 12503 of Reference (g) or section. 115 of Reference (i).

*DoDI 1215.06, February 7, 2007*

E4.  ENCLOSURE 4

## TABLE E4.T1.  RESERVE COMPONENT UTILIZATION AUTHORITIES

| Utilization Categories | Legal Authority | Purpose of Duty | Applies To | Type of Duty | |
|---|---|---|---|---|---|
| **Training** | | | | | |
| | 10 USC 10147 | Annual Training (AT)/Drill Requirement | Reserve Only | AD/IDT | Involuntary |
| | 10 USC 12301(b) | Annual Training | Reserve & National Guard | AD | Involuntary |
| | 10 USC 12301(d) | Additional/Other Training Duty | Reserve & National Guard | AD | Voluntary |
| | 32 USC 502(a) | Annual Training (AT)/Drill Requirement | National Guard Only | FTNGD/IDT | Involuntary |
| | 32 USC 502(f)(1) | Additional Training Duty | National Guard Only | FTNGD | Involuntary |
| | 32 USC 502(f)(2) | Additional/Other Training Duty | National Guard Only | FTNGD | Voluntary |
| **Support** | | | | | |
| | 10 USC 12301(d) | AGR Duty/Operational Support/Additional Duty | Reserve & National Guard | AD | Voluntary |
| | 32 USC 502(f)(2) | AGR Duty/Operational Support/Additional Duty | National Guard Only | FTNGD | Voluntary |
| | 32 USC 502(f)(1) | Other Duty | National Guard Only | FTNGD | Voluntary |
| **Mobilization** | | | | | |
| | 10 USC 12301(a) | Full Mobilization | Reserve & National Guard | AD | Involuntary |
| | 10 USC 12302 | Partial Mobilization | Reserve & National Guard | AD | Involuntary |
| | 10 USC 12304 | PRC | Reserve & National Guard | AD | Involuntary |
| | 14 USC 712 | Emergencies | USCGR Only | AD | Involuntary |
| | | | | | |
| **Other** | | | | | |
| | 10 USC 12503 | Funeral Honors | Reserve & National Guard | ID | Voluntary |
| | 32 USC 115 | Funeral Honors | National Guard Only | ID | Voluntary |
| | 10 USC 12319 | Muster Duty | Reserve & National Guard | ID | Involuntary |
| | 10 USC 12301(h) | Medical Care | Reserve & National Guard | AD | Involuntary |
| | 10 USC 12322 | Medical Evaluation and Treatment | Reserve & National Guard | AD | Voluntary |
| | 10 USC 802(d) | Disciplinary | Reserve & National Guard | AD | Involuntary |
| | 10 USC 10148 | Unsat Participation (up to 45 days) | Reserve & National Guard | AD | Involuntary |
| | 10 USC 12301(g) | Captive Status | Reserve & National Guard | AD | Involuntary |
| | 10 USC 12303 | Unsat Participation (up to 24 months) | Reserve & National Guard | AD | Involuntary |
| | 10 USC 12402 | Duty at National Guard Bureau | National Guard Only | AD | Voluntary |
| | 10 USC 331 | Insurrection | National Guard Only | FS | Involuntary |
| | 10 USC 332 | Insurrection | National Guard Only | FS | Involuntary |
| | 10 USC 12406 | Insurrection | National Guard Only | FS | Involuntary |

AD      - Active Duty
ID      - Inactive Duty
IDT     - Inactive Duty Training
FTNGD - Full Time National Guard Duty
FS      - Federal Service

26

ENCLOSURE 4

*DoDI 1215.06, February 7, 2007*

E5.  ENCLOSURE 5

UNIFORM RESERVE, TRAINING, AND RETIREMENT CATEGORIES

E5.1.  RESERVE COMPONENT CATEGORIES (RCCs)

Categories identifying an individual's status in a RC.  There are three RCCs:  The Ready Reserve, the Standby Reserve, and the Retired Reserve.  Each member of the National Guard and Reserve is assigned within one of those categories.  (All National Guard members, including those in the ING, are in the Ready Reserve.)

E5.1.1.  Ready Reserve Categories.  The Ready Reserve is comprised of military members of the Reserve and National Guard, organized in units or as individuals, or both, and liable for involuntary order to AD in time of war or national emergency pursuant to sections 12301 and 12302 of Reference (g) and section 712 of Reference (h) in the case of members of the Coast Guard Reserve.  The Ready Reserve consists of three sub-categories: the Selected Reserve, the IRR, and the ING.

E5.1.1.1.  Selected Reserve.  The Selected Reserve consists of those units and individuals in the Ready Reserve designated by their respective Service, and approved by the Chairman of the Joint Chiefs of Staff, as so essential to initial wartime missions that they have priority over all other Reserves.  All Selected Reservists are in an active status.  They are trained as prescribed in section 10147(a)(1) of Reference (g) or section 502(a) of Reference (i), as appropriate.  In addition to the involuntary call up authorities set out in the previous paragraph, members of the Selected Reserve may also be involuntarily called to AD to augment the active forces for any operational mission pursuant to section 12304 of Reference (g).  The Selected Reserve includes the following:

E5.1.1.1.1.  Selected Reserve Units.  Units manned and equipped to serve and/or train either as operational or as augmentation units.  Operational units train and serve as units.  Augmentation units train together, but when mobilized, lose their unit identity and become part of an AC unit or activity.  Selected Reserve units include:

E5.1.1.1.1.1.  Drilling Unit Reservists.  Trained unit members participating in unit training activities on a part-time basis shall have the RCC and TRC designator of "SA."

E5.1.1.1.1.2.  Unit Full-Time Support (FTS) Personnel

E5.1.1.1.1.2.1.  AGR.  National Guard or Reserve members of the Selected Reserve serving on AGR duty assigned or attached to Selected Reserve units (to include full-time National Guard duty), as defined in section 101 of Reference (g), for the purposes of organizing, administering, recruiting, instructing, or training the RCs, who may also perform other duties as prescribed in section 12310 of Reference (g).  All such AGR members must be assigned against, or attached to, an authorized mobilization position in the unit they support.  They shall have the RCC and TRC designator of "SG."

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 10
Page 27 of 40

E5.1.1.1.1.2.2.  Military Technician (Dual Status) (MT).  A civilian employee of the Military Department concerned who is required, as a condition of civilian employment, to maintain military membership in a Reserve component and who is assigned to a position as a technician in the administration and training of such Reserve component, or in the maintenance and repair of supplies or equipment issued to such Reserve component.  The military and civilian position skills of MTs must be compatible.  MTs are not accounted for separately in RCC/TRC categories.  Accordingly, these MTs are accounted for in Reserve end strengths as Drilling Unit Reservists (E5.1.1.1.1. of this Enclosure), and, as such, are accountable under the TRC designator of "SA."  NOTE:  There are certain technicians providing unit FTS who are not required to maintain military membership (i.e., non-dual status technicians) and others who are not required to hold compatible military and civilian positions.

E5.1.1.1.1.2.3.  Non-Dual Status Technician (NDST).  NDSTs are not accounted for in RCC/TRC categories.  A civilian employee employed as a technician before November 18, 1997, pursuant to any of the authorities specified in section 10217(b) of Reference (g) and is not a member of the Selected Reserve or after that date has ceased to be a member of the Selected Reserve or is employed pursuant to section 709 of Reference (i) in a position designated pursuant to subsection (c) of that section and when hired was not required to maintain membership in the Selected Reserve.  NDST shall encumber only those technician positions identified by the Secretary concerned as NDST positions.

E5.1.1.1.1.2.4.  AC.  AC personnel are not accounted for in RCC/TRC categories.  Members of the active forces of the Military Services, paid from AC military personnel appropriations, assigned or attached to National Guard or Reserve units to provide advice, liaison, management, administration, training, and/or maintenance support in the category of FTS pursuant to section 12501 of Reference (g).  These members are not part of the Selected Reserve, but may deploy with their assigned unit, should it mobilize.  AC members performing FTS are counted as part of trained strength in units, but not in the Selected Reserve strengths.

E5.1.1.1.1.2.5.  Civil Service Employees (CIV).  CIVs are not accounted for in RCC/TRC categories.  Such personnel are hired pursuant to section 3101 of 5 U.S.C. (Reference (u)) to provide administrative support to RC units.  They are in the category of FTS to the RCs, but are not part of the Selected Reserve.  This category is exclusive of dual-status MTs and NDSTs.

E5.1.1.1.2.  Full-Time Members (Special Category).  Trained Selected Reserve members who are performing AD or FTNGD for more than 180 days in a fiscal year, but who are exempted from counting against the AD strengths pursuant to section 101(d)(6)(B)(ii) and (iii) of (Reference (g)).  Specifically, this includes U.S. Property and Fiscal Officers and members performing duty for the purpose of interdiction and counterdrug activities.  These personnel shall have the RCC and TRC of "SV."

E5.1.1.1.3.  Individual Mobilization Augmentees (IMAs).  Individual members of the Selected Reserve assigned to an RC billet in an AC or non-DoD organization.  They are trained

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 10
Page 28 of 40

individuals pre-assigned to an AC or a Selected Service System (SSS) billet that must be filled to support mobilization (pre- and/or post-mobilization) requirements, contingency operations, operations other than war, or other specialized or technical requirements.  IMAs participate in training activities on a part-time basis with an AC unit or SSS preparing for active service, as required.  The amount of training required may vary from 0 to 48 IDT periods per year.  All IMAs must perform a minimum of 12 days of AT each year.  They have the RCC and TRC designator of "TB."

   E5.1.1.1.4.  Training Pipeline.  An RCC designation "U" that identifies Selected Reserve enlisted members who have not yet completed IADT as provided in section 671 of Reference (g) and officers who are in training for professional categories or in undergraduate flying training.  Pursuant to section 671 of Reference (g), all Ready Reservists shall receive training commensurate with their intended wartime assignments, and must complete the basic training requirements of the member's Service before assignment on land outside the United States, its territories or possessions.  The training pipeline is synonymous with the term "non-deployable account."  Personnel in the training pipeline may be mobilized, but may not always be available for deployment with their units. If otherwise eligible for mobilization and deployment, they shall be considered as mobilization assets.  Training pipeline personnel are accounted for separately in the following training categories:

      E5.1.1.1.4.1.  Members Currently on IADT.  Includes the second part of split IADT for enlisted members, which has the RCC and TRC designator of "UF."

      E5.1.1.1.4.2.  Enlisted Members Awaiting Second Part of Split IADT.  Those members shall have the RCC and TRC designator of "UQ."

      E5.1.1.1.4.3.  Members Awaiting IADT Authorized to Perform IDT.  Those members in the Selected Reserve serving with pay.  Service performed by members while in that status is creditable toward computation of basic pay.  Members in this category shall have the RCC TRC designator of "UP."  This category also includes National Guard members awaiting IADT and not authorized to perform IDT.  See paragraph 6.6.4.1.4. for specific criteria regarding this category.

      E5.1.1.1.4.4.  Other Selected Reserve Untrained Personnel in Training Programs.  Includes chaplain candidates, health profession students, and early commissioning program participants with the RCC and TRC designator of "UX."

      E5.1.1.1.4.5.  AGR Enlisted Members Currently on, or Awaiting, IADT.  Includes NPS AGR personnel and has the RCC and TRC designator of "US."

      E5.1.1.1.4.6.  Individuals in a Simultaneous Membership Program.  Senior Reserve Officers' Training Corps (ROTC) Cadets, Selected Reserve enlisted members in officer candidate programs, and Marine Corps Platoon Leader Class students who are also permitted to be members of a Selected Reserve unit.  These members have the RCC and TRC designator of "UT."

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 10
Page 29 of 40

*DoDI 1215.06, February 7, 2007*

E5.1.1.1.5.  <u>AGR not in Selected Reserve Units</u>.  National Guard or Reserve members of the Selected Reserve, serving on AGR duty (to include full-time National Guard duty) as defined in Chapter 1 of Reference (g), and Coast Guard Reserve AGRs, but who are not assigned or attached to Selected Reserve units.  They occupy positions in organizations, other than Selected Reserve units, for the purposes of organizing, administering, recruiting, instructing, or training the RCs, and may also perform other duties as prescribed in section 12310 of Reference (g).  They shall have the same RCC and TRC designator as AGRs in units - "SG."

E5.1.1.1.6.  <u>Civil Service Employees (CIV) not in Selected Reserve Units</u>.  CIVs are not accounted for in RCC/TRC categories.  Such personnel hired under section 3101 of Reference (u) to provide administrative support to the RCs.  They are in the category of FTS to the RCs, but are not part of the Selected Reserve.

E5.1.1.2.  <u>IRR</u>  The IRR consists of Reservists in the following categories:

E5.1.1.2.1.  IRR is a manpower pool comprised principally of individuals who have had training, have previously served in the AC or in the Selected Reserve, and have some period of their military service obligation (MSO) or other contractual obligation remaining.  Some individuals volunteer to remain in the IRR beyond their MSO or contractual obligation and participate in programs providing a variety of professional assignments and opportunities for earning retirement points and military benefits.  Members may voluntarily participate in training for retirement points and promotion, with or without pay.  IRR members are not required to meet the same AT and IDT training requirements as Selected Reserve members.  Exceptions to this training requirement restriction shall be approved by the USD(P&R).  Required training (involuntary) may not exceed 30 days a year pursuant to section 10147 of Reference (g).  IRR members may be required to perform MD as described in paragraph 6.6.4.2.1. of the main body of this Instruction.  Trained members of the IRR have the RCC and TRC designator of "RE," with the exception of those members in the category described in paragraph E5.1.1.2.2.

E5.1.1.2.2.  Within the IRR there is a category of members, as designated by the Secretary concerned, who have volunteered to be called to AD pursuant to the provisions of section 12304 of Reference (g) when needed.  This category of the IRR is provided for in section 10144(b) of Reference (g).  Members in this mobilization category shall be eligible for benefits (other than pay and training) as normally available to members of the Selected Reserve, as determined by the Secretary of Defense.  IRR members in this category have the RCC and TRC designator of "RM."

E5.1.1.2.3.  The IRR also includes some personnel participating in officer training programs or in the Armed Forces Health Professional Scholarship Program (AFHPSP).  The RCC and TRC designator "PJ" is used for officers not in the Selected Reserve but participating in officer training programs.  Included within this category are cadets of the Merchant Marine Academy.  The RCC and TRC designator "PK" is used for officers not in the Selected Reserve, but participating in the AFHPSP.  Members in that stipend program are required to perform 45 days of AD for training a year pursuant to section 2121(c) of Reference (g).

30

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 10
Page 30 of 40

E5.1.1.2.4.  The IRR also includes enlisted members awaiting IADT (except for members of the National Guard), who are not authorized to perform IDT.  These members are assigned to units and are serving without pay.  Service performed by members in that status is not creditable toward computation of basic pay and shall have the RCC and TRC designator of "RU."  NPS enlistees between the ages of 18 1/2 and 26 years enlisting pursuant to section 12103 of Reference (g) shall commence IADT, insofar as practicable, within 270 days after the date of that enlistment.  All other enlisted members shall perform IADT, insofar as practicable, within 360 days of their enlistment.

E5.1.1.2.5.  The IRR also includes members of the Delayed Entry Program enlisted pursuant to section 513 of Reference (g).  Currently, there is no requirement to account for those untrained members of the IRR in the RCCPDS.  However, these IRR members may be coded with the RCC and TRC designator of "RH."

E5.1.1.3.  <u>ING</u>.  The ING consists of National Guard personnel in an inactive status in the Ready Reserve, not in the Selected Reserve, attached to a specific National Guard unit.  To remain ING members, members must muster once a year with their assigned unit, but they do not participate in training activities.  On mobilization, ING members may mobilize with their units.  Similar to IRR members, some ING members have legal and contractual obligations.  ING members may not train for points or pay and are not eligible for promotion.  Currently, the ING category is used only by the ARNG and has the RCC and TRC designator of "II."

E5.1.2.  <u>Standby Reserve Categories</u>.  The Standby Reserve consists of those units or members, or both, of the Reserve components, other than those in the Ready Reserve or Retired Reserve, who are liable for active duty only as provided for in sections 12301 and 12306 of Reference (g).  The Standby Reserve consists of personnel who are maintaining their military affiliation without being in the Ready Reserve, but have been designated key civilian employees, or have a temporary hardship or disability.  Those individuals are not required to perform training and are not part of units.  The Standby Reserve is a pool of trained individuals who may be mobilized as needed to fill manpower needs in specific skills.  The Standby Reserve consists of the active status list and the inactive status list categories.

E5.1.2.1.  <u>Active Status List</u>.  The following members of the Standby Reserve are in an active status:

E5.1.2.1.1.  Members designated as key employees pursuant to Reference (q) and transferred from the Ready Reserve to the Standby Reserve Active Status List for the period they remain designated as a key employee.  Key employees may participate voluntarily without pay in RC training for retirement points only and may be considered for promotion.  This voluntary training shall not be performed in an imminent danger area.  While there is no statutory prohibition against paying active status Standby Reservists for IDT or AD, members of the Standby Reserve who have been screened out of the Ready Reserve as key employees shall not be paid for training.  They have the RCC and TRC designator of "YC."

E5.1.2.1.2.  Personnel not having fulfilled their statutory MSO, who are temporarily assigned for a hardship reason but intend to return to the Ready Reserve, or who are retained by a RC in an active status pursuant to section 12646 of Reference (g).  These members may participate voluntarily with or without pay and may receive credit for, and be considered for, promotion.  They have the RCC and TRC designator of "YD."

E5.1.2.2.  <u>Inactive Status List</u>.  Members in the Standby Reserve who are not required to remain in an active program, but who retain Reserve affiliation in a non-participating status and whose skill may be of future use to the Armed Force concerned.  These members cannot participate in prescribed training.  While in an inactive status, Reserve members are not eligible for pay or promotion and do not accrue credit for years of service pursuant to provisions of Chapter 1223 of Reference (g).

E5.1.2.2.1.  Members transferred to the Standby Reserve Inactive Status List pursuant to section 1209 of Reference (g) instead of separating.  They have the RCC TRC designator of "YL."

E5.1.2.2.2.  All other members transferred to the Standby Reserve Inactive Status List pursuant to Reference (p).  They have the RCC TRC designator of "YN."

E5.1.3.  <u>Retired Reserve Categories</u>

E5.1.3.1.  All Reserve personnel transferred to the Retired Reserve.  Retired Reservists voluntarily may train, with or without pay.  The Retired Reserve consists of the following retired categories:

E5.1.3.1.1.  Reserve members who have completed the requisite qualifying years creditable for non-regular retired pay pursuant to Chapter 1223 of Reference (g), and who have reached the designated retirement age and are receiving retired pay.  Those members shall be assigned the RCC and TRC designator of "V1."

E5.1.3.1.2.  Reserve members who have completed the requisite qualifying years creditable for non-regular retired pay but are either not yet eligible to receive retired pay, or are eligible to receive retired pay but have not applied for such pay.  Those members shall be assigned the RCC and TRC designator of "V2."

E5.1.3.1.3.  Reserve members retired for physical disability pursuant to sections 1201, 1202, 1204, or 1205 of Reference (g).  Members have completed 20 years of service creditable for regular retired pay, or are 30-percent or more disabled and otherwise qualified pursuant to section 1201 of Reference (g).  These members shall be assigned the RCC and TRC designator of "V3."

E5.1.3.1.4.  Reserve members who have completed the requisite years of active service and are receiving regular retired or retainer pay.  These personnel shall be assigned the RCC and TRC designator of "V4."  Excluded from this category are Regular (not RC) enlisted

ENCLOSURE 5

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 10
Page 32 of 40

personnel of the Navy and the Marine Corps with 20 or more, but less than 30, years of active military service who are transferred to the Fleet (Navy) Reserve or the Fleet Marine Corps Reserve upon retirement. They remain in the Fleet Reserve or Fleet Marine Corps Reserve until they have completed a combined total of 30 years of active and retired or retainer service.

E5.1.3.1.5. Reserve personnel drawing retired pay pursuant to other than age, service requirements, or physical disability. This category is restricted for retirement under special conditions, as authorized by the Office of the Assistant Secretary of Defense for Reserve Affairs under legislation. These personnel shall be assigned the RCC and TRC designator of "V5." Also included in this RCC and TRC will be Voluntary Separation Incentive recipients who become ineligible for retention in an active or inactive status in a Reserve component because of age, years of service, failure to select for promotion, or medical disability, and who request to be placed in this category. These individuals shall be tracked separately by the appropriate Reserve personnel management office.

E5.1.3.2. All members retired for having completed the requisite years of active duty service (Regular or Reserve), regardless of the retired list where assigned, may be ordered to AD when required by the Secretary of the Military Department concerned, pursuant to section 688 of Reference (g).

E5.1.3.3. Retired Reserve members may be ordered to AD in their status as Retired Reserve members. It is not necessary to place the member in the Ready Reserve for that purpose.

E5.1.3.4. Former members having completed 20 satisfactory years of service creditable for non-regular retirement, but electing to be discharged from the RCs, are not a part of the Retired Reserve and have no military status.

*DoDI 1215.06, February 7, 2007*

E6.  <u>ENCLOSURE 6</u>

## TABLE E6.T1. AUTHORIZED RESERVE, TRAINING, AND RETIREMENT CATEGORIES

| RCC | RC SUB-CATEGORY | RCC DESIGNATOR | TRC DESIGNATOR | COMPRISED OF | MINIMUM NUMBER OF IDT PERIODS REQUIRED ANNUALLY | MINIMUM NUMBER OF DAYS OF AT REQUIRED ANNUALLY | REMARKS | CURRENTLY USED BY | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | ARNG | USAR | USNR | USMCR | ANG | USAFR | USCGR |
| READY RESERVE | SELECTED RESERVE | S<br><br>TRAINED IN UNITS | A | INDIVIDUALS IN UNITS | 48 | RESERVE: 14 DAYS<br><br>USCGR: 12 DAYS<br><br>NATIONAL GUARD: 15 DAYS | 10 U.S.C. 10147 (REFERENCE (g)), REQUIRES 14 DAYS AT. (EXCLUDE TRAVEL)<br><br>32 U.S.C. 502 (REFERENCE (i)), REQUIRES 15 DAYS AT. (INCLUDE TRAVEL) | X | X | X | X | X | X | X |
| | | | | | | | | X | | | | X | | |
| | | | G | AGR | N/A | | AGR MAY BE REQUIRED TO ATTEND DRILLS. (INCLUDES USNR TARs, USCGR RPAs (14 U.S.C. 276 (REFERENCE (h)), USMCR ARs, AND ALL STATUTORY TOURS). | X | X | X | X | X | X | X |
| | | | V | USPFO & RC MEMBERS ON AD IN SUPPORT OF COUNTER-DRUG ACTIVITIES | N/A | N/A | MEMBERS ARE ON AD FOR MORE THAN 180 DAYS AND COUNT AGAINST SELRES STRENGTH , BUT DO NOT COUNT AGAINST AGR STRENGTH | X | X | X | X | X | X | X |
| | | T<br><br>TRAINED INDIVIDUALS<br><br>NON-UNIT | B | IMA | IDT VARIES BETWEEN 0 AND 48 PERIODS EACH YEAR, AS DETERMINED BY DOD POLICY | RESERVE:- 12 TO 14 DAYS (EXCLUDE TRAVEL) | UNLESS TRAINING CAN BE ACCOMPLISHED ON WEEKENDS, AT IS LIMITED TO 12 DAYS BY POLICY. | | X | X | X | | X | X |
| | | U<br><br>TRAINING PIPELINE<br><br>NON-DEPLOYABLE ACCOUNT | F | PERSONNEL CURRENTLY ON IADT | O | N/A | INCLUDES SECOND PART OF SPLIT TRAINING AND ARMY ONE-STATION UNIT TRAINING (APPLIES TO TRCs F, P, AND Q). | X | X | X | X | X | X | X |
| | | | P | PERSONNEL AWAITING IADT AND AUTHORIZED TO PERFORM IDT | MINIMUM IDT TO BE DETERMINED BY DoD COMPONENT POLICY | N/A | INCLUDES PERSONNEL WITH OR WITHOUT PAY. | X | X | X | X | X | X | X |
| | | | Q | PERSONNEL AWAITING SECOND PART OF IADT | 48 | N/A | | X | X | X | X | X | X | X |

ENCLOSURE 6

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 10
Page 34 of 40

*DoDI 1215.06, February 7, 2007*

TABLE E6.T1. AUTHORIZED RESERVE, TRAINING, AND RETIREMENT CATEGORIES, Cont.

| RCC | RC SUB-CATEGORY | RCC DESIGNATOR | TRC DESIGNATOR | COMPRISED OF | MINIMUM NUMBER OF IDT PERIODS REQUIRED ANNUALLY | MINIMUM NUMBER OF DAYS OF AT REQUIRED ANNUALLY | REMARKS | CURRENTLY USED BY | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | ARNG | USAR | USNR | USMCR | ANG | USAFR | USCGR |
| READY RESERVE | SELECTED RESERVE | U TRAINING PIPELINE, NON-DEPLOYABLE ACCOUNT | S | AGR CURRENTLY ON, OR AWAITING IADT | DETERMINED BY DoD COMPONENT POLICY | N/A | INCLUDES NPS AGR (NAVY TAR) PERSONNEL. | | | X | | | | |
| | | | T | INDIVIDUALS IN A SIMULTANEOUS MEMBERSHIP | 48 | SAME AS TRC A | SENIOR ROTC CADETS OR MARINE CORPS PLATOON LEADER CLASS MEMBERS WHO ARE ALSO PERMITTE BE MEMBERS OF A SELECT RESERVE UNIT. | X | X | | X | X | X | |
| | | | X | PERSONNEL IN OTHER TRAINING PROGRAMS | 48 | SAME AS TRC A | SELECTED RESERVE UNTRAINED MEMBER IN OTHER TRAINING PROGRAMS INCLUDING CHAPLAINS, MEDICAL, HEALTH PROFESSIONAL STIPEND, AND EARLY COMMISSIONING. MUST MEET THE SAME TRAINING REQUIREMENTS. AS TRC A RESERVISTS. | X | X | | X | | | |
| | IRR and ING | R IRR | E | INDIVIDUAL MEMBERS OF THE READY RESERVE NOT IN SELECTED RESERVE (INCLUDES OFFICERS AWAITING AD OR SELECTED RESERVE ASSIGNMENT) | N/A | 1 | IRR MEMBERS MAY VOLUNTARILY PARTICIPATE IN TRAINING FOR RETIREMENT POINTS AND PROMOTION WITH OR WITHOUT PAY. REQUIRED TRAINING MAY NOT EXCEED 30 DAYS EACH YEAR. (10 U.S.C. 10147, REFERENCE (g)). | | X | X | X | | X | X |
| | | | M | SPECIAL CATEGORY WITHIN THE IRR SUBJECT TO INVOLUNTARY CALL TO AD IAW 10 USC 12304 (REFERENCE (g). | N/A | N/A | MEMBERS MUST VOLUNTEER FOR THIS CATEGORY, AND MAY ONLY REMAIN IN THIS CATEGORY FOR 48 MONTHS AFTER LEAVING ACTIVE SERVICE. | | X | X | X | | X | X |
| | | | H | UNTRAINED MEMBERS OF THE IRR. (DEP) 10 U.S.C. 513, REFERENCE (g) | | | | | X | X | X | | X | X |
| | | | U | PERSONNEL AWAITING IADT | NOT AUTHORIZED TO PERFORM IDT | N/A | | | X | X | X | X | X | X |

ENCLOSURE 6

*DoDI 1215.06, February 7, 2007*

TABLE E6.T1. AUTHORIZED RESERVE, TRAINING, AND RETIREMENT CATEGORIES, Cont.

| RCC | RC SUB-CATEGORY | RCC DESIGNATOR | TRC DESIGNATOR | COMPRISED OF | MINIMUM NUMBER OF IDT PERIODS REQUIRED ANNUALLY | MINIMUM NUMBER OF DAYS OF AT REQUIRED ANNUALLY | REMARKS | CURRENTLY USED BY | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | ARNG | USAR | USNR | USMCR | ANG | USAFR | USCGR |
| READY RESERVE | IRR And ING | P READY RESERVE TRAINING | J | PERSONNEL NOT IN THE SELECTED RESERVE - PARTICIPATING IN OFFICER TRAINING PROGRAMS | 0 | AS REQUIRED BY SPECIFIC PROGRAM | CHAPLAIN AND JUDGE ADVOCATE GENERAL (JAG) SCHOOLING, EDUCATION DELAY, ROTC ASSIGNMENT DELAY, ARMY EARLY COMMISSIONING PROGRAM, COAST GUARD DIRECT COMMISSION CANDIDATES, MARINE PLATOON LEADER CLASS, MERCHANT MARINE CADETS (USNR). | | X | X | X | | X | X |
| | | P READY RESERVE TRAINING | K | PERSONNEL NOT IN THE SELECTED RESERVE - PARTICIPATING IN THE AFHPSP | 0 | 45 DAYS | AFHPSP REQUIRES 45 DAYS AD ANNUALLY. 10 U.S.C. 2121(C) (REFERENCE (g)). | | X | X | | | X | |
| | | I ING | I | ING | 0 | 1 | MUST MEET ANNUAL MUSTER WITH ASSIGNED UNIT. MAY NOT TRAIN FOR POINTS OR PAY AND ARE NOT ELIGIBLE FOR PROMOTION. | X | | | | | | |
| STANDBY RESERVE | | Y STANDBY | C | ACTIVE STATUS LIST | 0 | 0 | KEY EMPLOYEES, ONLY. PER DoD DIRECTIVE 1200.7 (REFERENCE (q)). ACTIVE STANDBY MEMBERS MAY VOLUNTARILY TRAIN FOR POINTS WITHOUT PAY AND ARE ELIGIBLE FOR PROMOTION. | | X | X | X | | X | X |
| | | | D | ACTIVE STATUS LIST PROGRAMS | 0 | 0 | OTHER ACTIVE STATUS MEMBERS. | | X | X | X | | X | X |
| | | | L | INACTIVE STATUS LIST | 0 | 0 | MEMBERS TRANSFERRED TO IN-ACTIVE STATUS LIST INSTEAD OF SEPARATION UNDER 10 U.S.C. 1209, CHAPTER 61 (REFERENCE (g)). INACTIVE STAND-BY MEMBERS MAY NOT TRAIN FOR POINTS WITH OR WITHOUT PAY AND ARE NOT ELIGIBLE FOR PROMOTION. | | X | X | X | | X | X |
| | | | N | INACTIVE STATUS LIST | 0 | 0 | OTHER INACTIVE STATUS MEMBERS. | | X | X | X | | X | |

ENCLOSURE 6

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 10
Page 36 of 40

*DoDI 1215.06, February 7, 2007*

TABLE E6.T1. AUTHORIZED RESERVE, TRAINING, AND RETIREMENT CATEGORIES, Cont.

| RCC | RC SUB-CATEGORY | RCC DESIGNATOR | TRC DESIGNATOR | COMPRISED OF | MINIMUM NUMBER OF IDT PERIODS REQUIRED ANNUALLY | MINIMUM NUMBER OF DAYS OF AT REQUIRED ANNUALLY | REMARKS | CURRENTLY USED BY | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | ARNG | USAR | USNR | USMCR | ANG | USAFR | USCGR |
| RETIRED RESERVE | | V  RETIRED | 1 | DRAWING NON-REGULAR RETIRED PAY UNDER 10 U.S.C. 12731 (REFERENCE (g)) | N/A | N/A | RESERVE MEMBERS WHO HAVE COMPLETED 20 QUALIFYING YEARS CREDITABLE FOR NON-REGULAR RETIRED PAY, ARE 60 YEARS, OR MORE, OF AGE, AND ARE DRAWING NON-REGULAR RETIRED PAY | X | X | X | | | X | X |
| | | | 2 | NOT DRAWING NON-REGULAR RETIRED PAY, BUT ELIGIBLE AT AGE 60, UNDER SECTION 10 U.S.C. 12731 (REFERENCE (g)) | N/A | N/A | RESERVE MEMBERS WHO HAVE COMPLETED 20 QUALIFYING YEARS CREDITABLE FOR NON-REGULAR RETIRED PAY, BUT ARE NOT YET 60 YEARS OF AGE, OR ARE AGE 60 AND HAVE NOT APPLIED FOR NON-REGULAR RETIRED PAY | X | X | X | | | X | X |
| | | | 3 | RESERVE MEMBERS RETIRED FOR PHYSICAL DISABILITY | N/A | N/A | RESERVE MEMBERS RETIRED FOR PHYSICAL DISABILITY UNDER 10 U.S.C. 1201, 1202, 1204, OR 1205 (REFERENCE (g)). MEMBERS WHO HAVE 20 YEARS OF SERVICE CREDITABLE FOR NON-REGULAR RETIRED PAY OR ARE 30-PERCENT OR MORE DISABLED. | X | X | X | | | X | X |
| | | | 4 | RESERVE MEMBERS WHO HAVE COMPLETED 20, OR MORE, YEARS OF AD | N/A | N/A | RESERVE MEMBERS WHO HAVE COMPLETED 20, OR MORE, YEARS OF AD SERVICE AND RETIRED UNDER 10 U.S.C. 3911, 3914, 6323, 6330, 8911, OR 8914 (REFERENCE (g)). DOES NOT INCLUDE REGULAR ARMY AND AIR FORCE ENLISTED PERSONNEL WITH BETWEEN 20 AND 30 YEARS OF MILITARY SERVICE; AND REGULAR AND RESERVE NAVY AND MARINE CORPS ENLISTED PERSONNEL IN HE FLEET RESERVE (NAVY) AND FLEET MARINE CORPS RESERVE WITH BETWEEN 20 AND 30 YEARS OF SERVICE. | X | X | X | | | X | X |
| | | | 5 | DRAWING NON-REGULAR RETIRED PAY UNDER OTHER THAN 10 U.S.C. 12731 (REFERENCE (g)), OR OTHER THAN REASONS OF PHYSICAL DISABILITY | N/A | N/A | RESERVE PERSONNEL RETIREMENT PAY BASED ON RETIREMENT FOR REASONS OTHER THAN AGE, SERVICE REQUIREMENTS OR PHYSICAL DISABILITY, AS AUTHORIZED BY THE ASD(RA). CERTAIN VSI RECIPIENTS INELIGIBLE FOR RETENTION IN ACTIVE OR INACTIVE RESERVE STATUS. | X | X | X | | | X | X |

37

ENCLOSURE 6

Defs.' Opposition to Pls.' Renewed Motion for Preliminary Injunction
Ex. 10
Page 37 of 40

E7. ENCLOSURE 7

MEMBERS PARTICIPATING IN APPROVED PROGRAMS

OUTSIDE THE DEPARTMENT OF DEFENSE

E7.1. SELECTIVE SERVICE SYSTEM (SSS)

E7.1.1.  The SSS administers the Military Selective Service Act (MSSA) (Reference (o)). The MSSA authorizes the Director of Selective Service, by delegation from the President, "...to order to active duty with their consent and to assign to the Selective Service System such officers of the selective-service section of the state headquarters and headquarters detachments and such other officers of the federally recognized National Guard of the United States or other armed forces personnel (including personnel of the reserve components thereof), as may be necessary for the administration of the national and of the several state headquarters of the Selective Service System."

E7.1.2.  The Department of Defense and the Office of the Director of Selective Service shall agree on the number of RC members assigned as IMAs to the SSS.  The SSS shall reimburse the Department of Defense for total personnel costs for IDT and AT for those members.

E7.1.3.  Additionally, agreements between the Department of Defense and the Office of the Director of Selective Service may provide for the use of IRR members of the RCs in an IDT or AD status; with or without pay.  The SSS shall reimburse the Department of Defense for all associated costs, including IDT and AT pay, for those members.

E7.1.4.  Request for assignment to the SSS in a full-time AD status must be approved pursuant to DoD Directive 1000.17 (Reference (v)).  Costs for those members shall be reimbursed to the Department of Defense.  Members shall not be assigned to a RCC or TRC, shall not be counted against RC strengths, and shall not be included in the RCCPDS files.

E7.2. NATIONAL SECURITY EMERGENCY PREPAREDNESS PROGRAMS

E7.2.1.  The National Emergency Preparedness Program (all hazards) is an integral part of U.S. national security.  Support of emergency preparedness may be provided through RC members participating with Federal, State, and local civil agencies only when clearly furthering specifically identifiable DoD interests.  Participation shall be in an IDT, ADT, or FTNGD status.  The primary basis for RC participation is to meet DoD program requirements and therefore costs of the program are paid by the DoD Component, except when the RC members are supporting a presidentially declared emergency or disaster.  In those cases, costs are usually on a reimbursable basis from the Federal Emergency Management Agency (FEMA).  Subject to priorities and guidance in DoD 3025.1 (Reference (w)), military support of those activities is a proper mission for DoD Components.  Military planning and liaison may be provided by RC

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 10
Page 38 of 40

members at selected civil government and military headquarters, and includes such tasks and responsibilities as military support to civil authorities for CONUS defense, coordinating DoD response to domestic emergencies, and physical security of key assets.

E7.2.2.  Assigning Emergency Preparedness Liaison Officers (EPLOs) in a full-time AD (other than for training) or FTNGD status in support of Emergency Preparedness Programs outside the Department of Defense must be approved pursuant to Reference (v).  The following programs are approved for such participation:

E7.2.2.1.  <u>Federal EPLOs.</u>  Reserve officers performing planning and liaison responsibilities between DoD Components and Federal Agencies, including interface with the civil sector, as directed by their DoD Component through the Military Service planning agent. Federal EPLOs function primarily in support of DoD missions.  All costs are paid by the DoD Component.  Each Military Department is authorized to assign one or more Federal EPLOs (below flag or general officer rank) at FEMA national headquarters, at the DoD Director of Military Support, and at military headquarters that serve as the DoD, Military Service, or Regional Planning Agents for domestic emergency support.  Federal EPLOs:

E7.2.2.1.1.  Provide DoD and Service liaison with Federal Agencies and organizations, and between the Military Services.

E7.2.2.1.2.  Facilitate planning, coordination, and training for military support to civil authorities and national security emergency preparedness.

E7.2.2.1.3.  Advise Federal Agencies and organizations on DoD and Service capabilities and resources.

E7.2.2.1.4.  Advocate mutual support required by the Department of Defense.

E7.2.2.1.5.  On order, augment DoD response to domestic emergency operations.

E7.2.2.2.  <u>Regional EPLOs.</u>  Reserve officers performing planning and liaison responsibilities between DoD Components and Federal regional headquarters, including interface with the civil sector, as directed by their DoD Component through the Military Service planning agent.  Regional EPLOs function primarily in support of DoD missions.  All costs are paid by the DoD Component.  Each Military Department is authorized to assign one or more EPLOs (below flag or general officer rank) at each FEMA region and at military headquarters and locations with key functions as Department of Defense, Military Service, and Regional Planning Agents for domestic emergency support.  Regional EPLOs perform the same functions described in paragraphs E7.2.2.1.1. through E7.2.2.1.5. only at the regional level.

E7.2.2.3.  <u>State EPLOs.</u>  Reserve officers performing planning and liaison responsibilities between their DoD Components and State or U.S. Territory emergency service headquarters including interface with the civil sector, as directed by their DoD Component through the Military Service planning agent.  State EPLOs function primarily in support of DoD missions.

All costs are paid by the DoD Component.  Each Military Department is authorized to assign one or more EPLOs (below flag or general officer rank) at each State or U.S. territorial headquarters and shall assign such officers to functions supervised by the State Area Command.  State EPLOs provide Service representation and liaison to the military and civil authorities within the State, commonwealth, U.S. possession, and other eligible jurisdiction.  State EPLOs perform the same functions described in paragraphs E7.2.2.1.1. through E7.2.2.1.5. only at the State level.

   E7.2.3.  All EPLOs should attend the DoD Emergency Preparedness Course presented at the FEMA Mount Weather Emergency Assistance Center as soon as possible after assignment.  This will help to ensure that DoD representatives performing these vital functions are properly trained in this complex environment.


E7.3.  <u>VOLUNTARY PARTICIPATION IN PROGRAMS OUTSIDE THE DEPARTMENT OF DEFENSE</u>

Members of the IRR may participate voluntarily in programs outside the Department of Defense in an AD or IDT status, with pay or without pay.  Any pay provided shall be reimbursed to the Department of Defense by the supported Agency.  Members of the Standby Reserve on the Active Status List may voluntarily participate, without pay, in approved civil defense activities and receive retirement points pursuant to Reference (k).

E7.4.  <u>IRR MEMBERS PARTICIPATING IN DEFENSE SUPPORT TO CIVIL AUTHORITIES</u>

IRR members participating in Defense Support to Civil Authorities (DSCA) training activities may request ADT to attend DSCA courses.  If so ordered, those Reservists shall be entitled to pay and allowances including travel allowances for such training.



# Department of Defense
# INSTRUCTION

NUMBER 1215.19

December 12, 2000

Incorporating Change 1, March 8, 2001

USD (P&R)

SUBJECT:  Uniform Reserve, Training and Retirement Category Administration

References:  (a)  DoD Instruction 1215.19, "Uniform Reserve, Training and Retirement
                 Category Administration," March 14, 1997 (hereby canceled)
            (b)  DoD Directive 1215.6, "Uniform Reserve, Training and Retirement
                 Categories," March 14, 1997
            (c)  DoD Directive 1205.17, "Official National Guard and Reserve
                 Component Personnel Data," June 20, 1985
            (d)  DoD Instruction 7730.54, "Reserve Components Common Personnel
                 Data System (RCCPDS)," March 15, 1999
            (e)  through (t), see enclosure 1

## 1.  PURPOSE

This Instruction reissues reference (a) to implement policy, as provided in reference
(b), assigns responsibilities, and prescribes procedures that pertain to:

   1.1.  The designation and use of uniform Reserve component (RC) categories
(RCCs) and training and retired categories (TRCs) for the Ready Reserve, Standby
Reserve, and Retired Reserve.

   1.2.  Categorizing, maintaining, and reporting personnel data in accordance with
references (c) and (d).

   1.3.  The use of RC duty for both training and mission support purposes.

   1.4.  The minimum training criteria for each category of the RCs.

1

*DODI 1215.19, Dec. 12, 2000*

1.5.  Capitalizing on RC capabilities to accomplish operational requirements while maintaining mission readiness for overseas and domestic operations.

1.6.  Participation in Selective Service System (SSS) activities, civil defense activities, and Continental United States (CONUS) Defense programs by members of the Ready and Standby Reserve.

## 2.  APPLICABILITY AND SCOPE

This Instruction applies to:

2.1.  The Office of the Secretary of Defense, the Military Departments (including the Coast Guard when it is not operating as a Military Service in the Department of the Navy by agreement with the Department of Transportation (DoT)), the Chairman of the Joint Chiefs of Staff, the Combatant Commanders, the Defense Agencies, the DoD Field Agencies, and all other organizational entities within the Department of Defense (hereafter referred to collectively as "the DoD Components").  The term "Military Departments," as used herein, refers to the Departments of the Army, the Navy, and the Air Force.  The term "Secretary concerned" refers to the Secretaries of the Military Departments and the Secretary of Transportation for the Coast Guard when it is not operating as a Service in the Navy.  The term "Military Services" refers to the Army, the Navy, the Air Force, the Marine Corps, and the Coast Guard.

2.2.  The requirements for categorizing and recording of RC personnel, and the training requirements for those categories.

2.3.  All members of the total RCs to include the Ready Reserve, the Standby Reserve, and the Retired Reserve.

2.4.  Use of all inactive duty (ID), inactive duty training (IDT), active duty (AD), and full-time National Guard duty (FTNGD) periods performed by all RC members not counted in Active component (AC) end strengths, in accordance with 10 U.S.C. 115(d) (reference (e)).

2.5.  The designation and official recording of all Reserve force personnel data in the Reserve Component Common Personnel Data System (RCCPDS) in accordance with DoD Directive 1205.17 (reference (c)) and DoD Instruction 7730.54 (reference (d)).

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 11
Page 2 of 40

*DODI 1215.19, Dec. 12, 2000*

2.6.  The participation of RC members in approved programs outside the Department of Defense.

## 3.  DEFINITIONS

Terms used, but not defined in the text of this Instruction, and the Uniform Reserve, training, and retirement categories used in this Instruction are defined in enclosure 2.

## 4.  POLICY

It is DoD policy that:

4.1.  All RC members are to be placed in the appropriate, authorized RCCs and TRCs.

4.2.  All RC members are to be trained in accordance with their assignments and meet minimum, satisfactory training participation requirements.

4.3.  RC Utilization be maximized.   All training duty planned and performed by RC members should capitalize on RC capabilities to accomplish operational requirements while maintaining their mission readiness for overseas and domestic operations.

4.4.  Assignment of RC members outside the United States is restricted to only those RC members qualified for duty outside the United States, and who are in the authorized status.

## 5.  RESPONSIBILITIES

Under the provisions of DoD Directive 1215.6 (reference (b)):

5.1.  The Assistant Secretary of Defense for Reserve Affairs, under the Under Secretary of Defense for Personnel and Readiness, shall:

5.1.1.  Establish DoD policy guidance for RC training and retirement categories.

5.1.2.  Establish policy guidance for the minimum training criteria and the IDT and AD requirements associated with each category.

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 11
Page 3 of 40

*DODI 1215.19, Dec. 12, 2000*

5.2.  The <u>Secretaries of the Military Departments</u> and the <u>Commandant of the Coast Guard</u> shall:

5.2.1.  Designate all RC members in a RCC and TRC in accordance with criteria established in enclosures 2 and 4.

5.2.2.  Ensure that plans and policies for the management of RCCs are consistent with reference (b) and this Instruction.

5.2.3.  Ensure that RC members perform duty in accordance with the minimum criteria established for each RCC in enclosure 4.

5.2.4.  Include in the budget for the active component both military personnel and operations and maintenance funds to provide AD tours for RC members on AD in support of AC programs.

5.2.5.  Through coordination with supported organizations, ensure that RC members who serve on active duty tours funded by active component resources (i.e., Active Duty for Special Work (ADSW) - AC funded), receive full pay, allowances, and entitlements appropriate for the length of AD tour.

5.2.6.  Establish criteria for combining AD and IDT to achieve desired readiness levels and to meet requirements, as necessary.

5.3.  The <u>Commanders of the Combatant Commands</u> shall:

5.3.1.  Exercise Combatant Command (COCOM) over RC forces when mobilized or ordered to Active Duty Other than for Training (ADOT).  COCOM consists of the authority specified in 10 U.S.C. 164(c) (reference (e)), except that, unless otherwise directed by the Secretary of Defense, assigned RC forces on ADOT may not be deployed until validated by the parent Service for deployment.

5.3.2.  The degree of authority, short of COCOM, that Commanders-in-Chief (CINC) have over assigned RC forces when not on AD, and when on ADT, is defined as Training Readiness Oversight (TRO).  TRO includes specific authority to:

5.3.2.1.  Provide guidance to Service component commanders on operational requirements and priorities to be addressed in Military Department training and readiness programs.

4

*DODI 1215.19, Dec. 12, 2000*

5.3.2.2.  Comment on Service component program recommendations and budget requests.

5.3.2.3.  Coordinate and approve participation by assigned RC forces in joint exercises and other joint training when on ADT or performing IDT.

5.3.2.4.  Obtain and review readiness and inspection reports on assigned RC forces.

5.2.3.5.  Coordinate and review mobilization plans (including post-mobilization training activities and deployability validation procedures) developed for assigned RC forces.

6.  <u>PROCEDURES</u>

6.1.  <u>Placement of RC Members in RCCs and TRCs</u>

6.1.1.  In accordance with 10 U.S.C. 115(d) (reference (e)), each unit and member of the RCs not counted in AD end strengths pursuant to Section 115 (a)(1) of reference (e) shall be placed in one of the RCCs and TRCs identified.  Individuals shall be assigned to RCCs and TRCs based on their RC obligations to meet mission requirements and training requirements.

6.1.2.  Table 1 (see enclosure 4) establishes authorized RCCs and TRCs in the RCs for training and accountability purposes.  Enclosure 2 describes those categories.

6.2.  <u>Guidelines for RC Duty Categories</u>

6.2.1.  Enclosure 5 graphically portrays the primary duty categories for RC members.  The duty categories and guidelines for their use are provided below.

6.2.2.  <u>Inactive Duty Training (IDT)</u>.  Authorized training performed by members of an RC not on AD, and performed in connection with the prescribed activities of the RC of which they are a member.  It consists of regularly scheduled unit training periods, additional IDT periods, and equivalent training.  The primary purpose of IDT is to provide individual and/or unit readiness training.  IDT may support AC missions and requirements; i.e., operational support, thereby adding substance to the Total Force.

Defs.' Opposition to Pls.' Renewed Motion for Preliminary Injunction
Ex. 11
Page 5 of 40

*DODI 1215.19, Dec. 12, 2000*

6.2.2.1.  Paid IDT periods shall not be under 4 hours.  No more than two IDT periods may be performed in any calendar day.  In accordance with 37 U.S.C. 206 (reference (f)) and within the guidelines prescribed below, Service Secretaries may prescribe additional standards for IDT.

6.2.2.2.  IDT periods for points only (without pay) shall not be less than 2 hours with a maximum of two points authorized in any 1 calendar day.

6.2.2.3.  One retirement point in any 1 calendar day may be granted for attendance at a professional or trade convention, with a minimum of 4 hours, in accordance with DoD Instruction 1215.7 (reference (g)).

6.2.2.4.  Where practical, multiple IDT periods over consecutive days shall be used to maximize training effectiveness and/or enhance mission support.

6.2.2.5.  IDT shall not be performed in designated Imminent Danger Areas.

6.2.2.6.  <u>Additional IDT Periods</u>.  A sub-category of IDT.

6.2.2.6.1.  Additional IDT periods improve readiness by providing for individuals and units the required and necessary training to attain and maintain designated readiness levels.  The Secretary concerned shall establish guidance for and approve use of additional IDT periods in accordance with limits in subparagraphs 6.2.2.6.3.1. through 6.2.2.6.3.3., below.

6.2.2.6.2.  Additional IDT periods are for the use of drilling Reservists who are not military technicians.  The RC shall identify additional IDT periods separately from normal unit or individual training periods in budget documents and in internal records so that training period costs and training support costs for each type of additional training clearly may be identified, justified, and audited.  If additional IDT periods are approved for use by military technicians, they shall be identified separately in budget documents to monitor compliance with this Instruction.

6.2.2.6.3.  Three categories of additional IDT periods are:

6.2.2.6.3.1.  Additional training periods (ATPs) for units, components of units, and individuals are for accomplishing additional required training, as defined by post-mobilization mission requirements.  The number of those training periods shall not exceed 30 each fiscal year (FY) for any member.

*DODI 1215.19, Dec. 12, 2000*

6.2.2.6.3.2.  Additional flying and flight training periods (AFTPs) are authorized for primary aircrew members for conducting aircrew training and combat crew qualification training to attain and maintain aircrew flying proficiency and sustain required readiness.  These AFTPs shall not be in addition to the ATPs in subparagraph 6.2.2.6.3.1., above.  The number of these training periods shall not exceed 48 each FY for any aircrew member, unless specifically authorized by the Secretary concerned.

6.2.2.6.3.3.  Readiness management periods (RMPs) are used to support the following functions in preparing units for training:  the ongoing day-to-day operation of the unit, accomplishing unit administration, training preparation, support activities, and maintenance functions.  The number of RMPs shall not exceed 30 each FY for any member.  Those training periods shall be used only where sufficient full-time support (FTS) personnel are not available to accomplish those duties.  These RMPs shall not be performed on the same day another training period (IDT, ATP, or AFTP) is being performed and not more than one RMP shall be performed by an individual in 1 calendar day.

6.2.2.6.4.  Notwithstanding the limitations in subparagraphs 6.2.2.6.3.1. and 6.2.2.6.3.3., above, the Secretary concerned may authorize ATPs or RMPs in excess of those specified on an exception basis.  Exceptions shall be strictly limited to specific skills and missions requiring training in excess of that authorized in subparagraphs 6.2.2.6.3.1. and 6.2.2.6.3.3., above.  In no case shall either ATPs or RMPs, or a combination of those additional IDT periods, exceed 54 in each FY for each person.  Those training periods shall not be used for augmenting missions, and must provide bona fide training opportunities required to meet readiness levels.  This authority may not be delegated below the Secretaries of the Military Departments.

6.2.3.  Inactive Duty (ID).  Authorized duty, other than training, performed by members of an RC not on AD.  It consists of Muster Duty and Funeral Honors Duty.

6.2.3.1.  Muster Duty (MD).  A special category of ID.  Meets the continuous screening requirement established by 10 U.S.C. 10149 (reference (e)).  A member of the Ready Reserve may be ordered without his consent to MD one time a year by an authority designated by the Secretary concerned in accordance with Section 12319 of reference (e).

Defs.' Opposition to Pls.' Renewed Motion for Preliminary Injunction
Ex. 11
Page 7 of 40

*DODI 1215.19, Dec. 12, 2000*

6.2.3.1.1.  MD shall be considered equivalent to IDT, except for pay, and shall include a minimum of 2 hours at the muster site.  MD shall not be performed for more than 1 day, including travel, each calendar year.  An allowance for MD shall be paid in accordance with 37 U.S.C. 433 and DoD Instruction 1215.7 (references (f) and (g)) at the rate determined by the DoD Per Diem Committee and included in the DoD 7000.14-R (reference (h)).

6.2.3.1.2.  In cases where a total of more than 1 day is required to meet the MD requirement, or in other specific circumstances approved under regulations issued by the Secretary concerned, ADT may be used instead of MD.

6.2.3.2.  <u>Funeral Honors Duty (FHD)</u>.  The rendering of military funeral honors is the ceremonial paying of respect and the final demonstration of the country's gratitude to those who, in times of war and peace, have faithfully defended our Nation. Funeral Honors Duty includes both the preparation for and the actual performance of funeral honors functions at the funeral of a veteran as defined in Section 1491 of reference (e).

6.2.3.2.1.  Members of the Ready Reserve may perform FHD in a voluntary status in accordance with the provisions of Section 12503 of reference (e) or 32 U.S.C. 115 (reference (i)).  No more than one FHD period shall be performed in a day.  FHD shall include a minimum of 2 hours of duty during a day, including travel, for the performance of duty and/or preparation/training for duty.  Service credit for this duty shall be in accordance with Section 12732(a)(2)(E) of reference (e).  This duty may be performed in either a pay or non-pay status.  If in a pay status, an allowance for FHD shall be paid in accordance with either Section 435 or 206 of reference (f), as authorized by the Secretary concerned.

6.2.3.2.2.  Though other AD categories may be used to provide funeral honors support, the duty category in which funeral honors and the preparation for funeral honors are performed shall be determined by the Secretary concerned, and in no case may the performance of funeral honors or the preparation for such honors be considered a period of drill or training.

6.2.4.  <u>Active Duty</u>.  Full-time duty in the active Military Service of the United States.  It includes full-time training duty, annual training duty, and attendance, while in active Military Service, at a school designated as a Service school by law and the Secretary of the Military Department concerned.  It does not include full-time National Guard duty.  For the RC, AD is comprised of the categories ADT and ADOT.

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 11
Page 8 of 40

*DODI 1215.19, Dec. 12, 2000*

6.2.4.1.  At any time, an authority designated by the Secretary concerned may order a member of the RC under his or her jurisdiction to AD or retain him or her on AD with the consent of the member under the authority of 10 U.S.C. 12301(d), 12301(h) and 12322 (reference (e)).  However, a member of the Army National Guard of the United States (ARNGUS) or Air National Guard of the United States (ANGUS) may not be ordered to AD under that authority without the consent of the Governor or other appropriate authority of the State or territory, the Commonwealth of Puerto Rico, or the District of Columbia.  The categories of AD for RC members serving with RC are depicted at enclosure 5 and described in subparagraphs 6.2.4.2. and 6.2.4.3., below.

6.2.4.2.  <u>Active Duty for Training (ADT)</u>.  A category of AD used to provide structured individual and/or unit training, or educational courses to RC members.  Included in the ADT category are AT, IADT, and OTD.  The primary purpose of ADT is to provide individual and/or unit readiness training.  ADT may support AC missions and requirements; i.e., operational support, thereby adding substance to the Total Force.

6.2.4.2.1.  Initial AD training (IADT), which includes basic military training and technical skill training, is required for all enlisted accessions.  Subparagraph 6.5.4.1.4.1., below, provides specific guidance on IADT.

6.2.4.2.2.  Annual Training (AT) is the minimum period of AD training that Reserve members must perform each year to satisfy the training requirements associated with their RC assignment.  The primary purpose of AT is to provide individual and/or unit readiness training.  AT may support AC missions and requirements; i.e., operational support, thereby adding substance to the Total Force.  AT may be required for all members of the Ready Reserve.  By DoD policy, members of the Selected Reserve shall perform AT.  For all members of Selected Reserve units, except for those in the National Guard, that training shall be for not less than 14 days (exclusive of travel time) each year in accordance with Section 10147 of reference (e), and not less than 12 days (exclusive of travel time) for the Coast Guard Reserve.  National Guard units are required to perform full-time military training (in AD/full-time National Guard duty status) for at least 15 days each year including travel time in accordance with 32 U.S.C. 502 (reference (i)).  Individual Mobilization Augmentees (IMAs) are members of the Selected Reserve, not assigned to a Reserve unit organized to serve as a unit.  IMAs are required to perform a minimum of 12 days of AT each year in accordance with DoD Directive 1235.11 (reference (j)).  Accomplishing AC operational requirements or mission support, as a consequence of conducting unit or individual training, may be a key element in planning and conducting AT.

Defs.' Opposition to Pls.' Renewed Motion for Preliminary Injunction Ex. 11 Page 9 of 40

*DODI 1215.19, Dec. 12, 2000*

6.2.4.2.3. Other Training Duty (OTD) is authorized training, other than IADT or AT, that provides all other structured training, to include on the job training, for individuals or units to enhance proficiency. OTD is authorized to provide for full-time attendance at organized and planned specialized skill training, refresher and proficiency training, and professional development education programs. It shall be used to support RC members in obtaining the necessary skills and disciplines to achieve required readiness standards. The primary purpose of OTD is to provide individual and/or unit readiness training. OTD may support AC missions and requirements; i.e., operational support, thereby adding substance to the Total Force. Authorization for ADT shall be managed in accordance with directives established by the Secretaries concerned. Non-military technician personnel shall receive priority consideration for such training. OTD may support active component (AC) missions and requirements, when it also provides individual and/or unit readiness training.

6.2.4.3. <u>Active Duty Other than for Training (ADOT)</u>. A category of AD used to provide RC support to either AC or RC missions. It includes the categories of ADSW, AGR Duty, and involuntary AD in accordance with 10 U.S.C. 12301, 12302, and 12304 (reference (e)), and 14 U.S.C. 712 (reference (k)). Training may occur in the conduct of ADOT.

6.2.4.3.1. AD for special work (ADSW) is an authorized tour of AD for RC personnel from applicable military or Reserve personnel appropriations (ADSW-AC funded or ADSW-RC funded) to support AC or RC programs, respectively. The purpose of ADSW is to provide the necessary skilled manpower assets to support existing or emerging requirements. Training may occur in the conduct of ADSW. Authorization of ADSW shall be managed in accordance with Directives established by the Secretary concerned. To assist the Military Services in managing these tours the following guidelines are provided.

6.2.4.3.1.1. Consistent with the purpose of ADSW, which is to provide temporary support, these tours are normally limited to 139 days, or fewer, in one FY by DoD policy. However, the Secretary concerned may grant exceptions to this policy on an individual basis for specific mission requirements.

6.2.4.3.1.2. ADSW tours exceeding 180 days are accountable against AD strengths (active component, or AGR end strengths, consistent with pay appropriations) in accordance with Section 115 of reference (e) unless specifically provided for in public law. Short breaks in tours; i.e., 30 days or fewer, to circumvent this accountability requirement, are not authorized.

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 11
Page 10 of 40

*DODI 1215.19, Dec. 12, 2000*

6.2.4.3.1.3.  Non-military technician personnel shall receive priority consideration for those tours.  Training may occur in the conduct of ADSW.

6.2.4.3.2.  AGR duty is AD performed by a member of an RC of the Army, the Navy, the Air Force, or the Marine Corps, the Coast Guard, or FTNGD performed by a member of the National Guard under an order to AD or FTNGD for a period of 180 consecutive days or more for organizing, administering, recruiting, instructing, or training the Reserve components, or to perform other duties as prescribed in Section 12310 of reference (e).  Personnel performing such duty are included in the FTS numbers for each RC under the collective title of Active Guard and Reserve (AGR).  This includes Naval Reserve Training and Administration of Reserves (TARs) and canvasser recruiters, Marine Corps Reserve Active Reserves (ARs), and Coast Guard Reserve, Reserve Program Administrators (RPAs).

6.2.4.3.3.  Involuntary AD is used in support of military operations when the President or the Congress determines that RC forces are required to augment the AC.  It is provided for within the provisions of 10 U.S.C. 12301 and 12302 (reference (e)) for full and partial mobilization, respectively, Section 12304 of reference (e) for Presidential Reserve Call-Up authority, and 14 U.S.C. 712 (reference (k)) for Secretary of Transportation Coast Guard Reserve call-ups for domestic emergencies.  For other purposes, the Secretaries concerned may order members involuntarily to AD in accordance with provisions of Sections 12301(b) or 12303 of reference (e) and Section 712 of reference (k).  Involuntary duty also includes RC members in a captive status, in accordance with Section 12301(g) of reference (e) and members ordered to AD for disciplinary purposes in accordance with Section 802(d) of reference (e).

6.3.  <u>Maximize RC Utilization</u>

6.3.1.  All training duty planned and performed by RC members should capitalize on RC capabilities to accomplish operational requirements while maintaining their mission readiness for overseas and domestic operations.  RC members may be employed to accomplish operational requirements and mission support as part of conducting training duty.  Enclosure 5 depicts the structure and relationships of RC duty categories for ID, AD, and FTNGD.

6.3.2.  Training programs shall provide for the minimum training time or number of training periods required for attaining the prescribed unit readiness status and maintaining individual proficiency.  Mission support may be a key element in developing training programs, but training shall be the paramount consideration.

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 11
Page 11 of 40

*DODI 1215.19, Dec. 12, 2000*

6.3.3.  Combinations of AD, ID, and FTNGD may be used to achieve desired readiness levels and mission requirements.  However, the specific criteria established for each type of AD, ID, and FTNGD must be considered when combining various types of duty.

6.4.  <u>Assignment Restrictions Outside the United States</u>

6.4.1.  A member of the RCs shall not be assigned to AD on land outside the United States, its territories and possessions, until the member has completed the basic training requirements of the member's Armed Force in accordance with Section 671(a) of reference (e).

6.4.2.  FTNGD shall not be performed on land outside the United States, its territories or possessions, because a member of the RCs must be in a status provided for in reference (e).

6.5.  <u>Training Participation Requirements</u>

6.5.1.  The Secretaries concerned shall establish standards for satisfactory participation at required training periods, which shall include the number and percentages of training periods for meeting the minimum standards, in accordance with DoD Directive 1215.13 (reference (l)).  Individuals attending IDT periods are required to meet those minimum training standards.  Those standards shall contain procedures for accounting for absences and excused drills, as necessary.  Individuals may voluntarily attend extra IDT periods for points.

6.5.2.  There is no statutory maximum annual limit on required training for members of the National Guard.

6.5.3.  To ensure that trained and qualified RC units and individuals are available for AD throughout the entire spectrum of requirements, including war or national emergency, contingency operations, military operations other than war, contributory support, and at such other times as the national security may require, and that funds appropriated annually for RC training and operations are adequate for meeting these requirements, the Secretary concerned shall establish necessary criteria and procedures to do the following:

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 11
Page 12 of 40

*DODI 1215.19, Dec. 12, 2000*

6.5.3.1.  Approve any additional IDT as necessary and consistent with law. Authorizing and utilizing additional training is subject to the categories, limitations, and controls in subparagraph 6.2.2.6., above.

6.5.3.2.  Ensure that all RC members receive training in accordance with assignments and required readiness levels.   Minimum training requirements are provided for in 10 U.S.C. 10147 (reference (e)) and further prescribed in subparagraphs 6.2.2., 6.2.4., and 6.5.4.

6.5.3.3.  Provide for training for the Individual Ready Reserve (IRR), Standby Reserve, and Retired Reserve in a voluntarily status in accordance with DoD procedures described below.

6.5.4.  <u>Training Requirements by Personnel Category</u>

6.5.4.1.  <u>Selected Reserve</u>

6.5.4.1.1.  <u>IDT</u>.  Except as specifically provided in subparagraph 6.5.4.2., below, members of the Ready Reserve shall participate in 48 scheduled drills or training periods each year.  By DoD policy, that requirement applies to all members of Selected Reserve units; however, the Secretary concerned may, except in the case of the ARNGUS or the ANGUS, reallocate the number of scheduled drills within a Reserve component where warranted to achieve readiness requirements.   The Secretary concerned may reduce the number of scheduled drills of selected lower priority units and increase the scheduled drills of higher priority units by not more than 10 percent, rounded to the nearest whole number.   The aggregate number of scheduled drills within a component shall not be reduced by this reallocation (Section 10147 of reference (e) and 32 U.S.C. 502 (reference (i))).   IDT requirements for individual Selected Reserve members not assigned to a unit organized to serve as a unit, or Individual Mobilization Augmentees (IMAs), shall be determined by the organization to which assigned and resourced by the appropriate Service component in accordance with DoD Directive 1235.11 (reference (j)).

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 11
Page 13 of 40

*DODI 1215.19, Dec. 12, 2000*

6.5.4.1.2.  <u>AT</u>.  Except as specifically provided in subparagraph 6.5.4.2., below, AT is required for all members of the Ready Reserve.  By DoD policy, the requirement for ADT for purposes of AT is limited to members of the Selected Reserve.  For members of the Reserves, ADT for purposes of AT shall be for not less than 14 days, 12 days for the Coast Guard Reserve, (exclusive of travel time) each year, except as provided in subparagraph 6.5.4.1.2.1., below.  Units of the National Guard are required to perform full-time military training for at least 15 days each year, including travel time in accordance with 32 U.S.C. 502 (reference (i)).

6.5.4.1.2.1.  AT for IMAs or other Selected Reserve members not assigned to a unit organized to serve as a unit, and in training categories ordered to AD for AT at headquarters, support organizations, or to activities not operating on Saturday, Sunday, or Federal holidays, normally is limited by DoD policy to 12 days excluding travel time (i.e., from Monday of the first week through Friday of the second week).  Such training may begin on any day of the week to maximize training opportunities, or to support a training event or activity.

6.5.4.1.2.2.  When required, members may be ordered to AT for longer periods than those minimum periods established in subparagraphs 6.5.4.1.2. and 6.5.4.1.2.1., above, up to a maximum of 30 days each FY, for activities that enhance readiness or provide support to operational missions that results from the required training.  Training may begin on any day of the week to maximize training opportunities, or support a training event or activity.

6.5.4.1.2.3.  Annual training normally is performed during one consecutive period.  Split tours may be authorized for selected units or individuals, if required to meet training missions or enhance mission support associated with required training.  Any additional costs must be justified fully.  Authorization for variations in AT lengths shall be managed in accordance with Directives established by the Secretary concerned.

6.5.4.1.3.  <u>Periods of AD Performed by Members of the Selected Reserve</u>.  AD performed under 10 U.S.C. 12301(d), 12302, 12304, and 12406 (reference (e)), may not be substituted for training required by Section 10147 of reference (e) and by subparagraph 6.5.4.1.2., above, unless in the judgment of the Secretary concerned:

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 11
Page 14 of 40

*DODI 1215.19, Dec. 12, 2000*

6.5.4.1.3.1.  AD performed under Sections 12301(d), 12302, 12304, or 12406 of reference (e) is equivalent to the training that might have been performed under the authority of Section 10147 of reference (e) and subparagraph 6.5.4.1.2., above.

6.5.4.1.3.2.  AD performed under Sections 12301(d), 12302, 12304, or 12406 of reference (e) when combined with training required by Section 10147 of reference (e) and subparagraph 6.5.4.1.2., above, constitutes an undue personal hardship.

6.5.4.1.4.  <u>Initial Active Duty Training</u>

6.5.4.1.4.1.  Initial AD training (IADT) is a sub-category of ADT used to provide basic military training and technical skill training required for all enlisted accessions.  For non-prior service (NPS) persons who are qualified for induction for active duty in an Armed Force (generally male citizens and resident aliens between the ages of 18 1/2 and 26 years of age) and who are not under orders to report for induction under the Military Selective Service Act (50 U.S.C. App 451 <u>et seq</u>., reference (m)), IADT shall be for a period of not less than 12 weeks, to commence, insofar as practical, within 270 days after the date of enlistment in accordance with 10 U.S.C. 12103 (reference (e)).  For all other enlistees and inductees, the period of IADT shall be prescribed by the Secretary concerned to commence, insofar as practical, within 360 days after entry into Service, except that in time of war or national emergency declared by Congress or the President, basic training (or its equivalent) shall be for a period of not less than 12 weeks in accordance with Section 671(b) of (reference (e).  Periods of basic training or equivalent training shorter than 12 weeks may also be established by the Secretary concerned for members who have been credentialed in a medical profession or occupation and are serving in a healthcare occupational specialty in accordance with Section 671(c) of reference (e).  Enlisted members receiving stipends under the Armed Forces Health Professions Scholarship Program (AFHPSP) for Reserve Service are not required to participate in Ready Reserve training until they have completed their educational training in accordance with Sections 671(b), 12103, and 16201 of reference (e).

6.5.4.1.5.  The Secretaries concerned may require members enlisted for service in the Selected Reserve to participate in IDT periods before completing IADT.  Those training periods shall be with pay.  Voluntary participation in IDT before completing IADT may be authorized in either a pay or non-pay status.

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 11
Page 15 of 40

*DODI 1215.19, Dec. 12, 2000*

6.5.4.1.6.  In accordance with Section 10147(b) of reference (e), an individual Reservist may not be required to perform a period of ADT if the first day of that period falls during the last 120 days of the member's required membership in the Ready Reserve if the member has served on AD for one year or longer.

6.5.4.2.  <u>Individual Ready Reserve and Inactive National Guard (IRR/ING)</u>

6.5.4.2.1.  Members of the IRR, not scheduled for mandatory or voluntary training, may be required to serve one day of MD each year to accomplish continuous screening requirements in accordance with Sections 10149, 10204, 10205, 10206, 12319, and 12644 of reference (e).  Exemptions from IRR screening during one FY are authorized for members who served on AD during the FY; who reside outside geographical limitations established by the Secretaries concerned, or the Commandant of the Coast Guard when not operating as a Service in the Navy; who are in the grade of O-4 or higher, and have no remaining required period of membership in the Ready Reserve, or, who were successfully screened in the preceding FY.  Under no circumstances should a member serve an initial period in the IRR of more than 18 months without participating in a screening either during an annual muster day, during a period of training, or through some other means.  The Services are required to maintain records on the current status of each member's physical condition, dependency status, military qualifications, civilian occupational skills, availability for service, present address, and other necessary information to facilitate a call-up to active duty, as prescribed.

6.5.4.2.2.  Members of the IRR, including individuals enlisting directly into the IRR, may participate voluntarily in IDT, for points only, in accordance with the regulations of the Military Services.  Those IRR members participating in approved programs outside the Department of Defense (enclosure 3) may participate in IDT, with pay, if that pay is reimbursable from the supported non-DoD organization to the Department of Defense.

6.5.4.2.3.  Members of the ING shall muster with their assigned unit once a year to maintain their ING status and unit affiliation.  They may not participate in any training activities in either a pay or points only status, and are not eligible for promotion.

6.5.4.3.  <u>Standby Reserve</u>.  The Standby Reserve consists of personnel who maintain their military affiliation without being in the Ready Reserve in accordance with 10 U.S.C. 10141, 10150, 10151, 10152, and 10153 (reference (e)) and DoD Directive 1235.9 (reference (n)).

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 11
Page 16 of 40

DODI 1215.19, Dec. 12, 2000

6.5.4.3.1.  <u>Active Status List</u>.   By DoD policy, members of the Standby Reserve in an active status may participate voluntarily without pay in RC training for retirement points only.   These members may be considered for promotion and, if selected, be promoted.   The following members of the Standby Reserve are in an active status:

6.5.4.3.1.1.  Personnel who have not fulfilled their statutory MSO.

6.5.4.3.1.2.  Personnel temporarily assigned to the Standby Reserve because of hardship, or other cogent reason, who intend to return to the Ready Reserve.

6.5.4.3.1.3.  Personnel retained in an active RC status under Section 12646 of reference (e).

6.5.4.3.1.4.  Members transferred from the Ready Reserve to the Standby Reserve, after being designated as "key personnel" by their employers, may volunteer for assignment to the Standby Reserve Active Status List for the period they remain designated as key personnel.   Individuals desiring to be transferred shall apply directly to the RC concerned.

6.5.4.3.2.  <u>Inactive Status List</u>.   The following members of the Standby Reserve are in an inactive status (they may not participate for points, pay, or promotion credit and may not be considered for promotion, or be promoted):

6.5.4.3.2.1.  Members transferred to the Inactive Status List instead of separating in accordance with Section 1209 of reference (e).

6.5.4.3.2.2.  All other members transferred to the Inactive Status List in accordance with DoD Directive 1235.9 (reference (n)).   Personnel enrolled in a military school course, including correspondence courses, when transferred from the Ready Reserve to the Standby Reserve Inactive Status List may continue voluntary participation in the course until completion.   Those personnel shall not be entitled to pay and allowances, travel and transportation, or earn retirement points for that training.

6.5.4.4.  <u>Retired Reserve</u>.   Consists of all personnel transferred to the Retired Reserve and subject to mobilization in accordance with DoD Directive 1352.1 (reference (o)).   Retired Reservists may voluntarily train, with or without pay.   The Retired Reserve consists of the following categories:

17

6.5.4.4.1.  Reserve members receiving retired pay under Chapter 1223 of reference (e).

6.5.4.4.2.  Reserve members who have transferred to the Retired Reserve after completing the requisite qualifying years creditable for retired pay under 10 U.S.C. Chapter 1223 (reference (e)), but who are not yet 60 years of age, or are age 60 and have not applied for retired pay.

6.5.4.4.3.  Reserve members retired for physical disability under Sections 1201, 1202, 1204, or 1205 of reference (e).  Members who have completed the requisite years of Military Service creditable for non-regular retired pay under Chapter 1223 of reference (e) or are 30-percent or more disabled and otherwise qualified under Section 1201 of (reference (e)).

6.5.4.4.4.  Reserve officers and enlisted members who have retired after completion 20, or more, years of active Military Service.  This does not include Regular enlisted members of the Navy or the Marine Corps, with 20 to 30 years of active Military Service, who are transferred to the Fleet Reserve (Navy) or the Fleet Marine Corps Reserve.

6.5.4.4.5.  Reserve personnel drawing retired pay based on retirement for reasons other than age, service requirements, or physical disability.  This category is restricted to those who are retired under special conditions, as authorized by the Assistant Secretary of Defense for Reserve Affairs under legislation.

6.6.  <u>Voluntary Training</u>.  Members of the RCs, not subject to mandatory training, shall be encouraged to participate to maintain their mobilization readiness.  The opportunity to participate voluntarily without pay in training shall be limited by the manpower and resources authorized by the Secretary concerned.

6.7.  <u>Funds</u>.  Funds for personnel in uniform Reserve, training and retirement categories shall be in accordance with DoD 7000.14-R (reference (p)).  The Secretary concerned should include in the military personnel and operations and maintenance budgets for the AC, funds to provide AD tours for Reserves on active duty, including temporary duty, in support of AC and RC programs.

*DODI 1215.19, Dec. 12, 2000*

7.  <u>EFFECTIVE DATE</u>

This Instruction is effective immediately.


Bernard D. Rostker
Under Secretary of Defense
(Personnel and Readiness)


Enclosures - 5
    E1.  References, continued
    E2.  Definitions and Uniform Reserve, Training and Retirement Categories
    E3.  Members Participating In Approved Programs Outside the Department of
        Defense
    E4.  Table 1, "Authorized Reserve, Training and Retirement Categories"
    E5.  Chart, "Reserve Component Duty Categories"

*DODI 1215.19, Dec. 12, 2000*

E1.  <u>ENCLOSURE 1</u>

<u>REFERENCES</u>, continued

(e)  Title 10, United States Code, "Armed Forces"

(f)  Sections 206, 433, and 435 of title 37, United States Code, "Pay and Allowances of the Uniformed Services"

(g)  DoD Instruction 1215.7, "Service Credit for Reserve Retirement," October 15, 1993

(h)  DoD 7000.14-R, "Department of Defense Financial Management Regulation," Volume 7A, "Military Pay Policy and Procedures for Active Duty and Reserve Pay," April 2000

(i)  Title 32, United States Code, "National Guard"

(j)  DoD Directive 1235.11, "Management of Individual Mobilization Augmentees (IMAs)," May 6, 1996

(k)  Sections 276, 291, and 712 of title 14, United States Code, "Coast Guard"

(l)  DoD Directive 1215.13, "Reserve Component Member Participation Policy," December 14, 1995

(m)  Sections 451 to 500 and the Appendix of title 50, United States Code, "Military Selective Service Act"

(n)  DoD Directive 1235.9, "Management of the Standby Reserve," February 10, 1998

(o)  DoD Directive 1352.1, "Management and Mobilization of Regular and Reserve Retired Military Members," March 2, 1990

(p)  DoD 7000.14-R, "Department of Defense Financial Management Regulation," Volume 2A, "Presentation and Formulation," June 2000

(q)  DoD Directive 1200.7, "Screening the Ready Reserve," November 18, 1999

(r)  Section 3101 of title 5, United States Code, "Government Organization and Employees"

(s)  DoD Directive 1000.17, "Detail of DoD Personnel to Duty Outside the Department of Defense," February 24, 1997

(t)  DoD Directive 3025.1, "Military Support to Civil Authorities," January 15, 1993

*DODI 1215.19, Dec. 12, 2000*

E2.  ENCLOSURE 2

DEFINITIONS
AND
UNIFORM RESERVE, TRAINING AND RETIREMENT CATEGORIES

## E2.1.  DEFINITIONS

E2.1.1.  Active Status.  Status of all Reserves, except those on an inactive status list, assigned to the Inactive National Guard, or in the Retired Reserve.  Reserve members in an active status may train with or without pay, earn retirement points, and may earn credit, and be considered, for promotion.

E2.1.2.  Annual Screening.  One-day ADT or MD each year for IRR members that enables the Armed Forces to maintain the current status of each member's physical condition, dependency status, military qualifications, civilian occupation skills, availability for service, and other information in accordance with 10 U.S.C. 10149 (reference (e)).

E2.1.3.  Contributory Support.  Support to military operations or missions, other than war or contingency operations, provided by members or units of the RCs.

E2.1.4.  Equivalent Training (ET).  A sub-category of IDT.  It is IDT performed instead of regularly scheduled IDT.

E2.1.5.  Full-Time National Guard Duty (FTNGD).  Training or other duty, other than inactive duty, performed by a member of the ARNGUS or the ANGUS in a member's status as a member of the National Guard of a state or territory, the Commonwealth or Puerto Rico, or the District of Columbia under 32 U.S.C. 316, 502, 503, 504, or 505 (reference (i)) for which the member is entitled to pay from the United States, or for which the member has waived pay from the United States.  FTNGD is active service in accordance with Section 101(d)(3) of reference (e).

E2.1.6.  IMA Detachments.  An administrative organization of IMAs designed to assist in the training and management of those IMAs.

E2.1.7.  Inactive Status.  Status of Reserve members on an inactive status list of RC, or assigned to the ING.  Those in an inactive status may not train for retirement points or pay, and may not receive credit for or be considered for promotion, or be promoted.

ENCLOSURE 2

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 11
Page 21 of 40

*DODI 1215.19, Dec. 12, 2000*

E2.1.8.  <u>Key Employee</u>.   Any Reservist identified by his or her employer, private or public, as filling a key position.

E2.1.9.  <u>Key Position</u>.   A civilian position, public or private (designated by the employer in accordance with DoD Directive 1200.7 (reference (q)) that cannot be vacated during war or national emergency.

E2.1.10.  <u>Multiple IDT Periods (MIDTPs)</u>.   Two scheduled IDT periods performed in one calendar day, each at least 4 hours in duration.   No more than two IDT periods may be performed in one day.

E2.1.11.  <u>Non-Deployable Account</u>.   An account where Reservists (officer and enlisted) either in units or as individuals are assigned to a RCC and TRC, when the individual has not completed IADT or its equivalent.   Reservists in a non-deployable account are not considered as trained strength assigned to units or mobilization positions and are not deployable overseas on land with those units or mobilization positions.   See also "training pipeline," subparagraph E2.2.1.1.6., below.

E2.1.12.  <u>Non-Prior Service (NPS) Personnel</u>.   Individuals without any prior Military Service, who have not completed IADT or its equivalent, and enlist directly into a U.S. Armed Force.

E2.1.13.  <u>Qualifying Years of Creditable Service for Non-Regular Retired Pay</u>. The time National Guard or Reserve members must serve to be eligible for non-regular retired pay at age 60 years.   Individuals must have at least 20 years of service, or as otherwise provided for in law, in which they received at least 50 retirement points, and the last 8 years of such service (6 years during designated drawdown period) must have been served in an RC.

E2.1.14.  <u>Reserve Components (RCs)</u>.   RCs of the U.S. Armed Forces are:

E2.1.14.1.  The Army National Guard of the United States (ARNGUS).

E2.1.14.2.  The U.S. Army Reserve (USAR).

E2.1.14.3.  The U.S. Naval Reserve (USNR).

E2.1.14.4.  The U.S. Marine Corps Reserve (USMCR).

E2.1.14.5.  The Air National Guard of the United States (ANGUS).

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 11
Page 22 of 40

*DODI 1215.19, Dec. 12, 2000*

E2.1.14.6.  The U.S. Air Force Reserve (USAFR).

E2.1.14.7.  The U.S. Coast Guard Reserve (USCGR).

E2.1.15.  <u>Secretary Concerned</u>.   The Secretaries of the Army, the Navy and the Air Force, or the Secretary of Transportation, when the Coast Guard is operating as a DoT Agency.

E2.1.16.  <u>Trained Strength in Units</u>.   Personnel (drilling Reserve or National Guard members, AGR, and AC) assigned to Reserve units who, in the case of enlisted members, have completed IADT of 12 weeks, or its equivalent, and are eligible for deployment overseas on land when mobilized under proper authority.   Excludes personnel in non-deployable accounts or a training pipeline.

E2.1.17.  <u>Training and Retired Categories (TRC)</u>.   Categories identifying (by specific TRC designator) an RC member's training or retirement status in an RCC and an RC.

E2.1.18.  <u>Training Period</u>.   An authorized and scheduled regular IDT period.   A training period must be at least 4 hours.   The term was previously used interchangeably with other common terms such as drills, drill period, assemblies, periods of instruction, etc.

E2.1.19.  <u>Training Unit</u>.   A unit established to provide military training to individual Reservists or to RC units.

E2.1.20.  <u>Unit</u>.   For an RC of the Armed Forces, denotes a Selected Reserve unit organized, equipped, and trained to serve on AD as a unit, or that augments, or shall be augmented by, another unit.

E2.1.21.  <u>Voluntary Training</u>.   Training in a pay or non-pay status, especially applicable to RC members of the IRR, Standby Reserve active status list, and retirees. Participation in voluntary training may be achieved by training with Selected Reserve or voluntary training units; performing ADT; completing authorized military correspondence courses; attending designated courses of instruction; performing equivalent duty; participating in special military and professional events designated by the Military Department; or participating in authorized civil defense activities.   Retirees may voluntarily train with organizations to which they are properly pre-assigned by orders for recall to AD in a national emergency or declaration of war.   Such training shall be limited to that training made available within the resources authorized by the Secretary concerned.

ENCLOSURE 2

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 11
Page 23 of 40

*DODI 1215.19, Dec. 12, 2000*

E2.1.22.  <u>Voluntary Training Unit</u>.  A unit established to provide RC training in a non-pay status for volunteers of the IRR and active status Standby Reserve attached under competent orders and participating in such units for retirement points.  Also called "reinforcement training unit" or "mobilization training unit."

## E2.2.  <u>RESERVE COMPONENT CATEGORIES (RCC)</u>

Categories identifying an individual's status in an RC.  There are three RCCs:  The Ready Reserve, the Standby Reserve, and the Retired Reserve.  Each member of the National Guard and Reserve is assigned within one of those categories.  (All National Guard members, including those in the Inactive National Guard (ING), are in the Ready Reserve.)

E2.2.1.  <u>READY RESERVE CATEGORIES</u>.  The Ready Reserve is comprised of military members of the Reserve and National Guard, organized in units or as individuals, or both, and liable for involuntary order to AD in time of war or national emergency under 10 U.S.C. 12301 and 12302 (reference (e)) and 14 U.S.C. 712 (reference (k)).  The Ready Reserve consists of three sub-categories:  the Selected Reserve, the IRR, and the ING.

E2.2.1.1.  <u>Selected Reserve</u>.  The Selected Reserve consists of those units and individuals in the Ready Reserve designated by their respective Services, and approved by the Chairman of the Joint Chiefs of Staff, as so essential to initial wartime missions that they have priority over all other Reserves.  All Selected Reservists are in an active status.  They are trained as prescribed in Section 10147(a)(1) of reference (e) or 32 U.S.C. 502(a) (reference (i)), as appropriate.  In addition to the involuntary call up authorities set out in the previous paragraph, members of the Selected Reserve may also be involuntarily called to AD to augment the active forces for any operational mission under Section 12304 of reference (e).  The Selected Reserve includes the following:

E2.2.1.1.1.  <u>Selected Reserve Units</u>.  Units manned and equipped to serve and/or train either as operational or as augmentation units.  Operational units train and serve as units.  Augmentation units train together, but when mobilized, lose their unit identity and become part of an AC unit or activity.  Selected Reserve units include:

E2.2.1.1.2.  <u>Drilling Unit Reservists</u>.  Trained unit members participating in unit training activities on a part-time basis shall have the RCC and TRC designator of "SA."

ENCLOSURE 2

*DODI 1215.19, Dec. 12, 2000*

E2.2.1.1.3.  Full-Time Members (Special Category).  Trained Selected Reserve members who are performing AD or FTNGD for more than 180 days in a fiscal year, but who are exempted from counting against the AD strengths in accordance with 10 U.S.C. 101(d)(6)(B)(i) and (ii) (reference (e)).  Specifically, this includes U.S. Property and Fiscal Officers and members performing duty for the purpose of interdiction and counter-drug activities.  These personnel shall have the RCC and TRC of "S*V*."

E2.2.1.1.4.  Unit Full-Time Support (FTS) Personnel

E2.2.1.1.4.1.  AGR.  Guard or Reserve members of the Selected Reserve serving on AGR duty assigned or attached to Selected Reserve units (to include full-time National Guard duty), as defined in Section 101 of reference (e), for the purposes of organizing, administering, recruiting, instructing, or training the RCs, or to perform other duties as prescribed in Section 12310 of reference (e).  All such AGR members must be assigned against, or attached to, an authorized mobilization position in the unit they support.  This includes Naval Reserve TARs, Marine Corps Reserve ARs, and Coast Guard Reserve RPAs.  They shall have the RCC and TRC designator of "SG."

E2.2.1.1.4.2.  Military Technician (Dual Status)(MT).  A civilian employee of the Military Department concerned who is required as a condition of employment to maintain military membership in a Reserve component and who is assigned to a position as a technician in the administration and training of such Reserve component, or in the maintenance and repair of supplies or equipment issued to such Reserve component.  The military and civilian position skills of MTs must be compatible.  MTs are not accounted for separately in RCC/TRC categories.  Accordingly, these MTs are accounted for in Reserve end strengths as Drilling Unit Reservists (E2.2.1.1.2. of this enclosure, above), and, as such, are accountable under the TRC designator of "SA."  NOTE: There are certain technicians providing unit FTS who are not required to maintain military membership (i.e., non-dual status technicians) and others who are not required to hold compatible military and civilian positions.

E2.2.1.1.4.3.  Non-Dual Status Technician (NDST).  A civilian employee employed as a technician before November 18, 1997, under any of the authorities specified in Section 10217(b) of reference (e) and is not a member of the Selected Reserve or after that date has ceased to be a member of the Selected Reserve or is employed under 32 U.S.C. 709 (reference (i)) in a position designated under subsection (c) of that section and when hired was not required to maintain membership in the Selected Reserve.  NDST shall encumber only those technician positions identified by the Secretary concerned as NDST positions.

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 11
Page 25 of 40

*DODI 1215.19, Dec. 12, 2000*

E2.2.1.1.4.4. <u>AC</u>.  AC personnel are not accounted for in RCC/TRC categories.  Members of the active forces of the Military Services, paid from AC military personnel appropriations, assigned or attached to National Guard or Reserve units to provide advice, liaison, management, administration, training, and/or maintenance support in the category of FTS in accordance with 10 U.S.C. 12501 (reference (e)).  These members are not part of the Selected Reserve, but may deploy with their assigned unit, should it mobilize.  AC members performing FTS are counted as part of trained strength in units, but not in the Selected Reserve strengths.

E2.2.1.1.4.5. <u>Civil Service Employees (CIV)</u>.  CIVs are not accounted for in RCC/TRC categories.  Such personnel are hired under 5 U.S.C. 3101 (reference (r)) and 32 U.S.C. 709 (reference (i)) to provide administrative support to RC units.  They are in the category of FTS to the RCs, but are not part of the Selected Reserve.  This category is exclusive of dual-status MTs and NDSTs.

E2.2.1.1.5. <u>Individual Mobilization Augmentees (IMAs)</u>.  Individual members of the Selected Reserve assigned to an RC billet in an AC or non-DoD organization.  They are trained individuals pre-assigned to an AC or a Selected Service System (SSS) billet that must be filled to support mobilization (pre and/or post mobilization) requirements, contingency operations, operations other than war, or other specialized or technical requirements.  IMAs participate in training activities on a part-time basis with an AC unit or SSS preparing for active service, as required.  The amount of training required is determined by DoD policy and may vary from 0 to 48 IDT periods per year.  All IMAs must perform a minimum of 12 days of AT each year.  They have the RCC and TRC designator of "TB."

E2.2.1.1.6. <u>Training Pipeline</u>.  An RCC designation "U" that identifies Selected Reserve enlisted members who have not yet completed IADT of 12 weeks, or its equivalent, and officers who are in training for professional categories or in undergraduate flying training.  In accordance with Section 671 of reference (e), all Ready Reservists shall receive training commensurate with their intended wartime assignments, and must complete the basic training requirements of the member's Service before assignment on land outside the United States, its territories or possessions.  The training pipeline is synonymous with the term "non-deployable account."  Personnel in the training pipeline may be mobilized, but may not always be available for deployment with their units.  It is DoD policy that, if otherwise eligible for mobilization and deployment, they shall be considered as mobilization assets.  Training pipeline personnel are accounted for separately in the following training categories:

Defs.' Opposition to Pls.' Renewed Motion for Preliminary Injunction Ex. 11 Page 26 of 40

*DODI 1215.19, Dec. 12, 2000*

E2.2.1.1.6.1.  Members Currently on IADT.  Includes the second part of split IADT for enlisted members, which has the RCC and TRC designator of "UF."

E2.2.1.1.6.2.  Enlisted Members Awaiting Second Part of Split IADT. Those members shall have the RCC and TRC designator of "UQ."

E2.2.1.1.6.3.  Members Awaiting IADT Authorized to Perform IDT. Those members in the Selected Reserve serving with pay.  Service performed by members while in that status is creditable toward computation of basic pay.  Members in this category shall have the RCC TRC designator of "UP."  This category also includes National Guard members awaiting IADT and not authorized to perform IDT. See subparagraph 6.5.4.1.4.1. of this Instruction for specific criteria regarding this category.

E2.2.1.1.6.4.  Other Selected Reserve Untrained Personnel in Training Programs.  Includes chaplain candidates, health profession students, and early commissioning program participants with the RCC and TRC designator of "UX."

E2.2.1.1.6.5.  AGR Enlisted Members Currently on, or Awaiting, IADT.  Includes NPS AGR personnel (Naval Reserve TARs and ADSW) and has the RCC and TRC designator of "US."

E2.2.1.1.6.6.  Individuals in a Simultaneous Membership Program. Senior Reserve Officers' Training Corps (ROTC) Cadets, Selected Reserve enlisted members in officer candidate programs, and Marine Corps Platoon Leader Class students who are also permitted to be members of a Selected Reserve unit.  These members have the RCC and TRC designator of "UT."

E2.2.1.1.7.  AGR not in Selected Reserve Units.  Guard or Reserve members of the Selected Reserve, serving on AGR duty (to include full-time National Guard duty) as defined in Chapter 1 of reference (e), and Coast Guard Reserve RPAs, but who are not assigned or attached to Selected Reserve units.  They occupy positions in organizations, other than Selected Reserve units, for the purposes of organizing, administering, recruiting, instructing, or training the RCs, or performing other duties as prescribed in Section 10 U.S.C. 12310 (reference (e)).  They shall have the same RCC and TRC designator as AGRs in units - "SG."

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 11
Page 27 of 40

DODI 1215.19, Dec. 12, 2000

E2.2.1.1.8.  <u>Civil Service Employees (CIV) not in Selected Reserve Units</u>.  CIVs are not accounted for in RCC/TRC categories.  Such personnel hired under 5 U.S.C. 3101 and 32 U.S.C. 709 (references (r) and (i)) to provide administrative support to the RCs.  They are in the category of FTS to the RCs, but are not part of the Selected Reserve.

E2.2.1.2.  <u>IRR and ING</u>.  The IRR/ING consists of Reservists in the following categories:

E2.2.1.2.1.  IRR is a manpower pool comprised principally of individuals who have had training, have previously served in the AC or in the Selected Reserve, and have some period of their MSO or other contractual obligation remaining.  Some individuals volunteer to remain in the IRR beyond their Military Service obligation or contractual obligation and participate in programs providing a variety of professional assignments and opportunities for earning retirement points and military benefits.  Members may voluntarily participate in training for retirement points and promotion, with or without pay.  IRR members shall not be required to meet the same AT and IDT training requirements as Selected Reservists.  Exceptions to this training requirement restriction shall be approved by the Under Secretary of Defense for Personnel and Readiness.  Required training (involuntary) may not exceed 30 days a year under Section 10147 of reference (e).  IRR members may be required to perform MD as described in subparagraph 6.5.4.2.1. of the main body of this Instruction.  Trained members of the IRR have the RCC and TRC designator of "RE," with the exception of those members in the category described in subparagraph E2.2.1.2.2., below.

E2.2.1.2.2.  Within the IRR there is a category of members, as designated by the Secretary concerned, who have volunteered to be called to AD under the provisions of 10 U.S.C. 12304 (reference (e)) when needed.  This category of the IRR is provided for in Section 10144(b) of reference (e).  Members in this mobilization category shall be eligible for benefits (other than pay and training) as normally available to members of the Selected Reserve, as determined by the Secretary of Defense.  IRR members in this category have the RCC and TRC designator of "RM."

E2.2.1.2.3.  The IRR also includes some personnel participating in officer training programs or in the AFHPSP.  The RCC and TRC designator "PJ" is used for officers not in the Selected Reserve but participating in officer training programs.  Included within this category are cadets of the Merchant Marine Academy.  The RCC and TRC designator "PK" is used for officers not in the Selected Reserve, but participating in the AFHPSP.  Members in that stipend program are required to perform 45 days of AD for training a year in accordance with Section 2121(c) of reference (e).

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 11
Page 28 of 40

*DODI 1215.19, Dec. 12, 2000*

E2.2.1.2.4.  The IRR also includes enlisted members awaiting IADT (except for members of the National Guard), who are not authorized to perform IDT. These members are assigned to units and are serving without pay.  Service performed by members in that status is not creditable toward computation of basic pay and shall have the RCC and TRC designator of "RU."  NPS enlistees between the ages of 18 1/2 and 26 years enlisting under Section 12103 of reference (e) shall enter IADT, insofar as practicable, within 270 days after the date of that enlistment.  All other enlisted members shall perform IADT, insofar as practicable, within 360 days of their enlistment.

E2.2.1.2.5.  The IRR also includes members of the Delayed Entry Program enlisted under Section 513 of reference (e).  Currently, there is no requirement to account for those untrained members of the IRR in the RCCPDS. However, these IRR members may be coded with the RCC and TRC designator of "RH."

E2.2.1.2.6.  The ING consists of National Guard personnel in an inactive status in the Ready Reserve, not in the Selected Reserve, attached to a specific National Guard unit.  To remain ING members, members must muster once a year with their assigned unit, but they do not participate in training activities.  On mobilization, ING members may mobilize with their units.  Similar to other IRR, some ING members have legal and contractual obligations.  ING members may not train for points or pay and are not eligible for promotion.  Currently, the ING category is used only by the ARNG and has the RCC and TRC designator of "II."

E2.2.1.3.  <u>STANDBY RESERVE CATEGORIES</u>.  The Standby Reserve consists of those units or members, or both, of the Reserve components, other than those in the Ready Reserve or Retired Reserve, who are liable for active duty only as provided for in Sections 12301 and 12306 of reference (e).  The Standby Reserve consists of personnel who are maintaining their military affiliation without being in the Ready Reserve, but have been designated key civilian employees, or have a temporary hardship or disability.  Those individuals are not required to perform training and are not part of units.  The Standby Reserve is a pool of trained individuals who may be mobilized as needed to fill manpower needs in specific skills.  The Standby Reserve consists of the active status list and the inactive status list categories.

E2.2.1.3.1.  <u>Active Status List</u>.  The following members of the Standby Reserve are in an active status:

E2.2.1.3.1.1.  Members designated as key employees in accordance with DoD Directive 1200.7 (reference (q)) and transferred from the Ready Reserve to the Standby Reserve Active Status List for the period they remain designated as key

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 11
Page 29 of 40

*DODI 1215.19, Dec. 12, 2000*

personnel.  Key employees may participate voluntarily without pay in RC training for retirement points only and may be considered for promotion.  While there is no statutory prohibition against paying active status Standby Reservists for IDT or AD, by DoD policy members of the Standby Reserve who have been screened out of the Ready Reserve as key employees may not be paid for training.  They have the RCC and TRC designator of "YC."

E2.2.1.3.1.2.  Personnel not having fulfilled their statutory MSO, or temporarily assigned for a hardship reason intending to return to the Ready Reserve, or retained by an RC in an active status under 10 U.S.C. 12646 (reference (e)).  These members may participate voluntarily with or without pay and may receive credit for, and be considered for, promotion.  They have the RCC and TRC designator of "YD."

E2.2.1.3.2.  <u>Inactive Status List</u>.  Members in the Standby Reserve who are not required to remain in an active program, but who retain Reserve affiliation in a non-participating status and whose skill may be of future use to the Armed Force concerned.  These members cannot participate in prescribed training.  While in an inactive status, Reserve members are not eligible for pay or promotion and do not accrue credit for years of service in accordance with provisions of Chapter 1223 of reference (e).

E2.2.1.3.2.1.  Members transferred to the Standby Reserve Inactive Status List under Section 1209 of reference (e) instead of separating.  They have the RCC TRC designator of "YL."

E2.2.1.3.2.2.  All other members transferred to the Standby Reserve Inactive Status List in accordance with DoD Directive 1235.9 (reference (n)).  They have the RCC TRC designator of "YN."

E2.2.1.4.  <u>RETIRED RESERVE CATEGORIES</u>

E2.2.1.4.1.  All Reserve personnel transferred to the Retired Reserve.  Retired Reservists voluntarily may train, with or without pay.  The Retired Reserve consists of the following retired categories:

E2.2.1.4.1.1.  Reserve members who have completed the requisite qualifying years creditable for non-regular retired pay and are receiving retired pay (at, or after, age 60) under Chapter 1223 of reference (e).  Those members shall be assigned the RCC and TRC designator of "V1."

E2.2.1.4.1.2.  Reserve members who have completed the requisite qualifying years creditable for non-regular retired pay and are not yet 60 years of age,

*DODI 1215.19, Dec. 12, 2000*

or are age 60 and have not applied for non-regular retirement pay. Those members shall be assigned the RCC and TRC designator of "V2."

E2.2.1.4.1.3. Reserve members retired for physical disability under 10 U.S.C. 1201, 1202, 1204, or 1205 (reference (e)). Members have completed 20 years of service creditable for regular retired pay, or are 30-percent or more disabled and otherwise qualified under Section 1201 of reference (e). These members shall be assigned the RCC and TRC designator of "V3."

E2.2.1.4.1.4. Reserve members who have completed the requisite years of active service and are receiving regular retired or retainer pay. These personnel shall be assigned the RCC and TRC designator of "V4." Regular (not RC) enlisted personnel of the Navy and the Marine Corps with 20 to 30 years of active Military Service who are transferred to the Fleet Naval Reserve or the Fleet Marine Corps Reserve on retirement, until they have completed 30 years of total active and retired or retainer service, are NOT included in that category.

E2.2.1.4.1.5. Reserve personnel drawing retired pay under other than age, service requirements, or physical disability. This category is restricted for retirement under special conditions, as authorized by the Office of the Assistant Secretary of Defense for Reserve Affairs under legislation. These personnel shall be assigned the RCC and TRC designator of "V5." Also included in this RCC and TRC will be Voluntary Separation Incentive recipients who become ineligible for retention in an active or inactive status in a Reserve component because of age, years of service, failure to select for promotion, or medical disability, and who request to be placed in this category. These individuals shall be tracked separately by the appropriate Reserve personnel management office.

E2.2.1.4.2. All members retired for having completed the requisite years of active duty service (Regular or Reserve), regardless of the retired list where assigned, may be ordered to AD when required by the Secretary of the Military Department concerned, in accordance with Section 688 of (reference (e)).

E2.2.1.4.3. Retired Reserve members may be ordered to AD in their status as Retired Reserve members. It is not necessary to place the member in the Ready Reserve for that purpose.

E2.2.1.4.4. Former members having completed 20 satisfactory years of service creditable for non-regular retirement, but electing to be discharged from the RCs, are not a part of the Retired Reserve and have no military status.

ENCLOSURE 2

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 11
Page 31 of 40

*DODI 1215.19, Dec. 12, 2000*

E3.  ENCLOSURE 3

MEMBERS PARTICIPATING IN APPROVED PROGRAMS
OUTSIDE THE DEPARTMENT OF DEFENSE

E3.1.  SELECTIVE SERVICE SYSTEM (SSS)

E31.1.1  The SSS administers the Military Selective Service Act (MSSA)
(reference (m)).  The MSSA authorizes the Director of Selective Service, by delegation
from the President, "...to order to active duty with their consent and to assign to the
Selective Service System such officers of the selective-service section of the state
headquarters and headquarters detachments and such other officers of the federally
recognized National Guard of the United States or other armed forces personnel
(including personnel of the reserve components thereof), as may be necessary for the
administration of the national and of the several state headquarters of the Selective
Service System."

E3.1.2.  The Department of Defense and the Office of the Director of Selective
Service shall agree on the number of RC members assigned as IMAs to the SSS.  The
SSS shall reimburse the Department of Defense for total personnel costs for IDT and
AT for those members.

E3.1.3.  Additionally, agreements between the Department of Defense and the
Office of the Director of Selective Service may provide for the use of IRR members of
the RCs in an IDT or AD status, in a pay or non-pay status.  The SSS shall reimburse the
Department of Defense for all associated costs, including IDT and AT pay, for those
members.

E3.1.4.  Request for assignment to the SSS in a full-time AD status must be
approved in accordance with DoD Directive 1000.17 (reference (s)).  Costs for those
members shall be reimbursed to the Department of Defense.  Members shall not be
assigned to a RCC or TRC, shall not be counted against RC strengths, and shall not be
included in the RCCPDS files.

E3.2.  NATIONAL SECURITY EMERGENCY PREPAREDNESS PROGRAMS

E3.2.1.  The National Emergency Preparedness Program (all hazards) is an integral
part of U.S. national security.  Support of emergency preparedness may be provided
through RC members participating with Federal, State, and local civil agencies only when
clearly furthering specifically identifiable DoD interests.  Participation shall be in an

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 11
Page 32 of 40

*DODI 1215.19, Dec. 12, 2000*

IDT, ADT, or FTNGD status.  The primary basis for RC participation is to meet DoD program requirements and therefore costs of the program are paid by the DoD Component, except when the RC members are supporting a presidentially declared emergency or disaster.  In those cases, costs are usually on a reimbursable basis from the Federal Emergency Management Agency (FEMA).  Subject to priorities and guidance in DoD 3025.1 (reference (t)), military support of those activities is a proper mission for DoD Components.  Military planning and liaison may be provided by RC members at selected civil government and military headquarters, and includes such tasks and responsibilities as military support to civil authorities for CONUS defense, coordinating DoD response to domestic emergencies, and physical security of key assets.

E3.2.2.  Assigning Emergency Preparedness Liaison Officers (EPLOs) in a full-time AD (other than for training) or FTNGD status in support of Emergency Preparedness Programs outside the Department of Defense must be approved in accordance with DoD Directive 1000.17 (reference (s)).  The following programs are approved for such participation:

E3.2.2.1.  <u>Federal EPLOs</u>.  Reserve officers performing planning and liaison responsibilities between DoD Components and Federal Agencies, including interface with the civil sector, as directed by their DoD Component through the Military Service planning agent.  Federal EPLOs function primarily in support of DoD missions.  All costs are paid by the DoD Component.  Each Military Department is authorized to assign one or more Federal EPLOs (other than flag or general officer rank) at FEMA national headquarters, at the DoD Director of Military Support, and at military headquarters that serve as the DoD, Military Service, or Regional Planning Agents for domestic emergency support.  Federal EPLOs:

E3.2.2.1.1.  Provide DoD and Service liaison with Federal organizations and Agencies, and between the Military Services.

E3.2.2.1.2.  Facilitate planning, coordination, and training for military support to civil authorities and national security emergency preparedness.

E3.2.2.1.3.  Advise Federal Agencies and organizations on DoD and Service capabilities and resources.

E3.2.2.1.4.  Advocate mutual support required by the Department of Defense.

ENCLOSURE 3

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 11
Page 33 of 40

*DODI 1215.19, Dec. 12, 2000*

E3.2.2.1.5.  On order, augment DoD response to domestic emergency operations.

E3.2.2.2.  <u>Regional EPLOs</u>.  Reserve officers performing planning and liaison responsibilities between DoD Components and Federal regional headquarters, including interface with the civil sector, as directed by their DoD Component through the Military Service planning agent.  Regional EPLOs function primarily in support of DoD missions.  All costs are paid by the DoD Component.  Each Military Department is authorized to assign one or more EPLOs (below flag or general officer rank) at each FEMA region and at military headquarters and locations with key functions as Department of Defense, Military Service, and Regional Planning Agents for domestic emergency support.  Regional EPLOs perform the same functions described in subparagraphs E3.2.2.1.1. through E3.2.2.1.5., above, only at the regional level.

E3.2.2.3.  <u>State EPLOs</u>.  Reserve officers performing planning and liaison responsibilities between their DoD Components and State or U.S. Territory emergency service headquarters including interface with the civil sector, as directed by their DoD Component through the Military Service planning agent.  State EPLOs function primarily in support of DoD missions.  All costs are paid by the DoD Component.  Each Military Department is authorized to assign one or more EPLOs (other than flag or general officer rank) at each State or U.S. territorial headquarters and shall assign such officers to functions supervised by the State Area Command.  State EPLOs provide Service representation and liaison to the military and civil authorities within the State, commonwealth, U.S. possession, and other eligible jurisdiction.  State EPLOs perform the same functions described in subparagraphs E3.2.2.1.1. through E3.2.2.1.5., above, only at the State level.

E3.2.3.  All EPLOs should attend the DoD Emergency Preparedness Course presented at the FEMA Mount Weather Emergency Assistance Center as soon as possible after assignment.  This will help to ensure that DoD representatives performing these vital functions are properly trained in this complex environment.

ENCLOSURE 3

*DODI 1215.19, Dec. 12, 2000*

E3.3.  <u>VOLUNTARY PARTICIPATION IN PROGRAMS OUTSIDE THE DEPARTMENT OF DEFENSE</u>

Members of the IRR may participate voluntarily in programs outside the Department of Defense in an AD or IDT status, with pay or without pay.   Any pay provided shall be reimbursed to the Department of Defense by the supported Agency.   Members of the Standby Reserve on the Active Status List, may voluntarily participate, without pay, in approved civil defense activities, and receive retirement points in accordance with DoD Instruction 1215.7 (reference (g)).

E3.4.  <u>IRR MEMBERS PARTICIPATING IN MILITARY SUPPORT TO CIVIL AUTHORITIES</u>

IRR members participating in Military Support to Civil Authorities (MSCA) training activities may request ADT to attend MSCA courses.   If so ordered, those Reservists shall be entitled to pay and allowances including travel allowances for such training.

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 11
Page 35 of 40

*DODI 1215.19, Dec. 12, 2000*

## E4.  ENCLOSURE 4

### E4.T1.  TABLE 1.  AUTHORIZED RESERVE, TRAINING AND RETIREMENT CATEGORIES

| RCC | RC SUB-CATEGORY | RCC DESIGNATOR | TRC DESIGNATOR | COMPRISED OF | MINIMUM NUMBER OF IDT PERIODS REQUIRED ANNUALLY | MINIMUM NUMBER OF DAYS OF AT REQUIRED ANNUALLY | REMARKS | CURRENTLY USED BY | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | ARNG | USAR | USNR | USMCR | ANG | USAFR | USCGR |
| READY RESERVE | SELECTED RESERVE | S TRAINED IN UNITS | A | INDIVIDUALS IN UNITS | 48 | RESERVE, 14 DAYS (EXCLUDE TRAVEL); GUARD, 15 DAYS (INCLUDE TRAVEL) | 10 U.S.C. 10147 (REFERENCE (u)), REQUIRES 14 DAYS AT. / 32 U.S.C. 502 (REFERENCE (l)), REQUIRES 15 DAYS AT. | X (Guard) | X | X | X | X (Guard) | X | X |
| | | | G | AGR | N/A | UNCSR 12 DAYS (EXCLUDE TRAVEL) | AGR MAY BE REQUIRED TO ATTEND DRILLS. (INCLUDES USNR, IARS, USCGR, IDP (14 U.S.C. 376 (REFERENCE (k)), USMCR, GRR, AND ALL STATUTORY TOURS). | X | X | X | X | X | X | X |
| | | | V | USPFO & RC MEMBERS ON AD IN SUPPORT OF COUNTER-DRUG ACTIVITIES | N/A | N/A | MEMBERS ARE ON AD FOR MORE THAN 180 DAYS AND COUNT AGAINST SELRES STRENGTH, BUT DO NOT COUNT AGAINST AGR STRENGTH. | X | X | X | X | X | X | X |
| | | T TRAINED INDIVIDUALS NON-UNIT | B | IMAs | IDT VARIES BETWEEN 0 AND 48 PERIODS EACH YEAR, AS DETERMINED BY DOD POLICY | RESERVE - 12 TO 14 DAYS (EXCLUDE TRAVEL) | UNLESS TRAINING CAN BE ACCOMPLISHED ON WEEKENDS, AT IS LIMITED TO 12 DAYS BY POLICY. | | X | X | X | | X | X |
| | | U TRAINING PIPELINE, NON-DEPLOYABLE ACCOUNT | P | PERSONNEL CURRENTLY ON IADT | 0 | N/A | INCLUDES SECOND PART OF SPLIT TRAINING AND ARMY ONE-STATION UNIT TRAINING (APPLIES TO TRCs P, F, AND Q). | X | X | X | X | X | X | X |
| | | | F | PERSONNEL AWAITING IADT AND AUTHORIZED TO PERFORM IDT | MINIMUM IDT TO BE DETERMINED BY DOD COMPONENT POLICY | N/A | INCLUDES PERSONNEL WITH OR WITHOUT PAY. | X | X | X | X | X | X | X |
| | | | Q | PERSONNEL AWAITING SECOND PART OF IADT | 48 | N/A | | X | X | X | X | X | X | X |

36

ENCLOSURE 4

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 11
Page 36 of 40

*DODI 1215.19, Dec. 12, 2000*

E4.T1.   TABLE 1.   AUTHORIZED RESERVE, TRAINING AND RETIREMENT CATEGORIES, Cont.

| RCC | RC SUB-CATEGORY | RCC DESIGNATOR | TRC DESIGNATOR | COMPRISED OF | MINIMUM NUMBER OF IDT PERIODS REQUIRED ANNUALLY | MINIMUM NUMBER OF DAYS OF AT REQUIRED ANNUALLY | REMARKS | CURRENTLY USED BY | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | ARNG | USAR | USNR | USMCR | ANG | USAFR | USCGR |
| READY RESERVE | SELECTED RESERVE | U TRAINING PIPELINE, NON-DEPLOYABLE ACCOUNT | S | AGR, CURRENTLY ON, OR AWAITING IADT | DETERMINED BY DoD COMPONENT POLICY | N/A | INCLUDES XPS AGR (NAVY TAR) PERSONNEL. | | | X | | | | |
| | | | T | INDIVIDUALS IN A SIMULTANEOUS MEMBERSHIP | 48 | SAME AS TRC A | SENIOR ROTC CADETS OR MARINE CORPS PLATOON LEADER CLASS MEMBERS WHO ARE ALSO PERMITTED TO BE MEMBERS OF A SELECTED RESERVE UNIT. | X | X | | X | X | X | |
| | | | X | PERSONNEL IN OTHER TRAINING PROGRAMS | 48 | SAME AS TRC A | SELECTED RESERVE UNTRAINED MEMBER IN OTHER TRAINING PROGRAMS INCLUDING CHAPLAIN, MEDICAL, HEALTH PROFESSIONAL STIPEND, AND EARLY COMMISSIONING. MUST MEET THE SAME TRAINING REQUIREMENTS, AS TRC A RESERVISTS. | X | X | | X | | | |
| | IRR and ING | R IRR | E | INDIVIDUAL MEMBERS OF THE READY RESERVE NOT IN SELECTED RESERVE (INCLUDES OFFICERS AWAITING AD OR SELECTED RESERVE ASSIGNMENT) | N/A | 1 | IRR MEMBERS MAY VOLUNTARILY PARTICIPATE IN TRAINING FOR RETIREMENT POINTS AND PROMOTION WITH OR WITHOUT PAY. REQUIRED TRAINING MAY NOT EXCEED 30 DAYS EACH YEAR. (10 U.S.C. 10147, REFERENCE (s)). | X | X | | X | | X | X |
| | | | M | SPECIAL CATEGORY WITHIN THE IRR SUBJECT TO INVOLUNTARY CALL TO AD IAW 10 USC 12304 (REFERENCE (n)) | N/A | N/A | MEMBERS MUST VOLUNTEER FOR THIS CATEGORY, AND MAY ONLY REMAIN IN THIS CATEGORY FOR 48 MONTHS AFTER LEAVING ACTIVE SERVICE. | | X | X | X | | X | X |
| | | | H | UNTRAINED MEMBERS OF THE IRR, (DEP) 10 U.S.C. 513, REFERENCE (s) | N/A | N/A | | X | X | X | X | | X | |
| | | | U | PERSONNEL AWAITING IADT | NOT AUTHORIZED TO PERFORM IDT | N/A | | X | X | X | X | X | X | X |

37                                                    ENCLOSURE 4

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 11
Page 37 of 40

*DODI 1215.19, Dec. 12, 2000*

E4.T1.   TABLE 1.   AUTHORIZED RESERVE, TRAINING AND RETIREMENT CATEGORIES, Cont.

| RCC | RC SUB-CATEGORY | RCC DESIGNATOR | TRC DESIGNATOR | COMPRISED OF | MINIMUM NUMBER OF IDT PERIODS REQUIRED ANNUALLY | MINIMUM NUMBER OF DAYS OF AT REQUIRED ANNUALLY | REMARKS | CURRENTLY USED BY | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | ARNG | USAR | USNR | USMCR | ANG | USAFR | USCGR |
| READY RESERVE | IRR And ING | P READY RESERVE TRAINING | J | PERSONNEL NOT IN THE SELECTED RESERVE - PARTICIPATING IN OFFICER TRAINING PROGRAMS | 0 | AS REQUIRED BY SPECIFIED PROGRAM | CHAPLAIN AND JUDGE ADVOCATE GENERAL (JAG) SCHOOLING, EDUCATION DELAY, EDUCATION DELAY, ARMY EARLY COMMISSIONING PROGRAM, COAST GUARD DIRECT COMMISSION CANDIDATES, MARINE PLATOON LEADER CLASS, MERCHANT MARINE CADETS (USNR). | X | X | X | | X | X |
| | | P READY RESERVE TRAINING | K | PERSONNEL NOT IN THE SELECTED RESERVE - PARTICIPATING IN THE AFHPSP | 0 | 45 DAYS | AFHPSP REQUIRES 45 DAYS AT ANNUALLY. 10 U.S.C. 2121(C) (REFERENCE (x)). | X | X | | | X | |
| | I ING | I | I | ING | 0 | 1 | MUST MEET ANNUAL MUSTER WITH ASSIGNED UNIT. MAY NOT TRAIN FOR POINTS OR PAY AND ARE NOT ELIGIBLE FOR PROMOTION | X | | | | | |
| STANDBY RESERVE | | Y STANDBY | C | ACTIVE STATUS LIST | 0 | 0 | KEY EMPLOYEES, ONLY, PER DoD DIRECTIVE 1200.7 (REFERENCE (t)). ACTIVE STANDBY MEMBERS MAY VOLUNTARILY TRAIN FOR POINTS WITHOUT PAY AND ARE ELIGIBLE FOR PROMOTION. | X | X | X | | X | X |
| | | | D | ACTIVE STATUS LIST PROGRAMS | 0 | 0 | OTHER ACTIVE STATUS MEMBER. | X | X | X | | X | X |
| | | | L | INACTIVE STATUS LIST | 0 | 0 | MEMBERS TRANSFERRED TO IN-ACTIVE STATUS LIST INSTEAD OF SEPARATION UNDER 10 U.S.C. 1209, CHAPTER 69 (REFERENCE (z)). INACTIVE STAND-BY MEMBERS MAY NOT TRAIN FOR POINTS WITH OR WITHOUT PAY AND ARE NOT ELIGIBLE FOR PROMOTION | X | X | X | | X | X |
| | | | N | INACTIVE STATUS LIST | 0 | 0 | OTHER INACTIVE STATUS MEMBERS. | X | X | X | | X | |

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 11
Page 38 of 40

*DODI 1215.19, Dec. 12, 2000*

E4.T1.   TABLE 1.   AUTHORIZED RESERVE, TRAINING AND RETIREMENT CATEGORIES, Cont.

| RCC | RC SUB-CATEGORY | RCC DESIGNATOR | TRC DESIGNATOR | COMPRISED OF | MINIMUM NUMBER OF IDT PERIODS REQUIRED ANNUALLY | MINIMUM NUMBER OF DAYS OF AT REQUIRED ANNUALLY | REMARKS | CURRENTLY USED BY | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | ARNG | USAR | USNR | USMCR | ANG | USAFR | USCGR |
| RETIRED RESERVE | | V RETIRED | 1 | DRAWING NON-REGULAR RETIRED PAY UNDER 10 U.S.C. 12731 (REFERENCE (f)) | N/A | N/A | RESERVE MEMBERS WHO HAVE COMPLETED 20 QUALIFYING YEARS CREDITABLE FOR NON-REGULAR RETIRED PAY, ARE 60 YEARS, OR MORE, OF AGE, AND ARE DRAWING NON-REGULAR RETIRED PAY | X | X | X | | X | X |
| | | | 2 | NOT DRAWING NON-REGULAR RETIRED PAY, BUT ELIGIBLE AT AGE 60, UNDER SECTION 10 U.S.C. 12731 (REFERENCE (f)) | N/A | N/A | RESERVE MEMBERS WHO HAVE COMPLETED 20 QUALIFYING YEARS CREDITABLE FOR NON-REGULAR RETIRED PAY, BUT ARE NOT YET 60 YEARS OF AGE, OR ARE AGE 60 AND HAVE NOT APPLIED FOR NON-REGULAR RETIRED PAY | X | X | X | | X | X |
| | | | 3 | RESERVE MEMBERS RETIRED FOR PHYSICAL DISABILITY | N/A | N/A | RESERVE MEMBERS RETIRED FOR PHYSICAL DISABILITY UNDER 10 U.S.C. 1201, 1202, 1204, OR 1205 (REFERENCE (s)). MEMBERS WHO HAVE 20 YEARS OF SERVICE CREDITABLE FOR NON-REGULAR RETIRED PAY OR ARE 30-PERCENT OR MORE DISABLED. | X | X | X | | X | X |
| | | | 4 | RESERVE MEMBERS WHO HAVE COMPLETED 20, OR MORE, YEARS OF AS | N/A | N/A | RESERVE MEMBERS WHO HAVE COMPLETED 20, OR MORE, YEARS OF AS SERVICE AND RETIRED UNDER 10 U.S.C. 3911, 3914, 6323, 6330, 8911, OR 8914 (REFERENCE (s)). DOES NOT INCLUDE REGULAR ARMY AND AIR FORCE ENLISTED PERSONNEL WITH BETWEEN 20 AND 30 YEARS OF MILITARY SERVICE AND REGULAR AND RESERVE NAVY AND MARINE CORPS ENLISTED PERSONNEL IN HS FLEET RESERVE (NAVY) AND FLEET MARINE CORPS RESERVE WITH BETWEEN 20 AND 30 YEARS OF SERVICE. | X | X | X | | X | X |
| | | | 5 | DRAWING NON-REGULAR RETIRED PAY UNDER OTHER THAN 10 U.S.C. 12731 (REFERENCE (f)), OR OTHER THAN REASONS OF PHYSICAL DISABILITY | N/A | N/A | RESERVE PERSONNEL RETIREMENT PAY BASED ON RETIREMENT FOR REASONS OTHER THAN AGE, SERVICE REQUIREMENTS OR PHYSICAL DISABILITY, AS AUTHORIZED BY THE SECDEF. CERTAIN VSI RECIPIENTS IN ELIGIBLE FOR RETENTION IN ACTIVE OR INACTIVE RESERVE STATUS | X | X | X | | X | X |

ENCLOSURE 4

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 11
Page 39 of 40

*DODI 1215.19, Dec. 12, 2000*

# E5.  ENCLOSURE 5

## CHART, RESERVE COMPONENT DUTY CATEGORIES



ENCLOSURE 5

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 11
Page 40 of 40



# Department of Defense
# DIRECTIVE

September 22, 1987
NUMBER 1215.6

ASD(RA)

SUBJECT:  Uniform Reserve, Training and Retirement Categories

References:  (a)  DoD Directive 1215.6, "Uniform Training/Pay Categories Within the Reserve Components," January 31, 1974 (hereby canceled)
   (b)  DoD Directive 1205.17, "Official National Guard and Reserve Component Personnel Data," June 20, 1985
   (c)  DoD Instruction 7730.54 "Reserve Components Common Personnel Data System (RCCPDS)," May 7, 1986
   (d)  Title 10, United States Code, "Armed Forces," (as amended) April 21, 1987
   (e)  through (r), see enclosure 1

## A.  REISSUANCE AND PURPOSE

This Directive reissues reference (a) to:

1.  Update DoD policy and assign responsibilities for implementing the recent changes in law.

2.  Establish DoD policy guidance for maintaining and reporting personnel data in accordance with references (b) and (c).

3.  Designate uniform Reserve component categories (RCCs), training or retired categories (TRCs) for the Ready Reserve, Standby Reserve, and Retired Reserve of the Armed Forces under Sections 268, 270, 271, 273, 274, 1376, 2001, and 6017 of reference (d).

4.  Establish minimal training criteria for each category of the Reserve components (RCs).

5.  Provide uniform planning policies and procedures on training.

6.  Establish policy guidance for participation in Selective Service System (SSS) activities, civil defense activities, and Continental United States (CONUS) Defense programs by members of the Ready and Standby Reserve.

## B.  APPLICABILITY

This Directive applies to the Office of the Secretary of Defense (OSD), the Military Departments and their Reserve components, the Organization of the Joint Chiefs of Staff (OJCS), the U.S. Coast Guard and its Reserve component with the concurrence of the Department of Transportation (DoT), and the Defense Agencies (hereafter referred to collectively as "DoD Components").

Defs.' Opposition to Pls.' Renewed Motion for Preliminary Injunction
Ex. 12
Page 1 of 24

## C. DEFINITIONS

Unform Reserve, Training and Retirement categories used in this Directive are defined in enclosure 2. Terms used in this Directive are defined in enclosure 3.

## D. RCC AND TRC CATEGORY TABLE

Table 1 (see enclosure 4) establishes authorized RCCs and TRCs in the RCs for training and accountability purposes. Each unit and member of the Ready Reserve, Standby Reserve, and Retired Reserve not counted in active duty (AD) end strengths, in accordance with 10 U.S.C. 115(b)(1)(B) (reference (d)), shall be placed in one of the RCCs and TRCs so identified.

## E. POLICY

1. **Establishment of Criteria**. To ensure that trained and qualified RC units and individuals are available for AD in time of war or national emergency and that funds appropriated annually for RC training are adequate for meeting mobilization requirements, the Secretary concerned shall establish necessary criteria and procedures to do the following:

   a. Place all RC members in a RCC and TRC in accordance with this Directive. Individuals shall be assigned to RCCs and TRCs based on their mobilization obligations and training requirements.

   b. Ensure that all RC members receive training in accordance with mobilization assignments and required readiness levels. All members of the Ready Reserve, except members of the U.S. Army National Guard and the U.S. Air National Guard, may be required to serve on AD training (ADT) up to 30 days a year (10 U.S.C. 270(a)(2), reference (d)). Training for the Individual Ready Reserve (IRR), Standby Reserve, and Retired Reserve may be accomplished voluntarily in accordance with DoD procedures in this Directive.

   c. Approve any additional inactive duty training (IDT) as necessary and consistent with law. Authorizing and utilizing additional training is subject to the categories, limitations, and controls in subsection E.3., below.

   d. Authorize ADT and AD for special work (ADSW) subject to the categories, limitations, and controls in subsection E.4., below.

2. **Considerations for Establishing Criteria**

   a. Training programs shall provide for the minimal number of IDT periods, annual training (AT), and ADT required for attaining the prescribed unit readiness status and maintaining individual proficiency.

   b. Paid IDT periods shall not be less than 4 hours. No more than two IDT periods may be performed in any calendar day.

   c. IDT periods for points only (without pay) shall not be less than 2 hours duration with a maximum of two points authorized in any 1-calendar day (one point in any 1-calendar day for attendance at professional or trade conventions) (DoD Instruction 1215.7, reference (e)).

2

Defs.' Opposition to Pls.' Renewed Motion for Preliminary Injunction
Ex. 12
Page 2 of 24

d.  Where practical, multiple IDT periods (MIDTPs) shall be used for maximizing the effectiveness of training.

3.  <u>Additional IDT Periods</u>.  Additional IDT periods are intended to improve readiness by providing for individuals and units to receive required and necessary training for attaining and maintaining designated readiness levels. The Secretary concerned shall establish guidance for and approve use of additional IDT periods in accordance with limits outlined below:

a.  These training periods are intended for the principal use of nontechnician drilling Reservists.  The RC shall identify additional IDT periods separately from normal unit or individual training periods in budget documents and in internal records so that training period costs and training support costs for each type of additional training clearly may be identified, justified, and audited.  Those additional IDT periods used by technicians shall be identified separately in budget documents to monitor compliance with this policy.  IDT for all Guard and Reserve personnel shall be in accordance with 37 U.S.C. 206 (reference (f)).

b.  Three categories of additional IDT periods are as follows:

(1)  Additional training periods (ATPs) for units, subunits, and individuals are for accomplishing additional required training as defined by a unit's wartime mission.  The number of these training periods shall not exceed 12 per fiscal year (FY) for any member.

(2)  Additional flying and flight training periods (AFTPs) are authorized for primary aircrew members for conducting aircrew training and combat crew qualification training to attain and maintain aircrew flying proficiency and sustain mobilization readiness.  AFTPs shall not be in addition to the ATPs in subparagraph E.3.b.(1), above.  The number of these training periods shall not exceed 48 per fiscal year (FY) for any aircrew member unless specifically authorized by the Secretary concerned.

(3)  Readiness Management Periods (RMPs) are used to support the ongoing day-to-day operation of the unit, accomplishing unit administration, training preparation, support activities, and maintenance functions.  The number of periods shall not exceed 24 per fiscal year (FY) for any member.  These training periods shall be used only where sufficient full-time support personnel are not available to accomplish these duties.  RMPs shall not be performed on the same day another training period (IDT, ATP, or AFTP) is being performed and not more than one RMP shall be performed by an individual in 1-calendar day.

4.  <u>Active Duty</u>

At any time, an authority designated by the Secretary concerned may order a member of the Reserve component under his or her jurisdiction to AD or retain him or her on AD with the consent of the member.  However, a member of the Army National Guard of the United States or the Air National Guard of the United States may not be ordered to active duty under this subsection without the consent of the governor or other appropriate authority of the state or territory, Puerto Rico, the Canal Zone, or the District of Columbia, whichever is concerned (10 U.S.C. 672 (d) (reference (d))).  Five categories of AD for RC members serving with RC are as follows:

3

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 12
Page 3 of 24

a.  Initial active duty training (IADT), which includes basic military training and technical skill training, is required for all accessions.  For nonprior service (NPS) male enlistees who are between the ages of 18½ and 26, this IADT shall be for a period of not less than 12 weeks to commence insofar as practical within 270 days after the date of enlistment.  For all other enlistees and inductees, IADT shall be for a period prescribed by the Secretary concerned to commence insofar as practical within 360 days after entry into service, except that in time of war or national emergency declared by Congress or the President the period of basic training (or its equivalent) shall be for a period of not less than 12 weeks.  (10 U.S.C. 511 (b), 511 (d), and 671 (b) (reference (d))).

b.  AT is required for all members of the Ready Reserve.  By DoD policy, this requirement is limited to members of the Selected Reserve.  For members of the Reserves, this training shall be for not less than 14 days (exclusive of travel time) each year (10 U.S.C. 270(a)(1), reference (d)).  Units of the National Guard are required to perform full-time military training for at least 15 days per year including travel time (32 U.S.C. 502, reference (g)).

c.  ADT is authorized to provide for full-time attendance at organized and planned specialized skill training, flight training, combat crew training, unit conversion training, refresher and proficiency training, officer acquisition training, professional development education programs, etc., for providing RC members with necessary skills and disciplines supporting RC missions.  Authorized ADT must provide a primary training content to recipient.  Authorization for ADT shall be managed in accordance with Directives established by the Secretaries concerned.  Nontechnician personnel shall receive priority consideration for such training.

d.  ADSW is authorized for personnel from applicable military or Reserve personnel appropriations for projects supporting active or RC programs, such as annual screening, operation of training camps, training ships, and unit conversions to new weapons systems, when such duties are essential to the organization.  Projects supporting study groups, training site and exercises, short-term mission projects, and administrative support functions also are included.  Authorization for ADSW shall be managed in accordance with Directives established by the Secretary concerned.  ADSW tours exceeding 180 days are accountable against AD strengths (regular or RC AD end strengths, consistent with pay appropriations) in accordance with Section 115(b)(1)(B) of reference (d).  By DoD policy, these tours normally are limited to 139 days or less in 1 FY.  Exceptions to the 139-day limit may be granted on an individual basis for specific mission requirements.  Nontechnician personnel shall receive priority consideration for these tours.  Short breaks in tours, i.e., 30 days or less, to circumvent this requirement are not authorized.

e.  AD, other than for training or ADSW, including full-time National Guard duty, is authorized in support of RC missions, under Sections 265, 672(d), 678, 715, 3019, 3033, 3496, 8019, 8033, and 8496 of reference (d) and Section 708 of reference (g).  These members are included in the full-time support numbers for each RC under the collective title of Active Guard or Reserve (AGR), including Navy training and administration of Reserves (TARs) and all statutory tour personnel.

4

Defs.' Opposition to Pls.' Renewed Motion for Preliminary Injunction Ex. 12 Page 4 of 24

Sep 22, 87
1215.6

5.  Restriction on Assignment Outside United States

     A member of the RCs may not be assigned to active duty on land outside the United States, its territories and possessions until the member has completed basic training (10 U.S.C. 671 (a) (reference (d))).

6.  Training Participation

     The Secretaries concerned shall establish minimal standards for satisfactory participation at required training periods, which shall include the number and percentages of training periods for meeting the minimal standards. Individuals attending IDT periods are required to meet these minimal training standards.  These standards shall contain procedures for accounting for absences and excused drills, as necessary.  Individuals voluntarly may attend extra IDT periods for points only in accordance with DoD Directive 1215.13 (reference (h)).

    a.  Selected Reserve

     (1)  IDT.  Except as specifically provided in regulations by the Secretary of Defense or the Secretary of Transportation for the Coast Guard, members of the Ready Reserve shall participate in at least 48 scheduled training periods each year.  (See Section 270(a)(1) of reference (d) and 32 U.S.C. 502 (reference (g))).

     (2)  AT.  Except as specifically provided for in regulations by the Secretary of Defense or the Secretary of Transportation for the Coast Guard, AT is required for all members of the Ready Reserve.  By DoD policy, this requirement is limited to members of the Selected Reserve.  For members of the Reserves, this training shall be for not less than 14 days (exclusive of travel time) each year (reference (d)).  Units of the National Guard are required to perform full-time military training for at least 15 days per year including travel time (reference (g)).

     (3)  AT tours for individual mobilization augmentees (IMAs) or other Reservists individually assigned to all training categories ordered to AT at headquarters, support organizations, or to activities not operating on Saturday, Sunday, or Federal holidays, normally are limited by DoD policy to a maximum of 12 days excluding travel time; i.e., from Monday of the first week through Friday of the second week.

     (a)  When valuable training opportunities are available and required on weekends or for longer periods than 12 days, members may be ordered to AT for up to 19 days excluding travel time for activities such as participating in mobilization exercises.  Training may begin on days other than Monday when special activities begin during the week.

     (b)  AT normally is performed during one consecutive period. Split tours may be authorized for selected units or individuals if required to meet training missions.  Any additional costs must be justified fully. Authorization for variations in AT lengths shall be managed in accordance with Directives established by the Secretaries concerned.

Defs.' Opposition to Pls.' Renewed Motion for Preliminary Injunction Ex. 12 Page 5 of 24

(4)  Short periods of AD performed by members of the Selected Reserve, under Sections 672(d), 673, 673b, 3500, or 8500 of reference (d), may not be substituted for training required by 10 U.S.C. 270 (reference (d)) and by this Directive, unless in the judgment of the Secretary concerned:

(a)  AD service performed under these sections is equivalent to the training that might have been performed under the authority of Section 270 of reference (d) and this Directive.

(b)  AD service under these sections when combined with training required by Section 270 of reference (d) and this Directive constitutes an undue personal hardship.

(5)  NPS Personnel:

(a)  Those personnel commissioned or enlisted directly into a U.S. Armed Force who have not completed basic training (IADT) of 12 weeks or its equivalent.

(b)  The Secretaries concerned may require personnel commissioned or enlisted for service in the Selected Reserve to participate in IDT periods before completing IADT.  These training periods may be with or without pay.

(c)  IADT, which includes basic military training and technical skill training, is required for all accessions.  For NPS male enlistees who are between the ages of 18½ and 26, this initial active duty training shall be for a period of not less than 12 weeks to commence insofar as practical within 270 days after the date of enlistment.  For all other enlistees and inductees, initial AD training shall be for a period prescribed by the Secretary concerned to commence insofar as practical within 360 days after entry into service, except that in time of war or national emergency declared by Congress or the President the period of basic training (or its equivalent) shall be for a period of not less than 12 weeks. (See Sections 511 (b), 511(d), and 671 (b) of reference (d)).

(d)  Individual Reservists are exempt from participating in AT or ADT during the last 120 days before completing their Military Service Obligation (MSO) if they have served on AD for 1 year or longer. (See Section 270(a) of reference (d)).

b.  IRR

(1)  Members of the IRR, not scheduled for mandatory or voluntary training, are required to serve at least 1 day on AD each year to accomplish annual screening requirements in accordance with Sections 271(a), 275(a), 652, and 1004 of reference (d).  The Services are required to maintain the current status of each member's physical condition, dependency status, military qualifications, civilian occupational skills, availability for service, and other information as prescribed.  Annual screening by the Services shall include determining skill proficiency degradation and, if necessary, identifying applicable refresher training needs by skill.

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 12
Page 6 of 24

Sep 22, 87
1215.6

(2)  IRR members, including individuals enlisting directly into the IRR, may participate voluntarily in IDT for points only in accordance with component regulations.

c.  <u>Standby Reserve</u>.  The Standby Reserve consists of personnel who maintain their military affiliation without being in the Ready Reserve in accordance with 10 U.S.C. 267, 272 and 273 (reference (d)) and DoD Directive 1235.9 (reference (i)).

(1)  <u>Active Status List</u>.  The following members of the Standby Reserve are in an active status. They may participate voluntarily without pay in RC training for retirement points only and may be considered for promotion.

(a)  Personnel not having fulfilled their statutory MSO.

(b)  Personnel temporarily assigned for hardship or other cogent reason who intend returning to the Ready Reserve.

(c)  Personnel retained in an active RC status under Section 1006 of reference (d).

(d)  Members of Congress and any Service members transferred from the Ready Reserve to the Standby Reserve after being designated as key personnel by their employers may volunteer for assignment to the Standby Reserve Active Status List for the period they remain designated as key personnel.  Individuals desiring to be transferred shall apply directly to the RC concerned.

(2)  <u>Inactive Status List</u>.  The following members of the Standby Reserve are in an inactive status.  They may not participate for points, pay, or be considered for promotion:

(a)  Members transferred to the Inactive Status List instead of separating in accordance with Section 1209 of reference (d).

(b)  All other members transferred to the Inactive Status List in accordance with DoD Directive 1235.9 (reference (i)).  Personnel enrolled in a military school course, including correspondence courses, when transferred from the Ready Reserve to the Standby Reserve Inactive Status List may continue voluntarily participating in the course until completion.  These personnel shall not be entitled to pay and allowances, travel and transportation, or to earn promotion and retirement points for this training.

d.  <u>Retired Reserve</u>.  Consists of all personnel transferred to the Retired Reserve and subject to mobilization in accordance with DoD Directive 1352.1 (reference (j)).  Retired Reservists voluntarily may train (without pay) with a unit where they have premobilization orders.  Suitable arrangements with the unit are required.  The Retired Reserve consists of the following categories:

(1)  Reserve members having completed 20 qualifying years creditable for retirement pay, are 60 years or more of age, and have applied for retired pay.

7

(2)  Reserve members having completed 20 qualifying years credita-
ble for retirement pay, are not yet 60 years of age, or are age 60 and have
not applied for retirement pay.

(3)  Reserve members retired for physical disability under 10
U.S.C. 1201, 1202, 1204, or 1205 (reference (d)).  Members have completed
20 years of active service creditable for retirement pay or are more than 30
percent disabled.

(4)  Reserve members having completed 20 or more years of AD
service and retired under Sections 3911, 3914, 6323, 6330, 8911, or 8914 of
reference (d).  This includes regular enlisted personnel of the Army, Navy,
Marine Corps, and Air Force with 20 to 30 years of Military Service who become
Reserve members on retirement.  Navy and Marine Corps retirees are transferred
to the Fleet Reserve (Navy) and Fleet Marine Corps Reserve, respectively.

(5)  Reserve personnel drawing retirement pay based on retirement
for reasons other than age, Service requirements, or physical disability.  This
category is restricted to those who are retired under special conditions as
authorized by the Assistant Secretary of Defense (Reserve Affairs) (ASD(RA))
pursuant to legislation.

(6)  Personnel not eligible for retirement pay, but having request-
ed placement on the Honorary Retired List under Section 274 of reference (d)
and under DoD Instruction 1200.15 (reference (k)).

e.  <u>Voluntary Training</u>.  Members of the RCs, not subject to mandatory
training, shall be encouraged to participate in order to maintain their
mobilization readiness.  Opportunity to participate voluntarily without pay in
training shall be limited by the manpower and resources authorized by the
Secretary.

F.  <u>MEMBERS PARTICIPATING IN APPROVED PROGRAMS OUTSIDE THE DEPARTMENT OF
DEFENSE</u>

1.  <u>Selective Service System</u>.  The SSS administers the Military Selective
Service Act (MSSA) in accordance with 50 U.S.C., App. 451 et seq. (reference
(1)).  The MSSA authorizes the Director of Selective Service, by delegation
from the President, "...to order to active duty with their consent and to
assign to the Selective Service System such officers of the selective-service
section of the State headquarters and headquarters detachments and such other
officers of the federally recognized National Guard of the United States or
other armed forces personnel (including personnel of the reserve components
thereof), as may be necessary for the administration of the national and of the
several State headquarters of the Selective Service System."

a.  <u>Active Duty</u>.  Requests for assignment to SSS in an AD status must be
approved in accordance with DoD Directive 1000.17 (reference (m)).  Costs for
these members shall be reimbursed to the Department of Defense.  Members shall
not be assigned to a RCC or TRC, shall not be counted against RC strengths,
and shall not be included in the RCCPDS files.

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 12
Page 8 of 24

Sep 22, 87
1215.6

b. <u>Inactive Duty</u>. The Department of Defense and the Office of the Director of Selective Service shall agree annually on the number of RC members assigned as IMAs to the SSS. The SSS shall reimburse the Department of Defense for IDT and AT for these members.

2. <u>Civil Defense Activities and CONUS Defense Programs</u>

a. The U.S. civil defense and CONUS defense programs are an integral part of U.S. national security. Support of civil defense may be provided through RC members participating with Federal, State, and local civil agencies only when clearly furthering specifically identifiable DoD interests. Participating shall be in an IDT or ADT status and on a reimbursable basis, except when the primary basis for participating is to meet a DoD program requirement. Subject to priorities and guidance in DoD Directive 3025.10 (reference (n)), military support of these activities is a proper mission for DoD Components. Military planning and liaison may be provided by RC members at selected civil government and military headquarters and includes such tasks and responsibilities as mutual support to civil authorities for civil defense, CONUS defense, physical security of key assets, and disaster relief operations.

b. Programs involving RC members in civil defense activities directly supporting the Federal Emergency Management Agency (FEMA) or State and local government under a FEMA program must be approved jointly by FEMA and the Department of Defense. Assigning members in an AD (other than for training) status supporting of civil defense outside the Department of Defense must be approved in accordance with DoD Directive 1000.17 (reference (m)). The following programs are approved for such participation:

(1) <u>Federal Liaison Officers</u>. These are Reserve officers serving as IMAs performing planning and liaison responsibilities between DoD Components and Federal regional headquarters, including interface with the civil sector as directed by their DoD Component through the Military Service planning agent. Federal liaison officers function primarily in support of DoD missions. All costs are paid by the DoD Component. Each Military Department is authorized to assign one or more Federal liaison officers (other than flag or general officer rank) at each FEMA Region and at FEMA National Headquarters.

(2) <u>State Liaison Officers</u>. These are Reserve officers serving as IMAs performing planning and liaison responsibilities between their DoD Components and State or U.S. Territory Civil Defense or Emergency Service headquarters for interfacing with the civil sector as directed by their DoD Component through the Military Service planning agent. State liaison officers function primarily in support of DoD missions. All costs are paid by the DoD Component. Each Military Department is authorized to assign one or more State liaison officers (other than flag or general officer rank) at each State or U.S. territorial headquarters and shall assign or attach such officers to functions supervised by the State Area Command (STARC).

(3) <u>Regional Military Emergency Coordinators (RMECs)</u>. These are Reserve officers serving as IMAs and performing resource claimancy tasks for their DoD Components while participating in resource management of emergency preparedness and crisis operations under DoD Directive 5030.45 (reference (o)).

9

RMEC officers function primarily in support of DoD missions. All costs are paid by the DoD Component. Each Military Department is authorized to assign one or more officers (other than flag or general officer rank) to the DoD RMEC team.

      (4) <u>Civil Preparedness Support Detachments (CPSD)</u>. These are Selected Reserve units of the U.S. Army Reserve (USAR) whose missions are to augment the communications and security capabilities of FEMA emergency operations centers.

      (5) <u>FEMA IMAs</u>. These are IMAs assigned to responsibilities supporting civil defense planning at FEMA headquarters and regions, and at State and local civil defense activities. These IMAs perform 2 weeks of annual ADT and FEMA reimburses the Department of Defense for these training costs.

    c. Members of the IRR and Standby Reserve Active Status List voluntarily participating in approved Civil Defense activities may receive retirement points in accordance with DoD Instruction 1215.7 (reference (e)).

    d. IRR members participating in civil defense activities may request ADT to attend civil defense courses. If so ordered, these Reservists shall be entitled to pay and allowances including travel allowances for such training.

G. <u>FUNDS</u>

    1. Funds for personnel in the Uniform Reserve, Training and Retirement categories in the RCs, as identified in this Directive, shall be in accordance with DoD 7110.1-M (reference (p)).

    2. The Secretary concerned is authorized to include in the budget for the active component (AC), funds providing AD tours for Reserves on temporary duty in support of AC and RC programs.

H. <u>EFFECTIVE DATE AND IMPLEMENTATION</u>

    This Directive is effective immediately. Forward two copies of implementing documents to the Assistant Secretary of Defense (Reserve Affairs) within 90 days.

William H. Taft, IV
Deputy Secretary of Defense

Enclosures - 5
  1. References
  2. Uniform Reserve, Training and Retirement Categories
  3. Definitions
  4. Table 1, Authorized Reserve, Training and Retirement Categories
  5. Acronyms

10

Sep 22, 87
1215.6 (Encl 1)


REFERENCES, continued


(e)  DoD Instruction 1215.7, "Reserve Retirement Point Credit," December 19, 1974

(f)  Title 37, United States Code, "Pay and Allowances of the Uniformed Services," Section 206 (as amended) December 31, 1985

(g)  Title 32, United States Code, "National Guard," Sections 502, 708, and 709, (as amended) December 31, 1985

(h)  DoD Directive 1215.13, "Unsatisfactory Performance of Ready Reserve Obligation," June 30, 1979

(i)  DoD Directive 1235.9, "Management and Mobilization of the Standby Reserve," July 8, 1986

(j)  DoD Directive 1352.1, "Management and Mobilization of Regular and Reserve Retired Military Members," February 27, 1984

(k)  DoD Instruction 1200.15, "Assignment to and Transfer Between Reserve Categories, Discharge from Reserve Status, Transfer to the Retired Reserve and Notification of Eligibility for Retired Pay," February 16, 1973

(l)  Title 50, United States Code, "War and National Defense," Appendix 451 et seq., (as amended) December 31, 1985

(m)  DoD Directive 1000.17, "Department of Defense Personnel Assigned to Duty Outside the Department and Supporting Non-DoD Activities," May 31, 1977

(n)  DoD Directive 3025.10, "Military Support to Civil Defense," July 22, 1981

(o)  DoD Directive 5030.45, "DoD Representation on Federal Emergency Management Agency (FEMA) Regional Preparedness Committees and Regional Field Boards," November 29, 1983

(p)  DoD 7110.1-M, "Budget Guidance Manual," July 1982, authorized by DoD Directive 7110.1, October 30, 1980

(q)  Title 5, United States Code, "Government Organization and Employees," Section 3101, (as amended) December 31, 1985

(r)  DoD Directive 1200.7, "Screening the Ready Reserve," April 6, 1984

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 12
Page 11 of 24

Sep 22, 87
1215.6 (Encl 2)

### Uniform Reserve, Training and Retirement Categories

There are three RCCs. They are the Ready Reserve, the Standby Reserve, and the Retired Reserve. Each member of the National Guard and Reserve is assigned within one of these categories. (All National Guard members, including those in the Inactive National Guard (ING), are in the Ready Reserve.)

A. <u>Ready Reserve Categories</u>. The Ready Reserve is comprised of military members of the Reserve and National Guard, organized in units or as individuals, and are liable for recall to AD for augmenting the AC in time of war or national emergency under 10 U.S.C. 672 and 673 (reference (d)). The Ready Reserve consists of three RC subcategories: the Selected Reserve, the IRR, and the ING.

1. <u>Selected Reserve Categories</u>. The Selected Reserve consists of those units and individuals in the Ready Reserve designated by their respective Services and approved by the Joint Chiefs of Staff (JCS) as so essential to initial wartime missions that they have priority over all other Reserves. All Selected Reservists are in an active status. The Selected Reserve consists of the following Reserve categories:

a. <u>Selected Reserve Units</u>. Units manned and equipped to serve and/or train either as operational or as augmentation units. Operational units train and serve as units. Augmentation units train together, but when mobilized, lose their unit identity and become part of an AC unit or activity. Selected Reserve units include the following training categories:

(1) <u>Drilling Unit Reservists</u>. Trained unit members participating in unit training activities on a part-time basis. (RCC and TRC SA.)

(2) <u>Unit Full-Time Support Personnel</u>

(a) <u>Active Guard Reserve (AGR)</u>. Guard or Reserve members of the Selected Reserve ordered to AD or full-time National Guard duty with their consent for organizing, administering, recruiting, instructing, or training RC units. All unit AGR members must be assigned against or attached to an authorized mobilization position in the unit they support. (RCC and TRC SG.)

(b) <u>Military Technicians (MT)</u>. Federal civilian employees providing full-time support for administration, training, and maintenance in a Selected Reserve unit. These employees must maintain their status as drilling Reservists in the same unit, are often referred to as dual status individuals, and are counted in the drilling Reservist subcategory. Dual status means they are both civilian employees and drilling Reservists of a Guard or Reserve unit. All dual status MTs must be in mobilizable positions. (RCC and TRC SM.)

(c) <u>Active Component (AC)</u>. AD members paid from regular component appropriations assigned or attached to units by their respective Services to provide advice, liaison, management, administration, training, and/or maintenance support in the category of full-time support. These personnel are not part of the Selected Reserve, but shall deploy with their assigned unit when mobilizing. ACs are counted as part of trained strength in units, but not in the Selected Reserve strengths.

2-1

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 12
Page 12 of 24

(d)  Civil Service Employees (CIV).  These personnel are hired under 5 U.S.C. 3101 (reference (q)) and 32 U.S.C. 709 (reference (g)) to provide administrative support to the RCs.  They are in the category of full-time support to the RCs, but are not part of the Selected Reserve.  CIVs do not have mobilization assignments and they are not in the Selected Reserve strengths.

(3)  Individuals in a Simultaneous Membership Program.  Senior Reserve Officer Training Corps (ROTC) Cadets and Marine Corps Platoon Leader Class students who are also permitted to be members of a Selected Reserve unit. (RCC and TRC ST).

b.  Trained Individuals.  Individual members of the Selected Reserve assigned to an AC organization.  Trained individuals include the following training categories:

(1)  IMAs.  Trained individuals preassigned to an AC, SSS, or a FEMA organization's billet that must be filled on or shortly after mobilization. IMAs participate in training activities on a part-time basis with an AC unit preparing for recall in a mobilization.  The amount of training required is determined by RC policy and may vary from 0 to 48 training periods a year. All IMAs must perform a minimal 2 weeks of AT each year.  (RCC and TRC TB.)

(2)  Individual AGR.  Individual Active Guard Reserve members of the Selected Reserve ordered to AD or full-time National Guard duty in an AC organization with their consent for organizing, administering, recruiting, instructing, or training the RCs.  They are assigned in headquarters and support functions (i.e., Army personnel at Major U.S. Army Reserve Command (MUSARC) and/or State level and above.)  (RCC and TRC TR.)

(3)  Individual MTs.  Military Technicians, who are Federal civilian employees providing full-time support for administration, training, and maintenance in the Selected Reserve, not in a unit.  These employees must maintain their status as drilling Reservists.  All individual MTs must be in mobilizable positions.  (RCC and TRC TW.)

c.  Training Pipeline.  Selected Reserve officer and enlisted personnel who have not yet completed IADT.  In accordance with 10 U.S.C. 671 (reference (d)), all Ready Reservists shall receive training commensurate with their intended wartime assignments, and must complete a minimum of 12 weeks or the equivalent of IADT before any deployment on land outside the United States. The training pipeline is synonymous with the term non-deployable account. Since these personnel in the training pipeline may be mobilized, but may not be available for deployment with their units, they are accounted for separately in the following training categories:

(1)  Personnel currently on IADT.  Includes the second part of split IADT.  (RCC and TRC UF.)

(2)  Personnel Awaiting Second Part of Split IADT.  (RCC and TRC UQ.)

Defs.' Opposition to Pls.' Renewed Motion for Preliminary Injunction Ex. 12 Page 13 of 24

Sep 22, 87
1215.6 (Encl 2)

(3) <u>Personnel Awaiting IADT</u>.  Includes personnel in the Selected Reserve serving with or without pay.  NPS males between the ages of 18½ and 26 years enlisting under Section 511(d) of (reference (d) shall enter IADT insofar as practicable within 270 days after the date of that enlistment. All other members shall perform IADT insofar as practicable within 360 days of that enlistment.  (RCC and TRC UP.)

(4) <u>Other Selected Reserve Untrained Personnel in Training Programs</u>.  Includes chaplains, medical, and early commissioning programs. (RCC and TRC UX.)

2.  <u>IRR Categories</u>.  The IRR (together with the ING) consists of those Ready Reservists not in the Selected Reserve.  IRR consists of the following Reserve categories:

a.  IRR is a manpower pool principally with individuals having had training, having served previously in the AC or in the Selected Reserve, and having some period of their MSO remaining.  There are some voluntary individuals in the IRR for hardship or special nonpay programs providing a variety of professional assignments and opportunities for earning retirement points and military benefits.  These personnel all have an obligation to complete either MSO or another contractural commitment.  Members voluntarily may participate in training for retirement points and promotion with or without pay.  Required training (involuntary) may not exceed 30 days a year under 10 U.S.C. 270(a)(2) (reference (d)).  (RCC and TRC RE for those trained.  TRC RH for those requiring further training or with unknown training status. See table 1.)

b.  Test programs were conducted in FY 1979 and FY 1983 for enlisting nonprior service personnel directly into the IRR.  These personnel were required to receive IADT and are required to receive periodic refresher training.  (RCC and TRC RE for those trained, or RCC and TRC RH for those requiring further training, or those with unknown training status.)

c.  The IRR also includes some personnel participating in officer training programs or in the Armed Forces Health Scholarship program.  Members in this scholarship program are required to perform 45 days of AD for training a year in accordance with Section 2121(c) of reference (d).  (RCC and TRC PJ for officers not in the Selected Reserve participating in officer training programs or RCC and TRC PK for officers not in the Selected Reserve participating in Armed Forces Health Scholarship Programs.)

3.  <u>ING Category</u>

The ING consists of National Guard personnel in an inactive status in the Ready Reserve, not in the Selected Reserve, attached to a specific National Guard unit.  For these personnel to remain ING members, they must muster once a year with their assigned unit, but they do not participate in training activities.  On mobilization, ING members mobilize with their units. Similar to the IRR, some ING members have legal and contractural obligations. ING members may not train for points or pay and are not eligible for promotion.  Currently, the ING category is used only by the Army National Guard. (RCC and TRC II.)

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 12
Page 14 of 24

B.  Standby Reserve Categories.  The Standby Reserve consists of personnel maintaining their military affiliation without being in the Ready Reserve, having been designated key civilian employees, or who have a temporary hardship or disability.  These individuals are not required to perform training and are not part of units.  The Standby Reserve is a pool of trained individuals who may be mobilized as needed to fill manpower needs in specific skills.  The Standby Reserve consists of the following training categories:

1.  Active Status List.  The following members of the Standby Reserve in an active status may participate voluntarily without pay in RC training for retirement points only and may be considered for promotion:

a.  Members of Congress and any members transferred from the Ready Reserve to the Standby Reserve, as a result of being designated as key personnel by their employers, may volunteer for assignment to the Standby Reserve Active Status List for the period they remain designated as key personnel.  Individuals desiring to be transferred shall apply directly to the component concerned.  (RCC and TRC YC.)

b.  Personnel not having fulfilled their statutory MSO, or temporarily assigned for hardship reason intending to return to the Ready Reserve, or retained by an RC in an active status under 10 U.S.C. 1006 (reference (d)).  (RCC and TRC YD.)

2.  Inactive Status List.  The following members of the Standby Reserve are in an inactive status.  They may not participate for points or pay and may not be considered for promotion:

a.  Members transferred to the Inactive Status List instead of separating under Section 1209 of reference (d).  (RCC TRC YL.)

b.  All other members transferred to the Inactive Status List in accordance with DoD Directive 1235.9 (reference (i)).  (RCC TRC YN.)

C.  Retired Reserve Categories

1.  Consists of all personnel transferred to the Retired Reserve. Retired Reservists voluntarily may train with a unit where they have premobilization orders.  Suitable arrangements with the unit are required.  The Retired Reserve consists of the following retired categories:

a.  Reserve members having completed 20 qualifying years creditable for retirement pay, are 60 years or more of age, and have applied for retirement pay.  These members shall be assigned to RCC and TRC V1.

b.  Reserve members having completed 20 qualifying years creditable for retirement pay, are not yet 60 years of age, or are age 60 and have not applied for retirement pay.  These members shall be assigned to RCC and TRC V2.

c.  Reserve members retired for physical disability under Sections 1201, 1202, 1204, or 1205 of reference (d).  Members have completed 20 years of active service creditable for retirement pay or are more than 30 percent disabled. These members shall be assigned to RCC and TRC V3.

2-4

Defs.' Opposition to Pls.' Renewed Motion for Preliminary Injunction Ex. 12 Page 15 of 24

Sep 22, 87
1215.6 (Encl 2)

    d. Reserve members having completed 20 or more years of AD service and retired under Sections 3911, 3914, 6323, 6330, 8911, or 8914 of reference (d). This includes regular enlisted personnel of the Army, Navy, Marine Corps and Air Force with 20 to 30 years of Military Service who become Reserve members on retirement. Navy and Marine Corps retirees are transferred to the Fleet Reserve and Fleet Marine Corps Reserve, respectively. These personnel shall be assigned to RCC and TRC V4.

    e. Reserve personnel drawing retired pay under other than age, Service requirements, or physical disability. This category is restricted for retirement under special conditions as authorized by the Office of the Assistant Secretary of Defense (Reserve Affairs) (OASD(RA)) pursuant to legislation. These personnel shall be assigned to RCC and TRC V5.

    f. Personnel not eligible for retirement pay, but having requested placement on the Honorary Retired List under section 274 of reference (d) and DoD Instruction 1200.15 (reference (k)). These personnel shall be assigned to RCC and TRC V6.

    2. Enlisted Navy and Marine Corps Reserve and regular members retired with 20 or more years of AD, but less than 30 years, are assigned to the Fleet Reserve (Navy) and Fleet Marine Corps Reserve, respectively. When these personnel complete a total of 30 years of Active and Fleet Reserve (retired) service, the Reserve members are then assigned to the Retired Reserve and regular members are assigned to the Regular Retired List. Army and Air Force regular and Reserve enlisted personnel retiring after completing 20 or more years, but less than 30 years of AD, are members of the Reserve and are included in the Retired Reserve. When these members complete a total of 30 years of active and retired service, the regular enlisted retirees are placed on the regular retired list.

    3. All retired members having completed at least 20 years AD (Regular or Reserve), regardless of the retired list where assigned, may be ordered to AD when required by the Secretary of the Military Department in accordance with Section 688 of reference (d).

    4. Retired Reserve members may be ordered to AD in their status as Retired Reserve members. It is not necessary to place the member in the Ready Reserve for this purpose.

    5. Discharged retired members are former members having completed 20 satisfactory years creditable for retirement, but electing to be discharged from the RCs. Since these personnel have been discharged, they are not a part of the Retired Reserve.

Defs.' Opposition to Pls.' Renewed Motion for Preliminary Injunction
Ex. 12
Page 16 of 24

Sep 22, 87
1215.6 (Encl 3)

## DEFINITIONS

1. <u>Active Duty (AD)</u>. Full-time duty in a U.S. Military Service. A general term applied to all active Military Service, including full-time National Guard duty, without regard to duration or purpose. May be served with either ACs or RCs.

2. <u>Active Status</u>. All Reserves are in an active status except those on an Inactive Status List of a RC, in the Inactive Army National Guard, or in a retired status in accordance with Section 267(b) of reference (d). Those in an active status may train for points and/or pay and may be considered for promotion.

3. <u>AD for Special Work (ADSW)</u>. ADSW is authorized for personnel from military and Reserve personnel appropriations for projects on AC or RC programs. These include annual screening, training camps operation, training ships operation, and unit conversions to new weapons systems when such duties are essential to the organization. Support for study groups, training sites and exercises, accomplishing short-term projects, and performing administrative or support functions. ADSW tours exceeding 180 days are accountable against AD end strength in accordance with 10 U.S.C. 115(b)(1)(B) (reference (d)). By policy, such tours normally are limited to 139 days or less in 1 FY. Exceptions to the 139-day limit may be granted on an individual basis for specific mission requirements. Nontechnician personnel shall receive priority consideration for such tours.

4. <u>AD for Training (ADT)</u>. An ADT tour under orders providing for automatic reversion to inactive duty status when the specified period of ADT is completed. ADT includes full-time attendance at formal specialized skill training, flight training, combat crew training, and professional development education programs intended to provide RC members with necessary skills and disciplines supporting RC missions. Special AD for activities having a primary training content also is authorized as ADT.

5. <u>Annual Screening</u>. At least 1 day of ADT is required each year for IRR members to accomplish the annual screening requirements of Section 271 of reference (d). The Services are required to maintain the current status of each member's physical condition, dependency status, military qualifications, civilian occupational skills, availability for service, and other information prescribed by Section 271 of reference (d) and the Service Secretary.

6. <u>Annual Training (AT)</u>. The minimal period of AT or annual field training that a Reserve member must perform each year to satisfy the AT requirements associated with his and or her RC assignment. AT normally is performed during one consecutive period. Selected units or IMAs may perform this training in increments of 3 or more days if training requirements and any additional costs (including travel costs) are justified.

7. <u>Inactive Duty Training (IDT)</u>. Authorized and scheduled training performed by a Reservist not on AD, AT, or ADT and consisting of regular training periods, assemblies or drills, periods of applicable duty or equivalent training,

Defs.' Opposition to Pls.' Renewed Motion for Preliminary Injunction Ex. 12
Page 17 of 24

additional special duties authorized for Reservists by an authority designated by the Secretary concerned and performed by Reservists with the prescribed organization where they are assigned. Includes similar duties performed by Reservists in their status as National Guard members.

8. <u>Inactive Status</u>. Those Reserve members, on an inactive status list of a RC in accordance with 10 U.S.C. 273, (reference (d)), or assigned to the Inactive Army National Guard. Those in an inactive status may not train for points or pay and may not be considered for promotion.

9. <u>Individual Mobilization Augmentees (IMAs)</u>. IMAs are drilling individual Reservists that are trained and preassigned to an AC organization, a SSS, or a FEMA billet that must be filled on or shortly after mobilization. IMAs participate in training activities on a part-time basis with these organiza-tions preparing for recall or mobilization. The IDT amount required is determined by component policy and may vary from 0 to 48 drills a year.

10. <u>IMA Detachments</u>. An administrative unit for managing and training IMA.

11. <u>Initial ADT (IADT)</u>. IADT includes basic military training and technical skill training required for all accessions. For nonprior service male enlistees who are between the ages of 18 1/2 and 26, this IADT shall be for a period of not less than 12 weeks to commence insofar as practical within 270 days after the date of enlistment. For all other enlistees and inductees, IADT shall be for a period prescribed by the Secretary concerned to commence insofar as practical within 360 days after entry into service, except that in time of war or national emergency declared by Congress or the President the period of basic training (or its equivalent) shall be for a period of not less than 12 weeks. A member of the RC may not be assigned to active duty on land outside the United States, its territories and possessions until the member has completed basic training.

12. <u>Key Employee</u>. Any member identified by his and/or her public or private employer occupying a key position as defined in DoD Directive 1200.7, (reference (r)).

13. <u>Key Position</u>. A civilian (public or private sector) position that may not be vacated during war or national emergency as designated by the Agency Head and approved by the Secretary concerned in accordance with reference (r).

14. <u>Multiple IDT Periods (MIDTPs)</u>. Consists of two scheduled periods of IDT performed in 1-calendar day, each at least 4 hours in duration. No more than two IDT periods may be performed in 1 day.

15. <u>Nondeployable Account</u>. Separate accounts in each unit and centrally for individuals not in units that collect Reservists assigned to RCCs and TRCs UF, UQ, UP, and UX for both officer and enlisted personnel who have not completed basic IADT of 12 weeks or its equivalent. These personnel are not considered as trained strength assigned to units or mobilization positions and therefore are not deployable overseas on land with those units or to those mobilization positions. Synonymous with Training Pipeline.

16. <u>Nonprior Service Personnel</u>. An individual receiving a commission in or enlists directly into a U.S. Armed Force and has not completed basic IADT.

3-2

Defs.' Opposition to Pls.' Renewed Motion for Preliminary Injunction Ex. 12 Page 18 of 24

Sep 22, 87
1215.6 (Encl 3)

17. <u>Qualifying Years Creditable for Retirement Pay</u>. In order for a Guardsman or Reservist to be eligible for retired pay at age 60, the individual must have at least 20 years of service in which the individual receives at least 50 retirement points in a year. The last 8 years of qualifying years of service must have been served in a RC.

18. <u>Reserve Component (RC) Category (RCC)</u>. The category identifying the status of individual in a specific RCC within each RC Identified by a RCC designator.

19. <u>RCs of the Armed Forces</u>. As defined in 10 U.S.C. 261(a) (reference(d)), the RCs include the U.S. Army National Guard, the Army Reserve, the Naval Reserve, the Marine Corps Reserve, the U.S. Air National Guard, the Air Force Reserve, and the Coast Guard Reserve.

20. <u>Secretary of Military Department (Secretary Concerned)</u>. The Secretaries of the Army, Navy, Air Force, and (for purposes of this Directive) the Commandant of the Coast Guard when the Service is operating as a DoT Agency.

21. <u>Selected Reserve Strength</u>. The total numbers of Guardsmen and Reservists who are members of the Selected Reserve subject to the Presidential recall authority of 200,000 persons and for mobilization under declarations of war or national emergency. Includes paid and nonpaid members. All Selected Reservists are in an active status.

22. <u>Training and Retired Category (TRC)</u>. The category identifying the status of individuals in a specific TRC within each RCC and RC. Identified by a TRC designator.

23. <u>Training Period</u>. An authorized and scheduled regular IDT period of a prescribed time, not less than 2 hours for retirement point credit, and not less than 4 hours for pay. Previously used interchangeably with other common terms such as drills, drill periods, assemblies, periods of instruction, etc.

24. <u>Training Pipeline</u>. RCC designation for those untrained officers and enlisted personnel who have not completed IADT of 12 weeks or its equivalent. Synonymous with non-deployable account.

25. <u>Trained Strength in Units</u>. Those personnel assigned to units who have completed basic IADT of 12 weeks or its equivalent and are eligible for deployment overseas on land, when mobilized under proper authorities. Excludes personnel in nondeployable accounts.

26. <u>Training Unit</u>. A unit established to provide military training to individual Reservists or to RC units.

27. <u>Unit</u>. When used alone, the term denotes a unit of the Selected Reserve that is organized, equipped, and trained to be mobilized and to serve on AD as a unit or that augments or is augmented by another unit. Headquarters and support functions without wartime missions are not considered units under this Directive.

28. <u>Voluntary Training</u>. Training in a nonpay status for IRR members and active status Standby Reservists. Participating in voluntary training is for retire-

Defs.' Opposition to Pls.' Renewed Motion for Preliminary Injunction Ex. 12 Page 19 of 24

ment points only and may be achieved by training with drilling units of the Selected Reserve, voluntary training units, or reinforcement training units; by ADT without pay; by completing of authorized military correspondence courses; by attendance at designated courses of instruction; by participating in desig-nated special military events; or by participating in authorized civil defense activities. Retirees also may train voluntarily without pay or other credit with organizations to which they shall be assigned upon recall to AD, or with other organizations with which applicable arrangements have been made. Oppor-tunity to participate voluntarily shall be limited to that training made available within the manpower and resources authorized by the Secretary con-cerned.

29. <u>Voluntary Training Unit or Reinforcement Training Unit</u>. A unit formed by volunteers to provide RC training in a nonpay status for IRRs and active status Standby Reservists attached under competent orders and participating in such units for retirement points.

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 12
Page 20 of 24

Sep 22, 87
1215.6 (Encl 4)

# TABLE 1
# AUTHORIZED RESERVE, TRAINING AND RETIREMENT CATEGORIES

| RESERVE COMPONENT CATEGORY | RESERVE COMPONENT SUB-CATEGORY | RES. COMP CATEGORY DESIGNATOR | TRAINING/RETIREMENT CATEGORY (TRC) DESIGNATOR | COMPRISED OF | MINIMUM NUMBER OF PERIODS OF IDT REQUIRED ANNUALLY | MINIMUM NUMBER OF DAYS OF AT REQUIRED ANNUALLY | REMARKS | ARNG | USAR | USNR | USMCR | ANG | USAFR | USCGR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| READY RESERVE | SELECTED RESERVE | S (TRAINED INDIVIDUALS IN UNITS) | A | INDIVIDUALS IN UNITS | 48 | RESERVE — 14 DAYS (EXCL. TRAVEL); GUARD — 15 DAYS (INCL. TRAVEL) | 10 USC 270(A) (1) REQUIRES 14 DAYS OF AT EXCL. OF TRAVEL TIME. 32 USC 502 REQUIRES A MINIMUM OF 15 DAYS OF AT PER YEAR (BY POLICY. INCLUDES TRAVEL TIME.) | X | X | X | X | X | X | X |
| | | | G | ACTIVE GUARD/RESERVE (AGR) IN UNITS | N/A | N/A | AGR MAY BE REQUIRED TO ATTEND DRILLS (INCLUDES NAVY TARS AND MC FTS) (ARMY BELOW MUSARC/STARC) | X | X | X | X | X | X | |
| | | | M | MILITARY TECHNICIANS IN UNITS | 48 | SAME AS TRC A | MT ARE DUAL STATUS PERSONNEL WHO MUST BE ASSIGNED TO A DRILLING BILLET AND MUST FULFILL THE IDT AND ADT REQUIREMENTS OF THAT BILLET | X | X | X | X | X | X | |
| | | | T | INDIVIDUALS IN A SIMULTANEOUS MEMBERSHIP PROGRAM | 48 | SAME AS TRC A. | SENIOR ROTC CADETS OR MARINE CORPS PLATOON LEADER CLASS MEMBERS WHO ARE ALSO PERMITTED TO BE MEMBERS OF A SELECTED RESERVE UNIT | X | X | X | X | X | X | |
| | | U (TRAINED INDIVIDUALS (NON UNITS)) | B | INDIVIDUAL MOBILIZATION AUGMENTEES (IMA'S) | IDT VARIES BETWEEN 0 AND 48 DAYS/PER YEAR DETERMINED BY COMPONENT POLICY | RESERVE — 12-14 DAYS (EXCL. TRAVEL) | UNLESS TRAINING CAN BE ACCOMPLISHED ON WEEKENDS, AT IS LIMITED TO 12 DAYS BY POLICY. REPLACES PREVIOUS TRCS A, B, C, & D FOR IMAS. | X | X | X | X | X | X | X |
| | | | R | INDIVIDUAL ACTIVE GUARD/RESERVE (AGR) | N/A | N/A | INDIVIDUAL AGR MAY BE REQUIRED TO ATTEND DRILLS DEPENDING ON JOB ASSIGNMENT (INCLUDES NAVY TARS AND TEMAC, MC FTS AND ALL STAT TOUR PERSONNEL) (ARMY MUSARC/STARC AND ABOVE) | X | X | X | X | X | X | |
| | | | W | INDIVIDUAL MILITARY TECHNICIANS | 48 | SAME AS UNIT TRC A | EX. ARNG/ANG STATE HEADQUARTERS, NUMBERED AF HQDTS. ARNG MAINT. DEPOTS | X | X | X | X | X | X | |
| | | U (TRAINING PIPELINE (NON DEPLOYABLE ACCOUNT)) | F | PERSONNEL CURRENTLY ON IADT | 0 | N/A | OFFICERS AND ENLISTED. INCLUDES 2ND PART OF SPLIT TRAINING AND ARMY ONE-STATION UNIT TRAINING. (APPLIES TO TRCS F, O & P) | X | X | X | X | X | X | X |
| | | | O | PERSONNEL AWAITING 2ND PART OF IADT | 48 | N/A | | X | X | X | X | X | X | X |
| | | | P | PERSONNEL AWAITING ENTRY ON IADT | MINIMUM IDT TO BE DETERMINED BY COMPONENT POLICY | N/A | INCLUDES PERSONNEL WITH OR WITHOUT PAY. MEMBERS MUST NORMALLY ENTER IADT WITHIN 270 DAYS OF ENLISTMENT | X | X | X | X | X | X | X |
| | | | X | PERSONNEL IN OTHER TRAINING PROGRAMS | 48 | SAME AS UNIT TRC A | SELECTED RESERVE UNTRAINED MEMBERS IN OTHER TRAINING PROGRAMS, INCLUDING CHAPLAINS, MEDICAL, HEALTH PROFESSIONAL STIPEND, AND EARLY COMMISSIONING. MUST MEET THE SAME TRAINING REQUIREMENTS AS TRC A RESERVISTS | X | X | | | | | |

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 12
Page 21 of 24

## TABLE 1, CONTINUED
# AUTHORIZED RESERVE, TRAINING AND RETIREMENT CATEGORIES

| RESERVE COMPONENT CATEGORY | RESERVE COMPONENT SUB CATEGORY | RES. COMP CATEGORY (RCC) DESIGNATOR | TRAINING/ RETIREMENT CATEGORY (TRC) DESIGNATOR | COMPRISED OF | MINIMUM NUMBER OF PERIODS OF IDT REQUIRED ANNUALLY | MINIMUM NUMBER OF DAYS AT REQUIRED ANNUALLY | REMARKS | ARNG | USAR | USNR | USMCR | ANG | USAFR | USCGR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| READY RESERVE | INDIVIDUAL READY RESERVE/ INACTIVE NATIONAL GUARD | R (IRR) | E | TRAINED INDIVIDUAL MEMBERS OF THE IRR | N/A | 1 | IRR MEMBERS MAY VOLUNTARILY PARTICIPATE IN TRAINING FOR RETIREMENT POINTS AND PROMOTION WITH OR WITHOUT PAY. REQUIRED TRAINING MAY NOT EXCEED 30 DAYS PER YEAR PER 10 USC 270 (A)(2) (IF STATUS OF TRAINING IS UNKNOWN, USE TRC H). | | x | x | x | | x | x |
| | | | H | INDIVIDUAL MEMBERS OF THE IRR REQUIRING FURTHER TRAINING | N/A | 1 | | | x | x | x | | x | x |
| | | P (READY RESERVE TRAINING) | J | PERSONNEL NOT IN THE SELECTED RESERVE PARTICIPATING IN OFFICER TRAINING PROGRAMS. | 0 | AS REQUIRED BY SPECIFIC PROGRAM | CHAPLAIN AND JAG SCHOOLING, EDUCATION DELAY, ROTC ASSIGNMENT DELAY, ARMY EARLY COMMISSIONING PROGRAM, COAST GUARD DIRECT COMMISSION CANDIDATES, M.C. PLATOON LEADER CLASS. | | x | x | x | | x | x |
| | | | K | PERSONNEL NOT IN THE SELECTED RESERVE PARTICIPATING IN ARMED FORCES HEALTH SCHOLARSHIP PROGRAMS. | 0 | 45 DAYS | HEALTH PROFESSIONS SCHOLARSHIP PROGRAMS 10 USC 2121(C) AND DODD 1215.14 REQUIRE 45 DAYS OF ACTIVE DUTY ANNUALLY. | | x | x | | | x | |
| | | (ING) | I | INACTIVE NATIONAL GUARD (ING). | 0 | 1 | MUST MEET ANNUAL MUSTER WITH ASSIGNED UNIT. MAY NOT TRAIN FOR POINTS OR PAY, AND ARE NOT ELIGIBLE FOR PROMOTION. | x | | | | | | |
| STANDBY RESERVE | | Y (STANDBY) | C | ACTIVE STATUS LIST. | 0 | 0 | KEY EMPLOYEES ONLY PER DODD 1200.7. ACTIVE STANDBY MEMBERS MAY VOLUNTARILY TRAIN FOR POINTS WITHOUT PAY AND ARE ELIGIBLE FOR PROMOTION. OTHER ACTIVE STATUS MEMBERS | | x | x | x | | x | x |
| | | | D | ACTIVE STATUS LIST. | 0 | 0 | | | x | x | x | | x | x |
| | | | L | INACTIVE STATUS LIST. | 0 | 0 | MEMBERS TRANSFERRED TO INACTIVE STATUS LIST IN LIEU OF SEPARATION UNDER CH 6 (10 USC 1209). INACTIVE STANDBY MEMBERS MAY NOT TRAIN FOR POINTS WITHOUT PAY AND ARE NOT ELIGIBLE FOR PROMOTION. OTHER INACTIVE STATUS MEMBERS | | x | x | x | | x | x |
| | | | N | INACTIVE STATUS LIST | 0 | 0 | | | x | x | x | | x | x |

4-2

Sep 22, 87
1215.6 (Encl 4)

### TABLE 1 , CONTINUED
# AUTHORIZED RESERVE, TRAINING AND RETIREMENT CATEGORIES

| RESERVE COMPONENT CATEGORY | RESERVE COMPONENT SUB CATEGORY | RES. COMP. CATEGORY (RCC) DESIGNATOR | TRAINING/ RETIREMENT CATEGORY (TRC) DESIGNATOR | COMPRISED OF | MINIMUM NUMBER OF PERIODS OF IDT REQUIRED ANNUALLY | MINIMUM NUMBER OF DAYS OF AT REQUIRED ANNUALLY | REMARKS | CURRENTLY USED BY | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | ARNG | USAR | USNR | USMCR | ANG | USAFR | USCGR |
| RETIRED RESERVE | | V (RETIRED) | 1 | DRAWING RESERVE RETIRED PAY UNDER 10 USC 1331 | N/A | N/A | RESERVE MEMBERS WHO HAVE COMPLETED 20 QUALIFYING YEARS CREDITABLE FOR RETIREMENT PAY, 60 YEARS OF AGE OR MORE AND ARE DRAWING RETIRED PAY. (PREV CAT 1.) | | X | X | X | | X | X |
| | | | 2 | NOT DRAWING RETIRED PAY BUT ELIGIBLE AT AGE 60 UNDER 10 USC 1331. | N/A | N/A | RESERVE MEMBERS WHO HAVE COMPLETED 20 QUALIFYING YEARS CREDITABLE FOR RETIREMENT PAY BUT ARE NOT YET 60 YEARS OF AGE OR ARE AGE 60 AND NOT APPLIED FOR PAY. (PREVIOUS CATEGORY 3.) | | X | X | X | | X | X |
| | | | 3 | RESERVE MEMBERS RETIRED FOR PHYSICAL DISABILITY. | N/A | N/A | RESERVE MEMBERS RETIRED FOR PHYSICAL DISABILITY UNDER 10 USC 1201, 1202, 1204 OR 1205. MEMBERS HAVE 20 YEARS OF ACTIVE SERVICE CREDITABLE FOR RETIREMENT PAY OR ARE MORE THAN 30% DISABLED. (PREVIOUS CATEGORY 6) | | X | X | X | | X | X |
| | | | 4* | RESERVE MEMBERS WHO HAVE COMPLETED 20 OR MORE YEARS OF ACTIVE DUTY. | N/A | N/A | RESERVE MEMBERS WHO HAVE COMPLETED 20 OR MORE YEARS OF ACTIVE DUTY SERVICE AND RETIRED UNDER 10 USC 3911, 3914, 6323, 8330, 8911, OR 8914. INCLUDES REGULAR AND RESERVE ARMY AND AF ENLISTED PERSONNEL, WITH BETWEEN 20 AND 30 YEARS OF MILITARY SERVICE, AND REGULAR AND RESERVE NAVY AND MARINE CORPS ENLISTED PERSONNEL, IN THE FLEET RESERVE (NAVY) AND FLEET MARINE CORPS RESERVE WITH BETWEEN 20 AND 30 YEARS OF SERVICE. (PREVIOUS CATEGORY 7.) | | X | X | X | | X | X |
| | | | 5 | DRAWING RESERVE RETIRED PAY UNDER OTHER THAN 10 USC 1331 OR OTHER THAN REASONS OF PHYSICAL DISABILITY. | N/A | N/A | RESERVE PERSONNEL, DRAWING RETIREMENT PAY BASED ON RETIREMENT FOR REASONS OTHER THAN AGE, SERVICE REQUIREMENTS OR PHYSICAL DISABILITY. THIS CATEGORY IS RESTRICTED TO THOSE WHO ARE RETIRED UNDER SPECIAL CONDITIONS AS AUTHORIZED BY THE ASSISTANT SECRETARY OF DEFENSE (RESERVE AFFAIRS) PURSUANT TO LEGISLATION. | | X | X | X | | | |
| | | | 6 | NOT DRAWING RETIRED PAY AND NOT ELIGIBLE AT AGE 60 HONORARY RETIREES | N/A | N/A | MEMBERS WHO ARE NOT ELIGIBLE FOR RETIRED PAY, WHO HAVE REQUESTED PLACEMENT ON THE HONORARY RETIRED LIST UNDER 10 USC 274 AND 1000,1200.15, ¶(C) 3 + 4 (PREVIOUS CATEGORY 5) | | X | X | X | | X | X |

*NOTE: PREVIOUS CATEGORY 4 DELETED. SEE TEXT

4-3

Sep 22, 87
1215.6 (Encl 5)

## ACRONYMS

| Acronym | Description | Page Established |
|---------|-------------|------------------|
| AC | Active Component | 10 |
| AD | Active Duty | 2 |
| ADSW | Active Duty for Special Work | 2 |
| ADT | Active Duty Training | 2 |
| AFTP | Additional Flying and Flight Training Period | 3 |
| AGR | Active Guard/Reserve | 4 |
| ASD(RA) | Assistant Secretary of Defense (Reserve Affairs) | 8 |
| AT | Annual Training | 2 |
| ATP | Additional Training Periods | 3 |
| CIV | Civil Service Employee | 2-2 |
| CONUS | Continental United States | 1 |
| CPSD | Civil Prepardness Support Detachment | 10 |
| DoD | Department of Defense | 1 |
| DoT | Department of Transportation | 1 |
| FEMA | Federal Emergency Management Agency | 9 |
| FY | Fiscal Year | 3 |
| IADT | Initial ADT | 4 |
| IDT | Inactive Duty Training | 2 |
| IMA | Individual Mobilization Augmentees | 5 |
| ING | Inactive National Guard | 2-1 |
| IRR | Individual Ready Reserve | 2 |
| JCS | Joint Chiefs of Staff | 2-1 |
| MIDTP | Multiple IDT Period | 3 |
| MSO | Military Service Obligation | 6 |
| MSSA | Military Selective Service Act | 8 |
| MUSARC | Major U.S. Army Reserve Command | 2-2 |
| NPS | Nonprior Service | 4 |
| OJCS | Organization of the Joint Chiefs of Staff | 1 |
| OSD | Office of Secretary of Defense | 1 |
| RCCPDS | Reserve Components Common Personnel Data System | 1 |
| RCC | Reserve Component Category | 1 |
| RC | Reserve Component | 1 |
| RMEC | Regional Military Emergency Coordinator | 9 |
| RMP | Readiness Management Period | 3 |
| ROTC | Reserve Officers Training Corps | 2-2 |
| SSS | Selective Service System | 1 |
| STARC | State Area Command | 9 |
| TAR | Training and Administration of the Reserve | 4 |
| TRC | Training and/or Retired Categories | 1 |
| USAR | U.S. Army Reserve | 10 |

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 12
Page 24 of 24

REPRINT - Changes 1 and 2 have been incorporated.



February 16, 1973
**NUMBER** 1200.15

---

ASD (M&RA)

# Department of Defense Directive

SUBJECT  Assignment to and Transfer Between Reserve Categories,
Discharge from Reserve Status, Transfer to the
Retired Reserve and Notification of Eligibility for
Retired Pay

Refs.: (a)  The Military Selective Service Act of 1971 (50 U.S.C.
App 451 et seq.)
(b)  Title 10, United States Code
(c)  DoD Directive 1200.7, "Screening the Ready Reserve,"
July 2, 1970
(d)  DoD Directive 1200.3, "Fulfilling the Military Service
Obligation," August 21, 1968
(e)  DoD Directive 1235.9, "Management and Mobilization
of the Standby Reserve," August 28, 1973
(f)  DoD Directive 1205.6, "Assignment to and Transfer
Between Reserve Categories, and Discharge from
Reserve Status," Nov. 9, 1968 (hereby cancelled)
(g)  DoD Directive 1200.4, "The Retired Reserve of the
Reserve Forces," September 24, 1963 (hereby
cancelled)
(h)  DoD Directive 1340.7, "Notification of Eligibility for
Retired Pay for Members of Reserve Components,"
March 29, 1967 (hereby cancelled)

## I.  PURPOSE AND APPLICABILITY

This Directive establishes Department of Defense policy and
guidance to the Military Departments for assignment of mili-
tary personnel to and transfer between reserve categories
and discharge from reserve status; transfer of reserve offi-
cer and enlisted personnel to the Retired Reserve of the
Reserve Forces, and notification of members of the respec-
tive Reserve Components by the Military Departments when
the member has completed the years of service required for
eligibility for retired pay.

#First amendment (Ch 2, 1/18/74)

2-2

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 13
Page 1 of 10

## II.  POLICY

### A.  Transfer Between Reserve Categories

1. <u>Ready Reserve</u> original membership may be attained by:

   a. Transfer thereto under sections 269(a) and 651 of reference (b) upon release from active duty;

   b. Appointment as a reserve officer and assignment to the Ready Reserve under section 6(d), reference (a), and section 269(a) of reference (b);

   c. Entry (appointment or enlistment) into the Army National Guard of the United States or Air National Guard of the United States in accordance with section 269(b) of reference (b) as affected by sections 510, 591, 3077, 3261, 3351, 8077, 8261, and 8351 of reference (b);

   d. Direct entry under section 511 of reference (b); or

   e. Direct voluntary entry (appointment or enlistment) of an individual into the Ready Reserve under chapters 31 and 35 of reference (b), other than as provided above.

2. <u>Standby Reserve</u> without prior membership in the Ready Reserve may be attained in accordance with sections 269(e)(1) and 269(f) of reference (b) upon release from five or more years of active duty (other than for training) in the Armed Forces.

3. <u>Transfer to the Standby Reserve</u> (section 269 of reference (b))

   a. Provided they are not on active duty, the following personnel who have not fulfilled their total military service statutory obligation shall, upon their request, be assigned to or transferred to the Standby Reserve:

      (1)  Those who have served five or more years on active duty (other than for training).

2

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 13
Page 2 of 10

Feb 16, 73
1200.15

Continuation of II. A. 3. a.

> (2)  Those who have served on active duty (other than for training) and participated satisfactorily in accredited training programs of the Ready Reserve for a combined total of at least five years, or such shorter period as the Secretary of a Military Department concerned, with the approval of the Secretary of Defense, may prescribe.

b.  Individuals qualifying for assignment or transfer to the Standby Reserve under 3. a., above, shall if otherwise qualified therefor and a suitable vacancy exists, be afforded the opportunity to execute a written agreement to be assigned to or remain in the Ready Reserve.  All such voluntary agreements will provide that:

> (1)  The reservist may be transferred to the Standby Reserve by the appropriate Secretary for cogent reasons;

> (2)  The reservist waives his right to transfer to the Standby Reserve under the conditions stated in 3. a., above, while serving under such agreement.

> (3)  The period of the agreement shall be as prescribed by paragraph IV. B. 2., reference (c).

c.  Transfer to the Standby Reserve under the screening process in conformance with section 271 of reference (b) will be accomplished under reference (c).

d.  Transfer to the Standby Reserve of members of the Army National Guard of the United States or the Air National Guard of the United States will be subject to section 269(g) of reference (b).

e.  Upon transfer of a member of the Ready Reserve to the Standby Reserve, notification thereof to the Selective Service System will be made by the Military Department concerned in accordance with paragraph V. A. 6. (a) of reference (e).

f.  Assignment to the Inactive Status List of the Standby Reserve and retention thereon is governed by reference (e).

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 13
Page 3 of 10

Continuation of II. A. 3.

### 4. Transfer from the Standby Reserve

    a. In accordance with section 272 of reference (b), any member of the Standby Reserve who has not completed his statutory obligated period of military service in the Ready Reserve may be transferred to the Ready Reserve whenever the reasons for his transfer to the Standby Reserve no longer exist, provided he is otherwise qualified and a requirement exists.

    b. Subject to such regulations as the appropriate Secretary may prescribe, a member of either the Standby Reserve or the Retired Reserve may, upon his own request, be transferred to the Ready Reserve if qualified and a requirement exists for him. However, a member of the Retired Reserve who is entitled to retired pay may not be transferred to the Ready Reserve unless the Secretary concerned personally makes a special finding that the member's services in the Ready Reserve are indispensable. Such voluntary transfer will be accomplished under section 269(d) of reference (b). Those who have fulfilled their Ready Reserve statutory obligation will be required to execute a written agreement to serve in the Ready Reserve under conditions set forth in A. 3. b., above.

    c. In any case, where an individual is transferred from the Standby Reserve to the Ready Reserve or the Retired Reserve, notification thereof to the Selective Service System will be made by the Military Department concerned in accordance with paragraph V. A. 6. (b) of reference (e).

### B. Discharge

    1. Enlisted members of the Ready Reserve or the Standby Reserve not on active duty who have completed their statutory obligation or who are not otherwise subject to a military obligation will be discharged upon the completion of their obligation or upon the expiration of their enlistment, as the case may be, unless they voluntarily (1) reenlist to serve in the Ready Reserve or Standby Reserve, or (2), where applicable, extend their enlistment to remain in the Ready Reserve or (3) request transfer to the Inactive Status List of the Standby Reserve under the provisions of reference (e). Only those personnel listed in section IV. A. 1. (b)(c) and (d) of reference (e) may reenlist in the Standby Reserve.

Defs.' Opposition to Pls.' Renewed Motion for Preliminary Injunction Ex. 13 Page 4 of 10

Feb 16, 73
1200.15

Continuation of II. B.

2. Any person who while a member of a Reserve Component becomes a regular or duly ordained minister of religion shall be discharged from such Reserve Component upon request under section 1162(b) of reference (b). The definition of regular or duly ordained minister of religion provided in section 16(g) of reference (a) shall be used in connection with this regulation.

3. Those commissioned officers of the reserve who have accepted indefinite appointments under section 593 of reference (b) will not be subject to mandatory discharge upon completion of the statutory obligation.

4. Discharge from one's statutory obligation for hardship or other causes will be governed by pertinent provisions of references (c) and (d).

5. Discharge from the Reserve Components is governed by sections 1003, 1162, and 1163 of reference (b), subject to sections 680-681 and 1006 of the same reference.

6. Upon the discharge of members of the Standby Reserve, due notification thereof will be made to the Selective Service System by the Military Department concerned.

C. <u>Transfer to the Retired Reserve of the Reserve Forces</u>

1. <u>Retired Reserve Lists</u>. The Retired Reserve consists of persons covered by section 274 of reference (b). Their names shall be carried on retired lists maintained by the appropriate Secretaries of the Military Departments under section 1376(a) of reference (b).

2. <u>Eligibility for Assignment or Transfer to the Retired Reserve</u>

a. The appropriate Secretary of a Military Department:

(1) Shall assign or transfer to the Retired Reserve any member of a Reserve Component who is retired under section 3911, 6323, or 8911 of reference (b).

(2) Shall assign or transfer to the Retired Reserve, upon his application under section 1331 of reference (b), any member of a Reserve Component who:

5

Continuation of II. C. 2. a. (2)

    (a)  has completed a total of twenty years of honorable service in the Armed Forces, unless he is a member of the Ready Reserve and is serving under an agreement to remain in the Ready Reserve for a stated period;

    (b)  is serving under an agreement to remain in the Ready Reserve for a stated period but for whom the agreement has been waived by the Secretary concerned; or

    (c)  has been found physically disqualified for active duty as a result of a service-connected disability regardless of total years of service completed.

(3)  May assign or transfer to the Retired Reserve, upon his application, any member of a Reserve Component who:

    (a)  has completed ten or more years of active commissioned service in the Armed Forces; or

    (b)  has been found physically disqualified for active duty, not as a result of his own misconduct, regardless of total years of service completed.

(4)  May also assign or transfer to the Retired Reserve, upon his application, any member of a Reserve Component who, having attained the age of 37 years:

    (a)  has completed a minimum of eight years of service described in section 1332(a)(2) of reference (b); or

    (b)  has completed a minimum of eight years of service described in section 1332(a)(1) of reference (b), (including at least six months of honorable service on active duty in time of war or national emergency), except that the service may have been performed before or after July 1, 1949; or

    (c)  has consistently supported the Armed Forces in an outstanding manner, when the Secretary concerned determines that such action is warranted.

b.  Upon assignment or transfer to the Retired Reserve, a member shall be placed on the retired list in the highest grade in which

Continuation of II. C. b.

Feb 15, 73#
1200.15

> he has satisfactorily served, as determined by the Secre-
> tary concerned, or in the highest grade for which eligible
> according to law.

\* 3. <u>Removal from Active Status.</u>  Individual reservists who are \*
\*    qualified for retirement under the provisions of sections 1331 \*
\*    and 1332, title 10, U.S.C. (reference (b)), except for having \*
\*    reached 60 years of age, are required to attain 50 points \*
\*    annually to be retained in the Ready Reserve or active status \*
\*    list, Standby Reserve.  Waiver of this requirement on a one- \*
\*    time basis may be made under exceptional circumstances by \*
\*    the Secretary concerned.  This policy is effective with the \*
\*    anniversary date of each reservist's current training year \*
\*    (retirement year). \*

D. <u>Notification of Eligibility for Retired Pay</u>

1. The Secretary of each Military Department shall provide a
   notification to each person who has met all of the following
   conditions for eligibility for retired pay at age 60 under
   section 1331(a) of reference (b):

   a. Completion of at least 20 years of qualifying service as
      prescribed in section 1331(a)(2) of reference (b).

   b. Performance under section 1331(a)(3) of reference (b) of
      the last eight years of qualifying service while a member
      of a Reserve Component named in section 1332(a)(1) of
      reference (b).

   c. As prescribed in section 1331(c) of reference (b), if the
      person was a reserve of an Armed Force, or a member
      of the Army without component or other category covered
      by section 1332(a)(1) of reference (b) (except a regular
      component) before August 16, 1945, he must have per-
      formed active duty after April 5, 1917 and before
      November 12, 1918, or after September 8, 1940 and
      before January 1, 1947, or active duty (other than for
      training) after June 26, 1950 and before July 28, 1953.

2. The notification will be issued within one year after the
   person concerned has completed all of the above eligibility
   requirements.

3. After a person has been granted retired pay under chapters
   67 and 71 of reference (b) or has been notified in accordance
   with this Directive that he has completed the years of service
   required for eligibility for retired pay at age 60, this eligi-
   bility may not be denied or revoked on the basis of any error,
   miscalculation, misinformation, or administrative determina-
   tion of years of service performed, unless it resulted directly
   from the fraud or misrepresentation by the individual con-
   cerned.

#First amendment (Ch 2, 1/18/74)

7

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 13
Page 7 of 10

Continuation of II. D.

Feb 16, 73#
1200.15

4. The number of years of creditable service upon which retired pay is computed may be adjusted to correct any error, miscalculation, misinformation or administrative determination, and when such a correction is made the person is entitled to retired pay in accordance with the number of years of creditable service, as corrected, from the date he is granted retired pay.

5. The format for the notification is enclosed. Local reproduction of the notification format is authorized.

6. In view of the restrictions on denial or revocation of eligibility for retired pay, as stated in paragraph 3., above, suitable controls and procedures shall be established to avoid errors, miscalculations, misinformation, and erroneous administrative determinations.

7. The notification shall be issued in the name of an official having general responsibility for administering the controls and procedures referred to in 6., above, and shall be authenticated by the handwritten signature of the officer or employee immediately responsible for the determination of the eligibility of the member being notified.

8. The granting of retired pay to a person under chapters 67 and 71, reference (b), is conclusive as that person's entitlement to such pay only if the payment of the retired pay is begun after the effective date of P.L. 89-652, October 14, 1966 (section 1406 (reference

9. A notification that a person has completed the years of service required for eligibility for retired pay under reference (b) is conclusive as to the person's subsequent entitlement to such pay only if the notification is made after the effective date of P.L. 89-652, October 14, 1966 (section 1406 of reference (b)).

III. CANCELLATION

References (f), (g), and (h) are hereby superseded and cancelled.

IV. EFFECTIVE DATE AND IMPLEMENTATION

This Directive is effective immediately. Two copies of implementing Service regulations will be furnished to the Assistant Secretary of Defense (Manpower and Reserve Affairs) within 90 days.

H. P. Clements

Deputy Secretary of Defense

Enclosure - 1
  Format

#First amendment (Ch 1, 4/27/73)

Defs.' Opposition to Pls.' Renewed Motion for Preliminary Injunction
Ex. 13
Page 8 of 10

Feb 16, 73
1200.15 (Encl 1)

## Format



This is to notify you that, having completed the required years of service, you will be eligible for retired pay upon application at age 60 in accordance with the provisions of Title 10, U. S. Code, Chapter 67.  Your eligibility for retired pay may not be denied or revoked on the basis of any error, miscalculation, misinformation or administrative determination of years of creditable service performed unless it resulted directly from fraud or misrepresentation on your part.  Notwithstanding the foregoing, the number of years of creditable service upon which retired pay is computed may be adjusted to correct any error, miscalculation, misinformation, or administrative determination, and when such a correction is made you will be eligible for retired pay in accordance with the number of years of creditable service, as corrected, from the date retired pay is granted.

In the event you are now or later become entitled under any other provision of the law to retired pay from an armed force or retainer pay as a member of the Fleet Reserve or Fleet Marine Corps Reserve, you will not be entitled to retired pay under the provisions of 10 U.S.C., 1331.

Command line or _____
                       (Name of official having general responsibility for
                        issuance)

                       _____
                       (Signature of authenticating officer or employee)



Department of Defense
# DIRECTIVE

**NUMBER** 1352.1

July 16, 2005

USD(P&R)

SUBJECT:   Management and Mobilization of Regular and Reserve Retired Military Members

References   (a) DoD Directive 1352.1, subject as above, March 2, 1990 (hereby canceled)
(b) Sections 688, 6330, 12301(a), 12307, and 973 and Chapters 61, 63, 65, 1223, 367, 571, 573, and 367 of title 10, United States Code
(c) DoD Directive 1000.17, "Detail of DoD Personnel to Duty Outside the Department of Defense," November 21, 2003
(d) DoD Directive 1200.7, "Screening the Ready Reserve," November 18, 1999
(e) DoD Instruction 7730.54, "Reserve Components Common Personnel Data System," August 6, 2004
(f) Chapters 11 and 21 of title 14, United States Code

## 1. REISSUANCE AND PURPOSE

This Directive:

1.1.  Reissues reference (a).

1.2.  Implements Sections 688, 973, 12301(a), and 12307 of reference (b) by prescribing uniform policy and guidance governing the peacetime management of retired Regular and Reserve military personnel preparing for their use during a mobilization.

## 2. APPLICABILITY AND SCOPE

2.1.  This Directive applies to the Office of the Secretary of Defense, the Military Departments (including the Coast Guard when it is not operating as part of the Navy by agreement with the Department of Homeland Security), the Chairman of the Joint Chiefs of Staff, the Combatant Commands, the Office of the Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities in the Department of Defense (hereafter referred to as the "DoD Components").  The term "Military

*DoDD 1352.1, July 16, 2005*

Services," as used herein, refers to the Army, the Navy, the Air Force, the Marine Corps, and the Coast Guard. The term "Secretary concerned," refers to the respective Secretaries of the Military Departments and the Secretary of Homeland Security for the Coast Guard when it is not operating as part of the Navy.

2.2. This Directive also applies to non-DoD organizations that have DoD-related missions, such as the Department of Homeland Security and the Selective Service System, and non-DoD organizations that have North Atlantic Treaty Organization-related missions, under agreements with those non-DoD organizations.

3. <u>DEFINITIONS</u>

The terms used in this Directive are defined in enclosure 1.

4. <u>POLICY</u>

4.1. It is DoD policy that military retirees be ordered to active duty as needed to perform such duties as the Secretary concerned considers necessary in the interests of national defense as described in Sections 12301 and 688 of reference (b).

4.2. The DoD Components and the Commandant of the U.S. Coast Guard shall plan to use as many retirees as necessary to meet national security needs.

4.3. The military retirees ordered to active duty may be used according to guidance prescribed by the Secretary concerned as follows:

4.3.1. To fill shortages or to augment deployed or deploying units and activities or units in the Continental United States, Alaska, and Hawaii supporting deployed units.

4.3.2. To release other military members for deployment overseas.

4.3.3. Subject to the limitations of Section 973 of reference (b) and DoD Directive 1000.17 (reference (c)), fill Federal civilian workforce shortages in the Department of Defense, the U. S. Coast Guard, or other Government entities.

4.3.4. To meet national security needs in organizations outside the Department of Defense with Defense-related missions, if the detail outside the Department of Defense is approved according to reference (c).

4.3.5. To perform other duties that the Secretary concerned considers necessary in the interests of national defense.

4.4. Military retirees shall be ordered to active duty with full pay and allowances. They may not be used to fill mobilization billets in a non-pay status.

4.5.  Military retirees serving on active duty may be reassigned to meet the needs of the Military Service.

5. RESPONSIBILITIES

5.1.  The Assistant Secretary of Defense for Reserve Affairs and the Deputy Under Secretary of Defense (Military Personnel Policy) (DUSD(MPP)), under the Under Secretary of Defense for Personnel and Readiness, shall provide policy guidance for the management and mobilization of DoD military retirees.

5.2.  The Secretaries of the Military Departments and the Commandant of the U.S. Coast Guard shall ensure plans for the management and mobilization of military retirees are consistent with this Directive.

5.3.  The Directors of the Defense Agencies, the Secretary of Homeland Security, the Director of the Selective Service System, and Heads of Federal Agencies, shall, by agreement, assist in identifying military and Federal civilian wartime positions that are suitable to be filled by military retirees.  They shall also process those requirements according to Departmental policy, including any appropriate coordination under reference (c), before the positions are filled by the Military Services.  The Secretary of the Military Department shall retain the right to disapprove the request if no military retiree is available.

5.4.  The Secretaries of the Military Departments, or designees, shall:

5.4.1.  Prepare plans and establish procedures for mobilization of military retirees according to this Directive.

5.4.2.  Determine the extent of military retiree mobilization requirements based on existing inventories and inventory projections for mobilization of qualified Reservists in an active status in the Ready Reserve, including Individual Ready Reserve and the Inactive National Guard (when placed in an active status), or the Standby Reserve.

5.4.3.  Develop procedures for identifying retiree Categories I and II and conduct screening of retirees according to DoD Directive 1200.7 (reference (d)).

5.4.4.  Maintain necessary records on military retirees and their military qualifications. Maintain records for military retiree Categories I and II, including retirees who are key employees, and their availability for mobilization, civilian employment, and physical condition. Data shall be maintained on retired Reserve members according to DoD Instruction 7730.54 (reference (e)).

5.4.5.  Advise military retirees of their duty to provide the Military Services with accurate mailing addresses and any changes in civilian employment, military qualifications, availability for service, and physical condition.

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 14
Page 3 of 5

DoDD 1352.1, July 16, 2005

5.4.6.  Pre-assign retired members, when determined appropriate and as necessary.

5.4.7.  Determine refresher training requirements.

6.  <u>EFFECTIVE DATE</u>

This Directive is effective immediately.

Gordon England
Acting Deputy Secretary of Defense

Enclosure - 1
  E1.  Definitions

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 14
Page 4 of 5

*DoDD 1352.1, July 16, 2005*

## E1. ENCLOSURE 1

## DEFINITIONS

E1.1.1.  <u>Key Employee</u>.  Any Reservist or any military retiree (Regular or Reserve) identified by his or her employer, private or public, as filling a key position.

E1.1.2.  <u>Key Position</u>.  A civilian position, public or private (designated by an employer and approved by the Secretary concerned), that cannot be vacated during war, a national emergency, or mobilization without seriously impairing the capability of the parent agency or office to function effectively, while meeting the criteria for designating key positions as outlined in reference (d).

E1.1.3.  <u>Military Retiree Categories</u>.

E1.1.3.1.  <u>Category I</u>.  Non-disability military retirees under age 60 who have been retired fewer than 5 years.

E1.1.3.2.  <u>Category II</u>.  Non-disability military retirees under age 60 who have been retired 5 years or more.

E1.1.3.3.  <u>Category III</u>.  Military retirees, including those retired for disability, other than categories I or II retirees (includes warrant officers and healthcare professionals who retire from active duty after age 60).

E1.1.4.  <u>Military Retirees or Retired Military Members</u>.

E1.1.4.1.  Regular and Reserve officers and enlisted members who retire from the Military Services under 10 U.S.C. Chapters 61, 63, 65, 1223, 367, 571, or 573, and 14 U.S.C. Chapters 11 and 21 (references (b) and (f)).

E1.1.4.2.  Reserve officers and enlisted members eligible for retirement under one of the provisions of law in paragraph E1.4.1. who have not reached age 60 and who have not elected discharge or are not members of the Ready Reserve or Standby Reserve (including members of the Inactive Standby Reserve).

E1.1.4.3.  Members of the Fleet Reserve and Fleet Marine Corps Reserve under Section 6330 of reference (b).

ENCLOSURE 1

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 14
Page 5 of 5



Department of Defense

# DIRECTIVE

**NUMBER** 1402.1
January 21, 1982
<span style="color:red">Certified Current as of December 1, 2003</span>

<span style="color:red">Incorporating Through Change 3, November 16, 1994</span>
ASD(MRA&L)

SUBJECT:  Employment of Retired Members of the Armed Forces

References: (a)  DoD Directive 1402.1, "Employment of Retired Members of the Uniformed Services," August 16, 1969 (hereby canceled)
          (b)  Sections 3326, 5303, and 5532 of title 5, United States Code
          (c)  Federal Personnel Manual (FPM) Bulletin No. 300-49, "Issuance of Interim Regulations on Decentralization of Personnel Authorities," March 21, 1979
          (d)  Public Law 95-454, "Civil Service Reform Act, 1978"
          (e)  DoD 1340.12-M, "Military Retired Pay Manual," September 5, 1979
          (f)  Office of Personnel Management Handbook X-118, "Qualifications Standards," January 1975
          (g)  DoD 5000.12-M, "DoD Manual for Standard Data Elements," December 1982

## 1.  REISSUANCE AND PURPOSE

This Directive reissues reference (a), implements references (b) and (c), and provides policy and guidance on the employment of retired members of the Armed Forces.

## 2.  APPLICABILITY

The provisions of this Directive apply to the Office of the Secretary of Defense, the Military Departments (including their National Guard and Reserve components), the Organization of the Joint Chiefs of Staff, the Unified and Specified Commands, the Defense Agencies, and the Uniformed Services University of the Health Sciences (herein referred to as "DoD Components"), including the nonappropriated fund instrumentalities of any such Component.  The term "Armed Forces," as used herein, refers to the Army, the Navy, the Air Force, the Marine Corps, and the Coast Guard.

3.  <u>DEFINITIONS</u>

    3.1.  <u>Retired Member of the Armed Forces</u>.  A member or former member of the Armed Forces who is entitled to retired, retirement, or retainer pay.

    3.2.  <u>Position</u>.  A civilian office or position (including a temporary, part-time, or intermittent position as these terms are defined by the Office of Personnel Management (OPM)) to be filled, with or without compensation, under appointment or personal service contract from appropriated or nonappropriated funds, provided an employer-employee relationship exists.

    3.3.  <u>Category A Positions</u>.  All wage system positions paid from appropriated funds; all general schedule (GS) positions, GS-7 and below, paid from appropriated funds; and GS positions, GS-8 and above, paid from appropriated funds for which payment of travel expenses to first duty station has been authorized.

    3.4.  <u>Category B Positions</u>.  All positions paid from appropriated funds not covered in category A, above.

    3.5.  <u>Attached Operating Agency</u>.  The field operating agency responsible for performing civilian personnel operational functions in support of a major DoD Component headquarters, such as the Department of the Army's Civilian Personnel Center.

4.  <u>POLICY AND PROCEDURES</u>

    4.1.  <u>Delegation of Authority</u>.  The authority to approve the appointment of a retired member of the Armed Forces to a position in the Federal service, in or under the Department of Defense, during the 180 days after retirement is delegated to the Heads of DoD Components.  This includes appointments that, before the issuance of FPM Bulletin No. 300-49 (reference (c)), required the prior approval of the OPM.  This authority may be re-delegated as follows:

        4.1.1.  For category A positions, at least one level above the appointing authority.

        4.1.2.  For category B positions, at a level not below the major DoD Component headquarters (or attached operating agency).

        4.1.3.  For positions paid from nonappropriated funds, at a level not lower than the appointing authority.

DODD 1402.1, January 21, 1982

4.2. <u>General Policies</u>

    4.2.1.  The basic objective in filling positions in the Department of Defense is to ensure the appointment of fully qualified employees, generally the "best qualified" under consideration, consistent with the provisions of 5 U.S.C. 3326 (reference (b)).

    4.2.2.  Retired members of the Armed Forces have a right to seek and to be considered for Federal civilian employment.  Such consideration shall be extended equitably and in compliance with the merit system principle of open competition to avoid both the practice and appearance of preferential treatment.  This is essential not only in the interests of the public and of career employees, but to protect retired members from unwarranted allegations that they obtained their positions through influence based upon prior military service.

    4.2.3.  The following principles shall be observed before employing retired members of the Armed Forces.

        4.2.3.1.  Full consideration shall be given, in accordance with in-service placement and promotion procedures (including procedures negotiated under the Federal Service Labor Management Relations Statute (Title VII of the Civil Service Reform Act of 1978, reference (d)), to eligible and qualified DoD civilian employees.

        4.2.3.2.  When appointment is in the competitive civil service and selection is from an established civil service register, retired members of the Armed Forces shall be accorded treatment consistent with regulations issued by the OPM.

        4.2.3.3.  When the selection for appointment, whether in or outside the competitive civil service, is other than from an established civil service register, recruitment for the position shall be conducted in a way that ensures reasonable efforts are made to obtain applicants from all possible sources to avoid any suspicion of attempts to unduly limit competition.

        4.2.3.3.1.  This requires that the vacancy be well publicized; that recruitment be conducted over a sufficient period of time to give all interested candidates an opportunity to apply; and that qualification requirements for the position be written in a manner that does not give an advantage to a particular person.

        4.2.3.3.2.  When selecting a retired member, it must be established that the member is better qualified than any in-service candidate.  This requirement does not necessitate special recruitment efforts or delays in selections for shortage category positions for which OPM has authorized advanced re-hiring rates.

        4.2.3.3.4.  Positions may not be held open pending the retirement of a member of the Armed Forces in order to provide that person with a preferential opportunity to apply for or be appointed to the position.  Active recruitment shall be

initiated when the position becomes vacant, unless suspension of recruitment can be fully justified for management reasons unrelated to the impending retirement of a member of the Armed Forces.

4.2.3.3.5.  If the position was last occupied by the proposed appointee or another military incumbent, change to civilian incumbency must meet a bona fide management need and not be to afford civilian employment to the proposed appointee.

4.3.  Appointments 180 Days After Retirement

4.3.1.  Appointments or transfers of retired members of the Armed Forces to positions in any DoD Component during the 180 days immediately following retirement may be made only when:

4.3.1.1.  The appointment is to a position for which the minimum rate of basic compensation has been increased by the OPM under the authority of 5 U.S.C. 5303 (reference (b)); or

4.3.1.2.  The appointment is to a position for which:

4.3.1.2.1.  Equally well-qualified personnel are not available among the employees being considered under applicable in-service placement and promotion procedures;

4.3.1.2.2.  Employee candidates are not available among those required to be considered in priority placement programs, or among those on applicable DoD Component Reemployment Priority Lists, or under the OPM Displaced Employee Program; and

4.3.1.2.3.  Intensive external recruitment efforts have failed to produce any better qualified candidates.

4.3.2.  A proposed appointment of a retired member of the Armed Forces under subparagraph 4.3.1.2., above, requires the prior approval of the official to whom authority has been delegated under paragraph 4.1., above.  Each appointment must comply with the spirit and intent of governing legislation and this Directive.  Each appointment of a retired member during the 180-day period must be fully documented to reflect this compliance.  As a minimum, this documentation shall include the information outlined at enclosure 1.  Documentation shall be retained in the active files for 2 years from the date of appointment action.

4.4.  Documentation and Notification Requirements.  Under the Dual Compensation Act (5 U.S.C. 5532, reference (b)), retired or retainer pay of those retired from the Armed Forces may be subject to reduction.  Defense procedures for administering the Act are contained in DoD 1340.12-M (reference (e)).  When a civilian office or position is filled

DODD 1402.1, January 21, 1982

by a retired member, the personnel action shall be reported by the appointing office on Standard Form (SF) 50, "Notification of Personnel Action," or equivalent form, to the Military Department finance center responsible for administering the member's retired or retainer pay.  Implementing regulations applicable to nonappropriated fund instrumentalities shall be uniform to the maximum extent possible.

5.  <u>RESPONSIBILITIES</u>

The <u>Heads of DoD Components</u> shall ensure that the policy and guidance in this Directive are followed.

6.  <u>EFFECTIVE <span style="color:red">DATE</span></u>

This Directive is effective *immediately.*

Frank C. Carlucci
Deputy Secretary of Defense

Enclosures - 1
   E1.  Information to Accompany Requests for Approval of Proposed Appointments of Retired Members of the Armed Forces

5

DODD 1402.1, January 21, 1982

E1.  <u>ENCLOSURE 1</u>

<u>INFORMATION TO ACCOMPANY REQUESTS FOR APPROVAL OF PROPOSED
APPOINTMENTS OF RETIRED MEMBERS OF THE ARMED FORCES</u>

E1.1.1.  <u>Information About the Proposed Appointee</u>

E1.1.1.1.  The effective * date (YYMMDD) of retirement from the Armed
Forces.

E1.1.1.2.  Rank at time of retirement.

E1.1.1.3.  * Pay grade and Uniformed Service, at the time of retirement;
whether Regular or non-Regular.

E1.1.1.4.  A current Personal Qualifications Statement (SF 171) completed by
the proposed appointee.

E1.1.2.  <u>Information About the Position Involved</u>

E1.1.2.1.  * Date (YYMMDD) the position was established.

E1.1.2.2.  * Date (YYMMDD) it was last occupied.

E1.1.2.3.  Whether the position was converted from military to civilian status.

E1.1.2.4.  * Date (YYMMDD) of conversion (if converted).

E1.1.2.5.  Reason for conversion.

E1.1.2.6.  Whether the proposed appointee was the last military occupant.

E1.1.2.7.  A current position description.

E1.1.2.8.  Whether the position is continuing or temporary.

E1.1.2.9.  A copy of the qualification standards covering the position.
(Alternatively, reference may be made to Handbook X-118 (reference (f)) when X-118
standards are applied without modification.)

E1.1.2.10.  Whether efforts to fill the position have been continuous since it
became vacant; if not, the reasons therefore.

ENCLOSURE 1

DODD 1402.1, January 21, 1982

E1.1.3.  <u>Consideration of Career Employees</u>.  To ensure that full consideration, in accordance with placement and promotion procedures of the DoD Component concerned, was given to eligible career employees, the following information shall be included:

E1.1.3.1.  A copy of any notices used to publicize the vacancy to interested career employees.

E1.1.3.2.  Documentation on how the proposed appointee is superior to all qualified employees given consideration.

E1.1.3.3.  A statement as to whether the appropriate placement and promotion procedures were followed; if these procedures were not followed, the reasons therefore.

E1.1.4.  <u>Appointment From a Civil Service Register (Information Additional to E1.1.1., E1.1.2., and E1.1.3.)</u>.  When the proposed appointee has eligibility on an appropriate civil service register and has been reached for appointment, the following additional information shall be provided:

E1.1.4.1.  A copy of the certificate of eligibles on which the proposed appointee's name appears.  The examination announcement under which the proposed appointee filed shall be identified if it is not included on the certificate itself.

E1.1.4.2.  A copy of the request for the certificate, including selective factors and names of nominees if selective certification or name request was involved.

E1.1.4.3.  A statement as to how the proposed appointee is superior to any eligibles standing higher on the certificate.

E1.1.5.  <u>Appointment From Other Than a Civil Service Register (Information Additional to E1.1.1., E1.1.2., and E1.1.3.)</u>.  When it is proposed to appoint a retired member from other than a civil service register, the following additional information shall be provided:

E1.1.5.1.  Under what authority (OPM regulation) the retired member will be appointed.

E1.1.5.2.  If temporary appointment pending establishment of register authority has been secured, a copy of the request for a certificate of eligibles, including selective factors and a copy of the authority.

E1.1.5.3.  If any positive recruiting efforts were made to seek out applicants for the position, the methods used (including specific dates and places), copies of any notices publicizing the vacancy, and any contacts with recruiting sources.

ENCLOSURE 1

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 15
Page 7 of 8

DODD 1402.1, January 21, 1982

E1.1.6.  <u>General Note For Personnel Processing This Information</u>:  Items marked with an asterisk (*) have been registered in the DoD Data Element Program.  Data elements and coding must be as indicated in the instructions.  In cases in which specific coding instructions are not provided, reference must be made to DoD 5000.12-M (reference (g)).  Noncompliance by a DoD Component with either the coding instructions contained herein or those registered in the DoD Data Element Program shall make such DoD Component responsible for required concessions in database communication.  Cost of data conversions shall be borne by the Head of the DoD Component concerned.

ENCLOSURE 1

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 15
Page 8 of 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHAPLAINCY OF FULL GOSPEL CHURCHES, et al., | ) ) ) | |
| v. | ) ) | Civil Action No. 1:99cv2945 (RMU) |
| THE HONORABLE DONALD C. WINTER, Secretary of the Navy, et al., | ) ) ) ) | |
| ROBERT H. ADAIR, et al., | ) ) | **Consolidated with** |
| v. | ) ) | Civil Action No. 1:00cv566 (RMU) |
| THE HONORABLE DONALD C. WINTER, Secretary of the Navy, et al., | ) ) ) ) | |

## SUPPLEMENTAL DECLARATION OF VERONICA K. BERTO

Pursuant to 28 U.S.C. § 1746, I, Veronica K. Berto, make the following declaration. I am aware that this declaration will be used in litigation and that this declaration is the legal equivalent to a statement under oath.

1.    I am a civilian employee of the Department of the Navy.  I currently serve as a Program Analyst (GS-12) in the Force Structure (N971) division in the Chief of Navy Chaplains' Office. I have served in this position since December 17, 1991.  In that role, I am familiar with the current composition and manning of the Navy Chaplain Corps, to include the status (e.g., Regular Navy, Naval Reserve, Retired Reserve) and designator (e.g., 4100, 4105, 4109) assigned to each Chaplain Corps officer.

2.    As a result of this litigation, I was asked by defendants to review the personnel detailed

on a chart entitled "Priests Over Age 62," and represented to me to have been Exhibit 8 to a brief filed by the Plaintiffs in this litigation in 2003. I was specifically requested to determine whether the Chaplain Corps officers detailed on that chart, not identified as holding the "4109" designator, were continued on active duty pursuant to Section 637 of Title 10 of the U.S. Code.

3.    Prior to Fiscal Year ("FY") 2003, if a Reserve Officer serving on active duty as a Lieutenant (paygrade O-3) or Lieutenant Commander (paygrade O-4) Failed of Selection to the next higher rank/paygrade on two occasions (commonly referred to as "twice FOS'ing" or "2X FOS"), in order to remain on active duty, that officer was required to request to be continued on active duty via letter to the Chief of Naval Personnel. That policy changed in Fiscal Year 2003, when personnel who had twice Failed of Selection were required to be considered for continuation on active duty by a Board convened pursuant to Section 637 of Title 10 of the U.S. Code. In general, continuation boards continue officers in 3-year increments if they have less than 14 years of qualifying service towards retirement. If an officer has more than 14 years of qualifying service towards retirement and is selected for continuation, that officer will be continued until eligible for retirement by statute.

4.    Based on my review of the relevant records on file in the Chief of Navy Chaplains' Office, the following information is responsive with regard to the Lieutenant (paygrade O-3) chaplains included on the plaintiffs' Exhibit 8:

    a.  LT Biala was considered and recommended for continuation by the FY2003 Active Duty Navy Lieutenant Staff Corps (Chaplain Corps) Continuation Selection Board. He retired in August 2004.

b. LT Matthew F. D'Souza was transferred to the Retired Reserve in February 2002. He was not considered for continuation by a continuation board, as none was required prior to FY2003.

c. LT James F. Finley was considered and recommended for continuation by the FY2003 Active Duty Navy Lieutenant Staff Corps (Chaplain Corps) Continuation Selection Board, and transferred to the Retired Reserve in FY2004.

5.    Based on my review of the relevant records on file in the Chief of Navy Chaplains' Office, the following information is responsive with regard to the Lieutenant Commander (paygrade O-4) chaplains included on the plaintiffs' Exhibit 8:

a. LCDR Alfonso E. Erestain was considered and recommended for continuation by the FY2005 Active Duty Navy Lieutenant Commander Staff Corps (Chaplain Corps) Continuation Selection Board.

b. LCDR Adrian R. Gervacio was considered and recommended for continuation by the FY2004 Active Duty Navy Lieutenant Commander Staff Corps (Chaplain Corps) Continuation Selection Board. He retired in November 2006.

c. LCDR Bruce C. Maxwell received an age waiver of January 2002, which was withdrawn in August 2003. LCDR Maxwell was separated from the Navy on September 4, 2003 due to exceeding the maximum age for Naval officers.

d. LCDR William T. J. Shuppert was not considered for continuation by a continuation board in FY2003 because he had 18 years of service, placing him within "sanctuary" of the FY2003 policy change, per Section 632(a)(3) of Title 10 of the U.S. Code. He retired in January 2004.

6.    I was also asked to confirm information from the declaration I made in conjunction with this litigation in March 2007. Specifically, I was asked to determine whether any of the following persons were on active duty:

| | | | |
|---|---|---|---|
| Adair, Robert H. | Belt, Michael | DeMarco, Gregory R. | Harkness, Furniss |
| Lavell, Michael | Linzey, George W. | Nall, Timothy D. | Rush, Thomas |
| Weibling, James M. | Hamme, Richard | Wright, Michael A. | Blair, William C. |
| Farrell, Larry | Quiles, Rafael J. | Swanson, Lyle | Tomlin, Ronald |
| Wilder, David S. | Purser, Robert D. | Carson, Martha | Johnston, Mark R. |
| Kitchen, Jr., Klon K. | Merritt, Denise Y. | Roysden, Daniel E. | Spalding, Mary H. |
| Wilson, Barby E. | | | |

In my declaration in March 2007, I indicated that Daniel E. Roysden was not on active duty in the U.S. Navy. Upon further review of my records, that statement was in error. Daniel E. Roysden was on active duty in the U.S. Navy as of March 2007, and was to remain on active duty until April 30, 2007, at which time he was due to separate from the Navy.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Arlington, Virginia, this 1st day of May, 2007.

_Veronica K. Berto_
VERONICA K. BERTO

1

2

3

4

5

6

7

FILED

02 DEC 16 AM 8:34

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

8    **UNITED STATES DISTRICT COURT**

9    **SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| RONALD G. WILKINS, | CASE NO. 99-1579-IEG (LSP) |
| Plaintiff, | **ORDER DENYING PLAINTIFF'S MOTION FOR RECONSIDERATION** |
| vs. | [Doc. No. 57] |
| UNITED STATES OF AMERICA, et al., | |
| Defendants. | |

11

12

13

14

15

16       Presently before the Court is plaintiff Ronald G. Wilkins' motion for reconsideration of the

17   Court's October 3, 2002 order denying plaintiff's motion for partial summary judgment. For the

18   reasons discussed herein, the Court denies plaintiff's motion.

19                          **PROCEDURAL BACKGROUND**

20       On July 29, 1999, plaintiff Ronald G. Wilkins ("Wilkins") filed a complaint for alleged

21   violations of the First and Fifth Amendments to the United States Constitution against the

22   following defendants: the United States; the Honorable Richard Danzig, the Secretary of the Navy;

23   Vice Admiral Daniel T. Oliver, the Chief of Naval Personnel; and Vice Admiral Anderson B.

24   Holderby, the Chief of Chaplains. Wilkins, a former naval officer in the U.S. Navy's Chaplain

25   Corps, alleged that he was unconstitutionally selected for early retirement from the Navy based, in

26   part, on the Navy's discriminatory conduct against Non-Liturgical faith groups in the Chaplain

27   Corps. He also alleges that various institutionalized practices of the Navy in the management of

28   the Chaplain Corps violate the Establishment and Free Exercise Clauses of the First Amendment

- 1 -

67

99cv1579

1  as well as the Equal Protection and Due Processes Clauses of the Fifth and the Fourteenth

2  Amendments to the U.S. Constitution. (See First Compl. at ¶¶ 22, 27, 34, and 45.)  Based on ten

3  separate "Counts," Wilkins requested the following relief against the defendants:  rescission of his

4  involuntary early retirement; retroactive reinstatement to active duty with all the benefits and

5  privileges included therein; an amendment of his records in the Navy to portray his actual

6  performance; compensatory and punitive damages exceeding $68 million; and attorney fees and

7  costs as deemed appropriate. (See id. at ¶¶11.a-11.h & ¶¶12-14.)

8           On October 18, 1999, defendants filed a motion to dismiss the entire complaint, arguing

9  that the Court lacked subject matter jurisdiction over plaintiff's suit and that Wilkins had failed to

10  exhaust his administrative remedies.  In an order filed December 16, 1999, the Court granted

11  defendants' motion to dismiss, finding that it lacked subject matter jurisdiction due to (1) the

12  exclusive jurisdiction of the Court of Federal Claims; (2) the Feres doctrine; and (3) failure to

13  exhaust remedies before the Board for Correction of Naval Records (BCNR).  Plaintiff appealed.

14  The Ninth Circuit Court of Appeals affirmed in part, reversed in part, and remanded the matter.

15  Wilkins v. United States, 279 F.3d 782 (9th Cir. 2002).  In its opinion, the Ninth Circuit affirmed

16  dismissal of the damages claims and requests for an injunction against promotion of Liturgical

17  chaplains to flag rank and for an order directing the Secretary of the Navy to take specific punitive

18  actions against former Chiefs of Chaplains.  Id. at 790.  The opinion went on to reverse the

19  dismissal of the remaining claims for injunctive and declaratory relief and to remand the matter to

20  this Court for further proceedings.  Id.

21           On remand, plaintiff amended his complaint, and defendants subsequently submitted an

22  amended answer.  Plaintiff filed a motion for partial summary judgment on July 2, 2002.  In his

23  motion, plaintiff sought: (1) a declaration that the practice of allowing chaplains to sit on

24  separation or promotion boards is unconstitutional under the Establishment Clause; (2) an

25  injunction ordering plaintiff's separation orders void and ordering his reinstatement to active duty;

26  and (3) an injunction against the use of chaplains on separation or promotion boards and ordering

27  the development of a plan to address the composition of future boards to remedy any past

28  unconstitutional effects. (See Pla's Proposed Order for Partial Summary Judgment).

99cv1579

1     The Court denied plaintiff's motion for partial summary judgment on October 3, 2002,

2 finding that disputed issues of material fact exist as to whether the policies and statute under attack

3 grant a "denominational preference," and whether the Navy's practices lead to an excessive

4 entanglement of government with religion. (Oct. 3 Order at 7:11-16). Plaintiff filed the present

5 motion for reconsideration of the court's denial of partial summary judgment on October 29, 2002.

6 In that motion, plaintiff argues that the Court committed error by failing to resolve a purely legal

7 dispute. Defendants filed an opposition to the motion on November 25, 2002, and plaintiff filed a

8 reply to the opposition on December 2, 2002.

9                              **FACTUAL BACKGROUND**

10     The Court has already found that the following material facts are not in dispute. Plaintiff

11 Ronald G. Wilkins enlisted in the Navy in 1959. He became a line officer in 1965. He left active

12 duty, remaining in the Naval Reserve and began seminary and full-time ministry in 1971. He was

13 accepted into the Navy's Chaplain Corps and returned to active duty in the Navy in 1978 as a Navy

14 Chaplain. In 1994, the fiscal year 1995 selective early retirement (SER) Board selected Wilkins

15 for early (involuntary) retirement. (See Pla's Proposed Statement of Uncontroverted Facts #26;

16 Def's Response to Pla's Uncontroverted Fact #26). Plaintiff left the service on August 1, 1995

17 and has not been on active duty since that time.

18     The FY 1995 SER board had four chaplain board members. (Id. Fact #27.). The president

19 of that board was Rear Admiral Byron Holderby, Jr., the Deputy Chief of Chaplains from August

20 1994 to August 1997. (Id. Fact #28.). Current chaplain promotion boards (including the FY 2003

21 Chaplain Corps promotion selection board) include two chaplains. (Compare Pla's Proposed

22 Statement of Uncontroverted Facts #51 with Def's Response to Pla's Uncontroverted Fact #51).

23     A clergy person cannot become a chaplain unless he or she has received the endorsement of

24 an ecclesiastical organization. (Compare Pla's Proposed Statement of Uncontroverted Facts #6

25 with Def's Response to Pla's Uncontroverted Fact #6 (disputing the fact, but then noting that "on

26 [sic] of the qualifications for appointment as a commissioned officer in the Navy's Chaplain Corps

27 is the endorsement of an ecclesiastical endorsing agency." (citing DOD Directive 1304.19))). If a

28 Navy chaplain loses the ecclesiastical endorsement of his or her sponsoring organization, and he or

1   she fails to obtain a new endorsement from another ecclesiastical organization, he or she can no

2   longer serve in the Chaplain Corps. (See Pla's Proposed Statement of Uncontroverted Facts #7;

3   see also Def's Response to Pla's Uncontroverted Fact #6 (providing a list of alternatives to

4   Chaplains who no longer have endorsements, although the list does not include continued service

5   in the Chaplain Corps) (citing DOD Dir. 1332.31; 10 U.S.C. § 643; SECNAVINST 1900.109A)).

6   If a chaplain who loses his or her endorsement obtains a new endorsement, the Chief of Chaplains

7   must first consider the needs of the Navy before recommending the chaplain's continuance to the

8   Chief of Naval Personnel.  The Secretary of the Navy may continue the chaplain's service upon

9   receipt of a recommendation through the Chief of Naval Personnel. (Compare Pla's Proposed

10  Statement of Uncontroverted Facts #8 with Def's Response to Pla's Uncontroverted Fact #8. See

11  also SECNAVINST 1900.10A).

12                                      **DISCUSSION**

13  **I.      Reconsideration Pursuant to Federal Rule of Civil Procedure 60**

14          Since plaintiff does not explicitly state the procedural basis for his motion, the Court will

15  treat it as a motion to reconsider pursuant to Federal Rule of Civil Procedure 60(b). Rule 60(b)

16  provides six main grounds upon which a court may reconsider a final order.[1]  Defendant fails to

17  cite any of these grounds specifically. Accordingly, the Court will construe the motion as one

18  under 60(b)(6), a catch-all category providing relief for any non-enumerated reason that justifies

19  such relief. See Fed. R. Civ. Proc. 60(b). Rule 60(b)(6) is meant to be used "sparingly as an

20  equitable remedy to prevent manifest injustice." U.S. v. Alpine Land & Reservoir Co., 984 F.2d

21  1047, 1049 (9th Cir. 1993). "The rule is to be utilized only where extraordinary circumstances

22  prevented a party from taking timely action to prevent or correct an erroneous judgment." Id.

23          Rule 60 reconsideration is generally appropriate in three instances: 1) when there has been

24  _____

25          [1]Specifically, Rule 60(b) provides that a court may relieve a party of an order for the following
    reasons:
26          (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered
            evidence which by due diligence could not have been discovered in time to
27          move for a new trial under Rule 59(b); (3) fraud . . .; (4) the judgment is void;
            (5) the judgment has been satisfied, released, or discharged . . .; or (6) any
28          other reason justifying relief from the operation of the judgment.
    Fed. R. Civ. Proc. 60(b).

1  an intervening change of controlling law, 2) new evidence has come to light, or 3) when necessary

2  to correct a clear error or prevent manifest injustice. <u>U.S. v. Westlands Water Dist.</u>, 134 F.Supp.2d

3  1111, 1131 (E.D.Cal. 2001) (citing <u>School District No. 1J, Multnomah County, Oregon v. Acands,</u>

4  <u>Inc., et al.</u>, 5 F.3d 1255, 1262 (9th Cir. 1993). A motion for reconsideration, however, is "not a

5  vehicle to reargue the motion or to present evidence which should have been raised before."

6  <u>Westlands Water Dist.</u>, 134 F. Supp. at 1131 (citing <u>Bermingham v. Sony Corp. of Am., Inc.</u>, 820

7  F.Supp. 834, 856 (D.N.J. 1992), aff'd, 37 F.3d 1485 (3d Cir.1994)). "[R]ecapitulation of the cases

8  and arguments considered by the court before rendering its original decision fails to carry the

9  moving party's burden." <u>Id.</u> To gain reconsideration of a motion under Rule 60, the moving party

10  "must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior

11  decision." <u>Id.</u>

12  **II.    Analysis**

13  Plaintiff argues in his motion that the Court committed clear error in its order denying

14  partial summary judgment by failing to answer a fundamental question of law in this case. (<u>See</u>

15  Mem. P&A at 1:13-17). Namely, plaintiff demands to know, "[w]hat authority of the sovereign is

16  given to clergy when they are commissioned as Navy chaplains?" (<u>Id.</u>). The Court declines to find

17  clear error requiring reconsideration because this question is overly-broad and because the answer

18  to the narrower question at issue here is dependent on material, disputed facts.

19  The dispute before the Court concerns whether an unconstitutional SER board selected

20  plaintiff for early retirement. If so, a second dispute involves whether the promotion board that

21  plaintiff would face upon reinstatement is unconstitutional. The legal question that the Court must

22  therefore decide in order to resolve this dispute is whether the sovereign may constitutionally grant

23  a chaplain its authority to fire or promote other chaplains. To accept plaintiff's invitation to

24  answer a broader question would leave the Court unnecessarily and imprudently outlining the outer

25  contours of the Establishment Clause as it relates to military chaplains in all circumstances. It is

26  enough for this Court to answer the question before it today and to leave the fixing of other

27  constitutionally-permissible boundaries for future controversies that demand such resolution.

28  Plaintiff suggests that the Court must side either with plaintiff's characterization of

1   defendants' view that chaplains "possess all the Sovereign's authority," or with plaintiff's view

2   that they possess none of the sovereign's authority. (Mem. of P&A at 6-7). In fact, the Court need

3   only decide whether chaplains may exercise the sovereign's authority over personnel decisions to

4   the extent that they sit on promotion and SER boards. In considering that question, plaintiff

5   apparently concedes that in order to accommodate the rights of the service members, chaplains

6   must have ancillary and de minimis support from the sovereign. (See Reply at 5:12-20). However,

7   plaintiff argues that Amos makes clear as a matter of law that chaplains may exercise absolutely no

8   authority of the sovereign. (Mem. P&A at 7:11-15). In so arguing, plaintiff has simply cited a new

9   case to reargue the position he took in the prior proceedings on partial summary judgement. (See

10  Pla' Mem. of P&A in support of Mot. for Part. Summ. J. at 18 et seq.).

11         In fact, the Court finds, as it found in its October 3, 2002 decision, that no binding

12  Establishment Clause principle mandates a decision for plaintiff as a matter of law. Assuming, as

13  plaintiff has done for purposes of this motion, that the question of whether this dispute involves a

14  denominational preference is immaterial, (See Mem. P&A at 1:23-26), then Lemon v. Kurtzman,

15  403 U.S. 602 (1971), provides the proper framework for analysis. Under Lemon, the Court must

16  examine whether: 1) the law has a secular purpose; 2) whether its principal or primary effect is to

17  advance or inhibit religion; and 3) whether it creates an excessive entanglement of government

18  with religion. Lynch v. Donnelly, 465 U.S. 668, 679 (1984) (citing Lemon, 403 U.S. 602, 614

19  (1971)). Amos applied the Lemon factors to a statutory exemption from anti-discrimination laws

20  for a nonprofit organization affiliated with a religious institution. See Corporation of Presiding

21  Bishop of Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 335 (1987). In

22  discussing the second Lemon factor, the Court stated that "[f]or a law to have forbidden 'effects'

23  under Lemon, it must be fair to say that the government itself has advanced religion through its

24  own activities and influence." Id. at 337. The Court went on to suggest that such advancement

25  might come in the form of "sponsorship, financial support, and active involvement of the sovereign

26  in religious activity." Id. (internal citation omitted). Plaintiff argues that the rule to be distilled

27  from Amos is that "the Sovereign cannot be directly involved in religious activity," and that, based

28  on this rule, the court must decide in favor of plaintiff on summary judgment. (Reply at 5:8-11).

99cv1579

1 First, the Court notes the internal inconsistency of plaintiff's argument that the sovereign

2 may (and must) pay and provide logistical support for chaplains, but cannot be directly involved in

3 religious activity. A more coherent approach to the <u>Lemon</u> factors as applied in this case

4 recognizes that the sovereign must provide some support to chaplains in order to accommodate the

5 Free Exercise rights of the service members, and therefore that the sovereign must become directly

6 involved in religious activity to a limited extent. The question thus becomes whether, under the

7 third <u>Lemon</u> factor, the authority granted chaplains here - that of sitting on chaplain promotion and

8 SER boards - amounts to an <u>excessive</u> entanglement of government and religion. Whether and to

9 what extent government and religious organizations become entangled when chaplains sit on the

10 boards are precisely the disputed issues of material fact that led the Court in the first instance to

11 deny plaintiff's motion for partial summary judgment. Nothing in <u>Amos</u> or plaintiff's briefs

12 suggests that such a decision resulted in clear error or manifest injustice.[2]

13 Moreover, even accepting, arguendo, plaintiff's interpretation of <u>Amos</u>, it is a question of

14 fact in this case whether the sovereign is directly involved in religious activity. Defendants dispute

15 that the SER and promotion boards are religious activities. It appears to the Court that the question

16 of whether these boards are indeed religious in character depends on the factual issue of the extent

17 to which chaplains act in their roles as administrative officers or as religious representatives when

18 they sit on them. This then leads back to the factual inquiry into the relative excessiveness of the

19 government's entanglement with religion in this case.

20 Plaintiff also argues that this Court's October 3, 2002 opinion resulted in clear error

21 because it did not take heed of the Navy's own regulations or international law concerning

22 chaplains. First, plaintiff argues that SECNAVINST 1730.7B, ¶ 4.a, limits chaplains to

23

24 [2] Similarly, <u>Board of Education of Kiryas Joel v. Grumet</u>, 512 U.S. 687, 696-98 (1994) does not demand that the Court's October 3, 2002 opinion be reconsidered because of clear error. That case instructs that the government generally cannot delegate its power to religious persons without effective

25 means of guaranteeing that the power will be used for secular, neutral, and non-ideological purposes. <u>Id.</u> `Such delegation of authority is not as suspect where individuals' "religious identities are

26 incidental to their receipt of civic authority." <u>Id.</u> at 699. Here, the parties dispute whether chaplains act more as religious representatives or as administrative officers when they sit on SER and promotion

27 boards. They also dispute whether Navy procedures are effective in guaranteeing that chaplains serve on the boards as non-ideological and neutral officers. These are merely restatements of the factual

28 issues surrounding the question of entanglement between the government and religion that led the Court to deny the motion for summary judgment in the first instance.

1   performing "only such duties as are related to religious ministry support," and that holding that

2   chaplains might under a certain set of facts serve on promotion and SER boards would contradict

3   this regulation. (Reply at 6:19-18). Plaintiff's interpretation of the Navy regulation leaves it in

4   direct conflict with 10 U.S.C. § 612 (mandating that selection boards consist of one type of officer

5   from the category under consideration). The Court fails to see how it would have committed clear

6   error in deciding that a Navy regulation must be interpreted, if possible, to be consistent with a

7   federal statute. It is not clear error to suggest that a chaplain's participation on an SER or

8   promotion board overseeing the firing and promotion of chaplains may be related to religious

9   ministry support.

10      Second, plaintiff argues that the Court committed clear error by allegedly overlooking that

11   under the Geneva Convention Relative to the Treatment of Prisoners of War ("Geneva

12   Convention"), chaplains must be "ministers of religion," and therefore, according to plaintiff, may

13   not be agents of the Sovereign, in order to receive special treatment. (Mem. P&A at 11).

14   Defendants point out in response that medical personnel also receive special treatment under the

15   Geneva Convention, and yet medical officers apparently serve on SER and promotion boards

16   relating to the firing and promotion of other medical officers. (Defs' Opp'n at 5:15-22).

17      It is worth noting at the outset that Chapter IV of the Geneva Convention does not itself

18   contain any definition of chaplains or contain any explicit prohibitions upon their non-combatant

19   activities within the military administration. See Geneva Convention, Arts. 33-36. The Court

20   notes in this regard that serving on an SER or promotion board overseeing the Chaplain Corps is a

21   far cry from actively engaging in combat. The Geneva Convention's special status for chaplains

22   stems both logically and reasonably from both a chaplain's religious affiliation and, perhaps more

23   importantly, from the fact that chaplains are not actively engaged in combat. For this second

24   reason, the Convention also accords special status to medical personnel. Id. In fact, Navy

25   regulations specifically state that the performance of duties related to the "administration . . . of

26   religious units" by chaplains would not endanger their noncombatant status under the Geneva

27   Convention. U.S. Navy Regulations, Chapter 10, Section 3, Art. 1063, Detail of Persons

28   Performing Medical or Religious Services, Ex. 18 to Defs' Opp'n to Pl's Mot. for P. Summ. J. It

- 8 -

99cv1579

1  is not clear error to suggest that sitting on promotion or SER boards overseeing the firing or

2  promotion of chaplains would be within the universe of "religious duties" to which chaplains

3  should adhere in order to ensure their noncombatant status.  Chaplains Manual, OPNAVINST

4  1730.1, § 1204, Ex. 7 to Pl's Mot. for P. Summ. J.  In sum, the Court declines to hold that the

5  application of 10 U.S.C. § 612 to chaplains contravenes the Geneva Convention.

**CONCLUSION**

7       For the reasons discussed above, the Court **DENIES** plaintiff's motion for reconsideration

8  of the Court's order denying plaintiff's motion for partial summary judgment.

9       **IT IS SO ORDERED.**

11  **Dated:** ___12/13/08___

                      **IRMA E. GONZALEZ**
                      United States District Judge

13  cc:    Magistrate Judge Leo S. Papas
            all parties

- 9 -

99cv1579

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

REV. CHARLES E. LARSEN *et al.*,　　　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　　　　　Plaintiffs,　　　　　　:　　Civil Action No.:　　02-2005 (RMU)
　　　　　　　　　　　　　　　　　　　:
　　　　　　　　v.　　　　　　　　　　:　　Document Nos.:　　48, 51
　　　　　　　　　　　　　　　　　　　:
THE UNITED STATES NAVY *et al.*,　　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　　　　　Defendants.　　　　　　:

## MEMORANDUM OPINION

### GRANTING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT;
### DENYING THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## I.　INTRODUCTION

This matter comes before the court on the parties' cross motions for summary judgment.

The plaintiffs, Charles Larsen, Gregory McNear and James Linzey, are three non-liturgical

Protestant ministers who applied for but were denied commissions in the Navy Chaplain Corps

(the "Corps" or "Chaplaincy").[1]  They bring suit against the Navy and the Secretary of the Navy

(collectively, the "defendants") to challenge alleged prejudice in Corps hiring practices.

Specifically, the plaintiffs allege that the Navy has established religious quotas for Navy chaplain

accessions that intentionally favor liturgical clergy in violation of the First and Fifth

Amendments.[2]  The parties now each seek summary judgment.  Because the Navy's current

chaplain accession program seeks legitimate military ends while accommodating individual

rights to an appropriate (albeit limited) degree, the court grants the defendants' motion for

---

[1]　　On May 1, 2006, the parties filed a stipulation of dismissal as to a fourth plaintiff, David
Myers, which the court approved that same day.

[2]　　On November 18, 2004, the court dismissed the plaintiffs' claims under the Religious
Freedom Restoration Act.  Mem. Op. (Nov. 18, 2004).

summary judgment and denies the plaintiffs' motion for summary judgment.

## II.    BACKGROUND

### A.    Factual Background

Because the facts of the present case are similar to several cases now pending before this court, the court limits its discussion of the plaintiffs' allegations to what is necessary to resolve the instant motion.

The plaintiffs are non-liturgical ministers, all with prior military service.  Compl. ¶ 1. They applied to the Corps at various times in their careers, but the defendants rejected them because, the plaintiffs allege, of a "systematic and pervasive religious prejudice" against non-liturgical faith groups.  *Id.* ¶ 2.  As part of this prejudice, the Navy favors liturgical Protestants, despite the under-representation of liturgical Protestant service personnel and an over-representation of non-liturgical Protestant service personnel in the Navy generally.  *Id.* ¶¶ 1-2.

The Defense Manpower Data Center ("DMDC") collects data on the religious preferences of individual Armed Forces members for the Department of Defense ("DOD").  *Id.* ¶ 8. According to the plaintiffs, this data indicates that:

> In stark contrast to their low and declining percentage of [Navy] personnel, the Protestant liturgical chaplain category consistently comprises over 33% of the Chaplain Corps, about three times the actual percentage of [Navy] personnel who identify a religious preference.  In contrast, non-liturgical chaplains have never come close to an equivalence of their faith group percentage of those who identify a religious preference.

*Id.* ¶ 13.

2

The plaintiffs claim that the over-representation of liturgical chaplains stems from the Navy's conscious decision to insure that liturgical chaplains control the Corps. *Id.* ¶ 18. "Prior to some time around 1988," the defendants based the composition of the Corps on the religious demography of the country. *Id.* ¶ 16. Because proportional representation led to an increased number of non-liturgicals, the Corps became "concern[ed]." *Id.* ¶ 17. The defendants thus abandoned their goal of proportional representation and, in 1988, imposed a "subjective quota system," Pls.' Mot. for Summ. J. ("Pls.' Mot.") at 4, known as the "Thirds Policy," *id.* ¶ 18. Under this policy, the defendants divided the Corps into thirds: Roman Catholic, Protestant liturgical, and non-liturgical Christian and Special Worship. *Id.* Since the defendants implemented their Thirds Policy, their accession goals for chaplain candidates have not only been arbitrary, but have also been a "deliberate misrepresentation of the Navy's free exercise needs . . . for the purpose of minimizing the career opportunities for non-liturgical clergy and . . . limit[ing] their influence in the Corps and in the Navy, and hinder[ing] the religious rights of non-liturgical personnel." *Id.* ¶ 22. In 2001, the Navy abandoned the Thirds Policy, preferring instead to "take the best qualified candidates, regardless of denomination." Pls.' Mot. at 6.

With regard to the individual plaintiffs, Rev. Larsen spent sixteen years in active duty in the Navy. Compl. ¶ 4(A). He left in 1982 to attend the Dallas Theological Seminary and complete the post-graduate education necessary to become a Navy chaplain. *Id.* While at Dallas Theological Seminary, Rev. Larsen applied to the Navy's Student Seminary Program, but he was not accepted. *Id.* In 1987, after graduating from Dallas Theological Seminary, Larsen applied to join the Corps, but the Corps rejected him with a letter stating that his non-liturgical faith group had "no quota." *Id.*

3

Rev. McNear served in the Air Force and the Colorado Air National Guard prior to completing seminary in 1981. *Id.* ¶ 4(B). In 1993, he applied to the Navy to become a chaplain, but he was told he needed additional post-graduate semester hours to meet the Corps' criteria. *Id.* Rev. McNear promptly completed these requirements and reapplied. *Id.* The Navy rejected his application because, among other things, Rev. McNear was too old and did not satisfy the "needs of the Navy." *Id.*, Ex. 8 ¶ 2. According to the plaintiffs, the age explanation was a "sham" because liturgical Protestant candidates received waivers to join the Corps despite their age during the same period, and the "needs of the Navy" is a "code-phrase" for an illegal quota system disfavoring non-liturgical Protestants. Compl. ¶ 4(B).

Finally, Rev. Linzy is endorsed by the Chaplaincy of Full Gospel Churches, a non-liturgical group. *Id.* ¶ 4(D). He spent three years of active duty as an Army chaplain and applied to become a Navy chaplain. *Id.* The Navy rejected his application – despite a shortage of chaplains – and explained to Rev. Linzy that he would have been viewed more favorably if he were a "baby baptizer" – that is, if he were *not* non-liturgical. *Id.*; *see also* Compl. ¶ 7(A) (noting that liturgical denominations are sometimes referred to as "high church" or "baby baptizers").

### B.   Procedural Background

The court last issued a memorandum opinion in this case on November 18, 2004, denying in part and granting in part the defendants' motion to dismiss. In their motion to dismiss, the defendants moved for dismissal for lack of subject-matter jurisdiction and failure to state a claim on which relief can be granted. Mem. Op. (Nov. 18, 2004). Specifically, the defendants argued that the court lacked subject-matter jurisdiction over the plaintiffs' demand to be commissioned as officers, *id.* at 7, that sovereign immunity barred the plaintiffs' request for monetary damages,

4

*id.* at 9, that the plaintiffs failed to allege immediate or imminent injury necessary for constitutional standing, *id.* at 12, that the plaintiffs' claims were barred by the applicable statute of limitations, *id.* at 20, and that the plaintiffs had failed to state a claim under the Religious Freedom Restoration Act, *id.* at 22.

Regarding subject-matter jurisdiction, the court construed the plaintiffs' complaint as seeking the opportunity to compete for commission in the Corps rather than, as the defendants had argued, asking the court to actually commission the plaintiffs in the Navy. *Id.* at 7-8. Noting the court's jurisdiction to entertain such claims, *id.* at 7 (citing *Emory v. Sec. of the Navy*, 819 F.2d 291, 294 (D.C. Cir. 1987)), the court denied the defendants' motion for dismissal. Because the plaintiffs never served as Navy chaplains, the court ruled that monetary damages (in the form of constructive and retirement credit), are inappropriate. Mem. Op. (Nov. 18, 2004) at 11 (citing 5 U.S.C. § 702).

With regard to standing, the court concluded that the plaintiffs' pleadings sufficed, at the motion to dismiss stage, in alleging a concrete plan to reapply to the Corps if the court ordered the Navy to remove the unconstitutional barriers they allege. *Id.* at 17. With this assessment, the court concluded that the plaintiffs' alleged harm was sufficiently imminent to establish standing. *Id.* Finally, the court granted the defendants' motion to dismiss the plaintiffs' Religious Freedom Restoration Act claims, concluding that the plaintiffs do not challenge a law of neutral or general applicability – a prerequisite for suits under that statute. *Id.* at 24-26.

5

## III.   ANALYSIS

Because of the procedural complexity of this case, the court takes a step back to briefly recount the plaintiffs' existing claims.  The plaintiffs argue that the defendants' past Thirds Policy and its current chaplain accession plan violate the First and Fifth Amendments.  Compl. ¶¶ 24-45.  They seek declaratory relief, injunctive relief and an order from the court directing the defendants to eliminate current and past bias and to provide certain remedies to the plaintiffs.  *Id.* at 24.  As to declaratory relief, the plaintiffs request a judgment that: (1) the Navy's accession policies violate the First and Fifth Amendments, and DOD regulations; (2) the Navy has unlawfully denied Rev. Larsen an opportunity to compete for the Seminary Program, a commission, a career, and a promotion; (3) the Navy's conduct has denied the other plaintiffs an equal opportunity to compete for a commission; and (4) the Navy has unlawfully caused Rev. McNear to lose a career in the Naval Reserve.  *Id.* at 24-25.  As to injunctive relief, the plaintiffs ask the court to stop the defendants from discriminating in chaplain accession and career development decisions and to stop the defendants from deriving accession goals that are not based on the Navy's religious needs.  *Id.* at 25-26.  Finally, the plaintiffs ask the court to order the defendants to eliminate vestiges of discrimination, develop a neutral accession system based solely on the religious needs of the Navy Corps and to allow the plaintiffs the opportunity to be commissioned as chaplains if they are otherwise qualified.  *Id.* at 26-27.

From a legal perspective, the plaintiffs' case boils down to a constitutional challenge to the Navy's now-extinct Thirds Policy and its current chaplaincy accession policy.  The parties have filed cross-motions for summary judgment.  The court now turns to the merits of those motions.

6

## A.    Subject-Matter Jurisdiction

Before tackling the merits of the plaintiffs' claims, the court must consider the defendants' arguments that the court lacks subject-matters jurisdiction.  Specifically, the defendants argue that the plaintiffs' claims are barred by sovereign immunity, Defs.' Mot. for Summary J. ("Defs.' Mot.") at 7, and that the plaintiffs lack standing to challenge both the Navy's past and its current hiring practices, *id.* at 10.

### 1.    Legal Standard for Subject-Matter Jurisdiction

Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-89 (1938); *see also Gen. Motors Corp. v. Envtl. Prot. Agency*, 363 F.3d 442, 448 (D.C. Cir. 2004) (noting that "[a]s a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction").

Because "subject-matter jurisdiction is an 'Art. III as well as a statutory requirement[,] no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003) (quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxite de Guinea*, 456 U.S. 694, 702 (1982)).  On a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject-matter jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  The court may dismiss a complaint for lack of subject-matter jurisdiction only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Empagran S.A. v. F. Hoffman-Laroche, Ltd.*, 315 F.3d 338, 343 (D.C. Cir. 2003) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

7

Because subject-matter jurisdiction focuses on the court's power to hear the claim, however, the court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim. *Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003); *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). Moreover, the court is not limited to the allegations contained in the complaint. *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). Instead, to determine whether it has jurisdiction over the claim, the court may consider materials outside the pleadings. *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

###     2.     The Plaintiffs' Claims Are Not Barred by Sovereign Immunity

The defendants argue that the court lacks subject-matter jurisdiction over the plaintiffs' challenge to the Navy's accession practices because "it seeks to completely overhaul the Navy's system of commissioning new officers into its Chaplaincy Corps – a policy constitutionally and statutorily committed to the Navy's discretion[.]" Defs.' Mot. at 7.

At its heart, the plaintiffs seek to compete for a position without the Navy subjecting them to an allegedly unconstitutional hiring practice. Such a claim is precisely within the ambit of the federal judiciary. *Chappell v. Wallace*, 462 U.S. 296, 304 (1983) (stating that "this Court has never held, nor do we now hold, that personnel are barred from all redress in civilian courts for constitutional wrongs suffered in the course of military service"); *Dilley v. Alexander*, 603 F.2d 914, 920 (D.C. Cir. 1979) (noting that "courts have shown extreme reluctance to interfere with the military's lawful exercise of its discretion over internal management matters," but pointing out that this principle "is wholly inappropriate . . . when a case presents an issue that is

8

amenable to judicial resolution.  Specifically, courts have shown no hesitation to review cases in which a violation of the Constitution, statutes, or regulations is alleged").

The defendants rely on *Orloff v. Willoughby*, in which the Supreme Court noted that "Congress has authorized the President alone to appoint Army officers in grades up to and including that of colonel, above which the advice and consent of the Senate is required." *Id.* at 8 (quoting *Orloff v. Willoughby*, 345 U.S. 93, 91 (1953)).  In *Orloff*, the Court found it "obvious that the commissioning of officers in the Army is a matter of discretion within the province of the President as Commander in Chief." *Orloff*, 345 U.S. at 91.  Despite the seeming unequivocal nature of *Orloff*, however, this circuit has made clear that "[s]ince *Orloff*, the doctrine of nonreviewability of military decisions has undergone considerable modification, as courts have evinced increased willingness to review military actions alleged to contravene express constitutional, statutory or regulatory requirements." *Blevins v. Orr*, 721 F.2d 1419, 1421 (D.C. Cir. 1983).

In short, and contrary to the defendants' assertion, "[i]t is the duty of the federal courts to inquire whether an action of a military agency conforms to the law, or is instead arbitrary, capricious or contrary to the statutes and regulations governing that agency." *Dilley*, 603 F.2d at 920.  Balanced against the Supreme Court's caution in *Orloff*, the court's role here is "limited but crucial." *Ridgely v. Marsh*, 866 F.2d 1526 (D.C. Cir. 1989) (quoting *Blevins*, 721 F.2d at 1421). Accordingly, the court rejects the Navy's contention that its personnel decisions are immune from judicial scrutiny where constitutional wrongs are alleged.

### 3.    Standing

9

The defendants claim that the plaintiffs lack standing to challenge the Navy's accession practices because they have "failed to demonstrate that they face a concrete likelihood of future injury[.]" Defs.' Mot. at 10. In essence, the defendants claim that the plaintiffs can show neither immediate or imminent injury nor redressability. *Id.* Though the court previously rejected the defendants' challenge to the plaintiffs' standing, its analysis focused on the burdens attending the plaintiffs at the motion to dismiss phase of the litigation, rather than at the motion for summary judgment phase. Because the plaintiffs' burden of demonstrating standing is greater at the summary judgment phase, *Sierra Club v. Envtl. Prot. Agency*, 292 F.3d 895, 898-99 (D.C. Cir. 2002), the court must consider the issue anew.

### a.    Legal Standard for Standing

Article III of the Constitution limits the jurisdiction of federal courts to cases or controversies. U.S. Const. Art. III, § 2, cl. 1. These prerequisites reflect the "common understanding of what it takes to make a justiciable case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). Consequently, "a showing of standing is an essential and unchanging predicate to any exercise of a court's jurisdiction." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing standing. *Lujan*, 504 U.S. at 561; *Steel Co.*, 523 U.S. at 104; *City of Waukesha v. Envtl. Prot. Agency*, 320 F.3d 228, 233 (D.C. Cir. 2003) (per curiam). The extent of the plaintiff's burden varies according to the procedural posture of the case. *Sierra Club*, 292 F.3d at 898-99. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct

10

suffice.  *Id.*

To demonstrate standing, a plaintiff must satisfy a three-pronged test.  *Id.*, 292 F.3d at

898 (citing *Defenders of Wildlife*, 504 U.S. at 560).  First, the plaintiff must have suffered an

injury in fact, defined as a harm that is concrete and actual or imminent, not conjectural or

hypothetical.  *Byrd v. Envtl. Prot. Agency*, 174 F.3d 239, 243 (D.C. Cir. 1999) (citing *Steel Co.*,

523 U.S. at 103).  Second, the injury must be fairly traceable to the governmental conduct

alleged.  *Id.*  Finally, it must be likely that the requested relief will redress the alleged injury.  *Id.*

Our court of appeals has made clear that no standing exists if the plaintiff's allegations are

"purely speculative[, which is] the ultimate label for injuries too implausible to support

standing."  *Tozzi v. Dep't of Health & Human Servs.*, 271 F.3d 301, 307 (D.C. Cir. 2001).  Nor is

there standing where the court "would have to accept a number of very speculative inferences

and assumptions in any endeavor to connect the alleged injury with [the challenged conduct]."

*Winpisinger v. Watson*, 628 F.2d 133, 139 (D.C. Cir. 1980).

> **b.    The Plaintiffs Have Standing to Challenge the Navy's Current Policy**

The defendants argue that the plaintiffs lack standing to request prospective relief because

the possibility of future harm is speculative or hypothetical.  Defs.' Mot. at 11 (citing *City of L.A.*

*v. Lyons*, 461 U.S. 95 (1983)).  The court previously considered this issue in addressing the

defendants' motion to dismiss and concluded, noting the procedural posture of the case at that

time, that general factual allegations of injury resulting from the defendants' conduct may

suffice, "for on a motion to dismiss [courts] 'presum[e] that general allegations embrace those

specific facts that are necessary to support the claim.'"  Mem. Op. (Nov. 18, 2004) at 16 (quoting

*Lujan*, 504 U.S. at 561).  Thereafter, the court projected that "at the summary judgment stage, the

11

court could not construe the plaintiffs' 'interest[] in becoming chaplains' more favorably than the 'some day' plans in *Lujan* – plans which, the Court in *Lujan* noted, lacked concreteness 'or indeed even any specification of *when* the some day will be.'" *Id.*

In assessing standing, the court must consider whether the plaintiffs plan to reapply to the Corps – and, if they do plan to reapply, whether their plan is a mere "some day" intent or hope, or something more – something concrete. *Lujan*, 504 U.S. at 564. An inquiry into the plaintiffs' plan necessarily centers around the plaintiffs' intentions. *Gratz v. Bollinger*, 539 U.S. 244, 261 (2003).

Recognizing the scant record concerning the plaintiffs' intentions on reapplying to the Navy Chaplaincy, the court previously ordered briefing as to "whether each plaintiff is 'able and ready' to apply for a Navy chaplain commission." Order (Aug. 9, 2004). The court's inquiry stemmed from the Supreme Court's explanation in *Gratz* that a plaintiff had standing to seek prospective relief if the plaintiff could demonstrate that he is "able and ready" to apply if the allegedly discriminatory impediment was removed. *Id.* In response, on August 23, 2004, the plaintiffs submitted a memorandum accompanied by declarations from each plaintiff responding to the court's inquiry that "'yes', I am 'able and ready' to apply for a Navy chaplain commission." Pls.' Supplemental Mem. (Aug. 23, 2004), Ex. 2 ¶ 3; *see also id.* Exs. 3 ¶ 3 & 5 ¶ 3.

Despite the plaintiffs' assertions, the defendants contend that the plaintiffs' readiness and willingness to reapply to the Navy remains speculative. Defs.' Mot. at 12. Although the court concurs with the government's assessment, this characterization does not damn the plaintiffs' standing because the nature of the prospective standing inquiry is inherently speculative,

concerning the subjective intent of the suing party.  The speculative quality of the plaintiffs'

assertions notwithstanding, the plaintiffs' declarations constitute "direct testimonial evidence" of

their intent to reapply, *Arrington*, 473 F.3d at 338, which suffices in defeating summary

judgment,[3] *Anderson*, 477 U.S. at 255 (noting that in considering a motion for summary

judgment, the court must draw all justifiable inferences in the nonmoving party's favor and

accept the nonmoving party's evidence as true); *see also, Gratz*, 539 U.S. at 282 (Stevens, J.,

dissenting) (noting that the plaintiff in *Grutter v. Bollinger*, 539 U.S. 306 (2003), succeeded in

demonstrating standing through a declaration that the plaintiff  "still desires to attend the Law

School and become a lawyer").

One final note regarding the plaintiffs' readiness to reapply.  The defendants argue that

for various reasons the plaintiffs do not currently meet the basic threshold qualifications for

acceptance into the Navy chaplaincy.  Defs.' Mot. at 17-18.  For example, the defendants argue

that defendants McNear and Larson both fail to meet the current age requirement for accession,

---

[3]    The court notes that the ability of litigants to gain standing by simply declaring their readiness and willingness reduces the standing assessment from the traditional bleeding plaintiff inquiry, to a formulaic pleading requirement.  Such superficial formality is equally present in the traditional standing inquiry.  *Cf.* B. Woodward & S. Armstrong, *The Brethren* 192 (1981) (noting Justice White's rhetorical question asking "[w]hy didn't the Sierra Club have one goddamn member walk through the park and then there would have been standing to sue?").  Indeed, the court is at a loss to see how a Sierra Club members' walk through the park creates real skin in the game.  And with advice of half decent counsel, it seems doubtful that any litigant would fail to demonstrate standing under the current doctrine (e.g., an attorney advising his client to walk through the park or invoke the buzz words "ready and able" before initiating suit).  Nevertheless, the Supreme Court has instructed that a litigant has standing by demonstrating readiness and willingness to compete, *N.E. Fl. Chapter of the Assoc. Gen. Contractors of Am. v. City of Jacksonville, Fl.*, 508 U.S. 656, 666 (1993), and it is not to this court to second guess that determination, *Hutto v. Davis*, 454 U.S. 370, 375 (1982) (indicating that Supreme Court precedent "must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be").

that Larson has been unable to obtain an ecclesiastical endorsement, that McNear has not remained in touch with his endorser since first applying to the chaplaincy in 1996, and that McNear has not been hired by a congregation as a pastor.  *Id.*

The current Navy Instruction governing basic qualifications for chaplain accession is Secretary of the Navy Instruction 1120.9 ("SECNAVINST 1120.9").  Defs.' Reply in Supp. of Mot. to Dismiss ("Defs.' Reply") at 6, n. 4; Ex. A.  The current policy requires that applicants "be able to complete 20 years of active service by age 68."  *Id.*, Ex. A at 4.  To the defendants, plaintiffs McNear's and Larson's current ages disqualify them from consideration in the chaplaincy, and in turn, strip them of standing in this case.[4]  Defs.' Mot. at 18.  The court is not persuaded.  Though SECNAVINST 1120.9 has an age requirement which plaintiffs McNear and Larson apparently do not satisfy, that age requirement is not absolute: the Navy can waive this requirement if, *inter alia*, "extraordinary circumstances cause such a waiver to be in the best interests of the Naval Service" or "[w]hen a gross inequity to the applicant would otherwise result."  Defs.' Reply, Ex. A at 4.  The defendants argue that this exception poses no loophole for the plaintiffs because the fact that the Navy *can* grant a waiver on a case-by-case basis does not mean that all candidates are entitled to one.  *Id.* at 7.  Though the defendants are correct that the waiver does not create a rule, their argument misses the point.  Because the court's immediate

---

[4]     The defendants cite to portions of McNear's and Larson's depositions which do not exist in the record.  For example, the defendants cite McNear's deposition at pages 87-88, Defs.' Mot. at 18, but the excerpt provided skips from page 50 to page 94.  Defs.' Mot., Ex. 3.  Likewise with regard to plaintiff Larson, the defendants cite to Larson's deposition at page 174, Defs.' Mot. at 18, but the excerpt provided ends at page 149.  Defs.' Mot., Ex. 4.  For this reason, though the court presumes that plaintiffs McNear and Larson do not qualify under the Navy's age requirement, nothing provided by the defendants in the record confirm this fact.

inquiry concerns the plaintiffs' standing to bring suit, not the merits of their case, the court's inquiry focuses not on whether the Navy must grant an age waiver to McNear and Larson, but whether such a waiver is possible. *Ranger Cellular v. F.C.C.*, 348 F.3d 1044 (D.C. Cir. 2003) (recognizing standing if there is a "realistic possibility" of competing).

The plaintiffs cite numerous instances in which otherwise age disqualified candidates received a waiver from the Navy. Pls.' Reply at 17-18. Because circumstances exist under SECNAVINST 1120.9 under which the Navy would consider McNear and Larson despite their age, their non-qualification under SECNAVINST 1120.9 does not divest them of standing.

To the defendants, the plaintiffs also fail to meet threshold requirements concerning current ecclesiastical endorsements and physical fitness. Defs.' Mot. at 18. The defendants support these claims with citations to non-existent pages of their exhibits. *See Infra.* at n.4. Moreover, the defendants cite no cases suggesting that the plaintiffs must meet every procedural and ministerial prerequisite for application at every stage in a litigation alleging a more grievous and fundamental impediment to their candidacy. Accepting the defendants' arguments would mean that a plaintiff seeking the opportunity to compete must satisfy all of that job's other qualifications throughout the litigation.

Although the plaintiffs bear the burden of demonstrating standing, the court cannot scrutinize their standing under the defendants' particularized arguments without evidentiary support. It suffices for the court that the plaintiffs declare their present desire, their readiness and their willingness to apply. *Gratz*, 539 U.S. at 282 (Stevens, J., dissenting). The court presumes that if the time came for the plaintiffs to reapply, they would align all of their ducks regarding the Navy's procedural prerequisites for applicants; they would update their resume, they would

15

renew their ecclesiastical endorsements, they would spit-shine their shoes, and yes, they would

get in shape.  For purposes of standing, the court only assess whether it is possible for the

plaintiffs to meet the eligibility requirements of the Navy, not whether they currently meet every

last one.

<strong>c.    The Plaintiffs Lack Standing to Challenge the Navy's Thirds Policy</strong>

Part of the plaintiffs' case challenges the constitutionality of the Navy's now-

decommissioned Thirds Policy.  Pls.' Mot. at 13-27.  The purpose of that policy, as the plaintiffs

see it, was "to have the Navy Chaplain Corps reflect the religious denominational and faith group

makeup of the American population."  Pls.' Statement of Facts in Supp. of its Mot. for Summ. J.

at 39.  To implement the policy, the plaintiffs contend, the Navy used a formula for computing

the accession targets for each of the faith groupings to achieve congruity with the religious

demographics of the nation at large.  Pls.' Mot. at 3.  The plaintiffs challenge the Thirds Policy

by providing statistical evidence demonstrating a systematic favoritism for liturgical Protestants

at the expense of non-liturgical Protestants.  *See id.* 17.

For their part, the defendants provide their own set of statistical evidence which they

contend proves that these accession goals "played no role in determining which candidates

received commissions."  Defs.' Mot. at 41-45.  At the summary judgment stage, the court's role

is not to evaluate the parties' evidence or draw factual conclusions.  FED. R. CIV. P. 56(c).  And a

proper evidentiary evaluation of the parties' evidence and expert testimony would ultimately fall

to a fact finder, at a later stage in litigation.  As elaborated below, however, because the Navy

voluntarily abandoned its Thirds Policy and because the plaintiffs present no evidence showing

that the Navy took this action merely to avoid judicial review, the plaintiffs' challenge to this

16

policy is moot.

### i.    Legal Standard for Mootness

Article III's case-or-controversy requirement prohibits courts from issuing advisory opinions or decisions based on hypothetical facts or abstract issues. *Flast v. Cohen*, 392 U.S. 83, 96 (1968). "The doctrine of mootness is a logical corollary of the case or controversy requirement[.]" *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 90 (D.C. Cir. 1986). In cases where challenged conduct ceases and "there is no reasonable expectation that the wrong will be repeated, . . . it becomes impossible for the court to grant any effectual relief whatever to the prevailing party, and any opinion as to the legality of the challenged action would be advisory." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000). Accordingly, a court may not rule on the merits of a case in which the claim for relief is moot.

Courts must evaluate mootness "through all stages" of the litigation to ensure that a live controversy remains. *21st Century*, 318 F.3d at 198 (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000) and *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)). As a result, "[e]ven where litigation poses a live controversy when filed, the [mootness] doctrine requires a federal court to refrain from deciding it if 'events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'" *Id.* (quoting *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990)).

A case is moot when "the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *City of Erie*, 529 U.S. at 287 (internal quotations omitted). An intervening event may render a claim moot if (1) there is no reasonable expectation that the

17

conduct will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violations. *Pharmachemie B.V. v. Barr Labs,, Inc.*, 276 F.3d 627, 631 (D.C. Cir. 2002); *Sellers v. Bureau of Prisons*, 959 F.2d 307, 310 (D.C. Cir. 1992). A case is not moot, however, so long as any single claim for relief remains viable, as the remaining live issues satisfy the case-or-controversy requirement. *Tucson Med. Ctr. v. Sullivan*, 947 F.2d 971, 978 (D.C. Cir. 1991) (internal quotations and citations omitted). The burden of establishing mootness rests on the party raising the issue, and it is a heavy burden. *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979); *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 458-59 (D.C. Cir. 1998).

### ii.   The Plaintiffs' Challenge to the Navy's Thirds Policy is Moot

To the extent that the Navy ever employed a Thirds Policy in its chaplain accession decisions, a fact the parties dispute, this policy has "since been replaced by the current faith group-neutral system[.]" Defs.' Mot. at 18; *see* Pls.' Mot. at 6 (recognizing that the "[d]efendants abandoned any [faith group cluster] specific accession goals or targets" in 2001). In this case, the plaintiffs seek to enjoin the Navy from utilizing unconstitutional policies so that the plaintiffs can compete for membership in the Corps. *See* Mem. Op. (Nov. 18, 2004) at 7 (construing the plaintiffs' complaint as "seeking to compete for a position without the Navy subjecting them to an allegedly unconstitutional hiring practice"). Because the Thirds Policy is no longer in service, an injunction would serve no purpose. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108-109 (1998).

In *Steel Co.*, the plaintiff challenged a steel manufacturer's failure to report toxic and

hazardous chemical storage end emissions statistics as required by statute.  After the plaintiff

initiated suit, the steel manufacturer voluntarily submitted its reports.  For this reason, the Court

ruled that injunctive relief – "aimed at deterring petitioner from violating [the relevant statute] in

the future," was insufficient for purposes of Article III standing.  *Id.*, at 108-109.  In the case, the

United States, speaking through an amicus brief, argued that "there is a presumption of [future]

injury when the defendant has voluntarily ceased its illegal activity in response to litigation."  *Id.*

at 109 (correction in original).  Characterizing this argument as creating a "sword out of a

shield," the Court ruled that "[i]t is an immense and unacceptable stretch to call the presumption

[of future injury] into service as a substitute for the allegation of present or threatened injury

upon which initial standing must be based."  *Id.* (citing *Lyons*, 461 U.S. at 109).

Had the plaintiffs in the present case alleged that "a continuing violation or the

imminence of a future violation, the injunctive relief requested would remedy that alleged harm."

*Id.* at 108.  But like the plaintiff in *Steel Co.*, the plaintiffs here do not allege that the Navy plans

to reinstate its challenged Thirds Policy.  For this reason, the plaintiffs' challenge to the Navy's

Thirds Policy is not redressible by court-ordered injunctive relief, and is, therefore, dismissed as

moot.

**B.    The Defendants Are Entitled to Summary**

19

### Judgment as to the Navy's Current Practice

Having resolved the requisite jurisdictional issues, the court turns now to the pending merits upon summary judgment. Simply put, the issue before the court is whether the Navy's current chaplain accession practice violates the Constitution.

### 1. Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on

20

summary judgment.  *Id.*

The moving party may defeat summary judgment through factual representations made in a sworn affidavit if he "support[s] his allegations . . . with facts in the record, *Green*, 164 F.3d at 675 (quoting *Harding v. Gray*, F.3d 150, 154 (D.C. Cir. 1993)), or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338 (D.C. Cir. 2006).  Indeed, for the court to accept anything less "would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial." *Green*, 164 F.3d at 675.

> **2.     Appropriate Legal Standard of Review for Assessing the Plaintiffs' Establishment Clause and Free Exercise Clause Claims**

Under the current naval policy, the Navy "takes the best qualified candidates, regardless of denomination."  Pls.' Mot. at 6; *see also* Defs.' Mot. at 26 (indicating that the policy "does not set any accession goals, guidelines, or quotas for chaplain applicants from any denomination, faith group, or faith group category").  Whereas the Navy's goal in the formerly-employed Thirds Policy was to link the composition of the Navy Chaplaincy to the religious denominational demographics of the community generally, the Navy currently "considers numerous factors" in deriving its chaplaincy accession needs.  *Id.* at 30.  These factors include: "the breadth of locations where Navy personnel serve," "the unique circumstances of Naval service, which involves personnel isolated on ships sailing all over the world," "the various functions and tasks of chaplain officers outside of religious services including assistance to those of other faith groups and even no faith groups," "the need to keep accession, promotion, and retention in line with other naval communities," the need to prevent shortages of qualified clergy," "the need to

21

maintain capacity to respond to events requiring quick access to chaplains from different faith groups not stationed on site, such as terror attacks," and "the need to consider administrative necessities in managing an all-volunteer corps." *Id.* (citing exhibits 14 and 16).

In assessing the constitutionality of the Navy's current practice, the court turns to case law concerning the First Amendment's religion clauses. The court ferociously guards the constitutional command that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" U.S. Const. Am. I. Congress "may justify an in-road on religious liberty [however] by showing that it is the least restrictive means of achieving some compelling state interests." *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981). "It is basic that no showing merely of a rational relationship to some colorable state interest would suffice; in this highly sensitive constitutional area, '(o)nly the gravest abuses, endangering paramount interest, give occasion for permissible limitation[.]" *Sherbert v. Verner*, 374 U.S. 398, 406 (1963) (quoting *Thomas v. Collins*, 323 U.S. 516, 530 (1945)). Ordinarily, in considering a claim of religious infringement, the court does not take the government's word at face value, but instead conducts an independent inquiry to assess its plausability. *Id.* (noting that certain stated justifications for infringement on religious liberty would likely not suffice in justifying the infringement and recognizing the government's burden of showing that no alternatives existed to meet those justifications); *see also, Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972) (recognizing that "[t]he essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion").

When the claims of religious infringement are levied against the military, however, the

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 18
Page 22 of 41

Supreme Court has charted a far different course.  Noting that "the military is, by necessity, a

specialized society separate from civilian society," *Parker v. Levy*, 417 U.S. 733, 743 (1974), the

Supreme Court declared that judicial review of challenges to military action "is far more

deferential than constitutional review of similar laws or regulations designed for civilian

society," *Goldman v. Weinberger*, 475 U.S. 501, 508 (1986); *Steffan v. Perry*, 41 F.3d 677, 692

(D.C. Cir. 1994) (recognizing the highly deferential standard set forth in *Goldman* and that "even

the First Amendment must yield at times to the exigencies of military life").

In *Goldman*, the Supreme Court considered a challenge to an Air Force regulation

mandating uniform dress for Air Force service members.  Goldman, an orthodox Jew, challenged

this regulation because, in application, it prevented him from wearing a Jewish head covering,

the yarmulke.[5]  Justice Stevens, concurring with the majority's disposition, rendered a concise

background of the case:

> [Goldman's] devotion to his faith is readily apparent.  The yarmulke is a familiar and
> accepted sight.  In addition to its religious significance for the wearer, the yarmulke
> may evoke the deepest respect and admiration – the symbol of a distinguished
> tradition and an eloquent rebuke to the ugliness of anti-Semitism.  Captain
> Goldman's military duties are performed in a setting in which a modest departure
> from the uniform regulation creates almost no danger of impairment of the Air
> Force's military mission.  Moreover, on the record before us, there is reason to
> believe that the policy of strict enforcement against Captain Goldman had a
> retaliatory motive – he had worn his yarmulke while testifying on behalf of a
> defendant in a court-martial proceeding.

---

[5]      "Yarmulkes are generally understood to be a form of religious observance.  They are
commonly seen and accepted in today's society wherever Orthodox Jews are found."
*Goldman v. Weinberger*, 475 U.S. 501, 511 n. 1 (1986).  These head coverings are the
"symbol of [a] faith whose roots are as deep and venerable as Western civilization itself
[constituting a] symbol of a great faith from which Western morality and the Judeo-
Christian tradition have arisen."  *Goldman v. Sec. of Defense*, 739 F.2d 657 (1984)
(Starr, J., dissenting from denial of rehearing *en banc*).

23

With these facts, Justice Stevens editorialized that this was "an especially attractive case" justifying judicial rebuke of the challenged military policy. *Id.* at 511 (Stevens, J., concurring). Nevertheless, Justice Stevens joined the majority in concluding that Goldman's religious liberties in wearing his yarmulke, an unquestioned hallmark of his religious faith, yielded to the military's decision to institute a uniform dress policy which lacked an exception for religious attire. *Id.* at 511-512. Recognizing that such regulations "may be more objectionable" for the plaintiff, the Court nonetheless took the view that the Air Force's policy, which "encourages the subordination of personal preferences and identities in favor of the overall group mission," was paramount. *Id.* at 508.

In reaching this decision, the Supreme Court rejected the traditional "strict scrutiny" analysis in favor of a more deferential analysis. *Id.* at 507-508. In *Orloff*, the Supreme Court had recognized that "the very essence of compulsory service is the subordination of the desires and interest of individual to the needs of the service." *Orloff*, 345 U.S. at 91. In *Goldman*, the Court extended this reference to "desires and interests" to servicemen in the practice and religious commands of their religious faith. *Goldman*, 475 U.S. at 507 (quoting *Orloff*). In short, because "within the military there is simply not the same [individual] autonomy as there is in the larger civilian community . . . when evaluating whether military needs justify a particular restriction on religiously motivated conduct, courts must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." *Id.* at 508 (citing *Parker*, 417 U.S. at 751).

The plaintiffs advocate the use of the traditional strict scrutiny analysis. Pls.' Mot. at 13.

24

And to distance themselves from *Goldman*, they simply ignore it.[6]  Nowhere in the plaintiffs'

motion for summary judgment, their opposition to the defendants' cross-motion for summary

judgment, or their reply in support of their motion for summary judgment do the plaintiffs

distinguish, let alone cite, *Goldman*.  The plaintiffs, instead, cite a litany of cases for the

proposition that the court must apply strict scrutiny when a plaintiff alleges preferential treatment

based on denominational membership (*a.k.a.*, "denominational preference" cases).  Pls.' Mot. at

14 (citing *Larson v. Valente*, 456 U.S. 228 (1982), *Hernandez v. C.I.R.*, 490 U.S. 680, 685

(1989), *County of Allegany v. Am. Civil Liberties Union*, 492 U.S. 573, 608-609 (1989), and

*Bowen v. Kendrick*, 487 U.S. 589, 623 (1988)).  The cases cited by the plaintiffs, however,

concern constitutional challenges to government conduct outside of the military context.  The

irreducible fact remains that claims of religious infringement to military conduct occupies a

---

[6]     The plaintiffs cite *Anderson v. Laird*, 466 F.2d 283 (D.C. Cir. 1972) to support their
contention that the court need not defer to the military's judgment. Pls.' Mot. at 10.  The
plaintiffs' reliance on *Laird* is misplaced.  In *Laird*, the D.C. Circuit invalidated a
program requiring military cadets at the United States Military Academy at West Point,
New York, the United States Naval Academy at Annapolis, Maryland, and the United
States Air Force Academy at Colorado Springs, Colorado, to attend religious services.
The Circuit's decision, comprised of separate concurring opinions by Judges Bazelon
and Leventhal, ruled that the forced attendance law violated the Establishment Clause.
*Laird*, 466 F.2d at 290.  Judge Bazelon held that compulsory church attendance was
"absolutely proscribed by the Establishment Clause." *Id.*  Yet Judge Bazelon also
recognized that if the program's purpose was "of preserving the right to free exercise of
religion," it would be constitutionally permissible. *Id.*  In fact, as if prescient to the facts
of this case, Judge Bazelon continued that "accommodation of the Establishment Clause
to permit maintenance of religious personnel and institutions within the military is
necessitated . . . by the mandate of the Free Exercise Clause that soldiers be given the
opportunity to worship." *Id.* n.36.

Judge Leventhal, for his part, ruled that the compulsory church attendance requirement
violated the Establishment Clause, but predicated his ruling on the fact that the military
had demonstrated no "military necessity" for the program. *Id.* at 297.  Here, by contrast,
the Navy explicitly rests their chaplaincy program on such claims of military necessity.
*See supra* at 27-28.

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 18
Page 25 of 41

judicial space of their own.[7]

The plaintiffs' argument for strict scrutiny has some doctrinal appeal given the breadth of cases applying the strict scrutiny analysis. But the ubiquity of strict scrutiny does not prove its application absolute. Along with *Goldman*, the Supreme Court has applied one form or another of relaxed scrutiny "in several cases involving discrete categories of governmental action in which there are special reasons to defer to the judgment of the political branches." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 571 n.5 (1993). And with regard to cases concerning the religion clauses, "rigidity could well defeat the basic purpose of these provisions, which is to insure that no religion be sponsored or favored, none commanded, and none inhibited." *Waltz v. Tax Comm'n*, 397 U.S. 664, 669 (1970). Therefore, "short of those expressly proscribed governmental acts, there is room for play in the joints productive of a

---

[7]     The plaintiffs advocate the use of strict scrutiny because the Navy's accession program, in practice, suggests statistical denominational preference. Pls.' Mot. at 13-14 (citing *Larson v. Valente,* 456 U.S. 228, 246 (1982)). A suggestion of denominational preference, demonstrated through statistics, would complicate the court's analysis, and perhaps require judicial application of strict scrutiny, *Orloff* and *Goldman* notwithstanding, *see Waltz v. Tax Comm'n*, 397 U.S. 664, 669 (1970) (noting that the "course of constitutional neutrality in this area cannot be an absolutely straight line"). If a plaintiff happened into court with hard statistics showing that a current military program worked a statistically significant disparity in treatment between members of different faiths, perhaps the scales would tip away from deference to military judgment and in favor of judicial stewardship of individual rights. Without suggesting that a statistical suggestion of denominational preference would spur the court to conduct fact finding in a battle between statistical experts, the court leaves this determination for another court on another day.

Such a circumstance does not exist in the present case, however. Here, though the plaintiffs allege that the previously utilized accession program created denominational preferences, *see generally*, Pls.' Mot. at 2, the plaintiffs own data shows that under the Navy's current accession policy, accession rates among applicants of different faith groups have "converged," and any previously existing statistical differences "have dissipated," Pls.' Stmt. of Facts ¶ 126 (quoting Pls.' Mot. Ex. 28 (Leuba Decl.) at 65 ¶ CP12).

26

benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference." *Id.*

The plaintiffs misread the court's August 22, 2002 Memorandum Opinion in the related *Adair* case as endorsing a strict scrutiny analysis for the present case. In that ruling, the court mentioned strict scrutiny within the context of delineating the plaintiffs' initial burdens in avoiding a pre-discovery summary judgment challenge. *Adair v. England*, 217 F. Supp. 2d 7, 14 (D.D.C. 2002). That analysis is not at all applicable in the current context, in which the court has occasion to reach the constitutional merits of the case.

In a Memorandum Opinion issued on January 10, 2002 in *Adair*, the court suggested that relaxed scrutiny as articulated in *Goldman* did not apply to the military chaplaincy cases. The court's determination was based, in part, on the nature of the defendants' stated justifications at the time for its policies. *Adair v. England*, 183 F. Supp. 2d 31 (D.D.C. 2002) (noting that the challenged regulation in *Adair* involved "considerations that are not related to strictly military affairs or to the defense of the country"). There, the government "never tr[ied] to articulate how the challenged policies and practices – e.g., alleged religious preferences for liturgical Christian chaplains – would further any operational, strategic, or tactical objectives." *Id.* Without the Navy demonstrating a link between the chaplaincy and strategic or national defense concerns, the court was left to conclude that the Navy's interest in creating the chaplaincy constituted only "quality-of-life issues" which were "designed to hire, retain, and promote chaplains to satisfy the religious needs of Navy service members." *Id.* Now, by contrast, the court has before it the Navy's stated justifications for its policy: "Chaplains help prepare and maintain sailors' and marines' ability to engage in combat and other tactical, strategic, and operational missions,

27

directly tying chaplains to the Navy's ability to defend the nation." Defs.' Mot. at 28. The court takes the Navy's statement at its word. *Goldman*, 475 U.S. at 507-509 (instructing that "courts must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest"). Accordingly, the court concludes that the Navy's interest in developing a chaplaincy is akin to the Air Force's needs in mandating standards of uniformity at play in *Goldman*; that is, it concerns "operational, strategic, or tactical matters." *Goldman*, 475 U.S. at 507-509; *see, e.g.*, *Katcoff v. Marsh*, 755 F.2d 223, 237 (2d Cir. 1985) (recognizing that "the morale of our soldiers, their willingness to serve, and the efficiency of the Army as an instrument for our national defense rests in substantial part on the military chaplaincy, which is vital to our Army's functioning"). For this reason, the relaxed scrutiny employed in *Goldman* is the appropriate level of judicial scrutiny in evaluating how the Navy goes about implementing those goals.

　　The court has one additional justification for its conclusion. In *Grutter v. Bollinger*, the Supreme Court recognized with approval the assertion of high ranking retired military leaders that a "highly qualified, racially diverse officer corps . . . is essential to the military's ability to fulfill its principle mission to provide national security." 539 U.S. at 329. Both affirmative action programs designed to promote diversity in the military officers corps and the Navy's current chaplaincy accession program do not instinctively implicate national security the way, for example, troop assignments, rules of engagement, or weapons procurement might. But just as the Supreme Court credits the statements of former military officials in asserting that maintaining racial diversity promotes national security, so too does this court credit the Navy's "tying chaplains to the Navy's ability to defend the nation." Defs.' Mot. at 28. In a very real sense, in

28

other words, the Navy's stated interest in operating a chaplaincy corps (which may involve

incidental religious discrimination) resounds with equal force as the military's interest in seeking,

fostering, and promoting racial diversity in its officers corps (which may involve incidental racial

discrimination).  *See Grutter*, 539 U.S. at 329.  In both cases, military service demands "the

subordination of the desires and interests of the individuals to the needs of the service."  *Orloff*,

345 U.S. at 92.

### 3. The Defendants' Current Navy Accession Policy Survives Constitutional Scrutiny

Because religion clause cases engender "room for play in the joints," *Waltz*, 397 U.S. at

669, the court begins its analysis with mention of the constitutional context of this case.  The

realities of maintaining a military in a religiously pluralistic nation places the government in a

delicate constitutional position given the Establishment Clause and the Free Exercise Clause.  On

the one hand, "[s]pending federal funds to employ chaplains for the armed forces might be said

to violate the Establishment Clause."  *Abington Sch. Dist. v. Schempp*, 341 U.S. 203, 308-09

(Stewart, J. dissenting).  "Yet a lonely soldier stationed at some faraway outpost could surely

complain that a government which did *not* provide him the opportunity for pastoral guidance was

affirmatively prohibiting the free exercise of his religion."  *Id.* (emphasis in original); *see also*,

844 (Brennan, J., concurring) (recognizing that the military chaplaincy constitutes a practice

"conceivably violative of the Establishment Clause [but] the striking down of which might

seriously interfere with certain religious liberties also protected by the First Amendment").  It is

in the space between the constitutional command against practices respecting an establishment of

religion and the command against practices which prohibit the free exercise thereof that the

military chaplaincy rests.  With this fundamental understanding of the constitutional difficulties

29

attending the Navy chaplaincy program in mind, the court proceeds.

The plaintiffs challenge the Navy Chaplaincy's current open accession system, which "takes anybody who comes along," by arguing that it lacks a sufficient nexus to the actual Department of Navy free exercise needs – "the constitutional compelling purpose for the Chaplaincy Corps." Pls.' Mot. at 41. Without this nexus, the plaintiffs argue, the Navy "cannot show their means is narrowly tailored to the accomplishment of [the Chaplaincy Corps'] function." *Id.* The plaintiffs ask the court to declare the current system constitutionally invalid and order the Navy to adopt a system tailored narrowly to the Navy's actual free exercise needs.

The plaintiffs' argument, as the court sees it, is this: under normal circumstances, the government may not finance religious programs. The military context, however, constitutes an exception to this general rule because accommodating the free exercise needs of military service members is itself a "compelling interest." Pls.' Mot. at 41-42. To the plaintiffs, in applying the traditional strict scrutiny analysis, the military's accommodation of free exercise (the "compelling interest" in the strict scrutiny analysis) must be narrowly tailored to survive constitutional scrutiny. *Id.* In other words, the Navy is constitutionally permitted to operate a military chaplaincy *only if* it can narrowly tailor its chaplaincy program to the purpose for its creation – the actual free exercise needs of the military service. *Id.* The court does not share the plaintiffs' understanding.

### a. Distinguishing Between Permissive and Mandatory Accommodation

Before evaluating the Navy's chaplaincy program under the relaxed scrutiny standard set forth in *Goldman*, the court takes a moment to highlight an inconsistency in the plaintiffs' constitutional argument which permeates their claims and, ultimately, leads inexorably to its

30

failing.  The plaintiffs argue vigorously that the Navy's chaplaincy program serves a compelling interest in satisfying the religious needs of Naval service members.  Pls.' Mot. at 6.  But to the plaintiffs, that chaplaincy program must be narrowly tailored to the free exercise needs of the military service members it serves.  The problem in this approach is that it equates the Navy's compelling interest in organizing a chaplaincy with a constitutional instruction requiring it.  In other words, the plaintiffs argument confuses that which the constitution permits and that which it requires.

When the plaintiffs argue that the Navy's chaplaincy satisfies a compelling purpose, they speak of this compelling purpose not in permissibly accommodating the religious needs of the Navy, but in satisfying the constitutional *requirement* that the Navy accommodate the religious needs of its service members.  *See, e.g.*, Pls.' Mot. at 43 (arguing that chaplaincy must meet "the specific or expected Free Exercise needs of [Navy] personnel").  To be clear, the plaintiffs never expressly argue that the Navy must establish a chaplaincy to accommodate the religious needs of the Navy.  But their arguments imply it.

The difference is crucial.  If the Navy were constitutionally required to organize and constitute a chaplaincy, so as to ensure the free exercise rights of its service members, then the chaplaincy program would have to not only be narrowly tailored to the free exercise needs of the Navy's service members, it would have to be in relative synergy with it.  *Church of the Lukumi Babalu Aye, Inc.,* 508 U.S. at 562 (noting that a proactive component of the Free Exercise clause is to safeguard religious liberty, which "generally require[s] government to accommodate religious differences").

If, as is the case here, the Navy is permitted, but not constitutionally required, to

accommodate religious needs of its members via a chaplaincy program, the Navy's program need

not satisfy every single service members' free exercise need, but need only promote free exercise

through its chaplaincy program.  The program is constitutionally sound if it simply works toward

accommodating those religious needs.  *See* Arlin Adams, *The Doctrine of Accommodation in the*

*Jurisprudence of the Religion Clauses*, 37 DePaul L. Rev. 317, 319 (1988) (discussing the

differences between permissive and mandatory religious accommodation).

 To be sure, the court would evaluate how well the chaplaincy program accommodated the

service's religious needs whether the chaplaincy was constitutionally required or constitutionally

permitted.  But if the constitution required a military chaplaincy, a single service member's lack

of access to clergy (or any religious need for that matter) would suffice in invalidating the

program as a whole.  Likewise, if a chaplaincy were constitutionally required, the court would

invalidate the program on the suggestion that another means would accomplish greater free

exercise ends.

 The plaintiffs cite *Katcoff* to support their claim that the Navy's chaplaincy must be

narrowly tailored to the religious needs of Naval service members.  Pls.' Mot. at 19.  In *Katcoff*,

the Second Circuit expressed its view that the constitution mandated a military chaplaincy.

*Katcoff*, 755 F.2d at 234.  The court stated that if the military did not organize a chaplaincy, "the

effect of compulsory military service . . . would deprive the soldier of his right under the

Establishment Clause not to have religion inhibited and of his right under the Free Exercise

Clause to practice his freely chosen religion."  *Id.*  For two reasons, the court avoids a direct

evaluation of this legal assertion.  First, though the plaintiffs in *Katcoff* were not conscripted to

military service, the court qualified its exposition of constitutional rights to those serving in

32

"compulsory military service."[8]  *Id.*  Perhaps in compelled military service situations the

Supreme Court's sanction of "the subordination of the desires and interests of the individual to

the needs of the service," *Orloff*, 345 U.S. at 92, would resound with less force.  But because the

plaintiffs in the instant case are not conscripted service members arguing the subversion of their

religious freedoms, the court does not have occasion to evaluate the *Katcoff* court's statement

regarding the constitutional requirements placed on the government in draft service situations.

Second, the plaintiffs do not expressly argue that the free exercise clause requires a

military chaplaincy.  Without an explicit argument in this regard, the court does not opine as to

the constitutional dimensions of the chaplaincy on such sweeping terms.  *Mazer v. Stein*, 347

U.S. 201, 206, n. 5 (1954) (noting that the court does not "reach for constitutional questions not

raised by the parties").

According to the Navy, given the diversity of religious beliefs and geographic dispersion

of the military, it would be "impossible in any given military unit or community to provide a

chaplain for each faith group represented by its members."  Defs.' Mot., Ex. 15 at iv.  The court

accepts the Navy's assertions in this regard, *see Orloff*, 345 U.S. at 92, and the Navy's arguments

convince the court in their own right that stationing a chaplain wherever a service member needs

one would be a logistical nightmare the execution of which would significancy and perpetually

---

[8]     With minor historic exceptions, however, our military is a volunteer organization.  See
*Holmes v. United States*, 391 U.S. 936 (1968) (Douglas, J., dissenting in the denial of
certiorari) (recounting the history of conscripted military service in the United States).
In volunteering, military service members must understand and accept that "the military
'is the executive arm' whose 'law is that of obedience.'"  *Parker v. Levy*, 417 U.S. 733,
749 (1974).  The court sees no principled reason why this logic would not apply to
civilians who are attempting to gain admission into the military, one of its services, or a
specialized corps within one of those services.

strain military resources.  For these various reasons, in evaluating the Navy's chaplaincy program, the court need not assess whether it is perfect in its accommodation of service members' free exercise needs, just whether it is sufficiently tailored to the Navy's interest in permissibly accommodating those religious needs.[9]

> **b.    The Navy's Chaplaincy Program Satisfies the *Goldman* Standard**

Under a relaxed standard of review, the court assesses whether "legitimate military ends are sought to be achieved," and whether the program "is designed to accommodate the individual right to an appropriate degree."[10]  *Goldman*, 475 U.S. at 505 (quoting *Goldman v. Sec. of Def.*, 734 F.2d 1531 (D.C. Cir. 1984)).  Assessing the Navy's current chaplain accession system under this two part test, the court rules that it is constitutionally sound.

First, the court rules that the Navy's chaplaincy system seeks "legitimate military ends."[11] *Id.*  According to the government, supported by affidavit, the chaplaincy furthers the Navy's mission of national defense.  Defs.' Mot. at 28.  Marine Brigadier General Joseph Dunford, for

---

[9]    In addition to confusing permissive and mandatory accommodation, the plaintiffs' argument is not persuasive because it relies, at its core, on the application of strict scrutiny.  But as the court previously ruled, strict scrutiny analysis does not apply in this case given the judicial deference accorded the military in decisions concerning military affairs and the understanding that service in the military implies a measured reduction in the rights of service members.  *See* discussion infra at 21-28.

[10]    Justice O'Conner, dissenting in *Goldman*, lamented the majority's holding because "[n]o test for free exercise claims in the military context is even articulated, much less applied."  *Goldman*, 475 U.S. at 528 (O'Conner, J., dissenting).  Be that as it may, yet seeking precedential guidance as to the applicable standard of review, the court applies the legal test employed by the D.C. Circuit in its opinion in the case, which the Supreme Court affirmed.

[11]    The plaintiff seemingly concedes this point by recognizing that the military chaplaincy constitutes a compelling military interest.  Pls.' Mot. at 10.  Nevertheless, the court's holding does not depend on this concession.

34

example, recognizes that the chaplaincy's contribution to the military "directly influences the will

of the individual Marines to fight and the combat effectiveness of our units." *Id.,* Ex. 12 ¶ 2.

General Dunford continues that prior to deployment of Marines in the current imbroglio in Iraq,

"chaplains were essential in the development of combat leadership, combat stress training, family

readiness, and a wide range of other areas.  Because chaplains participate in every aspect of unit

training, the contribution they make is truly immeasurable." *Id.*  He continues with a detailed

and thoroughly convincing assessment of the necessity of the Navy Chaplaincy Corps.

According to Department of Defense findings presented in its Study of Representation of

Religious Faiths in the Armed Forces, Navy Chaplains

> [P]rovide for the religious and moral needs of military personnel, their families,
> authorized Department of Defense civilians, and retired personnel, with primary
> attention given to the welfare of the service member.  They conduct services of
> worship, administer rites and sacraments consistent with the chaplains' faith group,
> and provide a full range of religious activities.  They serve as personal counselors and
> as leaders in religious education and humanitarian services.

Defs.' Mot., Ex. 15 at 3.  With these statements, the court concludes that the Navy's interest in

maintaining a chaplaincy is important, it is compelling, and therefore, at an irreducible minimum,

serves legitimate military ends.  *Goldman*, 734 F.2d at 1535; *Katcoff*, 755 F.2d at 234.

The second prong of the court's inquiry evaluates whether the program is "designed to

accommodate the individual right to an appropriate degree."  *Goldman*, 475 U.S. at 505.  The

*appropriate* degree of accommodation depends, of course, on the military's need for its program

and the compatibility of that program with individual needs.  In *Goldman*, the Air Force's strict

application of its dress code regulation in practice foreclosed *any* accommodation of individual

rights.  But such absolute non-accommodation was constitutionally permissible, the court ruled,

35

because "the First Amendment does not require the military to accommodate such practices in the face of its view that they would detract from the uniformity sought by the dress regulations." *Id.* at 508.

A review of the Navy's current chaplaincy accession policy satisfies the court that it is likewise "designed to accommodate the individual right to an *appropriate* degree." *Id.* a 505. Navy "[c]haplains help prepare and maintain sailors' and marines' ability to engage in combat and other tactical, strategic, and operational missions, directly tying chaplains to the Navy's ability to defend the nation." Defs.' Mot. at 28. Under the current chaplaincy accession system, the Navy assesses its current religious needs by "consideration of the particularized needs of its individual units and installations." *Id.* at 30. The Navy "strives to recruit chaplains of various faith groups [and] does not . . . adhere to any quotas." Defs.' Mot., Ex. 14 ¶ 11; Ex. 42 ¶ 4. Instead, the Navy "aims to access only the best qualified applicants regardless of faith group." *Id.* "To determine if an applicant is the best qualified . . . a Chaplain Appointment and Recall Eligibility Advisory Group (CARE Advisory Group) meets to consider the [applicant]." *Id.* The religious denominations or faith group identification of individual applicants is "never a factor in recommendations" of the CARE group for accessions. *Id.* Rather, the Navy bases its accession system on many factors, including "the breadth of locations where Navy, Marine, and Cost Guard personnel serve; the unique circumstances of Naval service, which involve personnel on ships sailing all over the world; and the various functions and tasks of chaplain officers outside of religious services." Defs.' Mot., Ex. 16 at 3-4.

Given that it would be "impossible in any given military unit or community to provide a chaplain for each faith group represented by its members," Defs.' Mot., Ex. 15 at iv, the Navy's

36

use of a more relaxed hiring approach, which ignores faith group identifiers, seems reasonable

and justified.  And given the importance of the Corps to the Navy's needs, the current program

does what is possible under the circumstances to "accommodate the individual right to an

appropriate degree."  *Goldman*, 475 U.S. at 505.

### c.  The Plaintiffs' Suggested Alternative

The plaintiffs attempt to highlight the problems in the Navy's program by suggesting an

alternative approach.  The problem for the plaintiffs, however, is that they utterly fail in

suggesting a system which is equally effective at meeting the Navy's needs while also being

more accommodating to the rights of either the individual plaintiffs of the average yeoman.

Coupling this difficulty with the court's own inability to surmise a process better designed to

more closely accommodate individual interests, the court has no reason to reject the Navy's

current approach in favor of another.

The Navy possesses a generalized interest in maintaining the Chaplaincy Corps and the

plaintiffs' interest in competing for a position in that Corps is not directly or inherently in

conflict with the Navy's interest.  Nevertheless, the plaintiffs do not seek merely the opportunity

to compete for a position in the chaplaincy.  Rather, they want to compete in a chaplaincy infused

with selection criterion of their choosing.

Under the plaintiffs' proposal, the Navy should base its chaplain selection on the actual

religious demographics of the Navy.[12]  Pls.' Mot. at 8.  In this way, the plaintiffs suggest, the free

---

[12]     The plaintiffs characterize an accession system based on a blending of national religious
demographics and Navy religious demographics as "optimal," but fail to explain how
such a blending ensures a better nexus between the chaplaincy and the religious needs of
the Navy than the current system.  Pls.' Mot. at 8.

exercise needs of the Navy service members will be better accommodated.  *Id.*  To the plaintiffs, their approach would more closely tailor the Navy's chaplaincy program to the purpose for its creation (*i.e.*, the free exercise needs of Naval service members).  The plaintiffs' approach is itself flawed because it confuses religious demographics with religious need.  This is so for three principal reasons.

First, under the plaintiffs' suggested plan, numerous religious service members would have no access to clergy of their faith.  For example, according to the Navy, "if less than .27 percent of personnel identify themselves as Muslim, proportional representation would require that the Chaplain Corps be composed of only 2 Muslim chaplains.  The dispersion of religious needs across the Sea Services would indicate at least a requirement of 10 Muslim chaplains to ensure access to a chaplain of this tradition in every major geographical area."  Defs.' Mot. Ex. 14 at 6.  In short, according to the Navy, "[s]trict proportionality does not consider effectively the distribution and dispersion challenges of the Sea Services."  *Id.*

Second, the plaintiffs suggestion fails to account for the complexities and variations of religious worship among religions generally and between individual parishioners specifically.  Corresponding the chaplaincy's composition to precise demographics assumes that religions each maintain an equal need for chaplains of that particular faith.  The Navy characterizes this issue as "faith specific liturgical and religious requirements."  Defs.' Mot., Ex. 15 at v.  Simply put, the plaintiffs' plan assumes that individual religious adherents share the same level of religious practice and, therefore, need for clergy.  The Navy has found, by contrast, that the disparities in beliefs and practices "make it impossible to effectuate a perfect match between chaplains of faith group clusters and the needs of sea service personnel and their families."  *Id.*, Ex. 14 at 4

38

(recognizing that "military personnel and their families who identify themselves as belonging to a particular religious tradition may or may not adhere as rigidly to the specific dogma of their stated religious denomination").

Third, the plaintiffs' recommended scheme presumes that clergy from one religious denomination are unable to cater to the religious needs of a service member from a different religious denomination. According to the Navy, however, "Protestant chaplains usually find . . . that they can serve Protestants from many denominations by incorporating elements of worship generally acceptable to Protestants." Defs.' Mot., Ex. 15 at 6. For Roman Catholics, by contrast, worship requirements and specific sacramental ministry "must be met by priests within the Roman Catholic faith group category." *Id.*

To summarize, a chaplaincy program which accurately accounts for the religious needs of the Navy (which is what the plaintiffs seek) would have to account for the various duty locations of religious service members, the religious needs of their religion generally, the religious needs of the service members specifically, and the level of accommodation that a clergy member of a different denomination, or faith for that matter, could serve to that service members. The Navy suggests that such a detailed analysis would unnecessarily "assign the Court the role of monitoring [the Navy's chaplaincy program] to ensure that accessions matched Navy demographics." Defs.' Mot. at 20. The court agrees.

If the court ordered the Navy to create a new accession system which accounted for these various complicating factors, the resulting Chaplaincy program would likely involve substantial government entanglement with religion, requiring the Navy to conduct routine surveys and studies into the religious habits and interests of its service members. *See* Pls.' Mot. at 44

(praying for the court to order the Navy to establish "objective criteria and procedures to identify [the Navy's] free exercise needs in the context of Defendants' operational requirements, and a plan to ensure the [chaplaincy] structure is focused on those needs and maintained through adequate accession plans"); *see also*, Defs.' Mot., Ex. 18 at I-8 & I-9.  Such entanglement would itself be susceptible to significant constitutional challenge.  *See, e.g.*, *Aguilar v. Felton*, 473 U.S. 402, 413 (1985), *rev'd on other grounds*, (noting that "pervasive monitoring by public authorities . . . infringes precisely those Establishment Clause values at the root of the prohibition of excessive entanglement").

Regarding practical considerations, the Navy concluded that "the need for chaplains is not directly related to the number of adherents to denominations included under the umbrella of a faith group category."  Defs.' Mot. at 30 (citing Ex. 15 at I-6).  Instead, the Navy has "learned that in providing for the free exercise of religion, [it] must consider units or installations, rather than individuals or broad statistical representation, as the primary criterion in being able to serve the cumulative total of individual requirements most effectively."  Defs.' Mot., Ex. 15 at I-6.

Having considered the issue in depth and concluded that it is impractical to consider individual religious needs or broad statistical representations, the Navy's determination is entitled to deference by the court.  *Goldman*, 475 U.S. at 508 (asserting that the court's must give "great deference to the 'professional judgment of military authorities'").  The Navy's current system does not beget a chaplaincy that is perfectly tailored to the free exercise needs of the Navy.  Such a tailoring, however, is, according to the Navy, impossible to achieve.  And given the relaxed scrutiny applicable in cases in the military context, it is also not constitutionally required.

IV.    CONCLUSION

For the foregoing reasons, the court grants the defendants' motion for summary judgment.

An order consistent with this Memorandum Opinion is separately and contemporaneously issued

on this 30th day of April, 2007.


RICARDO M. URBINA
United States District Judge


41

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHAPLAINCY OF FULL GOSPEL CHURCHES, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 1:99cv02945 (RMU) |
| v. | ) ) ) | |
| THE HONORABLE DONALD C. WINTER, Secretary of the Navy, et al., | ) ) ) | |
| Defendants. | ) ) | consolidated with |
| ROBERT H. ADAIR, et al., | ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 1:00cv00566 (RMU) |
| v. | ) ) ) | |
| THE HONORABLE DONALD C. WINTER, Secretary of the Navy, et al., | ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF KILIAN KAGLE

Pursuant to 28 U.S.C. § 1746, I, Kilian B. Kagle, declare as follows:

1. I am a Second Class Legalman (pay grade E-5) on active duty in the United States Navy. I am currently assigned to the Office of the Judge Advocate General, General Litigation Division, Washington Navy Yard, District of Columbia.

1

2. As a Legalman performing paralegal duties for the General Litigation Division, I am responsible for coordinating administrative functions and requests for information between the Office of the Chief of Chaplains and the Office of the Judge Advocate General as required for this litigation. In the course of my duties, I have access to, and regularly utilize, the Chaplain Corps' "alpha" roster, both from prior years as well as the current version. The alpha roster is a list of all Chaplain Corps officers on active duty at a given point in time. The alpha roster provides information on each officer's rank, current duty station, projected rotation date and historically also included an Additional Qualification Designator (AQD) code. AQD codes are utilized by each officer community to identify particular skill sets held by individual officers. In the Chaplain Corps, the AQD code is a three digit numeric code that corresponded to the religious endorsing agency of each officer. The Chaplain Corps does not have enough AQD codes assigned by the Navy to support the continuously growing list of authorized endorsing agents, and thus no longer includes AQD codes in alpha rosters.

3. As part of this litigation, I was tasked to assemble the following data: (1) the total number of chaplains on active duty in the U.S. Navy; (2) the total number of chaplains on active duty in the U.S. Navy, broken down by the faith group categories formerly employed by the Navy (i.e., Roman Catholic, liturgical Protestant, non-liturgical Protestant, and Special Worship), **Attachment 1**; (3) the total number of Jewish chaplains on active duty in the U.S. Navy.

4. In order to complete this task, I submitted a data query to the Navy Standard Integrated Personnel System (NSIPS), the electronic repository for personnel and pay data for all active duty Navy service members. After submitting a query to NSIPS, I was provided with the

2

requested data in late January 2007 in the form of a list of the names of active duty chaplains. I cross-referenced the list of names with the Chaplain Corps alpha roster to determine the endorsing agent for each chaplain listed. Then, I separated the endorsing agents into their respective faith group categories and calculated the requested totals. **Attachment 2.**

5. As of January 2007, the total number of chaplains on active duty in the U.S. Navy is 836. The total number of chaplains on active duty in the U.S. Navy, broken down by the faith group categories formerly employed by the Navy, is as follows: Roman Catholic – 125; Liturgical Protestant – 249; Non-liturgical Protestant – 415; and Special Worship – 47. The total number of Jewish chaplains on active duty in the U.S. Navy is 9.

Further declarant sayeth not.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Washington, D.C., this _____9_____ day of March, 2007.

Kilian B. Kagle

**Attachment 1:** A list previously submitted to this court in this matter, which illustrates how the Navy generally categorized the various denominations and religions.

**Attachment 2:** A spreadsheet listing the names, ranks, faith group categories and endorsing agents of Navy chaplains serving on active duty as of January 2007.

3

## RELIGIOUS DENOMINATION/FAITH GROUP IDENTIFIERS

| Religious Denomination | Faith Group Cluster |
|---|---|
| African Methodist Episcopal Church (AME) | Liturgical |
| African Methodist Episcopal Zion Church (AMEZ) | Liturgical |
| American Baptist Association (ABA) | Non-Liturgical |
| American Baptist Churches (ABC) | Non-Liturgical |
| Anglican Catholic Church (ACC) | Roman Catholic |
| Anglican Church in America (ACA) | Liturgical |
| Apostolic Catholic Assyrian Church of the East (ACAC) | Roman Catholic |
| Assemblies of God (AG) | Non-Liturgical |
| Associated Reformed Presbyterian Church (ARP) | Liturgical |
| Associated Gospel Churches (AGC) | Non-Liturgical |
| Baptist Bible Fellowship (BBF) | Non-Liturgical |
| Baptist General Conference (BGC) | Non-Liturgical |
| Baptist Missionary Association of America (BMAA) | Non-Liturgical |
| Bible Presbyterian Church (BPC) | Liturgical |
| Brethren (BRETH) | Non-Liturgical |
| Central Bible Church (CBC) | Non-Liturgical |
| Central Conference of American Rabbis (Reform) (CCAR) | Special Worship Category |
| Chaplaincy of the Full Gospel Churches (CFGC) | Non-Liturgical |
| Charismatic Episcopal Church (CEC) | Liturgical |
| Christian and Missionary Alliance (CMA) | Non-Liturgical |
| Christian Church Disciples of Christ (CCDC) | Non-Liturgical |

1

Attachment 1

| | |
|---|---|
| Christian Churches and Churches of Christ (CHCCC) | Non-Liturgical |
| Christian Methodist Episcopal Church (CME) | Liturgical |
| Christian Reformed Church (CR) | Liturgical |
| Christian Science (CS) | Special Worship Category |
| Churches of Christ (CC) | Non-Liturgical |
| Churches of Christ in Christian Union (CCCU) | Non-Liturgical |
| Churches of God (Anderson, Indiana) (CGAI) | Non-Liturgical |
| Church of God (Cleveland, Tennessee) (CGCT) | Non-Liturgical |
| Church of God General Conference (CGGC) | Non-Liturgical |
| Church of God General, North America (CGCNA) | Non-Liturgical |
| Church of God in Christ (CGIC) | Non-Liturgical |
| Church of God of Prophecy (CGP) | Non-Liturgical |
| Church of Jesus Christ of Latter-Day Saints (LDS) | Special Worship Category |
| Church of Jesus Christ of Latter-Day Saints Reorganized (LDSR) | Special Worship Category |
| Church of the Living God (CLG) | Non-Liturgical |
| Church of the Lutheran Brethren (CLB) | Liturgical |
| Church of the Nazarene (CN) | Liturgical |
| Church of the United Brethren in Christ (CUBC) | Non-Liturgical |
| Conservative Baptist Association of America (CBAA) | Non-Liturgical |
| Conservative Congregational Christian Conference (CCCC) | Non-Liturgical |
| Conservative Lutheran Association (CLA) | Liturgical |
| Cooperative Baptist Fellowship (CBF) | Non-Liturgical |

2

Attachment 1

| | |
|---|---|
| Elim Fellowship (EF) | Non-Liturgical |
| Episcopal Church (EC) | Liturgical |
| Evangelical Covenant Church in America (ECCA) | Non-Liturgical |
| Evangelical Congregational Church (ECC) | Non-Liturgical |
| Evangelical Free Church in America (EFCA) | Non-Liturgical |
| Evangelical Lutheran Churches of America (ELCA) | Liturgical |
| Evangelical Methodist Church (EMC) | Liturgical |
| Evangelical Presbyterian Church (EPC) | Liturgical |
| Fellowship Grace Brethren Church (FGBC) | Non-Liturgical |
| Free Methodist Church of North America (FM) | Liturgical |
| Free Will Baptist (FWB) | Non-Liturgical |
| Full Gospel Fellowship Church and Ministry International (FGFMI) | Non-Liturgical |
| General Association of General Baptists (GAGB) | Non-Liturgical |
| General Association of Regular Baptist Churches (GARB) | Non-Liturgical |
| Independent Fundamental Churches of America (IFCA) | Non-Liturgical |
| International Church of Foursquare Gospel (ICFG) | Non-Liturgical |
| International Council of Community Churches (ICCC) | Non-Liturgical |
| Jewish | Special Worship Category |
| Kansas Yearly Meeting of Friends (KYMF) | Non-Liturgical |
| Liberal Catholic Church (LCC) | Roman Catholic |
| Liberty Baptist Fellowship (LBF) | Non-Liturgical |
| Lutheran Church in America (LCA) | Liturgical |

3

Attachment 1

| | |
|---|---|
| Lutheran, Missouri Synod (LMS) | Liturgical |
| Lutheran, American (ALC) | Liturgical |
| Lutheran, Association of Evangelical (AELC) | Liturgical |
| The Missionary Church (MISS) | Non-Liturgical |
| Missionary Church Association (MCA) | Non-Liturgical |
| Moravian Church (M) | Non-Liturgical |
| National Association of Baptist Churches (NABC) | Non-Liturgical |
| National Association of Congregational Christian Churches (NACCC) | Non-Liturgical |
| National Baptist Convention, USA, Inc. (NBCUS) | Non-Liturgical |
| National Baptist Convention of America (NBCA) | Non-Liturgical |
| National Fellowship of Grace Brethren Churches (NFBC) | Non-Liturgical |
| North American Baptist Conference (NBC) | Non-Liturgical |
| Open Bible Standard Church (OBSC) | Non-Liturgical |
| Orthodox Church in America (OCA) | Non-Liturgical |
| Orthodox, Eastern (ORTH) | Special Worship Category |
| Orthodox, Greek (ORTH) | Special Worship Category |
| Orthodox, Russian (ORTH) | Special Worship Category |
| Orthodox Presbyterian (OP) | Liturgical |
| Pentecostal Assemblies of the World (PAW) | Non-Liturgical |
| Pentecostal Church of God (PCG) | Non-Liturgical |
| Pentecostal Church of God North America (PCGNA) | Non-Liturgical |
| Pentecostal Free Will Baptist Church, Inc. (PFWB) | Non-Liturgical |
| Pentecostal Holiness Church (PH) | Non-Liturgical |

4

Attachment 1:

| | |
|---|---|
| Plymouth Brethren (PB) | Non-Liturgical |
| Presbyterian Church in America (PCA) | Liturgical |
| Presbyterian Church in the USA (PUSA) | Liturgical |
| Presbyterian United, USA (UP) | Liturgical |
| Presbyterian, Cumberland (CP) | Liturgical |
| Presbyterian, Reformed (Evangelical Synod) (RPES) | Liturgical |
| Primitive Methodist (PM) | Liturgical |
| Progressive National Baptist Convention, Inc (PNBC) | Non-Liturgical |
| Reformed Church in America (RCA) | Non-Liturgical |
| Reformed Episcopal Church (REC) | Liturgical |
| Reformed Presbyterian Church of North America (RPCNA) | Liturgical |
| Roman Catholic (RC) | Roman Catholic |
| Salvation Army (SA) | Non-Liturgical |
| Seventh-Day Adventist (SDA) | Special Worship Category |
| Southern Baptist (SB) | Non-Liturgical |
| Southern Methodist Church (SMC) | Liturgical |
| United Church of Christ (UCC) | Liturgical |
| United Episcopal Church of North America (UECNA) | Liturgical |
| United Methodist (UM) | Liturgical |
| United Pentecostal Church International (UPCI) | Non-Liturgical |
| Unitarian Universalist (UU) | Non-Liturgical |
| Wesleyan Church (W) | Liturgical |

5

Attachment 1

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 19
Page 8 of 32

| NAME | RANK | CAT |
|------|------|-----|
| ROUSER LETICIA PATSY/JEAN | LT | L- United Church of Christ |
| VIEIRA JANE F | CAPT | L- United Church of Christ |
| FUNG KARL KALAU | CAPT | L- United Church of Christ |
| RHODES JEFFREY ELLSWSW | CDR | L- United Church of Christ |
| STURGIS RONALD CARL | CDR | L- United Church of Christ |
| STMARTIN PETER BRUCE | CDR | L- United Church of Christ |
| TROAST DONALD PAUL | CDR | L- United Church of Christ |
| YUILLE THOMASINA ALEXINE | LCDR | L- United Church of Christ |
| SHOLTES ANDREW PETER | LCDR | L- United Church of Christ |
| GOMULKA LEILA | LCDR | L- United Church of Christ |
| STALLINGA BETH ANN | LT | L- United Church of Christ |
| HECKATHORNE ROBIN SHAFFER | LT | L- United Church of Christ |
| MILLER AMMIE LEE | LT | L- African Methodist Episcopal |
| LOVE RITA RENEE | LTJG | L- African Methodist Episcopal |
| MORRISON JOHN WESLEY | CAPT | L- African Methodist Episcopal |
| TAYLOR ATTICUS TYRONE | LCDR | L- African Methodist Episcopal |
| BROWN DAVID REID | LCDR | L- African Methodist Episcopal |
| HARRISON GLENDA JENNINGS | LCDR | L- African Methodist Episcopal |
| BUFORD MAURICE A | LT | L- African Methodist Episcopal |
| ALLEN CASSIE LOU | LT | L- African Methodist Episcopal |
| CLARKE MILES RICHMOND | LT | L- African Methodist Episcopal |
| LEROW DONALD FRANCIS | CAPT | L- Anglican Catholic |
| WAITE BRIAN KIMBALL | LCDR | L- Anglican Catholic |
| BEEDE CLAUDE ROBERT | CDR | L- Bible Presbyterian Church |
| WAUN WILLIAM GEORGE | CDR | L- Charismatic Episcopal |
| HAN JEFFREY TEH | LCDR | L- Charismatic Episcopal |
| VANBRUNT DEAN RAY | LT | L- Charismatic Episcopal |
| GARRETT SHERRI LYNN | LT | L- Christian Methodist Episcopal Church |
| POOLE JOHNNY WILL PETTY | CAPT | L- Christian Methodist Episcopal Church |
| DAWSON PASCHAL LEE III | LCDR | L- Christian Methodist Episcopal Church |
| GILLEN YOLANDA LYNN ARNOLD | LCDR | L- Christian Methodist Episcopal Church |
| JELTEMA DAVID JOHN | LT | L- Christian Reformed Church |
| SILVEIRA RICHARD JAMES | CDR | L- Christian Reformed Church |
| ANDERSON BRUCE MARSHALL | CDR | L- Christian Reformed Church |
| BOUMA ROGER LEE | LCDR | L- Christian Reformed Church |
| WALCOTT THOMAS JAMES | LCDR | L- Christian Reformed Church |

| | | |
|-----|-----|------|
| RC | 125 | 15.0% |
| NL | 415 | 49.6% |
| LP | 249 | 29.8% |
| SW | 47 | 5.6% |
| | 836 | 100.0% |

Attachment 2 (1 of 23 pages)

| | | |
|---|---|---|
| VRIELAND DOUGLAS JACK | LCDR | L-Christian Reformed Church |
| DICONTI MARC GREGORY | LCDR | L-Conservative Lutheran |
| ROBERTSON SHEILA CAROL | CAPT | L-Cumberland Presbyterian |
| ABLESON BRADFORD EDWARD | CAPT | L-Cumberland Presbyterian |
| HEADRICK ANTHONY BRIAN | LCDR | L-Cumberland Presbyterian |
| MCBETH DAVID LEE | LCDR | L-Cumberland Presbyterian |
| PIPKIN MICHAEL R | LT | L-EPISCOPAL |
| PERDUE THOMAS H | LT | L-EPISCOPAL |
| QUERIDO MANUAL TABLANTE JR | LT | L-EPISCOPAL |
| SEILER JEFFREY HAMILTON | CDR | L-EPISCOPAL |
| PIKE STEPHEN PHILLIP | CDR | L-EPISCOPAL |
| BELL DEDRA ANN | LCDR | L-EPISCOPAL |
| FISH CAMERON HOOVER | LCDR | L-EPISCOPAL |
| HINSON JEROME ANDREW | LCDR | L-EPISCOPAL |
| FORNEA STANLEY WAYNE | LCDR | L-EPISCOPAL |
| PUMPHREY CHARLES MICHAEL | LCDR | L-EPISCOPAL |
| MCINNIS VICTOR ERWIN | LCDR | L-EPISCOPAL |
| BEZY BERNARD ANTHONY | LCDR | L-EPISCOPAL |
| LOGAN JEFFREY | LCDR | L-EPISCOPAL |
| WINWARD MARK S | LCDR | L-EPISCOPAL |
| HOFFMAN ROY E | LT | L-EPISCOPAL |
| OHALLORAN JOY CHARITY GRACE | LT | L-EPISCOPAL |
| THAMES DAVID BLAKE | LT | L-EPISCOPAL |
| MUNOZ FRANK PETER JR | LT | L-EPISCOPAL |
| STALLRYAN JAMIE JOHN | LT | L-Evangelical Lutheran Church in America |
| ORRIS GLENN WILLIAM | LT | L-Evangelical Lutheran Church in America |
| ECKERT JAMES DAVID | LT | L-Evangelical Lutheran Church in America |
| CONNOLLY JOHN D | LT,JG | L-Evangelical Lutheran Church in America |
| GRAGG STEPHEN THOMAS | CAPT | L-Evangelical Lutheran Church in America |
| GRIFFITH HARRY WILLIAM | CDR | L-Evangelical Lutheran Church in America |
| HAHN PATRICK ALLEN | CDR | L-Evangelical Lutheran Church in America |
| BEYER STEPHEN P | CDR | L-Evangelical Lutheran Church in America |
| FREDRICKSON JON CALVIN | CDR | L-Evangelical Lutheran Church in America |
| SEYB STOCKTON KARLA M | CDR | L-Evangelical Lutheran Church in America |
| SWANSON JOHN ALBERT | CDR | L-Evangelical Lutheran Church in America |
| EICHLER TIMOTHY RICHARD | CDR | L-Evangelical Lutheran Church in America |
| GREENWALT MICHAEL LEROY | CDR | L-Evangelical Lutheran Church in America |

| Name | Rank | Church |
|---|---|---|
| TELLEEN BRADLEY EDWARD | CDR | L-Evangelical Lutheran Church in America |
| PETERSON LYNN ELLEN | CDR | L-Evangelical Lutheran Church in America |
| REITZ JOHN OTTO | LCDR | L-Evangelical Lutheran Church in America |
| REEB KAY RAMYNKE | LCDR | L-Evangelical Lutheran Church in America |
| BAUGHMAN BARRY JOSEPH | LCDR | L-Evangelical Lutheran Church in America |
| WORMAN ERNEST WILLIAM III | LCDR | L-Evangelical Lutheran Church in America |
| CLARK PHILLIP EDWARD | LCDR | L-Evangelical Lutheran Church in America |
| MCLAUGHLIN PATRICK JAMES | LCDR | L-Evangelical Lutheran Church in America |
| GRAEF RUSSELL PAUL | LCDR | L-Evangelical Lutheran Church in America |
| STAMM BRIAN JAMES | LCDR | L-Evangelical Lutheran Church in America |
| OSWALD TIMOTHY JOHN | LCDR | L-Evangelical Lutheran Church in America |
| WHITE TIMOTHY RONALD | LCDR | L-Evangelical Lutheran Church in America |
| HOELZ DEAN LESTER | LCDR | L-Evangelical Lutheran Church in America |
| WEST JAMES ERWIN | LCDR | L-Evangelical Lutheran Church in America |
| PICKETT CLINTON AMBROSE III | LCDR | L-Evangelical Lutheran Church in America |
| JOHNSON JAMES LOWELL | LCDR | L-Evangelical Lutheran Church in America |
| HODGES CHARLES EUGENE | LCDR | L-Evangelical Lutheran Church in America |
| TROST CARL EDWARD | LCDR | L-Evangelical Lutheran Church in America |
| BORNEMANN JEFFREY RALPH | LT | L-Evangelical Lutheran Church in America |
| JOHNSTON RICHARD WILLIAM | LT | L-Evangelical Lutheran Church in America |
| PLUMMER JEFFREY SCOTT | LT | L-Evangelical Lutheran Church in America |
| TANIS MARK A | LT | L-Evangelical Lutheran Church in America |
| MASSIE MARC HAROLD | LT | L-Evangelical Methodist Church |
| JANNING TIMOTHY J | LCDR | L-FreeMethodist |
| COATES STEPHEN M | LT | L-FreeMethodist |
| MUEHLER CARL BENJAMIN | LT | L-Lutheran Church, Missouri synod |
| PRINCE MATTHEW GENE | LTJG | L-Lutheran Church, Missouri synod |
| WOHLRABE JOHN C JR | CAPT | L-Lutheran Church, Missouri synod |
| PUTTLER JAMES DANIEL | CAPT | L-Lutheran Church, Missouri synod |
| CROSSAN ROBERT DAVIES | CAPT | L-Lutheran Church, Missouri synod |
| FRUSTI JONATHAN MATTHEW | CAPT | L-Lutheran Church, Missouri synod |
| PRECUP JOHNNA LEE | CDR | L-Lutheran Church, Missouri synod |
| LOGID MARK JAY | CDR | L-Lutheran Church, Missouri synod |
| STEINER MARK GILBERT | CDR | L-Lutheran Church, Missouri synod |
| MUEHLER CRAIG G | CDR | L-Lutheran Church, Missouri synod |
| TODD GREGORY N | CDR | L-Lutheran Church, Missouri synod |
| SMITH JONATHAN MICHAEL | CDR | L-Lutheran Church, Missouri synod |

| | | |
|---|---|---|
| KALSOW LARRY DONALD | LCDR | L-Lutheran Church, Missouri synod |
| WARNKE MATTHEW LEE | LCDR | L-Lutheran Church, Missouri synod |
| RESCHKE MARK CARL | LCDR | L-Lutheran Church, Missouri synod |
| CRANDALL TED LEE | LCDR | L-Lutheran Church, Missouri synod |
| RECKLING MICHAEL JOHN | LCDR | L-Lutheran Church, Missouri synod |
| RUSSELL RANDALL HENRY | LCDR | L-Lutheran Church, Missouri synod |
| SCHILLING DAVID DWAINE | LCDR | L-Lutheran Church, Missouri synod |
| RILEY PATRICK | LCDR | L-Lutheran Church, Missouri synod |
| TEWS MARK WILLIAM | LCDR | L-Lutheran Church, Missouri synod |
| SNEATH MICHAEL W | LCDR | L-Lutheran Church, Missouri synod |
| THOMSON JOHN MICHAEL | LCDR | L-Lutheran Church, Missouri synod |
| BERTEAU DANIEL C | LCDR | L-Lutheran Church, Missouri synod |
| MORENO MICHAEL PAUL | LCDR | L-Lutheran Church, Missouri synod |
| CONROE JON WALLACE | LCDR | L-Lutheran Church, Missouri synod |
| RUPE RYAN R | LT | L-Lutheran Church, Missouri synod |
| SMITH ANDREW DANIEL | LT | L-Lutheran Church, Missouri synod |
| CHRISTENSEN LYNN WILSON | LT | L-Lutheran Church, Missouri synod |
| TOWNES RICHARD ARTHUR JR | LT | L-Lutheran Church, Missouri synod |
| WEIGELT BRIAN D | LT | L-Lutheran Church, Missouri synod |
| HEDGES J PHILLIP JR | CDR | L-Nazarene |
| HALEY BRIAN JOSEPH CAMPBE | LCDR | L-Nazarene |
| BONNETTE RICHARD ALAN | LCDR | L-Nazarene |
| DOWLING DORMAN CURTIS | LCDR | L-Nazarene |
| KELVINGTON DORAN TIMOTHY | LCDR | L-Nazarene |
| BARSTOW STEVEN RICHARD | LCDR | L-Nazarene |
| LEE ERIK PAUL | LCDR | L-Nazarene |
| HILL BRIAN JEFFREY | LT | L-Presbyterian |
| TODD DAVID MICHAEL | LT | L-Presbyterian |
| CULLEN DAVID JAMES III | LT | L-Presbyterian Church in America |
| VANDYKE JOHN CARDEN | LT | L-Presbyterian Church in America |
| DESOUSA CRISTIANO SILVA | LTJG | L-Presbyterian Church in America |
| WRIGLEY PAUL RILEY | CAPT | L-Presbyterian Church in America |
| ROSANDER DOUGLAS EDWARD | CDR | L-Presbyterian Church in America |
| CALLISON ROBERT ALVIN | CDR | L-Presbyterian Church in America |
| TUBLEY DAVID ALAN | CDR | L-Presbyterian Church in America |
| COUNTS KENNETH DARBY | CDR | L-Presbyterian Church in America |
| RIGGS JASON LANCE | LCDR | L-Presbyterian Church in America |

| | | |
|---|---|---|
| HORN DWIGHT ARTHUR | LCDR | L-Presbyterian Church in America |
| WILLIAMS RANDY EDWARD | LCDR | L-Presbyterian Church in America |
| ORREN STEVEN TODD | LCDR | L-Presbyterian Church in America |
| MCCLIMON PHILLIP ARTHUR | LT | L-Presbyterian Church in America |
| FISHER STEPHEN DANIEL | LT | L-Presbyterian Church in America |
| BAIK JOHAN | LT | L-Presbyterian Church in America |
| BURNS ROBERT NICHOLAS JR | LT | L-Presbyterian Church in America |
| LEE LOUIS CHONGMIN | LT | L-Presbyterian Church in America |
| CAUBLE CHRISTOPHER SCOTT | LT | L-Presbyterian Church in America |
| QUINN JEFFREY | LT | L-Presbyterian Church, USA |
| VORIS STEVEN JAY | LT | L-Presbyterian Church, USA |
| AMES MARK ROBERT | LT | L-Presbyterian Church, USA |
| KELLY VICTORIA ANNE | LT | L-Presbyterian Church, USA |
| BUTLERSAEGER AUTUMN ELIZABE | LTJG | L-Presbyterian Church, USA |
| DIETZ PETER WILSON | LTJG | L-Presbyterian Church, USA |
| EVANS ROBERT DAVID | CAPT | L-Presbyterian Church, USA |
| DOUGLASS WILBUR C III | CAPT | L-Presbyterian Church, USA |
| GWALTNEY PHILLIP EDWIN | CAPT | L-Presbyterian Church, USA |
| TIDD MARK LUZERNE | CAPT | L-Presbyterian Church, USA |
| LANTZ TIMOTHY SPENCER | CAPT | L-Presbyterian Church, USA |
| GREENSLIT LAWRENCE PUTNEY | CAPT | L-Presbyterian Church, USA |
| KIBBEN MARGARET GRUN | CAPT | L-Presbyterian Church, USA |
| CRALL ROBERT LEE | CDR | L-Presbyterian Church, USA |
| GREGORY PETER WILSON | CDR | L-Presbyterian Church, USA |
| SMITH MARK WARREN | CDR | L-Presbyterian Church, USA |
| DORN CONSTANCE ANN | LCDR | L-Presbyterian Church, USA |
| WILSON DIANE MYERS | LCDR | L-Presbyterian Church, USA |
| HOGG MICHAEL SCOTT | LCDR | L-Presbyterian Church, USA |
| PEASE EDWARD S | LCDR | L-Presbyterian Church, USA |
| MIDDLETON WILLIAM EVERETT | LCDR | L-Presbyterian Church, USA |
| KROENER JOHN SCOTT | LCDR | L-Presbyterian Church, USA |
| KIM MYUNG BAE | LCDR | L-Presbyterian Church, USA |
| LINK DANIEL EDWARD | LCDR | L-Presbyterian Church, USA |
| EDWARDS JAMES MONROE | LCDR | L-Presbyterian Church, USA |
| GOODBOW JAMES ALFRED | LCDR | L-Presbyterian Church, USA |
| FUEHRER ROBERT ALLAN | LCDR | L-Presbyterian Church, USA |
| OWEN JOHN BICKEL | LCDR | L-Presbyterian Church, USA |

| Name | Rank | Faith Group |
|---|---|---|
| KING PHILIP DAVID | LCDR | L-Presbyterian Church, USA |
| SONG YOUNG | LT | L-Presbyterian Church, USA |
| LANTZ DIANA ADRIE | LT | L-Presbyterian Church, USA |
| CHANEY MICHAEL BURNELL | LT | L-Presbyterian Church, USA |
| HEFNER JASON | LT | L-Presbyterian Church, USA |
| PENA ALFRED VICTOR | LT | L-Presbyterian Church, USA |
| ORTIZ CARLOS B | CDR | L-Reformed Episcopal Church |
| HOLIMAN WILLIAM JESS JR | LCDR | L-Reformed Episcopal Church |
| CARTER JOHN ALLEN | LT | L-SWodoxPresbyterian |
| WEAVER BRYAN JAY | LT | L-SWodoxPresbyterian |
| POWER TIMOTHY JAMES | CAPT | L-SWodoxPresbyterian |
| CARR ANTHONY THEODORE | LCDR | L-SWodoxPresbyterian |
| SHAFER SCOTT JACKSON | LT | L-United Methodist |
| BROWN DALE ELMER | LT | L-United Methodist |
| BIXBY JENNIFER LYNN | LT | L-United Methodist |
| OBANNON MICHAEL QUINN | LT | L-United Methodist |
| ALDERMAN LUIS EDWARD II | LT | L-United Methodist |
| STANFIELD CHRIS JERELD | LT | L-United Methodist |
| HOLCOME NORMAN DEWEY JR | CAPT | L-United Methodist |
| SEELY GERALD DON | CAPT | L-United Methodist |
| THIES THOMAS EVERETT | CAPT | L-United Methodist |
| WAITE DOUGLAS JOHN | CAPT | L-United Methodist |
| PUSATERI RICHARD ANTHONY | CAPT | L-United Methodist |
| LEA JOHN HARVEY III | CAPT | L-United Methodist |
| ROZIER RENDELL RAY | CDR | L-United Methodist |
| PHILLIPS TRAVIS M JR | CDR | L-United Methodist |
| SCHUTZ MICHAEL LOUIS | CDR | L-United Methodist |
| RAMIREZ ABEL | CDR | L-United Methodist |
| WILLIAMS ROBERT THOMAS | CDR | L-United Methodist |
| CASERTA HAROLD H. | CDR | L-United Methodist |
| WHITE DALE CHARLES | CDR | L-United Methodist |
| CLORE GARY WAYNE | CDR | L-United Methodist |
| NAZARIO NESTOR | LCDR | L-United Methodist |
| GRIFFIN HERBERT LEE JR | LCDR | L-United Methodist |
| PIERCE JAMES CLIFTON | LCDR | L-United Methodist |
| DICKENS JOHN VAN III | LCDR | L-United Methodist |
| GORE MICHAEL W | LCDR | L-United Methodist |

| | | |
|---|---|---|
| SOUDERS STEVEN LLOYD | LCDR | L-United Methodist |
| LAWRENCE MARCUS ELLIOTT | LCDR | L-United Methodist |
| CHURCH ROBERT ALLEN | LCDR | L-United Methodist |
| LEE STEPHEN MICHAEL | LCDR | L-United Methodist |
| BENDER LAURA JANE | LCDR | L-United Methodist |
| STEVENS MATTHEW TODD | LCDR | L-United Methodist |
| GREEN MICHAEL ALAN | LCDR | L-United Methodist |
| ALKULA CHARLES JAMES | LT | L-United Methodist |
| MCCRIMMON GREGORY JOHN | LT | L-United Methodist |
| STATLER THOMAS JERRY | LT | L-United Methodist |
| MCCLELLAN HAGAN R JR | LT | L-United Methodist |
| VERGARA VERNON VILLANUEVA | LT | L-United Methodist |
| MCCORMICK CHARLES DOUGLAS | LT | L-United Methodist |
| GRIGGS MICHAEL HENRY | LT | L-United Methodist |
| BROWN DANIEL JOSEPH | LT | L-United Methodist |
| BOWDEN JENNIFER DIANNE | LT | L-United Methodist |
| VAUGHAN BRUCE ALLEN | LT | L-United Methodist |
| BAKER MICHAEL RAY | LT | L-United Methodist |
| SIEMER MARGARET ELIZABETH | LT | L-United Methodist |
| KOCH CARL PRESTON | LCDR | LUTHBRE |
| OSBORNE SHAWN MARSHALL | LTJG | LUTH-BRETHCHU |
| POPE MYLON DAVID | LT | L-Wesleyan |
| RHOADS CARL PHILIP | LT | L-Wesleyan |
| MARSHALL ROBERT WALLA | CAPT | L-Wesleyan |
| CARR GARY W | CDR | L-Wesleyan |
| RITCHIE GORDON DUANE | CDR | L-Wesleyan |
| JOHNSON BRENT DANIEL | LCDR | L-Wesleyan |
| ANDREWS DENNIS KENDALL | LT | L-Wesleyan |
| CARVER JACK LEE | LCDR | N-American Baptist Association |
| MOZON OLLIS JON JR | CAPT | N-American Baptist Churches |
| MARRERO EMILIO JR | CAPT | N-American Baptist Churches |
| RANARO HARVEY EDGAR JR | CDR | N-American Baptist Churches |
| MEEHAN DIANA LEE | CDR | N-American Baptist Churches |
| MCELWAIN DAVID MARC | CDR | N-American Baptist Churches |
| AXTELL LEE A | CDR | N-American Baptist Churches |
| RAMSEY KATHLEEN A | LCDR | N-American Baptist Churches |
| COOLEY RONALD A | LCDR | N-American Baptist Churches |

| | | |
|---|---|---|
| WILMOT ALAN KEITH | LCDR | N-American Baptist Churches |
| VANDERWERKEN ROGER EMORY | LCDR | N-American Baptist Churches |
| MACK LEROY GREGORY III | LT | N-American Baptist Churches |
| BENSON JEFFREY | LT | N-American Baptist Churches |
| RUMERY PAUL NATHAN | LT | N-American Baptist Churches |
| JOHNSON JAMES ALLEN JR | LT | N-American Baptist Churches |
| JOHNSON JOSEPH DANIEL | LT | N-American Baptist Churches |
| SHEARER BRIAN KEITH | LT | N-Assemblies of God |
| DURHAM JERRY D | LT | N-Assemblies of God |
| SCHULTZ DEREK P | LT | N-Assemblies of God |
| MACKLIN HARVEY C | LT | N-Assemblies of God |
| FOSHEE GARY W | LT | N-Assemblies of God |
| ROACH JOSEPH L | LTJG | N-Assemblies of God |
| WILKINS OLRIC RICARDO | CAPT | N-Assemblies of God |
| HIGHTOWER JAMES M | CAPT | N-Assemblies of God |
| DENLEY JAMES T | CDR | N-Assemblies of God |
| ROSA LOUIS | CDR | N-Assemblies of God |
| WITT PAUL WALTER | LCDR | N-Assemblies of God |
| GILLETTE GREGG D | LCDR | N-Assemblies of God |
| NASH EDWARD J | LCDR | N-Assemblies of God |
| WOOD GLEN | LCDR | N-Assemblies of God |
| THORNTON LOFTEN CARTUS | LCDR | N-Assemblies of God |
| FARMER CARL HENRY | LCDR | N-Assemblies of God |
| POWELL TIMOTHY BYRD | LCDR | N-Assemblies of God |
| MALANA JUDY TAKADA | LCDR | N-Assemblies of God |
| COX DENIS NORMAN | LCDR | N-Assemblies of God |
| MODDER WESLEY JAMES | LT | N-Assemblies of God |
| GEORGE BEN E | LT | N-Assemblies of God |
| PEUGH JAMES MURLE | LT | N-Assemblies of God |
| OFUASIA JONES BENJAMIN | LT | N-Associated Gospel Churches |
| WILBURN JOSEPH EDWARD | LT | N-Associated Gospel Churches |
| EASTMAN JOHN JACOB | LT | N-Associated Gospel Churches |
| BROWN STEVEN DOUGLAS | CDR | N-Associated Gospel Churches |
| FREIBERG WAYNE R | CDR | N-Associated Gospel Churches |
| TORRALVA ARMANDO SALAZAR | LCDR | N-Associated Gospel Churches |
| BREGEL BRECK C | LCDR | N-Associated Gospel Churches |
| MDURED EMILE GEORGE | LCDR | N-Associated Gospel Churches |

| SLATER DAVID LLOYD | LT | N-Associated Ctiurches |
| ROZEMA JONATHAN A | LT | N-Associated Gospel Churches |
| PRIMEAUX JOSEPH RUSSEL JR | LT | N-Baptist |
| LOGAN EDSIL LAMAR | LT | N-Baptist |
| AMADOR KENNETH R | LT | N-Baptist Bible Fellowship |
| CATES GREGORY ALAN | LT | N-Baptist Bible Fellowship |
| RIVERS RAY F | LT | N-Baptist General Conference |
| POTTER RANDAL K | LT | N-Baptist General Conference |
| WEAVER RODNEY E | LT | N-Baptist General Conference |
| CARLSON DAVID JAMES | LTJG | N-Baptist General Conference |
| SLOAT WESLEY B | CDR | N-Baptist General Conference |
| BOYLE BRUCE HAROLD | CDR | N-Baptist General Conference |
| SEXTON MICHAEL STEPHEN | LCDR | N-Baptist General Conference |
| SHIRK DAVID ALLEN | LCDR | N-Baptist General Conference |
| RADETSKI SCOTT LAWRENCE | LCDR | N-Baptist General Conference |
| CONTRERAS SAMUEL | LT | N-Baptist General Conference |
| CLINE DAVID LEE | LCDR | N-Baptist General Conference |
| URBAN LOUIS M | LT | N-Baptist Missionary Association of America |
| OWENS CHARLES AARON | LT | N-Brethren |
| WHEELER DENNIS MICHAEL | LT | N-CALVARY CHAPEL |
| WEEDEN GARY PAGE | CDR | N-CALVARY CHAPEL |
| KLINGENSCHMITT GORDON JAMES | LT | N-Central Bible Church |
| TODD TROY KEVIN | LT | N-CFGC |
| PARKS JEFFREY B | LT | N-CFGC |
| THORNTON COREY TODD | LT | N-CFGC |
| GRASS MICHAEL QUENTIN | CDR | N-CFGC |
| SCOTT BRENT WILLIAM | LCDR | N-CFGC |
| ROYSDEN DANIEL EUGENE | LCDR | N-CFGC |
| HARPER DIANE P | LCDR | N-CFGC |
| SCHLUTER GREG THADDEUS | LCDR | N-CFGC |
| CATHCART GREGORY CORWIN | LCDR | N-CFGC |
| STROUD DAVID AARON | LCDR | N-CFGC |
| SCOTT LONNIE | | N-CFGC |
| MERCADO ROBERT | | N-CFGC |
| COLEMAN DEANN C | | N-CFGC |
| TREMBLAY PAUL SCOTT | LT | N-CFGC |
| MILLER KENNETH LEVI | LT | N-CFGC |

| | | |
|---|---|---|
| ROE RICHARD LEE | LT | N-CFGC |
| RILEY WILLIAM SYLVESTER | LT | N-CFGC |
| BELLAR PATRICK AARON | LT | N-CHRISEVANGCHAMER |
| AULT JOHN D | LT | N-Christian Churches and Churches of Christ |
| STARKEY DAVID ALAN | CAPT | N-Christian Churches and Churches of Christ |
| MARTIN BRUCE ALAN | CDR | N-Christian Churches and Churches of Christ |
| MCALEXANDER KALAS KIRK | CDR | N-Christian Churches and Churches of Christ |
| MAURICE JOHN WEATHERS JR | CDR | N-Christian Churches and Churches of Christ |
| YOUNG DENNIS WILLIAM | CDR | N-Christian Churches and Churches of Christ |
| HAAGEN PERRY DANIEL | LCDR | N-Christian Churches and Churches of Christ |
| BIGELOW MICHAEL ALLAN | LT | N-Christian Churches and Churches of Christ |
| CARTWRIGHT BRETT | LT | N-Christian Churches and Churches of Christ |
| SNYDER ALAN M | LT | N-Christian Churches and Churches of Christ |
| ROZANEK DAVID EDWARD | LT | N-Christian Churches(Disciples of Christ |
| YORK LORENZO COOPER | CAPT | N-Christian Churches(Disciples of Christ |
| CRAMBLIT DONALD MICHAEL | CDR | N-Christian Churches(Disciples of Christ |
| FAUNTLEROY WILLIAM KYLE | CDR | N-Christian Churches(Disciples of Christ |
| NARVAEZ ISRAEL | LCDR | N-Christian Churches(Disciples of Christ |
| REARICK ROBERT ALLEN | LCDR | N-Christian Churches(Disciples of Christ |
| MILLER VINSON WAYNE | LCDR | N-Christian Churches(Disciples of Christ |
| RAY PRATIK | LT | N-Christian Churches(Disciples of Christ |
| EKSTROM RANDALL DANGERFIELD | LT | N-Christian Churches(Disciples of Christ |
| TWIST DONALD M | LT | N-Christian Missionary Alliance |
| ANDERSON CHARLES JAMES | CDR | N-Christian Missionary Alliance |
| JENSEN VAL JON | CDR | N-Christian Missionary Alliance |
| MILNE JEFFREY SCOTT | LCDR | N-Christian Missionary Alliance |
| MCINTOSH DOUGLAS CHAD | LTJG | N-Church of God Anderson, INDIANA |
| PACE CATHERINE VICTORIA | LT | N-Church of God Anderson, INDIANA |
| BENNETT RICKEY L | LT | N-Church of God Anderson, INDIANA |
| TATE JESSIE RAYMOND | CAPT | N-Church of God Cleveland |
| DOUGLAS RALPH SHERMAN | CDR | N-Church of God Cleveland |
| FELDER GERALD WAYNE | CDR | N-Church of God Cleveland |
| GIBSON DAVID LAMAR | CDR | N-Church of God Cleveland |
| MORENO JAIRO | CDR | N-Church of God Cleveland |
| UNDERWOOD MELVIN HOUSTON | LCDR | N-Church of God Cleveland |
| METZGER BARRY ALLAN | LCDR | N-Church of God Cleveland |
| MUCHA JAMES THOMAS | LT | N-Church of God Cleveland |

| BAGROW PHILIP BENJAMIN | LT | N-Church of God Cleveland |
| INGRAM GERALD SCOTT | LT | N-Church of God Cleveland |
| JACOBSON BRIAN L. | LT | N-Church of God Cleveland |
| CAIN KIMBERLY | LT | N-Church of God in Christ |
| GRAY GERALD LEONARD | CAPT | N-Church of God in Christ |
| WILSON CHARLES EDWARD | CDR | N-Church of God in Christ |
| GOODWIN MELODY H | CDR | N-Church of God in Christ |
| BROWN ARTHUR MCGILL | CDR | N-Church of God in Christ |
| JENKINS TAGORE | LCDR | N-Church of God in Christ |
| JOHNSON CASSANDRA | LT | N-Church of God in Christ |
| REED WILLIAM ALLEN | CAPT | N-Church of God Prophecy |
| KENNEDY RONALD JAMES | LT | N-Churches of Christ |
| HOPKINS JEREMY S | LTJG | N-Churches of Christ |
| MENTZER BRUCE D | LCDR | N-Churches of Christ |
| BYNUM DAVID OTTO | LCDR | N-Churches of Christ |
| VAUGHN ROY HENSLEY III | LT | N-Churches of Christ |
| HESTER CHRIS ELMER | LT | N-COALSPT |
| DILLMAN SHANE R | LT | N-COALSPTFLD |
| YOUNG LEROY CARLDELL | LT | N-COALSPTFLD |
| BROOKS MARK LEE | LT | N-COALSPTFLD |
| STEPHENS DANIEL CLIFTON | CDR | N-COALSPTFLD |
| COMETA JUAN QUIOGUE | LT | N-Conservative Baptist Association in America |
| BRYAN DOUGLAS DEAN | CDR | N-Conservative Baptist Association in America |
| LEE GUY MARTIN | CDR | N-Conservative Congregational Christian Conference |
| MACRAE WAYNE ALAN | CDR | N-Conservative Congregational Christian Conference |
| HALL ROBERT WAYNE | LT | N-Conservative Congregational Christian Conference |
| BLAIR JOSEPH SCOTT | LT | N-Cooperative Baptist |
| SANDFORD BENNETT CAMPBELL | LT | N-Cooperative Baptist |
| DUNHAM DARIN D | LT | N-Cooperative Baptist |
| ROGERS MARK ALAN | LT | N-Cooperative Baptist |
| COLEY PATRICIA ANN | LT | N-Cooperative Baptist |
| WIGGINS ARTHUR LEE JR | LT | N-Cooperative Baptist |
| MITCHELL SUNNY | LT | N-Cooperative Baptist |
| OTT PETER N | LTJG | N-Cooperative Baptist |
| HARRIS JOANNA LYNN | LTJG | N-Cooperative Baptist |
| ROSS JEFFREY J. | LTJG | N-Cooperative Baptist |
| RECTOR KAREN JANE | LT | N-Cooperative Baptist/FEL |

| Name | Rank | Religion |
| --- | --- | --- |
| BARRY CARLA MARIE | LT | N-ECA |
| FLINT ERIC REEVES | LT | N-ECA |
| WOOD BARBARA JEAN | LT | N-ECA |
| ROBINSON AZARIAH POWELL | LT | N-ECA |
| LOW PEGGY LEE | LT | N-ECA |
| PARK PHILIP NAMKYU | LT | N-ECA |
| MILLER AARON T | LT | N-ECA |
| REDMOND JAMES DAREN | LT | N-ECA |
| GIRALMO MARK A | LT | N-ECA |
| LECOMPTE ROBERT J | LT | N-ECA |
| BUENVIAJE JOSEPH ALBANO | LT | N-ECA |
| HWANG SONG SIK | LT | N-ECA |
| HATTON LESLIE ARTHUR | LT | N-ECA |
| DAHLSTROM PETER J | LT | N-ECA |
| SROKA SCOT EDWARD | LTJG | N-ECA |
| MASTERSON DAVID LAWRENCE | LT | N-Evangelical Congregational |
| FISHER JAMES ROBERT JR | CAPT | N-Evangelical Covenant Church in America |
| KREKELBERG ANNE MARIE | CDR | N-Evangelical Covenant Church in America |
| YI MIL AM | CDR | N-Evangelical Covenant Church in America |
| SAVILLE JEFFREY NEIL | LCDR | N-Evangelical Covenant Church in America |
| CAMERON ALAN | LCDR | N-Evangelical Covenant Church in America |
| ANDERSON JOHN G | LT | N-Evangelical Covenant Church in America |
| TOMASEK WAYNE NEIL | LT | N-Evangelical Free Church of America |
| MCGAHA ROBERT KASE | CDR | N-Evangelical Free Church of America |
| YORTON MARK BRADLY | LCDR | N-Evangelical Free Church of America |
| SAWATSKY KIMBERLY | LCDR | N-Evangelical Free Church of America |
| BAILEY RAY ALLEN | LCDR | N-Evangelical Free Church of America |
| NIEMEYER PATRICK ANTHONY | LT | N-Evangelical Free Church of America |
| PETERS GREGORY ROBERT | LT | N-Evangelical Free Church of America |
| FUSON JAISEN ERIC | LT | N-Evangelical Free Church of America |
| NIX DAYNE EDWARD | CDR | N-Fellowship of Brethren |
| GALLE JOHN A | LCDR | N-Fellowship of Brethren |
| TERRY JEFFREY A | LCDR | N-Fellowship of Brethren |
| COOPER ROBERT PERRY | CDR | N-Free Will Baptists |
| FOX SCOTT ALLAN | LT | N-Full Gospel Fellowship |
| HALL DANIEL WARREN | LT | N-Fundamental Baptist |
| WIESE RICHARD HOWARD | LT | N-Fundamental Baptist |

| Name | Rank | Denomination |
|---|---|---|
| LONG TAVIS JOHN | LT | N-Fundamental Baptist |
| JOHNSON ROBERT D | LT | N-Fundamental Baptist |
| OWENS DANIEL C | LT | N-FUNDAPTFEL |
| JOHNSON MARTIE | LT | N-GENCHURNEWJER |
| BUTLER RICHARD COREY | CDR | N-General Association of General Baptists |
| WEBBER THOMAS BRIAN | LCDR | N-General Association of General Baptists |
| TAYLOR MICHAEL ALLYN | LT | N-General Association of Regular Baptists |
| KIM PAUL BRIAN | LT | N-INDCHAFFILATED |
| MOORE BERTRAM EDWARD JR | LT | N-Independent Fundamental Church of America |
| AUGUSTIN JEFFREY MARK | LT | N-Independent Fundamental Church of America |
| ALEXANDER DAVID WILLIAM | LT | N-Independent Fundamental Church of America |
| GOEBEL JAMES ROCKAFELLOW | LT | N-Independent Fundamental Church of America |
| AMEDICK MICHAEL DAVID | LT | N-Independent Fundamental Church of America |
| PARKER DALE WARD | CAPT | N-Independent Fundamental Church of America |
| DEMY TIMOTHY JAMES | CDR | N-Independent Fundamental Church of America |
| PENNELL GRADY J | CDR | N-Independent Fundamental Church of America |
| STEWART GARY PAUL | LCDR | N-Independent Fundamental Church of America |
| DUFOUR JOSEPH EARL | LCDR | N-Independent Fundamental Church of America |
| LENZ ALAN WALTER | LCDR | N-Independent Fundamental Church of America |
| GAULT TIMOTHY DAVID | LT | N-Independent Fundamental Church of America |
| FOSKETT MICHAEL EDWARD | LT | N-Independent Fundamental Church of America |
| PELIKAN PHILIP J | CDR | N-Independent Church of Foursquare Gospel |
| ROBERTSON AARON DONALD | LT | N-International Church of Foursquare Gospel |
| HOUK RAYMOND J | LCDR | N-International Church of Foursquare Gospel |
| ISINKAIYE OLUSHOLA MICHAEL | LT | N-International Church of Foursquare Gospel |
| BASS EDWARD D | LT | N-International Church of Foursquare Gospel |
| STOUGARD STEVEN EARL | LT | N-International Church of Foursquare Gospel |
| HUERTA GREGORIO EDUARDO ARI | LT | N-International Church of Foursquare Gospel |
| STAMPER CARL JOSEPH | LT | N-International Council of Community Churches |
| MARTIN RUSSELL DAVID | LT | N-Liberty Baptist Fellowship |
| GREER PAUL BRIAN | LT | N-Liberty Baptist Fellowship |
| TOMLIN RONALD D | CDR | N-Liberty Baptist Fellowship |
| APPLETON BILLY M | CDR | N-Liberty Baptist Fellowship |
| CROUTERFIELD BRUCE WILLIAM | LT | N-Liberty Baptist Fellowship |
| FLEMING GLENN ALAN | LT | N-Liberty Baptist Fellowship |
| MCCONVILLE MYRON DUANE | LT | N-Missionary Churches |
| RIDLEY PHILLIP ERROL | LT | N-National Baptist Convention in the USA |

| Name | Rank | Denomination |
|------|------|--------------|
| GARDNER CALVIN BRUCE SR | LTJG | N-National Baptist Convention in the USA |
| NIXON HENRY JR | CAPT | N-National Baptist Convention in the USA |
| ALEXANDER LUTHER CHARLES JR | CAPT | N-National Baptist Convention in the USA |
| DOWNING ULYSSES JR | CAPT | N-National Baptist Convention in the USA |
| JEFFERSON AARON JR | CDR | N-National Baptist Convention in the USA |
| BEDFORD KEVIN JAMES | CDR | N-National Baptist Convention in the USA |
| BRADLEY DAVILA BRENDA FAY | CDR | N-National Baptist Convention in the USA |
| WILLIAMS WILLIE | LCDR | N-National Baptist Convention in the USA |
| HENDRICKS MELVIN JOE | LCDR | N-National Baptist Convention in the USA |
| DANIELS REGINALD S | LCDR | N-National Baptist Convention in the USA |
| JONES ROBERT LEE JR | LCDR | N-National Baptist Convention in the USA |
| MARKS ROBERT JR | LT | N-National Baptist Convention in the USA |
| NORTON KEVIN CHEVEL | LT | N-National Baptist Convention in the USA |
| PAULK WINSTON KEITH | LT | N-National Baptist Convention in the USA |
| JACKSON DWAYNE ARTHUR | LT | N-National Baptist Convention in the USA |
| BYRD TERRELL LAMAR | LT | N-National Baptist Convention in the USA |
| THOMPSON GUY ANTHONY | LT | N-National Baptist Convention of America |
| KING RONNIE CARL | CAPT | N-National Baptist Convention of America |
| JAMES KELVIN CASPER | CDR | N-National Baptist Convention of America |
| PERSON DARRYL NATHANIEL | LCDR | N-National Baptist Convention of America |
| CARROLL EDWIN MARCUS | LCDR | N-National Baptist Convention of America |
| DANCE JAMES LEANDER | LT | N-National Baptist Convention of America |
| ROBERTSON MARGARET ANN | LCDR | N-National Baptist Convention of America |
| BURT ROBERT | RADM | N-Open Bible Standard Church |
| ROSS DEREK KEITH | CDR | N-Pentecostal Assemblies of the World |
| BARNES CARL MICHAEL | LT | N-Pentecostal Assemblies of the World |
| LUFF CHARLES LEE | LT | N-Pentecostal Church International |
| WHEATON SHARON KAYE | LT | N-Pentecostal church of God in NSW America |
| ARNOLD RALPH WAYNE JR | CAPT | N-Pentecostal Holiness |
| MCDOWELL MARC ANTHONY | LCDR | N-Pentecostal Holiness |
| MOORE TIMOTHY RAY | LT | N-Pentecostal Holiness |
| OVERTURF TIMOTHY LEE | CDR | N-Plymouth Brethren |
| REIVES SHARON JANEL | LTJG | N-Progressive National Baptist Convention, Inc. |
| THOMAS LATTA ROOSEVELT JR | LT | N-Progressive National Baptist Convention, Inc. |
| SIAS LESLIE KIM | LT | N-Progressive National Baptist Convention, Inc. |
| BATTLE ERIC FITZGERALD | LT | N-Progressive National Baptist Convention, Inc. |
| HARRIS FERGUSON LEE | LT | N-Progressive National Baptist Convention, Inc. |

| | | |
|---|---|---|
| BAKER ALAN T | RADM | N-Reformed Church in America |
| DONAHUE KIM MACDONALD | LCDR | N-Reformed Church in America |
| NELSON ROBERT S | LT | N-Southern Baptist |
| ROBERTS STEVEN LEONARD | LT | N-Southern Baptist |
| KIMBALL BRIAN MICHAEL | LT | N-Southern Baptist |
| WILLS ROBERT BRYANT | LT | N-Southern Baptist |
| MOWBRAY DAVID L | LT | N-Southern Baptist |
| NIETO PHILIP J | LT | N-Southern Baptist |
| WEEMS MATTHEW STEVEN | LT | N-Southern Baptist |
| HEATHERLY GARY STEPHEN | LT | N-Southern Baptist |
| COOK THOMAS TINE | LT | N-Southern Baptist |
| BRADSHAW ROBERT EDWARD | LT | N-Southern Baptist |
| JONES KERMIT ELWOOD JR | LT | N-Southern Baptist |
| JENKINS JEFFERY BRIAN | LT | N-Southern Baptist |
| ROCHESTER JASON HALL | LT | N-Southern Baptist |
| LEE RICHARD S | LT | N-Southern Baptist |
| HOWARD BENJAMIN JACOB | LT | N-Southern Baptist |
| CONARD MARK EDWARD | LT | N-Southern Baptist |
| BRADLEY DAVID ROY | LT | N-Southern Baptist |
| MATHIS BENNY LEON JR | LT | N-Southern Baptist |
| WARNE STEPHEN L | LT | N-Southern Baptist |
| FELTON DEMETRIC SR | LT | N-Southern Baptist |
| SETTLEMOIR JON E | LT | N-Southern Baptist |
| KIMBALL HARLAN LONZO | LTJG | N-Southern Baptist |
| CLOER STEPHEN LEVI | LTJG | N-Southern Baptist |
| HYDER PAUL ALLEN | LTJG | N-Southern Baptist |
| EPPERSON RALPH STEPHEN | CAPT | N-Southern Baptist |
| THERIOT GENE PAUL | CAPT | N-Southern Baptist |
| HILL ALBERT L | CAPT | N-Southern Baptist |
| MILLINER EDWARD LEE JR | CAPT | N-Southern Baptist |
| CASH TIERIAN | CAPT | N-Southern Baptist |
| MILTON NATHANIEL NMN | CAPT | N-Southern Baptist |
| EVANS JOHN STEVEN | CAPT | N-Southern Baptist |
| BELTRAM ROBERT PAUL | CAPT | N-Southern Baptist |
| PERDUE WILLIAM GENE JR | CAPT | N-Southern Baptist |
| LANGSTON MICHAEL W | CAPT | N-Southern Baptist |
| MCGUIRE DEBRA EVON | CAPT | N-Southern Baptist |

| Name | Rank | Denomination |
| --- | --- | --- |
| FEAGLE ROBERT H | CDR | N-Southern Baptist |
| COOK TERRY WAYNE | CDR | N-Southern Baptist |
| WYRICK PHILIP ALAN | CDR | N-Southern Baptist |
| KESSLER CHARLES ROBERT | CDR | N-Southern Baptist |
| ADAMS GEORGE EDWARD | CDR | N-Southern Baptist |
| DUNN DOYLE WILLIAM | CDR | N-Southern Baptist |
| HILDER FREDERICK ASA JR | CDR | N-Southern Baptist |
| BROWN RONDALL | CDR | N-Southern Baptist |
| FRANKLIN JOHN VICTOR | CDR | N-Southern Baptist |
| SCOTT ROBBIE HAROLD JR | CDR | N-Southern Baptist |
| BROWN ROOSEVELT HARVEY | CDR | N-Southern Baptist |
| FANNING TED MIDDLETON | CDR | N-Southern Baptist |
| EAST WALTER E | CDR | N-Southern Baptist |
| BIADOG MANUEL A | CDR | N-Southern Baptist |
| DENTON JOHN D | CDR | N-Southern Baptist |
| FINCH BRYAN K | CDR | N-Southern Baptist |
| UNGER STEVEN PAUL | CDR | N-Southern Baptist |
| HENDRICKS MARK R | CDR | N-Southern Baptist |
| HANSEN ALAN MADS | CDR | N-Southern Baptist |
| CROMER DAVID CLARKE | LCDR | N-Southern Baptist |
| INMAN RICHARD WARREN | LCDR | N-Southern Baptist |
| MOON GEORGE R | LCDR | N-Southern Baptist |
| CHERRY CARLA SUSAN | LCDR | N-Southern Baptist |
| MILAM WILLIAM D | LCDR | N-Southern Baptist |
| HUNT THOMAS RAY JR | LCDR | N-Southern Baptist |
| GORDON TERRY CONNER | LCDR | N-Southern Baptist |
| ONEIL ROBERT EMMETT III | LCDR | N-Southern Baptist |
| JOHNSON KENNETH DAVID | LCDR | N-Southern Baptist |
| ANDERSON KEVIN LENWOOD JR | LCDR | N-Southern Baptist |
| MCGUFFIN FREDERICK ALFRED | LCDR | N-Southern Baptist |
| HALL MICHAEL EUGENE | LCDR | N-Southern Baptist |
| TANNER EDWARD LEE | LCDR | N-Southern Baptist |
| PRICE CURTIS | LCDR | N-Southern Baptist |
| ZEPEDA BRACKEN MARY ANN | LCDR | N-Southern Baptist |
| SHEARIN FRANK WINSTON III | LCDR | N-Southern Baptist |
| MORTON JOEL S | LCDR | N-Southern Baptist |
| STEWART THOMAS RAY | LCDR | N-Southern Baptist |

| | | |
|---|---|---|
| MCKAY DANIEL E | LCDR | N-Southern Baptist |
| MOSES STEVEN RANDALL | LCDR | N-Southern Baptist |
| SHAW STEPHEN JAMES | LCDR | N-Southern Baptist |
| SMITH PATRICK WILLIAM | LCDR | N-Southern Baptist |
| SMITH STEVEN CHRISTOPHER | LCDR | N-Southern Baptist |
| PITTMAN JAMES HOWARD | LCDR | N-Southern Baptist |
| WADE ANDREW ALAN | LCDR | N-Southern Baptist |
| YOUNGER GEORGE BRADFORD | LCDR | N-Southern Baptist |
| MENDES GEORGE JAMES | LCDR | N-Southern Baptist |
| STALLARD WILLIAM DANIEL | LCDR | N-Southern Baptist |
| JOHNS JOHN TIMOTHY | LCDR | N-Southern Baptist |
| CAMPBELL RAYMOND DAVID | LCDR | N-Southern Baptist |
| ALVIS ERSKINE L | LCDR | N-Southern Baptist |
| WILLIAMS MICHAEL DEAN | LCDR | N-Southern Baptist |
| BROWN MICHAEL DAVID | LCDR | N-Southern Baptist |
| FORD CLIFFORD A | LCDR | N-Southern Baptist |
| PURVIS DANNY BYRON | LCDR | N-Southern Baptist |
| SKIDMORE SHANNON DON | LCDR | N-Southern Baptist |
| DUNDAS STEVEN LESLIE | LCDR | N-Southern Baptist |
| ETHERIDGE ROBERT JEFFREY | LCDR | N-Southern Baptist |
| SUMMERLIN RAYMOND MCCOY | LCDR | N-Southern Baptist |
| KNACH THEODORE HENRY JR | LCDR | N-Southern Baptist |
| RAVELO SAMUEL ELIAS | LT | N-Southern Baptist |
| HALL TIMOTHY RUEL | LT | N-Southern Baptist |
| MOLINA JOSE ROLANDO | LT | N-Southern Baptist |
| TISWLE JEFFERY CLAY | LT | N-Southern Baptist |
| HAMILTON WILLIAM NICKOLAS | LT | N-Southern Baptist |
| WALDRON EDWARD ALLAN JR | LT | N-Southern Baptist |
| CHRISTIAN ROBERT RUSS | LT | N-Southern Baptist |
| YANG DAVID SUNGHTON | LT | N-Southern Baptist |
| CASH CAREY HALL | LT | N-Southern Baptist |
| HALEY MARK L | LT | N-Southern Baptist |
| HOLCOMBE HENRY FREDERICK JR | LT | N-Southern Baptist |
| PEYTON MICHAEL TERRY | LT | N-Southern Baptist |
| WILLIAMS TEDDY LEE JR | LT | N-Southern Baptist |
| CRITTENDON BRYAN KEITH | LT | N-Southern Baptist |
| LUSSI EMORY CARLTON | LT | N-Southern Baptist |

| Name | Rank | Religion |
|---|---|---|
| MYHAND WESLEY THOMAS | LT | N-Southern Baptist |
| RINALDI RONALD THOMAS | LT | N-Southern Baptist |
| WIGGINTON PAUL CLIFTON | LT | N-Southern Baptist |
| ROGERS DONALD WAYNE JR | LT | N-Southern Baptist |
| BRADSHAW JAMES ALAN | LT | N-Southern Baptist |
| CALLAHAM SCOTT NELSON | LT | N-Southern Baptist |
| ROBERTS TERRY ALLEN | LT | N-Southern Baptist |
| MCKINNEY JOHN E | LT | N-Southern Baptist |
| JOYNER PATRICK SCOTT | LT | N-Southern Baptist |
| STENNETT DARREN LEE | LT | N-Southern Baptist |
| MILLS STEVEN DOUGLAS | LT | N-Southern Baptist |
| RYAN RICHARD HUGH JR | LT | N-Southern Baptist |
| NORDAN RONALD CARROLL | LT | N-Southern Baptist |
| PHILLIPS MICHAEL LYNN | LT | N-Southern Baptist |
| LEE KENNETH ROY JR | LT | N-Southern Baptist |
| WALMSLEY WINNIE JUNE | LT | N-Southern Baptist |
| BROWN LEEMON GARY JR | LT | N-Southern Baptist |
| HICKS WILLIAM DAVID | LT | N-Southern Baptist |
| WALLINGFORD DENISE LYNN | LT | N-Southern Baptist |
| THORNTON GARRY ROSS JR | LT | N-Southern Baptist |
| HALE RUSSELL ARLIE | LT | N-Southern Baptist |
| BERRENS MATTHEW KARL | LT | N-Southern Baptist |
| MOORE ROBERT ANTHONY | LT | N-Southern Baptist |
| JESSUP TRENT A | LT | N-Southern Baptist |
| ALLISON MARK EDWARD | LT | N-Southern Baptist |
| ADAMS DOYLE SCOTT | LT | N-Southern Baptist |
| MICHAELIS KURT ALLEN | LT | N-Southern Baptist |
| ZACHARY STEPHEN JAMES | LT | N-Southern Baptist |
| PETE ROBERT JOSEPH. | LT | N-Southern Baptist |
| BROOKS ALLEN KEITH | LT | N-Southern Baptist |
| ODELL RONALD SHERETTE JR | LT | N-Southern Baptist |
| KEITH JOHN FREDRICK | LT | N-Southern Baptist |
| SPRINGER TIMOTHY ALLEN | LT | N-Southern Baptist |
| KELLY DENNIS A | LTJG | N-Southern Baptist |
| KAEHR KENYON GENE | LT | N-The Missinary Church |
| KANE CYNTHIA LYNNETTE | CAPT | N-Unitarian Universalist |
| MALENE ROBERT MICHAEL | RC | RC |

| | | |
|---|---|---|
| DANSAK THOMAS EDWARD | CAPT | RC |
| LINEHAN STEPHEN J | CAPT | RC |
| LAMONDE JOSEPH RICHARD | CAPT | RC |
| KAUL JOHN LESLIE | CAPT | RC |
| CAIAZZO GREGORY GENE | CAPT | RC |
| DANNER JAMES LASLEY | CAPT | RC |
| LESAK WILLIAM PATRICK | CAPT | RC |
| YAGESH RICHARD CHARLES | CAPT | RC |
| PETRUSKA WILLIAM MARTIN | CAPT | RC |
| KLOAK DAVID G | CAPT | RC |
| MCGEORY PETER W | CAPT | RC |
| KELLY BRIAN FRANCIS | CAPT | RC |
| CUDDY WILLIAM F JR | CAPT | RC |
| BROWN LEWIS EDWARD | CAPT | RC |
| PUGLIESE FRANK A | CAPT | RC |
| JOSLYN JAMES W | CAPT | RC |
| DEVINE WILLIAM D | CAPT | RC |
| MCCLANAHAN ROBERT P JR | CAPT | RC |
| HANNIGAN JOHN THOMAS | CDR | RC |
| RUSSO LAWRENCE J | CDR | RC |
| SIMPSON BRIAN L | CDR | RC |
| ZUFFOLETTO MICHAEL PETER | CDR | RC |
| TRAPANI ANTHONY M | CDR | RC |
| DILLON JEROME VINCENT | CDR | RC |
| WHEATLEY ROBERT CARROLL | CDR | RC |
| RODES KENNETH JOHN | CDR | RC |
| NGUYEN AN BINH | CDR | RC |
| SCORDO JOSEPH ANTHONY | CDR | RC |
| FIX DONALD P | CDR | RC |
| TARGONSKI CONRAD ANDREW | CDR | RC |
| MCCORMICK PATRICK J | CDR | RC |
| DELIS ROBERT DALE | CDR | RC |
| LYLE JOHN W | CDR | RC |
| DORY MICHAEL EDWARD | CDR | RC |
| KEANE ROBERT LAWRENCE | CDR | RC |
| PARISI MICHAEL JOSEPH | CDR | RC |
| MANDATO KIERAN G | CDR | RC |

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 19
Page 28 of 32

| | | |
|---|---|---|
| DANG CHIN VAN | CDR | RC |
| KENNEDY WILLIAM M | CDR | RC |
| AGUILERA SALVADOR | CDR | RC |
| HALL THOMAS P | CDR | RC |
| KLEPACKI MICHAEL STEPHEN | CDR | RC |
| BARRETT MILES J | CDR | RC |
| KOESTER TIMOTHY JOSEPH | CDR | RC |
| KAWCZYNSKI RONALD | CDR | RC |
| MIKSTAY MICHAEL ANTHONY | CDR | RC |
| MUDD DAVID ALAN | CDR | RC |
| LOGAN ARTHUR HATLEY | CDR | RC |
| BROWN BENEDICT JOSEPH | CDR | RC |
| COYLE ROBERT JOSEPH | CDR | RC |
| MUELLER MICHAEL GENE | CDR | RC |
| SMITH STUART DOUGLAS | CDR | RC |
| BRZEK JON J | CDR | RC |
| CONCHA ALFONSO J | CDR | RC |
| MUHM WILLIAM JAMES | CDR | RC |
| HOGAN TIMOTHY DESIRE | LCDR | RC |
| JOHNSON LAWRENCE PATRICK | LCDR | RC |
| GARVEY MICHAEL PATRICK | LCDR | RC |
| KANICKI PHILLIP ANDREW | LCDR | RC |
| EVERS PAUL HENRY | LCDR | RC |
| SALAMONI VINCENT A | LCDR | RC |
| CREIDER PHILIP BRUCE | LCDR | RC |
| KUSS ALLEN RAY | LCDR | RC |
| BORZYCH ALEXANDER JAMES | LCDR | RC |
| MOSS DONALD ROY | LCDR | RC |
| FOLEY FRANCIS PATRICK | LCDR | RC |
| MENSAH GABRIEL | LCDR | RC |
| SHAUGHNESSY PAUL JOSEPH | LCDR | RC |
| LEE JOHN THOMAS | LCDR | RC |
| VANDENBOOGARD STEVEN JOHN | LCDR | RC |
| DERMOTT WILLIAM R | LCDR | RC |
| SHIMOTSU JOHN M | LCDR | RC |
| BOYLE DENNIS PATRICK | LCDR | RC |
| HICKS STEVEN E | LCDR | RC |

| | | |
|---|---|---|
| SHULEY KEITH J | LCDR | RC |
| BERCHMANZ ANTONY | LCDR | RC |
| DEELEY KEVIN JAMES | LCDR | RC |
| SWEENEY KEVIN J | LCDR | RC |
| GEGOTEK TADEUSZ JOZEF | LCDR | RC |
| LINDBLAD KARL ALBERT M | LCDR | RC |
| HELLWIG LEE WAYNE | LCDR | RC |
| STAKE RONALD PATRICK | LCDR | RC |
| BROWN SHAUN STEPHEN | LCDR | RC |
| VIDRINE RICHARD JOSEPH | LCDR | RC |
| MERRIS CHRISTOPHER | LCDR | RC |
| HOOG ERIC RICHARD | LCDR | RC |
| KOCH JOSEPH | LCDR | RC |
| EVERETT WILLIS E | LCDR | RC |
| COFFEY JOSEPH L | LCDR | RC |
| SPENCER ROBERT A | LCDR | RC |
| ERESTAIN ALFONSO ESCANILLA | LCDR | RC |
| WESLEY DARRELL JAMES | LCDR | RC |
| KEENER ROBERT JOSEPH | LCDR | RC |
| LE PETER TAI THANH | LT | RC |
| KELLY JOHN EMMETT | LT | RC |
| SIKORSKI LESZEK MIROSLAW | LT | RC |
| MONAHAN JOHN CARROLL | LT | RC |
| BAUTISTAROJAS JOSE ANTONIO | LT | RC |
| MEDVE KENNETH A | LT | RC |
| CUNHA EGIONOR DEOLIVERRA | LT | RC |
| GEINZER JOHN ALPHONSE | LT | RC |
| HOKE JOHN DAVID | LT | RC |
| HADDAD WAYNE M | LT | RC |
| HOUSE RICHARD M | LT | RC |
| REARDON JOSEPH DANIEL | LT | RC |
| ONUH WILLIAM IBEZIMAKO | LT | RC |
| BARGOLA CERINO OBLANDA | LT | RC |
| RENDON MATTHIAS | LT | RC |
| KARAVA NORBERT JEROME | LT | RC |
| TIONGSON JOSELITO SALAMAT | LT | RC |
| BURNETTE JOHN CLARA | LT | RC |

| Name | Rank | |
|------|------|------|
| ENRIQUEZ REAN FREDERICK | LT | RC |
| NIELSON KENNETH WAYNE | LT | RC |
| JOHNSON CHARLES WAYNE | LT | RC |
| IANUCCI THOMAS ANTHONY | LT | RC |
| UBALDE ULYSSES LOPEZ | LT | RC |
| HENDRICKSON MICHAEL DOUGLAS | LT | RC |
| KERSTEN JAY JOSEPH | LT | RC |
| DSOUZA MATTHEW FELICIAN | LT | RC |
| MULKERIN TERRENCE JAMES | LT | RC |
| WALSH FRANCIS EDWARD | LT | RC |
| FINLEY JAMES FULTON | LT | RC |
| WELCH BERNARD JOSEPH | LT | RC |
| COLVIN ANDREW BRYAN | LTJG | RC |
| LINEBACK JOHN STEVEN | CAPT | SW |
| BARTZ WILLIAM JOHN | CAPT | SW |
| CWIKLINSKI CARL JEROME | CDR | SW |
| SCHRANZ MITCHELL | CDR | SW |
| ELSON IRVING ALEX | CDR | SW |
| KAPROW MAURICE SHALOM | CDR | SW |
| NEWMAN JOEL DAVID | CDR | SW |
| SCHMIDTLEIN CURTIS DON | CDR | SW |
| GIANULIS MILTON D | CDR | SW |
| PHILLIPS SETH DAVID | LCDR | SW |
| RINGO RONALD ROSS JR | LCDR | SW |
| VANCE ROBERT JAY | LCDR | SW |
| NOEL MUHIYYALDIN M MALAK JR | LCDR | SW |
| SAIFULISLAM ABUHENA M | LCDR | SW |
| KOCZAK MARK WILLIAM | LCDR | SW |
| NELKO ANDREW DAVID | LCDR | SW |
| KISH KARL ANDREW | LCDR | SW |
| KALANTZIS JOHN ANGELO | LCDR | SW |
| SHIN JEANETTE GRACIE | LCDR | SW |
| SCHWAB MARVIN ALAN | LCDR | SW |
| KOLODNY DANIELLA MARGALITH | LT | SW |
| KREISLER NEAL RAYMOND | LT | SW |
| WHITAKER DANIEL CRAIG | LT | SW |
| STUART CLIFFORD ALLEN | LT | SW |

| | | |
|---|---|---|
| HARDING BRANDON SCOTT | SW | SW |
| HOWARD MICHAEL D | LT | SW |
| DUESENBERRY STEPHEN SAMUEL | LT | SW |
| WOZNIAK EUGENE | LT | SW |
| ALLEN CHRISTOPHER C | LT | SW |
| BEMEL KEVIN SCOTT | LTJG | SW |
| HUNTER CHARLOTTE ELIZABETH | CDR | SW-Christian Science |
| CRAFT RANDAL BARRETT | CDR | SW-Christian Science |
| ALLEN RAYNARD | LT | SW-Seventh Day Adventists |
| COX MARK DEVIN | LT | SW-Seventh Day Adventists |
| PETERS ROBERT W | LT | SW-Seventh Day Adventists |
| ADAMS EVAN DRAKE | LT | SW-Seventh Day Adventists |
| TAGALOA MICHAEL J | LT | SW-Seventh Day Adventists |
| GIRARDIN DAVID WALTER | CAPT | SW-Seventh Day Adventists |
| ORTIZ RUBEN AGUAYO | LCDR | SW-Seventh Day Adventists |
| BLACK LARRY DEWAYNE | LCDR | SW-Seventh Day Adventists |
| HAKANSON JOHN MICHAEL | LCDR | SW-Seventh Day Adventists |
| ANDERSON PAUL STAFFORD | LCDR | SW-Seventh Day Adventists |
| RODRIGUEZ SANTIAGO | LT | SW-Seventh Day Adventists |
| TOMLINSON MICHAEL LEE | LT | SW-Seventh Day Adventists |
| MORAN TERRY LEE | LT | SW-Seventh Day Adventists |
| LOGAN JOHN ROBERT | LT | SW-Seventh Day Adventists |
| CHESTER MICHAEL ALLEN | LT | SW-Seventh Day Adventists |

Thomas C. Carter                                    March 21, 2006

Macon, GA

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


REV. CHARLES E.                )

LARSEN, et al.                 )

                               )

                               )   CASE NO. 02CV02005

vs.                            )

                               )

THE UNITED STATES              )

NAVY, et al.,                  )

                               )

                               )


                    March 21, 2006

                      9:00 a.m.

                    Macon, Georgia


        This is the deposition of Thomas C.

    Carter taken in the office of Adams, Jordan

    & Treadwell, 577 Mulberry Street; testimony

    is given before Diane Dorsey, Certified

    Court Reporter, B-1708.

    Signature to the deposition is reserved.

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 20
Page 1 of 2

| Page 30 |
|---|
| 1  the shortage of actual bodies to fill the billets. |
| 2      Q.   While you were the detailer, there was |
| 3   a -- you were under authorization? |
| 4      A.   That's correct. |
| 5      Q.   Were you familiar with the way The One |
| 6   Shop -- I'm trying to think of the right word -- |
| 7   developed its end strengths for the physical years? |
| 8          MR. HYDE:  Objection, vague. |
| 9          THE WITNESS:  No. |
| 10  BY MR. SCHULCZ: |
| 11     Q.   Were you familiar with how The One Shop |
| 12  developed its accession goals? |
| 13     A.   Not that I recall, and I certainly would |
| 14  not have been involved in the details of it. |
| 15     Q.   Okay.  As the detailer -- what kind of |
| 16  concerns did you have about denominational mix or the |
| 17  faith-group categories in terms of the numbers |
| 18  available? |
| 19         MR. HYDE:  Objection, vague. |
| 20         THE WITNESS:  My concern would be |
| 21  meeting the needs of the sailors, the |
| 22  marines, and the Coast Guard personnel at |
| 23  the different commands, and the large |
| 24  commands particularly in which we would |
| 25  provide a mix of those. |

| Page 31 |
|---|
| 1   BY MR. SCHULCZ: |
| 2      Q.   How were those needs communicated to you? |
| 3      A.   Usually those needs would come from the |
| 4   command chaplains in the field. |
| 5      Q.   How typically would they report that to |
| 6   you? |
| 7      A.   In the sense that, you know, I already had |
| 8   a good sense of it by just looking at the people who |
| 9   were there and seeking, again, to provide a mix -- |
| 10  what I called a mix of individuals from different |
| 11  faith groups, again depending on the size of the |
| 12  command and how many chaplains you had would |
| 13  determine what kind of mix you could put at any |
| 14  particular place. |
| 15     Q.   When you talked to the plans and policies |
| 16  branch, did you express a need for specific chaplains |
| 17  by denomination? |
| 18     A.   I do not recall talking in specific terms |
| 19  of that.  I was more interested in just the hard |
| 20  numbers at that particular time because of the |
| 21  shortage of chaplains and not being able to fill |
| 22  billets, leaving them open. |
| 23         For me it was more a matter of just hard |
| 24  terms of numbers, regardless of the denomination or |
| 25  faith-group mix of the chaplains. |

| Page 32 |
|---|
| 1      Q.   So you were concerned with putting a face |
| 2   in a place? |
| 3      A.   That would be my major concern, that's |
| 4   correct. |
| 5      Q.   So you provided no information to the |
| 6   plans, policy, and accessions branch about specific |
| 7   faith-group requirements? |
| 8          MR. HYDE:  Objection, vague. |
| 9   BY MR. SCHULCZ: |
| 10     Q.   Can you answer the question? |
| 11     A.   I can answer the question. |
| 12         I probably provided information because of |
| 13  the shortage of Catholic chaplains, would have |
| 14  provided the kind of information to them that, you |
| 15  know, there is a shortage of Catholic chaplains, and |
| 16  we cannot get some Catholic chaplains at commands |
| 17  where we need them. |
| 18     Q.   Other than Catholics, you can't remember |
| 19  any other -- |
| 20     A.   You're talking about in terms of the other |
| 21  specific groups like liturgical and nonliturgical. |
| 22     Q.   Yes. |
| 23     A.   No.  From my standpoint that was not an |
| 24  issue, again, looking at hard numbers. |
| 25     Q.   Were there any billets that were |

| Page 33 |
|---|
| 1   faith-group-specific? |
| 2      A.   There is no coding of faith group in the |
| 3   billet system. |
| 4      Q.   I know there is no coding. |
| 5      A.   That's correct. |
| 6      Q.   Were there any informal coding that would |
| 7   reserve certain billets to specific faith groups? |
| 8      A.   To my knowledge, there were probably only |
| 9   two in which you could speak of that, and both of |
| 10  those were overseas.  It was practice, I'm not sure |
| 11  whether it was policy, that normally the senior |
| 12  chaplain at Naples and the senior at Rota would be |
| 13  Catholic chaplains. |
| 14     Q.   And this was informal? |
| 15     A.   It was practice.  I'm not sure that it was |
| 16  policy.  I did ask to check on the status of forces |
| 17  agreements, and I was told -- I never saw it |
| 18  specifically -- that the status of forces agreement |
| 19  for Rota, Spain, did call for the senior chaplain to |
| 20  be Catholic.  I never saw that in writing, and this |
| 21  was not done by the Chaplain Corps.  It was done by a |
| 22  line officer that checked that for me. |
| 23     Q.   Okay. |
| 24         MR. SCHULCZ:  Could you mark this as |
| 25  Exhibit No. 3. |

9  (Pages 30 to 33)

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 20
Page 2 of 2

26MAR97

w/ch 1 ~~3 Enclose~~

**DEPARTMENT OF THE NAVY**
OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20350-1000

SECNAVINST 1120.4A
OP-09G22
14 May 1986

SECNAV INSTRUCTION 1120.4A

From:  Secretary of the Navy

Subj:  APPOINTMENT OF REGULAR AND RESERVE OFFICERS IN THE
CHAPLAIN CORPS OF THE NAVY

Ref:   (a) DODDIR 1310.2 of 24 Mar 84 (NOTAL)
       (b) DODDIR 1205.14 of 24 May 84 (NOTAL)
       (c) SECNAVINST 1000.7D
       (d) DODDIR 1205.5 of 16 May 80 (NOTAL)
       (e) DODDIR 1312.3 of 15 Oct 81 (NOTAL)
       (f) SECNAVINST 1210.5
       (g) SECNAVINST 1730.7
       (h) SECNAVINST 1420.1
       (i) SECNAVINST 5350.10A
       (j) Title 10, United States Code
       (k) SECNAVINST 5300.28A
       (l) Manual of the Medical Department (NAVMED P-117)
       (m) DODDIR 1304.19 of 1 Jun 84 (NOTAL)
       (n) SECNAVINST 1427.2
       (o) SECNAVINST 1427.1A
       (p) SECNAVINST 1920.6A

Encl:  (1) Theological Student Program                              (A

1. <u>Purpose</u>.  To establish regulations governing:            (R

     a.  Appointment of officers in the Chaplain Corps, including
appointment in the Regular component under reference (a), in the
Reserve component under reference (b) and in either component
through interservice transfer from another Service under refer-
ences (c) and (d);

     b.  Voluntary recall of officers of the Chaplain Corps to
the active-duty list; and

     c.  Award of entry grade credit on appointment in the
Chaplain Corps under reference (e).

2. <u>Cancellation</u>.  SECNAV Instruction 1120.4.  All other regula-   (A
tions and memoranda providing guidance governing accessions,
appointments, eligibility requirements and entry grade credit
for service in the Chaplain Corps inconsistent with this instruc-
tion are held in abeyance pending their modification or cancel-
lation.  Processing initiated before the effective date of this
instruction will be continued pursuant to policy and instruc-
tions in effect before that date.

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 21
Page 1 of 13

SECNAVINST 1120.4A
1 4 MAY 1986

R)      3.  Applicability.  This instruction applies to all individuals
appointed as Regular or Reserve officers in the Chaplain Corps,
including officers from another Service, Reserve officers trans-
ferred into the Regular component, Reserve officers voluntarily
recalled to the active-duty list and officers transferred from
the line or another staff corps into the Chaplain Corps.

        a.  Additional guidance on the transfer of Chaplain Corps
officers from other Services into the Chaplain Corps of the Navy
is found in references (c) and (d).

        b.  Additional guidance on the transfer of Reserve Chaplain
Corps officers into the Regular component of the Chaplain Corps
and the transfer of Regular and Reserve between the line and the
Chaplain Corps or between another staff corps and the Chaplain
Corps is found in reference (f).

R)      4.  Policy.  The Department of the Navy will maintain authorized
strength and grade levels in the Chaplain Corps by recruiting
clergy of religious faith groups of the United States to provide
religious ministries under reference (g), to support the annual
five-year promotion plan approved under reference (h), to
provide a base for an all-Regular career force and to attain
authorized strength in the Reserve components to meet approved
mobilization requirements.

        a.  Requirements for newly appointed officers on the active-
duty list sufficient to support an all-Regular force will be
filled primarily through the Theological Student Program author-
ized in enclosure (1).  Requirements which cannot be fully met
by this source will be met by direct appointment of qualified
members of the clergy.

        b.  Requirements for officers on the active-duty list in
career grades that cannot be met by promotion will be supple-
mented by voluntary recall to active duty of Chaplain Corps
officers who have not served previously on extended active duty.

        c.  Requirements for officers on the active-duty list which
cannot be met by the preceding sources will be met by the
voluntary recall of Chaplain Corps officers who have served
previously on extended active duty and by interservice transfer
of chaplains from other Services.

        d.  Requirements for Selected Reserve and Individual Ready
Reserve officers will be filled primarily by the transfer of
officers from the active-duty list who have completed their
initial obligated service.  Requirements which cannot be met
from this source will be met by direct appointment of qualified
members of the clergy as Reserve officers of the Chaplain Corps
on inactive duty.

2

SECNAVINST 1120.4A
**1 4 MAY 1986**

e.  All initial appointments in the Chaplain Corps will be
Reserve appointments, with subsequent transfer to the Regular
Navy under reference (f).

5.  Accession plans.  The Chief of Naval Operations will develop       (A
an annual accession plan to support authorized strength in the
Chaplain Corps.  There must be enough accessions to support the
annual five-year promotion plans for the active-duty and Reserve
components and ensure that the promotion opportunity and flow
necessary to meet authorized strength-in-grade requirements are
maintained.  Accession plans must support execution of Affirma-
tive Action Plans established under reference (i).

6.  Basic qualifications.  To be eligible for appointment as a         (R
Chaplain Corps officer in either the active-duty or Reserve com-
ponents, or for voluntary recall from the Reserve component to
the active-duty list, the applicant must meet the following
requirements:

a.  Citizenship.  Must be a citizen of the United States with
the following exception:  a citizen of the Northern Mariana
Islands who indicates in writing to a commissioned officer of
the Armed Forces of the United States an intent to become a
citizen of the United States may be appointed as a commissioned
officer in the Regular or Reserve component.  Under reference
(j), such an individual cannot serve as an officer in a vessel
of the United States until legally a citizen of the United
States.  This exception expires upon establishment of the
Commonwealth of the Northern Mariana Islands.

b.  Age.  Must be able to complete 20 years of active
commissioned service by age 60.  The Deputy Chief of Naval
Operations (Manpower, Personnel, and Training) (DCNO(MPT)) may
waive the age restrictions up to age 62 for otherwise qualified
applicants for appointment on the active-duty list or in the
Reserve component in the following instances:

(1) When there is a shortage against authorized strength
in the active duty component which cannot be met through the
Theological Student Program, direct appointments, voluntary
recall from the Reserve component or by in-zone promotion under
the annual five-year promotion plan.

(2) When there is a shortage against authorized strength
in the Reserve component which cannot be met by transfer of
officers from the active-duty list, from the Theological Student
Program, in-zone promotions under the annual five-year promotion
plan, or by direct procurement of qualified civilians who meet
age requirements.

3

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 21
Page 3 of 13

SECNAVINST 1120.4A
1 4 MAY 1986

      (3) When extraordinary circumstances cause such a waiver to be in the best interest of the naval service.

      (4) When a gross inequity to the applicant would otherwise result.

Before appointment, applicants who will be unable to complete 20 years of active commissioned service by age 60 will be required to acknowledge in writing that they are ineligible for Regular appointment. Before appointment, applicants who will be unable to complete 20 years of creditable service for retirement shall acknowledge the same in writing. DCNO(MPT) shall maintain on file written justification for each waiver granted.

    c. <u>Moral character</u>. Must be of good moral character and of unquestioned loyalty to the United States as determined by interview and investigation. As prescribed in reference (k), no person who is drug or alcohol dependent, who abuses drugs or alcohol, whose preservice abuse of drugs and/or alcohol indicates a proclivity to continue abuse in the Service, or who has a record of any trafficking offenses shall be permitted to enter or be retained in the Chaplain Corps.

    d. <u>Physical standards</u>. Must meet the physical standards for service on active duty established by the Director, Naval Medicine and approved by the Chief of Naval Operations. DCNO(MPT) may grant waivers for physical defects that will not interfere with the performance of active duty within the guidelines of reference (1).

R)

7. <u>Professional qualifications</u>. To be eligible for appointment in the Chaplain Corps, or voluntary recall from the Reserve component to the active-duty list, the applicant must meet the following minimum educational and professional requirements.

    a. <u>Education</u>

      (1) Must be a graduate of an accredited college or university with a baccalaureate degree of not less than 120 semester hours.

      (2) Must have completed three resident years of graduate professional study in theology or related subjects, validated by a Master of Divinity or equivalent degree, or 90 semester hours at an accredited seminary or graduate school of religion.

      (3) Colleges, universities, graduate schools or seminaries are considered accredited if listed in the <u>Education Directory, Colleges and Universities</u> (current edition) published

4

SECNAVINST 1120.4A
1 4 MAY 1986

by the U. S. Department of Education, National Center for Educa-
tion Statistics, Washington, D. C. 20202, or the Directory, ATS
Bulletin Part 4 (current edition) published by the Association
of Theological Schools, Vandalia, Ohio 45377. Foreign educa-
tional institutions not so listed may be treated as accredited
upon certification by a listed institution that the applicant's
credits are transferable at full value to the certifying
institution.

   b. Ecclesiastical endorsement. Must have endorsement from
an ecclesiastical endorsing agency recognized by the Department
of Defense under reference (m).

8. Examination of professional qualifications. The profes-
sional qualifications of all applicants for appointment in the
Chaplain Corps or for voluntary recall from the Reserve com-
ponent to the active-duty list shall be examined as follows:

   a. Appointments in grades of lieutenant commander and
below. The Chief of Chaplains shall examine and certify the
professional qualifications of all applicants.

   b. Appointments in grades of commander and above. The
DCNO(MPT) shall appoint a Chaplain Qualifications Board (CQB)
composed of senior Chaplain Corps officers to examine the
professional qualifications of all applicants. The CQB shall
certify, subject to the concurrence of the Chief of Chaplains,
that the applicant has met fully the qualifications of paragraph
7 and certify which specific qualifications of the Table in
paragraph 9 are fully met. The CQB shall also provide an
evaluation of the quality and desirability of the candidate
based on his/her professional qualifications and experience.

   c. Voluntary recall. To be eligible for voluntary recall
from the Reserve component to the active-duty list, the appli-
cant must be a fully qualified member of the clergy of a
religious faith group represented by a DOD-recognized ecclesias-
tical endorsing agency under reference (m). Recalled officers
will be recalled in the rank held as a Reserve and will not have
entry grade recomputed.

   d. Examination procedure. The examining body will review
an applicant's academic performance, graduate theological
education, professional experience, professional reputation,
interviews by a recruiting officer and a chaplain, letters of
personal or professional recommendation and ensure that an
ecclesiastical endorsement has been submitted for each appli-
cant. This review must be completed before recommending the
applicant for appointment or recall and prior to recommending

5

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 21
Page 5 of 13

SECNAVINST 1120.4.

14 MAY 1986

entry grade credit to be awarded on appointment.  Once the
examining body has examined and certified the applicant's
professional qualifications, DCNO(MPT) or Commander, Navy
Recruiting Command acting for DCNO(MPT) shall determine whether
the applicant is otherwise qualified for a commission as a
chaplain.  No applicant shall be appointed as a Chaplain Corps
officer without these determinations.

R)    9.  <u>Entry grade credit</u>.  Entry grade and date of rank upon
appointment in the Chaplain Corps shall be based on the number
of years of entry grade credit awarded for prior active commis-
sioned service, advanced education and professional experience
under reference (e).  Credit shall be granted subject to the
computation rules in paragraph 10 and as specified in the
following table:

ENTRY GRADE CREDIT TABLE

| Qualification | Credit |
|---|---|
| 1.  Commissioned service in any of the Uniformed Services on active duty or in an active status but not active duty other than as a theological student. | one year for each year |
| 2.  Successful completion of graduate professional study validated by a Master of Divinity or equivalent degree under the criteria of paragraph 7. | three years |
| 3.  Seven or more years of full-time practical experience in ministry following completion of the educational requirements in paragraph 7. To be credited, the applicant must have accrued the experience as a fully qualified member of the clergy of a religious faith group represented by a DOD-recognized ecclesiastical endorsing agency under reference (m).  The experience may include pastoral ministry, religious education or other form of full-time religious vocation. | one year |
| 4.  Unusual cases involving special experience or unique qualifications. | One-half year for each year |

6

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 21
Page 6 of 13

SECNAVINST 1120.4A
1 4 MAY 1986

5.  The Department of the Navy will not normally grant entry grade credit for special experience or unique qualifications.  ASN (M&RA), considering the recommendations and supporting justification of DCNO(MPT), may waive this limitation on a case by case basis when there is a requirement that cannot be met within the guidelines of this instruction.

up to a maximum of three years of credit

10.  <u>Limits and Computation of entry grade credit</u>.  Entry grade credit shall be computed as follows:

(A

a.  A period of time or a qualification shall be counted only once.

b.  Qualifying periods of less than one full year will be proportionally credited to the nearest day.

c.  Credit will not be awarded for service as a warrant officer.

d.  Graduates of the Service academies will not be awarded credit for any service performed or education, training or experience obtained before graduation from the academy concerned.

e.  Entry grade credit will not normally be awarded for education, training or experience obtained while on active duty or on inactive duty in an active status.  If the officer completes advanced education specified in paragraph 7 for initial appointment in less than the normal number of years, the officer may be given constructive credit for the difference between the normal number of years and the actual number of years taken.  Detailed guidance is furnished in sections 533 and 5600 of reference (j).

f.  To obtain a high level of experience in the naval chaplaincy environment before entering the career force total entry grade credit shall normally be limited to six years.  ASN (M&RA), considering the recommendations and supporting justification of the DCNO(MPT), may waive this limit on a case by case basis when there is a requirement that cannot be met within the guidelines of this instruction.

g.  Because the recall of a Chaplain Corps officer from inactive duty is not an appointment, such officers are not entitled to additional entry grade credit.

7

SECNAVINST 1120.4A

**1 4 MAY 1986**

A)    11.  _Entry grade credit in transition period_.  This instruction
provides credit to be awarded to individuals appointed in the
Chaplain Corps from the effective date of this instruction.
There shall be no retroactive changes made as a result of this
instruction to the number of years credit previously granted to
officers appointed in the Chaplain Corps before the effective
date of this instruction.

R)    12.  _Appointments_.  A prospective Chaplain Corps officer will be
appointed initially as a Naval Reserve officer subject to the
following guidance governing entry grade, date of rank, prece-
dence, and application processing:

       a.  _Entry grade_.  A prospective Chaplain Corps officer shall
be appointed in a grade based on total entry grade credit
awarded.  The minimum entry grade credit required for each grade
is equal to the promotion flow points prescribed in the approved
annual five-year promotion plan in effect at the time of appoint-
ment.  Entry grade and date of rank of Chaplain Corps officers
transferred from other Services into the Chaplain Corps of the
Navy shall be determined under references (c) and (d).

       b.  _Date of rank_.  When the minimum entry grade credit
required for appointment in a given grade is granted, the date
of rank shall be the date of appointment.  When entry grade
credit is granted in excess of the minimum years required for
appointment in a given grade (but less than the amount necessary
to justify the next higher grade), the excess credit shall be
used to adjust the date of rank within grade.  The appointee's
excess entry grade credit shall be compared with the time-in-
grade of Chaplain Corps officers on the active-duty list in the
same grade.  The date of rank upon appointment shall be the same
as that of the Chaplain Corps officer on the active-duty list in
the same grade with time-in-grade most equal to, but not less
than, the appointee's excess entry grade credit.

       c.  _Assignment of precedence_.  Each appointee will be placed
on the active-duty list or assigned precedence as follows:

          (1) Appointees ordered to active duty or retained on
active duty (other than active duty of Reserve officers as
described in Section 641(1) of reference (j)) incident to
appointment shall be placed on the active-duty list under the
provisions of reference (n).  All appointees whose placement on
the active-duty list would render them eligible for considera-
tion in zone or above zone for promotion by an active-duty
promotion selection board within one year of entering on active
duty shall be counseled regarding the option to defer eligi-
bility for consideration for promotion under reference (h), and
shall acknowledge such counsel in writing.

8

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 21
Page 8 of 13

SECNAVINST 1120.4A
1 4 MAY 1986

(2) Appointees not concurrently ordered to or retained on active duty (other than active duty as described in Section 641(1) of reference (j)) shall be assigned a running mate on the active-duty list and placed on the inactive-duty precedence list in an active status under reference (o).

d. <u>Failure to complete qualifications</u>. Officers who fail to complete the Chaplain Basic Course or any required qualification in the Theological Student Program normally shall be relieved of any statutory service obligation and active-duty obligation incurred as a result of accepting an appointment into the Chaplain Corps or the Theological Student Program, and shall be separated for cause under reference (p) under the following guidelines:

(1) Officers who <u>do not have</u> pre-existing service obligations under prior appointments or enlistments shall normally have their service obligation cancelled and be discharged for cause.

(2) Officers who <u>have</u> pre-existing service obligations under prior appointments <u>shall</u> normally be reappointed in their previous competitive category to complete their initial service obligation.

(3) Officers who <u>have</u> pre-existing service obligations under prior enlistments <u>shall</u> normally be reverted to their previous enlisted status to complete their initial service obligation.

(4) The Chief of Naval Personnel may recommend, with supporting justification, retention and transfer to another competitive category when that action would be in the best interest of the naval service.

13. <u>Theological Student Program</u>. Selection and appointment for active duty in the Chaplain Corps through the Theological Student Program shall be made as required by enclosure (1) and paragraph 12.    (A

14. <u>Application Processing</u>. All qualified applicants accepted for appointment either on active duty or inactive duty shall be commissioned within 60 days following receipt of a complete application by Navy Recruiting Command. DCNO(MPT) may authorize delayed commissioning when a later time is requested by the applicant.    (A

15. <u>Responsibilities</u>    (A

a. The Chief of Naval Operations is responsible for:

9

Defs.' Opposition to Pls.' Renewed Motion for Preliminary Injunction Ex. 21 Page 9 of 13

SECNAVINST 1120.4A
14 MAY 1986

  (1) Procurement and appointment of Chaplain Corps officers in compliance with this instruction, and

  (2) Establishing the annual accession plan.

 b.  The Deputy Chief of Naval Operations (Manpower, Personnel, and Training) may approve entry grade credit and establish entry grades and dates of rank in compliance with the guidelines in this instruction.

 c.  The Chief of Chaplains/Director of Religious Ministries is responsible for certification of professional qualifications and calculation of entry grade credit based on these qualifications for the DCNO(MPT).

 d.  The Commander, Navy Recruiting Command shall determine grade and date of rank based on this calculation subject to approval of the DCNO(MPT).


James F. Goodrich
Under Secretary of the Navy

Distribution:
SNDL A1  (Immediate Office of the Secretary)
  A3  (Chief of Naval Operations)
  A5  (Bureaus)
  FJ18 (Military Personnel Command)
  FJ76 (Recruiting Command)

Copy to:
SNDL A2A  (Department of the Navy Staff Offices) (JAG, only)

Stocked:
CO, NAVPUBFORMCEN
5801 Tabor Ave.
Phila., PA  19120-5099  (100 copies)

10

SECNAVINST 1120.4A CH-1
3 DEC 1986

## THEOLOGICAL STUDENT PROGRAM

1. **Purpose.**  To aid in meeting future year accession requirements for chaplains on the active-duty list and in the Reserve Component.  DCNO(MPT) will conduct a Theological Student Program within the following guidelines.

2. **Eligibility.**  Candidates must meet the basic qualifications in paragraph 6 and must:

   a.  Receive a letter of approval from a religious faith group recognized under reference (m).

   b.  Have a baccalaureate degree of not less than 120 semester hours from an accredited college or university.

   c.  Be matriculated in an accredited graduate theological school in a program of professional study in theology or related subjects leading to a Master of Divinity or its equivalent.  The school is considered accredited if listed in the Education Directory, Colleges and Universities (current       (A edition) published by the U.S. Department of Education, National Center for Education Statistics, Washington, D.C. 20202, or if listed as accredited in the Directory, ATS      (R Bulletin Part 4 (current edition) published by the Association of Theological Schools, Vandalia, Ohio, 45377.  Foreign educational institutions not so listed may be treated as accredited upon certification by a listed institution that the applicant's credits are transferable at full value to the certifying institution.

   d.  Maintain a satisfactory full time standing under the standards of the graduate theological school in which enrolled and in any training program prescribed by their religious faith group.

3. **Appointment.**  Candidates selected for the program will be appointed as a Reserve Ensign in the Unrestricted Line, Designator (1945) for inactive duty, inactive status, during the period of their professional studies, under the following conditions:

   a.  Serve without pay or allowances while in a student status except during periods of active duty for training.

Enclosure (1)

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 21
Page 11 of 13

SECNAVINST 1120.4A CH-1
3 DEC 1986

    b.  Complete theological education and receive a degree.

    c.  Obtain an ecclesiastical endorsement under paragraph 7b.

    d.  Complete Chaplains School basic course.

    e.  Accept, if offered, a superseding appointment to Lieutenant (junior grade) in the Chaplain Corps, USNR, 4105, for active or inactive duty under reference (b).

    f.  Total service obligation is eight years.  Service after superseding appointment in the Chaplain Corps is in active status in the Reserve.  For officers appointed to active-duty list, initial active duty obligation is three years.

4.  _Disenrollment_.  Theological Student Program officers may be separated from the Naval Reserve under paragraph 12d in the following circumstances:

    a.  Withdrawal of the letter of approval by the student's religious faith group.

    b.  Academic failure.

    c.  Discontinuing professional training or withdrawal from school without prior assurance of resumption within one year.

    d.  Failure to obtain a Master of Divinity or equivalent degree.

    e.  Failure to obtain an ecclesiastical endorsement for superseding appointment.

    f.  Failure to attend or successfully complete the Chaplain Basic Course when ordered to that school.

5.  _Active Duty for Training_.  Theological Student Program officers, in the discretion of the Chief of Chaplains, after the completion of Chaplain Basic Course, may be voluntarily called to active duty for training for on-the-job-training under the supervision of a chaplain.  Such assignments shall, to the extent possible, involve tasks in religious ministry programs consistent with the level of training of the officer. The assignment will be performed at a command as near the theological student's school as possible, except as may be otherwise directed by the Chief of Chaplains.

Enclosure (1)                    2

Defs.' Opposition to Pls.' Renewed Motion for Preliminary Injunction
Ex. 21
Page 12 of 13

SECNAVINST 1120.4A CH-1

**3 DEC 1986**

6.  <u>Superseding Appointment in the Chaplain Corps</u>.  DCNO(MPT)
may offer to Theological Student Program officers who
successfully complete the requirements for superseding
appointment, to the extent necessary to meet current year
accession plan requirements for the active-duty list and the
Reserve Component, superseding appointments in the Chaplain
Corps, U. S. Naval Reserve.

    a.  Selection will be based on criteria established by
DCNO(MPT) and the Chief of Chaplains.

    b.  Those not offered a superseding commission, and those
who do not accept one when offered, will be honorably
discharged from the Naval Reserve under paragraph 12d.

3                    Enclosure (1)

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 21
Page 13 of 13

Samuel A. Wyvill, II                                  June 21, 2007
                        Memphis, TN

Page 1

              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA

CHAPLAINCY OF FULL GOSPEL )
CHURCHES,                 )
                          )
            v.            ) Case: 1:99CV002945 (RMU)
                          )
THE HON. DONALD WINTER,   )
ET AL.                    )
                          ) Consolidated with
                          )
ROBERT H. ADAIR, ET AL,   )
                          )
            v.            ) CASE: 1:00CV00566 (RMU)
                          )
THE HON. DONALD WINTER,   )
ET AL.                    )

                       DEPOSITION

                          OF

                  SAMUEL A. WYVILL II

                    JUNE 21, 2007

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 22
Page 1 of 10

Samuel A. Wyvill, II                                      June 21, 2007

Memphis, TN

Page 2

1                    The deposition of SAMUEL A. WYVILL II,

2      is taken on this, the 21st day of June, 2007, on

3      behalf of the Plaintiff, pursuant to notice and

4      consent of counsel, beginning at approximately

5      9:30 a.m., in the offices of Morrow and Associates,

6      80 Monroe Avenue, Suite 610, Memphis, Tennessee.

7                    This deposition is taken pursuant to

8      the terms and provisions of the Federal Rules of

9      Civil Procedure.

10                    All forms and formalities, excluding

11     the signature of the witness, are waived, and

12     objections alone as to matters of competency,

13     irrelevancy and immateriality of the testimony are

14     reserved to be presented and disposed of at or before

15     the hearing.

16

17

18

19

20

21

22

23

24

25

Alderson Reporting Company
1-800-FOR-DEPO

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
322f067a-a31e-493c-b4f7-7e19a08a92d7
Ex. 22
Page 2 of 10

Samuel A. Wyvill, II                                    June 21, 2007
                          Memphis, TN

---

                                                          Page 3

1                 A P P E A R A N C E S
2

3      FOR THE PLAINTIFF:          ARTHUR A. SCHULCZ, SR., ESQ.
                                   2521 Drexel Street
4                                  Vienna, VA  22180
                                   703-645-4010
5

6      FOR THE DEFENDANT:          MICHAEL Q. HYDE, ESQ.
                                   U.S. Department of Justice
7                                  20 Massachusetts, Northwest
                                   Washington, DC  20530
8                                  202-514-2205
9

10                                 LT KATHERINE PASIETA, JAGC
                                   Department of the Navy
11                                 1322 Patterson Avenue, SC
                                   Washington Navy Yard, DC
12                                 20374
13

14

15

16

17

18     Reported by:
19

                       Sandra J. Vaughn
20                     TN Certified Court Reporter
                       Morrow & Associates
21                     80 Monroe Avenue - Suite 610
                       Memphis, Tennessee 38103
22                     (901) 528-1168
                       www.morrowandassociates.com
23

24

25

---

              Alderson Reporting Company
                   1-800-FOR-DEPO

Samuel A. Wyvill, II                              June 21, 2007
                        Memphis, TN

1    the active duty requirements is enforced on them by

2    another command, by the command that is in charge of

3    their activities, orders, and all that.

4        Q      Okay.  In paragraph three of this Exhibit 2, in

5    subparagraph two, it says some twenty-four thousand

6    in all rates and designators who were previously

7    transferred to the retired reserve when DOD

8    regulations provided for such.  Do you see that

9    phrase?

10       A      Yes, sir.

11       Q      What are you referring to here?

12       A      In that particular phrase?

13       Q      Yes.

14       A      We still had in our inventory, I think in

15   September of 1997, we DOD directed twelve hundred

16   point fifteen, either canceled or modified, I think

17   it was modified.  At that moment we still had

18   twenty-four thousand officers in -- that we had

19   previously transferred to the retired reserve -- no,

20   today we have that.  I'm sorry.  In 1997, we probably

21   had close to thirty-eight, thirty-nine thousand

22   officers.  1997, I'm sorry.

23       Q      You are referring to this twenty-four thousand

24   who have -- in the retired reserve and who had not

25   obtained eligibility for retired pay and benefits at

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 22
Page 4 of 10

Samuel A. Wyvill, II                                June 21, 2007
                        Memphis, TN

                                                    Page 54

1    honorary retiree was re-called to active duty beyond

2    the statutory age separation?

3    A      I can't remember.

4    Q      Okay.  As I said, it's okay if you can't

5    remember or don't know.  In paragraph four, the first

6    sentence says regarding the third category above, and

7.   the third category refers to what you have described

8    as a few members who are not receiving VSI payments.

9    Do you see that?  What is VSI?  I'm on Page 2.  Let

10   me start over again, because I didn't mean to confuse

11   you.  We will go back to paragraph -- the third part

12   of that says a few members are not receiving VSI

13   payments but were transferred because they possess

14   critical professional skills?

15   A      Yes, sir.

16   Q      Are skill sets in short supply -- the Navy

17   needed to maintain an inventory, okay.  Do you see

18   that?

19   A      Yes, sir.

20   Q      What is VSI?

21   A      VSI is a program called Voluntary Separation

22   Incentive.  It was an active duty downsizing program

23   through the 1990s, from about 1993 through 2001,

24   separating people from active duty.  There were a

25   variety of programs.  VSI was one of them.  The

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 22
Page 5 of 10

Samuel A. Wyvill, II                                    June 21, 2007
                        Memphis, TN

Page 55

1    Voluntary Separation Incentive said there were annual
2    payments given out based on the number of years and
3    your pay grade.  I think it's under 10 U.S. Code
4    1176.  It authorized an annual payment to get off
5    active duty, a separation payment, annually for twice
6    the number of years you were on active duty.
7             An example would be a lieutenant commander with
8    fourteen years of active duty would receive by
9    getting off active duty twenty-eight annual
10   payments.  As a condition for receiving the annual
11   payments, he must remain in the military.
12   He must remain either on the RASL, and if no longer
13   on the RASL because he doesn't meet qualifications,
14   he has to remain in the military, and if he does not
15   he loses his payments.
16   Q     Is it safe to say this is a string that the
17   military kept on a person who they might want to call
18   back later?
19             MR. HYDE:  Object to the use of colorful
20   terms, use of metaphors rather.
21   A     I don't think so.
22   Q     Okay.  Let me then go back to paragraph four.
23   It says, regarding the third category above, it says,
24   these few members were transferred to retired reserve
25   in the past ten years -- you cite an instruction --

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 22
Page 6 of 10

Samuel A. Wyvill, II                          June 21, 2007
                        Memphis, TN

Page 66

1   A      It gives me five categories we are to

2   categorize our reserve.  That's correct.

3   Q      Where do you place a person who is not eligible

4   for retired pay?

5   A      That is the question I had to DOD when I had

6   thirty-one thousand officers who were holding

7   commissions that were retired on 18 September, 1997.

8   Q      And what was the answer?

9   A      The answer was they didn't care if we had

10  another category.  They just didn't want it reported.

11  Q      Okay.  That was for people that had been

12  categorized previous, correct?

13  A      At that point, that's correct.

14  Q      But there is nothing in this directive or

15  instruction that allows the Secretary of the Navy to

16  create a new category, is there, for new people?

17  A      There is nothing in that instruction, no.

18  Q      Mr. Wyvill, the court reporter has marked for

19  identification what she has identified as Exhibit 4.

20  I'm going to ask you to scan this, because I want to

21  ask you if you have seen this before?

22  A      No.  I haven't.

23  Q      This, as the title says, the Declaration of

24  Veronica Berto.  Do you know her by any chance?

25  A      I do.

Alderson Reporting Company
1-800-FOR-DEPO

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 22
Page 7 of 10

Samuel A. Wyvill, II                                June 21, 2007
                        Memphis, TN

---

Page 71

1    A      Yes, sir.

2    Q      You don't see him anymore, you have no

3    interaction with him?

4    A      That is correct.

5    Q      So, the only function that you have in this

6    process is that you take him when he shows up on the

7    RASL and put him in the retired reserve?

8    A      That is correct.

9    Q      If this -- if the DOD instructions eliminated

10   the category in 1997, what was the authority to place

11   these six people in retired reserve status?

12                MR. HYDE:  Objection, calls for a legal

13   conclusion.

14   A      Since 1997, whenever I saw one of these things

15   come out, because I was very concerned over my

16   twenty-four thousand that were still in there, thirty

17   some thousand still in there, what is our legal

18   authority to keep doing it.  And phone calls to DOD

19   says no problem.  We are not barring you from

20   transferring people to the retired reserve.  They

21   just don't fit any of our categories.

22   Q      Do you know who told you that?

23   A      I dealt with whoever was there at the time.

24   The most recent was Tom Bush.

25   Q      When was the last time you talked to him?

---

Alderson Reporting Company
1-800-FOR-DEPO

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 22
Page 8 of 10

Samuel A. Wyvill, II                              June 21, 2007
                          Memphis, TN

Page 80

1    precursor of testimony by counsel, but you can answer

2    the question.

3    A      We don't place them in categories.  DOD places

4    them in categories and doesn't use that category.

5    Q      But the instructions -- does not the

6    instruction say that the secretary will identify all

7    reserve component into one of those categories?

8              MR. HYDE:  Objection to the extent it

9    calls for a legal conclusion.

10   A      I'm telling you when the instruction came out,

11   we called DOD.  DOD said they knew we had a lot of

12   these people that are not going to be in their

13   categories and they knew we had them and we were

14   transferring a few people to retired reserve where we

15   had skills.  I got from that Mr. Bush saying it's

16   okay to do that.  And I also have an op-nav

17   instruction that tells me to do it and I have a

18   bu-pers instruction that tells me to do it, so I do

19   it in those few cases.

20   Q      All right.  I would like to refer you to

21   Exhibit 1, which is your declaration, paragraph 7,

22   which is on Page 3.  In paragraph 7 you provide an

23   example of a person re-called to active duty but was

24   needed -- was needed for an extended period of time

25   to complete a study for the Secretary of Navy.  You

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 22
Page 9 of 10

Samuel A. Wyvill, II                              June 21, 2007
                        Memphis, TN

                                                    Page 84

1     that the Department of Defense uses?

2     A     Yes, sir.  I am.

3     Q     Is that table one of 1215.06?

4     A     Yes, sir.

5     Q     So, if I can refer you to that, which is

6     Exhibit 3, table E 6, enclosure six, Page e37.

7     A     I have it.

8     Q     Now, the fourth column from the left says TRC

9     designator?

10    A     Right.

11    Q     Do you see that?

12    A     Yes, sir.

13    Q     Do you know what the term "TRC" means?

14    A     Yes, sir.  I do.

15    Q     What is that?

16    A     Training retirement category.

17    Q     So, there are five categories there, correct?

18    A     Yes, sir.

19    Q     And a person who is not drawing retirement pay

20    does not fit into any one of these categories, do

21    they?

22    A     The only one that I am aware of that are, and

23    it was poorly written, are those VSI people who DOD

24    says fits category V-5.  But the definition in there

25    does not describe them.

Alderson Reporting Company
1-800-FOR-DEPO

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 22
Page 10 of 10



THE SECRETARY OF DEFENSE

WASHINGTON, THE DISTRICT OF COLUMBIA

9 FEB 1987

Honorable Sam Nunn
Chairman, Committee on Armed Services
United States Senate
Washington, D. C.  20510

Dear Mr. Chairman:

Attached is the "Study of Representation of Religious Faiths in the Armed Forces" as required by Section 513, The National Defense Authorization Act for Fiscal Year 1987.

Sincerely,

Attachment

STUDY OF REPRESENTATION OF

RELIGIOUS FAITHS

IN THE ARMED FORCES

Section 513, DoD Defense Authorization Act, 1987

## BENEFITS AND DETRIMENTS OF DEMOGRAPHICS

2.  An analysis of the benefits and detriments to the Armed
Forces of using the demographic distribution of faiths among
members of the Armed Forces as a guide to the faith distribution
within the Corps of Chaplains.

The Chaplain Corps/Services currently are comprised of 3,488

clergy who are representatives of 105 different faith groups.

Through the years, the Services have determined the character-

istics of the chaplaincy that best meet the requirement to

provide for free exercise.  While the overriding consideration is

one of quality, the Services do seek to maintain within the

Chaplain Corps/Services, chaplains of diversified religious

backgrounds.  This diversity, however, is based upon the require-

ment to provide for the free exercise of religion and is designed

primarily to meet the religious needs of service members and

their families.  Through the years, the Services have learned

that in providing for the free exercise of religion, they must

consider units or installations, rather than individuals or broad

statistical representation, as the primary criterion in being

able to serve the cumulative total of individual requirements

most effectively.  Proportional representation (attempting to

have the faith distribution within the Chaplain Corps/Services

reflect the religious demographics of faith among members of the

Armed Forces) cannot provide "a faith  mixture" within the

chaplaincy to meet effectively the religious needs of military

members, because military members do not have the mobility to go

where the specific chaplain might be who represents his/her faith group. The sailor aboard the ship at sea or the soldier deployed in a mobile training or combat environment are representative of the concept. If they are to be served at all, it must be by a chaplain who only coincidentally might be of their specific faith group. With Service members spread around the world at literally thousands of locations, the nearest chaplain of a specific small faith group represented by (for example) four chaplains of the total of 3,488, might well be half a continent away. While at first consideration it might appear that religious freedom would be well served by a chaplain force that replicates the religious complexion of the total military population, closer examination shows that it would not serve its intended purpose.

This conclusion is not unique to the Military Services. Similarities exist on college campuses, prisons, hospitals, and other institutions. Even if the military chaplaincy attempted to provide a chaplain for each faith group represented in the military (a process that would be almost impossible due to uncertain and dynamic national demographics and career management of chaplains), only a few members would have access to a chaplain of their particular faith because of the highly mobile, organizationally-dependent nature of the military and its global commitment.

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 23
Page 4 of 7

A military chaplaincy based upon proportional representation alone would not provide an adequate number of clergy from specific faith groups to meet the faith specific needs of military members either in the larger or smaller groups. For example, 26 percent of the military population indicates a religious preference of Roman Catholic. Accordingly, in a military unit with two chaplains assigned, whose population probably is about 26 percent Roman Catholic, the religious needs of the unit would best be served by the assignment of one Roman Catholic chaplain and one Protestant chaplain. The faith requirements of ministering to Roman Catholic personnel require the ministrations of a priest, and therefore justify the assignment of one Roman Catholic chaplain, even though the unit membership is only 26 percent Roman Catholic. Therefore, 50 percent of the chaplains assigned to this particular unit would be Roman Catholic. In this example, proportional representation would not provide an adequate number of Roman Catholic chaplains to meet current requirements.

Similarly, based solely on the faith demographics of the military population, it would appear that the military has an abundance of Jewish chaplains. Those identifying themselves as Jews represent only 0.37 percent of the total force, while Jewish chaplains serving in the military chaplaincy represent 1.38 percent. Once again, the military requirements for meeting the

I-8

religious needs of Jewish personnel indicate that there is not an abundance of Jewish chaplains, but rather that more are needed. The demographic distribution formula does not meet the religious needs of the complex military community.

Further, the use of demographics as the criteria for determining faith distribution among chaplains would involve maintaining a proportional relationship not just among Orthodox, Protestant, Catholic, and Jew, but would require a faith distribution of chaplains among the 150 faith groups currently represented by members of the Armed Forces. Proportional representation implies that for each faith group represented in the Armed Forces, at least one chaplain would be represented in the military chaplaincies. Since the total number of chaplains for each of the Services remains constant, new representation would be accomplished by decrementing other faith groups or by reducing the numbers from those faith groups having multiple representation. Fluctuations in the military population as people come and go would require a periodic reworking of the faith distribution among the military chaplaincies. This would seriously impact upon the management of the Chaplain Corps/Services and would affect career progression and impact upon service stability.

Finally, using only proportional representation would adversely impact upon the quality of the chaplain force. The study was unable to discover any significant benefit to using the

I-9

demographic distribution of faiths among members of the Armed
Forces as a guide to the faith distribution within the Chaplain
Corps/Services. Faith representation rather than the quality of
the individual could easily become paramount in the management
priorities of the chaplaincy, a condition inimical to the
maintenance of a professional chaplain force.

The military chaplaincy, although sensitive to the demographic
distribution of faiths among members of the Armed Forces, cannot
establish faith representation as the sole criterion in
determining the faith distribution of chaplains. Rather, the
military chaplaincy must also consider the military requirements
and the mandate of providing for the free exercise of religion in
designing, developing, and sustaining the Chaplain Corps/
Services.

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 23
Page 7 of 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHAPLAINCY OF FULL GOSPEL )
CHURCHES, et.al., )
 )
   Plaintiffs, ) Civil Action No. 1:99CV002945
 ) (RMU)
v. )
 )
GORDON R. ENGLAND, )
Secretary of the Navy, et.al.,)
 )
   Defendants. )

          Consolidated with

ROBERT H. ADAIR, et.al., )
 )
   Plaintiffs, ) Civil Action No. 1:00CV00566
 ) (RMU)
v. )
 )
GORDON R. ENGLAND, )
Secretary of the Navy, et.al.,)
 )
   Defendants. )
 )

## DECLARATION OF REAR ADMIRAL BARRY C. BLACK, CHC, USN

Pursuant to 28 U.S.C. ' 1746, I, Barry C. Black,
declare as follows:

1.  I am a Rear Admiral (pay grade O-8) on active duty in

the United States Navy Chaplain Corps (CHC).  I am currently the

Chief of Navy Chaplains, a position I assumed in August 2000.

In this capacity, I serve as the Director of Religious Ministry

Support for the Department of the Navy.  I am the principal

1

advisor and spokesperson for the Chaplain Corps. See Attachment 1 (Secretary of the Navy Instruction ("SECNAVINST") 1730.7B)

2. The Navy Chaplain Corps is composed of approximately 900 commissioned officers. These officers serve in a dual capacity; they are both Naval officers and Chaplains. As Naval officers, they wear the prescribed uniform, issue and receive lawful orders, adhere to military traditions and customs, and follow military rules and regulations. This includes compliance with the Uniform Code of Military Justice. Although Chaplain Corps officers cannot assume command over Naval operational units, by statute, they may command such activities as are appropriate to the Corps. See 10 U.S.C. § 5945. In his or her pastoral role, a Chaplain's ministry generally encompasses the following: providing worship opportunities in accordance with his or her religious tradition; ensuring the free exercise of religion for all authorized personnel by facilitating their worship requirements; conducting seasonal and faith group specific observances; participating in command ceremonies; providing personal and pastoral counseling; intervening in crisis situations; conducting weddings, funerals, and memorials; advising commands on issues of free exercise of religion, religious discrimination, and religious accommodation; conducting personal growth retreats and marriage preparation

2

workshops; and providing pastoral care to immigrants, detainees, and prisoners of war.  To that end, the Chaplain Corps operates pursuant to an unofficial motto of "cooperation without compromise."  This means that Chaplain Corps officers are expected to support, directly and indirectly, the religious needs of all Sea Service personnel, their families and other authorized personnel.  No chaplain is forced to minister beyond, or out of accordance with, the tenants of his or her religious organization.  However, a chaplain is expected to facilitate where he or she cannot minister to ensure that the religious needs of all authorized personnel are accommodated. Facilitation may entail referral to another Navy or military chaplain or the use of civilian clergy and lay leaders.

3.  The approximately 900 commissioned officers in the Navy Chaplain Corps are assigned and distributed to hundreds of duty stations across the United States and around the world.  Sea Service personnel and their families come from a myriad of religious and/or faith backgrounds.  Therefore, the Navy does not structure its Chaplain Corps based on proportional representation.  Managing the Chaplain Corps using proportional representation of self-identified religious preferences is problematic for a number of reasons.  First, historically almost 30 percent of personnel do not indicate a religious preference

3



or, identify a specific faith group cluster at enlistment other than Protestant or Christian.  There is, of course, no such religious organization called "no religious preference," nor can a specific religious organization be definitively identified for such a broad self-definition as "Protestant" or "Christian." Such identifications, however, do not mean that individuals of these religious preferences have no religious needs or do not deserve to freely exercise their religious rights.  While they may not list or express concern the faith group of their chaplain, they use and benefit from the various functions and tasks provided by Chaplains Corps officers.  For this reason, the Chaplain Corps stresses the importance of chaplains facilitating for the widest range of religious needs, not just providing for the adherents of their own tradition.

4.  Second, within clergy of these generalized faith group clusters, or even within clergy of more specific religious traditions, there exists a broad spectrum of beliefs and practices. In addition, military personnel and their families who identify themselves as belonging to a particular religious tradition may or may not adhere as rigidly to the specific dogma of their stated religious denomination.  Such disparities in beliefs and practices, both within clergy of particular religious traditions, and by adherents to particular religions,

4

make it impossible to effectuate a perfect match between chaplains of faith group clusters and the needs of sea service personnel and their families.

5.    Third, while it may be easier to identify the needs of adherents to a particular faith group whose dogma is monolithic, it is significantly more challenging to identify the needs of personnel who self-identify as being from one tradition but who practice or worship with another.    For example, a service member may have attended churches of a non-liturgical tradition as a child, and may identify himself at enlistment as a non-liturgical, but find his religious needs met by a liturgical community.    In practice this does occur.

6.    Fourth, although proportional representation might succeed if all personnel were assigned permanently to a single or a limited number of geographic areas, this is not the reality of the sea services.    There are nearly 500 separate geographically dispersed duty assignments in the Navy, Marine Corps, and Coast Guard.    Additionally, the operational forces, who deploy where there are the least available religious support alternatives, are spread over thousands of miles of open-ocean and in countries around the globe.    Without a diverse mix of chaplains for distribution within the Chaplain Corps community, the Navy cannot assign Chaplains of different faith group mixes

5

to these dispersed assignments. Thus, people from numerically inferior religious organizations or faith groups may have their religious needs ignored if a chaplain is only assigned based on majority representation. For example, given a Chaplain Corps of 900, if less than .27 percent of personnel identify themselves as Muslim, proportional representation would require that the Chaplain Corps be composed of only 2 Muslim chaplains. The dispersion of religious needs across the Sea Services would indicate at least a minimum requirement of 10 Muslim chaplains to ensure access to a chaplain of this tradition in every major geographical area. This same logic could be applied to other numerically smaller faith groups, who likewise would consistently be stripped of the ability to have access to a chaplain of their faith tradition simply because they do not form a numerically significant portion of the total force. Strict proportionality does not consider effectively the distribution and dispersion challenges of the Sea Services.

7. Fifth, a large percentage of the functions and tasks required of military chaplains are not limited by a specific faith group tradition. With the exception of leading, conducting, or providing faith group specific services, a large percentage of the required religious ministry tasks are not faith group specific and can be provided by a chaplain from any

6

religious organization. For example, the command advisory function is not limited by a chaplain's faith group, nor are many supervisory roles.  All chaplains are trained and expected to provide these required functions.

8.   Sixth, with a retention rate of over 93 percent, the Chaplain Corps typically accesses and invests in an officer for 20 years.  If the Chaplain Corps were managed by proportional representation, there would be no way to maintain a stable and predictable officer community.  Stability is essential to an effective officer corps. Presently, the Chaplain Corps is managed in the same way and abides by the same rules as every other officer community.  To enforce proportional representation would create a constantly shifting officer community that functions independent from the rest of the officer communities. Chaplains affected by proportional changes could be forced to separate at any point in their career, regardless of demonstrated performance, based on shifting denominational preferences within the total force.  If the Chaplain Corps must continually shift its personnel assets to reflect changing religious demographics, the Corps would constantly be removing chaplains from service who have gained significant expertise and leadership skills.  This in turn would cripple the Corps' ability to maintain experienced officers in its rank structure.

7

9.   Seventh, using proportional faith groups or religious organizations as a primary determining factor in accessions is problematic, when, as has been true of accessions over the last several years, there are shortages of available and qualified clergy willing to sacrifice and commit to the arduous life of Naval service.  Stability is one of the critical recruiting and retention considerations when clergy commit to military service. If proportional representation leads to the kind of career instability described above, there may be further shortages of willing applicants resulting in the inability of the Corps to fulfill its mission.

10.   Furthermore, the Navy Chaplain Corps does not need to employ proportional representation to ensure that the religious needs of its servicemembers are met.  An individual's religious needs are often satisfied by chaplains from a different tradition because they share many of the same basic beliefs and practices.  This is the very essence of our pluralistic military environment, whether that entails providing or facilitating services.  For example, in my 25-year Naval career, I, as a Seventh Day Adventist, have performed only two Seventh Day Adventist services, but I have conducted and participated in innumerable worship services open to Christians from many different backgrounds.  In these services, I have led worship

8

for people who may self-identify as Liturgical Protestants, Non-Liturgical Protestants, or Special Worship groups notwithstanding my purported descriptor as a Special Worship Category chaplain.  Any inference that I cannot perform such divine services, and satisfy a broad range of the spiritual needs of those worshipers in attendance, underestimates my capacity and ability to perform ministerial services.  I believe that such an inference also underestimates the abilities of others of my Corps regardless of their descriptors.

11.  In order to maintain diversity, the Chaplain Corps strives to recruit chaplains of various faith groups.  The Chaplain Corps does not, however, adhere to any quotas. Furthermore, the Chaplain Corps no longer establishes recruiting goals by faith group clusters.  Instead, the Chaplain Corps aims to access only the best qualified applicants regardless of faith group.  To determine if an applicant is the best qualified, when that applicant's package is received by the Chief of Chaplain's Office, a Chaplain Appointment and Recall Eligibility Advisory Group (CARE Advisory Group) meets to consider the package.  See Attachment 2 (Chief of Chaplains Instruction (COCINST) 1110.1G). Prior to becoming the Chief of Chaplains, I sat on several CARE Advisory Groups.  The religious denomination and/or faith group of an applicant was never a factor in the recommendations of

9

those CARE Advisory Groups. As the Chief of Chaplains, I receive recommendations from the CARE Advisory Group regarding which applicants are the best qualified for appointment. I review the recommendation, draft an endorsement, and then forward both recommendations to Commander, Navy Recruiting Command or Chief of Naval Personnel for final approval/disapproval. I have never considered religious denomination and/or faith group in making a final recommendation regarding an applicant for appointment or recall.

12. During my Naval career, I have been a member of approximately 30 Chaplain Corps promotion selection boards. I have also served as a board recorder on two occasions. I have served as a member on promotion selection boards for every pay grade (O-3 through O-7). I have served as the President of several promotion selection boards while serving as the Deputy Chief of Chaplains and the Chief of Chaplains. During my career, I have never called a fellow Chaplain Corps officer, nor have any ever contacted me, to discuss eligible officers prior to the promotion selection boards. I have never walked into a promotion selection board with a preconceived notion about which officers should be selected for promotion by that board. I have served with officers from a wide spectrum of religious

10

denominations and the Chaplain Corps has selected officers from a wide spectrum of religious denominations for promotion.

13.    Members for Chaplain Corps promotion selection boards are assigned by the Bureau of Naval Personnel in Millington, Tennessee.  I have no contact, either formal or informal, with the Bureau of Naval Personnel regarding what Chaplain Corps officers will sit as members of promotion selection boards. Prior to the start of any promotion selection board, I am unaware of the other officers who will sit as board members with me.  I have no prior contact with Chaplain Corps officers who have been selected to sit as board members.

14.    There were a number of years when the opportunity for promotion selection was significantly lower.  This was a direct result of a Congressionally mandated Navy-wide drawdown, which occurred between 1989 and 1998. During this period the Navy was reduced by 37 percent, but the Chaplain Corps only by 22 percent.  Nevertheless, this drawdown eliminated 252 chaplain billets, which was devastating for community management.  The full impact of these reductions can best be understood by an understanding of the following.  Prior to the drawdown, from 1979 to 1987, the Chaplain Corps accessed an average of 102 chaplains per year.  This number is twice as large as current average accessions numbers.  Accessions were increased because

11

the Navy was projected to grow to 600 ships and the Chaplain Corps planned for an end strength of 1300.  Despite these projected billet increases, the implementation of the Defense Officer Personnel Management Act (DOPMA) meant the Chaplain Corps was unable to retain on active duty more than 60 of the approximately 102 chaplains accessed in a given year.  To meet this reduced retention goal, in 1984, the Chaplain Corps required the yearly Indefinite Extension Boards to determine which Lieutenant chaplains would be separated after their initial three year service obligation.  Prior to this point, the Chaplain Corps retained nearly 100 percent of all chaplains who requested indefinite extension.  In the years after 1984, Indefinite Extension Boards could only select between 25 and 40 percent for continuation on active duty (in order to retain no more than 60 of the officers accessed in a given Fiscal Year). The objective of these Indefinite Extension Boards was to retain, at the three year mark, the Lieutenants with the most competitive records, thus making promotion to Lieutenant Commander considerably more competitive.

15.  The manpower drawdown was especially heavy in the early 1990s, not just in terms of the loss of chaplain billets but in terms of which billets were eliminated.  Furthermore, Chaplain Corps billets were not reduced equally in all ranks.

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 24
Page 12 of 24

In the controlled grades of Lieutenant Commander and Commander, the Chaplain Corps was reduced by 10 percent more than the rest of the Navy. In the controlled grade of Captain, the Chaplain Corps lost 6 percent more billets than the rest of the Navy. In other words, the Chaplain Corps now had significantly more officers within controlled grades than authorized after the drawdown. When these controlled grade billets were taken away, the Chaplain Corps was forced to find a means of reducing the numbers of chaplains who once filled those billets. The Chaplain Corps was required to use all authorized force structure management tools so as to meet its new end-strength requirements. These tools included using the Temporary Early Retirement Authorization (TERA), Selective Early Retirement (SER) Boards, and reduction of promotion opportunity. We were forced to reduce promotion opportunity because we were already at the limit of the Department of Defense and Secretary of the Navy flow point guidelines but exceeded our authorized end strength in the Lieutenant Commander and Commander pay grades. Because flow points either reached or exceeded the maximum allowed number of years, the number of officers considered to be in-zone eligible increased to the point that the Chaplain Corps was unable to maintain traditional levels of promotion percentages. Because the number of in-zone eligible officers

13

increased, but the number of officers who could be selected (based on vacancies) remained relatively the same or decreased, the overall number of officers who could be selected decreased dramatically. For example, in Fiscal Year 1993, because a promotion board could only select a certain number of officers, and the promotion zone was very large, this equated to a 70 percent promotion opportunity to Lieutenant Commander. By contrast, the opportunity for promotion to Lieutenant Commander in Fiscal Year 2003 is 85 percent (projected to be 90 percent in Fiscal Year 2004). See Attachment 3 (LCDR Promotion Statistics). Similarly, this same officer selected to Lieutenant Commander in Fiscal Year 1993, and who became eligible for promotion to Commander, faced a 50 percent promotion opportunity. By contrast, the opportunity for promotion to Commander in Fiscal Year 2003 is 65 percent (projected to be 70 percent in Fiscal Year 2004). See Attachment 4 (LCDR Promotion Statistics). Even the use of TERA and SER Boards did not obviate the requirement for lower promotion opportunities. At a 60 percent promotion opportunity, Chaplain Corps officers eligible for promotion to Lieutenant Commander and Commander in Fiscal Years 1998 and 1999 experienced the lowest promotion opportunities in the Navy and in the history of the Chaplains Corps. In short, during the

14

drawdown, promotion selection boards were highly competitive (because most of the weaker records were eliminated at the Indefinite Extension Boards and the promotion opportunity was at a historic low). The Chaplain Corps was unable to select many Chaplain Corps officers who by their demonstrated strong performance might have been promoted in years with higher promotion opportunities. In-zone eligible officers who twice fail to select are statutorily required to leave active duty, unless they can be extended.

Further declarant sayeth not.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed at Arlington, Virginia, this 28th day of March, 2002.

BARRY C. BLACK
RADM, CHC, USN

15



DEPARTMENT OF THE NAVY
OFFICE OF THE SECRETARY
1000 NAVY PENTAGON
WASHINGTON, DC 20350-1000

IN REPLY REFER TO

SECNAVINST 1730.7B
N097
12 October 2000

SECNAV INSTRUCTION 1730.7B

From:  Secretary of the Navy

Subj:  RELIGIOUS MINISTRY SUPPORT WITHIN THE DEPARTMENT OF THE
       NAVY

Ref:   (a) DoD Directive 1304.19 of 18 Sep 93 (NOTAL)
       (b) U.S. Navy Regulations, 1990
       (c) Title 10, United States Code
       (d) DoD Directive 5120.8 of 20 Mar 95 (NOTAL)

1.  Purpose.  To assign responsibilities for religious ministry
support within the Department of the Navy.  This revision should be
reviewed in its entirety.

2.  Cancellation.  SECNAVINST 1730.7A.

3.  Applicability.  This instruction applies to all members of the
Department of the Navy.

4.  Definitions

    a.  Chaplains.  As commissioned officers, Navy chaplains are
professionally qualified clergy of a certifying faith group who
provide for the free exercise of religion for all military members of
the Department of the Navy, their family members, and other authorized
persons, in accordance with reference (a).  Chaplains advise commands
in matters of morale, morals, and spiritual well being.  In accordance
with Article 1063 of reference (b), chaplains shall be detailed or
permitted to perform only such duties as are related to religious
ministry support.  Chaplains shall not bear arms.  Chaplains shall not
be assigned collateral duties which violate the religious practices of
the chaplain's faith group, require services as director, solicitor,
or treasurer of funds other than administrator of a Religious Offering
Fund, serve on a court-martial or stand watches other than that of
duty chaplain.

    b.  Chief of Chaplains.  The Chief of Chaplains in accordance with
Section 5142 of reference (c) is appointed by the President to perform
such duties as described by the Secretary of the Navy and law.  In
this capacity, the Chief of Chaplains serves as the Director of
Religious Ministry Support for the Department of the Navy.  The

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 24
Page 16 of 24                    Attachment 1 to Exhibit 1
                                 (1 of 4)

SECNAVINST 1730.7B
12 October 2000

Chief of Chaplains in accordance with Article 1009 of reference (b) is principal advisor and sponsor on matters concerning Chaplain Corps officers and Religious Program Specialists, and as head of the Chaplain Corps is the primary spokesperson regarding professional matters with the military and civilian communities.

c.   Deputy Chief of Chaplains.  The Deputy Chief of Chaplains as Deputy Director for Religious Ministry Support in the Department of the Navy is detailed by the Secretary of the Navy in accordance with Section 5142a of reference (c) to perform such duties as prescribed by the Secretary of the Navy, and serves as Chaplain of the Marine Corps.

d.   Department of the Navy.  The Naval Organization is organized under the Secretary of the Navy and consists of the following:  The Office of the Secretary of the Navy; the Office of the Chief of Naval Operations; the Headquarters, U.S. Marine Corps; the entire operating forces, including naval aviation, of the Navy and of the Marine Corps, including the reserve components of such forces; all field activities, headquarters, forces, bases, installations, activities and functions under the control or supervision of the Secretary of the Navy; and the U.S. Coast Guard when operating as a part of the Navy under law.

e.   Religious Ministry Support.  The entire spectrum of professional duties, performed by Navy chaplains and Religious Program Specialists, to include providing for or facilitating required religious needs and practices.

f.   Command Religious Program (CRP).  A CRP provides religious ministry support that is planned, programmed, budgeted, and implemented to meet identified religious ministry support requirements.

5.   Policy.  It is Department of the Navy policy that commanding officers shall provide Command Religious Programs (CRPs) in support of the religious needs and preferences for all members of the naval service, eligible family members and other authorized personnel.  The Chief of Chaplains, as the Director of Religious Ministry Support for the Department of the Navy, shall advise the Secretary of the Navy on policy formulation and oversight pertaining to the implementation of religious ministry support, plans, programs, and facilities.

a.   Organizational Placement and Responsibilities

(1) The Chief of Chaplains, as Director of Religious Ministry Support for the Department of the Navy:

SECNAVINST 1730.7B
12 October 2000

(a) Advises the Secretary of the Navy on all matters pertaining to the free exercise of religion within the naval service in accordance with Article 1009 of reference (b) and Section 5142 of reference (c). The Chief of Chaplains shall provide regular and frequent advice on:

<u>1</u>. Religious, ethical and moral implications of all Department of the Navy policies and actions.

<u>2</u>. Religious faith-group policies and positions affecting the Department of the Navy.

<u>3</u>. All matters pertaining to the organization and utilization of the Chaplain Corps as a staff corps of the Navy.

<u>4</u>. All matters pertaining to the organization and utilization of Religious Program Specialists.

(b) The Chief of Chaplains serves on the Armed Forces Chaplains Board (AFCB) in accordance with reference (d). As a member of the AFCB, the Chief of Chaplains represents the Secretary of the Navy to:

<u>1</u>. Department of Defense (DoD).

<u>2</u>. Chiefs of Chaplains/Chaplain Services of other DoD components.

<u>3.</u> 3. The Nation's religious faith groups.

(c) Advises the Commandant of the Marine Corps on religious ministry matters in reference to support, plans, programs, policy, personnel and facilities.

(d) Advises the Commandant of the Coast Guard on religious ministry matters relative to the use of Navy Chaplains in the Coast Guard.

(2) The Deputy Chief of Chaplains is the principal assistant to the Chief of Chaplains. He shall also serve as Chaplain of the Marine Corps, supervising religious ministry in the Marine Corps; and in accordance with reference (d) serve as a member of the AFCB.

(3) The Chief of Chaplains, as senior Chaplain in the Navy, advises the Chief of Naval Operations on all matters pertaining to the free exercise of religion within the Navy and assists the Chief of Naval Operations in carrying out his responsibilities in accordance with Article 1009 of reference (b) and Sections 5031 and 5032 of reference (c). In this capacity, the Chief of Chaplains:

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 24                (3 of 4)
Page 18 of 24

Attachment 1 to Exhibit 1

SECNAVINST 1730.7B
12 October 2000

(a) Directs officers of the Chaplain Corps, Religious Program Specialists and all other designated persons engaged in Religious Ministry Support within the Navy, the U.S. Marine Corps, and other governmental agencies receiving religious ministry support from Navy chaplains.

(b) Serves as program sponsor for the professional development, education and training of Chaplain Corps officers and Religious Program Specialists.

(c) Serves as program sponsor for the Chaplains Religious Enrichment Development Operation (CREDO).

(d) Provides technical sponsorship for the acquisition, operation, and maintenance of religious ministry support facilities, collateral equipment and other logistical support both ashore and afloat.

(4) The Chief of Chaplains shall, with respect to all duties pertaining to the procurement, distribution and support of Chaplain Corps personnel, report to and be supported by the Chief of Naval Personnel in accordance with Section 5142 of reference (c).

6. <u>Responsibilities</u>

a. The <u>Chief of Naval Operations</u> (CNO) shall exercise oversight to ensure compliance with this instruction and shall implement the policy in this instruction throughout the Navy. CNO shall initiate action with the Commandant of the U.S. Coast Guard and the Administrator of the Maritime Administration to implement this policy when using Navy Chaplains to provide religious ministry support.

b. The <u>Commandant of the Marine Corps</u> (CMC) shall issue orders to implement this instruction throughout the Marine Corps.

7. <u>Action</u>. CNO and CMC shall forward implementing instructions to CNO (N097).

Richard Danzig

Distribution:
SNDL A1 (SECNAV)
 A2 (Department of the Navy Staff Offices)
 A3 (CNO)
 A5 (CHNAVPERS)
 A6 (CMC)
 B5 (COGUARD)(Commandant only)



# DEPARTMENT OF THE NAVY
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
2000 NAVY PENTAGON
WASHINGTON, D.C. 20350-2000

IN REPLY REFER TO

COCINST 1110.1G
DEC 2 2 1997

### CHIEF OF CHAPLAINS INSTRUCTION 1110.1G

From:   Chief of Chaplains

Subj:   CHAPLAIN APPOINTMENT AND RECALL ELIGIBILITY ADVISORY
        GROUP

Ref:    (a) SECNAVINST 1120.4A

1. <u>Purpose</u>.  To establish the Chaplain Appointment and
Recall Eligibility (CARE) Advisory Group and define its
membership, responsibilities and procedures.

2. <u>Cancellation</u>.  COCINST 1110.1F.

3. <u>Background</u>.  Per reference (a), the Chief of Chaplains
validates the professional qualifications of all applicants
for appointment in the Chaplain Corps, the Chaplain
Candidate Program Officer (CCPO) program, and transfers
between active and inactive duty.  This includes applicants
for direct appointment to active duty, direct appointment to
inactive duty in the Naval Reserve, voluntary recall from
the inactive Naval Reserve to the active-duty list,
interservice transfers, and superseding applications from
CCPOs to active or inactive duty.  Once an applicant's
professional qualifications are validated, the Chief of
Chaplains forwards the application package to Commander,
Navy Recruiting Command, or Chief of Naval Personnel, with a
recommendation for the applicant's final selection.  The
CARE Advisory Group assists the Chief of Chaplains in these
processes.

4.   <u>Membership</u>

     Senior Member:  Deputy Chief of Chaplains (N097B)

     Members:        Executive Assistant (N1G)

                     Director, Plans, Programs and
                             Professional Development
                             (N971)

                     Director, Manpower, Facilities and
                             Policy Division (N972)

                     Director, Distribution and Placement
                             Division (N973)

1

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 24
Page 20 of 24
Attachment 2 to Exhibit 1
(1 of 3)

CCOCINST 1110..1G

> Director, Reserve Affairs Division
> (N097R)
>
> The Chief of Chaplains shall appoint two additional voting members to ensure maximal knowledge of faith groups, women and minorities in the CARE Advisory Group.

Briefer/Recorder:  Head Community Management Branch
(N972T)

5.  Responsibilities.  Per reference (a), the CARE Advisory Group shall examine each direct, superseding, recall or interservice transfer application and each Regular chaplain officer discharged from active duty who requests a Naval Reserve appointment.  The CARE Advisory Group will review each applicant's record giving particular consideration to the following:  ecclesiastical endorsement (or ecclesiastical approval for CCPO applicants), academic performance, graduate theological education, professional ministry experience, professional reputation and deportment, interview results and letters of personal or professional recommendation.

Specific responsibilities:

   a.  Senior member.  Call and chair CARE Advisory Group meetings as required and submit written reports to the Chief of Chaplains.  These reports shall recommend/not recommend appointment or recall of applicants based on the needs of the Navy, current accessions plan and professional qualifications.

   b.  N097R.  Provide, as requested, statistics and data on the faith group composition of the Naval Reserve chaplain community and CCPO officers.

   c.  Briefer/Recorder

      (1) Receive applications from CNRC and prepare a summary of the applications.

      (2) Ensure applicants' records are complete and ready for brief.

      (3) Inform Chaplain Program Manager (316A) of any missing data.

      (4)  Determine entry grade credit per reference (a).

2

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 24
Page 21 of 24

Attachment 2 to Exhibit 1
(2 of 3)

COCINST 1110.1G

(5) Inform the senior member of applications pending and schedule advisory group meetings as directed.

(6) Reserve the Conference Room for CARE Advisory Group meetings.

(7) Schedule personnel other than group members to brief the CARE Advisory Group as required.

(8) Provide, as requested, statistics and data on faith group composition of the Chaplain Corps active duty component.

(9) Deliver the briefing to the CARE Advisory Group.

(10) Record the vote.

(11) Prepare and submit a written report of the CARE Advisory Group's recommendations for the senior member's signature. This report will ultimately be given to the Chief of Chaplains for approval/disapproval.

6. _Procedures_.

a. _Quorum_. At least three members must be present to constitute a quorum. Recommendations shall be based on no less than a majority vote of the members present.

b. _Closed sessions_. CARE Advisory Group meetings are closed. No member shall discuss deliberations or recommendations outside CARE Advisory Group meetings.

A. B. HOLDERBY, JR.
Chief of Chaplains, Acting

Distribution:
CARE Advisory Group members

3

# 410X Promotion to LCDR

| | Promotion % | Flow Points | Compensation |
|---|---|---|---|
| FY91 | 80% | 10.11 | 30 |
| FY92 | 70% | 11 | 36 |
| FY93 | 70% | 11 | 32 |
| FY94 | 70% | 10.09 | 39 |
| FY95 | 70% | 10.04 | 39 |
| FY96 | 70% | 10.11 | 35 |
| FY97 | 70% | 11.04 | 35 |
| FY98 | 60% | 11.07 | 40 |
| FY99 | 60% | 11.08 | 26 |
| FY00 | 65% | 11.05 | 23 |
| FY01 | 70% | 11.04 | 23 |
| FY02 | 75% | 10.11 | 23 |

# 410X Promotion to CDR

|      | Promotion % | Flow Points | Compensation |
|------|-------------|-------------|--------------|
| FY91 | 70%         | 15.03       | 0            |
| FY92 | 70%         | 15          | 0            |
| FY93 | 70%         | 15          | 13           |
| FY94 | 65%         | 15.05       | 15           |
| FY95 | 65%         | 15.11       | 11           |
| FY96 | 60%         | 16.04       | 15           |
| FY97 | 60%         | 16.01       | 15           |
| FY98 | 50%         | 17.04       | 15           |
| FY99 | 50%         | 17.08       | 9            |
| FY00 | 50%         | 17.07       | 9            |
| FY01 | 55%         | 17.04       | 13           |
| FY02 | 60%         | 16.11       | 12           |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHAPLAINCY OF FULL GOSPEL CHURCHES, et al., | ) ) ) ) |
| v. | ) ) Case No. 1: 99CV002945 (RMU) |
| THE HON. DONALD C. WINTERS, et al. | ) ) **Consolidated with** |
| ROBERT H. ADAIR, et al., | ) ) ) |
| v. | ) ) Case No. 1: 00CV00566 (RMU) |
| THE HON. DONALD C. WINTERS, et al. | ) ) ) |

**DECLARATION OF CAPTAIN STEPHEN B. ROCK, UNITED STATES NAVY**

Pursuant to 28 U.S.C. § 1746, I, Stephen B. Rock, declare as follows:

1.  I am a Captain on active duty in the United States Navy Chaplain Corps. I currently serve as the Command Chaplain of the United States Coast Guard Academy. I have served in this position since June, 2003. I have been an active duty chaplain in the United States Navy for more than 20 years. Prior to my current job, I served as the Command Chaplain of NSA Naples Italy, Base Chaplain of Marine Corps Bases Japan, Command Chaplain of USS THEODORE ROOSEVELT (CVN 71), Chaplain Detailer for Naval Personnel Command, Command Chaplain at Naval Air Station Sigonella, Chaplain at Camp Lejeune Marine Corps Base,

Chaplain of USS LONG BEACH (CGN 9), and Chaplain at 3rd Force Service Support Group, Fleet Marine Force, Okinawa.

2.  While serving as the Head of the Chaplain Assignment and Placement Branch, Naval Personnel Command, Washington, DC from May 1994 to May 1996, my primary responsibility was the assignment and placement of over 1000 chaplains.

3.  The Secretary of the Navy has delegated to the Chief of Naval Operations (CNO) the responsibility for composing and conducting selection boards.  The CNO has in turn delegated this responsibility to the Chief of Naval Personnel (CNP).  When I served as detailer, I was assigned to the Bureau of Personnel, which reports to the CNP.  I did not report to the Chief of Chaplains, though my desk was within work-spaces maintained by the Chief of Chaplains office.  As part of my duties, I was tasked with finding qualified and available chaplains to be considered by the Chief of Naval Personnel (CNP) as potential nominees for sitting as members on statutory selection boards, including promotion boards and Selective Early Retirement (SER) boards.  Once I had composed an appropriate group of qualified and available chaplains, I would forward the list through the BUPERS chain of command to the CNP.  CNP would then forward an approved list of board nominees to the Secretary of the Navy for

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 25
Page 2 of 16

final approval.

4.    Secretary of the Navy (SECNAV) Instruction 1401.3 was the
governing instruction on nominating promotion and selective
early retirement board members during my assignment to the Navy
Bureau of Personnel. SECNAV Instruction 1401.3, paragraph 4(a),
included guidance stating that board members should be selected
from a wide range of leadership positions and reflect the
composition of the officer corps.  Paragraph 5 of the
Instruction states that the guidance on selection board
representation in this instruction could not to be used to
sponsor any single interest, but rather that it was to be used
to enhance the knowledge, experience and understanding of each
board as a whole.  The guidance of SECNAV Instruction 1401.3,
paragraph 5 applies to all communities within the Department of
the Navy, not just the Chaplain Corps.

5.    This instruction required me to propose selection board
nominees who collectively had a wide range of knowledge and
experience, which represented, to the extent possible, the
different experiences of the many chaplains within the Chaplain
Corps.  This guidance helped ensure the collective board, as a
whole, had a range of knowledge and experience that would
properly allow them to consider the accomplishments and records

of east-coast chaplains, west-coast chaplains, Navy chaplains, Marine Corps chaplains, Coast Guard chaplains, and chaplains from each faith group category.

6.   The primary tool used by selection board members for evaluating Chaplain Corps officers is the fitness report submitted by each of the chaplains' commanding officers.  These fitness reports contain the commanding officers' evaluations of a chaplain's performance and accomplishments in carrying out his or her assigned duties.  The SECNAV instruction requirements recognized that any board's ability to evaluate accomplishments and fitness reports would be enhanced by assembling a group with as much knowledge and diverse experience as possible.  A board composed this way would have an easier time evaluating the many types of chaplain corps duty, such as assignments to various geographic regions or military services (Marine, Coast Guard, or Navy), assignment to sea or land-based units and installations, or the unique experiences of chaplains from different Faith Group Categories.  Although the Navy knows and expects that any of its selection board members can adequately evaluate a fitness report, the presence of board members who understood a particular type of chaplain experience meant that a diverse group of board members could help each other evaluate and explain those experiences and career histories if necessary,

1: 00CV00566 (RMU)

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 25
Page 4 of 16

further enhancing the board's deliberations.  This would maximize the ability of a board to deliberate, evaluate, and understand the experiences of chaplains who the board members were considering.  I also believe that the requirements helped dispel any potential appearance of bias or impropriety.  The result of following SECNAV Instruction 1401.3 was that board composition would reflect, as much as possible, the differing experiences of the entire candidate pool considered by the board. It was important, therefore, that a selection board, as a whole, had the requisite knowledge needed to properly assess the actions and accomplishments of the chaplains considered by the board. By complying with these instructions, I did my best to recommend potential members of selection boards who, as a whole, reflected the composition of the Chaplain Corps.

7.    It is my understanding that the Navy interpreted Paragraphs 4(a) and 5 as not supporting or condoning the random selection of members without regard to their background, experience, and knowledge. My practice of compiling the list of potential selection board nominees complied with the SECNAV instruction. The instruction's guidance on assembling members with a wide range of knowledge and experience among them, and statutory guidance requiring reserve personnel on some boards, and the ability given limited resources to bring chaplains from their

stations to the location of the board meeting, made it necessary for me to carefully consider the mix of selection board nominees I was to propose. In doing so, I had to ensure the composition of the corps was reflected to the extent possible, that no chaplain was ever excluded from consideration because of religious affiliation, that I followed governing statutes regarding board composition requirements, that I complied with all applicable SECNAV Instructions and guidance, and that the my recommendations never promoted any individual interest. I chose a diverse group from those qualified and available to serve as board members with to comply with the Secretary's instruction to enhance the knowledge, experience, and understanding of the board as a whole.

8.    To the extent possible, I regularly recommended a mix of qualified and available chaplains from the different Faith Group Categories - liturgical Protestant, non-liturgical Protestant, and Roman Catholic. The availability of qualified chaplains from denominations within the Special Worship Faith Group Category was usually limited; however, they were never excluded from consideration because of their religious affiliation. Where the candidate pool included chaplains from any Special Worship category, I made an effort to locate qualified and available board members from that specific denomination who

could augment the collective knowledge and experience of the board. That was not always possible. Also, where women or minority chaplains were in the pool of those considered, I tried to recommend board members who were women or minorities if any were qualified and available. Although my recommendations took into account the pool of chaplains before the board, I never excluded any women, minorities, or members of any denomination or faith group category from consideration, nor was I ever instructed to so. I also tried to recommend chaplains from different geographic regions, with particular emphasis on having a variety of chaplains from commands in the western United States as well as commands in the eastern half of the United States, referred to as "west coast" and "east coast" chaplains. To the extent possible, I also tried to recommend chaplains with a variety of assignment experiences, such as those attached to operational Navy ships, those on land-based assignments, as well as those assigned to units with the Marines, Coast Guard, and Naval Construction Battalions. By statute, I was also required to include a reservist where reservist chaplains were in the pool of those considered. My proposed board nominees were never intended to represent any given group, nor to favor any single interest, but were to provide each board with a broad knowledge of the types of experiences, that may be reflected in the fitness reports of the chaplains the board would evaluate.

9.    SECNAVINST 1401.3, paragraph 4(a), prohibits the Chief of
Naval Operations (CNO) from excluding anyone from consideration
as a selection board member due to their gender, race, ethnic
origin, or religious affiliation.  This prohibition on
exclusionary practices applies to all communities within the
Department of the Navy.  The Chief of Naval Personnel (CNP) is
delegated the responsibility for composing and conducting
selection boards by the CNO, and is subject to the same rules
and instructions. During my tour as chaplain detailer, every
chaplain who was qualified and available to serve on a board
received due consideration regardless of religious affiliation.
No potential nominee was ever excluded during my tenure based on
religious affiliation, gender, or ethnic origin.  No qualified
and available chaplain was ever excluded because he or she
didn't share the same religious affiliation as the chaplains
under consideration, nor were any excluded to further any single
interest.  The SECNAV instruction prohibits exclusionary
practices and prevented the CNO from excluding anyone from board
nomination solely due to their religious background.  The
instruction as a whole, however, does not prevent the inclusion
of members from different Faith Group Categories, especially
when that was necessary to comply with the other parts of the
instruction, such as paragraphs 4(a) and 5.

1: 00CV00566 (RMU)

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 25
Page 8 of 16

10.  I am familiar with paragraph 1(c)(1)(e) of Enclosure 1 to SECNAVINST 1401.3, which says "Chaplain Corps board members shall be nominated without regard to religious affiliation."  To my knowledge, the CNP, whose authority to conduct selection boards is delegated by the CNO, has never interpreted this enclosure in a way that would make it inconsistent with the other parts of SECNAV Instruction 1401.3.  In response to the language of the enclosure, which both reemphasized the non-exclusionary policy and mandated that the final list of nominees be forwarded to the Secretary without reference to religious affiliations, I ensured that chaplains considered for potential board membership were never excluded because of their religious affiliation, and that any consideration of faith group mix was aimed only at enhancing the board's knowledge.  In addition, it is my understanding that the CNP did not forward the list of final board member nominees to the Secretary of the Navy with any reference to their religious affiliations.  Neither the SECNAV instruction nor enclosure (1) precludes the CNP from the necessary and practical consideration of religious Faith Group Categories to ensure that the board was composed in accordance with SECNAVINST 1401.3 paragraphs 4(a) and 5, which required that chaplain board members be selected from "a wide range of leadership positions and reflect the composition of the officer corps" and to "enhance the knowledge, experience, and

understanding of each board as a whole." Furthermore, my job was to propose potential board members without excluding anyone from consideration. In addition to my recommendations as a detailer, it is my understanding that the CNP also considered other outside factors such as geographic distance, operational requirements, and budgetary constraints in determining whether a chaplain should be ordered to travel for service as a board member. It is my understanding that the CNP then sent his list of nominees to the Secretary. The Secretary had final say on whether nominees for board membership would be accepted. Each list of the potential nominees I generated was very inclusive and resulted in a diverse group of chaplains who could collectively perform their duties as a selection board in an informed and professional manner. No racial, gender, ethnic, or religious groups were ever excluded from consideration. For my part, I considered all qualified and available chaplains. Since no religious denominations were excluded from consideration, my suggestions to the CNP were not exclusionary. In addition, it is my understanding that the nominations made by the CNP to the Secretary were made without regard to religious affiliation, thus it could not be a factor in whether the Secretary approved or disapproved the list.

11. At no time during my tenure as Chaplain Corps detailer was

1: 00CV00566 (RMU)

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 25
Page 10 of 16

a Roman Catholic chaplain unavailable to participate as a
selection board member.  I am not aware of any written or
unwritten policy requiring me to recommend a Roman Catholic
board member.  Had a Roman Catholic chaplain been unavailable,
the selection board would have been convened with another
chaplain who added to the collective knowledge of the board.  In
my experience, the numbers of chaplains on Active Duty have a
direct correlation to the likelihood that someone from their
faith background might be qualified and available to serve as a
selection board member.  At one time, I recall that the Navy
had almost 300 Catholic chaplains. Currently, I believe there
are approximately 135 on active duty.

12.  During my tour as a Chaplain Corps detailer, I recall
showing the list of potential selection board nominees to the
Chief of Chaplains for feedback on the diversity of the group
before submission of the recommended list to the CNP. I did not
report to the Chief of Chaplains office while assigned as a
detailer.  I recall being instructed by Rear Admiral Muchow, the
Chief of Chaplains at the time, that I could show him the list
of potential nominees only when he was not scheduled to be the
President of the particular board I was inquiring about.  While
I served as the detailer, neither the Chief of Chaplains nor the
Deputy Chief of Chaplains was ever involved in the selection of

a specific board member or nominee. I was never informed that my proposed nominees weren't acceptable because of their religious preferences or the faith-group mix. If there was ever any discussion with the Chief of Chaplains regarding board composition, it was only to ensure that the recommended board members were from the mix of experiences detailed above, in order to comply with SECNAVINST 1401.3 paragraphs 4(a) and 5, and to ensure the board did not appear to be severely limited in its knowledge and experience.

13.  As a Chaplain detailer, it was my duty to provide commanding officers with chaplains for their command religious programs. I often referred to my duties as providing commanding officers with a "toolbox," the toolbox being the chaplains necessary to provide for as many of the command's religious needs as possible given limited Navy resources. Where a command had more than one chaplain billet, this meant providing a mix of chaplains from different Faith Group Categories, so that such commands would be better able to meet the religious needs encompassed by each category. For example, while I served as the Command Chaplain at the Naval Support Activity in Naples, Italy, as many as 6 chaplains from the non-liturgical Protestant, Liturgical Protestant, Roman Catholic, and Special Worship Faith Group Categories were assigned to the command

1: 00CV00566 (RMU)

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 25
Page 12 of 16

religious program.  This enabled me, as the command chaplain, to provide the commanding officer with a religious program that met the needs of personnel with non-liturgical Protestant, Liturgical Protestant, Roman Catholic, and other religious needs.  If a command did not have enough chaplain billets to have a full "toolbox", or mix of chaplains, it was my job as detailer to make sure that other commands in the area had a mix of chaplains to assist that command in meeting the needs of service members and families from other Faith Group Categories. For example, an officer assigned as the only chaplain for a Marine battalion would be able to facilitate meeting the needs of Marines from other Faith Group Categories because I, as the detailer, would ensure that another command or battalion nearby was detailed a chaplain from a different faith group category. Because I was able to effectively manage chaplain placement with Faith Group Categories in mind, even a lone chaplain assigned to a large unit could rely upon the many other chaplains I assigned to other command religious programs in the area for assistance in facilitating the religious and spiritual needs of personnel.

14.  The Navy developed its Faith Group Categories based upon similarities between the practices, beliefs, historical traditions, and ability to meet certain religious needs of the various denominational preferences held by service members.  The

Faith Group Categories were developed to promote maximum logistical effectiveness in utilizing a limited pool of available chaplains to meet the religious and spiritual needs of the Navy, Marine Corps, and Coast Guard.  Of the four Faith Group Categories, the Special Worship Category is different because, among other reasons, the religious needs addressed by these denominations do not readily fit into the other Faith Group Categories. However, due to the small numbers of available chaplains in each of those denominations, we have placed them in a single Faith Group Category because they all share similar logistical management constraints.  From my experience as a detailer, chaplains from the Non-Liturgical Protestant faith group category are generally able to meet the needs for those who belong to the denominations within that category.  In addition, chaplains from the Liturgical Protestant Category are also generally able to meet the needs of service members who belong to denominations within that faith group category.  Roman Catholic service members have specific religious needs, such as worship requirements and sacramental ministry, which must be met by priests within the Roman Catholic faith group category.  In my experience, meeting the needs of service members from Special Worship category denominations often posed unique challenges because they have specific needs that cannot be met by chaplains of other faith groups, and because the Navy does not have enough

1: 00CV00566 (RMU)

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 25
Page 14 of 16

Chaplains of their denomination to provide coverage at all locations. As detailers, our solution was to utilize chaplains from Special Worship categories in regions. Though they may be detailed to a particular command, it is expected that Jewish chaplains, for example, would be available to other units if needed by service members assigned to them.

15. As a chaplain detailer, it was also important to have access to chaplains from a broad range of Faith Group Categories across all ranks. Many billets have minimum rank requirements based on the need for experienced officers to hold that position. Commands with multiple chaplains assigned need a mix of chaplains from different ranks to maintain military order and discipline within the command religious program, and to accommodate for tasking that requires different levels of military and managerial experience and knowledge. When I provided an appropriate "toolbox" to a command religious program, I had to provide a "toolbox" with different levels of rank. A large command needs more than just a mix of chaplains from different Faith Group Categories because commands also have billet requirements for officers with different levels of military knowledge and managerial experience. As with all officer communities in the Navy, chaplain job positions, called billets, have requirements contingent upon rank. As such, I had

to have access to a mix of chaplains from a broad range of Faith Group Categories at every rank. For example, a large command religious program cannot effectively operate with only new Lieutenants, nor is it be wise to staff one single command with only senior Captains. Though it was important for me to maintain the faith group mix of a command by attempting to assign a replacement chaplain from the same faith group category as the departing chaplain, I also had to maintain the proper number of officers at each rank, as required by the billet descriptions.

Further declarent sayeth not.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed this ___ ᒥᒍ___ day of May, 2006.

_____

STEPHEN B. ROCK
CAPT, CHC, USN

1: 00CV00566 (RMU)

Defs.' Opposition to Pls.' Renewed
Motion for Preliminary Injunction
Ex. 25
Page 16 of 16

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: | : |
| NAVY CHAPLAINCY | : |
| | :    Misc. Action No. 07mc269 (RMU) |
| | : |
| | : |

## DECLARATION OF CAPT STEPHEN T. GRAGG, CHC, USN

Pursuant to 28 U.S.C. §1746, I, CAPT Stephen T. Gragg, CHC, USN, declare as follows:

1.    I am the Executive Assistant to the Chief of Navy Chaplains. I am responsible for the Programming, Planning, Management, and Program Oversight for the Chief of Navy Chaplains Office.

2.    As a result of this litigation, I was asked by defendants to update certain information related to chaplains retained on active duty past age 62. I reviewed the information contained in Veronica Berto's Declaration dated March 9, 2007, and her Supplemental Declaration dated May 1, 2007. Defendants requested that I determine whether the information she provided about chaplains who were retained on active duty despite having reached age 62 has changed since Ms. Berto's declarations were signed. Based on my review of Ms. Berto's prior declarations and relevant records on file in the Chief of Navy Chaplains' Office, I provide the following updated information:

3.    Since Ms. Berto's March and May 2007 declarations, CAPT Lewis E. Brown and CDR Anthony M. Trapani have retired and are no longer on active duty. With these changes, the following chaplains are retained on active duty despite having reached 62 years of age as of the date of this declaration:

| Name | Rank | Designator | Age | Faith Group | Retirement Eligible |
|------|------|-----------|-----|-------------|---------------------|
| Pugliese, Frank A. | CAPT | 4100 | 64 | Roman Catholic | 2007 |
| Petruska, William M. | CAPT | 4100 | 64 | Roman Catholic | 2004 |
| Holcomb, Norman D., Jr. | CAPT | 4100 | 63 | United Methodist | 2001 |
| McCormack, Patrick J. | CDR | 4100 | 65 | Roman Catholic | 2010 |
| Scordo, Joseph A. | CDR | 4100 | 65 | Roman Catholic | 2008 |
| Kaprow, Maurice S. | CDR | 4100 | 63 | Jewish | 2010 |
| Berchmanz, Antony | LCDR | 4100 | 65 | Roman Catholic | 2015 |
| Moss, Donald R. | LCDR | 4100 | 65 | Roman Catholic | 2010 |
| Erestain, Alfonso E. | LCDR | 4109 | 70 | Roman Catholic | 2008 |
| Dsouza, Matthew F. | LT | 4109 | 72 | Roman Catholic | 2009 |
| Mulkerin, Terrence J. | LT | 4109 | 71 | Roman Catholic | 2008 |
| Walsh, Francis E. | LT | 4109 | 70 | Roman Catholic | 2009 |
| Welch, Bernard J. | LT | 4109 | 73 | Roman Catholic | 2006 |
| Finley, James F. | LT | 4109 | 70 | Roman Catholic | 2011 |

4.    Since Ms. Berto's March and May 2007 declarations, LCDR Berchmanz was selected for promotion to Commander. His promotion will not take effect until after October 1, 2007.

5.    In paragraph 3 of Ms. Berto's March 2007 Declaration, she stated that LCDR Donald R. Moss has failed to promote to Commander three times. Since then, he has failed to promote again, raising the total number of times he has failed to promote to Commander to four.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Arlington, Virginia, this 25th day of July, 2007.

CAPT Stephen T. Gragg, CHC, USN

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

IN RE:                                          :
NAVY CHAPLAINCY                                 :
                                                :    Misc. Action No. 07mc269 (RMU)
                                                :
_____ :


**DEFENDANTS' TABLE OF EXHIBITS IN SUPPORT OF THEIR
MEMORANDUM OPPOSING PLAINTIFFS' RENEWED
MOTION FOR A PRELIMINARY INJUNCTION AND ADDRESSING
MANDATE BY COURT OF APPEALS**


Dated: July 25, 2007                    Respectfully submitted,

                                        PETER D. KEISLER
                                        Assistant Attorney General

                                        JEFFREY A. TAYLOR
                                        United States Attorney

                                        VINCENT M. GARVEY
                                        Deputy Branch Director


                                        _____/S/_____
Of Counsel:                             MICHAEL HYDE
Lieutenant Katherine Pasieta            CHRISTOPHER HALL
Lieutenant Sergio Sarkany               DANIEL BENSING
Office of the Judge Advocate General    Trial Attorneys
Department of the Navy                  Federal Programs Branch, Civil Division
Washington Navy Yard, Bldg. 33          U.S. Department of Justice
1322 Patterson Ave., S.E., Suite 3000   P.O. Box 883
Washington, D.C.  30274-5066            20 Massachusetts Ave., N.W., Room 7132
                                        Washington, D.C. 20044
                                        Telephone: (202) 514-2205
                                        Attorneys for Defendants

Exhibit List

| Exhibit Number | Exhibit Description |
|---|---|
| 1. | Copy of Declaration of Veronica Berto |
| 2. | Secretary of the Navy Instruction ("SECNAVINST") 1820.2C |
| 3. | Chief of Naval Operations Instruction ("OPNAVINST") 1820.1 |
| 4. | Copy of Declaration of Samuel Wyvill |
| 5. | Copy of Declaration of Thomas Bush |
| 6. | ALNAV Message dated January 24, 2005 |
| 7. | Pub. L. 103-337 § 377, 108 Stat. 2663, 2737 (1994) (relevant pages) |
| 8. | Pub. L. 104-106 § 1501, 110 Stat. 186, 500 (1996) (relevant pages) |
| 9. | Copy of Supplemental Declaration of Samuel Wyvill |
| 10. | Department of Defense Instruction ("DODI") 1215.06 |
| 11. | DODI 1215.19 |
| 12. | Department of Defense Directive ("DODDIR") 1215.6 |
| 13. | DODDIR 1200.15 |
| 14. | DODI 1352.1 |
| 15. | DODI 1402.1 |
| 16. | Copy of Supplemental Declaration of Veronica Berto |
| 17. | Wilkins v. United States, Case No. 99-1579, slip op. (S.D. Cal. Dec. 16, 2002) |
| 18. | Larsen v. Navy, No. 1:02cv2005, slip op. (D.D.C. April 30, 2007) (Urbina, J.) |
| 19. | Copy of Declaration of Killian Kagle |
| 20. | Deposition of Thomas Carter (cited pages) |
| 21. | SECNAVINST 1120.4A |
| 22. | Deposition of Samuel Wyvill (cited pages) |
| 23. | Copy of Department of Defense, Study of Representation of Religious Faiths in the Armed Forces (relevant pages) |

| Exhibit Number | Exhibit Description |
|---|---|
| 24. | Copy of Declaration of Barry C. Black |
| 25. | Copy of Declaration of Stephen B. Rock |
| 26. | Declaration of Stephen T. Gragg |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

IN RE:                                              :
NAVY CHAPLAINCY                                      :
                                                    :      Misc. Action No. 07mc269 (RMU)
                                                    :
_____:

[proposed] **Order**

Upon consideration of the mandate of the Court of Appeals for the D.C. Circuit [CFGC

docket no. 236] and plaintiffs' renewed motion for a preliminary injunction [docket no. 3], the

parties' briefing thereon, and good cause having been shown, it is

ORDERED that plaintiffs' motion for a preliminary injunction is DENIED.

DONE, this _____ day of _____, 2007.

_____
RICARDO M. URBINA
United States District Judge