# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| IN RE: NAVY CHAPLAINCY | ) | 1: 07-mc-269 (RMU) |
| | ) | |

### PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR A PRELIMINARY INJUNCTION ADDRESSING DEFENDANTS' DENOMINATIONAL PREFERENCE IN RETAINING CATHOLIC CHAPLAINS ON ACTIVE DUTY PAST THEIR STATUTORY SEPARATION AGES FOLLOWING REMAND

Respectfully submitted,

Dated: August 1, 2007

　　/S/ Arthur A. Schulcz, Sr.　　
ARTHUR  A. SCHULCZ, Sr.
D.C. Bar No. 453402
Counsel for *CFGC* and the *Adair* Plaintiffs
2521 Drexel Street
Vienna, VA 22180
703-645-4010

Of Counsel:
Douglas McKusick, Esq.
THE RUTHERFORD INSTITUTE
P.O. Box 7482
Charlottesville, VA 22906-7482

# INDEX

INDEX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION TO REPLY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    DEFENDANTS FAIL TO MEET ANY ESTABLISHED JUDICIAL REVIEW
      STANDARD FOR ALLEGED ESTABLISHMENT CLAUSE VIOLATIONS. . . . . . . . 2

II.   DEFENDANTS' RESPONSE THAT "PLAINTIFFS IMPROPERLY RELY ON
      ALLEGATIONS THAT ARE NOT 'UNDISPUTED FACTS'"MISSTATE AND
      MISREPRESENT PLAINTIFFS' ARGUMENTS AND THE FACTS. . . . . . . . . . . . . . 5

      A.    Plaintiffs Claim Defendants' Special Pension Program Enabling Catholic
            Chaplains To Remain on Active Duty Past Their Statutory Separations Ages to
            Qualify for Pensions Is a Denominational Preference. . . . . . . . . . . . . . . . . . . . . . 5

      B.    Defendants Have Failed to Establish a Shortage of Catholic Chaplains Which
            Impacts the Ability of Catholics to Exercise Their Religion or Justifies
            Defendants Over-Age Catholic Pension Policy. . . . . . . . . . . . . . . . . . . . . . . . . . 7

      C.    The Purpose of Retaining Catholic Chaplains Past Age 62 Is to Enable Them to
            Qualify for Retired Pay. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      D.    Defendants' Argument About Active Duty Is a Red Hearing. . . . . . . . . . . . . . 10

III.  DEFENDANTS ARGUMENT THAT PLAINTIFFS WILL NOT SUCCEED ON THE
      MERITS HAS NO MERIT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      A.    Plaintiffs Have Shown Injury Establishing Article III Standing . . . . . . . . . . . . 10

            1.    Plaintiffs have standing to challenge defendants illegal past retentions. . 12

            2.    Plaintiffs have standing to challenge current retention practices . . . . . . . 13

            3.    Plaintiffs' Motion raises no prudential standing issues. . . . . . . . . . . . . . . 14

      B.    Title 10 does not authorize the Secretary to retain these chaplains on active duty
            past age 62. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

1.    10 U.S.C § 1251(c) does not allow the Secretary to defer the retirement of chaplains who are not eligible to retire at age 62. . . . . . . . . . . . . . . . . . . . 16

2.    The Navy is not authorized to retain on active duty as Retired Reserves chaplains who have not met the DOD definition of retired. . . . . . . . . . . 17

3.    DOD does not authorize the transfer of "the targeted chaplains" to the Retired Reserves for retention on active duty . . . . . . . . . . . . . . . . . . . . . . 19

4.    Retention of chaplains on active duty past age 60 was illegal when plaintiffs brought their Motion in 2003. . . . . . . . . . . . . . . . . . . . . . . . . . 21

IV.    DEFENDANTS FAIL TO SHOW AN INJUNCTION WILL CAUSE UNREASONABLE HARM TO OTHER PARTIES AND NOT SERVE THE PUBLIC INTEREST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

EXHIBIT LIST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## TABLE OF AUTHORITIES

**FEDERAL CASES**

*Abington School District v. Schempp*, 374 U.S. 203 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Adair v. England*, 183 F.Supp.2d 31 (D.D.C. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Adair v. England*, 217 F.Supp.2d 7 (D.D.C. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Anderson v. Laird*, 466 F.2d 283 (D.C. Cir.), *cert denied*, 409 U.S. 1076 (1972). . . . . . . . . . . 24

*Board of Education of Kyrais Joel v. Grumett*, 512 U.S. 687 (1994). . . . . . . . . . . . . . . . . . . 7, 10

*Bonham v. District of Columbia Library Administration*, 989 F.2d 1242 (D.C. Cir. 1993). . . 3, 24

*Center for Auto Safety v. Dole*, 846 F.2d 1532 (D.C. Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . 18

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006). . . . . . . . . 11, 14

*County of Allegheny v. ACLU*, 492 U.S.573 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

*Dilley v. Alexander*, 603 F.2d 919 (D.C. Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Emory v. Secretary of Navy*, 819 F.2d 291 (D.C. Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Goldman v. Weinberger*, 457 U.S. 503 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Katcoff v. Marsh*, 755 F.2d 223 (2d Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 8, 14

*Larson v. Valente,* 456 U.S. 223 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Lemon v. Kurztman, 403 U.S. 602 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Sargisson v. United States*, 913 F.2d 918 (Fed. Cir 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Service v. Dulles*, 354 U.S. 363 (1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*United Christian Scientist v. First Church of Christ Scientist*, 829 F.2d 1152
    (D.C. Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 9

*United States v. Larionoff*, 431 US 864, 872 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-21

*Strickland v. United States*, 69 Fed Cl. 684 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**FEDERAL STATUTES**

10 U.S.C. § 1470. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

10 U.S.C § 1251(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

10 U.S.C. § 10154(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## INTRODUCTION TO REPLY

Plaintiffs challenge defendants' unique Catholic pension program and each of its three component parts: illegal age waivers for Catholic clergy, continuing Catholic chaplains past statutory separation age, and placing them in the Retired Reserve without having met DOD's criteria for Retired Reserve so they may qualify for a military pension. This is a denominational preference on its face open only to Catholics. Defendants' Opposition (the "Opp.") to Plaintiffs' Renewed Motion (the "Mot.") for an Injunction misstates plaintiffs' claims, the facts, and the legal principles and precedents. It is similar to the Court's description of earlier legal disputes: "At times, reading the attorneys' briefs in this case is like attending a debate in which the participants have shown up in two different rooms. While the lawyers have put significant time, energy, and thoughtfulness into their briefs, they sometimes fail to address the other party's key point." *Adair v. England,* 183, F. Supp.2d 31, 57 (D.D.C. 2002). Defendants have avoided the Establishment issues and their burden thereunder; their arguments invite the Court to ignore controlling Circuit precedent.

Defendants' raise three main arguments. First, they argue plaintiffs' facts are merely allegations, Opp. at 5-7. Beginning there and running through their Opp. are a series of consistent misrepresentations as explained below, that mischaracterize plaintiffs claims. Defendants also ignore or misstate the applicable legal standard throughout their argument, inviting the Court to ignore controlling Circuit precedent.

Second, defendants incorrectly argue plaintiffs will not succeed on the merits, *id.* at 7-33. Contrary to the law of the case and well established precedent, they argue plaintiffs have no standing, *id.* at 8-15, and defendants may ignore Title 10 and Department of Defense ("DOD")

1

Instructions ("DODI") and Directives ('DODD") and do other than what DOD has directed, Opp. at 16-33. They then argue they may do what the Constitution forbids, ignoring precedent. *Id.* at 33-42.

Third, without evidence, defendants argue an injunction requiring the Navy to follow the law will injure other parties and would not serve the public interest, *id.* at 42-45.

