# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE:                                          :
NAVY CHAPLAINCY                                  :
                                                :        Misc. Action No. 07mc269 (RMU)
                                                :
_____:

## DEFENDANTS' REPLY IN SUPPORT OF THEIR RENEWED MOTION TO RECONSIDER ORDER DENYING APPEAL OF MAGISTRATE JUDGE'S ORDER AND FOR A PROTECTIVE ORDER AGAINST DISCOVERY OF SELECTIVE-EARLY RETIREMENT BOARD DELIBERATIONS

Dated: August 2, 2007                          Respectfully submitted,

                                               PETER D. KEISLER
                                               Assistant Attorney General

                                               JEFFREY A. TAYLOR
                                               United States Attorney

                                               VINCENT M. GARVEY
                                               Deputy Branch Director

                                               _____/S/_____

Of Counsel:                                    MICHAEL HYDE
Lieutenant Katherine Pasieta                   CHRISTOPHER HALL
Lieutenant Sergio Sarkany                      DANIEL BENSING
Office of the Judge Advocate General           Trial Attorneys
Department of the Navy                          Federal Programs Branch, Civil Division
Washington Navy Yard, Bldg. 33                 U.S. Department of Justice
1322 Patterson Ave., S.E., Suite 3000          P.O. Box 883
Washington, D.C.  30274-5066                    20 Massachusetts Ave., N.W., Room 7132
                                               Washington, D.C. 20044
                                               Telephone: (202) 514-2205
                                               Attorneys for Defendants

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    THE D.C. CIRCUIT HAS ALREADY FOUND THAT SIMILAR
      LANGUAGE CREATES AN ABSOLUTE PRIVILEGE PROHIBITING
      DISCOVERY OF SELECTION BOARD DELIBERATIONS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   PLAINTIFFS' PURPORTED NEED FOR DISCOVERY IS IRRELEVANT
      BECAUSE TITLE 10 ABSOLUTELY PROHIBITS DISCOVERY OF
      SER BOARD DELIBERATIONS REGARDLESS OF NEED.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.  PLAINTIFFS' PURPORTED NEED FOR DISCOVERY TO PROVE THEIR
      RFRA ALLEGATIONS DOES NOT RENDER THE LANGUAGE OF
      SECTIONS 613A OR 14104 AMBIGUOUS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

IV.   PLAINTIFFS HAVE NOT SHOWN SUFFICIENT NEED FOR DISCOVERY
      OF SER BOARD DELIBERATIONS SUFFICIENT TO OVERCOME THE
      GOVERNMENT'S LEGITIMATE INTERESTS IN NON-DISCLOSURE.. . . . . . . . . . . . . . . . . . . 12

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## TABLE OF AUTHORITIES

<u>**FEDERAL CASES**</u>

<u>Adair v. England</u>,
  183 F. Supp.2d 31 (D.D.C. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

<u>Adair v. Winter</u>,
  451 F. Supp.2d 202 (D.D.C. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 18

<u>Adair v. Winter</u>,
  451 F. Supp.2d 210 (D.D.C. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 16

<u>Baldrige v. Shapiro</u>,
  455 U.S. 345 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

<u>Burlington Ins. Co. v. Okie Dokie, Inc.</u>,
  439 F. Supp.2d 124 (D.D.C. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

<u>Chowdhury v. Northwest Airlines Corp.</u>,
  226 F.R.D. 608 (N.D. Cal. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

<u>In re England</u>,
  375 F.3d 1169 (D.C. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

<u>Gilligan v. Morgan</u>,
  413 U.S. 1 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

<u>Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal</u>,
  126 S. Ct. 1211 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

<u>Judicial Watch v. Dep't of Army</u>,
  466 F. Supp.2d 112 (D.D.C. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

<u>Lamie v. United States Trustee</u>,
  540 U.S. 526 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

<u>Longhofer v. U.S.</u>,
  29 Fed. Cl. 595 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

<u>McDaniel v. Paty</u>,
  435 U.S. 618 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Miller v. Dep't of Navy,
  383 F. Supp.2d 5 (D.D.C. 2005), rev'd on other grounds, 476 F.3d 936 (D.C.
  Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Murphy v. U.S.,
  993 F.2d 871 (Fed. Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

Orloff v. Willoughby,
  345 U.S. 83 (1953). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Pierce Cty., Wash. v. Guillen,
  537 U.S. 129 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5, 8

Tri-State Hosp. Supply Corp. v. United States,
  238 F.R.D. 102 (D.D.C. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

U.S. ex rel. Purcell v. MWI Corp.,
  209 F.R.D. 21 (D.D.C. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

United States v. Armstrong,
  517 U.S. 456 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

United States v. Johnson,
  529 U.S. 53 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

United States v. Stanley,
  483 U.S. 669 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9, 14

Ward v. Caldera,
  138 F. Supp.2d 1 (D.D.C. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

Wilkins v. U.S. Navy,
  No. 99-cv-1579, slip op. (S.D. Cal. Nov. 13, 2003). . . . . . . . . . . . . . . . . . . .  14, 15

**STATUTES AND OTHER AUTHORITIES**

Fed. R. Civ. P. 26. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 8, 11

Fed. R. Civ. P. 54. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

Fed. R. Evid. 501. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3, 11

10 U.S.C. § 613a. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

10 U.S.C. § 618(f) (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 5, 7

10 U.S.C. § 14104. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

U.S. Const. art. I, § 2, cl. 3.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

U.S. Const. art. I, § 8, cl. 14.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

U.S. Const. amend. XIV, § 2.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## INTRODUCTION

The D.C. Circuit has already found that a statute stating the deliberations of a military selection board "may not be disclosed" creates a privilege "block[ing] civil discovery" of such deliberations. In re England, 375 F.3d 1169, 1177, 1181 (D.C. Cir. 2004) (finding that former 10 U.S.C. § 618(f) prohibited civil discovery of deliberations by Navy active-duty officer promotion selection boards). Defendants demonstrated in their opening memorandum that Congress has now extended this same statutory prohibition to selective early retirement ("SER") boards by enacting statutes containing the same plain language already held to unambiguously prohibit discovery by the D.C. Circuit in In re England.[1] See 10 U.S.C. §§ 613a, 14104. Because of this intervening change in law, the Court should reconsider its prior rulings[2] that plaintiffs may have discovery of SER board deliberations and enter a protective order barring them from such discovery, just as the D.C. Circuit found the former 10 U.S.C. § 618(f) barred them from discovery of promotion board deliberations.

Plaintiffs' opposition primarily relies on their asserted need for discovery to prove their claims. Plaintiffs' arguments are foreclosed by Supreme Court decisions holding that a plaintiff's need for discovery is irrelevant to whether an absolute statutory privilege applies, even when the requested information is essential to prove a plaintiff's claim. Plaintiffs' arguments are therefore irrelevant to the issue before the Court – whether the plain language of Title 10 prohibits such

---

[1] All that remains of plaintiffs' requests for discovery of selection board deliberations is their request for discovery of SER board deliberations. Plaintiffs were denied discovery of promotion selection boards in In re England, 375 F.3d at 1181-82, and sections 613a and 14104 are now the operative statutes containing the privilege upheld in that opinion. Plaintiffs have not requested discovery of deliberations by the third type of selection board – active-duty continuation boards.

[2] See 3/8/2006 Order and Mem. Op. [CFGC docket nos. 215-16] (opinion of Magistrate Judge Facciola); 9/11/06 Order and Mem. Op. [CFGC docket nos. 234-35], published at Adair v. Winter, 451 F. Supp.2d 202 (D.D.C. 2006)(denying defendants' appeal of Magistrate Judge's findings).

discovery.

The plain language of sections 613a and 14104 reflects Congress's determination that litigants should not be permitted discovery of selection board deliberations absent the consent of the Secretary. As was the case in In re England, the Court should find these new statutes now prohibit plaintiffs from discovery of SER board deliberations, reverse its previous orders, and enter a protective order against such discovery.

## ARGUMENT

Rule 54 permits a court to revise its interlocutory orders "at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." Fed. R. Civ. P. 54(b); see also Judicial Watch v. Dep't of Army, 466 F. Supp.2d 112, 123 (D.D.C. 2006); Burlington Ins. Co. v. Okie Dokie, Inc., 439 F. Supp.2d 124, 131 (D.D.C. 2006); see generally Defs.' Mem. at 3-4.[3] Reconsideration is justified "as justice requires" where "a controlling or significant change in the law or facts [has occurred] since submission of the issue to the court.'" Judicial Watch, 466 F. Supp.2d at 123 (quoting Cobell v. Norton, 224 F.R.D. 266, 272 (D.D.C. 2004)). Further, a party is not entitled to discovery of privileged information. Fed. R. Civ. P. 26(b)(1); U.S. ex rel. Purcell v. MWI Corp., 209 F.R.D. 21, 24 (D.D.C. 2002). The court may enter a protective order against impermissible discovery. See Fed. R. Civ. P. 26(b)(2), (c); id. Rule 37(a)(4)(B) (court may enter protective order upon denial of motion to compel); see generally Defs.' Mem. at 4.

## I.    THE D.C. CIRCUIT HAS ALREADY FOUND THAT SIMILAR LANGUAGE CREATES AN ABSOLUTE PRIVILEGE PROHIBITING DISCOVERY OF SELECTION BOARD DELIBERATIONS.

Congress is empowered to create by statute privileges that prohibit the discovery of

---

[3] In this reply, defendants refer to their opening memorandum in support of this motion as "Defs.' Mem." and plaintiffs' opposition as "Pls.' Opp."

information in civil litigation.  Baldrige v. Shapiro, 455 U.S. 345, 360 (1982); cf. Fed. R. Evid. 501

(recognizing privileges "provided by Act of Congress").  Defendants demonstrated in their opening

memorandum that Congress, pursuant to its constitutional authority to regulate the military, recently

enacted valid prohibitions against civil discovery of selection board deliberations, which apply in

these cases to bar plaintiffs from discovery of SER board deliberations.  See Defs.' Mem. at 2-3, 5-

11.

        In their opposition, plaintiffs largely ignore the D.C. Circuit's holding in In re England that

the former 10 U.S.C. § 618(f) prohibited discovery of promotion selection board deliberations.

Because sections 613a and 14014 contain the same unambiguous language as that in the former

section 618(f), they deny plaintiffs discovery of SER board deliberations just as the language of

section 618(f) denied them discovery of promotion board deliberations.  Specifically, the former

section 618(f) stated:

> Except as authorized or required by this section, proceedings of a
> selection board convened under section 611(a) of this title
> [authorizing active-duty promotion selection boards] may not be
> disclosed to any person not a member of the board.

10 U.S.C. § 618(f) (2006) (emphasis added).  The D.C. Circuit held this language alone sufficient

to prohibit discovery of the deliberations by the type of board at issue, finding it to be "the language

of command – 'may not be disclosed' – in a context in which commands are expected to be obeyed."

In re England, 375 F.3d at 1177.  This "language of command" is substantively the same as that

contained in sections 613a(a) and 14104(a):

> The proceedings of a selection board convened under section 611 this
> title [authorizing active-duty promotion, SER, and continuation
> boards] may not be disclosed to any person not a member of the
> board.

-3-

10 U.S.C. § 613a(a) (emphasis added); see also 10 U.S.C. § 14104(a) (same language applied to

boards for officers on inactive duty).  The only substantive difference between section 618(f) and

subsection (a) of the new statutes is the extension of the privilege upheld in In re England to SER

and active-duty continuation selection boards.

        To the extent there is a substantive difference between the former section 618(f) and sections

613a and 14104, the difference serves only to strengthen the privilege.  In addition to the language

addressed in In re England, sections 613a and 14104 also state:

> (b) Prohibited uses of board discussions, deliberations, and records.
> – The discussions and deliberations of a selection board described in
> subsection (a) and any written or documentary record of such
> discussions and deliberations –
>> (1) are immune from legal process;
>> (2) may not be admitted as evidence; and
>> (3) may not be used for any purpose in any action, suit, or
>> judicial or administrative proceeding without the consent of
>> the Secretary of the military department concerned.

10 U.S.C. §§ 613a(b), 14104(b).  This plain language clearly prohibits a court from compelling

disclosure of selection board deliberations or the use of such deliberations in any judicial proceeding

unless the Secretary of the military department concerned agrees to such disclosure and use.  See

Defs.' Mem. at 5-6.

        Finding that this language creates an absolute privilege prohibiting plaintiffs from discovery

of SER board deliberations is consistent with the statutes' legislative history.  Although analysis of

legislative history is unnecessary where a statute's plain language is unambiguous, the legislative

history may be "instructive" and support a court's conclusion as to the meaning of the statute's plain

language.  In re England, 375 F.3d at 1178 (stating that judicial inquiry is complete where terms of

-4-

statute are unambiguous, but finding legislative history of 10 U.S.C. § 618(f) instructive and supportive of court's conclusion that statute created privilege against civil discovery of promotion board deliberations); see also Baldrige, 455 U.S. at 356 (Supreme Court looked to legislative history to support conclusion that Census Act created privilege for certain census records); Pierce Cty., Wash. v. Guillen, 537 U.S. 129, 146 (2003) (citing legislative history to support interpretation of statutory privilege).  Here, defendants have shown that, as was the case with section 618(f), "nothing in [the legislative history] remotely suggests that Congress intended an unexpressed exception to the ban on disclosure for civil discovery."  Compare In re England, 375 F.3d at 1178; see Defs.' Mem. at 7-8.  Plaintiffs cite nothing in the legislative history of sections 613a and 14104 indicating that Congress intended to allow any exception for civil discovery to its prohibition against disclosure of selection board deliberations absent the Secretary's consent.  Cf. United States v. Johnson, 529 U.S. 53, 58 ("When Congress provides exceptions in a statute, it does not follow that courts have authority to create others."); In re England, 375 F.3d at 1178 (citing same).

Plaintiffs do not address defendants' showing that the new language in sections 613a and 14104 apply to these pending cases because they are procedural rules governing the availability of evidence.  See Defs.' Mem. at 6-7.  Accordingly, there is no dispute that Congress intended to apply the new statutes to pending cases such as these.

Because the D.C. Circuit has already held that the language now contained in sections 613a and 14104 functions to prohibit discovery of deliberations by another type of selection board, additional language strengthens the absolute privilege, and the legislative history fortifies the conclusion that the privilege was intended to bar plaintiffs' discovery of SER board deliberations, the Court should inquire no further and apply the statutes as written to prohibit discovery of SER

board deliberations.  See In re England, 375 F.3d at 1177 ("It is well established that when the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." (internal quotation marks and citation omitted)); Baldrige, 455 U.S. at 362 (in analyzing application of statutory privilege, stating that Congress's statutory mandate is "to be followed by the courts").

## II.    PLAINTIFFS' PURPORTED NEED FOR DISCOVERY IS IRRELEVANT BECAUSE TITLE 10 ABSOLUTELY PROHIBITS DISCOVERY OF SER BOARD DELIBERATIONS REGARDLESS OF NEED.

Plaintiffs' opposition boils down to their assertions that they need discovery of SER board deliberations to prove their constitutional and RFRA claims and that a protective order against such discovery would deny them judicial review of their claims by denying them evidence they claim to need to prove their allegations.  See, e.g., Pls.' Opp. at 31-44 (need for discovery); id. at 21-31 (judicial review).  These arguments have been litigated multiple times, both prior to and in this litigation, and found to be without merit.

Plaintiffs' need-based arguments are foreclosed by the Supreme Court's holding in Baldrige – a case relied upon by the D.C. Circuit in In re England and by defendants, but entirely ignored in plaintiffs' opposition.  There, the government claimed a statutory privilege from disclosure of certain information collected by the Census Bureau.  The Court read the Census Act as providing a "bar on disclosure of all raw data reported by or on behalf of individuals" that precluded civil discovery of such information.  455 U.S. at 361.  Just as plaintiffs claim to do here, the municipality seeking discovery in Baldrige brought causes of action based upon the Constitution, citing the Constitution's requirement that congressional representation be based upon population and its argument that certain census data was needed to contest an erroneous undercount by the census that would render it under-

represented in Congress and deprive it of certain federal funds. <u>Baldrige</u>, 455 U.S. at 351 n.5; <u>see</u> U.S. Const. art. I, § 2, cl. 3 (representation in House of Representatives apportioned among States based upon their population as determined in Census); <u>see also</u> U.S. Const. amend. XIV, § 2. The Supreme Court recognized the importance of the municipality's constitutional claims. <u>Id.</u> at 362 ("This is not to say that the city of Denver does not also have important reasons for requesting the raw census data for purposes of its civil suit."). However, the Court concluded that the municipality's need for discovery was not a relevant concern in the face of an absolute statutory privilege: "A finding of 'privilege' . . . shields the requested information from disclosure <u>despite the need demonstrated by the litigant.</u>" <u>Id.</u> (emphasis added). This is true even if the information sought is "essential to the establishment of plaintiff's claim." <u>Id.</u> at 360; <u>see also</u> <u>Tri-State Hosp. Supply Corp. v. United States</u>, 238 F.R.D. 102, 109 (D.D.C. 2006) (stating "it is established beyond question" that absolute statutory privilege applies even if information sought is relevant and essential to establish plaintiff's claims); <u>Chowdhury v. Northwest Airlines Corp.</u>, 226 F.R.D. 608, 614-15 (N.D. Cal. 2004) (citing <u>Baldrige</u> in rejecting argument that statutory and regulatory privilege would prevent plaintiff from prosecuting his claim, despite fact that plaintiff sought discovery to support claim of discrimination).

