# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| IN RE: NAVY CHAPLAINCY | ) | Case No. 1: 07-mc-269 (RMU) |
| | ) | |
| | ) | |

## PLAINTIFFS' RULE 54(B) MOTION TO ALTER OR AMEND
## THE COURT'S 2002 INTERLOCUTORY DECISION

### INTRODUCTION

Plaintiffs respectfully move the Court for an Order under Fed. R. Civ. P. 54(b) ("Rule 54(b)") amending or modifying its 1/10/02 Memorandum Opinion and Order in *Adair v. England*, 183 F.supp.2d 31 (D.D.C. 2002), addressing the following rulings: (1) chaplains sit on selection boards as naval officers and not as denominational representatives, *id.* at 62; (2) having more than one chaplain as a chaplain selection board member raises no Establishment Clause concerns, *id.* at 61; (3) plaintiffs' claim that defendants' policy of allowing chaplains to rate chaplains violates the Establishment Clause fails to state a valid claim, *id.* at 60-61; (4) the presumption of regularity applies to chaplains' actions and decisions on chaplain selection boards, *id.* at 60-62; and (5) *Larkin v. Gendel's Den. Inc*, 459 U.S. 116 (1982) does not apply in this litigation when addressing the legality of defendant'selection boards, *id.* at 61-62.

The challenged rulings were made responding to the defendants' motion to dismiss, prior to discovery. As shown in the accompanying Memorandum of Points and Authorities in Support of this Motion, discovery has produced new evidence demonstrating chaplains serving as selection board members do, indeed, act as the denominational representatives they were hired to be. The new evidence shows defendants have unconstitutionally fused civic and religious

authority and the presumption of regularity does not apply when denominational representatives are given civic authority to award or deny benefits to other denominational representatives.

Plaintiffs' Memorandum also provides other changes that have occured and evidence that has been produced since 2002 when the Court made its *Adair* rulings. These changes show the defendants were not honest in representing how chaplains serve on selection boards and the important role denomination plays in chaplain benefit decisions.  These changes since 2002 include: (1) subsequent DOD regulations clarifying the role of chaplains as denominational representatives; (2) a D.C. Circuit decision recognizing chaplains have a *unique* role as both naval officers and denominational representatives; this implicates the Establishment Clause considerations and prohibitions against the merger of civic and religious power when destributing government benefits; (3) defendants have argued before this and other courts that the religion of chaplains is an important necessity for chaplain selection board members, a position that is inconsistent with its argument that chaplains serve as naval officers; (4) defendants and Department of Defense training and policies which, in conjunction with defendants' own regulations, show defendants treat chaplains as <u>unique</u> officers and restrict chaplains from the common duties given to all other officers, contrary to defendants' argument to this Court; and (5) defendants have argued here and in other courts denomination was important on selection boards, showing chaplains serve on selecton boards as denominational representatives.  Whether defendants' original arguments were deceptive or reflect mere opportunism, the result is an inconsistent and deceitful position which seeks to manipulate the judicial process while violating the Establishment Clause.

If the Court grants plaintiffs' above Motion, plaintiffs will coordinate with defendants for a partial summary judgment briefing schedule on the following issues: (a) chaplains are

commissioned as denominational representatives; (b) defendants' selection board procedures,

policies and practices do not provide constitutionally sufficient guarantees that chaplains will not

act as denominational representatives on such boards; (c) defendants' practice delegating

discretionary civic power to these denominational representatives to award or deny government

benefits to other denominational representatives violates the Establishment and Equal Protection

Clauses; and (d) defendants' selection boards from 1977 to present are unconstitutional and void

*ab initio*.

In the alternative, should the Court denies plaintiffs' Rule 54(b) motion to amend or alter

the above cited portions of the Courts's 2002 decision, plaintiffs request an order directing entry

of a final judgment on those issues and a determination "there is no just reason for delay" under

Rule 56(b).

<div style="margin-left: 40%;">

Respectfully submitted,

</div>

July 18, 2008                          /S/_____
                                       ARTHUR A. SCHULCZ, SR.
                                       Attorney for the Plaintiffs
                                       D.C. Bar No. 453402
                                       2521 Drexel Street
                                       Vienna, VA 22180 703-645-4010:
                                       FAX 703-645-4011


Of Counsel:
Douglas McKusick, Esq.
THE RUTHERFORD INSTITUTE
P.O. Box 7482
Charlottesville, VA 22906-7482

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN RE: NAVY CHAPLAINCY | ) )  Case No. 1: 07-mc-269 (RMU) ) ) |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF THEIR RULE 54(B) MOTION TO ALTER OR AMEND
THE COURT'S JANUARY 2002 INTERLOCUTORY DECISION**

July 18, 2008

ARTHUR A. SCHULCZ, SR.
Law Office of Arthur A. Schulcz, Sr., PLLC
Attorney for the Plaintiffs
D.C. Bar No. 453402
2521 Drexel Street
Vienna, VA 22180 703-645-4010:
FAX 703-645-4011

Of Counsel:
Douglas McKusick, Esq.
THE RUTHERFORD INSTITUTE
P.O. Box 7482
Charlottesville, VA 22906-7482

# INDEX

INDEX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

GLOSSARY AND ABBREVIATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.      NEW EVIDENCE, REGULATORY CHANGES AND OTHER LEGAL EVENTS
        SHOW THE COURT  SHOULD AMEND ITS JANUARY 2002 DECISION. . . . . . . . . 6

        A.      Rule 54(b) Authority To Amend or Alter Judgment. . . . . . . . . . . . . . . . . . . 6

        B.      Chaplains Are Hired and Employed Only as Denominational Representatives. . . 7

                1.      DOD Regulations define chaplains as denominational representatives.. . . 7

                2.      Defendants' regulations treat chaplains as denominational representatives
                        by excluding chaplains from the duties common to all other Naval
                        officers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                3.      The Geneva Convention recognizes that chaplains are unlike all other
                        military officers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

                4.      The Code of Conduct demonstrates DOD's determination and
                        defendants' recognition chaplains are unlike all other naval officers. . . . 11

                5.      Defendants cannot as a matter of law divorce a chaplain's role and
                        function as denominational representatives from their status as naval
                        officers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                6.      *In re England* found chaplains were unique officers.. . . . . . . . . . . . . . . 15

                7.      Chaplains' religious identities make them unlike all other naval
                        officers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        C.      Statistics Show Chaplains Serving as Selection Board Members Act like
                Denominational Representatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

   1. <u>Statistical analysis of all 1977-2002 chaplain selection boards shows denominational bias infected their decisions</u>. . . . . . . . . . . . . . . . . . . . . . 16

   2. <u>CARE Board records show defendants' denominational prejudice in accessions</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

   3. <u>CARE Board members' denominations influence Navy chaplain accession decisions</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

   4. <u>Chaplain board members' denominational identities affect their chaplain promotion board decisions</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

   5. <u>A board members' denomination affects chaplain retention decisions</u>. . . 27

   6. <u>Chaplain board members' denominations impact chaplain SER decisions</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

   7. <u>Statistics show chaplains serving on chaplain selection boards do not act as naval officers</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

  D. Defendants' Arguments That Specific Denominations Were <u>Required</u> on Chaplain Promotion Boards Is Inconsistent with Their Argument Chaplains Serve on Selection Boards as Naval Officers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

  E. Investigations Show Chaplain Board Members Act as Denominational Representatives Because Defendants' Promotion Board Procedures Allow Board Members To Do So. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

  F. The Presumption of Regularity Does Not Apply to Chaplains Sitting on Selection Boards or Evaluating Other Chaplains. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

  G. *Larkin* and its Progeny Apply in this Case Because Defendants Have Fused Civic and Religious Power. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

II. IN THE ALTERNATIVE, PLAINTIFFS  MOVE FOR CERTIFICATION OF A FINAL JUDGEMENT UNDER FEDERAL RULE OF  CIVIL PROCEDURE 54(b). . . . . . . . . 37

  A. Rule 54(b)'s Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

  B.  The Court Dismissed Two of Plaintiffs' Cognizable Claims For Relief. . . . . . 38

  C. The Court's Judgment on These Two Claims Is Final. . . . . . . . . . . . . . . . . . . 39

D.    There Is No Just Reason to Delay. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

      1.    The equitable interests favor Rule 54(b) certification. . . . . . . . . . . . . . 40

      2.    The judicial administrative interests favor Rule 54(b) certification. . . . . 41

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

LIST OF EXHIBITS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

# <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES:**

*Adair v. England*, 183 F.Supp.2d 31 (D.D.C. 2002). . . . . . . . . . . . . . . . . . . 1-4, 15, 32, 35, 39, 42

*Adair v. England*, 417 F.Supp.2d 1 (D.D.C. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 31

*Adair v. England*, 209 F.R.D. 1 (D.D.C. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 40

*Agostini v. Felton*, 521 U.S. 203 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Aktieselskabet AF 21 v. Fame Jeans Inc.*, 525 F.3d 8 ( D.C. Cir. 2008). . . . . . . . . . . . . . . . . . . 35

*Bell Atlantic Corp. v. Twombly*, --- U.S. ----, 127 S.Ct. 1955 (2007). . . . . . . . . . . . . . . . . . . . . 35

*Bldg. Industry Ass'n of Super. Calif. v. Babbitt*, 161 F.3d 740 (D.C. Cir. 1998). . . . . . . . . 38, 40

 *Bd. of Education of Kiryas Joel v. Grumet,* 512 U.S. 687 (1994). . . . . . . . . . . . 2, 30, 36, 37, 43

*Campbell v. U.S. Dept. of Justice*, 231 F.Supp.2d 1 (D.D.C. 2002). . . . . . . . . . . . . . . . . . . . . . . 6

*Chaplaincy of Full Gospel Churches v. England*, 221 F.R.D. 255 (D.D.C. 2004). . . . . . . . . . . . 37

*Cooper v. First Govt. Mortgage and Investors Corp.*, 216 F.R.D. 126 (D.D.C. 2002). . . . . . . . . 41

*Childers v. Slater*, 197 F.R.D. 185 (D.D.C. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Cullen v. Margiotta*, 811 F.2d 698, *cert. denied sub nom. Nassau County Republican
        Committee v. Cullen*, 483 U.S. 1021 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Curtis-Wright Corp. v. General Electric Co.*, 446 U.S. 1 (1980). . . . . . . . . . . . . . . . . . . . . 39-41

*County of Allegheny v. ACLU*, 492 U.S. 573 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Ferres v. United States*, 340 U.S. 135 (1950). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Geller v. Secretary of Defense*, 423 F. Supp. 16 (D.D.C. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Gomez v. United States*, 490 U.S. 858 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Midrash Sephardi v. Town of Surfside*, 366 F.3d 1214 (11th Cir. 2004), *cert. denied*,
        543 U.S. 1146 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*In re England*, 375 F.3d 1169 (D.C. Cir. 2004), *cert. denied*, 543 U.S. 1152 (2005). . . . . . 1, 6, 15

*In re Southeast Banking Corp.*, 69 F.3d 1539 (11th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . 42

*Johnson v. Ashcroft*, 223 F.Supp.2d 116 (D.D.C. 2002), *aff'd* 2003 WL 22890057 (D.C. Cir 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Johnson v. Mulkasey*, 248 F.R.D. 347 (D.D.C. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 41

*Keystone Tobacco, Inc. v. United States Tobacco Co.*, 217 F.R.D. 235 (D.D.C. 2003). . . . . . . . . 7

*Langevine v. District of Columbia*, 106 F.3d 1018 (D.C. Cir. 1997). . . . . . . . . . . . . . . . . . . . . . 7

*Larkin v. Grendle's Den, Inc.*, 459 U.S. 116 (1982). . . . . . . . . . . . . . . . . . . . . . . . 2, 34, 35, 38

*Metcalf & Eddy v. Mitchell*, 269 U.S. 514 (1926). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Moore v. Hartman*, 332 F.Supp.2d 252 (D.D.C. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Palmer v. Shultz*, 815 F.2d 84 (D.C. Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Rigdon v. Perry*, 962 F.Supp. 150 (D.D.C. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 11

*Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572 (1980). . . . . . . . . . . . . . . . . . . . 42-43

**COURT OF MILITARY APPEALS:**

*United States v. Lewis*, 12 M.J. 205 (CMA 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**FEDERAL STATUTES:**

10 U.S.C. § 612. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

10 U.S.C. § 632. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 41

10 U.S.C. § 643. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7- 9, 15, 17-19, 22-25

10 U.S.C. § 3547. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

10 U.S.C. § 3581. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

10 U.S.C. § 6031(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

10 U.S.C. § 8547. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

10 U.S.C. § 8581. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

**OTHER AUTHORITIES**:

DOD Directive 1304.19, Subj: Appointment of Chaplains for the Military Departments". . . . . 7

DOD Instruction 1304.28, Subj: Guidance for the Appointment of Chaplains for the Military
       Departments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

DOD Instruction 1300.21, Subj: Code of Conduct (CoC) Training and Education. . . . . . . . . 8, 9

OPNAVINST 1730.1, Chaplains Manual. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

OPNAVINST 3461.6, Subj: Enemy Poisoners of War, Retained Personnel, ... and other
       Detainees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

SECNAVINST 1000.9, Subj: The Code of Conduct for Members of the Armed Forces. . . . . . . 11

SECNAVINST 1730.7B, Subj: Religious Ministry Support Within the Department of the
       Navy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-10

NAVPERS 15807, The History of the Chaplain Corps, U.S. Navy, Vol. I, 1778-1939. . . . . . 9-10

## **GLOSSARY AND ABBREVIATIONS**

| **Abbreviation** | **Term or Description** |
|---|---|
| DOD | Department of Defense |
| DODD | DOD Directive |
| DOD I | DOD Instruction |
| IG | Inspector General |
| NAVPERS | Navy Papers |
| NIG | Naval Inspector General |
| NR | Naval Regulation(s) |
| OPNAVISNT | Operational Navy Instruction |
| SECNAVINST | Secretary of the Navy Instruction |

### **RANKS**

| | |
|---|---|
| CAPT | Captain |
| CDR | Commander |
| LCDR | Lieutenant Commander |
| RADM | Rear Admiral |

**INTRODUCTION**

Plaintiffs have developed a significant amount of data in discovery since 2002 when the Court ruled on Defendants' 2000 Motion to Dismiss ("MTD"), *see Adair v. England*, 183 F.Supp.2d 31 (D.D.C. 2002) (denying and granting in part defendants' MTD). This data, highly relevant to the role, function and decision making results of chaplains as selection board members, was unavailable to the Court when it issued its MTD decision. Defendants have since argued before this and other courts specific faith groups were <u>necessary</u> on selection boards, <u>contradicting</u> their MTD contention chaplains serve on selection boards as "Naval officers", not as denominational representatives. *In re England*, 375 F.3d 1169, 1171 (D.C. Cir. 2004), *cert. denied*, 543 U.S. 1152 (2005), and defendants' mandatory Code of Conduct training which recently came to plaintiffs' attention, clearly show chaplains are <u>uniquely</u> different naval officers, contradicting defendants' position that chaplains are like other naval officers.

This information, which the Court and plaintiffs did not have in 2002, show defendants misrepresented the role and function of chaplains, giving rise to the instant motion. Whether defendants' prior arguments were deliberately or ignorantly deceptive, or reflected mere opportunism, the result is an inconsistent and deceitful position which seeks to manipulate the judicial process while justifying continuing Establishment Clause violations.

The Court's 6/18/07 consolidation of *Gibson v. U.S. Navy*, 06cv1696, with *Chaplaincy of Full Gospel Churches v. Winter,* No. 99cv2945, and *Adair v. Winter*, No. 00cv566, ("*CFGC/Adair*") into this new case adds a level of complexity, given *Adair's* law of the case; *Gibson* raises challenges not specifically addressed but implicated by the Court's 2002 *Adair* decision. *Gibson* includes a challenge to 10 U.S.C. § 612's constitutionality <u>as applied to</u> defendants' unique chaplain selection board procedures with their secret votes and small boards.

This motion seeks to remove any obstacles to the resolution of that claim by subsequent summary judgment, significantly advancing the progress of this case.

Plaintiffs move the Court under Fed. R. Civ. P. 54(b) ("Rule 54(b)") for an Order amending or modifying the following rulings in its *Adair* 1/10/02 Memorandum Opinion and Order holding: (1) Navy chaplains "are first and foremost Naval officers" and sit on selection boards as such, not as denominational representatives, 183 F.Supp.2d at 62; (2) plaintiffs' claim having more than one chaplain serve as a selection board member raises no Establishment Clause concerns, *id*. at 61-62 (dismissing plaintiffs' claim); (3) plaintiffs' claim defendants' policy allowing chaplains to rate chaplains violates the Establishment Clause failed to state a claim, *id*. at 60-61; (4) the presumption of regularity applies to chaplains' actions and decisions on chaplain selection boards, *id.* at 60; *see Adair v. England*, 417 F.Supp.2d 1, 6 (D.D.C. 2006) (applying its 2002  presumption of regularity ruling to deny plaintiffs' challenge to the Navy's 26 year practice reserving at least one selection board membership for Catholic chaplains); and (5) the principles of *Larkin v. Grendel's Den, Inc.,* 459 U.S. 116 (1982) (and by implication*, Bd. of Ed. of Kiryas Joel v. Grumet,* 512 U.S. 687 (1994)), did not apply in this case, *Adair*, 183 F.Supp.2d at 61-62.

If the Court grants plaintiffs' above Motion, plaintiffs will coordinate with defendants for a partial summary judgment briefing schedule on the following issues: (a) chaplains are commissioned as denominational representatives; (b) defendants' selection board procedures, policies and practices do not provide constitutionally sufficient guarantees that chaplains will not act as denominational representatives on such boards; (c) defendants' practice delegating discretionary civic power to these denominational representatives to award or deny government benefits to other denominational representatives violates the Establishment and Equal Protection Clauses; and (d) defendants' selection boards from 1977 to present are unconstitutional and void

*ab initio*.

If the Court denies plaintiffs' Rule 54(b) motion to amend or alter the cited portions of the Courts's 2002 decision, plaintiffs request an order under Fed. R. Civ. P. 56(b) directing entry of a final judgment on those issues and a finding that "there is no just reason for delay."

## BACKGROUND

Plaintiffs challenge the constitutionality of defendants' selection board procedures which delegate to individual chaplains discretionary civic power to destroy or advance other chaplains' careers with no objective accountability. The *CFGC/Adair* plaintiffs' original Complaints inartfully alleged having more than one chaplain on a promotion board violated the Constitution. Defendants' 2000 MTD argued "as duly appointed Naval officers, chaplains, as with any other staff-corps officers, legitimately participate in the normal course of duties for officers, including sitting on promotion boards and rating the performance of junior officers." *Adair*, 183 F.Supp.2d at 60 (quoting the defendants' MTD at 20). Defendants argued chaplains were no different than other naval officers and "it is appropriate for [chaplains] to undertake the duties routinely performed by Naval officers", *id*. at 62 (citing the MTD at 23). Defendants denied chaplains were denominational representatives or that such representation made a legal difference. This ignored the clear prohibitions defendants' own regulations place on chaplains, restricting them from "the normal course of duties for officers", demonstrating defendants do not treat chaplains like other naval officers but as uniquely different naval officers, totally <u>unlike</u> other officers. Defendants also ignore their own Code of Conduct and Geneva Convention training emphasizing chaplains are <u>forbidden</u> from exercising command, *i.e.*, giving orders, proving chaplains are unlike other naval officers, specifically because they are religious representatives.

The Court presumed defendants were telling the truth, relied on the presumption of

3

regularity and accepted defendants' MTD argument. The Court concluded chaplains are "first and foremost Naval officers", serve on selection boards as "Naval officers," not as denominational representatives, *Adair*, 183 F.supp.2d at 62, and denied the *CFGC/Adair* plaintiffs' subsequent motions for Reconsideration, *CFGC* Doc. No. 68, and a Rule 54(b) determination. *CFGC* Doc. No. 174. *Adair v. England*, 417 F.Supp.2d 1, 6 (D.D.C. 2006) reaffirmed the Court's reliance on its 2002 *Adair* decisions as the law of the case.

Subsequent to their MTD and the Court's 2002 decision, defendants changed their position in several aspects. First, they significantly changed the number of chaplain board members on chaplain promotion boards. Prior to the MTD, chaplains dominated the boards with only one non-chaplain board member. In fiscal year ("FY") 2003, defendants limited chaplain promotion board members to two, a tacit admission chaplains are not like other "naval officers." Defendants have not changed their challenged procedures which allow and facilitate one board member's manipulation of the board for non-secular, non-neutral and ideological purposes.

Second, defendants argued before this and other courts the chaplain board member's denomination and religious background was important and necessary to have valid chaplain selection boards. If a chaplain's denomination and religious background is an important criteria for board membership, chaplains are not serving on boards as naval officers.

Plaintiffs subsequently discovered defendant's own training materials show the unique nature of chaplains because of their religious character, a uniqueness *In re England* recognized.

On June 18, 2007, the Court consolidated *CFGC/Adair* with and *Gibson v. U.S. Navy*, 06cv1696, a case transferred from the Northern District of Florida, creating *In re Navy Chaplaincy*. *Gibson* raises issues the *CFGC/Adair* Complaints do not address. 10 U.S.C. § 612 requires selection boards have a board member from the category under consideration if

4

available.  *Gibson* specifically challenges § 612's constitutionality as applied to defendants'
unique chaplain selection board procedures using a small number of board members voting in
secret.  Defendants have no accountability or guarantees to ensure chaplains, hired as
denominational representatives, use the delegated civic power exclusively for secular, neutral and
non-ideological purposes when awarding or denying benefits to other denominational
representatives.  *Gibson* cites *CFGC/Adair* and *Larsen v. U.S. Navy*, No. 02cv2005, statistical
evidence developed after the Court's 2002 MTD decision.  That evidence shows (a) defendants
favored specific denominations in choosing chaplain selection board members and (b) those
boards made choices benefitting candidates from the favored denominations, *i.e.*, candidates
from the preferred denominations were selected for accessions and promotions at higher rates
than candidates of denominations not fortunate to be in defendants' favored religious groups for
board memberships.  Defendants' policies, practices and procedures make a chaplain's
denomination important to his/her standing in the community.

    This is a demonstration the Navy Chaplain Corps, as an institution, has favored
denominations and those favorites become the "model" or template against which every other
chaplain's standing is gauged: Catholics first, three liturgical denominations second, Southern
Baptists third, with non-Baptist non-liturgicals only as a last resort.  This is also a simple
demonstration that those denominations chosen for assignment to selection boards tended to
prefer candidates like themselves, a practice which is "natural" and could be controlled for or
managed if there were institutional procedural protections in place which prevented abuse,
ensuring the presumption of regularity was viable.

    Other new developments addressing a chaplain's functioning include: (1) subsequent
DOD regulations clarifying the role and function of chaplains as denominational representatives;

5

(2) *In re England*'s recognition chaplains have a "unique*"* role as both naval officers and denominational representatives, 375 F.3d at 1171, which implicates the Establishment Clause's prohibitions against the merger of civic and religious power; (3) defendants' arguments before this and other courts that specific chaplain denominations were a necessity for valid chaplain selection boards, a position inconsistent with their argument chaplains serve as naval officers and not denominational representatives;[1] and (4) discovery of recent evidence of both Department of Defense Directives ("DODD") and Navy mandatory Geneva Convention and Code of Conduct training that unequivocally establishes chaplains are unique officers and distinctly unlike all other naval officers because of their religious identity, contrary to defendants' previous arguments.

The totality of this evidence shows defendants misled the Court.  This Motion asks the Court to amend its ruling based on the new evidence, correcting defendants' misrepresentations.

## ARGUMENT

**I.**  **NEW EVIDENCE, REGULATORY CHANGES AND OTHER LEGAL EVENTS SHOW THE COURT  SHOULD AMEND ITS JANUARY 2002 DECISION**

### A.  Rule 54(b) Authority To Amend or Alter Judgment

The decisions at issue here are interlocutory.  "A district court may revise its own interlocutory decisions 'at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.'"  *Campbell v. U.S. Dept. of Justice*, 231 F.Supp.2d 1, 6-7 (D.D.C. 2002) (quoting Rule 54(b) and citing *Childers v. Slater*, 197 F.R.D. 185, 190 (D.D.C. 2000)); *see Moore v. Hartman*, 332 F.Supp.2d 252, 256-57 (D.D.C. 2004) (Rule 54(b)

---

[1]  When *CFGC/Adair* filed suit, chaplain promotion boards were composed of chaplains, at least one of whom was Catholic, and only one line officer.  In 2003, defendants unofficially reduced the number of chaplain promotion board members to two.  However, one of those is the Chief of Chaplains or his Deputy, both Rear Admirals, who alternate as Board presidents.

governs the disposition of requests for reconsideration of interlocutory orders).

Interlocutory orders are not subject to the law of the case doctrine and may always be reconsidered prior to final judgment. *Langevine v. District of Columbia*, 106 F.3d 1018 (D.C. Cir. 1997) (citing *Schoen v. Washington Post*, 246 F.2d 670, 673 (D.C. Cir. 1957)). Reconsideration of an interlocutory decision is available under the standard "as justice requires." *Childers*, 197 F.R.D. at 190. "The Court generally will grant a motion for reconsideration when the movant demonstrates (1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error of law in the first order." *Keystone Tobacco, Inc. v. United States Tobacco Co.*, 217 F.R.D. 235, 237 (D.D.C. 2003). Plaintiffs meet these standards, especially as to the discovery of new evidence which also shows a clear error of law.

**B.      Chaplains Are Hired and Employed Only as Denominational Representatives**

**1.      DOD Regulations define chaplains as denominational representatives**

10 U.S.C. § 643 requires each chaplain to have and maintain an ecclesiastical endorsement as a "professional qualification" to be appointed and continued as a chaplain. DOD has established uniform standards and procedures for accessioning, appointing and retaining chaplains. Subsequent to this Court's 2002 decision, DOD published new regulations clarifying that chaplains are hired as denominational representatives and religious leaders. DOD Directive (DODD) 1304.19, "Appointment of Chaplains for the Military Departments" ( Exhibit 1), ¶ 4.1, establishes as DOD's policy "that the Chaplaincies of the Military Departments:"

> Are established to advise and assist commanders in the discharge of their
> responsibilities to provide for the free exercise of religion in the context of
> military service as guaranteed by the Constitution, to assist commanders in
> managing religious affairs (DoDD 5100.73 ...), and to serve as the principal
> advisers to commanders for all issues regarding the impact of religion on military
> operations.

7

Every function DOD identifies for Chaplains is related to religion and religious expression.

DOD Instruction (DODI) 1304.28 (Exhibit 2), "Guidance for the Appointment of Chaplains for the Military Departments," implements DODD 1304.19 by providing specific DOD instructions and requirements for chaplain appointments. DODI 1304.28, ¶ E2.1.9 defines a chaplain using the term "Religious Ministry Professional ( RMP)".

> An individual endorsed <u>to represent a Religious Organization and to conduct its religious observances or ceremonies</u>. An RMP is a fully qualified member of the clergy for those Religious Organizations that have a tradition of professional clergy or their equivalents. The Religious Organization's endorsement verifies that an RMP is professionally qualified to serve as a chaplain in the military and meets the graduate education and religious leadership requirements of this Instruction. (Emphasis added).

1304.28, ¶6.1, requires each RMP have "an endorsement from a qualified Religious Organization". Paragraph E2.1.7 defines "Endorsement" as "the internal process that Religious Organizations use when designating RMPs <u>to represent their Religious Organizations to the Military Departments</u> and confirm the ability of their RMPs to conduct religious observances or ceremonies in a military context." (Emphasis added). DODI 1304.28 ¶ 6.1.4. also requires "two years of religious leadership experience for an active component appointment." In accord with 10 U.S.C. § 643, DODI 1304.28, ¶ 6.5 requires administrative separation processing "be initiated immediately" upon loss of an endorsement.

These DOD regulations validate the DOD defendants' declaration in *Rigdon v. Perry*, 962 F.Supp. 150 (D.D.C. 1997) (defendants here were named *Rigdon* defendants), stating chaplains were faith group representatives on loan from their respective faith group communities to the military departments and served at the pleasure of those faith communities. Exhibit 3, ¶ 2. When an endorser determines a chaplain fails to act as a denominational representative and withdraws its endorsement, a decision beyond defendants' control, the chaplain must be

separated immediately.   10 U.S.C. § 643; DODI 1304.28, ¶ 6.5.

DOD regulations, the history of chaplains from the Revolutionary War, *see* Extracts of The History of the U.S. Navy Chaplain Corps Vol. 1 (1778-1939), NAVPERS 15807 (Exhibit 4) at 3-11, and 10 U.S.C. § 643 establish chaplains are hired as denominational representatives, *see Geller v. Secretary of Defense*, 423 F. Supp. 16 (D.D.C. 1976) (Air Force Jewish chaplain allowed to wear a beard in accordance with Jewish tradition since he "was employed specifically by the military to serve in a religious capacity").

Chaplains are appointed to the office of "chaplain", NAVPERS at 9-10, whereas other naval officers are commissioned  to a rank.  This is important as a matter of law because the "office" of chaplain has historically and legally been a unique religious office, a fact the Navy's own history, regulations and instructions acknowledge.

> **2.**     **Defendants' regulations treat chaplains as denominational representatives by excluding chaplains from the duties common to all other Naval officers**

Defendants' regulations recognize the limited, explicitly religious nature of the chaplain's office.  Secretary of the Navy Instruction (SECNAVINST) 1730.7B, Subj: Religious Ministry Support Within the Department of the Navy (Exhibit 5), specifically defines chaplains as "professional clergy of a certifying faith group who provide for the free exercise of religion for all members of the Department of the Navy ....  Chaplains advise commands in matters of morale, morals, and spiritual well being."  ¶ 4.  The same paragraph specifically limits chaplains solely to religious related duties and excludes chaplains from participation in the duties common to all other naval officers:

> In accordance with Article 1063 of [Navy Regulations, 1990], <u>chaplains shall be detailed or permitted to perform only such duties as are related to ministry support</u>.  Chaplains <u>shall not</u> bear arms.  Chaplains <u>shall not</u> be assigned collateral

9

duties which violate the religious practices of the chaplain's faith group, require services as director, solicitor, or treasurer of funds other than administrator of a Religious Offering Fund, serve on a court-martial or stand watches other than that of duty chaplain.  (Emphasis added).

These prohibitions, originating in the Navy Department's February 7, 1919, Special Order No. 65, set chaplains apart from all other naval officers who must bear arms, serve on courts martial, supervise funds and stand watches as duty officers.  Whereas all other officers must report information that relates to violations of laws or regulations, *see* Navy Regulations ("NR") 1137 (Obligation to Report Offenses) and 1131 (Requirement of Exemplary Conduct) (Exhibit 6), chaplains are accorded confidentiality in all communications with those who seek their advice or counsel, even if the communication concerns illegal acts.  Defendants' special treatment for chaplains, accorded by regulation and custom, clearly recognizes chaplains function as religious leaders representing their faith group, and it is inappropriate and illegal to fuse religious and civic authority by allowing chaplains to exercise the sovereign's authority, *e.g.*, determine guilt or innocence in a court-martial, act as a duty officer or manage government funds.  SECNAVINST 1730.7B recognizes the difference between a chaplain's limited function as a faith group representative and religious leader, and the role and function of other officers as *military* leaders. "A military leader is charged with the responsibility to carry out the mission of his armed force and is clothed with the authority to demand a 'discipline without counterpart in civilian life.'" *United States v. Lewis*, 12 M.J. 205, 207 (CMA 1982) (quoting *Schlessinger v. Councilman*, 420 U.S. 738 (1975)).  A chaplain has no authority to demand discipline, *see Rigdon*, 962 F.Supp at 159, but is charged with representing his faith group, not "carry[ing] out the mission of his armed force", particularly since chaplains cannot bear arms or act as duty officers, and as the DOD and Navy's own instructions recognize, chaplains cannot assume command of other sailors or

10

military personnel.  *See* 4 below.

### 3.    The Geneva Convention recognizes that chaplains are unlike all other military officers

The Geneva Convention for the Treatment of Prisoners of War recognizes a

chaplain's unique religious role by giving chaplains special status, treatment and duties when

captured.  Chaplains captured by the enemy are NOT prisoners of war ("POWs"), they are

"retained personnel."  The capturing force must allow captured chaplains to minister to captured

POWs, provide transportation to carry out that responsibility and allow chaplains to move about

freely.  "Chaplains [in a retained status] shall not be compelled to carry out any work other than

their religious duties."  Operational Navy Instruction (OPNAVINST) 3461.6 ( Exhibit 7), ¶ 1-

3.g(2).  If no captured personnel need their ministry, captured chaplains must be returned to their

Armed Force.  *Id*.  "In order to be entitled to this immunity, chaplains must at all times, both in

time of war and in time of peace, <u>be engaged exclusively in religious duties</u> ...."  Chaplains

Manual, OPNAVINST 1730.1 (Exhibit 8) at 1-3, § 1204.2 (emphasis added).  International law

requires no other type of officer be repatriated while hostilities exist.  The DOD's and Navy's

regulations supporting the Geneva Convention reflect the fact chaplains are unique, distinct and

distinguished from other naval officers.

### 4.    The Code of Conduct demonstrates DOD's determination and defendants' recognition chaplains are unlike all other naval officers

SECNAVINST 1000.9 (Exhibit 9), publishing Executive Order (EO) 10631

(8/17/55) as modified by EO 12017 (11/3/1977), established The Code of Conduct (the "Code").

The Code defines in six articles the obligations for every Armed Forces member in hostilities or

peace.  *Id*. The Code  has the force of law and is enforceable by the Uniform Code of Military

Justice.  *See* NR 1140 (capture by the enemy) and 1141 (Code of conduct) (Exhibit 6).

11

The Code specifically <u>exempts</u> chaplains from significant responsibilities it places on <u>all</u> <u>other</u> Armed Forces officers, showing chaplains are not like other officers.  The Code's Article III requires every Armed Forces member to resist capture and never surrender while the means to resist is available, and if captured, to make every effort to escape.  Exhibit 6, Enc. 1.  However, "[a]s individuals, medical personnel and chaplains do not have a duty to escape or to actively aid others in escaping as long as the enemy treats them as 'retained personnel.'"  DODI  1300.21, ¶ E2.3.3.3 (Exhibit 10).

The Code's Article IV requires the senior captured commissioned officer to assume command of other prisoners of war, *i.e.*, to take charge, establish a chain of command, continue to resist, and seek to escape.   However, "[m]edical personnel shall not assume command over non-medical personnel and <u>chaplains shall not assume command over military personnel of any</u> <u>branch</u>."  DODI 1300.21, ¶ E2.3.4 (emphasis added).  NR 1140.3 reflects this law: a chaplain can not be "a superior commissioned officer with respect to a person in the naval service who is junior in rank."  (Exhibit 6).  Although medical personnel and chaplains are both treated as "retained personnel," medical personnel may command other medical personnel whereas chaplains can <u>never</u> command, even if they are the only officer present, making chaplains distinctly unlike all other officers.  It verifies that chaplains cannot exercise the sovereign's authority, *i.e.*, the ability to give orders, *see* 10 U.S.C. §§ 3581, 8581 ("Chaplains have rank without command"), or allocate government benefits.

The Code's "Legal Aspects of Evasion and Captivity", designed by defendants' Judge Advocate General (Exhibit 11), emphasizes this last point.[2]  "Whether their status [as Retained

---

[2]  Completing a level B block of instruction (required for some officers) recently, a plaintiff recognized the inconsistency of the Navy's argument chaplains are like all other officers

Personnel] is recognized or not, chaplains are restricted from taking command over military

personnel of any branch of service ....'  "Fundamental Rights and Obligations", p. 2 of 4 (Exhibit

11).  "Chaplains may not command military members of any branch of service regardless of

status," "Organization During Captivity", p. 4 of 4 (Exhibit 11); *see also* Extracts of defendants'

Lesson Plan for Code of Conduct Training, Level A (Exhibit 22), pp. 15 ("retained personnel")

and 46 (chaplains can not "take" command over any service member).

<div align="center">

**5.    Defendants cannot as a matter of law divorce a chaplain's role and function as denominational representatives from their status as naval officers**

</div>

"The term 'officer' is one inseparably connected with an office", which is "a

public station conferred by the appointment of government" and  has the "essential elements of a

public station, permanent in character, created by law, whose incidents and duties are prescribed

by law."  *Metcalf & Eddy v. Mitchell*, 269 U.S. 514, 520 (1926).  10 U.S.C. § 6031(a) establishes

a Navy chaplain's duties: "An officer in the Chaplain Corps may conduct public worship

according to the manner and forms of the church of which he is a member."  Defendants' prior

argument chaplains are like all other naval officers ignores the implications of § 6031, the DOD

regulations and definitions above, and Congress's determination of chaplains' "incidents and

duties [] prescribed by law", *e.g.* conducting worship.

"When a statute creates an office to which it assigns specific duties, those duties outline

the attributes of the office.  Any additional duties performed pursuant to a general authorization

in the statute reasonably should bear some relation to the specified duties."  *Gomez v. United*

---

with its published legal training and provided copies to counsel.  This led to specific documents
addressing the Code and Geneva Convention.  Exhibit 22 contains extracts from defendants' new
Code of Conduct training – level A – required for all personnel.

<div align="center">

13

</div>

*States*, 490 U.S. 858, 864 (1989). *Gomez*, addressing a magistrate's scope of authority, found Congress did not intend magistrates to have authority to seat felony juries. *Id.* Examination of the statutes that authorize chaplains and their legislative history shows that a chaplain's only function is to act as a representative of his or her faith group in ministering to and facilitating military faith group members' religious needs. *See* 10 U.S.C. §§ 3547 (Army) and 8547 (Air Force) ("each chaplain shall, when practicable, hold appropriate religious services" on Sunday and "appropriate religious burial services"). Congress made sure chaplains' status as commissioned officers did not suggest they had civic authority in addition to religious authority. 10 U.S.C. §§ 3581 ("Chaplains have rank without command"), 8581 (same).

Section 6031's specific definition of chaplains' duties, to conduct religious services, originates in the second section of the Act of 1794 that established the United States Navy and authorized the <u>office</u> of chaplain. That Act provided "there shall be employed on board of the said ships of forty-four guns ... one chaplain." NAVPERS 15807 (Exhibit 4), p. 8. His primary duties were to conduct divine services twice a day and preach a sermon on Sunday. *Id*. at 11. A chaplain was an officer because he occupied the office of chaplain. Until 1914, a chaplain was addressed as "chaplain," his title and office. Chaplains were paid at a rate different than other officers until 1860 when Congress provided that "Chaplains shall be paid as lieutenants." Act of June 1, 1860, Ch. LXVII, 36th Cong., Sess. 1. Subsequent legislation fixed a chaplains pay as that of a lieutenant commander based on the number of years of service. During the Civil War, Congress established "relative rank" for chaplains determining "the order of precedence of the various grades of naval officers" for protocol but not for pay purposes, NAVPERS at 104. "Relative rank merely fixed precedence at official and social functions." *Id.* Chaplains did not get *authentic* rank until 1914, *i.e.*, paid equally with other officers. *Id.* at 137.

14

This shows Congress and the Navy historically have severely limited a chaplain's role, duties and authority to that of a denominational representative and religious leader, making chaplains distinctly different from all other officers.  DOD acknowledges this same treatment, *see* B above.  In light of the Navy's and Congress's history of restrictions on chaplain activities, defendants cannot honestly or legally claim that chaplains are just like other Navy officers.

### 6.    *In re England* **found chaplains were unique officers**

Subsequent to *Adair*'s 2002 holding chaplains were like other naval officers, 183 F.Supp.2d at 62,  *In re England*, 375 F.3d at 1171, addressed the nature of chaplains: "A Navy chaplain's role within the service is 'unique' involving simultaneous service as clergy or a 'professional representative' of a particular religious denomination and as a commissioned naval officer", citing OPNAVINST 17301 and Chaplain's Manual.  The fact they are "unique" means chaplains, although commissioned as officers, are <u>unlike</u> all other officers.  Defendants' regulations and historical treatment of chaplains reflect that uniqueness; *see* 2-5 above.

### 7.    **Chaplains' religious identities make them unlike all other naval officers**

The evidence above shows chaplains are unique in that: (1) defendants limit chaplains to religious duties; (2) defendants restrict them from the secular duties common to all other officers; (3) chaplains are hired to represent their religious organizations to the military; and (4) have a primary allegiance to their endorser, an outside civilian religious organization, which can terminate a chaplain's career at any time.  10 U.S.C. § 643.  Chaplains cannot be unique in everything they do in the Navy because of their religious identity and then be like all other officers merely because they walk into a selection board room.  In fact, the evidence below shows chaplains act like denominational representatives on selection boards when given the

power to award or deny benefits for other denominational representatives.

**C.    Statistics Show Chaplains Serving as Selection Board Members Act like Denominational Representatives**

**1.    Statistical analysis of all 1977-2002 chaplain selection boards shows denominational bias infected their decisions**

No discovery had taken place when the Court held chaplains served on selection boards as naval officers and not as denominational representatives. Discovery has identified the denominations for chaplain board members, candidates, and selectees for nearly all chaplain career grade (lieutenant commander (LCDR), commander (CDR) and captain (CAPT)) promotion boards from 1977 through 2002. In 2006, defendants produced more than 4000 chaplain accession records from 1985-2005, including the Chaplain Accession and Recall Evaluation (CARE) Boards' decision memorandums and the CARE board worksheets. Six years of those CARE records specifically identified the CARE board members, enabling plaintiff's expert, Dr. Harald Leuba, Ph.D., to identify each selection board member's denomination and endorser,[3] and analyze the impact of denomination on the CARE board selections. Plaintiffs also obtained via FOIA defendants' Chaplain Active Duty and Retention Advisory Group ("CADRAG") results, retaining chaplains beyond their initial three year trial period. Because defendants were less than forthcoming in production, plaintiffs' analysis has progressed through various stages over a long period of time, shown in their expert's work discussed in detail below.

Dr. Leuba's Addendal Declaration (Exhibit 12) (February 2005) analyzed the impact of denomination on promotion board results. He first found defendants treated Baptists statistically

---

[3] Some endorsers represent groups of independent churches who share common beliefs, *i.e.*, faith groups, but who do not consider themselves denominations per se, *e.g.*, CFGC and Associated Gospel Churches. For purposes of this motion, denomination as it refers to a chaplain will also mean the endorsers who represent distinct faith groups.

16

differently from non-Baptist chaplains, although defendants place both within the Non-liturgical

faith group cluster. This conceals defendants' religious prejudice, allowing their favorable

treatment of Baptists to moderate the chaplain promotion board members' harsh treatment of

non-Baptists in the non-liturgical faith group cluster. Dr. Leuba concluded that board members'

religious orientation, reflected in their FGC designation, influenced the board results. *Id.* at ¶ 6

(Catholics and Liturgical chaplains on Promotion Boards tend to over-promote fellow Catholics

and Liturgicals and under-promote Non-liturgicals and Special Worship chaplains). "Religious

mix on the Promotion Board is three times as important in predicting who will and will not he

promoted as the Religious mix in the Pool of Candidates." *Id.*, and ¶¶ 65-67.

　　　　Obtaining more data, Dr. Leuba's "Compendium" (Exhibit 13) further analyzed the

validity of the well-recognized social science phenomena that people tend to like and prefer those

who are most like themselves. The Center for Naval Analysis's ("CNA") March 2000 study,

"Promotions in the Navy Chaplain Corps" (Exhibit 14), identified this factor at work in Navy

chaplain promotions.[4] CNA noted the impact of two Catholics on every promotion board (the

"2RC Policy") until 1986 when *Wilkins v. Lehman* concluded that a chaplain's Establishment

Clause challenge to the 2RC Policy would most likely succeed and enjoined a Navy chaplain's

separation for failure of selection ("FOS") under the 2RC Policy. CNA 26-28. Defendants

reduced the Catholic reserved board membership to one on every subsequent board until

FY2003. CNA reviewed and validated a doctoral thesis by CH Stan McCreary that examined the

Navy's chaplain promotion system, argued Catholics were preferred in promotions, liturgical

Protestants did better than Non-liturgicals, and concluded that chaplain board members liked

---

　　　　[4] Dr. Leuba's Compendium, App. N identifies major shortcomings in CNA's analysis,
including a failure to analyze above zone promotions and perform cohort analysis.

those like themselves, "like likes like", which he called "affinity."[5]  CNA 11-12, 26-28.  Dr.

Leuba specifically analyzed McCreary's "like likes like" theory in the light of more complete

data and showed that chaplain candidates for CDR and CAPT who had board members with the

same or similar denomination did statistically significantly[6] better than  chaplains without a

denominational similarity or match with a board member.  Compendium, Appendix M, ¶¶ 130-

135 (Exhibit 13).

    The next phase in Dr. Leuba's analysis was his response to a comment in *Larson v. U.S.*

*Navy* by defendants' expert, Dr. Siskin, that perhaps Dr. Leuba was suggesting there was a

relationship between the probability of selection to the probability of having someone on the

board "like" the candidate.  Dr. Leuba called this the "Siskin Conjecture: The Pattern of

Denominations Assigned to U.S. Navy Chaplain Corps Selection Boards Controls the Decisions

which Flow from those Boards" (the "SC"), Exhibit 15.  Analyzing the composition of

defendants' selection boards over time, Dr. Leuba found defendants had a favorite set of

denominations for promotion and CARE board memberships: 80% of promotion board

memberships went to five denominations, including Southern Baptists, a non-liturgical

denomination.  *See* SC at 9, Table 1.  Those denominations whose members appear most often

on boards have statistically significant higher candidate selection rates.  *Id.* ¶¶ 48-49.

---

    [5]  CNA recommended the Navy "Reform the promotion process" and abandon its one
Catholic on every board policy, expand the boards with line officers as the majority and assign
only one chaplain board member on a neutral, random basis.  CNA 2, 46-47.  Defendants did not
modify their chaplain promotion system until several years after *CFGC* and *Adair* challenged the
board system's constitutionality, which this Court denied without prejudice.

    [6]  "Statistically significant" means the difference between two categories or sets of data
measuring some difference between groups is not attributable to chance, and is 1.96 standard
deviations or more.  *Palmer v. Shultz*, 815 F.2d 84, 92-97 (D.C. Cir. 1987) (discussing the legal
meaning and implications of statistical significance).

To address all possible explanations for possible denominational preference on the boards, Dr. Leuba again analyzed the available data for all selection boards involving the award or denial of benefits: accessions, promotions, CADRAG board retentions, and selective early retirement (SER). "Do Denominational Representatives Acting as Government Decision-makers Make Denominationally Biased Choices When Awarding or Denying Benefits to Other Denominational Representatives? A statistical analysis declaration" by Harald R. Leuba, Ph.D. (Hereafter "Denominationally Biased Choices") (Exhibit 16). Dr. Leuba tested "every available hypothesis with all the available data", *e.g.,* the Siskin Conjecture, Roman Catholic preference, like likes like, etc. *Id.* ¶ 76. Dr. Leuba "established (1) a statistically significant relationship between the denominations the Navy assigns to selection boards and denominations which receive the benefits and advantages doled out by those boards", *id.* ¶ 103; (2) "the mix of denominations which are appointed has been statistically skewed to favor five denominations", *id.* ¶ 126.1.1 (citing Appendix B); (3) "in every case except promotions to LCDR the data [showing bias] was inconsistent with the hypothesis of regularity", *id.* ¶ 123; and (4) "some denominations are more successful than others because they are the beneficiaries of denominationally biased choices. (*See* Appendix Q)." *Id.* ¶ 115.

Statistics show three distinct and complementary facts in every personnel area that can be measured by data. First, Catholics have been the preferred denomination for over 27 years, Compendium at 2-4, ¶¶ 3-10; App. K at 11, Table K-10. Second, in his Allonge Declaration at 2, ¶ 6, Dr. Leuba found:

> U. S. Navy Chaplain Corps' personnel decisions are contaminated by considerations of denomination. There is an institutional preference among denominations (Catholic > Episcopal > other Liturgical > Baptist > other Non Liturgical > Orthodox and Special Worship) and this preference priority forms the basis for populating the selection boards; that pattern of preference in turn

controls the mix of denominations which are selected into, promoted within, or involuntarily retired from the U.S. Navy Chaplain Corps. The favoured denominations receive disproportionate benefit; the disfavored ones are denied unbiased and equitable consideration for admission, advancement, and tenure.

Third, there is a demonstrated statistically significant tendency for candidates before a promotion panel to benefit (*i.e.*, fare better) when they shared a denomination with some board member than when they did not share a denomination with any board member. Compendium at 19 (2d * citing App. G & M), 26-29, ¶¶ 31-53; App. M, ¶¶ 35, 65, 69, 128-135. These findings are addressed in detail below.

The inescapable conclusion is chaplains making decisions that award or deny government benefits to other chaplains, *i.e.*, other denominational representatives, act like denominational representatives and favor those most like themselves. This violates the Establishment Clause.

### 2.    CARE Board records show defendants' denominational prejudice in accessions

Accessioning is the process that recruits civilian clergy and commissions them as Navy chaplains. Until FY2001, after *CFGC* and *Adair* challenged their practice, defendants developed faith group cluster ("FGC") goals as targets for both the Chaplain Corps' desired end strength and their recruiting, *i.e.*, accession goals. Defendants use a Chaplain Accession and Recall Evaluation (CARE) board to evaluate all applicants for the Chaplain Corps ("CHC"). CARE board members were exclusively chaplains until some time in 2001when one non-chaplain member was informally added.

Defendants produced over 4000 CARE board records in *Larsen* containing applications for chaplain appointment in one of three chaplain accession programs: (1) the Chaplain Candidate Program ("CCP"), also known as the Theological Student Program, commissions seminary students as Ensigns and allows them to serve limited periods of active duty, enabling

students to try the Navy and the Navy to evaluate them; (2) the D4105-A program recruits civilian clergy for direct appointments to active duty; and (3) the D4105-I program recruits civilian clergy for appointments in the inactive Naval Reserve.  After completion of seminary, CCP officers who want to go on active duty are processed through the S4105-A [Active duty] program; those wanting to go to the inactive Reserves process through the S4105-I [Inactive Reserve] program.

Dr. Leuba's analysis of defendants' 1985 to 2005 CARE Board records of all applications for these programs produced the statistical results below which clearly show defendants' denominational prejudice for Catholics (RC), Liturgical Protestants (LP) and bias against Non-liturgicals (NL).  Dr. Leuba's "September 2006 *Larsen* Withdrawal & Correction Declaration" (the "W&C"), (Exhibit 17), Tables 1 (CCP), 3 (S4105-A), 6 (S4105-I), 7 (D4105-A), and 8 (D4105-I).

**Probability of Being Recommended by CARE Board**

| Program | RC | LP | NL | SW |
|---------|------|-------|--------|-------|
| CCP* | 95.0% | 82.5% | **75.6%** | 88.8% |
| D4105-A* | 92.4% | 77.0% | **65.7%** | 61.4% |
| D4105-I* | 96.3% | 77.3% | **60.7%** | 75.0% |
| S4105-A | 100% | 94.0% | **76.8%** | 91.3% |
| S4105-I | 100% | 95.2% | **95.2%** | 100% |

* = accession programs; personnel in the two "S" programs are already commissioned officers.

An important indicator of blatant prejudice is the S4105-A Non-liturgical selection rate, despite the fact the CCP officers have been through the accessioning process once already and were Naval Reservists.[7]  The only program that does not show an established pattern of bias is

---

[7] SECNAVINST 1120.4, ¶ 4.a, states this program is supposed to be the  primary source of chaplains for "an all-Regular force", *i.e.*, active duty.

the S4105-I, because there were no inactive duty FGC goals or quotas associated with this program.  The results of every other program show the Navy's hierarchical preference and prejudice at work: Catholics first, followed by Liturgical Protestants, with Non-liturgicals last in three of the four categories showing bias and next-to-last in the fourth. These accession rate differences are statistically significant beyond two standard deviations, not the result of chance. *See* n. 6 *supra*.  These consistently prejudicial but predictive results are correlated to the denominations of the chaplain board members who served on the CARE boards. This is a demonstration the CHC has favorite denominations, *see* 3 below (Catholics are first preference, followed by three liturgical denominations and Southern Baptists (Non-liturgical)).

Exhibit 18, Table QE-6 of Dr. Leuba's W&C, shows the individual accession rates for each endorser of the Non-liturgical faith group cluster who provided four or more chaplain candidates from 1985 to 2005.  Exhibit 19 provides a list of the abbreviations identifying each endorser or denomination.  Exhibit 20 shows Non-liturgical denominational accession rates ranked according to the number of chaplain candidates the denomination provided; Exhibit 21 ranks the Non-liturgical denominations by their candidate acceptance rates.  Faith groups with accession rates below two-thirds (66.66%) are shown in bold, *e.g.*, CFGC and AGC.  The wide variation in the Non-liturgical accession rates are statistically significant for some groups, *e.g.*, CFGC.  W&C at 150 (App QE).  The only explanation for these significant differences is the theological differences these faith groups represent, reflecting the prejudice inherent in the CHC and defendants' CARE board process because it uses chaplains as decisions makers.

3.    **CARE Board members' denominations influence Navy chaplain accession decisions**

Dr. Leuba's  "The Siskin Conjecture" ("SC"), Exhibit 10, examined the

22

relationship between selection board members' denominations and the board results in terms of

the candidates' denominations.  Defendants' records over a six year span allowed Dr. Leuba to

identify CARE board members' denominations for comparison with the Board results.  SC, ¶63.

Dr. Leuba organized the CARE board denominational representation into three tiers based on the

frequency of denominational representation on the boards and then computed the acceptance

rates for those candidates in the corresponding tier as shown below.  *Id.*

| The Navy's Implicit Favorites: | Percent Recommended for Accession* |
|---|---|
| **Tier I**   Roman Catholic | |
| - There was at least one Roman Catholic on most CARE Panels | 96.40% |
| **Tier II**   SB,  ELCA, UM , LMS, NBCUS, BGC, ABC, CS  & SDA | 85.45 % |
| - Significant representation on CARE Advisory Group | |
| **Tier III**  EC, AME, PNBC, RCA, etc | 79.71 % |
| - Minimal or No representation of CARE Advisory Group | |

* Data from Navy's electronic data base, 27 July 2006
*See* Exhibits 24 (Accession Favorites) and 19 for denomination identities

The same  religiously biased results in the accession process are replicated in the more

than 2000 chaplain applicants for active duty reviewed by the CARE Board.  *Id.*, ¶ 64.

| The Navy's Implicit Favorites: | Percent Recommended to Active Duty* |
|---|---|
| **Tier I**    Roman Catholic | |
| - a faith group cluster composed of one denomination | 93.89% |
| - There was at least one Roman Catholic on most CARE Panels | |
| **Tier II**   SB,  ELCA, UM , LMS, NBCUS, BGC, ABC, CS  & SDA | 72.26 % |
| - Significant representation on CARE Advisory Group | |
| **Tier III**  EC, AME, PNBC, RCA, etc | 62.48 % |
| - Minimal or No representation of CARE Advisory Group | |

* Data from Navy's electronic data base, 27 July 2006

Dr. Leuba concluded:

These patterns are all statistically significant well beyond one chance in a million,

in the region of seven standard deviations. There can be "no statistical doubt" that the selection boards are picking "people like us" to add to the Corps, and rejecting "people who are different". And since the only differentiating dimension visible in the records is denomination, it follows that this is religious discrimination. It may be unwitting on the part of the individual chaplain board members, it may even be unwitting on the part of the subordinate assignment officer who decided whom to suggest for a role on the selection panels, but it was not *institutionally* innocent and it cannot be unwitting to defend it in the face of this data.

*Id*., ¶ 65 (emphasis added). It is apparent that chaplain CARE board members who award or

deny benefits act as denominational representiaves, not naval officers.

### 4.    Chaplain board members' denominational identities affect their chaplain promotion board decisions

Discovery produced promotion board memberships and results for the career

promotion boards (LCDR, CDR, CAPT) for 26 years, 1977 through 2002, with the exception of

several boards whose records defendants claim could not be located. Dr Leuba initially found

that while many differences in the FGCs "in zone" promotion rates did not reach statistical

significance,[8] 22% of Roman Catholic promotions came from above zone [those who had

previously been considered but not selected] while only 13% of the Non-Liturgical promotions

came from above zone. This accounted for the favorable Catholic promotion rate when

considering cohorts but hidden in the normal "in zone" FGC analysis. Addendal, ¶ 101.

The Siskin Conjecture subsequently examined the relationship between the denomination

of promotion board members, the frequency with which their denominations served as board

members, and the denominational members selected for promotion. Dr. Leuba identified four

tiers of denomination board participation as indicated by their frequency of appearance on

boards, demonstrating the Navy definitely preferred some denominations as board members. SC

---

[8] This was before his analysis finding defendants' favorable treatment of Southern Baptists hid defendants' prejudice against other Non-liturgical faith groups within the FGC.

¶ 48.  Those tiers of denominational preference are:

**The Navy's Implicit Favorite Promotion Board Denominations**

**Tier I**    Roman Catholic
      - a faith group cluster composed of one denomination
      - There was at least one Roman Catholic on every Promotion Panel

**Tier II**   PUSA, SB,  ELCA, UM , LMS, ABC, CC(DC), UCC & SDA
      - Double digit percentage likelihood of representation on Promotion boards

**Tier III**  EC, AME, NBCUS, PNBC, RCA, etc
      - non-trivial participation

**Tier IV** CGIC, CR, ORTH, CHCCC, N, PCA, GAGB, CFGC, etc.
      - Minimal participation, or no participation on Promotion Boards

*Id*.

Dr. Leuba's analysis of promotion board results found the prejudice alleged by plaintiffs and demonstrated in the CARE board results particularly evident at the rank of Commander, the most critical grade for career naval officers.  Only selection to commander guarantees an officer the ability to reach 20 years of service necessary to retire with a pension because 10 U.S.C. § 632 allows the Navy to separate those officers who twice fail to select below the grade of commander.  Dr. Leuba's analysis, SC ¶ 48, shown in the table below, clearly shows the impact of defendants' favorite denominations for board members on chaplain Commander boards. Those chaplain candidates whose denominations served more often as board members did significantly better than those chaplains' whose denominations did not serve on many boards as shown in the following statistical analysis chart.

**1977 thru 2002 Denominational Appearance as Promotion Board Members**
(  )= total number of appearances

| Faith Group Cluster → | Roman Catholic | Liturgical Protestant | Non-Liturgical Protestant | Special Worship | % **Selected to CDR*** |
|---|---|---|---|---|---|
| Tier I - 100% | RC (102) | | | | **48.34 %** |
| Tier II - 25 to40% | | PUSA (43) ELCA (29) UM (21) LMS (15) ABC (12) UCC (10) CC/DC (10) | SB (37) | SDA (11) | **45.07 %** |
| Tier III - 7 to15% 4 to 8 seats in 25 years | | AME (8) RCA (7) EPIS (7) | NBCUS (7) PNBC (7) | J (6) | **36.12 %** |
| Tier IV - 0 - 5% 0 to 3 seats in 25 years | 5 Other [Catholic type] (0) | CRC (3) ECCA (3) CME (2) 53 Others(0-2) | BGC (5) GARB (4) CGIC (3) 109 Others (0-2) | LDS (4) ORTH (3) CS (1) 10 Others (0) | **27.00 %** |

 * As reported in Biographies, Chaplain Corps History, Volume X.  Exhibits 25 (Promotion

Board Favorites) and 19 identify the endorser or denomination abbreviations.

       The selection rates above are statistically significant beyond three standard deviations (chi

Square <.001).  *Id.*  Candidates from the denominations with the most board members are the

chaplains most likely to rise to the rank of CDR.  "The likelihood of a candidate's being selected

by a board is correlated to the likelihood that the board contains a panel member with the same

denomination as the candidate."  SC, ¶ 58.  This shows two things.  First, denomination is

important to a chaplain's standing in the community, contrary to the Establishment Clause's

religious neutrality mandate.  Second, the relationship between the board members denomination

and the board results shows chaplains are acting as denominational representatives, protecting

their denominational self-interests, and not acting as naval officers who would distribute

government benefits without denominational bias, active or passive, influencing their decisions.

### 5.    A board members' denomination affects chaplain retention decisions

Defendants would routinely access more chaplains than they needed until they

experienced chaplain recruiting shortfalls.  Defendants' CADRAG process determined which

chaplains would continue on active duty after the chaplain's initial three-year period of service.

The CADRAG information did not identify the board members.  Dr. Leuba analyzed CADRAG

decisions addressing 246 chaplains who were eligible for and requested consideration for

continuation on active duty using defendants' established hierarchy of favorite denominations.

SC, ¶ 81.  His results from the Siskin Conjecture are quoted below.

> 82.  Table 5 summarizes the board's decisions tallied by "faith group cluster" -
> but I have not used the Navy's "faith groups".  Instead of using the Navy's (I)
> Roman Catholic, (II) Liturgical Protestant, (III) Non-Liturgical Protestant and (IV)
> Special Worship Group, I used groups based on the Navy's de jure[9] preference for
> denominations.

> 83.  Recently (see above - the Siskin Conjecture), I have used an operational
> definition of "favored denominations".  I simply look at which denominations the

---

[9]  I understand the distinction between *de jure* and *de facto* to be a contrast between what
is true or "supposed to be true", based on the rules of the Organization, and what seem to be the
"facts on the ground" as those rules are followed (or ignored.)  The Navy may say that I have
misused this comparison in my text here.  The Navy will say that it has no *de jure* favorite
denominations, and may argue that whatever statistically significant uneven distribution which
may be occurring is incidental, accidental.  It is my opinion here that the data demonstrate an
historic pattern and practice (a *de jure* intention) to place Roman Catholic, Presbyterian (USA),
Lutheran (ELCA), United Methodist and Southern Baptist denominations on selection boards,
with a smattering of other "acceptable" denominations added from time to time for appearances'
sake - but always with the intention of supporting "mainstream" denominational influence in
general and Catholic influence in particular.

Navy assigns to its selection Boards (promotion Boards, SER Boards and C/A/R/E Boards) and let that distribution define the de jure preference pattern:

**Tier I**   The denomination(s) which is/are assigned to all or to virtually all selection Boards

> This is Roman Catholics, and there is no "close second".

**Tier II**   The denominations which are frequently assigned to a Selection Board, but not "always" assigned or even almost always assigned.

|          |        |                                                          |
|----------|--------|----------------------------------------------------------|
| This is  | SB     | (They are on about half as many boards as the Catholics) |
|          | ELCA   | (They are on about 1/3 as many boards as the Catholics)  |
|          | PUSA   | (They are on about 1/3 as many boards as the Catholics)  |
| and      | UM     | (They are on about 1/3 as many boards as the Catholics)  |

**Tier III** All other denominations.

84.   In the Siskin Conjecture I break this third group into two subgroups: IIIa which is those denominations who have had more than incidental presence on some selection boards and IIIb, those denominations who have never had a seat on a selection board, or almost never.  I also explore the possibility that the "favorites" may change over time, or from context to context.  In the present instance, however, we do not know who was on these CADRAG boards, and we only have 246 decisions to parse, so I will simply use this generalized, operationally defined, sequence of favorites.

**Table 5**
Probability of Selection for Continuation in Service
Candidate Denominations Tiered

| Faith Cluster | Number Considered | Number Selected | Number Rejected | Percent Continued | Percent Rejected |
|---------------|-------------------|-----------------|-----------------|-------------------|------------------|
| Tier I        | 46                | 43              | 0               | 100%              | 0%               |
| Tier II       | 85                | 69              | 8               | 89.6%             | 9.4%             |
| Tier III      | 115               | 86              | 18              | 82.7%             | 15.7%            |
| Total         | 246               | 198             | 26              | 88.6%             | 10.3%            |

\* Number Considered includes selected + rejected + alternates.

28

85.   This pattern of results (even without considering that the Siskin Conjecture predicts an ordering from Tier I to Tier III) is statistically significant (using a Chi Square statistic) at p<.001 (more than three standard deviations.)  Chance alone cannot account for this preference among the denomination-based clusters.

86.   This pattern is also consistent with the results from the 1981 C/A/R/E board mentioned earlier. In 1981 and 1982 the C/A/R/E Board undertook a "continuation" consideration for 27 chaplains.  Twelve of these chaplains were Roman Catholic; ten were continued.  Of the remaining 15 chaplains, only 3 were continued.

Once again, the board members' denominations affect the outcome, making religion significant to a chaplain's standing in the community, violating the Establishment Clause.  If the chaplain board members acted as naval officers, their denomination would have no influence on the decisions.  *See* 7 below.

> **6.    Chaplain board members' denominations impact chaplain SER decisions**

Defendants also used chaplains as board members on a limited number of selective early retirement (SER) boards.  Dr. Leuba analyzed the board results against defendants' favored denominations reflected in their consistent choice of favored board memberships.  The Siskin Conjecture table (at p. 16) below again shows denomination counts when awarding or denying benefits to denominational representatives.

| **The Navy's Implicit Favorites** | **Percent lost to SER\*** |
|---|---|
| **Tier I**   Roman Catholic<br>          - a faith group cluster composed of one denomination<br>          - There was at least one Roman Catholic on every SER Panel | 1.72 % |
| **Tier II**   SB,  ELCA, UM , LMS, NBCUS, BGC, CC(DC)  & SDA<br>          - Significant representation on Promotion boards<br>          - Representation on at least one SER Board | 6.29 % |
| **Tier III**   EC, AME, PUSA, ABC, UCC, PNBC, RCA, etc.<br>          - Significant representation on Promotion boards<br>          - NO representation of SER Boards | 3.43 % |

29

**Tier IV** CGIC, CR, ORTH, CHCCC, N, PCA, etc.                                     8.70 %
     - Minimal or no participation on Promotion Boards
     - NO representation on SER Boards
* Based on Data in Grayson Declaration compared to CDR inventory in Chaplains History

    60.   Of course, when making a SER decision, one selects the chaplains who do *not* match the template; one should not be surprised when the closest match (the Catholics) lose the fewest chaplains and the most distant match (the denominations who are so undervalued that they are "never" given a seat on any selection board) lose the most chaplains - proportionately 5 times as many as the most favored denomination.  [This is statistically significant, p <.001.]

       **7.**    **Statistics show chaplains serving on chaplain selection boards do not act as naval officers**

      Dr. Leuba's analysis of the four types of boards on which chaplains have been given discretionary civic authority as board members to award or deny government benefits shows that in each case, "The likelihood of a candidate's being selected by a board is correlated to the likelihood that the board contains a panel member with the same denomination as the candidate."  SC, ¶ 58.

      This is not the behavior expected of neutral, secular naval officers conforming to the presumption of regularity; it is the behavior expected of denominational representatives operating in secret without checks on the exercise of their authority.  *See* E below.  Whether this tendency is accidental or deliberate on the part of individual Chaplains, or an accidental or deliberate consequence of the Navy's having denominational favorites for assignment to selection boards, does not matter under Establishment Clause analysis.   The above results illustrate the danger of the forbidden union of discretionary civic power with denominational  representatives, *see Grumet*, 512 U.S. at 696-99, and government favoritism which benefits those denominations who are favored by having a similar faith member or advocate on the board.  "Which denominations are placed on the Chaplain selection boards matters!", SC  ¶100, demonstrating

that chaplains cannot put aside the denominational representative role that defines their identity in and out of the Navy and for which they have been educated, trained and hired.  The Establishment Clause forbids defendants to allow religion to have any relevance to anyone's standing in the community or making denomination relevant in government promotion or benefit decisions.

   D.    **Defendants' Arguments That Specific Denominations Were <u>Required</u> on Chaplain Promotion Boards Is Inconsistent with Their Argument Chaplains Serve on Selection Boards as Naval Officers**

   Defendants have argued chaplain selection boards <u>had</u> to have specific faith group composition.  This argument contradicts their 2000-01 position chaplains serve on selection boards as naval officers.  In February 2006, the *CFGC/Adair* plaintiffs moved for declaratory judgment that the defendants' practice of reserving at least one promotion board seat for a Catholic violated the Establishment Clause.  *Adair*, 417 F.Supp.2d at 4.  Defendants argued that specific denominational mixes were required on promotion boards and there <u>must</u> be a Catholic on every board.  Defendants' Opposition and Cross-Motion, *CFGC* Docket No. 284, pp. 8-9, 25-28 (incorporated by reference).  Defendants never explained why having a Catholic was necessary for a valid and fair board but having a Pentecostal, Jew, Mormon, United Methodist or Bible Church chaplain was not.  This parallels defendants' 2005 arguments in *Wilkins v. United States*, 99cv1579 (S.D. Cal.), at Exhibit 23. The only obvious difference among chaplains appointed as board members is their denomination.  Dr. Leuba's analysis in C above clearly shows denomination is an important factor in determining which denominational representatives are awarded or denied government benefits.

   It is inconsistent for defendants to argue chaplains serve on promotion boards as naval officers, not denominational representatives, and then argue each board must have at least one

31

Catholic and other specific denominational representation as reflected by faith group clusters.

Defendants classify most Christian chaplains and clergy into one of four religious categories

defined by their allegedly common worship characteristics.[10]  This categorization on the basis of

religious beliefs is itself an admission the various differences are significant.  To argue a mix or

even a specific combination is necessary to have a valid board is an admission that religion is a

factor important in composing the board as well as in board deliberations.  Making religion

relevant to a person's standing in the political community violates the Establishment Clause,

*County of Allegheny v. ACLU*, 492 U.S. 573,593-94 (1989), and the constitutional guarantees of

equal treatment, *Midrash Sephardi v. Town of Surfside*, 366 F.3d 1214, 1242 (11th Cir. 2004),

*cert. denied*; 543 U.S. 1146 (2005).  This is inconsistent with defendants' representation

chaplains serve on selection boards as naval officers; if they served as naval officers,

denomination would be irrelevant.  Defendants' attempted explanation of why they needed

specific faith groups, when stripped of the smoke screen, shows defendants are selecting

denominational representatives through their purposefully staffed chaplain selection board

system.  This Court did not have the opportunity to address the previous obvious inconsistency in

defendants' arguments, the issue now before it.

Defendants stopped their practice of stacking chaplain selection boards with liturgical and

Catholic chaplains in FY03 in the face of *CFGC/Adair* and other chaplain legal challenges.  This

should be taken for what it is, an admission defendants' argument they had to have specific

denominations on boards (itself an admission denomination is important in the decision process)

was nothing more than post hoc justification to cover up their illegal preferences and prejudices.

---

[10]  *See Adair,* 183 F.Supp.2d at 36 (defining Liturgical Protestant and Non-liturgical categories).

E.    **Investigations Show Chaplain Board Members Act as Denominational Representatives Because Defendants' Promotion Board Procedures Allow Board Members To Do So**

Evidence from three investigations into defendants' chaplain promotion boards verifies

Dr. Leuba's analysis and shows chaplain board members advance their denominational interests.

Defendants challenged board procedures allow chaplains to vote their denominational biases with

no accountability.  RADM Black, Deputy Chief of Chaplains, explained the process of "zeroing

out" a candidate in the investigation of the FY 2000 Captain Chaplain Promotion Board (Exhibit

26), showing how a single member's vote will manipulate the board.  The NIG's  Report to Sen.

Santorum (Exhibit 27) agrees with RADM Black's testimony that CDR Washburn had been

zeroed out.  CDR Washburn's NIG testimony (Exhibit 28) provides a theological and/or

ideological reason for being zeroed out, her conservative view of women in ministry.

Both the DOD Inspector General ("DODOG") and the Naval Inspector General (NIG)

investigated the FY97 and 98 CHC Commander Boards.  Board members "'vote the record' by

depressing one of five buttons in a 'sleeve' which hides the voter's hand, ensuring the secrecy of

the vote.  The buttons coincide with degrees of confidence the voter has in the record being

projected, ranging from zero to 100 in 25 degree increments."  DODIG Report P 98C69119125,

p. 8 (Extracts at Exhibit 29).  The DODIG found evidence denominational considerations played

a part in chaplain promotions.  *Id.* at  4 (Catholic chaplain board member lobbied for Catholics),

31 ("some evidence that denominational considerations were factors in the above zone

selections").  A FY97 CDR board member's 2/4/98 NIG testimony at 2-4 (Exhibit 30- shaded

areas) also provides evidence of chaplains advancing their denominational interests.

F.    **The Presumption of Regularity Does Not Apply to Chaplains Sitting on Selection Boards or Evaluating Other Chaplains**

33

Dr. Leuba found statistically significant differences in the relationship between board denominational makeup and decision results among the various denominational tiers for almost every occasion chaplains made benefit related decisions, reflecting defendants' hierarchy of favored denominations. This negates the presumption of regularity. It is a demonstration of irregularity, showing religion is an evaluation criteria for chaplains. Non-chaplain naval officers would ignore denomination when making decisions awarding government benefits, whereas the evidence shows chaplains cannot abandon their denominational identities and character when making such decisions. Nothing suggests that this same tendency for chaplains to allow their denominational identity to influence decisions on boards does not affect chaplains when rating other chaplains. Rating a chaplain is a decision that affects the rated chaplain's opportunity for future benefits.

The Court made its presumption of regularity ruling on a motion to dismiss where the plaintiffs' factual allegations are presumed to be true. The Court recognized plaintiffs had a heavy burden to show the presumption did not apply and presumed they could not meet it, *Adair*, 183 F.Supp.2d at 60. The new evidence above shows plaintiffs have met that heavy burden because it clearly shows chaplains making decisions affecting the award or denial of benefits for other denominational representatives are influenced by their denominational character, identity and experience, contrary to the presumption of regularity. The question is not whether every chaplain serving as a board member allows his denominational background and identity to influence his decision, but whether *some* chaplains, intentionally or unintentionally, allow their denominational background and role as denominational representatives to influence their decisions. The evidence clearly shows this is the case, placing defendants in violation of the Establishment Clause. "The potential for conflict inheres in the situation," *Larkin*, 459 U.S. at

125 (quoting *Levitt v. Committee for Public Education*, 413 U.S. 472, 480 (1973)), and the

presumption of regularity has no basis, application or authority under Establishment Clause

analysis and precedent. *See id.* ("We assume that churches would act in good faith ...").

The MTD holding applying the presumption of regularity appears to conflict with current

Circuit precedent, *Aktieselskabet AF 21 v. Fame Jeans Inc.*, 525 F.3d 8, 18 ( D.C. Cir. 2008).

> A court deciding a motion to dismiss must not make any judgment about the
> probability of the plaintiff's success, for a complaint "may proceed even if it
> appears 'that a recovery is very remote and unlikely,'" *Bell Atlantic Corp. v.
> Twombly,* --- U.S. ----, 127 S.Ct. 1955, 1965 167(2007) (quoting *Scheuer v.
> Rhodes,* 416 U.S. 232,(1974)); a complaint "may not be dismissed based on a
> district court's assessment that the plaintiff will fail to find evidentiary support for
> his allegations," *id.* at 1969 n. 8. Further, the court must assume "all the
> allegations in the complaint are true (even if doubtful in fact)," *Twombly,* 127
> S.Ct. at 1965 (citing *Swierkiewicz [v. Sorema N.A.*, 534 U.S. 506, 511 (2002)]),
> and the court must give the plaintiff "the benefit of all reasonable inferences
> derived from the facts alleged," *Stewart [v. National Educ. Ass'n]*, 471 F.3d 169,
> 173 (D.C. Cir. 2006)].

### G.    *Larkin* and its Progeny Apply in this Case Because Defendants Have Fused Civic and Religious Power

Plaintiffs opposed defendants' MTD arguing *Larkin* and its analysis concerning the

fusion of civic and religious power supported their claim defendants' use of chaplains on

selection boards violated the Establishment Clause. The Court rejected plaintiffs' *Larkin*

argument, holding it did not apply in this case, *Adair*, 183 F.Supp.2d at 61, based on its finding

the presumption of regularity applied, *id.* at 60-61, and therefor chaplains serve on promotion

boards as naval officers, not denominational representatives, *id.* at 62. The above evidence

shows the presumption of regularity does not apply when chaplains are given authority to award

or deny benefits to other chaplains. Chaplains on selection boards act as the denominational

representatives they were hired to be.

The evidence specifically shows: (1) defendants have a preferred set of denominations

when choosing chaplain selection board members; (2) candidates from the favored

denominations benefit from having a board member from a similar denomination; (3) defendants

misrepresented the role and function of chaplains as being like other officers rather than unique

officers whom DOD classifies as and defendants treat as denominational representatives; (4)

chaplains do act as denominational representatives when awarding or denying benefits for other

denominational representatives, disproving the presumption of regularity; and (5) defendants

have not shown they have "any 'effective means of guaranteeing' that the delegated power 'will

be used underlined exclusively for secular, neutral, and nonideological purposes.'" *Larkin,* 459 U.S. at126

(quoting *Committee for Public Education v. Nyquist*, 413 U.S. at 780) (emphasis added).  As

shown in C above, this results in the unconstitutional and forbidden fusion of religious and civic

authority.  *See Grumet*, 512 U.S. at 698-99 (government may not deliberately delegate

discretionary power to an individual ... on the ground of religious identity"), 703-704 ("and

power must be exercised in a manner neutral to religion").

When the Supreme Court has spoken on an issue, lower courts are required to follow the

established precedent.  *Agostini v. Felton*, 521 U.S. 203, 237 (1997).  Explaining and applying

*Larkin's* non-fusion principles, *Grumet* specifically distinguished between " a government's

purposeful delegation [of civic authority] on the basis of religion and a delegation on principles

neutral to religion, to individuals whose religious identity are incidental to their reception of civic

authority."  518 U.S. at 699 (distinguishing *McDaniel v. Paty*, 435 US 618 (1978)) .  Defendants

may not "deliberately delegate discretionary power to an individual, institution, or community on

the ground of religious identity."  *Id.*  The evidence shows defendants have done so.

Chaplains' religious identity is not "incidental to their reception" of the power to

distribute or deny government benefits.  Defendants have delegated discretionary civic power on

the basis of religion to persons defined by their religious identity, whom defendants hired and employ as denominational representatives. Defendants do not have the guarantees required to ensure the denominational representatives exercise their delegated civic power solely for 'secular, neutral and non-ideological' purposes. *Grumet* and *Larkin* apply in this case.

## II.    IN THE ALTERNATIVE, PLAINTIFFS MOVE FOR CERTIFICATION OF A FINAL JUDGEMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 54(b)

If the Court denies plaintiffs' Motion to Amend, plaintiffs move for a Fed. R. Civ. P. 54(b) final judgment on the two *Adair*/*CFGC* claims the Court dismissed and the related decisions which form the basis for or flow from those dismissals, *see Adair*, 183 F.2d at 60-62. Those claims address whether First Amendment concerns are raised by the Navy's practices of (1) having chaplains serve on Navy chaplain selection boards, *see Adair* Complaint ¶ 50; *Chaplaincy of Full Gospel Churches (CFGC)* Complaint ¶ 86; and (2) allowing chaplains to rate other chaplains, *see Adair* Complaint, Count 7, ¶¶ 70-74; *CFGC* Complaint, Count 9, ¶¶ 110-115. The Court previously denied the *CFGC/Adair* plaintiffs' Motions for Reconsideration, *Adair v. England*, 209 F.R.D. 1 (D.D.C. 2002) and for a Rule 54 Order, *Chaplaincy of Full Gospel Churches v. England*, 221 F.R.D. 255 (D.D.C. 2004).

Allowing the Court of Appeals to address the major issues inherent in the Court's 2002 decision is appropriate under Rule 54 and in the interests of justice. The two dismissed claims address the underlying issues: (1) a chaplain's role on a selection board as defined by the Constitution, statutes and regulations; (2) whether defendants may delegate discretionary civic authority to officers hired to perform primarily religious functions on the basis of their religious identities as denominational representatives; and (3) whether defendants may delegate civic power with no "'effective means of guaranteeing' that the delegated power 'will be used

37

exclusively for secular, neutral, and nonideological purposes.'" *Larkin*, 459 U.S. at 125 (quoting *Nyquist*, 418 U.S. at 780). These questions are critical elements of this case and, as shown below, there is no danger that the Court of Appeals would have to revisit these questions on subsequent appeal. There is no just reason for delay as this litigation now approaches its tenth year, and the appeal process itself may take another year. Resolution of this issue would substantially advance resolution of a major issue, thereby conserving judicial resources.

### A.    Rule 54(b)'s Requirements

Rule 54(b) allows a court to issue a final judgment upon one or several of multiple claims making them suitable for appellate review.

> When more than one claim for relief is presented in an action ... the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of the judgment.

A district court must meet two criteria to qualify a Rule 54(b) order as a final judgment. First, it must insure its judgment "constitutes 'a judgment in the sense that it determines a cognizable claim for relief' [and] 'final' in the sense that it is 'an ultimate disposition of an individual claim entered in the course of a multiple claims action.'" *Bldg. Industry Ass'n of Super. Calif. v Babbitt,* 161 F.3d 740, 744 (D.C. Cir. 1998) (quoting *Curtis-Wright Corp. v. General Electric Co.*, 446 U.S. 1, 7 (1980)); MOORE'S FEDERAL PRACTICE 3D at 202-22 and 23, § 202.06[1] (a judgment or claim must be "final as to the claims with respect to which judgment is to be entered"). Second, the court must determine whether there is any just reason for delay, *Johnson v. Mulkasey*, 248 F.R.D. 347, 355 (D.D.C. 2008). Plaintiffs' two claims meet these requirements.

### B.    The Court Dismissed Two of Plaintiffs' Cognizable Claims For Relief

The Court dismissed plaintiffs' claims addressing whether the Establishment Clause prohibits defendants' delegation of the sovereign's authority to Navy chaplains in two areas: selecting chaplains for promotion or separation, and rating other chaplains. *Adair*, 183 F.Supp.2d at 60-62. The Court appeared to have relied on the presumption of regularity, *id.* at 60, *i.e,* since Navy chaplains are Navy officers, they could normally be presumed to follow the law. The Court concluded "that Plaintiffs have failed to state a claim on either of their challenges to the composition of chaplain promotion boards." *Id.* at 62. These claims meet Rule 54(b)'s well established criteria for certification as final judgments as they are final judgments on less than all the plaintiffs' claims, are separable from the remaining claims and there is no just reason for delay in bringing their review before the Court of Appeals.

## C.    The Court's Judgment on These Two Claims Is Final

In addition to being a decision "upon a cognizable claim for relief," Rule 54(b) requires a court's final judgment determination "must be 'final' in the sense that it is 'an ultimate disposition of an individual claim entered in the course of a multiple claims action.'" *Curtis-Wright Corp. v. General Electric Co.*, 446 U.S. 1, 7 (1980) (quoting *Sears, Roebuck and Co. v. Mackey,* 351 U.S. 427, 436 (1956)). "Finality means that the judgment must dispose of at least a single substantive claim." MOORE'S at 202-23, § 22.06[2].

The Court dismissed two of Plaintiffs' distinct Establishment Clause claims in granting in part and denying in part defendants' MTD. The first addressed chaplains serving as selection board members, the second addressed chaplains rating chaplains. *Adair* 183 F.Supp.2d at 60-62. Although the Court's decision dismissed plaintiffs' claim that having more than one chaplain board member was illegal, its holding that chaplains serve as naval officers and not denominational representatives made the number of board members irrelevant. The dismissed

39

claims have a common nexus: defendants' delegation of the sovereign's authority to clergy specifically commissioned as naval officers on the basis of their religious identity for the purpose of conducting religious services and ministry. The dismissed claims are separate from the remaining claims, seek unique and separate remedies, and multiple claims remain. The Court's prior refusal to reconsider its decision, *Adair,* 209 F.R.D. at 3-5, and a denial of the current Motion to Amend would indicate the Court has no intention of revisiting the issues, demonstrating the Court's decision is a final judgment. *See, e.g., Johnson v. Ashcroft*, 223 F.Supp.2d 116, 117 (D.D.C. 2002) (explaining a "final" decision's requirements), *aff'd* 2003 WL 22890057 (D.C. Cir 2003).

### D.    There Is No Just Reason to Delay

In determining there is no just cause for delay, "the District Court should consider judicial administrative interests, as well as the equities. The judicial administrative interests include whether the claims under review are separable from the remaining claims, and whether the circuit court would have to decide the same issues more than once if certification is granted." MOORE'S at 202-24, § 202.06[3]; *Babbitt*, 161 F.3d at 744 (quoting *Curtis-Wright*, 446 U.S. at 8). The equitable interests include the impact on the parties if adjudication of a final judgment of a separate claim is delayed for a long period. *See, e.g., Curtis-Wright*, 446 U.S. at 11 (discussing financial impact on parties in light of long delay until final resolution). Here, both the equitable and the "judicial administrative interests" favor granting Rule 54(b) because they both show there is no just reason to delay appellate review.

### 1.    The equitable interests favor Rule 54(b) certification

These cases are in their ninth year; *CFGC* was filed 11/5/99, *Adair* was filed 3/17/00. All the original *CFGC/Adair* named active duty plaintiffs have retired after reaching

their statutory time in service limits mandated for those who failed of selection ("FOS") to Commander or were separated under 10 U.S.C. § 632 for multiple FOS. The time it takes to conclude litigation is a legitimate factor which district courts may evaluate in considering whether to grant Rule 54(b). *See, e.g., Curtis-Wright,* 446 U.S. at 11. *Ferres v. United States*, 340 U.S. 135, 145 (1950), observed: "A [military person] is at a peculiar disadvantage in litigation. Lack of time and money, the difficulty if not impossibility of procuring witnesses, are only a few of the factors working to his disadvantage." Retirements and separation from active duty have and will continue to adversely impact the plaintiffs.

The underlying issue whether governmental authority can be legally delegated to officers whose identity is defined by their religious character is a question central to this case and one the Court of Appeals will eventually address. The facts of this case illustrate the truism that justice delayed is justice denied. The litigation has gone on for years addressing legal issues and the appellate process itself adds years to the litigation. The resolution of these discrete legal issues at the earliest time advances the equitable interests and the judicial interests addressed below.

## 2.    The judicial administrative interests favor Rule 54(b) certification

District courts must determine the judicial interests implicit in a Rule 54(b) certification. These include whether "the claims under review are separable from the remaining claims", MOORE'S at 202-12, § 202.06[2], and "whether the circuit court would have to decide the same issues more than once if certification is granted." *Cooper v. First Govt. Mortgage and Investors Corp.*, 216 F.R.D. 126, 127 (D.D.C. 2002); *Curtis-Wright*, 446 U.S. at 8; MOORE'S at 202-24, § 202.06[3]. The two claims upon which a Rule 54(b) Order is requested are separable and the Court of Appeals would not have to decide the same legal issues more than once.

"[I]f the facts underlying different claims are different, then the claims are separate for

Rule 54(b) purposes." *Johnson*, 248 F.R.D. at 355 (quoting *Walers v. Morton Build., Inc.*, 737 F.2d 698, 702 (7th Cir. 1984)).  Plaintiffs' allegations of constitutional violations in defendants' operation of its Chaplain Corps selection board procedures address the issues of (1) the proper definition and role of a chaplain; (2) does that role change when a chaplain serves on a selection board, and (3) does the Establishment Clause forbid defendants from delegating  to denominational representatives the sovereign's authority to award or deny government benefits to other denominational representatives.  The facts underlying plaintiffs' dismissed claims are different from the facts underlying plaintiffs' remaining Establishment, Free Exercise, Free Speech and Due Process Clause claims.  The dismissed claims address separate and distinct legal theories and seek remedies separate and unique to each claim.   "Claims are separable when there is more than one possible recovery, or if 'different sorts of relief' are sought."  MOORE'S at 202-12, § 202.06[2].

 In determining whether claims are separable, in addition to "the factual overlay (or lack thereof) between the claim disposed of and the remaining claims", courts look at "whether the claims disposed of and the remaining claims seek separate relief."  MOORE'S at 202-23, § 202.06[2]; *see also Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 580-81 ("two claims made and two quite different sorts of relief sought") and n.18 (1980).  Separability addresses the "point at which one claim parts company with another," *In re Southeast Banking Corp.*, 69 F.3d 1539, 1547 (11th Cir. 1995).  Plaintiffs' two dismissed claims easily meet this test.

The remaining claims include Free Speech claims, the use of additional qualification designators to identify each candidate chaplain's faith group in the board proceedings, *Adair*, 183 F.Supp.2d at 55-60, 62-67 (discussing Plaintiffs' other claims), and other claims relating to defendants' preference and requirements for liturgical services.   These remaining claims are

42

separate and distinct from plaintiffs' dismissed claims.  Because of the claims' separateness, the

underlying legal theories and considerations addressing the dismissed claims will not be

reviewed again by the Court of Appeals if decided now.

Plaintiffs' dismissed claims exist separately and seek relief specific to the legal theory

underlying those claims, specifically the Establishment Clause forbids the fusion of civic and

religious authority without constitutional safeguards guaranteeing the delegated civic authority

will not be used for religious purposes or to advance denominational interests.  This

constitutional requirement precludes the use of denominational representatives, *i.e.*, chaplains, as

chaplain selection board members absent the constitutional guarantees required by *Larkin* and

*Grumet.*   The relief is invalidation of illegal boards and an injunction ordering defendants to

provide the necessary constitutional guarantees.   No other claims seek this relief.  Whether

chaplains can rate other chaplains is separate from all other claims and seeks separate relief, *i.e.*,

an injunction prohibiting such future practices.

The situation here is similar to the claims that the Supreme Court reviewed in *Seatrain*,

444 U.S. at 581 and n.18, where a favorable disposition "of respondents [claim on appeal] would

leave them with no reason to press the [alternate] one."  *Id.*   If plaintiffs succeed on their claim

that the Establishment Clause precludes the delegation of governmental power to chaplains as

commissioned denominational representatives, other claims concerning board legality may

become moot.

There is no overlap between Plaintiffs' dismissed claims and those that remain.  The issue

concerning the Establishment Clause's restriction on the government's delegation of its power to

personnel defined by their religious identity to award or deny benefits is not present in the other

claims, nor is the specific relief sought duplicated elsewhere.  *See, e.g., Cullen v. Margiotta*, 811

F.2d 698, 712-13 (2nd Cir.) (discussing difference between § 1983 and RICO claims in reviewing a Rule 54(b) challenge), *cert. denied sub nom. Nassau County Republican Committee v. Cullen*, 483 U.S. 1021 (1987).  The dismissed claims "involve at least some different questions of fact and law and could be separately enforced," and since they seek "different sorts of relief ... the claim for greater relief would be pressed by the plaintiff[s] even if the other claim was granted." *Id.* (citing *Seatrain*, 444 U.S. at 580-81 & n.18 and other sources) (discussing criteria to determine separable claims).  Plaintiffs' two claims are separable from those that remain.

## CONCLUSION

New evidence based on selection board actual decisions, *In re England*'s decision, and DOD's new definitions of chaplains as RMPs all show chaplains are hired as denominational representatives and function in that same capacity on chaplain selection boards.  Defendants have misled the Court by arguing chaplains are like all other naval officers, when in fact defendants treat chaplains as denominational representatives, denying them command of other military personnel and the duties common to all other officers, as shown by (1) new evidence of defendants' Geneva Convention and Code of Conduct training, (2) defendants' subsequent arguments specific denominational board memberships are necessary, and (3) defendants' own regulations and practices.  The Court's findings that chaplains serve on chaplain selection boards as naval officers rather than denominational representatives and the presumption of regularity applies to chaplains when functioning as board members should be vacated or modified to reflect the reality that chaplains function on boards in the same capacity and context in which they are hired, denominational representatives.  The Court should also vacate its dismissal of plaintiffs' claim that chaplains rating chaplains violates the Constitution because the same denominational bias affects the rating chaplain's decision process.

In granting this Motion, the Court should direct the parties to provide a briefing schedule for the subsequent summary judgment motion.

In the alternative, if the Court denies plaintiffs' Rule 54(b) Motion to Amend the court's 2002 decision, the dismissed claims at issue meet all the criteria for Rule 54(b) certification as final judgments in that they are final, they are separable and seek separate relief, and there is no just reason to delay appellate review of these two specific issues. Accordingly, plaintiffs respectfully move the Court to certify these two claims for appellate review under Rule 54(b) by holding the dismissal of plaintiffs' claims is a final judgment and order the entry of such judgements with a finding there is no just cause for delay.

Respectfully submitted,

July 18, 2008

 /S/                               
ARTHUR A. SCHULCZ, SR.
Attorney for the Plaintiffs
D.C. Bar No. 453402
2521 Drexel Street
Vienna, VA 22180 703-645-4010:
FAX 703-645-4011

Of Counsel:
Douglas McKusick, Esq.
THE RUTHERFORD INSTITUTE
P.O. Box 7482
Charlottesville, VA 22906-7482

**LIST OF EXHIBITS**

Exhibit No.            Subject or Topic

Exhibit 1      DODD 1304.19, Subj: Appointment of Chaplains for the Military Departments

Exhibit 2      DODI 1304.28, Subj:  Guidance for the Appointment of Chaplains for the
               Military Departments

Exhibit 3      *Rigdon v. Perry* Declaration by Chaplain (Colonel) Richardson, USAF,  on behalf
               of the DoD defendants

Exhibit 4      Extracts from The History of the United States Navy Chaplain Corps, Vol.1
               (1778-1939), NAVPERS 15807

Exhibit 5      SECNAVINST 1730.7B, Subj: Religious Ministry Support Within the
               Department of the Navy

Exhibit 6      Naval Regulation Chapter 11, Section 4, 1131, 1137, 1140 (capture by the enemy)
               and 1141 (Code of Conduct)

Exhibit 7      OPNAVINST 3461.6 , Subj:  Enemy Poisoners of War, Retained Personnel, ...
               and other Detainees

Exhibit 8      OPNAVINST 1730.1, Chaplains Manual

Exhibit 9      SECNAVINST 1000.9, Subj: The Code of Conduct (the "Code"), with Executive
               Order 10631 (8/17/55) as modified by EO 12017 (11/3/1977)

Exhibit 10     DODI 1300.21, Subj: Code of Conduct (CoC) Training and Education

Exhibit 11     Extracts from Navy Level B Code of Conduct Training: "Legal Aspects of
               Evasion and Captivity", and "Organization During Captivity", p. 4 of 4.

Exhibit 12     Addendal Declaration by Dr. Harald R. Leuba, Ph.D.

Exhibit 13     Compendium Declaration Dr. Harald R. Leuba, Ph.D.

Exhibit 14     "Promotions in the Chaplain Corps", March 2000 Study by Center for Naval
               Analysis

Exhibit 15     "The Siskin Conjecture" by Dr. Harald R. Leuba, Ph.D.

Exhibit 16     "Do Denominational Representatives Acting as Government Decision-makers

Make Denominationally Biased Choices When Awarding or Denying Benefits to Other Denominational Representatives?  A statistical analysis declaration" by Harald R. Leuba, Ph.D.

Exhibit 17    "September 2006 *Larsen* Withdrawal & Correction Declaration" by Dr. Harald R. Leuba, Ph.D.

Exhibit 18    Table QE-6 from Withdrawal and Correction Declaration Dr. Harald R. Leuba, Ph.D.

Exhibit 19    List of Abbreviations identifying each endorser or denomination which corresponds to the Navy's additonal qualification designator

Exhibit 20    Accession rates by denomination according to the number of candidates for accession as Navy chaplains from each denomination, ranked by the number of chaplain candidates each endorser or denomination provided 1985-2005

Exhibit 21    1985-2205 Non-liturgical denomination accession rate by percentage of candidates recommended by the CARE board for accessionaing as Navy chaplains, ranked from highest % to lowest

Exhibit 22    Extracts of Defendants' Lesson Plan for Level A (all personnel) Code of Conduct Training,

Exhibit 23    Defendants' arguments chaplains from specific faith groups were necessary for valid boards in *Wilkins v. United States*, 99cv1579 (S.D. Cal.)

Exhibit 24    List of abbreviations identifying endorsers or denominations by their accession tier (I-III) indicating defendants' favored denominations

Exhibit 25    List of abbreviations identifying endorsers or denominations by their promotion tier (I-IV) indicating defendants' favored denominations

Exhibit 26    RADM Barry Black's Testimony to the Navy Inspector General in its investigation into allegations of misconduct on the FY 200 CHC Captain promotion board

Exhibit 27    Navy Inspector General's 11/6/2000 lettre to Senator R. Santorum reporting it had verified CDR Washburn's allegations of misconduct on the FY 200 CHC Captain promotion board

Exhibit 28    CDR Washburn's Testimony to the Navy Inspector General in its investigation into her allegations of misconduct on the FY 200 CHC Captain promotion board

Exhibit 29    Extracts from 3/11/ 99 DODIG Investigation Report P 98C69119125, "Alleged

Denominational Discrimination and other improprieties, Navy Fiscal Year 1997 and 1998 Selection Boards for Active Duty Chaplain Corps Commander"

Exhibit 30    FY97 Active Duty Chaplain Corps Commander board member's 2/4/98 testimony to the Naval Inspector General

Exhibit 31    Declaration of Arthur A. Schulcz, Sr.

## CERTIFICATE OF SERVICE

I hereby certify that on July 18, 2008, I electronically filed the foregoing **Plaintiffs' Rule**

**54(b) Motion to Alter or Amend the Court's January 2002 Interlocutory Decision** with the Clerk

of the Court to be served by the Court's CM/ECF system on the following:

> Michael Q. Hyde
> Attorney, Civil Division
> U.S. Department of Justice
> 20 Massachusetts Ave., NW
>  Room 7322
> Washington, D.C. 20001

> /s / Arthur A. Schulcz, Sr.
> ARTHUR A. SCHULCZ, SR.
> Counsel for *In e Navy Chaplaincy* Plaintiffs
> D.C. Bar No. 453402
> 2521 Drexel Street
> Vienna, VA 22180
> 703-645-4010



# Department of Defense

# DIRECTIVE

NUMBER 1304.19

June 11, 2004

USD(P&R)

SUBJECT: Appointment of Chaplains for the Military Departments

References: (a) DoD Directive 1304.19, "Appointment of Chaplains for the Military Services," September 18, 1993 (hereby canceled)

(b) DoD Directive 1332.31, "Administrative Separation of Chaplains Upon Loss of Professional Qualifications," October 16, 1981 (hereby canceled)

(c) DoD Instruction 1330.7, "Visits of Civilian Religious Leaders to Military Installations in Overseas Areas," April 26, 1974 (hereby canceled)

(d) DoD Instruction 1304.28, "Guidance for the Appointment of Chaplains for the Military Departments," June 11, 2004

(e) DoD Directive 5100.73, "Support of Headquarters of Combatant and Subordinate Joint Commands," November 15, 1999

## 1. REISSUANCE AND PURPOSE

This Directive:

1. Reissues reference (a) to update policy and responsibilities.

2. Cancels references (b) and (c).

3. Continues the educational and ecclesiastical requirements for appointing military chaplains.

In re Navy Chaplaincy
07mc269 (RMU)
Exhibit 1

*DODD 1304.19, June 11, 2004*

2. <u>APPLICABILITY</u>

This Directive applies to the Office of the Secretary of Defense, the Military Departments, (including the Coast Guard when it is operating as a Military Service in the Navy), the Chairman of the Joint Chiefs of Staff, the Combatant Commands, the Defense Agencies, the DoD Field Activities (hereafter referred to collectively as "the DoD Components").   The term "Military Departments," as used herein, refers to the Department of the Army, the Department of the Navy, and the Department of the Air Force.   The term "Military Services" as used herein refers to the Army, the Navy, the Air Force, and the Marine Corps.

3. <u>DEFINITIONS</u>

Terms used in this Directive are defined in DoD Instruction 1304.28 (reference (d)).

4. <u>POLICY</u>

It is DoD policy that the Chaplaincies of the Military Departments:

    1.  Are established to advise and assist commanders in the discharge of their responsibilities to provide for the free exercise of religion in the context of military service as guaranteed by the Constitution, to assist commanders in managing Religious Affairs (DoD Directive 5100.73 (reference (e)), and to serve as the principal advisors to commanders for all issues regarding the impact of religion on military operations.

    2.  Shall serve a religiously diverse population.   Within the military, commanders are required to provide comprehensive religious support to all authorized individuals within their areas of responsibility.   Religious Organizations that choose to participate in the Chaplaincies recognize this command imperative and express willingness for their Religious Ministry Professionals (RMPs) to perform their professional duties as chaplains in cooperation with RMPs from other religious traditions.

    3.  Requirements and details addressing the Chaplaincies of the Military Departments are found in reference (d).

In re Navy Chaplaincy
07mc269 (RMU)
Exhibit 1

*DODD 1304.19, June 11, 2004*

5. <u>RESPONSIBILITIES</u>

   1.  The <u>Under Secretary of Defense for Personnel and Readiness</u> shall issue additional implementing guidance, as appropriate.

   2.  The <u>Secretaries of the Military Departments</u> shall adhere to this Directive, reference (d), and other pertinent guidance to ensure that persons appointed as chaplains meet the minimum professional and educational qualifications prescribed in  reference (d) and other pertinent guidance.   The Secretaries of the Military Departments may impose additional professional requirements.


6. <u>EFFECTIVE DATE</u>

This Directive is effective immediately.




Paul Wolfowitz
Deputy Secretary of Defense




In re Navy Chaplaincy
07mc269 (RMU)
Exhibit 1



Department of Defense

# INSTRUCTION

NUMBER 1304.28
June 11, 2004

USD(P&R)

SUBJECT: Guidance for the Appointment of Chaplains for the Military Departments

References: (a) DoD Directive 1304.19, "Appointment of Chaplains for the Military
Departments," June 11, 2004
(b) Sections 533(a)(1), 643, 827, 3353(a)(1), 5600(a)(1) of title 10,
United States Code
(c) Assistant Secretary of Defense (Force Management Policy)
Memorandum, "Educational Requirements for Military Chaplain
Applicants," April 2, 2002 (hereby canceled)
(d) Principal Deputy Under Secretary of Defense (Personnel and
Readiness) Memorandum, "Assignment of Chaplains for Military
Service," October 14, 2003 (hereby canceled)
(e) through (i), see enclosure 1

## 1. PURPOSE

This Instruction:

1.1. Implements reference (a) and Section 643 of reference (b).

1.2. Cancels reference (c), (d), and DD Form 2741, "Department of Defense
Ecclesiastical Endorsing Organization Verification/Reverification Information."

1.3. Assigns responsibilities appointing chaplains for the Military Departments and
identifies the educational and ecclesiastical requirements for appointment of military
chaplains.

1.4. Modifies requirements and procedures for Religious Organizations to endorse
religious ministry professionals for the chaplaincy.

1

*DODI 1304.28, June 11, 2004*

1.5.  Implements and establishes the criteria and procedures for the administrative separation and loss of professional qualifications of chaplains of the Military Departments.

## 2.  APPLICABILITY AND SCOPE

This Instruction applies to the Office of the Secretary of Defense, the Military Departments, (including the Coast Guard when it is operating as a Military Service in the Navy) the Chairman of the Joint Chiefs of Staff, the Combatant Commands, the Defense Agencies, the DoD Field Activities, and all other organizational entities in the Department of Defense (hereafter referred to collectively as the "DoD Components"). The term "Military Departments," as used herein, refers to the Department of the Army, the Department of the Navy, and the Department of the Air Force.  The term "Military Services" as used herein refers to the Army, the Navy, the Air Force, and the Marine Corps.

## 3.  DEFINITIONS

Terms used in this Instruction are defined in enclosure 2.

## 4.  POLICY

This Instruction implements policy established in reference (a).   The guidance in enclosure 3 shall apply.

## 5.  RESPONSIBILITIES

5.1.  The Under Secretary of Defense for Personnel and Readiness shall develop overall policy for the appointment of chaplains to the Military Departments, establish professional qualification requirements for chaplains, and shall ensure Religious Organizations endorsing Religious Ministry Professionals (RMPs) to serve as military chaplains shall maintain all requirements as prescribed in enclosure 3.

5.2.  The Secretaries of the Military Departments shall adhere to DoD policy in sections 4. and 6. of this Instruction to ensure that persons appointed as chaplains meet the minimum professional and educational qualifications prescribed in this Instruction. The Secretaries of the Military Departments may impose additional professional requirements.

*DODI 1304.28, June 11, 2004*

6. <u>PROCEDURES</u>

    6.1. To be considered for appointment to serve as a chaplain, an RMP shall receive an endorsement from a qualified Religious Organization verifying:

        6.1.1. The RMP is a fully qualified RMP of a Religious Organization that meets the administrative requirements of this Instruction.

        6.1.2. An RMP's application shall include the endorsement of the person's ecclesiastical credentials on a DD Form 2088, "Statement of Ecclesiastical Endorsement," (enclosure 6).

            6.1.2.1. If a Religious Organization has not previously endorsed military chaplains, it shall file the administrative documents required by enclosure 3 in conjunction with the endorsement of its first fully qualified RMP in an application for appointment as a chaplain for a Military Department.

            6.1.2.2. The Armed Forces Chaplains Board (AFCB) shall accept the required documents only when the applicable Military Department has determined the RMP is fully qualified in all ways other than ecclesiastical endorsement. The AFCB shall notify the Military Departments of Religious Organizations that have filed the prerequisite documents and whose packets have been found administratively complete.

            6.1.2.3. The Military Departments may evaluate RMPs from Religious Organizations that are submitting the administrative filing requirements for the first time and are pending determination of the fully qualified status of their prospective chaplain. The Military Departments shall consult with the AFCB to determine if the administrative requirements are pending acceptance in such cases.

        6.1.3. The RMP is willing to function in a pluralistic environment as defined in this Instruction and to support directly and indirectly the free exercise of religion by all members of the Military Services, their family members, and other persons authorized to be served by the military chaplaincies.

        6.1.4. The RMP has 2 years of religious leadership experience for an active component appointment. Religious leadership experience shall be compatible with the duties of RMPs in their respective Religious Organization and relevant to the settings of military chaplaincy.

*DODI 1304.28, June 11, 2004*

6.1.5.  The RMP is educationally qualified for appointment as a chaplain.  The educationally qualified applicant shall possess a baccalaureate degree with not less than 120 semester hours (180 quarter hours) from a qualifying educational institution.  The educationally qualified applicant shall also possess a post-baccalaureate graduate degree in the field of theological or related studies from a qualifying educational institution.  A qualifying graduate degree program shall require no fewer than 72 semester hours (108 quarter hours) of graduate-level work.  Related studies may include graduate courses in pastoral counseling, social work, religious administration, and similar disciplines when one-half of the earned graduate credits include topics in general religion, world religions, the practice of religion, theology, religious philosophy, religious ethics, and/or the foundational writings from the applicant's religious tradition.

6.2.  A qualifying RMP-producing educational institution is an accredited college, university, or school of theology listed in the current edition of the American Council on Education (ACE), Accredited Institutions of Post-secondary Education and relevant ACE supplements to that publication (reference (e)), or any unaccredited institution that meets the requirements of subparagraphs 6.2.1. through 6.2.4., below.

6.2.1.  An unaccredited educational institution may obtain designation as a qualifying RMP-producing educational institution for a specific applicant to the chaplaincy who graduated from that educational institution by providing certification from registrars at three accredited educational institutions that maintain programs for the preparation of clergy.  Each registrar shall certify that his or her educational institution would have accepted at least 90 percent of the credit hours earned and courses leading to the awarding of the post-graduate degree in theological or related studies earned by that applicant at the unaccredited educational institution, as of the year of graduation.

*DODI 1304.28, June 11, 2004*

6.2.2.  An unaccredited educational institution may be designated as a qualified RMP-producing educational institution by providing the AFCB certification from the registrars of three different accredited educational institutions that maintain programs for the preparation of RMPs.  Each registrar shall certify the list of the major areas of study that that educational institution would accept at least 90 percent of the credit hours earned by a student who is awarded a post-graduate degree in theological or related studies at the unaccredited educational institution.  A designation as a qualified RMP-producing educational institution may apply to any year in which the unaccredited educational institution produced graduates or the institution may request this designation for a period of up to 5 years.  The unaccredited educational institution shall submit the required documentation no later than the beginning of the academic year if designation for future years is sought.  Applications for renewal of this status shall be for periods not to exceed 5 years.

6.2.3.  The required documentation shall be submitted to the AFCB.  The AFCB shall review and approve the documentation for completeness prior to forwarding to the Office of the Deputy Under Secretary of Defense for Military Personnel Policy for inclusion on the list of qualifying educational institutions for Reserve Officers. The required documentation shall be sent to the following:  Office of the Under Secretary of Defense for Personnel and Readiness, ATTN:  OUSD(P&R)MPP-AFCB, 4000 Defense Pentagon (Room 2E341), Washington, DC 20301-4000.

6.2.4.  Applications containing the required documentation may also be submitted at any time from unaccredited educational institutions requesting designation as a qualifying educational institution for prior school years.

6.3.  A new DD Form 2088 shall be required at each change of career status, as defined by the Military Departments, to re-endorse the qualifications of the chaplain concerned.

6.4.  Requirements for applicants for the chaplaincy:

6.4.1.  Applicants for appointment as a chaplain shall meet physical standards in accordance with DoD Directive 6130.3 (reference (f)) and be otherwise qualified to serve as a commissioned officer in accordance with reference (b) and DoD Directive 1310.2 (reference (g)).

6.4.2.  Applicants shall affirm that, if appointed, they shall abide by applicable laws, and all applicable regulations, directives, and instructions of the Department of Defense and the Military Department that the appointment is made.

*DODI 1304.28, June 11, 2004*

6.5.  Administrative separation of chaplains upon loss of professional qualifications.   If a chaplain loses ecclesiastical authority to function as an RMP or has ecclesiastical endorsement to serve as a chaplain withdrawn, the appropriate Religious Organization shall provide written notification to the Military Department concerned. Processing for separation in accordance with Section 643 of reference (b) shall be initiated immediately upon such notification.   This Instruction does not preclude separation in accordance with other regulations of the Military Department concerned (i.e., when separation for reasons other than loss of ecclesiastical endorsement is appropriate).

6.5.1.  When a separation action is initiated under this Instruction, the chaplain shall be notified in writing of the following:

6.5.1.1.  The chaplain has a right to consult with military counsel or with civilian counsel obtained at no expense to the Government, and to submit statements in response to the notice.

6.5.1.2.  The chaplain has lost ecclesiastical endorsement.

6.5.1.3.  Under conditions established by the Secretary of the Military Department concerned, the chaplain may:

6.5.1.3.1.  Seek another ecclesiastical endorsement within the time frame allotted by the Military Department involved.

6.5.1.3.2.  Apply for non-chaplain duties with the understanding that the officer shall be discharged voluntarily as a chaplain on one day and appointed in a non-chaplain capacity on the next day.

6.5.1.3.3.  Apply for voluntary retirement, if eligible for such retirement; or

6.5.1.3.4.  Tender a voluntary resignation.

6.5.2.  If a request is not submitted under subparagraph 6.5.1.3., above, or if such a request is disapproved, the chaplain shall be separated with an appropriate discharge.  Chaplains of the Army National Guard and the Air National Guard shall not be administratively separated without the consent of the Governor of the State or territory or his or her designated representative.

*DODI 1304.28, June 11, 2004*

6.5.2.1.  The chaplain shall be provided a reasonable period of time consistent with the policies of the Military Department that the chaplain serves to respond to the notice.  If the chaplain states that action under subparagraph 6.5.1.3., above, is requested, the chaplain shall be notified in writing of the date and manner by which such request shall be submitted.

6.5.2.2.  If the chaplain does not respond to the notice in a timely manner, separation processing shall be completed in accordance with subparagraph 6.5.3., below.

6.5.3.  The Secretary of the Military Department concerned may:

6.5.3.1.  Approve a request for a new ecclesiastical endorsement for a serving chaplain submitted in accordance with this Instruction; or

6.5.3.2.  Approve a voluntary resignation, if tendered, and direct an appropriate discharge; or

6.5.3.3.  Approve a voluntary retirement, if requested by an eligible applicant; or

6.5.3.4.  Approve a request for assignment to non-chaplain duties through voluntary resignation and appointment in accordance with regulations implementing Chapters 36 or 1205 of reference (b); or

6.5.3.5.  Direct an appropriate discharge if an action in subparagraph 6.5.1.3., above, is not requested and/or approved.

6.6.  Visits of Endorsing Agents to military installations in overseas areas are encouraged to enhance the spiritual welfare of military personnel, particularly at seasons of special religious significance.

6.6.1.  Such visits shall keep the religious organization aware of the ministry of the organization's chaplains and the spiritual and religious activities of the military community and permit Ecclesiastical Endorsing Agents to maintain their professional relationships with endorsed chaplains.

6.6.2.  Such visits shall be at the discretion of the commander(s) of the installations involved.

*DODI 1304.28, June 11, 2004*

6.6.3.  The Ecclesiastical Endorsing Agents who visit installations representing their Religious Organizations shall do so at no expense to the Government.  The Ecclesiastical Endorsing Agent shall be afforded protocol privileges appropriate to those of a civilian employee in the grade of GS-15.

6.6.4.  The Military Departments may establish procedures governing the visits of Ecclesiastical Endorsing Agents to overseas installations.  The AFCB may provide administrative assistance in arranging such visits.

6.7.  The chaplain candidate programs exist within the Military Departments for the purpose of familiarizing graduate students of religion with religious support activities in the military environment.  Participants in this program serve as commissioned officers in the Reserve components of the Military Departments.  Chaplain candidates are not authorized to serve as or in place of chaplains.

6.7.1.  Upon successful completion of their academic and religious training, participants in the Chaplain Candidate Programs may seek appointment as chaplains.

6.7.2.  Each Military Department is responsible for implementing this program in accordance with Department-specific policies and regulations.

6.7.3.  At a minimum, applicants and participants in the Chaplain Candidate Program shall:

6.7.3.1.  Be approved by a Religious Organization recognized as able to provide ecclesiastical endorsements for chaplains in accordance with the provisions of this Instruction.

6.7.3.2.  Be a matriculated student in graduate-level degree-granting religious studies programs of qualifying educational institutions.  Such programs and institutions shall comply with criteria in paragraph 6.2. of this Instruction for educational requirements for Chaplains.  Subparagraph 6.2.1. of this Instruction does not apply for chaplain candidates.

6.7.3.3.  Be able to complete educational, ecclesiastical, and professional experience requirements for appointment as chaplains prior to reaching the age limitation for such original appointments, as established by the Military Department to which the applicant is applying.

6.7.3.4.  Be able to meet all other appointment eligibility criteria of the Military Department to which the applicant is applying.

*DODI 1304.28, June 11, 2004*

7.  <u>EFFECTIVE DATE</u>

This Instruction is effective immediately.

Charles S. Abell
Principal Deputy Under Secretary of Defense
for Personnel and Readiness

Enclosures - 6
   E1.  References, continued
   E2.  Definitions
   E3.  Administrative Filing Requirements for a Religious Organization Desiring to
        Endorse Religious Ministry Professionals for the Military Chaplaincy
   E4.  Format for Providing Required Information to Meet Administrative
        Requirements to Endorse Chaplains to the Military Departments
   E5.  Format for Providing Required Information to Endorse RMPs as Chaplains to
        the Military Departments
   E6.  DD Form 2088, "Statement of Ecclesiastical Endorsement"

*DODI 1304.28, June 11, 2004*

E1.  <u>ENCLOSURE 1</u>

<u>REFERENCES</u>, continued

(e)  American Council on Education, "Accredited Institutions of Post Secondary Education," current edition

(f)  <u>DoD Directive 6130.3</u>, "Physical Standards for Appointment, Enlistment, and Induction," December 15, 2000

(g)  <u>DoD Directive 1310.2</u>, "Appointing Commissioned Officers," May 28, 1996

(h)  <u>DoD Directive 5120.8</u>, "Armed Forces Chaplains Board Charter," March 20, 1995

(i)  Section 501(c)(3) of the title 26, United States Code (Internal Revenue Code)

ENCLOSURE 1

*DODI 1304.28, June 11, 2004*

E2.  ENCLOSURE 2

DEFINITIONS

E2.1.  TERMS

Terms used in this Instruction are defined as follows:

E2.1.1.  Change of Career Status.  Includes, but is not limited to, initial application for the chaplaincy, change from Reserve to active status or the opposite, and extension on active duty beyond the initial obligated period of service.  This term is further defined by the various Military Services.  A change of career status requires endorsement or re-endorsement by the Religious Organization endorsing the chaplain.

E2.1.2.  Chaplain.  A commissioned officer of the Chaplain Corps of the Army, a commissioned officer of the Chaplain Corps of the Navy, or a commissioned officer in the Air Force designated for duty as a chaplain.

E2.1.3.  Counsel.  A lawyer qualified under Section 827 of title 10, United States Code (Article 27(b)(1) of the Uniform Code of Military Justice) (reference (b)) or a civilian lawyer retained at no expense to the Government.

E2.1.4.  Ecclesiastical.  The forms and practices related to Religious Organizations.

E2.1.5.  Ecclesiastical Endorsement.  Written documentation from a Religious Organization that complies with the administrative requirements of this Instruction that an applicant for the military chaplaincy is fully and professionally qualified and endorsed to perform all offices, functions, sacraments, ordinances, and ceremonies required of a RMP for that Religious Organization, and is capable and authorized to minister as required within a pluralistic environment.

E2.1.6.  Ecclesiastical Endorsing Agent.  An individual authorized to provide or withdraw Ecclesiastical Endorsements on behalf of a Religious Organization.

E2.1.7.  Endorsement.  The internal process that Religious Organizations use when designating RMPs to represent their Religious Organizations to the Military Departments and confirm the ability of their RMPs to conduct religious observances or ceremonies in a military context.

E2.1.8.  Pluralistic Environment.  A descriptor of the military context of ministry. A plurality of religious traditions exist side-by-side in the military.

*DODI 1304.28, June 11, 2004*

E2.1.9.  <u>Religious Ministry Professional (RMP)</u>.  An individual endorsed to represent a Religious Organization and to conduct its religious observances or ceremonies.  An RMP is a fully qualified member of the clergy for those Religious Organizations that have a tradition of professional clergy or their equivalents.  The Religious Organization's endorsement verifies that an RMP is professionally qualified to serve as a chaplain in the military and meets the graduate education and religious leadership requirements of this Instruction.

E2.1.10.  <u>Religious Organization</u>.  An entity that is organized and functions primarily to perform religious ministries to a non-military lay constituency and that has met the religious purposes test of Section 501(c)(3) of title 26, United States Code (reference (i)), and holds current status as a Section 501(c)(3) Schedule "A" organization.  Religious Organizations possess ecclesiastical authority to endorse and withdraw endorsement for Religious Ministry Professionals serving under their authority.

E2.1.11.  <u>Separation</u>.  Discharge or retirement from military service.

ENCLOSURE 2

*DODI 1304.28, June 11, 2004*

E3.  ENCLOSURE 3

ADMINISTRATIVE FILING REQUIREMENTS FOR A RELIGIOUS ORGANIZATION
DESIRING TO ENDORSE RELIGIOUS MINISTRY PROFESSIONALS FOR THE
MILITARY CHAPLAINCY

E3.1.1.  Religious Organizations that choose to participate in the Military Chaplaincies recognize the chaplaincies of the Military Departments serve a religiously diverse population and that military commanders are required to provide comprehensive religious support to all authorized individuals within their areas of responsibility. Religious Organizations participating in the military chaplaincies therefore express willingness for their RMPs to perform their professional duties as Chaplains in cooperation with Chaplains from other religious traditions and that:

E3.1.1.1.  Chaplains shall wear the appropriate insignia in accordance with uniform regulations of their respective Military Services.

E3.1.1.2.  The Religious Organization shall complete and maintain all administrative requirements of this Instruction (enclosure 3) as a prerequisite to being able to endorse applicants for the chaplaincies.

E3.1.1.3.  Endorsement by a Religious Organization meeting the administrative qualifications of this Instruction (enclosure 3) is an essential element of a chaplain's professional qualifications.   A chaplain whose endorsement is withdrawn shall be processed for separation in accordance with paragraph 6.5.

E3.1.2.  A Religious Organization desiring to provide an RMP to serve as a chaplain in the Military Departments shall meet the administrative filing requirements of this Instruction and maintain the required information for that purpose on file with the Department of Defense.   The Religious Organization shall submit the required documentation to the AFCB in the format specified in enclosure 4.   Submission of the required documents may be made through secure and verified electronic media.   The Religious Organization shall be able to submit documents to permit endorsement of chaplains for the first time only when they are endorsing a fully and professionally qualified candidate, without requirement for waivers of the standards specified by the applicable Military Department.   See paragraph 6.1.

E3.1.3.  The Religious Organization shall submit documents verifying the following information with regard to such organization:

*DODI 1304.28, June 11, 2004*

E3.1.3.1.  That the Religious Organization is organized as an entity functioning primarily to perform religious ministries to a non-military lay constituency and currently holds a Section 501(c)(3) exempt status (reference (i)) as a church for Federal tax purposes from the Internal Revenue Service (IRS) (note "church" is used by the IRS not to denote a belief system, but to distinguish "churches" from other types of religious organizations; see IRS Instructions for Form 1023 Schedule A).  Such rules stipulate that the particular religious beliefs of the organization are truly and sincerely held and that the practices and rituals associated with the organization's religious belief or creed are not illegal or contrary to clearly defined public policy.  In order to determine whether a particular Religious Organization has properly acquired, and currently maintains, an IRS tax exempt status and does not engage in practices that are illegal or contrary to defined public policy, the USD(PR) shall take appropriate steps to verify with the DoD Components and other Federal Agencies compliance with these requirements.

E3.1.3.2.  That it possesses ecclesiastical authority to grant and withdraw initial and subsequent ecclesiastical endorsement for ministry in the Armed Forces.

E3.1.3.3.  That it verifies the Religious Organization shall provide chaplains who shall function in a pluralistic environment, as defined in this Instruction, and who shall support directly and indirectly the free exercise of religion by all members of the Military Services, their family members, and other persons authorized to be served by the military chaplaincies.

E3.1.3.4.  That it agrees to abide by all DoD Directives, Instructions, and other guidance and with Military Department regulations and policies on the qualification and endorsement of RMPs for service as military chaplains.

E3.1.4.  The Religious Organization shall supply the name, title, mailing address, electronic contact, the Employer Identification Number assigned to the organization by the IRS, and telephone number of the agent authorized to represent the Religious Organization to the Military Departments to include authority to grant and withdraw ecclesiastical endorsements.  This agent may not be a currently serving military Chaplain (active duty, National Guard, or Reserve).

E3.1.5.  A Religious Organization shall immediately notify the AFCB when changes occur in the status of the organization, designated endorsing agent, or the contact addresses and telephone numbers of either.

*DODI 1304.28, June 11, 2004*

E3.1.6.  A Religious Organization shall re-verify that it meets the requirements in paragraph E3.1.2., above, if chaplains endorsed by it are unable to gain re-endorsement at times of change of career status.

E3.1.7.  Religious Organizations that are currently able to endorse RMPs for Military Service as chaplains under earlier versions of this Instruction may continue to endorse RMPs as long as they continue to meet the requirements in effect when they originally began to endorse RMPs for the military chaplaincies. Such organizations shall affirm in writing to the AFCB by January 31st of each year that they continue to meet such requirements.  This provision applies equally to Religious Organizations that endorse chaplains directly to the Department of Defense through an embedded endorsing organization; Religious Organizations that, under previous versions of this Instruction, were extended the privileges of endorsing chaplains through representation by external endorsing organizations; and larger organizations that have acted on behalf of member Religious Organizations.

E3.1.8.  By January 31st of each year, each Religious Organization shall provide to the AFCB a complete list of Chaplains endorsed for military chaplaincy.  Chaplains shall be listed alphabetically by name and Military Department.

E3.1.9.  In accordance with DoD Directive 5120.8 (reference (h)), the AFCB shall inform Religious Organizations that endorse Chaplains that they no longer meet the administrative requirements of paragraphs E3.1.2. through E3.1.5., above, and may no longer endorse Chaplains for Military Service.  Before taking such action, the AFCB shall give written notice stating the reasons for lack of compliance and shall allow the Religious Organization concerned a reasonable opportunity to provide a written reply that shall be carefully considered in making a final decision.  Review of administrative compliance may be initiated if the Religious Organization fails to respond to requests by endorsed chaplains for assistance or re-endorsement at times of change of career status or if the AFCB cannot contact the Religious Organization in a reasonable period of time.  Religious Organizations informed that they may no longer endorse chaplains due to lack of administrative compliance may resubmit their required documents.  The AFCB shall not review the compliance of a Religious Organization with reference (a) and this Instruction again until the Religious Organization completes all administrative requirements.  If a Religious Organization is no longer able to endorse chaplains under this Instruction, all ecclesiastical endorsements issued by that Organization shall be considered withdrawn.  Serving chaplains endorsed by that Organization shall be considered to have had their endorsements revoked (paragraph 6.5. applies).

*DODI 1304.28, June 11, 2004*

E4.  ENCLOSURE 4

FORMAT FOR PROVIDING REQUIRED INFORMATION TO MEET ADMINISTRATIVE
REQUIREMENTS TO ENDORSE CHAPLAINS TO THE MILITARY DEPARTMENTS

E4.1.1.  Religious Organizations desiring to endorse RMPs to the military to serve
as military chaplains shall forward written notification of such intent to the AFCB in
accordance with paragraph E3.1.2., above.

E4.1.1.1.  The written notification may be submitted through traditional hard
copy or secure electronic means with verifiable signature.

E4.1.1.2.  The written notification shall be submitted on organization letterhead
or from an official electronic account capable of secure electronic signature.

E4.1.1.3.  The written notification shall include, at a minimum, a statement that
meets the requirements of paragraph E3.1.3. and provides the following information in
the following order:

E4.1.1.3.1.  Name of organization.

E4.1.1.3.2.  Address of organization.

E4.1.1.3.3.  Name, address, telephonic, and electronic contact for
endorsing official.

E4.1.1.3.4.  Statement verifying ability of the designated endorsing
official to endorse and withdraw endorsement of candidates and Chaplains.

E4.1.1.3.5.  Statement verifying the Religious Organization shall
immediately notify the AFCB when changes occur in the status of the organization,
designated endorsing agents, or the contact addresses and telephone numbers of either.

E4.1.1.3.6.  Signature of responsible official with authority to make such
statements on behalf of the organization.

E4.1.1.4.  The written statement shall include as enclosures verification of
current status as an IRS Section 501(c)(3) exempt organization in accordance with
subparagraph E3.1.3.1., above, the Employer Identification Number assigned to the
organization by the IRS, and all other enclosures to support this status.

*DODI 1304.28, June 11, 2004*

E5.  ENCLOSURE 5

FORMAT FOR PROVIDING REQUIRED INFORMATION TO ENDORSE RMPS AS
CHAPLAINS TO THE MILITARY DEPARTMENTS

E5.1.1.  Religious Organizations submitting required documentation of their first fully qualified RMP to a specific Military Department shall forward the applicant's documentation in accordance with paragraph 6.1. of this Instruction.  The written documentation shall, at a minimum include:

E5.1.1.1.  Application for Appointment:  DA Form 61; AF Form 24/Addendum; Navy:  NC1100/11.

E5.1.1.2.  Application for Active Duty: DA Form 160; AF Form 125, EAD Application (AF Reserve/Guard; Navy Reserve Recall:  NP1131/5.

E5.1.1.3.  Application Letter requesting Appointment by applicant; (Navy: include in form of applicant "Motivational Statement" if not included in NC1100/11).

E5.1.1.4.  Official copy of each Undergraduate and Graduate Transcript.

E5.1.1.5.  Statement verifying date of latest National Agency Check or check in progress; SF Form 86, Questionnaire for Security Positions.

E5.1.1.6.  Standard Form 88 (Navy: DD2808), Report of Medical Examination and SF Form 93- Report of Medical History (Certified true copies; Navy:  DD2807-1); DD Form 2807-2 Medical Pre-screen-AF.

E5.1.1.7.  DD Form 368 Conditional Release.

E5.1.1.8.  All OPRs/OMPF microfiche or copies of DD Form 214, NGB Form 22, OERs, etc.

E5.1.1.9.  Official Photograph; or full body photo.

E5.1.1.10.  Birth Certificate and Driver's license.

E5.1.1.11.  Credit Check AETC Form 1325-AF.

E5.1.1.12.  Chaplain Interview-Army, Navy:  NC1100/13; 3 to 5 Letters of Recommendation-AF; Navy:  minimum of 3 letters.

*DODI 1304.28, June 11, 2004*

E5.1.1.13.  Family Member Information Document (Typed on plain bond paper; Biography/Resume).

E5.1.1.14.  Certificate of Ecclesiastical Endorsement; Ordination Certificate.

ENCLOSURE 5

*DODI 1304.28, June 11, 2004*

## E6.  ENCLOSURE 6

## DD FORM 2088, "STATEMENT OF ECCLESIASTICAL ENDORSEMENT"

| STATEMENT OF ECCLESIASTICAL ENDORSEMENT | Form Approved<br>OMB Number 0704-0190<br>Expires Feb 28, 2006 |
|---|---|

The public reporting burden for this collection of information is estimated to average 45 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to the Department of Defense, Executive Services and Communications Directorate (0704-0190). Respondents should be aware that notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number.
**PLEASE DO NOT RETURN YOUR COMPLETED FORM TO THE ABOVE ORGANIZATION. RETURN COMPLETED FORM TO CHIEF OF CHAPLAINS (ITEM 2).**

**PRIVACY ACT STATEMENT**

**AUTHORITY:** Title 10, U.S. Code, Sections 532 and 12201; EO 9397.
**PRINCIPAL PURPOSE(S):** To verify the professional and ecclesiastical qualifications of Religious Ministry Professionals for initial appointment or chaplains change of career status appointments as chaplains in the Military Service.  This form is an essential element of a chaplain's professional qualifications and will become part of a chaplain's military personnel record.
**ROUTINE USE(S):** None.
**DISCLOSURE:** Voluntary; however, failure to provide all the information requested may significantly delay the processing of this endorsement.

**1. FROM**

| a. TYPED OR PRINTED NAME OF RELIGIOUS ORGANIZATION GRANTING RELIGIOUS MINISTRY PROFESSIONAL ENDORSEMENT<br>Ecclesiastical Fellowship of Worshippers | b. DATE OF CURRENT INTERNAL REVENUE CODE (IRC) 501(c)(3) EXEMPT STATUS<br>January 1, 1990 | c. EMPLOYER IDENTIFICATION NUMBER (IRC)<br>39-1234567 |
|---|---|---|
| | d. TELEPHONE *(Include Area Code)*<br>200-111-2222 | e. FAX NUMBER *(Include Area Code)*<br>200-111-3333 |

| f. ADDRESS. (1) STREET *(Include apartment or suite number)*<br>123 Main Street | (2) CITY<br>Anytown | (3) STATE<br>OH | (4) ZIP CODE<br>40005 |
|---|---|---|---|

| g. E-MAIL ADDRESS<br>fellows@lifthands.net | h. WEB SITE<br>www.lifthands.net |
|---|---|

**2. TO**

| a. CHIEF OF CHAPLAINS<br>*(X appropriate block)* | X | (1) ARMY | b. ADDRESS. (1) STREET *(Include apartment or suite number)*<br>2511 Jefferson Davis Hwy, Suite 12500 Presidential Towers | | |
|---|---|---|---|---|---|
| | | (2) NAVY | (2) CITY<br>Arlington | (3) STATE<br>VA | (4) ZIP CODE<br>22202-3907 |
| | | (3) AIR FORCE | | | |

**3. APPLICANT INFORMATION.   a. IS THIS AN INITIAL ENDORSEMENT?** *(X one)*    X   YES    NO

| b. TYPED OR PRINTED NAME *(Last, First, Middle Initial)*<br>Chaplain, Wannabee A. | c. SSN<br>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 | d. TELEPHONE *(Include Area Code)*<br>300-222-3333 |
|---|---|---|

| e. ADDRESS. (1) STREET *(Include apartment or suite number)*<br>2004 Oak Street | (2) CITY<br>West Lake | (3) STATE<br>VA | (4) ZIP CODE<br>24444 |
|---|---|---|---|

| f. E-MAIL ADDRESS   wannabee@cxnet.org |
|---|

| g. NUMBER OF YEARS OF PROFESSIONAL MINISTRY EXPERIENCE APPLICANT HAS COMPLETED<br>3 | h. NUMBER OF MONTHS OF PRIOR ACTIVE MILITARY SERVICE APPLICANT HAS COMPLETED | |
|---|---|---|
| | (1) OFFICER   0 | (2) ENLISTED   4 |

| i. APPLICATION IS FOR<br>*(X one)* | | (1) RESERVE *(Non-Active Duty)* | | (4) EXTENDED ACTIVE DUTY *(Indefinite)* |
|---|---|---|---|---|
| | X | (2) NATIONAL GUARD | | (5) REGULAR COMMISSIONED OFFICER |
| | | (3) INITIAL ACTIVE DUTY *(3 years)* | | (6) RESERVE (AGR) |

**4. ECCLESIASTICAL ENDORSING AGENT**

a. AS THE ECCLESIASTICAL ENDORSING AGENT AUTHORIZED TO REPRESENT   Ecclesiastical Fellowship of Worshippers   ,
*(Name of religious organization) (Item 1)*
I HEREBY VERIFY THE ABOVE APPLICANT TO BE PROFESSIONALLY QUALIFIED AS A RELIGIOUS MINISTRY PROFESSIONAL FOR THE MILITARY CHAPLAINCY.

| b. TYPED OR PRINTED NAME *(Last, First, Middle Initial)*<br>Scott, Barney T. | c. E-MAIL ADDRESS<br>btscott@lifthands.net |
|---|---|

| d. ADDRESS. (1) STREET *(Include apartment or suite number)*<br>9876 White House Lane | (2) CITY<br>Sometown | (3) STATE<br>GA | (4) ZIP CODE<br>30005 |
|---|---|---|---|

| e. TELEPHONE<br>*(Include Area Code)*<br>400-444-5555 | f. FAX NUMBER<br>*(Include Area Code)*<br>400-444-4444 | g. SIGNATURE | h. DATE SIGNED *(YYYYMMDD)*<br>20040331 |
|---|---|---|---|

**5. COMMENTS**
Applicant is a Phi Beta Kappa, graduated cum laude and is an All-American track star.  Exceptional ability and leadership skills.

**DD FORM 2088, MAR 2004**      PREVIOUS EDITION IS OBSOLETE.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Father Vincent Rigdon, et al. )
                            )
           Plaintiffs, )
                            )
           v. )
                            )
Dr. William J. Perry, et al. )
                            )
           Defendants. )

Case Number  1:96CV02092

Judge:  Charles R. Richey

Deck Type:  Civil General

## DECLARATION OF CHAPLAIN CECIL R. RICHARDSON

1.    I am Chaplain, Colonel, Cecil R. Richardson, USAF.  I
serve in the Office of the Secretary of Defense, in the
Department of Defense ("DoD"), as the Executive Director of the
Armed Forces Chaplains Board ("Chaplains Board").  The Chaplains
Board is composed of the three chiefs of chaplains of the
Military Departments (Army, Navy, and Air Force), the three
deputy chiefs, and myself.  The Chaplains Board's primary
function is to advise the Secretary of Defense on religious,
ethical, and moral issues related to the Military Services and
policies for the protection of religious guarantees under the
First Amendment.

2.    Chaplains are clergy persons who are selected and
credentialed through a process of endorsement by their faith

1

communities to provide professional ministry within the armed forces. Chaplains are "on loan" from and remain fully accountable to their faith communities. Chaplains are able to function within the military only through the ongoing endorsement of their faith community. Thus, chaplains serve as representatives of the variety of religious traditions within the United States.

3.    The principal purpose of the military chaplaincy is to satisfy the needs of military members and their families and thus to provide for the free exercise of religion by members of the armed forces, the morale of military members, and the strength of our national defense. Chaplains engage in activities designed to meet the religious needs of a pluralistic military community. In addition to providing worship services, they provide moral and religious education, pastoral counseling, family support, crisis intervention, community services, cultural activities, and humanitarian programs. Chaplains must be trained to minister and survive wherever there are military personnel, including in combat zones.

4.    Chaplains are members of the armed forces and are fully accountable to their Military Service. Upon appointment as an officer in the armed forces, a chaplain is subject to the same discipline and training as is given to other officers. Except

2

for the fact that they have "rank without command," they are
commissioned officers with all of the rights, privileges,
responsibilities, and restrictions that attend a military
commission.  As members of the armed forces, chaplains are also
personnel of the Federal government and are subject to many of
the laws and regulations that govern Federal personnel.

    5.   No statute or DoD regulation or policy prevents a
chaplain from discussing any moral issue in connection with
preaching, counseling, or other religious duties.

    6.   I am familiar generally with the circumstances of the
information to Army, Navy, and Air Force Catholic chaplains
concerning participation in the Catholic Church's "Project Life
Postcard Campaign."

    6.a. Reverend Monsignor Aloysius R. Callaghan of the Roman
Catholic Archdiocese for the Military Services, in a May 29, 1996
letter, informed Catholic chaplains of the postcard campaign,
which was sponsored jointly by the National Committee for a Human
Life Amendment and the Secretariat for Pro-Life Activities of the
National Conference of Catholic Bishops.  According to the May 29
letter, on the weekend of June 29th and 30th, 1996, Catholics
around the country were being asked to sign postcards urging
their Senators and Representatives to vote to override the

President's veto of HR 1833, known as the Partial Birth Abortion Act. The letter suggested that the Catholic chaplains ask their parishioners to be part of this effort, and provide them names and addresses of legislators. Monsignor Callaghan provided a copy of the "project postcard" with the letter and suggested the chaplains copy it and provide the copies to their parishioners.

6.b. On June 7, 1996, the United States Air Force Chief of Chaplains Service sent out a message to all Major Command Chaplain offices that reminded chaplains of the restrictions on political and lobbying activities by members of the Armed Forces that are contained in DoD and Air Force directives, and informed them that those restrictions preclude chaplains from participating or encouraging others to participate in the postcard campaign. The message from the Chief of Chaplains Service requested that the information be disseminated further to all senior chaplains.

6.c. On June 21, 1996, Rear Admiral Holderby, Jr., Deputy Chief of Chaplains of the United States Navy, issued a memorandum for the Major Claimant Staff Chaplains for immediate and wide distribution within each claimancy. The memorandum described the postcard campaign and the political activities and lobbying restrictions on Armed Forces personnel. Chaplain Holderby informed chaplains that Navy personnel may not participate

4

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 22, 1996.

Cecil R. Richardson
Chaplain, Colonel, USAF

6



# THE HISTORY OF THE
# CHAPLAIN CORPS, UNITED STATES NAVY

## VOLUME ONE
## 1778 – 1939



Clifford Merrill Drury

Captain, Chaplain Corps

United States Naval Reserve

**NAVPERS 15807**

In Re Navy Chaplaincy
07-mc-269 (RMU)
EXHIBIT 4

# INTRODUCTION

This is the first comprehensive and official history of the United States Navy chaplaincy ever prepared. Upon orders from the Secretary of the Navy, historians were selected to write the history of all phases of the Navy's activities during the recent war. A history of the Chaplain Corps was included in this overall program.

Chaplain Clifford M. Drury, who was on leave from San Francisco Theological Seminary where he occupies the chair of Church History, was called to Washington in March 1944 to work on this project. Chaplain R. D. Workman, then Chief of Chaplains, took a personal interest in the work and gave it much of his time. Chaplain Workman has continued his interest and assistance in the publication even though he is now retired. Until August 1945 Chaplain Drury served as District Chaplain of the Potomac River Naval Command and devoted only a portion of his time to the writing of this history. After VJ day he was able to give full time until his detachment from active duty on 1 July 1946. He returned to duty for three or four months during each of the summers of 1947 and 1948, and also in the early part of 1949, to complete the assignment.

While the immediate objective of the history-writing project of the Navy was focused on the recent war, the Chaplains Division felt that a study of the evolution of the Corps from its inception to World War II was also needed. Such a work was a logical and necessary prologue to the history of the Corps during the recent war.

This work, therefore, has been prepared with a three-fold purpose. In the first place, it presents a picture of the varied activities of chaplains from the days of the Continental Navy through World War II. Attention is given to the evolution of the Chaplain Corps itself. (The effectiveness of the chaplain's service was greatly increased when he no longer stood alone but became a part of a recognized Corps of the Navy, officially headed by a Chief of Chaplains.) Mention is made of the social and moral conditions under which naval personnel lived, because that which so vitally affects ethics and morality is logically a part of this study. Something of the religious life and activities of naval personnel on ships and stations where no chaplains have been on duty is included.

Secondly, this work has been written with the hope that it might be a guide and inspiration to the chaplains who compose the present Corps. The reasons for certain regulations, the significance of certain traditions, and the importance of the general policies that guide the activities of the individual chaplain as well as those of the Corps have their roots in the past. The lessons learned in the painful and costly experience of World War II must be recorded, while they are vivid in memory, for the benefit of the chaplains of tomorrow.

Finally, mindful of the necessity of having the support of the various denominations which have contributed members of their clergy to the naval chaplaincy, this history is presented to the public with the hope that it may be a factor in sustaining interest in the Navy Chaplain Corps. The Navy looks to the Naval Academy at Annapolis for many of its line officers. It looks to the churches of the United States for its chaplains. An intelligent and sympathetic appreciation of the opportunities and responsibilities of naval chaplains on the part of organized religion is necessary for the maintenance of a continuing supply of consecrated and well-qualified young men for this challenging field of religious endeavor.

The *History of the Chaplain Corps, United States Navy* will consist of two volumes of narrative and one volume containing the biographical and service-record sketches of 3,353 chaplains who served in the Continental and United States Navies down to the end of 1945. The latter volume was issued as a Government publication in 1948.[1]

This, the first volume of the narrative, presents the history of the Chaplain Corps from the days of the Continental Navy to 8 September 1939 when President Franklin D. Roosevelt declared the existence of a state of national emergency. Volume Two will continue the narrative from 8 September 1939 through World War II to 1949.

[1] For sale by Superintendent of Documents, U. S. Government Printing Office, Washington 25, D. C. Price $2.50.

Navy chaplains have long felt the need for a history of the Corps and it is with real joy and satisfaction that I now commend this work to the public. Nowhere outside of the armed services of the United States is it possible to find so many clergymen of so many different faiths working together in such close harmony for the spiritual welfare of so many. Here is a story that the church people of all denominations should read. And here is a guide and textbook for the chaplains still on active duty and for those who shall enter this service in the years to come.

WILLIAM N. THOMAS,
*Rear Admiral, ChC., USN.*

CHAPTER TWO

# CHAPLAINS IN THE CONTINENTAL NAVY

## 1775–1785

The history of the chaplaincy of the United States Navy necessarily parallels the history of the Navy itself. While this work is designed primarily to recount what Navy chaplains did, the conditions under which they lived and worked, and the results they accomplished, it will also be necessary to trace enough of the background of naval history to give perspective to the picture. Since ships and shore stations are the parishes of Navy chaplains, an elementary knowledge of the names and types of ships as well as some idea of the history of shore bases is essential to an understanding of the story of the Chaplain Corps.

The Continental Navy antedates the United States Navy. On 13 October 1775 a timid Congress by a margin of one vote authorized the building of two swift sailing vessels, one with fourteen guns and the other with ten. A Marine Committee of three members, later enlarged to seven, was appointed to conduct naval affairs.[1] After authorizing ships and an embryonic Navy Department, Congress directed its attention to the regulations which should govern the new Navy. Faced with the necessity of producing a set of rules immediately, it was natural that Congress should turn to the rules of the Mother Country for a model. Thus it happened that from the very beginning of the Continental Navy due consideration was given to Divine Services and to the place of chaplains on the larger vessels, since this was an inherent part of the British system.

The second article of the Navy regulations adopted 28 November 1775 read:

The Commanders of the ships of the thirteen United Colonies, are to take care that divine service be performed twice a day on board, and a sermon preached on Sundays, unless bad weather or other extraordinary accidents prevent.

Although the chaplain is not mentioned in this article, the reference to a sermon implies that Congress intended that there should be an ordained clergyman on board.

The third article designed to protect the morals of those aboard ship was as follows:

If any shall be heard to swear, curse, or blaspheme the name of God, the Commander is strictly enjoined to punish them for every offence, by causing them to wear a wooden collar, or some other shameful badge of distinction, for so long time as he shall judge proper. If he be a commissioned officer, he shall forfeit one shilling for each offence, and a warrant or inferior officer six pence. He who is guilty of drunkenness, if a seaman, shall be put in irons until he is sober, but if an officer, he shall forfeit two days pay.[2]

The first mention of a chaplain in the *Journals of the Continental Congress* refers to his share in the distribution of prize money. On 6 January 1776 Congress passed a resolution which included the provision:

That the Commander in Chief have one twentieth of the said allotted prize money. . .

That the lieutenants of marines, surgeons, chaplains, pursers, boatswains, gunners, carpenters, the masters' mates, and the secretary of the fleet, share together, and have two twentieth parts and one half of one twentieth part divided amongst them, equally of all prizes taken when they are in company.[3]

On 15 November 1776, more than a year after the first vessels had been authorized, Congress fixed the pay of officers in the Navy. The base pay of the chaplain was $20 a month, and, for purposes of comparison, the surgeon received $25. Officers in the pay grade which included the Navy chaplain, however, were to receive $4 a week subsistence when in domestic ports and when they were unable to live aboard their ships. This rate of pay compared favorably with that allowed Army officers. As early as 29 July 1775 Congress had fixed the pay of Army chaplains at $20 a month. This was raised to $33.33 on 16 January 1776.

[1] Alden and Westcott, *The United States Navy*, p. 10.
832159—49——2

[2] *Journals of The Continental Congress*, III:378.
[3] *Ibid.*, IV:36.

The article in Navy regulations calling for the performance of Divine Service twice daily and the delivery of a sermon on Sunday, together with the two previously mentioned references to a chaplain in the *Journals,* are the only known instances of official action by the Continental Congress regarding the Navy chaplaincy. These suffice, however, to show that Congress was aware of the spiritual needs of naval personnel and that it intended that chaplains be provided to ships whenever possible.

References to the presence and work of chaplains in the Continental Navy are few. The Library of Congress has a collection of John Paul Jones letters, two of which reveal Jones seeking chaplains in France for his ships *Ranger* and *Bon Homme Richard.* The first letter, written from Passy, France, on 12 July 1778, was directed to H[enry] Grand in Paris and reads:

> In the selection of a Chaplain the following qualifications are deemed requisite "I could wish him to be a man of reading and of letters who understands, speaks and writes the french & english with elegance and propriety: For political reasons it would be well if he were a clergyman of the protestant profession whose sanctity of manners and happy natural principles would diffuse unanimity and cheerfulness thro' the ship. And if to these essentials are added the talent of writing fast and in fair characters, such a man would necessarily be worthy the highest confidence, & might, therefore, assure himself of my esteem and friendship; he should always have a place at my table, the regulation whereof would be entirely under his direction."[4]

It seems evident that Jones was looking for a man who could serve not only as the ship's chaplain but also as his private secretary. A few weeks later Jones was given command of the *Bon Homme Richard.* After some difficulty he assembled a crew of about 330, including only thirty Americans. Most of the crew were "raw French peasants."[5] Writing from L'Orient, on 30 April 1779 to his friend "Father John" Mehegan at Brest, the chaplain and secretary to Admiral Count d'Orvilliers, Jones said:

> Having a number of French under my command, I am in want of a Chaplain. You know whom I would prefer if they are disengaged.[6]

Undoubtedly Jones was requesting a chaplain of the Catholic faith. There is no evidence of his securing either a Protestant chaplain for the *Ranger* or a Catholic for the *Bon Homme Richard.*

[4] Jones Collection, Letter No. 6783.
[5] Sands, *Life and Correspondence of John Paul Jones,* p. 156.
[6] Jones Colection, Letter No. 7073. See also *American Catholic Historical Researches,* p. 221.

Another reference to a chaplain is found in the following letter from the Marine Committee to Seth Harding, Captain of the Continental frigate *Confederacy,* regarding an unidentified chaplain who had gotten into trouble:

<div align="right">May 26th, 1779</div>

Sir

I am ordered by the Marine Committee to desire that you will send up the Chaplin [sic] of your Ship to this place under a Guard so as to be brought before the Committee on friday evening next at six OClock, I am Sir

<div align="right">Yr. hble sert.<br>John Brown, Secy[r]</div>

The nature of the offense or the outcome of the trial is not disclosed.

The first chaplain known to have served in the Continental Navy was the Reverend Benjamin Balch, a Harvard graduate and a Congregational minister, whose father had served in a similar capacity in His Majesty's expedition of 1745 in "King George's War" against Cape Breton. Benjamin Balch fought in the Battle of Lexington as one of the Minute Men. Later he served as an Army chaplain in the siege of Boston. On 28 October 1778 Balch reported aboard the frigate *Boston* under the command of Samuel Tucker. The muster roll, which carries the names of 287 men, indicates that the chaplain was paid at the rate of ninety shillings a month.[8] Some time after the capture of the *Boston* by the British in 1780 at Charleston, South Carolina, Balch began his service on the *Alliance.*

By 1781 the Continental Navy had only two frigates, the *Alliance* and the *Deane,* each of which carried thirty-two guns. When Balch served as chaplain on the *Alliance* from October 1780 to June 1781, the Anglophobic Irishman, John Barry, was her Captain.[9] During this time, the ship saw considerable action.

Chaplain Balch had with him two of his young sons, Thomas and Benjamin, who, because of their youth, were entered on the ship's payroll as drawing the pay of one man. The Chaplain's part in the *Alliance's* capture of two British vessels off Halifax follows:

The peril the ship was in brought out the desperate courage of every man on board the *Alliance,* the 'cloth'

[7] Paullin, (ed.), *Out-Letters of the Continental Marine Committee and Board of Admiralty August 1776–September 1780,* II:78.
[8] Sheppard, *The Life of Samuel Tucker,* p. 344. The original Journal of Samuel Tucker is in the Essex Institute, Salem, Mass.
[9] Clark, *Gallant John Barry, pp.* 193, 227, 239.

Case 1:07-mc-00269-RMU    Document 21-5    Filed 07/19/2000    Page 6 of 13

being no exception. Reverend Benjamin, armed cap-a-pie, was seen in the midst of the fray, and thereafter is said to have become known on the ship as the "fighting parson." His son, Thomas, was also in the fight, and when father and son met afterwards, it was with an embrace and with the words, "Thank God, my son."[10]

Benjamin Balch had twelve children, one of whom, William, was the first chaplain known to receive a commission in the United States Navy after the present Navy Department was established in 1798.

Soon after Chaplain Balch left the *Alliance* in October 1781, Captain Barry appointed James Geagan, a Navy surgeon, to serve as chaplain.[11] In those days many clergymen also practiced medicine and while it is possible that Geagan was ordained, the probability is that he was not. Since Barry was a devout Catholic, it has been assumed by some that Geagan was an Irish Catholic priest. Geagan served as chaplain or acting chaplain for about seven months. When the billet of ship's surgeon became vacant in July 1782, he was appointed to that position. In spite of his friendship for Captain Barry, he with a number of other officers left the *Alliance* at a French port sometime before 12 December 1782, because they had not been paid.[12]

Some of the colonies had naval forces of their own which may have included chaplains. A record of the Virginia Assembly for November 1781 shows that this body was then reducing its naval force and that "every person of the naval staff establishment,

including the commissioner of the navy, chaplains" and others were being dismissed.[13]

Possibly chaplains served aboard some of the larger privateers, but of this there is no record. Congress encouraged these vessels to prey upon British shipping. Approximately 70,000 men embarked on such cruises and accounted for 600 British ships.[14]

The Continental Navy played a minor role in the Revolutionary War. Some ships authorized were never built or otherwise acquired. Others that were put into commission never saw action. However, the combined forces of the Continental Navy, the state navies, the privateers, and the invaluable assistance of the French Navy undoubtedly hastened the successful conclusion of the struggle. When the war ended the Continental Navy consisted of only four ships. By 1785 even these had been sold. Roughly speaking, the history of the Continental Navy spanned only ten years, from 1775 to 1785.

The records of the services rendered by Navy chaplains in the Revolutionary War are fragmentary. Benjamin Balch and James Geagen are the only chaplains who are known to have served in the Continental Navy. More important than the services of individual chaplains was the adoption by the Continental Congress of regulations which provided a place for religion and for chaplains in the Navy. These regulations were expanded in the rules which governed the new Navy of 1798.

[10] *Danvers Historical Collection*, VII:89-91.
[11] Clark, *op. cit.*, pp. 239, 247, 269.
[12] Griffin, *Commodore John Barry*, pp. 166, 188-263.

[13] Stewart, *The History of Virginia's Navy of the Revolution*, p. 120. A note in the Edel Collection gives the following information without stating source: "Land Grants to Chaplains in the Navy of Virginia in Revolution. John Braidfoote, Chaplain in State Navy of Virginia, received grant of 6,000 acres."
[14] Alden and Westcott, *The United States Navy*, p. 12; Sprout, H. and M., *The Rise of American Naval Power*, p. 11.

# CHAPTER THREE

# THE BEGINNINGS OF THE UNITED STATES NAVAL CHAPLAINCY

## 1789–1800

For thirteen years, 1785 to 1798, there was no American Navy and, therefore, no Navy chaplains. The Constitution adopted in 1789 invested Congress with the power "to provide and maintain a navy." The Congressional Act of 1789 establishing the War Department gave the Secretary of War jurisdiction over both the naval and military forces. Since the Navy Department was not established until 30 April 1798, both branches of our armed forces were under one administrative head for about nine years. Although several ships were authorized in the latter part of this period, no naval vessels actually put to sea under the authority of the Secretary of War.

The United States Navy was born out of a troubled international situation. As early as 1785 American ships had been seized by Algerian pirates and their crews held for ransom. Repeated outrages perpetrated by the Algerian corsairs on American ships and sailors finally aroused Congress to pass on 27 March 1794 "An Act to provide a Naval Armament." This Act called for the building of six frigates, four of forty-four guns and two of thirty-six. Joshua Humphreys of Philadelphia, who was selected to build one of the frigates, originated a new design for his vessel, the *United States,* which was so acceptable that it was used for the other frigates as well. In brief, his plan called for vessels which were longer, broader, and lower in the water than similar vessels of the British Navy. These fast-sailing fighting ships were the best of their time.[1]

There were then three categories of ships considered sufficiently large to warrant chaplains. First there were the three-masted square-rigged vessels which carried up to twenty-four guns, mounted on a single deck. These were called sloops. While they sometimes had a chaplain, this proved the exception rather than the rule. Then there were the frigates, which were larger than sloops, although similarly rigged. These carried from twenty-eight to forty-four guns on the spar deck above and the gun deck below.

It was not until 1815 that the United States acquired its first ship of the line or line-of-battle ship. This type mounted seventy-four or more guns on two and even three decks.[2] These three types can be compared to the light cruisers, heavy cruisers, and battleships of today.

Although the Act of 1794 authorized the building of six frigates, the keels of only three were immediately laid. They were the *United States,* the *Constitution,* and the *Constellation,* honored names in the history of the United States Navy. Construction was halted in 1795 when a humiliating treaty was signed with Algiers. For about three years the bare skeleton, keel and ribs of ships, lay in their ways exposed to the elements.

Even though the United States had concluded treaties with Morocco and Algiers, none had been made with Tunis and Tripoli, which were also focal points of piracy and extortion for Mediterranean shipping. However, before anything serious happened in that area, American relations with France took an unexpected turn for the worse. The Jay Treaty signed with Great Britain in 1794 was viewed by the French as a violation of the Franco-American Treaty of 1778. In consequence the French began preying upon American shipping. On 21 June 1797 the Secretary of State reported that the French had seized thirty-two American ships in the previous nine months.[3] This situation was intolerable, and public sentiment rapidly crystallized in favor of aggressive defensive action.

Work on the unfinished frigates was resumed. On 7 September 1797 the *Constellation* was launched. On 21 October the *Constitution* slid down the ways. An ever darkening international horizon caused Congress to authorize the acquisition of twelve additional vessels, each of twenty-two guns, on 27 April 1798. Three days later Congress established the Navy Department and President Adams selected Benjamin

---

[1] Alden and Westcott, *The United States Navy,* p. 43.

[2] Sprout, H. and M., *The Rise of American Naval Power,* pp. 42–3.

[3] Goldsborough, *Naval Chronicle,* I: 78.

Case 1:07-mc-00028-RMU   Document 21-5   Filed 07/18/2008   Page 8 of 15

Stoddert to be its first secretary.[4] On 10 May 1798 the *United States* was launched. Continued French depredations on American shipping finally aroused Congress to vigorous action. On 28 May hostile action against armed French vessels hovering off the coast of the United States was authorized, and on 7 July Congress declared that the treaties with France were no longer in effect. Thus began the Quasi War with France which lasted until 30 September 1800, a little more than two years. During this time, a fleet of about fifty vessels was sent to sea, only nine of which were heavy frigates.

The *Constellation*,[5] the first of the frigates authorized in 1794, sailed from Hampton Roads under the command of Captain Thomas Truxtun on 23 June 1798. On 13 July the *United States* under command of Captain John Barry, and on 20 July the *Constitution* under Captain Samuel Nicholson put to sea.

In 1799 the following additional frigates were added: *Chesapeake, Philadelphia, Congress, Insurgente, Essex, John Adams, Adams, George Washington, Boston,* and the *General Greene*.[6] The *President* and the *New York* were not added to the fleet until 1800. The *Insurgente* was captured from the French in 1799, but she foundered at sea the following year. As will be shown, chaplains were to serve on most of these vessels.

When peace was declared in the fall of 1800, public sentiment quickly demanded a curtailment of the naval establishment. A new administration under President Jefferson, bent on economizing, was elected in the fall of 1800. Secretary of Navy Stoddert, realizing that the new administration would be anti-navy, hastily acquired sites for Navy Yards at Portsmouth (New Hampshire), Boston, New York, Philadelphia, Washington, and Norfolk. These sites acquired during the closing weeks of a defeated administration laid the foundation for a permanent shore establishment of the Navy.

## THE FIRST UNITED STATES NAVY CHAPLAINS

The second section of the Act of 1794 stated that there shall be employed on board each of the said ships of forty-four guns . . . one chaplain." His pay was to be $40 a month plus two rations a day.[7] When

the President was authorized to equip and man the frigates *United States, Constellation,* and *Constitution* by the Act of 1 July 1797, a chaplain was detailed to each vessel with the same rate of pay as had been previously set.

According to the Secretary of the Navy's report of 24 December 1798 a chaplain was authorized in frigates of forty-four, thirty-six, and thirty-two guns, having a complement of 400, 340, and 260 men respectively.[8]



WILLIAM BALCH
First chaplain known to be commissioned, United States Navy, 1799–1801. From a painting by Clayton Braun.

Who had the honor of being the first chaplain in the newly established Navy in 1798? There is conclusive evidence that William Balch, a son of Benjamin Balch, was commissioned a chaplain in the United States Navy on 30 October 1799. On that date the Secretary of the Navy wrote to Captain James Sever of the *Congress*:

Sir, I enclose you a commission for William Balch as Chaplain and John Mushainey as Boatswain for the Con-

---

[4] Technically, the first Secretary of the Navy was George Cabot of Massachusetts who declined the nomination after legally holding the office for fourteen days. Mayo, *Your Navy,* p. 17.
[5] Ships of the same class did not always carry the same number of guns.
[6] *Nav. Doc. Quasi War,* IV:484.
[7] *Gen. Reg. of Navy & Marine Corps,* p. 233.

[8] *Nav. Doc. Quasi War,* II:116–7.

The main content is a full-page reproduction (image) of a commission document.

*Courtesy Massachusetts Historical Society.*

Reproduction of original commission granted Chaplain William Balch, 13 October 1799, and signed by President John Adams.

gress. You will require these Gentlemen to take the enclosed oath and return them to this office.[9]

This, the first commission known to have been given a United States naval chaplain, reads:

JOHN ADAMS President of the United States of America,

To all who shall see these Presents, Greeting:

KNOW YE, That reposing special Trust and Confidence in the Patriotism, Valor, Fidelity and Abilities of William Balch, I do appoint him a Chaplain in the Navy of the United States: He is therefore carefully and diligently to discharge the duty of a Chaplain by doing and performing all manner of Things thereunto belonging. And I do strictly charge and require all Officers, Seamen and others, under his command, to be obedient to his Orders as a Chaplain. And he is to observe and follow such Orders and Directions, from time to time, as he shall receive from me, or the future President of the United States of America, or his superior Officer set over him, according to the Rules and Discipline of the Navy. This Commission to continue in force during the pleasure of the President of the United States for the time being.

Given under my Hand, at Philadelphia, this Thirtieth day of October in the Year of our Lord One Thousand Seven Hundred Ninety nine and in the twenty fourth Year of the Independence of the United States.
John Adams

By Command of the President of
the United States of America
Be. Stoddert

A copy of the oath used by the Navy Department in 1805, thought to be the same as that used in 1799, follows:

I . . . . . . . . . . . . . . . . . appointed . . . . . . . . . . . . . . . . . . do solemnly swear to bear true allegiance to the United States of America, and to serve them honestly and faithfully against all their enemies or opposers whomsoever; and to observe and obey the orders of the President of the United States of America, and the orders of the officers appointed over me, and in all things to conform myself to the rules and regulations which now are or hereafter may be directed, and to the articles of war which may be enacted by Congress, for the better government of the navy of the United States, and that I will support the constitution of the United States.

Balch served on two ships. His duty aboard the *Congress* was cut short when that vessel was dismasted in a storm early in 1800. As Captain Barron of the *Chesapeake* needed a chaplain, Balch was transferred to that vessel on 1 May 1800 and served there a little more than a year.

While William Balch may have been the first

commissioned chaplain to serve in the United States Navy, there is clear evidence that William Austin was serving as a chaplain, without a commission, aboard the *Constitution* nearly a year before Balch reported for duty on the *Congress*. The *Constitution* first sailed from Boston on 20 July 1798 under the command of Captain Nicholson who was relieved less than a year later by Captain Silas Talbot. The first name on the ship's muster roll which Captain Talbot signed in July 1799 is that of "William Austin—Chaplain."[10] According to this record, Austin had been paid to 31 May 1799, a fact that indicates he was serving on board prior to that date.

On 27 August 1800 Captain Talbot wrote the Secretary of the Navy stating:

I have always understood that Mr. Austin (a young Gentleman that has acted as Chaplain for about two years past) meant to leave the ship at her return from her late cruise, that his object in coming into the service was principally to acquire a little property to enable him to support himself a few years in the Commencement of the Study of the Law which he means to engage in; he is now absent and I cannot obtain immediately his answer on the Subject of Continuing in service. But I am almost Confident that he will decline. He has not had any warrant.[11]

Other sources indicate that Austin took passage from Cape Francois for New York aboard the American sloop *Chase* on 7 July 1800, which may have been the time he left the *Constitution*. Talbot intimated that Austin had been serving as chaplain for about two years and this places the date of his reporting sometime in the summer of 1798. However, Talbot himself did not take command of the *Constitution* until the summer of 1799.

On 17 May 1801 Austin wrote to the Secretary of the Navy on behalf of Captain Nicholson, who was then being criticized for his conduct when in command of the *Constitution*. Austin wrote:

I was a chaplain on board the frigate Constitution eighteen months, with Captain Nicholson, six, with Captain Talbot, twelve. My situation with both was similar. Captain Nicholson's politeness made him my companion; with him I lived, at his table I constantly sat, his cabin was my residence, and from it I seldom retired until his usual time of rest.[12]

Austin disproved the charge of intoxication which had been made against Captain Nicholson and signed his letter "Late Chaplain on board the frigate *Constitution*." This letter indicates that Austin was chaplain during the last six months of Captain Nicholson's command and therefore must have begun

---

[9] Nav. Rec. Coll.; I:3:10.

[10] Nav. Rec. Coll.
[11] *Ibid.*, Area 7.
[12] *Ibid.*, IV:2:89.

— 10 —

his duties about 1 January 1799, or ten months before William Balch was commissioned.

The first discovered reference to "Divine Service" on any United States ship-of-war is that found in the log of the *Constitution* for Sunday, 13 January 1799, which may have been Austin's first Sunday aboard.[13] An earlier reference to "prayers" is found in the Journal[14] kept by a James Pity (or Pettis) who was a member of the crew of the *Constitution*. On Sunday 12 August 1798 he noted: "a 11 oc A.M. call'd all hands aft to attend prayers. Doctr. Blake stood Chaplain." The muster roll lists a Charles Blake as surgeon's mate. Undoubtedly, for want of a regularly appointed chaplain, the ship's doctor read prayers. Pity referred to "prayers" on various Sundays but on 13 January changed his terminology from "prayers" to "Divine Service," thereby agreeing with a similar notation in the ship's log for Sunday, 13 January 1799 "At 10 call'd all hands aft and performed Divine Service."

After that date references to Divine Services appear with regularity both in the Journal kept by Pity and in the ship's log.

Since the practice of using unordained men as chaplains was common in the early days of the Navy, it cannot be assumed that Austin was a clergyman. There is no information regarding his education. Talbot stated that he served without "warrant" of commission. Thus Austin was appointed by the captain of the vessel on which he served and drew chaplain's pay. However, since he performed some if not all the duties of a chaplain, including conducting Divine Services, and was so listed in the official records of the ship, it appears that the distinction of being the first chaplain the United States Navy goes to him.

A section of the Act approved by Congress on 2 March 1799 contained the phrase: "Commanders of the ships of the United States, having on board chaplains." The plural use of the word "chaplain" suggests that Austin was not the only chaplain on duty at that date. No chaplain other than Austin, however, is known to have been in service before William Balch.

## NAVY REGULATIONS GOVERNING CHAPLAINS

According to Captain Talbot's letter quoted previously, one of the primary reasons Austin entered

the Navy as a chaplain was "to acquire a little property." This is reminiscent of the regulations of the Continental Navy which provided that chaplains receive their proportionate share of prize money. This section was included with but little change in the Act of 2 March 1799. Austin was not disappointed in his financial aspirations for he shared in the proceeds of the sale of those vessels captured by the *Constitution* during its cruise from July 1799 to August 1800.[15]

The Act of 1799 was superseded by the Act of 23 April 1800, which contained many of the former provisions, including the ratio for the distribution of prize money. The possibility of gaining quick and easy wealth through the sale of captured ships was a powerful incentive in recruiting for both privateers and the Navy.

The provision governing Divine Service in the Act of 1799 was taken from the Navy regulations of 1775 with the addition of the words, "having on board chaplains." This implies that Divine Services were to be held only on ships which carried chaplains. Further revisions are found in the Act of 1800. The section, with the additions shown in italics, then read:

The commanders of all ships and vessels in the navy, having chaplains on board, shall take care that divine services be performed *in a solemn, orderly, and reverent manner* twice a day, and a sermon preached on Sunday, unless bad weather, or other extraordinary accidents prevent it; *and that they cause all, or as many of the ship's company as can be spared from duty, to attend at every performance of the worship of Almighty God.*

The inclusion of the words: "in a solemn, orderly, and reverent manner" suggests that Divine Services had not always been so conducted. Judged by present day custom, compulsory attendance of all available hands at Divine Service twice a day as well as attendance at a sermon on Sunday seems rather stringent. No provision was made for members of religious minorities who might then have been in the Navy.

The newly-born Navy was without precedent or regulation regarding the selection and commissioning of chaplains. Sometimes captains chose their own chaplains as is indicated in the following letter from the Secretary of the Navy to Captain Samuel Barron dated 28 February 1800:

To complete the officering of the Chesapeake, You require

---

[13] Log Book of the United States Frigate *Constitution*, 6 Dec. 1798–20 Oct. 1800. In the Naval History Collection, New York Historical Society.
[14] Nav. Rec. Coll.

[15] *Nav. Doc. Quasi War*, VI:283.

The substance of the circular order issued by Welles was included in the 1865 edition of *Navy Regulations*:

No person will be appointed to any commissioned or warranted office in the Navy until he shall have passed a physical and a professional examination, except Chaplains and Professors of Mathematics, who are not required to undergo the latter. . . .

Although this edition of *Regulations* did not require a candidate for the chaplaincy to pass a professional examination, it did specify that he "must be a regularly ordained minister of some religious denomination, and of unimpeached character." The three following editions of the *Regulations* repeated this condition with the exception of the two latter clauses.

The Navy Department was beginning to insist on younger and stronger men for the chaplaincy. By 1862, the day had passed when an old or sick clergyman could turn to the Navy for an easy berth.

## RELATIVE RANK

The growth of the Navy during the war made necessary a clarification of the status and a decision on the order of precedence of the various grades of naval officers. On 13 March 1863, Secretary of the Navy Welles issued a circular which permitted chaplains and professors of mathematics of more than twelve years' service to rank with commanders. Those with less than twelve years' service were to rank with lieutenant commanders.[38]

The *Navy Regulations* of 1865 listed the various grades of officers, including chaplains, who were classified as "staff officers" as distinguished from the "line officers." The *Regulations* then defined "the relative rank" between the officers of the two classes, using the basis set forth by Welles in 1863 concerning chaplains. The establishment of relative rank meant that staff officers wore the insignia, and had other prerogatives pertaining to their respective positions, but did not necessarily draw the pay of that rank nor did they hold a commission as such. Relative rank merely fixed precedence at official and social functions.

The first chaplains to hold the relative rank of commander, received by right of seniority, were the following ten listed in the 1863 *Navy Register*: Rodman Lewis, F. W. Taylor, M. R. Talbot, Chester Newell, T. B. Bartow, Joseph Stockbridge, Photius

Fisk, Nathaniel Frost, John Blake, and E. C. Bittinger. In the *Register* of the following year, six chaplains on the retired list, including C. S. Stewart, George Jones, and Moses B. Chase, were also listed as commanders.

The revised *Regulations* for 1869 contained nothing about relative rank for chaplains with the result that the *Navy Registers* of 1 July 1869, 1 January 1870, and 1 January 1871 listed the chaplains simply under two categories: "Active" and "Retired." On the basis of subsequent events, it may be assumed that having once tasted the privileges of rank, the chaplains were unhappy with the reversion to their former ungraded status. The fact that Congress, on 3 March 1871, passed the following Act implies that pressure was brought to bear by an influential chaplain or group of chaplains: "Chaplains shall have relative rank as follows: Four, the relative rank of captain, seven, that of commander; and not more than seven that of lieutenant commander or lieutenant." This accounted for eighteen of the authorized twenty-four. The failure of this Act to define the status of the remaining six, when the full quota of twenty-four was in service, caused some embarrassment to those left unclassified.

The first four chaplains to attain the "relative rank" of captain, listed in the 1872 *Navy Register*, were Joseph Stockbridge, John Blake, E. C. Bittinger, and Robert Givin. All attained the rank on the basis of seniority. As vacancies occurred in the higher grades, names were moved up, with the result that some chaplains were given the relative rank of commander with less than five years service. Such was the case with Chaplain W. O. Holway in 1873. Some held the relative rank of lieutenant commander, with less than two years service, as did Chaplain J. B. Van Meter in 1873. This may have brought criticism from other officers, for, beginning with the *Register* of 1878, the grade of lieutenant was substituted for that of lieutenant commander, which was entirely in accord with the law. This explains the demotion of Chaplains Rose, Crawford, Rawson, Van Meter, Tribou, Clark, and Hager from lieutenant commander in 1877 to lieutenant in 1878.

It is to be noted that the Act of 1871 removed the requirement of twelve years' service before a chaplain could be ranked with commanders. For more than twenty years following 1878, chaplains were listed in the *Navy Registers* under the four categories: Captains, Commanders, Lieutenants, and Chaplains.

The first chaplains to be given the relative rank

---

[38] V:2:406.

of commodore were Chester Newell and Joseph Stockbridge. These chaplains, both retired at the time they were privileged to wear the broad stripe, were the only chaplains to rise above the relative rank of captain during the nineteenth century.[39]

While most chaplains of that generation, undoubtedly, welcomed the official recognition which came with relative rank, there was at least one who registered a protest to the innovation. He was Chaplain Van Meter, who in a letter to the Secretary of the Navy dated 11 April 1878, objected:

Perfect freedom of intercourse with all grades of the service are essential to a proper performance of a Chaplain's work. There should be no artificial barriers between him and the men on the one hand, or the officers upon the other. He should have the same access to them as is had by a civilian, and they should have such access to him. *No rank should be attached to such an office as this,*—it is utterly incongruous with its nature. The conferring of what is termed "relative rank" upon the Chaplaincy is a comparatively recent thing, and I cannot but regard it as a mistake. Rank is a device for effecting and maintaining organization and regulating subordination and command. But the Chaplain is no part of a military organization. He does not exist for the sake of anything which that organization contemplates. His relations are with men as men, not as officers and seamen, commanders and subordinates, and his office relates to matters altogether outside of, and above, military discipline. He commands no one,—in his duties no one can command him. There is no reason, in the nature of his office and its relations to the service, why any one, even the third class boy or scullion should regard him as a superior,—no reason why an Admiral should consider him a subordinate. Rank digs a gulf between him and those to whom he should minister as the servant of all, separating him on the one hand from the men, who see in him a superior to whom they must defer,—on the other from the outranking officers, not necessarily by any fault or incivility of theirs, but by the feeling of estrangement on both sides which these distinctions engender. . . .[40]

Van Meter's colleagues felt, not that "the chaplain is no part of a military organization" but that, since he must live and work within the naval organization, even the nebulous relative rank gave him a certain official standing. It enabled the chaplain to be more effective in his work, for it gave him protection and an allotted place among his brother officers, and imposed limits upon the discriminatory acts of the occasional unsympathetic commanding officer. Also, there were certain financial considerations that went with rank, including longevity and retirement pay, which were important factors in attracting the right kind of men to the chaplaincy.

Rank in the military service is an issue that has brought criticism from civilian clergymen, who claim that the office of a Christian or Jewish chaplain is incompatible with the gradations which rank imposes. Most chaplains connected with the service, however, while admitting that there are limitations in accepting rank, consider it indispensable in the effectiveness of their work.

During the seventies, a number of incidents occurred which involved the assignment of chaplains to cabins on board ship. A difference of opinion existed as to whether the chaplain should occupy the fourth or the fifth cabin on the port side off the wardroom.[41] While the whole matter may seem rather trivial, yet, it involved the prestige of the chaplain aboard ship.

When Chaplain John D. Beugless reported for duty aboard the *Susquehanna* in August 1864, he found the marine officer occupying the fourth room. "As a matter of accommodation to Mr. Wallace," wrote Beugless to the Secretary of the Navy on 17 March 1865, "I took, temporarily, the after room." A little later, Lieutenant Wallace took up quarters on shore and the Chaplain occupied his room. The marine officer soon returned and demanded the fourth room. "We have agreed," wrote the Chaplain, "to refer the matter to the Department, and most respectfully beg leave to solicit your decision as to who is entitled to the said fourth (4th) room on the Port side of the ship."[42]

On 3 April the Secretary sent back his decision:

"All rooms abaft the one assigned to the Surgeon or Assistant Surgeon in charge of the Medical Department to be occupied by the officers entitled to rooms on port side in the order of their rank of seniority, whether designated as Fleet Officers, Marine Officers, or otherwise."[43]

As Chaplain Beugless did not join the Navy until just before reporting for duty on the *Susquehanna,* it is probable that he was the junior officer and, therefore, the one who moved to the fifth room.

---

[39] Promotion to the relative rank of commodore was made possible by the Act of 3 March 1871 which provided that "Officers of the Medical, Pay, and Engineer Corps, chaplains, professors of mathematics, and constructors, who shall have served faithfully for forty-five years, shall, when retired, have the relative rank of commodore." The Act also provided that officers with forty years service who retired at the age of sixty-two could be promoted to this rank. Both Newell and Stockbridge came under this latter provision for both were commissioned on 8 September 1841.

[40] Nav. Rec. Coll., III: Mar.–Apr., 1878:327.

[41] Original plans of the frigate *United States* in Nav. Rec. Coll. show that the fifth cabin was allotted to the chaplain. Several chaplains, on the other hand, testify to having occupied the fourth.

[42] Nav. Rec. Coll., III:2 of Mar. 1865:344.

[43] *Ibid.,* I:Apr. 1865:280.

apply only to appointments made after the proposed changes became law.

In the course of the discussion the advisability of chaplains having rank was raised. One of the committee members asked the chaplains whether it might not be well to abolish the chaplaincy altogether and to send civilian clergymen aboard ship to minister to the spiritual needs of the men. "Do you not believe," he asked, "that if you had no rank at all . . . you would command universal respect, and command the love and respect of the naval officers, more than if you attempted to divide with them the mere earthly honors?"

Chaplain Hoes replied: "Under existing circumstances, no sir." And Chaplain Clark added that

on board ship rank simplifies matters . . . the fact that naval chaplains have rank settles matters that come up necessarily much more than any other method could settle them. For instance, if we did not have rank, there would have to be whole pages of regulations defining our position.

In spite of all the agitation, the session adjourned without approving the bill.

## NEW LEGISLATION GIVES INCREASED PAY

On 28 June 1906, Congress passed an Act which contained the following provision:

That all chaplains now in the Navy above the grade of lieutenant shall receive the pay and allowances of lieutenant-commander in the Navy according to length of service under the provisions of law for that rank, and all chaplains now in the Navy in the grade of lieutenant shall receive their present sea pay when on shore duty: *Provided,* That naval chaplains hereafter appointed shall have the rank, pay, and allowances of lieutenant (junior grade) in the Navy until they shall have completed seven years of service, when they shall have the rank, pay, and allowances of lieutenants in the Navy; and lieutenants shall be promoted, whenever vacancies occur, to the grade of lieutenant-commander, which shall consist of five numbers, and when so promoted shall receive the rank, pay, and allowances of lieutenant commander in the Navy: *Provided* further, That nothing herein contained shall be held or construed to increase the number of chaplains as now authorized by law or to reduce the rank or pay of any now serving.[2]

[2] 34 *Stat.* 554–50. The clause "which consists of five numbers" refers to the Navy custom of printing a signal number opposite every officer's name in the *Navy Register.* This custom began with the 1898 edition. The reference in the law of 1906 to the "five numbers" meant that only five chaplains could hold the rank of lieutenant commander. The law made no reference to the quota of the higher ranks so the limitations set by the Act of 1899 of five captains and seven commanders remained. The signal number is not to be confused with the file number (sometimes erroneously called serial number) given every officer in the Navy. This number appears on the officer's jacket on file in the Navy Department and is stamped on his "dog tag."

This law carried two important provisions for chaplains. In the first place, while it did not place the older chaplains on the same pay scale with other naval officers, it did grant a welcomed financial increase. The words "and allowances" meant that the chaplains who qualified would receive not only the base pay of a lieutenant commander, but, also the longevity pay, rental allowance, and other financial benefits that went with the rank. This also became the maximum pay of commanders and captains in the Chaplain Corps.

The new law corrected the unforeseen application of section 13 of the Act of 1899 which credited newly commissioned chaplains, who entered with the rank of lieutenant, with five years service, thus, giving them the pay of a lieutenant commander. Chaplain J. F. McGinty, commissioned on 16 January 1905, was the last to enter with this status.

The second important provision of this law authorized, for the first time in the history of the Navy, the commissioning of chaplains with the rank of lieutenant (junior grade). The first chaplain to enter the Corps with this rank was George E. T. Stevenson, who received his commission 26 April 1907.

The next law which affected the pay of naval officers was the Act of 13 May 1908 which fixed Navy pay at essentially its present (1946) base rates. The annual base pay of ensigns was $1,700; lieutenant (junior grade), $2,000; lieutenant, $2,400; lieutenant commander, $3,000; commander, $3,500; and captain, $4,000. A longevity increase of ten percent of this base pay was granted for each additional five years service up to forty percent. In other words, four increases or "fogies" were authorized. The law also allowed an increase of ten percent to all officers on sea duty or on shore duty beyond the continental limits of the United States. To the general provisions of the law was added the single exception: "*Provided* . . . that the pay and allowances of chaplains in the Navy shall in no case exceed that provided for lieutenant-commanders."[3]

Finally, on 29 August 1916, Congress erased all limitations on the pay of Navy chaplains and granted them full equality with other naval officers. The law passed on that date stated that hereafter "all commissioned officers of the active list of the Navy shall receive the same pay and allowances according to rank and length of service."[4] The law also changed the age of retirement from sixty-two to sixty-four. By the provisions of this Act, all chaplains who held rank

[3] 35 *Stat.* 128.
[4] *Ibid.*

— 137 —

above that of lieutenant commander received the full pay of their respective ranks. This reform removed one of the main causes for discontent in the Chaplain Corps. Thus, the way was further prepared for the high morale and splendid efficiency demonstrated by the Chaplain Corps during the First World War.

## THE DEMAND FOR MORE CHAPLAINS

It is well to consider at this point, how the expansion of the Navy which took place during Theodore Roosevelt's administration affected the Chaplain Corps. Between 1900 and 1909, the enlisted personnel had increased from 25,000 to 45,000. As there was no corresponding increase in the number of chaplains, it was obvious that the Corps was totally unable to meet the new opportunities and responsibilities. In 1901, even before Roosevelt's expansion program began, all twenty-four chaplains had important assignments. Chaplains Hoes on the *Kearsage* and Wright on the *Massachusetts* were with the North Atlantic Squadron; Dickins on the *Chicago* with the South Atlantic; Brown on the *Iowa* with the Pacific; and Frank Thompson on the *Brooklyn* and Rennolds on the *Newark* with the Asiatic. On ships in the training service were Frazier, Steele, Edmonson, Sykes, Harry Jones, Gill, Reaney, and Helms. Several were on duty at Navy Yards: Tribou at Boston, McAlister at Mare Island, Holway at New York, Morrison at Philadelphia, Isaacs at San Francisco, and Cassard at Newport. Chidwick was attached to the receiving ship *Vermont;* Clark to the Naval Academy, and Royce to the Naval Home (formerly called Naval Asylum) in Philadelphia.

There is evidence that even this distribution of chaplains was inadequate, for in a pamphlet by Strobridge, published around the turn of the century under the title *The Chaplains in the United States Navy, Their Unfair Treatment,* appeared this statement: ". . . at present there are several of our larger ships at sea without chaplains, although one of our leading admirals says this never should be so, and some of our shore stations are also without any."[5]

Another pamphlet, appearing anonymously about the same time, shows the need for more chaplains:

The Navy Register for Jan'y 1902 shows *twenty-six* ships needing Chaplains, only twelve of which are supplied. There are also *eighteen* shore stations requiring Chaplains.

*At least FORTY-FOUR Chaplains are needed to meet the actual requirements of the service.*

Of all the sea-going officers of the Navy the Chaplains' Corps alone shows no increase in point of numbers for *sixty years.*[6]

In December 1907, when sixteen first-line battleships of the Atlantic Fleet left Hampton Roads for a cruise around the world, only five of the ships had a chaplain aboard. These were: the *Connecticut,* Gleeson; the *Georgia,* Charlton; the *Minnesota,* Evans; the *Rhode Island,* Fleming; and the *Virginia,* Stevenson.[7] A number of other vessels accompanied the battleships, including some units of the Pacific Fleet, bringing the total up to forty-two ships. There simply were not enough chaplains to fill all the billets ashore and afloat.

Throughout the first decade of the twentieth century, Congress refused to approve any of the bills introduced into both Houses which called for an increase in the chaplain quota. *Senate Document* No. 138, printed by order of a 23 January 1903 Senate resolution, recorded correspondence between Secretary of the Navy Long and Chaplain Cassard. The Chaplain proposed an increase in the quota to thirty-four, and Long concurred, stating that he had recommended an increase to Congress. No action resulted, however.

Around 1910, the churches of the United States began to take an active interest in both Army and Navy chaplains. The organization of the Federal Council of the Churches of Christ in America, in 1908, brought a new and powerful ally to the side of the chaplains.

The House of Bishops of the Protestant Episcopal Church sent a memorial on 30 January 1910 to the Secretary of the Navy requesting a quota increase. On 28 February, the Right Reverend Alfred Harding, Bishop of Washington, followed the memorial with a letter to the Secretary in which he pointed out that, in 1842 the ratio of chaplains to naval personnel had been one to 508, while in 1910 the ratio was one to 2,251. The Bishop, stating that he believed he was speaking "in behalf of the whole religious world of the United States in urging upon Congress the

---

[5] The Reverend G. E. Strobridge, author, first read the material as a paper before the New York Methodist Preachers Association, whose members authorized its publication and saw that copies were sent to the President of the United States, the Secretary of the Navy, and members of Congress, as well as to individuals. It seems reasonable to believe that Chaplain W. O. Holway, a Methodist, then on duty at Brooklyn Navy Yard, could and may have supplied both facts and arguments to Dr. Strobridge. Copy of pamphlet may be found in Nav. Rec. Coll., Chaplains' File. No date of publication is indicated. Possibly, 1902.

[6] Evidence points to Chaplain Tribou as being the writer, although he could not openly acknowledge authorship.
[7] *Navy Register,* 1908.



**DEPARTMENT OF THE NAVY**
OFFICE OF THE SECRETARY
1000 NAVY PENTAGON
WASHINGTON, DC 20350-1000

IN REPLY REFER TO

SECNAVINST 1730.7B
N097
12 October 2000

SECNAV INSTRUCTION 1730.7B

From: Secretary of the Navy

Subj: RELIGIOUS MINISTRY SUPPORT WITHIN THE DEPARTMENT OF THE
      NAVY

Ref:  (a) DoD Directive 1304.19 of 18 Sep 93 (NOTAL)
      (b) U.S. Navy Regulations, 1990
      (c) Title 10, United States Code
      (d) DoD Directive 5120.8 of 20 Mar 95 (NOTAL)

1.    Purpose. To assign responsibilities for religious ministry support
within the Department of the Navy. This revision should be reviewed in its
entirety.

2.    Cancellation. SECNAVINST 1730.7A.

3.    Applicability. This instruction applies to all members of the
Department of the Navy.

4.    Definitions

a.        Chaplains. As commissioned officers, Navy chaplains are
professionally qualified clergy of a certifying faith group who provide for
the free exercise of religion for all military members of the Department of
the Navy, their family members, and other authorized persons, in accordance
with reference (a). Chaplains advise commands in matters of morale, morals and
spiritual well being. In accordance with Article 1063 of reference (b),
chaplains shall be detailed or permitted to perform  only such duties as are
related to religious ministry support. Chaplains shall not bear arms.
Chaplains shall not be assigned collateral duties which violate the religious
practices of the chaplain's faith group, require services as director,
solicitor, or treasurer of funds other than administrator of a Religious
Offering Fund, serve on a court-martial or stand watches other than that of
duty chaplain.

b.        Chief of Chaplains. The Chief of Chaplains in accordance with
Section 5142 of reference (c) is appointed by the President to perform
such duties as described by the Secretary of the Navy and law.   In
this capacity, the Chief of Chaplains serves as the Director of
Religious Ministry Support for the Department of the Navy. The

07-mc-269(RMU)
EXHIBIT 5

SECNAVINST 1730.7B
12 October 2000

Chief of Chaplains in accordance with Article 1009 of reference
(b) is principal advisor and sponsor on matters concerning Chaplain
Corps officers and Religious Program Specialists, and as head of
the Chaplain Corps is the primary spokesperson regarding professional
matters with the military and civilian communities.

c. Deputy Chief of Chaplains. The Deputy Chief of Chaplains as
Deputy Director for Religious Ministry Support in the Department of
the Navy is detailed by the Secretary of the Navy in accordance with
Section 5142a of reference (c) to perform such duties as prescribed by
the Secretary of the Navy, and serves as Chaplain of the Marine Corps.

d. Department of the Navy. The Naval Organization is organized
under the Secretary of the Navy and consists of the following: The
Office of the Secretary of the Navy; the Office of the Chief of Naval
Operations; the Headquarters, U.S. Marine Corps; the entire operating
forces, including naval aviation, of the Navy and of the Marine Corps,
including the reserve components of such forces; all field activities,
headquarters, forces, bases, installations, activities and functions
under the control or supervision of the Secretary of the Navy; and the
U.S. Coast Guard when operating as a part of the Navy under law.

e. Religious Ministry Support. The entire spectrum of
professional duties, performed by Navy chaplains and Religious Program
Specialists, to include providing for or facilitating required
religious needs and practices.

f. Command Religious Program (CRP). A CRP provides religious
ministry support that is planned, programmed, budgeted, and
implemented to meet identified religious ministry support
requirements.

5. Policy. It is Department of the Navy policy that commanding
officers shall provide Command Religious Programs (CRPs) in support of the
religious needs and preferences for all members of the naval service,
eligible family members and other authorized personnel. The Chief of
Chaplains, as the Director of Religious Ministry Support for the
Department of the Navy, shall advise the Secretary of the Navy on
policy formulation and oversight pertaining to the implementation of
religious ministry support, plans, programs, and facilities.

a. Organizational Placement and Responsibilities

(1) The Chief of Chaplains, as Director of Religious Ministry
Support for the Department of the Navy:

07-mc-269(RMU)
EXHIBIT 5

SECNAVINST 1730.7B
12 October 2000

(a) Advises the Secretary of the Navy on all matters pertaining to the free exercise of religion within the naval service in accordance with Article 1009 of reference (b) and Section 5142 of reference (c). The Chief of Chaplains shall provide regular and frequent advice on:

1. Religious, ethical and moral implications of all Department of the Navy policies and actions.

2. Religious faith-group policies and positions affecting the Department of the Navy.

3. All matters pertaining to the organization and utilization of the Chaplain Corps as a staff corps of the Navy.

4. All matters pertaining to the organization and utilization of Religious Program Specialists.

(b) The Chief of Chaplains serves on the Armed Forces Chaplains Board (AFCB) in accordance with reference (d). As a member of the AFCB, the Chief of Chaplains represents the Secretary of the Navy to:

1. Department of Defense (DoD).

2. Chiefs of Chaplains/Chaplain Services of other DoD components.

3. The Nation's religious faith groups.

(c) Advises the Commandant of the Marine Corps on religious ministry matters in reference to support, plans, programs, policy, personnel and facilities.

(d) Advises the Commandant of the Coast Guard on religious ministry matters relative to the use of Navy Chaplains in the Coast Guard.

(2) The Deputy Chief of Chaplains is the principal assistant to the Chief of Chaplains. He shall also serve as Chaplain of the Marine Corps, supervising religious ministry in the Marine Corps; and in accordance with reference (d) serve as a member of the AFCB.

(3) The Chief of Chaplains, as senior Chaplain in the Navy, advises the Chief of Naval Operations on all matters pertaining to the free exercise of religion within the Navy and assists the Chief of Naval Operations in carrying out his responsibilities in accordance with Article 1009 of reference (b) and Sections 5031 and 5032 of reference (c). In this capacity, the Chief of Chaplains:

07-mc-269(RMU)
EXHIBIT 5

SECNAVINST 1730.7B
12 October 2000

    (a) Directs officers of the Chaplain Corps, Religious Program Specialists and all other designated persons engaged in Religious Ministry Support within the Navy, the U.S. Marine Corps, and other governmental agencies receiving religious ministry support from Navy chaplains.

    (b) Serves as program sponsor for the professional development, education and training of Chaplain Corps officers and Religious Program Specialists.

    (c) Serves as program sponsor for the Chaplains Religious Enrichment Development Operation (CREDO).

    (d) Provides technical sponsorship for the acquisition, operation, and maintenance of religious ministry support facilities, collateral equipment and other logistical support both ashore and afloat.

    (4) The Chief of Chaplains shall, with respect to all duties pertaining to the procurement, distribution and support of Chaplain Corps personnel, report to and be supported by the Chief of Naval Personnel in accordance with Section 5142 of reference (c).

    6. <u>Responsibilities</u>

    a. The <u>Chief of Naval Operations</u> (CNO) shall exercise oversight to ensure compliance with this instruction and shall implement the policy in this instruction throughout the Navy. CNO shall initiate action with the Commandant of the U.S. Coast Guard and the Administrator of the Maritime Administration to implement this policy when using Navy Chaplains to provide religious ministry support.

    b. The <u>Commandant of the Marine Corps</u> (CMC) shall issue orders to implement this instruction throughout the Marine Corps.

    7. <u>Action.</u> CNO and CMC shall forward implementing instructions to CNO (N097).


    Richard Danzig

    Distribution:
    SNDL A1 (SECNAV)
        A2 (Department of the Navy Staff Offices)
        A3 (CNO)
        A5 (CHNAVPERS)
        A6 (CMC)
        B5 (COGUARD) (Commandant only)

07-mc-269(RMU)
EXHIBIT 5

Chapter 11

# GENERAL REGULATIONS

## Section 4. Duties of Individuals

## Contents

| | Article | | | Article |
|---|---|---|---|---|
| Officer's Duties Relative to Laws, Orders and Regulations | 1130 | | Rules for Preventing Collisions Afloat and in the Air | 1139 |
| Requirement of Exemplary Conduct | 1131 | | Capture by an Enemy | 1140 |
| Compliance With Lawful Orders | 1132 | | Code of Conduct for Members of the Armed Forces of the United States | 1141 |
| Language Reflecting on a Superior | 1133 | | Unavoidable Separation from a Command | 1142 |
| Exchange of Duty | 1134 | | Report of a Communicable Disease | 1143 |
| Relations With Foreign Nations | 1135 | | Immunization | 1144 |
| Foreign Religious Institutions | 1136 | | Service Examinations | 1145 |
| Obligation to Report Offenses | 1137 | | | |
| Responsibilities Concerning Marijuana, Narcotics and Other Controlled Substances | 1138 | | | |

**1130.   Officer's Duties Relative to Laws, Orders and Regulations.**

All officers in the naval service shall acquaint themselves with, obey and, so far as their authority extends, enforce the laws, regulations and orders relating to the Department of the Navy. They will faithfully and truthfully discharge the duties of their offices to the best of their ability in conformance with existing orders and regulations and their solemn profession of the oath of office. In the absence of instructions, they shall act in conformity with the policies and customs of the service to protect the public interest.

**1131.   Requirement of Exemplary Conduct.**

All commanding officers and others in authority in the naval service are required to show in themselves a good example of virtue, honor, patriotism and subordination; to be vigilant in inspecting the conduct of all persons who are placed under their command; to guard against and suppress all dissolute and immoral practices, and to correct, according to the laws and regulations of the Navy, all persons who are guilty of them; and to take all necessary and proper measures, under the laws, regulations and customs of the naval service, to promote and safeguard the morale, the physical well-being and the general welfare of the officers and enlisted persons under their command or charge.

**1132.   Compliance With Lawful Orders.**

All persons in the naval service are required to obey readily and strictly, and to execute promptly, the lawful orders of their superiors.

**1133.   Language Reflecting on a Superior.**

No person in the naval service shall use language which may tend to diminish the confidence in or respect due to his or her superior officer.

**1134.   Exchange of Duty.**

No person in the naval service shall exchange an assigned duty with another without permission from his or her commanding officer or appropriate superior.

**1135.   Relations With Foreign Nations.**

Persons in the Department of the Navy, in their relations with foreign nations and with the governments or agents thereof, shall conform to international law and to the precedents established by the United States in such relations.

In Re Navy Chaplaincy
07-mc-269 (RMU)
EXHIBIT 6

## GENERAL REGULATIONS

#### 1136. Foreign Religious Institutions.

Persons in the Department of the Navy shall respect the religious institutions and customs of foreign countries which they visit.

#### 1137. Obligation to Report Offenses.

Persons in the naval service shall report as soon as possible to superior authority all offenses under the Uniform Code of Military Justice which come under their observation, except when such persons are themselves already criminally involved in such offenses at the time such offenses first come under their observation.

#### 1138. Responsibilities Concerning Marijuana, Narcotics and Other Controlled Substances.

1. All personnel shall endeavor to prevent and eliminate the unauthorized use of marijuana, narcotics and other controlled substances within the naval service.

2. The wrongful possession, use, introduction, manufacture, distribution and possession, manufacture, or introduction with intent to distribute, of a controlled substance by persons in the naval service are offenses under Article 112a, Uniform Code of Military Justice. Except for authorized medicinal or other authorized purposes, the possession, use, introduction, sale or other transfer of marijuana, narcotics, or other controlled substances on board any ship or craft, aircraft of the Department of the Navy or within any base, naval station, or other place under the jurisdiction of the Department of the Navy by all persons is prohibited.

3. The term "controlled substance" means a drug or other substance included in Schedule I, II, III, IV, or V established by Section 202 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (84 Stat. 1236), as updated and republished under the provisions of that Act.

#### 1139. Rules for Preventing Collisions Afloat and in the Air.

1 All persons in the naval service responsible for the operation of naval ships, craft and aircraft shall diligently observe the International Regulations for Preventing Collisions at Sea (commonly called the COLREGS), the Inland Navigation Rules, domestic and international air traffic regulations, and such other rules and regulations as may be established by the Secretary of Transportation or other competent authority for regulating traffic and preventing collisions on the high seas, in inland waters or in the air, where such laws, rules and regulations are applicable to naval ships and aircraft. In those situations where such law, rule or regulation is not applicable to naval ships, craft or aircraft, they shall be operated with due regard for the safety of others.

2. Any significant infraction of the laws, rules and regulations governing traffic or designed to prevent collisions on the high seas, in inland waters or in the air which may be observed by persons in the naval service shall be promptly reported to their superiors, including the Chief of Naval Operations or the Commandant of the Marine Corps when appropriate.

3. Reports need not be made under this article if the facts are otherwise reported in accordance with other directives, including duly authorized safety programs.

#### 1140. Capture by an Enemy.

1. A person in the naval service who is captured by the enemy is required to give his or her name, rank, service number and date of birth. In order to communicate with his or her family, as guaranteed in the Geneva Convention Relative to the Treatment of Prisoners of War, he or she may give the names and addresses of his or her parents, guardians or next of kin.

2. Except as provided in the foregoing, all persons in the naval service captured by the enemy shall evade answering further questions to the utmost of their ability and shall make no oral or written statement disloyal to or harmful to the United States or its allies.

3. When a person in the naval service is a prisoner of war or otherwise detained by a hostile entity so that circumstances prevent resort to the normal chain of command, a commissioned officer of another armed force who is not a medical officer (medical corps, dental corps, nurse corps or medical service corps), or chaplain is a superior commissioned officer with respect to a person in the naval service who is junior in rank.

GENERAL REGULATIONS

1141. Code of Conduct for Members of the Armed Forces of the United States.

1. Regular training in and explanation of the Code of Conduct for Members of the Armed Forces of the United States shall be conducted in accordance with directives issued by the Secretary of Defense and the Secretary of the Navy.

2. Instructions in the Code of Conduct for Members of the Armed Forces of the United States shall be included in the general military training program of the command.

3. A text of the Code of Conduct for Members of the Armed Forces of the United States shall be posted in one or more conspicuous places, readily accessible to personnel of the command.

1142. Unavoidable Separation from a Command.

A person in the naval service who is separated from his or her ship, station or unit due to shipwreck, disaster or other unavoidable circumstances shall proceed as soon as possible to the nearest United States military activity and report to the commanding officer thereof.

1143. Report of a Communicable Disease.

All persons in the naval service shall report promptly to a medical representative, or where no medical officer is readily available, to higher authority, the existence or suspicion of communicable disease in persons with whom they are living or otherwise come in contact.

1144. Immunization.

Persons in the naval service shall permit such action to be taken to immunize them against disease as is prescribed by competent authority.

1145. Service Examinations.

1. Persons in the Department of the Navy, without proper authority, shall not:

a. have in their possession, obtain, sell, publish, give, purchase, receive or reproduce any examination paper, or any copy thereof, or answer sheet thereto, for any examination whatsoever which has been, is, or is to be, administered within the Department of the Navy.

b. attempt or offer to have in their possession, obtain, sell, publish, give, purchase, receive or reproduce any examination paper, or any part or copy thereof, or answer sheet thereto, for any examination whatsoever which has been, is, or is to be, administered within the Department of the Navy.

2. Prior to, during or after any examination which is to be, is being or has been administered within the Department of the Navy, persons in the Department of the Navy shall not, without proper authority, disclose, or solicit the disclosure of, any information regarding questions or answers to questions on such examinations.

3. Persons in the Department of the Navy shall not engage in any unauthorized form of giving or accepting assistance or self-help during the administration of any examination within the Department of the Navy.

Army Regulation 190–8
OPNAVINST 3461.6
AFJI 31-304
MCO 3461.1

Military Police

# Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees

Headquarters
Departments of the Army,
the Navy, the Air Force,
and the Marine Corps
Washington, DC
1 October 1997

07 mc- 269 (RMU)

EXHIBIT 7

# SUMMARY of CHANGE

AR 190-8/OPNAVINST 3461.6/AFJI 31-304/MCO 3461.1
Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other
Detainees

This revision--

o Establishes a multi-service regulation for all services (para 1-4a).

o Ensures compliance with DOD Directive 2310.1 dated August 1994 (para 1-4g).

o Establishes HQDA, Deputy Chief of Staff for Operations as the primary Army
  Staff responsibility for the Enemy Prisoner of War, Civilian Internee and
  Retained Persons Program (para 1-4c).

o Establishes a DD FORM 2745, Enemy Prisoner of War(EPW) Capture Tag (para
  2- 1b).

o Highlights Combatant Commanders, Task Force Commanders and Joint Task
  Force Commanders responsibilities (para 1-4g).

o Establishes procedures for conducting tribunals (para 1-6).

o Establishes Public Affairs policy (para 1-9).

o Establishes policy for EPW held aboard ship (para

2-1b). o Updates OCONUS evacuation policy (para 2-3).

o Establishes the use of Health and Comfort Packs as a temporary
  substitution for Advance of Pay for short term operations (para 3-4h).

o Updates procedures for contracting EPW (para

4-22). o Combines AR 190-8 and AR 190-57 (para 6-1).

Headquarters
Departments of the Army,
the Navy, the Air Force,
and the Marine Corps
Washington, DC
1 October 1997

*Army Regulation 190–8
*OPNAVINST 3461.6
*AFJI 31–304
*MCO 3461.1

Effective 1 November 1997

Military Police

# Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees

By Order of the Secretary of
the Navy:

By Order of the Secretary of
the Air Force:

By Order of the Secretary of
the Navy:

TOGO D. WEST, JR.
Secretary of the Army

J.L. JOHNSON
Admiral, United States Navy
Chief of Naval Operations
Acting

RICHARD A. COLEMAN
Colonel, USAF
Chief of Security Police

LT GENERAL J.L. JONES, USMC
Marine Corps Deputy Chief of Staff
for Plans, Policies and Operations

J.S. Mobley
Rear Admiral, United States Navy
Director, Navy Staff

**History.** This printing publishes a revision of this publication. Because the publication has been extensively revised the changed portions have not been highlighted.

**Summary.** This regulation implements Department Of Defense Directive 2310.1 and establishes policies and planning guidance for the treatment, care, accountability, legal status, and administrative procedures for Enemy Prisoners of War, Civilian Internees, Retained Persons, and Other Detainees. This regulation is a consolidation of Army Regulation 190-8 and Army Regulation 190-57 and incorporates SECNAV Instruction 3461. 3 and Air Force Joint Instruction 31-304. Policy and procedures established herein apply to the services and their capabilities to the extent that they are resourced and organized for enemy prisoner of war operations. **Applicability.** This is a multi-service regulation. It applies to the Army, Navy, Air Force and Marine Corps and to their Reserve components when lawfully ordered to active duty under the provisions of Title 10 United States Code.

**Proponent and exception authority.** The proponent of this regulation is the Deputy Chief of Staff for Operations and Plans. The proponent has the authority to approve

exceptions to this regulation that are consistent with controlling law and regulation. Proponents may delegate the approval authority, in writing, to a division chief within the proponent agency in the grade of colonel or the civilian equivalent. **Army management control process.** The Regulation contains management control provisions in accordance with AR 11-2, but does not contain checklists for conducting management control. Reviews are used to accomplish assessment of management controls.

**Supplementation.** Army supplementation of this regulation and establishment of command or local forms is prohibited without prior approval from HQDA (DAMO-ODL), WASH DC 20310. Navy, Marine Corps and Air Force supplementation of this regulation is authorized, but is not required. If supplements are issued, major or second echelon commands will furnish one copy of each supplement to their headquarters, as follows: Navy, to the Chief of Naval Operations (N51 1), 2000 Navy Pentagon, Washington DC 20350-2000, Marine Corps, to the Commandant of the Marine Corps, HQ USMC (POS10) 2 Navy Annex, Washington DC, 203 80- 1775 11), and Air Force, to HQ USAF/SPO,

1340 Air Force Pentagon, Washington, DC 20330-1340.

**Suggested Improvements.** Users are invited to send comments and suggested improvements through channels as follows: HQDA (DAMO-ODL), WASH DC 203 10- 0440.

**Distribution.** *Army:* Distribution of this regulation is made in accordance with initial distribution number (IDN) 092120, intended for command levels A, B, C, D, and E for Active Army, Army National Guard, U. S. Army Reserve.
*Navy:* SNDL A (Navy Department); B5 (Coast Guard); (COMDTCOGARD, only) 21A (Fleet Commanders in Chief); 22A (Fleet Commanders); 23 (Force Commanders); 24 (Type Commanders); 26A (Amphibious Groups); 28 (Squadron, Division, and Group Commanders—Ships); 41A (COMSC); SECNAV/OPNAV Directives Control Office, Washington Navy Yard Bldg 200, 901 M Street SE, Washington DC 20374-5074 *Air Force:* F
*Marine Corps:* PCN 10203324000

---

*This regulation supersedes AR 190-8, 1 June 1982, and rescinds AR 190-57, 4 March 1987. This regulation also rescinds DA Form 5451-R, August 1985; DA Form 5452-R, August 1985; and DA Form 5976, January 1991.

# Contents (Listed by paragraph and page number)

## Chapter 1
**Introduction,** *page 1*
Purpose ● 1–1, *page 1*
References ● 1–2, *page 1*
Explanation of abbreviations and terms ● 1–3, *page 1*
Responsibilities ● 1–4, *page 1*
General protection policy ● 1–5, *page 2*
Tribunals ● 1–6, *page 2*
The National Prisoner of War Information Center (NPWIC) ● 1–7, *page 3*
The Branch PWIC ● 1–8, *page 3*
Public Affairs ● 1–9, *page 4*

## Chapter 2
**Beginning of Captivity EPW/RP,** *page 4*
Initial actions upon capture ● 2–1, *page 4*
Evacuation and care of EPW and RP ● 2–2, *page 5*
Evacuation Policy ● 2–3, *page 5*

## Chapter 3
**Administration and Operation of EPW Internment Facilities,** *page 5*
Establishment ● 3–1, *page 5*
EPW internment facilities ● 3–2, *page 5*
EPW Facility Management ● 3–3, *page 5*
Operation of prisoner of war internment facilities ● 3–4, *page 6*
Procedures for prisoner of war correspondence ● 3–5, *page 7*
Discipline and security ● 3–6, *page 9*
Punitive Jurisdiction ● 3–7, *page 10*
Judicial proceedings ● 3–8, *page 10*
Loss or damage to property ● 3–9, *page 11*
Death and burial ● 3–10, *page 11*
Transfer of prisoners of war ● 3–11, *page 12*
Repatriation of sick and wounded EPW/RP ● 3–12, *page 13*
Repatriation of other EPW/RP ● 3–13, *page 14*
Repatriation transfer procedures ● 3–14, *page 14*
Retained personnel ● 3–15, *page 14*
Complaints and requests to camp commanders ● 3–16, *page 15*
EPW/RP safety program ● 3–17, *page 15*

## Chapter 4
**Employment and Compensation for EPWs,** *page 15*

*Section 1*
*General Policy and Guidelines, page 15*
General principles ● 4–1, *page 15*
Restricted employment ● 4–2, *page 15*
Liability to perform labor ● 4–3, *page 15*
Authorized work ● 4–4, *page 16*
Unauthorized work ● 4–5, *page 16*
Decisions on work conditions and safeguards ● 4–6, *page 16*
Referrals to HQDA, ODCSOPS ● 4–7, *page 16*
Length of workday ● 4–8, *page 16*
Rest periods ● 4–9, *page 17*
Responsibility for work supervision ● 4–10, *page 17*
Work detail leaders and interpreters ● 4–11, *page 17*
Task system ● 4–12, *page 17*
Employing EPW ● 4–13, *page 17*
Paid work ● 4–14, *page 17*
Restriction on paid work ● 4–15, *page 17*
Rates for paid work ● 4–16, *page 17*
Days of paid work per month ● 4–17, *page 18*
Unpaid work ● 4–18, *page 18*
Sale of articles and repair services ● 4–19, *page 18*
Disability compensation ● 4–20, *page 18*
Operation of government vehicles ● 4–21, *page 18*

*Section II*
*Contract Employment, page 18*
Rules and procedures ● 4–22, *page 18*

## Chapter 5
**Beginning of Internment (CI),** *page 18*
General protection policy—civilian internee ● 5–1, *page 18*
Civilian Internee Safety Program ● 5–2, *page 19*
Republic of Korea/United States Agreement on processing civilian internees in Korea ● 5–3, *page 19*

## Chapter 6
**Administration and Operation of CI Internment Facilities,** *page 19*
Internment Facility ● 6–1, *page 19*
Administrative processing ● 6–2, *page 20*
Personal effects ● 6–3, *page 20*
Internee Committee ● 6–4, *page 21*
Supplies ● 6–5, *page 21*
Medical Care and Sanitation ● 6–6, *page 22*
Social, Intellectual, and Religious activities ● 6–7, *page 22*
Procedures for communications ● 6–8, *page 23*
Complaints and requests to camp commanders and protecting power ● 6–9, *page 24*
Discipline and security ● 6–10, *page 24*
Provisions common to disciplinary and judicial punishments ● 6–11, *page 25*
Disciplinary proceedings and punishments ● 6–12, *page 25*
Judicial proceedings ● 6–13, *page 26*
Death and burial ● 6–14, *page 27*
Transfers ● 6–15, *page 27*
Release ● 6–16, *page 28*

## Chapter 7
**Employment and Compensation—Civilian Internees,** *page 28*
General ● 7–1, *page 28*
Ability to perform labor ● 7–2, *page 28*
Authorized work ● 7–3, *page 28*
Unauthorized work ● 7–4, *page 28*
Working conditions ● 7–5, *page 28*
Length of workday ● 7–6, *page 28*
Day of rest ● 7–7, *page 28*
Paid work ● 7–8, *page 28*
Unpaid work ● 7–9, *page 28*
Compensation for paid work ● 7–10, *page 29*
Disability compensation ● 7–11, *page 29*

**Appendixes**
A.   References, *page 30*
B.   Internment Serial Number, *page 31*

**Glossary**

**Index**

# Chapter 1
# Introduction

## 1–1. Purpose

a. This regulation provides policy, procedures, and responsibilities for the administration, treatment, employment, and compensation of enemy prisoners of war (EPW), retained personnel (RP), civilian internees (CI) and other detainees (OD) in the custody of U.S. Armed Forces. This regulation also establishes procedures for transfer of custody from the United States to another detaining power.

b. This regulation implements international law, both customary and codified, relating to EPW, RP, CI, and ODs which includes those persons held during military operations other than war. The principal treaties relevant to this regulation are:

(1) The 1949 Geneva Convention Relative to the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field (GWS).

(2) The 1949 Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea (GWS SEA).

(3) The 1949 Geneva Convention Relative to the Treatment of Prisoners of War (GPW).

(4) The 1949 Geneva Convention Relative to the Protection of Civilian Persons in Time of War (GC), and In the event of conflicts or discrepancies between this regulation and the Geneva Conventions, the provisions of the Geneva Conventions take precedence.

## 1–2. References

Required and related publications and prescribed and referenced forms are listed in appendix A.

## 1–3. Explanation of abbreviations and terms

Abbreviations and special terms used in this regulation are explained in the glossary.

## 1–4. Responsibilities

a. *The Secretaries of the Military Departments.* The Secretaries will—

(1) Develop internal policies and procedures consistent with this regulation in support of the Department of Defense (DOD), EPW/CI and other detainee programs.

(2) Ensure that appropriate training, as required, pursuant to DOD Directive 5100.77 is provided so that the principles of the Geneva Conventions, and the rights and obligations thereunder, are known by members of their service.

(3) Ensure that suspected or alleged violations of the international law of war are promptly reported and investigated per DOD Directive 5100.77.

(4) Conduct a periodic review of the EPW, CI and RP Program and training to ensure compliance with the law of war.

b. *The Secretary of the Army (SA).* The Secretary of the Army is the DOD Executive Agent (EA) for administering the DOD EPW, CI and RP Program. The SA, in coordination with the Assistant Secretary of Defense, International Security Affairs (ASD-ISA), will plan and develop the policy and coordinate the operation of the programs.

c. *The Army Deputy Chief of Staff for Operations and Plans (DCSOPS).* DCSOPS has primary Headquarters, Department of the Army (HQDA) staff responsibility for the EPW, CI and RP programs. The DCSOPS will—

(1) Develop and disseminate policy guidance for the treatment, care, accountability, legal status, and processing of EPW, CI, RP, and ODs.

(2) Report suspected or alleged violations of law committed by or against military personnel or civilians.

(3) Provide HQDA staff supervision for National Prisoner of War Information Center (NPWIC).

(4) Develop plans for the initial assignment and replacement of block internment serial numbers (ISNs) from the NPWIC to the Branch PWIC and for the assignment of the theater code section of the ISN.

(5) Provide necessary reports, coordination, technical advice, and staff assistance to:

(a) The Office of the Secretary of Defense (OSD).

(b) The Joint Chiefs of Staff (JCS).

(c) The military departments.

(d) Unified commands.

(e) Department of State and other Federal agencies.

(f) The International Committee of the Red Cross (ICRC).

(g) Protecting powers.

d. *The Army Judge Advocate General (TJAG).* The TJAG will provide HQDA guidance and advice to commanders on the legal aspects of the EPW, CI and RP program. TJAG will—

(1) Conduct liaison in coordination with the ASA-ISA, the Department of State, the Department of Justice, and other Federal agencies; the JCS; the Defense Intelligence Agency (DIA); the military departments; the ICRC; the Protecting Powers; and other detaining powers, as required.

(2) Provide advice and assistance to commanders on legal aspects of reported violations by EPW, CI, RP, and ODs.

(3) Provide theater guidelines for any EPW, CI and RP claims against the U.S. Government.

(4) Provide guidance regarding GPW Article 5 Tribunals.

e. *Deputy Chief of Staff for Logistics (DCSLOG).* The DCSLOG will ensure logistical resources are available to support EPW operations.

f. *The Assistant Secretary of the Army Financial Management (ASA-FM&C).* The ASA-FM&C will establish the policies and procedures governing entitlement, control, and accounting for pay, allowances, and personal funds for EPW, CI, RP, and ODs per the provisions of the GPW and GC.

g. *Combatant Commanders, Task Force Commanders and Joint Task Force Commanders.* Combatant Commanders, Task Force Commanders and Joint Task Force Commanders have the overall responsibility for the EPW, CI and RP program, operations, and contingency plans in the theater of operation involved to ensure compliance with international law of war. DOD Directive 2310.1 provides that persons captured or detained by the U.S. Military Services shall normally be handed over for safeguarding to U.S. Army Military Police, or to detainee collecting points or other holding facilities and installations operated by U.S. Army Military Police as soon as practical. U.S. Army Military Police have units specifically organized to perform the long-term functions associated with EPW/CI internment. Commanders must ensure the proper force structure is included in any joint operational plans. Commanders at all levels will ensure that all EPW, CI, RP, and ODs are accounted for and humanely treated, and that collection, evacuation, internment, transfers, release, and repatriation operations are conducted per this regulation. Combatant Commanders, Task Force Commanders and Joint Task Force Commanders will—

(1) Provide for an EPW, CI and RP camp liaison and assistance program to ensure the protection of U.S. interests per the Geneva Conventions upon the capture and transfer of EPW, CI, RP, and ODs to a host or other nation.

(2) Plan and procure logistical support to include: transportation, subsistence, personal, organizational and Nuclear, Biological & Chemical (NBC) clothing and equipment items, mail collection and distribution, laundry, and bath for EPW, CI and RP.

(3) Collect and dispose of captured enemy supplies and equipment through theater logistics and Explosive Ordnance Disposal (EOD) channels.

(4) Coordinate for acquisition of real estate, and as required, for planning, design, contracting, and construction of facilities for EPW, CI and RP with the Theater or JTF Engineer.

(5) Establish guidance for the use, transport, and evacuation of EPW, CI, RP, and ODs in logistical support operations.

(6) Identify requirements and allocations for Army Medical units in support of the EPW, CI and RP Program, and ensure that the

1

medical annex of OPLANs, OPORDs and contingency plans includes procedures for treatment of EPW, CI, RP, and ODs. Medical support will specifically include:

(a) First aid and all sanitary aspects of food service including provisions for potable water, pest management, and entomological support.

(b) Preventive medicine.

(c) Professional medical services and medical supply.

(d) Reviewing, recommending, and coordinating the use and assignment of medically trained EPW, CI, RP and OD personnel and medical material.

(e) Establishing policy for medical repatriation of EPW, CI and RP and monitoring the actions of the Mixed Medical Commission.

*h. U. S. Army Criminal Investigation Command (USACIDC).* USACIDC will provide criminal investigative support to EPW, CI and RP Camp Commanders per AR 195-2.

## 1–5. General protection policy

*a.* U.S. policy, relative to the treatment of EPW, CI and RP in the custody of the U.S. Armed Forces, is as follows:

(1) All persons captured, detained, interned, or otherwise held in U.S. Armed Forces custody during the course of conflict will be given humanitarian care and treatment from the moment they fall into the hands of U.S. forces until final release or repatriation.

(2) All persons taken into custody by U.S. forces will be provided with the protections of the GPW until some other legal status is determined by competent authority.

(3) The punishment of EPW, CI and RP known to have, or suspected of having, committed serious offenses will be administered IAW due process of law and under legally constituted authority per the GPW, GC, the Uniform Code of Military Justice and the Manual for Courts Martial.

(4) The inhumane treatment of EPW, CI, RP is prohibited and is not justified by the stress of combat or with deep provocation. Inhumane treatment is a serious and punishable violation under international law and the Uniform Code of Military Justice (UCMJ).

*b.* All prisoners will receive humane treatment without regard to race, nationality, religion, political opinion, sex, or other criteria. The following acts are prohibited: murder, torture, corporal punishment, mutilation, the taking of hostages, sensory deprivation, collective punishments, execution without trial by proper authority, and all cruel and degrading treatment.

*c.* All persons will be respected as human beings. They will be protected against all acts of violence to include rape, forced prostitution, assault and theft, insults, public curiosity, bodily injury, and reprisals of any kind. They will not be subjected to medical or scientific experiments. This list is not exclusive. EPW/RP are to be protected from all threats or acts of violence.

*d.* Photographing, filming, and video taping of individual EPW, CI and RP for other than internal Internment Facility administration or intelligence/counterintelligence purposes is strictly prohibited. No group, wide area or aerial photographs of EPW, CI and RP or facilities will be taken unless approved by the senior Military Police officer in the Internment Facility commander's chain of command.

*e.* A neutral state or an international humanitarian organization, such as the ICRC, may be designated by the U.S. Government as a Protecting Power (PP) to monitor whether protected persons are receiving humane treatment as required by the Geneva Conventions. The text of the Geneva Convention, its annexes, and any special agreements, will be posted in each camp in the language of the EPW, CI and RP.

*f.* Medical Personnel. Retained medical personnel shall receive as a minimum the benefits and protection given to EPW and shall also be granted all facilities necessary to provide for the medical care of EPW. They shall continue to exercise their medical functions for the benefit of EPW, preferably those belonging to the armed forces upon which they depend, within the scope of the military laws and regulations of the United States Armed Forces. They shall be provided with necessary transport and allowed to periodically visit EPW situated in working detachments or in hospitals outside the

EPW camp. Although subject to the internal discipline of the camp in which they are retained such personnel may not be compelled to carry out any work other than that concerned with their medical duties. The senior medical officer shall be responsible to the camp military authorities for everything connected with the activities of retained medical personnel.

*g.* Religion.

(1) EPW, and RP will enjoy latitude in the exercise of their religious practices, including attendance at the service of their faith, on condition that they comply with the disciplinary routine prescribed by the military authorities. Adequate space will be provided where religious services may be held.

(2) Military chaplains who fall into the hands of the U.S. and who remain or are retained to assist EPW, and RP, will be allowed to minister to EPW, RP, of the same religion. Chaplains will be allocated among various camps and labor detachments containing EPW, RP, belonging to the same forces, speaking the same language, or practicing the same religion. They will enjoy the necessary facilities, including the means of transport provided in the Geneva Convention, for visiting the EPW, RP, outside their camp. They will be free to correspond, subject to censorship, on matters concerning their religious duties with the ecclesiastical authorities in the country of detention and with international religious organizations. Chaplains shall not be compelled to carry out any work other than their religious duties.

(3) Enemy Prisoners of War, who are ministers of religion, without having officiated as chaplains to their own forces, will be at liberty, whatever their denomination, to minister freely to the members of their faith in U.S. custody. For this purpose, they will receive the same treatment as the chaplains retained by the United States. They are not to be obligated to do any additional work.

(4) If EPW, RP, do not have the assistance of a chaplain or a minister of their faith. A minister belonging to the prisoner's denomination, or in a minister's absence, a qualified layman, will be appointed, at the request of the prisoners, to fill this office. This appointment, subject to approval of the camp commander, will take place with agreement from the religious community of prisoners concerned and, wherever necessary, with approval of the local religious authorities of the same faith. The appointed person will comply with all regulations established by the United States.

## 1–6. Tribunals

a. In accordance with Article 5, GPW, if any doubt arises as to whether a person, having committed a belligerent act and been taken into custody by the US Armed Forces, belongs to any of the categories enumerated in Article 4, GPW, such persons shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal.

b. A competent tribunal shall determine the status of any person not appearing to be entitled to prisoner of war status who has committed a belligerent act or has engaged in hostile activities in aid of enemy armed forces, and who asserts that he or she is entitled to treatment as a prisoner of war, or concerning whom any doubt of a like nature exists.

c. A competent tribunal shall be composed of three commissioned officers, one of whom must be of a field grade. The senior officer shall serve as President of the Tribunal. Another non-voting officer, preferably an officer in the Judge Advocate General Corps, shall serve as the recorder.

d. The convening authority shall be a commander exercising general courts-martial convening authority.

e. Procedures.

(1) Members of the Tribunal and the recorder shall be sworn. The recorder shall be sworn first by the President of the Tribunal. The recorder will then administer the oath to all voting members of the Tribunal to include the President.

(2) A written record shall be made of proceedings.

(3) Proceedings shall be open except for deliberation and voting by the members and testimony or other matters which would compromise security if held in the open.

(4) Persons whose status is to be determined shall be advised of their rights at the beginning of their hearings.

(5) Persons whose status is to be determined shall be allowed to attend all open sessions and will be provided with an interpreter if necessary.

(6) Persons whose status is to be determined shall be allowed to call witnesses if reasonably available, and to question those witnesses called by the Tribunal. Witnesses shall not be considered reasonably available if, as determined by their commanders, their presence at a hearing would affect combat or support operations. In these cases, written statements, preferably sworn, may be submitted and considered as evidence.

(7) Persons whose status is to be determined have a right to testify or otherwise address the Tribunal.

(8) Persons whose status is to be determined may not be compelled to testify before the Tribunal.

(9) Following the hearing of testimony and the review of documents and other evidence, the Tribunal shall determine the status of the subject of the proceeding in closed session by majority vote. Preponderance of evidence shall be the standard used in reaching this determination.

(10) A written report of the tribunal decision is completed in each case. Possible board determinations are:

(a) EPW.

(b) Recommended RP, entitled to EPW protections, who should be considered for certification as a medical, religious, or volunteer aid society RP.

(c) Innocent civilian who should be immediately returned to his home or released.

(d) Civilian Internee who for reasons of operational security, or probable cause incident to criminal investigation, should be detained.

f. The recorder shall prepare the record of the Tribunal within three work days of the announcement of the tribunal's decision. The record will then be forwarded to the first Staff Judge Advocate in the internment facility's chain of command.

g. Persons who have been determined by a competent tribunal not to be entitled to prisoner of war status may not be executed, imprisoned, or otherwise penalized without further proceedings to determine what acts they have committed and what penalty should be imposed. The record of every Tribunal proceeding resulting in a determination denying EPW status shall be reviewed for legal sufficiency when the record is received at the office of the Staff Judge Advocate for the convening authority.

## 1–7. The National Prisoner of War Information Center (NPWIC)

The NPWIC will—

a. Forward blocks of ISNs to designated Branch PWIC in Theater and CONUS, as required.

b. Obtain and store information concerning EPW, CI and RP, and their confiscated personal property. Information will be collected and stored on each EPW, CI, and RP captured and detained by U.S. Armed Forces. This includes those EPW, RP, who were captured by the United States but are in custody of other powers and those who have been released or repatriated. EPW, CI and RP cannot be forced to reveal any information however they are required to provide their name, rank, serial number and date of birth. The Geneva Convention requires the NPWIC to collect and store the following information for EPW, RP:

(1) Complete name.

(2) ISN.

(3) Rank.

(4) Serial number.

(5) Date of birth.

(6) City of birth.

(7) Country of birth.

(8) Name and address of next of kin.

(9) Date of capture.

(10) Place of capture. Capturing unit.

(11) Circumstances of capture.

(12) Location of confiscated personal property.

(13) Nationality.

(14) General statement of health.

(15) Nation in whose armed services the individual is serving.

(16) Name and address of a person to be notified of the individual's capture.

(17) Address to which correspondence may be sent.

(18) Certificates of death or duly authenticated lists of the dead.

(19) Information showing the exact location of war graves together with particulars of the dead.

(20) Notification of capture.

(21) List of personal articles of value not restored upon repatriation.

c. Obtain and store information concerning CI and ODs who are kept in the custody of U.S. Armed Forces who are subjected to assigned residence, or who were interned and then released. The following information will be collected:

(1) Any particulars that may assist in the individual's identification. This information shall include at least the person's surname, first names, place and date of birth, nationality, last residence and distinguishing characteristics, the first name of the father and the maiden name of the mother, the date, place and nature of the action taken with regard to the individual, the address at which correspondence may be sent and the name and address of the person to be informed.

(2) The individual's personal data for notification of his or her internment, state of health, and changes to this data.

(3) Certificates of death or authenticated lists of the dead and information showing the location of graves.

(4) Authenticated lists of personal valuables left by these protected persons.

(5) Information pertaining to children living in territories occupied by the United States. This will include all data necessary for identifying children whose identity is in doubt.

d. Process all inquiries concerning EPW and RP captured by U.S. Armed Forces.

e. Make reports to the ICRC, the State Department, and other Federal agencies as required.

f. Provide to the adverse party via the ICRC's Central Tracing Agency (CTA) all pertinent information pertaining to EPW, CI, and RP, in custody of the U.S. Armed Forces.

g. Transmit via the CTA/ICRC/PP, all official documents and information on judicial proceedings concerning EPW and RP captured, interned, retained or detained by U.S. Armed Forces.

h. Information and Property Transfers.

(1) In response to an inquiry, the NPWIC will forward all information and documents to the CTA or PP.

(2) Valuables and personal property which can be returned to a released or repatriated person will be forwarded through the CTA or PP.

(3) Valuables and personal property of deceased EPW/RP, which can be released, will be forwarded to the next of kin through the CTA or PP.

i. The ICRC/PP transmits information, documents, and personal effects to the State it represents as follows:

(1) If civilians are concerned, to their countries of origin and/or residence.

(2) If combatants or EPW, CI, and RP are concerned, to their country of origin or to the Power on which they depend.

## 1–8. The Branch PWIC

a. The Branch PWIC functions as the field operations agency for the NPWIC. It is the central agency responsible to maintain information on all EPW, CI and RP and their personal property within an assigned theater of operations or in CONUS.

b. The Branch PWIC serves as the theater repository for information pertaining to:

(1) Accountability of EPW, CI, and RP, and implementation of DOD policy.

(2) Providing initial and replacement block ISN assignments to theater EPW, CI and RP processing organizations, and requests replacement ISNs from the NPWIC.

(3) Obtaining and storing information concerning all EPW, CI and RP, in the custody of U.S. Armed Forces, those captured by U.S. Armed Forces and transferred to other powers for internment (either temporarily or permanently), those EPW and RP released or repatriated. Obtaining and storing information about CI kept in the custody of U.S. Armed Forces within its assigned theater of operations who are subjected to assigned residence, interned, or released. Information required includes:

(a) That which may assist in an individual's identification.

(b) Certificates of death or authenticated lists of the dead.

(c) Information showing the location of war graves, together with particulars of the dead.

(d) Individual personal data, notification of capture, state of health, and changes.

(e) Certificates of death or authenticated lists of the dead and information showing the location of graves.

(f) Authenticated lists of personal valuables left by CI.

(g) Information pertaining to children living in territories occupied by the United States. This will include all data necessary for identifying children whose identity is in doubt.

(4) Processing, storing and maintaining all personal property of escaped or dead EPW/CI/RP or articles of value which were not restored upon repatriation, until final disposition instructions are received from the NPWIC or next higher headquarters.

(5) Processing and replying to all inquiries received from the NPWIC, the chain of command, or other agencies as directed by the NPWIC concerning EPW/CI/RP and other protected persons in the theater of operations that the U.S. is responsible for under the Geneva Convention.

(6) Making regular reports to the NPWIC, the chain of command, and supported internment facilities as required. This will include all pertinent information, official documents and information on judicial proceedings pertaining to EPW/CI/RP in the theater of operations for which the U.S. is responsible under the Geneva Convention.

(7) Valuables and personal property which can be returned to a released or repatriated person are forwarded to the ICRC CTA or Protecting Power, as directed by the NPWIC.

(8) Valuables and personal property of deceased EPW, CI, and RP which can be released, will be forwarded to the next of kin through the NPWIC to the ICRC Central Tracing Agency or Protecting Power.

(9) Confiscated property which cannot be released or returned will be stored until final disposition is determined.

(a) Unclaimed property will be safeguarded by the Branch PWIC until all EPW/CI have been repatriated. If property ownership cannot be determined, said property shall be released through the MP BDE G-4 and SUPCOM to the Defense Reutilization and Marketing Office (DRMO).

(b) Unclaimed money and negotiable instruments will be maintained by the PWIC pending inquiry. Upon completion of all repatriation actions and inquiries, unclaimed money and negotiable instruments will be transferred to the FAO as abandoned property.

(10) Accountability data concerning personal and confiscated property of EPW, CI, and RP transferred to CONUS will be forwarded directly to the PWIC designated to support CONUS operations.

(11) The Branch PWIC is responsible for establishing and enforcing the information requirements that the United States forces will collect on EPW,CI and RP taken or held in the Branch PWIC's area of responsibility. The Branch PWIC will receive its information requirements from the NPWIC.

## 1–9. Public Affairs

In the interest of national security, and the protection of the prisoners from public curiosity, and in adherence to the GPW and GC,

EPW, CI, RP and other detainees will not be photographed as per paragraph 1-5d. Interviews of EPW, CI, RP and other detainees by news media will not be permitted. Requests for media access to EPW, CI, or other detainee internment facilities will be coordinated through the Public Affairs Office, and the Staff Judge Advocate, and approved by the first commander who exercises General Court Martial Convening Authority over the internment facility. Requests for exception to policy will be forwarded through command channels to HQDA (SAPA-PP), Washington, D.C. 20310-4420

## Chapter 2
## Beginning of Captivity EPW/RP

### 2–1. Initial actions upon capture

a. The commanding officer of the capturing unit will ensure that:

(1) All EPW/RP are protected, safeguarded, and accounted for per this regulation. This regulation applies from the time of capture until evacuation to designated internment facilities.

(a) Each EPW/RP will be searched immediately after capture. Use males to search males and females to search female prisoners, when possible. Weapons, ammunition, and equipment or documents with intelligence value will be confiscated and turned over to the nearest intelligence unit. Propaganda and other Psychological Operations (PSYOP) materials will be confiscated, identified by the EPW/RP name and ISN and turned over to the supporting EPW/CI PSYOP unit through intelligence channels. Currency will only be confiscated on the order of a commissioned officer and will be receipted for using DA Form 4137 (Evidence/Property Custody Document). EPW and RP are allowed to retain personal effects such as jewelry, helmets, canteens, protective mask and chemical protective garments, clothing, identification cards and tags, badges of rank and nationality, and Red Cross brassards, articles having personal or sentimental or religious value, and items used for eating except knives and forks.

(b) All prisoners of war and retained persons will, at the time of capture, be tagged using DD Form 2745. They will be searched for concealed weapons and items of intelligence. All equipment, documents, and personal property confiscated during the search must be tagged and administratively accounted for by the capturing unit. Capturing units must provide the: date of capture, location of capture (grid coordinates), capturing unit, and any special circumstances of the capture (how the EPW was captured). The remaining information will be included on the tag as it becomes available.

(c) The DD Form 2745 is perforated in three parts. The form is individually numbered and is constructed of durable, waterproof, tear-resistant material, and has reinforced eye-holes at the top of parts A and C. Part A is attached to the detainee with wire, string, or other type of durable material. Part B is retained by the capturing unit and maintained in the unit's records. Part C is attached to the property confiscated from the detainee, so that it may later be matched to that detainee.

(d) Prisoners may be interrogated in the combat zone. The use of physical or mental torture or any coercion to compel prisoners to provide information is prohibited. Prisoners may voluntarily cooperate with PSYOP personnel in the development, evaluation, or dissemination of PSYOP messages or products. Prisoners may not be threatened, insulted, or exposed to unpleasant or disparate treatment of any kind because of their refusal to answer questions. Interrogations will normally be performed by intelligence or counterintelligence personnel.

(e) Prisoners will be humanely evacuated from the combat zone and into appropriate channels as quickly as possible. Instructions given to prisoners during evacuation from the combat zone will be, if possible, in their own language and as brief as possible. When military necessity requires delay in evacuation beyond a reasonable period of time, health and comfort items will be issued, such as food, potable water, appropriate clothing, shelter, and medical attention. Prisoners will not be unnecessarily exposed to danger while awaiting evacuation. The capturing unit may keep prisoners in the

combat zone in cases where, due to wounds or sickness, prompt evacuation would be more dangerous to their survival than retention in the combat zone. Individuals presumed to have intelligence value should be separated immediately from other EPW.

*(f)* Accountability will be maintained for all evacuated prisoners, regardless of the evacuation channel used. Units designated to receive the prisoners at the collecting points or camps will prepare a receipt DD Form 629 (Receipt for Prisoner or Detained Person) with a list of each prisoner's name attached and provide a copy of the receipt to the escort.

*(2)* Prisoners will not be located next to obvious targets such as ammunition sites, fuel facilities, or communications equipment. First aid and medical treatment will be provided to the same extent that the United States provides to its own forces. Sick and wounded prisoners will be evacuated separately, but in the same manner as U.S. and allied forces. Accountability and security of prisoners and their possessions in medical facilities is the responsibility of the respective echelon commander.

*b.* Special policy pertaining to the temporary detention of EPW, CI, RP and other detained persons aboard United States Naval Vessels:

(1) Detention of EPW/RP on board naval vessels will be limited.

(2) EPW recovered at sea may be temporarily held on board as operational needs dictate, pending a reasonable opportunity to transfer them to a shore facility, or to another vessel for transfer to a shore facility.

(3) EPW/RP may be temporarily held aboard naval vessels while being transported between land facilities. They may also be treated and temporarily quartered aboard naval vessels incidental to their treatment, to receive necessary and appropriate medical attention if such detention would appreciably improve their health or safety prospects.

(4) Holding of EPW/RP on vessels must be temporary, limited to the minimum period necessary to evacuate them from the combat zone or to avoid significant harm that would be faced if detained on land.

(5) Use of immobilized vessels for temporary holding of EPW/RP is not authorized without SECDEF approval.

## 2–2. Evacuation and care of EPW and RP

Those units designated to hold and evacuate EPW and RP will:

a. Collect prisoners from capturing units, and evacuate them from the combat zone as soon as possible.

b. Ensure sick and wounded EPW and RP in their custody are classified, by qualified medical personnel, as either walking wounded or litter, or as non-walking wounded. Walking wounded or litter EPW will be evacuated through established evacuation channels. Non-walking wounded or sick EPW will be delivered to the nearest medical aid station and evacuated through medical channels. All detained personnel will remain physically segregated from U.S. and allied patients.

(1) Appropriate intelligence sources will be notified when EPW and RP are found in possession of large sums of U.S. or foreign currency. A receipt DA Form 4137 will be prepared to account for all property that is taken from the EPW. Copies of DD Form 629 (Receipt for Prisoner or Detained Person) and DA Form 4137 will be maintained to establish positive accountability of the EPW and their property and can be used to substantiate proper care and treatment at a later time. DA Form 4137 will be used to account for property released before final disposition is ordered. Records of disposition of property will be evacuated with prisoners for inclusion in their personnel records.

(2) EPW will be segregated into categories of officer, noncommissioned officer, enlisted, male, female, nationality, recognized ethnic groups, deserters or any other category that the senior officer or NCO having custody of the prisoners designate to ensure the security, health and welfare of the prisoners. Segregation should prevent prisoners from communicating by voice or visual means. Guards will communicate with the prisoners only to give commands and instructions.

(3) The requirements for safeguarding prisoners are the same as those for capturing units.

c. In cases of mass capture or surrender of entire units, combatants should be disarmed and those with the greatest intelligence value identified for debriefing.

d. Repatriation or parole of the remainder should be considered, with final determination directed by HQDA. Prisoners will not be forced to be repatriated against their will. Prisoners who refuse repatriation will be treated as prisoners of war until their legal status and further disposition can be determined by competent authority.

## 2–3. Evacuation Policy

a. Evacuation of EPW or RP outside the theater of operations requires SECDEF approval.

b. Wounded EPW generally will not be evacuated to CONUS until released from medical channels. They will be processed through U.S. military police assets. If EPW are to be medically evacuated, they will be processed and accounted for per this regulation.

## Chapter 3
## Administration and Operation of EPW Internment Facilities

### 3–1. Establishment

Internment facilities will be established in the communications zone of each theater of operations for the purpose of receiving, accounting for, administering, securing, and logistically supporting EPW/ RP.

### 3–2. EPW internment facilities

a. The operation of all EPW internment facilities is governed by the provisions of the Geneva Conventions.

b. The theater commander remains responsible for the location of EPW facilities. EPW/RP may be interned only in premises located on land and affording proper health and hygiene standards. Except in extreme circumstances, in the best interests of the individual, EPW/RP will not be interned in correctional facilities housing military or civilian prisoners. Prisoners will not normally be interned in unhealthy areas, or where the climate proves to be injurious to them, and will be removed as soon as possible to a more favorable climate. Transit camps or collecting points will operate under conditions similar to those prescribed for permanent prisoner of war camps, and the prisoners will receive the same treatment as in permanent EPW camps.

c. The internment facility will be marked with the letters "PW" (Prisoner of War Camps) and will be placed so they will be clearly visible from the air during the daytime. Other markings may be used when agreed to by the combatant commanders and approved by HQDA.

### 3–3. EPW Facility Management

a. The United States may subject EPW/RP to internment and may have contingency plans to confine and enclose EPW in camps located both in and outside CONUS. Medical personnel and chaplains classified as RP, while retained by the Detaining Power with a view to assisting prisoners of war, shall not be considered prisoners of war. The EPW facility commander will provide command, control, accountability, administrative, and logistical support for the operation of all EPW/CI facilities. The EPW/CI facility commander will:

(1) Intern prisoners captured by or transferred to the custody of U.S. forces.

(2) Process interned prisoners to include tagging, assignment of ISN, fingerprinting, photographing, and weighing, as needed.

(a) EPW and RP may be required to show their identity card issued by his or her government; however in no case may the card be taken from the individual.

(b) If an EPW does not hold an identity card issued by his or her

government, the EPW will be issued a completed DA Form 2662-R (EPW Identity Card). The identity card will be in the possession of the EPW at all times. A notation indicating preparation of DA Form 2662-R will be made under item 36 of DA Form 4237-R (Detainee Personnel Record). DA Form 2662-R will be reproduced locally on 5-by 3-inch card head to foot. A copy for reproduction purposes is located at the back of this regulation. DA Form 4237-R will be reproduced locally on 8 1/2 by 11-inch paper. A copy for reproduction purposes is located at the back of this regulation. These forms are for the use of Army only.

(c) DA Form 2663-R (Fingerprint Card) will be prepared in duplicate for each EPW/RP. One copy will be retained at the camp in which the EPW/RP is confined and will accompany the EPW/RP upon transfer. The other is forwarded to the Branch PWIC.

(3) Provide prisoners with humane treatment, health and welfare items, quarters, food, clothing, and medical care. Health Services Command (HSC) provides medical and dental care for EPW in federal or civilian health care facilities per HSC plans.

(4) Provide for morale, religious, intellectual, educational, social, physical and recreational activities for the prisoners.

(5) Establish liaison with the supporting Branch PWIC, collect necessary information regarding the location, the physical well-being, legal status, and any change thereto, of all prisoners interned by the command.

(6) Allow prisoners to correspond with their families and receive relief shipments.

(7) Provide prisoners copies of the 1949 Geneva Conventions (in their own language, if possible).

(8) Employ and compensate assigned prisoners based on verified needs/requirements and monitor all aspects of EPW and RP employment per this regulation. If sundry packets are provided, no advance pay is required.

(9) Provide command and control, and operate, administer, and secure the camp.

(10) Prepare necessary documents for administrative actions, court-martial charges or any disciplinary proceedings for prisoners.

(11) Post personnel files and maintain unit level records of proceedings.

(12) Supervise qualified EPW/RP in providing medical care and field sanitation/preventive medicine for prisoners.

(13) Provide the initial medical examination and monthly screening of prisoners.

(14) Maintain EPW labor and finance records on each prisoner per AR 37-1.

(15) Ensure preparation of monthly pay credit statements of prisoner's personal accounts and ensure pay for prisoners.

(16) Direct activities relating to the assignment and supervision of work projects for prisoners.

(17) Advise employers of provisions for handling EPW.

(18) Establish and maintain records of prisoner labor projects.

(19) Provide initial reports of and perform initial investigation and inquiries into prisoner labor injuries or incidents.

(20) Report allegations of criminal acts or war crimes committed by or against EPW/RP to the supporting element of the U.S. Army Criminal Investigation Command (USACIDC). Deaths resulting from other than natural causes will be investigated by USACIDC.

(21) Provide assistance to the medical facility commander to assess the threat posed by hospitalized EPW.

(22) Establish and maintain complete and accurate accountability information regarding the location, physical and legal status, training, and employment of all individuals in the custody of, or assigned to, the EPW facility. Information will be posted to the individual's personal, medical, and financial records, and will be provided to the supporting PWIC and next higher headquarters, as required.

(23) Provide an area for intelligence collection efforts. *b.* USACIDC will ensure criminal investigative support for EPW and RP is planned and resources are allocated for this purpose. **3–4. Operation of prisoner of war internment facilities** EPW camps will be organized and operated, when possible, as other military commands. Each internment facility will be commanded by a commissioned officer of the U.S. Military. The following provisions will be observed:

a. The Geneva Conventions will be posted within the camp in the language(s) of the EPW/RP nation(s). A copy of the text will be supplied, on request, to any person who does not have access to posted copies. The supporting EPW/CI PSYOP unit can assist in preparing and disseminating native language copies of the text as well as other translation, printing, and audio-visual information dissemination support.

b. EPW will be interned in camps according to their nationality and language. They will not be separated from other prisoners belonging to the Armed Forces with which they were serving at the time of their capture, except with their consent. Officers will be separated from enlisted personnel and females will be separated from males.

c. EPW representatives will be authorized for EPW Camps.

(1) At each enlisted EPW or branch camp, EPW will select a prisoner representative. These representatives will be elected by secret ballot every 6 months and are eligible for reelection. EPW will be permitted to consult freely with their representatives. In turn, their representatives will represent them before:

(a) The military authorities.

(b) The Protecting Power.

(c) The ICRC.

(d) Other relief or aid organizations.

(2) In officer EPW camps or in camps with both officers and enlisted EPW, the senior EPW officer, unless incapacitated or incompetent, will be recognized as the prisoner representative. In officer EPW camps, one or more advisers chosen by the EPW officers will assist the prisoner representative. The supporting EPW/ CI PSYOP unit can assist in identifying officers, key communicators, and English speaking EPW who may be hiding within the camp population.

(3) In mixed camps (officers and enlisted), one or more enlisted advisors will be elected to assist the EPW officer representative.

(4) The camp commander will be designated as the final approval authority for each elected prisoner representative. When the camp commander denies, approves, or dismisses an elected representative, a notice to that effect will be sent through channels to HQDA, (DAMO-ODL) NPWIC for forwarding to the ICRC or the PP. Reasons for the refusal will be included. EPW will then be permitted to elect another representative.

(5) RP (medical personnel and chaplains) are not considered prisoners of war and therefore may not elect prisoner representatives. The senior medical officer in each camp will be responsible for matters connected with the activities of retained medical personnel. Individual chaplains, like the responsible medical officer, will have direct access to camp authorities.

(6) Prisoner representatives may appoint EPW assistants. These assistants are in addition to the advisers provided for in (2) above. The camp commander will also approve the selection of such assistants and their continuance in those positions.

(7) Prisoner representatives must be of the same nationality, observe the same customs, and speak the same language as the EPW they represent. EPW interned in separate compounds due to differing nationality, language, or customs will be permitted to have their own prisoner representative according to (1) through (4) above. The internment facility commander will establish the local policy for an escort to accompany the representative.

(8) Duties, responsibilities, and available resources.

(a) Representatives will be responsible for furthering the physical, spiritual, and intellectual well-being of the persons they represent. They will not exercise any disciplinary powers. They will not perform any other work if the work interferes with their duties as representatives. They will be allowed a reasonable time to acquaint their successors with their duties and related current affairs.

(b) Representatives may be given the freedom of movement

needed to accomplish their duties, such as inspection of labor detachments and receipt of supplies. Ordinarily, representatives will be permitted to visit places where EPW, whose interests they represent are detained.

*(c)* Postal and telegraph facilities will be made available to prisoner representatives for communicating with the U.S. Army authorities; Protecting Powers, if any; the ICRC and its delegates; the Mixed Medical Commission, and other organizations authorized to assist EPW. Prisoner representatives at branch camps will be granted the same facilities for communication with the prisoner representative of the parent camp.

*d.* EPW/RP social privileges. Social privileges will be subject to security considerations and camp discipline. EPW/RP will be encouraged to take part in intellectual, educational, and recreational activities. The introduction of political overtones into or the furtherance of anti-U.S. propaganda objectives through these activities is prohibited. The supporting EPW/CI PSYOP unit can assist in identifying agitators, malcontents, and political officers who may create resistance within the camp. These units are also trained to develop and implement programs to reduce hostile political activity and to persuade EPW/CI populations to accept U.S. authority and regulations.

*e.* EPW/RP will be quartered under conditions as favorable as those for the force of the detaining power billeted in the same area. The conditions shall make allowance for the habits and customs of the prisoners and shall in no case be prejudicial to their health. The forgoing shall apply in particular to the dormitories of EPW/RP as it regards both total surface and minimum cubic space and the general installation of bedding and blankets. Quarters furnished to EPW/RP must be protected from dampness, must be adequately lit and heated (particularly between dusk and lights-out), and must have adequate precautions taken against the dangers of fire. In camps accommodating both sexes, EPW/RP will be provided with separate facilities for women. When possible consult the preventive medicine authority in theater for provisions of minimum living space and sanitary facilities.

*f.* The daily food rations will be sufficient in quantity, quality, and variety to keep EPW/RP in good health and prevent loss of weight or development of nutritional deficiencies.

(1) Account will be taken of the habitual diet of the prisoners.

(2) EPW/RP who work may be given additional rations when required.

(3) Sufficient drinking water will be supplied to EPW/RP.

(4) The use of tobacco will be permitted in designated smoking areas.

(5) EPW will, as far as possible, be associated with the preparation of their meals and may be employed for that purpose in the kitchens. Furthermore, they will be given means of preparing additional food in their possession. Food service handlers must have training in sanitary methods of food service.

(6) Adequate premises will be provided for messing.

(7) Collective disciplinary measures affecting food are prohibited.

*g.* Clothing, underwear, and footwear will be supplied to EPW/ RP in sufficient quantities, and allowances will be made for the climate of the region where the prisoners are detained. Captured uniforms of enemy armed forces will, if suitable for the climate, be made available to clothe EPW/RP. The camp commander will ensure the regular replacement and repair of the above articles. EPW/ RP who work will receive clothing appropriate to the nature or location of the work demands.

*h.* Canteens. EPW/RP will be provided sundry/health and comfort packs, which may be supplemented with items tailored to their cultural needs, as a temporary substitute for establishing canteen operations. When directed by the Theater Area Provost Marshal or senior Military Police officer in the internment facilities' chain of command, canteens will be installed in all camps, where EPW/RP may procure foodstuffs, soap, tobacco and ordinary articles in daily use. The tariff will never exceed local market prices. When authorized, canteens will be operated IAW the provisions of the GPW. Procedures regarding EPW/RP payment for canteen purchases are contained in AR 37-1. Profits made by camp canteens will be used for the benefit of the prisoners; a special fund will be created for this purpose. The prisoners' representative may make suggestions regarding the management of the canteen and of this fund. When an internment facility is closed, the credit balance of the special fund will be transferred to another U.S. internment facility

operating in theater. When all facilities are closed, funds will be turned over to an international welfare organization. The fund will be employed for the benefit of EPW/RP of the same nationalities as those who have contributed to the fund. In case of a general repatriation, profits will be kept by the United States.

*i.* Hygiene and medical care:

(1) The United States is bound to take all sanitary measures necessary to ensure clean and healthy camps to prevent epidemics. EPW/RP will have access, day and night, to latrines that conform to the rules of hygiene and are maintained in a constant state of cleanliness. In any camps in which women EPW/RP are accommodated, separate latrines will be provided for them. EPW/RP will have sufficient water and soap for their personal needs and laundry. The necessary facilities and time will be made available for those purposes. The supporting EPW/CI PSYOP unit can assist in maintaining and improving health and sanitary conditions by producing and disseminating informational products concerning proper hygiene, sanitation, and food preparation, where required.

(2) Every camp will have an infirmary. EPW/RP with a contagious disease, mental condition, or other illness, as determined by the medical officer, will be isolated from other patients. A list of endemic diseases of military importance can be obtained from the theater surgeon or preventive medicine officer. EPW/RP will be immunized and reimmunized against other diseases as recommended by the Theater Surgeon. EPW/RP suffering from serious disease, or whose condition necessitates special treatment, surgery, or hospital care, must be admitted to any military or civilian medical unit where such treatment can be given. Special facilities will be available for the care and rehabilitation of the disabled, particularly the blind. EPW/RP will be accorded the attention of medical personnel of the power on which they depend and, if possible, of their nationality. EPW/RP will not be denied medical care. The detaining authorities shall, upon request, issue to every EPW/RP who has undergone treatment, an official certificate indicating the nature of the illness or injury, and the duration and kind of treatment received. A duplicate of this certificate will be forwarded to the ICRC. The detaining authority will also ensure medical personnel properly complete the SF 88 (Report of Medical Examination), SF 600 (Chronological Record of Medical Care and DA Form 3444 (Treatment Record). The cost of treatment will be borne by the United States.

(3) Medical inspections of EPW/RP will be held at least once a month, where each detainee will be weighed and the weight recorded on DA Form 2664-R (Weight Register). DA Form 2664-R will be reproduced locally on 8- by 5-inch card. A copy for reproduction purposes is located at the back of this regulation. This form is for the use of Army only. The purpose of these inspections will be to monitor the general state of health, nutrition, and cleanliness of prisoners and to detect contagious diseases, especially tuberculosis, venereal disease, lice, louse-borne diseases and HIV.

(4) EPW who, though not attached to the medical service of the Armed Forces, are physicians, surgeons, dentists, nurses, or medical orderlies may be required to exercise their medical functions in the interests of prisoners of war dependent on the same power after being certified per Paragraph 3-15. They will continue to be classified as EPW, but will receive the same treatment as corresponding RP (medical personnel). They will be exempted from any other work.

(5) Experimental research will not be conducted on EPW/RP.

## 3–5. Procedures for prisoner of war correspondence

*a.* EPW/RP will be allowed to send and receive letters and cards. There is no restriction on the number or length of letters or cards EPW/RP may receive. EPW/RP will be permitted to send not less than two letters and four cards monthly, in addition to the capture

cards provided in Article 70, GPW. In the event EPW/RP are prevented from writing their monthly quota of letters and cards because of a lack of stationery forms, they will be allowed to make up their quotas when forms are available.

b. All persons may address complaints, in writing to U.S. military authorities and the Protecting Power. These communications will not be limited in length or number, nor will they be charged against the person's correspondence quota. They will be transmitted without delay.

c. Letters and cards addressed to persons other than representatives of a Protecting Power or to U.S. military authorities will not:

(1) Contain complaints or criticism of any governmental agency or official.

(2) Refer to events of capture.

(3) Compare camps.

(4) Contain quotations from books or other writings.

(5) Contain numbers, ciphers, codes, music symbols, shorthand, marks, or signs other than those used for normal punctuation.

(6) Contain military information on numbers of EPW/RP. (Exceptions: Letters to a Protecting Power or prisoner representative or to a relief or aid organization.)

(7) Should any such correspondence be discovered, it will be turned over to the supporting counterintelligence element.

d. Correspondence forms.

(1) EPW will use DA Form 2667-R (Prisoner of War Mail (Letter)) and DA Form 2668-R (Prisoner of War (Post Card)) for correspondence, except as authorized elsewhere in this regulation. DA Form 2667-R will be reproduced on 8 1/2-by 11-inch paper, head to head. DA Form 2668-R will be reproduced locally on 6-by 4-inch cards, head to foot. Copies for reproduction purposes are located at the back of this regulation. These forms are for the use of Army only. Legal documents may be written on blank paper instead of DA forms. Prisoner representatives may use ordinary paper in writing to:

(a) The Protecting Power.

(b) ICRC.

(c) Other approved relief or aid organizations.

(d) U.S. military authorities.

(2) Except for official correspondence by prisoner representatives or unless required by HQDA, communication in two or more copies is prohibited.

(3) Camp commanders will distribute DA letter and card forms to EPW/RP.

(4) Upon Completion of DA Form 4237-R, but not later than 1 week after arrival at a camp for processing, each EPW or RP will be permitted to send a DA Form 2666-R to a relative or next of kin.

(5) Within a period of not more than 1 week after arrival at the first EPW camp or when an EPW/RP's address is changed by transfer to a hospital or to another camp, a DA Form 2665-R (Capture Card for Prisoner of War) will be filled out and forwarded to the Branch PWIC. DA Form 2665-R will be reproduced locally on 6-by 4-inch card, head to foot, a copy for reproduction purposes is located at the back of this regulation. This form is for the use of Army only.

e. Subject to (1) and (2) below, outgoing letters and cards will be sent unsealed directly from the camp to the theater commander's designated censorship element. All incoming letters and cards that arrive at a camp without having been censored will be sent to the designated censorship element before delivery to addressees.

(1) Communication to the Protecting Power or the ICRC. Letters and cards not intended for other addresses and not containing enclosure for other addresses will be forwarded directly from the camp to the proper Branch PWIC

(2) Other correspondence. Outgoing letters and cards from a branch camp's EPW will be forwarded as soon as possible.

f. Date and packaging of correspondence. Letters and cards will be forwarded without undue delay in pouches or in government envelopes.

(1) EPW/RP may not write letters for others who are able to write. If an EPW/RP is unable to write, the camp commander may permit another person to write the message. The person doing the writing will countersign the message.

(2) EPW/RP legal documents may be enclosed with outgoing correspondence. When it becomes necessary for a detainee to send a legal document, the document and forwarding letter or card may be enclosed in a plain envelope.

(3) EPW/RP will not send maps, sketches, or drawings in outgoing correspondence.

g. Individuals will not be permitted to mail or receive registered, certified, insured, or COD.

h. Letters and cards to or from EPW/RP sent by ordinary mail are postage free.

i. Outgoing letters and cards will be secured by using locked boxes or similar means. Only authorized U.S. personnel will handle outgoing mail. Incoming mail may be sorted by detainees when supervised by U.S. personnel.

j. Censorship of EPW/RP mail may be instituted by the theater commander as follows:

(1) Outgoing letters and cards may be examined and read by the camp commander or his designated representative. No censorship action of any kind will be taken at the camp. The camp commander will return to the sender for rewriting any outgoing correspondence containing obvious deviations from regulations with a copy provided to the supporting counterintelligence element.

(2) Camp commanders will designate U.S. military personnel to supervise the opening of all mail pouches containing incoming letters and cards for detainees. These items will be carefully examined by the named personnel before delivery to detainees.

(3) EPW/CI wishing to make complaints concerning mail delivery must direct those complaints to:

(a) The camp authorities

(b) The responsible major commander.

(c) The Protecting Power/ICRC.

k. Parcels.

(1) Persons may receive individual parcels and collective shipments containing:

(a) Foodstuffs.

(b) Clothing.

(c) Medical supplies.

(d) Articles of a religious, educational, or recreational nature.

(2) EPW/RP will not be permitted to mail parcels (Article 16, 1974 Universal Postal Convention).

(3) Parcels received for transferred persons will be forwarded immediately.

(4) Nonperishable articles received for persons who have died or escaped, or who have been repatriated, will be forwarded to the Branch PWIC. Perishable items received for deceased or escaped persons will be released to the prisoner representative who will deliver them to the camp infirmary or hospital for the benefit of EPW/RP.

(5) The contents of all incoming parcels will be examined at the camp by a U.S. officer in the presence of the addressee or the named representative. When considered necessary, the camp commander may request that the parcel be examined by the censors. The articles in each parcel will be removed. The string, the inner wrappings, the outer container, and any extraneous items found in the parcel will not be turned over to the EPW/RP or the designated representative. Examination will be close enough to reveal concealed articles and messages; however, undue destruction of contents of parcels will be avoided.

l. EPW/RP may send and receive telegrams as determined by the camp commander. They may not make or receive telephone calls. (1) At a minimum:

(a) A detainee who has not received mail from next of kin for 3 months may send a telegram. One month from the date a previous telegram was sent, a detainee who has not received a written answer or other communication from the addressee may send another telegram.

(b) Detainees unable to receive mail from their next of kin or send mail to them by ordinary postal routes, or who are a great

distance from their home, will be permitted to send one telegram a month.

*(c)* A person who is seriously ill, or who has received news of serious illness or death in the family, may be permitted to send a telegram. The camp commander may authorize the sending of additional telegrams.

(2) The sending of telegrams as provided for in (1) above will be governed by the following:

(a) The message proper will consist of not more than 15 words.

(b) The cost of sending the telegram will be debited to the person's account.

(c) Arrangements for messages going to or through enemy-occupied countries will be made with the ICRC Field Director.

(d) Telegrams, as a general rule, shall be written in their native language.

(e) No telegram will be sent to a Government official or to a Protecting Power.

(f) Telegrams are subject to the same procedures for censorship listed in paragraph 3-5j(2).

m       EPW/RP may receive books. Books that arrive at camps uncensored will be censored. Publications containing maps may be made available to the EPW/RP upon approval of the camp commander, provided they do not contain maps of the territory surrounding the camps. Books, included in parcels of clothing and foodstuffs, may be confiscated on order of the camp commander.

n. The following may be made available to EPW/RP:

(1) Current newspapers and magazines published in the English language and selected by the camp commander.

(2) Unmarked, unused magazines in the English language, published in the United States, and distributed by approved relief or aid organizations at the discretion of the camp commanders after censorship.

(3) Foreign language newspapers and magazines published in the United States, upon approval of the camp commander and after censorship of individual issues.

(4) Newspapers and magazines published outside the United States, regardless of language, must be approved by the theater commander.

## 3–6. Discipline and security

Measures needed to maintain discipline and security will be established in each camp and rigidly enforced. The camp commander will maintain records of disciplinary punishments. These records will be open to inspection by the Protecting Power.

*a.* The following acts will not be permitted:

(1) Fraternization between EPW, RP and U.S. military or civilian personnel. Fraternization is defined as improper or intimate communications or actions between U.S. Armed Forces personnel and EPW/RP.

(2) Donating or receiving gifts or engaging in any commercial activity between persons in U.S. custody and U.S. personnel.

(3) Setting up of courts by detainees. Disciplinary powers will not be delegated to or exercised by EPW/RP. Punishment will not be administered by EPW/RP.

*b.* The GPW, regulations, orders, the contents of any special agreements and notices on the conduct and activities of detainees will be published in a language the detainee understands. They will be posted in places within each camp where the detainees may read them and will be made available to persons who do not have access to posted copies. Additional copies will be given to the prisoner representatives. Every order and command will be addressed to detainees personally. The supporting EPW/CI PSYOP unit may assist in providing necessary printed, loudspeaker, or other audiovisual support in communicating directly to EPW/RP. To protect persons from acts of violence, bodily injury, and threats of reprisals at the hands of fellow detainees, a copy of the following notice in the detainees' language will be posted in every compound:

### NOTICE

EPW/RP who fear that their lives are in danger or that they may

suffer physical injury at the hands of other EPW/RP will immediately report the fact personally to any U.S. Armed Forces Personnel of this camp without consulting the EPW/CI representative. From that time on, the camp commander will assure adequate protection to such EPW/RP by segregation, transfer, or other means. EPW/RP who mistreat fellow detainees will be punished.

Signed (Commanding Officer)

*c.* The following military courtesies are required of EPW:

(1) When the U.S. national anthem is played or "To the Colors" or "Retreat" is sounded, EPW not in buildings will stand at attention and face toward the music or colors.

(2) Besides the courtesies required in their own armies toward their officers, enlisted EPW will salute all commissioned officers of the U.S. Armed Forces. Officer EPW will be required to salute only officers of a higher rank and the camp commander regardless of grade.

(3) EPW may salute in the way prescribed by regulations in force in their own armies.

(4) Other military courtesies will be rendered per AR 600-25 (Salutes, Honors, and Visits of Courtesy) and FM-22-5 (Drill and Ceremonies).

*d.* U.S. military personnel will extend the following courtesies toward EPW:

(1) U.S. military personnel will not be required to salute EPW or assume the position of attention when addressing them; however, U.S. officers will return the salutes of EPW.

(2) When addressing senior officer EPW on official business, U.S. military personnel will be courteous and extend the respect due them by grade and age.

*e.* Flags upon which an enemy political emblem or device appears will be seized. EPW/RP will not have any political emblem, insignia, flag, or picture of political leaders. Badges of grade and nationality, and decoration worn as part of the uniform are permitted. EPW/RP may have pictures of political leaders that appear in magazines, books, and newspapers if the pictures are not removed.

*f.* Security guidelines outlined below concern the custody and use of EPW/RP.

(1) *Guard work details.* EPW on work details will be guarded as required to provide security against escape. Selected EPW/RP may be employed without guards in areas where military personnel are on duty if:

(a) EPW/RP are under a U.S. work supervisor.

(b) Frequent counts of detainees and work inspections are made at irregular intervals.

(2) *Preventing escape.* The camp commander will ensure that each EPW/RP understands the meaning of the English word "halt" . If EPW/RP attempt to escape, the guard will shout "halt" three times, thereafter the guard will use the least amount of force necessary to halt the EPW/RP. If there is no other effective means of preventing escape, deadly force may be used.

(a) In an attempted escape from a fenced enclosure, a prisoner will not be fired at unless he/she has cleared the outside fence and is making further effort to escape.

(b) EPW/RP attempting to escape outside a fenced enclosure will be fired on if they do not halt after the third command to halt.

(c) An EPW/RP will have succeeded in escaping when he or she has:

1. Joined the armed forces of the power on which he or she depends or those of an ally of that power.

2. Left the territory under U.S. control or control of U.S. allied powers.

3. Joined a ship flying the flag of the power on which he or she depends, or of an ally of that power, in U.S. territorial waters, and the ship is not under U.S. control.

*(d)* An EPW who has successfully escaped shall not be punished for the escape if subsequently recaptured.

## 3–7. Punitive Jurisdiction

*a.* EPW/RP are subject to punishment under the Uniform Code of Military Justice and other U.S. Laws, regulations and orders in force during the time of their detention.

*b.* Judicial proceedings against EPW and RP will be by courts-martial or by civil courts. When EPW are tried by courts-martial, pretrial, trial, and post-trial procedures will be according to the UCMJ and the U.S. Manual for Courts-Martial. An EPW will not be tried by a civil court for committing an offense unless a member of the U.S. Armed Forces would be so tried.

*c.* When possible, disciplinary rather than judicial measures will be taken for an offense. The disciplinary measures below are authorized:

(1) Suspend or eliminate privileges granted over and above the minimum privileges provided for in the GPW and GC.

(2) Confinement.

(3) A fine not to exceed one-half of the advance of pay (article 60 GPW) and working pay (article 62 GPW) that the detainee would otherwise receive during a period of not more than 30 days.

(4) Fatigue duties not exceeding 2 hours daily. This punishment will not be applied to officers.

*d.* EPW and RP rights. Before any disciplinary punishment is pronounced, EPW/RP will be given precise information regarding the offenses for which they are accused. They will be given a chance to explain their conduct and to defend themselves. They will be permitted to call witnesses and to have use of a qualified interpreter, if necessary and reasonably available. The board's decision will be announced to the person and to the person's representative.

*e.* The following are limitations on punishment:

(1) Collective punishment for individual acts, corporal punishment, imprisonment in premises without sunlight, and any form of torture or cruelty is forbidden.

(2) EPW may not be deprived of their grade or prevented from wearing insignia of grade and nationality.

(3) No EPW or RP will be handcuffed or tied, except to ensure safe custody or when prescribed by a responsible medical officer as needed to control a medical case requiring restraint.

(4) No EPW or RP may be punished more than once for the same act or sentenced to any penalties except those authorized herein.

(5) In no case will disciplinary punishments be inhumane, brutal, or dangerous to the person's health. The length of a single disciplinary punishment will not exceed 30 days. Confinement served while awaiting the hearing of a disciplinary offense or the award of disciplinary punishment will be deducted from punishment awarded. No more than 30 days punishment may be prescribed even if a person is answerable for several acts at the same time. This is true whether such acts are related or not. The period between pronouncing an award of disciplinary punishment and commencing punishment will not exceed 30 days.

(6) When EPW or RP are awarded a further disciplinary punishment, a period of at least 3 days will elapse between punishments if the length of one of the punishments is 10 days or more.

(7) EPW or RP being disciplined or judicially punished will not be subjected to more severe treatment than that authorized for the same offense by members of the U.S. Armed Forces of equal grade.

(8) EPW or RP sentenced by a courts-martial or awarded disciplinary punishment will not be treated differently from other detainees after their punishment.

*f.* Offenses and warranted punishments. EPW or RP who attempt to escape or escape the confines of the camp, but who do not succeed in their escape, will be liable only to disciplinary punishments for those escape acts. They will not be liable to judicial proceedings, even if they are repeat offenders. Escapes or attempts to escape, even if they are repeat offenses, will not be considered aggravating circumstances if detainees are tried by judicial proceedings for offenses committed during their escapes or attempts to escape. Offenses, such as those against public property, theft without intention of self-enrichment, drawing up or use of false papers, or wearing of civilian clothing, that are committed by detainees with the sole intent of making their escape easier and that do not entail any violence against life or limb will warrant disciplinary punishment only. Because of attempts to escape, EPW and RP may be subjected to close watch. The watch must not affect the state of their health. The EPW and RP watched must be in camp. The watch must not deprive them of the safeguards granted by the Geneva Conventions. Persons who aid or abet an escape or an attempt to escape will be liable on this count for disciplinary punishment only.

*g.* Offenses against discipline. EPW and RP accused of an offense against disciplinary measures will not be confined pending a hearing, unless members of the U.S. Armed Forces would be confined if they were accused of a similar offense or unless camp order and discipline would be jeopardized. A period spent in confinement awaiting disposal of an offense against disciplinary measures will be reduced to an absolute minimum. It will not exceed 14 days.

*h.* Confinement. A pretrial investigation of an offense alleged to have been committed by a detainee will be conducted as soon as circumstances permit so that trial, if warranted, will take place as soon as possible. A detainee will not be confined while awaiting trial unless a member of the U.S. Armed Forces would be so confined if accused of a similar offense, or unless national security would be served. In no case will this confinement exceed 3 months. A period spent in confinement while awaiting trial will be deducted from a sentence of imprisonment. The period will be taken into account in fixing a penalty.

*i.* Retention of Geneva Convention benefits. Persons prosecuted for an act committed before capture will retain, even if convicted, the protection of the Geneva Conventions. EPW, RP undergoing confinement will:

(1) Continue to enjoy the benefits of the Geneva Convention except when such benefits do not apply because detainees are confined.

(2) Be permitted to exercise their right to complain and to confer with visiting representatives of the Protecting Power.

(3) Not be deprived of the prerogatives attached to their grade.

(4) Be allowed to exercise and to stay in the open air at least 2 hours daily.

(5) Be given medical attention as prescribed in this regulation.

(6) Be permitted to read and write and to send and receive letters and cards. Parcels, however, may be withheld from them until the punishment is completed. Such parcels will be released to the safekeeping of the detainee representative. If perishable goods are contained in the parcels, the detainee representative will give them to the camp infirmary or hospital to distribute them fairly among the other detainees.

## 3–8. Judicial proceedings

*a.* No EPW or RP will be tried or sentenced for an act that was not forbidden by U.S. law or by international law in force at the time the act was committed.

*b.* No moral or physical coercion will be exerted to induce EPW or RP to admit guilt for any act.

*c.* No EPW or RP will be convicted without having had the chance to present a defense and without having the assistance of a qualified advocate or counsel.

*d.* Accused persons will be notified promptly of the charges in writing. Charges will be in a language understood by the accused. These persons will be tried as soon as possible. A notification (in duplicate) of proceedings against a detainee will be submitted through channels to the NPWIC. The NPWIC will send such notification to the Protecting Power in cases of charges involving the death penalty or imprisonment for 2 years or more. Upon request, the Protecting Power will be furnished data on the status of such proceedings. Furthermore, the Protecting Power will be entitled, upon request, to be furnished with all data or any other proceedings started against a detainee. The information will be sent without delay. Trial will not commence until 3 weeks after the Protecting

Power has been notified. Unless evidence is submitted at the opening of the trial that this regulation has been fully complied with, the trial will not proceed. The following information will be provided:

(1) Surname and first name, grade, if proper, ISN, date of birth, and profession, trade, or prior civil capacity of the detainee.

(2) Place of internment or confinement.

(3) Specification of the charges with penal provisions under which they are brought.

(4) Designation of the court that will hear the case.

*e.* The EPW representatives will be informed of all judicial proceedings against EPW and RP and the results of the proceedings. Records of trials will be kept by the first Staff Judge Advocates General office in the internment facility's chain of command. These records will be open to inspection by representatives of the Protecting Power.

*f.* In each trial by court-martial, accused persons will be entitled to assistance by one of his prisoner comrades, a qualified advocate or counsel of their own choice, to the calling of witnesses, and services of a competent interpreter, if needed. The commander concerned will appoint a Judge Advocate to serve as defense counsel in additional to any other counsel of the accused person's choice. The commander concerned will notify the accused person of these rights in ample time before the trial.

(1) If the accused does not exercise the right to choose an advocate or counsel, notice to that effect will be sent through the NPWIC to the Protecting Power to permit the Protecting Power to choose counsel. If the accused and the Protecting Power fail to choose an advocate or counsel, the commander concerned shall appoint a counsel, which in normal circumstances will be the judge advocate previously appointed. The accused person must consent to the service of the appointed advocate or counsel..

(2) If requested by the accused person, the commander concerned will appoint an interpreter to assist the accused person during the preliminary hearing and the hearing in court. The interpreter must not be a trial counsel, a defense counsel, an assistant to either, a witness, or have any bias or interest in the case. Accused persons have the right to object to the interpreter appointed, and to ask for a replacement.

(3) A judge advocate will serve as defense counsel in any general or special court-martial of an EPW/RP.

*g.* Representatives of the Protecting Power may attend the trial. It may be decided that in the interest of security, the trial will be conducted with the public excluded. If so, a notice will be given to NPWIC at least 3 weeks before the trial opens to permit notice to the Protecting Power.

*h.* Two copies of the findings and the sentence, if applicable, will be forwarded immediately to NPWIC. A summary will be sent to the Protecting Power, and the detainee representative. Notice of the EPW, RP decision to use or waive the right of appeal to the Court of Appeals for the Armed Forces, when review by that court is not mandatory, will also be forwarded (in duplicate) to HQDA (DAMOODL), NPWIC, WASH, DC 20310-0400. NPWIC will send a copy of the decision to the Protecting Power. An EPW, RP waiver of the right to appeal will in no way affect, or change the requirement for, review by a supervisory authority, a board of review, or the U.S. Court of Military Appeals when such review is required under the UCMJ. If the sentence adjudged is death, one copy of the court- martial record of trial will be forwarded to ODCSOPS, NPWIC. NPWIC will send a copy of the record of trial to the Protecting Power. The following information will be included:

(1) A precise wording of the approved finding and sentence.

(2) A summary report of the evidence, including any preliminary investigation, elements of offenses, and any defense raised thereto.

(3) If applicable, the place where the detainee will serve confinement.

*i.* A sentence to confinement imposed on EPW, or RP will be served in the same type of place and under the same conditions as in the case of a member of the U.S. Armed Forces. EPW and RP sentenced to U.S. Disciplinary Barracks (USDB) or Federal penitentiaries will remain EPW/RP. Accountability requirements will be coordinated prior to any transfer by the losing commander and Commandant, USDB through HQDA (DAMO-ODL) NPWIC. Accused persons and the Protecting Power will be informed as soon as possible of all offenses that are punishable by the death sentence under U.S. laws. Lists of these offenses will be posted in all camps. Duplicate lists will be given to detainee representatives. Other offenses will not thereafter be made

punishable by the death penalty without the concurrence of the power on which the detainee depends.

(1) An EPW or RP can be sentenced to death only if the court has taken into consideration, to the maximum extent possible, the fact that the accused is not a US citizen and is not bound to it by any duty or allegiance and is in US custody as a result of circumstances beyond their own will or control.

(2) If the death sentence is pronounced, it will not be carried out until 6 months have passed from the date the Protecting Power received the U.S. notice of the judgment and sentence.

(3) ODCSOPS will monitor and acknowledge when the ICRC/ Protecting Power has received the notice permitting the execution of the sentence.

## 3–9. Loss or damage to property

a. Persons will be held responsible for the loss of, or damage to, any Government property through negligence or wrongful acts. A complaint may be made to the installation commander that property of a private person has been destroyed, lost, or damaged by a person interned at the installation, including any branch camp. If the EPW, RP does not accept responsibility for the damage, the commander will appoint a board of one to three officers to investigate the complaint.

b. Reports of survey or statements of charges will be processed according to AR 735-5. For this purpose, the commanding officer of an internment facility will be considered an installation commander. Amounts collected will be disposed of according to AR 735-5.

c. Supporting EPW/CI PSYOP units can assist the commanding officer in improving relations with local populations following loss or damage to private property.

## 3–10. Death and burial

a. For general procedures and authorized expenses for the care and disposition of remains, see AR 638-30 and AR 600-8-1.

b. When EPW and RP have chosen to make a will, the original will and two certified copies will be forwarded to the supporting PWIC upon death or at their request.

c. When an EPW or RP in U.S. custody dies, the attending medical officer will immediately furnish the camp (or hospital) commander or other officer charged with their custody before death, the following information:

(1) Full name of deceased.

(2) ISN of deceased.

(3) Date, place, and cause of death.

(4) Statement that death was, or was not, the result of the deceased's own misconduct.

(5) When the cause of death is undetermined, the attending medical officer will make a statement to that effect. When the cause of death is finally determined, a supplemental report will be made.

d. The camp or hospital commander, or other officer charged with custody of the person before death, will notify the proper Branch PWIC immediately, by telegram or the most expeditious means, of the death. The data listed in subparagraph c above will be included. If the required data has not been determined, a supplemental report will be made as soon as possible.

e. The attending medical officer and the appropriate camp commander will complete a DA Form 2669-R (Certificate of Death). DA Form 2669-R will be reproduced locally on 8 1/2 by 11-inch paper. The form is located at the back of this regulation. This form is for the use of Army only. Enough copies of form will be made out to provide distribution as follows:

(1) Original—information center.

(2) Copy—information center (branch), if necessary.

(3) Copy—The Surgeon General.

(4) Copy—EPW or RP personal file.

(5) The proper civil authorities responsible for recording deaths in the particular state if the EPW dies in the United States.

f. Investigating officer's report:

(1) The camp commander will appoint an officer to investigate and report:

(a) Each death or serious injury caused by guards or suspected to have been caused by guards or sentries, another detainee, or any other person.

(b) Each suicide or death resulting from unnatural or unknown causes.

(2) One copy of the investigating officer's report will be forwarded to the NPWIC

(3) USACIDC special agents will investigate deaths from other than natural causes per AR 195-2. A copy of the USACIDC report of investigation, if any, will be attached to the camp commander's report.

g. Burial, record of internment, and cremation. Deceased detainees will be buried honorably in a cemetery established for them according to AR 638-30. Deceased detainees will be buried, if possible, according to the rites of their religion and customs of their military forces. Unless unavoidable circumstances require the use of collective (group or mass) graves, detainees will be buried individually. Graves Registration Services will record any later movement of the remains. The United States will also care for the ashes of cremated persons. Ashes will be kept by Graves Registration Service persons until proper disposal can be decided according to the wishes of the power on which that person depended. A body may be cremated only due to imperative hygiene reasons, the detainee's religion, or the detainee's request for cremation. When a body is cremated, this fact together with the reasons will be set forth in the death certificate.

h. Burial at sea and after land transfer. If a detainee dies at sea, the body will not be buried there unless absolutely necessary. If the body has to be buried at sea, the procedures prescribed for U.S. troops will be followed as far as possible; however, a U.S. flag will not be used. When death occurs during a land transfer, the responsible officer will follow the same procedures for burial prescribed for U.S. military personnel.

i. The personnel file of a deceased person with all pertinent records will be forwarded to the Branch PWIC.

## 3–11. Transfer of prisoners of war

a. General. Permanent transfer of EPW in the custody of the U.S. forces to the host nation or other allied forces requires approval of the Secretary of Defense (SECDEF). The permanent transfer of EPW to foreign national control will be governed by bilateral national agreement and in accordance with subparagraph b below following SECDEF approval. Temporary transfer of EPW/RP to accommodate surges in prisoner population beyond the immediate capability of U.S. forces to manage is authorized. Theater commanders will develop measures to ensure accountability and humane treatment of prisoners so transferred.

b. EPW/RP may only be transferred from the custody of the United States to a power which is a party to the GPW, and only after a representative of the United States has visited the Power's internment facilities and is satisfied that the Power in question is willing and able to apply the GPW. EPW/RP transfers should not increase the difficulty of repatriation. Prisoners of war during transfer will have sufficient food and drinking water to keep them in good health, and will be provided adequate clothing, shelter, and medical attention. Precautions will be taken, especially in case of transport by sea or by air, to ensure their safety during transfer. A complete list of all transferred prisoners be made before their departure and maintained by the Branch PWIC.

c. The supporting Branch PWIC and NPWIC will be notified immediately by the EPW camp commander of any EPW or RP transferred.

d. Transfer within the territory of the detaining power will always be carried out humanely and in conditions no less favorable than those enjoyed by the troops of the detaining power during their movements. If EPW/RP are transferred on foot, only those who are fit to walk may be so transferred. The EPW/RP will not be exposed to excessive fatigue during transfer by foot.

e. The sick, wounded, or infirm EPW and RP as well as maternity

cases will be evacuated through U.S. military medical channels and will remain in medical channels until they are certified "fit for normal internment" by competent medical authorities.

f. Necessary clothing, adequate shelter, and medical attention will be made available.

g. Suitable precautions will be taken to prevent EPW and RP, from escaping and to ensure their safety. Wounded and sick EPW and RP will not be transferred as long as their recovery may be endangered by the journey, unless their safety demands it.

h. The EPW and RP will be permitted to take with them their personal effects and property. The weight of their baggage may be limited if the conditions of transfer so require, but in no case will it be limited to less than 55 pounds per EPW/RP. The personal property that the EPW and RP are unable to carry will be forwarded separately.

i. The mail and parcels addressed to EPW and RP who have been transferred will be forwarded to them without delay.

j. Property, such as that used for religious services, or items donated by welfare agencies, will be forwarded as community property. These items are not to be considered a part of the 55 pounds of personal effects and property that each EPW is authorized to take.

k. When EPW and RP are to be transferred, they will be notified of their new postal addresses before departure. Notice will be given in time to pack and tag their luggage. They will also be given time to inform their next of kin and the Branch PWIC of their transfer and new address.

l. EPW and RP will not be confined in a jail or other correctional institution during transfer except in an emergency. They will be confined only in such fashion while the circumstances that necessitate the measures continue to exist. Transfer will be effected under conditions not less favorable than those under which U.S. Armed Forces are transferred.

m. Receipt of transferred EPW/RP.

(1) EPW and RP will not be accepted for detainment or transfer to U.S. Military control from outside nations without prior approval from SECDEF. EPW and RP received by transfer from an allied nation will be properly receipted for by the officer designated to accept them. The receipt will indicate the place and date the United States assumed custody and the name, grade, ISN, and nationality of each transferred EPW and RP. Three or more copies of the receipt will be prepared. The original, plus one copy, will be delivered to the commander of the camp to which the EPW and RP are assigned. Upon receiving the copies, the camp commander will forward immediately one copy directly to the Branch PWIC, or to the NPWIC if the Branch PWIC is not operational. A DA Form 4237-R or an allied equivalent form for individuals listed on the receipt should be delivered to the accepting officer at the time the transfer is effected.

(2) EPW and RP transferred between EPW facilities and hospitals will be receipted for as above when there is little chance that the EPW/RP will be returned to the original camp. When EPW and RP are transferred to hospitals outside the jurisdiction of the EPW/ CI camp, the hospital commander is required to submit their strength accountability reports to the supporting branch PWIC.

(3) The use of a manifest identifying the name, rank/status, ISN, power served/nationality, and physical condition of each EPW and RP transferred and received is required. The manifest will be attached to the original receipt of transfer and forwarded to the Branch PWIC.

n. EPW and RP captured or detained by the U.S. Marine Corps, Navy, Air Force, or Coast Guard are turned over to the U.S. Army at receiving points designated by the Theater Commander.

(1) All inter-service transfers should be effected as soon as possible after initial classification and administrative processing has been accomplished.

(2) CI will only be transferred within theater, unless directed by DOD.

(3) A manifest is required to identify as a minimum the: name, rank/status, ISN (if assigned), power served/nationality, and physical condition of each EPW and RP transferred and received. The manifest will be attached to the receipt of transfer and will become a permanent record to assure accountability of each prisoner.

*o.* When EPW are moved to a port of debarkation from an interior point, the theater commander will provide for:

(1) Transportation of the EPW up to and including their departure from the port.

(2) Care and security of the EPW, their baggage, monies, other valuables, and records until their custody is assumed by the CONUS EPW command.

*p. Transfers between Army commands.* The EPW's command, with the advice of military medical authority, is authorized to transfer injured, sick, and wounded EPW to other commands.

*q. Transfer of personal effects.*

(1) Each EPW and retained person will be permitted to hand carry personal effects and property not to exceed 55 pounds.

(2) EPW/RP who have been serving as chaplains or clergymen during their internment will be permitted to transfer, at Government expense, an additional 110 pounds to take other religious materials with them.

*r.* The transfer of physically disabled, insane, mentally incompetent, or wounded EPW/RP in a theater of operations will be according to procedures set up by the Theater Commander.

*s.* When a railroad car other than an U.S. Military-owned or operated hospital car is used to transfer EPW or RP patients, Red Cross signs will be placed on the inside of the middle window of each side of the car and on the inside of each door window of the car. These signs will be made of white paper or cardboard with a large red cross in the center of the sign. The word "hospital" will be placed above, and the word "car" below the red cross, in black letters. When EPW/RP patients are transferred in a compartment, drawing room, bedroom, or roomette, a sign as described above, with the exception of the word "car," in proportionate dimensions will be placed on the outside of the door of the compartment, drawing room, bedroom, or roomette.

*t.* Theater commanders are subject to the general restrictions on transfers contained in this regulation. They may transfer injured, sick, or wounded EPW who are within their commands to or from hospitals designated by the theater surgeon or Commander, HSC with guidance from the Joint Medical Regulation Office (JMRO) or the Theater Patient Movement Requirements Center (TPMRC) if:

(1) The EPW requires prolonged hospitalization or specialized treatment, including surgery, that is not available locally.

(2) The transfer is recommended by a medical officer after an examination of the EPW.

*u.* When EPW no longer require medical care, they may be returned to the command from which transferred or to an EPW camp within the receiving command.

## 3–12. Repatriation of sick and wounded EPW/RP

*a.* Sick and wounded prisoners will be processed and their eligibility determined for repatriation or accommodation in a neutral country during hostilities. Both will be according to the procedures set forth below.

(1) Sick and wounded prisoners will not be repatriated against their will during hostilities.

(2) Procedures for a Mixed Medical Commission will be established by HQDA, according to this regulation and Annex II of the GPW. The purpose of the Commission will be to determine cases eligible for repatriation. The Mixed Medical Commission will be composed of three members. Two of the members, appointed by the ICRC and approved by the parties to the conflict, will be from a neutral country. As far as possible, one of the neutral members will be a surgeon and the other a physician. The third member will be a medical officer of the U.S. Army selected by HQDA. One of the members from the neutral country will act as chairman.

*b.* If for any reason the use of neutral doctors cannot be arranged for by the ICRC, the United States, acting in agreement with the

Protecting Power concerned, will set up a Medical Commission. This Commission will perform the duties of a Mixed Medical Commission.

*c.* The Mixed Medical Commission will:

(1) Examine EPW, and RP who have applied for repatriation.

(2) Inspect clinical records pertaining to these EPW.

(3) Determine those cases eligible for repatriation or hospitalization in a neutral country.

*d.* Decisions made by the Mixed Medical Commission will be a majority vote and cannot be changed to the detriment of the EPW and RP examined, except upon concurrence of the Commission.

*e.* The decisions made by the Mixed Medical Commission on all cases will be communicated to HQDA (DAMO-ODL), NPWIC, the Protecting Power, and the ICRC, during the month following the Commission's visit. Each EPW and RP examined will be informed by the Mixed Medical Commission of the decision made on the case.

*f.* The United States will carry out the decisions of the Mixed Medical Commission as soon as possible and within 3 months of the time after it receives due notice of the decisions.

*g.* The U.S. member will arrange all administrative details to expedite the work of the Commission. Commanders concerned will assist, facilitate, and expedite the operations of the Commission to the fullest extent.

*h.* The EPW and RP noted below will be examined by the Mixed Medical Commission.

(1) EPW and RP designated by a camp or hospital surgeon or a retained physician or surgeon who is exercising the functions of the surgeon in a camp.

(2) EPW and RP whose applications are submitted by a prisoner representative.

(3) EPW and RP recommended for examination by the power on which the EPW and RP depend or by an organization duly recognized by that power and that gives assistance to them.

(4) EPW, RP who submit written requests. These EPW will not be examined until the EPW listed in (1), (2), and (3) above have been examined.

*i.* An EPW or RP found ineligible by the Mixed Medical Commission may apply for reexamination 3 months after the last examination.

*j.* Each commander will be notified before arrival of the Commission. Before arrival of the Commission at a camp, hospital, or other designated place, the commander will prepare DA Form 2670- R (Mixed Medical Commission Certificate for EPW) and update and make available the records. For each EPW and RP to be examined, DA Form 2670-R will be completed in four copies. DA Form 2670-R will be locally reproduced on 8 1/2 by 11-inch paper. This form is located at the back of this regulation. This form is for the use of Army only.

*k.* The commanding officers of designated hospitals will complete DA Form 2671-R (Certificate of Direct Repatriation for EPW) and forward to the Branch PWIC. DA Form 2671-R will be locally reproduced on 8 1/2 by 11-inch paper. The form is located at the back of this publication. This form is for the use of Army only. The certificate will be in four copies to:

(1) Make the repatriation of sick and wounded EPW, RP easier.

(2) Relieve the Mixed Medical Commission of the need to visit EPW and RP patients who are eligible for direct repatriation.

*l.* The following EPW and RP are eligible for direct repatriation:

(1) EPW and RP suffering from disabilities as a result of injury, loss of limb, paralysis, or other disabilities, when these disabilities are at least the loss of a hand or foot, or the equivalent.

(2) Sick or wounded EPW and RP whose conditions have become chronic to the extent that prognosis appears to preclude recovery in spite of treatment within 1 year from inception of disease or date of injury.

*m.* The original and one copy of DA Form 2671-R will be forwarded to ODCSOPS, NPWIC. The other two copies will be attached to the clinical record. In all instances, these records will accompany the records of the EPW or RP when transferred.

**3–13. Repatriation of other EPW/RP**

Prisoners who are not sick or wounded will be repatriated or released at the cessation of hostilities as directed by OSD.

**3–14. Repatriation transfer procedures**

a. Control and accountability of EPW and RP will be maintained until the EPW or RP is receipted for by the serving power or designated protecting power.

b. The use of a manifest identifying at the minimum; name, rank/status, ISN, power served/nationality, and physical condition of each EPW and RP transferred is required. The manifest will be used as an official receipt of transfer and will become a permanent record to assure accountability of each EPW and RP until final release.

c. Copies of appropriate personnel, finance, and medical records will accompany the released and/or repatriated EPW/RP. These records will be transferred to the custody of the designated official receipting for the EPW/RP.

d. All confiscated personal property that can be released, will accompany the released or repatriated EPW/RP. An inventory will be conducted and any discrepancies identified. The individual will sign a property receipt for his personal items.

e. Upon completion of the transfer, the U.S. escort guard will forward the official receipt of transfer to the Branch PWIC.

f. Upon notification from the PWIC that the transfer is complete, the losing EPW or RP internment facility will forward all official records and confiscated property that cannot be released to the Branch PWIC for final disposition.

g. The PWIC will:

(1) Notify the NPWIC of final status of released/ repatriated EPW and RP.

(2) Forward all EPW and RP records and reports per AR 25-400-2, The Modern Army Recordkeeping System (MARKS).

(3) Dispose of confiscated property in their possession per instructions received from the NPWIC and applicable Army Regulations.

**3–15. Retained personnel**

a. Enemy personnel entitled to a retained status should have on their person at the time of capture a special identity card attesting to their status. The minimum data shown on the card will be the name, date of birth, grade, and service number of the bearer. The card will state in what capacity the bearer is entitled to the protection of GPW. The card will also bear the photograph of the owner and either the signature or fingerprints or both. It will be embossed with the stamp of the military authority with which the person was serving at time of capture.

b. Enemy personnel who fall within any of the following categories, are eligible to be certified as RP:

(1) Medical personnel who are members of the medical service of their armed forces.

(2) Medical personnel who are exclusively engaged in:

(a) The search for or the collection, transport, or treatment of the wounded or sick.

(b) The prevention of disease.

(c) Staffs exclusively engaged in administering medical units and establishments.

(3) Chaplains.

(4) The staff of the National Red Cross, Red Crescent, and other voluntary aid organizations. These organizations must be duly recognized and authorized by their governments. The staff of these organizations may be employed on the same duties as persons in (2) above, if such organizations are subject to military laws and regulations.

c. RP whose status is certified will not be considered as EPW; however, they will receive the benefits and protection of an EPW.

d. EPW who are certified to be proficient medically or religiously continue to be considered and identified as EPW, as appropriate, but will be administered and trained in the same way prescribed for RP. Enemy personnel who are classified in these categories and are determined qualified by competent Army authority are eligible to be certified as proficient to perform medical or religious duties:

(1) EPW who are ministers of religion; however, they have not officiated as chaplains to their own forces.

(2) Specially trained EPW, employed at the time of their capture as hospital orderlies, nurses, or auxiliary stretcher-bearers, in search for, or in collecting, transporting, or treating of the wounded and sick. These EPW are not eligible for RP status but may be employed only on medical duties they are qualified to perform.

e. Certification of the retained status of personnel will be effected upon the decision that the special identity card held by each such person is valid and authentic. This certification will be decided, if possible, at the time of processing by the camp commander.

f. The Theater Commander, or CINCUSACOM will confirm the certification of the technical proficiency of the persons described in paragraph 3-15d. Qualified U.S. Military medical and religious personnel must first confirm the medical or religious proficiency of each EPW.

g. Classification forms will be completed as follows:

(1) DA Form 2672-R (Classification Questionnaire for Officer Retained Personnel) will be completed in three copies by captured officers and civilians of equal grade who have or:

(a) Claim RP status.

(b) Are applicants for a certificate of medical proficiency. DA Form 2672-R will be locally reproduced on 8 1/2 by 11-inch paper. The form is located at the back of this publication. This form is for the use of Army only.

(2) DA Form 2673-R (Classification Questionnaire for Enlisted Retained Personnel) will be completed in three copies by all captured enlisted persons and civilians of equal grade who have or are applicants for a certificate of medical proficiency. DA Form 2673-R will be loally reproduced on 8 1/2 by 11-inch paper. The form is located at the back of this publication. This form is for the use of Army only.

h. The camp commander will retain one copy of each of the forms noted in subparagraph g above. The second will be forwarded to the next higher commander. The third copy will be forwarded to the Branch PWIC.

i. Verifications of retained status and religious or medical proficiency will be recorded on the DA Form 4237-R of the person concerned. Denials of claims to retained status or certification of proficiency will also be receipted together with a brief statement of the reason.

j. RP are subject to the internal discipline of the camp in which they are retained; however, they may not be compelled to do any work except that relating to their medical or religious duties.

k. RP, who are members of the enemy's Armed Forces, will be assigned to EPW camps. If available, they will be assigned in the ratio of two physicians, two nurses, one chaplain, and seven enlisted medical personnel per 1,000 EPW. Economy of medical staffing may be achieved at higher levels per guidance from Commanding General, HSC. As much as possible, these RP will be assigned to camps containing EPW from the same Armed Forces upon which the RP depend.

l. CINCs, Task Force Commanders, Joint Task Force Commanders are authorized to transfer RP and EPW who are qualified to perform medical or religious duties between EPW camps within their jurisdiction in order to distribute them equitably.

m. Subject to security requirements the theater commander will ensure:

(1) Full use of enemy medical personnel for the treatment of sick and wounded EPW/RP.

(2) Release of U.S. medical personnel, when possible, from caring for sick and wounded EPW except for supervision and training of enemy medical personnel.

n. The senior medical officer in each camp will provide close and continuing supervision of the professional activities of the retained medical persons and report all improper activities.

o. RP will not be allowed access to or custody of narcotic drugs or other controlled substances as delineated in Title 21, United

States Code, except under close supervision of U.S. medical personnel.

*p.* EPW camp surgeons or hospital commanders in which retained persons are used will verify:

(1) Accuracy of the final diagnosis.

(2) Adequacy of treatment.

(3) Final disposition of patients treated by RP.

*q.* While caring for the sick and wounded, RP will receive the same daily rate of pay as is received by EPW.

*r.* Monthly allowances for RP will be the same as those prescribed for EPW of the same rank.

*s.* RP may be detained in EPW camps. When practical, they will be assigned quarters separate from EPW.

*t.* RP will wear on their left sleeve a water resistant arm band bearing the distinctive emblem (Red Cross, Red Crescent) issued and stamped by the military authority of the power with which they have served. Authorized persons who do not have such armbands in their possession will be provided with Geneva Convention brassards (AR 670-1).

*u.* RP will enjoy the same correspondence privileges as EPW. Chaplains will be free to correspond, subject to censorship, on matters about their religious duties. Correspondence may be with ecclesiastical authorities both in the country where they are retained and in the country on which they depend, and with international religious organizations. RP will be authorized the following additional privileges:

(1) They will be granted facilities necessary to provide EPW with medical care, spiritual assistance, and welfare services.

(2) They will be authorized to visit EPW periodically in branch camps and in hospitals outside the EPW camps in order to carry out their medical, spiritual, or welfare duties.

(3) They will be given the necessary means of transportation for making such visits.

(4) The senior retained medical officer, as well as chaplains, will have the right to correspond and consult with the camp commander or his or her authorized representatives on all questions about their duties.

*v.* RP are subject to the same disciplinary measures as are EPW.

*w.* RP will be retained only insofar as the state of health, the spiritual needs, and the number of EPW require. Persons whose retention is not required will be repatriated as soon as military requirements permit. Nothing precludes reasonable measures to prevent such persons from carrying information of strategic or tactical value. Should they come into possession of such information, their return to their own armed force may be delayed until the information is of no significant value.

## 3–16. Complaints and requests to camp commanders

*a.* EPW and RP have the right to make complaints and requests to camp commanders and the ICRC/protecting powers regarding the conditions of their internment. EPW and RP may not be punished for making complaints, even if those complaints later prove unfounded. Complaints will be received in confidence, as they might endanger the safety of other detainees. Appropriate action, including segregation, will be taken to protect detainees when necessary. This policy also applies to persons who are confined pending trial or as a result of a trial.

*b.* EPW and RP may take complaints or requests to the camp commander.

*c.* Persons exercising the right to complain to the ICRC or protecting power about their treatment and camp may do so:

(1) By mail.

(2) In person to the visiting representatives of the ICRC or protecting power.

(3) Through their detainee representative.

*d.* Written complaints to the protecting power will be forwarded promptly through HQDA, ODCSOPS (DAMO-ODL) NPWIC. A separate letter with the camp commander's comments will be included. Military endorsements will not be placed on a detainee's communication.

*e.* If an ICRC/protecting power communicates directly with an EPW/CI camp commander about any matter requiring an answer, the communication and commander's reply will be forwarded to HQDA, ODCSOPS (DAMO-ODL) NPWIC, for proper action.

*f.* Any act or allegation of inhumane treatment will be investigated and, if substantiated, reported to HQDA as a Serious Incident Report (SIR) per AR 190-40. Once completed, a copy of the SIR accompanies the prisoner to the EPW/CI camp, and a copy is furnished to the monitoring Branch PWIC. All available pertinent information that the EPW or RP is willing to give, will be entered on the form.

## 3–17. EPW/RP safety program

A safety program for EPW and RP will be set up and administered in each EPW camp. Army regulations, circulars, and pamphlets in the 385-series may be used as guides for establishing an EPW and RP safety program. Accident injury forms used in the EPW and RP safety programs will be prepared, administered, and maintained separately from those prepared for other persons included under the Army Safety Program.

## Chapter 4
## Employment and Compensation for EPWs

### Section I
### General Policy and Guidelines

### 4–1. General principles

*a.* To the extent possible, EPW will be employed in work needed to construct, administer, manage, and maintain EPW camps. EPW will be employed in other essential work permitted by this regulation only when qualified civilian labor is not available. Essential work is work that must be done, despite the availability of EPW.

*b.* EPW labor, external to DOD, is regulated by contract. When authorized by theater directives, EPW, RP may be given advance pay. Procedures for administering this advance pay are set forth in AR 37-1.

### 4–2. Restricted employment

*a.* EPW will not be employed in positions that require or permit them:

(1) Access to classified defense information or records of other personnel.

(2) Access to telephone or other communication systems.

(3) Authority to command or instruct U.S. personnel.

*b.* EPW may be employed in the following types of labor:

(1) EPW camp administration, installation, or maintenance.

(2) Agriculture.

(3) Public works, public utilities, and building operations which have no military character or purpose.

(4) Transportation and handling of stores which are not military in nature or purpose.

(5) Domestic service.

### 4–3. Liability to perform labor

*a.* Subject to the limitations stated in paragraph 4-5 and 4-6, EPW will be required to perform any and all work consistent with their grade and status as follows:

(1) Officer EPW. Officer EPW will not be required to work. Officer EPW, however, may make a written request for work. The camp commander will provide such work, if feasible. Officer EPW may, at any time, revoke a voluntary request for work. Officer EPW are required to maintain their personal areas, equipment and other items/areas in a manner that promotes good health and personal hygiene.

(2) Noncommissioned officer (NCO) EPW. NCO EPW will be required to do supervisory work only. NCO EPW, however, may make a written request for work other than supervisory work. NCO

EPW may, at any time, revoke a voluntary request for work other than supervisory work.

(3) Enlisted EPW. Enlisted EPW will be required to do any and all work consistent with this regulation.

*b.* Fitness of EPW for labor will be verified at least once a month by medical examination. An attending medical officer will classify the level of physical fitness EPW can perform for work as follows: heavy work, light work, and no work. Lists of these individual labor levels of EPW will be posted in each EPW camp. If physical conditions permit, each EPW will perform labor as directed by the camp commander.

## 4–4. Authorized work

*a.* Categories. Levels of work for which each EPW are authorized and may be compelled to perform are categorized as follows:

(1) Restricted work. EPW may be compelled to perform the following types which may not be of a military nature or purpose:

(a) Public works and building operations. The primary factor in deciding whether EPW may be employed is the nature of the construction being undertaken. If the construction is purely military in nature, each EPW may not be compelled to engage in such work. If the construction is not purely military in nature, the purpose for which the structure is to be used is the deciding factor. If the completed construction is intended to be used primarily by units engaged in, or in direct support of, military operations against the enemy, EPW may not be compelled to work on the project.

(b) Transporting and handling stores. The first consideration is the nature of the property being handled. If the stores are military in nature, EPW may not be compelled to transport or handle them. If the items are not military in nature, then their purpose is the deciding factor. EPW may not be required to transport or handle stores specifically consigned to units engaged in military operations. EPW and RP may, however, be required to handle stores when handling is incidental to the performance of authorized types of work. For example, work in a military mess may be classified as domestic service. Handling of rations by EPW in connection with domestic service may be required.

(c) Public utility services. Construction, repair, or maintenance of water, sewage, drainage, gas, or electrical facilities are not of an inherent military nature. The purpose of these services is the deciding factor as to whether or not EPW may be compelled to engage in such activities. Such services may be intended primarily or exclusively for the benefit of units engaged in, or directly supporting, operations against the enemy. If so, EPW may not be required to perform these services. On the other hand, services intended primarily or exclusively for other purposes represent work that EPW may be compelled to perform.

(2) Nonrestricted work. EPW may be compelled to perform types of work listed below having no direct military purpose:

(a) Construction, administration, management, and maintenance of EPW camps.

(b) Agriculture.

(c) Manufacturing industries, with the exception of metallurgical, machinery, and chemical industries.

(d) Commercial business and arts and crafts.

(e) Domestic service, including a clothing repair shop, laundry, bakery, or a mess hall.

## 4–5. Unauthorized work

*a.* Unhealthy or dangerous work. EPW and RP may not be employed in any job considered injurious to health or dangerous because of the inherent nature of the work, the conditions under which it is performed, or the person's physical unfitness or lack of technical skill. A specific task should be considered, not the industry as a whole. The specific conditions for each job are the deciding factors. For example, an otherwise dangerous task may be rendered safe by the use of safety equipment. Likewise, an otherwise safe job may be dangerous because of the circumstances under which the work is required to be done. Similarly, dangerous work may be safe for those whose training and experience have made them adept at it. EPW will not be employed in tasks requiring:

(1) Exertion beyond physical capacity.

(2) Use of inherently dangerous mechanisms or materials such as:

(a) explosives or mine removal.

(b) Mechanisms that are dangerous because the person is unskilled in their use.

(3) Climbing to dangerous heights or exposure to risk of injury

from falling objects under motion and not under full control.

*b.* Humiliating work. No person will be assigned labor that is humiliating or degrading for a member of the U.S. Armed Forces. This prohibition does not prevent EPW from doing ordinary and frequently unpleasant tasks such as maintaining sanitation facilities, ditch digging and manual labor in agriculture.

*c.* Other specifically prohibited work. Certain occupations or types of work are prohibited for safety, security, or other reasons. EPW and RP will not be:

(1) Permitted to work in an area where they may be exposed to combat zone fire.

(2) Employed as personal servants to members of the U.S. Armed Forces.

(3) Employed to tend bars or serve alcoholic beverages in officers' messes or similar establishments.

(4) Permitted to work inside correctional facility walls or near inmates.

*d.* Questionable work. In case of doubt as to whether certain work is authorized, the next higher HQ Staff Judge Advocate (SJA) will review the proposed tasks. The purpose of the review will be to ensure consistency with this regulation and the law of war. The SJA will provide recommendations in writing to the camp commander. A copy will be forwarded to HQDA (DAJA-IA), WASH DC 20310- 22 14.

## 4–6. Decisions on work conditions and safeguards

Commanders will make on-the-job decisions as to whether work is safe. They will take into account the guidance set forth in this regulation. Commanders will make decisions by ordinary standards of sound judgment, assisted by the informed advice of persons familiar with the occupations and other available data. Data will include the opinions of the SJA. Preliminary job training will be given when necessary and; protective clothing and accessories will be provided as required (e.g., hard-toed shoes, goggles, and gloves). Such safety devices will be equal to safeguards provided for civilian labor. Commanders will make periodic inspections to ensure satisfactory conditions and safeguards are maintained at all times.

## 4–7. Referrals to HQDA, ODCSOPS

*a.* When substantial doubt exists as to whether or not a type of work is permissible according to this regulation, a request to ODCSOPS for specific instructions will be made through channels by the most expeditious means.

*b.* Each question forwarded will be accompanied by a statement as to:

(1) Type and place of work.

(2) Tasks to be performed.

(3) Number of EPW to be employed.

(4) Other facts having a direct bearing on the employment.

## 4–8. Length of workday

*a.* The length of the workday for EPW, including the time for travel will not exceed that permitted for civilians in the locale who are employed in the same general type of work. The working period may be extended but will not be considered excessive because EPW are laboring under a task system. EPW contracts will contain specific terms on the hours of employment.

*b.* Except as provided in subparagraph c below, the EPW will not be required to work more than 10 hours (in one day) exclusive of a one hour lunch and rest period. They will not be kept out of camp for more than 12 consecutive hours, including travel time. Rest

cycles consistent with the wet bulb, black globe temperature will be monitored and followed.

c. EPW may be required to work any number of hours for the efficient operation of the EPW compound messes. EPW are responsible for preparing food within these messes.

## 4–9. Rest periods

a. Day of rest. Each EPW will be allowed a rest period of 24 consecutive hours every week. These hours will preferably be on Sunday or on the day of rest in the prisoner's country of origin or as established by his or her religious affiliation.

b. Annual. Each EPW who has worked for one full year will be given a rest period of eight consecutive days during which the U.S. will give working pay to the EPW.

## 4–10. Responsibility for work supervision

The EPW camp commander will:

(1) Decide, as far as practical, how adequate the technical supervision is which is provided by the using agency.

(2) Report the facts on inadequately supervised details to the using agency.

(3) Refuse to continue details on contract work unless adequate work supervision is provided.

## 4–11. Work detail leaders and interpreters

EPW camp commanders are authorized to use selected EPW as work detail leaders and interpreters. The time of work detail leaders and interpreters will be included in labor reports under the same project work classification as their details. The supporting EPW/CI PSYOP unit can assist the camp commander in identifying key communicators, informal leaders, and linguists among the camp population for use as work detail leaders and interpreters.

## 4–12. Task system

The task system will be used when it is possible to predetermine the amount of finished work that an EPW, or group of EPW, can reasonably be expected to complete in a specific period of time.

a. Elements of the task system. The task system consists of:

(1) Assigning each EPW, or each group of EPW, a definite and reasonable amount of work to be completed within each workday or other predetermined time period.

(2) Payment for completed work according to this regulation.

(3) Incentive adjustments of the required work according to this regulation.

(4) Penalty measures needed to enforce the task system.

b. Decision on daily tasks. The camp commander will decide the reasonable amount of completed work to be required of each EPW or group of EPW during a day.

c. Notice to EPW. EPW will be informed of the adoption of the task system before it is put into effect. Each EPW or group of EPW, depending upon whether separate or group tasks are assigned, will be informed of the amount of completed work required each day.

d. Incentives. As an incentive, EPW who have completed the required amount of work in less than normal time may be returned to quarters.

e. Enforcing the task systems. The camp commander may take disciplinary action against physically qualified EPW who habitually fail to complete the assigned tasks.

## 4–13. Employing EPW

a. The greatest benefit from EPW labor on work projects will be obtained. EPW will be employed, as far as practical, on work for which they are qualified. The Dictionary of Occupational Titles, U.S. Government Printing Office, WASH, DC, will be used as a guide in deciding the qualifications of each EPW.

b. In assigning EPW to details requiring special training and skills, the following qualification will be considered:

(1) Technical skills.

(2) Aptitudes.

(3) Past work records.

(4) On-the-job training.

c. EPW capable of performing skilled and semi-skilled work should be employed on essential work. Persons on work details that require special training or skill will remain as constant as practical. When it is necessary to substitute an EPW in such a detail, the using agency will be notified.

## 4–14. Paid work

EPW will be compensated for performing work for which pay is authorized. The rate of such pay shall be not less than as prescribed in Article 62, GPW. Compensation for all such work will be made as authorized from U.S. Army appropriated funds, canteen funds, or camp EPW funds. Types of paid work for which compensation is authorized are:

a. Labor performed for a contract employer or for a federal agency.

b. Services as orderlies and cooks (for officer EPW).

c. Services to construct, administer, manage, and maintain EPW camps, branch camps, and hospitals when such services are performed by EPW permanently assigned to certain duties or occupations.

d. Labor of RP for their duties.

e. Spiritual or medical duties required to be performed by EPW for fellow EPW.

f. Service as prisoner representative or assistant. Such persons will be paid from the camp EPW fund. If no such fund exists, they will be paid the prescribed rate of pay from U.S. Army appropriated funds.

g. Work as detail leaders or interpreters.

## 4–15. Restriction on paid work

a. Mess personnel. The number of EPW cooks and assistant cooks who will be paid for work in camp messes will in no case exceed the total number authorized for Army enlisted messes of the same or similar size.

b. Fatigue details. Kitchen police, latrine orderlies, and other fatigue details will normally be provided by rotating enlisted EPW. Each EPW assigned to these details will not be paid from Government canteen or camp EPW funds. Assignment of persons to such details by rotation on a duty roster may interfere with the work program. If so, the Camp Commander may assign those duties to EPW who volunteer and whose skills or training are not essential for other work details. In such cases, EPW assigned may be paid the authorized daily rate from canteen credits contributed by all EPW. Payment will be under supervision of the Camp Commander.

c. Gardening work.

(1) To the extent practical, EPW will be required to raise their own vegetables. This work will be classified as paid work.

(2) The produce from gardens operated with EPW labor will be U.S. property. It will be used for the benefit of EPW and U.S. Armed Forces personnel. It should not be sold or traded in civilian markets.

## 4–16. Rates for paid work

EPW employed for paid work will be compensated at a rate to be specified, on either piecework or by the workday, as provided below:

a. Piecework rates. Piecework rates will be used in compensating EPW when the work performed is for a contract employer or a Federal agency other than DOD.

b. Working rates. Working rates will be used for compensating all other paid work (other than contract work) as follows:

(1) EPW of all grades, whether acting in a supervisory capacity or otherwise, will be compensated at the authorized daily rate per full workday.

(2) EPW laboring less than the full workday will be compensated in proportion to the number of hours worked, except when working under a task system and having completed the required task, EPW working under a task system will be paid only for the completed parts of the task despite the number of hours worked.

(3) The U.S. work supervisor may decide that an EPW who is not under a task system is producing less than should be produced

in a full workday. If so, the EPW will be compensated at a rate proportionally lower than the authorized daily rate. Such a decision must be approved by the Camp Commander.

### 4–17. Days of paid work per month
The maximum number of days of paid work for an EPW will be limited to the number of workdays in a calendar month. The total workdays include the total number of days minus Sunday and any holiday specifically authorized by HQDA, ODCSOPS, (DAMOODL) NPWIC.

### 4–18. Unpaid work
EPW/RP will not be paid for those services connected with administering and maintaining EPW camps, branch camps, and hospitals when such services are performed on a daily rotation or other temporary basis. Unpaid work, in all cases, will include:

   a. Kitchen police.
   b. Latrine orderlies.
   c. Ground police.
   d. Other routine fatigue details of the types normally assigned and performed equitably and temporarily by persons in U.S. Army units.

### 4–19. Sale of articles and repair services
The canteen officer may sell articles made to order for, or repair services performed for, U.S. personnel by EPW. This sale is subject to the following provisions:

   *a.* Articles will be manufactured or repair services will be performed only during the spare time of EPW.
   *b.* No expense to the U.S. will be incurred for equipment, materials, or labor.
   *c.* Repair work or the making of articles to order for U.S. personnel will be prohibited unless an order for the work is placed through the EPW canteen.
   *d.* The canteen officer will fix the price of each article or repair service. The price will reasonably conform to prices for similar articles or services in the civilian market, less the cost of any material supplied by the customer.
   *e.* The canteen officer and the Camp Commander will enter into a blanket contract. Under this contract, the canteen officer will pay to the Camp Commander amounts derived from the sale of articles made to order for, and repair service performed for, U.S. personnel, less a handling charge by the canteen of not more than 10 percent. The canteen officer will submit a voucher monthly to the camp commander. The voucher will list:

   (1) The individual sales and services performed during the month.
   (2) The price charged for each.
   (3) The deductions made for handling charges.

   *f.* The Camp Commander will deposit the amount derived from the sale of articles made to order for, or repair services performed for, U.S. personnel with the U.S. Treasurer. Procedures for these transactions are prescribed in AR 37-1. The EPW will be paid an hourly rate. The rate will not exceed the authorized daily rate for paid work for the services performed. However, in no case will the amount paid to the EPW exceed the price of the article or repair service fixed under subparagraph d above. Amounts will be subject to deductions provided for in this regulation. Any residual money will be disbursed by the EPW camp counsel for use by camp EPW. This disbursement must be approved by the Camp Commander.

### 4–20. Disability compensation
   *a.* An EPW may be injured or suffer a disability while working under circumstances that may be attributed to work. If so, DA Form 2675-R (Certificate of Work Incurred Injury or Disability) will be completed in four copies. The original will be given to the EPW; the second copy will be forwarded to the PWIC to be sent to the National Prisoner of War Information Center; and the third and fourth will be placed in the EPW's personnel file.

   *b.* A claim by the EPW for compensation for work-incurred injury or disability will be forwarded to the PWIC. The PWIC will send the claim to the Power on which the EPW depends for settlement. A copy of the completed DA Form 2675-R taken from the personnel files of the EPW will be attached to the claim. DA Form 2675-R will be reproduced locally on 8 1/2 by 11 inch paper. This form is for the use of Army only.

### 4–21. Operation of government vehicles
EPW may be licensed to operate Government motor vehicles according to AR 600-55.

### Section II
### Contract Employment

### 4–22. Rules and procedures
Rules and procedures governing the military and contract employment of EPW will be according to the most current contract laws, procedures and guidelines and comply with the provisions of the Geneva Convention. All requests for the contracting of EPW will be forwarded promptly through channels to HQDA, ODCSOPS (DAMO-ODL) and be coordinated with HQDA, DAJA.

### Chapter 5
### Beginning of Internment (CI)

### 5–1. General protection policy—civilian internee
   *a.* Treatment.
   (1) No form of physical torture or moral coercion will be exercised against the CI. This provision does not constitute a prohibition against the use of minimum force necessary to effect compliance with measures authorized or directed by these regulations.
   (2) In all circumstances, the CI will be treated with respect for their person, their honor, their family rights, their religious convictions and practices, and their manners and customs. At all times the CI will be humanely treated and protected against all acts of violence or threats and insults and public curiosity. In all official cases they will be entitled to a fair and regular trial as prescribed by this regulation.
   (3) The CI will be especially protected against all acts of violence, insults, public curiosity, bodily injury, reprisals of any kind, sexual attack such as rape, forced prostitution, or any form of indecent assault.
   (4) The CI will be treated with the same consideration and without adverse distinction based on race, religion, political opinion, sex, or age.
   (5) The CI will be entitled to apply for assistance to the protecting powers, the International Committee of the Red Cross, approved religious organizations, relief societies, and any other organizations that can assist the CI. The commander will grant these organizations the necessary facilities to enable them to assist the CI within the limits of military and security considerations.
   (6) The following acts are specifically prohibited:
   (a) Any measures of such character as to cause the physical suffering or extermination of the CI. This prohibition applies not only to murder, torture, corporal punishment, mutilation, and medical or scientific experiments, but also to any other measure of brutality.
   (b) Punishment of the CI for an offense they did not personally commit.
   (c) Collective penalties and all measures of intimidation and terrorism against the CI.
   (d) Reprisals against the CI and their property.
   (e) The taking and holding of the CI as hostages.
   ( *f* ) Deportations from occupied territory to the territory of the occupying power or to that of any other country, occupied or not, are prohibited.
   *b.* Authorization to intern. Internment of protected civilian persons in a CI camp is authorized and directed provided that such

persons satisfy the requirements for being accorded the status of CI. One of the following two conditions must apply:

(1) Internment has been determined by competent U.S. Military authority to be necessary for imperative reasons of security to the United States Armed Forces in the occupied territory.

(2) Internment has been directed by a properly constituted U.S. military court sitting in the occupied territory as the sentence for conviction of an offense in violation of penal provisions issued by the occupying U.S. Armed Forces.

*c.* Order for internment.

(1) A protected civilian person in occupied territory will be accepted for evacuation to, and/or for internment in, a CI camp only on receipt of one of the following:

(a) An internment order for imperative security reasons authenticated by a responsible commissioned officer of the United States Military specifically delegated such authority by the theater commander.

(b) An order of an authorized commander approving and ordering into execution a sentence to internment pronounced by a properly constituted U.S. military court sitting in the occupied territory.

(2) The internment order will contain, as a minimum, the following information:

(a) The internee's personal data to include full name, home address, and identification document number, if any.

(b) A brief statement of the reason for internment.

(c) Authentication to include the signature of the authenticating officer over his or her typed name, grade, service number, and organization.

*d.* Compassionate internment. Notwithstanding the provisions of b and c above, requests by the CI for the compassionate internment of their dependent children who are at liberty without parental care in the occupied territory will normally be granted when both parents or the only surviving parent is interned.

*e.* Spies and saboteurs.

(1) As individually determined by the theater commander, protected civilian persons who are detained as alleged spies or saboteurs or as persons under definite suspicion of activities hostile to the security of the United States as an occupying power, will be regarded as having forfeited rights of communication with the outside world under the Geneva Convention (GC) for reasons of military security. Such forfeiture will be viewed as an exceptional and temporary measure. Due to the seriousness of the charges, such persons will not be processed as ordinary CI.

(2) Suspected spies and saboteurs will be afforded the same human rights treatment as the CI, and in case of trial, will be accorded the rights of fair and regular trial prescribed by the GC and by this regulation.

(3) When by the direction of the theater commander, suspected spies and saboteurs rights of communication with the outside world have been restored, their internment in a CI camp may be ordered in accordance with the provisions stated in paragraphs b and c above. When so interned, they will be accorded full CI status and rights and privileges as provided for by these regulations.

(4) At the earliest date consistent with the security of the United States, they will be released and granted full rights and privileges as protected persons under the GC.

*f.* Custodial security. The degree of security and control exercised over the CI will reflect the conditions under which their internment is authorized and directed and will recognize the escape hazards and difficulties of apprehension attendant on the internment of the CI in the occupied territory.

*g.* Appeals and periodic review of security internment cases.

*(1) Appeals.* The CI who are interned for imperative security reasons will be accorded the right to appeal the order directing their internment. Such appeals will be decided with the least possible delay by a board of officers. Appeals will be decided only on the grounds of the existence or nonexistence of imperative security reasons requiring the internment of the protected person.

*(2) Periodic review.* In the case where an appeal has been rejected, the board will review the case at least every 6 months, if possible, to determine whether continued internment is essential to the security of the U.S. Armed Forces.

*(3) Reclassification to assigned residence.* In each CI case reviewed by the board in which continued control is necessary, the CI will be considered for an assignment to a residence in an area where there is adequate control.

*h.* Support of dependents. The United States will financially support the CI's dependents who are at liberty in the occupied territory and are without adequate means of support or are unable to earn a living.

## 5–2. Civilian Internee Safety Program

*a. Establishment.* A safety program for the CI will be established and administered in accordance with the policies prescribed in AR 3 85-10 and other pertinent safety directives.

*b. Reports and records.* DA forms and procedures outlined in AR 3 85-40 will be used in the implementation of the CI safety program. When so used, the letters "CI" will be clearly stamped at the top and bottom of each form. All such forms will be prepared, administered, and maintained separately from those prepared for personnel included under the Army Safety Program.

## 5–3. Republic of Korea/United States Agreement on processing civilian internees in Korea

a. On 12 February 1982, the United States and Korea signed The Memorandum of Agreement for the Transfer of the CI. The agreement applies to both the Republic of Korea (ROK) Armed Forces and the United States Armed Forces in Korea (USFK) who handle the CI.

b. As a result of this agreement, USFK Regulation 190-6 reflects minor modifications to procedures and forms concerning the processing of CI applicable only to the Korean theater of operations.

# Chapter 6
# Administration and Operation of CI Internment Facilities

## 6–1. Internment Facility

*a. Location.* The theater commander will be responsible for the location of the CI internment facilities within his or her command. The CI retained temporarily in an unhealthy area or where the climate is harmful to their health will be removed to a more suitable place of internment as soon as possible.

*b. Quarters.* Adequate shelters to ensure protection against air bombardments and other hazards of war will be provided and precautions against fire will be taken at each CI camp and branch camp.

(1) All necessary and possible measures will be taken to ensure that CI shall, from the outset of their internment, be accommodated in buildings or quarters which afford every possible safeguard as regards hygiene and health, and provide efficient protection against the rigors of the climate and the effects of war. in no case shall permanent places of internment be placed in unhealthy areas, or in districts the climate of which is injurious to CI.

(2) The premises shall be fully protected from dampness, adequately heated and lighted, in particular between dusk and lights out. The sleeping quarters shall be sufficiently spacious and well ventilated, and the internees shall have suitable bedding and sufficient blankets, account being taken of the climate, and the age, sex and state of health of the internees.

(3) Internees shall have for their use, day and night, sanitary conveniences which conform to the rules of hygiene and are constantly maintained in a state of cleanliness. They shall be provided with sufficient water and soap for their daily personal hygiene and for washing their personal laundry; installations and facilities necessary for this purpose shall be provided. Showers or baths shall also be available. The necessary time shall be set aside for washing and for cleaning.

(4) CI shall be administered and housed separately from EPW/

RP. Except in the case of families, female CI shall be housed in separate quarters and shall be under the direct supervision of women.

*c. Marking.* Whenever military considerations permit, internment facilities will be marked with the letters "CI" placed so as to be clearly visible in the daytime from the air. Only internment facilities for the CI will be so marked.

*d. Organizations and operation.*

(1) The CI internment facilities will be organized and operated, so far as possible, as other military commands.

(2) A U.S. Military commissioned officer will command each CI internment facility.

(3) When possible, the CI will be interned in CI camps according to their nationality, language, and customs. All CI who are nationals of the same country will not be separated merely because they speak different languages.

(4) Complete segregation of female and male CI will be maintained except—

(a) When possible, members of the same family, particularly parents and children, will be lodged together and will have facilities for leading a normal family life.

(b) A parent with children, if single or interned without spouse, will be provided quarters separate from those for single persons.

(c) CI may be searched for security purposes. Female CI may be searched only by female personnel.

## 6–2. Administrative processing

*a.* Military police processing.

(1) Military Police (MP) prisoner of war units officially establish CI status and processes the CI.

(2) Only civilian persons entitled to protected status and that meet the requirements set forth in the GC will be classified as a CI.

(3) Dependent children, who are interned for compassionate reasons with their parents, will not be classified as CI or otherwise processed except as required on DA Form 2674-R (Enemy Prisoner of War/Civilian Internee Strength Report) (RCS CSGP-1583) and DA Form 2663-R. DA Form 2674-R will be reproduced locally on 8 1/2 by 11 inch paper, head to head. A copy for reproduction purposes is located at the back of this regulation. This form is for the use of Army only. Children under the age of twelve are to be identified by the wearing of some form of identity badge or wristband or some other means of identification.

(4) All efforts will be made to take the necessary measures to ensure that children under fifteen, who are orphaned or are separated from their families as a result of the war, are not left to their own resources.

*b.* DA Form 2674-R

(1) General. DA Form 2674-R will be prepared for each CI camp and hospital to which CI are assigned. Preparation will be in accordance with applicable procedures set forth for EPWs. DA Form 2674-R will be reproduced locally on 8 1/2 by 11-inch paper, head to head. A copy for reproduction purposes is located at the back of this regulation. This form is for the use of Army only.

(2) Personnel to be accounted for. All civilians processed and classified as CI and for whom a DA Form 4237-R has been prepared in accordance with paragraph 6-2. of this regulation and dependent children for whom compassionate internment with their CI parents has been approved in accordance with procedures prescribed by the theater commander.

(3) Basic personnel data. References to entries in section B, Remarks, requiring basic personnel data, will be interpreted as follows:

(a) Name. Enter last names and first names, in that order, alphabetically according to section (assigned gains, losses, and so forth) of CI and dependent children.

(b) Internment serial number. Enter complete serial number. of this regulation (dependent children are not assigned internment serial numbers (ISNs)).

(c) Grade. Civilian capacity or title, CI only.

(d) Sex. CI and dependent children.

(e) Nationality. CI and dependent children. Enter name of country of which parents claim citizenship.

(f) Occupational skill. Applies only to CI.

(4) Remarks column. On initial entry, enter in the "remarks" column the notation "approved by" (insert appropriate headquarters) on (insert date approved) CI and dependent children.

*c.* Civilian internee personnel record.

(1) DA Form 4237-R will be prepared for each protected civilian processed in an occupied territory as a CI or dependent child.

(2) All pertinent information available or which the CI is willing to give will be entered on the form. If a CI refuses or is unable to give any items of information, a notation will be made in item 36 on DA Form 4237-R. The codes to be used are contained in the Prisoner of War Information System (PWIS) Operator's Manual. Stamp the letters "CI" at the top and bottom of all pages of the form.

(3) All items on DA Form 4237-R are self explanatory except the following entries:

*(a) Item 3.* Civilian capacity or title (for example, mayor or police chief) if appropriate.

*(b) Item 4.* Serial number of identification document, if any.

*(c) Item 5.* Entry of "civilian internee."

*(d) Items 19 through 21.* Not applicable.

*(e) Items 23 through 25.* Name of apprehending unit and location, if known.

*(f) Item 35.* List impounded items from DA Form 1132 (Prisoner's Personal Property List-Personal Deposit Fund) and have the CI sign in the appropriate space verifying the impounded items.

(4) Entries will be typed if possible; otherwise, the form will be printed by hand in BLOCK LETTERS.

(5) Once completed, a copy of the form will accompany the CI to the CI camp. A copy will be furnished to the Branch PWIC monitoring CI activity for the theater commander.

*d. Internment serial number (ISN).* ISNs for each CI will be assigned according to the procedure set forth for EPW. The letters ACI@ will be substituted for AEPW@ e.g. US9AB-0001CI.

*e. DA Form 2677-R (Civilian Internee Identity Card).* Each CI will be issued a completed DA Form 2677-R. Notation thereof will be made under item 36 of DA Form 4237-R. DA Form 2677-R will be reproduced locally on 3- by 5- inch card head to foot. (Copy for local reproduction is located at the back of this regulation.) This form is for the use of Army only. All cards will be weatherproof. The CI will retain their identity cards at all times.

*f. Internment card.* On completion of a DA Form 4237-R, but not later than one week after arrival at a CI camp, each CI must complete two copies of DA Form 2678-R (Civilian Internee Notification of Address). One copy will be addressed to the EPW/CI information organization and the other copy to a relative or next-ofkin. DA Form 2678-R will be reproduced locally on 4- by 6-inch card, printed head to foot. (Copy for local reproduction is located at the back of this regulation.)

*g. DA Form 2663-R.* DA Form 2663-R will be completed in duplicate for each CI and for each interned dependent child. One copy will be retained in the camp at which the CI or dependent child is interned and will accompany internee on transfers; the other copy will be forwarded to the Branch PWIC.

## 6–3. Personal effects

*a.* All personal effects, including money and other valuables, of the CI will be safeguarded. Personal effects are classified according to their disposition.

*b.* The personal effects that detainees are allowed to retain, but are taken from them temporarily for intelligence purposes, will be receipted for and returned as soon as practical. Any national identification card or DA Form 2677-R will not be taken from the CI at any time.

(1) The camp commander may receive personal effects that the CI are permitted to retain, but which they wish stored. Individual receipts will be given to the CI for all items stored in this manner.

(2) Any claim by a CI for compensation for personal effects, money, or valuables stored or impounded by the United States and not returned upon repatriation or any loss alleged to be the fault of

the United States or its agents will be referred to the country to which the CI owes allegiance. In all cases, camp commanders will provide the CI with a statement, signed by a responsible officer, describing the property not returned and the reason. A copy of this statement will be forwarded to the Branch PWIC.

c. An inventory of personal effects that have been impounded will be entered on DA Form 4237-R, item 35. Also, DA Form 1132 will be completed by the CI and signed by the officer in charge or his or her authorized representative and a copy given to the CI.

d. The commanding officer of the camp where the CI is interned will be responsible for storing and safekeeping impounded personal effects. Such property will be marked or otherwise identified and securely bound or packaged. Upon transfer, the CI's impounded property will be delivered to the commanding officer of the receiving facility.

e. Money found in the possession of the CI will be handled according to AR 37-1.

f. Confiscated items of economic value will be receipted to the proper agency. Items of intelligence interest will be brought to the attention of military intelligence personnel immediately and receipted to them.

g. Personal property and documents of importance to the next-of-kin left by a CI who has been released, has died, or has been in an escaped status in excess of 30 days, will be forwarded to the Branch PWIC in sealed parcels. The parcels will be accompanied by statements identifying the CI and listing the contents. All parcels will be receipted for by the authorized losing or gaining facility representative.

h. The theater commander will be responsible for retaining and storing other personal effects, pending final disposition instructions from HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400.

## 6–4. Internee Committee

a. Election. At each camp and branch camp, CI will be elected by secret written ballot to the Internee Committee. This committee is empowered to represent the camp to the protecting powers, International Committee of the Red Cross, or other authorized relief or aid organizations and U.S. military authorities.

b. Composition. The Internee Committee will consist of not less than two and not more than three elected members. Elections will be held every 6 months or upon the existence of a vacancy. Committee members are eligible for re-election.

c. Approval. Each member of the Internee Committee will be approved by the camp commander prior to assumption of duty. If the camp commander refuses to approve or dismisses an elected member, a notice to that effect with the reasons for refusal or dismissal will be forwarded through channels to the Branch PWIC for transmittal to the protecting power with a copy furnished to NPWIC.

d. Assistants. Each member of the Internee Committee may have an assistant to act as an interpreter. The interpreter must be approved by the camp commander.

e. Duties.

(1) The Internee Committee will be responsible for furthering the physical, spiritual, and intellectual well being of the CI. Members will not be required to perform any other work if it interferes with their duties.

(2) Any mutual assistance organization set up by the CI will be under the jurisdiction of the Internee Committee.

(3) Internee Committee members will be provided with the necessary materials, facilities, and transportation and will be given the freedom required to accomplish their duties. Additional special duties performed by members of an Internee Committee include the following:

(a) Visits to outside labor details.

(b) Checking the management of the canteen and the canteen fund.

(c) The presentation and transmittal of petitions and complaints to the appropriate authorities.

(d) The distribution and disposition of collective relief shipments.

(e) Keeping informed of ongoing and final judicial proceedings instituted against a CI whom they represent.

(f)

The delivery of perishable goods to the infirmary when addressed to a CI undergoing disciplinary punishment.

(g) Representing the interest of the CI by ensuring the transport of their community property and luggage that they are unable to take with them on transfers because of baggage weight limitations.

(4) Members of Internee Committees who are transferred will be allowed a reasonable time to acquaint their successors with their duties and related current CI affairs.

f. Communications facilities. Members of the Internee Committee will be accorded postal and telegraphic facilities for communicating with the protecting powers, International Committee of the Red Cross and its delegates, or other relief and aid organizations authorized to assist the CI and U.S. military authorities. Committee members of branch internment camps will be accorded similar facilities for communicating with the Internee Committee of the parent CI camp. These communications will be unlimited and will not be considered as forming a part of the correspondence quota outlined in paragraph 6-8.

## 6–5. Supplies

a. General.

(1) The CI must provide their own clothing and footwear. Approved items of clothing and equipment, general supplies, subsistence, and fuel will be supplied upon requisition.

(2) Except for work clothing or as circumstance warrant, or climatic conditions required, no replacement clothing will be issued.

(3) Except for hats and other accessories any item of clothing that may be worn as outer garments will be marked as prescribed below:

(a) All shirts, undershirts, blouses, jackets, coats including overcoats and raincoats, and similar articles will be marked with the letters "CI" across the back and on the front of each sleeve between the elbow and shoulder. The letters will be black and 4 inches high. If the clothing or uniforms are of such color that black letters do not contrast well, white will be used.

(b) Trousers, walking shorts, and like items of clothing will be similarly marked with the same letters across the back just below the belt and on the front of both legs just above the knees.

(c) At the discretion of the camp commander, the ISN or other identification marks may be written or stamped on the inside of all CI clothing.

b. Food.

(1) Subsistence for the CI will be issued on the basis of a master CI menu prepared by the theater commander. Preparation of the menu will include the following:

(a) The daily individual food ration will be sufficient in quantity, quality, and variety to maintain the CI in good health and to prevent nutritional deficiencies.

(b) The customary diet of the CI will be considered.

(c) The CI performing physical labor will receive additional food in proportion to the kind of labor performed.

(d) Expectant and nursing mothers and children under 15 years of age will receive additional food in proportion to their physiological needs.

(2) Facilities will be available to the CI for preparing additional food received or procured by them from authorized sources.

c. Miscellaneous.

(1) The issuance of expendable supplies is authorized according to allowances prescribed in Army publications.

(2) Equipment required to support vocational training projects such as gardening, carpentry, tinsmithing, blacksmithing, masonry, repairing shoes and clothing, tailoring, barbering, potting, and farming may be requisitioned through normal supply channels. Subject to restrictions imposed on authorized expenditures from the camp Civilian Internee Fund, camp commanders may purchase locally items of equipment, materials, and supplies needed in the vocational training program that are not available through supply channels.

## 6–6. Medical Care and Sanitation

*a.* General.

(1) Dental, surgical, and medical treatment will be furnished free to the CI.

(2) A medical officer will examine each CI upon arrival at a camp and monthly thereafter. The CI will not be admitted into the general population until medical fitness is determined. These examinations will detect vermin infestation and communicable diseases especially tuberculosis, malaria, and venereal disease. They will also determine the state of health, nutrition, and cleanliness of each CI. During these examinations, each CI will be weighed, and the weight will be recorded on DA Form 2664-R.

(3) Each CI will be immunized or reimmunized as prescribed by theater policy.

*b.* CI medical personnel.

(1) Qualified CI medical personnel will be used as much as possible in medical and hygiene work necessary for the well-being of all CI.

(2) Required Army medical personnel will be provided within the capability of the theater commander.

*c.* Medical facilities. Each CI camp will provide personnel, material, and facilities for adequate routine and emergency dispensary treatment. Patients requiring hospital treatment will be moved, if feasible, to a civilian hospital. The treatment must be as good as that provided for the general population. When civilian hospital facilities are not available or their use is not feasible due to security considerations, U.S. military hospital facilities may be used. Guards for hospitalized CI will be provided, as necessary.

*d.* Medical care.

(1) Medical and dental care, including dentures, spectacles, and other required artificial appliances, will be provided the CI in accordance with AR 40-3.

(2) Each CI will be given an initial radioscopic chest examination. If active disease is found, pulmonary disease consultation is indicated. If no active disease is found, the individual will be followed through routine periodic examinations.

(3) For children up to 14 years of age, a tuberculin skin test (TST) will be administered. No chest x-ray is necessary if the TST is negative. The local medical officer will establish guidance for subsequent tests based on the tuberculosis experience of the population. Routine annual tuberculin testing of children is not warranted unless there is clear-cut evidence of high risk. (See AR 40-26, para 8 f.)

(4) Experimental research will not be conducted on the CI even if the CI agrees to it.

(5) Sick call for the CI desiring medical attention will be held each day. Emergency treatment will be provided at all times.

*e.* Blood donations. At each CI camp and hospital, a list will be maintained according to blood types of CI who have volunteered to furnish blood.

*f.* Records and reports

(1) General. The medical records and forms used for the hospitalization and treatment of U.S. Army personnel and for EPWs will be used for CI. The letters "CI" will be stamped at the top of the form. Medical and dental records will accompany the CI when they are transferred.

(2) Certificate of Work Incurred Injury or Disability. If a CI is injured while working or incurs a disability that may be attributed to work, a DA Form 2675-R will be completed.

(3) Certificate of medical treatment. Each CI who has undergone medical treatment will be given on request an official certificate indicating the nature of his or her illness or injury, and the duration and kind of treatment given. A duplicate of this certificate will be forwarded to the Branch PWIC.

(4) Seriously ill report. When a CI is seriously ill because of injury or disease, the camp or hospital commander will notify the Branch PWIC without delay and provide a brief diagnosis of the case. Follow-up reports, including notification of removal from the seriously ill list, will be submitted each week thereafter during the period the CI remains critical.

*g.* Sanitation.

(1) Hygiene and sanitation measures will conform to those prescribed in AR 40-5 and related regulations. Camp commanders will conduct periodic and detailed sanitary inspections.

(2) A detailed sanitary order meeting the specific needs of each CI camp or branch camp will be published by the CI camp commander. Copies will be reproduced in a language that the CI understands and will be posted in each compound.

(3) Each CI will be provided with sanitary supplies, service, and facilities necessary for their personal cleanliness and sanitation. Separate sanitary facilities will be provided for each sex.

(4) All CI will have at their disposal, day and night, latrine facilities conforming to sanitary rules of the Army.

## 6–7. Social, Intellectual, and Religious activities

*a.* General.

(1) Subject to security considerations and camp discipline, the CI will be encouraged, but not required, to participate in social, intellectual, religious, and recreational activities. Introducing political overtones into or furthering enemy propaganda objectives through these activities will not be tolerated.

(2) Premises and facilities for conducting the activities in (1) above will be made available in each camp, if possible. Required materials and supplies will be requisitioned through normal supply channels.

(3) Carefully selected and qualified civilian nationals and CI may be used for the conducting of activities in (1) above where practical as long as they are closely supervised by U.S. Military personnel.

*b.* Visits.

(1) Official. Duly accredited representatives of the protecting powers and of the International Committee of the Red Cross and CI will be permitted to visit and inspect CI camps and other places of internment in the discharge of their official duties. The inspections will be at times previously authorized by the theater commander. Such visits will not be prohibited, nor will their duration and frequency be restricted, except for reasons of imperative military necessity, and then only as a temporary measure. These representatives will be permitted to—

(a) Interview the CI without witnesses, if requested.

(b) Distribute relief supplies and approved materials intended for educational, recreational, or religious purposes, or for assisting the CI in organizing their leisure time within the places of internment. Visiting representatives may not accept from the CI any letters, papers, documents, or articles for delivery.

(2) Social. Near relatives and other persons authorized by the theater commander will be permitted to visit the CI as frequently as possible in accordance with theater regulations. They should be advised that the taking of photographs on or about the facility is prohibited.

(3) Emergency visits by civilian internees. Subject to theater policy, the CI may visit their homes in urgent cases, particularly in cases of death or serious illness of close relatives.

*c.* Education.

(1) The CI education program, as developed for each CI camp, will reflect consideration of the following:

(a) The several educational levels represented in the CI population of the camp.

(b) The establishment of basic courses of instruction to include elementary level reading, writing, geography, mathematics, language, music, art, history, and literature.

(c) The uninterrupted education of dependents residing with their CI parents. This education will reflect to the extent determined feasible by the theater commander, the educational curriculums of the particular country.

(d) The development of vocational training projects with an immediate view of developing skills that may be useful during internment and a longer range view of enabling the CI to learn a useful trade in which they may engage when returned to normal civilian life. Such projects may include, at the discretion of the theater commander, carpentry, tinsmithing, masonry, repairing shoes and clothing, tailoring, barbering, potting, and farming.

(2) Equipment required to support the education program will be requisitioned through normal supply channels. At the discretion of the camp commander, items not in supply may be purchased locally and paid for from the camp Civilian Internee Fund provided the items will benefit most CI. The CI personnel employed in the education program will be paid the established rate of pay from the camp Civilian Internee Fund.

*d.* Religion.

(1) CI will enjoy freedom of religion, including attendance at services of their respective faiths held within the internment camps. Wines used for religious purposes will be permitted.

(2) CI who are clergy may minister freely to CI who voluntarily request their ministration. Equitable allocation of CI clergy will be effected among the various camps.

(3) If there is a shortage of CI clergy and the circumstances warrant, the camp commander will provide the CI clergy with the necessary means of transport for visiting the CI in branch camps and hospitals.

(4) The CI clergy will be permitted to correspond on religious matters with the religious authorities in the country of detention and, as far as possible, with the international religious organizations of their faiths. This correspondence will not be considered as forming a part of the quota that may be established in accordance with paragraph 6–8, but will be subject to censorship.

(5) Ordained clergy or a theological student who are not CI may be authorized to enter a camp and conduct religious services. Visits by such personnel will be in accordance with procedures prescribed by the theater commander.

*e.* Recreation.

(1) Recreational activities and facilities, in addition to sports and outdoor games, may include concerts and plays put on by the CI, recorded music, selected motion pictures, and other activities provided by the theater commander.

(2) Special playgrounds will be reserved for dependent children of the CI.

(3) Expenditures from the camp Civilian Internee Fund for the purchase or rental of recreational equipment are authorized.

(4) Appointed delegates of the International Committee of Red Cross are authorized to assist in developing recreational and welfare activities.

## 6–8. Procedures for communications

*a.* Restrictions on numbers and addresses. Procedures for CI correspondence will be in accordance paragraph 3-5. a-f. except that DA Forms 2668-R and 2680-R (Civilian Internee PostCard) will be substituted for DA Forms 2667-R and 2679-R (Civilian Internee Letter) respectively. No restriction will be placed on persons with whom the CI may correspond. DA Form 2679-R will be reproduced on 8 1/2-by 11-inch paper, head to head. DA Form 2680-R will be reproduced on 4-by 6-inch card, head to foot. Copies for local reproduction are located at the back of this regulation. These forms are for the use of Army only.

*b.* Outgoing mail. The following procedures apply to outgoing mail:

(1) Letters and cards will be typed or written legibly in ink. Block printing may be used.

(2) Correspondence will be addressed as follows:

(a) Names and addresses will be complete; they will be placed in the spaces designated on the correspondence forms.

(b) The return address will be in block print to include the full name, grade, ISN, place and date of birth of the sender, and the name of the camp to which assigned. Instructions for including the APO number or the country in which the camp is located should be issued by local directives.

(c) A person at a branch camp will give the parent camp as the return address. The person will be retained on the rosters and postal records of the parent camp.

(d) The surnames in the address and return address of letters and cards will be underlined.

(3) Each person will be required to date his or her letters and cards. The name of the month will be written, not shown by a number.

(4) To expedite the handling of mail, CIs will designate the language of their communication.

(5) The date will not be crossed off, written over, or otherwise modified.

(6) Letters and cards will not be numbered consecutively.

(7) The entire letter or card will be written by the same person. If necessary, the address may be written by someone else.

(8) The CI may not write letters for others who are able to do so themselves. A person may be unable to write because of lack of education, accident, or sickness. If so, the camp commander may permit another person to write the message. In these cases, the person doing the writing will countersign the message.

(9) Letters and cards with parts excised, deleted, or otherwise mutilated before being dispatched from the camp will be returned to the person for rewriting.

*c.* Correspondence sent to civilian internees. Instructions on letters and cards that are sent to CI should be communicated by CI to their correspondents.

(1) The name and return address of the sender will be typewritten or hand printed. For letters, the sender's name and address will always appear on the backs of the envelope. The addresser's surname will be underlined.

(2) The name, grade, ISN of the detainee, the name or number of the base camp, and the geographical designation or APO number will be placed in the center lower half of the envelope card. These items are specified by local directives or the camp commander. The entire name of the detainee will be in block print. The address will be placed as near the lower edge of the envelope as possible; the postmark at the top will not be obscured or obliterated.

(3) The term "Civilian Internee Mail" will be placed in the upper left corner on the address side. In the upper right corner the words "Postage Free" must be shown.

*d.* Legal documents. Legal documents, such as wills and deeds, may be enclosed with outgoing correspondence. When it is necessary for a CI to send a legal document, the document and forwarding letter or card may be enclosed in a plain envelope.

*e.* Maps, sketches, or drawings. The CI will not send maps, sketches, or drawings in outgoing correspondence.

*f.* Registered certified, insured, COD, or airmail items. Individuals will not be permitted to mail registered, certified, insured, COD, or airmail items. If registered, certified, insured, or COD mail of either domestic or foreign origin addressed to a detainee is received, it will be refused. The local post office will return them to the sender.

*g.* Postage. Letters and cards to and from the CI will be sent by ordinary mail and postage free.

*h.* Security. Outgoing letters and cards will be secured by using locked boxes or similar means. Only authorized U.S. personnel will handle outgoing mail. Incoming mail may be sorted by the CI when supervised by U.S. personnel.

*i.* Censorship. Censorship of the CI mail will be according to policies established by the theater commander:

(1) Outgoing letters and cards may be examined and read by the camp commander. The camp commander will return outgoing correspondence containing obvious deviations from regulations for rewriting.

(2) Camp commanders will name U.S. military personnel to supervise the opening of all mail pouches containing incoming letters and cards for CI. These items will be carefully examined by the named personnel before delivery to detainees. Those items that arrive without having been censored by appropriate censorship elements will be returned for censorship to the designated censorship elements.

(3) The CI complaints concerning mail delivery will not be directed to censorship elements. These will be directed to—

(a) The camp authorities.

(b) The responsible major Army commander.

(c) HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 203 10-0400.

*(d)* The protecting power.

*j.* Procedures for parcels.

(1) A person may receive individual parcels and collective shipments containing—

(a) Foodstuffs.

(b) Clothing.

(c) Medical supplies.

(d) Articles of religious, educational, or recreational nature.

(2) Books, included in parcels of clothing and foodstuffs, may be confiscated as the camp commander decides.

(3) The CI may send parcels subject to such restrictions as may be deemed necessary by the theater commander with respect to quotas, contents, size, and weight. The CI may send parcels free of charge up to a weight of 5 kilograms per package, or 10 kilograms in the case of articles that cannot be separated (Art 39, Universal Postal Convention).

(4) Parcels received for transferred persons will be forwarded immediately to them.

(5) Nonperishable articles received for persons who have died, escaped, or been released will be forwarded to the Branch PWIC. Perishable items received for deceased or escaped persons will be released to the Internee Committee who will deliver them to the camp infirmary or hospital for the benefit of the CI.

(6) The contents of all incoming parcels will be examined at the camp by a U.S. officer in the presence of the addressee or the named representative. When considered necessary, the camp commander may request that the parcel be examined by the censorship element. The articles in each parcel will be removed. The string, the inner wrappings, the outer container, and any extraneous items found in the parcel will not be turned over to the CI or the named representatives. Examination will be close enough to reveal concealed articles and messages; however, undue destruction of contents of parcels will be avoided.

*k.* Telegrams and telephone calls. The CI may read and receive telegrams. They may not make or receive telephone calls.

(1) Dispatching telegrams will be as follows:

(a) A CI who has not received mail from next-of-kin for 3 months may send a telegram not earlier than one month from the date a previous telegram was sent.

(b) CI who are unable to receive mail from their next-of-kin or send mail to them by ordinary postal routes or who are a great distance from their home will be permitted to send one telegram a month.

(c) The CI who is seriously ill or who has received news of serious illness or death in the family will be permitted to send a telegram. The camp commander will authorize the sending of additional telegrams.

(2) The sending of telegrams as provided for in (1) above will be governed by the following:

(a) The message proper will consist of not more than 15 words.

(b) The cost of sending the telegram will be charged to the personal account of the CI.

(c) Arrangements for messages going to or through enemy-occupied countries will be made with the local International Committee of the Red Cross field director and will be sent through the International Committee of Red Cross, Geneva, Switzerland.

(d) Telegrams will be in the English.

(e) No telegram, except by members of the Internee Committee, will be sent to a Government official or to a protecting power.

(f) Telegrams will be censored according to instructions issued by the chief censor.

*l.* Books. The CI may receive books. Persons or organizations may donate new or unmarked used books, singly or in collections, to camp libraries. Books that arrive at camps uncensored will be censored by a representative of the censorship element. Publications (books, magazines, newspapers, and so forth) containing maps may be made available to the CI upon approval by the camp commander, provided they do not contain maps of the territory surrounding the camps.

*m.* Newspapers and magazines. The following may be made available to the CI:

(1) Current newspapers and magazines published in English in the United States and selected by the camp commanders.

(2) Unmarked, unused magazines in English published in the United States and distributed by approved relief or aid organizations received at the discretion of the camp commanders for camp libraries after censorship by the censorship element.

(3) Foreign language newspapers and magazines published in the United States, upon approval of the camp commander and after censorship of individual issues by the censorship element.

(4) Newspapers and magazines published outside the United States, regardless of language, must be approved by the theater commander or HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400.

## 6–9. Complaints and requests to camp commanders and protecting power

*a.* Persons may make complaints or requests to the camp commander, who will try to resolve the complaints and answer the requests. If the CI are not satisfied with the way the commander handles a complaint or request, they may submit it in writing, through channels, to HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400.

*b.* Persons exercising the right to complain to the protecting power about their treatment and camp may do so—

(1) By mail.

(2) In person to the visiting representatives of the protecting power.

(3) Through their Internee Committee.

*c.* Written complaints to the protecting power will be forwarded promptly through HQDA (DAMO-ODL)NPWIC, WASH DC 20310-0400. A separate letter with the comments of the camp commander will be included. Military endorsements will not be placed on any CI communications.

*d.* If a protecting power communicates with a CI camp commander about any matter requiring an answer, the communication and commander=s reply will be forwarded to HQDA (DAMO-ODL) NPWIC, WASH DC 20310-0400, for proper action.

*e.* Any act or allegation of inhumane treatment or other violations of this regulation will be reported to HQDA (DAMO-ODL), WASH DC 20310-0400 as a Serious Incident Report. Reporting instructions in AR 190-40 will be used.

## 6–10. Discipline and security

Measures needed to maintain discipline and security will be set up in each camp and rigidly enforced. Offensive acts against discipline will be dealt with promptly. The camp commander will record disciplinary punishments. The record will be open to inspection by the protecting power.

*a.* Prohibited acts.

(1) Associations on close terms between the CI and U.S. military or civilian personnel.

(2) Exchange of gifts between the CI and U.S. military or civilian personnel.

(3) Setting up of courts by the CI. The CI will not have any disciplinary power or administer any punishment.

*b.* Regulations, orders, and notices. Regulations, orders, and notices on the conduct and activities of the CI will be written in a language the CI can understand. They will be posted in a place within each camp where the CI may read them. They will also be made available to persons who do not have access to posted copies. Additional copies will be given to the Internee Committee. This requirement will also apply to the text of the GC and texts of special agreements concluded under it. Every order and command addressed personally to the CI must be given in a language he or she understands. To protect persons from acts of violence, bodily injury, and threats of reprisals at the hand of fellow internees, a copy of a notice in the internee's language will be posted in every compound.

**NOTICE**

The CI regardless of faith or political belief, who fear that their lives are in danger or that they may suffer physical injury at the hands of other detainees will immediately report the fact personally to any U.S. Army officer of this camp without consulting the Internee Committee. From that time on, the camp command will assure adequate protection to such civilian internees by segregation, transfer, or other means. Civilian internees who mistreat fellow internees will be punished.

Signed (Commanding Officer)

Courtesies. The normal civilian courtesies will be required of the

c. CI in their relationships with military personnel. U.S. military personnel will be courteous and will extend to the CI the regard due them.

d. Flags and political emblems. Flags on which a political enemy emblem or device appears will be seized. The CI will not have any political emblem, insignia, flag, or picture of political leaders. The CI may have pictures of political leaders that appear in magazines, books, and newspapers if the pictures are not removed.

e. Security. All security matters connected with the custody and utilization of the CI are the responsibilities of the theater commanders in overseas areas.

## 6–11. Provisions common to disciplinary and judicial punishments

a. General.

(1) If general laws, regulations, or orders declare acts committed by the CI to be punishable, whereas the same acts are not punishable when committed by persons who are not interned, these acts will only entail disciplinary punishment.

(2) When possible disciplinary punishment rather than judicial punishment will be used.

(3) The courts or authorities in passing sentence or awarding disciplinary punishment will consider the fact that the defendant is not a national of the United States. They will be free to reduce the penalty prescribed for the offense with which the CI is charged and will not be obliged to apply the prescribed minimum sentence but may impose a lesser one.

(4) Punishment will not be inhumane, brutal, or dangerous to the health of the CI The age, sex, and state of health of the CI will be considered.

(5) Imprisonment in premises without daylight is prohibited.

(6) The length of time a CI is confined while awaiting a disciplinary hearing or a trial will be deducted from any disciplinary or judicial punishment involving confinement to which he or she may be sentenced and will be taken into account in finding any penalty.

(7) No CI may be punished more than once for the same offense.

(8) The CI who has served disciplinary punishment on judicial sentences will not be treated differently from other CI.

b. Confinement benefits. The CI undergoing confinement, whether before or after trial and whether in connection with disciplinary or judicial proceedings, will—

(1) Be allowed to exercise and stay in the open air at least two hours daily.

(2) Be allowed to attend daily sick call, receive medical attention as needed, and if necessary be transferred to a hospital.

(3) Be given enough food to maintain them in as good health as that provided other CI.

(4) Be permitted to confer with visiting representatives of the protecting power or the ICRC.

(5) Be permitted to receive spiritual assistance.

(6) If a minor, be treated with proper regard.

(7) Be provided with hygienic living conditions.

(8) Be provided adequate bedding and supplies and facilities necessary for personal cleanliness.

(9) If a female, be confined in separate quarters from male CI and will be under the immediate supervision of women.

## 6–12. Disciplinary proceedings and punishments

a. Authority to order disciplinary punishment. Without prejudice to the competence of courts and higher authorities, disciplinary punishment may be ordered only by the camp commander.

b. Rights of accused prior to imposition of disciplinary punishment. Prior to imposition of disciplinary punishment, the CI will be-

(1) Provided precise information regarding the offense of which they are accused.

(2) Given an opportunity to defend the allegation.

(3) Permitted to call witnesses and to have, if necessary, the service of a qualified interpreter.

c. Authorized disciplinary punishment. The following disciplinary punishments are authorized:

(1) Discontinuance of privileges granted over and above the treatment provided for by this regulation.

(2) Confinement.

(3) A fine not to exceed one-half of the wages that the CI may receive during a period of not more than 30 days.

(4) Extra fatigue duties, not exceeding 2 hours daily, in connection with maintaining the internment camp.

d. Duration of disciplinary punishment.

(1) The duration of any single disciplinary punishment will not exceed 30 consecutive days. The maximum of 30 days will not be exceeded even if the CI is answerable for several breaches of discipline, whether related or not, at the time when punishment is imposed.

(2) The period elapsing between the pronouncing of the disciplinary punishment and the completion of its execution will not exceed 30 days.

(3) After imposition of disciplinary punishment on the CI, further discipline will not be imposed on the same CI until at least 3 days have elapsed between the execution of any two of the punishments if the duration on one of the two punishments is 10 days or more.

e. Escape and connected offenses.

(1) The CI who are recaptured after having escaped or when attempting to escape will be liable to disciplinary punishment with respect to this act only, even if it is a repeated offense.

(2) The CI punished as a result of escape or attempt to escape may be subjected to special surveillance that does not affect the state of their health, when the punishment is exercised in a CI camp and if it does not violate any of the provisions of this regulation.

(3) The CI who aid and abet an escape or an attempt to escape, if no injury is done to a person, will be liable to disciplinary punishment only.

(4) Escape, or attempt to escape, even if it is a repeated offense, will not be deemed an aggravating circumstance in cases where the CI is prosecuted for offenses committed incidental to or during his or her escape or attempt to escape.

(5) The CI is liable to prosecution for an escape or attempted escape that results in a death or serious bodily injury to another person.

f. Confinement pending hearing.

(1) The CI accused of an offense for which disciplinary punishment is contemplated will not be confined pending a disciplinary hearing unless it is essential to the interest of camp order and discipline. Its duration will in any case be deducted from any sentence of confinement.

(2) Any period spent by the CI in confinement awaiting a hearing will be reduced to an absolute minimum. For offenses entailing disciplinary punishment only, it will not exceed 14 days.

g. Confinement facilities. CI confined as disciplinary punishment will undergo their punishment in a CI camp stockade.

h. Confinement benefits. In addition to the benefits provided by paragraph 6-11 b of this regulation, the CI placed in confinement in connection with disciplinary proceedings will be allowed to send and receive letters, cards, and telegrams in accordance with the

provisions of this chapter. Parcels and remittances of money, however, may be withheld from the CI until the completion of the punishment. Parcels will be released to the safekeeping of the Internee Committee. If perishable goods are contained in the parcels, the Internee Committee will give them to the infirmary or hospital.

## 6–13. Judicial proceedings

*a.* General principles.

(1) The penal laws of the occupied territory will remain in force, with the exception that they may be repealed or suspended by the United States in cases where they constitute a threat to its security or an obstacle to the application of the GC.

(2) The United States may subject the population of the occupied territory to provisions that are essential to enable it to fulfill its obligation under the GC, to maintain orderly government of the territory, and to ensure the security of the U.S. Armed Forces.

(3) The penal provisions enacted by the United States will not come into force before they have been published and brought to the knowledge of the inhabitants in their own language. The effect of penal provisions will not be retroactive.

(4) The CI may be tried by general court-martial that must sit within the occupied territory. The CI will not be tried before summary or special court-martial.

(5) No CI will be tried or sentenced for an act that was not forbidden by U.S. law or by international law in force at the time the act was committed.

(6) No protected person may be punished for an offense he or she has not personally committed.

(7) No moral or physical coercion will be exerted to induce the CI to admit guilt for any act.

(8) No CI will be convicted without having had the chance to present a defense with the assistance of a qualified advocate or counsel.

*b.* Notification of judicial procedures.

(1) The accused will be promptly notified, in writing in a language they understand, of the charges against them and will be tried as rapidly as possible.

(2) A notice (in duplicate) of proceedings against the CI will be submitted through channels to HQDA (DAMO-ODL) NPWIC, WASH DC 20310-0400 for transmittal to the protecting power, in cases of charges involving the death penalty or imprisonment for 2 years or more. Upon request, the protecting power will be furnished with information regarding the status of such proceedings. Furthermore, the protecting power will be entitled, on request, to be furnished with all particulars of any other proceedings instituted against the CI.

(3) The above notice will be sent without delay. The trial will not commence until 3 weeks after the protecting power has been notified.

(4) The notice will include the following:

(a) Surname and first names; internment serial number; date of birth; and profession, trade, or prior civil capacity of the CI.

(b) Place of internment.

(c) Specification of the charges with penal provisions under which they are brought.

(d) Designation of the court that will hear the case.

(e) Place and date of the first hearing.

(5) The Internee Committee will be informed of all judicial proceedings against the CI that it represents and of the results of the proceedings.

(6) The records of trials will be kept by the courts and will be open to inspection by the representatives of the protecting power.

*c.* Rights and means of defense.

(1) In each trial by court-martial, the accused will be entitled to assistance by a qualified advocate or counsel of his or her own choice, the calling of witnesses, and if necessary the services of a competent interpreter. The CI will be advised of these rights by the commander concerned in due time before the trial.

(2) When the accused does not exercise the right to choose an advocate or counsel, notice to that effect will be sent through HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400, to the protecting power. The protecting power may provide a counsel.

(3) When the protecting power is not functioning and the accused is faced with a serious charge, the convening authority will provide, subject to consent of the accused, an advocate or counsel.

(4) Unless the CI freely waives such assistance, an accused will be provided with the assistance of an interpreter both during preliminary investigation and during the hearing in court. The CI will have the right to object to the interpreter provided and to ask for a replacement.

(5) The defense counsel will be given at least 2 weeks before the opening of the trial and will be granted the necessary facilities to prepare the defense of the accused. The defense counsel will be permitted to visit the accused freely and to interview the accused in private. The defense counsel will also be permitted to confer with any witnesses for the defense including other CI. These privileges will continue until the term of appeal or petition has expired.

(6) Copies of the charge sheet will be given to the accused and the defense counsel in the language that they understand at least 2 weeks before the trial begins.

(7) The interpreter, appointed for and sworn by the court, will provide the official translation of all trial proceedings. The interpreter must not be a trial counsel, defense counsel, assistant to either, or witness; nor should he or she have any bias or interest in the case. The interpreter will translate testimony given in the language of the accused into English for the benefit of the court.

*d.* Participation of protecting power in criminal proceedings. Representatives of the protecting power will be permitted to attend the trial of any CI unless the hearing has to be held secretly as an exceptional measure in the interest of the security of the United States. If a trial is to be held in secret, a notice as to the reasons, the date, and place of the secret trial will be sent to HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400. They will be notified at least three weeks before the opening of the trial to permit timely notification to the protecting power.

*e.* Notification of judgment and sentence.

(1) In all cases requiring notification to the protecting power, two copies of the findings, and if applicable the sentence will be forwarded immediately to HQDA, ODCSOPS(DAMO-ODL), NPWIC WASH DC 20310-0400, in the form of a summary communication for transmittal to the protecting power. When NPWIC transmits this information to the protecting power, it will include a brief statement of the appellate rights of the accused. Notification as to the decision of the CI to use or waive his or her right to appeal will also be forwarded (in duplicate) to HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400, for transmittal to the protecting power. If the sentence adjudged is death, the information set forth in *g* below, together with one copy of the court-martial record of trial will be forwarded to HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400, for transmittal to the protecting power.

(2) After final approval of a sentence involving the death penalty or imprisonment for 2 years or more, the following information will be forwarded (in duplicate) to HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 203 10-0400, for transmittal to the protecting power:

(a) A precise wording of the approved finding and sentence.

(b) A summarized report of the evidence.

(c) If applicable, the name of the place where confinement will be served.

*f.* Appeals in criminal proceedings.

(1) The convicted CI sentenced to confinement or to punishment other than death will have the right of appeal provided for by the laws applied by the court. In all instances, the CI condemned to death will be permitted to petition for pardon or reprieve. The CI will be fully informed of the right to appeal or petition and of the time within which it must be done.

(2) When the laws applied by the court make no provision for appeals, the convicted CI will have the right to petition against the finding and sentence to the competent authority of the United States.

(3) Any period allowed for appeal in the case of sentences involving the death penalty or imprisonment of 2 years or more will not begin to run until notification of the judgment has been received by the protecting power.

(4) Courts of Appeal, if at all possible, will sit in the occupied territory.

*g.* Death penalty.

(1) The CI will be informed as soon as possible of all offenses that are punishable by the death sentence under applicable laws. Lists of these offenses will be posted in all camps. Duplicate lists will be given to the Internee Committee.

(2) The death sentence may not be pronounced against the CI who was under 18 years of age at the time of the offense unless the attention of the court has been particularly called to the fact that since the accused is not a national of the United States, he or she is not bound to it by any duty or allegiance.

(3) If the death sentence is pronounced, it will not be executed for at least 6 months from the date when the protecting power received the detailed communication furnished by the United States in regard to trial (e. above) except as provided in 4 below.

(4) The 6-month period after suspension of the death sentence ((3) above) may be reduced in an individual case in circumstances of grave emergency involving an organized threat to the security of the United States. However, the protecting power must always be notified by HQDA (DAMO-ODL) as to the exception to the 6- month waiting period.

*h.* Civil proceedings. In every case where the CI is a party to any civil litigation, the camp commander will if the CI so requests inform the court of his or her detention. The camp commander will, within legal limits, take all necessary steps to prevent the CI from being in any way prejudiced by reason of his or her internment regarding the preparation and conduct of the case or execution of any judgment of the court.

*i.* Confinement pending trial. A pretrial investigation of an offense alleged to have been committed by the CI will be conducted rapidly so that the trial will take place as soon as possible. The CI will not be confined while awaiting trial unless a civilian national of the occupied territory would be so confined if accused of a similar offense. The CI may be confined if it is essential to do so in the interest of camp or national security. However, this confinement will never exceed 3 months.

*j.* Confinement facilities. CI confined as judicial punishment will serve their sentences in an internment facility, assigned by the theater commander, in the occupied territory as long as U.S. authorities can guarantee their protection.

*k.* Confinement benefits. In addition to the benefits stated in paragraph 6-1 1*b*, the CI placed in confinement in connection with judicial proceedings will be permitted to receive one relief parcel each month.

## 6–14. Death and burial

*a.* Reference. For general procedures and authorized expenses for the care and disposition of remains, see AR 63 8-30 and AR 63 8-40.

*b.* Disposition of wills. When a person has chosen to make a will, the original and two certified copies will be forwarded to the Branch PWIC upon death or at the CI's request.

*c.* Information furnished to camp or hospital commander upon death. When the CI in U.S. custody dies, the attending medical officer will promptly furnish the following to the camp (or hospital) commander, the local provost marshal, or other officers who were charged with the custody of the CI prior to his or her death.

(1) Full name.

(2) ISN.

(3) Date, place, and cause of death.

(4) Statement that in his or her opinion death was, or was not, the result of the CI's own misconduct.

(5) When the cause of death is undetermined, the medical officer will make a statement to that effect.

(6) When the cause of death is finally determined, a supplemental report will be made.

*d.* Notifying the Branch PWIC of a death. The camp or hospital commander or other officer charged with custody of the CI prior to his or her death will notify the local Branch PWIC immediately by telegram of the death. Notification will include all data required in *c* above. The use of supplemental reports is authorized until requirements have been met.

*e.* Certificate of Death. A copy of DA Form 2669-R is contained in this regulation. For each death, the attending medical officer and the responsible camp commander will complete a DA Form 2669-R. The form will be made out in enough copies to provide the distribution below.

(1) Original—NPWIC.

(2) Copy—Branch PWIC.

(3) Copy—The Surgeon General.

(4) Copy—CI's Personnel File.

(5) If the CI dies in the United States, a copy will be sent to the proper civil authorities responsible for recording deaths in that State.

*f.* Investigating officer's report.

(1) The camp or hospital commander will appoint an officer to investigate and report the following:

(a) Each death or serious injury caused, or suspected to have been caused, by guards or sentries, another CI, or any other person.

(b) Each suicide or death resulting from unnatural or unknown causes.

(2) The precepts outlined in GC 1949, part IV, section 3, will be used as a guide. (See DA Pam 27-1.)

(3) Military police investigators may be used at the discretion of the camp commander.

*g.* Burial, record of interment, and cremation.

(1) The deceased CI will be buried honorably in a cemetery set up for them according to AR 638-30 and if possible, according to the rites of their religion. Unless unavoidable circumstances require the use of collective (group or mass) graves, the CI will be buried in a separate grave.

(2) Graves Registration Services will record information on burials and graves. A copy of DD Form 551 (Record of Interment) will be forwarded to the Branch PWIC. The United States will care for graves and record of any subsequent moves of the remains.

(3) A body may be cremated only because of imperative hygiene reasons, the CI's religion, or the CI's request for cremation. The reason for cremation of a body will be cited on the death certificate. Ashes will be kept by Graves Registration until proper disposal can be decided according to the instructions of the protecting power.

*h.* Forwarding deceased person's file. The personnel files of a deceased person with all pertinent records will be forwarded to the Branch PWIC.

## 6–15. Transfers

*a.* Authority to transfer. Theater commanders may direct the transfer of the CI, subject to the following conditions:

(1) The CI may not be transferred beyond the borders of the occupied country in which interned except when for material reasons it is impossible to avoid such displacement. The CI thus evacuated will be transferred back to the area from which they were evacuated as soon as hostilities in that area have ceased.

(2) The sick, wounded, or infirmed CI, as well as maternity cases, will not be transferred if the journey would be seriously detrimental to the health of the CI.

(3) If the combat zone draws close to an internment camp, CI may not be transferred unless they can be moved under adequate conditions of safety. However, CI may be moved if they would be exposed to greater risks by remaining than by being transferred.

*b.* Notification of transfer.

(1) The CI to be transferred will be officially advised of their departure and their new postal address in time for them to pack their luggage and notify their next-of-kin. The Internee Committee members to be transferred will be notified in time to acquaint their successors with their duties and related current affairs.

(2) The Branch PWIC and NPWIC will be notified immediately of any CI transferred.

*c.* Treatment during transfer.

(1) Generally, the CI will be transferred under conditions equal to those used for the transfer of personnel of the U.S. Military in the occupied territory. If, as an exceptional measure, the CI must be transferred on foot, only those who are in a fit state of health may be so transferred. The CI will not be exposed to excessive fatigue during transfer by foot.

(2) The sick, wounded, or infirmed CI as well as maternity cases will be evacuated through U.S. military medical channels and will remain in medical channels until they are certified "fit for normal internment" by competent medical authorities.

(3) Potable water and food sufficient in quantity, quality, and variety to maintain them in good health will be provided to the CI during transfer.

(4) Necessary clothing, adequate shelter, and medical attention will be made available.

(5) Suitable precautions will be taken to prevent CI from escaping and to ensure their safety.

*d.* Transfer of personal effects and property.

(1) The CI will be permitted to take with them their personal effects and property. The weight of their baggage may be limited if the conditions of transfer so require, but in no case will it be limited to less than 55 pounds per CI. The personal property that the CI are unable to carry will be forwarded separately.

(2) The mail and parcels addressed to CI who have been transferred will be forwarded to them.

(3) Property, such as that used for religious services, or items donated by welfare agencies will be forwarded as community property. These items are not to be considered a part of the 55 pounds of personal effects and property that each CI is authorized to take.

## 6–16. Release

*a.* General.

(1) Control and accountability of CI will be maintained until the CI is receipted for by a representative of his or her country of residence or a designated protecting power.

(2) After hostilities cease and subject to the provisions of (3) below, CI will be released as soon as the reasons for their internment are determined by the theater commander to no longer exist.

(3) The CI who are eligible for release but have judicial proceedings pending for offenses not exclusively subject to disciplinary punishment will be detained until the close of the proceedings. At the discretion of the theater commander, the CI may be detained until completion of their penalty. The CI previously sentenced to confinement as judicial punishment may be similarly detained. Lists of the CI held under this guidance will be forwarded to the Branch PWIC and NPWIC for transmittal to the protecting power.

*b.* Return of impounded personal effects. Upon release, the CI will be given all articles, moneys, or other valuables impounded during internment and will receive in currency the balance of any credit to their accounts. If the theater commander directs that any impounded currency or articles be withheld, the CI will be given a receipt.

*c.* Cost of transport. The United States will pay the cost of returning the released CI to the places where they were living when interned.

*d.* Medical fitness. The CI will not be admitted into the general population until their medical fitness is determined.

## Chapter 7
## Employment and Compensation—Civilian Internees

### 7–1. General

a. Theater commanders may issue, within their respective commands, implementing instructions governing the employment and compensation of the CI consistent with these regulations. Copies of such instructions will be forwarded promptly to ODCSOPS.

b. The CI will be employed, so far as possible, in work necessary for the construction, administration, management, and maintenance of the CI camps.

c. The CI compensation procedures will be accomplished in accordance with AR 37-1.

### 7–2. Ability to perform labor

a. The CI will be required to perform any work consistent with their age and physical condition and in accordance with this regulation.

b. The fitness of CI for labor will be determined using the same procedures as those outlined in paragraph 3-4 b.

c. The CI under 18 years of age will not be compelled to work.

### 7–3. Authorized work

a. Compulsory. The CI may be compelled to perform only the following type of work:

(1) Administrative, maintenance, and domestic work in an internment camp.

(2) Duties connected with the protection of the CI against aerial bombardment or other war risks.

(3) Medical duties if they are professionally and technically qualified.

b. Voluntary. Subject to the provisions of paragraph 4-4. and to other restrictions as may be imposed by the theater commander, the CI may volunteer for, but may not be compelled to perform, work of any type without regard to the military character, purpose, or classification of the work. They will be free to terminate such work at any time subject to having labored for 6 weeks and having given an 8-day notice.

### 7–4. Unauthorized work

The criteria for unauthorized work for CI is the same as those found for EPW/RP in paragraph 4-5.

### 7–5. Working conditions

The working conditions for the CI, to include protective clothing, equipment, and safety devices, will be at least as favorable as those prescribed for the civilian population of the occupied territory by the national laws and regulations and as provided for in existing practice. In no case will the working conditions for the CI be inferior to those for the civilian population employed in work of the same nature and in the same district.

### 7–6. Length of workday

a. The length of the working day of the CI will not exceed that permitted for civilians in the locality who are employed in the same general type of work. A rest period of not less than 1 hour will be allowed during the workday.

b. The length of the workday for CI will be in accordance with paragraph 4-8.

### 7–7. Day of rest

Each CI will be allowed a rest of 24 consecutive hours every week, preferably on Sunday or on the day of rest in his or her country.

### 7–8. Paid work

The following are types of work for which the CI will be compensated:

a. Services, including domestic tasks, in connection with administering and maintaining CI camps, branch camps, and hospitals when the CI performs these services permanently.

b. Spiritual and medical duties performed by the CI on behalf of their fellow CI.

c. Services as members and as assistants to the members of the Internee Committee. These persons will be paid from the camp Civilian Internee Account. If there is no such account, they will be paid the prescribed rate from U.S. Army appropriated funds.

d. All types of work that the CI does not have to do but does voluntarily.

**7–9. Unpaid work**
The criteria for unpaid work for CI is the same as for EPW/RP found in paragraph 4-18.

**7–10. Compensation for paid work**
The daily compensation that the CI will receive for paid work will be announced by the Department of the Army at an appropriate time subsequent to an outbreak of hostilities. The CI compensation procedures will be in accordance with AR 37-1.

**7–11. Disability compensation**
Procedures for CI disability compensation will be the same as those found in paragraph 4-20.

## Appendix A
## References

### Section I
### Required Publications

**AR 37–1**
Army Accounting and Fund Control. (Cited in para 3-3n.)

**AR 40–3**
Medical, Dental, and Veterinary Care. (Cited in para 6-6d.)

**AR 40–5**
Preventive Medicine. (Cited in para 6-6g.)

**AR 190–40**
Serious Incident Report. (Cited in para 3-16f.)

**AR 195–2**
Criminal Investigation Activities. (Cited in para 1-4h.)

**AR 600–8–1**
Army Casualty Operation/Assistance/Insurance. (Cited in para 3-10a.)

**AR 600–25**
Salutes, Honors, and Visits of Courtesy. (Cited in para 3-6c.(4))

**AR 600–55**
The Army Driver and Operator Standardization Program (Selection, Training,Testing, and Licensing). (Cited in para 4-21)

**AR 638–30**
Graves Registration Organization and Functions in Support Major Military Operations. (Cited in para 3-10a.)

**AR 670–1**
Wear and Appearance of Army Uniforms and Insignia. (Cited in para 3-15e.)

**AR 735–5**
Policies and Procedures for Property Accountability. (Cited in para 3-9b.)

**FM 22–5**
Drill and Ceremonies. (Cited in para 3-6c.(4))

**Dictionary of Occupational Titles**
(Cited in para 4-13a.)

**Manual for Courts–Martial**
Manual for Courts-Martial, U.S., 1984. (Cited in para 3-7b.)

**Uniform Code of Military Justice**
(Cited in para 3-7b.)

**DODD 2310.1**
DOD Program for Enemy Prisoners of War (EPOW) and Other Detainees. (Cited in para 1-4g.)

**DODD 5100.77**
DOD Law of War Program. (Cited in para 1-4a.(2))

### Section II
### Related Publications

A related publication is merely a source of additional information. The user does not have to read it to understand this regulation.

**AR 40–66**
Medical Record Administration.

**AR 40–400**
Patient Administration.

**AR 55–355**
Defense Traffic Management Regulation. (NAVSUPINST 4600.70, AFR 75-2, MCO P4600.14B, DLAR 4500.3

**AR 190–14**
Carrying of Firearms and Use of Force for Law Enforcement and Security Duties.

**AR 190–47**
The Army Corrections System

**AR 355–15**
Management Information Control System.

**AR 380–5**
Department of the Army Information Security Program.

**AR 985 series**
Army Safety Program.

**DA PAM 27–1**
Treaties Governing Land Warfare.

**FM 33–1**
Psychological Operations

**AF Handbook (AFH) 31–302**
Air Base Defense and Contingency Operations Guidance and Procedures.

**SECNAVINST 3461.3**
Program for Prisoners of War and Other Detainees.

### Section III
### Prescribed Forms

**DA Form 2662–R**
EPW Identity Card. (Prescribed in para 3-3a(2)(b))

**DA Form 2663–R**
Fingerprint Card. (Prescribed in para 3-3a(2)(c))

**DA Form 2664–R**
Weight Register. (Prescribed in para 3-4i(3))

**DA Form 2665–R**
Capture Card for Prisoner of War. (Prescribed in para 3-5d(5))

**DA Form 2666–R**
Prisoner of War - Notification of Address. (Prescribed in para 3-5d(4))

**DA Form 2667–R**
Prisoner of War Mail - Letter. (Prescribed in para 3-5d(1))

**DA Form 2668–R**
Prisoner of War Mail - Post Card. (Prescribed in para 3-5d(1))

**DA Form 2669–R**
Certificate of Death. (Prescribed in para 3-10e)

**DA Form 2670–R**
Mixed Medical Commission Certificate for EPW. (Prescribed in para 3-12j)

**DA Form 2671–R**
Certificate of Direct Repatriation for EPW. (Prescribed in para 3-12k)

**DA Form 2672–R**
Classification Questionnaire for Officer Retained Personnel.

**DA Form 2673–R**
Classification Questionnaire for Enlisted Retained Personnel.

**DA Form 2674–R**
Enemy Prisoner of War/Civilian Internee Strength Report.

**DA Form 2675–R**
Certificate of Work Incurred Injury or Disability. (Prescribed in para 6-6f(2))

**DA Form 2677–R**
Civilian Internee Identity Card. (Prescribed in para 6-2e)

**DA Form 2678–R**
Civilian Internee Notification of Address. Prescribed in para 6-2f)

**DA Form 2679–R**
Civilian Internee Mail. (Prescribed in para 6-8a)

**DA Form 2680–R**
Civilian Internee Post Card. (Prescribed in para 6-8a)

**DA Form 4237–R**
Detainee Personnel Record. (Prescribed in para 3-3a(2)(b))

**DD Form 2745**
Enemy Prisoner of War (EPW) Capture Tag. (Prescribed in para 2-1b.)

**Section IV**
**Referenced Forms**

**DA Form 1132**
Prisoners Personal Property List - Personal Deposit Fund

**DD Form 551** Record
of Internment

**DD Form 629**
Receipt for Prisoner or Detained Person

**Standard Form 88**
Report of Medical Examination

**Standard Form 600**
Chronological Record of Medical Care

**DA Form 1132**
Prisoners Personal Property List-Personal Deposit Fund

**DA Form 3444**
Treatment Record

**DA Form 4137**
Receipt for Evidence/Property Custody Document

**Appendix B**
**Internment Serial Number**
The internment serial number (ISN) is a unique identification number assigned to each EPW, RP and CI taken into the custody of the U.S. Armed Forces. Throughout internment/detention, EPW/CI are identified. PWIS accountability for EPW, RP and CI by the U.S. is established when the ISN is assigned. The ISN will consist of three components, with the first two separated by a dash as follows:
  *a. First Component.* The first component will contain five characters. The first two will be the alpha-characters 'US'. The third character will be either the alpha or numeric designation for the command/theater under which the EPW, RP and CI came into the custody of the U.S. The fourth and fifth positions are alpha-characters designating the EPW, RP and CI serving power.
  *b. Second Component.* The second component is a six character numeric identifier. These numbers will be assigned consecutively to all EPW, RP and CI processed through ISN assigning organizations. The Branch PWIC will assign blocks of numbers to ISN assigning organization/elements in the supported theater.
  *c. Third Component.* The third component will consist of an acronym identifying the classification of the individual: either EPW, RP, or CI, to represent Enemy Prisoner of War, Retained Person, or Civilian Internee, respectively. Should an individual that was initially classified as an EPW later determined to be a medically or religiously qualified retained person, the classification may be changed to "RP"with the approval of the EPW command/brigade.
  *d. Example.* The first EPW processed by an ISN assigning organization in a theater designated as "9"and whose country was designated as "AB"will be assigned the following ISN: US9AB- 000001EPW. The tenth such EPW processed by the same command will be assigned the ISN of: US9AB-000010-EPW. If the eleventh individual processed by the same command was an RP and the fifteenth a CI, their ISNs would be: US9AB-0000011-RP and US9AB-000015-CI, respectively.
  *e.* EPW transferred to CONUS without having been assigned an ISN and those captured within the Continental U.S., will be processed and assigned an ISN as above, by the CONUS EPW organizations.

## Glossary

### Section II
### Abbreviations

**Section 1**
Abbreviation
s

**ADP**
Automated Data Processing

**APO**
Army Post Office

**Cdr**
Commander

**CI**
Civilian Internee(s)

**COD**
Cash on Delivery

**CONUS**
Continental U.S.

**CTA**
Central Tracing Agency

**DA**
Department of the Army

**DAR**
Defense Acquisition Regulation

**DCSINT**
Deputy Chief of Staff for Intelligence

**DCSLOG**
Deputy Chief of Staff for Logistics

**DCSOPS**
Deputy Chief of Staff for Operations and Plans

**DCSPER**
Deputy Chief of Staff for Personnel

**DOD**
Department of Defense

**DRMO**
Defense Reutilization and Marketing Office

**EDCSA**
Effective Date of Change of Strength Accountability

**EPW**
Enemy Prisoner(s) of War

**FAO**
Finance and accounting officer

**FBI**
Federal Bureau of Investigation

**FORSCOM**
Forces Command

**GC**
Geneva Convention Relative to the Protection of Civilian Persons in time of War

**GPW**
Geneva Convention Relative to the Treatment of Prisoners of War

**GWS**
Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the field

**GWS SEA**
Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Ship-wrecked Members of Armed Forces at Sea

**HQDA**
Headquarters, Department of the Army

**HSC**
U.S. Army Health Services Command

**ICRC**
International Committee of the Red Cross

**ISN**
Internment Serial Number

**JCS**
Joint Chiefs of Staff

**MPMIS**
Military Police Management Information Systems

**NCO**
noncommissioned Officer

**OD**
Other Detainees

**OSD**
Office of the Secretary of Defense

**NPWIC**
National Prisoner of War Information Center

**PP**
Protected Person

**PSYOP**
Psychological Operations

**PWIC**
Prisoner of War Information Center

**RP**
Retained Personnel

**ROK**
Republic of Korea

**SJA**
Staff Judge Advocate

**TJAG**
The Judge Advocate General

**TRADOC**
U.S. Army Training and Doctrine Command

**TSG**
The Surgeon General

**TST**
Tuberculin Skin Test

**UCMJ**
Uniform Code of Military Justice

**USAFAC**
U.S. Army Finance and Accounting Center

**USFK**
U.S. Armed Forces, Korea

### Section II
### Terms

**Canteen**
A facility set up for the sale of authorized services and items of merchandise.

**Central Tracing Agency**
Centralizes tracing requests concerning all persons reported missing during the conflict. Requests are either forwarded by centralized information bureaus or submitted by families via their respective National Red Cross or Red Crescent Societies. The Central Tracing Agency (CTA) then passes them on for processing to the appropriate authorities and forwards replies to the requesters.

**Civilian Internee(s)**
A civilian who is interned during armed conflict or occupation or for security reasons or for protection or because he has committed an offense against the detaining power.

**Civilian Internee Account**
Accounts established and records maintained under control of the disbursing officer. Deposit Fund Account 21X6015.

**Civilian Internee Branch Camp**
A subsidiary camp under the supervision and administration of a civilian internee camp.

**Civilian Internee Camp**
An installation established for the internment and administration of civilian internees.

**Civilian Internee Compound**
A subdivision of a CI enclosure.

**Civilian Internee Enclosure** A subdivision of a CI camp.

**Contract Employer**
Any person, corporation, association, State or municipal government agency, and other employer (except DOD) that contracts for work to be done.

**Dependent Child Internee**

A child who on request of the interned parents, for compassionate reasons, is accommodated in a CI internment camp with the interned parents.

**Detainee**

A term used to refer to any person captured or otherwise detained by an armed force.

**Domestic Service**

Such normal household duties as preparing and serving food and the care and repair of clothing.

**Enemy Prisoner of War**

A detained person as defined in Articles 4 and 5 of the Geneva Convention Relative to the Treatment of Prisoners of War of August 12, 1949. In particular, one who, while engaged in combat under orders of his or her government, is captured by the armed forces of the enemy. As such, he or she is entitled to the combatant's privilege of immunity from the municipal law of the capturing state for warlike acts which do not amount to breaches of the law of armed conflict. For example, a prisoner of war may be, but is not limited to, any person belonging to one of the following categories who has fallen into the power of the enemy: a member of the armed forces, organized militia or volunteer corps; a person who accompanies the armed forces without actually being a member thereof; a member of a merchant marine or civilian aircraft crew not qualifying for more favorable treatment; or individuals who, on the approach of the enemy, spontaneously take up arms to resist invading forces.

**Enlisted EPW**

Enlisted EPW and civilian EPW entitled to be treated as enlisted EPW.

**EPW Branch Camp**

A subsidiary camp under supervision and administration of the main EPW camp.

**EPW Camp**

A camp set up by the U.S. Army for the separate internment and complete administration of EPW.

**EPW Compound**

A subdivision of an EPW enclosure.

**EPW Enclosure**

A subdivision of an EPW camp. Internment Serial Number Unique, controlled identification number assigned an EPW upon capture and entry into the Prisoner of War Information System.

**Military Nature**

Term that applies to those items or those types of construction that are used exclusively by members of the Armed Forces for operational purposes (e.g., arms, helmets). The purposes are in contrast to items or structures that may be used either by civilian

or military personnel (e.g., food, soap, buildings, public roads, or railroads).

**Military Purpose**

Activities intended primarily or exclusively for military operations as contrasted with activities intended primarily or exclusively for other purposes.

**Noncommissioned Officer EPW**

Enlisted EPW and civilian EPW entitled to be treated as a Noncommissioned Officer EPW.

**Other Detainee (OD)**

Persons in the custody of the U.S. Armed Forces who have not been classified as an EPW (article 4, GPW), RP (article 33, GPW), or CI (article 78, GC), shall be treated as EPWs until a legal status is ascertained by competent authority.

**Personal Effects**

Personal effects EPW may retain include the following:

  a. Clothing.

  b. Mess equipment (knives and forks excluded).

  c. Badges of rank and nationality.

  d. Decorations.

  e. Identification cards or tags.

  f. Religious literature.

  g. Articles that are of a personal use or have a sentimental value to the person.

  h. Protective mask.

**Prisoner of War Information System**

A computer information system designed to assist military police in the field, the Branch PWIC and the National PWIC to manage enemy prisoners of war by providing automated support for the policies and procedures established by regulation.

**Prisoner of War Information Center (PWIC)**

A TOE organization established to collect information pertaining to EPW, RP and CI and to transmit such information to the National Prisoner of War Information Center.

**Protected Person**

Persons protected by the Geneva Convention who find themselves, in case of a conflict or occupation, in the hands of a Party to the conflict or Occupying Power of which they are not nationals.

**Retained Personnel**

Enemy personnel who come within any of

the categories below are eligible to be certified as retained personnel (RP).

  a. Medical personnel who are members of the medical service of their armed forces.

  b. Medical personnel exclusively engaged in the—

   (1) Search for, collection, transport, or treatment of, the wounded or sick.

   (2) Prevention of disease.

   (3) Staff administration of medical units and establishments exclusively.

  c. Chaplains attached to enemy armed forces.

  d. Staff of National Red Cross societies and other voluntary aid societies duly recognized and authorized by their governments. The staffs of such societies must be subject to military laws and regulations.

**Section III**
**Special Abbreviations and Terms**
This section contains no entries.

# Index

This index is organized alphabetically by topic and subtopic. Topics and subtopics are identified by paragraph number.

**Canteen, 3-4h**
**Capture, 2-1**
**Civilian Internee**
    Authorization to Intern, 5-1b
    Definition (Glossary Section II)
    Personal effects, 6-3
    Treatment, 5-1a(1)
    **Complaints**
        CI, 6-9
        EPW and RP, 3-16,
**Correspondence**
    Enemy Prisoner of War and Retained Personnel, 3-5
    Civilian Internee, 6-8

**Discipline and Security**
    CI, 6-10, 6-11
    EPW and RP, 3-6
**Death and Burial, 3-10**
    Civilian Internee, 6-14
    Burial at sea, 3-10h
**Death Penalty**
    Civilian Internee, 6-13g
    EPW/RP, 3-8i(1)
**DOD Directive 2310.1, 1-4g**

**Enemy Prisoner of War**
    Definition (Glossary-Section II,
    Sick and Wounded, 2-2
    Transfers, 3-11
    Questioning of Prisoners, 2-1a(1)(d)
    Evacuation of Prisoners, 2-2, 2-3,
**Escape**
    Preventing Escape, 3-6f(2)
**Evacuation Policy, 2-3**
**Executive Agent, 1-4b**

**Flags, 3-6e**
**Finance**
    Supplemental Pay, 4-14, 4-16

**Health and Comfort Packets, 3-4h**

**International Committee of the Red Cross**
**Internee Committee, 6-4**

**Internment Serial Numbers (Appendix B)**

**Judicial proceedings**
    Civilian Internees, 6-13
    EPW/RP, 3-8,

**Labor (Civilian Internee,**
    Authorized work,  7-3
    Unauthorized work,  7-4
    Working conditions, 7-5
    Day of rest, 7-7
**Labor (EPW/RP)**
    Authorized work, 4-4
    Length of work day, 4-8
    Rest Periods, 4-9
    Task system, 4-12
    Unauthorized work, 4-5

**Mail**
    Civilian Internee, 6-8b
    EPW/RP, 3-5
**Medical**
    Civilian Internee Dental Care, 6-6d(1)
    Civilian Internee Medical Care and Sanitation, 6-6

    Medical Personnel, 1-5f
    Mixed Medical Commission, 3-12
**Military Police, 1-4g, 6-2**

**National Prisoner of War Information Center (NPWIC,, 1-7**
**Naval Vessels, 2-1b**

**Prisoner of War Information Center, 1-8**
**Property, 3-9**

**Other Detainee (Glossary Section II)**

**Parcels, 3-5k**
**Photographing, 1-5d**
**Prisoner of War Information Center**
    National Prisoner of War Information Center, 1-6
    Branch Prisoner of War Information Center, 1-7

**Protection Policy, 1-5**
**Public Affairs, 1-9**

**Release**
    Civilian Internee, 6-16
**Religion, 1-5g**
    Civilian Internee, 6-7
    Chaplains, 3-15b(3)
    Enemy Prisoner of War, 1-5g(2)
    Ministers, 3-15d(1)
**Repatriation, 3-14)**
    Sick and wounded, 3-12)
**Retained Personnel, 3-15)**
    Definition (Glossary Section II)
    Chaplains, 3-15b(3)
    Medical Personnel, 1-5f

**Safety**
    Civilian Internee, 5-2
    EPW/RP, 3-17
**Saluting, 3-6d**
**Social, Intellectual and Religious activities, 3-4d**
    Civilian Internee, 6-7
    EPW/RP, 3-4d
**Spies and Saboteurs, 5-1e**

**Telegrams**
    Civilian Internee, 6-8k
    EPW/RP, 3-5l
**Tobacco, 3-4h**
**Transfers**
    CI, 6-15
    EPW and RP, 3-11
**Tribunals, 1-6**
    Article 5 GPW, 1-6a

| | DATE ISSUED |
|---|---|
| **EPW IDENTITY CARD**<br>For use of this form, see AR 190-8;<br>the proponent agency is DCSPER. | |
| | **LAST NAME** |
| | **FIRST NAME** / **GRADE** |
| | **SERVICE NUMBER** / **POWER SERVED** |
| *(Photograph)* | |
| **PLACE OF BIRTH** | **DATE OF BIRTH** |
| **SIGNATURE OF BEARER** | |

**DA FORM 2662-R, May 82**          EDITION OF 1 JUL 63 IS OBSOLETE.

*(Front)Reverse of DA Form 2662-R, May 82*

| | | WEIGHT | COLOR OF EYES |
|---|---|---|---|
| | | HEIGHT | COLOR OF HAIR |
| | | BLOOD TYPE | RELIGION |
| | | | NOTICE |

37

# FINGERPRINT CARD

INTERNMENT SERIAL NUMBER

For use of this form, see AR 190–8; the proponent agency is DCSPER.

| LAST NAME | | FIRST NAME | | | GRADE |
|---|---|---|---|---|---|

| POWER SERVED | NATIONALITY | SEX | AGE | HEIGHT | WEIGHT |
|---|---|---|---|---|---|

| OTHER MARKS OF IDENTIFICATION | COLOR OF EYES | COLOR OF HAIR |
|---|---|---|

*LEAVE THIS SPACE BLANK*

| SIGNATURE OF OFFICIAL TAKING FINGERPRINTS | CLASSIFICATION |
|---|---|

| SIGNATURE OF EPW/CIVILIAN INTERNEE | REFERENCE |
|---|---|

| 1. RIGHT THUMB | 2. RIGHT INDEX | 3. RIGHT MIDDLE | 4. RIGHT RING | 5. RIGHT LITTLE |
|---|---|---|---|---|
| | | | | |

| 6. LEFT THUMB | 7. LEFT INDEX | 8. LEFT MIDDLE | 9. LEFT RING | 10. LEFT LITTLE |
|---|---|---|---|---|
| | | | | |

| LEFT FOUR FINGERS TAKEN SIMULTANEOUSLY | LEFT THUMB | RIGHT THUMB | RIGHT FOUR FINGERS TAKEN SIMULTANEOUSLY |
|---|---|---|---|
| | | | |

**DA FORM 2663●R, May 82**          EDITION OF 1 JUL 63 IS OBSOLETE



**PRISONER OF WAR MAIL**

|  |  |
|---|---|
| **IMPORTANT**<br><br>This card must be completed by each prisoner immediately after being taken prisoner and each time his/her address is changed *(by reason of transfer to a hospital or to another camp).*<br><br>This card is distinct from the special card which each prisoner is allowed to send to his/her relatives. | **TO:**<br><br>**CENTRAL PRISONERS OF WAR AGENCY** |

**DA FORM 2665-R, May 82**                    EDITION OF 1 JUL 63 IS OBSOLETE.

*(Front)*

### CAPTURE CARD FOR PRISONER OF WAR
For use of this form, see AR 190-8; the proponent agency is DCSPER.

*WRITE LEGIBLY IN BLOCK LETTERS. DO NOT ADD ANY REMARKS*

| NAME *(Last, First, MI)* | | GRADE |
|---|---|---|
| SERVICE NUMBER | POWER SERVED | PLACE OF BIRTH |
| DATE OF BIRTH | FIRST NAME OF FATHER | MAIDEN NAME OF MOTHER |
| NAME, ADDRESS, AND RELATIONSHIP OF NEXT OF KIN | | DATE OF CAPTURE OR TRANSFER<br><br>1 |

**PHYSICAL CONDITION** *(Check applicable box)*

| | GOOD HEALTH | I | RECOVERED | I | [SICK | | I SER,OUSLY WOUNDED |
| | NOT WOUNDED | | CONVALESCENT | | | | SLIGHTLY WOUNDED |

| FORMER ADDRESS | INTERNMENT SERIAL NO. |
|---|---|

PRESENT ADDRESS *(Name of Camp, or Hospital, and Location)*

| DATE | SIGNATURE OF PRISONER |
|---|---|

**PRISONER OF WAR MAIL**

| | TO: |
|---|---|
| | STREET |
| DO NOT WRITE HERE | CITY |
| | COUNTRY |

- 

**DA FORM 2666-R, May 82**          EDITION OF 1 JUL 63 IS OBSOLETE.

(Front)

**PRISONER OF WAR NOTIFICATION OF ADDRESS**

For use of this form, see AR 190-8; the proponent agency Is DCSPE R.

| LANGUAGE | POWER SERVED |
|---|---|

*PRINT CLEARLY THE INFORMATION **CALLED** FOR. DO NOT ADD **ANY** REMARKS.*

| NAME *(Last, First, MI)* | I GRADE |
|---|---|

| INTERNMENT SERIAL NUMBER | DATE OF CAPTURE OR TRANSFER |
|---|---|

| DATE OF BIRTH | PLACE OF BIRTH |
|---|---|

**PHYSICAL CONDITION** *(Check applicable box)*

| GOOD HEALTH | RECOVERED    SICK | SERIOUSLY WOUNDED |
|---|---|---|
| Nt i WOUNDED | CONVALESCENT | L IG HT LY WOUNDED |

FORMER ADDRESS

PRESENT ADDRESS *(Name of Camp or Hospital, and Location)*

| DATE | SIGNATURE OF PRISONER |
|---|---|

*Reuerse of DA Form 2666-R, May 82* (Reverse)

41

papod aiaq Slunoo

_____    dump Jo atuaN

_____ twig ᴊo 838m pue awe

zaqumm japes luatutualur

_    (Lw *4say* 'pin) amaN

:1:13CIN3S

*(s'41 ⁸741 Uo 1'1�hd)*

---

**PRISONER OF WAR MAIL**                    **LETTER**

_____

**Language_**

_____

**To_**

_____

  **Street _**

_____

  **City_**

_____

  **Country_**

  _____

  **Province or Department_**

*(Fold on this line)*

---

**DO NOT WRITE HERE**

*(Fold on this line)*

42

**DO NOT WRITE BEYOND HEAVY LINES**

**PRISONER OF WAR MAIL**

| *SENDER* | TO: |
|---|---|
| NAME *(Last, first, MI)* | |
| INTERNMENT SERIAL NUMBER | STREET |
| DATE AND PLACE OF BIRTH | CITY |
| NAME OF CAMP | COUNTRY |
| COUNTRY WHERE POSTED | PROVINCE OR DEPARTMENT |

**DA FORM 2668-R, May 82**                     EDITION OF 1 JUL 63 IS OBSOLETE.

*(Front)*

DATE

### POST CARD

For use of thus form, **see** AR **190-8,** the proponent agency Is OCSPE LANGUAGE

IPOWERSERVED

*WRITE. BETWEEN LINES AND AS LEGIBLY AS POSSIBLE*

44

*Reverse of DA Form 2668-R, May 82*

## CERTIFICATE OF DEATH
For use of this form, see AR 190-8, the proponent agency is DCSPER.

| | INTERNMENT SERIAL NUMBER |
|---|---|

FROM:

P

| NAME (Last, first, MI) | | GRADE | SERVICE NUMBER |
|---|---|---|---|

| NATIONALITY | POWER SERVED | PLACE OF CAPTURE/INTERNMENT AND DATE |
|---|---|---|

| PLACE OF BIRTH | DATE OF BIRTH |
|---|---|

| NAME, ADDRESS, AND RELATIONSHIP OF NEXT OF KIN | FIRST NAME OF FATHER |
|---|---|

| PLACE OF DEATH | DATE OF DEATH | CAUSE OF DEATH |
|---|---|---|

| PLACE OF BURIAL | DATE OF BURIAL |
|---|---|

IDENTIFICATION OF GRAVE

PERSONAL EFFECTS (To be filled in by Office of Deputy Chief of Staff for Personnel)

| RETAINED BY DETAINING POWER | FORWARDED WITH DEATH CERTIFICATE TO (Specify/ | FORWARDED SEPARATELY TO (Specify) |
|---|---|---|

BRIEF DETAILS OF DEATH/BURIAL BY PERSON WHO CARED FOR THE DECEASED DURING ILLNESS OR DURING LAST MOMENTS (Doctor, Nurse, Minister of Religion, Fellow Internee). IF CREMATED, GIVE REASON. (If more space is required, continue on reverse side),

| DO NOT WRITE IN THIS SPACE DATE | SIGNATURE OF MEDICAL OFFICER |
|---|---|
| CERTIFIED A TRUE COPY | |
| | SIGNATURE OF COMMANDING OFFICER |
| | WITNESSES |
| | SIGNATURE          ADDRESS |
| | SIGNATURE          ADDRESS |

**MIXED MEDICAL COMMISSION CERTIFICATE FOR EPW**
For use of this form, see AR 190-8; the proponent agency Is DCSPER.

FROM:

TO:

T

L

_____

The undersigned make up the Mixed Medical Commission. They are dully appointed under the GPW of 1949 to examine _____ *(state nationality)* EPW in custody of the US Armed Forces. The EPW claim eligibility for repatriation or for hospitalization in a neutral country under the provisions of that convention. The EPW named below has been presented to the Commission and has been examined at the location, and on the date shown.

**STATUS**

| NAME *(Last, first, MI)* | INTERNMENT SERIAL NUMBER | GRADE<br>DATE OF BIRTH |
|---|---|---|
| SERVICE NUMBER | | |

| MEDICAL: | LITTER<br>LOCKED WARD | AMBULANT<br>OPEN | ISOLATION |
|---|---|---|---|

SURGICAL:

NEUROPSYCHIATRIC:

FINAL DIAGNOSIS *(Continue on reverse side if more apace is required).*

a. INELIGIBLE FOR REPATRIATION OR HOSPITALIZATION IN A NEUTRAL COUNTRY, ELIGIBLE FOR DIRECT REPATRIATION.

b. 

c. ELIGIBLE FOR HOSPITALIZATION IN A NEUTRAL COUNTRY.

d. ELIGIBLE FOR RE-EXAMINATION BY NEXT COMMISSION.

| PLACE OF EXAMINATION | DATE |
|---|---|
| TYPED NAME OF CHAIRMAN, MIXED MEDICAL COMMISSION | SIGNATURE |
| TYPED NAME OF MEMBER | SIGNATURE |
| TYPED NAME OF US MEDICAL REPRESENTATIVE | SIGNATURE |

## CERTIFICATE FOR DIRECT REPATRIATION FOR EPW

For use of this form, see AR 190-B; the proponent agency is DCSPER.

FROM:

TO:

P

L

**The undersigned make up the medical command of a US general hospital. They have examined the EPW named herein and have agreed that he/she is eligible for repatriation according to the medical agreement in the GPW of 1949.**

## STATUS

MEDICAL:                    - LITTER                    _ AMBULANT

| NAME (Last, first, MI) | | GRADE |
|---|---|---|
| SERVICE NUMBER | INTERNMENT SERIAL NUMBER | DATE OF BIRTH |
| | LOCKED WARD | _ OPEN | - ISOLATION |

SURGICAL:

NEUROPSYCHIATRIC

FINAL DIAGNOSIS

| PLACE OF EXAMINATION | DATE |
|---|---|
| TYPED NAME OF COMMANDING OFFICER | SIGNATURE |
| TYPED NAME OF EXECUTIVE OFFICER | SIGNATURE |
| TYPED NAME OF CHIEF OF SERVICE | SIGNATURE |

**CLASSIFICATION QUESTIONNAIRE FOR OFFICER RETAINED PERSONNEL**

For use of this form, see AR 190-8; the proponent agency is DCSPE R.

| NAME *(Last, first, MI)* | | GRADE | SERVICE NUMBER | |
|---|---|---|---|---|
| DATE OF BIRTH | NATIONALITY | POWER SERVED | DATE OF CAPTURE | |
| LENGTH OF MILITARY SERVICE | RELIGION | INTERNMENT SERIAL NUMBER | | |

| GENERAL EDUCATION *(Check highest school attended)* | | LANGUAGES | EXCELLENT | GOOD | FAIR |
|---|---|---|---|---|---|
| PRIMARY SCHOOL | HIGH SCHOOL | | | | |
| UNIVERSITY OR COLLEGE | | | | | |

**PROFESSIONAL EDUCATION**

| NAME OF PROFESSIONAL SCHOOL | LOCATION | YEARS ATTENDED | YEAR GRADUATED | DEGREE |
|---|---|---|---|---|
| | | | | |

| NAME OF HOSPITAL | LOCATION | SERVICE | TIME YEAR COMPLETED | *(Months)* |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

**INTERNSHIP** *(Do not include Residences)*

| HOSPITAL OR INSTITUTION | LOCATION | SERVICE OR SUBJECT TIME | YEAR COMPLETED | *(Months)* |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

RESIDENCES AND FELLOWSHIPS

| | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## CLASSIFICATION QUESTIONNAIRE FOR ENLISTED RETAINED PERSONNEL
### For use of this form, see AR 190-8, the proponent agency is DCSPER

| NAME *(Last, first, MI)* | | GRADE | SERVICE NUMBER |
|---|---|---|---|
| DATE OF BIRTH | NATIONALITY | POWER SERVED | DATE OF CAPTURE |
| LENGTH OF MILITARY SERVICE | RELIGION | INTERNMENT SERIAL NUMBER | |

**EDUCATION** *(Check highest school attended)*

| | | LANGUAGES | EXCELLENT | GOOD | FAIR |
|---|---|---|---|---|---|
| PRIMARY SCHOOL | HIGH SCHOOL | | | | |
| UNIVERSITY OR COLLEGE | | | | | |
| | | | | | |

### PRINCIPAL ASSIGNMENTS IN

| STATION | LOCATION | SPECIFIC MEDICAL DUTIES | TIME *(Months)* |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| DOCUMENTARY EVIDENCE | DATE VERIFIED | VERIFIED: |
|---|---|---|
| IDENTITY CARD | | |
| NONE | | EPW PROCESSING CO |
| | | .—CAMP COMMANDER |
| | | AREA COMMANDER |

| STATION | LOCATION | SPECIFIC ASSIGNMENTS |
|---|---|---|
| | | |
| | | |
| | | |

| PRESENT MEDICAL ASSIGNMENT | MEDICAL CLASSIFICATION |
|---|---|

### MILITARY SERVICE
### VERIFICATION
### MEDICAL ASSIGNMENTS SINCE CAPTURE

REMARKS

| DATE | NAME *(Typed or Printed)* | SIGNATURE |
|---|---|---|
| | | |

**ENEMY PRISONER OF WAR/CIVILIAN INTERNEE STRENGTH REPORT**
For use of this form, see AR 190-8; the proponent agency Is DCSPER.

*REQUIREMENT CONTROL SYMBOL*
*CSGPA-1583*

PERIOD ENDING 2400 HOURS *(Year, month, day)*

PAGE NO.

NO. OF PAGES

### SECTION A — STRENGTH

| LINE | | CATEGORY a | TYPE PERSONNEL | | | | | | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| | | | ENEMY PRISONERS OF WAR b | MILITARY DETAINEES c | RETAINED PERSONS d | CIVILIAN DETAINEES e | INNOCENT CIVILIANS f | OTHER g | h |
| 1 | | PREVIOUS STRENGTH | | | | | | | |
| 2 | | INITIAL | | | | | | | |
| 3 | | RETURN FROM ESCAPE | | | | | | | |
| 4 | G A I N S | ASSIGNED FROM ANOTHER POWER EPW CAMP | | | | | | | |
| 5 | | TRANSFERRED FROM ANOTHER US EPW CAMP | | | | | | | |
| 6 | | OTHER | | | | | | | |
| 7 | | TRANSFERRED TO ANOTHER POWER EPW CAMP | | | | | | | |
| 8 | | ESCAPE | | | | | | | |
| 9 | | REPATRIATION | | | | | | | |
| 10 | | INTERNATIONAL TRANSFER | | | | | | | |
| 11 | | RELEASE IN PLACE | | | | | | | |
| 12 | L O S S E S | TRANSFERRED TO ANOTHER US EPW CAMP | | | | | | | |
| 13 | | DEATH | | | | | | | |
| 14 | | OTHER | | | | | | | |
| 15 | ACCOUNTABLE NOT UNRELEASED | TRANSFER TO HOSPITAL | | | | | | | |
| 16 | | IN TRANSIT | | | | | | | |
| 17 | | UNPROCESSED | | | | | | | |
| 18 | | OTHER | | | | | | | |

64

**SECTION B — GAINS/LOSSES/CHANGES**

| NAME OF DETAINEE | INTERNMENT SERIAL NUMBER | DISPOSITION |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**SECTION C — AUTHENTICATION**

| NAME AND TITLE | RANK | SIGNATURE | PAGE NO. OF |
|---|---|---|---|
| | | | NO. / PAGES |

**CERTIFICATE OF WORK INCURRED INJURY OR DISABILITY**
For use of this form, see AR 190-8; the proponent agency is DCSPE R.

| FROM: | DATE |
|---|---|

TO:

P                                      7

L

| NAME *(Last, first, MI)* | | | GRADE |
|---|---|---|---|
| INTERNMENT SERIAL NUMBER | SERVICE NUMBER | NATIONALITY | POWER SERVED |
| INJURYDISEASE | LABOR PERFORMED AT TIME OF INJURY OR WORK DISABILITY | | |

**SECTION I – TO BE COMPLETED BY INVESTIGATING OFFICER**

WITNESSES

CIRCUMSTANCES UNDER WHICH INJURY OR DISABILITY WAS INCURRED

| | TYPED OR PRINTED NAME, GRADE AND ORIGINATION OF INVESTIGATING OFFICER |
|---|---|
| In my opinion the injury to, or physical disability of, the EPW/Civ Internee named above _is _is not attributable to his/her work assignment. | SIGNATURE                    DATE |

**SECTION II – TO BE COMPLETED BY MEDICAL OFFICER**

STATEMENT OF MEDICAL TREATMENT AND HOSPITALIZATION

| | TYPED OR PRINTED NAME AND GRADE OF MEDICAL OFFICER |
|---|---|
| In my opinion the injury, or physical disability of the EPW/Civ Internee named above in Section I_ was _was not attributable to his/her work assignment. | SIGNATURE                    DATE |

66

FINDINGS OF MEDICAL OFFICER

| | | DATE ISSUED |
|---|---|---|
| **CIVILIAN INTERNEE IDENTITY CARD**<br>**For use of this form, see AR 190-57; the**<br>**proponent agency is ODCSPER.** | | |
| | **LAST NAME** | |
| | **FIRST NAME** | **SEX** |
| | **SERVICE NUMBER** | **POWER SERVED** |
| *(Photograph)* | | |
| **PLACE OF BIRTH** | | **DATE OF BIRTH** |
| **SIGNATURE OF BEARER** | | |
| | */.* | |

**DA FORM 2677-R, NOV 86** **EDITION OF AUG 63 IS OBSOLETE.**

*(FRONT)*

| | | | WEIGHT | COLOR OF EYES |
|---|---|---|---|---|
| | | | | COLOR OF HAIR |
| | | | 3  :  3<br>**HEIGHT** | |
| | | | **BLOOD TYPE** | **RELIGION** |
| | | | | |
| | | | **NOTICE** | |

*REVERSE OF DA FORM 2677-R, NOV 86*

68

# CIVILIAN INTERNEE NOTIFICATION OF ADDRESS
**For use of this form, see AR 190-57; the proponent agency is ODCSPER.**

---

**DO NOT WRITE HERE**

TO:

STREET

CITY

COUNTRY

PROVINCE OR DEPARTMENT

---

**DA FORM 2678—R, NOV 86**        EDITION OF AUG 63 IS OBSOLETE.

*(Front)*

---

LANGUAGE                                    POWER SERVED

---

**PRINT CLEARLY THE INFORMATION CALLED FOR DO NOT ADD ANY REMARKS**

**NAME** *(Last, First, MI)*                                          GRADE

INTERNMENT SERIAL NUMBER                    DATE OF CAPTURE OR TRANSFER

DATE OF BIRTH                PLACE OF BIRTH

**PHYSICAL CONDITION** *(Check applicable box)*

| | GOOD HEALTH | RECOVERED | SICK | SERIOUSLY WOUNDED |
|---|---|---|---|---|
| | NOT WOUNDED | CONVALESCENT | | SLIGHTLY WOUNDED |

FORMER ADDRESS

DATE                SIGNATURE OF PRISONER

**PRESENT ADDRESS** *(Name of Camp or Hospital and Location)*

*(Fold on this line)*

**SENDER:**

Name *(Last, first, MI)*

Internment Serial

Number Date and Place

of Birth Name of Camp

Country where posted

---

## CIVILIAN INTERNEE LETTER

For use of this form, see AR 190-57; the proponent agency is ODCSPER

_____

Language____
_____

To_
_____

Street_
_____

City_
_____

Country_
_____

Province or Department _

*(Fold on this line)*

---

**DO NOT WRITE HERE**

*(Fold on this line)*

**DA FORM 2679-R, NOV 86**          EDITION OF AUG 63 IS OBSOLETE

74

# CIVILIAN INTERNEE POST CARD

For use of this form, see AR 190-57; the proponent agency is ODCSPER

| SENDER | TO: |
|---|---|
| NAME *(Last, First, MI)* | |
| INTERNMENT SERIAL NUMBER | STREET |
| DATE AND PLACE OF BIRTH | CITY |
| NAME OF CAMP | COUNTRY |
| | PROVINCE OR DEPARTMENT |
| COUNTRY WHERE POSTED | |

**DA FORM 2680—R, NOV 86**          EDITION OF AUG 63 IS OBSOLETE

| LANGUAGE | POWER SERVED | DATE |
|---|---|---|

*(Front)*

WRITE BETWEEN LINES AND AS LEGIBLY AS POSSIBLE

*REVERSE OF DA FORM 2680-R, NOV 86*

## DETAINEE PERSONNEL RECORD

**For use of this form, see AR 190-8; the proponent agency is ODCSPER.**

**PART I -TO BE COMPLETED AT TIME OF PROCESSING**

| | | |
|---|---|---|
| **CARD I** | 1. INTERNMENT SERIAL NO. *(143)* | 2. NAME *(Last, first, middle) (14.34)* | 3. RANK *(35-37)* |

| 4. ENEMY SVC NO. *(38-46)* | 5. TYPE *(47)* | E. DATE OF CAPTURE *(48-53)* | 7. DATE OF BIRTH *(54-59)* |
|---|---|---|---|

| 8. NATIONALITY *(60-61)* | 9. EDUCATION *(62)* | 10. RELIGION *(63-64)* | 11. MARSTA *(65)* | 12. PW CAMP UIC *(66-71)* | 13. PW PROCESS DATE *(72-77)* |
|---|---|---|---|---|---|

| **CARD II** *(Keypuncher will pich ut, Item I above)* | '14. SEX *(14)* | 15. LANGUAGE I *(15-16)* | 16. LANGUAGE II *(17-18)* |
|---|---|---|---|

| 17. PHYSICAL CONDITION *(19)* | 18. PW CAMP LOCATION *(20-22)* | 19. ENEMY UNIT *(23-34)* |
|---|---|---|

| 20. ARM OF SVC (35) | 21. MOSC *(36.39)* | 22. CIVILIAN OCCUPATION *(40-45)* | 23. UIC-CAPTURE UNIT *(46-51)* |
|---|---|---|---|

| 24. CORPS AREA OF CAPTURE *{52)* | 25. PLACE OF CAPTURE | 26. POWER SERVED | 27. PLACE OF BIRTH |
|---|---|---|---|

| 28. ADDRESS TO WHICH MAIL FOR PW MAY BE SENT | 29.  FATHER/STEPFATHER |
|---|---|
| | 30.  MOTHER'S MAIDEN NAME |
| 31. PERMANENT HOME ADDRESS OF PW | 32.  NAME, ADDRESS, AND RELATIONSHIP OF PERSON TO BE INFORMED OF CAPTURE |
| 33. OTHER PARTICULARS FROM ID CARD | 34.  DISTINGUISHING MARKS |

IMPOUNDED PERSONAL EFFECTS AND MONEY (1AW AR 37-36)

THE ABOVE LIST OF IMPOUNDED ITEMS IS CORRECT

*(Signature of Detainee)*

| 36. REMARKS | 37. PHOTO |
|---|---|
| | PHOTO *(Front View)*      PHOTO *(Right Profile)* |

| 38. PREPARED BY (Individual and *unit*) | 39. SIGNATURE |
|---|---|

| 40. DATE PREPARED | 41. PLACE |
|---|---|

77

78

**PART II – TO BE MAINTAINED BY UNIT HAVING CUSTODY**

| 42a. LAST NAME | b. FIRST NAMES |
|---|---|

**43. INTERNMENT SERIAL NUMBER**

**44.** MEDICAL RECORD

a.        IMMUNIZATION *(Vaccinations and Innoculations with Dates)*

| a.MAJOR ILLNESSES AND PHYSICAL DEFECTS *(With Dates)* | b.BLOOD GROUP |
|---|---|

**45. INTERNMENT EMPLOYMENT QUALIFICATIONS**

**46. SERIOUS OFFENSES, PUNISHMENTS, AND ESCAPES** *(With Dates)*

**47.** TRANSFERS

| FROM *(Location)* | TO *(Location)* | DATE |
|---|---|---|

**48. REMARKS**

| a. CERTIFICATE OF CREDIT BALANCE ISSUED TO EPW (Amount *in words*) | b. AMT IN FIGURES |
|---|---|
| c. LOCATION | d. DATE |

| a. CERTIFICATE OF CREDIT BALANCE ISSUED TO EPW *(Amount in words)* | b. AMT IN FIGURES |
|---|---|
| c_ LOCATION | d, DATE |

**49.** FINANCIAL STATUS AT TIME OF FIRST INTERNATIONAL TRANSFER
**50.** FINANCIAL STATUS AT TIME OF SECOND INTERNATIONAL TRANSFER
**51.** REPATRIATION

| a.MODE | b.DATE |
|---|---|

| a. CERTIFICATE OF CREDIT BALANCE ISSUED TO EPW *(Amount in figures)* | b. AMT IN FIGURES |
|---|---|

79

a.  REASON

52.                     FINANCIAL STATUS AT TIME OF REPATRIATION

80    c. LOCATION                                                      d. DATE

**UNCLASSIFIED**



ELECTRONIC PUBLISHING SYSTEM TEXT

FORMATTER ... Version 2.45


PIN:                    050730–000

DATE:              05-11-98

TIME:             10:41 :04

PAGES SET:        84


DATA FILE:        ar190-8.fil

DOCUMENT:        AR 190–8

DOC STATUS: REVISION

# CHAPLAINS MANUAL





OPNAVINST 1730.1

In Re Navy Chaplaincy
07-mc-269 (RMU)
EXHIBIT 8

000001

# CHAPTER 1—THE CHAPLAIN CORPS

## SECTION 1100.—GENERAL

1101. Chaplaincy Established
1102. Mission of the Chaplain Corps
1103. Anniversary of the Chaplain Corps

## SECTION 1200.—CHAPLAINS IN THE NAVY

1201. The Unique Role of the Chaplain
1202. The Chaplain as a Professional Representative of His Church
1203. The Chaplain as a Naval Officer
1204. Bearing of Arms
1205. Form of Address
1206. Ecclesiastical Public Relations Activities

## SECTION 1300.—COMMAND SPONSORSHIP OF RELIGIOUS PROGRAM

1301. Command Prerogatives and Responsibilities
1302. Chaplain's Place in the Unit Organization
1303. Right To Communicate With the Commanding Officer
1304. Professional Communication

# CHAPTER 2—ADMINISTRATIVE

## SECTION 2100.—CHIEF OF CHAPLAINS

2101. Place in the Organization
2102. The Chaplains Division

## SECTION 2200.—INTERSERVICE COOPERATION

2201. Armed Forces Chaplains Board
2202. Assignment With Other Armed Forces
2203. Cooperative Ministry

## SECTION 2300.—OFFICIAL, SOCIAL, AND CLERICAL AMENITIES

2301. Calls—Official and Social
2302. Chaplain Corps Social Amenities
2303. Ecclesiastical Amenities
2304. Official Visits to a Command
2305. Visits to the Office of the Chief of Chaplains



# CHAPTER 1

# The Chaplain Corps

## SECTION 1100

## General

### 1101. Chaplaincy Established

1. The second article of *Navy Regulations* adopted by the Continental Congress 28 November 1775 made provision for divine services afloat:

The commanders of the ships of the thirteen United Colonies, are to take care that divine service be performed twice a day on board, and a sermon preached on Sundays, unless bad weather or other extraordinary accidents prevent.

Although chaplains are not mentioned in this article, the reference to a sermon implies that Congress intended that there should be an ordained clergyman on board. The first chaplain known to have served in the Continental Navy was the Rev. Edwards Brooks, a Congregational minister. In the spring of 1777 Brooks reported aboard the *Hancock*. He was captured by the British in May 1777 and was reported exchanged for a captured British chaplain.

2. The article adopted by the Continental Congress, with a few changes, became article II of the Articles for the Government of the Navy enacted by the Congress of the United States, and is included now in the United States Code: 10 U.S.C. 6031(b).

### 1102. Mission of the Chaplain Corps

The Chaplain Corps is comprised of representatives of religious bodies of the United States. Its purpose is to provide professional guidance to the Department of the Navy and to promote the spiritual, religious, moral, corporate, and personal well-being of members of that establishment, their dependents, and other authorized persons by

providing the ministries appropriate to their rights and needs.

## 1103. Anniversary of the Chaplain Corps

In 1954, the Secretary of the Navy directed that 28 November of each year be observed throughout the naval establishment as the anniversary of the Navy Chaplain Corps. The Secretary also directed that commanding officers of ships and stations provide for such ceremonies and activities as may be appropriate and feasible to mark the observance.

# SECTION 1200

# Chaplains in the Navy

## 1201. The Unique Role of the Chaplain

Duties performed by the chaplain in support of the command religious program are official in nature. The professional aspects of the chaplaincy are not separated from but are in support of a chaplain's official duties and responsibilities. However, the professional role of a chaplain as a representative of a religious body and as a naval officer requires an identification of professional and official duties and responsibilities.

## 1202. The Chaplain as a Professional Representative of His Church

1. The term "professional" as used in this manual refers to those aspects of the chaplain's role which are determined not by the Navy, Marine Corps, or Coast Guard, but by the chaplain's identity as a member of the clergy whose profession is the ministry of religion.

2. The Navy does not generate religious ministry. It receives ministries from the churches and religious bodies of America in accordance with the religiously pluralistic pattern of American society. The United States Code provides that:

An officer of the Chaplain Corps may conduct public worship according to the manner and forms of the church of which he is a member. 10 U.S.C. 6031(a).

The term "church" as used in this manual is used to include denominations and religious bodies of all faiths.

3. Since all liturgical, sacramental, and pastoral acts are performed on the basis of ecclesiastical rather than naval credentials, it follows that the ultimate responsibility for the substantive nature of chaplains religious ministry rests with their churches.

4. The maintenance of ecclesiastical credentials (i.e., status as an ordained member of the clergy and a valid ecclesiastical endorsement) is the official responsibility of each chaplain.

5. The religious context of the Navy, like that of American society at large, is one of religious pluralism, in which independent churches and religious bodies coexist in mutual respect. Because of the impracticality of providing clergy of every faith or denomination in every ship or station, the Navy and the churches of America have evolved jointly a pattern of cooperative ministry. The principle of cooperative ministry places on every chaplain the obligation to:

a. Make provision for meeting the religious needs of those in the command who are adherents of other churches.

b. Cooperate with other chaplains and commands in meeting the religious needs of members of the chaplain's own faith group.

000018

## 1203. The Chaplain as a Naval Officer

1. The chaplains' relationship to their churches, as the source of ecclesiastical credentials, does not exist in isolation from an equally binding relationship to the Navy. In accepting a Naval commission a member of the clergy acknowledges military command, accepts the principle of command responsibility for the spiritual and moral welfare of naval personnel, and is subject to military regulations and directives and the Uniform Code of Military Justice. In return, the Navy grants the chaplain the right of conducting ministry not as an outsider visiting a naval activity, but as a member of the Navy community, involved in its whole life and responding to its total needs.

2. In the act of endorsing their clergy for Navy commissions, the churches of America accept the placing of their ordained representatives under military command, subjection of those so endorsed to military regulations and directives, to the principle of command responsibility for the spiritual and moral welfare of naval personnel, and the necessity of cooperative ministry. In return the churches receive the right of extending their ministries to Navy, Marine Corps, and Coast Guard personnel.

3. While the chaplain's ecclesiastical credentials derive solely from the chaplain's church and the substantive nature of this ministry is determined by that church, the conditions for this ministry are determined by the naval service. As a naval officer the chaplain is obligated to:

a. Provide ministry within the framework of the religious program sponsored by the commanding officer.

b. Adapt this ministry to the conditions of the naval service.

c. Conduct this ministry in coordination with the ministries of other chaplains, according to the pattern of cooperative ministry evolved by the churches and the Navy.

d. Design this ministry to meet the religious needs of the personnel of the command, their dependents, and other authorized persons.

## 1204. Bearing of Arms

1. Chaplains are forbidden to carry weapons.

2. This restriction arises from the provisions of the Geneva Conventions of 1949 which accord a special protective and non-combatant status to chaplains. Pursuant to the Geneva Conventions, chaplains are exempt from being treated and retained as prisoners of war, and they are permitted to carry out their religious duties after falling into enemy hands. In order to be entitled to this immunity, chaplains must at all times, both in time of war and in time of peace, be engaged exclusively in religious duties; and they must always abstain from all hostile acts. For chaplains to bear arms would be incompatible with their religious functions and spiritual duties. An individual chaplain who violates this noncombatant status by carrying a weapon endangers the noncombatant status of other chaplains, offering the enemy an excuse to treat all chaplains as combatants. (See Article 0845, U.S. *Navy Regulations*)

## 1205. Form of Address

1. Chaplains are addressed in oral or written communications in accordance with Article 0810 of *Navy Regulations*, except that by long custom a chaplain's ecclesiastical identity takes priority over the officer identity in all but formal official situations. Chaplains of all ranks are addressed and introduced properly by the term "chaplain."

2. Terms of address which are common within particular faith groups or denominations such as "Father," "Pastor," or "Rabbi" may be used appropriately in relationships within that faith group. However, the use

of the term "chaplain" is common to all faith groups and expresses the identity of the clergy within the military community.

## 1206. Ecclesiastical Public Activities

1. The Chief of Chaplains is responsible for maintaining relationships with churches and religious bodies of the nation. Chaplains should be alert to advise that office of any actual or potential situation which might affect these relationships and to forward pictures, articles, and news reports which would be of interest to the religious press and would interpret the chaplain's ministry to the religious bodies of America.

2. Navy chaplains are invited frequently to speak or preach before civilian groups or congregations. The acceptance of such invitations is often in the best interest of the Navy from the standpoint of public and ecclesiastical relations. When a chaplain speaks or preaches before a civilian group as an official representative of the Navy or the command, the chaplain is in a duty status; travel and other expenses will be funded by the Navy. It is important for the chaplains to speak at national-level conventions or to participate in denominational policymaking activities when opportunities are presented. If travel is involved, TAD or authorization orders at no expense to the government may be issued. Ordinarily, the civilian group or denomination will assume responsibility for other incurred expenses.

3. Chaplains may at times speak, preach, provide pastoral services, or serve on denominational-related committees or task groups in an off-duty status. Great care should be taken that off-duty activities will not impinge upon or interfere with regular duties; but when this condition is met, off-duty activities are to be encouraged. The acceptance of an honorarium when the chaplain preaches or performs a pastoral service in an off-duty status is permitted.

4. The services of chaplains on active duty are available to the military community without charge to military personnel. An honorarium or stipend for baptisms, funerals, or marriages in Armed Forces Chapels should be refused tactfully. If offense would be given by such refusal the chaplain will make clear, in an appropriate manner, that the offering is not being accepted for personal use.

# SECTION 1300

# Command Sponsorship of Religious Program

## 1301. Command Prerogatives and Responsibilities

1. Responsibility for the welfare of personnel, and specifically for the preservation of the moral and spiritual well-being of personnel, is basic to naval command (*Navy Regulations*, Article 0727.a). The sponsorship of the religious program is a command prerogative growing out of this responsibility, and the chaplain's total ministry takes place within this context. The authority and credentials of the chaplain's church do not give the chaplain an inherent right to perform acts of religious ministry in the Navy apart from a command-sponsored religious program.

2. Support of the religious program, including funding and logistic support, is an integral part of the command's total operation of the ship or installation. Guidelines for planning and budgeting procedures are provided in Chapter 4.

## 1302. Chaplain's Place in the Unit Organization

1. The chaplain is assigned to duty directly under the executive officer or, as appropriate, the chief of staff. As an advisor to the commanding officer on moral and religious matters, the chaplain is one of the key officers in promoting the moral, spiritual, and religious welfare of personnel. It is not appropriate to assign the chaplain within the personnel or administrative departments.

2. When more than one chaplain is attached to a command the senior chaplain is responsible, under the executive officer or chief of staff, for the religious program. The senior chaplain supervises and coordinates the team ministry of all chaplains of the command. Since this supervisory responsibility is administrative rather than ecclesiastical, the assignment of a senior chaplain is not made on the basis of denomination. Regardless of the number of denominations or faiths represented, there is only one senior chaplain in the command.

## 1303. Right to Communicate With the Commanding Officer

1. The provisions of Article 1107 of *Navy Regulations* concerning the right to communicate with the commanding officer should be understood and observed by all chaplains.

2. Chaplains assigned to duty under a senior chaplain will note that, while the right of any person to communicate with the commanding officer at a proper time and place may not be denied or restricted, a chaplain who desires to exercise this right shall keep the senior chaplain and executive officer informed of this intention.

3. Because of the chaplain's key role as an advisor to the commanding officer on moral and religious matters, which are integral to the commanding officer's basic responsibility for the welfare of personnel, ready access to the commanding officer is particularly important in the performance of the duties of the senior chaplain. Therefore it is incumbent upon the senior chaplain to keep the executive officer/chief of staff fully and completely informed at all times.

## 1304. Professional Communication

Occasions arise when a unit chaplain wishes to consult directly with a supervisory chaplain, or with the Chief of Chaplains, or a member of the Chief of Chaplains' staff, regarding professional concerns. Such communication is appropriate and is to be encouraged.

When the professional matter has military or command implications and/or is not clearly distinguished from such implications, the chaplain will keep the commanding officer informed.

of the training group program are to enhance counseling skills and to provide consultation services for the unit chaplain who may need to consult with a more highly trained counselor.

2. *Training group leader and consultants.*—The leader or consultant for an area counseling training group should be the incumbent of a 7520 (postgraduate training in counseling) or a 7530 (postgraduate training in clinical pastoral education) subspecialty coded billet. If no such subspecialty billet is present in the area, action should be initiated at command level to recommend a coded billet.

3. *Training group membership.*—Training groups should be open on a continuing basis to all chaplains of the area who desire to participate.

4. *Format.*—Design of the training is the responsibility of the leader or consultant and the group itself. There is no standardized requirement as to format, frequency of meeting, etc. The program is designed to meet a need, not to impose a requirement, and the need as determined by the group itself is therefore the determining factor.

## 6307. Navy Relief Society

1. The Navy Relief Society is an organization whose purpose is to provide service and assistance to Naval personnel and their dependents in time of need. All chaplains should be familiar with the *Navy Relief Society Manual* and should maintain close contact with the nearest auxiliary or branch.

2. Chaplains have long worked closely with the Navy Relief Society, and there is clearly an area of mutual concern. In recent years, the trend has been in the direction of the employment of professional social workers whenever the Navy Relief case load requires a substantial amount of time. However, the Chief of Chaplains and the president of the Navy Relief Society have avoided ruling out altogether the use of chaplains in Navy Relief auxiliaries and branches. Some chaplains serve as executive vice presidents, and a few as executive secretaries. The guideline for chaplain involvement, as with other appropriate collateral duties, should be one of time and proportion. Should participation in Navy Relief duties occupy a disproportionate part of a chaplain's time, to the detriment of primary duties of religious ministry and counseling, then the appropriateness of the assignment must be examined.

## 6308. American Red Cross

The American Red Cross has an official relationship with the Armed Forces. Through its system of field directors serving on board military activities, its Home Service Program in every county chapter throughout the United States, and its direct communication between field directors and local chapters, it offers unique and invaluable services. Every chaplain should be familiar with the *American Red Cross Handbook for Service to Servicemen and Veterans,* and should maintain close contact with the nearest field director's office.

# SECTION 6400

# Collateral Duties

## 6401. General

1. By virtue of their place in the military organization, Navy chaplains serve the entire command, not just that portion of the command which is identified with their particular denomination, or with the chapel program as such. Navy chaplains generally consider opportunities for constructive contacts with the total Navy, Marine Corps, and Coast Guard community to be a part of their religious ministry. The assignment

of a limited number of appropriate collateral duties may provide such constructive contacts.

2. The centrality of the chaplain's primary duty of religious ministry is the basic principle which should determine the place of collateral duty assignments. The chaplain is an ordained member of the clergy, made available to the Navy by the churches for religious ministry, and anything which detracts from the primacy of this identity is prohibited. (See Article 0845, U.S. Navy Regulations)

## 6402. Appropriate and Inappropriate Collateral Duties

1. The appropriateness of any particular collateral duty is determined by the circumstances.

2. Any collateral duty is inappropriate if it is so time-consuming or the circumstances are such as to interfere with the performance of the chaplain's primary duty of religious ministry.

3. There are certain collateral duty responsibilities to which chaplains may contribute in connection with their religious ministry, but for which they should not be assigned primary responsibility because of the extensiveness of the involvement in non-religious matters. For instance, chaplains contribute substantially to the PAO function through their ecclesiastical relations and humanitarian involvement, but they should not be assigned duty as the public affairs officer. They participate in the Casualty Assistance Calls Program, particularly in the early stages, when after the next of kin have been notified of the death the chaplain ministers to the bereaved, assists in making funeral arrangements and giving religious support. They may assist the CACO, but they shall not be assigned as the CACO. They may be involved in recreational activities, but should not be assigned as special services officer.

4. The most appropriate collateral duties are those most closely related to and supportive of religious ministry, and to the promotion of personal growth and development.

## 6403. Procedure in Case of Inappropriate Collateral Duty Assignments

1. If chaplains regard collateral duty assignments as excessive or inappropriate, they should seek professional advice from their supervisory chaplain. They should discuss the matter frankly with their executive officer or chief of staff, as appropriate, and request release from such assignments if it seems indicated. In some cases, where the expectations of their denomination with regard to their ministry are at issue, consultation with an ecclesiastical official may be indicated. The commanding officer may desire to consult the supervisory chaplain or eventually the Chief of Chaplains if clarification is needed.

2. If the matter is not resolved satisfactorily by such actions, chaplains may state their case in writing to the Chief of Naval Personnel via official channels.

## 6404. Prohibited Collateral Duties

1. Chaplains shall not be assigned a collateral duty if it involves action in violation of the chaplain's conscience or the practices of their church.

2. Chaplains shall not be assigned a collateral duty if it violates their noncombatant status.

3. Chaplains shall not be assigned as chairman, coordinator, secretary or treasurer of fund drives; nor be assigned in any capacity relating to the solicitation, collection, handling or disbursing of any moneys, except as custodian of a chapel fund. (R)

4. The appropriate professional role of chaplains is altered substantially by inclusion on a courts-martial board, as their ministry

000074

is thereby juridically bound. Therefore, chaplains shall not be assigned to serve on courts-martial nor render judgment in disciplinary cases, but should be confined to their professional functions as religious counselors and advisors.

5. Chaplains shall not be assigned watches other than that of duty chaplain.

# SECTION 6500

# Community Service and Public Affairs

## 6501. Relation of Religious Ministry to Community Life

Practically all religious faiths and denominations regard religion as relevant to and legitimately influencing all of life. Service to others is regarded almost universally as one of the most appropriate expressions of religious devotion. For these reasons, religion cannot be divorced from service to the community in which religious people live. Both chaplains and chapel congregations traditionally have involved themselves in service activities, some of which are regarded as "mission" enterprises designed to extend the benefits of religious faith to a larger group, and some of which are regarded solely as services to the community.

## 6502. Mission Activities

1. Participation in and contributions to church-related mission activities often have a high priority for worshipers, chapel councils, and chapel funds. In the case of Protestant chapel communities made up of persons from many denominations, interdenominational mission activities (such as the American Bible Society, Church World Service, etc.) often are most appropriate. Where the mission enterprise is denominational in character, participation should be on the basis of full understanding of its denominational nature and concurrence by the chapel group.

2. Mission activities within the command and/or the Navy-Marine Corps community which are evangelistic in nature always will observe carefully the requirements of religious pluralism and the right of all persons to make their own religious choices.

## 6503. Community Service Activities

1. Day nurseries, scout troops, social and recreational programs for youth, service centers and coffee houses for young adult service personnel, Alcoholics Anonymous groups, and educational activities are among the community service activities frequently offered by chapels.

2. Involvement with community social agencies may be an expression of religious outreach as well as a natural extension of the counseling ministry of chaplains (see section 6300).

## 6504. Relationship With Civilian Churches

1. The ministry of chaplains is an extension of the ministry of civilian churches. Hence, a close relationship with civilian congregations and clergy is essential.

2. Cooperative relationships and interaction with civilian congregations in the vicinity of shore activities in the United States, with foreign churches in the vicinity of overseas bases, and in ports visited by deployed units are to be encouraged.

3. It is in the interest of the naval service itself, as well as the religious programs of the Navy, Marine Corps, and Coast Guard, for chaplains to attend church conferences and retreats; to preach, speak, and officiate

**DEPARTMENT OF THE NAVY**
**Office of the Secretary**
**Washington, D.C. 20350**

SECNAVINST 1000.9
Op-09BL
4 October 1979

**SECNAV INSTRUCTION 1000.9**

**From: Secretary of the Navy**
**To:    All Ships and Stations**

**Subj:    Code of Conduct for Members of the Armed Forces of the United States**
**(a) DODINST 1300.7 of 8 Jul 1964, Train-**

**Ref:**

**ing and Education Measures Necessary to Support the Code of Conduct (NOTAL)**

**(b) NAVREGS Art 1122**

**Encl:    (1) Executive Order 10631, 17 Aug 1955, "Code of Conduct for Members of the Armed Forces of the United States," as amended by Executive Order 12017, 3 November 1977**

**1. Purpose.** To disseminate enclosure (1) for the guidance of all Navy and Marine Corps military personnel.

**2. Cancellation.** Navy Department General Order No. 4, 18 March 1957.

**3. Action**

  a. The Chief of Naval Operations and the Commandant of the Marine Corps will provide for instruction in the Code of Conduct in conformance with the current edition of reference (a).

  b. Officers in command of activities or units having Navy or Marine Corps members assigned shall comply with the provisions of reference (b) regarding the instruction of military personnel in the Code of Conduct for Members of the Armed Forces of the United States, and the conspicuous posting of the Code of Conduct in places readily accessible to such personnel.

R. JAMES WOOLSEY
Acting Secretary of
the Navy

**Distribution:**
**SNDL Parts 1 and 2**
**MARCORPS Codes H and I**

**Chief of Naval Operations**
**Op-09815C**
**Wash., DC 20350 (200 copies)**

**Stocked:**

**CO, NAVPUBFORMCEN**
**5801 Tabor Ave.**
**Phila., PA 19120 (500 copies)**

07-mc-269 (RMU)
EXHIBIT 9

SECNAVINST 1000.9
4 October 1979

ARMED FORCES—CODE OF CONDUCT

**No.** 10631

August 20, 1955, 20 F.R. 6057

CODE OF CONDUCT FOR MEMBERS OF THE ARMED FORCES OF
THE UNITED STATES

By virtue of the authority vested in me as President of the United States, and as Commander In Chief of the armed forces of the United States, I hereby prescribe the Code of Conduct for Members of the Armed Forces of the United States which Is attached to this order and hereby made a part thereof.

Every member of the armed forces of the United States is expected to measure up to the standards embodied in this Code of Conduct while he is in combat, or in captivity. To ensure achievement of these standards, each member of the armed forces liable to capture shall be provided with specific training and Instruction designed to better equip him to counter and withstand all enemy efforts against him, and shall be fully Instructed as to the behavior and obligations expected of him during combat or captivity.

The Secretary of Defense (and the Secretary of the Treasury with respect to the Coast Guard except when it is serving as part of the Navy) shall take such action as is deemed necessary to implement this order and to disseminate and make the said Code known to all members of the armed forces of the United States.

DWIGHT D. EISENHOWER

**THE WHITE HOUSE,**
*August 17, 1955.*

CODE OF CONDUCT FOR MEMBERS OF THE UNITED STATES
ARMED FORCES

I

I am an American fighting man. I serve In the forces which guard my country and our way of life. I am prepared to give my life in their defense.

II

I will never surrender of my own free will. If in command I will never *surrender my* men while they still have the means to resist

III

If I am captured I will continue to resist by all means available. I will make every effort to escape and aid others to escape. I will accept neither parole nor special favors from the enemy.

IV

If I become a prisoner of war, I will keep faith with my fellow prisoners. I will *give* no information or take part in any action which might be harmful to my comrades. If I am senior, I will take command. If not, I will obey the lawful orders of those appointed over me and will back them up In every way.

V

When questioned, should I become a prisoner of war, I am required to give my name, rank, service number and date of birth. I will evade answering further questions to the utmost of my ability. I will make no oval or written statements disloyal to my country and its allies or harmful to their cause.**1**

VI

I will never forget that I am an American fighting man, responsible for *my* actions. and dedicated to the principles which made my country free. I will trust in my God and in the United States of America-

1097

1 Amended by Executive Order 12017, November 3, 1977

Enclosure (1)



Department of Defense

# INSTRUCTION

NUMBER 1300.21
January 8, 2001

ASD(ISA)

SUBJECT: Code of Conduct (CoC) Training and Education

References: (a) DoD Directive 1300.7, "Training and Education to Support the Code of
              Conduct," December 8, 2000
          (b) Executive Order 10631, "Code of Conduct for Members of the
              Armed Forces of the United States," August 17, 1955, as amended
          (c) "Report of the 1976 Defense Review Committee for the Code
              of Conduct," September 10, 1976
          (d) DoD Directive 2310.2, "Personnel Recovery," June 30, 1997
          (e) through (j), see enclosure 1

   PURPOSE

1.

This Instruction:

    1.1. Implements policy, assigns responsibilities, and prescribes procedures under
reference (a) to develop and execute Code of Conduct (CoC) training for members of the
U.S. Armed Forces.

    1.2. Provides guidance to train members of the Armed Forces in support of the CoC
(reference (b)), in accordance with reference (c).

   APPLICABILITY

2.

This Instruction applies to the Office of the Secretary of Defense (O SD), the Military
Departments, the Chairman of the Joint Chiefs of Staff, the Combatant Commands, the
Inspector General of the Department of Defense, the Defense Agencies, the DoD Field
Activities, and all the other organizational entities within the Department of Defense
(hereafter referred to collectively as "the DoD Components").

07-mc-269 (RMU)
EXHIBIT 10

POLICY

3.

It is DoD policy under reference (a) that all members of the Armed Forces at risk of capture shall receive the applicable level of CoC training.

RESPONSIBILITIES

4.

4.1. The Assistant Secretary of Defense for International Security Affairs (ASD(ISA)), under the Under Secretary of Defense for Policy, shall serve as the principal staff assistant and civilian advisor to the Secretary of Defense and to the Under Secretary of Defense for Policy on personnel recovery. The ASD(ISA) has designated the Defense Prisoner of War/Missing Personnel Office (DPMO) as his Office of Primary Responsibility (OPR) for personnel recovery, including CoC training. The DPMO, on behalf of the ASD(ISA), shall execute its responsibilities as delineated in DoD Directive 1300.7 (reference (a)) and maintain cognizance of the performance of responsibilities assigned in paragraph 4.3.

4.2. The Assistant Secretary of Defense for Public Affairs (ASD(PA)) shall provide joint-Service information materials in support of the CoC for dissemination within the Military Departments. While such material is not prescribed specifically for training and education use, it is intended to augment the Military Service member's understanding and appreciation of the CoC (reference (b)). The ASD(PA) shall coordinate material prepared for this purpose with the Joint Personnel Recovery Agency (JPRA).

4.3. The Commander, United States Joint Forces Command (CINCUSJFCOM), is the DoD Executive Agent for personnel recovery as prescribed in DoD Directive 2310.2 (reference (d)). This includes CoC training and education measures. The CINCUSJFCOM has designated JPRA his OPR for CoC training and education measures. The U.S. Joint Forces Command shall ensure clear, direct, and expeditious lines of communication exist among the JPRA, the DPMO, and the Services on policy matters for CoC training and education measures. The JPRA shall:

4.3.1. Oversee and monitor CoC training and provide CoC training-related support to the DoD Components.

4.3.2. Establish clear, expeditious lines of communication between the Survival, Evasion, Resistance, and Escape (SERE) training facilities throughout the Armed Forces and the Services.

4.3.3. Ensure CoC training conforms to this Instruction and the "Report of the 1976 Defense Review Committee for the Code of Conduct" (reference (c)), and clearly identifies Military Service-unique training requirements.

4.3.4. Ensure that doctrinal materials allow sufficient flexibility in interpreting and implementing the doctrine to meet Military Service-unique training needs.

4.3.5. Establish and disseminate policies, procedures, and guidance for the DPMO relevant to training in support of the CoC and related specialized programs within the Military Services.

4.3.6. Inform the DPMO of all significant initiatives, accomplishments, and challenges concerning training and education measures necessary to support the CoC.

4.3.7. Monitor and provide oversight for Service and mission-specific refresher and continuation training.

4.4. The Commanders of the Combatant Commands shall:

4.4.1. Designate the level of training (i.e., Level A, B, or C) personnel operating in the command's area of operation must have prior to deployment to theater, and communicate these requirements to the respective Services. CoC training needs should be identified for wartime requirements as well as for areas considered high risk due to terrorist activities and areas with the likely potential for detention of members of the Armed Forces by foreign governments for the purpose of exploitation. The Commanders of the Combatant Commands must determine who is considered high-risk-of-capture and exploitation for the purpose of CoC training. During war and operations other than war, personnel operating beyond the forward line of troops (e.g. all aviators, Special Operations Forces, long-range reconnaissance patrol members) are clearly in more danger than others of becoming prisoners of war. Combat forces generally require higher-level CoC training than support forces. As such, the commands must identify their requirements precisely, and they and the Services must train them to the applicable level.

4.4.2. Determine CoC continuation training requirements for personnel identified to operate in the command's area of operations.

4.4.3. Require all personnel to receive CoC training commensurate with their risk-of-capture level prior to deployment to the command's area of operations.

5. PROCEDURES

5.1. The DPMO shall review Military Service-level implementing instructions for training related to the CoC to ensure conformity to this Instruction. Additionally, it shall coordinate with the General Counsel, Department of Defense, as required, to ensure compliance with policies of the Department of State and other Agencies of the Executive Branch.

5.2. The Secretaries of the Military Departments shall:

5.2.1. Train all personnel in the applicable level of CoC training as identified by the Commanders of the Combatant Commands. Training related to the CoC shall be conducted at three levels for the following categories of personnel:

5.2.1.1. Level A. Minimum level of understanding for all members of the Armed Forces, to be imparted during entry training of all personnel.

5.2.1.2. Level B. Minimum level of understanding for Military Service members whose military jobs, specialties, or assignments entail moderate risk of capture and exploitation. As a minimum, the following categories of personnel shall receive Level B training at least once in their careers: members of ground combat units, security forces for high threat targets, and anyone in the immediate vicinity of the Forward Edge of Battle Area or the Forward Line of Troops. Training shall be conducted for such Service members as soon as they assume a duty that makes them eligible.

5.2.1.3. Level C. Minimum level of understanding for Military Service members whose military jobs, specialties, or assignments entail a significant or high risk of capture and exploitation. This group of personnel should not be limited to those whose position, rank, seniority, or exposure to Top Secret or higher classified information makes them vulnerable to greater-than-average exploitation efforts by a captor. As a minimum the following categories of personnel shall receive formal Level C training at least once in their careers: combat aircrews, special operations forces (e.g., Navy special warfare combat swimmers and Special Boat Units, Army Special Forces and Rangers, Marine Corps Force Reconnaissance units, Air Force Special Tactics teams, and psychological operations units) and military attaches. Training shall be conducted for such Service members as soon as they assume duties or responsibilities that make them eligible.

5.2.2. Validate and accredit all Service CoC training and ensure it conforms with the policies in DoD Directive 1300.7 (reference (a)) and training guidance in this Instruction.

5.2.3. Employ qualified instructors and approved materials for CoC training to ensure that all personnel receive applicable knowledge prescribed in enclosures 2 and 3.

5.2.4. Use existing Military Service inspection programs to evaluate CoC training programs related to CoC to ensure that they meet the requirements this Instruction establishes. Ensure that the Military Services provide inspection results to the DPMO and the JPRA within 30 days of the close of each calendar year.

5.3. The Commander, JPRA shall:

5.3.1. Research and develop applicable training programs when necessary, and modify existing programs in the areas of combat survival, evasion, captivity, and escape, to ensure adequate and appropriately uniform training throughout the Department of Defense.

5.3.2. Provide select Service personnel with baseline resistance training to enable these individuals to become qualified as resistance training instructors by their respective SERE schools. While realistic, stressful training is authorized, it must be closely supervised to prevent abuse. Examples, statements, writings, and materials that undermine the confidence and spirit of the U.S. Armed Forces or its Service members, such as those of a defeatist nature, shall not be used in training programs, except when directed towards positive learning outcomes.

5.3.3. Ensure Service training is tailored to specific types of operations (e.g., wartime, peace, or military operations other than war) and that it is conducted in a progressive manner. When determining the level of training required, the Military Services shall consider those personnel assigned to countries where civil strife, banditry, guerrillas, and terrorists are known to operate. Refresher or continuation training should be conducted throughout the Service member's career.

5.3.4. Develop, in coordination with the Military Services, and distribute multimedia-training materials to support training related to the CoC throughout the Armed Forces. Materials shall include guidance on applying realistic, well-monitored training.

5.3.5. Serve as the DoD historian and librarian in all CoC matters and provide for identifying, collecting, and controlling copies of all documentation extant or produced in the future on the CoC and related topics.

5.3.5.1. Documentation shall include, but not be limited to, "Report of the 1976 Defense Review Committee for the Code of Conduct" (reference (c)), CoC training materials (manuals, pamphlets, and audiovisual presentations), reports, scholarly papers, and other publications or manuscripts.

5.3.5.2. These materials shall be available for use, review, and research by the Military Services and other Agencies.

5.3.6. Monitor and evaluate ongoing training programs to achieve and maintain adequate and applicable uniformity of Military Service implementation documents and training programs related to the CoC. At the discretion of the Services, the JPRA will combine inspection requirements with existing Military Service inspection programs.

5.4. Enclosure 2 prescribes detailed training policy and guidance in support of the CoC for conduct of U.S. military personnel detained by hostile forces.

*DODI 1300.21, January 8, 2001*

5.5. Enclosure 3 sets forth detailed training policy and guidance in support of the CoC for conduct of U.S. military personnel in governmental detention or hostage situations during operations other than war. This training must be consistent with the potential risk of capture and the threat and must be conducted at three levels, as related in subparagraph 5.2.1., above.

5.6. Enclosure 4 prescribes general training objectives under this Instruction.
INFORMATION REQUIREMENTS

6. _____

The Military Services shall maintain records indicating completion by individual personnel of instruction related to the CoC. The routine collection and annual reporting of Level B and C training data to the Commanders of the Combatant Commands is exempt from licensing in accordance with DoD 8910.1-M (reference (i)) and DoD 8320.1-M-1 (reference (j)).
EFFECTIVE DATE AND IMPLEMENTATION

7. _____

This Instruction is effective immediately.

Walter B. Slocombe
Under Secretary of Defense For Policy

---

Enclosures - 4
   E 1.
      References, continued
   E 2.
      Guidance for Instruction in Support of the Code of Conduct
   E 3.
      Guidance for Instruction to Assist U.S. Military Personnel in Captivity or Hostile Detention During Peacetime
   E 4.
      Training Objectives

E1. <u>ENCLOSURE 1</u>

<u>REFERENCES,</u> continued

(e) Executive Order 12017, "Amending the Code of Conduct for Members of the Armed Forces of the United States," November 3, 1977

(f) Executive Order 12633, "Amending the Code of Conduct for Members of the Armed Forces of the United States," March 28, 1988

(g) "Geneva Convention Relative to the Treatment of Prisoners of War," August 12, 1949

(h) Chapter 47 of title 10, United States Code, "Uniform Code of Military Justice (UCMJ)"

(i) DoD 8910.1-M, "DoD Procedures for Management of Information Requirements," June 1998

(j) DoD 8320.1-M-1, "Data Elements and Data Codes Standardization Program," April 1, 1998

*DODI 1300.21, January 8, 2001*

E2. ENCLOSURE 2

GUIDANCE FOR INSTRUCTION IN SUPPORT OF THE CODE OF CONDUCT

E2. 1. INSTRUCTIONAL REQUIREMENT

E2. 1.1. The CoC, established by E.O. 10631 (reference (b)), and as amended by E.O. 12017 (reference (e)) and E.O. 12633 (reference (f)), outlines basic responsibilities and obligations of members of the U.S. Armed Forces. All members of the Armed Forces are expected to meet the standards the CoC embodies. Although designed for evasion and prisoner of war (POW) situations, the spirit and intent of the CoC are applicable to Service members subjected to other hostile detention, and such Service members should conduct themselves consistently in a manner that avoids discrediting themselves and their country.

E2.1.2. The CoC, in six brief Articles, addresses those situations and decision areas that, to some degree, all personnel could encounter. It includes basic information useful to U.S. POWs in their efforts to survive honorably while resisting their captor's efforts to exploit them to the advantage of the enemy's cause and their own disadvantage. Such survival and resistance requires varying degrees of knowledge of the meaning of the six Articles of the CoC.

E2. 1.3. The degree of knowledge members of the Armed Forces require is dictated by the Service member's susceptibility to capture, the amount of sensitive information the Service member has, and the potential captor's or detaining power's likely assessment of the Service member's usefulness and value.

E2. 1.3.1. Consequently, the military duties, specialties, assignments, levels of position, rank, and seniority of some individuals require detailed training in the principles, procedures, and techniques of survival evasion and recovery, resistance to exploitation, and escape. For others, basic explanations of the problems, duties, and obligations of an evader and captive suffice.

E2.1.3.2. The complex circumstances of detention that are not incident to an armed conflict with a foreign power (e.g., governmental detention and terrorist captivity as a result of operations other than war) require special instructions prescribed in enclosure 3.

E2.1.3.3. The degree of knowledge an individual Service member requires may change with changes in duty assignment and levels of responsibility. New information may become available on potential enemies' POW management techniques. Supplementary training shall be provided, as required.

E2.1.3.4. As a convenience to training managers, trainers, and those being trained, required levels of understanding are provided based on knowledge needed. The Commanders of the Combatant Commands concerned shall determine the personnel to which these levels apply. The Military Services are responsible for identifying and qualifying CoC and SERE training specialists.

E2. 1.4. To facilitate such training, section E2.2., below, is outlined for each Article of the CoC as follows:

E2.1.4.1. Statement of the Article of the Code of Conduct.

E2. 1.4.2. Basic explanatory material on that Article.

E2.1.4.3. Training guidance for Level A, Level B, and Level C.

E2.1.5. The intent of providing subject matter guidance to use in ascending levels of understanding is to direct the Military Services to increase each Service member's depth of knowledge depending on his or her needs, not to provide a checklist of topics or number of hours of instruction required. Training at Levels B and C should include more detailed information on coping skills and more complex problem solving on leadership and command topics than were first introduced to the Service member during Level A training.

E2.2. ARTICLES OF THE CODE OF CONDUCT AND IMPLEMENTING INSTRUCTIONS (E.O. 10631, reference (b))

E2.2. 1. Article I. I AM AN AMERICAN, FIGHTING IN THE FORCES WHICH GUARD MY COUNTRY AND OUR WAY OF LIFE. I AM PREPARED TO GIVE MY LIFE IN THEIR DEFENSE.

E2.2. 1.1. Explanation:

E2.2.1.1.1. Article I of the CoC applies to all Service members at all times. A member of the Armed Forces has a duty to support U.S. interests and oppose U.S. enemies regardless of the circumstances, whether located in a combat environment or in captivity.

E2.2. 1.1.2. Medical personnel and chaplains are obligated to abide by the provisions of the CoC; however, their special retained status under the Geneva Conventions (reference (g)) grants them some flexibility in its implementation as outlined in section E2.3. Medical personnel, depending on their mission profile and employment capabilities, require varying levels of CoC training.

E2.2. 1.2. Training Guidance for Levels A, B, and C. Familiarity with the wording and basic meaning of Article I is necessary to understand that:

E2.2. 1.2.1. Past experience of captured Americans reveals that honorable survival in captivity requires that a Service member possess a high degree of dedication and motivation. Maintaining these qualities requires knowledge of and a strong belief in the following:

E2.2.1.2.1.1. The advantages of American democratic institutions and concepts.

E2.2. 1.2.1.2. Love of and faith in the United States and a conviction that the U.S. cause is just.

E2.2.1.2.1.3. Faith in and loyalty to fellow POWs.

E2.2. 1.2.2. Possessing the dedication and motivation such beliefs and trust foster enables POWs to survive long and stressful periods of captivity, and return to their country and families honorably with self-esteem intact.

E2.2.2. Article II. I WILL NEVER SURRENDER OF MY OWN FREE WILL. IF IN COMMAND, I WILL NEVER SURRENDER THE MEMBERS OF MY COMMAND WHILE THEY STILL HAVE THE MEANS TO RESIST.

E2.2.2.1. Explanation. Members of the Armed Forces may never surrender voluntarily. Even when isolated and no longer able to inflict casualties on the enemy or otherwise defend themselves, it is their duty to evade capture and rejoin the nearest friendly force.

E2.2.2.1.1. Surrender is the willful act of members of the Armed Forces turning themselves over to enemy forces when not required by utmost necessity or extremity. Surrender is always dishonorable and never allowed. When there is no chance for meaningful resistance, evasion is impossible, and further fighting would lead to their death with no significant loss to the enemy, members of Armed Forces should view themselves as "captured" against their will versus a circumstance that is seen as voluntarily "surrendering." They must remember that the capture was dictated by the futility of the situation and overwhelming enemy strengths. In this case, capture is not dishonorable.

E2.2.2. 1.2. The responsibility and authority of a commander never extends to the surrender of command, even if isolated, cut off, or surrounded, while the unit has a reasonable power to resist, break out, or evade to rejoin friendly forces.

E2.2.2.2. Training Guidance:

E2.2.2.2. 1. Levels A, B, and C. Training should ensure that each individual is familiar with the wording and basic meaning of Article II, as stated in subparagraph E2.2.2. 1., above.

E2.2.2.2.2. Levels B and C. Training should be oriented toward additional depth of knowledge on the following topics. Specifically, Service members must:

E2.2.2.2.2. 1. Understand that when they are cut off, shot down, or otherwise isolated in enemy-controlled territory, they must make every effort to avoid capture. The courses of action available include concealment until recovered by friendly rescue forces, evasive travel to a friendly or neutral territory, and evasive travel to other pre-briefed areas.

E2.2.2.2.2.2. Understand that capture does not constitute a dishonorable act if the Service member has exhausted all reasonable means of avoiding it and the only alternative is death or serious bodily injury.

E2.2.2.2.3. Level C. Training should ensure that Service members understand and are confident in their ability to stay alive using survival skills while evading, the procedures and techniques of rescue by search and recovery forces, and the procedures for properly using specified evasion destinations.

E2.2.3. Article III. IF I AM CAPTURED, I WILL CONTINUE TO RESIST BY ALL MEANS AVAILABLE. I WILL MAKE EVERY EFFORT TO ESCAPE AND AID OTHERS TO ESCAPE. I WILL ACCEPT NEITHER PAROLE NOR SPECIAL FAVORS FROM THE ENEMY.

E2.2.3.1. Explanation. The misfortune of capture does not lessen the duty of a member of the Armed Forces to continue resisting enemy exploitation by all means available. Contrary to the Geneva Conventions (reference (g)), enemies whom U.S. Forces have engaged since 1949 have regarded the POW compound as an extension of the battlefield. The POW must be prepared for this fact.

E2.2.3.1.1. The enemy has used a variety of tactics to exploit POWs for propaganda purposes or to obtain military information in disregard of the Geneva Conventions. The CoC requires resistance to captor exploitation efforts. In the past, enemies of the United States have used physical and mental harassment, general mistreatment, torture, medical neglect, and political indoctrination against POWs.

E2.2.3.1.2. The enemy has tried to tempt POWs to accept special favors or privileges not given to other POWs in return for statements or information desired by the enemy or for a pledge by the POW not to attempt escape.

E2.2. 3.1.3. POWs must not seek special privileges or accept special favors at the expense of fellow POWs.

E2.2.3.1.4. The Geneva Conventions recognize that the regulations of a POW's country may impose the duty to escape and that POWs may attempt to escape. Under the guidance and supervision of the senior military person and POW organization, POWs must be prepared to take advantage of escape opportunities whenever they arise. In communal detention, the welfare of the POWs who remain behind must be considered. A POW must "think escape," must try to escape if able to do so, and must assist others to escape.

E2.2.3.1.5. The Geneva Conventions authorize the release of POWs on parole only to the extent authorized by the POWs' country and prohibit compelling a POW to accept parole. Parole agreements are promises a POW gives the captor to fulfill stated conditions, such as not to bear arms or not to escape, in consideration of special privileges, such as release from captivity or lessened restraint. The United States does not authorize any Military Service member to sign or enter into any such parole agreement.

E2.2.3.2. Training Guidance:

E2.2.3.2.1. Levels A, B, and C. Training should ensure that Service members are familiar with the wording and basic meaning of Article III, as stated in subparagraph E2.2.3.1., above.

E2.2.3.2.2. Levels B and C. Training should be oriented toward an additional depth of knowledge on the following topics. Specifically, Service members must:

E2.2.3.2.2.1. Understand that captivity is a situation involving continuous control by a captor who may attempt to use the POW as a source of military information, for political purposes, and as a potential subject for political indoctrination.

E2.2.3.2.2.2. Be familiar with the rights and obligations of both the POW and the captor under reference (g) and be aware of the increased significance of resistance should the captor refuse to abide by the provisions of the Geneva Conventions. Be aware that the resistance the CoC requires is directed at captor exploitation efforts, because such efforts violate the Geneva Conventions. Understand that resistance beyond that identified above subjects the POW to possible punishment by the captor for order and discipline violations. Certain actions by the POW can be prosecuted as criminal offenses against the detaining power.

E2.2.3.2.2.3. Be familiar with, and prepared for, the fact that certain countries have reservations to Article 85 of the 1949 Geneva Convention (III) relative to the Treatment of Prisoners of War (reference (g)). Article 85 offers protection to a POW

convicted of a crime based on facts occurring before capture. Understand that captors from countries that have expressed a reservation to Article 85 often threaten to use their reservation as a basis for adjudging all members of opposing armed forces as "war criminals." As a result, POWs may find themselves accused of being "war criminals" simply because they waged war against these countries before capture. The U.S. Government and most other countries do not recognize the validity of this argument.

E2.2.3.2.2.4. Understand that a successful escape by a POW causes the enemy to divert forces that might otherwise be fighting, provides the United States valuable information about the enemy and other POWs in captivity, and serves as a positive example to all members of the Armed Forces.

E2.2.3.2.2.5. Understand the advantages of early escape in that members of the ground forces are usually relatively near friendly forces. For all captured individuals, an early escape attempt takes advantage of the fact that the initial captors are usually not trained guards, that the security system is relatively lax, and that the POW is not yet in a debilitated physical condition.

E2.2.3.2.2.6. Understand the importance of beginning escape planning at the earliest possible moment and continuing escape planning throughout captivity even when no obvious escape opportunities exist. POWs should passively collect information on the captors, the strengths and weaknesses of the facility and its security personnel, the surrounding terrain and conditions that could affect an escape attempt, and items and materials within the camp that may support an escape effort. This alertness and continual planning for escape places a POW in the best position to exploit, facilitate, or provide assistance during an escape opportunity.

E2.2.3.2.2.7. Be familiar with the complications of escape after arrival at an established POW camp. These may include secure facilities and an experienced guard system, increased distance from friendly forces, debilitated physical condition of prisoners, psychological factors that reduce escape motivation ("barbed-wire syndrome"), and possible differing ethnic characteristics of the escapee and the enemy population.

E2.2.3.2.2.8. Understand the command supervisory role of the senior U.S. military person and the POW organization in escapes from established POW camps. Understand the responsibilities of escapees to their fellow POWs.

E2.2.3.2.2.9. Understand that acceptance of parole means a POW has agreed not to engage in a specified act, such as to escape or to bear arms, in exchange for a stated privilege, and that U.S. policy forbids a POW to accept such parole.

E2.2.3.2.2.10. Understand the effects on POW organization and morale, as well as the possible legal consequences, of accepting a favor from the enemy that results in gaining benefits or privileges not available to all POWs. Such benefits and

privileges include acceptance of release before the release of sick or wounded POWs or those who have been in captivity longer. Special favors include improved food, recreation, and living conditions not available to other POWs.

E2.2.3.3. Level C. Training should be oriented toward additional details on the topics set forth in subparagraph E2.2.3.2.2., above, as well as understanding the necessity for and the mechanics of covert organizations in captivity. Those organizations serve the captive's ends, such as escaping.

E2.2.4. Article IV. IF I BECOME A PRISONER OF WAR, I WILL KEEP FAITH WITH MY FELLOW PRISONERS. I WILL GIVE NO INFORMATION OR TAKE PART IN ANY ACTION WHICH MIGHT BE HARMFUL TO MY COMRADES. IF I AM SENIOR, I WILL TAKE COMMAND. IF NOT, I WILL OBEY THE LAWFUL ORDERS OF THOSE APPOINTED OVER ME AND WILL BACK THEM UP IN EVERY WAY.

E2.2.4. 1. Explanation. Officers and noncommissioned officers shall continue to carry out their responsibilities and exercise their authority in captivity.

E2.2.4. 1.1. Informing, or any other action detrimental to a fellow POW, is despicable and is expressly forbidden. POWs especially must avoid helping the enemy to identify fellow POWs who may have knowledge of value to the enemy and who may be made to suffer coercive interrogation.

E2.2.4. 1.2. Strong leadership is essential to discipline. Without discipline, camp organization, resistance, and even survival may be impossible.

E2.2.4.1.3. Personal hygiene, camp sanitation, and care of the sick and wounded are imperative.

E2.2.4. 1.4. Wherever located, POWs should organize in a military manner under the senior military POW eligible for command. The senior POW (whether officer or enlisted) in the POW camp or among a group of POWs shall assume command according to rank without regard to Military Service. The senior POW cannot evade that responsibility and accountability. (See section E2.3., below.)

E2.2.4.1.5. When taking command, the senior POW shall inform the other POWs and shall designate the chain of command. If the senior POW is incapacitated, or is otherwise unable to act for any reason, the next senior POW shall assume command. Every effort shall be made to inform all POWs in the camp (or group) of the members of the chain of command who shall represent them in dealing with enemy authorities. The responsibility of subordinates to obey the lawful orders of ranking American military personnel remains unchanged in captivity.

E2.2.4.1.6. U.S. policy on POW camp organization requires that the senior military POW assume command. The Geneva Convention on POWs (reference (g)) provides additional guidance to the effect that in POW camps containing only enlisted personnel, a prisoners' representative shall be elected. POWs should understand that such an elected representative is regarded by U.S. policy as only a spokesperson for the senior POW. The prisoners' representative does not have command, unless the POWs elect the senior POW to be the prisoners' representative. The senior POW shall assume and retain actual command, covertly if necessary.

E2.2.4.1.7. Maintaining communications is one of the most important ways that POWs aid one another. Communication breaks down the barriers of isolation that an enemy may attempt to construct and helps strengthen a POW's will to resist. Each POW, immediately upon capture, shall try to make contact with fellow POWs by any means available and, thereafter, shall continue to communicate and participate vigorously as part of the POW organization.

E2.2.4.1.8. As with other provisions of the CoC, common sense and the conditions in the POW camp shall determine the way in which the senior POW and the other POWs structure their organization and carry out their responsibilities. It is important that:

E2.2.4.1.8.1. The senior POW establish an organization.

E2.2.4.1.8.2. The POWs in that organization understand their duties and know to whom they are responsible.

E2.2.4.2. Training Guidance:

E2.2.4.2. 1. Levels A, B, and C. Training should ensure that Service members are familiar with the wording and basic meaning of Article IV, as stated in subparagraph E2.2.4. 1., above, and understand that:

E2.2.4.2. 1.1. Leadership and obedience to those in command are essential to the discipline required to effect successful organization against captor exploitation. In captivity situations involving two or more POWs, the senior ranking POW shall assume command; all others shall obey the orders and abide by the decisions of the senior POW regardless of differences in Military Service affiliations. Failure to do so shall result in the weakening of organization, a lowering of resistance, and, after repatriation, may result in legal proceedings under the UCMJ (reference (h)).

E2.2.4.2. 1.2. Faith, trust, and individual group loyalties have great value in establishing and maintaining an effective POW organization.

E2.2.4.2.1.3. A POW who voluntarily informs or collaborates with the captor is disloyal to the United States and fellow POWs and, after repatriation, is subject to disciplinary action under reference (h) for such actions.

E2.2.4.2.2. Levels B and C. Training should be oriented toward additional depth of knowledge on the following topics. Specifically, Service members must:

E2.2.4.2.2.1. Be familiar with the principles of hygiene, sanitation, health maintenance, first aid, physical conditioning, and food use. It shall include recognition and emergency self-treatment of typical POW camp illnesses by emergency use of primitive materials and available substances (e.g., toothpaste, salt, and charcoal). Such knowledge exerts an important influence on POW ability to resist and assists an effective POW organization.

E2.2.4.2.2.2. Understand the importance of, and the basic procedures for, establishing secure communications between separated individuals and groups of POWs attempting to establish and maintain an effective organization.

E2.2.4.2.2.3. Be familiar with the major ethnic (to include racial demographics), cultural and national characteristics of the enemy that may affect POW-captor relationships to the detriment of individual POWs and the POW organization.

E2.2.4.2.2.4. Further understand that:

E2.2.4.2.2.4. 1. An informer or collaborator should be insulated from sensitive information on POW organization, but members of the POW organization should continually encourage and try to persuade the collaborator to cease such activities.

E2.2.4.2.2.4.2. Welcoming a repentant collaborator "back to the fold" is generally a more effective POW organizational approach than continued isolation, which may encourage the collaborator to continue such disloyal conduct.

E2.2.4.2.2.4.3. There is a significant difference between the collaborator who must be persuaded to return and the resister who, only after having been physically or mentally tortured, complies with a captor's improper demand (such as to provide information or a propaganda statement). The collaborator's conduct is reprehensible and cannot be sanctioned, whereas the resister should be given help to gather strength and resume resistance.

E2.2.4.2.2.5. Understand that in situations where military and civilian personnel are imprisoned together, the senior military POW should make every effort to persuade civilian prisoners that the Military Service member's assuming overall command leadership of the entire prisoner group, based upon experience and specific training, is advantageous to the entire prisoner community.

E2.2.4.2.3. Level C. Understand the need for, and the mechanics of, establishing an effective covert organization in situations where the captor attempts to prevent or frustrate a properly constituted organization.

E2.2.5. Article V. WHEN QUESTIONED, SHOULD I BECOME A PRISONER OF WAR, I AM REQUIRED TO GIVE NAME, RANK, SERVICE NUMBER, AND DATE OF BIRTH. I WILL EVADE ANSWERING FURTHER QUESTIONS TO THE UTMOST OF MY ABILITY. I WILL MAKE NO ORAL OR WRITTEN STATEMENTS DISLOYAL TO MY COUNTRY AND ITS ALLIES OR HARMFUL TO THEIR CAUSE.

E2.2.5. 1. Explanation. When questioned, a POW is required by the Geneva Conventions (reference (g)) and the CoC (reference (b)), and is permitted by the UCMJ (reference (h)), to give name, rank, service number, and date of birth. Under reference (g), the enemy has no right to try to force a POW to provide any additional information. However, it is unrealistic to expect a POW to remain confined for years reciting only name, rank, service number, and date of birth. There are many POW camp situations in which certain types of conversation with the enemy are permitted. For example, a POW is allowed, but not required by the CoC, the UCMJ, or the Geneva Conventions, to fill out a Geneva Conventions "capture card," to write letters home, and to communicate with captors on matters of camp administration and health and welfare.

E2.2.5.1.1. The senior POW is required to represent fellow POWs in matters of camp administration, health, welfare, and grievances. However, POWs must constantly bear in mind that the enemy has often viewed POWs as valuable sources of military information and propaganda that they can use to further their war effort.

E2.2.5.1.2. Accordingly, each POW must exercise great caution when completing a "capture card," when engaging in authorized communication with the captor, and when writing letters. A POW must resist, avoid, or evade, even when physically and mentally coerced, all enemy efforts to secure statements or actions that may further the enemy's cause.

E2.2.5.1.3. Examples of statements or actions POWs should resist include giving oral or written confessions; making propaganda recordings and broadcast appeals to other POWs to comply with improper captor demands; appealing for U.S. surrender or parole; engaging in self-criticisms; and providing oral or written statements or communications on behalf of the enemy or harmful to the United States, its allies, the Armed Forces, or other POWs. Captors have used POWs' answers to questions of a personal nature, questionnaires, or personal history to create improper statements such as those listed above.

E2.2.5.1.4. A POW should recognize the enemy might use any confession or statement as part of a false accusation that the captive is a war criminal rather than a POW. Moreover, certain countries have made reservations to the Geneva Conventions

(reference (g)) in which they assert that a war criminal conviction has the effect of depriving the convicted individual of POW status. These countries may assert that the POW is removed from protection under reference (g) and the right to repatriation is thus revoked until the individual serves a prison sentence.

E2.2.5.1.5. If a POW finds that, under intense coercion, he unwillingly or accidentally discloses unauthorized information, the Service member should attempt to recover and resist with a fresh line of mental defense.

E2.2.5.1.5.1. POW experience has shown that although enemy interrogation sessions may be harsh and cruel, it is usually possible to resist, if there is a will to resist.

E2.2.5.1.5.2. The best way for a POW to keep faith with the United States, fellow POWs, and oneself is to provide the enemy with as little information as possible.

E2.2.5.2. Training Guidance:

E2.2.5.2.1. Levels A, B, and C. Training should ensure that Service members are familiar with the wording and basic meaning of Article V, as stated in subparagraph E2.2.5. 1., above.

E2.2.5.2.2. Levels B and C. Levels B and C training should provide additional understanding of Article V. Specifically, Service members must:

E2.2.5.2.2.1. Be familiar with the various aspects of the interrogation process, its phases, the procedures, methods and techniques of interrogation, and the interrogator's goals, strengths, and weaknesses.

E2.2.5.2.2.2. Understand that the Geneva Conventions and the CoC require a POW to disclose name, rank, service number, and date of birth, when questioned. Understand that a POW must avoid answering further questions. A POW is encouraged to limit further disclosure by using resistance techniques such as claiming inability to furnish additional information because of previous orders, poor memory, ignorance, or lack of comprehension. The POW may never voluntarily give the captor additional information, but must resist doing so, even if it involves withstanding mental and physical duress.

E2.2.5.2.2.3. Understand that short of death, it is unlikely that a POW may prevent a skilled enemy interrogator, using all available psychological and physical methods of coercion, from obtaining some degree of compliance by the POW with captor demands. However, understand that if the interrogator takes the Service member past the point of maximum endurance, the POW must recover ("bounce back") as quickly as possible and resist each successive captor exploitation effort to the utmost.

Understand that a forced answer on one point does not authorize continued compliance. The POW must resist answering again at the next interrogation session.

E2.2.5.2.2.4. Understand that the CoC (reference (b)) authorizes a POW to communicate with the captor on individual health or welfare matters and, when applicable, on routine matters of camp administration. Conversations on those matters are not considered to be giving unauthorized information, as defined in subparagraph E2.2.5.1.3., above.

E2.2.5.2.2.5. Understand that the POW may furnish limited information on family status and address in completing a Geneva Conventions capture card under reference (g). Be aware that a POW may write personal correspondence. Be aware that the captor shall have full access to both the information on the capture card and the contents of personal correspondence.

E2.2.5.2.2.6. Be familiar with the captor's reasons for and methods of attempting to involve POWs in both internal and external propaganda activities. Understand that a POW must use every means available to avoid participating in such activities and must not make oral or written statements disloyal to the United States or its allies, or detrimental to fellow POWs.

E2.2.5.2.2.7. Be familiar with the captor's reasons for and methods of attempting to indoctrinate POWs politically. Be familiar with the methods of resisting such indoctrination.

E2.2.5.3. Level C. Training should provide additional details, and Service members should specifically:

E2.2.5.3.1. Understand that even when coerced beyond name, rank, service number, date of birth, and claims of inabilities, it is possible to thwart an interrogator's efforts to obtain useful information by using certain additional ruses and stratagems.

E2.2.5.3.2. Understand and develop confidence in the ability to use properly the ruses and stratagems designed to prevent successful interrogation.

E2.2.6. Article VI. I WILL NEVER FORGET THAT I AM AN AMERICAN, FIGHTING FOR FREEDOM, RESPONSIBLE FOR MY ACTIONS, AND DEDICATED TO THE PRINCIPLES WHICH MADE MY COUNTRY FREE. I WILL TRUST IN MY GOD AND IN THE UNITED STATES OF AMERICA.

E2.2.6.1. Explanation. A member of the Armed Forces remains responsible for personal actions at all times. Article VI is designed to assist members of the Armed Forces to fulfill their responsibilities and survive captivity with honor. The CoC does not conflict with the UCMJ (reference (h)), which continues to apply to each military

member during captivity or other hostile detention. Failure to adhere to the CoC may subject Service members to applicable disposition under the UCMJ.

E2.2.6.1.1. When repatriated, POWs can expect their actions to be subject to review, both as to circumstances of capture and as to conduct during detention. The purpose of such review is to recognize meritorious performance and, if necessary, investigate any allegations of misconduct.

E2.2.6.1.2. Such reviews shall be conducted with due regard for the rights of the individual and consideration for the conditions of captivity.

E2.2.6.1.3. A member of the Armed Forces who is captured has a continuing obligation to resist all attempts at indoctrination and remain loyal to the United States.

E2.2.6.1.4. The life of a POW may be very hard. POWs who stand firm and united against enemy pressures shall aid one another immeasurably in surviving this ordeal.

E2.2.6.2. Training Guidance for Levels A, B, and C. Training should ensure that members are familiar with the wording and basic meaning of Article VI, and:

E2.2.6.2. 1. Understand the relationship between the UCMJ and the CoC (references (h) and (b), respectively), and realize that failure to follow the guidance of the CoC may result in subsequent disposition under the UCMJ. Every member of the Armed Forces of the United States should understand that Service members may be held legally accountable for personal actions while detained.

E2.2.6.2.2. Be knowledgeable of the national policy the President expressed in reference (b) promulgating the CoC:

"No American prisoner of war will be forgotten by the United States. Every available means will be employed by our Government to establish contact with, to support and to obtain the release of all our prisoners of war. Furthermore, the laws of the United States provide for the support and care of dependents of the Armed Forces including those who become prisoners of war. I assure dependents of such prisoners that these laws will continue to provide for their welfare."

E2.2.6.2.3. Understand that the Military Services, as prescribed in Federal law, shall take care of both the POW and dependents and that pay and allowances, eligibility and procedures for promotion, and benefits for dependents continue while the POW is detained even if the enemy does not report the Service member as being a POW and his or her status reflects missing in action.

E2.2.6.2.4. Understand the importance of military members ensuring that their personal affairs and family matters (pay, powers of attorney, wills, debt payments, and children's schooling) are kept current through discussion, counseling or filing of documents before being exposed to risk of capture.

E2.2.6.2.5. Understand that failure to accomplish the matters set forth in subparagraph E2.2.6.2.4., above, has resulted in an almost overwhelming sense of guilt on the part of the POWs and has placed unnecessary hardship on family members.

E2.3. <u>SPECIAL ALLOWANCES FOR MEDICAL PERSONNEL AND CHAPLAINS</u>

E2.3.1. Article I. Under the Geneva Conventions, medical personnel who are exclusively engaged in the medical service of their armed forces and chaplains who fall into the hands of the enemy are "retained personnel" and are not POWs. While this allows them the latitude and flexibility necessary to perform their professional duties, it does not relieve them of their obligation to abide by the provisions of the CoC. Like all members of the Armed Forces, medical personnel and chaplains are accountable for their actions.

E2.3.2. Article II. No additional flexibility. However, medical personnel and chaplains are subject to lawful capture. They may only resort to arms in self-defense or in defense of the wounded and sick in their charge when attacked in violation of the Geneva Convention (I). They must refrain from all aggressive action and may not use force to prevent their capture or that of their unit by the enemy. It is, on the other hand, perfectly legitimate for a medical unit to withdraw in the face of the enemy.

E2.3.3. Article III. Under the Geneva Conventions, medical personnel who are exclusively engaged in the medical service of their armed forces and chaplains who fall into the hands of the enemy are "retained personnel" and are not POWs. Reference (g) requires the enemy to allow such persons to continue to perform their medical or religious duties, preferably for POWs of their own country. When the services of those "retained personnel" are no longer needed for these duties, the enemy is obligated to return them to their own forces.

E2.3.3.1. The medical personnel and chaplains of the Military Services who fall into the hands of the enemy must assert their rights as "retained personnel" to perform their medical and religious duties for the benefit of the POWs and must take every opportunity to do so.

E2.3.3.2. If the captor permits medical personnel and chaplains to perform their professional functions for the welfare of the POW community, special latitude is authorized those personnel under the CoC, as it applies to escape.

E2.3.3.3. As individuals, medical personnel and chaplains do not have a duty to escape or to actively aid others in escaping as long as the enemy treats them as "retained personnel." U.S. experience since 1949 when the Geneva Conventions (reference (g)) were first concluded reflects limited compliance by captors of U.S. personnel with those provisions. U.S. medical and chaplain personnel must prepare to be treated as other POWs.

E2.3.3.4. If the captor does not permit medical personnel and chaplains to perform their professional functions, they are considered identical to all other POWs with respect to their responsibilities under the CoC. Under no circumstances shall the latitude granted medical personnel and chaplains be interpreted to authorize any actions or conduct detrimental to the POWs or the interests of the United States.

E2.3.4. Article IV. Medical personnel shall not assume command over non-medical personnel and chaplains shall not assume command over military personnel of any branch. Military Service regulations that restrict eligibility of those personnel for command shall be explained to all personnel at an applicable level of understanding to preclude later confusion in a POW camp.

E2.3.5. Article V. This Article and its explanation also apply to medical personnel and chaplains ("retained personnel"). They are required to communicate with a captor in connection with their professional responsibilities, subject to the restraints discussed in Article I, above, and VI, below.

E2.3 .6. Article VI. There are no special allowances to Article VI for medical personnel and chaplains.

E3. ENCLOSURE 3

GUIDANCE FOR INSTRUCTION TO ASSIST U.S. MILITARY PERSONNEL IN CAPTIVITY OR HOSTILE DETENTION DURING OPERATIONS OTHER THAN WAR

E3.1. POLICY

This policy on the conduct of U.S. military personnel isolated from U.S. control applies at all times. U.S. military personnel finding themselves isolated from U.S. control are required to do everything in their power to survive with honor.

E3.2. SCOPE

The Code of Conduct is a moral guide designed to assist military personnel in combat or being held as POWs to live up to the ideals in the DoD policy. The guidance in this enclosure assists U.S. military personnel who find themselves isolated from U.S. control in operations other than war, or in a situation not related specifically to the CoC. This enclosure is the special guidance referred to in subparagraph E2.1.3.2. The Military Departments shall establish procedures to ensure that all U.S. military personnel under their control are made aware of the guidance in this enclosure. Dissemination procedures should parallel those used to ensure proper education and training in support of the CoC throughout the Department of Defense.

E3.3. RATIONALE

U.S. military personnel, because of their employment in a wide range of circumstances throughout the world, participate in operations other than war that can result in detention by unfriendly governments or captivity by terrorist groups. The guidance in this enclosure helps U.S. military personnel survive those situations with honor and does not replace the UCMJ (reference (i)) as a vehicle for enforcement of proper conduct. The guidance in this enclosure, although exactly the same as the CoC (reference (b)) in some areas, applies only during operations other than war. For specific missions or in areas of assignment where U.S. military personnel may have a high risk of governmental detention or terrorist captivity, the Military Services are obligated to provide training and detailed guidance to such personnel to ensure their adequate preparation for the situation. USJFCOM's office of primary responsibility for CoC training, JPRA, on behalf of ASD(ISA), shall review and monitor for adequacy Service training programs for adequacy and consistency with this guidance.

E3.4. <u>GENERAL</u>

U.S. military personnel captured by terrorists or detained by hostile foreign governments are often held for individual exploitation, or to influence the U.S. Government, or both. That exploitation may take many forms, but each form of exploitation is designed to assist the foreign government or the terrorist captors. In the past, terrorists or governments exploited detainees for information and propaganda efforts, including confessions to crimes never committed. This assisted or lent credibility to the detainer. Governments also have been exploited in such situations to make damaging statements about themselves or to force them to appear weak in relation to other governments. Governments have paid ransoms for captives of terrorists, and such payments have improved terrorist finances, supplies, status, and operations, often prolonging the terror carried on by such groups. The U.S. Government's policy is that we will not negotiate with terrorists.

E3 .5. <u>RESPONSIBILITY</u>

The U.S. Government shall make every good-faith effort to obtain the earliest release of U.S. military personnel, whether detainees or hostages. Faith in one's country and its way of life, faith in fellow detainees or captives, and faith in one's self are critical to surviving with honor and resisting exploitation. Resisting exploitation and having faith in these areas are the responsibility of all Americans. On the other hand, the destruction of such faith must be the assumed goal of all captors determined to maximize their gains from a detention or hostage situation.

E3.6. <u>GOAL</u>

U.S. military personnel must take every reasonable step to prevent exploitation of themselves and the U.S. Government. If the captive cannot prevent exploitation completely, the captive must take every step to limit exploitation as much as possible. Detained U.S. military personnel often are catalysts for their own release, based on their ability to become unattractive sources of exploitation; e.g., one who resists successfully may expect detainers to lose interest in further exploitation attempts. Detainees, or hostages, must make their own judgments as to which actions shall increase their chances of returning home with honor and dignity. Without exception, the military member who may say honestly that he or she has done his or her utmost in a detention or hostage situation to resist exploitation upholds DoD policy, the founding principles of the United States, and the highest traditions of Military Service.

E3.7. <u>MILITARY BEARING AND COURTESY</u>

U.S. military personnel shall maintain their military bearing, regardless of the type of detention or captivity, or harshness of treatment. They should make every effort to remain calm, courteous, and project personal dignity. That is particularly important during the process of capture and the early stages of internment when the captors may be uncertain of their control over the captives. Discourteous, nonmilitary behavior seldom serves the long-term interest of a detainee or hostage and often results in unnecessary punishment that serves no useful purpose. Such behavior, in some situations, may jeopardize survival and severely complicate efforts to gain release of the detainee or hostage.

E3.8. <u>CLASSIFIED INFORMATION</u>

There are no circumstances in which a detainee, or hostage, should voluntarily give classified information or materials to those who are not authorized to receive them. To the utmost of their ability, U.S. military personnel held as detainees or hostages shall protect all classified information. An unauthorized disclosure of classified information, for whatever reason, does not justify further disclosures. Detainees and hostages must resist to the utmost of their ability, each and every attempt by their captor to obtain such information.

E3.9. <u>CHAIN OF COMMAND</u>

In group detention or hostage situations, military detainees or hostages shall organize, to the fullest extent possible, in a military manner under the senior military member present and eligible to command. The importance of such organization cannot be overemphasized. Historically, in both peacetime and wartime, establishing a military chain of command has been a tremendous source of strength for all captives. Every effort shall be made to establish and sustain communications with other detainees or hostages. Military detainees or hostages shall encourage civilians being held with them to participate in the military organization and accept the authority of the senior military member. In some circumstances, such as embassy duty, military members may be under the direction of a senior U.S. civilian official. Notwithstanding such circumstances, the senior military member still is obligated to establish, as an entity, a military organization and to ensure that the guidelines in support of the DoD policy to survive with honor are not compromised.

E3.10. <u>GUIDANCE FOR DETENTION BY GOVERNMENTS (DETAINEE)</u>

E3.10.1. U.S. military personnel must be aware that the basic protections available to prisoners of war under Article 3 of reference (g) may not be required during operations other than war. It is essential that U.S. military personnel understand that the provisions of the Geneva Conventions affording prisoner of war protections apply only during declared war or international armed conflict. In conflicts not of an international character, the combatants are required to apply only the minimum protections of Article 3 of reference (g). As a result, U.S. military personnel detained by a hostile force during Military Operations Other Than War (MOOTW) may be subject to the domestic criminal laws of the detaining nation. For example, if a U.S. pilot, shot down during a MOOTW, kills a civilian to avoid detection by a hostile force, that pilot may be denied the protections of the Geneva Convention and tried under the criminal laws of the detaining nation. In addition to the Geneva Conventions, there may also be a Status of Forces agreement or some other binding agreement that provides certain parameters for the duties of the detaining government. Detainees should attempt to maintain military bearing, if possible, and should avoid aggressive or combative behavior that would violate the criminal or civil laws of the subject country. Detainees should not forget, however, that they have an inherent right of self-defense. Lost, isolated or captive Service members must be prepared to assess the dangers associated with being taken into captivity by local authorities. Their assessment of the dangers should dictate what efforts should be taken and what measure of force may be required to avoid capture, resist apprehension, and resist cooperation once captured.

E3.10.2. Governments are obligated to notify the detainee's consular officials. As American citizens, detainees should ask immediately and continually to see U.S. embassy personnel, or a representative of an allied or neutral government.

E3.10.3. Since the detainers' goals may be maximum political exploitation, U.S. military personnel who are detained must be extremely cautious of their captors in everything they say and do. In addition to asking for a U.S. representative, detainees should provide name, rank, service number, date of birth, and the innocent circumstances leading to their detention. Further discussions should be limited to and revolve around health and welfare matters, conditions of their fellow detainees, and going home.

E3.10.3.1. Historically, the detainers have attempted to engage military captives in what may be called a "battle of wits" about seemingly innocent and useless topics as well as provocative issues. To engage any detainer in such useless, if not dangerous, dialogue only enables a captor to spend more time with the detainee. The detainee should consider dealings with his or her captors as a "battle of wills;" the will to restrict discussion to those items that relate to the detainee's treatment and return home against the detainer's will to discuss irrelevant, if not dangerous, topics.

E3.10.3.2. A detainee should make every effort to avoid providing propaganda for the detaining government. If a detainee is forced to make a statement or sign documents, he or she must provide as little information as possible and then continue to resist to the utmost of his or her ability. If a detainee writes or signs anything, such action should be measured against how it reflects on the United States and the individual as a member of the military, or how it could be misused by the detainer to further the detainer's ends.

E3.10.3.3. Detainees are not likely to earn their release by cooperation. Release may be gained by the military member doing his or her best to resist exploitation, thereby reducing his or her value to a detainer, and thus prompting a hostile government to negotiate seriously with the U.S. Government.

E3.10.4. U.S. military detainees should accept release, unless doing so requires them to compromise their honor or cause damage to the U.S. Government or its allies. Persons in charge of detained U.S. military personnel shall authorize release of any personnel under almost all honorable circumstances.

E3.10.5. Escape attempts from governmental detention are not recommended, except under unique or life threatening circumstances. Although escape is considered a last resort, it may become necessary if conditions deteriorate to the point that the risks associated with escape are less than the risks of remaining captive. These risks would include torture, the death of detainees due to treatment by the detainers, or the credible threat of death or torture of the detainees by the detainers. Escape planning should begin at the onset of detention to improve the chances of escape should an escape attempt be required. The decision to escape should be based on the careful consideration of the relevant circumstances to include an assessment of the current detention conditions, potential for success, risk of violence during the escape attempt, and the potential reprisals if recaptured and on detainees remaining behind. Because escape from government detention is a crime in most countries, a failed escape attempt may provide the detainer with further justification to prolong detention by adding additional criminal or civil charges. This would be particularly true if detaining government personnel or civilians were wounded or killed during an escape by or because of the detainee. A detainee in this case may be subjected to severe punishment at the hands of the detainer's legal system that may result in bodily harm or even death to the detainee.

E3.11. <u>GUIDANCE FOR CAPTIVITY BY TERRORISTS (HOSTAGE)</u>

Capture by terrorists is generally the least predictable and structured form of captivity during operations other than war. The captor may qualify as an international criminal. The possible forms of captivity vary from spontaneous, "target of opportunity" kidnapping to a carefully planned and well-orchestrated hijacking. In such captivities, hostages play a greater role in determining their own fate since the terrorists in many instances expect or receive no rewards for providing good treatment or releasing victims

unharmed. If U.S. military personnel are uncertain whether captors are genuine terrorists or surrogates of another government, they should assume that they are terrorists. Tension levels will be extremely high. The terrorists feel vulnerable at this point. Hostages should reduce this tension level by controlling their emotions, following instructions as far as practicable, and avoiding physical resistance. Sudden movement or action could precipitate a deadly response.

E3.1 1.1. One recommendation is for military personnel to obtain a U.S. tourist passport to assist in blending in with other travelers and to delay the initial identification process in a hostage situation. Surrender the tourist passport if the terrorists demand identification during the initial stage, or delay identification as a U.S. military or official traveler by claiming inability to locate documents. If directly confronted about the DoD status, lying is not recommended. The initial delay serves only to maximize survival during the initial stage.

E3.1 1.2. Surviving in some terrorist situations may depend on a hostage's ability to portray himself or herself as a person rather than an object and by conveying personal dignity and apparent sincerity. Hostages may discuss non-substantive topics to convey their human qualities and build rapport by:

E3.1 1.2.1. Introducing commonalities such as family, clothes, sports, hygiene, food, etc.

E3.11.2.2. Active listening. Allowing captors to discuss their cause or boast, but not to praise, pander, participate or debate with them.

E3.11.2.3. Using their own names.

E3.1 1.2.4. Being careful about whining or begging as it may increase abuse.

E3.1 1.2.5. Introducing benign topics at critical times (impasses, demands) to reduce tensions.

E3.1 1.2.6. Avoiding emotionally charged topics of religion, economics, and politics.

E3.1 1.2.7. Avoiding being singled out by being argumentative or combative.

E3.1 1.2.8. Avoiding escalating tensions with language such as "gun, kill, punish," etc.

E3.11.3. Hostages should make reasonable efforts to avoid signing confessions, making propaganda broadcasts, conducting "news interviews," etc., which could embarrass the United States or host governments. Propaganda has been successfully avoided by presenting logical reasons; however, the threat of death by terrorists for non-

compliance is more realistic than in governmental detention. The hostage should not mistake pride for inappropriate resistance. If forced to sign or make a statement, hostages should attempt to degrade the propaganda and to provide the minimum information.

E3.11.4. Hostages should plan for being rescued. Leaving fingerprints whenever and wherever possible should assist in locating hostages. The hostage should not attempt to hide his or her face, if photographs are taken. Photographs provide positive identification and information about the terrorists. In case of rescue, the hostage should plan to reach the "safest" area, such as under desks, behind chairs, or any large object that provides protection. Avoid doors, windows, and open areas. When sounds or activities indicate an imminent rescue, the hostage should head for the "safest" area. If it cannot be reached, dropping to the floor with hands visible is appropriate. Hostages should not attempt to "help" rescue forces and jump up or point out the terrorists. Sudden movements could have deadly consequences. Instructions by the rescuers must be followed and rough handling can be expected until authentication is accomplished. Only then should information about the terrorists and other hostages be relayed to the rescue party.

E3.11.5. U.S. military personnel held hostage by terrorists should accept release using guidance in paragraph E3.10.4., above. U.S. military personnel must keep faith with their fellow hostages and conduct themselves according to the guidelines of this enclosure. Hostages and kidnap victims who consider escape to be their only hope are authorized to make such attempts. Escape from detention by terrorists is risky but may become necessary if conditions deteriorate to the point that the risks associated with escape are less than the risks of remaining captive. These risks would include torture, the death of detainees due to treatment by the detainers or the credible threat of death or torture of the detainees by the detainers. Hostages and kidnap victims should begin planning for an escape as soon as possible after coming under the control of terrorists to improve their chances of escape if an escape is attempted. This planning should include the passive collection of information on the captors, the strengths and weaknesses of the facility and its personnel, the surrounding area and conditions that could have an impact on an escape attempt, and items and materials within the detention area that may support an escape effort. This alertness and continual planning for escape places a hostage or kidnap victim in the best position to exploit, facilitate, or provide assistance during an escape opportunity. The decision to escape should be based on the careful consideration of the unique circumstances of the terrorist situation to include an assessment of the current detention conditions, potential for success, risk of violence during the escape attempt, and the potential reprisals if recaptured and on detainees remaining behind.

## E4. <u>ENCLOSURE 4</u>

<u>TRAINING OBJECTIVES</u>

### E.4.1. <u>TRAINING OBJECTIVES</u>

The objectives of this Instruction are to ensure that:

E4. 1.1. The Military Departments maintain energetic, uniform, and continuing training programs in support of the CoC, including instruction in the methods of survival, evasion, escape, and resistance under varying degrees of hostile exploitation.

E4.1.2. The meaning and interpretation of the CoC are uniform at all stages of training, and that such training develops in each participant the levels of learning indicated in enclosures 2 and 3.

E4.1.3. There is consistency in all DoD CoC training programs, materials, and instructional information.

E4. 1.4. Instructional material related to the CoC develops in all members of the Armed Forces a uniform, positive attitude that they have the ability to and must resist captor efforts to exploit them to the disadvantage of themselves, their fellow POWs, and their country. The theme of all instruction shall encourage this positive attitude.

E4.1.5. Training programs impress on all trainees that the inherent responsibilities of rank, leadership, military bearing, military discipline, teamwork, devotion to fellow members, and the duty to resist the enemy are not lessened by capture.



# LEGAL ASPECTS OF EVASION AND CAPTIVITY

Menu | Back | Next | Exit

## Fundamental Rights and Obligations

Retained Personnel

no longer needed or allowed, they are to be returned to their forces. While the Code of Conduct still applies to Retained Personnel, there is some flexibility in how it is applied:

- Retained Personnel do not have a duty to escape or to aid others to escape.
- Should captors fail to recognize their status, Retained Personnel then have the same responsibilities under the Code of Conduct as any other prisoner.

Whether their status is recognized or not, chaplains are restricted from taking command over military personnel of any branch of Service and medical personnel may not assume command over nonmedical personnel. Medical personnel and chaplains must assert their rights as





In Re Navy Chaplaincy
07-mc-269 (RMU)
EXHIBIT 11



# ORGANIZATION DURING CAPTIVITY

**Parameters of Command** ● Establishing Command ● Duties ● Relieving Command/Ineligibility

### Relieving Command/Ineligibility

Only under extreme circumstances, based on objective, substantiated evidence of actions and performance, can an individual who has properly assumed command be relieved.

Some personnel are ineligible for command in a captivity situation. These personnel are members of the Medical and Chaplain Corps and their legal status is that of retained personnel. Medical personnel may not assume a SRO position regardless of their rank or seniority, unless all captives are members of the Medical Corps and therefore are all of the same status. Chaplains may not command military members of any branch of service regardless of status.



4 of 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHAPLAINCY OF FULL GOSPEL CHURCHES, | ) | |
| | ) | |
| v. | ) | Case Number |
| | ) | 1:99CV0028945(RMU) |
| THE HON. GORDON R. ENGLAND, et. al. | ) | |
| _____ | ) | Consolidated with |
| ROBERT H. ADAIR, et. al. | ) | |
| | ) | |
| v. | ) | Case Number |
| | ) | 1:00CV00566(RMU) |
| THE HON. GORDON R. ENGLAND, et. al. | ) | |
| _____ | ) | |

### ADDENDAL DECLARATION OF HARALD R. LEUBA, PhD

**Religious Bias in Composition and Conduct
of
Navy Chaplain Corps Promotion Boards
Evidence and Effect**

Pursuant to 28 U.S.C. Section 1746, and under the penalty of perjury**,** I, Harald R. Leuba, PhD declare as follows:

1.    I live at 9555 Persimmon Tree Road, Potomac, Maryland 20854.  I am competent to testify on, and have personal knowledge of, and  involvement with, the matters addressed and methods used in this declaration.  The conclusions that I state here are scientifically certain.

## EXECUTIVE SUMMARY:

2.    This is an Addendum to my earlier Statistical Analyses.   This work addresses the question of clear Evidences of Religious Bias in the Composition of US Navy Chaplain Corps Promotion Boards, as a specific issue, and the Effect of Religious Preference in the Management of the Chaplain Corps as a broad issue.

07-mc-269 (RMU)
**EXHIBIT 12**

## DATA

3.     In performing this work, and reaching the conclusions stated here, I have studied three Navy sponsored reports and several sets of data provided by the Navy.  These include:

• Smith, et al "Promotions in the Navy Chaplain Corps", Center for Naval Analyses, Alexandria, Virginia 10 March 2000 CRM D0000149.A1/SR1. (Reference 1. )

• Siskin, Bernard R, PhD  "Statistical Analysis of the Promotion Selections in the U.S. Navy Chaplain Corps During the Time Period 1991-2002" Expert Witness Statement in the matter of Ronald Wilkins, et. al. vs United States of America, The Center for Forensic Economic Studies, June 2003. (Reference 2.)

And

• Halley, Michael D. Editor  <u>United States Navy Chaplains 1982-1991: Biographical and Service Record Sketches of Chaplains on Active Duty During the Period I January 1982 - 21 December 1991</u> Volume X in the History of the Chaplain Corps United States Navy, Chaplain Resource Board, Norfolk, Virginia, June 1993. (Reference 3.)
   [I have formatted this information into a data base for use here - see Appendix A.]

4.     The information available to me also included hundreds of pages of records provided by the Navy, presenting:

• lists of candidates, by religious affiliation, considered for promotion during the decade 1991-2002. [I have formatted these records as a data base for use here - see Appendix B.]

• lists of officers, by religious affiliation, who have served on Promotion Boards during the period 1977-2002. [I have formatted these records as a data base for use here - see Appendix C.]

And

• lists of candidates, by name, considered for promotion during the period 1981 to 1994. [I have correlated these to the information in Appendix A and B, and, for Promotion to Commander, presented the results here in Appendix D.]

## FINDINGS

5.     It is statistically certain that the Faith Distribution on the Navy Chaplain Corps' Promotion Boards is contrived, and not the result of a "faith neutral" assignment process.

• Of the 73 Promotion Boards about which the Navy provided information, every one had at least one Roman Catholic Chaplain. The chance probability of this, if Promotion Board assignments were blind about religious faith, would be 1 in 1.6 million. [See Para 21.]

And

- Of the 73 Promotion Boards, every one had at least one Liturgical Christian Chaplain. The chance probability of this, if Board assignments were blind about religious faith, would be 0.00007819 or about 1 chance in twelve and a half thousand. [See Para 23.]

- The compound chance of always getting at least one Catholic and one Liturgical Chaplain on every Promotion Board is trillions to one, if there were no bias operating. [See Paragraph 24.]

6.    There can be no scientific doubt that the U. S. Navy Chaplain Corps' Promotion Boards are "stacked" with a majority of Catholic and Liturgical Officers, at the expense of, and to the detriment of, Non-Liturgical and Special Worship Chaplains. [See Paragraph 14.]

- Catholic and Liturgical Chaplains on the Promotion Boards tend to over promote fellow Catholics and Liturgicals and under promote Non-Liturgicals and Special Worship Chaplains. [See Table 7.]

- Religious Mix on the Promotion Board is three times as important in predicting who will and will not be promoted as the Religious Mix in the Pool of Candidates (See Paragraph 65.]

- As rank increases, the relative Faith Distribution in the Chaplain Corps drifts to match the Faith Distribution of the Promotion Boards. [See Paragraph 71.]

7.    The US Navy has a pervasive and enduring pattern and practice of religious discrimination in its personnel management of Navy Chaplains.   This prejudice is manifest by a preference for Catholic and Liturgical clergy and a dis-affinity for Non-Liturgical and Special Worship clergy.

- Roman Catholic Chaplains are accessioned into the Corps at higher rank than Non-Liturgical Chaplains, giving the Catholics a "head start" on the career ladder. [See Paragraph 179.]

- Catholics are promoted faster and promoted more often than their peers. [See Table 13.]

- Catholic Chaplains are nearly twice as likely to be promoted to Captain as are Liturgicals and Baptists, and three to eight times as likely to be promoted to Captain as Other Non-Liturgicals and Special Worship Chaplains. [See Paragraph 186.]

8.    Every dimension of personnel management which can be illuminated with data shows that Non-Liturgical Chaplains are disadvantaged by the Chaplain Corps' pattern and practice of religious preferences.

- Non-Liturgical Chaplains are under accessioned into the Chaplain Corps. [See Paragraph 210.]

- When they are promoted, Non-Liturgical Chaplains wait longer in the promotion queue than Catholic and Liturgical Chaplains. [See Table 14.]

- Non-Liturgical Chaplains are less likely to be promoted to higher rank than Catholic and Liturgical Chaplains [See Table 18.]

- Non-Liturgical Chaplains are twice as likely as Catholic Chaplains to be "Released from Active Duty" before they are further considered for promotion,. [See Table 13A.]

- Non-Liturgical Chaplains are less likely to be allowed to stay in the Corps until they retire than are Catholic and Liturgical Chaplains. [See Table 19.]

- Non-Liturgical Chaplains are even less likely to be given Medical Retirements than are Catholic Chaplains. [See Table 19.]

- Non-Liturgical Chaplains are excluded from consideration for promotion to such an extent that their careers are shortened and their horizons are limited vis a vis Catholic and Liturgical Christian Chaplains. [See All of the Above.]

9.    I am mindful, of course, that these conclusions are contrary to the statements and representations of the Defendants and their references.  I will show how the Defendants in the CNA study (Reference 1) and the Defendants' expert witness,  Dr. Bernard Siskin (Reference 2), have been mislead by the pre-digested data they were given by the Navy and have arrived at erroneous conclusions.

- The Navy Faith Group assignment data used by both references is confounded, inconsistent and in error.  The errors may be "minor", but the Faith Group comparisons are contaminated and unreliable.  [See Paragraph 148.]

- Both references treat Navy data on Selections by Promotion Boards (see Appendix B) as though the data was complete,  and it is not.  Disproportionate numbers of Non-Liturgicals are denied further consideration for Promotion which is given to Catholics and Liturgicals. [Paragraph 123.]

- Both references make the same mathematical error in combining conditional probabilities as though they were independent trials - thereby doing things like:

    A Roman Catholic Chaplain is considered for promotion nine times and finally selected on the tenth opportunity.  The Navy's "statistical model" says that this Chaplain had a 10% chance of selection on the last trial, but the model is wrong. This Chaplain had a 100% chance of being selected, eventually.

Five Non-Liturgical Chaplains are each considered for selection twice, and four of them resign, retire, or are forced out after their second refusal; the fifth Chaplain is promoted. The Navy's "statistical model" says that this is also a 10% chance of selection (one selection in ten considerations). But the model is wrong. One of these five Non-Liturgical chaplains was promoted; the other four were not. The Probability of Promotion is 20%.

10.    The Navy's pre-digested data does not include in "% Selected", Promotions from Above the Zone, and both Reference 1 and Reference 2 ignore that fact as well as the promotions themselves, and incorrectly conclude that there are no differences in promotion rates.

•    22% of the Roman Catholic promotions come from Above Zone, but are not included in the "% Selected" data from the Navy. [See Paragraph 101.]

•    13% of the Non-Liturgical promotions come from Above Zone, and are not included in the "% Selected" data from the Navy. [See Paragraph 101.]


**CONCLUSION**:

11.    Navy demographic data show (see Paragraph 68) that:

55% of the Accessions into the Chaplain Corps are Roman Catholic and Liturgical and
45% of the Accessions into the Chaplain Corps are  Non-Liturgical and Special Worship

but:

71% of the Captains in the Chaplain Corps are Roman Catholic and Liturgical and
29% of the Captains in the Chaplain Corps are Non-Liturgical and Special Worship.

Meanwhile,

the Navy as a whole has been

48% Roman Catholic and Liturgical and
52% Non-Liturgical and Special Worship (See Table 17)

and the Chaplain Corps Promotion Boards have been

68% Roman Catholic and Liturgical and
32% Non-Liturgical and Special Worship [See Paragraph 69.]

Of course promotions are contaminated by Religious Preference, and of course, References 1 and 2 have gotten the "Percent Selected" arithmetic wrong. [See Paragraph 86ff.]

# Table of Contents

Topic                                                                                           Para #

**Executive Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2
Promotion Board Composition Reflects Religious Bias . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5
US Navy Chaplain Corps has Pervasive Religious Discrimination in Corps Management . . . . .   7
Roman Catholics get a Head Start and are Promoted Faster and More Often than their Peers  . .   8
Non-Liturgicals are Under Represented at every Rank in the Corps and Pushed out Most Often  . 9
Non-Liturgicals have their Careers Shortened and their Horizons limited by Religious Bias  . . . . 10
The Navy's Pre-digested data has lead/mislead its Opinion Givers to Faulty Conclusions  . . . . . . 11
**Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Promotion Board Assignments by Faith Group . . . . . . . . . . . . . . . . . . . . . . . . . . Table 1 . . 13
Promotion Boards are "Stacked" with a Majority of Catholics and Liturgicals . . . . . . . . . . . . .  14
Navy's Record of 1 Catholic and 1 Liturgical on Every Board could not be a "chance" event . . . 24
Navy Chaplain Corps Intentionally uses Faith as basis for Chaplains on Promotion Boards. . . . 25
Policy of 2 Catholics on every Board was changed to 1 in 1986 . . . . . . . . . . . . . . . . . . . . . . . . 29
Navy Chaplain Corps Protected Catholic "Influence" in Implementing this Change . . . . . . . . . 31
Board Composition Before and After the Change . . . . . . . . . . . . . . . . . . . . . . . . . Table 2 . . . 31
Faith-Based Vote Before and After the Change . . . . . . . . . . . . . . . . . . . . . . . . . . . . Table 3 . . . 33
**Impact**
Using Faith as a Basis for Promotion Board Assignment Violates Navy Policy . . . . . . . . . . . . . 36
One Cannot Achieve any *Regular* Pattern of Board Staffing w/o Managing by Faith . . . . . . . . 37
Defendants Admit they use Faith Group to Manage the Chaplain Corps . . . . . . . . . . . . . . . . . . 38
Stacking the Boards tends to Stack the Corps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
Promotion Board Influence Covers Promotions, but also Influences Release from Active Duty . 41
**Evidence that Board Composition Influences Board Decisions**
Promotion Pool . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Table 4 . . . . 46
Promotion Board Composition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
Chaplains Who Were Promoted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..  . .Table 5 . . 55
Correlation Promotions to Pool and Board . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Table 6/6A . 60
Proof of Bias Correlated to Board Composition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
Linear Regression Weights as Index of "Explanation"; Boards' Faith  matters . . . . . . . . . . . . . 64
Folk Lore is Right, Religious Favoritism Exists . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
Catholic Chaplains are promoted; Non-Liturgical Chaplains are dismissed . . . . . . . . . . . . . . . . 69
A Different Way of Looking at the Issue of Board Influence
1 Catholic vs 2 Catholic Boards, Decisions re CDR Promotions . . . . . . . . . . .  . . . .  Table 7 . . . 72
Catholics are Advantaged in Both Cases; Non-Liturgicals are Disadvantaged in Both . . . . . . . . 78
Baptist Influence Also Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
So Did Baptist Promotions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
Religious Preference is Not a Uniquely Catholic Attribute . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
Religious Preference may not be Intentional or Conscious . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
Even Non-Baptist Non-Liturgical Presence on Boards seems to help their Selection  Table 8 . . 84

# Table of Contents (continued)

Sheet 2 of 3

Para #

**The Navy's Probability of Selection is Not a Probability of Promotion**

$N_s$ is Not All Selected Chaplains . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

$N_c$ is Not All Considered Chaplains . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

An Model is not a Fact

Promotions in the Real Life Navy Chaplain Corps are Not Like the Navy's Model . . . . . . . . . 91

The Navy says Both Probability of Promotion (Probability of Selection) . . . . Table 9 . . . . . . . 94

And Probability of Promotion (Demographics) . . . . . . . . . . . . . . . . . . . . . . . . Table 10 . . . . . . 94

Probability of Selection Compounded is Demographics at Higher Ranks  . . . Table 9A . . . . . . 98

$N_s/N_c$ is Just a Model and it Does Not Match Real Life in the Navy . . . . . . . . . . . . . . . . . . . . . . 100

$N_s$ Does not Count 22% of Roman Catholic Promotions from Above Zone . . . . . . . . . . . . . . 101

$N_c$ Does not Count any of the Chaplains Considered for those Promotions  . . . . . . . . . . . . . . 102

$N_s/N_c$ Does Not take into Account Chaplains Denied Consideration for Promotion . . . . . . . . 103

FY 1992 Board for Commanders illustrates these Complexities . . . . . . . . . . . . . . . . . . . . . . . 104

Post Hoc, Ergo Propter Hoc . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

The "Percent Selected" in Ref 1 and Ref 2 are Incorrect and Cannot be Relied Upon . . . . . . . 108

The Correct Method of Estimating Probability of Promotion is to Look at Records . . . . . . . . 109

Appendix D is Navy's Promotion Lists for Commander 1981-1992 . . . . . . . . Table 11 . . . . . 112

Dr. Siskin's Coin Flipping Stranger was a Flimflam Man . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

What Happened to all the Missing Non-Liturgicals

Non-Liturgicals are Lost from Further "Consideration" for Promotion at each Step . . . . . . . . 120

The Missing Chaplains are not Included in the Navy's Pre-digested Data . . . . . . . . . . . . . . . 123

**What do the True Records Show?**

Vol X, Ref 3, Demographics counted line by line . . . . . . . . . . . . . . . . . . . . . . . Table 12 . . . . . 128

Personnel Management in the Chaplain Corps Explicitly Favors Catholics . . . . . . . . . . . . . . 129

And Disfavors Non-Liturgicals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

An Alternative $N_s/N_c$ Model

This Model is a Fiction, but it Produces the Appearance of Equal Probability of Selection . . . 138

      And the fact of unequal Probability of Promotion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

The Navy's Figures are Not What they are Supposed to be . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

The Navy's Figures have led/mislead the Navy's Opinion Givers . . . . . . . . . . . . . . . . . . . . . . 142

There are Four Reasons Why/How the Navy's Pre-Digested Data is Misleading . . . . . . . . . . 143

The Pre-Digested Navy Data are a Snapshot   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

The Pre-Digested Navy Data are Confounded re Faith Group . . . . . . . . . . . . . . . . . . . . . . . . 148

The Pre-Digested Navy Data Conceal Prior "Consideration" . . . . . . . . . . . . . . . . . . . . . . . . . . 155

The Pre-Digested Navy Data Conceal the Fact that Board Action Leads to RAD . . . . . . . . . . 159

There is Some Good Data

Vol X, U.S. Navy Chaplain Corps Biographical Data (Appendix A) . . . . . . . . . . . . . . . . . . . . 162

U.S. Navy Chaplain Corps Promotion Board Instructions and Reports (Appendix D) . . . . . . . 169

How the Promotion Process Works . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

Public High School Analogy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

Two Sets of Data - Both Sets Lead to the Same Truth . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

## Table of Contents (continued)

Para #

Biographical Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Table 13 . . 178
Promotion to Commander is Glacis on which Many Non-Liturgical Chaplains Fall . . . . . . . . . . 179
Drop Out Rate is a Measure of the Performance of the Corps . . . . . . . . . . . . . . . . . . . . . . . . 182
Catholics are Preferred Over Non-Liturgicals 6 to 1 . . . . . . . . . . . . . . . . . . . . . . Table 13A . 185
    Three Times as Likely to be Promoted and
    Half as Likely to be Forced Out of the Service
Promotion List Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Table 14 . . 187
Even This Probability is an Under Estimate, because the Process is Ongoing . . . . . . . . . . . . . 190
Roman Catholics are Preferred over all Other Faith Groups . . . . . . . . . . . . . . . . . . . . . . . . . 192
Roman Catholics are More Likely to be Promoted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192
Roman Catholics are Promoted Faster . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193
References 1 and 2 Tally these records incorrectly - down, not across . . . . . . . . . . . . . . . . . . 196
References 1 and 2 are Confounded . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197
The Conclusions in References 1 and 2 are Unfounded . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198
**Other Evidences of Religious Preference in Chaplain Corps Personnel Management**
Accessions and Separations Favor Catholics and Disfavor Non-Liturgicals . . . . . . Table 15 . . 199
Accessions do not Match Population Served or Population of Potential Servers . Table 16 . . 203
Accessions do not Match What Army and Air Force Finds in Available Clergy . Table 17 . . 208
Promotion Practice Exacerbates Inequity Rather than Ameliorating it.  . . . . . . . Table 18 . . 214
**Recap and Epilogue**
Catholic Chaplains Get Favored Treatment When They Join the Corps . . . . . . . . . . . . . . . . . .217
Catholic Chaplains Get Favored Treatment During Their Careers . . . . . . . . . . . . . . . . . . . . . . 218
Catholics are Retired;  Non-Liturgicals are Released . . . . . . . . . . . . . . . . . . . . . . Table 19 . . 219
This Preferential Treatment Even Applies to Chaplains with Medical Problems . Table 19 . . 220

**CERTIFICATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 221

References                                      Page 51

Appendices                                   Page 52

## ANALYSIS

12.    In Discovery, the Navy provided Faith Group information for most of the officers assigned to each of the Promotion Boards which were convened from 1977 through 2002.  Non Chaplain officers did not have faith group information provided, but the Faith Group data provided covered more than 90% of all the assigned officers.

13.    Table 1 provides data on Board assignment frequency  by Faith Group.

**Table 1.**
**Representation by Faith Group**
**Number of Boards**

| Seventy Three Boards | Roman Catholic | Liturgical Protestant | Non-Liturgical | | Special Worship | |
|---|---|---|---|---|---|---|
| | | | Baptist | Other | Jewish | Other |
| Number of Boards with No Officers of this Faith: | 0 | 0 | 16 | 52 | 66 | 57 |
| Number of Boards with One Officer of this Faith: | 42 | 13 | 40 | 20 | 7 | 16 |
| Number of Boards with Two Officers of this Faith: | 29 | 35 | 17 | 1 | 0 | 0 |
| Number of Boards with Three Officers of this Faith: | 2 | 21 | 0 | 0 | 0 | 0 |
| Number of Boards with  Four Officers of this Faith | 0 | 4 | 0 | 0 | 0 | 0 |

14.    Even without considering the precision of statistical analysis, Table 1 shows clearly that religion-based decision-making is taking place in Chaplain Corps Promotion Board composition.  Every Board had at least one Roman Catholic Chaplain.  Every Board had at least one Liturgical Protestant Chaplain assigned.  This is compelling evidence of an arbitrary practice of "stacking the deck" so that every Board has a majority of Catholics and Liturgicals.*

_____

* With a Board composed of 5 members, it is not obvious that One Catholic and One Liturgical can constitute a majority, but in point of fact, the Catholics and Liturgicals were at least 50% of

15.    Statistics can tell us how unlikely this pattern of religious discrimination/allocation is. The Biographical Data for the Navy Chaplain Corps, Vol X [See Reference 3], indicates that there were 674 Officers eligible to serve on Promotion Boards, and of these 196 were Catholic.]

16.    According to the laws of Combinatorial Mathematics, there are over one trillion different possible Board compositions if one is choosing five officers from a pool of 674. [The actual number of possible, equally likely, statistical combinations is 1,141,984,766,384**].

- The Probability of having exactly one Catholic on any one 5 member Board is 0.3687.
- The Probability of having exactly two Catholics on any one 5 member Board is 0.3027.
- The Probability of having exactly three Catholics on any one 5 member Board is 0.1234.
- The Probability of having exactly four Catholics on any one 5 member Board is 0.0250.
- The Probability of having exactly five Catholics on any one 5 member Board is 0.0020. And.
- The Probability of having no Catholics on any one 5 member Board is 0.1783.

17.    It may be pointed out that (a) not all of the 674 ranking Chaplains, nor all of the 196 Roman Catholic Chaplains, for that matter, were on Active Duty during each of the 73 Boards, and also that (b) not all of the Boards had 5 members.  However, reducing the number of available Chaplains or increasing the size of the Board, does not make it much easier (statistically) to achieve a random sample with NO Catholics on the Board.

18.    For Example, if we limit candidates for service on a Promotion Board to the Chaplains who were (a) at or above the rank of Commander and (b) on Active duty at the time of one Board (instead of at any time for *all* Boards), then we are choosing from a population of 284 Officers, 82 of whom are Catholic, and:

- The Probability of having no Catholics on any one 5 member Board is 0.1794.***

19.    With the assumptions and data at hand, the probability of composing one Board and having at least one Catholic on it is 0.8217. (1.00 - 0.1783). The probability of establishing two Boards, at random, and getting at least one Catholic on at each of them, is 0.8217 times 0.8217 (or 0.6752).  Two consecutive Boards with Catholics on each of them, then, is likely to occur most of the time (67.5%), but the probability of drawing four consecutive Boards and getting at least one Catholic on each of them is less than half: 0.4558.

_____

* (cont.) the membership on 71 of the 73 Boards convened during this period, 1977 to 2002. [The average Board for considering promotions to Captain was 70% Roman Catholic and Liturgical.]

** The Formula is $C^{674}_5$ or (674*673*672*671*670*669!)/(5*4*3*2*1)*(669!)

*** The Formula is $C^{202}_5/C^{284}_5$

20.    Following this calculus, the likelihood of random assignment or faith neutral allocation producing 73 consecutive Boards with at least one Catholic on every one of them is 0.0000005945. (This is 0.8217 to the 73rd power.)

21.    The probability of achieving what actually happened, with respect to getting Catholics on every Board, if the system was not biased, contrived, or controlled is about 1 time in 1.6 million.

22.    Similar analysis for the Liturgical Officers (of whom there were 97 Commanders, Captains and Admirals on Active Duty who *could* have been chosen to be on a Promotion Board) shows:

•    The Probability of having no Liturgical Officers on any one Board is 0.1215.*

23.    And (as in paragraphs 19 and 20 above) the probability of composing 73 consecutive Boards and always getting at least one Liturgical on every one of them is 0.8785 to the 73rd power, or 0.00007819.

24.    Every person on earth, all six billion of them, could have drawn a sample Chaplain Corps Promotion Board once a month, for every month, from 1977 to 2002  and not one of them would, in all statistical likelihood, have picked a sample with 73 consecutive Promotion Boards with at least one Catholic and at least one Liturgical on EVERY Board.  The Navy's actual result could not have happened by chance!

25.    The Navy Chaplain Corps intentionally chooses Chaplains for the Promotion Boards based on Religious Faith Group.  No other interpretation fits these data.

26.    In assembling Promotion Boards, The Navy Chaplain Corps, identifies, selects, assembles, *balances* Board composition so that:

•    One or two Roman Catholics are on EVERY Board,
•    One or two (or three or four)  Liturgical Chaplains are on EVERY Board, and
•    One "Other" (Non-Liturgical or Special Worship Chaplain), is assigned to most Boards.

27.    This does not even *look* fair; furthermore, it is not even handed; and even if it were argued to be  "well meaning," it is a misguided introduction of religion *per se* into an assignment process which is supposed, by Navy policy, to be faith blind or faith neutral.

28.    In the first place, the **fact** of assigning one or two Catholics to each Promotion Board is an explicit introduction of  "considerations of faith" into what should be a purely administrative action.

_____

* The formula in this case is $C^{187}_5/C^{284}_5$

29.     The policy of assigning two Catholics to every Board was changed in 1986/7, following a court case (Wilkins vs. Lehman, *et al*), but the Policy as well as the change were and are explicit acknowledgments that faith**,** in fact Catholicism, was, *and is,* one of the criteria in assigning Chaplains to Promotion Panels. (See Reference 1, p26.)

30.     In the second place, it is interesting to notice that in implementing this change the Navy protected Catholic influence as much as it could, while being required to reduce the Catholic presence on the Promotion Boards by one half.

31.     Table 2 presents the average Board composition, by Faith Group, before and after the change of Policy from two Catholics to one Catholic.  Note that the effect of the change was to drop one Catholic Chaplain from the Board, as "agreed", but his/her slot was not opened up to other Chaplains; the Navy, instead, added a non Chaplain:

**Table 2.**
**What Happened to Board Composition after the Change in Policy**
**From Two Catholics on the Board to One Catholic on the Board?**

| Average Board Composition: | "Two Catholics" 1977 to 1987 | "One Catholic" 1988 to Present | Nominal Change |
|---|---|---|---|
| Total Number on **"voters"** on each Promotion Board | 6.00 | 5.95 | None |
| Number of **NON Chaplains** on each Board | 0.06 | 1.07 | **Plus One** |
| Number of **Catholic** Chaplains on Each Board | 1.97 | 1.07 | **Minus One** |
| Number of **Liturgical** Chaplains on Each Board | 2.55 | 1.98 | Minus Half |
| Average Number of **Baptist** Chaplains on Each Board | 0.97 | 1.07 | Tiny Plus |
| Number of **Other Non-Lit** Chaplains on Each Board | 0.23 | .36 | Tiny Plus |
| Number of **Special Worship** Chaplains on Each Board | 0.16 | .43 | Plus a Quarter |

32.     One wonders if it was irony, misunderstanding, or circumvention of intent, that the "extra" Catholic was replaced with a non Chaplain, instead of a Chaplain of a "non Catholic Persuasion".

33.    Table 3 provides an assessment of the Catholic proportion of the total faith-based vote on a Promotion Board, under alternative one and two Catholic configurations.

**Table 3.**
**"Catholic Influence"**
**Under Alternative Board Configurations**

| Configuration:<br>(w/ave of 5.9 to 6.0 Officers on each Board) | Catholic Faith-Based Vote as a Percent<br>of all Faith-Based Votes |
|---|---|
| Two Catholics (no Non Chaplains) | 34.5 |
| One Catholic (no Non Chaplains) | 18.0 |
| One Catholic and One Non Chaplain | 22.0 |

34.    Replacing one Catholic Chaplain with a non Chaplain Officer, although consistent with the seeming *letter* of the Policy change, only reduced apparent "Catholic Influence" by 1/3. Following the seeming *spirit* of the change in Policy would have reduced apparent "Catholic Influence" by ½.

## IMPACT

35.    One might ask, "So what? What difference does all this make?"

36.    First, assigning Chaplains to Promotion Boards based on each Chaplain's religious belief (whether Catholic, or not, or Liturgical, or not, etc.)  is contrary to stated, official Navy Policy. Officially, no Chaplain is supposed to be assigned to, or not assigned to, a Promotion Board because of his (or her) religion; it is clearly a violation of that policy to control Promotion Board composition:

•    (a) so that every Board has Two Catholics, or
•    (b) so that every Board has One Catholic, or
•    (c) so that  every Board will have at least one Roman Catholic and at least one Liturgical as well as (71 times out of 73) at least one "Other" Chaplain, and routinely one non Chaplain.

37.    One cannot achieve any *regular* pattern of Faith Group distribution without *considering,* in fact *managing by*, Faith Group.

**Defendants Admit that they Manage by Faith Group**

38.    In a related case (see Motion for Summary Judgment [Reference 4]), the Navy says "The Chaplain Corps uses four categories of faith groups to manage its Chaplains: ..." They do not say they use these categories "to tally", "to record", "to keep track of", "to account for", or even "to understand", "to monitor", or "to review" the Corps' records; they say they use these categories to "manage" the Corps - and this is what they do.  They use Faith Group to control the number of Chaplains who are accessioned into the Corps, who are allowed to stay in the Corps, who are promoted within the Corps, and even who are (and are not) allowed to get Medical Retirements.

In fact, every dimension of personnel management practice which we can illuminate with data shows the effect of control based on Religious Faith Group - with deference always in favor of the Roman Catholics, and limitation always accruing to the Non-Liturgicals' Faith Groups in general and Evangelicals within that Group and Special Worship Faith Groups in particular.

39.    This statement in Reference 4 is an admission that the Navy uses Faith Group to manage the Corps.

40.    Second, to the extent that religious preference influences promotion decisions, stacking the Boards with a preferred religion, tends to stack the Chaplain Corps itself with promotions that are from those religions.  The corollary of this observation is that denying Promotion Board seats to certain Faith Groups works to keep those Faith Groups from being promoted, and, in a vicious circle, reduces their availability for service on Promotion Boards.

**Promotion Boards influence Corps composition both directly and indirectly.**

41.    Promotion Boards influence Corps composition both directly and indirectly.
The direct influence is, of course, by *promotion*.   Every candidate who is promoted adds his/her credentials to the leadership of the Corps.

42.    But Board decisions also influence Corps composition  indirectly.  First, officers who are not promoted on the first available opportunity, (a) gain or maintain seniority within their current rank, but (b) lose seniority to those of their cohort who have been promoted.  Second, officers who are not promoted on their second *consideration* are, and know themselves to be, prejudiced against vis a vis further service.  From time to time, although irregularly enforced, it has been Navy policy that one is "Up or Out".  Presumably, being "passed over twice" is cause for severance from the Corps.

43.    Since Promotion Boards can pass over a candidate, the Boards' decision influences the candidate's career, perhaps even his continuance in the service, if he is passed over.

44.    The balance of this section of the addendal  will demonstrate the invidious effect of "stacking the Promotion Boards."  The evidence is clear, but laying it out requires a little care:

45.    If one wants to assay the effect of Promotion Board composition on Promotion Board selection, one needs (a) a description of the candidate pool, (b) an assessment of the actual Promotion Boards as they sat, and (c) an enumeration of the promotions which effectuated.

46.    The Promotion Pool.  Table 4 gives several alternatives for assaying the relative number of candidates for promotion:

**Table 4.**
**Comparison of Faith Group Distributions**
**Of Chaplains who *could* be Promoted:**
**Completed Careers vs Active Duty vs Those who *were* considered**

|  | Roman Catholic | Liturgical Protestant | Non-Liturgical | | Special Worship | |
|---|---|---|---|---|---|---|
|  |  |  | Baptist | Other | Jewish | Other |
| Completed Careers | 212 | 323 | 186 | 93 | 9 | 22 |
| Active Duty 12/31/91 | 217 | 341 | 213 | 169 | 14 | 27 |
| Total "Considered" 1991- 2002 | 290 | 492 | 561 | | 78 | |

47.    The first two lines of Table 4 present data drawn from "History of the Chaplain Corp, U.S. Navy Volume X: Biographies 1982-1991" (Ref 3.).   "Completed Careers" is data characterizing all Chaplains whose retirement or release from Active duty is recorded in this volume.

48.    The second row in Table 4 shows the Faith Group distribution of all Chaplains who were still on Active Duty on December 31, 1991.  Completed Careers shows what happened to the cohort who has gone through the promotion process.  Active Duty shows the current status of serving Officers.  This is the pool who *will be* considered.

49.    The third row in Table 4 is a tabulation of the Officers who were considered by the Promotion Boards which were convened between 1991 and 2002.  These data were taken from Dr. Siskins's Statistical Analysis (Ref 2.), and corroborated by review of the Promotion Board Lists that were  produced as Exhibit 1 at my deposition on October 1, 2003.  (See Appendix B.) [Where Dr. Siskin has tallied only the Chaplains who were considered In Zone, I have verified his counts in the Navy's Consecutive Sequence Number list and then counted the Above Zone considered as well as the Below Zone considered. See Appendix E.]

50.    I include the data in Row 3 with some trepidation as they are not what they seem to be. (See "The Navy's 'Probability of Selection' is not a probability of promotion", below, beginning in Paragraph 86).  However, (a) the data ought to be correlated to what the Board actually considered, and (b) we can also look at the question again, from a different angle, on an individual Board basis. [That examination will follow this one.]

51.     Where Rows 1 and 2 of Table 4 count each Chaplain once, Row 3 counts each Chaplain every time he is "considered". Row 3 counts once a Chaplain who is *considered* and then promoted, but may count more than once a Chaplain who was listed as Below Zone (and not selected), and considered again, (once, twice, thrice - and not selected) as In Zone, and then considered an additional time or two, or three or eight(!) times (and not selected) as Above Zone. I have not settled on what the best measure of candidacy is, but I am disposed to use Row 1. These are Chaplains whose careers have been completed and what happened is what happened. This is the answer to the question of where each Chaplain ended his career. Row 2 certainly measures the pool of candidates, but some of these people have not yet been considered for the highest ranks. Row 3, which is clearly de facto the pool of people who were considered, is overly weighted with Chaplains who were not (and probably will not be) promoted.

52.     On balance, though, almost any reasonably representative pool of candidates will suffice to test the influence of Promotion Board composition. We need a relative distribution, by Faith Group; we do not need a census of the candidates. [The analysis here is about the patterns by Faith Group, the relative numbers, not the actual counts.]

53.     I will address, in another section of this addendal, why and how the Navy seems to loose a disproportionate number of Non-Baptist Non-Liturgicals and Special Worship Chaplains, but for now, let us use the Completed Careers data. [This data is the most conservative versus the position we are testing (and will show): that the Faith Distribution of the Promotion Board Composition colors the selection decisions of that Board.]

54.     <u>Promotion Board Composition</u>. Data for the second variable in our test will be drawn from the Promotion Board data which has been produced by the Navy - See Appendix C. Here we will tabulate, for all the Promotion Boards combined, the number of Chaplains, by Faith Group, who were assigned to any Board. An interesting refinement will be to correlate each Board's composition to each Board's selections. We will turn to that next, but the sample sizes are very small, so statistical confidence limits are very large.

55.     <u>Chaplains who were Promoted.</u> We do not have actual promotion data for the whole period during which these Boards operated. What we do have is a record of promotion from the middle of this period (1981 to 1992), the records in Reference 3, and a derivative record of promotions, by Faith Group from the last decade during which these Boards operated, 1991-2002. Table 5 shows both of these samples.

56.     Line 1 in Table 5 begins in Reference 2, as verified by cross comparison to Navy primary records, Appendix B. Line 1 includes Above Zone promotions as well as In Zone and Below Zone. (See Appendix E.) If we were to use these figures in conjunction with tallies of the number of *considered* Chaplains, we would step into a morass of conditional probabilities and Bayesian Statistics. But that is not an issue at present, as we have decided (see paragraph 51) to use the record of Chaplains who have completed their careers as the surrogate for "considered", instead of the confounded tally in References 1 and 2. (See Appendix D and E.)

**Table 5.**
**Comparison of Faith Group Distribution of**
**Officers Selected for Promotion 1981-1992 and 1992-2002**

| Chaplains from each Faith Group Promoted to CDR and Above | Roman Catholic | Liturgical Protestant | Non-Liturgical Baptist    Other | Special Worship Jewish    Other |
|---|---|---|---|---|
| 1991-2002 (Ref 2) | 109 | 167 | 193 | 47 |
| 1981-1992 (Ref 3) | 171 | 231 | 119         45 | 3          8 |
| Ratio | 1.57 | 1.38 | .84 | .23 |

57.    Line 2 in Table 5  is drawn from the individual Chaplain biographical records, Reference 3, (See Appendix A).

58.    The third row in Table 5 presents the ratio between Row 1 and Row 2.  This is a measure of the similarity between the two distributions (if they were "equivalent" but just with different sample sizes, the ratio would be constant across Faith Groups.)  Clearly the two time periods are different, at least in terms of their treatment of Non-Liturgicals and Special Worship Chaplains, whose lot *may* have improved in this later decade - a surmise we can return to..

59.    Faced with a choice between (a) a verified number of promotions from the middle of the time when these Boards operated, and (b) a dis-aggregated (Non-Liturgicals are treated as a single pool, and so too are Special Worship Chaplains) sample from the end of this period (after the 2 Catholic Policy had been changed), Table 6 will use the more representative, more detailed sample (based on Reference 3).  We can turn later to consider the sample from Reference 2.

60.    We are now ready to assemble the data we want to correlate: the Pool of Candidates, the Promotion Board Composition, and the Pattern of Selections.  (See Table 6 and 6A on the next page.)

61.    The  difference between Table 6 and Table 6A, is that Table 6A converts the actual counts in Table 6 into relative percentages.  This has two advantages.  First, it provides an explicit notice that it is the relative figures which are important, and second by converting to percentages, direct visual observation is facilitated. [One "must" note that the relative percentage of Chaplains who are promoted (Row 3),  versus the number who are available for promotion (Row 1), increases for Roman Catholic and Liturgical Chaplains (for example from 25.2% to 29.6% for Catholics) and decreases for Non-Liturgicals and Special Worship Chaplains (from 11.0% to 7.8% for Non-Baptist, Non-Liturgicals.)  This is hard evidence of Faith Group bias in promotions in the U.S. Navy Chaplain Corps, and we are about to see *why* it occurs.]

**Table 6.**
**Comparison of Faith Group Distribution of**
**Candidates, Officers on Promotion Boards, and Those Selected**
**Actual Counts**

| Number of Chaplains Who | Roman Catholic | Liturgical Protestant | Non-Liturgical | | Special Worship | |
|---|---|---|---|---|---|---|
| | | | Baptist | Other | Jewish | Other |
| 1. Completed their Careers 1981-1992 | 212 | 323 | 186 | 93 | 7 | 23 |
| 2. Were Assigned to Promotion Boards: 1977-2002 | 104 | 158 | 74 | 26 | 6 | 16 |
| 3. Were Promoted to CDR and Above: 1991-2002 | 171 | 231 | 119 | 45 | 3 | 8 |

**Table 6A.**
**Comparison of Faith Group Distribution of**
**Candidates, Officers on Promotion Boards, and Those Selected**
**Relative Percentages**

| Percent of Chaplains by Faith Group, Who | Roman Catholic | Liturgical Protestant | Non-Liturgical | | Special Worship | |
|---|---|---|---|---|---|---|
| | | | Baptist | Other | Jewish | Other |
| 1. Have Completed Their Careers | 25.2 | 38.3 | 22.0 | 11.0 | 0.8 | 2.7 |
| 2. Were Assigned to Promotion Boards | 27.1 | 41.1 | 19.3 | 6.8 | 1.5 | 4.2 |
| 3. Have Been Promoted | 29.6 | 40.0 | 20.6 | 7.8 | 0.5 | 1.5 |

62.    The data lines in Tables 6 and 6A are comparable because they are from contemporary policy periods, and they cover many of the same Chaplains, but they are not exactly the same Chaplains *per se.* Some of the Chaplains whose careers were completed prior to 1991 served on Promotion Boards (Row 2) in 1977 to 1991, and some of the Chaplains in Row 3 who were promoted may also have served (in their turn) on Promotion Boards in 1993 to 2002. The point here is that the three data lines provide different, but still comparable, windows on the U S Navy's Chaplain Corps promotion system.

63.    Table 6 provides the numbers we need to measure the relationships between (Row 1), the number of Chaplains available for promotion, (Row 2), the number of Chaplains by faith group on the Promotion Boards and (Row 3),  the Number of Chaplains who are promoted.

64.    Not surprisingly (the data lines ought to be correlated), the correlations here are all above .95. This indicates that just over 90% of the variability in the differences in promotion rates can be explained by the independent variables.  The linear regression is:

> Number Promoted =    a constant (-6.934)
> + **0.305**  x  Number Accessioned
> + **0.941**  x  Number on Promotion Board

65.    There is more to the statistical theory than this, but it is convenient to think of the regression weights (.305 and .941) as *measuring* the relative importance of the two factors.

66.    The telling point in this linear regression is that the presence of Chaplains of a given faith on the Promotion Board receives three times the weight (.941) in predicting *that* faith's number of promotions, as does the weight (.305) for the prevalence of that faith group in the pool of candidates.

67.    We have now shown that the folk lore psychology is justified in the case of Navy Chaplain Corps Promotion Boards.  The composition of the Promotion Board influences (one might say "contaminates") the Board's selections. The Boards tend to select candidates who have the same faith as they do.  The linear regression demonstrates that belief in what one might call "Religious Favoritism" or "Religious Elitism" is justified.

68.    The Navy's Alpha Rosters show that:

•    55% of the Chaplain Corps' accessions are Catholic and Liturgical, and
•    45% of its accessions are Non-Liturgical and Special Worship; but

•    71% of the Chaplain Corps' Captains are Catholic and Liturgicals and
•    29% are of its Captains are Non-Liturgical and Special Worship.

69.    This difference in faith distribution at accession, vs faith distribution at Captain is "end of career" proof that there is religion-based bias in the Navy Chaplain Corps' career management system.  Catholic and Liturgical Chaplains tend to be promoted; Non-Liturgical and Special Worship Chaplains tend to be dismissed from the service.

70.    The Catholics and Liturgicals on the Boards tend to over promote fellow Catholics and Liturgicals and under promote Non-Liturgicals and Special Worship Chaplains.

71.    As rank increases, the relative Faith Distribution in the Corps drifts to match the Faith Distribution of the Promotion Boards.  And since the distribution of Faith Groups on the

Promotion Boards is controlled (by religious preference), so too is the distribution of Faith Groups at the highest ranks of the Corps controlled by arbitrary intervention by Chaplain Corps' management.

**Here is another way of illuminating this issue.**

72.    Instead of considering Board composition *en toto*, on the average, let's look at what subsets of "similar" Boards actually did on particular Promotion choices.  The sample sizes are smaller, of course, so the statistical confidence limits are broader,  but the evidence is still dramatic.

**Table 7.**
**Comparison of Records for**
**Promotion Boards with One and Two Catholics**

| | Roman Catholic | Liturgical Protestant | Non-Liturgical Baptist | Other | Special Worship Jewish | Other |
|---|---|---|---|---|---|---|
| **Boards with One Catholic (1987-1992)** | | | | | | |
| Number of different LCDRs considered | 72 | 123 | 72 | 50 | 8 | 7 |
| Number Selected | 41 | 58 | 37 | 25 | 5 | 4 |
| Promotion Percent* | 56.9% | 47.2% | 51.4% | 50.0% | 62.5% | 57.1% |
| **Boards with Two Catholics (1981-1986)** | | | | | | |
| Number of different LCDRs considered | 72 | 95 | 64 | 27 | 3 | 4 |
| Number Selected* | 46 | 44 | 23 | 14 | 2 | 3 |
| Promotion Percent | 63.9% | 46.3% | 35.9% | 51.9% | 66.7% | 75.0% |

_____

\* This is nearly a true Promotion Percent [see paragraph 190].  This is not the misleading "Probability of Selection" which is used in Ref 1 and Ref 2.  The reasons why this distinction is important will be discussed below. [Paragraph 132 ff]  The percentage here is the probability of being selected (eventually) regardless of the number of times or number of Boards ones candidacy was presented to.  There are still a few problems with the computation done this way, as a few LCDRs (about 10% of the total) were considered both before 1987, and not selected, and also considered in the period when there was only one Catholic Chaplain on the Board; these candidates' record in front of each set of boards is included in the totals for each set of boards.

73.    The Navy recently produced a second set of Promotion Board related lists.  This collection seems to be the instructions to and reports from most of the Promotion Boards which met between 1981 and 1995.  The data are not altogether complete, but they can be salvaged by correspondence to (and filled-in from) other records - See Appendix D.

74.    Between October 1, 1980  and September 30, 1992, twelve Promotion Boards  met to consider candidates for promotion to Commander.  These Boards considered a total of  over 500 different Navy Chaplains.  During this time period there were six Boards which had two Catholic members and six Boards which had just one Catholic member.

75.    The performance of these two configurations is compared in Table 7 (on the previous page).  [The individual data lines which are summarized there can be found in Appendix D.]

76.    The twelve Promotion Boards which met during this time were, not coincidentally, convened with two Catholic Chaplains on every Board from 1981 through 1987, and then, in 1987 because of a Court decision (and concern that having two Catholics on every Board was undue Catholic influence), the number of Catholic Chaplains on each Board was changed to one.

77.    Table 7 shows that when there were two Catholics on the Board, the likelihood of *those* boards promoting a Catholic was roughly 10% larger than when there was only one Catholic Chaplain on the Promotion Board.  This result, notwithstanding the fact that the CNA Study (Reference 1) thought it was statistically significant, albeit using an improper computation, is not statistically significant when tested as a stand alone comparison.  41 Chaplains chosen out of 72 considered is not statistically different than 46 Chaplains chosen out of 72  considered.  The difference *matters* to the five extra Chaplains who are promoted, but it is not statistically significant at the .25 level.

78.    On the other hand, both when there were two Catholics on the Board and when there was only one Catholic on the Board, Catholics did better than any other faith, even the Liturgicals.  But the most disadvantaged Chaplains in this time period are the Non-Liturgicals, and collectively, they suffered more setback under two Catholics than they do now under the One-Catholic-Chaplain-on-Each-Board regimen.  The number of promotions which the Liturgicals lose to the Catholics is statistically significant at the .01 level, and the number of promotions which the Non-Liturgicals lose to Catholics is also statistically significant at the .01 level.

79.    It is of more than passing interest to note that when the number of Catholics changed from two on the Board to one on the Board, something else changed too. (See Table 2).  The Baptist vote on each Board changed from 0.97 votes out of six Chaplains to 1.07 votes out of five Chaplains, and their proportional influence went from 16.2 % (0.97/6) to 21.4% (1.07/5).

80.    This is a 132% increase in "religious power" (if one believed in such power, and if one measured it as the relative per capita Faith Group vote on the Board).  This 132% increase in Baptist Power is accompanied by a 143% increase in the probability of such relatively "Baptist Intense" Boards selecting a Baptist.

81.    While the statistical evidence so far is supportive of the proposition that Promotion Board composition influences Board selections; clearly this tendency is not limited to Catholics, who are currently "in the controlling seats" in Chaplain Corps management.

82.    The data do not inform whether this preference result is intentional and conscious, or unintentional and simply a reflection of the phenomenon which the CNA study bowed to: "Like will promote like", or "Birds of a feather flock together". The underlying presumption there is that it is easier for Chaplains of a given faith to find not only affinity with others of the same faith, but, less draconianly, they may simply understand those Chaplains' work experience better and see its relevance to future assignments more readily than for Chaplains who have a different background.

83.    Two of the twelve Chaplain Promotion Boards summarized in Table 7, had a Non-Baptist Non-Liturgical Chaplain on the Board. The selections of these two Boards are summarized in Table 8.

**Table 8.**
**Comparison of Records for Promotion Boards with**
**One Non-Baptist Non-Liturgical Chaplain and No Non-Baptist Non-Liturgical Chaplains**

| | Roman Catholic | Liturgical Protestant | Non-Liturgical Baptist | Other | Special Worship Jewish | Other |
|---|---|---|---|---|---|---|
| **Boards with One Non-Baptist Non-Lit (1987& 1990)** | | | | | | |
| Number of different LCDRs considered | 7 | 20 | 11 | 7 | 1 | 0 |
| Number Selected | 5 | 10 | 9 | 4 | 0 | 0 |
| Promotion Percent | 71.4% | 50.0% | 81.8% | 57.1% | 0 % | 0 % |
| **Boards with No Non-Baptist Non-Lits (1981-1992)** | | | | | | |
| Number of different LCDRs considered | 137 | 198 | 116 | 70 | 10 | 11 |
| Number Selected | 82 | 92 | 60 | 35 | 7 | 7 |
| Promotion Percent | 59.9% | 46.6% | 51.7% | 50.0% | 70.0% | 63.6% |

84.    Table 7 compared sample sizes that were roughly the same size (about 300 Chaplains each), but Table 8, because almost all Promotion Boards have no Non-Baptist Non-Liturgicals

members on them, has a very small sample as a test case. This broadens confidence limits on statistical comparisons. However, (not surprisingly) the, may we call them the "Non-Baptist Non-Liturgical Boards" (sic), promoted their "kind" nearly 30% more when they were on the Board, than when they were not.

85.    This difference falls just shy of being statistically significant at the .05 level, but it is certainly consistent with an observation that "Faith Matters" - in what (who) the Promotion Boards select.

**The Navy's "Probability of Selection" is not a Probability of Promotion.**

86.    The Navy's "Probability of Selection" is not a Probability of Promotion. And both of the Navy's statistical references, the CNA study (Reference 1) and the analysis by their statistical expert, Dr. Bernard Siskin (Reference 2) are wrong in their adoption, and promulgation of this fiction.

87.    The "statistic" *probability of selection* is computed as:

$$N_S/N_C$$

Where:

- $N_S$ is the Number of candidates, In Zone, who were selected (for promotion by that particular Board, on that particular occasion),

and

- $N_C$ is the Number of candidates, In Zone, who were considered (for promotion by that particular Board, on that particular occasion).

But

- $N_S$ is the NOT the Number of candidates who were promoted. Candidates from Above Zone who are selected on this occasion are not included in the count. Candidates from Below Zone who are selected on this occasion are not included in the count.

and

- $N_C$ is the NOT the Number of candidates who were considered (for promotion by that particular Board, on that particular occasion) Candidates In Zone, who were promoted by a previous Board, are not counted in this Board's totals. Some, but not all, of the Candidates who were considered by a previous Board and not promoted, are counted in this Board's totals. But no Candidates who were considered by this Board from Above the Zone, or Below the Zone, whether selected or not, are counted.

88.    $N_S/N_C$ may be a convenient and easy calculation that can be done by a Promotion Board clerk to check that the Board was reasonably fair and in compliance with equal opportunity policies and goals, but $N_S/N_C$ is neither accurate nor complete and it should not be acceptable when it comes time to examine true promotion rates.

89.    The Navy's statistical advocates have done discourse and discovery a disservice by uncritically adopting and promulgating an incomplete, inaccurate and impure model.


**A model is not a fact; it is a model.**

90.    The $N_S/N_C$ model uses a situationally simplified calculation to describe a process which is much more complex in real life.

91.    In real Navy life,

•      Some Chaplains are promoted from Above the Zone.

•      Some Chaplains are promoted from Below the Zone.

•      Some Chaplains are removed from further consideration.


92.    If one wonders about the nuclear family, one might find it useful to ask the man in the street how many children he has.  We would not be surprised that the average answer was 2.3 children, and we would not be amused by supercilious concerns about the .3 child, nor silly comments about men having children.  It would not occur to us to, in 21ˢᵗ century America, to amend our question with concern for how many *live* children he had.  But the fact is that not all children live to graduate high school.

93.    Similarly, in real Navy life,  not all Navy Chaplains survive the promotion ordeal.  A few die, but many are forced out - by policy, or age, or pressure. One of the tools of personnel management in the Navy is called "Up or Out".  This refers to the fact that if one is not promoted (presumably after two tries) one is "out", and since being before the Promotion Board and not being selected is the definition of being *passed over*, Board action is important whether it is to promote or to deny (consideration for) promotion.

94.    $N_S/N_C$ does not reflect any of these real life complications.  It is not surprising then, that the Navy can present data, for example, that says both:

**Table 9.**
**Probability of Promotion₁**

|  | LCDR | CDR | CAPT |
|---|---|---|---|
| Roman Catholic | 57.6% | 58.7% | 43.3% |
| Liturgical | 61.7% | 51.4% | 46.7% |
| Non-Liturgical | 64.9% | 53.7% | 44.6% |

And:

**Table 10**
**Probability of Promotion₂**

|  | LCDR | CDR | CAPT |
|---|---|---|---|
| Roman Catholic | 18.0% | 20.6% | 21.4% |
| Liturgical | 36.1% | 32.2% | 35.7% |
| Non-Liturgical | 41.6% | 41.8% | 38.1% |

95.    Probability of Promotion₁ is Ns/Nc as presented in Reference 4, paragraph 9, page 51 as a "fact".

96.    Probability of Promotion₂ is the Percentage of Chaplains serving at that Grade, as presented in Reference 4, paragraph 8 page 2 as a "fact".

97.    The Navy calls Probability of Promotion₁ "Selection Rates" with parenthetic reference to In Zone  Eligible Chaplains.

•    The invited inference is that the rates are nominally the same across Faith Groups, though it is clearly "harder" for all Faith Groups to rise to the rank of Captain.

98.    If the Probability of Promotion₁ (Table 9) were a correctly calculated, independent trials-based **Probability of Selection**, a sample of 100 accessioned Chaplains of each Faith Group would produce the following Numbers of Chaplains at each higher Rank:  The number of Chaplains at Rank (R+1) equals the Number of Chaplains at Rank (R) times the Probability of Selection to Rank (R+1) from Rank (R) or:

$$[N_{(R+1)} = N_{(R)} * P_{(R+1)}]$$

**Table 9A.**
**Probability of Promotion₁**
(Number of Chaplains Reaching each Higher Rank)

|  | LCDR | CDR | CAPT |
|---|---|---|---|
| Roman Catholic | 57.6 | 33.8 | 14.6 |
| Liturgical | 61.7 | 31.7 | 14.8 |
| Non-Liturgical | 64.9 | 34.9 | 15.5 |

99.     The Navy calls Probability of Promotion₂ "Demographics as of December 2004".

•     The obvious contradiction is: if the "selection rates" are nominally the same across faith groups, how can the relative likelihood of advancement for Non-Liturgicals in Table 10 *decrease* from 42% at LCDR and CDR to 38% at CAPT, while at the same time the likelihood of advancement for Catholics *increases* from 18% at LCDR to 20.6% at CDR to 21.4% at CAPT?

100.     The answer is that $N_S/N_C$ is just a model and Demographics are real life.

101.     When the Navy's statistical opinion givers count $N_S$ they never get around to including the 10 to 20% of the Chaplains who are promoted from Above Zone. [It is 13% for Non-Liturgicals and 22% for Roman Catholics - See Reference 2, Defendant's Exhibit 11, p 3.]  Nor do they include, i.e. count, the 1% who are promoted from Below the Zone.

102.     When the Navy's statistical opinion givers count $N_C$ they ignore the fact that most selected Chaplains have been considered more than once; some have been considered 7, 8 and 9 times.  [The average selected Chaplain has been considered twice.] And when they count the *considers* for the Non selected Chaplains they ignore the fact that these Chaplains too have been considered more than once, more than four times on the average.

103.     Further confounding $N_S/N_C$ as a measure of promotion is that it fails to take into account the reverse side of Board action - loss of Chaplains from the population because they have been eliminated from further consideration - by being released from active duty or involuntarily retired.

104.     For example:

In the FY 1992 Board for eligibles to Commander:

132 Chaplains were considered (Above, In and Below Zone)
  56 Chaplains were considered Above Zone
        11 of these were selected, although 2 of those were actually also selected in FY 91
              1 of the remaining 9 selected this year, was considered 8 times before.
  46 Chaplains were considered In Zone
        16 of these were selected,  all of them had been considered at least once before.
  30 Chaplains were considered Below Zone
        None were selected this year, but
        27 had been considered before
28 Non Selected Chaplains left the Corps following the Board's decision.

105.   I am not arguing *post hoc, ergo proptor hoc* ("after the fact, therefore because of it"); I am pointing out that:  the pool of the to-be-considered-the-next-time is changed just as much by (a) the removal of the selected (i.e. promoted) Chaplains as it is by (b) the disappearance (for whatever reason) of some of the unselected Chaplains, and therefore:

•       The act of combining "probabilities" from Board to Board, across fiscal years violates one of the underlying conditions necessary for statistical combination: each trial is not independent of what happened on the previous trial.

106.   In Reference 2, Dr. Siskin reports, concerning the 1992 Board for Commanders, that there were 4 In Zone Roman Catholics considered and two selected, so he calculates "50% of the In-Zone Eligible Chaplains were selected." Two selections out of 4 considered is clearly 50%.  But all 4 of *those* Chaplains had been considered before (and counted as such in 1991). [See Appendix D.]

107.   They have been considered 8 times and selected twice, what is the Probability of Selection?  It is, surely 50% on this trial.  Was it zero on the last trial?  What is the average? Complicating the arithmetic even further is the fact that the FY92 "eligibles" list also included 13 Catholics from Above the Zone (who have already been *considered* 71 times.)  Two of these Catholic Chaplains are selected this time, but Siskin has neither the 2 selections, nor the 13 "considerations" that these two Chaplains had among them reflected in his "percent".

108.   The "percent" calculations in both Reference 1 and Reference 2 are incorrect and cannot be relied upon for assaying promotion rates in the US Navy Chaplain Corps - for the simple reason that the denominators in all those calculations are a witches brew of incompatible numbers. One might as well average phone numbers and license plates and divide by temperature.

109.   The proper calculation of promotion rates is to look at the individual candidates and see what happened to them and their careers.

110.   We can do that with the Navy's Promotion List data, if we carefully avoid double (triple and quadruple) counting.

111.    Appendix D presents the Promotion Board record of all 530 US Navy Chaplain Corps LCDRs who were submitted to promotion consideration at any time (and each time) from FY 1981 through FY 1992.

112.    The Promotion results are summarized in Table 11.

**Table 11**
**Promotion to CDR as a function of Faith Group**

|  | B | J | L | N | R | S | ? | T L |
|---|---|---|---|---|---|---|---|---|
| Total # of Chaplains | 117 | 10 | 193 | 65 | 128 | 11 | 6 | 530 |
| Promoted to CDR | 59 | 7 | 101 | 37 | 86 | 7 | 0 | 297 |
| Not (yet) Promoted | 58 | 3 | 92 | 28 | 42 | 4 | 6 | 233 |
| Percent Promoted | 50.4 | 70.0 | 52.3 | 56.9 | 67.2 | 63.6 | 0 | 56.0 |
| Of Those Who were Promoted: |  |  |  |  |  |  |  |  |
| Ave Number of Times ea was "considered" | 1.8 | 1.5 | 1.7 | 2.0 | 1.6 | 1.6 |  | 1.73 |
| Ave Number of Time "considered" In Zone | 0.9 | 1.1 | 1.0 | 1.0 | .9 | 1.0 |  | .95 |
| Of Those Yet to be Promoted: |  |  |  |  |  |  |  |  |
| Ave Number of Times each was "considered" | 4.2 | 5.7 | 3.3 | 4.2 | 4.3 | 4.0 |  | 3.80 |
| Ave Number of Times "considered" In Zone | 0.5 | 1.0 | 0.7 | 0.7 | 0.8 | 0.5 |  | 0.64 |

Legend:
B = Non-Liturgicals - Baptist affiliation    J = Jewish and Reformed Jewish    L = Liturgical Protestant
N = Non-Baptist Non-Liturgicals    R = Roman Catholic    S = Non Jewish Special Worship
? = Unknown    TL = Total

Data Source: Appendix D

113.    The figures in Table11 are drawn from Appendix D, based on Navy Documents.  They show (a) the true Probability of Selection or Probability of Promotion for LCDRs to CDR in this period and (b) provide a window into why the figures in References 1 and 2 are misleading.

114.    Besides the absolute differences in promotion probability, wherein Non-Liturgicals and Special Worship Chaplains and Liturgical Chaplains experience about the same likelihood of promotion in this period (1981 to 1992), i.e. 52%; the Catholics have a statistically significant advantage of a nearly 25% better rate, i.e., 67%.  Symptoms of this can be read in the Table's "internals": Catholics are promoted sooner (with an average of 1.6 stops in the queue) compared to the longer (1.8 to 2.0 stops) for the Non-Liturgicals and Liturgicals.  The "consideration" pattern for Chaplains who have not been promoted *yet* is driven by two opposing factors: First, the frequently passed over Chaplains from Above the Zone, raise the average number of prior (unsuccessful) opportunities for promotion, and Second, the Below the Zone Chaplains (who have, on the average been considered just once, lowers the average number of prior (unsuccessful) opportunities for promotion.

115.    Under $N_s/N_c$, of course, if one promotes an Above the Zone Chaplain every now and then, one can "increase" his "politically correct" numbers without having to reflect the individual decision in the public Probability of Selection recitations.

**The "coin-flipping stranger" whom Dr. Siskin introduces us to on page 2 of his Analysis (Reference 2) is, as Siskin suspects, "a cheater."**

116.    The man tosses a coin; if it is heads he puts it in a piggy bank (the promoted) and reaches back into his pocket for another coin.  If that one is also heads, it too goes into the piggy bank, but if it comes up tails, he puts it back in his pocket, and draws another coin.  These are not *independent* trials and they cannot be accurately analyzed as though they were.

117.    Furthermore, if the stranger has a hole in his pocket, and some of the coins fall through it, then the calculus gets even more complicated.

**What happened to all the Non-Liturgicals?**

118.    The Navy's experts introduced us to $N_s/N_c$ in Reference 1.  There they asserted that the promotion rates for Chaplains *considered* for promotion were uninfluenced by faith group assignment.  This finding flew in the face of acknowledged "widespread belief" to the contrary, as well as in the face of the demographic facts.

119.    Reference 1 presented information that had me ask the question at the head of this section: What happened to all the Non-Liturgicals?

120.    One can see a hint of what is missing in the gap between Chaplains promoted to Lieutenant Commander and Chaplains *considered* for promotion to Commander and then Chaplains *considered* and  promoted to Captain:

| From Reference 1,  Table 2 | Considered | Promoted  - to LCDR |
|---|---|---|
| Liturgical | 326 | 256 |
| Non-Liturgical | 327 | 260 |

| From Reference 1,  Table 3 | Considered | Promoted  - to CDR |
|---|---|---|
| Liturgical | 382 | 275 |
| Non-Liturgical | 364 | 252 |

| From Reference 1, Table 5 | Considered | Promoted - to CAPT |
|---|---|---|
| Liturgical | 298 | 176 |
| Non-Liturgical | 242 | 129 |

121.    These are not exactly the "same" Chaplains, but they are the "same pool" and notice the systematic decline from Liturgical/Non-Liturgical parity at the Lieutenant level.

122.    At the Lieutenant to LCDR level there are roughly the same number of Liturgicals and Non-Liturgicals, (a ratio of 1.00 in both "considered" and "promoted").  But notice the increasing disparity as the ranks rise (a ratio of 1.05 in "considered" and 1.09 in "promoted") at the Commander level; and (1.23 in "considered" and 1.39 in "promoted") at the Captain level.

123.    There is a systemic reduction in the number of Non-Liturgical Chaplains "considered" for promotion at each successively higher level - and therein lies both the evidence for religious bias in the US Navy's Chaplain Corps promotion system and the explanation for why their "expert" and their pre-digested data do not see the bias.

124.    The "missing" Chaplains, those not *considered*, are not in the Navy's pre-digested data.

125.    Clearly, there were some Non-Liturgicals missing - and unaddressed by either of the Navy's opinion givers (Reference 1 and Reference 2.)

**So, what do the true records show?**

126.    If we use the biographical data from the Chaplains Corps History, Volume X, (see Reference 3), we can treat the files as individual personnel records and read the record. This may not look like a Promotion Study (Dr. Siskin has said that it is not one).  But (a) it is a reading of actual promotions; it is what you would tell your children if they asked you "Did you get the raise, Daddy?" (or Mommy).  They would not ask you "Do you even know if you were considered?" Furthermore, (b) look at  the mess that the Navy's so-called  "promotion studies", $N_s/N_C$, have given us.

127.    The following are real world statistics, based on the actual personnel records of over 1500 US Navy Chaplains who served on Active Duty in the Chaplain Corps for some portion of the decade 1982 through 1991.  These are not the residue of an incomplete model incorrectly applied.

128.   Table 12 deserves a careful read, not a dismissive, "it's not a promotion study."

## Table 12
## Chaplain Corps Demographics
## Promotions and Releases

|  | Roman Catholic | Liturgical | Non-Liturgicals Baptist      Other | Special Worship | Total |
|---|---|---|---|---|---|
| Percent Promoted LT | 95.63% | 98.48% | 97.80%  99.57% | 96.83% | 98.27% |
| Percent RAD | 0% | 1.01% | .55%      0% | 1.59% | 0 |
| Percent Promoted LCDR | 87.61% | 83.26% | 82.87%  77.78% | 71.15% | 82.70% |
| Percent RAD | 7.34% | 13.43% | 13.64%  17.28% | 15.38% | 12.98% |
| Percent Promoted CDR | 79.33% | 64.90% | 61.62%  54.84% | 53.57% | 65.71% |
| Percent RAD | 7.26% | 16.52% | 15.66%  21.51% | 25.00% | 15.17% |
| Percent Promoted CAPT | 52.46% | 52.63% | 52.17%  55.88% | 28.57% | 52.36% |
| Percent RAD | 4.92 % | 7.89% | 5.43%    4.92% | 0% | 6.29% |

129.   Note that:

•   Religious Discrimination in Promotion is evident

  o   The promotion rates differ significantly ($p<.01$) both across ranks and among Faith Groups.

And

  o   At Commander, Roman Catholics get disproportionately more promotions than any other Faith Group and are 1.25 to 1.5 times as likely to be promoted as are Non-Liturgicals, who lose 25 to 30% of their fair share of the promotions at this level.

•   Religious Discrimination in Release from Active Duty is evident

  o   The RAD rates differ significantly ($p<.01$) both across  ranks and among Faith Groups.

And

      o      At Lieutenant Commander and Commander, Roman Catholics are disproportionately less likely to be released than is any other Faith Group and Non-Liturgicals lose two to three times as many of their candidates at these ranks as do the Roman Catholics.

130.   Personnel management in the US Navy Chaplain Corps works to the explicit benefit of Catholics in particular and to the detriment of Non-Liturgicals. This is accomplished by promotion on the one hand and by the denial of consideration for promotion (through the mechanisms of Release From Active Duty) on the other.

131.   To forestall any possible argument that this "doesn't make sense" because the $N_s/N_c$ statistics speak otherwise:

**Here is an alternative Promotion Model:**

132.   In this model $N_s/N_c$ is fixed, but RAD is differential.

133.   The list on the next two pages simulates five cycles of a promotion system which works like the current US Navy Chaplain Corps system.

134.   To facilitate explication, I have reduced the model to just two faith groups, Roman Catholics and Non-Liturgicals, and just one change in rank. The model would clearly generalize to four (or five or more) Faith Groups and four (or more) Ranks .

135.   In this model I have "set" selection In Zone on each "consideration" for all Faith Groups at .33 and applied a differential RAD rate of 0.00 for Catholics and .33 for Non-Liturgicals.

136.   Other figures would work just as well to illustrate the interaction between (a) sequential consideration calculated as though the trials were independent and (b) systematic denial of further consideration to some portion of one or more competing Faith Groups after each consideration. That is, exactly what is happening in the US Navy Chaplain Corps.

137.   I have performed the arithmetic manipulations here exactly as does the Navy in its tabulations. I treat each *consideration* as a stand alone event, and tally each Promotion Board (I call them "cycles" here) separately. The Chaplains who are not promoted, or Released, are put back into the eligibles pool for further *consideration*. After three *considerations*, surviving, but not yet promoted Chaplains are still in the pool, but they are no longer In Zone. I also include, but do not "count" the Chaplains who are promoted from Above the Zone. And, as with the Real World data, I have more of these (by just one) for the favored group, the Roman Catholics, than for the disfavored group, the Non-Liturgicals.

# A MODEL

Sheet 1 of 2

Promotion Rate IN ZONE is 1/3
RAD rate is 0 for Catholics 1/3 for Non-Lits
Above Zone Promotions do not "count"
Both Catholics and Non Lits have same input stream

What If in **Cycle 1**, the Promotion Board considers?

| | Selects | "Considers" | Returned | Released | Sent to Next Cycle | % Sel | Cum Selected |
|---|---|---|---|---|---|---|---|
| Passed over Catholics (Above Zone) | 3 | 0 | 0 | 3 | 0 | 3 | | |
| New Catholics | 3 | 0.99 | 3 | 2 | 0 | 2 | 33.33% | 1 |
| | | | | | | | | |
| New Non Liturgicals | 3 | 0.99 | 3 | 1.3467 | 0.6633 | 1.3467 | 33.33% | 1 |

**Cycle 2**

| | Selects | "Considers" | Returned | Released | Sent to Next Cycle | % Sel | Cum Selected |
|---|---|---|---|---|---|---|---|
| Passed over Catholics (Above Zone) | 3 | 1 | 0 | 2 | 0 | 2 | n/a | |
| Catholics left over (in Zone) from Cycle 1 | 2 | 0.66 | 2 | 1.33 | 0 | 1.33 | | |
| New Catholics | 3 | 0.99 | 3 | 2 | 0 | 2 | 33.32% | 3.6 |
| | | | | | | | | |
| Non-Lits left over (in Zone) from Cycle 1 | 1.3467 | 0.333 | 1.3467 | 0.679179 | 0.334521 | 0.679179 | | |
| New Non Lits | 3 | 1 | 3 | 1.34 | 0.66 | 1.34 | 33.25% | 2.3 |

**Cycle 3**

| | Selects | "Considers" | Returned | Released | Sent to Next Cycle | % Sel | Cum Selected |
|---|---|---|---|---|---|---|---|
| Passed over Catholics (Above Zone) | 2 | 0 | 0 | 2 | 0 | 2 | | |
| Catholics left over (in Zone) from Cycle 1 | 1.33 | 0.4389 | 1.33 | 0.8911 | 0 | 0.8911 | | |
| Catholics left over (in Zone) from Cycle 2 | 2 | 0.66 | 2 | 1.34 | 0 | 1.34 | | |
| New Catholics | 3 | 0.99 | 3 | 2.01 | 0 | 2.01 | 33.00% | 5.6889 |
| | | | | | | | | |
| Passed over Non-Lits (Above Zone) | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Non-Lits left over (in Zone) from Cycle 1 | 0.679179 | 0.224129 | 0.679179 | 0.304883 | 0.150166 | 0.304883 | | |
| Non-Lits left over (in Zone) from Cycle 2 | 1.34 | 0.4422 | 1.34 | 0.601526 | 0.296274 | 0.601526 | | |
| New Non-Lits | 3 | 0.99 | 3 | 1.3467 | 0.6633 | 1.3467 | 33.00% | 3.96 |

**MODEL**                                                                                                          Sheet 2 of 2

Then in **Cycle 4**, the Promotion Board considers:

| | Selects | "Considers" | Returned | Released | Sent to Next Cycle | % Sel | Cum Selected |
|---|---|---|---|---|---|---|---|
| **Cycle 4** | | | | | | | |
| Passed over Catholics (Above Zone) | 2 | 0 | 0 | 2 | 0 | 2 | | |
| Catholics left over (in Zone) from Cycle 1 | 0.8911 | 0.294063 | 0.8911 | 0.597037 | 0 | 0.597037 | | |
| Catholics left over (in Zone) from Cycle 2 | 1.34 | 0.4422 | 1.34 | 0.8978 | 0 | 0.8978 | | |
| Catholics left over (in Zone) from Cycle 3 | 2.01 | 0.6633 | 2.01 | 1.3467 | 0 | 1.3467 | | |
| New Catholics | 3 | 1 | 3 | 2 | 0 | 2 | 33.14% | 8.09 |
| | | | | | | | | |
| Passed over Non-Lits (Above Zone) | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Non-Lits left over (in Zone) from Cycle 1 | 0.304883 | 0.100611 | 0.304883 | 0.136862 | 0.06741 | 0.136862 | | |
| Non-Lits left over (in Zone) from Cycle 2 | 0.601526 | 0.198504 | 0.601526 | 0.270025 | 0.132997 | 0.270025 | | |
| Non-Lits left over (in Zone) from Cycle 3 | 1.3467 | 0.444411 | 1.3467 | 0.604534 | 0.297755 | 0.604534 | | |
| New Non-Lits | 3 | 0.99 | 3 | 1.3467 | 0.6633 | 1.3467 | 33.00% | 5.69 |
| **Cycle 5** | | | | | | | |
| Passed over Catholics (Above Zone) | 2.6 | 0 | 0 | 2.59 | 0 | 2.59 | | |
| Catholics left over (in Zone) from Cycle 2 | 0.8978 | 0.296274 | 0.8978 | 0.601526 | 0 | 0.601526 | | |
| Catholics left over (in Zone) from Cycle 3 | 1.3467 | 0.444411 | 1.3467 | 0.902289 | 0 | 0.902289 | | |
| Catholics left over (in Zone) from Cycle 4 | 2 | 0.66 | 2 | 1.34 | 0 | 1.34 | | |
| New Catholics | 3 | 0.99 | 3 | 2.01 | 0 | 2.01 | 33.00% | 10.48 |
| | | | | | | | | |
| Passed over Non-Lits (Above Zone) | 0.13686 | 0 | 0 | 0.090328 | 0 | 0.090328 | | |
| Non-Lits left over (in Zone) from Cycle 2 | 0.27 | 0.0891 | 0.27 | 0.121203 | 0.059697 | 0.1 | | |
| Non-Lits left over (in Zone) from Cycle 3 | 0.6045 | 0.199485 | 0.6045 | 0.27136 | 0.133655 | 0.3 | | |
| Non-Lits left over (in Zone) from Cycle 4 | 1.3467 | 0.444411 | 1.3467 | 0.604534 | 0.297755 | 0.89 | | |
| New Non-Lits | 3 | 0.99 | 3 | 1.3467 | 0.6633 | 1.34 | 33.00% | 7.41 |

**The Navy's personnel management system and method of calculation *could* easily lead to both:**
**(1) The appearance of EQUAL promotion rates and (2) very UNEQUAL numbers of promotions.**

138.   This Model is a fiction, of course, but it produces a pattern of promotion and severance which looks just like the pattern which is produced by the Navy's arithmetic.  It produces data which looks like the $N_S/N_C$ model.

139.   This gives:
•        the appearance of equal promotion rates and
•        the fact of unequal opportunity.

**The Navy's figures are not what they are supposed to be.**

140.   The figures are not what one supposes them to be, given that they are called a Probability of Selection.  They are not *the* probability of selection.

141.   The figures are not what is properly produced in honest discourse; they are misleading; they confound Faith Group; they conceal material facts.

142.   The figures which the Navy gave to its experts, the CNA study (Reference 1) and Dr. Siskin (Reference 2) are not proper data.  They are not what they were represented as being.  The numbers are derivative tabulations, pre-digested, and the digestion has lead, mislead, the Navy's experts and advocates to faulty conclusions.

143.   The pre-digested data are misleading for four reasons:

First, they are a snapshot.

144.   Dr. Siskin has chided me for my use of the Alpha Roster data, saying that it is a snapshot. (I responded that it is not a "snapshot", but rather a film strip, and I was looking for repeated patterns, and evidence of who was left out of the pictures.)  However, the Navy's pre-digested data is a snapshot.  The CNA study even uses that word:

> "The data in this research memorandum come from two related data bases: the Officer Master File and the Longitudinal Officer Master File. .... The changes are taken from the quarterly **snapshots** of the Navy OMF that CNA receives.  The LOMF begins with the record from the September 1972 **snapshot**." [Reference 1, page 17, emphasis added.]

145.   What is wrong with using a snapshot?  The pre-digested tabulations fail to disclose the missing Chaplains: the ones who have left the pool of those to be considered - never to be promoted.  Their absence remarks as much on promotion *per se* as does counting the Chaplains who are promoted.

146.   Using data with these omissions overlooked leads to faulty conclusions.

147.   The Navy's opinion givers have not noticed the "missing" Chaplains, and their conclusions which adopt the Navy's pre-digested data can not be relied upon.

Second, the pre-digested data are confounded.

148.    In distributing each of perhaps 150 different denominations into four Faith Groups, the Navy's data digestion process put some Liturgicals into the Non-Liturgicals Faith Group and some Non-Liturgicals into the Liturgical Faith Group.

149.    Clearly, this sort of error works to conceal differences in promotion rates between the two groups.  The data are confounded when some Liturgical Chaplains, notably some (1) Evangelical Covenant Church in America, (2) Evangelical Congregational Church, (3) Conservative Congregational Christian Conference, (4) Free Methodist Church of North America, (5) Independent Fundamental Churches of America, (6) Moravian Church, (7) National Association of Congregational Christian Church in America, (8) Orthodox Church in America,  (9) Reformed Church in America, and (10) African Methodist Episcopal Church Chaplains - all of whom are properly considered by themselves, their sponsors, and Navy policy as "Liturgical"), are classified as Non-Liturgical and some Non-Liturgicals (notably some (1) American Baptist Church, (2) Church of the Nazarenes, and (3) Wesleyan Church Chaplains - all of whom are considered by themselves, their sponsors, and Navy policy as Non-Liturgical) are classified as Liturgical.

150.    One *might* argue that the number of classification errors is not "significant", or that even if they were corrected (not an easy task), "the answer would be the same".  But (a) the FACT of confounded data cannot be swept away with naked assertion and (b) even if the data were corrected, they would still be fatally flawed for biased omission (see below).

151.    One simply may not compare "apples to oranges" if some of the apples are oranges and some of the oranges are apples.  The data is confounded and ALL conclusions based on it are suspect.

152.    This is clearly a classic confounding, and comparisons of the Faith Groups based on the Navy's classifications are unreliable.

153.    Using confounded data leads to confounding conclusions.

154.    One of the  Navy's opinion givers (Reference 2) has tried to make appropriate corrections, but he has not done so flawlessly.  Reference 1 in the original and Reference 2 in "Correction" are still in error on this point. And their conclusions re "Faith Groups" do not address true differences in Faith Group promotion rates.

Third, the pre-digested data conceal the fact that most of the "considered" Chaplains have been considered before.

155.    This means that both References 1 and 2 have treated the pre-digested data from the Navy about Promotion Board decisions as though each Board was a statistically independent trial - when they are not independent trials.  They are sequential selections from an unstable, but finite urn, without replacement, as well as a Random Walk experiment within that urn.

156.   The sequential trials are dependent, so standard combinatorial probabilities cannot be used without making conditional probability adjustments - none of which were made by either Navy opinion giver.

157.   Combining probabilities incorrectly conceals truth.  So-called analyses which use improper statistical methods cannot be relied upon.

158.   The Navy's opinion givers have either not noticed this dependence from Board to Board (Reference 1) or explicitly assumed the contrary (Reference 2) and their conclusions which rely on the Navy's pre-digested data are not valid.

Fourth, the pre-digested data conceal the fact that both Selected and Considered are affected by Promotion Board actions

159.   There are two processes at work regarding Promotion within the US Navy Chaplain Corps, not just one.  In one process Chaplains may be **selected** or not; in the other process Chaplains may be allowed to come back for an additional **consideration**, or not.  Both the numerator and  the denominator of:

$$N_S/N_C$$

are at risk and no Navy opinion giver (neither Reference 1 nor Reference 2) has taken this into account. Furthermore, the processes are dependent, so standard combinatorial probabilities cannot be used without making conditional probability adjustments - none of which were made by either Navy opinion giver.

160.   Compounding this statistical oversight (myopia) is the fact that both references blithely ignore all promotions which take place outside the Zone.  So both references undercount promotions *per se* as well as undercounting considerations.  The errors are offsetting to some extent, but they are not equal errors, so while the Navy's pre-digested numbers may seem superficially plausible, they are in fact substantially and importantly incorrect.

161.   Without putting too fine an edge on it, neither Reference 1 nor Reference 2 is of any probative value.  The best that can be said for them is that they are good examples of classical errors in statistical inference (incomplete data, confounded data, and inappropriate models). The criticism that can be laid on them can be tempered only by the fact that it is the Navy's pre-digestion of the data which has lead to this mischief.

**There is some good data.**

162.   Fortunately one does not have to rely on pre-digested data.  The Navy has provided extracts of the original documents and it is possible to reconstruct what has actually happened to the careers of some 1500 US Navy Chaplains.

163.    First, the US Navy Chaplain Corps publishes a History series.  One of these volumes, Reference 3, provides who's who type information on all the Chaplains who served more than incidental Active Duty at any time between 1982 and 1991.

164.    Appendix A, below,  summarizes the promotion history of every Chaplain who has served any substantial amount of active duty time in the US Navy Chaplain Corps from 1 January 1982 to December 31, 1991.   About half of these Chaplains served all this time in the Corps; about a quarter retired or left before this period was over and about a quarter joined the Service during this period.

165.    This data can be used to perform a "promotion analyses". [See also Table 12, above. For Table 12, the records in Appendix A were sorted by time in grade for every Chaplain who served at each Grade.  For those who served long enough to be eligible (flow points) the number who were promoted, the number who were not promoted, and the number who died, retired or were released was counted.)  Each record was counted only once for each rank.]

166.    Here, we are treating the records as a census (which they are) and recording the demographics, which also speak to promotion; we get the same answer, but with a different accent.

167.    The theory in this analysis is that one can look at the Chaplains' promotion records as one might look at the personnel files themselves.  For those Chaplains who have "finished" their careers the record is complete.  We can read the dates of promotion and learn how long it took , if they were promoted, and what rank they stopped at, if they were not promoted. For those whose careers are in process, each Chaplain's highest rank is yet to be determined.  But we can read how long it took him (or her) to reach the level they are at.

168.    Whether one approves of this approach or not, the career patterns ought to be independent of Faith Group. There is no *a priori* statistical reason or theory for supposing that one Faith Group or another should be among the ranks disproportionately to its population ratio. [That is, if the Catholics are 18% of all Chaplains, there is no statistical reason for assuming that they would not be 18% of the Lieutenants, 18% of the Commanders, 18% of the Captains, and if there were several dozen admirals, 18% of the Admirals as well.]  Criticisms of those who interpret demographic data are camouflage for reluctance to accept the findings.

169.    Second, in discovery, the Navy has produced hundreds of pages of lists that present some data on the seniority, "Zone", Faith Group, and name of candidates who were considered eligible for promotion for various ranks for several periods between 1981 and 2002.  The lists with sequence numbers, endorser ID and Faith Group assignment, are reproduced here in Appendix B, after processing by an Optical Character Reader.  Appendix D correlates all these lists with the information in Appendix A and presents the Commander portion of the "Promotion File."

170.    What follows now is an explanation of the promotion process and an application of these data to the question of religious bias.

**How the Promotion Process Works**

171.    The Chaplain Corps Promotion system vocabulary (with "zones" and "flow-points") is unfamiliar if not arcane; but the process itself is very similar to moving through the grades in Public High School:

| In Public High School | In the Chaplain Corps |
|---|---|
| • Students are separated by classes: Freshman, Sophomore, Junior and Senior | • Officers are separated by Ranks: Lieutenant Junior Grade (LTJG), Lieutenant Commander, (LCDR) Commander (CDR), and Captain (CAPT) |
| • Each year all Students in each class are considered for promotion to the next class. | • Each year all Officers in each rank are considered for promotion to the next rank. |
| • Successful students are put forward to the next class | • Successful Officers are promoted to the next rank |
| • Unsuccessful students are sent back to redo the year - and be considered for promotion next year. | • Unsuccessful Officers are kept in grade for another year - and are considered for promotion next year. |
| • Every year a new crop of students arrive to start their educations, at the first level | • Every year a new crop of entry level Chaplains joins the Corps - at LTJG or LT. |
| • Some students drop out before they graduate. | • Some Officers leave the Service before they are promoted. |

172.    In the Chaplain Corps, a Promotion Board is convened each year to consider Officer candidates for advancement to the next rank.  The Board is presented with a list of "eligibles", sequenced by seniority.  The list is subdivided into zones, but it is still a sequential list running from the most experienced, but not yet promoted candidate, to the least experienced Officer who is eligible. The Officers sequenced high on the list are said to be "Above Zone", meaning that they have been considered for promotion before (several times) and were not selected.  The Officers in the middle portion of the list are the prime candidates for selection.  These Officers have been in grade for the required number of years, plus or minus one, and they are said to be "In Zone."  The bottom of the list is called "Below Zone" and this is all the officers who could be promoted early if they were outstanding.

173.    Promotion Board rules specify that every officer on the list is eligible and the rules require that if any officer Below Zone is promoted, then all his (or her) peers must also be "considered".

174.    At the end of the day there are two separate, related sets of data.

175.   On the one hand, we have Appendix A, the Officer Corps in general (the population of the high school, if you will).  This population can be counted as a whole and one can estimate the graduation rates.  Or it can be looked on as a collection of individual personnel records and one can scan each record and read the promotion rates for members of that class (by age, race, gender, or faith group).  This is a retrospective, promotion study.

176.   On the other hand, we have Appendix D, akin to the School Principal's pass-fail lists, the Navy's  Promotion Board lists, with the eligibles listed and the selected officers "tick marked" and we can count the number of officers who were eligible and the number who were promoted, and calculate promotion percentages, for members of that class (by age, race, gender, or faith group).

**Both sets of data converge on the same truth:**

177.   The US Navy Chaplain Corps does use religious affiliation as a factor in promotion, with Roman Catholics being the primary beneficiary of this preference and Non-Liturgicals being particularly disadvantaged.

178.   Appendix A is a list of all Chaplains who have served any substantial amount of time on Active Duty in the US Navy Chaplain Corps between 1981 and 1992.  This Appendix lists every Chaplain, by name, and provides a "who's who" type of summary of their career - including their religious affiliation and promotion record.  Here is what that data say about Religion as a Factor in Advancement in the US Navy Chaplain Corps:

179.   Table 13 (on the next page) Demonstrates that:

•    Roman Catholics are given a "head start" on the promotion ladder by being commissioned at a higher grade than their non Catholic brethren. ($p < .01$)

     Nearly 60% of the Roman Catholic's who are commissioned into the Chaplain Corps, come in as Lieutenants.

     Only 10% of the Non Catholics who are commissioned into the Chaplain Corps come in as Lieutenants; the vast majority start their careers one rung down - at Lieutenant Junior Grade.

•    Roman Catholic (and Liturgical) Chaplains have higher promotion rates from Lieutenant to Lieutenant Commander and then from Lieutenant Commander to Commander than do Non-Liturgical and Special Worship Chaplains. ($p < .01$)

**TABLE 13.**
**Religion as a Factor in Advancement in the US Navy Chaplain Corps**
**Biographical Data**

|  | Roman Catholic | Liturgical | Baptist | Other Non-Lit | Special Worship | Total |
|---|---|---|---|---|---|---|
| **Commissioned LT** | 178 | 74 | 38 | 22 | 4 | 320 |
| **Commissioned LTJG** | 253 | 594 | 364 | 230 | 63 | 1504 |
| Percent Promoted to LT | 97.6 | 98.5 | 97.8 | 99.6 | 96.8 | 98.3 |
| Percent Promoted to LCDR | 87.6 | 83.3 | 82.9 | 77.8 | 71.2 | 82.7 |
| Percent Promoted to CDR | 79.3 | 64.9 | 61.6 | 54.8 | 53.6 | 65.7 |
| Percent Promoted to CAPT | 52.5 | 52.6 | 52.2 | 55.9 | 28.6 | 52.4 |
| **Percent Released from Active Duty** | 13.8 | 23.9 | 21.1 | 21.7 | 25.4 | 20.8 |

- The promotion rate differences at the first and last steps, Lieutenant JG to Lieutenant and Commander to Captain, are both statistically insignificant. The first step because "everybody" gets promoted. The last step because:

- Commander represents a special barrier in the careers of Navy Chaplains. Compared to Roman Catholic Chaplains, Liturgicals lose 14% of their Chaplains at this grade, Baptists lose 18%, and Other Non-Liturgicals and Special Worship Chaplains lose 25%. By the time a Chaplain is ready for consideration for his (or her) captaincy, all the "weak" Chaplains (in the institutions' view) have been dropped by the wayside. (p<.001)

- Roman Catholics are kept in the Corps by both their promotion and by the denial of promotion to other faiths. The Released from Active Duty percentages show that the Non Catholic denominations are nearly twice as likely to be relieved of duty, discouraged to stay, or involuntarily separated as are Catholic Chaplains - and the Data in Appendix D will show that Catholics who have been "passed over" for promotion are much more likely to be allowed to stay in the Corps than are Non-Catholics. This gives the Promotion Board results the specious appearance of considering and rejecting Catholics with the "same" likelihood that they consider and reject candidates of other faiths. The difference

is that the rejected Catholics are the same Chaplains year after year, while the Non Catholic Chaplains tend to be new candidates, as the ones rejected in previous years have left the service - see the Percent Released from Active Duty.

180.    Before Leaving this last point, an important feature of the public high school analogy needs to be addressed: the relationship between "Graduation Rates" and "Expulsion Rates".

181.    Of course the US Navy Chaplain Corps does not have caps and gowns (well they have caps), but in any case, being promoted to Captain may be likened to graduation.  And being "Released from Active Duty" may be a euphemism akin to expulsion.

182.    When one looks at loss rates in a High School, one challenges the school, not the student, if the rates are high and especially if the rates are unevenly distributed by gender, race or socio-economic status.  In the Chaplain Corps, one might try to argue that drop out rates are indices of dissatisfaction and "measure" the degree to which different faith groups "fit in" with the Navy milieu.  However,  if the drop out or forced out rates vary widely by Faith Group that ought to be a concern to Corps management, indeed a concern to Navy management.

183.    And the loss rates vary dramatically:

**TABLE 13A**
**Religion as a Factor in Advancement in the US Navy Chaplain Corps**
**Biographical Data**
**(The Data in this Table are derived from Appendix A)**

|  | Roman Catholic | Liturgical | Baptist | Other Non-Lit | Special Worship | Total |
|---|---|---|---|---|---|---|
| **Number Commissioned at LTJG** | **253** | **594** | **364** | **230** | **63** | **1504** |
| Percent Promoted to CAPT | 25.3 | 16.8 | 13.2 | 8.26 | 3.17 | 15.5 |
| Percent Released from Active Duty | 13.8 | 23.91 | 21.14 | 21.74 | 25.40 | 20.8 |

184.    Table 13 presented the Chaplain Corps' rank to rank record (based on the actual careers of over 1500 Chaplains).  Table 13A just looks at the bottom line.  What percentage of the entry level Chaplains can expect to make it to Captain, and what percentage can expect to be "Released from Active Duty" before being allowed to retire.

185.    Clearly, the Roman Catholic Chaplains are a favored group in both regards.

186.    The Catholic Chaplains are nearly twice as likely to be promoted to Captain as the Liturgicals and Baptists, and three to eight times as likely to be promoted to Captain as Other Non-Liturgicals and Special Worship Chaplains.

187.    On the other side of the so-called performance scale, Roman Catholic Chaplains are only about half as likely to be "opted out" (whether by being driven away or asked to leave) as are their less favored colleagues.  (p<.01)

188.    Appendix D is a collection of all the Promotion Board lists for all the candidates considered for promotion to Commander between 1981 and 1993.  This Appendix lists every Chaplain, by name, who was considered by any O-5 Board during this time period.  Most of these Chaplains were considered by more than one Board, some by more than ten Boards.  Here is what this data say about religion as a factor in advancement in the US Navy Chaplain Corps:

**TABLE 14**
**Religion as a Factor in Advancement in the US Navy Chaplain Corps:**
**Promotion Board Lists**
**(The Data in this Table are derived from Appendix D)**

| FY 1981-1992 CDR Promotion Lists | Roman Catholic | Liturgical | Non Liturgical | Total |
|---|---|---|---|---|
| Number of Different LCDR Chaplains Considered | 128 | 193 | 182 | 503 |
| Number of LCDR Chaplains Selected (Eventually) | 86 | 101 | 96 | 283 |
| Promotion Percentage | 67.2% | 52.3% | 52.7% | 56.3% |
| Average number of times *Considered* | | | | |
| Promoted - total # of *considers* | 1.6 | 1.7 | 1.9 | 1.7 |
| Promoted - # of *considers* In Zone | 0.9 | 1.0 | 1.0 | .95 |
| Not Promoted (yet) - total # of *considers* | 4.3 | 3.3 | 4.2 | 3.8 |

189.    Table 14 is the mathematically correct method for analyzing the data from the Promotion Board lists.

190.    However, it should be emphasized, and understood, that these figures are underestimates of the final Probability of Promotion.

191.   Many of the Chaplains who were under consideration when this table ended, both Above Zone and currently Below Zone, will be promoted before their careers are over.  That is why using the Demographic Data (Appendix A) is in fact a more reliable assessment of the true probability of getting promoted than using the individual Promotion Board Decisions, which deal with just a snap shot of a yet to be completed process.  A photo at the end of the third furlong may be interesting, but it is not a photo finish.

192.   Notwithstanding this limitation, Table 14 demonstrates:

•      Roman Catholic promotion rates (67.2%) for selection to Commander are 25% better than Non-Liturgical promotion rates (52.7%).

•      Roman Catholics tend to be promoted sooner (average of 0.9 *considers, i.e.* before entering the In Zone) than Non-Liturgicals (average of 1.0 appearances on the In Zone list before being selected).

193.   As the record continues to unfold, it is only likely that the Roman Catholic Promotion Percentage will rise (as 22% of the remaining Above Zone Roman Catholic Chaplains are likely to be promoted - eventually - and only 13% of the Above Zone Non-Liturgicals are likely to be promoted - under current practice) and the Non-Liturgical Promotion Rate will drop further, proportionately, as twice as many of the surviving Below Zone, not yet promoted Non-Liturgical Chaplains as opposed to Catholic Chaplains will be forced out of the Service before being considered enough times to be promoted.

194.   The Navy's advocates in this litigation, the CNA Study (Reference 1) and their expert witness statement (Reference 2), both make fatal flaws in summarizing the Promotion Board records.

195.   We have addressed these earlier.

196.   Appendix D presents an opportunity to see the problems with *selected* and *considered*. Both references make two related errors in  *interpreting* the data in this Appendix..

•      The Navy's advocates  try to interpret the data one column at a time.

            This ignores both the fact that some of the candidates in that class have already been promoted, and it ignores the fact that many of the candidates in that class have already been *considered* and not been promoted.

            Some of these candidates have been *considered* again (and they are counted *again*), other candidates have not been *considered* again, thus effectively deciding that they will not be promoted.

            The opinion givers' tallies, tally up, not across, and do not tally correctly!

- The Navy's advocates try to interpret the data without considering the counts for the Above Zone and Below Zone selections, or eligibles.

  Although the number of such selections is small compared to In Zone selections, the compounding effect is profound. and the data effect is deceptive.  It calculates ratios:

  $$N_s/N_C$$

  without including all the candidates who were selected, and without correctly counting the number of candidates who were *considered*.

197.  The statistics in References 1 and 2 are confounded.

198.  The conclusions in References 1 and 2 are unfounded.

## Some Additional Evidence of Religious Bias in Chaplain Corps Management

199.   When I first examined the Navy Chaplain Faith Group distribution, I was struck, as a psychologist and as a statistician, by the extent to which the Navy Chaplain faith distribution misaligned with the faith distribution of the lay Navy.  I took the misalignment as evidence of disproportional recruiting and unbalanced promotion, vis a vis faith.

200.   I am informed now that the Supreme Court has ruled in discrimination cases (Hazelwood) that the issue of "proportional" representation is not the relationship between the proportions in the served population vs the proportions in the serving population, but rather the proportions in the serving population and the proportions among those available (eligible, qualified) to serve.

201.   Thus, not having shown that the faith distribution of the pool of potentially available clergy was the same as the faith distribution of the population being served, the test (which is failed) is not:

---

### Table 15.  Navy Adherents vs Navy Chaplains

| Faith Group | Percentage of Population Served* | Percentage of Chaplain Corp** |
|---|---|---|
| Catholic | 35.8 | 20.0 |
| Liturgical | 12.5 | 34.9 |
| Non-Liturgical | 48.6 | 37.8 |

*   Data from the 09-99 and 02-00 Defense Manpower Data Center religious preference report.

** In the Defendant's Memorandum of Points and Authorities in Support of Defendant's Cross Motion for Partial Summary Judgment and in Opposition to Plaintiff's Motion for Partial Summary Judgment, Defendants present the number of Catholic (171), Liturgical (298), Non-Liturgical (338) and Total (854) Chaplains in the Corps as of July 2001.   Although there are slight changes in numbers, and thus proportions, from year to year, this date is certainly representative of all recent time periods.

---

202.   It may well be "reasonable to assume" that there is a correlation between the number of clergy in a given faith and the number of adherents to that faith, but it is a fact that not all faiths use, have, or require the same ratio of clergy to faithful.

203.    Thus, *a priori* probabilities aside, the proper test of religious discrimination in accessions is some form of:

---

### Table 16.  Navy Chaplains vs National Clergy

| Faith Group | Percentage of Population Available* | Percentage of Chaplain Corp** |
|---|---|---|
| Catholic | 29.2 | 20.0 |
| Liturgical | 18.8 | 34.9 |
| Non-Liturgical | 52.0 | 37.8 |

* Calculated from internet information available at http://www.adherents.com/rel_USA.html based on research by the Pew Research Council
** op cit

---

204.    This "model" (Table 16), which also shows religious prejudice in accessions on the part of the U.S. Navy Chaplain Corps, only applies if one assumes that the availability of clergy in the population at large parallels the population density of adherents to each faith, but making that assumption merely substitutes an assumption about the relative density of Chaplains by faith group in the total population for the same assumption about the availability of Chaplains in a sub-population (the Navy).

205.    Interestingly, even if we had a list of ALL the clergy in the United States, we could not assume that that group was the "available" population of eligibles for service in the US Navy Chaplain Corps, as US Navy Chaplains are required to have qualifications that are not, or may not be, required of "all clergy" - viz: a Master of Divinity degree (or 90 semester hours of credit from an accredited seminary or theological school) and ecclesiastical endorsement from an Ecclesiastical Endorsing Organization recognized by the Department of Defense.

206.    Conclusion: As a statistician, and adherent to the "theory of parsimonious explanation" I am disposed to believe that the best proxy for the distribution of faiths among potential Navy Chaplains is the ***same*** as the distribution of faiths among the actual members of the US Navy lay in general, there being no *a priori* reason to assume that the two populations have different faith proclivities.  So, I would still assert that Table 15 presents a valid test - a test which shows bias.

207.    However, given that the Defendants have asserted that this is de jure a "fundamentally misconceived frame of reference", I submit two alternatives:

208. First: Presumably the population of Chaplains available to the Navy (and Marine Corps) is similar to that which the Army and Air Force have mined - See Table 17:

---

### Table 17. Navy Chaplains vs Army & Air Force Chaplains

| Faith Group | Percentage of Navy Adherents* | Percentage of Navy Chaplains** | Percentage of Army & AF Chaplains*** |
|---|---|---|---|
| Catholic | 35.8 | 20.0 | 14.8 |
| Liturgical | 12.5 | 34.9 | 36.3 |
| Non-Liturgical | 48.6 | 37.8 | 48.1 |

\* See Table 2
\*\* See Table 2
\*\*\* Data from http://wfial.org/index.cfm?fuseaction=artGeneral.article_6

---

209. Conclusion: The first thing to note from Table 17 is that the Navy *could* have (some might say *should* have) recruited a higher percentage of Non-Liturgical Chaplains. Instead the Navy chose to put emphasis on "bringing up its Catholic and Liturgical numbers" - at the expense of the Non-Liturgical Chaplains.

210. Conclusion: Setting aside the "desirability" (or not) of matching the distribution in the serving population to the distribution in the served population, Table 17 clearly demonstrates that the U.S. Navy Chaplain Corps did not match the proportion of Non-Liturgical Chaplains in its accession pool to the proportion of Non-Liturgical Chaplains available to the military. Instead, they gave preference in accession to Catholics and Liturgicals - at the expense of Non-Liturgical Chaplains.

211. The Army and Air Force Chaplain Corps conform to the faith distribution of the served Navy population, better than the Navy Chaplain Corps. Clearly, the Navy had to work to get it wrong.

212. Conclusion: The statistical argument demonstrating religious preference in the U.S. Navy Chaplain Corps accession program is established, again. (P<.01)

213. A second possible "frame of reference" is that the population of Chaplains *available* for promotion must be *the* population of actual Chaplains who are accessioned into the U.S. Navy Chaplain Corps at the entry level.

214.     This test, laid out in Table 18, is not a test of the fairness of the accession process, but it is a test of the fairness of the promotion process, as well as a test of any internal "affirmative action" aimed at redressing the imbalance at the entry level.

---

## Table 18. Navy Promotions vs Navy Accessions

| Faith Group | Percentage of Chaplains Accessioned* | Percentage of Chaplain Corps** (As a whole) | Percentage of Chaplain Corps Above 04*** |
|---|---|---|---|
| Catholic | 18.8 | 20.0 | 27.6 |
| Liturgical | 36.7 | 34.9 | 41.3 |
| Non-Liturgical | 39.7 | 37.8 | 29.2 |

* This is the average percentage by faith group of new Chaplains accessed into the Corps between 1980 and 2002 (based on the Alpha Roster).

** op cit

*** This is the relative percentage of Chaplains (in column 2) who have been promoted to commander or above. (Using relative percentages neutralizes the effect of different numbers of accessions and promotions in different years.)

---

215.     Conclusion:  Clearly, even beyond challenging the inequity in their accession program, the retention and promotion practice in the U.S. Navy Chaplain Corps works not to rectify the disparity between the proportions of clergy in the Corps to either the proportions of faith groups served, or the proportions of clergy available in the market place- it exacerbates it.  At the highest ranks of their profession, the Catholic Chaplains gain nearly 70% in relative representation, while the Non-Liturgical Chaplains lose nearly 35% in relative representation. ($p<.01$)

216.     Conclusion: This result cannot be an accident, a statistical anomaly, or mere happenstance.  It is the result of intentional or unintentional systematic practice and policy. (The statistical chance of this proportional shift happening in an unbiased setting is 1 in several billion.  An individual Chaplain has a better chance of winning the lottery than he/she does of having had a promotion-environment free of Religious Bias during his/her tenure in the U.S. Navy Chaplain Corps.)

**RECAP & EPILOGUE**

217.    Catholic Chaplains get favored treatment when they join the Corps.

•       They are more likely to be commissioned as LT (instead of LTJG) than their Liturgical and Non-Liturgical peers.  (This gives them a career-long "head start" on the seniority ladder.) - See Table 13.

218.    Catholic Chaplains get favored treatment during their careers.
•       They are promoted earlier. (See Tables 13 and 14.)
•       They are promoted faster. (See Tables 13 and 14.)
•       They are promoted further than their Non-Liturgical peers. (See Tables 13 and 14.)

219.    Catholic Chaplains even get favored treatment when they leave the service.
•       They find it "easier" to get medical disability retirement. (See Table 19.)
•       They are more likely to be "retired" than simply Released from Active Duty. (*Ibid*)
•       They are less likely to be *required* to leave the Corps.  ( See Table 19.)

**Table 19.**
**Comparison of Conditions of Departure for Chaplains leaving the Corps**

|  | Active Duty Chaplains | Medical or Disability Retirement | Retirement | Released from Active Duty |
|---|---|---|---|---|
| Roman Catholic Chaplains | 213 | 12 | 149 | 55 |
| Liturgical Chaplains | 335 | 9 | 188 | 160 |
| Non-Liturgical and Special Worship Chaplains | 648 | 6 | 133 | 229 |

220.    Table 19 shows that Catholic Chaplains get favored treatment when they leave the service.

•       They find it "easier" to get medical disability retirement;

        Catholics (in spite of the fact that their active duty numbers are barely 20% of the total Corps) are given nearly 40% (twice their "share") of the medical and disability retirements.  ($p < .001$)

- Catholic Chaplains are more likely to be "retired" than simply Released from Active Duty.

  Catholics who leave the service get to "retire" three times as often as they are "Released" to leave Active Duty service.

- Non- Liturgical Chaplains who leave the Corps are more often than not released from active duty, instead of being allowed to "retire".

221.    This pattern of results is statistically significant p<.001.


**CERTIFICATION**

222.    I certify under the penalties of perjury, (a) that this is my work, (b) that I am competent to analyze this data, and (c) that the conclusions represented here are true, complete, accurate and scientifically certain to the best of my knowledge and belief.


  /S/ Harald R. Leuba, PhD
Harald R. Leuba, PhD        3/31/05
Potomac,    Maryland        USA


# References

1.    Smith, Karen D, Ivancovich, John S., Reese, David L. "Promotions in the Navy Chaplain Corps", Center for Naval Analyses, Alexandria, Virginia 10 March 2000 CRM D0000149.A1/SR1.

2.    Siskin, Bernard R, PhD "Statistical Analysis of the Promotion Selections in the U.S. Navy Chaplain Corps During the Time Period 1991-2002" Expert Witness Statement in the matter of Ronald Wilkins, et. al. vs United States of America, The Center for Forensic Economic Studies, June 2003.

3.    Halley, Michael D. Editor  United States Navy Chaplains 1982-1991: Biographical and Service Record Sketches of Chaplains on Active Duty During the Period I January 1982 - 21 December 1991  Volume X in the History of the Chaplain Corps United States Navy, Chaplain Resource Board, Norfolk, Virginia, June 1993.

4. Defendants' proposed "Material facts as to which there is no genuine issue in support of their motion for summary judgment" in Ronald Wilkins vs United States of America, et. al. Case No. 99-cv1579

**Data Bases**

Appendix A.  All Chaplains who served on Active Duty in the US Navy Chaplain Corps
            1 January 1982 through 31 December 1992 (See Reference 3).

Appendix B.  Consecutive Sequence Numbers for Promotion Boards 0-4 to 0-6; 1991 to 2002
            168 sheets of paper Bates Stamped   Produced as Exhibit 1 at the Defendant's
            Deposition of me on October 1, 2003.  These sheets have been processed through
            an Optical Character Reader and are printed here as Appendix B.

Appendix C.  Chaplain Corps Promotion Board Composition
            Spread sheet listing Year, Grade and membership (by Faith Group) for every
            Board reported on in the Navy produced discovery documents

Appendix D.  Promotion Board results for all Chaplains considered for Promotion to CDR
            by any Board between 1 October 1981 and 30 September 1992.

Appendix E.   Comparison of Tallies of Eligible, Considered, and Selected Officers
             Tables comparing the information in Reference 2 with the information in
             Appendix B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHAPLAINCY OF FULL GOSPEL CHURCHES, ) | |
| ) | |
| v.  ) | Case Number |
| ) | 1:99CV0028945(RMU) |
| THE HON. GORDON R. ENGLAND, et. al.  ) | |
| _____ ) | Consolidated with |
| ROBERT H. ADAIR, et. al.  ) | |
| ) | |
| v.  ) | Case Number |
| ) | 1:00CV00566(RMU) |
| THE HON. GORDON R. ENGLAND, et. al.  ) | |
| _____ ) | |

## COMPENDIUM DECLARATION OF HARALD R. LEUBA, PhD

### Statistical Analysis: The Question of
### Religious Preference in the Operation and Management of
### The U.S. Navy Chaplain Corps

Pursuant to 28 U.S.C. Section 1746, and under the penalty of perjury**,** I, Harald R. Leuba, PhD declare as follows:

1.     I am a U.S. Citizen living at 9555 Persimmon Tree Road, Potomac, Maryland 20854.  I am competent to testify on, and have personal knowledge of, and  involvement with, the matters addressed and methods used in this declaration.  The conclusions that I state here are statistically tested and scientifically certain.

2.     This is a follow-on, correction to, and expansion of, my recent Addendal.  This document summarizes my work to date and lays out the data and the statistical analyses underpinning my conclusions.

3.     The errors that I correct here are inconsequential with respect to the data, the logic or the inference structure which flows therefrom.  The data is the Navy's; the analyses and the conclusions are mine; the result is a proof that the U.S. Navy incorporates denominational preference (Roman Catholic) into its personnel management system for the Chaplain Corps.

4.      This document begins with an Executive Summary; that is followed by an Errata, a List of Data and References, a list of Conclusions and Opinions, and then a general discussion.  There are 16 Appendices, several notes and an Index.

# EXECUTIVE SUMMARY

1.    The U.S. Navy Chaplain Corps *manages* their chaplains by "Faith Group".  This is an admission in both their written pleadings* and in their oral argument.**

2.    The Navy *says* that there is no religious bias.

3.    However, every indicator of preference or benefit in the U.S. Navy Chaplain Corps shows that Catholic Chaplains receive preferential treatment.  Every dimension of personnel management which can be illuminated with data, indicates:

    Catholics Chaplains get the best treatment
    Chaplains "like" Catholics (namely the "Liturgicals") are tolerated, and
    Chaplains "unlike" Catholics are shunned, set aside and disenfranchised.

4.    An Example to begin with:

At the beginning of their careers, Catholic Chaplains are given a head start on the promotion ladder.  A statistically significant disproportionate number of Catholic Chaplains are commissioned at higher rank than are Liturgical, Non-Liturgical, and Special Worship Chaplains:

**Biographical Data**
**(1972-2002)**

| Commissioned at: ↓ | Roman Catholic | Liturgical | Non Liturgical | Special Worship |
|---|---|---|---|---|
| LTJG | 308 | 814 | 770 | 58 |
| LT (or higher) | 253 | 146 | 116 | 8 |
| Ratio → | .82 | .18 | .15 | .14 |

_____

\*  See Proposed "fact" number 1 in Defendants' proposed "Material facts as to which there is no genuine issue, in support of their motion for summary judgment" (Wilkins v. United States - see Reference 4).

\*\*  I personally heard Attorney Hyde, in Federal District Court in San Diego, California on May 13, 2005 explain how Jewish Chaplains are managed differently than Chaplains of fungible faith, and how the distribution of Roman Catholic Chaplains to various operational units requires husbanding.

A Further Example:

5.    Once their careers are started, Catholic Chaplains seeking promotion have always had a more "comporting" Promotion Board than non-Catholics:

> There is at least one Catholic Chaplain on every Chaplain Corps Promotion Board, and there is at least one Liturgical Chaplain on every Promotion Board.  Together these designated seats form a majority voting block on virtually all Chaplain Corps Promotion Boards.  (See Appendix M, page 2.)

> Special Worship Chaplains and Non-Baptist Non-Liturgical Chaplains are given a seat on fewer than 30% of the Promotion Boards, and never have a majority. (See below, Table 1, p23.)

And then:

6.    Catholic Chaplains have twice the likelihood of rising to the rank of Captain as do Non-Baptist, Non-Liturgical Chaplains. (See below, Table 17, page 46.)

7.    The Navy *says* that promotion rates among those "considered" for promotion are the same but:

> Catholic and Liturgical Chaplains are more likely to be "considered" for promotion than are Non-Liturgical Chaplains:

| Table 1.* | % of the Chaplain Corps when at LT | % of those "Considered" for LCDR | Relative % Gain (Change in "Market Share") |
|---|---|---|---|
| Roman Catholic | 15.43 | 19.76 | ⇑ 26.5 |
| Liturgical | 28.40 | 36.38 | ⇑ 28.1 |
| Non Liturgical | 48.77 | 43.86 | ⇓ 10.0 |

8.    Notice that Catholics and Liturgicals gain "market share" *before* the Promotion cycle - and Non-Liturgicals lose it.   The percent promoted matters, vis a vis religious bias; but the percent "considered" seems to matter more.

_____

\*  All the data in this Table, and the following series of numbered Tables, come from Navy Exhibits (mostly Reference 4) and none of it has been corrected for: (1) Faith Group confounding, (2) Above Zone promotions, or (3) Favorable Period of Time sampling.  Each of those errors distorts the data toward the Navy's "there are no substantial differences" posture - and even so, the pattern of bias and preference is still evident - at p<.01.

Another Example:

9.    What is true about "missing" considerations (drop outs, force outs, or involuntary early retirements) disfavoring Non-Liturgicals (and favoring Catholics) at the first competitive promotion, LCDR, is also true at all the other ranks, here is the table for CAPTAIN:

| Table 2. | % of the Chaplain Corps when at CDR | % of those Considered for CAPT | Relative % Gain (Change in "Market Share") |
|---|---|---|---|
| Roman Catholic | 20.77 | 28.30 | ⇑ 36.3 |
| Liturgical | 34.62 | 33.65 | ⇓ 2.8 |
| Non Liturgical | 44.62 | 38.05 | ⇓ 14.7 |

10.    Furthermore, specifically with respect to career terminations caused by SER ("Selective Early Retirement"), Catholic Chaplains are less likely to be forced into involuntary retirement than are Non-Liturgical Chaplains.

11.    The Navy *says* that SER *rates* among the "eligibles" are the same - but Catholics are under-represented among the *eligicals*.  And Non-Liturgicals are over represented:

| Table 3. | % of CDR's in the Corps | % of the CDR's said to be "eligible" for SER | Relative % Gain (Change in "Market Share") |
|---|---|---|---|
| Roman Catholic | 24.88 | 12.43 | ⇓ 50.0 |
| Liturgical | 34.44 | 31.35 | ⇓ 9.0 |
| Non Liturgical | 35.89 | 52.43 | ⇑ 46.1 |

12.    The percent of Chaplains selected for early retirement matters in terms of bias, but the percent exposed to SER Board action, i.e., said to be "eligible", matters more.

13.    The Navy will argue that there are rules and procedures, "precepts" and "orders", which control the "decision" of who is or is not "eligible" for SER selection, or who is or is not supposed to be "considered" for promotion, but whatever those rules and procedures are, they are embedded in a culture or environment which, as we have just demonstrated, leads to disparate impact - benefitting Catholic Chaplains and depriving Non-Liturgical Chaplains of equitable treatment.  (When it's a "good thing", Catholics get more than their "share".  When it's a "bad thing", Catholics get protected from it.)

Another Example:

14.    At the end of their careers, Catholic Chaplains are more likely to be given a medical retirement if their careers are shortened; Non-Liturgical Chaplains more likely to be released from Active Duty without the benefits of retirement.

**Comparison of Conditions of Departure for Chaplains leaving the Corps**
(Biographical Data - Reference 3)

|  | Active Duty Chaplains | Medical or Disability Retirement | Retirement | Released from Active Duty |
|---|---|---|---|---|
| Roman Catholic | 213 | 12 | 149 | 55 |
| Liturgical | 335 | 9 | 188 | 160 |
| Non-Liturgical and Special Worship | 648 | 6 | 133 | 229 |

15.    Catholics who want to stay in the service after reaching mandatory retirement age are more likely to be given waivers to do so than are non-Catholic Chaplains.

|  | Chaplains Serving on Active Duty Beyond Age 62 |
|---|---|
| Roman Catholic | 15 |
| Liturgical | 0 |
| Non Liturgical | 0 |

16.    Preference for Catholics permeates the Chaplain Corps and is underpinned by the "Faith Group" taxonomy the Navy uses to "manage" the Corps.

17.    The U.S. Navy Chaplain Corps distinguishes among its Chaplains on the basis of rank and on the basis of what they call "Faith Group Clusters."  Defendants identify over 110 different religious denominations which the Navy, for its own purposes, categorizes into four Groups (sic):

•    Roman Catholic,
•    Liturgical Protestant
•    Non-Liturgical Protestant
and
•    Special Worship

18.    Roman Catholics are given their own "Group" -
       and a Roman Catholic is given a seat on every Promotion Board.

19.    No other denomination is singled out for separate "groupness", nor is any other
*denomination* guaranteed a seat on every Promotion Board.

20.    This is one feature of a systemic structure which introduces religious bias into the decision
of whom to put on a Promotion Board.

21.    Another feature of the systemic structure is the invisible protocols (or undisclosed rules,
rites, management actions) which stack the promotion pools with preferred religions and protect
these same religions from adverse action - e.g., involuntary retirement, and even mandatory
retirement.

22.    Whether this backdrop of institutional bias and preference is what colors the decisions of
individual Promotion Board members or whether those members are merely acting out of
"natural" self interest -  the practice of allowing a *group* of predominately Catholic and Liturgical
Chaplains to pass judgement on the promotion of all Chaplains has distorted promotion results.

23.    I have heard Navy Counsel say that the "law" requires the Navy to put a Chaplain on every
Promotion Board which considers "Chaplains" for promotion (Reference 9).  And I have also
heard that the Supreme Court has declared that one may not assume that Religion has been
institutionalized, just because a "Government Employee" has a denomination.

24.    However, (1) the law does not require that 80-90% of each Chaplain Promotion Board
should be Chaplains, nor does the law require (2) that at least one of those Chaplains must be a
**Roman Catholic**, and (3) the Supreme Court edict surely does not mean to condone or franchise
the "Government Employee" voting his denomination *per se.*

25.    Promotion to Commander is the rank in the Chaplain Corps at which most careers falter.
The CNA Study (Reference1) found a statistically significant preference for Catholics at this rank
- and, speculating that this was because Promotion Boards at that time had *two* Roman Catholics
on every Board, the CNA study bowed to an hypothesis that "like promotes like".

26.    The tendency to vote for one's own kind is not limited to Catholics, and the tendency
might be inconsequential if Catholics (and Liturgicals) did not dominate the Promotion Boards;
however, they do dominate them.

27.    Here are the Board Results for CDR promotions between 1981 and 2002.  This shows not
the number of Catholics or Baptists, or Methodists, or Mormons, etc., who were promoted, but
rather the percentage of the cases where promotion occurred when somebody shared a
denomination-in-common with a Board Member versus the percentage of promotion in cases
when a Chaplain candidate for promotion did not share a denomination with any Board Member.

**Promotion Board Voting Patterns
as a Function of
Whether a Board Member
Shares a Denomination with an Eligible Candidate  - or Not**

|  | Judging Chaplains "like" us | Judging "Others" |
|---|---|---|
| Percent Selected In Zone | 61.8 % | 51.6 % |
| Percent Selected Above Zone | 8.5 % | 4.8 % |

28.     These results are statistically significant at beyond the .01 level and indicate that denominational mix on a Promotion Board influences the promotion decisions of that Board. [One does not need to assume that this is "vote trading" or collusion; it could be nothing more complicated, nor more sinister, than simply "voting for one's own when one sees them".  That would not always produce a promotion, but it would weigh the total vote in that direction, and tend to add to the number of promotions "earned" by one's "favorite faith."]

29.     In any case, the statistic does demonstrate that faith "matters" and has influenced  the Promotion Board outcomes*.

30.     In closing for this Executive Summary, I note that with the recent elevation of Non-Liturgicals to leadership roles in the Chaplain Corps, the data are looking better.  But although there may be a "sea change" on this watch, the protocols which enabled institutional bias are still in place, were in place during the period which gave rise to this lawsuit, and since they seem to be arrogantly voluntary (see again Reference 9), they may not stay changed, or be precluded from over correction, without outside intervention.

31.     It has been said that "What goes around, comes around".  Risking "fundamental favoritism" in exchange for "Roman Catholic patronage" is not statistically neutral.

32.     This summary is a statistician's summary; there is only Aristotelian logic and statistical reasoning underlying the inferences made and conclusions drawn.  I did not intend to draw any legal conclusions, nor suggest any particular "relief".  I leave those issues to others, with the hope that my analyses will be helpful.

_____

* In response to a question from the Bench (5/13/05) Wilkins (in oral argument) pointed out that: if the Boards were more balanced, or if the Boards had more voters, or if the Boards operated more openly, this contamination might be reduced. (See Reference 9.)

**ERRATA**

There were a few consequential errors in my Addendal which I need to acknowledge and address. I say "consequential" because they may have mislead a casual reader or incited a partisan one. These errors are not consequential in terms of the conclusions I reached.  In fact, the statistical analysis I have undertaken since the Addendal, at least partially in the service of correcting these errors (and locating others), has reinforced my conclusions.

**Error 1**:  In proofreading the Addendal, I failed to notice a miss-statement in Paragraph 149 wherein I chided the Navy for miss-characterizing some Non-Liturgical denominations as Liturgical, and some Liturgical denominations as Non-Liturgical.  I inadvertently included the Plaintiff's denomination, Independent Fundamental Churches of America, in the list as miss-characterized as Non-Liturgical, when this denomination is in fact Non-Liturgical, and the Navy (and I) characterized it as such.  Since I made this miss-statement only in Paragraph 149 and it is nowhere reflected in any of the data, none of my analysis nor conclusions are affected.  Since there are still 15 instances of classification confusion in the Navy data, my point about Faith Group confounding in the Navy data is still valid.

I have revisited the coding of Endorsers and provided a detailed cross walk between:

- •      (1) the way I have coded them here,
- •      (2) the way the Navy, and Dr. Siskin (Reference 2) coded them and
- •      (3) the way the Navy and the CNA Study (Reference 1) coded them.

This cross walk tabulation is provided here at Appendix F.  There are 116 denominations listed; there is disagreement on how to code 15 of these.  This does not mean that all data tabulations based on these categorizations will be in error by plus or minus 13% (15/116).  All of the data disagreements deal with what one might call small endorser sub-populations, so the error rate might be no more than 3 or 4% - still, this is enough to be of concern, enough to question, and enough to index lack of care on the Navy's part.

**Error 2:**  Dr. Siskin made a dozen or so errors in counting entries for his tables in "CORRECTED - Defendants' Exhibit 11, p.1 through 16."  None of these "bothered" me, and most of them were related to the confounding I commented on in Paragraph 149 (above), but I was wrong when I typed in Appendix E in the Addendal that he had tallied one Special Worship Chaplain Promoted from Above Zone by the 1996 LCDR Board.  Dr. Siskin did not report any such promotion and he was right. [On the other hand, he did report that there was a Liturgical Promotion here that is not reflected in the records.  Furthermore, because the data that the Navy gave him did not reflect "zone" breaks for Grade 05 promotions in FY 2002, both of us likely miscounted the In Zone promotions that year.]

I note in passing that the copy of this data which Defendants' counsel showed me at my deposition:

.                         Consecutive Sequence Numbers for Promotion Boards 0-4 to 0-6;
                         1991 to 2002;  168 sheets of paper Bates Stamped WO1710 to WO1871,
and marked as:
                         "Exhibit 1" at my deposition


is the SAME information as Dr. Siskin used, but my copy was poorly photocopied and neither
completely legible, nor completely produced.  I ran my copy through an OCR process and
generated my own machine-readable file which I produced as Appendix B in my Addendal.  I
now have a copy of the Defendants' Exhibit 5, Bates Stamped 0227 through 0426.  The errors
commented on here can be adduced from sheets 0298 and 0380 to 0384 in that Exhibit.

I have not reproduced my Appendix B from the Addendal here in this Compendium.  First, the
records themselves are unchanged.  Second, the reason for producing data is to guarantee that the
"other side" can see what one has done - and Dr. Siskin and the Navy already have this data.
Third, if the Navy, or the Court, or another reader wants the data, I can provide it on a computer
disk - and save them the problems I had passing the records through an OCR process and proof
reading them.

**Error 3.** I made much of a deduction I drew from the data that an eligible Chaplain for
Promotion could be considered In Zone more than one time.  It seems to be true that a Chaplain
who is not selected for Promotion may be considered again, but subsequent "considers" are
Above Zone.  This misunderstanding on my part was a fallout of my having to fill-in missing
information for incompletely photocopied promotion reports and it was graphically presented in
my Appendix D and allegorically addressed in my Ns/Nc Model (pages 34 and 35 of the
Addendal.)  I acknowledge, now, that the Navy does not intend to consider an otherwise
"eligible" chaplain more than once In Zone. [It happens, but it is not supposed to happen. - See
also Appendix O.]

In any case, I used the "fact" (sic) of repeated In Zone considers as one of several reasons why
the Ns/Nc model was inappropriate statistically.  Since that conclusion was not based on this
deduction alone, the conclusion stands. I will address this further, later in this Compendium. [See
also Appendix J and Appendix O.]

**Error 4.**  In preambling Appendix A for the Addendal, I opined that that set of biographical
records seemed to be complete.  I am now convinced (see the discussion here at the expanded
Appendix A) that the data base is NOT complete.  It is complete enough for all the purposes to
which it was put here, so this error is inconsequential to my work.  But the "missing chaplains"
have left their shadows in those records and those shadows tell a story.  See Discussion here of
Cohorts and Survival Patterns, by Faith Group (Appendix K.)

[See also, however, the implication that these missing chaplains have for the CNA Study,
Reference 2.  See Appendix I here.]

**New Error:**

In an earlier Declaration (4/29/03), I opined:

"Nearly one in three of the Non-Liturgical and Special Worship Chaplains who have served in the U. S. Navy Chaplain Corps in the last twenty three years have had their careers foreshortened or corrupted by the systemic (and well known) bias in the selection and promotion system."

I based that conclusion on an analysis of the data I had from the Navy's Alpha Rosters.

Since the time I said that I have obtained additional data, and: (a) I have managed to discover that and how the Chaplain History Data is not nearly as complete (in the early years) as I had assumed (nor as complete as the Navy led the CNA to assume) and (b) I have managed to both (1) answer the question of "What Happened to All the Non-Liturgicals?" and (2) estimate how many have "fallen by the wayside." (See Appendix K.)

I can revise my earlier "one third" opinion now and conclude that:

"More than one half of the Non-Baptist, Non-Liturgical Chaplains who have served in the U.S. Navy Chaplain Corps in the last 63 years have had their careers slowed or foreshortened by denominational prejudice within the U. S. Navy Chaplain Corps' promotion and retention system."

And,

If more than half of the Non-Baptist, Non-Liturgical Chaplains have had their careers disrupted or befouled by the Navy's denominational preferences, then the *a priori* probability that CDR Wilkins (a Non Baptist, Non-Liturgical) was a victim of this denominational preference when he was Involuntarily Retired, begins as "more likely than not", even without considering the statistical anomalies in (a) the way his SER eligibility was determined, or (b) the way the SER criteria were evaluated with respect to him, when he was "before" the SER Board in 1995.

**DATA**

1.     In performing this work, and reaching the conclusions stated here, I have studied, it is now six, Navy sponsored documents and several sets of data provided by the Navy.  These include:

•     Smith, et al "Promotions in the Navy Chaplain Corps", Center for Naval Analyses, Alexandria, Virginia 10 March 2000 CRM D0000149.A1/SR1. (Reference 1. )

•     Siskin, Bernard R, PhD "Statistical Analysis of the Promotion Selections in the U.S. Navy Chaplain Corps During the Time Period 1991-2002" Expert Witness Statement in the matter of Ronald Wilkins, et. al. vs United States of America, The Center for Forensic Economic Studies, June 2003. (Reference 2.) [Exhibit 9 at the Defendant's October 2003 deposition of me.]

•     Siskin, Bernard R., PhD "Statistical Analysis of the Promotion Selections in the U.S. Navy Chaplain Corps During the Time Period 1991-2002" Expert Witness Statement in the matter of Ronald Wilkins, et. al. vs United States of America, SUPPLEMENTAL REPORT, The Center for Forensic Economic Studies, September 2003. (Reference 2 - CORRECTED.) [Exhibit 10 at the Defendant's October 2003 deposition of me.]

•     Halley, Michael D. Editor  <u>United States Navy Chaplains 1982-1991: Biographical and Service Record Sketches of Chaplains on Active Duty During the Period I January 1982 - 21 December 1991</u> Volume X in the History of the Chaplain Corps United States Navy, Chaplain Resource Board, Norfolk, Virginia, June 1993. (Reference 3.)

•     Martin, H. Lawrence , Editor <u>United States Navy Chaplains 1972-1981: Biographical and Service Record Sketches of Chaplains on Active Duty During the Period 1 January 1972 - 31 December 1981</u>  Volume VIII in the History of the Chaplain Corps United States Navy, NavPers 15507, Navy Publications and Forms Center, Philadelphia, PA. (Reference 5)  [I have formatted the information in References 3 and 5  into a data base for use here - see Appendix A.]

And:

•     The tables, numbers and representations included in Defendant Attorney Hyde's early 2005 Motion for Partial Summary Judgment in this matter, to which he attached a list of some 56 "Material Facts" as to which he alleged there was "no genuine issue" or dispute. Although I expressed "dispute" about many of these facts, I take them all as "certified" representations of what the Navy says is true, and use them to frame certain issues here.

2.     The information available to me also included hundreds of pages of records provided by the Navy, presenting:

•     lists of candidates, by religious affiliation, considered for promotion during the decade 1991-2002. [I have formatted these records as a data base for use here - see Appendix B.]

- assemblages of sheets of paper dealing with Promotion Boards. This information was transcribed from Navy documents into a data file. Each Board Member's name is now included in that file, and presented here as Appendix C in the Compendium.

- lists of candidates, by name, considered for promotion during the period 1981 to 2002. [I have correlated these names to the information in Appendix A and B, and, for Promotion to Lieutenant Commander, Commander, and Captain, the results are presented here in Appendix D. These records are not complete, but they are useful.]

And

- A Navy produced CD with a list of officers accessioned into the U.S. Navy Chaplains Corps, by year from 1988 through 1997, showing accession details, denomination, promotion history, assignment history and current (2002) status.

## FINDINGS

### Conclusions and Opinions Previously Sworn

| Reference & Page | Conclusion as Stated in the Reference |
|---|---|
| A 2  B 2  C 4  D 2  E 2 | Chaplains from the Non-Liturgical faith group are systematically under represented in every rank, in every year and in total. |
| A 2  B 5  C 5 | Whether this systematic bias is the result of a conscious "1/3 1/3 1/3" policy, a prejudice in favor of "white collar" Protestants, or just a byproduct of familiarity in selection boards - it cannot be due to chance. |
| A 3  B 6  C 6 | Non-Liturgical Protestants are much less likely to be promoted across the Commander barrier than Liturgical Protestants, or indeed chaplains from other faiths in general. |
| A 5  B 2  C 3 | There is some systematic, hand of Man, effect operating here - to limit the participation, and the promotion, of Non-Liturgical Protestant Chaplains in the United States Navy Chaplain Corps. |
| B 2  C 5  D 5  E 2 | As potential rank increases, the U.S. Navy Chaplain Corps promotion system, is much less likely to promote a Non-Liturgical than a Liturgical Chaplain. |
| B 16 C17  E 2 | Liturgical Chaplains gain relative proportion of the total at each rank as rank increases, Non-Liturgicals lose relative proportion as rank increases. |
| B 4  C 4 | There are biases at work in (1) Chaplain acceptance into the Navy and in (2) Chaplain promotion within the Navy, that go far beyond pure chance. |
| B 9  C 10 | Non-Liturgical Chaplains have been "denied" roughly 36% of their "deserved" Captaincies, if their relative representation had stayed constant, vis a vis Liturgical Chaplains. |
| B 12 C13 | These management actions "Deprive the Non-Liturgical Chaplains of a fair |

and equitable opportunity to be selected for the Chaplain Corps in the first place, or promoted to higher rank in general, or leadership in particular, once he/she has been admitted to the Corps."

B 18 C18      The U. S. Navy Chaplain Corps disadvantages, disenfranchises and de-motivates (by withholding proportionate professional growth opportunities) its Non-Liturgical Chaplains.

D 3      A newly accessioned Chaplain has a 30% probability of achieving a captaincy, if he (or she) is a "white collar" (Catholic or Liturgical) clergyman and only half that chance (17%) if he (or she) is a "blue collar" - a Non-Liturgical or Special Worship Chaplain.

D 3 E 2      Nearly 1 in 3 of the Non-Liturgical and Special Worship Chaplains who have served in the U.S. Navy Chaplain Corps in the last twenty three years have had their careers foreshortened or corrupted by this systemic (and well known) faith based bias in the selection and promotion system.

B 6 C 6      The Navy's "naked statistics" from their Motion, conceal real differences in Promotion Rates.

B 7 C 7      There is a tendency, in the Navy Chaplain Corps, not to "consider" Non-Liturgical Chaplains.

B 10 C 10      This culling (of Non-Liturgicals) may be due to an unwitting policy, but it happened.

B 9 C 9      The chance of losing this large a percentage representation (of Non-Liturgicals) is 3 in a million

B 17 C 18      By repeating their focus on just Chaplain selections from among those "considered", the Navy fails to deal with the promotion rates for all Chaplains, and the disproportionate loss of Non-Liturgical Chaplains.

D 3      Navy Cohort Data demonstrate how the CNA Study missed the mark when it reported "we found one difference by faith group." They should have found more.

D 7      The CNA Report used confounded data and did not take into "consideration" the Chaplains missing from their tabulations of Chaplains "considered" for promotion.

G 22      The Navy's Ns/Nc, Percent Selected, model overlooks Above Zone Promotions, conceals Chaplains denied "consideration" and is invalid

B 2 C 2 E 2      The faith distribution of the members of the U.S. Navy Chaplain Corps is dramatically different than the expressed-preference faith-distribution of the general Navy population - to the relative detriment of Non-Liturgical Christians - in the U.S. Navy general population.

B 18 C18      What starts as a near match between the faith distribution of the Population being served and the faith distribution of the Chaplains accessioned, erodes to 1/3 1/3 1/3 as rank rises.

| | |
|---|---|
| B 12 C13 | These management actions "Deprive the served community in the Navy of a fair and equitable opportunity for 'representation' of their faith group in the population of Chaplains." |
| B 11 C 12 D 5 | There is a clear 1/3 1/3 1/3 under-current in the data presented by the Navy Motion; this pattern could not have happened by chance, with 48% of the population being served being Non-Liturgical, more than once in ten million years. |
| D 5 E 2 | There is a specious consistency being maintained among the relative proportions of "white collar" clergy (Roman Catholic and Liturgical clergy) versus "other" clergy (Non-Liturgical and Special Worship).  This works to the advantage of the Catholics and the disadvantage of the Non-Liturgicals. |
| B 12 C13 | A "1/3 1/3 1/3" system, whether de facto, de jure or de minimus - introduces a non merit factor into the selection process. |
| B-14 C15 | There is a statistically significant tendency for Liturgicals to outnumber Non-Liturgicals on Promotion Boards - if it were true, as the Navy contends, that there is no systematic attempt to "stack" the Boards, then a ratio as unbalanced as has occurred, could be expected - once every 650 years. |
| B 14 C15 | There seems to have been a change in Board population policy in 1998, to "one of each".  This too, could have happened by pure chance, once in 72 million million years. |
| D12 | There is a "Like Likes Like" phenomenon at work in the U. S. Navy Chaplain Corps'  personnel management system.  There can be no statistical doubt.  Non-Liturgical and Special Worship Chaplains are less "favored" by the "establishment" than are the Catholic and Liturgical Chaplains - and that is the definition of discrimination. |
| D 3 E 2 | The CNA Report was right in saying it found "widespread" belief that the Chaplain Corps promotion, selection and retention system is rife with religious bias. |
| D 4 | No matter how one parses the data, there is a consistent picture of relative over-promotion of Catholic Chaplains in particular, and Liturgical Chaplains to a lesser extent, and both under-promotion and excess discharge of Non-Liturgical and Special Worship Chaplains. |
| D 6 | This PATTERN of consistent under promoting of Non-Liturgical and Special Worship Chaplains has harmed these Chaplains, by hurting their careers; it has harmed the Navy's Non-Liturgical and Special Worship Group populations, by depriving them of representational service from Chaplains of their faith; and it has harmed the Navy Chaplain Corps, by fostering and perseverating a process which was widely recognized as biased - but not corrected. |
| D 6 | The only way these statistics can possibly be obtained is through the effect of human bias and preference (intentional or not) as it plays out in the Navy |

Chaplain Corps promotion boards, indefinite extension boards and SER boards. [The statistical likelihood of these consistent biases happening by pure chance is nil.]

D 12        The SER Board's selection of Chaplain Wilkins for Involuntary Retirement is so unlikely statistically, that unless there is something in his personnel files that "demanded" his separation, the decision to select him for early retirement has to be "tainted".

D 12        Given that 1/3 of the Non-Liturgical Chaplains who join the Corps have had their careers foreshortened or corrupted by the Chaplain Corps' predilection for faith based discrimination, I conclude that it is "more likely than not" that Chaplain Wilkins is one of those Chaplains who has been victimized by the system.

D 12        One is tempted to say that "not every Non-Liturgical" has been disadvantaged, unjustifiably, some of them may have "deserved" to have their careers fall short. But (a) they have all served in a hostile environment and (b) for some evangelical denominations - NONE of them have ever been allowed to rise to the rank of Captain.

D 13        With this backdrop, where the statistical likelihood of Wilkins' selection for SER was so remote, the factual evidence supports the conclusion that the Board's decision must have been both (a) discriminatory and (b) an example of the general phenomenon of religious bias in the Navy Chaplain Corps.

## Conclusions and Opinions Previously Sworn
### (Published in the Addendal, provided here with references here)

1.    It is statistically certain that the Faith Distribution on the Navy Chaplain Corps' Promotion Boards is contrived, and not the result of a "faith neutral" assignment process.

•      Of the 73 Promotion Boards about which the Navy provided information, every one had at least one Roman Catholic Chaplain. The chance probability of this, if Promotion Board assignments were blind about religious faith, would be 1 in 1.6 million. [See Appendix M, ¶13.]

And

•      Of the 73 Promotion Boards, every one had at least one Liturgical Christian Chaplain. The chance probability of this, if Board assignments were blind about religious faith, would be 0.00007819 or about 1 chance in twelve and a half thousand. [See Appendix M, ¶ 15 .]

•      The compound chance of always getting at least one Catholic and one Liturgical Chaplain on every Promotion Board is trillions to one, if there were no bias operating. [See Appendix M, ¶ 16.]

2.    There can be no scientific doubt that the U. S. Navy Chaplain Corps' Promotion Boards are "stacked" with a majority of Catholic and Liturgical Officers, at the expense of, and to the detriment of, Non-Liturgical and Special Worship Chaplains. [See Appendix M, ¶ 5.]

•    Catholic and Liturgical Chaplains on the Promotion Boards tend to over promote fellow Catholics and Liturgicals and under promote Non-Liturgicals and Special Worship Chaplains. [See Appendix M, Table 7.]

•    Religious Mix on the Promotion Board is three times as important in predicting who will and will not be promoted as the Religious Mix in the Pool of Candidates (See Appendix M, ¶ 65.]

•    As rank increases, the relative Faith Distribution in the Chaplain Corps drifts to match the Faith Distribution of the Promotion Boards. [See Appendix M, ¶ 71.]
And

•    There is a statistically significant  tendency for Chaplains serving on a promotion Board, as a group, to promote candidates before their Board who share a denomination with them, - i.e.: "Like Likes Like". (See Appendix M, ¶ 71-82 and below, page 29, ¶ 49 ff.)

7.    The US Navy has a pervasive and enduring pattern and practice of religious discrimination in its personnel management of Navy Chaplains.   This prejudice is manifest by a preference for Catholic and Liturgical clergy and a dis-affinity for Non-Liturgical and Special Worship clergy.

•    Roman Catholic Chaplains are accessioned into the Corps at higher rank than Non-Liturgical Chaplains, giving the Catholics a "head start" on the career ladder. [See page 54 below, ¶ 186 and Table 21.]

•    Catholics are promoted faster and promoted more often that their peers. [See Table 21.]

•    Catholic Chaplains are nearly twice as likely to be promoted to Captain as the Liturgicals and Baptists, and three to eight times as likely to be promoted to Captain as Other Non-Liturgicals and Special Worship Chaplains. [See Paragraph 193, below, p 57.]

8.    Every dimension of personnel management which can be illuminated with data, shows that Non-Liturgical Chaplains are disadvantaged by the Chaplain Corps' pattern and practice of religious preferences.

•    Non-Liturgical Chaplains are under accessioned into the Chaplain Corps. [See Paragraph 219.]

•    When they are promoted, Non-Liturgical Chaplains wait longer in the promotion queue than Catholic and Liturgical Chaplains. [See Table 23.]

- Non-Liturgical Chaplains are less likely to be promoted to higher rank than Catholic and Liturgical Chaplains [See Table 18.]

- Non-Liturgical Chaplains are twice as likely as Catholic Chaplains to be "Released from Active Duty" before they are further considered for promotion,. [See Table 22.]

- Non-Liturgical Chaplains are less likely to be allowed to stay in the Corps until they retire than are Catholic and Liturgical Chaplains. [See Table 19, page 64 below.]

- Non-Liturgical Chaplains are even less likely to be given Medical Retirements than are Catholic Chaplains. [See Table 19, op cit.]

- Non-Liturgical Chaplains are excluded from consideration for promotion to such an extent that their careers are shortened and their horizons are limited vis a vis Catholic and Liturgical Christian Chaplains. [See All of the Above.]

9.     I am mindful, of course, that these conclusions are contrary to the statements and representations of the Defendants and their references.  I will use information from those two Navy References to show that they found the same facts that I found and could have drawn the same conclusions, had they not been mislead by the context they were given for their data.

That is, I will show:

- how the Defendants in the CNA study (Reference 1) and the Defendants' expert witness, Dr. Bernard Siskin (Reference 2),  have been misled by the pre-digested data they were given by the Navy and have arrived at erroneous conclusions. [See Appendix I & J.]

- that the Navy Faith Group assignment data used by both references is confounded, inconsistent and in error.  The errors may be "minor", but the Faith Group comparisons are contaminated and unreliable.  [See Appendix F.]

- that both references treat Navy data as though the data was complete,  and it is not.  Disproportionate numbers of Non-Liturgicals are denied further consideration for Promotion which is given to Catholics and Liturgicals. [See Appendix I, J & K.]

- that both references make mathematical errors in combining conditional probabilities as though they were independent trials (which the Navy's experts assume, incorrectly, that they are) thereby doing things like:

> A Roman Catholic Chaplain is considered for promotion nine times and finally selected on the tenth opportunity.  The Navy's "statistical model" says that this Chaplain had a 10% chance of selection on the last trial, but the model is wrong.  This Chaplain had a 100% chance of being selected, eventually.

Five Non-Liturgical Chaplains are each considered for selection twice, and four of them resign, retire, or are forced out after their second refusal; the fifth Chaplain is promoted. The Navy's "statistical model" says that this is also a 10% chance of selection (one selection in ten considerations). But the model is wrong. One of these five Non-Liturgical chaplains was promoted; the other four were not. The individual Probability of Promotion is 20%.

And, I will show

•      that both of the Navy's References have found, but only one has reported, the promotion bias in favor of Catholic Chaplains and against Non-Baptist, Non-Liturgical Chaplains which I verify here. (See, again, Appendix I and J.)

10.    The Navy's pre-digested data does not include Promotions from Above Zone in their "% Selected", and Reference 2 disregards that fact as well as the promotions themselves, and incorrectly concludes that there are no differences in promotion rates. But Reference 2 itself reports that:

•      22% of the Roman Catholic promotions come from Above Zone, and are not included in the "% Selected" data from the Navy. [See Reference 2, "Corrected" (sic) Defendants' Exhibit 11, p.3.] and

•      13% of the Non-Liturgical promotions come from Above Zone, and are not included in the "% Selected" data from the Navy. [Ibid.]

11.    Navy demographic data show (see Appendix M, ¶ 67) that:

55% of the Accessions into the Chaplain Corps are Roman Catholic and Liturgical and
45% of the Accessions into the Chaplain Corps are  Non-Liturgical and Special Worship
but:
71% of the Captains in the Chaplain Corps are Roman Catholic and Liturgical and
29% of the Captains in the Chaplain Corps are Non-Liturgical and Special Worship.

Meanwhile,  the Navy as a whole has been:

48% Roman Catholic and Liturgical and
52% Non-Liturgical and Special Worship (See Table 17, page 62 below.)

and the Chaplain Corps Promotion Boards have been:

68% Roman Catholic and Liturgical and
32% Non-Liturgical and Special Worship [See Appendix C.]

Of course, promotions are contaminated by Religious Preference, and of course, References 1 and 2 have been mislead by the pre-digested data they were given by the Navy.

**Further Findings**

With the additional work I have done, I am now in a position to expand upon my earlier conclusions as follows:

- I have corrected my error about considering passed over In Zone Chaplains more than one time, In Zone, and I have added all the available data on Promotion Lists to my Appendix D, which in the Addendal covered only CDR's and only 1981 to 1992.  I have now expanded Appendix D to LCDR's and CAPT's and I have incorporated all the data I have from 1981 to 2002.  These "tables" lead to a more complete picture of Promotions by Denomination - a picture which reaffirms earlier conclusions that Non Baptist, Non-Liturgicals get the short end of the stick.

- Using Faith Group as a tool for looking at "Like Likes Like" is akin to using a sledge hammer to install map tacks.  I have decomposed both the Chaplain Promotion Boards (Appendix C) and the lists of In Zone (and Above Zone) eligibles (Appendix D) into Endorser based records (as are available in the data given to Dr. Siskin) and I have counted the matches.  It is abundantly clear and statistically certain ($p < .001$) that the denominational make up of a Promotion Board influences the denominational distribution of the Candidates those Boards select for Promotion. (See Appendix G and M.)

- With the addition of the Volume VIII data to Appendix A here, I have been able to replicate the calculations which the CNA Study (Reference 1) undertook and demonstrate that their data confounds Year Group and promotion probability.  (See Appendix I..)  This explains why they got such high average promotion rates and also why they failed to find more of the religious-based promotion-influence than "just the one case".

- The "old cohorts" issue which illuminated the CNA study's confounding, also led to an explication of "What happened to all the Non-Liturgicals?".  Answer, they were dropped out, forced out, discouraged out of the Corps - coincident with Promotion steps.  (See Appendices H and K.)

- Presence at the Federal Court in San Diego on May 13, and reflection on what I heard there, encouraged me: (1) to further explore why/how the Non-Liturgicals were denied "consideration" (see Appendix K) and also (2) to use the data in Reference 4, which is "certified" by the Navy, to demonstrate the existence of a statistically significant "mechanism" which protects Catholics from exposure to SER action. (See Appendix L.)

- Finally, I took the time to work on a couple of statistical "fillips" - things which explain superficial contradictions: See Appendix N, a discussion of the interaction between the 1991-2002 time period and these data, and Note 5,  "The Cream Effect", which could explain a "surprise" in the probability of Promotion at Captain.

# INTRODUCTION

This report is not about the Religion, Bible Study, Denominational Differences, or Church Architecture.

It is about discrimination in the work place.

I am not charged with opining on whether religious discrimination within the personnel management system of the U.S. Navy Chaplain Corps is unlawful, nor even with proving that such discrimination is a violation of the Navy's own prohibitions against letting religious differences influence personnel management matters.

I am charged with looking at "data" and determining whether that data demonstrates a statistically significant pattern and practice of denominational preference or prejudice vis a vis the personnel management actions and decisions of the U.S. Navy Chaplain Corps.

In order to discharge this responsibility I need to (1) look at data, (2) define or describe personnel management actions (for example: promotion) which might be influenced by "religious preference", and (3) select appropriate statistical tests to determine if the data selected in step 1 indicate that the actions identified in step 2 were, or seem to have been, influenced by denominational preference, or "religious" structure in the Chaplain Corps per se, or within its management rules and protocols.

In presenting my results I need to (1) make sure that the data that I use is valid (i.e., not just "accurate", not necessarily "complete", but representative, correctly described, and suitable for the purposes to which it is put) and I also need to (2) look at the data and analyses performed by others and address how their results comport with mine, or why they do not.

The processes of data validation and statistical method comparison require detailed foundational work. The work is straight forward, but interesting only to those who "like this sort of stuff"; however, it is absolutely necessary. Virtually all apparent contradictions between statistical experts can be understood in terms of data, definitions and methodological errors.

## Presentation of Results

Because Data is central to every analysis, I have included with this report, a copy of the data I used in the report. Because Data is not what one wants to look at first, I have put the data in an Appendix - There are 8 data Appendices.

Because comparison of my results with those of the Navy's experts (References 1 and 2) is not only inevitable, but appropriate, I have included that in this report in two places.  In the main text I have given a thumbnail comparison.  I have provided a detailed critique in an Appendix. There is one Appendix ( Appendix I) which discusses the issues I have with Reference 1, and another Appendix (J) which discusses the issues I have with Reference 2.

The body of the report is a sequential discussion of selected Personnel Management topics in the U.S. Navy Chaplain Corps.  This is more than "just" promotion.  I also look at  accession, retention, retirement, and attrition.  I do not look at utilization and assignments - but could do so if (a) I had the data and if (b) there were an interest, an issue (and a budget).

**ANALYSIS** - FAITH GROUP

1.     The Navy "manages" (this is their term, their admission- see References 4 and 9) - the Navy manages the Chaplain Corps by Faith Group, or "Faith Group Cluster": "Roman Catholic, Liturgical Protestant, Non-Liturgical Protestant and Special Worship".

2.     Although they "manage" by Faith Group, they say they do not base any of their personnel management actions on Religious Preference - except duty assignment, Promotion Board Membership, Retention on Active Duty past mandatory Retirement date, etc. etc.

3.     This is, of course, semantic double-talk.

4.     First, the Navy does not "manage" by four broad categories of Religious Association (based on commonality of belief, nor on prevalence of denomination).

5.     They manage by Roman Catholic versus all other religions.  (See also Note 1, Distinction, Difference and Discrimination, p 77 below.)

6.     Roman Catholics are given their own "Faith Group"; Liturgicals (Episcopalian, Lutheran, Presbyterian, Methodist, etc.) are combined into one pool; Baptists, who outnumber Roman Catholics two-to-one, are lumped in with "everybody else", everybody else, that is, except the Special Worship Group; the Special Worship Chaplains (Jewish, Mormon, Seventh Day Adventist, Christian Science, Unitarian, and Muslim) are classed into a fourth division.

7.     Confounding all this, literally confounding it, statistically confounding it, the Navy is inconsistent in assigning what one might call "minority endorsed" denominations into Liturgical and Non-Liturgical.*

_____

* Clearly, this sort of error works to conceal differences in impact upon (e.g. promotion) or use of (e.g. Promotion Board duty) the Liturgicals and the Non Liturgicals.  The data are confounded when some Liturgical Chaplains, notably some (1) Evangelical Covenant Church in America, (2) Evangelical Congregational Church, (3) Conservative Congregational Christian Conference, (4) Moravian Church, (5) National Association of Congregational Christian Church in America, (7) Orthodox Church in America, (8) Reformed Church in America, and (9) African Methodist Episcopal Church Chaplains - all of whom are properly considered by themselves, their sponsors, and Navy policy as "Liturgical"), are classified as Non-Liturgical and some Non-Liturgicals (notably some (1) American Baptist Church, (2) Church of the Nazarenes, and (3) Wesleyan Church Chaplains - all of whom are considered by themselves, their sponsors, and Navy policy as Non-Liturgical) are classified as Liturgical. [Note: In my Addendal, I incorrectly, a proof reading error, listed IFCA's as among the mis-categorized groups.] The absolute number of mis-characterizations may or may not be minimal, but the errors are pervasive, traveling through the Navy Data into the CNA study and onto Dr. Siskin's work.]

**ANALYSIS** - PROMOTION BOARD COMPOSITION

8.     It is obviously self contradicting to say that one manages by Faith Group (e.g., assigns a Jewish Chaplain to London, and a Catholic Chaplain to every Promotion Board) and claim at the same time that one does not "manage" by religious denomination.

9.     As a result of Discovery (in a different case) the Navy provided documents from which one can extract Faith Group information for most of the officers assigned to each of the Promotion Boards which were convened from 1977 through 2002. (See Appendix C.) Non Chaplain officers assigned to Boards did not have faith group information provided, but the Faith Group data provided covered the Chaplains, and the Chaplains constituted more than 90% of all the officers Assigned to Promotion Board duty.

10.    Table 1 provides data on Board assignment frequency by Faith Group.

**Table 1.**
**Representation by Faith Group**
**Number of Boards**

| Seventy Three Boards | Roman Catholic | Liturgical Protestant | Non-Liturgical Baptist | Non-Liturgical Other | Special Worship Jewish | Special Worship Other |
|---|---|---|---|---|---|---|
| Number of Boards with No Officers of this Faith Group: | 0 | 0 | 16 | 52 | 66 | 57 |
| Number of Boards with One Officer of this Faith Group: | 42 | 13 | 40 | 20 | 7 | 16 |
| Number of Boards with Two Officers of this Faith Group: | 28 | 35 | 17 | 1 | 0 | 0 |
| Number of Boards with Three Officers of this Faith Group: | 3 | 21 | 0 | 0 | 0 | 0 |
| Number of Boards with Four Officers of this Faith Group: | 0 | 4 | 0 | 0 | 0 | 0 |

14.    Without even considering the precision of statistical analysis, Table 1 shows clearly that religion-based decision-making is taking place in Chaplain Corps Promotion Board composition.

Every Board had at least one Roman Catholic Chaplain.  Every Board had at least one Liturgical Protestant Chaplain assigned (and most had two.)   This is compelling evidence of an arbitrary practice of "stacking the deck" so that every Board has a majority of Catholics and Liturgicals.

15.    Statistics can tell us how unlikely this pattern of religious discrimination/allocation is. The pure chance probability of selecting 73 Promotion Boards and always getting at least One Catholic on each of them is about one time in 1.6 million.  The chance of getting at least one Catholic and at least one Liturgical on every Board is so low that every person on earth, all six billion of them, could have drawn a random sample for a Chaplain Corps Promotion Board once a month, for every month, from 1977 to 2002  and not one of them would, in all statistical likelihood, have picked a sample with 73 consecutive Promotion Boards with at least one Catholic and at least one Liturgical on EVERY Board.  The Navy's actual result could not have happened by chance!  (See Appendix M, ¶ 3 to 26.)

16.    The Navy Chaplain Corps intentionally chooses Chaplains for the Promotion Boards based on Religious denomination.  No other interpretation fits these data.

17.    In assembling Promotion Boards, the U.S. Navy Chaplain Corps, identifies, selects, assembles, ***"balances"*** *(sic)* Board composition so that:

•      One or two Roman Catholics are on EVERY Board,
•      One or two (or three or four)  Liturgical Chaplains are on EVERY Board, and
•      One "Other" (Non-Liturgical or Special Worship Chaplain), is assigned to most Boards.

18.    This does not even ***look*** fair; furthermore, it is not even handed; and even if it were argued to be "well meaning," it is a misguided introduction of religion *per se* into an assignment process which is supposed, ordered, required, by Navy policy, to be faith blind or faith neutral.

19.    The policy of assigning two Catholics  to every Board was changed in 1986/7, following settlement in a court case (Wilkins vs. Lehman, *et al*), but the Policy as well as the change were and are explicit acknowledgments that faith**,** in fact Catholicism, was, and remains today, one of the criteria in assigning Chaplains to Promotion Panels. (See Ref 1, p26.)

## IMPACT

20.    One might ask, "So what? What difference does all this make?"

21.    **First**, assigning Chaplains to Promotion Boards based on each Chaplain's religious belief (whether Catholic, or not, or Liturgical, or not, etc.)  is contrary to stated, official Navy Policy.

22.    Officially, no Chaplain is supposed to be assigned to, or not assigned to, a Promotion Board because of his (or her) religion; it is clearly a violation of that policy to control Promotion Board composition:

- (a) so that every Board has Two Catholics, or
- (b) so that every Board has One Catholic, or
- (c) so that  every Board will have at least one Roman Catholic and at least one Liturgical as well as (71 times out of 73) at least one "Other" Chaplain, and routinely one non Chaplain.

23.    One cannot achieve any *regular* pattern of Faith Group distribution without *considering,* in fact *managing by*, Faith Group.

**Defendants Admit that they Manage by Faith Group**

24.    In Defendants' Motion for Summary Judgment (Reference 4)  they say "The Chaplain Corps uses four categories of faith groups to manage its Chaplains: ..." They do not say they use these categories "to tally", "to record", "to keep track of", "to account for", or even "to understand", "to monitor", or "to review" the Corps' records; they say they use these categories to "manage" the Corps - and this is what they do.  They use Faith Group to control the number of Chaplains who are accessioned into the Corps, who are allowed to stay in the Corps, who are promoted within the Corps, and even who are (and are not) allowed to get Medical Retirements.

25.    In fact, every dimension of personnel management practice which we can illuminate with data shows the effect of control based on Religious Faith Group - with deference always in favor of the Roman Catholics, and limitation always accruing to the Non-Liturgicals' Faith Groups in general and Evangelicals within that Group and Special Worship Faith Chaplains in particular.

26.    This statement in Reference 4 is an admission.  So too, it appeared to me, was the *we have to do this; it is our judgment and our duty* soliloquy I heard in Defendants' oral argument in California (see Reference 9.)

27.    **Second**, to the extent that religious preference influences promotion decisions, stacking the Boards with a preferred religion tends to stack the Chaplain Corps itself with promotions that are from those religions.  The corollary of this observation is that denying Promotion Board seats to certain Faith Groups or denominations works to keep those Faith Groups and denominations from being promoted and, in a vicious circle, reduces their availability for service on Promotion Boards.

**Promotion Boards influence Corps composition both directly and indirectly.**

28.    Promotion Boards influence Corps composition both directly and indirectly.  The direct influence is, of course, by *promotion.*   Every candidate who is promoted adds his/her credentials to the leadership of the Corps.

29.    But Board decisions also influence Corps composition  indirectly.  First, officers who are not promoted on the first available opportunity, (a) gain or maintain seniority within their current

rank, but (b) lose seniority to those of their cohort who have been promoted.  Second, officers who are not promoted on their second *consideration* are, and know themselves to be, prejudiced against vis a vis further service.  From time to time, although irregularly enforced, it has been Navy policy that one is "Up or Out".  Being "Passed Over" or "FOS" ( Failure of Selection) twice is cause for severance from the Corps.

30.    Since Promotion Boards can pass over a candidate, the Boards' decision influences the candidate's career, perhaps even his continuance in the service, if he is not promoted.

**RELIGION ON THE BOARDS**

31.    We can show that there is a correlation between the number of Catholics on a Promotion Board and the Number of Catholics selected by those Boards.  (See Appendix M., ¶ 40 to 66.)

32.    We can, with difficulty, test for this sort of bias among the other denominations - and here too we find that there is a tendency for "like to promote like."  Most psychologists who think about this, suspect that this tendency to promote those like oneself is "human nature".  The evidence here shows that this is a learned phenomenon, which may mean that although "natural", it is not involuntary.

**What I mean by "with difficulty"**

33.    The difficulty comes about because of the Navy's parsing of the denominations.

34.    The Navy singles out Roman Catholics into their own Faith Group (sic), and thus we can easily identify Catholics per se in the Navy supplied data - and we can learn that Roman Catholics gain more than their proportionate share of the promotions - both In Zone and Above Zone. [That fact has been found in *every* study - see ¶ 96, below.]

35.    On the other hand, no other denomination is separated into its own segment in the Navy's Faith Group lexicon.  The "Liturgical Faith Group", for example, lumps Episcopalian, Methodist, Presbyterian, Lutheran, etc., into one broad category, and an hypothesis of "Like Likes Like"*

_____

\* I use this phrase, "Like Likes Like", to refer back to the phenomenon referenced in the CNA Study (Reference 1,  page 12) wherein they acknowledge a tendency for the "traditional faith groups", the "mainline Protestants and Roman Catholics", to perpetuate themselves in management positions in the Chaplain Corps - "not deliberately, but because of affinity.  That is, an individual is more comfortable with someone like him/herself and so is more likely to promote others of the same group." [This paragraph in Reference 1 goes on to speculate that "the finding of no differences in promotion in the more recent period could be due to the opening up of the selection boards to more types of chaplains ...." {cf my Appendix N here.} But it could also have been due, of course, to incomplete analysis.  More about this, about problems within the CNA study, can be found in Appendix I of this Compendium.]

cannot be examined within a group of quasi-like denominations - except in the most gross terms, i.e., vs Non-Liturgicals. [But we see the "Like Likes Like" phenomenon evident on that comparison too, when we make it. See Appendix M, ¶ 71-82.]

36.    The analysis that follows is based on Appendix D, all LCDRs before all CDR Promotion Boards from FY 1981 through FY 2002.  Of course, with the data quality that is available, this is not in fact *all* candidates (the Navy says it can't find either the FY 1980 CAPT or the FY 1993 CDR Promotion Board Reports and some of the Below Zone candidates for the reports they can find are missing from the data*), but Appendix D is surely a representative sample.

37.    I have used CDR Boards as the base for exploring these "Like Likes Like" issues.  I have done this because the CNA Study found a statistically significant preference here for Catholic Chaplains when the CDR Promotion Boards had two Catholics, and this seemed a good place to start looking for replication.

38.    I also used CDR Promotion because this is *the* barrier which the highest proportion of Chaplains fail to cross - so this should be the place where it is easiest to show a statistically significant difference  - if there is a statistically significant difference.  There could be enough variability in promotion rates to provide for reasonably tight confidence limits for statistical estimates.  This focus on Promotions at the CDR level does not mean that the "Like Likes Like" process only operates at this rank.

39.    If the phenomenon is active in the Chaplain Corps it probably permeates it. [It does; the examination of the other ranks is presented in Appendix M, ¶ 93 to 135.]

40.    Within the CDR Promotions, I looked at both In Zone and Out of Zone promotions.  The Instructions to the Boards require them to "consider" all eligible candidates, but the clear expectation is that, and the facts are that, most promotions are given to In Zone candidates.  About a fifth of all CDR promotions, however, are given to candidates who are Above Zone or Below Zone.

41.    An unsuccessful candidate who has been considered In Zone may (usually does) appear on the list of eligibles the following year, as Above Zone, where he or she is still eligible and still must be considered, again.  Such a candidate is at a statistical, personnel related, disadvantage.  He (or she) has been "passed over" by a previous Board which found, by majority vote, that the candidate was not qualified, worthy, or ready for promotion - so getting promoted from Above Zone is an uphill battle.  On the other hand, many promotions come to these candidates, with patience - some after eight, nine or ten successive "considerations".

_____

* This is not important anyway, as Below Zone eligibles do not figure into the analysis here - although it could be interesting to look at them; the Below Zone eligibles can alert a Board Member to a "once in a career" opportunity to promote one of their own, as it did, perhaps, in 1991 for one CME Board Member and one CME Chaplain.

42.     A Below Zone candidate is, on the other hand, a candidate who is technically eligible by reason of having achieved a minimum "time in grade" in their current rank and by standing in the seniority queue in a position within range of the primary Promotion Zone.  These are candidates who may be considered for "early" promotion, and although they are all supposed to be fully considered if any of them are promoted, their de facto purpose on the list is to assure that there are "enough" eligibles before the Board to meet the Navy's quota needs at the next rank.  Below Zone promotions are rare and should signal the appearance of a "fast tracker" or "outstanding young officer".

43.     If there were no "Like Likes Like" phenomenon at work in the Navy Chaplain Corps, the probability of an In Zone Promotion, whether different for different denominations or not, would not be a function of whether the candidate held a denomination in common with some Board Member.   But this seems not to be the case.

44.     Let us begin with a definition of what we mean by a denominational match, and an examination of how likely that is to occur.

45.     A denominational match happens when a candidate before a Promotion Board has the same "Endorser" as one (at least one) member of the Promotion Board.  ( "Endorser" is the term the Navy uses to denote the Organization which "authenticates" or "sponsors" or "identifies" a particular Chaplain for entrance into the Corps.  Endorsers are denomination specific.)

46.     Table 2 (based on data in Appendix D) counts "matches" and In Zone promotions for all the CDR Boards from 1981 to 2002.

**Table 2**
**Probability of a Matching Denomination on the Board**

| Denomination | Number of In Zone Eligibles | Number of Eligibles Selected | Probability of a Match on the Board | Number of Eligibles Not Selected | Probability of a Match on the Board |
|---|---|---|---|---|---|
| Roman Catholic | 171 | 116 | 1.000 | 55 | 1.000 |
| All Others | 543 | 302 | 0.267 | 241 | 0.174 |

This Table shows two important points:

47.     **First**, there is always a Roman Catholic on the Promotion Board. (So the simultaneous occurrence of a Catholic on the Board when a Catholic is promoted is an artifact of the way the Boards are set up - but Catholic presence still correlates to and facilitates "Like Likes Like".  It may even "model" that phenomenon, or seem to "justify it", for other denominations who could "follow the leader" (if only to "balance the scales".)

48.    The "reason" for, or "temptation to", "balance the scales" is evident in Table 2.  There we see that the likelihood of a Catholic being promoted to CDR (in an environment where every Catholic candidate has a "sponsor" (sic) on "his" (or "her") Board ) is 67.8 %; but the likelihood of "any body else" getting promoted is just 55.6%.

49.    **Second**, the major finding evident in Table 2 is that Non-Catholic candidates promoted from In Zone have a 27% likelihood of having a member of their Promotion Board with the same Endorser as they have (i.e., they share their denomination).  On the other side of the decision, Non-Catholic Candidates passed over for promotion had only a 17% chance of having a member of the Promotion Board with the same Endorser.

50.    This is a stunning difference.   (P<.001)

51.    Non-Catholic candidates who share an "Endorser" with a Board Member are about 1.4 times as likely to be promoted In Zone as are Non-Catholic candidates who do not share an Endorser with a Board Member. This difference in promotion rates is clear evidence that Non-Catholic denominations are also selecting their own kind and Passing Over other denominations. [This could be collusion, but it does not have to be collusionary.  If  "everybody" voted for both (a) "their own" and (b) "some" others, the data could still "average out" to look something akin to this; "Like Likes Like" whether there was "vote trading" or not..]

52.    If there were no "Like Likes Like" phenomenon at work in the Navy Chaplain Corps, the probability of an Above Zone Promotion, whether different for different denominations or not, would not be a function of whether the candidate for promotion held a denomination in common with some Board Member or not.

53.    However, there is a statistically significant tendency for LCDR chaplains who are given Above Zone Promotions, to be given that promotion when someone of their particular denomination is on the Promotion Board. (See Table 3, on page 31 here, below, and also see Appendix M, ¶ 122.)

54.    I know that this is not "supposed" to occur.  I know that this smells of patronage.

55.    I also know that such promotions cannot be "ordered" or "demanded" by just one denomination on the Board. With four or five other votes, no one Board member can elevate a particular, previously failed, but still eligible Chaplain - but one vote can be a "majority of one" and one "voice" can highlight a deserving candidate.

56.    That "voting for one's own" is plausible, and statistically likely, and that "success" would follow "automatically" by the operation of arithmetic in a "majority wins" calculation, if one also voted for "some" others -  is about as far as we can strictly push this data.  Beyond this,  we enter a world of speculation, but it is at least "common sense" speculation, and it is consistent with the pattern of what has happened on occasion.

57.    [I can hear Defendants' Attorney  Hyde, in my imagination, asserting, yet again, that my portfolio is "numbers" and not mind reading.  I am not reading the minds of the Board members. I am pointing to data which shows: (1) that the Boards do allow denomination to influence their selections - at least some of the time and data which shows: (2) whether one wants to embrace my speculation or not, that there is "smoke" here (as in "where there is smoke there is fire") which supports the commonly held belief in the Chaplain Corps that favoritism is afoot.]

58.    I am not saying that "horse trading" (you promote "my guy" and I'll promote yours) is taking place, but the pattern of the promotion data is consistent with such an hypothesis at least 70% of the time.

59.    A reading of the raw data finds many instances like:

| Board Year | | Board Members | Board Decisions | | Selected Eligibles |
|---|---|---|---|---|---|
| **1981** | where  an | RC* | Promote Above Zone an | | RC |
| | | SB | | 2 | SB |
| | | LMS | | an | LMS |
| and | | UM Board | | and a | UM Chaplain; |
| | | | | | |
| **1986** | where a 2 | RC | Promote Above Zone an | | RC |
| and | 2 | ELCA Board | | and an | ELCA Chaplain; |
| | | | | | |
| **1987** | where  an | RC | Promote Above Zone an | | RC |
| | | SB | | an | SB |
| and | | PUSA Board | | and a | PUSA Chaplain; |
| And | | | | | |
| | | | | | |
| **1992** | where  an | RC | Promote Above Zone  2 | | RC |
| | | SB | | an | SB |
| and | | UM Board | | and a | UM Chaplain. |

60.    But the plural of anecdote is not data, so we need a method for statistically analyzing this information.

_____

* RC, PUSA, SB, LMS etc are abbreviations for Endorsers of particular Chaplains.  In this instance RC stands for Roman Catholic, SB for Southern Baptist, LMS for Lutheran Missouri Synod, and UM for United Methodist, etc, but the point in the listing is not the individual denominations, but the "coincidence" of the same denominations appearing among the ranks of the Above Zone Promotions as appear among the Board members.  A complete listing of the Board Member's denominations and the denominations of the Chaplains selected by those Boards, and not selected by those Boards, is presented in Appendix A2 and G.

61.    Table 3 counts the Above Zone (68 of them) and Below Zone (10 of them) promotions issued by these twenty-one Boards during this period. (See Appendix D, G and M.)

**Table 3**
**Denomination Presence on a Board**
**and Promotions by the Board**
**Part I - Above Zone & Below Zone Promotions**
**Catholics vs All Others**

| Denomination | Number of Promotions which share a denomination with a Board Member | Number of Promotions which DO NOT share a denomination with a Board Member | Probability of a shared denomination |
|---|---|---|---|
| Roman Catholic | 17 | 0 | 100% |
| All Others | 26 | 35 | 42.6 % |

62.    This Table also shows two important points:   The first, which bears repeating, is that there is always a Roman Catholic on the Promotion Board. (Thus, the simultaneous occurrence of a Catholic on the Board when a Catholic is promoted Above Zone is an artifact of the way the Boards are set up by the Navy - but Catholic presence  still correlates to and facilitates "Like Likes Like" and may "model" that phenomenon, or seem to "justify it" for other denominations who could "follow the leader" (if only to "balance the scales".)

63.    The second point to make from Table 3 flows from the fact that there are only five or six members of a Board and there are more than one hundred denominations in the Navy Chaplain Corp.  The "all other things being equal" probability of finding a "match" between the denomination of a Board Member and the denomination of a candidate is on the order of 22%, so there is a statistically significant "Like Likes Like" effect in that among Non-Catholic Above Zone promotions, the chance of having a "denomination match" is nearly twice this number. (p<.001)

64.    It is obvious from this data that Catholics, at least, have both (a) a favored position in the Chaplain Corps in that there is always a Catholic present on a Promotion Board, and (b) that this presence correlates to, and may *cause* an "excess" of promotions for Catholics before those Boards.

65.    One might wonder whether, in fact, the whole "Like Likes Like" statistical significance might not be "explained away" by Catholic presence, and Catholic preference for Catholics.

66.    The answer to that question lies in testing the data again, with Catholics omitted from the Table and the tallies.

67.    Table 4 does this:

**Table 4**
**Denomination Presence on a Board**
**and Promotions by the Board**
**Part II - Above Zone & Below Zone Promotions**
**vs In Zone Promotions**
**(excluding Catholic Chaplains)**

| Promotion Range ↓ | Number of Promotions which share a denomination with a Board Member | Number of Promotions which DO NOT share a denomination with a Board Member | Probability of a shared denomination |
|---|---|---|---|
| Above & Below Zone | 26 | 35 | 42.6 |
| In Zone | 78 | 224 | 26.7 |

68.    The pattern of results, even with Catholics taken out of the equation, is still statistically significant at the .001 level.

69.    So far, we have looked at (a) Catholics and (b) everybody else.

70.    It is logical, and might well be interesting to look at the "everybody else", but the Navy's Faith Groups are both too coarse a grouping, and confounded. The Faith Groups are confounded in that they have some Liturgicals classified as Non-Liturgicals and some Non-Liturgicals classified as Liturgical.

71.    I have made a point about this repeatedly (one might even say "crusaded" about it); and Dr. Siskin has reasoned, not without some justification, that the number of such miss-classifications is minimal.

72.    I am not "beating a dead horse" now that I turn to this issue again. I am pointing out an additional confounding - one that is at the crux of the litigation. "Faith Group" is not the name of the disenfranchised class in the U. S. Navy Chaplain Corps. The class is that cohort of non-liturgical (and perhaps even a few Liturgical) Chaplains who have such small numbers, or such "non-mainstream" (a la Reference 1) presence, that they are overlooked, ignored, set apart, and rejected "out of hand". I have called them "Non-Baptist, Non-Liturgicals", but if the Navy's advocates here want to refine this "Group" for data analysis, I would be happy to collaborate.

73.    Meanwhile, there is a confounding in the Navy Data and the Navy Faith Group "cluster" classification schema. To help address this, let us look at "Endorsers" or denominations instead of "Faith Groups":

74.   Table 6 does this:

**Table 6**
**Denomination Presence on a Board**
**and Promotions by the Board**
**Part III - Above Zone Promotions by Denomination**

| Denomination | Number of Promotions which share a denomination with a Board Member | Number of Promotions which DO NOT share a denomination with a Board Member | Percent of all Out of Zone Promotions with shared denomination | Probability of a shared denomination |
|---|---|---|---|---|
| Roman Catholic | 17 | 0 | 100 % | 1.00 |
| Southern Baptist | 9 | 4 | 69 % | 0.67 |
| Lutheran | 6 | 3 | 67 % | 0.46 |
| Methodist | 6 | 3 | 67 % | 0.28 |
| Presbyterian | 3 | 0 | 100 % | 0.27 |
| Other Specific Liturgical | 2 | 6 | 25 % | 0.20 |
| Other Specific Baptist | 0 | 2 | 0 % | 0.19 |
| Episcopal | 0 | 4 | 0 % | 0.07 |
| Specific Special Worship | 0 | 2 | 0 % | 0.05 |
| Specific Non-Baptist Non-Liturgical | 0 | 11 | 0 % | 0.02 |

75.   The story being told by Table 6 is not just that Roman Catholics are better at obtaining Above Zone and Below Zone promotions than every other denomination, nor even just that a Catholic candidate for Promotion is more likely to find affinity, commonality of faith, with some Member of his or her Board.  The story is that there is a correlation between (a) the Probability that when an Out of Zone Promotion occurs it occurs when that denomination has a member on the Promotion Board and (b) the likelihood that that denomination has a Member on any Promotion Board.

76.    This is not just a tautological correlation (that Roman Catholics always have a member of the Board and that  Non-Baptist Non-Liturgicals seldom have a Member of the Board - both of which circumstances are controlled by the Chaplain Corps and demonstrate bias and religious favoritism in the management of the Corps), this correlation is also a question of timing and experience.

77.    Table 6 shows that in terms of the ratio of Out of Zone Promotions with and without a common religious denomination, there is a clear distinction between (a) those denominations where the majority of the Out of Zone promotions occur in conjunction with having a matching denomination on the Board, and (b) those denominations where a majority of the Out of Zone promotions occur in Board configurations when there is no matching denomination on the Board.

78.    A close examination shows that the difference between the two groups is not polity, but experience on Promotion Boards, as measured by the probability of that denomination's appearing on a Promotion Board whether one of "its" eligibles is before the Board for promotion consideration or not.

79.    Let me explain the significance of this and:

**What I mean by "learned behavior"** (cf ¶ 32)

80.    "Like Likes Like" is certainly a natural phenomenon.  Like Likes Like pervades American Society (the "Old Boys Network").  Like Likes Like even seems practical, if one acknowledges that familiarity (common basis) facilitates communication and joint action.

81.    But Like Likes Like is still, at its core, prejudice, and it, that, prejudice, is usually prohibited - as it is in the U.S. Navy Chaplain Corps.

82.    However, as frequently happens, practice is different than policy, and as one gains experience in a process, one learns the limits of the rules, and the boundaries of propriety.  And, unfortunately, as time passes, strict adherence to the letter of the policy frequently erodes, and "just this once", or "everybody else does it", or "we need to correct this past injustice and promote good ole Joe", creeps into the community.

83.    We have shown (a) that there is a tendency, on the average (averaged across all denominations, including the ones who have obeyed strict stricture not to let faith or denomination influence their decisions on a Promotion Board) that there are denominations which do let faith or denomination influence their decisions on a Promotion Board, and we have shown (b) that although there are denominations which do let faith or denomination influence their decisions on a Promotion Board, different denominations have more or less of this proclivity than others.

84.    We can also show (c) that this tendency to act out Like Likes Like is not a denomination-specific character flaw, but rather is a practice which "experience on Promotion Boards" teaches.

85.    As a Chaplain sits on more and more Promotion Boards, he or she "learns the ropes" and the "honored in the breach" conventions - and - see Table 6 - as the experience level rises (as measured by the probability of appearing on a Board when there is a member of "your" denomination in the pool of candidates before that Board) , as the experience level rises, so too does the probability of getting (causing?) one of one's own to be promoted Out of Zone.

86.    The conclusion here is admittedly based on small numbers, but the numbers tell a profound story, and "account" for a major portion of the differences in promotion rates among Chaplains of different denominations.

87.    The end result is that a kind of specious parity unfolds as the various "common" denominations learn how to "work the system".

88.    Catholics always get their share (and more) of the available promotions, because the Chaplain Corps stacks the deck so that every Board has at least one Catholic on it.

89.    Non-Baptist, Non-Liturgical Chaplains always get "the short end of the stick", because the Chaplain Corps includes the Non-Baptist Non-Liturgicals in the broad category called "Non-Liturgical" and then disproportionately chooses a Baptist to be on the Promotion Board, when they "need" a Non-Liturgical "representative".

90.    The other Liturgical denominations, and the Baptists, "jockey for position" and the result for them all is not random variation but a contrived pseudo equity:

**Table 7**
**Promotion Rates to CDR by Denomination**

| Denomination | Probability of Promotion[1] | Probability of Promotion[2] | Probability of Promotion[3] |
|---|---|---|---|
| Roman Catholic | **66.8 %** | **70.9 %** | **59.6 %** |
| Lutheran | 54.4 % | 61.5 % | 55.6 % |
| Methodist | 54.4 % | 60.0 % | 47.6 % |
| Presbyterian | 52.6 % | 55.9 % | 62.5 % |
| Other Liturgical | 55.3 % | 56.1 % | 55.6 % |
| Baptist | 53.8 % | 56.9 % | 58.6 % |
| Special Worship | 58.5 % | 57.1 % | 47.1 % |
| Non Baptist Non-Liturgical | **51.9 %** | **56.4 %** | **50.0 %** |

1 Data used here (Appendix D - FY81-FY02); 2 Data from Appendix A (1981-1992); 3 Data adapted from Siskin

91.    Table 7 makes the point that across different time periods and even with different definitions of "considered" Catholics always do better in the Promotion race than any other denomination, and the Non-Baptist, Non-Liturgical denominations always do worse than the Catholics as well as worse than the average of all the other denominations.

Here is why:

**Table 8**
**Probability that a Candidate will find**
**"denominational affinity" With a Board Member**

| Denomination | Probability that a Candidate will find "denominational affinity" With a Board Member |
|---|---|
| Catholic | 100 % |
| Presbyterian | 57.5 % |
| Lutheran | 57.5 % |
| Episcopalian | 21.9 % |
| Methodist | 20.5 % |
| Episcopalian | 21.9 % |
| Southern Baptist | 52.0 % |
| American Baptist Convention | 17.8 % |
| Assembly of God | 0% |
| Chaplaincy of Full Gospel Churches | 0% |
| Church of Christ | 5.4 % |
| Independent Fundamental Churches | 1.4 % |
| Seventh Day Adventist | 16.4 % |
| Latter Day Saints | 4.1% |
| Jewish | 8.2 % |

92.    Because of the way the Corps controls Membership on Promotion Boards, the Non-Baptist, Non-Liturgicals are "denied a seat at the table" - and a "voice in the process."

They are denied fair and balanced consideration for promotion, which leads to inequitable separation from the Service (under "up or out").  In short, they have their careers curtailed and their options reduced - all because of the operation of a denominational bias in the Chaplain Corps' method of populating Promotion Boards.

93.    Faith Group conceals denominational differences.  Differences in denominational assignment to Promotion Boards contaminate promotion decisions.

**Why Does the Navy *say* There is no Difference in Promotion Rates?**

94.    Given the above demonstration that promotions in the U.S. Navy Chaplain Corps *are* influenced by religious denomination, directly, and Catholic preference vis a vis control of the constituency on Promotion Boards, indirectly (and knowing that this effect cascades into differential Chaplain Corps promotion rates), one might well wonder, "But why does the Navy say that there is no difference in Promotion Rates?"

95.    The answer is that they say it because they believe it, or more correctly:

Because they believe it, they say it.

96.    The data that they publish do not suggest that there is no difference in promotion rates.

See Table 9:

**Table 9**
**Probability of Promotion to Commander**

| Navy Reference →<br>Faith Group ↓ | CNA Study<br>Reference 1 (p24) | Dr. Siskin's Study<br>Reference 2 (Ex11, p2) |
|---|---|---|
| Roman Catholic | 83.7 | 58.7 |
| Liturgical Protestant | 72.0 | 52.0 |
| Non-Liturgical | 69.2 | 53.2 |

97.    Catholics, obviously, have an "inside track", at least in terms of promotion to CDR - and Both Navy references have already published that fact.  The CNA Study even identified it as "statistically significant".  And Dr. Siskin would also have found "statistical significance" had he tested Roman Catholics against "others".

98.    Let us Explore, what happened in these References (see also Appendix I which critiques Reference 1 and Appendix J which critiques Reference 2.),

**But first a remark about Statistical Analysis**

99.    In order to test for a significant difference, one has to have a "difference" to look at, or for, either in results or in treatments.  That seems simple enough.

•    "Are these two groups different in terms of what we did to them or in terms of how they behaved?"

•    And if they are different, on either score, the analyst is allowed to calculate statistical likelihood and draw inferences.

100.    I point this out, here, because differentiation is an undercurrent in the present case, and a trap in statistics, for the unwary, or the clients of the devious.  If one is not careful about how the two (or more) classes (of either results or treatments) are defined, one can either decompose into statistically insignificant trivia at one extreme, or aggregate into an indistinguishable slurry at the other extreme.

•    If the Faith Groups are confounded - they minimize the likelihood of the analyst's seeing any difference.

•    If the Faith Groups are merged - they immediately dilute any difference which was there.

101.    If we take a hint from the Navy's lead and separate Chaplains into Roman Catholic and "other", we could have a "clean" comparison - to the extent that Catholicism was the issue.

102.    If we are careless about how we assign Chaplains to groups, we can dilute the difference (the statistical term is "confound" it) and compromise our capacity to detect any real effect or change among the groups which might exist.  In the Navy's Chaplain classification scheme, they have some Liturgicals classified as Non-Liturgical and some Non-Liturgicals classified as Liturgical. Clearly, that makes it "harder" to see any differences between the so-called Liturgicals and the so-called Non-Liturgicals..

103.    On the other hand, if the difference is really there, and we aggregate across boundaries, and set up false dichotomies, we can both obscure the difference and mislead those who rely on our work.

104.    In the present instance, not only do the Navy and its opinion givers confound denominational assignments, they pool their data across ranks and denominations and dilute the differences that they found.

105.    It is statistically "wrong" to combine subgroups which are suspected of being different, even if one calls it "controlling for".

106.    Both the CNA Study and Dr. Siskin found a difference in the promotion rates for Roman Catholic Lieutenant Commanders to Commander, versus the rate for Non-Liturgical Lieutenant Commanders to Commander.

107.    The CNA Study called what it found a "statistically significant" difference and went on to explore that. [I will explore this too; see below and see also Appendix I.]

108.    Dr. Siskin presented the numbers in the table above, but proceeded to aggregation without noticing that he too had found, or almost found, a statistically significant difference.  Dr. Siskin seems not to have tested Roman Catholic promotions at the Commander level against either all other promotions at the Commander Level or even just  Non-Liturgical promotions at the Commander level - or more to the point, Non-Baptist, Non-Liturgicals at the Commander level. Had he done so, using a binomial test, he would have found that the probability of getting as few promotions among the Non-Liturgicals as he found, had the "true" rate of selection been what he found for the Roman Catholic Chaplains (i.e., 58.7%) is 0.03 (with a one tailed test).  This would have been statistically significant at the threshold Dr. Siskin used, 5%, but even without a statistical test, the difference is in the direction of the hypothesis he was supposed to test, and it should have nudged his curiosity.

109.    In any case, in either case, in both cases, the Navy's references found that Promotion Rates to Commander were better for Roman Catholics than for Non-Liturgicals - and they would have found "the full story", had they not made a series of distorting assumptions and errors. (Again, see Appendix I for a critique of Reference 1 and Appendix J for a critique of Reference 2.)

**Probability of Promotion**

110.    To begin with, let us notice that promotion to Commander is *the* critical step in a Navy Chaplain's career.  After he (or she) reaches that point they no longer "have" to retire with the mere passage of time, or fear dismissal because of FOS (Failure of Selection - to Captain - unless of course, the Navy decides that it needs to "SER" someone.)

110.1.    Promotion to Commander demarks rise to "the senior ranks"; it conveys some sort of security, and it establishes one as a "real" officer - a "Commander".   If a service can winnow out the "chaff" at the CDR threshold, then "anybody" can be promoted up to that point, and after that point - "all the candidates are good". [See Note 5, "The Cream Effect".] Can we agree that if there is bias at the Commander level, there is bias in the system?  Do we need to show bias at every level, to prove that there is bias in the system?  If there is "just a little bit" of bias at other ranks and a statistically significant amount of bias at the Commander level, is that okay?

110.2.    The numbers which Dr. Siskin uses, which the Navy calls "probability of selection", are not a Probability of <u>Promotion</u>.  To the extent that either of the Navy's statistical references adopt this fiction, they are misled and they mislead others. (See, again, Appendix J.)

111.    The proper calculation of promotion rates is to look at the individual candidates and see what happened to them and their careers.

111.1    We can do that with the Navy's Promotion List data, if we carefully avoid double (triple and quadruple) counting:

111. 2    Appendix D presents the Promotion Board record of all*  907 US Navy Chaplain Corps LCDRs who were submitted to promotion consideration at any time (and each time) from FY 1981 through FY 2002.

112.    The Promotion results are summarized in Tables 11 and 12.   Table 11 deals with the time period 1981 to 1992; Table 12 deals with the period that Dr. Siskin uses, 1991 to 2002.  (There is some overlap - to keep the time periods equal.)

### Table 11
### Promotion to CDR as a function of Faith Group
### (1981 to 1992)

|  | B | J | L | N | R | S | ? | T L |
|---|---|---|---|---|---|---|---|---|
| Total # of Chaplains | 117 | 10 | 193 | 65 | 128 | 11 | 6 | 530 |
| Promoted to CDR | 59 | 7 | 101 | 37 | 86 | 7 | 0 | 297 |
| Not (yet) Promoted | 58 | 3 | 92 | 28 | 42 | 4 | 6 | 233 |
| **Percent Promoted** | **50.4** | **70.0** | **52.3** | **56.9** | **67.2** | **63.6** | **0** | **56.0** |
| Of Those Promoted |  |  |  |  |  |  |  |  |
| Ave Number of Times ea was "considered" | 1.8 | 1.5 | 1.7 | 2.0 | 1.6 | 1.6 |  | 1.73 |
| Of Those Yet to be Promoted |  |  |  |  |  |  |  |  |
| Ave Number of Times each was "considered" | 4.2 | 5.7 | 3.3 | 4.2 | 4.3 | 4.0 |  | 3.80 |

Legend:
B = Non-Liturgicals - Baptist affiliation        J = Jewish and Reformed Jewish        L = Liturgical Protestant
N = Non-Baptist Non-Liturgicals        R = Roman Catholic        S = Non Jewish Special Worship
? = Unknown        Tl = Total

_____

*As before, and as always with this data, it is not really complete.  It is "all" the data the Navy says it could "find" and it is supposedly "representative."

113.    The figures in Tables 11 and 12 are drawn from Appendix D, based on Navy Documents. They show (a) the true Probability of Selection or Probability of Promotion for LCDRs to CDR in these periods and (b) provide a window into why the figures in Reference 2 are misleading, to wit:

(1)  Reference 2 does not count Above Zone Promotions within this time period, as importantly,

(2)  It does not count the promotions which will be earned by the Above Zone Chaplains who are considered in this period as they exhaust their Above Zone opportunities in the next decade, and finally,

(3)  The decade 1991-2002 had a new Chief of Chaplains (a Seventh Day Adventist) and *some* of the Catholic preference from the earlier decades subsided. [See ¶ 239 below and also Appendix N.]

## Table 12
## Promotion to CDR as a function of Faith Group
## (1991 to 2002)

|  | B | J | L | N | R | S | ? | T L |
|---|---|---|---|---|---|---|---|---|
| Total # of Chaplains | 133 | 11 | 206 | 104 | 109 | 22 | 1 | 586 |
| Promoted to CDR | 78 | 7 | 111 | 52 | 65 | 9 | 0 | 322 |
| Not (yet) Promoted | 55 | 4 | 95 | 52 | 44 | 13 | 1 | 264 |
| **Percent Promoted** | **58.6** | **63.6** | **53.9** | **50.0** | **59.6** | **40.9** | **0** | **54.9** |
| Percent Promoted (per Reference 2) |  |  | 52.0 |  | 58.7 |  |  | 53.8 |
| Of Those Promoted |  |  |  |  |  |  |  |  |
| Ave Number of Times ea was "considered" | 2.2 | 2.3 | 2.3 | 2.2 | 2.4 | 1.9 |  | 2.27 |
| Of Those Yet to be Promoted |  |  |  |  |  |  |  |  |
| Ave Number of Times each was "considered" | 3.4 | 4.8 | 3.6 | 3.4 | 3.3 | 3.7 |  | 3.46 |

Legend:
B = Non-Liturgicals - Baptist affiliation    J = Jewish and Reformed Jewish    L = Liturgical Protestant
N = Non-Baptist Non-Liturgicals    R = Roman Catholic    S = Non Jewish Special Worship
? = Unknown    Tl = Total

114.    But all these caveats aside, the data which Dr Siskin had available, still show that the Catholics do best and the Non-Liturgicals don't do as well.

115.    Besides the absolute differences in promotion probability, wherein Non-Liturgicals and Special Worship Chaplains and Liturgical Chaplains experience about the same likelihood of promotion in the 1981 to 1992 period, i.e. 52%; the Catholics have a statistically significant advantage of a nearly 25% better rate, i.e., 67%.  (See Table 11.) Symptoms of this can be read in the Table's "internals": Catholics are promoted sooner (with an average of 1.6 stops in the queue) compared to the longer queue (1.8 to 2.0 stops) for the Non-Liturgicals and Liturgicals. [Notice that that "faster track" advantage has disappeared in the 1992-2002 decade.]

116.    The "consideration" pattern for Chaplains who have not been promoted *yet* is driven by two opposing factors:

•       First, the frequently passed over Chaplains from Above the Zone, raise the average number of prior (unsuccessful) opportunities for promotion, and
•       Second, the Below the Zone Chaplains (who have, on the average been considered once in the 1981-1992 decade and who are more likely to be considered twice Below Zone in the 1991-2002 decade, lower the average number of prior (unsuccessful) opportunities for promotion.

117.    The net effect of these two opposing factors is that the number of "considerations" (or "eligibles") in the 1991-2002 decade is about one opportunity less for the yet-to-be-successful candidates than it was for the 1981-1992 decade.  These opportunities will play out.  In 2012 the data for the decade 1991-2002 will show higher promotion rates (because of additional Above Zone promotions which are yet to play out), and the additional Above Zone considerations which that will entail.

118.    Table 11, dealing with the earlier decade, 1981-1992, and having run through its "likely" Above Zone promotions, shows both: (1) a higher overall promotion rate and (2) it reflects the longer queue for Above Zone promotions which have played out.  The Above Zone Chaplains in the 1992-2002 decade who will be prompted have not yet "stood in line long enough."

119.    Where analysis of the Promotion Boards is one way to look at promotion, it is not the only way; it is not the way an individual chaplain, nor an outside observer would look at it. The question to them is not "What did the Board decide?", but rather "Were you promoted?"  These are very very different questions, and focusing on the first has left a very important dimension of career progress largely undiscussed, or intentionally ignored..

**What happened to all the Non-Liturgicals?**

120.    Why are so few Non-Liturgicals "considered" for promotion?  Answer: Because they are systematically dropped out, forced out, or discouraged out of the Corps in numbers and percentages disproportionate to their accessions.  (See also Appendix K)

121.    The Navy's experts introduced us to the semantic nuances of Promotion Discourse in Reference 1.  There they asserted that the promotion rates for Chaplains *considered* for promotion were uninfluenced by faith group assignment.  This finding flew in the face of acknowledged "widespread belief" to the contrary, as well as in the face of the demographic facts, and even in the face of the statistically significant findings in their own report.

122.    Table 13 extracts data from Reference 4 ("fact" 8 and "fact" 51) and calculates gains and losses for Navy Faith Groups along the "path to promotion".  Recall that this is "certified" data; all that I have done is couch it in a format which shows both relative changes between promotions and relative changes at promotions.  Notice that only the Non-Liturgicals lose "market share".

**Table 13**
**Gains and Losses Along the Promotion Pipeline**
**As a Function of Faith Group**

| PIPELINE ↓ | Catholic Group % | Catholic Cum GAIN | Liturgical Group % | Liturgical Cum GAIN | Non-Lit Group % | Non-Lit Cum LOSS |
|---|---|---|---|---|---|---|
| Percent at LTJG* | 0.0 | -- | 25.0 | -- | 75.0 | -- |
| % at LT* | 15.43 | 0.00 | 28.40 | 3.40 | 48.77 | - 10.20 *** |
| % Eligible for LCDR ** | 18.81 | 3.38 | 34.64 | 9.64 | 41.77 | - 17.20 |
| % at * LCDR | 18.04 | 2.61 | 36.08 | 11.08 | 41.57 | - 17.40 |
| % Eligible for CDR ** | 18.14 | 2.71 | 34.51 | 9.51 | 42.59 | - 16.18 |
| % at* CDR | 20.61 | 5.18 | 32.12 | 7.12 | 41.82 | -16.95 |
| % Eligible for CAPT ** | 26.95 | 11.52 | 32.05 | 7.05 | 36.28 | - 22.49 |
| % at* CAPT | 21.43 | 6.00 | 35.71 | 10.71 | 38.10 | - 20.67 |

\*    Data from Table XX (Fact 8).
\*\*    Data based on Table XX (Fact 51), with 5% for Special Worship.
\*\*\* This cell's entry is three times the entry in the adjacent cell; the entries at LTJG bore a 3:1 ratio; this is "wheeled" around the RC base line at LT.

123.    My assertion here is that logic argues that the timing of these losses reflects on the Corps, and not on the Chaplains.  There is "something" in the way the Corps operates which is having a differential, a disparate, impact on Non-Liturgical Chaplains and which, in that context, helps Catholic and Liturgical Chaplains.  The losses tend to occur at the promotion thresholds - "thresholds" are not "family" events, but flow points!

**Career Patterns, Drop Out Rates, and Timing**

124.    I took all the records from the Chaplain Histories (Volumes VIII and X, References 3 and 5) and I sorted them by year of Commissioning and Faith Group. (I separated the Non Liturgicals into Baptist and "Other", i.e. (1) Baptist and (2) Non-Baptist, Non-Liturgical). Then I prepared a spread sheet which counted the number of chaplains in each cohort and the number who had retired or otherwise left the service after X years, with "x" running from 1 to 37.  Full analysis of those results is here, in the Compendium, in Appendix K, the results themselves are here in Appendix H, together with Bar Charts for each set of cohorts.

125.    Table 14 shows the first of several important characteristics of these cohort data:

**Table 14**
**Drop Out Rates by Faith Group**
**Part A: the early years**

| Faith Group →<br>Period ↓ | Roman<br>Catholic | Liturgical<br>Protestant | Baptist | Non-Baptist<br>Non-Liturgical |
|---|---|---|---|---|
| First Year | 5.1 % | 0.3 % | 0.9 % | 0.6 % |
| First 10 Years | 52.5 % | 44.1 % | 37.9 % | 34.4 % |

126.    Is it ironic that the Roman Catholics are the least likely to stay in the Chaplain Corps during the early career years, before there are any significant promotion barriers?  [They drop out at a rate of about 5.2% a year.]

127.    Is it a measure of commitment to their careers that the Non-Liturgicals in general, and the Non-Baptist, Non-Liturgicals in particular, are the most reliable to the Corps - the most likely to persevere through the first decade? [Their loss rate is just 3.4 % per year.]

128.    I do not have a "statistical" answer to those questions, but I can report that these differences are statistically significant beyond the .001 level.  Catholics and Liturgicals "quit"; Non-Liturgicals  "Soldier on" with the job.

129.    Against that record, one cannot justify harboring the belief that the Non-Baptist, Non Liturgicals are dropping out of the Corps at the CDR threshold because "they have changed their

minds" about their commitment, or because (as Defendants' Attorney Hyde suggested, in Reference 9,  they have "family issues".)

130.    Let us look at the "Drop Out" rates further along:

**Table 15**
**Drop Out Rates by Faith Group**
**Part B: The mid Career Years**

| Faith Group →<br>Period ↓ | Roman Catholic | Liturgical Protestant | Baptist | Non-Baptist Non-Liturgical |
|---|---|---|---|---|
| 2 years prior to CDR Zone | 2.0 % | 1.9 % | 2.3 % | 1.6 % |
| 3 years after CDR Zone | 3.1 % | 8.2 % | 3.5 % | 11.7 % |

131.    Clearly, (1) the "drops outs" occur coincident with the Promotion cycle and (2) are more common (then) among the Non-Baptist, Non-Liturgicals than among the Roman Catholics, or any other "Faith Group".

132.    And this disparate loss rate also happens to the Non-Baptist Non-Liturgicals at the CAPT level:

**Table 16**
**Drop Out Rates by Faith Group**
**Part C: The Last Career Years**

| Faith Group →<br>Period ↓ | Roman Catholic | Liturgical Protestant | Baptist | Non-Baptist Non-Liturgical |
|---|---|---|---|---|
| 3 years prior to CAPT Zone | 5.1 % | 3.1 % | 3.5 % | 5.0 % |
| 4 years after CAPT Zone | 13.5 % | 11.7 % | 21.4 % | 25.4 % |

133.    The evidence shows that:

•       (1) every Faith Group attrits,

•       (2) Catholics are the most prone to early attrition, and least prone to later attrition.

•       (3) Early attrition is monotonic  - each year another largely fixed percentage of Chaplains leaves Active Duty. [This is nominally 5% per year for  Catholics, 4% per year for Liturgicals and 3% per year for Non-Liturgicals.]

- (4) Mid Career attrition seems to superimpose "steps" onto the steady pattern of attrition, steps which coincide with promotion opportunities.

- (5) Catholics gain "market share" at each rank transition and Non-Liturgicals lose it.

- (6) Some of these losses occur due to failure to be selected for promotion, and some occur coincident with failure to be considered - i.e. discharge or disappearance.

134.    The statistical evidence suggests that the Chaplain Corps personnel management system exerts a  systemic pressure on Non-Liturgical Chaplains.  This is a pressure which is strong enough to overwhelm those Chaplains' natural tendency to stay in Service, and they are both systemically and systematically denied promotion opportunity.  One might even wonder if there is not a preliminary "consideration" for promotion which takes place within the Officer Efficiency Report process and (a) expresses Corps bias, (b) alerts Non-Liturgical Chaplains that their opportunities are limited - or about to be limited, and (c) is an explicit pressure to retire.

135.    What is the Chaplain Corps *doing* to these people?

136.    When their careers are behind them, here is what happens to the careers of One Hundred Chaplains of each "Faith Group".   (See Appendix A and Appendix K.)

**Table 17**
**Career Pattern by Faith Group**
**Number of Chaplains Achieving/Surviving**

| Faith Group → Period ↓ | Roman Catholic | Liturgical Protestant | Baptist | Non-Baptist Non-Liturgical |
|---|---|---|---|---|
| Accessioned | 100 | 100 | 100 | 100 |
| Serve 10 yrs | 47 | 56 | 63 | 66 |
| Serve 20 yrs | 39 | 54 | 60 | 60 |
| Serve 31 yrs | 22 | 37 | 14 | 20 |
| Rise to CDR | 48 | 43 | 38 | 29 |
| Rise to CAPT | 23 | 22 | 15 | 11 |

137.    Not surprisingly, no matter how one looks at the detail in all this data, the pattern is consistent:

- (1)  Catholics and Liturgicals are "over-represented" in extreme longevity  - signaling that they were promoted and retained in the Corps in proportions in excess of their sub-population numbers.

- (2)  Catholics are at an average higher rank than their brethren of other denominations - signaling that they have an advantage in the promotion queue.

- (3)  Non-Liturgicals in general, and Non-Baptist Non-Liturgicals in particular are under-represented in length of service - signaling that they were not promoted (and had to leave). Had they been promoted, that record would have appeared in the History volumes as they would have been on Active Duty with their peers.

- (4)  Non-Liturgicals in general, and Non-Baptist Non-Liturgicals in particular are under promoted, for even those who survive into later periods have an average lower rank than their brethren.

148.    And *that* is what happened to all the Non-Liturgicals.

**So, what do the true records show?**

149.    If we use the biographical data from the Chaplains Corps History, Volume X, (see Reference 3), we can treat the files as individual personnel records and read the record. This may not look like a Promotion Study (Dr. Siskin has said that it is not one).  But (a) it is a reading of actual promotions; it is what you would tell your children if they asked you "Did you get the raise, Daddy?" (or Mommy).  They would not ask you "Do you even know if you were considered?"

Furthermore, (b) look at  the mess that the Navy's so-called  "promotion studies",  $N_S/N_C$, have given us.

150.    The following are real world statistics, based on the actual personnel records of over 1500 US Navy Chaplains who served on Active Duty in the Chaplain Corps for some portion of the decade 1982 through 1991.  These are not the residue of an incomplete model incorrectly applied. [And, it is to be noted, they are also not the truncated data base that is evident in Volume VIII of that History.]

151.    Table 18 (on the next page) deserves a careful read, not a dismissive, "it's not a promotion study."

152.    Note that:

- Religious Discrimination in Promotion is evident

    o    The promotion rates differ significantly (p<.01) both across ranks and among Faith Groups.

    o    At Commander, Roman Catholics get disproportionately more promotions than any other Faith Group and are 1.25 to 1.5 times as likely to be promoted as are Non-Liturgicals, who lose 25 to 30% of their fair share of the promotions at this level.

**Table 18**
**Chaplain Corps Demographics**
**Promotions and Releases**

| | Roman Catholic | Liturgical | Non-Liturgicals<br>Baptist    Other | Special Worship | Total |
|---|---|---|---|---|---|
| Percent Promoted LT | 95.63% | 98.48% | 97.80%  99.57% | 96.83% | 98.27% |
| Percent RAD | 0% | 1.01% | .55%      0% | 1.59% | 0 |
| Percent Promoted LCDR | 87.61% | 83.26% | 82.87%  77.78% | 71.15% | 82.70% |
| Percent RAD | 7.34% | 13.43% | 13.64%  17.28% | 15.38% | 12.98% |
| Percent Promoted CDR | 79.33% | 64.90% | 61.62%  54.84% | 53.57% | 65.71% |
| Percent RAD | 7.26% | 16.52% | 15.66%  21.51% | 25.00% | 15.17% |
| Percent Promoted CAPT | 52.46% | 52.63% | 52.17%  55.88% | 28.57% | 52.36% |
| Percent RAD | 4.92 % | 7.89% | 5.43%    4.92% | 0% | 6.29% |

Data from Reference 3.

153.  Note that

•    Religious Discrimination in Release from Active Duty is also evident:

> o    The RAD rates differ significantly (p<.01) both across  ranks and among Faith Groups.

> o    At Lieutenant Commander and Commander, Roman Catholics are disproportionately less likely to be released than is any other Faith Group and Non-Liturgicals lose two to three times as many of their candidates at these ranks as do the Roman Catholics.

154..  Personnel management in the US Navy Chaplain Corps works to the explicit benefit of Catholics in particular and to the detriment of Non-Liturgicals.  This is accomplished by promotion on the one hand and by the denial of consideration for promotion (through the mechanisms of Release From Active Duty or Involuntary Retirement) on the other hand.

155.   To forestall any possible argument that this "doesn't make sense" because the $N_s/N_c$ statistics speak otherwise:

I put a Simulation in the Addendal at this point.  The theory of the simulation was sound, but the model assumed that an In Zone Chaplain could be considered "in zone" up to three times.  The model was wrong.  But, as I said then, a model is not a fact.

Here are the facts:

**The Navy's figures are not what they are supposed to be.**

156.    The figures are not what one supposes them to be, given that they are called a Probability of Selection.  They are not *the* probability of selection.

157.    The figures are not what is properly produced in honest discourse; they are misleading; they confound Faith Group; they conceal material facts.

158.    The figures which the Navy gave to its experts, the CNA study (Reference 1) and Dr. Siskin (Reference 2) are not proper data.  They are not what they were represented as being.  The numbers are derivative tabulations, pre-digested, and the digestion has led, misled, the Navy's experts and advocates to faulty conclusions.

159.    The pre-digested Navy data are misleading for four reasons: (For a full discussion, see Appendix J):

•       First, they are a snapshot.

•       Second, the pre-digested data are confounded.

•       Third, the pre-digested data conceal the fact that most of the "considered" Chaplains have been considered (at least Below Zone) before.

•       Fourth, the pre-digested data conceal the fact that both Selected and Considered are affected by Promotion Board actions

**The CNA Study makes another, important, error.**

160.    I have used the data in both volumes of the Chaplains History to reconstruct what the Center for Naval Analyses (CNA) did in its study of "Promotions in the Navy Chaplain Corps" -

(a) I am able to verify their major conclusion that the promotion system favored Catholics, at least up to 1986 and

(b) I can explain why they did not see more of the bias.

161.   The CNA study talked about promotions to LCDR, CDR and CAPT and found a major, statistically significant difference, only at CDR. [Recall that CDR is *the* defining step in a Chaplains Career.]

162.   There is no "statistically significant" difference in the CNA data at LCDR (but the difference that is there favors Catholic Chaplains).

163.   There is also no  "statistically significant" difference at CAPT (but again, the difference that is there favors Catholics).  After 1986 there is a small difference in favor of the Non-Liturgicals, at Captain, perhaps because of the "Cream effect" (see Note 5), but this small difference is insufficient to offset the long term, collective disadvantage Non-Liturgicals endure in the Chaplain Corps' promotion (and retention) system.

164.   Here is the thumbnail story at the CDR level:

165.   The CNA study says that it looked at 1052 LCDRs in "year groups" 1957-1980, and it found a statistically significant "tail probability" for Roman Catholics, and Liturgicals.

•     The "tail probability" model that the CNA Study used to estimate statistical likelihood was improper. The trials (year to year) are not independent.  (a) Chaplains passed over in a previous year may be "considered" again - that is NOT "independent", (b) Chaplains selected are not considered again (of course); that too is not statistical independence.

•     Furthermore, Chaplains leave the Corps and are not replaced (at that seniority level), so the successive "trials" are not "independent."

166.   Thus, whether the CNA "tallies" are accurate or not,  their "probability" assertions are incorrect.  One may be able to conduct non-parametric statistical tests on the CNA data, but one can not, legitimately, use the statistical model that CNA tried to apply.  (For a full discussion of the issues here, see Appendix I.)

**There are two proper methods for determining if Promotions are biased.**

•     First, one can do a cohort study, where all the members of the cohort are accounted for and the results are summed across cohorts.  This is the "demographic" study as I have laid it out in the Addendal, complete with both promotion rates and drop out rates. [We cannot do that on the CNA data as a whole, because the drop outs (from the Corps) are dropped out (from the data).  That is, the data base does not record who has left the service before being promoted.  However, we can salvage something from the CNA Study - see below.]

•     Second, one can do a longitudinal study across promotion boards - see Appendix D in my Addendal.  Here one looks at what happens to each chaplain as he appears in front of successive Promotion Boards, until he or she is, eventually, promoted, or not (retired or released from Active Duty.).

167.   I have recently added the 1992 to 2002 Promotion Board results to my Appendix D. (See also Tables 11 & 12.)  Although there are still promotions which will accrue to some of the Chaplains who have been considered and not been promoted (yet), I can update the "so far" record:

**Table 19
Promotions to CDR
1981-2001
(Data from Appendix D, revised and expanded)**

| Data | Total | Baptist | Other Non-Lit | Liturgical | Catholic | Special Wshp |
|------|-------|---------|---------------|------------|----------|--------------|
| Considered | 901 | 203 | 133 | 325 | 198 | 42 |
| Selected | 512 | 110 | 71 | 180 | 128 | 23 |
| Percent | 56.8 % | 54.2 % | 53.4 % | 55.4 % | 64.6 % | 54.8 % |

168.   Catholics are still getting preferred treatment, but they did even better when they had two votes on the Promotion Boards:

**Table 20
Promotions to CDR
1981-1986
(Data from Appendix D, revised and expanded)**

| Data | Total | Baptist | Other Non-Lit | Liturgical | Catholic | Special Wshp |
|------|-------|---------|---------------|------------|----------|--------------|
| Considered | 267 | 64 | 27 | 96 | 73 | 7 |
| Selected | 149 | 27 | 16 | 52 | 49 | 5 |
| Percent | 55.8 % | 42.2 % | 59.3 % | 54.2 % | 67.1 % | 71.4  % |

**There is some good data.**

169.   Fortunately one does not have to rely on pre-digested data.  The Navy has provided extracts of the original documents and it is possible to reconstruct what has actually happened to the careers of some 2000 US Navy Chaplains.

170.   First, the US Navy Chaplain Corps publishes a History series.  Two of these volumes, References 3 and 5,  provide who's who type information on Chaplains who served more than incidental Active Duty at any time between 1972 and 1991.

171.   Appendix A, below,  summarizes the promotion history of "every" Chaplain who has served any substantial amount of active duty time in the U.S. Navy Chaplain Corps from 1 January 1982 to December 31, 1991.   About half of these Chaplains served all this time in the Corps; about a quarter retired or left before this period was over and about a quarter joined the Service during this period.

172.   This data can be used to perform a "promotion analyses". [See also Table 18, above. For Table 18, the records in the 1982-1991 portion of Appendix A were sorted by time in grade for every Chaplain who served at each Grade.  For those who served long enough to be eligible (flow points) the number who were promoted, the number who were not promoted, and the number who died, retired or were released was counted.)  Each record was counted only once for each rank.]

173.   Here, we are treating the records as a census (which they are) and recording the demographics, which also speak to promotion; we get the same answer, but with a different accent.  [We get the same answer if we avoid the old cohort confounding pothole we just criticized CNA for falling into- see Appendix I.]

174.   The theory in this analysis is that one can look at the Chaplains' promotion records as one might look at the personnel files themselves.  For those Chaplains who have "finished" their careers the record is complete.  We can read the dates of promotion and learn how long it took , if they were promoted, and what rank they stopped at, if they were not promoted. For those whose careers are in process, each Chaplain's highest rank is yet to be determined.  But we can read how long it took him (or her) to reach the level they are at.

175.   Whether one approves of this approach or not, the career patterns ought to be independent of Faith Group. There is no *a priori* statistical reason or theory for supposing that one Faith Group or another should be among the ranks disproportionately to its population ratio. [That is, if the Catholics are 18% of all Chaplains, there is no statistical reason for assuming that they would not also be 18% of the Lieutenants, 18% of the Commanders, 18% of the Captains, and if there were several dozen admirals, 18% of the Admirals as well.]  Criticisms of those who interpret demographic data are camouflage for reluctance to accept the findings - that "all other things are not equal" and that there is differential filtering (promotion and drop-out) based on Faith Group (sic) denomination, happening along the career path.

176.   Second, in discovery, the Navy has produced hundreds of pages of lists that present some data on the seniority, "Zone", Faith Group, and name of candidates who were considered eligible for promotion for various ranks for several periods between 1981 and 2002.  The lists with sequence numbers, endorser ID and Faith Group assignment, were reproduced in the Addendal as Appendix B, after processing by an Optical Character Reader.  Appendix D here correlates all these lists with the information in Appendix A and presents the LCDR, CDR and Captain Commander records of the "Promotion File."

177.   What follows now is an explanation of the promotion process and an application of these data to the question of religious bias.

**How the Promotion Process Works**

178.    The U.S. Navy Chaplain Corps Promotion System vocabulary (with "zones" and "flow-points", and singular definitions for common words such as "consider") is unfamiliar if not arcane; but the process itself is very similar to moving through the grades in Public High School:

| In Public High School | In the Chaplain Corps |
|---|---|
| • Students are separated by classes: Freshman, Sophomore, Junior and Senior | • Officers are separated by Ranks: Lieutenant Junior Grade (LTJG), Lieutenant Commander, (LCDR) Commander (CDR), and Captain  (CAPT) |
| • Each year all Students in each class are considered for promotion to the next class. | • Each year all Officers in each rank are considered for promotion to the next rank. |
| • Successful students are put forward to the next class | • Successful Officers are promoted to the next rank |
| • Unsuccessful students are sent back to redo the year - and be considered for promotion next year. | • Unsuccessful Officers are kept in grade for another year - and are considered for promotion next year. |
| • Every year a new crop of students arrive to start their educations, at the first level | • Every year a new crop of entry level Chaplains joins the Corps - at LTJG or LT. |
| • Some students drop out before they graduate. | • Some Officers leave the Service before they are promoted. |

179.    In the Chaplain Corps, a Promotion Board is convened each year to consider Officer candidates for advancement to the next rank.  The Board is presented with a list of "eligibles", sequenced by seniority.  The list is subdivided into zones, but it is still a sequential list running from the most experienced, but not yet promoted candidate, to the least experienced Officer who is eligible. The Officers sequenced high on the list are said to be "Above Zone", meaning that they have been considered for promotion before (at least once and perhaps several times) and were not selected.  The Officers in the middle portion of the list are the prime candidates for selection. These Officers have been in grade for the required number of years, plus or minus one, and they are said to be "In Zone." An Officer may only be "In Zone" once.  If selected he/she is promoted. If not selected, the officer may be considered again (Above Zone), or may retire or otherwise leave the Service.  The bottom of the list is called "Below Zone" and this is all the officers who could be promoted early if they were outstanding.  A Below Zone Officer may appear on the Below Zone list more than once.

180.    Promotion Board rules specify that every officer on the list is eligible and the rules require that if any officer Below Zone is promoted, then all his (or her) peers must also be "considered".

181.    At the end of the day there are two separate, related sets of data.

182.    On the one hand, we have Appendix A, the Officer Corps in general (the population of the high school, if you will).  This population can be counted as a whole and one can estimate the graduation rates.  Or it can be looked on as a collection of individual personnel records and one can scan each record and read the promotion rates for members of that class (by age, race, gender, or faith group).  This is a retrospective, promotion study. [Of course, one must be careful to be sure that his "student directory" has all the eligibles who matriculated, not just the ones who are still in school.]

183.    On the other hand, we have Appendix D, akin to the School Principal's pass-fail lists, the Navy's Promotion Board lists, with the eligibles listed and the selected officers "tick marked" and we can count the number of officers who were eligible and the number who were promoted, and calculate promotion percentages, for members of that class (by age, race, gender, or faith group).

**Both sets of data converge on the same truth:**

184.    The U.S. Navy Chaplain Corps does use religious affiliation as a factor in promotion, with Roman Catholics being the primary beneficiary of this preference and Non-Liturgicals being particularly disadvantaged.

185.    Appendix A is a list of all Chaplains who have served any substantial amount of time on Active Duty in the US Navy Chaplain Corps between 1971 and 1991.  This Appendix lists every Chaplain, by name, and provides a "who's who" type of summary of their career - including their religious affiliation and promotion record.  Presumably it lists every chaplain who was commissioned between 1/1/72 and 12/31/91, but we know that there are at least half a dozen such chaplains lost from the records.)  Here is what the Vol X data say about Religion as a Factor in Advancement in the U.S. Navy Chaplain Corps:

186.    Table 21 (on the next page) Demonstrates that:

•        Roman Catholics are given a "head start" on the promotion ladder by being commissioned at a higher grade than their non Catholic brethren. (P<.01)

                Nearly 60% of the Roman Catholic's who are commissioned into the Chaplain Corps, come in as Lieutenants.

                Only 10% of the Non Catholics who are commissioned into the Chaplain Corps come in as Lieutenants; the vast majority start their careers one rung down - at Lieutenant Junior Grade.

•        Roman Catholic (and Liturgical) Chaplains have higher promotion rates from Lieutenant to Lieutenant Commander and then from Lieutenant Commander to Commander than do Non-Liturgical and Special Worship Chaplains. (p<.01)

## TABLE 21
## Religion as a Factor in Advancement in the US Navy Chaplain Corps
## Biographical Data

|  | Roman Catholic | Liturgical | Baptist | Other Non-Lit | Special Worship | Total |
|---|---|---|---|---|---|---|
| **Commissioned LT** | **178** | **74** | **38** | **22** | **4** | **320** |
| **Commissioned LTJG** | **253** | **594** | **364** | **230** | **63** | **1504** |
| Percent Promoted to LT | 97.6 | 98.5 | 97.8 | 99.6 | 96.8 | 98.3 |
| Percent Promoted to LCDR | 87.6 | 83.3 | 82.9 | 77.8 | 71.2 | 82.7 |
| Percent Promoted to CDR | 79.3 | 64.9 | 61.6 | 54.8 | 53.6 | 65.7 |
| Percent Promoted to CAPT | 52.5 | 52.6 | 52.2 | 55.9 | 28.6 | 52.4 |
| **Percent Released from Active Duty** | **13.8** | **23.9** | **21.1** | **21.7** | **25.4** | **20.8** |

• The promotion rate differences at the first and last steps, Lieutenant JG to Lieutenant and Commander to Captain, are both statistically insignificant. The first step because "everybody" gets promoted. The last step because:

• Commander represents a special barrier in the careers of Navy Chaplains. Compared to Roman Catholic Chaplains, Liturgicals lose 14% of their Chaplains at this grade, Baptists lose 18%, and Other Non-Liturgicals and Special Worship Chaplains lose 25%. By the time a Chaplain is ready for consideration for his (or her) captaincy, all the "weak" Chaplains (in the institution's view) have been dropped by the wayside. (P<.001) [See Note 5, the Cream Effect, below, p 83.]

• Roman Catholics are kept in the Corps by both their promotion and by the denial of promotion to other faiths. The Released from Active Duty percentages show that the Non Catholic denominations are nearly twice as likely to be relieved of duty, discouraged to stay, or involuntarily separated as are Catholic Chaplains - and the Data in Appendix D will show that Catholics who have been "passed over" for promotion are much more likely to be allowed to stay in the Corps than are Non-Catholics. This gives the Promotion Board results the specious appearance of considering and rejecting Above Zone Catholics with

the "same" likelihood that they consider and reject candidates of other faiths. The difference is that the rejected Catholics are the same Chaplains year after year, while the Non Catholic Chaplains tend to be new candidates, as the ones rejected in previous years have left the service - see the Percent Released from Active Duty.

187.   Before Leaving this last point, an important feature of the public high school analogy needs to be addressed: the relationship between "Graduation Rates" and "Expulsion Rates".

188.   Of course the U.S. Navy Chaplain Corps does not have caps and gowns (well they have caps), but in any case, being promoted to Captain may be likened to graduation. And being "Released from Active Duty" may be a euphemism akin to expulsion.

189.   When one looks at loss rates in a High School, one challenges the school, not the student, if the rates are high and especially if the rates are unevenly distributed by gender, race or socio-economic status. In the Chaplain Corps, one might try to argue that drop out rates are indices of dissatisfaction and "measure" the degree to which different faith groups "fit in" with the Navy milieu. However, if the drop out or forced out rates vary widely by Faith Group that ought to be a concern to Corps management, indeed a concern to Navy management.

190.   And the loss rates vary dramatically:

**TABLE 22**
**Religion as a Factor in Advancement in the U.S. Navy Chaplain Corps**
**Biographical Data**
**(The Data in this Table are derived from Appendix A)**

|  | Roman Catholic | Liturgical | Baptist | Other Non-Lit | Special Worship | Total |
|---|---|---|---|---|---|---|
| **Number Commissioned at LTJG** | **253** | **594** | **364** | **230** | **63** | **1504** |
| Percent Promoted to CAPT | 25.3 | 16.8 | 13.2 | 8.26 | 3.17 | 15.5 |
| Percent Released from Active Duty | 13.8 | 23.91 | 21.14 | 21.74 | 25.40 | 20.8 |

191.   Table 21 presented the Chaplain Corps' rank-to-rank record (based on the actual careers of over 1500 Chaplains). Table 22 just looks at the bottom line. What percentage of the entry level Chaplains can expect to make it to Captain, and what percentage can expect to be "Released from Active Duty" before being allowed to retire.

192.   Clearly, the Roman Catholic Chaplains are a favored group in both regards.

193.    The Catholic Chaplains are nearly twice as likely to be promoted to Captain as the Liturgicals and Baptists, and three to eight times as likely to be promoted to Captain as Other Non-Liturgicals and Special Worship Chaplains.

194.    On the other side of the so-called performance scale, Roman Catholic Chaplains are only about half as likely to be "opted out" (whether by being driven away or asked to leave) as are their less favored colleagues. (p<.01)

195.    Appendix D is a collection of all the Promotion Board lists for all the candidates considered for promotion to Commander between 1981 and 1993. This Appendix lists every Chaplain, by name, who was considered by any O-5 Board during this time period. Most of these Chaplains were considered by more than one Board, some by more than ten Boards. Here is what this data say about religion as a factor in advancement in the U.S. Navy Chaplain Corps:

**TABLE 23**
**Religion as a Factor in Advancement in the U.S. Navy Chaplain Corps:**
**Promotion Board Lists**
**(The Data in this Table are derived from Appendix D)**

| FY 1981-1992 CDR Promotion Lists | Roman Catholic | Liturgical | Non Liturgical | Total |
|---|---|---|---|---|
| Number of Different LCDR Chaplains Considered | 128 | 193 | 182 | 503 |
| Number of LCDR Chaplains Selected (Eventually) | 86 | 101 | 96 | 283 |
| Promotion Percentage | 67.2% | 52.3% | 52.7% | 56.3% |
| Average number of times *Considered* | | | | |
| Promoted - total # of *considers* | 1.6 | 1.7 | 1.9 | 1.7 |
| Promoted - # of *considers* In Zone | 0.9 | 1.0 | 1.0 | .95 |
| Not Promoted (yet) - total # of *considers* | 4.3 | 3.3 | 4.2 | 3.8 |

196.    Table 23 is the mathematically correct method for analyzing the data from the Promotion Board lists.

197.    However, it should be emphasized, and understood, that these figures are underestimates of the final Probability of Promotion.

198.   Many of the Chaplains who were under consideration when this table ended, both Above Zone and currently Below Zone, will be promoted before their careers are over.  That is why using the Demographic Data (Appendix A) is in fact a more reliable assessment of the true probability of getting promoted than using the individual Promotion Board Decisions, which deal with just a snapshot of a yet to be completed process.  A photo at the end of the third furlong may be interesting, but it is not a photo finish.

199.   Notwithstanding this limitation, Table 23 demonstrates:

•       Roman Catholic promotion rates (67.2%) for selection to Commander are 25% better than Non-Liturgical promotion rates (52.7%).

•       Roman Catholics tend to be promoted sooner (average of 0.9 *considers, i.e.* before entering the In Zone) than Non-Liturgicals (average of 1.0 appearances on the In Zone list before being selected).

200.   As the record continues to unfold, it is only likely that the Roman Catholic Promotion Percentage will rise (as 22% of the remaining Above Zone Roman Catholic Chaplains are likely to be promoted - eventually - and only 13% of the Above Zone Non-Liturgicals are likely to be promoted - under current practice) and the Non-Liturgical Promotion Rate will drop further, proportionately, as twice as many of the surviving Below Zone, not yet promoted Non-Liturgical Chaplains as opposed to Catholic Chaplains will be forced out of the Service before being considered enough times to be promoted.

201.   The Navy's advocates in this litigation, the CNA Study (Reference 1) and their expert witness statement (Reference 2), both make fatal flaws in summarizing the Promotion Board records.

202.   We have addressed these earlier.

203.   Appendix D presents an opportunity to see the problems with *selected* and *considered*. Both references make two related errors in  *interpreting* the data in this Appendix..

•       The Navy's advocates  try to interpret the data one column at a time.

                This ignores both the fact that some of the candidates in that class have already been promoted, and it ignores the fact that many of the candidates in that class have already been *considered* and not only not been promoted, but have been driven out of the service.

                Some of these candidates have been *considered* again (and they are counted *again*), other candidates have not been *considered* again, thus effectively deciding that they will not be promoted.

The opinion givers' tallies, tally up, not across, and do not tally correctly!

- The Navy's Reference 2 advocates try to interpret the data without considering the counts for the Above Zone and Below Zone selections, or eligibles.

    Although the number of such selections is small compared to In Zone selections, the compounding effect is profound and the data effect is deceptive.  It calculates ratios:

$$N_s/N_C$$

    without including all the candidates who were selected, and without correctly counting the number of candidates who were *considered*.

204.   The statistics in both References 1 and 2 are confounded.

205.   The conclusions in both References 1 and 2 are unfounded.

## Some additional evidence of Religious Bias in Chaplain Corps Management

206.   When I first examined the Navy Chaplain Faith Group distribution, I was struck, as a psychologist and as a statistician, by the extent to which the Navy Chaplain faith distribution misaligned with the faith distribution of the lay Navy.  I took the misalignment as evidence of disproportional recruiting and unbalanced promotion, vis a vis faith.

207.   I am informed now that the Supreme Court has ruled in discrimination cases (Hazelwood) that the issue of "proportional" representation is not the relationship between the proportions in the served population vs the proportions in the serving population, but rather the proportions in the serving population and the proportions among those available (eligible, qualified) to serve.

208.   Thus, not having shown that the faith distribution of the pool of potentially available clergy was the same as the faith distribution of the population being served, the test (which is failed) is not:

---

### Table 24.  Navy Adherents vs Navy Chaplains

| Faith Group | Percentage of Population Served* | Percentage of Chaplain Corp** |
|---|---|---|
| Catholic | 35.8 | 20.0 |
| Liturgical | 12.5 | 34.9 |
| Non-Liturgical | 48.6 | 37.8 |

*   Data from the 09-99 and 02-00 Defense Manpower Data Center religious preference report.

** In the Defendant's Memorandum of Points and Authorities in Support of Defendant's Cross Motion for Partial Summary Judgment and in Opposition to Plaintiff's Motion for Partial Summary Judgment, Defendants present the number of Catholic (171), Liturgical (298), Non-Liturgical (338) and Total (854) Chaplains in the Corps as of July 2001.   Although there are slight changes in numbers, and thus proportions, from year to year, this date is certainly representative of all recent time periods.

---

209.   It may well be "reasonable to assume" that there is a correlation between the number of clergy in a given faith and the number of adherents to that faith, but it is a fact that not all faiths use, have, or require the same ratio of clergy to faithful.

210.    Thus, *a priori* probabilities aside, the proper test of religious discrimination in accessions is some form of:

---

### Table 25.  Navy Chaplains vs National Clergy

| Faith Group | Percentage of Population Available* | Percentage of Chaplain Corp** |
|---|---|---|
| Catholic | 29.2 | 20.0 |
| Liturgical | 18.8 | 34.9 |
| Non-Liturgical | 52.0 | 37.8 |

* Calculated from internet information available at http://www.adherents.com/rel_USA.html based on research by the Pew Research Council
** op cit

---

211.    This "model" (Table 25), which also shows religious prejudice in accessions on the part of the U.S. Navy Chaplain Corps, only applies if one assumes that the availability of clergy in the population at large parallels the population density of adherents to each faith, but making that assumption merely substitutes an assumption about the relative density of Chaplains by faith group in the total population for the same assumption about the availability of Chaplains in  a sub-population (the Navy).

212.    Interestingly, even if we had a list of ALL the clergy in the United States, we could not assume that that group was the "available" population of eligibles for service in the U.S. Navy Chaplain Corps, as U.S. Navy Chaplains are required to have qualifications that are not, or may not be, required of "all clergy" - viz: a Master of Divinity degree (or 90 semester hours of credit from an accredited seminary or theological school) and ecclesiastical endorsement from an Ecclesiastical Endorsing Organization recognized by the Department of Defense.  (cf Appx F.)

213.    Conclusion: As a statistician, and adherent to the "theory of parsimonious explanation" I am disposed to believe that the best proxy for the distribution of faiths among potential Navy Chaplains is the ***same*** as the distribution of faiths among the actual members of the U.S. Navy lay in general, there being no *a priori* reason to assume that the two populations have different faith proclivities.  So, I would still assert that Table 24 presents a valid test - a test which shows bias.

214.    However, given that the Defendants have asserted that this is de jure a "fundamentally misconceived frame of reference", I submit two alternatives:

215.   **First**: Presumably the population of Chaplains available to the Navy (and Marine Corps)  is similar to that which the Army and Air Force have mined - See Table 26:

---

### Table 26. Navy Chaplains vs Army & Air Force Chaplains

| Faith Group | Percentage of Navy Adherents* | Percentage of Navy  Chaplains** | Percentage of Army & AF Chaplains*** |
|---|---|---|---|
| Catholic | 35.8 | 20.0 | 14.8 |
| Liturgical | 12.5 | 34.9 | 36.3 |
| Non-Liturgical | 48.6 | 37.8 | 48.1 |

\*      See Table 24
\*\*     See Table 24
\*\*\*    Data from http://wfial.org/index.cfm?fuseaction=artGeneral.article_6

---

216.    Conclusion:  The first thing to note from Table 26 is that the Navy *could* have (some might say *should* have) recruited a higher percentage of Non-Liturgical Chaplains.  Instead the Navy chose to put emphasis on "bringing up its Catholic and Liturgical numbers" - at the expense of the Non-Liturgical Chaplains.

217.    Conclusion:  Setting aside the "desirability" (or not) of matching the distribution in the serving population to the distribution in the served population, Table 26 clearly demonstrates that the U.S. Navy Chaplain Corps did not match the proportion of Non-Liturgical Chaplains in its accession pool to the proportion of Non-Liturgical Chaplains available to the military.  Instead, they gave preference in accession to Catholics and Liturgicals - at the expense of Non-Liturgical Chaplains.

218.    The Army and Air Force Chaplain Corps conform to the faith distribution of the served Navy population, better than the Navy Chaplain Corps.  Clearly, the Navy had to work to get it wrong.

219.    Conclusion: The statistical argument demonstrating religious preference in the U.S. Navy Chaplain Corps accession program is established, again.  (P<.01)

220.    **Second:** Another possible  "frame of reference" is that  the population of Chaplains ***available*** for promotion must be ***the*** actual population of Chaplains who are accessioned into the U.S. Navy Chaplain Corps at the entry level.

221.    This test, laid out in Table 27, is not a test of the fairness of the accession process, but it is a test of the fairness of the promotion process, as well as a test of any internal "affirmative action" aimed at redressing the imbalance at the entry level.

---

### Table 27. Navy Promotions vs Navy Accessions

| Faith Group | Percentage of Chaplains Accessioned* | Percentage of Chaplain Corps** (As a whole) | Percentage of Chaplain Corps Above 04*** |
|---|---|---|---|
| Catholic | 18.8 | 20.0 | 27.6 |
| Liturgical | 36.7 | 34.9 | 41.3 |
| Non-Liturgical | 39.7 | 37.8 | 29.2 |

* This is the average percentage by faith group of new Chaplains accessed into the Corps between 1980 and 2002 (based on the Alpha Roster).

** op cit

*** This is the relative percentage of Chaplains (in column 2) who have been promoted to commander or above. (Using relative percentages neutralizes the effect of different numbers of accessions and promotions in different years.)

---

222.    Conclusion:  Clearly, even beyond challenging the inequity in their accession program, the retention and promotion practice in the U.S. Navy Chaplain Corps works not to rectify the disparity between the proportions of clergy in the Corps to either the proportions of faith groups served, or the proportions of clergy available in the market place- it exacerbates it.  At the highest ranks of their profession, the Catholic Chaplains gain nearly 70% in relative representation, while the Non-Liturgical Chaplains lose nearly 35% in relative representation. (P<.01)

223.    Conclusion: This result cannot be an accident, a statistical anomaly, or mere happenstance. It is the result of intentional or unintentional systematic practice and policy.

223.1  The statistical chance of this proportional shift happening in an unbiased setting is 1 in several billion.  An individual Chaplain has a better chance of winning the lottery than he/she does of having had a promotion-environment free of Religious Bias during his/her tenure in the U.S. Navy Chaplain Corps.

**RECAP & EPILOGUE**

224.    Catholic Chaplains get favored treatment when they join the Corps.

•       They are more likely to be commissioned as LT (instead of LTJG) than their Liturgical and Non-Liturgical peers.  (This gives them a career-long "head start" on the seniority ladder - See Table 21.)

225.    Catholic Chaplains get favored treatment during their careers.
•       They are promoted earlier (See Tables 11 and 23.)
•       They are promoted faster (See Tables 11, 12 and 23)
•       They are promoted further than their Non-Liturgical peers (See Tables 13, 18 and 21)

226.    Catholic Chaplains even get favored treatment when they leave the service.
•       They find it "easier" to get medical disability retirement (See Table 28)
•       They are more likely to be "retired" than simply Released from Active Duty (*Ibid*)
•       They are less likely to be *required* to leave the Corps.  ( See Table 28)

### Table 28.
**Comparison of Conditions of Departure for Chaplains leaving the Corps**

|  | Active Duty Chaplains | Medical or Disability Retirement | Retirement | Released from Active Duty |
|---|---|---|---|---|
| Roman Catholic Chaplains | 213 | 12 | 149 | 55 |
| Liturgical Chaplains | 335 | 9 | 188 | 160 |
| Non-Liturgical and Special Worship Chaplains | 648 | 6 | 133 | 229 |

227.    Table 28 shows that Catholic Chaplains get favored treatment when they leave the service.

•       They find it "easier" to get medical disability retirement;

        Catholics (in spite of the fact that their active duty numbers are barely 20% of the total Corps) are given nearly 40% (twice their "share") of the medical and disability retirements.  (p < .001)

- Catholic Chaplains are more likely to be "retired" than simply Released from Active Duty.

  Catholics who leave the service get to "retire" three times as often as they are "Released" to leave Active Duty service.

- Non- Liturgical Chaplains who leave the Corps are more often than not released from active duty, instead of being allowed to "retire".

228. This pattern of results is statistically significant p<.001.

**CLOSING COMMENTS  -  CLIQUES AND CABALS**

229.    During the five years I have worked with this data, it has always been evident, in the data, that Roman Catholics held a preferred place in the Chaplain Corps.

230.    I have wondered about the reasons for such preference and also about the mechanisms by which a preferential policy is carried forward.

231.    Three of the mechanisms for effectuating preferential outcomes for Catholics are clear:

   (1) The establishment of a separate "Faith Group" for Catholics, while all other Chaplains are lumped into pools of allegedly similar denominations,

   (2) Stacking the Promotion Boards so that there is always at least one Catholic (there used to be two) on every Board, and always assuring that the Catholics and Liturgicals (as a group) have a majority on every Board (or virtually every Board), and

   (3) arranging that when there is a Non-Liturgical Chaplain placed on a Promotion Board, that "slot" is usually given to a Southern Baptist.

232.    "Membership" on a Promotion Board is not "supposed" to color the Boards' decisions; individual Board Members are under SECNAV Orders and sign an Oath not to let their denomination, nor the denomination of the candidates under their consideration affect their recommendations for promotion.

233.    The data here demonstrate, with statistical certainty, that this is an intention which is not always consistent with the outcomes.

234.    At every Rank and in every time period, there is a tendency for Boards to promote a higher percentage of the candidates "like" themselves in denomination than candidates who do not share a denomination with any Board Member. At Commander, the rank which is used as the "choke point" to winnow the Corps, this "tendency" is statistically significant at the .01 level for In Zone Promotions and at the .025 level with respect to Above Zone Promotions.

235.    Before I end this report  I will return to a discussion of the mechanisms by which the preferred religion manages to maintain its benefits of preference.  My reason for writing this section of the Compendium however, is to address one aspect of this "Like Likes Like" phenomenon.

236.    Clearly, if there is a tendency for Board Members, on the average, to select for promotion candidates of the same denomination as themselves, then there is a mechanism for favoritism, patronage, and bias. And that opportunity "works" to the advantage of the Catholics, now - at least because the Catholics have an advantage in terms of presence on the Boards. But, equally, "what goes around can come around" and the opportunity for such improper decision making *could*, under a different Chief of Chaplains and different policy with respect to Board composition, lead to a different imbalance in promotions.

237.   Bias is bias and exchanging preference for Catholicism to a preference du jour, is not equity. "Parity" is not equity. "One-third, one third, one third" is not equity and Dr. Siskin's coin tossing stranger would be a cheater if he tossed five heads and five tails in every set of ten tosses - especially if he tossed Head, Tail, Head, Tail, Head, Tail, Head, Tail, Head, Tail, etc.  One can demonstrate that specious "consistency" is as strong an evidence of bias (control) as is disparate distribution.

238.   In 1984 there was a Seventh Day Adventist (CDR Herman Kibble) assigned to the LCDR Promotion Board.  Between 1984 and 2001 a Seventh Day Adventist served on an additional 11 Promotion Boards, Kibble sharing this duty with then Commander Barry Black, who rose to Chief of Chaplains.

239.   Without impugning the motives of Admiral Black, in fact I intend to applaud him, the *possibility* of bias on his watch has to be considered. If, in the end, there is no evidence of bias, that may show that "one man can make a difference" - but the main thrust on my concern here is that if one man can change things, one man can change them back, or change them worse, and the current U.S. Navy Chaplain Corps personnel management system is vulnerable to religion-based Promotion System corruption.

(1) There was a Seventh Day Adventist assigned to eleven Promotion Boards from 1984 to 2001 for which I have a complete list of In Zone eligibles by denomination; (the Navy can't find the Promotion Board Record for 1993.) [See also Appendix D, G and N.]

(2) There were five Seventh Day Adventist Chaplains before these Boards as eligible for promotion to LCDR and one as eligible for promotion to CDR - all six were selected.

Meanwhile, there were 543 Chaplains of other denominations before these eleven Boards, as In Zone eligible, of whom 330 were Selected, the difference in this pair of ratios, 6/6 vs 330/543, is statistically significant - but that does not prove that the Seventh Day Adventist Board Members "caused" this outcome - as one vote of five or six they could not have "mandated" this outcome, nor does it prove that they and the other Board Members colluded or engaged in "horse trading". [The pair of ratios, 106/185 vs 224/358, or 57% vs 63%, is actually in favor of the eligibles who did not share a denomination with any Board Member, but it is not statistically significant.]  Just to complete the list of options, this outcome is consistent with the non Seventh Day Adventist Board Members "doing the right thing", and voting without regard to their own denomination, or the individual candidate's denomination.  And since Admiral Black was clearly "on the way up" and in fact the Chief of Chaplains during this period, "his" Boards seem to have behaved largely in accordance with their oath of office

240.   The fact that one man could model or cause a change in Board membership and Board behavior, should indicate that Board membership ought not to be controlled by Religion, and that if Board denominational membership influences Board denomination decisions, then the denominations which are present on the Boards should be randomly chosen, not contrived, and their influence should also be tempered by (diluted with) non-denominational votes.

241.   Besides the influence mechanisms evident in Board Composition and Board voting, the U.S. Navy Chaplain Corps has other tools for indirectly influencing personnel management outcomes.

242.   There is at least one administrative mechanism which obscures some of the bias in the promotion process -that is the "statistical" rule that only In Zone promotions count in published estimates of "Probability of Selection".

243.   This counting practice omits Above Zone promotions from the discourse (but not from the personnel files) and Catholics benefit from both "extra" promotions and from the public appearance of parity.

244.   I have not been able to unravel details of the process or processes by which the following results are achieved, but there is clear disparate impact in:

> (1) The fact that Catholic Chaplains are "excused" from exposure to the SER process at a statistically significantly better rate than Non-Liturgicals.  A higher percentage of Non-Liturgicals are said to be "eligible" for Involuntary Retirement than are Catholics. (See also Appendix L.)

And

> (2) The fact that Non-Liturgicals are disproportionately not among those "considered" for Promotion, compared to Catholic Chaplains. A lower percentage of Non-Liturgicals are said to be "eligible" for Promotion than are Catholics. (See also Appendix K.)

245.   The U.S. Navy Chaplain Corps personnel management system is rife with evidence of, and opportunity for, religious preference. Some of this preference is systemic (i.e. based in the way the system operates); some of this preference originates in personal bias and seems facilitated by systemic processes, and some of it is explicit: e.g. Faith Groups (one for Catholics, alone, and three for "everybody else") and a Catholic on every Promotion Board, etc.

246.   Statistical analysis can demonstrate the fact of this bias, and suggest some amelioration, but ti cannot root it out.

247.   The evidence here suggests that:

> (1) the Navy's "Preferred Religion" has been Roman Catholic for several decades,

> (2) that inroads into an institutionalized patronage system can be made (were made) when the Chief of Chaplains was a Special Worship Chaplain (instead of a Catholic Chaplain), and therefore

> (3) the Chaplain Corps personnel management system, as presently configured, is demonstrated to be vulnerable to specific religious influence.

**CERTIFICATION**

248.   I certify under the penalties of perjury, (a)  that this is my work, (b) that I am competent to analyze this data, and (c) that the conclusions represented here are true, complete, accurate and scientifically certain to the best of my knowledge and belief.


   /S/ Harald R. Leuba, PhD
Harald R. Leuba, PhD       9 June 2005
Potomac,     Maryland              USA

# References

1.   Smith, Karen D, Ivancovich, John S., Reese, David L. "Promotions in the Navy Chaplain Corps", Center for Naval Analyses, Alexandria, Virginia 10 March 2000 CRM D0000149.A1/SR1.

2.   Siskin, Bernard R, PhD "Statistical Analysis of the Promotion Selections in the U.S. Navy Chaplain Corps During the Time Period 1991-2002" Expert Witness Statement in the matter of Ronald Wilkins, et. al. vs United States of America, The Center for Forensic Economic Studies, June 2003. And  Siskin, Bernard R., PhD "Statistical Analysis of the Promotion Selections in the U.S. Navy Chaplain Corps During the Time Period 1991-2002" Expert Witness Statement in the matter of Ronald Wilkins, et. al. vs United States of America, SUPPLEMENTAL REPORT, The Center for Forensic Economic Studies, September 2003. (Reference 2 - CORRECTED.)

3.    Halley, Michael D. Editor  United States Navy Chaplains 1982-1991: Biographical and Service Record Sketches of Chaplains on Active Duty During the Period I January 1982 - 21 December 1991  Volume X in the History of the Chaplain Corps United States Navy, Chaplain Resource Board, Norfolk, Virginia, June 1993.

4.  Defendants' proposed "Material facts as to which there is no genuine issue in support of their motion for summary judgment" in Ronald Wilkins, et. al. vs United States of America, Feb 2005.

5.    Martin, H. Lawrence , Editor United States Navy Chaplains 1972-1981: Biographical and Service Record Sketches of Chaplains on Active Duty During the Period 1 January 1972 - 31 December 1981  Volume VIII in the History of the Chaplain Corps United States Navy, NavPers 15507, Navy Publications and Forms Center, Philadelphia, PA.

6.    Berto, Veronica K. "Declaration"; In the matter of Ronald G. Wilkins  vs The United States of America, et al., 30 September 2003.

7.   Memo dated 28 November 1994, "PRECEPT CONVENING THE FY-95 SELECTION BOARD TO RECOMMEND COMMANDERS IN THE CHAPLAIN CORPS FOR SELECTIVE EARLY RETIREMENT", From Secretary of the Navy to RADM Anderson B. Holderby.

Reference 8.  Chapman, Kimric J. "Declaration;  In the matter of Ronald G. Wilkins  vs The United States of America, et al., 26 April 2005.

Reference 9.  Statements made by Counsel for the Navy (Michael Hyde) at the Hearing in Federal District Court (for the Southern District of California) on this matter in San Diego, CA on 13 May 2005.

## Incorporated References:

A.    Declaration of Harald R. Leuba, in The United States District Court for the District of Columbia, Case Number 1:99CV002945(RMU), in the matter of Chaplaincy of Full Gospel Churches v The Honorable Richard J. Danzig, et. al., ~~to~~ 15 June 2000.

B.    Declaration of Harald R. Leuba, in The United States District Court for the District of Columbia, Case Number 1:99CV002945(RMU), in the matter of Chaplaincy of Full Gospel Churches v The Honorable Gordon R. England, 12 May 2002.

C.    Declaration of Harald R. Leuba, United States District Court, Southern District of California, Case No. 99cv2272-TW (LSP) in the matter of Lieutenant Patrick M. Sturm v The United States Navy, 18 May 2002.

D.    Declaration of Harald R. Leuba, United States District Court, Southern District of California, Case No. 99cv1579 in the matter of Ronald Wilkins v United States of America, et. al., 29 April 2003.

E.    Supplemental Expert Opinion of Harald R. Leuba, United States District Court, Southern District of California, Case No. 99cv1579 in the matter of Ronald Wilkins v United States of America, et. al., 12 October 2003.

F.    Addendal Declaration of Harald R. Leuba, United States District Court, Southern District of California, Case No. 99cv1579 in the matter of Ronald Wilkins v United States of America, et. al., 17 February 2005.

G.    Addendal Declaration of Harald R. Leuba, United States District Court for the District of Columbia,  Case No. 99cv0028945(RMU)  in the matter of Chaplaincy of Full Gospel Churches v The Honorable Gordon R. England, 31 March 2005.

H.    Reclama of Harald R. Leuba, United States District Court, Southern District of California, Case No. 99cv1579 IEG (BLM) in the matter of Ronald Wilkins v United States of America, et. al., 7 April 2005.

# DATA APPENDICES

I have attached a lot of data.

I have done this in the service of analysis.

I do not expect collaboration, although this data would facilitate that.

I do not expect anyone to actually transcribe this data and verify my analyses - although one could do that. [But if one wanted to do that, I can and will provide a computer disk with this data.  We are engaged in a small community here and I could easily produce data disks for all interested parties.]

The real reason one must provide a copy of his/her data is so that other parties to the dialogue can verify findings or correct significant errors, even in one's own work.  No sensible person looks for and then dwells on isolated data entry errors; these always occur, but even an overview of the "other party's" data file can be helpful.  It establishes a frame of reference and it identifies the variables at issue (sometimes these lie in the interstices.).

> **Case in Point**: The Navy (see Reference 8) found "93 errors" in my Addendal's Appendix D, page 12. They could not have done that had I not provided the "raw data". And I would not have been disabused of my interpretation.  No one is served if error is allowed to perseverate.

> Embarrassing though it may have been, I appreciate being informed of my error. The data here should facilitate further correction, should that be necessary, but I promise not to interpret silence as accedence.

> **Case in Point:** The CNA study (Reference 1) reported startlingly high promotion rates.  It looks to me as though the CNA used cohort data, and that data had been truncated by "drop outs".  No other explanation fits.  However, had the CNA study appended a data set, even a cursory review of it could have answered this question.

Finally, had Dr. Siskin (Reference 2) appended a copy of the data he used, I could have saved scores of hours replicating his analysis line by line from the records produced at my deposition. I know that my labor costs are not "his problem", but respect for our shared discipline and professional standards of referencing should have encouraged him to "spend the paper" to copy (or at least provide a sample of) his data.

In any case, for what it's worth, here is the data I used in this Compendium:

Appendix A.  All Chaplains who served on Active Duty in the US Navy Chaplain Corps
            1 January 1972 through 31 December 1991 (See References 3 & 5).

            This Appendix has been revised from my Addendal, to include Chaplains from
            Reference 5.

            The Appendix includes a discussion of data truncation.

Appendix A2  This Appendix collects individual Chaplain records from Appendix A
            (indirectly - through Appendix D) and then compares them to the Endorser
            information from Appendix C, for the Boards before which these names
            appeared as candidates.  This is back up data, by name,  for the first "Like Likes
            Like" test.

Appendix B.  Consecutive Sequence Numbers for Promotion Boards 0-4 to 0-6; 1991 to 2002
            168 sheets of paper Bates Stamped WO1710 to WO1871,  Produced as Exhibit 1
            at the Defendant's Deposition of me on October 1, 2003.  These sheets have been
            processed through an Optical Character Reader and were printed in my Addendal
            as Appendix B.

            This Appendix is NOT reproduced here, even though I have made a couple of
            minor corrections in it.  It is not reproduced because it is now clear that this data
            is the **same** data as Dr. Siskin used - and the reason for including a data
            Appendix is so that the "other side" can see what "this side" has used for data.
            Since Dr. Siskin (and the Navy) had this data before I did, there is no point in
            "sacrificing a tree" to it.  (That is, there is no reason to copy it here.  If any one
            doubts that "my" copy aligns with "their" copy, I will provide a computer file.)

Appendix C.  Chaplain Corps Promotion Board Composition

            Spread sheet listing Year, Grade, **Name,** and membership (by Endorser) for every
            Promotion Board from 1977 to 2002, reported on in the Navy produced
            discovery documents.  In the copy of this Appendix appended to this
            Compendium, I have included each Board Member's name.

Appendix D.  Promotion Board results for all Chaplains considered for Promotion to LCDR
            by any Board between 1 October 1981 and 30 September 2002.

Plus        Promotion Board results for all Chaplains considered for Promotion to CDR
            by any Board between 1 October 1981 and 30 September 2002.

Plus        Promotion Board results for all Chaplains considered for Promotion to CAPT
            by any Board between 1 October 1981 and 30 September 2002.

Since the Addendal, which I prepared as quickly as I could, I have expanded the CDR file there through the period used by Reference 2 (Dr. Siskin), so that "our" records could be compared on a "common basis". And I have here provided similar tables for LCDR and CAPT. I have tried to correct any errors I have made, had made, in the CDR file, in reconstructing, misconstruing that some Chaplains who were "considered" In Zone, had been "considered" In Zone, before, or after that "consider". This misinterpretation, precipitated by poor photocopying in the records that the Navy produced in a different law suit, did not, does not, materially affect the conclusions reached in the Addendal, nor those reached here. It did lead to an otherwise avoidable investment in time to layout, literally, the promotion trail - but that was only a delay and an inconvenience, an obstacle and a hindrance, not an impenetrable screen. Within the limits driven by the data quality, these Appendices list *every* Chaplain who was officially eligible for promotion (and who was supposed to be considered) as well as *every* Chaplain who was selected for promotion to LCDR, CDR or Capt.

I want to point out that I am "vindicated" or at least my error is "mitigated" exactly because I included the data Appendix in the Addendal. As I have said, the reason one includes a copy of his Data is so that users, reviewers, and nay sayers can see it and check it.

Appendix E.   Comparison of Tallies of Eligible, Considered, and Selected Officers; Tables comparing the information in Reference 2 with the information in Appendix B

This Appendix was prepared for the Addendal to show the relationship between the data the Navy gave me at my Deposition and the data which Dr. Siskin used. After preparing this Appendix, I surmised that we had the "same" data, although my copy was much much harder to use. And after submitting the Addendal, Attorney Hyde has confirmed that this data is the "same" as the data that was given to Dr. Siskin - so this Appendix is (a) no longer central to my work and (b) not reproduced here.

Appendix F.   Faith Group Codes; Assignment of Denominations to Faith Groups

This Appendix lists every denomination in the data used here, the Chaplain Histories, volumes VIII and X, and the Data provided by the Navy.

I have listed the denominations alphabetically by common name, as well as alphabetically by Abbreviation. On each list, I have included the classification (i.e. Faith Group) assigned by: (1) the Navy (in Dr. Siskin's data), (2) the Navy (in the data the CNA used) and (3) me, in Appendix A - although I have stepped back from the Navy's "Faith Group" taxonomy in favor of groupings which isolate rather than dilute the distribution of favor.

Appendix G.   Like Likes Like

This Appendix presents the collected raw data and the Summary Table for examining the issue of (1) Promotion Board Member denomination vs (2) Selection or Non Selection of Candidates before that Board, based on candidate denomination.  That is: Do Board Members have a tendency (collectively) to select candidates "like" themselves in denomination?

The Appendix is divided into five sections:

Captain Boards from 1981 to 2000
CDR Boards from 1981 to 2002
LCDR Boards from 1981 to 1989
LCDR Boards from 1991 to 2002

and

Boards with an SDA Chaplain Member

Appendix H: Survival Cohorts

This Appendix presents the data from Appendix A in a complex sort and format.

There are four spread sheets here.  Each spread sheet is four pages (sets of nine or ten columns) wide and 9 pages long.  Thus, each spread sheet requires 35 or 36 sheets of paper to print.  Each sheet is numbered down the left hand side from 1 to 292, and each "column" is numbered on lines one and two.  The individual pages here could be taped (back) together into one big spread sheet. [But it is probably easier to work with an electronic copy in Excel.  If you need one ask for it.]

There is one spread sheet for each of "my" Faith Groups:  (1) Baptist,
(2) Liturgical, (3) Non-Baptist/Non-Liturgical, and (4) Roman Catholic.
I did not print the sheet for Special Worship, as there are too few in total to support a coherent cohort analysis.

Each sheet formats all the Chaplains from that Faith Group by Commissioning year Cohort, and then physically lines up the cohorts so that (1) each year group has its own column and (2) so that Chaplains who have been in the service for the "same" number of years are on the same row.  An incidental format feature is that each "data base" is in a separate section of the Spread Sheet, so Chaplains who joined the Corps before the start of the coverage period for Volume VIII of the Chaplains History, i.e. before 1971 are in one section, Chaplains commissioned between 1971 and 1982 are in another section and Chaplains commissioned between 1981 and 1992 are in a third section.

This display and analysis were necessary to look for "the missing chaplains" (See Appendix K.) and to demonstrate the cohort confounding in the CNA Study. (See Appendix I.)

In addition to the four spread sheets, this Appendix also includes Bar Charts for the four main Faith Groups and three data sets.

Appendix I    Critiquing the CNA Study (Reference 1)

Appendix J    Critiquing Dr. Siskin's Report (Reference 2)

Appendix K    What Happened to all the Non-Liturgicals

Appendix L    Critiquing the SER Process - Part 1 June 2005
                                       Part 2  October 2002
                                       Part 3 February 2005

Appendix M    Analysis of Promotion Board Composition and Promotion Board Decisions

The discussion here, which starts with material from the Addendal, demonstrates (a) that Chaplain Board composition is controlled by religious preferences and then it demonstrates (b) that those preferences influence the Boards' decisions -

(1) measured in toto,
(2) assessed on a One Catholic/Two Catholic basis, and even
(3) assessed on a denomination by denomination basis.

Appendix N    Why/How the time period 1991-2002 is not a "representative" sample

This Appendix draws attention to promotions which will occur which are not yet in the data base, and also notices both that the denomination of the "leadership" in the Chaplain Corps changed during this period, and that that change seems to have influenced the expression of denomination based bias in, at least, Promotion Board decision making.  The fact that one man could change things, leads to the question of how one insures that "things" do not go back to how they were, or, get worse.

Appendix O   Only One In Zone Consider?

This Appendix shows  (a) that a Chaplain can be considered more than once, and (b) illustrates how the data which were produced led me to assume that that is commonplace.

Appendix P   Critiquing Material Facts as to which there is no issue

> I do not recant nor withdraw my opinion in the Addendal wherein I critiqued the alleged material facts as to which it was asserted that there was no substantial dispute.  I did and do dispute many of those so-called "facts".  However, having weighed in, in the Addendal, there is no need to repeat the process or the analysis here.

**NOTES:**

These Notes are my personal, professional opinion.  They are colored by the fact that my mother was an English teacher (and I enjoy the written word), as well as by the fact that my father was trained as a Jesuit (and I enjoy tight reasoning), but they are also colored by the fact that I am a trained and experienced psychologist, operations research analyst, personnel specialist and statistician.

These perceptions, beliefs, recitations are not colored by the opinions of Plaintiffs' or their counsel - I do not even know their opinions on the matters I discuss here.

I removed the notes from the main body of the text because although they set the stage for my analysis, they are not part of it.  I put them here (rather than in the trash), because they set the stage for my analysis.


Note 1. **DISTINCTION, DIFFERENCE AND DISCRIMINATION**

1.1    In human affairs, we require distinction to exercise discretion; we require differentiation to support determination.  We require definition and division to control distribution.  Without the capacity to tell each other apart, we cannot establish order, manage resources, or assign roles and missions; without the capacity to tell each apart we cannot reward performance, punish deprivation, or assign responsibility.

1.2    Without the capacity to tell each other apart, we cannot discriminate.

1.3    And therein lie both the origins of our growth and the seeds of our dereliction.

1.4    All distinction facilitates; some of it facilitates management; some of it facilitates mischief; and some of it facilitates both.

1.5    My father used to wax on at the dinner table about the little town in Northern Arizona named Paraffin.  He loved the parable of paraffin.  All the "stuff" that the little town made was shipped to Phoenix, and sold as "paraphernalia".  All the people of Paraffin were loyal supporters of the local High School team, the "Paraphernalians", and when outsiders came to town, they were quickly dubbed, "Paraphernaliens".  This reduced much erstwhile discord, because although the "outsiders" were clearly "outsiders", most folks couldn't tell the Paraphernalians from the Paraphernaliens.  Dad's point, his argument, was: Beware of people who say "There are two kinds of people".  What they usually mean is "their kind" and "your kind".

1.6.    I am reminded of this story because differentiation is an undercurrent in the present case, and a trap in statistics.  First, in order to test for a significant difference, one has to have a "difference" to look at, or for, either in results or in treatments.

1.7    Second, if one is not careful about how the two (or more) classes (of either results or treatments) are defined, one can either decompose into statistically insignificant trivia at one extreme, or aggregate into an indistinguishable slurry at the other

1.8    On the other hand, definition, demarcation, and differentiation can lead to discrimination - as noted up front, in the title for this note.

1.9    My Father's story came back to me as I was re-reading my earlier Statements in this matter, and noticing that the "bounds of the Faith Groups" were set by the Navy.

And then, I had just written, in Appendix M, p17, ¶ 89:

> "Neither the U.S. Navy's "Faith Group" categories, nor its management of Chaplains based on these groups, is faith neutral.  Data analysis shows that the consequence of this management practice is disparate impact, the de facto establishment of Catholicism as the "favored" religion within the U.S. Navy Chaplain Corps, relegation to "ugly step sister" of all the other "mainstream faiths", and treatment as "ugliest step sister of all", of all the Non-Baptist, Non-Liturgical denominations.

1.10    The Navy separates, defines, taxonomizes, **manages** its Chaplains in four "Groups" or "faith clusters": (1) Roman Catholic, (2) Liturgical, (3) Non-Liturgical Protestant and (4) Special Worship.

1.11    If one stops and takes stock, this categorization, whether it has "historic roots" or not, is *Roman Catholic* in perspective.  I do not need to make a "Federal Case" over this (although of course it IS now a "Federal Case"), but let me suggest why this "grouping" seems "Catholic-centric" in origin.

1.12    **<u>First</u>**, notice that in fact this categorization is, in reality, Catholic vs "other".

1.12.1 Only the Catholics are singled out for their own "group" or "cluster".

1.12.2 The "others" are separated, not on the basis of denominational prevalence (Baptists outnumber Catholics 2 to 1), but on the basis of "*degrees of separation*" from the Catholic Church.

1.13    The Navy's second "group" is "Liturgical" (Episcopal, Lutheran, Methodist, Anglican, Presbyterian, Congregational, Greek Orthodox, etc) - Churches which offer services to which a Catholic is "allowed" to go, if a Catholic service is not available.

1.14    The third Group is "Non-Liturgical", denominations which Catholics will "allow" into Heaven only by dogma exemption, ("Baptism of desire"?)

And

1.15    The Fourth group is the genuine outsiders (from a Catholic perspective): Jew and Muslim, Seventh Day Adventist and Unitarian, Mormon and Christian Science - who believes that those denominations form a cohesive "faith cluster"?

1.16    **Second**, if there is any residual reservation about accepting that the Navy's schema is "Catholic in focus",  imagine that instead of "Roman Catholic, Liturgical, Non-Liturgical Protestant, and Special Worship", the Admiralty had said: "Papist, Christian, Anti-Baptist, and Heathen"?

1.17    Names are more than mere labels.  They reveal underlying belief, and - in this case - underlying prejudice, prejudice which is still operating, in the World - and in the U.S. Navy Chaplain Corps.

1.18    The problem with the Navy system, not just its taxonomic system, but its personnel management system for accessioning, retaining and promoting Chaplains, is not just, or not only, that they have institutionalized Catholicism; it is that they have failed to establish a personnel management system which addresses the reasons why we have Chaplains in the military, in the first place, by law - so that FREE EXPRESSION has an opportunity.

1.19    What the Navy should do, should have done, is:  (1) measure (poll) its community requiring service, (2) assay the availability of indigenous resources in the areas where their community is deployed (how many synagogues are in Iraq?), and (3) acquire, by contract or accession, the requisite mix of Chaplains (they are not fungible*), and then (4) allocate those Chaplain resources appropriately.

1.20     But that is just a statistician's reading of the data - what could lie under the Navy's so-called Faith Groups and what could alleviate or eliminate the biases which that set of definitions leads to.  I am not redressing wrongs; I am only presenting the data that says they exist.

_____
* Clergy are no more fungible than musicians.

Note 2.  **Defining a Sample**

2.1    It is not inappropriate to define one's sample so that it excludes cases where the phenomenon of concern cannot occur.  In fact, failing to exclude such cases can be improper. For example, if one wonders whether tall men wear larger shoes or smaller shoes (do all parts of them grow longer, or do they save on "foot" to grow leg) one should build a sample of tall men, not a sample of all men.  And if some of these tall men are known to suffer from a disease which lengthens bones, this group should be treated as a sub-sample.

2.2    On the other hand, if one has a sample of CDR promotions and the evidence is that that sample reflects preference for Catholics, one should not pool the CDR promotions with LCDR promotions, where there is no evident statistically significant preference for Catholics, as to do so dilutes and obscures one's finding re the CDR's  - as it has done in Reference 2.

Note 3. **Allusory Illusory Collusory**

3.1    There are fundamental a priori reasons for having reservations about commissioning Chaplains to pass Promotion Judgment on other Chaplains.  Unfettered patronage is one risk; institutionalization of a preferred faith is a more serious risk, but the most profound reason not to put Chaplains in charge of judging other Chaplains, is that temptation *per se* undermines both the integrity of the individual and the trust base of the served population.

3.2    To be sure, one may not approach a Chaplain performing a proper duty with an assumption that he or she is per force biased, no more than one may approach a Judge with the assumption that he or she is posturing for appointment to a higher Court; but that said, the "appearance" of a conflict of interest, allusion to "political incorrectness",or widespread rumor and concern for impropriety, while justifying neither indictment nor presumption, certainly provide grist for an hypothesis.

3.3    Here is the hypothesis:

3.4    In a setting where the Roman Catholic denomination is always represented on the Promotion Board, where Roman Catholic Chaplains routinely join the Chaplain Corps at a higher rank than most other Chaplains, where Roman Catholic Chaplains are the presumptive beneficiaries of numerous "perks" of office - for example being allowed to stay in the Service past their "required" retirement age, being given "medical" retirements disproportionately more often than their peers, passing through a revolving door to the Reserves, where they earn seniority and benefit for further promotion, etc, in a setting like that, there is both the appearance of the Navy's having established a "preferred religion", and the fact of widespread resentment among those who are not the beneficiaries of such preferential treatment. [I cite as proof that there is widespread concern over religious favoritism the statements to that effect in Reference 1.]

3.5    In a setting where every Promotion Board has a Roman Catholic Chaplain as a voting member, the non-Catholic members of the Board see both the possibility of patronage, and the opportunity for it.

3.6    Maybe the coincidental occurrence of a denomination shared between a candidate and a Board member plants the first seed for concern.  Maybe the simple fact that some denominations are more common (in the Corps) than others, sets the stage for concern.

3.7    But whether justified by real favoritism, or feared because of assumed favoritism, as Chaplains of various denominations participate is this process, their discipline erodes, their conscience moderates, their priorities and overriding sense of fairness integrate, and they take the first step on the slippery slope - and accept, perhaps it is just signaled by body language, it need not be an explicit, articulated "deal", they accept an "understanding" that if they "allow" such and so a candidate who is sponsored by some other Board Member to be Promoted, then they can/may accept that Member's support for a candidate of their choice.

3.8    That is the hypothesis.  It is not an assumption, not a speculation; it is a psycho- logical explanation for how what might look like "horse trading" within a Promotion Board could evolve there.

3.9    I am not saying that this erosion of compliance with the written letter of their instructions needs to be explicit, nor even that it is diabolical.

3.10    What I am saying is that the Hypothesis that I want to test here is that:

•    the tendency to "horse trade" promotions among Board Members is a complex psycho- dynamic with origins in fact (perhaps misinterpreted or misunderstood fact - Catholic dominance of the Corps, and coincidental "good luck" on the promotion Boards of candidates who share a denomination with some Board Member)

•    the tendency to "support" ones own kind is a natural human (tribal archetype) imperative.

•    the opportunity to allow, let, cause, express, permit (what have you) bias to play out in a Promotion Board is dependent upon both: (a) there being "some" members of your tribe (your denomination) among the pool of those to be considered and (b) there being a "critical mass" of experience with the system so that trading, sponsoring, fostering, negotiating, (what have you) a group decision occurs to the parties, or is at least is recognized by "a majority" of them when it appears.

3.11    This hypothesis suggests that if I separate Promotion Boards into individual denominations, not just so called  "Faith Groups", and I look at what happened to the candidates whose records appeared before those Boards, I will see a "patronage" effect in exact proportion to the extent to which the Board has

(a) members with institutional experience with the way Boards operate and
(b) members with choices before them that may confound denomination and quality.

3.12    The first desiderata (if that is the word) is measured by the commonality of that denomination on Promotion Boards - as this indexes both the likelihood that the serving Board Member has served before, as well as the likelihood that he or she "knows a fellow Chaplain" with whom frank conversations about the internal workings of the Promotion Board process have taken place.

3.13    The second condition occurs when there are "enough" candidates of various denominations that one could exercise discretion or preference.  One cannot exercise "discrimination" or " bias" if everybody is to be promoted; likewise, one has no opportunity to exercise "patronage" (and no "quid" to trade for a "pro quo") if there are no members of the pool of eligibles with whom one shares a denomination.

3.14    Again, I am not impugning motives, speculating about intrigue within the Board, or even suggesting that anyone is less than honorable and conscientious; I am laying out a careful hypothesis to test the already suggested "Like Likes Like" proposition.

3.15    We should see the phenomenon, if it exists, when there are "experienced" Promotion Board Members and a representative pool of candidates.  We should see less of the phenomenon, even if it exists, when the Board Members "don't have a dog in that fight" and have not been in a position to learn that they can "trade their vote".

3.16    Again: the quotation marks in the last paragraph signify an allusion, an *hypothesis* hinting at collusion, a question of whether what we see is an illusion; I am not suggesting that there has been a break down in military discipline.

3.17    I take it as a very hopeful sign, in fact, that the Boards with Seventh Day Adventists (and the Chief of Chaplains) on them did "better" in this regard, in recent years, than seems to be the record in the "80's.


Note 4.  **Recent Promotion Board Performance**

4.1    I surmise that the strikingly high ratio of 15.6 for Seventh Day Adventist's in Table M-10 is an artifact of the recent, frequent presence of now Admiral Barry Black on Promotion Boards - and I may comment in passing that the performance of the Boards in terms of Catholic favoritism has diminished in these years - Catholics are still doing a little better than everybody else and Non-Baptist, Non-Liturgicals are still doing a little worse, but the recent record is improved in this regard.  Does this show that one man can make a difference? Does it show that the Navy is "trying to improve" (in the wake of the lawsuits)?  Is this evolutional change or a temporary improvement?  Can full equity/parity follow?  Or are the systemic barriers insurmountable? Could another Chief of Chaplains turn a blind eye on rampant patronage?

See also Appendix N and "Cliques and Cabals" page 66 ¶ 229 above.

**Note 5**

## The Cream Effect

5.1.   Cream separates from milk and rises to the top.

5.2.   Outstanding candidates for consideration are referred to as "the Cream of the Crop."

5.3.   People who have overcome disadvantage are often noticed to be "superior", or the "creme de la creme".

5.4.   Consider, for instance:

- Jim Thorpe
- Paul Robeson
- Jackie Robinson

and

- Dr. Mary McCleod Bethune

5.5.   Each of these minorities rose above  "disadvantage" (prejudice) and were recognized as outstanding - once they were recognized at all.


5.6.   The "cream effect" refers to the psychological construct that when the upper end of a distribution is singled out, they will (almost by definition) be "better" than "average" - at least on the dimension upon which they were selected.

5.6.1  If a classroom full of students is arranged by height and the tallest 10% are singled out - those students will, of course, be "taller than average".

5.6.2  Similarly, if a pool of Chaplains is sorted by "quality" and the "best" are promoted - the promoted Chaplains should be, by force of selection, "better than average".

5.7.   In a circumstance where there are a series of tests to be passed, with different criteria at each test, it is possible for there to be more "discrimination" (prejudice)  at one level than another.

5.8.   In the US Navy Chaplain Corps, promotion at the LT level shows little or no effect of religious preference. ["Everybody" gets promoted - almost everybody gets promoted.] See Table 1 (on the next page.)

**Table 1.**
**U.S. Navy Chaplain Corps**
**Advancement to Lieutenant**
(Data from Addendal Table 12, page 32)

| Faith Group | Percent Promoted | Percent Drop Out |
|---|---|---|
| Roman Catholic | 95.63 | 0 |
| Liturgical | 98.48 | 1.01 |
| Baptist | 97.80 | 0.55 |
| Other Non-Liturgical | 99.57 | 0 |

5.9.    But the situation changes at the Commander Threshold. About half the "Blue Collar" clergy have their careers halted by this barrier.  Many are forced out of the service and many more are simply passed over as "not qualified": (Reference 1 found and reported the "preference" for Catholics at this rank.)

**Table 2.**
**U.S. Navy Chaplain Corps**
**Advancement to Commander from LCDR**
(Data from Addendal Table 12, page 32)

| Faith Group | Percent Promoted | Percent Drop Out |
|---|---|---|
| Roman Catholic | 79.33 | 7.26 |
| Liturgical | 64.90 | 16.52 |
| Baptist | 61.62 | 15.66 |
| Other Non-Liturgical | 54.84 | 21.51 |

5.10.    Then, at the Captain level, the Cream Effect begins to take hold.  The Chaplains who have survived the promotion gauntlet this far are "better than average" and if they are Non-Liturgicals, they are much better than "average".

**Table 3.**
**U.S. Navy Chaplain Corps**
**Advancement to Captain from CDR**
(Data from Addendal Table 12, page 32)

| Faith Group | Percent Promoted | Percent Drop Out |
|---|---|---|
| Roman Catholic | 52.46 | 4.92 |
| Liturgical | 52.63 | 7.89 |
| Baptist | 52.17 | 5.43 |
| Other Non-Liturgical | 55.88 | 4.92 |

5.11.    It is possible to quantify the shift in relative merit at the Commander level.

•    Nearly sixty percent (59.97 %) of the Roman Catholics who are accessioned into the Chaplain Corps rise to Commander, so they are the "top 60%" or notionally an average of 70 (the median of 40 to 100). [This is not precise, but it is roughly right and easy to visualize, as the middle of the *remaining* distribution.]

•    Fewer than thirty percent (27.62 %) of the Non-Baptist, Non-Liturgicals who are accessioned into the Chaplain Corps rise to Commander, so these Commanders are in the "top 30%" or notionally an average of 85 (the median of 70 to 100).

5.12.    Which makes the Non-Baptist, Non-Liturgical candidates for Captain about 20% "better" on the average [85/70 = 1.21], than their Catholic competitors.  This is a large otherwise relative advantage in quality to overcome, and at the Captain level, the Non-Baptist, Non-Liturgicals do a little better than the Catholics - but not as much better as the measured* quality difference could justify, but better.

_____

* This is a measured and real quality difference.  It is *measured* by the action of the various Promotion Boards who selected these candidates in the face of existing prejudice; it is a real difference if (and only if) one stipulates that there is no fundamental difference in quality of the "average" accessioned Chaplain, across Faith Groups.

(A statistician's view:)                    Note 6
**WHAT THE NAVY CHAPLAIN CORPS SHOULD DO RE PROMOTION BOARDS**

6.1.     As recently as 15 to 20 years ago the Navy assigned Two Roman Catholics to every Chaplain Corps Promotion Board, and had six officers on each Board.

6.2.     Without admitting that this was "wrong", or an improper introduction of Religion into purely secular matters, at present, the Navy populates its Chaplain Corps Promotion Boards with four (or five) Chaplains and one general line officer.

6.3.     Among the Chaplains the Navy always includes at least one Catholic, and usually includes one or two Liturgical Chaplains; sometimes they include one "other" Faith Group Chaplain.

6.4.     The Navy says (Reference 9) that they "have" to do this because (a) Congress requires them to have Chaplains on Chaplain Boards and because (b) they need to match the Faith Group distribution on the Boards to the Faith Group distribution of the candidates for promotion so that there will be someone on the Board who can "understand" that Faith Groups' Chaplain experience in the Corps as reflected in that Chaplain's personnel record. [Because the Navy does indeed "manage" by Faith Group, one may accept the proposition that Chaplains of different Faith Groups have different experiences in the Corps, and that these differences will be reflected in the personnel records.]

6.5.     The law does require that Chaplain Corps Promotion Boards include a Chaplain ("a" Chaplain, not "nothing but Chaplains".)  The idea, and it applies to all services and all branches within each service, is that there should be somebody on the Board who represents continuity of the Branch and who can assure compatibility and the "good of the Service" in the promotion decisions which are made for that Branch of the Service.

6.6.     Under the present circumstance, with only five officers on the Board, and the majority of them "White Collar"clergy, the opportunity for "bias" is undeniable - and the evidence here suggests it has been irresistible.  Understandably, one may not approach this issue with the assumption that the Religious Chaplains will "behave improperly" just because they have individual faiths, but in a context where the evidence shows that a statistically significant number of them have behaved improperly in just this manner, at least on occasion, one is reminded of the old "Cold War" Paradigm: trust but verify.

6.7.     Under the present circumstance, with only five officers on the Board, and the majority of them "White Collar" clergy, the voting can be "stacked".  If (a) each individual Voting Member rates all the candidates 0, 25,  50, 75 or 100 (or 1, 2, 3, or 4; or even 0 to100 for that matter), if (b) nominally half the eligibles are to be promoted and if (c) the "decision" to promote or not is based on the majority, then one Board Member can "block" any eligible candidate from promotion just by "zeroing" him or her. [This happens as follows: The other three or four voting Board Members assign numbers to all the eligibles.  By definition of what

"average" means, they will, collectively assign "above average" scores to half the pool of eligibles - and all of those candidate would be promoted - but for the "zeroing" of one of them by the remaining Board Member.  If the Board minutes reflected the votes, if the Board discussed the votes, if the Board had more voters, this "zeroing" could be isolated, or understood in situ, or explained, or diluted by additional votes.  In each of these instances, accountability and "verification" would be introduced.

6.8.    One could recommend, as was done by the CNA Study: (a) fewer Chaplains on the Promotion Boards, and (b) larger Promotion Boards.

6.9.    Finally, the voting processes, the internal Board deliberations, need to be, if not more open or more public, at least more accountable.

**Note 7**

**DATA ERRORS**

7.1.    I have been told, in my career, that no matter how carefully one proof reads, "there is always a typo."

7.2.    The typographical errors and mispeaks remark on the quality of the editing, but, within reason, they do not detract from the logic of the analysis.

7.3.    Similarly, as cited in the CNA study (Ref 1), "every large data base" has some base line error rate - perhaps as much as 1 to 2% in this instance.   Such errors are "maddening" (and embarrassing)  to the analyst, but they seldom make any substantive difference to the statistical conclusions drawn from data summaries. [The standard error of the mean is much smaller than the standard error of the distribution.]

7.4.    In Dr. Siskin's tabulations (Ref 2) he makes a few tally count errors.  These probably embarrass him, but they do not trouble me.  We both would correct them, given the opportunity to do so, but the summary statistics are not materially affected.  I challenge his logic and his statistical model, but his counting errors are neither systematic nor consequential.

7.5.    Similarly, there are undoubtedly tally count errors in the tables I have submitted here. These embarrass me, and I would correct them, will correct them, if noticed and if I am given an opportunity to do so.  Indeed, in this Compendium I have corrected the errors I have noticed, but no doubt there are still a few errors remaining here - random and inconsequential.

7.6.    On the other hand, there may be a "whole family" of "errors" in the tables in my Appendix D.  These occurred because the raw data, the materials produced by the Navy, were poorly photocopied and incomplete. [See the preamble to the Appendix.] There were illegible lines, missing pages and even missing "precepts". [There were no documents at all relating to promotions to CDR for the years 1991 and 1993 and none relating to Captains for the years 1990 and 1993.] I had to use the "structure of the neighborhood" to "fit" the data I had into a pattern which matched the existing data as well as I could.  I made many assumptions to accomplish this; my assumptions were systematic with respect to the surrounding data, and reliable in terms of Faith Group assignment.  In fact, if I could not find a data match in the surrounding lists (and from the Chaplain's History), I introduced a data line named "REDACTED" and I assigned the right Faith Group to that "name" based on the Endorser information listed in the collateral records, if I had collateral records, e.g. Appendix B - the same data which Dr. Siskin used - except that he was given the records for 1990, 1991 and 1993. [I do not know why or how he was given the data that the Navy said (Reference 6) that it does not have, but he says (page 1, Exhibit 10, Ref 2) that he was given the theretofore missing data.]

7.7.     In any case, embarrassed and chagrined though I may be, these errors in Appendix D do not compromise either my conclusions nor the integrity of my analysis.  The errors are not systematic with respect to any "hypothesis" and in the end they are not consequential with respect to my analysis.  What the errors do say, since the Navy says it has found 93* of them (Ref 6), is that the Navy has the data that it cannot find - elsewise, how can they "proof read" my Tables?

7.8     I submit, and challenge: if the data in Appendix D were complete and accurate, the statistical conclusions would be the same: Roman Catholics are given more promotions at both the CDR level, in proportion to their numbers, than are any other Faith Group - especially more than are assigned to Non-Baptist, Non-Liturgicals.  This includes both In Zone and Above Zone Promotions.

_____
* I do not "admit" that there are 93 errors.

Without seeing the whole data file, I cannot verify that count.  However, I do not deny that it is possible that there are 93 errors in my data file.  In fact, it would be a remarkable achievement if there were only 93 errors.  With 907 Chaplains to sequence, say 35 In Zone at a time over a 20 year period, there are more than $1.27 \times 10^{45}$ possibilities, so if I made only 93 errors in sequencing the records, my error rate is: .000000000000000000000000000000000000000000001.

# INDEX

| Topic | Page # | Para # |
|---|---|---|
| 93 Errors | 90 | 7.7 |
| | 90 | fn |
| Above Zone - about a fifth of all promotions are AZ and BZ | 27 | 40 |
| Above Zone not counted | 59 | 203.. |
| Above Zone promotions -22% go to Catholics | 58 | 201 |
| | Ref 2 | Ex 11, p3 |
| | J-4 | 15 |
| Above Zone Promotions, although few, they are important | 59 | 203.. |
| Accessions are driven by Religious Preference p<.01 | 62 | 219 |
| Accessions not treated by/w "Affirmative Action" | 63 | Table 27 |
| Accessions vs Military Clergy | 62 | Table 26 |
| Accessions vs National Clergy | 61 | Table 25 |
| Admiral | 52 | 175 |
| | 67 | 239 |
| | 83 | 4.1 |
| Admission to Managing by Faith Group | 22 | 1 |
| | 25 | 26 |
| All 907 LCDRs considered for CDR | 40 | fn |
| Allusory, Illusory, Collusory | 81 | Note 3 |
| Appendix D, defined | 57 | 195 |
| Arrogant (?) | 7 | 30 |
| | 25 | 26 |
| As record unfolds, more Drop Outs will occur | 58 | 200 |
| As record unfolds, more promotions will happen | 58 | 200 |
| Avoids, Navy, discussing second part of "promotion" | K-2 | 6 |
| Bar Charts | 75 | Appx H |
| | | Appx H |
| Below Zone - defined | 28 | 42 |
| Below Zone - Infrequent Promotions | 28 | 42 |
| Below Zone - Missing Data - Doesn't matter here | 27 | fn |
| Below Zone - one CME Promotion in 1991 | 27 | fn |
| Bias by degrees | 84 | 5.7 |
| Bias in a statistical sense | L-4 | 15 |
| Board - See Promotion or | | |
| Board - See SER | | |
| Board Performance, Recent | 7 | 30 |
| | 83 | Note 4 |
| C.N.A Study found statistically significant difference at CDR | 50 | 161 |
| C.N.A. Study - Confirmed - in part | 49 | 160a |
| C.N.A. Study - What's wrong with it | Appx | I |
| C.N.A. Study and reference to the Cream Effect | 50 | 163 |
| C.N.A. Study confounded Year Group and "considered" | Appx J | |
| C.N.A. Study used improper statistical method | 50 | 165-66 |
| Cabals and Cliques and vulnerability | 66 | 240 |
| | 68 | 247(3) |

| | | |
|---|---|---|
| Career Path is more than Promotion | 42 | 119 |
| | | |
| Catch 22 | L-1 | 5 |
| | L-5 | 26 |
| Catholic on Board as a Model for others | 28 | 47 |
| Catholic Chaplains are twice as likely, and 3 to 8 times as | 57 | 193 |
| Catholics are only about 1/2 as likely to be opted out | 57 | 194 |
| Catholics are at average higher rank (sooner) | 46 | 137.2 |
| Catholics are kept in the Corps, not "dropped out" | 55 | 186…. |
| Catholics are over represented in longevity | 46 | 137.1 |
| Catholics are promoted sooner and faster | 42 | 115 |
| | 58 | 199.. |
| Catholics get a head start | 54 | 186 |
| | 54 | Table 21 |
| Catholics quit | 44 | 126 |
| Catholics, at CDR, get 1.25 to 1.5 times more promotions | 47 | 152 |
| Catholics, favored treatment at end of careers p<.01 | 64 | 226-228 |
| | 64 | Table 28 |
| Catholics, favored treatment during careers p<.01 | 64 | 225 |
| Catholics, favored treatment when they join Corps p<.01 | 64 | 224 |
| Celibacy, Hyde allusion to | K-4 | 12 |
| CDR is *the* Barrier in an Officer's career | 27 | 38 |
| | 39 | 110ff |
| | 55 | 186 |
| Chaplain Corps is rife w/ evidence of religious preference | 68 | 245 |
| Chaplain Corps is vulnerable to religious influence | 68 | 247(3) |
| | 69 | 249 |
| Chaplains - requirements for | 61 | 212 |
| Chief of Chaplains, SDA | 41 | 113.2 |
| | Appx M | 114 |
| Cliques and Cabals | 66 | 269 |
| Cohorts - What Happens to 100 Chaplains | 46 | Table 17 |
| Cohorts - Year Groups | 44 | 124 |
| | Appx I | Appx H |
| Cohorts, Surviving | Appx H | Appx I |
| | I-17 | Table 14 |
| Coin Tossing | 67 | 237 |
| | Appx J | 51 |
| Collusion or Arithmetic | 7 | 28 |
| | 29 | 51 |
| | 29 | 55-56 |
| | 83 | 3.16 |
| Combining Subgroups can obscure real differences | 38 | 105 |
| Commander is *the* step | 6 | 23 |
| | 39 | 110-110.1 |
| Commander represents a special barrier | 27 | 38 |
| | 55 | 186… |
| Conceal material facts | 49 | 157 |
| Confounded | 49 | 159.1 |
| | I-2 | 11 |

| | | |
|---|---|---|
| Confounded cont. | I-19 | 11 |
| "considered" | 3 | 7 |
| | 4 | 13 |
| "considered"  cont. | 36 | 91 |
| | 42 | 120 |
| | 43 | 121 |
| | 47 | 149 |
| "considered"  cont. | 49 | 159 |
| | 50 | 165 |
| | 54 | 180 |
| "considered"  cont. | 58 | 203 |
| | 68 | 244(2) |
| | K-1 | 1-5 |
| "considered"  cont. | I-8 | 32 |
| | Appx J | 45-50 |
| Considered vs Selected | 58 | 203 |
| | Appx K | Table 5 |
| Corps puts Systemic pressure on Non-Liturgicals | 46 | 134 |
| Corps, Chaplain - see also Chaplain Corps | | |
| Cream Effect, The | 84 | Note 5 |
| Critiquing Dr. Siskin's Study | 76 | Appx J |
| Critiquing the C.N.A. Study | 76 | Appx I |
| Critiquing the SER Process | 76 | Appx L |
| Data - Incomplete | 73 | Appx A |
| Data Appendices - description of | 72 | |
| Data Disks, available | 72 | |
| | 73 | |
| Data Errors | 88 | Note 7 |
| Data Period Confounding | Appx I | Appx N |
| Data Period has not run its course | 42 | 118 |
| Data Period, Favorable | Appx N | |
| Data, why Publish it | 72 | |
| Decade for all Promotions to occur | 1-7 | 25 |
| | I-8 | 36 |
| Defining a Sample | 79 | Note 2 |
| Demographic data are better basis for estimating Probability | 58 | 198 |
| Demographic study critics are camouflage | 52 | 175 |
| Denominational presence on boards vs outcome | 31 | Table 3 |
| Denominational treatment contaminates promotion decisions | 37 | 93 |
| Difference in promotion rates - found by both Refs | 39 | 106 |
| | 39 | 109 |
| Difference in promotion rates - None | 37 | 94 |
| Difference in promotion rates - Not None | 37 | Table 9 |
| Differences in promotion rates - reason for | 35 | 86 |
| Differences mater, and can confound data | 38 | 100-104 |
| Distinction, Difference and Discrimination | 77 | Note 1 |
| Disparate impact | 4 | 13 |
| | 44 | 123 |
| | 45 | 132 |
| | 67 | 237 |

| | | |
|---|---|---|
| Disparate Impact (cont.) | 68 | 244 |
| | 78 | 1.9 |
| | L-4 | 17 |
| Dr. Siskin see also Siskin. Dr | | |
| Dr. Siskin's data will still show Catholics do best | 42 | 114 |
| Dr. Siskin found a difference and pooled it away | 39 | 108 |
| Dr. Siskin, See Reference 2 | Appx | J |
| | | |
| Drop Out - Catholics | 44 | 126 |
| | 45 | 133.2 |
| Drop Out - Non-Liturgicals | 44 | 128 |
| Drop Out, Forced out, Discouraged Out | 42 | 120 |
| | Appx | K |
| Drop Outs -  Hyde's belief that its "family issues" | 44 | 129 |
| Drop Outs - Mid Career | 45 | Table 15 |
| Drop Outs - The Last Career Years | 45 | Table 16 |
| Drop Outs reflect on Corps not Chaplains | 56 | 189 |
| Drop Outs 1988-1997 | I-15 | Table 12 |
| Earlier - see Faster, Sooner | | |
| Eligibles, lift of for Promotion | J-9 | 45-50 |
| Endorser -  Defined | 28 | 45 |
| Endorser -  Sample Codes | 30 | fn |
| | Appx F | |
| Endorsers - Presence on Boards | 33 | Table 6 |
| Error(s) | 1 | 3 |
| | 3 | fn |
| | 8 | Errata |
| Errors, 93 | 72 | |
| | 90 | 7.7 |
| | 90 | fn |
| Errors, C.N.A. | Appx I | |
| Errors, Reference 2 (Siskin) | Appx J | |
| Error, mine, re In Zone | 9 | 3 |
| | 19 | Findings |
| | 53 | 179 |
| Error, mine, re In Zone (continued) | Appx O | |
| | 8 | Error 2 |
| | 88 | 7.6 |
| Ethical thing, Intelligent men do the | Appx M | 114 |
| Every dimension of Personnel Management | 25 | 25 |
| Exchanging preferences | 67 | 237 |
| Faith distribution mis-alignment | 60 | 199 |
| | 60 | 206 |
| | 60 | Table 24 |
| Faith distribution mismatch, Navy exacerbates it p<.01 | 63 | 222 |
| Faith Group Conceals denominational differences | 37 | 93 |
| Faith Group Confounding | 75 | Appx F |
| Faith Groups - Confounded | 22 | fn |
| Faith Groups - Defined | 22 | 6 |
| | 26 | 35 |
| Faith Group - Not the name of the disenfranchised class here | 32 | 72 |

| | | |
|---|---|---|
| Family issues | 44 | 129 |
| Faster - Catholics get Promoted | 58 | 199 |
| Fatal flaws | 58 | 201 |
| | I-2 | 10 |
| | J-5 | 23 |
| FOS Failure of Selection | Appx L | |
| Fungible faith (denied) | 79 | fn |
| Fungible faith (suggested) | 2 | fn |
| Gains and Losses along the promotion pipeline | 43 | Table 13 |
| Head start, Catholics get | 55 | 186 |
| | 54 | Table 21 |
| | K-7 | 25 |
| High Promotion Rates | 19 | 3rd . |
| | 42 | 117 |
| | I-5 | 18 |
| | K-5 | 17 |
| High School Drop Outs | 56 | 189 |
| High School Promotion Model | 53 | 178 |
| Honorable men | Appx M | 114 |
| Husbanding Catholics | 2 | fn |
| Hyde, Attorney Michael Q. | 2 | fn |
| | 11 | 1 |
| | 30 | 57 |
| | 44 | 129 |
| | Ref 9 | |
| | 74 | Appx E |
| Hyde (continued) | L-1 | 1 |
| Hyde's belief that its "family issues" | 44 | 129 |
| | K-4 | 12 |
| In Zone - my misinterpretation | 74 | Appx B |
| | | Appx O |
| In Zone - passed over Chaplain is at a disadvantage | 27 | 41 |
| Incorporated References | 71 | |
| Intelligent men | Appx M | 114 |
| Interpreting Records one column at a time | 58 | 203 |
| Jewish Chaplain, Management of | 2 | fn |
| Jewish Chaplain to London | 23 | 8 |
| LCDRs considered for CDR 1981 to 1992 | 40 | Table 11 |
| LCDRs considered for CDR 1991 to 2002 | 41 | Table 12 |
| Law, the, re Board Membership | 6 | 23 |
| | 86 | 6.5 |
| Learned Behavior | 34 | 80 |
| Leuba, Prior Statements by | 71 | |
| Like Likes Like - collusion - see Collusion | 7 | 28 |
| Like Likes Like - defined | 26 | fn |
| Like Likes Like - gross comparison | 27 | 35 |
| | M | 71-82 |
| Like Likes Like - Horse Trading | 30 | 57 |
| Like Likes Like - Horse Trading - Examples? | 30 | 59 |
| Like Likes Like - How Much is okay? | M-25 | 125-26 |

| | | |
|---|---|---|
| Like Likes Like - is still prejudice | 34 | 81 |
| Like Likes Like - proclivity differs with experience | 34 | 83 |
| | 35 | 85 |
| Like Likes Like - w/o Catholics | 31 | 65-68 |
|     Like Likes Like - w/o Catholics (cont.) | 32 | Table 4 |
| Like Likes Like - permeates the Corps | 27 | 39 |
| | M | 93-135 |
| Loss Rates, Drop Out Rates | 56 | Table 22 |
| Losses occur at Flow Points | 44 | 123 |
| | 45 | 133.4 |
| Losses reflect on the Corps not the Chaplains | 44 | 123 |
| Lottery, Chaplain has better chance there than in Corps | 63 | 223.1 |
| Low Promotion Rates | K-5 | 17 |
| Majority of Board is Catholic and Liturgical | M-2 | fn |
| Managing by Faith Group | 22 | 1 |
| | 25 | 23 |
| Market Share | 43 | 122 |
| Market Share - Catholics gain, Non-Lits lose | 46 | 133.5 |
| Material Facts alleged to be w/o dispute | 2 | fn |
| | 3 | fn |
| | 11 | 1.. |
|     Material Facts alleged to be w/o dispute (cont) | 19 | |
| | | 5th . |
| | 25 | 24 |
| | 43 | 122 |
|     Material Facts alleged to be w/o dispute (cont) | 76 | Appx P |
| | L-2 | Table 1 |
| Mechanisms which support Religious Bias | 66 | 231 |
| | 68 | 241-244 |
| | L-6 | 23-26 |
| Mischief | 77 | Note 1 |
| | J-10 | 57 |
| Misleading - Failure to count Above Zone | 41 | 113 |
| Misleading - Time Period not completed | 41 | 113.1 |
| Missing Non-Liturgicals | 42 | 120 |
| | 75 | Appx H |
| | Appx | K |
| Navy Data - can't find 1993 | 27 | 36 |
| Navy's Data is not Probability of Promotion | 49 | 156 |
| Navy's experts have been misled | 49 | 158 |
| Navy's Figures are not what they are supposed to be | 49 | 156 |
| Non Liturgicals soldier on | 44 | 128 |
| Non-Baptist, Non-Liturgicals get the Short End of the Stick | 35 | 89 |
| | 37 | 82 |
| Non-Catholics Like Likes Like - Above Zone | 29 | 53 |
| | M | 122 |
| Non-Catholics Like Likes Like - In Zone | 29 | 51 |
| Non-Lits lose 2 to 3 times as many as Catholics at LCDR/CDR | 48 | 153 |
| Non-Liturgicals are under promoted | 47 | 137.4 |
| Non-Liturgicals are under represented in length of service | 47 | 137.3 |

| | | |
|---|---|---|
| Notes | 77 | |
| Options with respect to Religious Bias | 68 | 248 |
| Out of Zone Promotions Correlated to Board Appearances | 33 | Table 6 |
| | 33 | 75 |
|     Out of Zone Promotions Correlated to Board Appearances (cont.) | 34 | 77 |
| Parable of Paraffin | 77 | 1.5 |
| Parsimonious Explanation, Theory of | 61 | 88 |
| Passed Over - see also FOS (Failure of Selection) | 27 | 41 |
| Passes Over Twice as basis for dismissal | 26 | 29 |
| Passed Over Catholics stay in Corps | 56 | 186….. |
| Patronage | 29 | 54 |
| Personnel Management in Corps benefits Catholics | 48 | 154 |
| Personnel Management in Corps disadvantages Non-Lits | 48 | 154 |
| Personnel Records, vol X as | 47 | 149 |
| Pipeline, losses in | 43 | Table 13 |
| | Appx K | |
| Pre-digested data | 49 | 159 |
| Prior Statements by H. Leuba | 71 | |
| Probability of denominational Match - Non-Catholic | 29 | 49 |
| | 31 | 63 |
| Probability of Promotion to CDR | 35 | Table 7 |
| | 37 | Table 9 |
| Probability of Promotion to CDR - because of Exp on Boards? | 36 | 91 |
| Probability of Promotion to CDR - Catholic | 29 | 48 |
| Probability of Promotion to CDR - correlated to Exp on Boards | 36 | Table 8 |
| Probability of Promotion to CDR - Non-Catholic | 29 | 48 |
| Probability of Promotion w/ missing Chaplains replaced | I-18 | Table 15 |
| Probability of Selection is not Probability of Promotion | 39 | 110.2 |
| | Appx I | |
| | Appx J | |
| Promotion Analysis - History Data | 52 | 172 |
| Promotion Board - Composition | 23 | 9 |
| Promotion Board - Composition - 90% Chaplains | 5 | 24 |
| | 23 | 9 |
| Promotion Board - Composition - Majority White Collar | 23 | 14 |
| Promotion Board - Composition - Navy Chooses | 24 | 16 |
| Promotion Board - Composition - Navy Chooses - violates ow rules | 24 | 21 |
| Promotion Board - Composition - one Catholic | 23 | 14 |
| Promotion Board - Composition - two Catholics | 24 | 19 |
| Promotion Board - Direct and Indirect Influence | 25 | 28 |
| Promotion Board - Members by Name | Appx | C |
| Promotion Board oath does not always protect eligibles p<.01 | 66 | 232-234 |
| Promotion Boards - Correlation to Who is Promoted | 26 | 31 |
| | M | 40-66 |
| Promotion Boards, Stacking them Stacks the Corps | 25 | 27 |
| Promotion Boards, What should be done about them | 7 | fn |
| | 86 | Note 6 |
| Promotion Rates differ across Faith Groups and Rank | 47 | 152 |
| | 48 | Table 18 |
| Promotion Rates differ less at first and last step | 55 | 186.. |

| | | |
|---|---|---|
| Promotion to Commander is the Step - see also Commander | 6 | 25 |
| Promotion to CDR 1981-1986 | 51 | Table 20 |
| Promotion to CDR 1981-2001 | 51 | Table 19 |
| Promotion to CDR, different studies | Appx K | Table 3 |
| Promotions after Data Period | 58 | 198 |
| | 51 | 167 |
| | Appx N | |
| Promotions yet to accrue | 51 | 167 |
| Proof by Exhaustion | Appx L | |
| Proper calculation is to look at individual records | 40 | 111 |
| Proper discourse | 49 | 157 |
| Pseudo Equity | 35 | 90 |
| Reference 1, Critique of | Appx | I |
| Reference 2, Critique of | Appx | J |
| References | 70 | |
| Released from Active Duty | 55 | 186…. |
| | 56 | 188 |
| Religion as a Factor in Advancement | 55 | Table 21 |
| | 57 | Table 23 |
| Religious Discrimination can be changed | 68 | 247(2) |
| Religious Discrimination in RAD is statistically significant | 48 | 153 |
| Roman Catholic - | see Catholic | |
| Roman Catholic Chaplains are a favored group - Captain | 57 | 192 |
| Roman Catholic is the Navy's "Preferred Religion" | 68 | 247(1) |
| Sample, Biased | Appx N | |
| Sample, Definition | 77 | Note 2 |
| Sample, Favorable Period | 3 | 8 |
| | Appx N | |
| SDA - Impact | 67 | 238-240 |
| SDA - Impact as Chief of Chaplains | 41 | 113.3 |
| | Appx M | 114 |
| SER, bias in process?  (need data) | L-4 | 14 |
| SER - bias surrounding selection of "eligibles" | L-4 | 23-26 |
| Shared denomination - see "Like Likes Like" | 7 | Table |
| Simulation - Omitted | 49 | 155 |
| Siskin, Dr. - | 8 | Err 1 |
| | 8 | Err 2 |
| Siskin, Dr. (continued) | 32 | 71 |
| | 35 | fn |
| | 37 | Table 9 |
| | 37 | 97 |
| Siskin, Dr. (continued) | 39 | 106-108 |
| | 42 | 114 |
| | 47 | 149 |
| Siskin, Dr. (continued) | 49 | 159 |
| Siskin, Dr. Coin Tossing Stranger | 67 | 237 |
| Siskin, Dr. Counting In Zone Selections (error in) | 8 | Err 2 |
| Siskin, Dr. Critique of Reference | Appx J | |
| Siskin, Dr. pre-digested data given to | 49 | 158 |
| Siskin, Dr. Sampling Period | 40 | 112 |
| | Appx N | |

| | | |
|---|---|---|
| Snapshot | 49 | 159.1 |
| | 58 | 198 |
| | I-2 | 7 |
| Specious Parity | 35 | 87 |
| Speculation and Atty Hyde | 30 | 57 |
| Supreme Court - Hazelwood | 60 | 206 |
| Survival Cohorts | 75 | Appx H |
| Surviving Non-Liturgicals may be "better" Officers than others | 85 | 5.12 |
| Systemic pressure exerted by Chaplain Corps | 46 | 134 |
| Temptation to "balance the scales" | 29 | 48 |
| Time Period, not representative | 76 | Appx N |
| Two Catholics | 24 | 19 |
| | I-4 | 15 |
| | M-4 | 21 |
| Two Catholics (cont.) | M-4 | Table 2 |
| | M-5 | Table 3 |
| | M-13 | 76 |
| Two Catholics (cont.) | M-14 | Table 7 |
| | M-14 | 77-78 |
| Unconsidered | I-3 | fn |
| Underestimates, Promotion Probability statistics are | 58 | 197 |
| Up or Out | 26 | 29 |
| Valid method of analysis: cohort study w/i biographical records | 50 | 166- |
| Valid method of analysis: longitudinal study across Boards | 50 | 166-- |
| What goes around can come around | 66 | 236 |
| What Happened to all the Non-Liturgicals | 42 | 120 |
| | Appx | K |
| What to do About Promotion Boards | I-19 | 28 |
| Why does Navy say No Difference | 37 | 94 |

# Appendix G

## Like Likes Like

This Appendix presents the collected raw data and the Summary Table for examining the issue of (1) Promotion Board Member denomination vs (2) Selection or Non Selection of Candidates before that Board, based on candidate denomination.  That is: Do Board Members have a tendency (collectively) to select candidates "like" themselves in denomination?

The Appendix is divided into five sections:

Captain Boards from 1981 to 2000
CDR Boards from 1981 to 2002
LCDR Boards from 1981 to 1989
LCDR Boards from 1991 to 2002

and

Boards with an SDA Chaplain Member

## APPENDIX G - Captain Boards judging "people like us" vs "others"

Faith Group Composition of Chaplain Corps Promotion Panels (FY 1981-2000)

| Year | | IZ/S | iz/ns | AZ/S | az/ns |
|------|------|------|-------|------|-------|
| 1981 | PUSA(2) | 3 | 3 | 1 | 7 |
| 1981 | ELCA | 3 | 1 | 0 | 2 |
| 1981 | SB | 4 | 0 | 0 | 5 |
| 1981 | RC(2) | 6 | 4 | 3 | 7 |
| Others | | 5 | 8 | 2 | 21 |
| Total | | 21 | 16 | 6 | 42 |

| | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S | |
|------|------|------|-------|------|-------|------|------|
| 1982 | ELCA | 3 | 1 | | 3 | | |
| 1982 | PUSA | 1 | 2 | 1 | 10 | | |
| 1982 | ORTH | | | | | | |
| 1982 | SB | 2 | 1 | | 5 | | |
| 1982 | UM | | | 1 | 6 | | |
| 1982 | RC | 4 | 1 | | 11 | | |
| Others | | 2 | 3 | 0 | 20 | | |
| Total | | 12 | 8 | 2 | 55 | 1 | LMS |

| | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|------|------|------|-------|------|-------|------|
| 1983 | PUSA | 0 | 1 | 2 | 10 | |
| 1983 | RC(2) | 3 | 3 | 0 | 9 | |
| 1983 | UM | 0 | 0 | 0 | 6 | |
| 1983 | AME | 0 | 0 | 0 | 0 | |
| 1983 | ELCA | 0 | 1 | 0 | 4 | |
| Others | | 4 | 8 | 2 | 22 | |
| Total | | 7 | 13 | 4 | 51 | |

| | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|------|------|------|-------|------|-------|------|
| 1984 | ELCA | 0 | | 0 | 4 | |
| 1984 | EC | 2 | 2 | 1 | 2 | |
| 1984 | PUSA(2) | 0 | 1 | 1 | 9 | |
| 1984 | RC(2) | 6 | 5 | 1 | 10 | |
| Others | | 3 | 10 | 1 | 18 | |
| Total | | 11 | 17 | 4 | 43 | |

|      |          | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |    |
|------|----------|------|-------|------|-------|------|----|
| 1985 | PUSA     | 0    | 0     | 1    | 7     |      |    |
| 1985 | ABC      | 0    | 2     | 0    | 3     |      |    |
| 1985 | RC(2)    | 3    | 5     | 3    | 9     |      |    |
| 1985 | ELCA     | 1    | 4     | 0    | 2     |      |    |
| Others |        | 12   | 12    | 1    | 23    |      |    |
| Total  |        | 16   | 23    | 5    | 44    |      |    |

|      |          | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |    |
|------|----------|------|-------|------|-------|------|----|
| 1986 | RC(2)    | 3    | 0     | 1    | 11    |      |    |
| 1986 | AME      | 0    | 0     | 0    | 0     |      |    |
| 1986 | J        | 0    | 0     | 0    | 0     |      |    |
| 1986 | PUSA     | 1    | 0     | 0    | 5     |      |    |
| 1986 | DC       |      |       | 0    | 5     |      |    |
| Others |        | 3    | 8     | 2    | 46    |      |    |
| Total  |        | 7    | 8     | 3    | 57    | 1    | UM |

|      |          | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |    |
|------|----------|------|-------|------|-------|------|----|
| 1987 | ELCA     | 1    | 2     | 0    | 3     |      |    |
| 1987 | PUSA(2)  | 1    | 0     | 0    | 5     |      |    |
| 1987 | RC(2)    | 4    | 5     | 1    | 13    |      |    |
| 1987 | ABC      | 1    | 0     | 1    | 2     |      |    |
| Others |        | 3    | 9     | 2    | 31    |      |    |
| Total  |        | 10   | 16    | 4    | 56    |      |    |

|      |          | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |    |
|------|----------|------|-------|------|-------|------|----|
| 1988 | RC       |      |       |      |       |      |    |
| 1988 | UM       |      |       |      |       |      |    |
| 1988 | RCA      | NO   |       |      |       |      |    |
| 1988 | GARB     |      | DATA  |      |       |      |    |
| 1988 | SB       |      |       | NO   |       |      |    |
| 1988 | PUSA     |      |       |      | DATA  |      |    |
| Others |        |      |       |      |       |      |    |
| Total  |        |      |       |      |       |      |    |

|      |          | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |    |
|------|----------|------|-------|------|-------|------|----|
| 1989 | ELCA     | 1    | 0     | 0    | 4     |      |    |
| 1989 | RC       | 1    | 0     | 0    | 17    |      |    |
| 1989 | CC(DC)[2]|      |       | 0    | 2     |      |    |
| 1989 | SB       | 0    | 3     | 1    | 12    |      |    |
| 1989 | UM       |      |       |      |       |      |    |
| Others |        | 2    | 3     | 0    | 16    |      |    |
| Total  |        | 4    | 6     | 1    | 56    |      |    |

Compendium, Appendix G, page 3

|      |        | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|------|--------|------|-------|------|-------|------|
| 1991 | ELCA   | 1    | 0     | 0    | 0     |      |
| 1991 | CP     | 0    | 0     | 0    | 0     |      |
| 1991 | PUSA   | 0    | 1     | 0    | 2     |      |
| 1991 | RC     | 9    | 11    | 0    | 15    |      |
| 1991 | SB     | 1    | 1     | 2    | 17    |      |
| Others |      | 13   | 11    | 0    | 14    |      |
| Total |       | 24   | 24    | 2    | 48    |      |

|      |        | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|------|--------|------|-------|------|-------|------|
| 1992 | RCA    | 0    | 0     | 0    | 0     |      |
| 1992 | LMS    | 0    | 2     | 0    | 3     |      |
| 1992 | RC     | 5    | 8     | 0    | 19    |      |
| 1992 | SDA    | 0    | 0     | 0    | 1     |      |
| 1992 | IFCA   | 0    | 0     | 0    | 0     |      |
| Others |      | 11   | 9     | 2    | 31    |      |
| Total |       | 16   | 19    | 2    | 53    |      |

|      |        | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|------|--------|------|-------|------|-------|------|
| 1994 | RCA    | 0    | 0     | 0    | 0     |      |
| 1994 | RC     | 5    | 6     | 0    | 0     |      |
| 1994 | ELCA   | 2    | 0     | 0    | 0     |      |
| 1994 | CS     | 0    | 0     | 0    | 3     |      |
| 1994 | CC(DC) | 0    | 0     | 0    | 23    |      |
| 1994 | PUSA   | 0    | 1     | 0    | 1     |      |
| Others |      | 6    | 10    | 2    | 23    |      |
| Total |       | 13   | 17    | 2    | 50    |      |

|      |        | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|------|--------|------|-------|------|-------|------|
| 1995 | LMS    | 0    | 0     | 0    | 5     |      |
| 1995 | CHCCC  | 0    | 0     | 0    | 1     |      |
| 1995 | BGC    | 0    | 0     | 0    | 0     |      |
| 1995 | PUSA   | 0    | 1     | 0    | 4     |      |
| 1995 | RC     | 4    | 3     | 1    | 20    |      |
| 1995 | SDA    | 0    | 0     | 0    | 1     |      |
| Others |      | 6    | 6     | 0    | 25    |      |
| Total |       | 10   | 10    | 1    | 55    |      |

|      |        | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|------|--------|------|-------|------|-------|------|
| 1996 | PNBC   | 0    | 0     | 0    | 0     |      |
| 1996 | RC     | 2    | 0     | 0    | 19    |      |
| 1996 | ELCA   | 0    | 0     | 0    | 3     |      |
| Others |      | 8    | 13    | 4    | 27    |      |
| Total |       | 10   | 13    | 4    | 49    |      |

Compendium, Appendix G, page 4

| | | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|---|---|---|---|---|---|---|---|
| 1997 | ELCA | | 0 | 0 | 0 | 2 | |
| 1997 | ABC | | 1 | 0 | 0 | 1 | |
| 1997 | UM | | 0 | 1 | 1 | 7 | |
| 1997 | PNBC | | 0 | 0 | 0 | 0 | |
| 1997 | RC | | 0 | 4 | 0 | 16 | |
| Others | | | 8 | 8 | 1 | 21 | |
| Total | | | 9 | 13 | 2 | 47 | |

| | | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|---|---|---|---|---|---|---|---|
| 1998 | LMS | | 1 | 3 | 0 | 2 | |
| 1998 | RC | | 3 | 2 | 1 | 13 | |
| 1998 | BGC | | | | | | |
| 1998 | SDA | | | | 0 | 1 | |
| 1998 | UCC | | | | 0 | 0 | |
| Others | | | 6 | 9 | 1 | 32 | |
| Total | | | 10 | 14 | 2 | 48 | |

| | | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|---|---|---|---|---|---|---|---|
| 1999 | NBCUS | | 1 | 0 | 0 | 1 | |
| 1999 | RC | | 2 | 3 | 0 | 11 | |
| 1999 | J | | 0 | 0 | 0 | 2 | |
| 1999 | UCC | | 0 | 0 | | | |
| Others | | | 9 | 20 | 0 | 41 | |
| Total | | | 12 | 23 | 0 | 45 | |

| | | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|---|---|---|---|---|---|---|---|
| 2000 | SDA | | 0 | 0 | 0 | 1 | |
| 2000 | UM | | 2 | 2 | 0 | 0 | |
| 2000 | RC | | 2 | 3 | 1 | 4 | |
| 2000 | SB | | 1 | 4 | 1 | 3 | |
| Others | | | 5 | 8 | 1 | 12 | |
| Total | | | 10 | 17 | 3 | 20 | |

| **CAPT Promotion Boards** Judging "People Like Us" | | | | **CAPT Promotion Boards** Judging "Others" | | | | |
|---|---|---|---|---|---|---|---|---|
| **FY** | IZ/S | iz/ns | AZ/S | az/ns | **FY** | IZ/S | iz/ns | AZ/S | az/ns |
| 81 | 16 | 8 | 4 | 21 | 81 | 5 | 8 | 2 | 21 |
| 82 | 10 | 5 | 2 | 35 | 82 | 2 | 3 | 0 | 20 |
| 83 | 3 | 8 | 2 | 29 | 83 | 4 | 8 | 2 | 22 |
| 84 | 8 | 7 | 3 | 25 | 84 | 3 | 10 | 1 | 18 |
| 85 | 4 | 11 | 4 | 21 | 85 | 12 | 12 | 1 | 23 |
| 86 | 4 | 0 | 1 | 21 | 86 | 3 | 8 | 2 | 46 |
| 87 | 7 | 7 | 2 | 23 | 87 | 3 | 9 | 2 | 31 |
| 89 | 2 | 3 | 1 | 40 | 89 | 2 | 3 | 0 | 16 |
| 90 | | | | | 90 | | | | |
| 91 | 11 | 13 | 2 | 34 | 91 | 13 | 11 | 0 | 14 |
| 92 | 5 | 10 | 0 | 23 | 92 | 11 | 9 | 2 | 31 |
| 94 | 7 | 7 | 0 | 27 | 94 | 6 | 10 | 2 | 23 |
| 95 | 4 | 4 | 1 | 31 | 95 | 6 | 6 | 0 | 25 |
| 96 | 2 | 0 | 0 | 22 | 96 | 8 | 13 | 4 | 27 |
| 97 | 1 | 5 | 1 | 26 | 97 | 8 | 8 | 1 | 21 |
| 98 | 4 | 5 | 1 | 16 | 98 | 6 | 9 | 1 | 32 |
| 99 | 3 | 3 | 0 | 14 | 99 | 9 | 20 | 0 | 41 |
| 2000 | 5 | 9 | 2 | 8 | 2000 | 5 | 8 | 1 | 12 |
| | 96 | 105 | 26 | 416 | | 106 | 155 | 21 | 423 |
| % | **47.8%** | | **5.9%** | | | **40.6%** | | **4.7%** | |

**BOARDS w/o significant Options**     (2 or more Members w/o constituencies)

| **CAPT Promotion Boards** Judging "People Like Us" | | | | **CAPT Promotion Boards** Judging "Others" | | | | |
|---|---|---|---|---|---|---|---|---|
| **FY** | IZ/S | iz/ns | AZ/S | az/ns | **FY** | IZ/S | iz/ns | AZ/S | az/ns |
| 81 | 16 | 8 | 4 | 21 | 81 | 5 | 8 | 2 | 21 |
| 82 | 10 | 5 | 2 | 35 | 82 | 2 | 3 | 0 | 20 |
| 83 | 3 | 8 | 2 | 29 | 83 | 4 | 8 | 2 | 22 |
| 84 | 8 | 7 | 3 | 25 | 84 | 3 | 10 | 1 | 18 |
| 85 | 4 | 11 | 4 | 21 | 85 | 12 | 12 | 1 | 23 |
| 87 | 7 | 7 | 2 | 23 | 87 | 3 | 9 | 2 | 31 |
| 90 | | | | | 90 | | | | |
| 92 | 5 | 10 | 0 | 23 | 92 | 11 | 9 | 2 | 31 |
| 2000 | 5 | 9 | 2 | 8 | 2000 | 5 | 8 | 1 | 12 |
| | 58 | 65 | 19 | 185 | | 45 | 67 | 11 | 178 |
| % | **47.2%** | | **9.3%** | | | **40.2%** | | **5.8%** | |

Compendium, Appendix G, page 6

## APPENDIX G - CDR Promotion Boards judging "people like us" vs "others"

Faith Group Composition of Chaplain Corps Promotion Panels

(FY 1981-2002)

|  |  | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|---|---|---|---|---|---|---|
| 1981 | AME | 0 | 0 | 0 | 0 | |
| 1981 | LMS | 4 | 0 | 1 | 0 | |
| 1981 | RC | 11 | 2 | 1 | 13 | |
| 1981 | SB | 5 | 2 | 2 | 20 | |
| 1981 | UM | 5 | 1 | 1 | 8 | |
| Subtotal | 1981 | 25 | 5 | 5 | 41 | |
| Others | 1981 | 12 | 4 | 0 | 39 | |
| Total | 1981 | 37 | 9 | 5 | 80 | |

|  |  | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|---|---|---|---|---|---|---|
| 1982 | ABC | 0 | 0 | 0 | 2 | |
| 1982 | ELCA | 0 | 0 | 2 | 8 | |
| 1982 | RC | 8 | 3 | 2 | 13 | |
| 1982 | SB | 1 | 2 | 0 | 22 | |
| 1982 | UP | 0 | 0 | 0 | 0 | |
| Subtotal | 1982 | 9 | 5 | 4 | 45 | |
| Others | 1982 | 4 | 4 | 2 | 43 | |
| Total | 1982 | 13 | 9 | 6 | 88 | |

|  |  | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|---|---|---|---|---|---|---|
| 1983 | GARB | 0 | 0 | 0 | 2 | |
| 1983 | RC | 4 | 1 | 1 | 14 | |
| 1983 | SB | 0 | 0 | 1 | 22 | |
| 1983 | UM | 0 | 0 | 0 | 7 | |
| Subtotal | 1983 | 4 | 1 | 2 | 45 | |
| Others | 1983 | 4 | 4 | 1 | 44 | |
| Total | 1983 | 8 | 5 | 3 | 89 | |

|  |  | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|---|---|---|---|---|---|---|
| 1984 | ABC | 1 | 1 | 0 | 2 | |
| 1984 | AME | 0 | 0 | 0 | 0 | |
| 1984 | PUSA | 0 | 0 | 1 | 6 | |
| 1984 | RC | 5 | 3 | 0 | 12 | |
| Subtotal | 1984 | 6 | 4 | 1 | 20 | |
| Others | 1984 | 9 | 5 | 3 | 39 | |
| Total | 1984 | 15 | 9 | 4 | 59 | |

|  |  | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|---|---|---|---|---|---|---|
| 1985 | ELCA | 2 | 1 | 0 | 5 | |
| 1985 | PUSA | 1 | 1 | 0 | 5 | |
| 1985 | RC | 7 | 2 | 1 | 13 | |
| 1985 | SB | 0 | 0 | 1 | 13 | |

| | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|---|---|---|---|---|---|---|
| Subtotal | 1985 | 10 | 4 | 2 | 36 | |
| Others | 1985 | 6 | 5 | 1 | 20 | |
| Total | 1985 | 16 | 9 | 3 | 56 | |
| | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
| 1986 | ELCA | 0 | 0 | 1 | 5 | |
| 1986 | GARB | 0 | 0 | 0 | 0 | |
| 1986 | RC | 4 | 2 | 1 | 11 | |
| 1986 | SDA | 0 | 0 | 0 | 0 | |
| Subtotal | 1986 | 4 | 2 | 2 | 16 | |
| Others | 1986 | 8 | 7 | 2 | 34 | |
| Total | 1986 | 12 | 9 | 4 | 50 | |
| | | IZ/S | iz/ns | AZ/S | az/ns | **BZ/S** |
| 1987 | AME | 0 | 0 | 0 | 0 | |
| 1987 | CN | 0 | 0 | 0 | 0 | |
| 1987 | ELCA | 0 | 0 | 0 | 4 | |
| 1987 | PUSA | 0 | 1 | 1 | 3 | |
| 1987 | RC | 5 | 0 | 1 | 13 | |
| 1987 | SB | 1 | 2 | 1 | 9 | |
| Subtotal | 1987 | 6 | 3 | 3 | 23 | |
| Others | 1987 | 10 | 4 | 0 | 31 | |
| Total | 1987 | 16 | 7 | 3 | 54 | |
| | | IZ/S | iz/ns | AZ/S | az/ns | **BZ/S** |
| 1988 | ELCA | 1 | 0 | 0 | 4 | |
| 1988 | PNBC | 1 | 0 | 0 | 0 | |
| 1988 | PUSA | 1 | 0 | 0 | 3 | |
| 1988 | RC | 4 | 1 | 1 | 11 | |
| 1988 | SB | 2 | 0 | 0 | 10 | |
| Subtotal | 1988 | 9 | 1 | 1 | 28 | |
| Others | 1988 | 8 | 7 | 1 | 22 | |
| Total | 1988 | 17 | 8 | 2 | 50 | |
| | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
| 1989 | GARB | 0 | 0 | 0 | 0 | |
| 1989 | LMS | 1 | 0 | 0 | 0 | |
| 1989 | NBCUS | 1 | 0 | 0 | 1 | |
| 1989 | PUSA | 0 | 0 | 0 | 2 | |
| 1989 | RC | 11 | 3 | 0 | 11 | |
| 1989 | UM | 2 | 3 | 2 | 4 | |
| Subtotal | 1989 | 15 | 6 | 2 | 18 | |
| Others | 1989 | 4 | 6 | 1 | 18 | |
| Total | 1989 | 19 | 12 | 3 | 46 | |
| | | IZ/S | iz/ns | AZ/S | az/ns | **BZ/S** |
| 1990 | BGC | 0 | 0 | 0 | 0 | |
| 1990 | CC(DC) | 0 | 0 | 0 | 0 | |
| 1990 | CP | 0 | 0 | 0 | 0 | |
| 1990 | ELCA | 2 | 1 | 0 | 4 | |

Compendium, Appendix G, page 8

|         | Year  | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|---------|-------|------|-------|------|-------|------|
|         | 1990  | RC   | 0     | 2    | 2     | 11   |
| Subtotal| 1990  | 2    | 3     | 2    | 15    |      |
| Others  | 1990  | 9    | 5     | 2    | 33    |      |
| Total   | 1990  | 11   | 8     | 4    | 48    |      |

|         | Year  | IZ/S | iz/ns | AZ/S | az/ns | **BZ/S** |
|---------|-------|------|-------|------|-------|----------|
| 1991    | ALC   | 0    | 0     | 0    | 0     |          |
| 1991    | PNBC  | 0    | 0     | 0    | 1     |          |
| 1991    | RC    | 6    | 6     | 1    | 10    |          |
| 1991    | RCA   | 0    | 0     | 0    | 0     |          |
| 1991    | SB    | 8    | 1     | 0    | 5     |          |
| Subtotal| 1991  | 14   | 7     | 1    | 16    |          |
| Others  | 1991  | 31   | 14    | 2    | 24    |          |
| Total   | 1991  | 45   | 21    | 3    | 40    |          |

|         | Year  | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|---------|-------|------|-------|------|-------|------|
| 1992    | ELCA  | 0    | 0     | 0    | 2     |      |
| 1992    | J     | 1    | 0     | 0    | 2     |      |
| 1992    | RC    | 2    | 1     | 2    | 10    |      |
| 1992    | SB    | 7    | 3     | 1    | 5     |      |
| 1992    | UM    | 3    | 4     | 1    | 10    |      |
| Subtotal| 1992  | 13   | 8     | 4    | 29    |      |
| Others  | 1992  | 14   | 11    | 2    | 20    |      |
| Total   | 1992  | 27   | 19    | 6    | 49    |      |

|         | Year  | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|---------|-------|------|-------|------|-------|------|
| 1994    | LMS   | 0    | 0     | 0    | 1     |      |
| 1994    | RC    | 1    | 0     | 1    | 8     |      |
| 1994    | RCA   | 0    | 0     | 0    | 0     |      |
| 1994    | SB    | 2    | 4     | 0    | 9     |      |
| 1994    | UCC   | 0    | 0     | 0    | 2     |      |
| 1994    | UM    | 1    | 4     | 2    | 7     |      |
| Subtotal| 1994  | 4    | 8     | 3    | 27    |      |
| Others  | 1994  | 11   | 8     | 2    | 28    |      |
| Total   | 1994  | 15   | 16    | 5    | 55    |      |

1994 data is based on Appendix B

|         | Year  | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|---------|-------|------|-------|------|-------|------|
| 1995    | J     | 1    | 0     | 0    | 1     |      |
| 1995    | NBCUS | 2    | 0     | 0    | 2     |      |
| 1995    | RC    | 5    | 3     | 0    | 7     |      |
| 1995    | RCA   | 0    | 0     | 0    | 0     |      |
| 1995    | SB    | 1    | 4     | 2    | 9     |      |
| Subtotal| 1995  | 9    | 7     | 2    | 19    |      |
| Others  | 1995  | 11   | 8     | 1    | 39    |      |
| Total   | 1995  | 20   | 15    | 3    | 58    |      |

|         | Year  | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|---------|-------|------|-------|------|-------|------|
| 1996    | CGIC  | 0    | 0     | 0    | 0     |      |

Compendium, Appendix G, page 9

| | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|---|---|---|---|---|---|---|
| 1996 | LMS | 1 | 1 | 1 | 0 | |
| 1996 | PUSA | 3 | 0 | 0 | 2 | |
| 1996 | RC | 3 | 1 | 0 | 8 | |
| 1996 | UCC | 1 | 0 | 0 | 1 | |
| Subtotal | 1996 | 8 | 2 | 1 | 11 | |
| Others | 1996 | 10 | 13 | 3 | 21 | |
| Total | 1996 | 18 | 15 | 4 | 32 | |
| | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
| 1997 | CR | 0 | 0 | 0 | 0 | |
| 1997 | ELCA | 3 | 0 | 1 | 3 | |
| 1997 | NBCUS | 1 | 0 | 0 | 0 | |
| 1997 | RC | 6 | 2 | 0 | 5 | |
| 1997 | SB | 2 | 2 | 0 | 4 | |
| Subtotal | 1997 | 12 | 4 | 1 | 12 | |
| Others | 1997 | 7 | 10 | 0 | 20 | |
| Total | 1997 | 19 | 14 | 1 | 32 | |
| | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
| 1998 | LMS | 0 | 0 | 0 | 2 | |
| 1998 | RC | 0 | 1 | 2 | 4 | |
| 1998 | SB | 0 | 1 | 0 | 6 | |
| 1998 | UM | 0 | 1 | 0 | 3 | |
| Subtotal | 1998 | 0 | 3 | 2 | 15 | |
| Others | 1998 | 4 | 7 | 0 | 20 | |
| Total | 1998 | 4 | 10 | 2 | 35 | 1 |
| | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
| 1999 | CME | 0 | 0 | 0 | 0 | 1 |
| 1999 | RC | 5 | 4 | 0 | 4 | |
| 1999 | SB | 3 | 2 | 0 | 4 | |
| Subtotal | 1999 | 8 | 6 | 0 | 8 | |
| Others | 1999 | 12 | 20 | 2 | 21 | 1 |
| Total | 1999 | 20 | 26 | 2 | 29 | 2 |
| | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
| 2000 | ECCA | 0 | 1 | 0 | 0 | |
| 2000 | NBCUS | 0 | 0 | 0 | 0 | |
| 2000 | PUSA | 1 | 1 | 1 | 1 | |
| 2000 | RC | 6 | 2 | 0 | 7 | |
| Subtotal | 2000 | 7 | 4 | 1 | 8 | |
| Others | 2000 | 13 | 21 | 2 | 29 | |
| Total | 2000 | 20 | 25 | 3 | 37 | 0 |
| | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
| 2001 | CMA | 1 | 0 | 0 | 1 | |
| 2001 | RC | 4 | 8 | 0 | 8 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2001 | SDA | 1 | 0 | 0 | 2 | |
| 2001 | UCC | 0 | 1 | 1 | 2 | |
| Subtotal | 2001 | 6 | 9 | 1 | 13 | |
| Others | 2001 | 24 | 19 | 1 | 34 | |
| Total | 2001 | 30 | 28 | 2 | 47 | 0 |

| | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|---|---|---|---|---|---|---|
| 2002 | ABC | 0 | 0 | 0 | 0 | |
| 2002 | LDS | 0 | 0 | 0 | 0 | |
| 2002 | PCA | 0 | 2 | 0 | 1 | |
| 2002 | RC | 5 | 15 | 2 | 7 | |
| Subtotal | 2002 | 5 | 17 | 2 | 8 | |
| Others | 2002 | 13 | 28 | 3 | 30 | |
| Total | 2002 | 18 | 45 | 5 | 48 | |

2002 data is from a corrected copy of APPX B

| | **CDR Promotion Boards** Judging "People like them" | | | | | **CDR Promotion Boards** Judging "Others" | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **IZ/S** | **iz/ns** | **AZ/S** | **az/ns** | | **IZ/S** | **iz/ns** | **AZ/S** | **az/ns** |
| 1981 | 25 | 5 | 5 | 41 | ... | 12 | 4 | 0 | 39 |
| 1982 | 9 | 5 | 4 | 45 | ... | 4 | 4 | 2 | 43 |
| 1983 | 4 | 1 | 2 | 45 | ... | 4 | 4 | 1 | 44 |
| 1984 | 6 | 4 | 1 | 20 | ... | 9 | 5 | 3 | 39 |
| 1985 | 10 | 4 | 2 | 36 | ... | 6 | 5 | 1 | 20 |
| 1986 | 4 | 2 | 2 | 16 | ... | 8 | 7 | 2 | 34 |
| 1987 | 6 | 3 | 3 | 23 | ... | 10 | 4 | 0 | 31 |
| 1988 | 9 | 1 | 1 | 28 | ... | 8 | 7 | 1 | 22 |
| 1989 | 15 | 6 | 2 | 18 | ... | 4 | 6 | 1 | 18 |
| 1990 | 2 | 3 | 2 | 15 | ... | 9 | 5 | 2 | 33 |
| 1991 | 14 | 7 | 1 | 16 | ... | 31 | 14 | 2 | 24 |
| 1992 | 13 | 8 | 4 | 29 | ... | 14 | 11 | 2 | 20 |
| 1994 | 4 | 8 | 3 | 27 | ... | 11 | 8 | 2 | 28 |
| 1995 | 9 | 7 | 2 | 19 | ... | 11 | 8 | 1 | 39 |
| 1996 | 8 | 2 | 1 | 11 | ... | 10 | 13 | 3 | 21 |
| 1997 | 12 | 4 | 1 | 12 | ... | 7 | 10 | 0 | 20 |
| 1998 | 0 | 3 | 2 | 15 | ... | 4 | 7 | 0 | 20 |
| 1999 | 8 | 6 | 0 | 8 | ... | 12 | 20 | 2 | 21 |
| 2000 | 7 | 4 | 1 | 8 | ... | 13 | 21 | 2 | 29 |
| 2001 | 6 | 9 | 1 | 13 | ... | 24 | 19 | 1 | 34 |
| 2002 | 5 | 17 | 2 | 8 | ... | 13 | 28 | 3 | 30 |
| | 176 | 109 | 42 | 453 | | 224 | 210 | 31 | 609 |
| **% Sel** | **61.8%** | | **8.5%** | | | **51.6%** | | **4.8%** | |

| | CDR Promotion Boards Judging "People like them" | | | | | CDR Promotion Boards Judging "Others" | | | |
|---|---|---|---|---|---|---|---|---|---|
| | IZ/S | iz/ns | AZ/S | az/ns | | IZ/S | iz/ns | AZ/S | az/ns |
| 1991 | 14 | 7 | 1 | 16 | … | 31 | 14 | 2 | 24 |
| 1992 | 13 | 8 | 4 | 29 | … | 14 | 11 | 2 | 20 |
| 1994 | 4 | 8 | 3 | 27 | … | 11 | 8 | 2 | 28 |
| 1995 | 9 | 7 | 2 | 19 | … | 11 | 8 | 1 | 39 |
| 1996 | 8 | 2 | 1 | 11 | … | 10 | 13 | 3 | 21 |
| 1997 | 12 | 4 | 1 | 12 | … | 7 | 10 | 0 | 20 |
| 1998 | 0 | 3 | 2 | 15 | … | 4 | 7 | 0 | 20 |
| 1999 | 8 | 6 | 0 | 8 | … | 12 | 20 | 2 | 21 |
| 2000 | 7 | 4 | 1 | 8 | … | 13 | 21 | 2 | 29 |
| 2001 | 6 | 9 | 1 | 13 | … | 24 | 19 | 1 | 34 |
| 2002 | 5 | 17 | 2 | 8 | … | 13 | 28 | 3 | 30 |
| | 86 | 75 | 18 | 166 | | 150 | 159 | 18 | 286 |
| % Sel | 53.4% | | 9.8% | | | 48.5% | | 5.9% | |

| | CDR Promotion Boards Judging "People like them" | | | | | CDR Promotion Boards Judging "Others" | | | |
|---|---|---|---|---|---|---|---|---|---|
| | IZ/S | iz/ns | AZ/S | az/ns | | IZ/S | iz/ns | AZ/S | az/ns |
| 1981 | 25 | 5 | 5 | 41 | … | 12 | 4 | 0 | 39 |
| 1982 | 9 | 5 | 4 | 45 | … | 4 | 4 | 2 | 43 |
| 1983 | 4 | 1 | 2 | 45 | … | 4 | 4 | 1 | 44 |
| 1984 | 6 | 4 | 1 | 20 | … | 9 | 5 | 3 | 39 |
| 1985 | 10 | 4 | 2 | 36 | … | 6 | 5 | 1 | 20 |
| 1986 | 4 | 2 | 2 | 16 | … | 8 | 7 | 2 | 34 |
| 1987 | 6 | 3 | 3 | 23 | … | 10 | 4 | 0 | 31 |
| 1988 | 9 | 1 | 1 | 28 | … | 8 | 7 | 1 | 22 |
| 1989 | 15 | 6 | 2 | 18 | … | 4 | 6 | 1 | 18 |
| 1990 | 2 | 3 | 2 | 15 | … | 9 | 5 | 2 | 33 |
| | 90 | 34 | 24 | 287 | | 74 | 51 | 13 | 323 |
| % Sel | 72.6% | | 7.7% | | | 59.2% | | 3.9% | |

## APPENDIX G - LCDR Promotion Boards
## judging "people like us" vs "others"
### Faith Group Composition of Chaplain Corps
### Promotion Panels

(FY 1984 - 1989)

| | **LCDR Selections,** | | | | **by Board** |
|---|---|---|---|---|---|
| | Board Date & Membership | Selected | FOS | Selected | FOS |
| | FY 84 | IZ/S | iz/ns | AZ/S | az/ns |
| 1984 | RC(2) | 6 | 1 | 1 | 0 |
| 1984 | PUSA | 2 | 1 | | |
| 1984 | SDA | 0 | 0 | | |
| 1984 | LMS | 1 | 0 | | |
| 1984 | (ELCA) | 4 | 0 | 1 | 0 |
| 1984 | subtotal | 13 | 2 | 1 | 0 |
| 1984 | Others | 30 | 5 | 0 | 2 |
| 1984 | Total | 43 | 7 | 2 | 2 |
| | FY 85 | IZ/S | iz/ns | AZ/S | az/ns |
| 1985 | EC | 2 | 0 | | |
| 1985 | SB | 8 | 3 | | |
| 1985 | LMS | 1 | 2 | | |
| 1985 | (ELCA) | | | | |
| 1985 | PNBC | | | | |
| 1985 | RC | 8 | 2 | 1 | 0 |
| 1985 | Subtotal | 19 | 7 | 1 | 0 |
| 1985 | Others | 30 | 6 | 3 | 4 |
| 1985 | Total | 49 | 13 | 4 | 4 |

| | **LCDR Selections,** | | | | **by Board** |
|---|---|---|---|---|---|
| | Board Date & Membership | Selected | FOS | Selected | FOS |
| 1986 | FY 86 | IZ/S | iz/ns | AZ/S | az/ns |
| 1986 | PUSA(2) | 1 | 1 | | |
| 1986 | (PCA) | 1 | 0 | 1 | 0 |
| 1986 | SB | 10 | 0 | 1 | 1 |
| 1986 | RC (2) | 9 | 1 | 1 | 0 |
| 1986 | Subtotal | 21 | 2 | 3 | 1 |
| 1986 | Others | 29 | 10 | 1 | 5 |
| 1986 | Totals | 50 | 12 | 4 | 6 |

**LCDR Selections,** by Board

| Board Date & Membership | | Selected | FOS | Selected | FOS |
|---|---|---|---|---|---|
| 1987 | FY 87 | IZ/S | iz/ns | AZ/S | az/ns |
| 1987 | ELCA | 6 | 0 | 0 | 1 |
| 1987 | (LMS) | 3 | 0 | 0 | 0 |
| 1987 | PUSA | | | 0 | 1 |
| 1987 | (PCA) | 1 | 1 | 0 | 0 |
| 1987 | DC | 0 | 0 | 0 | 0 |
| 1987 | ECCA | 1 | 0 | | 1 |
| 1987 | NBCUS | 1 | 0 | | |
| 1987 | RC | 15 | 1 | 0 | 1 |
| 1987 | Subtotal | 27 | 2 | 0 | 4 |
| 1987 | Other | 27 | 10 | 0 | 1 |
| 1987 | Total | 54 | 12 | 3 | 5 |
| | | | | | |
| 1988 | FY 88 | IZ/S | iz/ns | AZ/S | az/ns |
| 1988 | ELCA | 2 | 0 | 1 | 0 |
| 1988 | (LMS) | 1 | 0 | 0 | 1 |
| 1988 | PUSA | 5 | 1 | 0 | 1 |
| 1988 | (PCA) | 1 | 1 | 1 | 0 |
| 1988 | SB | 9 | 3 | 2 | 2 |
| 1988 | ABC | 3 | 0 | | |
| 1988 | DC | 3 | 0 | | |
| 1988 | RC | 7 | 2 | 0 | 1 |
| 1988 | Subtotal | 31 | 7 | 4 | 5 |
| 1988 | Others | 19 | 8 | 2 | 5 |
| 1988 | Total | 50 | 15 | 6 | 10 |
| | | | | | |
| 1989 | FY 89 | IZ/S | iz/ns | AZ/S | az/ns |
| 1989 | UM | 0 | 2 | 1 | 1 |
| 1989 | SB | 2 | 2 | 0 | 3 |
| 1989 | LDS | 1 | 0 | 0 | 0 |
| 1989 | PNBC | 0 | 0 | 0 | 0 |
| 1989 | RC | 0 | 0 | 1 | 1 |
| 1989 | Subtotal | 3 | 4 | 2 | 5 |
| 1989 | Other | 5 | 3 | 2 | 10 |
| 1989 | Total | 8 | 7 | 4 | 15 |

**LCDR Board decisions**

| | Decisions About "People like us" | | | | Decisions About "Others" | | | |
|---|---|---|---|---|---|---|---|---|
| | **** In Zone **** | | *** Above Zone *** | | **** In Zone **** | | *** Above Zone *** | |
| | Selected | FOS | Selected | FOS | Selected | FOS | Selected | FOS |
| FY 84 | 13 | 2 | 1 | 0 | 30 | 5 | 0 | 2 |
| FY 85 | 19 | 7 | 1 | 0 | 30 | 6 | 3 | 4 |
| FY 86 | 21 | 2 | 3 | 1 | 29 | 10 | 1 | 5 |
| FY 87 | 27 | 2 | 0 | 4 | 27 | 10 | 0 | 1 |
| FY 88 | 31 | 7 | 4 | 5 | 19 | 8 | 2 | 5 |
| FY 89 | 3 | 4 | 2 | 5 | 5 | 3 | 2 | 10 |
| Subtl | 114 | 24 | 11 | 15 | 140 | 42 | 8 | 27 |
| % | 83% | | 42% | | 77% | | 23% | |

The same data with a strict interpretation of "like us"
(i.e., w/o PCA and LMS):

**LCDR Board decisions**

| | Decisions About "People like us" | | | | Decisions About "Others" | | | |
|---|---|---|---|---|---|---|---|---|
| | **** In Zone **** | | *** Above Zone *** | | **** In Zone **** | | *** Above Zone *** | |
| | Selected | FOS | Selected | FOS | Selected | FOS | Selected | FOS |
| FY 84 | 9 | 2 | 0 | 0 | 34 | 5 | 1 | 2 |
| FY 85 | 19 | 7 | 1 | 0 | 30 | 6 | 3 | 4 |
| FY 86 | 20 | 2 | 2 | 1 | 30 | 10 | 2 | 5 |
| FY 87 | 23 | 1 | 0 | 4 | 31 | 11 | 0 | 1 |
| FY 88 | 29 | 6 | 3 | 3 | 21 | 9 | 3 | 6 |
| FY 89 | 3 | 4 | 2 | 5 | 5 | 3 | 2 | 10 |
| Subtl | 103 | 22 | 8 | 13 | 151 | 44 | 11 | 28 |
| % | 82% | | 38% | | 77% | | 28% | |

One might be tempted to try to analyze these data on an individual denomination basis. For, example, one might wonder if "PUSA's always behave that way" or if "LMS's are less prone to this than SB's." Interesting though those speculations may be, the data will not support them. There is too much change from year to year on the number of, and target percentage, for promotions. Some years "everybody" gets promoted, some years only about half the eligibles will be successful.

## APPENDIX G - LCDR Promotion Boards
## judging "people like us" vs "others"

Faith Group Composition of Chaplain Corps
Promotion Panels

(FY 1991-2002)

| | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|---|---|---|---|---|---|---|
| 1991 | BGC | 0 | 0 | 0 | 0 | |
| 1991 | RC | 11 | 4 | 2 | 0 | |
| 1991 | RCA | 0 | 0 | 0 | 0 | |
| 1991 | SDA | 3 | 0 | 0 | 0 | |
| 1991 | UM | 5 | 2 | 0 | 0 | |
| Subtotal | 1991 | 19 | 6 | 2 | 0 | |
| Others | 1991 | 49 | 16 | 1 | 0 | |
| Total | 1991 | 68 | 22 | 3 | 3 | |
| | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
| 1992 | ABC | 0 | 1 | 0 | 0 | |
| 1992 | LMS | 1 | 0 | 0 | 1 | |
| 1992 | RC | 8 | 2 | 1 | 4 | |
| 1992 | UCC | 0 | 0 | 0 | 0 | |
| Subtotal | 1992 | 9 | 3 | 1 | 5 | |
| Others | 1992 | 25 | 17 | 3 | 10 | |
| Total | 1992 | 34 | 20 | 4 | 15 | |
| | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
| 1993 | PCA | 2 | 0 | 0 | 0 | |
| 1993 | PUSA | 8 | 3 | 0 | 3 | . |
| 1993 | RC | 12 | 7 | 2 | 2 | |
| 1993 | SB | 10 | 7 | 1 | 3 | |
| 1993 | SDA | 2 | 0 | 0 | 0 | |
| Subtotal | 1993 | 34 | 17 | 3 | 8 | |
| Others | 1993 | 41 | 19 | 0 | 9 | |
| Total | 1993 | 75 | 36 | 3 | 17 | |
| | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
| 1994 | AME | 0 | 0 | 0 | 1 | |
| 1994 | LMS | 1 | 1 | 0 | 1 | . |
| 1994 | RC | 9 | 8 | 0 | 10 | |
| 1994 | SB | 4 | 3 | 2 | 4 | |
| Subtotal | 1994 | 14 | 12 | 2 | 16 | |
| Others | 1994 | 23 | 9 | 3 | 14 | |
| Total | 1994 | 37 | 21 | 5 | 30 | |

| | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|---|---|---|---|---|---|---|
| 1995 | CGIC | 2 | 0 | | | |
| 1995 | LMS | 0 | 2 | | | |
| 1995 | PUSA | 2 | 3 | | | |
| 1995 | RC | 11 | 6 | | | |
| 1995 | UM | 2 | 1 | | | |
| Subtotal | 1995 | 17 | 12 | | | |
| Others | 1995 | 39 | 19 | | | |
| Total | 1995 | 56 | 31 | | | |

| | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|---|---|---|---|---|---|---|
| 1996 | ELCA | 2 | 0 | 0 | 2 | |
| 1996 | J | 0 | 0 | 0 | 0 | |
| 1996 | NBCUS | 0 | 0 | 0 | 1 | |
| 1996 | RC | 1 | 3 | 1 | 14 | |
| 1996 | SB | 2 | 0 | 0 | 1 | |
| 1996 | UM | 1 | 0 | 1 | 1 | |
| Subtotal | 1996 | 6 | 3 | 2 | 19 | |
| Others | 1996 | 3 | 2 | 2 | 18 | |
| Total | 1996 | 9 | 5 | 4 | 37 | |

| | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|---|---|---|---|---|---|---|
| 1997 | ABC | 0 | 1 | 0 | 0 | |
| 1997 | LMS | 2 | 1 | 0 | 1 | |
| 1997 | RC | 3 | 5 | 3 | 14 | |
| 1997 | UCC | 0 | 0 | 0 | 0 | |
| Subtotal | 1997 | 5 | 7 | 3 | 15 | |
| Others | 1997 | 11 | 8 | 1 | 10 | |
| Total | 1997 | 16 | 15 | 4 | 25 | |

| | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|---|---|---|---|---|---|---|
| 1998 | CME | 0 | 0 | 0 | 1 | |
| 1998 | PHC | 0 | 0 | 0 | 0 | |
| 1998 | RC | 3 | 3 | 1 | 14 | |
| Subtotal | 1998 | 3 | 3 | 1 | 15 | |
| Others | 1998 | 13 | 19 | 2 | 11 | |
| Total | 1998 | 16 | 22 | 3 | 26 | |

| | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|---|---|---|---|---|---|---|
| 1999 | CGIC | 0 | 0 | 0 | 0 | |
| 1999 | CR | 0 | 0 | 0 | 0 | |
| 1999 | PUSA | 4 | 3 | 0 | 2 | |
| 1999 | RC | 5 | 7 | 2 | 16 | |
| 1999 | SDA | 0 | 0 | 0 | 1 | |
| Subtotal | 1999 | 9 | 10 | 2 | 19 | |
| Others | 1999 | 16 | 13 | 4 | 17 | |
| Total | 1999 | 25 | 23 | 6 | 36 | |

|  |  | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|---|---|---|---|---|---|---|
| 2000 | EPC | 3 | 0 | 0 | 0 | |
| 2000 | PUSA | 2 | 0 | 1 | 1 | |
| 2000 | RC | 6 | 4 | 2 | 19 | |
| 2000 | UCC | 0 | 0 | 0 | 0 | |
| Subtotal | 2000 | 11 | 4 | 3 | 20 | |
| Others | 2000 | 23 | 19 | 3 | 16 | |
| Total | 2000 | 34 | 23 | 6 | 36 | |

|  |  | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|---|---|---|---|---|---|---|
| 2001 | OBSC | 1 | 0 | 0 | 0 | |
| 2001 | PUSA | 2 | 1 | 0 | 0 | |
| 2001 | RC | 6 | 4 | 2 | 21 | |
| 2001 | SDA | 0 | 0 | 0 | 0 | |
| Subtotal | 2001 | 9 | 5 | 2 | 21 | |
| Others | 2001 | 28 | 23 | 10 | 16 | |
| Total | 2001 | 37 | 28 | 12 | 37 | |

|  |  | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|---|---|---|---|---|---|---|
| 2002 | ABC | 2 | 0 | 0 | 1 | |
| 2002 | NACCC | 0 | 0 | 0 | 0 | |
| 2002 | PUSA | 2 | 0 | 0 | 1 | |
| 2002 | RC | 3 | 1 | 1 | 17 | |
| Subtotal | 2002 | 7 | 1 | 1 | 19 | |
| Others | 2002 | 21 | 17 | 5 | 31 | |
| Total | 2002 | 28 | 18 | 6 | 50 | |

**1991-2002 BOARDS**

| | LCDR Promotion Boards Judging "People Like Us" | | | | | LCDR Promotion Boards Judging "Others" | | | |
|---|---|---|---|---|---|---|---|---|---|
| FY | IZ/S | iz/ns | AZ/S | az/ns | FY | IZ/S | iz/ns | AZ/S | az/ns |
| 91 | 19 | 6 | 2 | 0 | 91 | 49 | 16 | 1 | 0 |
| 92 | 9 | 3 | 1 | 5 | 92 | 25 | 17 | 3 | 10 |
| 93 | 34 | 17 | 3 | 8 | 93 | 41 | 19 | 0 | 9 |
| 94 | 14 | 12 | 2 | 16 | 94 | 23 | 9 | 3 | 14 |
| 95 | 17 | 12 | | | 95 | 39 | 19 | | |
| 96 | 6 | 3 | 2 | 19 | 96 | 3 | 2 | 2 | 18 |
| 97 | 5 | 7 | 3 | 15 | 97 | 11 | 8 | 1 | 10 |
| 98 | 3 | 3 | 1 | 15 | 98 | 13 | 19 | 2 | 11 |
| 99 | 9 | 10 | 2 | 19 | 99 | 16 | 13 | 4 | 17 |
| 2000 | 11 | 4 | 3 | 20 | 2000 | 23 | 19 | 3 | 16 |
| 2001 | 9 | 5 | 2 | 21 | 2001 | 28 | 23 | 10 | 16 |
| 2002 | 7 | 1 | 1 | 19 | 2002 | 21 | 17 | 5 | 31 |
| | 143 | 83 | 22 | 157 | | 292 | 181 | 34 | 152 |
| % | 63.3% | | 12.3% | | | 61.7% | | 18.3% | |

**BOARDS w SIGNIFICANT OPTIONS**

(2 OR MORE Board members with no constituency)

**LCDR Promotion Boards**
Judging "People Like Us"

| FY | IZ/S | iz/ns | AZ/S | az/ns |
|------|------|------|------|------|
| 92 | 9 | 3 | 1 | 5 |
| 93 | 34 | 17 | 3 | 8 |
| 94 | 14 | 12 | 2 | 16 |
| 95 | 17 | 12 | | |
| 97 | 5 | 7 | 3 | 15 |
| 98 | 3 | 3 | 1 | 15 |
| 2000 | 11 | 4 | 3 | 20 |
| 2001 | 9 | 5 | 2 | 21 |
| 2002 | 7 | 1 | 1 | 19 |
| | 109 | 64 | 16 | 119 |
| % | **63.0%** | | **11.9%** | |

**LCDR Promotion Boards**
Judging "Others"

| FY | IZ/S | iz/ns | AZ/S | az/ns |
|------|------|------|------|------|
| 92 | 25 | 17 | 3 | 10 |
| 93 | 41 | 19 | 0 | 9 |
| 94 | 23 | 9 | 3 | 14 |
| 95 | 39 | 19 | | |
| 97 | 11 | 8 | 1 | 10 |
| 98 | 13 | 19 | 2 | 11 |
| 2000 | 23 | 19 | 3 | 16 |
| 2001 | 28 | 23 | 10 | 16 |
| 2002 | 21 | 17 | 5 | 31 |
| | 224 | 150 | 27 | 117 |
| % | **59.9%** | | **18.8%** | |

**BOARDS w SIGNIFICANT OPTIONS**

(2 OR MORE Board members with no constituency)
(2 OR MORE Board members with no experience)

**LCDR Promotion Boards**
Judging "People Like Us"

| FY | IZ/S | iz/ns | AZ/S | az/ns |
|------|------|------|------|------|
| 92 | 9 | 3 | 1 | 5 |
| 93 | 34 | 17 | 3 | 8 |
| 94 | 14 | 12 | 2 | 16 |
| 95 | 17 | 12 | | |
| 97 | 5 | 7 | 3 | 15 |
| 2000 | 11 | 4 | 3 | 20 |
| 2001 | 9 | 5 | 2 | 21 |
| 2002 | 7 | 1 | 1 | 19 |
| | 106 | 61 | 15 | 104 |
| % | **63.5%** | | **12.6%** | |

**LCDR Promotion Boards**
Judging "Others"

| FY | IZ/S | iz/ns | AZ/S | az/ns |
|------|------|------|------|------|
| 92 | 25 | 17 | 3 | 10 |
| 93 | 41 | 19 | 0 | 9 |
| 94 | 23 | 9 | 3 | 14 |
| 95 | 39 | 19 | | |
| 97 | 11 | 8 | 1 | 10 |
| 2000 | 23 | 19 | 3 | 16 |
| 2001 | 28 | 23 | 10 | 16 |
| 2002 | 21 | 17 | 5 | 31 |
| | 211 | 131 | 25 | 106 |
| % | **61.7%** | | **19.1%** | |

**BOARDS w/o SDA**

| | LCDR Promotion Boards Judging "People Like Us" | | | | LCDR Promotion Boards Judging "Others" | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **FY** | IZ/S | iz/ns | AZ/S | az/ns | **FY** | IZ/S | iz/ns | AZ/S | az/ns |
| 92 | 9 | 3 | 1 | 5 | 92 | 25 | 17 | 3 | 10 |
| 94 | 14 | 12 | 2 | 16 | 94 | 23 | 9 | 3 | 14 |
| 95 | 17 | 12 | | | 95 | 39 | 19 | | |
| 96 | 6 | 3 | 2 | 19 | 96 | 3 | 2 | 2 | 18 |
| 97 | 5 | 7 | 3 | 15 | 97 | 11 | 8 | 1 | 10 |
| 98 | 3 | 3 | 1 | 15 | 98 | 13 | 19 | 2 | 11 |
| 2000 | 11 | 4 | 3 | 20 | 2000 | 23 | 19 | 3 | 16 |
| 2002 | 7 | 1 | 1 | 19 | 2002 | 21 | 17 | 5 | 31 |
| | 72 | 45 | 13 | 109 | | 158 | 110 | 19 | 110 |
| % | **61.5%** | | **10.7%** | | | **59.0%** | | **14.7%** | |

**APPENDIX G - Promotion Boards with an SDA member judging "people like us" vs "others"**

| LCDR | FY 84 | IZ/S | iz/ns | AZ/S | az/ns |
|------|-------|------|-------|------|-------|
| 1984 | RC(2) | 6 | 1 | 1 | 0 |
| 1984 | PUSA | 2 | 1 | | |
| 1984 | **SDA** | 0 | 0 | | |
| 1984 | LMS | 1 | 0 | | |
| 1984 | (ELCA) | 4 | 0 | 1 | 0 |
| Subtotal | 1984 | 13 | 2 | 1 | 0 |
| Others | 1984 | 30 | 5 | 0 | 2 |
| Total | 1984 | 43 | 7 | 2 | 2 |

| LCDR | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|------|------|------|-------|------|-------|------|
| 1991 | BGC | 0 | 0 | 0 | 0 | |
| 1991 | RC | 11 | 4 | 2 | 0 | |
| 1991 | RCA | 0 | 0 | 0 | 0 | |
| 1991 | **SDA** | 3 | 0 | 0 | 0 | |
| 1991 | UM | 5 | 2 | 0 | 0 | |
| Subtotal | 1991 | 19 | 6 | 2 | 0 | |
| Others | 1991 | 49 | 16 | 1 | 0 | |
| Total | 1991 | 68 | 22 | 3 | 3 | |

| LCDR | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|------|------|------|-------|------|-------|------|
| 1993 | PCA | 2 | 0 | 0 | 0 | |
| 1993 | PUSA | 8 | 3 | 0 | 3 | . |
| 1993 | RC | 12 | 7 | 2 | 2 | |
| 1993 | SB | 10 | 7 | 1 | 3 | |
| 1993 | **SDA** | 2 | 0 | 0 | 0 | |
| Subtotal | 1993 | 34 | 17 | 3 | 8 | |
| Others | 1993 | 41 | 19 | 0 | 9 | |
| Total | 1993 | 75 | 36 | 3 | 17 | |

| LCDR | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|------|------|------|-------|------|-------|------|
| 1999 | CGIC | 0 | 0 | 0 | 0 | |
| 1999 | CR | 0 | 0 | 0 | 0 | |
| 1999 | PUSA | 4 | 3 | 0 | 2 | |
| 1999 | RC | 5 | 7 | 2 | 16 | |
| 1999 | **SDA** | 0 | 0 | 0 | 1 | |
| Subtotal | 1999 | 9 | 10 | 2 | 19 | |
| Others | 1999 | 16 | 13 | 4 | 17 | |
| Total | 1999 | 25 | 23 | 6 | 36 | |

| LCDR | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|------|------|------|-------|------|-------|------|
| 2001 | OBSC | 1 | 0 | 0 | 0 | |
| 2001 | PUSA | 2 | 1 | 0 | 0 | |
| 2001 | RC | 6 | 4 | 2 | 21 | |
| 2001 | **SDA** | 0 | 0 | 0 | 0 | |
| Subtotal | 2001 | 9 | 5 | 2 | 21 | |
| Others | 2001 | 28 | 23 | 10 | 16 | |
| Total | 2001 | 37 | 28 | 12 | 37 | |

| CDR | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|------|------|------|-------|------|-------|------|
| 1986 | ELCA | 0 | 0 | 1 | 5 | |
| 1986 | GARB | 0 | 0 | 0 | 0 | |
| 1986 | RC | 4 | 2 | 1 | 11 | |
| 1986 | **SDA** | 0 | 0 | 0 | 0 | |
| Subtotal | 1986 | 4 | 2 | 2 | 16 | |
| Others | 1986 | 8 | 7 | 2 | 34 | |
| Total | 1986 | 12 | 9 | 4 | 50 | |

| CDR | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|------|------|------|-------|------|-------|------|
| 2001 | CMA | 1 | 0 | 0 | 1 | |
| 2001 | RC | 4 | 8 | 0 | 8 | |
| 2001 | **SDA** | 1 | 0 | 0 | 2 | |
| 2001 | UCC | 0 | 1 | 1 | 2 | |
| Subtotal | 2001 | 6 | 9 | 1 | 13 | |
| Others | 2001 | 24 | 19 | 1 | 34 | |
| Total | 2001 | 30 | 28 | 2 | 47 | 0 |

| CAPT | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|------|------|------|-------|------|-------|------|
| 1992 | RCA | 0 | 0 | 0 | 0 | |
| 1992 | LMS | 0 | 2 | 0 | 3 | |
| 1992 | RC | 5 | 8 | 0 | 19 | |
| 1992 | **SDA** | 0 | 0 | 0 | 1 | |
| 1992 | IFCA | 0 | 0 | 0 | 0 | |
| Subtotal | 1992 | 5 | 10 | 0 | 23 | |
| Others | 1992 | 11 | 9 | 2 | 31 | |
| Total | 1992 | 16 | 19 | 2 | 4 | |

| CAPT | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|------|------|------|-------|------|-------|------|
| 1995 | LMS | 0 | 0 | 0 | 5 | |
| 1995 | CHCCC | 0 | 0 | 0 | 1 | |
| 1995 | BGC | 0 | 0 | 0 | 0 | |
| 1995 | PUSA | 0 | 1 | 0 | 4 | |
| 1995 | RC | 4 | 3 | 1 | 20 | |
| 1995 | **SDA** | 0 | 0 | 0 | 1 | |
| Subtotal | 1995 | 4 | 4 | 1 | 31 | |
| Others | 1995 | 6 | 6 | 0 | 25 | |
| Total | 1995 | 10 | 10 | 1 | 56 | |

Compendium, Appendix G, page 22

| CAPT | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|------|------|------|-------|------|-------|------|
| 1998 | LMS | 1 | 3 | 0 | 2 | |
| 1998 | RC | 3 | 2 | 1 | 13 | |
| 1998 | BGC | | | | | |
| 1998 | **SDA** | | | 0 | 1 | |
| 1998 | UCC | | | 0 | 0 | |
| Subtotal | 1998 | 4 | 5 | 1 | 16 | |
| Others | 1998 | 6 | 9 | 1 | 32 | |
| Total | 1998 | 10 | 14 | 2 | 48 | |

| CAPT | | IZ/S | iz/ns | AZ/S | az/ns | BZ/S |
|------|------|------|-------|------|-------|------|
| 2000 | **SDA** | 0 | 0 | 0 | 1 | |
| 2000 | UM | 2 | 2 | 0 | 0 | |
| 2000 | RC | 2 | 3 | 1 | 4 | |
| 2000 | SB | 1 | 4 | 1 | 3 | |
| Subtotal | 2000 | 5 | 9 | 2 | 8 | |
| Others | 2000 | 5 | 8 | 1 | 12 | |
| Total | 2000 | 10 | 17 | 3 | 20 | |

**"SDA" Board decisions**

| RANK | FY | Decisions About "People like us" | | | | Decisions About "Others" | | | |
|------|-----|------|------|------|------|------|------|------|------|
| | | **** In Zone **** | | *** Above Zone *** | | **** In Zone **** | | *** Above Zone *** | |
| | | Selected | FOS | Selected | FOS | Selected | FOS | Selected | FOS |
| LCDR | 1984 | 13 | 2 | 1 | 0 | 30 | 5 | 0 | 2 |
| LCDR | 1991 | 19 | 6 | 2 | 0 | 49 | 16 | 1 | 0 |
| LCDR | 1993 | 34 | 17 | 3 | 8 | 41 | 19 | 0 | 9 |
| LCDR | 1999 | 9 | 10 | 2 | 19 | 16 | 13 | 4 | 17 |
| LCDR | 2001 | 9 | 5 | 2 | 21 | 28 | 23 | 10 | 16 |
| CDR | 1986 | 4 | 2 | 2 | 16 | 8 | 7 | 2 | 34 |
| CDR | 2001 | 6 | 9 | 1 | 13 | 24 | 19 | 1 | 34 |
| CAPT | 1992 | 5 | 10 | 0 | 23 | 11 | 9 | 2 | 31 |
| CAPT | 1995 | 4 | 4 | 1 | 31 | 6 | 6 | 0 | 25 |
| CAPT | 1998 | 4 | 5 | 1 | 16 | 6 | 9 | 1 | 32 |
| CAPT | 2000 | 5 | 9 | 2 | 8 | 5 | 8 | 1 | 12 |
| | Subtotal | 112 | 79 | 17 | 155 | 224 | 134 | 22 | 212 |
| | % | 5 8.64% | | 9.88% | | 6 2.57% | | 9.40% | |

**APPENDIX K**

**WHAT HAPPENED TO ALL THE NON-LITURGICALS?**

**What happened to all the Non-Liturgicals?**      Part 1.

1.      The Navy's experts introduced us to the semantic nuances of promotion discourse in Reference 1.  There they asserted that the promotion rates for Chaplains *considered* for promotion were uninfluenced by faith group assignment.  This finding flew in the face of acknowledged "widespread belief" to the contrary, as well as in the face of the demographic facts, and even in the face of the statistically significant findings in their own report.

2.      Reference 1 presented information that had me ask the question at the head of this Appendix: What happened to all the Non-Liturgicals?  I have been asking this question for five years; this Appendix provides the answer.

3.      In Reference 1 one can see the tracks of what is missing in the gaps between Chaplains promoted to Lieutenant Commander and Chaplains *considered* for and promoted to Commander and then Chaplains *considered* for and  promoted to Captain:

| From Reference 1,  Table 2 | Considered | Promoted  - to LCDR |
|---|---|---|
| Liturgical | 326 | 256 |
| Non-Liturgical | 327 | 260 |

| From Reference 1,  Table 3 | Considered | Promoted  - to CDR |
|---|---|---|
| Liturgical | 382 | 275 |
| Non-Liturgical | 364 | 252 |

| From Reference 1, Table 5 | Considered | Promoted - to CAPT |
|---|---|---|
| Liturgical | 298 | 176 |
| Non-Liturgical | 242 | 129 |

4.      These are not exactly the "same" Chaplains, but they are the "same pool".   The fact to notice here is the systematic decline from Liturgical/Non-Liturgical parity at the Lieutenant level to the ever decreasing proportion of Non-Liturgicals in the pool of those *considered* as the rank rises.

5.      At the Lieutenant to LCDR level there are roughly the same number of Liturgicals and Non-Liturgicals, (a ratio of 1.00 in both "considered" and "promoted").  But notice the increasing disparity as the ranks rise (a ratio of 1.05 in "considered" and 1.09 in "promoted") at the Commander level; and (1.23 in "considered" and 1.39 in "promoted") at the Captain level.

6.      There is a systematic reduction in the number of Non-Liturgical Chaplains "considered" for promotion at each successively higher level - and therein lies both the evidence for religious bias in the US Navy's Chaplain Corps promotion system and the explanation for why their "expert" and their pre-digested data do not see the bias.

•      Career growth is not just Step 1: Commissioned; Step 2: Promoted.

•      Chaplains grow their careers in a context that includes Officer Efficiency Reports, various inter-personal relations, career counseling, involuntary retirement, voluntary release from Active Duty, assignment and re-assignment, and a labyrinth of regulations which influence their destinies.

•      By focusing on just one action in this whole process, the Promotion Board, the Navy "sidesteps" (avoids discussing) the disparate impact their personnel management milieu is having on the career patterns of Non-Liturgical Chaplains. [But, even at that, the prejudice in the system is also evident in the actions of the Promotion Boards - see Above.]

•      There is more to "promotion" than "considered", but "considered" is very important.

7.      The "missing" Chaplains, those not *considered*, are not in the Navy's pre-digested data.

8.      Clearly, there are some Non-Liturgicals missing.

**What happened to all the Non-Liturgicals?**      Part 2.

9.      In Table K-1,  I have sorted the records for all the Chaplains for whom we have data into decades, based on commissioning date.  The boundaries of the decades were chosen to align with the "coverage dates" of the Chaplain Corp History volumes.

**Table K-1**
**Number of U.S. Navy Chaplains Surviving in the Data**
**By Faith Group**
**(Number Reported on Active Duty Commissioned During the Indicated Period)**

| Decade →<br>Faith Group ↓ | 1942-<br>1951 | 1952-<br>1961 | 1962-<br>1971 | 1972-<br>1981 | 1982-<br>1991 | 1992-<br>1997* | Ratio of 1982-91<br>to 1942-71 |
|---|---|---|---|---|---|---|---|
| Roman Catholic | 4 | 57 | 130 | 107 | 179 | 123 | 0.93 |
| Non Baptist NL | 1 | 27 | 32 | 71 | 143 | 95 | **2.57** |
| Liturgical | 45 | 132 | 144 | 200 | 295 | 184 | 0.89 |
| Baptist | 12 | 56 | 104 | 116 | 171 | 104 | 0.99 |
| Total** | 63 | 273 | 422 | 515 | 831 | 525 | 1.10 |

* The data in this column come from the Navy's CD produced in Discovery, and are FY data.  The balance of the data in this table are CY and are based on the Chaplain's Histories, Volumes, VIII and X.
** This is the Total; Special Worship Chaplains are not included in the Table.

10.      Volume VIII of that history is supposed to include all Chaplains who were on Active Duty for any substantial period of time between 1 January 1972 and 31 December 1981.  This would "surely" be all the Chaplains who were commissioned into Active Duty during this decade plus all the Chaplains who had been commissioned before this period and whose Active Duty service continued into it.

11.      The first thing to notice from Table K-1 is that as the cohorts age, i.e., as the data deals more and more with Chaplains who were commissioned "many years ago", the number of Chaplains in the data decreases.

•      On the average, there are as many Chaplains in (a) the data base from the 1982-1991 decade (those who were commissioned during the period covered by Volume X of the Chaplain Corps History, Ref 3 - not those earlier commissioned Chaplains who were still on Active Duty during some part of this period) as (b) survive from those commissioned during the first three decades "covered" by these data.

•      Logically, this could be because the Chaplain Corps is growing, or because the "older" Chaplains left Active Duty and were "dropped out of the Data Base" (or both).

12.     The second thing to notice from Table K-1 is that this phenomenon, the older Chaplains dropping out of the Data Base, is especially significant for Non-Baptist, Non-Liturgical Chaplains.  This "drop out" phenomenon is not just a "curiosity".  It is, as we shall see shortly, a result of the fact that Non-Baptist, Non-Liturgical Chaplains are singularly "driven out" of the Service by some feature of the U.S. Navy Chaplain Corps.

•       Logically, that feature could be either or both an environment which is hostile to their "Faith Group" in particular, or a conflict with the Corps based on some unsuitability in their character. (Attorney Hyde, with implied comparison to Catholic celibacy, speculated that "perhaps they [the Non-Liturgicals] had family issues" - see Reference 9.)

•       In any case, there can be no statistical doubt that this disparity is real. $p < .001$.

13.     Table K-2 reprises the decade information that was presented in Table K-1 subdivided by Faith Group, but this time, the subdivision is based on the highest rank achieved.

**Table K-2**
**Number of U.S. Navy Chaplains Surviving in the Data**
**By Rank**
**(Number Reported on Active Duty Commissioned During the Indicated Period)**

| Decade →<br>Faith Group ↓ | 1942-1951 | 1952-1961 | 1962-1971 | 1972-1981 | 1982-1991 | 1992-1997* | Ratio of 1982-91 to 1942-71 |
|---|---|---|---|---|---|---|---|
| Admiral | 1 | 3 | 3 | 0 | 0 | 0 | 0.000 |
| Captain | 50 | 152 | 167 | 31 | 7 | 4 | 0.019 |
| Commander | 11 | 77 | 178 | 194 | 239 | 41 | 0.898 |
| LCDR | 2 | 44 | 73 | 225 | 566 | 241 | 4.756 |
| LT | 0 | 0 | 4 | 59 | 20 | 106 | 5.000 |
| Total ** | 63 | 273 | 422 | 515 | 831 | 525 | 1.096 |

\* The data in this column come from the Navy's CD produced in Discovery and are FY data.  The balance of the data in this table are CY and are based on the Chaplain's Histories, Volumes, VIII and X.
\*\* This is the Total; Lieutenants Junior Grade are not included in the Table.

14.     The first thing to notice from this table is that the distribution within the table is skewed.  The "older" Chaplains have a higher average rank than the more recent ones - of course.  The U.S. Navy Chaplain Corps uses a seniority based promotion system.   This does not mean: "if one stays in the Corps long enough, one will rise to Admiral."  It means: "if one rises to Commander, one is *allowed* to stay in the Corps until retirement. Under the Navy's general "Up or Out" policy, a chaplain who is not promoted to Commander in a reasonable period of time (and two tries) may be asked to leave Active Duty.  Such a Chaplain is not always "Released from Active Duty", but the rules allow it.

15.     Many of the Commanders and Captains leave, of course - eventually all of them leave; but if one reaches these higher ranks, one is allowed to stay in the Corps until retirement (unless, of course, there is a SER Board.)

16.     The second thing to notice from this table is the impact of the "rank versus decade" confounding on observed "promotion rates".

17.     Anybody who used "older data" or who included "older data" in a Promotion Study would find speciously high promotion rates, and on the other side of the coin, anybody who limited his/her "Promotion Study" to relatively recent data would find artificially low promotion rates.

18.     Look at Table K-3:

•       The CNA Study (Reference 1) used data from "Year Groups 1957 to 1980" and found "high" overall promotion rates to Commander. (cf Appendix I).

•       Dr. Siskin (Reference 2) used recent data (promotions between 1991 and 2002),  and found "lower" promotion rates. (cf Appendix J and N.)

19.     The high apparent promotion rates are because "early data" no longer includes the un-promoted who have left Active Duty.

20.     The lower rates are because the "eventual" Above Zone promotions which may come to the patient, have not yet all played out.

**Table K-3**
**Promotion Rates to CDR by Data Sample**

| Denomination | Probability of Promotion My Appendix D | Probability of Promotion Dr. Siskin[1] | Probability of Promotion CNA |
|---|---|---|---|
| Roman Catholic | **66.8 %** | **58.7 %** | **83.7 %** |
| Liturgical | 54.4 % | 52.0 % | 72.0 % |
| Non-Liturgical | 53.8 % | 53.2 % | 69.2 % |

[1]This Data has not been corrected for uncounted Above Zone and Below Zone promotions.

21.     But, whatever distortions are introduced by this "favorable sampling period" confounding or "older cohort" confounding, it is notable that the Roman Catholic Chaplains always do better in the promotion race, under any circumstances, than do the Non-Liturgical Chaplains.

22.    Having shown:

•        that Non-Liturgicals are disproportionately "dropped out" of the data and

•        that the early data is disproportionately higher ranked than the recent data,

let us see if these two factors interact when it comes to Non-Liturgical vs Roman Catholic Chaplain promotions.

23.    If the drop outs are related to promotion steps, they correlate to Navy  policies and practices, and may not be "explained away" (or dismissed) as character traits, or "family issues" within the disenfranchised denominations.

24.    Tables K-4 and K-5 are repeated from Reference 4. (Table K-4  was under "fact" 8; Table K-5 was under "fact" 51.)  I have some issues with both of these tables, which I addressed in my Addendal, but (a) the context from which I drew the Tables certifies them as "what the Navy believes" and (b) notwithstanding my issues, the information in these tables proves that some feature of the Navy Chaplain Corps promotion process is depriving Non-Liturgical Chaplains of opportunity.

**Table K-4**
**Faith Group-Category Demographics of the Chaplain Corps**
**Broken Down by Rank**
**As of December 2004 (From Ref 4, Fact 8)**

|          | LTJG  | Lt    | Lt. Cdr | Cdr   | Captain | Admiral |
|----------|-------|-------|---------|-------|---------|---------|
| Non-Lit  | 75.00 | 48.77 | 41.57   | 41.82 | 38.10   | 50.00   |
| Lit-Prot | 25.00 | 28.40 | 36.08   | 32.12 | 35.71   | 0       |
| R. Cath  | 0     | 15.43 | 18.04   | 20.61 | 21.43   | 50.0    |
| Sp Wor.  | 0     | 4.93  | 4.31    | 5.45  | 4.76    | 0       |

25.    It is noteworthy that even these ersatz mutually acceptable material facts, demonstrate  the presence of Religious Bias in Chaplain Corps personnel management:

•        There are no Roman Catholic LTJG's; the Catholics get a head start.

•        75% of the most junior Officers in the Corps are Non-Liturgicals (They do not get a head start) and they lose half their *relative* numbers on the way up:

•        Only 38% of the Captains are Non-Liturgical.

- 18% of the Corps (Catholic) at the LCDR level, rises to 21% of the Corps at the Captain Level. This is a 16% increase in "market share" for Catholics, while

- 42% of the Corps (Non-Liturgical) at the LCDR level, drops to 38% of the Corps at the Captain Level.   This is a 10% decrease in "market share" for Non-Liturgicals.

26.    Even if these percentages were correct, one could not say that they were *right*.

**Table K-5**
**Selection Rates (% of In-Zone Eligible Chaplains Selected)**
**By Faith Group Categories for Fiscal Years 1991-2002**
**Chaplain Corps Lieutenant Commander, Commander and Captain Promotion Boards**
**Broken out by Rank (From Ref 4, Fact 51)**

|  | Lt Commander (O-4) | | | Commander (O-5) | | | Captain   (O-6) | | |
|---|---|---|---|---|---|---|---|---|---|
|  | Elig. | Sel. | % Sel | Elig. | Sel. | % Sel | Elig | Sel. | % Sel |
| Roman Catholic | 132 | 76 | 57.6% | 92 | 54 | 58.7% | 90 | 39 | 43.3% |
| Lit. Protestant | 243 | 150 | 61.7 | 175 | 90 | 51.4 | 107 | 50 | 46.7 |
| Non-Liturgical | 293 | 190 | 64.9 | 216 | 116 | 53.7 | 121 | 54 | 44.6 |

27.    From the data in these two tables we can calculate the ratios in the pipeline as Chaplain cohorts flow from LT to Captain.  See Table K-6 (on the next page.)

28.    The individual Chaplains reported upon in this table are not being followed through the pipeline; Table K-6 is a report at each stage in the process, based on data provided by the Navy and "certified" as correct. When we do follow the individual Chaplains through the pipeline we find the same pattern (see Table 12 in my Addendal).]

29.    Note that relative to the Catholic and Liturgical Faith Groups, the Non-Liturgical Faith Group loses Chaplains all along the promotion pipeline - between promotions, and at promotion opportunities.

30.    Catholics and Liturgicals gain about 6% and 11% in relative "market share" of the Corps - and they do this at the expense of the Non-Liturgicals, who lose more than 20%.

31.    It is still logically possible that these losses are due to a "character flaw" among Non-Liturgicals or a philosophical, psychological, or "personality"  mismatch with the Corps.

32.    But this logical possibility is inconsistent with the timing of the losses, which are not early disillusionment or  "shakedown cruise" dropouts, but tend to coincide with flow points, i.e. promotion opportunities.

**Table K-6**
**Gains and Losses Along the Promotion Pipeline**
**As a Function of Faith Group**

| PIPELINE ↓ | Catholic Group % | Catholic Cum GAIN | Liturgical Group % | Liturgical Cum GAIN | Non-Lit Group % | Non-Lit Cum LOSS |
|---|---|---|---|---|---|---|
| Percent at LTJG* | 0.0 | -- | 25.0 | -- | 75.0 | -- |
| % at LT* | 15.43 | 0.00 | 28.40 | 3.40 | 48.77 | - 10.20 *** |
| % Eligible for LCDR ** | 18.81 | 3.38 | 34.64 | 9.64 | 41.77 | - 17.20 |
| % at * LCDR | 18.04 | 2.61 | 36.08 | 11.08 | 41.57 | - 17.40 |
| % Eligible for CDR ** | 18.14 | 2.71 | 34.51 | 9.51 | 42.59 | - 16.18 |
| % at* CDR | 20.61 | 5.18 | 32.12 | 7.12 | 41.82 | -16.95 |
| % Eligible for CAPT ** | 26.95 | 11.52 | 32.05 | 7.05 | 36.28 | - 22.49 |
| % at* CAPT | 21.43 | 6.00 | 35.71 | 10.71 | 38.10 | - 20.67 |

* Data from Reference 4, Fact (8).
** Data based on Table 5, Reference 4, Fact (51) with 5% for Special Worship.
*** This cell's entry is three times the entry in the adjacent cell; the entries at LTJG bore a 3:1 ratio; this is "wheeled" around the RC base line at LT.

33.    My assertion here is that logic argues that the timing of these losses reflects on the Corps, and not on the Chaplains.  There is "something" in the way the Corps operates which is having a differential, a disparate, impact on Non-Liturgical Chaplains and which, in that context, helps Catholic and Liturgical Chaplains.  The losses tend to occur at the promotion thresholds - "thresholds" are not "family" events, but flow points!

**Career Patterns, Drop Out Rates, and Timing**

34.     I took all the records from the Chaplain Histories (Volumes VIII and X, References 3 and 5) and I sorted them by year of Commissioning and Faith Group. (I separated the Non Liturgicals into Baptist and "Other", i.e. Non-Baptist, Non-Liturgical). Then I prepared a spread sheet which

counted the number of chaplains in each cohort and the number who had retired or otherwise left the service after X years, with "x" running from 1 to 37. Those results are here in the Compendium, in Appendix H, together with Bar Charts (Appendix H2) for each set of cohorts.

35.    Table K-7 shows several important characteristics for the early years of these cohort data:

**Table K-7**
**Drop Out Rates by Faith Group**
**Part A: the early years**

| Faith Group →<br>Period ↓ | Roman<br>Catholic | Liturgical<br>Protestant | Baptist | Non-Baptist<br>Non-Liturgical |
|---|---|---|---|---|
| First Year | 5.1 % | 0.3 % | 0.9 % | 0.6 % |
| First 10 Years | 52.5 % | 44.1 % | 37.9 % | 34.4 % |

36.    Is it ironic that the Roman Catholics are the least likely to stay in the Chaplain Corps during the early career years, before there are any significant promotion barriers?

37.    Is it a measure of commitment to their careers that the Non-Liturgicals in general, and the Non-Baptist, Non-Liturgicals in particular, are the most likely to stay in the Corps - the most likely to persevere through the first decade?

38.    I do not have a "statistical" answer to those questions, but I can report that these differences are statistically significant beyond the .001 level.  Catholics and Liturgicals "quit"; Non-Liturgicals  "Soldier on" with the job.

39.    Against that record, one cannot justify harboring the belief that the Non-Baptist, Non Liturgicals are dropping out of the Corps at the CDR threshold because "they have changed their minds" about their commitment, or because they have "family issues".

40.    Let us look at the "Drop Out" rates further along:

**Table K-8**
**Drop Out Rates by Faith Group**
**Part B: The mid Career Years**

| Faith Group →<br>Period ↓ | Roman<br>Catholic | Liturgical<br>Protestant | Baptist | Non-Baptist<br>Non-Liturgical |
|---|---|---|---|---|
| 2 years prior to CDR Zone | 2.0 % | 1.9 % | 2.3 % | 1.6 % |
| 3 years after CDR Zone | 3.1 % | 8.2 % | 3.5 % | 11.7 % |

41.     Clearly, (1) "drops outs" occur coincident with the Promotion cycle and (2) drop outs are more common (then) among the Liturgicals and Non-Baptist Non-Liturgicals than among the Roman Catholics and Baptists (the "larger" denominations).

42.     Something like this also happens at the CAPT level, with the Catholics fairing best, and liturgicals doing better than Non-Liturgicals. (cf "degrees of separation" from Catholic.)

**Table K-9**
**Drop Out Rates by Faith Group**
**Part C: The Last Career Years**

| Faith Group →<br>Period ↓ | Roman Catholic | Liturgical Protestant | Baptist | Non-Baptist Non-Liturgical |
|---|---|---|---|---|
| 3 years prior to CAPT Zone | 5.1 % | 3.1 % | 3.5 % | 5.0 % |
| 4 years after CAPT Zone | 13.5 % | 11.7 % | 21.4 % | 25.4 % |

43.     The evidence shows that:

•       (1) every Faith Group attrits,

•       (2) Catholics are the most prone to early attrition, and least prone to later attrition.

•       (3) Early attrition is monotonic - each year another largely fixed percentage of Chaplains leaves the Active Duty. [This is nominally 5% per year for Catholics, 4% per year for Liturgicals and 3% per year for Non-Liturgicals.]

•       (4) Mid Career attrition seems to superimpose "steps" onto the steady pattern of attrition, steps which coincide with promotion opportunities.

•       (5) Catholics gain "market share" at each rank transition and Non-Liturgicals lose it.

•       (6) Some of these losses occur due to failure to be selected for promotion, and some occur coincident with failure to be considered - because one is no longer in the pool.

44.     The statistical evidence suggests that the Chaplain Corps personnel management system exerts a systemic pressure on Non-Liturgical Chaplains. This is a pressure which is strong enough to overwhelm those Chaplains' natural tendency to stay in Service, and they are both systemically and systematically denied promotion opportunity. One might even wonder if there is not a preliminary "consideration" for promotion which takes place within the Officer Efficiency Report process and (a) expresses Corps bias, (b) alerts Non-Liturgical Chaplains that their opportunities are limited - or about to be limited, and (c) encourages them to leave, to retire or to petition for release from Active Duty.

45.    What is the Chaplain Corps *doing* to these people?

46.    When their careers are behind them, here is what happens to the careers of One Hundred Chaplains of each "Faith Group".   (See Appendix H and Appendix A.)

**Table K-10**
**Career Pattern by Faith Group**

| Faith Group → Period ↓ | Roman Catholic | Liturgical Protestant | Baptist | Non-Baptist Non-Liturgical |
|---|---|---|---|---|
| Accessioned | 100 | 100 | 100 | 100 |
| Serve 10 yrs | 47 | 56 | 63 | 66 |
| Serve 20 yrs | 39 | 54 | 60 | 60 |
| Serve 31 yrs | 22 | 37 | 14 | 20 |
| Rise to CDR | 48 | 43 | 38 | 29 |
| Rise to CAPT | 23 | 22 | 15 | 11 |

47.    Not surprisingly, no matter how one looks at the detail in all this data, the pattern is consistent:

•    (1) Catholics and Liturgicals are "over-represented" in the top category of longevity  - signaling that they were promoted and retained in the Corps in proportions in excess of their sub-population numbers.

•    (2) Catholics are at an average higher rank than their brethren of other denominations - signaling that they have an advantage in the promotion queue.

•    (3) Non-Liturgicals in general, and Non-Baptist Non-Liturgicals in particular are under-represented in long length of service - signaling that they were not promoted (and had to leave).  Had they been promoted, that record would have appeared in the History volumes as they would have been on Active Duty with their peers.

•    (4) Non-Liturgicals in general, and Non-Baptist Non-Liturgicals in particular are under promoted, for even those who survive into later periods have an average lower rank than their brethren.

48.    And *that* is what happened to all the Non-Liturgicals.

**APPENDIX  M**
**Analysis of Promotion Board Composition**
**and Promotion Board Decisions**

1.      The discussion here, which starts with material from the Addendal, demonstrates (a) that U.S. Navy Chaplain Corps Promotion Board composition is controlled by religious preferences and then it demonstrates (b) that those preferences influence the Boards' Promotion decisions -

        (1) measured in toto,
        (2) assessed on a One Catholic/Two Catholic basis, and even
        (3) assessed on a denomination by denomination basis.

2.     In Discovery, the Navy provided Faith Group information for most of the officers assigned to each of the Promotion Boards which were convened from 1977 through 2002.  (See Appendix C.)  Non Chaplain officers did not have faith group information provided, but the Faith Group data provided covered the Chaplains, and the Chaplains constituted more than 90% of all the assigned officers.

3.     Table M-1 provides data on Board assignment frequency by Faith Group.

**Table M-1.**
**Representation by Faith Group**
**Number of Boards**

| Seventy Three Boards | Roman Catholic | Liturgical Protestant | Non-Liturgical | | Special Worship | |
|---|---|---|---|---|---|---|
| | | | Baptist | Other | Jewish | Other |
| Number of Boards with No Officers of this Faith: | 0 | 0 | 16 | 52 | 66 | 57 |
| Number of Boards with One Officer of this Faith: | 42 | 13 | 40 | 20 | 7 | 16 |
| Number of Boards with Two Officers of this Faith: | 28 | 35 | 17 | 1 | 0 | 0 |
| Number of Boards with Three Officers of this Faith: | 3 | 21 | 0 | 0 | 0 | 0 |
| Number of Boards with  Four Officers of this Faith | 0 | 4 | 0 | 0 | 0 | 0 |

4.    Without even considering the precision of statistical analysis, Table M-1 shows clearly that religion-based decision-making is taking place in Chaplain Corps Promotion Board composition.

5.    Every Board had at least one Roman Catholic Chaplain.  Every Board had at least one Liturgical Protestant Chaplain assigned.  This is compelling evidence of an arbitrary practice of "stacking the deck" so that every Board has a majority of Catholics and Liturgicals.*

6. .   Statistics can tell us how unlikely this pattern of religious discrimination/allocation is.

7.    The Biographical Data for the Navy Chaplain Corps, Vol X [See Reference 3], indicates that there were 674 Officers eligible to serve on Promotion Boards, and of these 196 were Catholic.]

8.    According to the laws of Combinatorial Mathematics, there are over one trillion different possible Board compositions if one is choosing five officers from a pool of 674.  [The actual number of possible, **equally likely**, statistical combinations is 1,141,984,766,384**].

•    The Probability of having exactly one Catholic on any one 5 member Board is 0.3687.
•    The Probability of having exactly two Catholics on any one 5 member Board is 0.3027.
•    The Probability of having exactly three Catholics on any one 5 member Board is 0.1234.
•    The Probability of having exactly four Catholics on any one 5 member Board is 0.0250.
•    The Probability of having exactly five Catholics on any one 5 member Board is 0.0020.  And.
•    The Probability of having no Catholics on any one 5 member Board is 0.1783.

9.    It may be pointed out that (a) not all of the 674 ranking Chaplains, nor all of  the 196 Roman Catholic Chaplains, for that matter, were on Active Duty during each of the 73 Boards, and also that (b) not all of the Boards had 5 members.  However, reducing the number of available Chaplains or increasing the size of the Board, does not make it much easier (statistically) to achieve a random sample with NO Catholics on the Board.

10.    If we limit candidates for service on a Promotion Board to the Chaplains who were (a) at or above the rank of Commander and (b) on Active duty at the time of one Board (instead of at any time for *all* Boards), then we are choosing from a population of 284 Officers, 82 of whom are Catholic, and the Probability of having no Catholics on any one 5 member Board is 0.1794.**

_____

*  With a Board composed of 5 members, it is not obvious that One Catholic and One Liturgical can constitute a majority, but in point of fact, the Catholics and Liturgicals were at least 50% of the membership on 71 of the 73 Boards convened during this period, 1977 to 2002.  [The average Board for considering promotions to Captain was 70% Roman Catholic and Liturgical.]

** The Formula is $C^{674}_5$, or (674*673*672*671*670*669!)/(5*4*3*2*1)*(669!)

11.    With the assumptions and data at hand, the probability of composing one Board and having at least one Catholic on it is 0.8217. (1.00 - 0.1783). The probability of establishing two Boards, at random, and getting at least one Catholic on at each of them, is 0.8217 times 0.8217 (or 0.6752).  Two consecutive Boards with Catholics on each of them, then, is likely to occur most of the time (67.5%), but the probability of drawing four consecutive Boards and getting at least one Catholic on each of them is less than half: 0.4558.

12.    Following this calculus, the likelihood of random assignment or faith neutral allocation producing 73 consecutive Boards with at least one Catholic on every one of them is exactly: 0.0000005945. (This is 0.8217 to the 73rd power.)

13.    The probability of achieving what actually happened, with respect to getting Catholics on every Board, if the system was not biased, contrived, or controlled is about 1 time in 1.6 million.

14.    Similar analysis for the Liturgical Officers (of whom there were 97 Commanders, Captains and Admirals on Active Duty who *could* have been chosen to be on a Promotion Board) shows that he Probability of having no Liturgical Officers on any *one* Board is 0.1215.*

15.    And (as in paragraphs 8 to 12 above) the probability of composing 73 consecutive Boards and always getting at least one Liturgical on every one of them is 0.8785 to the 73rd power, or 0.00007819.

16.    Every person on earth, all six billion of them, could have drawn a random sample for a Chaplain Corps Promotion Board once a month, for every month, from 1977 to 2002  and not one of them would, in all statistical likelihood, have picked a sample with 73 consecutive Promotion Boards with at least one Catholic and at least one Liturgical on EVERY Board.  The Navy's actual result could not have happened by chance!

17.    The only interpretation which fits these data is that: The U.S. Navy Chaplain Corps intentionally chooses Chaplains for the Promotion Boards based on Religious Faith Group.

18.    In assembling Promotion Boards, The Navy Chaplain Corps, identifies, selects, assembles, **balances** Board composition so that:

•      One or two Roman Catholics are on EVERY Board,
•      One or two (or three or four)  Liturgical Chaplains are on EVERY Board, and
•      One "Other" (Non-Liturgical or Special Worship Chaplain), is assigned to most Boards.

19.    This does not even **look** fair; furthermore, it is not even handed; and even if it were argued to be  "well meaning," it is a misguided introduction of religion *per se* into an assignment process which is supposed, ordered, required, by Navy policy, to be faith blind or faith neutral.

---

* The Formula is $C^{202}_5 / C^{284}_5$

20.    The **fact** of assigning one or two Catholics to each Promotion Board is an explicit introduction of "considerations of faith" into what should be a purely administrative action.

21.    The **policy** of assigning two Catholics to every Board was changed in 1986/7, following settlement in a court case (Wilkins vs. Lehman, *et al*) but the Policy as well as the change were, and are, explicit acknowledgments that faith, in fact Catholicism was, and is, one of the criteria in assigning Chaplains to Promotion Panels. (See Ref 1, p26.)

22.    It is interesting to notice that in implementing this **change in policy** in 1986/7, the Navy protected Catholic influence as much as it could, while being required to reduce the Catholic presence on the Promotion Boards by one half.

**Table M-2.**
**What Happened to Board Composition after the Change in Policy**
**From Two Catholics on the Board to One Catholic on the Board?**

| Average Board Composition: | "Two Catholics" 1977 to 1987 | "One Catholic" 1988 to Present | Nominal Change |
|---|---|---|---|
| Total Number of **"voters"** on each Promotion Board | 6.00 | 5.95 | None |
| Number of **NON Chaplains** on each Board | 0.06 | 1.07 | **Plus One** |
| Number of **Catholic** Chaplains on Each Board | 1.97 | 1.07 | **Minus One** |
| Number of **Liturgical** Chaplains on Each Board | 2.55 | 1.98 | Minus Half |
| Average Number of **Baptist** Chaplains on Each Board | 0.97 | 1.07 | Tiny Plus |
| Number of **Other Non-Lit** Chaplains on Each Board | 0.23 | .36 | Tiny Plus |
| Number of **Special Worship** Chaplains on Each Board | 0.16 | .43 | Plus a Quarter |

23.    Table M-2 (above) presents the average Board composition, by Faith Group, before and after the change of Policy from two Catholics to one Catholic.  Note that the effect of the change was to drop one Catholic Chaplain from the Board, as "agreed", but his/her slot was not opened up to other Chaplains; the Navy, instead, added a non Chaplain:

24.    One wonders if it was irony, misunderstanding, or circumvention of intent, that the "extra" Catholic was replaced with a non Chaplain, instead of a Chaplain of a "non Catholic Persuasion".

25.    Table M-3 provides an assessment of the Catholic proportion of the total faith-based vote on a Promotion Board, under alternative one and two Catholic configurations.

**Table M-3.**
**"Catholic Influence"**
**Under Alternative Board Configurations**

| Configuration:<br>(w/ave of 5.9 to 6.0 Officers on each Board) | Catholic Faith-Based Vote as a Percent of all Faith-Based Votes |
|---|---|
| Two Catholics (no Non Chaplains) | 34.5 |
| One Catholic (no Non Chaplains) | 18.0 |
| One Catholic and One Non Chaplain | 22.0 |

26.    Replacing one Catholic Chaplain with a non Chaplain Officer, although consistent with the seeming *letter* of the Policy change, only reduced apparent "Catholic Influence" by 1/3. Following the seeming *spirit* of the change in Policy would have reduced apparent "Catholic Influence" by 1/2.


## IMPACT

27.    One might ask, "So what? What difference does all this make?"

28.    **First**, assigning Chaplains to Promotion Boards based on each Chaplain's religious belief (whether Catholic, or not, or Liturgical, or not, etc.)  is contrary to stated, official Navy Policy. Officially, no Chaplain is supposed to be assigned to, or not assigned to, a Promotion Board because of his (or her) religion.   It is clearly a violation of that policy to control Promotion Board composition:

•        (a) so that every Board has Two Catholics, or
•        (b) so that every Board has One Catholic, or
•        (c) so that  every Board will have at least one Roman Catholic and at least one Liturgical as well as (71 times out of 73) at least one "Other" Chaplain, and routinely one non Chaplain.

29.    One cannot achieve any *regular* pattern of Faith Group distribution on Promotion Boards without *considering,* in fact *managing by*, Faith Group with respect to Promotion Boards.

**Defendants Admit that they Manage by Faith Group**

30.    In Defendants' Motion for Summary Judgment (Reference 4)  they say "The Chaplain Corps uses four categories of faith groups to manage its Chaplains: ..."

30.1    They do not say they use these categories "to tally", "to record", "to keep track of", "to account for", or even "to monitor",  "to understand", or "to review" the Corps' records; they do not say, as they might if they were using skills or training (as in managing Navy Band members), that they distribute their Chaplains based on where their ministry is required; the Navy says they use these categories to "Manage the Corps" -  and this is what they do.

31.    The Navy uses Faith Group (sic) to control the distribution of denominations on Promotion Boards, the number of Chaplains who are accessioned into the Corps, who are allowed to stay in the Corps, who are promoted within the Corps, and even who are (and are not) allowed to get Medical Retirements.

32.    In fact, every dimension of personnel management practice which we can illuminate with data shows the effect of control based on Religious Denomination - with deference always in favor of the Roman Catholics, and limitation always falling on Chaplains from the Non-Liturgical Faith Group in general and Evangelicals within that Group and Special Worship Faith Group Chaplains in particular.

33.    This statement in Reference 4 is an admission.  So too, it appeared to me, was the *we have to do this and it is our judgment and our duty* soliloquy I heard from Defendants' Attorney Hyde in oral argument on this topic in California (see Reference 9.)

34.    **Second,** to the extent that religious preference influences promotion decisions, stacking the Boards with a preferred religion tends to stack the Chaplain Corps itself with promotions that are from those religions.  The corollary of this observation is that denying Promotion Board seats to certain Faith Groups or denominations works to keep those Faith Groups and denominations from being promoted and, in a vicious circle, reduces their availability for service on Promotion Boards.

**Promotion Boards influence Corps composition both directly and indirectly.**

35.    The direct influence of Promotion Boards is, of course, by *promotion.*   Every candidate who is promoted adds his/her credentials to the leadership of the Corps.

36.    But Board decisions also influence Corps composition  indirectly.  First, officers who are not promoted on the first available opportunity, (a) gain or maintain seniority within their current rank, but (b) lose seniority to those of their cohort who have been promoted.  Second, officers who are not promoted on their second *consideration* are, and know themselves to be, prejudiced against vis a vis further service.  From time to time, although irregularly enforced, it has been

Navy policy that one is "Up or Out".  Presumably, being "passed over twice" is cause for severance from the Corps.

37.    Since Promotion Boards can pass over a candidate, the Boards' decision influences the candidate's career, perhaps even his continuance in the service, if he (or she) is not promoted.

38.    The balance of this Appendix  will demonstrate the invidious effect of  "stacking the Promotion Boards."  The evidence is clear, but laying it out requires a little care.

39.    I have three models, each of which leads to the same conclusion: Denomination matters.

•       The first model (which I presented first in the Addendal, and begin with here) uses  "a broad scale".  This approach looks at the collection of Boards as a whole and  tries to correlate faith distribution in the Promotion Boards as a pool to the Faith Distribution of the selectees vs the Faith Distribution of the eligibles.  This is a "neat and tidy" calculation, but not an altogether transparent statistical method.  It demonstrates that the religious mix on the Board is three times as important in determining the religious mix among the promoted as the raw distribution in the pool of eligibles.  (¶ 40-69)

•       The second model, which also appeared in the Addendal, divides the Boards into those with one and two Catholics, and those with and with out specific Faith Groups and compares the selections of the two groups of Boards.  The results show a statistically significant relationship between Board composition and Board decisions.  (¶ 70-85.)

•       The third approach is to abandon the Navy's Faith group terminology and look at the actual comparison of the *denominations* of the Board Members versus the denominations of the eligibles.  This is a clear and straight forward test of "like promotes like".  It proves that candidates of a denomination equal to that of a Board member do better, on the average, than candidates who do not share a denomination with any Board Member. (¶ 86-135.)  ( P<.01)

No matter how one parses this data, "faith matters" in promotion decisions.

**Model 1:  Comparing the Pool of Faith Groups on the Promotion Boards
 to the Pool of Faith Groups who get Promoted**

40.    If one wants to try to correlate Promotion Board composition to Promotion Board selection, one needs (a) a description of the candidate pool, (b) an assessment of the actual Promotion Boards as they sat, and (c) an enumeration of the promotion decisions which effectuated.

41.    <u>The Promotion Pool</u>.  Table M-4 gives several alternatives for assaying the relative number of candidates for promotion:

**Table M-4.**
**Comparison of Faith Group Distributions**
**Of Chaplains who *could* be Promoted:**
**Completed Careers vs Active Duty vs Those who *were* considered**

|  | Roman Catholic | Liturgical Protestant | Non-Liturgical | | Special Worship | |
|---|---|---|---|---|---|---|
|  |  |  | Baptist | Other | Jewish | Other |
| Completed Careers | 212 | 323 | 186 | 93 | 9 | 22 |
| Active Duty 12/31/91 | 217 | 341 | 213 | 169 | 14 | 27 |
| Total "Considered" 1991- 2002 | 290 | 492 | 561 | | 78 | |

42.     The first two lines of Table M-4 present data drawn from "History of the Chaplain Corp, U.S. Navy Volume X: Biographies 1982-1991" (Ref 3.).   "Completed Careers" is data characterizing all Chaplains whose retirement or release from Active duty is recorded in this volume.

43.     The second row in Table M-4 shows the Faith Group distribution of all Chaplains who were still on Active Duty on December 31, 1991.  Completed Careers shows what happened to the cohort who has gone through the promotion process.  Active Duty shows the current status of serving Officers.  This is the pool who *will be* considered.

44.     The third row in Table M-4 is a tabulation of the Officers who were considered by the Promotion Boards which were convened between 1991 and 2002.  These data were taken from Dr. Siskin's Statistical Analysis (Ref 2.), and corroborated by review of the Promotion Board Lists that were  produced as Exhibit 1 at my deposition on October 1, 2003.  (See Appendix B.) [Where Dr. Siskin has tallied only the Chaplains who were considered In Zone, I have verified his counts in the Navy's Consecutive Sequence Number list and then counted the Above Zone considered as well as the Below Zone considered. See Appendix E, in the Addendal.]

45.     I include the data in Row 3 with some trepidation as they are not what they seem to be. (See "The Navy's 'Probability of Selection' is not a probability of promotion", above, in Appendix J).  However, (a) the data ought to be correlated to what the Board actually considered (in the Standard English denotation for that word), and (b) we can also look at the question again, from a different angle, on an individual Board basis,  and eventually on an individual denomination basis. [Those examinations will  follow this one.]

46.     Where Rows 1 and 2 of Table M-4 count each Chaplain once, Row 3 counts each Chaplain every time he is "considered".  Row 3 counts once a Chaplain who is *considered* and then promoted, but may count more than once a Chaplain who was listed as Below  Zone (and not selected), and considered again, (and not selected) as In Zone, and then considered an additional time or two, or three or eight(!) times (and not selected) as Above Zone.

47.    I have not settled on what the best measure of candidacy is, but I am disposed to use Row 1.  These are Chaplains whose careers have been completed and what happened is what happened.  This is the answer to the question of where each Chaplain ended his career.

•    Row 2 certainly measures the pool of candidates, but some of these people have not yet been considered for the highest ranks.

•    Row 3, which is clearly de facto the pool of people who were considered, is overly weighted with Chaplains who were not (and probably will not be) promoted.

48.    On balance, though, almost any reasonably representative pool of candidates will suffice to test the influence of Promotion Board composition.  We need a relative distribution, by Faith Group; we do not need a census of the candidates. [The analysis here is about the patterns by Faith Group, the relative numbers, not the actual counts.]

49.    I have addressed, in another Appendix to this Compendium (see Appendix K), why and how the Navy seems to loose a disproportionate number of Non-Baptist Non-Liturgicals and Special Worship Chaplains, but for now, let us use the Completed Careers data.  [This data is the most conservative versus the position we are testing (and will show): that the Faith Distribution of the Promotion Board Composition colors the selection decisions of that Board.]

50.    Promotion Board Composition.  Data for the second variable in our test will be drawn from the Promotion Board composition data which has been produced by the Navy - See Appendix C.  Here we will tabulate, for all the Promotion Boards combined, the number of Chaplains, by Faith Group, who were assigned to any Board.  An interesting refinement will be to correlate each Board's composition to each Board's selections.  We will turn to that next, (in Model 2) but the sample sizes are very small, so statistical confidence limits are very large.

51.    Chaplains who were Promoted.  We do not have actual promotion data for the whole period during which these Boards operated.  What we do have is a record of promotion from the middle of this period (1981 to 1992), the records in Reference 3, and a derivative record of promotions, by Faith Group from the last decade during which these Boards operated, 1991-2002.   Table M-5 shows both of these samples.

52.    Line 1 in Table M-5 begins in Reference 2, as verified by cross comparison to Navy secondary* records, Appendix B (in the Addendal). Line 1 includes Above Zone promotions as well as In Zone and Below Zone.  (See Appendix E.)

_____

* In the Addendal I referred to these records as "primary", but, having seen the precepts for, and reports from, Promotion Boards, it occurs to me, I now understand, that these "pre-digested" records are not primary records, but secondary records.  The distinction is important in general, but not central to the analysis at hand.

53.    If we were to use these figures in conjunction with tallies of the number of *considered* Chaplains, we would step into a morass of conditional probabilities and Bayesian Statistics. But that is not an issue at present, as we have decided (see paragraph 47) to use the record of Chaplains who have completed their careers as the surrogate for "considered" - instead of the confounded tally in References 1 and 2. (See Appendices D, E, I and J.)

**Table M-5.**
**Comparison of Faith Group Distribution of**
**Officers Selected for Promotion 1981-1992 and 1992-2002**

| | Chaplains from each Faith Group Promoted to CDR and Above | Roman Catholic | Liturgical Protestant | Non-Liturgical | | Special Worship | |
|---|---|---|---|---|---|---|---|
| | | | | Baptist | Other | Jewish | Other |
| 1 | 1991-2002 (Ref 2) | 109 | 167 | 193 | | 47 | |
| 2 | 1981-1992 (Ref 3) | 171 | 231 | 119 | 45 | 3 | 8 |
| 3 | Ratio | 1.57 | 1.38 | .84 | | .23 | |

56.    Line 2 in Table M-5  is drawn from the individual Chaplain biographical records, Reference 3, (See Appendix A).

57.    The third row in Table M-5 presents the ratio between Row 1 and Row 2.  This is a measure of the similarity between the two distributions (if they were "equivalent" but just with different sample sizes, the ratio would be constant across Faith Groups.)  Clearly the two time periods are different, at least in terms of their treatment of Non-Liturgicals and Special Worship Chaplains, whose lot *may* have improved in this later decade - a surmise we will return to (See Appendix N.)

58.    Faced with a choice between (a) a verified number of promotions from the middle of the time when these Boards operated, and (b) a dis-aggregated (Non-Liturgicals are treated as a single pool, and so too are Special Worship Chaplains) sample from the end of this period (after the 2 Catholic Policy had been changed), Table M-6 will use the more representative, more detailed sample (based on Reference 3).  We can turn later to consider the sample from Reference 2. (See Model 3 and Appendix N.)

59.    We are now ready to assemble the data we want to correlate: the Pool of Candidates, the Promotion Board Composition, and the Pattern of Selections.  (See Table M-6 and M-6A.)

60.    The  difference between Table M-6 and Table M-6A, is that Table M-6A converts the actual counts in Table M-6 into relative percentages.  This has two advantages.  First, it provides an explicit notice that it is the relative figures which are important, and second by converting to percentages, direct visual observation is facilitated.

**Table M-6.**
**Comparison of Faith Group Distribution of**
**Candidates, Officers on Promotion Boards, and Those Selected**
**Actual Counts**

| Number of Chaplains Who ↓ | Roman Catholic | Liturgical Protestant | Non-Liturgical Baptist | Other | Special Worship Jewish | Other |
|---|---|---|---|---|---|---|
| 1. Completed their Careers 1981-1992 | 212 | 323 | 186 | 93 | 7 | 23 |
| 2. Were Members of Promotion Boards: 1977-2002 | 104 | 158 | 74 | 26 | 6 | 16 |
| 3. Were Promoted to CDR and Above: 1991-2002 | 171 | 231 | 119 | 45 | 3 | 8 |

**Table M-6A.**
**Comparison of Faith Group Distribution of**
**Candidates, Officers on Promotion Boards, and Those Selected**
**Relative Percentages**

| Percent of Chaplains by Faith Group, Who ↓ | Roman Catholic | Liturgical Protestant | Non-Liturgical Baptist | Other | Special Worship Jewish | Other |
|---|---|---|---|---|---|---|
| 1. Have Completed Their Careers | 25.2 | 38.3 | 22.0 | 11.0 | 0.8 | 2.7 |
| 2. Were Members of Promotion Boards | 27.1 | 41.1 | 19.3 | 6.8 | 1.5 | 4.2 |
| 3. Have Been Promoted | 29.6 | 40.0 | 20.6 | 7.8 | 0.5 | 1.5 |

[One "must" note that the relative percentage of Chaplains who are promoted (Row 3), versus the number who are available for promotion (Row 1), increases for Roman Catholic and Liturgical Chaplains (for example from 25.2% to 29.6% for Catholics) and decreases for Non-Liturgicals and Special Worship Chaplains (from 11.0% to 7.8% for Non-Baptist, Non-Liturgicals.) This is hard evidence of Faith Group bias in promotions in the U.S. Navy Chaplain Corps, and we are about to see *why* it occurs.]

61.    The data lines in Tables M-6 and M-6A are comparable because they are from contemporary policy periods, and they cover many of the same Chaplains, but they are not exactly the same Chaplains *per se*.  Some of the Chaplains whose careers were completed prior to 1991 served on Promotion Boards (Row 2) in 1977 to 1991, and some of the Chaplains in Row 3 who were promoted may also have served (in their turn) on Promotion Boards in 1993 to 2002. The point here is that the three data lines provide different, but still comparable, windows on the U S Navy's Chaplain Corps promotion system.

62.    Table M-6 provides the numbers we need to measure the relationships between (Row 1), the number of Chaplains available for promotion, (Row 2), the number of Chaplains by faith group on the Promotion Boards and (Row 3),  the Number of Chaplains who are promoted.

63.    Not surprisingly (the data lines ought to be correlated), the correlations here are all above .95. This indicates that just over 90% of the variability in the differences in promotion rates can be explained by the independent variables.  The linear regression is:

$$\text{Number Promoted} = \text{ a constant } (-6.934)$$
$$+ \ \mathbf{0.305} \ \text{ x } \ \text{Number Accessioned}$$
$$+ \ \mathbf{0.941} \ \text{ x } \ \text{Number on Promotion Board}$$

64.    There is more to the statistical theory than this, but it is convenient to think of the regression weights (.305 and .941) as *measuring* the relative importance of the two factors.

65.    The telling point in this linear regression is that the presence of Chaplains of a given faith on the Promotion Board receives three times the weight (.941) in predicting *that* faith's number of promotions, as does the weight (.305) for the prevalence of that faith group in the pool of candidates.

66.    We have now shown that the folk lore psychology (Reference 1) is justified in the case of Navy Chaplain Corps Promotion Boards.  The religious composition of the Promotion Board influences (one might say "contaminates") the Board's selections. The Boards tend to select candidates who have the same faith as they do.  The linear regression demonstrates that belief in what one might call "Religious Favoritism" or "Religious Elitism" is justified.  Like likes like.

67.    The Navy's Alpha Rosters show that:

- 55% of the Chaplain Corps' accessions are Catholic and Liturgical, and
- 45% of its accessions are Non-Liturgical and Special Worship; but

- 71% of the Chaplain Corps' Captains are Catholic and Liturgicals and
- 29% are of its Captains are Non-Liturgical and Special Worship.

68.    This difference in faith distribution at accession, vs faith distribution at Captain is "end of career" proof that there is religion-based bias in the Navy Chaplain Corps' career management system.  Catholic and Liturgical Chaplains tend to be promoted; Non-Liturgical and Special Worship Chaplains tend to be disappear from the Service.

69.    The Catholics and Liturgicals on the Boards tend to over promote fellow Catholics and Liturgicals and under promote Non-Liturgicals and Special Worship Chaplains.

70.    As rank increases, the relative Faith Distribution in the Corps drifts to match the Faith Distribution of the Promotion Boards.  And since the distribution of Faith Groups on the Promotion Boards is controlled (by religious preference), so too is the distribution of Faith Groups at the highest ranks of the Corps controlled by arbitrary intervention by Chaplain Corps' management.

**Here is another way of illuminating this issue:**
**Model 2.   Direct Comparison of Promotion Boards and Outcomes**

71.    Instead of considering Promotion Board composition *en toto*, let's look at what subsets of "different" Boards actually did on particular Promotion choices.  The sample sizes are smaller, of course, so the statistical confidence limits are broader,  but the evidence is still dramatic.

72.    Table M-7 (on the next page) compares the promotion outcomes from Promotion Boards with 2 Catholics to the promotion outcomes from Promotion Boards with only (sic) one Catholic.

73.    The Navy produced a second set of Promotion Board related lists.  This collection seems to be the instructions to and reports from most of the Promotion Boards which met between 1981 and 1995.  The data are not altogether complete, but they can be salvaged by correspondence to (and filled-in from) other records - See Appendix D in the Addendal.

74.    Between October 1, 1980  and September 30, 1992, twelve Promotion Boards  met to consider candidates for promotion to Commander.  These Boards considered a total of over 500 different Navy Chaplains.  During this time period there were six Boards which had two Catholic members and six Boards which had just one Catholic member.

 75.    The performance of these two configurations is compared in Table M-7 (on the next page).  [The individual data lines which are summarized in Table M-7 can be found in Appendix D. The Addendal version of this Appendix has only the Chaplains for this Table; the Compendium version of this Appendix has these CDR candidate Chaplains as well as Chaplains considered later, and considered for LCDR and CAPT.]

76.    The twelve CDR Promotion Boards which met during this time were, not coincidentally, convened with two Catholic Chaplains on every Board from 1981 through 1986, and then, in 1987 because of a Court approved settlement (and concern that having two Catholics on every

Board was undue Catholic influence), the number of Catholic Chaplains on each Board was changed to one.

**Table M-7**
**Comparison of Records for**
**Promotion Boards with One and Two Catholics**

| | Roman Catholic | Liturgical Protestant | Non-Liturgical Baptist    Other | | Special Worship Jewish    Other | |
|---|---|---|---|---|---|---|
| **Boards with One Catholic (1987-1992)** | | | | | | |
| Number of different LCDRs considered | 72 | 123 | 72 | 50 | 8 | 7 |
| Number Selected | 41 | 58 | 37 | 25 | 5 | 4 |
| Promotion Percent* | 56.9% | 47.2% | 51.4% | 50.0% | 62.5% | 57.1% |
| **Boards with Two Catholics (1981-1986)** | | | | | | |
| Number of different LCDRs considered | 72 | 95 | 64 | 27 | 3 | 4 |
| Number Selected | 46 | 44 | 23 | 14 | 2 | 3 |
| Promotion Percent* | 63.9% | 46.3% | 35.9% | 51.9% | 66.7% | 75.0% |

77.     Table M-7 shows that when there were two Catholics on the Board, the likelihood of *those* boards promoting a Catholic was roughly 10% larger than when there was only one Catholic Chaplain on the Promotion Board.  This result, notwithstanding the fact that the CNA Study (Reference 1) thought it was statistically significant, albeit using an improper computation (see Appendix I in this Compendium), is not statistically significant when tested as a stand alone comparison.  41 Chaplains chosen out of 72 considered is not statistically different than 46 Chaplains chosen out of 72  considered.  The difference *matters* to the five extra Chaplains who are promoted, but it is not statistically significant below the .25 level.

_____

* This is nearly a true Promotion Percent [see Compendium ¶ 113 and 197ff].  This is not the misleading "Probability of Selection" which is used in Ref 2.  The reasons why this distinction is important have been discussed above. [See Appendix J.]  The percentage here is the probability of being selected (eventually) regardless of the number of times or number of  Boards ones candidacy was presented to.  There are still a few problems with the computation done this way, as a few LCDRs (about 10% of the total) were considered both before 1987, and not selected, and also considered in the period when there was only one Catholic Chaplain on the Board; these candidates' record in front of each set of boards is included in the totals for each set of boards.

78.    On the other hand, both when there were two Catholics on the Board and when there was only one Catholic on the Board, Catholics did better than any other faith, even the Liturgicals. But the most disadvantaged Chaplains in this time period are the Non-Liturgicals, and collectively, they suffered more setback under two Catholics than they do now under the One-Catholic-Chaplain-on-Each-Board regimen.  The number of promotions which the Liturgicals lose to the Catholics is statistically significant at the .01 level, and the number of promotions which the Non-Liturgicals lose to Catholics is also statistically significant at the .01 level.

79.    It is of more than passing interest to note that when the number of Catholics changed from two on the Board to one on the Board, something else changed too. (See Table M-2).  The Baptist vote on each Board changed from 0.97 votes out of six Chaplains to 1.07 votes out of five Chaplains, and their proportional influence went from 16.2 % (0.97/6) to 21.4% (1.07/5).

80.    This is a 132% increase in "religious power" (if one believed in such power, and if one measured it as the relative per capita Faith Group vote on the Board).  This 132% increase in Baptist Power is accompanied by a 143% increase in the probability of such relatively "Baptist Intense" Boards selecting a Baptist.

81.    While the statistical evidence so far is supportive of  the proposition that Promotion Board composition influences Board selections; clearly this tendency is not limited to Catholics, who are (and have been)  "in the controlling seats" in Chaplain Corps management.

82.    The data do not inform whether this religious preference result is intentional and conscious, or unintentional and simply a reflection of the phenomenon which the CNA study bowed to: "Like will promote like", or "Birds of a feather flock together".  The underlying presumption there is that it is easier for Chaplains of a given faith to find not only affinity with others of the same faith, but, less draconianly, they may simply understand those Chaplains' work experience better and see its relevance to future assignments more readily than for Chaplains who have a different background.

83.    Two of the twelve Chaplain Promotion Boards summarized in Table M-7, had a Non-Baptist Non-Liturgical Chaplain on the Board.  The selections of these two Boards are summarized in Table M-8 (on the next page).

84.    Table M-7 compared sample sizes that were roughly the same size (about 300 Chaplains each), but Table M-8, because almost all Promotion Boards have no Non-Baptist Non-Liturgicals members on them, has a very small sample as a test case.  This broadens confidence limits on statistical comparisons.  However,  (not surprisingly) the, may we call them the  "Non-Baptist Non-Liturgical Boards" (sic), promoted their "kind" nearly 30% more when they were on the Board, than when they were not.

85.    This difference falls just shy of being statistically significant at the .05 level using a two tailed test, but it is certainly consistent with an observation that "Faith Matters" - in what (who)

the Promotion Boards select, and may be taken as "statistically significant" at the .05 level, using a one tailed test.

**Table M-8**
**Comparison of Records for Promotion Boards with**
**One Non-Baptist Non-Liturgical Chaplain and No Non-Baptist Non-Liturgical Chaplains**

|  | Roman Catholic | Liturgical Protestant | Non-Liturgical Baptist | Other | Special Worship Jewish | Other |
|---|---|---|---|---|---|---|
| **Boards with No Non-Baptist Non-Lits (1981-1992)** |  |  |  |  |  |  |
| Number of different LCDRs considered | 137 | 198 | 116 | 70 | 10 | 11 |
| Number Selected | 82 | 92 | 60 | 35 | 7 | 7 |
| Promotion Percent | 59.9% | 46.6% | 51.7% | 50.0% | 70.0% | 63.6% |
| **Boards with One Non-Baptist Non-Lit (1987& 1990)** |  |  |  |  |  |  |
| Number of different LCDRs considered | 7 | 20 | 11 | 7 | 1 | 0 |
| Number Selected | 5 | 10 | 9 | 4 | 0 | 0 |
| Promotion Percent | 71.4% | 50.0% | 81.8% | 57.1% | 0 % | 0 % |

**DISTINCTION, DIFFERENCE AND DISCRIMINATION**

86.    The U.S. Navy Chaplain Corps distinguishes among its Chaplains on the basis of rank and on the basis of what they call "Faith Group."  Defendants' Exhibit 5 lists 110 different religious denominations which the Navy, for its own purposes, categorizes into four Faith Groups:

•       Roman Catholic,
•       Liturgical Protestant
•       Non-Liturgical Protestant
and
•       Special Worship

87.    If the assignment of denominations to a Faith Group mattered no more than the alphabetical sorting of denominational names, no adverse consequences would follow from this arbitrary differentiation.

88.    But the U.S. Navy Chaplain Corps *manages* their chaplains by Faith Group.  This is an admission in both their written pleadings* and in their oral argument.**

89.    Neither the U.S. Navy's "Faith Group" categories, nor its management of Chaplains based on these groups, is faith neutral.  Data analysis shows that the consequence of this management practice is disparate impact,  the de facto establishment of Catholicism as the "favored" religion within the U.S. Navy Chaplain Corps, relegation to "ugly step sister" of all the other "mainstream faiths", and treatment as "ugliest step sister of all", of all the Non-Baptist, Non-Liturgical and Special Worship denominations.

•      Roman Catholics are given their own "Group"
                And a Roman Catholic is given a seat on every Promotion Board

90.    No other denomination is singled out for separate "groupness", nor is any other *denomination* guaranteed a seat on every Promotion Board.

91.    Liturgical Christians (Lutheran, Methodist, Presbyterian, Congregational, Episcopalian, and all other Non-Catholic, "liturgical" denominations, are pooled together, along with their own "opposites" (the liberal and conservative factions of Lutheran, Methodist, Congregational, Episcopal, and Presbyterian, etc.)  into one "group".

91.1.   One of the ironies of classification/categorization is that opposites are among the most similar of "different" items.  In conventional taxonomy opposites share all but one dimension. [A white cat is more *like* a "black cat" than it is a *like* a rusty Ford convertible.]  But in religious classification (and utilization), opposites in this sense may be anathema to each other.  A congregation may "welcome" a visiting clergyman of a conforming service more readily than one from a factional differentiation.  Issues and differences such as infant baptism, music in the service, and dispensationalists  vs charismatics may well be more important in using Chaplains than the gross differentiations suggested by the Navy's "Catholic vs Others" Faith Groups.

_____

*  See Proposed "fact" number 1 in Defendants' proposed "Material facts as to which there is no genuine issue in support of their motion for summary judgment" (Reference 4).

**   I personally heard Attorney Hyde, in Federal Court in San Diego, California on May 13, 2005 explain how Jewish Chaplains are managed differently than Chaplains of fungible faith, and how the distribution of Roman Catholic Chaplains to various operational units requires husbanding .

91.2.   I do not know whether this pooling with ones own opposite is a "good idea" or a bad one, or whether separating each side of the "Catholic" denomination is consistent with that, but it bears some thought.  The Navy has not explained the basis for its use of these four "groups" (sic); it has merely stated that this set of "Groups" is  "necessary" to manage the Corps.

91.3.   The Liturgical Faith Group is given at least one representative on every Promotion Board. This assignment bias with respect to Promotion Boards not only guarantees what I refer to as the "White Collar Clergy" a majority voting block on the Promotion Boards, it also gives disparate equity in that process vis a vis individual denominations. [Shortly, see ¶ 93, below, I will provide additional evidence that this disparity causes disparate promotion rates.]

92.     The fourth "Faith Group" is what the Navy calls "Special Worship".  This is Jewish and Muslim; Seventh Day Adventist and Unitarian; Christian Science and Mormon, (as well as "Reorganized" Mormon).

92.1    Everybody else is, in the Navy's lexicon, "Non-Liturgical Protestant".  This group is largely Southern Baptists (who alone outnumber the Roman Catholics in the Chaplain Corps by nearly 2 to 1), but the "Group" also includes other Baptist denominations,  evangelicals and charismatics, Assembly of God, Pentecostal, Christian Church (Disciples of Christ) , Church of Christ, Church of God, Nazarene, Wesleyan and Salvation Army and many other Chaplains from "small endorsers".

92.2.   These last two groups are given a seat on Promotion Boards about 80% of the time, but most of that is allocated to a Baptist, and generally to a Southern Baptist.  The Non-Baptist Non-Liturgical and Special Worship Chaplains are given a seat on the Promotion Board only about 1/3 of the time - and even less often when promotion to Captain is under consideration.


**Model 3.   The Impact of Denominational Distribution on Promotion Boards vs the Denominational Selections of those Boards**

93.     As can be seen in Table M-9, on the next page, different denominations have both (a) very different likelihoods of being allowed to pass judgment on Chaplain Promotion, and (b) a likelihood which is not proportional to the relative distribution of the individual denominations in the Corps as a whole.

94.     Column 4 in Table M-9  indicates whether a candidate before a Promotion Board is likely to be reviewed by a Board Member with the same Faith Group as the candidate.  Column 5 calculates a metric that reflects this likelihood in terms of each Faith Group's relative proportion of the Corps.

95.     Catholic Chaplains have about twice the "fair share" likelihood of being reviewed by at least one Chaplain of their Faith as do Chaplains of any of the other Faith Group.

**Table M-9**
**Faith Groups Assigned to Promotion Boards**
**1977 to 2002**

| Faith Group | Number in Chaplain Corps (1)* | Percent of Chaplain Corp (2) | Number Assigned to Promotion Boards (3) | Percent of All Boards with at least one of this FG (4) | Relative Likelihood of a Board match Col (5) |
|---|---|---|---|---|---|
| Roman Catholic | 171 | 20.0 | 104 | 100.0 | 5.0 |
| Liturgical | 298 | 34.9 | 162 | 100.0 | 2.9 |
| Non-Liturgical | 338 | 39.6 | 96 | 78.1 | 2.0 |
| Special Worship | 47 | 5.5 | 22 | 9.6 | 1.7 |

* Legend:

Column 1 is the number of Chaplains in the Corps in July 2001, the data and the date were provided by the Navy as representative in its Memorandum of Points and Authorities in Support for its Motion for Summary Judgment. Ref 4.
Column 2 is the percentage of the Corps represented by the Faith Group counted in Column 1.
Column 3 is the number of Chaplains of this Faith Group assigned to any Promotion Board. We have data on 73 Boards during this period, so clearly many boards had more than one Chaplain from some Faith Groups.[Table M-1.]
Column 4 is the percent of all Boards which had at least one member of this Faith Group assigned. [Appendix C.]
Column 5 is the ratio of the percentage in Column 4 to the percentage in Column 2.

96.    This difference is only relevant if a Board member treats fellow denomination candidates differently than he or she treats "other" denominations.  That is, stacking the Boards in favor of one Faith Group, or one denomination or another, only "matters" if something akin to "like likes like" is operating in the Chaplain Corps.

97.     Analysis in the Addendal (repeated above) suggested that this is the case - and that the propensity for like to promote like is not limited to Catholic Board Members.  In the next section of this Compendium I will return to this question and use denominational matches to explore it.

98.    In the meantime, it is important to notice that the metric in Column 5 in Table M-9 is even more dramatic when denomination is used to diss-aggregate the data.  As usual, "the Devil is in the Details."

99.    Look at Table M-10 (on the next page).

**Table M-10**
**Denominations Assigned to Promotion Boards**
**1977 to 2002**

| Denomination | Number in the USN Chaplain Corps | % of the USN Chaplain Corps | Number of Board Members with this denomination | % of Boards with at least one Member with this Denomination | Relative Likelihood of a Board Match |
|---|---|---|---|---|---|
| Catholic | 482 | 23.0% | 104 | 100.0% | 4.3 |
| | | | | | |
| Southern Baptist | 295 | 14.1% | 38 | 49.3% | 3.5 |
| 17 Other Baptists | 172 | 8.2% | 36 | 45.2% | 5.5 |
| | | | | | |
| Methodist | 219 | 10.5% | 25 | 34.2% | 3.3 |
| Presbyterian | 155 | 7.4% | 42 | 54.8% | 7.4 |
| Lutheran | 174 | 8.3% | 42 | 53.4% | 6.4 |
| Episcopalian | 56 | 2.7% | 4 | 5.5% | 2.1 |
| UCC | 48 | 2.3% | 10 | 13.7% | 6.0 |
| AME | 17 | 0.8% | 8 | 11.0% | 13.5 |
| 24 Other Liturgical | 153 | 7.3% | 31 | 41.1% | 5.6 |
| | | | | | |
| CC(DC) | 41 | 2.0% | 4 | 5.5% | 2.8 |
| Assembly of God | 36 | 1.7% | 0 | 0.0% | 0.0 |
| CFGC | 19 | 0.9% | 0 | 0.0% | 0.0 |
| 35 Other NB-NL | 183 | 8.7% | 18 | 24.7% | 2.8 |
| | | | | | |
| SDA | 22 | 1.1% | 12 | 16.4% | 15.6 |
| Jewish | 26 | 1.2% | 6 | 8.2% | 6.6 |
| LDS | 23 | 1.1% | 3 | 4.1% | 3.7 |
| 2 Other SW | 7 | 0.3% | 1 | 1.4% | 4.2 |

Legend as before, except that the population by denomination is based on the records in the Chaplain Histories (Ref 3).

100.    Notice, again, that the Catholics are the only denomination that always has a member of its discipline on the Promotion Board.  What appeared to be a monolithic benefit for the Liturgical Chaplains, in Table M-9, erodes here in a flurry of non random variation where some relatively small sub-populations of Chaplains have apparently very high relative degrees of "matching" a denomination to a Board Member.

101.    However, in point of fact, that presumptive "benefit" is not really there.

102.     As the size of the sub-population decreases, the probability of having one of your group appear on a list of candidates to be considered also decreases, and this compounds with the lower probability of your denomination being chosen to be on any Board, so that the probability of a small sub-population Chaplain appearing before a Board which has a Chaplain of his or her faith on it is diminishingly small.

103.     For example, although the Jewish sub-population seems to have a "higher than a Catholic's" proportionate likelihood of encountering one of their own on a Promotion Board (that is the Jewish likelihood metric in Column 6 of Table M-10 is 6.6 where the Catholic's is 3.3), none of the Boards that I have examined so far has had a Jewish Board Member on it who was given an opportunity to vote on a Jewish In Zone candidate - but every Catholic candidate before a Board has had a Catholic Board Member there who could vote for (or against) him or her.

104.     The major finding in Table M-10 has to be about the Non-Baptist, Non-Liturgicals, all of whom are from small sub-populations of the Chaplain Corps; they virtually never find a friendly face, a comporting denomination, on the Promotion Boards.

105.     Does this matter?


**FAITH MATTERS** - Illusory, Allusory, Collusory?

106.     Without getting into a long preamble here, one may look for evidence that a Faith-Based Promotion Board's religious composition colors its decisions. I am not contravening a Supreme Court enjoinder against assuming that just because a person is assigned to a duty because he has a particular faith he may be assumed (actually may not be assumed) to allow that faith to color his or her decisions - for that reason alone.   I am not saying that I assume there is bias, and here is the proof.

107.     I am saying (1) that bias has already been alleged, widely (see Reference 1) and (2) that it may be tested for by the analysis proposed here.

108.      In the Addendal which this Compendium expands upon, I used the Navy's Faith Groups as the basis for considering this issue.  (See ¶s 27-85 above.)

109.     Faith Group is a crude classification; it masks many differences and may easily dilute an individual denomination's capacity or propensity to support eligible chaplains "like" themselves. Even so, the Addendal found evidence in support of "Like Likes Like"*.

_____
* This catch phrase is a bow to the use of the concept in the CNA Promotion Study (Reference 1, which, in turn bowed, to the presentation of the concept in their references and the appearance of the phenomenon in their data.)

110.    What I have done here is:

•    take the denominational information from each Board, for example the FY 1991 LCDR Board which was composed of one

> BGC (Baptist General Conference)
> RC (Roman Catholic)
> RCA (Reformed Church in America)
> SDA (Seventh Day Adventist)

And one

> UM (United Methodist)

•    and then I counted/tallied all Above Zone and In Zone eligibles before this Board and annotated the alignment/juxtaposition between the candidates and the Board Members by denomination:

|        | IZ/S | iz/ns | AZ/S | az/ns |
|--------|------|-------|------|-------|
| BGC    | 0    | 0     | 0    | 0     |
| RC     | 11   | 4     | 2    | 0     |
| RCA    | 0    | 0     | 0    | 0     |
| SDA    | 3    | 0     | 0    | 0     |
| UM     | 5    | 2     | 0    | 0     |
| "Others" | 49 | 16    | 1    | 3     |

> Where IZ/S signifies that a candidate with this denomination was selected In Zone
> iz/ns signifies that a candidate with this denomination was not selected In Zone
> AZ/S signifies that a candidate with this denomination was selected Above Zone, and
> az/ns signifies that a candidate with this denomination was not selected Above Zone

111.    This little chart is clearly too small a sample from which to draw any conclusions.  It is consistent with "like likes like" as the ratios of Selection to Non-Selection are slightly better for candidates who shared a denominations with someone on the Board than it is for the denominations which had no one on the Board, but it is also consistent with "there is no bias evident" as the difference noted is both slight and not statistically significant.

112.    However, we can repeat this tally process for all the Boards for which we have at least denominational data and we can see what happens.

113.    Before performing this analysis, it may be appropriate to refine our hypothesis.  Even the little example here gives us an insight.  Notice that in this example, (a) three denominations are

on the Board which rarely appear there: BGC (which appeared on only 4 of the 73 Boards),  RCA (which appeared on only 7 of the 73 Boards) and SDA (which appeared on only 12 Boards) and (b) two of these three denominations (the BGC and the RCA) had no candidates of their faith in the pool of eligibles, either In Zone or Above Zone.

114.    If we have an hypothesis that "like likes like" and that the mechanism for achieving this "goal" is to "horse trade" (non verbally or non-explicitly), then we should not see the phenomenon at work if a significant number of the Chaplains on the Board "don't have a dog in this fight" - and, in the instance at hand, we should also not see the phenomenon "played out" when the Chief of Chaplains is watching. [Without assuming that anyone is "corrupt", as Elliott Richardson once told me, "when in doubt, intelligent people do the ethical thing."]

115.    Let us therefore look for evidence of "like likes like", and let us temper statistical significance with a one tailed test, and permission to parse the cases into those where the effect *could* have occurred and those where it was not possible. [For example, there is no information in a test where either everybody gets selected (e.g.. the 1981 LCDR Panel), or where there are virtually no choices (e.g. the 1996 LCDR Panel) and including those counts in a Chi Square test dilutes the opportunity to observe a difference. [If there is a temptation to say that I am "picking and choosing" cases here and that is improper statistically - consider that it is *required*, statistically, if one is trying to isolate a phenomenon to study it.  Failing to separate dissimilar subsets of data leads to concealment of (failure to observe) differences - as happens in Reference 2 when promotions at different ranks are pooled.]

116.    This hypothesis suggests that if I separate Promotion Boards into individual denominations, not just so called  "Faith Groups", and then I look at what happened to the candidates whose records appeared before those Boards, I will see a "patronage" effect in exact proportion to the extent to which the Board has (a) members with institutional experience with the way Boards operate and (b) members with choices before them that confound denomination and quality.

117.    We have 73 Promotion Boards, judging at three ranks.  And we have two sets of related data.

118.    First, I have data for most of the In Zone and Above Zone eligibles from 1981 to 1990. These are the "packets" with names which I obtained in January, from discovery in a California case.  These are summarized in Appendix D here, Appendix D-1 deals with Promotions to LCDR, D-2 with Promotions to CDR (this is an expansion and correction to Appendix D in my Addendal) and Appendix D-3 provides information about Promotions to Captain.

119.    Second, I have the data from my deposition, Appendix B in my Addendal.  This is the same data as Dr. Siskin used in Reference 2.  It does not have names, but it does have denominations and it is fully suitable for the analysis proposed here. [Dr. Siskin could have done this analysis, or at least looked at Non-Baptist, Non-Liturgical ~~promotions~~ *selections.*]

120.    Case 1. LT to LCDR Promotions 1981 to 1990

121.    Prior to 1983 virtually all LT eligibles for LCDR were promoted, even after this period, most LCDR eligibles were selected.  If most eligibles are selected, one should not "expect" much of an *opportunity* for biased Board Members (if there were any) to exercise preference voting, nor should one should one expect to see much evidence of biased voting (even if it happened).

**LCDR Board Decisions - 1984-1989**   (Data from Appendix G)

| | Decisions About "People like us" | | | | Decisions About "Others" | | | |
| | **** In Zone **** | | *** Above Zone *** | | **** In Zone **** | | *** Above Zone *** | |
| | Selected | FOS | Selected | FOS | Selected | FOS | Selected | FOS |
|---|---|---|---|---|---|---|---|---|
| FY 84 | 13 | 2 | 1 | 0 | 30 | 5 | 0 | 2 |
| FY 85 | 19 | 7 | 1 | 0 | 30 | 6 | 3 | 4 |
| FY 86 | 21 | 2 | 3 | 1 | 29 | 10 | 1 | 5 |
| FY 87 | 27 | 2 | 0 | 4 | 27 | 10 | 0 | 1 |
| FY 88 | 31 | 7 | 4 | 5 | 19 | 8 | 2 | 5 |
| FY 89 | 3 | 4 | 2 | 5 | 5 | 3 | 2 | 10 |
| Subtotal | 114 | 24 | 11 | 15 | 140 | 42 | 8 | 27 |
| % | 83% | | 42% | | 77% | | 23% | |

122.    This pattern of results is statistically significant.  ($p < .01$)

123.    That does not prove that "horse trading" was taking place, but it does prove that having a Board Member on "your" board with whom you share a denomination, improves your chances of getting promoted In Zone, and it also improves your chances of getting promoted "Above Zone" (in case you did not have a "friend" on the last Board.)  Appendix G in this Compendium has the raw tallies for each of these Boards. Appendix D has the names and denominations of each of the eligibles.

124.    Without going any further than this, without looking at any other Rank (and both the CDR and CAPT ranks show a "like likes like" effect) and without considering any other period, what we have so far is proof that religion, denomination, has influenced promotion in the U.S. Navy Chaplain Corps.  And this data is all from the Navy.

Appendix C (here in the Compendium) identifies the Board members, by name and denomination. Appendix D here identifies the eligibles by name and denomination and whether or not they were selected for promotion. All I did was sort the data by Promotion Board and count the number of matches between the denomination of a Board Member and the denomination of an eligible In Zone or Above Zone candidate for promotion.

125. The reason that the analysis so far is dispositive is this: If denominational choice onto a Promotion Board influenced *any* of the Board's choices, the process of denominational choice for Board Membership contaminated the promotion process, and the controls on Board discretion were inadequate to forestall malfeasance. If this is not adequate proof, consider the following:

*What percentage of biased Promotion Boards is acceptable?*

126. Case 2. LCDR to CDR Promotions 1991 to 2002

| | **LCDR Promotion Boards** Judging "People Like Us" | | | | | **LCDR Promotion Boards** Judging "Others" | | | |
|---|---|---|---|---|---|---|---|---|---|
| **FY** | **IZ/S** | **iz/ns** | **AZ/S** | **az/ns** | **FY** | **IZ/S** | **iz/ns** | **AZ/S** | **az/ns** |
| 91 | 19 | 6 | 2 | 0 | 91 | 49 | 20 | 1 | 0 |
| 92 | 9 | 3 | 1 | 5 | 92 | 25 | 17 | 3 | 10 |
| 93 | 34 | 17 | 3 | 8 | 93 | 41 | 19 | 0 | 9 |
| 94 | 14 | 12 | 2 | 16 | 94 | 23 | 9 | 3 | 14 |
| 95 | 17 | 12 | | | 95 | 39 | 19 | | |
| 96 | 6 | 3 | 1 | 19 | 96 | 3 | 2 | 3 | 18 |
| 97 | 5 | 7 | 3 | 15 | 97 | 11 | 8 | 1 | 10 |
| 98 | 3 | 3 | 1 | 15 | 98 | 13 | 19 | 2 | 12 |
| 99 | 9 | 10 | 2 | 19 | 99 | 16 | 13 | 4 | 17 |
| 2000 | 11 | 4 | 3 | 20 | 2000 | 23 | 19 | 3 | 16 |
| 2001 | 9 | 5 | 2 | 21 | 2001 | 28 | 23 | 10 | 16 |
| 2001 | 7 | 1 | 1 | 19 | 2001 | 21 | 17 | 5 | 31 |
| Subtotal | 143 | 83 | 21 | 157 | Subtotal | 292 | 185 | 35 | 153 |
| % | 63.3% | | 11.8% | | | 61.2% | | 18.6% | |

127. In Case two, LCDR promotion in the 1991 to 2002 decade, we find that there is no statistically significance evidence for "Like Likes Like". There is a small benefit, if you are In Zone, to having a denominational match with some member of the Promotion Board, and, on the other hand, a small benefit, *if you are Above Zone*, in NOT sharing a denomination with a Board Member.

127.1. This lack of statistical significance, at this rank and in this time period, may cause a pause in argument; in fact, it probably should occasion some reflection. However, this result does not "unseat" the conclusion reached in ¶ 125. That conclusion would stand even if this data were statistically significant "in the wrong direction." (And what we have is no statistically significant difference and a split result.)

127.2. **First**, this time period (1991-2002) is different, see Appendix N. Even a statistically significant "counter example" could not be generalized onto the earlier data.

127.3. **Second**, the "like likes like" phenomenon was statistically significant in the LCDR Promotions for the earlier period (1984-1989). If the two periods (at the same rank) were both statistically different - in opposite directions, the combined effect would still be to prove that denominational mix on the Promotion Boards influenced some of those Boards' decisions.

127.4. **Third**, as we shall see next, the "like likes like" phenomenon happens in promotions to CDR and CAPT - in all periods for which we have data.

128.  Having, "waived my hands" at the only potential counter example (LCDR Promotions in the 1991 to 2002 time period, for which we have "mixed", statistically insignificant results), let's look at what happens at the most important choice point, the one where the Corps is winnowed and where most of the Chaplains whose careers fail, fail: CDR.

128.1. Promotion to Commander is *the* defining step in a Chaplain's career.  It separates him or her into "higher" management and protects him or her from "up or out" - at least to some extent.

129   Furthermore, if the CDR step focuses "selection" (or bias, or discrimination), or aggravates it, then there may be less such prejudice evident at other ranks - less "below", because "they do not matter", and less "above", because the winnowing has already taken place - See Note 5. "The Cream Effect."   (Page 83 in the Compendium.)

130.  We already know that there is denominational discrimination in selections to CDR - see the Addendal, here is some of the locus:

131.  Case 3 CDR Promotions 1981 to 2002

| | CDR Promotion Boards Judging "People like them" | | | | | CDR Promotion Boards Judging "Others" | | | |
|---|---|---|---|---|---|---|---|---|---|
| | IZ/S | iz/ns | AZ/S | az/ns | | IZ/S | iz/ns | AZ/S | az/ns |
| 1981 | 25 | 5 | 5 | 41 | ... | 12 | 4 | 0 | 39 |
| 1982 | 9 | 5 | 4 | 45 | ... | 4 | 4 | 2 | 43 |
| 1983 | 4 | 1 | 2 | 45 | ... | 4 | 4 | 1 | 44 |
| 1984 | 6 | 4 | 1 | 20 | ... | 9 | 5 | 3 | 39 |
| 1985 | 10 | 4 | 2 | 36 | ... | 6 | 5 | 1 | 20 |
| 1986 | 4 | 2 | 2 | 16 | ... | 8 | 7 | 2 | 34 |
| 1987 | 6 | 3 | 3 | 23 | ... | 10 | 4 | 0 | 31 |
| 1988 | 9 | 1 | 1 | 28 | ... | 8 | 7 | 1 | 22 |
| 1989 | 15 | 6 | 2 | 18 | ... | 4 | 6 | 1 | 18 |
| 1990 | 2 | 3 | 2 | 15 | ... | 9 | 5 | 2 | 33 |
| 1991 | 14 | 7 | 1 | 16 | ... | 31 | 14 | 2 | 24 |
| 1992 | 13 | 8 | 4 | 29 | ... | 14 | 11 | 2 | 20 |
| 1994 | 4 | 8 | 3 | 27 | ... | 11 | 8 | 2 | 28 |
| 1995 | 9 | 7 | 2 | 19 | ... | 11 | 8 | 1 | 39 |
| 1996 | 8 | 2 | 1 | 11 | ... | 10 | 13 | 3 | 21 |
| 1997 | 12 | 4 | 1 | 12 | ... | 7 | 10 | 0 | 20 |
| 1998 | 0 | 3 | 2 | 15 | ... | 4 | 7 | 0 | 20 |
| 1999 | 8 | 6 | 0 | 8 | ... | 12 | 20 | 2 | 21 |
| 2000 | 7 | 4 | 1 | 8 | ... | 13 | 21 | 2 | 29 |
| 2001 | 6 | 9 | 1 | 13 | ... | 24 | 19 | 1 | 34 |
| 2002 | 5 | 17 | 2 | 8 | ... | 13 | 28 | 3 | 30 |
| Subtotal | 176 | 109 | 42 | 453 | | 224 | 210 | 31 | 609 |
| % Sel | 61.8% | | 8.5% | | | 51.6% | | 4.8% | |

Leuba Compendium Appendix M,  Page 26 of  27

132.   In Zone Promotions are 20% higher if you have a denomination which matches that of someone on the Board and Above Zone Promotions are almost 100% higher.  Denominational assignment to the Promotion Boards *matters*; the process should not be "stacked" - to do so biases the outcomes and undermines the integrity of the Board, and the Corps, and the Navy. (These results are statistically significant at $p < .01$.)

133.   Case 3 Captain Promotions 1981 to 2002

| | CAPT Promotion Boards<br>Judging "People Like Us" | | | | | CAPT Promotion Boards<br>Judging "Others" | | | |
|---|---|---|---|---|---|---|---|---|---|
| FY | IZ/S | iz/ns | AZ/S | az/ns | FY | IZ/S | iz/ns | AZ/S | az/ns |
| 81 | 16 | 8 | 4 | 21 | 81 | 5 | 8 | 2 | 21 |
| 82 | 10 | 5 | 2 | 35 | 82 | 2 | 3 | 0 | 20 |
| 83 | 3 | 8 | 2 | 29 | 83 | 4 | 8 | 2 | 22 |
| 84 | 8 | 7 | 3 | 25 | 84 | 3 | 10 | 1 | 18 |
| 85 | 4 | 11 | 4 | 21 | 85 | 12 | 12 | 1 | 23 |
| 86 | 4 | 0 | 1 | 21 | 86 | 3 | 8 | 2 | 46 |
| 87 | 7 | 7 | 2 | 23 | 87 | 3 | 9 | 2 | 31 |
| 89 | 2 | 3 | 1 | 40 | 89 | 2 | 3 | 0 | 16 |
| 91 | 11 | 13 | 2 | 34 | 91 | 13 | 11 | 0 | 14 |
| 92 | 5 | 10 | 0 | 23 | 92 | 11 | 9 | 2 | 31 |
| 94 | 7 | 7 | 0 | 27 | 94 | 6 | 10 | 2 | 23 |
| 95 | 4 | 4 | 1 | 31 | 95 | 6 | 6 | 0 | 25 |
| 96 | 2 | 0 | 0 | 22 | 96 | 8 | 13 | 4 | 27 |
| 97 | 1 | 5 | 1 | 26 | 97 | 8 | 8 | 1 | 21 |
| 98 | 4 | 5 | 1 | 16 | 98 | 6 | 9 | 1 | 32 |
| 99 | 3 | 3 | 0 | 14 | 99 | 9 | 20 | 0 | 41 |
| 2000 | 5 | 9 | 2 | 8 | 2000 | 5 | 8 | 1 | 12 |
| Subtotal | 96 | 105 | 26 | 416 | Subtotal | 106 | 155 | 21 | 423 |
| % | 47.8% | | 5.9% | | | 40.6% | | 4.7% | |

134.   Again, denomination matters.

135.   In Zone promotions are nearly 20% better if there is a match between the denomination of a candidate and the denomination of a Board Member, and Above Zone promotions are also about 20% higher if there is a match.

Q e d

**APPENDIX N**

**FAVORABLE PERIOD OF TIME SAMPLE**
**Un-Representative Data?**

The data the Navy gave to Dr. Siskin covered Chaplain Corps selections from 1991 to 2002.

I have challenged those data as confounded, and Dr Siskin's statistical method as in violation of the assumptions he set.  (See Appendix J.)

Here, I have a different "bone to pick".  The data the Navy gave Dr. Siskin is "different" from data for the earlier periods.

If this is true, then his data are unrepresentative, and conclusions based on that data  would not be relevant (comparable or extendable), even if the Faith Groups confounding was corrected, and even if the statistical calculations were done appropriately.

The data are different in two respects.

**First**, although a time series, the Siskin data are a truncated series.

The data from 1972 to 1981 or from 1982 to 1991 (from Appendix A) or from 1981 to 1992 (from Appendix D)

•      list , for example: all the Officers who were considered for promotion (and not selected) before 1981, but who were still being considered during 1981-1992  - and also

•      list all the officers who were considered during 1981 to 1992 and not selected yet.

When these promotions are counted, some of the "Above Zone" left overs from before 1981 are counted when they are promoted, and some of the "not yet promoted" Above Zone considers are also counted, <u>or would be counted -</u> if they are recorded in the data period following 1992.

The data that the Navy gave to Dr. Siskin, from which he excludes the Above Zone promotions anyway, have not yet fully "unfolded" - there are more promotions yet to occur (Above zone), in all likelihood.  And, to the extent that the "tardy" or "late" promotions may be due to one set of denominations more than another (Catholics get more promotions, faster promotions, than non-Catholics), the "recent" data are both incomplete and biased  (in a statistical sense).  (See ¶ 17, Appendix K.)

**Second**, there was a "change at the top" in the period of time covered by the data the Navy gave to Dr. Siskin.  A Special Worship Chaplain was elevated to Chief of Chaplains and a Non-Baptist, Non-Liturgical Chaplain was made Deputy.

And some of the manifestations of Catholic preference waned.  To me, as a statistician, this suggests not that "prejudice" has been obliterated, but more likely than not, one form (one denomination du jour) may have been exchanged for another.

I do not want to sound cynical, nor do I want to accuse anyone of conscious or deliberate bias. What I am duty bound to notice though, is that the circumstances underlying the data changed.

Data from a changed circumstance may not be used to "represent" conditions before the change - unless there are appropriate adjustments and corrections, or unless the purpose of the comparison is to explore the implications of the change.  And here, the explicit purpose of Dr. Siskin's analysis seems to be to argue that there is no difference in promotion rates (even though his data do show that Catholics are still getting statistically significantly more "selections" to Commander, proportionately, than do Non-Baptist, Non-Liturgicals.)

From 1977 to 1990 there were 42 Promotion Boards - 2 of these had a Seventh Day Adventist as a Board Member, none as the President of the Board.

From 1991 to 2002 there were 36 Promotion Boards - 10 of these had a Seventh Day Adventist as a Board Member - or President of the Board.

This, by itself, is a statistically significant difference.  There has been a "change".

Using the algorithms from Appendix, G, these "SDA" Boards, in *this period*,  - unlike all the other periods examined, showed no statistically significant difference in selection rates for eligible Chaplains who shared a denomination with a Board Member and eligible Chaplains who did not share a denomination with a Board Member:

| Board | | **"SDA" Board decisions** | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Decisions About "People Like us" | | | | Decisions About "Others" | | | |
| RANK | FY | **** In Zone **** | | *** Above Zone *** | | **** In Zone **** | | *** Above Zone *** | |
| | | Selected | FOS | Selected | FOS | Selected | FOS | Selected | FOS |
| LCDR | 1984 | 13 | 2 | 1 | 0 | 30 | 5 | 0 | 2 |
| LCDR | 1991 | 19 | 6 | 2 | 0 | 49 | 16 | 1 | 0 |
| LCDR | 1993 | 34 | 17 | 3 | 8 | 41 | 19 | 0 | 9 |
| LCDR | 1999 | 9 | 10 | 2 | 19 | 16 | 13 | 4 | 17 |
| LCDR | 2001 | 9 | 5 | 2 | 21 | 28 | 23 | 10 | 16 |
| CDR | 1986 | 4 | 2 | 2 | 16 | 8 | 7 | 2 | 34 |
| CDR | 2001 | 6 | 9 | 1 | 13 | 24 | 19 | 1 | 34 |
| CAPT | 1992 | 5 | 10 | 0 | 23 | 11 | 9 | 2 | 31 |
| CAPT | 1995 | 4 | 4 | 1 | 31 | 6 | 6 | 0 | 25 |
| CAPT | 1998 | 4 | 5 | 1 | 16 | 6 | 9 | 1 | 32 |
| CAPT | 2000 | 5 | 9 | 2 | 8 | 5 | 8 | 1 | 12 |
| | Subtotal | 112 | 79 | 17 | 155 | 224 | 134 | 22 | 212 |
| | % | 5  8.64% | | 9.88% | | 6  2.57% | | 9.40% | |

Leuba Compendium Appendix N,  Page 2 of 3

Even though, all six of the SDA eligibles who appeared before these Promotion Boards In Zone were selected*, the Boards as a whole acted in compliance with their oath and orders - except for the SDA specific benefit, there is no other evidence of "like likes like" - which, although "good", is also statistically different from the results for other periods.

There are two possibilities concerning this data period and the "SDA" Boards:

**Option 1**: The Siskin Period is different; promotion rates are more balanced; the prejudice that flows from "like likes like" has abated (temporarily, or partially, or changed) - and the Siskin data illuminates that issue,

> but does not prove that there is no religious prejudice in the Chaplain Corps - it proves that there is religious prejudice and that it changes, did change, can change, with a change in "the man at the top."

[The prejudice need not be "his" for those who are prejudiced to understand that they have to "go along to get along" or that they have to "lie low" in his presence.]

**Option 2**:  The Siskin Period is not different and the change in the number of SDA's on the Promotion Boards is random variation; the drop in promotion rates is random variation; and the change in the behavior of the Promotion Boards is random variation,

> but there is still religious preference at work within the U.S. Navy Chaplain Corps promotion system, as during the earlier period - but the pattern of random variation has swamped the effect in the Siskin Period.

Of course the data periods are different.

Dr. Siskin's data is different in understandable ways (lower because he does not include Above Zone promotions, and lower even if Above Zone promotions were counted - because they have not all happened yet), and even so, his data still shows that Roman Catholic Chaplains get more promotions to CDR (the important step) than do the Non-Baptist, Non-Liturgicals.  And his data still show that the Promotion System is vulnerable to denomination-based bias.

_____

* There were 543 Chaplains of other denominations before these eleven Boards, as In Zone eligible, of whom 330 were Selected, the difference in this pair of ratios, 6/6 vs 330/543, is statistically significant - but that does not prove that the Seventh Day Adventist Board Members "caused" this outcome - as one vote of five or six they could not have "mandated" this outcome, nor does it prove that they and the other Board Members colluded or engaged in "horse trading".

It is however, both statistically significant and consistent with "Like Likes Like".

CRM D0000149.A1/ SR1
10 March 2000

Copy # 3

# Promotions in the Navy Chaplain Corps

Karen D. Smith • John S. Ivancovich
David L. Reese

# Center for Naval Analyses

4401 Ford Avenue • Alexandria, Virginia 22302-1498

In Re Navy Chaplaincy
07-mc-269 (RMU)
EXHIBIT 14

# Contents

**Summary** . . . . . . . . . . . . . . . . . . . . . . . .    1

   What we found . . . . . . . . . . . . . . . . . . .    1

   Why all the furor? . . . . . . . . . . . . . . . . .    2

   What we recommend . . . . . . . . . . . . . . . .    2

      Make these results widely known . . . . . . . . . . .    2

      Reform the promotion process . . . . . . . . . . .    2

      Work to identify and eliminate differences in fitness

        reporting . . . . . . . . . . . . . . . . . . . .    3

**Study origins and purpose** . . . . . . . . . . . . . . . . .    5

   Navy Chaplain Corps' Strategy XXI . . . . . . . . . . .    5

   CNA Chaplain Corps study . . . . . . . . . . . . . .    6

   Issues of diversity . . . . . . . . . . . . . . . . . . .    7

**Background** . . . . . . . . . . . . . . . . . . . . . . . .    9

   Career progression . . . . . . . . . . . . . . . . . . .    9

   Promotion: a quick look at the literature . . . . . . . . .    10

      Race/ethnicity and gender . . . . . . . . . . . . .    10

      Religion . . . . . . . . . . . . . . . . . . . . . .    11

   Promotion: how the process works . . . . . . . . . . . .    12

      Promotion boards . . . . . . . . . . . . . . . . .    12

      Flow points . . . . . . . . . . . . . . . . . . . .    13

      Information available . . . . . . . . . . . . . . . .    13

**Analysis of promotion** . . . . . . . . . . . . . . . . . . .    17

   Data . . . . . . . . . . . . . . . . . . . . . . . . . .    17

      Caveats . . . . . . . . . . . . . . . . . . . . . .    17

      The sample . . . . . . . . . . . . . . . . . . . .    18

      Variables . . . . . . . . . . . . . . . . . . . . .    19

   Methodology . . . . . . . . . . . . . . . . . . . . . .    21

      Limitations . . . . . . . . . . . . . . . . . . . .    21

   Results . . . . . . . . . . . . . . . . . . . . . . . .    22

      Faith group, race/ethnicity, and gender . . . . . . .    22

A closer look . . . . . . . . . . . . . . . . . . . . .    26
Assignments . . . . . . . . . . . . . . . . . . . . . .    29
Summary . . . . . . . . . . . . . . . . . . . . . . .    37
The perception of promotion . . . . . . . . . . . . . .    38

**Discussion of results.** . . . . . . . . . . . . . . . . . .    41
Personal characteristics: race/ethnicity, gender, and faith
grouping. . . . . . . . . . . . . . . . . . . . . . . .    41
Job characteristics: assignment type . . . . . . . . . . .    42

**Recommendations.** . . . . . . . . . . . . . . . . . . . .    45
Counter perceptions of bias . . . . . . . . . . . . . . .    45
Reform the promotion process . . . . . . . . . . . . . .    46
Consider changes to the promotion boards. . . . . .    46
Remove information on faith group from the PSR . .    47
Work to identify and eliminate differences in fitness
reporting . . . . . . . . . . . . . . . . . . . . . . .    48
Provide guidance to commanders . . . . . . . . . .    48
Reconsider the role of chaplains in writing fitness
reports . . . . . . . . . . . . . . . . . . . . . . .    49
Orient chaplains to the Navy and its evaluation
system . . . . . . . . . . . . . . . . . . . . . . .    50
Encourage mentoring relationships . . . . . . . . . .    51
Make these results widely known . . . . . . . . . . . .    52
Perform additional analysis . . . . . . . . . . . . . . .    52

**Appendix A: Definition of variables** . . . . . . . . . . . . .    55
Composition of faith groupings . . . . . . . . . . . . . .    55
Racial/ethnic groups. . . . . . . . . . . . . . . . . . .    58
Assignment types . . . . . . . . . . . . . . . . . . . . .    59
Defining assignment bins . . . . . . . . . . . . . . . . .    63

**Appendix B: Statistical analysis of promotion differences** . . .    75
Description of the problem . . . . . . . . . . . . . . . .    75
Model of the promotion process . . . . . . . . . . . . . .    77
The promotion process as a binomial experiment . .    77
Determining the promotion rate distribution. . . . .    78
Mathematical description of meaningful differences . . .    79
Results of the analysis: Promotion to commander . . . . .    81

References . . . . . . . . . . . . . . . . . . . . . . . . . . .   87

List of figures . . . . . . . . . . . . . . . . . . . . . . . .   91

List of tables . . . . . . . . . . . . . . . . . . . . . . . . .   93

# Summary

The Navy Chief of Chaplains asked the Center for Naval Analyses (CNA) to help the Chaplain Corps examine its roles, missions, functions, and structure. While interviewing chaplains and line officers, we discovered that perceptions of bias in the promotion process are widespread. In this paper, we seek to shed light on the reality of promotion in the Navy Chaplain Corps. We present and analyze data on promotions to O-4, O-5, and O-6 by race/ethnicity, gender, faith group, and community served.

## What we found

We found no meaningful differences in promotion rates by gender or race/ethnicity at any of the levels we analyzed. We found one difference by faith group: the Roman Catholic promotion rate was significantly higher at the promotion-to-O-5 level. When we examined promotions of a smaller sample, those taking place after 1986, we found that there was no longer a meaningful differential. This change may be related to a change in composition of promotion boards, from two Roman Catholic members to one.

We found numerous differences in promotion rates by assignment. Chaplains serving the most time in many of the assignment types had a lower probability of promotion. Chaplains with time in Washington-area billets consistently had a higher probability of promotion. A single tour in the Marine Corps was associated with higher promotion rates to O-5 and O-6. Chaplains without time in medical billets had higher promotion rates to O-5 and O-6; those with more than 30 months in medical billets had lower promotion rates to these ranks. Chaplains with more than 27 months in Coast Guard assignments had a lower rate of promotion to O-6.

1

# Why all the furor?

When we examined actual promotions, we found only one meaningful difference in promotion rates among faith groupings and no differences by race/ethnicity or gender. Why, then, are perceptions of bias so prevalent? One contributing factor is the small size of the chaplain community.

Because of the low number of chaplains, the number of promotions in any given faith grouping varies widely from year to year. A chaplain whose faith group received few promotions in one year may feel discriminated against—whereas a year later, the same faith group may have seen many of its chaplains promoted, both absolutely and relative to other groups. From year to year, one or another group of chaplains may take these numbers as evidence of discrimination. It is therefore not surprising that chaplains of all groups voiced concerns that their group was a victim of bias—even though the aggregate numbers in our analysis don't show such differences.

# What we recommend

## Make these results widely known

Faulty perceptions thrive on rumor and in the absence of information. The Chaplain Corps should make the findings of this study widely and easily available. It should also publicize the steps it is taking to implement change and explain their rationale.

## Reform the promotion process

**Change the composition of the promotion boards.** Simply increasing the number of members would open the boards to more points of view and would serve to counter perceptions of bias. Adding more non-chaplain officers should also be considered. The Navy may want to adopt the policy of the Army and Air Force: their chaplain boards include only one chaplain, and the rest are line officers. At the very least, the Chaplain Corps should consider selecting members of promotion boards without regard to faith group, as mandated in SECNAV Instruction 1401.3.

- Remove information on faith group from the performance summary
record. The information given to promotion boards should not
include a candidate's faith group. The Additional Qualification Des-
ignator (AQD) that encodes faith group should be removed from the
record.

## Work to identify and eliminate differences in fitness reporting

**Provide guidance to commanders across the services.** The breadth of
constituency served by Navy chaplains makes it hard to foster unifor-
mity in evaluation. It is important for the Chaplain Corps to provide
guidance to commanders on what to expect of their chaplains so they
can evaluate them appropriately and consistently.

**Reconsider the role of chaplains in writing fitness reports.** We suggest
that the commanding officer be designated the reporting senior and
that supervisory chaplains play a clearly subsidiary role in the prepa-
ration of fitness reports. If the input of supervisory chaplains plays a
significant role in the final fitness report, we suggest that the supervi-
sory chaplain's name be made visible, both to the chaplain being
evaluated and to selection boards.

**Orient chaplains to the Navy and its evaluation system.** Before they
reach their first duty station, all new chaplains should be fully
informed about what it means to be an officer in the U.S. Navy and
equipped with an understanding of fitness reports, awards and com-
mendations, and promotions. They could be sent to the Navy's
Officer Indoctrination School, where line officers teach such topics
to new members of the Navy's other professional staff corps. Alterna-
tively, the professional Navy curriculum at the Chaplain Basic School
could be strengthened.

**Encourage mentoring relationships.** It is important for chaplains to
have continuing access to professional advice and the benefit of other
chaplains' experience. By encouraging mentoring, the Chaplain
Corps could build such relationships through mutual compatibility—
not through mandating them.

3

# Study origins and purpose

The U.S. Navy Chaplain Corps has a long history of faithful service to the Sea Services. Chaplains have been everywhere our armed forces have been, from the front lines in wartime to isolated outposts on foreign shores, providing ministry to service members and their families. Chaplains hold religious services according to their own faith group traditions, help ensure the freedom of religious expression for all service members, facilitate access to religious services for those not of the chaplain's faith group, and provide pastoral care for all within the services.

 Today, over 900 Navy chaplains serve on active duty supplemented by nearly 400 Navy chaplains in the Reserve. The chaplains are assisted by over 800 active-duty, enlisted Religious Program Specialists (RPs). Within naval commands, chaplains and RPs work together in religious ministry teams (RMTs).

The mission of the Navy Chaplain Corps is both broad and deep: providing ministry across the Sea Services. Navy chaplains serve not only within the Department of the Navy, but with other services as well. They currently support the Navy, Marine Corps, Coast Guard, and Merchant Marine and serve in many joint force commands. Chaplains and RPs serve at all levels of the armed forces, from individual ships and smaller ground force units (battalion level) to the Office of the Secretary of the Navy.

# Navy Chaplain Corps' Strategy XXI

Throughout its history, the Navy Chaplain Corps has adapted its delivery of ministry to the needs of the Sea Services and to the times. The environment within today's military has changed; military downsizing, the changing nature of warfare, the introduction of new technology, and the changing demographics of service members have forced the military to examine its roles, missions, and functions. The

- Chaplain Corps is not immune to these changes and has begun the
- challenge of examining its delivery of ministry as it moves into the next century. In an initiative known as Strategy XXI, the Chaplain Corps is examining its role and adapting to the changing needs and requirements of the Sea Services.

In November 1997, the Navy Chief of Chaplains asked the Center for Naval Analyses (CNA) to help the Chaplain Corps examine its roles, missions, functions, and structure. In response to the Chief of Chaplains' request, CNA started to work with the Chaplain Corps to help determine how its analysis would support the Strategy XXI process.

# CNA Chaplain Corps study

In support of Strategy XXI, CNA began work on this study, entitled *Establishing the Operational Requirements and Future Organizational Structure for the Chaplain Corps*. The study's sponsor is the Navy Chief of Chaplains. When he first approached CNA, he was concerned about three main issues: how current Navy outsourcing initiatives would affect the Chaplain Corps; whether, as a result of military downsizing, the Chaplain Corps had distanced itself from the operational forces; and what the Navy's regionalization concept meant and how it could be applied to the Chaplain Corps. Following discussions with the Chief, which helped us better understand Strategy XXI, the scope of the study was expanded to encompass the following set of tasks:

- Examine the mission and functions that the Chaplain Corps now performs in support of the Sea Services, with particular emphasis on the support of operational commands.

- Examine how this mission and these functions might evolve to better support the services in the future.

- Investigate emerging roles and the potential for new roles for the Chaplain Corps.

- Analyze the Chaplain Corps' structure and its ability to support its current and potential future roles.

To accomplish these goals, we took a comprehensive approach. It was important to do background research to understand the roles and

missions of the Chaplain Corps, past and present. We also needed to understand the expectations of the stakeholders in the Chaplain Corps. The stakeholders are all those whom the chaplains serve and with whom they serve. They include the military officer and enlisted communities; faith groups who supply chaplains to the military (know as the ecclesiastical endorsers); families of service members; and the Chaplain Corps as an institution, as well as individual chaplains and RPs. We identified the expectations of the stakeholders in a number of ways, including written surveys, individual interviews, and conversations. We also needed to conduct quantitative analysis to further our understanding of the Chaplain Corps and its issues. Finally, we investigated opportunities, mismatches, and unexpected results as they came to light from our analysis.

This document presents the results of the study. Our intentions are to understand those issues of greatest importance to the Chaplain Corps and provide the Corps with insights, options, opportunities, and recommendations for its consideration. Although the Chief of Chaplains is the sponsor of the study, the results of the study belong to the entire Chaplain Corps. In their final form, these results are available not only to the Chaplain Corps, but throughout the Department of the Navy.

# Issues of diversity

In the course of our analysis, we became aware that the Chaplain Corps is not immune from issues of diversity and charges of discrimination. Besides the usual categories of gender, race, and ethnicity, the Chaplain Corps must deal with another type of diversity that is potentially even more divisive: religious diversity [1].

Currently, the Navy Chaplain Corps contains representatives of over 70 different faith groups. This variety is but a subset of the almost 200 ecclesiastical endorsers recognized by the Department of Defense.

Perceptions of bias in the promotion process are widespread. Most chaplains we spoke to mentioned it as a personal concern [1]. In addition, many line officers remarked on the extent of chaplain concern about the fairness of the promotion process. Given this level

of interest, we sought to shed light on the reality of promotion in the Chaplain Corps.

In addition, we look at a further dimension of diversity: community served. As noted, Navy chaplains serve in a wide variety of assignments, from Marine Corps combat units to Navy ships to operational staffs to Coast Guard districts to Navy hospitals. The scope and variety is unusual, and at times, some communities have voiced concerns that chaplains serving with their units have been short-changed when it comes to promotions.

This research memorandum examines diversity and promotion. We present and analyze data on promotions to lieutenant commander, commander, and captain by race/ethnicity, gender, faith group, and community served.

This paper is part of a series that present various aspects of our work for the Chief of Chaplains. Other papers cover perceptions of the Navy Chaplain Corps [1], historical highlights of chaplain activities [2], the results of a survey of ecclesiastical endorsers [3], chaplain training concerns [4], and the delivery of ministry and the Chaplain Corps organization [5].

8

# Background

## Career progression

A chaplain begins his/her career as an officer differently from line officers. There are two additional requirements that a prospective chaplain must fulfill. Besides possessing a bachelor's degree, he/she must

- Have earned a Master of Divinity (M.Div) degree from an accredited seminary or have earned 90 semester hours of credit from an accredited seminary or theological school, and

- Have obtained an ecclesiastical endorsement from an Ecclesiastical Endorsing Organization recognized by the Department of Defense (DOD) [6].[1]

In most cases, a chaplain is also required to have three years of civilian ministry before entering full-time Navy duty as a chaplain.

Typically, when chaplains without prior commissioned service enter the Navy, they are given three years of "constructive service"; that is, they are given credit for the time they spent in seminary.[2] They may receive additional credit for time spent in civilian ministry (seven or more years of ministry equates to one year credit). Thus, chaplains are commissioned at a range of grades, most often either lieutenant, J.G. (O-2), or lieutenant (O-3).

---

1. Ecclesiastical endorsers represent the denominations and faith groups that provide chaplains to the military. In most cases, a faith group has its own ecclesiastical endorsing organization, but some use a common endorser.

2. Constructive service is also given to members of other professions, such as medical doctors, dentists, and lawyers.

- The years of credit they receive are subtracted from the actual year
- they are commissioned, to arrive at a "year group." All officers within a year group are considered for promotion to higher ranks at given intervals (known as flow points), depending on the retention behavior of their community.

About six years after becoming lieutenants, they come into zone for promotion to lieutenant commander. This is the first point at which significant numbers of chaplains fail to be selected.

In this paper, we look at promotion of chaplains to the ranks of lieutenant commander (O-4), commander (O-5), and captain (O-6). First, we take a brief look at the literature on promotion.

# Promotion: a quick look at the literature

## Race/ethnicity and gender

The literature on minorities and promotion in the military is extensive, and has been reviewed elsewhere [7, 8]. CNA has done several studies on officer promotion. Reference [9] found that, in comparison with Caucasians, all minority groups in the Marine Corps are promoted to O-3, O-4, and O-5 levels at lower rates. However, when differences in officer characteristics, occupation, and commissioning source were controlled for, only African American and non-Hispanic minorities had lower probabilities of promotion to O-3, and only African Americans had a lower probability of promotion to O-4. The study found no difference by race/ethnicity in promotion to O-5 and no difference at any rank in promotion by gender.

Another study looked at promotion of Navy surface warfare officers to lieutenant and lieutenant commander [8]. Actual O-3 promotion rates were lower for African Americans. When the study adjusted for other characteristics, it found that Caucasians and women had a higher probability of promotion. At the O-4 level, there was no evidence of a racial difference in promotion rates, but female gender was associated with a higher probability of promotion.

10

## Religion

Less work has been done on religious affiliation and success, in civilian or military workplaces. A dissertation by a Navy chaplain summarizes some of that work [10]. It also reviews actual promotions in the Navy Chaplain Corps from 1956 to 1991, applying a standard statistical test (the Chi-square test), to look for significant differences.

The author found no difference among faith groups for promotion to captain. He did find some differences among his larger sample for promotion to commander. First, he analyzed promotion rates for larger denominations (those with at least ten chaplains in the sample). He found that Roman Catholics were promoted at a significantly higher rate, whereas Conservative Baptists and Progressive National Baptists were promoted at a significantly lower rate than other groups. He also looked at major faith groups (Catholic, Protestant, and Jewish). Once again, he found that Catholics were promoted at a significantly higher rate between 1956 and 1991.

This dissertation also looked at "affinity" groupings, defining four different groups: Roman Catholic, mainline Protestant (e.g., Episcopal and Lutheran), general Protestant (e.g., Assembly of God and Church of God in Christ), and special Protestant (e.g., Christian Scientist and Unitarian). It found that Catholics and mainline Protestant were promoted at significantly higher rates.

The dissertation analyzed two other sets of variables among the Protestant chaplains: polity and baptismal policy. It found that the chaplains from connectional polities were promoted at higher rates than those from free-church faiths.[3] Finally, chaplains from faith groups that practice infant baptism were promoted at significantly higher rates than those from faith groups that practice adult baptism.

The author also analyzed his data within smaller year groups. All of the differences he found occurred at times between 1956 and 1986;

---

3. Connectional polities are those in which ministers report to a hierarchy or body of elders that plays an active role in the life of the individual churches. Free-church faith groups are independent of a hierarchy, but may be voluntarily associated with others of the same faith.

there were no differences in promotion rates to commander between 1987 and 1991.

The author explained his findings by theorizing that "like will promote like." In other words, the historic domination of the Chaplain Corps by the traditional faith groups (mainline Protestants and Roman Catholics) tends to perpetuate itself—not deliberately, but because of affinity. That is, an individual is more comfortable with someone like him/herself and so is more likely to promote others of the same group. This tendency is exacerbated if candidates for promotion otherwise appear equally qualified. The finding of no differences in promotion in the more recent period could be due to the opening up of the selection boards to more types of chaplains and to attempts to reform the fitness reports so that they differentiate more among officers.

We next take a closer look at the promotion process.

# Promotion: how the process works

## Promotion boards

Every year, the Navy convenes one selection board per chaplain grade O-4 through O-7 to recommend candidates for promotion. (Two boards annually consider chaplain promotions to lieutenant rank, and a combined board considers all staff-corps promotions to two-star rank.) Each selection board is composed of officers of higher rank than those being considered and is presided over by its senior member. Secretary of the Navy (SECNAV) Instruction 1401.3, *Selection Board Membership*, governs the composition of boards [11]. The instruction states that "board members should be selected from a wide range of leadership positions and reflect the composition of the officer corps, including women and racial or ethnic minorities." In addition, "exclusion from board membership by reason of gender, race, ethnic origin, or religious affiliation is prohibited."

For staff corps, the instruction requires that each board consist of five or more members and that at least one member be an active-duty, unrestricted line officer. The remaining members should be from the

12

&ndash; corps under consideration. According to the instruction, "Chaplain
&ndash; Corps board members shall be nominated *without regard to* religious
affiliation" [emphasis added].

## Flow points

Overall guidance on how long it takes for promotion to each grade is
contained in SECNAV Instruction 1420.1A [12]. Within these guide-
lines, each community's flow points and opportunity may vary,
according to the requirements and retention behavior of that
community. Table 1 shows the guidelines given in the instruction.

Table 1.   Guidelines for promotion flowpoint and opportunity[a]

| Grade | Flow point[b] | Variance | Opportunity | Variance |
|-------|---------------|----------|-------------|----------|
| 04 | 10 years | +/- 1 year | 80 percent | +/- 10 percent |
| 05 | 16 years | +/- 1 year | 70 percent | +/- 10 percent |
| 06 | 22 years | +/- 1 year | 50 percent | +/- 10 percent |

a. Source: Reference [12].
b. Years of active commissioned service plus all entry grade credit.

Officers who fall into the prescribed flow point are considered to be
"in zone" for promotion. The limits of each zone are indicated by
name, active-duty precedence number, and date of rank of a desig-
nated junior and senior officer. A limited number of officers may be
promoted above zone (senior to the senior officer in the zone) and
below zone (junior to the junior officer in the zone).

## Information available

Each board operates under a precept, giving guidance to the board
on the criteria to use in its selection process:

> The mission of any board is to select those 'best qualified'
> based on performance. Additional guidance in the precept
> addresses equality in the consideration of minority officers
> and consideration of historic preexisting restrictions on the
> assignability of women officers. [13]

Two members of the board review each candidate's record, which includes copies of his/her fitness reports, personal awards, and other matters of official record. Using this detailed information, one member (that candidate's briefer) annotates the candidate's Performance Summary Record (PSR), which is displayed to all members of the board when each candidate is considered in turn. The PSR includes a picture of the candidate, a list of his/her degrees and service schools attended, award information, special qualifications, and a summary of each fitness report. The briefer's role is to summarize strengths and weaknesses and to ensure that the salient points of the candidate's record are brought out.

Faith group is supposed to be invisible to the board. But the PSR includes an officer's Additional Qualification Designation (AQD) codes. This information, which identifies special skills and knowledge, may contain relevant information for other officer communities to consider. For chaplains, however, the three-digit AQD encodes faith group. At the very least, a board member knows his/her own AQD and may be familiar with other AQDs, and thus able to determine other chaplains' faith groups. Even without the AQD, the small size of the chaplain community makes it likely that more is known about many individual chaplains than is typical of other officer communities. In addition, we have been told that the narrative sections of the fitness reports often contain words that could be used to identify the broad faith group of the candidate, in which case at least the two members who read the full record are likely to know the candidate's faith group.

Board members may not discuss anything that is not in the PSR. They cannot contradict the PSR based on personal knowledge, but they may second it, based on their personal knowledge of what is in the record. There is no private information in a board; it is only for expedience that each board member does not look at each complete record. The records are available to all if amplifying information is needed. For example, if a candidate submits a letter to the board, that fact is noted on the PSR, and the briefer is likely to summarize its contents. Any member is free to look at the original letter if he/she feels a need.

14

– More information on promotion boards and their selection
– procedures is in [13]. With this background on the subject, we turn
to our analysis of promotions in the Chaplain Corps.

# Analysis of promotion

## Data

The data in this research memorandum come from two related data-bases: the Officer Master File and the Longitudinal Officer Master File.

The Navy's Officer Master File (OMF) contains information on all Navy officers on active duty. It is continuously updated as changes occur in an officer's demographic or career information. Information is updated on such things as number of dependents, duty station, and promotions. CNA receives quarterly snapshots of the OMF.

To support a variety of manpower, personnel, and training analyses, CNA has created another data set based on the OMF. The file, known as the Longitudinal Officer Master File (LOMF), allows analysts to follow Navy officers through their careers. Basically, it tracks and records changes that occur to each officer's record from quarter to quarter. The changes are taken from the quarterly snapshots of the Navy OMF that CNA receives. The LOMF begins with records from the September 1972 snapshot.

The LOMF allows us to track the careers of individual chaplains. We use this information to analyze promotion issues. For this analysis, our data sample begins at the start of the LOMF with September 1972 and ends in September 1998.

### Caveats

Anytime you use large data bases, there will be some level of error in the data. An individual chaplain, when presented with his/her record from the LOMF, may or may not find a few mistakes in it. However, because the data are ultimately based on the Navy's system for pay and personnel management, and individuals thus have an incentive to correct any errors, we do not believe the errors to be widespread or systematic.

To reassure ourselves about the accuracy of our data, we asked the Chief of Chaplains' office to check our records for chaplains on duty in September 1998 with their records, which are based on personal knowledge as well as official files. This check revealed relatively few differences and gave us confidence in our database. We corrected our records for those chaplains in the sample who were on duty in September 1998. We also were able to reduce substantially the number of older records with blanks in the ecclesiastical endorser field. The supplemental information on endorsers was provided by the archivist at the Chaplain Resource Board.

## The sample

To identify chaplains' records in the OMF and LOMF, the study team used the 4100 series of designators.[4] All records with these designators were extracted from the OMF and LOMF. For our analysis of promotion, we created different samples for each rank, depending on flowpoint. We used information on chaplain flowpoints over time to arrive at the following cutoffs:

- For promotion to lieutenant commander, we included 884 chaplains from year groups 1974 to 1986. Before 1982, promotion to the O-4 level was universal; all chaplains were promoted. Thus, we narrowed the dates so that only chaplains who had undergone a competitive promotion cycle were included in our sample.

- The commander sample included 1,052 chaplains from year groups 1957 through 1980, and the captain sample consisted of 798 chaplains from year groups 1949 through 1977. All of the chaplains in our sample were serving on active duty at some time between 1972 and 1998. Chaplains who left the Navy before 1972 are not included.

---

4. The first three digits indicate the designator; in this case, 410 represents chaplain. The fourth digit indicates the service status of the officer. For example, 0 denotes Regular Navy officer and 5 denotes officer of the Naval Reserve.

## Variables

We looked at four sets of characteristics that have been alleged to affect a chaplain's chances of promotion: faith group, race/ethnicity, gender, and assignments.

### Faith categories

We looked at faith group from two perspectives. Our first classification is one used by the Chaplain Corps. Faith groups are divided into four categories: Roman Catholic, Liturgical, Nonliturgical, and Special Worship Consideration. Liturgical refers to those Protestant denominations that follow a set liturgy at their services, whereas nonliturgical Protestants do not. Special Worship Consideration is a small group of faith groups that do not fit into the other categories. Appendix A lists the individual faith groups that are in each of these categories.

We used these groups because of perceptions within the Chaplain Corps that bias exists in the promotion process against and/or for one or more of these groups.

We also looked at faith groups in another way that might affect promotion, suggested by a senior chaplain. This is a three-part grouping according to polity, or church governance. One category is episcopal. These faith groups have a strict hierarchy and usually feature geographical subgroups headed by bishops. Examples of episcopal polities are the Episcopal, Methodist, and Roman Catholic faith groups. A second category is congregational. These faith groups feature independent congregations that do not report on a day-to-day basis to a higher church authority. Examples of this polity are the Southern Baptist, Unitarian, and Jewish faith groups. The final category, presbyterial, is intermediate in degree of independence. It can be considered representative in structure. This group comprises primarily the Presbyterian faith groups and Reformed churches.

The theory behind this classification is that chaplains from a congregational polity may have lower promotion rates, especially at lower ranks, because they must adjust to a structure—the Navy's hierarchy—that is very different from that of their church or faith group. Chaplains from episcopal polities would be expected to do better at

19

early promotions, and those from presbyterian polities would fall somewhere in the middle. This grouping is similar to the distinction between connectional and free church polities drawn by [10].

### Race/ethnicity

We used the race and ethnic codes in the OMF to construct racial/ethnic categories. Following DOD practice, if an individual listed an ethnic background, they were placed in that category. If they did not, they were placed in a race category. Our categories are African-American, Asian-Pacific Islander, Caucasian, Hispanic, Native American, and other/not specified. Appendix A lists the codes used to define these groups.

We looked at ethnicity and race because prior studies of Marine and Navy officer promotion have discovered some differences in promotion by race/ethnicity, other things being equal. In addition, our interviews with chaplains revealed perceptions of racial and ethnic bias in the promotion process.

### Gender

Previous studies of officer promotion have shown differences in promotion by gender, other things being equal. Once again, chaplains also voiced concern about gender bias in promotions.

### Assignments

Navy chaplains serve in a wide variety of units, bases, and staffs. Not only are they assigned to the usual shore and sea billets, they also serve in medical facilities, with Marines, and in the Coast Guard and the Merchant Marine. Our interviews revealed a perception that some types of duty are more or less career enhancing, either because standards for fitness reports vary, or because certain assignments are considered less challenging or make the chaplain more or less visible.

Using the LOMF, we counted, for each chaplain considered for promotion, the number of months he/she had spent in the following assignment types:

- Navy sea duty

- Navy shore duty

20

- Medical

- Marine Corps

- Coast Guard and Merchant Marine

- The Washington, DC, area.[5]

# Methodology

In this study, we determined the fraction of chaplains in our sample promoted to each grade in each subgroup (for example, Roman Catholics). We then used Bayesian statistical methods to determine whether the promotion rates of these subgroups were statistically the same or if any of the subgroups had a different (higher or lower) rate from the overall sample. Appendix B details the methodology used.

Assuming that the promotion rates for all subgroups come from the same probability distribution, we calculated, for each subgroup, a "tail probability." This number indicates the probability of promoting exactly the number promoted or fewer for promotion rates lower than the overall rate, or exactly the number promoted or more for promotion rates higher than the overall rate. Following conventional statistical practice, we assume that if this calculated probability is .05 or less, it is unlikely that the promotion rate of the subgroup comes from the same distribution as the overall sample. In this event, the data suggest that the promotion rate for such a subgroup is different from that of the overall sample.

## Limitations

Other CNA studies of Navy and Marine line officer promotions have used different statistical techniques (for example, [7, 8, 9]). These studies had larger samples with which to work and access to additional information on some characteristics that might be related to promotion, such as test scores, grades, and college characteristics. These studies were able to estimate the effect of such factors as race, gender, and assignments on promotion, holding other factors

---

5.   See appendix A for the codes used to construct these assignment types.

constant. The chaplain study did not have the resources required to perform this type of analysis. Our look at promotion was only a small part of the overall study, motivated by the level of concern about promotions voiced by those we interviewed. In addition, our relatively small sample would have made it difficult to reach meaningful conclusions about some of the smaller subgroupings that are of interest here.

# Results

## Faith group, race/ethnicity, and gender

### Lieutenant commander

Table 2 shows the actual promotion figures for promotion to lieutenant commander. It contains the number in the sample (those considered for promotion) and the number and percentage that were ever promoted in total and for each of the subgroups of interest.[6] It also shows the tail probability—the probability of obtaining that promotion rate or more extreme promotion rates given the overall promotion rate distribution. Subgroups with a tail probability of .05 or lower are marked with an asterisk (*).

A total of 884 chaplains were considered for promotion to lieutenant commander, and about 80 percent of them were successful. Only one of the subsample categories, the race and ethnic category of *other/not specified*, looks very different, failing the .05 probability test. It includes those chaplains whose race or ethnicity is designated as "other" in the Officer Master File, without any additional information. Because we can draw no definitive conclusions concerning race or ethnicity from this sample, no meaningful conclusions can be drawn. The probabilities for all the other categories pass the .05 test. From this, we do not find evidence that subsample differences in promotion rates to lieutenant commander are statistically meaningful.

---

6.  "Promoted" includes chaplains who were passed over one or more times and then promoted, as well as those who were promoted the first time they were considered by a selection board. Thus, in-zone, below-zone, and above-zone promotions are all included in this group.

Table 2.  Promotions to lieutenant commander: initial year groups 1974–1986

| Grouping | Category | Considered | Promoted | Percent promoted | Tail probability |
|---|---|---|---|---|---|
| Total | All | 884 | 708 | 80.1 | n/a |
| Faith grouping | Liturgical | 326 | 256 | 78.5 | 0.297 |
| | Nonliturgical | 327 | 260 | 79.5 | 0.437 |
| | Roman Catholic | 183 | 150 | 82.0 | 0.310 |
| | Special worship | 44 | 39 | 88.6 | 0.108 |
| | Unknown | 4 | 3 | 75 | 0.589 |
| Polity | Congregational | 334 | 265 | 79.3 | 0.410 |
| | Episcopal | 455 | 374 | 82.2 | 0.186 |
| | Presbyterial | 91 | 66 | 72.5 | 0.062 |
| | Unknown | 4 | 3 | 75 | 0.589 |
| Gender | Female | 40 | 34 | 85 | 0.292 |
| | Male | 844 | 674 | 79.9 | 0.471 |
| Race/ethnicity | African American | 86 | 74 | 86.0 | 0.111 |
| | Asian, Pacific Islander | 24 | 19 | 79.2 | 0.537 |
| | Caucasian | 716 | 574 | 80.2 | 0.492 |
| | Hispanic | 35 | 26 | 74.3 | 0.257 |
| | Native American | 14 | 11 | 78.6 | 0.55 |
| | Other/not specified | 9 | 4 | 44.4 | 0.02* |

**Commander**

Table 3 shows the same information for the promotion-to-commander sample. The year groups analyzed here are 1957 through 1980. A total of 1,052 chaplains are in our sample; 74 percent of them were promoted.

If one looks at only the promotion percentages, without considering the subsample sizes, several groups *appear* different from the overall sample. For example, the *unknown* faith group category shows a 100-percent promotion rate. However, only two chaplains are in this category, so there could only have been three outcomes: zero, 50, or 100 percent promoted. Thus, this group and several others with very small sample sizes are not statistically different from the mean, even though they look different.

23

Table 3.   Promotions to commander: initial year groups 1957–1980

| Grouping | Category | Considered | Promoted | Percent promoted | Tail probability |
|---|---|---|---|---|---|
| Total | All | 1,052 | 778 | 74.0 | n/a |
| Faith group | Liturgical | 382 | 275 | 72.0 | 0.245 |
| | Nonliturgical | 364 | 252 | 69.2 | 0.047* |
| | Roman Catholic | 264 | 221 | 83.7 | 0.004* |
| | Special Worship | 40 | 28 | 70.0 | 0.334 |
| | Unknown | 2 | 2 | 100 | 0.546 |
| Polity | Congregational | 383 | 265 | 69.2 | 0.042* |
| | Episcopal | 561 | 431 | 76.8 | 0.108 |
| | Presbyterial | 106 | 80 | 75.5 | 0.411 |
| | Unknown | 2 | 2 | 100 | 0.546 |
| Gender | Female | 10 | 8 | 80 | 0.494 |
| | Male | 1,042 | 770 | 73.9 | 0.366 |
| Race/ethnicity | African American | 44 | 33 | 75 | 0.514 |
| | Asian, Pacific Islander | 16 | 12 | 75 | 0.591 |
| | Caucasian | 971 | 721 | 74.3 | 0.445 |
| | Hispanic | 13 | 8 | 61.5 | 0.235 |
| | Native American | 6 | 3 | 50 | 0.188 |
| | Other/not specified | 2 | 1 | 50 | 0.454 |

Initially, three subsample categories do fail the .05 probability test. Two are within the faith grouping: the nonliturgical (probability of .047) and the Roman Catholic (probability of .004) chaplains. One is within the polity grouping: the congregational chaplains (probability of .042). The Roman Catholic subsample has an extremely low probability, indicating that this subsample is not governed by the overall promotion rate distribution, but rather is governed by a different, higher promotion rate distribution. It appears that the Roman Catholic subsample may be skewing the overall sample higher and thus leading to the low probabilities of both the non-liturgical and congregational categories (Roman Catholic falls into the episcopal polity group).

24

We then looked at the promotion to commander sample excluding the Roman Catholic subsample to see if there are meaningful differences between the promotion rates of the remaining categories.[7] Table 4 shows the new calculations. All the remaining categories pass the .05 probability test when the Roman Catholic subsample is excluded. From this, we can conclude that the other groups are most likely drawn from the same promotion rate distribution and the differences in promotion rates among them are not meaningful.

Table 4.  Promotion to commander (excluding Roman Catholic sample)

| Grouping | Category | Considered | Promoted | Percent promoted | Tail probability |
|----------|----------|------------|----------|------------------|------------------|
| Overall | All (minus RC) | 788 | 557 | 70.7 | n/a |
| Faith group | Liturgical | 382 | 275 | 72.0 | 0.337 |
| | Nonliturgical | 364 | 252 | 69.2 | 0.327 |
| | Special Worship | 40 | 28 | 70 | 0.523 |
| | Unknown | 2 | 2 | 100 | 0.499 |
| | | | | | |
| Polity | Congregational | 383 | 265 | 69.2 | 0.318 |
| | Episcopal | 297 | 210 | 70.7 | 0.517 |
| | Presbyterial | 106 | 80 | 75.5 | 0.178 |

**Captain**

Table 5 shows the information on those considered for promotion to captain. A total of 798 chaplains are in our sample from year groups 1949 through 1977, and 57 percent of them were promoted.

All of the categories pass the .05 probability test. We conclude that they are all most likely drawn from the same promotion rate distribution, and the differences in promotion rates across groups are not meaningful.

---

7.  See appendix B for the details.

Table 5.  Promotions to captain: initial year groups 1949–1977

| Grouping | Category | Considered | Promoted | Percent promoted | Tail probability |
|----------|----------|-----------|----------|-----------------|-----------------|
| Total | All | 798 | 453 | 56.8 | n/a |
| | | | | | |
| Faith group | Liturgical | 298 | 176 | 59.1 | 0.263 |
| | Nonliturgical | 242 | 129 | 53.3 | 0.186 |
| | Roman Catholic | 232 | 134 | 57.8 | 0.417 |
| | Special Worship | 25 | 13 | 52 | 0.389 |
| | Unknown | 1 | 1 | 100 | 0.568 |
| | | | | | |
| Polity | Congregational | 262 | 145 | 55.3 | 0.364 |
| | Episcopal | 443 | 251 | 56.3 | 0.450 |
| | Presbyterial | 89 | 56 | 62.9 | 0.155 |
| | Unknown | 1 | 1 | 100 | 0.568 |
| | | | | | |
| Gender | Female | 3 | 3 | 100 | 0.183 |
| | Male | 795 | 450 | 56.6 | 0.485 |
| | | | | | |
| Race/ethnicity | African American | 18 | 13 | 72.2 | 0.141 |
| | Asian, Pacific Islander | 8 | 5 | 62.5 | 0.518 |
| | Caucasian | 762 | 430 | 56.4 | 0.458 |
| | Hispanic | 6 | 2 | 33.3 | 0.228 |
| | Native American | 3 | 3 | 100 | 0.183 |
| | Other/not specified | 1 | 0 | 0 | 0.432 |

## A closer look

We found no meaningful differences in promotion rates by gender or race/ethnicity at any of the levels we analyzed. We found one difference by faith group; this was at the promotion-to-commander level. The Roman Catholic promotion rate was significantly higher in our sample. This finding is consistent with the earlier analysis of chaplain promotions [10]. That analysis, which had data on promotion boards through 1991, further divided its sample into subsamples of five-year periods. It found that Catholics did not have a significantly higher promotion rate in the 1987-1991 period. The author speculated that this may have been due in part to a change in the composition of promotion boards that took place in 1987. Reference [10] cites a 1986

court case in which evidence indicated a Navy policy of placing two Roman Catholics on each promotion board (Wilkins vs. Lehman, et al.). In the following years, according to [10], only one Catholic served on subsequent O-5 and O-6 boards.

We wanted to see whether the results in [10] would also hold in our sample, which included more recent data than [10]. We assume that the same policy regarding Catholics on promotion boards was followed for the O-4 boards as well. We calculated the promotion rates for year groups that would have been in zone since 1986 for promotion to O-4, O-5, and O-6.

We applied Bayesian statistical methods to this new sample. Table 6 shows the results for all three ranks. The year groups in each sample are selected to include only those considered for promotion after 1986.

Table 6.    Promotions after 1986

| Rank | Initial year groups | Faith grouping | Considered | Promoted | Percent promoted | Tail probability |
|------|------|------|------|------|------|------|
| Lt. Commander | 1979-1986 | All | 546 | 405 | 74.2 | n/a |
| | | Liturgical | 195 | 143 | 73.3 | .438 |
| | | Nonliturgical | 210 | 154 | 73.3 | .435 |
| | | Roman Catholic | 112 | 83 | 74.1 | .532 |
| | | Special Worship | 27 | 24 | 88.9 | .059 |
| | | Unknown | 2 | 1 | 50 | .451 |
| Commander | 1973-1980 | All | 393 | 269 | 68.4 | n/a |
| | | Liturgical | 143 | 92 | 64.3 | .208 |
| | | Nonliturgical | 150 | 104 | 69.3 | .449 |
| | | Roman Catholic | 78 | 59 | 75.6 | .123 |
| | | Special Worship | 22 | 14 | 63.6 | .394 |
| Captain | 1966-1977 | All | 287 | 149 | 51.9 | n/a |
| | | Liturgical | 97 | 53 | 54.6 | .353 |
| | | Nonliturgical | 87 | 47 | 54.0 | .401 |
| | | Roman Catholic | 86 | 40 | 46.5 | .217 |
| | | Special Worship | 17 | 9 | 52.9 | .562 |

27

This examination of promotions since 1986 shows no meaningful differences in faith-group promotion rates. Thus, the higher promotion rate for Roman Catholics that we observed in the entire sample—spanning promotions from 1972 to 1998—was not present in the period between 1987 and 1998. Nor were there any other meaningful differences (defined as a probability of .05 or less) by faith group at any of the three ranks.

Note that the overall percentage promoted at all three ranks is lower in the most recent period than it was in the larger sample. This pattern reflects two factors: lower promotion opportunities in a period of downsizing, and less time available for promotions above zone to appear in the data in the most recent years.

We wanted to look further at whether the observation of lower O-5 promotion rates for Roman Catholics in the recent period was also true for promotions to O-4 and O-6. To do so, we normalized the promotion percentages to adjust for the differences in overall promotion rates for the two samples. Table 7 shows the normalized rates for the post-86 sample and the rates of the larger sample. In effect, the normalized rate projects what the post-86 rate would have been given the mean of the larger sample.[8] The last column shows the difference between the rate of the larger sample and the normalized rate for the post-86 sample.

We cannot draw statistical conclusions about these numbers. We can only observe patterns in the data. Note that at all three ranks, the post-86, normalized rates are lower for the Catholic chaplains. The post-86, normalized rates for the other faith groupings are not consistently higher or lower than their rates in the larger sample. The change in composition of the promotion boards after 1986 may be associated with this pattern. Having one fewer Roman Catholic on the promotion board may be associated with fewer Catholic promotions.

---

8.  We calculated the normalized rates by multiplying the promotion rate for each small subsample by the ratio of the overall large-sample promotion rate to the overall small-sample promotion rate (the post-86 sample).

Table 7.    Comparison of large and small samples

| Rank | Faith grouping | Promotion rate of large sample | Normalized rate of post-86 promotions | Difference (column 3 minus column 2) |
|---|---|---|---|---|
| Lt. Commander | All | 80.1 | | |
| | Liturgical | 78.5 | 79.1 | 0.6 |
| | Nonliturgical | 79.5 | 79.1 | -0.4 |
| | Roman Catholic | 82.0 | 80.0 | -2.0 |
| | Special Worship | 88.6 | 96.0 | 7.4 |
| Commander | All | 74.0 | | |
| | Liturgical | 75.1 | 69.6 | -5.5 |
| | Nonliturgical | 70.6 | 75.0 | 4.4 |
| | Roman Catholic | 86.3 | 81.8 | -4.5 |
| | Special Worship | 73.7 | 68.8 | -4.9 |
| Captain | All | 56.8 | | |
| | Liturgical | 59.1 | 59.8 | 0.7 |
| | Nonliturgical | 53.3 | 59.1 | 5.8 |
| | Roman Catholic | 57.8 | 50.9 | -6.9 |
| | Special Worship | 52.0 | 57.9 | 5.9 |

This possible relationship does not imply deliberate bias on the part of board members. It is more likely that [10]'s thesis of affinity is at work. In brief, this thesis suggests that people are more likely to look favorably on others who share important characteristics with them. In the case of a chaplain, no characteristic is likely to be more valued than faith group.

## Assignments

Our final set of variables concerns time spent in different assignment types. We looked at months spent in a chaplain's career in billets in the Marine Corps, Coast Guard and Merchant Marine, medical facilities, other Navy shore facilities, Navy sea duty, and the Washington, DC, area.[9]

---

9.    The Merchant Maine has two chaplain billets, both at the Merchant Marine Academy. We include them with Coast Guard billets because they too are remote from the Navy and Marine Corps. In presenting the results, we refer to this category as "Coast Guard."

We used the same three samples of chaplains: those passed over or promoted to lieutenant commander, commander, and captain. We first looked at the distribution of chaplains in months per assignment type. From these figures, we constructed bins to classify different levels of duration. These levels varied according to assignment type and rank, depending on number of billets and typical tour lengths. For example, for assignment types with few billets, such as Coast Guard/Merchant Marine, we had two categories at the two lower ranks: 0 to 9 months (capturing those without such experience on their fitness reports) and 10 months or more. For assignment types with many billets, especially at the most senior level, we had four bins, depending on the distribution of chaplains in that type. In these cases, we bounded the bins by looking at the frequencies of chaplains per month in each duty type.

Figure 1 is an example of how the bins were chosen.[10] It shows, for the promotion-to-commander sample, the number of chaplains with x cumulative months of duty in sea billets. (Chaplains with zero months of sea duty are not included in the graph.) The dashed lines show where the lines were drawn between time bins. Thus, we see a relatively small number of chaplains between 1 and 9 months, two periods with peaks (10 to 37 and 38 to 60 months), and a tail with more than 60 months of sea duty.

After drawing the bin lines, we calculated promotion rates for the chaplains in each bin and again used Bayesian statistical methods to determine any meaningful differences.

---

10. Similar graphs for the other assignment types and ranks are in appendix A.

Figure 1.   Distribution of sea duty: promotion-to-commander sample



## Lieutenant commander

Table 8 shows the results of the analysis of assignments for promotion to lieutenant commander. The information presented is the same as that for the preceding variables. For each assignment time bin, we show the number of candidates for promotion that fell into that group, the number and percentage that were promoted, and the tail probability. Once again, the tail probability tells the probability of getting that percentage or higher for observations above the mean and that percentage or lower for observations below the mean. For example, consider chaplains who fall into the category of 0 to 9 months of Marine Corps assignments. Their promotion rate of 81.3 percent is higher than the overall mean of 80.1 percent. The probability of a promotion rate of 81.3 percent or higher for that group is .341. Thus, this group is consistent with the overall probability distribution.

31

Table 8.   Assignments and promotion to lieutenant commander

| Assignment category | Considered | Promoted | Percent promoted | Tail probability |
|---|---|---|---|---|
| Overall | 884 | 708 | 80.1 | n/a |
| Marine Corps months | | | | |
| 0 to 9 | 300 | 244 | 81.3 | 0.341 |
| 10 to 40 | 486 | 402 | 82.7 | 0.124 |
| 41 or more | 98 | 62 | 63.3 | 0.002* |
| Coast Guard months | | | | |
| 0 to 9 | 828 | 665 | 80.3 | 0.459 |
| 10 or more | 56 | 43 | 76.8 | 0.325 |
| Medical months | | | | |
| 0 to 9 | 721 | 587 | 81.4 | 0.258 |
| 10 to 26 | 100 | 85 | 85.0 | 0.143 |
| 27 or more | 63 | 36 | 57.1 | 0.00006* |
| Navy sea months | | | | |
| 0 to 9 | 267 | 221 | 82.8 | 0.180 |
| 10 to 40 | 525 | 423 | 80.6 | 0.426 |
| 41 or more | 92 | 64 | 69.6 | 0.015* |
| Navy shore months | | | | |
| 0 to 9 | 231 | 192 | 83.1 | 0.165 |
| 10 to 60 | 597 | 479 | 80.2 | 0.483 |
| 61 or more | 56 | 37 | 66.1 | 0.012* |
| DC months | | | | |
| 0 to 9 | 859 | 684 | 79.6 | 0.423 |
| 10 or more | 25 | 24 | 96.0 | 0.029* |

Once again, the probabilities below .05 are indicated by an asterisk. There is a clear pattern: these probabilities are all at the high end of the range of time. For Marine Corps, medical, sea duty, and shore duty, the probability of promotion is *lower* for candidates who spent the longest time in these categories. The other assignment type with a differential in promotion rates is the group with a tour in the Washington, DC, area. This group had a *higher* promotion rate than those who did not have such a tour.[11] There is no difference in promotion rates associated with Coast Guard assignments.

---

11. Because there are so few of these assignments, we did not break this assignment type into more than two categories.

The finding that chaplains at the high end of the time scale had lower promotion rates is not surprising. Chaplains are expected to serve in a variety of billets to acquire a wide range of experience. A chaplain whose career does not show such variety is likely to have high amounts of time in at least one of the assignment types.

The finding that a Washington tour is related to higher promotion rates could have several explanations. One possibility is that high-performing chaplains are detailed to posts in the Washington arena. Another is that chaplains who serve in Washington have more visibility with those who are likely to sit on promotion boards. A third is that chaplains in Washington are more likely to have their fitness reports written by other, higher-ranking chaplains. By virtue of both their level of experience and their being chaplains rather than line officers, they may have a better understanding of what words to use to appeal to chaplains on the boards.

### Commander

The results are somewhat different when we look at the promotion-to-commander sample. The time bins in table 9 represent cumulative service in each assignment type. At this level, all but one category show several significant differences in promotion rates. And many of the tail probabilities are very low. Three patterns remain consistent with the lieutenant commander sample:

- Coast Guard assignments are not associated with differences in promotion rates.

- Chaplains with the longest amounts of time in all the categories except Washington assignments have a lower probability of promotion.

- Chaplains with Washington assignments have a higher probability of promotion.

Let's look at each of the assignment types in turn.

Table 9.    Assignments and promotion to commander

| Assignment category | Considered | Promoted | Percent promoted | Tail probability |
|---|---|---|---|---|
| Overall | 1,052 | 778 | 74.0 | n/a |
| Marine Corps months | | | | |
| 0 to 9 | 161 | 138 | 85.7 | 0.0005* |
| 10 to 30 | 381 | 305 | 80.1 | 0.009* |
| 31 to 42 | 197 | 154 | 78.2 | 0.118 |
| 43 or more | 313 | 181 | 57.8 | $5.55 \times 10^{-8}$* |
| Coast Guard months | | | | |
| 0 to 9 | 955 | 709 | 74.2 | 0.448 |
| 10 to 30 | 60 | 46 | 76.7 | 0.380 |
| 31 or more mon | 37 | 23 | 62.2 | 0.082 |
| Medical months | | | | |
| 0 to 9 | 665 | 518 | 77.9 | 0.034* |
| 10 to 30 | 225 | 164 | 72.9 | 0.397 |
| 31 or more | 162 | 96 | 59.3 | 0.0001* |
| Navy sea months | | | | |
| 0 to 9 | 168 | 129 | 76.8 | 0.243 |
| 10 to 37 | 489 | 392 | 80.2 | 0.004* |
| 38 to 60 | 272 | 194 | 71.3 | 0.209 |
| 61 or more | 123 | 63 | 51.2 | $3.20 \times 10^{-7}$* |
| Navy shore months | | | | |
| 0 to 30 | 226 | 183 | 81.0 | 0.014* |
| 31 to 96 | 691 | 547 | 79.2 | 0.007* |
| 97 or more | 135 | 48 | 35.6 | $2.98 \times 10^{-18}$* |
| DC months | | | | |
| 0 to 9 | 976 | 711 | 72.8 | 0.0001* |
| 10 or more | 76 | 67 | 88.2 | 0.003* |

**Marine Corps.** Our analysis shows that candidates with one tour or less in the Marine Corps have higher promotion rates. The rate was highest for those with essentially no Marine Corps time, but chaplains who spent between 10 and 30 months in the Marine Corps also had a promotion rate higher than the mean. In contrast, chaplains with more than 3-1/2 years in Marine Corps assignments had a lower rate of promotion. These chaplains were in the group with the most Marine Corps experience.

This set of findings is problematic; we are uncertain how to explain it.

**Coast Guard.** Our data show no significant differences in promotion rate relating to time spent in this service. Time in the Coast Guard neither helps nor hurts a candidate's chances for promotion to commander.

**Medical.** Candidates with no time in medical billets have a higher probability of promotion, whereas those with more than 2-1/2 years have a lower promotion probability.

Perhaps members of the medical staff corps are harder graders than the line community. This assertion was made by the commanding officer of a hospital with whom we spoke. Other explanations may be that less competitive chaplains are placed in medical billets, or that medical duty is not viewed as being as challenging as other types of duty.

**Navy sea.** Having no sea duty is not related to a chaplain's chances of promotion to commander. Candidates with 1 to 3 years of sea duty have a higher probability of promotion; those with more than 5 years of sea duty have a lower promotion probability.

At this point, 5 years represents just over a third of a chaplain's career. It is possible that candidates with more time at sea do not have the variety of experience that a promotion board seeks.

**Navy shore.** Candidates with less than 2-1/2 years of shore duty have a higher probability of promotion; those with more than 8 years have a very low promotion rate.

This finding also suggests that variety in assignments is valued.

**Washington, DC, area.** We find that candidates with no Washington experience have a lower probability of promotion, whereas those who have such experience have a higher promotion rate.

The possible explanations are the same as those discussed for the promotion-to-lieutenant commander sample.

35

### Captain

Table 10 shows the results of our analysis of cumulative assignments and promotion to captain. For all categories but one, candidates who fall in the longest-assignment bin have a lower probability of promotion. This result again probably reflects some failure to have a sufficiently diverse career, because a lot of time in one assignment type means less time available for others. The one exception, time in Washington, shows a higher probability of promotion at the longest time interval. This repeats what we found at promotion to O-4 and O-5 levels, probably for the same reasons.

For the first time, we find a meaningful difference for Coast Guard assignments: promotion rates are lower for those with 28 or more months in the Coast Guard. This amount of time is not long enough to be reflecting some lack of diversity in assignments, especially at the captain level, which comes after 20 years of service. It may reflect different standards or styles of fitness reporting, as most of the chaplains in this group probably have more than one tour in the Coast Guard. Another explanation that has been offered is that Coast Guard chaplains are less visible to the rest of the Chaplain Corps, including those who serve on promotion boards.

For this sample, the shortest interval of Navy shore duty was associated with a higher probability of promotion, possibly picking up those with the most time spent elsewhere, accumulating diverse careers. And as was true at the commander level, a lack of medical experience was associated with a higher probability of promotion. Those with more than 30 months of medical experience had a lower promotion rate. Once again, we can only suggest some possible reasons: alleged harder grading by the medical corps, possible placement of less competitive chaplains in medical billets, a perception that medical duty is not as challenging.

One final category showed a higher probability of promotion: those with 1 to 2 years of Marine Corps experience. We are uncertain how to interpret this result. It is similar to our finding at the O-5 level.

36

Table 10. Assignments and promotion to captain

| Assignment category | Considered | Promoted | Percent promoted | Tail probability |
|---|---|---|---|---|
| Overall | 798 | 453 | 56.8 | n/a |
| Marine Corps months | | | | |
| 0 to 9 | 97 | 58 | 59.8 | 0.319 |
| 10 to 27 | 214 | 142 | 66.4 | 0.006* |
| 28 to 54 | 236 | 139 | 58.9 | 0.300 |
| 55 or more | 251 | 114 | 45.4 | 0.001* |
| Coast Guard months | | | | |
| 0 to 9 | 699 | 408 | 58.4 | 0.274 |
| 10 to 27 | 38 | 19 | 50.0 | 0.203 |
| 28 or more | 61 | 26 | 42.6 | 0.022* |
| Medical months | | | | |
| 0 to 9 | 466 | 293 | 62.9 | 0.018* |
| 10 to 30 | 156 | 87 | 55.8 | 0.438 |
| 31 to 42 | 79 | 32 | 40.5 | 0.004* |
| 43 or more | 97 | 41 | 42.3 | 0.005* |
| Navy sea months | | | | |
| 0 to 9 | 58 | 30 | 51.7 | 0.267 |
| 10 to 37 | 275 | 169 | 61.5 | 0.095 |
| 38 to 65 | 297 | 172 | 57.9 | 0.385 |
| 66 or more | 168 | 82 | 48.8 | 0.035* |
| Navy shore months | | | | |
| 0 to 51 | 132 | 92 | 69.7 | 0.003* |
| 52 to 142 | 566 | 321 | 56.7 | 0.506 |
| 143 or more | 100 | 40 | 40.0 | 0.001* |
| DC months | | | | |
| 0 to 9 | 678 | 372 | 54.9 | 0.242 |
| 10 to 37 | 78 | 51 | 65.4 | 0.086 |
| 38 or more | 42 | 30 | 71.4 | 0.041* |

## Summary

We found no meaningful differences in promotion rates by gender or race/ethnicity at any of the levels we analyzed. We found one difference by faith group; this was at the promotion-to-commander level. The Roman Catholic promotion rate was significantly higher in our sample. This finding is consistent with the earlier analysis of chaplain promotions [10]. When we examined promotions of a smaller

sample, those taking place after 1986, we found that there was no longer a meaningful differential. This change may be related to a change in composition of promotion boards, from two Roman Catholic members to one.

We found numerous differences in promotion rates by assignment. Many of these followed a pattern: chaplains in the longest time bin in many of the assignment types had a lower probability of promotion. In addition, we found that chaplains with time in Washington area billets consistently had a higher probability of promotion. We also discovered that a single tour in the Marine Corps was associated with higher promotion rates to commander and captain. Chaplains without time in medical billets had higher promotion rates to commander and captain; those with more than 30 months in medical billets had lower promotion rates to these ranks. Finally, chaplains with more than 27 months in Coast Guard assignments had a lower rate of promotion to captain.

## The perception of promotion

As noted, perceptions of bias in the chaplain promotion process are widespread and contradictory. Particularly contentious are charges of religious bias. When we examined actual promotions, however, we found only one meaningful difference in promotion rates among faith groupings. Why, then, are perceptions of bias so prevalent? One contributing factor is the small size of the chaplain community.

The effect of small numbers on perceptions is illustrated in the next figures 2, 3, and 4, which cover promotions to O-4, O-5, and O-6, respectively. They show the number of chaplains promoted in each broad faith grouping for each year group we analyzed.

Because of the low numbers of chaplains, the groups show wild swings, especially at the higher ranks, where the numbers are smallest. The small numbers are likely to contribute to perceptions of bias, as follows. Chaplains in a particular year group in which their faith group received few promotions may feel discriminated against, whereas a year later, the same faith group may have seen many of its chaplains promoted, both absolutely and relative to other groups.

Figure 2.   Promotion to lieutenant commander: year groups 1974-1986



Figure 3.   Promotion to commander: year groups 1957–1980



From year to year, one group of chaplains or another may take these numbers as evidence of discrimination. It is therefore not surprising that chaplains of all groups voiced concerns that their group was a victim of bias or that another group was favored—even though the aggregate numbers in our analysis do not show such differences. The single exception—Roman Catholics at the promotion to commander level in the large sample—has not been in evidence in the period after 1986.

Figure 4.   Promotion to captain: initial year groups 1949-1977



# Discussion of results

## Personal characteristics: race/ethnicity, gender, and faith grouping

For the most part, we did not find evidence of differences in promotion rates in the Chaplain Corps. We found no meaningful differences in promotions by race/ethnicity or gender. In this regard, the Chaplain Corps record is exemplary. And, in all but one case, we found no meaningful differences in promotion by faith groupings. We did find that Roman Catholics were promoted at a higher rate to commander in our large sample covering year groups 1957-1980. This finding does not necessarily indicate bias in the promotion system, although the lack of a differential in promotions after Catholic representation on the selection boards was reduced is suggestive. This is not to say, however, that deliberate bias is the only, or even the most likely, explanation for the pattern we observed.

The Roman Catholics in our sample may share some underlying trait that contributed to the higher promotion rate. For example, some officers have suggested that Roman Catholics succeed because they are unmarried and hence do not have the distractions of family life. This may allow them to devote themselves more fully to their jobs.

Another explanation may be the relative shortage of Roman Catholic priests and the high percentage of Roman Catholics in the Navy and Marine Corps. For example, recent personnel records indicate that 29 percent of officer and enlisted Marines are Roman Catholic, as are 25 percent of Navy enlisted personnel.[12] In September 1998, the number of Roman Catholic chaplains was 191, 21 percent of the Chaplain Corps. Members of promotion boards, regardless of their faith group, may take such a gap into account in their actions. The

---

12. Data are not collected on the religious preferences of Navy officers.

41

Chaplain Corps may be trying to be representative of those it serves, so that it can serve adherents of all faith groups equally.

But why was this differential confined to the rank of commander? A possible explanation is that when officers reach the level of commander, they can remain in the Navy until retirement; there is no "up or out" policy at this level. Thus, promoting Roman Catholics to commander would help the Navy retain the numbers of Roman Catholic chaplains needed to minister to the large number of Roman Catholics in the services.

Under a new concept of ministry suggested by this study—ensuring access—the effort to match the faith group composition of the Chaplain Corps to the composition of the services may assume less importance. Reference [5] fully discusses the topic of ensuring access to ministry. In brief, the concept focuses on the requirements for religious ministry support and the resources available to satisfy them. No longer would commands rely almost exclusively on their assigned chaplains to provide ministry. Instead a broad spectrum of resources--including lay leaders, reserves, neighboring commands, other services, contract clergy, community facilities, and community organizations—would be viewed as resources to meet the requirements.

The Chief of Chaplains has been briefed on this concept and has embraced it. Its implementation may help ensure that the best chaplains, regardless of faith group, are recruited, retained, and promoted in the Chaplain Corps.

# Job characteristics: assignment type

We found a number of differences in promotion rates by assignment. Many of these followed a pattern: chaplains in the longest time bin in many of the assignment types had a lower probability of promotion. This result may reflect a lack of diversity in those chaplains' careers. Our interviews revealed a shared understanding among chaplains that diversity is valued, although we could find no written guidance to this effect.

Another finding was that chaplains with time in Washington area billets consistently had a higher probability of promotion. This result may reflect both cause and effect: chaplains may be put in these billets because they are top performers, and/or the billets themselves may be career-enhancing. Chaplains in the Washington area are more likely to be exposed to the leadership of the Corps, thus enhancing their visibility. Fitness reports in this area are likely to be written by senior chaplains, who are skilled practitioners of the art. And discussions with the Chief of Chaplains' staff confirmed that many billets in the area—especially those on the Chief's staff—are likely to be filled with hand-picked candidates.

We also discovered that a single tour in the Marine Corps was associated with higher promotion rates to commander and captain. Chaplains without Marine experience also had a higher rate of promotion to commander. We're uncertain how to interpret these results.

Chaplains without time in medical billets had higher promotion rates to commander and captain; those with more than 30 months in medical billets had lower promotion rates to these ranks. This pattern suggests that medical billets are not career-enhancing. Perhaps this duty is viewed as less taxing than billets with other communities. Alternatively or additionally, less competitive chaplains may be detailed to these assignments, or fitness reporting standards and styles may be different.

Finally, chaplains with more than 27 months in Coast Guard assignments had a lower rate of promotion to captain. Perhaps Coast Guard officers have different standards or styles in writing fitness reports. Chaplains serving more than one tour with the Coast Guard—which has the fewest chaplain billets of any of the assignment types—may suffer from a lack of visibility in the Chaplain Corps at large.

44

# Recommendations

We have discussed two sets of issues with regard to promotions in the Navy Chaplain Corps. One is the existence of meaningful differences in promotion rates by faith grouping and by assignment type. The second is the perception of unfairness in the promotion process. We uncovered this in our interviews and observe it in the lawsuits that periodically challenge Navy Chaplain Corps promotions. We offer recommendations to address both of these sets. We would point out, however, that there is no firm line between the two types of issues. We present some recommendations that address both reality and perceptions.

## Counter perceptions of bias

Our interviews with chaplains revealed a common perception of bias in the promotion process [1]. The effects of this perception can grow to be serious and harmful. We talked to chaplains who were bitter about not being promoted and attributed their failure to bias against them. In some cases, it was clear to us that their attitudes had affected their work and had the potential to infect junior chaplains with whom they shared their experiences and feelings. Many in the line community also remarked on these negative attitudes, without any prompting. Given the high retention rates of chaplains, even those who have failed promotion, there is ample opportunity for these perceptions of injustice to be communicated. Not only those few chaplains who pursue their cases in the courts and the media harm the reputation of the Chaplain Corps.

It is only human nature that those passed over believe that the results of the promotion board are based not on their own shortcomings, but on the biases of those doing the judging. Nonetheless, it is important that the Chief of Chaplains acknowledge these perceptions and take steps to alleviate and counter them. Not only is morale affected within

45

the Chaplain Corps, but these negative perceptions can be passed on to ecclesiastical endorsers and other clergy, potentially harming recruiting efforts.

We offer some suggestions that may guard against both the reality and the perception of bias.

# Reform the promotion process

## Consider changes to the promotion boards

Our analysis of promotions after 1986, when Roman Catholic representation was reduced from two to one on each board, suggests that the faith group representation on the board may affect who is selected for promotion. The composition of the promotion boards should be carefully considered due to its potential to affect the fairness of the promotion process and perceptions thereof.

This year's (FY 2000's) chaplain promotion boards to lieutenant commander, commander, and captain each consisted of one line officer and four chaplains.[13] Almost all of the other Navy staff corps boards were larger, and several included more than one officer from a community other than its own (line or other staff corps).

Each of the FY 2000 chaplain boards included one female chaplain, one Catholic, and at least one racial/ethnic minority. This composition is in line with guidance for gender and race/ethnicity, but as the board members are to be nominated *without regard to* faith group, not proportional to faith group, the presence of a Roman Catholic on each board could be considered problematic.

Judging from the FY 2000 selection boards, the size and composition of the boards are not ideal. Compared to most other staff corps, chaplain selection boards have fewer members in total and fewer outside their own community. In the other services, the Army and Air Force chaplain promotion boards each contain only one chaplain, with the

---

13. The identity of board members was determined from [14].

–
–     rest line officers. This practice may minimize suspicions of bias according to faith group.

The Navy Chaplain Corps should reconsider the composition of its boards. Simply increasing the number of members would open the boards to more points of view and would serve to counter perceptions of bias. Adding additional, non-chaplain officers should also be considered. We understand that the FY 2001 boards will consist of two line officers and three chaplains.

The Navy Chaplain Corps may want to go one step further and consider adopting the policy of the Army and Air Force. We are unaware of any lawsuits alleging bias against chaplain promotion boards in those services and suspect that the composition of their boards is a significant reason why. Changing to a predominantly line board would also emphasize the purpose of the chaplain corps—to serve—and would be a strong signal of the "customer" orientation of the Corps. A further suggestion is to include a Marine Corps officer from time to time or, alternatively, an officer from the amphibious Navy.

At the very least, the Chaplain Corps should consider selecting members of promotion boards without regard to faith group, even if some boards may sit without representation of some faith groups.

Any of these changes that are adopted should be widely publicized and explained to the rank and file. In particular, if board members are selected without regard to faith group, as mandated in SECNAV Instruction 1401.3, it is important to explain this policy to head off charges of bias against those whose faith group is not represented on any particular board.

## Remove information on faith group from the PSR

It would be hard, if not impossible, to completely eliminate any clues to a chaplain's faith group from the information available to promotion board members. The narrative section of the fitness report may use words that identify a specific faith group or imply a broader faith grouping. However, there is one easy-to-implement change that would make faith group less obvious. The 500 series AQDs should be

removed from the PSR. These three-digit numbers stand for a chaplain's faith group.

# Work to identify and eliminate differences in fitness reporting

Our analysis of assignments and promotion indicates that there may be differences in fitness report standards across assignment types. Among the potential sources of differences are:

- Non-Navy evaluators writing differently and using different standards[14]

- Non-line evaluators (specifically the medical corps) using different standards

- Chaplains in supervisory or command chaplain positions drafting fitness reports for other chaplains. Being chaplains, the supervisors may have a better sense of what to highlight in a chaplain's performance and how to communicate to other chaplains.

Some steps have been taken to enable selection boards to compare fitness reports across evaluators. Data are collected that show mean scores given by each reporting senior. This information allows a selection board to account for an evaluator who is a consistently low grader or one who is consistently higher. However, such information may mask the true situation when fitness reports are drafted by senior chaplains and rubber-stamped by a commanding officer.

We offer several suggestions to deal with the differences in chaplain evaluation.

## Provide guidance to commanders

The breadth of constituency—Navy, Marine Corps, Coast Guard, Merchant Marine, and the medical community—served by Navy

---

14. We are told that Navy fitness reports are characterized by flowery language and liberal use of superlatives. Other communities may have a different style, as well as different grading standards.

chaplains makes it hard to foster consistency in evaluation. Variation in standards and styles is difficult to overcome. But the Chaplain Corps can help commanders across the Sea Services understand the role of the chaplain. It is important for the Chaplain Corps to provide guidance to commanders on what to expect of their chaplains so they can evaluate them appropriately. Personnel at different levels should all take a role in this process, from the Chief of Chaplains to the individual chaplain in his first billet.

- SECNAV Instruction 1730.7A [15] outlines the duties of the Navy chaplain across the services. The Navy, Marine Corps, and Coast Guard all have analogous instructions or orders that apply to their specific environments. These should be reviewed for consistency with the SECNAV Instruction.

- Each chaplain should explain his/her role as a Navy chaplain to the commanding officer, referring to SECNAV Instruction 1730.A as authority.

- Service schools for prospective commanding officers should instruct students on the role of the chaplain and the command religious program.

- Thought should be given to providing an attachment to the fitness report form outlining the major criteria for judging a command religious program and an effective chaplain.

## Reconsider the role of chaplains in writing fitness reports

In many cases it is common practice for supervisory, regional, and force chaplains to draft the fitness reports of junior chaplains. Senior chaplains certainly have a role in providing input to fitness reports. The commanding officer, however, should be encouraged to take ownership of the command religious program and the chaplains who administer it. If senior chaplains are wholly responsible for fitness reports, there may be unhealthy consequences:

- Chaplains' ties with the line community they serve may be loosened if responsibility for their fitness reports is relinquished to other chaplains.

- Resentments and perceptions of bias among chaplains may be fostered.

- Such an arrangement confounds the chain of influence with the chain of command. (See [1].)

We suggest, therefore, that the commanding officer be designated the reporting senior and that supervisory chaplains play a clearly subsidiary role in the preparation of fitness reports. If the input of supervisory chaplains plays a significant role in the final fitness report, we also suggest that the supervisory chaplain's name be made visible, both to the chaplain being evaluated and to selection boards.

## Orient chaplains to the Navy and its evaluation system

The Chaplain Basic School should frankly address the topic of fitness reports and promotions so that all chaplains start with the same knowledge base. The issue of awards and commendations should also be covered.[15] In this way, a chaplain could speak with his commanding officer about the ins and outs of fitness reports. Such a discussion may be especially helpful to more junior commanding officers who have little experience with fitness reports and with commanding officers of different communities or services.

Currently, the Chaplain Corps is considering sending its new chaplains to the Navy's Officer Indoctrination School (OIS). The other professional staff corps (Medical Corps, JAG Corps, and the Civil Engineering Corps) send their new officers there before they receive corps-specific training. At OIS, new staff corps officers gain in-depth understanding of the Navy and what it means to be a Navy officer. The school lasts six weeks and is staffed primarily by line officers. In contrast, the Chaplain Corps covers such topics in the first few weeks of the Chaplain Basic School. This course is taught by other chaplains and may not provide as rigorous an orientation to the Navy as the OIS.

---

15. Several chaplains we spoke with felt at a disadvantage because they were unaware of the procedures for accumulating awards and commendations. When chaplains appear otherwise equal on paper, those with numerous commendations are probably more likely to be promoted.

Sending new chaplains to OIS may help eliminate differences in fitness reporting, by providing new chaplains with the same level of orientation to the Navy as that given other staff corps officers and by ensuring that all chaplains have the information they need to succeed as officers in the U.S. Navy.[16] In our interviews, some chaplains indicated that they had not been sufficiently instructed in some aspects of being an officer, such as the proper way to wear the uniform. The line officers on staff at the OIS are practiced at exemplifying and communicating these requirements. Sending chaplains to OIS is congruent with our previous recommendations of increasing representation of line officers on promotion boards and ensuring that line officers play an active part in writing chaplains' fitness reports. Once again, the goal is to increase ties between the chaplaincy and those they serve and to provide all chaplains with an equal chance at a successful career.

Sending chaplains to OIS and taking advantage of the existing curriculum and staff should receive serious study. Then the Chaplain School could concentrate on the chaplain-specific subjects that need to be imparted to incoming chaplains. If variety in assignments is indeed valued by the Chaplain Corps, this would be the place to send that message clearly and strongly.

Alternatively, if chaplains are not sent to OIS, the Chaplain Basic School should include more comprehensive information on fitness reporting and awards and commendations in its curriculum. It should also ensure that basic information about the requirements of being a Navy officer is fully covered.

## Encourage mentoring relationships

We have just suggested that new chaplains be instructed in the intricacies of the performance evaluation and promotion system before they arrive at their first assignment. It is also important for chaplains to have continuing access to professional advice and the benefit of

---

16. Currently chaplains with previous military experience may have an advantage of information over chaplains who come into the Navy with no such background. OIS may help even the playing field.

other chaplains' experience. A good way to accomplish this is through mentoring relationships.

The Chaplain Corps experimented with a mandated mentoring system. This system did not work; mentors cannot be assigned willy-nilly. Mentor relationships must be developed. They work best when based on mutual compatibility.

Such relationships can also be fostered through social occasions—both gatherings at official functions, such as Professional Development Training Courses and Workshops, and smaller, geographically based gatherings. Such events should be promoted throughout the Chaplain Corps. Chaplains at neighboring commands can provide a network of support for each other, and inter-service gatherings may be useful in fostering a wider understanding of opportunities to serve in the Chaplain Corps.

## Make these results widely known

Faulty perceptions thrive on rumor and in the absence of information. The Chaplain Corps should make the findings of this study widely and easily available. It should also publicize the steps it is taking to implement change and explain their rationale.

## Perform additional analysis

Additional analysis could be done to shed more light on the differentials in promotion rates. Multivariate regression analysis, as discussed earlier, could reveal the interactions among the variables of interest and tease out the relationship of single variables to promotion, holding other variables constant. Besides additional work on promotions, analysis could be performed on extensions and Selective Early Retirement Boards. Additionally, a cross-service comparison would be of interest, if the data could be acquired from the Army and Air Force.

Given the breadth and depth of negative perceptions surrounding promotions, the cost in time and ill will associated with threatened and pending lawsuits, and the problematic results we discovered, the

Chaplain Corps may want to study some alternatives to the current promotion system. Some alternatives, raised by Navy chaplains during our interviews, are discussed in [1]. These include the "rankless" chaplain concept (used by the Royal Navy) and ways of increasing movement through the ranks.

# Appendix A: Definition of variables

## Composition of faith groupings

Table 11 shows the composition of the faith groupings we used in our analysis. We used two classifications: broad faith groups, and polities. The broad faith groupings are used by the Chaplain Corps administratively. They are: liturgical Protestant (L), nonliturgical Protestant, (NL), Roman Catholic (RC) and Special Worship Consideration (SWC). The polity groups are congregational (C), episcopal (E), and presbyterial (P). We assigned each ecclesiastical endorser to one of each of these classifications using a number of sources. We consulted three standard reference works [16, 17, 18]. For faith groups that were not covered in these books, we consulted with several chaplains of various faith groups and with Dr. Timothy Weber, Dean of Northern Baptist Theological Seminary, an expert in church history.

Table 11. Faith and polity groupings

| Endorser | Faith grouping[a] | Polity[b] |
|---|---|---|
| African Methodist Episcopal | L | E |
| African Methodist Episcopal Zion | L | E |
| American Baptist Association | NL | C |
| American Baptist Churches | NL | C |
| Anglican Catholic Church | L | E |
| Assemblies of God | NL | C |
| Associated Gospel Churches | NL | C |
| Associated Reformed Presbyterian | L | P |
| Baptist Bible Fellowship | NL | C |
| Baptist General Conference | NL | C |
| Baptist Missionary Association of America | NL | C |
| Bible Presbyterian Church | NL | P |
| Brethren Church | NL | C |
| Central Bible Church | NL | C |

Table 11. Faith and polity groupings (continued)

| Endorser | Faith grouping[a] | Polity[b] |
|---|---|---|
| Chaplaincy Full Gospel Churches | NL | C |
| Christian and Missionary Alliance | NL | C |
| Christian Church (Disciples of Christ) | NL | C |
| Christian Churches and Churches of Christ | NL | C |
| Christian Methodist Episcopal Church | L | E |
| Christian Reformed Church | L | P |
| Christian Science | SWC | C |
| Church of God (Anderson, IN) | NL | C |
| Church of God (Cleveland, TN) | NL | E |
| Church of God General Conference | NL | C |
| Church of God in Christ | NL | E |
| Church of God in North America | NL | C |
| Church of God of Prophecy | NL | C |
| Church of the Nazarene | L | E |
| Church of United Brethren in Christ | NL | E |
| Churches of Christ | NL | C |
| Churches of Christ in Christian Union | NL | C |
| Conservative Baptist Association in America | NL | C |
| Conservative Congregational Christian Conference | NL | C |
| Conservative Lutheran Association | L | E |
| Cumberland Presbyterian | L | P |
| Episcopal Church | L | E |
| Evangelical Congregation Church | L | E |
| Evangelical Covenant Church in America | L | C |
| Evangelical Free Church of America | NL | C |
| Evangelical Lutheran Church in America | L | E |
| Free Methodist of North America | L | E |
| Free Will Baptist | NL | C |
| General Association of General Baptists | NL | C |
| General Association of Regular Baptists | NL | C |
| Independent Fundamental Churches of America | NL | C |
| International Church of Foursquare Gospel | NL | E |
| Jewish | SWC | C |
| Kansas Yearly Meeting of Friends | NL | C |
| LDS | SWC | E |
| Liberty Baptist Fellowship | NL | C |
| Lutheran Church, Missouri Synod | L | E |
| Missionary Church | NL | C |

*Appendix A*

Table 11. Faith and polity groupings (continued)

| Endorser | Faith grouping[a] | Polity[b] |
|---|---|---|
| Moravian | L | E |
| National Association of Baptist Churches | NL | C |
| National Association of Congregational Christian Churches | L | C |
| National Baptist Convention in the USA | NL | C |
| National Baptist Convention of America | NL | C |
| National Fellowship of Brethren Churches | NL | C |
| Open Bible Standard Churches | NL | C |
| Orthodox | SWC | E |
| Orthodox Presbyterian | L | P |
| Pentecostal Assemblies of the World | NL | C |
| Pentecostal Church of God | NL | C |
| Pentecostal Church of God in North America | NL | C |
| Pentecostal Free Will Baptist Church, Inc. | NL | C |
| Pentecostal Holiness Church | NL | E |
| Plymouth Brethren | NL | C |
| Presbyterian Church in America | L | P |
| Presbyterian Church, USA | L | P |
| Primitive Methodist | L | C |
| Progressive National Baptist Convention, Inc. | NL | C |
| Reformed Church in America | L | P |
| Reformed Episcopal Church | L | E |
| Reformed Presbyterian Church of North America | L | P |
| Roman Catholic | RC | E |
| Seventh-Day Adventist | SWC | P |
| Southern Baptist | NL | C |
| Unitarian Universalist Association | SWC | C |
| United Church of Christ | L | C |
| United Episcopal Church of North America | L | E |
| United Methodist | L | E |
| United Pentecostal Church International | NL | C |
| Unknown (AQD 515) | L | P |
| Wesleyan | L | E |
| Westgate Chapel | NL | C |

a. L = liturgical; NL = nonliturgical; RC = Roman Catholic; SWC = special worship consideration.
b. C = congregational; E = episcopal; P = presbyterial.

# Racial/ethnic groups

Table 12 shows the definition of racial/ethnic groups used in the analysis. The groups are constructed from the OMF race and ethnic codes. Tables 13 and 14 define the racial and ethnic codes, respectively. Following DOD practice, ethnicity supersedes race. Thus, for example, an African American with an ethnic code of 4 (Puerto Rican) is classified as Hispanic.

Table 12. Defining racial/ethnic groups

| Definition | If OMF race code is: | and OMF ethnic code is: |
|---|---|---|
| African American | N or B (1984-85) | X, Y, Z, or blank |
| Caucasian | C or 0 (1972-74) | X, Y, Z, or blank |
| Hispanic | Any | S, 1, 4, 6, or 9 |
| Asian/Pacific Islander | Any | 3, 5, D, E, G, J, K, L, Q, V, or W |
| Asian/Pacific Islander | or M | X, Y, Z, or blank |
| Native American | Any | 2, 7, or 8 |
| Native American | or R | X, Y, Z, or blank |
| Other/not specified | X, Z or none of the above combinations | |

Table 13. Race codes[a]

| | |
|---|---|
| C | Caucasian |
| M | Asian/Mongoloid |
| N | Negroid |
| R | American Indian |
| X | Other[b] |
| Z | Unknown |

a. Source: Reference [19].
b. "Includes all officers who identify with a race other than one of the above."

*Appendix A*

Table 14. Ethnic codes[a]

| Code | Ethnic group |
|------|--------------|
| 1 | Spanish descent |
| 2 | American Indian |
| 3 | Asian-American |
| 4 | Puerto Rican |
| 5 | Filipino |
| 6 | Mexican-American |
| 7 | Eskimo |
| 8 | Aleut |
| 9 | Cuban-American |
| D | Indian |
| E | Melanesian |
| G | Chinese |
| H | Guamanian |
| J | Japanese |
| K | Korean |
| L | Polynesian |
| Q | Other Pacific Island descent |
| S | Latin American with Hispanic descent |
| V | Vietnamese |
| W | Micronesian |
| X | Other |
| Y | None |
| Z | Unknown |

a. Source: Reference [19].

# Assignment types

We used a number of fields on the OMF to determine the assignment types. Navy sea duty and Marine Corps, Coast Guard, and Merchant Marine assignments are separate and distinct. Navy sea duty was defined as assignments with type assignment codes of C (sea duty) or D (deployed ship or squadron homeported outside the United States). Table 15 shows the codes we used to identify Marine Corps assignments, and table 16 shows the codes for the Coast Guard and Merchant Marine.

The other three categories are related as follows: Navy shore comprises all Navy shore duty (including Washington, DC) except naval hospitals and other medical facilities, which are in the Medical category. Navy shore duty must have one of the type assignments in table 17. The codes used to define medical billets are shown in table 18. Assignments in the Washington, DC, area had homeport codes of ARLING or WASHDC.

Table 15. Defining Marine Corps assignments

| Code | Meaning |
|---|---|
| Activity type | |
| 5295 | MARCORP MARSTA |
| 8000 | MARINE AIR WING |
| 8100 | MARTRAREPLACMT |
| 8120 | MARCORPAIRFAC |
| 8139 | MARCORPAIRSTA |
| 8140 | MARAIRBASERON |
| 8141 | MARCORLNDGFLD |
| 8145 | MAR CORPS BASE |
| 8146 | MARINE BARRACKS |
| 8250 | MAR CRUIT DEPOT |
| 8268 | MAR CORPS SCOL |
| 8362 | MARCORPSUPPACT |
| 8365 | MARCORPSLOGBASE |
| 8372 | MARCORWARTRACEN |
| 8391 | MARCORESCRUITDI |
| 8445 | MARCORDEV&EDCOM |
| 8453 | MC SECFORCE BN |
| 8454 | HDQTRS MAR CORP |
| 8456 | MC FORSVC&SUPGP |
| 8460 | MARCOR RESUPCEN |
| 8570 | MARINE BRIGADE |
| 8640 | MARINE DIVISION |
| Ship station code | |
| 59N | MC Air Station |
| 72A | Fleet Marine Force |
| 72B | HQ USMC/Co&Battery |
| 72C | MC activity, school |
| 72D | MC District |

*Appendix A*

Table 15. Defining Marine Corps assignments (continued)

| Code | Meaning |
|------|---------|
| 72E | MC Recruiting Activities |
| 72Z | Marine Corps Activities |
| Words in activity title | |
| FMF | |
| MEU | |
| MDIV | |
| MCAS | |
| MAW | |
| MAWF | |
| MAWU | |
| USMC | |
| MCLB | |
| MCRD | |
| MCBASE | |
| MC DEV | |
| MC CRUITDEP | |
| 1STFORSERVREGPAC | |
| 1STMDEMCAGCC29P | |
| 3RDFORSERVREGPAC | |
| CAC 29 PALMS | |
| MCAGRDCMBTC29PL | |

Table 16. Defining Coast Guard/Merchant Marine assignments

| Code | Meaning |
|------|---------|
| Activity type | |
| 1629 | US COAST GUARD |
| 4096 | MARITIME ACT |
| 4097 | MARITDEFZONE |
| Ship station code | |
| 59G | CG Air Base |
| 68G | Coast Guard |
| 98E | Coast Guard Academy |
| 78E | Maritime Service Recruiting Station |
| 91G | Merchant Marine Academy |
| Words in activity title | |
| USCG | |

61

Table 16.  Defining Coast Guard/Merchant Marine
assignments (continued)

| Code | Meaning |
|------|---------|
| USGC | |
| COAST | |
| COGAR | |
| US CG | |
| CGDIST | |
| CGUARD | |
| CSTGRD | |
| MMRACAD | |
| MMA | |

Table 17.  Defining Navy shore duty

| Type assignment | Meaning |
|-----------------|---------|
| A | Alaska (shore duty) |
| G | Other nonmilitary U.S. Govt. agency |
| H | Hawaii (shore duty) |
| O | Outside U.S. (shore duty) |
| S | Shore duty |

Table 18.  Defining medical assignments

| Code | Meaning |
|------|---------|
| Activity type | |
| 1655 | ARM SVC MED REG |
| 1992 | COMNAVMEDCOM |
| 2750 | NAV MEDICAL CL |
| 3055 | NAVMEDMATSUPCOM |
| 3213 | MED FRON BASE |
| 3435 | US NAVAL HOSPITAL |
| 3437 | NAVMEDPRACGRP |
| 4170 | NAVREGMEDCEN |
| 4175 | MED RESCH INST |
| 4188 | MED RESCH UNIT |
| 4209 | PREV MED UN |
| 7439 | NAVHOSPCORPSCOL |
| Words in activity title | |

*Appendix A*

Table 18. Defining medical assignments (continued)

| Code | Meaning |
|------|---------|
| REHABC | |
| REHCEN | |
| MEDCEN | |
| REGMED | |
| MEDCOM | |
| BUMED | |
| NRMC | |
| NSHS | |
| USNH | |
| NMC | |
| NH | |

# Defining assignment bins

As described in the main text, we plotted the number of months chaplains served in various assignment types and divided these into bins to look at the relationship between assignment types and promotion. The range of months in each bin varied with rank and assignment type. It depended on a number of factors.

For all assignment types but one we had a category reflecting no experience at each of the three ranks. This covered zero to 9 months (typically, fitness reports are not written until an officer has been on duty for at least 10 months).

The exception is Navy shore duty at the commander and captain promotion points. For shore duty at these levels, we constructed three bins to capture those with relatively little Navy shore duty, those in the vast middle, and those with a great deal of shore duty. We did not, except for promotion to lieutenant commander, have a category for zero shore duty. There are very few chaplains with zero shore duty at the higher ranks.

For assignment types with few billets, we defined two bins to distinguish between those with and those without such experience on their fitness reports. The first bin contained chaplains with between zero and 9 months of experience; the second bin contained those with

10 or more months. The assignment types with this grouping are Coast Guard at the promotion to O-4 level and Washington billets at the promotion to O-4 and O-5 levels.

The remaining assignment types were divided into three or four bins depending on the groupings revealed by the graphs. Figures 5–22 show the frequencies and the bin lines.

Figure 5.  Cumulative time for promotion-to-lieutenant-commander sample: Marine Corps assignments



*Appendix A*

Figure 6.  Cumulative time for promotion-to-lieutenant-commander sample: medical assignments



Figure 7.  Cumulative time for promotion-to-lieutenant-commander sample: Navy sea duty



Figure 8.   Cumulative time for promotion-to-lieutenant-commander sample: Navy shore assignments



Figure 9.   Cumulative time for promotion-to-lieutenant commander sample: Coast Guard and Merchant Marine assignments



*Appendix A*

Figure 10. Cumulative time for promotion-to-lieutenant commander sample: DC assignments



Figure 11. Cumulative time for promotion-to-commander sample: Marine Corps assignments



Figure 12. Cumulative time for promotion-to-commander sample:
medical assignments



Figure 13. Cumulative time for promotion-to-commander sample: Navy
sea duty



*Appendix A*

Figure 14. Cumulative time for promotion-to-commander sample: Navy shore assignments



Figure 15. Cumulative time for promotion-to-commander sample: Coast Guard and Merchant Marine assignments



69

Figure 16. Cumulative time for promotion-to-commander sample: DC
assignments



Figure 17. Cumulative time for promotion-to-captain sample: Marine
Corps assignments



*Appendix A*

Figure 18. Cumulative time for promotion-to-captain sample: medical assignments



Figure 19. Cumulative time for promotion-to-captain sample: Navy sea duty



71

Figure 20. Cumulative time for promotion-to-captain sample: Navy shore assignments



Number of months in activity type

Figure 21. Cumulative time for promotion-to-captain sample: Coast Guard and Merchant Marine assignments



Number of months in activity type

*Appendix A*



Figure 22. Cumulative time for promotion-to-captain sample: DC assignments

73

# Appendix B: Statistical analysis of promotion differences

Our analysis of promotion results by faith group, polity group, gender, race/ethnicity, and assignments showed that there are differences in promotion percentages. An important question is whether these differences are meaningful. Even more fundamental is what we mean by "meaningful" within the context of this analysis. Given the relatively small size of the promotion samples in the Chaplain Corps, compared to the Navy as a whole, we would expect some differences in the actual promotion percentages for these groupings. The question therefore comes down to whether these differences reflect actual differences in the promotion process or merely random statistical differences that could be expected from the sample.

In answering this question, we begin with a description of the problem. As part of the analysis, we model the promotion process. From the model, we determine the statistical measures and analysis that will help us answer the question of whether the promotion percentage differences are meaningful. We then provide a brief mathematical description of that analysis. Finally, as an example, we present the results of the analysis of faith and polity groups, gender, and race/ethnicity for the promotion-to-commander sample. We applied the same analytical techniques to the O-4 and O-6 samples and to the data on assignments for all ranks, with the results reported in the main text.

## Description of the problem

The promotion analysis presented in the main text of this document is that of an exhaustive sample of the Chaplain Corps. All chaplains serving on active study between the years 1972 and 1998 are included in the sample. Because of this, the analysis is reflective of an exhaustive sample and not of a random sample. The differences between the analyses are subtle, but important.

In a random sample, we would examine only a subset of chaplains and analyze their promotion probabilities. We would be forced to consider a random sample if all the promotion data were not available. We would then ask two questions: Are the differences we see in the random sample reflective of differences in the whole Chaplain Corps? And are these differences meaningful? For an exhaustive sample such as the one with which we are working, the first of these questions is already answered: There are differences between the promotion percentages for the Chaplain Corps as a whole. For promotion to commander, for example, the promotion percentage for female chaplains is higher than that for males. The second question—are these differences meaningful?—is the important one. The analysis of this question differs whether you are dealing with a random or an exhaustive sample.

The question of whether the differences between the promotion percentages are meaningful essentially asks whether they reflect differences in the promotion process or are the result of random statistical differences from the sample. For each individual category within a grouping, this question can be expressed as: What is the probability that the actual promotion percentage can be obtained from the overall promotion process for the entire Chaplain Corps?

For example, consider promotions to commander. The overall promotion percentage is 74 percent, whereas the promotion rate for female chaplains is 80 percent. The question that we want to ask is: Given that the overall promotion rate was 74 percent, what is the probability that a subset of the overall sample (the female chaplains) could have a promotion rate of 80 percent or higher? We therefore want to look at the overall promotion process and compare individual groupings to the overall process. To complete this analysis, we need a model of the promotion process and an associated mathematical description.

*Appendix B*

# Model of the promotion process

## The promotion process as a binomial experiment

In modeling the promotion process, we first consider a binomial experiment. A binomial experiment possesses the following properties:

- The experiment consists of $n$ identical trials.

- Each trial results in one of two outcomes. For lack of a better nomenclature, we will call one outcome a success, $S$, and the other a failure, $F$.

- The probability of success on a single trial is equal to $p$ and remains the same from trial to trial. The probability of a failure is equal to $(1-p) = q$.

- The trials are independent.

- The random variable of interest is $Y$, the number of successes observed during the $n$ trials [20].

In the ideal, the binomial experiment seems like a reasonable model of the promotion process. When an officer is considered for promotion (individual trial), his promotion (success) or lack of promotion (failure) should stand on his own record (trials are independent). His probability of promotion is governed by a promotion rate (probability of success, $p$) and the promotion rate remains the same for all officers considered (trials are identical).

The real promotion process does not necessarily follow the ideal described above. Groups of officers are considered in each promotion board, and there are limitations on the numbers who can be promoted. Individuals who are successful with one promotion board may not have been successful with another, given these limitations. We also know that promotion percentages vary from board to board. Finally, the question as to whether the promotion rate remains the same for all officers is exactly the one that we are seeking to answer with this analysis.

77

Given that there are a number of unknowns involved in the promotion process and that the promotion process itself may stray from the ideal described, we will model the process by applying Bayesian statistical methods. The fundamental assumption governing Bayesian statistical methods is that a distribution can be assigned to any parameter in a statistical decision process [21]. For our purposes, we consider the promotion process to be binomial and the promotion rate, *p*, to be given by a distribution, this distribution to be determined by the promotion data.

## Determining the promotion rate distribution

In determining the distribution of the promotion rate, we want to assume an initial distribution and use the promotion data itself to allow us to determine the actual distribution. In Bayesian statistical decision problems, this initial distribution is known as the *a priori* or prior distribution. The final distribution determined from the data is known as the *a posteriori* or posterior distribution [21].

The prior distribution that we choose for the promotion rate is that of the uniform distribution. This choice of prior distribution assumes that all promotion rates are equally likely. We make this choice because it represents the most general prior distribution, and therefore requires the least amount of specific knowledge about the process and thus introduces the least initial bias about the promotion rates themselves. The uniform distribution is also a member of the beta family of distributions, so we can use the beta distribution as our choice of a prior distribution.

The beta probability density function with parameters $\alpha$ and $\beta$, ($\alpha > 0$ and $\beta > 0$) is given by:

$$f(x) = \frac{x^{\alpha-1}(1-x)^{\beta-1}}{B(\alpha, \beta)}$$

where $B(\alpha, \beta) = \int_0^1 y^{\alpha-1}(1-y)^{\beta-1}\,dy = \frac{\Gamma(\alpha)\Gamma(\beta)}{\Gamma(\alpha+\beta)}$

for ($0 \leq x \leq 1$) and 0 elsewhere [20]. For the uniform distribution, $\alpha = \beta = 1$.

An important property of the beta family of distributions is that it forms a conjugate family. That means that if we choose a beta distribution as our prior distribution, our posterior distribution will also be a beta distribution. For a binomial process, if we choose a beta distribution with parameters $\alpha$ and $\beta$, ($\alpha > 0$ and $\beta > 0$) as our prior distribution, then the posterior distribution will be a beta distribution with parameters $\alpha + S$ and $\beta + F$, where $S$ is the number of successes in the binomial process and $F$ is the number of failures [21]. When applied to our promotion data with uniform prior distributions, the posterior distributions are given by beta distributions with parameters $1 + P$ and $1 + NP$ where $P$ is the number promoted and $NP$ is the number not promoted. ($NP$ is equal to the total sample size minus the number promoted.)

# Mathematical description of meaningful differences

We have modeled promotions by a binomial process where the promotion rate is given by a beta distribution. For subsamples of the total promotion sample, we still must determine whether promotion rate differences are meaningful or statistically random. We can do this by calculating the probability of obtaining such a promotion rate (or more extreme promotion rates) given the overall promotion rate distribution. Essentially, this calculation tells us whether the promotion rate of the subsample is governed by the overall promotion rate distribution, or is more likely governed by a different distribution.

To explain this better, we return to the example given in the first section of this appendix. The overall promotion rate to commander is 74 percent. From the total sample of promotions to commander, we determine the posterior beta distribution of promotion rates. The promotion rate for the subsample of female chaplains is higher, at 80 percent. What we want to determine is the probability of obtaining a promotion rate of 80 percent or higher for a subsample the size of the female chaplain sample given the overall posterior beta distribution. If this probability is low, we can say that promotion rates to commander for female chaplains are more likely governed by a different promotion rate distribution than that of the overall sample. For our

analysis, we will choose a probability cutoff of .05 in determining what constitutes a low probability.[17]

Given our model, for a subsample of size $N$, the probability of promoting exactly $S$ officers in a binomial process where the promotion rate is given by a beta distribution $f(x)$ is:

$$Prob(S, f) = \int Prob(S, N - S, f) f(y) dy$$

where $Prob(S, N - S; f)$ is the binomial probability distribution for $S$ successes in a sample of size $N$ given probability of success $f$. $Prob(S, N - S; f)$ is given by:

$$Prob(S, N - S; f) = \binom{N}{S} y^S (1 - y)^{N-S}$$

where $\binom{N}{S}$ is the binomial coefficient.

The expression for $Prob(S, f)$ gives the probability of promoting exactly $S$ officers from the subsample. What we want to calculate is the probability of promoting exactly $S$ officers or fewer for promotion rates lower than that of the overall or $S$ officers or more for promotion rates higher than that of the overall. Thus, we need to calculate the entire tail probabilities for the subsamples (left tails for lower subsample promotion rates and right tails for higher subsample promotion rates). We can obtain these tail probabilities by adding up all the probabilities from 0 to $S$ for lower promotion rates (yielding the left-hand probability tail) and from $S$ to $N$ for higher promotion rates (yielding the right-hand probability tail). Considering the expressions above, this probability is given by:

$$Prob^{L/R}(S, N) = \sum_{a = a^*}^{b^*} \int_0^1 \binom{N}{a^*} y^{a^*} (1 - y)^{N - a^*} f(y) dy$$

---

17. This is in keeping with conventional statistical analysis, which often considers probability extremes as .05 low, .95 high.

80

where $Prob^L(S, N)$ is for a subsample with a promotion rate lower than the overall rate and $Prob^R(S, N)$ is for a subsample with a promotion rate higher than the overall rate. For $Prob^L(S, N)$, $a^* = 0$ and $b^* = S$. For $Prob^R(S, N)$, $a^* = S$ and $b^* = N$. For the purposes of our analysis, these probabilities were calculated numerically.

## Results of the analysis: Promotion to commander

Table 19 presents the results of the statistical analysis of promotions to commander. This table contains the groupings of faith group, polity, gender, and race or ethnicity, and the individual categories within each grouping. For each of the categories within the groupings as well as the overall sample, the table presents the category sample size, number of chaplains promoted, promotion rate (the number of chaplains promoted divided by the sample size), the exact probability of obtaining that number promoted given the category sample size, $Prob(S, f)$ above, and the tail probability for the category, $Prob^{L/R}(S, N)$ above.

Following our example through, we see that the exact probability of a female promotion rate of 80 percent, given a female sample size of 10, is .272. The tail probability is .494, far above the .05 that would indicate a meaningful difference.

Focusing on the tail probabilities, three subsample categories fail the .05 probability test: two within the faith grouping, the nonliturgical and the Roman Catholic chaplains, and one within the polity grouping, the congregational chaplains. The extremely low tail probability for the Roman Catholics indicates to us that this subsample is not governed by the overall promotion rate distribution, but rather is governed by a different, higher promotion rate distribution. We also suspect, given this extremely low tail probability, that the Roman Catholic subsample may be skewing the overall sample higher and thus leading to the failure of both the nonliturgical and congregational polity categories. (Roman Catholics are included in the episcopal polity grouping).

Table 19. Statistical analysis of promotion to commander

| Grouping | Sample size | Promoted | Promotion rate | Exact probability $Prob(S, f)$ | Tail probability $Prob^{L/R}(S, N)$ |
|---|---|---|---|---|---|
| **Overall** | 1,052 | 778 | 74.0% | N/A | N/A |
| **Faith Group** | | | | | |
| Liturgical | 382 | 275 | 72.0% | .030 | .245 |
| Nonliturgical | 364 | 252 | 69.2% | .009 | .047 |
| Roman Catholic | 264 | 221 | 83.7% | .0002 | .004 |
| Special Worship | 40 | 28 | 70.0% | .115 | .344 |
| Unknown | 2 | 2 | 100.0% | .546 | .546 |
| **Polity** | | | | | |
| Congregational | 383 | 265 | 69.2% | .008 | .042 |
| Episcopal | 561 | 431 | 76.8% | .014 | .108 |
| Prebyterial | 106 | 80 | 75.5% | .081 | .411 |
| **Gender** | | | | | |
| Female | 10 | 8 | 80.0% | .272 | .494 |
| Male | 1,042 | 770 | 73.9% | .018 | .366 |
| **Race/ethnicity** | | | | | |
| African American | 44 | 33 | 75.0% | .133 | .514 |
| Asian, Pacific Islander | 16 | 12 | 75.0% | .222 | .591 |
| Caucasian | 971 | 721 | 74.3% | .021 | .445 |
| Hispanic | 13 | 8 | 61.5% | .138 | .235 |
| Native American | 6 | 3 | 50.0% | .143 | .188 |
| Other/not specified | 2 | 1 | 50.0% | .385 | .454 |

Given the high Roman Catholic promotion rates and the extremely low tail probability, we look at the promotion-to-commander sample excluding the Roman Catholic subsample to see if there are meaningful differences between the promotion rates of the remaining categories. Table 20 shows the statistical analysis for promotion to commander excluding the Roman Catholic subsample. The table

*Appendix B*

presents results for the adjusted overall sample as well as the two groupings of faith group and polity.[18]

Table 20. Statistical analysis of promotion to commander (excluding Roman Catholic sample)

| Grouping | Sample size | Promoted | Promotion rate | Exact probability $Prob(S, f)$ | Tail probability $Prob^{L/R}(S, N)$ |
|---|---|---|---|---|---|
| **Overall** | 788 | 557 | 70.7% | N/A | N/A |
| **Faith Group** | | | | | |
| Liturgical | 382 | 275 | 72.0% | .033 | .337 |
| Nonliturgical | 364 | 252 | 69.2% | .033 | .327 |
| Special Worship | 40 | 28 | 70.0% | .133 | .523 |
| Unknown | 2 | 2 | 100.0% | .499 | .499 |
| **Polity** | | | | | |
| Congregational | 383 | 265 | 69.2% | .032 | .318 |
| Episcopal | 297 | 210 | 70.7% | .043 | .517 |
| Prebyterial | 106 | 80 | 75.5% | .049 | .178 |

Looking at the tail probabilities in table 20, $Prob^{L/R}(S, N)$, we see that all the remaining categories pass the .05 probability test when the Roman Catholic subsample is excluded. We conclude that the remaining categories are most likely drawn from the same promotion rate distribution and the individual differences in promotion rates are not meaningful as we have defined it.

Another way of understanding this result is to look at the individual category promotion rate distributions. Because the beta family of distributions is a conjugate family, the individual category distributions are also given by beta distributions. These can be calculated in the same manner as the overall beta distribution shown above.

---

18. Excluding the Roman Catholic sample deletes the category from the faith grouping and proportionally decreases the overall sample and the episcopal polity grouping by the Roman Catholic sample.

Figure 23 shows the faith-group promotion-probability density functions for promotions to commander. Most of the density functions peak slightly below that of the overall, and most share considerable overlap. The most obvious exception is the density function for the Roman Catholic subsample. This density functions peaks considerably to the right of the overall and shares very little overlap with the density functions of the other subsamples. This is a visible indicator that the promotion rate distribution that governs Roman Catholic promotions to commander is different from that governing promotions for the other subsamples tested.

Appendix B



Figure 23. Faith group probability density functions: promotion to commander

# References

[1]  John S. Ivancovich, et al. *Serving with Those in Uniform: The U.S. Navy Chaplain Corps as Seen by the Fleet and Fleet Marine Force*, forthcoming (CNA Research Memorandum)

[2]  Elizabeth S. Young and John S. Ivancovich. *The Continuity of Change: The U.S. Navy Chaplain Corps, 1940-1980*, forthcoming (CNA Research Memorandum)

[3]  John S. Ivancovich. *From the Pulpit: The Navy Chaplain Corps and the Ecclesiastical Endorsers*, forthcoming (CNA Research Memorandum)

[4]  John S. Ivancovich and Elizabeth S. Young. *Chaplains' View of Training and Development*, forthcoming (CNA Research Memorandum)

[5]  John S. Ivancovich, David L. Reese, Karen D. Smith, and Elizabeth S. Young. *The U.S. Navy Chaplain Corps: Moving Toward the New Century*, forthcoming (CNA Report 229)

[6]  Secretary of the Navy Instruction 1120.4A, *Appointment of Regular and Reserve Officers in the Chaplain Corps of the Navy*, 14 May 1986

[7]  James H. North and Karen D. Smith, with contributions from Daniel F. Harrington, Maj., USMC. *Officer Accession Characteristics and Promotions to Captain and Major*, Nov 1993 (CNA Research Memorandum 93-110)

[8]  Martha E. Koopman, with Tiffani Board and David Reese. *Early-Career Surface Warfare Officer Promotion: Effect of Race, College Characteristics, and Initial Assignment*, Sep 1995 (CNA Research Memorandum 95-124)

[9] James H. North and Dan D. Goldhaber, with Kletus S. Lawler and Jeremy N. Suess. *Successful Officer Careers: Analysis of Augmentation, Promotion, and Voluntary Continuation*, Aug 1995 (CNA Research Memorandum 95-55)

[10] Stanley H. McCreary. *A Study of Faith Group Affiliation and Promotion to Captain and Commander in the U.S. Navy Chaplain Corps*, PhD dissertation, United States International University, 1992

[11] Secretary of the Navy Instruction 1401.3, *Selection Board Membership*, 1 Dec 1989

[12] Secretary of the Navy Instruction 1420.1A, *Promotion and Selective Early Retirement of Commissioned Officers on the Active-Duty Lists of the Navy and Marine Corps*, 8 Jan 1991

[13] "Selection Boards 101: The Basics," *Perspective: Professional Bulletin of the Navy Officer Community*, Jan-Feb 1998, p. 14

[14] Website of the Bureau of Navy Personnel, *www.bupers.navy.mil*

[15] Secretary of the Navy Instruction 1730.7A, *Religious Ministries Within the Department of the Navy*, 2 Sep 1993

[16] Frank S. Mead. *Handbook of Denominations in the United States*, revised by Samuel S. Hill, new tenth edition, Nashville: Abingdon Press, 1995

[17] Eileen W. Lindner, ed. *Yearbook of American and Canadian Churches, 1998*, Nashville: Abingdon Press, 1998

[18] J. Gordon Melton, ed. *Encyclopedia of American Religions*, Detroit, MI: Gale Research, 1993

[19] *Manual of Navy Officer Manpower and Personnel Classifications*, vol. 2, the Officer Data Card (NAVPERS 15839H), 1994

[20] William Mendenhall and Richard L. Scheaffer, *Mathematical Statistics with Applications*. North Scituate, MA: Duxbury Press, 1973

[21]   Morris H. De Groot. *Optimal Statistical Decisions*, New York: McGraw-Hill, 1970

# List of figures

Figure 1.   Distribution of sea duty: promotion-to-commander
sample . . . . . . . . . . . . . . . . . . . . . . .   31

Figure 2.   Promotion to lieutenant commander: year groups
1974-1986 . . . . . . . . . . . . . . . . . . . . .   39

Figure 3.   Promotion to commander: year groups
1957–1980 . . . . . . . . . . . . . . . . . . . . .   39

Figure 4.   Promotion to captain: initial year groups
1949-1977 . . . . . . . . . . . . . . . . . . . . .   40

Figure 5.   Cumulative time for promotion-to-lieutenant-
commander sample: Marine Corps assignments. . .   64

Figure 6.   Cumulative time for promotion-to-lieutenant-
commanderbsample: medical assignments . . . . .   65

Figure 7.   Cumulative time for promotion-to-lieutenant-
commander sample: Navy sea duty . . . . . . . . .   65

Figure 8.   Cumulative time for promotion-to-lieutenant-
commander sample: Navy shore assignments . . . .   66

Figure 9.   Cumulative time for promotion-to-lieutenant
commander sample: Coast Guard and Merchant
Marine assignments . . . . . . . . . . . . . . . .   66

Figure 10.   Cumulative time for promotion-to-lieutenant
commander sample: DC assignments . . . . . . . .   67

Figure 11.   Cumulative time for promotion-to-commander
sample: Marine Corps assignments . . . . . . . . .   67

Figure 12.  Cumulative time for promotion-to-commander
sample: medical assignments . . . . . . . . . . . .    68

Figure 13.  Cumulative time for promotion-to-commander
sample: Navy sea duty . . . . . . . . . . . . . . . .    68

Figure 14.  Cumulative time for promotion-to-commander
sample: Navy shore assignments . . . . . . . . . .    69

Figure 15.  Cumulative time for promotion-to-commander
sample: Coast Guard and Merchant Marine
assignments . . . . . . . . . . . . . . . . . . . . .    69

Figure 16.  Cumulative time for promotion-to-commander
sample: DC assignments  . . . . . . . . . . . . . .    70

Figure 17.  Cumulative time for promotion-to-captain sample:
Marine Corps assignments . . . . . . . . . . . . .    70

Figure 18.  Cumulative time for promotion-to-captain sample:
medical assignments  . . . . . . . . . . . . . . . .    71

Figure 19.  Cumulative time for promotion-to-captain sample:
Navy sea duty  . . . . . . . . . . . . . . . . . . . .    71

Figure 20.  Cumulative time for promotion-to-captain sample:
Navy shore assignments . . . . . . . . . . . . . . .    72

Figure 21.  Cumulative time for promotion-to-captain sample:
Coast Guard and Merchant Marine assignments  . .    72

Figure 22.  Cumulative time for promotion-to-captain sample:
DC assignments . . . . . . . . . . . . . . . . . . .    73

Figure 23.  Faith group probability density functions:
promotion to commander . . . . . . . . . . . . .    85

# List of tables

Table 1.   Guidelines for promotion flowpoint and
           opportunity . . . . . . . . . . . . . . . . . . . . .   13

Table 2.   Promotions to lieutenant commander: initial year
           groups 1974–1986 . . . . . . . . . . . . . . . . . .   23

Table 3.   Promotions to commander: initial year groups
           1957–1980 . . . . . . . . . . . . . . . . . . . . . .   24

Table 4.   Promotion to commander (excluding Roman
           Catholic sample) . . . . . . . . . . . . . . . . . .   25

Table 5.   Promotions to captain: initial year groups
           1949–1977 . . . . . . . . . . . . . . . . . . . . . .   26

Table 6.   Promotions after 1986 . . . . . . . . . . . . . . .   27

Table 7.   Comparison of large and small samples . . . . . . .   29

Table 8.   Assignments and promotion to lieutenant
           commander . . . . . . . . . . . . . . . . . . . . . .   32

Table 9.   Assignments and promotion to commander . . . . .   34

Table 10.  Assignments and promotion to captain . . . . . . .   37

Table 11.  Faith and polity groupings . . . . . . . . . . . . .   55

Table 12.  Defining racial/ethnic groups . . . . . . . . . . .   58

Table 13.  Race codes . . . . . . . . . . . . . . . . . . . . . .   58

Table 14.  Ethnic codes . . . . . . . . . . . . . . . . . . . . .   59

Table 15.  Defining Marine Corps assignments . . . . . . . . .   60

Table 16.   Defining Coast Guard/Merchant Marine
            assignments . . . . . . . . . . . . . . . . . . . . .   61

Table 17.   Defining Navy shore duty . . . . . . . . . . . . . .   62

Table 18.   Defining medical assignments . . . . . . . . . . .   62

Table 19.   Statistical analysis of promotion to commander . . .   82

Table 20.   Statistical analysis of promotion to commander
            (excluding Roman Catholic sample) . . . . . . . .   83

94

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

REV. CHARLES E. LARSEN, et al.,  )
                                         )
             v.                     )     Case No. 02CV02005
                                           )
THE UNITED STATES NAVY, et al.  )
                                         )

### The Siskin Conjecture:
### The Pattern of Denominations Assigned to U.S. Navy Chaplain Corps Selection Boards Controls the Decisions which Flow from those Boards

An Expert Witness Declaration by:  Harald R. Leuba, Ph.D.

Pursuant to 28 U.S.C. Section 1746, and under the penalty of perjury, I declare as follows:

1.  Dr. Bernard Siskin and I have been exchanging opinions, reservations and low grade accusations in the "Chaplains' Matter" for nearly six years.

2.  Recently I was provided with data he has had for ;

    (a)      This new (old) data improves illumination on the terrain we have been disputing, and

    (b)      A conjecture of his has provided a testable hypothesis which does not impugn the motives of chaplain members of selection boards when recommending career management decisions about other chaplains and chaplain candidates.

**The "new" (old) data.**

3.  Sometime  around October 2005, the Navy copied a collection of works sheets and decision memoranda which had been prepared by their C/A/R/E Advisory Group.  These documents address roughly 97% of all candidates considered by that board from FY1985 through FY2005 for accession into the U.S. Navy Chaplain Corps, or assignment to active duty therein.

4.  The Navy used the C/A/R/E Advisory Group decision memoranda to prepare an electronic database for Dr. Siskin.  He used that data to prepare his December 21, 2005 declaration in this matter (Siskin, 2005.)  I was given a copy of this Navy/Siskin database on 27 July 2006.

5.  I have compared the Navy/Siskin electronic database to the paper records it was derived from; I have corrected the database  as necessary, and augmented it with:

<div align="right">

07-mc-269 (RMU)
**EXHIBIT 15**

</div>

(a)    data from the C/A/R/E Advisory Group work sheets;
and
(b)    information from the face of some of the decision memoranda about the C/A/R/E Advisory Group's composition which the Navy and Dr. Siskin failed to capture[1].

6.   "My" database has been provided to the Defendants, with highlights indicating which data entries I changed, and references to the "Bates Number" of each hard copy record I used to verify the data entry error.

**The Siskin Conjecture - Part I.**

7.   In his December 21, 2005 declaration (op cit) Dr. Siskin hypothesized[2] something like this:

> The likelihood of a candidate's being selected by a board is correlated to the likelihood that the board contains a panel member with the same denomination as the candidate.

8.   Although he attributes this formulation to me, his hypothesis is not exactly what I had hitherto been testing.  In the past I drew the inference in the other direction:  The *fact* of a denominational match between a board member and a candidate improved the candidate's chances of being selected (by that board.)

9.   Here, Dr. Siskin is suggesting that an actual match on a particular board is not necessary; what marks the nexus, in the Siskin conjecture, is not the actual "co-incidence" (co-occurrence of

---

[1]  Both Dr. Siskin in his declaration, and the Navy in preparing the database for Dr. Siskin, ignored, overlooked, or simply set aside, the C/A/R/E Advisory Group work sheets. "Ignored" carries a connotation of disapproval, and while such an inference may be justified, my point here is that neither the Navy nor Dr. Siskin entered any data from the work sheets into their database, nor was information from the work sheets reflected in Dr. Siskin's declaration. The missing or overlooked or "ignored" information includes: (a) records for four score of candidates who do not appear in the decision memoranda, (b) thousands of bits of data dealing with faith group cluster and denominational quotas, (c) evidence within the pattern of entries on the work sheets which reflects pre-screening, as well as (d) post facto decision alterations.  " My" database also included information from the decision memoranda which identified the C/A/R/E Board members, information which I used to identify their denominations.

[2]  I am not sure that Dr. Siskin meant this as a particular hypothesis.  I suspect rather that he was setting up a straw man so that he could denigrate my analysis.  But whatever his motivations, (a) his words were to this effect and (b) the hypothesis has scientific merit.  (See Part II here.)

a candidate's denomination and a board member's denomination) but an underlying similarity *per se,* for which a surrogate measure is the *likelihood* of the match in the first place.

10.   This is, or could be, a manifestation of the "like, likes, like" hypothesis which was introduced to this dialogue first by LCDR McCreary (1992), deferred to by the Center for Naval Analysis (Smith et al, 2000), and relied upon heavily in my work, especially in my Allonge (Leuba, 2005), but it is significantly different with respect to the source of "intent".

**The Siskin Conjecture - Part II.**

11.   Where some observers of the "like, likes like" affinity model interpret that model as requiring that board members consciously (or almost consciously) favor those "like" themselves who appear before the board, the more general formulation proffered here can be seen as both more subtle and less of an invitation to presume bias.  It is mathematically similar; it may even be psychologically similar in its theoretical underpinnings and its mechanism of expression.  But, it is profoundly different in the etiology of intent.

12.   Sacco, et al (2003a) reminded us that in a traditional personnel-panel selection context, the interviewer brings demographic information to the table just as surely as does the interviewee, and that this is a recipe for both (a) the opportunity for discrimination to occur[3] and (b) an opportunity for that discrimination to be undetected if the data analysis is incomplete[3].

13.   Dr. Siskin's conjecture is more even-handed than this explicit awareness of the potential for blatant discrimination.  His formulation suggests that the concatenation is removed (i.e. distant) from the obvious superficiality of both the interviewer and the interviewee being of the same race or gender or even denomination.  They are more fundamentally (more deeply) *similar* than that.  The connection is still "like, likes, like", but the basis for that likeness is more resonant than a simple "single dimension" similarity.[4]  This is not less inherent, or less intrinsic, but it is (or may be) less "one on one."

14.   If the theory is right, then a candidate who was fundamentally "like" the members of a selection board might be selected even though he was "different", or partially dissimilar, on one or more of the superficial demographic variables.

---

[3]  The data analysis issue is, of course, that since discrimination is a two party transaction, if one does not collect and analyze data from both sides of the transaction, one cannot observe the interaction (if any)  between the demographics of the selection panel constituency and the demographics of the candidates recommended by those panels.

[4]  I am reminded of a comment I was privileged to hear from Caspar "Cap"  Weinberger in August 1972.   In response to a question about working in the White House, Mr. Weinberger told us:  "You do not get to be on the President's staff because you have learned what his positions are; you get to be one of the President's men because you think the way he thinks."

15.  Building from the general principles of "affinity", one need not allege, suspect, or even decry "prejudice and corruption", to notice:  If you walk into a board room, a cafeteria, a PTA meeting, or indeed any place where people get together regularly, you will notice clustering based on similarity.  It may be as blatant as racial aggregation, or gender separation, or even those with and without children, or canes, or uniforms.  We (all of us) tend to be more comfortable in "familiar" surroundings.  [*Birds of a feather* do *flock together.*[5]]

16.  What if, in the Chaplain Corps, the same sort of thing happens?   Personnel selection boards convene and (a) because some of the members have served together before (on boards or off), they recognize each other, (b) maybe they even like each other, (c) maybe they even understand where "the other guy is coming from".

>>> Or maybe, they were selected because they have something in common. <<<

17.   It would not be amiss to staff a selection board with people who were already successful at doing the job the candidates being considered were applying for.

18.   Board members who were "good at the job" being applied for might be able to estimate the potential in others to do that job well, or they might be able to look around the board table at their peers and recognize common ground which they could then seek within the candidates.  This subjective process might be conscious or unconscious; but it is prima facie valid  –

*unless the common denominator among the board correlates to an irrelevant or proscribed variable.*

19.  The risk here is that the evaluation is totally subjective, and the board membership is not as "representative" of the denominations being evaluated as the Navy says it is.

(a)    The evaluation is *totally* subjective because the objective factors, qualifications to *be* a chaplain and time in grade to be eligible for promotion, are the same for all candidates[6].  The candidates can be distinguished only on the basis of their

---

[5]  In this understanding of "similarity" we need to keep a perspective on who or what or how similarity is established - by those in the group - not by the anthropologists or bird watchers outside the group.  Sometimes, the bird who looks different to us, from outside the flock, is just as much "one of the crowd" as any other member.

[6]  To avoid cluttering up the discussion at this point, I have illustrated the selection process for promotion; the logic remains the same for accession decisions, decisions about whom to add to the Active Duty list, SER decisions, and continuation in service decisions.  As we shall see, the consequences are the same in all these different contexts: Boards composed to a *pattern* of "the ideal chaplain" tend to select candidates who share some underlying dimensions which correlate to the definition of "ideal" - whether that definition of "ideal" is correct or not!

(subjective) Officer Efficiency Reports (as interpreted by the board members) and their AQD (their individual religious sponsorship/endorser/denomination.)[7]

(b)     Selection board membership is not nearly as "representative" of the affected denominations as the Navy alleges. Although board membership has recently become reasonably balanced across faith group clusters (sic), in the past, selection board membership was largely limited to a small number (five) of "favorite" denominations.

20.     Sacco, et al (2003b) have addressed how this common background could contaminate the board's decisions, based on:

"... Schneider's (1987) Attraction-Selection-Attrition (ASA) theory.  This approach postulates that people are attracted, selected, and retained (or decide to remain on the job) based on similarity between the individual's personality and those of the organizational members.  Because people may make judgments about their co-workers' personalities or other relevant attributes based on demographics, or to the extent that demographics are important determinants of similarity judgments, the ASA framework provides additional support for relational and organizational demography perspectives."

21.     Quite clearly, if the "Organization" routinely staffs its selection panels with members of a *de jure* "clique", whatever those "insiders" have in common becomes the implicit *de facto* template for "success" in the organization.

21.     If the *same* denominations judge candidates for continuation in the Service as judge the candidates for promotion, then it is both predictable and proscribe-able that the denominations barred from participation in the selection panels will also be the denominations who suffer both the most "loss on the way to being considered for promotion" and the least success in promotion when they are given an opportunity to be considered [cf "the missing Non-Liturgicals", Appx F.]

22.     Hart (2005) has highlighted this concern:

"As one court has explained it, 'when the evaluation is to any degree subjective and when the evaluators themselves are not members of the protected minority, the legitimacy and nondiscriminatory basis of the articulated reason for the decision may be subject to particularly close scrutiny'."[8]

---

[7]  Kagle, 2006, defines AQD as an "Additional Qualification Designator" which is used "to identify each officer's particular skill sets."  For chaplains, this is "a three digit numeric code that corresponded to the religious endorsing agency for each officer." Kagle adds: "The Chaplain Corps no longer includes AQD codes in documents utilized by the selection board process."

[8]Page v. Bolger, 645 F.2d 227, 230 (4th Cir. 1981).

**Testing the Siskin Conjecture:**

23.  The data tell me (see Appendix A, below) that whoever is or was assigning chaplains to the Promotion Boards and the SER Boards, and even the C/A/R/E Advisory Group, was not making those assignments at random.  The Navy's advocates have told us that there was an effort to "balance" the boards by faith group cluster, but this "balance" came late to the process (after 2000) and has never been achieved in denominational terms.

24.   There were undoubted logistic concerns that affected selection board staffing patterns.  "As long as you have to be in the building for the 05 Board, can you handle the 04 Board too?  You are the Deputy xxx; it's your job to sit on one of these boards.  Hey, John, can you do this when you come by?"

25.  But, there may also have been, although I do not allege it in particular, it has to be *considered*, some measure of favoritism being acted out.  As diligent as the Navy may have been to be sure that the selection panels were "balanced" with respect to gender and minority status, the Chaplain Corps' faith group category subtext enabled five denominations to fill the <u>majority</u> of the seats on all the selection panels.   Appendix A presents this phenomenon in detail as it operated for promotion boards.  Appendix B compares the denominational participation patterns for promotion boards to those for SER Boards and C/A/R/E Boards.

26.   Dr. Siskin's conjecture suggests that one does not need an exact match between the denomination of the candidate and a denomination on a particular Board, if the Board is composed of "like minded" officers.  Their like-mindedness will resonate with, and they will tend to select, copacetic candidates.

27.   We can use Siskin and Weinberger (footnote 4) to extract an "operational definition" of the Navy's "ideal" Chaplain (or favorite denominations), from the Navy's patterns and practice re the staffing of selection boards.

28.   All I have to do is make a list of all the chaplains the Navy assigned to personnel selection boards over a statistically significant period of time, and then point to that list and say: "the ideal chaplain is embodied by that composite".

29.   To the extent that any candidate "matches" or "looks like" that composite he or she will fare well in the selection deliberations because he or she will "look right".

30.   This paradigm is not the "like, likes" like" I have been belaboring (although one flows from the other); this is a profoundly different insight which we have Dr. Siskin to thank for.

31.   The Chaplain Corps' "pattern and practice" regarding the assignment of denominations to promotion boards can be divided into three periods, bounded by litigation events. (For further detail, see the graphs, pie charts and tables in Appendix A.)

a.  Three Time periods

32.  Prior to 1986/87, the Chaplain Corps placed two Roman Catholics on every promotion panel, and filled out the panel with a majority of Liturgical Chaplains (drawn from three "favorite" denominations).  Accessions at this time were managed by faith group cluster, and there was an effort to align the pattern of accessions to the rank and file's pattern of faith group cluster preferences.

33.  After 1986/87, in what seems to be a response, if not a settlement, to then pending litigation charging undue Catholic influence, the Navy changed the pattern of chaplains on promotion boards from (a) two Roman Catholics to (b) one Roman Catholic and one line officer, and although a few more Non-Liturgical Chaplains were allowed to sit on a promotion board after 1987, the overall effect was not a substantial change in representation.  Furthermore, concomitant with this change, the Corps abandoned its "matching pattern" for accessions, and adopted a quota system, "the thirds policy." [9]

34.  In 2000, following new law suits filed in 1999 and 2000 raising concerns again about imbalances in the selection panels - and consequential imbalances in the decisions which flowed from those panels, the Navy (a) broadened denominational representation on the Promotion panels, (b) increased the number of line officers on the panels from one, to two (and eventually to five), and it abandoned the use of quotas as a planning guide for accessions.

b.  Favorite Denominations

35.  In order to test the Siskin Conjecture, we need a measure of the "the likelihood of a denomination being on a selection board."

•    We have SER Board data for only four boards staffed with Chaplains.

•    We have data for only five years of C/A/R/E Advisory Group boards.

•    We have no data for membership on Continuation in Service (CADRAG) boards.

•    But we have nearly complete promotion board membership data for LCDR, CDR, and Capt boards for nearly 30 years. [See Appendix A.]

_____

[9]  Then CAPT Donald Muchow, later Chief of Chaplains, here Chief of the Plans, Policy and Programs Branch, wrote a July 31, 1986 memorandum, approved by the Chief of Chaplains: "Revised FY87 Accession Goals". This memo shows the Corps abandoning its objective criteria for accessions and substituting subjective criteria as the basis for its goals and quotas.  "The Chief of Chaplains has determined that the faith group category mix that best meets the needs of the Navy is 35% liturgical Protestant, 35% non-liturgical Protestant, and 30% other," (of which 25% was to be Catholic, with the remaining 5% for Jewish, Orthodox and Mormon).

36.  We can rank this promotion board incidence data by time period and faith group cluster, and establish a set of "frames" for comparing selection rates for pools of similarly situated candidates:

Table 1.
Denominational Likelihood on Promotion Boards
(Each denomination's total number of appearances from 1977 thru 2002 is noted in parenthesis)

| Faith Group Cluster → | Roman Catholic | Liturgical Protestant | Non-Liturgical Protestant | Special Worship |
|---|---|---|---|---|
| Tier I - 100% | RC (102) | | | |
| Tier II - 25 to40% | | PUSA (43) ELCA (29) UM (21) | SB (37) | |
| Tier III - 7 to15% | | LMS (15) UCC (10) AME (8) RCA (7) EPIS (7) | ABC (12) CC/DC (10) NBCUS (7) PNBC (7) | SDA (11) J (6) |
| Tier IV - 0 - 5% | 5 Others (0) | CRC (3) ECCA (3) CME (2) 53 Others(0-2) | BGC (5) GARB (4) CGIC (3) 109 Others (0-2) | LDS (4) ORTH (3) CS (1) 10 Others (0) |

37.   Table 1 does not separate the denominational appearances by time period, and it does separate them by faith group cluster.

•   There are substantial and potentially interesting differences across the time periods, to which we will return.

•   The separation by faith group cluster highlights the inequity in denominational representation, and facilitates a discussion of:

c.  Core Values vs Corps Values

38.   Presumably, the U.S. Navy shares our country's core values, among which are a commitment to plurality and the "separation of Church and State".  The evidence in Table 1 and Appendix A suggests that within the Navy, the Chaplain Corps seems to value Roman Catholicism ahead of all other denominations.

•   Prior to 1988 the Corps placed two Roman Catholics on every selection panel, and harvested the benefits of that system - reporting to itself at the time that 38% of all the

Commanders in the Corps were Roman Catholic, while only 23% of the total Corps was Roman Catholic.  [This 150% over representation at CDR is statistically significant.]

• When the Corps dropped the "two Catholics on every promotion board" policy, it simultaneously changed its accession policy from parity with the rank and file, to the 35%, 35%, 30% cited above.  This quota policy not only facilitated accessioning for Catholics in particular (since their quota was so far above the probable number of applicants), but it also provided a pretext "justification" for rejecting Non-Liturgical Protestant candidates - since their pool of applicants was much larger than the ceiling the quota levied on them.

**Hypotheses:**

39.   All other things being equal, the probability of being selected by a Chaplain Corps selection board ought to be independent of the candidate's denomination.  That is, in the absence of perturbing bias, our best estimate for the percentage of candidates of denomination X who are selected for decision Y should be statistically the same as the "average" percentage of *all* candidates considered for decision Y.[10]

40.   The imposition of quotas perturbs that relationship for the faith group clusters which have to be "culled", requiring the reformulation:

> Our best estimate for the percentage of candidates of denomination X who are selected for decision Y should be statistically the same as the "average" percentage selected for Y of all candidates belonging to the same faith group cluster as denomination X.

41. A board composed of people who are good at their jobs, who know what "good" looks like, who measure candidates against their own templates and the templates of valued peers, will select:

(a)  Candidates who are qualified,
(b)  Candidates who comport to the ideal,

and

(c)  Candidates who "look like" themselves" (collectively.)

42.   This may be "the same" mathematics and nearly the same statistical analysis as "like, likes, like", but the Siskin Conjecture does not require a denominational match on the board, nor does it imply that board members consciously (or unconsciously) violate their oath to be impartial - it only requires a "likeness" between the "kind of person the candidate is" and the "kind of person"

---

[10] This is the proper *a priori* statistical assumption.  If we suspect bias, the proper test is to compare the selection rate for denomination X to the selection rate for all other denominations, or, alternatively, to the selection rate for the presumptively favored denomination.

the board is seeking, which, in transitive social mathematics[11], is "the kind of person the board is composed of."

**Here is what the data tell us:**

a.  <u>From the distribution of denominations on the selection panels</u>

43.  The Navy has an implicit pattern for the Chaplains it wants.

•        Just look at how it defines its faith group clusters, so that it can  manage them that way, with Catholics set aside in their own group.

•         Look at how the Navy has populated its selection panels.

•        Or look at what the Chaplain Corps calculated for its "ideal mix" of denominations, once it adopted quotas. (See Appendix C.)

•        Or look at the "bottom line" denominational mix it has orchestrated among its higher ranks, Commander and Captain.

44.  There are statistically significant departures from parity in the Navy's planning documents, in the staffing patterns it employs for its selection boards, and in the results of the decisions of those boards as they are reflected in published data.

45.  When the Navy assembles a selection panel it considers three things:

First, is the proposed panel member a Chaplain in good standing of the appropriate rank.

Second, does the proposed panel member add intended balance to the panel.  Balance is or has been defined as representation from one of the three "major" faith group categories, with a *de jure* limit that the board must have a Catholic and may not have a majority of what I call "blue collar" clerics.

The third factor is "between the lines" in the lists of approved selection panel members. Of course they have to be available, but they also have to be "acceptable."  A psychiatrist, or a "headhunter" might be able to interview the Chaplains selected for this duty and write a precis or profile which captured significant characteristics which the chaplains had in common.  I can do much the same thing in a "black box" kind of way by simply saying whatever mix of denominations fit into *this* box (the actual list of preferences), that *mix* contains, embodies, the <u>collateral</u> characteristics the Navy wants.

_____

[11]  Not all social mathematics is transitive.  Mr. Jones admires Mrs. Jones; Mrs. Jones admires her mother; Mr. Jones has reservations about Mrs. Jones' mother.

46. The successful candidate may *be* a Catholic more often than Unitarian, but it is his perceived constellation of skills, not his catholicity which leads to his selection.[12]

47. If one needs to assign motivation to the denominational discrimination which flows through the Chaplain Corps personnel management system, the duty officer who "packs the selection board" is the party with "intent."  And the defenders of the selection board staffing patterns are collaborators.

b.  <u>From the decisions made by the selection panels</u>

48.   Based on the patterns in Appendix A and B, we may posit that the Navy's "favorite denominations are:

|  |  | Percent Selected to CDR* |
|---|---|---|
| The Navy's Implicit Favorites: |  |  |
| Tier I   Roman Catholic | | 48.34 % |
| | - a faith group cluster composed of one denomination | |
| | - There was at least one Roman Catholic on every 05 Promotion Panel | |
| Tier II  PUSA, SB, ELCA, UM , LMS, ABC, CC(DC), UCC & SDA | | 45.07 % |
| | - Double digit representation on Promotion boards | |
| Tier III  EC, AME, NBCUS, PNBC, RCA, etc | | 36.12 % |
| | - Non-trivial participation on Promotion Boards (4 to 8 seats In 25 years) | |
| Tier IV CGIC, CR, ORTH, CHCCC, N, PCA, GAGB, CFGC etc. | | 27.00 % |
| | - Minimal participation, or no participation on Promotion Boards (0 to 3 seats in 25 years) | |

* As reported in Chaplain Corps History, Volume X.

---

[12]  I wrote this to help the Navy's advocates distinguish between the confrontation with "regularity" which they see in my use of the "like, likes, like" theory, and the more even handed, pseudo objective process which unfolds in the Siskin Conjecture, i.e. this template model.  But I think that this distinction is an intellectual deceit, if it is not hair splitting.  Deductive reasoning may allow the *Board* to believe that they are picking the best qualified candidate, but if they pick candidates who are disproportionately one denomination more than another, then the Navy has to do better than argue a  "general" similarity to a template.  The *Navy* has to have a reason for preferring one set of religious beliefs (for assignment to selection boards) over another - or they have to show how a person with "those religious beliefs" is more likely to posses this   (???)  specified skill.

49.    The pattern of figures above is statistically significant (chi Square <.001) and supports the Siskin Conjecture.  The denominations which fare best in terms of getting a seat on a promotion board, are also the denominations which are the most likely to rise to the rank of CDR.

50.    However, this is "overall" and does not take into account that the "favorite denominations" as *measured* by the likelihood of being assigned to a promotion board, changed (at least the probability of assignment to a promotion board changed) in 1988 and again in 2000.  One might wonder if the likelihood of selection for promotion for those denominations also changed.

Table2.
Testing the Siskin Conjecture
Promotions to Commander 1977-1987
Denominations on Selection Panels ↓

| Faith Group Cluster → | Roman Catholic | Liturgical Protestant | Non-Liturgical Protestant | Special Worship |
|---|---|---|---|---|
| Tier I - 100% | RC (59) | PUSA (29) | | |
| Tier II - 25 to40% | | ELCA (16) UM (12) | SB (18) | |
| Tier III - 7 to15% | | AME (7) EPIS (7) | ABC (7) CC/DC (4) | ORTH (3) SDA (2) J (2) |
| Tier IV - 0 - 5% | Others (0) | CRC (1) CME (0) 53 Others(0-2) | BGC (0) N (3) 109 Others (0-2) | LDS (0) CS (0) 10 Others (0) |

Number of Candidates Considered/Selected and Percent Selected ↓ (including Above Zone Selections)

| Faith Group Cluster → | Roman Catholic | Liturgical Protestant | Non-Liturgical Protestant | Special Worship |
|---|---|---|---|---|
| Tier I - 100% | 120/103    86% | 14/11    79% | | |
| Tier II - 25 to40% | | 42/31    74% | 71/56    79% | |
| Tier III - 7 to15% | | 11/11    100% | 27/21    78% | 7/4    57% |
| Tier IV - 0 - 5% | | 41/36    87% | 34/16    47% | 4/3    75% |

Data for 1981 to 1987 from Precepts produced by USN; 1977-1980 estimated from Chaplains' History.

51.   Table 2, above, presents the data for the first period, 1977-1987.

- Tier I, the denominations which are most likely to be assigned to a promotion board in the 1977-1987 period (Roman Catholic and Presbyterian USA), are also the denominations which are the most likely to be promoted.

- Tier II denominations fare better than the denominations which are even less likely to be assigned to a promotion board (although one has to combine the small samples in the Tier III and Tier IV categories to "see" this advantage.)

- Tier IV for the Non-Liturgicals fares worst in terms of appearance on a promotion board, and also worst (as predicted) in terms of promotion to CDR - suffering pressure from the incipient quota.

52.  Table 3, below, presents the data for the second period, 1988-1999.

53.  For Table 3 I have aligned the "favorite denominations" with the incidence data for this second time period, but one could also stay with the pattern which is "established" from the whole time period.  After all, the issue in any given instance is not the presence or not of any particular denomination on that board, but rather the overall likelihood of each denomination's having a chance to be on a selection board.

Table3.
Testing the Siskin Conjecture
Promotions to Commander 1988-1999
Denominations on Selection Panels ↓

| Faith Group Cluster → | Roman Catholic | Liturgical Protestant | Non-Liturgical Protestant | Special Worship |
|---|---|---|---|---|
| Tier I - 100% | RC (35) | | | |
| Tier II - 25 to40% | | PUSA (11) ELCA (13) UM (8) | SB (17) | |
| Tier III - 7 to15% | | LMS (12) UCC (7) RCA (7) | CC/DC (6) NBCUS (5) PNBC (5) BGC (5) | SDA (6) J (4) |
| Tier IV - 0 - 5% | Others (0) | CRC (2) ECCA (0) CME (2) 53 Others(0-2) | ABC (3) GARB (0) CGIC (3) 109 Others (0-2) | LDS (1) ORTH (0) CS (1) 10 Others (0) |

Table 3. (1988-1999, Continued)
Number of Candidates Considered/Selected and Percent Selected ↓ (In Zone Selections only )

| Faith Group Cluster    → | Roman Catholic | Liturgical Protestant | Non-Liturgical Protestant | Special Worship |
|---|---|---|---|---|
| Tier I - 100% | 64/40        62% | | | |
| Tier II - 25 to40% | | 74/41        55% | 42/26        62% | |
| Tier III - 7 to15% | | 19/11        58% | 18/10        56% | 15/8        53% |
| Tier IV - 0 - 5% | | 28/15        54% | 60/31        52% | 11/6        55% |

Data from Kagle Declaration and Appendix 3 to Siskin (2005) report.

54.   The data for this time period are "consistent" with the hypotheses: (a) Tier I fares better than Tier II, (b) Non-Liturgicals lose more proportionately as the Tiers increase than do the Liturgicals (as predicted by quota pressure), but the differences are not all statistically significant.

55.   Table 4 finishes this look at what happened to CDR promotions as the staffing pattern for selection boards changed.  Table 2 covered the "two Catholics on every Board" period; Table 3 applied to the change to one Catholic and one line officer (as well as the imposition of quotas); Table 4 covers the recent shift to (a) two line officers and (b) a broader range of denominations.

Table4.
Testing the Siskin Conjecture
Promotions to Commander 2000-2002
Denominations on Selection Panels ↓

| Faith Group Cluster    → | Roman Catholic | Liturgical Protestant | Non-Liturgical Protestant | Special Worship |
|---|---|---|---|---|
| Tier I - 100% | RC (8) | | | |
| Tier II - 25 to40% | | | | |
| Tier III - 7 to15% | | PUSA (3) UCC (3) PCA (2) | SB (2) ABC (2) AGC (2) ECCA (2) | SDA (3) LDS (3) |
| Tier IV - 0 - 5% | Others (0) | 53 Others(0-1) | 109 Others (0-1) | Others (0) |

Table 4. (2000-2002, Continued)
Number of Candidates Considered/Selected and Percent Selected ↓ (In Zone Selections only )

| Faith Group Cluster → | Roman Catholic | Liturgical Protestant | Non-Liturgical Protestant | Special Worship |
|---|---|---|---|---|
| Tier I - 100% | 32/15     47% | | | |
| Tier II - 25 to40% | | | | |
| Tier III - 7 to15% | | 12/7     58% | 29/13     45% | 3/1     33% |
| Tier IV - 0 - 5% | | 26/11     42% | 32/12     38% | 7/3     43% |

Data from Appendix 3 to Siskin (2005) report.

56.   The data in the various cells in Table 4 do not differ from each other, statistically.  But, if the sample sizes were larger, one might be able to conclude that Catholics were still being given too many board seats, and that Tier IV Non-Liturgicals were still receiving too few promotions.

57.   Finding no statistical significance is not a "failure" to confirm the Siskin Conjecture, rather it is what the conjecture would predict.  In this time period, 2000 to 2002, there is (**by design and intention**) supposed to be no statistically significant difference in the likelihood of any given denomination's appearing on a selection panel,  so if that were true, the conjecture would predict no significant difference in promotion rates.

c.   Interim Summary

58.  The data in paragraph 48 verified the validity of the Siskin Conjecture with respect to selection panels considering candidates for promotion to Commander. That paragraph used the overall profile of denominational preferences in selection panels in the U.S. Navy Chaplain Corps to form pseudo cohorts of denominations which were "similarly likely" to have one of their own assigned to a promotion panel.

The evidence was clear and statistically significant well beyond three standard deviations.

---

**A caution:**  One should not assume that just because "things" seem to be working smoothly *now*, they will continue to do so.

Although the promotion board actions *seem* to have risen above denominational prejudice - under the current board staffing regimen,

(1) The current system rests on the shifty foundation of the continuation in service boards and if that process is not corrected, no long lasting equity or parity can be achieved. (See Appendix F.)

(2) Whatever the Navy is allowed to do "on its own" may be undone voluntarily once vigilance is distracted.

Regularization should be ordered now, so that it may be assured in the future.

---

Dr. Siskin was right:

> The likelihood of a candidate's being selected by a board is correlated to the likelihood that the board contains a panel member with the same denomination as the candidate.

59.  Tables 2, 3 and 4 analyzed the data for Commander promotion boards across the time periods, 1977-1987, 1988-1999, and 2000-2002.  The pattern of results showed that (a) as the composition of the selection panels changed (reducing the exaggerated preference for some few denominations on selection panels), (b) the distortions in the likelihood of promotion reduced - exactly to the degree, and among the denominations, that the conjecture forecast.

> At least with respect to promotion to Commander,
> prejudiced patterns in selection board staffing led to, leads to,
> prejudices in the decisions made by those boards.

d.   <u>What about other kinds of selection panels?</u>

<u>Involuntary Retirement via SER Board decision</u>

| | Percent lost to SER* |
|---|---|
| The Navy's Implicit Favorites: | |
| | |
| Tier I   Roman Catholic | 1.72 % |
|     - a faith group cluster composed of one denomination | |
|     - There was at least one Roman Catholic on every SER Panel | |
| | |
| Tier II   SB,  ELCA, UM , LMS, NBCUS, BGC, CC(DC)  & SDA | 6.29 % |
|     - Significant representation on Promotion boards | |
|     - Representation on at least one SER Board | |
| | |
| Tier III  EC, AME, PUSA, ABC, UCC, PNBC, RCA, etc | 3.43 % |
|     - Significant representation on Promotion boards | |
|     - NO representation of SER Boards | |
| | |
| Tier IV CGIC, CR, ORTH, CHCCC, N, PCA, etc. | 8.70 % |
|     - Minimal or no participation on Promotion Boards | |
|     - NO representation on SER Boards | |

* Based on Data in Grayson Declaration compared to CDR inventory in Chaplains History

60.   Of course, when making a SER decision, one selects the chaplains who do *not* match the template; one should not be surprised when the closest match (the Catholics) lose the fewest chaplains and the most distant match (the denominations who are so undervalued that they are "never" given a seat on any selection board) lose the most chaplains - proportionately 5 times as many as the most favored denomination.  [This is statistically significant, $p < .001$.]

<u>Accessions</u>

61.  The new "old" data mentioned in paragraph 4 above contain records for virtually all the candidates considered for accession into the Chaplain Corps between 1985 and 2005.  This is nearly 1000 applicants who were passed through the recruiters.  Because these are candidates who were located (and perhaps encouraged or discouraged) by recruiters who had both quotas and incentives for meeting those quotas, this population has been pre-screened; they are all qualified.

62.  Even so, they were screened again, by the C/A/R/E Advisory Group and some (but not all) of them were recommended to the Chief of Chaplains for admission into the Chaplain Corps Officer Program (akin to an ROTC program for seminary students).

63.  We have membership information for the C/A/R/E Advisory Group for five years.  We can identify each Chaplain member's denomination in the Chaplain Corps History volume, and these can be compared to the "favorite" denominations as expressed by selection board membership.

The Navy's Implicit Favorites:                                    Percent Recommended
                                                                    for Accession*

Tier I    Roman Catholic
          - a faith group cluster composed of one denomination        96.40%
          - There was at least one Roman Catholic on every Promotion Panel
          - There was at least one Roman Catholic on every SER Panel
          - There was at least one Roman Catholic on most CARE Panels

Tier II   SB,  ELCA, UM , LMS, NBCUS, BGC, ABC, CS  & SDA             85.45 %
          - Significant representation on CARE Advisory Group

Tier III  EC, AME, NBCUS, PNBC, RCA, etc                             79.71 %
          - Minimal or No representation of CARE Advisory Group
          * Data from Navy's electronic data base, 27 July 2006

<u>Additions to the Active Duty List (*acdu*)</u>

64.   The new "old" data also contained requests from some 2,000 chaplains seeking assignment to active duty (*acdu*) .  These applications, like those for participation in the Student Program, were reviewed by the C/A/R/E Advisory Group.

The Navy's Implicit Favorites:                                    Percent Recommended
                                                                    to Active Duty*

Tier I    Roman Catholic
          - a faith group cluster composed of one denomination        93.89%
          - There was at least one Roman Catholic on every Promotion Panel
          - There was at least one Roman Catholic on every SER Panel
          - There was at least one Roman Catholic on most CARE Panels

Leuba Declaration - the Siskin Conjecture, page 17

Tier II  SB,  ELCA, UM , LMS, NBCUS, BGC, ABC, CS  & SDA                72.26 %
      - Significant representation on CARE Advisory Group

Tier III  EC, AME, NBCUS, PNBC, RCA, etc                                62.48 %
      - Minimal or No representation of CARE Advisory Group
* Data from Navy's electronic data base, 27 July 2006

## Conclusion

65.   These patterns are all statistically significant well beyond one chance in a million, in the region of seven standard deviations.  There can be "no statistical doubt" that the selection boards are picking "people like us" to add to the Corps, and rejecting "people who are different".  And since the only differentiating dimension visible in the records is denomination, it follows that this is religious discrimination.  It may be unwitting on the part of the individual chaplain board members, it may even be unwitting on the part of the subordinate assignment officer who decided whom to suggest for a role on the selection panels, but it was not *institutionally* innocent and it cannot be unwitting to defend it in the face of this data.

66.   The <u>moment of intent</u> is memorialized in the Navy's pleadings in this matter.  In their "Reply in Support of their Cross Motion to Dismiss, or in the Alternative for Partial Summary Judgment" (Adair, 8/11/2006), Defendants describe the stream of logic and the reason for their selection of a pattern of faith group clusters on personnel selection boards: (1) faith group cluster is one of the factors used in assigning chaplains to duty locations, (2) a chaplain's efficiency report will reflect differences due to duty assignments, (3) placing chaplains with a mix of experience on promotion boards the Navy "expects" ... "at least one member ..to understand the manner in which each faith group category was logistically managed and how the differences in utilization, administration and deployment may inform board evaluations of chaplain fitness reports" (p. 4.)

67.   The Navy put this *mix* of Chaplains on the selection boards with the intention of influencing their recommendations.  The *mix* was *chosen*: (a) at least one Catholic was assigned to every promotion board, (b) at least one Liturgical Chaplain was assigned to every promotion board, and (c) when one looks at the <u>denominations</u> that were *chosen* to "represent" the Liturgical and the Non-Liturgical faith group clusters, the pattern there (1) is biased, i.e. has de jure favorites and (2) matches the pattern of denominations who benefitted from the Boards' actions.  (3) The denominations that are never assigned to selection panels (or virtually never assigned) are the same denominations that are (i) under-promoted vis a vis their peers, (ii) forced into involuntary retirement most often, (iii) under accessioned and (iv) shunned from active duty by the operation of quotas.

68.   Defendants admit an FY2003 shift from staffing promotion boards with five chaplains and two non-chaplains to staffing promotion boards with two chaplains and five non-chaplains [see Notice of Motion ( 2/28/05 Wilkins)].  Defendants declare that this shift is not an admission that the former policy was flawed.  They aver that the change is an exercise of military discretion - and

admit that the pattern of faith group clusters used in 1985 to 2002 was also a military judgment - i.e. intention.

**Epilogue**

69.  We do not have any data that tell us what the denominational participation is in CADRAG (the continuation in service) boards, but IF, i.e., *if,* the pattern of preference there is like the pattern on promotion boards, and SER boards, and C/A/R/E boards, then we know:

•     something interesting about the Continuation in Service Boards and

•     something important about some chaplains who have been missing from (missing out on) consideration for promotion.

70.  First, about four weeks ago I have received a copy of a FOIA response provided by the Department of the Navy to Mr. Laurence W. Jones, on or about October 3, 2002.

71.  I received this data from Mr. Schulcz, attorney for the Plaintiffs.  I do not know who Mr. Jones is, nor what his relationship is or may be with respect to this case.  I was given this data because after noticing that some old data from the C/A/R/E Advisory Group for 1981 dealt with "Indefinite Extension", I asked Mr. Schulcz if he had anything else that dealt with this decision.

a.   The "Extension/Continuation in Service" process.

72.   After a newly accessioned Naval Officer has served on active duty for nearing three years, the first "re-up" window occurs.   He (or she) is asked if they wish to continue in Active Duty Service.

73.   In the Chaplain Corps most serving chaplains (but not all of them) opt to be considered for extension, and most of those who request an additional tour of active duty (but not all of them) are recommended for further service.

74.  These two decisions:

          (1) the individual Chaplain's decision to ask for continuation
and
          (2) the Navy's decision on whether to extend that Chaplain's service,

interact to impact the denominational mix of the Corps as experience levels increase.

75.   Whatever self-selection or filtering which may be taking place at this juncture, its compound effect may explain (a) the disproportionate loss of non-liturgical candidates for "consideration"

for promotion to LCDR, CDR and CAPT[13] and (b) it may comment upon the denominational preferences within the Chaplain Corps.

b.   The Data

76.   The FOIA data are neither as "tidy" nor as complete as one might hope.

•     They deal with a limited sampling of time periods, 1987, 88, 89, 90, 92 and then 1996.

•     The data from each end of this period (i.e.1987 and 1992 &1996) are not useful.

   •     The data for 1987 is illegible and
   •     The data for 1992 and 1996 do not show what decision was made.

•     Only the data for 1990 lists the eligibles who did not request consideration for retention.

77.   Even so, we can glean some statistically significant information from this data.

78.   The inferences therefrom can support other findings or encourage further discovery.

79.   Appendix DF is a copy of the FOIA response.  Appendix DB is a database transcribed from the FOIA response.  The database provides one line for every name listed in the FOIA response, for 1988 to 1990.  I captured the denomination associated with each Chaplain in the FOIA lists, and I recorded the decision.  I captured the Chaplain's name only for  chaplains who were (a) not selected,  (b) whose decisions were changed by the approving authority (the Chief of Chaplains?), or (c) for the six chaplains who were noted in the May 1990 list as eligible for continuance who did not request reconsideration.

80.   I used the Chaplains History Volume X (Halley 1993) to verify each chaplain's denomination and to "look up" what happened to the chaplains whose names I recorded - i.e. the rejected, the "changed" and the six who chose not to continue.

_____

      [13]  When the Navy publishes promotion statistics the reports are based on the number of promotions with respect to the number of candidates who are considered.  "Considered" in this context has a term of art quality.  First, a candidate is only "considered" if his or her name is put on the list, and it only counts as a consider on the first occasion it is there.  A candidate who is not selected on his first opportunity is said to be FOS (Failed of Selection), and if he is FOS two times for the same rank up to an including CDR, he *may* be "selected out" by the CADRAG, CARE or Indefinite Extension Boards.  On the other hand, if such a candidate is not selected out, he remains on the promotion list and may be selected for promotion - which has the effect of re-starting the FOS count.  The first time I looked at the Navy's promotion data I wondered why the number of "considers" at each higher rank showed a "faith group cluster" effect that seemed to evidence "missing" (Non-Liturgical) candidates as rank increased.  The answer may be here.

c. Results

81.   The data cover CADRAG decisions made concerning 246 chaplains who were both (a) eligible for and (b) requested to be considered for, extension (or continuance) on active duty.

82.   Table 5 summarizes the board's decisions tallied by "faith group cluster" - but I have not used the Navy's "faith groups".  Instead of using the Navy's (I) Roman Catholic, (II) Liturgical Protestant, (III) Non-Liturgical Protestant and (IV) Special Worship Group, I used groups based on the Navy's de jure[14] preference for denominations.

83.   Recently (see above - the Siskin Conjecture), I have used an operational definition of "favored denominations".  I simply look at which denominations the Navy assigns to its selection Boards (promotion Boards, SER Boards and C/A/R/E Boards) and let that distribution define the de jure preference pattern:

Tier I   The denomination(s) which is/are assigned to all or to virtually all selection Boards

        This is Roman Catholics, and there is no "close second".

Tier II   The denominations which are frequently assigned to a Selection Board, but not "always" assigned or even almost always assigned.

|  |  |
|---|---|
| This is SB | (They are on about half as many boards as the Catholics) |
| ELCA | (They are on about 1/3 as many boards as the Catholics) |
| PUSA | (They are on about 1/3 as many boards as the Catholics) |
| and  UM | (They are on about 1/3 as many boards as the Catholics) |

Tier III All other denominations.

84.   In the Siskin Conjecture I break this third group into two subgroups: IIIa which is those denominations who have had more than incidental presence on some selection boards and IIIb,

---

        [14]  I understand the distinction between *de jure* and *de facto* to be a contrast between what is true or "supposed to be true", based on the rules of the Organization, and what seem to be the "facts on the ground" as those rules are followed (or ignored.)  The Navy may say that I have misused this comparison in my text here.  The Navy will say that it has no *de jure* favorite denominations, and may argue that whatever statistically significant uneven distribution which may be occurring is incidental, accidental.  It is my opinion here that the data demonstrate an historic pattern and practice (a *de jure* intention) to place Roman Catholic, Presbyterian (USA), Lutheran (ELCA), United Methodist and Southern Baptist denominations on selection boards, with a smattering of other "acceptable" denominations added from time to time for appearances' sake - but always with the *intention* of supporting "mainstream" denominational influence in general and Catholic influence in particular.

those denominations who have never had a seat on a selection board, or almost never. I also explore the possibility that the "favorites" may change over time, or from context to context. In the present instance, however, we do not know who was on these CADRAG boards, and we only have 246 decisions to parse, so I will simply use this generalized, operationally defined, sequence of favorites.

Table 5
Probability of Selection for Continuation in Service
Candidate Denominations Tiered

| Faith Cluster | Number Considered | Number Selected | Number Rejected | Percent Continued | Percent Rejected |
|---|---|---|---|---|---|
| Tier I | 46 | 43 | 0 | 100% | 0% |
| Tier II | 85 | 69 | 8 | 89.6% | 9.4% |
| Tier III | 115 | 86 | 18 | 82.7% | 15.7% |
| Total | 246 | 198 | 26 | 88.6% | 10.3% |

* Number Considered includes selected + rejected + alternates.

85.   This pattern of results (even without considering that the Siskin Conjecture predicts an ordering from Tier I to Tier III) is statistically significant (using a Chi Square statistic) at $p<.001$ (more than three standard deviations.) Chance alone cannot account for this preference among the denomination-based clusters.

86.   This pattern is also consistent with the results from the 1981 C/A/R/E board mentioned earlier. In 1981 and 1982 the C/A/R/E Board undertook a "continuation" consideration for 27 chaplains. Twelve of these chaplains were Roman Catholic; ten were continued. Of the remaining 15 chaplains, only 3 were continued.

87.   It is clear, based on this analysis of the FOIA data and corroborated by the analysis of the 1981-82 C/A/R/E Advisory Group continuation considerations,

•    The Siskin Conjecture (using the de jure favorites) is verified in the CADRAG context.

and
•    There is denominational preference at work in the Corps' decision about which denominations to allow to continue on Active Duty.

88.   Catholics, as usual, are preferred over everybody else, and the second favorite denominations (three Liturgical [ELCA, PUSA, and UM] and one Non-Liturgical [SB]) are preferred over all the others. This alone could account for the loss of "considers" as the promotion board lists are prepared for LCDR, CDR and CAPT. [See Appendix F.]

d.  Anecdotal Support for this systematic Denominational Preference within CADRAG

89.  In the roughly 250 decisions which the CADRAG issued, four were overruled by the approving authority, and one of the chaplains who had not asked to be considered for a continuation seems to have been enticed into staying.

90.  Of the four CADRAG decisions which the Chief of Chaplains reversed, three were for Roman Catholics that the CADRAG had recommended to Inactive Duty.

>   Ronald Chiasson had been recommended for RAD[15];
>   the CoC asked that he be extended until 1994.
>   Ref 1 indicates that Chiasson was RAD 10/90.

>   Leslie Colaco had been recommended for RAD;
>   the CoC asked that he be extended to age 60.
>   Ref 1 indicates a tour in Japan 90-92, followed by one in Iceland.

>   Stanley Czarnota had been recommended for RAD;
>   the CoC asked that he be extended.
>   Ref 1 indicates a tour in Maine 90-93 followed by one in Great Lakes.

91.  One decision for an Alternate was changed to an "out".

CADRAG had recommended:

>   Lyrice Marsh, a CFGC, for alternate status
>   (in case the end strength allowance provided a billet);
>   the CoC changed this.  Ref 1 indicates Marsh was RAD 9/89.

92.  These four CoC interventions favored a Catholic chaplain on three occasions, and disadvantaged a CFGC on the remaining occasion.  This is  statistically significant[16] evidence of pro Catholic and anti CFGC bias.

---

[15]  RAD stands for "Released from Active Duty".  This may be, as here, an "adverse action" imposed by the CADRAG Board and approved by the Chief of Chaplains, or it may be a neutral administrative implementation following upon the affected Chaplain's desire to leave Active Duty when his (or her) tour is finished.

[16]  Following the logic Dr. Siskin used for his coin tossing stranger, here we have the Chief of Chaplains overruling the CADRAG board four times - each time in a direction which is consistent with preference for Catholics or against CFGC.  In a one tailed test, the statistical likelihood of this set of outcomes is 1/32, which corresponds to two standard deviations beyond chance expectation.

93.   Finally, it may be interesting to note that of the six chaplains who (we know) were eligible for continuance but who are not recorded here as having requested it, one "changed his mind" or was "enticed" by an attractive assignment.

>    Rabbi Jon Cutler was listed in the FOIA documents as not having asked for consideration for continuance.  Ref 1 indicates that he stayed for one more tour, in Okinawa.

e.   Revisiting "What Happened to all the Non-Liturgicals?"

94.   The FOIA data indicate that chaplains can be "lost" from Active Duty in the Corps "voluntarily" as well as involuntarily.  They can be lost voluntarily via not requesting continuation.  They can be lost involuntarily by having their requests for continuation denied.

95.   When one looks at the Chaplains History (Halley, 1993) to see if there is any visible distinction between those chaplains lost from further consideration because they did not volunteer for extension when it was available (the other five chaplains we know about in the FOIA records) and those who wanted to stay and were rejected, we see that both are coded "RAD", released from active duty.  The Chaplains History cannot help us differentiate withdrawals from rejections.

96.   But, in conjunction with the FOIA data we can make some relevant inferences:

•    Since CADRAG (and subsequent CoC direction/intervention) suggests that virtually all Catholics who want to extend their tours will be approved, one might make the assumption that most of the "early (Catholic) losses" evidenced in the Chaplains History are voluntary.

>    Catholics lose nearly 9 times as many chaplains in their first year (5.1%) as do Non-Baptist, Non-Liturgicals (0.6%).[17]]

•    Since CADRAG (and subsequent CoC action) suggests that Non-Baptist, Non-Liturgical chaplains are least likely (Tier III) to be continued in the service when they want to stay, one might make the assumption that most of the late losses (those on the threshold of consideration for CDR, for example) are rejections rather than voluntary withdrawals.

>    Catholics lose 3.1% of their chaplains during the 3 years following entrance into the CDR zone; Non-Baptist Non-Liturgicals lose 11.7% during these three years.[18]

97.   I believe that it has been disingenuous in the extreme for Plaintiffs to feign skepticism in the past when I have opined that *some* underlying Chaplain Corps practice has been removing Non-

---

[17]   See Table K-7 in my Compendium.

[18]   See Table K-8 in my Compendium.

Liturgicals from the pool of those to be considered for promotion.  The Navy is full well aware of the operation of its Continuance in Service Boards and has avoided providing any information from their records concerning these actions.

98.   The inferences drawn in the two bullet points above (in paragraph 96) could be verified very easily (or in the alternative, dispelled) by reference to Navy records.

99.   It is my opinion that the data demonstrate that Non-Liturgical, Non-Baptist candidates are being systematically deprived of the opportunity to be considered for promotion to Commander.  The mechanism for this deprivation is the CADRAG board; the cause is the pattern of denominational staffing on that board, as expressed through the operation of  "like, likes, like" or the Siskin Conjecture.

**Summary Conclusion**

100.   The Siskin Conjecture is verified -

> putting a preferred subset of denominations on selection boards correlates to the outcome that candidates from those denominations experience before those boards, in every known context: Promotion Boards, SER Boards, C/A/R/E Boards and even the CADRAG Boards (because the *de jure* denominations in the other boards predict the results of the CADRAG boards).

This outcome may be the result of relational demographics operating through a generic "ideal" (a la the Siskin Conjecture or the Weinberger Assertion), affinity considerations (a la "like, likes, like"), some sort of "old boys" network working its will within the Chaplain Corps, any combination of the above - or, in fact, all of the above.

Which denominations are placed on the Chaplain selection boards matters!

**Certification and Oath**

101.   I certify under the penalties of perjury, (a)  that this is my work, (b) that I am competent to analyze this data, and (c) that the conclusions represented here are mine, true, complete, accurate and scientifically certain to the best of my knowledge and belief.


 /S/ Harald R. Leuba, PhD
Harald R. Leuba, PhD        29 November 2006
Potomac,    Maryland                        USA

**References:**

Gastwirth, Joseph L. (1984) <u>Statistical Methods for Analyzing Claims of Employment Discrimination</u>, *Industrial and Labor Relations Review*, Vol 38, No. 1 (October 1984) Cornell University 0019-7939/84/3801

Grayson,


Halley, Michael D. Editor,  <u>United States Navy Chaplains 1982-1991: Biographical and Service Record Sketches of Chaplains on Active Duty During the Period I January 1982 - 21 December 1991</u>  Volume X in the History of the Chaplain Corps United States Navy, Chaplain Resource Board, Norfolk, Virginia, June 1993.

Hart, Melissa (2005) "Subjective Decision making and Unconscious Discrimination", *Alabama Law Review*, Vol. 56:3:741

Hyde, Michael (2005) "Material facts as to which there is no genuine issue", 99cv1579.

Hyde, Michael and Hall, Christopher, (2006) "Defendants' Reply in Support of Their Cross Motion to Dismiss, or in the Alternative for Partial Summary Judgment", United States District Court for the District of Columbia, Case 1:99cv-02945-RMU-JMF Document 231, August 11, 2006.

Kagle, Kilian (2006) "Declaration", in Chaplaincy of Full Gospel Churches v. The Honorable Donald C. Winter consolidated with Adair v The Honorable Donald C. Winter, United States District Court for the District of Columbia, Case 1:99cv-02945-RMU, Defendants' Exhibit 8, 24 May 2006.

Krieger, Linda Hamilton (1995) "The Content of Our Categories: A Cognitive Bias Approach to Discrimination and Equal Employment Opportunity", Stanford Law Review, Vol. 47:1161

Leuba, Harald R., <u>Declaration: The Question of Denominational Preference in U.S.</u> <u>Navy Chaplain Corps' Accessions</u>, United States District Court for the District ofColumbia,  Case No. 02CV02005  in the matter of Rev. Charles E. Larsen, et al., v The United States Navy, et al. 3 October 2005.

Leuba, Harald R., <u>Appendage Declaration: The Question of Denominational Preference in U.S. Navy Chaplain Corps' Accessions: An Extension to a prior Statistical Examination</u>, United States District Court for the District of Columbia,  Case No. 02CV02005  in the matter of Rev. Charles E. Larsen, et al., v The United States Navy, et al. 24 November 2005.

Leuba, Harald R., Allonge Declaration, United States District Court for the District of Columbia, Case No. 02CV002945 (RMU) in the matter of Chaplaincy of Full Gospel Churches v. the Hon Gordon R. England, et al 14 February 2006.

Martin, H. Lawrence, Editor United States Navy Chaplains 1972-1981: Biographical and Service Record Sketches of Chaplains on Active Duty During the Period 1 January 1972 - 31 December 1981  Volume VIII in the History of the Chaplain Corps United States Navy, NavPers 15507, Navy Publications and Forms Center, Philadelphia, PA.

McCreary, Stanley H., A Study of Faith Group Affiliation and Promotions to Captain and Commander in the U.S. Navy Chaplain Corps, A dissertation submitted to the United States International University, San Diego, California 1992.

Morris, Scott B. and Russell Lobsenz (1998)  Significance Tests and Confidence Intervals for the Adverse Impact Ratio. 13th Annual Conference for the Society for Industrial and Organizational Psychology, Dallas, Texas. April.

Muchow, D.K., Deputy Chief of Chaplains.  "Note concerning FY87 Accession Goals" Document DA 7359 Copy attached to Reference Leuba, October 2005.

OFCCP Compliance Manual - Chapter 7 - Identification & Remedy of Employment Discrimination. On line (11/13/2005) U.S. Department of Labor, Employment Standards Administration, Office of Federal Contract Compliance Programs. http://www.dol.gov/esa/regs/compliance/pfccp/how2/ofcpch7.htm.

OPNAV Instruction 1120.9, Appointment of Officers in the Chaplain Corps of the Navy, 20 December 2005.  (Available on line at Http://dodssp.daps.mil/Directives/1120_9.pdf) and SECNAV Instruction 1120.4A, the predecessor guidance.

Oyer, Paul & Scott Schaefer (2002) Sorting, Quotas, and the Civil Rights Act of 1991: Who Hires When it's Hard to Fire?, Journal of Law and Economics, vol XLV (April).

Peterson, David W. and John M. Conley (2001) "Of Cherries, Fudge, and Onions: Science and its Courtroom Perversion"  Law and Contemporary Problems, Vol 64: No 4. 2001. Article available at http://www.law.duke.edu/journals/64LCPPeterson.

Sacco, Joshua M.; Scheau, Christine R.; Ryan, Ann Marie & Schmitt, et al. (2003a)  An Investigation of Race and Sex Similarity Effects in Interviews: A multilevel Approach to Relational Demography, paper presented at 15th Annual Conference for the Society for Industrial and Organizational Psychology, New Orleans, Louisiana. July 2000, published in 2003: Journal of Applied Psychology, Vol. 88. No. 5. 822-86 5.  Available on line (11/25/2006): http://iopsych.msu.edu/Schmitt/interviewer%20similarity.doc.

Sacco, Joshua, & Neal Schmitt (2003b) <u>A multilevel longitudinal study of demographic misfit and diversity effects on turnover and profitability</u>, paper presented at the 18th annual SIOP conference in Orlando, Florida, May.

Siskin, Bernard R. (2005) "Declaration" in Larsen v. U.S. Navy, District Court for the District of Columbia, Case No. 02 CV 02005, 21 December 2005.

Smith, Karen D., Ivanovich, John S. & Reese, David L. (2000) "Promotions in the Navy Chaplain Corps", Center for Naval Analysis, Alexandria, VA,10 March 2000.  CRM D0000149.A1/SR1.

Seidel, Marc-David L. (2000)  Friends in High Places: <u>The Effects of Social Networks on Discrimination in Salary Negotiations</u>, *Administrative Science Quarterly*, June.  On line (10/18/2006) http://www.findarticles.com/p/articles/ml_m4035/is_2_45/al_64705571/print

Washington Post, Military Faith Groups and Chaplains, Tuesday 30 August 2005

Appendix A
Denominational Preferences on Chaplain Corps Selection Boards

A1   In its pleadings in this matter, the Navy's advocates have repeatedly represented:

> "The Navy composed its selection boards, from approximately FY 1988 through FY 2002, such that the faith group category mix on the board, like the composition of the Chaplain Corps generally, reflected to the extent possible each of the faith group categories, in compliance with SECNAVINST 1401.3 ¶¶ 4(a) and 5." [19]

A2   This statement is misleading, and it may even be intentionally deceptive.

A3   This statement is misleading because it posits that "faith group category" is somehow the measure of composition of the "Corps generally" which is to be "reflected" in the selection boards.

A4   However:  first, if one looks at the "faith group categories" through the prism of this litigation, then both the social science concept of stereotyping[20] and the Supreme Court's *presumption of invidious intent*[21] argue that the faith group cluster "system" is a pretext for

---

[19] See e.g., 1:99-cv-02945-RMU-JMF Document 224 filed 05/24/06 pages 99, 100 and 101 of 109.

[20] Krieger (1995) writes "the assumption that statements reflecting stereotyped views betoken discriminatory animus makes sense if one understands discrimination as resulting from prejudice and further understands prejudice as comprising a cognitive component (stereotypes), an affective component (aversion or dislike), and a behavioral component (discrimination aimed at creating or enforcing social distance.)  If we assume (as does social psychology theory) that these components necessarily function as inseparable parts of an integrated whole, then the presence of one can be assumed to evidence the others.   And what is true of "statements" must be true of articulated policy - the faith group clusters which establish "Roman Catholic" as its own "group" and define all other denominations (very very broadly) in terms of distance from Catholic (see page 1174.)

[21] Krieger (Ibid, p 1181) cites the "presumption of invidiousness" as "first articulated by the Supreme Court in Furnco Construction Corp. V. Waters.  The Court in Furnco stated: "[W]e know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting.  Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, whom we generally assume acts only with *some* reason, based his decision on an impermissible consideration such as race."

And here, we infer that that impermissible consideration is religion!

concealing Roman Catholic preference, providing beneficial terms of consideration to Roman Catholics in particular, and facilitating discriminating against a broad range of denominations who are *buried* in collections of dissimilar belief structures which are proxied (in a biased manner) with a favored set of "representatives" (namely Southern Baptist, Presbyterian Church of the USA (not the Presbyterian Church of America), the Evangelical Lutheran Church of America (moreso than the Lutheran Missouri Synod) and the United Methodists (moreso than the American Methodist Episcopals).

A5    Second, The Navy's general statement about how it composes selection boards is more than misleading; it is baldly incorrect. The SECNAVINST 1401.3 says nothing about "faith group clusters".  In fact, ¶ 4(a) says that:

> "... Exclusion from board membership by reason of gender, race, ethnic origin, or religious affiliation is prohibited."

> ¶5 says:

> "Guidance on selection board representation in this instruction is not to be used to sponsor any single interest, but is used to enhance the knowledge, experience, and understanding of each board as a whole."

A6    The Navy's pattern of staffing selection boards is not comporting with this Instruction; it is not even compliant with this Instruction; it violates it.

A7    One cannot populate selection boards, year after year for thirteen years (1988-2002), for promotions to LCDR, CDR and Captain, and *always* get at least one Catholic on every board, without considering religious affiliation - without contriving to include *one* Catholic.

A8    More than 25% of the selection board seats from 1977 to 2002 were given to a Roman Catholic - thus appearing to use the Board staffing pattern to "sponsor a single interest", in apparent violation of both the SEC NAV instructions and a Constitutional prohibition on the government's adopting a position which endorses or facilitates one pattern of religious beliefs over all others.

A9    Furthermore, one cannot  populate selection boards, year after year for thirteen years, for promotions to LCDR, CDR and Captain, choosing from more than 120 different denominations and

> •    Use just five denominations (Roman Catholic, Lutheran Church of America, Presbyterian Church, USA, Southern Baptist, and United Methodist) to fill more than 60% of all  board seats,

and

> •    never get even one chaplain from more than 80 disenfranchised denominations.

A10    Random variation or chance[22] cannot explain the Corps' manifest preferences:

   (1) to include one Roman Catholic on every Selection Board,

   (2) to form a *majority* on every board with Catholics plus chaplains from a favored subset of denominations (PUSA[23], LCA, UM, and SB) and

   (3) to limit participation for <u>all other</u> denominations to either token involvement, or no involvement at all.

A11    One denomination (Roman Catholic) averages more than one seat per board - for Promotion Boards, C/A/R/E Boards, and SER Boards[24].  Four denominations (PUSA, LCA, UM, and SB) average between 3/4 and 1/3 of a seat per board.  Five denominations average between 1/4 and 1/7th seats per board, while twenty seven  denominations are given between a 10% chance of being on a board and no chance of serving. Eighty four other denominations have no participation in any Promotion Board - and endure more disadvantage than just exclusion.

A12    The statistical fact of bias in the Navy's choice of which denominations to place on Selection Boards is important for two reasons.

   First, the pattern of preference for Roman Catholics, and to a lesser extent, for what might be called four "mainstream" denominations, signals to members of those denominations inside and outside the Navy that the Chaplain Corps is "sympathetic" to (only) those belief structures - no wonder  applications for Service in the Navy Chaplain Corps are declining.

   Second, as we have seen before (Leuba, Allonge 2005), and we shall see here in "the Siskin Conjecture" (in the body of this declaration), the choice of which denominations to place on the selection panels influences the decisions of those panels.

---

   [22]  The odds against these patterns of bias are billions to one against.  This cannot have happend by chance; it cannot have "changed" by chance; it reflects intention.  Is it not a violation of both the SECNAV Instructions and a common sense reading of the U.S. Constitution?

   [23]  PUSA is the Navy's code for the Presbyterian Church of the United States; ELCA is the code for the Evangelical Lutheran Church of America; UM stands for United Methodist, and SB for Southern Baptist.

   [24]  Although the Navy has produced some Continuation in Service Board decisions, in response to a FOIA request (see Appendix D here).  They have not produced in discovery, or in the FOIA response, any information about board composition.  It seems likely, in view of the pattern across selection boards, SER boards, and C/A/R/E boards, that Catholics and the "favorite" denominations would also have a majority of the seats on the Continuation in Service Boards.

A13    The following "pie charts", graphs and appearance tables provide a view of

    (a) exactly how biased the Navy's selection of denominations for service on its Promotion
    Boards has been

and

    (b) they also show how this pattern has changed, in what may look like a cynical attempt
    to deal with "appearances" without actually addressing the core issues.

A14    This is the "two Catholic" period.   ↓



There were two Roman Catholics on every promotion Board, and two or three Liturgicals. The Catholics and the Liturgicals, combined, had virtually all the votes.

A15    In 1987 the promotion panel staffing pattern was "voluntarily" changed, as part of a settlement. "Two Catholics" on every board was changed to one Catholic and one Line Officer.



Note that after this, change, even in "faith group cluster" terms, the *representation* was still uneven.

Liturgicals continued to be over represented

- at the expense of Non Baptists and Special Worship Chaplains who remained under represented.

A16    When the current litigation began (in CY1999), and concerns were raised *again* about religious preference on Chaplain Corps Promotion Boards, the Navy broadened its representation - *somewhat*.  Line Officers became "major" participants in the process (counter-balancing or even diluting the Chaplains' influence)  and the faith groups became more evenly represented:

(See pie chart on next page →)

Leuba Declaration - the Siskin Conjecture, page 32



A17    But while participation "spread" on a faith group cluster basis, most denominations still did not benefit from the increased opportunities: ↓







A18   The charts above and the tables below demonstrate:

(1) The Chaplain Corps *chose* to maximize Catholic influence on its promotion boards (and in Appendix B we will see that this preference held for SER[25] Boards, and C/A/R/E Boards, and presumably CADRAG Boards.  These preference patterns were not "accidental" nor the result of chance.  They were intentional.  Their manifest purpose was to institutionalize Roman Catholic "influence" in the personnel management matters of the U.S. Navy Chaplain Corps.

(2) When challenged (in 1986/87), the Chaplain Corps *chose* to maintain as much Roman Catholic preference and control as possible.  Instead of reducing Catholic influence from 33% (when there were two Catholics on a six Chaplain board) to 16% (by having only one Catholic chaplain on a six Chaplain Board)  the Navy kept Catholic influence as high as possible, at 20% of the religious vote (with one Catholic and one Line Officer on a six member board.)

(3) When confronted with the same "constitutional" argument again, in 1999, the Corps adjusted its policies to minimize the "appearance" of undue (faith group) influence, but explicitly reserved the "discretion" to assign Chaplains to Selection Boards ad lib - including ex officio membership by the Chief of Chaplains on Promotion Boards, and Community Division leaders on C/A/R/E and CADRAG boards.

A19   As we have seen before (Leuba, Compendium 2005) and report again (here, in the body of this declaration), these are "practices and policies" which directly color the decisions made by those boards.

---

[25]  SER = Selective Early Retirement Boards, C/A/R/E = Chaplain Accession and Recall Evaluation Boards; CADRAG = Chaplain Active Duty Extension Boards.

Leuba Declaration - the Siskin Conjecture, page 34

## DENOMINATIONAL ASSIGNMENTS FOR LIEUTENANT COMMANDER BOARDS

| | 77 | 78 | 79 | 81 | 82 | 83 | 84 | 85 | 86 | 87 | 88 | 89 | 90 | 91 | 92 | 93 | 94 | 95 | 96 | 97 | 98 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RC | XX | XX | XX | XX | XX | XXX | XX | XX | XX | XX | XX | X | X | X | X | X | X | X | X | X | XX | X |
| PUSA | X | X | . | X | XX | X | X | . | XX | XX | . | . | . | X | . | X | . | . | X | . | . | X |
| SB | . | X | X | X | X | X | . | X | . | X | X | X | . | . | X | XX | . | X | . | . | . | . |
| UM | X | . | X | X | . | . | . | . | . | . | . | . | X | X | X | . | . | . | X | X | . | . |
| ELCA | X | . | . | . | . | X | . | . | . | XX | X | . | X | . | . | . | . | . | . | X | . | . |
| LMS | . | . | . | . | . | . | X | X | . | . | . | . | . | X | . | X | X | . | . | XX | . | . |
| SDA | . | . | . | . | . | . | X | . | . | . | . | . | . | X | . | X | . | . | . | . | . | X |
| ABC | . | X | . | . | . | . | . | . | . | . | X | . | . | . | X | . | . | . | . | . | . | . |
| UCC | . | . | . | . | . | . | . | . | . | . | . | . | . | XX | . | . | . | . | X | . | . | . |
| AME | . | X | . | X | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | . | . | . |
| DC | . | X | . | . | . | . | . | . | . | X | X | . | . | . | . | . | . | . | . | . | . | . |
| NBCUS | . | . | . | . | . | . | . | . | . | X | . | X | . | . | . | . | . | . | X | . | . | . |
| PNBC | . | . | . | . | . | . | . | X | . | X | . | X | . | . | . | . | . | . | . | . | . | . |
| BGC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | X | . | . | . | . | . |
| CGIC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | . | X |
| CRC | . | . | . | . | X | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . |
| E | . | . | X | . | . | . | . | X | . | . | . | . | . | . | . | . | . | . | . | . | . | . |
| J | X | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | . |
| LDS | . | . | . | . | . | . | . | . | . | . | . | X | . | . | . | . | . | . | . | . | . | . |
| AGC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . |
| CHCCC | . | . | . | . | . | . | . | . | . | . | . | X | . | . | . | . | . | . | . | . | . | . |
| CME | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . |
| ECCA | . | . | . | . | . | . | . | . | . | X | . | . | . | . | . | . | . | . | . | . | . | . |
| N | . | . | X | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . |
| OBSC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . |
| PCA | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . |
| PHC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . |
| **RCA** | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | . | . | . | . | . | . |

93 Other Denominations . . . . . . . . . . . . . . . . . .

. . . . . . . . 0

## DENOMINATIONAL ASSIGNMENTS FOR COMMANDER BOARDS

| | 77 | 78 | 79 | 81 | 82 | 83 | 84 | 85 | 86 | 87 | 88 | 89 | 90 | 91 | 92 | 93 | 94 | 95 | 96 | 97 | 98 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RC | XX | XX | XX | XX | XX | XX | XX | XX | XX | X | X | X | X | X | X | . | X | X | X | XX | X | X |
| SB | . | X | X | X | X | X | . | X | . | X | . | . | . | X | X | . | X | . | . | X | X | X |
| UM | X | X | X | X | . | X | . | . | . | . | . | . | X | . | X | . | . | . | . | X | X | . |
| ELCA | X | . | . | . | X | X | . | . | X | X | X | . | X | X | X | . | . | . | X | . | . | . |
| PUSA | X | . | . | . | X | X | X | . | X | X | X | . | . | . | . | . | . | . | X | . | . | . |
| LMS | . | . | . | X | . | . | . | . | . | . | . | X | . | . | . | . | X | . | X | . | X | . |
| ABC | X | X | . | . | . | X | X | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . |
| NBCUS | . | . | . | . | . | . | . | . | . | . | . | X | . | . | . | . | X | . | X | . | . | . |
| GARB | . | . | . | . | . | X | . | . | X | . | . | X | . | . | . | : | . | . | . | . | . | . |
| AME | . | . | . | X | . | . | X | . | . | X | . | . | . | . | . | . | . | . | . | . | . | . |
| RCA | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | X | X | . | . | . | . |

Leuba Declaration - the Siskin Conjecture, page 35

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UCC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | X | . |
| E | . | . | X | . | . | . | . | X | . | . | . | . | . | . | . | . | . | . | . |
| N | . | . | X | . | . | . | . | . | X | . | . | . | . | . | . | . | . | . | . |
| DC | . | . | . | . | . | . | . | . | . | X | . | X | . | . | . | . | . | . | . |
| SDA | . | . | . | . | . | X | . | . | . | . | . | . | . | . | . | . | . | . | . |
| J | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | X | . | . |
| PNBC | . | . | . | . | . | . | . | . | X | . | . | X | . | . | . | . | . | . | . |
| ORTH | . | X | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . |
| BGC | . | . | . | . | . | . | . | . | X | . | . | . | . | . | . | . | . | . | . |
| CGIC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . |
| CMA | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . |
| CME | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X |
| CP | . | . | . | . | . | . | . | . | . | X | . | . | . | . | . | . | . | . | . |
| CRC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . |
| ECCA | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . |
| LDS | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . |
| PCA | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . |
| 93 Other Denominations | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . |

. . . . . . 0

# DENOMINATIONAL ASSIGNMENTS FOR CAPTAIN BOARDS

| | 77 | 78 | 79 | 81 | 82 | 83 | 84 | 85 | 86 | 87 | 88 | 89 | 90 | 91 | 92 | 93 | 94 | 95 | 96 | 97 | 98 | 99 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RC | XX | XX | XX | XX | X | XX | XX | XX | XX | XX | X | X | . | X | X | . | . | X | X | X | X | X |
| PUSA | X | X | X | XX | X | X | XX | X | X | XX | X | . | . | X | X | . | X | X | . | . | . | . |
| ELCA | X | . | . | X | X | X | X | X | . | X | . | X | . | X | . | . | X | . | X | . | . | . |
| SB | . | . | X | X | X | . | . | . | . | . | X | X | . | X | . | . | . | . | . | . | . | . |
| UM | . | X | X | . | X | X | . | . | . | . | X | X | . | . | . | . | . | . | . | . | X | . |
| DC | . | X | . | . | . | . | . | X | . | . | XX | . | . | . | X | . | . | . | . | . | . | . |
| SDA | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | X | . | . | X | . | . |
| ABC | . | . | . | . | . | . | X | . | X | . | . | . | . | . | . | . | . | X | . | . | . | . |
| E | . | X | X | . | . | X | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . |
| LMS | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | X | . | . | X | . | . |
| RCA | . | . | . | . | . | . | . | . | . | X | . | . | . | X | . | X | . | . | . | . | . | . |
| UCC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | X | . |
| AME | . | . | . | . | X | . | . | X | . | . | . | . | . | . | . | . | . | . | . | . | . | . |
| BGC | . | . | . | . | . | . | . | X | . | . | . | . | . | . | . | . | . | X | . | X | . | . |
| J | . | . | . | . | . | . | X | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . |
| ORTH | X | . | . | X | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . |
| PNBC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | X | . | . |
| AGC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . |
| CGIC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | . | . |
| CP | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | . | . | . | . | . | . |
| CS | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | X | . | . | . | . | . |
| ECC | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . |
| GARB | . | . | . | . | . | . | . | . | . | . | X | . | . | . | . | . | . | . | . | . | . | . |

```
          LDS        .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .
          NBCUS      .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    2
          96 Other Denominations   .    .    .    .    .    .    .    .    .    .    .    .    .
.    .    .    .    .    .             0
```

# APPENDIX B
## Favorite denominations
### i.e. the denominations assigned to personnel selection boards

| Denom | <---------- Seats on Selection Boards ----------> | | | |
| | Promotion | SER | CARE (1)* | CARE (2)* |
| --- | --- | --- | --- | --- |
| AGC | 1 | 0 | 1 | 0 |
| AME | 8 | 0 | 0 | 0 |
| BGC | 4 | 1 | 1 | 0 |
| CC(DC) | 4 | 1 | 2 | 0 |
| CGCT | 0 | 0 | 43 | 0 |
| CGIC | 3 | 0 | 0 | 0 |
| CHCCC | 2 | 0 | 0 | 0 |
| CMA | 1 | 0 | 0 | 0 |
| CN | 1 | 0 | 0 | 0 |
| CR | 3 | 0 | 0 | 0 |
| DC | 5 | 0 | 0 | 0 |
| EC | 8 | 0 | 29 | 0 |
| ELCA | 29 | 2 | 24 | 0 |
| GARB | 4 | 0 | 0 | 0 |
| IFCA | 1 | 0 | 0 | 0 |
| LDS | 4 | 0 | 0 | 0 |
| N | 2 | 0 | 0 | 0 |
| NACCC | 1 | 0 | 0 | 0 |
| NBCUS | 8 | 2 | 0 | 0 |
| OBSC | 1 | 0 | 0 | 0 |
| ORTH | 3 | 0 | 0 | 0 |
| PCA | 2 | 0 | 0 | 0 |
| PCG | 0 | 0 | 37 | 0 |
| PHC | 1 | 0 | 0 | 0 |
| PNBC | 7 | 0 | 0 | 0 |
| RCA | 7 | 0 | 6 | 0 |
| SDA | 12 | 1 | 32 | 0 |
| UCC | 10 | 0 | 0 | 0 |
| UM | 25 | 1 | 4 | 0 |
| J | 6 | 0 | 1 | 2 |
| ECCA | 2 | 0 | 42 | 5 |
| GAGB | 0 | 0 | 5 | 5 |

| | | | |
|---|---|---|---|
| EPC | 1 | 0 | 8 | 7 |
| CP | 2 | 0 | 15 | 20 |
| CME | 2 | 0 | 21 | 22 |
| LMS | 15 | 2 | 33 | 22 |
| PUSA | 43 | 0 | 57 | 31 |
| OP | 0 | 0 | 90 | 36 |
| CS | 1 | 0 | 75 | 38 |
| RC | 104 | 4 | 119 | 55 |
| ABC | 13 | 0 | 80 | 71 |
| SB | 38 | 2 | 124 | 91 |
| Total | 384 | 16 | 849 | 405 |
| Eighty Other Denominations | 0 | 0 | 0 | 0 |

\*  CARE (1) is the records LAR01010 to LAR01123
    CARE (2) is the records LAR01421 to LAR01951

**Appendix C**
**The Navy's "Ideal" mix of Denominations 1985-1993**

Denomination Inventory Mix acdu and "ideal"
on date closest to 4 May 1990

1. Start reconstruction/estimate with Work Sheets for the period.
2. Use the entry dated closest to May 4, 1990 to capture acdu and "ideal" on that date.
3. If there were no accession considerations for any given denomination in that period, look back at 1989 (and then forward to 1990+)
4. Check Chaplain History Volume X for active duty service surrounding the 1989-1991 period for inventory in the period.

| Reference | Denomination | Faith Group | 1990 acdu | 1990 "Ideal" | 1989 acdu | 1989 Ideal |
|---|---|---|---|---|---|---|
| 1993 | AACC | L-CATH | 1 | 0 | | |
| 1989 | ABA | NB-ABA | 2 | 0 | | |
| LAR01611 | ABC | NB-ABC | 28 | 13 | | |
| VOL X | ACC | NB-OTHER | 1 | 0 | | |
| LAR01593 | AG | N-AG | 22 | 18 | | |
| LAR01579 | AGC | N-AG | 7 | 9 | | |
| LAR01584 | AME | L-METH | 5 | 18 | | |
| VOL X | ARP | L-OTHER | 2 | 0 | | |
| VOL X | BBF | NB-OTHER | 2 | 0 | | |
| LAR01620 | BGC | NB-BGC | 5 | 1 | | |
| | BMA | NB-OTHER | 4 | 0 | | |
| 1986 | CB | N-CB | 2 | 6 | | |
| 1989 | CC | N-CC | 5 | 13 | | |
| 1989 | CCCC | N-CONG | 6 | 0 | | |
| LAR01611 | CFGC | N-CFGC | 15 | 18 | | |
| VOL X | CGAI | N-CG | 5 | 0 | | |
| LAR01619 | CGIC | N-CG | 10 | 31 | | |
| | CGCT | N-CG | 13 | 4 | | |
| VOL X | CGP | N-CG | 2 | 0 | | |
| 1989 | CHCCC | N-CC | 15 | 9 | | |

| Reference | Denomination | Faith Group | 1990 acdu | 1990 "Ideal" | 1989 acdu | 1989 Ideal |
|-----------|--------------|-------------|-----------|--------------|-----------|------------|
| LAR01619 | CMA | N-CMA | 6 | 2 | | |
| 1989 | CME | L-METH | 5 | 6 | | |
| 1991 | CP | L-PRESBY | 5 | 1 | | |
| 1995 | CR | L-OTHER | 6 | 0 | | |
| 1989 | CS | SW-CS | 3 | 0 | | |
| 1989 | DC | N-DC | 20 | 9 | | |
| LAR01610 | ECC | N-CONG | 2 | 0 | | |
| LAR01578 | EFCA | N-OTHER | 3 | 1 | | |
| LAR01600 | ELCA | L-LUTH | 55 | 44 | 63 | 98 |
| 1989 | EPIS | L-EPIS | 29 | 23 | | |
| LAR01593 | FGC | N-OTHER | 9 | 18 | | |
| VOL X | FMNA | L-METH | 2 | 0 | | |
| LAR01578 | GARB | NB-GARB | 1 | 1 | | |
| 1989 | GO | SW-ORTH | 9 | 16 | | |
| | ICCC | N-OTHER | 0 | 0 | | |
| LAR01610 | ICFSG | N-ICFCG | 1 | 2 | | |
| 1989 | IFCA | N-IFCA | 5 | 1 | | |
| LAR01610 | J | SW-J | 17 | 49 | | |
| LAR01610 | LBF | NB-LBF | 1 | 0 | | |
| LAR01611 | LDS | SW-LDS | 11 | 32 | | |
| LAR01610 | LMS | L-LUTH | 33 | 22 | 40 | 65 |
| VOL X | LUTH BRETH | L-LUTH | 0 | 0 | | |
| VOL X | MISS | N-MISS | 1 | 0 | | |
| VOL X | MORAVIAN | L-OTHER | 1 | 0 | | |
| VOL X | MUSLIM | SW-MUS | 0 | 0 | | |
| LAR01619 | N | L-NAZ | 5 | 4 | | |
| VOL X | NACCC | N-CONG | 2 | 0 | | |
| LAR01620 | NBC A | NB-NBC | 5 | 22 | 16 | 45 |
| LAR01579 | NBC U | NB-NBC | 19 | 46 | | |
| LAR01586 | NTAIBC | NB-OTHER | 0 | 0 | | |
| VOL X | OBSC | N-OTHER | 2 | 0 | | |
| LAR01610 | OCA | SW-ORTH | 9 | 24 | | |
| VOL X | OP | L-PRESBY | 5 | 0 | | |
| VOL X | PB | N-OTHER | 3 | 0 | | |

| Reference | Denomination | Faith Group | 1990 acdu | 1990 "Ideal" | 1989 acdu | 1989 Ideal |
|---|---|---|---|---|---|---|
| TableContinues | | | | | | |
| LAR01584 | PCA | L-PRESBY | 20 | 2 | | |
| VOL X | PHC | N-PENT | 3 | 0 | | |
| LAR01590 | PNBC | NB-NBC | 8 | 4 | | |
| LAR01586 | PNCC(!) | N-OTHER | 0 | 0 | | |
| LAR01610 | PUSA | L-PRESBY | 60 | 25 | | |
| LAR01605 | RC | C-RC | 271 | 285 | | |
| 1986 | RCA | NE-RCA | 3 | 6 | | |
| VOL X | RJ | SW-J | 1 | 0 | | |
| LAR01610 | SB | NB-SB | 160 | 122 | | |
| LAR01588 | SDA | SW-SDA | 16 | 6 | | |
| LAR01590 | UCC | L-UCC | 21 | 14 | | |
| LAR01596 | UM | L-METH | 113 | 77 | | |
| 1993 | UPC1 | N-PENT | 1 | 0 | | |
| LAR01619 | UU | SW-UU | 1 | 1 | | |
| LAR01598 | W | L-W | 5 | 1 | | |

Totals                                                  1110      1006

| LAR0161 | End Strength | FY 91 | 1110 |
|---|---|---|---|
| | | RC | 263 |
| | | Lit | 404 |
| | | Non-Lit | 383 |
| | | Jewish | 18 |
| | | Orthodox | 10 |
| | | SDA, LDS, CS | 32 |

| LAR0693 | End Strength | FY 93 | 1080 |
|---|---|---|---|
| | | RC | 242 |
| | | Lit | 365 |
| | | Non-Lit | 415 |
| | | Jewish | 16 |
| | | Orthodox | 13 |
| | | SDA, LDS, CS | 29 |

| SUBTOTALS | (from list above) | acdu | Ideal |
|---|---|---|---|
| | Roman Catholic | 271 | 285 |
| | Liturgical | 373 | 237 |
| | Non-Liturgical | 399 | 356 |
| | Special Worship | 67 | 128 |

| | Total | 1110 | 1006 |
|---|---|---|---|
| Percentages | (from list above) | acdu | Ideal |
| | Roman Catholic | 24.4% | 28.3% |
| | Liturgical | 33.6% | 23.6% |
| | Non-Liturgical | 35.9% | 35.4% |
| | Special Worship | 6.0% | 12.7% |

Note:  Whether the "ideal" was achieved or not, this indicates that:

(a) the numbers on the Work Sheets were more than simple acdu inventory, and

(b) the Community Manager was basing his faith group cluster quotas on a denomination by denomination calculation.

**Appendix DF**

CADRAG FOIA request received circuitously in October 2006; copy provided under separate cover.

**Appendix DB**

**Database Transcription of the CADRAG FOIA request**

| Denom | fgc | Select | Non-Select | Alternate | % Sel | % Rejected | Strict % |
|-------|-----|--------|-----------|-----------|-------|-----------|----------|
| AME | Lit | 1 | 1 | | 50% | 50% | 50.00% |
| ARP | Lit | 1 | | | 100% | 0% | 100.00% |
| BPC | Lit | 1 | | | 100% | 0% | 100.00% |
| CME | Lit | 1 | | | 100% | 0% | 100.00% |
| CN | Lit | 3 | | | 100% | 0% | 100.00% |
| CP | Lit | 1 | | | 100% | 0% | 100.00% |
| CR | Lit | 1 | | | 100% | 0% | 100.00% |
| ELCA | Lit | 13 | 1 | 1 | 93% | 7% | 86.67% |
| EPIS | Lit | 4 | | 2 | 100% | 0% | 66.67% |
| LMS | Lit | 7 | | 1 | 100% | 0% | 87.50% |
| OP | Lit | 1 | | | 100% | 0% | 100.00% |
| PCA | Lit | 3 | 1 | | 75% | 25% | 75.00% |
| PUSA | Lit | 12 | 3 | 3 | 80% | 17% | 66.67% |
| RCA | Lit | 1 | 1 | 1 | 50% | 33% | 33.33% |
| RPCNA | Lit | 1 | | | 100% | 0% | 100.00% |
| UCC | Lit | 3 | 1 | 1 | 75% | 20% | 60.00% |
| UM | Lit | 16 | 3 | 2 | 84% | 14% | 76.19% |
| W | Lit | 2 | | | 100% | 0% | 100.00% |
| | | 72 | 11 | 11 | 87% | 12% | 76.60% |
| ABC | NB | 3 | 1 | | 75% | 25% | 75.00% |
| BBF | NB | 1 | | | 100% | 0% | 100.00% |
| BGC | NB | 1 | 1 | | 50% | 50% | 50.00% |
| BMAA | NB | 0 | 1 | | 0% | 100% | 0.00% |
| NABC | NB | 0 | 1 | | 0% | 100% | 0.00% |
| NBC | NB | 2 | | 1 | 100% | 0% | 66.67% |
| NBCUS | NB | 1 | | | 100% | 0% | 100.00% |
| PNBC | NB | 2 | 1 | | 67% | 33% | 66.67% |
| SB | NB | 28 | 1 | 2 | 97% | 3% | 90.32% |
| | | 38 | 6 | 3 | 86% | 13% | 80.85% |

| Denom | fgc | Select | Non-Select | Alternate | % Sel | % Rej | Strict % |
|-------|-----|--------|------------|-----------|-------|-------|----------|
| AG | NN | 6 | 1 | | 86% | 14% | 85.71% |
| AGC | NN | 2 | 1 | 1 | 67% | 25% | 50.00% |
| CB | NN | 1 | | | 100% | 0% | 100.00% |
| CBC | NN | 1 | | | 100% | 0% | 100.00% |
| CC(DC) | NN | 2 | | 1 | 100% | 0% | 66.67% |
| CCCC | NN | 2 | 1 | | 67% | 33% | 66.67% |
| CCCU | NN | 0 | 1 | | 0% | 100% | 0.00% |
| CFGC | NN | 0 | 1 | | 0% | 100% | 0.00% |
| CGCT | NN | 6 | | 2 | 100% | 0% | 75.00% |
| CHCCC | NN | 2 | 2 | | 50% | 50% | 50.00% |
| CMA | NN | 1 | | | 100% | 0% | 100.00% |
| DC | NN | 2 | | | 100% | 0% | 100.00% |
| EFCA | NN | 2 | | | 100% | 0% | 100.00% |
| FGBC | NN | 2 | | | 100% | 0% | 100.00% |
| ICCC | NN | 1 | | | 100% | 0% | 100.00% |
| IFCA | NN | 4 | 1 | | 80% | 20% | 80.00% |
| NACCC | NN | 1 | | | 100% | 0% | 100.00% |
| PB | NN | 1 | | 1 | 100% | 0% | 50.00% |
| Subtotal | | 36 | 8 | 5 | 82% | 16% | 73.47% |
| fgc Total | | 74 | 14 | 8 | 0.8409 | 0.1458 | 0.7708 |
| RC | RC | 40 | | 3 | 100% | 0% | 93.02% |
| CS | SW | 1 | | | 100% | 0% | 100.00% |
| LDS | SW | 3 | | | 100% | 0% | 100.00% |
| ORTH | SW | 1 | | | 100% | 0% | 100.00% |
| SDA | SW | 4 | | | 100% | 0% | 100.00% |
| TOTAL | | 415 | 64 | 49 | 87% | 12% | 78.60% |

Changed
Recommendations

|  |  |  |  | Outcome |  |
|---|---|---|---|---|---|
| **From Alt to IRAD** | | (1 out of 23) | | | |
| Oct-88 | CF | GC | Non Select | Lyrice Marsh | RAD 9/89 | |
| **From Non Select to retain** | | (3 out of 28) | | | |
| May-90 | RC | Til 94 | Ronald Chiasson | RAD 10/90 | |
| Oct-88 | RC | Til age 60 | Lelslie Colaco | Japan 90-92 | Iceland 92-eof |
| Oct-90 | RC | … | Stanley Czarnota | Maine 90-93 | Great Lakes 93-eof |
| **From Did not request Continuance to Stayed** | | (1 out of 6) | | | |
| May-90 | J | Did not Request - Granted RAD | Jon Cutler | RAD 7/92 | (Okinawa) |

**Appendix E**
**Development of Accession Plans**

Military manpower planning begins with the "top" announcing to the "bottom" that it is about time to report collective needs.

The President's office informs the Secretary of Defense that the budget is to be submitted to Congress on such and so a date.

The Secretary of Defense passes the information on to the Civilian leaders of the Services (e.g. the Secretary of the Navy.)

The Service Secretaries pass the schedule to the Service Departments (providing references to: (a) current overall change guidance and (b) last year's FYDP [Five Year Defense Plan].)

The Chief of Naval Operations (e.g.) alerts the Branches, Divisions,  "communities", that the cycle is underway.

The communities (e.g. the Chaplain Corps) begin with last year's approved plan[26].  They examine the implications of approved program changes (what drives requirements?)   This informs the Corps of how many additional, or fewer, chaplains they will require.  Then they examine the current inventory to estimate continuance and losses.

The Chaplain Corps keeps a larger proportion of its current cadre than does the average Navy Community.[27]

In the Chaplain Corps, some losses:

•     are involuntary, but identifiable (e.g. statutory retirements)
•     are involuntary and estimable (accidents, transfers, resignations, voluntary retirements)
•     are discretionary (e.g. SER and Involuntary Retirement or not imposed on Officers who
        have been passed over for promotion twice [See LAR0524]), and
•     some are statutorily driven (but can be waived with SecNav approval), e.g. retirement at
        age 60 (or 62, or 68).

_____

[26] Typically the FYDP (the five year defense plan) is simply rolled forward by using last year's plan as a basis and adjusting this year with "pluses and minuses".  The last time, that I know of, that the FYDP was looked at *de novo*, was when President Carter introduced "zero based budgeting" in 1976.

[27] "The Chaplain Corps has the highest retention rate in the Navy (92%) and the highest continuation rate at the 6 to 11 year mark (67%) – 25% higher than the entire Navy."  All Navy continuation at this point was 42%. [See LAR00524.]

The Chaplain Corps community manager reviews the then current Active Duty List. This is no more burdensome a task that when a small university Registrars Office reviews the current list of students to anticipate graduation rates and allowances for the incoming class. There are fewer than 1000 records to review and they could be clustered by "year group".

However, in planning accessions, the Chaplain Corps community manager does not review the current Active Duty List by year group and rank based on career progression, he looks for losses from the Active Duty List by Faith Group Cluster.   (Career progression is planned collaterally.)

Losses are counted[28] by faith group cluster.

Every community manger estimates current accession requirements as:

> Losses are tallied by Faith Group Category.
> ☞   The Navy manages Inventory by Faith Group Category.

Gains = OPA - (BS ADL) - Losses.

Where:          Gains is the number of new acquisitions which the Community Manager will recommend "up" the chain of command.

OPA is the Officer Programmed Authorization (the number of billets which will be funded on 30 September in the new fiscal year);

BS ADL is the Begin Strength on the Active Duty List for this fiscal year, and

Losses is the forecast or projected total loss anticipated for the coming fiscal year.

The Chaplain Corps community manager does his calculations in faith group cluster terms and recommends a total number of acquisitions back up the chain of command, presenting faith group cluster breakdown to the Chief of Chaplains[29], who then submits the total (without faith group cluster detail) to the Chief of Naval Operations, who then combines all the community requirements and provides total manpower requirements estimates to the Secretary of the Navy, and then to the Secretary of Defense. [When I worked for the Secretary of Defense/Systems Analysis/Manpower I reviewed these submissions and made recommendations up my "chain of command" on how to allocate or reallocate or count or estimate losses so as to minimize cost and maximize management flexibility.]

---

[28]  The accession planning documents which have been produced show counts for anticipated losses;  DEFA00301 and DEFA00302 show actual tallies (tick marks in blocks of 5), by faith group cluster for FY 93 and FY 94.

[29]  See LAR0211.

Following internal Department of Defense review, the budget is submitted to the President (where it is reviewed by the Office of Management and Budget - it may be changed, or questioned there) and then it is submitted to the Congress - where it may be further changed, by percentages or specific increments.

After passage by the Congress and signature by the President, the authorizations are provided to the Secretary of Defense, who informs the Services: (a) what their authorizations are and (b) what their flexibilities are (or are not.)  The Service Secretaries dis -aggregate the guidance they have been given and the Chief of Naval Operations (e.g.), and then the Chiefs of the branches are informed of their authorized end strength.  When the authorization returns to the Chief of Chaplains it is not identified by faith group or denomination.  Those dimensions are reintroduced when the guidance passes back down his chain of command to the community manager.

The guidance or "end strength" that comes back down to the community manager is not necessarily the same figure as was sent up.  The community manager makes adjustments to the plan he originally submitted, to keep his/her totals in line with what was approved.

The Chaplain Corps community manager then drafts memoranda for the Chief of Chaplains to sign and send to the "Commander Navy Recruiting Command" concerning how many chaplain candidates to recruit, "with denomination/gender requirements as follows:" [See e.g. LAR0214.]

| e.g. | | |
|------|---------------------------|----|
| | Roman Catholic | 8 |
| | Liturgical Protestant | 12 |
| | Non-Liturgical Prot. | 8 |
| | Jewish | 1 |
| | Orthodox | 1 |
| | | |
| | Female | 4 |
| | Male | 26 |

The Chief of Chaplains thus "tasks" the Navy Recruiting Command to seek out a specified total number of candidates, (a) for direct addition to the ADL (Active Duty List) , (b) for entrance into the CCPO (Chaplain Candidate Program), and (c) for recruitment into the IRR (Individual Ready Reserve), but the totals are:

- subdivided by program
- subdivided by "denomination" and "gender"

and even

- subdivided by recruiting area
  "to enable CNRC
  (Commander, Naval
  Recruiting Command)
  to execute the tasking..."
  [See LAR0214.]

> The Chief of Chaplains orders replacements by "denomination and gender." [ See LAR0214.]

Leuba Declaration - the Siskin Conjecture, page 48

When the Chief of Chaplains orders six regional recruiters to collectively recruit, e.g. 66 Chaplains, one should not be surprised if each area thinks of its own goal as "11" [cf LAR01960-2047].

Similarly, if the requirement for the IRR is 12 Liturgicals, each Area will think of itself as "on the hook" for 2 candidates.  My point here is not: "which among these areas accepts responsibility for recruiting the 1 Orthodox?"   My point here is that the recruiters are told that there are quotas in effect.

Should we think the recruiters ignore this instruction when we use the distribution of denominations submitted to the C/A/R/E Board as the baseline distribution of those "available to serve"?   My own opinion here is that the "population available to serve" is the population which presented itself to the recruiters. What they pass along to the C/A/R/E group is already screened by the recruiters - based on the (quota) instructions they received from the Chief of Chaplains.

Not only does the C/A/R/E Advisory Group receive quotas as figures against which they monitor their collective recommendations, but the recruiters also receive quotas to guide them in their efforts.  This is a two stage, quota-based culling.

The Chaplain Corps community manager:

•      Uses faith group and denomination to count losses, and then
•      Uses faith group and denomination to establish accession goals
and then

•      Manipulates those goals so that the mix of denominations and faith groups which end up in the Chaplain Corps is specifically different than the mix of denominations and faith groups which presented themselves for Service.

   (1) The quotas are set, percentage wise, so that the percentages designated/allowed for Catholics and Liturgicals are in excess of the percentages of those available to serve who are Catholic and Liturgical (maximizing their likelihood of selection), while the quota percentage designated/allowed for Non-Liturgicals is well below the percentage of those available to serve who are Non-Liturgical (curtailing every Non-Liturgical's likelihood of Selection).[30]

   (2) The quotas change over time to increase Liturgical representation and decrease Non-Liturgical participation in the Corps.  Under normal "community" manpower planning,

---

[30]  If the applicant pool is 26.9% Liturgical, a quota set at 35% guarantees that <u>no</u> qualified candidate will be rejected; on the other hand, if the applicant pool is 44% Non-Liturgical, a quota set at 35% guarantees that 20% of the applicants will be rejected, simply by operation of the quota.

each year's manpower requirements are based on mission changes to a base line and replacements for those who leave Active Duty. But in the Chaplain Corps, there is a systematic, insidious drift in the planned accessions [see LAR0018 to LAR00023]:

| | Roman Catholic | | Liturgical | | Non-Liturgical | |
| FY | Number to Accession | Percent of End Strength | Number to Accession | Percent of End Strength | Number to Accession | Percent of End Strength |
|---|---|---|---|---|---|---|
| 91 | 22 | 23.7 | 20 | 36.4 | 17 | 34.5 |
| 92 | 19 | 23.8 | 17 | 36.3 | 13 | 34.1 |
| 93 | 18 | 23.7 | 13 | 36.5 | 13 | 34.0 |
| 94 | 20 | 24.1 | 17 | 36.4 | 13 | 33.6 |
| 95 | 18 | 23.2 | 14 | 36.8 | 13 | 33.8 |

This is not maintenance of the status quo; it is planned control of the denominational distribution of the chaplains on Active Duty[31] - to favor both Roman Catholics and Liturgicals in excess of their availability in the population of those offering themselves for Service, and to the detriment of Non-Liturgicals presenting themselves for service as Navy Chaplains.

The specific effect of the Chaplain Corps community manager's faith group cluster quotas, and their manipulation, has been to place an impediment in the path of Non-Liturgical candidates in particular with respect to service in the Chaplain Corps. The general effect of the quotas has been to facilitate within cluster denominational discrimination for both the Liturgical and the Non-Liturgical candidates.

Note that (a) even if these plans were not carried out, or could not be carried out because there were too few well qualified applicants, (b) it is still the case (1) that this is what the plans *were* and (2) that the Corps as a whole has been successful at "preferring" Catholics and Liturgicals and marginalizing Non-Liturgicals.

---

[31] The Chaplain Corps' input to the FYDP puts twice the pressure (quota) on Non-Liturgicals that it does on Roman Catholics. The average RC *gain* programmed for this period (1990 to 1997) is 147% of the losses; for Non-Liturgicals it is just 76% of the losses. This is a formula for increasing, and evidence of an intention to increase, or at least maintain the Roman Catholic "share" of the Corps and to reduce the Non-Liturgical "share".

## Appendix F
## "Promotion" is NOT Accurately Characterized in Navy Pleadings

F.1    Defendants (a) couch their data in terms of faith group clusters (which conceals within cluster discrimination) and (b) they ignore their own decisions to curtail the pool of candidates to be considered for promotion.

F.2    Plaintiffs have repeatedly drawn attention to Non-Liturgical candidates <u>missing</u> in the Navy's pattern of promotion data[32]:

From the CNA Study (Smith, et al 2000) Table 2:

|  | Number of Candidates | | |
|  | Considered | Promoted | to LCDR |
| Liturgical | 326 | 256 | |
| Non-Liurgical | 327 | 260 | |
| ratio | **.997** | **.985** | |

From the CNA Study (Smith, et al 2000) Table 3:

|  | Number of Candidates | | |
|  | Considered | Promoted | to CDR |
| Liturgical | 382 | 275 | |
| Non-Liurgical | 364 | 252 | |
| ratio | **1.05** | **1.09** | |

From the CNA Study (Smith, et al 2000) Table 5:

|  | Number of Candidates | | |
|  | Considered | Promoted | to CAPT |
| Liturgical | 298 | 176 | |
| Non-Liurgical | 242 | 129 | |
| ratio | | **1.23** | **1.36** |

F.3    At each step up the promotion ladder, the ratio of Liturgical to Non-Liturgical candidates being considered systematically increases, from parity at LCDR to 105% at CDR and 123% at CAPT - favoring the Liturgical Candidates. This pattern is statistically significant (p<.001).

---

[32] This data originates from the Navy. They provided it to the Center for Naval Analysis (CNA) and used it in an Exhibit, #28 (copy attached). Plaintiffs quote the data from the CNA study (Smith et al, 2000). Defendants point to the *percent selected* at the promotion board stage, but do not address changes in the likelihood of being *considered for promotion*. Plaintiffs point to (1) a statistically significant preference for Catholic selection at the CDR level and (2) the systematic loss of Non-Liturgical candidates at every increase in rank.

F.4     The *selection rates*, among those *considered*, based of faith group clusters, may seem on a par across ranks, if one looks only at the Promotion Board action, but the CADRAG[33] Board action is a precursor event; if one wishes to be *considered* for promotion with one's peers, it is first necessary that one be *allowed* to continue to serve on Active Duty.

F.5     Defendants have belittled Plaintiffs concern about chaplains missing from the pools of those considered for promotion.  They even disingenuously (since they had the CADRAG data) suggested in open court that "maybe they (the Non-Liturgicals) have family issues"[34].

F.6     In their pleadings, Defendants have brushed aside Plaintiffs' concerns about missing candidates, suggesting that because Plaintiffs did not explain (to the Navy's satisfaction) why or how the Non-Liturgicals were disappearing, that the issue was a red herring.[35]

F.7     Such brusque and dismissive representation may be "understood" in some quarters as merely over zealous advocacy (Peterson and Conley, 2001), but given what the Navy must know about its own system, the defense strategy here strikes me as deceptive.  The Navy knows where these missing Non-Liturgical candidates have gone.  A Freedom of Information Request has located them (see above.)  They are being systematically refused an opportunity to stay in the Corps.

F.8     It is well established in employment discrimination litigation that the whole pathway between putting ones name into the hat and being promoted is the proper domain to examine, and that focus on only one narrow step in the entire process is frequently (intentionally) misleading.

F.9     A defendant may not rebut allegations of discrimination in promotion by quoting statistics about who is promoted, while ignoring data about who is *considered* for promotion.

> The Navy pretends that flow points and facially neutral objective time in grade requirements determine eligibility for promotion consideration, but the Navy ignores (conceals, "forgets", fails to acknowledge or discuss) that prior to establishing the lists of who will and will not be "considered" for promotion, a selection panel convenes to decide who will and will not be allowed to stay on Active Duty.

---

[33] CADRAG is the acronym for the Chaplain Corps Active Duty Retention/Release Advisory Group - a board which considers whether or not to allow continuation on active duty of chaplains who wish to stay in service.

[34] I heard Mr. Hyde make this representation in Federal Court in San Diego on May 13, 2005.

[35] See page 21, in Defendants' 5/24/06 Memorandum in Opposition to Plaintiffs' Motion for Declaratory Judgment and/or Partial Summary Judgment and in Support of their Cross-Motion to dismiss or in the Alternative for Partial Summary Judgment.

F.10    The Navy's advocates look at Plaintiff summarized, Navy data:

**Table F.1**
**Denominational Density at Mileposts on the Path to Promotion**

| Denomination | Recruited | Commissioned | Considered for CDR | Promoted to CDR | Percent who rose to CDR (to date) |
|---|---|---|---|---|---|
| column: | (1) | (2) | (3) | (4) | (5) |
| Roman Catholic | 202 | 476 | 199 | 232 | 48.5 % |
| Lutheran Church Amer | 40 | 115 | 40 | 55 | 47.8 % |
| Southern Baptist | 109 | 293 | 132 | 127 | 43.3 % |
| Chaplaincy of Full Gospel Churches | 26 | 19 | 4 | 0 | 0.0 % |

Data Source: (1) Navy C/A/R/E Data 1986 to 2005; (2) & (4) Chaplain's History 1982 to 1991; (3)  Discovery - See Appendix D- CDRs 1988 to 2001 in Compendium (Leuba 2005); (5) = (4)/(2).  The data periods are not identical; but all the Chaplains are "similarly situated" cohorts and all ratios are commensurable.

and comment (a) that this in not a "promotion study" and then (b) feign wonderment at the number of chaplains (they) lost (Column 2-Column 3) for "consideration."

F.11    This is standard statistical information for employment discrimination.  The "feeder group" (column 1) is a central factor in determining "similarly situated" candidates for promotion.

F.12    The probability of "promotion" for these similarly situated candidates may be estimated as:

$$P_{Promotion},i = P_{CARE},i * P_{CADRAG},i * P_{Selection|Consideration},i$$

Where:

| | |
|---|---|
| i | is an index for a denomination under consideration |
| $P_{Promotion},i$ | is the probability that an applicant from denomination i will be promoted (eventually) |
| $P_{CARE},i$ | is the probability of C/A/R/E approval for denomination i |
| $P_{CADRAG},i$ | is the probability of CADRAG approval for denomination i. |
| $P_{Selection|Consideration},i$ | is the likelihood of Selection for Promotion for denomination i, if denomination i is considered for promotion. |

F.13    The Table below (on the next page) uses Navy Data to present results for a representative sample of denominations.  The "distinguishing factor" between (i) the denominations: Catholic,

Presbyterian Church USA, and Southern Baptist on the one hand and (ii) Presbyterian Church of America and Chaplaincy of Full Gospel Churches on the other hand, is that denominations in (i) are allowed to sit on the promotion and selection boards and denominations in (ii) are not.

**Table F.2**
**Denominational Disparity along the Pathway to Promotion**

| Denomination | $P_{CARE},i$ | $P_{CADRAG},i$ | $P_{Selection|Consideration},i$ | $P_{Promotion},i$ |
|---|---|---|---|---|
| Column | (1) | (2) | (3) | (4) |
| Roman Catholic | 94.0 % | 100 % | 54.6 % | 51.3 % |
| Presbyterian USA | 91.4 % | 80 % | 77.3 % | 56.5 % |
| Southern Baptist | 79.8 % | 97 % | 50.0 % | 38.7 % |
| Presbyterian America | 50.0 % | 75 % | 40.0 % | 15.0 % |
| Chaplaincy of Full Gospel Churches | 84.6 % | 0 % | 0.0 % | 0.0 % |

Data Sources: (1) C/A/R/E data base, CC-EF, CCPO program; (2) Table 2, Appendix D below; (3) Dr. Siskin's CDR Tables, his Declaration of May 2006; (4) = (1) * (2) * (3).

**Conclusion**

F.14    Clearly, denomination affects a Chaplain candidate's opportunities for and likelihood of promotion.

F.15    Not only does $P_{selection|Consideration},i$ vary with denomination -

even in Dr. Siskin's data for 1992 to 2002, when one removes the obfuscation and discrimination facilitation inherent in the faith group cluster system,

but the denominations also suffer differential continuation rates, CADRAG, as well as quota controlled Accession opportunities, CARE.

F.16    To represent that <u>Promotion decisions are not contaminated by denominational consideration</u> is a material distortion of the facts, and a willful disregard of data known to (or which should have been known to) the Navy's advocates:

(a) accession rates as measurable from the CCPO program in the data base the Navy prepared for their expert, Dr. Bernard Siskin,

Leuba Declaration - the Siskin Conjecture, page 54

(b) the differential continuation in service rates evident in the results of the Continuation in Service Board records the Navy produced in response to a FOIA request,

and

(c) the line-by-line, denomination by denomination promotion data the Navy provided to their expert, Dr. Bernard Siskin, as Appendix 3 for his May 2006 Declaration.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE: NAVY CHAPLAINCY | ) | Case No. 1: 07-mc-269 (RMU) |

## Do
## Denominational Representatives Acting as Government Decision Makers Make Denominationally Biased Choices When Awarding or Denying Benefits to Other Denominational Representatives?

### A Statistical Analysis and Declaration by Harald R. Leuba, PhD[1]

**Summary:**

1.    This analysis rebuts the general presumption of regularity

•      as applied to U.S. Navy Chaplains
•      when participating as panel members on U.S. Navy Chaplain Corps Selection Boards
•      making decisions for and about denominational candidates who appear before them.

2.    The analysis divides into three related issues:

3.    **First,** for every kind of selection-board-determined benefit: Accession, Supercession, Assignment to Active Duty, Continuance on Active Duty, In Zone Promotion, Above Zone Promotion, Below Zone Promotion, and Involuntary Retirement; wherever there is a sufficient body of data, that data show a statistically significant relationship between:

(a)    the likelihood of any particular religious denomination being appointed to a U.S. Navy Chaplain Corps selection board and

(b)    the likelihood of candidates from *that* denomination receiving benefits from those Chaplain Corps selection boards.

---

[1]  I am a U.S. Citizen living at 9555 Persimmon Tree Road, Potomac, Maryland 20854.  I am competent to testify on, and have personal knowledge of and involvement with the matters addressed and methods used in this declaration.  The conclusions I state here are statistically tested, scientifically certain, and independently arrived at. (My cv is attached, as Appendix Z.)

4.   **Second**, although the demonstration of a statistically significant relationship, between (a) board member religion and (b) the candidates who benefit, places a burden of explanation on the Defendants, the analysis here is careful to observe that if there is *intention* underlying this pattern of benefit allocation, that need not necessarily flow from conscious bias on the part of the selection-board members; their actions may be unwitting, or flow naturally from a common base.

    4.1.   Contemporary research in social psychology (*e.g.* Sacco, *et. al.,* 2003a) suggests that distortion at the selection board level may flow from affinity ["like, likes like"] (cf McCreary, 1992.)

    4.2.   Contemporary research is psychophysics ( Link, 1992) suggests that the seeds for the distortion may be sown when the Institution establishes an *a priori,* even an *a priori pro tem,* favorite set of denominations to be assigned to selection boards.

5.   This literature, and the data presented below, lead me to opine that if one wishes to assign intention, it rests properly on the authorities who make the decisions about which denominations to assign to the selection boards.

6.   **Third,** whatever the etiology or nexus for the demonstrated denominational bias in the allocation of benefits within the Chaplain Corps, the discussion closes with a logical analysis[2] that:

    6.1.   the presumption of regularity may be necessary for the orderly conduct of some government business, but it is still an assumption.  There may be a heavy burden of proof required to rebut it, but that proof is statistically certain here.

    6.2.   Chaplains are hired to be, and serve as, Denominational Representatives.  Although they may have duties as Naval Officers, they bring their denominational standing (and its interests and value system with them) to those duties.

    6.3.   When Chaplains are sitting on U.S. Navy Chaplain Corps selection boards, they are acting as decision makers, awarding or denying Government benefits to other Chaplains.

**My Conclusion:**

7.   The U.S. Government treads at its peril when it allows, permits, *requires* Chaplains to make suitability decisions about other Chaplains.  Such decisions will not be religiously neutral.

---

   [2]  If I inadvertently invade the Court's prerogative at this juncture, I do so without prejudice or usurporous intent.  Although hired as an Expert in this matter, my posture is more amicus than advocate.  My opinion is based on my experience in this field and my expert (statistical, logical, & psycho-logical) interpretation of the data and the phenomena underlying them, as described below.  To vet that expertise, I have appended my cv.

# PART I.

8.    For every kind of selection-board-determined benefit, the data show a statistically significant relationship between:

(a)    the likelihood of any particular religious denomination being appointed to a U.S. Navy Chaplain Corps selection board and

(b)    the likelihood of that denomination receiving benefits from those Chaplain Corps selection boards.

9.    Although he has denounced (renounced) his ownership, this formulation arises from a conjecture by Defendants' Expert, Dr. Siskin, thus I have called it "The Siskin Conjecture.[2]"

10.    While he may once again eschew responsibility, and may once more challenge this analysis as "post hoc", the following analysis, across <u>every</u> selection board venue where we have data, may well be "after the fact" (how else would one be able to analyze the results of the boards' decisions), but it is not *post hoc*, as that concept applies in statistical analysis.

11.    The fact that this pattern of results is a <u>pattern</u>

• across time and
• across all types of selection boards, and
• that it applies when new data are examined, and
• even applies when denominational patterns *change*,

demonstrates that it is neither a coincidence nor an artifact of data mining.

12.    The results are not an accident (see below) and the analysis is not *post hoc*.

## **Accession Decisions**

13.    Accession decisions are made along a path; one of the hurdles on this path is a selection panel.  That panel is the **Chaplain Accession and Recall Evaluation** Advisory Group, generally referred to as the C/A/R/E board.

14.    Membership on C/A/R/E is ex officio, from the Chief of Chaplains office.  Membership remains relatively stable over time, as the Chaplains assigned to the Chief's office fill their tours.

---

[2]  See page 5 of his December 21, 2005 Declaration in *Larsen* and page 3 of my Declaration of 1 December 2006.

15.    From 1999 to 2005, the format that the C/A/R/E board used to report the recommendations it made to the Chief of Chaplains about whom to allow into the Corps, and whom to refuse, began with a list of board members present at each meeting.

16.    The records show that of 998 members present at 209 meetings, 85% were Chaplains. This is clearly*: "chaplains making benefit decisions about other chaplains."*

17.    The C/A/R/E board participants during this six year period included 54 different individuals from 22 denominations[3]:

| Denomination | Faith Group Cluster (fgc) and Endorsing Group | Number of Chaplains | Number of Appearances | Subtotal No. of fgc. Appearances |
|---|---|---|---|---|
| EC | L-Episcopal | 1 | 29 | ↓ |
| EPC | L-Evangelical Presby | 1 | 8 | ↓ |
| CME | L-Christ Meth Episc | 1 | 21 | ↓ |
| UM | L-United Meth | 1 | 4 | ↓ |
| OP | L-Orthodox Presby | 1 | 90 | ↓ |
| CP | L-Cumberland Presby | 2 | 15 | ↓ |
| ELCA | L-Luth Church Amer | 5 | 24 | ↓ |
| LMS | L-Luth MO Synod | 3 | 33 | ↓ |
| PUSA | L-Presbyterian USA | 5 | 57 | 281 |
| CC(DC) | NB-Church of Christ | 1 | 2 | ↑ |
| CGCT | NB-Church of God | 3 | 43 | ↓ |
| ECCA | NB-Evan Covenant | 2 | 42 | ↓ |
| PCG | NB-Pentecostal | 1 | 37 | ↓ |
| RCA | NE-Reformed Chc Am | 2 | 6 | ↓ |
| ABC | NL -Amer Bapt Conv | 4 | 80 | ↓ |
| BGC | NL -Bapt Gen Conf | 1 | 1 | ↓ |
| GAGB | NL -Bapt, Gen Assy | 1 | 5 | ↓ |
| SB | NL -Bapt, Southern | 6 | 124 | 340 |
| RC | Roman Catholic | 10 | 119 | 119 |
| CS | SW- Christian Science | 1 | 75 | ↑ |
| J | SW-Jewish | 1 | 1 | ↓ |
| SDA | SW-Seventh Day Adv | 1 | 32 | 108 |

     **\*** The data in this table are drawn from Database CC-EF provided in *Larson*.

18.    As we shall see when looking at Early Retirement Boards and Promotion Boards, and presumably Continuation Boards, this pattern of denominational representation on C/A/R/E

---

[3] The codes, e.g., RC for Roman Catholic, are assigned by the Chaplain Corps and have been provided in Kagle, 2006.  I use L as the abbreviation for the Navy's Liturgical faith group cluster, NL for non-Liturgical, with NL-Bapt for Baptists, NB for non-Baptists, and NE for errors in assignment to non-Liturgical. SW = Special Worship Group.

Boards, drawn as it is from duty stations, is not like the denominational participation patterns that the Navy *constructed* in those other venues to "represent the faith group clusters" (Hyde 2006.) These differences are statistically significant; binomial z > 3; p < .001.

19.    For C/A/R/E Boards (between 1999 and 2005)

    Non-Liturgical board members outnumbered Liturgical members (340 > 281.)
    Roman Catholic "faith group cluster" was not on every Board.  (Only 57% of them.)

20.    Furthermore, the overall denominational pressures in the 2000-2005 period were not "like" the pressures which the Navy exercised prior to the commencement of this series of law suits.

21.    About the same time as the current series of lawsuits began, CY 2000,

    •    The number of candidates for accession into the Chaplain Corps dropped.

    •    The Navy abandoned (or so it says) its use of quotas for accession planning.

and

    •    The Navy started to increase the denominational diversity of the Corps - including elevating a Special Worship Chaplain to Chief of Chaplains.

22.    For Promotion Boards (1977-1999) (See Appendix B.)

    Non-Liturgical board members were outnumbered by Liturgical members. (85 < 148)
    Roman Catholic "faith group cluster" was on every Board.  (100% )

23.    From a data analysis point of view, these differences provide an opportunity to test if it is the mix of denominations on a given set of boards which influences board outcomes, or if it is the general preference for some denominations as board members which plays out in the board decisions.  (The evidence suggests it is both – see especially Appendix E.)

24.    Among the variety of decisions delegated to the C/A/R/E board, the only decision dealing unambiguously with net <u>accessions</u> is the Student Program, sometimes referred to as CCPO. This section of this declaration will deal with the CCPO program.  The other C/A/R/E programs will be discussed following the discussion of the CCPO program.

25.    In CCPO, seminary students apply for admission into the Inactive Reserve in exchange for unspecified support during their graduate studies and the prospect of a Commission offer upon graduation.  As with the NROTC, this is a Commission they are duty bound to accept if it is offered.

26.    During the period of time covered by these records (January 20, 1999 to September 13, 2005) there were 334 Candidates whose applications came before the C/A/R/E board.   If the board's decision was dispositive (*i.e.*, not a deferral) I tallied only the first decision.  If the only decision in the record was a deferral (which happened once), I counted that as a denial, for it had the effect of not being a recommendation for accession.[4]

27.    Here is what the accession data show with respect to The Siskin Conjecture, *i.e.,* a correspondence between:

  (a) the probability of a denomination being on a C/A/R/E board and
  (b) that denomination's likelihood of success before the C/A/R/E board.

| (a) Relative probability of being on a C/A/R/E Board | Denomination | Number of Candidates | Number Recommended | (b) Moving Ave Percent |
|---|---|---|---|---|
| Tier II | CME | 0 | | ↓ |
| Tier II | EPC | 0 | | ↓ |
| Tier II | ECCA | 0 | | ↓ |
| Tier II | RCA | 0 | | ↓ |
| Tier II | GAGB | 0 | | ↓ |
| Tier II | CS | 0 | | ↓ |
| Tier II | OP | 1 | | ↓ |
| Tier II | CP | 1 | 1 | ↓ |
| Tier II | CC(DC) | 1 | 1 | ↓ |
| Tier II | ABC | 1 | 1 | ↓ |
| Tier II | PCG | 2 | 2 | ↓ |
| Tier II | BGC | 2 | 1 | 75% |
| Tier II | CGCT | 5 | 4 | ↑ |
| Tier II | EC | 5 | 4 | 80% |
| Tier I | SDA | 9 | 9 | ↑ |
| Tier I | ELCA | 9 | 9 | ↓ |
| Tier I | PUSA | 10 | 10 | ↓ |
| Tier I | LMS | 13 | 13 | ↓ |
| Tier I | UM | 15 | 10 | ↓ |
| Tier I | J | 21 | 19 | ↓ |
| Tier I | SB | 40 | 32 | ↓ |
| Tier I | RC | 52 | 51 | 91% |
| | Subtotal | 187 | 167 | 89% |
| Tier III | Other | 147 | 127 | 86% |

These data support Table A1 in Appendix A.  There "CME to EC" refers to the denominations here in the low frequency of occurrence group; "SDA to RC" refers to the more frequently appearing denominations.

---

  [4] This data tabulating detail (together with a change in time period covered) may account for small differences between the tallies here and those in my Withdrawal Declaration, Leuba 2006b.

07-mc-269 (RMU)
EXHIBIT 16

28.    Overall the percentages here are consistent with the hypothesis.  The moving average increases as the likelihood of being on the board increases; the success rate for the denominations which were on the C/A/R/E board is higher than the success rate for the denominations which were not on the C/A/R/E board (this is the group in the bottom line of the table identified as "Other".)

29.    Beyond the relationships which can be *observed*, if one compares the likelihood of success for the eight denominations which were most likely to be on the C/A/R/E board (the cohort from SDA to RC) to all the other denominations, the result falls just short of statistical significance for a one tailed test.[5]  This does not mean that The Siskin Conjecture is false; it only means that it is unproven, *so far*.  All the statistical test results will be collected together in a Table on pp 16 to 18, below.

30.    If one looks at the denominations which are "favorite" within the Chaplain Corps for staffing promotion boards (see Appendix B), as opposed to those which were used for C/A/R/E boards, one finds (see also Appendix A, Table A2):

| Popular Denominations vs | Candidates | Candidates | Percent |
|---|---|---|---|
| RC | 52 | 1 | 98% |
| SB, PUSA, ELCA, UM | 74 | 13 | 82% |
| LMS, SDA, J | 41 | 2 | 95% |
| Subtotal | 167 | 16 | 91% |
| Other | 124 | 22 | 82% |

31.    The "split" between [LMS, SDA, and J] on the one hand, popular on C/A/R/E boards and [SB, PUSA, ELCA, and UM] on the other, popular on promotion boards, sheds a small light on the question of a change in "favorite denominations", between (a) when the Corps is constructing a so-called "balanced" board for promotions, versus (b) the denominations which were de facto most common on this ex officio board (LMS, SDA and J).  In both cases the "favorite denominations" do well, but the *unusual* favorites (LMS, SDA and J) in the C/A/R/E setting did even better in the C/A/R/E setting.  This difference is statistically significant at the level of 2 standard deviations, binomial z =2.1.

32.    Again, all these statistical test results will be collected together in a Table on pp 16 to 18, below.

---

[5]  One may use a one-tailed test because the hypothesis is directional; although the significance level is just at the .05 level here, one may gain confidence in the overall hypothesis as the data accumulates across board venues.

33.    If we repeat *this* denominational comparison for the period 1988-1999 (when the records do not tell us who was on the C/A/R/E board) here is what we find:

- The denominations which were popular on the C/A/R/E board in the 1995-2000 period (which may not be the same denominations that were ex officio C/A/R/E board members in 1986-1995) fared better,
        89.3% recommendation rates in front of those boards, than did
- the denominations that were never allowed to sit on a C/A/R/E board in 1995-2000
        74.2% recommendation rates.  (See Table A4 in Appendix A.)

34.    These two selection rates are statistically significantly different, binomial z = 4.

35.    Also, as a test of The Siskin Conjecture, the denominations which are the favorites for promotion boards did in the C/A/R/E venue as well:

- 97.2% recommendation rate for Roman Catholics,
- 82.0% recommendation rate for PUSA, SB, ELCA, and UM, and
- 78.0% recommendation rate for everybody else.  (See Table A5 in Appendix A.)

36.    These differences too are statistically significant at the level of four standard deviations.

37.    Finally, if we test the "Like, Likes, Like" hypotheses in this data, where we know the boards' denominations, (see Table A3 in Appendix A) we find:

| | |
|---|---|
| No chance for a match | 83.6% Recommended |
| Denom on Bd, no Match | 85.2% Recommended |
| Denom on Bd. Had a Match | 90.0% Recommended |

38.    This result is clearly in the direction of support for the Like, Likes, Like hypothesis, but as a stand alone result it falls short of statistically significant; z = 1.3.

39.    I will summarize all these results at the end of Part I, and draw conclusions.

## Additions to the ADL List

40.    Still within the C/A/R/E boards, turning attention to the other major focus of that group's charter: additions to the Active Duty List, through direct accession, D-4105A.

41.    Appendix A, again, provides the summary tables for these decisions.  Tables A6, A7, and A8 summarize the data for the period of time (1999-2005) when we know the denominations which sat on the C/A/R/E board, and Tables A9, A10, and A11 focus on the records before then (1986-1999.)

42.    When we know which denominations sat on the C/A/R/E board, and we sort the candidates before those boards on the basis of whether or not their denomination was favored enough to serve on a C/A/R/E board (see Table A6, Appendix A),we find:

> Popular denominations on C/A/R/E boards      85.3%  recommended
> Occasional presence on C/A/R/E boards        84.6%  recommended
> Never on C/A/R/E board                       76.9%  recommended

43.    This pattern of results is consistent with The Siskin Conjecture as applied to C/A/R/E boards, and it does just reach the 5%  level for one-tailed statistical significance. (z = 1.7)

44.    When we backcast these same denominations to the 1986 to 1999 period (see Table A9 in Appendix A), we find:

> 1999-2005 Popular denominations on C/A/R/E boards      78.8%  recommended
> Denominations occasionally on C/A/R/E boards 99-05     83.3%  recommended
> Denominations never on C/A/R/E boards 99-05            56.0%  recommended

which is consistent with The Siskin Conjecture, even though we are not sure that these denominations were also the C/A/R/E board's favorite members in 1986-1999.  This pattern of results is statistically significant, beyond the .001 level; z = 6.4)

45.    If we look at the 1986-1999 C/A/R/E board results in terms of the Chaplain Corps favorite denominations for promotion boards (see Table A10 in Appendix A), we find, again, that the patterns are consistent with The Siskin Conjecture:

•      93.3% recommendation rate for Roman Catholics,
•      69.2% recommendation rate for PUSA, SB, ELCA, and UM, and
•      63.6% recommendation rate for everybody else.  (See Table A10 in Appendix A.)

46.    This pattern of results is consistent with The Siskin Conjecture as applied to C/A/R/E boards, and it reaches beyond the .1%  level statistical significance. (z = 9.6)

47.    And, if we look at the occasions when there was an exact match between a candidate before the C/A/R/E board and some member of the board, we find, for D-410A recommendations to active duty (see Table A8 in Appendix A):

•      87.9% recommendation rate when there was a match
•      84.7% recommendation rate when the candidate matched a denomination which sat on some C/A/R/E boards (but not this particular one), and
•      79.0% recommendation rate when the candidate's denomination was never on a C/A/R/E board.

48.    Both The Siskin Conjecture and the McCreary "Like, Likes,Like" affinity hypothesis are supported by these data, although in this particular table the sample sizes do not support a determination that the difference in selection rates is statistically significant - as a stand alone calculation.

49.    However, if we apply an analysis of variance to these data, across the C/A/R/E programs, for the period of time where we know the denominations which sat on the board, the results do reach statistical significance. (See Tables A.11 to A.15 in Appendix A.)

50.    The level of significance corresponds to two standard deviations, and the differences in the means suggests that (a) being one of the denominations which *could* have a match [The Siskin Conjecture] is worth about a 5% advantage in terms of the likelihood of being selected, and actually having such a match [Like, Likes, Like] is worth another 5% - thus supporting both The Siskin Conjecture and the "Like, Likes, Like" hypothesis.


## Continuance on Active Duty Decisions

51.    The Defendants have been less than forthcoming with information about the existence of the CADRAG[6] boards, and have not produced anything like a full record of results, but (a) there were a few "continuation in service" records available from the C/A/R/E board, and (b) the Navy did provide some CADRAG records in a FOIA response to Mr. Jones (see Appendix X.)

52.    The CADRAG board is a selection panel, staffed by Chaplains, passing judgment on other Chaplains who have completed periods of obligated service and seek a continuance on Active Duty.

53.    Because of a congruence (if not a coincidence) between obligation periods and flow points, the CADRAG board winnows the Active Duty lists prior to the selection point for CDR. I have noticed disparate losses across the Navy's faith group clusters at this point and expressed a statistician's concern that the pool of eligibles for consideration for promotion exhibited denominational pruning (Leuba, 2000).

54.    Much as the earth's shape (round) can be seen from earth during an eclipse of the moon, the systematic decline in non-Liturgical candidates for consideration for promotion told us that losses were taking place.  With the CADRAG data in hand, limited though it may be, we can now measure the losses directly, and test The Siskin Conjecture at the same time.

---

[6] CADRAG is the acronym for Chaplains Active Duty Review Advisory Group.

55.    The Navy has not provided information about the denominations of the Chaplains who sat on the CADRAG boards; the following table is based on the assumption that the Navy's favorite denominations for CADRAG seating are the same as the Navy's favorite denominations for promotion boards.

•      Tier I = Roman Catholic;

•      Tier II = Presbyterian Church USA, Southern Baptist; United Methodist and Lutheran Church of America;

•      Tier III = denominations sometimes appointed to promotion boards, at least more often than just once or twice, and

•      Tier IV is all the other denominations.  (See also Appendix B and D.)

**Table X1** (from Appendix X)
Probability of Selection for Continuation in Service
Candidate Denominations Tiered

| Faith Cluster | Number Considered | Number Selected | Number Rejected | Percent Continued | Percent Rejected |
|---|---|---|---|---|---|
| Tier I | 46 | 43 | 0 | 100% | 0% |
| Tier II | 85 | 69 | 8 | 90.6% | 9.4% |
| Tier III | 38 | 29 | 4 | 87.9% | 10.5% |
| Tier IV | 77 | 57 | 14 | 80.2% | 18.2% |
| Total | 246 | 198 | 26 | 88.6% | 10.3% |

* Number Considered includes selected + rejected + alternates.

56.    This pattern of results is statistically significant at the level of 4 standard deviations, confirming The Siskin Conjecture.  No matter which denominations were actually on these CADRAG boards, the denomination which the Navy was most likely to assign to selection boards (Roman Catholic) fared best in front of the CADRAG boards, and the denominations the Navy used sparingly or not at all (Tier IV), fared worst.

## **Promotion**

57.    As the name suggests, Promotion Boards allocate promotions.  Panels consisting of six chaplains (prior to 1986/87), or five chaplains and a line officer or two (1987-2003), or just two

chaplains and three line officers (currently), review the records of candidates determined (by seniority) to be eligible for promotion, and vote to select a specified number of them for promotion. (See Appendix B and V.)

58.    Appendix D provides the data necessary to test The Siskin Conjecture.

58.1.    Overall, the data pattern is consistent with the Conjecture, reaching statistical significance for promotion to CDR, but perhaps more convincing is the picture of what happens to chaplains from the Siskin Tiers as their careers unfold.  ⇓

59.    Results of statistical tests applied to the data in Appendix D are included in the summary table, below, on page 16 ff.



60.    Appendix G provides the data necessary to test the McCreary "Like, Likes, Like" affinity theory in selection boards dealing with promotion.

60.1.    Again, as with the data in Appendix D, for The Siskin Conjecture,

• when the data is classified (see Appendix H) so that one can test the McCreary "Like, Likes, Like" affinity hypothesis,

• the data pattern is consistent with the theory, reaching statistical significance for promotion to CDR,

• but perhaps even more convincing is the correlation between a candidate's similarity to the mix of denominations on the board and the candidate's likelihood of promotion. See Figure 2 (on the next page.)

**Figure 2.  Similarity to Board**
**vs**
**Probability of Selection for Promotion to Commander**



61.  Results of statistical tests applied to the data in Appendix G are included in the summary table, below, on page 16 ff.

## Involuntary Retirement  (SER)

62.   SER (Selective Early Retirement) boards are convened in periods of downsizing, or when the promotion opportunities within the eligible population thin because there are too many Chaplains on Active Duty at those ranks.

63.   SER boards were used in 1991 to 1998 to thin the ranks of Commander and Captain in the U.S. Navy Chaplain Corps.

64.   Admirals were used to staff the SER boards from 1991 to 1998 for Captains and to staff the boards from 1991 to 1994 for Commanders.  The 1995-1998 CDR SER boards were staffed with Chaplains.

65.   Because they judged some of the same candidates, one can compare how consistent the Chaplains were as panel members vs how consistent the Admirals were.  The data suggest (see my July 2005 Supplemental SER Declaration, p 3-5) that although they were given the same instructions, the Chaplains made decisions which were inconsistent with the instructions they were given and also inconsistent with the decisions made by the Admirals.

66.    The Chaplains seem to have introduced denomination into their deliberations.  I wrote:

"Chaplains were 'harder' on Liturgicals than they were on Baptists and Non-Liturgicals. The difference with respect to Non-Liturgicals in general is significant at the .10 level; the difference between the rate for Baptists in particular and the rate for Liturgicals in particular is statistically significant at the .05 level."

67.    The general fact that Chaplains were 'harder' on Liturgicals than non-Liturgicals, and harder on the Liturgicals than the Admirals were, is predicted by The Siskin Conjecture in the context of these four boards, because in these four boards, non-Liturgical chaplains had a larger share of the seats than is customary in Chaplains Corps selection boards in general, and on the average they, the non-Liturgicals, had better outcomes than the Liturgicals; (cf Appendix E.)

68.    But beyond this, Chaplains were statistically significantly (nearly five standard deviations) 'easier' on members of their own denomination than on members of "other" denominations. (See Appendix Y.)

## Results

69.    Tables on the following three pages summarize the results of the statistical analyses here.

70.    Appendix A provided data counts for C/A/R/E board decisions dealing with pure accessions (the Student Seminary Program) and for direct accessions/cum assignment to Active Duty.

71.    Appendix A looked at The Siskin Conjecture, "Like, Likes, Like", and the general possibility that Catholics are the Navy's favorite denomination.

72.    Appendix D provided data counts for promotion boards, for testing The Siskin Conjecture, divided into two perspectives: In Zone selections made by promotion boards, and overall Corps action (including the effect of the CADRAG decisions and Above Zone and Below Zone promotions) as reflected in the Chaplains' Biographical History data.

73.    Appendix G provided data counts for promotion boards, In Zone and Above Zone, for testing the McCreary "Like, Likes, Like" affinity theory, as well as a perspective on what happens when the administration of the Corps shifts from Liturgical to non-Liturgical.  (See also Appendices E, J and P.)

74.    Appendix X provided data counts for the CADRAG records which are available.  These data are used to test The Siskin Conjecture.

75.    Appendix Y provided data counts and analysis for testing the McCreary "Like, Likes, Like" affinity theory in the context of SER.

76.    **Summary of Results**

Testing every available hypothesis with all the available data

Col (1) is the Analysis Table in Appendix A, D, G, or X.

Col (2) is the Hypothesis being tested: TSC = The Siskin Conjecture; RC = Roman Catholic Preference; LLL = Like, Likes, Like.

Col (3) is the likelihood of selection for the least favored group, those with no representation on any C/A/R/E board, or those who are not Roman Catholic, or those without a denominational match to some board member.

Col (4) is the likelihood of selection for the most favored group (those whose denomination was appointed to a C/A/R/E board, or those who are Roman Catholic, or those with a denominational match to some board member.

Col (5) is the z score, the number of standard deviations by which the two proportions differ from each other, computed with the binomial test of two proportions (cf Siskin 1980).

Col (6) notes which z scores cross the threshold of statistical significance.

The second half of this column keeps a running count on the number of occasions when (a) the difference being tested crossed the level of statistical significance associated with two standard deviations (for a two tailed test), and (b) where that difference was in the direction of confirming the hypothesis, i.e., was "proof" that the null hypothesis was not credible. The hypothesis that there was no difference was rejected. The hypothesis that the selection rates are different is supported. If the Defendants believe that this is not evidence of religious discrimination, they need to identify a "business reason" for this outcome. The running tally here is an homage to Dr. Siskin's coin-tossing stranger. Let us keep track of how many times he is "wrong" in this data.

Col (7) notes whether the direction of the difference in selection rates is consistent with the hypothesis being tested, even if it is not statistically significant.

The second half of this column keeps a running count on the number of occasions when the difference being tested, whether statistically significant or not, is consistent with the predictions of the hypothesis . The running tally here is an homage to Dr. Siskin's coin-tossing stranger. Let us keep track of how many times he is "wrong" in this data. If the coin-tossing stranger flips his coin once, and it turns up heads, so what? This was just one toss. But if he reliably tosses more heads than tails ....

77.    **Summary of Results**
Testing every available hypothesis with all the available data

C/A/R/E Boards

| Table | Hypothesis Tested | Group A (disfavored) | Group B (favored) | z score (# of sd's) | Statistically Significant | | Consistent w/ Hypothesis | |
|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | | (7) | |
| A.1 | TSC | 85.5 | 90.5 | 1.4 | | | yes | 1 |
| A.2 | RC | 85.4 | 98.1 | 3.6 | yes | 1 | yes | 2 |
| Text p 7 | TSC change in favorites | 85.0 | 95.4 | 2.1 | yes | 2 | yes | 3 |
| A.3 | TSC | 82.4 | 98.1 | 0.7 | | | yes | 4 |
| A.3 | LLL | 84.4 | 90.0 | 1.3 | | | yes | 5 |
| A.4 | TSC | 74.2 | 88.8 | 4.1 | yes | 3 | yes | 6 |
| A.5 | TSC | 78.0 | 89.7 | 3.9 | yes | 4 | yes | 7 |
| A.5 | RC | 78.0 | 97.2 | 6.9 | yes | 5 | yes | 8 |
| A.6 | TSC | 76.9 | 85.3 | 1.7 | yes | 6 | yes | 9 |
| A.7 | TSC | 78.6 | 85.7 | 1.0 | | | yes | 10 |
| A.7 | RC | 78.6 | 85.4 | 1.4 | | | yes | 11 |
| A.8 | LLL | 81.2 | 87.9 | 1.2 | | | yes | 12 |
| A.9 | TSC | 56.0 | 79.3 | 6.4 | yes | 7 | yes | 13 |
| A.10 | TSC | 64.0 | 79.1 | 4.7 | yes | 8 | yes | 14 |
| A.10 | RC | 66.3 | 93.3 | 9.6 | yes | 9 | yes | 15 |
| A.15 | TSC | 81.4 | 88.7 | ANOVA | yes | 10 | yes | 16 |
|  | LLL | 81.4 | 88.7 | ANOVA | yes | 10 | yes | 16 |
| Appen-dix E | Change in leadership & denom mix | 74.2 | 100 | 3.7 | yes | 11 | yes | 17 |
| Appen-dix Y | LLL in SER | cusp | cusp -3 ranks | 4.2 | yes | 12 | yes | 18 |

78.    **Summary of Results** (continued)
<u>Promotion Boards</u> (See Appendix D.)

| Table | Hypothesis Tested | Group A (disfavored) | Group B (favored) | z score (# of sd's) | Statistically Significant | | Consistent w/ Hypothesis | |
|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | | (7) | |
| D1. | TSC CAPT's | 37.6 | 42.6 | 1.1 | | | yes | 19 |
| D1. | RC's are favored | 38.9 | 42.6 | 0.9 | | | yes | 20 |
| D2. | TSC CDR's | 56.8 | 65.3 | 2.1 | yes | 13 | yes | 21 |
| D2. | RC's are favored | 55.0 | 65.3 | 2.7 | yes | 14 | yes | 22 |
| D3. | TSC LCDR's | 47.8 | 47.6 | -0.1 | | | | |
| D3. | RC's are favored | 47.1 | 47.6 | 0.1 | | | | |
| D4. | TSC CAPT's | 44.5 | 55.6 | 2.2 | yes | 15 | yes | 23 |
| D4. | RC's are favored | 45.4 | 55.6 | 2.2 | yes | 16 | yes | 24 |
| D5. | TSC CDR's | 67.0 | 75.5 | 2.2 | yes | 17 | yes | 25 |
| D5. | RC's are favored | 63.6 | 75.5 | 3.3 | yes | 18 | yes | 26 |
| D6. | TSC LCDR's | 83.0 | 77.5 | -1.8 | yes | No | **no** | 1 |
| D6. | RC's are favored | 78.5 | 77.5 | -0.3 | | | no | 2 |
| X1. | TSC CADRAG | 80.2 | 100.0 | 4.2 | yes | 1 | yes | 1 |
| X2. | RC's are favored | 77.8 | 100 | 7.6 | yes | 2 | yes | 2 |

79.   **Summary of Results** (continued)
Promotion Boards (See Appendix G.)

| Table | Hypothesis Tested | Group A (disfavored) | Group B (favored) | z score (# of sd's) | Statistically Significant | | Consistent w/ Hypothesis | |
|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | | (7) | |
| G1 | LLL Capt IZ | 40.6 | 45.7 | 1.1 | | | yes | 3 |
| G1 | LLL Capt AZ | 4.7 | 5.9 | .8 | | | yes | 4 |
| G2 | LLL Capt IZ | 40.1 | 47.2 | 1.2 | | | yes | 5 |
| G2 | LLL Capt AZ | 5.8 | 10.2 | 1.3 | | | yes | 6 |
| G3 | LLL IZ CDR 81-02 | 51.6 | 61.8 | 2.7 | yes | 3 | yes | 7 |
| G3 | LLL AZ CDR 81-02 | 4.8 | 8.5 | 2.4 | yes | 4 | yes | 8 |
| G4 | LLL IZ CDR 91-02 | 48.5 | 53.4 | 1.0 | | | yes | 9 |
| G4 | LLL AZ CDR 91-02 | 5.9 | 9.8 | 2.1 | yes | 5 | yes | 10 |
| G5 | LLL IZ CDR 81-90 | 59.2 | 72.6 | 2.2 | yes | 6 | yes | 11 |
| G5 | LLL AZ CDR 81-90 | 3.9 | 7.7 | 2.1 | yes | 7 | yes | 12 |
| G6-G8 | LLL IZ LCDR 91-02 | 61.7 60.0 | 63.3 63.0 | .4 .7 | | | yes | 13 |
| G6-G8 | LLL AZ LCDR 91-02 | 18.3 19.1 | 12.3 12.6 | -1.6 -1.4 | | | no* | |

\* This may be an anomaly, or it may be a reversal which is *consistent* with a change in Chaplain Corps' faith group du jour - compare 1991-1999 to 2000-2005.  (See Appendix E.)

**Summary of Results**

80.     The statistical tests tabulated on the preceding three pages present an overwhelming confirmation for every hypothesis tested, across time periods, across selection board venues, across changes in Corps leadership, and even across variations in which denominations are the *pro tem* favorites.

81.     The Siskin Conjecture is confirmed:

81.1.     There is, overall, a statistically significant positive relationship between (a) the likelihood of a denomination's being assigned to a selection board, and (b) the probability that candidates from that denomination will benefit when they appear in front of such boards - independently of whether any particular board has both a candidate and a board member from the same denomination.

81.2.     Not every candidate from a favorite denomination is selected every time, but every candidate from a favorite denomination has a statistically significant "edge", an "inside track", whenever he or she is considered by a selection board which itself has a high probability of including that candidate's denomination.  The possibility that the candidate's denomination will be on the board (or has been on the board) somehow disposes the board to be sympathetic, understanding, favorably disposed toward, candidates from its (that board's) mainstream denominations.

82.     The McCreary "Like, Likes, Like" affinity hypothesis is confirmed:

82.1.     There is, overall, a statistically significant positive benefit accruing to any candidate who is fortunate enough to appear before any selection board which happens to have a member of the candidate's denomination sitting on the selection board.

82.2.     Not every candidate who appears in front of a board which has a member from the candidate's own denomination will be selected by that board, but every candidate fortunate enough to encounter a selection board which has a member from his or her denomination has a statistically significant "edge", an "inside track".  The occasion that the candidate's denomination is on the board somehow disposes that board to be sympathetic, understanding, favorably disposed toward, candidates from its (that board's) instant denominations.

83.     That Roman Catholics get preferential treatment is confirmed:

83.1.     There is, overall, a statistically significant positive benefit accruing to any candidate who is endorsed by the Roman Catholic Church.

83.2.    Not every Roman Catholic candidate who is considered by a selection board is selected by that board (even though that board generally has a Roman Catholic board member).  But regardless of the board type (accession, continuation, promotion) Roman Catholic candidates, as a denomination, fare far better than chance.  Catholics not only fare better than the average for *all other* denominations, they fare better than the average selection rate for *every other* denomination.

84.    Not every statistical test listed in these tables is statistically significant,

84.1.    but to show disparate impact, or that there is the possibility of discrimination, one does not have to show that it always occurs - only that it occurs so often that it rises to the level of statistical significance.

84.2    In order to demonstrate that systemic bias is occurring, one does not have to show that *every* process in the system is  biased, only that one step is contaminated.  No matter how many steps are in the path to success, a "glass ceiling" is still a ceiling.

84.3.    In order to establish that denomination matters, one does not have to provide evidence that each faith or denomination discriminates against every other faith or denomination, one only has to show that some denominations, are sometimes given the opportunity to show favoritism, and that on a statistically significant number of those occasions, that favoritism is expressed as a denial of government benefits to some denominations, or as a miss-appropriation of benefits to one's "friends".

85.    Not every statistical test listed in these tables is statistically significant, but virtually every result is consistent with the hypothesis tested.

85.1     Dr. Siskin called his coin-tossing stranger a "cheater" because the stranger flipped ten heads in a row.

85.2.    Here the Navy has flipped ten heads in a row - three times in a row.

85.3.    The table lists the results of 44 different statistical tests for three different hypotheses that "denomination matters", and the Table shows statistically significant support for one or more of those hypotheses on 25 occasions, and "moral support" on 39 occasions.

85.4.    There was only one test result which was statistically significant "in the opposite direction" of the hypothesis - and *that* case is not "the exception which proves the rule"; at this level of statistical significance, one should expect one to two tests to come out "the wrong way" in any run of 40+ tests.  But in this particular test, this may even be an instance which actually confirms the LLL hypothesis, because the denominational mix used for the LCDR boards changed in this period.

85.6.    ALL five of the non-confirmations, *i.e.,* all five of the tests where the data was inconsistent with the hypothesis that "denomination matters" occurred for promotions to LCDR, not one of the signal career markers for Chaplains, except that all the successful ones have to pass through this stage. [At LCDR, most of the drop outs prior to consideration are Roman Catholic, and most of the candidates, proportionately, who are promoted to what is in effect the work-a-day clergy, are non-Liturgical Protestants.]

86.    However, even supposing that the LCDR promotion decisions were inconsistent with all the hypotheses that "denomination matters", the conclusion which follows is that this is the *only* selection board decision which is NOT contaminated by confounding between the denominations on the board interacting with the candidates' denominations.

87.    All the other selection board decisions tested here, (a) Accessions, (b) Additions to the Active Duty List, (c) Continuation in Service Boards, (d) In Zone Promotions to CDR, (e) Above Zone Promotions to CDR, (f) In Zone Promotions to CAPT, (g) Above Zone Promotions to CAPT, and (h) Involuntary Retirement (when Chaplains are staffing the selection boards), are contaminated by the denomination of the Chaplain members of those board, and every statistical test is consistent with that hypothesis.

88.    <u>Recap- Paradigm</u>

### Board Type vs Voting Content

| Board Operations ⇩   Boards ⇒ | C/A/R/E Accession | C/A/R/E ADL List | Promotion | CADRAG | SER |
|---|---|---|---|---|---|
| Pre-determined number to select | No | Sometimes | Yes | Yes | Yes |
| Rank all candidates | No | Yes | Mixed | Yes | Yes |
| Could decisions be influenced by OER halo | No | Mixed | Yes | Yes | Yes |
| Majority Rule | Yes | Yes | Yes | Yes | Yes |
| Is Chief of Chaplains Board President | No | No | Frequently | No | Generally |
| Does Chief of Chaplains review board decisions | Yes | Yes | Yes | Yes | Yes |
| Can one vote select | No | No | Yes | Yes | Yes |
| Can one vote reject | ??? | ??? | Yes | Yes | Yes |

| | | | | | |
|---|---|---|---|---|---|
| Were Quotas part of the process at least < 2000 | Yes | Yes | ??? | ??? | No |
| Catholic Preference Implicit or Explicit | Explicit | Explicit | Implicit | Explicit | Implicit |

89.    Recap  Hypothesis Tests

**Board Type vs Hypotheses Tested**

| Board Operations ⇓    Boards ⇒ | C/A/R/E Accession | C/A/R/E ADL List | Promotion | CADRAG | SER |
|---|---|---|---|---|---|
| **Hypothesis Tests** | | | | | |
| Siskin Conjecture | yes | yes | yes | yes | yes |
| Like, Like, Like | yes | yes | yes | no data | yes |
| RC's get favored treatment | yes | yes | yes | yes | yes |
| Could Results show "Thirds Policy" at work | yes | yes | yes | yes | yes |

90.    Recap - Conclusions

**Board Type vs Hypothesis Verification**

| Board Operations ⇓    Boards ⇒ | C/A/R/E Accession | C/A/R/E ADL List | Promotion | CADRAG | SER |
|---|---|---|---|---|---|
| **Conclusions** | | | | | |
| Siskin Conjecture | yes | yes | yes | yes | hint |
| Like, Like, Like | consistent | consistent | yes | ??? | yes |
| RC's favored | yes | yes | CAPT & CDR | yes | Favored in Eligibility |

91.    The Siskin Conjecture is statistically significant in many data sets and consistent with the data in general.  It is even consistent with the SER data in that the denominations used on those boards were uncharacteristically "heavy" with non-Liturgical Chaplains and Dr. Siskin concluded that non-liturgical candidates fared better than Liturgicals , though not to a statistically significant degree.

92.    Like, Likes, Like is also statistically significant in many data sets, and consistent with virtually all the data - especially the SER data.

93.    That Roman Catholics get favored treatment is statistically significant in most data sets and virtually universally present whenever there is enough data to pose a careful test.

## In sum

94.    When Chaplains sit on personnel selection boards, judging other chaplains, virtually every kind of religious discrimination is present and statistically significant:

94.1    The denominations chosen to sit on the selection boards are a biased sample.  Most denominations do not have any chance at participation.  The denominations that are allowed to serve on selection boards do not all have an equal (to each other), nor even a proportional (to their density in the Corps), opportunity to participate.

94.2.    The Chaplains who sit on the selection boards, collectively:

94.2.1.    have a tendency to vote for "the school solution", *i.e.,* candidates from the same denominations that the Navy assigns to the selection boards. [The Siskin Conjecture.]

94.2.2.    have a tendency to vote for candidates "like" themselves, *i.e.,* candidates from the same denomination as a board member, [Like, Likes, Like.]

and they

94.2.3.    have a tendency to bow to the Institutional view that there is a shortage of Catholic Chaplains - and review Catholic candidates more generously than they review non-Catholics. [Preference for Roman Catholics.]

95.    There is even some evidence of denomination-based animus in the Chaplains' decisions related to other Chaplains' worship practices, in particular those of the Chaplaincy of Full Gospel Churches; however, there are other disenfranchised or marginalized denominations, *e.g.* any "Catholic" other than a Roman Catholic; Presbyterian Church of America (as opposed to the Presbyterian Church of the USA); and perhaps even an anti-cyclic, anti *du jour* backlash against Methodists. [Could CDR Bouck, 1986, have predicted this fallout?]

**96      Every kind of religious discrimination and prejudice is evident in these records:**

- 96.1.    Individual chaplains have shown bias for or against other individuals and/or their denomination;

- 96.2.    Collective bias has been exhibited by panels composed of chaplains voting  for or against denominations congruent with or markedly different from the panels' own mix of denominations; and

- 96.3.    Institutional preference for Catholics has been expressed, signaled and implemented as: (a) exceptions and waivers for Catholics, (b) with emphasis on Catholic participation in selection boards, and (c) further reinforced with reduced accession and Active Duty quotas for non-Liturgicals, especially non-Baptist, non-Liturgicals.

To wit:

97.    <u>At the Individual Level:</u>

97.1.    Chaplains Bouck and Wilkins were selected out, *i.e.,* forced into involuntary retirement, largely, the data suggest, because they were reviewed by a SER Board on which they had no "friends", and may have had an "enemy".  The circumstances suggest that an "affront" which the Corps understood from Bouck's and Wilkins' separate challenges to religious favoritism was "paid back" by the board.  It *may* be that these two separations were in fact pseudo-objective judgments made by the board members collectively, but the statistical analysis here suggests that *some* of the decisions made by those boards were not based on the written record, but were, rather, influenced by exogenous factors.  If *some* of the decisions were bad, and if these two decisions are suspect on the face of the record, then in all probability, these two decisions (among others) were individually faulty.

97.2.    But whether one assumes that these two decisions were motivated by one board member's retaliation, or were the collective opinion of a posse of board members who had no particular reason to protect Bouck or Wilkins, and preferred to spend their political capital in that context on at-risk candidates from their own denominations, it is still true that these selections were not justified from or by the written record. (See Appendix Y and Leuba 2003b and 2005e.)

97.3.    On the positive side of the bias (at least positive from the beneficiary's point of view), a candidate fortunate enough to appear before a board on which there sits a member of his or her denomination may also be fortunate enough to gain an early promotion.  Such a promotion may be "deserved", but it happens at the expense of a level playing field.  (In order for one candidate to be promoted, another has to be passed over.)

97.3.1    In 1999 there was a rare event, a Christian Methodist Episcopal chaplain was assigned to a promotion board, her first opportunity to so serve, and as luck would have it, there was on the Below Zone list before that board, a CME candidate.  That candidate was selected for promotion by that board.  This coincidence does not "taint" the decision. Certainly the decision is not tainted by the mere "appearance of a conflict of interest"; the presumption of regularity (even though is does not hold) trumps the appearance of a conflict.  But, nonetheless, one may observe that in a record (see Appendix G) of nearly 500 CDR promotions, only 1 (this one) was from below zone.

98.    <u>At the collective level:</u>

98.1.    Each of the decisions noted above may have been collective action, but I do not allege collusion; I only acknowledge the possibility that perhaps one board member proposed the action and the remaining members, "not having a dog in this fight" went along with the decision.  (See also Zeroing in Appendix K.)

98.2.    However, the Reverend Judy Malana is certainly an example of denominational prejudice by the board as a whole; and if not her, <u>by name</u> (because the Chief of Chaplains intervened in her case) then six other known (non-Catholic[7]) Chaplains who sought an opportunity to serve on Active Duty following the completion of their seminary studies, and were deferred[8] by the C/A/R/E board, in the hope that the end strength could be filled out with a Catholic:  "... the one remaining FY98 quota must be for a Roman Catholic.  The need for Priests in FY98 exceeds all other categories.  There are 5 more Priests in the pipeline." (See LAR01407/8 and Appendix C here.)   Here the board as a whole (see LAR01408; "all votes were unanimous") made a decision based on their view of "the needs of the Service" - *we do not need another non-Liturgical[9]; we need another Catholic.*

98.3.    In a different venue (but still with a preference *for* Roman Catholics) Father Bertrand was retained by a the first SER board staffed with Chaplains, (the same SER board which forced Wilkins into involuntary retirement).  Father Bertrand was retained even though he had been passed over five times for consideration to Captain (which should measure what other boards thought of his potential) and even though (a) he was just a year away from mandatory retirement and (b) two or more  FOS (failure of

---

[7]   The records show that the C/A/R/E board deferred more than 78 candidates, but only six were, like Judy Malana, applying for supercession to Active Duty.  All six deferred candidates were evangelicals or charismatics.

[8]   See records LAR01509, 1901, 1929 and 1948.

[9]   Again, all six deferred candidates were evangelicals or charismatics.

selection)  "subjects one to involuntary retirement", Father Bertrand was a Catholic, and the board collectively agreed to keep him (and only him) from among the three candidates before them who had been FOS five times. [CDR Wilkins, who had a career potential of more than 8 years, might be understood as taking umbrage at this junction; he had never been passed over for promotion.]

99.    At the Institutional Level

99.1.    It is always possible that an individual chaplain will be singled out for his or her excellence and promoted below zone (CDR Muchow, later to rise to Chief of Chaplains, was promoted to Captain from below zone); and it is always possible that an individual chaplain will be blocked from accession (for example) because of drug abuse or alcohol addiction (See LAR01277), but in a system where

discrimination against an individual CAN be expressed without "discovery" or without accountability,

one must assume that some of the collective loss which has been suffered by many of the non-liturgical denominations (and a few liturgical denominations, *e.g.,* PCA and any non-Roman Catholic) fell within the class of actions "caused" by individual animus.

99.2.    It is likely that there are other instances which we could identify were we to have the particulars of individual grievances and board dynamics, but the point is not (to mix a metaphor) whether Cain hated Abel (or Holderby was "out to get" Wilkins"), the point is that the U.S. Navy chaplain Corps:

• 99.2.1.    tolerated (as in suffered and permitted) expressions of personal prejudice;

• 99.2.2.    facilitated expressions of collective prejudice and preference (via its patterns of denominational staffing of selection boards); and

• 99.2.3.    fostered institutional preference - for Catholics in particular, via quotas, the myth of a Catholic Shortage, and in a variety of clear signals: placing a Roman Catholic on every selection board, continuing Roman Catholics on Active Duty past their mandatory retirement age, "tasking" recruiters to find Catholics, under exposing Roman Catholic Chaplains to SER, providing age waivers and rank waivers for Catholic accessions, and blocking them, or denying them to non-Catholics.

100.    Based on the statistical record, I estimate that in the last 20 years, nearly half of the candidates for entrance into the U.S. Navy Chaplaincy suffered curtailment of opportunity because they were not Catholic or Liturgical.  Furthermore, nearly half of those who were admitted into the U.S. Navy Chaplaincy had their careers slowed or truncated because they were

not Roman Catholic, or mainstream Liturgical. And finally, of the non-Liturgical chaplains who managed to survive, if not prosper, in that environment, another 25% of them lost opportunity to Southern Baptists (because the Southern Baptists were "at the table", and the non-Baptist, non-Liturgicals were not. )

101.    Having arrived at the statistical conclusion that bias was afoot, I am within my charter to say: "since we have demonstrated that such things happened more often than chance would expect, we are on solid footing suggesting that 'in all probability' _____, _____, and ____ are examples of the phenomenon."

# Part II.

102.    What causes this pattern of biased results?

103.    We have established a statistically significant relationship between the denominations the Navy assigns to selection boards and the denominations which receive the benefits and advantages doled out by those boards.

104.    According to the "rules of discrimination litigation" as remarked upon by the Supreme Court,[10] once Plaintiffs have demonstrated a statistically significant difference of 2 or 3 standard deviations, the hypothesis that the decisions were neutral with respect to denomination is "undercut" and the burden of explanation shifts to the Defendants.

105.    I have wondered what the Defendants could say besides something to the effect that the analysis is wrong.

106.    The only logical alternative to intentional denominational bias is consequential discrimination - as in:

> *"they are promoted, or accessioned, or retained because they are better, or more useful to us."*

106.1.    But to embrace that explanation, one has to harbor beliefs like these:

Catholics get more than their fair share of the seats on selection panels for the same reason that they get more than their fair share of the promotions to Captain.

106.2.    Or, even more specifically:

---

[10]  See, e.g. Siskin & Trippi, (2005)

Catholics are assigned to every promotion panel because they are among the Chaplains best qualified to judge the qualifications of other Chaplains. CFGC chaplains, on the other hand, are never assigned to promotion panel duty because they are irregular enough as Chaplains, that their judgment about the qualifications of other Chaplains are not to be relied upon.

107.    I will not belabor these possibilities, nor offer others, because they are all offensive.

108.    The point I am making here is that the logical explanations for the statistically significant relationship between (a) the likelihood of a denomination's being assigned to a selection panel and (b) that denomination's success ratio in front of selection panels can only flow from:

108.1.    Bias (witting or unwitting) at the selection panel level belonging to the denominations on the panel with respect to the denominations presented by the candidates (Option 1), or

108.2.    Bias in the institution which expresses itself as a preference for certain denominations and then relies on "nature taking its course" to produce biased outcomes from the selection panels (Option 2), or

108.3.    Differential rates of usefulness or quality across denominations which (a) causes the increased likelihood of appointment to a selection panel and (b) correlates to increased value of a candidate, and therefore increased likelihood of selection by a selection panel (Option 3).

109.    An example of Option 3, could be: "Roman Catholics make better chaplains because they are not distracted by family issues."[11]

110.    I do not opine on whether this is a "valid business reason"; I only offer it as an example of the syntax that has to be employed if one is going to avoid Option 1 or 2, above.

111.    We have demonstrated a statistically significant relationship between

(a) the denominations of Chaplains assigned to selection panels and
(b) the denominations of the candidates those panels select

at both the individual board level (viz SER boards) and at a more general, collective, level across time (e.g. the CADRAG boards.)  Thus, both Options 1 and 2 above are consistent with the data.

---

[11]  This is the "reason" which was offered by Attorney Hyde in Court in San Diego, in May 2006 to explain the loss of Non-Liturgical chaplains prior to consideration for CDR .

112.    Furthermore, the recent *change* in the patterns of denominations placed on selection boards (see Appendix E), suggests that Option 3 is not valid; its echo in the record is evidence of past Institutionally sponsored discrimination.

113.    Random or denominationally neutral distribution of benefits is not consistent with the record.

114.    Nor does the record suggest that some denominations are actually "higher quality than others".

115.    On the contrary, the data demonstrate that some denominations are more successful than others because they are the beneficiaries of denominationally biased choices.   (See Appendix Q.)

116.    **At the individual board level**, or more properly, at the individual board-member level, this statistically significant relationship invites one to "explain" the phenomenon as "like, likes, like".

116.1.    Whether witting (which may be a violation of the board member's oath) or unwitting (the fallout of an unconscious halo evaluation for those with whom one shares beliefs and experiences) this looks like a preference for ones own, and/or a prejudice against "others".

117.    **At the more general level**, the statistical correlation between the likelihood of a denomination's being on a selection board and likelihood of success before that board of candidates from that denomination, could be due to a common cause: "the Navy just likes these denominations best" - and both appoints them to the boards and when they appear before the boards that collective preference produces the pattern of results we have observed.

117.1.    I am not asserting here that the individual chaplains appointed to Chaplain Corps selection boards are anything less than conscientious and objective, collectively. [It is always possible, of course, that one Chaplain on one board will vote in a manner which *seems* to be driven by denominational concerns - *e.g.* the one CME below zone selection, or Wilkin's SER, but the process underlying the overall pattern of results here need not make that assumption in general.]

## Part III.

118.    Why is the impact of board member denomination Important?

119.    I may be outside my brief, trespassing into the realm of legal opinion, but my analysis is offered to assist the Court.

120.    I note that the presumption of regularity is an assumption.  I recognize that it is not only a reasonable deference, as in "innocent until proven guilty", but it is useful in the conduct of the public business to offset any alleged "taint" which might otherwise flow from the appearance of a conflict of interest.

121.    Thus, the presumption of regularity stands until it is quashed by evidence to the contrary.

122.    The burden of proof may be heavy, but the presumption may be toppled by substantial data, proof beyond a reasonable doubt.

123.    I opine that that proof has been presented above.  In more than half of the tests of the presumption which were conducted (and every test which could be conceived of was attempted), the presumption was rejected at a level of two or three or four or five or six standard deviations and in every case except promotions to LCDR the data was inconsistent with the hypothesis of regularity.

124.    The best that can be said for the presumption of regularity is that it survives un-rejected, *i.e.,* acquitted, for the single least important selection panel decision made by the U.S. Navy Chaplain Corps by Chaplains about other Chaplains, promotion to LCDR, and it falls in every other venue.

125.    I opine that Chaplains are *Denominational Representatives*.

Chaplains are certainly commissioned Naval Officers, but they are only *in* the Corps as representatives of their denomination, and their selection/accession was influenced by their denomination.  [cf Berto 3/9/07, and why some Chaplains over age 62 are continued on Active Duty - because they are needed to represent their denomination. ] (See also Appendix I.)

126.    I opine that when Chaplains are sitting on Selection Boards, they are performing that duty as Denominational Representatives.

126.1.    If a Chaplain assigned to selection board duty was NOT primarily a denominational representative, his denomination would not be relevant to his appointment to the selection panel.  And although the Secretary of the Navy Instructions for Chaplain Corps selection board appointments prohibits inclusion or exclusion because of a Chaplain's religion:

126.1.1.    The mix of denominations which are appointed has been statistically skewed to favor five denominations (see Appendix B), and

126.1.2.    The Defendants' advocates have said recently (Hyde 2006) that the Corps *has* to assign *Chaplains* from a range of faith groups to its

Selection Boards, because: (1) since it assigns Chaplains from different faith group clusters to different duty stations, (2) it needs Chaplains familiar with how Officer Efficiency Reports reflect those duty stations to be present on the Boards to understand how the candidates before them are to be evaluated.

This is an admission that those Chaplains are on those Boards because of their capacity to "represent" (sic) their faith group cluster - *i.e., they are there because they are chaplains who are different from other chaplains.*

127.    I opine that when Chaplains are sitting on Selection Boards, they are acting as Government Decision Makers.

127.1.    The Chaplains sitting on the Selection Boards vote concerning the administration (or denial) of Government benefits (e.g. hiring, promotion, involuntary retirement).

127.2.    Their collective recommendation is forwarded to a reviewing and approving authority, where "99 times out of 100" it is adopted by the Navy.

128.    That is the operational definition of decision maker.

129.    However, if one were tempted to argue that the "approving authority" is the "Government Decision Maker", then note that that authority, in this case, is the Chief of Chaplains, himself a Chaplain (and denominational representative, of *his* denomination.)

## **Epilogues**

### **Intention**

130.    The <u>moment of intent</u> is memorialized in the Navy's pleadings in this matter.  In their "Reply in Support of their Cross Motion to Dismiss, or in the Alternative for Partial Summary Judgment" (Adair, 8/11/2006), Defendants describe the stream of logic and reason for their selection of a pattern of faith group clusters on Personnel Selection boards: (1) faith group cluster is one of the factors used in assigning chaplains to duty locations, (2) a chaplain's efficiency report will reflect differences due to duty assignments, (3) placing chaplains with a mix of experience on promotion boards the Navy "expects" ... "at least one member ..to understand the manner in which each faith group category was logistically managed and how the differences in utilization, administration and deployment may inform board evaluations of chaplain fitness reports" (p. 4.)

131.     The Navy put a *limited mix* of Chaplain denominations on the promotion boards with the intention of influencing the boards' recommendations.  The *mix* was *chosen*: (a) at least one Catholic was assigned to every promotion board, (b) at least one Liturgical Chaplain was assigned to every promotion board, and (c) when one looks at the <u>denominations</u> that were *chosen* to "represent" the Liturgical and the Non-Liturgical faith group clusters, the pattern there:

> (1) is biased, *i.e.* has de facto favorites and

> (2) matches the pattern of denominations who benefitted from the Boards' actions.

> (3) The denominations that are never assigned to selection panels (or virtually never assigned) are the same denominations that are:

>> •      (i) under-promoted vis a vis their peers;
>> •      (ii) forced into involuntary retirement most often;
>> •      (iii) under accessioned; and
>> •      (iv) shunned from active duty by the operation of quotas.

132.     Defendants admit an FY2003 shift from staffing promotion boards with five chaplains and two non-chaplains to staffing promotion boards with five non-chaplains and two chaplains [see Notice of Motion ( 2/28/05 Wilkins)].  Defendants declare that this shift is not an admission that the former policy was flawed.  They aver that the change is an exercise of military discretion - and admit that the pattern of faith group clusters used in 1985 to 2002 was also a military judgment - *i.e.*, intention.

133.     The following statement is clearly false:

> **No chaplain was ever included or excluded from board membership because of his or her denomination or faith group category.**  (*cf.* Rock Declaration ¶ 8,9.)

134.     If every Board has one Catholic, that board member was *chosen* because of his denomination.

135.     If some denominations serve 50 times or even 150 times (e.g. Presbyterian Church of the USA and Southern Baptist) and others serve no times (e.g. Presbyterian Church in America and CFGC) then those denominations were included or excluded because of their individual religious beliefs - no other interpretation fits the data. It can't be "chance", and nothing in the record, other than denomination, distinguishes these chaplains from each other.

136.     Finally, if the Navy is "telling the truth" when it says it rejected random selection of chaplains for selection board membership, it is admitting that it *chose* the denominations it used.

**Moot?**

137.    I do not opine on the <u>legal status</u> of the following question:

137.1.    Does the fact that the Navy has changed its selection board staffing from six chaplains, to five chaplains, to four chaplains, to two chaplains mean that there is no longer any consequence from having *Chaplains* pass judgment on other chaplains?

138.    I do opine as a statistician that:

138.1.    there was a statistically significant impact when the Navy had six chaplains on the selection boards.  (See also the CNA study.)

138.2.    there was a statistically significant impact when the Navy had five chaplains on the selection boards. (See the change the Navy introduced when the litigation began again.)

138.3.    there was a statistically significant impact when the Navy had four chaplains on the selection board. (See Appendix E as well as my Supplemental SER Declaration).

And:

138.4.    there will still be a statistically significant impact when the Navy has just two chaplains on the selection boards.  ⇒ ⇒ ⇒ ⇒ ⇒ ⇒ ⇒



139.    The effect may be diluted; we may have to have more data, or more careful analysis, but *some* denominationally "motivated" decision contamination is inevitable, so long as the U.S. Navy Chaplain Corps requires some chaplains to make decisions about how to allocate limited benefits among fellow chaplains.

**Certification and Oath**

140.    I certify under the penalties of perjury, (a)  that this is my work, (b) that I am competent to analyze this data, and

(c) that the conclusions represented here are mine, true, complete, accurate and scientifically certain to the best of my knowledge and belief.


  /S/ Harald R. Leuba, PhD.

Harald R. Leuba, PhD          20 August 2007

Potomac,    Maryland                    USA


## List of Appendices

Appendix A     Accession Decisions

Appendix B     Denominational Preferences on Chaplain Corps Selection Boards

Appendix C     Catholic Shortage

Appendix D     The Siskin Conjecture and Promotion Boards

Appendix E     Effect of a Change in Denominational Preference Patterns

Appendix F     Dr. Siskin's Statistical Opinions in the Chaplains Matter are Fatally Flawed, without probative value, and misleading; his methods in front of this Court are inconsistent with his own best advice when publishing outside this Court and may be suggestive of an intention to allow this Court to misunderstand.

Appendix G     Promotion Board Decisions - Like, Likes, Like

Appendix H     How the effect of the Board's denomination upon the candidate's selection *might* work:

Appendix I     Indicia to test the Hypothesis: Chaplains are Denominational Representatives

Appendix J     Denomination du jour?

Appendix K     Knots of Conflict; Kernels of Knowledge

Appendix L     Longitudinal Preference

Appendix M     The Mathematics of Officer Efficiency Reports

Appendix N     A candidate's sequence Number makes a Difference

Appendix O     The Halo Effect in Officer Efficiency Reports

Appendix P     Parsing Bias - de jure, du jour, de trop

Appendix Q     Chaplain *Quality*

Appendix R     What is the proper Ratio of Clergy by Denomination?

Appendix S     Similarity Scale Measuring the "Likeness" Between two Chaplains

Appendix T     Taxonomies and Data Coding Issues re Religious Favoritism in the U.S. Chaplain Corps Personnel Management System

Appendix U     Why is the Bias "Under the Radar"?

Appendix V     Voting Paradigm Changes across Types of  Selection Boards

Appendix W     "Like, Likes, Like" in a different Navy accession context

Appendix X     Chaplains excised from the Corps via CADRAG

Appendix Y     Yes, the Denomination of the Board Members is Reflected in their decisions in SER actions

Appendix Z     Relevant Education and Experience- Harald R. Leuba, PhD

**REFERENCES**

Berto, Veronica K. (2006) <u>Declaration</u>, United States District Court for the District of Columbia, Case No. 01:06-cv-01832-HHK in the matter of Klingenschmitt v The Hon. Donald C. Winter (Secretary of the Navy) 22 November 2006.

Berto, Veronica K., (2007) <u>Declaration</u>,  United States District Court for the District of Columbia,  Case Number 1: 07-mc-269 (RMU), in the matter of *In Re Navy*, 9 March 2007.

Bouck, Wayne L. CDR (1986) "Study of the Selection and Representation of Chaplains (O-6) According to Faith Group Within the Chaplain Corps, United States Navy During FY75 - FY87." Prepared for the Chief of Chaplains, Rear Admiral John R. McNamara; 21 November 1986. cc: Secy John Lehman, 7U005922

Catholic News Agency, (2005)  "Priestly shortage? Not in Lincoln.", Press Release, Lincoln, Neb., Oct 26, 2005 / 12:00 am http://www.catholicnewsagency.com/new.php?n=5252

Dawis, Rene V.1 987. Scale Construction. *Journal of Counseling Psychology* 34(4): 481-489.

Freidlin, Boris and Joseph L. Gastwirth (2000) <u>Change-point Tests Designed for the Analysis of Hiring Data Arising in Employment Discrimination Cases</u>, American Statistical Association note, published on line, November 2005. http://www.amstat.org/publications/JBES/index.cfm?fuseaction = Freidlin2000

Gastwirth, Joseph L. (1984) <u>Statistical Methods for Analyzing Claims of Employment Discrimination</u>, *Industrial and Labor Relations Review*, Vol 38, No. 1 (October 1984) Cornell University 0019-7939/84/3801.

Gastwirth. Joseph L., (2000)  <u>Statistical Science in the Courtroom</u>, Springer, New York, 2000.

Grayson, Kristy L. (2003) Attachment 3 99cv1579, Exhibit 5 PAGE 0395 to 0426, CHC Selective Early Retirement Board, lists by SER of Eligibles (by denomination) and list of Selectees (by denomination).

Grayson, Kristy L. (2005) Declaration, Attachment 3, Wilkins v United States of America, United States District Court, for the Southern District of California, Case Number 99cv1579. Exhibit 5.

Halley, Michael D. Editor (1993) *United States Navy Chaplains 1982-1991: Biographical and Service Record Sketches of Chaplains on Active Duty During the period 1 January 1982 - 31 December 1991.* Volume X in the History of the Chaplain Corps United States Navy, Chaplain Resource Board, Norfolk, Virginia.

Hart, Melissa (2005) "Subjective Decision Making and Unconscious Discrimination", *Alabama Law Review*, Vol. 56:3:741.

Hyde, Michael (2005) "Material facts as to which there is no genuine issue", Wilkins v United States of America, United States District Court, for the Southern District of California, Case Number 99cv1579.

Hyde, Michael and Hall, Christopher, (2006) "Defendants' Reply in Support of Their Cross Motion to Dismiss, or in the Alternative for Partial Summary Judgment", in Chaplaincy of Full Gospel Churches v. The Honorable Donald C. Winter consolidated with Adair v The Honorable Donald C. Winter, United States District Court for the District of Columbia, Case 1:99cv-02945-RMU-JMF Document 231, August 11, 2006.

Johnson, Robert R. And Bernard R. Siskin. (1982)  Elementary Business Statistics: A First Course, Duxbury Press, Boston, MA 1982.

Kagle, Kilian (2006) Declaration United States District Court for the District of Columbia,  Case No. 1:99-cv-02945 RMU) in the matter of Chaplaincy of Full Gospel Churches, *et al.* v. The Honorable Donald C. Winter (Secretary of the Navy, *et al.*) combined with 1:00-cv-00566 (RMU) in the matter of Robert H. Adair, *et al.*, v The Honorable Donald C. Winter (Secretary of the Navy, *et al.*), 24 May 2006.

Krieger, Linda Hamilton (1995) "The Content of Our Categories: A Cognitive Bias Approach to Discrimination and Equal Employment Opportunity", Stanford Law Review, Vol. 47:1161.

Landy, Frank J. (2005) Editor *Employment Discrimination Litigation: Behavioral, Quantitative and Legal Perspectives.* The Professional Practice Series, published by the Society for Industrial and Organizational Psychology; Jossey Bass/Wiley, San Francisco, California.

Leuba, Harald R. (2003a) <u>Declaration</u>, United States District Court, Southern District of California, Case No. 99cv1579 in the matter of Ronald Wilkins v United States of America, *et al.*, 29 April 2003.

Leuba, Harald R. (2003b) <u>Supplemental Expert Opinion</u>, United States District Court, Southern District of California, Case No. 99cv1579 in the matter of Ronald Wilkins v United States of America, *et al.*, 12 October 2003.

Leuba, Harald R. (2005a) <u>Addendal Declaration</u>, United States District Court, Southern District of California, Case No. 99cv1579 in the matter of Ronald Wilkins v United States of America, *et al.*, 17 February 2005.

Leuba, Harald R. (2005b) <u>Reclama</u>, United States District Court, Southern District of California, Case No. 99cv1579 IEG (BLM) in the matter of Ronald Wilkins v United States of America, *et al.*, 7 April 2005.

Leuba, Harald R. (2005c) <u>Correction</u>, United States District Court, Southern District of California, Case No. 99cv1579 IEG (BLM) in the matter of Ronald Wilkins v United States of America, *et al*., 30 April 2005.

Leuba, Harald R. (2005d) <u>Compendium Declaration</u>, United States District Court, Southern District of California, Case No. 99cv1579 IEG (BLM) in the matter of Ronald Wilkins v United States of America, *et al.*, 9 June 2005

Leuba, Harald R. (2005e)  <u>Supplemental Declaration</u> "Statistical Analysis of the SER Process in the U.S. Navy Chaplain Corps and the 1995 and 1996 CDR SER Decisions*"* in the United States District Court for the District of Columbia,  Case No. 99cv0028945(RMU) in the matter of Chaplaincy of Full Gospel Churches v The Honorable Gordon R. England, consolidated with 1:00CV00566(RMU), in the matter of Chaplaincy of Full Gospel Churches v U.S. Navy 21 July 2005.

Leuba, Harald R., (2005f)  <u>Declaration: The Question of Denominational Preference in U.S. Navy Chaplain Corps' Accessions</u>, United States District Court for the District of  Columbia, Case No. 02CV02005  in the matter of Rev. Charles E. Larsen, et al., v The United States Navy, *et al.* 3 October 2005.

Leuba, Harald R., (2005g) <u>Appendage Declaration: The Question of Denominational Preference in U.S. Navy Chaplain Corps' Accessions: An Extension to a prior Statistical Examination</u>, United States District Court for the District of Columbia,  Case No. 02CV02005  in the matter of Rev. Charles E. Larsen, *et al.*, v The United States Navy, *et al.* 24 November 2005.

Leuba, Harald R., (2006a) Allonge Declaration, United States District Court for the District of Columbia, Case No. 02CV002945 (RMU) in the matter of Chaplaincy of Full Gospel Churches v. the Hon Gordon R. England, *et al.* 14 February 2006.

Leuba, Harald R., (2006b)  Declaration Withdrawal and Correction, in the United States District Court for the District of Columbia,  Case No. 02CV02005 in the matter of Rev. Charles E. Larsen, *et al.*, v The United States Navy, *et al.* 27 September 2006.

Leuba, Harald R., (2006c) *The Siskin Conjecture*: The Pattern of Denominations Assigned to U.S. Navy Chaplain Corps Selection Boards Biases the Decisions which Flow from those Boards, in the United States District Court for the District of Columbia, Case No. 02CV02005 in the matter of Rev. Chas E. Larsen, *et al.*, v U.S. Navy, *et al.*, December 1, 2006.

Leuba, Harald R., (2007a)  Reply, Rebuttal and Recalculation, Declaration of Harald R. Leuba, PhD in the United States District Court for the District of Columbia, Case No. 02CV02005 in the matter of Rev. Chas E. Larsen, *et al.*, v U.S. Navy, *et al.*, 14 Feb 2007.

Leuba, Harald R. (2007b) Too Many Catholic Priests?  A statistical analysis, Declaration in the United States District Court for the District of Columbia, Case No. 99CV002945(RMU) combined with 00CV00566 (RMU) in the matter of Chaplaincy of Full Gospel Churches, *et al.*, v The Honorable Donald C. Winter and Robert H. Adair, *et al.*, v. The Honorable Donald C. Winter,  5 March 2007a.

Leuba, Harald R. (2007c) Selective Early Retirement Boards (SER) Compound Religious Discrimination in the U.S. Navy Chaplain Corps, A Statistical Analysis and Declaration by Harald R. Leuba, PhD in the United States District Court for the District of Columbia, Case No. 07-mc-269 (RMU) in Re: Navy Chaplaincy, 18 July 2007.

Lindner, Eileen w., Ed; (2006) "Yearbook of American & Canadian Churches", The National Council of Churches of Christ in the USA, New York, New York.

Link, Stephen W. (1992) *The Wave Theory of Difference and Similarity*, Lawrence Erlbaum Assoc., Hillsdale, N.J.

Martin, H. Lawrence, (1982) Editor United States Navy Chaplains 1972-1981: Biographical and Service Record Sketches of Chaplains on Active Duty During the Period 1 January 1972 - 31 December 1981  Volume VIII in the History of the Chaplain Corps United States Navy, NavPers 15507, Navy Publications and Forms Center, Philadelphia, PA.

McCreary, Stanley H., (1992) A Study of Faith Group Affiliation and Promotions to Captain and Commander in the U.S. Navy Chaplain Corps, A dissertation presented to the Graduate Faculty of the School of Human Behavior, United States International University, in Partial Fulfillment

of the requirements for the Degree of Doctor of Philosophy in Psychology; submitted to the United States International University, San Diego, California.

McLean, I., (1990) The Borda and Condorcet principles: Three medieval applications. In *Social Choice and Welfare* 7(2):99-108.

Muchow, D.K., Deputy Chief of Chaplains, (1986) "Note concerning FY87 Accession Goals" Document DA 7359 Copy attached to Reference Leuba, October 2005.

OFCCP Compliance Manual - Chapter 7 *Identification & Remedy of Employment Discrimination,* U.S. Department of Labor, Employment Standards Div., Office of Federal Contract Compliance Programs, on line http://www.dol.gov/esa/regs/compliance/ofccp/how2/ofcpch7.htm

OMB (Office of Management and Budget) *Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies.* Washington, D.C. 2003; on line: http://www.whitehouse.gov/omb/fedreg/reproducible.html

OPNAV Instruction 1120.9, (2005) "Appointment of Officers in the Chaplain Corps of the Navy", 20 December 2005. (Available on line at Http://dodssp.daps.mil/Directives/1120_9.pdf) and SECNAV Instruction 1120.4A, the predecessor guidance.

Peterson, David W. and John M. Conley (2001) "Of Cherries, Fudge, and Onions: Science and its Courtroom Perversion" *Law and Contemporary Problems*, Vol 64: No 4.

Riordan, C. M. (2000) "Relational demography within groups: Past developments, contradictions, and new directions." In G. R. Ferris (Ed.) *Research in Personnel and Human Resources Management.* Volume 19 (pp 131-174). New York: JAI.

Sacco, Joshua M.; Scheau, Christine R.; Ryan, Ann Marie & Schmitt, et al. (2003a) An Investigation of Race and Sex Similarity Effects in Interviews: A multilevel Approach to Relational Demography, paper presented at 15th Annual Conference for the Society for Industrial and Organizational Psychology, New Orleans, Louisiana. July 2000, published in 2003: *Journal of Applied Psychology*, Vol. 88. No. 5. 822-86 5. Available on line (11/25/2006): http://iopsych.msu.edu/Schmitt/interviewer%20similarity.doc.

Sacco, Joshua M. and Neal Schmitt (2003b) "A multilevel longitudinal study of demographic misfit and diversity effects on turnover and profitability", *Challenges in Hiring and Justifying a Diverse Workforce,* Symposium at the 18th annual SIOP conference in Orlando, Florida, May 2003.

Siskin, Bernard R. (2005)  Declaration of , United States District Court for the District of Columbia,  Case No. 02CV02005  in the matter of Rev. Charles E. Larsen, *et al.,* v  The United States Navy, *et al.* 21 December 2005.

Siskin, Bernard R. (2006)  "Statistical Analysis of Promotion and Early Retirement Selections in the United States Navy Chaplain Corps", United States District Court for the District of Columbia,  in the matter of Chaplaincy of Full Gospel Churches, *et al.* v. The Honorable Donald C. Winter (Secretary of the Navy, *et al.*) combined with 1:00-cv-00566 (RMU) in the matter of Robert H. Adair, *et al.*, v The Honorable Donald C. Winter (Secretary of the Navy, *et al.*) 22 May 2006.

Siskin, Bernard and Jerome Staller with David Rorvik, (1989) "What are the Chances?: Risks, Odds and Likelihood in Everyday Life", Crown, New York 1989.

Siskin, Bernard and Joseph Trippi (2005) "Statistical Issues in Litigation", *Employment Discrimination Litigation: Behavioral, Quantitative and Legal Perspectives.* Frank J. Landy Editor The Professional Practice Series, published by the Society for Industrial and Organizational Psychology; Jossey Bass/Wiley, San Francisco, California 2005.

Seidel, Marc-David L.  (2006) "Friends in High Places: The Effects of Social Networks on Discrimination in Salary Negotiations" *Administrative Science Quarterly*, available (10/18/06) at http://www.findarticles.com/p/articles/ml_m4035/ls_2-45/ai_64705571/print.

Smith, Karen D., Ivanovich, John S. & Reese, David L. (2000)  "Promotions in the Navy Chaplain Corps", Center for Naval Analysis, Alexandria, VA,10 March 2000.  CRM D0000149.A1/SR1.

Thornton, George C. III and Peter H Wingate, (2005) Industrial and Organizational Psychologists as Expert Witnesses: Affecting Employment Discrimination Litigation Post *Daubert*, in Landy, Frank J Editor*, Employment Discrimination Litigation,* Jossey-Bass 2005, San Francisco, CA**.**

U.S. General Accounting Office (2007) Government Auditing Standards ("The Yellow Book"), Washington, D.C.

Wadle, Scott W., (2004) An Analysis of Marine Corps Service Assignment at the United States Naval Academy, A dissertation submitted to the United States Naval Postgraduate School, Monterey, California.

Washington Post, (2005) Military Faith Groups and Chaplains, Tuesday 30 August 2005.

Williams, K. Y. & O'Reilly, C. A. (1998). "Demography and diversity in organizations: A review of 40 years of research.  Research in Organizational Behavior. 20, 77-140.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| REV. CHARLES E. LARSEN, et al.,   )<br>      )<br>      v.                 )<br>      )<br>THE UNITED STATES NAVY, et al.   )<br>      ) | Case No. 02CV02005 |

### DECLARATION WITHDRAWAL
### and Correction
### HARALD R. LEUBA, PhD
### Denominational Preference in U.S. Navy Chaplain Corps Accessions

Pursuant to 28 U.S.C. Section 1746, and under the penalty of perjury**,** I, Harald R. Leuba, Ph.D., declare as follows:

1.     I hereby withdraw my October 3, 2005 Declaration in this matter, and invite Dr. Bernard Siskin to withdraw his of December 21, 2005.  [The following is my expanded Opinion.]

**Why?**

2.     On July 14 and 27, 2006 I was provided with copies of paper records and electronic files produced by the Navy which I had not seen before.

3.     I have now analyzed this new data, covering thousands of Navy Chaplains and Chaplain candidates, and I have gained access to Secretary of the Navy Instruction 1120.4A and 1120.9 regarding  "Appointment of Officers in the Chaplain Corps of the Navy".

4.     My October 2005 Declaration ignored the differences between Chaplain Corps Accession Programs (because the data I had at the time was too limited); Dr. Bernard Siskin's Declaration ignored the primary accession program and misunderstood the others.

5.     Both of us were mislead, misdirected, by the records that the Navy chose to produce and we both treated the data as though (i.e. assumed that) they *represented* the accession process.  They do not.

**Summary:**

6.     In this declaration I will: (a) describe the Chaplain Corps accession process, (b) describe the data that was produced for the "Accession" declarations in Larson, and (c) put all of that into a context of both (i) other data and (ii) the Secretary of the Navy's instructions.  I will discuss both policy and practice.

7.    When the "dots are connected" we will see that:

- The Navy has maintained a religion-based quota system within its Chaplain Corps for at least 20 years.

- Roman Catholics, in particular, are singled out for preferential treatment;

- Mainstream Liturgicals and Southern Baptists are "in the middle";  and

- Non-Baptist, Non-Liturgicals are marginalized.

8.    The Navy uses two systems/processes to foster this result:

- By managing by Faith Group Cluster, and setting quotas by "Faith Group Cluster", and then establishing one so-called Cluster for Roman Catholics alone, the Navy has given precedence to Roman Catholics.

    [Faith Group Cluster is a misdirection at best, a deceit at worst.  So-called "faith group cluster" bears no more relationship to Religious Denomination than height does to gender,  or eye color to race.  Gender and race are protected classes for discrimination purposes, height and eye color are not.  Religious preference is a protected class; faith group cluster (an administrative construct) obscures very important (to the parties involved) religious differences.]

- Human beings (even US Naval officers; even Chaplains) have a natural tendency to feel closest to, understand best, like best, and value highest, people "like" themselves as opposed to people who are "different".

    [By assigning *Chaplains* to Officer Selection Boards on the basis of their "faith group cluster", and by having preference for some "clusters" over others (a Catholic is on virtually every board), and by having preferences for some denominations within clusters vis a vis other denominations, the Selection Boards tend (through natural processes) to select more candidates "like" themselves than candidates who are different from themselves.  This drift or list toward conformity at each step in the personnel processes may be slight, but the compound effect is both statistically, and practically, significant and demonstrably biased.]

9.    Analysis of the data here (i) shows the fact of denominational discrimination and (ii) it exposes the mechanisms by which that discrimination is effected and perpetuated.

10.    The following conclusions quoted from my Supplemental Appendage,11/24/05 stand robustly affirmed by the new data and the corrected understanding:

"5.      Every conclusion stated in my 3 October 2005 Declaration stands.  Not only do these additional records contain nothing which might challenge my earlier conclusions or call into question the inferences contained in that document, these records support and confirm an important subset of these earlier findings, and they permit an expansion.

"6.      These additional records confirm the assumptions in my earlier Declaration, before I had any information about the composition or workings of the CARE Board; it is a "Board" and it does pass judgment upon candidates for admission into the Corps in the form of a recommendation which may be acted upon by higher authority.   [LAR01075 records the Chief of Chaplains objecting to a decision to reject a Roman Catholic candidate.]

"7.      The Navy's pattern of assigning "favored" chaplain denominations to Selection Boards, as demonstrated through examination of the denominational membership of Promotion Boards and SER (involuntary retirement) Boards, carries through to the assignment of denominations to CARE (accession) Boards.

"8a.     The natural, human tendency of "like likes like" (see Reference 19) cascades through the U.S. Navy Chaplain Corps' personnel management system, and a systematically biased choice of denominations to sit on Selection Boards has led to a parallel distortion in the distribution of chaplain denominations selected for service in the Corps (i.e. accessions), chaplains selected for promotion within the Corps (i.e. advancement), and the forced, involuntary retirement, of discriminated-against denominations when it comes time to cull the Corps (i.e., release from active duty - with a reduction in pension.).

"8b.     This is a startling conclusion; so startling that it bears clear repeating.  The Navy's well established institutional preference for some denominations as members of Selection Boards has worked to drift the composition of the Chaplain Corps into a desired (biased) pattern - through the entirely natural tendency of those on the Boards to prefer candidates like themselves."


**What is an Accession?**

11.     Before using the idiosyncratic jargon of U.S. Navy Chaplain Corps Accession, (C/A/R/E, acdu, CCPO, Recall, D4105-I, Supersession, RAD, IndExt, etc.), we would do well to think about the common vocabulary of Inventory Management in general.

12.     Whether one is discussing the clothes in ones closet or the "stuff" in the medicine cabinet, the soups in the pantry or the Chaplains in the Navy, **Accession** is what one brings into the system.  **Loss** is what one takes out.  Most of the activity in-between is **Mission** (or mission support.)

13.     If you have been into a "big box" hardware store recently, you may have seen teams of "bean counters" using handheld recording devices to count the number of items of each sort that are still on the store's shelves.  This is called "taking inventory".  Together with purchase and

sales records, these numbers are used to estimate losses, and then used to update the purchasing department's planned acquisitions.

14.    What is on the shelves is **Inventory**.  Where those items are placed is part of **stock management**; moving them from the top shelf to the eye level shelves, or taking them into the back of the store for seasonal storage does not change inventory.

**The mistake I made; a mistake Dr. Bernard Siskin makes:**

15.    The Defendants have provided us with some records from the C/A/R/E Advisory Group[1], and we have understood (misunderstood) those records as being "Accession" Data.  Some of the data is accession data, but most of it is stock management.  All of it may be interesting, but it is not all relevant to *accession*.

16.    I have attached, as "Correction AP" (Appendix AP - Accession Process) a brief description of the Chaplain Corps' accession program as described in official Navy documents and as practiced, as evidenced by the data set which has only recently been provided to me[2].

17.    When the C/A/R/E Advisory Group reviews student applications for admission as Chaplain Candidate Program Officers (CCPO, also known as the "1945" program), the C/A/R/E group is considering accessioning civilian graduate-students into a program designed to produce Navy Chaplains.  Candidates who are approved for the CCPO program are accessioned into the Reserve Component of the Navy[3], and are commissioned as Ensigns.

18.    When the C/A/R/E group subsequently reviews these Officer's applications for "Supersession", it is evaluating successful students from the CCPO program to offer them LT or LTJG appointments in the Active Duty Navy (the S4105-A program), or on inactive duty (the S4105-I program.)

---

[1] C/A/R/E stands for: <u>Chaplain Appointment and Recall Eligibility</u> Advisory Group [see: OPNAV (Naval Operations) INST (Instruction) 1120.9 "Appointment of Officers in the Chaplain Corps of the Navy", 20 December 2005.]

[2] Two months ago, as I was walking into the DOJ's scheduled deposition of me on July 14, literally as we were walking through the door into the conference room, LCDR Ouellete (USN JAG) handed a paper copy of a data base to Mr. Schulcz, indicating that this data base was the information which the Navy had assembled per Dr. Bernard Siskin's outline, and which Dr. Bernard Siskin had drawn upon to prepare his Declaration of 21 December 2005.  I had been asking for a copy of this data for seven months, and here it was.  (See Appendix DL - Data Lists, for a description of the data sets used here, and information on how to access them.)

[3] See  OPNAVINST 1120.9 op. cit. , Enclosure 1, ¶3.

19.    But, when the C/A/R/E group reviews applications for RECALL, the C/A/R/E group is considering whether or not to return or assign a currently Inactive Chaplain to Active Duty.

20.    These process streams (and other reviews as well) are crucial to keeping the cadre of Active Duty Chaplains at authorized end strength, but the 1945/S4105 program is *accession*; the RECALL program is stock management.

21.    I should have looked at the data by program.  I did not; I have corrected that mistake here.

22.    Dr. Bernard Siskin did look at the data by program, but he misunderstood them[4].  I encourage Dr. Bernard Siskin to withdraw his report, and correct these mistakes, as well as others (see Appendix BX - Bernard Siskin's Errors.)

**The Navy's Programs**

23.    Appendix AP provides some overview of how one becomes a Navy Chaplain, what the eligibility requirements are, and the pathways and hurdles one has to traverse.

24.    The Navy maintains two populations: Active Duty and the Reserve Component.

•    Civilians can come into the Navy directly, either onto Active Duty or into the Reserves.

    If they are not qualified to be Chaplains, and if they are matriculated into an approved seminary program, they can be commissioned into the Inactive Reserves, i.e. become affiliated with the Navy in its Chaplain Corps Officer Program (akin to Naval ROTC).

    Upon successful completion of their education they may be offered an appointment as a Chaplain in the USN Chaplain Corps, either on Active Duty or Inactive Duty.

•    Current military on Inactive Duty with the Navy may volunteer for Active Duty.  This process is also called "Recall".  (Recall is not an "accession", as that sailor has already been accessioned.)

•    Current Military with another DOD branch may apply to the Navy for transfer to the Naval Reserve or for Active Duty in the USN Chaplain Corps.

---

[4] Dr. Bernard Siskin ignored the 1945 program altogether.  He erred in his understanding of the Recall Program (he admits this in his deposition.)  He elevated a clerical error (omission of program nomenclature) into the status of "program", by calling it "Other".  And he dealt with TRANSFERs as though they were all **into** the Navy, but the Transfer program deals with Inter-Service movement in general. C/A/R/E approvals can increase the Navy's end strength (for incoming Chaplains) or decrease it (for departing Chaplains).

This process is called Inter-Service Transfer, and whether it is a Navy accession or not depends on whether the Chaplain submitting the petition is offering to join the Navy or is asking for permission to leave it.

**The ADL**

26.    The Navy refers to its cadre of Active Duty Chaplains as the Active Duty List, or ADL.

27.    Both Dr. Bernard Siskin and I have been confused, or misguided, or have misperceived or misunderstood the difference between (i) accession to the Navy (which per SECNAVINST 1120.9 perforce includes both the ADL and the Reserve Component) and (ii) adding to the ADL.

28.    I can't speak for how Dr. Siskin was mislead; in his declaration he says "I have also had discussions with Counsel for the Navy and with Navy Chaplain Corps personnel concerning the process of accession for Navy Chaplains.  In addition, I was supplied with the paper records showing the CARE Board Panel recommendations from 1985 to 2005." [¶ 8 page 5, ref. 25.]

29.    But I can locate the origins of *my* confusion:

29a.    Defendants keep presenting in their briefs, as "material facts as to which there is no genuine issue", statements and tables like this:

"As of December 2004, the faith group-category demographics of the Chaplain Corps were as follows:

**TABLE: CHAPLAIN CORPS FAITH GROUP CATEGORY
DEMOGRAPHICS AS OF DECEMBER 2004\***

|  | Number | Percentage |
|---|---|---|
| Non-Lit Prot. | 372 | 44.39% |
| Lit. Prot. | 269 | 31.10 |
| R. Catholic | 149 | 17.78 |
| Sp. Worship | 30 | 4.77 |
| Total | 838 | |

"\* Defendants could not account for the faith group category of 8
chaplains at the rank of lieutenant. <u>See</u> Smith Supp. Decl. Att.1"
[Footnote in original. See 99cv1579 ¶7 page 1, Ref 8.]

29b.    Not said, but clearly implied in this "fact", is that this is the denominator for accessions.

29c.   When I prepared the Declaration I am now withdrawing (and which this expanded opinion supplants), the only data I had been given was an incomplete set of CARE work sheets. I had been given no CARE Decision Memoranda and no context.  I examined the work sheets carefully and was able to reconstruct a largely accurate, and reasonably complete, picture of additions to the ADL.  But I made the mistake of thinking, and saying, that these were "accessions".  They were not.  They were additions to the Active Duty List.

29d.   This shortcoming was brought to my attention at Defendants' deposition of me on 14 July, 2006 - when Mr. Hall grilled me about why I had not examined accessions "by program".  I said that that was because (a) I didn't have to examine them by program if I was only looking at the structure of the data (as a whole) and (b) I couldn't examine them by program because I did not have "enough" data. [The CARE work sheets which I had been given were either photocopied poorly or copied from an intermediate stage - most of my records did not indicate the CARE Board's decision.] That afternoon, after the deposition was recessed, Mr. Schulcz gave me (a) the paper copy of the database LCDR Ouellete had produced that morning, and (b) a thick stack of documents which "may have been the paper records that Dr. Bernard Siskin referred to in his Declaration in December 2005. [See Dr. Bernard Siskin's comment in my ¶28 above.]

29e.   With a sufficient body of data at hand, I was able to see that the Work Sheets dealt with "acdu[5]" <u>only</u>, and with further research I was able to unravel/decipher the accession process and its relationship to acdu changes. [See Appendix AP.]

30.   The Active Duty List is not the list of accessions.

31.   However, the Active Duty List is a very important feature of a Naval Chaplain's career. Not only are pension and promotions dependent upon service there – *service* there is why Chaplains join the Navy.

**So, where do we go from here?**

32.   Let's examine accessions (first) and then examine changes to the acdu.

**Pure Accession - the 1945/CCP Program**

33.   Appendix AP quotes the Secretary of the Navy as saying that the **primary** source for newly-appointed (i.e. accessioned) officers for the ADL will be <u>through</u> (as in a process to be passed through) the Chaplain Candidate Program.  The CCP is thus the entry stage for accessioning.  One of the CCP's outputs is addition to the ADL; the other output is addition to the Reserve Component.

---

[5] "acdu", usually written cursively in lower case, **acdu**, stands for Active Duty.

34.    In the data which was provide to Dr. Bernard Siskin (in 2005) and to me (in 2006) [See Appendix DL- Data Lists], there are records of CARE consideration for almost a thousand applicants for the student program.  This is not a complete record [See both Appendix DL - Data Lists, missing and incomplete and Appendix WH - What Happened to the missing candidates?], but nevertheless this is a meaningful volume of data.

35.    Table 1 shows the Navy's faith group distribution for this data and the CARE Board's recommendations. The difference in selection rates for Catholics vs Non-Liturgicals is statistically significant, at 7.4 standard deviations, and the difference in selection rates between Liturgicals and Non-Liturgicals is also statistically significant, at 2.2 standard deviations[6]

**Table 1.**
**CARE Consideration of Candidates for the Student Program**
**(FY 1985-2005; all applications)**

| The Navy's Faith Group | Number of Candidates | Number Recommended | Number Not Recommended | Other | Percent Recommended |
|---|---|---|---|---|---|
| Catholic | 201 | 191 | 5 | 5 | **95.0** |
| Liturgical | 257 | 212 | 37 | 8 | 82.5 |
| Non-Liturgical | 414 | 313 | 86 | 15 | **75.6** |
| Special Worship | 80 | 71 | 8 | 1 | 88.8 |
| Total | 952 | 787 | 136 | 29 | 82.7 |

---

[6] This is a good place to comment on statistical significance.  By Court approved convention, we consider any event which is statistically significant at the level of 2 (or three) standard deviations to be beyond the likelihood of having occurred by chance.  Litigants may use that "fact" as evidence that there must be a reason for the discrepancy. [Of course, that reason could still be "chance", but that is determined to be *unlikely*.]   The number of standard deviations one finds varies with (a) the size of the difference and (b) the size of the sample. Other things being equal, a measured difference is "more significant" if it comes from a larger population.  And therein lies the issue of what one is *allowed* to say if a test does not show statistical significance. The "rules" (even as Dr. Bernard Siskin states them in his professional writings, ref 12, p. 280-81) are that if a test fails to show statistical significance one may only say that it failed; one may not say that the test proves that there is no difference, or that the test proves that the two populations are the same. Just as a criminal tried and acquitted is not proven innocent, the rules are that we may only say that the data was insufficient to prove him guilty. [See also Appendix BX.]

36.    When I began this series of paragraphs, I called the 1945/CCP data a "pure" measure of accession. I used this characterization because the pool of candidates was not contaminated with a stream which had already been screened, and also because there were (we think) no explicit quota's operating. However, neither condition is necessarily or precisely correct.

36.1a  Some of the candidates tallied in Table 1 are repeaters, i.e. candidates who applied before and were rejected or deferred and then applied again. There are even a few who applied, were approved, and then allowed their approvals to lapse, and had to apply again. Removing all these candidates from the pool of data reduces the sample size, but it does not alter the conclusion:

**Table 2.**
**CARE Consideration of Candidates for the Student Program**
**(FY 1985 to 2005; first time applications)**

| The Navy's Faith Group | Number of Candidates | Number Recommended | Number Not Recommended | Other | Percent Recommended |
|---|---|---|---|---|---|
| Catholic | 195 | 186 | 4 | 5 | **95.4** |
| Liturgical | 244 | 202 | 34 | 8 | 82.8 |
| Non-Liturgical | 391 | 306 | 74 | 11 | **78.3** |
| Special Worship | 79 | 70 | 8 | 1 | 88.6 |
| Total | 909 | 764 | 120 | 25 | 84.0 |

36.1b  Catholics are still the most likely to be approved for the CCP program and the cluster composed of the Non-Liturgical Protestants is still the least likely to be approved, and those differences are still statistically significant. But the sample sizes have dropped, and the difference gap has narrowed, so the Non-Liturgicals as a cluster are now no longer statistically significantly less likely to be recommended to participate in the Chaplain Candidate Program than the Liturgical Protestants. [The difference is still in the "expected" direction, but it does not, alone, rise to the level of statistical significance - unless one argues that since it is in the *expected* direction we may use a one tailed test, in which case this is still statistically significant, at the .05 level.[7]]

_____

[7]  It may break the current flow of attention, but another "lesson in statistics" might well be very helpful right here. Part I of this lesson: When the Courts decided that statistical significance could be established when the observed difference was more than two or three standard deviations away from the *expected* average, they were, in a real mathematical sense, saying that if the odds on such a difference were only 5% or 1%, then the difference *per se* could be taken as a "fact" and the burden of proof for explaining or justifying it, shifted to the "other side" in the litigation. If *a priori* one is "expecting" that, if there is a difference, it will be the one

36.2    Although there were, so far as the Navy has acknowledged, no quotas operating with respect to the 1945/CCP candidates, how can we be sure?  The Navy denied that there were any quotas operating with respect to acdu, but then the Work Sheets arrived and there were the quotas, entered into preprinted spaces.

•       We do not have any Work Sheets for the 1945/CCP considerations.
•       Maybe there are none;
•       Maybe they simply have not been produced.

36.2a    We do know that there is a C/A/R/E vetting process at work for the CCP candidates.

•       The decisions are recorded in the C/A/R/E decision memoranda.
•       Some decisions are marked "No" (which signals at least some decision choice);
•       others are marked "ineligible" (which signals at least some differentiation).
•       Some candidates are reviewed and deferred (which implies that the application to the Group was not adequately or at least not fully pre-screened).

36.2b    Table 1 (above) showed the number of non decision recommendations by faith group. One could suspect that the observed pattern is consistent with either :

•       (a) Non-Liturgicals have a higher likelihood of having an incomplete application than Catholics, or
•       (b) Non-Liturgicals are simply not as attractive as Chaplains as Catholics and the CARE Board needed additional time to figure out a reason for saying "No".

36.2c    The data would be consistent with either of those hypotheses, but it is too thin to be statistically significant.

37.    In combining all the data I was given about candidates for the 1945 program into one time pool (1985-2005), I am not unmindful of the fact that Dr. Siskin thinks that the "relevant period" is 1996 to 2006.  I think that the post 2000 period is after a change point. (See Appendix CP.)

38.    I can subdivide the data into decades or half decades; I can even break it down by year, but the more we subdivide it, the smaller the sample size in each cell - and the less likely we will be to

_____

direction and not the other, e.g. Catholics are more preferred, then the 1% and 5% standards may still apply, but be attained with a slightly lower number of standard deviations, because one need only look at half, one side of, the normal distribution.  Part II of the lesson here:  Dr. Bernard Siskin is arguing (in his Submissions to this Court) that if the difference in the data does not rise to the level of statistical significance then "the proper statistical conclusion is that there is no difference, and the rates are the same".  He does not make this fallacious and prejudicial statement in his public, professional pronouncements (see Appendix BX, Case 3); *that* difference strikes me as integrity significant.

find statistical significance, using simple tests between two cells.  We can, however, subdivide the data and use an Analysis of Variance, which uses all the data to look at the <u>patterns</u> in subdivided data.

39.    I calculated the probability of selection for each faith group cluster (as defined by the Navy), for each year in the data.  I used the candidate's view of the decision, i.e.:

$$\frac{\text{Number of Recommendations for Acceptance}}{\text{Number of Considers (including non Decisions)}}$$

40.    I then divided the data into half decades (treating the interim years as replicates).

41.    The Analysis of Variance found both a half decade effect (p<.001) and a faith group cluster effect (p<.002), but it did not find an interaction (p<.7).



41a.    The time periods are different, with fewer candidates:

| | |
|---|---|
| 1986-1990 | 422 |
| 1991-1995 | 365 |
| 1996-2000 | 145 |
| 20001-2005 | 220 |

and a mildly higher overall selection rate:

| | |
|---|---|
| 1986-1990 | 81% |
| 1991-1995 | 90% |
| 1996-2000 | 96% |
| 20001-2005 | 88% |

in the last decade.

41b.    The faith group clusters are reliably separated, in all the time periods: Catholics always have the highest approval rates; Non-Liturgicals always have the lowest approval rates.

42.    This analysis shows a reliable, across time, statistically significant, pattern of religious discrimination in accessions based on faith group clusters.  Even when there are no apparent quotas or limitations in the background limiting what the Navy may do, their Personnel Selection boards *prefer* Catholics and regard Non-Liturgicals with minimal appreciation.

q e d ?

**What Happens Next?**

43.    When a student's application is recommended for approval, and if the applicant completes the commissioning process, the applicant is <u>accessioned</u>, and commissioned as an Ensign in the Chaplain Candidate Program.

44.    Following this, the erstwhile Chaplain continues to study (to meet his/her endorser's requirements), may attend Active Duty Training (in pay status), is encouraged to participate in local volunteer chaplaincy activities, and, upon successful completion of academic studies may be offered an appointment as an LTJG or LT in the Chaplain Corps of the United States Navy, either as an member of the ADL (active duty list) or in the Reserve Component.

45.    S4015-A[8] is the program designator for candidates who have completed the CCP and are being considered for Active Duty.  These candidates are not being accessioned (that was done at the 1945/CCP stage.)  At this stage the candidates are being promoted (this is their first such opportunity) and they are being considered for addition to the acdu list.  Here are the 1985-2005 data:

**Table 3.**
**CARE Consideration of Candidates for the S4105-A Program**
**(FY 1985 to 2005)**

| The Navy's Faith Group | Number of Candidates | Number Recommended | Number Not Recommended | Other | Percent Recommended |
|---|---|---|---|---|---|
| Catholic | 11 | 11 | 0 | 0 | **100.0** |
| Liturgical | 50 | 47 | 3 | 0 | 94.0 |
| Non-Liturgical | 125 | 96 | 11 | 18 | **76.8** |
| Special Worship | 23 | 21 | 1 | 1 | 91.3 |
| Total | 209 | 175 | 15 | 19 | 83.7 |

46.    The first thing I notice in this table is the loss rate.  This double decade saw nearly 1000 students apply for the precursor program to S4105-A, and barely 20% applied when it came "time to pay the piper". [We will explore this curiosity in Appendix WH - What Happened to the missing Chaplains; our concern here is with accession rates, not acdu application rates.]

---

[8]  S4105-I is (a) the program designator for Inactive Duty, and (b) a superceding candidate's other option at this juncture.  Some Candidates who apply for S4105-A are recommended for S4105-I.  The process does not flow in the other direction, and neither program is an "Accession"; all S-4105-A/I candidates are already in the Reserve Component.

47.     The second thing to notice is that: the pattern of approval rates in Table 3 (in fact each of the Navy faith group cluster's absolute selection rates there) is virtually the same as was present when these candidates joined the CCP, some years earlier (cf Table 2.)

48.     If the candidates were screened when they applied for the CCP program and only the "good" ones were admitted, then they should all be equally "good", equally likely to be acceptable when the time came to enter full service, but the selection rates at this late juncture are virtually what they were when the process began – suggesting the hypothesis that the two judgments are independent of candidate quality and are more like a simple faith-cluster based lottery: Pick a cluster and then spin the wheel; Catholics have a 95-100% acceptability; Non-Liturgicals have a 75-80% acceptability.

49.     Let us look at what the alternative explanations might be for this replicated pattern of acceptability; why do Catholic candidates do better at both the end and the start of the 1945/CCP than the other denominations/faith group clusters?

·       $Hypothesis_0$   The rates are not different; this is a statistical artifact.
·       $Hypothesis_1$   The rates reflect quota based allowances.
·       $Hypothesis_2$   The rates reflect perceived quality differences.

49.0     We can reject $Hypothesis_0$. The selection rates *are* statistically significantly different from each other; furthermore, the pattern is reliable across every dimension of personnel panel decision making which we have examined. Catholics are *always* more likely to end up on the beneficial side of any selection than anybody else, and Non-Liturgicals are almost invariably the least likely to benefit, [whenever there is a large enough count of data to make meaningful, confident statistical assessments.]

49.1a   Without trying to write a mind numbing matrix of differential equations, $H_1$ simply suggests that the a candidate's likelihood of selection is Q/N, where Q is the quota allocated to that cohort and  N is the number of applicants from that cohort.

For Example:

        Suppose you are interviewing musicians for a Navy Band

                If there are ten applicants for drummer and you need five drummers,
                        Each applicant has a 50% a priori likelihood of being selected.

                If there are twenty applicants for horn player and you need four horn players,
                        Each applicant has a 20% a priori likelihood of being selected.
And
                If there are three applicants for xylophone player, and you need seven.
                        Each xylophonist is *a priori* "certain" of a position, if he can play at all.

49.1b   So long as the quotas serve a "valid business purpose", one need not look askance at differential selection rates.

49.1c   We can "test" Hypothesis$_1$ in the Chaplain Corps context by comparing the Quotas[9] to what the CARE Board did with/to the S4105-A candidates.

49.1d   Recall (see Appendix AP) that the candidates for S4105-A are not accessions.  The accession decision was made at the CCP stage.  The candidates here are being considered for addition to the Active Duty List, and it is the Active Duty List Adm Muchow was referring to when he said:

> "Faith Group mix best meets the needs of the naval service when 35% of the Chaplain Corps inventory is liturgical, 35 percent is non-liturgical and 30 percent other (Roman Catholic, Jewish, Orthodox)." [Reference 20.]

49.1e   Table 4 provides the test:

**Table 4.**
**Quotas vs**
**CARE Consideration of Candidates for the S4105-A Program**
**(FY 1985 to 2005)**

| Faith Group | Number of Candidates | % of Pool | Quota | Q/N Col 3/Col 2 | Percent Recommended |
|---|---|---|---|---|---|
| Column | (1) | (2) | (3) | (4) | (5) |
| Catholic | 11 | 5.2 | 25% | 1.00 | **100.0** |
| Liturgical | 50 | 23.9 | 35% | 1.00 | 94.0 |
| Non-Liturgical | 125 | 45.9 | 35% | .762 | **76.8** |
| Special Worship | 23 | 11.0 | 5% | 1.00 | 91.3 |
| Total | 209 | 100 | 100 | n/a | 83.7 |

49.1f   If we test what the CARE Board did (column 5) vs what the Quota formula predicted they would do (column 4), we find no statistically significant difference.

---

[9]  The Navy's overall average Quota by faith group cluster [See Appendix QE] has been, for over 20 years: 35% Liturgical, 35 % Non-Liturgical, and 30% Other (25% Roman Catholic and 5% Special Worship). [See Appendix QE - Quota Effect.]

49.1g   This lack of statistical significance does not prove the alternative Hypothesis[10] that the rates are the same – we can only say: (a) that we failed to reject it by showing that the rates were different; and (b) the possibility that Quotas are driving the selection outcome remains a credible option. [The acquitted defendant may say that his innocence remains a credible option; he may not say his innocence was proven. {Well, he can *say* it, but he is being imprecise, and if he says it in front of lawyers they will not be mislead.}]

But look at this:

**A Written Confession**

49.1h   Statistical analysis can shed light on these issues, and "prove" some things beyond a reasonable doubt. [For example, statistics can show that $H_0$ is unlikely to be true (the hypothesis that there is no difference in selection for accession rates between faith group clusters cannot stand up to statistical analysis.)  There are differences which cry out for an explanation other than "chance".]

49.1i   But statistical analysis cannot "prove" the alternative hypothesis to be true. [As we have just seen, statistical analysis can only show that $H_1$ is a plausible, potentially credible, description of what is happening.

49.1j   We can augment statistical analysis with a "written confession".

49.1k   Deep in the stack of paper records which were given to Dr. Bernard Siskin in 2005, and which I received in July 2006, there is this exchange:

> Document # LAR01407, dated 20 Jan 1998
>
> > In disapproving a C/A/R/E Advisory Group set of Recommendations which Recommended two chaplains to active duty (including one Roman Catholic) and four to Inactive Duty (no Catholics, but one Non-Liturgical, Judy Malana) the Chief of Chaplains writes:
> >
> > "I want Judy Malana on active duty.  We will not recommend her for inactive duty.  If the Board does not want to so recommend, then put her in a single category as recommended by COC and it can then go forward."
> > [signed, COC = Chief of Chaplains.]
> >
> > To which the Chairman of the C/A/R/E Advisory Group replies:

---

[10]  Dr. Bernard Siskin is wrong (and he knows it!)  A null hypothesis is not proven true.  See Appendix B~~S~~X.

"Chief:

"The CARE Board most highly recommends the needs of the Navy take priority.

"Thus the one remaining FY98 quota must be for a Roman Catholic.  The need for Priests in FY98 exceeds all other categories.

"There are 5 more Priests in the pipeline.  All votes were unanimous."

[Signed G.C. Paul]

49.1(el)   I submit that this exchange tips the scales of doubt.  The U.S. Navy Chaplain Corps was using faith group quotas, did favor Catholics, and at least one Non-Liturgical chaplain lost an opportunity (or nearly lost it, she got it back when the Chief of Chaplains had her assigned to Active Duty).  What about the other three Chaplains who wanted to be on Active Duty but were "deferred" that day to make room for the Catholics in the pipeline?  The ~~accession~~ acdu process was contaminated by faith group considerations, "justified" by quotas.

[For further examples, see Appendix QE - the Quota Effect.  There we will see both the long history of quotas, and their pernicious effects not just between, but *within,* faith group clusters.]

49.2a   Hypothesis$_2$, that the selection rates reflect perceived quality differences, addresses "discrimination", whether blatant and conscious, or implicit and unconscious, as in disparate impact.  This hypothesis covers both what one might call accurate perceptions and what one has to admit may be unreliable, individually contaminated, perceptions.

49.2b   If (and I am NOT saying that this is the case), if *some* Chaplains allow their own denominational beliefs to color their opinions of the quality or usefulness of *some* other Chaplains (of a different denomination), then those opinions may be reflected in the personnel selection decisions made by the Boards on which such Chaplains sit.

49.2c   On the other hand, if *some* Chaplains unwittingly allow (or are unable to resist the natural human tendency to allow) unconscious perceptions to color their opinions of the quality or usefulness of *some* other Chaplains (of a different denomination), then those opinions may also be reflected in the personnel selection decisions made by the Boards on which such Chaplains sit.

49.2d   This is the "like, likes, like" concept which LCDR McCreary introduced to this dialogue (Ref 19), which was referred to in the Center for Naval Analysis Study (Ref 28) when they noticed that Catholic candidates did much better than everybody else when there were two Catholics on the promotion boards, and which Saco et. al. (Ref 22) warn that disregard for can derail any analysis of selection-panel performance data.

49.2e   Here we have interpreted this theory as having both general and specific effects  [See also Appendix LL - Like, Likes, Like.]

49.2f   The underline{general} valence of *likeness* is the sort of thing which is referred to when one names the historic prejudices: "WASPs", "Old Boy's Network", "County Club Mentality", etc. In the context of the Chaplain Corps this refers to the "them" when some Chaplains lament that the Corps is rife with denominational prejudice. We can describe a circle which includes "them" if we look at the list of denominations who are allowed to sit on Selection Boards versus the list of denominations who are never (or almost never) given a seat.

49.2g   The <u>specific</u> valence of *likeness* is what happens when, for example a CME[11] Chaplain is assigned to a Promotion Board (which happens very seldom) and a CME candidate appears before that board (which also happens infrequently) and then the CME candidate is selected Below Zone (which is an exceedingly rare event.) I am not saying that the CME Board Member violated an impartiality oath. I am saying that it is virtually impossible for a party to it, to ignore this kind of "coincidence". [One of the more than 10,000 lines of data I poured over to prepare the data bases for this work had a coding variant which stood out *for me*, a chaplain's denominational code was listed as LUBA. I did not change his denomination, nor put him at the top of the list, but I *noticed* him, and I proof read his data-line *again*.] If the CME Board Member (who had never been on a selection board before) noticed another CME candidate in the list of eligibles (when there are very very few CME chaplains in the Corps), it is only "natural" that the CME Board Member would look at the application file for the CME candidate, and if the candidate was impressive, it is not intentional bias, or a corrupt violation of ones oath of impartiality, to honestly say "I think Charlie should be considered."

49.2h   If this happens *sometimes*, then the whole process cannot be totally free of the occasional confounding effects of a board member/candidate denominational-match.

49.2i   If this happens at the general level, "these people are 'like' us; these people are not 'our sort' ", then the whole process cannot be totally free of the common confounding effects of  board member denominational-participation/candidate denominational-match.

49.2j   Board members are entitled to the presumption of regularity, but this is a rebutable presumption, not a stipulation. Good science would have us test the presumption. Fair treatment of the complaint filed in this litigation would have us test the presumption.

49.2k   Table 5 (on the next page) provides this test.

49.2(el)   The selection rate pattern in this table is consistent with the hypothesis of discrimination based on perceived quality, but the sample sizes for the two programs we are looking at here are too small to provide a sensitive binomial test. Chi square, however, suggests that the columns of data which generated the Likelihood calculations are statistically significantly different. Going further than that (See Appendix LL), when we calculate these figures across all programs for all the data we have, the binomial (i.e. percent selected) differences are statistically significantly

---

[11] CME is the Navy's faith code for Christian Methodist Episcopal.

different.  Having a match on the board "helps"; but being one of the "in crowd", is even more beneficial.

**Table 5**
**Similarity as a Factor in Likelihood of Selection**

| Program | Similarity Condition* | Likelihood of Selection |
|---------|----------------------|------------------------|
| 1945/CCP | none | 83.58 % |
| | general only | 85.16 % |
| | specific and general | 90.00 % |
| S4105-A | none | 83.05 % |
| | general only | 97.14% |
| | specific and general | 92.86 % |

\* none - no match and this candidate's denomination never sat
      on a CARE Board
  general - no match on this occasion, but this candidate's
      denomination has appeared on other CARE Boards
  specific and general - a match occurred between this candidate
      and at least one member of the CARE Board on this
      occasion.

**Summary so far:**

50.    We are now in a position to summarize concerning Accessions:

Hypothesis$_0$    The accession rates are different across the Navy's faith group clusters;
Hypothesis$_1$    The rates reflect quota based allowances at the faith group cluster level, and
Hypothesis$_2$    The rates reflect *perceived* quality differences at the denominational level.

50.1    The possibility remains (but seems unlikely) that the perceived differences in quality are "justified".

50.2    At this point, however, it seems more likely that the U.S. Navy Chaplain Corps is harvesting the results of having established quotas in the first place and then staffing its selection panels with Chaplains who represent a "favorite" subset of denominations, and disregarding, devaluing, under-utilizing Chaplains from *minority* denominations.

50.2a    Here I mean "minority" in a traditional discrimination sense, i.e. chaplains who are endorsed by organizations which have only a few representatives in the Corps.  This includes all the Non- Baptist, Non-Liturgicals, all of the Special Worship (except a few who are occasionally

"allowed" to sit on a selection Board) and a few of the Liturgical denominations. [Appendix QE will illustrate how this "plays out" with factions within the Liturgical cluster: e.g. Presbyterian Church of America vs the Presbyterian Church, USA and the United Methodists vs the Lutherans, as well as the denomination represented by the Plaintiffs: CFGC, vs the Roman Catholics.]

**The "Finish Line" in Student Accession: S4105-I**

51.    When the seminary students were admitted to the CCP, they undertook an 8 year service obligation; this obligation tolled from the moment of Commissioning into the CCP; it was to be completed after graduation, either on the ADL list (see above) or in the Reserve Component.

52.    S4105-I is the program designator for a Chaplain Candidate who stays in the Reserve Component, and does not apply (immediately) for Active Duty.  Such a supersession is not an accession per se (as the Chaplain had already started on the path to accession when he/she accepted the CCP appointment); this is the culminating step in this Chaplain's accession journey.

53.    Graduate Clergy who apply for the ADL (the S4105-A Program, see ¶ 45, above) are evaluated by C/A/R/E through the prism of ADL quotas.  (The Navy has said that it stopped using faith group quotas to *plan* ADL accessions (sic) after CY 2000.  This is at least an oblique admission that quotas were used until 2001, and their consequences are still present, as may be their "old habits die hard" reverberations.)

54.    Graduate Clergy who apply for S4105-I (i.e., Inactive Duty) are supposedly unlimited by the operation of ADL quotas.  (Those quotas would come into play when the Inactive Chaplain was Recalled - see ¶ 73, below.)

**Table 6.**
**CARE Consideration of Candidates for the S4105-I Program**
**(FY 1985 to 2005)**

| The Navy's Faith Group | Number of Candidates | Number Recommended | Number Not Recommended | Other | Percent Recommended |
|---|---|---|---|---|---|
| Catholic | 40 | 40 | 0 | 0 | **100.0** |
| Liturgical | 83 | 79 | 4 | 0 | 95.2 |
| Non-Liturgical | 84 | 80* | 3 | 1 | **95.2** |
| Special Worship | 7 | 7** | 0 | 0 | 100.0 |
| Total | 214 | 206 | 7 | 1 | 96.3 |

* Including 4 who applied for Active Duty or Inactive Duty and were recommended for Inactive.

** Including 1 who applied for Active Duty or Inactive Duty and was recommended for Inactive.

55.    Table 6 (above) provided candidate and CARE results data for S4105-I (just as Table 3 did for S4105-A.)

56.    The data in Table 6 are not interesting because they are about accessions; they are not. (The "decision" to let these candidates into the Navy has already been made. They were approved for the Student Program and have been enlisted into the Reserve Component as Ensigns.)

57.    The data is Table 6 are not even interesting because they reflect on the ADL; these are not applications for the ADL.

58.    These data are interesting because (a) they answer part of the question "What happened to all the other students?", and (b) because the data are not surprising.

58a.    Nearly as many successful graduate students apply for S4105-I as applied for S4105-A. There are still about 60% of those who signed up "missing", but we now know that this group applied to stay in the Reserves. [To follow this story further, see Appendix WH - What Happened to the Missing Chaplains?]

58b.    What is not surprising about this data (or maybe it is surprising, depending upon what one expects), is: (a) applicants for Inactive Duty do not have to pass through the screen of ADL quotas – so the selection rates should be, and are, nearly equal, and (b) all of these applicants also passed a "quality" screen on the way into the CCP and (3) then completed their course work for the Masters in Divinity; these are "certifiably" competent clergy and they are all (virtually all) recommended for continuance in the Reserve Component of the Corps.

59.    When these two facts (1 - not having a quota leads to equal selection rates and 2- pre-screening and graduation leads to equal selection rates) are combined, the proposition that quotas were at work vis a vis the ADL list is reinforced a la proof by elimination [quotas were not a factor in C/A/R/E approval for Inactive Duty.]


**But what about "*accession*" and the ADL?**

60.    This Declaration was precipitated in the service of correcting a mistake or misdirection which has been allowed to percolate through the discourse on "accessions" to date. Virtually all of the Tables and assertions and argument heretofore, either from the Plaintiffs or the Defendants, have mistakenly limited attention to additions to Active Duty without saying so. This is not what the word "accession" means, not in common everyday civilian English, and not in the Secretary of the Navy's Instruction 1120.9 or 1120.4A.

61.    However, making the distinction between "accession" and "addition to the Active Duty List" does not diminish the importance of either process – the distinction makes it easier to discuss the component processes accurately.

62.    Thus, while "accession" is the process of providing Chaplains for the Navy as a whole, both the Active Duty Compliment and the Reserve Component , and while the Litigation here is styled as "accession", discourse has been limited to the Active Duty List.

63.    Even so, there are "good and valid reasons" for discussing "acdu".  Participation on Active Duty is the *sine quo non* for a Navy Chaplain who has joined the Corps to *serve*.  Participation in the Reserve Component is rewarding and has the potential for service, but Active Duty is (literally) "where the action is" - and Chaplains barred from such service by virtue of their denomination are victims of religious discrimination.


**D4105-A**

64.    Where the CCP (and then the S4105 program) is supposed to be the "primary" source for accessioning into the ADL (and the Reserve Component), most of the other Chaplains who are accessioned into the Chaplain Corps enter through the D4105 program.  Candidates for the Chaplain Corps may enter the Navy directly to Active Duty, D4105-A.  Or, they may enter indirectly, into the Reserves, D4105-I, from which they may volunteer for Active Duty and then be considered for Recall.

65.    We can examine the D4105 data (and will do so), but it is important to note at the start that this is not a "pure" pool of *accession* applicants.

•    Some of the candidates who apply to be considered for D4015-A are rejects from CCP;

•    Some are applicants who have applied for Active Duty in the past and been rebuffed and are now applying again.

[Because the data we have does not start "at the beginning of time", we cannot be sure that the first mention of a Chaplain in our data base is also his first application for Active Duty, but making that assumption, and omitting all second and third and fourth and fifth and sixth (one Chaplain applied nine times for Active Duty - before he was accepted - perseverance pays off?), omitting all subsequent applications and only considering the first may be the best we can do.]

65a.    The most important source of contamination, i.e., the biggest reason why analysis of D4105-A recommendations in not a "pure" assaying of accession, is than many if not most of the applicants for D4105-A, come from D4105-I.  Those candidates have already been accessioned into the Corps (either directly into the Reserve Component (via D4104-I) or they arrived in the Inactive cadre after an Active tour.)

66.    Therefore, we should look at the D4105-A recommendations (first applications only), but we should look at them as acdu recommendations and not call them "accessions" (as Dr. Bernard Siskin and I have both done in our 2005 Declarations).

67.    Table 7 presents data for:

- All D4105-A applicants (regardless of prior experience)
- First applications for Active Duty (removing later applications)
- FY 1986 through FY2005 (from the Navy's Data list, corrected)  [See Appendix DL - Data Lists.]

**Table 7.**
**CARE Consideration of Candidates for D4105-A**
**(FY 1985 to 2005; first time applications)**

| Faith Group | Number of Candidates | Number Recommended | Number Not Recommended | Other | Percent Recommended |
|---|---|---|---|---|---|
| Catholic | 172 | 159 | 8 | 5 | **92.4** |
| Liturgical | 322 | 248 | 59 | 15 | 77.0 |
| Non-Liturgical | 350 | 230 | 99 | 21 | **65.7** |
| Special Worship | 57 | 35 | 16 | 6 | 61.4 |
| Total | 901 | 672 | 182 | 47 | 74.6 |

68.    The selection rate (for Active Duty) for Roman Catholics in Table 7 is statistically significantly different from the selection rate for Liturgicals ($p<.001$, $z = 5$ standard deviations); The selection rate for Liturgicals is statistically significantly different from the selection rates for Non-Liturgicals ($p<.001$, $z = 3$ standard deviations.)

69.    As before, with Table 3, we can subdivide the data by semi decades, use the individual years as replicates and test faith groups across the five year periods - with the same result: The five year periods are slightly different (primarily in terms of the number of candidates available, which (harken back to the Navy Band  example) leads to a slightly higher acceptance rate (and to the extent that there is a truly limited pool of candidates, the acceptance rates will tend to all crowd together closer and closer toward 95- 100%. [We will see this phenomenon dramatically demonstrated when we turn our attention to RECALL, below ¶ 74.])

**D4105-I**

70.    D4105-I is "neither fish nor fowl".  It is not "acdu", because these applicants are applying for Inactive Duty.  It is not simple "accession" since many of these candidates have already been accessioned.

71.    D4105-I has the same problems with not being a pure measure of accession as D4105-A. Civilians can apply for D4105-I, but Chaplains can apply for D4105-I from Active duty.  If the pool of candidates has "virgins" in it, people who have never been accessioned, as well as

veterans who have been both accessioned and served on active duty, no meaningful "accession" conclusions can be based on collective statistical analysis of the CARE Group's recommendations about D4105-I.  [There are no "secrets" or "contrary facts" or "uncomfortable results" (for the Plaintiffs) in looking at the D4105-I recommendations; they simply are not a "clean" or a clear test of either acdu or accession – but they do expose the C/A/R/E Advisory Group's underlying denominational (faith cluster) biases.]

72.    Table 8 presents summary results for all the candidates whose applications are recorded as having been considered by a  C/A/R/E Advisory Group between late 1985 and end FY 2005.

**Table 8.**
**CARE Consideration of Candidates for D4105-I**

| The Navy's Faith Group | Number of Candidates | Number Recommended | Number Not Recommended | Other | Percent Recommended |
|---|---|---|---|---|---|
| Catholic | 113 | 105 | 5 | 3 | **96.3** |
| Liturgical | 141 | 109 | 31 | 1 | 77.3 |
| Non-Liturgical | 135 | 82 | 48 | 5 | **60.7** |
| Special Worship | 20 | 15 | 5 | 0 | 75.0 |
| Total | 409 | 311 | 87 | 9 | 76.0 |

73.    Whatever they were deciding (it was not accessions, and it was not acdu), when the CARE Board had an unfettered (no quotas) occasion to consider petitions for participation in the Navy's Reserve Component, the Group displayed the same sort of faith based discrimination which we have seen on every other occasion where there was "enough data" to look at[12]: Catholics are preferred, Non-Liturgicals are at the bottom of the preference scale and Liturgicals hold the "middle".

**Recall**

74.    "Recall" is the name for the only other significant source for Active Duty Chaplains to fill authorized Active Duty end strength.

---

[12]  This includes promotions (in zone and above zone), Separation decisions, Selective Early Retirement Boards, Accessions (see above), participation in Active Duty (see above), continuance on duty (especially post age 65), waiver for admission if over age 40 [See the Appendix to Appendix AP.], and even, if one looks at the data, decisions about who may and may not be approved for a disability retirement.

- Transfer as in transfer from one DOD Service to another, is recognized in SEVNAVINST 1120.9 as an authorized source for ADL Chaplains, but (a) the total numbers (only one or two applications per year) are too small to support statistically significant analysis and (b) the available data is "scrambled". The C/A/R/E memoranda which record the Groups' recommendations re petitions for inter-service transfer are unreliable in recording the direction of the petitioned-for transfer. Some Chaplains want to join the Navy; some want to leave it. If the decision memoranda do not tell us the direction of the proposed move, we can not count changes to Navy end strength.

- The "Other" Program which Dr. Siskin tabulates in his December 2005 Declaration is not a formal program. It is simply a collection of clerically incomplete records, where the program actually involved has been omitted from the C/A/R/E Advisory Group's Recommendation Memorandum.

75.    Recall covers both "recall" as the word is used in everyday civilian street-English (e.g. being *recalled* to Active Duty after having served before); but the Program includes calling-up from the Reserve Component, Chaplains who were approved for Inactive Duty at some earlier time (see, S4105-I and D4105-I, as well as RAD, Released from Active Duty -- which happens outside the CARE context).

76.    Chaplain Corps policy (see Appendix AP) indicates that Recall is in some sense not just a less than primary source for additions to the ADL, it is a virtual  "bottom of the barrel", with the CARE Board directed to accept first voluntary applications from candidates who have not previously served an extended tour of active duty and accepting as a last resort those who have served before and wish to serve again. As such, it is not surprising that the program is most active, gets the most CARE Board attention, in May and June, when there is insufficient time for a newly accessioned Chaplain to complete processing and Chaplain School and still receive Orders for Active Duty before the end of the fiscal year.

77.    Because of this scheduling phenomenon, the CARE Board sometimes (a) approves some candidates for acdu immediately (meaning not immediate assignment to Active Duty, but immediate approval for scheduled assignment), and (b) approves conditionally, or defers approval of some other Chaplains for subsequent acceptance if they are needed, or if one of the preciously approved Chaplains withdraws or is unable to be activated for some reason.

78.    This peculiarity, or variant, in the CARE Board's practice, provides two windows onto the question of potential religious discrimination.

- First, we can look at the distribution of faith group clusters the Board recommends immediately.

- Second, we can look at the distribution of faith group clusters the Board sets aside, as "second string", "bench warmers" or the "farm team."

79.    Table 9 presents a summary of the C/A/R/E Board's immediate recommendations for all Recall applications between 1985 and 2005.

79a.    I have not omitted repeat applications from the data used to prepare this table.

79b.    Although I could leave the "repeats" out, in the context of Recall these are not like successive attempts at passing a test.  These candidates have all been "vetted", i.e. accessioned. They have all been approved as standing members of the Reserve Component.  A Chaplain who wants to volunteer for Active Duty submits what is in effect a "standing offer".  The Board receives these offers and holds them (for an indeterminate amount of time) before convening to consider them.   After considering the current pool of applications, the Board invites/requires the unselected (and the "deferred" - on this occasion) to reapply for the next opportunity.

**Table 9.**
**CARE Consideration of Candidates for RECALL**

| The Navy's Faith Group | Number of Candidates | Number Recommended | Number Not Recommended | Other or DEFERRED | Percent Recommended |
|---|---|---|---|---|---|
| Catholic | 110 | 104 | 5 | 1 | **94.6** |
| Liturgical | 186 | 112 | 62 | 12 | 60.2 |
| Non-Liturgical | 236 | 147 | 83 | 6 | 62.3 |
| Special Worship | 12 | 7 | 5 | | 58.3 |
| Total | 544 | 370 | 155 | 19 | 68.0 |

80.    Roman Catholics are clearly and statistically significantly preferred for RECALL over all other faith group clusters.  [In a milieu where Catholics are perceived to be in "shortage", and where Recall is used to "fill in" at the end of the year, this pattern of selection rates is forecast by the Navy Band Model (see ¶ 49.1 above).[13]  Of course, using the Band Model to explain the results does not justify them.  It simply demonstrates that the differences in selection rates flow from the presence of quotas.  The quotas still need to be explained. ]

81.    What is less dramatic, but statistically still significant, is that the distribution of "Deferred" (i.e. candidates saved "in case they are needed") is significantly (a) not Catholic, and (b) after that, disproportionately Liturgical instead of Non-Liturgical. [Although this conclusion can be "seen" in the data posted in Table 9, it is demonstrated (and defended) by reference to the CARE memoranda

---

[13]    The statistical significance here is <.000001; the binomial test z-score suggests that the two distributions: Catholic and Other, differ by more than 11 standard deviations. [That does not make the difference "bigger"; it only means it is much less likely to be an accident.]

which memorialized these deferrals and not by the casual tallying of "other" which is all that is reflected in Table 9.  See Appendix QE- the Quota Effect.]

82.    Once again, we should look at this data across time.  The first reason for looking at the data across time is simply to see if the pattern is reliable; the second reason is to see if Dr. Bernard Siskin has a "representative" sample when he says that the "relevant period" is 1996 to 2006, and the third reason for looking at this data across time is to see if we can "spot" what happened at the "change point".  [See Appendix CP - Change Point.]

83.    Dividing the data behind Table 9 into half decades, as before: 1986-1990 vs 1991-1996 and then 1996-2000 vs 2000-2005 immediately highlighted a major background change for the Navy Chaplain Corps, and perhaps for the Department of Defense as well:

> Sometime between CY/FY 2000 and CF/FY 2001 (the arrival of the new Century, the change in Washington from Clinton to Bush, the terrorist attacks on the World Trade Center and the Pentagon, the War in Afghanistan, the elevation of a Special Worship Chaplain to Chief of Chaplains, and a Non-Baptist, Non-Liturgical to Deputy Chief ) – sometime during this period, the pool of candidates for active duty "dried up".



84.    Figure 2 plots  (a) the relative candidate population (achieved by expressing each period's number of candidates in that period as a proportion of the number who were available in 1985-1990)  [Note the steady and dramatic drop in applicants.]

And it plots (b) the average candidate's probability of being selected.  [This is, of course, the "reduction to zero" of the Navy Band Quota Model.  If one "has" to have 20 Active Duty Chaplains, for some year, and there are only 22 who have applied, then the selection rate for that year *has* to be higher than it was when there were 120 candidates available for 20 billets.]

85.    The reduction in the number of candidates applying for Recall may not have been as precipitous as my CY/FY 2000 vs CY/FY 2001 language suggests (but there is other evidence that a Change Point occurred then [see Appendix CP]).  However, whether gradual or sudden, the reduction in the number of candidates eroded the CARE Board's discretion.

> In the half decade 1986 to 1990 they were able to review 45 candidates per year and reject half of them; by the end of the most recent period they were reviewing 8 candidates per year and having to accept them all. [The only Recall candidate the CARE Board rejected in the most recent five year period was a Catholic (!) being considered for back-to-back Active Duty tours.]

86.    This reduction in discretion is important to the discrimination dialogue, because if the Board has no discretion, it cannot express latent discriminatory tendencies even if they are still there under the surface (even if only in the name of quotas).  Doing "data analysis" in this period (only) as Dr. Bernard Siskin has tried to defend, is a guarantee that one will not "see" any evidence of disparate treatment.

87.    However, if one breaks Figure 2 down by faith group cluster, one can see how the faith group preferences endured as long as they could.  [In Appendix CP - Change Point, I will repeat the argument that voluntary "improvement" in discriminatory behavior is evidence: (a) that the behavior is under control, and (b) far short of a demonstration that it will not reappear once the spot light has been removed.]



Figure 3:
Selection Rate vs Pool

88.    The same caution may be noted for "good behavior" forced by the necessity of limited options; "bad behavior" may come back as soon as the population of candidates begins to grow again[14].


**Recap and Conclusions**

89.    Beginning with a newly released body of data, and with the backdrop of the Secretary of the Navy's Instructions (1120.4A & 1120.9) about adding Chaplains to the Corps, this Declaration has:

•    Noted the distinction between accession into one of the Navy's two components (Active Duty or the Reserve Compliment) and appointment to Active Duty service.

•    Demonstrated that the accession process reflects faith group cluster preferences, with Catholics being preferred for accession over all other denominations, and the Non-Liturgical "faith group cluster" being marginalized.

•    Demonstrated that additions to the Active Duty List have been driven by faith group quotas from at least 1985 to 2000 and may still be under the shadow of those quotas - as in "old habits die hard."

_____

    [14] One might have the concern here that the drop in applicants for the Navy Chaplaincy was not a Recall phenomenon alone; perhaps interest in the Navy Chaplaincy as a career is down across the board.  Catholics are not the only clergy in short supply, now.  This *could* be a consequence of the community of potential Chaplains becoming increasingly aware of, or concerned about, a degradation in the work environment of the Navy Chaplaincy.  The Department of Defense has access to data which could address this concern, if anybody is curious or concerned.

- Demonstrated that Catholics have been given preferential selection treatment in every Program and every time period.  Liturgicals have benefitted from disproportionately high quotas, and Non-Liturgical Chaplains have been rejected, and set aside – and discriminated against because of their denomination.

- Demonstrated that the mechanism by which faith group cluster preference is expressed in Chaplain Corps selection is (a) the direct consequence of explicit quotas, and (b) an indirect consequence of implicit preference expressed by a biased distribution of denominations placed on the Chaplain Corps' personnel selection panels.

90.    Under the Chaplain Corps' current Administrative procedures, whatever denominations hold the highest ranks will favor those of "like" denomination, and the system will perpetuate itself until such time as the leadership changes to a new "religion du jour".

(Unless the rules are changed.)


**Certification and Oath**

91.   I certify under the penalties of perjury, (a)  that this is my work, (b) that I am competent to analyze this data, and (c) that the conclusions represented here are mine, true, complete, accurate and scientifically certain to the best of my knowledge and belief.


 /S/ Harald R. Leuba, PhD
Harald R. Leuba, PhD       27 September 2006
Potomac,     Maryland                USA

# References

1      Black, Barry, Memo, 5000 Ser N097/00971 Oct 5,  2000.

2      Black, Barry, Memo, 1730 Ser N097/01298 Oct 26, 2001.

3      Black, Barry, Memo, 1730 Ser N097/02171 Jun 20 2002.

4.     CD, a cd disc provided by the Navy reporting Chaplain Corps accessions 1988-1997.

5.     Freidlin, Boris and Joseph L. Gastwirth, <u>Change-point Tests Designed for the Analysis of Hiring Data Arising in Employment Discrimination Cases</u>, American Statistical Association note, published on line, November 2005 <u>http://www.amstat.org/publications/</u> JBES/index.cfm?fuseaction=Freidlin2000

6.     Gastwirth. Joseph L.,  <u>Statistical Science in the Courtroom</u>, Springer, New York, 2000.

7.     Halley, Michael D. Editor,  <u>United States Navy Chaplains 1982-1991: Biographical and Service Record Sketches of Chaplains on Active Duty During the Period I January 1982 - 21 December 1991</u>  Volume X in the History of the Chaplain Corps United States Navy, Chaplain Resource Board, Norfolk, Virginia, June 1993.

8.     Hyde, Michael, "Material facts as to which there is no genuine issue", 99cv1579 2005.

9.     Hyde, Michael and Hall, Christopher,  "Defendants' Reply in Support of Their Cross Motion to Dismiss, or in the Alternative for Partial Summary Judgment". United States District Court for the District of Columbia, Case 1:99cv-02945-RMU-JMF Document 231 August 11, 2006.

10.    Johnson, Robert and Kuby, Patricia, <u>Elementary Statistics</u> Eighth Edition, Duxbury, Pacific Grove, California 2000.

11.    Johnson, Rodney D. and Bernard R. Siskin, <u>Quantitative Techniques for Business Decisions</u>. Prentice-Hall, Englewood Cliffs, New Jersey 1976.

12.    Johnson, Robert R. and Bernard R. Siskin, <u>Elementary Business Statistics</u>, Duxbury Press, Boston, MA 1980.

13.    Johnson, Robert R. and Bernard R. Siskin, <u>Elementary Business Statistics: A First Course</u>, Duxbury Press, Boston, MA 1982.

14.    Johnson, Robert R. and Bernard R. Siskin, <u>Elementary Statistics for Business</u>, Second Edition, Duxbury Press, Boston, MA 1985.

15.    Leuba, Harald R., <u>Compendium Declaration</u>, United States District Court for the District of Columbia,  Case No. 99cv0028945(RMU)  in the matter of Chaplaincy of Full Gospel Churches v The Honorable Gordon R. England, 9 June 2005.

16.    Leuba, Harald R., <u>Declaration: The Question of Denominational Preference in U.S. Navy Chaplain Corps' Accessions</u>, United States District Court for the District of Columbia,  Case No. 02CV02005  in the matter of Rev. Charles E. Larsen, et al., v The United States Navy, et al. 3 October 2005.

17.    Leuba, Harald R., <u>Appendage Declaration: The Question of Denominational Preference in U.S. Navy Chaplain Corps' Accessions: An Extension to a prior Statistical Examination</u> United States District Court for the District of Columbia,  Case No. 02CV02005  in the matter of Rev. Charles E. Larsen, et al., v The United States Navy, et al. 24 November 2005.

18.    Martin, H. Lawrence, Editor <u>United States Navy Chaplains 1972-1981: Biographical and Service Record Sketches of Chaplains on Active Duty During the Period 1 January 1972 - 31 December 1981</u>  Volume VIII in the History of the Chaplain Corps United States Navy, NavPers 15507, Navy Publications and Forms Center, Philadelphia, PA.

19.    McCreary, Stanley H., <u>A Study of Faith Group Affiliation and Promotions to Captain and Commander in the U.S. Navy Chaplain Corps,</u> A dissertation submitted to the United States International University, San Diego, California 1992.

20.    Muchow, D.K., Deputy Chief of Chaplains.  "Note concerning FY87 Accession Goals" Document DA 7359 Copy attached to Reference Leuba, October 2005.

21.    OPNAV Instruction 1120.9, "Appointment of Officers in the Chaplain Corps of the Navy", 20 December 2005.  (Available on line at <u>Http://dodssp.daps.mil/Directives/1120_9.pdf</u>) and SECNAV Instruction 1120.4A, the predecessor guidance.

22.    Sacco, Joshua M.; Scheau, Christine R.; Ryan, Ann Marie & Schmitt, et al. 2003.  "An Investigation of Race and Sex Similarity Effects in Interviews: A multilevel Approach to Relational Demography", *Journal of Applied Psychology*, Vol. 88. No. 5. 822-865.

23.    Siskin, Bernard and Jerome Staller with David Rorvik, "What are the Chances?: Risks, Odds and Likelihood in Everyday Life", Crown, New York 1989.

24.    Siskin, Bernard "Statistical Issues in Litigation", *Employment Discrimination Litigation: Behavioral, Quantitative and Legal Perspectives.* Frank J. Landy Editor The Professional Practice Series, published by the Society for Industrial and Organizational Psychology; Jossey Bass/Wiley, San Francisco, California 2005.

25.    Siskin, Bernard R., <u>Declaration of</u> , United States District Court for the District of Columbia,  Case No. 02CV02005  in the matter of Rev. Charles E. Larsen, et al., v  The United States Navy, et al. 21 December 2005.

26.    Siskin, Bernard, R., "Statistical Analysis of Promotion and Early Retirement Selections in the United States Navy Chaplain Corps, Supplemental Report, in C.F.G.C. v Donald Winter, et. al. May 2006.

27.    Siskin, Bernard, R., "Declaration of Bernard R. Siskin, PhD."  Defendant's Exhibit D, attached to "Defendants' Reply in Support of Their Cross Motion to Dismiss, or in the Alternative for Partial Summary Judgment". United States District Court for the District of Columbia, Case 1:99cv-02945-RMU-JMF , Document 231 August 11, 2006.

28.    Smith, et al, "Promotions in the Navy Chaplain Corps", Center for Naval Analyses, Alexandria, Virginia 10 March 2000 CRM D0000149.A1/SR1.

29.    Thornton, George C. III and Peter H Wingate, <u>Industrial and Organizational Psychologists as Expert Witnesses: Affecting Employment Discrimination Litigation Post <em>Daubert</em></u>, in Landy, Frank J Editor<em>, Employment Discrimination Litigation,</em> Jossey-Bass 2005, San Francisco, CA**.**

30.    Washington Post, Military Faith Groups and Chaplains, Tuesday 30 August 2005.

## Appendices

Appendix AP            the Accession Process - overview, policy and practice

Appendix BX[15]        Bernard Siskin's declaration errors

Appendix CP            Change Point - definition, demonstration, effect

Appendix CV             cv for Harald Leuba

Appendix DL            Data Lists used in this Declaration, description and availability

Appendix FG            Faith Group Categories, and the humbug they cause

Appendix LL            Like, Likes Like - theory, application and data

Appendix QE            Quota Effect - discussion and demonstration

Appendix WH            What Happened to all the Missing (student) Chaplains?

---

[15]  I originally named this Appendix "BS" for B(ernard) S(iskin), but upon proofreading, and having heard how *sailors* talk, I recognize that this may convey more than I intended, even though I think the data that Dr. Bernard Siskin chose to use is a Biased Sample.  But, to assuage potential eruptions of sensibilities, I have changed the name here to BX.  However, this Appendix still deals with statistical choices Dr. Bernard Siskin knowingly makes, which have the effect (and I believe the intention) of distorting his results - to support what he thinks his clients want him to say, and in the end have the consequence of potentially deceiving the Court.

# APPENDIX AP.
## The U.S. Navy Chaplain Corps Accession Process - an overview

## Part I  Policy:

A1.    OPNAV (Naval Operations) INST (Instruction) 1120.9, "Appointment of Officers in the Chaplain Corps of the Navy", 20 December 2005, provides continuing guidance that the Chaplain Corps is required to recruit Religious Ministry Professionals (RMPs) of Religious Organizations (ROs) of the United States:

> •    to maintain a base for an all-Regular Career Force,

and to

> •    to attain authorized strength in the Reserve Component to meet approved mobilization requirements.

A2.    *Accession* is, therefore, the *addition* of an RMP to the Corps, either as a member of the Active Duty Roster, or as a member of the Reserve Component.

A3.    The Instruction is silent on the issue of Religious Denominations, requiring only that the RMP be endorsed by a DOD (Department of Defense) approved RO.

> [The Faith Group Cluster concept is an "overlay", introduced at least 20 years ago by the then Chief of Chaplains.]

A4.    The Instruction states that a "Chaplain Corps appointee must be:

•    a citizen of the United States;

•    able to complete 20 years of active commissioned service by age 68 (nee 60).

> DCNO (Deputy Chief of Naval Operations, N1/NT) "may waive these restrictions for otherwise qualified applicants for appointment on the ADL or in the Reserve Component." .. "when there is a shortage against authorized strength on the ADL which cannot be met" ... by other means; under extraordinary circumstance (and the best interests of the Navy); or "when a gross inequity to the applicant would otherwise result".
>
> [In practice, this waiver has been disproportionately exercised for Catholic candidates, without apparent regard to the "gross inequity" which flows to un-waived candidates.][16]

---

[16] I bring this up here because it may occur to the reader.  Although I do not address it here, this need not be taken on faith.  The figures will be produced later - see page 48.

- possessed of "good moral character" as evidenced by "interview and investigation";

- able to meet the physical standards for Active Duty service;

- willing to take an oath to "abide by applicable laws, and all applicable regulations, directives, and instructions of the Department of Defense (DOD) and DON [Department of the Navy]" ....[including] ...a "willingness to function in a pluralistic environment and to **support, both directly and indirectly, the free exercise of religion by all members of the Naval service,** their family members, and other persons authorized to be served by the chaplaincy;"   [Emphasis added.]

- endorsed by "a qualified Religious Organization (RO)" - endorsed in writing on DD Form 2088;

- experienced with at least two years of "religious leadership", for an ADL appointment; And
- (regardless of his or her endorser's requirements) educated with at least 90 semester hours of graduate study in theology (broadly defined) or possessed of a Master's degree in divinity.

A4.   The Instruction is explicit on the issue of the priority to be placed on the sources for new chaplains:

- "Requirements for newly-appointed officers on the Active Duty List (ADL) sufficient to support an all Regular force will be filled primarily through the Chaplain Candidate Program."

- "Requirements [for the ADL], which cannot be fully met by this source, will be met by direct appointment of qualified religious ministry professionals."

- "Requirements for officers on the ADL in career grades that cannot be met by promotion will be supplemented by voluntary recall to active duty of Chaplains who have not served previously on extended active duty."

- "Requirements for officers on the ADL which cannot be met by the preceding sources will be met by voluntary recall of Chaplain Corps officers who have served previously on extended active duty and by inter-service transfer of chaplains from other services."

- "Requirements for Selected Reserve (SELRES) and Individual Ready Reserve (IRR) officers will be filled primarily by the transfer of officers from the ADL who have completed their initial obligated service."

- "Requirements which cannot be met from this source will be met by direct appointment of qualified religious ministry professionals as Reserve officers of the Chaplain Corps on inactive duty or through the Chaplain Candidate Program."

A5.    Thus:

• The 1945 (or CCP, or COPO), i.e., the Student program, is the primary source for clergy into the Corps, with the S4105-I or S4105-A programs demarking the supersession of those individuals into the Inactive (Reserve Component) or the Active (ADL) component of the Chaplain Corps.

• The direct entrance of non-student candidates (qualified civilians and former military) is the secondary source for clergy into the Corps, with the D4105-I (Inactive) and D4105-A (Active Duty) being the relevant program designators.

• Recall from the reserves, with precedence given to those who have not already served an extended active duty tour, but with those who have served such a tour also eligible to volunteer, is the third priority for filling the ADL. [But note that in ¶ 6.d.(7), p 8, the Instruction, in discussing "entry grade credit" (which is given to compensate applicants for experience and education), mentions *en passant*, that officers being recalled from inactive duty "are not entitled to additional entry grade credit", because Recall is "not an appointment", i.e., not an *accession*.]

• The lowest priority in terms of numbers, but an equally "valid" source for Navy Chaplains, is transfer from other DOD Service Departments.

A6.    The Instruction places the primary responsibility for implementing this policy upon the Chief of Chaplains, but it notes:

• Commander, Navy Recruiting Command (COMNAVCRUITCOM) shall determine a chaplain's grade and date of rank based on the criteria established in this instruction...."

A7.    A careful reading of the Instruction suggests that a person who wants to be a Chaplain in the Navy Chaplain Corps has to:

• apply through a Navy Recruiter;

• be interviewed (and recommended) by both a recruiting officer and a current Navy Chaplain;

• pass a credential screen conducted by the Chief of Chaplains, assisted by the C/A/R/E Advisory Group (who are supposed to "validate" the credentials for all applicants to the CCPO program, direct entrance into, and transfers between active and inactive duty, and voluntary recall, inter-service transfers, and superceding applications to active or inactive duty.

    [This Instruction says the C/A/R/E group has to validate the credentials (i.e. make a "determination that the candidate is qualified"); C/A/R/E is not required or directed to *rank* the candidates, nor judge them relative to other candidates, although that is certainly an inference re their duties, which they seem to have adopted.]

Leuba Sept 2006 Declaration re Accessions: page 35

And

•     have his/her credentials further certified as "qualified" to be a Naval Officer, by the DCNO (Deputy Chief, Naval Operations) or by COMNAVCRUITCOM acting for the DCNO.

## Part II  Practice:

A8.    The overall process of "joining the Navy" as a Chaplain may seem linear and reasonable to its managers, and to many of the applicants, but the journey is convoluted and there are many opportunities for a "slip twixt cup and lip."

**Step 1.  From Candidate Glimmer to Application**
**Step 2.  From Application to C/A/R/E Work Sheet**
**Step 3.  From the Work Sheet to a C/A/R/E Advisory Group**
**Step 4.  Within the C/A/R/E Advisory Group**
**Step 5.  From Recommendation to Approval by the Chief of Chaplains**
**Step 6.  From Approval by the Chief of Chaplains to Approval by the DCNO**
**Step 7.  From DCNO clearance to Chaplain School graduate.**
**Step 8.  From Graduation to Service on Active Duty.**

A9.   Each of these steps presents its own set of challenges and screens, and candidates may be lost to the process at any point along the path.  Any screen or filter, step or sub-step, any opportunity to be blocked or impediment to advancement, can (a) influence not only that candidate's progress, but also (b) alter the denominational mix of the candidates who continue.

**Step 1.  Application**

A10.   The recruiter puts the candidate in contact with (or delivers him or her to) a current USN Chaplain who counsels and interviews the candidate, and provides a letter of recommendation to the C/A/R/E Office.

A11   Candidates may rise or fall on the basis of this letter.

    [LAR01268[17] seems to have been photocopied with a "post it" attached; the note says: "The 3 not recommended were for: no English proficiency (1+2) a very low (2 of 10) recommendation by the Chap. (3)"]

---

[17]LAR01278 is the Bates number for one of the documents (a) which were used to generate the database provided to Dr. Bernard Siskin in 2005, and (b) which were provided to me immediately after the first session of the DOJ (Department of Justice) deposition of me on 14 July 2006.  [See also Appendix D - Data Sets.]

**Step 2.  From Application to Work Sheet**

A12.   The C/A/R/E Office receives the completed applications and reviews them for administrative completeness.

A13.   Incomplete applications may be sent back for, or a separate letter may ask for, supplemental documentation,  (e.g. an Endorser's statement, a college transcript.)

A14.   Applications which are administratively complete are sorted by the program applied for:

|  |  |
|---|---|
| Student | - 1945 Program |
| Active Duty | - Directly (Program D4105-ACDU) |
|  | - Supersession (from the Student Program, S4105-ACDU) |
|  | - Recall from Inactive Duty (RECALL) or |
|  | - Via Inter-service Transfer (XFER) |
| Inactive Duty | - Directly (e.g. Standby Reserves, or Ready Reserves) |
|  | - Supersession (for a student candidate who has graduated and wishes to serve the next portion of his obligation in the Reserves, S4105-I  or |
|  | - Via Inter-service Transfer (XFER) within or to the Reserves |

A15.   Once an application is complete and in the hands of the C/A/R/E Office, it does not go directly to the C/A/R/E Advisory Group for review.

A16.   I do not have dated records from which to "prove this", and it is not crucial to my analysis here, but there is evidence to support this conclusion.

A16a.  First, if the applications were submitted to the C/A/R/E Board in the sequence in which they arrived, there would be no "systematic" ordering to them on the C/A/R/E Work Sheets.  And they are ordered on those sheets:  Candidates for D4105 Active Duty are listed above those for S4105, which is listed above those for Recall.   Within program: Catholic candidates are usually listed above Liturgical, Liturgical above Non-Liturgical and Non-Liturgical above Special Worship Group.



A16b.   The figure to the left plots each faith group's relative share of each ordinal position on a C/A/R/E Work Sheet.  Thus, Catholics occupy 50% of the first positions, 20% of the second positions and 10% or less of all the later positions on the list.  Liturgicals are in the top position only 30% of the time, and thereafter cycle around 40% regardless of list length.  Non-Liturgicals occupy only 15% of the top positions and are regularly the last on the list.

A16c.   I do not opine here that this pattern is good or bad; I point out that it signals an underlying ordinal sequence in the way the C/A/R/E Office thinks of the faith groups.

A16d.   Furthermore, I do not opine that the C/A/R/E Office, or the clerk who prepares the Work Sheets is anticipating the Board's decisions, although, as the figure below shows,  there is a correlation between success and ordinal position on the list↓



A16e.   Second, candidates are "batched".  In LAR01505 it looks as though the C/A/R/E Office has "sat" on a group of applications for quite some time in order to assemble a "decent sized" pool for "last chance in the year" consideration. Similarly, there is "looming deadline" behind LAR01508, which sends some applications back to the Office for reprocessing in the Spring.

A16f.   The batching is occasionally driven by immediate circumstances (e.g. the calendar, a change in quota numbers [See Appendix QE], or the accumulation of a "critical mass" of applications.)

A16g.   Sometimes the batching is done on the basis of program, sometimes on the basis of candidate similarity (e.g. Special Worship candidates are more likely to be reviewed by a C/A/R/E Advisory Group with other Special Worship candidates than they are to be reviewed along with only non Special Worship candidates.  In a sense, "birds of a feather are flocked together.")

A16h.   The purpose of these figures and this logic, is not to begin data analysis here, but to demonstrate that there are "things" going on behind the scenes here, and those "things" may well contribute to the continuance or loss of some candidates.   That is, the C/A/R/E Office (and not just the C/A/R/E Advisory Group) is one of the hurdles on the track to Active Duty.

A17.   The C/A/R/E Advisory Group Work Sheet is filled in (from the applications?) at some time prior to a scheduled Board[18] meeting.   [Not all Work Sheets have been produced and not all the

---

[18] I have tried to use the official designation, "C/A/R/E Advisory Group", but when they meet they function as a personnel selection board, and they refer to themselves, informally, as a "Board". [See LAR01834 and the "Comments" heading in the electronic data base which the Navy prepared for Dr. Siskin.] The context here is clearly as a personnel selection *board*.

work sheets which have been produced have a legible date written on them . However, every C/A/R/E Advisory Group Work Sheet that has been produced, and that has its own legible date, corresponds to a Recommendation Memorandum dated the same day or a day or two later.]

**C/A/R/E Work Sheet**

A18.    The Work Sheet form has remained essentially unchanged for at least 20 years.

A19.    The forms which have been produced (See Appendix DL - Data Lists) are all headed with "acdu" which (a) was written on the top of a preprinted blank and which (b) I take to mean "active duty".  None of the C/A/R/E Advisory Group Work Sheets which have been produced have any other heading written at the top, but since the C/A/R/E Advisory Group Recommendation Memoranda routinely deal with candidates for the CPO (1945 program) as well as Inactive Duty applications in addition to Active Duty applications, it may well be that there are other C/A/R/E Work Sheets headed "1945" and "inacdu" which have not been produced here. [This understanding is not critical to the analysis here; it simply puts the Work Sheets which were produced in the context of the Recommendation Memoranda which were produced.]

A 20.    In my October 2005 Declaration, I described the C/A/R/E Work Sheet; here is an update of that description:

A 21.    The lower section of the Work Sheet has pre-printed headings for a two line running total.

A 21a  The top line (the numerator) is the net acdu[19] recommendations to date; (excluding all Candidates to be considered on this form); the second line is the Goal/Quota, the number of Chaplains of that category who are authorized to be added to active duty end strength in the current fiscal period (generally a fiscal year, FY) . [For more on Quotas and how they influence faith group representation and denominational choices in the Chaplain Corps, see Appendix QE - Quota Effect.]

A 22.    Within each line of data, the entries are categorized first by Faith Group and then by Source. This is sometimes supplemented with a handwritten tally of the net sum to date for BLK (Blacks) FEM (Females) , HISP (hispanic), API (Asian, Pacific Islanders),  etc.

A23:    The upper portion of the Work Sheet is a data template:

---

[19]  This is the critical distinction between (a)  my Declaration last October  (and also Dr. Bernard Siskin's Declaration last December) and (b) a correct interpretation of the C/A/R/E Recommendation Memoranda.  Both Dr. Bernard Siskin and I allowed ourselves to be mislead by the Navy's characterizations; we took "Recommended for Active Duty" (see Dr. Bernard Siskin's footnote 1 on every one of his data tables) as "accession", but (see Part I above) Recall is not an "accession"; nor is any change in career status from Inactive Duty to Active Duty. Heretofore, neither of us has addressed <u>accessions.</u>

**Illustration of C/A/R/E Board Form - Upper Portion**

| Name | RFG | PROG | AGE | DOB | WAIV | DOR | EXP | #ACDU | G/L | Y/N |
|------|-----|------|-----|-----|------|-----|-----|-------|-----|-----|
|      |     |      |     |     |      |     |     |       |     |     |

Name    Candidate's name; this is not redacted in the records provided to me in July 2006.

RFG    Candidate's Religious Faith Group - however in using the form, the C/A/R/E Board posts denomination not Faith Group. This is a two factoid indicator that the C/A/R/E process is managing by denomination. First (even though the Goals are couched in Faith Group terms, and the bottom of the Form tallies net standing in Faith Group terms), Faith Group per se, except for Catholic, is not listed in the "evaluation" portion of the form. [Some forms have the "faith group cluster" nomenclature written in the left hand margin of the Work Sheet, especially when the denominations being considered on that Work Sheet appear infrequently.] Second, the Candidate's denomination is listed - suggesting that it is **denomination** and not Faith Group which is the basis for some non Catholic distinctions re the Recommendations made by the C/A/R/E Advisory Group. [See Appendix QE.]

PROG    Candidate Source (Recall, Direct Acquire, Supercede or Inter-service Transfer).

AGE    Candidate's age.

DOB    Candidate's Date of Birth; this is seldom filled in.

WAIV    Waiver granted or needed to facilitate a Candidate's accession. [This is used primarily as a holding place for the candidate's rank, but that rank is frequently the result of the "entry grade" assigned.]

DOR    Date of Rank - sporadically filled-in in the C/A/R/E Form; Date of Rank can signal a candidate's progress relative to his/her peers. Sometimes the Work Sheet is annotated "2 FOS" to signal that the candidate has been passed over for promotion (FOS = "Failure of Selection") two or more times.

EXP    Candidate's years of Experience - seldom filled-in; and when it is filled in it is usually the candidate's Year Group, an alternative index of a candidate's relative progress .

#ACDU    Number of Active Duty Chaplains (on this date) from the Candidate's denomination. On most C/A/R/E forms this datum is supplemented with an additional figure which seems to be an additional benchmark of some sort, e.g every Catholic Candidate in January 1989 has "261/385" in this cell; an IFCA Candidate on this form has "15/1" in this cell.

G/L    Gains and Losses (to date) for this denomination. For example, the Catholic Candidates on the January 1989 Work Sheet have "+5/-14" (the Corps had acquired 5 new Catholic Chaplains, and lost 14, so far this FY) and the IFCA Candidate has "+1/-0" in this cell.

Y/N    Yes (recommend the Candidate for acdu) or No (do not recommend the candidate for acdu). This is usually blank. When it is filled in, it frequently says something like "ACDU JUN" which signifies (as can be verified by reference to the matching Recommendation Memorandum): recommend for Active Duty in June. Sometimes this column records a split vote. In 99% of the cases where a produced Work Sheet can be aligned to a produced Recommendation Memoranda, and where the Work Sheet indicates a recommendation, the recommendations on the two data records are the same.

A24.    It looks, from this form, as though the C/A/R/E Board is not managing by Faith Group - but rather is managing by denomination and that somehow the 35, 35, 30 Faith Group "rule" has been decomposed into line-by-line, denomination-by-denomination quotas.  I say "it looks like"; I do not say "the Navy *IS* managing within Faith Group, by denomination".

A25.    What I can say, based on an analysis of the data in the bottom portion of the Work Sheets, is that the Navy is managing by faith group cluster.  And, I can add: (a) since the Navy is managing by faith group cluster, candidates who apply in numbers greatly in excess of the permissible quotas suffer more rejections than candidates who apply in numbers which more closely match the quota, and (b) among the candidates who are rejected from a given faith group cluster, some specific denominations are rejected more often than others.   [See Appendix QE - Quota Effect.  See also the Navy Band Quota Model in ¶49 above.]

**Step 3.  From the Work Sheet to the C/A/R/E Advisory Group**

A26.    There is an "official" C/A/R/E pre-screening process [For Example: LAR01802 ], but there may be more to the filter at this stage than formal meetings.  There are many instances of names being listed on Work Sheets and then crossed off [LAR01308], never to appear again (in these records).  One may only assume that the candidate has withdrawn or been dismissed.

A27.    Whatever the reason(s), candidates may be lost or turned away at this juncture.  Since we do not have a record of the entire population who applied (e.g. who approached a Navy recruiter), we can only approximate the pool of applicants with a bracket of estimates: as the broadest bound - the distribution of denominations in the USA, and as the narrowest bound - the distribution of denominations who passed the pre-screen for the 1945 program.

A28.    This is not a critical point of interpretation; the only issue being argued here is that the accession process is more complicated than simply: (a) submit application, (b) C/A/R/E disposition, (3) go on Active Duty.

A29.    Neither the process nor the data are that simple, and treating the data that simply produces misleading results.  [See Appendix S.]

**Step 4.  Within the C/A/R/E Advisory Group**

A30.    The C/A/R/E Advisory Group is an oversight group with between-meeting duties to give advice to the C/A/R/E Office, and a periodic duty to meet and review applications for membership into or affiliation with the USN Chaplain Corps.  When the Group meets, it is required to have a quorum of at least three members drawn from an approved ex officio roster, who themselves are members of the roster by reason of their regular duty positions.  [I deduce this from the record; it is helpful to think of the Group in this context, but if I am wrong in my inferences here that does not affect the statistical analysis.  I used this understanding to formulate a context in which to test the data; I do not change any data.]

A31.    LAR01453 asks the Chief of Chaplains for permission to convene a "special C/A/R/E Advisory Group" due to time deadlines and the "unavailability of the Deputy, EA and two Division Directors".

A32.    Documents which the Navy produced in 2005, as well as some additional ones provided to Dr. Bernard Siskin in 2005, and provided to me in July 2006, contain some C/A/R/E Recommendation Memoranda which record the identity of the C/A/R/E Advisory Group members who were present for the meeting which lead to that Recommendation Memorandum.

A33.    I have coded this information and aligned it with each of the recommendations made by the referent  Recommendation Memorandum.  Two statistically significant observations are:

First, the denominational distribution sitting on the C/A/R/E Boards is neither random nor balanced. It favors Catholics and Southern Baptists; it ignores Methodists and most Non-Baptist Non-Liturgicals.   [See Appendix LL - Like, Likes, Like and Appendix QE - Quota Effect.]

Second, Candidates who are denominationally "like" the Board fare better vis a vis Board recommendations than candidates who are not "like" the board, whether there is a denominational match or not.  [See Appendix LL - Like, Likes, Like Appendix QE - Quota Effect.]

A34.    Whether applying for "Accession" or simply (sic) applying for an opportunity to *serve*, some candidates who are shunned by the C/A/R/E Board suffer because they come from "disfavored" denominations.   Although "Recommended for acdu" is not necessarily an accession decision, it is still an interesting and important decision.

**Step 5.  From Recommendation to Approval by the Chief of Chaplains**

A35.    The C/A/R/E Advisory Group recommendation memoranda are addressed to the Chief of Chaplains and the memo format includes a "decision block" below and to the left of the Group Chairman's signature transmitting the recommendations.  This block is:

> APPROVED _____
> DISAPPROVED _____

A36.    It happens, several times a year, that the C/A/R/E Advisory Group recommendation memo has pen and ink changes on its face, as produced here.  Some of these may be simple clerical errors as the Group's actual decision is transferred to the Memo (which is clearly based on a word processor's draft.).  It is also possible that scheduling plans, for example, were incompletely thought through, or inaccurately calculated.  But, sometimes, the memo said, when typed, ACDU SEPT 96 (FY 96), and that is changed (in pen and ink) to "OCT" which is FY 97.

A37.    It is even possible that the change was initialed (or made) by the Chief of Chaplains.

A38.    In any case, whatever the cause, these are changes to the schedule, if not the population, of who will be an acdu Chaplain, are made after the C/A/R/E Advisory Group recommendation.

A39.    The C/A/R/E Advisory Group recommendation is neither the beginning, nor the end of the ~~Accession~~ candidate review process.

A40.    Even after the C/A/R/E Advisory Group memoranda are signed and sent forward, the Chief of Chaplains has a review, and may ask for changes:

LAR01277 12 October 1993, the Chief writes:
> "Will approve all these recommendations except WALLACE, Richard J. Believe we should not accept/consider his application until at least 2 yrs have passed without drug use."

LAR01328 11 June 1996, the Chief writes:
> "all but candidate Banks"

LAR01407 20 Jan 1998, in disapproving a C/A/R/E Advisory Group set of Recommendations which Recommended two chaplains to active duty (including one RC) and four to Inactive Duty (no RC, but one AG, Judy Malana) the Chief writes:

> "I want Judy Malana on active duty.  We will not recommend her for inactive duty. If the Board does not want to so recommend, then put her in a single category as recommended by COC and it can then go forward." [COC = Chief of Chaplains.]

To which the Chairman of the C/A/R/E Advisory Group replies:

> "Chief:
> The C/A/R/E Board most highly recommends the needs of the Navy take priority.
> Thus the one remaining FY98 quota must be for a Roman Catholic.  The need for Priests in FY98 exceeds all other categories.
> There are 5 more Priests in the pipeline.  All votes were unanimous."
>                Signed G.C. Paul

The next record in the file (LAR01408) shows the Recommendation for "INACDU APR" crossed out and changed with a pen and ink to: "ACTIVE DUTY".

A41.    This series of exchanges demonstrates that:

> (1) The C/A/R/E recommendation is not the "end" of the ~~Accession~~ Process;
> (2) The COC is one of the steps in the ~~Accession~~ Process;
> (3) The C/A/R/E Advisory Group refers to itself as a "Board";
> (4) There are Quotas; and
> (5) There are institutional ("unanimous") preferences ("priority") for Catholic Priests.

**Steps 6 to 8  From COC Approval to DCNO clearance to Chaplain School graduate to Service on Active Duty.**

A42.    Policy (see Part I above) tells us that there are additional "i's" to be dotted and "t's" to be crossed before a candidate recommended for active duty is actually added to the active duty roster.

A43.    The data tell us that there is a roughly 20% loss at this step.  They also tell us that this loss is not "even handed" insofar as the treatment of different faith group clusters, and different denominations within faith group cluster.

A44.    None of the paper records, or electronic records which the Navy has produced that have been provided to me address the output from the DCNO (or COMNAVCRUITCOM) review, nor do they address the input and output from Chaplain School.

A45.    This is not a data void, nor is it a lament.  We have the input to the DCNO review (the output of the C/A/R/E Advisory Group recommendations as approved by the Chief of Chaplains, See Appendix DL, Data File C/A/R/E Memos) and we have the input into Active Duty (See Appendix DL, Data File USN acdu.)

A46.    These two files can be compared, line by line (See Appendix DL, Data Lists, Data File MA - C/A/R/E acdu vs Navy acdu).   Table A1 shows the result of this comparison for data covering comparable periods (FY87 through FY01):

**Table A1**
**Comparison of C/A/R/E Recommendations for acdu**
**vs USN Records of actual additions to acdu**

| Navy's Faith Group Cluster[20] | Number Considered by C/A/R/E Board | Number Recommended by C/A/R/E Board | Percent Recommended | Number Added to Active Duty | Percent Lost |
|---|---|---|---|---|---|
| Roman Catholic | 275 | 257 | 93.4 | 237 | 7.8 |
| Liturgical | 478 | 402 | 84.1 | 303 | 24.6 |
| Non-Liturgical | 740 | 434 | 58.6 | 353 | 18.7 |
| Special Worship | 103 | 67 | 65.0 | 54 | 19.4 |
| Total | 1596 | 1160 | 72.7 | 947 | 18.3 |

---

[20]  Wherever I have had to use "clusters" in this Appendix,  I have used the Navy's faith group clusters even though those groupings (sic) are contaminated.  I have done this because it is the *Navy's* clusters which drive the quotas and facilitate the denominational discrimination.

A47.    Note that approximately 18 percent, or 213 (1160-947) of the chaplains recommended for acdu by the C/A/R/E Advisory Group were "dropped" along the way to active duty.

A48.    We do not need to dwell of the possible reasons for these losses[21], but we should note:

•        They are substantial and statistically significant,
•        They are disproportionately Non-Catholic[22] (Catholics lose 8%, Liturgicals lose 25% and Non-Liturgicals lose 19%.)
and
•        Such losses may be being anticipated when the quotas are set for each FY.


## Part III Programs

A50.    Having reviewed policy and practice, and having looked carefully at what happens along the way, we are now in a position to identify each Program and remark on its relevance to accession.

### CCPO or Chaplain Candidate Student Program (1945)

A52.    This is a "pure" accession program.  Civilians (graduate students) present themselves for consideration as Chaplain candidates.  The successful ones are commissioned as ensigns in the Reserve Component.   While in conforming student-status they are designated "1945", for inactive duty, inactive status.  They serve without pay or allowances, except during periods of Active Duty for Training (ADT).  Their service obligation is eight years and they must accept, if offered, a superceding appointment to LTJG (or LT) in the Chaplain Corps .

### S4105-I and S4105-A

A53.    These programs, called "Supersession",  are the "follow-ons" to CCPO.  S4105-I is for Inactive Duty; S4105-A is for Active Duty.

---

[21]    Chaplains recommended for Active Duty may voluntarily withdraw; must be counseled on the advantages of withdrawal, if e.g. a pending promotion consideration would be tabled if the transfer to (or from) Active duty took place as scheduled; can be dropped for the "good of the Service"; will be released if they fail to complete requirements, e.g. 90 hours of theological study, Seminary or Chaplain School, or have a personal mishap; or may be dropped for administrative reasons if processing takes more than 120 days; or can be delayed or rescheduled or have their orders cancelled, if the anticipated ADL vacancy does not materialize.

[22] The difference in loss rates between Catholics and everybody else is statistically significant ($z = 8.2$, using the test for two means described in Johnson and Siskin Reference 12 page 386.)

A54.   A 1945 Chaplain who has completed his/her program of graduate education (and may have participated in on the job training with a serving  Chaplain) may be offered a superceding appointment in either the Reserve Component (from which he/she may subsequently volunteer for Recall), or in Active service.

A55.    Since an accession decision/screening has already taken place at the entry level, this is not properly an "accession", but supercession rates may well be informative anyway.

**D4105-I and D4105-A**

A56.    These programs entrain non-student civilians, the way the S4105 programs entrain student civilians who want to become Chaplains when they finish their education.

A57.    However, the "Direct" program is not a "pure" measure of accession. Some of the applicants to D4105 have been rejected by the 1945 program (and were not eligible for S4105); some are former military who have served their obligations (total years of service required of them from the program they were in earlier), and some of the candidates who present themselves to the C/A/R/E system for the D4105 program are re-appliers who were rebuffed the first time.

A58.    Thus, although some of the candidates in the pool of applicants to D4105 are being screened for "accession" for the first time, some are repeats.  We may make the simplifying assumption that "the world started the day the data started" and treat all first time appearances in the records as the first time these candidates applied for D4105 status.

**Recall**

A59.  As noted above under Part I Policy, Recall is not an accession.  Even so, success rates may tell us something about the denominational mix that the Chaplain Corps wants (will allow) within the ADL.

**Transfer**

A60.  Like Recall, Transfer is not an accession.  This program is for current Chaplains within the DOD system who would like to change their Service, e.g. move from the Navy to the Air Force, or move from the Army to the Navy.

A61.   The words "transfer" or "Inter-service Transfer" connote a change; they do not signal the direction of the change.  Some transfers are applications to join the Navy (e.g. LAR01804 )  and some are applications to leave the Navy (e.g. LAR01520 ).  Since the C/A/R/E memoranda do not usually specify the direction of the move, counting the number of "approvals" says nothing about the direction of, or amount of, change recommended to the ADL.

A62.   Omitting the Transfer Program from the overall data analysis makes very little difference - except to the chaplains involved!  The sample sizes are very small in any case:  while the CC-EF[23] data base (See Appendix DL - Data Lists) has 1396 applications for the D4105 program (both active and inactive), the same data base has only 45 applications for Transfer (both into and out of the Navy and for both active and inactive service.

_____

[23]  CC-EF refers to the Chief of Chaplains Electronic File which was provided to me on July 2006 [See Appendix DL - Data Lists].

**Appendix to Appendix AP:**

Here, as promised, are the figures about candidates over age 40.

Age is important, has been important, because the OPNAV Instruction requires that an accessioned chaplain be "young enough" to have a reasonable likelihood of completing 20 years of service prior to nominal retirement. In the version of this Instruction which is described above, the age limit has been increased from 60 to 68. Prior to the issuance of this version, accessions were covered by SEVNAV Instruction 1120.4A, which set the age limit for accession at 40.



For the 1986-1995 decade, note that the RC candidates are a "minority" under age 40 and a dominant majority over age 40.

And also notice that the selection rate is higher for Catholic candidates than for other candidates, regardless of age.

There are many more candidates in this decade than in the 1996-2005 period:

The Navy is more "strapped" to obtain replacement chaplains in this later decade.



As a result there are proportionately more age waivers than in the earlier decade - leveling the disparity re Catholic somewhat, but not eliminating it.

The over 40 RC waivers still out number the under 40 RC candidates.

The selection rates are closer together here - reflecting the reduction in the number of candidates available.

## APPENDIX BX[24]
### Bernard Siskin's Errors[25]

B1.     Discourse in this dialogue of declarations has slipped the bounds of decorous debate and a vocabulary of personal character assassination has appeared in recent submissions.

B2.     I will not say that Dr. Bernard Siskin "lacks a fundamental understanding of proper statistical inference", nor will I bandy about the extremes he is prone to use: his coin tossing stranger is a "cheater", a compound average in his book is "an outright statistical lie", what he is uncomfortable with in my work is "absurd" and "meaningless"  or  "arbitrary, illogical and has no scientific foundation".

B3.     I will, however, point out that Dr. Bernard Siskin "speaks with a forked tongue".

B4.     He stands on one side of a statistical choice in his Declarations here (when that provides an error-based "benefit" for the argument he is selling) and he stands on the other side of those same choices when he is in public representing himself as a educator who is there to teach students and other professionals the "right" way to conduct this kind of work.

B5.     Dr. Bernard Siskin has (a) a long and impressive list of occasions on which he has been an "expert witness" in Court, in depositions, and for litigation. [I draw attention to his cv as presented in Reference 25.]

_____

[24&15] I originally named this Appendix "BS" for B(ernard) S(iskin), but upon proofreading, and having heard how *sailors* talk, I recognize that this may convey more than I intended, even though I think the data that Dr. Bernard Siskin chose to use is a Biased Sample.  But, to assuage potential eruptions of sensibilities, I have changed the name here to BX.  However, this Appendix still deals with statistical choices Dr. Bernard Siskin knowingly makes, which have the effect (and I believe the intention) of distorting his results - to support what he thinks his clients want him to say, and in the end have the consequence of potentially deceiving the Court.

[25] One might wonder "Why is Leuba so 'exercised' by this debate; expert witnesses always knock the other guy's work".  The answer is: We are at war; our system of government is under attack from religious extremists abroad and our freedoms here at home are in danger. I fear for my country and honor those who are defending it - including the Navy. The Navy deserves better than it is getting in this litigation.  The data, all the history of this issue, cry out for eliminating the religious discrimination which has been allowed to grow cancer-like within the USN Chaplain Corps.  The debate is being ill served by a hired expert who seems to be arguing "damn the rules of statistics, I have a position to defend."  Defendant's attorneys are not statisticians; they depend upon their expert for sound analysis - they are not receiving it, and our country, our Constitution, is caught in the crossfire.  I can do something about that, and this is it!

B5b.    Dr. Bernard Siskin also has (b) said that "In the hands of the careless, the unknowledgeable, or the unscrupulous, statistical information can be as false as 'damned lies'." [Reference 12, p. 85.]

B6.    If we accept Dr. Bernard Siskin's cv as proof that he is not among the "unknowledgeable", and argue that since he is charging fees for his attention he is surely not "careless", then he has left himself (and us) little room.

B7.    I am hard pressed to undertake that Dr. Bernard Siskin's errors in his declarations in this matter are unwitting.

**Let's look at a few of Dr. Bernard Siskin's declaration errors:**

**Case 1.**    In Reference 25 for the Navy, Dr Bernard Siskin puts a footnote on all his Tables, saying:

> "Considers only accessions to active duty and only the *last* application through a program". [Italics added.]

In Reference 24, writing for a "Professional Practice Series" on "Statistical Issues in Litigation", Dr. Bernard Siskin writes:

> "Special issues in combining, or aggregating, data occur when some test takers in the various administrations are repeat test takers.  If these multiple test takers number only a few individuals, one can simply keep the *first* test observation and delete the rest. (Keeping the first test minimizes the effect of practice and learning because, in general, most, if not all, of the other test takers will be first time takers of this test.)" (See page 144; italics added.)

Why does this shift from "first" to "last"  matter?

Because it subtly (or not so subtly) moves the selection rates closer together.

Including the "last" test  gets more "successful" candidates; that moves all the selection rates closer together, and that reduces the room for a difference to be observed.

For Example:

> Here are data extracted from Dr. Bernard Siskin's Reference 25 compared to the *same* data taken from CC-EF (the data base which the Navy prepared for Dr. Bernard Siskin), but these data lookat the first application of the test.

> (I have summed these across the years, so that the differences are more easily observed; and I have not (here) corrected any incidental data entry errors in Dr. Bernard Siskin's data - but see Appendix DL.)

**Last Consideration for Active Duty through the D4105-A Program**
**vs**
**First Consideration for Active Duty through the D4105-A Program**

| Siskin Cluster[26] | Applications BS count | Accessions BS count | Apparent % Recommended | Count First Apl | Count those Accessions | Apparent % |
|---|---|---|---|---|---|---|
| PNL | 149 | 131 | 87.9 % | 149 | 126 | 84.5 % |
| Others | 355 | 306 | 86.2 % | 355 | 290 | 81.6 % |

This "little" difference may seem like an argument about the length of the eyelashes on a gnat. It is not.

First, the principle is important. Tiny or not, this error biases the apparent results in the direction of "no difference" – the argument Dr. Bernard Siskin is trying to sell.

Second, the difference is not truly "tiny", a 4.5% absolute difference (86.2 -81.6) is nearly 25% of the available room in which to see a difference (4.5/{100-81.6}). And:

Third, this practice (of using a biased choice of data for the Navy, and recommending the proper choice in public) was applied to every one of Dr. Bernard Siskin's data tables in Reference 25, so the error cascades through his "analysis."

Dr. Bernard Siskin also makes other errors in this footnote to his Tables. Dr. Bernard Siskin defines "accession" both incorrectly and incompletely.

His definition is incorrect (See Appendix AP) because recommendation to acdu is not an "accession" [see also ¶ 64a in the body of this Declaration].

Dr. Bernard Siskin defines even that (being recommended for Active Duty) incompletely as that is only one is a series of steps leading to being on Active Duty, and the losses which occur post "recommendation" are both significant (20%) and uneven across faith group clusters. (See Appendix AP ¶ 43ff.)

---

[26] Dr. Bernard Siskin sets up his own "clusters" here (See Case 2) below.

**Case 2.** When not under oath, Dr. Bernard Siskin has described the <u>preferred method</u> for conducting the analyses he undertakes for the Navy in this litigation - but in his Declarations in this matter he has not followed his own advice, and **every deviation** in his Declaration has distorted the tabulated "statistical calculations" in favor of his client's hypothesis and against the Plaintiffs' allegations.

In Reference 24 (written before his Declaration here), Dr. Bernard Siskin says of the "Shortfall Method":

> "The shortfall method is more useful to the courts because it specifies the number of protected class members who would have been expected to pass the test if their pass rate had equaled that of the nonprotected class members ... p 141.

In his Declaration in this litigation, however, Dr. Bernard Siskin does not look at

> (a) the number of protected class members who would have been expected to pass the test if their pass rate had <u>equaled that of the nonprotected class members,</u>

he uses

> (b) the number of protected class members who would have been expected to pass the test if their pass rate had <u>equaled that of the whole group of test takers</u>.

This latter, biased, comparison may seem plausible when one looks at how Dr. Bernard Siskin describes it in his Declaration (Reference 25):

> "How does one determine what is expected from a neutral process? It is simply a matter of comparing the number of actual selections with the expected number of accessions for any faith group category. In conducting my analysis, I assume that a Protestant non-Liturgical applicant would have the same chance of selection, on average, as any other candidate or as a Protestant Liturgical Candidate. Hence, if 30 percent of the applicants were Protestant non-Liturgical, we would expect 30% of those selected to be Protestant non-Liturgical. Thus, if there are ten selections, I would expect that three of the ten applicants selected (30 percent) would be Protestant non-Liturgical" (See ¶ 15, pp 9-10 in his December 21, 2005 Declaration in this matter.)

But what has "slipped through the cracks" here is that instead of testing, e.g. Protestant non-Liturgicals vs Others (as he *says* in his Declaration, as he heads his text in Reference 25, and as he recommends in Reference 24) he tests Protestant non-Liturgicals vs the *Total*.

This distinction may seem like a "nuance" to non-statisticians, but it has profound, and biased, consequences for everything that follows.

For example:

<div align="right">(Page change here to have the following Tables on one sheet)</div>

(From Siskin's Tables 1, Reference 24 )
**Statistical Analysis of Protestant Non-Liturgical (PNL)**
**Accessions if the Rate of Accession of PNLs in Each Year**
**in each Program were Identical to the Overall Accession Rate.**
**1996-2005**

| Program | PNL Accessions | | | Statistical Shortfall/Surplus in Units of Standard. Deviation. |
| | Actual | Expected[i] | Accessions[i] | |
| | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| D4105 | 131 | 129 | (2) | 0.64 |
| S4105 | 66 | 64 | (2) | 0.96 |
| Transfers | 9 | 9 | 0 | 0.00 |
| Other | 12 | 13 | 1 | 0.58 |
| Recalls | 45 | 44 | (1) | 0.11 |
| | | | | |
| Overall | 263 | 259 | (4) | 1.02 |

[i]  Rounded to whole persons

Done correctly (i.e., in accordance with both his own professional advice and generally accepted "best practice" in our field) this would be:

**Statistical Analysis of Protestant Non-Liturgical (PNL)**
**Accessions if the Rate of Accession of PNLs in Each Year**
**in each Program were Identical to the Rate for NON PNLs.**
**1996-2005**

| Program | PNL Accessions | | | Statistical Shortfall/Surplus in Units of Standard. Deviation. |
| | Actual | Expected[i] | Accessions[i] | |
| | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| D4105 | 131 | 127 | (4) | 0.32 |
| S4105 | 66 | 62 | (4) | 0.32 |
| Transfers | 9 | 8 | (1) | 0.39 |
| Other | 12 | 23 | 11 | -1.83 |
| Recalls | 45 | 44 | (1) | 0.06 |
| | | | | |
| Overall | 263 | 263 | (0) | 0.00 |

I am NOT drawing attention here to the single "marginally" statistically significant result for "Other"[27].    That is not what Case 2 is about.[28]

I am also NOT drawing attention here to several other incidental arithmetic errors behind the figures in Dr. Bernard Siskin's Table 1.

While being able to verify tabulated calculations is important, there is a much larger issue here.

If one removes the "rounding" adjustment, and corrects the underlying arithmetic, these two methods produce a ***pattern*** of SMALL differences.

|  | Actual Selections | Expected Selections — Using the Method in — | |
|---|---|---|---|
|  |  | Siskin Ref 25 | Siskin Ref 24 |
| D4105 | 131 | 128.43 | 126.58 |
| S4105 | 66 | 64.30 | 62.30 |
| Transfers | 9 | 8.28 | 7.76 |
| Other | 12 | 15.17 | 23.40 |
| Recalls | 48 | 44.68 | 44.49 |
| Overall | 263 | 263.01 | 263.03 |

The differences between Dr. Bernard Siskin's two methods are small (one might even argue that they are tiny), but, except for typing errors and arithmetic errors (which are important in their own right as indicators of care and quality control, but are presumably randomly distributed) the method which Dr. Bernard Siskin *chose* to use in his Declaration here (Reference 25) produces **systematic** error in favor of his clients' hypothesis.

_____

[27] I think that "Other" is an invention of Dr. Bernard Siskin's to "hold" data he does not know where else to count.  When one looks at the data he was given (which I was able to do after July 2006), one can see that the records from which these particular cases are taken are simply incomplete memoranda, on which the CARE Group's clerk neglected to type in a program name.

[28] There are a host of errors which Dr. Bernard Siskin makes in understanding the Programs and in defining "accession". [Recall is not an accession. Transfer cannot be analyzed as the "numbers go both ways"; some Chaplains transfer into the Navy and some transfer out; without separating the "direction" of the proposed move one does not know if an approval adds to the Navy or subtracts from it. Other, is a clerical omission elevated to the status of separate analysis - so most, 60%, of Dr. Bernard Siskin's Tables cannot address accession.  The other two tables do not address accession; they address additions to Active Duty. [See Appendix AP - above.] and they do that incorrectly - which is the point of Case 2 here.

The problem with these two methods is that the approach Dr. Bernard Siskin *chose* to use in his Declaration here, *always* moves the estimate of "Expected" closer to the actual. That is, it *always* biases the estimate toward the hypothesis: "There is no difference in selection rates for the protected class and the total."

This systematic bias comes about because the selection rate for the total is based on the **average** rate and the average includes the protected class. [In a sense, one is testing for a difference between a thing and itself.]

The "estimate" in Dr. Bernard Siskin's Declaration approach has been corrupted (a statistical term) by the arithmetic. [He knows this.]

When Dr. Bernard Siskin tallies ten comparisons of expected versus actual, he has presented ten consecutive estimates, each of them biased in favor of his client's position. He does, in short, what he accuses his coin tossing stranger of doing, obtaining ten "hits" in a row; and he called that stranger a *cheater.*

In his Declaration here, he has presented three tables said to be relevant to accessions, with a total of 26 estimated differences based on averages, and every one of them is biased toward the position his clients have asked him to defend. And then he does 100 more estimates in his Appendix, all of them similarly biased in favor of his "assigned" hypothesis.

In his oft published essay on "The Art of Statistical Deception" (References 11, 12, 13 and 14, and reproduced in Reference 10), Dr. Bernard Siskin describes a case where an employer calculates average salary, including his own salary in the pool (i.e. putting two different "groups" into the same pool) and Siskin calls this "An outright statistical lie."

None of Dr. Bernard Siskin's tables in his December Declaration in this matter are to be credited.

The least of their problems is that the numbers therein cannot be tracked back even to the predigested data which was given to him by the Navy.

The flaw which would justify their being struck from the record is that they are wittingly and by choice, biased (statistically as well as in the "common language" meaning of that word) in favor of his principles' interests.

This is not independent, and it is not "true and correct".

**Case 3.**    In his Declarations for the Navy (References 25, 26 and 27) Dr. Bernard Siskin writes

> "The proper statistical conclusion, based on the observed data [in which he finds no statistically significant difference], is that there is equality of .... [selection] rates for the faith groups."

In the various editions of his text book on Elementary Statistics, Dr. Bernard Siskin[29] writes:

> "**Failing to reject the null hypothesis implies only that we did not find sufficient evidence to reject the statement of the hull hypothesis.** Note: Some people prefer to use the phrase 'accept $H_o$' in place of 'fail to reject $H_o$'" However, failure to reject the null hypothesis states the decision more accurately – namely that we failed to find sufficient evidence to convict (reject) the accused ($H_o$) as in a courtroom trial. We acquitted the defendant; we did not prove the defendant innocent." [p 280-81, Reference 12. Bold face in the original.]

Dr. Bernard Siskin is flatly wrong when he says, in his Declarations to this Court, that he has "proven" that the ...... rates are the same because he has failed to find statistical significance. He knows he is "less than accurate" to say this, but he still says it when hired to support a position.

{I know that is harsh.}

Let's take another look at the coin tossing stranger whom Dr. Bernard Siskin accuses of "cheating" – and instead of standing there and letting the stranger take our money, let us collect data for ten days, here are the first three:

| Day | Outcome | Likelihood | Statistically Significant? |
|---|---|---|---|
| Monday | Head | .5 | No, only one trial |
| Thursday | Head | .5 | No, only one trial |
| Tuesday (morning) | Head | .5 | No, only one trial |

---

[29] I do not know if I am being generous here or not. Dr. Bernard Siskin *says* on page one paragraph one of his December Declaration: "I have authored four books on statistical methodology. ...." His cv lists one pop culture book on the likelihood of assorted happenings, and he then lists himself as the first author on three books with R. Johnson (who in the Library of Congress references for those books record B. Siskin as the junior author.) Johnson has now published at least an eighth edition of this text book on elementary statistics and his junior author for this edition is Patricia Kuhn. The Art of Statistical Deception, and the understanding recited here about what one may properly say if one does not find a satisfactory level of statistical significance are in this latest edition as well as the earlier ones. A skeptic or cynic might think that Dr. Bernard Siskin's cv had been "puffed" here and that he did not write this material. I need not weigh in on that point to observe that he participated in these books and should know the proper interpretation to flow from insignificant results. Mr. Hyde is not a statistical sophisticate; he has been mislead by Dr. Bernard Siskin's outlandish assertion, and in believing it and then quoting it to the Court, he risks being seen as intending to mislead the Court.

Continuing:

| Day | Outcome | Likelihood | Statistically Significant? |
|---|---|---|---|
| Saturday | Head | .5 | Still No, only one trial |
| Wednesday | Head | .5 | No, only one trial |
| Friday | Head | .5 | No, only one trial |
| Monday | Head | .5 | No, only one trial |
| Sunday | Head | .5 | No, only one trial |
| Tuesday | Head | .5 | No, only one trial |
| Friday | Head | .5 | No, only one trial |

If we combine the data, we can/may reject the null hypothesis and conclude that the coin is biased (or the stranger is biased) or we are gullible.

But if we follow Dr. Bernard Siskin's rule that failure to reject the null hypothesis proves it, then on Monday we "proved" that the coin is unbiased because one head in one toss is not statistically significant, and we proved that the coin was unbiased again on Thursday, and again on Saturday, etc. Somewhere along this path way, if we pool the data, we will see that the coin is biased, or that the stranger is biased, or that we are gullible. But if we keep declaring the coin "proved unbiased" today, (and it was proven unbiased yesterday too), when will we realize that both the coin and the method of examination are biased?

If we follow Dr. Bernard Siskin's statistical inference rule, and subdivide our data into ten rows (as he has done in his Tables A1 to A10 in Reference 25, we can be gullible and believe both (a) that there is no statistically significant difference and (b) that that means that the selection rates are the same.

[The Navy deserves better advocacy than that.]

**Case 4**   Dr. Bernard Siskin has opined recently (8/11/06, in Adair; Reference 27) that "Dr. Leuba's report is predicated upon a misunderstanding of how to properly conduct statistical significance tests and calculate shortfalls."   And he goes on to suggest/explain that:

> "I have aggregated the results (which were calculated separately by year and position) to the position level and then overall, using the well-known Mantel Haenszel statistic...."

But in his most recent professional appearance (Reference 24, p 144) Dr. Bernard Siskin writes:

"Now, assume that the same unsuccessful candidates bid for and were interviewed for each of ten promotional opportunities.  In such a case the use of the Mantel Haenszel or aggregated binomial tests may be invalid because these procedures assume independence of selection between administrations."

Here, again we have Dr. Bernard Siskin telling the Court one thing and telling his professional colleagues something entirely different.

Let us turn to an instance where he manages to play both sides of the street in the same Court document:

**Case 5**   In his December 2005 Declaration in this matter, Dr. Siskin says that:

> "there is no statistically significant difference in the likelihood that a Protestant non-Liturgical candidate will be accessed ..." and he goes on to set up his own faith group clusters" (e.g. page -4-)

•     Liturgical Protestant
•     Non-Liturgical Protestant, and
•     Other (which, because that is all that remains, is both Catholic and Special Worship.)

Now, my criticism at this point is not only that his "third group" has been diluted so that it looks more like the other groups in likelihood of accessing,

Nor is my criticism at this point that he is unwittingly (I trust) not actually speaking of accessioning, but is actually focused narrowly on recommendation for Active Duty.

My criticism here is that on page -18- Dr. Bernard Siskin says:

> "Dr. Leuba seems to have been mislead by his finding of a high acceptance rate of Roman Catholic applications, in light of the shortage of Roman Catholic applicants.

Dr. Bernard Siskin hereby gives notice, that in his view (a) there is a shortage of Roman Catholic applicants, and (b) that they have a high acceptance rate.

How can there be a "shortage" if there are no quotas?  Shortage with respect to what?

How can Dr. Bernard Siskin say (in this same document):

> "In conducting my analysis, I assume that a Protestant non-Liturgical applicant would have the same chance of selection, on average, as any other candidate *[including a Roman Catholic?]* or as a Protestant Liturgical Candidate.   Hence, if 30 percent of the applicants were Protestant non-Liturgical, we would expect 30% of those selected to be Protestant non-Liturgical.  Thus, if there are ten selections, I would expect that three of the ten applicants

selected (30 percent) would be Protestant non-Liturgical" (See ¶ 15, pp 9-10 in his December 21, 2005 Declaration in this matter.)

And imply (by omission?) that this logic does not extend to Roman Catholic applicants (but just in case it does, Dr. Bernard Siskin pools the Roman Catholics in with the Special Worship candidates - and conceals the fact that his data show this:

| Navy's<br>Faith Group Cluster | Dr. Siskin's overall<br>Accession rate |
|---|---|
| Catholic | **89.8 %** |
| Liturgical | 80.1 % |
| Non-Liturgical | 83.2 % |
| Special Worship | **78.8%** |

Using the statistical test for proportions described in Johnson and Siskin (Reference 12), the Catholic acceptance rate *in Dr. Siskin's data* is statistically significantly higher than the non Catholic rate.

He has statistical significance glaring at him, so noticeable that he uses the difference to "explain" my alleged confusion, and yet he is silent about the implications either for a quota system, or for the raw, and herein demonstrated again, fact of preference for Catholics.

At every crossroad, Dr. Bernard Siskin chooses an adulteration or a method he knows is wrong, with the effect of concealing or diluting or minimizing otherwise observable differences.

Dr. Bernard Siskin says *Leuba doesn't understand*.

Dr. Bernard Siskin is not even right about that; I do understand!

**A note about statistics and**
**"The Art of Statistical Deception"**

It would not have occurred to me to write this if I had not looked in Dr. Bernard Siskin's book[30] and found the title. (See Reference 12 & 13, Section 3-5 and Reference 14, Section 2-7.)

One might be mislead by this title, and the context in which I raise it, and assume that Dr. Bernard Siskin is an advocate of deception or was intent on providing a tutorial.

I think that it is clear from their syntax in *situ* and the way they present their examples (in overview and not in recipe) that the authors are in fact warning their readers that statistics can be used badly (wittingly or unwittingly) and that caution and thought need to be exercised by those who use the statistician's products.

That said, however, I also think that Dr. Bernard Siskin's December Declaration in this matter reflects several, what shall we call them, ploys?,  adaptations?, approaches  - which serve more to obscure the "true" probability of accession (as Johnson and he define true probability in their book) than it does to illuminate it.

I think that their example about the small business man who reports the average salary of his employees (including himself in the category) is akin to what Dr. Bernard Siskin does here in comparing NPL selection rates to the selection rates for all candidates. [I also think that it violates the scholarly advice he provides in Reference 24 about comparing groups to each other.]

I think that their example about the realtor who provides insufficient information could have been written about Dr. Bernard Siskin's focus here on "Faith groups" instead of on denominations.

_____

[30] Because this note is about deception, let me be precise here.  Point 1. This is not Dr. Bernard Siskin's book.  It is mine; I bought it (from Amazon.com) after a library discarded it. Point 2. This is not "Dr. Bernard Siskin's book.".  He was the junior co-author with Robert Johnson.  Point 3.  Dr Bernard Siskin has not "authored four books on statistical methodology" as he asserts in Paragraph 1 of his Declaration.  He has co-authored one pop culture book of probability tidbits "What are the Chances? Risks, Odds, & Likelihood in Everyday Life" (The chance that the next person you meet will be a Born Again Christian is 33% - [p 155, no source given.])  This is not a book about methodology of any sort, statistical or otherwise).  Further, Johnson and he have written the "same" highly readable "Elementary Statistics" book in three incarnations.  I am not being petty, or petulant, or pedantic in these "corrections". [Though I may be being envious; the only "book" I ever wrote (on quantitative psychology and human factors) I did not finish in time to meet my contract with John Wiley & Son.]  Dr. Bernard Siskin is a competent statistician and an experienced expert witness.  I think he "knows better" than to have done what he did in his December Declaration and this appendix is going to draw some parallels between what Dr. Bernard Siskin does in his December Declaration and some of the methods he says are deceptive - as described in "his" books.

But, even at that, the Realtor's discussion of average temperatures was not as deceptive as it would have been had the realtor only discussed mountain temperatures during the Fourth of July weekend. The parallel example here is that Dr. Bernard Siskin's December Declaration only discusses 13% of the data he was given by the Navy - and even if the Navy "told" him to limit his attention to the last ten years, sampling differences, and changes in the underlying apparatus of acdu/accessions (change-point) should surely have raised the hairs on the backs of his hands if not on the back of his neck.

I think that his example about Conglom Corporation representing itself as a friend of the small investor could be a parable for why not to segregate ones limited data into 50 lines.

On the other hand, and to be both fair and to forestall reflected criticism, his observations on the uses (and misuses) of graphs are exactly on point - and I notice that he uses no graphs in his December Declaration.



Here is a graph I modeled on the "Johnson and Siskin" thumbtack tossing experiment (see Ref 13, page 117.)

This is a good use of the data I had, but it is deceptive; it "stretches" to suggest that I had "years" of data, when all that I had was 45 cases in all that period.

Nonetheless, the data is "valid"; the inferences I want the viewer to take away are valid; but the "picture" here exceeds the bench mark value of 1000 words by some significant margin. If we change the ratio of the scales we can highlight the variation, instead of the implied stability.



But both curves are deceptive in the sense that they are making us look at a tree instead of the forest. Special Worship Chaplains are under accessioned relative to their percentage of applicants; we can prove that with a simple binomial test. We do not need to draw a graph and read the differences in asymptotes.

The diabolical deception here, however, is not in the graph, not in the choice of scale, not in the use of parametric statistics, and not even in data error rate.

The diabolical deception here is the use of a single label to hold all the data about a collection of Chaplain candidates who are not cohesive in any coherent way.

The diabolical deception is in adopting the Navy's management categories as the basis for statistical analysis.  Surely the first thing a good statistician would do when presented with a question about disparate impact would be to see if the groups that "management" identifies as different are treated differently, but the second thing a good statistician should do is look to see if management's classification system was reasonable, consistent, and relevant.

"Special Worship Chaplains" are the most egregious, most glaring, example of how the Navy has couched this argument to conceal its institutional and historic preference for Catholics, and how the continued use of these so called "faith group clusters" is the instant support for the deception being perpetrated by the defenders of the Navy's denominationally prejudiced Chaplain Corps personnel management system.

The Navy classifies it's Chaplains into four faith group clusters.

•       It has shown no **business reason** for needing to classify it's Chaplains by "faith group".

•       The classification system is Roman Catholic-centric in focus.  Roman Catholics have their own "group", all by themselves..  All other denominations are divided into three  groups defined in terms of "degrees of separation from Roman Catholic".  Closest are the "Papal Infallibility" denouncers of the Protestant Reformation (Lutheran, Episcopalian, etc.,) all classified as "Protestant Liturgical"; next are the Sacrament non-conforming disciplines lumped together as "Non-Liturgical"; and everybody else, plus the original Great Schism of 1040, i.e. the Orthodox, is classified as "other", in the "Special Worship Group."

•       These groups are different in terms of the degree of their non Roman Catholicness, but that is the only systematic differential they share, and (a) Catholicness is not demonstrably correlated to any military purpose, and further (b) just as with many classification systems applied to *people*, the intra group variation on other **more relevant** religious dimensions is large vis a vis the inter group variation.  That is the definition of confounding.

The "big lie" in this data is concealment of the disenfranchised in a crowd of similarly "named" but relevantly different clergy.  Religious belief in America, and indeed in the World, is very important - at least to the believers.  An Imam is not a "substitute" for a Rabbi; a Presbyterian is not a "substitute" for a Priest.  Within this general terrain of difference, one needs to look at the data on *denomination* and test whether the denominations in control in the U.S. Navy Chaplain Corps are "treating others the way they treat themselves".

# APPENDIX CP
## Change Point

CP1.    Prior to 1986/87, all U.S. Navy Chaplain Corps promotion panels had two Roman Catholics sitting as members.

CP2.    As a result of (settling?) litigation alleging that this was an undue introduction of religious preference into secular matters, the Navy entered into an agreement to limit Catholic membership on promotion boards to a single seat.

CP3.    Since 1986/87 they have mostly honored this agreement, generally "filling out the Board" with one *non*-Chaplain.

CP4.    Some time around 2000/2, when there was new litigation alleging religious discrimination in Chaplain Corps personnel decision matters,

•    the Navy started putting *two* non-Chaplains on every Promotion Board.  The CARE Board records which were recently produced to the Plaintiffs by the Navy suggest that this pattern of having a non-Chaplain Board Member, has been extended to the CARE Boards. (See my "Appendage" Declaration.)

•    Meanwhile, overlooked in the interstices of the Defendant's pleadings, there is a remark (an acknowledgment) that

> "Since fiscal year 2001, the Navy has not broken down chaplain accession goals by faith group categories ..." [Reference 8, "fact" 6.] This is at least an oblique admission that prior to FY 2002 the Navy did allow faith group to play a part in accession plans. [See also Appendix QE - Quota Effect.]

•    And also at this time, as an independent action, or as part of a general "getting the house in order", the Navy appointed a Chief of Chaplains who was a from their Special Worship Faith cluster, and a Deputy Chief who was from a Non-Baptist, Non-Liturgical denomination.  These were "sea changes" in the denominational patterns of the Corps hierachy.

•    Finally, for whatever reason, the number of U.S. citizens interested in becoming a United States Navy Chaplain dropped almost 50% when measured as applicants per year between 1985 and 1995, and then dropped another 50% between 1995 and 2000.  In the earlier decade the C/A/R/E Board was able to consider 30 or 40 candidates per year and reject as many as 20.  In the most recent half decade, C/A/R/E Board considered a dozen candidates

per year and had to accept virtually all of them. When the pool of applicants decreases *that much*, opportunity for discrimination virtually disappears.

CP5.    The purpose of this section of my Declaration is not to describe each of these changes, nor to attempt to figure out what their individual and collective impacts might have been.  My point here is to (a) demonstrate that there has been a change, and then (b) to suggest that the fact that "something has changed":

•       means that data from after the change may not be representative of behavior prior to the change,
and also
•       signals that the Navy is in control of what it does

           (a) may revert to discriminatory practice after the furor dies down or
           (b) may select a different denominational preference pattern du four.

Personnel selection decisions free of denominational contamination should be the goal, not just letting some other group "have a turn."

CP6.    I have read that it is a commonplace in discrimination litigation that as soon as the lawsuit is filed, the Defendants' management team begins to focus not only on defense, but also on damage limitation - and in an effort to be in compliance, management frequently begins hiring more minorities. (Gastwirth, Ref 6.)

CP7.    Defendants respond in this manner so often that the legal literature has a name for the phenomenon, Change-point[31], and the statistical literature has developed a lively debate about how best to handle the statistical analyses which are required.

CP8.    In Dr. Bernard Siskin's Declaration, although he has data covering twenty years of Navy "accession" practice, he only analyzes the most recent decade. And although the period covered by "his" data includes the period covered by the complaint, data, he only analyzes the most recent decade.

CP9.    Dr. Bernard Siskin's narrowed consideration raises the obvious question: Why does an expert statistician voluntarily truncate his data base?

CP10.   The good reasons for not using all the data and the bad reasons for not using all the data, have a concern in common - that the new data is different from the old data (read "change-point"?).

---

           [31] Wherever the record is clear, U.S. Courts (as well as those in the United Kingdom) have ruled that it is behavior during the period which precipitated the complaint which is relevant, not behavior during the "well I have mended my ways" period. (Reference 5.)

CP11.   Dr. Bernard Siskin tells us that he limited his focus because he was "asked to".

CP12.   All that one has to do to *see* that there has been a change point is (a) look at the list of things which have *changed* (see ¶ CP 4 above) and then (b) look at the data across time.  →→→→→→→



CP12.   This figure shows clearly that there change in the acdu recommendation pattern in 2000/2001 [just about marker 14/15 in figure CP-1].  Prior to this "point" the acdu recommendation rates were different from each other, with Catholics always at the top,  and the Non-Liturgical faith group cluster always at the bottom.  But when the change point occurred, the tracks for each faith group converged. (This pattern is  statistically significant.)

CP13.   If the pre and post change point periods are different in terms of (a) *that* the recommendation rates are different across faith group clusters, or (b) *why* the recommendation rates are different across faith group clusters, then even if properly analyzed the later data may not "represent" the earlier period.  Thus, even if Dr. Bernard Siskin's analysis was done correctly (and it was not) it cannot be used to represent the Navy's conduct about accessions during the period of time which precipitated this complaint.

CP14.   In the figure above, which puts all the available data on a comparable footing, one can see that "something changed" between year 14 and year 15.  Prior to 2002 the three "groups" have separate tracks.  After 2002 the three Series overlap each other.

CP15.   In the 1988 to 2002 period (the period covered by the data that the Navy provided to the Plaintiffs, and the period during which the alleged bias took place):

•       The data cluster composed of Catholics and Special Worship Chaplains is always at the top of the chart, in a consistent position of preferred selection probability.

•       The data cluster composed of most of the Liturgical denominations (and a few Non-Liturgical denominations) is "in the middle" and

•       The data cluster composed of the Baptists and Non-Baptists as well as a few unpopular Liturgical denominations is routinely at the bottom in terms of selection.

CP16.   After 2002, the three series tend to come together and the earlier differential acdu recommendation rate pattern seems to have dissipated (temporarily?)

CP17.   Chi Square (op cit) demonstrates that the three Data Clusters:

•   have statistically different preference patterns between each other within the 1988 and 2002 period; ($p<.001$ or differ by three standard deviations) and

•   do not have statistically different patterns between each other within the 2002 and 2005 period; but

•   differ in their patterns between the two periods ($p<.001$ or differ by three standard deviations.)

CP18.   This analysis, "explains" (¶ CP19), demonstrates (¶ CP20), and suggests (¶ CP21):

CP19.   How Dr. Siskin can assert that there are no differences (within the data he looked at).

When the whole data period is culled to focus on just the most recent period, and when the data clusters are composed to dampen the effects of differential treatment, the real differences in some of the data are swamped by the noise in the rest of it, and one can then use a statistical test to note that there is no pattern still *visible* in the data.

CP20.   Why my Declaration and Appendage can point to real differences in selection rates.

When all the available data is separated into denominationally distinct sets, the effect of denomination upon accession can be readily observed in the data:

**Table CP-1** [32]
**If 100 Chaplain Candidates of each Denomination were Considered by a CARE Board,**
**How Many would be Accessioned?**

| Navy Defined Group | Sample Denomination | Percent likely to be Selected |
|---|---|---|
| Catholic | Catholic | 96 |
| Liturgical | Episcopal | 90 |
| Liturgical | Presbyterian | 86 |

[32] Sampled from  Table 3, Page 26 in my October Declaration

| | Lutheran | 81 |
|---|---|---|
| Non-Liturgical | Southern Baptist | 71 |
| | Assembly of God | 60 |
| | Church of God in Christ | 50 |
| | Chaplaincy of Full Gospel | 46 |
| Special Worship | Muslim | 66 |
| | Mormon | 60 |
| | Seventh Day Adventist | 58 |
| | Unitarian Universalist | 33 |

> The differences in selection rates here are statistically significant beyond two standard deviations when one compares groups across the double lines, and sometimes statistically different within the groups, e.g. both the Church of God in Christ and the Chaplaincy of Full Gospel Churches are much less likely to be accessioned than are the Southern Baptists, who are less likely to be accepted into the Corps than any of the Liturgicals, who in turn etc.

CP21.   Finally, the data change at 2000/2002 suggests this hypothesis:

> The Chief of Chaplains impacts accession rates beyond the implicit presence of his denomination on a Board.

CP22.   Finding a change point has profound consequences for the dispute at hand.

CP23.   First, because the finding applies to a recent period, a period which is statistically and operationally different that the earlier period ( i.e., a "different period"),  regardless of how correct the calculations may be, they do not apply inferentially, may not be interpreted retroactively, to cover past behavior. [This is a statistical opinion, not a legal one.]

CP24.   Second, Dr. Bernard Siskin (having subdivided his data into ten years, five accession programs, and two different category comparisons) calculated 100 standard deviation scores and found none that rose to the level of statistical significance at the .05 level of likelihood.

> Since the chance of a .05 level of statistical significance is, by intention, 5%, there should have been 5 such occurrences in Dr. Bernard Siskin's sample of 100. The probability of not getting a statistically significant result in one sample should be .95. And the probability of not getting even one statistically significant result in 100 trials

should be .95[100] or .006.  This is statistically significant in its own right at the level of two and a half standard deviations. (And even if Dr. Bernard Siskin's method of calculating the standard deviations is incorrect [in cannot be verified as he provides neither the data nor the statistical formulae he used, and the data are not independent trials[33]] this statistical significance (in reverse) conclusion follows because we are not testing standard deviations *per se*, but rather the implications of Dr. Bernard Siskin's assertion that he tested for significance and found none.)

CP25.  Third, the fact that the data between 1995 and 2005 shows NO variation from "parity" between the "faith groups" as defined by the Navy and as used by Dr. Bernard Siskin, argues that the accession process was operating to "keep the **groups** balanced" (even though the denomination by denomination preference structure - e.g. for Catholics and against evangelicals - remained undisturbed).

Dr. Berard Siskin subdivided his data by year and by program and then analyzed it by "faith groups cluster" and found NO variation.  The raw data show that each CARE Board was required to report how many Chaplains it had accessioned - by faith group cluster.  (There was a sample Board record attached to my October Declaration - the faith group monitoring tally is filled in at the bottom of that form). This constellation of facts suggests that the Boards were monitored by
(and may well have thought themselves to be being evaluated by) how well they maintained the politically correct balance.  The fact that the balance was maintained, when calculated on the basis of these faith group clusters (but not when calculated on the basis of denominational categorizations) shows that the Navy was (as it repeatedly states) "managing by faith group cluster". (This is, see above, statistically significant beyond the level of two standard deviations.)

_____

[33]Concern for the validity of Dr. Bernard Siskin's "standard deviation" method originates because he does not say what he did, and it is compounded because most statisticians use parametric methods and assume "independence" -  that is they assume that the outcome of one trial does not effect the probability of selection on the next trial.  The data which Dr. Bernard Siskin analyzed are not independent.  Since the CARE Board is given a quota in total (and guided by an implicit requirement to be "equitable", which is monitored explicitly) the Board's decision re the $n^{th}$ candidate under consideration is, by human nature, influenced by what the Board has decided earlier. [One need not have been a fly on the wall to conceive "vibes" in the debate, if not outright statements, like, "We've already got three 'Church of Eric', if we pick John, we can't pick Jane."  Even if a Board meets without deliberating, and votes in silence, considerations like these must occur to some board members.  One cannot vote a quota number of candidates without at least counting the number of votes one has cast.] The trials are not independent, not here in accessions, and not in Selective Early Retirement Boards, and not in Promotion Boards - but that only matters if a statistician wants to use parametric methods, which is why I use non-parametric methods - e.g. Chi-square.

CP26.   The only logical or statistical conclusion which fits these facts, the only conclusion which accepts Dr. Bernard Siskin's Declaration (limited to 1995 to 2005) as well as the denominational analyses which can be drawn from the Navy's raw records for 1985 to 2005, is change-point.

CP27.    The Navy has historically monitored its Chaplain Corps in terms of the proportions of (a) Catholics (with or without "other" [sometimes referred to on their own as the "Special Worship" group]), (b) Liturgical Protestant, and (c) Non-Liturgical Protestants. The Navy has done this for years; and, for years, the system has overlaid a de facto denomination by denomination preference structure.  When the litigations started in 1986/87, the Navy "settled" the initial challenge and changed its pattern of denominations on selection Boards: instead of placing two Catholics on every Promotion Board, they limited it to just one (but the Navy did not change the culture underneath, and denominational preference patterns persevered); in 2000/2002 when the litigation rose to a new fervor, the Navy again changed the pattern of denominations it placed on selection Boards, adding two non-Chaplains to every Promotion Board - and it stepped up its monitoring efforts - based on faith group clusters - but, again, it left the underlying culture of discrimination in place, and it also left the policies which facilitate that culture in place.

CP28.   In Dr. Bernard Siskin's non-advocate role as a statistician, he and his colleague Robert Johnson have published several editions of a thorough and improbably readable text book about Elementary Statistics. (Refs 12,13 and 14.)  There, when discussing experimental probability, and the central limit theorem, Johnson and Siskin presents a Chart (Ref 13, p117), which illustrates the central limit theorem:   "The larger the number of experimental trials, n, the closer the experimental probability P'(A) is expected to be to the true probability P(A).

CP29. Here in Figure CP-2 is a copy of the Siskin and Johnson Figure 5-3. [Their graph is based on 50 samples of 10 tosses.]



Leuba Sept 2006 Declaration re Accessions: page 69

CP30.  In Dr. Bernard Siskin's role as an advocate, in his December Declaration, he has data covering only 87 rejections which he distributes among 100 "experiments".  Not surprisingly, on a sample by sample basis Dr. Siskin's data here scatters across the entire range -  from 0% to 100%.  However, summing his data, by program (which he does not do in his December Declaration) and looking at it by "faith group cluster", the chart below (Figure CP-3) and the two following (Figures CP-4 and CP-5) show what Dr. Bernard Siskin's data here looks like:



CP31.  Notice that not one of these three "faith group cluster" charts has the initial oscillation that is present in the data from the Johnson and Siskin thumbtack tossing experiment. (Figure CP-2)  I do not mean "notice" as in, "Isn't this a curiosity?"



I mean *notice* as in, this is *evidence* of a curious (or perhaps not so curious) lack of variation.

It is a statistical fact, a statistically significant fact, that the data which Dr. Bernard Siskin tabulated here are less variable than one would expect.



There is a specious consistency here (see above.) The CARE Boards are using tighter "quality control bounds" on their decision patterns than chance would predict.

CP32.  All this comment about specious consistency might sound like a *catch 22* ("if it's not out of tolerance, it's too close") or a difficult four year old Goldilocks complaining about porridge (if it's not too hot, or too cold, it's too medium), but variation is the hallmark of random events.  In point of fact, it is Dr. Bernard Siskin's mysterious stranger's having no variation (ten heads in ten flips) which leads Dr. Bernard Siskin to suspect "cheating".  Too little variation is an indicator of intentional control or manipulation.

CP33.  In the present instance we see the CARE Boards CONTROLLING selection ratios <u>among</u> faith group clusters *after* the change-point, (see Figures CP-3, CP-4 and CP-5 - above) and we see some control, by faith group cluster, *before* the change point (see Figures CP-6, CP-7, and CP-8), but we do not see "parity" <u>within</u> faith group clusters, either before or after FY 2000. (Compare Figures CP-10, CP-11 and CP-12 to Figures CP-3, CP-4 and CP-5).







CP34.  What we see <u>within</u> faith group clusters, both before and after the change-point  is significant denominational prejudice. (Compare Charts CP-10, CP-11, and CP-12 to each other.)

CP35.  In looking at the plots, please keep in mind (a) that the series above this point in this document: (i) deal with 1996 to 2005, (ii) have used confounded classifications to define the faith group clusters, and (iii) when the probability of selection is already near to 90%, it is difficult to see much year to year change in the cumulative selection rate.  On the other hand, (b) the charts below: (i) cover an earlier and a longer time period (1988 to 2002), (ii) have reasonably consistent definitions of faith group clusters, when clusters are used, but also (iii) show the consistently lower selection rates for non-Baptist, non-Liturgical Chaplains as a group, with  Southern Baptists and CFGC's singled out as examples of the Navy Chaplain Corps' disaffection for some denominations.

CP36.  Just to hammer home the point that some denominations are still, and have been for some time, preferred over others, compare Figure CP-5 and CP-6 (above) to each other, on the same graph, as I have done here in Figure CP-8.

CP37.  The numbers in the tables in this Declaration; the statistical computations above, and now these figures - no matter how one looks at the data, if one *looks* at the DATA, all of the data, and if

one resists the temptation to extrapolate *backwards* the general assertions in Dr. Bernard Siskin's Declaration, then these conclusions (and only these conclusions) fit the entire data set:



CP38. The U.S. Navy Chaplain Corps has denominational preferences in its accession program. Dr. Bernard Siskin's 1996 to 2005 data base demonstrates (a) that there was a change-point in or about FY 2000. The Accessions apparatus changed - the selection of Chaplains by faith group cluster took on a more balanced appearance, but the disparate impact <u>within</u> the Non-Liturgical faith group cluster remained.



CP39. The Navy does manage by Faith Group. They keep track of their Chaplains by "faith group cluster", and they assign them to selection board duty, by "faith group cluster". [Selection Boards include (at least): Promotion Boards, Selective Early Retirement Boards, and, Accession and Recall Boards.]



CP40. The Corps staffs these Boards with a pattern of denominations which conforms to their intended mix of faith groups in the Corps as a whole. Whether they do this for its "unintended consequences" or not, they *say* they do this to assure "representation" by *faith group cluster*. Two features of how they implement this "policy" drive the outcome.



- First, the assignment of Chaplains to Board duty, by "faith groups cluster", is neither balanced across faith group clusters, nor balanced across denominations.

- Second, the Navy provides each Board with a "decision record log" onto which the Board's recorder is required to post the Board's decisions - not just the decisions *per se*, but, in a presumably well intentioned effort to assure compliance with equal employment opportunity goals and free exercise of religion goals - the recorder is required to keep track of candidates and selections by *faith group cluster*.

CP41.   Thus, because the Navy manages its Chaplains by "faith group cluster", and keeps its records on that basis, the monitoring of the Corps' selection performance is done on the basis of the faith group clusters - and denominational differences are not simply "ignored", they are allowed to be considered "off the books!"

CP42. In consequence, because of (a) the operation of  "like likes like", (b) the pseudo balanced pattern of faith group clusters on the Boards, (c) the biased pattern of denominations on the Boards, and (d) the subtle or not so subtle pressure to keep track of the Board's decisions in faith group cluster terms - the decisions of the Boards (1) tend to match the "faith group cluster" of the Board itself (which is based on the distribution of denominations the Navy respects) and (2) the probability of selection (by faith group cluster) tends to be "politically correct", while (3) within faith group cluster, the denominations who get to sit on Boards will benefit and those who do not get to sit on Boards will suffer.

**This structure explains**:

CP43.   Why Dr. Siskin consistently reports "no significant difference" regarding the selection rates by **faith group cluster**, especially during a period of increased vigilance regarding religious bias. [Dr. Siskin only looks at "faith group cluster", and there was a change-point coincident with the appointment of Admiral Black as the Chief of Chaplains in FY 2000.]

CP44.   Why the denominationally parsed data consistently finds differences in selection rates among **denominations** within faith group clusters. [The Navy controls (by monitoring it[34] ) CARE Board decision parity at the cluster level and leaves the denominations to the mercy of the "like likes like" phenomenon playing out through a pattern and practice of assigning favored denominations to selection boards.]

CP45.   It also explains:

CP46.   Why or how (a) the "raw" mix of denominations available in the population drifts into (b) the "parity" mix of faith group clusters which the Navy achieves at the upper ranks of the Chaplain Corps.

---

[34] There is a mantra in the military: "The troops only do what the General's inspect." This is meant to suggest (a) if you don't inspect it, it won't get done; but it also means that (b) if you inspect, the troops are likely to modify their behavior to conform to your inspection criteria.

CP47.   Accession, as studied by Dr. Siskin, is not the beginning of the process.  The Chaplains who recruit the candidates have a "mix" of denominations themselves (and whether they recruit their own or not, they are certainly more adept at talking to other members of their denomination) and they have accession goals based on faith group clusters!  This is a recipe for a screen or a funnel, which filters the pool, (perhaps just a little bit, but with a constant erosive effect like waves on a rocky coast) away from the natural variety of denominations from which the Army and Air Force recruit, and into the mix which the Navy considers.

CP48.   Then within the accession assessment process, the CARE Board (with its own mix of denominations and required decision-by-decision monitoring), is pressed toward "political correctness" on a faith group cluster basis, and lists towards denominational bias within cluster because of "like likes like" and the non-randomness of the selection of the denominations assigned to Board duty.

CP49.   This structural analysis cannot explain

> Why The Navy's advocates seem unable to recognize the relevance of:
> the difference between rough parity on the basis of *faith group cluster*
> and
> routine inequity across religious *denominations.*

But Table CP-2 demonstrates it**:**

### Table CP-2
### Faith and the Probability of Accession
Comparing Faith Group Accession rates
(The Navy Method - Dr. Siskin's approach)
to
Denominational Accession Rates (What is Happening to the Affected Chaplains?)

| Navy Defined "Faith Group" | Sample Denominations | Probability of Selection |
|---|---|---|
| Catholic and SW | Catholic | 96 |
| | Muslim | 66 |
| | Mormon | 60 |
| | Seventh Day Adventist | 58 |
| | Unitarian Universalist | 33 |
| Subtotal | Group Average | **89** |
| Liturgical | Episcopal | 90 |

| | | |
|---|---|---|
| | Presbyterian | 86 |
| | Methodist | 84 |
| | Lutheran | 81 |
| Subtotal | Group Average | **88** |
| Non-Liturgical | American Baptist Convention | 92 |
| | Southern Baptist | 71 |
| | Disciples of Christ | 70 |
| | Assembly of God | 60 |
| | Church of God in Christ | 50 |
| | Chaplaincy of Full Gospel | 46 |
| Subtotal | Group Average | **85** |

The sample denominations are listed within each faith group category in terms of their estimated probability of selection, but the rank order sequence is not the result of random variation as much as it is a statistically significant reflection of denominational bias and favoritism which extends across the data periods, across the different Chief of Chaplains tenures, and across decades.

**APPENDIX CV**
**Relevant Education and Experience**
**Harald R. Leuba, PhD**

## Education:

| | | |
|---|---|---|
| 1958 | B.S. Mathematics and Physics | New Mexico State University, Las Cruces, NM |
| 1960 | Graduate Study - Mathematics | University of Washington, Seattle, WA |
| 1963 | M.S. Psychology and Statistics | George Washington University, Washington, D.C. |
| 1964 | M.A. Psychology | Johns Hopkins University, Baltimore, MD |
| 1965 | PhD Psychology and Operations Research | |
| | | Johns Hopkins University, Baltimore, MD |
| 1966 | Post Doctoral Research - Quantification of Human Performance | |
| | | National Science Foundation Fellowship |
| | | Johns Hopkins University, Baltimore, MD |
| 1971 | National Security Seminar | Industrial College of the Armed Forces, Fort McNair, Washington, DC |
| 1972 | Resident Executive Program | Federal Executive Institute, Charlottesville, VA |

## Experience:

| | | |
|---|---|---|
| 1954-1958 | Co-op Engineer | **White Sands Missile Test Facility**, White Sands NM |
| 1958-1960 | Junior Engineer | **Boeing Airplane Company**, Seattle, WA |
| 1958-1960 | Instructor, Statistics | **Seattle University**, Seattle, WA |
| 1960-1967 | Mathematician | **ARINC Research Corporation**, |
| | Human Factors Engineer | Washington, DC |
| | Operations Research Engr | etc |
| | Group Supervisor | |
| | Senior Scientist/OpsRes | ARINC Research Corporation, Annapolis, MD |
| 1964-1967 | Associate Professor | **Johns Hopkins University**, Baltimore, MD |
| | Human Engineering | |
| | Statistics & Experimental Design | |
| 1967-1975 | Operations Research Analyst | **Office of the Secretary of Defense**, |
| | Manpower Analyst | Arlington, VA |

|            | NATO Analyst                                                                                      | **Office of the Secretary of Defense**                                         |
|------------|---------------------------------------------------------------------------------------------------|--------------------------------------------------------------------------------|
|            | Director, Support Utilization Division                                                             |                                                                                |
|            | Director, Nuclear Weapons and Planning                                                             |                                                                                |
| 1970-71    | Congressionally Required Study                                                                     |                                                                                |
|            | Leader,  Analysis of Navy Training Activities in Culebra and Vieques, PR                           |                                                                                |
| 1973-1974  | Presidential Executive Interagency Detail                                                          |                                                                                |
|            | Leader- Task Force on Performance Evaluation                                                       | **U.S. Civil Service Commission**                                              |
| 1975-1976  | Program Manager                                                                                    | **Enviro Control Incorporated,** Prime Contractor                              |
|            | Smoking & Health                                                                                   | to **National Cancer Institute**, Rockville, MD                                |
| 1976-1977  | Vice President                                                                                     | **Smithsonian Institution**, Washington, DC Science Information Exchange       |
| 1977-1979  | Vice President, Energy                                                                             | **Evaluation Research Corporation**, Falls Church, VA                          |
| 1979-1992  | Director, Resource Development                                                                     | **Jack Faucett Associates**, Bethesda, MD                                      |
| 1980-1981  | Senior Scientist                                                                                   | **Doty Associates**, Rockville, MD                                             |
| 1980-Present | President/CoFounder                                                                              | **CONTEXT**, Washington, DC                                                    |
|            | Consultant/Expert Witness on Environmental Analysis Data Validation and Statistical Analysis       |                                                                                |

for
**Superfund Response Management**
**The US Navy**
**The US General Accounting Office**
**The US Department of Commerce**
**Edison Electric Institute**
**Logistics Management Institute**
**Oak Ridge National Laboratory**
**Federal Mine Safety and Health Review Commission**
**Consumer Product Safety Commission**
**National Bureauy of Standards**

**National Paint and Coatings Association**
**National Bottled Water Association**

and Licensed General Contractor    **The House Doctor**
        Remodeling       Maryland,
        Endless Pools       Virginia and the
        Four Seasons Sunrooms    District of Columbia

**Minor Legal Experience**

Plaintiff and Defendant in Civil Court    Montgomery County
Jury Duty    Alexandria City
        Montgomery County
Expert Witness re Navy Training Activities in Puerto Rico
Expert Witness re Superfund Activities at Acme Solvent Recovery
        Lowry Landfill (Denver, Colorado)
        Smith Farm (Louisville, Kentucky)
Indexer for Administrative Law Decisions of Federal Mine Safety and Heath Review
        Commission.
Member and Chair    Montgomery County Animal Matters
        Hearing Board

**Major projects of relevance to this Litigation:**

Manpower Requirements studies in the Pentagon (including Navy Manpower)
Special Project Officer - re Marine Chaplains in Vietnam
Headquarters and Command and Control studies in the Pentagon
    (Including a review for SECDEF of ALL headquarters world wide)
Data Validation studies for Department of Energy and Oak Ridge National
    Laboratories
    of all Federal Data systems related to US Energy supply, use and conservation
Data Forensics (circumstance reconstruction) for Litigation Attorneys in Superfund
PRP groups
Performance Evaluation Task Force with US Civil Service Commission (one platform
    was a Navy facility)
Officer Efficiency Report review in the Pentagon - for DOC Cooke
Reviewing and Indexing the Decisions of the Federal Mine Safety and Health Review
Commission
Information Theory applications to data uncertainty, and reconstruction of information
sets based on data structure and number rules.
Regression and statistical analysis of aircraft reliability and maintainability (ARINC)
Statistical analysis of aircraft accidents (for Boieng Airplane Company)
Data collection and statistical analysis for all energy production, world wide (DOD)


**Expert Declarations in this matter:**

A.    Declaration of Harald R. Leuba, in The United States District Court for the
    District of Columbia, Case Number 1:99CV002945(RMU), in the matter of
    Chaplaincy of Full Gospel Churches v The Honorable Richard J. Danzig, et. al.,
    ~~10~~ 15 June 2000.

B.    Declaration of Harald R. Leuba, in The United States District Court for the
    District of Columbia, Case Number 1:99CV002945(RMU), in the matter of
    Chaplaincy of Full Gospel Churches v The Honorable Gordon R. England, 12
    May 2002.

C.    Declaration of Harald R. Leuba, United States District Court, Southern District
    of California, Case No. 99cv2272-TW (LSP) in the matter of Lieutenant Patrick
    M. Sturm v The United States Navy, 18 May 2002.

D.    Declaration of Harald R. Leuba, United States District Court, Southern District of California, Case No. 99cv1579 in the matter of Ronald Wilkins v United States of America, et. al., 29 April 2003.

E.    Supplemental Expert Opinion of Harald R. Leuba, United States District Court, Southern District of California, Case No. 99cv1579 in the matter of Ronald Wilkins v United States of America, et. al., 12 October 2003.

F.    Addendal Declaration of Harald R. Leuba, United States District Court, Southern District of California, Case No. 99cv1579 in the matter of Ronald Wilkins v United States of America, et. al., 17 February 2005.

G.    Addendal Declaration of Harald R. Leuba, United States District Court for the District of Columbia,  Case No. 99cv0028945(RMU)  in the matter of Chaplaincy of Full Gospel Churches v The Honorable Gordon R. England, 31 March 2005.

H.    Reclama of Harald R. Leuba, United States District Court, Southern District of California, Case No. 99cv1579 IEG (BLM) in the matter of Ronald Wilkins v United States of America, et. al., 7 April 2005.

I.    Compendium Declaration of United States District Court, Southern District of California, Case No. 99cv1579 IEG (BLM) in the matter of Ronald Wilkins v United States of America, et. al., 9 June 2005

J.    Predicting Board Decisions from the Navy's Board Assignments - an Information Theory Supplement to - the Compendium Declaration of Harald R. Leuba, PhD in the United States District Court for the District of Columbia, Case No. 99cv0028945(RMU)  in the matter of Chaplaincy of Full Gospel Churches v The Honorable Gordon R. England, 5 August 2005

K.    Codicil Declaration, A Further Look at the Correlation between the Denomination of Promotion Board Members and the Promotion Probabilities of Candidates with "Matching" Denominations, in the United States District Court for the District of Columbia,  Case No. 99cv0028945(RMU)  in the matter of Chaplaincy of Full Gospel Churches v The Honorable Gordon R. England, 12 August 2005

L.    Leuba, Harald R., <u>Declaration: The Question of Denominational Preference in U.S.Navy Chaplain Corps' Accessions,</u> United States District Court for the District of Columbia,  Case No. 02CV02005  in the matter of Rev. Charles E. Larsen, et al., v The United States Navy, et al. 3 October 2005. [Withdrawn, see ¶1 here.]

M.    Leuba, Harald R., <u>Appendage Declaration: The Question of Denominational Preference in U.S. Navy Chaplain Corps' Accessions: An Extension to a prior Statistical Examination</u> United States District Court for the District of Columbia, Case No. 02CV02005  in the matter of Rev. Charles E. Larsen, et al., v The United States Navy, et al. 24 November 2005.

N.    Rebuttal, Reproval and Reconciliation - Explicating the Apparent Conflicts Between Dr. Siskin's Data Presentations and Mine, Declaration of Harald R. Leuba, PhD in the United States District Court for the District of Columbia, Case No. 99cv0028945(RMU)  in the matter of Chaplaincy of Full Gospel Churches v The Honorable Donald C. Winter, et al. 21 June 2006

**Appendix DL**
**Data Lists Used to Support this Declaration**

This document was occasioned by additional data that was provided to me immediately following the Defendants' first-session of their deposition of me on 14 July 2006. I have invested the last two months in transcribing nearly 10,000 records into assorted electronic files, correlating those files to each other and analyzing the results.

The bulk of this data was originally assembled for, and a database was provided to, the Defendants' designated "expert" (Dr. Bernard Siskin) some time prior to December 2005.

Although I repeatedly asked (through counsel for Plaintiffs) to see what Dr. Bernard Siskin was given, the hard copy records were not provided to me until after the Plaintiff's initial deposition session of me on July 14, 2006.

A paper copy of the electronic file *said* to have been derived from the hard copy paper records was not provided to Counsel for Plaintiff's until the afore mentioned deposition was nearly underway (literally as we were entering the deposition venue.)

I was given a set of the paper records which were presumably the source of the electronic file on the afternoon of July 14, after the deposition session recessed.

I received what was implied as a true electronic copy of the electronic file on 27 July 2006.

I do not recite this history to wail about mistreatment, nor to lament the malfeasance or inattention of Defendant's counsel; I only provide this history to explain why the present document is also belated. I received the data late.

**When I prepared my Accessions Declaration in November of 2005**

The only data I had was a series of redacted records which seemed to be work papers used by a selection panel in evaluating candidates for accession into the Chaplain Corps.

These records had been given to counsel for the Plaintiffs and passed along to me. They were not a continuous series of documents (there were obvious gaps); the names and DOB's (dates of birth) had been redacted (obscured) from the paper copies I was given, and the results of the Board's deliberations (recommendations) were indicated on *some* of the documents – but not on most of them.

Nevertheless, experienced as I am with incomplete records and reconstructing the milieu from which they derive, I was confident in (a) inferring a structure and (b) opining on what the records suggested, and (c) concluding that the pattern of denominational bias evident in the records was statistically significant.

In December 2005, Dr. Siskin issued his (defective[35]) Declaration in this matter, citing (a) discussions he "had with Counsel for the Navy and with Navy Chaplain Corps personnel concerning the process of accession for Navy chaplains" and referencing (b) a database that the Navy had prepared for him, based on his instructions.

Upon reading Dr. Siskin's report, I immediately asked the Navy (through Mr. Schulcz) for access to the information Dr. Siskin cited.

Although I reprised this request several times over the ensuing several months, I was never given an opportunity to discuss Navy accessions with Counsel for the Navy or with Navy Chaplain Corps personnel, and I was not given access to the data Dr. Siskin used until the day the Navy deposed me on this matter, July 17, 2006.

Literally as we were walking into the conference room which had been set up at the Department of Justice (DOJ), LCDR Quelette handed Mr. Schulcz a print out of a database which he *said* was the data which Dr. Siskin had used.

Later that afternoon, Mr. Schulcz provided me with a four inch high stack of paper documents (some 807 sheets of paper) which he understood were the source of LCDR Quelette's database.

**Executive Summary**

With recent (6/17/06) access to additional data on this matter, I am able to:

(a) confirm my earlier conclusions that the statistical information demonstrates denominational preference in accessions into the U.S. Navy Chaplain Corps;
(b) point to specific instances (admissions) by the Navy personnel who implement the U.S. Navy Chaplain Corps's protocols evidencing the impact of denominational preference for Catholics;
(c) show how the surviving data reflect underlying denominational preferences; and
(d) explain how Dr. Bernard Siskin's tabulations and rhetoric wash out (conceal and obscure) differences in treatment which should have been evident to him (and given his experience, one may believe that he *chose* his computational model with this consequence in mind.)

**These paper records**

Are almost certainly the source for the printed database; but it is equally certain that they correspond imperfectly, very imperfectly, to the information which Dr. Bernard Siskin characterizes.

---

[35] See Appendix BX (above).

The major oversight(?), the biggest proportion of the information which is missing from the electronic data base Dr. Bernard Siskin designed for the Navy to code for him, is that although he had the paper records, there are no transcriptions in *his* database from the C/A/R/E Work Sheets. There is no capturing of information about denominational inventories, quotas or gains and losses.

**Missing or Incomplete Data?**

When data are missing it is *sometimes* possible to demonstrate *that* they are missing, without being able to demonstrate how much is missing.  And when some data are missing, it is a "leap of faith" to assume that what remains (what was provided) *represents* the whole.

Here we can suspect that data are missing, because the record "density" is uneven by year.

We can know that there is data missing because (a) we can see holes in the forms (i.e., cells where data could be/should be –especially the Y/N column in the CARE Board Work Sheet – but also incidental omissions of age and program[36] in the CARE Board Recommendation Memoranda.

We also know that data are missing because there are names in the memoranda which are not abstracted in the Work Sheets (and vice versa); there are Work Sheets with no correlated Memo and Memo's with no correlated Work Sheet. There are chaplains "Recalled" whose entry into the Corps is not recorded (and which, because of their age or rank, must have occurred during this record period.) There are Deferrals identified in the Recommendation Memoranda who disappear from the records.  {They may have withdrawn from the process.}  At least one of the "missing" records had the effect, if not the intention, of removing one CFGC candidate from the data pool.

There are pre-record (LAR01520) and post record (LAR01523) decisions and changes which are not noted in the database.

The data assembled by the Navy and provided to the Defendants' "expert" was incomplete and misleading, and the Defendants' expert was mislead and his work is being used by the Defendants at the risk of misleading the Court.

These are clearly an incomplete data set, but more importantly, (b) they demonstrate that the Accession Decision is NOT the simple (sic) single step process: consideration by the CARE Board and recommendation to the Chief of Chaplains, which Defendant's expert assumes (or was lead to assume). [See Appendix AP, above.]

---

[36] It is these clerical omissions of program name which Dr. Bernard Siskin tallies as "Other Program" in his December Declaration.

**Data Outside the Records**

What does it mean if a name is crossed off a C/A/R/E Work Sheet?  That the process of listing names to be submitted for Board consideration has several steps and, like a cross word puzzle started in ink, if there is a change, the entry has to be struck over, not erased?  What happened to those candidates?  Don't they "count" as part of the pool?  How can one (viz, Dr. Bernard Siskin should not) represent that he is comparing estimates of "expected" selection rates when the denominator is already pre-screened?

What does it mean that the C/A/R/E Advisory Group Recommendation Memoranda deal with the 1945 Program as well as applications for both inactive duty and active duty, but that the only C/A/R/E  Work Sheets which were produced were the ones which provided background information for candidates for active duty?  Candidates for Active Duty are not accessions. Where are the input records, the lists of candidates for accession?

This data base is incomplete on its face.  There are Recommendation Memoranda reporting the conclusions/recommendations of the CARE Board which have no back-up documentation; there are C/A/R/E Work Sheets providing information for the candidates who were considered by the Board, but no Recommendation Memorandum describing or summarizing the CARE Board's recommendation.  There are some memoranda describing the results of deliberations regarding whom to interview and whom not to invite for an interview, but then there is no record of what happened to the interviewees.

Both because Dr. Siskin's "data" troubled[37] me, and because it is "prudent" to examine "data" before using it – especially before using it to make *sworn* statements, I looked at the data as soon as it was given to me.

> A scan of the paper copy of the electronic file showed that many (many!) of the paper records had not been included.  [The electronic file transcribed information from only the C/A/R/E Advisory Group Recommendation Memoranda; there were no entries corresponding to any of the C/A/R/E Advisory Group Work Sheets which were also part of the paper record.]

> A careful count of the data Dr. Siskin *said* he had, indicated that (a) he used only 13% of what he was given and (b) that what he was given was more than what was included in what had been characterized-as the paper-copy of the electronic file.

---

[37]  I was troubled (a) that Dr. Bernard Siskin seemed to have so much more data than he used and (b) by the fact that he had a dramatic anomaly in his "Other" Program for 2001, but there was no "place" to verify what he had done. (c) I was also troubled by the fact that he had allowed others to prepare the data for him, and provided only a cursory (and it turns out, not very thorough,  accuracy check) and, to be fair, of course, (d) I was troubled by what he *said* he found - it didn't "jibe" for me, and, again, there was no "place" to look to see the data *per se.*

So, I set about:

(a) verifying that (or what) the hard copy paper records were a copy of;

(b) determining if the records Dr. Siskin *used* were included in the paper records I was given; and

(c) determining if the electronic file I was subsequently given, which was represented as a "true transcript" of the paper records, was in fact a true transcript, and if so,

(d) assessing how accurate and complete (and representative) that record was.

Validating[38] this data required a substantial amount of work time, as well as substantial calendar time, but the enclosed document is being submitted before the scheduled continuation session of the deposition of me which was interrupted on 14 July 2006.

The Data presented here are:

| Set | Description |
|-----|-------------|
| AD | A list by name, denomination and source program, of all Chaplains entered into Active Duty for most years from FY 1987 to FY 2001. [From DEF00224 to DEF00256] |
| EF | The electronic file which the Navy prepared for Dr. Bernard Siskin. |
| LA | An electronic file that I created from the paper records [LAR01241 to LAR02999] to mimic, verify EF |
| CC | This is a data base I assembled from EF and LA to compare the two files line by line - to correct transcription errors in either |
| BS | The portion of EF which *I think* Dr. Bernard Siskin used. |
| WS | An electronic file composed of the information included in the paper records [LAR01241 to LAR09999]. These were not captured in EF, but they were available to, and apparently not used by Dr. Siskin.  This is (a) data from the C/A/R/E Advisory Group Work Sheets included in LAR01241 …, plus data on the Group membership recorded for the meetings of the C/A/R/E Advisory Group during this period, primarily LAR01421 to LAR01958.]    In addition to records formatted ny name to align as much as possible with the by name records in EF, this file includes records of the Quotas and acdu counts on every Work Sheet. |
| CD | A file copied from a CD the Navy provided (in 2003?) showing the accession program, denomination, promotion history, and then current status and assignment |

---

[38] Data Validation (see my c.v.; I did not invent the construct, but I did develop it and apply it to all the Department of Energy data forms) is the process of making sure that data are (a) a realistic reflection of the process(es) being referred to, (b) a reliable record of the variables being observed, (c) an accurate transcription of the data that was available, and (d) both reliable and representative.  This is a tall order, but the processes are formal and replicable.

of all Chaplains "accessioned" between 1988 and 1997, with names and DOB redacted.

MA    A fine composed of line by line comparison of CD, AD and CE so that it is possible to estimate (a) the coverage of CE, (what percentage of the actual additions to acdu are recorded in the CE file (answer: about 97%), and what percentage of the applicants recommended for acdu actually end up there (answer: about 80%).

FG    A separate component of the Navy's electronic files which provides a table of correspondence between a candidate's denomination and the faith group cluster to which that denomination is assigned..

I have not provided copies of all this data here. To do so would waste too many trees; the stack of paper would be more than 18 inches high.

I have provided the first few pages of each of these data sets as attachments to this Appendix. These pages show the format and content of the files. Readers interested in copies of this information may request them from Navy.Data@att.net.

**File AD - a list of Chaplains who were Ordered to Active Duty**

This is a list by name, denomination and source program, month of and year of accession, of all Chaplains entered into Active Duty for most years from FY 1987 to FY 2001.

The list was given to me by Attorney for the Plaintiffs in mid September when we discussed my "progress" at coding the paper records.

Mr. Schulcz delivered a set of Bates numbered documents, from DEF00224 to DEF00256, that he said had been produced by the Navy. In addition to listing each Chaplain's name, these little sets of records ended each fiscal year with a summary (by goal) of the accessions by faith group cluster as well as counts for minorities. I captured the names in file AD, and the quota reports on a separate sheet in the file WS.

**File EF – the Electronic File which the Navy prepared for Dr. Bernard Siskin.**

LCDR Ouellete (USN, JAG) handed a paper copy of this database to Mr. Schulcz, in my presence, on 14 July 2006.

During a break in their deposition of me, I asked LCDR Ouellete if he could provide me with an electronic copy of the file which he had given to Mr. Schulcz that morning. He replied: "You can enter it by hand; I had to." I reprised my request through Mr. Schulcz and on the 28th of July he e-mailed 23 smaller files to me which he had received from Mr. Christopher Hall (from the Department of Justice). These components assembled into (i) a roughly 20 year record that "matched" the printout I had received earlier, (ii) a short list of errata which I posted, and (iii) a

copy of the "Final Faith Match" codes which had been used to assign individual denominations to one of the Navy's "faith group clusters." (See file FG.)

I have verified that the Electronic Files are the "same" information in hard copy and Excel Spreadsheet copy.

I combined 22 of the 23 smaller files mentioned in the paragraph above into one long linear, consistently formatted file, running from 1985 through FY 2005, with the errata file which was a separate file incorporated. The remaining file is FG. (See below.)

**File LA - a file I created by entering all the data from all the paper records.**

I read every one of the 617 paper records that were given to me and I typed all the extractable data into a series of Excel Spreadsheets (a) to capture the data and (b) to provide an *independent* (at least different eye/hand) view of what the records said, so that could be used to verify EF (and vice versa.)

This produced:  21 records from work sheets w/o accompanying memos.
                861 work sheet records with a match
                2637 memo records w/o a work sheet match

**File BS - the Data which I think Dr. Bernard Siskin Used**

On 21 December 2006, Dr. Bernard Siskin produced a Declaration (Reference 25) in this matter in which he said he was "supplied with the paper records showing the CARE Board Panel recommendations from 1985 to 2005" (page 5, para 8.) He went on to say that the Navy had followed instructions provided by Dr. Bernard Siskin's team (LECG), and had prepared a database from these records (page 6, para 9). Dr. Bernard Siskin went on to say that his team had:

> "checked the accuracy of the Navy's data entry by (i) reviewing the accuracy of the data entry for every candidate who was not  recommended, and (ii) reviewing the accuracy of the data entry for every candidate who was recommended for accession on every 10th CARE Board memorandum. Thus, LECG checked the accuracy of 100 percent of the candidates not recommended and approximately a 10 percent sample of candidates who were recommended for accession" (page 6, paragraph 10.)

Dr. Bernard Siskin reports that he tested data entry for 408 (a ten percent sample) of candidates who were recommended and 640 candidates who were not recommended.

This suggests that the database which the Navy assembled for Dr. Bernard Siskin from the paper records, should have had 640 candidates who were not recommended and 4080 who were, for a **total file of approximately 4,720 records.**

In December, after reading Dr. Bernard Siskin's Declaration, I asked for a copy of the paper records and the accompanying data file. Mr. Schulcz relayed my request to the Department of Justice and the Navy JAG.

On July 14, 2006, LCDR Ouellete (Navy JAG) handed a data base print out to Mr. Schulcz and represented that it was a copy of the file which had been prepared for Dr. Bernard Siskin.

**This file had 3,475 records in it.**

Given its origin and representation, I accept that the electronic copy that I received two weeks later is a faithful equivalent to the printout – but I still note that neither the electronic copy nor the printed copy corresponds properly to the total number of records Dr. Bernard Siskin says he had in his database (which he does not produce in his declaration). Nor does the electronic copy (or the printed copy) correspond well to the variety (viz the Work Sheets) and content of the paper records.

I am unable to "reconstruct" the data which Dr. Siskin says he used from the data which he was provided.

I do not think the problem is with me.

> (a) He does not publish his data, nor provide access to it.
>
> (b) I have just suggested that Dr. Bernard Siskin may not have counted his data properly,
>
> (c) I know that there are nearly 150 duplicated paper records (with different Bates numbers). That is not "enough" documents to explain 1275 "extra" records, but it is enough to suggest that unless one did what I did, and compared the files line by line, sorted by name and data, that the final record count could easily be off by a score or more.
>
> (d) I had enough trouble seeing that names were the same, or not the same (because the age or faith group was different, even considering the change in date) that I am not at all sure that Dr. Bernard Siskin's casual limitation of his data to the "last" appearance for a program was done correctly (even though it was an incorrect thing to do).
>
> (e) I entered both the Navy's errata, and corrected other errors in my CC-EF file, which may have remained in Dr. Bernard Siskin's database.

And

> (f) I located the "Other" Program in Dr. Bernard Siskin's database, diagnosed it as incomplete data, figured out what was missing and corrected it.

I am able to examine the paper records he was provided with and report that data transcribed from them (by the Navy) are neither as accurate nor as complete as he assumes.  He states that it was "approximately 98% accurate."  He calculates percent accurate as the number of errors (in a relevant field) divided by the total number of records.  [One could calculate accuracy as the number of keystrokes which were in error divided by the number which were made.] I have summarized my accuracy observations and data coverage observations below (in discussing Data Set CC, which is where I performed my data verification.)  Note that not all of the errors we can observe were made by data coding.  Many of them are in the original paper records.  E.g.:

> Set a LAR01510  Memo says Alston was considered for INACDU and approved
> Set b 001606  Work Sheet (here) says Alston requested (to be considered for) ACDU.

I can't tell which record is "right"; I can tell that one is "wrong".

After I had compiled LA (the file I transcribed from the hard copy paper records) and compared it to file EF (the electronic file I received on 27/28 July), and reconciled (i.e. corrected) those files, I attempted to make a data base which "looked" like the data that Dr. Bernard Siskin said he used. [Connoting nothing more than B(ernard) S(iskin), I called this file BS; although I recognize, now, that BS could also stand for "Biased Sample", which I believe it is.]

Beginning with the corrected EF, I extracted all the applications for Active Duty, limited the file to the 1996-2005 decade (based on FY rather than CY, since the "2005" records end with the end of that FY), and then I examined the "repeat patterns".

Although I (and Dr. Bernard Siskin, when he is in a "neutral corner") believe that if one wants to eliminate repeat applications, one should omit all but the first, Dr. Siskin says that he kept the last.  Not knowing whether he meant the "last" each year, or the last in the decade, or even the last since the candidate was last on Active Duty, I took his remark literally, and omitted all considerations to acdu except the last one.

It is obvious that this step distorts the data.

Assignment to Active Duty is an "absorbing boundary".  Candidates who apply and are accepted disappear from the applicant pool when that acceptance or recommendation happens - whether that happens on the first application or the last. When Chaplains are in short supply in general (the overall application rate dropped more than 50% between the 1985-1995 decade and the 1996-2005 decade), virtually "all" candidates are eventually accepted.

This can be analogized by thinking about the high school basket ball coach who decides whom to "send into the game next"; when all the good players are tired (have already had one tour), the coach has to reach deep into the "bench".  [These records reflects 177 candidates who appear in the records three or more times, applying for Active Duty, one of these (Ronald Tomlin) was considered 10 times, before finally being recommended to Active Duty.]

Out of curiosity, I made a side journey here, and sorted the whole file (all 20+ years) into first time considerations versus last considerations, regardless of program applied for. The results are quite interesting. Not surprisingly, "eventual" acceptance rates are a little higher than "first trial" acceptance rates. On the other hand, one may (or may not) be surprised by the fact that if one defines "benefit" as the absolute acceptance rate (and not the improvement in acceptance rate) then faith group cluster which benefits most from having an opportunity to be reconsidered is also the faith group cluster which has the best chance on the first consideration.

**Table DL-1**
**Benefit of Reconsideration**
**(all C/A/R/E considerations, regardless of program**

| Navy's Faith Group Cluster | <<<<< First Time Considered >>>>> | | | <<<< Last Recorded Consider >>>> | | |
|---|---|---|---|---|---|---|
| | Number of Applications[39] | Number of Approvals | % Yes | Number of Applications[40] | Number of Approvals | % Yes |
| Roman Catholic | 533 | 500 | **93.8** | 116 | 108 | 93.1 |
| Liturgical | 829 | 641 | 77.3 | 243 | 205 | 84.4 |
| Non-Liturgical | 1027 | 727 | **70.8** | 409 | 337 | 82.4 |
| Special Worship | 172 | 134 | 77.9 | 45 | 38 | 84.4 |

Roman Catholics do equally well on both the first and the last "consideration". [This must be a phenomenon akin to the "hard core unemployed". If one selects virtually "everybody" from one cohort (whether for reasons of bias or because of quotas), one will leave only the hard core "on the table".]

All the other faith group clusters "benefit" from a "second chance" (may I say "of course?")

Based on "first considerations", Catholics have a statistically significant advantage over all other faith group clusters. Liturgicals and Special Worship candidates do about the same, and both do better than the least preferred faith group cluster: the Non-Liturgicals.

---

[39] This is all candidates who appear in the records only one time. Any candidate who appears more than one time, regardless of the program(s) applied for or reason for being reconsidered (e.g. Deferred or continued, rejected or simply a repeat) is put into a separate pool.

[40] This is the "last" application for this program for any candidate who has applied for any program more than once. This pool of candidates is the ones "set aside" in footnote 39; it is NOT the particular candidates who were rejected on their first consider. [That's why the horizontal subtotals seem to be from different tracks - they are.]

Based on "reconsiderations",  Catholics still have a statistically significant advantage over all other faith group clusters.  But when "pushed to the wall" by repeated petitions for reconsideration, all the other faith group clusters are treated "about the same". The sample sizes are insufficient to declare the 2% difference between Non-Liturgical and Liturgical as "statistically significant" even though it is in the "expected" direction.

[Of course, and I mean that literally now, of course the fact that including only the last reconsideration tends to level the apparent selection rates is (a) the reason why one is supposed to omit them from analysis, and is also (b) the reason why unscrupulous advocates might include them when bent on "proving" that there is no significant difference in the recommendation rates.]

**File WS - Records from the C/A/R/E Advisory Group Work Sheets.**

The C/A/R/E memos themselves are neither uniformly formatted, nor flawlessly typed.  The formatting variations:

(a) allowed me to look at the question of Board Member denominations, because around December 2002, the memo's form included an attendance list (and I could look up each Chaplain Corps member's denomination in the History volumes, or even in the data at hand).

(b) mislead Dr. Bernard Siskin into preparing a "program Table" called Other – for those cases where the Memo failed to identify the program which was under consideration, thereby leading Dr. Bernard Siskin to elevate a clerical omission into a "Program" (sic.)

I exploited (a) and

- captured every recorded Board Member's denomination.
- Then I correlated every surviving Work Sheet to a surviving Recommendation Memo, and
- Recorded the Memo's recommendation for each candidate on that candidate's Work Sheet data line, and then
- co-located the list of denominations on *that* Board with each of the candidates which that Board considered (on that occasion.)

This is the basic data base for Appendix LL, Like Likes Like.

The Work Sheets provided two other data formats:

First, I had a candidate based date record similar to the CC-EF record, except that when those records came from a Work Sheet they included Inventory information for this candidates denomination at this time (total inventory, gains and losses to date) most of the time for most of the denominations, and it did not include the Board's recommendation, most of the time for all of the candidates listed on that work sheet.  This data was (is) available for regression analysis to compare the Board's decision (when moved from the memo record to the work sheet record) to the inventory level, gain and loss status, etc.

 Second, I created a data form for recording the Quota numbers from the bottom portion of the Work Sheets.  This is the basic grist for Appendix QE - Quota Effect.

**File CC (sometimes CC-EF for "Chief of Chaplains Electronic File)**
                                          **- the combined file for EF and LA**

The electronic file I received on 27 July seems to be "exactly" the paper copy of the "data base" I was given following my deposition (accepting that the known errata had not been posted.)

The paper records I received in the afternoon of 14 July agreed "well" with the electronic file with respect to C/A/R/E Recommendation Memoranda, and not at all with respect to the C/A/R/E WorkSheets.

When I finished entering all the paper records, I had 3,507 individual, non duplicated records.

There were 3,274 which had been coded properly in all major respects.  (I did not mark or change errors in middle initials or spelling of a Program name.  I did correct spelling for denominational names, and I corrected coder errors in spelling of a candidates' name. [There are a dozen or so errors in candidate name which were made by the Board and generally I left those (for at least the reason that how was I to know which of two obvious variants was correct.)  I did correct errors in recording the Program identity or the Board's recommendation.  Each of those corrections was identified by comparing a de novo transcription (LA) to the transcription the Navy had performed (EF) and then examining the relevant paper record. [That chore was made less onerous than it might have been, because I coded the Bates number, and data line number (as well as the number of lines of data per record) as I was coding the individual lines of data.

- There were 165 records in the CC-EF (i.e. Chief of Chaplains Electronic File) which had substantial (i.e. data outcome affecting) errors.  I have marked these in my copy of the file with an asterisk in the Source field, and bold type in the affected data field.

- There were 68 lines of candidate information in the paper records which had been missed by the Navy's data coder.  I have marked these CC-Missed in the Source field.

- There were 8 lines of candidate information in the CC-EF file for which I could find no paper records.  I kept these in the file and marked them as "UNK doc #" in the source file.

Most of the 68 lines of candidate information I found in the paper records which were not already in the CC-EF originated in the C/A/R/E Work Sheets.  I coded all of the C/A/R/E Work Sheets and then matched them, by name and date to records coded from the C/A/R/E recommendation Memoranda.  I kept the C/A/R/E Work Sheet file separate. (See WS, below.)

The "CC" File seems to be about 97% complete in terms of covering the population of candidates considered for accession.

[This is a complicated inference.]

**First**, we have a list of chaplains who were actually added to end strength for most of the years between FY 1987 and FY 2001.  [Data Set: "AD", drawn from: DEFA00226 to DEFA00256.]

This can be compared, by name, to the list of named candidates recommended for Active duty as memorialized in the C/A/R/E Advisory Group memoranda. [Data Set: "EF", which form the basis for the electronic file produced in hardcopy as LAR02444 to LAR02522.]

Approximately 97% of the Chaplains listed in "AD" as having been added to end strength, are included in the "EF" as having been recommended for Active Duty.  Thus, based on this comparison, one may assume that the C/A/R/E memoranda which were used to develop the "CE" covered approximately 97% of the chaplains who were considered by the C/A/R/E Advisory Group during these two decades.

**Second**, having estimated that the CC-EF is approximately 97% complete with respect to candidates recommended for Active Duty, one may assume that there was no systematic sampling, and that the memoranda which were produced in hard copy [LAR01241 to LAR02047] covered **both** 97% of the candidates who were recommended for Active Duty and 97% of the candidates who were *considered* for Active Duty.

**Third**, because the C/A/R/E Advisory Group memoranda which address recommendations for Active Duty also address recommendations for participation in the Student Program, and acceptance into Inactive Duty, we may extend our assumption string one step further and assume that 97% of the candidates *considered* for entrance into the Chaplain Corps during these two decades are also memorialized in the surviving/produced documents even though the C/A/R/E Advisory Group Work Sheets which were produced are all (virtually all) annotated at the top "acdu" suggesting that there may be **another** set of documents which deal with accessions into the Chaplain Corps.

## An Important Data Density Observation

Approximately 82% of the candidates who are recommended for Active Duty are added to end strength.

This proves that "recommended for acdu" would not be an "accession" even if Dr. Bernard Siskin had been correct in declaring that acdu = accession.

This also proves that the process of being added to Active Duty does not end with the C/A/R/E Board's recommendation. [We knew that - see Appendix AP.  Among the subsequent steps in the process are Chief of Chaplain's approval; graduation from Chaplain School; and receipt of orders, which cannot be issued (will not be issued) if doing so would exceed authorized end strength limits.]

This further proves that if one is concerned about the possibility of denominational discrimination in a process, one should look at the whole process, not just a single weigh station on the route.  This is important enough that I will repeat myself when discussing Data Set MA, which is how this loss rate is demonstrated:

**Table DL-2**
**Candidate Losses after C/A/R/E Recommendation**

| Faith Group Cluster | Number of Officers Recommended | Number Who Do Not arrive @ acdu | Loss Rate |
|---|---|---|---|
| Roman Catholic | 275 | 3 | **1%** |
| Liturgical | 478 | 61 | **13%** |
| Non-Liturgical | 740 | 27 | **4%** |
| Special Worship | 103 | 9 | **9%** |

**A not so Important Observation about Data Error Rates**

There was about a 2% error rate in the difference between the program the candidate was recommended for and the program he or she is recorded as having moved to active duty from. [I think that I have corrected/adjusted for most of these errors.]

There are spelling errors in both the candidate's name and in his/her denomination, but these are only nuisance errors; they do not lead to assignment errors for data analysis purposes.

There are still a few errors in this database.  I noticed them when performing comparisons between work sheets (as I transcribed them) and the memos (as I transcribed them).  The errors were corrected in the derivative tables and do not contaminate the analyses, but they may still be present in the "Master file".  The number of records affected is well under ½ of 1%.

Some "errors" in this data were made in the original documents, and although to be corrected if possible, should not be counted against the performance of the Navy's data coder.

Database construction is not the simple matter that many people assume it to be.  One begins with "simple" transcription and immediately confronts coding choices:  Is "MC DONALD" the same thing as "Mc Donald"?  And shouldn't it be: "McDonald" (without the space)?  Trivial matters, of course, but variation can make automatic data sorting difficult.

Some of the "errors" in a database (either in the original records or in the transcription) make a difference; some do not.

Miss-spelling a middle name (or omitting a middle initial) matters less than miss-coding a Board decision, but it may make it difficult to identify duplicated data, or repeat appearances.

Date errors matter very little, but they complicate data verification.

Omitting (failing to capture) a record number, ditto.

Note:  None of this discussion about error rates is meant as criticism of the Navy's data coder. Humans are remarkable, but we are not perfect.  I made nearly as many mistakes in data entry as did the Navy's data coder.  Whenever this combined file showed a difference in our two records, I referred to the appropriate Bates numbered document, and corrected whichever data entry was incorrect.  If that error was in the Navy's data file, I changed it and marked the Navy's record as CC-EF* so that an interested party can see what has been changed.  If there is a criticism implied here, I mean it to construe to Dr. Bernard Siskin who says he checked the data (found a 2% error rate, and corrected those errors.)  His review was too cursory- he left more errors than he found.


### File CD - The Navy's list of acdu accessions 1988-1997

When this CD was produced several years ago, it was called "accessions"; it is additions to the ADL during the indicated decade.  The file is difficult to use, (a) because it is redacted, and (b) because it is set up with merged cells, and empty cells, and very wide columns.  I have put all the separate years together, consolidated the format, filled in the blank cells with a place holder (...) and used this data to test the CC-EF for completeness as well as for loss rate.

The file is also interesting for what is says about retention.  The faith cluster the Navy works the hardest to acquire is also the faith cluster which is least likely to stay - which could be the reason the Navy has to try so hard to recruit or assign this faith cluster (sic; it is the Roman Catholic "cluster"), but it is at least as likely that in being less selective in "accessions" or "acdu" the C/A/R/E Advisory Group is accepting candidates who are unlikely to pan out.

That is, the performance data could be a comment on the candidates' denomination (maybe Roman Catholics as a generality do not "like" Navy life) or it could be a comment on the C/A/R/E Advisory Group's poor quality control. In letting "every" Catholic into the Corps, they perforce admit some who are less likely to stay (or less likely to be "worth keeping") - candidates whose "quality level" is (or could be) apparent to the C/A/R/E Advisory Group when it exercises discrimination among applicants of the other faith group clusters and rejects the ones it is "concerned" about.


### File MA  -the Matched Acdu file

I compared the list of names of Chaplains actually added to acdu (either from DEFA20026 to DEFA00256) or from the Navy's CD to all the Chaplains who were recommended for acdu at about that time.  Every time there was a match I paired the two data files and set the records aside, and then continued with the record by record comparison.   In the end I had (a) a file with 947 "matched" chaplains, (b) a list of chaplains who had been added to acdu for whom there was

no C/A/R/E memorandum of recommendation (about 3% of the total)  and (c) a list of recommended chaplains who did not show up on the acdu list (about 18% of the total).

Data File MA lists these names.

To put a little tidbit of analysis here, Table DL-2 (which was shown above, on p. 96) shows the faith distribution of candidates recommended for acdu vs the faith distribution of those who, for one reason or another, never made it to Active Duty.  This distribution is statistically significantly "unequal".  I used the Chi square statistic, which is non-parametric and which does not require the assumption of independence between trials,  $X^2 = 34.5$,  p< .001.

**Table DL-2**
**Candidate Losses after C/A/R/E Recommendation**

| Faith Group Cluster | No of Recommended | Number Not on acdu | Loss Rate |
|---------------------|-------------------|--------------------|-----------|
| Roman Catholic | 275 | 3 | **1%** |
| Liturgical | 478 | 61 | **13%** |
| Non-Liturgical | 740 | 27 | **4%** |
| Special Worship | 103 | 9 | **9%** |

Judging from the pattern of "omissions", it seems likely that the Chaplains who made it to acdu were in fact "run through the C/A/R/E Process"; but the C/A/R/E Recommendation Memoranda were not recovered from the files when the document stack was produced.

However, it is important to notice that not all personnel actions relevant to application for acdu are included in the C/A/R/E process.  Actions which move a candidate from Active Duty to the Reserve Component happen outside the C/A/R/E process, but then the candidate may apply again for Active Duty and will "appear" again in the records.

Similarly, candidates who are recommended for Active Duty or 1945 and who do not follow through, or get orders, or complete the programs, will also not have those events recorded in the C/A/R/E memoranda.

**FG - the Data Set with the Navy's Faith Group Cluster codes**

As part of the production associated with the electronic data base the Navy prepared for Dr. Bernard Siskin, the Navy provided a "cross walk" showing how each denominational code (even the typing errors[41]) was (or was not) assigned to a faith group cluster.

---

[41] e.g. 1945, 32, acdu, ACG, GCIC, LSM, T, etc.

This set of relationships is still interesting.  See Appendix FG.  Not the least reason it is interesting is (a) the Navy is still classifying some denominations who think of themselves as Liturgical as Non-Liturgical (e.g. the Reformed Church in America, the National Association of Congregational Christians, and the Evangelical Congregational Church) and they are still classifying as Liturgical some denominations who think of themselves as Non-Liturgical (e.g. the Nazarenes and Moravians).  But the code structure is also interesting for Catholic anomolies:  Only *Roman* Catholics are coded in the Catholic "cluster."  Orthodox Presbyterians are coded as Liturgical with other Presbyterians (including Evangelical Presbyterians), but Orthodox Catholics are coded as Special Worship; Independent Catholic Church is coded as Liturgical; as are the American Anglican Catholic Church and the National Catholic Apostolic Church, but the Old Holy Catholic Church is Special Worship.  There are only a few candidates from these endorsers, and they are singularly unsuccessful in front of the C/A/R/E Advisory Group

## Data Set AD - List of acdu Enrollees

| Record ID # | FY | Month | Name | Denomination | Program |
|---|---|---|---|---|---|
| DEFA00238 | 93 | OCT | Adams, Keith N. | EPIS | D4105-A |
| DEFA00232 | 91 | JAN | Adcock, Talmadge K. | UPI | RECALL |
| DEFA00233 | 91 | JUL | Aguilera, Salvador | RC | D4105-A |
| DEFA00238 | 93 | OCT | Alicea, David | DC | D4105-A |
| DEFA00251 | 99 | JUN | Alkula, Charles J. | UM | D4105-A |
| DEFA00255 | 2001 | MAR | Allen, Cassie L. | AME | S4105-A |
| DEFA00250 | 98 | JUN | Alvis, Erskine | SB | RECALL |
| DEFA00255 | 2001 | JUN | Amador, Kenneth R. | BBF | RECALL |
| DEFA00226 | 87 | OCT | Anderson, Bruce | CR | D4105 |
| DEFA00244 | 95 | SEP | Anderson, James | RC | RECALL |
| DEFA00238 | 93 | OCT | Anderson, Kevin L. | SB | D4105-A |
| DEFA00245 | 96 | JUL | Anderson, Kim | CGAI | D4105-A |
| DEFA00245 | 96 | FEB | Anderson, Paul S. | SDA | D4105-A |
| DEFA00229 | 90 | OCT | Andraeas, Alan L. | AG | S4105-A |
| DEFA00253 | 2000 | JUN | Andrews, Dennis K. | WES | D4105-A |
| DEFA00235 | 92 | OCT | Appleton, Billy M. | LBF | RECALL |
| DEFA00245 | 96 | JUL | Arnold, Yolanda | CME | S4105-A |
| DEFA00245 | 96 | JUL | Arthur, Kobena K. | AME | D4105-A |
| DEFA00244 | 95 | JUL | Asher, James W. | CUBC | D4105-A |
| DEFA00245 | 96 | OCT | Askiew, James E. | AME | D4105-A |
| DEFA00229 | 90 | JAN | Atkinson, Bruce G. | LDS | D4105-A |
| DEFA00246 | 96 | JUL | Atkinson, Gary | UM | D4105-A |
| DEFA00227 | 87 | JUL | Augustine, Louis | UM | D4105A |
| DEFA00251 | 99 | OCT | Austring, Bryan A. | BCC | D4105-A |
| DEFA00239 | 93 | APR | Axtell, Lee | ABC | RECALL |
| DEFA00239 | 93 | APR | Aycock, Benjamin | SB | D4105-A |
| DEFA00245 | 96 | FEB | Baez, Thomas | SDA | D4105-A |
| DEFA00241 | 94 | FEB | Bailey, Ray A. | EFCA | D4105-A |
| DEFA00232 | 91 | DEC | Baldridge, Kempton D. | EPIS | RECALL |
| DEFA00247 | 97 | FEB | Balzora, Lulrick | SB | RECALL |
| DEFA00243 | 95 | OCT | Banken, Robert | RC | D4105-A |
| DEFA00227 | 87 | JUL | Barber, Michael | PNBC | D4105A |
| DEFA00255 | 2001 | JAN | Bargola, Cerino | RC | D4105-A |
| DEFA00254 | 2000 | SEP | Bargrow, Philip | CGCT | D4105-A |
| DEFA00255 | 2001 | OCT | Barnes, Carl M. | PAW | S4105-A |

**Data Set BS  -- Reconstruction of  Dr. Bernard Siskin's data set**

**Step 1        Board Memo Day columns aligned**
**Step 2        Errata posted**
**Step 3        Navy Chaplain Corps fgc Entered**
**Step 4        Source Notes Added**

**CC-EF        Chaplain Corps, Electronic File w/o corrections**
                         **3274  Records**
                                                          **Coded by USN**
**CC-EF*        Asterisk indicates error in data entry; correct entry is in bold**
                         **165    Records**
**CC-MISSED        Entry available from LAR0#### document (reference given)**
                         **68      Records not Captured by Navy's data coder**
        **Subtotal            3507  Records**

**LAR0####  Paper Record w/ Bates Number (LAR01241 to LAR02047)**
                         **3498  Records            Coded by HRL**
**UNK doc #  Entry in CC electronic file with no paper record in LAR01279 to LAR02047**
                         **8        Records**

**SPECIOUS        Entry thought to be without basis in the records**
                         **1      Record**
**Subtotal            3507  Records**
**Step 5        Age Separated from "Parenthetical comments"**
                **Filled in for some missing cells**

Leuba Sept 2006 Declaration re Accessions: page 100

**Step 6**    **Minority Status Separated from "Parenthetical comments"**
                     **Minimal consistency in codes**
**Step 7**    **Rank Status Separated from "Parenthetical comments"**
**Step 8**    **Merged w/ my transcription of the Paper Records**
**Step 9**    **Comported Date formats**
**Step 10**    **Compared records line by line and reconciled differences by reference to paper records**
**Step 11**    **Added Sequence Numbers (to align files for further comparison & verification)**
**Step 12**    **Records sourced from Work Sheets alone identified in Col D**
**Step 13**    **Repeated petitions/Reconsiderations noted in Column R**


**Column I in the LAR0 file has ordinal sequence number for candidates who appear in the list two or more times**
**Column R has appearance codes:**
                     **… = Place holder to keep records together when being sorted**
                     **R = Reconsideration**
                     **FD = Action following a Deferral**
                     **? = Subsequent consideration for same program; may not be "independent"**


**Step 14**    **Individual Decisions coded (see Table)**              **See Column Y**
**Step 15**    **Decision History captured for each successive appearance by the candidate/chaplain**
                     **See Column Z**
**Step 16**    **Decision History spread into several columns AA etc.**
**Step 17**    **Eliminate all considerations prior to FY1996**
**Step 17**    **Eliminate all Non-acdu considerations**
**Step 18**    **Sort decisions by number of repeats - and omit all but the last one.**

COL >>>

| A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4 | LAR01468 | 29-Sep-00 | Memo | ... | ... | ... | Abara, Lawrence | 0 | ... | 53 | AFAM |
| 10 | LAR01853 | 15-May-02 | Memo | ... | ... | ... | Adams, Doyle S. | 0 | ... | 32 | ... |
| 12 | LAR01948 | 5-Apr-05 | Memo | ... | ... | ... | Adams, Evan D. | 0 | ... | 33 | ... |
| 16 | LAR01325 | 9-Jul-96 | Both | ... | ... | ... | Adams, Sharon | 1 | ... | 37 | FEM |
| 50 | LAR01916 | 2-Apr-04 | Memo | ... | ... | ... | Alderman, Luis E. | 2 | ... | 42 | ... |
| 52 | LAR01937 | 16-Nov-04 | Memo | ... | ... | ... | Alexander, David W. | 0 | ... | 25 | ... |
| 60 | LAR01434 | 11-May-99 | Memo | ... | ... | ... | Alkula, Charles J. | 0 | ... | 40 | ... |
| 70 | LAR01791 | 13-Dec-00 | Memo | ... | ... | ... | Allen, Cassie L. | 0 | ... | 40 | FM AF |
| 72 | LAR01924 | 8-Jun-04 | Memo | ... | ... | ... | Allen, Raynard | 2 | 42 | AFAM | |
| 74 | LAR01950 | 19-Apr-05 | Memo | ... | ... | ... | Allen, Christopher | 3 | ... | 48 | ... |
| 84 | LAR01858 | 25-Jul-02 | Memo | ... | ... | ... | Allison, Mark E. | 2 | ... | 44 | ... |
| 92 | LAR01319 | 26-Aug-96 | Both | ... | ... | ... | Alston, Andre C. | 3 | ... | 46 | AA... |
| 98 | LAR01414 | 24-Oct-97 | Both ... | ... | ... | | Alvis, Erskine L. | 3 | ... | 35 | ... |
| 102 | LAR01787 | 20-Oct-00 | Memo | ... | ... | ... | Amador, Kenneth R. | 3 | ... | 37 | HISP |
| 106 | LAR01872 | 10-Dec-02 | Memo | ... | ... | ... | Amdick, Michael | 0 | ... | 39 | ... |
| 110 | LAR01323 | 19-Jul-96 | Both ... | ... | ... | | Amora, Edito | 0 | 41 | ... | |
| 126 | LAR01849 | 3-Apr-02 | Memo | ... | ... | ... | Anderson, John G. | 0 | ... | 33 | ... |
| 128 | LAR01945 | 8-Mar-05 | Memo | ... | ... | ... | Anderson, Jason | 0 | ... | 34 | ... |
| 134 | LAR01344 | 31-Jan-96 | Both ... | ... | ... | | Anderson, Kim M. | 0 | ... | 34 | FEM |
| 138 | LAR01350 | 9-Nov-95 | Memo | ... | ... | ... | Anderson, Paul S. | 2 | ... | 38 | BLK |
| 148 | LAR01452 | 19-Apr-00 | Memo | ... | ... | ... | Andrews, Dennis K. | 0 | ... | 38 | ... |
| 150 | LAR01348 | 30-Nov-95 | Both ... | ... | ... | | Anson, Cesar R. | 0 | 45 | API | |
| 174 | LAR01340 | 22-Mar-96 | Both ... | ... | ... | | Arnold, Yolanda | 2 | ... | 27 | FEM/ |

**COL >>>**

| M | N | O | P | Q | R | S | T | U |
|---|---|---|---|---|---|---|---|---|
| ... | ... | RC | C-RC | D4105-ACDU | ... | Deferred     ... | | |
| ... | ... | RC | C-RC | D4105-ACDU | ... | Deferred     ... | | |
| ... | ... | RC | C-RC | D4105-ACDU | ... | recommended for live interview     ... | | |
| ... | API | RC | C-RC | D4105-ACDU | ... | ACDU FEB     ... | | |
| LT | ... | RC | C-RC | D4105-ACDU | ... | ACDU OCT     ... | | |
| LT | ... | RC | C-RC | D4105-ACDU | ... | ACDU OCT     ... | | |
| LT | ... | RC | C-RC | D4105-ACDU | ... | ACDU JUN     ... | | |
| ... | ... | RC | C-RC | D4105-ACDU | ... | ACDU OCT     ... | | |
| LT | ... | RC | C-RC | D4105-ACDU | ... | ACDU OCT     ... | | |
| ... | ... | RC | C-RC | D4105-ACDU | ... | ACDU OCT     ... | | |
| ... | ... | RC | C-RC | D4105-ACDU | ... | ACDU JAN     ... | | |
| ... | ... | RC | C-RC | D4105-ACDU | ... | ACDU JUN     ... | | |
| LT | API | RC | C-RC | D4105-ACDU | ... | ACDU JAN     ... | | |
| LT | ... | RC | C-RC | D4105-ACDU | ... | ACDU JUN     ... | | |
| ... | HISP | RC | C-RC | D4105-ACDU | ... | ACDU JUN     ... | | |
| LT | ... | RC | C-RC | D4105-ACDU | ... | ACDU JUN     ... | | |
| LT | ... | RC | C-RC | D4105-ACDU | ... | ACDU JUN     ... | | |
| LT | ... | RC | C-RC | D4105-ACDU | ... | ACDU JUN     ... | | |
| ... | API | RC | C-RC | D4105-ACDU | ... | ACDU JUN     ... | | |
| ... | API | RC | C-RC | D4105-ACDU | ... | ACDU SEP     ... | | |
| ... | ... | RC | C-RC | D4105-ACDU | ... | ACDU SEP     ... | | |
| ... | BLK | RC | C-RC | D4105-ACDU | ... | ACDU JAN     ... | | |
| ... | ... | RC | C-RC | D4105-ACDU | ... | ACDU JAN     ... | | |

Leuba Sept 2006 Declaration re Accessions: page 103

**COL >>>**

| V | W | X | Y | Z | | |
|---|---|---|---|---|---|---|
| LAR01437 | 4 | 4 | DAD 0 | DAD | | |
| LAR01834 | 6 | 7 | DAD 0 | CIY,DAD | DAD | |
| LAR01918 | 12 | 20 | DAD 0 | DAD | | |
| LAR01348 | 7 | 10 | DAY 1 | | | |
| LAR01323 | 1 | 11 | DAY 1 | | | |
| LAR01317 | 1 | 9 | DAY 1 | | | |
| LAR01377 | 1 | 3 | DAY 1 | | | |
| LAR01366 | 1 | 7 | DAY 1 | | | |
| LAR01356 | 1 | 6 | DAY 1 | | | |
| LAR01352 | 1 | 3 | DAY 1 | | | |
| LAR01414 | 3 | 10 | DAY 1 | | | |
| LAR01414 | 4 | 10 | DAY 1 | | | |
| LAR01410 | 2 | 4 | DAY 1 | | | |
| LAR01403 | 4 | 19 | DAY 1 | | | |
| LAR01403 | 3 | 19 | DAY 1 | | | |
| LAR01403 | 1 | 19 | DAY 1 | | | |
| LAR01403 | 2 | 19 | DAY 1 | | | |
| LAR01448 | 1 | 1 | DAY 1 | | | |
| LAR01449 | 1 | 6 | DAY 1 | | | |
| LAR01462 | 1 | 5 | DAY 1 | | | |
| LAR01462 | 2 | 5 | DAY 1 | | | |
| LAR01789 | 4 | 4 | DAY 1 | | | |
| LAR01792 | 3 | 3 | DAY 1 | | | |

**Data Set CC-EF**

## Merged Electronic Files received from Navy/DOJ ~ 7/27/06

Step 1  Board Memo Day columns aligned
Step 2  Errata posted
Step 3  Navy Chaplain Corps fgc Entered
Step 4  Source Notes Added

| | | |
|---|---|---|
| CC-EF | Chaplain Corps, Electronic File w/o corrections | |
| 3274 | Records      Coded by USN | |
| CC-EF* | Asterisk indicates error in data entry; correct entry is in bold | |
| 165 | Records | |
| CC-MISSED | Entry available from LAR0#### document (reference given) | |
| 68 | Records  not Captured by Navy's data coder | |
| Subtotal    3507 | Records | |
| LAR0#### | Paper Record w/ Bates Number (LAR01241 to LAR02047) | |
| 3498 | Records      Coded by HRL | |
| UNK doc # | Entry in CC electronic file with no paper record in LAR01279 to LAR02047 | |
| 8 | Records | |
| SPECIOUS | Entry thought to be without basis in the records | |
| 1 | Recor | |
| Subtotal    3507 | Records | |

Step 5  Age Separated from "Parenthetical comments"    -   Filled in for some missing cells
Step 6  Minority Status Separated from "Parenthetical comments"   Minimal consistency in codes
Step 7  Rank Status Separated from "Parenthetical comments"
Step 8  Merged w/ my transcription of the Paper Records
Step 9  Comported Date formats
Step 10       Compared records line by line and reconciled differences by reference to paper record
Step 11       Added Sequence Numbers (to align files for further comparison & verification)
Step 12       Records sourced from Work Sheets alone identified in Col D

Step 13        Repeated petitions/Reconsiderations noted in Column R
               Column I in the LAR0 file has ordinal sequence number for candidates who appear in the list two or more times

               Column R has appearance codes:
                       … = Place holder to keep records together when being sorted

                       R = Reconsideration
                       FD = Action following a Deferral
                       ? = Subsequent consideration for same program; may not be "independent"

Step 14        Individual Decisions coded (see Table)                    See Column Y
Step 15        Decision History captured for each successive appearance by the candidate/chaplain
                            See Column Z
Step 16        Decision History spread into several columns AA etc.

**TABLE for decision Codes**

Three Digit Codes

First Digit is for the program

|     |     |
| --- | --- |
| D | D4105 |
| S | S4105 |
| X | Xfer (in or out of Navy) |
| ? | Unknown |

Second Digit is for Status
   Being Applied for

|     |     |
| --- | --- |
| A | Active Duty |
| I | Inactive |
| ? | Unknown |

First two digits combine

|     |     |
| --- | --- |
| 19 | for 1945 |
| CH | for change of endorser |
| CI | for "come in" for Interview |
| RA | for Recall Acdu |
| RI | for Reserve |
| CI | for "come in" for Interview |
| RA | for Recall Acdu |
| RI | for Reserve |

Third digit is for outcome

|     |     |
| --- | --- |
| C | Contingent |
| D | Deferred or Tabled |
| I | Inactive approved when Active was requested |
| N | No |
| Y | Yes |
| ? | Unknown |
| O | Omitted |
| W | Withdrawn |

Leuba Sept 2006 Declaration re Accessions: page 107

COL >>>

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Bates # | Record | Record | Board | Board | Board | Candidate | Date Seq | MI | Age | Minority | | Status |
| | Bates # | DATE | Form | Month | Year | Number | Name | for Repeats | ... | Age | Status | Rank | Rank |
| **RECORD** | **DATA SOURCE** | **CARE Board Memo Date** | **Board Day** | **Board Month** | **Board Year** | **Bd #** | **Last Name** | **First Name** | **Middle Initial** | **Age** | **Minority Status** | **RANK** | **Parenthetical Comments** |
| Sequence | Bates # | DATE | Source | Month | Year | Number | Name | for Repeats | ... | Age | Status | Rank | ... |
| 1 | CC-EF | 23-Jun-95 | 23-Jun-95 | Jun | 1995 | 1 | Aaron | Scott | T | 29 | | | |
| 2 | LAR01287 | 23-Jun-95 | Memo | ... | ... | | Aaron, Scott T. | 0 | | ...29 | ... | ... | ... |
| 3 | CC-EF | 29-Sep-00 | 29-Sep-00 | Sep | 2000 | 1 | Abara | Lawrence | NA | 53 | AFAM | | 53/AFAM |
| 4 | LAR01468 | 29-Sep-00 | Memo | ... | ... | | Abara, Lawrence | 0 | | ...53 | AFAM | | AFAM |
| 5 | CC-EF | 27-Jan-87 | 21-Jan-87 | Jan | 1987 | 1 | Adams | Mark | T | 30 | ... | ... | 30 |
| 6 | LAR01497 | 27-Jan-87 | Memo | ... | ... | | Adams, Mark T. | 0 | | ...30 | | | |
| 7 | CC-EF | 27-Jan-87 | 21-Jan-87 | Jan | 1987 | 1 | Adams | George | E | 31 | ... | ... | 31 |
| 8 | LAR01497 | 27-Jan-87 | Memo | ... | ... | | Adams, George, E. | 0 | | ...31 | ... | ... | ... |
| 9 | CC-EF | 15-May-02 | | May | 2002 | ... | Adams | Doyle | S | 32 | | | 32 |
| 10 | LAR01853 | 15-May-02 | Memo | ... | ... | | Adams, Doyle S. | 0 | | ...32 | | | |
| 11 | CC-EF | 5-Apr-05 | 5-Apr-05 | Apr | 2005 | 1 | Adams | Evan | D | 33 | | | 33 |
| 12 | LAR01948 | 5-Apr-05 | Memo | ... | ... | | Adams, Evan D. | 0 | | ...33 | | | |
| 13 | CC-EF | 19-Jul-96 | 19-Jul-96 | Jul | 1996 | 1 | Adams | Sharon | | 35 | BLK/FEM ... | | 35/BLK/FEM |
| 14 | LAR01323 | 19-Jul-96 | Both | ... | ... | | Adams, Sharon | 2 | | 35 | BLK/FEM | | BLK/FEM |
| 15 | CC-EF | 9-Jul-96 | 9-Jul-96 | Jul | 1996 | 1 | Adams | Sharon | | 37 | FEM | | 37/FEM |
| 16 | LAR01325 | 9-Jul-96 | Both | ... | ... | | Adams, Sharon | 1 | | 37 | FEM | | FEM |
| 17 | CC-EF | 6-Apr-92 | 6-Apr-92 | Apr | 1992 | 1 | Adams | Keith | NA | 35 | ... | LT | 35/LT |
| 18 | LAR01700 | 6-Apr-92 | Memo | ... | ... | | Adams, Keith | 0 | | ...35 | | LT | |
| 19 | CC-EF | 20-Nov-87 | 20-Nov-87 | Nov | 1987 | 1 | Adcock | Talmadge | K | 28 | | | 28 |
| 20 | LAR01512 | 20-Nov-87 | Memo | ... | ... | | Adcock, Talmadge K. | 1 | | 28 | ... | ... | |
| 21 | CC-EF | 30-May-89 | 30-May-89 | May | 1989 | 1 | Adcock | Talmadge | K | 29 | | | 29 |
| 22 | LAR01542 | 30-May-89 | Both | ... | ... | | Adcock, Talmadge K. | 2 | | 29 | ... | ... | ... |
| 23 | CC-EF | 17-Jul-89 | 14-Jul-89 | Jul | 1989 | 1 | Adcock | Talmadge | K | 29 | | | 29 |

COL >>>

| O | P | Q | R | S | T | U | V | W |
|---|---|---|---|---|---|---|---|---|
| Denom | Denom | Program | Recon-Sider | Y/N | DOR | EXP | Bates # | Line no |
| Denom | Denom | Program | Recon-Sider | Y/N | DOR | EXP | Bates # | for Name |
| **Denomination fgc (Per Navy)** | | **Program Requested** | **Recon-sider?** | **Recommended** | **Board Notes** | **Coder Notes** | **DATA SOURCE** | |
| Denom | fgc | Program | Recon | Y/N | … | ... | Bates # | list position |
| J | SW-Jewish | 1945 | … | 1945 | | ... | CC-EF | |
| J | SW-J | 1945 | … | 1945 | ... | ... | LAR01287 | 10 |
| RC | C-Roman Catholic | D4105-ACDU | … | not recommended | | ... | CC-EF | 2 |
| RC | C-RC | D4105-ACDU | … | no | … | ... | LAR01468 | 2 |
| SB | NB-SB | D4105-ACDU | |.. | D4105-ACDU Oct 87 | | | CC-EF | |
| SB | NB-SB | D4105-ACDU | … | ACDU OCT | … | … | LAR01497 | 12 |
| SB | NB-SB | D4105-ACDU | … | D4105-ACDU Mar 87 | | | CC-EF | |
| SB | NB-SB | D4105-ACDU | … | ACDU MAR | … | … | LAR01497 | 13 |
| SB | NB-SB | D4105-ACDU | … | ACDU Sep 02 | | | CC-EF | |
| SB | NB-SB | D4105-ACDU | … | ACDU SEP | … | … | LAR01853 | 3 |
| SDA | SW-SDA | D4105-ACDU | … | D4105-ACDU Jun 05 | | | CC-EF | |
| SDA | SW-SDA | D4105-ACDU | … | ACDU JUN | … | … | LAR01948 | 2 |
| UM | L-Methodist | D4105-ACDU | … | ACDU Feb 96 | | | CC-EF | |
| UM | L-METH | D4105-ACDU | R | ACDU JAN | … | … | LAR01323 | 5 |
| UM | L-Methodist | D4105-ACDU | … | not recommended | | | CC-EF | |
| UM | L-METH | D4105-ACDU | … | no | … | … | LAR01325 | 6 |
| EPIS | L-Episcopal | D4105-ACDU | … | D4105-ACDU Oct 92 | | | CC-EF | |
| EPIS | L-EPIS | D4105-ACDU | … | ACDU OCT | … | … | LAR01700 | 4 |
| UPI | N-Pentecostal | 1945 | … | 1945 | | | CC-EF | |
| UPI | N-PENT | 1945 | … | 1945 | … | … | LAR01512 | 8 |
| UPI | N-Pentecostal | S4105-ACDU | … | not recommended | | | CC-EF | |
| UPI | N-PENT | S4105-ACDU | … | no | … | … | LAR01542 | 4 |
| UPI | N-Pentecostal | S4105-INACDU | … | S4105-INACDU | | | CC-EF | |

Leuba Sept 2006 Declaration re Accessions: page 109

COL >>>

| X | Y | Z | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| No Rec in Memo | DECISION this time | Decision History | Second Decision | Third Decision | Fourth Decision | Fifth Decision | Sixth Decision | Seventh Decision | Eighth Decision | Ninth Decision | Tenth Decision |
| | Decision | | | | | | | | | | |
| list length | Code | | | | | | | | | | |
| 11 | 19Y | | | | | | | | | | |
| 3 | | | | | | | | | | | |
| 3 | DAN | | | | | | | | | | |
| 27 | DAY | | | | | | | | | | |
| 27 | DAY | | | | | | | | | | |
| 5 | DAY | | | | | | | | | | |
| 7 | DAY | | | | | | | | | | |
| 11 | DAY | DAN,DAY | DAY | | | | | | | | |
| 6 | DAN | DAN | | | | | | | | | |
| 10 | DAY | | | | | | | | | | |
| 14 | 19Y | 19Y | | | | | | | | | |
| 9 | SAN | 19Y,SAN | SAN | | | | | | | | |

Leuba Sept 2006 Declaration re Accessions: page 110

**File CD – The Navy's Production of Accessions FY 1988 to FY 1997**

| | |
|---|---|
| Navy's "Accessions" CD | Page 1 (Column 1) |
| Navy's "Accessions" CD | Page 1 (Column 2) |
| Navy's "Accessions" CD | Page 1 (Column 3) |
| Navy's "Accessions" CD | Page 1 (Column 4) |
| Navy's "Accessions" CD | Page 1 (Column 5) |
| Navy's "Accessions" CD | Page 1 (Column 6) |

FISCAL YEAR 1988 CHAPLAIN CORPS ACCESSIONS

NAME        INCOMPLETE ENTRY       RANK AT ACCESSION
SOURCE OF ACCESSION  FAITH GROUP       FG     FG
PRESENT STATUS  LT DATE OF RANK LCDR DATE OF RANK
LCDR ZONE  CDR DATE OF RANK      CDR ZONE    CAPT DATE OF RANK
CAPT ZONE  FUNDED GRADUATE EDUCATION (FGE)
FGE SUBSPECIALTY       DUTY ASSIGNMENTS      PRESENT STATUS

FY 88  35     YES    Lieutenant junior grade
Superceding   Baptist Bible Fellowship       B-Other        B
No longer on Active Duty      1-Jan-89         ...
FY-95 In-Zone Select ...      ...>     ...>      ...>
...>     ...>     ...>     ...>

FY 88  43     ...>    Lieutenant junior grade
Superceding   National Baptist Convention USA     B-Other       B
Active Duty    1-May-89      1-Oct-98
FY-99 Above-Zone Select    ...>    ...>    ...>    ...>    ...>
...>     ...>     ...>

FY 88  51     ...>    Lieutenant junior grade
Direct  Progressive National Baptist Convention      B-Other        B
RAD September 1991          ...>    ...>    ...>    ...>    ...>
...>     ...>     ...>     ...>
...>     ...>

FY 88  12     ...>    Lieutenant junior grade
Recall  Progressive National Baptist Convention, Inc.  B-Other    B
Active Duty    1-Nov-88      1-Jul-95        FY-96 Above-Zone Select
FOS 2002-Present  ...>   ...>      ...>      ...>    ...>
Naval Station Puget Sound    RAD December 1991

# FG    Navy's Faith Group Codes

**DATA SET FG**

| CHECKED | | DENOMINATION | FAITH GROUP |
|---|---|---|---|
| X | ACDU | THIS IS WRONG. | |
| | | SHOULD BE ISFSG TO CHARISMATIC EPISCOPAL | NON TO LIT |
| ? | CMBC | C M BIBLE CHURCH | ? |
| ? | SOVGRACE | SOVEREIGN GRACE | ? |
| | RC | ROMAN CATHOLIC | CATH ROM |
| ? | AACC | AMERICAN ANGLICAN CATHOLIC CHURCH | LIT |
| | AALC | ASSOCIATION OF AMERICAN LUTHERAN CHURCHES | LIT |
| | AELC | ASSOCIATION OF EVANGELICAL LUTHERAN CHURCHES | LIT |
| ? | AFLC | AMERICAN FELLOWSHIP OF LUTHERAN CHURCHES | LIT |
| | ALC | AMERICAN LUTHERAN CHURCH | LIT |
| | AME | AFRICAN METHODIST EPISCOPAL | LIT |
| | AMEZ | AFRICAN METHODIST EPISCOPAL ZION | LIT |
| | ARP | ASSOCIATED REFORMED PRESBYTERIAN | LIT |
| | BPC | BIBLE PRESBYTERIAN CHURCH | LIT |
| ? | CEEPIS | CHARISMATIC EPISCOPAL | LIT |
| | CHAR EPISC | CHARISMATIC EPISCOPAL | LIT |
| | CHAREPI | CHARISMATIC EPISCOPAL | LIT |
| | CHAREPIS | CHARISMATIC EPISCOPAL | LIT |
| | CHARISEPIS | CHARISMATIC EPISCOPAL | LIT |

**Data Set MA**  **Merged Electronic Files received from Navy/DOJ ~ 7/27/06**

ALL xxY codes (Yes to Active Duty)  vs Navy's list of Chaplains brought onto Active Duty by year.

Compared to List of acdu Chaplains DEFA00226 to DEFA00256 -

And then compared to the Navy's CD for the two years which are not in the DEFA00226 etc file

Matched to the Navy's CD for FY88 and FY89

The first block of Chaplains (here at the top of this listing) are "batch" matched; they do not necessarily line up 1 to 1.

The matching is done by Denomination and Program, and then by the closest reasonable date.

The Chaplains in this type face:  SAVE  are extracted from the Navy's CD for the years (FY88 and FY89) which were missing from DEFA00226 etc.
The chaplains marked "SAVE" in this type face came from the CC-EF file and were "matched" to a CD Chaplain.

102 Chaplains matched.
62 Chaplains did not match; a "conservative" approach would be to "force" a match regardless of date.

| 168 | LAR01559 | 7-Feb-89 | Arminio, Alfonse M. | 0 | RC- | C-RC | D4105-A | DAY | SAVE |
| 394 | LAR01561 | 24-Jan-89 | Beltram, Robert | 0 | SB | NB-SB | RECALL | RAY | SAVE |
| 448 | LAR01505 | 19-Jun-87 | Beyer, Stephen | 0 | LCA | L-LUTH | RECALL | RAY | SAVE |
| 460 | LAR01562 | 19-Jan-89 | Bidot, Juan C. | 0 | PUSA | L-PRESBY | D4105-A | DAY | SAVE |
| 598 | LAR01540 | 6-Jun-89 | Boyle, Dennis P. | 0 | RC | C-RC | RECALL | RAY | SAVE |
| 690 | LAR01522 | 30-Jun-88 | Brown, Roosevelt H. | 0 | SB | SB | D4105-A | DAY | SAVE |
| 692 | LAR01562 | 19-Jan-89 | Brown, Arthur M. | 0 | CGIC | N-CG | D4105-A | DAY | SAVE |

**C/A/R/E  WORK SHEETS     Entered from Paper Records July 2006**
**Format 1**

**Proofed data from Memo File**
**Formatted to match Work Sheet file as entered**
**Sorted to co-locate the "same" consideration**
**Results transferred from Memo to work sheet**
**Delete non Work Sheet records**
**Condense Results**

| Bates # | Source | list Position | list Length | DATE | Name | Age Rank | Denom | fgc | Program |
|---------|--------|---------------|-------------|------|------|----------|-------|-----|---------|
| LAR01326 | Table | 2 | 4 | 9-Jul-96 | Adams, Sharon  35 LT | | UM | L-METH | D4105A |
| LAR01324 | Table | 8 | 8 | 19-Jul-96 | Adams, Sharon  35 ... | | UM | L-METH | D4105A |
| LAR01590 | Table | 3 | 4 | 5-Jan-90 | Almarez, Joseph 48 LCDR | | EF | N-OTHER | RECALL |
| LAR01320 | Table | 5 | 6 | 25-Aug-96 | Alston, Andre    46 LCDR | | NBCU | NB-NBC | RECALL |
| LAR01560 | Table | 12 | 15 | 7-Feb-89 | Alston, Andre C. 38 LT | | NBCU | NB-NBC | RECALL |
| LAR01415 | Table | 6 | 6 | 24-Oct-97 | Alvis, Erskine L.  35 LT | | SB | NB-SB | RECALL |
| LAR01324 | Table | 2 | 8 | 19-Jul-96 | Amora, Edito      41 LCDR | | RC | C-RC | RECALL |
| LAR01284 | Table | 1 | 4 | 8-Aug-95 | Anderson, James 57 O-6 | | RC | C-RC | RECALL |
| LAR01345 | Table | 4 | 4 | 31-Jan-96 | Anderson, Kim M. 34  ... | | CGAI | N-CG | D4105A |
| LAR01308 | Table | 4 | 5 | 20-Dec-94 | Anderson, Paul    37  ... | | SDA | SW-SDA | D4105A |
| LAR01537 | Table | 9 | 11 | 29-Jun-89 | Andraeas, Alan L. 29  ... | | AG | N-AG | S4105A |
| LAR01349 | Table | 7 | 9 | 30-Nov-95 | Anson, Cesar R.   45  ... | | RC | C-RC | D4105A |
| LAR01655 | Table | 4 | 9 | 5-Aug-91 | Appleton, Billy M. 33 LTJG | | LBF | NB-LBF | RECALL |

**C/A/R/E  WORK SHEETS     Entered from Paper Records July 2006**

**Format 1     (Continued)**

| Date of Birth | Date of Rank | EXP | ACDU | ACDU | G/ | /L | Y/N | Decision Code |
|---|---|---|---|---|---|---|---|---|
| Feb-61 | ... | YG93 | ... | ... | 6 | -4 | Y | DAN |
| Feb-61 | ... | YG94 | ... | ... | 0 | -2 | ... | DAY |
| Nov-59 | ... | ... | 1 | 0 | 0 | 0 | no | SAN |
| Nov-59 | Jul-88 | YG86 | 1 | 4 | 0 | 0 | ... | RAY |
| Dec-41 | Nov-84 | Released by Indef | ... | ... | | | No | RAN |
| Jul-50 | Jul-95 | YG85 | ... | ... | 0 | -1 | no | RAN |
| Jul-50 | Nov-88 | ... | 16 | 45 | 2 | -4 | Yes | RAY |
| Jun-62 | ... | YG91 | ... | ... | 3 | -5 | ... | RAY |
| Jun-55 | ... | YG84 | 212 | ... | 1 | -19 | ... | RAN |
| Feb-38 | Jun-95 | YG75 | 217 | ... | 1 | -20 | ... | RAY |
| Dec-61 | ... | YG93 | 1 | ... | 0 | 0 | ... | DAY |
| Jul-57 | ... | YG92 | 15 | ... | 2 | -1 | ... | DAN |
| Aug-60 | ...      ... | | 24 | 16 | 0 | 0 | Yes | SAY |
| Sep-50 | ... | YG92 | 219 | ... | 4 | -13 | Yes | DAY |
| Aug-58 | Mar-90 | YG88 | 1 | 1 | 0 | -1 | Yes | RAY |
| Jan-53 | ... | ... | 77 | 115 | 1 | -5 | No | DAN |
| Sep-45 | ... | YG91 | 227 | ... | 16 | -25 | ... | DAY |
| 29-Oct | ... | ... | 261 | 385 | 8 | -17 | Yes | DAY |
| Feb-69 | ... | YG93 | ... | ... | 0 | 0 | ... | SAY |
| Jun-55 | ... | YG92 | 5 | ... | 1 | -1 | ... | DAY |
| Sep-58 | ... | YG92 | 1 | ... | 0 | 0 | ... | DAY |

C/A/R/E  WORK SHEETS     Entered from Paper Records July 2006
Format 2              (Board Composition)

All available records of Board Identity - produced in July 2006

| Rec ord # | Date | Chairman | BD members   ...   ...   ... | | | RECORDER |
|---|---|---|---|---|---|---|
| LAR01421 | 12/16/1998 | Ferguson, M. R. | Magness, J. B. | Cadenhead, Judy   ... | ... | Berto, V. |
| LAR01422 | 1/20/1999 | Black, B. C. | Ferguson, M. R. | Paul, G. C. ... | ... | Berto, V. |
| LAR01423 | 2/2/1999 | Black, B. C. | Ferguson, M. R. | Magness, J. B. | ...   ... | Berto, V. |
| LAR01424 | 2/3/1999 | Black, B. C. | Ferguson, M. R. | Magness, J. B. | ...   ... | Berto, V. |
| LAR01425 | 2/19/1999 | Ferguson, M. R. | Paul, G. C. | Magness, J. B. | ...   ... | Berto, V. |
| LAR01426 | 3/4/1999 | Black, B. C. | Ferguson, M. R. | Paul, G. C. | Magness, J. B. | Berto, V. |
| LAR01427 | 3/10/1999 | Black, B. C. | Ferguson, M. R. | Magness, J. B. | ...   ... | Berto, V. |
| LAR01428 | 3/31/1999 | Black, B. C. | Ferguson, M. R. | Paul, G. C. | | |
| | | | McNabb, J. E. | Lamonde, J. R. | | Berto, V. |
| LAR01429 | 4/19/1999 | Black, B. C. | Ferguson, M. R. | Magness, J. B. | McNabb, J. E. | Berto, V. |
| LAR01430 | 4/27/1999 | Black, B. C. | Ferguson, M. R. | McNabb, J. E. | ...   ... | Berto, V. |
| LAR01431 | 4/30/1999 | Black, B. C. | Ferguson, M. R. | McNabb, J. E. | ...   ... | Berto, V. |
| LAR01432 | 5/4/1999 | Black, B. C. | Ferguson, M. R. | Magness, J. B. | McNabb, J. E. | Berto, V. |
| LAR01433 | 5/6/1999 | Ferguson, M. R. | Magness, J. B. | McNabb, J. E. | ...   ... | Berto, V. |
| LAR01434 | 5/11/1999 | Ferguson, M. R. | Magness, J. B. | McNabb, J. E. | ...   ... | Berto, V. |
| LAR01435 | 5/14/1999 | Ferguson, M. R. | Magness, J. B. | McNabb, J. E. ... | ... | Berto, V. |
| LAR01436 | 6/17/1999 | Ferguson, M. R. | Linehan, S.J. | Magness, J. B. | McNabb, J. E. | Berto, V. |
| LAR01437 | 7/6/1999 | Black, B. C. | Ferguson, M. R. | Linehan, S.J. | Magness, J. B. | Berto, V. |
| LAR01438 | 7/13/1999 | Black, B. C. | Linehan, S.J. | McNabb, J. E. | Magness, J. B. | Berto, V. |

## C/A/R/E  WORK SHEETS    Entered from Paper Records July 2006
## Format 3            (Quota Tallies)
## All available records – produced in July 2006

| BATES | DATE | Note | Liturgical Num | Liturgical Den* | Non-Lit Num | Non-Lit Den* | RC Num | RC Den* | Other Num | Other Den* | Total Num | Total Den* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LAR01493 | 11/4/1985 | ... | 8 | 35 | 8 | 35 | ... | ... | 6 | 30 | 22 | 100 |
| LAR01486 | 4/16/1986 | ... | 25 | 35 | 34 | 35 | ... | ... | 14 | 30 | 73 | 100 |
| LAR01486 | 4/16/1986 | ANNOTATION | 25 | ... | 34 | ... | ... |  | 15 | ... | 74 |  |
| LAR01484 | 4/30/1986 | ... | 25 | 35 | 34 | 35 | ... | ... | 15 | 30 | 74 | 100 |
| LAR01484 | 4/30/1986 | ANNOTATION | 30 | ... | 34 | ... | ... |  | 15 | ... | 79 |  |
| LAR01482 | 5/16/1986 | ... | 30 | 35 | 34 | 35 | ... | ... | 15 | 30 | 79 | 100 |
| LAR01480 | 5/28/1986 | ... | 33 | 35 | 34 | 35 | ... | ... | 15 | 30 | 82 | 100 |
| LAR01480 | 5/28/1986 | ANNOTATION | ... | ... | ILLEGIBLE |  | ... | ... | ... |  | ... | ... |
| LAR01478 | 6/20/1986 | ... | 34 | 35 | 34 | 35 | ... | ... | 16 | 30 | 84 | 105 |
| LAR01476 | 7/17/1986 | FY87 | 4 | 35 | 2 | 35 | ... | ... | 2 | 30 | 8 | 100 |
| LAR01476 | 7/17/1986 | FY86 | 43 | 44 | 41 | 39 | ... | ... | 19 | 19 | 103 | 105 |
| LAR01474 | 8/21/1986 | ... | 6 | 33 | 5 | 13 | ... | ... | 4 | 44 | 15 | 90 |
| LAR01471 | 8/26/1986 | ... | 7 | 33 | 6 | 13 | ... | ... | 6 | 44 | 19 | 90 |
| LAR01472 | 8/28/1986 | ... | 7 | 33 | 6 | 13 | ... | ... | 6 | 44 | 19 | 90 |
| LAR01576 | 10/19/1988 | ... | 12 | 20 | 7 | 23 | 4 | 2 | 0 | 4 | 23 | 72 |
| LAR01574 | 11/2/1988 | ... | 12 | 20 | 8 | 23 | 4 | 25 | 0 | 4 | 24 | 72 |
| LAR01572 | 11/9/1988 | ... | 12 | 20 | 9 | 23 | 3 | 25 | 0 | 4 | 24 | 72 |
| LAR01572 | 11/9/1988 | LOSSES | ... | 34 | ... | 20 | ... | 17 | ... | 2 | ... | 73 |
| LAR01570 | 11/30/1988 | ... | 13 | 20 | 11 | 23 | 3 | 25 | 0 | 4 | 27 | 72 |
| LAR01568 | 12/6/1988 | ... | 14 | 20 | 11 | 23 | 3 | 25 | 1 | 4 | 29 | 72 |
| LAR01566 | 12/23/1988 | ... | 14 | 20 | 10 | 23 | 4 | 25 | 1 | 4 | 29 | 72 |
| LAR01563 | 1/11/1989 | ... | 17 | 20 | 10 | 23 | 5 | 25 | 1 | 4 | 33 | 72 |
| LAR01560 | 2/7/1989 | ... | 19 | 20 | 15 | 23 | 8 | 25 | 1 | 4 | 43 | 72 |
| LAR01448 | 2/22/1989 | ... | 20 | 20 | 16 | 23 | 12 | 25 | 1 | 4 | 49 | 72 |
| LAR01552 | 4/12/1989 | ... | 22 | 22 | 19 | 23 | 18 | 25 | 1 | 4 | 60 | 74 |
| LAR01552 | 4/12/1989 | ANNOTATION | ... | ... | ... | "#'s Look good" | ... | ... | ... |  | ... | . |
| LAR01550 | 4/17/1989 | ... | 23 | 22 | 20 | 23 | 23 | 25 | 1 | 5 | 67 | 74 |

* Num signifies Numerator (additions to acdu to date); Den signifies Denominator (Quota for this FY)

| BATES | Direct Pro Num | Den* | Recall/ Supercede Num | Den* | Total Num | Den* | Black Num | Den* | Hisp Num | Den* | API Num | Den* | Other Num | Den* | FEM Num | Den* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LAR01493 | 18 | 65 | 1 | 20 | 3 | 15 | 22 | 100 | ... | ... | ... | ... | ... | ... | | |
| LAR01486 | 37 | 65 | 23 | 20 | 13 | 15 | 93 | 100 | ... | ... | ... | ... | ... | ... | | |
| LAR01486 | ... | 38 | ... | 23 | ... | 13 | 74 | ... | ... | ... | ... | ... | ... | ... | ... | |
| LAR01484 | 38 | 61 | 23 | 29 | 13 | 15 | 74 | 105 | ... | ... | ... | ... | ... | ... | | |
| LAR01484 | ... | 42 | ... | 23 | ... | 14 | 79 | ... | ... | ... | ... | ... | ... | ... | | |
| LAR01482 | 42 | 61 | 23 | 29 | 14 | 15 | 79 | 105 | ... | ... | ... | ... | ... | ... | | |
| LAR01480 | 45 | 61 | 23 | 29 | 14 | 15 | 82 | 105 | ... | ... | ... | ... | ... | ... | ... | |
| LAR01480 | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | |
| LAR01478 | 47 | 62 | 23 | 29 | 24 | 25 | 84 | 100 | ... | ... | ... | ... | ... | ... | | |
| LAR01476 | 3 | 61 | 5 | 14 | 0 | 25 | 8 | 100 | ... | ... | ... | ... | ... | ... | | |
| LAR01476 | 46 | 46 | 41 | 41 | 16 | 16 | 103 | 105 | ... | ... | ... | ... | ... | ... | | |
| LAR01474 | 7 | 61 | 6 | 11 | 2 | 18 | 15 | 90 | ... | ... | ... | ... | ... | ... | | |
| LAR01471 | 11 | 61 | 6 | 11 | 2 | 18 | 19 | 90 | ... | ... | ... | ... | ... | ... | | |
| LAR01472 | 11 | 61 | 6 | 11 | 2 | 18 | 19 | 90 | ... | ... | ... | ... | ... | ... | | |
| LAR01576 | 18 | 36 | 5 | 36 | 23 | 72 | ... | ... | ... | ... | ... | ... | ... | ... | | |
| LAR01574 | 19 | 36 | 5 | 36 | 24 | 72 | ... | ... | ... | ... | ... | ... | ... | ... | | |
| LAR01572 | 19 | 36 | 5 | 36 | 24 | 72 | ... | ... | ... | ... | ... | ... | ... | ... | | |
| LAR01572 | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | | |
| LAR01570 | 21 | 36 | 6 | 36 | 27 | 72 | ... | ... | ... | ... | ... | ... | ... | ... | | |
| LAR01568 | 23 | 36 | 6 | 36 | 29 | 72 | ... | ... | ... | ... | ... | ... | ... | ... | | |
| LAR01566 | 23 | 36 | 6 | 36 | 39 | 72 | ... | ... | ... | ... | ... | ... | ... | ... | | |
| LAR01563 | 25 | 36 | 8 | 36 | 33 | 72 | ... | ... | ... | ... | ... | ... | ... | ... | | |
| LAR01560 | 31 | 36 | 12 | 36 | 43 | 72 | ... | ... | ... | ... | ... | ... | ... | ... | | |
| LAR01448 | 36 | 36 | 13 | 36 | 49 | 72 | ... | ... | ... | ... | ... | ... | ... | ... | | |
| LAR01552 | 42 | 36 | 18 | 36 | 60 | 74 | ... | ... | ... | ... | ... | ... | ... | ... | | |
| LAR01552 | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | | |
| LAR01550 | 47 | ... | 20 | ... | 67 | 74 | ... | ... | ... | ... | ... | ... | ... | ... | | |
| LAR01548 | 48 | ... | 19 | ... | 67 | 67 | ... | ... | ... | ... | ... | ... | ... | ... | | |
| LAR01545 | 48 | 52 | 19 | 19 | 67 | 74 | ... | ... | ... | ... | ... | ... | ... | ... | | |
| LAR01545 | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | .. | | |

**APPENDIX FG**
**Faith Group Categories**
**(and the humbug[42] they cause)**

This Appendix is the first part of a two part expose of the Faith Group Category humbug*.

In Part I  Logic will show

- The faith group category system is not necessary.
  [It is defended as "necessary" so that chaplains from different faith group categories or different clusters of denominations and groups[43] may be assigned to different (somehow uniquely relevant) posts where they are to serve "personnel's religious needs, irregardless of religious views.[44]"  That practice is both unnecessary and patently self-contradictory.]

- The faith group category system is Roman Cathocentric.
  [There is one "cluster" for *Roman* Catholics alone, and all other Catholics and all other denominations are "grouped" into categories or clusters based, not on *their* common beliefs and practices (which are often fractious and volatile within "cluster"), but on the basis of how far removed the so-called category is from Roman Catholic beliefs. This devalues, in some proportion or other, every other denomination on the face of the earth.]

- The faith group category system empowers or facilitates the expression of intra-denominational and inter-denominational prejudice within Categories.

---

[42] * I chose the word "humbug" carefully; it is not as strident as "hoax" and it allows for an interpretation of both gentle good will, and a backfired practical joke.  Whatever the motivation when it was set up, the Navy's faith group category (or faith group cluster) system has harmed the Navy and the Chaplains who serve it, regardless of their so-called "Category."]

[43] I am informed that although neither "denomination" nor "faith group" are terms of art in normal parlance, one and not the other is a pitfall when speaking of or to what some of the uninitiated (myself included) might otherwise call a "denomination".  Some entities, endorsers, believers, dislike the name "denomination".  I won't try to explain why, or get into this any further, but it does highlight (as though the situation needed attention) that individual faith is very important to the affected parties.  Meaning no offense to the populations of believers, however they are subdivided, and whatever they call themselves, and with no malice toward the Navy, I shall try to discuss so-called "faith group categories",  or "faith group clusters" as an administrative construct, and will continue to refer (imprecisely, ineloquently, and only in the service of communication in this venue) to the elements of those clusters as denominations (with a lower case "d".)

[44] Yes, I strung these words together, but they are in the same sequence and syntax as in the original, Reference 9.

[Because the Chaplain Corps is alert to the possibility of religious discrimination, the Navy monitors personnel selection-board performance in terms of faith group cluster (faith group category) results, on the basis of faith group category.  That means that any discrimination or prejudice which may take place within the boundaries of a cluster or category is "underneath the radar".]

In Part two (See Appendix QE) data analysis will show:

*    The Quota system, however well intentioned, has been too coarse a tool.

    [If one had a legitimate business reason for needing 25 Catholic Chaplains for every 5000 sailors or if one had a legitimate business reason for asserting that exactly 22 of every 100 Chaplains had to be a Catholic, one could not justify "lumping" all the remaining requirements into amorphous, internally conflicted, non-Catholic "categories".  The result would be (and is), (a) a forced culling of applicants to fit under predesignated limits, and (b) competition within cluster or category for limited opportunities to serve.]

And, again:

*    The faith group category system has empowered or facilitated the expression of intra-denominational and inter-denominational prejudice within the co-called Faith Group Categories.

**PART I - logic**

**Issue One** - the logical case for/against management by faith group category.

Articulated in a variety of carefully worded ways, the Navy says that it needs to manage by faith group category, because the religious needs of its personnel come in a "variety of flavors" and if the Navy is to fulfill its obligation to them (the served population), then the Chaplain Corps needs to be able to dispatch, distribute, make available, an appropriate mix of RMP's (Religious Ministry Professionals).

Mr Hyde has put it this way:

    "The Navy has a strong, compelling interest in maintaining a broad mix of chaplains from each faith group category at all ranks, so that chaplains from each faith group category may be properly detailed throughout the Navy's nearly 500 duty stations to meet personnel's religious needs."  p. 3, ref 9.

Of course the Navy wants to provide "chaplain services" to its personnel, but why are those services related to "faith group category"?

Mr Hyde answers that in this way:

> "Thus, the assignment of Roman Catholics to a different faith group, and the assignment of Non-liturgical Protestant chaplains to the same faith group is based upon the judgment that chaplains within the same faith group category can generally meet the needs of personnel encompassed by that category and can be managed, utilized and deployed in similar fashion." last sentence, p. 5, ref. 9.

Thus, it is the Navy's judgment (I do not think Mr. Hyde is arrogant enough to be saying this on his own), it is the *Navy's **judgment*** that the purpose of the faith groups is to facilitate *matching* a chaplain flavor to a duty station need.

Again:
> "Further, the faith group categories reflect a logistical tool used by the Navy to utilize, deploy , and manage the limited resources of the Chaplain Corps ..."
> p.1, ref. 9.

And:
> "Because the differences in the manner in which each faith group category is managed, ..." p1, ref 9.

And finally:
> "Utilization of faith group categories leads to differences in the manner in which chaplains from each faith group category are managed, utilized and deployed, irrespective of the differences between respective chaplains' religious views".
> p. 4, ref. 9.

As a person who trades on inference, this series of assertions strikes me as circular on the one hand, and self contradictory on the other.

First, the Navy is saying that it needs different faith group clusters because it deploys them differently, and then, because it deploys them *differently*, it needs them.

Second, the Navy is saying that it deploys Chaplains and uses them "irrespective of religious views", but it assigns them to faith group clusters or categories, <u>based on religious views</u>.

Maybe the Navy needs a variety of Chaplains to serve the variety of religious views among its service personnel, but their logic doesn't prove that they need *THIS* taxonomy of faith groups.

Furthermore, (a) the judgment behind the faith-group clustering is not borne out by denominational realities, and (b) it is overtaken by the Chaplains' oath (if not the Chaplains "motto".)

- Chaplains from the Roman Catholic cluster (sic) can surely serve service personnel who are Catholic.

Can they also serve:   Episcopals? Methodists? Apostolic Catholics? Greek Orthodox?

[We do not need to exhaust the list, nor fill in the details to know that the answer is: "Yes", and "sometimes", and  "it depends", and  "under extreme conditions" and "only over my dead body."]

- Chaplains from the Liturgical Cluster can surely serve service personnel who are - what?

Can any Episcopal serve any Methodist or Church of Christ or Presbyterian?

The answer runs across the same range as above, for Catholics, but it distributes differently; there are Episcopalian Clergy who will (and those who will not) serve with female clergy who are also Episcopal, and the new data the Navy just gave me shows that there are now a growing number of Charismatic Episcopals; the Presbyterians have already divided into the Presbyterian Church of America and the Presbyterian Church of the USA; there are splinters and factions throughout the "Liturgical Community". Mispeak, the Liturgical community is not a "community" in the same sense that the Liturgical Faith group Category is not a "Category". It is a bag full, with no cohesion; they are simply placed in the same "bag."  The cohesion is imagined; there are factions and frictions within what outsiders see as the "same" denomination. Yes, there are frictions between Catholics and Protestants (the "Irish Troubles".)   But there are also frictions between Muslims and Jews, and they "belong" to the same faith group category. We do not need to reach across so-called faith group categories to be reminded that some of man's most bitter religious conflicts are between virtual kin.

The "judgment" that the RMOs from a given cluster are "better" at serving the members of *their* (sic) category (sic) is either:

(a) a fiction which can be held only by an outsider who sees all "other" religions as equal, or it is

(b) belied by an oath-based accommodation which is TRUE regardless of whether the served party belongs to *my* "Category" or some other one.

Except perhaps for Roman Catholics[45], it seems that either it does not matter which faith group cluster you belong to:

- conflict with other denominations in "your" cluster is nearly as inevitable as conflict with denominations in other clusters, if not more so[46], or

---

[45]  I am in danger of getting ahead of myself here.  Let us note and harken back to this point later.

[46]  a la Cain and Able?

- the ability to provide Chaplain support, undertaken in the oath, is straightforward with respect to denominations different than your own, whether those denominations are designated, not joined, "members" of "your" Faith Group Category or whether they are just, coincidentally, "members" of some other Faith Group Category.

I know that the language there is more convoluted than the logic.  (I would not want to have to diagram that sentence.)  Here is the point:

> If you are a Chaplain, and you are not a Roman Catholic, then it does not matter to *you* (even if it does matter to the Chaplain Corps) whether you are in a post where most of the service personnel you have to service are or are not your denomination, whether they are simply not your so-called "faith group category", or in it with you, but not "of" your particular denomination. Your *faith group category* is the "irregardless" in terms of your ability to serve.

> If you need help with an Orthodox wedding, or a Bris, you know where to get help. Otherwise, you do what you have sworn to do:  "abide by applicable laws, and all applicable regulations, directives, and instructions of the Department of Defense ....[including] ...a "willingness to function in a pluralistic environment and to ***support, both directly and indirectly, the free exercise of religion by all members of the Naval service,*** their family members, and other persons authorized to be served by the chaplaincy"    [OPNAVINST 1120.9, Ref 21, emphasis added.]

> or as the Chaplain Corps motto has it: "Provide for your own, facilitate for others, care for all".[47]

And, [see (b) above] thus, the differentiation implied in the judgment that says the Navy needs (these) different faith group clusters is inconsistent with the oath the Navy requires every Chaplain to affirm before undertaking Service.

Either any Chaplain can meet any service personnel's needs, or (a) that chaplain has violated his oath of office, **and** (b) the Navy has "established" religious differentiation, based on a Roman Cathocentric taxonomy.

There are no other logical options.

---

[47]  The "official" version of this motto incorporates the "faith group category" concept into the motto:  "We provide for those of our own faith group, we facilitate ministry for those of other faith groups, and we care for all".  I took the quote in the text here from a press story about a Unitarian/Universalist Chaplain.

**Issue Two** - the argument that the Navy's faith group category system is Roman Cathocentric.

First, a note to Mr. Hyde and Mr. Hall: No, I am not about to represent myself as an "expert" on comparative religion. On that score I know no more than is encompassed by a "reasonable man" standard. But I am an expert on Taxonomy. (I was the senior scientist, a vice president, at the Smithsonian Institution, for what was then the largest scientific data base in the world. We "indexed" all the research projects in the world which used U.S. funds.) Taxonomy is a fancy word for classification, and classification and coding are fundamental, if mundane and underrated, tools used by statisticians (among others.) There are **rules** for taxonomies; even Dr. Bernard Siskin knows this; he describes some rules for data classification in his books on elementary statistics books.]

Second, let's begin with a look at the "Faith Group Cluster" cosmos, as the USN Chaplain Corps defines it. [My drawing here does not prove anything, it simply illustrates where we are going:]



For now, this drawing merely illustrates what I mean by Roman Cathocentric[48].

What follows is the proof for this drawing:

The Navy separates all "denominations" into four so-called clusters or categories:

- Roman Catholic
- Liturgical Protestant
- Non-Liturgical Protestant, and
- Special Worship Group

Roman Catholics (and only *Roman*[49] Catholics) are "grouped" (sic) assigned to Category 1. All other denominations are spread into one of three other "Categories", which are distinguished from each other in terms of how different their fundamental polity is from Roman Catholic.

Thus, the denominations which grew out of the "Protestant reformation" are called "Liturgical"; the denominations which grew out of "individual responsibility" vs faith through an intermediary are called Protestant-Non-Liturgical, and all the other denominations (or endorsers), notably including the Orthodox who are both "close" historically to Catholic and parties to the Great Schism, all these others are lumped into the most distant Category: "Special Worship Group".

---

[48] "Cathocentric" signifies that Roman Catholic is the signal center of the Navy's classification system. It would not "matter" how the Navy classified denominations but for (a) putting "Roman Catholic" at the center (and if that is not ceded, then putting Roman Catholic in its own single- denomination "group", and providing that distinction for no other denomination, elevates Roman Catholicism to a separate plateau of recognition and distinction and signifies for both Roman Catholics and all other denominations, that in the Navy, "Roman Catholics have special status." In addition, how the Navy classifies denominations into "faith group categories" matters because the Navy manages the categories differently. Assignments, duty stations, participation as members of selection boards, and accession quotas are all admitted to be based on faith group category. Statistical analysis demonstrates that promotions, separations, medical benefit retirement, recruitment past age 40, continuance in Service past age 65, student support, and sufferance with respect to continuance in service after FOS are all demonstrably different for different faith group categories - and more importantly, the Navy's monitoring of those actions by faith group category alone permits different treatment for different denominations within each faith group category.

[49] There are other Catholics: e.g. Reformed Catholics, Apostolic Catholics, Old Holy Catholic Church, etc. listed in the Navy's data base of denominations (See Appendix DL - FG codes). None of these other Catholics are assigned to the "Roman Catholic" faith group cluster; they are all distributed to Special Worship or Liturgical. [And only one of them was assigned to Active Duty. That practice is both practically and statistically significant.]

- The denominations which were either the first to split from Catholicism, or which were never part of the "Christian" system - are placed as far distant from Category One as possible, in "Other", Category four, which was initially Jews, the Orthodox and the Latter Day Saints, but which has evolved to include the Reformed Jews, and the Reformed Latter Day Saints, and a host of "special" denominations/faiths/endorsers - Muslim, Jehovah's Witnesses, Seventh Day Adventist, Christian Science, Unitarian, Buddhist, and lately the "Orthodox Catholic: and the "Old Holy Catholic Church" (see Data Set FG).

- Denominations which had their origins in the second split with Roman Catholicism, are placed closest to Roman Catholic, in Category two.  These are the Episcopalians (and the Charismatic Episcopalians), the Lutherans (and the Evangelical Lutherans) together with the Presbyterians (in four varieties), the United Church of Christ, the Methodists and the Methodist Episcopal's, as well as the  Congregational's (oops, the Navy puts the Congregational's in with the Non-Liturgicals and the Nazarenes in with the Liturgicals), etc. All these non-Catholics are part of the Liturgical Protestant Category.

- All the other denominations (or Endorsers), from Baptist to Moravian, from Assembly of God to Christian Missionary Alliance, and from the Chaplaincy of Full Gospel Churches to the New Life Christian Fellowship; all these are lumped together into "Non-Liturgical, Protestant", in Category three.

Summary:

There is one "cluster" (sic) for Roman Catholics; everybody else is one of three "categories" which (a) are defined in terms of difference from Roman Catholic, and which (b) are not internally cohesive.

That demonstrates "Roman Cathocentricity."

The Navy's faith group category system, characterizes all "other" denominations in terms of Roman Catholic theology and practice.

The "category" or "cluster" system ignores differences which are more important to many other people than life and death (since they deal with everlasting life and eternal damnation, extending even unto the third generation).  Denomination *matters* to the Navy only if your denomination is Roman Catholic.  If you believe something else, then here's a one of three sizes fits all solution.

**The Navy's faith group Categories are not "Religion" neutral**

The Navy begins its latest defense (Reference 9, page 1, ¶ 1, sentence 1) with:

> "Religion is not, and has not been, a proper consideration permitted by the Navy in determining a chaplain's merit for promotion or selective early retirement (SER)."

Without being too pedantic, I note that this is either (or perhaps all):

> (a) a backhanded admission that Religion has been an *improper* consideration permitted (at least as in "suffered and endured") in determining a chaplain's merit ....; or

> (b) a diversionary statement, thought to be true, but leaving out that Religion, while not a dimension in judging *merit*, is a dimension in judging *eligibility* (based on quotas); or

> (c) an incomplete statement, in that Religion is permitted to operate as a dimension of *distinction*, if not one of *merit* in other decisions of Chaplain Corps personnel management, e.g. accessions, duty assignments, service on selection boards; etc.

If we exercise just a tiny bit of semantic discipline here, we can see that "religion" is an umbrella word, sometimes equated with faith group cluster, and not isomorphic to denomination.

If we follow the Navy's lead and discourse about faith group categories, we might argue that denominational distinctions do not matter to the Navy Chaplain Corps.

One would/could base that conclusion on the fact that the Navy insists on "managing by (their) faith group Categories" and they hardly ever mention "denominations".   [I do not think that this muteness is because they are concerned about the sensitivities of, e.g. the Christian Scientists, who might take umbrage at being referred to as a "denomination", nor is the Navy's "stick in your eye" remark that CFGC is an Endorser and not a denomination a counter example.]

Close reflection on the irrelevance-or-unimportance-of-denomination- premise (and examination of the faith group categories themselves [See Appendix DL - Data Set FG.]) reveals:

The Navy Chaplain Corps is in fact unconcerned about denominational differences – except for the Roman Catholic denomination.

Roman Catholics are the only denomination given their own faith group cluster (sic).

That, again, is a demonstration of Roman Cathocentricity.


**Issue Three** - the faith group category system facilitates denominational prejudice

Because the Navy Chaplain Corps is explicitly focused on faith group categories, and is implicitly unconcerned with denominational distinctions, they express quotas (when they have them), counts (when they publish them) and EEO type monitoring (when they take their own performance measures for some personnel actions) in faith group cluster terms.

This has at least three distorting effects.

First, the Navy's public emphasis on category and de-emphasis on denomination surely supports (and may be intended to support) the impression that "we are all in this boat together". "Our differences are not nearly as important as our mission." But it also sends the signal, that *YOUR* differences are not as important as *my* classification system.

Second, as a practical matter, not collecting data by denomination makes personnel management decision information based on denomination invisible. That invisibility (a) deprives the Navy of a management tool, and (b) limits (or is used in an attempt to limit) discovery in this litigation, and (c) it permits denominational preferences to be expressed by those who are being monitored for "religious bias", but only being monitored with respect to faith group bias, to express their preferences within the context of faith group. Baptists do "better" than non-Baptists (even though, or because they are in the same cluster), PUSA does better than PCA (even though, or because they are in the same cluster), and so forth: Presbyterians and Episcopals do better than Methodists. And, of course, Catholics do much better than everybody else (because there is nobody else in their cluster with whom they have to compete?)

Third, focus on faith group categories provides a shield or shelter, or "excuse" for denominational preferences to be expressed by the Navy itself in assigning Chaplains to personnel selection boards.

The Navy may *say* they are even handed, insofar as possible, in assuring that all the faith group clusters are represented on the various personnel selection boards, but in the way the Navy does this, the representation by faith group cluster in neither denominationally balanced (on average) nor randomly assigned.

Preferred denominations within faith group categories are given the vast majority of the available seats and most denominations, most of the denominations which represent many chaplains, are never given an opportunity to serve.

"Yes", the Navy may say, but Board Members are entitled to the presumption of regularity and I may not assume that just because there is a disparate balance of denominations there will be a disparate balance in the selections made by those denominations. I do not make that assumption, but I do test it. The Navy fails the test. (See Appendix LL.)

However, my focus in this section of this appendix has not been on the fact of denominational preference, it has been on the fact that the faith group category system facilitates denominational preference and all of the above is an explanation of how that happens.

This facilitation is systemic. It flows from the focus on faith group categories. Some of the discrimination which we will see in Part II could not happen if the faith group categories were not used.

Without faith group categories providing "cover",

•    the Navy would know what these data show, on a denomination by denomination basis
     how biased their personnel management system has become, and

•    the affected Chaplains would not be both (a) discriminated against and (b) unawares of
     how grossly they have been treated.

The Table below illustrates what I mean by denomination-by-denomination bias.

My decision to use non-*Roman* Catholic as one of my examples here is motivated by my
curiosity about what happens to the *Catholics* who are not allowed into the Navy's Roman
Catholic cluster; my decision to use CFGC as the other example here is motivated, of course, by
the fact that they are the complaining "denomination" in this litigation.  Although this Appendix
is not a data analysis appendix, and I have already presented some analyses above and will
present more below, this is an opportune place to illustrate what I mean by denominational
differences in the data are being concealed (obscured) by the Navy's insistence on presenting
everything in "Faith Group Category" terms:

| Percent of Applicants Who ↓ | Roman Catholic | Other Catholic | Chaplaincy of Full Gospel Churches |
|---|---|---|---|
| Are Granted 1945 Accession* | 97.9 % | 0.0 % | 84.0 % |
| Are Assigned to Active Duty* | 93.4 % | 25.0 % | 35.9 % |
| Are Promoted to CDR** | 45.4 % | 0.0 % | 0.0 % |
| Are Promoted to CAPT** | 19.4 % | 0.0 % | 0.0 % |

*   Based on Data here - see Data File CC-EF
** Based on data from the Chaplains History (Vol X) 1980-1991

The Faith Group Category system may not have been "set up to benefit a particular denomination
or harm others: but it has had that effect. [See also Appendix QE the Quota Effect.]

**Part II** - In the second part of this expose' (see Appendix QE- the Quota Effect) analysis will show:

•    The Quota system, however well intentioned, has been too coarse a tool.

    [If one had a legitimate business reason for needing 25 Catholic Chaplains for every 5000 "sailors" or if one had a legitimate business reason for asserting that exactly 22 of every 100 Chaplains had to be a Catholic, one could not justify "lumping" all the remaining requirements into amorphous, internally conflicted, non-Catholic "categories".  The result would be (and is), (a) a forced culling of applicants to fit under predesignated limits, and (b) competition within cluster or category for limited opportunities to serve.]

And, again:

•    The faith group category system has empowered or facilitated the expression of intra-denominational and inter-denominational prejudice within the co-called Faith Group Categories.

**Appendix LL**
**Like, Likes, Like**

What I have said has been misquoted and misunderstood.

I am not saying that Chaplains on Navy Personnel Selection Boards are biased. Nor am I saying that they intentionally violate their Service oath to be impartial in their judgments.

What I have done by examining this topic from a psycho-statistical point of view is elevate an already well-understood phenomenon to the point where its relevance is obvious - and it thus invites overblown misinterpretation from those bent on rejecting the data.

**The conclusion:**

All living things "cluster".  This is a biological imperative and a social pleasure.  Without wallowing in nature vs nurture, evolution vs free will; all people (including all Chaplains as a group) tend to form relationships based on similarity – like, likes like.

When the Center for Naval Analyses looked at the issue of "Promotions in the Navy Chaplain Corps" (Reference 28), it was against a backdrop of "wide spread belief" that there were denominational prejudices at play.  When the authors of that study "noticed" a statistically significant tendency for Catholics to be promoted to Commander above all other denominations[50], they investigated and laid the cause at the doorstep of the "two Catholics on every Promotion Board" time period.  And although that is an implicit allegation that the Catholics on the Boards were not making impartial decisions about Catholic candidates, the CNA study satisfied its mission (by deciding the problem was in the past) and its curiosity (by nodding at LCDR McCreary's study (Reference 19) and saying that this may have been a consequence of "affinity" – like, like, like).

The psychology and sociology literature is full of studies where one group of people judge or evaluate another group, one at a time.  Forming opinions about others is one of the things people do.  A subset of these studies has observed that the process of forming these opinions is dependent on both what the target presents, and what the observer brings to the situation.  At its simplest level, if the person in front of you is "attractive" (to you) you will pay more attention, be less confrontational, learn more, and be more objective (we think) than if the person in front of you is Unattractive to you.

---

[50] This is a mispeak.  The CNA was also following the Navy's data and did its analysis based on the Navy's faith group cluster categories, not denominations.

And since what is attractive to you is one the "things" you bring to the process, your preferences, perceptions, experiences (and prejudices) ... need I go on? may color your decision. You may not "add" as much to the variation in outcome as the target does, but it is unlikely that you are irrelevant - you were chosen for this task *for a reason*.

The research shows that:

> (a) People tend to confer positive valence upon, value more highly, infer more positive character for, people "like" themselves than they do for people who are "different". [Likeness is, of course context specific. Likeness at a PTA meeting is not the same thing as likeness in the mall parking lot; likeness at a wedding is not the same thing as likeness at a football game; etc.]

And the research shows that:

> (b) Statisticians who study personnel-panel decision-making are in grave danger of misunderstanding the data if they ignore the possibility of judge/applicant similarity.

Taking these two points together, I do not challenge the "presumption of regularity as it applies to Military Chaplains discharging their oath-governed duty when sitting on Personnel Selection Boards.

I merely suggest that the presumption of regularity is a presumption, not a stipulation. It is a boundary on analytic discourse which requires dispositive data before it may be breached - but it is not a barrier against collecting that data.

It is irresponsible not to look at the question of board/candidate similarity, if the scientific literature says that failing to do so is likely to produce misleading results.

It is disrespectful of the integrity of the Court not to look at the question of board/candidate similarity if (a) one component of the complainant's case charges "discrimination" in selection and if –

[This "and" is important. If the Navy did not use chaplains to judge other chaplains, the complainants would be "hard pressed" to point at the possibility of denominational prejudice based on similarity (or dissimilarity) between themselves and the Board. If, after deciding to use chaplains to judge other chaplains, the Navy had not chosen its personnel panel members from a limited range of denominations, and assigned them to the boards in uneven numbers, the complainants would be "hard pressed" to point at the possibility of denominational prejudice based on similarity (or dissimilarity) between themselves and the Board.]

And if –

(b) there is a *possibility* that the discrimination *could* be occurring.

The Navy has chosen to use chaplains to judge other chaplains; of that there can be no doubt.  Defense Exhibit 9 provides a list of the "Denominations and faith group categories of chaplain members of promotion selection boards for ranks Lieutenant Commander to Captain, Fiscal years 1988 to 2002."

That the Navy needs at least one Chaplain on every promotion board is not in dispute; Federal law requires one.

That the Navy has to use a "majority" of chaplains on each Board is not only not obvious; they have *changed* (See Appendix CP).  Prior to 1986/87 every Promotion Board[51] had two Catholics, and no non-Chaplains.  The Navy changed its practice in 1986/87 and replaced one of the Catholics with a non-Chaplain line officer of appropriate rank.  In 2000/2001 ("Change point"?) the Navy began to expand the non-Chaplain component of the promotion boards.  There was still, usually one Catholic, but now there were two, and sometimes three non-Chaplains.

These changes (a) do not nullify Complainant's concerns about past behavior, (b) are proof that the past behavior was not driven by any form of "military necessity" (for what has changed to make the new rules acceptable to the Navy?) and (c) are not a guarantee that the past practice may not reappear after the dust settles.

That the Navy has used a "biased" distribution of Chaplains (when it uses chaplains) is a point of contention and relevance:

The Navy, through its pleaders, asserts that the selection of board members is, on the average, "balanced" to the extent that may be practical, because each of the (major) faith group clusters is represented on each Board.

---

[51]  Yes, I am illustrating the logical and factual basis for looking at the issue of board/candidate similarity for CARE Boards, with data about Promotion Boards.  That is because the logic is the same and the facts are less in dispute.  (a) The Navy has not "admitted" that the CARE Board is predominantly Navy Chaplains, (b) Federal Law does not require that Board to have even one Chaplain member.  Once I get past the hurdle of arguing that it is irresponsible not to look at the question of board/candidate similarity, I will look at it for CARE Boards.

Let's see how well (and in what fashion) the Navy accomplishes this "balance" for its C/A/R/E Advisory Group.

**C/A/R/E Advisory Group Representation**

The paper records which were provided to me on the afternoon of July 14, 2006 included copies of C/A/R/E Advisory Group Recommendation Memoranda. The memoranda which were written between late 1998 and the end of the time period represented by the paper records (end FY04) included a list of the Advisory Group members who were present. I captured this information in Data Set WS.

There were 209 Advisory Group meetings during this six year period. Collectively, these 209 meetings had 998 members in attendance - the modal attendance was five. Over the six years, these 998 "seats" were filled by 81 different individuals, from 23 different denominations. [The Navy has 212 variations listed on its most current faith group category record (see Data Set FG), but of course, after one deletes errors and combines typing variants, there are still about 120 different denominations.]

Observation: 23 denominations out of 120 *could* be "reasonable", but only if "denomination" doesn't matter - and it does matter to the affected parties. In a very real sense, if denomination did not matter to the affected parties, there wouldn't be any denominations.

Of course one can't put 120 different denominations onto every panel, and of course even if they all "rotated" through the 998 seats in some random or systematic order, there would never be a guarantee that "your" denomination was present on the Board when it came time to consider your application.

It is not my task here (not now) to specify how unbiased "representation" could be achieved, all I need to do is observe that:

With 23 denominations using all 988 seats on the Board

There are     (a) 23 denominations who may be called "insiders" (at least by the outsiders),
and
               (b) 97 denominations who have NO chance of ever being considered by a C/A/R/E Advisory Group on which sits a "friendly face", a "fellow traveler", a "comrade in arms" - a Navy Chaplain from the same Endorser.

The Navy may be "satisfied" that it has "represented" all Liturgicals when it puts *any* Liturgical on a personnel selection board, or that it has "represented" all Non-liturgicals when it puts a Southern Baptist on a personnel selection board. But this is not "representation"; this is an "old boys network".

If service on the Advisory Group is ex officio, and if individual chaplains are assigned to their regular jobs for a planned tour of duty, one would expect the names of the attendees at Group meetings to be reasonably stable over time - and they are. But if the service on the Advisory Group is ex officio, and if the Navy rotates its "best and brightest" along this career path, then year after year the members of the Advisory Group will be "insiders", and their denominations (whatever they may be) will be favored *pro tem*.

Remember, there were 81 different individuals who participated in these boards, and they came from just 23 different denominations.

[I have just run a quick count of the denominations in the Chaplains' Corps History volume (Reference 18). Roughly 75 percent of all chaplains belong to one of these 23 denominations. The other 25 percent are a fairly large "minority".]

Table LL-1 shows how this minority fared at the hands of the majority:

| | Majority Candidate | | Minority Candidate | |
|---|---|---|---|---|
| Program | Total number of Candidates | Board voted Yes | Total number of Candidates | Board voted Yes |
| 1945 | 215 | 186 | 135 | 112 |
| Interview | 9 | 6 | 8 | 2 |
| D4105-A | 153 | 123 | 106 | 83 |
| D4105-I | 42 | 36 | 21 | 17 |
| S4105-A | 49 | 47 | 59 | 49 |
| S4105-I | 36 | 34 | 10 | 10 |
| RECALL | 62 | 57 | 21 | 20 |
| Total | 566 | 490 | 360 | 293 |

The selection rate patterns evident in this table are consistent with the hypothesis of "insiders" or favored denominations being assigned to boards, and those boards being unappreciative of the

credentials presented to them by "outsiders".  [This is the "general" likeness factor mentioned in ¶ 49.2f above (see page 17).]   The sample sizes for the various programs we are looking at here are too small to provide a sensitive test on a program by program basis.  However, the binomial test described by Siskin & Johnson (1982) suggests that the columns of data which generated the Likelihood calculations are statistically significantly different.  The overall probability of being recommended by the C/A/R/E board is 86.6 % if you are one of the majority denominations, but only 81.4 % if you are an "outsider." [52] The statistical significance of this calculation is beyond 2 standard deviations, p<.05.

And this is in a time period when (a) the selection rates have been crowded together by a reduction in the number of candidates who are available, (b) the Board's influences have been altered by the vocal disavowal of quotas (but Catholics are still among the "insiders"), and (c) the Boards have had an increase in non-Chaplain members.

## Conclusions in Brief

It is clear; it is statistically significant: candidates before a Chaplain Corps selection board fare better, with respect to the decision of that Board, when they share some denominational affinity with the Board, than when there is no denominational "similarity" between the candidate and any member of the Board.

This has been demonstrated to be true for: Promotion Boards, SER Boards and Accession Boards.  In the case of Promotion Boards, there was enough data to demonstrate that this "similarity" effect was (a) stronger when there was a "strict match" (I have called it a specific match in the text here) than when there was a close match, and (b) the data demonstrated that the effect, although still present, was less dramatic (less distortive) when there was a non Chaplain influence on the Board

---

[52]  Some might look at this difference and try to dismiss it with either: (a) but it is only a 5% difference (86.6-81.4), or (b) but "these are not the mainstream denominations, Catholic, Southern Baptist, etc."

First, this is not a 5% difference; it is a 39% difference – the rejection rate is 39% greater for the minorities than it is for the "insiders" [(100-81.40/100-86.6)].

Second, whether one interprets this large difference as due to a general "similarity" effect, or simply (sic) a belief that the denominations not seated on the Selection Board are too small to be given seats on those boards, the result remains the same: the denominations are disenfranchised from participation on Selection Boards, and they suffer disparate success rates in front of those boards.

In my Appendage Declaration, where I had CARE Board membership information for only the three years 2000 to 2002, I concluded that although the effect was slight, there was a statistically significant tendency for Candidates before the CARE Board to have a better chance of selection if they shared a denomination with some member of the Board, than if they did not.

Those "like, likes, like" findings can be expanded, now that a substantial volume of additional data has been provided.   [See Appendix DL and above.]

In Dr. Siskin's December 21, 2005 commentary, he says (incorrectly):

> "Contrary to Dr. Leuba's assertion, proper statistical tests of the data do not show that the likelihood of a candidates's accession was influenced by the likelihood of having a member of the same denomination on the CARE Board." (Page 5.)

Dr. Siskin's bald contradiction here does not address what I asserted.  I did not opine that there was a connection between the *likelihood* of a match and the likelihood of a selection, (a →b) although that may follow from the data, and may be related to the general similarity factor I postulate here.  What I asserted was a connection between the likelihood of selection and the *fact* of a match (b →a).  And, of course, although Dr. Siskin suggests that I used an improper statistical test, he neither offers a proper test nor explains my alleged impropriety.

Table LL-1 is a reprise of my statistical test.  (See also paragraph 2 and Table 3 in my October Declaration).  This test (Chi Square) is non-parametric, so there are no distribution assumptions to be violated.  Since Dr. Siskin recommends this test in his professional writings (see Reference 24*)*, his naked denial in his December Declaration of the statistical significance of the result I reported (the apparent impact of Board Membership denomination upon the decisions rendered by the Board, when candidates with matching denominations appear before the Board) may reflect disappointment with the facts more than statistical rectitude about the method.

**Table LL-1.**
**Chi-Square Test**
**CARE Accessions w & w/o a board Match FY 2000 to 2002**
[From data presented in my December Declaration]

|  | **Board Match** | **Non Match** | **Total** |
|---|---|---|---|
| **Selected** | 159 | 19 | 178 |
| **Rejected** | 215 | 48 | 263 |
| **Total** | 374 | 67 | 441 |

Degrees of freedom: 1
Chi-square = 4.72975680485869
*p* is less than or equal to 0.05.  (Beyond two standard deviations.)
The distribution is significant.

## Appendix QE
## The Quota Effect
## and How It Supports Religious Favoritism

Quotas in the U.S. Navy Chaplain Corps personnel system are pernicious, pervasive and perennial.

**Quota are pernicious** in the Navy for the same reasons they are pernicious in general: (a) they harm the Service because they lead to selection on the basis of "faith group category" at the expense of selection on the basis of quality; and (b) they harm the applicant population by transmitting a dimension of favoritism to the selected and an extra measure of "unworthiness" to the rejected.

**Quotas are pervasive** for although they are only explicit and "metrified" with respect to the C/A/R/E Advisory Group's recommendations to active duty, they spill over and are implicit in (a) the C/A/R/E Advisory Group's recommendations re accessions, (b) the Corps' decisions on whom to activate from among those recommended for Active Duty, and (c) as we have seen elsewhere, promotions to higher rank.

**Quotas are perennial** for they have been explicit every year for as far back as the C/A/R/E "acdu" (Active Duty) records go (at least into 1982) and although the Navy has now *said* that "Since fiscal year 2001, the Navy has not broken down chaplain accession goals by faith group categories ..." [Ref 8  Material Fact 6], the C/A/R/E board has continued to make decisions which (a) look like they are consistent with former quotas and which (b) continue to favor Roman Catholics.

### Behind the Quotas

I have argued (see Appendix FG) that the faith group cluster system is Roman Catholic centric. I have stopped short of saying that it was conceived to provide a ruse for "protecting Roman Catholic interests" in the Navy.  However, the rhetoric and record here are replete with references to a "shortage of Catholics".  Even Dr. Bernard Siskin has mouthed the phrase.

What *shortage?*

The Roman Catholic church says it has a shortage of priests, because they cannot find enough new priests to keep *their* authorized end strength numbers at full compliment.  But that's the Church, and surely, when it competes in the market place for clergy it picks up some candidates who might otherwise join the Navy.  But where does the Navy have a shortage of *priests*?

The Navy Intelligence Service might have a shortage of Farsi speakers; the Navy Medical Service might have a shortage of anesthesiologists; the Navy Band might have a shortage of piccolo players; but the Navy Chaplain Corps cannot have a shortage of priests (*per se*) unless it has a requirement for *priests*, per se.  And no such requirement has been articulated or defended.

Instead, the Navy has simply used faith group clusters (with one "cluster" set aside for Roman Catholic priests) and then steamed full speed ahead with quotas and a de facto preference for one religion over all others. By setting the quota for Catholic priests at a percentage level which is higher than the percentage of applicants in the pool who are eligible for the "designated" quota, the Navy has given itself permission to select *any* Catholic it wants, all of them if it wants, and it has distributed the "cuts" to the other faith group clusters - primarily to the Non-Liturgical "cluster" – because it is that cluster which has the largest discrepancy between the percentage of candidates in the applicant pool and the percentage *allowed* into the Chaplain Corps.

**The Historic Quotas**

Before I was given access to the old data which precipitated this Declaration, before I was disabused of the misconception that "accession" meant assignment to (only) the Active Duty Component of the Navy, I referred to a document I called "a major landmark"[53]:

> <u>A Major Landmark in the terrain</u>:
>
> 26.    In commenting on the FY87 Accession Plan (REVISED), the Division Officer in Charge of Accession Planning for the Chief of Chaplains summarized:
>
>> "Faith Group mix best meets the needs of the naval service when 35% of the Chaplain Corps inventory is liturgical, 35 percent is non-liturgical and 30 percent other (Roman Catholic, Jewish, Orthodox). <u>Additionally, Chief of Chaplains policy requires that Roman Catholic Chaplains comprise 25% of total chaplain inventory (plus or minus 2 percent). Should Roman Catholic chaplain inventory fall below 23 percent, end strength of the Chaplain Corps will not increase.</u>"
>>
>> (Emphasis added, see Document DA 7359 - attached - the author of this memo was D.K. Muchow, Deputy Chief of Chaplains.)
>
> 27.    This Doctrine clearly states the now folkloric "1/3, 1/3, 1/3" policy - but it also singles out Catholic Chaplains as the bench mark by which all accessions are to be planned - and warns that if the accessions cannot keep the pool at least 23% full of Catholics - no further accessions will be allowed.
>
> 28.    Now, I do not pretend that my judgment should substitute for that of the Chief of Chaplains'; if he says that 35%, 35%, 30% "best" meets the needs of the Service, that may well be what he needs.
>
> 29.    Nor would I argue even that my view of "the best" Accession ratios or Inventory ratios is relevant, but as a Statistician I am permitted to observe two things:
>
>> **1.**    In "stretching" to meet it's inventory goals, the Navy's Accession Process resorts to denominational preferences which undermine both the Navy's Constitutional free expression obligations and the value America places on religious plurality,

---

[53] The material quoted here, indented and in smaller type, is repeated from my October 2005 Declaration which I have withdrawn and supplanted with the document you are now reading.

(i.e., in "bending over backwards" to get "enough" Catholics, and adding Liturgicals as "substitute Catholics"[54], the Navy turns goals into quotas and by remainders, abuses certain Non-Liturgical and Special Worship minority religions).

2.  The Navy's stated  inventory goals do not match either (a) the distribution of denominations in the served population or (b) the distribution of denominations in the pool of candidates available to serve.  There may be a basis underlying the Chief of Chaplains' "best" mix, but the basis is not stated and the result is not like either of the standards of non-discriminatory representation which Courts have recognized, or which the other Military Services use to manage their Chaplains.

34.    However, (a) we can test the data to see if the results are consistent with such an hypothesis and (b) we can quote an additional Navy document which shows that at least for the "Other" category, the 30% which is Roman Catholic and Special Worship, the Navy does manage by denomination.

35.    From a 9 July 1991 Memorandum for the Chief of Chaplains, and initialed by him as "approved" (see DEFA00283):

### DIRECT ACCESSION / RECALL BREAKDOWN - FY92

| | DIRECT | RECALL | 1ST | 2ND | 3RD | 4TH |
|---|---|---|---|---|---|---|
| RC | 18 | 7 | 9 | 6 | 6 | 4 |
| LIT | 18 | 12 | 10 | 7 | 8 | 5 |
| NONLIT | 12 | 12 | 8 | 7 | 3 | 6 |
| J | 1 | 1 | 1 | | 1 | |
| ORTH | 1 | 0 | | | | 1 |
| LDS/CS/SDA | 1 | 0 | 1 | | | |
| TOTAL | 51 | 32 | 29 | 20 | 18 | 16 |

(columns 1ST–4TH grouped under heading **BY QUARTER**)

At the recessed deposition of me, I was asked about this "landmark" and quizzed as though I had inferred that it was other than a passing comment with no lingering effect, and what basis I had for leaving that impression.  The new (old) data puts this "landmark" into the longer context:

---

[54] Although (a) the Chaplain Corps is officially neutral (their motto is: "We provide for those of our own faith group, we facilitate ministry for those of other faith groups, and we care for all") and although (b) Liturgical Chaplains are not actually "substitutes" for Catholic Chaplains, the Chaplain Corps has decreed (see above) that [one can only assume that this is because the Liturgical doctrinal position is closer to Catholic than is the widely varied doctrine of the Non-Liturgicals] the Liturgical quota is higher than their presence in the served population (see Table 7 below) in order to compensate for a perceived shortage of Catholics.

In the paper records I was given that afternoon there are 178 separate (non-duplicate) C/A/R/E Work Sheets at roughly once a month from 1986 to 1998. (See Data Set WS.)

The lower portion of virtually every one of those Work Sheets was filled in by hand showing the faith group cluster quota then in effect for acdu recommendations, and the C/A/R/E Board's performance to date at meeting the required mix.

From 10/1/85 to 9/30/86 (FY 86) the Chaplain Corps was authorized to add 100 Chaplains to end strength  (to fill in for expected losses.)  The Chief of Chaplains translated this total into individual faith group cluster quotas. [See LAR01493 AND LAR01472.] Since the number authorized was exactly 100, we do not need to convert the subtotals into percentages.

|                          | Non-Liturgical | Liturgical | Other | (Catholic/Jew&LDS) | |
|--------------------------|----------------|------------|-------|--------------------|-----|
| For FY86, the quotas were: | 35           | 35         | 30    | (25                | 5)  |
| For FY87, the "landmark" said: | 35       | 35         | 30    | (25                | 5)  |

After FY87, the number of Chaplains authorized to be added to end strength varied from year to year and sometimes from quarter to quarter, from a high of 105 in late CY86 to a low of 31 toward the end of the SER period (1998).  Converting all these intermediary quotas (See Data Set WS) into relative percentages, and then averaging the percentages, this is what the average quota was for the FY 88 to FY 00 period:

|                   | Non-Liturgical | Liturgical | Other | (Catholic/Jew&LDS) | |
|-------------------|----------------|------------|-------|--------------------|-----|
| FY 88 to FY 00 quotas | 35         | 35         | 30    | (24                | 6)  |

And here is how the actual additions to acdu break down for this period (see Data Set AD):

|                    | Non-Liturgical | Liturgical | Other | (Catholic/Jew&LDS) | |
|--------------------|----------------|------------|-------|--------------------|-------|
| FY 88 to FY 00 actuals | 38         | 33         | 30    | (23 ½              | 6 ½)  |

Clearly, the "landmark" in 1987 described what the Navy wanted then, and what it has strived to maintain ever since.


## Now that they have stopped Using Quotas

The Navy has said (through it's advocates, see the quote on page 1 in this Appendix) that "Since fiscal year 2001, the Navy has not broken down chaplain accession goals by faith group categories ..."

Taken literally, this is (a) an admission that quotas were used this way in the past [but that fact could hardly be in dispute after they produced the data.], but it is also (b) an assertion that such quotas were not used in 2002. The "since" word allows an interpretation that the quotas, or at least some vestige of them, were in use in 2001, and DEFA00256 shows a quota of 15 for Catholic that year, but shows no other faith group quotas.

Using "since" in another connotation, "since" the Navy has not provided any C/A/R/E Advisory Group Work Sheets dated after CY1998, we may take them at their word that they did not have quotas for *all* the faith groups, but we cannot be sure that they have not continued their quota for Roman Catholics.

If we look at this the period after 2001/2002 carefully, not only from the point of view of this admitted change in quota policy, but also from the point of view of what else changed (see Appendix CP), it is obvious that the dramatic drop in candidates for the Chaplain Corps in the 2000 to 2005 period means that virtually "everybody" has to be accepted - there is little room for quota-based filtering.

For example:

An Analysis of Variance applied to all acdu applicants for the entire period involved in the data which has recently been provided to me, shows:

The Faith Group Clusters are statistically significantly different in their likelihood of being recommended for addition to the Active Duty List:

| Category | % Recommended |
|---|---|
| Catholic | 95.5 % |
| Liturgical | 89.5 % |
| Non-Liturgical (Baptist) | 61.8 % |
| (Non-Baptist) | 64.5 % |
| Special Worship | 75.3 % |

The various acdu sources have statistically significantly different rates of production:

| Program | % Recommended |
|---|---|
| S4105 | 91.6 % |
| D4105 | 69.6 % |
| Recall | 70.8 % |

And the half decades also have statistically significantly different yields (i.e. likelihood of being selected):

| Period | % Recommended |
|---|---|
| 1986-1990 | 66.2 % |
| 1991-1995 | 70.4 % |

|  |  |
|---|---|
| 1996-2000 | 78.2 % |
| 2000-2005 | 80.7 % |

The first dimension of analysis above disposes of any doubt that the Navy has faith group cluster preferences. The rate differences across faith group clusters are statistically significant well beyond three standard deviations (<.0001)

– Catholics are preferred over everybody else; Liturgicals are preferred over Non-Liturgicals.

The fourth dimension of analysis above is the one I want to focus on here. The number of candidates available has declined so much that the "flexibility" to use quotas has decreased.

In the first five years of this period the C/A/R/E Advisory Group was rejecting more candidates than it accepted in last five year period. In the first five year period, given that they were accepting at least 95% of a third of the candidates (the Catholics) and rejecting 35% of all the candidates, they had roughly 1 Liturgical or Non-Liturgical candidate they could reject for every one they chose to recommend.

In the most recent five year period, given that they are *still* recommending 95% of the Catholics, they could only reject one candidate for every ten they considered. That sort of makes "quotas" irrelevant. [I wonder if that's why the Navy has surrendered quotas. Quotas are a nuisance in this lawsuit and not very helpful to the Navy in the current drought of candidates.]

Maybe quotas will come back when the "dust settles" and the candidate pool increases again. ...

Maybe quotas will come back -- unless the Court sees that religious quotas unsupported by religious needs are unconstitutional.


**Part II - Quotas facilitate, enable within faith group cluster Discrimination.**

In discussing the mischief caused by the Navy's faith group cluster system, in Appendix FG, I promised to show:

•     The Quota system, however well intentioned, has been too coarse a tool.

    [If one had a legitimate business reason for needing 25 Catholic Chaplains for every 5000 sailors or if one had a legitimate business reason for asserting that exactly 22 of every 100 Chaplains had to be a Catholic, one could not justify "lumping" all the remaining requirements into amorphous, internally conflicted, non-Catholic "categories". The result would be (and is), (a) a forced culling of applicants to fit under predesignated limits, and (b) competition within cluster or category for limited opportunities to serve.]

And:

• The faith group category system has empowered or facilitated the expression of intra-denominational and inter-denominational prejudice within the co-called Faith Group Categories.

Table QE-1 Provides the base line needed to illustrate point 1.

**Table QE-1**
**C/A/R/E Recommendation rates**
**(All Candidates, all Decisions[55] 1985-2005)**

| Navy's Faith Group Cluster | Total No of Candidates | Number Recommended | Number Not Recommended | Percent Recommended |
|---|---|---|---|---|
| Catholic | 634 | 596 | 24 | 94.01% |
| Liturgical | 1037 | 805 | 198 | 77.63% |
| Non-Lit | 1479 | 1041 | 390 | 70.39% |
| Special Worship | 216 | 171 | 37 | 79.17% |

Begin consideration of Table QE-1 by looking as the selection rates by faith group cluster.

All of these rates are statistically significantly different from each other in paired comparisons, except the test of Special Worship vs Liturgical.

The difference in rates aligns well with the quotas in effect during this period[56], but of course not all of these decisions are or were quota related.

[Recall that this Declaration was precipitated by the recognition that we have all been discussing something we called "accessions", but which was just (although it is still important) additions to the Active Duty List. There is more involved here than only additions to the Active Duty List.]

---

[55] This is all decisions in the Data Set CC, except: (i) those three or four with no decision indicated, or the candidate's denomination omitted, (ii) those few change-of-denomination decisions which are (a) difficult to classify as to faith group cluster and (b) *all* approved anyway) and (iii) the score of Inter-Service Transfer decisions where it is not clear what approval means on a case by case basis. Not meaning to conceal this fact, I point out that all means all, even the repeat applications by the same candidate are included. I did this because in a 20 year career some repeats are not actual re-considerations, they are second occasions for duty in that program. I also did this because to the extent that reconsideration is required, it may distinguish the faith group clusters from each other. The curious reader may infer the "deferred" decisions by subtracting the sum of the recommendations from the total number of candidates.

[56] Defendants have said (see Material fact #6, Reference 8) that they stopped using quotas "in establishing accession plans" after FY2000. Without suggesting any disingenuity on their part, I accept the statement as literally true (quotas were in effect from at least 1985 to 2000), but I interpret the comment as allowing the possibility that quota's were still "lingering" in the system after FY 2000 if only as in bad "habits" not yet fully recovered from.

Table QE-2 examines all C/A/R/E Advisory Group decisions, including those which are pure accession (the CCPO program), partial accession, the D4105-I program, as well as the additions to Active Duty (none of which are accessions per se – the S4105-A program and the Recall program) as well as one program which may be both accession and addition to Active Duty (the D4105-A program).]

**Table QE-2**
**C/A/R/E Recommendations**
**vs Faith Group Cluster Goals**
**(All Candidates, all Decisions 1985-2005)**

| Navy's Faith Group Cluster | Total No of Candidates | Number Recommended | Percent of all Recommended | Average Quota 1985-2000 |
|---|---|---|---|---|
| Catholic | 634 | 596 | 22.8 | 25 % |
| Liturgical | 1037 | 805 | 30.1 | 35 % |
| Non-Lit | 1479 | 1041 | 39.8 | 35 % |
| Special Worship | 216 | 171 | 6.5 | 5 % |
| Total | 3366 | 2613 | | |

Table QE-2 does not "prove" that the rate of C/A/R/E recommendation for all decisions was "the same as" the rate required for decisions relating to addition to the Active Duty List, but the numbers are enticingly close, and even it they are not exact, they still illustrate the point:

•      If the pool of eligibles is small in relationship to the quota, then the percent selected will be higher than if the pool of eligibles is large in relationship to the quota.

**Table QE-3**
**C/A/R/E Recommendations/Ratio of Total**
**vs Faith Group Cluster Goals**
**(All Candidates, all Decisions 1985-2005)**

| Navy's Faith Group Cluster | Total No of Candidates | Number Recommended | Ratio of Pool to Recommended | Percent of all Recommended | Average Quota 1985-2000 |
|---|---|---|---|---|---|
| Catholic | 634 | 596 | 1.06 | 22.8 | 25 % |
| Liturgical | 1037 | 805 | 1.29 | 30.1 | 35 % |
| Non-Lit | 1479 | 1041 | 1.42 | 39.8 | 35 % |
| Special Worship | 216 | 171 | 1.26 | 6.5 | 5 % |
| Total | 3366 | 2613 | | | |

This is not a profound insight.  The ratio is simply the inverse of the selection rate.  But the fact has a profound implication.  Quotas drive selection rates.  That is what quotas are!

If the Navy sets quotas (selection rates) in a pattern which guarantees that denominations assigned to some faith group clusters have less chance of successful participation than "similar" denominations assigned to other so-called faith group clusters, then both (a) the quotas and (b) the cluster assignments can lead to distortions in denominational preference.

If in obeying the cluster-based selection-rate guidance, the C/A/R/E Board *has* to make a different kind of distinction (e.g. exert a tighter quality control, or introduce a secondary criteria, or even do something diabolical or creative) then the denominations in the affected faith group cluster can *expect* disparate treatment.

Since the so-called Non-Liturgical faith group cluster is the "cluster" which presents the tightest filter for the Board, it is logical that it would be this cluster which suffers the most in terms of (a) reduction in opportunity as well as (b) differential denomination by denomination selection rates.

I believe this proves that the faith group cluster system as a management tool is too coarse to be equitable.

Table QE-1 told us that the cluster average selection rate for Catholics was 94%, for Liturgicals it was 78%, and for Non-Liturgicals and Special Worship candidates it was 70% and 79% respectively.

Let's look at "the internals:"

### Table QE-4
### Selection Rates for Catholics
### by Denomination (all Decisions 1985-2005)

| Denominations within cluster | Total No of Candidates | Number Recommended | Number Not Recommended | Percent Recommended |
|---|---|---|---|---|
| Roman Catholic | 634 | 596 | 24 | 94.0 |
| Other Catholic | 7 | 1 | 6 | 14.3 |
| Total | 641 | 597 | 30 | |

In the Navy's faith group cluster system, the first cluster is reserved for *Roman* Catholics. In Data Set CC there are 7 "other" Catholic candidates considered. The Navy's faith group cluster system coded 4 of these as Special Worship - Catholics, and three as Liturgical - Catholics. (See Data Set FG). Seven is a very small sample, and it might seem trivial, except to the seven chaplains who were involved. On the other hand, the C/A/R/E board's approval rate for *Roman* Catholics is so high, that the difference here is statistically significant.

Even within the Catholic cluster, the definition of the cluster (as solely *Roman* Catholic) affected these denominations' cluster assignment, and within the cluster they were assigned to, the "other" Catholic denominations were marginalized.

### Table QE-5
### Selection Rates for Liturgicals
### by Denomination (all Decisions 1985-2005)

| Denominations within cluster | Total No of Candidates | Number Recommended | Number Not Recommended | Percent Recommended |
|---|---|---|---|---|
| Episcopal Group | 144 | 109 | 27 | 75.69 |
| ECA | 123 | 97 | 22 | 78.86 |

| | | | |
|---|---|---|---|
| Charismatic | 16 | 8 | 4 | 50.00 |
| Reformed | 5 | 4 | 1 | 80.00 |
| Lutheran Group | 343 | 280 | 53 | 81.63 |
| ELCA | 142 | 114 | 23 | 80.28 |
| LMS | 162 | 136 | 23 | 83.95 |
| Methodist Group | 239 | 177 | 55 | 74.06 |
| AME | 42 | 32 | 8 | 76.19 |
| CME | 10 | 9 | 1 | 90.00 |
| UM | 174 | 130 | 42 | 74.71 |
| Presbyterian Group | 277 | 181 | 42 | 79.74 |
| PUSA | 149 | 124 | 22 | 83.22 |
| PCA | 50 | 36 | 14 | 72.00 |
| OP | 9 | 4 | 4 | 44.44 |
| UCC | 45 | 28 | 14 | 62.22 |
| WES | 26 | 19 | 5 | 73.08 |

Not all of the Liturgical's selection rates in Table QE-5 are statistically different from each other, but collectively they are different; they do not come from the same pool of probabilities. [The variance is too great.]

Individually, some of these denominational differences are intriguing:

- for what they suggest not only about the dissimilarity of the religious beliefs within cluster and group, even within the relatively (but only relatively with respect to the Non-Liturgical "cluster") homogenous Liturgical cluster. [It is homogenous only from a Catholic or a non-Christian point of view.]

- but also intriguing for what they say about "insiders" and outsiders. PUSA[57] with a selection rate of 83.22 % has had seats on the C/A/R/E Board; PCA with a selection rate

---

[57] First, let me remind the reader that these denominational codes are spelled out in-full in the Navy's Faith Group Cluster code-assignment list, (Data set FG.)  But PUSA is the "Presbyterian Church USA" and PCA is the "Presbyterian Church in America".

Second, I am not "cherry picking" here.  I went looking for this "distinction" because I noticed that (a) the Navy's data coders have been unreliable in capturing the proper code, and there was a point when I thought these two codes were simple variants for the same denomination.  That was dispelled when (b) I went to the Internet and read what each ____ (denomination) said about itself (and what it did and did not say about the "other".)  Surely, the Navy did not mean to weigh in on this difference when it put both ____ (denominations) into the same faith group cluster and then let the PUSA's have 57 seats on the C/A/R/E Advisory Group (spread among 5 different Chaplains) and gave not even one seat to the PCA.  But this is what can happen when one disregards the denominational differences among *other* faiths - one establishes preferences for some religions (notably Roman Catholic) over others (generally all others.)  But in this microcosm the ripple effect has tumbled into Presbyterianism.

of 72.00% has not.  CME with 21 seats on the C/A/R/E Board fares better than the other "Methodists". [AME had no seats; UM had only 4.]

The presence of a quota for the cluster as a whole empowers, facilitates, and unless one looks at the data this way, conceals religious discrimination within the US Navy Chaplain Corps accessions process, as well as within the Chaplain Corps personnel management system in general.   I admit that this is a train of inference which may not be immediately obvious to a skeptic (and maybe nothing can open some minds), but consider this:

• It is the existence of the quota which *requires* something in addition to "pure" quality judgments when selecting candidates for recommendation.  If there were no quota, or more precisely, if all the candidates under consideration were facing the same threshold of quality, and some did not have an "edge" because they were in an "underpopulated" cohort, then the Board would not have to figure out how to choose from among the "fully qualified" to select some NOT to put forward.

• When something "else" *has* to be considered, people on selection boards begin to look for details in the candidate's record or reach into themselves for insight. [The Chief of Chaplains refers to prayer meetings where he and his colleagues seek Higher guidance on ~~whom to select~~ how to proceed. (Ref 1-3)] A secularist might wonder if the inner voices that are heard (or not) are unbiased, whether divinely inspired or not, or one might simply project that the board member is a reasonable person trying to do his conscientious best, and in "soul searching" affinity invites itself to be expressed.  It is not intentional bias or prejudice, if I struggle with a decision and "do the best I can" - even if in the end, I like my wife's mother less than I like mine.

• If the Board's decisions are monitored for fairness and balance - on a faith group cluster basis alone -  these examples of "curious outcomes" cannot even be observed, let alone investigated or explained.

Thus, the quota requires using an extra dimension for selecting from among the fully qualified, the extra dimension permits denomination to be marginally "relevant"; being marginally relevant suggests that it may be a "tipping" factor, and if it is, then the oversight process sums all the data across denominations and any distortion in the data "disappears".

What we have just demonstrated at the Catholic cluster (sic) and then within the Liturgical cluster, that denomination *matters*.  Denomination <u>matters</u> to those who are in one, and it also matters to the statistician who is examining "grouped" data.

"Cluster" becomes a "real can of worms" when one looks at the Non-Liturgical "cluster".  There are not only many more opportunities for "distinctions which matter a lot to at least one party", there are many many more parties, and a wider diversity of who is and is not allowed to express themselves via participation in the selection panel process as a board member.

**Table QE-6**
**Selection Rates for Non-Liturgicals**
**by Denomination (all Decisions 1985-2005)**

| Denominations within cluster | Total No of Candidates | Number Recommended | Number Not Recommended | Percent Recommended |
|---|---|---|---|---|
| ABA | 4 | 2 | 2 | 50.00% |
| ABC | 64 | 46 | 17 | 71.88% |
| AG | 86 | 69 | 16 | 80.23% |
| AGC | 33 | 21 | 12 | 63.64% |
| BBF | 11 | 8 | 2 | 72.73% |
| BGC | 18 | 13 | 5 | 72.22% |
| CB | 11 | 1 | 9 | 9.09% |
| CBAA | 13 | 9 | 4 | 69.23% |
| CC | 19 | 15 | 4 | 78.95% |
| CCCC | 11 | 11 | 0 | 100.00% |
| CFGC | 97 | 58 | 37 | >>> 59.79% <<< |
| CGAI | 6 | 5 | 0 | 83.33% |
| CGCT | 32 | 24 | 8 | 75.00% |
| CGIC | 23 | 15 | 6 | 65.22% |
| CHCCC | 18 | 15 | 2 | 83.33% |
| CMA | 16 | 12 | 3 | 75.00% |
| COALSPFLDCH | 18 | 11 | 6 | 61.11% |
| COBAPT | 19 | 16 | 3 | 84.21% |
| DC | 35 | 26 | 7 | 74.29% |
| ECC* | 15 | 13 | 2 | 86.67% |
| EFCA | 34 | 27 | 7 | 79.41% |
| EvanChurAlli | 14 | 11 | 2 | 78.57% |
| FGBC | 5 | 3 | 2 | 60.00% |
| FUNDBAPTFEL | 10 | 9 | 1 | 90.00% |
| GARB | 22 | 12 | 9 | 54.55% |
| ICFCG | 25 | 17 | 8 | 68.00% |
| IFCA | 38 | 28 | 6 | 73.68% |
| LBF | 29 | 14 | 14 | 48.28% |
| MISS | 4 | 1 | 1 | 25.00% |
| NABC | 9 | 8 | 1 | 88.89% |
| NBCA | 11 | 8 | 3 | 72.73% |
| NBCU | 68 | 45 | 20 | 66.18% |
| OBSC | 4 | 3 | 1 | 75.00% |
| PAW | 6 | 5 | 0 | 83.33% |
| PB | 6 | 5 | 1 | 83.33% |
| PCG | 5 | 4 | 1 | 80.00% |
| PH | 4 | 4 | 0 | 100.00% |
| PNBC | 26 | 18 | 8 | 69.23% |
| RCA* | 16 | 14 | 2 | 87.50% |
| SB | 480 | 349 | 115 | 72.71% |
| UPI | 13 | 8 | 5 | 61.54% |
| WBF | 4 | 3 | 1 | 75.00% |
| All Non-Lit | 1479 | 1041 | 390 | 70.39% |

**\*** Denotes what Plaintiffs (and the affected denomination) think is a miss-assignment to this faith group cluster.

Leuba Sept 2006 Declaration re Accessions: page 149

At first glance Table QE-6 presents a bewildering complex of data.

The bewilderment is part of what needs to be noticed (and believed) here.  The Non-Liturgical "cluster" is a wide variety of very different denominations.  Some of them are "mainstream" and they "go along to get along"; some are or seem to be "eccentric" or strident from others' point of view; some have to stifle a proselytizing urge; some have hierarchy here on earth; some use music; some eschew it; some permit women to be clergy; some abhor that; some are permissive about dancing, drinking, birth control (need I go on?); all may be assumed to be earnest.

Somewhere in that mix of diversity there is opportunity for unfettered prejudice guised as conscience, to express approval or disapproval for another person - indirectly because of his or her beliefs.

It is my belief, that this litigation is the fruit of the Navy's not only having insufficiently guarded against such expression, but having facilitated it by the way it has established its faith group cluster "system" and staffed its selection boards, and then blinded itself by cant and rant to the harvest it has produced.

Reaching past first impressions and reflections on the overall implications of Tables QE-4,5 and 6[58], we can make the specific, statistically significant argument:

In all this morass of data, Chaplains from the Chaplaincy of Full Gospel Churches are being discriminated against on the basis of their religious beliefs - as expressed by no other means than being associated with "that" Endorser. [No *other* religious or denominational variable is available in the record to correlate to the disproportionate levels of "recommendation" meted out by the C/A/R/E Advisory Group".]

It is a statistical "certainty"[59] that CFGC, with a C/A/R/E Advisory Group recommendation rate of only 59.79 % is lower than the average for all other denominations at 78.16%  and much lower than that for the favored, Roman Catholic denomination at 94.01%

---

[58]  Of course it is possible to generate Table QE-7 for the Special Worship category. That table would will show the same pattern of differences in rates of recommendation across different denominations within another clearly non-cohesive, faith group cluster. In the interests of time and space I have not prepared that table.  The data to do so are available in Data Set CC, and at Navy.Data@att.net.

[59]  Again, using the Johnson & Siskin binomial test described on page 386 of reference 12, the z score for CFGC v all others is 3.6; v RC it is 6.7.  Both are statistically significant at well beyond one chance in a thousand, and I have the "new" data's bulk to thank for the sensitivity of this test.

**Another Written Confession**

I have just used a well-established, well-referenced powerful statistical test, and applied it to a remarkable volume of data stretching across 20 years and covering (by best count) 97% of all the "accession" decisions made by the Navy between 1985 and 2005, and demonstrated, beyond all reasonable statistical doubt, that the C/A/R/E Advisory Group allowed denominational considerations, not just faith group cluster considerations, to color it's decisions.

The Navy has admitted (at least that is how I take their assertion that they no longer do it) they have admitted that they used to use a faith-group-cluster quota-system to guide their accession **plans.**

They have not admitted that they used these quotas to guide their accession **decisions**.  I think that the statistical analysis here has demonstrated several times over that the Navy has been using its faith group cluster scheme to control accessions and additions to the Active Duty List.

But the paper records behind this "new" data provide written evidence that this is exactly what the Navy has done.  They used quotas to both determine how many chaplains to recommend for active duty, and when; and they used quotas to be sure that as many as possible of those chaplains would be Catholic.  In effect the quotas were there only to assure the Navy that it could "accession" the next Catholic, without the encumbrance of already having that slot filled by a less attractive candidate.

I have already quoted from LAR01407 (January 20, 1998) where in the case of Judy Malana the Chief of Chaplains wanted her to supercede to Active Duty, and the C/A/R/E Board had refused her petition to S4105-A because they wanted to save that slot for a Catholic, and there was only one slot left in that fiscal year :

> "the one remaining [slot] must be [saved] for a Roman Catholic."

> "The need for Priests in FY98 exceeds all other categories"

> "There are five more Priests in the pipeline."

Record LAR01505, 19 June 1987[60], is a memorandum which considered five candidates applying for active duty under S4105-A (all of whom were approved) and then 20 more applying under RECALL (all but four were approved), the "unapproved" were set aside:

---

[60]  This date is significant in the Fiscal Year because Chaplains recommended for active duty after the end of June are very unlikely to be ordered to active duty by the end of the current fiscal year and end-year authorized-end-strength is the bright line controlling the C/A/R/E Advisory Group.

"The following were recommended as alternates.  If there is an unexpected loss or one of the above declines active duty, G3 will select an alternate from the following:

"[a Liturgical, CMA,; and three Non-Liturgicals, 1 OBSC and 2 SB].

"If an opening does not occur for the alternates, they will not be recalled in FY87, but will have to reapply.

[An opening did occur, but it was given to a Roman Catholic.]

LAR01508, 14 Aug 1987, is a memorandum which considered 10 candidates applying for active duty under the D4105 program, and approved 7 of them (for the first month of the new Fiscal year); the Board then set two candidates aside (a Liturgical, UCC and a Non-Liturgical, SB):

"The Advisory Group recommends that the following be held until next spring:" [in case the Board was having trouble meeting their quotas then.]

Of the 7 Chaplains approved for Active Duty, 5 were RC and 2 were Liturgical (Lutheran).]

Turn now to LAR01599, 22 Mar 90,

This Board recommended three Chaplains for active duty, all three were Roman Catholic, then went on:

"3.  The following were recommended to be held for a later CARE Group when future information on the FY91 accession numbers and end strength are known:"

| Butler, Mark H. | LDS | D4105 |
| Evans, Crutcher K. | SB | RECALL |
| Heyman, Jay B. | J | D4105 |
| Buckingham, Jay P. | W | D4105 |
| Wildhack, William A. | PUSA | RECALL |
| Elam, Carey P. | LMS | RECALL |

The Board held back, as potential appointments for the next year, if needed, 2 Special Worship chaplains; 3 Liturgicals and a Southern Baptist.

These are not isolated decisions, even if they are a sample of unusual frankness on the part of the C/A/R/E Advisory Group.  This is how the Group operated.  We can see that in the data, here we have the board admitting it.

Catholics were not the "highest priority";

they were the only priority:

- The board recommended Catholics on almost every available opportunity, 94.01% of the time.

- The overall average likelihood of recommendation (excluding Catholics) was 73.83%.

- The "pipeline" was monitored for Catholics.

- Slots were saved for Catholics.

- Other eligible candidates were shelved in case a Catholic showed up.

**Appendix WH**
**What Happened to all the Missing Chaplains**?

W1.     Looking at Table 3 on page 12, I was struck by the fact that we have records for nearly 1000 Chaplain Candidates who were recommended for the Chaplain Candidate Program, and yet we have records for only 209 Chaplain Candidates who completed their studies and applied for Active Duty.  What happened to the other 800?

**Table 3 - from page 12 above**
**CARE Consideration of Candidates for the S4105-A Program**
**(FY 1985 to 2005)**

| The Navy's Faith Group | Number of Candidates | Number Recommended | Number Not Recommended | Other | Percent Recommended |
|---|---|---|---|---|---|
| Catholic | 11 | 11 | 0 | 0 | **100.0** |
| Liturgical | 50 | 47 | 3 | 0 | 94.0 |
| Non-Liturgical | 125 | 96 | 11 | 18 | **76.8** |
| Special Worship | 23 | 21 | 1 | 1 | 91.3 |
| Total | 209 | 175 | 15 | 19 | 83.7 |

W2.     This "mystery" is not cleared up when one looks at supersession to Inactive Duty:

**Table 6 from page 19 above**
**CARE Consideration of Candidates for the S4105-I Program**
**(FY 1985 to 2005)**

| The Navy's Faith Group | Number of Candidates | Number Recommended | Number Not Recommended | Other | Percent Recommended |
|---|---|---|---|---|---|
| Catholic | 40 | 40 | 0 | 0 | **100.0** |
| Liturgical | 83 | 79 | 4 | 0 | 95.2 |
| Non-Liturgical | 84 | 80* | 3 | 1 | **95.2** |
| Special Worship | 7 | 7** | 0 | 0 | 100.0 |
| Total | 214 | 206 | 7 | 1 | 96.3 |

* Including 4 who applied for Active Duty or Inactive Duty and were recommended for Inactive.

** Including 1 who applied for Active Duty or Inactive Duty and was recommended for Inactive.

W3.    The C/A/R/E Advisory Group's acceptance rate, i.e. the likelihood of recommending a candidate's acceptance into Inactive Duty is so high (95 to 100%), that it seems probable, once again, that there is a pre-screen at work.  Only the "best" candidates are even being "considered".

•    Although the C/A/R/E Board memoranda refer to their deliberations as "consideration of applications", in this case these *applications* are more like *command invitations*.  The candidate has virtually no role in "application" other than to fill it out when invited to do so.  It is the Navy and not the candidate who has "first right of refusal[61]".

•    It is clear then, in this constellation of policies, that it is the Navy (who?) considers each "graduating" CCPO student and offers some (but clearly not all of them, not even most of them) a superceding appointment.

W4.    Thus, a working hypothesis about "what happened to all the missing Chaplains" is narrowed from "Candidates' differential reluctance to continue rates" to "differential rates of availability or attractiveness (to the Navy) upon graduation".

W5.    If we look at Table 2 again, we are reminded that the C/A/R/E Group's decisions at the beginning stage were driven in part by faith group cluster considerations. And within that set of parameters, Roman Catholic candidates were selected at a virtual "anyone is acceptable" threshold; Non-Liturgical candidates on the other hand, may have been screened more finely. Could losses on the way to supersession be due to poor screening at the beginning?

**Table 2 from page 9 above**
**CARE Consideration of Candidates for the Student Program**
**(FY 1985 to 2005; first time applications)**

| The Navy's Faith Group | Number of Candidates | Number Recommended | Number Not Recommended | Other | Percent Recommended |
|---|---|---|---|---|---|
| Catholic | 195 | 186 | 4 | 5 | **95.4** |
| Liturgical | 244 | 202 | 34 | 8 | 82.8 |
| Non-Liturgical | 391 | 306 | 74 | 11 | **78.3** |
| Special Worship | 79 | 70 | 8 | 1 | 88.6 |

---

[61]    SECNAV Instruction 1120.4A (Reference 21) says that a candidate enrolled in the Theological Student Program (which is what CCPO was called for most of the time that these candidates were in it) must apply for and "accept if offered, a superseding appointment to Lieutenant (junior grade) in the Chaplain Corps, USNR, 4105, for active duty or inactive duty ..."

W6.    If we compare the rates of acceptance at the initial screening to the rates of application for supersession, the negative correlation could suggest that the C/A/R/E Board did a very poor job of forecasting a candidate's future usefulness to the Corps.

W7.    Let us combine the data from Tables 2, 3 and 6 for a "straight line" look at acceptance and loss[62]:

**Table WH 1**
**Faith Group Losses to Supersession**

| Navy's Faith Group Cluster | Applied to CCPO | % Yes | Invited to S4105-A | % Yes | Invited to S4105-I | % Yes | Num lost | Cum % Lost |
|---|---|---|---|---|---|---|---|---|
| Roman Catholic | 195 | **95.4** | 11 | **100** | 40 | **100** | 144 | 74 % |
| Liturgical | 244 | 82.8 | 47 | 94.0 | 79 | 95.2 | 118 | 48% |
| Non-Liturgical | 391 | **78.3** | 96 | **76.8** | 80 | **95.2** | 215 | 55% |
| Special Worship | 79 | 88.6 | 21 | 91.3 | 7 | 100 | 51 | 64% |

W8.    And now, let's compare (a) "Cumulative % lost" (the last column above) to (b) the percent lost by virtue of C/A/R/E action, which is the compound percent lost, i.e. the combination of the loss rates at each stage = $[1- (P_{CCPO}*[P_{S4105A}+P_{S4105I}]/2)]$

**Table WH-2**
**Faith Group Losses to Supersession**

| Navy's Faith Group Cluster | Numerical Loss as a Percent | CARE Screening Loss |
|---|---|---|
| Roman Catholic | 74 % | 4.6 % |
| Liturgical | 48% | 21.7 % |
| Non-Liturgical | 55% | 32.7 % |
| Special Worship | 64% | 15.3 % |

W9.    The dominant patterns in Table WH-2 are statistically significant.  Catholics have the highest percentage of numerical loss (i.e. candidates who are not considered, or were not available to be considered, for supersession) and also the highest percentage of C/A/R/E acceptance when ever they are considered, either for participation in the CCPO program or on

---

[62]  Because these data are drawn from a 20 year time series, they are not, or course, the "same" individuals in a moving cohort; they are counts of cross sectional slices of the process.

those occasions when they are considered for supersession.  All the other faith group clusters (but especially the Non-Liturgical cluster), have (a) less loss, i.e. are more likely to be offered supersession, but (b) were also less "appealing" to the C/A/R/E Board as CCPO candidates and are now less appealing as superceding Chaplains.

W10.   This inversion, Catholics are preferred at every stage of every process, but somehow not offered supersession appointments in anything even remotely aligned to their participation rates in the CCPO, suggest that it is Catholics who are the "missing Chaplains".

W11.   There are three factors which limit the Navy's "ability" to offer a superceding appointment to a Chaplain candidate who was approved for the CCPO.

•       First, the Chaplain may not have completed all the requirements and may have "dropped out" - or been dismissed.

•       Second, even if the Chaplain graduates, the Navy may be barred by end strength limits from making an Active Duty offer.

•       Third, the Chaplain may no longer be "available"; the candidate's service obligation may have tolled and he/she is no longer "required" to accept supersession if it is offered.

**Possibility 1.   The reason these students have disappeared is that they didn't graduate.**

W12.   The OPNAV/SECNAV Instructions for the CCPO (reference 21), specify that:

> "Officers who fail to complete the Chaplain Basic Course or any required qualification in the Chaplain Candidate Program normally shall be relieved of any statutory service obligation and active duty obligation incurred as a result of accepting an appointment into the Chaplain Corps or the Chaplain Candidate Program, and shall be separated for cause per reference ..."

W13.   Thus, it is possible that the "missing" candidates didn't finish their programs.

W14.    Although the Navy certainly has "drop out" data for the candidates it approved for the CCPO program, we cannot make any "drop out" inferences from the C/A/R/E Board records. Those records have told us as much as they can about supersession rates already.  If the data show a candidate who is recorded as having been approved for the 1945 program, and then show no other activity, does that signal a "drop out" or is that one of our "missing" from being offered a supersession?

W15.    The best that we can do re drop outs, is:

- (a) notice that although there are differences in the patterns of faith group application and approval, over the years the percentage of approved candidates who are not considered for supersession has remained reasonably stable (see Table WH-3, below) and

- (b) stipulate that there has to be some drop out rate and in the absence of a reason for believing it is correlated to faith group cluster, we can set it at "the group average".

**Table WH-3**
**Applications Approved for CCPO and later Submitted for Supersession**

| C Y | Approved for CCPO | NO follow-on | S4105 Offer | Percent Not Considered |
|-----|-----|-----|-----|-----|
| 1985 | 4 | 1 | 3 | 25.0% |
| 1986 | 32 | 17 | 15 | 53.1% |
| 1987 | 31 | 16 | 15 | 51.6% |
| 1988 | 41 | 18 | 23 | 43.9% |
| 1989 | 36 | 20 | 16 | 55.6% |
| 1990 | 37 | 18 | 19 | 48.6% |
| 1991 | 34 | 22 | 12 | 64.7% |
| 1992 | 60 | 44 | 16 | 73.3% |
| 1993 | 63 | 39 | 24 | 61.9% |
| 1994 | 49 | 29 | 20 | 59.2% |
| 1995 | 15 | 11 | 4 | 73.3% |
| 1996 | 28 | 12 | 16 | 42.9% |
| 1997 | 21 | 7 | 14 | 33.3% |
| 1998 | 30 | 11 | 19 | 36.7% |
| TOTAL to date | 481 | 265 | 216 | 55.1% |
| 1999 | 33 | 22 | 11 | 66.7% |
| 2000 | 37 | 26 | 11 | 70.3% |
| 2001 | 52 | 36 | 16 | 69.2% |
| 2002 | 42 | 27 | 15 | 64.3% |
| 2003 | 47 | 42 | 5 | 89.4% |
| 2004 | 33 | 31 | 2 | 93.9% |
| 2005 | 40 | 40 | 0 | 100.0% |

W16.    I calculated the average dropout rate (55%) at the break between 1998 and 1999; candidates after this period could still be in school. Those prior to this break point have "tolled" their service obligation.

**Possibility 2.    The reason these students have disappeared is that they were not needed.**

W17.    The OPNAV/SECNAV Instructions for the CCPO (reference 21), specify that:

> "DCNO (N1/NT)may offer superseding appointments in the Chaplain Corps to CCPOs who successfully complete the necessary requirements. The number of appointments per year is equal to the current year accession plan requirements for the ADL and the Reserve Component."

W18.    Thus, it is possible that some of the Chaplain applicants who participated in the CCPO (mayhaps with the full intention of accepting a Commission if offered) were not offered Commissions, for the simple reason that when they were eligible, there was "no room at the Inn". [The Navy surely has data which can address this issue if they are curious or concerned.]

W19.    If this happened, the affected Chaplains are included in Table WH-3.  But, in a time of relative shortage, this seems exceedingly unlikely, as the Reserve Component is reasonably easy to enter as a supercessor (see Table 6 on page 19, and repeated above.)

**Possibility 3.   The reason these students have disappeared is that their service obligation expired.**

W20.    If a participant in the CCPO takes longer to finish his/her seminary studies than the tolling of the service obligation (8 years), they have no residual obligation, and need not *accept* the Navy's invitation to apply for supersession.

W21.    Catholic seminary education requires 8 years in total[63].  If a Catholic seminary student joins the Navy early enough in his journey, (a) he can harvest the benefits of participation (serve a military obligation in the IRR, being very unlikely for a call-up) , (b) avoid ever having to go onto Active duty[64] and (c) then be immediately available to serve the Church on the Bishop's schedule.  [I wonder if the Bishops have sussed this out.]

W22.    Here are C/A/R/E data showing the average applicant's age and time in CCPO:

|  | Age at the time of 1945 application/approval | Age at the time of S4105 consideration | Difference (years) |
|---|---|---|---|
| Catholic | 27.7 | 33.8 | 6.1 |
| Liturgical | 27.9 | 32.1 | 4.2 |
| Non-Liturgical | 29.4 | 32.7 | 3.3 |
| Special Worship | 29.4 | 32.1 | 2.7 |

---

[63]   I do not say this based on personal knowledge.  Website http://www.findarticles.com/ p/articles/mi_pnav/is_200208/ai_4208805913 provides a news story about a pair of Catholic Navy CCPO's.  The story quotes these students as saying: "There's a shortage of priests right now, so the Bishops have to decide whether we are needed more in our home diocese (parish) or in the Navy." and it continues: the whole process to become a priest takes about eight years, they said.

[64]   The Navy's rules require application for supersession within one year of meeting all the established requirements, but prohibit assignment to active duty before a candidate has achieved two years of "leadership experience", so every seminary student has at least a one year cushion, and some have a two year cushion.

If the "average" Catholic spends 6 years in the CCPO, and if the Navy *requires* two years of "leadership experience" for an appointment to Active Duty, the average Catholic is ineligible. [I wonder if the Catholic CCPO applicants have sussed this out.]

W23.    The little embedded table above is, of course two different pools of Chaplains.   Some of those considered for supersession were admitted to the CCPO program before the time slice covered by the C/A/R/E data began; some of those counted as recommended for CCPO have not yet had time to complete their educations.  But time series analysis being what it is, this is or should be an unbiased sample.  The age differences at the time of application are statistically significantly different across faith group clusters, and so too are the age differences at the time of consideration for supersession.  And, of course, the duration of each candidate's tenure in the program is also statistically significantly different across the faith group clusters.  Catholics spend a lot more time in the program than do the other denominations - and this (as a histogram analysis of their time in CCPO will also show) accounts for a significant portion of their "disappearance" or non-availability for supersession.

W24.    We can test the conclusion we reached above with a subset test.  The C/A/R/E data which has recently been provided to me includes records for 255 Chaplains who were both (a) recommended for the CCPO and (b) considered for supersession within the time period covered by the database.  We can parse these chaplains by faith group cluster and see if any of them were "running out of time".   Table WH-4 presents the data we need:

**Table WH-4**
**Matched Pairs, age at admission to CCPO**
**vs**
**Age at Consideration for Supersession**

| The Navy's Faith Group Cluster | Number Recommended for CCPO | No of Cases "at both ends" | Average Age at CCPO Acceptance | Average Age at S4105 Application | Average Duration of Education |
|---|---|---|---|---|---|
| Catholic | 192 | 24 | 28.2* | 33.8* | 5.4 |
| Liturgical | 210 | 66 | 28.6 | 32.0 | 3.4 |
| Non-Liturgical | 317 | 150 | 29.4 | 32.7 | 3.3 |
| SWC | 71 | 15 | 29.7 | 32.0 | 2.3 |

* Including one Catholic who was 47 years old when approved for CCPO.

W25.    The data in Table WH-4 agree well with the time slice comparison made in ¶ W22.

W26.    The Faith Group Cluster which the Navy works the hardest to acquire (Catholic) produces the fewest supersessions.

[I wonder if the recruiters (who receive "bonus points" for accessions - and lose them if the candidate does not supercede) know that they are spending more effort, for less payoff, when they recruit a Catholic.]

W27.    The Faith Group Cluster which the Navy screens the most thoroughly (Non-Liturgical), produces the highest proportion of successful supersessions.

W28.    The Navy's ROI (Return on Investment) for the Student Theological Program (CCPO) is "out of kilter", and the Navy is subsidizing (whatever the actual cost) Catholic Seminary education 400%[65] as much proportionately as for religious education of any other "faith group cluster."

[I wonder if the Secretary of the Navy is aware of this.]

---

[65]    Catholic CCPO participants stay in school almost twice as long as non-Catholics, and are, on the average, about half as likely to supercede [25% supersession vs 50%]; this is a roughly 4 to 1 ratio of investment to return.

**Table QE-6**
**Selection Rates for Non-Liturgicals**
**by Denomination (all Decisions 1985-2005)**

| Denominations within cluster | Total No of Candidates | Number Recommended | Number Not Recommended | Percent Recommended |
|---|---|---|---|---|
| ABA | 4 | 2 | 2 | 50.00% |
| ABC | 64 | 46 | 17 | 71.88% |
| AG | 86 | 69 | 16 | 80.23% |
| **AGC** | **33** | **21** | **12** | **63.64%** |
| BBF | 11 | 8 | 2 | 72.73% |
| BGC | 18 | 13 | 5 | 72.22% |
| **CB** | **11** | **1** | **9** | **9.09%** |
| CBAA | 13 | 9 | 4 | 69.23% |
| CC | 19 | 15 | 4 | 78.95% |
| CCCC | 11 | 11 | 0 | 100.00% |
| **CFGC** | **97** | **58** | **37** | **59.79%** |
| CGAI | 6 | 5 | 0 | 83.33% |
| CGCT | 32 | 24 | 8 | 75.00% |
| **CGIC** | **23** | **15** | **6** | **65.22%** |
| CHCCC | 18 | 15 | 2 | 83.33% |
| CMA | 16 | 12 | 3 | 75.00% |
| **COALSPFLDCH** | **18** | **11** | **6** | **61.11%** |
| COBAPT | 19 | 16 | 3 | 84.21% |
| DC | 35 | 26 | 7 | 74.29% |
| ECC* | 15 | 13 | 2 | 86.67% |
| EFCA | 34 | 27 | 7 | 79.41% |
| EvanChurAlli | 14 | 11 | 2 | 78.57% |
| FGBC | 5 | 3 | 2 | 60.00% |
| FUNDBAPTFEL | 10 | 9 | 1 | 90.00% |
| **GARB** | **22** | **12** | **9** | **54.55%** |
| ICFCG | 25 | 17 | 8 | 68.00% |
| IFCA | 38 | 28 | 6 | 73.68% |
| **LBF** | **29** | **14** | **14** | **48.28%** |
| MISS | 4 | 1 | 1 | 25.00% |
| NABC | 9 | 8 | 1 | 88.89% |
| NBCA | 11 | 8 | 3 | 72.73% |
| **NBCU** | **68** | **45** | **20** | **66.18%** |
| OBSC | 4 | 3 | 1 | 75.00% |
| PAW | 6 | 5 | 0 | 83.33% |
| PB | 6 | 5 | 1 | 83.33% |
| PCG | 5 | 4 | 1 | 80.00% |
| PH | 4 | 4 | 0 | 100.00% |
| PNBC | 26 | 18 | 8 | 69.23% |
| RCA* | 16 | 14 | 2 | 87.50% |
| SB | 480 | 349 | 115 | 72.71% |
| **UPI** | **13** | **8** | **5** | **61.54%** |
| WBF | 4 | 3 | 1 | 75.00% |
| All Non-Lit | 1479 | 1041 | 390 | 70.39% |

* Denotes what Plaintiffs (and the affected denomination) think is a miss-assignment to this faith group cluster.

**Bold** = faith group with more that 10 candidates and less than 66.67% recommended rate

## IDENTIFICATION OF NAVY CHAPLAIN FAITH GROUPS AND DENOMINATIONS
## BY ABBREVIATIONS

| FG ABR | FAITH GROUP (FG) / DENOMINATION | AQD |
|--------|--------------------------------|-----|
| AME | African Methodist Episcopal Church | 530 |
| AMEZ | African Methodist Episcopal Zion Church | 532 |
| ABA | American Baptist Association | 524 |
| ABC | American Baptist Churches in the U.S.A. | 525 |
| ACCC | American Council of Christian Churches | 505 |
| AMC | American Muslim Council | 400 |
| CHACC | Anglican Catholic Church | 598 |
| ACA | Anglican Church in America | 594 |
| ACACE | Apostolic Catholic Assyrian Church of the East | 553 |
| AG | Assemblies of God | 506 |
| AGC | Associated Gospel Churches | 504 |
| ARP | Associated Reformed Presbyterian Church | 581 |
| BBF | Baptist Bible Fellowship International | 523 |
| BGC | Baptist General Conference | 533 |
| BMAA | Baptist Missionary Association of America | 529 |
| BPC | Bible Presbyterian Church | 556 |
| BRETH | Brethren | 518 |
| CBC | Central Bible Church | 563 |
| JR | Central Conference of American Rabbis (Reform) | 587 |
| CFGC | Chaplaincy Full Gospel Churches | 579 |
| CMA | Christian and Missionary Alliance | 560 |
| CC(DC) | Christian Church (Disciples of Christ) | 507 |
| CHCCC | Christian Churches and Churches of Christ | 561 |
| CME | Christian Methodist Episcopal Church | 531 |
| CR | Christian Reformed Church | 534 |

| FG ABR | FAITH GROUP (FG) / DENOMINATION | AQD |
|---|---|---|
| CS | Christian Science | 508 |
| CGAI | Church of God (Anderson, Indiana) | 535 |
| CGCT | Church of God (Cleveland, Tennessee) | 573 |
| CGGC | Church of God General Conference | 517 |
| CGNA | Church of God General in North America | 536 |
| CGIC | Church of God in Christ | 521 |
| CGP | Church of God of Prophecy | 520 |
| CJCLDS | Church of Jesus Christ of Latter-Day Saints | 510 |
| CLG | Church of the Living God | 557 |
| CN | Church of the Nazarene | 511 |
| CUBC | Church of the United Brethren in Christ | 562 |
| CC | Churches of Christ | 509 |
| CCCU | Churches of Christ in Christian Union | 576 |
| CBAA | Conservative Baptist Association of America | 564 |
| CCCC | Conservative Congregational Christian Conference | 565 |
| CLA | Conservative Lutheran Association | 595 |
| CP | Cumberland Presbyterian Church | 583 |
| EF | Elim Fellowship | 554 |
| EC | Episcopal Church | 502 |
| ECC | Evangelical Congregational Church | 549 |
| ECCA | Evangelical Covenant Church in America | 537 |
| EFCA | Evangelical Free Church in America | 566 |
| ELCA | Evangelical Lutheran Churches of America | 596 |
| EMC | Evangelical Methodist Church | 559 |
| EPC | Evangelical Presbyterian Church | 586 |
| FGBC | Fellowship of Grace Brethren Churches | 513 |
| FMNA | Free Methodist Church of North America | 591 |

| FG ABR | FAITH GROUP (FG) / DENOMINATION | AQD |
|---|---|---|
| FWBAPT | Free Will Baptist | 538 |
| FGFCMI | Full Gospel Fellowship of Church and Ministry International | 577 |
| GAGB | General Association of General Baptists | 528 |
| GARB | General Association of Regular Baptist Churches | 526 |
| SDA | General Conference of Seventh Day Adventists | 545 |
| IFCA | Independent Fundamental Churches of America | 512 |
| ICFG | International Church of Foursquare Gospel | 568 |
| ICCC | International Council of Community Churches | 558 |
| PHC | International Pentecostal Holiness Church | 571 |
| J | Jewish | 501 |
| KYMF | Kansas Yearly Meeting of Friends | 567 |
| LRC | Liberal Catholic Church | 548 |
| LBF | Liberty Baptist Fellowship | 589 |
| LMS | Lutheran Church, Missouri Synod | 599 |
| MISS | Missionary Church | 575 |
| MCA | Missionary Church Association | 572 |
| M | Moravian Church | 539 |
| NABC | National Association of Baptist Churches | 550 |
| NACCC | National Association of Congregational Christian Churches | 540 |
| NBCA | National Baptist Convention of America | 541 |
| NBCUS | National Baptist Convention, U.S.A., Inc. | 542 |
| NABAPC | North American Baptist Conference | 555 |
| OBSC | Open Bible Standard Churches, Inc. | 569 |
| ORTH | Orthodox Church in America & Canada, Eastern Orthodox | 503 |
| OP | Orthodox Presbyterian | 584 |
| ORTH | Orthodox, Greek | 503 |
| ORTH | Orthodox, Russian | 503 |

07-mc-269 (RMU)
EXHIBIT 19

| FG ABR | FAITH GROUP (FG) / DENOMINATION | AQD |
|---|---|---|
| PAW | Pentecostal Assemblies of the World, Inc. | 551 |
| PCG | Pentecostal Church of God | 570 |
| PCGNA | Pentecostal Church of God North America | 522 |
| PFWB | Pentecostal Free Will Baptist Church, Inc. | 578 |
| PB | Plymouth Brethren | 514 |
| PUSA | Presbyterian Church (USA) | 580 |
| PCA | Presbyterian Church in America | 574 |
| PM | Primitive Methodist Church in the U.S.A. | 592 |
| PNBC | Progressive National Baptist Convention, Inc. | 544 |
| RCA | Reformed Church in America | 543 |
| RE | Reformed Episcopal Church | 588 |
| RPCNA | Reformed Presbyterian Church of North America | 585 |
| RCJCLDS | Reorganized Church of Jesus Christ of Latter-Day Saints | 516 |
| RC | Roman Catholic Church | 500 |
| SA | Salvation Army | 547 |
| SB | Southern Baptist Convention | 527 |
| UU | Unitarian Universalist Association | 546 |
| UCC | United Church of Christ | 519 |
| UEPNA | United Episcopal Church of North America | 597 |
| UM | United Methodist Church | 590 |
| UPCI | United Pentecostal Church International | 552 |
| UNK | Unknown | 600 |
| W | Wesleyan Church | 593 |

07-mc-269 (RMU)
EXHIBIT 19

Non-Liturgical Selection Rates by Denomination (all Decisions 1985-2005)

| Denominations within cluster | Total No of Candidates | Number Recommended | Number Not Recommended | Percent Recommended |
|---|---|---|---|---|
| SB | 480 | 349 | 115 | 72.71% |
| **CFGC** | **97** | **58** | **37** | **59.79%** |
| AG | 86 | 69 | 16 | 80.23% |
| **NBCU** | **68** | **45** | **20** | **66.18%** |
| | | | | |
| ABC | 64 | 46 | 17 | 71.88% |
| IFCA | 38 | 28 | 6 | 73.68% |
| DC | 35 | 26 | 7 | 74.29% |
| EFCA | 34 | 27 | 7 | 79.41% |
| **AGC** | **33** | **21** | **12** | **63.64%** |
| CGCT | 32 | 24 | 8 | 75.00% |
| **LBF** | **29** | **14** | **14** | **48.28%** |
| PNBC | 26 | 18 | 8 | 69.23% |
| ICFCG | 25 | 17 | 8 | 68.00% |
| **CGIC** | **23** | **15** | **6** | **65.22%** |
| **GARB** | **22** | **12** | **9** | **54.55%** |
| CC | 19 | 15 | 4 | 78.95% |
| COBAPT | 19 | 16 | 3 | 84.21% |
| | | | | |
| BGC | 18 | 13 | 5 | 72.22% |
| CHCCC | 18 | 15 | 2 | 83.33% |
| **COALSPFLDCH** | **18** | **11** | **6** | **61.11%** |
| CMA | 16 | 12 | 3 | 75.00% |
| RCA* | 16 | 14 | 2 | 87.50% |
| ECC* | 15 | 13 | 2 | 86.67% |
| EvanChurAlli | 14 | 11 | 2 | 78.57% |
| CBAA | 13 | 9 | 4 | 69.23% |
| **UPI** | **13** | **8** | **5** | **61.54%** |
| BBF | 11 | 8 | 2 | 72.73% |
| **CB** | **11** | **1** | **9** | **9.09%** |
| CCCC | 11 | 11 | 0 | 100.00% |
| NBCA | 11 | 8 | 3 | 72.73% |
| FUNDBAPTFEL | 10 | 9 | 1 | 90.00% |
| NABC | 9 | 8 | 1 | 88.89% |
| CGAI | 6 | 5 | 0 | 83.33% |
| PAW | 6 | 5 | 0 | 83.33% |
| PB | 6 | 5 | 1 | 83.33% |
| FGBC | 5 | 3 | 2 | 60.00% |
| PCG | 5 | 4 | 1 | 80.00% |
| ABA | 4 | 2 | 2 | 50.00% |
| MISS | 4 | 1 | 1 | 25.00% |
| OBSC | 4 | 3 | 1 | 75.00% |
| PH | 4 | 4 | 0 | 100.00% |
| WBF | 4 | 3 | 1 | 75.00% |
| Others <4 | 104 | 55 | | |
| | | | | |
| All Non-Lit | 1479 | 1041 | 390 | 70.39% |

**\*** Denotes what Plaintiffs (and the affected denomination) think is a miss-assignment to this faith group cluster.

**Bold** = faith group with more that 10 candidates and less than 66.67% recommended rate

## 1985-2005 NON-LITURGICAL ACCESSION SELECTION RATES
## BY DENOMINATION (4 OR MORE CANDIDATES)

**RANKED FROM HIGHEST PERCENTAGE RECOMMENDED
LOWEST TO PERCENTAGE RECOMMENDED**

| Rank Order | Denomination | Total No. Of Candidates | Percent Recommended |
|---|---|---|---|
| 1 | Conservative Congreg. Christian Conference | 11 | 100.00% |
| 1 | Pentecostal Holiness | 4 | 100.00% |
| 3 | Fundamental Baptist Fellowship | 10 | 90.00% |
| 4 | National Association of Baptist Churches | 9 | 88.89% |
| 5 | *Reformed Church in America | 16 | 87.50% |
| 6 | *Evangelical Congregational Church | 15 | 86.67% |
| 7 | Conservative Baptist Association of America | 19 | 84.21% |
| 8 | Christian Churches and Churches of Christ | 18 | 83.33% |
| 8 | Church of God of Anderson, Indiana | 6 | 83.33% |
| 8 | Pentecostal Assemblies of the World | 6 | 83.33% |
| 8 | Plymouth Brethren | 6 | 83.33% |
| 12 | Assemblies of God | 86 | 80.23% |
| 13 | Pentecostal Church of God | 5 | 80.00% |
| 14 | Evangelical Free Church in America | 34 | 79.41% |
| 15 | Christian Church (Disciples of Christ) | 19 | 78.95% |
| 16 | Evangelical Church Alliance | 14 | 78.57% |
| 17 | Church of God of Cleveland, Tennessee | 32 | 75.00% |
| 17 | Christian Missionary Alliance | 16 | 75.00% |
| 17 | Open Bible Standard Churches | 4 | 75.00% |
| 17 | World Baptist Fellowship | 4 | 75.00% |
| 21 | Disciples of Christ | 35 | 74.29% |
| 22 | Independ Fundamental Churches of America | 38 | 73.68% |
| 23 | Baptist Bible Fellowship | 11 | 72.73% |
| 24 | National Baptist Convention of America | 11 | 72.73% |

| Rank Order | Denomination | Total No. Of Candidates | Percent Recommended |
|---|---|---|---|
| 25 | Southern Baptist | 480 | 72.71% |
| 26 | Baptist General Conference | 18 | 72.22% |
| 27 | American Baptist Churches | 64 | 71.88% |
| 28 | Conservative Baptist Association of America | 13 | 69.23% |
| 28 | Progressive National Baptist Convention | 26 | 69.23% |
| 30 | ICFGC | 25 | 68.00% |
| 31 | **National Baptist Convention USA** | **68** | **66.18%** |
| 32 | **Church of God in Christ** | **23** | **65.22%** |
| 33 | **Associated Gospel Churches** | **33** | **63.64%** |
| 34 | **United Pentecostal International** | **13** | **61.54%** |
| 35 | **Coalition of Spirit Filled Churches** | **18** | **61.11%** |
| 36 | **Fellowship of Grace Brethren Churches** | **5** | **60.00%** |
| 37 | **Chaplaincy Full Gospel Churches** | **97** | **59.79%** |
| 38 | **General Association of Regular Baptists** | **22** | **54.55%** |
| 39 | **American Baptist Association** | **4** | **50.00%** |
| 40 | **Liberty Baptist Fellowship** | **29** | **48.28%** |
| 41 | **Missionary Church** | **4** | **25.00%** |
| 42 | **CB** | **11** | **9.09%** |

\* Denominations which identify themselves as Liturgical, but defendants in litigation identify as Non-liturgical

Bold = endorsers with accession rates below 66.67%

**Unit 3 Topic 5**

# Code of Conduct – Level A

## LEARNING OBJECTIVES:

Identify laws and conventions that affect treatment of combatants and noncombatants during war and Operations Other Than War (OOTW).

Identify components of laws and conventions that affect treatment of combatants and noncombatants during war and OOTW.

Identify aspects of the Spectrum of Captivity.

Identify components of the Code of Conduct.

## REFERENCES:

**Army Regulation 350-30 - Code of Conduct, Survival, Evasion, Resistance, and Escape (SERE) Training.** Retrieved 12 APR 06:
http://www.apd.army.mil/pdffiles/r350_30.pdf

**Biography of Journalist Pearl, D.** Retrieved 06 APR 06:
http://www.rotten.com/library/bio/journalists/daniel-pearl/

**Biography of POW Alvarez, E. Jr.** Retrieved 12 APR 06: http://www.en.wikipedia.org/wiki/Everett_Alvarez

**Biography of POW Cook, D. G.** Retrieved 04 APR 06: http://tibbsau.com/vhv0018.html

**Biography of POW Christian, M. D.** Retrieved 02 FEB 06: http://www.pownetwork.org/c/c083.htm

**Biography of POW Day, G. E.** Retrieved 03 FEB 06: http://www.pownetwork.org/bios/d/d051.htm

**Biography of POW Denton, J. A.** Retrieved 04 APR 06:
http://dentonfoundation.org/Jeremiah%20Denton.htm

**Biography of POW Guy, T. W.** Retrieved 07 FEB 06: http://www.pownetwork.org/g/g065.htm

**Biography of POW McCain, J. S. III.** Retrieved 12 APR 06:
http://www.en.wikipedia.org/wiki/John_McCain

**Biography of POW Rowe, J. N.** Retrieved 14 MAR 06: http://www.pownetwork.org/r/r077.htm

**DOD Directive 1300.7 - Training and Education to Support the Code of Conduct.** Retrieved 12 APR 06:
http://www.dtic.mil/whs/directives/corres/pdf2/d13007p.pdf.

In Re Navy Chaplaincy
07-mc-269 (RMU)
EXHIBIT 22

| DISCUSSION POINT | RELATED FACILITATOR ACTIVITY |
|---|---|

**SLIDE 1**



**Code of Conduct Level A Training**

Code of Conduct Level A Training

**SLIDE 2**



**Overview**

What would you do if you found yourself in enemy hands? Would you know how to react? How would you defend yourself and the information you possess from your captors?

You might wonder: What will captivity be like? Do I have any rights? What if they starve me? Torture me? What if they kill me? What if I get sick? What if they turn prisoner against prisoner? What if I never get home? How much can I take before I give in?

What if this were *your* fate? How would *you* survive?

From the Revolutionary War right through today, American prisoners of war (POWs) have found themselves asking those exact questions.

| DISCUSSION POINT | RELATED FACILITATOR ACTIVITY |
|---|---|

**SLIDE 15**



**Laws & Conventions**  *The Geneva Convention*

Examples of noncombatants also include:

○ Retained Personnel, such as:

- Medical officers,
- Corpsmen, and
- Chaplains.



**EXPLANATION**

**EXPLAIN:** Retained personnel have a special protected status because of their duties. They may be kept (or *retained*) *only* as long as they are permitted to perform their duties; once their duties are no longer needed or allowed, they must be returned to their forces.

**SLIDE 16**



**Laws & Conventions**  *The Geneva Convention*

According to the Geneva Conventions, all noncombatants, including prisoners, are to receive equal treatment.

# Laws & Conventions
## *The Geneva Conventions*

## Examples of Noncombatants:

❖ **Retained personnel**
- Medical officers
- Corpsmen
- Chaplains





15

| DISCUSSION POINT | RELATED FACILITATOR ACTIVITY |
|---|---|
| captors and will allow you to survive with honor. | |

**SLIDE 113**



**The Code of Conduct** *Article IV*
If I am senior, I will take command. If not, I will obey lawful orders of those appointed over me and will back them in every way.

**SLIDE 114**



**The Code of Conduct** *Article IV*
Many POWs credit the leadership of Lieutenant Colonel Theodore "Ted" Guy, USAF, for helping them survive their captivity. As SRO, he was responsible for maintaining order, chain of command, and the Code of Conduct among his fellow POWs.

Guy recognized the significance of his responsibility and stressed to his fellow POWs the value of maintaining their honor and unity. He said, "Honor is something that once you lose it you become like an insect in the jungle. You prey upon others and others prey upon you until there is nothing left. Once you lose your honor, all the gold in the world is useless in your attempt to regain it."

Code of Conduct

| DISCUSSION POINT | RELATED FACILITATOR ACTIVITY |
|---|---|
| **SLIDE 115**  | **The Code of Conduct** *Article IV* <br> Strong leadership and communication are essential to discipline. Discipline is the key to camp organization, resistance, and even survival. You must continue to carry out your responsibilities and exercise your authority in any captivity environment. The SRO, regardless of branch of service, must accept command. This responsibility and accountability may not be evaded. | |
| **SLIDE 116**  | **The Code of Conduct** *Article IV* <br> Should you find yourself a POW, you should know that: <br><br> o Chaplains are NOT authorized to take command over any servicemembers, and <br> o Medical personnel may NOT assume command over non-medical personnel. | |
| **SLIDE 117** | **The Code of Conduct** *Article V* <br> Article Five: When questioned, should I become a prisoner of war, I am required to give name, rank, service number, and date of birth. I will evade answering further questions to the utmost of my ability. I will make no oral or written statements disloyal to my country or its allies or harmful to their cause. | |

Code of Conduct

| DISCUSSION POINT | RELATED FACILITATOR ACTIVITY |
|---|---|
| **SLIDE 134/135**  **Question** Under the guidance of the Code of Conduct, all servicemembers are to accept any conditions for parole.<br><br>A.  True<br>B.  False | **Answer** B. False |
| **SLIDE 136/137**  **Question** The senior military member must always take the position of Senior Ranking Officer present over all other servicemembers, no matter the specialty.<br><br>A.  True<br>B.  False | **Answer** B. False |
| **SLIDE 138/139**  **Question** The Code of Conduct was created to help servicemembers understand what behaviors are expected of them.<br><br>A.  True<br>B.  False | **Answer** A. True |

Code of Conduct

1  | CAROL C. LAM
   | United States Attorney
2  | THOMAS B. REEVE, JR.
   | Assistant U.S. Attorney
3  | California State Bar No. 069310
   | United States Attorney's Office
4  | Federal Office Building
   | 880 Front Street, Room 6293
5  | San Diego, California 92101-8893
   | Telephone: (619) 557-7159
6  |
7  | PETER D. KEISLER
   | Assistant Attorney General
   | VINCENT M. GARVEY
8  | Deputy Branch Director
   | MICHAEL Q. HYDE
9  | CHRISTOPHER R. HALL
   | CARLTON E. GREENE
10 | Attorneys, Civil Division
   | U.S. Department of Justice
11 | P.O. Box 883
   | 20 Massachusetts Ave., N.W., Room 7132
12 | Washington, D.C. 20001
   | Telephone: (202) 514-2205
13 |
   | Attorneys for the Defendants
14 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD G. WILKINS, | Case No. 99cv1579 – IEG (LSP) |
| Plaintiff, | **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT** |
| v. | Date: May 13, 2005 |
| THE UNITED STATES OF AMERICA, et al. | Time: 10:30 a.m.    Courtroom: 1 |
| Defendants. | Hon. Irma E. Gonzalez |

In Re Navy Chaplaincy
07-mc-269 (RMU)
EXHIBIT 23

Dated: <u>April 11, 2005</u>

Respectfully submitted,

MICHAEL HYDE
CHRISTOPHER HALL
CARLTON E. GREENE
Trial Attorneys
Federal Programs Branch, Civil Division
<u>Attorneys for Defendants</u>

Of Counsel:
Lieutenant Commander Daniel P. Shanahan
Lieutenant James A. Ouellette, Jr.
United States Navy
Office of the Judge Advocate General

99cv1579

1   Cf. Adair I, 183 F. Supp.2d at 55 (stating only that claim "founded solely upon a constitutional right"

2   inappropriate for administrative board (emphasis added)).  Plaintiff admits that he did not appeal his

3   retirement to the BCNR.  See Wilkins, 279 F.3d at 789; 12/16/99 Order [docket no. 15] at 12; Pl. Reb.

4   to Defs.' Stmt Material Facts [docket no. 146] at ¶ 48.  As recounted in defendants' Renewed Motion

5   for Summary Judgment, see Defs.'S.J. Mem. at 13-14, the Ninth Circuit did not absolve plaintiff of his

6   obligation to exhaust claims such as this.  Plaintiff's claim that the Navy violated its own regulation –

7   SECNAVINST 1401.3 – in composing chaplain selection boards is one that the BCNR may correct by

8   reviewing whether the Instruction was properly applied and, if necessary, award plaintiff a new board.

9   See 10 U.S.C. § 1552; see also Saad v. Dalton, 846 F. Supp. 889, 891 (S.D. Ca. 1994) (BCNR has broad

10  equitable powers to order reinstatement) (citing Chappell v. Wallace, 462 U.S. 296, 303 (1983)).  Thus,

11  plaintiff was required to bring his claim first to the BCNR, and his failure to do so bars entry of summary

12  judgment in his favor on this claim.  See Chappell, 462 U.S. at 301-02.

13  **B.    Plaintiff's SER Board Was Composed in Compliance with All Requirements of SECNAVINST 1401.3.**

14          Because the Instruction is the Navy's own regulation, the Navy's interpretation of it is entitled

15  to substantial deference.  Where the composition of selection boards contributes to the Navy's ability

16  to defend the nation, the Navy's policies and interpretations of those policies are entitled to preclusive

17  deference.  See Goldman, 475 U.S. at 509-10.  As explained below, the Navy has never interpreted

18  SECNAVINST 1401.3 to preclude consideration of faith group categories in composing the membership

19  of chaplain selection boards.  Further, the Navy reasonably interpreted the Instruction consistent with

20  its requirement that all officer board members reflect the composition of the officers under consideration.

21          SECNAVINST 1401.3 contains several relevant requirements.  It requires that "[b]oard members

22  should be selected from a wide range of leadership positions and reflect the composition of the officer

23  corps . . .,"  SECNAVINST 1401.3 ¶ 4(a) (Pl.'s Cross Ex. 1), and that it "be used to enhance the

24  knowledge, experience and understanding of each board as a whole."  Id. ¶ 5.  The Navy applies these

25  requirements to all officer boards, requiring, for example, that boards for the submarine community

26  include members from various locations and assignments.  See Springer Supp. Decl. at ¶ 6.  In the case

27  of the Chaplain Corps, chaplains' relevant experiences reflect service, for example, with different

28  branches of the Navy or geographic regions, and service in the context of the different ways each faith

1  group category is utilized under chaplain management policies. Thus, the policy, properly applied to th

2  Chaplain Corps, permitted the consideration of the relevant experience of chaplains in composing th

3  board, so that the chaplain board members, as a whole, would have a broad knowledge, background, an

4  experience to review all chaplain records under consideration. Springer Supp. Decl. ¶ 6. By using thi

5  mix, the Secretary would have greater confidence that each chaplain received review by board member

6  most capable of evaluating his or her performance and ability to contribute to the Navy's mission in a

7  the next rank or in determining whether to recommend early retirement.

8  Plaintiff's argument that this policy provided any benefit to certain chaplains or that i

9  "sponsor[ed] any single interest," Pl.'s Mem. at 19 (citing SECNAVINST 1401.3 ¶ 5), is belied by the

10  actual data.[11] SER board membership was composed of chaplains from every faith group category. See

11  Defs.' Cross Ex. F.  Indeed, plaintiff's FY 1995 Commander SER board had two non-liturgical

12  chaplains, more than any other faith group category . The same diversity is true for promotion boards.

13  For Chaplain Corps promotion boards for fiscal years 1994 – 2002, during which time 43 boards were

14  held with 194 chaplain board members, 69 of those chaplain members were from the liturgical Protestant

15  faith group category, 62 were from the non-liturgical Protestant faith group category, 46 were from the

16  Roman Catholic faith group category, and 17 chaplain members were from the Special Worship

17  category. See Defs' Cross Ex. C. Further, contrary to plaintiff's conclusions, no faith group category

18  was present on every board. As plaintiff admits, SER boards held in fiscal years 1991 to 1994 had no

19  Roman Catholic chaplain members. See Pl's Cross Ex. 21. Further, for fiscal years 1994-2002, one

20  promotion board did not have a Roman Catholic chaplain member, but the same data also shows that

21  only one board over this period lacked a liturgical protestant chaplain member, and that every board but

22  one had a Non-liturgical Protestant chaplain. See Defs' Cross Ex. C.

23  The Navy is entitled to substantial deference in interpreting the Secretary's orders. See Goldman,

24  475 U.S. at 509-10; see also Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994); Auer v.

25  Robbins, 519 U.S. 452, 461 (1997). It is not a "helpless captive when a literal application . . would

26  [11] Plaintiff also points to the inadmissible opinion expressed in a CNA Study. First, there is no

27  evidence that the CNA interpreted SECNAVINST 1401.3's requirements as a whole or gave any
   consideration to the requirements of paragraph 4(a). Second, it is not for third parties to determine if

28  the Navy interpreted its Instruction permissibly; that determination is made by the Court after
   presentation of all the material facts.

99cv1579

1    subvert a regulatory scheme." <u>Buffalo Crushed Stone, Inc. v. Surface Transp. Bd.</u>, 194 F.3d 125 (D.D.C

2    1999). The Navy may appropriately extend its interpretation "beyond the immediate text" of Enclosure

3    1 "to discern whether the literal interpretation urged by [plaintiff] makes sense in the context of" the

4    Instruction as a whole. <u>Cf. Am. Train Dispatcher Ass'n v. I.C.C.</u>, 54 F.3d 842, 848, 849 (D.D.C. 1995).

5          Contrary to plaintiff's interpretation, which would ignore the requirements of paragraphs 4(a)

6    and 5, the Navy's interpretation of SECNAVINST 1401.3 gave effect to all relevant such that they do

7    not conflict with paragraphs 4(a) and 5. <u>See</u> Springer Supp. Decl. ¶ 4-8. The "without regard" language

8    does not literally preclude consideration of the broad range of chaplain experiences under the Chaplain

9    Corps' management policies, and the Navy does not interpret it to render paragraphs 4(a) and 5

10   meaningless. <u>Id.</u> The Navy may also reasonably determine that blind, random selection of chaplains

11   would be inconsistent with the requirements of paragraphs 4 and 5 regarding board composition.

12   Instead, Enclosure 1, along with the last sentence of paragraph 4(a) ("Exclusion from board membership

13   by reason of . . . religious affiliation is prohibited") serve to prohibit the exclusion of a chaplain board

14   member because of religious affiliation, not to prohibit the consideration of faith group categories to

15   comply with the purpose of paragraphs 4(a) and 5 – to provide a board with a broad range of knowledge

16   and experience. <u>Id.</u> ¶¶ 7-8. Enclosure 1 also prohibits the Chief of Naval Personnel from including a

17   citation to a chaplain's religious affiliation when forwarding board member nominations to the Secretary

18   for final approval. <u>Id.</u> ¶ 8.

19         Even if the "without regard" instruction were read to literally preclude a mix of faith group

20   categories, that reading would conflict with paragraphs 4(a) and 5, and the Navy is entitled to substantial

21   deference in resolving any conflict and interpreting the Instruction to give effect to all its requirements.

22   <u>Goldman</u>, 475 U.S. at 509-10; <u>cf. Thomas Jefferson Univ.</u>, 512 U.S. at 513. The interpretation need not

23   be the most reasonable one possible. <u>Cf. Thomas Jefferson Univ.</u>, 512 U.S. at 515.

24   **V.    THE CONSTITUTION DOES NOT PROHIBIT FAITH GROUP DIVERSITY ON CHAPLAIN SELECTION BOARDS.**

25         The manner in which the Navy composed chaplain selection board membership at the time of

26   plaintiff's retirement does not violate the Constitution. First, there is no evidence that any faith group

27   received any preferential treatment. In the absence of statistics showing such preference, strict scrutiny

28   does not apply. Instead, the Court should defer to the Navy's judgment that boards reflecting the

**NAVY DENOMINATIONAL TIER PREFERENCES FOR CARE BOARD MEMBERS**

| TIER | Abbreviation | FGC | Denomination/Faith Group Name |
|------|-------------|-----|-------------------------------|
| Tier I | RC | RC | Roman Catholic |
| | | | [Percent Recommended for Accession - 96.40%] |
| | | | |
| Tier II | NBCUS | NL | National Baptist Convention, U.S.A., Inc. |
| | ELCA | LP | Evangelical Lutheran Churches of America |
| | UM | LP | United Methodist |
| | LMS | LP | Lutheran Missouri Synod |
| | ABC | LP | American Baptist Church in the U.S.A. |
| | BGC | NL | Baptist General Conference |
| | CS | SW | Christian Science |
| | SB | NL | Southern Baptist Convention |
| | SDA | SW | General Conference of Seventh Day Adventists |
| | | | [Percent Recommended for Accession - 85.45%] |
| | | | |
| Tier III | AME | LP | African Methodist Episcopal Church |
| | RCA | LP | Reformed Church in America |
| | EPIS (EC) | LP | Episcopal Church |
| | NBCUS | NL | National Baptist Convention, U.S.A., Inc. |
| | PNBC | NL | Progressive National Baptist Convention, Inc. |
| | | | [Percent Recommended for Accession - 79.71%] |

## NAVY DENOMINATIONAL TIER PREFERENCES FOR PROMOTION BOARDS

| TIER | Abbreviation | FGC | Denomination/Faith Group Name |
|------|--------------|-----|-------------------------------|
| Tier **I** | RC | RC | Roman Catholic |
| | | | |
| | | | |
| Tier **II** | PUSA | LP | Presbyterian Church (USA) |
| | ELCA | LP | Evangelical Lutheran Churches of America |
| | UM | LP | United Methodist |
| | LMS | LP | Lutheran Missouri Synod |
| | ABC | LP | American Baptist Church in the U.S.A. |
| | UCC | LP | United Church of Christ |
| | CC(DC) | LP | Christian Church (Disciples of Christ) |
| | SB | NL | Southern Baptist Convention |
| | SDA | SW | General Conference of Seventh Day Adventists |
| | | | |
| Tier **III** | AME | LP | African Methodist Episcopal Church |
| | RCA | LP | Reformed Church in America |
| | EPIS (EC) | LP | Episcopal Church |
| | NBCUS | NL | National Baptist Convention, U.S.A., Inc. |
| | PNBC | NL | Progressive National Baptist Convention, Inc. |
| | J | SW | Jewish |
| | | | |
| Tier **IV** | CRC (CR) | LP | Christian Reformed Church |
| | ECCA | LP | Evangelical Covenant Church in America |
| | CME | LP | Christian Methodist Episcopal Church |
| | BGC | NL | Baptist General Conference |
| | GARB | NL | General Association of General Baptist |
| | CGIC | NL | Church of God in Christ |

07-mc-269 (RMU)
EXHIBIT 25

| TIER | Abbreviation | FGC | Denomination/Faith Group Name |
|------|-------------|-----|------------------------------|
| | LDS (CJCLDS) | SW | Church of Jesus Christ of Latter-Day Saints |
| | ORTH | SW | Orthodox (Orthodox Church in America & Canada, Eastern Orthodox, Greek Orthodox, Russian Orthodox |
| | CS | SW | Christian Science |

07-mc-269 (RMU)
EXHIBIT 25

REPORT OF INTERVIEW"

was interviewed in person on 14 June 2000 by
RADM Barry C. Black, CNC, USN, [Redacted]
[Redacted] 1, and     [Redacted]                , BUPERS IG regarding the
conduct of the FY00 Chaplain Corps (CHC) 0-6 Selection Board and its failure to select [Redacted]
            for promotion to [Redacted].  RADM Black was President c7the FY00 CHC 0-6 Selection Board.
RADM Black is assigned as the Deputy Chief of Chaplains.

*I. How many female officer records did tie board review? Do you recall reviewing the service record of                    ? Who briefed the record?*

RADM Black did not recall how many female officer records were reviewed by the FY-00 CHC O-6 Selection Board,

*2. How would you characterize [Redacted]   record? Was it competitive with the Chaplains who were selected for promotion? In your opinion, why wasn't she selected for promotion?*

RADM Black stated that he know: [Redacted]           and may have even briefed her record to the board. He said that [Redacted]        had a ""strong" and "competitive" record. RADM Black said, "I have admired her [Redacted]        work." He reiterated that he felt   [Redacted]      record was "quite competitive."  RADM  Black recalled that  the board reviewed eligible records at least twice.  He said             record might have been reviewed three times in the crunch.  RADM Black stated that all briefers provided good records presentations.  He continued that at the 0-6 level, Chaplain Corps rarely selects "above zone" and the fact tha [Redacted]        selected "above zone" on the FY-01 board was indicative of her strong record.

*3.  Was there any discussion about          [Redacted]                 record?  What was said?  By whom? Did this influence how you voted?  In what way?*

RADM Black stated that no board member said anything negative about [Redacted]           record. RADM Black indicated he was absolutely certain that there was no discussion.  He reaffirmed that never once did a board member make negative comments about any record.  He said, "I monitored that very closely.

RADM Black stated that he did make positive comment that [Redacted]         was a "class act".  He said that one board member made a disapproving facial expression.  RADM Black continued, "I would rather not say who it was."  He said he did not discuss anything with the person who made the facial expression.

*4.. During the voting was: [Redacted] "zeroed out"? Was a revote conducted? What was the result of the revote? How did you vote?*

RADM Black commented that  [Redacted]          was not selected because a board member vote :"zero". He said he was disturbed by that fact.  RADM Black indicated he might have called for a re-vote in the event someone had hit the wrong button while voting. He continued that every time  [Redacted] record came up it was "zeroed out".  RADM Black also recalled that the record of  [Redacted] was "zeroed out" and he fel [Redacted]            , record was the strongest in terms of narrative remarks. He said that at least twice     [Redacted]   record was zeroed out".  As Board President, he called attention to it.  RADM lack said, "I felt the need to speak out on this one."  RADM Black stated that he voted "100" fo [Redacted]

07-mc-269(RMU)

EXHIBIT 26

RADM Black said that he has spoken to CHNAVPERS about concerns with the selection process. He indicated that a board member can vote "zero" in a "preemptive strike" and take out a record. RADM Black gave an example of how 4 members voting "100" and 1 member voting "0" can affect the selection of a record without accountability.

**5. Did** [Redacted] **make any comments about** [Redacted] **or her record? Were the comments positive or negative? What did she say? What was the response of the other board members to her comments?**

RADM Black stated that [Redacted] did not make a single negative statement about [Redacted] During the board. He also said that outside of the board he never heard [Redacted] make any negative comments.

**6. Have you ever heard** [Redacted] **Make any derogatory statements about** [Redacted] **? When were these comments made; before, during, or after the selection board?**

RADM Black stated that outside of the board he never heard [Redacted] make any negative comments about [Redacted].

DEPARTMENT OF THE NAVY
NAVAL INSPECTOR GENERAL
1014 N STREET SE SUITE 100
WASHINGTON NAY YARD DC 20374-5006

IN REPLY REFER TO
19990725
Ser N56/**2137**
**0 6 NOV 2000**

The Honorable Rick Santorum
United States Senator
Suite 960 Widener
Bldg. One South Penn
Square Philadelphia,
PA 19107

Dear Senator Santorum:

This is in response to your facsimile of February 22, 2000 to the Department of the Navy Congressional Liaison Office and your letter of May 31, 2000, to the Department of the Navy Office of Legislative Affairs which forwarded the concerns of your constituent, [Redacted]                who alleges bias and irregularities in the FY00 Chaplain O-6 Selection Board. The investigation has been completed, and the allegations were substantiated.

In an administrative investigation of this nature, the standard of proof is a "preponderance of the evidence." The subject of [Redacted]       complaint denied the allegations. However, we concluded that a preponderance of the testimonial and documentary evidence showed that she did make biased statements about [Redacted],     that she was biased against her and acted on that bias by voting "no confidence (zero)" when [Redacted] record was presented during board deliberations, and that by so doing, the subject of the investigation violated the precept of the board that required members to "consider carefully without prejudice or partiality, the record of every eligible officer." A copy of the report of investigation has been forwarded to the Chief of Chaplains for review and action deemed appropriate.

[Redacted]      also expressed concern over the limited number of women available to serve on Selection Boards for the higher ranks of the Chaplain Corps and the perception that these officers hold biased views against more conservative female chaplains. The Chaplain Corps detailers have addressed this issue by requesting that the Line Officer community provide a female board member for future Chaplain Corps Selection Boards.

Thank you for bringing this matter to our attention. For your information, this same information has been provided to [Redacted] in separate correspondence.

Sincerely,

JILL VINES LOFTUS
DEPUTY NAVAL INSPECTOR GENERAL

07-mc-269 (RMU)
EXHIBIT 27

<u>REPORT OF INTERVIEW</u>
.

[Redacted]                                                            was interviewed
telephonically   on 18 May 2000 by    [Redacted ],               BUPERS IG regarding her
allegation of misconduct by     [Redacted]                          1, during the FY00 Chaplain
Corps (CHC) 0-6 Selection Board which            resulted in her failure of selection.

[Redacted]                  motivation for filing the complaint was to preserve the integrity of
the selection process. She noted there are lots contesting board results and the number
will rise. She stated there is a perception in the Chaplain Corps that board members can't be
trusted, tenets are ignored, and private agendas are pursued.  She knew of instances where
chaplains who were known to be dishonest or who had "caught red-handed" acting
improperly on a board, continued to be allowed to sit on selection boards     [Redacted]
[Redacted]                  as one who had been improperly passed over by a selection
board. She stated his record was eventually corrected and he receive the promotion, however
the board member concerned, an 0-6, continued to sit on selection boards.  She also stated
[Redacted]           (sp?), a senior chaplain a [sic?] at Naval Hospital, complained about
certain             officers serving on boards to the detailer    [Redacted]        But nothing was
done.
[Redacted]     stated she was not concerned about her own promotion date and had not initially
questioned the board's result or membership until other chaplains began expressing their concerns
to her.

The following questions were discussed with   [Redacted]

*1.  Do you know*     [Redacted]                    *personally?  When and how did you meet?  Have
you ever served with her?*

[Redacted] stated she had met   [Redacted]       17-18 years ago when they were both
assigned to sub tenders, Their contact with each other over the years has been limited to brief
encounters and professional correspondence. She remembered both had once attended a 1-2 day
seminar on ministering to submariners but did not recall having daily discussions wit! [Redacted]
remembered exchanging greetings with her once in the Chief of
Chaplains office and that     [Redacted] had given a lecture at the Supervisor Chaplain course
while    [Redacted]                the Basic Course.    [Redacted]              current position
at CNETis not in   [Redacted]       Chain of command, however, she is in   [Redacted]
chain of influence.  They exchange business e-mails concerning statistics and
notices.

*2. Were you aware of the opinions expressed by*  [Redacted]   *to*  [Redacted]    *concerning
you? How did you become aware? When?*

[Redacted]                    stated she initially had not been concerned about not making 0-6,
even knowing that  [Redacted]   had been a member of the board. Two-three weeks after she
heard she had been passed over  [Redacted]          called her to offer his condolences. During the
call he told her "here's some information regarding why you may have been passed over" and
related the information contained in her complaint  [Redacted]         stated he had never
mentioned this information to her before.  [Redacted] told her he believed  [Redacted]
was entirely capable of working to get her passed over intentionally and dishonestly
and that he would help  [Redacted] if she contested the board  [Redacted]
stated she was surprised at the information he told her..

*3. Have you ever heard of her expressing these opinions to anyone else? Has she ever expressed them to you?*

[Redacted]     stated that soon after  receiving the phone call fron  [Redacted] she received one fron   [Redacted]   saying similar things.     [Redacted]     told her [Redacted]                                    and everything she stood for, and as soon as she heard [Redacted]                       ember of the board she knew  [Redacted]   was doomed.     [Redacted]                 many other chaplains called her after she failed to select and indicated they fel  [Redacted]             had precluded her promotion but did not have any specific  information. She described it as an "outpouring of concern" not just toward her but geared toward the promotion possibility of conservative women chaplains.     [Redacted]                 stated she was unaware of  [Redacted]                   opinions toward her and indicated she was always  "sweet and smiley to her face".

*4. Why do you think     [Redacted]                               holds these opinions?*

[Redacted]  stated that [Redacted]                             has a service reputation of being a militant feminist and is, according to the Chaplain Corps grapevine, a "femi-nazi" feeling that the more conservative female chaplains were bad for the cause of women.         [Redacted] indicated   there were four other female O-6 chaplains who all had the same reputation. She stated [Redacted] emphatically believed all these officers "were in cahoots" together to keep conservative females from getting anywhere in the Chaplain Corps. Chaplain Graham told    [Redacted]               she feared reprisal and would not write a letter regarding the information she had her to include in the complaint. When asked why she felt    [Redacted]                             might make the comments   [Redacted]    had related to her, she indicated she could only base an opinion on gossip and innuendoes.     [Redacted]       did state that she and    [Redacted]       present themselves differently as women officers [Redacted]       stated she does not downplay her femininity when in uniform, while [Redacted]    does not emphasize hers.  It was her opinion that    [Redacted]   may feel threatened by that and based or  [Redacted] experience counseling rape victims she felt    [Redacted]          seemed to fit the pattern of someone who had been sexually assaulted or abused.

*5. When did you learn   [Redacted]was a member of the selection board?  How did you find this out?*

[Redacted]                       stated board membership is secret until the board convenes, then the detailers put out a message. She did not find out   [Redacted]             was on the board until then. While she recognized    [Redacted]               name, no flags were raised until she received the phone calls from  [Redacted]         and         [Redacted]        stated she had not corresponded with the board.

*6. Do you believe these opinions prejudices   [Redacted]         against you and prevented her from carrying out her oath as a member of the selection board?*
[Redacted]                      answered this question with a very strong yes. It was her belief  that [Redacted] did not <u>want</u> to put her opinions aside in order to rate    [Redacted]       solely on the contents of her service record.

2

*7.  Have you ever served on a selection board?  Based on that experience do you feel that one officer can influence the vote of the blard for or against someone's promotion?  Why do you feel this way?*

[Redacted]          stated she had served on appro:Crnately six selection boards. She has seen the process and how it could be perverted if someone ·7.:anted because of the vehic'e of secret voting. She felt     [Redacted]          could have influenced the board by voting 100 for other officers (inflating their score) and then zeroing her record out. She could not believe other board members would have tolerated comments.          [Redacted]          stated she would like to see the votes not be anonymous and be open like the Marine Corps does.

*8.  Selection boards review many outstanding records but can only select a finite number for promotion. Why do you feel*  [Redacted]          *opinions caused you to fail to select rather it simply being a matter of the board not being able to select everyone who was qualified?*

[Redacted]          stated she would agree with this statement if her record had been ranked 25. However, she recalled a conversation Commanding Officer of SUBSCHCOOL [Redacted]  at the time she was passed over. She stated he had offered condolences to her and told her RADM Padgett, Northwest Region, had told him the board could only select 12 and she had been ranked 13. Additionally, she receivtd a letter of condolence from Chaplain Black stating he was "personally disappointed that she did not make it."          [Redacted]          felt this indicated he may have had some suspicions.  Based on the above and the information from other chaplains discussed earlier  [Redacted]                    it was not simply a matter of her record not making the cut.

*9.  Have you had any contact with*    [Redacted]                    *since the selection board reported out?*

[Redacted]          Stated her contact with          [Redacted]    Has been limited mostly to business e-mails and sending reports.          [Redacted]          stated she had sent [Redacted]    a card when her father was ill and she had received a thank you note from her.          [Redacted] sent her an e-mail of condolences when  [Redacted]          was passed over, however, she did not send any congratulations when          [Redacted]    was selected for promotion.

# DEPARTMENT OF DEFENSE
# OFFICE OF INSPECTOR GENERAL

## REPORT OF INVESTIGATION

CASE NUMBER                                         DATE
P98C69119125

MAR 11 1999



## ALLEGED DENOMINATIONAL DISCRIMINATION AND OTHER IMPROPRIETIES: NAVY FISCAL YEAR 1997 AND 1998 SELECTION BOARDS FOR ACTIVE DUTY CHAPLAIN CORPS COMMANDER

Prepared by Program Integrity Directorate

Office of Departmental Inquires

FO/R OF/F/ICI\AL\\ USE ONLY [STRUCK OUT]

07-MC-269 (RMU)
EXHIBIT 29

P98C69119125                                                          4

previous boards and whose records were inferior to those of other eligible officers under consideration.

- One board member made inappropriate, critical remarks about LCDR Aufderheide because of a prior disagreement between that board member and LCDR Aufderheide.

For reasons set forth above, we did not substantiate the allegation that the FY 98 board improperly selected an officer who did not meet Navy physical readiness standards.  Further, we found that the appointment of two Roman Catholic chaplains to the FY 98 board violated no law or regulation and was reasonable given the shortage of potential appointees with requisite backgrounds.

With respect to the remaining allegations, we found some evidence that denominational considerations may have been a factor in selections made by the FY 98 board.  Specifically, we concluded that the [Redacted] Roman Catholic board member may have made comments that were designed to remind fellow board members of the shortage of Roman Catholic chaplains and, because of his concerns in that regard, may have stressed the qualifications of eligible officers who were Roman Catholic priests.  However, the evidence was insufficient to conclude that he made an overt denominational appeal or, more importantly, that, as a result of his comments, denomination took precedence over the qualifications of eligible officers as a selection criterion.  As a result, we concluded that the FY 98 selection of two Roman Catholic chaplains, who were not selected by previous boards, was consistent with law and regulation which pertain to selection board proceedings.

Of consequence to the specific case of LCDR Aufderheide, however, was our determination that a FY 98 board member made adverse comments regarding LCDR Aufderheide that caused another board member to alter his vote to the detriment of LCDR Aufderheide.  Although the board member who allegedly made the adverse comments did not recall making them, we found persuasive the testimony of two other board members and two recorders to the effect that unfavorable information concerning LCDR Aufderheide was, in fact, introduced during board deliberations.  Because that information was based on personal knowledge and had not been included in the information regarding LCDR Aufderheide placed before the board, we concluded that consideration of the unfavorable comments constituted "material error" within the meaning of applicable selection board statutes and regulations.  We recommend that the Secretary of the Navy consider a special selection board because of that error.

In considering all evidence gathered during our investigation, we found little indication of deficiencies in the Navy selection board process.  We do not consider the unfavorable comments made about LCDR Aufderheide as evidence of systemic weakness, but rather an isolated deviation from an otherwise sound process.  Accordingly, we make no recommendations for systemic change.

This report sets forth our findings and conclusions based on a preponderance of the evidence.

FOR OFFICIAL USE ONLY

first and second briefings will be conducted by different griefers (one primary and one secondary briefer).  Records are to be distributed randomly by recorders to voting members for briefing.

Board members work in two rooms–a records review room and the "tank."  All deliberations on the records and all voting occur in the tank, where the summarized record of each eligible officer is projected on a screen while a board member briefs the record.  After each briefing, members may discuss the record under consideration, then each must "vote the record" by depressing one of five buttons in a "sleeve" which hides the voter's hand, ensuring the secrecy of the vote.  The buttons coincide with degrees of confidence the voter has in the record being projected, ranging from zero to 100 in 25-degree increments.[9]

The briefer is responsible for reviewing the entire record of the eligible officer he or she is briefing, and for bringing to the attention of the other board members important points that highlight the eligible officer's career.  The other members review the eligible officer's Officer Summary Record projected onto a screen as the record is briefed.[10] The remainder of the eligible officer's record, to include fitness reports with narratives prepared by rating officers, is available to all board members but is generally reviewed only by the briefers of the record.

After an initial briefing of all records in-zone and above-zone, selection boards generally conduct a "confidence vote" to determine how the records are distributed on a scattergram.[11]  All records schoring above a certain level (a number selected by the  board, usually between 90 and 100) are set aside as "tentative" or "probable" selects.  These records are often selected for promotion without any further discussion.  Likewise, all records below a certain confidence level are set aside as probable nonselects.  The remaining records between these two cut-off points are said to fall in the "crunch."  Normally, multiple briefings and votes, and much discussion, will precede final selection of records from the crunch to fill the remaining available promotion slots.

---

[9] For example, a board member who strongly believes an eligible officer is qualified for promotion might depress the button indicating a 100-degree of confidence.  The member's votes are electronically  tabulated.

[10] The Officer Summary Record is a condensed document, consisting of personal information on the eligible officer–to include age, service dates, education, and awards–and a tabulation of the performance rating the eligible officer has received on fitness reports throughout his or her career.

[11]  Records considered by selection boards fall into three categories based on the eligible officers' dates of rank: in-zone; above-zone; and below-zone.  Records in-zone for a particular board are all those records of eligible officers who were promoted to their current grade during the period between two dates selected by the Secretary of the Navy for that fiscal year's board.  Records above-zone are those of eligible officers who were promoted to their current grade before the earliest date defining the zone, and who have previously been considered and non-selected in a prior year's "in-zone."  Records below-zone are records of eligible officers who were promoted to their current grade after the latest date defining the current in-zone.  Subject to certain restrictions and guidelines prescribed by the Secretary of the Navy in the board precept, selection boards may select for promotion records from any of these three categories.

above-zone.  Personnel from the Officer Promotions Division, Bureau of Naval Personnel, pointed out that an eligible officer's selection opportunities decrease significantly when he or she is nonselected in-zone and moves to above-zone for the next and subsequent selection boards.  Hence, it is reasonable to understand LCDR Aufderheide's implication that his opportunity for selection above-zone was reduced if, in fact, two above-zone selections were reserved for Roman Catholic chaplains.

Assessments of the two Roman Catholic eligible officers selected from above-zone varied among board members and recorders.  One board member testified to being "shocked that we picked someone five times failed to select," but also testified to being "comfortable with the group process."[28]  Another board member told us that he gave one of the selectees from above-zone low confidence votes because of weight control problems in the eligible officer's past.  On the other extreme, [Redacted] stated that, despite multiple nonselections, one of the above-zone selectees' records "screamed at the board" for selection.  One other board member and one recorder pointed out that the same eligible officer had extensive Reserve duty, which had put him at a disadvantage for selection in the active Navy in the past, but that the eligible officer's record was deserving of selection.

In consideration of those differing views, we asked each board member and recorder, as well as projectionists whom we identified as having served the FY 98 board, what comments regarding denomination were made during board proceedings. Again, the testimony was not consistent, although we found some evidence that denominational considerations–specifically the shortage of Roman Catholic priests– were a factor in the above-zone selections made by the FY 98 board.

[Paragraph redacted]


[Redacted]

Further, [Redacted] testified that during preliminary discussions, he specifically instructed members that "faith group" of eligible officers should not be "discussed at all or called attention to when the board convenes."  Four other board members and all recorders remember [Redacted]          admonition to that effect.  When asked whether any member subsequently made an appeal on behalf of any denomination during board deliberations, the board members testified as follows:

---

28  We confirmed that one of the two Roman Catholic selectees had been nonselected by several previous selection boards.  The other, like LCDR Aufderheide, had been nonselected once.

P98C69119125                                                                      34

The board member who allegedly made the unfavorable comments about LCDR Aufderheide confirmed that he had served with LCDR Aufderheide in London and that he had "several arguments, several disagreements with him" at the time. However, the board member denied that LCDR Aufderheide confronted him over alleged alcohol consumption or womanizing, and denied telling LCDR Aufderheide that he would prevent LCDR Aufderheide's selection for promotion. [Rest of paragraph redacted].

The three remaining board members (including [Redacted]) and one recorder stated that they had no memory of adverse comments made about LCDR Aufderheide.

Discussion

Of the four possible irregularities in FY 98 board proceedings that we address above, we concluded that two did not merit further consideration:

- As previously stated, we determined that the failure to meet Navy physical readiness standards does not disqualify an eligible officer for consideration by a selection board. Indeed, we found nothing in law, regulation or precept which identified physical readiness as a matter of particular importance for consideration by selection boards. Accordingly, the standards at some point in his career did not constitute a violation of law or material error which would justify a special selection board for those eligible officers who were not selected.

- Regarding the appointment of two Roman Catholic chaplains to the FY 98 board, we found no law or regulation that precluded such board composition. Further, the preliminary injunction, which gave rise to the allegation that two Roman Catholics on a selection board was improper, was based on Navy policy that was no longer in effect when the FY 98 board was constituted. Finally, the explanation for appointing two Roman Catholic board members in this case was unrelated to their denomination and was reasonable under the circumstances.

With respect to the remaining allegations, we found some evidence that denominational considerations may have been a factor in above-zone selections made by the FY 98 board. Specifically, we concluded that the [Redacted] Roman Catholic board member may have made comments that were designed to remind fellow board members of the shortage of Roman Catholic chaplains and may have supported eligible officers who were Roman Catholic priests because of his concerns in that regard.

FOR OFFICIAL USE ONLY

•

<u>Results of Interview</u>

On 4 February 1998, [redacted],                Naval Air
Warfare Center Aircraft Division, Patuxent River, was [redacted]
telephonically interviewed by Mr. Philip P. Cooper, NAVINSGEN
(NIT-52).  Mr. Cooper advised [redacted]     of the provisions
of the Privacy act of 1974.  [redacted]     provided the
following information under oath, and the interview was tape
recorded.

A few days prior to this interview, [redacted] spoke with
[redacted],          his predecessor in his current position.
At that time, [redacted]    was not aware that [redacted]
had been a member of the FY97 0-5 CHC Promotion Board.  He told
[redacted] that he had been talking to [redacted]
who works for [redacted]    and that [redacted] had
told him that the FY97 Board had considered him for promotion,
that the board members were going to be released from their oath
for purposes of facilitating an investigation.

The FY97 Board in question was the only board of any kind which
[redacted] sat on.  He was present during all the board
deliberations. He thought the board was handled according to the
guidelines of the precept.  However, inasmuch as it was his first
board, there were some things about it that made him
uncomfortable.

There's "sort of a mystique out there:" that boards, as
manifested by the board in question, take records and go over
them with a fine tooth comb, and they "compare this with that and
the value of apples against oranges, and the value of bananas
against pineapples kind of thing."  [redacted]     who was
taking more time than the other board members, would like to have
had more time to review all of the records in more detail.  It's
hard to guess what's going on in the board members' minds and to
know what expertise is being applied to review of the records.
Admiral Holderby, who has sat on a number of boards, can review a
record much faster than anyone else.  There was another chaplain
on that board who is reputed to have sat on many, many boards,
who also could review a record much faster than could
[redacted]  Admiral Holderby talked to [redacted] about his
slowness in reviewing records, saying, "Move along a little
quicker; you're behind everyone else."

A board normally has ten days to conduct its business.  Chaplain
Corps boards are reputed for taking only 2 ½ days.  Since the
Chaplain Corps is relatively small, members of the promotion
boards should have the luxury of being even more judicious about
their reviews and deliberations.

[redacted] opined that he would have constructed the board
membership differently.  Detailers are not normally assigned to
promotion boards.  The Chaplain Corps has two detailers, one
Protestant and one Catholic.  One is generally 0-6 and the other

DEFA00878
07-mc-269 (RMU) EXHIBIT 30

1

is an 0-5.   Two members of the FY97 board,                    and
      at the time the board met, either had orders to the
detailers' office or had been notified that they would be getting
such orders. Such membership generates a perception of conflict
of interest, given the allegiance of detailers to the Chief of
Chaplains office. "Maybe' that's helped fan the flames in the
minds of some people that something askew was going on."
Therefore, had              been President of the Board, he
would not have allowed                          to have been
members.

The Chaplain Corps does not have a lot of African-American 0-6
chaplains. There is a requirement that an African-American
chaplain sit on promotion boards.          does not
believe that the same minority representative should sit on as
many chaplain boards as has              who sat on the Board
in question. The requirement for minority representation on
chaplain boards could be met with minority officers taken from
the line community. Therefore, again for perception reasons, had
              been President of the Board, he would have found
someone other than              to sit on the board as the
minority representative.

              cannot remember specifically what was said during
the discussion of the precept, in regards to the interpretation
of "fully qualified" and "best qualified." He does remember
guidance given in the tank with respect to how to review and
assess the records of minority candidates; the occasion for this
guidance was a briefing given by the non-chaplain member of the
board.

In the tank there were several discussions about officers who had
been to sea a lot and moved around a lot, and who had experience
in the Fleet. [redacted]    does not remember any of the names
of those individuals.  There was, however,, some weight attached
to leadership positions which had been held in direct support of
Fleet Operations.

[redacted]    Is a Southern Baptist.  [redacted]

[redacted] "major sore point" concerns the consideration of
denomination at one point during the proceedings of the board.
It was nothing that he could have gone to the Secretary of the
Navy and said, "This was done illegally."  But it was done "with
such finesse at one point" that he felt that "one officer was
passed over due to "denominational considerations."  This was
serious, given the fact that when a chaplain at the 0-4 level is
passed over, "it's more than just a pass over;" it frequently
means that an officer must leave the Navy.

[redacted],              a Roman Catholic priest, was the last
one selected for promotion during the FY97 board.  The vote had
been tied between him and either [redacted],    a Southern
Baptist, or [redacted]       also a Southern Baptist.

DEFA 00879

[redacted] was selected, but his record was inferior to that of a number of those who had been passed over. [redacted], the Catholic member of the Board, strongly encouraged the board to vote for [redacted]. In spite of the B's on [redacted] fitreps, his congregations loved him, and said that the board needed to give him consideration because he was a hermit for a number of years before entering the chaplain corps and therefore had problems relating to people. During the final stages of discussion, [redacted] suggested that consideration be given to the needs of the chaplain corps, which is "sort of a catch phrase" in the chaplain corps to indicate that the greatest need was for more Catholic chaplains. (All of the board members, with the possible exception of [redacted] understood what [redacted] was implying.) Admiral Holderby, who was sitting next to [redacted] put his hand on his arm to indicate, "Be quiet." If [redacted] had pursued this issue and said blatantly that the board should consider denomination in this case, then [redacted] would have reported the incident to the Secretary of the Navy. The very next vote was overwhelmingly in favor of [redacted] [redacted] left the board "pretty well disgusted over that issue." He thought that what had happened was inappropriate, but nothing he "could raise a red flag over." Admiral Holderby did the right thing, "but the damage had already been done."

[redacted] did not hear anything else during the board's proceedings which indicated that denomination was factored into the deliberations. The President of the Board did not share any philosophy or give any guidance to indicate that denominational balance in the Chaplain Corps should be a consideration.

[redacted] has no reason to say that any of the board members were predisposed to selecting one group of Lutherans over any other.

[redacted] was under the impression that [redacted] , based on his good record, had been selected. After the first session, there was a confidence vote taken. All those who were in the top 96%, approximately 5, were set aside as tentatively selected. [redacted] was under the impression that [redacted] had been in that group.

[redacted] found out that he had been in the first group of selectees; he could only have discovered that fact by a leak from someone on the board.

The recorders passed out the records randomly to various primary briefers. The primary briefers were also secondary briefers for other groups. There was a color code that was used. [redacted], who is a Baptist, gave [redacted] a group of Baptist records which were not included in his primary review, and suggested that he might want to review them. "That was kind of a denominational thing that took [redacted] back a bit," as [redacted] walked over and said, "These are some

DEFA 00880

Baptist records that I thought you'd want to look at now."  This
was out of the norm for what [the board members] did."  The
records were non-minority Baptists.

DEFA 00881

## DECLARATION OF ARTHUR A. SCHULCZ, SR.  CONCERNING THE EXHIBITS ACCOMPANYING THIS MOTION

Pursuant to 28 U.S.C. § 1746, I, Arthur A. Schulcz, Sr., declare as follows:

1.      I am the counsel of record for the Plaintiffs in the three chaplain cases which have been consolidated into *In re Navy Chaplaincy*.  I was also the counsel of record in another chaplain's case, *Wilkins v. United States*, concerning similar issues.  In my role as counsel, I have gathered many documents and reviewed the documents defendants have produced and my plaintiff clients have provided me in support of this action.

2.      Exhibit 1 is a copy of DOD Directive (DODD)1304.19, Subj: Appointment of Chaplains for the Military Departments.  I obtained it from the DOD online electronic publications directory.

3.      Exhibit 2 is a copy of DOD Instruction (DODI) 1304.28, Subj:  Guidance for the Appointment of Chaplains for the Military Departments.  I obtained it from the DOD online electronic publications directory.

4.      Exhibit 3 is a copy of the declaration of Chaplain (Colonel) Richardson, USAF, at that time the Executive Director of the Armed Forces Chaplain Board, in the case of *Rigdon v. Perry* The Declaration was by and on behalf of the DoD defendants which included the defendants here.  I obtained it from counsel for the *Rigdon* plaintiffs.

5.      Exhibit 4 contains extracts from The History of the United States Navy Chaplain Corps, Vol.1 (1778-1939), NAVPERS 15807.  This is an official Navy Document and was provided to me by one of my chaplain clients.

6.      Exhibit 5 is a copy of SECNAVINST 1730.7B, Subj: Religious Ministry Support Within the Department of the Navy.  I obtained it from the U.S. Navy's online electronic publications

database.

7.      Exhibit 6 is a copy of Naval Regulation Chapter 11, Section 4, which includes regulations 1131, 1137, 1140 (capture by the enemy) and 1141 (Code of Conduct). I obtained it from the Navy's electronic online a publication database.

8.      Exhibit 7 is a copy of OPNAVINST 3461.6 , Subj:  Enemy Poisoners of War, Retained Personnel, ... and other Detainees.  I obtained it from the Navy's electronic online publication database.

9.      Exhibit 8 is a copy of OPNAVINST 1730.1, Chaplains Manual.  I obtained it from the Navy's electronic online publication database.

10.      Exhibit 9 is a copy of SECNAVINST 1000.9, Subj: The Code of Conduct (the "Code"), with Executive Order 10631 (8/17/55) as modified by EO 12017 (11/3/1977).  I obtained it from the Navy's electronic online publication database.

11.      Exhibit 10 is DODI 1300.21, Subj: Code of Conduct (CoC) Training and Education. I obtained it from the DOD online electronic publications directory.

12.      Exhibit 11 contains extracts from Navy Level B Code of Conduct Training: "Legal Aspects of Evasion and Captivity", and "Organization During Captivity", p. 4 of 4, addressing Section IV of the Code of Conduct.  It was provided to counsel by a plaintiff who was undergoing Code of Conduct training and noticed the inconsistency between the training emphasizing chaplains cannot command any personnel and defendants' arguments chaplains were like all other officers.

13.      Exhibit 12 Addendal Declaration by Dr. Harald R. Leuba, Ph.D.  Dr. Leuba is the Plaintiffs' statistical expert.  A copy of the Addendal has been provided to the defendants.

14.    Exhibit 13 is the Compendium Declaration of Harald R. Leuba, PhD., Statistical Analysis of Navy promotions and Chaplain Corps Personnel policies including SER from 1981 to 2002.

15.    Exhibit 14 is a copy of "Promotions in the Chaplain Corps", March 2000 Study by the Center for Naval Analysis, a civilian organization which does analysis for the Navy and other defense agencies. Defendants produced a copy in discovery.

16.    Exhibit 15 is a copy of "The Siskin Conjecture" by Dr. Harald R. Leuba, Ph.D. It has been provided to defendants.

17.    Exhibit 16 is a copy of "Do Denominational Representatives Acting as Government Decision-makers Make Denominationally Biased Choices When Awarding or Denying Benefits to Other Denominational Representatives? A statistical analysis declaration" by Harald R. Leuba, Ph.D. It is a statistical analysis examining the relationship between chaplains as decision-makers, their denomination and the results of those decisions. It is been provided to defendants.

18.    Exhibit 17 is a copy of Dr. Leuba's "September 2006 *Larsen* Withdrawal & Correction Declaration", a document produced for and used in the case of *Larson v. U.S. Navy*.

19.    Exhibit 18 is a copy of Table QE-6 from Withdrawal and Correction Declaration by Dr. Harald R. Leuba, Ph.D.; *see* statement number 18 above.

20.    Exhibit 19 is a list of abbreviations identifying each endorser or denomination which corresponds to the Navy's additonal qualification designator given to each chaplain to indicate his endorser or denomination. It was created from a document which defendants produced in discovery.

21.    Exhibit 20 is a chart showing Non-liturgical accession rates by denomination according to the number of candidates for accession as Navy chaplains from each denomination, ranked by the

number of chaplain candidates each endorser or denomination provided 1985-2005.  It is produced from Exhibit 18, Table QE – 6, and merely rearranges the order of denominations or endorsers according to the number of candidates whom they endorsed as potential Navy chaplains and which the Navy evaluated under its CARE board process.

22.    Exhibit 21 is a chart similar to Exhibit 20, based on Compendium Table QE – 6, shows ranked according to the percentage of candidates the CARE board recommended for accession.

23.    Exhibit 22 contains extracts of Defendants' Lesson Plan for Level A Code of Conduct Training, required of all Navy personnel.  One of the plaintiffs provided it to counsel

24.    Exhibit 23 ia copy of defendants' arguments  in *Wilkins v. United States*, 99cv1579 (S.D. Cal.) that chaplains from specific faith groups were necessary for valid boards

25.    Exhibit 24 is a list of abbreviations identifying endorsers or denominations by their accession tier (I-III) indicating defendants' favored denominations for CARE board memberships.  It uses the abbreviations used by Dr. Leuba and defendants to identify endorsers and/or denominations.

26.    Exhibit 25 is a list of abbreviations identifying endorsers or denominations by their promotion tier (I-IV) indicating defendants' favored denominations for promotion board memberships.

27.    Exhibit 26 is a copy of RADM Barry Black's Testimony to the Navy Inspector General (NIG) in its investigation into allegations of misconduct on the FY 2000 CHC Captain promotion board. It was part of the NIG's investigation into complaints by Commander Washburn she was discriminated against by the female Chaplain Captain promotion board member and was obtained under FOIA.    Defendants  made the redactions..

28.    Exhibit 27 is a copy of the Navy Inspector General's 11/6/2000 lettre to Senator R.

Santorum reporting it had verified CDR Washburn's allegations of misconduct on the FY 2000

CHC Captain promotion board.  It was produced as part of the response to the FOIA request

identified in paragraph 27 above.    Defendants  made the redactions..

29.    Exhibit 28 is a copy of CDR Washburn's Testimony to the Navy Inspector General in its

investigation into her allegations of misconduct on the FY 2000 CHC Captain promotion board.

Was obtained under the FOIA request described in paragraph 27 above.   Defendants  made the

redactions..

30.    Exhibit 29 contains extracts from the 3/11/ 99 DODIG Investigation Report P

98C69119125, "Alleged Denominational Discrimination and other improprieties, Navy Fiscal

Year 1997 and 1998 Selection Boards for Active Duty Chaplain Corps Commander".

It was obtained under FOIA and produced by defendants.  Defendants made all the redactions.

31.    Exhibit 30 is a copy of the testimony to the NIG investigating the FY 97-98 Chaplain

Commander promotion boards by a board member for the FY97 Commander Chaplain

promotion board.  It was produced under discovery.  Defendants made the redactions.

32.    I make this declaration under penalty of perjury, it is true and accurate to the best of my

ability, and it represents the testimony I would give if called upon to testify in a court of law.


July 18, 2008                            _____/S/_____

                                        Arthur A. Schulcz, Sr.
                                        Counsel for Plaintiffs
                                        2521 Drexel St.
                                        Vienna, VA 22180
                                        703-645-4010

07-mc-269(RMU)
EXHIBIT 31

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE: NAVY CHAPLAINCY | ) ) ) ) | Case No. 1: 07-mc-269 (RMU) |

### PLAINTIFFS' LIST OF EXHIBITS
### IN SUPPORT OF THEIR RULE 54(B) MOTION TO ALTER OR AMEND
### THE COURT'S 2002 INTERLOCUTORY DECISION

July 18, 2008

ARTHUR A. SCHULCZ, SR.
Law Office of Arthur A. Schulcz, Sr., PLLC
Attorney for the Plaintiffs
D.C. Bar No. 453402
2521 Drexel Street
Vienna, VA 22180 703-645-4010:
FAX 703-645-4011

Of Counsel:
Douglas McKusick, Esq.
THE RUTHERFORD INSTITUTE
P.O. Box 7482
Charlottesville, VA 22906-7482

**EXHIBIT LIST FOR PLAINTIFFS' RULE 54(b) MOTION TO ALTER OR AMEND**

Exhibit No.          Subject or Topic

Exhibit 1        DODD 1304.19, Subj: Appointment of Chaplains for the Military Departments

Exhibit 2        DODI 1304.28, Subj:  Guidance for the Appointment of Chaplains for the Military Departments

Exhibit 3        *Rigdon v. Perry* Declaration by Chaplain (Colonel) Richardson, USAF,  on behalf of the DoD defendants

Exhibit 4        Extracts from The History of the United States Navy Chaplain Corps, Vol.1 (1778-1939), NAVPERS 15807

Exhibit 5        SECNAVINST 1730.7B, Subj: Religious Ministry Support Within the Department of the Navy

Exhibit 6        Naval Regulation Chapter 11, Section 4, 1131, 1137, 1140 (capture by the enemy) and 1141 (Code of Conduct)

Exhibit 7        OPNAVINST 3461.6 , Subj:  Enemy Poisoners of War, Retained Personnel, ... and other Detainees

Exhibit 8        OPNAVINST 1730.1, Chaplains Manual

Exhibit 9        SECNAVINST 1000.9, Subj: The Code of Conduct (the "Code"), with Executive Order 10631 (8/17/55) as modified by EO 12017 (11/3/1977)

Exhibit 10      DODI 1300.21, Subj: Code of Conduct (CoC) Training and Education

Exhibit 11      Extracts from Navy Level B Code of Conduct Training: "Legal Aspects of Evasion and Captivity", and "Organization During Captivity", p. 4 of 4.

Exhibit 12      Addendal Declaration by Dr. Harald R. Leuba, Ph.D.

Exhibit 13      Compendium Declaration Dr. Harald R. Leuba, Ph.D.

Exhibit 14      "Promotions in the Chaplain Corps", March 2000 Study by Center for Naval Analysis

Exhibit 15      "The Siskin Conjecture" by Dr. Harald R. Leuba, Ph.D.

i

Exhibit 16    "Do Denominational Representatives Acting as Government Decision-makers Make Denominationally Biased Choices When Awarding or Denying Benefits to Other Denominational Representatives?  A statistical analysis declaration" by Harald R. Leuba, Ph.D.

Exhibit 17    "September 2006 *Larsen* Withdrawal & Correction Declaration" by Dr. Harald R. Leuba, Ph.D.

Exhibit 18    Table QE-6 from Withdrawal and Correction Declaration Dr. Harald R. Leuba, Ph.D.

Exhibit 19    List of Abbreviations identifying each endorser or denomination which corresponds to the Navy's additonal qualification designator

Exhibit 20    Accession rates by denomination according to the number of candidates for accession as Navy chaplains from each denomination, ranked by the number of chaplain candidates each endorser or denomination provided 1985-2005

Exhibit 21    1985-2205 Non-liturgical denomination accession rate by percentage of candidates recommended by the CARE board for accessionaing as Navy chaplains, ranked from highest % to lowest

Exhibit 22    Extracts of Defendants' Lesson Plan for Level A (all personnel) Code of Conduct Training,

Exhibit 23    Defendants' arguments chaplains from specific faith groups were necessary for valid boards in *Wilkins v. United States*, 99cv1579 (S.D. Cal.)

Exhibit 24    List of abbreviations identifying endorsers or denominations by their accession tier (I-III) indicating defendants' favored denominations

Exhibit 25    List of abbreviations identifying endorsers or denominations by their promotion tier (I-IV) indicating defendants' favored denominations

Exhibit 26    RADM Barry Black's Testimony to the Navy Inspector General in its investigation into allegations of misconduct on the FY 200 CHC Captain promotion board

Exhibit 27    Navy Inspector General's 11/6/2000 lettre to Senator R. Santorum reporting it had verified CDR Washburn's allegations of misconduct on the FY 200 CHC Captain promotion board

Exhibit 28    CDR Washburn's Testimony to the Navy Inspector General in its investigation into her allegations of misconduct on the FY 200 CHC Captain promotion board

Exhibit 29      Extracts from 3/11/ 99 DODIG Investigation Report P 98C69119125, "Alleged Denominational Discrimination and other improprieties, Navy Fiscal Year 1997 and 1998 Selection Boards for Active Duty Chaplain Corps Commander"

Exhibit 30      FY97 Active Duty Chaplain Corps Commander board member's 2/4/98 testimony to the Naval Inspector General

Exhibit 31      Declaration of Arthur A. Schulcz, Sr.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE: NAVY CHAPLAINCY | ) | Case No. 1: 07-mc-269 (RMU) |

## [proposed] ORDER GRANTING PLAINIFF'S RULE 54(b) MOTION TO ALTER OR AMEND

Before the Court is the plaintiff's motion for an order under Fed. R. Civ. P. Rule 54(b) ("Rule 54(b)") requesting the Court alter or amend its 2002 decision in *Adair v. England*, 183 F.Supp.2d 31 (D.D.C. 2002) dismissing several of plaintiffs' claims.  Plaintiffs have met their Rule 54(b)'s burden; their new evidence shows chaplains serve on selection boards as denominational representatives.  Accordingly, the Court GRANTS plaintiffs' motion and hereby vacates the Court's dismissal in *Adair,* 183 F.Supp.2d at 60-62 of the *Adair v. Winter* and *Chaplaincy of Full Gospel Churches v. Winter* plaintiffs' claims*,* and its decision that *Larkin v. Grendel's Den*, 459 U.S. 116 (1982), does not apply to chaplains serving as chaplain selection board members, *see id.* at 61-62.

The Court further ORDERS the parties to confer and provide within 21 days of this Order a partial summary judgement briefing schedule to address the appropriate issues arising from the grant of this Motion.

It is so ORDERED, this _____ the day of_____, 2008.

_____
RICARDO M. URBINA
U.S. DISTRICT COURT JUDGE

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
|  | ) |  |
| IN RE: NAVY CHAPLAINCY | ) | Case No. 1: 07-mc-269 (RMU) |
|  | ) |  |
|  | ) |  |

**[proposed in the alternative]**

## ORDER GRANTING PLAINIFF'S RULE 54(b) MOTION TO ALTER OR AMEND

Before the Court is plaintiffs' motion in the alternative for an order under Fed. R. Civ. P. Rule 54(b) directing entry of a final judgment on the dismissal of plaintiffs' claims in the Court's decision in *Adair v. England*, 183 F.Supp.2d 31, 62 (D.D.C. 2002), and a ruling that there is no just reason for delay.

For the reasons cited in plaintiffs' Memorandum supporting their Motion, the Court GRANTS plaintiffs' request. The Court finds its cited ruling is a final judgment under Rule 54(b) and further finds there is no just reason for delay.

It is so ORDERED, this _____ the day of_____, 2008.

_____
RICARDO M. URBINA
U.S. DISTRICT COURT JUDGE