## IN THE UNITED STATES DISTRICT COURT
## FOR THE  DISTRICT OF COLUMBIA

DAVID L. GIBSON )
  6008 Yellow Rose Drive )
  Pensacola, FL  32526 )
   and )
 )
RICHARD L. ARNOLD )
  13055 Fringetree Drive, #E )
  Jacksonville, FL  32246 )
   and )
 ) CASE  NO. 06cv1696 (GK)
RAY A. BAILEY )
  345 Wilson Dr., )
  Havelock, North Carolina, 28532 )
   and )
 )
RICK P. BRADLEY )
  2580 Grummer Lane )
  Conway, Ark. 72034 )
   and )
 )
GEORGE P. BYRUM )
  3421 Anderson Drive )
  Winston-Salem, NC  27127 )
   and )
 )
ANDREW CALHOUN )
  3269 East Bonnie Drive )
  Oak Creek, WI  53154 )
   and )
 )
TIMOTHY J. DEMY )
  7 Ellen Road )
  Middletown, RI  02842 )
   and )
 )
PATRICK T. DONEY )
  121 Buckhorn Dr. )
  Greenville, SC 29608 )
   and )
 )

JOSEPH E. DUFOUR                          )
    30138 Lilac Rd.                       )
    Valley Center, CA 92082              )
        and                           )
                                      )
FLOYD C. ELLISON                          )
    535 East J Street                    )
    Chula Vista, CA  91910               )
        and                           )
                                      )
ALAN GARNER                               )
    7834 W. Hearn Rd.                    )
    Peoria, AZ  85381                    )
        and                           )
                                      )
JOHN GORDY                                )
    516 Sage Road, North                 )
    White House, TN  37188               )
        and                           )
                                      )
WILLIAM A. HATCH, JR.                     )
    2245 Autumn Rd.                      )
    Poplar Bluff, MO 63901               )
        and                           )
                                      )
GARY HEINKE                               )
    2030 Rockvale Road                   )
    Lancaster, PA  17602                 )
        and                           )
                                      )
ROBERT L. HENDRICKS                       )
    243 Patricia                         )
    San Antonio, TX  78216               )
        and                           )
                                      )
FRANK JOHNSON                             )
    2789 Noble Fir Court                 )
    Woodbridge, VA  22192                )
        and                           )
                                      )
LAURENCE W. JONES                         )
    104 River Reach Drive West           )
    Swansboro, NC  28584                 )
        and                           )
                                      )

SAMUEL DAVID KIRK                              )
    4627 Rock Elm Woods                        )
    San Antonio, TX  78249                     )
          and                              )
                    )

FRANK S. KLAPACH                               )
    3810 S.E. Conifer Park Drive               )
    Port Orchard, WA  98366                    )
          and                              )
                    )

THOMAS G. KLAPPERT                             )
    7699 Kuhn Road                             )
    Greencastle, PA  17225                     )
          and                              )
                    )

JAN C. KOHLMANN                                )
    14508 Northeast Cash Rd.                   )
    Lawton, OK 73507                           )
          and                              )
                    )

ALLEN L. LANCASTER                             )
    172 North Liberty Springs Rd.              )
    Suffolk, VA 23434                          )
          and                              )
                    )

JAMES LOOBY                                    )
    1713 County Rd. 318                        )
    Early, TX 76802                            )
          and                              )
                    )

MANUEL MAK                                     )
    5 East Columbia St.                        )
    Danville, IL  81832                        )
          and                              )
                    )

WALKER E. MARSH, JR.                           )
    125 Whisperwood Blvd.                      )
    Slidell, LA  70458                         )
          and                              )
                    )

DAVID MITCHELL                                 )
    142 Prospect Street                        )
    Providence, RI  02906                      )
          and                              )
                    )

3

JAIRO MARINO                          )
    2009 Oak Brook Dr.            )
    Portland TX 78374             )
          and                )
                )
DAN NICHOLS                          )
    809 Malibu Drive             )
    Columbia, SC  29209          )
          and                )
                )
EDITH RENE PORTER-STEWART            )
    1061 Agate Street, Apt. B    )
    San Diego, CA  92109         )
          and                )
                )
JAMES V. PRINCE                      )
    3710 Cain St.                )
    Wilmington, NC  28409        )
          and                )
                )
JAVIER ROMAN                         )
    701 Creek Water Terrace  Apt 209  )
    Lake Merry, FL, 32746        )
          and                )
                )
LLOYD SCOTT                          )
    14 Heath Spur                )
    Ledyard, CT  06339           )
          and                )
                )
GARY PAUL STEWART                    )
    220 Walking Trail Dr.        )
    Concord, VA                  )
          and                )
                )
FRED A. THOMPSON, JR.                )
    2853 South Nephrite Way      )
    Meridian, ID 83642           )
          and                )
                )
GLENN THYRION                        )
    102 Burk                     )
    Crane, TX  79731             )
          and                )
                )

ARMANDO TORRALVA                          )
    6637 La Bianca Drive                   )
    Corpus, Christi, TX  78414            )
           and                         )
                            )

THOMAS DANIEL TOSTENSON                    )
    1822 West Brookwood Court             )
    Phoenix, AZ  85045                    )
           and                         )
                            )

JAMES TWAMLEY                             )
    6423 Verde Vista Court                )
    Klammath Falls, OR  77603             )
           and                         )
                            )

THOMAS R. WATSON                          )
    2804 Spoons Chapel Road               )
    Ashboro, NC  27205                    )
           and                         )
                            )

WILSON W. WINEMAN                         )
    918 Heather Woods Dr,                 )
    Nampa, ID 83686                       )
           and                         )
                            )

CHRIS XENAKIS                             )
    29 North Main St.                     )
    Cortland, NY 13045                    )
           and                         )
                            )

THE ASSOCIATED GOSPEL CHURCHES            )
    209 Pine Knoll Dr. Suite B            )
    Greenville, SC 29609                  )
                            )
              Plaintiffs,               )
                            )
             v.                          )
                            )

THE UNITED STATES NAVY                    )
    Washington, D.C. 20530                )
           and                         )
                            )

THE SECRETARY OF THE NAVY )
    Room 4E686 - The Pentagon )
    Washington, D.C. 20350-1000 )
                      )
        Defendants. )
_____ )

## CLASS ACTION
## FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTION AND EQUITABLE RELIEF, AND AN AS APPLIED CONSTITUTIONAL CHALLENGE TO 10 U.S.C. § 612 TO ADDRESS DEFENDANTS' UNCONSTITUTIONAL RELIGIOUS DISCRIMINATION, AND VIOLATIONS OF THE FIRST AND FIFTH AMENDMENT AND THE RELIGIOUS FREEDOM RESTORATION ACT

## I. INTRODUCTION

1.    The Complaint

a.    This a federal class action by Non-liturgical  Navy chaplains challenging religious discrimination and violations of the First and Fifth Amendments and the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000-bb, *et seq*,  in the U.S. Navy Chaplains Corps (the "CHC") promotion, accession, assignment, retention and separation systems and decision making processes.  This includes: (i) the unconstitutional composition of CHC chaplain selection boards and their discriminatory practices; (ii) the unconstitutional delegation to denominational representatives, *i.e.*, chaplains, of discretionary civic authority to award, deny or terminate government benefits for other denominational representatives; (iii) the establishment of forbidden denominational preferences; (iv) the establishment of illegal religious quotas for Navy chaplain promotions and career opportunities; (v) the establishment of a preferred religious tradition and a religious patronage system in the CHC; and (vi) creation of a pervasive climate of bias, animosity and deceit toward plaintiffs and members of the class, and (vii)

the use of chaplain board members on administrative or non-statutory boards which

award or deny government benefits to other chaplains without guarantees the power is

ued only for secular, neutral and non-ideological purposes.

b.      This is raises an "as applied" constitutional challenge to 10 U.S.C. § 612 which

requires selection boards contain at least one member of the category under consideration.

The Navy's chaplain promotion system uses small boards of five or six, or recently seven,

board members, including chaplains, who vote in secret with no accountability or

guarantees of religious neutrality in making selection decisions.  Because chaplains are

denominational representatives on loan to the Navy from their faith groups, the delegation

of discretionary government power to persons defined by their religious identity with no

guarantees against abuse, prejudice or misconduct violates the Establishment Clause.

c.      Exhibit 1 is an index of the Complaint's topics and counts.

d.      The issues involved in this litigation involve legal and constitutional questions

uniquely suited for judicial review and resolution, do not involve or require unique

military expertise or judgment, do not require exhaustion of administrative remedies as

the issues are legal and constitutional, and do not involve judicial interference with

military operations.

## II.  JURISDICTION AND VENUE

2.      Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1343, 1346, 5 U.S.C. § 702

and 42 U.S.C. § 2000-bb.  A declaration of the rights of these and other Navy Non-liturgical

chaplains and the constitutionality of 10 U.S.C. § 612 as applied to chaplain promotion boards,

various Navy and CHC practices or policies is sought pursuant to 28 U.S.C. §§ 2201 and 2202.

Venue is appropriate under 28 U.S.C. § 1391(e) since the defendants are a federal agency and have offices and facilities located in Washington, D.C..

### III. PARTIES

### A. Plaintiffs

3.    a.    Individual Plaintiffs.

The following named individual plaintiffs bring this action on behalf of themselves and as a class action on behalf of all other persons similarly situated in the class defined below in ¶ 9:

1.    CDR DAVID L. GIBSON.  CH Gibson resides at 6008 Yellow Rose Dr., Pensacola, FL 32526.  He is endorsed by the Church of God, Cleveland, Tennessee, a pentecostal, non-liturgical denomination.  He was commissioned as a chaplain in July 1984.  He began active duty October 31, 1986, and was subsequently promoted to LCDR. Despite outstanding fitness reports and a wide variety of challenging assignments, he was not selected for Commander by the FY99 and subsequent promotion boards.  At the same time it denied CH Gibson promotion to Commander, the Navy selected other chaplains with inferior records based on the Navy's bias against non-liturgical chaplains and preference for liturgical chaplains.

CH Gibson was subsequently selected by the FY03 Commander board.  That board had as a member an officer who had formerly rated and/or supervised CDR Gibson. CDR Gibson believes that had line officers been making the selection decisions when he was first considered for CDR, he would have been selected based on his record.  CH Gibson's promotion history reflects that of other pentecostal and charismatic Navy Chaplains.  This can be attributed to the CHC's Catholic reserved seat policy and stacking

8

boards with liturgical chaplains, many of whom disapprove of pentecostal theology and worship practices.

2.    RICHARD L. ARNOLD.  CH Richard Arnold lives at 13055 Fringetree Dr., #E, Jacksonville, FL, 32246.  CH Arnold was commissioned in the Theological Student Program as an Ensign in 1982 and entered active duty as a Navy chaplain in August 1987.  He was endorsed by the Southern Baptist Convention and entered the Navy with 3 years prior enlisted service in the Air Force where he rose to the rank of Sargent.  After various assignments, he was selected to go to postgraduate school in 1993 and completed his work in 1994.  During this time he was promoted to LCDR.

He then reported to Mayport, FL where he worked under the supervision of command chaplain Charles Eis, a Roman Catholic.  CH Eis' strange behavior and conduct led CH Arnold and another chaplain at Mayport, LCDR Aufderheide, to intercede with the commanding officer to have CH Eis psychologically evaluated for his fitness for service.  As a result of his involvement in an attempt to help CH Eis and protect his command and the Navy, CH Arnold was banished from the chapel by CH Eis and was accused by Catholics as having "destroyed Charlie's career."  CH Eis was later selected for Selective Early Retirement.

An acquaintance notified CH Arnold that CH (CAPT) Oddo, a Roman Catholic, made a comment at a Senior CHC leadership meeting that "There is no place in the navy for Rich Arnold."  This statement is without foundation and was a message from the Catholic CH Oddo to others, particularly Catholics, who might serve on promotion boards that CH Arnold was "damaged goods."  This statement had no other context except retaliation, given CH Arnold's outstanding record and service.  However, in

assignments following Mayport, the CHC detailed CH Arnold to LT (O-3) billets although he was a LCDR.  Because the promotion system operates with secret votes and small numbers, CH Arnold believes he was blackballed either in retaliation for his role in having CH Eis evaluated, or as a result of the false information and character assassination related to his role in reporting a senior chaplain's misconduct and strange behavior.  The BCNR denied his appeal of his non-selection to CDR.  CH Arnold is now retired.

   3.  LCDR RAY A.  BAILEY.  CH Bailey lives at 345 Wilson Dr., Havelock, North Carolina, 28532.  He is endorsed by the Evangelical Free Church of America, a non-liturgical faith group.  He entered active duty in January 1994.  The Navy's illegal and egregious prejudice against Non-liturgical faith groups and their chaplains has illegally prejudiced CH Bailey's career.  While stationed at the Naval Support Activity, Naples, Italy, the liberal Episcopalian command chaplain, CDR Gary Parker, made the general  comment to CH Bailey and the other Non-liturgical  chaplains under his supervision, "You talk about Jesus too much in your sermons."  This was a clear warning to CH Bailey and other Non-liturgical chaplains that CH Parker considered the provisions of 10 U.S. C. § 6031, which allows chaplains to conduct worship services according to the customs of their church, to be void.

   On the USS EMORY S. LAND (May-October 1999), liturgical Command CH Lanz  required CH Bailey to preach from the liturgical calendar and conduct liturgical services although CH Bailey is Non-liturgical.  CH Lanz said on numerous occasions, "the Navy should go to one style of worship, mine," Presbyterian and liturgical.

Throughout his Navy career, CH Bailey has been hindered by Liturgical Protestant senior chaplains who have tried to force his and all other ministry into a narrow liturgical format or mode regardless of the religious needs or preferences of the population he served. This prejudice is further reflected in the Navy's failure to consider him fairly for promotion. The Navy has injected bias and prejudice against Non-liturgical chaplains such as CH Bailey in the CHC promotion and career process, as evidenced in the flawed board composition and procedures. After being FOS numerous times, CH Bailey was promoted to LCDR in 2003. Reportedly, he was selected after the Navy eliminated the division between "above-zone" (previously not selected) and "in-zone". If true, this supports CH Bailey's belief he should have been selected when first considered, but was prejudiced by the CHC's bias against Non-liturgicals.

4.      LT RICK P. BRADLEY.  CH Bradley currently resides at 2580 Grummer Lane, Conway, Arkansas.  He was endorsed by the Southern Baptist Convention, commissioned and entered active duty as a chaplain in December 1997. Following Chaplain School and training at Camp Lejeune, he was sent to Guam for his first assignment to the sub tender USS FRANK CABLE, AS40.  He left Guam in December 1999 and transferred to Paris Island for the period January 2000 to September 2003, when he was reassigned to Marine Air Group at Beaufort, SC.  As a result of a physical in his pre-deployment procedures, he was discovered to have an unknown blood disease.  This led to a two-year period of multiple visits to Walter Reed Army Medical Center, Bethesda Naval Medical Center, and Johns Hopkins University, which finally determined the cause of his medical manifestations was a reaction to anthrax.  This made him ineligible for deployment and resulted in a medical board which subsequently

discharged him.  However, during the time when he was being evaluated, he went before a promotion board in March of 2002 for FY03, for which he FOS to LCDR despite outstanding fitness reports.

Prior to his revisiting Walter Reed, he worked with the Deputy Command Chaplain to ensure his file that appeared before the board was complete.  However, when he reviewed his Officer Personal Data Sheet after the board, he found it had been substantially altered with blanks and other incorrect information, so much so that it did not accurately reflect in any meaningful way his history, education or other information relied upon by the board.  There is no explanation as to how this information was corrupted.  In attempting to resolve this, he was told by his command chaplain he needed to talk to the Chief of Chaplains office.  That office told him he needed to work with his command chaplain.  Before this could be resolved, CH Bradley was medically discharged.  During his time on active duty, he was reprimanded by his senior chaplain for praying in Jesus' name at a graduation while assigned to Paris Island, although it is a practice consistent with his faith group's beliefs and practices.

CH Bradley's FOS to LCDR is believed to be the result of prejudice agasinst him for his consistent, effective performance and insistence on following the dictates of his conscience, which included praying in the name of Jesus, as authorized by his faith group.

5.     CDR GEORGE P. BYRUM.  CH Byrum lives at 3421 Anderson Dr., Winston-Salem, NC 27127.  He began his military career on March 24, 1972. Completing Navy flight school, he served as a Naval aviator until he entered the Theological Student Program in 1979.  Graduating from Southwestern Baptist Theological Seminary, he became a Navy chaplain in 1981, endorsed by the Plymouth

Brethren, a Non-liturgical faith group. During his career as a chaplain, he was selected for post-graduate schooling and earned a Masters Degree in pastoral counseling. CH Byrum's outstanding performance is indicated by the fact that he never had less then an "A" on his 26 observed fitness reports, was rated in the top 1% and 25 times recommended for "early promotion." CH Byrum had two combat tours, serving on the USS KENNEDY during the Beirut (Lebanon) conflict and in Desert Storm with the 4th Marine Expeditionary Brigade. He was selected for the Chaplain Advanced Course during which he completed a second Masters Degree. He was awarded the Humanitarian Service Medal for his work as the command chaplain of the Naval Air Station Guam for his leadership in relief work following Typhoon Omar in 1993. Despite his outstanding record, selection for postgraduate school and two additional graduate degrees, the Chaplain Corps FY96 SERB selected CH Byrum for involuntary retirement effective July 31, 1996, before he was considered for promotion to CAPT. CH Byrum challenged his selection for SER through the BCNR, using the same arguments presented here, that the reservation of a selection board seat for a Catholic, for both promotion and SER boards, was illegal. The BCNR rejected his petition.

Analysis of the FY96 SER candidate career histories shows while choosing CH Byrum with no FOS for SER, the board retained four of the six chaplains with numerous FOS to CAPT, including the chaplain with the most FOS (CH Palmer) who had about one year active service left. This is contrary to the Secretary's SER criteria for retention which emphasized future potential for service. CH Byrum believes the CHC selected him for involuntary retirement on the basis of his faith group and because his outstanding record as a Non-liturgical chaplain was a threat to the Liturgical domination of the CHC.

No other explanation is apparent given the records of those the CHC retained compared with CH Bryrum's.

6. REV. ANDREW CALHOUN. Rev. Calhoun currently resides at 3269 East Bonnie Drive, Oak Creek, Wisconsin. He began his career as a Navy chapalin commissioned as an Ensign in 1984 in the Theological Student Program and endorsed by the Church of God in Christ, a Non-liturgical denomination. He was subsequently given a superceding appointment to the CHC in 1988, came on active duty in 1990 and was assigned to the Naval Training Center, Great Lakes, Illinois. He was then assigned to the USS BAINBRIDGE. Because of his involvement with a community service program, his ship was recognized as having the most outstanding community service programs. In fact, the name of the Navy award given to ships for community service is now known as the USS BAINBRIDGE Award, a recognition of the contribution CH Calhoun made to both the Navy and his ship. His subsequent assignments included a tour at the Milwaukee, Wisconsin Coast Guard Station followed by postgraduate school, where he obtained a MTh degree, a reassignment to Okinawa for a one year unaccompanied tour, and then to Little Creek, Virginia. He was promoted to LCDR in 1994.

Two weeks prior to the FY2001 CDR board, he received a revised fitness report delivered to him by FedEx which substantially reduced his final fitness report for the period he was at the Milwaukee Coast Guard Station. This report was written outside the window in which corrections were authorized to be made and he received no warning or opportunity to rebut it, nor an explanation of the basis for the change. He came to believe this report was instigated by RADM Iasiello since a letter accompanying the report indicated it had the approval of RADM Iasiello, who also served as the president of the

promotion board before which the report was submitted.  The apparent unfairness of the later report which undermined his chances for promotion, the complicity of RADM Iasiello, who should have recused himself from consideration as president given his involvement in the approval of the revised report, and subsequent difficulty in attempting to resolve the question, convinced CH Calhoun the Navy had become hostile to him, there was no place for him in the Navy CHC and he submitted his resignation.   The CHC's animosity against him is further exemplified in its rejection of CH Calhoun's request for release from the Navy in the early summer of 2001 to pursue civilian employment opportunities and minimize the impact of transition on his family.  The Navy would not release him until February of 2002.  The Navy's treatment of CH Calhoun is typical of the second class treatment afforded many Non-liturgicals and reflects a determined effort to insure that gifted and qualified Non-liturgicals are removed from the service.

7.     CH (CDR) TIMOTHY DEMY.  CH Demy resides at 7 Ellen Road, Middletown, Rhode Island.  He was commissioned in the CHC in 1981 and came on active duty in July 1984.  He is endorsed by the Bible Churches Chaplaincy.  He was promoted to LCDR in 1988 and CDR in 1993.  CH Demy was the honor grad for the Chaplain Advanced Course and was assigned to the Chief of Chaplains Office in the summer of 1990 where he worked in the detailing office first as admin officer and then as the junior detailer.  After a tour with the Coast Guard Headquarters, he was assigned to the Naval Chaplain School as the supervisory course officer, followed by attendance at the Naval War College from March 1998 to 99.  He was the first chaplain to be

designated the honor graduate.  He was subsequently assigned to teach at the Naval War College.

CH Demy, although promoted to CDR, FOS to CAPT.  He was told this was due to "lack of operational time."  However, his fitness reports all show top 1%, he worked for two Chiefs of Chaplains, and he was specifically requested to go to the Chaplain School and the Naval War College.  Any lack of "operational" time was not due to a failure on his part, but a result of the system which assigned him to these important positions based on his demonstrated abilities and skills.  The failure to select CH Demy in light of his outstanding record can only be attributed to denominational biases against Non-liturgicals.  CH Demy was selected for involuntarily retirement by the FY08 Commander selective early retirement ("SER") Board and retired in June 2008.

8.      PATRICK T. DONEY.  CH Doney resides at 121 Buckhorn Dr., Greenville, SC 29608.  The Navy turned down CH Doney's first application to become a Navy chaplain in1971.  He was endorsed by the Associated Gospel Churches.  After the intervention of his endorser and Senators, who were on the Armed Forces Committee, the Navy offered him a commission in the Naval Reserve.  Several years later at a chaplain's convention, CAPT Eugene O'Brien, a Catholic priest who ran the accessions branch at the time CH Doney originally applied, told CH Doney: (1)  the reason the Navy turned him down the first time was because he was a graduate of Bob Jones University; and (2) he  was commissioned only because several senators with important posts on the Armed Services Committee intervened.

From 1972 until 1977, CH Doney volunteered numerous times for short active duty tours in the hope of establishing a record and eventually being allowed to come on

active duty. It was not until he spoke with RADM O'Connor at the conclusion of a short term active duty assignment in 1977 that he was allowed to come on active duty in 1978.

His first assignment was with the First Marine Division at Camp Pendelton, followed by assignment to a guided missile cruiser, the USS LEAHY. Although he was promoted in the Reserves in 1977, he was considered for promotion to the grade of CDR on active duty after a relatively short period of time and was FOS several times, which led to his return to the Naval Reserve in 1983. The Navy also turned down his request to transfer from the Reserves to the Regular Navy.

After returning to the Reserves, CH Doney continued to volunteer for numerous short term assignments. One of those, shortly after returning to the Reserves, sent him to Adack Island in the Aleutians to meet a need for a Protestant chaplain at a Navy base. A lady at Adack asked CH Doney to baptize her by immersion, which he did. The Catholic priest at Adack later expressed his anger to CH Doney and accused him of stealing sheep because the lady occasionally attended Mass. Although CH Doney explained the lady had requested it and as a Protestant chaplain who believed in baptism by immersion, he had a duty to meet her free exercise needs, the priest threatened to report him for "proselytizing".

CH Doney was not selected for promotion to CDR in the Reserves, despite his numerous short, temporary active duty tours and his outstanding record. It is believed this and the Navy's failure to allow him on active duty was the result of prejudice against him because he was a graduate of Bob Jones University's seminary, a conservative, evangelical seminary, and because he angered the Catholic chaplain at Adack. The

presence of a Catholic on every board ensured he would not receive a fair hearing, either on active duty or in the Reserves.

9.      LCDR JOSEPH E. DUFOUR.  CH Dufour resides at 30138 Lilac Rd., Valley Center, California.  He is currently assigned to the USS NIMITZ, an aircraft carrier based in San Diego, CA.  He entered active duty September 21, 1992, and is endorsed by the Bible Churches Chaplaincy, a Non-liturgical faith group.  CH Dufour had a successful and productive career prior to his assignment to the Naval Support Activity at Naples, Italy (Naples) as evidenced by his fitness reports and his promotion to LCDR.  He is one of several named plaintiffs who have been victimized by the Navy's oppressive culture of prejudice against Non-liturgical chaplains and faith groups that has come become a pattern and practice of bias at Naples, orchestrated by its Liturgical command chaplains. For example, no evangelical chaplain who has served under his Catholic command chaplain at Naples, CH (CAPT) Rock, has ever been subsequently promoted on active duty.  This systematic prejudice at Naples has resulted in a consistent pattern of threats, harassment, and professional and personal attacks resulting in biased fitness reports designed to destroy his opportunities for promotion and a Navy career.

Because CH Dufour challenged CH Rock over his prejudice and bias toward Non-liturgical Protestants and their programs at Naples, on information and belief, CH Rock contacted CH Dufour's Catholic command chaplain on the NIMITZ, a Boston priest like CH Rock.  His new command chaplain undermined CH Dufour's ministry and career and ensured CH Dufour will FOS to CDR.  CH Dufour is currently assigned to Camp Pendleton.

10.     CAPT FLOYD C. ELLISON (Ret.).  CH Floyd Ellison lives at 535

East J Street, Chula Vista, CA, 91910-6414. Endorsed by the American Baptist Convention, a Non-liturgical faith group, he was commissioned as a Navy Chaplain in the Naval Reserve in 1972 and reported for active duty in February 1974. CH Ellison had a distinguished career marked by excellent fitness reports, evidenced by his promotion to Lieutenant Commander in August, 1978, CDR in May 1984, and CAPT in August 1991. CH Ellison was selected for involuntary retirement by the fiscal year (FY) 97 SER board and was retired August 1997. In selecting CH Ellison for involuntary retirement despite his outstanding record of service, the SER Board ignored the records of other chaplains with records substantially inferior to his using the improper criteria of faith group affiliation rather than religiously neutral criteria such as military performance and potential. Statistical analysis shows the presence of a selection board member with the same or similar faith tradition as a candidate statistically increases the candidate's chances of favorable treatment by the board, in the SER context, retention. There was no Non-liturgical chaplain board member on his SER board and the grant of civic authority to a chaplain on the board violated the Establishment Clause.

11.    LCDR ALAN K. GARNER. CH Garner resides at 7834 W. Hearn Rd., Peoria, Arizona. He was a Chaplain Candidate Officer from January 1989 to April 1992 when he entered active duty as a Navy chaplain. He is an ordained Independent Baptist minister and endorsed by the Bible Churches Chaplaincy.

After an initial assignment aboard the guided missile cruiser USS LEAHY, CH Garner was assigned to the Naval Medical Center San Diego, CA. There LT Garner covered more hospital wards than any other chaplain on staff, facilitated two support groups, and helped train hospital staff in patient pastoral care. He was handpicked to

19

deploy with a Navy Fleet Hospital for six months as part of the United Nations Protection Forces.  He served as Division Officer over nine enlisted Religious Program Specialists ("RPs") and successfully prepared his department for a major inspection.  CH Garner was recognized for his excellent performance with outstanding fitness reports until the new Catholic command chaplain, CH (CAPT) Young reported to the Medical Center six months before LT Garner was scheduled to leave.  In CH Garner's final fitness report for his tour at the Medical Center, CAPT Young deliberately ignored LT Garner's outstanding performance and accomplishments, downgraded him in the areas of professional expertise and teamwork, and placed LT Garner in the "must promote" category, a significant reduction from his previous rating of "early promote."  CH Young never offered any explanation for the poor marks or the lower promotion recommendation.  Compared with his previous outstanding fitness reports, CH Young's evaluation cast CH Garner's performance in a bad light.

At the same time CH Young downgraded CH Garner's performance, the Medical Center recommended CH Garner be given the Navy Commendation Medal for his outstanding performance in actions that occurred during the same time frame in which CAPT Young found CH Garner's performance deficient.  While CH Young was savaging CH Garner's career, the Medical Center was thanking and rewarding him for the same performance of duty.  CH Young's evaluations resulted in CH Garner's FOS to LCDR, a fact acknowledged by the Bureau of Personnel ("LT Garner's fitness reports for the period 1 February 1996 to 20 July 1996 display a negative trend in performance and severely impacted the competitiveness of his record.").  CH Garner was forced to leave

active duty, but was subsequently promoted to LCDR in the Naval Reserve and served in Iraq when his reserve unit was activated.

CAPT Young has been the subject of several investigations, including allegations he favored Catholic chaplains in his ratings while trashing the careers of Protestant chaplains.

12.    LCDR JOHN GORDY, USN, CHC (Ret.).  CH Gordy lives at 516 Sage Rd. North, White House, Tennessee.  He began his military career as an enlisted man in the U.S. Marine Corps from January 1978 to December 1981.  He then attended college and seminary and was commissioned as an Ensign in the CHC in 1987 as a Chaplain Candidate.  He entered active duty in August 1988, endorsed by the Church of God, Cleveland, Tennessee.  He compiled an excellent record and was promoted to LCDR in September 1998.  He was selected for and successfully completed postgraduate school. When he reported to NSA Naples, the Catholic command chaplain, CAPT Ronald Buchmiller told CH Gordy, "You know I have a reputation for ruining evangelical careers."  CH Buchmiller is the same command chaplain who ended the careers of several other Non-liturgical chaplains assigned to Naples.  CH Buchmiller then proceeded to rate CH Gordy in a manner that guaranteed he would not be selected for CDR, and CH Gordy was subsequently FOS to CDR.  CH Gordy's failure to be selected despite his outstanding performance, as indicated by his record prior to Naples, his promotion to LCDR and selection for postgraduate school, is due to the CHC's tolerance of the anti Non-liturgical attitude exhibited by and boasted about by CH Buchmiller.

At his 2003 deposition in Naples, Italy, CH Gordy testified that when he first heard of the *Adair* and *CFGC* lawsuits, he dismissed their claims.  However, he changed

his view after his assignment at Naples where he was confronted by CAPT Buchmiller's anti-evangelical prejudice and hostility and the CHC's and Navy's willingness to condone the prejudice and hostility rather than address it decisively. CH Gordy retired due to his FOS.

13.    CH (MAJ) ROBERT A. HATCH, JR., US Army (Ret.). CH Hatch currently lives in Poplar Bluff, MO, after retiring as a US Army chaplain. He is endorsed by the American Baptist Churches of the USA.

CH Hatch began his career as a Navy Chaplain in 1983. After completion of his initial three-year tour, he was not allowed to continue on active duty despite outstanding performance reports and recommendations for his retention. The Commanding Officer, Marine Air Control Group 18's memo to the Commanding General, First Marine Aircraft Wing, described CH Hatch as "By far, one of the best Chaplains that I have encountered."

After separation from active duty in 1986, CH Hatch served in the Naval Reserve until 1989. CH Hatch's excellence and value to the CHC is evidenced by the fact that in his three-year period as a Reservist, he had 10 active duty training assignments when the norm is one per year. Included in this active duty training was a 103 day period (4/3/88 to 7/15/88) in the Chief of Chaplains Office to coordinate the events surrounding the retirement of the Chief of Chaplains, RADM McNamara, and the assumption of the office for the new Chief, RADM Koeneman. RADM Koeneman rated CH Hatch for this period and recommended he be retained and promoted.

CH Hatch is one of the large number of Non-liturgicals who were never allowed to complete their career because of the CHC's efforts to limit the number of Non-

liturgical chaplains.  He was forced out by the Navy's illegal prejudice without getting an opportunity for promotion.  He subsequently became an Army chaplain.

While at Ft. Stewart, GA, in 2001, CH Hatch learned of the litigation against the Navy from a former Navy Chaplain who is now an Army chaplain and plaintiff in the Chaplaincy of Full Gospel Churches (CFGC) litigation.  After reviewing the issues and evidence related to this action including the Stafford Report, the Ellis Report and the *Adair* Class Action Complaint, he became aware the CHC's biased policies favoring Liturgical chaplains and prejudicing Non-liturgical chaplains such as himself was the reason chaplains with weaker records were allowed to continue on active duty and he was not, despite his strong record and endorsements. Prior to this time there was no way for him to know 1) he had a cause of action and 2) the Navy's proffered reasons for his non-continuation were lies and deceit designed to conceal the Navy's prejudice against Non-liturgical Chaplains.  The Navy's official policy was that its career continuation system was fair and its criteria unrelated to faith group.  Until he read the cited documents, he had no evidence the Navy and its CHC's misrepresentations were part of an extensive program to conceal their illegal prejudice.

14.    GARY HEINKE, LCDR, USN, CHC, (Ret.).  CH Heinke resides at 2030 Rockvale Road, Lancaster, Pennsylvania.  He was commissioned as a chaplain in March 1982, endorsed by the Baptist General Conference.  CH Heinke's outstanding career is reflected in the fact the CHC first selected him for postgraduate school (Duke University) and then as its first chaplain to attend and graduate from the Marine Corps Command and General Staff College (C&GSC), an opportunity for which only a few officers with outstanding records are selected each year.  Following  completion C&GSC,

he was assigned to the USMC Combat Development Command, Quantico, Virginia. Although he was only a LCDR, he was initially assigned to a CDR billet (the Marine security battalion). During that assignment, the command chaplain was relieved for cause. Lieutenant General (LTG) Krulak, the base commander and Deputy Commandant of the Marine Corps, assigned LCDR Heinke as the base's deputy command chaplain, a CDR billet, placing him over several senior Liturgical chaplains. When CH Heinke received orders to duty on a ship, LTG Krulak used his influence to change those orders so CH Heinke would remain at Quantico to keep the momentum in the evangelical Family Worship Center and ministry, and to provide stability in the Chaplain Department.

Despite being selected for postgraduate education, the Marine Command and General Staff College, his assignment to two CDR billets and his reputation as demonstrated by LTG Krulak's intervention in changing his orders and assigning him over more senior chaplains, CH Heinke FOS to CDR in FY93. Subsequent to his failure of selection, CH Heinke was told that the president of the board, RADM White, did not like LTG Krulak and because of LTG Krulak's recognition of CH Heinke as an outstanding chaplain, used the board process to ensure that CH Heinke would not be promoted. In other words, CH Heinke's FOS was RADM White's perverted means of retaliation against LTG Krulak and the Liturgical hostility toward successful evangelicals like CH Heinke. A board recorder, without divulging board proceedings, commented to CH Heinke that "I thought you were in, you had made it, but something happened at the last minute, I can't explain it, you did not make it."

Before the next board, the CHC assigned CH Mike Burt as the command chaplain at Quantico shortly before CH Heinke and LTG Krulak were scheduled to leave, and just

before CH Heinke's fitness report was due.  CH Burt, a Liturgical chaplain, indicated he

was an emissary from RADM White.  He said his mission was to make sure CH Heinke

did not get promoted.  CH Burt said, "We can't let you leave here [Quantico] without

being punished."  When asked, "Punished for what?"  CH Burt said, "You know, the

evangelical ministry here and Krulak."  When asked who "we" referred to, CH Burt

replied, "The Chief of Chaplains."  CH Burt also said, "If you try to fight this, you'll

lose."  CH Burt marked down CH Heinke's fitness report one letter grade.  When CH

Heinke wrote a letter to GEN Krulak, who had become the Commandant of the Marine

Corps, to protest the lowering of his fitness report grade, he received a letter from CH

(CAPT) Pucherrelli stating that if CH Heinke had issues he needed to submit them

through CH Pucherrelli.  CH Pucherrelli  had been at Quantico a portion of the time CH

Heinke was there.  CH Heinke had been told, "You were either one of Puche's boys or

not...."  Since CH Heinke had been in conflict with CH Pucherrelli over numerous issues,

CH Heinke was not one of his boys.  CH Heinke wrote a follow on letter to GEN Krulak,

but received no response.

The entire time CH Heinke was at Quantico, there was constant conflict over

approaches to ministry between the Liturgical chaplains, who held the higher ranks, and

the Non-liturgical chaplains, who performed most of the ministry. The Non-liturgicals

started a "Family Worship Center," a contemporary worship service initially located in a

remote location, the high school cafeteria.  The service grew and had to be moved to

larger and newer accommodations, and competed with the base General Protestant

Service.  LTG Krulak started to attend the Family Worship Center on a regular basis,

which created jealousy among the senior Liturgical chaplains.  The tension and conflict

between Liturgicals and Non-liturgicals was evident in staff meetings and assignments. The Quantico chaplains' office was a hostile work environment which necessitated LTG Krulak's personal intervention.  The hostility continued after he left.

In addition to putting CH Heinke over chaplains who were senior in grade and having his orders change to enable him to stay at Quantico, LTG Krulak also awarded CH Heinke a Meritorious Service Medal, which angered Liturgical chaplains at Quantico.

The reason for CH Heinke's failure of selection was due to the CHC's religious hostility towards outstanding Non-liturgicals and, on information and belief, RADM White's personal hostility and retaliation against GEN Krulak.  That RADM White was able to manipulate the system to deny CH Heinke's promotion (and therefore his career) without accountability shows the CHC promotion system violates the Establishment and Due Process Clauses, *i.e.*, secret career ending votes with no accountability.

Having FOS twice and facing separation with a loss of pension and other benefits, CH Heinke retired under the Temporary Early Retirement Act May 1, 1997.  This was a constructive discharge.

15.     LCDR ROBERT L. HENDRICKS, USNR.  CH Hendricks lives at 243 Patricia, San Antonio, Texas.  He was commissioned as a Navy Chaplain September 9, 1982, endorsed by the Southern Baptist Convention and reported for active duty October 5, 1982.  Despite outstanding service as reflected in awards of the Navy Commendation and Navy Achievement Medals, he was twice FOS to LCDR.  He was separated after his second FOS in 1991.  CH Hendricks has continued to serve as a chaplain in the Naval Reserve where he was promoted to LCDR, but the Navy failed to select him for CDR.

In 2002, CH Hendricks began reading documents related to this action including the Stafford Report, the Ellis Report and the Class Action Complaint.  He became aware that the reason other chaplains with weaker records were promoted was the CHC's policies which favored Liturgical chaplains and prejudiced Non-liturgical chaplains such as himself.  Prior to this time he had believed the Navy's false official statements its promotion system was fair, all records were competitive, and faith group was not important.  Because of the secrecy of the promotion board process, and the deceit and concealment by the Navy, there was no way for him to know prior to reading the above cited documents he had a cause of action.

16.     CDR FRANK JOHNSON, CHC, USN, (Ret.).  CH Frank Johnson currently resides at 2789 Noble Fir Court, Woodbridge, VA.  He was commissioned as a Navy chaplain in 1981 and entered active duty in 1985, endorsed by the Southern Baptist Convention, a Non-liturgical denomination.  He was promoted to the grades of LCDR and CDR based on his outstanding records and was personally selected for important assignments by the Chief of Chaplains based on his reputation and record.  He was assigned as the recorder of the FY97 Chaplain CDR promotion board.  Allegations of denominational prejudice and misconduct resulted in both Naval Inspector General and Department of Defense Inspector General investigations into the FY97 and 98 boards.  CDR Johnson was interviewed by the investigators.  Subsequently, he was considered for promotion to CAPT for which he FOS.  Because of his outstanding record as compared to others who were selected, there is no explanation for his FOS other than retaliation for the testimony he gave under oath concerning the FY97 Chaplain CDR promotion board.

CDR Johnson retired in 2005 when, after FOS to CAPT, it became obvious his career had reached a dead end as a result of the CHC's prejudice.

17.    LCDR LAURENCE W. JONES.  CH Jones lives at 104 River Reach Dr. W., Swansboro, North Carolina.  He entered active duty in April 1986.  He is endorsed by the Southern Baptist Convention, a Non-liturgical faith group.  He was promoted to LCDR in March 1994, and selected for postgraduate school in 1996.  He completed his Master's Degree in Ethics at Duke University's Divinity School in 1998. With him at Duke were five other Navy chaplains: another male Southern Baptist, two female Southern Baptists, a minority male, and a Liturgical chaplain.  Of the six, CH Jones and the other Southern Baptist male were FOS to CDR in 2000.  Despite an excellent record including postgraduate schooling, and despite the Secretary of Navy's guidance such advance schooling was to be considered in a positive light, CH Jones was FOS to CDR.  Given his record, there is no explanation for his non-selection other than the culture of bias and prejudice against Non-liturgical chaplains and faith groups that permeates the CHC.  After discovering the Stafford Report and other evidence of denominational preference in promotions in 2001, CH Jones unsuccessfully tried to join the *Adair* legislation in 2002.  CH Jones was statutorily retired due to his FOS to CDR.

18.    LCDR SAMUEL DAVID KIRK.  CH Kirk lives at 4627 Rock Elm Woods, San Antonio, Texas 78249.  CH Kirk is endorsed by the Southern Baptist Convention.  He entered active duty as a chaplain in March 1982 and was promoted to LCDR in 1989.  Stationed on Okinawa from 1987 to1990, CH Kirk increased chapel attendance by 50%.  Because of this success he was moved to another chapel.  Despite his success in increasing chapel attendance through his preaching and leadership, he was not

given a favorable fitness report by the senior command chaplain, CH O'Brien, a Catholic priest who gave superior ratings to other Catholics but graded down Protestants such as CH Kirk. The basis for the differing treatment appears to have been faith group preference.

This illegal and prejudicial treatment resulted in his FOS to CDR which terminated his career. He left the Navy after 12 1/4 years active duty. CH Kirk then affiliated with the Reserve, where he is still serving as a Navy Chaplain.

19.    CDR FRANK S. KLAPACH. CH Klapach lives at 3810 S.E. Conifer Park Dr., Port Orchard, Washington. He entered active duty as an enlisted sailor May 11, 1970, and was released from active duty in 1974. When he entered the Navy in 1970, CH Klapach was a Catholic. During his enlistment, he had what Protestants call a "born again" experience. This concept and experience is fundamentally at odds with Catholic teaching. At the time of his born again experience, CH Klapach's Catholic pastor was CH Thomas Kuhn, who became angry when he discovered the change in then seaman Klapach's faith perspective and his subsequent joining the Assemblies of God, an evangelical, Non-liturgical faith group.

When he left the Navy in 1974, CH Klapach continued in the enlisted reserve, attended college and seminary, and with an endorsement by the Non-liturgical and pentecostal Assemblies of God, was commissioned in the Chaplain Candidacy Program January 5, 1976. He entered active duty as a Navy chaplain December 31, 1977, and was subsequently selected for post-graduate education and promoted to LCDR.

The first time the Navy considered CH Klapach for promotion to CDR, CH Kuhn, his former Catholic pastor, was a board member. Despite an outstanding record, the

29

board with CH Kuhn as a member did not select CH Klapach,[1] but he was selected on his second look.

After promotion to CDR, CH Klapach reported to the Puget Sound Naval Shipyard ("PSNS") as the senior chaplain in rank, experience and with the advantage of a postgraduate degree. Yet the PSNS command, with the reported concurrence of the Chief of Chaplains, RADM Muchow, placed CDR Klapach under a Catholic LCDR chaplain. There is no other explanation for this gross breach of military discipline and order except the Navy's overt culture of religious prejudice against Non-liturgical chaplains and their faith groups and its preference for Catholics.

Despite his completion of postgraduate schooling, an outstanding career and military record, CH Klapach was selected for involuntary early retirement as a CDR. His improper FOS to CDR in his first consideration prejudiced his record before the SER board. The Navy ignored the records of chaplains with substantially inferior records in selecting him for separation under the SER program. The Navy's basis for selecting CH Klapach was his Non-liturgical faith group identification.

20.    CH (CDR) THOMAS KLAPPERT, USN, (Ret.).  CH Klappert resides at 7699 Kuhn Road, Greencastle, Pennsylvania.  He began his Navy career upon graduating from the Naval Academy in 1973.  He served five years in the Marines, rising to the rank of Captain (O-3), and remained in the Reserves from 1978 to 1982 while he attended seminary.  Endorsed by the Independent Fundamental Churches of America

---

1   The Navy Inspector General's investigation of CH Washburn's failure to be selected for CAPT produced testimony showing that one hostile board member could guarantee that a chaplain would not be selected for promotion.

(now Bible Churches Chaplaincy), he was commissioned as a chaplain LTJG in September 1982, promoted to LT in 1983, LCDR in 1991 and CDR in 1998.

CH Klappert was assigned to Quantico, Virginia at the Marine Corps Headquarters from June 1992 to June 1995. While there, he was embroiled in the conflict between the Liturgical senior chaplains. CH Klappert became a central figure in the investigation of the Quantico command chaplain for serious misconduct resulting in the relief of the command chaplain for cause. This caused resentment among the senior Liturgical chaplains at Quantico as well as others in the CHC leadership, who resented the fact the command chaplain was caught and disciplined.

After Quantico, he was assigned to the Portsmouth Naval Yard. While there, he experienced great difficulty with a female organist and music director who caused division in the congregation and other difficulties. CH Klappert had finally determined to terminate her employment because of the division she was causing in the chapel; however, shortly prior to his scheduled rotation date from Portsmouth and before he was able to take that action, the organist filed a complaint alleging discrimination and harassment against CH Klappert. Although she initially obtained an ex parte protective order limiting CH Klappert from contact with her, at a subsequent hearing the judge vacated the order, found there was no substance in the complainant's allegations and "this is not sexual harassment." Nonetheless, the Navy began an investigation. Although CH Klappert submitted 16 witnesses' names who would verify the falsity of the allegations, the resulting investigation only interviewed 6, and perverted the testimony of those who had made statements so the meaning was entirely opposite to the witnesses' testimony.

Although the base commander had initially supported CH Klappert and expressed his confidence the investigation would refute the false allegations, it became apparent to CH Klappert that his commander had been told supporting CH Klappert was not in the base commander's career interests. CH Klappert believes this was retaliation for his previous opposition to religious oppression at Quantico and other places. It became obvious to CH Klappert this was retaliation for his involvement in the relief of the Quantico command chaplain, his career was over and he was not welcome in the CHC, and he was a target because of his previous success. Faced with an expensive and protracted fight should he choose to dispute the charges legally, he submitted his resignation. His discharge was involuntary because it was motivated by coercion and premised on retaliation.

21.    CPT  JAN C. KOHLMANN, U.S. Army.  CH Kohlmann is currently a U.S. Army Chaplain stationed at Ft. Sill, Oklahoma.  CH Kohlmann began his naval career as an enlisted torpedo man aboard a fast-attack submarine from 1970 to 1974, reaching enlisted grade E-5 when he was 19 years old. He became a Chief Petty Officer (E-7) in the Reserves in 1982.  After completing college, CH Kohlmann was initially commissioned as an Ensign (O-1) in the Chaplain Candidate Program in June 1984 while attending seminary.  He was then commissioned as a LTJG Chaplain in the Reserves in July 1986 and entered active duty May  25, 1988 as a LT.  He is endorsed by the Bible Churches Chaplaincy.

When he expressed his view of certain subjects based on his understanding of scripture, he was told by his senior chaplain (CAPT) that "the Navy CHC did not need any prophets" and this was Navy CHC policy, not just the senior Chaplain's.   Despite his

good fitness reports, he was twice FOS to LCDR, primarily on the basis of the Navy's bias against Non-liturgical chaplains and their faith groups, and its secret voting system without accountability that encourages denominational bias.

CH Kohlmann was separated on September 30, 1995 after he twice FOS to LCDR. He remained in the Naval Reserve from January 1996 to December 1997. He entered active duty as an Army chaplain on January 12, 1998.

While assigned to Korea as an Army chaplain, he heard of the Navy chaplain lawsuits and requested information. After reading the *Adair* Complaint, he understood the Navy had concealed its prejudicial policies by representing its promotion system was free of bias and denying all allegations to the contrary. This concealment and deceit precluded him from discovering the basis for his cause of action until he was informed of the chaplain litigation, well after the *Adair* plaintiffs had filed their action.

22.    CDR ALLEN L. LANCASTER (Ret.). CH Lancaster resides at 172 North Liberty Spring Rd., Suffolk, VA 23434. His case represents a prime example of the Navy's unconstitutional hostility and prejudice toward its Non-liturgical chaplains. CH Lancaster began his naval career in 1957 as an enlisted sailor, serving on active duty until 1961 and thereafter in the Naval Reserve until August 1980 (23 years) when he was commissioned as a Navy Chaplain. Endorsed by the Associated Gospel Churches, an evangelical, Non-liturgical faith group, he then spent 21 years as a Navy Chaplain.

After completing Chaplain School, his record shows a truly outstanding career, with every fitness report showing grades of "A" for all performance categories and all recommendations for "early promotion." He was promoted to LCDR.

Just prior to his first time in the primary zone for selection to CDR, CH Lancaster was selected to attend the Chaplain Advanced Course on the basis of his stellar record, a course which is normally available only for CDRs or those selected to be CDRs. In 1991, he was not selected for promotion to CDR. Nonetheless, because of his strong record, CH Lancaster was assigned to a high visibility position as chaplain on the USS SAIPAN and was selected for promotion to CDR his second time in zone.

Knowing he would be in the zone for CAPT in 1996, CH Lancaster reviewed his official file and found it was missing an outstanding fitness report dated July 1995 from another high visibility position. His rating officer sent a certified true copy of the missing July 1995 report to the Chief of Naval Personal on June 19, 1996. When CH Lancaster again reviewed his official file microfiche to make sure his record was complete, his July 95 fitness report was still missing. In February 1997, CH Lancaster again sent a copy of the July 95 report to the Navy CHC detailer for inclusion in his file. Following his fourth attempt to ensure his file was complete before the Chaplain CAPT selection board met, the detailer's office told CH Lancaster his missing report was in his records. CH Lancaster was not selected for CAPT and then discovered his July 95 fitness report was still missing, despite his four attempts to provide the missing report and the detailer's assurance the record was complete.

Whether the board actually reviewed CH Lancaster's record is a question. The promotion board's senior recorder is supposed to notify a chaplain's command if a record before the promotion board is incomplete. After the board, CH Lancaster asked the CAPT selection board's senior recorder if his record was complete. CH Epperson replied that all the records were complete. However, a review of his record showed the

July 95 report was still missing.  CH Lancaster's unit reported it had received no communication from the CHC indicating his record was not complete during the time the promotion board met.  Several weeks later, he contacted board member CAPT (now RADM) Barry Black who said, "I do not recall anyone not considered due to a missing report."  How could the board have reviewed CH Lancaster's record if all the records before the board were complete, none were missing, yet his record was incomplete?

In November 1997, en route to his new assignment to Camp Lejeune, North Carolina, CH Lancaster stopped in Washington D.C. to again attempt to complete his record.  He was introduced to LCDR Burdec, Naval Personnel Officer Records Section, who took the report and said, "I will personally ensure that it gets in your file."  However, when the next Chaplain CAPT board convened in May 1998, it notified CH Lancaster's unit his official record still lacked the July 1995 fitness report.  Deployed with the Marines at the Twenty-Nine Palms, CA, training center, CH Lancaster called Camp Lejeune.  CH (CDR) Cash forwarded the missing report to the board by fax (January 1997).  The July 95 report still did not reach his official record, a fact the BCNR noted in denying CH Lancaster's subsequent request for a new promotion board.  The Navy retired CH Lancaster as a CDR October 31, 2001 after 44 years of Naval service.

Overt and deliberate prejudice against Non-liturgical Chaplains and their faith groups is the only explanation for the consistent failure of seven documented attempts to get an important, exceptional fitness report into CH Lancaster's record.  CH Lancaster's saga demonstrates a pattern and practice of sabotaging outstanding Non-liturgical chaplains so liturgically dominated Chaplain boards will have an excuse for denying Non-

liturgical chaplains a fair opportunity for promotion, thereby maintaining Liturgical domination of the CHC.

23.    CDR JAMES F. LOOBY.  CDR Looby resides at 1713 County Rd. 318, Early, Texas.  He began his military career with the U.S. Air Force in June 1967, where he served until June 1971.  He completed seminary in 1975 with a MDiv and entered the CHC in February 1984, endorsed by the Southern Baptist Convention.  He served in a variety of assignments and was promoted to LCDR in April 1991 and subsequently to CDR by the FY96 promotion board.  However, he was not selected by the FY03 CAPT board.  He subsequently learned that a rumor was circulating among the CHC leadership that CDR Looby had been injured on active duty, was ineligible for promotion and had performance problems. On information and belief, this view was shared by RADM Iasiello, the president of his first CAPT board.  Because of his record, there is no other explanation for his FOS except reliance on an unfounded rumor contrary to his record and the failure of the CHC promotion system to ensure votes are based on the record, rather than denominational bias or information or opinion outside the record.

24.    MANUEL MAK.  Manuel Mak resides at 5 East Columbia St., Danville, IL  81832.  He began his naval career when commissioned as an Ensign in the Theological Student Program in 1982.  He was commissioned as a LTJG in the Navy Reserves in 1984.  He remained in the Reserves until March 1986 when he entered active duty, endorsed by the Southern Baptist Convention.

At both First Marine Division and his next assignment at Naval Air Station (NAS) Miramar, he experienced prejudice based on his Non-liturgical faith.  He had been at Miramar NAS for a considerable period of time when his new Liturgical command

chaplain told CH Mak he had to prove himself.  The command chaplain had no basis for his criticism and rated a Lutheran above CH Mak.

CH Mak was selected as the force chaplain to the Naval Support Force Antarctic, a position of great responsibility requiring the ability to function in an independent environment where he supervised six contract chaplains and two religious program specialists.  He was FOS to LCDR and forced to leave active duty in 1994.  Returning to the Reserves, he was promoted to LCDR in 1995.

His difficulty in the Navy, including his FOS while on active duty, are due to the Navy's prejudice against Non-liturgical chaplains and faiths.  In failing to select him for promotion while on active duty, the Navy selected other less qualified chaplains on the basis of their faith group.

In 2001 while attending a Reserve conference, CH Mak began hearing about this Class Action and the allegations in the Complaint.  After reading the Stafford Report, the Ellis Report and the Complaint, he became aware that the reason other chaplains with weaker records than his were promoted was the CHC's policies which favored Liturgical chaplains and prejudiced Non-liturgical chaplains such as himself.  Prior to that time, he had believed the Navy's representations and its official position its promotion system was fair and faith group was not a factor in promotion decisions.  The Navy's disinformation and deceit kept him from knowing he had a cause of action prior to reading the above cited documents.

25.    WALKER E.  MARSH, JR.  CH Marsh resides at 125 Whisperwood

Blvd., Slidell, Louisiana.  He was commissioned as a Navy chaplain in October 1982, entered active duty in January 1984 and was promoted to LCDR in November 1990.  He is endorsed by the Southern Baptist Convention.

In September 1985, he was assigned to the Naval Training Station, San Diego, CA.  The liturgical command chaplain, CH Dempsey, told CH Marsh in his initial interview: "I hope that you're not planning on making this a career because you already have three strikes against you.  You are the wrong sex, the wrong color and the wrong religion."  This indeed was a prophetic utterance.  After he arrived at the Naval Training Station, CH Marsh began an alternative Non-liturgical worship service with two other Non-liturgical chaplain LTs, Michael Lavelle and Robert Yourek (with whom the Navy later settled after he filed a claim of religious discrimination, *Yourek v. United States*, U.S. Court of Federal Claims, 98-772C).  Despite being restricted by the command chaplain to an unreasonable time (7:00 am) and still being required to participate in the liturgical General Protestant service, under CH Marsh's leadership the Non-liturgical service soon grew to approximately 60 attendees.  At this point, the command chaplain terminated the service.

After selection for and completion of postgraduate school, CH Marsh was assigned to the U.S. Marine Corps School of Infantry, Camp Pendelton, CA.  The Liturgical command chaplain for the base, CH Ha, established a chaplain meeting schedule and other procedures for the chaplains he "supervised" that created direct conflicts between his demands on their time and the time and priority requirements of the unit commanders to whom the chaplains were assigned and who rated them.  Rather than address the resulting conflict he had created with the unit commanders themselves, CH

Ha demanded his junior chaplains convince their commanders that he, rather than the commanders, was the appropriate official to determine the responsibilities and priorities for their chaplains.

CH Ha promised CH Marsh he would make sure CH Marsh would never be promoted. CH Ha made it clear the chaplain promotion boards, controlled by Liturgical chaplains, were tools to keep Non-liturgical chaplains in line and subservient to the senior chaplains rather than their unit commanders to whom they were assigned and accountable for ministry. This is another example of the well known CHC's truism, "the line may rate you, but the CHC promotes you."

The CHC's deceit and religious prejudice against CH Marsh and other Non-liturgical chaplains is exemplified in his assignment to the USS BELLEAU WOOD after his first FOS to CDR. His detailer, a member of the board that had not selected him on his first time for CDR, said he needed an unaccompanied tour (*i.e.*, no family) since it would better his chance for selection by the next promotion board because the BELLEAU WOOD assignment would be a supervisory position. When CH Marsh questioned the detailer about his first FOS and the fact that the next board results were not yet known, his detailer said, "Don't you know you'll get picked up?" When he reported to the ship, he discovered his assignment was not a supervisory position. After his second FOS while on the BELLEAU WOOD, the CHC told him the Navy would separate him under 10 U.S.C. § 632 and then gave him a series of changing return and separation dates that resulted in a two year involuntary, extended, unaccompanied tour. He spent two years

separated from his family as a result of CHC deceit and religious hostility. This is not the type of service or treatment given to Liturgical chaplains.[2]

Given his record, his selection for post-graduate schooling, and the promotion of other Liturgical chaplains with far inferior records, the only reason for his non-selection for promotion is the Navy's hostility toward Non-liturgical chaplains and their faith groups, as exemplified by the consistent reservation of a promotion board membership for Catholics and the over-representation of Liturgical Protestant on CHC promotion boards.

26.    DR. DAVID MITCHELL. Dr. Mitchell resides at 142 Prospect Street, Providence, Rhode Island. He entered the Navy CHC in Sept. 1987 with 4 years prior service in the USAF. He was endorsed by the Progressive National Baptist Convention, a Non-liturgical denomination. When he entered the primary zone for promotion to CDR in 2001, he had completed his work for his PhD and had held 3 supervisory billets in which he had received outstanding fitness reports. He was not selected for CDR despite his outstanding record and career.

The president of the CDR promotion board was RADM Iasiello, who as director of the Chaplain School, had supported a female chaplain candidate's unsupported and false allegation that Dr. Mitchell had sexually harassed her during an interview required for the chaplain commissioning program. Although the subsequent investigation proved his innocence, then CAPT Iasiello indicated to Dr. Mitchell that he believed the allegations and would find a way to end Dr. Mitchell's career. The 2001 CDR board with

_____

2  CH Dufour's command chaplain, CH Jerome Dillon, has been reassigned several times before his tour of duty was complete and assigned as command chaplain on several other ships in an apparent effort to boost his record and career.

RADM Iasiello as president selected two Catholic chaplains above zone who did not have records as strong as Dr. Mitchell's. Consideration of factors other than the record was improper and forbidden by the Secretary of Navy's instructions as well as Equal Opportunity regulations and the Equal Protection component of the Fifth Amendment. The Navy's secret voting process and small boards allow one board member to prevent a candidate's selection by voting zero with no accountability. Dr. Mitchell believes this process allowed RADM Iasiello to prevent his promotion. Dr. Mitchell retired in 2003, after two FOS to CDR.

27.    LCDR JAIRO MORENO. CH Moreno resides at 2009 Oak Brook Dr., Portland, Texas. He entered the Navy Chaplain Corps in 1987 and is endorsed by the Church of God of Cleveland, Tennessee, a pentecostal Non-liturgical denomination. CH Moreno is Hispanic, and the combination of being pentecostal and Hispanic resulted in bias and prejudice throughout his career as a chaplain. In Okinawa, he was assigned to work under the supervision of CAPT Rock, a Catholic command chaplain. In CH Rock's view, CH Moreno should have been Catholic rather than pentecostal because he was Hispanic. CH Rock subjected CH Moreno to a series of degrading and insulting incidents. CH Rock gave CH Moreno fitness reports that made him non-competitive for CDR. CH Moreno has FOS to CDR numerous times. No pentecostal chaplain who worked for CAPT Rock has been promoted.

The command chaplain who followed CH Rock was CH Lesak, another Catholic. On arrival, CH Lesak told CH Moreno, "I don't want anything to do with you because you have been passed over" and treated CH Moreno with disrespect and disdain.

The command chaplain who followed CH Lesak gave CH Moreno increased responsibilities and outstanding fitness reports, although nothing had changed in CH Moreno's approach to ministry. CH Moreno's FOS is due in large part to the animosity of his former Catholic command chaplains, who savaged his career with prejudiced fitreps, aggravated by the policy of always having a Catholic on every promotion board until 2003. CH Moreno was considered for promotion to CDR during that time. CH Moreno is one of two plaintiff chaplains with Hispanic ethnicity. Non-liturgical Hispanic chaplains are not promoted while Catholic Hispanic chaplains are.

28. REV. DAN NICHOLS. CH Nichols resides at 809 Malibu Drive, Columbia, South Carolina. He entered the Navy CHC in April 1982. At that time, he was endorsed by the United Methodist Church (UM), a Liturgical denomination. He was promoted to LCDR in 1986. Although he had been endorsed by the UM, CH Nichols came to believe he should baptize adults rather than infants, a practice which was not incompatible with his endorsing denomination at that time. However, consistent with his changed beliefs, he changed his endorsement from UM to Chaplaincy of Full Gospel Churches (CFGC), an endorsing agency for charismatic Non-liturgical churches and fellowships, just before the FY93 CDR promotion board.

When he was assigned to Whitby Island, Washington, 1991-94, after he changed his endorsement to CFGC, he was visited by RADM Muchow who upbraided CH Nichols because he did not believe in infant baptism. RADM Muchow told CH Nichols he was occupying a billet for baby baptizers, although officially there were no denominationally designated billets. In the immediate area of the base there was no shortage of churches who would baptize infants and CH Nichols arranged for several

baptisms under provisions which allow for contract clergy to meet a free exercise need when necessary.  When RADM Muchow left, CH Dave Young, the Catholic command chaplain, said to CH Nichols, "You've blown it now."  When asked what he meant, CH Young said, "You're on the wrong team," referring to CH Nichols' switch from a Liturgical to a Non-liturgical endorser.

After he was non-selected for CDR, a senior Methodist chaplain who had been indirectly asked by the UM endorser to contact CH Nichols, called.  The UM senior chaplain said, "You understand what its all about, don't you?  It's all about accessions. The more evangelicals [*i.e.*, Non-liturgicals] on active duty, the fewer Methodists get on active duty."  This reflects a statement his former UM endorser made concerning the Chief of Chaplain's concern over the large number of Non-liturgical chaplains.

The Navy's hostility toward Non-liturgical faith groups and particularly to charismatics deprived CH Nichols of a fair opportunity for promotion.  After his FOS, CH Nichols saw the handwriting on the wall; since the Navy had made continuation on active duty unreasonable and created a hostile environment, he retired under TERA when offered the opportunity.  CH Nichols heard of the chaplain litigation in 2002.

29.    LT  EDITH RENE PORTER-STEWART.  Until she was discharged March 1, 2006, for multiple FOS to LCDR, CH Porter-Stewart was an active duty Navy Chaplain assigned to the Naval Medical Center, San Diego, California.  She currently lives at 1061 Agate Street, Unit B, San Diego, California,  92109, but is a legal resident of Florida.

CH Porter-Stewart entered active duty as a Navy chaplain in September 1988, endorsed by the International Church of the Foursquare Gospel, an evangelical,

pentecostal, Non-liturgical faith group.  CH Porter-Stewart's career is filled with examples of the Navy's overt and covert hostility to effective, Non-liturgical chaplains. During Operation Desert Shield and Desert Storm (Persian Gulf War), she established an airport ministry for all Marines leaving or coming home at Cherry Point, NC.  She also developed and hosted several episodes of a television program for the Cherry Point, NC military community addressing such topics as reunion (when a service person returns after a deployment and combat) and suicide prevention.  Despite these highly effective programs, she experienced hostility from her command chaplains who recommended she be given low marks on her fitness report.  Her commander disregarded her command chaplain's recommendations, writing higher and more accurate fitness reports on her.

She was reassigned by her command chaplain from her highly effective ministry in the Headquarters Squadron, placed in a closet for an office and given a job with no job description, no budget, and no religious program support personnel.  Several months later, after she defined her duties and began building an effective ministry, as a LT she was placed in a CDR's position with no overlap or support where she was subjected to hostility, inappropriate language and harassment from the senior Second Marine Air Wing Chaplain.

In 1995-1997, she was assigned to Balboa Naval Hospital, aka the Naval Medical Center, San Diego, CA, and again faced great harassment and a hostile work environment.  CH Porter-Stewart, another female (LT) chaplain, two male chaplains and the Command Chaplain's civilian secretary filed complaints against the senior Chaplain, CH CAPT Dave Young.  The Board of Corrections removed CH Young's fitness reports on CH Porter-Stewart, but did not grant her a special board.  The Navy then placed CH

Young on CH Porter-Stewart's LCDR Chaplain Selection Board, which failed to select her. No active duty Non-liturgical chaplain who worked under CH Young has been promoted. CH Young rated his Catholic chaplains above Protestant chaplains, both Liturgical and Non-liturgical, not on the basis of performance but because they were Catholic.

30.     CAPT JAMES V. PRINCE.  CH Prince lives at 3710 Cain Ct., Wilmington, Delaware, 28409. He first entered active duty in the Navy as an enlisted man in November 1970. He left the Navy in 1974 to pursue a seminary degree. He was commissioned as an Ensign in the Theological Student Program in 1975 and returned to active duty as a chaplain 1980. He is endorsed by the Southern Baptist Convention, a Non-liturgical faith group. His superiors consistently rated CH Prince as outstanding, placing him in the top 1% and "early promote" rating categories. The Navy promoted him to CAPT in 1993 but then selected him for involuntary retirement in 1997 (FY98) with less than four years time in grade as a CAPT.

Before accepting an assignment to Washington, D.C., CH Prince asked the then Deputy Chief, RADM Black, if he should wait to move his family until after the SERB results were announced. RADM Black, who was the SERB president, assured him he had nothing to fear. CH Prince relocated his family, resulting in a large financial loss due to the expenses associated with sequential, necessary short term relocations once the SERB was announced.

Of the five chaplains selected by the FY98 SERB, four were Non-liturgicals. The fifth CAPT chaplain was Catholic CH John  Madden, whose vendetta and prejudicial comments against CH (LCDR) Aufderheide had resulted in CH Aufderheide's non-

45

selection to CDR and precipitated the DODIG investigation into the FY97 and 98

Chaplain CDR promotion boards.

CH Prince was selected for retirement on the basis of his faith group and because

his excellent record which made him a threat to the Liturgical domination of the CHC

leadership. Many other chaplains with far inferior records were protected and allowed to

remain on active duty, in violation of the Navy's own precepts, the Constitution and

RFRA.

31.    JAVIER ROMAN. Javier Roman lives at 701 Creek Water Terrace,

Apt 209, Lake Merry, Florida, 32746. He entered the Navy as a chaplain June 6, 1966, as

a LTJG endorsed by the Chaplaincy of Full Gospel Churches, a non-denominational

charismatic endorsing agency. He was promoted to LT a year later. On March 3, 2005,

he was separated for twice FOS to LCDR.

His initial assignment was to Twenty-nine Palms, where he served as a base and

battalion chaplain. In 2002, CH Roman was assigned to the aircraft carrier KITTY

HAWK, based in Yakuska, Japan. He was involved in Operation Enduring Freedom with

the carrier.

When the command chaplain learned CH Roman was endorsed by CFGC, he said

to CH Roman, "Oh, you're one of those troublemakers," referring to the fact that CFGC

had sued the Navy over religious discrimination.

While on the KITTY HAWK, CH Roman filed an official complaint because a

Catholic priest allowed to remain on active duty despite numerous FOS was selected for

promotion to LCDR.

CH Roman had to fill in as the command chaplain several times during his tenure on the KITTY HAWK. Despite his demonstrated ability to fulfill this role and his outstanding fitness reports from his previous assignments, he was not selected for promotion to LCDR. His CAPT said he did not understand why CH Roman was not promoted. CH Roman believes his FOS was due to his challenging the preference given to FOS Catholics in retentions and promotions, the animosity of the CHC leadership against his endorsing agency, CFGC, and the ability of one board member to ruin a chaplain's career with no accountability.

32.     LCDR LLOYD E. SCOTT, JR.  LCDR Scott lives at 14 Heath Spur, Ledyard, Connecticut. He entered the CHC with over 2½ years active and reserve prior service as a naval aviator. He was endorsed by Evangelical Free Church of America (EFCA), commissioned in the CHC in July 1976, came on active duty in March 1979 and was promoted to LCDR in 1982.

Despite his outstanding record, CH Scott FOS to CDR. Having served with several Liturgical chaplains who were later promoted, he could compare his performance and record with theirs and know his record was superior. His failure to select for Commandeer was the result of stacking promotion boards with Liturgical chaplains who tended to select those like themselves. This denied him the equal opportunity to compete for promotion based on record of performance. He was forced to prematurely retire from the U.S. Navy in 1994 while Liturgical chaplains with records inferior to his were promoted and allowed to continue.

During Desert Storm, he was assigned to the 1st Marine Expeditionary Force, filling two CDR positions at the same time. Shortly before he was due to leave the war

zone, the liberal command chaplain, CAPT Hiers, overheard LCDR Scott talking to his wife on the phone and telling her "my ministry here has been fantastic, but has been truncated by demonic forces personified by chaplains."  CAPT Hiers requested, and the Chief of Staff agreed, to order CH Scott evaluated for fitness for duty because of his comments regarding demonic forces, recognized by CH Scott's faith tradition.  Although the subsequent psychiatric evaluation rebutted the allegation of unfitness for duty for psychological problems, rumors were spread concerning CH Scott's stability and performance in Saudi Arabia.  These reports resulted in changes in his duty station which placed him in non-competitive billets.

CH Scott subsequently filed an Article 138 challenging the authority and propriety of ordering an EFCA ordained pastor to have a psychiatric evaluation; the phenomenon of demons is recognized by the EFCA.  The Article 138, ignoring the Free Exercise and Establishment Clause issues, sustained CH Hiers' authority.  The incident arising from the telephone conversation is illustrative of other conflicts between CAPT Hiers and CH Scott stemming from differences in their theological perspectives and CAPT Hiers' failure to recognize the legitimacy of theologies other than his own.

33.     LCDR GARY PAUL STEWART.  CH Stewart currently resides at 220 Walking Trail Dr., Concord, Virginia.  He was an active duty Navy chaplain endorsed by the Bible Churches Chaplaincy when this suit was filed.  He was commissioned as a chaplain March 19, 1985, entered active duty in April 1988 and was promoted to LCDR in 1995.   Because of his Non-liturgical faith group's tradition and beliefs, CH Stewart has been the object of religious prejudice and bias throughout his career.

In 1996, CH Stewart shared confidential matters regarding the command to which he was assigned with CH (CAPT) Blancett. CH Blancett came to CH Stewart's home in Oregon to confront him, telling him the CHC motto, "Cooperation without Compromise" was unrealistic. In front of CH Stewart and his wife, CH Blancett told him to compromise or suffer the consequences, *i.e.*, if you don't compromise by divulging protected communications, you'll never make it in the organization. CH Blancett followed through with his threat, giving CH Stewart a poor fitness report.

While at Great Lakes Naval Training Center, LCDR Stewart was put in charge of the Forrestal Village chapel which grew from 60 congregants to approximately 180. He learned from his sexton that CH (CAPT) Cooper, the Protestant Liturgical command chaplain, thought CH Stewart was "not liturgical enough," despite the fact that CH Stewart is a Non-liturgical chaplain. 10 U.S.C. § 6031 authorizes any chaplain to conduct worship according to the forms and ordinances of his faith group, and he was meeting the free exercise needs of Forrestal Village personnel, as shown by the increase in the congregation.

Despite the availability of a Non-liturgical chaplain to replace him when he left Great Lakes, CH Cooper put a Protestant Liturgical in charge of the Forrestal Village chapel, resulting in the congregation once again shrinking because their Non-liturgical worship needs were not being met.

At Great Lakes, CH Stewart was also reprimanded for praying "in Jesus' name." When he then concluded a prayer with "I pray in the name of my Lord and my Savior," as was his right under the Constitution and the Navy's own regulations, he was relieved from his duties. After he reported this to his endorser, the command lawyer concluded

CH Stewart had disobeyed the order not to close his prayers with a reference to Jesus Christ, whom CH Stewart and his faith group believe is the Son of God, Savior of the World, and the only scriptural authority to ask God for blessing and protection.

The reason for actions taken against CH Stewart is the Navy's culture of religious prejudice against Non-liturgical chaplains and faith groups which has resulted in LCDR Stewart's non-selection for promotion.

Congressmen Walter Jones (NC) invited CH Stewart to a meeting chaired by Senator Lindsey Graham (SC) on 6/6/06 to address issues arising from the House of Representative's language in the Defense Appropriations Bill allowing chaplains to pray according to their conscience. The meeting included members of the Armed Services, DOD and former Navy Chief, RADM Black. RADM Black said he was not aware of any chaplain being threatened or punished for praying a sectarian prayer when he was Chief. CH Stewart reminded RADM Black that (i) his endorser had written RADM Black complaining that CH Stewart had been criticized for praying according to his denominational beliefs and his career threatened by CH Burt, the current Chief, but then one of CH Stewart's command chaplains at Great Lakes; and (ii) RADM Black had replied to the endorser's letter. RADM Burt was at the 6/6/06 meeting. The Navy investigated CH Stewart and reassigned him on short notice in retaliation for his participation in Sen. Graham's meeting, causing CH Stewart and his family financial loss and great stress.

The Navy said CH Stewart was moved to Bethesda Naval Medical Center for "mentoring" which never occurred. His Bethesda command chaplain was reassigned because of inefficiency shortly after CH Stewart arrived and he became the deputy

50

command chaplain prior to his statutory retirement in 2007. The CHC sought other opportunities to retaliate against CH Stewart, such as falsely accusing him of participating in a radio interview while on duty, a fact which could have easily been checked and found to be false. The Navy's acts of retaliation and prejudice placed great stress on CH Stewart and his family.

34.    CH (CDR) FRED A. THOMPSON, JR.  CH Thompson resides at 2853 South Nephrite Way, Meridian, Idaho.  He began his naval service in 1978 when he enlisted in the Naval Reserve while he was in seminary.  Upon graduation from seminary, he was endorsed by the Assemblies of God, a pentecostal Non-liturgical denomination, and commissioned in the CHC in September 1980.  He was promoted to LCDR in August 1986 and in 1987, was assigned as the senior chaplain on the battleship USS IOWA, normally a CDR's billet.  Prior to that assignment, he had outstanding fitness reports and tours of duty; it is unlikely he would have been selected as the senior chaplain of the USS IOWA without an outstanding record.

Shortly after his  assignment to the USS IOWA, a Catholic priest, LCDR James Danner, who was junior to LCDR Thompson, was also assigned to the IOWA.  The ship's CAPT and the XO were both Catholics; their friendship with LCDR Danner caused tension within the ship when LCDR Danner refused to cooperate with LCDR Thompson, who was the command chaplain.  CH Thompson was subjected to a series of humiliating and embarrassing situations in which the ship's senior leadership demeaned him.  Because CH Thompson discussed some problems on the battleship with his senior chaplains in an attempt to obtain advice as how to best handle the situation with CH Danner and the Catholic command, he was later reprimanded by his commanding officer,

who subsequently made both CHs Danner and Thompson co-equal command chaplains, a very unusual situation and contrary to Navy regulations and protocol.

An explosion in Turret 2 of the IOWA killed 46 sailors, an event which made national news. When the ship reached Norfolk, CH Danner left the ship, leaving CH Thompson to address the issues that arose from the mass casualties and ministry to dependents of sailors killed in the explosion. Later, CH Danner was reassigned early at the request of the command due to his unwillingness to follow directions from the ship's leadership.

After the results of the official investigation of the explosion in Turret 2 were challenged by several dead sailors' dependents, CH Danner wrote a very insulting and critical letter to survivors and family members who questioned the investigation's results, which were later found to be flawed. The resulting outcry embarrassed the Navy. According to the Washington Times, CH Danner received a letter of reprimand from the Chief of Naval Personnel. While this would normally kill a naval officer's career, CH Danner was promoted to CDR and subsequently to CAPT. In contrast, CH Thompson was FOS to CDR and forced to leave the service in January 1993. He was subsequently promoted to CDR in the Reserves in 1995 and retired from the Reserves.

The fact that CH Danner, despite reportedly receiving an official letter of reprimand, was promoted while CH Thompson was discharged strongly suggests favoritism for Catholics and the prejudice against Non-liturgicals. CH Thompson learned of the chaplain lawsuits in 2002.

35.    CH GLENN THYRION. CH Thyrion lives at 102 Burke, Crane,

Texas 79731.  He entered active duty in October 1990, endorsed by the Church of the

Nazarene, an evangelical Non-liturgical faith group.  His first assignment after the

Chaplain School Basic Course was to the USS HALEAKALA, a ship with a history of

serious morale, moral and leadership challenges.  Before leaving the Chaplain School, its

director, CH Fitzgerald, told CH Thyrion if he had not shown he was a quality chaplain,

he would not have been assigned to the ship because of its history of serious problems.

On the HALEAKALA, CH Thyrion was initially put in charge of the evangelical worship

service.  When a new command chaplain was assigned, he removed CH Thyrion from the

evangelical, Non-liturgical service, giving that responsibility to a Protestant Liturgical

chaplain, and gave CH Thyrion the responsibility to run a liturgical General Protestant

service.  The new liturgical "pastor" of the evangelical service succeeded in driving the

congregation away from the service by espousing liberal, non-biblical theological

positions to the conservative and Bible centered congregation who voted with their feet.

     After his reassignment to the Liturgical service, the command chaplain criticized

CH Thyrion's preaching and gave him orders as to how he should preach.  When CH

Thyrion challenged the legality of such order as contrary to 10 U.S. C. § 6031, the

command chaplain told him he would approve his sermons on a case-by-case basis.  This

is contrary to statute and the Constitution.  *See Rigdon v. Perry*, 962 F. Supp.  150, 162

(D.D.C. 1997) (government officials may not dictate or interfere with a chaplain's

sermons).

     The Navy selected CH Thyrion for the clinical pastoral education program, a

specialized postgraduate course in hospital related skills and competencies.  Following

completion of the course, the CHC assigned CH Thyrion to Bethesda Naval Hospital

where his supervisor/command chaplain was CH Joan Vieira, a female, Liturgical Protestant. She did not like Non-liturgical male chaplains and fought every attempt by CH Thyrion to minister to the sailors, marines and families assigned to the Hospital. Liturgical CH Vieira criticized CH Thyrion because he was "too Christological," *i.e.*, too centered on Christ, and preached too long. She undercut his stature and status within the chapel community through such things as telling jokes to the congregation about an "incompetent male preacher" just before he was to preach. As justification for giving him low fitness reports, CH Vieira told CH Thyrion "you're talented and could make much more money as a civilian."

The Navy's systematic religious hostility resulted in his FOS to LCDR in 1999 and 2000 despite his excellent record prior to CH Vieira and his selection to postgraduate school. CH Vieira's overt hostility to CH Thyrion is typical of the culture of prejudice the Navy and its CHC leadership has cultivated and encouraged against evangelical Non-liturgical chaplains in violation of the Constitution and RFRA.

36.    ARMANDO S. TORRALVA. CH Torralva was an active duty Navy chaplain at the grade of LCDR assigned to Corpus Christi, Texas when this case was filed; he resides at 6637 LaBianca Dr., Corpus Christi, Texas. CH Torralva began his military career as a Chaplain Candidate endorsed by the Associated Gospel Churches, and was commissioned a 2LT in the USAF Reserve in August 1981. He was commissioned in the Air Force Chaplain Service, remained in the Air Force Reserve from 1984 to 1988, and was promoted to CAPT (O-3). He then entered the Navy as a chaplain in July 1988.

Among his various assignments, during the presidency of George Bush, Sr. CH Torralva was chaplain for the Marine 1 Squadron which flies the presidential helicopters. In 1997 CH Torralva was selected for postgraduate school and attended Princeton Theological Seminary. Although the normal chaplain postgraduate education program does not have sufficient hours to qualify for a degree, CH Torralva took extra hours and earned a Master of Theology. Despite the fact the Secretary's instructions require boards to look at postgraduate experience in a positive light, and the fact he was selected for postgraduate school based on the strength of his record, CH Torralva was not selected by the FY99 CDR Board. He was scheduled to fill a CDR's billet at COMFAIRMED Headquarters in Naples, Italy. Although he reminded the detailer that he had been FOS, the detailer reviewed his records and indicated to CH Torralva he had a competitive record and would probably be picked up by the next board.

Reporting to COMFAIRMED in August 1999, CH Torralva discovered his billet was unfunded, meaning that there was no funding supporting it and the billet had been withdrawn from the Headquarters. Nonetheless, he was assigned as a force chaplain, which would normally have meant exercising supervisory responsibilities over subordinate chaplains as a member of the Admiral's staff. CH Torralva, in his role as force chaplain, did an inspection of a chapel program at Rota, Spain. The command chaplain was Catholic CAPT McLaughlin. CH Torralva found minor improprieties and problems, including numerous complaints against the junior Roman Catholic chaplain from his parishioners and staff who complained he was not doing his job. CH Torralva also found minor discrepancies in the Religious Offering Fund. The command was

embarrassed, particularly since their difficulties were pointed out by a Protestant Hispanic.

CH Torralva's senior chaplain, CH (CAPT) Gentolli at CINCUSNAVEUR, the command chaplain of Naval Forces in Europe, directed CH Torralva to evaluate the problems at the Naval Support Activity at Naples. CH Torralva found the Religious Ministries Department under the Roman Catholic CH Ronald Buchmiller was divided, demoralized and dysfunctional due to CH Buchmiller's lack of leadership and hostility toward Protestant evangelicals. CH Torralva recommended in a white paper to CH Gentolli that they initiate team building exercises to help remedy the problem. He was criticized for his inspection and recommendation by both CH Buchmiller and the NSA Commander, CAPT Gray, who blamed the problems on a previous chaplain, Phil Veitch, who allegedly stirred up division and dissension. However, CH Veitch had been gone for some time and an objective evaluation showed the real problem was CH Buchmiller's anti-evangelical attitudes and prejudice. The Navy then transferred CH Torralva from COMFAIRMED to NSA Naples, working under CH Buchmiller, the same command chaplain he had just criticized.

While at COMFAIRMED, CH Torralva assumed the pastorship of a evangelical congregation of American military personnel assigned to NATO Headquarters at Armed Forces South (AFSOUTH). When he was reassigned to NSA Naples, CH Torralva retained his position as the chaplain/pastor for that congregation. When the new command chaplain, CH (CAPT) Steve Rock, another Catholic, reported in, his first words to CH Torralva were he wanted the AFSOUTH congregation disbanded. CH Torralva communicated that to AFSOUTH personnel who pointed out under Title 10 and the

Memorandum of Support among the Armed Forces the Navy had to provide support for the religious needs of AFSOUTH and therefore CH Rock could not shut down the evangelical congregation. This became a continuing bone of contention between Catholic CH Rock, who wanted to eliminate the evangelical congregation, and CH Torralva, their pastor. CH Torralva was supposed to be the deputy command chaplain because of his seniority as a LCDR, but CH Rock refused to allow CH Torralva to function as such. CH Rock made, and permitted others to make, openly disparaging anti-Hispanic comments about CH Torralva.

When the base commander, CAPT Gray, planned to initiate a "teen clinic" which would dispense birth control and provide sexual disease treatment to teenagers without parental consent, CAPT Gray directed the chaplains to help sell the program to the community. CH Torralva preached a sermon on parental responsibility, including their obligation to instruct their children in sexual matters, and mentioned the opening of the Teen Clinic without either criticizing or preaching against it. It caused a firestorm in his congregation, which included high ranking Army and Navy officers, and embarrassed CAPT Gray. He accused CH Torralva of violating an order not to discuss the Teen Clinic until such time as the command was ready to announce it to the community. CAPT Gray and CH Rock retaliated against CH Torralva on his fitness reports. A subsequent Article 138 investigation initiated by CH Torralva exonerated CAPT Gray. However, the investigation highlighted the dysfunctional and divisive Chaplain Department under CH Rock. Nonetheless, nothing was done.

Although the Navy pays lip service to Equal Opportunity, the promotion rate of Hispanic Protestants is clearly below that of Hispanic Catholics. It is believed this is due

to a perception among many Catholic board members that Hispanic personnel should be Catholic, not Protestant or evangelical, a perception flowing from comments made to several Hispanic non-Catholic chaplains, including CH Torralva.  The fact that CH Torralva could be selected to be the chaplain for Marine 1 Squadron, postgraduate school, as well as sent to occupy a CDR's billet while still a LCDR is clearly inconsistent with his FOS.  The only explanation is something other than his record was before the board. The Navy system of secret votes and small numbers of board members gives unbridled discretion to denominational representatives who have historic animosities with other denominations.

37.    THOMAS DANIEL TOSTENSON.  Rev. Tostenson resides at 1822 West Brookwood Court, Phoenix, Arizona.  He was commissioned a Navy chaplain in 1988; he is endorsed by the Evangelical Free Church, a Non-liturgical denomination.  He served in Desert Storm with the 8th Tank Battalion of the 2nd Marine Division, the highest decorated Marine Unit in that war.  He was only the second chaplain LT in the history of the CHC to graduate from the Naval War College.

He was subsequently assigned to Patuxtant Naval Air Station.  The command chaplain at that time was CDR Carl Drake, a Roman Catholic who had adopted a teenager as his son.  As a result of a child molestation charge filed by his adopted son, CDR Drake was forbidden to have contact with the boy.  CH Tostenson saw CDR Drake with the boy and reported it to the social worker.  CDR Drake was subsequently court-martialed for violating the court order.  Although sentenced to 4 years in prison, CDR Drake only served 9 months and was allowed to retire with full retirement pay.  CH Tostenson subsequently FOS to CDR despite an outstanding record.  Rev. Tostenson believes his

58

FOS was retaliation by the Catholic chaplain network through the Catholic board member for reporting CDR Drake.

38.     JAMES S. TWAMLEY.  CH Twamley resides at 6423 Verde Vista Court, Klammath Falls, Oregon.  He began his military career in the U.S. Army as an enlisted man, on active duty from January 73 to June 1976.  Attending college after his service, he remained in the Army Reserve for several years, joined the Air Force ROTC, was commissioned as a Navigator in 1981 and rose to the rank of CAPT (O-3) before he left the Air Force in August 1987 to become a Navy chaplain.   Having competed his necessary religious education and pastoral experience while in the Air Force, he was endorsed by the Assemblies of God, a pentecostal, Non-liturgical denomination, and was commissioned a Navy chaplain at the rank of LT in September 1987.

His prior military experience as an Army enlisted man and Air Force Officer provided CH Twamley an excellent backdrop for his military ministry and accordingly he received stellar fitness reports. He was promoted to LCDR in October 1992  In his spare time, he also managed to obtain a law degree.

CH Twamley's last assignment before he was forced to retire for FOS was a chaplain recruiter in Arizona in 1998-99.  He remembers Mrs. Berto in the Chief of Chaplains Office gave him his recruiting goals.  He was told to emphasize the recruiting of Catholics, then Liturgicals and discouraged from recruiting Non-liturgicals. Once he reached his Non-liturgical goal he had to sit on the paperwork of other interested Non-liturgical candidates. CH Twamley achieved his recruiting goals, while others did not.

Despite his stellar record, he was not selected for promotion by the FY99 and 00 CDR boards and forced to retire on January 1, 2000 with 22½  years time in service.  At

least one of the board members had a reputation of hostility toward pentecostal chaplains; only one of five pentecostal chaplain candidates was selected in FY99 and he was a minority.  CH Twamley had only one B in his fitreps as a LTJG whereas the investigation into the FY 97 and 98 CDR boards showed Catholics and Liturgical selectees with many Bs and Cs.  The CHC's system of secret voting with no accountability subjected CH Twamley to denominational bias, denying him the opportunity to be fairly considered for promotion on his record.

39.     THOMAS R. WATSON.  Rev. Watson resides at 2804 Spoons Chapel Road, Ashboro, North Carolina.  He began his military career in 1974 on graduation from the United States Naval Academy.  Commissioned as a Second Lieutenant in the USMC, he was promoted to the grade of CAPT (O-3), left active duty and transferred to the Reserves while he attended Southeastern Seminary.  He enrolled in the Theological Student Program where he gave up his Marine Corps commission and rank and was re-commissioned as an Ensign (O-1) in the Naval Reserve.  He entered active duty in 1984, endorsed by the Southern Baptist Convention.  After tours of duty in Okinawa with the Coast Guard and on the USS YELLOWSTONE, he was FOS to LCDR.  During his service as a chaplain, he twice replaced Liturgical chaplains whom he was told had left their commands with bad fitness reports, while he received excellent fitness reports.  Those chaplains were subsequently promoted while he was not.

During his time on the USS YELLOWSTONE, a Catholic chaplain on the 6th Fleet staff became angry with LT Watson because an invitation to visit the ship was given to a high ranking Catholic Cardinal in Rome when the ship visited Naples, Italy by an RP who knew the Cardinal.  The 6th Fleet Catholic chaplain thought he should have issued

the invitation.  Given LT Watson's prior military service and his excellent record, he
believes his FOS to LCDR was due to (a) being blackballed by the Catholic chaplain
network (Catholic chaplains met regularly and networked among themselves and were
given a reserved seat on every chaplain promotion board from 1977 through 2002); and
(b) the CHC's hostility to Non-liturgical prior service chaplains.

Prior to his discharge for FOS,  LT Watson was being treated for a medical
condition requiring surgery.  He was supposed to receive a Physical Evaluation Board
(PEB) after surgery to determine his medical fitness for continued service, which can
result in a pension if found medically unfit for active duty as a result of a service
connected medical condition.  He was improperly discharged in 1993 before the PEB was
complete.  After Congressional intervention, he was reinstated to active duty in 1995 to
complete the PEB process.  His reinstatement allowed him to gain the necessary time in
service (prior service plus active duty as a chaplain) to qualify for TERA and he retired in
1995 with a 30% disability.  Prior to hearing about the litigation in 2002, CH Watson had
no knowledge of the evidence showing religious bias and had no indication as to why he
was FOS to LCDR.

40.    LT WILSON W. WINEMAN, II.  CH Wineman resides at 918 Heather
 Woods Dr., Nampa, ID.  He was commissioned and entered active duty July 6, 1992,
endorsed by the Church of the Nazarene, an evangelical, Non-liturgical faith group.
Upon reporting to his initial assignment, his commander asked him if he was going to
convert the heathens in the unit to Catholicism, the commander's denomination.  CH
Wineman responded it was unlikely since he was a Protestant, but he would be willing to
share them 50 - 50 with the commander.  His commander then replied in a serious

manner, "Another God Damned Protestant.  Don't they know there isn't a Protestant worth his pay?"  This is typical of the sort of religious bias CH Wineman had to contend with.  Whereas the normal assignment to a ship is about two years, CH Wineman was assigned to the USS BOXER (a combination amphibious assault ship and helicopter carrier) for four years, including a tour during which the senior chaplain manifested overt suicidal tendencies and disrupted the chapel program.  Although a junior chaplain, CH Wineman was called on to address both the suicidal chaplain problem as well as keep the ship's religious programs functioning.

Six months prior to leaving the ship, he was told by the new command chaplain to phase down and close out his chapel programs, which he did.  The ship commander then graded CH Wineman down on his fitness report because his programs were being closed down whereas other programs by the other chaplains continued.  In other words, he was penalized for following the guidance of his command (and supervising) chaplain who failed to explain to the commander that CH Wineman was following orders and proper procedure.

CH Wineman was also criticized for not drinking alcohol at official Navy functions and social events even though it is against the ordinances of his faith, and was told by one senior Liturgical chaplain he was "too religious."   The Navy's bias against Non-liturgical CH Wineman resulted in the Navy's failure to select CH Wineman twice for promotion to LCDR prior to his medical retirement.  CH Wineman was assigned to Camp Pendelton, CA, when he was medically retired.

41.    CHRISTOPHER I. XENAKIS.  Rev. Xenakis currently resides at 29

North Main St., Cortland, New York. He was commissioned as a Navy chaplain in March 1983, endorsed by the Conservative Baptists. His first assignment was to the Naval Hospital in Oakland, California. On his arrival, two Roman Catholic priests asked him to join in an attempt to get the senior chaplain, a Methodist, relieved for cause, allegedly alcoholism and womanizing. Having just arrived, he refused to take sides. The ensuing investigation went nowhere. A year later, when CH Xenakis was leaving the command, a priest who was later promoted to CAPT told CH Xenakis he was very unhappy with his failure to be a "team player", *i.e.*, to side with him in his dispute with the senior chaplain, and that he would remember CH Xenakis.

CH Xenakis' second tour was aboard the USS SARATOGA, replacing an Assembly of God chaplain, a Non-liturgical. The command chaplain, a Presbyterian, and the assistant command chaplain, a Roman Catholic, had not gotten along with the Assembly of God predecessor and transferred their anti-evangelical animus to CH Xenakis. A few months after his arrival, the Presbyterian command chaplain transferred and was replaced by a Non-liturgical chaplain. The hostility toward CH Xenakis stopped and the Catholic chaplain's attitude softened, a testament to the dramatic positive effect the command chaplain's theological perspective can have on the personnel under his supervision and in the command.

In 1984-85, CH Xenakis completed certificate programs in crisis counseling and substance abuse counseling and had three articles published in U.S. Naval Institute Proceedings, two of which won awards. In 1990 he was assigned, based on his expertise, to Washington as a "special assistant" for family ministry, where he developed, coordinated and helped lead professional development and training events related to

family issues for chaplains and civilian social workers.  During the 1991 Gulf War, he wrote a "Return and Reunion" manual that Navy Family Services Centers used to help returning sailors and marines readjust to family life.

His Washington assignment brought him into the middle of senior officer conflicts, not unlike his experience at Oakland.  Although he was not assigned to the Chief of Chaplains Office, his office was down the hall from the Chief's office and the Chief and his assistants routinely gave him taskings and guidance at sharp variance with what his own command expected and wanted him to do.  His own office was plagued by overt hostility between the Roman Catholic chaplain members and the social workers who were also in the office.

CH Xenakis believes the Chief of Chaplains made improper and illegal communications with the members of the FY96 and 97 selection boards concerning his performance and reputation in the CHC, including recommendations he not be selected for promotion.  Roman Catholic and Liturgical chaplains whose records were inferior to that of CH Xenakis' were selected for promotion by the FY96 and 97 CDR Selection Boards.  The FY97 CDR Chaplain Board was one of those investigated by the NIG and the DODIG.  Their evidence suggested and the DODIG concluded promotions may have been based on denominational preferences.  The report of the investigation by the Minority Affairs Officer, CAPT Stafford, attached as an exhibit herein, clearly shows those selected by the FY97 and 98 boards had records inferior to many of those who were not selected, including CH Xenakis.

CH Xenakis served as a projectionist and recorder on CHC selection boards other than those that considered him.  Without commenting on specific board proceedings, he

was dumbfounded by the arbitrary comments board members, including board presidents, were allowed to make and how even an innocuous and subtle comment about "Corps reputation" could sway the entire board's decision for or against a given candidate. "Corps reputation" is not in the records, the only basis on which promotion decisions are supposed to be made.

b.    Organizational Plaintiff.

The Associated Gospel Churches ("AGC") is a fellowship of non-denominational Christian, evangelical churches which has endorsed chaplains to the military services since 1943.  It is incorporated in Pennsylvania but has no stock that is publically traded. Its offices are located at 209 Pine Knoll Drive, Suite B, Greenville, South Carolina.  The AGC has been forced to expend funds and effort attempting to protect its chaplains and resolve disputes between its chaplains and Liturgical command chaplains, *.e.g.,* a trip to Naples to assist CH Torralva.

AGC brings suit on behalf of itself and its Navy chaplains.  Analysis of Navy accessions from 1985-2005 shows AGC's Navy chaplain applicant approval rate is statistically significantly below that of Catholic and Liturgical Protestant denominations and many Non-liturgical denominations/faith groups.  AGC believes its low approval rate is a reflection of the CHC's bias towards evangelical endorsers, evangelical churches and the individual chaplains who make up the CARE board membership.  The high rejection rate has injured AGC financially and in regard to its reputation.  AGC receives financial support from its chaplains; rejection results in a loss of AGC's resources expended in recruiting and processing applicants and requires additional expenditure of resources to

recruit new candidates.  The defendants' prejudice interferes with and invades AGC's protected and legitimate interests.

AGC specifically challenges the CARE board system and (1) its use of chaplains as board members, (2) its complete lack of objective criteria, (3) its lack of constitutional controls to prevent denominational or theological bias as factors in CARE board decisions, and (4) the CHC's ability to set arbitrary recruiting goals by faith group or denomination which are not based on recognized free exercise needs.

### B. Other Chaplain Litigation

4.    In June 2002, 23 of these plaintiffs attempted to be added as named plaintiffs to a then potential class action filed in the District of Columbia, *Adair v. England*, [now Winter], 00cv566. Although the District Court granted approval to add additional plaintiffs on 2/7/02 and plaintiffs filed motions to add 25 additional plaintiffs in June 2002, the defendants opposed and the District Court denied the motion in September 2003 without explanation.  The District Court granted the *Adair* plaintiffs' motion to certify a class, *Adair v. England*, 209 F.R.D. 5 (D.D.C. 2002), had not defined the class as of the date this suit was originally filed.  The *Adair* plaintiffs moved to vacate the order certifying the class in 2006 after the last active duty plaintiff was separated and after this suit was filed..

### C.  The Defendants

5.    The Naval Defendants.

a.    The Navy is a military department of the U.S. Armed Forces created by an Act of Congress.  10 U.S.C. § 5011 *et seq*. The Navy is organized into several branches or categories, *i.e.*, subordinate groupings of individuals possessing similar qualifications or skills.  One of these branches is the Navy Chaplain Corps ("CHC"), 10 U.S.C. § 5142,

whose members are denominational representatives commissioned as officers because they possess specialized education, training and experience necessary to meet the free exercise needs of Department of Navy ("DON") military personnel and their families. *See* DOD Instruction ("DODI") 1304.28 and SECNAVINST 1730.7.C (defining chaplains as religious ministry professionals or "RMPs" endorsed by religious organizations to represent the religious organization to the military). *See* ¶ 21, *infra*. Although its headquarters is in Washington D.C., it has major bases and installations in Florida, including Pensacola.

b.      The Honorable Donald C. Winter is the current Secretary of the United States Navy (the "Secretary").  His office is in the Department of Navy, headquartered in Washington, D.C.  He is sued only in his official capacity, as civilian head of the co-defendant organization, the United States Navy (the "Navy").

## IV.  DEFINITIONS

6.      The Navy divides most of its Christian personnel and chaplains into three general categories which it calls faith group clusters or categories (FGCs):  Catholic, Liturgical Protestant, and Non-liturgical .[3]  These are terms commonly used by Navy chaplains and the last two terms have particular significance to this case and its issues.  To assist the Court in understanding these terms, the following general definitions are provided:

---

3      The Navy uses the term "Special Worship" to categorize and denote a small number of Christian and non-Christian faith groups which have unique or special needs for their worship and religious practices.  This includes, Jewish, Orthodox, Seventh Day Adventists, Christian Science, Latter Day Saints (Mormons), Moslems, Hindu and Unitarian who comprise about 2-3% of DON and 5% of CHC.

a.     At the time most of the events transpired which form the basis for this action, the category "Catholic" referred to only those chaplains of the Roman Catholic denomination.  The CHC places Catholic-like denominations which identify themselves as Catholic in the Special Worship category;

b.     Navy chaplains use "Liturgical Protestant" to collectively describe those Christian denominations which (1) use a set liturgy or order of worship[4] in their services, (2) baptize infants, (3) whose clergy wear special religious apparel, (4) follow a liturgical calender with specific scriptural readings by date for their services, and (5) recognize "sacraments."  This primarily includes those traditions or denominations that began during the Protestant Reformation and retained an established liturgy in their worship services such as the Lutheran, Reformed and Episcopal denominations, and the denominations which later evolved from them, *e.g.*, Presbyterian and Methodist.  Navy chaplains sometimes refer to these liturgical denominations as "baby baptizers" since infant baptism is a common feature of these liturgical denominations.  They are also referred to as "high church" or "main line churches."  As used herein, "Liturgical Protestant" will mean chaplains of the Lutheran, Episcopal, Methodist, Methodist Episcopal, United Church of Christ, Congregational, Reformed and Presbyterian denominations[5]; the term "Liturgical" without further description will refer to both

---

4     Almost every church has some "order" to its worship, but for these Protestant denominations there is no worship service without the prescribed liturgy.  There may be other Liturgical Protestant denominations, but the ones identified here commonly recognized as such by the Navy, are the largest and most well known.

5     Although the Orthodox denominations met all the characteristics for Liturgical Protestants, *i.e.*, a fixed liturgy, clergy wear vestments, follow a lectionary and baptize babies, the Navy has historically treated Orthodox churches, *e.g.*, Orthodox Church in America, Greek

Catholic and Liturgical Protestants who share a common liturgical history and baptize infants.

c.     "Non-liturgical" refers to those Christian denominations or faith groups without a formal liturgy or order in their worship service.  In general, they baptize only adults or children who have reached the age of reason, their clergy do not usually wear vestments or special religious dress during services, and they emphasize preaching from the Bible in worship services.  Some Navy chaplains refer to these faith groups as "low church." Baptist, Evangelical, Bible Church, Pentecostal, Charismatic and Christian Churches/Disciples of Christ faith groups or churches fall into the Non-liturgical category.  Although these faith groups see their tradition and beliefs arising from first century Christianity rather than the Protestant Reformation, the Navy often refers to these faith groups as "Non-liturgical Protestant".  Plaintiffs belong to this category and represent Baptist, Evangelical, Gospel and Bible churches, Pentecostal and other Non-liturgical  faith groups.

The Navy's categorization of "Non-liturgical" as a FGC implies a similarity of worship practices and theology among its many different faith groups.  This is incorrect because many of the Non-liturgical faith groups have sharp and serious differences in theology and reject the beliefs and worship practices of others within this FGC, *e.g.*, some Non-liturgical faith groups are hostile to charismatic or pentecostal worship practices and beliefs.  This complaint challenges this "one-size-fits-all" approach and practice because

---

Orthodox, as Special Worship.  This complaint places the Orthodox churches in the Special Worship category to minimize differences in categorizations and because the Navy treats them as Special Worship, not as Liturgical Protestant.

it ignores differences and limitations, masks discrimination and allows the Navy to ignore

its constitutional responsibility to provide for the free exercise of all faith groups.

d.    Other Definitions/Abbreviations:

Billet - an authorized position for Naval personnel at a specific location or unit

CHC - Navy Chaplain Corps

FOS - Failure of Selection - being considered for promotion but not selected.

LT - Lieutenant

LCDR - Lieutenant Commander

CDR - Commander

CAPT - Captain

RADM - Rear Admiral

Career Grades - the ranks (pay grades) of LCDR (O-4), CDR (O-5) and CAPT (O-6)

    whose active duty numbers are controlled by Congress.

DON - Department of Navy (includes the Navy and the Marines)

NIG - Navy Inspector General

DODIG - Department of Defense Inspector General

Precept - the Secretary of Navy's instructions to Navy selection boards

SER - selective early retirement - a statutory procedure to reduce officer strengths

    allowing the Secretary to convene boards to select officers for involuntary

    retirement who have the necessary time in service to qualify for retirement

## V.  CLASS ACTION ALLEGATIONS

7.    Plaintiffs bring this action on their own behalf and as a class action as representative

parties on behalf of all members of the class under the provisions of Rules 23(a) and 23(b) of the

Federal Rules of Civil Procedure for declaratory and injunctive relief, and relief incident to and subordinate to it, including costs and attorney fees.  A class action is appropriate because, as shown below: (a) the class is so numerous that joinder of all members is impracticable, (b) there are questions of law and fact common to the class, (c) the claims of the Plaintiffs are typical of the claims of the class, and (d) the representative parties will fairly and adequately protect the interests of the class.

8.      Definition of the Class.  The class so represented by Plaintiffs in this action, and of which Plaintiffs are themselves members, consists of present and former Non-liturgical Navy chaplains who served in the Navy when the Navy began placing two Catholic chaplains as selection board members on every career grade chaplain selection or promotion board (the "2RC Policy"), in 1976[6], to the present.  It includes those Non-liturgical chaplains whose active duty careers have been terminated or otherwise adversely affected by the Navy's and the CHC's unlawful bias and prejudice against Non-liturgical  chaplains, including the Navy's reserving selection board memberships solely for Catholics from 1976 to 2002,  its use of illegal denominational quotas, and the other continuing violations of the Constitution, statues and regulations as described herein.  It also includes those members of the class who have not yet personally suffered career injury as a result of the practices and policies challenged here, but whose manifestation has been delayed, *e.g.*,  prejudiced by adverse fitness reports but the injury has not yet manifested itself, or may be subject to the defendants' arbitrary religious discrimination or hostility now or in the

---

[6]      The 2RC Policy began in or before 1976 when RADM J. J. O'Connor, a Catholic, was Chief of Chaplains (July 1975 to June 1979).  *See* list of Chief of Chaplains, Exhibit 2.  Plaintiffs reserve the right to further amend their Complaint if discovery shows the 2RC Policy actually began earlier.  The 2 RC Policy ended in 1986 after Navy CH LT Ronald Wilkins successfully challenged the policy by obtaining an injunction enjoining his discharge for FOS, *Wilkins v. Lehman*, 85-cv3031 slip op. (S.D.Cal. 1986) (Exhibit 3).

future.

9.      As a further explanation, the class includes those Non-liturgical chaplains who, because of the Navy's illegal board composition, illegal quota system and/or denominational bias against their faith group, denomination or Non-liturgical tradition: (a) were FOS while on active duty and who are still on active duty, who left the Navy voluntarily, or were involuntarily separated from the Navy based on their FOS; (b) were FOS while on active duty but were or are in the Reserves; (c) were forced to retire as the result of SER boards or under the Temporary Early Retirement Act (TERA); (d) may suffer prejudice as active duty Non-liturgical chaplains due to the Navy's policies challenged herein unless the Navy is restrained from continuing those actions and policies; (e) saw or experienced the Navy's Non-liturgical bias and left active duty rather than endure that bias and prejudice, including those who retired early under TERA; (f) suffered adverse fitness reports (i) because of religious prejudice or (ii) they insisted on practicing the tenets or traditions of their Non-liturgical faith which the CHC hierarchy disapproved; (g) were not continued on active duty past their initial tour as a result of active duty continuation or Chaplain Accession and Reserve Evaluation ("CARE") boards or similar procedures; and (h) were subject to the same bias in the Reserve promotion system and/or assignment of pay billets. The preceding examples are representative illustrations only and do not include all the examples of prejudice or harm caused by the Navy's illegal prejudicial conduct and bias.

10.    The exact number of the class identified above is not known, but it is estimated that there are at least 1200 members.[7]  The class is so numerous that joinder of individual members in this action is impractical.

---

7      Plaintiffs conservatively estimate that approximately 1200 Non-liturgical chaplains were on active duty - including Reservists brings the potential class to 1400-1600.  Defendants possess the necessary records and information to identify and quantify the class.

11.    There are common questions of law and fact involved in this action that affect the rights of each member of the class and the relief sought is common to the entire class, namely:

a.    A  long and continuing pattern of violations of the First and Fifth Amendments including: (i) a chaplain promotion and selection board system that: (a) reserved at least one board seat for a Catholic chaplain from FY77-02; (b) used selection boards dominated by Liturgical chaplain board members personally selected or approved by the Chief of Chaplains (the "Chief") or his Deputy to select other chaplains for promotion; (c) uses a small number of board members who vote in secret without accountability, allowing one member to ruin a chaplain's career by voting zero; (d) allows the Chief or his Deputy to act as board president; (e) delegates civic power to award or deny government benefits to denominational representatives with no guarantees the power will be used for neutral, secular and non-ideological purposes; (ii) the establishment of illegal religious quotas for chaplain accessions and promotions; (iii) the establishment of a preferred religious tradition with unconstitutional discrimination and hostility on religious grounds against Non-liturgical chaplains and Non-liturgical Navy personnel; (iv) the establishment of a religious patronage system; (v) the illegal use of the SER process to separate Non-liturgical  chaplains based on their religious beliefs and speech; (vi) the establishment of accession goals unrelated to the DON's free exercise needs; and (vii) the use of chaplain dominated selection and accession boards with no protections or constitutional guarantees religious or personal bias does not influence the outcome.

b.    The violation of Non-liturgical chaplains' First Amendment rights of non-Establishment, Free Speech, Free Exercise and Right to Petition.

    c.      The violation of Non-liturgical chaplains' Fifth Amendment right to equal

treatment and other statutes and the violation of laws including 42 U.S.C. § 1981, the

RFRA, 42 U.S.C. § 2000bb, and Department of Defense and Navy regulations.

12.      The claims of the pPlaintiffs, who are representatives of the class, are typical of the

claims of the class in that the claims of all members of the class, including plaintiffs, depend on a

showing of the acts and omissions of defendants giving rise to the right of plaintiffs to the relief

sought.  There is no conflict between any individual named plaintiff and other members of the

class with respect to this action, or with respect to the claims for relief set forth in this complaint.

The class has similar injuries flowing from the Navy's systematic and intentional religious

prejudice.

13.      The named plaintiffs are the representative parties for the class, and are able to, and will,

fairly and adequately protect the interests of the class.  The plaintiffs' identification in ¶ 3 show

they adequately represent the various statuses of the class, *i.e.*, active, reserve, retired, separated.

The attorney for plaintiffs, Arthur A. Schulcz, Sr., will actively conduct and be responsible for

Plaintiffs' case.

14.      This class action is maintainable under Fed. Rule of Civil Procedure (the "Rules") 23(b)

because it satisfies the prerequisites of Rule 23 (a) and the following conditions of Rule 23(b):

        (1) the prosecution of separate actions by individual members of the class
would create a risk of
            (A) Inconsistent or varying adjudications with respect to individual
     members of the class which would establish incompatible standards of
     conduct for the defendants, all of whom oppose the class, or
            (B) adjudications with respect to individual members of the class
     which would, as a practical matter, be dispositive of the interests of the
     other members not parties to the adjudications or substantially impair or
     impede their ability to protect their interests; or
        (2) the party opposing the class has acted and refused to act on grounds
    generally applicable to the class, as more specifically alleged below, on grounds

which are generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole which this action seeks; or

(3) *** the questions of law and fact common to the members of the class predominate over any questions affecting individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

15.    The findings required by Rule 23(b)(1) and (2) are supported by the fact there is a large class of Non-liturgical chaplains against whom the Navy has operated in a systematic discriminatory manner, violating the Constitution, the Navy's own regulations, and promotion and equal opportunity policies. The declaratory and injunctive relief sought will affect all persons who have experienced the alleged discrimination.  The findings required by Rule 23(b)(3) are supported by fact that the constitutional and federal questions raised by plaintiffs dominate this action and apply to all members of the class.  If plaintiffs are successful, any individual relief that is incidental to this action will be determined by statute and require little if any involvement by the Court.  Additional considerations:

a.    The cost of pursuing individual relief would seem to preclude individual actions as evidenced by the almost complete lack of individual actions in this area.

b.    This is the fifth action challenging the Navy Chaplain Corps' policies and procedures. The first action, *Wilkins v. U.S.A.,* was brought by an individual chaplain  in the U.S. District Court in San Diego, CA in July 1999.  The second action, *Sturm v. Danzig*, was also brought in the U.S. District Court in San Diego in October 1999 by an active duty chaplain raising many of the same issues as in this case; it was dismissed as moot after CH Sturm was promoted to LCDR. The third action, *Chaplaincy of Full Gospel Churches v. Winter* ("*CFGC*"), was filed in the United States District Court for the District of Columbia, November 5, 1999.  It was brought by Chaplaincy of Full

Gospel Churches ("CFGC"), a recognized DOD endorsing agency, on behalf of itself, and as a representative of its active duty chaplains and Navy members of its faith group churches; eight CFGC chaplains joined as plaintiffs. *CFGC* raises many of the same issues here but is limited to CFGC endorsed Navy chaplains. The fourth action, *Adair v. Winter*, was filed in the District Court for the District of Columbia March 17, 2000. *See* ¶ 4 supra.

c.    There are no extraordinary difficulties in the management of this class action. There are no state law issues and this type of action is analogous to civil rights actions which are often resolved in a class action.

d.    The issues here are primarily constitutional and statutory which involve no exercise of military discretion or expertise.

## VI.  THE NAVY'S RELIGIOUS DEMOGRAPHICS

16.    The DOD records religious preference data for the individual service members. A 7/8/98 Report by the Defense Manpower Data Center (hereafter "DMDC") is attached at Exhibit 4. This data has special relevance to this case because it provides a factual religious demographic background against which to measure plaintiffs' allegations and the reasonableness of the Navy's actions and policies.

a.    Enlisted religious preference data is recorded at the time of enlistment on a block on the DD Form 4, Enlistment Form.

b.    Only the Navy has not provided its officer religious preferences to DMDC. Given the availability of this data in the Navy Officer Master Files, the failure to provide this data to DMDC is a conscious decision on the part of the Navy. Plaintiffs believe this omission is to hide the large number of Catholic officers, especially at the higher ranks.

17.     The DMDC data shows that the actual Navy membership of the Liturgical Protestant denominations at issue here represent about 8% of all DON active duty personnel, or about 11% of those who profess faith.[8]  Specifically, in 1998, those of various Methodist named or affiliated denominations, *i.e.*, those who have Methodist or Asbury in their name, represented approximately 3.78% (20,776) of all DON personnel (549,800); Presbyterian related denominations represented 1.05% (5,781); the various Lutheran denominations represent 2.90% (15,937);  Episcopal and Reformed Episcopal represented 0.73% (4,039); Methodist Episcopal represented 0.2 % (402); Reformed churches represented 0.1% (288); Orthodox represented 0.1% (256); a Liturgical Protestant total of approximately  8.76%.  In the February 2000 report, this total had decreased to 8.03%.

18.     Catholics, a major liturgical denomination, represented 24.09% (132,429) of the *total DON personnel* in 1998 and 23.56% (125,892) in 2000.  Of  total DON personnel *identifying a faith,* Catholics represented about one-third, 32.85% in 1998 and 31.59% in February 2002.

19.     Identified Non-liturgical faith groups currently represent about 53% of the Navy religious population identifying a faith.  The DON religious demographics based on the DMDC data for 1998-2001 and 2006 which includes DON officer preferences are shown at Exhibit 5.

**VII.  CHAPLAINS AS FAITH GROUP/DENOMINATIONAL REPRESENTATIVES**

20.     DODI 1304.28 implements the policies of DOD Directive ("DODD") 1304.19 ("The Appointment of Chaplains for the Military Departments") and defines chaplains as "religious ministry professionals" (RMPs): "an individual endorsed to represent a Religious Organization and to conduct its religious observances. An RMP is a fully qualified member of the clergy ...."  *Id.,* ¶E2.1.9.

---

8   About 1/3 of Department of Navy personnel identify no faith.

a.    1304.28 further defines "endorsement" as "the internal process religious organizations use when *designating RMPs to represent their religious organizations to the Military Departments*, confirming the ability of their RMPs to conduct religious observances or ceremonies in a military context." *Id.* ¶E2.1.7 (emphasis added). *See also In re England*, 375 F.3d 1169, 1171 (D.C. Cir. 2004), *cert denied*, 125 S.Ct. 1343 (2005) [citations omitted] (noting the "unique" role of chaplains "involving simultaneous service as clergy or a 'professional representative' of a particular denomination and as a commissioned officer.").

b.    In *Rigdon v. Perry*, 962 F.Supp. 150 (D.D.C. 1997), the executive director of the Armed Forces Chaplain Board submitted a declaration on behalf of the military defendants and DOD stating that chaplains were faith group representatives on loan from their faith group community who had "rank without command."

21.    DODD 1304.19, ¶4, "Policy," states chaplaincies of the Military Departments "are established to advise and assist commanders in the discharge of their responsibilities to provide for the free exercise of religion ... to assist commanders in managing religious affairs (DoD Directive 1500.73) (E)) and to serve as the principal advisers to commanders for all issues regarding the impact of religion on military operations."  DOD's definition of the chaplain's role, "to advise" and "to assist", shows DOD's intent to preclude chaplains' opportunities to exercise the sovereign's authority in any significant way, avoiding the appearance of "fusion" between religion and the government.

22.    The DOD's 1987 "Study of Representation of Religious Faiths in the Armed Forces" ("DOD Study") identified and analyzed tasks performed by military chaplains.

a.    "Each service indicated that a substantial majority of a chaplain's time is spent in

tasks that are clearly religious in nature, such as conducting religious services, education, and pastoral counseling.  The high percentage of time spent in these areas is to be expected, for *they are primary to the chaplain's role as a cleric in the military*."  *Id.* at I-12 (emphasis added).

b.     Considering whether "pastoral counseling" was secular or religious, DOD reported: "From the perspective of this study, pastoral counseling is considered a religious activity.  Pastoral counseling centers on the spiritual dimension, whether it involves crisis intervention, dealing with situational maladjustments, the management of stress, or caring for the bereaved and the victims of trauma."  *Id.*

c.     "Because of their roles as religious leaders, chaplains are sought after and become deeply involved in such programs as control of substance abuse, marriage enrichment, ethics and moral development, interpersonal relationships, and leadership."  *Id.* at I-13.

d.     "The administrative tasks, while secular in nature, are primarily associated with the management of ministerial activities within the military system."  *Id.*

e.     "In conclusion, the highest percentage of a chaplain's time is devoted to specific religious activities, and even those activities not clearly identified as religious in nature, are related to the execution of pastoral ministry."  *Id.* at 14.

23.     SECNAVINST 1730.7B, Subj: RELIGIOUS MINISTRY SUPPORT WITHIN THE DEPARTMENT OF THE NAVY, ¶ 4, specifically defined chaplains as "professional clergy of a certifying faith group who provide for the free exercise of religion for all members of the Department of the Navy" and defined their duties to "advise commands in matters of morale, morals, and spiritual well being."

24.    SECNAVINST 1730.7B, the operable regulation[9],  clearly and severely limits those

chaplain duties to "ministry support", *i.e.*, "religious activities."

> In accordance with Article 1063 of [Navy Regulations, 1990], chaplains shall be
> detailed or permitted to perform *only such duties as are related to ministry
> support*.  Chaplains shall not bear arms.  Chaplains shall not be assigned collateral
> duties which violate the religious practices of the chaplain's faith group, require
> services as director, solicitor, or treasurer of funds other than administrator of a
> Religious Offering Fund, serve on a court-martial or stand watches other that of
> duty chaplain.

¶ 4 (emphasis added).

25.    OPNAVINST 1730.1D of 06 May 2003, Subj: RELIGIOUS MINISTRY IN THE NAVY,

page 9, section (11), parallels this restriction:

> Chaplains shall not be assigned duties that violate noncombatant status or the
> religious practices of the chaplain's religious organization, undermine privileged
> communication, as defined in reference (m), or involve the management of funds
> other than the ROF. Chaplains shall not be assigned to serve as a member of a
> court-martial or on a Family Advocacy Program Case Review Committee;
> coordinate or advocate in the Sexual Assault Victim Intervention program; act as
> treasurer, director, or solicitor of non-ROF funds; stand watches other than those
> of Duty Chaplain; or participate in any activity directly prohibited by approved
> international conventions defining the status of noncombatant.

26.    10 U.S.C. § 647 requires a chaplain be separated (as a chaplain) if he loses his

endorsement.  He may be retained if he obtains another endorsement.

## VIII.  OTHER STATUTES AFFECTING THIS LITIGATION

28.    10 U.S.C. § 512 requires selection boards to be composed of a minimum of five officers,

one of whom should be from the category under selection.

29.    A chaplain's second FOS before reaching the rank of CDR can result in

involuntary separation form the Navy.  10 U.S.C. § 632.

---

9    On February 21, 2006 the Secretary issued 1730.7C which mirrors and does not change
     the relevant portions of 1730.7B, or its predecessor, 1730.7A.  Congress directed the
     Navy withdraw 1730.7C because it limited chaplains' religious speech when praying.

## IX.  THE NAVY'S ILLEGAL POLICIES AND ACTIONS

## COUNT 1

## THE NAVY'S ARBITRARY FGC GOALS AND/OR QUOTAS  ESTABLISHED AND MAINTAINED UNCONSTITUTIONAL RELIGIOUS PREFERENCE SYSTEMS

30.     The allegations of paragraphs 1 through 29 above are incorporated herein by reference as though pleaded in full.

31.     In the late 1960s and 1970s, America's religious demographics began a large, steady and measurable shift away from Liturgical Protestant denominations to Non-liturgical churches, to which plaintiffs and the class belong.   This trend continues today.

32.     Until approximately mid-1986, the allocation of authorized Navy chaplains among the various faith groups was based on objective criteria, the relative percentage a faith group or denomination represented in the total American religious population as reported in sources such as the annual Yearbook of American and Canadian Churches.  For example, if there were 100 Navy chaplains authorized and Catholics made up 25% of the American religious population and Baptists made up 20%, the Navy would try to have 25 Catholic and 20 Baptist chaplains.  *See* Exhibit 6 - formula for computing accession goals; Affidavit of CAPT Larry Ellis, CHC, USN, Exhibit 7, ¶ 7.

33.     Faced with shrinking Liturgical Protestant faith group membership, a growing Non-liturgical population and the implications for Navy chaplain faith group authorizations, the Navy abandoned its "objective" criteria (linking faith group membership with chaplain authorizations) around 1986.  It was replaced with the amorphous, subjective "Thirds Policy."

34.     A 7/31/86 Memo from CAPT Muchow (later Chief of Chaplains) to the Chief,  "Subj: Revised Fiscal Year 87 Accession Plan" (Exhibit 9), explained and implemented the "Thirds

Policy."  It divided chaplain end-strength allocations among three religious groupings made up of

faith group clusters or categories ("FGC"): Liturgical Protestant faith groups received 35%, Non-

liturgical faith groups received 35%, and "Others"constituted the remaining 30%, of which 25%

were to be Catholic.  In other words, the CHC reserved 35% of Navy chaplain promotions,

retentions on active duty and accessions for Liturgical Protestant chaplains, a FGC that

represented less than 12% of the identified religious needs of the Navy, in contrast to the Non-

liturgical free exercise needs which were approximately four times the Liturgical Protestants.

35.     The Thirds Policy created a denominational barrier allowing Liturgical Protestant (35%)

and Catholic (25%) chaplains, *i.e.*, the liturgical traditions, to maintain control of the CHC while

excluding Non-liturgical chaplains from real influence and representation.

    a.      No Navy document or witness has explained the rationale or logic behind the

    Thirds Policy's FGC percentages or how FGC recruiting goals or end strengths from

    FY87-00 were computed.

    b.      The Navy continued to emphasize recruiting Liturgical Protestant chaplains

    despite those faith groups shrinking memberships.  *See* Exhibit 8, Accession goals FY88-

    2001.  In some years the Liturgical Protestant accesion goal was twice that of Non-

    liturgicals.   The total accession goals over the 13 year period show the Thirds Policy for

    accessions had morphed into one-third each for Catholic, Liturgical Protestants, and the

    remaining one-third for Non-liturgicals and Special Worship.

    c.      Five Year End Strength plans show the CHC's consistent attempts to increase the

    Liturgical Protestant percentage of the CHC while decreasing Non-liturgical percentages

    below the Liturgical Protestant FGC.

36.    The Navy rejected otherwise qualified Non-liturgical chaplain candidates, including AGC candidates, because of CHC bias against their faith group's beliefs, traditions and worship practices.

a.    The Thirds Policy was implemented by two distinct mechanisms, (i) the arbitrary FGC accession goals and (ii) the CARE Board process which uses chaplains to evaluate other faith groups candidates for appointment as chaplains with no objective criteria. Because more Non-liturgicals applied than Liturgicals, the CARE board process was necessary to conform the applicant selections to the Thirds Policy.

b    Although Non-liturgical faith groups provided the largest FGC group of Navy chaplain candidates from 1985 to 2005, their FGC acceptance rate was 70.39% compared with the Catholic accession rate of 94% and Liturgical Protestant rate of 82.5%.

c.    The Navy has three accession programs for chaplains: the Chaplain Candidate Program ("CCP") (or Theological Student Program); the D4105-A, which takes civilian clergy  and commissions them directly to active duty; and D1405-I , which commissions civilian clergy into the inactive Naval Reserve.

d.    Statistical analysis of FGC accession rates from 1985 to 2005 for all chaplain accession programs shows a consistent pattern of preference for Roman Catholics ("RC"), followed by Liturgical Protestants ("LP") and in two of the three programs, Special Worship ("SW") followed by Non-liturgical ("NL") faith groups.

| Program | RC | LP | NL | SW |
|---------|------|------|--------|------|
| CCP | 95.0% | 82.5% | **75.6%** | 88.8% |
| D4105-A | 92.4% | 77.0% | **65.7%** | 61.4% |
| D4105-I | 96.3% | 77.3% | **60.7%** | 75.0% |

Source: Tables 1 (CCP), 7 (D4105-A), and 8 (D4105-I), from *Larson v. U.S. Navy*, No. 02-cv-2005 Exhibit 28 to Doc. No. 48., September 2006 Withdrawal & Correction Declaration Denominational Preference in the U.S. Navy Chaplain Corps Accessions, Expert Declaration of Harald R. Leuba, Ph.D., (the "W&C"), incorporated by reference.

     e.     FGC active duty acceptance rates from 1985 to 2005 for officers who completed the CCP, the S4105 program, show the same consistent pattern of preference.  Non-liturgical ("NL") faith groups are last again.

| Program | RC | LP | NL | SW |
|---|---|---|---|---|
| S4105-A | 100% | 94.0% | 76.8% | 91.3% |

*Id.*, Table 3 (S4105-A).

     f.     There are wide variations in the faith group accession rates within the Non-liturgical FGC.  AGC has one of the lowest rates, 2002-2005 Non-liturgical Accession, Table QE-6 (**Exhibit 21**) from *Larson v. U.S. Navy,* W&C, pp. 149-150;

     g.     The wide variation in the FGC accession rates is due to the Navy's use of a set of favored denominations for its CARE Board memberships who tended to approve those most like themselves and reject or limit those not like themselves.

**The Navy's Implicit Favorites:**          **Percent Recommended for Accession***

**Tier I**   Roman Catholic
     - There was at least one Roman Catholic on most CARE Panels     96.40%

**Tier II**   SB,  ELCA, UM , LMS, NBCUS, BGC, ABC, CS  & SDA     85.45 %
     - Significant representation on CARE Advisory Group

**Tier III**  EC, AME, PNBC, RCA, etc     79.71 %
     - Minimal or No representation on CARE Advisory Group
* Data from Navy's electronic data base, 27 July 2006
Source: The Siskin Conjecture, ¶ 63, Exhibit 15 to *In re Navy Chaplaincy*, Doc. No. 21 (Rule 54 Motion), incorporated by reference.

84

h.      Statistical analysis of board memberships and board decisions shows the CHC

treated Baptists more favorably than non-Baptist Non-liturgicals ("NBNL").

37.    The CHC applied the Thirds Policy to promotions.  Analysis of promotion board results

shows the original Thirds Policy continued to remain generally in effect through FY1995.

Catholics did not fill their accession quotas but reduced Catholic accessions did not affect the

number of Catholics promoted to CAPT until approximately 1996.

a.      During some time periods, CHC promotion boards consistently promoted

approximately the same number of Liturgical Protestant chaplains as Non-liturgical

chaplains, indicating the Thirds Policy evolved into (i) a quota making Liturgical

Protestant chaplain promotions approximately equal to Non-liturgicals, and (ii) a floor of

at least one- third Liturgical Protestants in the CHC.   The chaplain LCDR and CDR

promotion boards for FYs 97-99 provide the following FGC results.  Liturgical Protestant

consistently averaged at least 34% of promotions regardless of their percentage of the

DON's religious population.

| FY | Catholic | Prot. Liturgical | Non-liturgical | Special Worship |
|---|---|---|---|---|
| Commander | | | | |
| 97 | 6 | 8 | 6 | |
| 98 | 2 | 2 | 3 | |
| 99 | 6 | 9 | 8 | |
| Total (50) | 14 (28%) | 19 ( 38.0%) | 17 (34%) | |
| | | | | |
| Lieutenant Commander | | | | |
| 97 | 6 | 9 | 6 | 1 |
| 98 | 3 | 7 | 9 | 1 |
| 99 | 7 | 9 | 14 | |
| Total (72) | 16 (22%) | 25 (35%) | 29 (40%) | 2 (3%) |

b.      The Non-liturgical FGC classification hides the CHC's bias against the non-

Baptist Non-liturgical faith groups.

c.      The promotion board results show CHC's strong bias against prior-service Non-liturgicals.

d.      Cohort analysis of promotion rates shows the standard pattern of prejudice,  Non-liturgicals are below Liturgical Protestants who are below Catholics.

38.     By policy and practice, the CHC has established a favored set of denominations for use on selection boards which distribute government benefits.

a.      From FY1977 to 2003, 80% of promotion board memberships went to five denominations: Roman Catholic (RC), Southern Baptist (SB),  United Methodist (UM), Presbyterian Church USA (PUSA), and Evangelical Lutheran Church in America (ELCA)

b.      Statistical analysis of board precepts showing the frequency of denominations participation on promotion boards, shows the Navy's Implicit Favorite Denominations can be divided into four tiers:

**Tier I**   Roman Catholic
        - a faith group cluster composed of one denomination
        - There was at least one Roman Catholic on every Promotion Panel

**Tier II**   PUSA, SB,  ELCA, UM , LMS, ABC, CC(DC), UCC & SDA
        - Double digit percentage likelihood of representation on Promotion boards

**Tier III**  EC, AME, NBCUS, PNBC, RCA, etc.
        - non-trivial participation

**Tier IV** CGIC, CR, ORTH, CHCCC, N, PCA, GAGB, CFGC, etc.
        - Minimal participation, or no participation on Promotion Boards
Source: Siskin Conjecture, ¶ 48, Exhibit 15 to *In re Navy Chaplaincy* plaintiffs' rule 54(b) Motion to Amend or Alter 2002 Interlocutory Decision.  *In re Navy Chaplaincy* Doc. No. 21 (incorporated by reference).

39.     The goal of the unconstitutional Thirds Policy was further implemented by a deliberate, systematic, discriminatory Navy retention policy whose purpose was to keep Non-liturgical

chaplains from continuing on active duty beyond their initial three-year tour, assuring they would not be considered for promotion and minimizing their future influence.

    a.    Although plaintiffs' faith groups had been increasing and represented the majority of DON's religious population, they and other Non-liturgical chaplains were refused continuation on the basis of their faith group rather than their records.

    b.    Although Liturgical Protestant chaplains represented approximately 12% of the DON religious needs, they received 35% of the retention allocations and were routinely selected for retention beyond their initial 3-year tour of service in numbers disproportionate to their DON denominational membership. This policy resulted in the over-representation of Liturgical Protestant chaplains and the under-representation of Non-liturgicals in the Navy chaplain program.

40.    The Navy routinely accessed more chaplains than it needed, deciding whom it would retain or release by a Chaplain Active Duty Retention Advisory Group ("CADRAG") board.

    a.    Statistical analysis shows the Navy had a favorite set of denominations it routinely used for chaplain selection boards both statutory and administrative, *e.g.*, CADRAG. The denominations can be placed in Tiers according to frequency of appearance on boards.

    b. When CADRAG results are examined by denomination and Tier, the results show the board members' denominations are important.

### Probability of Selection for Continuation in Service
### Candidate Denominations Tiered

| Faith Cluster | Number Considered | Number Selected | Number Rejected | Percent Continued | Percent Rejected |
|---|---|---|---|---|---|
| Tier I | 46 | 43 | 0 | 100% | 0% |
| Tier II | 85 | 69 | 8 | 89.6% | 9.4% |

| Tier III | 115 | 86 | 18 | 82.7% | 15.7% |
|---|---|---|---|---|---|
| Total | 246 | 198 | 26 | 88.6% | 10.3% |

\* Number Considered includes selected + rejected + alternates.

Source: Table 5 from the Siskin Conjecture

c.   These results are statistically significant (using a Chi Square statistic) at $p<.001$ (more than three standard deviations.)  Chance alone cannot account for this significant difference among the denomination-based clusters.  Most of plaintiffs' faith groups fall in Tier III.

d.      The evidence above shows decisions as to who would be released from active duty after their initial three years of service were influenced by a chaplain's faith group under the Thirds Policy, not on performance or meeting DON's religious needs.

41.    These policies clearly established denominational preferences and discriminated against plaintiffs, Non-liturgical chaplains and the personnel they represent, but served no legitimate compelling secular or neutral purpose, and were not narrowly tailored to do so.

42.    These above patterns and practices violate the Constitution's First and Fifth Amendments, and fail strict scrutiny and any Establishment Clause test.

## COUNT 2

### THE NAVY HAS ESTABLISHED A HIERARCHY
### OF PREFERRED RELIGIOUS TRADITIONS

43.    The allegations of paragraphs 1 through 42 above are incorporated herein by reference as though pleaded in full.

44.    The Navy's unlawful religious quota system described above favors Catholic and Liturgical Protestant chaplains in promotions, retention, and career opportunities while Non-liturgical chaplains are denied these same benefits and rewards of military service.

45.    A statistical examination of the CHC's practices and policies by the *CFGC/Adair* plaintiffs' expert found that "Every dimension of personnel management which can be illuminated with data shows that Non-liturgical chaplains are disadvantaged by the CHC' policies and practices of religious preference...", Compendium Declaration of Dr. Harald R. Leuba, Ph.D. (the "Compendium"),  at 16, ¶8, Exhibit 13 to *In re Chaplaincy* Doc. No. 21, incorporated by reference.

46.    In a further analysis, Dr. Leuba concluded:

> The inescapable conclusion is that U.S. Navy Chaplain Corps' personnel decisions are contaminated by considerations of denomination. There is an institutional preference among denominations (Catholic > Episcopal > other Liturgical > Baptist > other Non Liturgical > Orthodox and Special Worship) and this preference priority forms the basis for populating the selection boards; that pattern of preference in turn controls the mix of denominations which are selected into, promoted within, or involuntarily retired from the U.S. Navy Chaplain Corps. The favored denominations receive disproportionate benefit; the disfavored ones are denied unbiased and equitable consideration for admission, advancement, and tenure."

Dr. Leuba's Allonge Declaration ¶6 (Exhibit 10).

47.    The CHC command has fostered the promotion of a disproportionate number of "high church" Protestant and Catholic Chaplains to the ranks of Commander, Captain and Admiral, and key billets in the Navy Chaplain Corps, *i.e.*, those positions with decision making responsibilities.  Prior to 2006, only one Non-liturgical held the office of Chief of Chaplains since 1917 (Exhibit 2), although the current Chief is a Non-liturgical selected after the chaplain litigation was filed.

a.    In January 1995, the Chaplain of the United States Marine Corps, CH (CAPT) Larry H. Ellis, wrote a memo to Navy Chief detailing years of apparent institutional bias against "low-church" Protestant Navy chaplains in regard to assignments to the most

prestigious and influential positions or billets within the CHC. CAPT Ellis Memorandum to Chief of Chaplains (hereafter "Ellis Report") (Exhibit 11).

b.      CAPT Ellis' memo states that as of his 1/25/95 report, only 14 clearly Non-liturgical Navy chaplains had filled the 119 top CHC billets over the prior 15 year period (1979-84), a fill rate for Non-liturgicals of 11.8%. *Id.* at ¶ 5. The fill rate for Liturgical Protestants was greater than 50%, *id.*, far out of proportion to the percentage of the liturgical denominations in the general population, the DON or the CHC.

c.      Despite this clear indicator of institutionalized religious discrimination, the Navy took no corrective action.

d.      Catholics and Liturgical Protestants still occupied a disproportionate percentage of those same key positions when this suit was filed.

e.      The policy placing two Catholic chaplains on every selection board (the 2RC Policy) from FY1977 to 1986 (started by RADM O'Connor and continued by following Chiefs) and the subsequent reduction to only one Catholic on each board (the 1RC Policy) led to a high selection rate for Catholics not based on performance or other legitimate selection criteria, especially at the key CDR level.

f.      The corollary policy followed by Chiefs after RADM O'Connor of placing two or more Liturgical Protestant chaplains on most chaplain selection board in addition to two Catholics, also prejudiced plaintiffs or gave the appearance of favoritism for the liturgical tradition.

g.      The 2RC policy was replaced in 1986 by the 1RC Policy which continued through FY 2002.

48.     The effect of the above policies can be seen in the table below showing what happens to

the careers of one hundred chaplains of each FGC and when the Non-liturgical FGC is

subdivided into Baptists and non-Baptists.  *See* Compendium Table K-10.

**Career Pattern by Faith Group**

| Faith Group → Period ↓ | Roman Catholic | Liturgical Protestant | Baptist | Non-Baptist Non-liturgical |
|---|---|---|---|---|
| Accessioned | 100 | 100 | 100 | 100 |
| Serve 10 yrs | 47 | 56 | 63 | 66 |
| Serve 20 yrs | 39 | 54 | 60 | 60 |
| Serve 30 yrs | 22 | 37 | 14 | 20 |
| Rise to CDR | 48 | 43 | 38 | 29 |
| Rise to CAPT | 23 | 22 | 15 | 11 |

49.    This data shows a consistent pattern:

   a.    Catholics and Liturgicals are "over-represented" in the top category of longevity

(30 years) - signaling that they were promoted and retained in the CHC in excess of their

DON and CHC representation.

   b.    The percentage of Catholics promoted to CDR and CAPT is greater than that of

any other FGC, showing their advantage in the promotion process.

   c.    Non-liturgicals in general, and Non-Baptist Non-liturgicals (NBNL) in particular

are under-represented in length of service (30 years), showing they were not promoted

and had to leave.  Had they been promoted, that record would have appeared in the CHC

History (biography) volumes as they would have been on active duty with their peers.

   d.    Non-liturgicals in general, and NBNLs in particular are under-promoted, and even

those who survive their initial tours have an average lower rank than chaplains from other

FGCs.

50.    The CHC reserved at least one selection board membership for Roman Catholic Chaplains for every possible career grade selection board that did not require Admiral board members from 1976 (FY77) until FY2002.

51.    This preference gave Catholics the ability to manipulate and control selection boards through secret votes, the small numbers of members and lack of accountability.  *See* Count 3.

52.    In addition to chaplain accession goals favoring Liturgical Protestants, the Navy's Reserve chaplain recall policy has demonstrated an illegal preference for Catholics and Liturgical Protestants.

> a.    In violation of its own policy and regulations, the Navy has brought senior ranking liturgical chaplains to active duty from the Naval Reserve who then compete and are selected for promotions without serving the necessary time in the difficult tours and demanding assignments the Navy requires for Non-liturgical chaplains to be competitive for promotion, *e.g.*, CAPTs Rock (RC), Vierra (UCC), Anderson (RC).

> b.    Whereas Non-liturgical chaplains who left active duty and were promoted to LCDR in the Reserves had to give up their rank to return to active duty, Catholic and Liturgical Protestant chaplains were allowed to return to active duty and keep the rank above LT obtained in the Reserves.

> c.    In September 2001 the Navy brought CDR John Lyle, a Catholic reservist, to active duty.  The Navy first placed him on temporary duty for 208 days, a violation of the Joint Travel Regulation which limits temporary duty to 180 days, and disguised his illegal recall by recalling him as a flight surgeon.  Exhibit 12.

53.    The Navy Chaplain command has fostered a "high church" Protestant and Catholic monopoly of Chief of Chaplain's position by policy and practice.  In 1988-2000, three of the four

Chiefs of Chaplains were Lutheran.  Prior to the *CFGC* and *Adair* chaplain lawsuits, only one clearly Non-liturgical officer has held the CHC's highest post, Chief of Chaplains.  List of Chiefs of Chaplains (Exhibit 2).

54.    The Navy discriminates in its chaplain retention policies and practices on the basis of a chaplain's religious faith group or denomination.

    a.    In spite of Title 10 U.S.C. § 632's requirement that an officer who is twice passed over for promotion be separated from the Navy, chaplains from favored denominations have been retained by the CHC despite multiple FOS.  Many Catholic chaplains who have twice FOS have been routinely provided with additional 3rd, 4th and more opportunities for promotion, whereas chaplains of Non-liturgical faith groups or denominations have routinely been separated after two FOS.

    b.    Although 10 U.S.C. § 14509 required separation of Reserve officers at age 60 until 2004, the CHC has retained Catholic chaplains, including FOS LTs and LCDRs, into their 60's and 70's until they qualify for a pension at 20 years time in service.

    c.    The Navy has used the SER process to reduce the number of higher ranking Non-liturgical chaplains, removing them from service while retaining Liturgical chaplains with inferior records and less potential for future service.  This insured domination of the CHC by the liturgical tradition and the minimization of Non-liturgical influence and opportunity for consideration for Admiral.

    d.    While "SERBing" Non-liturgical chaplains, the Navy has recalled liturgical Reserve chaplains at the career ranks of LCDR, CDR and CAPT, contrary to Navy policy, promoting many after they have returned to active duty.  Bringing these chaplains on at higher ranks reduces the number of promotions accordingly.

e.      The CHC has used the promotion system to enforce its promotion quota and/or Thirds Policy and CADRAG policy, forcing out otherwise qualified Non-liturgical chaplains, thereby ensuring Liturgical Protestant domination of the CHC.

55.    The effect of the Navy's 2RC and 1RC Policies, its denominational quota system and its granting religious preferences to the liturgical religious traditions has impermissibly endorsed Catholic and Liturgical Protestant as preferred religious traditions in violation of the First Amendment's Establishment Clause.

56.    This illegal endorsement and its associated policies do not serve a compelling government interest nor are they narrowly tailored to serve such an interest and violate the First and Fifth Amendments.

## COUNT 3

### THE NAVY'S CHAPLAIN SELECTION BOARD SYSTEM AND ITS PROCEDURES ARE UNCONSTITUTIONAL

57.    The allegations of paragraphs 1 through 56 above are incorporated herein by reference as though pleaded in full.

58.    In contrast to the U.S. Army and U.S. Air Force, which have used large selection boards made up of officers from other categories (both line and staff) to select chaplains for promotion, the Navy's small chaplain selection boards which failed to select most of these plaintiffs until recently were dominated by chaplains.

a.      From FY77 to FY87, all board members were chaplains.  From FY87 until after the FY01 CAPT board, *i.e.*, after *Adair* was filed, each career grade promotion board had one line officer.

b.      Beginning in FY02, there were two line officer board members.

94

      c.      Currently, career grade promotion boards have two chaplains, one of whom is the Chief or Deputy, who act as president.

59.     In spite of the stated precept the board may consider only merit and not denominational affiliation, until 2002, after several chaplain suits were filed, each selection candidate's three digit "faith group identifier" code (called an additional qualification designator or "AQD") was prominently displayed throughout the selection board process.[10]  The Navy chaplain promotion board members, who are denominational representatives, were clearly made aware of each chaplain selection candidate's denomination or faith group.

60.     This procedure's only purpose was to identify a candidate's faith group to the board, thereby creating a suspect religious category unrelated to any legitimate Navy objective.  This procedure allowed the Navy to enforce its Thirds Policy and permitted chaplains to exercise their individual or faith group prejudice for or against other chaplains or faith groups, particularly against Non-liturgical chaplains.

61.     The Navy Chief of Chaplains (the "Chief") is a Rear Admiral and approved all chaplain board members for the Navy's chaplain promotion boards until after the chaplain suits were filed.

      a.      In 1976, Catholic Chief of Chaplains RADM O'Connor began placing two or more Catholics on each career grade chaplain promotion board.

      b.      The Liturgical Protestant Chiefs who succeeded RADM O'Connor continued placing two Catholics on every board and ensured at least two Liturgical Protestant chaplains, sometimes the same denomination as the Chief or his Deputy, were board members.

---

10  In other chaplain litigation, the Navy maintains it no longer identifies each chaplain's AQD to the board members.

c.      The CHC stacked boards with Liturgical chaplains from FY77-02; some boards had no Non-liturgical board members.  Exhibit 13.

d.      The 2RC Policy ended in 1986 when CH (then LT) Ronald Wilkins, faced with discharge after two FOS, challenged the 2RC policy and obtained an injunction against his discharge.  The *Wilkins* Court found "the [Navy]'s policy of placing two chaplains of the Roman Catholic faith on each and every Chaplain Corps Selection Board" was probably "a violation of the First Amendment."  *Wilkins v. Lehman*, Civil No. 85-3031-GT, slip op. at 8, (S.D.Cal. 2/10/86) (Order Granting Injunction).  Exhibit 3.

e.      That decision produced a settlement with CH Wilkins, which included an end to the 2RC Policy.

f.      The *Wilkins'* Court suggested the Navy adopt the Army and Air Force practices of using non-chaplains as board members, which the Navy rejected.

g.      The Navy adopted the 1RC policy, reserving a promotion board membership for one Roman Catholic chaplain on every career grade selection board that did not require Admirals as board members, until FY 03.

h.       Although Catholics represent about  23.6% of the Navy (*see* Exhibit 5 and ¶ 19) and despite the *Wilkins* decision indicating that placing two chaplains of the same denomination on the same chaplain promotion board was constitutionally suspect, the Navy placed two Roman Catholic chaplains on the FY97 LCDR Chaplain Selection Board and on the FY98 CDR selection board.  Because the Chief selected or approved the board members, this was not an accident or the result of some random process.

62.     Existing records identifying the board members for the 73 career grade promotion boards

from FY77-02 (Exhibit 13) show the following  frequency of denominational and faith group

cluster (FGC) representation on these boards.  *See* Compendium Table 1.

### Representation by Faith Group & FGC
### Number of Boards

| Seventy Three Boards | Roman Catholic | Liturgical Protestant | Non-liturgical Baptist | Non-liturgical Other | Special Worship Jewish | Special Worship Other |
|---|---|---|---|---|---|---|
| Number of Boards with **No** Officers of this Faith: | 0 | 0 | 16 | 52 | 66 | 57 |
| Number of Boards with **One** Officer of this Faith: | 42 | 13 | 40 | 20 | 7 | 16 |
| Number of Boards with **Two** Officers of this Faith: | 29 | 35 | 17 | 1 | 0 | 0 |
| Number of Boards with **Three** Officers of this Faith: | 2 | 21 | 0 | 0 | 0 | 0 |
| Number of Boards with **Four** Officers of this Faith: | 0 | 4 | 0 | 0 | 0 | 0 |

63.     This Table clearly shows religion-based decision-making took place in the composition of

CHC promotion boards.

    a.     Every chaplain promotion or SER board from FY77 to FY02 not requiring

    Admirals as board members was composed under the 2RC or 1RC policy.  A few

    promotion boards had three Catholic members.

b.      Eighteen percent of the boards had only one Liturgical Protestant Chaplain, 82% had two or more and 29% had three.  No board lacked a Protestant Liturgical board member.

c.      Some boards had no Non-liturgical board member and only 18% of the boards had a NBNL board member.

d.      The Navy discontinued its 1RC Policy in FY03, after several chaplain lawsuits challenged the practice in their complaints.

64.    "Having the good fortune to find a member of your denomination on the selection board is worth a 25% increase in your likelihood of selection [(65%-51%)/51%]; a close match is worth about half that benefit."  Allonge Declaration of Harald  Leuba, Ph.D. (Exhibit 10) at 7, ¶22. Allonge Table 1 (pg.7),  shows the "Effect of a Denominational Match on Selection for Promotion (to Commander, 1981-2002)"

| Candidate Category | Number Considered | Number Selected | Probability of Promotion |
|---|---|---|---|
| 1. Catholic (Always a Match) | 170 | 113 | .665 |
| 2. Non-Catholic, Strict Match | 111 | 72 | .649 |
| 3. Non-Catholic, Close Match | 94 | 54 | .574 |
| 4. Non-Catholic, No Match | 328 | 168 | .512 |

65.    The Chief's control of the composition and membership of CHC promotion boards served no purpose or rationale except to control the composition and makeup of the CHC in a manner to ensure the continued operation of the Navy's illegal religious quota system for the benefit of preferred religious traditions.

a.      Exhibit 14 shows the over- and under-representation of FGC board members compared with the LT community under consideration for promotion to LCDR. Catholics were never under-represented whereas Non-liturgicals always were.

98

b.      Exhibit 15 shows the over and under representation of FGC board members compared with the LCDR community under consideration for promotion to CDR.

66.     As stated in ¶ 38 above, the Navy has a favorite set of denominations for promotion board memberships, giving five denominations 80% of chaplain promotion board memberships from 1977-2002 as shown.  The column "% Selected to CDR", shows the denomination of board members influences the board results and the favored denominations receive more promotions than the less favored from which many of these plaintiffs come.

**1977 thru 2002 Denominational Appearance as Promotion Board Members**
(  )= total number of appearances

| Faith Group Cluster → | Roman Catholic | Liturgical Protestant | Non-Liturgical Protestant | Special Worship | % Selected to CDR* |
|---|---|---|---|---|---|
| Tier I - 100% | RC (102) | | | | **48.34 %** |
| Tier II - 25 to40% | | PUSA (43) ELCA (29) UM (21) LMS (15) ABC (12) UCC (10) CC/DC (10) | SB (37) | SDA (11) | **45.07 %** |
| Tier III - 7 to15% 4 to 8 seats in 25 years | | AME (8) RCA (7) EPIS (7) | NBCUS (7) PNBC (7) | J (6) | **36.12 %** |
| Tier IV - 0 - 5% 0 to 3 seats in 25 years | 5 Other [Catholic type] (0) | CRC (3) ECCA (3) CME (2) 53 Others(0-2) | BGC (5) GARB (4) CGIC (3) 109 Others (0-2) | LDS (4) ORTH (3) CS (1) 10 Others (0) | **27.00 %** |

 * As reported in Biographies, Chaplain Corps History, Volume X.
Source: the Siskin Conjecture, ¶ 48, Exhibit 15 to *In re Navy Chaplaincy* plaintiffs' rule 54(b) Motion to Amend or Alter 2002 Interlocutory Decision. *In re Navy Chaplaincy* Doc. No. 21 (incorporated by reference).

66.    These differences are statistically significant, *i.e.*, not the result of chance, showing some

board members advance their own denominations in violation of the Establishment and Due

Process Clauses, which occurs at the expense of plaintiffs and the less favored denominations.

67.    Although one of the CHC's favored denominations for board memberships is the

Southern Baptist Convention, *see* ¶ 38 *supra*, the denomination of several of these plaintiffs,  this

favoritism has masked and/or enabled prejudice against them because of their strong

conservative theological and evangelical beliefs..

   a.    Testimony in *Adair v. Winter*, shows "there was a big battle in the Southern

   Baptist Convention with liberalism vs. conservatism" in the 1970s and '80s

   b.    That same testimony, agreeing with some plaintiffs experience, shows some

   senior Southern Baptist chaplains were very liberal and were for all practical purposes

   liturgical.

   c.    The ability to zero out a chaplain with no accountability allowed liberals of any

   faith group to end the careers of committed evangelicals and conservatives.

   d.    The fact Southern Baptists were favored in a CHC whose leadership was largely

   Liturgical Protestant is no defense to the Navy's illegal and burdensome prejudice and

   discrimination against these Southern Baptist plaintiffs or these non-Baptist plaintiffs.

68.    The Catholic and Liturgical Protestant domination of CHC promotion boards despite the

religious demographics of the DON and the CHC, *see* ¶¶ 61-62, *supra*, has benefitted them to the

detriment of plaintiffs.

69.    The Chiefs and Deputies have exercised enormous improper power and control over

Chaplain promotions in their role as board president.

a.    One Chief informed a board of his personal list of those whom he believed constituted "the future of the Navy."  The chaplains so identified were promoted.  This is a *per se* violation of 10 U.S.C. § 615 (defining type of information provided to board) and § 616(f)(2) (improper influence on board forbidden) as well as  the Navy's promotion board policies.

b.    RADM Holderby admitted to the NIG that as a RADM and board President, he could influence junior board members.

c.    The Chief and Deputy have inherent power to retaliate in subtle ways against any chaplain board member who challenges, disagrees with, or opposes them in selection decisions.

d.    A line officer was board president for the FY01 CHC CAPT board.  It selected 7 Non-liturgicals and 3 Liturgical Protestants.  In FY02, the Chief was again board president and the board chose 10 Liturgical Protestants and 3 Non-liturgicals.  The FY00 board (chaplain as president) selected 5 Liturgical Protestants and 5 Non-liturgicals.

70.    The Navy chaplain selection boards, both promotion and SER, were and are composed of a small number of board members, usually five or six, who vote confidence levels of  0, 25, 50, 75, and 100 in secret.  One zero vote guarantees the candidate will not be selected.[11]  This violates the First and Fifth Amendments by:

---

11  The NIG investigation of the FY00 Chaplain CAPT Promotion board established the female chaplain board member "zeroed out" a female chaplain candidate because the female board member disagreed with the candidate's view of women in ministry.  The NIG report describes zeroing out, a not uncommon practice on CHC boards.

a.      Delegating to denominational representatives discretionary government authority to award, deny or terminate government benefits for other denominational representatives;

b.      This delegation is absent *guarantees* the authority will be used for secular, neutral and non-ideological purposes as shown by several board investigations;

c.      The display of a chaplain's faith group allows some board members to exercise, either consciously or unconsciously, their denomination or faith group bias either (1) for those of their own faith group, thereby advancing their own faith group, or (2) against those faith groups whom they disagree with or dislike, and thereby penalize them, all in violation of the First Amendment;[12]

d.      Allowed the Catholic and Liturgical Protestant traditions and the Chiefs to operate the CHC much like a religious patronage system, in violation of the First and Fifth Amendments;

e.      Provides an unchallenged opportunity for religious bias or denominational issues to interfere with selecting the best qualified chaplains for promotion;

f.      Promotes denominational factionalism by creating the appearance, if not the reality, of promotion decisions being made on religious criteria unrelated to career performance and forbidden by the First Amendment as indicated in the Stafford Report and the subsequent DOD Inspector General inspection described below;

---

12   Plaintiffs do not allege all chaplains on chaplain selection boards would vote on their biases or preferences, but some have and some would, knowingly or unknowingly.

g.    Allows some board members to violate without accountability federal statues and the Navy's own equal opportunity regulations and policy concerning selection of best qualified candidates for promotion or retention.

h.    Promotes denominational tension by creating the appearance and reality of preferences for Catholic and Liturgical Protestants forbidden by the First and Fifth Amendments.

## Evidence of Religious Discrimination In Chaplain Promotions

71.    In 1997, responding to an allegation of religious discrimination by then LCDR Aufderheide on the FY97 and 98 Commander (O-5) chaplain promotion boards, CAPT J. N. Stafford, special assistant for Navy minority affairs, investigated the board results and submitted a report to the Chief of Naval Personnel (Exhibit 16).

a.    CAPT Stafford's analysis of the FY97 and 98 chaplain CDR promotion selection boards indicated "that the board may have systematically applied a denominational quota system."  *Id*. at 1, ¶ 2.

b.    CAPT Stafford also noted physical fitness standards that would have kept line officers from being promoted were apparently "waived" or ignored for certain liturgical chaplains who were promoted.  *Id*. at 2, ¶ 4.

c.    The subsequent March 1999 DOD IG investigation into the same boards found faith group "may have been a factor in" both the FY97 and 98 CDR boards in selecting chaplains for promotion.  Exhibit 17 (Extracts pp.3 & 4).

d.    The NIG and DOD IG board member interview notes clearly show denomination was a factor that overrode records, resulting in promotions for less qualified chaplains.

72.    While the NIG and DOD IG's evidence validated CAPT Stafford's finding that denomination was a promotion criteria, the Navy took no action to eliminate its use of "denominational considerations" for chaplain promotions or other obvious unconstitutional practices.

    a.    This evidence of systematic, illegal denominational bias shows Plaintiffs' and their class' opportunities for promotion were diminished in violation of the First and Fifth Amendments.

    b.    The 1RC and 2RC Policies established a forbidden religious test for board membership in violation of Article VI of the Constitution.

## SER Boards

73.    The 1RC policy was applied to every SER board that did not require Admirals as board members.[13]

74.    Every chaplain SER board had at least one chaplain board member.

75.    The CHC's favoritism for some denominations for board memberships, including Southern Baptists, *see* ¶ 38 *supra*, has masked and/or enabled prejudice against these plaintiffs, including these Southern Baptists, and their strong conservative theological and evangelical beliefs.

76.    All of the above challenged selection policies use facially neutral regulations and statutes as a cover for an illegal, systematic, discriminatory system or practice to accomplish forbidden religious discrimination and homogeny in the CHC.

---

13  As an economy measure, the FY 91-94 CAPT SER boards whose members by regulation had to be Admirals, also conducted the CDR SER boards.

77.    The above Navy policies and procedures violate the First and Fifth Amendments, RFRA, are subject to strict judicial scrutiny, are not related to a compelling government interest and are not narrowly tailored to achieve that purpose.

## COUNT 4

### THE NAVY HAS BEEN HOSTILE TO NON-LITURGICAL WORSHIP NEEDS

78.    The allegations in paragraphs 1 through 77 above are incorporated herein by reference as though pleaded in full.

79.    In violation of the First Amendment's Establishment, Free Exercise and Free Speech Clauses, the Navy has tried to established a *de facto* liturgical or "high church" "General Protestant" religion, disfavoring "low church" forms of worship and limiting the opportunity for Non-liturgical Navy personnel to have their religious needs met.  The Navy's mandated liturgical "General Protestant" service has attempted to squeeze all non-Catholic Christian servicemen and women (high and low church) into a single liturgical worship mold, including personnel from plaintiffs' Non-liturgical faith groups, while ignoring or actively hindering the religious needs of Non-liturgical personnel.

80.    Navy senior chaplains have (a) removed some plaintiffs from preaching or conducting religious services solely because they were Non-liturgical chaplains and (b) have hindered, opposed or closed Non-liturgical worship alternatives, even when such alternatives were well attended and in many cases exceeded attendance at the liturgical General Protestant service.

81.    Non-liturgical chaplains have been criticized and berated for preaching and teaching basic truths of the Christian faith, basic Protestant doctrine and their specific religious tradition.

82.     The Navy's categorization of FGCs in general and of "Non-Liturgical Protestant" in particular is arbitrary, capricious and masks discrimination against the Non-liturgical FGC's more religiously conservative members.

     a.     Catholic is a single FGC but it represents only a single denomination. Other "catholic" groups whose liturgy and history are similar, who share the same sacraments, *e.g.*, Orthodox, Liberal Catholic, are not included. The only difference between these "catholic" groups is they reject the authority of the Pope. However, the rejection of one group's authority by others is common to Protestant denominations and all other religions.

     b.     The denominations in the Liturgical Protestant FGC have similarities in terms of a common origin, historical doctrine, sacraments and liturgy.

     c.     In contrast to the relative homogeneity of the Liturgical Protestant and monolithic Catholic FGCs, the Non-liturgical FGC represents a wide spectrum of religious perspectives and worship practices, many of which are rejected by some groups within the FGC, *e.g.*, some faith groups reject pentecostal practices. *See* Declaration of CAPT James Poe, CHC, USN (Ret.) ("Poe"), Regional Chaplain, Naval Region Europe ¶¶ 10-12 (Exhibit 22).

     d.     Despite significant differences, the CHC treats all Non-liturgicals as fungible. Plaintiff Dufour pastored the Naples Non-liturgical contemporary Protestant worship service in which contemporary music and musicians were important parts. The Catholic command chaplain planned to replace CH Dufour with a Non-liturgical chaplain whose faith group did not allow using musical instruments in worship. Poe, ¶¶ 17-19.

83.    The CHC's active indifference or outright hostility to Non-liturgical DON personnel's worship needs and their chaplains is furthered and exemplified by the CHC's practice of assigning to command chaplain positions chaplains who are known to be anti-Non-liturgical and anti-evangelical, and allowing them to oppress and hinder the Non-liturgical religious community and their chaplains without accountability.

a.    In October 1997, the CHC assigned CH (CAPT) Ronald Buchmiller as the command chaplain in Naples, Italy.

b.    Catholic CH Buchmiller began criticizing the senior Protestant chaplain, LCDR De Marco (now an *Adair* plaintiff) because of his evangelical preaching and ending his prayers "in Jesus name" according to his Southern Baptist tradition. CH Buchmiller told CH De Marco and others that as De Marco's rater, he would make sure DeMarco would never make CDR.  CH Buchmiller fulfilled his promise.

c.    Catholic CH Buchmiller also criticized another Protestant chaplain who had taken over a charismatic Non-liturgical service because he preached classic Protestant doctrine, *e.g.*, sola scriptura and salvation by faith in Christ.

d.    Members of the Naples Protestant evangelical community have testified CH Buchmiller created a climate of religious oppression and fear.

e.    By 1999, at least nine English speaking Non-liturgical churches had sprung up off base whose membership was made up almost entirely of Navy personnel assigned to the Naples Navy base, driven off post by CH Buchmiller's overt hostility.  There were few such churches prior to CH Buchmiller's arrival.

f.    The Navy did not facilitate ministry to military members whose religious worship needs could only be met by attending off post Non-liturgical churches.  Although DOD

and Navy regulations provide for hiring civilian clergy when necessary to meet free exercise needs, the Navy did not employ available English speaking Non-liturgical pastors to meet Non-liturgical free exercise needs.  Although these Non-liturgical pastors were willing to minister to their parishioners at no cost to the government, the Navy denied these ministers base passes to minimally secured areas of Navy housing and the Naval hospital, even to visit parishioners in the hospital.

g.      CH Buchmiller greeted plaintiff John Gordy with "I guess you've heard I have a reputation for ruining evangelical careers" and proceeded to uphold his reputation.

h.      CH Gordy started a charismatic/pentecostal service.  In 2003-04, it had grown to the largest non-Catholic service at Naples with an average attendance of about 160 people.  When CH Gordy left, the CHC provided no charismatic or pentecostal replacement.  Similar problems have arisen in Rota, Spain, where their has been a continuing large charismatic/pentecostal congregation.

i.      CH Buchmiller shut down Bible studies in the barracks and attempted to preclude them in the housing area.

j.      CH Buchmiller was followed by Catholic CH Rock, who continued to vex the contemporary Non-liturgical service and at the same time tried to shut down an evangelical service at a nearby NATO base, despite the Navy's obligation under Title 10 to provide for the free exercise needs of American military personnel assigned at Allied Forces South (AFSOUTH) (now Joint Forces Command) in Naples.  Things did not improve under the successor Catholic command chaplain.

k.      The Naples command's policy toward the AFSOUTH congregation was to: (i) provide chaplains who had no theological or denominational identity with the

congregation, (ii) provide no sustained chaplain ministry after CH Torralva left; (iii) rotate chaplains each Sunday who had no interest in the congregation; and (iv) ignore the requests of Non-liturgicals such as CH Dufour who volunteered to become the AFSOUTH pastor.  *See* Poe, ¶ 16.

l.      Although the new Naples Chapel was constructed with a baptismal tub that allowed Non-liturgicals to immerse adults, the Catholic Command chaplain ordered that the water heater be deleted because "Protestants don't need a heater."  This made the baptismal useless.

84.     The Navy has no procedures to identify specific Non-liturgical worship needs such as the pentecostal/charismatic congregations at Naples and Rota.  Although these communities have been in existence for years, the Navy's response to satisfying their worship needs has been active indifference and/or hostility.  *See* Poe, ¶¶ 21-29.

85.     In the early 1990s, the Guantanamo Bay, Cuba, the Command Chaplain attempted to suppress the 0730 service, a Non-liturgical charismatic service, "with the avowed goal of forcing its members to attend the 'official' Protestant service", Exhibit 20, ¶ 2, contrary to the First Amendment.  The congregation successfully petitioned the Base Commander, who allowed the service to continue.  The CHC's early removal of the congregation's chaplain, who opposed the suppression, shows the CHC approved of the suppression.

86.     The Navy and CHC has no system to identify or reward Non-liturgical chaplains who transformed dead congregations into vibrant ones, or who "grow" congregations.

a.      Those who have these skills have been punished by poor or inadequate fitreps or marginalized, *e.g.*, CH Stewart, CH Dufour.

b.     The attitude of many command chaplains is "go to civilian churches for your

ministry needs", undermining the purpose of the CHC and showing disrespect for Non-

liturgical faith groups for whom "community" and fellowship is an important part of their

religious expression.

87.     The above examples show how the Navy's hostility to Non-liturgical DON members and

their chaplains simultaneously violates the Establishment Clause and, by burdening their ability

to practice their religion and faith, the Free Exercise Clause and RFRA.

### COUNT 5

### THE NAVY BURDENS NON-LITURGICAL CHAPLAINS' AND DON PERSONNEL'S FREE EXERCISE RIGHTS TO PRACTICE THEIR RELIGIOUS TRADITIONS

88.     The allegations of paragraphs 1 through 87 above are incorporated herein by reference as

though pleaded in full.

89.     The CHC's religious discrimination and hostility towards Non-liturgical chaplains in

accession, promotion and retention policies have resulted in over-representation of Liturgical

Protestant and under-representation of Non-liturgicals, compared to their percentage of the

religious demographics

90.     The Navy's discriminatory policies and hostility identified in this Complaint have

prevented the viewpoint or needs of Non-liturgical faith groups from being considered in Navy

decisions affecting religious ministry and resources.

91.     The CHC's deliberate and systematic over-representation of Liturgical Protestant

chaplains from at least 1986 to the present has ensured that the free exercise of those faith groups

are more than adequately met, but the under-representation of Non-liturgical chaplains limits

their ability to meet DON's Non-liturgical community's religious needs by severely limiting their access to chaplains and worship services of their faith groups.

92.     Non-liturgical chaplains must expend more effort to meet the needs of their faith group members than is required by Liturgical Protestant chaplains. *See* chaplain/adherent ratios by FGC. Exhibit 18.

93.     Whether the above challenged policies are deliberately motivated by faith group bias or are merely the result of gross indifference, they have produced an unconstitutional adverse and disparate impact on Non-liturgical chaplains and the DON personnel of their faith groups, deny Non-liturgical DON personnel and chaplains their Constitutional right to exercise their religion, their Fifth Amendment right to equal treatment under the law, and violate the neutrality required under the Establishment Clause.

## COUNT 6

## THE NAVY DISCRIMINATES AGAINST NON-LITURGICAL CHAPLAINS' RELIGIOUS FREE SPEECH

94.     The allegations contained in paragraphs 1 through 93 of the Complaint are incorporated herein by reference, the same as though pleaded in full.

95.     The Navy's discrimination against Non-liturgical chaplains and Navy personnel manifests unlawful disapproval of the religious speech that is inherent in their Non-liturgical tradition, practice and worship.

96.     Following the distribution of RADM Iasiello's "Chief of Navy Chaplains Official Statement on Public Prayer in the Navy", the Secretary of the Navy signed SECNAVINST 1730.7C on February 21, 2006, formalizing RADM Iasiello's "Official Statement."

a.      The SECNAVINST unconstitutionally established a Navy religion by defining acceptable and unacceptable religious words and concepts for chaplains to speak at ceremonies or other public events.  ¶ 6.c.

b.      The SECNAVINST is a formal adoption of what had become an unofficial policy, *e.g.*, numerous plaintiffs and members of the class, as well as chaplains outside the class, have been criticized or penalized for praying in accord with their faith traditions.

c.      The SECNAVINST illegally delegated to commanders authority to regulate or censor a chaplains prayer.  ¶ 6.

d.      While the SECNAVINST stated a chaplain may elect not to participate in a ceremony that requires a non-sectarian prayer without reprisal, *id.* ¶ 6.c.*,* the practical effect of such a provision is to undermine the chaplain's role in the unit or chapel and to coerce the compromise of faith beliefs since a chaplain is rated on "team work" and not participating in such ceremonies is obviously not working on the team.

e.      Although Congress directed 1730.7C be withdrawn, the Chief's "Official Statement", the Chaplain School's previous teachings restricting religious free speech at public ceremonies, reinforced by command chaplains' hostility to evangelical Non-liturgical beliefs, have created a culture of hostility which still emphasizes "the Navy way to pray", chilling plaintiffs' free exercise and free speech rights.

97.    The history of the above Navy polices and practices indicate they are response to the "heckler's veto", a concept the First Amendment forbids the Navy from adopting.

98.    The Navy policy reflected in the SECNAVINST above is a radical departure from the Navy's previous religious tradition and history and shows hostility to the Free Speech rights of Navy chaplains in general and to Non-liturgical chaplains in particular.  From the earliest daysof

the Navy, chaplains prayed an "evening prayer." In 1860, Congress passed what is now 10

U.S.C. § 6031, allowing chaplains to conduct services according to the church of which they are

members, in response to questions whether prayers had to follow the Episcopal Common Book

of Prayer, which had been the norm. Congress considered prayer to be the choice of the chaplain

according to his faith tradition.

99. Senior liturgical and Catholic chaplains have criticized plaintiffs and other Non-liturgical

chaplains for preaching or following the tenants and traditions of their faith in violation of the

Free Exercise and Free Speech Clauses, the provisions of 10 U.S.C. § 6031 which allows

chaplains to conduct public worship according to the customs and norms of the churches of

which they are members, and Naval Regulation 0817 which mirrors § 6031.

100. The persistent anti-Nonliturgical culture which produced SECNAVINST 1730.7C and the

hostility it reflects violate the rights guaranteed by the Establishment, Free Exercise and Equal

Protection Clauses, and RFRA.

## COUNT 7

**THE USE OF CHAPLAINS TO RATE OTHER CHAPLAINS, EXCEPT IN UNAVOIDABLE CIRCUMSTANCES, VIOLATES THE FIRST AND FIFTH AMENDMENTS**

101. The allegations in paragraphs 1 through 100 above are incorporated herein by reference as

though pleaded in full.

102. The Navy has created a culture and system which has allowed and allows certain senior

chaplains to exercise their religious bias and destroy Non-liturgical chaplains's careers with no

accountability.

a. No Non-liturgical or evangelical chaplain who worked for CH (CAPT) David

Young at Naval Medical Center San Diego has been promoted; no Non-liturgical who

worked under CH Buchmiller has been promoted on active duty; no Non-liturgical

chaplain who has worked under CH Rock at Naples has been promoted; no pentecostal

chaplain who worked under CH Rock or was considered by a board with him as a

member has been promoted.

b.      There are many other senior chaplains who have made careers out of destroying

other chaplains' careers,  *e.g.*, CHs Jane Vieira, Roy Swift, and at least one Non-liturgical

senior chaplain who admitted his leadership style was to destroy everyone else so he

would be the only one left standing, according to a witness.

103.    A 1999 memorandum for the Chief reported the CHC's misconduct rate was 26 times the

unrestricted line officers' misconduct rate, and concluded "too many officers with character flaws

and integrity problems are nurtured by the CHC culture and advanced by the CHC system."

Nonetheless, nothing has changed; the CHC developed but never implemented a plan to improve

the CHC's quality.

104.    Although aware of these career destroyers, the CHC and the Navy have taken no steps to

minimize their ability to destroy the lives, careers and families of Non-liturgical chaplains, to

discipline the career killers, or to protect, defend or remedy the damage to those who have served

and suffered under them.

105.    As Chief, RADM Muchow put out a letter in which he encouraged senior chaplains and

commanders to evaluate chaplains on the basis of their "spirituality", which was and remains an

undefined, subjective term.

106.    The Navy has established organizational structures and systems, *e.g.*, Regional Chaplains,

in which senior chaplains (often liturgical) rate other chaplains, even when those chaplains are

assigned to a specific DON unit or facility, rather than the commander of the base or unit on

which the chaplain serves. In some cases the regional chaplain has been able to acquire control

of funding for subordinate chaplains's funding allocations. One Catholic regional chaplain

eliminated Protestant Directors of Religious Education ("DRE") while keeping and fully funding

Catholic DREs.

107.    The Navy has no realistic, objective, secular, religiously neutral and non-ideological

standards by which to evaluate chaplains and their ministry. The above structures and systems

have no valid or reliable means of ensuring religious neutrality by keeping religious animosity,

bias or differences out of the rating process.

108.    The above systems are part of a systematic means of maintaining the Navy's illegal

discriminatory procedures, policies and objectives, and ensuring Non-liturgicals are prejudiced in

promotions and career opportunities.

109.    It is common practice for the senior chaplain to provide fitness report input or completed

fitness reports to the Commander or Executive Officer where more than one chaplain is assigned

to a unit, base or ship. Such input has no basis in objective, neutral, non-ideological standards

and this practice has been used by Catholic and liturgical senior chaplains to handicap or destroy

Non-liturgical chaplains' careers because commanders have little knowledge of junior chaplains'

work and incorrectly assume senior chaplains are free of bias, *e.g.*, Navy San Diego Medical

Center, Naples.

110.    Such systems violate the First and Fifth Amendments.

## COUNT 8

### ILLEGAL RETALIATION

111.    The allegations in paragraphs 1 through 110 above are incorporated herein by reference as

though pleaded in full.

112.    In response to plaintiffs' exercise of their rights in bringing this lawsuit and/or previously defending their right and responsibility to represent their faith group and meet the religious needs of Non-liturgical DON personnel or exposing CHC or Navy misconduct, prejudice, bias, illegality and duplicity, the Navy and/or CHC has sought to illegally retaliate, punish, harm or otherwise deprive some of these plaintiffs of their rights and career opportunities.

a.    CH Dufour complained to his Congressman about the prejudice and oppression at Naples.  His Naples command chaplain, Boston Catholic CH (CAPT) Malene, unjustifiably denied CH Dufour an end of tour award for his work in Naples and then called his new command chaplain, Boston Catholic CH Keane, to give CH Keene a bad report on CH Dufour.  Although CH Keene has praised CH Dufour's work, he told the USS NIMITZ's commander CH Dufour was not ready for promotion to CDR, although he provided CH Dufour no counseling about performance shortcomings.  After a lengthy discussion, the NIMITZ commander told CH Dufour, "When you're labeled 'damaged goods', there's not much you can do about it."

b.    Numerous other examples can be found in ¶¶ 3.a., *e.g.*, 3.a.14 (Heinke); 19 (Klapach); 25 (Marsh); 33 (Stewart); 34 (Thompson); 37 (Tostenson), etc.

## COUNT 9

## CONSTRUCTIVE DISCHARGE OF CERTAIN PLAINTIFFS

113.    The allegations in paragraphs 1 through 112 above are incorporated herein by reference as though pleaded in full.

114.    The Navy has used the realities of the up or out promotion system and separation process to make working conditions intolerable for many of these plaintiffs and other Non-liturgical chaplains who, after being FOS, left the Navy rather than endure more hostility, abuse, family

116

stress, humiliation or, when eligible, chose to retire under the TERA or other program lest they be separated from the Navy with nothing or be left with no reasonable choice except to leave the active Navy or retire.  Such separations or retirements were coerced and/or the products of hostile environments and constitute constructive discharges.

### COUNT10

### THE NAVY'S MANIFEST HOSTILITY TO NON-LITURGICAL RELIGIOUS TRADITIONS VIOLATES THE FIRST AND FIFTH AMENDMENTS

115.    The allegations of paragraphs 1 through 114 above are incorporated herein by reference as though pleaded in full.

116.    The Navy's illegal religious preference system and its resulting discrimination against Non-liturgical chaplains is one aspect of manifest Navy hostility toward Non-liturgical religious beliefs in violation of the First Amendment.

117.    Comparison of the DMDC's religious demographic data with the CHC's FGC accession goals from FY88 to 2000 provides irrefutable evidence of the Navy's religious bias and hostility against Non-liturgical traditions and faith groups.  Although the Navy (and national) membership of Non-liturgical traditions and faith groups exceeds that of Liturgical Protestant denominations by a factor of four, the Navy's former accession goals show an inverse relationship to its demographics.  In some years, the Liturgical Protestant goal was twice that of the Non-liturgical. This demonstrates the Navy's accession goals were developed on an arbitrary basis designed to hinder Non-liturgical faith groups.

118.    The current Navy accession policy has no goals related to denomination or faith group categories.  This violates the First Amendment by making the CHC a forbidden federal jobs

program for clergy, rather than an accommodation narrowly tailored to meet the specific religious free exercise needs of DON personnel.

119.    Liturgical Protestant and Catholic senior chaplains have purposely given some Non-liturgical chaplains lower performance ratings than similarly situated subordinate Liturgical Protestant and Catholic chaplains solely on the basis of their religious identification and beliefs, despite evidence of the Non-liturgical chaplain's superior performance.  CAPT David Young, the Catholic command chaplain at Naval Medical Center San Diego, consistently rated his Catholic chaplains above non-Catholics, despite glaring deficiencies in those Catholic chaplains' performance.  There are senior Catholic and Liturgical Protestant chaplains under whom no Non-liturgical chaplain has been promoted.  *See* Count 7.

120.    The Navy has established two systems of discipline and administration, one for liturgical traditions, and one for Non-liturgical traditions.  CH Drake, a Catholic chaplain, was court-martialed for violating an order but allowed to retire with full pay; CH Soto, a Catholic, was accused of adultery but referred to the Catholic Military Ordinate for investigation and discipline, then returned to active duty, promoted and allowed to retire as a CAPT while a Non-liturgical chaplain accused of child abuse in a divorce proceeding was administratively discharged and not allowed back on active duty, even though a civil trial found him not guilty.

121.    The CHC has retaliated against Non-liturgical chaplains who have complained about their "second class" treatment.  *See* Count 8.

122.    Other manifestations of prejudice against Non-liturgical beliefs:

    a.    Senior Catholic chaplains have forced Protestants to change vacation Bible school, a traditional Protestant/evangelical activity to teach children the Bible and Protestant doctrine, to accommodate Catholics.  In so doing, Non-liturgicals have been

forbidden to use certain evangelical practices and phrases, *e.g.*, born again, so as not to offend Catholics;

b.    Catholic and Liturgical Protestant senior chaplains have insisted on rotating chaplains through evangelical services instead of assigning a chaplain as a "pastor" for a congregation, reflecting the liturgical viewpoint that the liturgy satisfies the worship need, rather than the Non-liturgical view that good biblical preaching, music, and praise and worship comprise the worship experience;

c.    Catholic and Liturgical chaplains have restricted Protestant Sunday School material in some cases, excluding material acceptable and desirable to Non-liturgicals and, as exemplified in Naples, providing liberal religious education material offensive to many Non-liturgicals;

d.    Chaplains who protest such things have been criticized and downgraded on fitness reports, *e.g.*, not team players and causing division.

123.    The Navy's religious hostility violates the Establishment, Free Exercise and Free Speech Clauses and the Equal Protection component of the Fifth Amendment's Due Process Clause.

## COUNT 11

### FRAUDULENT CONCEALMENT OF THE EVIDENCE
### OF PLAINTIFFS' CAUSE OF ACTION

124.    The allegations in paragraphs 1 through 123 above are incorporated herein by reference as though pleaded in full.

125.    All selection board members and support personnel take an oath not to divulge the board proceedings unless he or she is released from that oath by the Secretary of the Navy or "higher

authority". This secrecy is reinforced by regulations, the Uniform Code of Military Justice, and statute.

126. The records of personnel being considered by promotion boards are protected from disclosure or exposure. A chaplain who is not selected by a board for promotion cannot compare his personnel file and fitness reports with those of chaplains who have been selected, or know for certain which selectees meet promotion considerations or criteria.

127. The causes of action for violations of plaintiffs' rights in and through the chaplain promotion and SER process are self-concealing.

    a. The secretive and restrictive nature of the Navy promotion system ensures that misconduct or illegality in the chaplain selection board process is easily concealed from the victims and other outsiders. This is shown by the DOD and Navy Inspector General investigations into the FY 97 and 98 chaplain CDR promotion boards.

    b. Any challenge to the "perception" of misconduct in the promotion process would have to overcome the presumption of regularity, which would in most cases be impossible, given the secret nature of board proceedings;

    c. The ability of the Chief, senior chaplains and the Navy to retaliate against "whistle blowers" is a further disincentive for those with knowledge of wrongdoing to bring it to light.

128. The former ability of the Chief to approve all chaplain members of a chaplain promotion board and his power to retaliate or stifle dissent minimized the probability misconduct would be brought to light, such as when the board president championed certain candidates for reasons other than the candidates' records, when faith group became a promotion consideration, or improper criteria were considered. The DOD and Navy Inspector General investigations into the

FY97 and 98 chaplain CDR promotion boards provide evidence of these improprieties concealed by the system.

129.    The Navy, and the CHC in particular, has lied to, misrepresented, or otherwise mislead plaintiffs and others who have raised questions about the appearance of quotas, faith group prejudice, and/or the fairness or objectivity of the chaplain promotion and SERB processes.

130.    Senior CHC officials have consistently maintained that faith group has no part in chaplain promotions, holding all chaplains, regardless of their faith group, compete for promotions on a level, merit based, playing field.  These senior chaplains have known that (a) faith group was a promotion factor and some promotions were based on denominational considerations; (b) personal knowledge of the candidate or other non-merit based criteria was more important than military performance for CHC promotions; and (c) the chaplain promotion and accession process was manipulated to ensure liturgical domination of the CHC.

131.    Senior CHC officials have maintained that all chaplain records are highly competitive, inflated with high marks, and even one or two low marks, *i.e.*, "B" or "C" or a "2", can make a chaplain uncompetitive.  However, the Stafford Report shows that Catholic and Liturgical Protestant chaplains with many "Bs" and "Cs" were selected while many chaplains with far better records, with no "Bs" or "Cs", were not, including some plaintiffs.

132.    Some senior CHC officials have conspired among themselves and others, knowingly or unknowingly, to deny or suppress the rights of plaintiffs and other Non-liturgical chaplains by depriving them of career opportunities and full Navy careers for religious reasons, including faith group prejudice and promotion of their own faith group and its members.  To accomplish this, these senior chaplains and other Navy officials have concealed and denied evidence of prejudice and bias in the selection process against plaintiffs, including the Navy's faith group quotas.

133.    Senior CHC officials have had a duty (a) to report wrongdoing and (b) to reveal the true nature of and prejudice in the Navy's promotion and other career related systems to plaintiffs and all other class members who have raised questions about the fairness and equity of the promotion process.  CHC and Navy officials have breached that duty.

134.    The above actions by the Navy constitute fraudulent concealment which has prevented plaintiffs and the class from discovering the Navy's illegal prejudice and actions which form the basis for these plaintiffs' causes of action.[14]  The self concealing nature of the promotion system and/or the Navy's fraudulent concealment has precluded Plaintiffs and their class from seeking timely redress.

135.     Plaintiffs have exercised due diligence in attempting to protect their legal rights. The Navy's deception and actions in concealing its prejudice and other illegalities, the presumption of regularity and the self-concealing nature of the Navy's board processes have prevented plaintiffs from gaining the necessary information and evidence to bring their claims until the *CFGC* and *Adair* law suits breached the CHC promotion system's walls of secrecy and deceit.

136.    Since discovery of the CHC and Navy misconduct and illegal actions, plaintiffs have acted in a timely manner.  Twenty-three of these Plaintiffs sought to join the *Adair* class action. When the *Adair* plaintiffs could no longer represent active duty personnel, plaintiffs here filed to become a class.

137.    The *Adair* Court's delay in certifying a class and the Navy's deception and concealment of its violation of regulatory, statutory and constitutional violations equitably tolls any statute of limitations for claims covered by said concealment until plaintiffs' discovery of the Navy's wrong and/or acts as an equitable estoppel against the Navy from arguing that a statute of

---

14     *See* note 3 *supra*.

limitation applies.  Likewise, the *Adair* court's failure to add plaintiffs and define the class also equitably tolls the statute.

## COUNT 12

## VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT

138.    The allegations in paragraphs 1 through 137 above are incorporated herein by reference as though pleaded in full.

139.    The Navy's above challenged actions illegally burden the religious rights of Non-liturgical chaplains and Navy personnel without a substantial government purpose or narrow tailoring in violation of the Religious Freedom Restoration Act, 42 U.S.C. § 2000-bb, *et seq*.

## COUNT 13

## A CHC RECRUITING POLICY REQUIRING ALL CHAPLAINS TO ASSIST IN RECRUITING CHAPLAINS VIOLATED THE FIRST AMENDMENT

140.    The allegations in paragraphs 1 through 139 above are incorporated herein by reference as though pleaded in full.

141.    Beginning in the late 1990's, the Navy developed a problem recruiting chaplains.   In March 2001, the Navy was about 60 chaplains below its authorized number and was still short when this suit was filed.

142.    Plaintiffs assert the CHC's recruiting shortfall is a direct result of the prejudicial practices they and *CFGC* and *Adair* are challenging.   Some endorsing agencies no longer recommend that clergy consider the Navy as a viable career opportunity.

143.    When clergy interested in the CHC ask active duty plaintiffs about their perspectives on the Navy as a career, plaintiffs have truthfully described the general perception by Non-liturgical

chaplains that they are often treated as second-class citizens.[15]  Plaintiffs' own experiences[16]

support the perception that Non-liturgical chaplains are not welcome in the CHC.

144.    The March 2001 Navy Chaplains' Leadership Conference in Dallas, Texas, discussed the

Navy's chaplain recruiting shortfall.  Echoing plaintiffs' claims, senior Catholic CH (CAPT)

Gomulka addressed[17] why the CHC had that problem, pointing out that:

> The Chaplain Corps has lied to clergy about opportunities for ministry in the sea
> services.  When new chaplains discover how they are restricted in their ministry
> by senior chaplains who are jealous of their talents, they become angry and return
> to civilian life informing their clergy friends about the "truth" of what they can
> expect if they become Navy chaplains.  The recent chaplain recruiting video is a
> perfect example of this problem.  While the video portrayed chaplains happily
> engaged in ministry at a particular duty station, the truth of the matter was that a
> number of chaplains had left the Navy after having served at that particular duty
> station, frustrated at the way they were limited by command chaplains to exercise
> a fulfilling and life-transforming ministry.  CNRC [Chief of Navy Recruiting
> Command] brought in chaplains from other commands to depict them happily
> engaged in ministry while the "real chaplains" at the duty station whose morale
> was quite low were nowhere to be seen.

Gomulka email, Exhibit 19 (Extract), ¶ 2.i.

145.    In March 2001, the then Chief, RADM Black, and his Deputy, RADM Iasiello, in

separate but similar messages (the "Directives") directed all chaplains to personally and actively

support chaplain recruiting efforts.

a.    The Directives established a new and mandatory Navy "chaplain to clergy"

recruiting policy and program (hereafter the "Recruiting Policy").

---

15    *See* ¶ 7 of Ellis Report ("Non-liturgicals are often reminded ... that they are not as highly
valued as others."), Ex. 4.

16    *See, e.g.*, ¶ 3.

17    Chaplain Gomulka emailed his trip report and memorandum to other chaplains, one of
whom provided the attached copy.

    b.    The Recruiting Policy required chaplains to furnish names of prospective seminary graduates and other clergy to the CHC for recruiting purposes, *id.*, and speaking positively of the Corps.

    c.    A chaplain's support/non-support for the Recruiting Policy was to be noted in fitness reports and chaplain support for recruiting was to be a criteria for promotion board consideration.

146.    The Directives were designed to punish plaintiffs for warning civilian clergy of the CHC's systematic hostility and culture of prejudice plaintiffs challenge in this case, reducing some plaintiffs' promotion opportunities while increasing the promotion opportunity of those complying with the Directives.

    a.    Because failure to support the new Recruiting Policy promised the severe sanction of reduced opportunity for promotion, the Directives compelled or attempted to compel plaintiffs to "speak" what they would not otherwise say.

    b.    The Directives sought to maintain the current irrational and disproportionate chaplain imbalance which plaintiffs allege constitutes an endorsement of religion forbidden by the Establishment Clause.

147.    The Directives and Recruiting Policy have two objectives that implicate First Amendment values.   The first objective was to obtain from active duty chaplains the names of likely candidates for the CHC's recruiters.   The second objective was to stifle criticism of the CHC, an issue of public concern, by compelling comments favorable to the CHC when potential candidates asked plaintiffs about the CHC.

148.    The Directives could only be supported by compelled speech plaintiffs would otherwise not make.

149.    Compliance with the Directives' second objective, making only positive comments, in effect, censored plaintiffs' speech.

150.    The Directives violated the First Amendment, irreparably injuring active duty plaintiffs by:

> a.    either censoring or compelling active duty or Reserve plaintiffs' and other chaplains' speech on issues of public concern, including alerting potential chaplains to the issues raised in this case;

> b.    retaliating or allowing retaliation against plaintiffs for not complying with the Navy's illegal directives.

## COUNT 14

## ILLEGAL COVERUP

151.    The allegations in paragraphs 1 through 150 above are incorporated herein by reference as though pleaded in full.

152.    Senior CHC and DON leadership has known of the abuses and prejudice reported herein, have refused to address them or take corrective measures and are defending their lack of action and their illegal policies.

153.    The NIG and the Judge Advocate General (JAG), despite ample indications of denominational considerations affecting chaplain promotions, have covered up, excused or ignored such abuses.

154.    The Navy has an obligation to expose and address misconduct, but has developed a culture where coverup is more important than its duty to see the law and regulations are followed.

155.    When asked why certain chaplains with non-competitive records were promoted, or when the fairness of the CHC's promotion system was challenged, senior CHC officers and Navy officials denied there were improprieties, stating chaplain fitreps were inflated and many chaplains with excellent records were competing for few positions.  The Navy and CHC leadership denied the validity of the early lawsuits' claims, characterizing the litigants as "sore losers", when in fact the investigations cited above revealed denominational bias was rampant in the CHC.

156.    The CHC leadership's consistent denial coupled with the secrecy of board proceedings and the presumption of regularity prevented plaintiffs' discovery of the prejudice and bias of the CHC's promotion and personnel policies until after these policies were challenged by litigation.

157.    This culture of coverup and non-accountability is a contributing factor to the culture of prejudice and bias alleged herein and results in a diminution of plaintiffs' constitutional and statutory rights.

158.    The Navy and CHC actions in concealing and denying the existence of its denominational preferences and prejudice against plaintiffs and other Non-liturgicals illegally concealed the basis for plaintiffs' constitutional and statutory claims and tolled all applicable statutes of limitation until plaintiffs discovered the basis for their claims.

## COUNT 15

## 10 U.S.C. § 613(a) IS UNCONSTITUTIONAL AS APPLIED TO PLAINTIFFS' CONSTITUTIONAL AND RFRA CLAIMS

159.    The allegations of paragraphs 1 through 158 above her incorporated herein as though pleaded in full.

127

160.    Plaintiffs have evidence from the defendants and DOD's investigations into promotion boards that denomination and/or religious ideology has become criteria for selection.

161.    Plaintiffs have testimony and information indicating denominational considerations dominated chaplain selection boards.  There is testimony a Protestant was removed from a CAPT Chaplain promotion list to make room for a Catholic after the Catholic board member complained no Catholic had been selected.  If selection board members are released from their vows of secrecy, plaintiffs will be able to establish denominational considerations have been the determining factor in chaplain promotion decisions, contrary to the Establishment and Due Process Clauses and RFRA.

162.    This Court previously held that the restriction in former 10 U.S.C. 618(f), which *In re England* found barred discovery, was not unconstitutional or contrary to RFRA.

163.    In October 2006, Congress amended Title 10, replacing § 618(f) with a new § 613(a) which forbids disclosure of selection board proceedings in litigation.

164.    Because a statutory change has eliminated § 618(f), in order to preserve their rights of appeal on the ability to conduct discovery and seek judicial review of statutory selection board proceedings and actions therein, plaintiffs challenge the constitutionality of § 613(a)'s restrictions on discovery as applied to plaintiffs' constitutional and RFRA claims.

     a.    Nothing in the legislation indicates Congress intended to bar constitutional claims.

     b.    Barring plaintiffs' claims allows the defendants to violate the Constitution at will during the board process with no accountability and effectively denies plaintiffs their First Amendment right to petition for redress for violations of their constitutional rights, other First Amendment rights, and their ability to bring RFRA claims.

c.    Denying plaintiffs' the ability to challenge the legality of actions within the board proceedings violates the separation of powers by prohibiting the judiciary from fulfilling its constitutional mandate to declare the law and the constitutionality of defendants' and Congress's actions.

## COUNT 16

**FUNDING OF THE CHC'S ILLEGAL POLICIES, PRACTICES AND ACTIONS EXCEEDS CONGRESS' AUTHORITY UNDER ARTICLE I, SECTION 8 OF THE CONSTITUTION'S TAXING AND SPENDING CLAUSE**

165.    The allegations in paragraphs 1 through 164 are incorporated herein by reference as though pleaded in full.

166.    Funding the Navy Chaplain Corps and its associated programs and activities involves a substantial expenditure of federal tax funds.

167.    The Establishment Clause of the Constitution's First Amendment specifically limits the taxing and spending power conferred by Article 1 Section 8.

168.    10 U.S.C. §§ 5142 and 5150 establish the Navy Chaplain Corps.

169.    10 U.S.C. §115(a)(1) requires Congress establish annually the Navy's officer active duty strength, including chaplains.  Congress funds specific numbers and ranks of chaplains.

170.    10 U.S.C. § 115((b)(1)(A) requires Congress approve annually the Navy's number of illegally Retired Reservists recalled to active duty (the 4109s) "under section 12301(d) ... for the purpose of providing operational support", and fund specific numbers of officers by grade.

171.    The Navy's denominational preference for Catholics communicates twin forbidden messages, favoritism to Catholics and inferiority and second class citizenship to plaintiffs and the class, some of whom have worked side by side with the 4109s and other illegally accessed Catholics and illegally recalled Liturgical Protestants.

172.    The Navy's twin unconstitutional messages are specifically directed to chaplains and communicated within the CHC through and by messages, meetings and publications bringing plaintiffs and the class into unavoidable contact with not only the message(s) but the personification of the Navy's forbidden message in the form of illegally hired and retained Catholic chaplains or illegally recalled Liturgical Protestant chaplains as well as the results of the Navy's illegal selection board procedures and biased personnel policies and practices.

173.    Plaintiffs' "challenge here is to that portion of the overall congressional appropriation for the [Navy] that is used for the operation and maintenance of the Chaplaincy Program." *See Katcoff v. Marsh*, 582 F.Supp. 463, 470 (S.D.N.Y. 1983), *aff'd*, 755 F.2d 223 (2d Cir. 1985).

174.    Plaintiffs specifically challenge on an as applied basis the expenditure of funds in authorizations Congress specifically knows will fund the actions of chaplains and chaplain related actions and policies, including those challenged here.  This is not an incidental expenditure of tax funds in the administration of an essentially regulatory statute.

175.    Congress recently changed the statutory provisions addressing chaplains showing, despite the wide latitude the Navy is given in the expenditure of tax dollars, it is Congress that consistently decides whether the Chaplaincy Program merits funding.

176.    Congress' use of tax funds, including those collected from the Non-liturgical chaplains, Navy personnel and their faith groups, to fund the Navy's unconstitutional and prejudicial policies and actions, and its establishment or endorsement of preferred religious traditions in the CHC violates the Establishment Clause's specific prohibition on such funding or support. Neither the taxes paid nor the funds expended are insubstantial.

## X.  PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for a declaration, injunction and judgment against the defendants as follows:

**A.      Declaratory Relief**

The allegations in paragraphs 1 through 174 above show there is a bona fide dispute between the Plaintiffs and the Navy concerning whether the above challenged Navy policies violate the Establishment, Free Exercise and Free Speech Clauses and the Fifth Amendment's due process (equal protection) clause, the Civil Rights Act, the RFRA, and the DOD and Navy's own regulations.

Pursuant to 28 U.S.C. §§ 2201 and 2202, plaintiffs request this Court render a Declaratory Judgment that:

1.      The following Navy policies and practices are unconstitutional as applied and suppress the plaintiffs' and the class's First and Fifth Amendment rights and these policies also violate federal Civil Rights laws, RFRA, and DOD and Navy regulations:

a.      The Third's Policy and its subsequent evolution including goals or quotas which distributed chaplain allocations among select FGCs or denominations without regard to the Navy's religious needs.

b.      The Navy's policies of: (i) reserving at least two promotion board memberships for Catholics between FY77 and 1986; (ii) reserving at least one selection board membership for a Catholic chaplain on each selection board not requiring Admirals from FY86 to 02; (iii) allowing the Chief of Chaplains or his Deputy to determine chaplain promotion board or SER board members; and (iv) allowing the Chief or his Deputy to be CHC selection board president.

c.      The Navy's former policy identifying to board members the faith group of each chaplain being considered by a promotion board or SER board.

d.      The Navy's hostility to and suppression of Non-liturgical alternatives to a liturgical General Protestant service and/or other religious education services, *e.g.*, Sunday School, Vacation Bible School, and the Navy's concomitant endorsement and establishment of an official liturgical General Protestant service and religious education.

e.      The establishment of systems and rating chains in which chaplains normally rate or provide unchallenged input for the evaluation of other chaplains of the same or different faith groups with no independent safeguards or provisions to (i) ensure religious neutrality in ratings or assignments; or, (ii) establish criteria to ensure denominational considerations or prejudice do not enter into the evaluation.

f.      The Navy's practice of "stacking" chaplain promotion boards between 1977 and 1986 with Catholic and Liturgical Protestant chaplain board members.

g.      The Navy's former practice (i) not quantifying DON's free exercise needs, (ii) deriving accession goals unrelated to DON's known or anticipated free exercise needs, and (iii) its current practice of having no accession goals.

h.      The delegation of discretionary civic authority to persons hired as denominational representatives for the purpose of awarding or denying benefits to other or similar denominational representatives with no guarantees the power will be used only for secular, neutral and non-ideological purposes.

2.    10 U.S.C. § 612 is unconstitutional as applied to the CHC boards which have a small number of board members who vote in secret with no accountability or guarantees the voting power will be used only for neutral, secular and non-ideological purposes.

3.    The dominance of the Navy's senior ranks and key billets by (i) Liturgical Protestant chaplains out of all proportion to their actual percentages in the Navy, (ii) Catholic chaplains out of all proportion to their percentage of the CHC, and (iii) the concomitant absence of appropriate numbers of Non-liturgical chaplains in those same ranks and billets is:

    a.    the result of the Navy's illegal religious discrimination and bias;

    b.    an illegal endorsement of the Catholic and Liturgical Protestant traditions;

    c.    a violation of the First and Fifth Amendments and RFRA.

4.    The Navy's policy and practice favoring certain religious denominations and discriminating against others in promotion, retention, key billeting decisions, and discipline and career opportunities has resulted in an unconstitutional religious test contrary to Article VI of the Constitution, an endorsement of religion, and illegal discrimination in violation of the First and Fifth Amendments, 42 U.S.C. § 1981 and RFRA, 42 U.S.C. § 2000-bb.

5.    Plaintiffs and members of the class have been unlawfully denied a fair opportunity for promotion in violation of the Constitution, federal statutes, and DOD and Navy regulations because CHC selection boards for LCDR through CAPT from FYs 1977 to the present have been (a) composed in violation of the Establishment and Due Process (Equal Protection) Clauses; (b) improperly biased with religious discrimination; and (c)

133

the results of such promotion boards are void and the Navy's personnel actions in response to those boards are *ultra vires* and void *ab initio*.

6.     CHC SER boards have been unconstitutionally composed, permeated by religious bias and/or conducted and administered in an unconstitutional manner in violation of the First and Fifth Amendments and the Religious Freedom Restoration Act.

7.     SECNAVINST 1730.7C's restrictions on religious speech at ceremonies or other functions, the Chief of Chaplains' similar letter and the prevailing culture resulting therefrom violates the Free Speech, Establishment, Free Exercise and Due Process Clauses.

8.     The challenged Chaplain Recruiting Directives and the CHC's Recruiting Policy violated the First and Fifth Amendments and any official comments in fitness reports or commendations reflecting those Directives (except for chaplains assigned recruiting duties) must be expunged from all chaplain records.

9.     All chaplain promotion boards held since the Navy promulgated the challenged Chaplain Recruiting Directives and their resulting Recruiting Policy are invalid since the Navy has injected unconstitutional standards and criteria into the promotion process.

10.     The Navy's failure to identify and meet the free exercise needs of its distinct religious communities, *e.g.*, pentecostal congregations at Naples and Rota, is unconstitutional and demonstrates hostility to those religious faith groups in violation of the Establishment Clause.

11.     The Navy's hostility and/or retaliation against chaplains who effectively pastor and/or grow military congregations demonstrates hostility to religion in general and plaintiffs and their Non-liturgical faith groups in particular.

12.     The Navy and CHC have illegally covered up misconduct and prejudice and thereby tolled the applicable statute of limitations.

13.     10 U.S.C. § 613(a) may not bar discovery of plaintiffs' constitutional and RFRA claims.

**B.      Injunctive Relief**

The allegations in paragraphs 1 through 174 above, incorporated herein by reference as though pleaded in full, show the plaintiffs have suffered, are suffering and will continue to suffer immediate, severe, and irreparable injury by virtue of the Navy's acts, policies and practices as set forth herein unless restrained by this Court.

Plaintiffs do not have an adequate remedy at law, so they seek injunctive relief on behalf of themselves and the class against the Navy, ordering the defendants, their agents and employees be enjoined from:

1.     Further and future faith based discrimination or retaliation in accession, promotion, career development and duty assignment decisions against Non-liturgical clergy and chaplains.

2.     Considering, displaying or providing a chaplain's denomination or faith group in the record which goes before a selection board when he or she is being considered by selection boards.

3.     Applying faith group quotas to chaplains being considered for promotion, retention, career development and duty assignment decisions, except where necessary to meet free exercise needs.

4.     Further and future interference in any manner with the fundamental right to Free Exercise of religion by Non-liturgical chaplains and Navy personnel.

5.     Further and future interfering in any manner with Non-liturgical chaplains' Free Speech rights including the religious content and viewpoint of their religious speech.

6.     Having a chaplain as a chaplain promotion or SER board member unless the number of non-chaplain board members is large (greater than 16), votes are not secret and there is accountability to ensure votes are based on neutral, secular and non-ideological criteria.

7.     Allowing the Chief or the Deputy Chief of Chaplains to have any role in determining CHC board memberships and from serving as president or board member of a chaplain promotion board.

8.     Identifying the faith group of any chaplain being considered for promotion, the SER program or other personnel management or career development program except where such identification is needed to further the Free Exercise interests of the Navy.

9.     Prohibiting Non-liturgical services when there is no danger to a compelling mission, or limiting non-Catholic Christian services to a "*liturgical* General Protestant" service.

10.     Restricting or denying Navy facilities for Non-liturgical services or other religious activities where Non-liturgical Navy personnel and a Non-liturgical chaplain or authorized lay leader are present.

11.    Having chaplains (a) rate other chaplains, except in exceptional cases based on operational necessity, and then only where there are safeguards to insure that denominational or religious neutrality is maintained and there are established objective criteria for evaluation; or (b) provide input on other chaplains' fitreps without objective, secular, neutral and non-ideological criteria.

12.    Treating Non-liturgical chaplains differently than Liturgical chaplains in matters of education, administration, career development and military justice or discipline.

13.     Bringing reservists to active duty above the grade of LT without a recorded, specific justification directly related to meeting religious free exercise needs as reflected in the Navy's religious demographics, and then only in accordance with Navy regulations.

14.    Requiring chaplains to support the challenged Navy Chaplain Recruiting policy or a similar future policy and referencing such support in chaplain fitness reports, except for those chaplains who have been specifically assigned to recruiting duty in the Navy Recruiting Command.

15.    Allowing any term in fitness reports which identifies a chaplain's specific faith group, *e.g.*, priest, rabbi, and removal of all such terms in existing fitreps.

16.    Establishing faith group accession goals without objective criteria.

17.    Not continuing to record and report officer religious faith preferences.

**C.    An Order**

Plaintiffs request that the Court issue an Order requiring the Navy to:

1.    Eliminate all vestiges of its past religious bias and discrimination in selecting chaplains for promotion and career assignments. For chaplain promotion and SER boards, this includes:

a.    Removal of all references to a chaplain's faith group or denomination in the selection process unless required to remedy past discrimination.

b.    Precluding chaplains from acting as chaplain selection board members until the provision of B.6. and 7. above are met and reviewed by the Court. Nothing here is intended to preclude allowing chaplains to assist in the operation of boards by acting as board recorders or having a chaplain available to provide information to board members and answer specific questions about chaplain assignments and terminology (*i.e.*, a technical advisor) provided such persons are chosen by a neutral personnel system based on neutral, secular criteria, and the Chief, the Deputy, and Office of the Chief of Chaplains are precluded from input or involvement in the selection of said recorders and CHC technical advisers.

c.    Provide a system of checks and balances to insure that (i) religion, faith group or denomination does not affect the promotion or career process unless linked to remedying past discrimination, and (ii) complaints of religious discrimination are promptly investigated and addressed.

2.    Develop programs and policies that identify and support specific chapel communities, *e.g.*, pentecostal and evangelical, particularly in overseas or isolated areas.

3.    Take all necessary and affirmative actions to immediately:

a.    Identify or project DON's operational religious free exercise needs through actual measurement or estimates based on national religious demographics, including (i) considering DON operational requirements, (ii) the resources required to meet those needs, (iii) the resources available through DON, (iv) the

resources available in operational/deployment areas and other resources such as
English speaking religious leaders/clergy in ports of call, and (v) other factors
such as appropriate retention and personnel considerations;

b.      Adjust the CHC, including its current rank structure, so it reasonably
reflects the Navy's religious needs;

c.      Develop faith group accession goals designed to structure the CHC to
meet the Free Exercise needs identified in 3.a.; and

d.      Adjust and fill CHC key billets in a manner that corrects the current
disparity between CHC and actual Navy religious demographics, and ensures that
chaplain career assignments are made in a non-discriminatory manner that meets
DON's religious needs.

4.      Energetically and effectively investigate all allegations of religious prejudice by
senior chaplains in rating or supervising Non-liturgical chaplains.  Where actual prejudice
is found or bias demonstrated, correct the records and remove the prejudice from the
affected Non-liturgical  chaplain's official career file and take other necessary actions to
make plaintiffs whole.

5.      Develop new policies and guidelines that:

a.      Reflect and address the wide differences in theological perspectives and
worship practices among faith groups characterized as Non-liturgical, *e.g.*,
pentecostal/charismatic faith groups versus those which reject pentecostal beliefs
and practices;

    b.      Provide approval and support mechanisms for alternative Non-liturgical services that meet the varying needs of the Navy's Non-liturgical religious community at Navy installations, bases, ships and facilities;

    c.      Ensure that such services receive priority or become the main Christian service when Non-liturgicals constitute a majority at the installation, base or facility;

    d.      Eliminate CHC bias against Non-liturgical worship, beliefs and chaplains;

    e.      Where a recognized faith community has developed, *e.g.*, charismatic and evangelical (Naples and Rota), ensure chaplains of that faith perspective are assigned in a manner providing continuity and effective support;

    f.      Develop secular, neutral criteria that identifies, describes and measures the performance standards and factors for chaplain evaluations.

6.     Develop a system to insure that the above reforms are working and effective.

7.     To continue to officially record the religious preference of *all* Navy personnel.

8.     Issue the necessary orders voiding all adverse personnel actions, including but not limited to separations and early retirements, flowing from the 1977-1986 2RC Policy, the follow on 1RC Policy (1986-2002), the Thirds Policy and its progeny and the unconstitutional promotion and SER boards described herein, and take other action to remedy the results of the Navy's illegal activities described herein and make plaintiffs and the class whole, as if there had been no prejudice.

9.     Instruct promotion boards that in considering chaplains with prior service as Navy, Marine or other Armed Service officers, the candidate's prior-service fitness

reports will be considered positively in the promotion process absent compelling contrary reasons.

10.    Rescind all letters or directives addressing how chaplains are to pray in public and publish regulations affirming a chaplain's right as a denominational representative to freely speak and pray from his or her faith perspective.

11.    Void the challenged Navy Chaplain Recruiting Directives and policies related thereto and, except for those chaplains assigned to Navy Recruiting Command, remove from all chaplain fitness reports all references to either support for or opposition to the challenged Navy Chaplain Recruiting Directives and their related policies.

12.    Develop a screening, evaluation and treatment program for Post Traumatic Stress Disorder (PTSD) for plaintiffs, the class, and where appropriate, their dependents.  This is necessary due to a large number of Plaintiffs who have PTSD as a result of working under command chaplains who have destroyed chaplains' careers, or other causes of PTSD or similar injury, such as betrayal by the CHC and the Navy.

**D.    Attorneys' Fees and Other Relief**

1.    That this Court award plaintiffs the reasonable costs and expenses of this action, including expert and attorneys' fees in accordance with the Equal Access to Justice Act, 28 U.S.C. § 2412; the Civil Rights Act, 42 U.S.C. § 1988; the Religious Freedom Restoration Act, 42 U.S.C. § 2000-bb; class action case law and/or any other applicable statue or rule of law or equity.

2.    That this Court:

    a.    Retain jurisdiction of this matter for the purposes of enforcing the Court's orders;

      b.      Require the Navy to provide periodic reports to the Court and plaintiffs as to its progress in complying with B and C above; and

      c.      The Court provide other such relief as may become apparent in the course of litigation.

Respectfully submitted,

DATED: August 18, 2008

   /S/ Arthur A. Schulcz, Sr.
ARTHUR A. SCHULCZ, SR.
Counsel for the Plaintiffs
Bar. No. 453402 (D.C.)
2521 Drexel Street
Vienna, VA 22180
703-645-4010

Of Counsel:
Douglas McKusick, Esq.
THE RUTHERFORD INSTITUTE
P.O. Box 7482
Charlottesville, VA 22906-7482

## EXHIBITS

| | |
|---|---|
| Exhibit 1 | Complaint's Table of Contents - topics and counts |
| Exhibit 2 | List of Chiefs of Chaplains |
| Exhibit 3 | Wilkins v. Lehman, Order granting injunction, 85-cv-3031, slip op. S.D. Cal. 2/10/86 |
| Exhibit 4 | 7/8/98 Report by the Defense Manpower Data Center |
| Exhibit 5 | Navy Religious Demographics 1998-2001 |
| Exhibit 6 | Formula for computing Accession Goals |
| Exhibit 7 | Affidavit of CAPT Larry Ellis, CHC, USN |
| Exhibit 8 | Accession goals FY88-2001 |
| Exhibit 9 | 7/31/86 CAPT Muchow Memo re: Revised Fiscal Year 87 Accession Plan |
| Exhibit 10 | Dr. Leuba's Allonge Declaration |
| Exhibit 11 | CAPT Ellis Memorandum to Chief of Chaplains (Ellis Report ) |
| Exhibit 12 | Order recalling CDR Lyle |
| Exhibit 13 | List of CHC board members, FY77-02 |
| Exhibit 14 | Chart showing the over and under representation of FGC board members compared with the LT community |
| Exhibit 15 | Chart showing the over and under representation of FGC board members compared with the LCDR community |
| Exhibit 16 | Stafford Report |
| Exhibit 17 | DODIG of FY97 and 98 Commander Chaplain Promotion Boards (Extracts pp.3 & 4) |
| Exhibit 18 | Chaplain/adherent ratios by Faith Group Cluster. |
| Exhibit 19 | CH Gomulka Memo (extract), Reasons and Solutions for Recruiting Problem |

Exhibit 20    23 Jul 92 Commanding Officer's Memo to Command Chaplain, Subj: PERMISSION TO WORSHIP.

Exhibit 21    Table QE-6, *Larson v. U.S. Navy*, September 2006 Withdrawal & Correction Declaration Denominational Preference in the U.S. Navy Chaplain Corps Accessions, Expert Declaration of Harald R. Leuba, Ph.D.

Exhibit 22    Declaration of CAPT James Poe, CHC, USN (Ret.), Regional Chaplain, Naval Region Europe

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 18, 2008, a true and correct copy of **First Amended**

**Complaint** were filed with the Court's Electronic Case Management Filing System which serves

a copy of said filing on the following;

Michael Q. Hyde
Attorney, Civil Division
U.S. Department of Justice
P.O. Box 883
Ben Franklin Station
Washington, D.C. 20044

/S/ Arthur A. Schulcz, Sr.
ARTHUR  A. SCHULCZ, Sr.
D.C. Bar No. 453402
Counsel for the *Adair* Plaintiffs
2521 Drexel Street
Vienna, VA 22180
703-645-4010
FAX: 703-645-4011

145

# INDEX

I.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.    JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.   PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     A.    Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     B.    Other Chaplain Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

     C.    The Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

IV.   DEFINITIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

V.    CLASS ACTION ALLEGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

VI.   THE NAVY'S RELIGIOUS DEMOGRAPHICS. . . . . . . . . . . . . . . . . . . . . . . . . . 76

VII.  CHAPLAINS AS FAITH GROUP/DENOMINATION REPRESENTATIVES. . . . . . 77

VIII. OTHER STATUTES AFFECTING THIS LITIGATION. . . . . . . . . . . . . . . . . . . . 80

IX.   THE NAVY'S ILLEGAL POLICIES AND ACTIONS. . . . . . . . . . . . . . . . . . . . . 81

     COUNT 1 -   THE NAVY'S ARBITRARY FGC GOALS AND/OR QUOTAS
                   ESTABLISHED AND MAINTAINED UNCONSTITUTIONAL
                   RELIGIOUS PREFERENCE SYSTEMS . . . . . . . . . . . . . . . . . . . . . . . . 81

     COUNT 2 -   THE NAVY HAS ESTABLISHED A HIERARCHY OF PREFERRED
                   RELIGIOUS TRADITIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

     COUNT 3 -   THE NAVY'S CHAPLAIN SELECTION BOARD SYSTEM IS
                   UNCONSTITUTIONAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

     COUNT 4 -   THE NAVY HAS BEEN HOSTILE TO NON-LITURGICAL WORSHIP
                   NEEDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

     COUNT 5 -   THE NAVY BURDENS NON-LITURGICAL CHAPLAINS' AND DON
                   PERSONNEL'S FREE EXERCISE RIGHTS TO PRACTICE THEIR
                   RELIGIOUS TRADITIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

COUNT 6 -   THE NAVY DISCRIMINATES AGAINST NON-LITURGICAL
            CHAPLAINS' RELIGIOUS FREE SPEECH. . . . . . . . . . . . . . . . . . . . . 111

COUNT 7 -   THE USE OF CHAPLAINS TO RATE OTHER CHAPLAINS,
            EXCEPT IN UNAVOIDABLE CIRCUMSTANCES, VIOLATES
            THE FIRST AND FIFTH AMENDMENTS. . . . . . . . . . . . . . . . . . . . . 113

COUNT 8 -   ILLEGAL RETALIATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

COUNT 9 -   CONSTRUCTIVE DISCHARGE OF CERTAIN PLAINTIFFS. . . . . . 116

COUNT 10 -  THE NAVY'S MANIFEST HOSTILITY TO NON-LITURGICAL
            RELIGIOUS TRADITIONS VIOLATES THE FIRST AND FIFTH
            AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

COUNT 11 -  FRAUDULENT CONCEALMENT OF THE EVIDENCE OF
            PLAINTIFFS' CAUSE OF ACTION. . . . . . . . . . . . . . . . . . . . . . . . . 119

COUNT 12 -  VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION
            ACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

COUNT 13 -  A CHC RECRUITING POLICY REQUIRING ALL CHAPLAINS TO
            ASSIST IN RECRUITING CHAPLAINS VIOLATED THE FIRST
            AMENDMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

COUNT 14 -  ILLEGAL COVERUP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

COUNT 15 -  10 U.S.C. § 613(a) IS UNCONSTITUTIONAL AS APPLIED TO
            PLAINTIFFS' CONSTITUTIONAL AND RFRA CLAIMS. . . . . . . . . 127

COUNT 16 -  FUNDING OF THE CHC'S ITS ILLEGAL POLICIES, PRACTICES
            AND ACTIONS EXCEEDS CONGRESS' AUTHORITY UNDER
            ARTICLE I, SECTION 8 OF THE CONSTITUTION'S TAXING
            AND SPENDING CLAUSE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

X.   PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

     A.   Declaratory Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

     B.   Injunctive Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

     C.   An Order. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

D.     Attorneys' Fees and Other Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

## CHIEF OF CHAPLAINS - UNITED STATES NAVY

| Name | Faith Group | Years as Chief | Dates |
|------|-------------|----------------|-------|
| CAPT John Brown Frazier CHC, USN | Methodist | 4 | Nov 1917 - Nov 1921 |
| CAPT Evan Walker Scott, CHC, USN | Congregationalist | 5 | Nov 1921 - July 1926 |
| CAPT Curtis Hoyt Dickens, CHC, USN | Univer/PE | 3 | July 1926 - July 1929 |
| CAPT Sydney Key Evans, CHC, USN | PE | 6 | July 1929 - July 1935 |
| CAPT Edward Aloysius Duff, CHC, USN | Roman Catholic | 2 | July 1935 - June 1937 |
| RADM Robert Dubois Workman, CHC, USN | Presbyterian (USA) | 8 | July 1937 - July 1945 |
| RADM William Nathaniel Thomas, CHC, USN | Methodist | 4 | July 1945 - Sept 1949 |
| RADM Stanton Willard Salisbury, CHC, USN | Presbyterian (USA) | 4 | Sept 1949 - Jan 1953 |
| RADM Edward Blaine Harp, Jr. CHC, USN | Reformed | 5 | Feb 1953 - June 1958 |
| RADM George Aloysius Rosso, CHC, USN | Roman Catholic | 5 | June 1958 - June 1963 |
| RADM Josephy Floyd Dreith, CHC, USN | Lutheran | 2 | July 1963 - June 1965 |
| RADM James Woodrow Kelley, CHC, USN | Southern Baptist | 5 | July 1965 - June 1970 |
| RADM Francis Leonard Barrett, CHC, USN | Methodist | 5 | July 1970 - June 1975 |
| RADM John J. O'Connor, CHC, USN | Roman Catholic | 4 | July 1975 - June 1979 |
| RADM Ross H. Trower, CHC, USN | Lutheran (Missouri Synd) | 4 | June 1979 - Aug 1983 |
| RADM Neil M. Stevenson, CHC, USN | Presbyterian (USA) | 2 | Aug 1983 - Aug 1985 |
| RADM John R. McNamara, CHC, USN | Roman Catholic | 3 | Aug 1985 - June 1988 |
| RADM Alvin B. Koeneman, CHC, USN | American Lutheran Church | 3 | June 1988 - Aug 1991 |
| RADM David F. White, CHC, USN | Reformed Christian Church of Amer | 3 | Aug 1991 - Aug 1994 |
| RADM Donald K. Muchow, CHC, USN | Lutheran (Missouri Synod) | 3 | Aug 1994 - Aug 1997 |
| RADM Byron Holderby, Jr. CHC, USN | Evangelical Lutheran Church in Amer | 3 | Aug 1997 - Aug 2000 |
| RADM Barry C. Black, CHC, USN | Seventh Day Adventist | 3 | Aug 2000 - Aug 2003 |
| RADM Louis V. Iasiello, CHC, USN | Roman Catholic | 3 | Aug 2003 - Present |

EXHIBIT 2

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

RONALD G. WILKINS,

    Plaintiff,    )  Civil No. 85-3031-GT(IEG)

    v.

JOHN LEHMAN, Secretary of
the Navy, et al.,

    Defendants.    )  PRELIMINARY INJUNCTION

On Friday, January 24, 1986, at 8:00 a.m., the
plaintiff's motion for a preliminary injunction came on for
hearing before the Honorable Gordon Thompson, Jr.  The plaintiff,
RONALD G. WILKINS, was represented by Charles T. Bumer.  The
defendants, JOHN LEHMAN, et al., were represented by Donald F.
Shanahan.

After careful consideration of the papers submitted to
the Court, together with the arguments presented at the hearing,
the Court finds that a preliminary injunction should issue.

/ / /

/ / /

/ / /

/ / /

EXHIBIT

3

## BACKGROUND

The plaintiff, RONALD G. WILKINS ("WILKINS"), is a Lieutenant in the United States Navy presently on active duty and serving as a United States Navy Chaplain at Camp Pendleton. The complaint seeks to prevent the defendants, collectively referred to as the "SERVICE", from unlawfully discharging WILKINS from the United States Navy. The claims for relief arise out of events surrounding the SERVICE's consideration of WILKINS for promotion to the rank of Lieutenant Commander.

WILKINS became eligible for consideration for promotion to the rank of Lieutenant Commander in 1983. In July of 1983, the Chaplain Corps Selection Board considered WILKINS for possible promotion. He was not selected. WILKINS appealed this decision to the Board of Corrections of Naval Records ("BCNR"). He claimed that certain errors contained in his record caused his record to be improperly considered.

The errors alleged include a fitness report concerning the period from August 5, 1980 to January 31, 1981 which failed to indicate that WILKINS suffered from hepatitis contracted during service in the Indian Ocean. In addition, it was alleged that certain other reports were drafted by a Group Chaplain Atwood who, WILIKINS claims, was personally prejudiced against him. It is alleged that Chaplain Atwood did not believe that ministers from the smaller fundamentalist religions could be effective in the military and, therefore, he was determined to remove WILKINS from the Chaplain Corps.

The BCNR did not act until after the Chaplain Corps Selection Board met in 1984. Thus, WILKINS was again passed over

70

76

1  for promotion on the basis of his record as it had previously
2  stood before the July 1983 Selection Board.

3      On December 24, 1984, the BCNR recommended that the
4  erroneous reports be removed from WILKINS' record. Specifically,
5  the report ending January 31, 1981, which failed to mention
6  WILKINS' hepatitis was removed, and substituted for it was a
7  report which indicated his actual condition. In addition, the
8  reports allegedly drafted by Chaplain Atwood were removed. The
9  majority of the BCNR stated that "these reports may well have
10  been tainted by religious discrimination."

11      The BCNR also recommended that WILKINS' record "be
12  placed before the earliest possible selection board convened to
13  consider officers of his category for promotion to Lieutenant
14  Commander as an officer who has not failed of selection for
15  promotion to that grade, but with the understanding that should
16  petitioner not be selected for promotion by that board, he will
17  be deemed to have twiced failed of selection for promotion for
18  all purposes."

19      WILKINS' record was placed before the Chaplain Corps
20  Selection Board that met in the summer of 1985. He was not
21  selected for promotion. On September 11, 1985, WILKINS was
22  informed that he would be discharged from the United States Navy
23  on January 1, 1986.

24      WILKINS filed his complaint for damages and injunctive
25  relief with this Court on December 30, 1985. Essentially, the
26  complaint states four claims for relief. First, WILKINS alleges
27  that the composition of Chaplain Corps Selection Boards is in
28  violation of the Establishment Clause of the First Amendment

-3-

(71)

77

1   to the Constitution. It is alleged that each board is comprised
2   exclusively of chaplains and that a SERVICE policy requires that
3   at least two members of each and every board be chaplains of the
4   Roman Catholic faith. The SERVICE does not deny that this policy
5   is in effect. It is also alleged, on information and belief,
6   that the United States Army and the United States Air Force place
7   only a single chaplain on their selection boards. The remainder
8   of each board consists of line officers.

9       Second, WILKINS alleges that his failure to be selected
10  for promotion was the result of religious discrimination. He
11  cites the finding of the BCNR that certain "reports may well have
12  been tainted by religious discrimination."

13      Third, WILKINS contends that his discharge after his
14  failure to be selected in the summer of 1985 would be in
15  violation of 10 U.S.C. §632. Pursuant to this section, WILKINS
16  asserts that the BCNR is not empowered to require that his
17  failure to be selected should count as if he has twiced failed.

18      Finally, WILKINS alleges that, pursuant to 10 U.S.C.
19  §632, he could not be discharged until sometime in April, 1986.
20  10 U.S.C. §632 provides that an officer who has failed selection
21  for the second time shall be discharged not later than the first
22  day of the seventh calendar month after the month in which the
23  report of the selection board is approved. The parties dispute
24  the date the report was approved.

25      On December 31, 1985, the Honorable Gordon
26  Thompson, Jr. issued a temporary restraining order which enjoined
27  the SERVICE from discharging WILKINS until a hearing could be
28  held on WILKINS' motion for a preliminary injunction. That

-4-

72

78

hearing was scheduled for January 10, 1986. At the hearing, it became apparent to the Court that the papers submitted did not adequately address the issues presented in the complaint. The Court ruled that the temporary restraining order should be continued and that additional briefing would be required. The hearing was rescheduled for January 24, 1986 at 8:00 a.m.

## DISCUSSION

By the instant motion, WILKINS requests that this Court preliminarily enjoin the SERVICE from discharging him from the United States Navy.

### A.  Introduction

In general, "an internal military decision is unreviewable unless the plaintiff alleges (a) a violation of the Constitution, federal statute, or military regulations; and (b) exhaustion of available intraservice remedies." Wallace v. Chappell, 661 F.2d 729, 732 (9th Cir. 1981) citing Mindes v. Seaman, 453 F.2d 197 (5th Cir. 1971). If the plaintiff satisfies both prerequisites, the Court then weighs four additional factors:

> (1)  The nature and strength of the plaintiff's claim....
> (2)  The potential injury to the plaintiff if review is refused.
> (3)  The extent of interference with military functions....
> (4)  The extent to which military discretion or expertise is involved.

Wallace, 661 F.2d at 733. As will be demonstrated in the last section of this order, it is the Court's opinion that the claims for relief contained in the complaint satisfy the standard

72

79

1  adopted in <u>Wallace</u>.  The decision to discharge WILKINS is,
2  therefore, reviewable by this Court.

3      B.    Standard for Issuance of a Preliminary Injunction

4          In the Ninth Circuit, a movant is ordinarily entitled
5  to a preliminary injunction upon a clear showing of either
6  (1) probable success on the merits and possible irreparable
7  injury or (2) sufficiently serious questions going to the merits
8  to make them a fair ground for litigation and a balance of
9  hardships tipping decidedly toward the party seeking the
10 preliminary relief.  <u>Adult World Bookstore v. City of Fresno</u>, 758
11 F.2d 1348, 1351 (9th Cir. 1985).  These are not really two
12 entirely separate tests but merely extremes of a single
13 continuum.  <u>Lydo Enterprises, Inc. v. City of Las Vegas</u>, 745 F.2d
14 1211, 1212 (9th Cir. 1984).  In essence, the usual standard
15 requires the district court to weigh two factors:  (1) the
16 strength of the movant's case on the merits and (2) the balance
17 of hardships to the parties if the Court were to issue or decline
18 to issue injunctive relief.  As the strength of the movant's
19 showing with regard to one of these factors increases, the
20 strength of the showing he must make with regard to the other
21 declines.

22          Where a plaintiff seeks to enjoin his or her discharge
23 from military service, the usual standard is modified.  The
24 movant is required to make a much stronger showing of irreparable
25 harm.  This modification is supported by the policy "implicit in
26 the magnitude of interests weighing against judicial interference
27 in the internal affairs of the armed forces..."  <u>Hartikka v.</u>
28 <u>United States</u>, 754 F.2d 1516, 1518 (9th Cir. 1985).  To

-6-

demonstrate sufficient irreparable injury after Hartikka, the circumstances of the discharge must be "genuinely extraordinary" that is, they must be a "far depar[ure] from the normal situation" of employment discharge." Hartikka, 754 F.2d at 1518.

C.  Application of the Standard to the Present Action

1.  Strength of WILKINS' Claims on the Merits

WILKINS states four claims for relief in his complaint. Two state claims under the First Amendment and two state claims under 10 U.S.C. §632.

First, the Court finds that WILKINS has a small probability of success on his claim that pursuant to 10 U.S.C. §632 he could not be discharged until sometime in April, 1986. If WILKINS' discharge itself was proper, it appears to this Court, at least without additional evidence on this question, that the SERVICE was empowered to discharge WILKINS on January 1, 1986.

Second, the Court finds that WILKINS has raised sufficiently serious questions going to the merits to make a fair ground for litigation his claims that the BCNR acted in violation of 10 U.S.C. §632 when it recommended that a single failure to be selected count as if WILKINS had twice failed.  It is persuasive to this Court that the BCNR felt compelled to remove a number of reports from WILKINS' record.  It is also significant that WILKINS' record, without the erroneous reports, was considered by only one Chaplain Corps Selection Board.  The Court finds little to support the SERVICE's contention that since WILKINS' record, even though tainted by the erroneous reports, was submitted to two separate Chaplain Corps Selection Boards, WILKINS should

-7-

81

1  receive only one more chance for selection.

2      Third, the Court finds that WILKINS has raised
3  sufficiently serious questions going to the merits to make a fair
4  ground for litigation his claim that his failure to be selected
5  was the result of religious discrimination.  The Court finds it
6  persuasive that the BCNR itself felt that certain "reports may
7  well have been tainted by religious discrimination."

8      Finally, the Court finds that WILKINS has demonstrated
9  a substantial probability of success on the merits of his claim
10  that the SERVICE's policy of placing two chaplains of the Roman
11  Catholic faith on each and every Chaplain Corps Selection Board
12  is a violation of the Establishment Clause of the First
13  Amendment.  The Court does recognize that the existence of
14  chaplains in the military is itself an accommodation between the
15  Establishment Clause and the free exercise rights of military
16  personnel.  On the other hand, the Court is of the opinion that
17  selection for promotion in the military, and the benefits
18  associated therewith, should not be made on the basis of
19  religious partisanship, even in the case of military chaplains.

20      The SERVICE attempts to justify the policy of placing
21  two chaplains of the Roman Catholic faith on each board in the
22  following manner.  The SERVICE states that it is composed in
23  large percentage of Roman Catholics (40%).  It then states that
24  "[t]he appointments are made to give the Catholic faith its
25  proportional representation on the Board."  The SERVICE also
26  contends that chaplains are selected for promotion on the basis
27  of relative competitiveness and religious affiliation is
28  immaterial.  The Court finds that this strains credulity.  If the

76

-8-                    82

1  purpose of the appointments is to give the Catholic faith its
2  proportional representation on the Board, one can only assume
3  that the purpose of the policy is to ensure that a certain
4  percentage of chaplains of the Roman Catholic faith are selected
5  for promotion.

6      The Court does not want to imply that it believes the
7  SERVICE has consciously sought to advance the Catholic faith.  It
8  is the Court's opinion that the policy of placing two chaplains
9  of the Roman Catholic faith on each board may be an excessive
10 government entanglement with religion.  The SERVICE, at this
11 stage, has failed to demonstrate any vital interest served by its
12 policy.  There is no allegation that absent this policy
13 servicemen of the Roman Catholic faith will be deprived of any
14 free exercise rights.  If, as the SERVICE asserts, chaplains are
15 promoted solely on the basis of their relative competitiveness,
16 perhaps the solution may be to conform to the practice of the
17 Army and the Air Force which make use of selection boards
18 comprised mainly of line officers.

19      2.   Balance of Hardships and Irreparable Injury
20     The SERVICE contends that the only injury that would
21 result if WILKINS were discharged is the type of injury which is
22 typically associated with a normal discharge.  Therefore, the
23 SERVICE reasons, Hartikka precludes the granting of preliminary
24 injunctive relief.

25     The Court finds, however, that the facts presented in
26 this case establish irreparable injury of a "genuinely
27 extraordinary" nature.  The Court reasons as follows:  There is a
28 substantial probability that the composition of the Chaplain

83

1  Corps Selection Board which failed to promote WILKINS will be
2  found to be composed in violation of the Establishment Clause of
3  the First Amendment.  Thus, WILKINS' discharge would be the
4  product of a violation of the First Amendment.  The chaplains'
5  central role in the military is to facilitate the free exercise
6  rights of servicemen.  It is the Court's opinion that WILKINS'
7  discharge would interfere with these rights.  Those servicemen
8  who would desire to take part in services performed by WILKINS
9  would be denied an opportunity to do so.  As the Supreme Court
10 has held, "[t]he loss of First Amendment freedoms, for even
11 minimal periods of time, unquestionably constitutes irreparable
12 injury."  Elrod v. Bonus, 427 U.S. 347, 373 (1976).
13          In addition to the irreparable harm that would result
14 if WILKINS were discharged, the balance of hardships tips
15 decidedly in WILKINS favor.  Not only will WILKINS suffer the
16 normal hardship associated with employment discharge, he will
17 have to maintain the endorsement of his endorsing agency to
18 pursue his litigation further.  It is alleged, and not
19 contradicted, that WILKINS cannot affiliate with any other
20 denominations if he desires to maintain his endorsement.  This
21 would severely limit his employment opportunites outside the
22 SERVICE.  It is also alleged that the SERVICE will suffer no
23 harm.  WILKINS has continued to perform his duties at Camp
24 Pendleton, apparently to the satisfaction of his present superior
25 officers.  The Court is also of the opinion that there would be
26 little or no interference with military functions should the
27 SERVICE be enjoined from discharging WILKINS.  Even though he is
28 a part of the SERVICE, WILKINS' major responsibilities require

84

79

1  him to perform his religious functions.   There would be little or
2  no impact on military readiness or discipline.

3      D.   Reviewability of the SERVICE's Decision

4         The standard for review of an internal military
5  decision was set forth in section A above.   The Court notes at
6  the outset the substantial similarity between the standard for
7  review and the standard for the issuance of a preliminary
8  injunction.   Both involve a balancing of the strength of the
9  plaintiff's case on the merits and the balance of hardships to
10  the parties.

11         1.   Claims for Relief
12         The Court finds that WILKINS states four claims for
13  relief.  Two state claims under the First Amendment and two state
14  claims under 10 U.S.C. §632.  WILKINS has, therefore, satisfied
15  the first prerequisite for review.

16         2.   Exhaustion of Intraservice Remedies
17         The Court finds first that WILKINS has not exhausted
18  his intraservice remedies with respect to his claim that pursuant
19  to 10 U.S.C. §632 he could not be discharged until sometime in
20  April, 1986.  That question should have been presented to the
21  BCNR.

22         On the other hand, the Court finds that WILKINS has
23  exhausted his intraservice remedies with respect to his claim
24  that, pursuant to 10 U.S.C. §632, the BCNR was not empowered to
25  require that his next failure to be selected for promotion would
26  count as if he had twice failed.   It is a ruling of the BCNR
27  itself which is challenged.

28  / / /

                                                          (79)

85

1   Finally, with respect to the two claims under the First
2   Amendment, exhaustion of intraservice remedies is not an absolute
3   requirement. "Resolving a claim founded solely upon a
4   constitutional right is singularly suited to a judicial forum and
5   clearly inappropriate to an administrative board." Glines v.
6   Wade, 586 F.2d 675, 678 (9th Cir. 1978). As was the AFBCMR (Air
7   Force Board for the Correction of Military Records) in Glines,
8   the BCNR here is "a clemency-oriented body, with authority to
9   "correct an error or remove an injustice," 10 U.S.C. §1552(a),
10  not to declare the law." Glines, 586 F.2d at 678. The Court
11  finds that the First Amendment issues which permeate the
12  selection process are sufficiently compelling that exhaustion
13  should not be required.

14      The Court also finds that, with respect to the
15  SERVICE's policy of placing two chaplains of the Roman Catholic
16  faith on each board, exhaustion would be futile. The Court
17  doubts that the BCNR has the authority to alter the composition
18  of the Board since the policy at issue was apparently approved by
19  the Secretary of the Navy.

20      Thus, with respect to three of his four claims, WILKINS
21  has either satisfied or should not be required to satisfy the
22  second prerequisite for review.

23      3.   The Four Additional Factors
24      The Court finds that the balancing of the four
25  additional factors weighs heavily in favor of judicial review.
26  First, WILKINS raises issues of constitutional dimension. In
27  addition, there is a substantial likelihood that WILKINS will
28  succeed on the merits. See section C1 above.

-12-

1          Second, WILKINS will suffer "genuinely extraordinary"
2     irreparable harm if review is refused.  See section C2 above.
3          Third, the extent of interference with military
4     functions is minimal at most.  See section C2 above.
5          Finally, little or no military discretion or expertise
6     is involved in the resolution of the constitutional or statutory
7     questions in dispute.
8          E.    Conclusion
9          1.    The Court finds that the internal military
10    decisions which are the subject of dispute in this case are
11    reviewable under the standard adopted in Wallace v. Chappell, 661
12    F.2d 729 (9th Cir. 1981).
13         2.    The Court finds that WILKINS has demonstrated a
14    substantial probability that he would succeed on the merits of
15    his claim that the policy of placing two chaplains of the Roman
16    Catholic faith on each Chaplain Corps Selection Board is in
17    violation of the First Amendment.
18         3.    The Court finds that WILKINS has raised
19    sufficiently serious questions going to the merits to make a fair
20    ground for litigation his claims that (a) his failure to be
21    selected for promotion was the product of religious discrmination
22    and (b) that the BCNR was not empowered to require that his
23    failure to be selected by the 1985 Board should count twice as if
24    he had failed.
25         4.    The Court finds that genuinely extraordinary
26    irreparable harm sufficient to satisfy the requirements of
27    Hartikka v. United States, 754 F.2d 1516 (9th Cir. 1985) would
28    result if WILKINS were discharged.

-13-

87

1    Accordingly, the defendants and all persons acting in
2  concert with them and under their control are hereby preliminary
3  enjoined from discharging the plaintiff from the United States
4  Navy until further order of this Court.
5    IT IS SO ORDERED.
6
7
8  DATED: *February, 10 1986*    _Gordon Thompson Jr._
9                               GORDON THOMPSON, JR., Chief Judge
                                United States District Court
10
11
12  cc:  Charles T. Bumer, Esq.
13       1168 Union Street, Suite 201
         San Diego, CA  92101
14
15       Donald F. Shanahan, AUSA
16
17
18
19
20
21
22
23
24
25
26
27
28

-14-

(82)

88

# DEFENSE MANPOWER DATA CENTER
## 1600 Wilson Boulevard, Suite 400
## Arlington, Virginia 22209



# Facsimile Cover Sheet

**To:**
Company:
Phone:
Fax:

**From:** _Jay Ferris_
Organization: DMDC - East
Phone:
Fax: (703) 696-5822 - DSN 426-5822
(703) 696-1491 - DSN 526-1491

**Date:** 7/8/98

**Pages including this cover page:** 4

**Comments:** _This is a copy of Scripts_
_Field_

EXHIBIT
4

| Religion | ARMY # | ARMY % | USAF # | USAF % | USMC # | USMC % | NAVY # | NAVY % | TOTAL # | TOTAL % |
|---|---|---|---|---|---|---|---|---|---|---|
| Asbury Bible Churches | 1 | 0 | 5 | 0 | 4 | 0 | 3 | 0 | 14 | 0.00% |
| Bible Protestant Church | 21 | 0 | 215 | 0.1 | 39 | 0 | 9 | 0 | 281 | 0.02% |
| Congregational Methodist Church | 38 | 0 | 281 | 0.1 | 15 | 0 | 20 | 0 | 354 | 0.03% |
| Evangelical Methodist Church of America | 8 | 0 | 13 | 0 | 2 | 0 | 4 | 0 | 27 | 0.00% |
| Fundamental Methodist Church, Inc. | 11 | 0 | 24 | 0 | 2 | 0 | 4 | 0 | 41 | 0.00% |
| Independent Churches Affiliated | 9 | 0 | 19 | 0 | 1 | 0 | 9 | 0 | 34 | 0.00% |
| Independent Fundamental BibleChurches | 5 | 0 | 57 | 0 | 2 | 0 | 7 | 0 | 74 | 0.01% |
| Tioga River Christian Conference | 2 | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 5 | 0.00% |
| Ukranian Evngelical Baptist Militant Conference | 1 | 0 | 5 | 0 | 1 | 0 | 1 | 0 | 8 | 0.00% |
| Methodist Protestant Church | 342 | 0.1 | 7883 | 2.1 | 103 | 0.1 | 76 | 0 | 8404 | 0.50% |
| Militant Fundamental Bible Churches | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 5 | 0.00% |
| United Christian Church | 347 | 0.1 | 30 | 0 | 10 | 0 | 15 | 0 | 402 | 0.03% |
| Anglican Orthodox Church, The | 155 | 0 | 143 | 0 | 53 | 0 | 31 | 0 | 442 | 0.03% |
| Baptist Bible Fellowship | 66 | 0 | 746 | 0.2 | 161 | 0.1 | 73 | 0 | 1055 | 0.08% |
| Brethren in Christ Fellowship | 3 | 0 | 15 | 0 | 2 | 0 | 10 | 0 | 30 | 0.00% |
| Christian Crusade | 6 | 0 | 22 | 0 | 11 | 0 | 34 | 0 | 73 | 0.01% |
| Independent Baptist Churches | 65 | 0 | 431 | 0.1 | 47 | 0 | 57 | 0 | 600 | 0.04% |
| Southwide Baptist Fellowship | 14 | 0 | 54 | 0 | 7 | 0 | 16 | 0 | 91 | 0.01% |
| Bible Presbyterian Church | 9 | 0 | 95 | 0 | 9 | 0 | 10 | 0 | 123 | 0.01% |
| American Baptist Association | 64 | 0 | 353 | 0.1 | 21 | 0 | 17 | 0 | 455 | 0.03% |
| Baptist Missionary Association of America | 57 | 0 | 292 | 0.1 | 25 | 0 | 44 | 0 | 451 | 0.03% |
| Free Will Baptist | 73 | 0 | 107 | 0 | 33 | 0 | 64 | 0 | 235 | 0.02% |
| General Association of General Baptists | 13 | 0 | 21 | 0 | 0 | 0 | 2 | 0 | 36 | 0.00% |
| Baptist Churches | 15 | 0 | 43 | 0 | 10 | 0 | 10 | 0 | 81 | 0.01% |
| American Baptist Convention | 77 | 0 | 64 | 0 | 234 | 0.1 | 11 | 0 | 386 | 0.03% |
| American Baptist Churches in the USA | 696 | 0.1 | 61 | 0 | 21 | 0 | 9 | 0 | 787 | 0.04% |
| World Baptist Fellowship | 3 | 0 | 14 | 0 | 0 | 0 | 3 | 0 | 20 | 0.00% |
| Advent Christian Church | 80 | 0 | 121 | 0 | 26 | 0 | 51 | 0 | 278 | 0.02% |
| African Methodist EpisCHURCH | 391 | 0.1 | 655 | 0.2 | 93 | 0.1 | 246 | 0.1 | 1391 | 0.10% |
| African Methodist Episcopal Zion Church | 73 | 0 | 175 | 0 | 26 | 0 | 47 | 0 | 625 | 0.02% |
| Baptist General Conference | 171 | 0 | 1037 | 0.3 | 217 | 0.1 | 101 | 0 | 1515 | 0.11% |
| Christian Methodist Episcopal Church | 128 | 0 | 250 | 0.1 | 98 | 0.1 | 141 | 0 | 525 | 0.04% |
| Christian Reformed Church | 38 | 0 | 134 | 0 | 32 | 0 | 54 | 0 | 256 | 0.02% |
| Church of God (Anderson, IN) | 11 | 0 | 62 | 0 | 4 | 0 | 7 | 0 | 84 | 0.01% |
| Church of God in North America | 4 | 0 | 5 | 0 | 1 | 0 | 0 | 0 | 12 | 0.00% |
| Evangelical Congregational Church | 15 | 0 | 26 | 0 | 2 | 0 | 19 | 0 | 62 | 0.00% |
| Free Will Baptist, NC State Convention of | 7 | 0 | 13 | 0 | 2 | 0 | 3 | 0 | 24 | 0.00% |
| Moravian Church | 42 | 0 | 48 | 0 | 29 | 0 | 23 | 0 | 142 | 0.01% |
| National Association of Congregational Christian Churches | 5 | 0 | 11 | 0 | 1 | 0 | 4 | 0 | 22 | 0.00% |
| General Comission of Chaplains and Armed Service Personnel | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0.00% |
| National Baptist Convention America | 142 | 0 | 37 | 0 | 2 | 0 | 6 | 0 | 187 | 0.01% |
| National Baptist Convention, USA Inc. | 172 | 0 | 35 | 0 | 4 | 0 | 3 | 0 | 214 | 0.02% |
| North American Baptist Conference | 19 | 0 | 21 | 0 | 1 | 0 | 2 | 0 | 13 | 0.00% |
| Primitive Methodist Church, USA | 5 | 0 | 9 | 0 | 0 | 0 | 3 | 0 | 24 | 0.00% |
| Progressive National Baptist Convention, INC. | 14 | 0 | 7 | 0 | 0 | 0 | 3 | 0 | 95 | 0.00% |
| Reformed Church in America | 15 | 0 | 40 | 0 | 2 | 0 | 9 | 0 | 15 | 0.00% |
| Church of God General Conference | 4 | 0 | 5 | 0 | 0 | 0 | 3 | 0 | 15 | 0.00% |
| ~~Latter Day Saints~~ | | | | | | | 6 | 0 | | 0.00% |
| Churches of Godmidmid | | | | | | | | | 6 | |
| Swendikfeker Churches, The General Conference | 2 | 0 | 3 | 0 | 0 | 0 | 1 | 0 | 6 | 0.00% |
| The Swedenborgian Church, General Conference of | 2 | 0 | 3 | 0 | 2 | 0 | 2 | 0 | 11 | 0.00% |
| Church of God of Prophecy | 23 | 0 | 45 | 0 | 7 | 0 | 17 | 0 | 92 | 0.01% |
| Independent Fundamental Churches of America | 22 | 0 | 15 | 0 | 2 | 0 | 4 | 0 | 43 | 0.00% |
| Fellowship of Grace Brethren Churches | 5 | 0 | 3 | 0 | 0 | 0 | 1 | 0 | 5 | 0.00% |
| Plymouth Brethren | 3 | 0 | 23 | 0 | 0 | 0 | 0 | 0 | 26 | 0.00% |
| Reformed Church in the United States | 2 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 9 | 0.00% |
| Reformed Episcopal Church | 209 | 0 | 255 | 0.1 | 98 | 0.1 | 103 | 0 | 565 | 0.04% |
| Reorganized Church of Jesus of Latter Day Saints | 93 | 0 | 152 | 0 | 40 | 0 | 56 | 0 | 341 | 0.02% |

| Religion | ARMY # | % | USAF # | % | USMC # | % | NAVY # | % | TOTAL # | % |
|---|---|---|---|---|---|---|---|---|---|---|
| Religion | 3571 | 0.3 | 3797 | 1 | 575 | 0.5 | 3543 | 1 | 12198 | 0.57% |
| Church of Christ | 2 | 0 | 0 | 0 | 7 | 0 | 22 | 0 | 31 | 0.00% |
| Reform Judaism | 2 | 0 | 0 | 0 | 4 | 0 | 7 | 0 | 13 | 0.00% |
| Conservative Judaism | 7 | 0 | 0 | 0 | 10 | 0 | 9 | 0 | 26 | 0.00% |
| Orthodox Judaism | 155 | 0 | 0 | 0 | 106 | 0.1 | 52 | 0 | 313 | 0.02% |
| Lutheran Church in America | 49 | 0 | 1 | 0 | 19 | 0 | 40 | 0 | 119 | 0.01% |
| American Lutheran Church, The | 240 | 0 | 674 | 0 | 67 | 0 | 228 | 0.1 | 1288 | 0.06% |
| Lutheran Church Missouri Synod | 53 | 0 | 0 | 0 | 5 | 0 | 26 | 0 | 84 | 0.01% |
| Evangelical Lutheran Churches, Association of | 31 | 0 | 107 | 0 | 16 | 0 | 38 | 0 | 192 | 0.01% |
| Christian and Missionary Alliance | 129 | 0 | 557 | 0.3 | 259 | 0.2 | 164 | 0 | 1519 | 0.11% |
| Christian Churches and Churches of Christ | 24 | 0 | 33 | 0 | 9 | 0 | 8 | 0 | 23 | 0.01% |
| Church of God (Cleveland, TN) | 4 | 0 | 3 | 0 | 2 | 0 | 11 | 0 | 23 | 0.00% |
| Church of the United Brethren Christ | 10 | 0 | 10 | 0 | 3 | 0 | 10 | 0 | 32 | 0.00% |
| Churches of Christ in Christian Union | 34 | 0 | 57 | 0 | 4 | 0 | 3 | 0 | 103 | 0.01% |
| Conservative Baptist Association of America | 15 | 0 | 5 | 0 | 0 | 0 | 1 | 0 | 23 | 0.00% |
| Conservative Congregational Christian Conference | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 2 | 0.00% |
| Elim Fellowship | 42 | 0 | 134 | 0 | 12 | 0 | 45 | 0 | 228 | 0.02% |
| Evangelical Free Church of America | 1 | 0 | 5 | 0 | 0 | 0 | 1 | 0 | 7 | 0.00% |
| Evangelical Friends Alliance | 10 | 0 | 45 | 0 | 3 | 0 | 5 | 0 | 88 | 0.00% |
| Evangelical Methodist Church | 9 | 0 | 20 | 0 | 3 | 0 | 6 | 0 | 38 | 0.00% |
| International Church of the Foursquare Gospel | 6 | 0 | 6 | 0 | 2 | 0 | 7 | 0 | 24 | 0.00% |
| Open Bible Standard Churches, Inc | 115 | 0 | 129 | 0 | 37 | 0 | 25 | 0 | 306 | 0.02% |
| Pentecostal Church of God of America, INC. | 813 | 0 | 582 | 0.3 | 259 | 0.2 | 475 | 0.1 | 2180 | 0.15% |
| Pentecostal Holiness Church | 5 | 0 | 10 | 0 | 2 | 0 | 3 | 0 | 20 | 0.00% |
| Missionary Church, The | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 3 | 0.00% |
| General Conference of the Brethren Church | 2 | 0 | 4 | 0 | 0 | 0 | 5 | 0 | 11 | 0.00% |
| Central Bible Church | 4 | 0 | 11 | 0 | 3 | 0 | 6 | 0 | 24 | 0.00% |
| Free Lutheran Congregations, The Association of | 1 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 3 | 0.00% |
| Elim Missionary Assemblies | 2 | 0 | 4 | 0 | 0 | 0 | 1 | 0 | 7 | 0.00% |
| Kansas Yearly Meeting of Friends | 0 | 0 | 3 | 0 | 1 | 0 | 0 | 0 | 4 | 0.00% |
| Missionary Church Association | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 4 | 0.00% |
| Ohio Yearly Meeting of Friends | 4 | 0 | 34 | 0 | 0 | 0 | 3 | 0 | 41 | 0.00% |
| Associate Reformed Presbyterian Church | 3 | 0 | 25 | 0 | 2 | 0 | 10 | 0 | 43 | 0.00% |
| Cumberland Presbyterian Church | 130 | 0 | 3 | 0 | 28 | 0 | 26 | 0 | 185 | 0.01% |
| Presbyterian Church in the United States | 24 | 0 | 10 | 0 | 3 | 0 | 1 | 0 | 38 | 0.00% |
| United Presbyterian Church, Evangelical Synod | 85 | 0 | 101 | 0 | 33 | 0 | 20 | 0 | 239 | 0.02% |
| Orthodox Presbyterian Church, The | 11 | 0 | 15 | 0 | 1 | 0 | 4 | 0 | 31 | 0.00% |
| Reformed Presbyterian Church, Evangelical Synod | 7 | 0 | 4249 | 1.2 | 5 | 0 | 5 | 0 | 4266 | 0.30% |
| United Presbyterian Church in the USA | 74 | 0 | 925 | 0.3 | 33 | 0 | 33 | 0 | 1069 | 0.05% |
| Presbyterian Church in America | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00% |
| Presbyterian Council for Chaplains and Military Personnel | 0 | 0 | 0 | 0 | 101 | 0.1 | 269 | 0.1 | 379 | 0.03% |
| United Methodist Church, The | 5130 | 1.3 | 22734 | 6.2 | 733 | 0.4 | 55503 | | 23503 | 6.12% |
| Unknown | 2 | 0 | 5 | 0 | 0 | 0 | 1 | 0 | 12 | 0.00% |
| Primitive Methodist Church, The | 57 | 0 | 52 | 0 | 15 | 0 | 67 | 0 | 222 | 0.02% |
| The Wesleyan Church | 27 | 0 | 78 | 0 | 3 | 0 | 7 | 0 | 118 | 0.01% |
| Southern Methodist Church | 5157 | 1.1 | 0 | 0 | 8126 | 2.3 | 10231 | 2.7 | 21524 | 1.53% |
| No Preference Recorded | 121785 | 25.1 | 54032 | 14.7 | 26117 | 15.3 | 79457 | 21 | 291361 | 20.05% |
| No Religious Preference | 1653 | 0.3 | 1021 | 0.3 | 479 | 0.3 | 1123 | 0.3 | 4296 | 0.31% |
| Seventh Day Adventist | 1220 | 0.3 | 2002 | 0.5 | 295 | 0.2 | 1327 | 0.4 | 4854 | 0.34% |
| Assemblies of God | 30 | 0 | 7 | 0 | 7 | 0 | 10 | 0 | 54 | 0.00% |
| Grace Gospel Fellowship | | | | | | | | | | |
| Independent Baptist Bible Mission | 83 | 0 | 80 | 0 | 6 | 0 | | | 26561 | 1.92% |
| Southern Baptist Convention | 10308 | 2.1 | 9592 | 2.1 | | | | | 101 | 0.01% |
| National Assoc. of Free Will Baptists | 34 | 0 | 51 | 0 | 7 | 0 | 9 | 0 | 101 | 0.01% |
| Baptist Churches, Other | 100584 | 20.5 | 60264 | 16.4 | 31439 | 18.3 | 57345 | 15.3 | 249542 | 17.73% |
| Brethren Church | 295 | 0.1 | 217 | 0.1 | 72 | 0 | 254 | 0.1 | 933 | 0.03% |
| Christian No denominational preference | 30435 | 6.3 | 25627 | 6.1 | 16239 | 10.5 | 15403 | 4.9 | 88793 | 6.31% |
| Buddhism | 516 | 0.2 | 503 | 0.1 | 364 | 0 | 524 | 0.1 | 1195 | 0.08% |
| Christian Science | 403 | 0 | 184 | 0.1 | 75 | 0 | 235 | 0.1 | 1434 | 0.10% |
| Church of God in Christ | 530 | 0.1 | 484 | 0.1 | 81 | 0 | 235 | 0.1 | 1434 | 0.10% |

| | ARMY # | % | USAF # | % | USMC # | % | NAVY # | % | TOTAL # | % |
|---|---|---|---|---|---|---|---|---|---|---|
| Religion | 734 | 0.2 | 627 | 0.2 | 235 | 0.1 | 1299 | 0.3 | 3115 | 0.22% |
| Church of God | 1251 | 0.3 | 638 | 0.2 | 522 | 0.4 | 585 | 0.2 | 3196 | 0.23% |
| Christian Church | 4227 | 0.9 | 1628 | 1 | 1520 | 0.9 | 2184 | 0.5 | 11547 | 0.84% |
| Protestant Episcopal Church | 57 | 0 | 47 | 0 | 24 | 0 | 57 | 0 | 225 | 0.02% |
| Friends | 137 | 0 | 63 | 0 | 41 | 0 | 171 | 0 | 3556 | 0.29% |
| Jehovah's Witness | 1452 | 0.3 | 1228 | 0.3 | 420 | 0.3 | 766 | 0.2 | 15529 | 1.09% |
| Church of Jesus Christ of Latter Day Saints (LSD) | 5196 | 1.1 | 5139 | 1.4 | 1935 | 1.1 | 3066 | 0.9 | 42279 | 3.03% |
| Lutheran Churches | 107 | 0 | 0 | 0 | 20 | 0 | 31 | 0 | 156 | 0.01% |
| Lutheran Council in the USA | 20011 | 4.2 | 0 | 0 | 6557 | 3.9 | 10512 | 2.6 | 40420 | 2.88% |
| Methodist Churches | 55 | 0 | 61 | 0 | 5 | 0 | 18 | 0 | 137 | 0.01% |
| Evangelical Church of North America | 105 | 0 | 41 | 0 | 16 | 0 | 86 | 0 | 250 | 0.02% |
| Evangelical Covenant Church in America | 37 | 0 | 11 | 0 | 23 | 0 | 12 | 0 | 63 | 0.01% |
| Evangelical Church Alliance, The | 2054 | 0.4 | 766 | 0.2 | 544 | 0.5 | 722 | 0.2 | 4556 | 0.29% |
| Muslim | 146 | 0 | 125 | 0 | 47 | 0 | 72 | 0 | 384 | 0.03% |
| Hindu | 525 | 0.1 | 675 | 0.2 | 235 | 0.1 | 523 | 0.2 | 2353 | 0.17% |
| Church of the Nazarene | 391 | 0.1 | 337 | 0.1 | 139 | 0 | 256 | 0.1 | 1113 | 0.08% |
| Eastern Orthodox Churches | 146 | 0 | 124 | 0 | 32 | 0 | 50 | 0 | 352 | 0.03% |
| Full Gospel Pentecostal Assoc, The | 6703 | 1.4 | 4232 | 1.2 | 2454 | 1.4 | 4222 | 1.1 | 17651 | 1.29% |
| Pentecostal Churches | 114 | 0 | 133 | 0 | 28 | 0 | 36 | 0 | 341 | 0.02% |
| United Pentecostal Church, International | 4875 | 1 | 0 | 0 | 1364 | 1.1 | 9650 | 1 | 10450 | 0.74% |
| Presbyterian Churches | 57 | 0 | 0 | 0 | 24 | 0 | 137 | 0 | 250 | 0.02% |
| Reformed Churches | 103722 | 21.4 | 81925 | 25 | 50445 | 29.4 | 81944 | 21.7 | 321034 | 22.34% |
| Roman Catholic Church | 82 | 0 | 21 | 0 | 20 | 0 | 75 | 0 | 203 | 0.01% |
| Salvation Army, The | 152 | 0 | 156 | 0 | 36 | 0 | 96 | 0 | 455 | 0.03% |
| Unitarian Universalist Association | 234 | 0 | 553 | 0.1 | 70 | 0 | 281 | 0.1 | 978 | 0.07% |
| United Church of Christ | 6523 | 1.4 | 4001 | 1.1 | 1455 | 0.8 | 4033 | 1.1 | 15162 | 1.15% |
| Protestant Other Churches | 13531 | 3.9 | 22257 | 7.1 | 7153 | 4.2 | 2058 | 2.4 | 61357 | 4.57% |
| Protestant No Denominational Preference | 2506 | 0.5 | 2505 | 0.7 | 823 | 0.5 | 1257 | 0.4 | 7659 | 0.55% |
| Other Religions | 541 | 0.1 | 689 | 0.2 | 195 | 0.1 | 179 | 0 | 1284 | 0.09% |
| Atheist | | | | | | | | | | |
| TOTAL | 485750 | 100 | 327541 | 100 | 171727 | 100 | 376073 | 100 | 1402091 | 100.00% |

## 1998-2001 NAVY RELIGIOUS DEMOGRAPHICS                    EXHIBIT 5

**FAITH GROUP/TRADITION**          **FAITH GROUP NUMBER (%)  OF NAVY PERSONNEL**

| PROTESTANT LITURGICAL | 7-98 Report | 9-99 Report | 02-00 Report | 05-01 Report |
|---|---|---|---|---|
| Methodist | 20,776 (3.78%) | 18,804 (3.50%) | 18,401(3.44%) | 17,725 |
| Presbyterian | 5,781 (1.05%) | 5,203 (0.97% ) | 5,116 (0.95%) | 4,842 |
| Lutheran | 15,937 (2.90%) | 14,392 (2.68%) | 14,127(2.64%) | 13,343 |
| Episcopal & Reformed Ec. | 4,039 (0.73%) | 3,817 (0.71%) | 3,766 (0.70%) | 3,446 |
| Reformed & Congregational | 586 (0.11%) | 587 (0.11%) | 575 (0.118%) | 490 |
| Methodist Episcopal | 652 (0.12%). | 611 (0.11%) | 612 (0.11%) | 596 |
| Category Total (% 0f DON) | **48,165 (8.76%)** | **43,776 (8.15%)** | **42,947(8.03%)** | **40,193 (7.46%)** |
| % of those professing faith | **13.00%** | **12.29%** | **12.22%** | **11.46%** |
| # of Chap. (% Corps): 859 [98]; 866 [99]; 871[00]; 829 [01] | 286 (33.29%) | 301(34.76%) | 307 (35.25%) | 292 (35.22%) |
| NON-LITURGICAL | | | | |
| Baptists | 98,481 (17.9%) | 91,501(17.04%) | 90,309 (16.9%) | 86,503 |
| Other Christian faith groups | 51,980 (9.45%) | 57,279 (10.66) | 58,074 (10.72) | 63,334 |
| Other non-liturgical Prot | 16,211 (2.95%) | 14,386(2.68%) | 14,124 (2.64%) | 13,338 |
| Pentecostal | 9,315 (1.69%) | 8,878 (1.66%) | 8,787 (1.64%) | 8,424 |
| Total for category (% 0f DON) | **175,987 (32.01%)** | **172,044 (32.03%)** | **171,294 (32.05%)** | **171,599 (32.01%)** |
| % of those professing faith | **47.53%** | **48.32%** | **48.77%** | **49.16%** |
| # Chaplains (%Corps) | 351(40.86%) | 351 (40.53%) | 347 (39.84%) | 337 (40.65%) |

| | 7-98 Report | 9-99 Report | 02-00 Report | 05-01Report |
|---|---|---|---|---|
| **CATHOLIC** (% 0f DON) | 132,429 (24.17%) | 127,070 (23.65%) | 125,892 (23.56%) | 124,075 (23.15%) |
| % of those professing faith | **35.89%** | **35.68%** | **35.22%** | **35.55%** |
| # Chaplains (%Corps) | 182(21.12%) | 179 (20.67%) | 181 (20.78) | 170 (20.51%) |
| **SPECIAL WORSHIP**[1] | | | | |
| Seventh Day Adventist | 1,617 (0.30%) | 1,658 (0.31%) | 1,646 (0.31%) | 1,658 |
| Jewish | 1,247 (0.23%) | 1,246 (0.23%) | 1,246 (0.23%) | 1,226 |
| LDS & Reorganized LDS | 5,120 (0.95%) | 5,036 (0.94%) | 4,984 (0.93%) | 4,957 |
| Christian Scientist | 599 (0.11%) | 478 (.09%) | 469 (0.09%) | 403 |
| Muslim[2] | 1,266 | 1,333 | 1,335 | 1,386 |
| Orthodox | 394 (0.05% ) | 362 (0.07%) | 350 (0.07%) | 347 |
| Other SW -no chaplain | 3,352 | 3,460 | 3,653 | 3,818 |
| Total for category (% 0f DON) | 13,595 (2.48%) | 13,211 (2.46%) | 13,333 (2.49%) | 13,448 (2.50%) |
| % of those professing faith | **3.58%** | **3.71%** | **3.79%** | **3.84%** |
| No. chaplains (% Corps) | 40 (4.66%) | 35 (4.04%) | 36 (4.13%) | 30 (3.62%) |
| **Total Dept of Navy** | 547,800 | 537,098 | 534,427 | 536,066 |
| % professing faith | 67.35% | 66.29% | 65.72% | 65.12% |

The above information was derived from reports issued from the Defense Manpower Data Center for July 1998; September 1999; February 2000; and May 2001.

1  Only those faith groups that have a chaplain reported in Navy Alfa  Rosters

2 Muslim chaplains not reported on Alfa rosters as Muslim chaplains prior to 2001

06-cv-1696 (RMU)
**Exhibit 5**

## RELIGIOUS PREFERENCES OF ACTIVE DUTY DON PERSONNEL WHO PROFESS FAITH

**JANUARY 2006**

NAVY

| Faith Group | Enlisted Number | % of Total | Officer Number | % of Total | Combined Number | % of Total |
|---|---|---|---|---|---|---|
| Roman Catholic | 69,901 | 33.7% | 13,827 | 40.8% | 83,728 | 34.7% |
| Liturgical | 19,519 | 9.4% | 6,816 | 20.1% | 26,335 | 10.9% |
| Nonliturgical | 111,038 | 53.5% | 11,569 | 34.2% | 122,607 | 50.8% |
| Special Worship | 7,107 | 3.4% | 1,662 | 4.9% | 8,769 | 3.6% |
| TOTAL | 207,565 | 100% | 33,874 | 100% | 241,439 | 100% |

MARINE CORPS

| Faith Group | Enlisted Number | % of Total | Officer Number | % of Total | Combined Number | % of Total |
|---|---|---|---|---|---|---|
| Roman Catholic | 37,370 | 31.6% | 6,587 | 38.6% | 43,957 | 32.5% |
| Liturgical | 12,640 | 10.7% | 3,373 | 19.8% | 16,013 | 11.8% |
| Nonliturgical | 63,505 | 53.7% | 6,593 | 38.6% | 70,098 | 51.8% |
| Special Worship | 4,761 | 4.0% | 514 | 3.0% | 5,275 | 3.9% |
| TOTAL | 118,276 | 100% | 17,067 | 100% | 135,343 | 100% |

**TOTAL DON PERSONNEL**
(COMBINED NAVY/MARINE CORPS)

| | Enlisted | | Officer | | Combined | |
|---|---|---|---|---|---|---|
| **Faith Group** | Number | % of Total | Number | % of Total | Number | % of Total |
| Roman Catholic | 107,271 | 32.9% | 20,414 | 40.1% | 127,685 | **33.9%** |
| Liturgical | 32,259 | 9.9% | 10,189 | 20.0% | 42,348 | **11.2%** |
| Nonliturgical | 174,543 | 53.6% | 18,162 | 35.7% | 192,705 | **51.1%** |
| Special Worship | 11,868 | 3.6% | 2,176 | 4.3% | 14,044 | **3.7%** |
| TOTAL | 325,841 | 100% | 50,941 | 100.1% | 376,782 | 99.9% |

## MEETING THE NEEDS OF THE NAVY

- ACCESS ON A BASIS PROPORTIONAL TO RELIGIOUS FAITH GROUP STRENGTH AMONG CIVILIAN RELIGIOUS FAITH GROUPS

- SEEK YEAR TO YEAR MIX APPROPRIATE TO RELIGIOUS FAITH GROUPS

- SEEK TO MAKE-UP PAST SHORTFALLS BY RELIGIOUS FAITH GROUPS

- PLAN TO RESPOND TO LOSS/GAIN FLUX

- PLAN TO RESPOND TO RECRUITING OPPORTUNITY

- MEET NEEDS OF NAVY WITH AVAILABLE ASSETS TO THE OPTIMUM POSSIBLE

EXHIBIT
6

BASE INVENTORY

RELIGIOUS FAITH GROUP MEMBERSHIP
————————————————————— X  FY END STRENGTH = BASE INVENTORY
TOTAL MEMBERSHIP RELIGIOUS FAITH GROUPS

ACCESSIONS MINIMUM

$$\frac{\text{RELIGIOUS FAITH GROUP MEMBERSHIP}}{\text{TOTAL MEMBERSHIP RELIGIOUS FAITH GROUPS}} \times \frac{\text{ANNUAL ACCESSIONS}}{2} = \frac{\text{ACCESSION}}{\text{MINIMUM}}$$

## AFFIDAVIT OF CAPTAIN LARRY H. ELLIS, U.S.N.(RETIRED)

1.      My name is Larry H. Ellis. I reside at 912 Indiana, Blytheville, AR., 72315.

I am over 21 years of age and have personal knowledge of and am competent to testify

to the facts and incidents related in this Affidavit.

2.      I was commissioned as a U.S. Navy chaplain in June 1968 and retired after

30 years of active service on July 1, 1998, at the rank of captain.

3.      As a Navy chaplain, I was endorsed by the Southern Baptist denomination.

4.      During the period 1991 to 1995, I was "The Chaplain" for the Marine Corps,

a separate branch or department of the U.S. Navy. The Navy provides chaplains for the

Marine Corps and my job was to coordinate and supervise the chaplain support, coverage

and activities for the Marine Corps.

5.      In October 1994, I attended the Navy Chaplain Corps Operational Ministries

Conference (also called the "Claimant Conference") attended by the chaplains from the

major Navy organizations and key staff officers from the office of the Chief of Chaplains

(the "Chief").

6.      On 20 October, 1994, during the conference, Chaplain Dave Atwater, who

EXHIBIT

7

Blumberg No. 5119

I believe was then the Director of Training, a position within the Chief's office, raised the issue of the perception among some non-liturgical chaplains that there was denominational bias in the assignment or "detailing" of Navy chaplains.

7.    The process of assigning chaplains to the various Navy chaplain positions is known as "detailing".

8.    Detailing is an important factor in a Navy chaplain's career because promotion boards look at the type of assignments that a chaplain has had to evaluate the scope or breadth of his or her experience as well as how the chaplain did in those assignments.  Certain types of assignments are helpful in getting promoted and if a chaplain has not had increasing responsibilities and diverse assignments, that chaplain may be at a disadvantage for promotion.

9.    "Liturgical" refer to those Christian denominations which have a formalized order of worship or "liturgy" such as Episcopal, Methodist, Lutheran, Presbyterian and Catholic.  The commonality among all liturgical denominations is that they baptize infants.  "Non-liturgical" refers to those denominations or faith groups which do not normally have a set order of worship.  Christian non-liturgicals also are generally more conservative in their theology, they may believe in a literal interpretation of the Bible, and they do not baptize infants.  Examples of non-liturgical denominations or faith

2

groups are Baptist; Pentecostal, e.g., Assemblies of God; and other bodies often characterized by the term Evangelical.

10.    Because many Protestant churches are not part of a denomination or are part of a small denomination, the Department of Defense and the Armed Forces Chaplains Board authorize "umbrella groups" such as the National Association of Evangelicals (or "NAE") to act as an endorsing agency for those non-denominational churches, fellowships, groups or bodies who share a common religious faith or theology and similar religious beliefs and practices. These "umbrella groups" must meet certain criteria established by the Department of Defense in order to endorse persons as candidates for the Chaplaincy.

11.    Ch. Atwater reported that non-liturgical chaplains had a perception that chaplains from liturgical denominations controlled the chaplain detailing process, that non-liturgical chaplains were not being treated fairly in that process and they were not being provided equal opportunities for important career enhancing billets (duty assignments are called"billets" in the Navy). Consequently, they perceived that they were not as highly valued as liturgical chaplains.

12.  . Since I was interested in the issue, during the resulting discussion I volunteered to examine Ch. Atwater's issue of possible liturgical bias in detailing and

3

write a report to the Chief, then Chaplain (Rear Adm.) Muchow.  The Chief accepted my

offer.

13.     To fully examine the issue, I identified those billets in the chaplain corps

that I thought most chaplains would agree were the key Chaplain Corps' billets in terms

of assignments or position.

14.     From Navy Program Support Guides for the preceding 15 years (1979-1994),

I identified each chaplain who occupied each key billet, his/her denomination and the

time period he/she occupied the billet.

15.     On January 25, 1995, I submitted my report to the Chief, providing copies

to all the division chiefs.

16.     My report speaks for itself.  It showed that chaplains from liturgical

denominations had dominated the Navy Chaplain Corps' key billets while chaplains from

non-liturgical denominations or faith groups had been largely excluded.  Out of 119

individuals who occupied these key billets, only 14 or 11.8 % were clearly non-liturgical.

17.     My report also highlighted the fact that the liturgical representation in the

Chaplain Corps' key billets was well out of proportion to the actual percentage or

4

membership of the liturgical denominations both in the Navy or in the general American population.

18.    I was familiar with denomination and faith group membership changes and membership trends, i.e., increasing or decreasing, because from 1977 to 1980 I was Head of the Personnel Plans and Policy Branch (or "PPP") within the Chief's Office.

19.    Tracking denomination and faith group membership and membership trends was important to me then because one of my PPP responsibilities was to advise the Chief on the optimal number of chaplains from each religious body as a percentage of the end strength for the Chaplain Corps in the next and out years.

20.    This introduced some tension because the number of religious bodies represented was increasing and there were significant demographic changes occurring. Simply put, Protestant liturgical denominations were declining in members and non-liturgical faith groups and denominations were growing.

21.    At that time, the Navy employed objective criteria to determine the number of active duty chaplains for each denomination or faith group authorized to have chaplains.

22.    That objective criteria was based on the faith group/denomination membership reported in the Annual Yearbook of American and Canadian Churches (the "Yearbook"). This is an annual publication that reports on denomination membership and the changes thereto in terms of increase or decrease since the last report.

23.    My office added up the membership of the denominations or faith groups with authorized ecclesiastical endorsing agencies. Because some denominations reported only adult or baptized members while others reported children, as well as adults, a factor was applied to those denominations who did not include children in their reported membership numbers in order to roughly equalize the basis for comparing memberships.

24.    There was also a method for accounting for the membership of those independent churches or bodies who shared the same common beliefs but did not belong to a denomination, i.e., faith groups such as the NAE, who were not counted in the Yearbook's membership report. My recollection is that the aggregate totals of the churches represented by "umbrella endorsing agencies" were treated as a religious body.

25.    The total of all these denomination memberships became the denominator, the individual denomination or faith group's membership became the numerator, and the resulting percentage was multiplied by the authorized end strength. This number

6

translated into the denomination or faith group's share of the authorized Navy active duty chaplains.  For example, if the Navy was authorized 100 chaplains, and Roman Catholics represented  25% and Baptists 20% of the religious population, we would try to structure our recruiting goals to achieve 25 Catholic and 20 Baptist chaplains.

26.   The objective of that policy was to have the Navy Chaplain Corps reflect the religious denominational and faith group make-up of the American population.  Since the purpose of the Navy Chaplain Corps is to provide for and facilitate the free exercise of religion by Navy personnel and the Navy recruited from all sectors of American society, the objective criteria policy allowed the Navy to make reasonable forecasts of its chaplain requirements.

27.    The Navy Chaplain Corps was facing a problem in 1977-1980:  while  the Chaplain Corps was heavily made up of liturgical representatives, the Protestant liturgical denominations were consistently losing membership, the basis for their percentage of representatives in the Navy Chaplain Corps.  On the other hand, non-liturgical denominations and faith groups were growing, i.e., increasing in membership. This was exacerbated by the high retention rates of chaplains.  Most served 20 years and those promoted usually stayed to mandatory separation.

28.    It was obvious to me and anyone who looked at the membership reports and

7

the published denomination trends that if the Navy continued to use objective criteria: a) the make up of the Navy Chaplaincy was out of line with the actual membership of the denomination and faith groups reflected by the Yearbook, b) the Navy Chaplain Corps would have to access and keep larger percentages of non-liturgical chaplains and, c) the make up of the Chaplain Corps and its leadership would change over time, shifting from a liturgical to a non-liturgical majority.

29.    I remember that during that time when I was in PPP, in around 1977 or 1978 when Ch. (Rear Admiral - now "Cardinal") O'Connor was Chief, a suggestion was made to modify the Chaplain Corps' objective criteria by using the actual Navy faith group membership as the basis for chaplain end strength. This data is captured when a person enlists and comes on active duty. At that time, no records were maintained as to officer religious preference. This suggestion would have shifted the percentages slightly in favor of the non-liturgical denominations or faith groups because of the realities of recruiting. Even then and more so today, the Armed Forces are comprised of persons who are upwardly mobile. The higher socio-economic groups are increasingly unlikely to serve in the military. Adm. O'Connor rejected this modification.

30.    Sometime in the mid to late 1980's, the Navy Chaplain Corps did away with objective criteria for its chaplain strength and went instead to "subjective" criteria. I believe the general feeling then was that the Navy needed "baby baptizers" at every

8

duty station in case a baby needed to be baptized, and the continuation of objective criteria would impact the ability of the Chaplain Corps to sustain the number of liturgical chaplains necessary to provide the perceived need for coverage. I believe the fact that membership in liturgical denominations was declining, actually and especially vis-a-vis the expanding population, was a driver to the change in policy.

31.     I was not in the Chief's office at that time but I believe this was general knowledge through the Chaplain Corps. I remember this change as coming during or around the time Admiral Koenaman was the Navy Chief of Chaplains, in the late 1980s.

32.     In addition to the perceived need to maintain sufficient liturgical end strength, the Navy was aggressively attempting to recruit and retain minorities and women.

33.     The new policy applied to active duty Navy chaplain accessions.

34.     The new subjective criteria were known by the chaplains who sat on the administrative boards that determined which chaplains could continue on Navy active duty beyond their initial three year tour. These boards, in effect, shaped the denominational make up of the future Chaplain Corps.

35.    Consequently, to meet the new priorities, many non-liturgical chaplains were not continued on active duty. Some liturgical chaplains were also released, but fewer, since there was a perceived need for their services. In other words, if two chaplains had equal records, the Continuation Board was more likely to chose a liturgical chaplain for continued Navy service because of the perception that we needed liturgical chaplains. In addition, the Navy was extending significant efforts to recruit liturgical chaplains. Most liturgical seminaries are less sympathetic to military service than evangelical seminaries and that was having an impact on the number of liturgicals seeking active duty in the Chaplain Corps.

36.    The above discussion is relevant to my report because the circumstances and policy concerning the subjective criteria policy I have described above were a contributing factor to the perception among non-liturgical chaplains that the Chaplain Corps was biased toward liturgical denominations and against non-liturgical chaplains.

37.    I discussed my report with Ch. (Rear Adm.) Muchow after I submitted it. He implied that the Chaplain Corps needed to make some changes. Although non-liturgical chaplains were tentatively scheduled to fill some of the key billets, changes took place before they actually moved so they did not occupy their intended billets and I remember no significant changes that occurred before Ch. Muchow retired. In other words, there was no concerted effort to address the problem. Since then, a non-

10

liturgical (a Southern Baptist) has been assigned as the Senior Detailer.

38.    When I was new in the PPP office (1977), one of the stated duties in my job description was to recommend the composition or membership of chaplain promotion selection boards to the Chief.  After I drew up my first proposed board membership list, I was informed that those decisions were made above my pay grade and finally approved by the Chief personally.  The Chief knew the personalities and strengths of the chaplains who could sit on the boards.  I believe the Chief, whomever he may have been, has consistently exercised his discretion in the make up of the boards.  Recommendations were made by the Senior Detailer, but final approval was the Chief's call.

39.    The above information and facts are true to the best of my knowledge, represent the testimony that I would give if called to testify in a court of law and are made under penalty of perjury.

_Larry H. Ellis_

Larry H. Ellis
Chaplain (Captain), U.S. Navy Retired

Subscribed and sworn to before me this 8th day of November, 1999

_Cathy D. Hudson_

NOTARY PUBLIC
My Commission expires _4-9-2000_


Seal


11

## NAVY CHAPLAIN ACCESSION GOALS
### fiscal years (FY) 89-00
Accessions = Direct Recruit+Reserve Recall+Superceeding

| FY | Total | RC | PR LIT | NON-LIT PR | SPECIAL WORSHIP |
|---|---|---|---|---|---|
| 89 | 74 | 25 | 22 | 23 | 4 |
| 90 | 60 | 19 | 13 | 23 | 5 |
| total | 134 | 44 | 35 | 46 | |
| 91 | 64 | 22 | 20 | 17 | 5 |
| total | 198 | 66 | 55 | 63 | |
| 92 | 83 | 25 | 30 | 24 | 4 |
| total | 281 | 91 | 85 | 87 | |
| 93 | 70 | 21 | 30 | 16 | 3 |
| total | 351 | 112 | 115 | 103 | |
| 94 | 97 | 25 | 45 | 21 | 6 |
| total | 448 | 137 | 160 | 124 | |
| 95 | 100 | 25 | 45 | 21 | 9 |
| total | 548 | 162 | 205 | 145 | |
| 96 | 76 | 20 | 37 | 14 | 5 |
| total | 624 | 182 | 242 | 159 | |
| 97 | 40 | 15 | 13 | 7 | 5 |
| total | 664 | 197 | 255 | 166 | |
| 98 | 40 | 15 | 13 | 7 | 5 |
| total | 704 | 212 | 268 | 173 | |
| 99 | 60 | 23 | 20 | 11 | 6 |
| total | 764 | 235 | 288 | 184 | |
| 00 | 65* | 22 | 20 | 15 | 8 |
| total | 829 | 257 | 308 | 199 | 65 |
| % of goals total | | 31.00% | 37.16% | 24.03 | 7.84% |
| FG % of Dept of Navy who profess faith (as of Feb 00) | | 35.22% | 12.22% | 48.77% | 3.79% |

EXHIBIT 8

```
                                              1100
                                              Ser 09G22
                                              30 Jul 86
```

From:  G2
To:    G
Via:   GB

Subj:  FY87 ACCESSIONS PLAN (REVISED)

1.  This FY87 accessions plan, presented for your approval, has
three elements:  method of entry (TSP, direct accession, recall),
faith group mix and projected losses.

- o  Method of entry for the 90 planned accessions should
  approximate the following:  18 TSPOs, 61 direct accessions
  and 11 recalls.

- o  Faith group mix best meets the needs of the naval service
  when 35 percent of the Chaplain Corps inventory is
  liturgical, 35 percent non-liturgical and 30 percent other
  (Roman Catholic, Jewish, Orthodox).  Additionally, Chief
  of Chaplains policy requires that Roman Catholic chaplains
  comprise 25 percent of total chaplain inventory (plus or
  minus 2 percent).  Should Roman Catholic chaplain
  inventory fall below 23 percent, end strength of the
  Chaplain Corps will not increase.

- o  Projected losses are determined from known statutory
  retirements (13), voluntary retirements (24) and other
  losses (resignations, RADs, admin. disch. etc.) (33).
  Projected losses, statutory and on-file voluntary
  retirements and other known losses are 20 liturgical, 22
  non-liturgical and 13 other for a total of 55.

2.  Current Chaplain Corps inventory is:  liturgical 422 (37%),
non-liturgical 431 (38%), other 284 (25%) for a total of 1137.
Roman Catholic chaplain inventory is 260 (22.8%).  Evaluation of
the elements comprising the accession plan should direct
recruiting efforts toward those chaplain candidates who best meet
the needs of the Navy.

EXHIBIT
9

3. Considering the present mix and projected gains and losses, G2 recommends chaplain candidates be accessed as follows:

| Projected TSP accessions (Roman Catholic chaplains are not considered in the TSP other category) | Liturgical | Non-Liturgical | Other | Total |
|---|---|---|---|---|
| | 11 | 4 | 3 | 18 |
| Projected direct accessions | 20 (33%) | 8 (13%) | 33 (54%) | 61 |
| Projected recall accessions | 2 | 1 | 8 | 11 |
| TOTAL (current inventory plus gains minus losses) | 430 (37%) | 416 (36%) | 311 (27%) | 1157 |

4. G22 will monitor progress of the plan and report to you on a bimonthly basis.

D. K. MUCHOW

APPROVE _____

DISAPPROVE _____

SEE ME _____

Copy to:
G1
G3
G4
GR

188

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CHAPLAINCY OF FULL GOSPEL CHURCHES, )
   et al.                           )         Case No. 1:99CV002945 (RMU)
              v.             )
THE HON. GORDON R. ENGLAND, et al.    )
------------------------------------------------------- )    Consolidated with
ROBERT H. ADAIR, et al.             )
              v.             )
THE HON. GORDON R. ENGLAND, et al.    )      Case No. 1:00CV00566 (RMU)
_____ )

# ALLONGE DELCARATION
## of Harald R. Leuba, Ph.D.

1.     Pursuant to 28 U.S.C. Section 1746, and under the penalties of perjury, I, Harald R. Leuba, Ph.D., declare as follows:

2.     I am an adult U.S. citizen of good reputation; I am an experienced statistician and operations research analyst; I am competent to testify upon, and have personal knowledge of, the facts, data, and analysis herein reported[1]. Although I am paid for my work, the data analysis informs my opinion - not my compensation ($250/hr). The opinions here are mine; the conclusions are scientifically certain to the best of my knowledge and belief.

## Results in Brief

3.     This document puts into context some earlier work and presents a new analysis of Chaplain Corps' records. The new analysis uses a measure of *denominational similarity* between candidates and the Chaplain Corps' selection boards which is based on the Navy's "Faith Group Cluster" system.

4.     When measured this way, nearly 75% of the uncertainty about which candidates will be selected for promotion to Commander (for example) can be accounted for or predicted by a knowledge of the denominations assigned to the selection board vis-à-vis the denomination of the candidate being considered.



---

[1] My cv (provided earlier) shows that I come to the issues here with substantial relevant experience: I am trained in mathematics and physics; psychology and statistics; I worked for the Secretary of Defense as a Director/senior operations research analyst on manpower issues, military command structure, and nuclear weapons and planning.

EXHIBIT
10

5.      Within the context of the U.S. Navy Chaplain Corps' personnel management system, this shows that *chaplains* sitting on personnel boards judging other chaplains either base their decisions (in substantial part) upon a commonality of faith, or are unable to resist natural human pressure to value most highly those who are most "like" themselves. This generality is shown to apply to all U.S. Navy Chaplain Corps personnel selection boards on which board denomination data is available: promotion boards, involuntary early retirement boards, and accession and recall boards.   In every case the evident bias is statistically significant (at the level of two standard deviations, or more).

6.      The inescapable conclusion is that U. S. Navy Chaplain Corps' personnel decisions are contaminated by considerations of denomination.   There is an institutional preference among denominations (Catholic > Episcopal > other Liturgical > Baptist > other Non Liturgical > Orthodox and Special Worship) and this preference priority forms the basis for populating the selection boards; that pattern of preference in turn controls the mix of denominations which are selected into, promoted within, or involuntarily retired from the U.S. Navy Chaplain Corps. The favoured denominations receive disproportionate benefit; the disfavoured ones are denied unbiased and equitable consideration for admission, advancement, and tenure.

7.      One might wonder why this finding is so late to arrive on the scene, or more importantly, why it has not been observed before.  The answer is:

(a) It *has* been observed before (by Navy sponsored studies (Smith, et al. 2000), by Navy Chaplains (e.g. McCreary, 1992) and in my earlier Declarations in this litigation).

(b) The reason we are tardy to this particular analysis is that heretofore I (and the Navy's analysts) followed the conventional (but incomplete) approach of just looking at the outcomes of the decisions.  Sacco et al. (2003, 852) point out that if one is interested in really finding out about how similarity affects important outcomes at work, one should not focus on only the individual being judged; *similarity* (by virtue of what the word means) requires at least two parties.  Similarity-based decision making is a contingent action; one has to look at the relationship between the demographics of the selectors and the demographics of the selectees.

## Outline of the Analysis Here

Theory -- Social Psychology Context
    Similarity based judgment is an established scientific fact
    The Navy says that its Chaplains swear an oath to be impartial
    100% compliance is both unnatural and unlikely
Toward a Methodology -- Stages of Analysis
    Boards with 2 Catholics vs Boards with one
    Denominational Matching
    Close Denominational Matches
    A Similarity Construct
Interpretation -- Guidelines

Correlation/Co-occurrence is a fact
Correlation is not cause
How do we know that this is not just an elaborate artefact?
Monitoring Political Correctness

# Theory – Social Psychology Context

<u>Similarity based judgment is an established scientific fact</u>

8.    **Whatever one calls it** -- "Social Stereotype" (Allport 1954), "Inheritance Group" (Davis 1963), "Ethnocentricity" (van der Dennen 1985), "Affinity Group" (McCreary 1992), "Group Selection" (Dawson 1999), "Social Categorization" (Williams and O'Reilly 1998), "Social-Identity" (Haslam 2001), "Relational Demography" (Riordan 2000), "Similarity Effect" (Sacco, et al. op. cit.), or even "Like Likes Like" (Raschka 1999) --

> the fact, effect, or confounding of members of one group to possess a valence toward their own and lesser valence(s) toward others, is a part of all life -

from genes in potato roots (Nicot et. al. 2005) to ants (Millor et. al. 2005) to doctors (Akerlof & Kranton 1999), lawyers (Karson 2004), and Indian chiefs (Harmon 2001, Ferguson 2005).

9.    Affinity, similarity, and likeness are cohesive forces in nature, from particle physics and molecular biology to social networks and international diplomacy.

10.    **Every distinction enables some preference.**   Similarity effect takes place on a one-to-one basis.  Although an inevitable undercurrent, it may not be directly observable in heterogeneous group-to-group data.

> (a) Similarity effect is context sensitive. "Similarity" at the PTA meeting is not "similarity" in the football game parking lot.

> (b) Similarity effect may be understood as either preference for one's own or prejudice against others and the effect may have different valences and different expressions.

> (c) Similarity effect can occur only in a context where the action taker has (i) constructive knowledge of, (ii) subliminal knowledge of, or (iii) assumed knowledge of, the attribute's state in the target (vis-à-vis the action taker's own state.) The strength of a similarity effect will vary from one action taker to another and within an action taker across attributes, across time, and across contexts; and since it takes place in a context, it can even vary across targets.

<u>The Navy says that its Chaplains swear an oath to be impartial</u>

11.    Even though their Center for Naval Analysis (CNA) study bowed to the concept of "like likes like" in explaining why promotion boards with two Catholics on them yielded significantly

more Catholic promotions than flowed from promotion boards with only one Catholic, the Navy attempts to deflect attention from the possibility of any denominational bias. They argue:

> (a) that chaplains take an oath to be impartial (and are Ordered to be impartial by the SECNAV Instructions which assign them to promotion boards);

> (b) that, as military officers discharging official duties, chaplains are entitled, as a matter of law, to the presumption of regularity; and

> (c) that in any case, the representation on the selection boards is designed to be "broad" and to reflect the diversity of the Chaplain Corps.

12.    Taking these claims in reverse order.

> (a) The Navy's so-called representation by Faith Group Cluster is a fiction. There was at least one Catholic chaplain assigned to every Chaplain Corps promotion board from 1977 to 2002. (This is all 73 boards for which we have data.) No other **denomination** enjoyed this singular degree of "representation". Meanwhile, although the so-called Liturgical Faith Group Cluster was *represented* on every one of the 73 promotion boards convened during this period (and frequently given two seats, or even three seats), three quarters of the (41) liturgical denominations were never assigned to any board. Non Baptist non-Liturgicals (which have 43 different denominations) were given a seat on only 21 boards – fewer than a third of the total, and less than 10% of the seats given to Liturgicals. The Navy's populating rules for selection boards are so different from either random or representational, that the prescribed pattern could only have happened by chance one time in 100 billion years.

> (b) The presumption of regularity may be *a priori* deferential, but it is unjustified in the face of: (1) the CNA study opined that a phenomenon akin to "like likes like" must have been operating with respect to the two-Catholic boards prior to 1986. (2) The Navy's 1986 agreement to reduce the number of Catholics on promotion boards from two to one is at least tacit admission that denomination had an influence. (3) The statistical evidence in Appendix G in my Compendium Declaration demonstrated a statistically significant tendency for candidates who had a denomination in common with any board member to fare better than candidates who did not have a "friend" on the board. And (4) this benefit accrued to both "in zone" candidates and "above zone" candidates (who had twice the likelihood of being "picked-out" if a member of their denomination was on the board.)

> (c) An "oath" is significant, but it is not an ironclad talisman. It can or might reduce the possibility of intentional discrimination, but it is no protection against unintentional discrimination. An oath, an intention, is not a mechanical barrier to unintentional error. Automobiles driven by chaplains are supposed to stay on their side of the road; elevators driven by chaplains always stay in lane.

<u>100% compliance is both unnatural and unlikely.</u>

13.     Given the evidence from the psycho-social literature, it is unlikely that selection board members, even chaplains, can avoid having their own personal constellations of likes and dislikes affect their decisions (wittingly or otherwise.) Given the rules of arithmetic, if *any* chaplain is unable to resist the temptation, or tendency, to let his (or her) denomination influence their decision, then the average decision is tainted. Given the evidence in the data (from the CNA study to my compendium, to that which follows here) it is statistically certain that chaplains as a whole have been unable to avoid allowing their denominational preferences to influence their decisions on selection boards when judging other chaplains.

## **Toward a Methodology — Stages of Analysis**

<u>Boards with 2 Catholics vs Boards with one</u>

14.     The first "official" recognition of data indicating a denominational bias in Chaplain Corps personnel selections was contained in the CNA study *Promotions in the Navy Chaplain Corps* (Smith, et al. 2000). This study found a statistically significant tendency for Catholics, in particular, to advance to the rank of Commander more often than any other denomination. Looking for a reason, the study authors satisfied themselves with an explanation based on separating all promotion boards into two periods (a) before 1986/87 when the Navy had been putting two Catholics onto every promotion board and (b) after 1986/87, when by settlement agreement, the Navy reduced the number of Catholic encumbered seats from two to one. Had the CNA authors continued to look at the issue of denominational preference, particularly within so-called Faith Group Clusters, the bias contained in the data was still there to be observed. [See also Appendix I in my Compendium Declaration.]

<u>Denominational Matching</u>

15.     The CNA study and McCreary's before that, found some statistical evidence suggesting that there has been a tendency for chaplains on promotion panels collectively, to select for promotion other chaplains *like* (i.e., denominationally similar to) themselves. However, until it was made public by the Navy during discovery, no one had an opportunity to follow Sacco et al.'s (op cit.) advice to look at the correspondence between the denominations of the selection panel members and the denominations of the candidates considered and chosen (or not) by those panels.

16.     When looking at promotions vs board member denominations, Appendix G in my Compendium Declaration:

> (a) Demonstrated a statistically significant tendency for candidates before a promotion panel to benefit (i.e. fare better) when they shared a denomination with some board member than when they did not share a denomination with any board member. And

> (b) Observed that this tendency need not be conscious or collusional, but also argued that the phenomenon's overt expression may have been learned in the promotion board milieu.

17.     In my SER Supplement, the data indicated that the majority Faith Group Cluster on a SER board tended to protect (i.e. retain) more candidates of its own denominations than it did of other Faith Group Clusters. The number of boards with chaplains judging other chaplains (just four boards) was not sufficient to test for statistical significance, but the results were in the predicted direction and were "close" to statistically significant ($p < .07$).

18.     Later in the analysis of SER decisions, the "Rank Order Bounds Rule" lead to the conclusion that a candidate's matching a board member's denomination was worth three rank orders of protection from involuntary retirement. The level of statistical significance for this finding was almost five standard deviations. [See appended Tables 9 & 10.]

19.     In my first Declaration on Accessions (in Larsen, this Court, 02CV0205) I concluded, based on sparse, incomplete, and largely illegible data, that the benefit of having a matching denomination on a selection board extended even unto accession boards. Dr. Siskin, somehow representing that Catholic presence on the CARE Boards was irrelevant, since it always occurred, removed the Catholic accessions from the statistical analysis and declared (incorrectly) that what was left was not statistically significant.

20.     I asked for a legible copy of the accession data two months ago, a copy of the data that the Navy provided to Dr. Siskin. As I write this I have neither received the data, nor been informed as to when or whether I may expect to see it. Thus, for here and now, the situation is that:

(a) Partial data indicate a statistically significant benefit to a Chaplain Corps candidate if he (or she) can manage to have their application reviewed by a CARE Board on which sits a member of their own denomination. [Catholic candidates have a greater than 90% chance of admission into the Corps through this path; CGFC chaplains (with no "representative" on the boards) have little greater than half that chance of admission.]

(b) I predict that the fact of denominational preference will be present in the complete or more complete accession board data when, if, and as it is provided (and verified).

Close Denominational Matches

21.     As a logical follow through to the demonstration (discovery/exposure/revelation) that Chaplains on all eight[2] kinds of Chaplain Corps selection boards tended to treat more favourably candidates before them with whom they shared a denomination, I wondered if this favourable treatment extended to "similar" or "familial" denominations, or was perhaps antithetic to them.

---

[2] The benefit of a denominational match has now been demonstrated for: Promotion Boards, In Zone and Above Zone, at every rank (LCDR, CDR, and CAPT) as well as for SER Boards and Accessions Boards. This is every type and kind of selection board on which the Navy has provided data; it invites the assumption that if there are any other Boards on which Chaplains review the records of other chaplains, the denominational match effect will contaminate those decisions as well. This might extend to continuation in service boards, disciplinary review boards, assignment boards, Chaplain School boards, award and merit boards, and every other administrative or operational group decision making formality within the Corps, if chaplains are the judges of other chaplains.

Would, for example, a Southern Baptist board member treat a National Baptist candidate better or worse than they treat either (a) a fellow Southern Baptist, or (b) a fellow "anything else". The question is interesting in the context of this litigation, but it is even more interesting for what it might say about religious factional development. [However, there is not enough data to test Jews versus Reformed Jews, or LDS against reformed LDS, etc., there is barely enough promotion board data to test a few "families" of denominations: Baptist, Methodist, Lutheran, Presbyterians.]

22.    The figures in Table 1 address this limited question and provide a further look at the effect of denominational preference as acted upon (wittingly or not) on U.S. Navy Chaplain Corps promotion boards. Having the good fortune to find a member of your denomination on the selection board is worth a 25% increase in your likelihood of selection [(65%-51%)/51%]; a close match is worth about half that benefit.

**Table 1.**
**Effect of a Denominational Match on Selection for Promotion**
**(to Commander, 1981-2002)**

| Candidate Category | Number Considered | Number Selected | Probability of Promotion |
|---|---|---|---|
| 1.  Catholic (Always a Match) | 170 | 113 | .665 |
| 2.  Non-Catholic, Strict Match | 111 | 72 | .649 |
| 3.  Non-Catholic, Close Match | 94 | 54 | .574 |
| 4.  Non-Catholic, No Match | 328 | 168 | .512 |

A Similarity Construct

23.    Differentiation, preference and choice are natural and necessary practice for finite creatures in a functionally infinite world. However, although preference and affinity-based-action may be natural and necessary, the patterns, which have evolved in modern society, whatever their natural origins, do not follow normal Cartesian mathematics.

24.    Preferences and prejudices are not necessarily mutual, nor symmetric, nor even transitive. One may prefer A to B and B to C, but, depending upon the context, prefer C to A. Catholics may be "closer" (affinity wise) to Episcopalians than they are to Methodists, and closer to Methodists than they are to Baptists; but Baptists may be "closer" to the Orthodox than the Catholics are.

25.    Thus, although one can conceive of some sort of a denominational "distance" table (akin to the city to city distance tables in some road atlases), when applied to denominations, sometimes the distance from A to B is not the same as the distance from B to A.

26.    Table 2 (on the next page) provides a similarity matrix based on the differentiations inherent in the Navy Chaplain Corps' pattern and practice. (Similarity is the obverse of distance.) This table is an objective capturing of the Navy's subjective denominational ordering.

(a) The denominations are differentiated nominally, by the Endorsers (the organizations which accredit or sponsor a chaplain for consideration into the Navy Chaplain Corps.)

(b) The denominations are ranked ordinally by (1) the sequence of denominations the Navy uses to establish the Faith Group Clusters and (2) the frequency, within cluster, with which the Navy selects a denomination to sit on a selection board.

(c) I attempted to scale the denominations in ratio terms, by allocating the range 1.0 to 0.5 to the ordinal (Catholic centered) sequence. For non-Catholic denominations, I used 1.0 as the similarity ratio for a denomination to itself; 0.9 for a close match, 0.8 for a cluster match, 0.7 for a denomination to which it was "indifferent", and 0.6 or 0.5 for shunned denominations. If I had to interpolate, I kept the similarity scale steps equal. I set the bottom of my scale at 0.5 as this is the likelihood of selection, or not, in an unbiased coin toss (i.e., if denomination were irrelevant.)

**Table 2.**
**Similarity Matrix for Navy Chaplains by Denomination**

| Candidate | < < < < < < < < < < Board RC | Lit | Member > > Baptist | > > > > > > > NB | > > > > > > SW |
|---|---|---|---|---|---|
| RC | 1.0 | 0.8 | 0.8 | 0.7 | 0.8 |
| LIT | | | 0.7 | 0.8 | 0.8 |
| exact | | 1.0 | | | |
| close | 0.9 | 0.9 | | | |
| other | 0.8 | 0.8 | | | |
| Non Lit Baptist | 0.7 | 0.7 | | 0.8 | 0.7 |
| exact | | | 1.0 | | |
| other | | | 0.9 | | |
| Non Lit - other | 0.5 | 0.7 | 0.6 | | 0.7 |
| exact | | | | 1.0 | |
| other | | | | 0.9 | |
| SW | 0.5 | 0.5 | 0.6 | 0.7 | |
| exact | | | | | 1.0 |
| other | | | | | 0.9 |
| ORTH | 0.5 | 0.5 | 0.7 | 0.8 | 0.9 |

27.      Of course, there are a huge number of alternative distance vectors which could be used in a table like this, and if we had more data, or the Navy's subjective probabilities, this table could be refined; but, as it stands this is a suitable hypothesis.

28.      This table can be used to *measure* the similarity between a board and a candidate appearing before the board.

29.      I looked at all the U.S. Navy Chaplain Corps promotion boards for Commander between 1981 and 2002 (except 1993 – the Navy says it can't find the board record for that year.)

(a) For each candidate before each board, I prepared a similarity score: $V_j = \text{Sum}_i\, v_{i,j}$, where $v_{i,j}$ is the number in Table 2 corresponding to the denomination of board member i, when compared to the $j^{th}$ candidate's denomination. [The names and denominations of all the candidates and all the board member's denominations are included in the data here at Appendix X. The names are not necessary for the analysis but are included so that the data can be verified by the Navy, or any interested party.]

(b) I prepared a database which sequenced all the candidates in terms of their similarity scores, and then, within groups of at least 20 or so similar scores (e.g. 3.7 to 3.9), I counted the number of candidates who were considered and the number who were selected; I then plotted each group's probability of selection versus its average similarity score. See Figure 1. [This is a reprise of the Figure on page 1.]



30.    Note the trend line, both within board sizes, but also between board sizes; the larger the number of chaplains on the board:

(a) the more denominational similarity they share with the "average" candidate, and

(b) the larger the increase in the likelihood of promotion.

31.    The linear correlation here is quite large[3] (.82).  The fact and size of this correlation suggests both:

(a) That there is a statistically significant correlation between (1) the measured similarity (between the board and a candidate before that board) and (2) the likelihood that that candidate will be selected for promotion; and

(b) That the correlation is so large that it accounts for most of the variance in uncertainty about who will and won't be promoted, leaving only about 1/4 of the variance to be accounted for by quality and chance.

## Interpretation – Guidelines

### Correlation/Co-occurrence is a fact

32.    This correlation is statistically significant.  The level of significance is beyond seven standard deviations.  The correlation is so large, and the statistical significance is so rare, that one might wonder if this isn't somehow a circular computation.  It is not.  Every data point is nothing more than (nor less than) the sum of the "distances" between the candidate under consideration and each board member doing the considering.  Different boards will have different distances to candidates from the same endorser, and under some constellations of board denominations, boards will have the same distance for candidates from different endorsers.  The fact of, or probability of, or even the sequence of selection is no part of the distance computation.  (See Appendix X.)

### Correlation is not cause

33.    It is a statistical verity, and a temptation to assume otherwise, but correlation, no matter how large it may be, is not a proof of causal relationship.  Correlation follows from cause; it does not lead to it (except as a research tool, where it helps direct the inquiry.)

34.    In the present instance there is no doubt that the mix of selection board denominations can be used to predict a candidate's probability of selection, but it isn't the board's denominations that *cause* the result.  It is the Navy, the Navy's choice of denominations to assign to selection boards,

---

[3] In the mathematics of linear regression/correlation, the best possible line is interpolated onto the data in a manner designed to minimize the sums of the squares of the distance between each data point and the regression line.  Rho is the correlation, and Rho squared is the amount of variance (difference from the mean) that can be accounted for by the regression line.  If Rho is .8712 (as it is here) then 75.9% of the variance in estimating the probability of whether a particular candidate will or will not be selected for promotion can be "explained" (accounted for or predicted) if one knows the "similarity measure" between the board and that candidate.  Thus, in this case, denominational similarity is three times as important in predicting success as all the other variables combined – including both quality and chance!  (There is only 24.1% of the available variance remaining to be accounted for by non-denominational factors.)

which is the determinant of which chaplain candidates will be selected – into the Corps, promoted within the Corps, and, in the case of SER, involuntarily forced out of the Corps[4].

<u>How do we know that this is not just an elaborate artefact?</u>

35.    One might reasonably wonder if this striking correlation between (a) the construct, **Similarity Matrix,** and (b) the outcome, Probability of Selection, is really anything more than a complicated surrogate for (c) Quality.

36.    That is, one might suppose (political correctness aside) that the chaplains closest to the Navy's model of "denominationally like the board" are also closest to the best qualified, e.g. the board. (The board members are known to be "high quality" because they are already higher ranked.)  That view would argue that it is *quality* which caused the constellation of characteristics identified in both the successful candidates and the board as "denominationally similar".

37.    If it were true that similarity correlated to quality, then (a) those with the highest similarity profiles would be most likely to be selected – (b) *regardless of who was on the Board.*

38.    Although the 21 CDR boards for which we have both board and candidate denominational information are each a different constellation of particular denominations, and also vary in terms of the number of chaplains who were assigned, we can make an interesting subset of data by striking:

  (a) the second Catholic board member when there were two
  (b) the third Liturgical board member when there were three
  (c) the second Baptist on the rare occasions when there were two, and then
  (d) all boards which did not have at least one RC, two Liturgicals and one Baptist.

Then, to avoid contamination by the "exact match", we strike all candidates who matched a board member's denomination.   This pattern of truncations excludes about half the data, but it yields a large sample of candidates before notionally equivalent groups of four voters, none of whom share a denomination with any candidate.  (See Figure 2.)

39.    Figure 2 shows:

  (a) that this sample is a reasonably high quality group of candidates; their mean probability of selection is roughly equal to that of the sample as a whole, but:

  (b) the correlation, instead of being +.87 with (i) a very tight spread and (ii) statistical significance beyond seven standard deviations, is (i) negative, (ii) small (.30), (iii) with a wide spread, and (iv) not statistically significant.



Figure 2  **Fourteen Qua Boards (votes from RC, Lit, Lit & Bapt)**

---

[4] Note that the correlation here predicts the *probability* of selection, not the event.  It predicts how attractive this "sort" of candidate is to this "sort" of board, it does not predict selection *per se.*

40.    This lack of correlation between similarity and the probability of selection for a subset of the board members and a subset of the candidates is not a proof that the correlation is Figure 1 is specious.

(a) On the contrary, this is a demonstration that the correlation in Figure 1 derives from the candidate's denominational similarity vis-à-vis the board's pattern of denominations (and not from some underlying correlate to quality.) [This is exactly the contingency which Sacco et. al. (op cit.) warned was the sine quo non of research on similarity based decision making.]

(b) If one "homogenizes" the boards, (and eliminates candidates with a match to a board member,) then the correlation between (1) similarity (in this contrived sub-sample designed to test if similarity was a surrogate for quality) and (2) the probability of selection, evaporates into noise (suggesting that quality is not correlated to similarity per se).

(c) This is a demonstration that the fact of a pattern of similarity between board members and candidates before the board is **the** major factor is candidate success, but it is also a hint as to how the system could be remediated[5].)

41.    The conclusion is that it is the Navy's choice of which denominations to put on the boards which drives (in large part) the mix of the denominations which are promoted (or accessioned, or involuntarily retired).

Monitoring Political Correctness

42.    It is logically possible that the Navy (as an institution) does not realize the extent to which it has suffered and permitted, allowed, or through benign (sic) neglect, caused the Chaplain Corps' personnel management system to become so entangled with denominational favouritism.

(a) The 1986/87 change from two Catholics on every board to just one was adopted to improve (at least the appearance of) equitability.

(b) The recent addition of a non-chaplain to all promotion boards has had the effect, if not the intention, of diluting the opportunity for denominational bias in board decisions.

(c) The annotation of the board minutes to record the decisions in terms of gender, national origin and faith group cluster is in the service of avoiding discrimination between the taxonomied groups.

43.    However, board oath's aside, so long as the monitoring by faith group cluster is based on the Catholic centric definition of "faith groups", denominational prejudice can be expressed "invisibly" *within* the reported statistics, and beyond them as well. [For example, "above zone" promotions are not subject to any monitoring – and they too reflect this preference for Catholics.

---

[5] One should be careful here NOT to think that the proper remedy is to make sure that every denomination has a "friend" on the Board. Although that could lead to the appearance of denominational equity, it would not produce the best possible selections. Counter-intuitively, perhaps, it would be better to see to it that nobody had a denominational match (or even a close match) on the selection board. The hint here is that removing denomination from the voting allows the votes to be based on something else. That *something else* ought to be quality, not "whose turn is it to be selected." (See the attached Note about Punch and Judy.)

Catholics have twice the likelihood, vs non-Catholics, of being promoted on a second or third or fourth appearance before a promotion board.)

## Certification

44.     I certify under the penalties of perjury that this declaration is true to the best of my knowledge, belief, and ability and that it represents the testimony I would give in a court of law if called to testify.

_Harald R Leuba_    2/14/06

Harald R. Leuba, PhD         2/14/06
Potomac, Montgomery County MD., U.S.A

**Note: A Parable for our times:**
**Punch and Judy Manufacturing**

Punch and Judy hire a salesman to sell their line of costumes for puppets.

The salesman is average and P&J sell some costumes.
The sales force is all male; market penetration is average for male costumes and below average for female costumes

Judy says that they need a female salesperson, and she hires her friend Blanch.
Blanch is a nice lady and she sells an average amount.
The sales force is "balanced" by gender; sales are average.

Punch reasons that if he hires a "good" salesman, market penetration will improve.
Punch interviews three male candidates and hires the best one.
[If sales skill is random among candidates, and if Punch can determine who has it and who does not, sales will be better than average for male costumes and average for female; the sales force is still balanced; but men sell more than women.]

Seeing Punch's results, Judy interviews three female candidates and hires the best one.
[If sales skill is random among the candidates, and if Judy can determine who has it and who does not, sales will be better than average for both male and female costumes, and the sales force will remain balanced in terms of gender and sales performance by gender.]

Things can go on like this, with Punch and Judy taking turns hiring the best candidate of their gender. The company will prosper (because they have a sales force in the top third of the skill spectrum and EEOC complaints will fail (because the work force statistics are balanced.)

Kukla, Fran, and Ollie, seeing all the money being made by P&J Puppet costumes, start their own line of accessories. They form a sales recruitment committee and interview six candidates at a time, hiring the best one, regardless of gender.

After a while, if sales skill is random among candidates, and if Kukla, Fran, and Ollie can determine who has it and who does not, KF&O will surpass P&J, because KF&O will have a work force in the top one sixth in skill (twice as rare as the P&J skill level); and they will be immune from EEOC complaints because their hiring practices are gender neutral.

The moral of the story is that hiring people "like oneself" can give the appearance of "political correctness" if one takes turns, or is careful to control the pattern of selections, but genuine merit-based selection is both more equitable and more profitable.

# References

Akerlof, George A., and Rachael E. Kranton. 1999. Economics and Identity. *Quarterly Journal of Economics* 115(3):1-56.*

Allport, Gordon W. 1954. *The Nature of Prejudice.* Reading, MA: Addison Wesley.

Byrne, D. 1969. Attitudes and Attraction. In *Advances in Experimental Social Psychology*, edited by L. Berkowitz, 4: 36-91. New York, NY: Academic Press.

Chopko, Mark E. 1988. Religious Hiring Exception Upheld: Anatomy of a Supreme Court Ruling. *Health Progress* 69(6):40-4.

— 1999. Constitutional Protection for Church Autonomy: A Practitioner's View. Paper for the Second European American Church/State Conference, May, University of Trier, GDR.*

Davis, Kingsley. 1963. The Corporate Image in Social Context - the Problem of Demographic Change. In *The Corporation and its Publics: Essays on the Corporate Image*, edited by John W. Riley, Jr., 106-136. New York, NY: John Wiley & Sons.

Dawson, D. 1999. Evolutionary Theory and Group Selection: The Question of Warfare. In *History and Theory* 38(4):79-100. Oxford, UK: Blackwell Publishing.

del Pozo, Rodriquez, and Joseph J. Fins. 2005. Death, Dying, and Informatics: Misrepresenting Religion. *BMC Medical Ethics* 1005(6):6.*

Dwork, Cynthia, Ravi Kumar, Moni Naor, and D. Sivakumar. 2001. Rank Aggregation Methods for the Web. Hong Kong: WWW10. cse.msu.edu/~cse960/Papers/games/rank.pdf*

Ferguson, Laura Kathryn. 2005. "Indian Blood" or Lifeblood? An Analysis of the Racialization of Native North American Peoples. A thesis submitted in partial fulfillment of the requirements for the degree of Master of Arts in Native American Studies, Montana State University, Bozeman, MT.*

Halley, Michael D. Editor. 1993. *United States Navy Chaplains 1982-1991: Biographical and Service Record Sketches of Chaplains on Active Duty During the Period I January 1982 - 21 December 1991,* Volume X in the History of the Chaplain Corps, Norfolk, VA: United States Navy, Chaplain Resource Board.

Harmon, Alexander. 2001. Tribal Enrollment Councils: Lessons on Law and Indian Identity. *The Western Historical Quarterly* 32 (2):175-201.*

Haslam, S. Alexander. 2001. *Psychology in Organizations: The Social-Identity Approach.* London, UK: Sage Publications.

Karson, Larry. 2004. Choosing Justice: The Implications of a Key-man system for Selecting a Grand Jury. Paper presented at the Southwestern Association of Criminal Justice conference, October 8, Houston, TX.

Martin, H. Lawrence , Editor. 1982 *United States Navy Chaplains 1972-1981: Biographical and Service Record Sketches of Chaplains on Active Duty During the Period 1 January 1972 - 31 December 1981*, Volume VIII in the History of the Chaplain Corps United States Navy, NavPers 15507, Philadelphia, PA: Navy Publications and Forms Center.

McCreary, Stanley H. 1992. A Study of Faith Group Affiliation and Promotions to Captain and Commander in the U.S. Navy Chaplain Corps. A dissertation presented to the Graduate Faculty of the School of Human Behavior, United States International University, in Partial Fulfillment of the requirements for the Degree of Doctor of Philosophy in Psychology, San Diego, CA.

McLean, I. 1990. The Borda and Condorcet principles: Three medieval applications. In *Social Choice and Welfare* 7(2):99-108.

Millor, J., J.M. Ame, J. Halloy, and J.L Deneubourg. 2005. Individual determination capability and collective decision making. *Journal of Theoretical Biology* 2 Epublished PMID*

Muhlhausen, David B. 2004. The Determinants of Sentencing in Pennsylvania: Do the Characteristics of Judges Really Matter? Center for Data Analysis Report #04-02.*

Nicot, N., J.F. Hausman, L. Hoffman, and D. Evers. 2005. Housekeeping gene selection for real time RT-PCR normalization in potato during biotic and abiotic stress. *Journal of Experimental Biology,* Epublished PMID*

Powell, Reed M. 1969. *Race, Religion, and the Promotion of the American Executive.* Columbus, OH: College of Administrative Science, Ohio State University.

Raschka, Chris. 1999. *Like Likes Like,* New York, NY: Doring Kindserley.

Riley, John W. (Editor). 1963. *The Corporation and its Publics: Essays on the Corporate Image,* New York, NY: John Wiley & Sons.

Riordan, C.M. 2000. Relational Demography within Groups: Past Developments, Contradictions, and New Directions, in *Research in Personnel and Human Resources Management,* edited by G.A. Ferris, 19:131-174. New York, NY: JAI Press.

Rogers, J. W., and P.M. Stromberger. 1988. The Amos decision: Will we see changes in the workplace? *Health Progress,* 69(6):45-7.*

Sacco, Joshua M.; Christine R. Scheau, Ann Marie Ryan, and Neal Schmitt. 2003. An Investigation of Race and Sex Similarity Effects in Interviews: A multilevel Approach to Relational Demography, *Journal of Applied Psychology,* 88(5):822-865.

Sisk, Gregory C., Michael Heise, and Andrew P. Morriss. 2004. Searching for the Soul of Judicial Decision Making: An Empirical Study of Religious Freedom Decisions. *Ohio State Law Journal,* 65(3):1-148.*

Siskin, Bernard R. 2003. Statistical Analysis of the Promotion Selections in the U.S. Navy Chaplain Corps During the Time Period 1991-2002. Expert Witness Statement in the matter of Ronald Wilkins, et al. vs United States of America, Philadelphia, PA: The Center for Forensic Economic Studies.

Smith, Karen D, John S. Ivancovich, and David L. Reese. 2000. *Promotions in the Navy Chaplain Corps,* Alexandria, VA: Center for Naval Analyses.

van der Dennen, J.M.G. 1985. Of Badges, Bonds and Boundaries: Ingroup/outgroup differentiation and ethnocentrism. Paper presented at the fifth Annual Meeting of the European Sociobiological Society, January 5-6 St. John's College, Oxford, U.K.*

Wagner, H. L. 1993. On Measuring Performance in Category Judgment Studies of Nonverbal Behavior. *Journal of Nonverbal Behavior,* 17 (1) Spring 1993.*

Williams, Katherine Y., and Charles A. O'Reilly. 1998. Demography and Diversity in Organizations: A Review of 40 years of Research. *Research in Organizational Behavior,* 20: 77-140.

Zamarripa, P. & Krieger, D. 1983. Implicit Contracts Regulating Small Group Leadership: The Influence of Culture. *Small Group Behavior* 14:187-210.

* This reference was available on line in October and November 2005.

**Table 3. Denominational Staffing Patterns**
**U.S. Navy Chaplain Corps Promotion Panels**

| Time Period | No of Panels | | <<<<  Number of Chaplains Assigned -- by Faith Group >>>>> | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Roman Catholic | Liturgical | Baptist | Non-Baptist* | Special Worship | Non-Chaplain |
| 1977-1987 | 31 | | 61 | 79 | 30 | 7 | 5 | 2 |
| 1988-1991 | 11 | | 11 | 24 | 17 | 5 | 2 | 5 |
| 1991-2002 | 31 | | 33 | 59 | 27 | 10 | 16 | 40 |

* "Non-Baptist" refers to chaplains who are both non-Liturgical and non-Baptist

**Table 4. Denominational Staffing Patterns**
**U.S. Navy Chaplain Corps Promotion Panels**

| Time Period | No of Panels | | <<<<  Number of Different Denominations Assigned  >>>>> | | |
|---|---|---|---|---|---|
| | | | Denominations Assigned | Non-Baptist Denominations | Special Worship* Denominations used |
| 1977-1987 | 31 | | 21 | 3 | 2 |
| 1988-1991 | 11 | | 17 | 3 | 1 |
| 1991-2002 | 31 | | 32 | 8 | 4 |

* Special Worship denominations: Jewish, Mormon, Seventh Day Adventist, Christian Science, Unitarian Universalist, Muslim.

There are over 121 different denominations sponsored to and recognized by the U.S. Navy Chaplain Corps; one of these is Roman Catholic; 41 of these are Liturgical; 9 are Baptist, 43 are Non-Baptist Non-Liturgical; the remaining 27 are Special Worship denominations.

**Table 5.**
**Effect of a Denominational Match Between a Candidate and a Panel Member**
**Selection for Promotion to Commander (In Zone)**
**Three Time Periods**

| | <-------- Denominational Match --------> | | | <----- No Denominational Match -----> | | |
|---|---|---|---|---|---|---|
| Time Period | Number of Candidates | Number Selected | Percent Selected | Number of Candidates | Number Selected | Percent Selected |
| 1981-1987 | 88 | 64 | 72.7 | 86 | 53 | 61.6 |
| 1988-1991 | 36 | 26 | 72.2 | 39 | 21 | 53.8 |
| 1991-2002 | 163 | 90 | 55.2 | 309 | 157 | 50.8 |
| Total | 287 | 180 | 62.7 | 434 | 231 | 53.2 |

**Table 6.**
**Effect of a Denominational Match Between a Candidate and a Panel Member**
**Selection for Promotion to Commander (Above Zone)**
**Three Time Periods**

| | <-------- Denominational Match --------> | | | <----- No Denominational Match -----> | | |
|---|---|---|---|---|---|---|
| Time Period | Number of Candidates | Number Selected | Percent Selected | Number of Candidates | Number Selected | Percent Selected |
| 1981-1987 | 245 | 19 | 7.8 | 259 | 9 | 3.5 |
| 1988-1991 | 66 | 5 | 7.6 | 77 | 4 | 5.2 |
| 1991-2002 | 184 | 18 | 9.8 | 304 | 18 | 5.9 |
| Total | 495 | 42 | 8.5 | 640 | 31 | 4.8 |

**Table 7.**
**Candidate and Panel Member Denominational Appearances**
**on Promotion Panels In Zone and the Percent of the Candidates Promoted**
**(U.S. Navy Chaplain Corps Promotions to CDR 1981 to 2002)**

| Denom-ination Group* | Number of Denoms in Sample | Sample of Denoms in "Group" | Total Number of Candidates | Denom Match*** NUMBER | Denom Match PERCENT | Number of Selections | Percent Selected |
|---|---|---|---|---|---|---|---|
| I | 46 | Jewish, SDA** IFCA, N, AG, LDS, CFGC CBC, ORTH | 188 | 0 | 0 | 93 | 49.5 |
| II | 15 | Episcopalian Presbyterian Misc Baptist | 110 | 35 | 32 | 61 | 55.5 |
| III | 7 | Lutheran Major Baptist Methodist | 253 | 161 | 64 | 144 | 56.9 |
| IV | 1 | Roman Catholic | 170 | 170 | 100 | 113 | 66.5 |

* The "groups" here are not the Navy's "Faith Group Clusters", but rather groups revealed by the structure of the data, ranging from collections of denominations that never have a member of their religion on a promotion panel (Group I) through collections which are represented "sometimes" (Group II) to those frequently assigned to promotion panels (Group III) to the denomination that is always given a seat on every promotion panel (Catholics - "Group" IV.)
** These are Navy abbreviations for various chaplain denominations: SDA = Seventh-Day Adventist; IFCA = Independent Fundamental Churches of America; N = Church of the Nazarene; AG = Assemblies of God; LDS = Church of Jesus Christ of Latter-day Saints; CFGC = Chaplaincy of Full Gospel Churches; CBC = Central Bible Church; ORTH = Orthodox (Eastern, Greek, & Russian).
*** There are more matches in this table than were reflected in Table 5, as the criterion there was a strict match based on the chaplains' sponsor: e.g., American Association of Lutheran Churches was not a match to Lutheran Church, Missouri Synod, and Southern Baptist was not a match for National Association of Baptist Churches. In this table a "match" was defined for "Baptists", "Methodists," "Lutherans," "Presbyterians," and "Episcopalians" to include all divisions and branches.

**Table 8**
**Denominational Matches on CDR Promotion Panels (In Zone)**
**(Information Theory applied to data from Table 5)**
*p(i,j)*

| 1981-1987 | Probability Match or Not | Probability Selected | Probability Rejected | Info Item | Amount |
|---|---|---|---|---|---|
| Denomination Match | .505 | .727 | .273 | *H(s)* | -.9129 |
| No Match | .495 | .616 | .384 | *H(s:m)* | -.8557 |
| Subtotal | 1.000 | .672 | .328 | % var | 6.26% |
| **1988-1991** | | | | | |
| Denomination Match | .480 | .722 | .278 | *H(s)* | -.9530 |
| No Match | .520 | .538 | .462 | *H(s:m)* | -.8979 |
| Subtotal | 1.000 | .627 | .373 | % var | 5.78% |
| **1992-2002** | | | | | |
| Denomination Match | .345 | .552 | .448 | *H(s)* | -.9985 |
| No Match | .655 | .508 | .492 | *H(s:m)* | -.9948 |
| Subtotal | 1.000 | .522 | .478 | % var | 0.37% |
| **Calculation Protocol:** | | | | | |
| Denomination Match | *p1* | *p11* | *p12* | *H(s)* | * |
| No Match | *p2* | *p21* | *p22* | *H(s:m)* | ** |
| Subtotal | 1.000 | *q1* | *q2* | % var | *** |

\* *H(s)*, the uncertainty in selection, is: $q1*\log_2(q1) + q2*\log_2(q2)$

\*\* *H(s:m)*, the uncertainty in selection with or without a match, is:
$q1*[p11*\log_2(p11) + p21*\log_2(p21)] + q2*[p12*\log_2(p12) + p22*\log_2(p22)]$

\*\*\* % var, the percent of the variance that can be explained by knowledge of a match, is:
$[H(s) - H(s:m)]/H(s)$

**Table 9.  1995 SER Candidates Ranked on Dimensions of Quality***
(Data entries are rank orders with ties ranked at the upper bound)

| Dimensions Of Quality<br><br>Candidate's NAME** | Medals for Valor RANK<br>(a) | Failure of Selection to CAPT RANK<br>(b) | Years Exp @ CDR RANK<br>(c) | Years to Retire RANK<br>(d) | Prior SER Quality RANK<br>(e) | Faith RANK<br>(f) | Rmax all Dim<br>(g) | Rmax w/o Faith or Valor<br>(h) | PANEL's SER RANK<br>(X) | ERROR? w/o Faith or Valor<br>(n) |
|---|---|---|---|---|---|---|---|---|---|---|
| By—, J V | 27 | 15 | 1 | 1 | 27 | 27 | 27 | 27 | 19 | |
| Bu—, R F | 27 | 15 | 2 | 2 | 27 | 27 | 27 | 27 | 19 | |
| Si——, T R | 27 | 15 | 3 | 24 | 27 | 12 | 27 | 27 | 19 | |
| Tu——, G L | 27 | 15 | 4 | 6 | 17 | 20 | 27 | 17 | 19 | |
| Mo———, J J | 27 | 15 | 5 | 12 | 27 | 12 | 27 | 27 | 19 | |
| Ba——, N R | 27 | 15 | 6 | 10 | 27 | 12 | 27 | 27 | 20<27 | |
| Be——, W T | 27 | 15 | 7 | 12 | 10 | 20 | 27 | 15 | 19 | |
| Ne——, E A | 27 | 15 | 9 | 10 | 10 | 20 | 27 | 15 | 19 | |
| Ha—, D M | 27 | 15 | 9 | 4 | 17 | 20 | 27 | 17 | 19 | |
| Um——, R D | 27 | 15 | 10 | 18 | 10 | 27 | 27 | 18 | 19 | |
| Du——, R W | 27 | 15 | 13 | 10 | 10 | 12 | 27 | 15 | 19 | |
| Wilkins, R G | 1 | 15 | 13 | 19 | 10 | 27 | 27 | 19 < | 20<27 | ERROR? |
| Me——, D L | 27 | 15 | 13 | 10 | 27 | 27 | 27 | 27 | 19 | |
| Mc——, S H | 27 | 15 | 14 | 21 | 10 | 27 | 27 | 21 | 19 | |
| St———, E T | 27 | 15 | 16 | 6 | 27 | 12 | 27 | 27 | 19 | |
| Kl———, F S | 27 | 16 | 15 | 4 | 17 | 27 | 27 | 17 | 19 | |
| Er—, B H | 27 | 18 | 17 | 16 | 27 | 27 | 27 | 27 | 19 | |
| Wa——, N M | 27 | 18 | 18 | 16 | 17 | 12 | 27 | 18 < | 20<27 | ERROR? |
| Py—, W B | 27 | 22 | 19 | 24 | 27 | 12 | 27 | 27 | 19 | |
| Ro——, R G | 27 | 22 | 20 | 20 | 10 | 12 | 27 | 22 | 19 | |
| Ja——, B C | 27 | 22 | 21 | 16 | 10 | 20 | 27 | 22 | 20<27 | |
| De——. LR | 27 | 22 | 22 | 24 | 10 | 12 | 27 | 24 | 20<27 | |
| Pa——, H D | 27 | 24 | 23 | 26 | 27 | 20 | 27 | 27 | 19 | |
| Ki—, R L | 27 | 24 | 25 | 18 | 17 | 2 | 27 | 25 | 20<27 | |
| Bu——, M T | 27 | 27 | 24 | 25 | 17 | 20 | 27 | 27 | 20<27 | |
| Cl—, L S | 27 | 27 | 26 | 16 | 17 | 12 | 27 | 27 | 20<27 | |
| Be——, C R | 27 | 27 | 27 | 27 | 10 | 2 | 27 | 27 | 19 | |

*The detail underlying this table is public.
** Out of deference for privacy *here*, the names used in this table have been obscured.

This table illustrates the application of the "Rank Order Bounds Rule". Step 1: Each candidate is rated (objectively) on each of the columns (a) through (f) in turn. Step 2: The rankings are ordered on a scale from 1 to N, where N is the number of candidates under consideration. If "adjacent" candidates have the same "score", ties are posted at the top of the shared range. [e.g. Wilkins was the only candidate on dimension (a) who had an award for valor, so his rank is 1, and everybody else tied for second, which was scored at the top of the shared range (2 through 27).] Step 3: Each candidate's pattern of scores is examined and his/her highest score is entered into column (g) as Rmax. Step 4: If, as here, there is no implicit order in the set of all Rmax, then one pulls the least discriminating dimension from the list, Valor in this case, and recalculates Rmax. In the present instance I also pulled "Faith" from the Rmax consideration because denomination is not "supposed" to be relevant. The fact that Wilkins was selected for Involuntary Retirement, demonstrates that whatever weighting scheme the board used, Valor was not substantially important. The same cannot be said for "Faith". Step 5: The panel's decision is entered into

column X. As before, ties are scored at the top of the range. Since the panel did not provide internal rank information, but only indicated who was retained and who was recommended for termination, the scores for all those who were retained are equal to the number who were retained, and the score for each of those who was Involuntarily Retired is N. Step 6: Compare the rank in column X to the rank in column (h). If the rank in column (h) is less than the rank in column X, then the Rank Order Bounds Rule identifies the selection as "questionable". [This means nothing more than that there was *something else* (outside the table) considered in making this selection.]

### Table 10.
### The Impact of Having a Denominational Match on a SER Panel

| Admirals (Not matched) | Considered | Selected | ???* | Rmax Total | Delta Ave | sd |
|---|---|---|---|---|---|---|
| Captains | 167 | 32 | 2 | 188 | 5.88 | 5.95 |
| Commanders | 87 | 13 | 2 | 49 | 3.77 | 4.14 |

| Chaplains Commanders | Considered | Selected | ??? | Rmax Total | Delta Ave | sd |
|---|---|---|---|---|---|---|
| no match | 80 | 21 | 7 | 37 | 1.76 | 4.16 |
| match | 29 | 7 | 0 | 33 | 4.71 | 1.38 |

--------------

\* "???" Denotes a questionable decision, i.e., a decision highlighted by the Rmax bounds rule.

The "Total, Average, and sd (standard deviation)" columns in this table are based on all the selections, not just, and not without, the ??? selections.

The statistical significance of a denominational match on a SER board as demonstrated in this analysis is not a numerical slight of hand, nor the result of any subjective scaling by the researcher. The rank orders in columns (a) to (f) in Table 9 are completely objective, being based on the clear meaning of the public, written record. The fact that "something else" was considered (or had to be considered) is not inherent in any of the ratings, but was brought to the process by the panel members (exercising their authority). The fact that all the questionable decisions occurred for candidates who had no "friend" on the board is statistically significant, but the more significant finding is in the average Rmax Delta (the difference between the totally objective Rmax, and the Panel's ultimate decision rank). Candidates with a match on the board were "scored", at the end of the process, three rungs better (safer) on the quality ladder than the candidates who did not have a "friend" on the board. This was not enough to protect some "bad" candidates with a match, but it was enough to pass some others up the ladder, over a candidate on the margin who did not have a match on the board. Student's t test (which is valid for rank order data) finds this statistically significant at the level of five standard deviations.



25 January 1995

From: The Chaplain, USMC

To: The Chief of Chaplains
    The Deputy Chief of Chaplains



Subj: Non-Liturgical Detailing

1. Pursuant to our plenary discussions about the subject issue, on 20 October at the Operational Ministries Conference, and in response to your request for data about the percentage of non-liturgicals holding key billets within the Chaplain Corps during the past fifteen years, I am providing the names and denominations of incumbents of these billets and a percentage analysis.

2. The list of billets chosen as key decision making billets could perhaps be expanded, however I believe you will agree that the below listed billets have historically been considered the most influential in our Corps. The titles of some of the billets have changed over the years but the major functions have remained relatively unchanged.  The billets on which I have data are the following:

        Chief of Chaplains 097
        Deputy Chief of Chaplains 097B
        Executive Assistant to the Chief of Chaplains 097A
        Director of Training 0971
        Director of Distribution and Placement 0973
        Director of Plans and Policy 0972
        Director of Ecc Relations and Recruitment (now subsumed
under 0972 and 097A)
        Assistant for Naval Reserve 097R
        Assistant for USMC 097M
        PACFLT
        LANTFLT
        CINCUSNAVEUR
        CNET
        U.S. NAVAL ACADEMY
        Director, Chaplain School

3. During the last fifteen years, dating from the time of Chaplain O'Connor's tenure as Chief of Chaplains, there have been a total of 119 incumbents of these billets. Because individuals have held more than one of these billets over the period of the report, the same individual's name will appear repeatedly. The data here presented were gleaned from Program Support Guides and there may be minor errors due to incomplete data. However, the conclusions to be drawn are so clear as to make any such discrepancies inconsequential. There is no suggestion that this pattern was deliberate. However the institutional bias is very clear.

4. The following is a breakdown by billet and incumbent, with

 

faith group represented:

Chief of Chaplains
```
O'Connor            Roman Catholic
Trower              Lutheran
Stevenson           Presbyterian
McNamara            Roman Catholic
Koeneman            Lutheran
White               Reformed Church in America
Muchow              Lutheran
```

Deputy Chief of Chaplains
```
Moore               United Methodist
Stevenson           Presbyterian
McNamara            Roman Catholic
Koeneman            Lutheran
White               Reformed Church in America
Muchow              Lutheran
Holderby            Lutheran
```

Executive Assistant to the Chief of Chaplains
```
Greenwood           Presbyterian
Ecker               Roman Catholic
O'Donnell           Roman Catholic
White               Reformed Church in America
Dressler            United Methodist
Wright              Roman Catholic
Dobes               Roman Catholic
O'Donnell           Roman Catholic
Estabrook           Roman Catholic
```

Director of Training 0971
```
Auel                Lutheran
Voth                Episcopalian
Perdew              Southern Baptist (1 year)
Coughlin            Roman Catholic
McNeil              Roman Catholic
Rothermel           Southern Baptist
Duncan              Lutheran
Atwater             Southern Baptist
```

Director of Manpower/Recruit (Plans and Policy) 0972
```
Evans               Lutheran
Kaelberer           Lutheran
OBrien              Roman Catholic
Koeneman            Lutheran
Muchow              Lutheran
Kirk                Lutheran
Gundlach            United Church of Christ
Belanus             Christian Reformed
```

Director of Distribution and Placement 0973
```
Hilferty            Roman Catholic
Boreczky            Roman Catholic
```




```
        Greenwood              Presbyterian
        McNamara               Roman Catholic
        Glynn                  Roman Catholic
        Hiskett                Lutheran
        McNeil                 Roman Catholic
        Duke                   Presbyterian
        Holderby               Lutheran
        Bourke                 Roman Catholic
        Rock                   Roman Catholic

Director of Ecclesiastical Rel and Recruitment 0974
        Gaughn                 Roman Catholic
        Goffrier               Cons. Baptist
        Plishker               Reformed Church in America
        Dobes                  Roman Catholic
        Mowry                  United Methodist
        Pocock                 Latter Day Saints
        Rimmer                 Associated Ref. Presbyterian
        LaMonde                Roman Catholic
        Caiazzo                Roman Catholic

Assistant for Naval Reserve 097R
        Evans                  Lutheran
        Piirto                 Lutheran
        Black                  Presbyterian
        Graham                 American Baptist
        Goetz                  United Church of Christ
        Duke                   Presbyterian
        McNeil                 Roman Catholic
        Brogan                 Roman Catholic

Assistant for the US Marine Corps
        McDonald               Southern Baptist
        Evans                  Lutheran
        Takesian               Presbyterian
        Hiskett                Lutheran
        Krabbe                 Lutheran
        Ellis                  Southern Baptist

PACFLT
        Moore                  United Methodist
        Stevenson              Presbyterian
        Conte                  Roman Catholic
        Voth                   Episcopalian
        White                  Reformed Church in America
        Kuhn                   Roman Catholic
        Holderby               Lutheran
        Condon                 Roman Catholic

LANTFLT
        Sieders                United Methodist
        Laboon                 Roman Catholic
        Purdham                Lutheran
        Kieffer                Roman Catholic
```

 

| Ecker | Roman Catholic |
|---|---|
| Johnson | Presbyterian |
| Rothermel | Southern Baptist |
| Black | Seventh Day Adventist |

CINCUSNAVEUR

| Keyser | Episcopalian |
|---|---|
| McPhail | Lutheran |
| McCall | Presbyterian |
| Goetz | United Church of Christ |
| Baldwin | Roman Catholic |
| Carroll | United Church of Christ |
| Duncan | Lutheran |

CNET

| Keyser | Episcopalian |
|---|---|
| Riggs | Disciples of Christ |
| Newman | Disciples of Christ |
| Coughlin | Roman Catholic |
| Moffit | American Baptist |
| Condon | Roman Catholic |
| Hornsby | Southern Baptist |

US Naval Academy

| Roberts | Presbyterian |
|---|---|
| Conte | Roman Catholic |
| Greenwood | Presbyterian |
| Whitting | Roman Catholic |
| Glynn | Roman Catholic |
| Holderby | Lutheran |
| Carroll | United Church of Christ |
| Hines | Roman Catholic |
| Friel | Roman Catholic |

Director, Chaplains School

| Trower | Lutheran |
|---|---|
| Eller | Southern Baptist |
| Beach | General Assoc. of Reg. Baptist |
| Riggs | Disciples of Christ |
| Muchow | Lutheran |
| Williams | Progressive Nat. Baptist |
| Bourke | Roman Catholic |

5.  Of the 119 incumbents of the above listed billets, only 14 have been clearly non-liturgical.  That equates to 11.8% of the billet fills.  Forty (40) have been Roman Catholic equating to 33.6% of the billet fills.  Sixty-four (64) have been liturgical equating to 53.8% of billet fills.  When one considers that the number of non-liturgicals is approximately equal to or greater than liturgicals, the relative frequency of assignment of liturgicals to key decision making billets is disconcerting. Lutherans, by themselves, account for 27 of the 119 or 22.7%, approximately twice the incumbents of all non-liturgicals.
6.  Why is this important?  First, it is an issue of justice.



Secondly, the ability of the Chief of Chaplains to proclaim a vision that will be followed requires a sense of trust in the fairness of his administration of the affairs of the Corps. Thirdly, the Ecclesiastical Endorsers from the non-liturgical Churches, while not organized, are increasingly disenchanted with what they believe to be the unfair treatment of their chaplains. Fourthly, and perhaps most importantly, when only one perspective is reinforced to decision makers, and even those few non-liturgicals who are given key billets are there because they have been able to be non-confrontive, the strength of diversity, which we tout to be so important, is unable to be realized. The thrust of the Chaplain Corps policies is thus skewed by incomplete perspective; perspective that perhaps could be supplied by the silent, in terms of position and influence, non-liturgicals. I might also point out, that although I have not carefully reviewed the numbers, it is likely that a large number of the blacks, hispanics, asians and others we are seeking to bring into the Corps, and support their advancement, reflect a non-liturgical stance.

7. All of the above is only one facet of the disgruntlement of many of your non-liturgical chaplains. Many of the junior ones are not aware of the historic patterns the data reflects, however, as Dave Atwater pointed out, non-liturgicals are often reminded, even if unintentionally, that they are not as highly valued as others. I am not in favor of quotas, but without conscientious fairness being voluntarily applied, this a boil that will continue to fester. Eventually, the whole body will feel the sickness, if we do not already.

8. Finally, you indicated that you wanted to hear the bad news. I hope this honest presentation of long stifled discontent is received as the helpful, candid appraisal it is intended to be. If I may be so bold as to speak for the Corps, we need for you to be a great Chief of Chaplains. Release the energy and insight of the faith groups that are, for all their lack of sophistication, still vital and growing. The "proverb" quoted by Spock in one of the Star Trek movies is germane: "Only Nixon could go to China." These issues can be addressed most healthily only by a liturgical. May God grant you wisdom as you consider the patterns of the past. I am available to discuss these issues further, if you desire.

Very Respectfully,

Larry H. Ellis

Copy to:
Executive Assistant
Division Directors

From:        Millington MSG Center
Sent:        Saturday, September 29, 2001 5:58 PM
To:          Pers000C; Pers0044 (Recovered); Pers0086; Pers4414; Duty Officer 1; MDS Transfer;
                Pers455D6; Pers0080
Subject:     BUPERS ORDER//

ADMINISTRATIVE MESSAGE

ROUTINE

**A** — R 281108Z SEP 01  ZYB

**B** — FM DEPCHNAVPERS MILLINGTON TN//PERS4414/PERS4G2//

**C** — TO CG MCB QUANTICO VA//JJJ//
NAS JACKSONVILLE FL//JJJ//
NETC NEWPORT RI//JJJ//
CMC WASHINGTON DC//JJJ//
COMMARFORLANT//JJJ//
PERSUPP DET JACKSONVILLE FL//JJJ//
PERSUPP DET WASHINGTON DC//JJJ//
PERSUPP DET NEWPORT RI//JJJ//

UNCLAS //N01321//

MSGID/GENADMIN/CHNAVPERS//

SUBJ/BUPERS ORDER//

**D** — RMKS/
BUPERS ORDER: 2711   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/4105  (PERS-4414S)
OFFICIAL RECALL ORDERS FOR
LCDR JOHN W LYLE  CHC USNR
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

**E** — IN CARRYING OUT/PROCESSING THESE ORDERS, BOTH PARTS ONE AND TWO
MUST BE READ AND LISTED INSTRUCTIONS COMPLIED WITH.
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
P A R T   O N E
HOME ADDRESS:
13008 QUARTZ LANE, CLIFTON, VA  20124
WITHIN SEVEN DAYS AFTER RECEIPT OF THESE ORDERS

**F** — PROCEED AND REPORT MEDICAL OFFICER DESIGNATED BY
MARINE CORPS BASE, QUANTICO, VA FOR PHYSICAL
EXAMINATION AND SCREENING FOR HUMAN IMMUNODEFICIENCY VIRUS (HIV)
EXPOSURE.  NEGATIVE HIV TEST RESULTS MUST BE VERIFIED AND DOCUMENTED
WITHIN TWELVE MONTHS PRIOR TO EXECUTION OF THE ORDERS.  INCLUDE A
FLIGHT PHYSICAL IF BEING ORDERED TO DUTY INVOLVING FLYING.  IF FOUND
NOT PHYSICALLY QUALIFIED IMMEDIATELY RETURN ABOVE ADDRESS, UPON
ARRIVAL CONSIDER RELEASED FROM TEMPORARY ACTIVE DUTY.  IF FOUND
PHYSICALLY QUALIFIED IMMEDIATELY RETURN ABOVE ADDRESS, UPON ARRIVAL
CONSIDER RELEASED FROM TEMPORARY ACTIVE DUTY UNTIL SUCH TIME AS
NECESSARY TO COMMENCE TRAVEL IN OCT 2001 AND IN TIME TO REPORT AS
DIRECTED BELOW:
MEMBER ADVISED:  REQUIRED TO CONTACT HIS/HER NEAREST MILITARY
TREATMENT FACILITY (MTF), MEDICAL DEPARTMENT REPRESENTATIVE, OR
TRICARE SERVICE CENTER PRIOR TO TRANSFER FOR COUNSELING ON URGENT
OR EMERGENCY MEDICAL CARE DURING PCS MOVES.  UPON ARRIVAL AT NEW DUTY
STATION, MEMBER IS REQUIRED TO CONTACT THE NEAREST MTF, MEDICAL
DEPARTMENT REPRESENTATIVE, OR TRICARE SERVICE CENTER TO SELECT A
PRIMARY CARE PROVIDER.  THESE POINTS OF CONTACT CAN ALSO PROVIDE
INFORMATION ON HEALTH CARE OPTIONS AVAILABLE FOR FAMILY MEMBERS NOT
ENROLLED IN TRICARE PRIME.  GENERAL TRICARE INFORMATION IS AVAILABLE
ON THE WEB AT: HTTP://WWW.TRICARE.OSD.MIL.
------ INTERMEDIATE ( ) ACTIVIT01( ) ------M

**G** — REPORT IN OCT 01              EDA: 01 OCT 01
TO MARCORPS BASE QUANTICO VA       UIC: 46967

1

EXHIBIT
12



I → FOR TEMPORARY DUTY.
FOR APPROXIMATELY 208 DAY(S)        ACC: 350
PERSONNEL ACCOUNTING SUPPORT: PERSUPPDET WASHINGTON DC
UIC:    42657
UPON COMPLETION OF TEMPORARY DUTY
AND WHEN DIRECTED, DETACH.
——— INTERMEDIATE ( ) ACTIVIT02( ) ———M
J  REPORT NET 27 APR 02 BUT NLT 29 APR 02        EDD: 26 APR 02
TO STU NETC NEWPORT                                    EDA: 29 APR 02
LOCATION: RI, NEWPORT                  UIC: 66949
FOR TEMPORARY DUTY UNDER INSTRUCTION
FOR APPROXIMATELY 12 DAY(S)              ACC: 341
PERSONNEL ACCOUNTING SUPPORT: PERSUPPDET NEWPORT RI
UIC:    43099
TO INCLUDE 12 DAY(S) AT AOLTC SR DH
CLASS: 02020   CONV: 020429 GRAD: 020510      CDP: 423V
K  UPON COMPLETION OF TEMPORARY DUTY UNDER INSTRUCTION
AND WHEN DIRECTED, DETACH.                    EDD: 10 MAY 02
REPORT NOT LATER THAN 01 OCT 2001 AND NOT EARLIER THAN
01 OCT 2001 . REPORTING PRIOR TO NOT EARLIER THAN DATE WILL
TERMINATE LEAVE STATUS AND RESULTS IN NON-PAYMENT OF PER DIEM FOR
PERIOD PRIOR TO THE NOT EARLIER THAN DATE SPECIFIED UNLESS AUTHORIZED
UNDER MILPERSMAN 1320-140.
——— INTERMEDIATE ( ) ACTIVIT02( ) ———M
REPORT NET 11 MAY 02 BUT NLT 13 MAY 02
TO STU NETC NEWPORT                    EDA: 13 MAY 02
LOCATION: RI, NEWPORT                  UIC: 66949
L  FOR TEMPORARY DUTY UNDER INSTRUCTION
FOR APPROXIMATELY 12 DAY(S)              ACC: 341
PERSONNEL ACCOUNTING SUPPORT: PERSUPPDET NEWPORT RI
UIC:    43099
TO INCLUDE 12 DAY(S) AT CHAP STAFF/LEAD
CLASS: 02020   CONV: 020513 GRAD: 020524      CDP: 4059
G  UPON COMPLETION OF TEMPORARY DUTY UNDER INSTRUCTION
(not listed)  AND WHEN DIRECTED, DETACH.              EDD: 24 MAY 02
REPORT NOT LATER THAN 01 OCT 2001 AND NOT EARLIER THAN
01 OCT 2001 . REPORTING PRIOR TO NOT EARLIER THAN DATE WILL
TERMINATE LEAVE STATUS AND RESULTS IN NON-PAYMENT OF PER DIEM FOR
PERIOD PRIOR TO THE NOT EARLIER THAN DATE SPECIFIED UNLESS AUTHORIZED
UNDER MILPERSMAN 1320-140.
——— ULTIMATE ACTIVITY ( ) ———M
REPORT NOT LATER THAN MAY 02
TO NAS JACKSONVILLE                    EDA: MAY 02
PERMANENT DUTY STATION  FL, JACKSONVILLE    UIC: 00207
FOR DUTY
                           ACC: 100
                  BSC:  00380
                  PRD:  0505
PERSONNEL ACCOUNTING SUPPORT: PERSUPPDET JACKSONVILLE
N  UIC:    43043
ABOVE DUTY IS IN CONNECTION WITH AEROSPACE MEDICINE. UPON
QUALIFICATION AND COMPLETION OF ACADEMIC TRAINING AND WHEN DIRECTED,
REPORT CO, NAVAL AVIATION SCHOOLS COMMAND, NAVAL AIR STATION,
PENSACOLA, FL (30500), DUTY UNDER INSTRUCTION IN A FLYING STATUS
INVOLVING OPERATIONAL OR TRAINING FLIGHTS. UPON COMPLETION OF
INSTRUCTION AND WHEN DIRECTED, REPORT NAVAL AEROSPACE MEDICAL
INSTITUTE, PENSACOLA, FL., DESIGNATION AS A FLIGHT SURGEON.
——— ACCOUNTING DATA ———
MAC CIC: 3N4J22215463540
CIC: A84J21EB
O  PCS ACCOUNTING DATA
N4J2 1721453/22520U 068566 A& 4J2/1/E/B 4J2221548354
TEMDUINS ACCOUNTING DATA FOR FY-02
1721804.22MB 000 00022/0 068892 4J2/1/E/B 4J2221548354
P  P A R T   T W O
BUPERS ORDER: 2711   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/4105    (PERS-4414S)
OFFICIAL RECALL ORDERS FOR
LCDR JOHN W LYLE, CHC USNR
COMMAND DELIVERING ORDERS: ENSURE MEMBER HAS A COMPLETED AND
DOCUMENTED HIV TEST WITHIN TWELVE MONTHS OF EDD. EVERY EFFORT SHOULD
BE MADE TO ENSURE RESULTS ARE RECEIVED PRIOR TO TRANSFER. HOWEVER,

2

REFLECTS THAT THE MEMBEF TEST WAS COMPLETED AND AWAITING SULTS.
TEST RESULTS SHOULD BE FORWARDED TO NEW DUTY STATION UPON RECEIPT FOR
INCORPORATION IN MEDICAL/DENTAL RECORDS.
------ INTERMEDIATE ( ) ACTIVIT01( ) ------M
- NO ADDITIONAL INFORMATION FOR THIS SECTION
------ INTERMEDIATE ( ) ACTIVIT02( ) ------M
COMMAND LEADERSHIP SCHOOL (CLS) PCO/PXO'S: IT IS NECESSARY TO
VIEW CRITICAL INFORMATION ON UNIFORM REQUIREMENTS, BOQ RESERVATIONS,
FIELD TRIP TO RECRUIT TRAINING COMMAND AND SPOUSE LEADERSHIP COURSE
(CSLC).VISIT CLS WEB SITE : WWWNT.CNET.NAVY.MIL/CLS(LOWER CASE).
TO CONTACT (CLS) CALL (401) 841-6382 (DSN 948-6382).
COMMAND LEADERSHIP SCHOOL (CLS) PCO/PXO'S: IT IS NECESSARY TO
VIEW CRITICAL INFORMATION ON UNIFORM REQUIREMENTS, BOQ RESERVATIONS,
FIELD TRIP TO RECRUIT TRAINING COMMAND AND SPOUSE LEADERSHIP COURSE
(CSLC).VISIT CLS WEB SITE : WWWNT.CNET.NAVY.MIL/CLS(LOWER CASE).
TO CONTACT (CLS) CALL (401) 841-6382 (DSN 948-6382).
------ INTERMEDIATE ( ) ACTIVIT02( ) ------M
COMMAND LEADERSHIP SCHOOL (CLS) PCO/PXO'S: IT IS NECESSARY TO
VIEW CRITICAL INFORMATION ON UNIFORM REQUIREMENTS, BOQ RESERVATIONS,
FIELD TRIP TO RECRUIT TRAINING COMMAND AND SPOUSE LEADERSHIP COURSE
(CSLC).VISIT CLS WEB SITE : WWWNT.CNET.NAVY.MIL/CLS(LOWER CASE).
TO CONTACT (CLS) CALL (401) 841-6382 (DSN 948-6382).
COMMAND LEADERSHIP SCHOOL (CLS) PCO/PXO'S: IT IS NECESSARY TO
VIEW CRITICAL INFORMATION ON UNIFORM REQUIREMENTS, BOQ RESERVATIONS,
FIELD TRIP TO RECRUIT TRAINING COMMAND AND SPOUSE LEADERSHIP COURSE
(CSLC).VISIT CLS WEB SITE : WWWNT.CNET.NAVY.MIL/CLS(LOWER CASE).
TO CONTACT (CLS) CALL (401) 841-6382 (DSN 948-6382).
------ ULTIMATE ACTIVITY ( ) ------M
CO INITIAL DUTY STATION DIRECTED TO NOTIFY NAVPERSCOM MILLINGTON,
TN (ATTN: NPC-812) BY MESSAGE AS SOON AS SUBJECT OFFICER REPORTS
IN EXECUTION OF THESE ORDERS. THIS NOTIFICATION IS REQUIRED TO
ENSURE ACTIVATION OF SNO'S PERSONNEL FILE AND THEREBY ENSURING
TIMELY CONSIDERATION FOR PERTINENT SELECTION BOARDS.
SAVE MONEY THE WELCOME CENTERS HAVE NEW PROGRAM INITIATIVES THAT
SAVE MONEY ON RENT, SECURITY DEPOSITS, AND HOME BUYING COST. REDUCE
TIME SPENT ON FINDING SUITABLE AND AFFORDABLE HOUSING. LEARN ABOUT
PROGRAMS THAT WILL SAVE TIME AND MONEY BY VISITING THE LOCAL WELCOME
CENTER.
YOU WILL BE ASSIGNED TO DUTY IN A PART OF AERONAUTIC ORGANIZATION
OF THE NAVY INVOLVING FLYING EFFECTIVE SUCH DATE AS ENDORSED HEREIN.
DESIGNATED STUDENT NAVAL FLIGHT SURGEON.
FOR A LIST OF LOCATIONS ON NAVY TEMPORARY LODGES AND TYPES OF
FACILITIES AVAILABLE TO YOU IN THE AREA OF YOUR NEW DUTY STATION FOR
USE UNTIL PERMANENT HOUSING CAN BE OBTAINED, SEE SECNAVINST 11107.2
SERIES. YOU ARE DIRECTED TO CALL THE NAVY LODGE CENTRAL RESERVATION
TOLL FREE NUMBER (1-800-NAVY-INN/1-800-628-9466) TO DETERMINE NAVY
LODGE AVAILABILITY IN THE VICINITY OF OLD AND NEW PERMANENT DUTY
STATIONS. IF YOU DETERMINE THAT TEMPORARY LODGING IS NECESSARY AT
EITHER LOCATION, RESERVATIONS ARE REQUIRED TO ENSURE ROOM
AVAILABILITY. FOR A MEMBER TRAVELING IN A "PCS WITH FAMILY" STATUS,
RESERVATIONS MAY BE MADE ANYTIME.
COMMAND DELIVERING ORDERS AND ULTIMATE COMMAND: DIRECTED TO COMPLY
WITH MILPERSMAN 1740-010 REGARDING THE NAVY SPONSOR PROGRAM.
MEMBER ADVISED: INFORMATION ON ULTIMATE DUTY STATION CAN BE
OBTAINED FROM YOUR LOCAL FAMILY SERVICE CENTER.
TRANSFERRING COMMAND: IF TRANSOCEANIC TRAVEL WILL BE PERFORMED
BY MEMBER, PORT CALL ASSIGNED BY THE NAVY PASSENGER TRANSPORTATION
OFFICE WILL CANCEL THE REPORT NOT LATER THAN DATE, AT RECEIVING
COMMAND, AND SHALL CONSTITUTE THE SPECIFIC DATE MEMBER IS TO REPORT
FOR TRANSPORTATION. IF THIS IS AN ORDER MODIFICATION, CANCELLATION
OR MODIFICATION OF PORT CALL MAY BE REQUIRED. IF SO, IMMEDIATELY
CONTACT SERVICING NPTO. OPNAVINST 4650.1S SERIES REFERS.
COMPLY WITH MILPERSMAN 1320-110 REGARDING TRAVEL TIME AUTHORIZED
IN EXECUTION OF THESE ORDERS.
------ SPECIAL INSTRUCTIONS ------
MEMBER ADVISED: HOUSEHOLD GOODS HELP LINE 1-800-444-7789.
TRANSPORTATION SPECIALISTS ARE ON DUTY TO SERVE YOU. WE ARE HERE TO
ANSWER QUESTIONS AND PROVIDE GUIDANCE CONCERNING SHIPMENT OF YOUR
HOUSEHOLD GOODS. MONDAY - FRIDAY, 0800 - 1700 EASTERN TIME. TO
ARRANGE FOR SHIPMENT OR A DELIVERY DATE OF YOUR HOUSEHOLD GOODS

3

CONTACT YOUR LOCAL PERSONAL PROPERTY OFFICE. VISIT NAVAL SUPPLY SYSTEMS COMMAND WEBS) AT WWW.NAVSUP.NAVY.MIL (SELECT CORP.SERVICES, 06 SUPPORT SERVICES, HHG) FOR ON-LINE HOUSEHOLD GOODS INFORMATION".

MEMBER DIRECTED: FOR INFORMATION REGARDING YOUR ULTIMATE DUTY STATION CONTACT THE NEAREST DEPARTMENT OF DEFENSE FAMILY SERVICE CENTER OR RELOCATION ASSISTANCE OFFICE.

YOU ARE ORDERED TO TEMPORARY ACTIVE NAVAL SERVICE FOR THE PURPOSE OF PHYSICAL EXAMINATION AND CONSIDERED IN TEMPORARY ACTIVE DUTY STATUS DURING TIME REQUIRED AND TRAVEL NECESSARY.

IF FOUND NOT PHYSICALLY QUALIFIED EXAMINING MEDICAL OFFICER ADVISE CHNAVPERS BY MESSAGE (ATTN: PERS-4414) REFERENCING THESE ORDERS, STATING DEFECTS IN DETAIL WITH ACTION TAKEN AND RECOMMENDATIONS, IF ANY, WITH INFORMATION COPIES TO BUMED AND COURTESY COPY ADDRESSEES ON THIS ORDER.

TRANSFERRING COMMAND: ENSURE MEMBER COMPLETES APPLICABLE ITEMS ON BOTH SIDES OF TRAVEL INFORMATION FORM (NAVPERS 7041/1), AS REQUIRED BY BUPERSINST 7040.6 OR 7040.7. UPON COMPLETION SUBMIT FORM TO DIRECTOR, PERMANENT CHANGE OF STATION, VARIANCE COMPONENT; 1240 EAST EAST 9TH STREET, SUITE 967, CLEVELAND, OHIO, 44199-2088.

MEMBER ADVISED: TRAVEL VIA PRIVATE OWNED CONVEYANCE IS PERMITTED AT YOUR OPTION FOR YOUR CONVENIENCE.

IF SERVING UNDER ORDERS AUTHORIZING YOUR PARTICIPATION IN THE NAVAL RESERVE TRAINING PROGRAM IN A PAY OR NON-PAY STATUS, YOU ARE DIRECTED TO REQUEST TERMINATION OF YOUR INACTIVE DUTY TRAINING ORDERS, VIA THE APPROPRIATE CHAIN OF COMMAND, TO BE EFFECTIVE NOT LATER THAN THE DAY PRECEDING THE DATE OF REPORTING TO ACTIVE DUTY IN COMPLIANCE WITH THESE ORDERS.

INFORM MEMBER THAT PLACEMENT ON THE ACTIVE DUTY LIST MAY HAVE RENDERED THE MEMBER ELIGIBLE FOR CONSIDERATION IN-ZONE OR ABOVE-ZONE FOR A PROMOTION SELECTION BOARD WITHIN ONE YEAR OF ENTERING ON ACTIVE-DUTY, IN WHICH CASE MEMBER WILL BE FOR PROMOTION UNDER SECNAVINST 1420.1A, UNLESS MEMBER SPECIFICALLY REQUESTS TO BE POINT OF CONTACT IS NMPC/PERS-85 AT AUTOVON 882-3252 OR COMMERCIAL (901) 874-3252.

NAVRESPERSCEN NEW ORLEANS LA PASS COPIES THESE ORDERS TO CODE 41 (RR).

FOR COMMAND MAILING ADDRESS CONSULT THE STANDARD NAVAL DISTRIBUTION LIST (SNDL) ONLINE AT HTTP://NEBT.DAPS.MIL/SNDL.HTM OR VISIT YOUR PSA, PSD OR ADMIN OFFICE.

COMMANDING OFFICER: ENSURE SERVICEMEMBER COMPLETES ARGUS QUESTIONNAIRE (AS REQUIRED BY OPNAV 1040.10) PRIOR TO EXECUTION OF ORDERS. WEBSITE: HTTP://ARGUS.NPRDC.NAVY.MIL.

(SIGNED)
G. L. HOEWING
REAR ADMIRAL, U. S. NAVY
DEPUTY CHIEF OF NAVAL PERSONNEL
PERS44

BT
NNNN

4

**ANALYSIS OF LCDR (Sel) LYLE'S ORDERS**                              <span style="text-align:right">**EXHIBIT** 12 a</span>

A.    Date of Orders: 28 September 01

B.    "FM" = from; identifies the responsible units in Bureau of Personnel ("BUPERS")
      PERS 4414
      PERS 4G2

C.    Headquarters to which addressed

D.    BUPERS ORDER Number and originating unit  PERS-4414S - Chaplain Corps detailer;
      and
      Subject of the Orders: OFFICIAL RECALL ORDERS FOR LCDR JOHN LYLE CHC
      [Chaplain Corps] USNR [US Navy Reserve]
            *Order does not identify Lyle as Commander Select*

E.    Specific directions that "IN CARRYING OUT ... THESE ORDERS , BOTH PARTS
      ONE AND TWO MUST BE READ AND LISTED INSTRUCTIONS COMPLIED
      WITH."

F.    "FLIGHT PHYSICAL" requirement and if not qualified to return home immediately.
            *Failure to pass a flight physical was supposed to invalidate the orders and end
            TDY*

G.    Reporting date: 01 OCT 01 [*This is three days after the Orders are issued*]

H.    Accounting Code 350 identifies Chief of Naval Operations funds.

I.    Identifies TDY period of 208 days at Quantico, VA.
            *This violates JFTR limit on TDY.  Under JFTR, any period more than 20 weeks is
            to be a PCS.*

J.    Identifies when the 208 days TDY is complete, 26 Apr 02

K.    Identifies period of additional TDY (29 Apr02 to 12 May 02) to attend 12 day "Command
      Leadership School."

L.    Designation of additional TDY to attend second 12 day school, "Chaplain Staff
      Leadership Class"(after completing the one above) from 11 May to 24 May 02.

M.    New Command, NAVAL AIR STATION, JACKSONVILLE, FL

N.    Designation of duty as "IN CONNECTION WITH AEROSPACE MEDICINE"

Directed to report to NAVAL AEROSPACE MEDICAL INSTITUTE, PENSACOLA, FL with designation as a "FLIGHT SURGEON."
*Lyle was a chaplain, not a flight surgeon or a medical officer*

O.    Accounting Code for PCS: ".2252"
*This code indicates a PCS rather than a TDY, it is used to signify a PCS move for a career officer*

P.    Identifies Chaplain Corps detailer's office.

Q.    Notice to Lyle that:
YOU ARE ASSIGNED DUTY IN PART OF AERONAUTICAL ORGANIZATION OF THE NAVY INVOLVING FLYING, EFFECTIVE SUCH DATE AS ENDORSED HEREIN.  DESIGNATED STUDENT NAVAL FLIGHT SURGEON.
*Lyle was not a flight surgeon or a medical officer*

R.    Reference to PCS

S.    Signature Line, RADM HOEWING

# CHAPLAIN PROMOTION BOARD MEMBERS
Fiscal Years (FY) 77 to 02

Roman Catholic Board Members (RC) indicated in Bold

| FY | O-4 BOARD MEMBERS | FG | O-5 BOARD MEMBERS | FG | O-6 BOARD MEMBERS | FG |
|---|---|---|---|---|---|---|
| 77 | RADM Withers M. Moore, P | UM | RADM Withers M. Moore, P | UM | CAPT Ross A. Trower, P | LCA |
| | *CAPT Maurice E. Roberts | UP | *CAPT Maurice E. Roberts | UP | CAPT John W. Cohill | PUS |
| | CAPT Carl A. Auel | ALC | CAPT Carl A. Auel | ALC | **CAPT Leo J. McDonald** | RC |
| | ***CAPT Robert C. Angus | | **CAPT William B. O'Connor** | RC | CAPT Michael Frimenko | ORTH |
| | ***CAPT John J. Hever | | *CAPT Joseph A. Howland | ABC | **CAPT John F. Laboon, Jr.** | RC |
| | **CAPT William B. O'Connor** | RC | **CAPT Michael A. Murphy** | RC | ***CAPT Lucian R. Brasley** | RC |
| | *CAPT Joseph A. Howland | ABC | | | | |
| | CAPT Matthew H. Simon | J | | | | |
| | **CAPT Michael A. Murphy** | RC | | | | |
| | | | | | | |
| 78 | CAPT Carroll R. Chambliss | AME | CAPT George T. Boyd | SB | **CAPT Leon S. Darkowski** | RC |
| | CAPT Max A. Eller | SB | CAPT Michael Frimenko | ORTH | CAPT Stacy L. Roberts, Jr. | UP |
| | CDR Ben Rice | PUS | ***CAPT Jude R. Senieur** | RC | *CAPT Charles L. Keyser | EC |
| | ***CDR Richard J. Dempsey** | RC | ***CAPT Lucian R. Brasley** | RC | **CAPT Ferdinand E. Slejzer** | RC |
| | *CDR Philip J. Holwager | DC | CAPT John C. Haney | UM | CAPT William W. Newman | DC |
| | ***CDR James E. Cronin** | RC | CAPT Owen F. Hardage | ABC | CAPT Marlin D. Seideo | UM |

Promotion Board Members    * - USNR-R    ** Non-CHC
*** Reservists not listed in CHC active duty biographies

1

EXHIBIT 13

| FY | O-4 BOARD MEMBERS | FG | O-5 BOARD MEMBERS | FG | O-6 BOARD MEMBERS | FG |
|---|---|---|---|---|---|---|
| 79 | CAPT Martin D. Seiders | UM | CAPT Martin D. Seiders | UM | CAPT Joseph E. Ryan | RC |
| | *CAPT Charles L. Keyser | E | CAPT Leroy A. Bevan | N | CAPT William C. Fuller | SB |
| | CAPT Leroy A. Bevan | N | *CAPT Charles L. Keyser | E | CAPT Neil M. Stevenson | PUSA |
| | CAPT Billy J. McKee | SB | CAPT Billy J. McKee | SB | *CAPT Lucian R. Brasley | RC |
| | CAPT John J. Glynn | RC | CAPT John J. Glynn | RC | CAPT William G. Willson | UM |
| | *CDR Alan P. Sullivan | RC | *CDR Alan P. Sullivan | RC | CAPT Murray H. Voth | E |
| | | | | | | |
| 81 | CAPT William C. Fuller, P. | SB | CAPT William C. Fuller, P. | SB | RADM Neil M. Stevenson, P | PUSA |
| | CAPT Carroll B. Chambliss | AME | CAPT Carroll B. Chambliss | AME | CAPT Peter I. Ota | PUSA |
| | CAPT Alan P. Sullivan | RC | CAPT Alan P. Sullivan | RC | CAPT Clark B. McPhail | ELCA |
| | CAPT Richard F. Wicker | UM | CAPT Richard F. Wicker | UM | CAPT George T. Boyd | SB |
| | CAPT Harry F. MacCall III | PUSA | CAPT Thomas J McDermott | RC | CAPT Lucian R. Brasley | RC |
| | CAPT Angelo J. Libera | RC | CAPT Oliver H. Wetzel | LMS | CAPT John W. McElroy | RC |

Promotion Board Members  * - USNR-R   ** Non-CHC
*** Reservists not listed in CHC active duty biographies

2

EXHIBIT 13

| FY | O-4 BOARD MEMBERS | FG | O-5 BOARD MEMBERS | FG | O-6 BOARD MEMBERS | FG |
|----|-------------------|-----|--------------------|-----|--------------------|-----|
| 82 | CAPT George T. Boyd, P | SB | **CAPT James W. Conte, P** | **RC** | RADM Ross H. Trower, Pres. | ELCA |
|    | **CAPT Bernard J.** | **RC** | CAPT Richard E. Barcus | ABC | CAPT Charles L. Greenwood | PUSA |
|    | CAPT Peter I. Ota | PUSA | CAPT Samuel Baez | UP | *CAPT Aaron Landes | ORTH |
|    | CDR James W. Moor | PUSA | CAPT Joe H. Parker | SB | CAPT Max E. Eller | SB |
|    | **CDR Kenneth F. Kieffer** | **RC** | **CAPT John J. Glynn** | **RC** | CAPT William G. Willson | UM |
|    | CDR Albert J. Roon | CR | CDR Alvin B. Koeneman | ELCA | **CAPT Laurence F. Keefe** | **RC** |
|    |  |  |  |  |  |  |
| 83 | CAPT Adna W. Riggs, P | SB | CAPT Billy J. McKee | SB | RADM Neil M. Stevenson, P | PUSA |
|    | **CAPT Laurence F. Keefe** | **RC** | **CAPT John W. McElroy** | **RC** | **CAPT Alfred F. Van Beck** | **RC** |
|    | **CAPT Robert J. Ecker** | **RC** | **CAPT Alan P. Sullivan** | **RC** | **CAPT Thomas W. Kelley** | **RC** |
|    | CAPT Richard D. Black | PUSA | CAPT Stanley J. Beach | GARB | CAPT Ernest McD. Reagan | UM |
|    | **CAPT Richard Kukler** | **RC** | CAPT William A. Smith | UM | CAPT Carroll R. Chambliss,P | AME |
|    | CAPT John F. Weaver | ELCA |  |  | CAPT Alvin B. Koeneman | ELCA |
|    |  |  |  |  |  |  |
|    |  |  |  |  |  |  |
|    |  |  |  |  |  |  |
|    |  |  |  |  |  |  |
|    |  |  |  |  |  |  |

Promotion Board Members   * - USNR-R   ** Non-CHC
*** Reservists not listed in CHC active duty biographies

EXHIBIT 13

| FY | O-4 BOARD MEMBERS | FG | O-5 BOARD MEMBERS | FG | O-6 BOARD MEMBERS | FG |
|----|-------------------|----|-------------------|----|-------------------|-----|
| 84 | COMOJohn R. McNamara,P | RC | CAPT Carroll B. Chambliss,P | AME | RADM Ross H. Trower, Pres. | ELCA |
|    | CAPT Herbert T. Lewis | PUSA | CAPT Eli Takesian | PUSA | CAPT Charles L. Keyser | EC |
|    | CAPT Wallace B. Turner | LMS | CAPT Richard E. Barcus | ABC | CAPT Peter I. Ota | PUSA |
|    | CDR Wilfred D. Fournier | RC | CAPT Kevin J. Cortney | RC | CAPT Eugene C. O'Brien | RC |
|    | CDR Herman L. Kibble | SDA | CAPT Kenneth F. Kieffer | RC | CAPT Frederick J. Murray | RC |
|    |  |  |  |  | CAPT William H. Bell | PUSA |
|    |  |  |  |  |  |  |
| 85 | CAPT Charles L. Keyser, P | EC | COMO John McNamara, P | RC | RADM Neil M. Stevenson, P | PUSA |
|    | CAPT Adna W. Riggs | SB | CAPT Peter I. Ota | PUSA | CAPT Richard E. Barcus | ABC |
|    | CAPT Angelo J. Libera | RC | CAPT Murray H. Voth | E | CAPT Robert J. Ecker | RC |
|    | CAPT Donald K. Muchow | LMS | CAPT Alan P. Sullivan | RC | CAPT Kenneth F. Kieffer | RC |
|    | CDR James C. Williams | PNBC | CAPT James R. Perdew | SB | CAPT Aldon E. Purdham | ELCA |
|    | CDR Charles E. Bourke | RC | CAPT Barry H. Greene |  |  |  |

Promotion Board Members  * - USNR-R   ** Non-CHC
*** Reservists not listed in CHC active duty biographies

4

EXHIBIT 13

| FY | O-4 BOARD MEMBERS | FG | O-5 BOARD MEMBERS | FG | O-6 BOARD MEMBERS | FG |
|----|-------------------|-----|-------------------|-----|-------------------|-----|
| 86 | RADM Neil M. Stevenson, P | PUSA | CAPT Alvin B. Koeneman, P | ELCA | COMO John McNamara,P | RC |
|    | CAPT Peter I. Ota | PUSA | CAPT Stanley J. Beach | GARB | CAPT Carroll R. Chambliss | AME |
|    | CAPT Robert J. Ecker | RC | CAPT Thomas W. Kuhn | RC | *CAPT Nisson E. Shulman | J |
|    | CAPT Alfred M. Clark | SB | CAPT Martin J. Witting | RC | CAPT Thomas F. Johnson | PUSA |
|    | CDR Richard P. Beck | RC | CDR Herman L. Kibble | SDA | CAPT John J. Glynn | RC |
|    |  |  | CDR Merle L. Metcalf | ELCA | CAPT Gordon A. Read | DC |
|    |  |  |  |  |  |  |
| 87 | CAPT Clark B. McPhail, P | ELCA | RADM John McNamara, P | RC | RADM Alvin B. Koeneman, P | ELCA |
|    | CAPT Robt R. Cunningham | PUSA | CAPT Carroll R. Chambliss | AME | CAPT Peter I. Ota | PUSA |
|    | CAPT Conall Coughlin | RC | CAPT George W. Evans | ELCA | CAPT Robert J. Ecker | RC |
|    | *CAPT Loren W. Richter | DC | CAPT Dudley C. Hathaway | CN | CAPT William H. Bell | PUSA |
|    | CAPT Paul Everts | ECCA | CAPT Earl L. Boyette | SB | CAPT Martin J. Witting | RC |
|    | CDR Leroy Gilbert | NBCUS | *CAPT William A. Stewart | PUSA | CAPT Robert G. Moffitt | ABC |

Promotion Board Members   * - USNR-R   ** Non-CHC
*** Reservists not listed in CHC active duty biographies

EXHIBIT 13

| FY | O-4 BOARD MEMBERS | FG | O-5 BOARD MEMBERS | FG | O-6 BOARD MEMBERS | FG |
|---|---|---|---|---|---|---|
| 87 Spcl | RADM Alvin B. Koeneman,P | ELCA | | | | |
| | **CDR Kenneth F. Kieffer** | **RC** | | | | |
| | CAPT Adna W. Riggs | SB | | | | |
| | CAPT Joseph J. Thompson | PUSA | | | | |
| | CDR James C. Williams | PNBC | | | | |
| | | | | | | |
| 88 | CAPT Walter A. Hiskett, P | ELCA | RADM Alvin B.Koeneman,P | ELCA | **RADM John McNamara, P** | **RC** |
| | *CAPT Thomas B. Handley | PUSA | **CDR Kenneth F. Kieffer** | **RC** | CAPT John J. Mowry | UM |
| | CAPT James F. Kirstein | SB | CAPT Adna W. Riggs | SB | CAPT David E. White | RCA |
| | **CAPT John F. Baldwin** | **RC** | CAPT Joseph J. Thompson | PUSA | CAPT Jerry D. Moritz | GARB |
| | CAPT William C. L. Asher | ABC | CDR James C. Williams | PNBC | CAPT Carl W. Flick | SB |
| | CDR Young C. Ha | DC | | | *CAPT William A. Stewart | PUSA |

Promotion Board Members  * - USNR-R   ** Non-CHC
*** Reservists not listed in CHC active duty biographies

6

EXHIBIT 13

| FY | O-4 BOARD MEMBERS | FG | O-5 BOARD MEMBERS | FG | O-6 BOARD MEMBERS | FG |
|---|---|---|---|---|---|---|
| 89 | CAPT John J. Mowry, P | UM | **RADM John R. McNamara,P** | RC | RADM Alvin B.Koeneman,P | ELCA |
| | CAPT Carl W. Flick | SB | CAPT Thomas F. Johnson | PUSA | **CAPT Conall R. Coughlin** | RC |
| | CAPT Thomas R. Pocock | LDS | CAPT Jerry D. Moritz | GARB | *CAPT Charles K. Elliott | CC(DC) |
| | CDR James C. Williams | PNBC | CAPT Ira C. Starling | UM | CAPT Ivan R. Fuller | CC(DC) |
| | **CDR Marshall R. Larriviere** | RC | *CAPT Walter D. Volz | LMS | CAPT Gerald T. Richards | SB |
| | | | CDR Leroy Gilbert | NBCUS | CAPT William A. Smith | UM |
| | | | | | | |
| 90 | CAPT Ira C. Starling | UM | RADM Alvin B.Koeneman,P | ELCA | | |
| | CAPT Lawrence A Shoberg | ALC | CAPT Philip J. Holwager | CC(DC) | | |
| | CDR Leroy Gilbert | NBCUS | **CAPT Thomas W. Kuhn** | RC | | |
| | *CDR William G. Condon | RC | CAPT Eddy B. Moran | CP | | |
| | CDR Constance E. Civiello | | CAPT Alger C. Wilson | ** | | |
| | CDR Douglas W. Lawson | CHCCC | CDR George C. Paul | BGC | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Promotion Board Members   * - USNR-R   ** Non-CHC
*** Reservists not listed in CHC active duty biographies

7

| FY | O-4 BOARD MEMBERS | FG | O-5 BOARD MEMBERS | FG | O-6 BOARD MEMBERS | FG |
|---|---|---|---|---|---|---|
| 91 | **CAPT Joseph F. O'Donnell** | **RC** | RADM David E. White | RCA | RADM Alvin B.Koeneman,P | ELCA |
| | CDR John W. Grove | UM | CAPT Harry T. Jones | SB | CAPT Eddy B. Moran | CP |
| | CDR Thomas C. Marsden | RCA | **CAPT Edward J. Kelley** | **RC** | CAPT Thomas F. Johnson | PUSA |
| | *CDR George C. Paul | BGC | CAPT James C. Williams | PNBC | **CAPT George P McCloskey** | **RC** |
| | CDR Barry Black | SDA | CDR Richard R. Gates | ALC | CAPT Chancellor Tzomes | ** |
| | CDR Marcia A. Kruse | ** | CDR Sarah S. McCullom | ** | CAPT Homer T. Hiers | SB |
| | | | | | | |
| 92 | CAPT Donald K. Muchow | MLS | RADM Alvin B.Koeneman,P | ELCA | RADM David E. White, P | RCA |
| | CAPT John R. Wall | ** | CAPT James L. Apple | J | CAPT Donald L. Krabbe | LMS |
| | CAPT Vincent W. Carroll | UCC | CAPT Lee S. Gurke | ** | **CAPT John M. Wright** | **RC** |
| | CDR George A. Langhorne | ABC | CAPT FrederickR. Zoebel | UM | CAPT Herman L. Kibble | SDA |
| | **CDR Marshall R. Larriviere** | **\*RC** | **CDR Charles E. Bourke** | **RC** | CAPT Allen R. Latty | IFCA |
| | CDR Eileen O'Hickey | UCC | CDR Mary Anne Walker | ** | | |
| | | | CDR Timothy T. Morita | SB | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Promotion Board Members  * - USNR-R   ** Non-CHC
*** Reservists not listed in CHC active duty biographies

EXHIBIT 13

| FY | O-4 BOARD MEMBERS | FG | O-5 BOARD MEMBERS | FG | O-6 BOARD MEMBERS | FG |
|---|---|---|---|---|---|---|
| 93 | CAPT Larry Ellis | SB | | | | |
| | CAPT Joseph A. Ferraro | RC | | | | |
| | CAPT George C. Paul | PCA | | | | |
| | CDR Thomas K. Chadwick | PUSA | | | | |
| | CDR Barry Black | SDA | | | | |
| | | | | | | |
| 94 | CAPT Fred A. Rothermel, P | SB | RADM Donald K. Muchow, P | LMS | RADM David E. White, P | RCA |
| | CAPT Thomas J. Benedum | LMS | CAPT Donald E. Dendulk | RCA | CAPT Harry C. Benson | ** |
| | CAPT Peter A. Oddo | RC | CAPT John F. Friel | RC | CAPT John R. McNeil | RC |
| | CDR John W. Morrison | AME | CAPT Dennis G. Murphy | ** | CAPT Anderson B. Holderby | ELCA |
| | CDR Julia T. Cadenhead | SB | CAPT Glenn H. McCranie | UM | CAPT Bernard W. Patton | ** |
| | *LCDR Raymond Vanzwienen | | CDR Eileen L. O'Hickey | UCC | CAPT Victor H. Smith | CS |
| | | | CDR David J. Funsch, | ** | CAPT Michael H. Kennedy | CC(DC) |
| | | | CDR Robert P. Beltram | SB | CAPT Moses L. Stith | PUSA |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Promotion Board Members  * - USNR-R   ** Non-CHC
*** Reservists not listed in CHC active duty biographies

9

EXHIBIT 13

| FY | O-4 BOARD MEMBERS | FG | O-5 BOARD MEMBERS | FG | O-6 BOARD MEMBERS | FG |
|----|-------------------|----|--------------------|----|--------------------|----|
| 95 | CAPT Glenn H. McCranie, P | UM | RADM David E. White, P | RCA | RADM Donald K. Muchow, P | LMS |
|    | **CAPTPatrick L. Fryer** | RC | CAPT Paul J. Connors | ** | CAPT John D. Craycraft | CHCCC |
|    | CDR Alphonso Jones | CGIC | CAPT Leroy Gilbert | NBCUS | CAPT George C. Paul | BGC |
|    | CDR Bruce W. Cavey | ** | **CAPT Ronald Livojevich** | RC | CAPT Thomas K. Chadwick | PUSA |
|    | CDR Martin R. Stahl | LMS | CAPT Thomas C. Carter | SB | CAPT Jacqueline O. Allison | ** |
|    | LCDR Mary E. Washburn | PUSA | CDR Albert I. Slomovitz | J | **CAPT George W Pucciarelli** | RC |
|    |  |  | CDR Cathy L. Good | ** | CAPT Barry C. Black | SDA |
|    |  |  |  |  |  |  |
| 96 | RADM Anderson B. Holderby | ELCA | RADM Donald K. Muchow, P | LMS | RADM Ernest F Tedeschi, P | ** |
|    | **CAPT Michael F. Gallagher** | RC | **CAPT Peter A. Oddo** | RC | CAPT James C. Williams | PNBC |
|    | CDR James G. Harwood | SB | CAPT Loy B. Hamilton | UCC | **CAPT Patrick L. Fryer** | RC |
|    | CDR Jonathan A. Panitz | J | CDR Lynn J. Robertson | ** | CAPT Patricia M. Spishock | ** |
|    | CDR Henry Nixon, Jr. | NBCUS | CDR Alphonso Jones | CGIC | CAPT Richard R. Gates | ELCA |
|    | CDR Gary G. Simons | UM | CDR Mary E. Washburn | PUSA |  |  |
|    | LCDR Michelle J. Howard | ** |  |  |  |  |
|    |  |  |  |  |  |  |
|    |  |  |  |  |  |  |

Promotion Board Members  * - USNR-R   ** Non-CHC
*** Reservists not listed in CHC active duty biographies

10

EXHIBIT 13

| FY | O-4 BOARD MEMBERS | FG | O-5 BOARD MEMBERS | FG | O-6 BOARD MEMBERS | FG |
|----|-------------------|-----|-------------------|-----|-------------------|-----|
| 97 | RADM Donald K. Muchow,P | LMS | RADM Anderson Holderby, P | ELCA | RADM Anderson Holderby, P | ELCA |
|  | CAPT Joseph A. Ferraro | RC | CAPT Leroy Gilbert | NBCUS | CAPT Carol A. Harrington | ** |
|  | CAPT Thomas J. Benedum | LMS | CAPT George D. Cooper | CR | CAPT Charles H. May | ABC |
|  | CAPT Eileen O'Hickey | UCC | CDR Linda D. Long | ** | CAPT E. F. Blancett | UM |
|  | CDR Ernest A. Poe | ABC | CDR George L. Tumlin | SB | CAPT Wayne K. Bumbry | PNBC |
|  | CDR Craig A. Wilson | ** | CDR James J. MacNew | RC | CAPT James W. Anderson | RC |
|  |  |  |  |  | CAPT Jan C. Gaudio |  |
|  |  |  |  |  |  |  |
| 98 | CAPT Russell O. Gunter, P | PHC | RADM Donald K. Muchow | LMS | RADM Donald K. Muchow | LMS |
|  | CAPT Stephen J. Linehan | RC | CAPT John R. Madden | RC | CAPT Charles B. Young | ** |
|  | CDR Carolyn C. Wiggins | CME | CAPT E. F. Blancett | UM | CAPT Edwin D. Condon | RC |
|  | CDR Nevin P. Carr | ** | CDR Julia T. Cadenhead | SB | CAPT George C. Paul | BGC |
|  | CDR William M. Petruska | RC | CDR Ronald A. Soutiere | RC | CAPT Barry C. Black | SDA |
|  |  |  | CDR Charles L. Meyers | ** | CAPT Eileen L. O'Hickey | UCC |

Promotion Board Members  *- USNR-R   ** Non-CHC
*** Reservists not listed in CHC active duty biographies

EXHIBIT 13

| FY | O-4 BOARD MEMBERS | FG | O-5 BOARD MEMBERS | FG | O-6 BOARD MEMBERS | FG |
|---|---|---|---|---|---|---|
| 99 | RADM Barry Black | SDA | CAPT David T. Hart, P | ** | *RADM Richard D. West, P | ** |
|  | CAPT Wilson | COGC | CAPT Thomas C. Carter | SB | CAPT Leroy Gilbert | NBCUS |
|  | CAPT Belanus | CR | CAPT Timothy T. Morita | SB | CAPT Joseph W. Estabrook | RC |
|  | CAPT Dave Young | RC | CAPT Carolyn C. Wiggins | CME | CAPT Arnold E. Resnicoff | J |
|  | CDR Mary E. Washburn | PUSA | CDR David G. Kloak | RC | CAPT Jane F. Vieira | UCC |
|  | CDR Angelini | ** |  |  |  |  |
| 00 | CAPT Charles Soto, P | RC | RADM James K. Moran, P | ** | RADM Barry C. Black | SDA |
|  | CDR Ronald F. Meyer | EPC | CAPT Louis V. Iasiello | RC | CAPT Robert J. Phillips | UM |
|  | CDR Karl K. Fung | UCC | CDR Luther C. Alexander | NBCUS | CAPT Stephen J. Linehan | RC |
|  | CDR Timothy E. Coolidge | ** | CDR Mary E. Washburn | PUSA | CAPT Anthony L. Winns | ** |
|  | LCDR Wendy L. Bausman | PUSA | CDR James R. Fisher | ECCA | CAPT Julia T. Cadenhead | SB |

Promotion Board Members   * - USNR-R   ** Non-CHC
*** Reservists not listed in CHC active duty biographies

EXHIBIT 13

| FY | O-4 BOARD MEMBERS | FG | O-5 BOARD MEMBERS | FG | O-6 BOARD MEMBERS | FG |
|----|-------------------|-----|-------------------|-----|-------------------|-----|
| 01 | RADM Barry C. Black | SDA | RADM Barry C. Black | SDA | RADM Timothy R. Beard, P | ** |
|    | CAPT Robert F. Burt | OBSC | CAPT Lawrence J. Mack, Jr. | ** | CAPT Timothy T. Morita | SB |
|    | CDR Patrick D. Smith | ** | **CAPT Stephen B. Rock** | RC | CAPT Jane F. Vieira | UCC |
|    | CDR Robert C. Kallio | ** | CAPT Eileen L. O'Hickey | UCC | **CAPT Paul F. Mclaughlin** | RC |
|    | **CDR Robert P. McClanahan** | RC | CDR Billy Joe Washington | ** | CAPT Douglas J. Olauson | LDS |
|    | LCDR Margaret G. Kibben | PUSA | CDR Charles J. Anderson | CMA | CAPT Charles T. Bush | |
|    | | | | | | |
| 02 | **RADM Louis V. Iasiello, P** | RC | **RADM Louis V. Iasiello, P** | RC | RADM Barry C. Black | SDA |
|    | CAPT Mary E. Washburn | PUSA | CAPT John S. Linebeck | LDS | CAPT Maggi | |
|    | CDR Hunt | NACCC | CAPT Ollis J. Mozon, Jr. | ABC | CAPT Thompson | |
|    | CDR Blacketter | ** | CAPT Ronald L. Swafford,Sr. | PCA | **CAPT Malene** | RC |
|    | CDR Marrero | ABC | CAPT David H. Thieman | ** | CAPT Simonds | |
|    | LCDR Lambert | ** | CDR Dennis R. Kennetz | ** | CAPT Magness | EC |
|    | | | CDR Ann C. Phillips | ** | CAPT James Poe | AGC |
|    | | | | | | |

Promotion Board Members  * - USNR-R   ** Non-CHC
*** Reservists not listed in CHC active duty biographies

13

EXHIBIT 13

# CHAPLAIN LT POPULATION (POOL FOR LCDR) BY FAITH GROUP
## COMPARED TO
## CHAPLAIN LCDR PROMOTION BOARD MEMBERS BY FAITH GROUP

| Year | % RC LT | %RC Board Members | % LP LT | % LP Board Members | % NL LT | % NL Board Members | % SW LT | % SW Board Members |
|------|---------|-------------------|---------|--------------------|---------|--------------------|---------|--------------------|
| 80 | 25% | 33% | 36% | 50% | 31% | 17% | 8% | 0% |
| 81 | 21% | 33% | 39% | 50% | 33% | 17% | 7% | 0% |
| 82 | 18% | 50% | 39% | 33% | 37% | 17% | 6% | 0% |
| 83 | 14% | 40% | 40% | 40% | 40% | 0% | 5% | 20% |
| 84 | 14% | 33% | 37% | 33% | 43% | 33% | 6% | 0% |
| 85 | 14% | 40% | 40% | 40% | 40% | 20% | 6% | 0% |
| 86 | 17% | 17% | 39% | 50% | 39% | 33% | 5% | 0% |
| 87 | 16% | 17% | 38% | 50% | 41% | 33% | 5% | 0% |
| 88 | 17% | 20% | 40% | 20% | 39% | 40% | 4% | 20% |
| 89 | 18% | 20% | 36% | 40% | 41% | 40% | 5% | 0% |
| 90 | 21% | 20% | 34% | 40% | 40% | 20% | 5% | 20% |
| 91 | 21% | 20% | 39% | 60% | 36% | 20% | 4% | 0% |
| 92 | 23% | 20% | 36% | 20% | 37% | 40% | 4% | 20% |
| 93 | 22% | 20% | 35% | 40% | 39% | 40% | 0% | 0% |
| 94 | 23% | 20% | 32% | 60% | 40% | 20% | 5% | 0% |
| 95 | 20% | 17% | 32% | 33% | 43% | 33% | 5% | 17% |
| 96 | 20% | 20% | 30% | 60% | 46% | 20% | 4% | 0% |
| 97 | 20% | 50% | 33% | 25% | 42% | 25% | 5% | 0% |
| 98 | 18% | 20% | 34% | 40% | 43% | 20% | 5% | 20% |
| 99 | 18% | 25% | 37% | 75% | 42% | 0% | 3% | 0% |
| 00 | 18% | 25% | 41% | 25% | 37% | 25% | 4% | 25% |
| 01 | 17% | 25% | 38% | 25% | 41% | 50% | 4% | 0% |

EXHIBIT

14

## PERCENT OF LIEUTENANTS IN POOL BY FAITH GROUP
## LESS THAN OR EQUAL TO
## 10% OF BOARD MEMBERS OF THE SAME FAITH GROUP



Special Worship    28.6%

Non-liturgical     0%

Liturgical Protestant   33.3%

Roman Catholic     28.6%

## PERCENT OF FY81-02 LCDR BOARDS IN WHICH THE FGC PERCENTAGE OF LIEUTENANTS (LT) IN LT POOL WAS UNDER-REPRESENTED BY THE FGC PERCENTAGE OF BOARD MEMBERS BY 10 PERCENT OR MORE



0    10%   20%   30%   40%   50%   60%   70%

Special Worship  0%

Non-Liturgical  68.2%

Liturgical Protestant  18.2%

Roman Catholic  0%

EXHIBIT
14

# PERCENT OF LCDR CHAPLAIN CANDIDATES FOR CDR BY FAITH GROUP COMPARED TO PERCENT OF CDR CHAPLAIN PROMOTION BOARD MEMBERS BY FAITH GROUP

| Year | % RC L LCDR | %RC Board Members | % LP LCDR | % LP Board Members | % NL LCDR | % NL Board Members | % SW LCDR | % SW Board Members |
|---|---|---|---|---|---|---|---|---|
| 81 | 28 | 33 | 33 | 50 | 33 | 17 | 7 | 0 |
| 82 | 50 | 17 | 23 | 67 | 27 | 17 | 0 | 0 |
| 83 | 29 | 33 | 36 | 67 | 28 | 0 | 7 | 0 |
| 84 | 33 | 33 | 21 | 67 | 40 | 0 | 4 | 0 |
| 85 | 36 | 40 | 40 | 40 | 20 | 20 | 4 | 0 |
| 86 | 27 | 33 | 32 | 33 | 42 | 17 | 0 | 17 |
| 87 | 21 | 33 | 46 | 50 | 34 | 17 | 16 | 0 |
| 88 | 20 | 17 | 36 | 50 | 28 | 33 | 0 | 0 |
| 89 | 40 | 17 | 34 | 33 | 22 | 50 | 0 | 0 |
| 90 | 11 | 20 | 47 | 40 | 43 | 40 | 0 | 0 |
| 91 | 20 | 20 | 39 | 60 | 33 | 20 | 8 | 0 |
| 92 | 9 | 20 | 39 | 40 | 45 | 20 | 7 | 20 |
| 93* | | | | | | | | |
| 94 | 3 | 17 | 48 | 50 | 48 | 17 | 0 | 17 |
| 95 | 23 | 17 | 23 | 33 | 45 | 33 | 11 | 17 |
| 96 | 12 | 33 | 44 | 30 | 36 | 33 | 9 | 0 |

EXHIBIT
I 5

| Year | %RC LCDR | %RC Board Members | %LP LCDR | %LP Board Members | %NL LCDR | %NL Board Members | %SW LCDR | %SW Board Members |
|---|---|---|---|---|---|---|---|---|
| 97 | 24 | 20 | 36 | 40 | 33 | 40 | 6 | 0 |
| 98 | 7 | 20 | 43 | 40 | 50 | 20 | 0 | 20 |
| 99 | 19 | 25 | 38 | 25 | 34 | 25 | 9 | 25 |
| 00 | 18 | 25 | 39 | 25 | 42 | 25 | 2 | 25 |
| 01 | 21 | 25 | 36 | 25 | 40 | 25 | 3 | 25 |
| 02 | 32 | 25 | 16 | 25 | 44 | 25 | 8 | 25 |

* = NO BOARD PRECEPT DATA

■ = FGC UNDER REPRESENTED ON BOARD BY 10% OR MORE

|  | | | |
|---|---|---|---|
| 2/21=9.5% | 4/21=19.0% | 14/21=66.6% | 1/21=4.8% |

/// = FGC OVER REPRESENTED ON BOARD BY 10% OR MORE

|  | | | |
|---|---|---|---|
| 5/21 =23.8% | 7/21=33.3% | 1/21=4.8% | 5/21=23.8% |

23 December 1997

MEMORANDUM FOR THE CHIEF OF NAVAL PERSONNEL

Subj: REQUEST FOR SPECIAL SELECTION BOARD ICO LCDR S.M. AUFDERHEIDE, CHC, USN,
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/4100

Ref: (a) DCN 123003990
(b) OPNAVINST 1730.1C
(c) NAVOP 064/90
(d) OPNAVINST 6110.1D

Encl: (1) Assignment History Matrix
(2) Performance Assessment Matrix
(3) Awards Matrix
(4) Physical Readiness Shortcomings ICO Chaplain Clark

1. Per reference (a). LCDR Aufderheide requested a special selection board to consider him for the rank
of Commander based upon his allegation of denominational discrimination by a member or members
of the 1997 Chaplain Corps 0-5 Selection Board. He asked that his record be compared with those of
the Evangelical Lutheran Church in America (ELCA) chaplains considered before this board. Because
the number of selectees for both the 1997 board, which failed to select LCDR Aufderheide on his first
look, and the 1998 board, which failed to select him on his second look, was relatively small, I
examined the records of every selectee before both boards. I have concluded that LCDR
Aufderheide's allegation of denominational discrimination has merit, and recommend that he be
granted a special board. Additional recommendations are contained in paragraph 5, below.

2. I believe that, in failing to select LCDR Aufderheide for promotion, neither the FY-97 nor the FY-98
Selection Boards conducted an impartial evaluation of his record, to include his assignment history,
number of awards or assessments of performance. Enclosures (1) through (3) provide a breakdown by
type of assignment, the total number of "B" and "C" grades earned, and number of personal awards
received by selectees of both boards as well as by LCDR Aufderheide. By these objective measures, it
is clear that LCDR Aufderheide has performed at or near the "head of the pack" throughout his career,
and that his record not only compares favorably with the ELCA chaplains, but is stronger than most of
those selected. In addition, the verbiage on the reverse of all of his observed fitness reports, unlike
that of some selectees, is unequivocal in endorsing him in the strongest possible terms for promotion.
Further, several of LCDR Aufderheide's fitness reports are signed by Navy Flag officers who are now
serving as Commanders in Chief, and their assessment of his performance should quite naturally carry
considerable weight, given their substantial experience in judging the capabilities and performance of
assigned personnel. These facts lead me to conclude that LCDR Aufderheide was improperly denied
promotion.

3. Although the Secretary of the Navy's Selection Board Precepts support the practice of "…giving due
consideration to the needs of the Navy for officers with particular skills" neither the precepts nor Navy
Regulations mandate the selection of officers based on affiliation with a given faith or denomination.
However, it appears that the board may have systematically applied a denominational quota system,
perhaps to ensure balanced denominational representation across the Chaplain Corps. It is important
to note that the precepts do mandate the application of a "best and fully qualified" standard, and
require that the board consider substandard performance that is documented in official records in
determining who is best qualified for promotion.

EXHIBIT
16

UC0013

Subj: REQUEST FOR SPECIAL SELECTION BOARD ICO LCDR S.M. AUFDERHEIDE, CHC, USN, 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/4100

4.  Per reference (b), the Chief of Chaplains is responsible for identifying personnel resources to meet Navy religious needs, as well as managing the Auxiliary and Contract Chaplain Program. When military chaplains of a given faith are unavailable, this program ensures that the free practice of religion is accomplished, both afloat and ashore, through use of lay leaders or by contracting religious services from civilian ministry sources. Because these avenues are employed with great success throughout the Fleet, the imposition of a quota system is especially inappropriate if "best and fully qualified" officers are passed over in favor of those who demonstrate substantial shortcomings, to include a <u>career pattern of failure to meet minimum Navy performance standards.</u>  The documented performances of at least two Roman Catholic selectees (Clark; Cuddy) are markedly inferior to that of Chaplain Aufderheide and also stand out in sharp contrast to the much stronger records of other Roman Catholics (McGeory; Trapani) selected by the board.  The record of a Protestant Chaplain (Klappert) also documents substandard performance, yet Chaplains Clark and Cuddy were selected by the 1998 board, and Chaplain Klappert was selected by the 1997 board. Specifically:

 a.  Commander Clark's record documents a persistent history of failure to achieve body fat standards.  In fact, when he was selected for 0-4 in 1990, his most recent fitness report before that 1990 board listed his body fat at 35 percent – clinically obese.  Despite this, he was selected, and at the time of his promotion, his body fat percentage was documented at 24 percent – out of standards.  Per references (c) and (d), then-Lieutenant Clark's 35 percent body fat fitness report should have been considered adverse, he should not have been recommended for promotion, and promotion should have been delayed until he achieved standards.  <u>This officer's weight problems are documented in nine separate fitness reports between 1987 and 1994.</u> Enclosure (4) refers.  Given that the Chief of Naval Operations places special emphasis on physical fitness as a major component of readiness, and that the Navy separates more that 1,300 enlisted personnel each year for failure to achieve body fat percentages, the promotion of this officer in 1990, and again in 1998, without any documentation that he was within standards, is especially troubling.

 b.  Chaplain Cuddy's record is not nearly as strong as LCDR Aufderheide's, yet he was selected for promotion during the FY-98 board.  In addition to 39 grades of B and 8 grades of C in his record, he was placed in the top five and ten percent categories in several fitreps throughout his career, always ranked near the bottom of the pack when competing with others, and routinely recommended for regular, as opposed to early promotion.  With the exception of one B grade in Chaplain Corps School (Writing Ability), Chaplain Aufderheide has been a straight-A, one percent, RAP officer.  Throughout his career, he is identified as a "future Chaplain Corps leader" and "future flag."  During two of four fitness report marking periods in Gaeta (UIC 30829), he was ranked 2 of 2 and 2 of 3, although he was the only chaplain assigned to the detachment.  However, his performance was compared to chaplains at his parent command, NAVSUPPACT Naples, Italy (UIC 62588) from which he was geographically separated.  During this tour, COMSIXTHFLT ranked LCDR Aufderheide as "...number one of 15 chaplains in the Naples/Gaeta area."  In Mayport, his most recent duty station prior to returning to overseas duty, he competed against officers with whom he was co-located, and ranked one of four on his first fitness report at that command.

 c.  Chaplain Klappert was selected during the 1997 board.  His record documents, from his arrival at Chaplain Corps School, a history of physical readiness/body fat shortcomings.  The photograph presently in his fiche was taken while he was a Lieutenant.  On many occasions,

Subj: REQUEST FOR SPECIAL SELECTION BOARD ICO LCDR S.M. AUFDERHEIDE, CHC, USN,
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/4100

he received grades of B in military bearing. He also has three fitness reports between 1989 and 1993 placing his body fat at 24, 27, and 23 percent, respectively. Per references (c) and (d), these reports should have been considered adverse. Chaplain Aufderheide, in contrast, routinely scores outstanding on the PRT, .

5. Specific recommendations:

    a.   Grant LCDR Aufderheide's request for a special board, and <u>ensure that this officer is retained on active duty until such time as a board is convened and results are promulgated</u>. Because LCDR Aufderheide is to be retired under Temporary Early Retirement Authority (TERA) on 1 April 1998, this board should be convened at the very earliest opportunity.

    b.   To preempt any possible bias on the part of the Chaplain Corps community chain of command, <u>limit membership of this special selection board exclusively to senior line officers who have served in command and have had significant responsibility for management of chaplains</u>.

    c.   <u>Initiate an Inspector General (IG) investigation into Chaplain Corps selection board processes</u>. The records of other chaplains who have failed to select should be compared to those of selectees to determine if denominational considerations were given priority over minimally acceptable performance standards. If it is established that improper selection practices have systematically occurred, shift responsibility for selection of chaplains for promotion to the line community.

    d.   <u>Require that Chaplain Corps selection boards apply the same minimum performance standards as those applied to other line and staff selection boards</u>.

Very respectfully,

J. N. STAFFORD
Captain, U.S. Navy
Special Assistant for
Minority Affairs (Pers-00J)

3

## ACTIVE DUTY ASSIGNMENT HISTORY

| FY-97 | SEA+ | MAJOR SHORE | USMC | OUTUS | FLAG |
|---|---|---|---|---|---|
| Aufderheide, S.M.* | X | X | X | X | X |
| Beyer, S.P.* | X | X | X | X | |
| Evans, J.S.* | X | X | X | X | |
| Frederickson, J.C.* | X | | X | X | X |
| Garcia, L.F. | X | X | X | X | |
| Griffith, H.W. | X | X | X | X | X |
| Hahn, P.A. | X | X | X | | |
| Kelly, B.F. | X | X | X | X | |
| Kienzle, J.C. | | X | X | X | |
| Klappert, T.G. | | X | X | | X |
| May, B.N. | | X | X | X | |
| McGeory, P.W. | X | X | X | X | X |
| Melley, J.J. | X | X | X | X | X |
| Petruska, W.M. | | X | X | X | X |
| Robertson, S.C. | X | X | X | X | X |
| Smith, L.M. | X | X | X | X | X |
| Tidd, M.L. | X | X | X | X | X |
| Trapani, A.M.* | | X | X | X | |
| Waite, D.J. | X | X | X | X** | |
| Whitson, G.L.* | | X | X | X | X |
| Wilson, C.E. | X | X | X | X | X |
| | | | | | |
| FY-98 | | | | | |
| Aufderheide, S.M.* | X | X | X | X | X |
| Baker, A.T.* | X | X | X | | |
| Clark, R.J. | X | X | X | | |
| Cuddy, W. F. | X | X | X | X | |
| Farris, M.E. | X | X | X | | X |
| Marshall, H.L | X | X | X | | |
| Parker, D.W. | X | X | X | | |
| Weidman, W.L. | X | X | X | X | X |

+ = Denotes assignment to ship's company only; not squadron or staff duty.

* = Combat

** = Pearl Harbor, HI

## PERFORMANCE ASSESSMENT

| FY-97 | B | C | |
|---|---|---|---|
| Aufderheide, S.M. | 01 LMS | | |
| *Beyer, S.P.* | 05 ELCA | | |
| Evans, J.S. | 07 SB | | |
| *Frederickson, J.C.* | 17 ELCA | *1* | |
| Garcia, L.F. | 02 SDA | | |
| *Griffith, H.W.* | 30 ELCA | *2* | |
| *Hahn, P.A.* | ELCA | | |
| Kelly, B.F. | 04 RC | | |
| Kienzle, J.C. | 05 RC | | |
| Klappert, T.G.** | 08 FFCA | | |
| May, B.N. | 08 NACUS | 1 | |
| McGeory, P.W. | 01 RC | | |
| Melley, J.J. | 02 RC | | |
| Petruska, W.M. | 02 RC | | |
| Robertson, S.C. | 18 CP | | |
| Smith, L.M. | 01 OP | | |
| Tidd, M.L. | 07 RC | | |
| Trapani, A.M. | 09 RC | | |
| Waite, D.J. | 03 UM | | |
| Whitson, G.L. | 08 SB | | |
| Wilson, C.E. | 14 UCC | 1 | |

| FY-98 | | | |
|---|---|---|---|
| Aufderheide, S.M. | 01 | | |
| Baker, A.T. | 30 RCA | 9 | |
| Clark, R.J.* | 05 RC | 1 | |
| Cuddy, W.F. | 39 RC | 8 | |
| Farris, M.E. | CN | | |
| Marshall, H.L. | 13 PNBC | 4 | |
| Parker, D.W. | 04 FFCA | | |
| Weidman, W.L. | 05 M | | |

\* = Failed to meet Navy weight standards for seven consecutive reporting periods (BF between 24-28%)
\*\* = Repeated BF failures ( BF between 23-27%)
Note: ELCA chaplains are italicized.

## AWARDS

| FY-97 | NA | NC | MSM | OTHER |
|---|---|---|---|---|
| Aufderheide, S.M. | 1 | 2 | 1 | |
| Beyer, S.P. | 2 | 2 | | |
| Evans, J.S. | 1 | 4 | | |
| Frederickson, J.C. | 1 | 1 | | |
| Garcia, L.F. | 1 | 3 | | |
| Griffith, H.W. | 1 | 1 | | |
| Hahn, P.A. | 1 | 1 | | |
| Kelly, B.F. | 2 | 2 | | |
| Kienzle, J.C. | 1 | 2 | | |
| Klappert, T.G. | | | | CGCM |
| May, B.N. | 3 | 1 | | |
| McGeory, P.W. | 2 | 2 | 1 | JSCM |
| Melley, J.J. | + | 1 | | JSAM |
| Petruska, W.M. | 1 | 3 | 1 | |
| Robertson, S.C. | 1 | 1 | | |
| Smith,L.M. | 2 | 1 | 1 | |
| Tidd, M.L. | | 3 | 1 | |
| Trapani. A.M. | | 4 | | |
| Waite, D. J. | 2 | | | |
| Whitson, G.L. | 0 | 4 | 1 | |
| Wilson. C.E. | | 2 | | |

| FY-98 | NA | NC | MSM | OTHER |
|---|---|---|---|---|
| Aufderheide, S.M. | 1 | 2 | 1 | |
| Baker. A.T. | 2 | 5 | | |
| Clark. R.J | 0 | 3 | | |
| Cuddy. W. F. | 0 | 2 | 1 | JSCM |
| Farris,M.E. | 1 | 1 | | |
| Marshall, H.L. | 1 | 1 | | |
| Parker, D.W. | 2 | 2 | 1 | |
| Weidman, W.L. | | 2 | | |




## PRT SHORTCOMINGS ICO COMMANDER CLARK

| | |
|---|---|
| 84 Jul-84 Aug: | Chaplain Corps School Fitness Report notes that the officer "...markedly improved fitness to meet weight standards." |
| 87 Jan-87 Aug: | Did not take PRT due to Medical Waiver. |
| 88 Jan-89 Jan: | C in military bearing. Ranked at 5% in bottom 3 of 10. Fitness report documents body fat at 35% - obese (Note 1). |
| 90 Feb -91 Jan | A in military bearing. Fitness report documents body fat at 25% - out of standards. Selected for O-4 in Jul 90. |
| 91 Feb-91 Oct: | Fitness report documents body fat at 24% - out of standards. Promoted to O-4. |
| 91 Nov-92 Jun: | A in military bearing. Fitness report documents body fat at 28% - out of standards. |
| 92 Jun-92 Oct: | B in military bearing. Fitness report notes that the officer is "...making progress towards meeting Navy weight standards." Body fat documented at 25% - out of standards. |
| 92 Nov-93 Oct: | B in military bearing. Fitness report notes that the officer "...recently completed Level III treatment for his weight." standards." Body fat documented at 25% - out of standards. |
| 93 Nov-94 Jan: | B in military bearing. Fitness report notes that the officer "...made significant progress towards meeting Navy weight standards." Body fat documented at 25% - out of standards. |
| 94 Feb-94 Jul: | B in military bearing. Block 73-Weakness Discussed: YES. Fitness report notes that officer "...completed Level III in the Compulsive Overeating Rehab program June 93 and participated in the Aftercare Program until 1 June 94, as required by regulations." Body fat documented at 28% - out of standards. |
| 94 Nov-95 Jul: | Reporting senior notes that officer "...was not weighed due to oversight on my part...I never had reason to question his weight." Body fat entry made as "XX." |

Note 1: The categories of "obese" and "over fat" were eliminated in 1990 and replaced by the term "out of standards." NAVOP 064/90 refers.

# DEPARTMENT OF DEFENSE
# OFFICE OF INSPECTOR GENERAL

## REPORT OF INVESTIGATION

**CASE NUMBER**
P98C69119125

**DATE**

MAR 1 1999



ALLEGED DENOMINATIONAL DISCRIMINATION AND OTHER IMPROPRIETIES:
NAVY FISCAL YEAR 1997 AND 1998 SELECTION BOARDS FOR
ACTIVE DUTY CHAPLAIN CORPS COMMANDER

Prepared by Program Integrity Directorate

Office of Departmental Inquiries

EXHIBIT
17

FOR OFFICIAL USE ONLY

- that the appointment of "detailers" (officers charged with duty assignments and other career management responsibilities) as board members created the perception of a conflict of interest (that is, detailers, in the course of their official duties, normally have access to a wide variety of personal information about eligible officers that should not be considered by a selection board); and

- that a board member violated his oath of secrecy by "leaking" information about board proceedings.

Although we found some indication that the well recognized shortage of Roman Catholic chaplains may have been a factor in the final selection made by the FY 97 board (after several votes, a Roman Catholic was picked over a Baptist), we found evidence insufficient to conclude that denomination was the primary consideration—or that any board member openly advocated the need to select Roman Catholics. Accordingly, we concluded that the selection was consistent with law and regulation that pertain to selection board proceedings. Further, we found that current detailers were not appointed to the board. Rather, two prospective detailers, who had not yet gained access to personal information that might have affected their independence, served on the board. Finally, evidence regarding an alleged "leak" was insufficient to substantiate impropriety by any board member.

By memorandum dated July 8, 1998, we advised the Assistant Secretary of Defense (Force Management Policy) that we did not substantiate allegations of misconduct involving

b7

### FY 98 Board

We further addressed allegations that irregularities occurred in the FY 98 board which were to the specific detriment of LCDR Aufderheide and, therefore, caused his nonselection. Specifically, we investigated the following allegations.

- Like the FY 97 board, a chaplain who did not meet Navy physical readiness standards was improperly selected for promotion.

- The appointment of two Roman Catholic chaplains as FY 98 board members violated the establishment clause of the United States Constitution.[4]

- The existence of denominational discrimination favored the selection of Roman Catholic chaplains. In that regard, the FY 98 board allegedly selected two Roman Catholic chaplains who had not been selected by

---

[4] The establishment clause of the United States Constitution states "Congress shall make no law respecting an establishment of religion." The Supreme Court has interpreted the clause to mean: "Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or nonattendance."



FOR OFFICIAL USE ONLY

P98C69119125                                                                          4

previous boards and whose records were inferior to those of other eligible officers under consideration.

- One board member made inappropriate, critical remarks about LCDR Aufderheide because of a prior disagreement between that board member and LCDR Aufderheide.

For reasons set forth above, we did not substantiate the allegation that the FY 98 board improperly selected an officer who did not meet Navy physical readiness standards. Further, we found that the appointment of two Roman Catholic chaplains to the FY 98 board violated no law or regulation and was reasonable given the shortage of potential appointees with requisite backgrounds.

With respect to the remaining allegations, we found some evidence that denominational considerations may have been a factor in selections made by the FY 98 board. Specifically, we concluded that the ████ Roman Catholic board member may have made comments that were designed to remind fellow board members of the shortage of Roman Catholic chaplains and, because of his concerns in that regard, may have stressed the qualifications of eligible officers who were Roman Catholic priests. However, the evidence was insufficient to conclude that he made an overt denominational appeal or, more importantly, that, as a result of his comments, denomination took precedence over the qualifications of eligible officers as a selection criterion. As a result, we concluded that the FY 98 selection of two Roman Catholic chaplains, who were not selected by previous boards, was consistent with law and regulation which pertain to selection board proceedings.

Of consequence to the specific case of LCDR Aufderheide, however, was our determination that a FY 98 board member made adverse comments regarding LCDR Aufderheide that caused another board member to alter his vote to the detriment of LCDR Aufderheide. Although the board member who allegedly made the adverse comments did not recall making them, we found persuasive the testimony of two other board members and two recorders to the effect that unfavorable information concerning LCDR Aufderheide was, in fact, introduced during board deliberations. Because that information was based on personal knowledge and had not been included in the information regarding LCDR Aufderheide placed before the board, we concluded that consideration of the unfavorable comments constituted "material error" within the meaning of applicable selection board statutes and regulations. We recommend that the Secretary of the Navy consider a special selection board because of that error.

In considering all evidence gathered during our investigation, we found little indication of deficiencies in the Navy selection board process. We do not consider the unfavorable comments made about LCDR Aufderheide as evidence of systemic weakness, but rather an isolated deviation from an otherwise sound process. Accordingly, we make no recommendations for systemic change.

This report sets forth our findings and conclusions based on a preponderance of the evidence.

# CHAPLAIN PER MEMBER RATIOS

## AVAILABILITY OF NAVY CHAPLAINS BY FAITH GROUP & TRADITION

This compares the number of chaplains of a faith group (FG) reported by CHC Rosters with the number of faith group members recorded by Defense Manpower Data Center's religious preferences reports. The chaplain/faith group member ratio ("Ratio") indicates the availability of a chaplain to a faith group member, i.e., how many members are served by one chaplain. There are gross disparities between faith groups in the availability of Navy chaplains to their members.

| Faith Groups | 2000 Chap. | Members | Ratio | 1998 Chap. | Members | Ratio |
|---|---|---|---|---|---|---|
| **PROTESTANT LITURGICAL TRADITION** | | | | | | |
| Congregational | 18 | 305 | 1:17 | 19 | 328 | 1:17 |
| Episcopal | 31 | 3,766 | 1:121 | 25 | 4,039 | 1:162 |
| Lutheran | 82 | 14,127 | 1:172 | 73 | 15,937 | 1:218 |
| Methodist | 62 | 18,401 | 1:296 | 64 | 20,776 | 1:324 |
| Methodist Episcopal | 14 | 612 | 1:43 | 12 | 652 | 1:54 |
| Presbyterian | 76 | 5,116 | 1:79 | 73 | 5,781 | 1:83 |
| Orthodox | 12 | 350 | 1:29 | 10 | 394 | 1:39 |
| Reformed | 12 | 270 | 1:23 | 10 | 258 | 1:23 |
| **TOTAL** | **307** | **42,947** | **1:140** | **286** | **48,165** | **1:168** |
| **SPECIAL WORSHIP FAITH GROUPS:**[1] | | | | | | |
| Christian Science | 4 | 469 | **1:117** | 4 | 599 | **1:150** |
| Jewish | 12 | 1,246 | **1:104** | 15 | 1,237 | **1:82** |
| Seventh Day Advent | 13 | 1,646 | **1:127** | 14 | 1,617 | **1:115** |
| **NON-LITURGICAL FAITH GROUPS:** | | | | | | |
| Baptist (all Baptist FG) | 190 | 90,309 | **1:475** | 195 | 98,481 | **1:505** |
| Pentecostal (all FG0 | 30 | 8,787 | **1:293** | 31 | 9,315 | **1:300** |
| Other Christian FG | 127 | 58,074 | **1:457** | 125 | 51,980 | **1:416** |
| Other non-liturgical Protestant | ___ | 14,124 | _____ | ___ | 16,211 | _____ |
| **TOTAL** | **347** | **171,294** | **1:494** | **351** | **175,987** | **1:501** |
| **CATHOLIC:**[2] | **181** | **125,892** | **1:696** | **182** | **132,429** | **1:728** |

EXHIBIT 18

---

[1] There are about 5000 Navy Mormons, but the LDS Church uses a combination of chaplains (7) and lay elders to support them - ratio is not the result of a Navy decision.

[2] Real shortage is due to national shortage of Catholic priests - not a Navy decision.

-----Original Message-----
**From:** Gomulka Capt Eugene T
**Sent:** Tuesday, March 27, 2001 12:37 PM
**To:** Charles Burt; Edwin Stanfield; George Paul; Henry Nixon; Jeffrey Han; John Gwudz; Joseph Estabrook; Micheal Williams; William Dillon; William Lesak
**Cc:** Puttler Chaplain James D
**Subject:** CHAPLAIN SHORTAGE

*MSC, MCRD and MAGTFTC Command Chaplains,*

*Those of us who attended the Senior Leadership Conference were briefed about the serious shortage of chaplains in our Corps that the Chief of Chaplains has made a priority issue. The Chaplain of the Marine Corps has already asked all chaplains serving with Marines to submit "leads," i.e., names of clergy and theological students who might have the "right stuff" to be Navy chaplains. While O-6 and E-9 personnel in attendance at the conference were asked to submit recruiting suggestions, what might you think about extending this invitation for ideas to all of our chaplains? If you think that the chaplains under your cognizance might have some good ideas worth sharing with our recruiters, you might want to encourage them to forward these ideas to Chaplain Carr at: CarrG@cnrc.navy.mil*

*As some of you who attended the conference may be preparing trip reports for your commands, you may be interested in "my take" on SLC Dallas 2001 as refelected in the attached Trip Report. Those who have a particular interest in the recruiting issue may also be interested in "my take" on why we have a chaplain shortage and what we can do to alleviate it as reflected in the attached copy of my paper, "Navy Chaplain Shortage: In Search of a Solution."*

*I was pleased that those of us who attended the conference from MARFORPAC were able to get together briefly on Tuesday to discuss issues pertinent to our AOR. I look forward to following up our discussion next week in Okinawa and in June with RMTs on the West Coast.*

*V/R & S/F, Gene Gomulka*

*Captain E. T. Gomulka*

*Force Chaplain - Marine Forces Pacific*

*Honor, Courage and Commitment:*

*Our Core Values by which we live, serve, fight and die*

*Comm: (808) 477-8529/8532 DSN: 477-8529/8532*

EXHIBIT 19

## Navy Chaplain Shortage: In Search of a Solution

1. Issue.

   The Chaplain Corps has not met its recruiting goals in recent years and faces the real possibility of losing some of its unfilled billets. The manpower problem will not be solved simply by investing more money or assigning more chaplains to Recruiting Command. In light of my passed recruiting experience, I believe the current structure of Chaplain Corps recruiting is systemically flawed and inhibits the successful recruitment of qualified applicants. I would like to examine some reasons for the current shortage and then offer some recommendations that could help alleviate the current shortage.

2. Reasons for the Shortage

   There are a number of reasons for the current Chaplain Corps manpower shortage. Included among them are the following:

   a.      A decrease in the number of civilian clergy. Fewer people are entering the ministry today and those who are ordained are generally older than those of times past.

   b.      The economy is in relatively good shape that always seems to impact recruiting in general.

   c.      Chaplain Corps separation policies in the past seriously weakened the prospect of job security. There were two years in a row (during the drawdown in military forces) when 40% of first term chaplains were involuntarily separated after their initial three-year contract. Select Early Retirement Boards (SERB) also forced some chaplains to retire who today serve as Endorsing Agents. One would not expect chaplains who were separated under these circumstances to encourage fellow members of the clergy to enter the Chaplain Corps.

   d.      With a decrease in the number of clergy, there are fewer associate pastors today. It is more difficult to recruit a person who has become a pastor (particularly of a well to do church) than it is to recruit an associate pastor who could view military chaplaincy as offering more benefits than he/she has in civilian ministry (e.g., freedom, authority, financial income, etc.).

   e.      There are systemic flaws in the Chaplain Corps recruiting structure that have contributed to the manpower shortage. While there are three major sources of active duty chaplains (civilian clergy, reserve chaplains and ordained chaplain candidates), the chaplain in charge of Chaplain Corps recruiting does not oversee a recruiting operation where he can readily access these three sources. Most of the efforts of chaplain recruiters over the past years have focused on direct accessions and have not fully tapped the two other major sources (reserve chaplains and ordained chaplain candidates). How many people who became chaplain candidates over the last 15 years were encouraged to enter active duty or reserve

h.  Another reason for the chaplain shortage has to do with the Chaplain Candidate Program that was poorly managed for many years before it was redirected to the Naval Chaplains School. While the program may be better managed today than it was for many years in the past, the director of Chaplain recruiting has little responsibility toward and contact with theological students once they are recruited and complete their basic training. If the Chaplain Candidate Program exists primarily to have candidates ultimately join the reserves or enter active duty service, the director of chaplain recruiting should allow the Naval Chaplains School to handle training while he/she is responsible for both recruitment into the program and appointment into the reserves or active duty service.

i.  The Chaplain Corps has lied to clergy about opportunities for ministry in the sea services. When new chaplains discover how they are restricted in their ministry by senior chaplains who are jealous of their talents, they become angry and return to civilian life informing their clergy friends about the "truth" of what they can really expect if they become Navy chaplains. The recent chaplain recruiting video is a perfect example of this problem. While the video portrayed chaplains happily engaged in ministry at a particular duty station, the truth of the matter was that a number of chaplains left the Navy after having served at that particular duty station, frustrated at the way they were limited by command chaplains to exercise a fulfilling and life-transforming ministry. CNRC brought in chaplains from other commands to depict them happily engaged in ministry while the "real chaplains" at that duty station whose morale was quite low were nowhere to be seen. The Chaplain Corps needs to recognize that fulfilled O2, O3 and O4 chaplains are some of its most important recruiters. While the Chief of Naval Operations says that we need to reward those who promote recruiting and retention, the chaplain shortage will only grow worse until Chaplain Corps leaders are willing to do something about chaplains who are responsible both for poor morale among their RMTs and who cause young, talented chaplains to leave the military.

j.  Contacting a Navy chaplain recruiter is not easy. Let me illustrate with an example. A former United States Marine entered the seminary, became a Navy Chaplain Candidate, and was later ordained. After serving a number of years at a church, he tried calling the Navy to come on active duty. There was no toll free number that he could call that would connect him directly to a live chaplain recruiter. All he could call was a 1-800 Navy recruiting number that promised to refer his call to a chaplain recruiter. When he did not have his call returned, he called the Army and was immediately speaking with an Army chaplain recruiter. Although he served in the Marine Corps and became a Navy Chaplain Candidate, he ultimately became an active duty Army chaplain. If I as an active duty chaplain want to call a chaplain recruiter to pass on a lead about a potential chaplain candidate or chaplain, what number do I call? Until we have better connectivity that allows more immediate contact with recruiters, we should not be surprised if applicants lose interest or approach another branch of the service.

k.    A final reason for the chaplain shortage has to deal with a number of lawsuits in recent history, many that have accused the Corps of denominational discrimination. As a result of such litigation, the Chaplain Corps has been hesitant to recruit O4 and above reserve chaplains based upon its need for chaplains from underrepresented faith groups. Navy lawyers have discouraged the Chaplain Corps from granting waivers to clergy from certain faith groups less such waivers contribute to the perception of discrimination and exacerbate current litigation problems involving alleged denominational discrimination. How many Reserve Lieutenant Commanders and Commanders from faith groups underrepresented in the Chaplain Corps are not being encouraged to consider active duty service because of legal concerns about potential accusations of denominational discrimination or favoritism? If the Medical Corps is short of certain specialists (e.g., cardiologists), will it not offer certain incentives (e.g., higher rank) and waivers that it would not offer to newly licensed doctors? Is the Chaplain Corps as concerned about denominational balance as much as the Medical Corps is dedicated to providing sea service personnel and their families with sufficient numbers of cardiologists, gynecologists, oncologists, etc.? If almost 30 percent of the sea services is composed of Roman Catholics that are served by a Chaplain Corps composed of approximately 20 percent Roman Catholic Chaplains, will the Chaplain Corps access qualified O-4 and above Catholic Reserve Chaplains just as the Medical Corps accesses experienced and senior medical specialists?

3. Recommended Solutions to the Chaplain Shortage

After having identified a number of reasons for the current chaplain shortage, I would now like to offer some recommendations that could have a major impact on the current recruiting crisis.

a. Repositioning and changing the functions of recruiting chaplains. There are five chaplains currently engaged in chaplain recruiting. The director of chaplain recruiting is stationed at CNRC in Millington. Two chaplains are in Hyattsville, MD and two others are in Dallas, Texas. I would recommend keeping the current number of chaplain recruiters (5) but redistributing them in the following manner:

1.    Appoint an O6 chaplain as "Director, Ecclesiastical Relations, Recruitment and Retention Division" (N974) who would work out of the Chief of Chaplains Office.

N974 would be responsible for directing the recruitment of clergy from all denominations and promoting chaplain retention in the Chaplain Corps. He could be assisted by a respected retired chaplain who could help liaison with endorsers, particularly former chaplains with whom he may have served on active duty. The contact that N974 would enjoy with endorsing agents could provide him leads and insights into clergy availability within particular faith groups that he could share with the other four recruiters under his/her cognizance.

4




DEPARTMENT OF THE NAVY
U.S. NAVAL STATION
PSC 1005, BOX 25
FPO AE 09593-1000

1731
23 JUL 1992

From: Commanding Officer
To:   Command Chaplain

Subj: PERMISSION TO WORSHIP

Ref:  (a) Command Chaplain endorsement on MSGT W. Butcher, USMC's
          memo dtd 15 Jul 92
      (b) Title 10, U.S. Code
      (c) OPNAVINST 1730.1B
      (d) SECNAVINST 1730.7
      (e) MILPERSMAN §5810150

1.  I have read and carefully considered the recommendation
forwarded by reference (a). After a lengthy review, I have
decided that discontinuing the 0730 worship service is
inconsistent with the both the letter and the spirit of
references (b) through (e). As a consequence, I direct that the
members of the group attending the 0730 service be permitted to
use the base chapel for their worship service.

2.  The issues raised by reference (a) and the basic
correspondence are extremely complex. They touch values which
cut to the heart of what it means to be an American. The freedom
to gather with fellow citizens and worship in one's own manner;
free from governmental restrictions, is a right that should only
be curtailed for the gravest of reasons.

3.  Suppression of the 0730 service, with the avowed goal of
forcing its members to attend the "official" Protestant service,
would violate the very principles which underlie my command
religious program. The goal of that program is and always has
been to provide spiritual comfort for as many command members as
practicable within the confines of this isolated environment. I
am painfully aware that we cannot be all things to all people. I
am equally aware that, due to our isolated location, some people
will go uncomforted or, if they wish to participate in organized
religious rites, be forced into compromises which leave them
unfulfilled. As leaders, we should be alert for opportunities to
ease these limitations whenever we can. When we cannot provide
chaplains to adequately service a particular group's needs, we
should actively seek responsible lay leaders from the community
who can help us broaden the services we provide. Under no
circumstances should we belittle the worship needs of others or





EXHIBIT
20



suggest to them that their style of worship is somehow secondary to our desire to run a more "orderly" program limited to the rites of "nationally recognized" groups.

4. My previous comments notwithstanding, access to the base chapel will continue to be restricted to those groups whose use is consistent with the needs of the broader community. Groups whose services would damage the chapel or render it otherwise unfit for the worship of other members of the community will not be permitted to use the facility. In addition, groups who exhibit characteristics, such as racial or ethnic intolerance, which are clearly inconsistent with the public nature of the facility will also be barred. Groups using the chapel will remain under your supervision and are expected to follow the directions of your staff with regards to the care and upkeep of the facility.

5. As you know from our previous discussions, I am personally committed to ensuring the command religious program meets the changing needs of our community. I am not unmindful of the special challenges these needs can present to you and to your staff. If you need assistance, please do not hesitate to call me.

W. C. McCamy

2

**Table QE-6**
**Selection Rates for Non-Liturgicals**
**by Denomination (all Decisions 1985-2005)**

| Denominations within cluster | Total No of Candidates | Number Recommended | Number Not Recommended | Percent Recommended |
|---|---|---|---|---|
| ABA | 4 | 2 | 2 | 50.00% |
| ABC | 64 | 46 | 17 | 71.88% |
| AG | 86 | 69 | 16 | 80.23% |
| **AGC** | **33** | **21** | **12** | **63.64%** |
| BBF | 11 | 8 | 2 | 72.73% |
| BGC | 18 | 13 | 5 | 72.22% |
| **CB** | **11** | **1** | **9** | **9.09%** |
| CBAA | 13 | 9 | 4 | 69.23% |
| CC | 19 | 15 | 4 | 78.95% |
| CCCC | 11 | 11 | 0 | 100.00% |
| **CFGC** | **97** | **58** | **37** | **59.79%** |
| CGAI | 6 | 5 | 0 | 83.33% |
| CGCT | 32 | 24 | 8 | 75.00% |
| **CGIC** | **23** | **15** | **6** | **65.22%** |
| CHCCC | 18 | 15 | 2 | 83.33% |
| CMA | 16 | 12 | 3 | 75.00% |
| **COALSPFLDCH** | **18** | **11** | **6** | **61.11%** |
| COBAPT | 19 | 16 | 3 | 84.21% |
| DC | 35 | 26 | 7 | 74.29% |
| ECC* | 15 | 13 | 2 | 86.67% |
| EFCA | 34 | 27 | 7 | 79.41% |
| EvanChurAlli | 14 | 11 | 2 | 78.57% |
| FGBC | 5 | 3 | 2 | 60.00% |
| FUNDBAPTFEL | 10 | 9 | 1 | 90.00% |
| **GARB** | **22** | **12** | **9** | **54.55%** |
| ICFCG | 25 | 17 | 8 | 68.00% |
| IFCA | 38 | 28 | 6 | 73.68% |
| **LBF** | **29** | **14** | **14** | **48.28%** |
| MISS | 4 | 1 | 1 | 25.00% |
| NABC | 9 | 8 | 1 | 88.89% |
| NBCA | 11 | 8 | 3 | 72.73% |
| **NBCU** | **68** | **45** | **20** | **66.18%** |
| OBSC | 4 | 3 | 1 | 75.00% |
| PAW | 6 | 5 | 0 | 83.33% |
| PB | 6 | 5 | 1 | 83.33% |
| PCG | 5 | 4 | 1 | 80.00% |
| PH | 4 | 4 | 0 | 100.00% |
| PNBC | 26 | 18 | 8 | 69.23% |
| RCA* | 16 | 14 | 2 | 87.50% |
| SB | 480 | 349 | 115 | 72.71% |
| **UPI** | **13** | **8** | **5** | **61.54%** |
| WBF | 4 | 3 | 1 | 75.00% |
| All Non-Lit | 1479 | 1041 | 390 | 70.39% |

**\*** Denotes what Plaintiffs (and the affected denomination) think is a miss-assignment to this faith group cluster.

**Bold** = faith group with more that 10 candidates and less than 66.67% recommended rate

06-cv-1696 (RMU)
**Exhibit 21**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

REV. CHARLES E. LARSEN, et al.,           )
                                          )
          v.                              )          Case No. 02CV02005
                                          )
THE UNITED STATES NAVY, et al.            )
_____)

**DECLARATION OF CAPT. JAMES FRANKLIN POE, CHC, USN**

Pursuant to 28 U.S.C. § 1746, I, JAMES FRANKLIN POE, declare as follows:

1.       My name is James Franklin Poe.  I currently live at 735 Poplar Grove Road, Springville, TN 38256.  I have personal knowledge of and am competent to testify on the matters addressed herein.

2.       I retired on 1 November 2006, as a Navy chaplain at the grade of Captain when I reached the statutory retirement age.   I had over 26 years of active duty as a Navy chaplain.

3.       I am endorsed by the Associated Gospel Churches, an association of Evangelical churches whose members adhere to the classic fundamental doctrines of the Christian faith.

4.       From November 2001 to April 2005, I was the Regional Chaplain/Religious Ministries Program Director for the Commander, Naval Region Europe ("CNRE").  I was stationed in Naples, Italy, where I also had Religious Ministry oversight for US NATO forces assigned to the Allied Forces Southern Command (AFSOUTH).

5.       My duties included responsibility for advising my Commander of Navy chaplain issues and chapel activity support within CNRE or impacting it. This included the Naval Support Activity ("NSA") in Naples, Italy, which came under CNRE.

6.       I was very familiar with the chaplains and chapel activities at NSA Naples, as well as

chapel services  at AFSOUTH Headquarters.  Since NSA Naples reported to CNRE, it fell under my area of responsibility.

7.      I have been asked by Mr. Arthur A. Schulcz, Sr., to comment on the Navy's assertion that "it has determined that chaplains in each [faith group] category are generally able to meet the religious needs of personnel with needs encompassed by those categories" on page 37 of the Defendants' opposition to the Plaintiffs' motion for summary judgment in the above cited case and its follow on assertion that non-liturgical chaplains "are generally able to meet the needs of all Non-liturgical personnel", citing a statement by Chaplain Wilder on page 38.

8.      Those statements or assumptions imply that a chaplain within a faith group category can effectively minister to and meet the free exercise needs of all other personnel within that category.  My experience shows that this implication is not always true for liturgical Protestants and it is much less true for the more diverse non-liturgical faith groups.  Liturgical groups like the Missouri Synod Lutherans will not share communion with many other liturgical faith groups.  Many liturgical faith groups possess different requirements for infant baptism and will not baptize infants of parents who do not hold their particular faith distinctions.  For non-liturgical faith groups, the assumption is true only in those cases when there are no basic contradictions in the different faith backgrounds.  For example a Southern Baptist can often minister to other faith groups who hold baptistic beliefs provided there are no other major theological differences.

9.      However, the statement or assumption by CH Wilder is false as a universal or even general rule among non-liturgicals because of the reality of important theological differences between non-liturgical faith groups, differences well known to the Chaplain Corps, even when basic beliefs are shared between faith groups.  Several examples below from my experience in Naples illustrate the falsity of that assumption.

10.     The non-liturgical faith group category is made up of a wide variety of faith groups, many of which hold differing theological positions and beliefs rejected by other faith groups or denominations within the non-liturgical faith group cluster.

11.     These non-liturgical faith group differences include and are often reflected in their worship and ministry styles.  For example, Pentecostal and Charismatic personnel, while believing many basic non-liturgical and Protestant beliefs and doctrines, have unique worship practices and minister and worship in ways that are rejected by other faith groups in the non-liturgical faith group cluster.

12.     Pentecostal and Charismatic worship or ministry needs cannot be met by just any non-liturgical chaplain just like a Protestant chaplain can not meet Roman Catholic needs.  At Naples, I was personally involved in this, and other ministry facts of life.

13.     A Pentecostal/Charismatic congregation brought together and molded into a faith community by Pentecostal Chaplain (LCDR) John Gordy was the largest non-Catholic congregation at NSA Naples.  During CH Gordy's leadership this congregation averaged about 160 congregants at its Sunday service.  Because no chaplain of like faith and practice who could meet this group's free exercise needs was detailed to Naples to relieve Chaplain Gordy, a Chief Petty Officer Lay Leader volunteered to assume the religious leadership responsibilities for this congregation provided it did not interfere with his regular duties.

14.     The second largest Protestant service in Naples was the non-liturgical Contemporary Worship Service lead by Chaplain (LCDR) Joseph Dufour (Evangelical).  This congregation averaged 130 congregants under Chaplain Dufour's leadership. A third non-liturgical Protestant service was held at AFSOUTH under the leadership of Chaplain (LCDR) Armando Torralva (Evangelical) which averaged 50 to 75 congregants. The only other Protestant congregation at

NSA Naples was a small liturgical congregation under the leadership of Chaplain (CDR) Pat Hahn (Lutheran) which averaged less than 10 congregants. This situation illustrates the well known fact that the vast majority of Protestants serving in the Navy are Evangelical or Pentecostal/Charismatic non-liturgicals. Thus, the demand for detailing, especially in religiously isolated overseas locations, is for Evangelical and Pentecostal/Charismatic non-liturgicals.

15.    But instead of detailing chaplains from Evangelical or Pentecostal non-liturgical faith groups to Naples, the Chaplain Corps detailed three chaplains, one each, from the Church of Christ, the Christian Churches and the Cumberland Presbyterian Church. The Church of Christ and Christian Churches are two almost theologically identical churches, except that the Church of Christ denomination (with a small number of adherents compared to other faith groups) does not believe in the use of musical instruments during their worship service; its members sing hymns a cappella. All three of these churches have small numbers of adherents, are not representative of the majority of Protestants, and issue from the same geographical region and historical religious movement.

16.    The Roman Catholic NSA Naples Command Chaplain appeared to be totally unfamiliar with Protestant denominations or beliefs.

A.    He initially placed a liturgical Lutheran Chaplain over the non-liturgical, Evangelical congregation at AFSOUTH when Chaplain Torralva transferred. He did this even though Chaplain Dufour (Evangelical) requested that he be allowed to serve that congregation in addition to his Contemporary Worship Service at the Support Site while he remained in Naples.

B.    But Chaplain Hahn could not adapt to provide for the worship needs of this congregation, which led to restlessness and sharp conflict between the chaplain and the

congregation.

C.      To meet the religious needs of this Evangelical, non-liturgical congregation and to bring peace to the congregation and the NSA Chaplain's Office, I personally assumed the religious ministry duties for this congregation bringing a heavy burden upon myself.  My regular duties required extensive travel throughout Europe for the Regional Command and entailed arduous administrative responsibilities.  Forcing me to work seven days a week, all that I could provide for this worthy congregation was to lead Sunday services.

D.      This situation continued while two chaplains at NSA Naples were virtually without jobs, having no congregations to minister to on Sundays.

17.     The Roman Catholic NSA Naples Command Chaplain also insisted that one non-liturgical could satisfy all other non-liturgical worship needs.  He initially planned to place the "non instrumental" chaplain in charge of the Protestant Contemporary Worship service, the second largest Protestant congregation in Naples, when Chaplain Dufour, who was then leading that service, rotated out of Naples.

18.     The Naples Command Chaplain's  actions required my intervention to convince the NSA Naples Command that this would be a disaster for the Contemporary Worship Service at the Support Site.  A "contemporary worship" service is built around the service's music ministry. This includes effectively integrating musicians (and their instruments) who can play contemporary Christian music into the service, making them an integral and basic part of it.

19.     Placing a chaplain in charge of the Contemporary Service who did not believe in using musical instruments during worship would have effectively killed that service.  This would have been a gross disservice to the members of that congregation, unnecessarily hindering and burdening their free exercise of religion since the isolated nature of NSA Naples and the Italian

culture did not provide many worship options off base for non-liturgicals.

20.    In fact, the Contemporary Worship Service at the NSA Support Site and the Evangelical Worship Service at AFSOUTH were virtually destroyed by this Chaplain Corps' detailing disaster.  After I transferred out, the service at AFSOUTH was eventually closed, suffering a slow death without a dedicated minister to provide essential ministry.  I recently learned that the Contemporary Worship Service at the Support Site, under the leadership of an Evangelical Protestant Command Chaplain who replaced the Roman Catholic Command Chaplain at NSA Naples, was experiencing renewed growth, until he was surprisingly deployed as an Individual Augmentee to the Combined Joint Task Force in Djibouti, Africa.

21.    A like adverse detailing situation existed at NAS Rota, Spain.  The two largest congregations in Rota were a Pentecostal/Charismatic service and a service which would be described as Evangelical, non-liturgical.  Instead of detailing a Pentecostal/Charismatic chaplain and an Evangelical non-liturgical chaplain to meet the ministry needs of those two large congregations, two liturgical, non-Evangelical chaplains (both United Methodist) were detailed in their place.

22.     These examples illustrate the failure of the Chaplain Corps leadership to appreciate or address the fundamental differences in beliefs and traditions within the non-liturgical faith group cluster and the fallacy of the "one non-liturgical chaplain fits all" mentality.

23.    They also illustrate an underlying indifference, if not hostility, to the free exercise needs of non-liturgical faith groups, especially those considered Evangelical.

24.    In Naples, I often commented that the failure of the Chaplain Corps leadership to adequately recognize non-liturgical free exercise needs resulted in chaplains sitting around with nothing to do because the chaplains' worship capabilities and backgrounds did not match the

Naples Chapel community free exercise needs.  During one period, there were three chaplains serving in the shrinking Contemporary Worship Service at the Support Site while a part time, non-chaplain, Lay Leader ministered in the largest Protestant worship service in Naples.

25.    These failures to recognize or meet the identified free exercise needs at Naples were not accidents or mere slip ups.  As part of my CNRE Regional Chaplain/Religious Ministries Program Director responsibilities, I made numerous efforts to ensure that a Pentecostal or Charismatic chaplain was detailed to replace Chaplain Gordy when he left Naples.  I also made numerous appeals to detail Evangelical non-liturgical chaplains to provide for the ministry needs of the large Evangelical non-liturgical Congregations at the Support Site and at AFSOUTH.

26.    This included a personal visit with the Chaplain Corps detailer at Millington, TN while I was on leave in the States.  The detailer at that time was liturgical chaplain CAPT Alan Baker, now the Deputy Chief of Chaplains/Chaplain of the Marine Corps.  I endeavored to make sure he understood the necessity for a Pentecostal or Charismatic chaplain replacement for CH Gordy and for Evangelical non-liturgical chaplains to replace Chaplains Torralva and Dufour because of those congregations' impact and importance in the Naples Chapel Community.

27.    Unfortunately, my pleas and efforts with the Chaplain Corps leadership to make sure that these congregations' free exercise needs were met fell on deaf ears, and CH Gordy left Naples with no Pentecostal or Charismatic replacement, even as Chaplains Torralva and Dufour left with no like faith group replacements.

28.    These are not the only examples of Navy Chaplain Corps indifference to the free exercise needs of its non-liturgical personnel, but they clearly illustrate the false assumption I was asked to address, specifically "whether a non-liturgical chaplain can effectively minister to and meet the free exercise needs of all other non-liturgical personnel."

29.     Having put much effort into trying to obtain the right chaplain faith group mix at Naples

and Rota without success, I believe the failure to provide the necessary chaplain resources at

those overseas, religiously isolated bases to match the free exercise needs of its non-liturgical

personnel was not an accident but a symptom of an underlying bias against non-liturgicals.

I make this declaration under the penalty of perjury, it is true and accurate to the best of

my ability, and it represents the testimony I would give if called upon to testify in a court of law.


Dated: February 22, 2007                    /S/ James Franklin Poe_____
                                            JAMES FRANKLIN POE