**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| IN RE: | : | |
| NAVY CHAPLAINCY | : | |
| | : | Misc. Action No. 07mc269 (RMU) |
| | : | |
| _____ | : | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' RULE 54(b)
MOTION TO ALTER OR AMEND THE COURT'S 2002
INTERLOCUTORY DECISION**

Dated: August 29, 2008

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

VINCENT M. GARVEY
Deputy Branch Director

_____/S/_____

Of Counsel:
Lieutenant Katherine Pasieta
Office of the Judge Advocate General
Department of the Navy
Washington Navy Yard, Bldg. 33
1322 Patterson Ave., S.E., Suite 3000
Washington, D.C.  30274-5066

MICHAEL HYDE
CHRISTOPHER HALL
DANIEL BENSING
Trial Attorneys
Federal Programs Branch, Civil Division
U.S. Department of Justice
P.O. Box 883
20 Massachusetts Ave., N.W., Room 7132
Washington, D.C. 20044
Telephone: (202) 514-2205
Attorneys for Defendants

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

RELEVANT BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.    PLAINTIFFS' REQUESTS FOR RECONSIDERATION AND ENTRY
      OF FINAL JUDGMENT ARE IMPROPER BECAUSE PLAINTIFFS
      ONCE AGAIN RAISE CLAIMS NOT ALLEGED IN THEIR COMPLAINT... . . . . . . . . . . . . . . . . . 4

II.   PLAINTIFFS' MOTION FOR RECONSIDERATION IS MERITLESS.. . . . . . . . . . . . . . . . . . . . . 7

      A.    Plaintiffs' Arguments and Submitted Material Are
            Duplicative of the Allegations in the Dismissed Claims
            and Therefore Immaterial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      B.    Defendants Concealed Nothing.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      C.    The Court Properly Dismissed Plaintiffs Claims and
            Should Reject Plaintiffs New Facial Challenges.. . . . . . . . . . . . . . . . . . . . . . . 15

            1.    Plaintiffs Lack Standing to Challenge the
                  Faith Group Membership of Selection Boards or of
                  Officers Who Review Chaplain Performance... . . . . . . . . . . . . . . . . . 15

            2.    Plaintiffs' Claims Lack Merit as a Matter of Law.. . . . . . . . . . . . . . . . 18

III.  THE COURT SHOULD DENY PLAINTIFFS' REQUEST FOR ENTRY
      OF FINAL JUDGMENT... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      A.    The Court Has Already Denied Plaintiffs' Motion for
            Entry of Final Judgment.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      B.    The Court Should Refuse Plaintiffs' Request for Entry of
            Final Judgment because There Is Substantial Overlap
            between the Dismissed Claims and Remaining Claims.. . . . . . . . . . . . . . . . . . . 25

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

# TABLE OF AUTHORITIES

FEDERAL CASES

Adair v. England,
    183 F. Supp.2d 31 (D.D.C. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Adair v. England,
    209 F.R.D. 1 (D.D.C. 2002).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Adair v. England,
    217 F. Supp.2d 1 (D.D.C. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Adair v. England,
    217 F. Supp.2d 7 (D.D.C. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Adair v. England, 417 F. Supp.2d 1 (D.D.C. 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Agostini v. Felton,
    521 U.S. 203 (1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Atchinson v. District of Columbia,
    73 F.3d 418 (D.C. Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet,
    512 U.S. 687 (1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Bell Atlantic Corp. v. Twombly,
    127 S. Ct. 1955, 1965 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Building Indus. Ass'n of Superior Californai v. Babbit,
    161 F.3d 740 (D.C. Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 26

Burlington Ins. Co. v. Okie Dokie, Inc.,
    439 F. Supp.2d 124 (D.D.C. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

CFGC v. England,
    221 F.R.D. 255 (D.D.C. 2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Cobell v. Norton, 224 F.R.D. 266 (D.D.C. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Cooper v. First Gov't Mortgage and Investors Corp.,
    216 F.R.D. 126 (D.D.C. 2002).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Curtiss-Wright Corp. v. General Electric Co.,
    446 U.S. 1 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Garvey v. District of Columbia,
    949 F. Supp. 878 (D.D.C. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Graves v. United States,
    967 F. Supp. 572 (D.D.C. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Emory v. Sec'y of Navy,
    708 F. Supp. 1335 (D.D.C. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16

Hill v. Henderson,
    195 F.3d 671 (D.C. Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 29

Hishon v. King & Spaulding,
    467 U.S. 69 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

In re England,
    375 F.3d 1169, 1177 (D.C. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

In re Korean Air Lines Disaster of September 1, 1983,
    156 F.R.D. 18, 22 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

In re Navy Chaplaincy,
    512 F. Supp.2d 58 (D.D.C. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

International Ctr. for Tech. Assessment v. Leavitt,
    468 F. Supp.2d 200 (D.D.C. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Johnson v. Mukasey,
    248 F.R.D. 347 (D.D.C. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Judicial Watch v. Dep't of Army, 466 F. Supp.2d 112 (D.D.C. 2006). . . . . . . . . . . . . . . passim

Key Airlines, Inc. v. National Mediation Bd.,
    745 F. Supp. 749 (D.D.C. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Larkin v. Grendel's Den,
    459 U.S. 116 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

Larsen v. Navy,
    486 F. Supp.2d 11 (D.D.C. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Lyons v. Jefferson Bank & Trust,
    994 F.2d 716 (10th Cir. 1993)............................................. 10

McDaniel v. Paty,
    435 U.S. 618 (1978)..................................................... 17

Mier v. Owens,
    57 F.3d 747 (9th Cir. 1995).............................................. 12

National Trust for Historic Preservation v. Dep't of State,
    834 F. Supp. 453 (D.D.C. 1993). ...................................... 4, 7, 25

Northeastern Fla. Chapter, Assoc. Gen. Contractors of Am. v. Jacksonville,
    508 U.S. 656 (1993)................................................... 15-16

Reed v. Islamic Rep. of Iran,
    242 F.R.D. 125 (D.D.C. 2007)............................................. 3

Saunders v. White,
    191 F. Supp.2d 95 (D.D.C. 2002). ....................................... 17

Sirmans v. Caldera,
    138 F. Supp.2d 14 (D.D.C. 2001). ..................................... 16-17

Ward v. Caldera,
    138 F. Supp.2d 1 (D.D.C. 2001). ....................................... 16, 17

W.C. & A.N. Miller Cos. v. United States,
    173 F.R.D. 1 (D.D.C. 1997)............................................... 11

Williams v. Poulos, 11 F.3d 271 (1st Cir. 1993). ................................ 5

OTHER CITATIONS

Fed. R. Civ. P. 12............................................................ 9

Fed. R. Civ. P. 54....................................................... passim

10 U.S.C. § 612.......................................................... passim

10 U.S.C. § 613............................................................ 13

10 U.S.C. § 5150........................................................... 18

10 U.S.C. § 5945. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Navy Regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**INTRODUCTION**

In what is a seemingly unending quest to litigate claims dismissed over six years ago rather than the merits of the claims still pending, plaintiffs move once again to reconsider this Court's dismissal in January 2002 of two claims in <u>Adair</u> and, in the alternative, move once again to have that dismissal certified as a final judgment eligible for immediate appeal. Plaintiffs' current motion fails for the same reasons their prior motions have failed.  Indeed, their failure to raise any new arguments not already rejected by the Court is reason enough to deny their motion.

First, plaintiffs improperly seek reconsideration and final judgment on claims they do not allege.  Plaintiffs now seek to assert facial challenges to 10 U.S.C. § 612(a)(2)(A), which requires that at least one officer from the category under consideration, in this case chaplains, serve on Navy selection boards and to the use of chaplains to review the work performance of other chaplains.  These claims are not pled in <u>Adair</u> as plaintiffs now reinterpret them.  It is improper for plaintiffs to seek reinstatement of or final judgment on claims that are not pled in their complaint.

Second, plaintiffs cite pages and pages of "evidence" in an odd attempt to prove the allegations contained in their dismissed claims.  This "new evidence" is entirely immaterial and irrelevant to whether the Court correctly dismissed plaintiffs' claims as a matter of law.  As was the case when plaintiffs opposed defendants' motion to dismiss and later moved for reconsideration, the Court assumed all of the factual allegations cited in the dismissed claims to be true; there was and is no need for plaintiffs to prove them.  The Court's dismissal was based not on a lack of proof, but on its decision that, even if plaintiffs proved all of their factual

allegations to be true, they are not entitled to the remedies they sought as a matter of law.

Third, the legal theory underlying plaintiffs' dismissed claims remains flawed. As the Court held, chaplains are naval officers, appointed by the President and confirmed by the Senate. Plaintiffs' conjecture that chaplains are unable to avoid the temptation to discriminate is legally incorrect and largely based on assumptions that offend our society's notions of religious freedom and equal protection.

Finally, the Court should again deny plaintiffs' motion to enter final judgment on the dismissed claims. Plaintiffs present no new arguments to support this second motion and fail to demonstrate any fault in the Court's previous decision

## RELEVANT BACKGROUND

This case consolidates three pending cases: <u>CFGC v. Winter</u>, No. 99-2945 (RMU), <u>Adair v. Winter</u>, No. 00-566 (RMU), and <u>Gibson v. United States Navy</u>, No. 06-1696 (RMU). <u>See</u> Order dated June 18, 2007 [<u>In re Navy Chaplaincy</u> docket no. 1] (consolidating cases). Plaintiffs in these actions are non-liturgical Protestant chaplains who allege that the Navy illegally and systemically discriminates against non-liturgical Protestant chaplains in favor of liturgical Protestant and Roman Catholic chaplains in promotions, retention, and accessions. Plaintiffs also allege that non-liturgical Protestant chaplains have been discriminated against through the Navy's alleged favoring of a "general Protestant service" and by its alleged restriction of non-liturgical forms of religious services.

The following procedural history is relevant to this motion. On January 10, 2002, the Court issued an opinion on defendants' motion to dismiss. Mem. Op. [<u>CFGC</u> docket no. 62], published at <u>Adair v. England</u>, 183 F. Supp.2d 31 (D.D.C. 2002) (Urbina, J.) ("<u>Adair I</u>"). The

Court partially granted the motion, dismissing plaintiffs' challenge to the Navy's use of more than one chaplain on Chaplain Corps promotion selection boards and to the use of chaplains to rate other chaplains on fitness reports utilized by those selection boards.  Id. at 60-62.

On January 28, 2002, plaintiffs moved for reconsideration of the partial dismissal, asking the Court to reinstate their claims against chaplains serving on promotion selection boards and rating other chaplains, and took the novel approach of moving for summary judgment on the dismissed claims [CFGC docket no. 68] ("Pls.' 2002 Mot. Reconsider").  The Court denied that motion on August 5, 2002.  Mem. Op. [CFGC docket no. 116], published at Adair v. England, 209 F.R.D. 1 (D.D.C. 2002) (Urbina, J.) ("Adair II").

On November 21, 2003, plaintiffs filed a motion under Federal Rule of Civil Procedure 54(b) for certification of the Adair I partial dismissal as a final judgment [CFGC docket no. 174] ("Pls.' 2003 Mot. Jmt.").  The Court denied that motion on May 6, 2004.  See Mem. Op. [CFGC docket no. 180], published at CFGC v. England, 221 F.R.D. 255 (D.D.C. 2004) (Urbina, J.).

## ARGUMENT

The overall theme of plaintiffs' motion is that the Court was mistaken in its prior decisions to dismiss two of their claims, to deny reconsideration of that dismissal, and to deny entry of final judgment on those claims.  Thus, plaintiffs reason, the Court should reconsider its dismissal or its refusal to enter final judgment on the dismissed claims.  Though they claim to raise new "evidence" in their latest motion, nothing plaintiffs now argue is substantively different than the arguments already rejected by the Court.  Where a party merely raises the same arguments made before and challenges only the Court's reasoning, a motion to reconsider is improper.  See Reed v. Islamic Rep. of Iran, 242 F.R.D. 125, 129 (D.D.C. 2007) (Urbina, J.)

3

(Rule 54(b) motion to reconsider "'not simply an opportunity to reargue facts and theories upon which a court has already ruled'" (quoting Black v. Tomlinson, 255 F.R.D. 532, 533 (D.D.C. 2006)); Judicial Watch v. Dep't of Army, 466 F. Supp.2d 112, 123 (D.D.C. 2006) (Rule 54(b) motion to reconsider proper if Court "has made an error not of reasoning, but of apprehension"); see also National Trust for Historic Preservation v. Dep't of State, 834 F. Supp. 453, 455 (D.D.C. 1993), aff'd in part, rev'd in part on other grounds, Sheridan Kalorama Historical Ass'n v. Christopher, 49 F.3d 750 (D.C. Cir. 1995) ("Reconsideration is not appropriate where a party is simply attempting to reargue factual or legal assertions contained in their original pleadings."). For this reason alone, and as more fully detailed below, the Court should deny plaintiffs' latest motion.

I.   **PLAINTIFFS' REQUESTS FOR RECONSIDERATION AND ENTRY OF FINAL JUDGMENT ARE IMPROPER BECAUSE PLAINTIFFS ONCE AGAIN RAISE CLAIMS NOT ALLEGED IN THEIR COMPLAINT.**

At a minimum, for a decision to be reconsidered or a judgment to be final, they must first be decided, and plaintiffs' new claims that 10 U.S.C. § 612(a)(2)(A) unconstitutionally requires at least one chaplain to serve on a selection board and that chaplains may never review the performance of other chaplains were never alleged, let alone decided.  Plaintiffs argue that the Court's reasoning renders the differences between the dismissed claims and the claims they now assert irrelevant.  On the contrary, the distinction is critical, is sufficient by itself to require denial of their motion, and in fact demonstrates that their motion is entirely unnecessary.

First, at no point in the Adair Complaint do plaintiffs request the relief they now seek in their motion.  As to promotion board membership, the Adair Complaint does not seek an injunction against any and all chaplains serving as members of promotion boards, but only

against service of more than one chaplain on a promotion board.  See Adair Third Am. Compl. [Adair docket no. 93] at 56, 61 (seeking declaratory and injunctive relief against use of "more than one chaplain" on selection boards).  Similarly, the Adair Complaint does not challenge every use of chaplains in chaplain performance review, but alleges that the Constitution would permit chaplains to review the performance of other chaplains in certain circumstances.  See id. at 51 (seeking order restricting chaplains from rating other chaplains unless such review is "based on operational necessity" and utilizes "safeguards" against discrimination).

As they have done before, plaintiffs may argue that they have changed the scope of their claims by rephrasing it in briefing.  Such an argument is meritless.  When a court decides a motion to reconsider, it is limited to the claims in the complaint.  See Key Airlines, Inc. v. National Mediation Bd., 745 F. Supp. 749, 751-52 (D.D.C. 1990) (motion to reconsider "not proper since the [dismissed] initial complaint did not include the instant claims"); Williams v. Poulos, 11 F.3d 271, 289 (1st Cir. 1993) (same) cf. Graves v. United States, 967 F. Supp. 572, 573 (D.D.C. 1997) (motion for reconsideration not proper vehicle for bringing new theories and argument not advanced earlier).  Further, plaintiffs cite no support for the proposition that a Court may enter a final judgment on claims that are not included in a complaint based solely on subsequent arguments in plaintiffs' briefs.  Cf. CFGC, 221 F.R.D. at 258 n.5 (in deciding motion for entry of final judgment, court interprets plaintiffs' claims as stated in complaint, not as reinterpreted in briefing).

Second, whether the Navy's specific policies and procedures violate federal law or the Constitution will be decided when the Court resolves the merits of plaintiffs' remaining claims.  Plaintiffs' remaining claims challenge, inter alia, the alleged use of religious quotas by

promotion selection boards, religious bias in the assignment of chaplains to serve as board members, and the use of forbidden criteria by chaplains reviewing other chaplains performance. The Court specifically held that if plaintiffs prove that the Navy "*in fact* acts to infringe religious liberty in an unconstitutional manner," it will find they are entitled to relief. See Adair I, 183 F. Supp.2d at 60-61 (internal quotation marks and citation omitted, emphasis in original). The Court's ruling, then, does not preclude plaintiffs from obtaining relief if, in fact, they prove they are the victims of discrimination.

Plaintiffs also argue that similar claims are alleged in Gibson, implying that granting the current motion would speed resolution of Gibson. See, e.g., Pls.' Mem. at 4-5. Regardless, this is not justification for reconsideration or entry of judgment in Adair. If plaintiffs' arguments are correct and dispositive in Gibson, the Court will have the opportunity to so rule when it addresses Gibson. Moreover, as with Adair, Gibson does not state facial challenges to either of the practices contained in plaintiffs' motion. As to selection board membership, the Gibson Amended Complaint does not seek a prohibition against chaplains serving on boards in all instances, but challenges the alleged lack of guarantees against discrimination by selection board members and seeks an injunction against service of chaplains as board members "unless the number of non-chaplain board members is large (greater than 16), votes are not secret, and there is accountability to ensure votes are based on neutral, secular, and non-ideological criteria." See, e.g., Gibson Am. Compl. [In re Navy Chaplaincy docket no. 22] at 136. Likewise, as to chaplain performance reviews, the Gibson Amended Complaint recognizes exceptions when chaplains should be permitted to rate other chaplains. See, e.g., Gibson Am. Compl. Count 7. A ruling on the instant motion or the claims as plaintiffs recharacterize them will not resolve the claims in

Gibson. See Adair I, 183 F. Supp.2d at 60-61 (First Amendment violated if government officer "*in fact* acts to infringe religious liberty in an unconstitutional manner" (internal quotation marks and citation omitted, emphasis in original)).

## II.    PLAINTIFFS' MOTION FOR RECONSIDERATION IS MERITLESS.

Federal Rule of Civil Procedure 54 permits a court to revise its interlocutory orders "at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."  Fed. R. Civ. P. 54(b); see also Judicial Watch, 466 F. Supp.2d at 123; Burlington Ins. Co. v. Okie Dokie, Inc., 439 F. Supp.2d 124, 131 (D.D.C. 2006); Cobell v. Norton, 224 F.R.D. 266, 272-72 (D.D.C. 2004).  However, the Court may reconsider prior orders only "as justice requires."  Judicial Watch, 466 F. Supp.2d at 123.  Under this standard, whether justice requires reconsideration involves consideration of "whether the court 'has patently misunderstood a party, has made a decision outside the adversarial issues presented to the [c]ourt by the parties, has made an error not of reasoning, but of apprehension, or where a controlling or significant change in the law or facts [has occurred] since submission of the issue to the court.'" Id. (quoting Cobell, 224 F.R.D. at 272); see also Burlington Ins., 439 F. Supp.2d at 131-32.  This standard "amounts to determining 'whether reconsideration is necessary under the relevant circumstances.'" Judicial Watch, 466 F. Supp.2d at 123 (quoting Singh v. George Wash. Univ., 393 F. Supp.2d 99, 101 (D.D.C. 2005)).  "Reconsideration is not appropriate where a party is simply attempting to reargue factual or legal assertions contained in their original pleadings." National Trust for Historic Preservation, 834 F. Supp. at 455; see also Judicial Watch, 466 F. Supp.2d at 123 (Rule 54(b) motion for reconsideration appropriate where court has made error of apprehension, "not of reasoning").  Even if the Court could somehow reinstate the claims as

plaintiffs now reinterpret them, plaintiffs have once again failed to demonstrate that their allegations state a proper claim upon which relief can be granted.

A.    **Plaintiffs' Arguments and Submitted Material Are Duplicative of the Allegations in the Dismissed Claims and Therefore Immaterial.**

It is well established that in deciding a motion to dismiss for failure to state a claim, the court accepts the plaintiffs' allegations as true, and decides whether those alleged facts support the granting of relief under plaintiffs' theory of recovery.  See Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007); Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984); Atchinson v. District of Columbia, 73 F.3d 418, 421 (D.C. Cir. 1996).  The Court recognized and followed this standard in deciding defendants' motion to dismiss.  See Adair I, 183 F. Supp.2d at 46.

Plaintiffs once again submit pages and pages of material and cite numerous statutes, military regulations, and treaties in an attempt to prove that chaplains are denominational "representatives" whose primary function is to represent their faith group and that the law somehow requires they do so when serving on promotion boards or in reviewing the performance of other chaplains.  Thus, they argue, they have proven that their claims are valid as a matter of law and that the assignment of such duties to chaplains improperly delegates government authority to religious representatives.

