# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

IN RE NAVY CHAPLAINCY : Miscellaneous Action No.: 07-269 (RMU)
:
: Re Document Nos.: 21, 29, 42

## MEMORANDUM OPINION

**DENYING THE PLAINTIFFS' MOTION TO ALTER OR AMEND THE COURT'S JANUARY 10, 2002
INTERLOCUTORY JUDGMENT, OR, IN THE ALTERNATIVE, TO CERTIFY JUDGMENT;
DENYING PLAINTIFF CHAPLAINCY FULL GOSPEL CHURCHES' MOTION TO ALTER OR AMEND
THE COURT'S AUGUST 17, 2000 INTERLOCUTORY JUDGMENT, OR, IN THE ALTERNATIVE, TO
CERTIFY JUDGMENT; GRANTING IN PART AND DENYING IN PART THE DEFENDANTS' MOTION
FOR PARTIAL DISMISSAL**

# I.  INTRODUCTION

This matter is before the court on the plaintiffs' motion to alter or amend the court's

interlocutory judgment that was issued on January 10, 2002, or, in the alternative, to certify the

judgment for appeal under Federal Rule of Civil Procedure 54(b).  The court further considers a

similar motion filed by one of the plaintiffs, the Chaplaincy of Full Gospel Churches ("CFGC"),

requesting that the court alter or amend its August 17, 2000 decision, or, in the alternative, that it

certify judgment.  Lastly, the court addresses the defendants' motion for partial dismissal.  For

the reasons explained below, the court denies both of the plaintiffs' motions to alter or amend the

court's previous judgments, as well as the alternative requests for certification under Rule 54(b).

Furthermore, the court grants in part and denies in part the defendants' motion for partial

dismissal.

## II. FACTUAL & PROCEDURAL BACKGROUND

Because the court has published more than a dozen opinions in this case, it will dispense with a full recitation of its lengthy and convoluted background.[1]  For ease and readability, however, the court presents here a skeletal description of the plaintiffs' claims,[2] offering a more comprehensive background throughout its discussion where such information proves necessary.

Briefly stated, the plaintiffs claim that the Department of the Navy and several of its officials (collectively, "the defendants") have discriminated against the plaintiffs on the basis of their religion, by establishing, promoting and maintaining "illegal religious quotas" and religious preferences in their personnel decision-making.  *Adair v. England*, Civ. No. 00-566 ("Adair"), 4th Am. Compl. ¶ 1; *Chaplaincy of Full Gospel Churches v. England*, Civ. No. 99-2945 ("CFGC"), 4th Am. Compl. ¶ 1; *Gibson v. Dep't of Navy*, Civ. No. 06-1696 ("Gibson"), Am. Compl. ¶ 1.  More specifically, the plaintiffs allege that the Navy discriminates against members of "non-liturgical" religions[3] when making decisions for the promotion, accession,[4] retention and separation of Navy chaplains.  *Adair*, Mem Op. (Jan. 10, 2002) at 5-9.

---

[1]   For a detailed account of the factual allegations, *see Adair v. England*, 183 F. Supp. 2d 31, 34-38, 40-45 (D.D.C. 2002).

[2]   The court by no means intends here to reiterate all of the plaintiffs' claims.  This memorandum opinion involves three consolidated cases, each with a complaint over 85 pages long and involving multiple claims.  *See generally Adair v. England et al.*, Civ. No. 00-566 ("Adair"), 4th Am. Compl.; *Chaplaincy of Full Gospel Churches v. England*, Civ. No. 99-2945, 4th Am. Compl.; *Gibson v. Dep't of Navy*, Civ. No. 06-1696 ("Gibson"), Am. Compl.

[3]   The term "non-liturgical" denotes Christian denominations or faith groups that do not have a formal liturgy or order in their worship service.  *Adair*, Mem Op. (Jan. 10, 2002) at 5.

[4]   The term "accessions" refers to individuals that the Chaplain Corps brings into the Navy, either active duty or reserve, as commissioned officers during the current fiscal year.  *Adair v. England*, 217 F. Supp. 2d 7, 9 n.5 (D.D.C. 2002).

Three cases were commenced, all raising "substantially similar constitutional challenges to the Navy Chaplaincy program." *In re Navy Chaplaincy*, Miscellaneous No. 07-269, Mem. Order (June 18, 2007) at 3-4.   The court ultimately determined that these cases, *Adair v. England*, *CFGC v. England* and *Gibson v. Dep't of the Navy*, should be consolidated under the caption *In re Navy Chaplaincy. See id.* at 4.

Although their constitutional challenges are nearly identical, the plaintiffs in each case are varied.  The *Adair* plaintiffs are 17 current and former non-liturgical chaplains in the Navy. *Adair*, Mem. Op. (Jan. 10, 2002) at 2.  In the *CFGC* case, the plaintiffs are composed of an endorsing agency for non-liturgical military chaplains called the Chaplaincy of Full Gospel Churches and seven of its individual members.  *Id.*  Lastly, the *Gibson* plaintiffs consist of 41 individual plaintiffs and one organizational plaintiff, the Associated Gospel Churches, which is "a fellowship of non-denominational, evangelical churches."  *Gibson*, Am. Compl. ¶ 3.

In the latest iteration of this longstanding dispute, the plaintiffs move the court to alter or amend two of its previous judgments.  Alternatively, the plaintiffs ask the court to certify these judgments for appeal under Rule 54(b).  The defendants, for their part, move the court to partially dismiss the plaintiffs' claims.  With the parties' respective motions ripe for consideration, the court turns to the parties' arguments and the applicable legal standards.

## III.  ANALYSIS

### A.  The Court Denies Both of the Plaintiffs' Rule 54(b) Motions

### 1.  Legal Standard for Altering or Amending an Interlocutory Judgment

A district court may revise its own interlocutory decisions "at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties."  FED. R.

CIV. P. 54(b); *see also Childers v. Slater*, 197 F.R.D. 185, 190 (D.D.C. 2000) (citing the

Advisory Committee Notes to Federal Rule of Civil Procedure 60(b)).  The standard for the

court's review of an interlocutory decision differs from the standards applied to final judgments

under Federal Rules of Civil Procedure 59(e) and 60(b).  *Compare Muwekma Tribe v. Babbitt*,

133 F. Supp. 2d 42, 48 n.6 (D.D.C. 2001) (noting that "motions for [relief upon] reconsideration

of interlocutory orders, in contrast to motions for [relief upon] reconsideration of final orders, are

within the sound discretion of the trial court") *and United Mine Workers v. Pittston Co.*, 793 F.

Supp. 339, 345 (D.D.C. 1992) (discussing the standard applicable to motions to grant relief upon

reconsideration of an interlocutory order) *with LaRouche v. Dep't of Treasury*, 112 F. Supp. 2d

48, 51-52 (D.D.C. 2000) (analyzing the defendant's motion for relief from judgment under Rule

60(b)) *and Harvey v. District of Columbia*, 949 F. Supp. 878, 879 (D.D.C. 1996) (ruling on the

plaintiff's motion to alter or amend judgment pursuant to Rule 59(e)).  A motion pursuant to

Rule 59(e), to alter or amend a judgment after its entry, is not routinely granted.  *Harvey*, 949 F.

Supp. at 879.  The primary reasons for altering or amending a judgment pursuant to Rule 59(e)

or Rule 60(b) are an intervening change of controlling law, the availability of new evidence, or

the need to correct a clear error or prevent manifest injustice.  *Id.*; *Firestone v. Firestone*, 76 F.3d

1205, 1208 (D.C. Cir. 1996) (per curiam); FED. R. CIV. P. 60(b); *LaRouche*, 112 F. Supp. 2d at

51-52.

        By contrast, relief upon reconsideration of an interlocutory decision pursuant to Rule

54(b) is available "as justice requires."  *Childers*, 197 F.R.D. at 190.  "As justice requires"

indicates concrete considerations of whether the court "has patently misunderstood a party, has

made a decision outside the adversarial issues presented to the [c]ourt by the parties, has made an

error not of reasoning, but of apprehension, or where a controlling or significant change in the

law or facts [has occurred] since the submission of the issue to the court." *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004) (internal citation omitted).  These considerations leave a great deal of room for the court's discretion and, accordingly, the "as justice requires" standard amounts to determining "whether [relief upon] reconsideration is necessary under the relevant circumstances." *Id.*  Nonetheless, the court's discretion under Rule 54(b) is limited by the law of the case doctrine and "subject to the caveat that, where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Singh*, 383 F. Supp. 2d at 101 (internal citations omitted).

### 2. Legal Standard for Rule 54(b) Certification of Final Judgment

Federal Rule of Civil Procedure 54(b) allows a district court in a case with multiple parties or multiple claims to "direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." FED. R. CIV. P. 54(b).  The purpose of Rule 54(b) is to "mediate[] between the sometimes antagonistic goals of avoiding piecemeal appeals and giving parties timely justice." *Taylor v. Fed. Deposit Ins. Corp.*, 132 F.3d 753, 760 (D.C. Cir. 1997).

Whether a case is one of the "exceptional cases" qualifying for Rule 54(b) certification is a decision that falls within the discretion of the district court, which is "most likely to be familiar with the case and with any justifiable reasons for delay." *Bldg. Indus. Ass'n of Super. Calif. v. Babbitt*, 161 F.3d 740, 743 (D.C. Cir. 1998) (quoting *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 437 (1956)).  Under the rule, "the district court [functions] as a dispatcher, determining in its sound discretion when a claim should proceed on to appellate resolution and when it should await its fellows." *Petties v. District of Columbia*, 227 F.3d 469, 472 (D.C. Cir. 2000) (internal

5

quotations omitted); *see also Hill v. Henderson*, 195 F.3d 671, 672 (D.C. Cir. 2000) (describing Rule 54(b) as an "escape hatch" permitting a partial disposition to become a final judgment).

The district court, however, must make certain determinations on the record before the appellate court can acquire jurisdiction. *Bldg. Indus. Ass'n*, 161 F.3d at 743; *see also Haynesworth v. Miller*, 820 F.2d 1245, 1253 (D.C. Cir. 1987) (noting that a district court's "[f]ailure to take the steps specified in Rule 54(b) is more than a mere technicality; without compliance, a federal court of appeals lacks jurisdiction to entertain challenges to the order"). First, the district court must ensure that it is dealing with a final judgment: "final" in the sense that it is "an ultimate disposition of an individual claim entered in the course of a multiple claims action," and "a 'judgment' in the sense that it determines a claim for relief." *Bldg. Indus. Ass'n*, 161 F.3d at 744 (quoting *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7 (1980)).

