UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                  )
                                  )
IN RE: NAVY CHAPLAINCY            )      Case No. 1:07-mc-269 (GK)
                                  )
_____)

AMENDED MEMORANDUM OPINION

Plaintiffs, current and former non-liturgical Protestant chaplains in the United States Navy ("Navy"), endorsing agencies for non-liturgical Protestant chaplains, and a fellowship of non-denominational Christian evangelical churches, bring this action against Defendants, Department of the Navy and several of its officials. Plaintiffs allege that Defendants discriminated against them on the basis of religion when making personnel decisions in violation of the First Amendment's Establishment Clause and the equal protection component of the Fifth Amendment's Due Process Clause, and that Defendants also violated the Establishment Clause by delegating governmental authority over personnel decisions to chaplains who sat on chaplain selection boards.

This matter is before the Court on Plaintiffs' Motion for a Preliminary Injunction [Dkt. No. 95] on remand from the Court of Appeals.[1]  Upon consideration of the Motion, Opposition [Dkt. No.

_____

[1] The District Court denied this Motion on January 30, 2012. Plaintiffs appealed that judgment and the Court of Appeals reversed and remanded for further proceedings. See infra Section

98], Reply [Dkt. No. 99], and the entire record herein, and for the reasons set forth below, Plaintiffs' Motion is **denied.**

## I.   BACKGROUND

### A.   Factual Background[2]

Congress provided for the organization of the Navy Chaplain Corps, "whose members are commissioned Naval officers who possess specialized education, training and experience to meet the spiritual needs of those who serve in the Navy and their families." Adair v. England, 183 F. Supp. 2d 31, 35 (D.D.C. 2002) (Adair I) (internal quotation marks omitted). The Navy divides the Chaplain Corps into four "faith groups": Catholic, liturgical Protestant, non-liturgical Protestant, and Special Worship. In re Navy Chaplaincy, 697 F.3d 1171, 1173 (D.C. Cir. 2012).

The term "liturgical Protestant" refers to "those Christian Protestant denominations whose services include a set liturgy or order of worship." Adair I, 183 F. Supp. 2d at 36. In contrast, the term "non-liturgical Protestant" refers to "Christian

_____

I.B. (setting out in detail the procedural background of this matter).

[2] For a more detailed account of the facts in this case, refer to Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 293-96 (D.C. Cir. 2006) and Adair v. England, 183 F. Supp. 2d 31, 34-38 (D.D.C. 2002) (Adair I).

denominations or faith groups that do not have a formal liturgy or order in their worship service." Id. Plaintiffs are current and former non-liturgical Protestants, "represent[ing] Southern Baptist, Christian Church, Pentecostal, and other non-liturgical Christian faith groups." Id.

In order to become a Navy chaplain, "an individual must have an 'ecclesiastical endorsement' from a faith group endorsing agency certifying that the individual is professionally qualified to represent that faith group within the Chaplain Corps." In re Navy Chaplaincy, 697 F.3d at 1173. Chaplaincy of Full Gospel Churches and Associated Gospel Churches are two such endorsing agencies and are among the Plaintiffs in this case. Id.

The Navy uses the same personnel system for all of its officers, including chaplains. In re England, 375 F.3d 1169, 1172 (D.C. Cir. 2004). That system "seeks to manage officers' careers to provide the Navy with the best qualified personnel through three critical personnel decisions: (1) promotion; (2) continuation on active duty; and (3) selective early retirement." Id. Chaplains, like all Navy officers, "are recommended for promotion by 'selection boards' convened to consider whether particular candidates should be promoted to a

higher rank." <u>In re Navy Chaplaincy</u>, 697 F.3d at 1173. Chaplain selection boards are currently composed of seven members: two chaplains and five other officers. <u>Id.</u> (citing SECNAVINST 1401.3A, Suppl. ¶ 1.c.(1)(f)).

Plaintiffs allege that Defendants "discriminated against [] [them] on the basis of their religion, by establishing, promoting and maintaining illegal religious quotas and religious preferences in their personnel decision making." <u>In re Navy Chaplaincy</u>, 841 F. Supp. 2d 336, 341 (D.D.C. 2012). More specifically, Plaintiffs allege that "the Navy's selection board process results in denominational favoritism that advantages Catholic and liturgical chaplains while disadvantaging non-liturgical chaplains" and that "this alleged systematic bias has left non-liturgical chaplains underrepresented in the Navy." <u>Id.</u> 340.