**I.    DEFENDANTS FAIL TO MEET ANY ESTABLISHED JUDICIAL REVIEW STANDARD FOR ALLEGED ESTABLISHMENT CLAUSE VIOLATIONS**.

Defendants Opposition completely ignores any recognized Establishment Clause test and controlling precedent in this Circuit. Opp. at 33-42. Not satisfied with flouting or ignoring the relevant case law, defendants invite the Court to (1) ignore controlling precedent as to how preferences and Establishment Clause claims are handled in this Circuit, and (2) to reconsider and redefine the law of the case as it applies to plaintiffs' Establishment Clause claims, contrary to Circuit precedent. *Id.* Responding to defendants' arguments throughout their Opposition requires application of the appropriate standard of review and for that reason it is addressed first.

Instead of showing they pass strict scrutiny as required by the law of the case, *Adair v. England,* 217 F.Supp.2d 7, 14-15 (D.D.C. 2002), and Supreme Court precedent, or the tri part test of *Lemon v. Kurztman*, 403 U.S. 602, 612-13, *see* Mot. at 17-28 (citing tests and applicable cases), defendants ask the Court sub silento to reconsider its previous holdings and adopt the deferential standard of a free exercise case, *Goldman v. Weinberger*, 457 U.S. 503 (1986). Opp. at 34. *Adair v. England*, 183 F.Supp.2d 31, 50-52 (D.D.C. 2002) rejected the very argument defendants rely on here, *Goldman's* relaxed standard, establishing the law of the case. There the Court asked the question, "Should Relaxed Strict Scrutiny Apply", *id.* at 50, and rejected

2

defendants' argument that *Goldman* should govern the Court's review, *id.* at 50-52. This Court

found that *Goldman* was a free exercise case "rather than a prohibition on governmental action

that an Establishment Clause claim would raise."

> In sum, while *Goldman* support the proposition that individual service member's
> First Amendment rights to the free exercise of his religion may be limited in
> certain circumstances involving the military, the Court has never expanded this
> rationale to Establishment Clause cases. Barring an explicit directive from the
> Supreme Court or the D.C. Circuit to do so, this Court refuses to take the first step
> down that slippery slope.

*Id.* at 52. *Accord, Adair*, 217 F.Supp.2d at 14-15.

To reject that rationale would be contrary to this Circuit's long-standing Establishment

Clause precedent. As plaintiffs pointed out, Mot. at 14-15, "the Touchstone for evaluating

church state relations under the Establishment Clause, is the test enunciated by the Supreme

Court in *Lemon v. Kurtzman*. 403 U.S. 602 (1971)," *United Christian Scientist v. First Church

of Christ Scientist*, 829 F.2d 1152, 1161 (D.C. Cir. 1987). The D.C. Circuit has further made it

clear there is no *de minimus* exception to the Establishment Clause. *Bonham v. District of

Columbia Library Administration*, 989 F.2d 1242, 1245 (D.C. Cir. 1993) ("To the extent that this

passage [citing a case] suggests a *de minimus* exception to Establishment Clause analysis, it is at

odds with existing authority.") (citing Fourth and Tenth Circuit cases). *Bonham* cited with

approval the Supreme Court holding, "it is no defense to say that the government's action

represents a 'relatively minor encroachment on the First Amendment'", *id.* (citing *Abington

School District v. Schempp*, 374 U.S. 203, 225, (1963)). Despite being on notice of this

Circuit's precedent, defendants fail to show why it should not apply.

Even a casual review of defendants' Opposition shows they have not met their

3

Establishment Claus burden.  In arguing that their old-age Catholic retirement program is constitutional because it has a compelling purpose, Opp. at 6, 33-42, defendants' fail to address any recognized Establishment Clause criteria.  Strict scrutiny assumes the practice is unconstitutional and places the burden on the government to show the practice has both a compelling purpose and a narrowly tailored means.  *Larson v. Valente*, 456 U.S. 223, 245 (1982).  Defendants' alleged justification for the preference,  Opp. at 33-44, completely ignores the latter and never explains or establishes that they have met the former.  They allege they have a compelling purpose, but they neither support it with documentation, explanation or evidence that they have measured the specific faith group requirements of the Department of Navy, let alone Catholics by themselves.  Defendants' unsupported assertion the record shows they *quantify* free exercise needs, Opp. at 36, is contradicted by Navy practice and testimony.

Defendants completely ignore the second part of their strict scrutiny burden, the second and third parts of the *Lemon* test, or the neutral observer test.  *See* Mot. 22-31.  It is apparent they are asking the Court to disregard Circuit and Supreme Court precedent and adopt a new standard unique to the military based on a free exercise case, *i.e.*, its constitutional because we say it is. *See* Opp. at 35, n.15.  Defendants forget that the only Circuit decision to address the chaplaincy, *Katcoff v. Marsh*, 755 F.2d 223 (2d Cir. 1985), verified both the compelling governmental purpose, *id.* at 232, 234, that specific religions were not advanced or hindered, *id.* at 225-26 (accession system is based on national religious demographic); 226 (promotion based on "military performance"); and the Army followed the Establishment Clause's mandate of neutrality, *id.* at 231.  *Katcoff* did not address *Lemon's* third prong to avoid a constitutional conflict.  It noted the provision of the chaplaincy of necessity would appear to entangle the

4

government and religion, *id.* at 232, but to find the chaplaincy violated *Lemon's* third prong would result in the Army violating the Establishment Clause because not providing for soldiers' free exercise rights would be hostile to religion. *Id.* at 232-34. Here, Defendants ask the Court to completely ignore all precedent.

Defendants cannot show their Special Catholic pension program is "narrowly tailored" because the provision of contract clergy and auxiliary chaplains can meet the free exercise needs of Catholics. Defendants have failed to show otherwise by failing to address plaintiffs' argument. *See* Mot. at 20. LCDR Stewart's Declaration, ¶ 4, Exhibit A, describes how the contracting for clergy provision works for the National Naval Medical Center, Bethesda, MD, including meeting Catholic needs. Defendants provide no evidence the same provisions will not address the Catholic needs they claim exist.

Defendants also fail all other Establishment Clause tests because they have failed to address them and meet their burden under Establishment Clause precedent.

## II.    DEFENDANTS' RESPONSE THAT "PLAINTIFFS IMPROPERLY RELY ON ALLEGATIONS THAT ARE NOT 'UNDISPUTED FACTS'"MISSTATE AND MISREPRESENT PLAINTIFFS' ARGUMENTS AND THE FACTS

### A.    Plaintiffs Claim Defendants' Special Pension Program Enabling Catholic Chaplains To Remain on Active Duty Past Their Statutory Separations Ages to Qualify for Pensions Is a Denominational Preference

Defendants mistakenly argue "plaintiffs merely assume that non-liturgical Protestant chaplains have sought but been denied the opportunity to serve past the ages listed by statute." Opp. at 5. This mischaracterizes plaintiffs' claim, see Mot. at 11-13, in an obvious effort to recast an Establishment Clause violation claim as an unsupported equal protection claim rather than a denominational preference. Defendants repeat this false mantra in various forms

5

throughout their brief in support of their various arguments.  For example, they argue "[b]ecause plaintiffs do not argue that they were denied the benefits they challenge, they lack standing to seek injunctive relief."  Opp. at 12; *see also id.* at 13 ( "plaintiffs have not shown any chaplain endorsed by CFGC or AGC ever sought or was denied retention after age 62 such that they would have standing in their own right."); 16 (plaintiffs are not similar "to those whose retention is challenged here"); 30 ("none of the plaintiffs allege that they have sought, much less been denied, transfer to the Retired Reserve.").  This is an attempt to deflect the appropriate legal analysis by misstating the issue and the appropriate legal standard.