Plaintiffs' arguments have also been rejected in these cases. In <u>In re England</u>, the D.C. Circuit applied <u>Baldrige</u> to find that 10 U.S.C. § 618(f) denied the <u>CFGC</u> and <u>Adair</u> plaintiffs discovery of promotion board deliberations despite their asserted need for such discovery. <u>See</u> <u>In re England</u>, 375 F.3d at 1177, 1178-79, 1180-81. The D.C. Circuit also rejected the <u>CFGC</u> and <u>Adair</u> plaintiffs' argument that the privilege against discovery of promotion board deliberations had the effect of precluding judicial review of their claims. <u>See</u> 375 F.3d at 1180 n.2 (finding privilege

against discovery of promotion board deliberations "does not preclude judicial review of the [plaintiffs'] claims").  Further, in rejecting similar arguments in the CFGC and Adair plaintiffs' challenge to the constitutionality of section 618(f), this Court found that "there is no general constitutional right to statutorily privileged evidence essential to establishing a constitutional claim." 9/11/06 Opinion and Order [CFGC docket nos. 232-33], slip op. at 2, published at Adair v. Winter, 451 F. Supp.2d 210, 212 (D.D.C. 2006) ("9/11/06 Order II"); see also id. at 12, 17.

In support of their need-based arguments, plaintiffs also ask the Court to find that Congress did not mean what sections 613a and 14104 say, but instead intended to allow disclosure and utilization of other remedies available under the Federal Rules of Civil Procedure "to provide appropriate security to protect legitimate governmental concerns during discovery."  Pls.' Opp. at 20, see also id. at 40-41.  Congress's enactment of sections 613a and 14104 as an absolute privilege is entirely consistent with the Federal Rules of Civil Procedure.  Rule 26 prohibits discovery of matters that are privileged.  See Fed. R. Civ. P. 26(b)(1) ("[P]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . .") (emphasis added)).

Further, by choosing the plain language of sections 613a and 14104, Congress has already weighed any competing interests and determined that any litigants' potential need for discovery of SER board deliberations does not outweigh the Navy's interest in maintaining the confidentiality of selection board deliberations.  The power to make that decision is constitutionally delegated to Congress.  See U.S. Const. art. I, § 8, cl. 14 (Congress is "[t]o make Rules for the Government and Regulation of the land and naval forces"); cf. Pierce Cty., 537 U.S. at 146-48 (holding federal statute enacting privilege protecting certain information collected by States regarding road conditions was

validly enacted pursuant to Congress's authority under Constitution's Commerce Clause); Baldrige, 455 U.S. at 361 (power to create statutory privilege protecting census information is "within congressional discretion, for Congress is vested by the Constitution with authority to conduct the census 'as they shall by Law direct'"). Moreover, Congress's conclusion that an absolute privilege is necessary is entitled to substantial deference. See United States v. Stanley, 483 U.S. 669, 681-82 & n.6 (1987) (distinctive element of Constitution's treatment of military is "specificity" of "grant of power" and "insistence (evident from the number of Clauses devoted to the subject) with which the Constitution confers authority over the [military] upon the political branches"); Gilligan v. Morgan, 413 U.S. 1, 10 (1973) (Constitution vests "complex subtle, and professional decisions as to composition, training, equipping, and control of military force" exclusively in legislative and executive branches); Orloff v. Willoughby, 345 U.S. 83, 93-94 (1953) ("[J]udges are not given the task of running the [military].") In re England, 375 F.3d at 1180-81 ("Our unwillingness to soften the import of Congress' chosen words even if we believe the words lead to a harsh outcome is longstanding. It results from 'deference to the supremacy of the Legislature, as well as recognition that Congressmen typically vote on the language of a bill.'" (quoting Lamie v. United States Trustee, 540 U.S. 526, 538 (2004)); cf. Miller v. Dep't of Navy, 383 F. Supp.2d 5, 10 (D.D.C. 2005), rev'd on other grounds, 476 F.3d 936 (D.C. Cir. 2007) (Judiciary employs highly deferential application of Administrative Procedure Act in reviewing military decisions "to ensure that the courts do not become a forum for appeals by every soldier dissatisfied with his or her ratings, a result that would destabilize military command and take the judiciary far afield of its area of competence" (quotation marks and citation omitted)).

Plaintiffs' arguments cannot be harmonized with Baldrige, In re England, or this Court's

holding that section 618(f) was constitutional, and therefore have no basis in law.  As was the case in <u>In re England</u>, the Court must apply the plain language of sections 613a and 14104 and prohibit plaintiffs' discovery of SER board deliberations.  <u>See</u> <u>In re England</u>, 375 F.3d at 1181 ("As in <u>Baldrige</u>, we accordingly apply the bar on disclosure as written, and conclude that it applies to block civil discovery of promotion selection board proceedings in civil litigation.").

### III.    PLAINTIFFS' PURPORTED NEED FOR DISCOVERY TO PROVE THEIR RFRA ALLEGATIONS DOES NOT RENDER THE LANGUAGE OF SECTIONS 613A OR 14104 AMBIGUOUS.

Plaintiffs argue that the language in sections 613a and 14104 is rendered ambiguous by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, <u>et</u> <u>seq.</u> ("RFRA"), an entirely separate statute.  <u>See</u> Pls.' Opp. at 3-21.  Here, plaintiffs again ignore <u>In re England</u>.  The D.C. Circuit found that the same language now contained in sections 613a(a) and 14104(a) is unambiguous and must be applied according to its terms to prohibit discovery of selection board deliberations: "There is no inherent ambiguity in the phrase 'may not be disclosed' that would justify departing from those plain terms pursuant to a judicially-crafted exception."  <u>In re England</u>, 375 F.3d at 1177.  Again, <u>In re England</u> precludes plaintiffs' statutory arguments and requires a finding that sections 613a and 14104 prohibit discovery of SER board deliberations.

Here, plaintiffs argue that a finding that sections 613a and 14104 prohibit discovery of SER board deliberations would conflict with RFRA's creation of a cause of action to protect religious free exercise.  Pls.' Opp. at 4, <u>see generally</u> <u>id.</u> at 3-21.  Here, plaintiffs manufacture a conflict where one does not exist.  Nothing in RFRA discusses discovery of privileged information in a civil lawsuit, and nothing in sections 613a or 14104 prohibit the plaintiffs from bringing claims under RFRA.  <u>Cf.</u> <u>In re England</u>, 375 F.3d at 1180 n.2 (finding that former section 618(f) "does not preclude judicial review of the Chaplains' claims").

-10-

The plain language of sections 613a and 14104 unambiguously applies to all civil actions, including those involving RFRA. See, e.g., 10 U.S.C. § 613a(b) (prohibiting use of selection board discussions and deliberations "for any purpose in any action, suit, or judicial or administrative proceeding without the consent of the Secretary of the military department concerned"). Plaintiffs cite no case holding that Congress, when using sweeping language applicable to all relevant circumstances, must also list every specific cause of action already governed by a statute's all-inclusive language. In short, Congress need not reference RFRA because the plain language of sections 613a and 14104 applies to all judicial proceedings, including these cases.

In support of their argument that RFRA guarantees them discovery, plaintiffs cite Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 126 S. Ct. 1211 (2006). See Pls.' Opp. at 6-7. O Centro has nothing to do with whether a party is entitled to discovery under RFRA. Instead, O Centro addresses whether RFRA creates a right of recovery and whether the plaintiffs had proven the merits of their RFRA claim. See, e.g., 126 S. Ct. at 1221(addressing whether government had obligations under RFRA when enforcing Controlled Substances Act). Nothing in O Centro addresses whether a plaintiff has a right to discovery of any information under RFRA.

As with all cases, discovery in any civil suit involving a RFRA claim is governed by the Federal Rules of Civil Procedure. As stated, the Federal Rules prohibit discovery of any privileged matters, even if they are relevant to a claim or defense in the litigation. See Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . ." (emphasis added)); see also Fed. R. Evid. 501 (recognizing privileges "provided by Act of Congress"). Plaintiffs provide no logical reason to exempt RFRA claims from the Federal Rules' prohibition against discovery of privileged information applicable to other civil

causes of action.  The existence of RFRA, just like the existence of any other cause of action, has nothing to do with whether the plain language of sections 613a or 14104 creates an absolute privilege.

Most important, plaintiffs' argument boils down to the same need-based arguments rejected by the Supreme Court in Baldrige.  Although they state their argument in terms of ambiguity, plaintiffs' argument relies on their assumption that they need discovery of SER board deliberations to prove their RFRA claims.  See, e.g., Pls.' Opp. at 12 (arguing that proving plaintiffs' RFRA claims "is an impossibility without discovery because only discovery can produce the evidence necessary to show a burdening of one's free exercise").  As stated previously, see, supra, Part II, plaintiffs' need for discovery is irrelevant when Congress has absolutely prohibited disclosure of information by enacting a statutory privilege.[4]

## IV.   PLAINTIFFS HAVE NOT SHOWN SUFFICIENT NEED FOR DISCOVERY OF SER BOARD DELIBERATIONS SUFFICIENT TO OVERCOME THE GOVERNMENT'S LEGITIMATE INTERESTS IN NON-DISCLOSURE.

Finally, even if plaintiffs' need could be considered, plaintiffs have failed to show sufficient justification to overcome the congressionally-recognized interest in non-disclosure.  Congress's clear instruction that selection board deliberations should not be disclosed or used in judicial proceedings absent the Secretary's consent, even if it were not an absolute privilege, at a minimum requires plaintiffs to overcome a very strong presumption against disclosure before obtaining discovery of

---

[4]  Plaintiffs argue that defendants ignored RFRA in their opening memorandum.  See Pls.' Opp. at 21.  Not so.  Defendants acknowledged plaintiffs' past arguments regarding their asserted need for discovery and stated that they were irrelevant to the issue before the Court.  See, e.g., Defs.' Mem. at 10.  As defendants have stated consistently throughout their briefing, Baldrige and In re England – cases that plaintiffs largely ignore even while they make this accusation against defendants – preclude plaintiffs' need-based arguments as a matter of law.

SER board deliberations. Cf. United States v. Armstrong, 517 U.S. 456, 468-69 (1996) (in context of criminal prosecutions, defendant must produce credible evidence of selective prosecution to show entitlement to discovery to support claim of selective prosecution under equal protection principles). Should the Court refuse to apply sections 613a and 14104 as an absolute privilege, it should revisit its finding that plaintiffs have demonstrated sufficient need for such discovery, that the discovery of SER board deliberations is not precluded by the deliberative process privilege, and that such discovery is likely to lead to the discovery of relevant evidence.

The Secretary of the Navy relies on SER board deliberations to engage in "[f]ree, uninhibited, and candid deliberations" to make subjective evaluations of naval officer records in determining which officers should be retired in accordance with the needs of the Navy. Decl. of Gordon R. England, Secretary of the Navy, originally filed as Tab H to Defs.' Opp. to Pls.' Mot. for Order [CFGC docket no. 124] (copy attached to Defs.' Mem. at Defs.' Ex. 1) ("England Decl.") at ¶ 9; Defs.' Mem. at 11-12. Confidentiality of SER board deliberations is essential to ensure that SER board recommendations are "based on full, frank, and independent advice and analyses." England Decl. ¶ 9; see also In re England, 375 F.3d at 1178 (adopting Secretary's rationale); 9/11/06 Order II at 21 (citing discussion in In re England). The legislative history of sections 618(f), 613a, and 14104 confirms that Congress sought to protect the integrity of these deliberations when it enacted the privilege. See Defs.' Mem. at 7-8; supra, Part I. Further, because it is disclosure itself that would chill future deliberations, routine use of measures short of a protective order barring any discovery, as proposed by plaintiffs, see Pls.' Opp at 18-20, 40-41, would not prevent the harm to future deliberations that Congress sought to prevent. Cf. In re England, 375 F.3d at 1178 (stating that "[s]election board members will be less likely to engage in frank and open discussion if such

-13-

discussions will be open to public scrutiny" and disclosure would "clearly inhibit frank assessment of candidates' relative strengths and weaknesses" (internal quotation marks omitted)).

Defendants' assertion of these interests is not improper, as plaintiffs charge. See, e.g., Pls.' Opp. at 40-41 (arguing that assertion of absolute privilege "can only indicate [defendants'] fear of the truth or its [sic.] doubt of this Court's ability to protect its interests"). In addressing a chaplain plaintiffs' similar argument, the court in Wilkins v. U.S. Navy stated: "[T]he principle behind the privilege is not to shield . . . discrimination from coming to light. Rather it is to prevent a chilling effect that may result if the process is opened to discovery, no matter what the topic of inquiry. . . . [R]egardless of whether the boards discriminated . . ., the fact remains that granting unfettered access to every past board member's testimony will make future boards less candid in their deliberations." Wilkins v. U.S. Navy, No. 99-cv-1579, slip op. (S.D. Cal. Nov. 13, 2003) (attached at Ex. A) at 11; cf. Stanley, 483 U.S. at 682-83 ("Even putting aside the risk of erroneous judicial conclusions (which would becloud military decisionmaking), the mere process of arriving at correct conclusions would disrupt the military regime."). It is improper for plaintiffs "to presume that the process was actually infected with unconstitutional bias." Wilkins, slip op. at 10.

As defendants have previously argued, plaintiffs have not shown sufficient justification for discovery of SER boards to support their contention that the Navy imposes quotas upon non-liturgical Protestant chaplains under consideration for early retirement. See, e.g., Defs.' Mem. at 12-13; Mem. in Supp. of Defs.'Mot. Reconsider Mag. Judge's Op. [CFGC docket no. 219] ("Defs.' Mot. Reconsider Mag. Op.") at 12-25; Reply in Support of Defs.' Mot. Reconsider Mag. Judge's Op. [CFGC docket no. 226] at 10-18. This is especially so because analysis of recommendations by SER board members shows that SER boards did not recommend non-liturgical Protestant chaplains at

-14-

rates different to any statistically significant degree than rates for other chaplains considered by SER boards. Defs.' Mot. Reconsider Mag. Op. at 16-22 (and exhibits cited therein). Further, this Court found that, in the context of plaintiffs' similar promotion claims, discovery of board deliberations is not essential to proving their claims. See 9/11/06 Order II at 15-16 (finding that discovery of promotion board deliberations would not produce evidence that was "necessary element of a claim of religious discrimination"); id. at 16 (citing alternative evidence available to plaintiffs).

Plaintiffs' response is insufficient to dispute defendants' showing. In addition to their prior arguments, plaintiffs rely on another new report by their expert, Dr. Leuba, to argue that chaplains from different faith group categories are exposed to SER at different rates. See Pls.' Opp. at 42 ("Dr. Leuba found the list of chaplains eligible for SER is 'not random across denominations nor random across faith group clusters.'"); id. Ex. 6. This argument has nothing to do with plaintiffs' need for discovery of SER board deliberations, as SER boards play no role in determining who will be considered by them for early retirement. See Wilkins, slip op. at 9 (discovery for Dr. Leuba's similar theory regarding promotion consideration "would be better directed towards those individuals who determine which chaplains are placed before the boards in the first place").