Plaintiffs present nothing the Court has not considered before.  See Judicial Watch, 466 F. Supp.2d at 123 (Rule 54(b) motion for reconsideration appropriate where court has made error of apprehension, "not of reasoning").  The allegations plaintiffs again attempt to prove were and are contained in the Adair Complaint.  For example, the Adair Third Amended Complaint alleges that board members consciously or unconsciously exercise faith group bias by advancing

the interests of their own faith group or penalizing those of other faith groups.  See <u>Adair</u> Third Am. Compl. ¶ 50(b).  Further, the Complaint alleges that the Navy has unconstitutionally delegated government functions to religious bodies, see <u>id.</u> ¶ 50(c).  This, they allege, creates an opportunity for religious bias in selecting chaplains for promotion, see <u>id.</u> ¶ 50(e), which violates federal statutes and military regulations governing the selection of the best- qualified candidates for promotion.  See <u>id.</u> ¶ 50(g).  Further, the <u>Adair</u> Complaint alleges "evidence" that plaintiffs claim proves religious discrimination has occurred in promotion decisions.  See, e.g., <u>id.</u> ¶¶ 52-58.  Plaintiffs also make similar allegations regarding the use of chaplains to review the performance of other chaplains.  See <u>id.</u> ¶¶ 72-73.  All of the material plaintiffs now submit is intended to prove these allegations.  Compare, e.g., Pls.' Mem. at 15 (arguing that submitted evidence shows "chaplains are unique" and "act like denominational representatives" when given power to award or deny government benefits for other chaplains).

Once again, plaintiffs' presentation of this "evidence" demonstrates a complete misunderstanding of the basis for a grant of dismissal under Rule 12(b)(6).  As the Court previously recognized, all of this material is irrelevant in determining the propriety of the Court's dismissal, even if some of it were new, because the Court already found that such material does not differ from the factual allegations in the <u>Adair</u> Complaint.  See <u>Adair II</u>, 209 F.R.D. at 4.  The Court did not, and need not now, evaluate extrinsic evidence in ruling on the motion to dismiss, and, accordingly, plaintiffs did not need to submit any evidence to prove their allegations.  Instead, the Court reviewed plaintiffs' allegations in the light most favorable to plaintiffs and ruled that even if plaintiffs proved their allegations, they failed to state a claim for relief as a matter of law.

Moreover, plaintiffs' submission of evidence now cannot support their current motion for reconsideration.  Even if new evidence could be considered, there is nothing new about the "evidence" plaintiffs now submit.  Because plaintiffs' putative evidence is entirely duplicative of the evidence, allegations, and arguments plaintiffs have made all along, it is insufficient to support a motion for reconsideration.  See International Ctr. for Tech. Assessment v. Leavitt, 468 F. Supp.2d 200, 206-07 (D.D.C. 2007) (new evidence submitted in support of motion for reconsideration "must not be merely cumulative" (quoting Lans v. Gateway 2000, Inc., 110 F. Supp.2d 1, 4 (D.D.C. 2000)); In re Korean Air Lines Disaster of September 1, 1983, 156 F.R.D. 18, 22 (1994); cf. Lyons v. Jefferson Bank & Trust, 994 F.2d 716, 728 (10th Cir. 1993) (party that failed to present available evidence "may not find refuge under Rule 60(b)(2) by finding substantially similar evidence from a newly discovered source").

**B.  Defendants Concealed Nothing.**

Plaintiffs also continue to argue that the Navy has concealed and ignored plaintiffs' evidence and arguments, thereby misleading the Court.  At the outset, plaintiffs' argument is absurd – plaintiffs raise almost the identical information and arguments they have raised since these cases began.[1]  That the defendants and the Court have yet to accept them does not mean that the defendants are somehow concealing or ignoring them.  Cf. Judicial Watch, 466 F. Supp.2d at 123 (Rule 54(b) motion for reconsideration appropriate where court has made error of apprehension, "not of reasoning").

---

[1]  To the extent they are not exactly the same, they are substantively the same as the allegations in plaintiffs' Complaint and their prior arguments that chaplains are faith group representatives who, without fail, will discriminate on the basis of religious belief.  See, supra, Part II.A.

Further, as before, much of the information plaintiffs cite was available to them prior to the Court's first consideration of defendants' motion to dismiss. Plaintiffs continue to rely on publicly-available military regulations, treaties, and historical events to support their argument. As has been the case all along, information that was available to plaintiffs at the time a decision was rendered cannot be used to justify a subsequent motion to reconsider. Cf. W.C. & A.N. Miller Cos. v. United States, 173 F.R.D. 1, 3 (D.D.C. 1997) (Rule 59(e) motion for reconsideration not "means to bring before the Court theories or arguments that could have been advanced earlier"); Garvey v. District of Columbia, 949 F. Supp. 878, 879 (D.D.C. 1996) (same).

Plaintiffs also argue that the Navy has somehow admitted that religious viewpoint is relevant in determining which chaplains should be assigned to selection boards, and that such admission justifies a finding that no chaplain should ever be assigned to serve as a member of a promotion selection board or to review the performance of other chaplains. Here, plaintiffs cite defendants' arguments in opposition to their 2006 Motion for Declaratory Judgment [CFGC docket no. 211] challenging the Navy's past practice of attempting to assign chaplains from each of the faith group categories as selection board members. See Pls.' Mem. at 31-32.

Defendants have repeatedly shown that this practice was not based on any determination that religious belief should be a criterion in deciding whether to promote a chaplain. See generally Defs.' Opp. Mot. Decl. J. [CFGC docket no. 223] at 24-28, 36-43; Defs.' Reply Mot. Decl. J. [CFGC docket no. 231] at 2-9. Instead, the practice focused on how chaplains were managed, not religious viewpoint, and was intended to ensure that board members would have sufficient knowledge of how chaplains are managed and utilized in the Navy. Board members

would therefore be better able to review chaplain performance, regardless of the chaplains' specific religious views.  See Mier v. Owens, 57 F.3d 747, 751 (9th Cir. 1995) ("Decisions regarding who is promoted and why are central to maintenance of the military's hierarchy."); Emory v. Sec'y of Navy, 708 F. Supp. 1335, 1339 (D.D.C. 1989) (staff corps promotion boards traditionally composed of officers who are members of same staff corps because "[t]hose in the same profession are more qualified to evaluate others in their profession").

Utilization of faith group categories to manage chaplains leads to differences in the manner in which chaplains from each faith group category are managed, utilized, and deployed, irrespective of the differences between respective chaplains' religious views.  See Decl. of Rear Admiral Barry Black (originally filed as Defs.' Cross-Mo. for Partial Summ. Jmt. [CFGC docket nos. 87, 91] Ex. 1, copy attached hereto as Ex. 1) at ¶¶ 3-10; Decl. of Capt. Stephen B. Rock (originally filed as Defs.' Opp. Mot. Decl. J. [CFGC docket no. 223] Ex. 5, copy attached hereto as Ex. 2) ("Rock Decl") at  ¶¶ 13-15; First Supplemental Decl. of Capt. Stephen B. Rock (originally filed as Defs.' Reply Mot Decl. J. [CFGC docket no. 231] Ex. B, copy attached hereto as Ex. 3) ("Rock Supp. Decl.") at ¶¶ 3-4.  The Navy may reasonably expect that differences in the management and utilization of chaplains within each faith group category, deployment patterns, and other management issues, just as differences in geographic assignments, land or sea based assignments, or in assignments to different branches in the Navy, see Rock Decl. ¶¶ 6, 8, 13-15; Rock Supp. Decl. ¶¶ 3-4, may be reflected in fitness reports.  Chaplain knowledge of how each faith group category is utilized, managed, and deployed by the Navy could thus be useful to a selection board in determining whether to promote or retire a chaplain.  By focusing on the broad inclusion of chaplains from each faith group category, where possible, the Navy generally

12

assigned to each board at least one member who could be expected to understand the manner in which each faith group category was logistically managed and how differences in utilization, administration, and deployment  may inform  board evaluations of chaplain fitness reports. Rock Supp. Decl. ¶¶ 3-4.

This does not mean that the Navy expected chaplains to make value judgments on chaplains' religious views.  Indeed, contrary to plaintiffs' assumption, Congress and the Navy prohibit the consideration of the merits of the religious belief of any chaplain.  See Agostini v. Felton, 521 U.S. 203, 235 (1997) (finding program that "carefully constrained program . . . cannot reasonably be viewed as an endorsement of religion").  Chaplains become naval officers only after they are shown to "be of good moral character and of unquestioned loyalty to the United States."  SECNAVINST 1120.4A (originally filed as Defs.' Opp. Mot Decl. J. [CFGC docket no. 223] Ex. 19, copy attached as Ex. 6) at ¶ 6.  Chaplains serve on selection boards as naval officers, not denominational representatives.  See Adair I, 183 F. Supp.2d at 62.  Selection boards include line officers, who even plaintiff does not presume would make decisions based upon religious bigotry.  Further, the Secretary provides specific instructions regarding the criteria that may be used, see, e.g., Precept Convening the FY-95 Selection Board ("FY-95 CHC Cdr. SER Bd. Precept") (originally filed as Defs.' Opp. Mot. Decl. J. [CFGC docket no. 223] Ex. 20, copy attached as 4), and does so "in a context in which commands are expected to be obeyed" (i.e., the military).  Cf. In re England, 375 F.3d 1169, 1177 (D.C. Cir. 2004).  Selection board officers are required by Congress and the Navy to swear that they will carry out their duties on selection boards "without prejudice or partiality."  10 U.S.C. § 613; see, e.g., FY-95 CHC Cdr. SER Bd. Precept at Encl. 2 ¶¶ 1, 10.  Selection board members must swear that they

complied with their obligations, were not subject to or aware of coercion or improper influence, and that their recommendations were in the best interest of the Navy. See, e.g., FY-95 CHC Cdr. SER Bd. Precept at Encl. 2 ¶10(f); Report of FY-95 Chaplain Corps Commander SER Board (originally filed as Defs.' Opp. Mot. Decl. J. [CFGC docket no. 223] Ex. 21, copy attached as Ex. 5). Members are under an order to seek permission to report any perceived misconduct, such as recommendations made for religious purposes. See, e.g., FY-95 CHC Cdr. SER Bd. Precept at Encl. 2 ¶ 10(f). Further, the Navy and Department of Defense may investigate any misconduct and grant relief from any inappropriate board recommendations. See, e.g., Pls.' Exs. 28-29. Plaintiffs also argue that the faith group categories themselves are based upon a judgment of the relative worth of particular religious viewpoints, and thus demonstrate that chaplains will discriminate when serving as promotion board members or in reviewing other chaplains' performance. See, e.g., Pls.' Mem. at 32. But, as defendants' have previously shown, see Defs.' Opp. Mot. Decl. J. [CFGC docket no. 223] at 4-5, 34-35, 37-38, the faith group categories are used to manage chaplains so that they may be broadly deployed within the military structure of the Navy, based upon the ability of chaplains to carry out their mission – providing for the religious needs of military personnel within the unique structure of the military. See Larsen v. Navy, 486 F. Supp.2d 11, 35 (D.D.C. 2007) (Urbina, J.) (accepting Navy's rationale for management of Chaplain Corps by faith group categories). Indeed, this distinction was discussed and reported to Congress in 1987 by the Department of Defense, see DOD Study (originally filed as Defs.' Opp. Mot. Decl. J. [CFGC docket no. 223] Ex. 18, copy of relevant pages attached hereto as Ex. 7) at I-4 to I-5 (noting deployment of chaplains from different faith group categories); cf. id. at I-4 ("Out of [military's] history and tradition [of meeting free

exercise needs] has evolved an expertise for efficiently and effectively deploying chaplains throughout the world.").[2]  This practice has nothing to do with measuring the relative merit of chaplains' religious beliefs.

Finally, even assuming, arguendo, that the Navy did assign chaplains so that religious considerations could be introduced to promotion decisions and reviews of performance, such a practice would not support plaintiffs' facial challenges to chaplains serving on boards or as reviewers of chaplain performance in all instances.  Again, the Court will have the opportunity to decide whether such policies "in fact" existed and discriminated against plaintiffs when it decides the merits of this claim.

**C.**     **The Court Properly Dismissed Plaintiffs Claims and Should Reject Plaintiffs New Facial Challenges.**

1.     *Plaintiffs Lack Standing to Challenge the Faith Group Membership of Selection Boards or of Officers Who Review Chaplain Performance.*

To establish standing, a plaintiff must show (1) an "injury in fact," which means the invasion of a legally protected interest that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," (2) a causal relationship between the injury and the challenged activity, and (3) that a favorable court ruling will redress the injury.  Northeastern

---

[2]  For example, Southern Baptist chaplains are included in the Non-liturgical Protestant faith group category not because of a judgment that they are less important or worthy than Roman Catholic chaplains, but because, as plaintiff Wilder admits, Southern Baptist chaplains can generally meet Non-liturgical Protestant needs.  See Dep. of David Wilder (originally filed as Defs.' Opp. Mot. Decl. J. [CFGC docket no. 223] Ex. 22, copy of relevant pages attached hereto as Ex. 8) at 95:4 – 96:5; see also Rock Decl. ¶ 14.  Thus, the assignment of Non-liturgical Protestant chaplains to the same faith group category is based upon the judgment that chaplains within that faith group category can generally meet the needs of personnel encompassed by that category and can be managed, utilized, and deployed in similar fashion, not on a judgment based on the relative merits of chaplains' religious beliefs.  See Larsen, 486 F. Supp.2d at 35 (accepting Navy's rationale for management of Chaplain Corps by faith group categories).

<u>Fla. Chapter, Assoc. Gen. Contractors of Am. v. Jacksonville</u>, 508 U.S. 656, 663 (1993). Plaintiffs allege that they have suffered an injury solely traceable to the assignment of duties to chaplains as selection board members or to review the performance of other chaplains, relying upon an assumption that chaplains will discriminate against other chaplains if given the chance, regardless of whether chaplains actually do.

These allegations fail to satisfy the first and second prongs of the standing analysis - demonstrating an "injury-in-fact" and a causal relationship between the injury asserted and the challenged conduct.  In its 2002 ruling on defendants' motion to dismiss, the Court recognized that government officials, including military chaplains, are presumed to act properly, in good faith, and to obey the law.  <u>Adair I</u>, 183 F. Supp.2d at 60; <u>see also</u> <u>Emory</u>, 708 F. Supp. at 1343 (strong presumption that selection board members faithfully discharge duties).

This ruling was not contrary to law, but is instead supported by precedent from other courts, including the Supreme Court.  In <u>Ward v. Caldera</u>, 138 F. Supp.2d 1 (D.D.C. 2001), the court dismissed an officer's challenge to an Army policy that defined a selection board's racial and gender make-up because the officer could not prove any substantial likelihood that the policy caused his failure to promote.  <u>Id.</u> at 8.  The <u>Ward</u> Court rejected the officer's claim because the injury alleged would require it to assume, contrary to Supreme Court precedent, that women and minorities "would have an inherent and unavoidable disposition to favor" their own gender and race.  <u>Id.</u>  The court concluded that such a presumption was "diametrically opposed" to Supreme Court holdings that "shunned such racial and gender stereotypes" and that the Supreme Court has never held "a decisionmaker's race or sex, by itself, prevents her from making an objective decision."  <u>Id.</u>; <u>accord</u> <u>Sirmans v. Caldera</u>, 138 F. Supp.2d 14 (D.D.C.

16

2001); <u>Saunders v. White</u>, 191 F. Supp.2d 95 (D.D.C. 2002).  Further, the Court found that the officer lacked standing because there was not a substantial likelihood that he could show the "selection board membership policy caused [his] non-promotion."  <u>Ward</u>, 138 F. Supp.2d at 8.

The Supreme Court applied the same rationale to clergy serving in government positions. In <u>McDaniel v. Paty</u> 435 U.S. 618 (1978), the Supreme Court held that states may not bar clergy from service in state legislatures.  435 U.S. at  628-29.  There, the Court recognized that such a bar is premised on the fear that if ministers were elected to office, "they will necessarily exercise their powers and influence to promote the interests of one sect or thwart the interest of another." <u>See</u> <u>id.</u>  Rejecting this premise, the Court held that the "American experience provides no persuasive support for the fear that clergymen in public office will be less careful of anti-establishment interests or less faithful to their oaths of civil office than their unordained counterparts."  <u>Id.</u> at 629.

Just as in <u>McDaniel</u>, <u>Adair I</u>, and <u>Ward</u>, plaintiffs here presume that chaplains will engage in religious bias based only on their status as clergy.  Such a presumption cannot provide an actionable "in fact" injury under the First Amendment.  Nor could such a presumption of unavoidable bias demonstrate that any injury they suffered resulted from the assignment of chaplains of a particular faith group; rather, there must be a showing that the decision-maker actually discriminated against the specific plaintiff at issue.

Indeed, arguments such as plaintiffs' are offensive and contrary to this nation's commitment to religious freedom and equal protection.  Under plaintiffs' argument, a chaplain with an impeccable record of impartiality would still be prohibited from serving on a promotion selection board or as a reviewer of another chaplain's performance merely because of his

17

religious identity.  Plaintiffs' proposed solution to the discrimination they allege is not to remedy discrimination where it actually occurs and is proven, but to create a new system that discriminates against all chaplains based on their status as religious clergy and their religious beliefs, without regard to their own individual actions.

Finally, plaintiffs will undoubtedly respond with their argument that chaplain selection boards have, in fact, engaged in religious discrimination.  See Pls.' Mem. at 16-31.  Even if true,[3] plaintiffs still do not have standing to bring the facial challenges they raise here.  If plaintiffs in fact prove that they were the victims of discriminatory promotion decisions or performance reviews, such facts would only provide standing to challenge those specific decisions.

2.    *Plaintiffs' Claims Lack Merit as a Matter of Law.*

Plaintiffs present a convoluted and inaccurate argument relying on various historical events, treaties, federal laws, and military regulations to draw their conclusion that chaplains are not the same as other government officers and therefore cannot be delegated responsibility to sit on promotion boards or review the work of other chaplains.  Despite their effort, it is clear that chaplains are officers within the United States Navy.  Chaplains are nominated by the President and confirmed by the Senate.  In addition, various statutes enacted by Congress make clear that chaplains are commissioned Navy officers.  See 10 U.S.C. § 5150 (establishing Chaplain Corps as staff officer corps of Navy and permitting Secretary to assign commissioned officers to Chaplain Corps).

First, nothing plaintiffs cite contradicts Congress's specific requirement that at least one

---

[3]    Defendants dispute plaintiffs' proffered statistical analysis and opinions, and have submitted numerous statistical analyses that show that the alleged systemic discrimination in chaplain promotion and retirement decisions has not occurred.

chaplain serve on a promotion selection board, see 10 U.S.C. § 612(a) ("[A] selection board shall include at least one officer from each competitive category of officers to be considered by the board"). Plaintiffs never reconcile this statute with their position.

Second, nothing plaintiffs cite authorizes chaplains to "represent" a faith group in an attempt to maximize government benefits for that group at the expense of other faith groups. Indeed, quite the contrary is true – Congress and the Navy prohibit the use of religious criteria in evaluating chaplains for promotion. See, infra, Part II.B.

For example, plaintiffs cite many limitations on chaplain duties and authority. See Pls.' Mem. at 7-16. It is true that the duties of chaplains are limited to comport with their mission to provide for the religious exercise of Navy personnel and dependents. That chaplain duties may be limited is nothing extraordinary and does not preclude them from serving as promotion board members or from reviewing other chaplains' performance; other staff corps officers have limitations on duty consistent with their membership in their profession. For example, Navy regulations, chap. 10, sec. 3, article 1063, restricts the duties of chaplains and other staff corps officers: "While assigned to a combat area during a period of armed conflict, members of Medical, Dental, Chaplain, Medical Service, Nurse or Hospital Corps and Dental Technicians shall be detailed or permitted to perform only such duties as are related to medical, dental, or religious service and the administration of medical dental or religious units and establishments."[4]

None of the limitations plaintiffs reference, however, have anything to do with service on promotion boards or review of other chaplains, and certainly none preclude a chaplain from such

---

[4]    The Navy's regulations may be found at the following internet website: http://doni.daps.dla.mil/US%20Navy%20Regulations/Forms/AllItems.aspx.

19

service.  If anything, the existence of specific limitations on the performance of other duties and the lack of any such specific limitation against service on promotion boards or against review of other chaplains' performance supports the conclusion that Congress and the military never intended to impose any such limitations on chaplains.

Plaintiffs also argue that chaplains cannot exercise command.  <u>See</u> Pls.' Mem. at 12. This argument is clearly wrong.  Congress has specifically provided that members of staff corps may exercise command as is appropriate to their corps.  <u>See</u> 10 U.S.C. § 5945.  There is nothing in this statute that precludes its application to chaplains.  Moreover, there is nothing in that statute or the sources plaintiffs cite that precludes chaplains from serving as selection board members or from reviewing other chaplains' performance.  Indeed, whether a chaplain can give orders to other officers is irrelevant, as no such authority is necessary to serve on promotion selection boards or to provide feedback on other officers' performance.

Plaintiffs pile assumption upon assumption to draw the conclusion that, as faith group "representatives," chaplains cannot be assigned the same duties as other officers without violating the First Amendment.  <u>See, e.g.</u>, Pls.' Mem. at 8-11.  Plaintiffs read far too much into the word "representative."  Regardless of whether the military has ever used this word to describe chaplains, plaintiffs do not show that the Navy intends it to have the specific meaning they argue in their motion – "representation" of a faith group's interest in deciding promotions or reviewing chaplains work performance.  Nor do they point to any statutory, regulatory, or informal instruction to chaplains demonstrating any expectation that chaplains will consider religious views in performing their duties.