Second, the court must determine whether there is any just reason for delay, keeping in mind that "[n]ot all final judgments on individual claims should be immediately appealable, even if they are in some sense separable from the remaining unresolved claims." *Id.* (quoting *Curtiss-Wright Corp.*, 446 U.S. at 8). Before "departing from the norm" by certifying a final judgment, the court "*must* take into account judicial administrative interests," including "such factors as whether the claims under review were separable from the others remaining to be adjudicated and whether the nature of the claims already determined was such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals." *Id.* (emphasis in original) (quoting *Curtiss-Wright Corp.*, 446 U.S. at 8); *see also Hill*, 195 F.3d at 672 (noting that when review is deferred, "it is less likely that the appellate court will face overlapping issues and circumstances on two occasions"). The court must also consider the equities involved. *Bldg. Indus. Ass'n*, 161 F.3d at 744 (citing *Curtiss-Wright Corp.*, 446 U.S. at 8).

**3. The Plaintiffs' Motion to Alter or Amend the Court's January 10, 2002 Judgment, or, in the Alternative, to Certify Judgment**

**a. The Court's January 10, 2002 Judgment & Subsequent Related Litigation**

On January 10, 2002, the court issued a memorandum opinion that granted in part a motion to dismiss that had been previously filed by the defendants. *See generally Adair*, Mem. Op. (Jan. 10, 2002). Of particular relevance here, the court determined that the plaintiffs failed to state a claim with respect to allegations that the defendants had violated the Establishment Clause by allowing chaplains to rate other chaplains and permitting more than one chaplain to sit on a chaplain selection board. *Id.* at 47. Guided by well-settled case law that requires a court to presume that government officials will conduct themselves properly and in good faith, the court refused to assume, despite the plaintiffs' urging, that "the usual rule for a chaplain sitting on a promotion board will be to discriminate against promotion candidates on the basis of religious denomination." *Id.* at 48. The court further rejected the plaintiffs' contention that "having chaplains rate other chaplains delegates a religious function to the governmental body," concluding instead that "Navy chaplains are first and foremost Naval officers," and as such are presumed to undertake the duties of an officer in good faith. *Id.* The court further agreed with the defendants' reasoning that it made sense to allow chaplains to rate other chaplains because "the Chaplain Corps fulfills a unique mission within the Navy that requires it to perform duties significantly different from those of Naval line officers and Naval officers in other staff corps." *Id.* at 49.

Citing these same reasons, the court also dismissed the plaintiff's claim that "having more than one chaplain on a board would provide an opportunity for religious bias because selection boards will inherently discriminate among religious denominations based on their own preferences." *Id.* at 50. The court took particular note of the fact that "the plaintiffs never

7

explain[ed] why having one chaplain on a promotion board is constitutional, but having more than one chaplain is unconstitutional." *Id.*

Immediately after the opinion was issued, the plaintiffs asked the court to reconsider its dismissal of the plaintiffs' claim that "having chaplains sit on chaplain promotion boards and allowing chaplains to rate other chaplains are practices that violate the First Amendment." *CFGC*, Mem. Op. (Aug. 5, 2002) at 3.  The court subsequently denied that motion, explaining that it had "reviewed the plaintiffs' allegations in the light most favorable to the plaintiffs and ruled that those allegations failed to state a claim for relief as a matter of law." *Id.* at 7.

The plaintiffs subsequently moved for entry of final judgment, a request that was also denied by the court.  *See generally id.*, Order (May 6, 2004).  The court agreed with the plaintiffs that its decision to dismiss the claims concerning the rating of chaplains by other chaplains and sitting on promotion boards was a "final judgment" for purposes of Rule 54(b).  *Id.* at 6.  It determined, nevertheless, that the equities of the case did not merit certification, expressing concern that allowing the plaintiffs to appeal the dismissed claims before the resolution of their other claims would result in unnecessary piecemeal litigation.  *Id.* at 7.

The plaintiffs have now filed yet another motion requesting that the court alter or amend its January 10, 2002 ruling.  *See generally* Pls.' 1st Mot. to Alter or Amend.  Specifically, the plaintiffs seek relief upon reconsideration of the court's decision to dismiss the plaintiffs' claims that chaplains should not rate other chaplains and that more than one chaplain should not sit on a promotion board.  *Id.*

**b.  The Court Denies the Plaintiffs' Motion to Alter or Amend the Court's January 10, 2002 Judgment, or, in the Alternative, to Certify Judgment**

In asking the court to reconsider the aforementioned rulings, the plaintiffs argue that evidence revealed during discovery that took place after the court's 2002 ruling shows that

chaplains serve on selection boards as denominational representatives.  Pls.' 2d Mot. for Recons. at 4.  The plaintiffs point to military regulations to support their assertions that chaplains are hired to represent their religious organizations and are therefore treated distinctly from other Naval officers.  *Id*. at 15.  The plaintiffs maintain that because a chaplain's "unique" role involves simultaneous service as a denominational representative and a military officer, he or she cannot be expected to "be like all other officers merely because [her or she] walk[s] into a selection board room."  *Id*.

The plaintiffs further assert that discovery produced by defendants since 2006 has demonstrated that "[t]hose denominations whose members appear most often on boards have statistically higher candidate selection rates."[5]  *Id*. at 18.  According to the plaintiffs' expert, when a candidate for promotion shared a denomination with a board member, there was a statistically significant higher chance that he or she would fare better in the selection process.  *Id*. The plaintiffs thus draw the "inescapable conclusion" that when chaplains make decisions to award or deny government benefits to other chaplains, they "act like denominational representatives and favor those most like themselves," thereby violating the Establishment Clause.  *Id*.

The defendants argue, among other things, that the plaintiffs' submissions "are duplicative of the allegations in the dismissed claims and therefore immaterial."  Defs.' Opp'n to

---

[5]      According to the plaintiffs' expert,

> [t]here is an institutional preference among denominations . . . and this preference priority forms the basis for populating the selection boards; that pattern of preference in turn controls the mix of denominations which are selected to, promoted within, or involuntarily retired from the U.S. Navy Chaplain Corps.  The favored denominations receive disproportionate benefit; the disfavored ones are denied unbiased and equitable consideration for admission, advancement, and tenure.

*Id*. at 20.

Pls.' Mot. to Alter or Amend at 8.  The defendants further contend that the plaintiffs' evidence

does not support that "the law somehow requires [the chaplains to represent their faith group]

when serving on promotion boards or in reviewing the performance of other chaplains."  *Id.*

The Circuit has described the role of chaplains within the service as "'unique' [because

it] involve[s] simultaneous service as clergy or a 'professional representative' of a particular

religious denomination and as a commissioned naval officer."  *In re England*, 375 F.3d 1169,

1171 (D.C. Cir. 2004).  The court wholeheartedly agrees with this assessment, as well as with the

plaintiffs' assertion that "the chaplains['] religious identities make them unlike all other naval

officers."  Pls.' 1st Mot. to Alter or Amend the Court's Jan. 10, 2002 J. ("Pls.' 1st Mot. to Alter

or Amend") at 15.  In fact, the dual role of chaplains as officers and religious representatives was

specifically and expressly taken into account by this court in its January 10, 2002 judgment.

*Adair*, Mem. Op. (Jan. 10, 2002) at 49 ("Another persuasive reason to allow chaplains to rate

other chaplains is that the Chaplain Corps fulfills a unique mission within the Navy that requires

it to perform duties significantly different from those of Naval line officers and Naval officers in

other staff corps.").

Nevertheless, the court remains unconvinced that simply because a Navy chaplain is

forced to wear two "hats" in the course of executing his or her duties, he or she will necessarily

engage in biased decision-making when reviewing other chaplains.  The plaintiffs do not allege

that as a denominational representative chaplains are expected to engage in bigotry or

discrimination.  *See generally* Pls.' 1st Mot. to Alter or Amend.  Nor do they argue that "every

chaplain serving as a board member allows his denominational background and identity to

influence his decision."  *Id.* at 34 ("The question is not whether every chaplain serving as a board

member allows his denominational background and identity to influence his decision, but

whether *some* chaplains, intentionally or unintentionally, allow their denominational background and role as denominational representatives to influence their decisions.").

To successfully state a claim that these challenged policies are facially unconstitutional, the plaintiffs would have to allege that "no set of circumstances exist" under which this policy would be constitutional. *United States v. Salerno*, 481 U.S. 739, 745 (1987). They have not alleged this, however. To the contrary, the plaintiffs appear to concede that some chaplains may review other chaplains and sit on promotion boards without allowing their denominational background and identity to influence their decisions. Pls.' 1st Mot. to Alter or Amend at 34. Moreover, as noted by the defendants, the chaplains are "required by Congress and the Navy to swear that they will carry out their duties on selection boards 'without prejudice or partiality,'" and that their recommendations are in the best interest of the Navy. Defs.' Opp'n at 13; *see also In re England*, 375 F.3d 1169, 1173 (D.C. Cir. 2004) ("By statute, each member of a selection board must take an oath to perform his duties 'without prejudice or partiality and having in view both the special fitness of officers and the efficiency of [the Navy].'" (quoting 10 U.S.C. § 613)).

The court therefore remains persuaded that circumstances exist under which the Navy's policies for selection boards would be considered constitutional (for instance, when chaplains sitting on selection boards act according to their official directives and not according to personal bias). Accordingly, the plaintiffs have not advanced any evidence or argument that would warrant the alteration or amendment of the court's prior dismissal of the plaintiffs' claims that the defendants' policies to have chaplains rate other chaplains or to have more than one chaplain sit on a review board facially violate the Establishment Clause.

The court is mindful that the plaintiffs have advanced substantial evidence in support of their arguments that for certain individual chaplains, their role as a denominational representative

may, in fact, impact their decision-making process with respect to reviewing other chaplains. *See* Pls.' 1st Mot. to Alter or Amend at 31 (noting that expert analysis "clearly shows denomination is an important factor in determining which denominational representatives are awarded or denied government benefits). To be clear, the court's 2002 dismissal of these two claims does not prevent the plaintiffs from pursuing their other claims that "some board members advance their own denominations in violation of the Establishment and Due Process Clauses," *Adair* 4th Am. Compl. ¶ 85, or that the Navy has established "denominational goals" and a "hierarchy of preferred religious traditions" in violation of the First and Fifth Amendments, *id.* ¶¶ 42-53, 59-71. In other words, to the extent that the plaintiffs raise an "as applied" challenge to the promotion boards and rating processes, the 2002 dismissal does not apply to those claims. *See Infra* Part III.B.4.

Lastly, the court turns to the plaintiffs' alternate request for certification under Rule 54(b). The parties have previously litigated this precise issue, and the court has already stated its reasons for refusing to certify final judgment for these same claims. *See generally Adair*, Mem. Op. (May 6, 2004). The court will not needlessly repeat its reasoning here, and, accordingly, denies the plaintiffs' motion.