Plaintiffs claim that, under the selection board process, "[c]haplain promotion board members 'vote the record' by depressing one of five buttons in a 'sleeve' which hides the voter's hands, ensuring the secrecy of the vote" and that "[t]he buttons coincide with degrees of confidence the voter has in the record considered, ranging from 0 to 100 in 25 degree increments." Pls.' Mot. for Prelim. Inj. at 4 (internal

quotation marks omitted). Plaintiffs allege that the secrecy of the vote enables chaplain promotion board members to engage in the practice of "zeroing out" candidates, a practice in which "a single [board] member voting zero" ensures that a candidate will not be selected "because of the small number of board members who vote[.]" Id. No other branch of the military uses the same or similar procedures in the management of the careers of its religious leaders.

Plaintiffs claim that, under this promotion system, which has no accountability, their "[s]tatistical analysis [] shows that in every [Navy Chaplain Corps] personnel management category that can be measured by data, the Navy has a preference for Catholics first, Liturgical Protestants second, with non-liturgical or Special Worship [faith group clusters] alternating third and fourth." Id. at 4-5.

Plaintiffs now move for a preliminary injunction, asking the Court to enjoin the Navy from "(1) the use of the Chief of Chaplains (the 'Chief') or his Deputy as chaplain selection board president; (2) the use of secret votes thereon with no accountability; and (3) placing chaplains on chaplain selection boards without effective guarantees [that] the power to distribute government benefits will be used solely for secular,

neutral and non-ideological purposes." <u>Id.</u> at 1. Plaintiffs request that the preliminary injunction remain in force "until the Court can evaluate on their merits the partial summary judgment (PSJ) motions pending before this Court."[3] <u>Id.</u> at 2.

**B.   Procedural Background**

This dispute involves three cases, <u>Chaplaincy of Full Gospel Churches v. England</u>, Civ. No. 99-2945, <u>Adair v. England</u>, Civ. No. 00-566, and <u>Gibson v. Dep't of Navy</u>, Civ. No. 06-1696, the earliest of which was filed in 1999, and each with a complaint of over 85 pages, containing multiple constitutional claims. On June 18, 2007, the District Court concluded that the three cases raised "substantially similar constitutional challenges to the Navy Chaplaincy program" and accordingly consolidated the cases under the caption <u>In re Navy Chaplaincy</u>. Order (June 18, 2007) at 3-4 [Dkt. No. 1].

On July 22, 2011, Plaintiffs filed the present Motion for a Preliminary Injunction - which is their sixth such motion for injunctive relief.[4] On August 26, 2011, Defendants filed their

---

[3] As discussed below, these motions are no longer pending. The Court did not reach the merits of the motions, but denied them without prejudice for case management purposes. <u>See</u> <u>infra</u> Section I.B.3.

[4] The District Court denied all five of Plaintiffs' previous motions for preliminary injunctive or similar emergency relief.

Opposition to Plaintiffs' Motion, and on September 12, 2011, Plaintiffs' filed their Reply in support of their Motion.

Plaintiffs' motion was denied by the District Court on January 30, 2012. See In re Navy Chaplaincy, 841 F. Supp. 2d 336. Plaintiffs appealed that judgment, and on November 2, 2012, the Court of Appeals reversed and remanded for further proceedings.[5] See In re Navy Chaplaincy, 697 F.3d 1171.

## 1. District Court Proceedings

In denying Plaintiffs' motion, the District Court "began by concluding that plaintiffs lacked Article III standing, reasoning that their asserted future injury was too speculative because it rested on the assumption that chaplains sitting on future selection boards would 'necessarily favor candidates affiliated with [their] own denomination,' an assumption that the court found implausible given that Naval officers 'are presumed to undertake their official duties in good faith.'" In re Navy Chaplaincy, 697 F.3d at 1175 (quoting In re Navy Chaplaincy, 841 F. Supp. 2d at 345).

The District Court then concluded that "even if Plaintiffs had Article III standing, the balance of the four preliminary

---

[5] The Court of Appeals issued its Mandate on January 18, 2013 [Dkt. No. 154].

injunction factors[6] weighed against granting injunctive relief."
In re Navy Chaplaincy, 697 F.3d at 1175. More specifically,
"[a]lthough the [District] [C]ourt presumed the existence of
irreparable harm because plaintiffs had alleged an Establishment
Clause violation, the court found that plaintiffs were unlikely
to succeed on the merits, and that the balance of the equities
and the public interest weighed against granting preliminary
injunctive relief." Id. (citations omitted).