Plaintiffs challenge the Navy's treatment of Catholic chaplains in a preferential manner which ensures that they qualify for a pension.  This system has three components: (1) Catholics were accessed beyond SECNAVINST 1120.4A's maximum age limit of 42; Mot. at 11 and Ex .8 (identifying Catholics accessed at age 42 and over); (2) these Catholic, accessed as reservists, were then illegally continued past their statutory separation age; (3) for those who have still not reached the time in service, they are illegally placed in the Retired Reserve and illegally recalled to active duty until they complete the TIS necessary to qualify for a pension. *Id.* at 11-12.

Defendants' arguments completely miss the first part of the system, misstate the law as it applies to the other two components and mischaracterize the underlying legal principles to either deceive or distract the Court.  Plaintiffs do not assume that non-liturgicals sought and were denied the opportunity for extensions past the statutory cutoff or placement into the Retired Reserve prior to being entitled to retired pay.  *See* Opp. at 6.  SECNAVINST 1120.4A 4 ¶6.5 established  the Navy's chaplain accession system with age 40 as the chaplain accession limit with a waiver to the maximum age of 42, *see* Mot. at 7, ¶ 3; 12.   This limit was designed to

6

preclude chaplains from having to be extended past Congress's choice of the optimum age for Reservists and Regulars. This is in accord with the Defense Officer Personnel Management Act of 1980 (DOPMA)'s emphasis on a young, fit and ready Regular active duty force. *See* 1980 U.S. Code Congressional News 6333, 6337-39. Defendants' establishment of a system especially for Catholics flouting Congress's intent is what plaintiffs challenge. This is classic situation of an unconstitutional denominational preference because the benefit flows one way to a single religion. *See Board of Education of Kyrais Joel v. Grumett*, 512 U.S. 687, 704 (1994) ("Here the benefit flows only to a single sect" and violates the Establishment Clause). All clergy cannot enter this special program, only the over-age Catholic chaplains because the system erects an age barrier for all other denominations. It keeps others out and lets Catholics in.

**B.    Defendants Have Failed to Establish a Shortage of Catholic Chaplains Which Impacts the Ability of Catholics to Exercise Their Religion or Justifies Defendants Over-Age Catholic Pension Policy**

Defendants claim the fact that "most chaplains serving over age 62 are Roman Catholic is not the result of denominational preference, but a shortage of certain type of chaplains necessary for the Chaplain Corps' legitimate mission to accommodate religious free exercise in the Navy," Opp. at 6, *see also id.* at 33-42. This ignores three fundamental facts which defendants have yet to dispute. First, defendants do not track religious free exercise needs because they have no system to do so. *See* Mot. at 25. The Chiefs of Chaplains and detailers admitted there is no system that requires commanders to determine or report religious. Without an identification of religious needs there can be no shortage. The fact a command occasionally reports a shortage of a Catholic or Jewish chaplain at a command, *see* Opp. at 36 (citing CAPT Carter), does not establish a Navy shortage, since other commands could have an overage. Defendants make no

7

assertion of a shortage of Jewish rabbis.   CAPT Carter testified he put "a face in a place",Carter Deposition (Exhibit 7) [32:1-4]; he did not address the overall need for any specific religious free exercise needs, it was not his job.  *Id.* [31:15-25].

If defendants were to allege that they have identified the specific requirements for Catholic free exercise (which they have not), the failure to address it for other faith groups, *e.g.,* Pentecostal, Baptist (many of whom reject pentecostal practices), Special Worship by specific faith group (Jewish, Mormon,) etc., and liturgical Protestant, would once again indicate Catholics were singled out for special treatment, a denominational preference on its face as well as a violation of equal treatment.

CAPT Poe's declaration, Mot. Exhibit 6 at ¶¶ 11-14, 21, provides examples of specific religious needs for non-liturgical pentecostals/charismatics and evangelical Protestants at Naples, Italy, and Rota, Spain, two overseas locations with no or limited alternatives available because of language and cultural problems.  The undisputed evidence is the Navy ignored these needs, *id.* at ¶¶ 25-27,  which shows defendants are either "preferential" in terms of which needs are important, or it reinforces the fact defendants do not track religious needs because they have been unimportant, at least until this litigation. Their argument fails to address why they have ignored special needs for non-Catholics even when those needs were specifically identified, *id.*, and yet show an inordinate concern for Catholics.  This is denominational preference.

Second, until this litigation was filed with a few liturgical exceptions, the only chaplains allowed to remain on duty past statutory separation were Catholics.  The only current Protestant, CAPT Holcomb, has already reached retirement age, so he is not being kept on duty to enable him to qualify for retired pay, as is the case of every other chaplain retained past age 62, the

majority of whom are Catholic.

Third, defendants have not addressed the fact the Catholic adherent/clergy ratio in the Navy is one-half that of civilian Catholics. *See* Mot. at 19 and 24 and Exhibit 10. This implies they have twice the opportunity or probability of having their needs met. Defendants neither attempt a refutation nor show the statistics are wrong or the Navy's unique circumstances make the ratios inapplicable. Defendants except their unsupported allegation of a shortage to be accepted by the Court because the Navy says it is so.

### C. The Purpose of Retaining Catholic Chaplains Past Age 62 Is to Enable Them to Qualify for Retired Pay

Defendants argue "plaintiffs present no evidence that the Secretary has ever retained a chaplain on active duty for the sole purpose of allowing that chaplain to obtain a pension." Opp. at 6. Such an assertion flies in the face of the evidence. Every chaplain retained past age 60 when that was the statutory limit, was retained until they reached 20 years time in service (TIS) and then retired. The purpose of the program is evident in the result. The declarations of Ms. Berto, Def. Ex. 16 (Supplemental), and CAPT Gragg (Def. Ex 26), illustrate the point. Ms. Berto, in ¶ 4a (LT Biala) and ¶ 5 (LCDR Erestain) identifies chaplains who were retained when this motion was first filed, but have since left active duty because they reached 20 years TIS and retired. CAPT Gragg, ¶ 3, identifies 2 Catholics over 62 who retired once eligible. Defendants have presented no evidence prior to this renewed motion of Catholic chaplains remaining on active duty who did not need to accumulate the necessary TIS to qualify for a pension. The burden on defendants under any Establishment Clause standard is to show that the practice does not further one denomination or religion in general. *United Christian Scientists*, 829 F.2d at

9

1161.  Here, the establishment of a program to allow over age Catholics (over age when they were commissioned, over age when they were extended, over age when they were illegally placed in the Retired Reserve), relieves the Catholic Church of a substantial financial burden by providing a pension and associated medical benefits for its aged clergy who would otherwise require financial support from their sending dioceses or religious orders.  This benefit flows to one sect.  *See Grumet*, 512 U.S. at 704.

### D.    Defendants' Argument About Active Duty Is a Red Hearing

Defendants mischaracterize plaintiffs' statement "that all chaplain reservists serving over age 60 when plaintiffs brought their original motion were serving on the active duty list", Opp. at 6, is a red herring and misses the point.  All the reservists who were illegally placed in the Retired Reserve had to first be extended on active duty.  As explained in Plaintiffs' Motion at 13, 37, 40-41, this was illegal because no statutory authority allowed for the extension of Reservists on the Active Duty List past the statutory separation age.

## III.    DEFENDANTS ARGUMENT THAT PLAINTIFFS WILL NOT SUCCEED ON THE MERITS HAS NO MERIT

Defendants three arguments why plaintiffs will not succeed on the merits, *id.* at 7-33 are contrary to the law of the case and well established precedent.  They argue first that plaintiffs lack standing, *id.* at 8-15; second, defendant may ignore Title 10 and Department of Defense ("DOD") Instructions ("DODI") and Directives ('DODD") and do other than what DOD has directed, Opp. at 16-33; third, they argue they may do what the Constitution forbids.  *Id.* at 33-42.