Plaintiffs also rely on Dr. Leuba's conclusion that the denominational identity of SER board members has an impact on selection rates, arguing that when chaplains serve as members of SER boards, they tend to favor, either wittingly or unwittingly, certain denominations over others. See Pls.' Opp. at 43. Plaintiffs are not entitled to discovery of SER board deliberations to support this theory because it is not a claim upon which relief can be granted – plaintiffs' claim premised upon the assumption that chaplains cannot be trusted to serve on selection boards has been dismissed. See Adair v. England, 183 F. Supp.2d 31, 61-62 (D.D.C. 2002). Plaintiffs also lack standing to raise this

-15-

argument, and the argument improperly presumes that a chaplain, merely because of his religious identity, will be unable to resist an urge to discriminate. See McDaniel v. Paty, 435 U.S. 618, 628-29 (1978) (rejecting argument that ministers serving in public office "will necessarily exercise their powers and influence to promote the interests of one sect or thwart the interests of another" because "American experience provides no persuasive support for the fear that clergymen in public office will be less careful of anti-establishment interests or less faithful to their oaths of civil office than their unordained counterparts"); Ward v. Caldera, 138 F. Supp.2d 1, 9 (D.D.C. 2001) (finding plaintiff lacked standing to challenge assignment of minorities and women to promotion selection board because claim would require court to assume, contrary to Supreme Court precedent, that women and minorities are inherently and unavoidably disposed to favor their own gender and race); cf. Adair, 183 F. Supp.2d at 60-61 (finding that Adair plaintiffs "would have difficulty in demonstrating that they have suffered the injury-in-fact necessary to have standing to bring" claim that rests upon presumption that chaplains will unavoidably discriminate when recommending other chaplains for promotion).

Plaintiffs' also rely on their contention as to which chaplains' records warranted selection for SER and which did not based only on their own inadmissible and unfounded opinion as to what criteria should be considered by SER boards. See Pls.' Opp. at 42-43 (expressing opinion based upon which chaplains had "greatest future potential"); id. Ex. 6 at 19-20 (utilizing "dimensions of quality" not contained in SER boards' governing precepts). Not only is this opinion baseless, but the Court cannot rely on plaintiffs' opinion as to the relative merit of officers to order discovery because the Judiciary "'lacks the special expertise needed'" to apply the SER precept's criteria or "'review . . . officers' records and rank them on the basis of relative merit.'" See Longhofer v. U.S.,

29 Fed. Cl. 595, 605 (1993) (quoting Murphy v. U.S., 993 F.2d 871, 873 (Fed. Cir. 1993)).

In any event, as defendants have demonstrated when Dr. Leuba asserted these theories in the past, Dr. Leuba has not properly shown that the selection rates of chaplains considered for SER differs among denominations or faith group categories to any statistically significant degree, whether analyzed based on selections, on whether Admirals or other officers serve as selection board members, or on whether a chaplain candidate's denomination matches the denomination of a chaplain serving as a selection board member.   See generally Siskin, Statistical Analysis of Promotion and Early Retirement Selections in the United States Navy Chaplain Corps, Supplemental Report (May 2006), originally filed as Ex. 14 to Defs.' Mem. Opp'n to Pls.' Mot. Declaratory J. and in Supp. of Cross-Mot. to Dismiss or for Partial Summ. J. [CFGC docket nos. 223, 224] (copy without appendices attached as Ex. B) at 24-30 (addressing Dr. Leuba's opinions regarding SER boards); id. at 25 (rebutting Dr. Leuba's theories based upon Admiral membership on SER boards); id. at 26-30 (rebutting Dr. Leuba's theories based upon denomination of chaplain SER board members and chaplain candidates).

Congress's decision to enact sections 613a and 14104 at the least provides reason for the Court to revisit its conclusion that defendants' relevance objection and assertion of the deliberative process privilege did not preclude plaintiffs from discovery of SER board deliberations,[5] and to find that the government's interest in non-disclosure outweighs any need by plaintiffs for discovery of SER board deliberations.

---

[5]  In addition to their objections to the discovery of SER board deliberations as protected by the deliberative process privilege and unlikely to lead to the discovery of relevant evidence, defendants preserve for subsequent review their objection that such discovery is prohibited by statutorily-authorized naval regulation.  See, e.g., Defs.' Mot. Reconsider Mag. Op. at 6-10, 25-32.

**CONCLUSION**

For the reasons set forth above, defendants request that this Court vacate its 9/11/06 Order and Memorandum Opinion [CFGC docket nos. 234-35], published at Adair v. Winter, 451 F. Supp.2d 202 (D.D.C. 2006), reverse the Magistrate Judge's March 3, 2006 Opinion and Order, and enter a protective order prohibiting plaintiffs from any discovery of SER board deliberations.

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2007, a true and correct copy of the foregoing Defendants' Reply in Support of Their Renewed Motion to Reconsider Order Denying Appeal of Magistrate Judge's Order and for a Protective Order Against Discovery of Selective-early Retirement Board Deliberations was served by the Court's ECF system upon the following:

Arthur A. Schulcz, Sr., Esq.
2521 Drexel Street
Vienna, VA 22180
Counsel for plaintiffs


_____/S/_____
MICHAEL Q. HYDE

FILED

03 NOV 13 AM 8:44

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| RONALD G. WILKINS,<br><br>                          Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>                       Defendants. | CASE NO. 99-1579-IEG (LSP)<br><br>**ORDER DENYING DEFENDANTS' APPEAL OF AND MOTION TO REVERSE THE MAGISTRATE'S ORDER GRANTING PLAINTIFF'S MOTION TO COMPEL**<br><br>[Doc. No. 80] |

     Presently before the Court is an appeal and motion to reverse Magistrate Judge Papas' discovery order (the "Magistrate's Order") brought by defendants the Navy and the Secretary of the Navy (collectively, the "defendants"). Defendants allege that the Magistrate's Order compelling defendants to allow members of certain Navy selection and promotion boards to be deposed was clearly erroneous and contrary to law. For the following reasons the Court denies the motion to reverse and affirms the Magistrate's Order with a qualification discussed herein.

## BACKGROUND

     Plaintiff Ronald G. Wilkins ("Wilkins") enlisted in the Navy in 1959. He became a line officer in 1965. He left active duty, remaining in the Naval Reserve and began seminary and full-time ministry in 1971. He was accepted into the Navy's Chaplain Corps and returned to active duty in 1978 as a Navy Chaplain. In 1994, the fiscal year 1995 selective early retirement (SER)

101

1   board selected Wilkins for early (involuntary) retirement.  Wilkins left the service on August 1,

2   1995 and has not been on active duty since that time.

3          On July 29, 1999, Wilkins filed a complaint for alleged violations of the First and Fifth

4   Amendments to the United States Constitution.  Wilkins alleged that he was unconstitutionally

5   selected for early retirement from the Navy based, in part, on the Navy's discriminatory conduct

6   against non-liturgical faith groups in the Chaplain Corps.  He also alleged that various

7   institutionalized practices of the Navy in the management of the Chaplain Corps violate the

8   Establishment and Free Exercise Clauses of the First Amendment as well as the Equal Protection

9   and Due Processes Clauses of the Fifth and the Fourteenth Amendments to the U.S. Constitution.

10  (See First Compl. at ¶¶ 22, 27, 34, and 45.)  Based on ten separate "Counts," Wilkins requested the

11  following relief against defendants: rescission of his involuntary early retirement; retroactive

12  reinstatement to active duty with all the benefits and privileges included therein; an amendment of

13  his records in the Navy to portray his actual performance; compensatory and punitive damages

14  exceeding $68 million; and attorney fees and costs as deemed appropriate.  (See id. at ¶¶11.a-11.h

15  & ¶¶12-14.)

16         On December 14, 1999, the Court granted a motion to dismiss, finding that it lacked

17  subject matter jurisdiction due to (1) the exclusive jurisdiction of the Court of Federal Claims; (2)

18  the Feres doctrine; and (3) failure to exhaust remedies before the Board for Correction of Naval

19  Records (BCNR).  Wilkins appealed.  The Ninth Circuit Court of Appeals affirmed in part,

20  reversed in part, and remanded the matter.  See Wilkins v. United States, 279 F.3d 782 (9th Cir.

21  2002).  In its opinion, the Ninth Circuit affirmed dismissal of the damages claims and requests for

22  an injunction against promotion of liturgical chaplains to flag rank and for an order directing the

23  Secretary of the Navy to take specific punitive actions against former Chiefs of Chaplains.  Id. at

24  790.  The opinion went on to reverse the dismissal of the remaining claims for injunctive and

25  declaratory relief and to remand the matter to this Court for further proceedings.  Id.

26         On remand, Wilkins amended his complaint, and defendants subsequently submitted an

27  amended answer.  Wilkins continues to allege in his amended complaint that he was improperly

28  selected for early retirement on the basis of his non-liturgical beliefs and also for defending his free

1  exercise rights in the past.  Furthermore, Wilkins alleges that the same religious prejudice that

2  resulted in his retirement permeates the Chaplain Corps generally and manifests itself in the

3  accession, continuation, promotion and separation processes.

4       During discovery Wilkins sought to depose various individuals who have served on

5  selection and promotion boards for the Chaplain Corps.  A difficulty arose, however, in that

6  members of these boards swear an oath of secrecy to not discuss their deliberations.  Thus, Wilkins

7  requested that defendants release the board members from this oath.  Wilkins' request was refused.

8  On June 16, 2003, Wilkins filed a motion with Magistrate Judge Papas to compel the Secretary of

9  the Navy to release the Chaplain Corps Selection Board Personnel from their oath.  On August 11,

10  2003 Judge Papas issued an order granting the motion.  The Magistrate's Order rejected

11  defendants' argument that an absolute statutory bar prevented discovery and also found that

12  Wilkins had overcome the deliberative process privilege.  (See Mag. Order at 3-7).

13       On September 11, 2003, defendants filed a an appeal of and motion to reverse the

14  Magistrate's Order.  Wilkins filed an opposition on October 3, 2003 setting forth his argument that

15  the Magistrate's Order should be affirmed.  Finally, on October 24, 2003 defendants filed their

16  reply.  The Court now turns to the instant appeal and motion to reverse.

## DISCUSSION

18  **A.    Legal Standard for Setting Aside Magistrate Judge's Order**

19       Appeals of non-dispositive matters adjudicated by a magistrate judge are governed by

20  Federal Rule of Civil Procedure 72(a).  That rule explains that "[w]ithin 10 days after being served

21  with a copy of the magistrate judge's order, a party may serve and file objections to the order. . ."

22  Fed. R. Civ. P. 72(a).  When an appeal under Rule 72(a) is made, "[t]he district judge to whom the

23  case is assigned shall consider such objections and shall modify or set aside any portion of the

24  magistrate judge's order found to be clearly erroneous or contrary to law." Id.; 28 U.S.C. §

25  636(b)(1)(A).  In adjudicating the appeal, a district court "may not simply substitute its judgment

26  for that of the [magistrate] court." Grimes v. City and County of San Francisco, 951 F.2d 236, 241

27  (9th Cir. 1991) (citing United States v. BNS, Inc., 858 F.2d 456, 464 (9th Cir. 1988)).  Rather, under

28  the clearly erroneous standard, a district court should reverse "only when a definite and firm

- 3 -

1    conviction arises that a mistake has been made." <u>United States v. Asagba</u>, 77 F.3d 324, 326 (9[th]

2    Cir. 1996).

3    **B.    Analysis**

4        Defendants argue that the Magistrate's Order erred in three respects. First, defendants

5    contend that, contrary to the magistrate judge's opinion, 10 U.S.C. § 618(f) creates an absolute

6    statutory bar to deposing SER or promotion board members. Second, defendants argue that even if

7    section 618(f) is not a complete bar, the Magistrate's Order erred when it concluded that a statutory

8    privilege under section 618(f) and the deliberative process privilege were overcome by Wilkins.

9    Finally, defendants allege that, in any event, testimony from the board members would not be

10   relevant to Wilkins' claims. The Court will address each allegation of error in turn.[1]

11       1.    Whether 10 U.S.C. § 618(f) Creates an Absolute Statutory Bar to Discovery

12       Defendants forcefully argued before the magistrate judge, and do so again in the present

13   motion, that Congress has expressly forbidden board members from disclosing information

14   regarding the decision-making process, even in the course of judicial proceedings. Defendants rely

15   on 10 U.S.C. § 618(f), which states that "[e]xcept as authorized or required by this section,

16   proceedings of a selection board convened under section 611(a) of this title may not be disclosed to

17   any person not a member of the board." 10 U.S.C. § 618(f).

18       The Supreme Court has repeatedly held that a "statute granting a privilege is to be strictly

19   construed so as to avoid a construction that would suppress otherwise competent evidence." <u>Pierce</u>

20   <u>County, Wash. v. Guillen</u>, 537 U.S. 129, 145 (2003) (quoting <u>Baldrige v. Shapiro</u>, 455 U.S. 345,

21   360 (1982)); <u>St. Regis Paper Co. v. United States</u>, 368 U.S. 208, 218 (1961). In other words,

22   "courts should avoid construing a confidentiality provision so that it would 'suppress otherwise

23   competent evidence unless the statute, strictly construed, requires such a result.'" <u>Zambrano v.</u>

24   <u>I.N.S.</u>, 972 F.2d 1122, 1125 (9th Cir. 1992) (quoting <u>St. Regis</u>, 368 U.S. at 218). Following the

25   principle articulated in <u>St. Regis</u>, the Ninth Circuit recognizes three categories of information-

26   shielding statutes: (1) "provisions which expressly bar disclosure in legal proceedings"; (2)

27

28       [1]Because, as discussed below, the relevance of the evidence is a factor within the deliberative
process privilege analysis, the Court addresses defendants' second and third charges of error together.

- 4 -

1  "provisions which expressly allow for disclosure in legal proceedings"; and (3) "provisions which

2  are silent on the issue of disclosure during legal proceedings." Zambrano, 972 F.2d at 1125.  As

3  was the case in Zambrano itself, the statutory provision at issue here falls within the third category.

4        In Zambrano, the Ninth Circuit followed the D.C. and Eleventh Circuits in concluding that

5  "where Congress has thought it necessary to protect against court use of records it has expressly so

6  provided by specific language." Id. at 1125 (quoting Freeman v. Seligson, 405 F.2d 1326, 1351

7  (D.C. Cir. 1968)).  The Court went on to reason that because the statute at issue had no specific

8  language shielding information from use in judicial proceedings, it should be interpreted to allow

9  for such use.  See Zambrano, 972 F.2d at 1125-1126.  Thus, the rule in this Circuit, as it is

10  elsewhere, is that without specific language barring discovery in the judicial process, a statutory

11  provision will be narrowly construed to allow limited use of the protected information.

12        At least one other court has concluded that section 618(f) does not bar disclosure in a

13  judicial context such as the present litigation.  In Chaplaincy of Full Gospel Churches v. Johnson,

14  the plaintiff also requested access to Navy Chaplain selection boards, and the Navy countered with

15  the same argument under section 618(f).  The Navy's argument was rejected.  The Johnson court

16  first noted that "general statutory bans on publication do not bar limited disclosure in judicial

17  proceedings, including court-supervised discovery." Johnson, 217 F.R.D. 250, 258 (D. D.C. 2003)

18  (quoting Laxalt v. McClatchy, 809 F.2d 885, 889 (D.C. Cir. 1987)).  The court then held that,

19  because section 618(f) does not specifically shield board deliberations from judicial proceedings or

20  court-ordered discovery, the plaintiff in that case was entitled to depose various board members

21  regarding their deliberations.  See id. at 259-260.

22        Here, defendants seek to undo the Magistrate's Order which also concluded that section

23  618(f) does not erect an absolute bar to judicial discovery of board member testimony.  Defendants

24  argue primarily that section 618(f) is distinguishable from the statutes that were analyzed in St.

25  Regis and Zambrano.  Specifically, defendants point out that the statute at issue in St. Regis

26  involved only a limited ban on disclosure by a particular agency.  Defendants further note and the

27  statute at issue in Zambrano prohibited only the use of information submitted by illegal aliens in

28  deportation proceedings.  Unlike these statutes, defendants argue, section 618(f) prohibits

- 5 -

1  disclosing the deliberations of the board to "any person not a member of the board," creating a

2  complete ban. 10 U.S.C. § 618(f).

3       Defendants' argument misses point. The reasoning in <u>Zambrano</u> is unmistakable. The

4  Ninth Circuit did not rely on the fact that the statute's application was limited to information

5  presented in deportation proceedings. Rather, its holding was almost wholly premised on the

6  absence of specific language prohibiting disclosure in a judicial setting. <u>See Zambrano</u>, 972 F.2d

7  at 1125-1126. The party opposing disclosure in <u>Zambrano</u> argued that a different result should

8  have been reached in light of the Supreme Court's decision in <u>Baldrige v. Shapiro</u>, 455 U.S. 345

9  (1982). <u>See id</u>. at 1126. In rejecting this argument, the Ninth Circuit reasoned as follows:

10       The provision in <u>Baldrige</u> contains an *express prohibition* against the production of
Census information in judicial proceedings. 13 U.S.C. § 9(a). Thus, <u>Baldrige</u> falls

11  squarely within the exception the Court identified in <u>St. Regis</u>. The Court stated
that judicial disclosure may be prohibited where the statute expressly requires such

12  a result. While the statute in <u>Baldrige</u> does specifically require such a result, the
IRCA provision at issue here *has no specific language prohibiting judicial*

13  *disclosure.*

14  <u>Zambrano</u>, 972 F.2d at 1126 (emphasis added). Thus, the Ninth Circuit's position is abundantly

15  clear: without an express prohibition on judicially-based disclosure, courts should not construe

16  statutory bans on publication to require such a result. Because section 618(f) lacks the requisite

17  specific language, Wilkins does not face an absolute bar to the discovery he seeks in this litigation.