Instead, in the context of all the material plaintiffs' present, it is clear that the military

20

means only that chaplains are authorized and endorsed by their faith group to exercise clerical duties in accordance with their faith group's beliefs, such as when a chaplain presides over a religious service.  In other words, chaplains can be described as a faith group "representative" only in the sense that they have a faith group's authorization and endorsement to undertake the ministerial duties of clergy from that faith group.  The phrase "representative" is not a term meant to imply that individual chaplains serve as representatives of their faith in making government decisions with authority and duty to promote their faith groups' interests at the expense of those of other faith groups in a manner similar to the way members of a legislative body promote their constituents' interests in voting on proposed legislation.

Plaintiffs also make much of their claim that their purported evidence rebuts the presumption that chaplains, as government officials, act in good faith.  See Pls.' Mem. at 33-35. Again, this is not a new argument, compare Pls.' 2002 Mot. Reconsider at 20, 25-29, and is meritless.  Plaintiffs mistakenly assume that the presumption may be rebutted as to an entire class of government officials as opposed to individuals in specific circumstances.  Whether plaintiffs could ultimately submit evidence proving individual instances of discrimination, that evidence cannot support the speculative prediction that all chaplains will, without fail, discriminate.

Finally, the First Amendment cases cited by plaintiffs do not support plaintiffs' argument that chaplains must be precluded from promotion board membership and from reviewing other chaplains' performance in all instances.  See Pls.' Mem. at 35-37.  Once again, the Court has already rejected plaintiffs' argument here.  See Adair I, 183 F. Supp.2d at 61-62 (distinguishing Larkin v. Grendel's Den, 459 U.S. 116 (1982), from chaplain participation on promotion

boards); see also Judicial Watch, 466 F. Supp.2d at 123 (Rule 54(b) motion for reconsideration appropriate where court has made error of apprehension, "not of reasoning").

The Court's prior conclusion is still correct. In Larkin, the Supreme Court overturned a grant of governmental power to a religious body. 459 U.S. at 118-22. Under the law at issue there, the decision of a church to veto the grant of liquor licenses was left to the governing body of that church. There, the government had no power to limit the rationales any governing body could use. In plaintiffs' cases, the decision-making body is composed of government officers, including line officers, and subject to limitations of and review by the Secretary of the Navy, and in the case of promotions, appointment by the President and consent of the Senate. Likewise, in Grumet, the relevant benefit flowed only to one sect by granting that sect control over its own school district. See Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet, 512 U.S. 687 (1994). In the instant case, the assignment of chaplains to selection boards and to review the performance of other chaplains has a secular purpose of ensuring proper consideration of all officers' records. See Emory, 708 F. Supp. at 1339 (staff corps promotion boards traditionally composed of officers who are members of same staff corps because "[t]hose in the same profession are more qualified to evaluate others in their profession").

## III.    THE COURT SHOULD DENY PLAINTIFFS' REQUEST FOR ENTRY OF FINAL JUDGMENT.

In cases where multiple claims for relief are presented, Rule 54 bars a court from entering "final judgment as to one or more, but fewer than all, claims or parties" unless the court "expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b). Whether to grant a party's request to certify an interlocutory decision as a final judgment is "'vested . . . primarily in the discretion of the District Court as the one most likely to be familiar with the case

and with any justifiable reasons for delay.'" Cooper v. First Gov't Mortgage and Investors Corp., 216 F.R.D. 126, 127 (D.D.C. 2002) (Urbina, J.) (quoting Sears, Roebuck & Co. v. Mackey, 351 U.S. 427, 437 (1956); citing Building Indus. Ass'n of Superior California v. Babbitt, 161 F.3d 740, 743 (D.C. Cir. 1998)); see also Johnson v. Mukasey, 248 F.R.D. 347, 354 (D.D.C. 2008) (Urbina, J.). Before certifying a decision as a final judgment under Rule 54(b), a district court must "insure that it is dealing with a 'final judgment': 'final' in the sense that the decision is an 'ultimate disposition of an individual claim entered in the course of a multiple claims action,' and a '"judgment" in the sense that it is a decision upon a cognizable claim for relief.'" Johnson, 248 F.R.D. at 354 (quoting Bldg. Indus. Assn., 161 F.R.D. at 744); see also Cooper, 216 F.R.D. at 127 (same).

If the district court determines that the decision is a "final judgment" within the meaning of Rule 54(b), the court must then "make 'an express determination that there is no just reason for delay.'" Cooper, 216 F.R.D. at 127 (quoting Fed. R. Civ. P. 54(b); citing Curtiss-Wright Corp. v. General Electric Co., 446 U.S. 1, 8 (1980)). In doing so, however, the district court must exercise its discretion sparingly in light of the "'historic federal policy against piecemeal appeals.'" Curtiss-Wright, 446 U.S. at 8 (quoting Sears, 351 U.S. at 438). This determination requires the district court to consider "'judicial administrative interests as well as the equities involved,'" such as "'whether the claims under review were separable from the others remaining to be adjudicated and whether the nature of the claims already determined was such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals.'" Cooper, 216 F.R.D. at 127 (quoting Babbitt, 161 F.3d at 744 (quoting Curtiss-Wright, 446 U.S. at 8)).

23

The purpose of Rule 54(b) is to economize the judicial resources of the appellate courts:

> [I]f review is deferred, it is less likely that the appellate court will face overlapping issues and circumstances on two occasions, and often the issues involved in the dismissal will be mooted by the outcome on the other counts (such as settlement or recovery by plaintiff of full compensation).

Hill v. Henderson, 195 F.3d 671, 672 (D.C. Cir. 1999). Deferral of appellate review where there is just reason for delay furthers this purpose even if deferral leads to new or duplicative proceedings at the trial court. Id.

### A. The Court Has Already Denied Plaintiffs' Motion for Entry of Final Judgment.

Consistent with what has become a recurring theme in this case, the Court has already considered plaintiffs' motion for entry of final judgment on the dismissed claims and rejected every argument raised by plaintiffs here. In its decision denying plaintiffs' first motion for entry of final judgment, the Court rejected plaintiffs' attempt to redefine the claims in the Adair Complaint. CFGC, 221 F.R.D. at 258 n.5. The Court concluded that its dismissal of the claims actually pled in the Adair Complaint was a final judgment, id. at 259, but found that there was just reason for delay. Id. Specifically, the Court found that the dismissed claims raised issues common to plaintiffs' other promotion claims. Id. Finally, the Court found that whatever interest plaintiffs had in an immediate appeal did not outweigh the standard presumption against piecemeal appeals. Id.

In their current motion, plaintiffs raise nothing new to support their argument that there is no just reason for delay. Plaintiffs again cite the impact of further delay, Pls.' Mem. at 40-41, their prediction that the Court of Appeals will ultimately have to address the issues raised in the dismissed claims, id. at 41, and their argument that the dismissed claims are separable from the

remaining claims.  Id. at 41-43.  Plaintiffs raised each of these arguments in their first motion for

entry of judgment.  Compare Pls.' 2003 Mot. Jmt. at 10 (impact of further delay on plaintiffs);

id. at 10-11 (Court of Appeals will ultimately address issues raised in dismissed claims); id. at 6-

9, 11-12 (addressing overlap between dismissed and remaining claims).

Moreover, plaintiffs provide no substantive rebuttal to the Court's first decision denying

entry of final judgment or any new argument as to why the Court's original conclusions are

incorrect.  Because plaintiffs' new motion for entry of judgment is essentially a motion to

reconsider the court's first opinion on the issue, plaintiffs are obliged to show some change in

the law or misapprehension by the Court, not simply that the Court was wrong.  See Judicial

Watch, 466 F. Supp.2d at 123 (reconsideration under Rule 54(b) appropriate where Court "has

patently misunderstood a party, has made a decision outside the adversarial issues presented to

the [c]ourt by the parties, has made an error not of reasoning, but of apprehension, or where a

controlling or significant change in the law or facts [has occurred] since submission of the issue

to the court" (emphasis added)); cf. National Trust for Historic Preservation, 834 F. Supp. at 455

(D.D.C. 1993) ("Reconsideration [of final judgment] is not appropriate where a party is simply

attempting to reargue factual or legal assertions contained in their original pleadings.").  For this

reason alone, the Court should deny plaintiffs' latest motion for entry of final judgment.

> **B.    The Court Should Refuse Plaintiffs' Request for Entry of Final Judgment
> because There Is Substantial Overlap between the Dismissed Claims and
> Remaining Claims.**

The Court's first decision to deny plaintiffs' motion for entry of judgment relied on its

determination that "[a]lthough the two dismissed claims are 'in some sense separable' from the

remaining claims, the two claims raise issues common to the plaintiffs' other promotion claims

and thus weigh heavily against a piecemeal appeal." CFGC, 221 F.R.D. at 259 (quoting Building Indus. Ass'n, 161 F.3d at 744). The Court's conclusion is still correct.

As defendants have previously shown and the Court previously found, there is substantial overlap between the dismissed claims and the remaining claims. The dismissed claims (and plaintiffs' recharacterized claims contained in their motion) challenge the use of chaplains on promotion selection boards and in rating other chaplains' performance. The remaining promotion and retirement board claims not dismissed by the Court allege, inter alia, that the Navy imposes religious quotas on decisions by selection board members, that the Constitution forbids the Navy from assigning the Chief of Chaplains and the Deputy Chief of Chaplains to serve as selection board members, and that certain past procedures used to recommend selection board members to the Secretary of the Navy violated military regulations and the First Amendment. The Court found that these claims all "raise issues common" to the dismissed claims, which "weigh[s] heavily against a piecemeal appeal." CFGC, 221 F.R.D. at 259.

Plaintiffs ignore these remaining claims in their brief, instead referencing their free speech claims, challenges to past displays of additional qualification designator codes to selection boards, and claims related to religious services. See, e.g., Pls.' Mem. at 42-43. This despite the fact that plaintiffs have litigated outright the overlapping claims alleging that promotion and retirement selection board members utilized illegal religious quotas and were appointed to the boards in violation of the Constitution, statute, and Navy regulation. For example, plaintiffs have at least twice moved for summary judgment on promotion claims

including challenges to board conduct and membership.[5]  Plaintiffs filed at least two motions for

a preliminary injunction based on injuries alleged to have been caused by the Navy's practices in

recommending chaplains for membership on selection boards.[6]  Plaintiffs have also filed

numerous motions and briefs in support of their request for discovery of selection board member

deliberations to advance their promotion and retirement claims.[7]  The Court has also addressed

these claims.[8]  This prior litigation confirms the overlap found by the Court.

Not only do the issues overlap, but so does much of the putative evidence plaintiffs

submit in support of these claims.  With the present motion, plaintiffs have filed numerous

---

[5]  See, e.g., Pls' Mot. Partial Summ. J. [CFGC docket no. 78] and Reply in Support Thereof
[CFGC docket no. 95] (arguing, inter alia, that Navy promotion boards engaged in systemic
religious discrimination); Pls.' Mot. Decl. J and/or Partial Summ. J. [CFGC docket no. 211] and
Reply in Support Thereof [CFGC docket no. 228] (challenging Navy practices in recommending to
Secretary chaplain members for service on promotion and retirement boards).

[6]  See Pls' Mot for Prelim. Inj. to Delay Promotion Bds. [CFGC docket no. 60]; Pls' Mot.
for TRO & Prelim. Inj. to Prevent Discharge of Non-liturgical Plaintiff for Failure to Select [for
Promotion] [Adair docket no. 139] and Reply in Support Thereof [Adair docket no. 143].

[7]  See Pls.' Mot. for Order Requiring Release of Chaplain Promotion Board Personnel from
Oath Not to Disclose Promotion Board Proceedings [CFGC docket no. 125] and Reply in Support
Thereof [CFGC docket no. 126]; Pls.' Br. on Why 10 U.S.C. § 618(f)'s Bar to Discovery of
Proceedings of Promotion Boards Cannot Apply to Selective Early Retirement and Continuation
Boards [CFGC docket no. 190] and Reply in Support Thereof [CFGC docket no. 193].

[8]  See, e.g., Adair I (deciding, inter alia, not to dismiss claims alleging quotas and
discrimination in selection board decisions); Adair v. England, 217 F. Supp.2d 1 (D.D.C. 2002)
(denying plaintiffs' motion for preliminary injunction delaying promotion boards until after decision
on motion for summary judgment); Adair v. England, 217 F. Supp.2d 7 (D.D.C. 2002) (denying
parties' cross motions for partial summary judgment on issues of, inter alia, discrimination by
promotion selection boards); Adair v. England, 417 F. Supp.2d 1 (D.D.C. 2006) (denying plaintiffs'
motion for preliminary injunction against discharge of plaintiff alleged to be victim of
discrimination by promotion boards); In re Navy Chaplaincy, 512 F. Supp.2d 58 (D.D.C. 2007)
(granting defs.' motion to reconsider and barring discovery of selection board proceedings); Minute
Order dated Sept. 11, 2006 (denying parties' cross motions for partial summary judgment on
plaintiffs' challenge to Navy's practices in recommending chaplains for membership on selection
boards).

reports by their statistical expert in support of their argument that chaplains do in fact discriminate against other chaplains while serving on selection boards. See Pls.' Ex. 12 (Addendal Decl. by Dr. Leuba), Ex. 13 (Compendium Decl. by Dr. Leuba), Ex. 15 ("The Siskin Conjecture" by Dr. Leuba), Ex. 16 (Decl. on Denominational Bias by Dr. Leuba), Ex. 17 (Leuba expert report from Larsen v. Navy). These and earlier, similar reports have been cited repeatedly by plaintiffs in support of their briefing on the remaining promotion claims. Compare Pls.' Mot. Decl. J and/or Partial Summ. J. [CFGC docket no. 211] and Reply in Support Thereof [CFGC docket no. 228] (challenging Navy practices in recommending to Secretary chaplain members for service on promotion and retirement boards) Ex. 15 (Leuba Compendium Decl.), Ex. 37 (Leuba Allonge Decl.) Ex. F (Leuba Rebuttal, Reproval & Reconciliation). Moreover, this same or similar evidence will likely be considered in deciding the claims in Gibson; plaintiffs admit that the same statistics they cite here will be used to support their allegations in Gibson. See Pls.' Mem. at 5 (noting Gibson Complaint's citation to statistics developed after dismissal).

Further, just as defendants have argued that the remaining claims have no merit and submitted their own statistical data to dispute the conclusions of plaintiff's statistical data, defendants would utilize similar, if not the same, arguments in relitigation of plaintiffs' dismissed claims. As this Court has already recognized, defendants would raise common defenses, such as their argument that the current board structure of two chaplains and five non-chaplain officers precludes any argument that board conduct or membership violates the Constitution. See CFGC, 221 F.R.D. at 259. Moreover, defendants would utilize their own statistical expert to provide data demonstrating that chaplains serving as board members do not discriminate against other chaplains, both to rebut plaintiffs' claims of denominational quotas

and to dispute plaintiffs' dismissed claims, if litigated.

Finally, plaintiffs' argument simply misses the point of the Court's first denial of their motion to enter final judgment.  Plaintiffs focus solely on the likelihood that the dismissed claims, as re-characterized in their briefing, would provide them all the relief they seek, if they ultimately prevail on the dismissed claims.  This may be true, but only if they are successful in pursuing those claims.  If they are not, this Court, and likely the Court of Appeals, would again have to address the same evidence in deciding the remaining claims.  Granting this motion would only set up the possibility that this Court and the Court of Appeals will have to review the law and facts multiple times, counter to the rationale behind Rule 54(b).  See Hill, 193 F.3d at 672 (avoiding likelihood that appellate court "will face overlapping issues and circumstances on two occasions").  The better course of action is to focus on resolving the remaining quickly and efficiently, not to create yet another interlocutory appeal.

## CONCLUSION

For the reasons stated, defendants request that the Court deny plaintiffs' motion for reconsideration or for certification of final judgment.

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2008, I caused a true and correct copy of the foregoing Defendants' Opposition to Plaintiffs' Rule 54(b) Motion to Alter or Amend the Court's 2002 Interlocutory Decision was served by the Court's ECF system upon the following:

> Arthur A. Schulcz, Sr., Esq.
> 2521 Drexel Street
> Vienna, VA 22180
> Counsel for plaintiffs

_____/S/_____
MICHAEL Q. HYDE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHAPLAINCY OF FULL GOSPEL       )
CHURCHES, et.al.,               )
                                )
                Plaintiffs,     )   Civil Action No. 1:99CV002945
                                )   (RMU)
v.                              )
                                )
GORDON R. ENGLAND,              )
Secretary of the Navy, et.al.,) )
                                )
                Defendants.     )
_____ )   Consolidated with
ROBERT H. ADAIR, et.al.,        )
                                )
                Plaintiffs,     )   Civil Action No. 1:00CV00566
                                )   (RMU)
v.                              )
                                )
GORDON R. ENGLAND,              )
Secretary of the Navy, et.al.,) )
                                )
                Defendants.     )
_____ )

## DECLARATION OF REAR ADMIRAL BARRY C. BLACK, CHC, USN

Pursuant to 28 U.S.C. ' 1746, I, Barry C. Black,
declare as follows:

1.  I am a Rear Admiral (pay grade O-8) on active duty in

the United States Navy Chaplain Corps (CHC).  I am currently the

Chief of Navy Chaplains, a position I assumed in August 2000.

In this capacity, I serve as the Director of Religious Ministry

Support for the Department of the Navy.  I am the principal

1

advisor and spokesperson for the Chaplain Corps.  See Attachment

1 (Secretary of the Navy Instruction ("SECNAVINST") 1730.7B)

2.  The Navy Chaplain Corps is composed of approximately

900 commissioned officers.  These officers serve in a dual

capacity;  they are both Naval officers and Chaplains.  As Naval

officers, they wear the prescribed uniform, issue and receive

lawful orders, adhere to military traditions and customs, and

follow military rules and regulations.  This includes compliance

with the Uniform Code of Military Justice.  Although Chaplain

Corps officers cannot assume command over Naval operational

units, by statute, they may command such activities as are

appropriate to the Corps.  See 10 U.S.C. § 5945.  In his or her

pastoral role, a Chaplain's ministry generally encompasses the

following:  providing worship opportunities in accordance with

his or her religious tradition; ensuring the free exercise of

religion for all authorized personnel by facilitating their

worship requirements; conducting seasonal and faith group

specific observances; participating in command ceremonies;

providing personal and pastoral counseling; intervening in

crisis situations; conducting weddings, funerals, and memorials;

advising commands on issues of free exercise of religion,

religious discrimination, and religious accommodation;

conducting personal growth retreats and marriage preparation

2

workshops; and providing pastoral care to immigrants, detainees, and prisoners of war. To that end, the Chaplain Corps operates pursuant to an unofficial motto of "cooperation without compromise." This means that Chaplain Corps officers are expected to support, directly and indirectly, the religious needs of all Sea Service personnel, their families and other authorized personnel. No chaplain is forced to minister beyond, or out of accordance with, the tenants of his or her religious organization. However, a chaplain is expected to facilitate where he or she cannot minister to ensure that the religious needs of all authorized personnel are accommodated. Facilitation may entail referral to another Navy or military chaplain or the use of civilian clergy and lay leaders.

3.   The approximately 900 commissioned officers in the Navy Chaplain Corps are assigned and distributed to hundreds of duty stations across the United States and around the world. Sea Service personnel and their families come from a myriad of religious and/or faith backgrounds. Therefore, the Navy does not structure its Chaplain Corps based on proportional representation. Managing the Chaplain Corps using proportional representation of self-identified religious preferences is problematic for a number of reasons. First, historically almost 30 percent of personnel do not indicate a religious preference

3

or, identify a specific faith group cluster at enlistment other than Protestant or Christian.  There is, of course, no such religious organization called "no religious preference," nor can a specific religious organization be definitively identified for such a broad self-definition as "Protestant" or "Christian." Such identifications, however, do not mean that individuals of these religious preferences have no religious needs or do not deserve to freely exercise their religious rights.  While they may not list or express concern the faith group of their chaplain, they use and benefit from the various functions and tasks provided by Chaplains Corps officers.  For this reason, the Chaplain Corps stresses the importance of chaplains facilitating for the widest range of religious needs, not just providing for the adherents of their own tradition.

4.  Second, within clergy of these generalized faith group clusters, or even within clergy of more specific religious traditions, there exists a broad spectrum of beliefs and practices. In addition, military personnel and their families who identify themselves as belonging to a particular religious tradition may or may not adhere as rigidly to the specific dogma of their stated religious denomination.  Such disparities in beliefs and practices, both within clergy of particular religious traditions, and by adherents to particular religions,

4

make it impossible to effectuate a perfect match between chaplains of faith group clusters and the needs of sea service personnel and their families.

5.   Third, while it may be easier to identify the needs of adherents to a particular faith group whose dogma is monolithic, it is significantly more challenging to identify the needs of personnel who self-identify as being from one tradition but who practice or worship with another.  For example, a service member may have attended churches of a non-liturgical tradition as a child, and may identify himself at enlistment as a non-liturgical, but find his religious needs met by a liturgical community.  In practice this does occur.