### 4. Plaintiff CFGC's Motion to Alter or Amend the Court's August 17, 2000 Judgment, or, in the Alternative, to Certify Judgment

#### a. The Court's August 17, 2000 Judgment & Subsequent Related Litigation

On August 17, 2000, the court granted in part and denied in part a motion to dismiss that had been submitted by the defendants in the *CFGC* case.[6] *See generally CFGC*, Mem. Op. (Aug. 17, 2000). In particular, the court determined that the organizational plaintiff, CFGC,

---

[6] The court's August 17, 2000 opinion was not issued by the undersigned, but rather by the member of this court to whom this case was originally assigned. *See generally CFGC*, Mem. Op. (Aug. 17, 2000).

("Plaintiff CFGC") lacked standing to assert claims on its own behalf, but that it did have

standing to raise claims on behalf of its members.  *Id.* at 8-19.

Plaintiff CFGC has now filed a motion seeking that the court alter or amend its August

17, 2000 judgment that Plaintiff CFGC does not have standing to bring suit on its own behalf.

*See generally* CFGC's Mot. to Alter or Amend.  In the alternative, Plaintiff CFGC requests that

the court certify its judgment under Rule 54(b).  *Id.*

### b.  The Court Denies Plaintiff CFGC's Motion to Alter or Amend the Court's August 17, 2000 Judgment, or, in the Alternative, to Certify Judgment

Plaintiff CFGC argues that at the time of the court's 2000 ruling, the court "did not fully

understand (1) CFGC's mission or responsibilities as a [Department of Defense] endorser, (2)

CFGC's actual process of obtaining clergy as chaplain applicants and (3) its continuing

responsibility to support its endorsed chaplains once CFGC applicants are appointed as such."

CFGC's Mot. to Alter or Amend at 5.  Plaintiff CFGC advances new evidence of the defendant's

alleged religious discrimination and argues that the defendant's discriminatory acts have

frustrated Plaintiff CFGC's ability to meet its "mission to recruit charismatic clergy for the Navy

Chaplain Corps and has caused [] 'concrete and demonstrable injury to the organization's

activities – with the consequent drain on the organization's resource,' proving standing."  *Id*. at

31-32.  The defendants assert that relief under Rule 54(b) would be improper because "nothing

[Plaintiff CFGC] now argue[s] is substantively different than the arguments rejected by the Court

in August 2000."  Defs.' Opp'n to CFGC's Mot. to Alter or Amend at 5.

The court's August 17, 2000 memorandum opinion clearly acknowledged that the

purpose of CFGC was to "find[] and endorse[] [non-liturgical protestant] clergy to meet the

Department of Defense standards for commission as a chaplain in the armed forces."  *CFGC*,

Mem. Op. (Aug. 17, 2000) at 4.  The court also recognized that once a candidate enters the

Corps, Plaintiff CFGC continued to "provid[e them with] spiritual and professional guidance," and that the organization had "begun monitoring promotions and providing [its endorsed chaplains with] transition assistance to the civilian sector." *Id.* Further, the court's 2000 opinion noted that Plaintiff CFGC spent approximately $700 in the endorsement of each candidate, and that, in turn, each endorsed chaplain provided Plaintiff CFGC with a monthly payment, which generated the main source of income for the organization. *Id.* at 3-4. The court also credited that Plaintiff CFGC had stopped its candidate endorsements to the Navy Chaplaincy Corps due to the difficulty that it had experienced in recruiting non-liturgical protestant chaplains for the Navy. *Id.* Additionally, for purposes of ruling on the motion to dismiss, the court accepted as true all of the plaintiffs' allegations, including allegations that the defendants' discriminatory actions had caused Plaintiff CFGC harm. *Id.* at 2.

Thus, it appears that contrary to Plaintiff CFGC's assertions, the court thoroughly understood Plaintiff CFGC's mission as an endorser, as well as the recruiting process, the continuing responsibility by Plaintiff CFGC to support endorsed chaplains once appointed and the financial effects that the defendants' alleged acts were having on Plaintiff CFGC. *See CFGC*, Mem. Op. (Aug. 17, 2000) at 2-4. In addition to understanding these vital facts, the court correctly referred to *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) as the controlling precedent to determine whether an organization has standing to bring a claim on its own behalf. *Id.* at 10. Indeed, Plaintiff CFGC agrees that *Havens* provides the correct applicable legal standard. Pls.' Mot. to Alter or Amend at 10. Under *Havens*, the court then accurately noted that an organization may have standing to bring suit on its own behalf if the alleged actions by the defendant caused it an injury in fact. *CFGC*, Mem. Op. (Aug. 17, 2000) at 8-9.

Guided by a firm understanding of the applicable law and the relevant facts, the court in its August 17, 2000 ruling concluded that Plaintiff CFGC had "not alleged sufficient programmatic injuries that go to the heart of its organizational purposes," because it was "not in the business of lobbying the [Department of Defense] or ensuring equal protection for all [non-liturgical protestant] clergy within the armed forces." *Id.* The court rejected the arguments by Plaintiff CFGC that it had directed considerable resources to minimize the effect of the defendants' alleged discrimination, noting that Plaintiff CFGC's "primary function is limited to sponsorship of clergy" and not to providing such assistance to the chaplains. *Id.* at 10. Ultimately, the court concluded that because "the Defendants' alleged activity . . . [was] not at 'loggerheads' with [Plaintiff CFGC's] mission and does not constitute injury in fact," Plaintiff CFGC did not have standing to bring this suit in its own right. *Id.*

As noted above, Rule 54(b) motions are not simply an opportunity to reargue facts and theories upon which a court has already ruled. *Black v. Tomlinson*, 255 F.R.D. 532, 533 (D.D.C. 2006). Plaintiff CFGC's motion nevertheless appears to do precisely that. Pls.' Mot. to Alter or Amend at 10. The value of Plaintiff CFGC's purported "new evidence" would merely be to establish the truthfulness of the allegations of discrimination, allegations that the court, in its August 17, 2000 ruling, would have assumed as true prior to dismissing the claims at issue. *See CFGC*, Mem. Op. (Aug. 17, 2000) at 2 (accepting as true all of the plaintiffs' allegations). Accordingly, the court declines to alter or amend its judgment.

The court now turns to Plaintiff CFGC's alternative request for certification of the court's 2000 ruling as final judgment under Rule 54(b). Plaintiff CFGC argues that certification is appropriate because the court's August 17, 2000 ruling "is a final judgment on less than all of the plaintiff's claims, is separable from the remaining claims and there is no just reason for delay in

bringing its review before the Court of Appeals." CFGC's Mot. to Alter or Amend at 39. The defendants contend that "neither the equities of this case nor the interests of judicial administration favor Plaintiffs' request for entry of a final judgment." Defs.' Opp'n to CFGC's Mot. to Alter or Amend at 14. More specifically, the defendants argue that "there is no harm to Plaintiffs if entry of a final judgment as to the question of CFGC's direct organizational standing is deferred until all of the claims are decided," because "CFGC is still a Plaintiff in its representative capacity, and may still participate in the litigation to the extent that the chaplains it represents also possess Article III standing." *Id.* at 14.

In determining whether to certify this issue as a final judgment under Rule 54(b), the court considers whether, after taking into account judicial administrative interests and the equities involved, certification is appropriate. *Bldg. Indus. Ass'n*, 161 F.3d at 744. Here, the court is not persuaded that either judicial interests or equities weigh in favor of certification. Plaintiff CFGC acknowledges that, notwithstanding the court's August 17, 2000 opinion, it maintains organizational standing as a representative, and, at this point, there is no reason to question whether Plaintiff CFGC can pursue all of its claims by nature of its representative standing.[7] Thus, this case may properly advance with Plaintiff CFGC as a litigant, and any issues of direct organizational standing, to the extent that they are still relevant, may be addressed alongside other claims in any appeal that may result. Accordingly, because the case is not an "exceptional case" meriting Rule 54(b) certification, and for reasons of judicial economy

---

[7]     Plaintiff CFGC suggests that certification is appropriate on the issue of whether it has direct standing to sue the defendants because the defendants have challenged Plaintiff CFGC's representational standing to challenge the defendants' accession system. *See* CFGC's Mot. to Alter or Amend at 32 ("Defendants have consistently challenged the individual plaintiffs' ability to challenge defendants' accession practices claiming that they have not been injured by the practice."). *Id.* at 42. The court, however, has never ruled that Plaintiff CFGC lacks representational standing to pursue its claims. In the event that the court were to make such a ruling in the future, Plaintiff CFGC may file a renewed motion for Rule 54(b) certification.

and equities, the court determines that the plaintiffs are not entitled to Rule 54(b) certification. *Bldg. Indus. Ass'n*, 161 F.3d at 743.

### B. The Court Grants in Part and Denies in Part the Defendants' Motion for Partial Dismissal

### 1. Legal Standard for Motion to Dismiss Pursuant to Rule 12(b)(1)

Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. Envtl. Prot. Agency*, 363 F.3d 442, 448 (D.C. Cir. 2004) (noting that "[a]s a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction").

Because "subject-matter jurisdiction is an 'Art[icle] III as well as a statutory requirement[,] no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003) (quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982)). On a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing by a preponderance of the evidence that the court has subject matter jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Because subject matter jurisdiction focuses on the court's power to hear the claim, however, the court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim. *See Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003); *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). Thus, the court is not limited to the allegations contained in the complaint. *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). Instead, "where necessary,

17

the court may consider the complaint supplemented by undisputed facts evidenced in the record,

or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."

*Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992) (citing *Williamson v. Tucker*,

645 F.2d 404, 413 (5th Cir. 1981)).

### 2.  Legal Standard for Rule 12(b)(6) Motion to Dismiss

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint. *Browning v.

Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  The complaint need only set forth a short and plain

statement of the claim, giving the defendant fair notice of the claim and the grounds upon which

it rests. *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003) (citing

FED. R. CIV. P. 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  "Such simplified notice

pleading is made possible by the liberal opportunity for discovery and the other pretrial

procedures established by the Rules to disclose more precisely the basis of both claim and

defense to define more narrowly the disputed facts and issues." *Conley*, 355 U.S. at 47-48

(internal quotation marks omitted).  It is not necessary for the plaintiff to plead all elements of

his prima facie case in the complaint, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-14 (2002),

or "plead law or match facts to every element of a legal theory," *Krieger v. Fadely*, 211 F.3d

134, 136 (D.C. Cir. 2000) (internal quotation marks and citation omitted).

Yet, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.

Ct. 1937, 1949 (2009) (internal quotation marks omitted); *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 562 (2007) (abrogating the oft-quoted language from *Conley*, 355 U.S. at 45-46, instructing

courts not to dismiss for failure to state a claim unless it appears beyond doubt that "no set of

facts in support of his claim [] would entitle him to relief").  A claim is facially plausible when

18

the pleaded factual content "allows the court to draw the reasonable inference that the defendant

is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at

556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more

than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at

556).

In resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual

allegations – including mixed questions of law and fact – as true and draw all reasonable

inferences therefrom in the plaintiff's favor. *Holy Land Found. for Relief & Dev. v. Ashcroft*,

333 F.3d 156, 165 (D.C. Cir. 2003); *Browning*, 292 F.3d at 242. While many well-pleaded

complaints are conclusory, the court need not accept as true inferences unsupported by facts set

out in the complaint or legal conclusions cast as factual allegations. *Warren v. District of

Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004); *Browning*, 292 F.3d at 242. "Threadbare recitals of

the elements of a cause of action, supported by mere conclusory statements, do not suffice."

*Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555).

### 3. The Court Denies the Defendants' Motion to Dismiss the *Gibson* Plaintiffs' Promotion and Selective Early Retirement Claims Due to Their Failure to Exhaust Administrative Remedies

#### a. The *Gibson* Plaintiffs' Claims Challenging the Defendants' Promotion and Selective Early Retirement Systems

The defendants move to dismiss the *Gibson* plaintiffs' "counts 1, 2, [and] 3 in their

entirety and parts of *Gibson* counts 11 and 13." Defs.' Mot. for Partial Dismissal at 9.

Generally, as the defendants describe, these counts all raise challenges to the Navy's "personnel

management systems," the decision-making systems that control the promotions, accession,

retention and selective early retirement of chaplains. *Id.* As elaborated upon further below, the

*Gibson* plaintiffs specifically challenge the policies and practices that the Navy relies on to

19

periodically review chaplains for promotion and selective early retirement ("promotion boards" and "selective early retirement boards").

In count one of their complaint, the *Gibson* plaintiffs allege that "the Navy's arbitrary . . . goals and/or quotas established and maintained unconstitutional religious preference systems." *Gibson*, Am. Compl ¶ 30. According to these plaintiffs, the Navy Chaplain Corps has rejected otherwise qualified non-liturgical chaplain candidates because of its "bias against their faith group's beliefs, traditions and worship practices." *Id.* ¶ 36. Specifically, the *Gibson* plaintiffs allege that the Navy Chaplain Corps has used a quota system, or a "Thirds Policy," to discriminate against non-liturgical chaplains who seek to join or to be promoted within the Corps. *See id.* ¶¶ 30-42. They allege that "[b]y policy and practice, [the Navy Chaplain Corps] has established a favored set of denominations for use on selection boards which distribute government benefits," and, conversely, that due to such a policy of denominational preference, non-liturgical members were not allowed to participate in promotion board memberships at the same rate that other denominational members were allowed. *Id.* ¶¶ 38-39. Similarly, the *Gibson* plaintiffs argue that "statistical analysis shows [that] the Navy had a favorite set of denominations it routinely used for chaplain selection boards," and that such favoritism impacted the retention rate of non-liturgical chaplains. *Id.* ¶¶ 40-41.

Similarly, under count two, the *Gibson* plaintiffs reassert that "the Navy has established a hierarchy of preferred religious traditions." *Id.* ¶ 43. Again, they restate that "this preference priority forms the basis for populating the selection boards," which "in turn controls the mix of denominations which are selected into, promoted within, or involuntarily retired from the U.S. Navy Chaplain Corps." *Id.* ¶ 46. They specifically allege that "[t]he Navy has used the [Selective Early Retirement] process to reduce the number of higher ranking Non-liturgical

20

chaplains" and to ensure "domination of the [Navy Chaplain Corps] by the liturgical tradition." *Id.* ¶ 54.

In count three, the *Gibson* plaintiffs charge that "[t]he Navy's chaplain selection board system and its procedures are unconstitutional" because they provide "an unchallenged opportunity for religious bias or denominational issues to interfere with selecting the best qualified chaplains for promotion." *Id.* ¶¶ 57, 70.  The *Gibson* plaintiffs allege that these unlawful selection policies are also used to determine the composition and the decision-making process of the selective early retirement boards and promotion boards, thus violating the First and Fifth Amendment and the Religious Freedom Restoration Act. *Id.* ¶¶ 73-77.

Count eleven alleges that "senior chaplains and other Navy officials have concealed and denied evidence of prejudice and bias in the selection process, including the Navy's faith group quotas." *Id.* ¶ 132.  In so doing, the *Gibson* plaintiffs claim that officials in the Navy Chaplain Corps have breached their duty "to report wrongdoing" and "to reveal the true nature of and prejudice in the Navy's promotion and other career-related systems to plaintiffs and all other class members who have raised questions about the fairness and equity of the promotion process." *Id.*

Finally, in count thirteen, the *Gibson* plaintiffs allege that the Navy Chaplaincy Corps violated the First Amendment by engaging in a "recruiting policy requiring all chaplains to assist in recruiting chaplains." *Id.* ¶ 140.  According to the *Gibson* plaintiffs, the Navy's policy for recruiting chaplains required current chaplains "to furnish names of prospective seminary graduates and other clergy to the [Corps] for recruiting purposes, and [to] speak positively of the Corps." *Id.* ¶ 145.

### b.  The Parties' Arguments

The defendants argue that the court lacks jurisdiction to adjudicate the *Gibson* plaintiffs'

allegations that relate to the Navy's promotion and selective early retirement processes because

the *Gibson* plaintiffs have failed to timely exhaust their administrative remedies by not first

obtaining the review of a "special selection board" or "special board," as is required by law.

Defs.' Partial Mot. to Dismiss at 11.  The defendants thus urge the court to dismiss for lack of

jurisdiction "each of the [c]ounts asserted by the *Gibson* [p]laintiffs insofar as it concerns

promotion and selective early retirement board decisions."  *Id.*

The *Gibson* plaintiffs contend that they were "not required to exhaust their administrative

remedies before challenging [the d]efendant's promotion and [selective early retirement]

processes."  *Gibson* Pls.' Opp'n to Defs.' Partial Mot. at 4.  Among other arguments, the *Gibson*

plaintiffs declare that a statutory exception to the jurisdiction-stripping provision applies to their

claims.  *Id.*  In their reply, the defendants acknowledge that there is a statutory exception to the

jurisdiction-stripping provision for challenges to "the validity of a law, regulation, or policy

relating to selection boards," but they maintain that the exception does not apply because the

*Gibson* plaintiffs are challenging the outcome of the "individual selection board proceedings."

*Id.*

### c.  Legal Framework: 10 U.S.C. § 1558(f) and § 628(h)

In 2001, Congress enacted legislation that limits a court's jurisdiction over those actions

filed on or after December 28, 2001 that seek judicial review of a decision or recommendation

by certain military boards.  *See* 10 U.S.C. §§ 1558(f), 628(h).  More specifically, the relevant

provisions require that a person seeking judicial review of a decision made by a "selection

board" or a "promotion board" must first exhaust his or her administrative remedies by resorting

to a "special board" or a "special selection board," respectively.[8] *See* 10 U.S.C. §§ 1558(f), 628(h).

Under 10 U.S.C. § 1558(f)(1), a provision titled "Judicial Review,"

[a] person seeking to challenge an action or recommendation of a selection board, or an action taken by the Secretary of the military department concerned on the report of a selection board, is not entitled to relief in any judicial proceeding unless the action or recommendation has first been considered by a *special board* under this section or the Secretary concerned has denied the convening of such a board for such consideration.

*Id.* § 1558(f)(1) (emphasis added).  Similarly, 10 U.S.C. § 628(h), entitled "[l]imitations of other jurisdiction," forbids any "court of the United States" from considering "a claim based to any extent on the failure of a person to be selected for promotion by a promotion board," unless "the person has first been referred by the Secretary concerned to a *special selection board* convened under [10 U.S.C. § 628] and acted upon by that board and the report of the board has been approved by the President."  *Id.* § 628(h)(1) (emphasis added).

The plain language of these statutes indicates that a district court may review the special selection board's or a promotion board's decisions only after a special board (for challenges to a special selection board's decision) or a special selection board (for challenges to a promotion board's decision) first considers a plaintiff's claim.  10 U.S.C. §§ 1558(f), 628(h); *see also Blackmon-Malloy v. United States Capitol Police Bd.*, 575 F.3d 699, 704 (D.C. Cir. 2009)

---

[8]    A "special board" is defined as "a board that the Secretary . . . convenes under any authority to consider whether to recommend a person for . . . retirement."  10 U.S.C. § 1558(b)(1).  A "special selection board" is a board convened to consider an officer's eligibility for a promotion, *see id.* § 628, or to review the decision by a selection board not to recommend an officer (or a former officer) for promotion, *see id.* § 14502.  A special selection board is separate and distinct from both a "selection board;" *id.* § 1558(b)(2)(B)(iii) (excluding a special selection board from the definition of a selection board), and a "special board," *id.* § 1558(b)(1)(C) (excluding a special selection board from the definition of a special board).

(observing that determining whether a statute's exhaustion requirements are jurisdictional "is a question of statutory interpretation"); *Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin. Inc.*, 502 U.S. 32, 44 (1991) (determining that the district court lacked jurisdiction because the relevant statute had "provide[d the Court] with clear and convincing evidence that Congress intended to deny the District Court jurisdiction" to review the case); *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 101-103 (D.C. Cir. 1986) (noting that "the inclusion of a detailed grievance procedure to resolve [] disputes . . . was the strongest evidence of Congressional intent" that a party must exhaust administrative remedies before resorting to the federal courts). Thus, a court lacks jurisdiction to review decisions by the promotion boards and special selection boards if a plaintiff fails to exhaust his or her administrative remedies under § 1558 and § 628. *See Nat'l Coal. to Save Our Mall v. Norton*, 269 F.3d 1092, 1095 (D.C. Cir. 2001) (determining that Congress's "unequivocal intent to cut off judicial review" for a specific type of claim meant that the court lacked jurisdiction over that claim); *Cotrich v. Nicholson*, 2006 WL 3842112, at *2 (M.D. Fla. Dec. 19, 2006) (dismissing the case, *inter alia*, for lack of jurisdiction due to the plaintiff's failure to exhaust the administrative procedures in § 1558).

There is, however, one critical exception. Under § 1558 and § 628, "nothing" limits "the jurisdiction of any court of the United States under any provision of law to determine the validity of any law, regulation, or policy relating to selection boards." 10 U.S.C. §§ 1558(g), 628(i). Stated otherwise, under § 1558(g) and § 628(i), a court retains jurisdiction to review the actions by a selection or promotion board so long as the claim seeks judicial review of the "validity of any law, regulation, or policy relating to selection boards." 10 U.S.C. §§ 1558(g), 628(i).