### 2. Court of Appeals Proceedings

On appeal, the Court of Appeals reversed the District
Court's conclusion that Plaintiffs lacked Article III standing,
reasoning that "[P]laintiffs' allegation that the challenged
policies will likely result in discrimination is sufficiently
non-speculative to support standing." Id. at 1177. The Court
then "review[ed] the district court's ultimate decision to deny
injunctive relief, as well as its weighting of the preliminary
injunction factors[.]" Id. at 1178. The Court concluded that
"the district court correctly assumed that plaintiffs have

---

[6] In order to obtain a preliminary injunction, a plaintiff "must
establish [1] that [she] is likely to succeed on the merits, [2]
that [she] is likely to suffer irreparable harm in the absence
of preliminary relief, [3] that the balance of the equities tips
in [her] favor, and [4] that an injunction is in the public
interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S.
7, 20 (2008); see infra Section II (setting out in detail the
legal standard for injunctive relief).

demonstrated irreparable harm" and agreed with the District Court's conclusion that the balance of the equities and the public interest weighed against granting the injunction. Id. at 1179 (stating that "in assessing the balance of the equities and the public interest, we must 'give great deference to the professional judgment of military authorities' regarding the harm that would result to military interests if an injunction were granted") (quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008)).

Noting that the remaining issue was likelihood of success on the merits, the Court of Appeals saw "no error in the district court's conclusion that plaintiffs are unlikely to succeed on the merits" of their delegation theory.[7] Id. at 1179.

However, the Court of Appeals noted that "[w]e have a different view of the district court's resolution of plaintiffs' denominational preference theory, i.e., that the Navy discriminates against non-liturgical Protestants on the basis of their religious denomination." Id. at 1179-80. Plaintiffs claim that "their statistical analysis provides strong evidence of a

---

[7] Under this theory, Plaintiffs claim that the Navy impermissibly delegates governmental authority to religious entities by permitting chaplains to make promotion decisions without effective guarantees that the authority will be exercised in a secular manner.

pattern of discrimination." Id. at 1180. Defendants challenge Plaintiffs' statistical evidence and offer their own expert analysis, which they claim demonstrates that no such discrimination exists. Id.

The Court of Appeals observed that "the district court made no factual findings to resolve these competing claims" and that "[a]ll it had to say about the issue was this: 'the plaintiffs have submitted no evidence from which the court could assume that the future promotion boards will follow any putative pattern of alleged discrimination.'" Id. (quoting In re Navy Chaplaincy, 841 F. Supp. 2d at 346)). The Court then concluded that "[t]he district court's entirely conclusory statement gives us no insight at all into whether the court perceived the defect in the Establishment Clause claim to be legal or factual, or, if factual, whether it thought the weakness lay in the evidence of past or future discrimination." Id. Accordingly, the Court of Appeals vacated the District Court's denial of Plaintiffs' Motion and remanded for further proceedings consistent with its opinion.

### 3. Reassignment of the Case

On May 31, 2012, Judge Ricardo Urbina, who had handled this dispute since 2001, retired and thereafter, the Calendar

Committee reassigned it to the undersigned Judge. Because of the complexity of the procedural and constitutional issues raised, which the parties have now been litigating for well over a decade, the Court held a lengthy Status Conference on July 24, 2012 to fully explore the most efficient procedure for resolving it. After hearing from the parties at that Status Conference, this Court dismissed without prejudice nine outstanding motions, at least five of which were dispositive, and issued a Case Management Order (July 25, 2012)[8] [Dkt. No. 124, later amended] setting numerous deadlines in order to move the case towards resolution.

### 4. Record Considered in Resolving Plaintiffs' Motion

On November 2, 2012, the Court of Appeals issued its opinion on Plaintiffs' Motion, reversing and remanding for further proceedings. On November 19, 2012, this Court ordered the parties to submit a joint statement identifying those briefs and exhibits they believed constituted the record to be considered on remand in resolving Plaintiffs' Motion. Order

---

[8] Under the Case Management Order, as amended, the parties will have fully briefed their cross-motions for summary judgment on statute of limitations grounds by May 20, 2013. After deciding those motions, the Court will, if necessary, set a briefing schedule for comprehensive dispositive motions on the merits of the constitutional issues raised by Plaintiffs.