### A.    Plaintiffs Have Shown Injury Establishing Article III Standing

Defendants' chant a distinct mantra in arguing that plaintiffs do not have standing,

plaintiffs have not shown "a particularized injury", Opp. at 8, 10, 11, 12. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006), shows their argument is meritless and contrary to this Circuit's precedent. Defendants' argument severs the word "irreparable" from "injury". Defendants' argument about personalized injury is similar to their argument rejected by *CFGC*, *see id.* at 298-99 (discussing "tangible injury" that constitutes irreparable harm). *CFGC* explained that unlike other injuries, harm under the Establishment Clause is caused by the government's invasion of a liberty interest; "the pertinent liberty here is protection against government imposition of a state religion or religious preference." *Id.*

> [T]he Establishment Clause is implicated as soon as the government engages in impermissible action. Where, as here, the charge is one of official preference of one religion over another, such governmental endorsement "sends a message to non-adherents of the favored denomination that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *Lynch v. Donnelly,* 465 U.S. 668, 688 (1984) (O'Connor, J. concurring). This harm, to which [plaintiffs] repeatedly refer throughout their briefs, *see, e.g.,* Appellants' Reply Brief 9 ("here the message is the Navy prefers Catholics."), occurs merely by virtue of the government's purportedly unconstitutional policy or practice establishing a religion .....

*Id.* at 302. Thus, the harm inflicted by defendants' practice is the message the practice communicates. *Id.* This harm "occurs the moment the government [Establishment violation] action takes place" and "First Amendment interests *are* 'threatened or in fact being impaired.'" *Id.* at 303 (emphasis in original) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Plaintiffs claim the defendants' practice violates the Establishment Clause, communicating a message that plaintiffs are second class citizens and Catholics are first class and favored. Mot. at 26, 29-31. The harm produced by a preference is the message. *CFGC,* 454 F.3d at 302-03; *County of Allegheny v. ACLU*, 492 U.S.573, 292-97 (1983). The pracctice makes

11

religion relevant to a chaplain's standing in the community.

Defendants' argument that Associated Gospel Churches (AGC) and CFGC cannot raise these arguments on behalf of their chaplains, Opp. at 13, is contrary to the clear words of precedent and the law of the case established by the Court's 8/17/00 Memorandum at 21, *CFGC* Docket No. 30. The other active duty plaintiffs cited in *Gibson* receive the same unconstitutional message from defendants' practice, specifically that plaintiffs are inferior and second class, while Catholics are entitled to special treatment because of their favored status with the Navy.

### 1.    Plaintiffs have standing to challenge defendants illegal past retentions

Defendants incorrectly argue plaintiffs have no standing to challenge "allegedly improper retention of chaplains in the past." Opp. at 8-10. Plaintiffs challenge a practice that has continually allowed Catholic chaplains to illegally remain on active duty and qualify for pensions. Those chaplains who were illegally retained are still on active duty. Consequently, allowing them to do so is a continuing violation of the Establishment Clause because it clearly communicates a message of preference. For example, CH Erestain was illegally accessed, illegally retained as a passed over LCDR, and illegally placed in the Retired Reserve. He retires at the end of July from Bethesda Naval Medical Center at age 72. LCDR Stewart, a non-liturgical plaintiff in *Gibson*, serves with CH Erestain. *See* Stewart Decl. (Ex. A) at ¶ 4.c. The defendants' message to LCDR Stewart and all other non-liturgicals is that Catholics are preferred and non-liturgicals are second class citizens because they are not in the favored religious tradition. The fact CH Erestain will retire does not end the message because there are other 4109s and others who appear destined to become 4109s, judging by defendants' Exhibit 1 list of Catholics extended on active duty and the dates they become eligible for retired pay.

If defendants allowed Catholic chaplains to illegally remain on active duty in the past, their continuation is also illegal. Defendants point to no Congressional ratification of defendants' past illegal acts.

**2.    Plaintiffs have standing to challenge current retention practices**

Defendants' argue plaintiffs lack standing to challenge current practices for a variety of unsupported reasons. First, defendants argue plaintiffs have not suffered particularized injury, Opp. at 10-11. This is addressed in II.A. *supra*.

Second, defendants argue plaintiffs, including chaplains endorsed by CFGC and AGC, were not "denied the benefits they challenge", *id.* at 12-13. This is also addressed in II.A *supra*. The law of this case remains that CFGC, and by implication AGC, have standing to seek prospective relief on behalf of their members, 8/17/00 Memorandum at 21, *CFGC* Doc. No. 30, who suffer injury because of the message of preference defendants' practice communicates.

Defendants' attempt to justify the disparate treatment of chaplains Belt and Porter-Stewart, Opp. at 12-13. Their argument that Belt and Porter-Stewart were not similarly situated misses the point. The Navy had a shortage of chaplains when it discharged Belt and Porter-Stewart; it chose to retain some chaplains who had failed of selection and discharge others on the basis of denomination. They retained Catholics, who needed retention to qualify for retired pay, and discharged non-Catholics who needed l less TIS to qualify for retired pay. Here, decisions affecting government benefits were made on the basis of religion.

Third, defendants misstate the law and the facts to argue plaintiffs have no standing as taxpayers, Opp. at 13-15. Plaintiffs specifically challenge Congress's provision of funds and the expenditure thereof to support defendants' unconstitutional Catholic pension program. It would

13

be strange, indeed, if the civilian law students who challenged the Army chaplaincy in *Katcoff*

had standing, 755 F.2d at 231, but chaplains directly injured by defendants' denominational

preference and prejudicial practices did not.

### 3.    Plaintiffs' Motion raises no prudential standing issues

Defendants' prudential standing argument, Opp. at 15-16, ignores the very criteria

they cite.  Their argument "no individual rights would be vindicated" or some other litigants are

"best suited to assert a particular claim", *id*. at 15, ignores the reality of the Establishment Clause

rights and injuries which *CFGC*, 454 F.3d at 302-04, clearly explained.  Plaintiffs assert their

individual rights under the Establishment Clause have been violated and there are no others who

are best suited to raise that claim.  Contrary to defendants argument, *see* Opp. at 15-16, plaintiffs

are "properly before the Court", and there is nothing "abstract" or a "generalized grievance"

about plaintiffs' claim which is a particularized constitutional injury for which they are "the

actual proponents of the rights asserted".  In summary, none of the prudential standing arguments

defendants raise apply in this case.

### B.    Title 10 does not authorize the Secretary to retain these chaplains on active duty past age 62

Defendants argument that "Title 10 authorizes the Secretary to retain chaplains on active

duty past age 62", Opp. at 16-33,  fails for two reasons.  First, defendants do not address the

denominational preference resulting from the abuse of statutory authority.  This exercise of

statutory authority has primarily benefitted Catholics.  Defendants have failed to show one non-

liturgical allowed to take advantage of the retired pay qualification program offered Catholics.

Second, defendants failed to adequately address plaintiffs' argument that those chaplains

14

currently designated as 4109 were illegally retained because they were Reservists who failed

selection to the grade of commander. *See* Mot. at 13, 37. Their argument that these chaplains

were excluded from the limitations 10 U.S.C. § 14703 places on the extensions of chaplains who

failed to be selected for commander, rests on their absurd assertion that those limitations only

applied to chaplains on the Reserve Active Status List (RASL) and these chaplains are on active

duty. That is precisely plaintiffs' argument, that being on active duty removed these chaplains

from consideration because the placement of § 14703 and its internal language clearly shows that

it applied only to officers on the RASL. Defendants are trying to have their cake and eat it too.

They argue that § 14703 allows them to extend Reservists while ignoring the limitations on the

very authority upon which they rely. This also ignores the structure of the active forces which

Congress established and envisioned in DOPMA, the active forces would be made up of

Regulars so there would be no need to extend Reservists on active duty. Defendants point to no

provision which allows the extension of reservists on active duty past their statutory separation

age. Rather, defendants ask the Court to sanction a system which Congress never envisioned.