18       2.    Whether the Deliberative Process Privilege Bars Discovery

19       Defendants also argue that the Magistrate's Order improperly concluded that Wilkins had

20  overcome the deliberative process privilege.[2] "The deliberative process privilege rests on the

21  obvious realization that officials will not communicate candidly among themselves if each remark

22  is a potential item of discovery and front page news, and its object is to enhance 'the quality of

23  agency decisions,' by protecting open and frank discussion among those who make them within the

24  Government." <u>Department of Interior v. Klamath Water Users Protective Ass'n</u>, 532 U.S. 1, 8-9

25

26       [2]The Magistrate's Order found that although section 618(f) did not represent a complete bar
to discovery, it did afford defendants a qualified privilege. (<u>See</u> Mag. Order at 4). The Magistrate's

27  Order then concluded that the analysis of the residual qualified privilege under section 618(f)
coincided with an analysis of the deliberative-process privilege. (<u>Id</u>. at 5). Because the parties do not

28  dispute this reasoning, the Court will also address any qualified privilege under section 618(f) under
a deliberative process analysis.

1  (2001) (quoting <u>NLRB v. Sears, Roebuck & Co.</u>, 421 U.S. 132, 151 (1975) (internal citation

2  omitted)); <u>Maricopa Audubon Soc. v. U.S. Forest Service</u>, 108 F.3d 1089, 1092 (9th Cir. 1997).

3  The Ninth Circuit has long held, however, that "[t]he deliberative process privilege is a qualified

4  one," and that a "litigant may obtain deliberative materials if his or her need for the materials and

5  the need for accurate fact-finding override the government's interest in non-disclosure." <u>F.T.C. v.</u>

6  <u>Warner Communications Inc.</u>, 742 F.2d 1156, 1161 (9th Cir. 1984) (citing <u>United States v. Leggett</u>

7  <u>& Platt, Inc.</u>, 542 F.2d 655, 658 (6th Cir. 1976)).

8          In determining whether a party seeking discovery may overcome the deliberative process

9  privilege, courts in the Ninth Circuit look primarily to four factors. <u>See</u> <u>Warner</u>, 742 F.2d at 1161.

10  These factors are "(1) the relevance of the evidence; (2) the availability of other evidence; (3) the

11  government's role in the litigation; and (4) the extent to which disclosure would hinder frank and

12  independent discussion regarding contemplated policies and decisions." <u>Id.</u>; <u>see also</u> <u>North</u>

13  <u>Pacifica, LLC v. City of Pacifica</u>, 274 F.Supp.2d 1118, 1122 (N.D. Cal. 2003) (acknowledging the

14  <u>Warner</u> factors as the proper focus of the inquiry). The Magistrate's Order sets forth and discusses

15  each of these factors in accordance with <u>Warner</u>. Thus, the Court will review the magistrate

16  judge's conclusion only for clear error. <u>See</u> Fed. R. Civ. P. 72(a).

17          The parties devote almost all of their energy to the issue of whether the evidence Wilkins

18  seeks from members of various boards is relevant to his claims. As an initial matter, the Court

19  pauses to point out and reject the main thrust behind defendants' relevance argument. Defendants,

20  in various ways, reason that discovery from the board members is irrelevant because Wilkins has

21  failed to show, by other evidence, that his claims of discrimination have merit. In particular,

22  defendants rely on their statistical analysis that allegedly shows an absence of religious

23  discrimination in Chaplain Corps promotion rates. (<u>See</u> Defs' Mem. at 15-17). Defendants also

24  argue that the requested discovery is not relevant because Wilkins lacks standing to pursue any

25  forward-looking relief. (<u>Id.</u> at 24). Here, defendants point out that the Navy has changed its

26  policies regarding selections and promotions within the Chaplain Corps since Wilkins ceased

27  active duty. (<u>Id.</u>). Accordingly, defendants argue, Wilkins lacks standing as far as challenging any

28  on-going discrimination, making any testimony from past board members irrelevant.

1          This motion, the focus of which is whether Wilkins is entitled to certain discovery, is not

2    the proper arena for defendants to attack the validity of the claims. First, defendants essentially

3    argue that Wilkins is not entitled to pursue certain evidence (board member testimony) because he

4    doesn't have enough evidence to support his claims. This line of reasoning, however, places the

5    cart before the horse. In other words, the very purpose of a discovery request is to obtain evidence

6    to support a claim. If lack of evidence were a reason to deny discovery as irrelevant, its purpose

7    would be lost. An argument that a plaintiff's claim is not supported by the evidence is properly the

8    subject of a motion for summary judgment, and not a reason to deny discovery. Defendants'

9    attempts to defeat this discovery request by attacking the sufficiency of Wilkins' evidence must

10   therefore be rejected. Second, defendants' standing arguments are also misplaced. Whether

11   Wilkins does or does not have standing to bring his claims does not bear on the relevance of the

12   requested discovery to those claims. Should defendants wish to challenge Wilkins' standing, a

13   motion to dismiss or a motion for summary judgment are the proper vehicles to do so. Again, the

14   Court will not address the validity of Wilkins' claims within the context of a discovery motion.[3]

15         As to his claim that he was improperly selected for early retirement, Wilkins has

16   demonstrated that testimony from the members sitting on his SER board would likely be relevant.

17   Wilkins directs the Court's attention to two liturgical Navy Chaplains who appear to have fit the

18   selection criteria for early retirement better than he, yet were retained by his board. (See Wilkins'

19   Opp'n. at 3-4). Defendants counter this argument by contending that Wilkins has misread the

20   selection criteria at issue. However, at this stage in the proceedings, the Court is not in a position

21   to pass judgment on who has provided the more compelling meaning of the selection criteria.

22   This, again, is a matter more properly left for summary judgment. The fact remains that "only

23   selection-board personnel – the witnesses to the decision-making process – have direct knowledge

24   _____

25       [3]In their reply, defendants set forth a related argument that is equally unpersuasive. On October 22, 2003, two days before their reply in the instant motion was filed, defendants filed a motion for summary judgment. Defendants now argue that they "are entitled to summary judgment" which

26   "renders [Wilkins'] motion to compel moot." (See Def' Reply at 9-10). Essentially, defendants would have this Court decide the motion for summary judgment in their favor, before giving Wilkins an

27   opportunity to oppose it, and then rule that Wilkins is not entitled to discovery because his claims have been rejected. Because this is not the appropriate time to adjudicate defendants' summary judgment

28   motion, the Court declines the invitation to use it as a means to make moot the present discovery request.

-8-

1  of possible religious discrimination in the selection-board process." Johnson, 217 F.R.D. at 260.

2  Therefore, the Magistrate's Order did not commit clear error when it concluded that testimony

3  from Wilkins' SER board would be relevant to his claim of religious discrimination.

4      Wilkins also asserts claims that the entire Chaplain promotion process was infected with

5  unconstitutional religious bias.  Here, the Court is less convinced of the relevance of board

6  member testimony.  Defendants explain that Wilkins' own statistical expert, Dr. Leuba, sets forth a

7  theory of discrimination that does not involve members of the actual promotion boards.  (See Defs'

8  Mem. at 14-15).  According to Dr. Leuba, discrimination in the promotion process does not occur

9  at the board level.  Rather, it occurs earlier, when chaplains are selected to appear before the board

10 in the first place.  Specifically, Dr. Leuba, challenges the accuracy of a Center for Naval Analysis

11 report finding no discrimination.  Dr. Leuba opines that the Navy's conclusion is false because it

12 looked only to "chaplains 'considered' for promotion (instead of ALL chaplains *eligible* for

13 promotion). . ."  (See Defs' Ex. A at 6) (capitalization and emphasis in original).  The report goes

14 on to conclude that the "major source of bias in the selection for promotion [is] *selection for*

15 *consideration for promotion.*"  (Id.) (emphasis in original).  In other words, Wilkins' theory is that

16 the Navy "stacks the deck" against non-liturgical chaplains by allowing fewer of those individuals

17 to be considered for promotions in the first place.  (See id. at 7).  As defendants point out,

18 however, determining which chaplains are placed before the promotion boards is not in the hands

19 of the board members.  See Secretary of the Navy Instruction 1420.1A.  Thus, under Wilkins'

20 theory of discrimination, members of the promotion boards appear incapable of shedding light on

21 whether discrimination was or is taking place on the basis of religious beliefs.  Wilkins' discovery

22 efforts would be better directed towards those individuals who determine which chaplains are

23 placed before the boards in the first place.

24     In sum, the Court finds that discovery from the members of Wilkins' SER board would be

25 highly relevant to his claim that he was improperly selected for early retirement.  Indeed, this is the

26 only direct evidence available to Wilkins that might establish whether he was personally the victim

27 of unconstitutional discrimination.  As for testimony from the members of past promotion boards

28 generally, the Court finds that, under Wilkins' theory of discrimination, this would be of only

1  limited relevance.

2      The next factor to be considered under <u>Warner</u> is the availability of other evidence. The

3  Magistrate's Order found it difficult to identify any other viable means available to Wilkins to

4  prove his discrimination claim other than the direct testimony of the board members who selected

5  him for early retirement. (<u>See</u> Mag. Order at 6). Defendants argue, on the other hand, that

6  statistical evidence, such as that contained in Dr. Leuba's report, is available to prove Wilkins'

7  claims. Dr. Leuba's report (or any other type of statistical analysis), however, cannot illuminate

8  what happened within Wilkins' SER board specifically. The allegation that the particular members

9  of Wilkins' SER board improperly selected him for early retirement is one that only the testimony

10  of those board members can validate. The Court agrees with defendants to an extent, however, that

11  as an alternative to deposing every individual who sat on a past selection or promotion board,

12  statistical evidence is available to demonstrate any *systemic* discrimination alleged. Once again,

13  Wilkins has a strong argument for overcoming the deliberative process privilege as to his SER

14  board, and a weaker one as to past board members in general.

15      The third factor to be analyzed is the government's role in the litigation. As the

16  Magistrate's Order correctly points out, "the Government is the actor that is allegedly violating

17  [Wilkins'] rights; thus, its conduct is at the heart of this litigation." (Mag. Order at 6). Defendants

18  do not take issue with the magistrate judge's conclusion as to this factor, and the Court finds no

19  clear error.

20      The fourth and final factor in the <u>Warner</u> analysis involves the extent to which disclosure

21  would hinder frank and independent discussions regarding the decisions involved in the

22  deliberative process. The magistrate judge resolved this factor in favor of Wilkins, concluding that

23  "the purpose of the deliberative process privilege is not served by barring the discovery because

24  [defendants have] no legitimate interest in protecting practices or decisions grounded upon or

25  contributing to unconstitutional discrimination." (<u>See</u> Mag. Order at 6). Here, the Court

26  respectfully parts company with the Magistrate's Order. Although the government may not have a

27  strong interest in protecting an unconstitutional decision-making process, it is improper at this

28  stage, to presume that the process was actually infected with unconstitutional bias. Moreover, as

- 10 -

1   the Magistrate's Order correctly notes, the burden is on the party attempting to overcome the

2   deliberative process privilege to show entitlement to discovery. (See Mag. Order at 5 (citing

3   United States v. Farley, 11 F.3d 1385, 1389 (7th Cir. 1993)). Thus, if any presumption would be

4   proper to make, it would seem to be one holding that no discrimination has taken place.

5         Even assuming, arguendo, that illegal discrimination was present within the selection and

6   promotion boards, the principle behind the privilege is not to shield that discrimination from

7   coming to light. Rather, it is to prevent a chilling effect that may result if the process is opened to

8   discovery, no matter what the topic of the inquiry. As the Supreme Court explained, the principle

9   behind the deliberative process privilege is "the obvious realization that officials will not

10  communicate candidly among themselves if each remark is a potential item of discovery and front

11  page news." Klamath, 532 U.S. at 8-9. If Wilkins is able to depose any board member he wishes

12  in a quest for evidence of discriminatory practices, communications within future boards would

13  inevitably be chilled to some extent. Thus, regardless of whether the boards discriminated against

14  Wilkins or others, the fact remains that granting unfettered access to every past board member's

15  testimony will make future boards less candid in their deliberations.

16        Looking to section 618(f) specifically, the government clearly maintains an important

17  interest in open dialogue within the context of selection and promotion boards. In particular,

18  Congress stated that its motives in enacting section 618(f) were "[t]o encourage candid discussions

19  free from outside interference." S. Rep. 102-482, at 2 (1992). Furthermore, Hansford T. Johnson,

20  Acting Secretary of the Navy, has stated that "free, uninhibited and candid deliberations by

21  selection boards are vital to the effective functioning of the promotion board process." (See

22  Johnson Decl. at ¶ 9). Finally, the Ninth Circuit has recognized that "[m]ilitary promotion is one

23  of the most obvious examples of a personnel action that is integrally related to the military's

24  structure. Decisions regarding who is promoted and why are central to maintenance of the

25  military's hierarchy." Mier v. Owens, 57 F.3d 747, 751 (9th Cir. 1995). In short, the government's

26  interest in preventing discovery is legitimate and cannot be cast aside merely because Wilkins has

27

28

Defendants' Reply in Favor of
Renewed Motion to Reconsider 99cv1579
Exhibit A
Page 11 of 14

1   alleged that misconduct took place.[4]

2       The Magistrate's Order notes, however, that concerns about chilling discussions within

3   Navy selection and promotion boards can be minimized through measures available in the

4   litigation process. The Magistrate's Order lists protective orders, the redacting of names, and the

5   sealing of transcripts as examples of how the government's concerns could be assuaged despite the

6   granting of Wilkins' motion to compel. Certainly if discovery and publication is limited in this

7   manner, the impact on candidness within Navy boards would be diminished. Therefore, although

8   allowing depositions of various board members would certainly pose some risk that frank and

9   candid communications would be hindered, this factor is less than dispositive in light of the

10  protective measures available during discovery as well as the remainder of the litigation.

11      Weighing the Warner factors, the Court finds no clear error in the Magistrate's Order.

12  Clearly, the most important of the four factors are the relevance of the evidence to Wilkins' claims

13  and the government's interest in maintaining open discussions within future boards. As noted

14  above, the Court finds that the testimony of the individuals comprising Wilkins' SER board is

15  more relevant than the testimony that Wilkins might seek to elicit from any and all past members

16  of promotions boards. As for the government's interests, the Court is mindful of defendants'

17  repeated fear that anyone skilled enough to draft a complaint and allege discrimination might be

18  able to conduct their own private investigation into selection or promotion boards. The policies

19  behind section 618(f) and the deliberative process privilege clearly disfavor such a result. On the

20  other hand, every attempt to obtain discovery cannot be turned into a motion for summary

21  judgment. Put another way, plaintiffs cannot be required to prove their claims by other means

22  before being allowed to seek the most direct and relevant evidence available. In light of the

23  competing interests at stake and the outcome of the Warner factors, the Court cannot say that the

24

25      [4]Wilkins also argues that the deliberative process privilege is "routinely denied" when "there
    is reason to believe the [deliberative information] may shed light on government misconduct." In re
26  Sealed Case, 121 F.3d 729, 746 (1997) (quoting Texaco Puerto Rico, Inc. v. Department of Consumer
    Affairs, 60 F.3d 867, 885 (1st Cir. 1995)). The outcome of this argument does not alter the Court's
27  conclusions. In particular, the misconduct argument does not address the qualified privilege afforded
    by section 618(f), which the Magistrate's Order found to be identical to the deliberative process
28  privilege. Thus, regardless of whether the deliberative process applies, the outcome remains
    unchanged.

- 12 -

1  Magistrate's Order was clearly erroneous in granting Wilkins' motion to compel.

2       The Magistrate's Order does not indicate, however, the extent to which Wilkins is entitled

3  to conduct his discovery. This, of course, is due to the fact that Wilkins' motion to compel

4  provides no indication as to who's testimony, specifically, he seeks. The Court finds that granting

5  Wilkins an unqualified licence to embark on a "fishing expedition" is unwarranted. Specifically,

6  the Court agrees with the Magistrate's Order to the extent that Wilkins is entitled, despite the

7  deliberative process privilege and section 618(f), to obtain the testimony of the members of his

8  SER board. Allowing more at this point, however, would be to unjustifiably risk undermining the

9  government's interest in maintaining candid discussions within Navy selection and promotion

10  boards. Wilkins' own theory of discrimination within the promotion boards appears to undermine

11  his argument that testimony of promotion board members would be particularly relevant to proving

12  his claims. Moreover, his claims of systemic discrimination are capable of proof through statistical

13  analysis and other means that do not involve a blind search for past board members with relevant

14  testimony.