6.   Fourth, although proportional representation might succeed if all personnel were assigned permanently to a single or a limited number of geographic areas, this is not the reality of the sea services.  There are nearly 500 separate geographically dispersed duty assignments in the Navy, Marine Corps, and Coast Guard.  Additionally, the operational forces, who deploy where there are the least available religious support alternatives, are spread over thousands of miles of open-ocean and in countries around the globe.  Without a diverse mix of chaplains for distribution within the Chaplain Corps community, the Navy cannot assign Chaplains of different faith group mixes

5

to these dispersed assignments.  Thus, people from numerically
inferior religious organizations or faith groups may have their
religious needs ignored if a chaplain is only assigned based on
majority representation.  For example, given a Chaplain Corps of
900, if less than .27 percent of personnel identify themselves
as Muslim, proportional representation would require that the
Chaplain Corps be composed of only 2 Muslim chaplains.  The
dispersion of religious needs across the Sea Services would
indicate at least a minimum requirement of 10 Muslim chaplains
to ensure access to a chaplain of this tradition in every major
geographical area.  This same logic could be applied to other
numerically smaller faith groups, who likewise would
consistently be stripped of the ability to have access to a
chaplain of their faith tradition simply because they do not
form a numerically significant portion of the total force.
Strict proportionality does not consider effectively the
distribution and dispersion challenges of the Sea Services.

        7.  Fifth, a large percentage of the functions and tasks
required of military chaplains are not limited by a specific
faith group tradition.  With the exception of leading,
conducting, or providing faith group specific services, a large
percentage of the required religious ministry tasks are not
faith group specific and can be provided by a chaplain from any

religious organization. For example, the command advisory
function is not limited by a chaplain's faith group, nor are
many supervisory roles. All chaplains are trained and expected
to provide these required functions.

8.   Sixth, with a retention rate of over 93 percent, the
Chaplain Corps typically accesses and invests in an officer for
20 years. If the Chaplain Corps were managed by proportional
representation, there would be no way to maintain a stable and
predictable officer community. Stability is essential to an
effective officer corps. Presently, the Chaplain Corps is
managed in the same way and abides by the same rules as every
other officer community. To enforce proportional representation
would create a constantly shifting officer community that
functions independent from the rest of the officer communities.
Chaplains affected by proportional changes could be forced to
separate at any point in their career, regardless of
demonstrated performance, based on shifting denominational
preferences within the total force. If the Chaplain Corps must
continually shift its personnel assets to reflect changing
religious demographics, the Corps would constantly be removing
chaplains from service who have gained significant expertise and
leadership skills. This in turn would cripple the Corps'
ability to maintain experienced officers in its rank structure.

7

9. Seventh, using proportional faith groups or religious organizations as a primary determining factor in accessions is problematic, when, as has been true of accessions over the last several years, there are shortages of available and qualified clergy willing to sacrifice and commit to the arduous life of Naval service. Stability is one of the critical recruiting and retention considerations when clergy commit to military service. If proportional representation leads to the kind of career instability described above, there may be further shortages of willing applicants resulting in the inability of the Corps to fulfill its mission.

10. Furthermore, the Navy Chaplain Corps does not need to employ proportional representation to ensure that the religious needs of its servicemembers are met. An individual's religious needs are often satisfied by chaplains from a different tradition because they share many of the same basic beliefs and practices. This is the very essence of our pluralistic military environment, whether that entails providing or facilitating services. For example, in my 25-year Naval career, I, as a Seventh Day Adventist, have performed only two Seventh Day Adventist services, but I have conducted and participated in innumerable worship services open to Christians from many different backgrounds. In these services, I have led worship

8

for people who may self-identify as Liturgical Protestants, Non-Liturgical Protestants, or Special Worship groups notwithstanding my purported descriptor as a Special Worship Category chaplain. Any inference that I cannot perform such divine services, and satisfy a broad range of the spiritual needs of those worshipers in attendance, underestimates my capacity and ability to perform ministerial services. I believe that such an inference also underestimates the abilities of others of my Corps regardless of their descriptors.

11. In order to maintain diversity, the Chaplain Corps strives to recruit chaplains of various faith groups. The Chaplain Corps does not, however, adhere to any quotas. Furthermore, the Chaplain Corps no longer establishes recruiting goals by faith group clusters. Instead, the Chaplain Corps aims to access only the best qualified applicants regardless of faith group. To determine if an applicant is the best qualified, when that applicant's package is received by the Chief of Chaplain's Office, a Chaplain Appointment and Recall Eligibility Advisory Group (CARE Advisory Group) meets to consider the package. See Attachment 2 (Chief of Chaplains Instruction (COCINST) 1110.1G). Prior to becoming the Chief of Chaplains, I sat on several CARE Advisory Groups. The religious denomination and/or faith group of an applicant was never a factor in the recommendations of

9

those CARE Advisory Groups.  As the Chief of Chaplains, I

receive recommendations from the CARE Advisory Group regarding

which applicants are the best qualified for appointment.  I

review the recommendation, draft an endorsement, and then

forward both recommendations to Commander, Navy Recruiting

Command or Chief of Naval Personnel for final

approval/disapproval.  I have never considered religious

denomination and/or faith group in making a final recommendation

regarding an applicant for appointment or recall.

12.  During my Naval career, I have been a member of

approximately 30 Chaplain Corps promotion selection boards.  I

have also served as a board recorder on two occasions.  I have

served as a member on promotion selection boards for every pay

grade (O-3 through O-7).  I have served as the President of

several promotion selection boards while serving as the Deputy

Chief of Chaplains and the Chief of Chaplains.  During my

career, I have never called a fellow Chaplain Corps officer, nor

have any ever contacted me, to discuss eligible officers prior

to the promotion selection boards.  I have never walked into a

promotion selection board with a preconceived notion about which

officers should be selected for promotion by that board.  I have

served with officers from a wide spectrum of religious

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 1
Page 10 of 24

denominations and the Chaplain Corps has selected officers from a wide spectrum of religious denominations for promotion.

13.    Members for Chaplain Corps promotion selection boards are assigned by the Bureau of Naval Personnel in Millington, Tennessee.   I have no contact, either formal or informal, with the Bureau of Naval Personnel regarding what Chaplain Corps officers will sit as members of promotion selection boards. Prior to the start of any promotion selection board, I am unaware of the other officers who will sit as board members with me.  I have no prior contact with Chaplain Corps officers who have been selected to sit as board members.

14.    There were a number of years when the opportunity for promotion selection was significantly lower.  This was a direct result of a Congressionally mandated Navy-wide drawdown, which occurred between 1989 and 1998. During this period the Navy was reduced by 37 percent, but the Chaplain Corps only by 22 percent.  Nevertheless, this drawdown eliminated 252 chaplain billets, which was devastating for community management.   The full impact of these reductions can best be understood by an understanding of the following.  Prior to the drawdown, from 1979 to 1987, the Chaplain Corps accessed an average of 102 chaplains per year.  This number is twice as large as current average accessions numbers.  Accessions were increased because

11

the Navy was projected to grow to 600 ships and the Chaplain
Corps planned for an end strength of 1300. Despite these
projected billet increases, the implementation of the Defense
Officer Personnel Management Act (DOPMA) meant the Chaplain
Corps was unable to retain on active duty more than 60 of the
approximately 102 chaplains accessed in a given year. To meet
this reduced retention goal, in 1984, the Chaplain Corps
required the yearly Indefinite Extension Boards to determine
which Lieutenant chaplains would be separated after their
initial three year service obligation. Prior to this point, the
Chaplain Corps retained nearly 100 percent of all chaplains who
requested indefinite extension. In the years after 1984,
Indefinite Extension Boards could only select between 25 and 40
percent for continuation on active duty (in order to retain no
more than 60 of the officers accessed in a given Fiscal Year).
The objective of these Indefinite Extension Boards was to
retain, at the three year mark, the Lieutenants with the most
competitive records, thus making promotion to Lieutenant
Commander considerably more competitive.

15. The manpower drawdown was especially heavy in the
early 1990s, not just in terms of the loss of chaplain billets
but in terms of which billets were eliminated. Furthermore,
Chaplain Corps billets were not reduced equally in all ranks.

12

In the controlled grades of Lieutenant Commander and Commander, the Chaplain Corps was reduced by 10 percent more than the rest of the Navy. In the controlled grade of Captain, the Chaplain Corps lost 6 percent more billets than the rest of the Navy. In other words, the Chaplain Corps now had significantly more officers within controlled grades than authorized after the drawdown. When these controlled grade billets were taken away, the Chaplain Corps was forced to find a means of reducing the numbers of chaplains who once filled those billets. The Chaplain Corps was required to use all authorized force structure management tools so as to meet its new end-strength requirements. These tools included using the Temporary Early Retirement Authorization (TERA), Selective Early Retirement (SER) Boards, and reduction of promotion opportunity. We were forced to reduce promotion opportunity because we were already at the limit of the Department of Defense and Secretary of the Navy flow point guidelines but exceeded our authorized end strength in the Lieutenant Commander and Commander pay grades. Because flow points either reached or exceeded the maximum allowed number of years, the number of officers considered to be in-zone eligible increased to the point that the Chaplain Corps was unable to maintain traditional levels of promotion percentages. Because the number of in-zone eligible officers

13

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 1
Page 13 of 24

increased, but the number of officers who could be selected
(based on vacancies) remained relatively the same or decreased,
the overall number of officers who could be selected decreased
dramatically.  For example, in Fiscal Year 1993, because a
promotion board could only select a certain number of officers,
and the promotion zone was very large, this equated to a 70
percent promotion opportunity to Lieutenant Commander.  By
contrast, the opportunity for promotion to Lieutenant Commander
in Fiscal Year 2003 is 85 percent (projected to be 90 percent in
Fiscal Year 2004).  See Attachment 3 (LCDR Promotion
Statistics).  Similarly, this same officer selected to
Lieutenant Commander in Fiscal Year 1993, and who became
eligible for promotion to Commander, faced a 50 percent
promotion opportunity.  By contrast, the opportunity for
promotion to Commander in Fiscal Year 2003 is 65 percent
(projected to be 70 percent in Fiscal Year 2004).  See
Attachment 4 (LCDR Promotion Statistics).  Even the use of TERA
and SER Boards did not obviate the requirement for lower
promotion opportunities.  At a 60 percent promotion opportunity,
Chaplain Corps officers eligible for promotion to Lieutenant
Commander and Commander in Fiscal Years 1998 and 1999
experienced the lowest promotion opportunities in the Navy and
in the history of the Chaplains Corps.  In short, during the

14

drawdown, promotion selection boards were highly competitive (because most of the weaker records were eliminated at the Indefinite Extension Boards and the promotion opportunity was at a historic low). The Chaplain Corps was unable to select many Chaplain Corps officers who by their demonstrated strong performance might have been promoted in years with higher promotion opportunities. In-zone eligible officers who twice fail to select are statutorily required to leave active duty, unless they can be extended.

Further declarant sayeth not.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed at Arlington, Virginia, this 28th day of March, 2002.

BARRY C. BLACK
RADM, CHC, USN

15



DEPARTMENT OF THE NAVY
OFFICE OF THE SECRETARY
1000 NAVY PENTAGON
WASHINGTON, DC 20350-1000

IN REPLY REFER TO

SECNAVINST 1730.7B
N097
12 October 2000

SECNAV INSTRUCTION 1730.7B

From:  Secretary of the Navy

Subj:  RELIGIOUS MINISTRY SUPPORT WITHIN THE DEPARTMENT OF THE
       NAVY

Ref:   (a) DoD Directive 1304.19 of 18 Sep 93 (NOTAL)
       (b) U.S. Navy Regulations, 1990
       (c) Title 10, United States Code
       (d) DoD Directive 5120.8 of 20 Mar 95 (NOTAL)

1.  Purpose.  To assign responsibilities for religious ministry
support within the Department of the Navy.  This revision should be
reviewed in its entirety.

2.  Cancellation.  SECNAVINST 1730.7A.

3.  Applicability.  This instruction applies to all members of the
Department of the Navy.

4.  Definitions

    a.  Chaplains.  As commissioned officers, Navy chaplains are
professionally qualified clergy of a certifying faith group who
provide for the free exercise of religion for all military members of
the Department of the Navy, their family members, and other authorized
persons, in accordance with reference (a).  Chaplains advise commands
in matters of morale, morals, and spiritual well being.  In accordance
with Article 1063 of reference (b), chaplains shall be detailed or
permitted to perform only such duties as are related to religious
ministry support.  Chaplains shall not bear arms.  Chaplains shall not
be assigned collateral duties which violate the religious practices of
the chaplain's faith group, require services as director, solicitor,
or treasurer of funds other than administrator of a Religious Offering
Fund, serve on a court-martial or stand watches other than that of
duty chaplain.

    b.  Chief of Chaplains.  The Chief of Chaplains in accordance with
Section 5142 of reference (c) is appointed by the President to perform
such duties as described by the Secretary of the Navy and law.  In
this capacity, the Chief of Chaplains serves as the Director of
Religious Ministry Support for the Department of the Navy.  The

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 1                                    Attachment 1 to Exhibit 1
Page 16 of 24                                (1 of 4)

SECNAVINST 1730.7B
12 October 2000

Chief of Chaplains in accordance with Article 1009 of reference (b) is principal advisor and sponsor on matters concerning Chaplain Corps officers and Religious Program Specialists, and as head of the Chaplain Corps is the primary spokesperson regarding professional matters with the military and civilian communities.

c.  Deputy Chief of Chaplains.  The Deputy Chief of Chaplains as Deputy Director for Religious Ministry Support in the Department of the Navy is detailed by the Secretary of the Navy in accordance with Section 5142a of reference (c) to perform such duties as prescribed by the Secretary of the Navy, and serves as Chaplain of the Marine Corps.

d.  Department of the Navy.  The Naval Organization is organized under the Secretary of the Navy and consists of the following:  The Office of the Secretary of the Navy; the Office of the Chief of Naval Operations; the Headquarters, U.S. Marine Corps; the entire operating forces, including naval aviation, of the Navy and of the Marine Corps, including the reserve components of such forces; all field activities, headquarters, forces, bases, installations, activities and functions under the control or supervision of the Secretary of the Navy; and the U.S. Coast Guard when operating as a part of the Navy under law.

e.  Religious Ministry Support.  The entire spectrum of professional duties, performed by Navy chaplains and Religious Program Specialists, to include providing for or facilitating required religious needs and practices.

f.  Command Religious Program (CRP).  A CRP provides religious ministry support that is planned, programmed, budgeted, and implemented to meet identified religious ministry support requirements.

5.  Policy.  It is Department of the Navy policy that commanding officers shall provide Command Religious Programs (CRPs) in support of the religious needs and preferences for all members of the naval service, eligible family members and other authorized personnel.  The Chief of Chaplains, as the Director of Religious Ministry Support for the Department of the Navy, shall advise the Secretary of the Navy on policy formulation and oversight pertaining to the implementation of religious ministry support, plans, programs, and facilities.

a.  Organizational Placement and Responsibilities

(1) The Chief of Chaplains, as Director of Religious Ministry Support for the Department of the Navy:

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 1                              Attachment 1 to Exhibit 1
Page 17 of 24                          (2 of 4)

(a) Advises the Secretary of the Navy on all matters pertaining to the free exercise of religion within the naval service in accordance with Article 1009 of reference (b) and Section 5142 of reference (c). The Chief of Chaplains shall provide regular and frequent advice on:

1. Religious, ethical and moral implications of all Department of the Navy policies and actions.

2. Religious faith-group policies and positions affecting the Department of the Navy.

3. All matters pertaining to the organization and utilization of the Chaplain Corps as a staff corps of the Navy.

4. All matters pertaining to the organization and utilization of Religious Program Specialists.

(b) The Chief of Chaplains serves on the Armed Forces Chaplains Board (AFCB) in accordance with reference (d). As a member of the AFCB, the Chief of Chaplains represents the Secretary of the Navy to:

1. Department of Defense (DoD).

2. Chiefs of Chaplains/Chaplain Services of other DoD components.

3. 3. The Nation's religious faith groups.

(c) Advises the Commandant of the Marine Corps on religious ministry matters in reference to support, plans, programs, policy, personnel and facilities.

(d) Advises the Commandant of the Coast Guard on religious ministry matters relative to the use of Navy Chaplains in the Coast Guard.

(2) The Deputy Chief of Chaplains is the principal assistant to the Chief of Chaplains. He shall also serve as Chaplain of the Marine Corps, supervising religious ministry in the Marine Corps; and in accordance with reference (d) serve as a member of the AFCB.

(3) The Chief of Chaplains, as senior Chaplain in the Navy, advises the Chief of Naval Operations on all matters pertaining to the free exercise of religion within the Navy and assists the Chief of Naval Operations in carrying out his responsibilities in accordance with Article 1009 of reference (b) and Sections 5031 and 5032 of reference (c). In this capacity, the Chief of Chaplains:

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 1                                    Attachment 1 to Exhibit 1
Page 18 of 24                                (3 of 4)

SECNAVINST 1730.7B
12 October 2000

(a) Directs officers of the Chaplain Corps, Religious Program Specialists and all other designated persons engaged in Religious Ministry Support within the Navy, the U.S. Marine Corps, and other governmental agencies receiving religious ministry support from Navy chaplains.

(b) Serves as program sponsor for the professional development, education and training of Chaplain Corps officers and Religious Program Specialists.

(c) Serves as program sponsor for the Chaplains Religious Enrichment Development Operation (CREDO).

(d) Provides technical sponsorship for the acquisition, operation, and maintenance of religious ministry support facilities, collateral equipment and other logistical support both ashore and afloat.

(4) The Chief of Chaplains shall, with respect to all duties pertaining to the procurement, distribution and support of Chaplain Corps personnel, report to and be supported by the Chief of Naval Personnel in accordance with Section 5142 of reference (c).

6. Responsibilities

a. The Chief of Naval Operations (CNO) shall exercise oversight to ensure compliance with this instruction and shall implement the policy in this instruction throughout the Navy. CNO shall initiate action with the Commandant of the U.S. Coast Guard and the Administrator of the Maritime Administration to implement this policy when using Navy Chaplains to provide religious ministry support.

b. The Commandant of the Marine Corps (CMC) shall issue orders to implement this instruction throughout the Marine Corps.

7. Action. CNO and CMC shall forward implementing instructions to CNO (N097).

Richard Danzig

Distribution:
SNDL A1 (SECNAV)
     A2 (Department of the Navy Staff Offices)
     A3 (CNO)
     A5 (CHNAVPERS)
     A6 (CMC)
     B5 (COGUARD)(Commandant only)

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 1                                    Attachment 1 to Exhibit 1
Page 19 of 24                                (4 of 4)



**DEPARTMENT OF THE NAVY**
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
2000 NAVY PENTAGON
WASHINGTON, D.C. 20350-2000

IN REPLY REFER TO

COCINST 1110.1G
DEC 2 2 1997

<u>CHIEF OF CHAPLAINS INSTRUCTION 1110.1G</u>

From:  Chief of Chaplains

Subj:  CHAPLAIN APPOINTMENT AND RECALL ELIGIBILITY ADVISORY
       GROUP

Ref:   (a) SECNAVINST 1120.4A

1. <u>Purpose</u>.  To establish the Chaplain Appointment and
Recall Eligibility (CARE) Advisory Group and define its
membership, responsibilities and procedures.

2. <u>Cancellation</u>.  COCINST 1110.1F.

3. <u>Background</u>.  Per reference (a), the Chief of Chaplains
validates the professional qualifications of all applicants
for appointment in the Chaplain Corps, the Chaplain
Candidate Program Officer (CCPO) program, and transfers
between active and inactive duty.  This includes applicants
for direct appointment to active duty, direct appointment to
inactive duty in the Naval Reserve, voluntary recall from
the inactive Naval Reserve to the active-duty list,
interservice transfers, and superseding applications from
CCPOs to active or inactive duty.  Once an applicant's
professional qualifications are validated, the Chief of
Chaplains forwards the application package to Commander,
Navy Recruiting Command, or Chief of Naval Personnel, with a
recommendation for the applicant's final selection.  The
CARE Advisory Group assists the Chief of Chaplains in these
processes.

4. <u>Membership</u>

    Senior Member:  Deputy Chief of Chaplains (N097B)

    Members:        Executive Assistant (N1G)

                Director, Plans, Programs and
                Professional Development
                (N971)

                Director, Manpower, Facilities and
                Policy Division (N972)

                Director, Distribution and Placement
                Division (N973)

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 1                                    Attachment 2 to Exhibit 1
Page 20 of 24                                (1 of 3)

CCOCINST 1110..1G

                    Director, Reserve Affairs Division
                        (N097R)

                    The Chief of Chaplains shall appoint two
                    additional voting members to ensure
                    maximal knowledge of faith  groups,
                    women and minorities in the CARE
                    Advisory Group.