### d.  The Court Retains Jurisdiction Notwithstanding the Exhaustion Requirements of 10 U.S.C. § 1558 and § 628

To determine whether the *Gibson* plaintiffs' claims fall within the exception to the jurisdiction-stripping provisions delineated above, the court must consider whether the *Gibson* claims require the court to determine "the validity of any law, regulation, or policy relating to selection boards."  10 U.S.C. §§ 1558(g), 628(i).  In doing so, the court limits its inquiry to those claims that the defendants specifically contend should be dismissed pursuant to the exhaustion jurisdictional requirements: counts one, two, three, eleven and thirteen of the *Gibson* plaintiffs' complaint.  Defs.' Mot. for Partial Dismissal at 9-10.

Under § 1558 and § 628, the court may only exercise jurisdiction over those claims that challenge the validity of any law, regulation, or policy that "relat[es] to selection boards" or, in other words, those claims that challenge a law, regulation or policy that has a connection or relationship to selection boards.  *See* Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/relate (last visited Nov. 30, 2011); *see also Engine Mfrs. Ass'n. v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose" (internal quotation marks omitted)).  The term "selection boards," in turn, refers to boards that are convened by the Navy for the purpose of, among other things, recommending persons for promotion and retirement.  *See* 10 U.S.C. § 1558(b)(2)(A) (defining "selection board").

In reviewing counts one, two and three of the *Gibson* complaint, it is clear that resolving these claims would require the court to opine on the validity of policies relating to selection boards.  *See* 10 U.S.C. § 1558(g), 628(i).  In these counts, the *Gibson* plaintiffs specifically challenge the policies used by the Navy to determine the composition and guide the decision-

making of both the promotion and the selective early retirement boards. *See supra* Part.III.B.3.a

(describing the claims in further detail). Because counts one, two and three assert challenges to

the validity of policies relating to selection boards, the court concludes that it maintains

jurisdiction to review these claims pursuant to the statutory exceptions of § 628(i) and § 1558(g).

With respect to counts eleven and thirteen, the court notes that the jurisdictional strictures

of § 1558(f) and § 628(h) apply to claims in which the plaintiffs are asking the court to review

discrete personnel actions by a selection board or a promotion board. *See* 10 U.S.C §§ 1558(f),

628(h). Counts eleven and thirteen do not, however, challenge specific personnel actions of a

promotion board or selection board. *Gibson* Am. Compl. ¶¶ 132, 140. Instead, those claims

allege that the Navy has concealed evidence of prejudice and has illegally required chaplains to

assist in recruitment efforts. Because the court is not persuaded that these claims fall under the

jurisdictional strictures of § 628(h) and § 1558(f), the court concludes that its jurisdiction to

entertain those claims is not limited by the statutory exhaustion requirements set forth in §

628(g) and § 1558(f). Accordingly, the court denies the defendants' motion for partial dismissal

insofar as it contends that the plaintiffs failed to exhaust their administrative remedies. *See* 10

U.S.C. §§ 1558(g), 628(i).

### 4. The Court Grants in Part and Denies in Part the Defendants' Motion to Dismiss the Plaintiffs' Claims Regarding the Composition of the Promotion and Selective Early Retirement Selection Boards

The defendants argue that the court should dismiss those claims by the plaintiffs that

"challeng[e] the composition of the Navy Chaplain Corps selection boards." Defs.' Mot. for

Partial Dismissal at 12-13. According to the defendants, the plaintiffs claim "that a Chaplain

Corps policy of assigning chaplains from a variety of faith group categories to serve on

promotion and selective early retirement boards represents something of a *per se* constitutional

26

violation." *Id.* at 13.  The defendants maintain that "the [c]ourt has already rejected th[ese] very

claim[s] pursuant to [Rule] 12(b)(6)" in its previous January 10, 2002 memorandum opinion and

"should do so again in these consolidated cases."[9]  *Id.* at 13, 16; *see also Adair*, Mem. Op. (Jan.

10, 2002) at 47-48.

The plaintiffs contend that in arguing that the court has already ruled on their claims

regarding the composition of the selection boards, the defendants erroneously lump together

several of the plaintiffs' claims regarding the composition of selection boards.  Pls.' Opp'n to

Defs.' Mot. for Partial Dismissal at 16.  The plaintiffs acknowledge that the court previously

rejected the claim made by the *Adair* and *CFGC* plaintiffs that "having more than one chaplain

on a board was unconstitutional."  *Id.*  Nevertheless, they assert that the court has not addressed

their claims that the voting procedures of board members, as applied, result in unconstitutional

acts of religious discrimination.  *Id.* at 17 (arguing that the voting procedures mixed with the

small size of the selection board result in an abuse of power "for personal, vindictive and

ideological purposes").  Nor, they argue, has the court addressed their claims that the defendants

"used a denominational hierarchy in [the] selection [of] chaplain board members."  *Id.* at 19.

As discussed earlier, the court determined in its January 10, 2002 ruling that the

plaintiffs' facial challenges to the policies of the selection boards were insufficient to state a

---

[9]     In the alternative, the defendants argue that the plaintiffs lack standing to bring their challenges to
the composition of the selection board.  Defs.' Mot. for Partial Dismissal at 13-14.  Indeed, the
plaintiffs devote the majority of their opposition to refuting the defendants' standing arguments.
*See* Pls.' Opp'n at 11-16.  In reviewing the defendants' arguments regarding standing, however, it
appears that the defendants are only challenging the plaintiffs' standing to launch a *facial* attack
on the composition of the selection board.  *See* Defs.' Mot. for Partial Dismissal at 13 (criticizing
the plaintiffs' arguments that the "Chaplain Corps policy of assigning chaplains from a variety of
faith group categories to serve on promotion and selective early retirement boards 'represents
something of a *per se* constitutional violation'").  Because such facial challenges by the plaintiffs
have already been dismissed for the reasons asserted above, *see supra* Part.III.A.3, the court need
not reach the defendants' standing arguments.

claim under Rule 12(b)(6).  *See supra* Part III.B.3; *Adair*, Mem. Op. (Jan. 10, 2002) at 47-50.

For the reasons asserted in that ruling and reiterated above, the court dismissed the facial

challenges to the defendants' selection board policies.  *See supra* Part III.B.3.  To the extent that

the plaintiffs again seek to reassert a facial challenge to the defendants' policies that allow

chaplains to sit on selection boards, the court dismisses it for the reasons already pronounced.

*See Adair*, Mem. Op. (Jan. 10, 2002) at 47-50.

The court agrees with the plaintiffs, however, that the defendants have cast too wide of a

net when discussing the types of claims that are properly considered dismissed under the court's

January 10, 2002 ruling.  As the court clarified above, its January 10, 2002 ruling did not dismiss

the plaintiffs' *as applied* claims.  *See supra* Part III.A.3.  Therefore, insofar as the plaintiffs

allege in their complaints that the selection boards' voting procedures and the "denominational

hierarchy" employed in selecting board members have, in fact, resulted in religious

discrimination, *see* Pls.' Opp'n to Defs.' Partial Mot. to Dismiss at 17-19, the court declines to

dismiss these claims at this time.  Because the legal viability of such as applied claims was not

raised in the government's motion for partial dismissal, the court reserves any judgment as to

that issue.  Accordingly, the court grants in part and denies in part the defendants' motion to

dismiss the plaintiffs' claims regarding the composition of the promotion and selective early

retirement boards.

### 5. The Court Denies the Defendants' Motion to Dismiss, Insofar as They Seek Dismissal Based on Mootness Grounds

### a. Legal Standard for Mootness

Under Rule 12(b)(1), a party may move to dismiss a case on grounds of mootness.

*Comm. in Solidarity with People of El Salvador v. Sessions*, 929 F.2d 742, 744 (D.C. Cir. 1991);

*Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1060 (Fed. Cir. 1995); *Am.*

28

*Historical Ass'n v. Peterson*, 876 F. Supp. 1300, 1308 (D.D.C. 1995).  Article III's case-or-controversy requirement prohibits courts from issuing advisory opinions or decisions based on hypothetical facts or abstract issues.  *Flast v. Cohen*, 392 U.S. 83, 96 (1968).  "The doctrine of mootness is a logical corollary of the case or controversy requirement[.]"  *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 90 (D.C. Cir. 1986).  In cases where challenged conduct ceases and "there is no reasonable expectation that the wrong will be repeated, . . . it becomes impossible for the court to grant any effectual relief whatever to the prevailing party, and any opinion as to the legality of the challenged action would be advisory."  *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000).  Accordingly, a court may not rule on the merits of a case in which the claim for relief is moot.

Courts must evaluate mootness "through all stages" of the litigation in order to ensure that a live controversy remains.  *21st Century Telesis Joint Venture v. Fed. Commc'ns Comm'n*, 318 F.3d 192, 198 (D.C. Cir. 2003) (citing *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000) and *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)).  As a result, "[e]ven where litigation poses a live controversy when filed, the [mootness] doctrine requires a federal court to refrain from deciding it if 'events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'"  *Id.* (quoting *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990)).

A case is moot when "the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  *City of Erie*, 529 U.S. at 287 (internal quotations omitted).  An intervening event may render a claim moot if (1) there is no reasonable expectation that the conduct will recur and (2) interim relief or events have completely and irrevocably eradicated the

effects of the alleged violations. *Pharmachemie B.V. v. Barr Labs, Inc.*, 276 F.3d 627, 631 (D.C. Cir. 2002); *Sellers v. Bureau of Prisons*, 959 F.2d 307, 310 (D.C. Cir. 1992). A case is not moot, however, so long as any single claim for relief remains viable, as the remaining live issues satisfy the case-or-controversy requirement. *Tucson Med. Ctr. v. Sullivan*, 947 F.2d 971, 978 (D.C. Cir. 1991) (internal quotations and citations omitted). The burden of establishing mootness rests on the party raising the issue, and it is a heavy burden. *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979); *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 458-59 (D.C. Cir. 1998).

### b. Because the Court Can Provide an Effective Remedy, the Plaintiffs' Claims Challenging the Composition of the Promotion Boards Are Not Moot

The defendants contend that the plaintiffs' claims challenging the faith group category composition of Chaplain Corps promotion boards should be dismissed as moot because these claims are premised on policies that no longer exist. Defs.' Mot. for Partial Dismissal at 16. The defendants maintain that adjudicating these claims "would give plaintiffs no prospective relief." *Id.* at 18.