(Nov. 19, 2012) [Dkt. No. 143]. On December 21, 2012, the parties filed their joint statement identifying, among other filings, briefings and exhibits on four dispositive motions, which they agreed constituted the relevant record. Joint Statement (Dec. 12, 2012) [Dkt. No. 152]. The Court considered that robust record for purposes of resolving Plaintiffs' Motion.

## II.  LEGAL STANDARD FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary and drastic remedy," Munaf v. Geren, 553 U.S. 674, 689 (2008), and "may only be awarded upon a clear showing that the plaintiff is entitled to such relief," Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011) (internal quotation marks omitted) (quoting Winter, 555 U.S. at 22); see Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (noting that "the movant, by a clear showing, carries the burden of persuasion").

A party seeking a preliminary injunction must establish "[1] that [she] is likely to succeed on the merits, [2] that [she] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of the equities tips in [her] favor, and [4] that an injunction is in the public interest." Winter, 555 U.S. at 20.

In the past, these four factors "have typically been evaluated on a 'sliding scale[,]'" such that "[i]f the movant makes an unusually strong showing on one of the factors, then [she] does not necessarily have to make as strong a showing on another factor." Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1291-92 (D.C. Cir. 2009). However, the continued viability of the sliding scale approach is uncertain "as the Supreme Court and the D.C. Circuit have strongly suggested, without holding, that a likelihood of success on the merits is an independent, free-standing requirement for a preliminary injunction." Stand Up for California! v. U.S. Dep't of the Interior, Nos. 12-309, 12-2071, 2013 WL 324035, at *6 (D.D.C. Jan. 29, 2013); Sherley, 644 F.3d at 393 ("[W]e read Winter at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction . . . [but] [w]e need not wade into this circuit split today.") (internal quotation marks omitted).

Nor need this Court resolve this unsettled issue because a preliminary injunction is not appropriate here, even under the less demanding "sliding scale" framework. See Stand Up for California!, 2013 WL 324035, at *6 ("If the plaintiffs cannot meet the less demanding 'sliding scale' standard, then a

fortiori, they cannot satisfy the more stringent standard alluded to by the Supreme Court and the Court of Appeals.").

## III. ANALYSIS

Plaintiffs' claims rest on at least two distinct theories, i.e., their delegation and denominational preference theories. Because the Court of Appeals affirmed the District Court's rejection of Plaintiffs' delegation theory, this Court need only consider whether Plaintiffs are entitled to injunctive relief under their denominational preference theory.

### A. Likelihood of Success on the Merits

According to Plaintiffs, the expert testimony they have submitted "suggests, if not establishes, [that] the challenged practices result in clear denominational preferences in the award of government benefits, advancing some denominations and inhibiting others to the detriment of Plaintiffs[.]" Pls.' Mot. for Prelim. Inj. at 17. Plaintiffs further contend that "[t]he challenged practices are not narrowly tailored to achieve a compelling purpose," and therefore "fail all Establishment Clause tests and result in unequal treatment for all chaplains." Id.

Defendants respond that liability for discrimination based upon religion cannot "be predicated solely on statistical

evidence of disparate impact in favor of or against certain denominations[,]" Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. at 19, because "proof of intent is a prerequisite to a finding of unconstitutional discrimination upon the basis of religion[,]" id. at 27. Defendants further contend that "[t]here is no empirical evidence that would suggest denominational favoritism or discrimination correlated to the denominational affiliation of chaplain board members." Id. at 19-20. In support of their argument, Defendants put forward evidence from their own expert witness, "[who] analyzed Plaintiffs' claims and found no disparate impact" but did find "serious flaws in [Plaintiffs' expert's] analyses." Id.

The Court of Appeals directed this Court to resolve these competing claims and to determine whether Plaintiffs are likely to succeed on the merits of their denominational preference theory. In re Navy Chaplaincy, 697 F.3d at 1180.