Defendants have failed to show other categories of reservists not eligible for retired pay who

have been allowed to continue on active duty past age 60.

Defendants argument that these Catholic Reservists were authorized to be extended past

age 60 (now 62), despite § 14703's limitations also fails because again it evidences a

denominational preference. Defendants have failed to show that this program is open to other

denominations or that it was necessary to achieve a compelling purpose and it was narrowly

tailored. The availability of alternatives through contract clergy clearly shows this exercise of

statutory authority, even assuming it was legitimate, benefits only one denomination in violation

15

of the Establishment Clause.

        **1.**        **10 U.S.C § 1251(c) does not allow the Secretary to defer the retirement of chaplains who are not eligible to retire at age 62**

        Defendants mix fact and fiction when they argue "[t]he Navy is authorized to retain chaplains from the regular Navy on active duty past age 62." Opp. at 18. The statute clearly allows the Secretary to defer the retirement of regular officers past age 62. The question is what did Congress intend what it used the words "defer the retirement". The defendants argue that "Section 1251 requires that an officer (below the rank In re retinal) reaching age 62 'shall be retired', Opp. at 19 (quoting § 1251(a)), and this "plain language qualifies the officer for retirement" whether the officer is eligible for retired pay or not. *Id.* Defendants then argue the Secretary can continue these chaplains on active duty until they have the necessary TIS to qualify for retired pay. Defer then means continue until eligible for a pension. This is absurd and does not fit with the normal meaning of either "defer" or "retired". *See* Mot. at 38-39. Title 10 establishes criteria for retired pay, *e.g.*, § 1223, and that criteria requires 20 years of active federal service or service connected disability. Neither DOD nor Title 10 provide any authority to "retire" an officer who has not met the statutory criteria. Defendants do not show the application of their absurd "retired" theory to other non-chaplain officers. As plaintiffs have pointed out, every DOD definition of retired is based on either entitlement to retired pay or related to disability. Mot. at 34-36. Defendants have created a category solely for the purpose of benefitting religion, specifically Catholics. This practice fails any Establishment Clause test.

        Defendants argument that "plaintiffs' argument would lead to the absurd conclusion that no officer not qualified for a pension would be subject to mandatory retirement," Opp. at 20,

completely ignores DOPMA's history as well as the history of military retired pay. The age limits established to become an officer were designed to ensure that officers who could not complete the necessary 20 years TIS to qualify for retired pay were not commissioned. SECNAVINST 1120.4A evidences that intent. *See* Mot. at 12. In the context of Congress's plan for a young, fit force, there is no contradiction. The authority was granted to extend people who had qualified for retirement because Congress set up a system where only persons who could qualify for retirement could be commissioned. Congress did not envision an old-age retirement program for Catholics, a program which stands out as an exception to every other officer or enlisted category because of its denominational flavor. Here we are arguing about the extension of chaplains, the majority of whom are Catholic. This in itself shows that we are dealing with the advancement of religion and a denominational preference subject to strict scrutiny. The availability of contract clergy or auxiliary chaplains shows this program is unconstitutional.

> **2.    The Navy is not authorized to retain on active duty as Retired Reserves chaplains who have not met the DOD definition of retired**

Defendants admit "the targeted 4109 chaplains are not eligible for retirement pay or benefits", Opp. at 20, but nonetheless argues the 4109s may be placed in the "Retired Reserves" despite the fact they fit none of the DOD's definitions of the Retired Reserve. Opp. at 20-23. Defendants argue that they may define the term "otherwise qualified" in § 10154(2) in any manner they see fit to allow chaplains not eligible for placement in DOD's definition of Retired to remain on active duty until they qualify for retired pay. This is contrary to law.

The term "otherwise qualified" by implication must refer to some sort of standard. Title

17

10 allows the Secretary of Defense to regulate the Reserves and he has exercised that discretion by defining the Retired Reserve.  As plaintiffs demonstrate in their Mot. at 32-36, every DODI or DODD defines "Retired Reserve" consistently and in a matter that excludes the 4109s.  Every DOD definition of Retired Reserve requires entitlement to retired pay or entitlement to disability pay.  *Id.*  Defendants admit no 4109 meets DOD's definition of Retired Reservist.  Opp. at 29.

Defendants' argument that under their regulation, "eligible officers may transfer to the Retired Reserves regardless of whether they have completed 20 years of service", Opp. at 21, is contrary to the Secretary of Defense's instructions.  Defendants essentially argue that they are free to ignore the Secretary of Defense's instructions, Opp. at 18-30.  The relevant DOD instructions and directives require the Secretary to classify *all* reservists in specific categories according to each category's criteria. The Secretary of Navy has no discretion, as even Mr. Bush admitted.  *See* Mot. at 33 and Ex. 15 (Bush) [95:11 - 97:21].  As plaintiffs point out, the 4109s fit no DOD Retired Reserve category, *id.* at 34-36, a fact defendants admit, Opp. at 29.  Defendants are left to argue that the Secretary of Navy may create his own categories in violation of the Secretary of Defense's instructions, definitions and limitations.  Opp. at 21-23.  Defendants cite no authority for this novel assertion, one which courts have routinely rejected.  "It is well established that if regulations promulgated by a service chief conflict with those issued by the Secretary of Defense or the relevant Secretary of the military service, the former are invalid when, and to the extent, they conflict with regulations issued by a superior in the chain of command." *Strickland v. United States*, 69 Fed Cl, 684, 703 (2006) (citing various cases).  *See also Center for Auto Safety v. Dole*, 846 F.2d 1532, 1534 (D.C. Cir. 1988); *Service v. Dulles*, 354 U.S. 363, 388 (1957) (Secretary must follow and comply with his regulations).

18

Defendants' argument "the Department of Defense interprets 10 U.S.C. § 10154(2) as authorizing transfer to the Retired Reserve through honorary retirement", Opp. at 23 (citing Bush declaration), is false.  Mr. Bush testified there has been no category for honorary retiree since 1997, Bush Deposition (Exhibit B) [125:14-126:1], [91:22-92:4],  and the Secretary had no discretion in terms of how to classify reservists because the directives use the word "shall" which is in the imperative and permits no discretion.  Bush (Ex. 15) [96:15-97:21].  Mr. Bush's argument depends on the fallacy that the Navy is not limited by the Secretary of Defense's exercise of discretion by defining the Retired Reserve in ways that both eliminate honorary retirees and preclude 4109s from placement in the Retired Reserve.  Mr. Bush cannot unilaterally void the Secretary of Defense's regulations or directives.  They may be changed only by the issuance of new directives or instructions.  *See Service*, 345 U.S. at 388 (Agency must comply with its directives).  None of the DODI or DODD at issue provide procedures for exceptions or waivers and defendants have pointed to none.  Once they have been issued, as Mr. Bush testified, they are binding on defendants.

### 3.    DOD does not authorize the transfer of "the targeted chaplains" to the Retired Reserves for retention on active duty

For the same reasons provided above, defendants' arguments that "the Department does not interpret DODI 1215.06 ... to prohibit the Navy's transfer of additional officers to the retired reserves" Opp. at 27, is contrary to established law as DOD and its agencies are bound by its regulations once DOD issues them.  *Sargisson v. United States*, 913 F.2d 918 (Fed. Cir 1990)).  It is improper and illegal to disregard the mandate of the regulations.  *United States v. Larionoff*, 431 US 864, 872 (1977).  The regulations are not ambiguous, and as Mr. Bush

19

testified, their mandate is clear. Reservists may be categorized only in accord with DOD's instructions and definitions which excluded the 4109s as defendants admit. Opp. at 29. A DOD official's pronouncements in contrast to the clearly stated policy of his agency can carry no weight and are illegal.