15       This is not to say, however, that Wilkins may never show entitlement to depose any

16  individuals beyond those on his SER board. The Court simply will not allow Wilkins, at this point,

17  to depose any board member he wishes. Should Wilkins be able to demonstrate that individuals

18  beyond those that served on his SER board have relevant information about his claims and that the

19  risk posed to the government's legitimate interests is justified, he may seek further discovery. This

20  issue will be left in the capable hands of the magistrate judge.

21  \\\\

22  \\\\

23  \\\\

24

25

26

27

28

- 13 -

1

**CONCLUSION**

2       For the reasons discussed above, the Court **DENIES** defendants' appeal of and motion to

3  reverse the Magistrate's Order granting Wilkins' motion to compel the Secretary of the Navy to

4  release selection board personnel from their oath of secrecy.  Specifically, the Court **AFFIRMS** the

5  Magistrate's Order to the extent that it allows Wilkins to depose the members of his SER board.

6  Requests to depose other selection and promotion board personnel may be made by Wilkins at a

7  later time for the consideration of Magistrate Judge Papas.

8       **IT IS SO ORDERED.**

9

10  Dated: _Nov. 12, 2003_                    _Irma E. Gonzalez_

11                                           **IRMA E. GONZALEZ**
                                            United States District Judge

12  cc:     Magistrate Judge Leo S. Papas
            all parties

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 14 -

STATISTICAL ANALYSIS OF PROMOTION AND
EARLY RETIREMENT SELECTIONS
IN THE UNITED STATES NAVY CHAPLAIN CORPS

in the matter of

C.F.G.C., et al. v. Donald C. Winter, et al.
and
Robert H. Adair, et al. v. Donald C. Winter, et al.

SUPPLEMENTAL REPORT

by

Bernard R. Siskin, Ph.D.
Director and Head of Labor Practice Group

LECG
Philadelphia, PA

May 2006

Defendants' Reply in Favor of
Renewed Motion to Reconsider
Exhibit B
Page 1 of 39

STATISTICAL ANALYSIS OF PROMOTION AND
EARLY RETIREMENT SELECTIONS
IN THE UNITED STATES NAVY CHAPLAIN CORPS
in the matter of
C.F.G.C., et al. v. Donald C. Winter, et al.
and
Robert H. Adair, et al. v. Donald C. Winter, et al.
SUPPLEMENTAL REPORT


Bernard R. Siskin, Ph.D.


## I.    INTRODUCTION AND SUMMARY

I have been requested by counsel for the Defendants to conduct statistical analyses of

promotion selections and early retirement selections at the U.S. Navy Chaplain Corps, to address

the question of whether Non-Liturgical Protestant Chaplains were disadvantaged by these

employment processes[1].  I have previously submitted a report in this matter dated June 23, 2003.

Additionally, since Plaintiffs have subsequently alleged that Roman Catholic Chaplains were

specifically advantaged, I was also asked to analyze the experience of Roman Catholic Chaplains

with respect to promotions and early retirement selections.  I was also asked to comment on various

"analyses" submitted by Plaintiffs' expert, Dr. Harald Leuba, in this matter. My understanding from

Counsel is that the relevant time period for this matter is 1988 to 2002.  I have studied the 1988 to

2002 time period for promotions and the 1991 - 1998 time period  for early retirement decisions[2].

---

[1]    I am being compensated at an hourly rate of $300.00.  A copy of my Curriculum
Vita is attached as Appendix 1.

[2]    The first SER Board was in 1991.  I was provided SER Board data for 1991 -
1998.

Defendants' Reply in Favor of
Renewed Motion to Reconsider
Exhibit B
Page 2 of 39

-2-

My statistical analyses show that:

- Overall, Non-Liturgical Protestant Chaplains were somewhat <u>more</u> likely to be promoted during the time period 1988 to 2002; this surplus of Non-Liturgical Protestant Chaplain promotions was numerically relatively small and well within statistical norms. Thus, the proper statistical inference is that the promotion rates of Non-Liturgical Protestant Chaplains are statistically the same as those of other Chaplains.

- There is no statistically significant difference in the promotion rates of Non-Liturgical Protestant Chaplains and other Chaplains for any of the three ranks of Lieutenant Commander, Commander, or Captain over the time period 1988 - 2002.

- Overall, Roman Catholic Chaplains were somewhat <u>less</u> likely to be promoted during the time period 1988 to 2002; this shortfall of Roman Catholic Chaplain promotions was numerically trivial and well within statistical norms. Thus, the proper statistical inference is that the promotion rates of Roman Catholic Chaplains are statistically the same as those of other Chaplains.

- There is no statistically significant difference in the promotion rates between Roman Catholic Chaplains and other Chaplains for any of the three ranks of Lieutenant Commander, Commander, or Captain over the time period 1988 - 2002.

- Overall, Non-Liturgical Protestant Chaplains were somewhat <u>less</u> likely to be selected for early retirement than other faith groups during the time period 1991 to 1998; this shortfall of Non-Liturgical Protestant Chaplains early retirement selections was numerically relatively small and well within statistical norms. Thus, the proper statistical inference is that the selection rates for early retirement of Non-Liturgical Protestant Chaplains are statistically the same as for other Chaplains.

- There is no statistically significant difference in the selection rate for early retirement of Non-Liturgical Protestant Chaplains relative to other Chaplains for the ranks of Commander and Captain over the time period 1991-1998.

- Overall, Roman Catholic Chaplains were also slightly <u>less</u> likely to be selected for early retirement during the time period 1991 to 1998; this shortfall of Roman Catholic Chaplain early retirement selections was numerically relatively small and well within statistical norms. Thus, the proper statistical inference is that the selection rates for early retirement of Roman Catholic Chaplains are statistically the same as for Chaplains of other

-3-

faith groups.

- There is no statistically significant difference in the selection rate for early retirement of Roman Catholic Chaplains for the ranks of Commander and Captain over the time period 1991-1998.

- Plaintiffs' expert, Dr. Harald Leuba, has submitted eight reports/Declarations in regard to this matter in addition to a report which also relates to promotions and selections for early retirement in regard to the Wilkins v. United States matter. None of his analyses have any probative value, due to meaningless "apples and oranges" comparisons, incorrect and invalid statistical analyses, and inclusion of data from long before the relevant time period. When Dr. Leuba does present data from the relevant time period of 1988 - 2002, his own figures refute Plaintiffs' allegation.

## II.    NOTE ON STATISTICAL EVIDENCE

How can a statistician assist the fact finder in evaluating the merits of a religion based promotion discrimination claim? To answer that question, consider the following illustration. Assume that you have engaged in a coin-flipping wager with a stranger in which you win one dollar for each flip that turns up tails. The stranger flips the coin ten times and reports ten heads. Should you accuse the stranger of cheating? Suppose you examine the coin and find it is two headed, or someone tells you that he saw the results of the flips and that they were not really all heads. In these cases, you have direct evidence that the stranger cheated, and you should accuse him of cheating. Suppose, however, that you have no such direct evidence. The only information you have upon which to decide whether to accuse him of cheating is the result of ten heads in ten flips. The question, then, is whether this pattern of results (or statistical evidence) is sufficient to infer that you have been cheated. To decide this, we must first compare the pattern of reported results with what we would expect in a fair coin-flipping game. If we assume that the coin and the flipping process are fair, we will not always observe five tails and five heads in ten flips, because of chance. Thus, if our stranger reported getting six heads in ten flips of the coin, would we consider accusing him of cheating, even though six heads is one more

-4-

than expected? Probably not. Six heads in ten flips clearly does not constitute statistical evidence of cheating. That is, the disparity (one more than expected) is reasonably attributed to chance. Our stranger reported, however, getting ten heads in ten flips of the coin. Should we accuse him of cheating? Maybe. We would certainly feel more comfortable with our accusation in this scenario. What objective criteria can we use to help us make (or not make) such an accusation? How do we weigh the possibility that chance alone can explain the disparity as opposed to other factors, such as cheating?

The odds of observing ten heads in ten flips of a fair coin, based on probability theory, is $0.001$. That is, there is less than a one in a thousand chance of this result occurring in a fair game. Thus, it is reasonable to rule out chance as the explanation for the ten-heads result and to accuse the stranger of cheating. Suppose, however, that he reported nine heads instead of ten. Nine or more heads would occur by chance in a fair game approximately once in one hundred games. Should we rule out chance and accuse him of cheating or simply consider him very lucky? We need a standard against which we can conclude that the likelihood of the result occurring by chance is so small that we can rule out chance as the cause. In traditional applications of statistics, if the likelihood that chance could cause the result is five percent or less, the result is said to be statistically significant. In our coin-flipping example, we can conclude, therefore, that something other than chance (or luck) was at work to produce the result. The chance probability of seeing nine or more heads in ten flips of the fair coin is less than the five percent "standard". Accordingly, we would accuse the stranger of cheating based solely on the statistical evidence.

The difference between the expected and actual number of heads was converted to a probability value. This value indicated the likelihood that chance factors alone could have caused such a large difference. As an alternative to calculating probability values, statisticians often express the difference

-5-

between the expected and actual results in units called standard deviations. These units can be directly converted to probabilities. The larger the difference between expected and actual values, the larger the units of standard deviations. The larger the difference in units of standard deviations, the smaller the probability that the difference is due to chance alone. A standard deviation difference greater than two units is associated with a chance probability value of five percent (0.05) or less.

In this report, I use the term "statistically significant" to indicate a particular result where the difference in units of standard deviations is greater than two units. Conversely, where this difference is less than two standard deviations, I use the term "not statistically significant". The decision maker in this matter, is free to adopt whatever standard of statistical significance deemed appropriate. However, traditional statistical inference and recent legal opinion tend to agree on the use of two standard deviations as a minimum standard.[3]

How can we analyze a claim that promotion decisions are related to religious faith group? Just as in the coin flipping illustration, we need to do two things:

(1)     compare what actually occurred with what we would expect to have occurred if faith group played no role in the promotion decisions; and,

(2)     determine if the difference is statistically significant; that is, whether it could be attributed to chance.

How does one determine what is expected from a faith group neutral process? It is simply a matter of comparing the number of actual promotions with the expected number of promotions for a particular faith group. If 30 percent of the promotion eligible group work force is Non-Liturgical Protestant, in a faith group neutral process we would expect 30 percent of those promoted to be Non-

---

[3]     In <u>Hazelwood School District v. United States</u> [433 U.S. 299, 311 n.14 (1977)], the Supreme Court relied upon a two to three standard deviations difference: "If the difference between the expected value and observed number is greater than two or three standard deviations, then the hypothesis that teachers were hired without regard to race would be suspect."

-6-

Liturgical Protestants. Thus, if there are ten promotion decisions made, I would expect that three of

the ten Chaplains promoted (30 percent) would be of the Non-Liturgical Protestant faith group.

If the result is statistically significant, does this prove that discrimination has occurred?

Absolutely not. It only means that we have examined the available statistical evidence and have made

an inference that it is very unlikely that the process was neutral with respect to religious faith group.

## III.    DATA

I relied on the following data provided to me:

- Navy Chaplain Corps Promotion Statistics (Appendix 2) - these data show the number of in-zone and above-zone eligible candidates and selections by faith group and position (Lieutenant Commander, Commander, and Captain) for the years 1991 to 2002. Appendix 2 also shows the comparable figures using the Plaintiffs' definition of faith group.

- Listing of in-zone and above-zone candidates and selection by faith group and position for 1988 to 1990 using the Navy designation of faith group (Appendix 3).

- Listing of in-zone and above-zone candidates and selections by faith group and position for 1988 to 1990 using the Plaintiffs' definition of faith group (Appendix 4).

- Number of Chaplains eligible for and selected for early retirement by faith group, position, and year for the time period 1991 to 1998 (Appendix 5).

- "Promotions in the Navy Chaplain Corps," Center for Naval Analyses, March 10, 2000.

-7-

## IV.    PROMOTION SELECTION PROCESS

Chaplains enter the U.S. Navy with a certain number of years of service, based on time spent in seminary and civilian ministry. They are generally commissioned at either Lieutenant JG or Lieutenant. Chaplains are then considered for promotion to higher ranks after their credited service plus years served at their current rank reaches predetermined levels. When a Chaplain reaches the overall required level of service at a particular rank, he/she becomes eligible for promotion to the next rank. Chaplains are considered to be "in-zone" the first time they are eligible for promotion to the next higher rank. Promotion Selection Boards are convened once a year to recommend candidates for promotions at each rank.

Eligible candidates who are passed over are then classified to be "above-zone" and are considered for promotion in subsequent years. It is my understanding that a candidate who is passed over twice for promotion to the next rank is generally separated from active duty, but under certain circumstances, some Chaplains may be continued on active duty.

In rare circumstances, Chaplains may be selected for promotion before they reach "in-zone" status, depending on their particular qualifications and the overall needs of the Navy. Such selected Chaplains are known as "below-zone" selections. It should be noted, however, that once the Navy determines the service criteria for reviewing below-zone candidates, all such eligible candidates are considered.

-8-

## V.    STATISTICAL ANALYSIS OF PROMOTION DECISIONS

### A.    Non-Liturgical Protestants

I first performed a series of statistical comparisons of the actual versus expected number of Non-Liturgical Protestants, selected based on the faith group mix of Navy Chaplain Corps candidates before each promotion Selection Board from 1988 through 2002 for the three ranks of Lt. Commander, Commander, and Captain. I conducted separate analyses of a) in-zone candidates and selections, b) above-zone candidates and selections, and c) combined in-zone plus above-zone selections controlling for zone.

The underlying premise of these analyses is that, if Non-Liturgical Protestants represent, for example, 30 percent of the candidates for a given position in a particular year, they should receive approximately 30 percent of the promotions for that position in that year.

Table 1A compares the actual and expected number of Non-Liturgical Protestant promotions for in-zone candidates separately for each year, for each position over the time period, and it also aggregates the total over all positions and years. Table 1A shows that, over all years and positions, there was a very slight over-selection of Non-Liturgical Protestants. Out of the 1,013 total in-zone promotions, while 409.4 Non-Liturgical Protestants would have been expected to be selected based on their representation in each promotion Selection Board in each year, there were actually 417 Non-Liturgical Protestants promoted. Thus, there was a slight over-selection of 7.6 Non-Liturgical Protestants, which is not statistically significant. The selection of Non-Liturgical Protestants for promotion was within statistical norms in each year and for each position overall.

The comparison of above-zone promotions with above-zone eligible candidates is presented in Table 1B. There were 147 promotions from above-zone candidates over the 1988-2002 time

Defendants' Reply in Favor of
Renewed Motion to Reconsider
Exhibit B
Page 9 of 39

-9-

period, as compared with 1,013 promotions from in-zone candidates (see Table 1A); thus, about 13 percent of promotions were from above-zone candidates. Table 1B shows that, overall, there was a very slight surplus of 2.5 more Non-Liturgical Protestant above-zone promotions than expected, with each year and position within statistical norms.

Table 1C combines the results of Tables 1A and 1B, showing all in-zone and above-zone promotions based on separate pools of in-zone and above-zone candidates. Again, the promotions of Non-Liturgical Protestants are statistically in line with their expected number overall, by position, and in every year.

I understand that Plaintiffs are challenging the faith group assignment for some number of Chaplains. Counsel for Defendant has provided me with an alternate set of counts of eligible and selected candidates using the faith group designation claimed by the Plaintiffs. To determine the effect of the Plaintiffs' faith group definition, I reran the Non-Liturgical Chaplain promotion analyses that I presented in Tables 1A through 1C, except that I used the Plaintiffs' faith group designations. These results are presented in Tables P-1A to P-1C in Appendix 6. While Plaintiffs figures result in slightly fewer Non-Liturgical Protestant promotions, overall there is still a slight surplus of Non-Liturgical Protestant promotions. The results are virtually the same as those in Tables 1A to 1C. Thus, regardless of which faith group definition is used, the promotion rates of Non-Liturgical Protestant Chaplains are the same as for Chaplains of other faiths.