          Briefer/Recorder:   Head Community Management Branch
                        (N972T)

5.  Responsibilities.  Per reference (a), the CARE Advisory
Group shall examine each direct, superseding, recall or
interservice transfer application and each Regular chaplain
officer discharged from active duty who requests a Naval
Reserve appointment.  The CARE Advisory Group will review
each applicant's record giving particular consideration to
the following:  ecclesiastical endorsement (or
ecclesiastical approval for CCPO applicants), academic
performance, graduate theological education, professional
ministry experience, professional reputation and deportment,
interview results and letters of personal or professional
recommendation.

Specific responsibilities:

     a.  Senior member.  Call and chair CARE Advisory Group
meetings as required and submit written reports to the Chief
of Chaplains.  These reports shall recommend/not recommend
appointment or recall of applicants based on the needs of
the Navy, current accessions plan and professional
qualifications.

     b.  N097R.  Provide, as requested, statistics and data
on the faith group composition of the Naval Reserve chaplain
community and CCPO officers.

     c.  Briefer/Recorder

          (1) Receive applications from CNRC and prepare a
summary of the applications.

          (2) Ensure applicants' records are complete and
ready for brief.

          (3) Inform Chaplain Program Manager (316A) of any
missing data.

          (4)  Determine entry grade credit per reference (a).

2

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 1                                    Attachment 2 to Exhibit 1
Page 21 of 24                                (2 of 3)

COCINST 1110.1G

(5) Inform the senior member of applications pending and schedule advisory group meetings as directed.

(6) Reserve the Conference Room for CARE Advisory Group meetings.

(7) Schedule personnel other than group members to brief the CARE Advisory Group as required.

(8) Provide, as requested, statistics and data on faith group composition of the Chaplain Corps active duty component.

(9) Deliver the briefing to the CARE Advisory Group.

(10) Record the vote.

(11) Prepare and submit a written report of the CARE Advisory Group's recommendations for the senior member's signature. This report will ultimately be given to the Chief of Chaplains for approval/disapproval.

6. <u>Procedures</u>.

    a. <u>Quorum</u>. At least three members must be present to constitute a quorum. Recommendations shall be based on no less than a majority vote of the members present.

    b. <u>Closed sessions</u>. CARE Advisory Group meetings are closed. No member shall discuss deliberations or recommendations outside CARE Advisory Group meetings.

*A. B. Holderby, Jr.*

A. B. HOLDERBY, JR.
Chief of Chaplains, Acting

Distribution:
CARE Advisory Group members

3

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 1                                    Attachment 2 to Exhibit 1
Page 22 of 24                                (3 of 3)

# 410X Promotion to LCDR

|  | Promotion % | Flow Points | Compensation |
|------|------|------|------|
| FY91 | 80% | 10.11 | 30 |
| FY92 | 70% | 11 | 36 |
| FY93 | 70% | 11 | 32 |
| FY94 | 70% | 10.09 | 39 |
| FY95 | 70% | 10.04 | 39 |
| FY96 | 70% | 10.11 | 35 |
| FY97 | 70% | 11.04 | 35 |
| FY98 | 60% | 11.07 | 40 |
| FY99 | 60% | 11.08 | 26 |
| FY00 | 65% | 11.05 | 23 |
| FY01 | 70% | 11.04 | 23 |
| FY02 | 75% | 10.11 | 23 |

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 1
Page 23 of 24                                        Attachment 3 to Exhibit 1

# 410X Promotion to CDR

| | Promotion % | Flow Points | Compensation |
|---|---|---|---|
| FY91 | 70% | 15.03 | 0 |
| FY92 | 70% | 15 | 0 |
| FY93 | 70% | 15 | 13 |
| FY94 | 65% | 15.05 | 15 |
| FY95 | 65% | 15.11 | 11 |
| FY96 | 60% | 16.04 | 15 |
| FY97 | 60% | 16.01 | 15 |
| FY98 | 50% | 17.04 | 15 |
| FY99 | 50% | 17.08 | 9 |
| FY00 | 50% | 17.07 | 9 |
| FY01 | 55% | 17.04 | 13 |
| FY02 | 60% | 16.11 | 12 |

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 1
Page 24 of 24

Attachment 4 to Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CHAPLAINCY OF FULL GOSPEL CHURCHES, et al., | ) ) ) |
| v. | ) ) Case No. 1: 99CV002945 (RMU) |
| THE HON. DONALD C. WINTERS, et al. | ) ) ) |
|  | **Consolidated with** |
| ROBERT H. ADAIR, et al., | ) ) ) |
| v. | ) ) Case No. 1: 00CV00566 (RMU) |
| THE HON. DONALD C. WINTERS, et al. | ) ) ) |

DECLARATION OF CAPTAIN STEPHEN B. ROCK, UNITED STATES NAVY

Pursuant to 28 U.S.C. § 1746, I, Stephen B. Rock, declare as follows:

1.  I am a Captain on active duty in the United States Navy Chaplain Corps. I currently serve as the Command Chaplain of the United States Coast Guard Academy. I have served in this position since June, 2003. I have been an active duty chaplain in the United States Navy for more than 20 years. Prior to my current job, I served as the Command Chaplain of NSA Naples Italy, Base Chaplain of Marine Corps Bases Japan, Command Chaplain of USS THEODORE ROOSEVELT (CVN 71), Chaplain Detailer for Naval Personnel Command, Command Chaplain at Naval Air Station Sigonella, Chaplain at Camp Lejeune Marine Corps Base,

Chaplain of USS LONG BEACH (CGN 9), and Chaplain at 3rd Force Service Support Group, Fleet Marine Force, Okinawa.

2.   While serving as the Head of the Chaplain Assignment and Placement Branch, Naval Personnel Command, Washington, DC from May 1994 to May 1996, my primary responsibility was the assignment and placement of over 1000 chaplains.

3.   The Secretary of the Navy has delegated to the Chief of Naval Operations (CNO) the responsibility for composing and conducting selection boards.  The CNO has in turn delegated this responsibility to the Chief of Naval Personnel (CNP).  When I served as detailer, I was assigned to the Bureau of Personnel, which reports to the CNP.  I did not report to the Chief of Chaplains, though my desk was within work-spaces maintained by the Chief of Chaplains office.  As part of my duties, I was tasked with finding qualified and available chaplains to be considered by the Chief of Naval Personnel (CNP) as potential nominees for sitting as members on statutory selection boards, including promotion boards and Selective Early Retirement (SER) boards.  Once I had composed an appropriate group of qualified and available chaplains, I would forward the list through the BUPERS chain of command to the CNP.  CNP would then forward an approved list of board nominees to the Secretary of the Navy for

1: 00CV00566 (RMU)

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 2
Page 2 of 16

final approval.

4.   Secretary of the Navy (SECNAV) Instruction 1401.3 was the governing instruction on nominating promotion and selective early retirement board members during my assignment to the Navy Bureau of Personnel. SECNAV Instruction 1401.3, paragraph 4(a), included guidance stating that board members should be selected from a wide range of leadership positions and reflect the composition of the officer corps.  Paragraph 5 of the Instruction states that the guidance on selection board representation in this instruction could not to be used to sponsor any single interest, but rather that it was to be used to enhance the knowledge, experience and understanding of each board as a whole.   The guidance of SECNAV Instruction 1401.3, paragraph 5 applies to all communities within the Department of the Navy, not just the Chaplain Corps.

5.   This instruction required me to propose selection board nominees who collectively had a wide range of knowledge and experience, which represented, to the extent possible, the different experiences of the many chaplains within the Chaplain Corps.  This guidance helped ensure the collective board, as a whole, had a range of knowledge and experience that would properly allow them to consider the accomplishments and records

of east-coast chaplains, west-coast chaplains, Navy chaplains, Marine Corps chaplains, Coast Guard chaplains, and chaplains from each faith group category.

6.    The primary tool used by selection board members for evaluating Chaplain Corps officers is the fitness report submitted by each of the chaplains' commanding officers.    These fitness reports contain the commanding officers' evaluations of a chaplain's performance and accomplishments in carrying out his or her assigned duties.    The SECNAV instruction requirements recognized that any board's ability to evaluate accomplishments and fitness reports would be enhanced by assembling a group with as much knowledge and diverse experience as possible.    A board composed this way would have an easier time evaluating the many types of chaplain corps duty, such as assignments to various geographic regions or military services (Marine, Coast Guard, or Navy), assignment to sea or land-based units and installations, or the unique experiences of chaplains from different Faith Group Categories.    Although the Navy knows and expects that any of its selection board members can adequately evaluate a fitness report, the presence of board members who understood a particular type of chaplain experience meant that a diverse group of board members could help each other evaluate and explain those experiences and career histories if necessary,

1: 00CV00566 (RMU)

further enhancing the board's deliberations. This would maximize the ability of a board to deliberate, evaluate, and understand the experiences of chaplains who the board members were considering. I also believe that the requirements helped dispel any potential appearance of bias or impropriety. The result of following SECNAV Instruction 1401.3 was that board composition would reflect, as much as possible, the differing experiences of the entire candidate pool considered by the board. It was important, therefore, that a selection board, as a whole, had the requisite knowledge needed to properly assess the actions and accomplishments of the chaplains considered by the board. By complying with these instructions, I did my best to recommend potential members of selection boards who, as a whole, reflected the composition of the Chaplain Corps.

7.    It is my understanding that the Navy interpreted Paragraphs 4(a) and 5 as not supporting or condoning the random selection of members without regard to their background, experience, and knowledge. My practice of compiling the list of potential selection board nominees complied with the SECNAV instruction. The instruction's guidance on assembling members with a wide range of knowledge and experience among them, and statutory guidance requiring reserve personnel on some boards, and the ability given limited resources to bring chaplains from their

stations to the location of the board meeting, made it necessary
for me to carefully consider the mix of selection board nominees
I was to propose.  In doing so, I had to ensure the composition
of the corps was reflected to the extent possible, that no
chaplain was ever excluded from consideration because of
religious affiliation, that I followed governing statutes
regarding board composition requirements, that I complied with
all applicable SECNAV Instructions and guidance, and that the my
recommendations never promoted any individual interest.  I chose
a diverse group from those qualified and available to serve as
board members with to comply with the Secretary's instruction to
enhance the knowledge, experience, and understanding of the
board as a whole.

8.    To the extent possible, I regularly recommended a mix of
qualified and available chaplains from the different Faith Group
Categories – liturgical Protestant, non-liturgical Protestant,
and Roman Catholic.  The availability of qualified chaplains
from denominations within the Special Worship Faith Group
Category was usually limited; however, they were never excluded
from consideration because of their religious affiliation.
Where the candidate pool included chaplains from any Special
Worship category, I made an effort to locate qualified and
available board members from that specific denomination who

1: 00CV00566 (RMU)

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 2
Page 6 of 16

could augment the collective knowledge and experience of the board. That was not always possible. Also, where women or minority chaplains were in the pool of those considered, I tried to recommend board members who were women or minorities if any were qualified and available. Although my recommendations took into account the pool of chaplains before the board, I never excluded any women, minorities, or members of any denomination or faith group category from consideration, nor was I ever instructed to so. I also tried to recommend chaplains from different geographic regions, with particular emphasis on having a variety of chaplains from commands in the western United States as well as commands in the eastern half of the United States, referred to as "west coast" and "east coast" chaplains. To the extent possible, I also tried to recommend chaplains with a variety of assignment experiences, such as those attached to operational Navy ships, those on land-based assignments, as well as those assigned to units with the Marines, Coast Guard, and Naval Construction Battalions. By statute, I was also required to include a reservist where reservist chaplains were in the pool of those considered. My proposed board nominees were never intended to represent any given group, nor to favor any single interest, but were to provide each board with a broad knowledge of the types of experiences, that may be reflected in the fitness reports of the chaplains the board would evaluate.

9.    SECNAVINST 1401.3, paragraph 4(a), prohibits the Chief of
Naval Operations (CNO) from excluding anyone from consideration
as a selection board member due to their gender, race, ethnic
origin, or religious affiliation.  This prohibition on
exclusionary practices applies to all communities within the
Department of the Navy.  The Chief of Naval Personnel (CNP) is
delegated the responsibility for composing and conducting
selection boards by the CNO, and is subject to the same rules
and instructions. During my tour as chaplain detailer, every
chaplain who was qualified and available to serve on a board
received due consideration regardless of religious affiliation.
No potential nominee was ever excluded during my tenure based on
religious affiliation, gender, or ethnic origin.  No qualified
and available chaplain was ever excluded because he or she
didn't share the same religious affiliation as the chaplains
under consideration, nor were any excluded to further any single
interest.  The SECNAV instruction prohibits exclusionary
practices and prevented the CNO from excluding anyone from board
nomination solely due to their religious background.  The
instruction as a whole, however, does not prevent the inclusion
of members from different Faith Group Categories, especially
when that was necessary to comply with the other parts of the
instruction, such as paragraphs 4(a) and 5.

1: 00CV00566 (RMU)

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 2
Page 8 of 16

10.  I am familiar with paragraph 1(c)(1)(e) of Enclosure 1 to
SECNAVINST 1401.3, which says "Chaplain Corps board members
shall be nominated without regard to religious affiliation."  To
my knowledge, the CNP, whose authority to conduct selection
boards is delegated by the CNO, has never interpreted this
enclosure in a way that would make it inconsistent with the
other parts of SECNAV Instruction 1401.3.  In response to the
language of the enclosure, which both reemphasized the non-
exclusionary policy and mandated that the final list of nominees
be forwarded to the Secretary without reference to religious
affiliations, I ensured that chaplains considered for potential
board membership were never excluded because of their religious
affiliation, and that any consideration of faith group mix was
aimed only at enhancing the board's knowledge.  In addition, it
is my understanding that the CNP did not forward the list of
final board member nominees to the Secretary of the Navy with
any reference to their religious affiliations.  Neither the
SECNAV instruction nor enclosure (1) precludes the CNP from the
necessary and practical consideration of religious Faith Group
Categories to ensure that the board was composed in accordance
with SECNAVINST 1401.3 paragraphs 4(a) and 5, which required
that chaplain board members be selected from "a wide range of
leadership positions and reflect the composition of the officer
corps" and to "enhance the knowledge, experience, and

understanding of each board as a whole." Furthermore, my job was to propose potential board members without excluding anyone from consideration. In addition to my recommendations as a detailer, it is my understanding that the CNP also considered other outside factors such as geographic distance, operational requirements, and budgetary constraints in determining whether a chaplain should be ordered to travel for service as a board member. It is my understanding that the CNP then sent his list of nominees to the Secretary. The Secretary had final say on whether nominees for board membership would be accepted. Each list of the potential nominees I generated was very inclusive and resulted in a diverse group of chaplains who could collectively perform their duties as a selection board in an informed and professional manner. No racial, gender, ethnic, or religious groups were ever excluded from consideration. For my part, I considered all qualified and available chaplains. Since no religious denominations were excluded from consideration, my suggestions to the CNP were not exclusionary. In addition, it is my understanding that the nominations made by the CNP to the Secretary were made without regard to religious affiliation, thus it could not be a factor in whether the Secretary approved or disapproved the list.

11. At no time during my tenure as Chaplain Corps detailer was

1:00CV00566 (RMU)

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 2
Page 10 of 16

a Roman Catholic chaplain unavailable to participate as a selection board member. I am not aware of any written or unwritten policy requiring me to recommend a Roman Catholic board member. Had a Roman Catholic chaplain been unavailable, the selection board would have been convened with another chaplain who added to the collective knowledge of the board. In my experience, the numbers of chaplains on Active Duty have a direct correlation to the likelihood that someone from their faith background might be qualified and available to serve as a selection board member. At one time, I recall that the Navy had almost 300 Catholic chaplains. Currently, I believe there are approximately 135 on active duty.

12. During my tour as a Chaplain Corps detailer, I recall showing the list of potential selection board nominees to the Chief of Chaplains for feedback on the diversity of the group before submission of the recommended list to the CNP. I did not report to the Chief of Chaplains office while assigned as a detailer. I recall being instructed by Rear Admiral Muchow, the Chief of Chaplains at the time, that I could show him the list of potential nominees only when he was not scheduled to be the President of the particular board I was inquiring about. While I served as the detailer, neither the Chief of Chaplains nor the Deputy Chief of Chaplains was ever involved in the selection of

a specific board member or nominee. I was never informed that
my proposed nominees weren't acceptable because of their
religious preferences or the faith-group mix. If there was ever
any discussion with the Chief of Chaplains regarding board
composition, it was only to ensure that the recommended board
members were from the mix of experiences detailed above, in
order to comply with SECNAVINST 1401.3 paragraphs 4(a) and 5,
and to ensure the board did not appear to be severely limited in
its knowledge and experience.

13. As a Chaplain detailer, it was my duty to provide
commanding officers with chaplains for their command religious
programs. I often referred to my duties as providing commanding
officers with a "toolbox," the toolbox being the chaplains
necessary to provide for as many of the command's religious
needs as possible given limited Navy resources. Where a command
had more than one chaplain billet, this meant providing a mix of
chaplains from different Faith Group Categories, so that such
commands would be better able to meet the religious needs
encompassed by each category. For example, while I served as
the Command Chaplain at the Naval Support Activity in Naples,
Italy, as many as 6 chaplains from the non-liturgical
Protestant, Liturgical Protestant, Roman Catholic, and Special
Worship Faith Group Categories were assigned to the command

1: 00CV00566 (RMU)

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 2
Page 12 of 16

religious program. This enabled me, as the command chaplain, to provide the commanding officer with a religious program that met the needs of personnel with non-liturgical Protestant, Liturgical Protestant, Roman Catholic, and other religious needs. If a command did not have enough chaplain billets to have a full "toolbox", or mix of chaplains, it was my job as detailer to make sure that other commands in the area had a mix of chaplains to assist that command in meeting the needs of service members and families from other Faith Group Categories. For example, an officer assigned as the only chaplain for a Marine battalion would be able to facilitate meeting the needs of Marines from other Faith Group Categories because I, as the detailer, would ensure that another command or battalion nearby was detailed a chaplain from a different faith group category. Because I was able to effectively manage chaplain placement with Faith Group Categories in mind, even a lone chaplain assigned to a large unit could rely upon the many other chaplains I assigned to other command religious programs in the area for assistance in facilitating the religious and spiritual needs of personnel.

14. The Navy developed its Faith Group Categories based upon similarities between the practices, beliefs, historical traditions, and ability to meet certain religious needs of the various denominational preferences held by service members. The

Faith Group Categories were developed to promote maximum logistical effectiveness in utilizing a limited pool of available chaplains to meet the religious and spiritual needs of the Navy, Marine Corps, and Coast Guard. Of the four Faith Group Categories, the Special Worship Category is different because, among other reasons, the religious needs addressed by these denominations do not readily fit into the other Faith Group Categories. However, due to the small numbers of available chaplains in each of those denominations, we have placed them in a single Faith Group Category because they all share similar logistical management constraints. From my experience as a detailer, chaplains from the Non-Liturgical Protestant faith group category are generally able to meet the needs for those who belong to the denominations within that category. In addition, chaplains from the Liturgical Protestant Category are also generally able to meet the needs of service members who belong to denominations within that faith group category. Roman Catholic service members have specific religious needs, such as worship requirements and sacramental ministry, which must be met by priests within the Roman Catholic faith group category. In my experience, meeting the needs of service members from Special Worship category denominations often posed unique challenges because they have specific needs that cannot be met by chaplains of other faith groups, and because the Navy does not have enough

1: 00CV00566 (RMU)

Chaplains of their denomination to provide coverage at all locations. As detailers, our solution was to utilize chaplains from Special Worship categories in regions. Though they may be detailed to a particular command, it is expected that Jewish chaplains, for example, would be available to other units if needed by service members assigned to them.

15. As a chaplain detailer, it was also important to have access to chaplains from a broad range of Faith Group Categories across all ranks. Many billets have minimum rank requirements based on the need for experienced officers to hold that position. Commands with multiple chaplains assigned need a mix of chaplains from different ranks to maintain military order and discipline within the command religious program, and to accommodate for tasking that requires different levels of military and managerial experience and knowledge. When I provided an appropriate "toolbox" to a command religious program, I had to provide a "toolbox" with different levels of rank. A large command needs more than just a mix of chaplains from different Faith Group Categories because commands also have billet requirements for officers with different levels of military knowledge and managerial experience. As with all officer communities in the Navy, chaplain job positions, called billets, have requirements contingent upon rank. As such, I had

to have access to a mix of chaplains from a broad range of Faith Group Categories at every rank. For example, a large command religious program cannot effectively operate with only new Lieutenants, nor is it be wise to staff one single command with only senior Captains. Though it was important for me to maintain the faith group mix of a command by attempting to assign a replacement chaplain from the same faith group category as the departing chaplain, I also had to maintain the proper number of officers at each rank, as required by the billet descriptions.

Further declarent sayeth not.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed this ___52___ day of May, 2006.