The plaintiffs respond that dismissal based on mootness is inappropriate because the court can still provide a remedy through a declaration and injunction, notwithstanding the defendants' change in its policies. Pls.' Opp'n to Defs.' Mot. for Partial Dismissal at 26-27. More specifically, the plaintiffs argue that the court can provide "[a] declaration [stating that] the challenged procedures are unconstitutional," thereby "void[ing] Plaintiffs' initial boards, [and] requiring Defendants to convene new selection boards." *Id.* at 27. Similarly, they contend that the court can issue "an injunction" that would "prohibit[] the challenged procedures and practices on future selection boards [and] protect[] active duty Plaintiffs . . . from further prejudice and unequal treatment." *Id.*

30

A case is not moot if a court can provide an effective remedy. *United States v. Chrysler Corp.*, 158 F.3d 1350, 1353 (D.C. Cir. 1998) (noting that "'even the availability of a partial remedy' is 'sufficient to prevent a case from being moot'" (quoting *Church of Scientology v. United States*, 506 U.S. 9, 13 (1992)). As the plaintiffs point out, the court can provide a remedy, namely, a declaration that the Navy Chaplain Corps has violated the Constitution by applying their procedures in a discriminatory fashion, as well as an injunction requiring the Navy to reevaluate the personnel decisions made by the selection boards with respect to the plaintiffs and to prevent such alleged future religious discrimination. Thus, the requested relief would alleviate the alleged past injury that the plaintiffs have suffered, even if, as the defendants argue, these challenged policies no longer exist. Because "[t]he availability of this possible remedy is sufficient to prevent this case from being moot," *Church of Scientology v. United States*, 506 U.S. 9, 13 (1992), the court denies the defendants' motion to dismiss insofar as it is based on mootness grounds.

**6. The Court Denies the Defendants' Motion to Dismiss, Insofar as They Argue that the Plaintiffs Lack Standing to Bring Certain Claims**

**a. Legal Standard for Standing**

Article III of the Constitution limits the jurisdiction of federal courts to cases or controversies. U.S. CONST. art. III, § 2, cl. 1. These prerequisites reflect the "common understanding of what it takes to make a justiciable case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). Consequently, "a showing of standing 'is an essential and unchanging' predicate to any exercise of [a court's] jurisdiction." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Simply stated, "Article III standing must be resolved as [a] threshold matter." *Raytheon Co. v. Ashborn Agencies, Ltd.*, 372 F.3d 451, 453 (D.C. Cir. 2004) (citing *Steel Co.*,

31

523 U.S. at 96-102).

     As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing

standing. *Lujan*, 504 U.S. at 561; *Steel Co.*, 523 U.S. at 104; *City of Waukesha v. Envtl. Prot.*

*Agency*, 320 F.3d 228, 233 (D.C. Cir. 2003) (per curiam).  The extent of the plaintiff's burden

varies according to the procedural posture of the case. *Sierra Club v. Envtl. Prot. Agency*, 292

F.3d 895, 898-99 (D.C. Cir. 2002).  At the pleading stage, general factual allegations of injury

resulting from the defendants' conduct will suffice. *Id.*

     To demonstrate standing, plaintiffs must satisfy a three-pronged test. *Sierra Club*, 292

F.3d at 898 (citing *Lujan*, 504 U.S. at 560).  First, plaintiffs must have suffered an injury in fact,

defined as a harm that is concrete and actual or imminent, not conjectural or hypothetical. *Byrd*

*v. Envtl. Prot. Agency*, 174 F.3d 239, 243 (D.C. Cir. 1999) (citing *Steel Co.*, 523 U.S. at 103).

Second, the injury must be fairly traceable to the governmental conduct alleged. *Id.*  Finally, it

must be likely that the requested relief will redress the alleged injury. *Id.*  This Circuit has made

clear that no standing exists if the plaintiffs' allegations are "purely 'speculative[, which is] the

ultimate label for injuries too implausible to support standing.'" *Tozzi v. Dep't of Health &*

*Human Servs.*, 271 F.3d 301, 307 (D.C. Cir. 2001) (quoting *Advanced Mgmt. Tech., Inc. v. Fed.*

*Aviation Admin.*, 211 F.3d 633, 637 (D.C. Cir. 2000)).  Nor does standing exist where the court

"would have to accept a number of very speculative inferences and assumptions in any endeavor

to connect [the] alleged injury with [the challenged conduct]." *Winpisinger v. Watson*, 628 F.2d

133, 139 (D.C. Cir. 1980).  Finally, if a plaintiff is an association, it may demonstrate standing as

long as "its members would have standing to sue in their own right, the interests at stake are

germane to the organization's purpose, and neither the claim asserted nor the relief requested

requires members' participation in the lawsuit." *Consumer Fed'n of Am. v. Fed. Commc'ns*

*Comm'n*, 348 F.3d 1009, 1011 (D.C. Cir. 2003) (quoting *Hunt v. Wash. State Apple Adver.*

*Comm'n*, 432 U.S. 333, 343 (1977)).

### b.  The Plaintiffs Have Standing to Bring Their Accession Claims

By way of background, the plaintiffs allege in their complaints that the Navy's past and

present chaplain accession policies violate the First and Fifth Amendment.  *CFGC*, 4th Am.

Compl. ¶¶ 48; *Adair*, 4th Am. Compl. ¶ 32; *Gibson* Am. Compl. ¶ 41; at 132.  With respect to

the Navy's past policy, the plaintiffs claim that the defendants implemented a quota, or a "Thirds

Policy," that resulted in accession rates for non-liturgical candidates that were significantly lower

than other faith group clusters.  Pls.' Opp'n to Defs.' Mot. for Partial Dismissal at 28.  The

plaintiffs further argue that although the defendants have now abandoned the Thirds Policy, the

defendants' current policy continues to violate the First and Fifth Amendments because they

"refuse to expend the efforts necessary to ensure [that] non-liturgical congregations . . . have

appropriate chaplains."  *Id.* at 31.  The plaintiffs therefore ask that the court require the

defendants to "(1) identify the religious needs [of the Navy], (2) determine what it takes to meet

them in the context of the Navy's operational requirements, and (3) allocate resources to obtain

the needed chaplains."  *Id.* at 32.

The defendants argue in their motion to dismiss that "there is no conceivable way in

which any of [the plaintiffs] can demonstrate standing to challenge the Navy's alleged accession

policies, past or present."  Defs.' Mot. for Partial Dismissal at 19.  More specifically, the

defendants contend that because "each Plaintiff successfully accessed into the Chaplain Corps,"

the plaintiffs cannot show that "the Navy's past or present accession policies caused them any

injury in fact," a requirement of standing.  *Id.* at 19-20.  The plaintiffs disagree, arguing, *inter*

*alia*, that the defendants' prejudicial accession policies directly harm them because these policies

33

limited their ability as non-liturgical chaplains to meet their communities' religious needs and increased their workload.  Pls.' Opp'n to Defs.' Mot. for Partial Dismissal at 30.  In response, the defendants assert that "there is no evidence that any chaplain's work load has been increased by an alleged disparity in accessions, much less any evidence that could be quantified to any degree sufficient to satisfy the injury in fact element of the standing test."  Defs.' Reply in Supp. of Defs.' Mot. for Partial Dismissal at 12.

The Circuit has explained that "the burden of production a plaintiff must bear in order to show it has standing to invoke the jurisdiction of the district court varies with the procedural context of the case." *Sierra Club*, 292 F.3d at 898-99.  In resolving a motion to dismiss, "general factual allegations of injury resulting from the defendant's conduct may suffice to establish standing."[10] *Id.* (citing *Lujan*, 504 U.S. at 561).  Thus, in order to survive the defendants' motion for partial dismissal, the plaintiffs do not need to demonstrate that the non-liturgical chaplains suffered an increased workload or limitations in meeting their religious communities' free exercise needs as a result of the defendants' accession policies.  Instead, at this stage, the court inquires as to whether the plaintiffs' pleaded factual content, accepted as true, allows the court to draw the reasonable inference that the plaintiff suffered such injuries in fact.  *See Iqbal*, 129 S. Ct. at 1949.  The court determines that it does.

The plaintiffs have proffered an affidavit from Captain James Poe, who testified concerning his experience overseeing the Navy's worship activity in Naples, Italy and Rota, Spain.  *Gibson*, Am. Compl., Ex. 22.  According to Captain Poe, it is "not always true" that non-liturgical groups "can effectively minister to and meet the free exercise needs" of their faith

---

[10]      "On a motion for summary judgment, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Sierra Club v. Envt'l. Prot. Agency*, 292 F.3d 895, 898-99 (D.C. Cir. 2002) (internal quotation marks and alterations omitted).

community.  *Id.* ¶ 8.  He cites his experiences in Naples and Rota to support his contention that the Navy has failed "to provide the necessary chaplain resources at those overseas, religiously isolated bases to match the free exercise needs of its non-liturgical personnel."  *Id.* ¶ 29.  Thus, the plaintiffs submit that the needs of Navy personnel of non-liturgical faiths were not being met. *See generally id.*  The plaintiffs further contend that the Navy's ability to meet the needs of the non-liturgical faith communities were due to the accession policies disfavoring non-liturgical chaplains.  Pls.' Opp'n to Defs.' Mot. for Partial Dismissal at 30.

As it must, the court accepts as true the plaintiffs' pleaded factual content, including Captain Poe's affidavit.  *Iqbal*, 129 S. Ct. at 1949.  These pleadings allow the court to reasonably infer that the Navy's alleged accession policies resulted in limitations of the plaintiffs' abilities to meet the free exercise needs of their respective religious communities and to their increased workload.  Because the plaintiffs' pleaded factual content, accepted as true, allows the court to draw the reasonable inference that the plaintiff suffered an injury in fact to support standing, *see id.* at 1949, the court denies the defendants' motion to dismiss the plaintiffs' accession claims for lack of standing.[11]

### c.  The Plaintiffs Have Standing to Bring Their Claims Challenging the Defendants' Retention Policies and Practices

---

[11]     The defendants also argue that the plaintiffs' accession claims should be dismissed as moot. Defs.' Mot. for Partial Dismissal at 16-18.  The defendants specifically contend that the Circuit has already determined in *Larsen v. Dep't of the Navy*, 525 F.3d at 4-5, that the plaintiffs' claims challenging the accession policies were mooted by "the Navy's 2001 adoption of a policy of accessing all best-qualified chaplain candidates irrespective of faith group or faith group category."  Defs.' Reply in Supp. of Defs.' Mot. for Partial Dismissal at 9.  Since the defendants' submission, however, the Circuit vacated its *Larsen* decision and instructed this court to entertain new briefings on the subject of mootness in light of new evidence.  *Larsen v. Dep't of the Navy*, Civ. Action No. 07-5196 (D.C. Cir. Nov. 10, 2010).  Accordingly, the court denies without prejudice the defendants' motion to dismiss the plaintiffs' accession claims based on mootness grounds, but grants leave to the defendants to refile their motion, if appropriate, after the court has ruled on the remanded *Larsen* matter.

The plaintiffs allege that the defendants' retention policies and practices are discriminatory because they purposefully "keep Non-liturgical chaplains from continuing on active duty beyond their initial three-year tour, assuring that they would not be considered for promotion and minimizing their future influence." *Adair*, 4th Am. Compl. ¶ 22; *CFGC*, 4th Am. Compl. ¶ 49; *Gibson*, Am. Compl. ¶ 39. The plaintiffs also challenge the Navy's practice of retaining Roman Catholic chaplains "past their statutory separation age." *Adair*, 4th Am. Compl. ¶ 37; *CFGC*, 4th Am. Compl. ¶ 69; *Gibson*, Am. Compl. ¶ 54.