### 1. Proof of Intent Is a Prerequisite to a Finding of Unconstitutional Discrimination on the Basis of Religion

As a threshold legal issue, the parties dispute whether Plaintiffs must show that the discrimination alleged was

intentional.[9] Defendants argue that Plaintiffs must prove that the Navy intentionally adopted policies designed to maintain liturgical Christian control over the Chaplain Corps. Defs.' Mot. for Summ. J. at 10-11; see Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. at 26-31. Plaintiffs respond that Defendants' "argument that the plaintiffs must show intentional discrimination" is "inconsistent with Establishment Clause precedent" and "contrary to the law of the case." Pls.' First Mot. for Summ. J. Reply at 10.

### a) Plaintiffs Bear the Burden of Demonstrating Discriminatory Intent

The Court of Appeals recognized that, under their denominational preference theory, Plaintiffs claim that "the Navy discriminates against non-liturgical Protestants on the basis of their religious denomination." In re Navy Chaplaincy, 697 F.3d at 1179-80 (emphasis added); see Adair First Am. Compl. at 43 (claiming that Defendants "are deliberately motivated by

---

[9] The parties debate this point in the briefs on Plaintiffs' instant motion, see Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. at 26-31; Pls.' Mot. for Prelim. Inj. Reply at 20-23, as well as in several of the parties' merits briefs, see Defs.' Mot. for Summ. J. at 10-11 [Dkt. No. 46]; Pls.' First Mot. for Summ. J. Reply at 7-10 [Dkt. No. 50]; Pls.' Opp'n to Defs.' Mot. for Summ. J. at 10-17 [Dkt. No. 56]; Defs.' Mot. for Summ. J. Reply at 4-6, 10 [Dkt. No. 68]; Pls.' Second Mot. for Summ. J. Reply at 8-9 [Dkt. No. 70].

faith group bias") (emphasis added). Plaintiffs argue that their denominational preference theory raises First Amendment and Fifth Amendment considerations. Pls.' Mot. for Prelim. Inj. at 17-18; see In re Navy Chaplaincy, 697 F.3d at 1174 (noting that under their denominational preference theory, Plaintiffs "assert that selection boards discriminate against non-liturgical Protestants in making promotion decisions in violation of the Establishment Clause and the Fifth Amendment's equal protection component").

Where, as here, Plaintiffs specifically claim that Defendants engaged in "invidious discrimination in contravention of the First and Fifth Amendments, [the Supreme Court's] decisions make clear that the plaintiff must plead and prove that the defendant acted with discriminatory purpose." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) (emphasis added) (citing Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520, 540-41 (1993) (First Amendment); Washington v. Davis, 426 U.S. 229, 240 (1976) (Fifth Amendment)); see also Personnel Admin. of Mass. V. Feeney, 442 U.S. 256, 272 (1979) (Fourteenth Amendment) ("[E]ven if a neutral law has disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a

discriminatory purpose."); <u>Brown v. Califano</u>, 627 F.2d 1221, 1234 n.78 (D.C. Cir. 1980) ("Supreme Court cases have made clear that proof of discriminatory intent, not just disproportionate impact, is necessary to establish an equal protection violation of constitutional dimensions.").

Under <u>Iqbal</u>, "purposeful discrimination requires more than 'intent as volition or intent as awareness of consequences . . . [i]t instead involves a decision maker's undertaking a course of action '<u>because of, not merely in spite of</u>, [the action's] adverse effects upon an identifiable group.'" 556 U.S. at 676-77 (emphasis added) (quoting <u>Feeney</u>, 442 U.S. at 279).

It is true that, in exceptional cases, the disparate impact of a facially neutral policy may be so severe that the clear factual pattern is "unexplainable on grounds other than" purposeful discrimination. <u>Village of Arlington Heights v. Metro. Hous. Dev. Corp.</u>, 429 U.S. 252, 266 (1977) (holding that plaintiffs' Fourteenth Amendment claim was not viable because plaintiffs failed to carry their burden of proving that the challenged government decision was motivated by discriminatory intent).

Such cases, however, are "rare" and "[a]bsent a pattern as stark as that in <u>Gomilion</u> or <u>Yick Wo</u>, <u>impact alone is not</u>

determinative, and the Court must look to other evidence." <u>Arlington Heights</u>, 429 U.S. at 266 (emphasis added). In <u>Gomilion v. Lightfoot</u>, 364 U.S. 339 (1960), a local statute altered the shape of a city from a square to a 28-sided figure, which had the effect of removing from the city all but four of its 400 African American voters, and not a single white voter. In <u>Yick Wo v. Hopkins</u>, 118 U.S. 356 (1886), a city board of supervisors denied building ordinance waivers to over 200 Chinese applicants, but granted waivers to all but one non-Chinese applicant.