The above arguments also address the Navy's illegal argument "there is no specific prohibition against the Navy's creation of additional categories for the Retired Reserves." Opp. at 28. Defendants cite no authority from the Secretary of Defense allowing them to create additional categories, particularly categories related to allowing Catholics to remain on active duty for the purpose of acquiring the time in service to qualify for retired pay. What defendants ignore throughout their discussion is that we are addressing a practice and policy that benefits only or primarily one denomination, Catholics, whose chaplains were allowed to be commissioned well past the statutory age limit leaving them ineligible for retired pay prior to reaching their statutory separation ages, except for defendants' special program which is both illegal and unconstitutional as a denominational preference.

Defendants argue out of both sides of their mouth. On one hand, "the Navy does not dispute that, where the Department of Defense requires an officer be classified in a certain manner, the Navy must do so." Opp. at 29. Then, it admits "chaplains granted an honorary retirement and transferred to the Retired Reserves do not fit any of the categories defined by the Department of Defense's regulations." *Id.* They then state "the Navy is not refusing to apply the definitions used by the Department of Defense to officers who meet those definitions," *id.*, while their whole argument is that they may classify the 4109s who do not meet those definitions and are included in "all" Reservists, contrary to what DOD requires. They cannot classify the 4109s

20

as DOD requires because there is no category into which they may be placed, which excludes them from Retired Reserves. They are excluded therefrom because neither Congress nor DOD intended chaplains who were not entitled to receive retired pay to be classified as "Retired" so they could be illegally placed into a retired category and then illegally recalled to qualify for a pension. Defendants also ignore the fact that Mr. Bush admitted there had been no "honorary retiree" category since 1997. Bush [125:14-126:1] (Exhibit B); *see also* [91:22-92:4] (no authorization to transfer a military person on active duty into the Retired Reserve as an honorary retiree); [141:17-142:3] (Secretary of Navy cannot place honorary retiree in one of DOD's Reserve categories). This is an illustration of the duplicitous nature of Defendants' argument in pursuit of justifying a denominational preference.

Finally, defendants absurd argument that "regardless of the circumstances surrounding the transfer to Retired Reserves, the recall of the targeted chaplains from the Retired Reserves once they were transferred to it was proper, Opp. at 30, completely turns the law on its head. If there was no authority to transfer the 4109s to the retired reserves to begin with, then the recall was just as illegal. *See, e.g., Larionoff*, 431 U.S. at 873 (regulations contrary to Congress's purpose are invalid) and n.12 ("a regulation out of harmony with a statute is a mere nullity").

**4.    Retention of chaplains on active duty past age 60 was illegal when plaintiffs brought their Motion in 2003**

Plaintiffs' Mot. at 11 shows that at every stage of the Catholic special retirement process, defendants' practice was both illegal (contrary to statute or regulation) and a denominational preference because it existed to benefit only Catholics. As shown above, defendants' arguments about the RASL are not supported by the structure of DOPMA or Title

10. *See* Mot at 37-41. Nowhere do defendants meet their burden to show they have a compelling purpose or it is narrowly tailored.

## IV.    DEFENDANTS FAIL TO SHOW AN INJUNCTION WILL CAUSE UNREASONABLE HARM TO OTHER PARTIES AND NOT SERVE THE PUBLIC INTEREST

Defendants' argument that "the requested injunction would do significant harm to the targeted chaplains", Opp. at 42, rings hollow as a matter of law when considered in the context of their arguments against the discharge of plaintiffs Belt and Porter-Stewart. When defendants were opposing the injunction to stop the discharge of these plaintiffs, they argued differently. Defendants then argued the operation of the law in a neutral law required the discharge of CHs Belt and Porter-Stewart and therefore there could be no injury. Defs.' Opposition to Plaintiffs Motion for a TRO at 19-24, *Adair* Doc. No. 145. But now defendants argue the same operation of law now produces substantial harm if applied to the targeted Catholic chaplains. This appears to be another example of a denominational preference. As plaintiffs explain and as defendants do not deny, these targeted chaplains were commissioned with age waivers in which they had to acknowledge that they would not be able to complete the necessary TIS to qualify for a pension. Thus, there was no expectation or implied contract, and even if there were, the law is well settled that a contract cannot obligate the government when the contract is in violation of the law.

Defendants' argument that these chaplains "were continued and are entitled to benefits authorized by law", Opp. at 43, presumes that their continuation was legal and constitutional. They are not entitled to future benefits of retired pay obtained through illegal means. The only benefits they are entitled to is that which they accrue while on legal active duty. They have no

entitlement to any benefits obtained through an illegal scheme.

Defendants' argument that "the Navy's current shortage of Roman Catholic chaplains would worsen", Opp. at 43, assumes that it is the Navy's responsibility to provide priests, when the responsibility to provide sufficient clergy to meet Catholic needs is the responsibility of the Catholic Church.  To have it otherwise would entangle the government with religion in violation of the Establishment Clause.

Defendants' corollary argument that "Plaintiffs provide no justification for reducing the Navy's ability to meet Roman Catholic religious needs", Opp. at 43, ignores two principles. First, the Navy has "the ability to meet Roman Catholic religious needs", *id.*, through contract clergy or auxiliary chaplains.  LCDR Stewart's Declaration (Exhibit A), ¶ 4, describes how this process works at the National Naval Medical Center, Bethesda, Maryland.  The Medical Center is contracting with a local monastery to meet Catholic needs at the hospital after the retirement of CH Erestain.  This is no different than the Medical Center contracting with a Muslim imam to meet Muslim needs or with a rabbinical organization to meet Jewish needs.  *Id.*  Defendants have failed to meet their burden to show that these options are not sufficient to meet whatever shortages they face, particularly absent a showing of a consistent pattern of identifying specific religious and denominational requirements to quantify shortages.

Defendants also fail to show how forcing the Navy to comply with the Constitution and other requirements of the law is not in the public interest.  They cite no authority and make no argument because the law is otherwise.  Defendants' argument that an injunction would not maintain the status quo assumes that the status quo allows the government to operate in violation of the Constitution, and particularly the Establishment Clause.  This is essentially an

23

argument that either the Court should overlook its obligation to declare and enforce the law, or

that there is a de minimus exception to the Establishment Clause to which the Navy is entitled.

This is contrary to the law as reflected in precedent.   *See Bohannon*, 989 F.2d at 1245 (the

Establishment Clause has no de minimus exception).

Defendants' remaining arguments that the Court should not interfere in military matters

ignores the law of the case and the precedent of this Circuit.  In *Anderson v. Laird*, 466 F.2d 283

(D.C. Cir.), *cert denied,* 409 U.S. 1076 (1972), the D.C. Circuit rejected similar military

expertise and deference arguments in holding mandatory chapel requirements for cadets and

midshipmen violated the Establishment Clause.  *See* Mot. at 15-17.  Determining whether a

practice meets the requirements of the Constitution is the Court's constitutional duty, which the

D.C. Circuit's precedent made clear.  *See, e.g.*, *Emory v. Secretary of Navy*, 819 F.2d 291, 294

(D.C. Cir. 1987); *Dilley v. Alexander,* 603 F.2d 919, 920, 921 (D.C. Cir. 1978).  The military

has not been granted an exception to either ignore the law or violate the Establishment Clause.