B.    Roman Catholics

I also performed a series of statistical comparisons of the actual versus expected number of Roman Catholics, selected based on the faith group mix of Navy Chaplain Corps candidates before each promotion Selection Board from 1988 through 2002 for the three ranks of Lt. Commander,

-10-

Commander, and Captain. I again conducted separate analyses of a) in-zone candidates and selections, b) above-zone candidates and selections, and c) combined in-zone plus above-zone selections controlling for zone.

Table 2A compares the actual and expected number of Roman Catholic promotions for in-zone candidates separately for each year, for each position over the time period, and it also aggregates the total over all positions and years. Table 2A shows that, over all years and positions, there was a very slight under-selection of Roman Catholics. Out of the 1,013 total in-zone promotions, 207.4 Roman Catholics would have been expected to be selected based on their representation in each promotion Selection Board in each year, as compared with 203 Roman Catholics actually promoted. Thus, there was a slight under-selection of 4.4 Roman Catholics. The selection of Roman Catholics was well within statistical norms in each year and for each position overall.

The comparison of above-zone promotions with above-zone eligible candidates is presented in Table 2B. Table 2B shows that, overall, there was a slight shortfall of 2.9 Roman Catholic above-zone promotions than expected, with each year and position within statistical norms.

Table 2C combines the results of Tables 2A and 2B, showing all in-zone and above-zone promotions based on separate pools of in-zone and above-zone candidates. Again, the promotions of Roman Catholics are statistically in line with their expected number overall, by year, and by position.

Again, since Plaintiffs are challenging the faith group assignment for some number of Chaplains, I reran the Roman Catholic Chaplain promotion analyses that I presented in Tables 2A through 2C, using the Plaintiffs' faith group designations. These results are presented in Tables P-

-11-

2A to P-2C in Appendix 6. The results are virtually the same as those in Tables 2A to 2C. Thus, regardless of which faith group definition is used, the promotion rates of Roman Catholic Chaplains are the same as for Chaplains of other faiths.

## VI.    SELECTIONS OF CHAPLAINS FOR EARLY RETIREMENT

I relied upon data provided by Counsel showing the number of Chaplains eligible for and selected for early retirement by faith group, position, and year. The data were available for the time period 1991 to 1998 (Appendix 5). It is my understanding that Plaintiffs have alleged that Non-Liturgical Protestant Chaplains were more likely than Liturgical Chaplains to be selected for early retirement; also, Plaintiffs have alleged that Roman Catholic Chaplains are the preferred group and are less likely than Chaplains of other faith groups to be selected for early retirement.

Chaplain Officers at the Commander and Captain levels are eligible for early retirement based on objective criteria of time-in-grade and years of active service. The number of Officers selected for early retirement is a function of the Navy's needs in a given year to reduce the number of Officer positions. I was provided data showing the number of Chaplains eligible and selected for early retirement by faith group for the ranks of Commander and Captain for the years 1991 to 1998. I analyzed early retirement selections in the same manner as I analyzed promotion selections. That is, if Non-Liturgical Protestants represented 30 percent of the Chaplains eligible for early retirement for a given position and year, then, if faith group were statistically independent of selections, one would expect approximately 30 percent of the early retirement selections for that position and year to be Non-Liturgical Protestants. Table 3 summarizes the results of these statistical analyses. Overall, there was a slight shortfall of 2.9 Non-Liturgical Protestants selected for early retirement. This overall shortfall was composed of a shortfall of 5.2 Non-Liturgical Protestant Commanders and

-12-

a surplus of 2.3 Non-Liturgical Protestant Captains. All shortfalls and surpluses of early retirement selections were well within statistical norms overall and for each year. Thus, there is no statistical support for Plaintiff's allegation that Non-Liturgical Protestant Chaplains were disproportionately more likely than Chaplains of other faith groups to be selected for early retirement.

Plaintiffs disagree with the faith group designation for some of the Chaplains in this analysis (as they object to some of the faith group designations for the promotion analyses). Table P-3 in Appendix 6 show the analyses using the Plaintiffs' faith group designations. The results are virtually unchanged and contradict the allegations of Plaintiffs that Non-Liturgical Protestants were disadvantaged by the early selection process.

I repeated these analyses for Roman Catholic Chaplains. The results, presented in Table 4 show that there was a very slight shortfall of 1.7 Roman Catholic Chaplain selections for early retirement, which is not statistically significant. Similarly, the actual number of selections by year, by position and overall is not statistically significantly different from the expected number of selections. I repeated this analysis using Plaintiffs' designation of faith groups; the results are presented in Table P-4 of Appendix 6. The results presented in Table P-4 are identical to those presented in Table 4, since there is no difference in the faith group designation for any eligible and selected Roman Catholic Chaplains.

## VII.    COMMENTS ON ANALYSES OF PLAINTIFFS' EXPERT, DR. LEUBA

Plaintiffs' expert, Dr. Leuba, has submitted a multitude of reports and Declarations in this matter and the Ronald Wilkins v. United States matter opining about how Non-Liturgical Protestants are disadvantaged and Roman Catholic Chaplains are favored by the Navy with respect to promotions and selections for early retirement. He has also included comments about accessions

-13-

in some of these reports. None of his reports or Declarations have any probative value.

In general, Dr. Leuba exhibits a lack of understanding of proper statistical comparisons and analyses. Dr. Leuba:

- makes inappropriate "apples and oranges" comparisons,

- does not appear to know how to properly compute tests of statistical significance,

- calls attention to percentages which are numerically different but are not statistically significantly different and are thus attributable to chance,

- inappropriately conducts "post-hoc" analyses[4], and

- computes promotion percentages from broad groups of Chaplains who are neither similarly situated nor comparable.

Unless one is comparing the outcomes for Chaplains who are reasonably similarly situated except for faith group, no valid inferences whatsoever can be drawn concerning whether or not there is valid statistical evidence that faith group is the factor that is influencing the outcome.

---

[4]     It is statistically incorrect to conduct post-hoc analyses (i.e., analyses in which one first looks at the data and then creates or selects groups to test which are then based on that initial examination). In such cases, any statistical tests are invalid because one can create an illusion of differences between the groups purely by chance by (i) defining groups so as to maximize the differences in the data and/or (ii) choosing to compare a group with a maximum value to a group with a minimum value, as if they were the only two groups available for comparison. For example, if one flips a coin ten times repeatedly, one will occasionally obtain nine heads and one will occasionally obtain nine tails, purely by chance. Observing the totality of outcomes, one would see a random process with an occasional greater than expected heads or tails result. However, if one chose to look at only the two cases where there were nine heads or nine tails, one would observe an illusion in which the two cases appeared to be statistically significantly different rather than simply the result of random fluctuation in the flipping process.

-14-

Dr. Leuba also includes figures from populations and decisions from as far back as 1972 (more than 34 years ago). In this report, I only specifically address figures which cover the relevant time period, 1988 to 2002. I also do not attempt to address every table, comment, or assertion made in all of Dr. Leuba's Declarations. I focus on the major assertions of Dr. Leuba. Even though accessions are not at issue in this matter, Dr. Leuba addresses accessions and therefore I include some comments on his analysis of accessions.

On May 12, 2002, Dr. Harold Leuba submitted a Declaration in this Adair matter. One of Dr. Leuba's conclusions in this Declaration is that the Chaplain Corps' representation does not match the faith group preferences of Navy personnel. This conclusion, even if correct, does not address any specific promotion decisions made by Selection Boards. Dr. Leuba's second conclusion regarding promotions is based on analysis of aggregated statistics of active duty Chaplains and promotions from back to 1972 and are of no probative value, since they do not compare Chaplains who were similarly situated with respect to their eligibility for selections by year; moreover, this analysis confounds decisions made in the recent time period with decisions made up to 34 years ago. It is also useful to note that Dr. Leuba discusses only four Faith groups in this Declaration - Liturgical, Non-Liturgical, Roman Catholic and Special Worship. In later Declarations, he is inconsistent in his tabulations, sometimes breaking down Non-Liturgical Chaplains into two subgroups of Baptists and non-Baptists, and sometimes breaking down Special Worship Chaplains into Jewish and Non-Jewish subgroups. His categorizations of faith groups appear to be driven by what the data shows, which is the very definition of post-hoc analysis.

Dr. Leuba submitted an Expert Opinion in the Wilkins matter dated April 29, 2003. In this Declaration also, Dr. Leuba only addresses four faith groups - Liturgical, Non-Liturgical Protestant,

-15-

Roman Catholic and Special Worship. I have reviewed this Expert Opinion in the Wilkins matter

and find it to be of no probative value for addressing the issue of promotions. While Dr. Leuba

states on page 3 of this report that there is a "clear and consistent pattern and practice of systematic

faith-based bias in the selection and promotion of U.S. Navy Chaplains," in fact he conducts no

promotion studies whatsoever. His most glaring and fatal error is that he simply lists the counts by

faith group of those Chaplains at the Lieutenant/Lieutenant JG ranks and the counts by faith group

of those at the Captain ranks at a particular point in time, and then misrepresents the ratio of these

numbers as a "promotion probability" (see Table 1 of this report). For example, in 2002, his tables

indicate that there are 131 Liturgical Chaplains at the Lieutenant/Lieutenant J.G. ranks and

33 Liturgical Chaplains at the Captain rank. From this, he then claims that the "promotion

probability" to the rank of Captain for Liturgical Chaplains in 2002 is $33/131 = 25.2$ percent.

Clearly, Dr. Leuba is not measuring promotions. Lieutenants and Lieutenants JG are three to four

ranks below Captain and these lower ranks are clearly not eligible for promotion to Captain in 2002.

Generally, a newly commissioned Chaplain enters the Navy as a Lieutenant, J.G. or Lieutenant with

approximately three or four years of credited service. The Navy promotes candidates from each rank

to the next higher rank based on their credited service and zone status each year. Chaplains do not

become in-zone for Captain until they have approximately 20 years of service. Thus, Chaplains at

rank Lieutenant JG or Lieutenant must serve a substantial number of additional years and advance

through the ranks of Lieutenant Commander and Commander before they first become eligible for

promotion to Captain. Furthermore, all of those at the Captain rank at a particular point in time have

not necessarily been selected in that year; in fact, some may have been selected for the Captain rank

many years earlier. Dr. Leuba's claims regarding "promotions" are incorrect and illogical.

-16-

Dr. Leuba takes issue with the notion of comparing promotions with those considered for promotions. On page 7, he claims this is a major source of bias. He states that it excludes from consideration all of those "outside the zone" Chaplains who are not considered "exceptional" (i.e., those few Chaplains who are "below the zone"). He further asserts that the exclusion of "non-exceptional" chaplains is the mechanism by which the Navy "stacks the deck" against the Non-Liturgical Protestant and Special Worship Chaplains.

If there were substantial numbers of "below-zone" candidates being promoted by circumventing the promotion board process, and if these below-zone promotions were disproportionately from the Liturgical faith groups, his complaint might warrant further study. However, there were a grand total of 11 promotions over the 12 year time period from the below-zone group, amounting to less than one selection per year. There were six such below-zone promotions for Lt. Commander, two for Commander, and three for Captain. Four of the 11 below-zone promotions were for Non-Liturgical Protestant Chaplains. These selections of "exceptional" candidates are relatively rare, do not exclude Non-Liturgical Protestants, and cannot possibly bias any promotion analysis. Dr. Leuba's complaint of bias is totally unfounded.

In addition to the above two reports, I have also been provided with seven additional Declarations:

- "Addendal" Declaration, April 2005

- "Compendium" Declaration, June 2005

- "Supplemental" Declaration, July 2005

- "Information Theory Supplement" to the Compendium Declaration, September 2005

- "Appendage" Declaration, November 2005

-17-

- "Allonge" Declaration, February 2006

- "Statistical Expert's" Declaration, May 2006

I have reviewed all of the additional Declarations of Dr. Leuba named above. None of these additional Declarations presents any valid statistical analyses which alter my opinion that Non-Liturgical Protestants were not disadvantaged by the promotion or early retirement processes of the Navy. Similarly, Dr. Leuba has presented no valid statistical analyses that support Plaintiffs' allegations that Roman Catholics or any other faith group were advantaged in any way with respect to promotions or early retirements.

I will comment on the major assertions in Dr. Leuba's additional Declarations.

1)    Addendal Declaration, April 2005

Dr. Leuba asserts that Roman Catholics are advantaged by the promotion process, and are especially advantaged when there are more than one Roman Catholic Chaplain on the Promotion Board. He also asserts that accessions and separations favor Catholics and disfavor Non-Liturgical Protestants. He is incorrect. As my analyses have shown, no particular faith group was either advantaged or disadvantaged. In a departure from the prior reports discussed above, Dr. Leuba now breaks down the Non-Liturgical Protestant faith groups into Non-Liturgical Baptist and Non-Liturgical Other; he also breaks down the Special Worship faith group into Jewish and other, with no clear rationale as to why he does this.

In Paragraphs 12 through 34, Dr. Leuba discusses various probability formulas and calculations relating to the chances of having a Roman Catholic on every Promotion Board. As Dr. Leuba claims in Paragraphs 29 to 31 that, until 1987, it was the Navy's practice to assign two Roman Catholics to a Promotion Board; after 1987, the Navy then modified its practice to assign

-18-

one Roman Catholic to each Promotion Board. The Navy acknowledges this practice after 1987, so probability calculations are irrelevant. The only issue is whether this affects a candidate's likelihood of selection for promotion. It does not, as detailed *infra*.

In this and other Declarations, Dr. Leuba makes many "apples and oranges" comparisons. For example, in his Table 5, Dr. Leuba compares the volume of promotions in one time period (1991 - 2002) to the volume of promotions in another time period (1982 - 1991)[5]. He submits that Table 5 demonstrates that "relatively more" Roman Catholics were promoted in the "old" 1982 - 1991 time period (ratio of 1.57) and relatively fewer Non-Liturgical Protestants were promoted in the 1982 - 1991 time period (ratio of 0.84). This would "mean" that there were relatively fewer Roman Catholic promotions and relatively more Non-Liturgical Protestant promotions in the "current" 1991 - 2002 time period. In reality, however, these ratio comparisons are meaningless. Comparing the number of promotions by faith group in two different time periods without considering the faith group mix of candidates eligible to be promoted in each of the two time periods is meaningless. For example, the results in Dr. Leuba's Table 5 could also be generated by a situation in which exactly one-half of all candidates for promotion were selected in each of the two time periods (obviously, a perfectly faith group-neutral selection process). Conversely, the results in Dr. Leuba's Table 5 could also be generated by a situation in which exactly one-half of all Roman Catholic, Non-Liturgical Protestant and Special Worship candidates were promoted, but only 10 percent of the Liturgical Protestant candidates were promoted. In fact, the results in Table 5 could be generated by a "fair" system, a system that favors Liturgical Protestants and a system that favors Non-Liturgical Protestants. Therefore, Table 5 is useless in assessing the possibility of discrimination.

---

[5]     This time period is incorrectly labeled as 1981 - 1992 in Dr. Leuba's Table 5.

-19-

This type of statistical comparison, in which the comparison has no relationship to whether or not discrimination exists is common throughout Dr. Leuba's statistical presentations. Meaningful comparisons would consider the faith group mix of candidates available to be promoted each year by position (e.g., Commander, Captain) and the promotion selection decisions made from these year/position pools.

In paragraphs 64-66, Dr. Leuba asserts that the presence of Chaplains of a given faith on the Promotion Board carries three times the weight of the prevalence of that faith group in the pool of candidates in predicting that faith's number of promotions. Both these statements and their supporting "analyses" are utterly false and meaningless.[6] Dr. Leuba's bases for these "conclusions" are the figures in his Table 6 in which he lists three distinct counts in three different time periods: a) Row 1 of Table 6 is labeled "Completed Their Careers 1981 - 1992", b) Row 2 of Table 6 are the numbers of each faith group assigned to Promotion Boards from 1977 - 2002, and c) Row 3 of Table 6 is labeled "Promoted to CDR and Above 1991 - 2002)[7]. Thus, Dr. Leuba is relating all promotions in one time period (1982 - 1991), irrespective of position, to a) all separations (or accessions) in a second time period (1981 - 1992), and to b) Promotion Board assignments in a third time period (1977 - 2002). These comparisons are illogical and any resulting calculations made from these comparisons are completely meaningless and of no probative value whatsoever with regard to the issue of whether or not the faith group of those on the Promotion Board affects a

---

[6]     Dr. Leuba's statement is based on a regression of five data points, where the data points are meaningless, as discussed *infra*.

[7]     However, in Paragraph 64, this figure is referred to as Number Accessioned. The time period in Row 3 of Table 6 (1991 - 2002) appears to be incorrect, since the figures in this row match those of Table 5, which, as noted above, are for 1982 - 1992.

-20-

candidate's likelihood of promotion .