_____
STEPHEN B. ROCK
CAPT, CHC, USN

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 2
Page 16 of 16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHAPLAINCY OF FULL GOSPEL CHURCHES, et al., | ) ) ) |
| v. | ) ) Case No. 1: 99CV002945 (RMU) |
| THE HON. DONALD C. WINTER, et al. | ) ) ) **Consolidated with** |
| ROBERT H. ADAIR, et al., | ) ) ) |
| v. | ) ) Case No. 1: 00CV00566 (RMU) |
| THE HON. DONALD C. WINTER, et al. | ) ) ) |

### FIRST SUPPLEMENTAL DECLARATION OF CAPTAIN STEPHEN B. ROCK, UNITED STATES NAVY

Pursuant to 28 U.S.C. § 1746, I, Stephen B. Rock, declare as
follows:

1.  I am a Captain on active duty in the United States Navy
Chaplain Corps. I previously provided a signed declaration in
this case in April 2006. I currently serve as the Command
Chaplain of the United States Coast Guard Academy. I have
served in this position since June, 2003. I have been an active
duty chaplain in the United States Navy for over twenty years.
Prior to my current job, I served as the Command Chaplain of NSA
Naples Italy, Base Chaplain of Marine Corps Bases Japan, Command
Chaplain of USS THEODORE ROOSEVELT (CVN 71), Chaplain Detailer

1: 00CV00566 (RMU)

for Naval Personnel Command, Command Chaplain at Naval Air
Station Sigonella, Chaplain at Camp Lejeune Marine Corps Base,
Chaplain of USS LONG BEACH (CGN 9), and Chaplain at 3rd Force
Service Support Group, Fleet Marine Force, Okinawa.

2.    While serving as the Head of the Chaplain Assignment and
Placement Branch, Naval Personnel Command, Washington, DC from
May 1994 to May 1996, my primary responsibility was the
assignment and placement of over 1000 chaplains.

3.    The board composition was aimed at one important goal... to
make the board as fair as possible.  From an external point of
view, the Navy sought to avoid any appearance of impropriety by
avoiding board membership that consisted of only chaplains who
shared the same or similar geographical assignment history,
faith group category, and deployment experiences. More
importantly, from an internal viewpoint, I was responsible for
ensuring that the board members collectively had as much
knowledge as possible about Chaplain Corps duties in the Navy,
Marine Corps, and Coast Guard, whether those duties were onboard
ship, deployed with the Marines, at base chapels at home or
abroad, or at Naval hospitals.  The Navy's interest in
maintaining an appearance of fairness supported an effort to
assemble boards with the most diverse knowledge base as

1: 00CV00566 (RMU)

DEFENDANTS'
EXHIBIT B
Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 3
Page 2 of 5

possible. My job included trying to ensure that selection board members, which at the time consisted of one line officer and multiple chaplain corps officers, brought a wealth of knowledge to the process. Specifically, the Navy determined that it was in the best interests of the process to include board members from multiple faith group categories who possessed knowledge about how chaplains from the various faith group categories were managed. In doing so, the board members would presumably be able to understand and explain pertinent information that might be included in the fitness report comments or career history of any chaplain being considered by the board. In a Navy environment requiring worldwide coverage of religious needs, where chaplain resources are limited, the various duties, responsibilities, and utilization patterns of chaplains from different faith group categories might possibly shed light on the career histories and fitness report comments before the board. The actual issues that would arise before each board was unknown, as the board memberships were determined before any records were reviewed and board deliberations were confidential. However, assigning, where possible, each board a membership that was diverse, the Navy was able to maximize the boards' ability to handle any legitimate question that might arise. This effort was never intended to introduce religion or membership in any denomination or faith group category as criteria in reviewing a

1: 00CV00366 (RMU)

DEFENDANTS'
EXHIBIT B
Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 3
Page 3 of 5

chaplain's record or the merits of selecting a chaplain for promotion or retirement.

4.    For instance, a board might benefit from such diversity if confronted with issues related to fitness report remarks about managing the provision of Roman Catholic, Liturgical Protestant, or Non-liturgical Protestant services.  These services differ from more than just a religious perspective, which would be irrelevant to a board's deliberations.  Notable differences may arise, for example, in the logistical challenges required to manage the necessary resources in providing the services, or the overseas travel requirements of low inventory Jewish and Greek Orthodox chaplains.  Because the Navy could not foresee the issues faced by each board's confidential deliberations, the practice of trying to enhance the knowledge of the board was of high importance.  The presence of members from multiple Faith Group categories, though not the main factor in assembling the board, was an additional consideration that the Navy believed would add to the collective knowledge of the members.  Because the needs of the Navy required utilization of some chaplains in areas of fleet concentration, those needs occasionally made it difficult for members of certain faith group categories, specifically those from Special Worship faiths, to obtain assignments as diverse as fellow chaplains from other faith

group categories. Again, the presence of a Special Worship chaplain as a board member, when a qualified chaplain was available, might be important to the board as a whole to explain why diversity of assignment was not necessarily possible for chaplains within the Special Worship category.

Further declarent sayeth not.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed this ___*/074*___ day of August, 2006.

_____
STEPHEN B. ROCK
CAPT. CHC, USN

I: 00CV00566 (RMU)

DEFENDANTS'
EXHIBIT B
Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 3
Page 5 of 5



# DEPARTMENT OF THE NAVY
### OFFICE OF THE SECRETARY
WASHINGTON. D.C. 20350-1000

28 November 1994

From: Secretary of the Navy
To:   RADM Anderson B. Holderby, Jr., CHC, USN,                    '4100

Subj: PRECEPT CONVENING THE FY-95 SELECTION BOARD TO
      RECOMMEND COMMANDERS IN THE CHAPLAIN CORPS FOR
      SELECTIVE EARLY RETIREMENT

Encl: (1) Board Membership
      (2) Supplemental Guidance

1.  The selection board, consisting of yourself as president
and the officers listed in enclosure (1), is ordered to
convene at the Navy Department, Washington, D.C., at 0900 on
06 December 1994 or as soon thereafter as may be
practicable.

2.  Each fiscal year a number of commanders retire from the
Navy as a result of approved voluntary retirements or
involuntary retirements based on length of service.
However, the Navy is currently faced with the need to
increase the number of retirements of commanders during this
fiscal year beyond the number of approved voluntary and
involuntary retirements, and thus this selective early
retirement board is being convened.  The function of the
board is to recommend for selective early retirement Regular
and Reserve commanders on the active-duty list, in the Staff
Corps communities whose early retirement, in the opinion of
the majority of the board, is in the best interest of the
Navy.

3.  10 USC §638 and §638a provide that Regular or Reserve
officers may be considered for early retirement by a
selection board convened pursuant to 10 USC §611(b).  10 USC
§638a restricts consideration for selective early retirement
to commanders who are retirement eligible or within two
years of retirement eligibility.

---

**DEFENDANTS'
EXHIBIT 20**

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 4
Page 1 of 10

Subj: PRECEPT CONVENING THE FY-95 SELECTION BOARD TO
RECOMMEND COMMANDERS IN THE CHAPLAIN CORPS FOR
SELECTIVE EARLY RETIREMENT

4.   The records and names of all eligible officers
determined as of the date the board convenes will be
furnished to the board by the Chief of Naval Personnel.
The board will carefully consider the case of every officer
whose name is furnished to it.   Under 10 USC §638(e)(2)(B),
officers with approved voluntary retirements, or officers
with involuntary retirement dates in FY-95 or FY-96, may not
be considered.   No officer whose name is on a promotion list
may be considered for early retirement.

5.   The major criterion for the Navy's success is its
ability to conduct prompt and sustained combat operations.
A balance of skills among the Navy's leaders is the key to
maintaining this ability.   Excellence in operational
environments and during arduous, demanding deployments is an
important measure of the qualities the Navy requires.
Officers may also have demonstrated leadership, skill,
integrity and resourcefulness in other difficult and
challenging joint and in-service assignments.   You must
ensure the officers retained possess the qualities to excel
in positions of responsibility and authority appropriate to
their grade.   You must consider each officer's potential for
future contributions in both traditional and more
specialized assignments and retain those who have the
highest potential for significant further service.
When determining whom to retain, you should also give
consideration to the resources expended by the Navy in
preparing officers for particular assignments, and the needs
of the Navy in managing billets with long training
pipelines.

6.   The total number of officers that may be recommended
will be exactly the number set forth below.   This number may
not exceed 30 percent of the in-zone eligible officers as of
the date the board convened.   The board will recommend no
more than or less than the number provided below:

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 4
Page 2 of 10

Subj: PRECEPT CONVENING THE FY-95 SELECTION BOARD TO RECOMMEND COMMANDERS IN THE CHAPLAIN CORPS FOR SELECTIVE EARLY RETIREMENT

| GRADE | COMPETITIVE CATEGORY | NUMBER TO SELECT |
|---|---|---|
| COMMANDER | CHAPLAIN CORPS | 8 |

7. The board will consider only those official records provided by the Chief of Naval Personnel as well as written communications from eligible officers. Requests for additional information can only be approved by the Secretary of the Navy. No board member, recorder, assistant recorder, or person acting on their behalf may communicate with an eligible officer, reporting senior, or other person to solicit information, favorable or unfavorable, about an eligible officer. The Chief of Naval Personnel may authorize communications as necessary to ensure the official records are complete.

8. The report of the board, prepared per paragraphs 10g and 11 of the supplemental guidance (enclosure (2)), will be forwarded to the Secretary of the Navy via, first, the Chief of Naval Personnel; second, the Chief of Naval Operations; and finally, the Judge Advocate General of the Navy for review as to the legality of the report.

9. Enclosure (2) provides the oaths to be administered and supplemental guidance.

JOHN H. DALTON
Secretary of the Navy

3

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 4
Page 3 of 10

1.  Board Members:

RADM Edward Moore, Jr., USN,                    1110
CAPT Michael H. Kennedy, CHC, USN,                  /4100
CAPT George C. Paul, CHC, USNR,                  /4105
CAPT William P. Dillon, Jr., CHC, USN,                    4100

2.  LCDR Mark L. Tidd, CHC, USN, will act as recorder.  LCDR
Lesa D. Cheathem, CHC, USN, and LT Robert T. Williams, CHC,
USN, will act as assistant recorders.  The recorder or an
assistant recorder will be present during all board
deliberations.

3.  CAPT Gary B. James, USN; CAPT Tracee D. Glass, USN; CDR
Ann C. Stewart, USN; LCDR Townsend G. Alexander, USN; LCDR
Katherine M. Rich, USN; LCDR Bruce R. Cohn; USN; LCDR
Stephen Greene, USN; LCDR Ross F. Mobilia, USN; LCDR Mark R.
Hunter, USN; LT Paul G. Thomasson, USN; LT Alan L. Andreas,
USN; LT Dallas S. Scholes, USN; LT William M. Johnson, USN;
LT Beth J. Hankins, USN; LT Christine W. Lonie, USN; LT Neil
R. Jurkovic, USN; LT Albert J. Magnan, USN; LT Joseph F.
Mahan, USN; LT Daniel H. Druckenmiller, USN; LT Michael J.
Duszynski, USN; ENS Andrea L. Dambra, USN; ENS Stacey L.
McLaurin, USN; CWO3 Billy J. Abrams, USN; CWO3 David L.
Likovetz, USN; CWO2 Juanetta D. Jones, USN; DPC James L.
Cole, USN; DS1 William S. Dargan, USN; DP1 Carl L. Trice,
USN; DP1 Angel T. Romero, USN; DP2 Clifford P. Fetner, USN;
and YN3 John J. Broughton, USN; are designated to serve as
projectionists and administrative support personnel for this
board.

## SUPPLEMENTAL GUIDANCE

1.  The following oath or affirmation shall be administered to the recorder and assistant recorders by the president of the board:

> "You, and each of you, do solemnly swear (or affirm) you will keep a true record of the proceedings of this board, and you will not divulge the proceedings of this board except as authorized or required by the Secretary of the Navy or higher authority. So help you God."

The following oath or affirmation shall then be administered by the recorder to the members of the board:

> "You, and each of you, do solemnly swear (or affirm) you will perform your duties as a member of this board without prejudice or partiality, having in view both the special fitness of officers and the efficiency of the Naval service, and you will not divulge the proceedings of this board except as authorized or required by the Secretary of the Navy or higher authority. So help you God."

The following oath or affirmation shall then be administered by the recorder to the projectionists and other support personnel:

> "You, and each of you, do solemnly swear (or affirm) you will not divulge the proceedings of this board except as authorized or required by the Secretary of the Navy or higher authority. So help you God."

2.  Due to historic statutory restrictions on the assignment of women in the Navy, the records of female officers before the board may show a career pattern different from that of their male counterparts. Such restrictions on duty assignments, which in the past have foreclosed to women opportunities for operational and command assignments available to men, cannot be allowed to prejudice the selection of women for retention. Accordingly, in determining a woman's qualification for retention, duty performed by a female officer, whose past assignability was constrained by law or policy, shall be given weight equal to duty performed by a male officer not so constrained which is equally well performed.

In making your determination of those female officers who are
best suited for retention, emphasis will be placed on her actual
performance in assignments rather than her pattern of assignments
as compared to male officers.

3.   The Department of the Navy is dedicated to equality of
treatment for all personnel without regard to race, creed, color,
sex, or national origin.  Aggressive commitment to equal
opportunity is critical.

    a.   Many minority officers have been assigned involuntarily
outside the traditional career development patterns, i.e.,
recruiting, equal opportunity, and specific billets requiring
minorities.  These assignments, though beneficial to the
interests of the Navy, have resulted in those officers having
career patterns different from officers who have been able to
serve in their primary or warfare specialties.  In making your
determination of those officers who are best suited for
retention, you must view such assignments as having the same
value as assignments within the primary or warfare specialty.

    b.   The <u>1988 CNO Study Group Report on Equal Opportunity in
the Navy</u>, which is available to you, noted that minority officers
who, prior to entering the Navy, had limited interaction with a
predominately majority environment, may take a longer time to
adjust and perform to the level of their contemporaries.  This
may result in initially lower fitness reports at the junior
officer level (through O-3) and a higher percentage of "late
bloomers" than their majority counterparts.  You must consider
this when evaluating a minority officer.

    c.   In evaluating the records of eligible officers, you
should be aware that past discrimination may have operated to the
disadvantage of minority officers.  Such discrimination may have
manifested itself in disproportionately lower fitness reports.
Equivalent performance by a minority officer and a non-minority
officer may not have resulted in equivalent fitness reports.  You
must consider this when evaluating minority officers.

4.   To meet statutory requirements, as well as to ensure our
ability to manage the weapons systems required to conduct
effective combat operations, the Navy is firmly committed to
maintaining a well-trained and knowledgeable corps of acquisition
officers.  The Acquisition Professional Community (APC) is

2                              Enclosure (2)

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 4
Page 6 of 10

designed to provide a cadre of these officers, with acquisition
and material support experience, who will lead the Navy's
research, development, test, and procurement of future weapons
systems and platforms. Service by these officers in assignments
requiring Acquisition Professionals, critical for the future
success of the Navy, may have resulted in a career pattern
different from officers who have served exclusively in their
primary or warfare specialty. In making your determination of
those officers who are best suited for retention, you must view
assignments in billets requiring Acquisition Professionals as
having the same value as assignments within the primary or
warfare specialty.

5.  Our ability to operate effectively with the other Services is
vital to our warfighting capability. To foster this ability, a
number of officers are assigned to joint military training and
education and to duties with other services and to joint staffs.
Board members shall give appropriate consideration to the
performance of officers who are serving or have served in such
assignments.

    a.  To meet statutory requirements, as well as to ensure our
ability to conduct joint operations, the Navy is firmly committed
to placing as many officers as possible in joint duty
assignments. These assignments, critical for the future success
of the Navy, may have resulted in a career pattern different from
officers who have served exclusively in their primary or warfare
specialty. In making your determination of those officers who
are best suited for retention, you must view joint duty
assignments as having the same value as assignments within the
primary or warfare specialty.

    b.  The Navy's ability to meet future joint operations
requirements depends, in part, on senior officers who have served
or are serving in joint duty assignments. Experience in a joint
duty billet is a factor for you to consider in determining which
officers are best qualified for retention.

6.  A Selective Early Retirement Board is prohibited from
considering the marital status of a member or the employment,
education, or volunteer service of a spouse.

7.  Many officers have special education (Ph.D., Masters degrees,
etc.) and subspecialties of substantial value to the Navy.

Enclosure (2)

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 4
Page 7 of 10

In determining an officer's fitness for retention, the selection board shall give weight to duty in education, training, recruiting, and subspecialty billets, equal to that given to other duty, equally well performed. Proven excellence in a variety of assignments involving training and educating service members will be vital to the Navy's officer corps.

8.  The official military personnel records provided to the board may include medical documents relevant to an officer's physical qualifications. If the board desires clarification of any such document, then the board president should reduce the board's questions to writing and forward them to me. I will provide such clarification as may be appropriate.

9.  The senior member of the board in the competitive category under consideration has been appointed as president and shall perform prescribed administrative duties. The board president has no authority to constrain the board from recommending those officers whose retirements are determined to be in the best interest of the Navy as specified by the Secretary. The board president shall ensure that paragraph 10 of this enclosure is read to each board member, recorder, and administrative support person on the convening date of the board or on the date of assignment to the board, whichever is later.

10.  The following instructions concerning communications and information applies to board proceedings:

a.  Each of you (president, members, recorders, and administrative support personnel) is responsible to maintain the integrity and independence of this selection board, and to foster careful consideration, without prejudice or partiality, of all eligible officers.

b.  You must pay particularly close attention to the rules governing communications with and among other board members, the information authorized to be furnished to you, and the procedures you should follow if you believe that the integrity of this selection board has been improperly affected.

c.  You are to base your recommendations on the material in each officer's military record, any information I have provided to the board, and any information communicated to you by

Enclosure (2)

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 4
Page 8 of 10

individual eligible officers under regulations I have issued. In your deliberations, you may discuss your own personal knowledge and evaluation of the professional qualifications of eligible officers to the extent that such matters are not precluded by law or Service regulation from consideration by a selection board or inclusion in an officer's military personnel record. You may not discuss or disclose the opinion of any person not a member of the board concerning an officer being considered unless that opinion is contained in material provided to the board.

d.    I am the only person who may appear in person to address you on any matter. All communications with this board, other than those that are clearly administrative, must be in writing, given to each of you, and made part of the board's record. I have designated in writing those persons authorized to provide routine administrative information to you.

e.    Before the report of the selection board is signed, the recommendations may be disclosed only to members of the board, recorders, and those administrative support personnel I have designated in writing. After you sign the board report, only the recommendations of the board may be disclosed. Except as authorized by law or regulation, the proceedings of the board may not be disclosed to any person not a board member or board recorder.

f.    If at any time you believe that you cannot in good conscience perform your duties as a member of this board without prejudice or partiality, you have a duty to request relief by me from this duty. I will honor any such request. If, as a board member or recorder, you believe that the integrity of the board's proceedings has been affected by improper influence of military or civilian authority, misconduct by the board president or a member, or any other reason, or believe someone is exerting or attempting to exert inappropriate influence over the board or its proceedings, you have a duty to request from me or the Secretary of Defense relief from your obligation not to disclose board proceedings and, upon receiving it, to report the basis for your belief.

g.    Upon the completion of board's deliberations, you will, as a minimum, certify in your report to me that:

5

Enclosure (2)

(1) To the best of your knowledge, the board complied with all instructions contained in the precept, and, as appropriate, other letters of guidance or instruction provided by me.

(2) That you were not subject to or aware of any censure, reprimand, or admonishment about the recommendations of the board or the exercise of any lawful function within the authorized discretion of the board;

(3) That you were not subject to or aware of any attempt to coerce or influence improperly any action in the formulation of the board's recommendations;

(4) That you were not party to or aware of any attempt at unauthorized communications;

(5) That, to the best of your knowledge, the board carefully considered the records of each officer whose name was furnished to the board; and

(6) That the selections of the officers recommended for retirement from among those officers considered are, in the opinion of the majority of the members of the board, in the best interest of the Navy.

11.   The written report of the board shall be signed by the board president, the board members, and board recorders, and shall contain a list of the names of the officers it recommends for retirement, with the certification described in paragraph 10g.

13.   The record of the board's proceedings shall be compiled by the recorders and administrative support staff and shall contain at a minimum:

a.   Convening notice.

b.   A list of all officers considered for early retirement.

c.   A list of all officers recommended for early retirement.

d.   Precept.

Enclosure (2)

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 4
Page 10 of 10

REPORT OF A SELECTION BOARD CONVENED AT

NAVY DEPARTMENT, WASHINGTON, D.C. ON 6 DECEMBER 1994

TO RECOMMEND COMMANDERS CHAPLAIN CORPS ON THE ACTIVE-DUTY LIST OF THE NAVY FOR SELECTIVE EARLY RETIREMENT

OFFICE OF THE CHIEF OF NAVAL PERSONNEL

Forwarded, approval recommended.

_____  12 Dec 1994
Chief of Naval Personnel (Date)

OFFICE OF THE CHIEF OF NAVAL OPERATIONS

Forwarded, approval recommended.

_____  12-21-94
Chief of Naval Operations (Date)

OFFICE OF THE JUDGE ADVOCATE GENERAL

The proceedings and recommendations
of the Board are legal.

_____  12/16/94
Judge Advocate General (Date)

OFFICE OF THE SECRETARY OF THE NAVY

Approved.