The defendants contend that the plaintiffs lack standing to challenge the Navy's alleged retention policies and practices, and they therefore urge the court to dismiss these claims. Defs.' Mot. for Partial Dismissal at 22. In other words, the defendants maintain that the plaintiffs cannot demonstrate that they have been injured as a result of either the individual decisions of the Navy's retention boards or the Navy's alleged practice to retain Roman Catholic chaplains beyond the statutory retirement age for Navy officers.[12] *Id.* at 25. The plaintiffs retort that the defendants' retention policies and practices have injured them by, *inter alia*, "increas[ing] the work required of non-liturgical chaplains to meet their duties, as illustrated by [Captain] Poe." Pls.' Opp'n to Defs.' Mot. for Partial Dismissal at 35.

As discussed above, at this procedural juncture, the court need only reasonably infer that the plaintiffs incurred an injury as a result of the defendants' retention policies. *Sierra Club*, 292

---

[12] The defendants acknowledge that three of the plaintiffs may have been injured by the defendants' retention policies. Defs.' Mot. for Partial Dismissal at 23-23. Insofar, however, as the plaintiffs' claims are based on these three plaintiffs' injuries, the defendants argue that the claims should be dismissed because they were brought outside of the statute of limitations period. *Id.* As discussed above, the court determines that the plaintiffs have sustained an injury separate and apart from the injury conceded by the defendants, namely, that the chaplains were required to work harder and with fewer resources to accomplish their objectives due to the defendants' policies. Because this injury is sufficient to support standing, the court takes no position does not reach the defendants' statute of limitations arguments for the other injuries sustained by these three plaintiffs.

F.3d at 898-99.  For the reasons already stated, *see supra* Part III.C.6.b, the court agrees that the plaintiffs have sufficiently pleaded factual content which, if presumed true, allows the court to reasonably infer that the plaintiffs were injured as a result of the defendants' retention policies. Specifically, the plaintiffs have alleged that they are underrepresented in the Navy Chaplaincy Corps as a result of the defendants' policies and practices favoring the retention of certain denominations and disfavoring the retention of non-liturgical chaplains, and therefore have had to work harder and with fewer resources to meet their objectives.  Pls.' Opp'n to Defs.' Mot. for Partial Dismissal at 35.  Because the plaintiffs' pleaded factual content, accepted as true, allows the court to draw the reasonable inference that the plaintiffs suffered an injury in fact to support standing, *see Iqbal*, 129 S. Ct. at 1949, the court denies the defendants' motion to dismiss the plaintiffs' retention claims.

### d.  The Plaintiffs Have Standing to Challenge the Navy's Alleged "Culture of Prejudice" and Its Disciplinary System

The plaintiffs allege that "[t]he Navy has established two systems of discipline and administration, one for liturgical traditions, and one for Non-liturgical traditions."  *Adair*, 4th Compl. ¶ 94; *Gibson*, Am. Comp. ¶ 120; *see also* CFGC, 4th Am. Compl. ¶ 8.  The defendants contend that the plaintiffs lack standing to challenge the Navy's disciplinary system because the plaintiffs have not proffered "that they face any injury from any disciplinary policies or practices."  Defs.' Mot. for Partial Dismissal at 35-36.  More specifically, the defendants assert that "none of the Plaintiffs alleges that he or she has ever been subject to court-martial or any other investigation or punishment under the Uniform Code of Military Justice."  *Id.* at 35.

The plaintiffs counter that the Navy's disciplinary system "consists of more than courts martial, [as] it includes investigations and administrative measures."  Pls.' Opp'n to Defs.' Mot.

for Partial Dismissal at 44.  The plaintiffs argue that the Navy uses its "administrative/discipline system" to favor chaplains of certain religions over others.  *Id.* at 45.  Specifically, the plaintiffs allege that at least seven of the plaintiffs (Plaintiffs Klappert, Thompson, Mitchell, Harkness, Scott, Steward and Torralva) have been the victims of improper investigations and have received disparate treatment with respect to punishments and rewards when compared to chaplains of other denominations.  *Id.* at 44-45.

In reply, the defendants maintain that six of these seven plaintiffs have now left the Navy and are thus "no longer subject to the Navy's disciplinary system and lack standing to challenge it."  Defs.' Reply in Supp. of Defs.' Mot. for Partial Dismissal at 23.  As for the seventh plaintiff, Plaintiff Klappert, the defendants argue that he does not actually claim that he was the victim of an improper investigation, but rather that he initiated an investigation into a retaliatory action by the defendants.[13]  *Id.* at 23-24.

As noted, to establish standing, the plaintiffs must show they suffered a concrete and actual injury that is traceable to the defendants' conduct and that is likely to be redressed by the relief that they are requesting.  *Byrd*, 174 F.3d at 243.  Here, the plaintiffs allege that they were actually injured as a result of the defendants' disparate treatment of non-liturgical chaplains when they were targeted for improper investigations and administrative punishments.  *Adair*, 4th Compl. ¶ 94; *Gibson*, Am. Comp. ¶ 120; *see also* CFGC, 4th Am. Compl. ¶ 8.  In the event that the plaintiffs are able to demonstrate such prejudice in the defendants' disciplinary system, the

---

[13]     In the alternative, the defendants argue that the plaintiffs' claims regarding the disciplinary system should be dismissed for failure to state a claim.  Defs.' Reply in Supp. of Defs.' Mot. for Partial Dismissal at 24-25.  Because, however, the defendants put forth this argument for the first time in their reply, the court does not consider it.  *See McBride v. Merrell Dow & Pharms.*, 800 F.2d 1208, 1211 (D.C. Cir. 1986) ("Considering an argument advanced for the first time in a reply brief, then, is not only unfair to an appellee, but also entails the risk of an improvident or ill-advised opinion on the legal issues tendered." (internal citation omitted)).

plaintiffs ask that the court require the defendants to "implement[ the] systematic changes and procedures necessary" to enjoin the disparate treatment of non-liturgical chaplains in disciplinary matters.  *Adair*, 4th Compl. at 81, ¶ 12.  If this were the only request for relief, then perhaps the defendants' arguments for dismissal would merit further consideration, given that the plaintiffs have now left the Navy and would thus not have anything to gain from observing a change in the Navy's disciplinary system.  *See Bois v. Marsh*, 801 F.2d 462, 466 (D.C. Cir. 1986) (explaining that a plaintiff who does not have any further dealings with the Army and does not expect to have a future relationship with the Army stands to gain nothing from the reform of the "military procedures to which she is no longer subject").

The plaintiffs, however, also request that the court "[i]ssue the necessary orders voiding all adverse personnel actions flowing" from the defendants' alleged discriminatory policies against the non-liturgical chaplains.  *Id.* at 84, ¶ 8.  The court may, for instance, issue an order requiring the Navy to review the plaintiffs' respective disciplinary files and find an appropriate remedy for the harm done by the alleged discriminatory policies and practices.  In such circumstances, the plaintiffs' requested relief would also likely redress their alleged injury, notwithstanding that the plaintiffs are no longer subject to the Navy's disciplinary system.  Because the plaintiffs have pleaded an actual injury that is traceable to the defendants' actions and may be redressed by the requested relief, the court concludes that the plaintiffs have standing at this juncture to pursue their claims concerning the disciplinary system.  *See Byrd*, 174 F.3d at 243.

### 7.  The Court Dismisses the *Gibson* Plaintiffs' "Tax-and-Spend" Claims

The *Gibson* plaintiffs allege that the "funding of the [Navy Chaplaincy Corps]'s illegal policies, practices and actions exceeds Congress' [taxation and spending] authority" under the

Constitution." *Gibson* Pls.' Compl. at 129.  According to the defendants, the court previously

dismissed an identical claim advanced by the *Adair* and *CFGC* plaintiffs.  Defs.' Mot. for Partial

Dismissal at 31.  The plaintiffs respond by underscoring that they have standing to bring such a

claim, but fail to address the defendants' contention regarding the previous dismissal of identical

claims.  *See* Pls.' Opp'n to Defs.' Mot. for Partial Dismissal at 38-39.

In its January 10, 2002 memorandum opinion, this court observed that the *Adair* and

*CFGC* plaintiffs had asserted claims that "the defendants ha[d] violated Congress's tax and

spending powers because Congress funds the [Navy] Chaplain Corps, whose policies violate the

Establishment Clause."  *Adair*, Mem. Op. (Jan. 10, 2002) at 60 n.29.  The court proceeded to

dismiss those claims, holding that they were merely another way for the plaintiffs to attempt to

establish standing to raise their Establishment Clause challenges.  *Id.*

In 2007, the *Gibson* plaintiffs filed their complaint before this court, asserting that

"Congress's use of tax funds . . . to fund the Navy's unconstitutional and prejudicial policies and

actions, and its establishment or endorsement of preferred religious traditions in the [Navy's

Chaplain Corps] violates the Establishment Clause's specific prohibition on such funding or

support."  *Gibson*, Am. Compl. ¶ 176.  The *Gibson* plaintiffs' claim is strikingly similar to those

previously dismissed claims raised by the *Adair* and *CFGC* plaintiffs, and the plaintiffs have not

identified any substantial differences between the *Gibson* plaintiffs' assertions and the *Adair* and

*CFGC* claims.  *See generally* Pls.' Opp'n to Defs.' Mot. for Partial Dismissal.  At its core, the

*Gibson* plaintiffs' claim regarding Congress's taxing and spending authority is an attack on the

constitutionality of the Navy Chaplain Corps policies.  Additionally, the plaintiffs presumably

assert such a claim in order to advance an alternative form of standing, *i.e.* taxpayer standing.

The Circuit, however, has observed that the plaintiffs' challenges to the Navy Chaplaincy Corp

40

policies are insufficient to convey taxpayer standing. *In re Navy Chaplaincy*, 534 F.3d 756, 762

(D.C. Cir. 2008) (concluding that the plaintiffs' contention that the Navy Chaplain Corps is

being operated in contravention of the law "directly undermines any claim to taxpayer

standing"). As such, the court incorporates its prior reasoning and dismisses the *Gibson*

plaintiff's claim that challenges Congress's taxation and spending authority. *See Adair*, Mem.

Op. (Jan. 10, 2002) at 60 n.29.

### 8. The Court Dismisses the *Gibson* Plaintiffs' Facial Claims Regarding the Use of Chaplains to Rate Other Chaplains

The *Gibson* plaintiffs claim in count 7 of their complaint that the "use of chaplains to rate

other chaplains, except in unavoidable circumstances, violates the First and Fifth Amendments."

Gibson Am. Compl. ¶ 101. The defendants argue that the court should reject this claim because

"[t]he court has already rejected the identical claim" brought by the *Adair* and *CFGC* plaintiffs.