Accordingly, under Supreme Court precedent, Plaintiffs must either (1) point to evidence establishing the existence of a policy or practice that the government adopted "<u>because of, not merely in spite of</u>" its adverse effect on Plaintiffs, <u>Feeney</u>, 442 U.S. at 279, or (2) demonstrate disparate impact "as stark as that in <u>Gomilion</u> or <u>Yick Wo</u>," <u>Arlington Heights</u>, 429 U.S. at 266.

> **b) The Law of the Case Doctrine Does Not Relieve Plaintiffs of Their Burden to Demonstrate Discriminatory Intent**

Plaintiffs argue that Defendants' position on the intent issue is contrary to the law of the case because "[Defendants] first raised this argument in [their] initial 2000 Motion to

Dismiss . . . which the Court rejected." Pls.' Mot. for Prelim.
Inj. Reply at 20-23. In support of their law of the case
argument, Plaintiffs heavily rely on the District Court's
statement in Adair v. England, 17 F. Supp. 2d 7 (D.D.C. 2002)
(Adair II) that:

> [t]he defendants are somewhat mistaken when they
> repeatedly state that plaintiffs have the "burden to
> prove the threshold inquiry: [that] the Chaplain Corps
> instituted policies . . . that actually discriminate
> against non-liturgicals" before the court can apply
> strict scrutiny. E.g., Defs.' Mot. at 60. The
> plaintiffs' burden is not that onerous. Rather, under
> Supreme Court precedent, the plaintiffs in this case
> bear the initial burden to show that the challenged
> Navy policies "suggest[] 'a denominational preference
> . . . .'" County of Allegheny, 492 U.S. at 608-09
> (1989). Accordingly, if the plaintiff can demonstrate
> after discovery that some or all of the Navy's
> policies and practices suggest a denominational
> preference, then the court will apply strict scrutiny
> to those policies and practices for which the
> plaintiffs have met this initial burden

Pls.' Mot. for Prelim. Inj. Reply at 21 (quoting Adair II, 217
F. Supp. 2d at 14-15); see Pls.' Opp'n to Defs.' Mot. for Summ.
J. at 11 (same); Pls.' Second Mot. for Summ. J. Reply at 9
(same).

Defendants respond that "nothing in the passage . . .
implies [that] the Court would not require a showing of
intentional discrimination (whatever that showing) in order to
demonstrate denominational preference" and that "it is clear

that the Court understood Plaintiffs' claim on this front to be one of intentional discrimination." Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. at 28; see Defs.' Mot. for Summ. J. at 10-11; Defs.' Mot. for Summ. J. Reply at 5-6.

Plaintiffs' contention that "Adair II rejected" the argument that Plaintiffs must show that Defendants acted with discriminatory intent to prevail on their First and Fifth Amendment claims, Pls.' Opp'n to Defs.' Mot. for Summ. J. at 11-12, reflects a misreading of the District Court's prior decisions in this case. In Adair II, the District Court determined that, although policies that explicitly discriminate on the basis of religion are subject to strict scrutiny, such scrutiny should not be applied to policies that do not explicitly discriminate on the basis of religion unless "[P]laintiff[s] can demonstrate after discovery that some or all of the Navy's policies and practices suggest a denominational preference[.]" Adair II, 217 F. Supp. 2d at 14. The District Court deferred "addressing the parties' dispute about how much of this showing can be comprised of statistical evidence until after discovery[.]" Id. at 15 n.9.

Defendants are correct that these passages do not imply, no less clearly state, that Plaintiffs need not show intentional

discrimination in order to demonstrate denominational preference. And in any case, "[i]nterlocutory orders are not subject to law of the case doctrine and may always be reconsidered prior to final judgment." Langevine v. Dist. Of Columbia, 106 F.3d 1018, 1023 (D.C. Cir. 1997); see Spirit of Sage Council v. Kempthorne, 511 F. Supp. 2d 31, 38 (D.D.C. 2007) ("[T]he law of the case doctrine leaves discretion for the Court to reconsider its decisions prior to final judgment.").