*Id.*

## CONCLUSION

Plaintiffs have shown Defendants have established and maintained a system that allows

Catholic priests to be commissioned as chaplains beyond the statutory age limits which

defendants have applied to plaintiffs and other non-Catholic chaplain applicants.  These over-

age Catholics acknowledged when they were commissioned with age waivers they would not

accrue sufficient time in service to qualify for retired pay.  Nonetheless, the record shows

defendants have allowed these Catholics to continue past their statutory separation age and then,

if they still have not accrued sufficient time for retirement, they are illegally placed in the

24

Retired Reserve, although they fail to meet any Department of Defense definition of a retired

Reservist. No other denomination is granted such a benefit which clearly relieves the Catholic

Church of providing for some of its elderly clergy. This is a denominational preference, not

accommodation.

Defendants have failed to meet their burden under any of the well-recognized criteria for

evaluating Establishment Clause claims. They have failed to meet the criteria for strict scrutiny

by failing to show they have a compelling purpose or it is narrowly tailored. The provision for

contract clergy clearly shows that the challenged program is not narrowly tailored, even if there

were a compelling purpose. Consequently, plaintiffs are entitled to an injunction to stop this

unconstitutional practice.

                                        Respectfully submitted,

Dated: August 1, 2007                     /S/ Arthur A. Schulcz, Sr.
                                        ARTHUR  A. SCHULCZ, Sr.
                                        D.C. Bar No. 453402
                                        Counsel for *In re Navy Chaplaincy* Plaintiffs
                                        2521 Drexel Street
                                        Vienna, VA 22180
                                        703-645-4010

Of Counsel:
Douglas McKusick, Esq.
THE RUTHERFORD INSTITUTE
P.O. Box 7482
Charlottesville, VA 22906-7482

**EXHIBIT LIST**

<u>Exhibit No.</u>     <u>Description</u>

A.                  Declaration of LCDR Stewart, CHC, USN

B.                  Extracts of Deposition of Mr. Thomas Bush.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 1, 2007, I electronically filed the foregoing **Plaintiffs'**

**Reply to Defendants' Opposition to Plaintiffs' Renewed Motion for a Preliminary**

**Injunction Addressing Defendants' Denominational Preference in Retaining Catholic**

**Chaplains on Active Duty past Their Statutory Separation Ages Following Remand** with

the Clerk of the Court to be served by the Court's CM/ECF system on the following:

> Michael Q. Hyde
> Attorney, Civil Division
> U.S. Department of Justice
> 20 Massachusetts Ave., NW
>  Room 7322
> Washington, D.C. 20001

> /s / Arthur A. Schulcz, Sr.
> ARTHUR A. SCHULCZ, SR.
> Counsel for *CFGC and Adair* Plaintiffs
> D.C. Bar No. 453402
> Counsel for *CFGC* and the *Adair* Plaintiffs
> 2521 Drexel Street
> Vienna, VA 22180
> 703-645-4010

27

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: NAVY CHAPLAINCY | )      Case No. 1: 07-mc-269 (RMU) |

### DECLARATION OF GARY PAUL STEWART

Pursuant to 28 U.S.C. § 1746, I, Gary Paul Stewart, declare as follows:

1.    I live at 9420 Morning Walk Drive, Hagerstown, MD.  I am an active duty non-liturgical chaplain at the grade of Lieutenant Commander currently assigned to National Naval Medical Center Bethesda, MD.  I am competent to testify on and have personal knowledge of the matters addressed or discussed in this declaration.

2.    I am currently assigned as the Deputy Director, Pastoral Care Services at National Naval Medical Center, Bethesda, Maryland.

3.    As part of my duties, I must ensure that the free exercise needs of the patients and staff at the Medical Center are met inasmuch as it is possible to do so.

4.    The Naval Medical Center:

    a.    recently lost its assigned rabbi chaplain and accordingly, Pastoral Care Services is in the process of contracting with a rabbinical organization to meet Jewish needs at the Medical Center in accordance with Naval directives;

    b.    has no Muslim chaplain assigned, and accordingly Pastoral Care Services has contracted with a local  imam to meet Muslim needs at the Medical Center in accordance with Naval directives;

07mc269(RMU
EXHIBIT A

      c.      with the retirement of Catholic Chaplain (LCDR) Erestain, the Pastoral Care Services has obtained coverage for Catholic ministry needs through volunteer support from a local monastery, and we re in the process of establishing a contract with an local monastery to meet Catholic needs at the Medical Center in accordance with Naval directives.

5.      The Pastoral care Department has had no problems hiring contract clergy or religious leaders to meet the identified religious needs for which no chaplains are available. Those needs include meeting:

      a.      a patient's request for a faith specific religious clergy or religious leader;

      b.      the religious needs and counseling for patients' dependants or family, including grief counseling when necessary;

      c.      the religious needs of the Medical Center Staff; and

      d.      other authorized personnel, including retired military and their families.

      I make this declaration under the penalty of perjury, it is true and accurate to the best of my ability, and it represents the testimony I would give if called upon to testify in a court of law.

Dated: July 31, 2007          /S/ Gary Paul Stewart
                            GARY PAUL STEWART

0001

1            UNITED STATES DISTRICT COURT

2              DISTRICT OF COLUMBIA

3   CHAPLAINCY OF FULL GOSPEL        )

4   CHURCHES,                        )

5         Plaintiff,                 )

6      v.                            ) No. 1:99CV002945(RMU)

7   THE HON. DONALD WINTER,          )

8   et al.,                          )

9         Defendants.                )

10  AND RELATED CASE.                ) No. 1:00CV00566(RMU)

11

12              Washington, D.C.

13              Wednesday, June 6, 2007

14  Deposition of THOMAS L. BUSH, called for examination

15  by counsel for Plaintiffs in the above-entitled

16  matter, the witness being duly sworn by CHERYL A.

17  LORD, a Notary Public in and for the District of

18  Columbia, taken at the offices of ARNOLD & PORTER

19  LLP, 555 12th Street, N.W., Washington, D.C., at

20  9:28 a.m., and the proceedings being taken down by

21  Stenotype by CHERYL A. LORD, RPR, CRR.

22

0002

1  APPEARANCES:

2

3  On behalf of Plaintiffs:

4      ARTHUR A. SCHULCZ SR., ESQ.

5      LAW OFFICE OF ARTHUR A. SCHULCZ SR.

6      2521 Drexel Street

7      Vienna, VA  22180

8      (703) 645-4010

9

10   On behalf of Defendants:

11      MICHAEL Q. HYDE, ESQ.

12      UNITED STATES DEPARTMENT OF JUSTICE

13      FEDERAL PROGRAMS BRANCH

14      20 Massachusetts Avenue, N.W.

15      Washington, D.C.  20530

16      (202) 514-2205

17          and

18

19

20

21

22

1:07mc269 (RMU)
EXHIBIT B

0091

1   requirements that we'd have in time of war or

2   national emergency.  Some may be shortages in

3   existing manpower requirements.

4       Q.   Okay.  When I have asked you if you can

5   identify a document currently that specifically

6   identifies honorary retirees as a category, you have

7   only identified -- I believe it's 1200.15.

8           And those all seem to be prior to the 1997

9   issue of two thousand point one five (sic).

10      A.   Yes.

11      Q.   Are you saying that merely because a

12   document may have been -- a document in the past

13   relied on -- strike that.

14          Are you saying that a document which has

15   been superseded still allows a category which is no

16   longer recognized by current documents?

17      A.   What I said was -- was there a document

18   that existed that identified honorary retirees, and I

19   said yes.

20      Q.   Okay.  Let me rephrase the question, then.

21      A.   Okay.

22      Q.   Is there a document which authorizes

0092

1   honorary retirees as a reserve -- or as a retired

2   reserve categorization currently?

3       A.   The current documents are silent on the

4   issue.

5       Q.   Okay.  When you say, silent, do you mean

6   that they do not specifically identify honorary

7   retirees as a category?

8       A.   Yes.

9       Q.   Are you arguing that the secretary of any

10  of the services has the authority to deviate from the

11  Department of Defense instruction as to the reserve

12  component categories?