Table 7 of Dr. Leuba's Addendal Declaration presents counts of candidates and selections

from Promotion Boards with One Catholic and Promotion Boards with Two Catholics. The Boards

with Two Catholics are for the years 1981 - 1986, prior to 1988. Even including these decisions

from prior to 1988, Dr. Leuba's statements regarding Table 7 are wrong. Contrary to Dr. Leuba's

assertions, these data do not provide support for the allegation that the number of Roman Catholics

on the Board adversely affects the likelihood of promotion for non-Roman Catholic candidates. In

fact, the data do not provide any support for the allegation that the number of Roman Catholics on

the Board has any impact on promotion decisions:

|  | Percent Promoted | | Disparity in Units of | |
| --- | --- | --- | --- | --- |
|  | One Catholic on Board | Two Catholics on Board | Standard Deviation | Statistically Significant? |
|  | (1) | (2) | (3) | (4) |
| Roman Catholic | 56.9% | 63.9% | 0.68 | No |
| Liturgical Protestant | 47.2 | 46.3 | 0.00 | No |
| Non-Liturgical Protestant (All) | 50.8 | 40.7 | 1.39 | No |
| Special Worship (All) | 60.0 | 71.3 | 0.00 | No |

In Table 8, Dr. Leuba presents figures broken down by whether there were one or no Non-

Baptist Non-Liturgical Chaplains on the Promotion Board. Again, some of these data go back to

1981. Nevertheless, contrary to Dr. Leuba's assertions, Table 8 does not support the conclusion that

the number of Non-Baptist Non-Liturgical Chaplains on a Promotion Board adversely affects Non-

Baptist, Non-Liturgical candidates or has any impact on the promotion decisions.

-21-

| | Percent Promoted | | Disparity in Units of Standard Deviation | Statistically Significant? |
|---|---|---|---|---|
| | One Non-Baptist Non-Liturgical Chaplain on Board | No Non-Baptist Non-Liturgical Chaplains on Board | | |
| | (1) | (2) | (3) | (4) |
| Roman Catholic | 71.4% | 59.9% | 0.38 | No |
| Liturgical Protestant | 50.0 | 46.6 | 0.23 | No |
| Non-Liturgical Protestant (All) | 72.2 | 51.1 | 1.49 | No |
| Special Worship (All) | 0.0 | 66.7 | 0.91[8] | No |

In Table 11, Dr. Leuba presents counts of Chaplains and those promoted to Commander. Here, he purportedly counts a candidate once rather than each time the candidate is considered for promotion. These data also show that there is no disparity in promotion rates by faith group. Dr. Leuba shows data for six faith groups: Non-Liturgical Baptists, Jewish, Liturgical Protestants, Non-Liturgical Non-Baptists, Roman Catholics, and non-Jewish Special Worship. The promotion rates range between 50.4 percent for Non-Liturgical Baptists to 70.0 percent for Jewish.[9] A proper test of statistical significance, which jointly tests whether there are disparities in the promotion rates among all six faith groups, yields a statistical disparity of only 1.81 units of standard deviation. Again, this result does not provide valid statistical support for the statement that there is a difference in the promotion rates among the faith groups, when candidates are counted once as opposed to

---

[8]    Although this disparity appears to be very large, it is not statistically significant because the 0 percent selected (see column 1) is from a sample of 1 observation (i.e., 0 selections, but only 1 candidate).

[9]    In his paragraph 114, Dr. Leuba constructs an invalid post-hoc analysis by first looking at the results of his calculations, and then comparing groups that had "higher" promotion rates with groups that had "lower" promotion rates. Post-hoc analysis is well known to be invalid. One cannot decide which groups to test by looking at the outcomes and then deciding to compare an after-the-fact "high" rate with an "after-the-fact" low rate.

-22-

being counted in each year in which they are considered, as I do in my analyses.[10]

In Paragraph 114, Dr. Leuba also mentions that Catholics are promoted "sooner" than Non-Liturgical and Liturgical Protestants. However, Dr. Leuba fails to assess the statistical significance of this "difference." In fact, the average number of times considered equals 1.6 for Roman Catholics and ranges from 1.8 to 2.0 for Liturgical Protestants and Non-Liturgical Baptists Non-Baptists. These figures are virtually the same and one must conclude that, since they are not statistically significantly different, the data do not allow an inference that Roman Catholics are promoted "sooner" than Non-Liturgical and Liturgical Protestants.

Dr. Leuba presents additional statistics on promotions and some new statistics on separations (Released from Active Duty) in his Table 12. These results are supposed to represent the figures which he compiled from the Chaplains Corps History for the time period 1982 to 1991. However, these figures do not consider how long a candidate was active during the period. These Chaplains could have worked for as little as a year or they could have worked for the full time period. Once again, Dr. Leuba has attempted to make comparisons with no controls for year, time spent in the Navy, date accessioned into the Chaplain Corps, or whether or not a candidate was even eligible for promotion. For example, one does not even become eligible for promotion to Captain until one has approximately 20 years of seniority. Consequently, the compilations in Table 12 are useless for assessing whether or not there is any valid statistical evidence to support Plaintiffs' allegations.

---

[10]    In addition, my analyses account for year of application and candidate rank

-23-

Similarly, Dr. Leuba's comparisons in Tables 13, 13A, and 14 have no probative value, since they pool all Chaplains who have served "any substantial amount of time"[11] between 1981 and 1992. Thus, all Chaplains are assumed to be equally likely to be promoted, regardless of when they were accessioned, what year they were considered for promotion, or whether they were eligible for promotion (e.g., had the necessary seniority to be considered for promotion to Captain or any other level).

2)    Compendium Declaration, June 2005

Here, Dr. Leuba summarizes many of the same flawed and meaningless comparisons made in his earlier reports and Declarations. He is inconsistent in this Declaration in his treatment of Non-Liturgical Protestants and Special Worship Chaplains. Sometimes, Dr. Leuba breaks these groups down into Non-Liturgical Baptist/Non-Baptist and Special Worship Jewish/Non-Jewish and sometimes he combines them.

I will comment on a few additional Tables in this Declaration. Table 12 presents counts of promotions to Commander by six faith groups for the time period 1991 - 2002. Table 12 focuses on unique individuals, but does not consider when or for how long a candidate was eligible for promotion. Nevertheless, putting this critical flaw aside, Dr. Leuba's statement in Paragraph 114, that "Catholics do best and the Non-Liturgicals don't do as well" is made without any consideration of whether the differences are statistically significant. A proper statistical analysis of the promotion rates of all six groups (which range from 40.9 percent for the relatively small group of Non-Jewish Special Worship Chaplains to 63.9 percent for the relatively small group of Jewish Special Worship Chaplains) shows that the six groups have promotion rates that are statistically the same (at

---

[11]    Dr. Leuba does not define the phrase "substantial amount of time."

-24-

0.79 units of standard deviation). Thus, Table 12 does not present any valid statistical evidence that promotion rates are different by faith group.

In Tables 19 and 20, Dr. Leuba tabulates data for two different time periods (1981 - 2001 and 1981 - 1986) on Chaplains who were considered and promoted to Commander; he looks at five faith groups - Roman Catholic, Liturgical Protestant, Non-Liturgical Baptist, Non-Liturgical Other and one category of Special Worship. Using both tables, one can obtain the results for the relevant years (1987 - 2001). For the relevant years in this matter (1987 - 2001), there are no statistically significant differences in promotion rates by faith group (0.13 units of standard deviation)

      3)    Supplemental Declaration, July 2005

Dr. Leuba presents his analyses of early retirement selection decisions in his Supplemental Declaration of July, 2005. He begins by presenting Table 2, which purports to be the percentage of Commanders and Captains eligible for potential exposure to Special Early Retirement (SER) Board Action. Here, he provides figures for four faith groups, without breaking out Non-Liturgical Protestants and Special Worships into subgroups. Column (1) of Table 2 represents Commanders/Captains on active duty in a single year (1991); column (2) represents Commanders/Captains selected for early retirement for the eight years 1991 - 1998. Dr. Leuba then computes "percent eligible" as column (2)/column (1) and obtains percentages greater than 100 percent (since he is comparing eligible Chaplains over 8 years to those on active duty for a single year). Clearly, this is an "apples and oranges" comparison and therefore a meaningless calculation.

Dr. Leuba proceeds to Table 7 in which he assigns Chaplains to five faith groups, breaking down Non-Liturgical Protestants into Baptists and non-Baptists, but not breaking down Special Worship Chaplains at all. Proper statistical analysis of Table 7 shows that all the tabulated faith

-25-

groups (Roman Catholics, Liturgical Protestants, Non-Liturgical Baptists, Non-Liturgical Non-Baptists, and Special Worship) have statistically _equal_ rates of selection for early retirement (disparity is 1.09 units of standard deviation)[12].

In Table 8, Dr. Leuba breaks out the selection decisions by the rank of person on the Board; he presents statistics for decisions made by Admirals for Commander, Captain, and All Ranks, and decisions made by Chaplains for the Commander position. Again, all of the results of the selections are neutral with respect to the faith group of the candidate.

|  | Disparity in Selection Rates in Units of Standard Deviation | Statistically Significant? |
|---|---|---|
|  | (1) | (2) |
| Admirals |  |  |
| Commander | 1.11 | No |
| Captain | 0.15 | No |
| All Ranks | 0.49 | No |
|  |  |  |
| Chaplains |  |  |
| Commander | 0.97 | No |

Again, in Table 12, Dr. Leuba attempts to make another comparison of SER Board actions by faith group. Here, he compares by faith group the number of Commanders and Captains in the Navy Chaplain Corps to the number sent to SER and the number forced to retire (see his columns 3 and 6). The rest of Table 12 is a repeat of Table 7, which I have already discussed above. However, as I discussed above with regard to Table 2, the number of Captains and Commanders in the Navy

---

[12]     Dr. Leuba claims that Roman Catholic Chaplains have a statistically significant "edge," but he is incorrect. He creates an illusion of an effect by "cherry-picking" the data (he compares the highest and lowest values, comparing Roman Catholics with Non-Liturgical Non-Baptists, and ignores the other faith groups). This type of post-hoc analysis is invalid.

-26-

Chaplain Corps does not represent the number of Captains and Commanders potentially eligible to be retired. This is illustrated by the fact that the third column in Table 12, labeled "Percent Eligible," has an overall figure of 105 percent, which is illogical and incorrect.

      4)     <u>Supplement to the Compendium Declaration, September 2005</u>

In his Supplement to Compendium Declaration, Dr. Leuba claims that selections are associated with the denominational composition of the Selection Board; i.e., that selections are affected by whether or not there is a match between the religious denomination of eligible candidates and the religious denominations of the members of the Selection Board. Again, Dr. Leuba's own data and tabulations for the relevant time period lead to the opposite conclusion, since there is <u>no</u> statistically significant relationship between the denomination of candidates and the presence or absence of a denomination match on the Selection Board and the likelihood of a candidate being selected . The data in Dr. Leuba's Table 1.1 for 1991 - 2002 show a statistically equivalent selection rate for those with a denomination match versus those candidates with no denomination match (1.50 units of standard deviation). In my comments below on the February 2006 Allonge Declaration, I will further discuss the absence of any effect of having a denominational match on the Board.

      5)     <u>Appendage Declaration, November 2005</u>

In his Appendage Declaration, Dr. Leuba continues his argument that "like likes like." That is, he continues to look at whether the denominational composition of Selection Boards is related to the selection decisions made (i.e., whether a candidate of a given denomination has a better chance of selection for promotion or accession if there is someone on the Selection Board of the same denomination or, conversely, whether the absence of a denomination match reduces the candidates'

-27-

chance of selection).[13]

Table 2 of this Declaration contains statistics aggregated over 20 years, from 1981 to 2002. These data cover years which are not relevant.

Table 4 presents figures on CARE Accession Boards for candidates with and without a denomination match for the years 2000 - 2002. Nevertheless, Dr. Leuba claims that his figures demonstrate statistically significantly adverse outcomes for candidates who are unlike members of the Board. Again, he does not calculate statistical significance properly. Proper statistical analyses of these accession rates controlling for year show that the differences in accession rates between candidates with a denomination match and candidates without a denomination match are not statistically significant. The disparity in accession rates is 1.72 units of standard deviation. Thus, the proper conclusion is that there is no valid statistical evidence that having a denomination match with someone on the CARE board has any effect on the likelihood of accession.

6)    Allonge Declaration, February 2006

In his Allonge Declaration, Dr. Leuba expands his already erroneous argument from "strict" denominational matching influencing selection to an argument that denominational "similarity" influences selection. Dr. Leuba's analyses of these data are flawed and incorrect, due to his aggregation of the data into arbitrary groups, failure to control for year and faith groups, and failure to correct the errors in his data base.

To analyze this hypothesis, he creates his own arbitrary construct of the extent to which a faith group denomination is "similar" to another faith group denomination. His construct is arbitrary,

---

[13]    He also claims that this works in reverse with respect to forced retirement. That is, having a denomination match reduces the chance of selection, and not having a denomination increases the chance of selection.

-28-

illogical and has no scientific foundation. His "similarity measures," range from 0.5 to 1.0. What

does a similarity of 0.6 mean? Second, Dr. Leuba's measures are inconsistent and illogical. For

example, from his Table 2, Dr. Leuba claims that a Roman Catholic candidate has a 0.8 similarity to

a Special Worship Board member. However, his Table 2 also shows that, if the candidate and Board

members switched places, but kept their same faith group, the "similarities" would be different. That

is illogical. Moreover, Table 2 also shows that a Roman Catholic Board member would have only a

0.5 "similarity" to another Special Worship candidate. His Appendix X, which reflects his underlying

data base, is riddled with errors. For example, Liturgical candidates are coded as having similarities

of 0.5, 0.8, and 0.9 to a Roman Catholic Board Member. Baptist candidates are sometimes coded as

having a 0.6 similarity to a Roman Catholic Board Member, and sometimes as having a 0.7 similarity

to a Roman Catholic Board Member. Non-Liturgical candidates are sometimes coded as having a 0.5

similarity to a Roman Catholic Board Member while at other times they are coded as having a 0.7

similarity to a Roman Catholic Board member.

    Moreover, even if one were to accept Dr. Leuba's similarity constructs, one would find that

his data do not support his assertions. I statistically analyzed the relationship between the faith group

of the candidates and the Board and the likelihood of selection via logistic regression which controlled

for the year and the candidate's faith group, using Dr. Leuba's data for the relevant time period from

1988 to 2002[14]. I specified two models: one which specified a strict denomination match and one

which used Dr. Leuba's concept of a "similarity" match. The results are summarized below.

---

[14]    For these runs, I corrected Dr. Leuba's errors in his data base and applied the
definitions that Dr. Leuba originally intended to use from his matrix.

-29-

| Model Controls | Effect of Faith Denomination Match in Units of Standard Deviation | Statistically Significant? |
|---|---|---|
| | (1) | (2) |
| Year, Candidate Faith Group, Strict Denomination Match | 0.73 | No |
| Year, Candidate Faith Group, Faith Similarity to Board | 0.93 | No |

Thus, Dr. Leuba's data do <u>not</u> present valid statistical evidence that denomination match (whether "strict" or "similar" according to Dr. Leuba) has any effect on the likelihood of being promoted. The proper statistical conclusion is that a denomination match between the candidate and the Board has no effect on the candidate's chance of being selected.

      7)    <u>Statistical Expert's Declaration, May 2006</u>

      I have just been provided with yet another report by Dr. Leuba, which is <u>unsigned</u> and dated May 10, 2006, five days before my report is due. I have not had time to fully read this latest Declaration. I reserve the right to address this latest Declaration in detail at a later date.

      Initially, this new Declaration simply appears to be a rehash of the flawed "analyses" that Dr. Leuba has already presented in his prior reports and Declarations. He reargues and reproduces his prior analyses of selection for early retirement, focusing in his Table A on unique persons rather than on selections in each year and without any consideration of length of service needed to be eligible for retirement. For example, his analysis would compare as similarly situated and equally likely to be selected for retirement someone who was initially eligible for retirement in 1995 (i.e., someone who could have been reviewed six times by 2001) and someone who was initially eligible for retirement in 2001 (i.e., someone who could have been reviewed only once by 2001). Nevertheless, as I discussed when Dr. Leuba first presented this table, selection rates among faith groups are not

-30-

statistically significantly different.

Dr. Leuba argues that "the Navy's analysis does not facilitate proper comparisons. SER decisions are not selections for retirement; they are selections of whom to retain. The difference is substantial, and material." This comment is statistically absurd. Since everyone is either chosen or not chosen, a study of those chosen is identical to a study of those not chosen. It is like saying that if I study the number of heads in 10 flips, it is substantially and materially different from studying the number of tails in 10 flips. Obviously, it is identical.