_____  0 3 JAN 1995
Secretary of the Navy (Date)

**DEFENDANTS'
EXHIBIT 21**

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 5
Page 1 of 4

REPORT OF A SELECTION BOARD TO RECOMMEND COMMANDERS IN THE
COMPETITIVE CATEGORY OF CHAPLAIN CORPS ON THE ACTIVE-DUTY LIST OF
THE NAVY FOR SELECTIVE EARLY RETIREMENT

The board met at 0900 on 06 December 1994 pursuant to the precept
of the Secretary of the Navy of 28 November 1994.

I, the undersigned, hereby certify that:

(1) The board, to the best of my knowledge, complied with DOD
Directive 1320.12, all instructions contained in the precept,
and, as appropriate other letters of guidance or instruction
provided by the Secretary of the Navy;

(2) I was not subject to or aware of any censure, reprimand,
or admonishment resulting from the recommendations of the board
or the exercise of any lawful function within the authorized
discretion of the board;

(3) I was not subject to or aware of any attempt to coerce or
influence improperly any action in the formulation of the board's
recommendations;

(4) I was not party to or aware of any attempt at
unauthorized communications;

(5) The board, to the best of my knowledge, has carefully
considered the records of the officers whose names were furnished
to the board; and

(6) That the selections of the officers recommended for
retirement from among those officers considered are, in the
opinion of the majority of the members of the board, in the best
interest of the Navy.

At 1515 on 7 December 1994 the board adjourned to await orders
of the Secretary of the Navy.


ANDERSON B. HOLDERBY, JR.
Rear Admiral
Chaplain Corps
U.S. Navy
President

MARK L. TIDD
Lieutentant Commander
Chaplain Corps
U.S. Navy
Recorder

REPORT OF A SELECTION BOARD TO RECOMMEND COMMANDERS IN THE
COMPETITIVE CATEGORY OF CHAPLAIN CORPS ON THE ACTIVE-DUTY LIST OF
THE NAVY FOR SELECTIVE EARLY RETIREMENT

EDWARD MOORE, JR.
Rear Admiral
U.S. Navy
Member

MICHAEL H. KENNEDY
Captain
Chaplain Corps
U.S. Navy
Member

GEORGE J. PAUL
Captain
Chaplain Corps
U.S. Naval Reserve
Member

WILLIAM P. DILLON, JR.
Captain
Chaplain Corps
U.S. Navy
Member

LESA D. CHEATHEM
Lieutenant Commander
Chaplain Corps
U. S. Navy
Assistant Recorder

ROBERT T. WILLIAMS
Lieutenant
Chaplain Corps
U.S. Navy
Assistant Recorder

2

REDACTED

REPORT OF A SELECTION BOARD TO RECOMMEND COMMANDERS IN THE
COMPETITIVE CATEGORY OF CHAPLAIN CORPS ON THE ACTIVE-DUTY LIST OF
THE NAVY FOR SELECTIVE EARLY RETIREMENT

| CONSEC | NAME | SSN | DESIG |
|--------|------|-----|-------|
| | | | 4100 |
| 0005 | | | 4100 |
| 0011 | | | 4100 |
| 0012 | | | 4100 |
| 0016 | | | 4100 |
| 0017 | | | 4100 |
| 0021 | | | 4100 |
| 0022 | | | 4100 |
| 0026 | | | |

26MAR97
w/ch 1 ~~Declest~~

**DEPARTMENT OF THE NAVY**
OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20350-1000

SECNAVINST 1120.4A
OP-09G22
14 May 1986

SECNAV INSTRUCTION 1120.4A

From:  Secretary of the Navy

Subj:  APPOINTMENT OF REGULAR AND RESERVE OFFICERS IN THE
       CHAPLAIN CORPS OF THE NAVY

Ref:   (a) DODDIR 1310.2 of 24 Mar 84 (NOTAL)
       (b) DODDIR 1205.14 of 24 May 84 (NOTAL)
       (c) SECNAVINST 1000.7D
       (d) DODDIR 1205.5 of 16 May 80 (NOTAL)
       (e) DODDIR 1312.3 of 15 Oct 81 (NOTAL)
       (f) SECNAVINST 1210.5
       (g) SECNAVINST 1730.7
       (h) SECNAVINST 1420.1
       (i) SECNAVINST 5350.10A
       (j) Title 10, United States Code
       (k) SECNAVINST 5300.28A
       (l) Manual of the Medical Department (NAVMED P-117)
       (m) DODDIR 1304.19 of 1 Jun 84 (NOTAL)
       (n) SECNAVINST 1427.2
       (o) SECNAVINST 1427.1A
       (p) SECNAVINST 1920.6A

Encl:  (1) Theological Student Program                              (A

1. <u>Purpose</u>.  To establish regulations governing:             (R

    a.  Appointment of officers in the Chaplain Corps, including
appointment in the Regular component under reference (a), in the
Reserve component under reference (b) and in either component
through interservice transfer from another Service under refer-
ences (c) and (d);

    b.  Voluntary recall of officers of the Chaplain Corps to
the active-duty list; and

    c.  Award of entry grade credit on appointment in the
Chaplain Corps under reference (e).

2. <u>Cancellation</u>.  SECNAV Instruction 1120.4.  All other regula-  (A
tions and memoranda providing guidance governing accessions,
appointments, eligibility requirements and entry grade credit
for service in the Chaplain Corps inconsistent with this instruc-
tion are held in abeyance pending their modification or cancel-
lation.  Processing initiated before the effective date of this
instruction will be continued pursuant to policy and instruc-
tions in effect before that date.

SECNAVINST 1120.4A
1 4 MAY 1986

R)    3.  Applicability.  This instruction applies to all individuals appointed as Regular or Reserve officers in the Chaplain Corps, including officers from another Service, Reserve officers transferred into the Regular component, Reserve officers voluntarily recalled to the active-duty list and officers transferred from the line or another staff corps into the Chaplain Corps.

        a.  Additional guidance on the transfer of Chaplain Corps officers from other Services into the Chaplain Corps of the Navy is found in references (c) and (d).

        b.  Additional guidance on the transfer of Reserve Chaplain Corps officers into the Regular component of the Chaplain Corps and the transfer of Regular and Reserve between the line and the Chaplain Corps or between another staff corps and the Chaplain Corps is found in reference (f).

R)    4.  Policy.  The Department of the Navy will maintain authorized strength and grade levels in the Chaplain Corps by recruiting clergy of religious faith groups of the United States to provide religious ministries under reference (g), to support the annual five-year promotion plan approved under reference (h), to provide a base for an all-Regular career force and to attain authorized strength in the Reserve components to meet approved mobilization requirements.

        a.  Requirements for newly appointed officers on the active-duty list sufficient to support an all-Regular force will be filled primarily through the Theological Student Program authorized in enclosure (1).  Requirements which cannot be fully met by this source will be met by direct appointment of qualified members of the clergy.

        b.  Requirements for officers on the active-duty list in career grades that cannot be met by promotion will be supplemented by voluntary recall to active duty of Chaplain Corps officers who have not served previously on extended active duty.

        c.  Requirements for officers on the active-duty list which cannot be met by the preceding sources will be met by the voluntary recall of Chaplain Corps officers who have served previously on extended active duty and by interservice transfer of chaplains from other Services.

        d.  Requirements for Selected Reserve and Individual Ready Reserve officers will be filled primarily by the transfer of officers from the active-duty list who have completed their initial obligated service.  Requirements which cannot be met from this source will be met by direct appointment of qualified members of the clergy as Reserve officers of the Chaplain Corps on inactive duty.

2

SECNAVINST 1120.4A
**1 4 MAY 1986**

    e.  All initial appointments in the Chaplain Corps will be
Reserve appointments, with subsequent transfer to the Regular
Navy under reference (f).

5.  <u>Accession plans</u>.  The Chief of Naval Operations will develop          (A
an annual accession plan to support authorized strength in the
Chaplain Corps.  There must be enough accessions to support the
annual five-year promotion plans for the active-duty and Reserve
components and ensure that the promotion opportunity and flow
necessary to meet authorized strength-in-grade requirements are
maintained.  Accession plans must support execution of Affirma-
tive Action Plans established under reference (i).

6.  <u>Basic qualifications</u>.  To be eligible for appointment as a          (R
Chaplain Corps officer in either the active-duty or Reserve com-
ponents, or for voluntary recall from the Reserve component to
the active-duty list, the applicant must meet the following
requirements:

    a.  <u>Citizenship</u>.  Must be a citizen of the United States with
the following exception:  a citizen of the Northern Mariana
Islands who indicates in writing to a commissioned officer of
the Armed Forces of the United States an intent to become a
citizen of the United States may be appointed as a commissioned
officer in the Regular or Reserve component.  Under reference
(j), such an individual cannot serve as an officer in a vessel
of the United States until legally a citizen of the United
States.  This exception expires upon establishment of the
Commonwealth of the Northern Mariana Islands.

    b.  <u>Age</u>.  Must be able to complete 20 years of active
commissioned service by age 60.  The Deputy Chief of Naval
Operations (Manpower, Personnel, and Training) (DCNO(MPT)) may
waive the age restrictions up to age 62 for otherwise qualified
applicants for appointment on the active-duty list or in the
Reserve component in the following instances:

        (1) When there is a shortage against authorized strength
in the active duty component which cannot be met through the
Theological Student Program, direct appointments, voluntary
recall from the Reserve component or by in-zone promotion under
the annual five-year promotion plan.

        (2) When there is a shortage against authorized strength
in the Reserve component which cannot be met by transfer of
officers from the active-duty list, from the Theological Student
Program, in-zone promotions under the annual five-year promotion
plan, or by direct procurement of qualified civilians who meet
age requirements.

3

SECNAVINST 1120.4A
1 4 MAY 1986

(3) When extraordinary circumstances cause such a waiver to be in the best interest of the naval service.

(4) When a gross inequity to the applicant would other-wise result.

Before appointment, applicants who will be unable to complete 20 years of active commissioned service by age 60 will be required to acknowledge in writing that they are ineligible for Regular appointment. Before appointment, applicants who will be unable to complete 20 years of creditable service for retirement shall acknowledge the same in writing. DCNO(MPT) shall maintain on file written justification for each waiver granted.

c. <u>Moral character</u>. Must be of good moral character and of unquestioned loyalty to the United States as determined by inter-view and investigation. As prescribed in reference (k), no per-son who is drug or alcohol dependent, who abuses drugs or alcohol, whose preservice abuse of drugs and/or alcohol indi-cates a proclivity to continue abuse in the Service, or who has a record of any trafficking offenses shall be permitted to enter or be retained in the Chaplain Corps.

d. <u>Physical standards</u>. Must meet the physical standards for service on active duty established by the Director, Naval Medicine and approved by the Chief of Naval Operations. DCNO(MPT) may grant waivers for physical defects that will not interfere with the performance of active duty within the guidelines of reference (l).

R)

7. <u>Professional qualifications</u>. To be eligible for appointment in the Chaplain Corps, or voluntary recall from the Reserve component to the active-duty list, the applicant must meet the following minimum educational and professional requirements.

a. <u>Education</u>

(1) Must be a graduate of an accredited college or university with a baccalaureate degree of not less than 120 semester hours.

(2) Must have completed three resident years of graduate professional study in theology or related subjects, validated by a Master of Divinity or equivalent degree, or 90 semester hours at an accredited seminary or graduate school of religion.

(3) Colleges, universities, graduate schools or semi-naries are considered accredited if listed in the <u>Education Directory, Colleges and Universities</u> (current edition) published

4

SECNAVINST 1120.4A
**1 4 MAY 1986**

by the U. S. Department of Education, National Center for Education Statistics, Washington, D. C. 20202, or the *Directory, ATS Bulletin Part 4* (current edition) published by the Association of Theological Schools, Vandalia, Ohio 45377. Foreign educational institutions not so listed may be treated as accredited upon certification by a listed institution that the applicant's credits are transferable at full value to the certifying institution.

b. <u>Ecclesiastical endorsement</u>. Must have endorsement from an ecclesiastical endorsing agency recognized by the Department of Defense under reference (m).

8. <u>Examination of professional qualifications</u>. The professional qualifications of all applicants for appointment in the Chaplain Corps or for voluntary recall from the Reserve component to the active-duty list shall be examined as follows:

a. <u>Appointments in grades of lieutenant commander and below</u>. The Chief of Chaplains shall examine and certify the professional qualifications of all applicants.

b. <u>Appointments in grades of commander and above</u>. The DCNO(MPT) shall appoint a Chaplain Qualifications Board (CQB) composed of senior Chaplain Corps officers to examine the professional qualifications of all applicants. The CQB shall certify, subject to the concurrence of the Chief of Chaplains, that the applicant has met fully the qualifications of paragraph 7 and certify which specific qualifications of the Table in paragraph 9 are fully met. The CQB shall also provide an evaluation of the quality and desirability of the candidate based on his/her professional qualifications and experience.

c. <u>Voluntary recall</u>. To be eligible for voluntary recall from the Reserve component to the active-duty list, the applicant must be a fully qualified member of the clergy of a religious faith group represented by a DOD-recognized ecclesiastical endorsing agency under reference (m). Recalled officers will be recalled in the rank held as a Reserve and will not have entry grade recomputed.

d. <u>Examination procedure</u>. The examining body will review an applicant's academic performance, graduate theological education, professional experience, professional reputation, interviews by a recruiting officer and a chaplain, letters of personal or professional recommendation and ensure that an ecclesiastical endorsement has been submitted for each applicant. This review must be completed before recommending the applicant for appointment or recall and prior to recommending

5

SECNAVINST 1120.4.

**1 4 MAY 1986**

entry grade credit to be awarded on appointment. Once the examining body has examined and certified the applicant's professional qualifications, DCNO(MPT) or Commander, Navy Recruiting Command acting for DCNO(MPT) shall determine whether the applicant is otherwise qualified for a commission as a chaplain. No applicant shall be appointed as a Chaplain Corps officer without these determinations.

9. <u>Entry grade credit</u>. Entry grade and date of rank upon appointment in the Chaplain Corps shall be based on the number of years of entry grade credit awarded for prior active commissioned service, advanced education and professional experience under reference (e). Credit shall be granted subject to the computation rules in paragraph 10 and as specified in the following table:

ENTRY GRADE CREDIT TABLE

| Qualification | Credit |
|---|---|
| 1. Commissioned service in any of the Uniformed Services on active duty or in an active status but not active duty other than as a theological student. | one year for each year |
| 2. Successful completion of graduate professional study validated by a Master of Divinity or equivalent degree under the criteria of paragraph 7. | three years |
| 3. Seven or more years of full-time practical experience in ministry following completion of the educational requirements in paragraph 7. To be credited, the applicant must have accrued the experience as a fully qualified member of the clergy of a religious faith group represented by a DOD-recognized ecclesiastical endorsing agency under reference (m). The experience may include pastoral ministry, religious education or other form of full-time religious vocation. | one year |
| 4. Unusual cases involving special experience or unique qualifications. | One-half year for each year |

6

SECNAVINST 1120.4A
**1 4 MAY 1986**

| | |
|---|---|
| 5.  The Department of the Navy will not normally grant entry grade credit for special experience or unique qualifications.  ASN (M&RA), considering the recommendations and supporting justification of DCNO(MPT), may waive this limitation on a case by case basis when there is a requirement that cannot be met within the guidelines of this instruction. | up to a maximum of three years of credit |

10.  <u>Limits and Computation of entry grade credit</u>.  Entry grade credit shall be computed as follows:     (A

a.  A period of time or a qualification shall be counted only once.

b.  Qualifying periods of less than one full year will be proportionally credited to the nearest day.

c.  Credit will not be awarded for service as a warrant officer.

d.  Graduates of the Service academies will not be awarded credit for any service performed or education, training or experience obtained before graduation from the academy concerned.

e.  Entry grade credit will not normally be awarded for education, training or experience obtained while on active duty or on inactive duty in an active status.  If the officer completes advanced education specified in paragraph 7 for initial appointment in less than the normal number of years, the officer may be given constructive credit for the difference between the normal number of years and the actual number of years taken. Detailed guidance is furnished in sections 533 and 5600 of reference (j).

f.  To obtain a high level of experience in the naval chaplaincy environment before entering the career force total entry grade credit shall normally be limited to six years.  ASN (M&RA), considering the recommendations and supporting justification of the DCNO(MPT), may waive this limit on a case by case basis when there is a requirement that cannot be met within the guidelines of this instruction.

g.  Because the recall of a Chaplain Corps officer from inactive duty is not an appointment, such officers are not entitled to additional entry grade credit.

SECNAVINST 1120.4A

**1 4 MAY 1986**

A)  11.  Entry grade credit in transition period.  This instruction
provides credit to be awarded to individuals appointed in the
Chaplain Corps from the effective date of this instruction.
There shall be no retroactive changes made as a result of this
instruction to the number of years credit previously granted to
officers appointed in the Chaplain Corps before the effective
date of this instruction.

B)  12.  Appointments.  A prospective Chaplain Corps officer will be
appointed initially as a Naval Reserve officer subject to the
following guidance governing entry grade, date of rank, prece-
dence, and application processing:

    a.  Entry grade.  A prospective Chaplain Corps officer shall
be appointed in a grade based on total entry grade credit
awarded.  The minimum entry grade credit required for each grade
is equal to the promotion flow points prescribed in the approved
annual five-year promotion plan in effect at the time of appoint-
ment.  Entry grade and date of rank of Chaplain Corps officers
transferred from other Services into the Chaplain Corps of the
Navy shall be determined under references (c) and (d).

    b.  Date of rank.  When the minimum entry grade credit
required for appointment in a given grade is granted, the date
of rank shall be the date of appointment.  When entry grade
credit is granted in excess of the minimum years required for
appointment in a given grade (but less than the amount necessary
to justify the next higher grade), the excess credit shall be
used to adjust the date of rank within grade.  The appointee's
excess entry grade credit shall be compared with the time-in-
grade of Chaplain Corps officers on the active-duty list in the
same grade.  The date of rank upon appointment shall be the same
as that of the Chaplain Corps officer on the active-duty list in
the same grade with time-in-grade most equal to, but not less
than, the appointee's excess entry grade credit.

    c.  Assignment of precedence.  Each appointee will be placed
on the active-duty list or assigned precedence as follows:

        (1) Appointees ordered to active duty or retained on
active duty (other than active duty of Reserve officers as
described in Section 641(1) of reference (j)) incident to
appointment shall be placed on the active-duty list under the
provisions of reference (n).  All appointees whose placement on
the active-duty list would render them eligible for considera-
tion in zone or above zone for promotion by an active-duty
promotion selection board within one year of entering on active
duty shall be counseled regarding the option to defer eligi-
bility for consideration for promotion under reference (h), and
shall acknowledge such counsel in writing.

8

SECNAVINST 1120.4A
**1 4 MAY 1986**

(2) Appointees not concurrently ordered to or retained on active duty (other than active duty as described in Section 641(1) of reference (j)) shall be assigned a running mate on the active-duty list and placed on the inactive-duty precedence list in an active status under reference (o).

d. <u>Failure to complete qualifications</u>. Officers who fail to complete the Chaplain Basic Course or any required qualification in the Theological Student Program normally shall be relieved of any statutory service obligation and active-duty obligation incurred as a result of accepting an appointment into the Chaplain Corps or the Theological Student Program, and shall be separated for cause under reference (p) under the following guidelines:

(1) Officers who <u>do not have</u> pre-existing service obligations under prior appointments or enlistments shall normally have their service obligation cancelled and be discharged for cause.

(2) Officers who <u>have</u> pre-existing service obligations under prior appointments <u>shall</u> normally be reappointed in their previous competitive category to complete their initial service obligation.

(3) Officers who <u>have</u> pre-existing service obligations under prior enlistments <u>shall</u> normally be reverted to their previous enlisted status to complete their initial service obligation.

(4) The Chief of Naval Personnel may recommend, with supporting justification, retention and transfer to another competitive category when that action would be in the best interest of the naval service.

13. <u>Theological Student Program</u>. Selection and appointment for active duty in the Chaplain Corps through the Theological Student Program shall be made as required by enclosure (1) and paragraph 12.    (A

14. <u>Application Processing</u>. All qualified applicants accepted for appointment either on active duty or inactive duty shall be commissioned within 60 days following receipt of a complete application by Navy Recruiting Command. DCNO(MPT) may authorize delayed commissioning when a later time is requested by the applicant.    (A

15. <u>Responsibilities</u>    (A

a. The Chief of Naval Operations is responsible for:

9

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 6
Page 9 of 13

SECNAVINST 1120.4A
1 4 MAY 1986

      (1) Procurement and appointment of Chaplain Corps officers in compliance with this instruction, and

      (2) Establishing the annual accession plan.

    b.  The Deputy Chief of Naval Operations (Manpower, Personnel, and Training) may approve entry grade credit and establish entry grades and dates of rank in compliance with the guidelines in this instruction.

    c.  The Chief of Chaplains/Director of Religious Ministries is responsible for certification of professional qualifications and calculation of entry grade credit based on these qualifications for the DCNO(MPT).

    d.  The Commander, Navy Recruiting Command shall determine grade and date of rank based on this calculation subject to approval of the DCNO(MPT).