Defs.' Mot. for Partial Dismissal at 33. The plaintiffs appear to concede that the *Gibson*

plaintiffs' claims are identical to those already dismissed by the court, but the plaintiffs argue

that the ruling should be reconsidered. Pls.' Opp'n to Defs.' Mot. for Partial Dismissal at 40.

Indeed, the plaintiffs note that they have filed a motion under Rule 54(b) requesting such

reconsideration. *Id.*

In its January 10, 2002 ruling, the court determined that the plaintiffs had failed to state a

claim in alleging that the defendants' policies of having chaplains rate other chaplains facially

violated the Establishment Clause. *Adair*, Mem. Op. (Jan. 10, 2002) at 49. As discussed above,

the court declines to alter or amend its January 10, 2002 memorandum opinion with respect to

this issue. *See supra* Part III.A.3.b. To the extent that the *Gibson* plaintiffs seek to assert a

similar facial challenge to the Navy's practice of having chaplains rate other chaplains, the court

dismisses this claim under Rule 12(b)(6) for those reasons already asserted in its January 10,

2002 memorandum opinion.  *See Adair*, Mem. Op. (Jan. 10, 2002) at 49.

### 9. The Court Denies Without Prejudice the Defendants' Motion to Dismiss the *Gibson* Plaintiffs' 10 U.S.C. § 613a Claims

By way of background, under 10 U.S.C. § 613a(b)(3), the discussions and deliberations

of a selection board "may not be used for any purpose in any action, suit, or judicial . . .

proceeding without the consent of the Secretary of the military department concerned."  10

U.S.C. § 613a(b)(3).  In count 15 of their amended complaint, the *Gibson* plaintiffs claim that 10

U.S.C. § 613a is unconstitutional as applied to their claims and denies them "the ability to

challenge the legality of actions within the board proceeding."  *Gibson*, Am. Compl. ¶¶ 159, 164.

They further assert that if the "vows of secrecy" dictated by § 613a were removed, the "plaintiffs

[would] be able to establish [that] denominational considerations have been the determining

factor in chaplain promotion decisions, contrary to the Establishment and Due Process Clauses

and [the Religious Freedom Restoration Act]."  *Id.* ¶ 161.

In their motion, the defendants argue that the court should dismiss count 15 of the *Gibson*

plaintiffs' complaint because "the Court has already rejected a virtually identical challenge to §

613a's predecessor statute, 10 U.S.C. § 618(f)."[14]  Defs.' Reply to Pls.' Opp'n to Defs.' Mot. for

Partial Dismissal at 18.  According to the plaintiffs, § 613a allows Congress to bar "effective

judicial review of government decisions" and thereby raises "serious constitutional questions."

Pls.' Opp'n to Defs.' Mot. for Partial Dismissal at 38.  The plaintiffs contend that this court's

prior decision concerning § 618(f) is irrelevant because it "addressed a statute no longer in

---

[14]    The defendants also contend that count 15 "does not represent a substantive cause of action on which Plaintiffs could obtain judgment," but rather is "a position in a discovery dispute."  Defs.' Mot. for Partial Dismissal at 31.  Because this court has, however, previously held that the plaintiffs' challenges to 10 U.S.C. § 613a "constitute more than a mere discovery dispute," the court does not address these arguments.  *In re Navy Chaplaincy,* Mem. Op. (Jan. 30, 2009) at 7.

existence" and explain that they are challenging § 613a in order "to preserve their appeal right." *Id.*

Prior to October 2006, § 618(f) barred the disclosure of promotion-board proceedings to any non-board member. *See* 10 U.S.C. § 618(f) (2005); Pub. L. No. 109-364, 120 Stat. 2185 (repealing § 618(f)). Although the *Adair* and *CFGC* plaintiffs challenged the constitutionality of § 618(f) as applied to their cases,[15] this court ultimately determined that § 618(f) did not bar judicial review of the plaintiffs' claims and was "not unconstitutional as applied to the plaintiffs' claims." *Adair*, Mem. Op. (Sep. 11, 2006) at 20 (noting that "[t]hough § 618(f) may have a collateral effect on a plaintiff's ability to access evidence relevant to the litigation of constitutional claims . . . , the court recognizes no constitutional right of access to discovery in this circumstance").

In October 2006, Congress repealed § 618(f) and simultaneously enacted § 613a. *See* National Defense Authorization Act for Fiscal Year 2007, Pub. L. No. 109-364, § 547, 120 Stat. 2216 (2006). Although the two provisions are very similar,[16] there is a critical difference between the provisions of § 618(f) and § 613a. While § 618(f) required only that proceedings of promotion selection boards not be disclosed, § 613a mandates non-disclosure for proceedings of both selection boards and selection boards that are convened to recommend officers for

---

[15]     Prior to their constitutional challenge, the *Adair* and *CFGC* plaintiffs challenged the applicability of § 618(f) to their cases, but ultimately lost that battle in the Circuit. *See generally In re Gordon R. England*, 375 F.3d 1169 (D.C. Cir. 2004).

[16]     Section 618(f) stated that "proceedings of a selection board convened under section 611(a) of this title may not be disclosed to any person not a member of the board." 10 U.S.C. § 618(f). Similarly, § 613a states that "[t]he proceedings of a selection board convened under section 611 of this title may not be disclosed to any person not a member of the board." *Id.* § 613a; *see also McGrady v. Mabus*, 635 F. Supp. 2d 6, 12 (D.D.C. 2009) (noting the substantial similarities between the two statutes and holding that any differences "do not substantively alter the parties' rights").

43

continuation on active duty or early retirement.  *Compare* 10 U.S.C. § 611(a) *with* 10 U.S.C. § 611(a)-(c).

At first blush, the court's prior reasoning concerning the constitutionality of § 618(f) would appear to also apply in determining the constitutionality of § 613a.  The parties, however, have failed to provide any briefing to the court on the issues regarding the differences between § 618(f) and § 613a.  *See generally* Defs.' Mot for Partial Dismissal; Pls.' Opp'n to Defs.' Mot for Partial Dismissal.  As such, the parties have also neglected to describe how, if at all, these differences impact whether the court's prior analysis of § 618(f) applies in determining the constitutionality of § 613a.  With such limited information, the court declines to dismiss count 15 by hastily applying its prior analysis.  Accordingly, the court denies without prejudice the defendants' motion to dismiss count 15 of the *Gibson* plaintiffs' complaint.

### 10.  The Court Grants the Defendants' Motion to Dismiss the Plaintiffs' Hostile Work Environment Claims

The defendants argue that the court should dismiss the plaintiffs' claims insofar as they allege that the Navy has a "culture of prejudice," because the plaintiffs have not alleged "that [they] were in fact the victim[s] of a discriminatory action by the Navy."  Defs.' Mot. for Partial Dismissal at 35.  Instead, the defendants maintain that "what Plaintiffs are alleging is the speculative possibility that the Navy's alleged 'culture' will lead to acts of discrimination in the future."  *Id.*

The plaintiffs contend that they have properly alleged a hostile work environment claim, which is an "actionable wrong [that] has injured Plaintiffs."  Pls.' Opp'n to Defs.' Mot. for Partial Dismissal at 44.  The defendants reply by urging the court to reject any belated attempt by the plaintiff to "recast their 'culture of prejudice' claims" as a hostile work environment claim

under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*  Defs.'
Reply in Supp. of Defs.' Mot. for Partial Dismissal at 21.

The plaintiffs allege that "[t]he Navy has created a culture and system which has allowed
and allows certain senior chaplains to exercise their religious bias and destroy plaintiffs' and
other Non-liturgical chaplains' careers with no accountability." *Adair*, 4th Am. Compl. ¶ 97.
They expressly challenge the Navy Chaplain Corps' "systematic hostility and culture of
prejudice," *id.* ¶ 98, which "chill[s the] plaintiffs' free exercise and free speech rights," *id.* ¶ 137;
*see also CFGC* 4th Am. Compl. ¶¶ 154, 171.  The plaintiffs do not appear, however, to allege
hostile work environment claims under Title VII, instead focusing on the defendants' alleged
promotion of a culture of prejudice in advancing their constitutional claims.  *See Adair*, 4th Am.
Compl. ¶ 137; *CFGC*, 4th Am. Compl. ¶ 171 (expressing that the "culture of hostility" chills the
plaintiffs' First Amendment rights).  Even if the arguments advanced by the plaintiffs can be
construed as a hostile work environment claim, it is "well-established" that "a plaintiff cannot
amend his [c]omplaint in an opposition to a defendant's motion for summary judgment." *Jo v.
District of Columbia*, 582 F. Supp. 2d 51, 64 (D.D.C. 2008).  The court, therefore, will not
consider a potential hostile work environment claim where the plaintiff has not clearly asserted
such a claim and instead attempts to raise it for the first time in opposing the defendants' motion
for summary judgment.  *See Worthey v. Snow*, 2006 WL 1722331, at *4 (D.D.C. June 20, 2006)
(declining to consider a hostile work environment claim asserted for the first time in the
plaintiff's opposition to a summary judgment motion).

In any event, the plaintiffs do not plead factual allegations from which a reasonable jury
could determine that a hostile work environment existed.   Assuming the veracity of the
plaintiff's allegations, which the court must do, the defendants actions did not subject the

45

plaintiffs to conduct that was "sufficiently severe or pervasive to alter the conditions of [their] employment and create an abusive working environment" under Title VII. *Singletary v. District of Columbia*, 351 F.3d 519, 526 (D.C. Cir. 2003). Courts have held that no hostile work environment existed in situations where the alleged instances of discriminatory behavior were far greater than the plaintiffs claim to have experienced in this case. *See, e.g.*, *Bryant v. Brownlee*, 265 F. Supp. 2d 52, 64 (D.D.C. 2003) (determine that no hostile work environment existed even though a coworker referred to the plaintiff as "nigger" and had stated that white men were first and black women were "at the bottom"). Accordingly, because the plaintiffs have not alleged facts from which a reasonable juror could find that a hostile work environment under Title VII existed, the court dismisses any such claims. *See Mahoney v. Donavan*, 2011 U.S. Dist. LEXIS 130946, at *28 (D.D.C. Nov. 14, 2011) (dismissing hostile work environment claim because the plaintiff had not pleaded facts from which a reasonable juror could determine that the defendant had created a hostile work environment.).

## IV.  CONCLUSION

For the foregoing reasons, the court denies the plaintiffs' motion to alter or amend its January 10, 2002 ruling or, in the alternative, certify judgment, and denies the *Gibson* plaintiffs' similar motion as to the court's August 17, 2000 ruling. Further, the court grants in part and denies in part the defendants' motion for partial dismissal. An Order consistent with this Memorandum Opinion is separately and contemporaneously issued this 21st day of March, 2012.

RICARDO M. URBINA
United States District Judge