Moreover, the District Court had already addressed the intent issue in Adair I -- a ruling at the early motion to dismiss stage, delivered only months before Adair II. Therefore Plaintiffs were on notice of the District Court's view of "the importance of the government's intent in the Establishment Clause calculus[.]" 183 F. Supp. 2d at 56 n.24.

Significantly, the District Court based its Adair I ruling, that Plaintiffs had stated a claim under the Establishment Clause, on the fact that Plaintiffs alleged intentional discrimination. See id. at 56 ("[P]laintiffs have properly asserted that the Navy intentionally hires liturgical protestant chaplains dramatically out of proportion from their overall representation among [Navy] personnel.") (emphasis added); id at 56 n.24 ("[P]laintiffs allege that the Navy has deliberately

adopted policies designed to maintain liturgical Christian control over the Chaplain Corps.") (emphasis added); id. ("[Plaintiffs] have clearly alleged an intentional preference.") (emphasis added); id. at 57 ("[P]laintiffs clearly offer well-pled factual allegations that the Navy institutes 'a deliberate, systematic, discriminatory' retention policy 'whose purpose was to keep non-liturgical chaplains from continuing on active duty, thus ensuring they would not be considered for promotion and minimizing their future influence.") (emphasis added) (citation omitted).

Thus, far from rejecting the argument that Plaintiffs must prove intent, the law of the case, as clearly articulated in Adair I, recognizes that the central theory of Plaintiffs' Establishment Clause claim rested on their being subjected to intentional discrimination.

## 2. Plaintiffs Have Failed to Demonstrate that Defendants Acted with Discriminatory Intent

The Court of Appeals pointed out that "whether plaintiffs are likely to succeed on the merits [of their denominational preference theory] — turns on whether they have made a strong showing of a pattern of past discrimination on the basis of religious denomination and whether that pattern is linked to the

- 23 -

policies they challenge." In re Navy Chaplaincy, 697 F.3d at 1180 (emphasis in original).

It is clear from the precedent discussed above that Plaintiffs bear the burden of demonstrating that Defendants' alleged "pattern of past discrimination" was motivated by discriminatory intent. Although "[p]roof of discriminatory intent must necessarily usually rely on objective factors . . . [t]he inquiry is practical." Feeney, 442 U.S. at 279 n.24. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Arlington Heights, 429 U.S. at 266.

The evidentiary basis for Plaintiffs' denominational preference theory is a series of reports written by their expert, Dr. Harald Leuba. Plaintiffs argue that Dr. Leuba's statistical analysis shows: "[1] [that] the Chiefs' denominations benefitted from their position in terms of promotions and accessions . . . [2] the Chief's influence on the Chaplain Corps rank structure . . . [3] the Navy's denominational favoritism . . . [4] the Navy's hierarchy of favorite denominations and their respective promotion rates . . . [and] [5] prejudice against Southern Baptists compared to

other denominations with Chiefs." Pls.' Mot. for Prelim. Inj.
Reply at 11 (citations omitted).

Because a preliminary injunction is an "extraordinary and
drastic remedy," Munaf, 553 U.S. at 689, it is axiomatic that
"the one seeking to invoke such stringent relief is obliged to
establish a clear and compelling legal right thereto based upon
undisputed facts," Belushi v. Woodward, 598 F. Supp. 36, 37
(D.D.C. 1984) (citing Rosemont Enterprises, Inc. v. Random House
Inc., 366 F.2d 303, 311 (2d. Cir. 1966)). "If the record
presents a number of disputes regarding the inferences that must
be drawn from the facts in the record, the court cannot conclude
that plaintiff has demonstrated a substantial likelihood of
success on the merits." In re Navy Chaplaincy, 841 F. Supp. 2d
at 345 (citing Suburban Assocs. Inc. v. U.S. Dep't of Housing &
Urban Development, No. 05-00856HHK, 2005 WL 3211563, at *10
(D.D.C. Nov. 14, 2005); SEC v. Falstaff Brewing Corp., No. 77-
0894, 1977 WL 1032, at *18 (D.D.C. Aug. 1, 1977)).