13      A.   I'm saying that the secretaries of the

14  military departments can consistent with the law

15  place people in the retired reserve.

16      Q.   When they don't meet the categorization as

17  defined by the Department of Defense?

18      A.   Yes.

19      Q.   So you're saying that even though the

20  Department of Defense instruction says it's binding

21  on the secretaries and that they must do certain

22  things that they have the flexibility to deviate?

124

1  program?

2      A.  Yes.

3      Q.  And what is that directive?

4      A.  Let me ask you to ask the question again,

5  please, and I can answer it again, please.  Ask your

6  question again, if you would, please, because I think

7  I was not listening to the entire question.  I need

8  to be sure I understood the question.

9      Q.  Just so we get the context right.

10     A.  Right.

11     Q.  So we are talking about the present tense

12  as of right now.  Is there a DOD directive or

13  instruction that authorizes the transfer of a

14  military person on active duty into the retired

15  reserve as an honorary retiree?

16     A.  No.

17     Q.  In the past, was there a directive that

18  authorized the transfer of a person on active duty

19  into the retired reserve as an honorary retiree?

20         MR. HYDE:  Let me object to the line of

21  questioning just to the extent you are asking for a

22  legal conclusion.

125

1        MR. SCHULCZ:  I'm asking him for his

2   knowledge as the deputate.

3        THE WITNESS:  The answer is yes.  The

4   answer is yes.

5        BY MR. SCHULCZ:

6    Q.   Okay.  And what is that directive or

7   instruction or instructions?

8    A.   Referring to what situation?

9    Q.   To the past that allowed a person to go

10  from active duty to the retired reserve as an

11  honorary retiree?

12     A.   The instruction, there are two

13  instructions.  One is 1200.15.  The other is 1215.6.

14     Q.   Okay.  When did the authority, if I can

15  use that term, to transfer people from active duty to

16  the retired reserve as honorary retirees, under these

17  two instructions, stop?

18     A.   The reference to an honorary retiree in

19  1200.15 changed in 1997.  The reference to honorary

20  retirees in 1215.6 changed in 1990.

21     Q.   1200.15 changed in 1997, and 1215.6

22  changed in 1990.  Did I get those dates correct?

126

1     A.   Yes.

2     Q.   Okay.  I believe I asked you before if

3   there was, were any kinds of reports that DOD

4   required on, through the honorary retiree program and

5   I believe your answer was no.  Am I -- do you

6   remember our previous conversation?

7     A.   I recall the previous conversation.

8     Q.   And did I correctly remember your answer

9   that there was, there were no reports required by a

10   service as to how they used retiree, the honorary

11   retiree program?

12         MR. HYDE:  Objection.  Vague.

13         BY MR. SCHULCZ:

14   Q.   Do you understand my question?

15   A.   Yes.

16   Q.   Okay.  Do you understand the question?

17   Can you answer the question?

18   A.   Yes.

19   Q.   So the answer is yes, that I correctly

20   remembered you saying there were no reports required

21   by a service to the Department of Defense concerning

22   their use of honorary retirees?

141

1  a category called honorary retirees?

2      A.   No.

3      Q.   Are the service secretaries at liberty to

4  create their own definitions of retired reserve?

5          MR. HYDE:  Objection to the extent it

6  calls for a legal conclusion.

7          THE WITNESS:  We have not precluded that

8  in our guidance, in our instruction.

9          BY MR. SCHULCZ:

10     Q.   My question is -- can you rephrase, can

11  you repeat the question.

12         THE REPORTER:  Question :  Are the service

13  secretaries at liberty to create their own

14  definitions of retired reserve?

15         THE WITNESS:  Yes.

16         BY MR. SCHULCZ:

17     Q.   Now Mr. Bush, in the DOD I 1215.06 which

18  we describe and in paragraph 5.2, you agreed that the

19  word shall was directive and when it tells the

20  secretary to categorize a person according to the

21  categories established in closure five, what category

22  does the secretary place an honorary retiree?

142

1    A.   He doesn't place him in one of those

2   categories.

3    Q.   What does he do?

4        MR. HYDE:  Objection.  Lack of personal

5   knowledge.

6        BY MR. SCHULCZ:

7    Q.   Can you answer the question?

8    A.   They would track them in their manpower

9   systems.

10    Q.   It says designate all reserve component

11   members.  Does, does all mean all?

12    A.   All means all the ones we have designated.

13        MR. SCHULCZ:  Okay.  Can we take about 10

14   minutes or just a short break.  I think I'm --

15        MR. HYDE:  To see if you're done?

16        MR. SCHULCZ:  Yes.

17        MR. HYDE:  That's fine.

18        (Recess.)

19        MR. SCHULCZ:  I have no further questions.

20        EXAMINATION BY COUNSEL FOR DEFENDANTS

21        BY MR. HYDE:

22    Q.   I just have a couple of questions.

NOTE: Pages 106-144 of Mr. Bush's deposition were transcribed at his continued deposition on

June 13, 2007.  The Heading, Caption and list of participants for that deposition (pages 106-108)

follow.  The pages are presented in numerical sequence  sequence to avoid confusion

1:07mc269 (RMU)
EXHIBIT B

106

1      IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF COLUMBIA

3  - - - - - - - - - - - - - X

4  CHAPLAINCY OF FULL GOSPEL :

5  CHURCHES,       :

6      Plaintiff,  : No. 1:99CV002945(RMU)

7   v.       :

8  THE HON. DONALD WINTER,  :

9  et al.,       :

10      Defendants.  :

11  AND RELATED CASE.    : No. 1:00CV00566(RMU)

12  - - - - - - - - - - - - - X

13          Washington, D.C.

14          Wednesday, June 13, 2007

15      Continued Deposition of THOMAS BUSH, a

16  witness herein, called for examination by counsel for

17  Plaintiff, the witness being duly sworn by SUSAN L.

18  CIMINELLI, a Notary Public in and for the District of

    Columbia, taken at the offices of Arnold & Porter

19  LLP, 555 Twelfth Street, N.W., Washington, D.C., at

20  1:00 p.m., Wednesday, June 13, 2007, and the

    proceedings being taken down by Stenotype by SUSAN L.

21  CIMINELLI, CRR, RPR, and transcribed under her

22  direction.

107

1   APPEARANCES:

2

3       On behalf of the Plaintiff:

4           ARTHUR A. SCHULCZ, SR., ESQ.

5           Law Office of Arthur A. Schulcz, Sr.

6           2521 Drexel Street

7           Vienna, VA  22180

8           (703) 645-4010

9

10      On behalf of the Defendants:

11          MICHAEL Q. HYDE, ESQ.

12          United States Department of Justice

13          Federal Programs Branch

14          20 Massachusetts Avenue, N.W.

15          Washington, D.C.  20530

16          (202) 514-2205

17          - and -

18

19

20

21

22

108

1  APPEARANCES (CONTINUED)

2       LT. SERGIO F. SARKANY, ESQ.

3       United States Judge Advocate General Corps

4       Code 14 (General Litigation)

5       1322 Patterson Avenue, Suite 3000

6       Washington Navy Yard

7       Washington, D.C.  20374

8       (202) 685-5453

9

10      ALSO PRESENT:

11       LCDR. Serajul Ali

12       Erin Mullen

13

14

15

16

17

18

19

20

21

22

109

1             C O N T E N T S

2   WITNESS            EXAMINATION BY COUNSEL FOR

3   THOMAS BUSH          PLAINTIFF

4     By Mr. Schulcz      110

5             DEFENDANTS

6     By Mr. Hyde       142

7

8

9

10          E X H I B I T S

11   BUSH EXHIBIT NO.          PAGE NO.

12   11 - DOD Directive 1215.6        113

13   12 - Priests over age 67 document    130

14   13 - Westlaw 10 USCA 101.54       138

15