Dr. Leuba's Table B is an extract from Table 12 of Dr. Leuba's July 2005 Supplemental Declaration and is illogical, as I discussed previously.

His hypothetical (see his Tables D and E) shows that there can be a relationship between selection and the denominations of the Board and the candidates, yet, the overall effect may be parity. This is interesting, but not relevant. The statistical evidence in this case leads to the conclusion that whether or not there is a match in the denominations of the Board and the candidates does affect the candidates' likelihood of selection, so the hypothetical has no relevance to this case.

I declare under penalty of perjury that the foregoing is true and correct.

*Bernard R. Siskin*

_____

Bernard R. Siskin, Ph.D.

Dated:   May 22, 2006

TABLE 1A

## NAVY CHAPLAIN CORPS PROMOTION ANALYSIS
## NON-LITURGICAL PROTESTANTS vs. OTHERS
## IN-ZONE PROMOTIONS
## 1988 - 2002

### Controlling for Year and Position

| Pool | Total Promotions | Non-Liturgical Protestant Promotions | | Shortfall in | |
| | | Actual | Expected | Promotions | Units of Std. Dev. |
|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) |
| **Year** | | | | | |
| 1988 | 78 | 34 | 33.3 | (0.7) | 0.09 |
| 1989 | 31 | 10 | 11.2 | 1.2 | 0.44 |
| 1990 | 35 | 13 | 12.2 | (0.8) | 0.14 |
| 1991 | 138 | 51 | 48.1 | (2.9) | 0.79 |
| 1992 | 78 | 30 | 30.9 | 0.9 | 0.16 |
| 1993 | 132 | 56 | 54.1 | (1.9) | 0.42 |
| 1994 | 66 | 23 | 22.5 | (0.5) | 0.00 |
| 1995 | 87 | 41 | 41.1 | 0.1 | 0.00 |
| 1996 | 37 | 14 | 14.0 | 0.0 | 0.00 |
| 1997 | 44 | 15 | 15.6 | 0.6 | 0.04 |
| 1998 | 31 | 14 | 15.2 | 1.2 | 0.35 |
| 1999 | 55 | 23 | 22.0 | (1.0) | 0.18 |
| 2000 | 66 | 31 | 30.3 | (0.7) | 0.08 |
| 2001 | 76 | 37 | 33.2 | (3.8) | 1.10 |
| 2002 | 59 | 25 | 25.6 | 0.6 | 0.04 |
| **Position** | | | | | |
| Lt. Commander | 506 | 225 | 215.7 | (9.3) | 1.33 |
| Commander | 326 | 130 | 129.3 | (0.7) | 0.03 |
| Captain | 181 | 62 | 64.4 | 2.4 | 0.41 |
| Total | 1,013 | 417 | 409.4 | (7.6) | 0.71 |

( ) = Favors Non-Liturgical Protestants

TABLE 1B

## NAVY CHAPLAIN CORPS PROMOTION ANALYSIS
## NON-LITURGICAL PROTESTANTS vs. OTHERS
## ABOVE-ZONE PROMOTIONS
## 1988 - 2002

### Controlling for Year and Position

| Pool | Total Promotions | Non-Liturgical Protestant Promotions | | Shortfall in | |
|------|------|------|------|------|------|
| | | Actual | Expected | Promotions | Units of Std. Dev. |
| | (1) | (2) | (3) | (4) | (5) |
| _Year_ | | | | | |
| 1988 | 9 | 5 | 3.6 | (1.4) | 0.66 |
| 1989 | 8 | 2 | 3.1 | 1.1 | 0.47 |
| 1990 | 9 | 3 | 3.4 | 0.4 | 0.00 |
| 1991 | 8 | 3 | 3.4 | 0.4 | 0.00 |
| 1992 | 12 | 4 | 4.4 | 0.4 | 0.00 |
| 1993 | 8 | 3 | 1.6 | (1.4) | 0.18 |
| 1994 | 12 | 7 | 4.5 | (2.5) | 1.25 |
| 1995 | 9 | 2 | 2.8 | 0.8 | 0.25 |
| 1996 | 11 | 7 | 3.8 | (3.2) | 1.83 |
| 1997 | 7 | 0 | 1.7 | 1.7 | 1.10 |
| 1998 | 8 | 2 | 2.2 | 0.2 | 0.00 |
| 1999 | 9 | 5 | 3.0 | (2.0) | 1.09 |
| 2000 | 9 | 3 | 3.3 | 0.3 | 0.00 |
| 2001 | 17 | 5 | 5.6 | 0.6 | 0.07 |
| 2002 | 11 | 2 | 4.0 | 2.0 | 0.99 |
| _Position_ | | | | | |
| Lt. Commander | 72 | 26 | 25.2 | (0.8) | 0.07 |
| Commander | 50 | 15 | 17.4 | 2.4 | 1.23 |
| Captain | 25 | 12 | 7.9 | (4.1) | 1.61 |
| Total | 147 | 53 | 50.5 | (2.5) | 0.00 |

( ) = Favors Non-Liturgical Protestants

TABLE 1C

## NAVY CHAPLAIN CORPS PROMOTION ANALYSIS
## NON-LITURGICAL PROTESTANTS vs. OTHERS
## ABOVE-ZONE AND IN ZONE PROMOTIONS
## 1988 - 2002

### Controlling for Year and Position and Zone

| Pool | Total Promotions | Non-Liturgical Protestants Promotions | | Shortfall in | |
|------|------|------|------|------|------|
| | | Actual | Expected | Promotions | Units of Std. Dev. |
| | (1) | (2) | (3) | (4) | (5) |
| **Year** | | | | | |
| 1988 | 87 | 39 | 37.0 | (2.0) | 0.59 |
| 1989 | 39 | 12 | 14.3 | 2.3 | 0.88 |
| 1990 | 44 | 16 | 15.7 | (0.3) | 0.00 |
| 1991 | 146 | 54 | 51.4 | (2.6) | 0.63 |
| 1992 | 90 | 34 | 35.3 | 1.3 | 0.25 |
| 1993 | 140 | 59 | 55.7 | (3.3) | 0.22 |
| 1994 | 78 | 30 | 27.0 | (3.0) | 0.84 |
| 1995 | 96 | 43 | 44.0 | 1.0 | 0.15 |
| 1996 | 48 | 21 | 17.8 | (3.2) | 1.06 |
| 1997 | 51 | 15 | 17.3 | 2.3 | 0.72 |
| 1998 | 39 | 16 | 17.4 | 1.4 | 0.36 |
| 1999 | 64 | 28 | 25.0 | (3.0) | 0.83 |
| 2000 | 75 | 34 | 33.6 | (0.4) | 0.00 |
| 2001 | 93 | 42 | 38.8 | (3.2) | 0.77 |
| 2002 | 70 | 27 | 29.6 | 2.6 | 0.70 |
| **Position** | | | | | |
| Lt. Commander | 578 | 251 | 240.9 | (10.1) | 1.27 |
| Commander | 376 | 145 | 146.7 | 1.7 | 0.49 |
| Captain | 206 | 74 | 72.3 | (1.7) | 0.23 |
| Total | 1,160 | 470 | 459.9 | (10.1) | 0.67 |

( ) = Favors Non-Liturgicals Protestants.

**NAVY CHAPLAIN CORPS PROMOTION ANALYSIS**
**ROMAN CATHOLICS vs. OTHERS**
**IN-ZONE PROMOTIONS**
**1988 - 2002**

**Controlling for Year and Position**

| Pool | Total Promotions | Roman Catholic Promotions | | Shortfall in | |
| | | Actual | Expected | Promotions | Units of Std. Dev. |
|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) |
| *Year* | | | | | |
| 1988 | 78 | 16 | 14.6 | (1.4) | 0.48 |
| 1989 | 31 | 12 | 9.5 | (2.5) | 1.41 |
| 1990 | 35 | 6 | 8.8 | 2.8 | 1.35 |
| 1991 | 138 | 26 | 30.1 | 4.1 | 1.30 |
| 1992 | 78 | 15 | 14.5 | (0.5) | 0.01 |
| 1993 | 132 | 27 | 26.9 | (0.1) | 0.00 |
| 1994 | 66 | 15 | 16.4 | 1.4 | 0.39 |
| 1995 | 87 | 20 | 19.1 | (0.9) | 0.17 |
| 1996 | 37 | 6 | 5.5 | (0.5) | 0.03 |
| 1997 | 44 | 9 | 10.4 | 1.4 | 0.44 |
| 1998 | 31 | 4 | 4.6 | 0.6 | 0.04 |
| 1999 | 55 | 13 | 12.2 | (0.8) | 0.15 |
| 2000 | 66 | 13 | 11.9 | (1.1) | 0.27 |
| 2001 | 76 | 12 | 13.7 | 1.7 | 0.50 |
| 2002 | 59 | 9 | 9.5 | 0.5 | 0.02 |
| *Position* | | | | | |
| Lt. Commander | 506 | 87 | 93.2 | 6.2 | 1.11 |
| Commander | 326 | 69 | 64.1 | (4.9) | 0.96 |
| Captain | 181 | 47 | 50.1 | 3.1 | 0.61 |
| Total | 1,013 | 203 | 207.4 | 4.4 | 0.48 |

( ) = Favors Roman Catholics

**TABLE 2B**

## NAVY CHAPLAIN CORPS PROMOTION ANALYSIS
## ROMAN CATHOLICS vs. OTHERS
## ABOVE-ZONE PROMOTIONS
## 1988 - 2002

### Controlling for Year and Position

| Pool | Total Promotions | Roman Catholic Promotions | | Shortfall in | |
| | | Actual | Expected | Promotions | Units of Std. Dev. |
| | (1) | (2) | (3) | (4) | (5) |
| _Year_ | | | | | |
| 1988 | 9 | 1 | 1.2 | 0.2 | 0.00 |
| 1989 | 8 | 1 | 1.6 | 0.6 | 0.07 |
| 1990 | 9 | 3 | 2.1 | (0.9) | 0.30 |
| 1991 | 8 | 3 | 2.6 | (0.4) | 0.00 |
| 1992 | 12 | 3 | 3.2 | 0.2 | 0.00 |
| 1993 | 8 | 4 | 0.6 | (3.4) | 1.37 |
| 1994 | 12 | 1 | 3.0 | 2.0 | 1.09 |
| 1995 | 9 | 5 | 2.9 | (2.1) | 1.29 |
| 1996 | 11 | 1 | 3.5 | 2.5 | 1.36 |
| 1997 | 7 | 3 | 3.4 | 0.4 | 0.00 |
| 1998 | 8 | 3 | 2.9 | (0.1) | 0.00 |
| 1999 | 9 | 3 | 3.5 | 0.5 | 0.00 |
| 2000 | 9 | 2 | 3.5 | 1.5 | 0.76 |
| 2001 | 17 | 3 | 6.6 | 3.6 | 1.77 |
| 2002 | 11 | 5 | 3.3 | (1.7) | 0.80 |
| _Position_ | | | | | |
| Lt. Commander | 72 | 24 | 26.4 | 2.4 | 0.54 |
| Commander | 50 | 13 | 9.5 | (3.5) | 0.37 |
| Captain | 25 | 4 | 8.0 | 4.0 | 1.52 |
| Total | 147 | 41 | 43.9 | 2.9 | 0.88 |

( ) = Favors Roman Catholics.

Defendants' Reply in Favor of
Renewed Motion to Reconsider
Exhibit B
Page 36 of 39

**NAVY CHAPLAIN CORPS PROMOTION ANALYSIS**
**ROMAN CATHOLICS vs. OTHERS**
**ABOVE-ZONE AND IN ZONE PROMOTIONS**
**1988 - 2002**

**Controlling for Year and Position and Zone**

| Pool | Total Promotions | Roman Catholic Promotions | | Shortfall in | |
|------|------------------|--------|----------|------------|----------------|
|      |                  | Actual | Expected | Promotions | Units of Std. Dev. |
|      | (1)              | (2)    | (3)      | (4)        | (5)            |
| **Year** |              |        |          |            |                |
| 1988 | 87               | 17     | 15.8     | (1.2)      | 0.36           |
| 1989 | 39               | 13     | 11.1     | (1.9)      | 0.81           |
| 1990 | 44               | 9      | 10.9     | 1.9        | 0.68           |
| 1991 | 146              | 29     | 32.7     | 3.7        | 1.06           |
| 1992 | 90               | 18     | 17.6     | (0.4)      | 0.00           |
| 1993 | 140              | 31     | 27.5     | (3.5)      | 0.36           |
| 1994 | 78               | 16     | 19.4     | 3.4        | 1.11           |
| 1995 | 96               | 25     | 21.9     | (3.1)      | 0.93           |
| 1996 | 48               | 7      | 9.0      | 2.0        | 0.72           |
| 1997 | 51               | 12     | 13.8     | 1.8        | 0.56           |
| 1998 | 39               | 7      | 7.4      | 0.4        | 0.00           |
| 1999 | 64               | 16     | 15.7     | (0.3)      | 0.00           |
| 2000 | 75               | 15     | 15.4     | 0.4        | 0.00           |
| 2001 | 93               | 15     | 20.3     | 5.3        | 1.62           |
| 2002 | 70               | 14     | 12.9     | (1.1)      | 0.25           |
| **Position** |          |        |          |            |                |
| Lt. Commander | 578     | 111    | 119.6    | 8.6        | 1.30           |
| Commander | 376         | 82     | 73.6     | (8.4)      | 1.11           |
| Captain | 206           | 51     | 58.1     | 7.1        | 1.35           |
| Total | 1,160          | 244    | 251.3    | 7.3        | 0.92           |

( ) = Favors Roman Catholics

**TABLE 3**

### NAVY CHAPLAIN CORPS EARLY RETIREMENT ANALYSIS
### NON-LITURGICAL PROTESTANTS vs. OTHERS
### 1991 - 1998

**Controlling for Year and Position**

| Pool | Total Early Retirement Selections | Non-Liturgical Protestant Early Retirement Selections | | Surplus In | |
|---|---|---|---|---|---|
| | | Actual | Expected | Number | Units of Std. Dev. |
| | (1) | (2) | (3) | (4) | (5) |
| Year | | | | | |
| 1991 | 27 | 11 | 9.9 | 1.1 | 0.29 |
| 1992 | 4 | 1 | 0.9 | 0.1 | 0.00 |
| 1993 | 2 | 0 | 1.0 | (1.0) | 0.72 |
| 1994 | 1 | 0 | 0.5 | (0.5) | 0.00 |
| 1995 | 8 | 3 | 4.4 | (1.4) | 0.80 |
| 1996 | 10 | 4 | 4.3 | (0.3) | 0.00 |
| 1997 | 11 | 3 | 3.9 | (0.9) | 0.28 |
| 1998 | 12 | 6 | 5.9 | 0.1 | 0.00 |
| Position | | | | | |
| Commander | 41 | 16 | 21.2 | (5.2) | 1.70 |
| Captain | 34 | 12 | 9.7 | 2.3 | 0.77 |
| Total | 75 | 28 | 30.9 | (2.9) | 0.67 |

( ) = Favors Non-Liturgical Protestants.

**TABLE 4**

**NAVY CHAPLAIN CORPS EARLY RETIREMENT ANALYSIS**
**ROMAN CATHOLICS vs. OTHERS**
**1991 - 1998**

**Controlling for Year and Position**

| Pool | Total Early Retirement Selections | Roman Catholic Early Retirement Selections | | Surplus In | Units of |
| | | Actual | Expected | Number | Std. Dev. |
| --- | --- | --- | --- | --- | --- |
| | (1) | (2) | (3) | (4) | (5) |
| _Year_ | | | | | |
| 1991 | 27 | 5 | 5.9 | (0.9) | 0.21 |
| 1992 | 3 | 1 | 0.9 | 0.1 | 0.00 |
| 1993 | 2 | 0 | 0.4 | (0.4) | 0.00 |
| 1994 | 1 | 0 | 0.1 | (0.1) | 0.00 |
| 1995 | 8 | 1 | 0.6 | 0.4 | 0.00 |
| 1996 | 10 | 0 | 0.5 | (0.5) | 0.00 |
| 1997 | 12 | 2 | 1.8 | 0.2 | 0.00 |
| 1998 | 12 | 2 | 2.5 | (0.5) | 0.02 |
| _Position_ | | | | | |
| Commander | 41 | 4 | 4.7 | (0.7) | 0.12 |
| Captain | 34 | 7 | 8.0 | (1.0) | 0.21 |
| Total | 75 | 11 | 12.7 | (1.7) | 0.42 |

( ) = Favors Roman Catholics.