James F. Goodrich
Under Secretary of the Navy

Distribution:
SNDL A1       (Immediate Office of the Secretary)
    A3       (Chief of Naval Operations)
    A5       (Bureaus)
    FJ18     (Military Personnel Command)
    FJ76     (Recruiting Command)

Copy to:
SNDL A2A     (Department of the Navy Staff Offices) (JAG, only)

Stocked:
CO, NAVPUBFORMCEN
5801 Tabor Ave.
Phila., PA  19120-5099  (100 copies)

10

SECNAVINST 1120.4A CH-1
3 DEC 1986

## THEOLOGICAL STUDENT PROGRAM

1. **Purpose.**  To aid in meeting future year accession requirements for chaplains on the active-duty list and in the Reserve Component.  DCNO(MPT) will conduct a Theological Student Program within the following guidelines.

2. **Eligibility.**  Candidates must meet the basic qualifications in paragraph 6 and must:

    a.  Receive a letter of approval from a religious faith group recognized under reference (m).

    b.  Have a baccalaureate degree of not less than 120 semester hours from an accredited college or university.

    c.  Be matriculated in an accredited graduate theological school in a program of professional study in theology or related subjects leading to a Master of Divinity or its equivalent.  The school is considered accredited if listed in the Education Directory, Colleges and Universities (current      (A edition) published by the U.S. Department of Education, National Center for Education Statistics, Washington, D.C. 20202, or if listed as accredited in the Directory, ATS      (R Bulletin Part 4 (current edition) published by the Association of Theological Schools, Vandalia, Ohio, 45377.  Foreign educational institutions not so listed may be treated as accredited upon certification by a listed institution that the applicant's credits are transferable at full value to the certifying institution.

    d.  Maintain a satisfactory full time standing under the standards of the graduate theological school in which enrolled and in any training program prescribed by their religious faith group.

3. **Appointment.**  Candidates selected for the program will be appointed as a Reserve Ensign in the Unrestricted Line, Designator (1945) for inactive duty, inactive status, during the period of their professional studies, under the following conditions:

    a.  Serve without pay or allowances while in a student status except during periods of active duty for training.

Enclosure (1)

SECNAVINST 1120.4A CH-1
3 DEC 1986

    b.  Complete theological education and receive a degree.

    c.  Obtain an ecclesiastical endorsement under paragraph
7b.

    d.  Complete Chaplains School basic course.

    e.  Accept, if offered, a superseding appointment to
Lieutenant (junior grade) in the Chaplain Corps, USNR, 4105,
for active or inactive duty under reference (b).

    f.  Total service obligation is eight years.  Service
after superseding appointment in the Chaplain Corps is in
active status in the Reserve.  For officers appointed to
active-duty list, initial active duty obligation is three
years.

4.  <u>Disenrollment</u>.  Theological Student Program officers may
be separated from the Naval Reserve under paragraph 12d in the
following circumstances:

    a.  Withdrawal of the letter of approval by the student's
religious faith group.

    b.  Academic failure.

    c.  Discontinuing professional training or withdrawal from
school without prior assurance of resumption within one year.

    d.  Failure to obtain a Master of Divinity or equivalent
degree.

    e.  Failure to obtain an ecclesiastical endorsement for
superseding appointment.

    f.  Failure to attend or successfully complete the
Chaplain Basic Course when ordered to that school.

5.  <u>Active Duty for Training</u>.  Theological Student Program
officers, in the discretion of the Chief of Chaplains, after
the completion of Chaplain Basic Course, may be voluntarily
called to active duty for training for on-the-job-training
under the supervision of a chaplain.  Such assignments shall,
to the extent possible, involve tasks in religious ministry
programs consistent with the level of training of the officer.
The assignment will be performed at a command as near the
theological student's school as possible, except as may be
otherwise directed by the Chief of Chaplains.

Enclosure (1)          2

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 6
Page 12 of 13

SECNAVINST 1120.4A CH-1

**3 DEC 1986**

6. <u>Superseding Appointment in the Chaplain Corps</u>.  DCNO(MPT) may offer to Theological Student Program officers who successfully complete the requirements for superseding appointment, to the extent necessary to meet current year accession plan requirements for the active-duty list and the Reserve Component, superseding appointments in the Chaplain Corps, U. S. Naval Reserve.

   a.  Selection will be based on criteria established by DCNO(MPT) and the Chief of Chaplains.

   b.  Those not offered a superseding commission, and those who do not accept one when offered, will be honorably discharged from the Naval Reserve under paragraph 12d.

3                              Enclosure (1)



THE SECRETARY OF DEFENSE

WASHINGTON, THE DISTRICT OF COLUMBIA

9 FEB 1987

Honorable Sam Nunn
Chairman, Committee on Armed Services
United States Senate
Washington, D. C.  20510

Dear Mr. Chairman:

Attached is the "Study of Representation of Religious Faiths

in the Armed Forces" as required by Section 513, The National

Defense Authorization Act for Fiscal Year 1987.

Sincerely,

Attachment

STUDY OF REPRESENTATION OF

RELIGIOUS FAITHS

IN THE ARMED FORCES

Section 513, DoD Defense Authorization Act, 1987

## ANALYSIS OF FAITH COMPOSITION

1.  A statistical listing of the faith composition of
the Armed Forces and of the Corps of Chaplains, to include an
analysis of how the number of adherents to faith groups is
determined.

The statistical listing of the faith composition of the Armed

Forces is at Section II-1.  The religious preference of military

members is made on a voluntary basis by the service member at the

point of entry into the service.  The primary reason for

requesting this information is to provide data in the event of an

emergency.  Redesignation of religious preference is made only

upon the specific request and at the initiative of the service

member.  The Services do require a periodic review of essential

data by service members.  However, changes occur only at the

request of the service member.  Each service employs its own

methodology for data collection.

Since the information found in II-1 is based solely upon the

input provided by the service member, the accuracy of the

statistics is probably more approximate than exact.  They do

indicate the diversity of the religious preference of service

members and highlight the complexity of military chaplaincy in a

pluralistic environment.  These data show that 84.55 percent of

the military population has indicated a religious preference, of

which 90.93 percent have indicated a specific religious

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
                    Exhibit 7.
                    Page 3 of 7

preference by naming a particular faith body.  A recent survey, "The Gallup Report," No. 236, May 1985, reveals that the religious preferences of Americans (religious preference is different from recorded membership, the latter always being lower) closely approximates the listings of the religious preferences of military members.  57 percent of the general population list Protestant as their religious preference, while 54.7 percent of the military population list a specific Protestant faith group; 28 percent of the general population list Catholic while 26.19 percent of the military population do the same; 2 percent of the general population list themselves as Jewish, while only .37 percent of the military population list the same faith; 4 percent of the general population show a preference for some religion other than listed above, while 3.99 percent of the military population fall into the same category; and 9 percent of the general population list "none" for religious preference, while 14.75 percent of the military population list "no religious preference" or "atheist."  The conclusion of this comparison is that the military population tend to reflect their civilian counterparts in religious affiliation.  The slightly higher incidence of "none" or "no religious preference" among the military population bears out the Gallup Survey's finding that younger people (the vast majority of the military population can be so classified) tend to have less defined religious affiliations.  The Gallup Survey found that among the general

I-2

population polled who were between 25 and 29 years of age, 13
percent listed "none" for religious preference.  It must be noted
that even the military population listing "no religious
preference" desire and utilize chaplaincy ministry and are often
very active in exercising their religious expression by
requesting the services of a chaplain for such things as
counseling, marriages, funerals, worship, and education.

The religious affiliation of the military chaplaincy is at
Section II-4.  Currently the military chaplaincies are composed
of clergy from 105 faith groups, with the highest percentage of
clergy listed as follows:  the Roman Catholic Church (19.84
percent), the Southern Baptist Convention (12.96 percent), the
United Methodist Church (10.72 percent), and Lutheran Churches,
which include the Lutheran Church in America, the Missouri Synod
Lutheran Church, and the American Lutheran Church (7.92 percent).
Typical of institutional ministries, the religious demographics
of the chaplaincy are not exactly proportional to the religious
preferences of the military population.  What is reflected,
however, is that the current diversity within the military
chaplaincy meets the diversified religious needs of military
personnel.

An appropriate faith distribution within the military chaplaincy
must meet the needs of the Military Services, through the

Chaplain Corps/Services, to provide for the free exercise of religion. The present system of chaplaincy management is based upon a long tradition of successfully providing for the free exercise of religion and meeting the religious needs of military personnel. Out of this history and tradition has evolved an expertise for efficiently and effectively deploying chaplains throughout the world. Given a fixed number of chaplains in the military chaplaincy, the Services must first decide how these resources are to be distributed. For example, how many units will be served by one chaplain, how many by two, how many by three or more? Factors in making this determination consist of the size of the unit, location of the unit (CONUS or overseas), mission and operational schedule (deployments), and proximity to other units with chaplains assigned. Once having decided the number of chaplains that will serve a unit, then the faith composition of the chaplaincy becomes a factor. In units served by a single chaplain, the denomination of the chaplain is not the only factor: what is important in such cases is whether in keeping with the tenets of his/her faith, the chaplain can minister in a pluralistic environment and is willing and able to provide for the religious needs of all members of the unit. In units with two chaplains assigned, experience has shown that the religious needs of the unit members are best served if a Roman Catholic chaplain and a Protestant chaplain are assigned. In units where there are three chaplains, the needs are best met by the assignment of a Roman Catholic chaplain, one chaplain who

will be able to meet the liturgical needs of the Protestant
members of the unit and one chaplain who will serve the needs of
those with a less defined liturgical orientation. In the case of
Jewish chaplains, assignment is based upon worldwide mission
requirements and the availability of local Jewish resources.
With knowledge of the accumulation of unit requirements, the
Services are able to develop assignment policies that determine
the broad requirements within which various faith group mixtures
of the military chaplaincies can be effective.

Defs.' Opp. to Pls.' Rule 54(b) Motion to Alter or Amend
Exhibit 7
Page 7 of 7

```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF COLUMBIA

 3

 4      - - - - - - - - - - - - - - - - - - X

 5      CHAPLAINCY OF FULL GOSPEL              :

 6      CHURCHES, et al.,                      :

 7               Plaintiffs,                   :

 8      v.                                     :  Civil Action No.

 9      THE HONORABLE GORDON R. ENGLAND,       :  1:99cv02945 (RMU)

10      Secretary of the Navy, et al.          :

11                                             :

12               Defendants.                   :

13      - - - - - - - - - - - - - - - - - - X

14      - - - - - - - - - - - - - - - - - - X

15      ROBERT H. ADAIR, et al.,               :

16               Plaintiffs,                   :

17      v.                                     :  Civil Action No.

18      THE HONORABLE GORDON R. ENGLAND,       :  1:00cv00566 (RMU)

19      Secretary of the Navy, et al.,         :

20               Defendants.                   :

21      - - - - - - - - - - - - - - - - - - X

22

23

24

25
```

ALDERSON REPORTING COMPANY
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

**Page 2**

```
 1                    Camp Lejeune, N.C.
 2                Tuesday, December 16, 2003
 3            Deposition of David S. Wilder, a
 4   Plaintiff in the above-entitled matter, pursuant to notice,
 5   the witness being duly sworn by TRACY SCHELL of Wilmington,
 6   N.C., taken at the Office of the Staff Judge Advocate, Marine
 7   Corps Base Camp Lejeune, Building 66, Camp Lejeune, North
 8   Carolina 28542, at 10:00 a.m., Tuesday, December 16, 2003,
 9   and the proceedings being taken down by Stenotype by Tracy
10   Schell, RPR, and transcribed under her direction.
11   APPEARANCES:
12   On behalf of the Plaintiffs:
13        ARTHUR A. SCHULCZ, SR., ESQ.
14        2521 Drexel Street
15        Vienna, VA 22180
16
17   On behalf of the Defendants:
18        MICHAEL Q. HYDE, ESQ.
19        Trial Attorneys
20        Federal Programs Branch, Civil Division
21        U.S. Department of Justice
22        P.O. Box 883
23        20 Massachusetts Ave., N.W. Room 6138
24        Washington, D.C. 20044
25        (202) 514-2205
```

**Page 3**

```
 1   APPEARANCES CONTINUED:
 2   Of Counsel:
 3        LT. COMMANDER JENNIFER L. ROPER
 4        Office of the Judge Advocate General
 5        Department of the Navy
 6        Washington Navy Yard, Bldg 33
 7        1322 Patterson Avenue, S.E., Suite 3000
 8        Washington, D.C. 30274-5066
 9
10   Also Present:  Chaplain Jimmy Meyers
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1              C O N T E N T S
 2   WITNESS         EXAMINATION BY COUNSEL FOR
 3   DAVID S. WILDER          DEFENDANT
 4   By Mr. Hyde             5
 5              PLAINTIFF
 6   By Mr. Schulcz          255
 7              E X H I B I T S
 8   DEFENDANT'S EXHIBIT NO.          PAGE NO.
 9   1 - Continuation Response         23
10   2 - Fitness reports            30
11   3 - Interrogatories            118
12   4 - Supplement to Interrogatories     120
13   5 - Memorandum for the Record         168
14   6 - Copies of church bulletins     171
15   7 - Fitness report, 01JUL01       223
16   8 - Fitness report, 01JUL01       226
17   9 - Fitness report, 22OCT03       229
18   10 - Additional comments         244
19   11 - Observations on Center for Naval Analysis 251
20   12 - Declaration of David S. Wilder    252
21   13 - Declaration of David S. Wilder    254
22
23
24
25
```

**Page 5**

```
 1              P R O C E E D I N G S
 2   Whereupon,
 3              DAVID S. WILDER
 4   was called as a witness by counsel for Defendant, and
 5   having been duly sworn by the Notary Public, was
 6   examined and testified as follows:
 7        EXAMINATION BY COUNSEL FOR DEFENDANT
 8        BY MR. HYDE:
 9        Q.  Chaplain Wilder, would you state your full for the
10   court reporter.
11        A.  Okay.  David Sterling, S-T-E-R-L-I-N-G, Wilder.
12        Q.  Chaplain Wilder, my name is Michael Hyde.  I'm an
13   attorney with the Department of Justice.  I represent the
14   Defendants in this action.
15        A.  Uh-huh.
16        Q.  Just as an initial, I'm going to try and call you
17   Chaplain today.  I may call you Mister.  It's not -- I don't
18   mean to be disrespectful.  It's a habit when I say Mr. or
19   Ms., but I'm going to try to call you by Chaplain or your
20   rank.  As I'm sure your attorney, Mr. Schulcz, explained to
21   you, I'm going to be asking you a series of questions today.
22   Please answer them as fully and completely as you can, as
23   truthfully as you can to the best of your ability.  If you do
24   not understand a question, please let me know.  And I'm not
25   going to try and trick you.  I want you to understand the
```

ALDERSON REPORTING COMPANY
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 94

1  people come up to you, and they say things like, you know,
2  what kind of chaplain are you. Well, what do you mean what
3  kind. Well, what denomination. Well, I'm Southern Baptist.
4  Well, my gosh, why can't we have a Southern Baptist service
5  sometimes, you know. And there's very few places that I've
6  been that we've had that.
7      Q.  So at Cherry Point -- at Cherry Point -- I keep
8  wanting to say Cherry Hill. At Cherry Point while you were
9  there about how many, if any, complaints did you get from
10  service members about non-liturgical services, approximation?
11     A.  Gosh, I don't know a number. I'm going to say a
12  lot, and most of the time they would come up with something
13  like, when we're deployed, you know, when we're in field and
14  we're doing services, and we have a free church style
15  service, they would say, you know, can we continue this when
16  we get back, you know. We don't have anything like this
17  around here. And the best answer really is to send them to
18  the Baptist Church up in town. The, you know, Church of the
19  Nazarene, or to, you know, Assembly of God, or whatever their
20  faith background is because they can find that. When you're
21  in the states, you have the luxury of going out in town and
22  finding a church that's somewhere close to your faith
23  tradition.
24      In Okinawa, for example, there was a Southern
25  Baptist church right near Camp Courtney, but it was a

Page 95

1  missionary speaking Japanese to the Japanese people. And so
2  you go there and you're not going to understand a thing
3  that's going on, so the base program is all there was.
4      Q.  At Cherry Point, you said assigned to Cherry Point,
5  not your group but at the base you had two Baptists and one
6  Episcopalian. So the two Baptists were Non-liturgical.
7      A.  Uh-huh.
8      Q.  The Episcopalian was liturgical?
9      A.  Yes.
10     Q.  My mind is drawing a blank. Could you just give me
11  the name of another non-liturgical denomination besides
12  Baptist?
13     A.  Assembly of God.
14     Q.  Okay.
15     A.  Pentecostal Holiness.
16     Q.  Let's go with the Assembly of God. What -- there
17  are two Baptists, two Baptists at the base.
18     A.  Yeah.
19     Q.  How would they be able to meet the needs, the
20  religious needs of a service member who's with the Assembly
21  of God?
22     A.  By having a free church style worship service, and
23  it would be a natural thing for them to be able to do, but
24  the General Protestant Service is a liturgical format. Do a
25  -- you've got two non-liturgical chaplains, do a

Page 96

1  non-liturgical service.
2      Q.  Is it your understanding that -- well, you've given
3  me an example where two Baptists can provide the service that
4  a service member with the Assembly of God could go to.
5      A.  Uh-huh.
6      Q.  Is that option available for the Roman Catholics?
7  In other words, there on the base --
8      A.  I don't understand the question.
9      Q.  Can they -- can a Roman Catholic service member's
10  needs be met by a chaplain other than a Roman Catholic?
11     A.  If there was no Roman Catholic priest available, I
12  would think that a Roman Catholic person would feel
13  relatively comfortable at an Episcopal style worship or at
14  even a Lutheran worship. It's pretty close. The form of
15  worship is pretty close. Now, are they going to be getting
16  mass from a Catholic priest, you know, serving communion to
17  them in that setting, no. So they might argue, well, our
18  needs really aren't being met and they'd be correct, but it's
19  close, if you follow me. But our approach of having a
20  General Protestant Worship Service where kind of the idea
21  behind it is, it's sort of a hodge podge service. It's kind
22  of some elements of Methodist, some elements of Episcopal,
23  some elements of Presbyterian, and kind of put together with
24  the idea that that's going to meet the needs of all
25  Protestants. The problem is that those different -- those

Page 97

1  different elements of the Protestant faith expression that
2  they pulled together for that General Protestant Service are
3  all from liturgical traditions, there's nothing there
4  from the evangelical free church style tradition.
5      And so, I have people all of the time go to the
6  General Protestant Worship Service, and go, when can we go to
7  church because I don't feel like I've been to church, because
8  it's a totally different style of worship, and there's no
9  emphasis on salvation, accepting Christ, confession of faith.
10  They have a confession of faith but it's not what we would
11  consider a confession of faith. We use the same words and
12  it's an entirely different experience.
13     Q.  When you -- if someone from MAG 14 came to you.
14     A.  Okay.
15     Q.  Someone within your group you were actually
16  assigned to by chaplain for, they would come to you and say
17  I'm looking for a non-liturgical service, did you have the
18  option of holding a service of some sort through MAG 14
19  rather than through Cherry Point?
20     A.  Not really.
21     Q.  Why not?
22     A.  For one thing, we have a place. And secondly, it
23  would be seen as kind of competition with the base chaplain
24  program. There was certainly no budgeting for it. You would
25  have no musician, no materials. And then -- but you look

25 (Pages 94 to 97)

ALDERSON REPORTING COMPANY
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

David S. Wilder

Camp Lejeune, NC

December 16, 2003

Page 268

1          MR. SCHULCZ:  Let's go back on the record.

2          MR. HYDE:  We're going back on?

3          MR. SCHULCZ:  Yeah, we're going back on.  Chaplain

4    Wilder, after this court reporter types this up, you'll be

5    sent a copy.  And review the copy, and check it for errors,

6    typos, and then you'll be asked to sign it and have it —

7    notarized, and then you send it back to me.

8

9                          _David S. Wilder_

10                         DAVID S. WILDER

11

12   SUBSCRIBED AND SWORN to before me this day

13   of _January 9th_, 2004

14

15   _Jennifer P. Waters_

16   Notary Public

17   My commission expires: 9/3/08

18

19

20

21

22

23

24

25

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

IN RE:                                          :
NAVY CHAPLAINCY                                 :
                                                :          Misc. Action No. 07mc269 (RMU)
                                                :
_____:


[proposed] **ORDER**


Upon consideration of Plaintiffs' Rule 54(b) Motion to Alter or Amend the Court's 2002

Interlocutory Decision [docket no. 21] and the parties' briefing thereon, the Court finds that

plaintiffs have failed to show they are entitled to the requested relief.  Accordingly, it is

ORDERED that plaintiffs' motion for a preliminary injunction is DENIED.

DONE, this  _____ day of _____, 2008.



_____
RICARDO M. URBINA
United States District Judge