Based on the existing record, the Court finds that
Plaintiffs have provided no evidence demonstrating that
Defendants intentionally discriminated against them. The
statistics proffered by Plaintiffs, without more, are not even
minimally sufficient to demonstrate the need for the

"extraordinary and drastic remedy" of a preliminary injunction. Munaf, 553 U.S. at 689. Even if we accepted Plaintiffs' contention that Dr. Leuba's statistical analysis "suggests, if not establishes, [that] the challenged practices result in clear denominational preferences in the award of government benefits," Pls.' Mot. for Prelim. Inj. at 17, Plaintiffs still would not have met their burden of demonstrating probable success on the merits because they made no attempt to show that Defendants' alleged pattern of past discrimination was motivated by discriminatory intent.

Instead, Plaintiffs repeatedly, and incorrectly, argue that they do not need to show intentional discrimination to demonstrate a likelihood of success on the merits of their denominational preference theory, and that it is sufficient for them to put forward statistics that merely "suggest a denominational preference." Pls.' Mot. for Prelim. Inj. Reply at 11-12, 20-23; see Pls.' Mot. for Prelim. Inj. at 17; Pls.' Opp'n to Defs.' Mot. for Summ. J. at 11; Pls.' Second Mot. for Summ. J. Reply at 9. Plaintiffs misunderstand their burden and have proffered no evidence that Defendants adopted the challenged policies "because of, not merely in spite of" their adverse effect on Plaintiffs. Feeney, 442 U.S. at 279

Moreover, the disparate impact demonstrated by Plaintiffs'
statistics is not nearly "as stark as that in <u>Gomilion</u> or <u>Yick
Wo</u>," and therefore, there is no justification for inferring that
the pattern of their statistics is "unexplainable on grounds
other than" purposeful discrimination. <u>Arlington Heights</u>, 429
U.S. at 266. For instance, Dr. Leuba found that when a candidate
considered for promotion to Commander happened to be of the same
denomination as the Chief of Chaplains, 83.3% of those
candidates were selected for promotion. Pls.' Mot. for Prelim.
Inj. at 8. In contrast, Dr. Leuba also found that when a
candidate considered for promotion to Commander happened to be
of a different denomination as the Chief of Chaplains, only
73.3% of those candidates were selected for promotion. <u>Id.</u>

A mere 10% difference between the promotion rate of
candidates of the same denomination as the Chief of Chaplains
and candidates of a different denomination as the Chief of
Chaplains is certainly not "stark" as defined in <u>Arlington
Heights</u>. Plaintiffs' demonstration of a 10% difference in
promotion rate is far removed from the pattern in <u>Gomilion</u>,
where the challenged local statute had the effect of removing
from the city 99% of African American voters and not a single
white voter, and the pattern in <u>Yick Wo</u>, where the building

ordinance waiver was denied to over 200 Chinese applicants, but granted to all but one non-Chinese applicant.

Accordingly, Plaintiffs' statistical evidence does not sufficiently show that Plaintiffs are likely to succeed on the merits of their denominational preference claim.

### B.  Evaluation of the Preliminary Injunction Factors

As noted above, the Court of Appeals concluded that "the district court correctly assumed that plaintiffs have demonstrated irreparable harm" and it saw no error in the District Court's conclusion that the balance of the equities and the public interest weighed against granting the injunction. In re Navy Chaplaincy, 697 F.3d at 1179.

Evaluating the four preliminary injunction factors, this Court concludes that Plaintiffs are not entitled to injunctive relief. Significantly, Plaintiffs have not demonstrated that they are likely to succeed on the merits of their denominational preference theory because they have not provided any evidence that Defendants intentionally discriminated against them. Moreover, as the District Court previously observed, "[a]lthough plaintiffs' claims might demonstrate an irreparable injury if ultimately vindicated . . . plaintiffs have failed to demonstrate that an injunction would not substantially injure

third parties" and "[they] have failed to show that the public interest would be furthered by the court's intrusion into military personnel decisions." <u>In re Navy Chaplaincy</u>, 841 F. Supp. 2d at 349 (citing <u>Goldman v. Weinberger</u>, 475 U.S. 503, 507-08 (1986); <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 312 (1982) (noting that courts must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction")). Accordingly, Plaintiffs are not entitled to injunctive relief.

## IV. CONCLUSION

Upon consideration of the Motion, Opposition, Reply, and the entire record herein, and for the reasons set forth in this Memorandum Opinion, Plaintiffs' Motion for a Preliminary Injunction is **denied.**

February 28, 2013

_____/s/_____
Gladys Kessler
United States District Judge

<u>Copies to</u>: attorneys on record via ECF