UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                               )
                               )
IN RE: NAVY CHAPLAINCY         )    Case No. 1:07-mc-269 (GK)
                               )
_____)
```

### MEMORANDUM OPINION

Plaintiffs, 65 current and former nonliturgical Protestant chaplains in the United States Navy, their endorsing agencies, and a fellowship of non-denominational Christian evangelical churches ("Plaintiffs"), bring this consolidated action against the Department of the Navy and several of its officials ("Defendants"). Plaintiffs allege that Defendants discriminated against non-liturgical Protestant chaplains on the basis of religion, maintained a culture of denominational favoritism in the Navy, and infringed on their free exercise and free speech rights.

This matter is before the Court on Plaintiffs' Motion for Class Certification [Dkt. No. 147]. Upon consideration of the Motion, Opposition [Dkt. No. 156], Reply [Dkt. No. 160], Sur-Reply [Dkt. No. 170], Sur-Sur-Reply [Dkt. No. 178], and the entire record herein, and for the reasons set forth below, Plaintiffs' Motion shall be **denied**.

I.   **BACKGROUND**[1]

    A.   **The Navy Chaplain Corps**

The Navy employs a corps of chaplains ("Chaplain Corps" or "CHC") to meet the religious needs of its members. Chaplains provide religious education, counseling, and support to sailors and Marines and advise commanders on religious, moral, and ethical issues. In re England, 375 F.3d 1169, 1171 (D.C. Cir. 2004) (citations omitted). The role of a chaplain "within the service is 'unique,' involving simultaneous service as clergy or a 'professional representative[]' of a particular religious denomination and as a commissioned naval officer." Id. (citations omitted). To serve these dual roles, chaplains must have a graduate level theology degree or equivalent, meet the physical and educational requirements applicable to all commissioned officers, and be endorsed by an endorsing agency as qualified to represent a particular faith group. Id. at 1171-72.

There are over 100 faith groups recognized by the Department of Defense, which the Navy has grouped into four "faith group categories" for purposes of organizing the Chaplain Corps: Roman Catholic, Liturgical Protestant, Non-liturgical

---

[1] The Court assumes familiarity with the extensive record of the case, which includes more than twenty written decisions by this Court and the Court of Appeals.

Protestant, and Special Worship. In re Navy Chaplaincy, 697
F.3d 1171, 1173 (D.C. Cir. 2012) ("In re Navy Chaplaincy I").
The Liturgical Protestant category consists of Protestant
denominations that trace their origins to the Protestant
Reformation, practice infant baptism, and follow a prescribed
liturgy; it includes Lutheran, Episcopal, Methodist, and
Presbyterian faiths. In re England, 375 F.3d at 1172;
Consolidated Complaint ("Consol. Compl.") ¶ 6(b) [Dkt. No. 134].
The Non-liturgical Protestant category is composed of Protestant
denominations that baptize at the "age of reason" and do not
follow a formal liturgy; it includes Baptist, Evangelical,
Pentecostal, Bible Church, and Charismatic faiths. In re
England, 375 F.3d at 1172; Consol. Compl. ¶ 6(c). The Special
Worship category encompasses all denominations not covered by
the other categories; it includes Jewish, Hindu, Buddhist,
Muslim, Jehovah's Witness, Christian Science, Mormon, and
Unitarian faiths. Chaplaincy of Full Gospel Churches v.
England, 454 F.3d 290, 295 n.3 (D.C. Cir. 2006); Consol. Compl.
¶ 6 n.5.

In order to maintain the requisite number of chaplains for
all ranks (what the Navy refers to as "authorized end
strength"), the Chaplain Corps creates an annual "accessions
plan" setting forth the number of officers it can bring on

active duty that fiscal year.  Declaration of Captain Gene P. Theriot, CHC, USN ("Theriot Decl.") ¶ 2 [Dkt. No. 29-6]; see also SECNAVINST 1120.4A(5).  The term "accession" refers to the process of bringing a qualified individual into the Chaplain Corps as a commissioned officer.  Theriot Decl. ¶ 2.  Chaplain Corps accessions are drawn primarily from the civilian population, but also from the reserve community, Chaplain Candidate Program, and inter-service transfers.  Id.; see also Consol. Compl. ¶ 44(c).

Chaplain applications are reviewed by a "Chaplain Appointment Recall and Eligibility Advisory Group" or what is commonly referred to as a "CARE" board.  Theriot Decl. ¶ 3.  The CARE board reviews chaplain applications and recommends certain applicants to the Chief of Chaplains, "giving particular consideration to: the existence of an ecclesiastical endorsement, academic performance, graduate theological education, professional ministry experience, professional reputation and deportment, interview results and letters of personal or professional recommendation."  Id.  After considering the CARE board's recommendations, the Chief of Chaplains forwards his or her recommendations for accession to the Commander of the Navy Recruiting Command or the Chief of Naval Personnel for final approval/disapproval.  Id.

After accession, chaplains are subject to the same personnel system as other naval officers and, like other officers, are required to be promoted in rank at regular intervals. In re England, 375 F.3d at 1172 (citing 10 U.S.C. § 611(a)). If a chaplain is considered but not selected for promotion to the next higher rank, he or she is said to have "failed of selection." Chaplaincy of Full Gospel Churches, 454 F.3d at 293. Two or more failures of selection subject the chaplain to the risk of involuntary separation, known as "selective early retirement." See 10 U.S.C. § 632(a)-(b). The Navy may, however, elect to continue a chaplain on active duty despite two or more failures of selection if, in its judgment, the needs of the Navy so require. See id. § 632(c)(2).

Each of these decisions regarding a chaplain's career — promotion, selective early retirement, and continuation on active duty - is made by a selection board composed of officers superior in rank to the person under consideration.[2] In re England, 375 F.3d at 1172. The selection board process is governed by statute and regulations prescribed by the Secretary of Defense. See 10 U.S.C. §§ 611, 612. Under the current

_____

[2] Selection board rules and processes differ according to the rank and type of personnel decision under consideration. See generally 10 U.S.C. §§ 611, 612. Unless otherwise stated, the Court uses the term "selection board" to refer generically to all boards convened for the purpose of considering a change to a naval officer's employment status.

regulations, chaplain selection boards are composed of seven members, two of whom are chaplains "nominated without regard to religious affiliation." In re Navy Chaplaincy, 738 F.3d 425, 427 (D.C. Cir. 2013) ("In re Navy Chaplaincy III") (citing SECNAVINST 1401.3A, Encl. (1), ¶ 1.c.(1)(f)). "Either the Chief of Chaplains or one of his two deputies serves as selection board president." Id.

## B. Plaintiffs' Claims

Plaintiffs are 65 current and former Non-liturgical Protestant chaplains who have collectively served in more than fifty different naval command stations worldwide during the past four decades,[3] their endorsing agencies, and a fellowship of non-denominational Christian evangelical churches. They allege that "the Navy has violated their constitutional and statutory rights by establishing a pervasive culture of hostility, animosity and prejudice towards themselves and their class" manifested by: (1) "a pattern of religious preferences favoring Liturgical Christian chaplains over Non-liturgical Christian chaplains"; (2) "procedures that allow and encourage denominational preferences in the award and denial of government benefits"; and

---

[3] Among other locations, Plaintiffs served in Florida, Italy, Japan, Guam, South Carolina, North Carolina, Wisconsin, Virginia, California, Iraq, Lebanon, Georgia, Texas, Maryland, Washington, the District of Columbia, Texas, New York, Saudi Arabia, the Aleutian Islands, and Somalia. See generally Consol. Compl., Addendum A [Dkt. No. 134].

(3) "hostility toward Non-liturgical religious speech and worship practices." Mot. at 5.

They contend that a statistical examination by their expert, Dr. Harald R. Leuba, Ph.D., demonstrates that "[e]very dimension of personnel management which can be illuminated with data shows that Non-liturgical chaplains are disadvantaged by the CHC'[s] policies and practices of religious preference[.]" Consol. Compl. ¶ 42.

Plaintiffs' Consolidated Complaint and accompanying "Addendum" collectively exceed 200 pages and contain sixteen separate counts, many of which are not conceptually or legally distinct. For purposes of this Motion, it is sufficient to divide their claims into three overarching categories, as follows.[4]

First, they attack a number of facially neutral personnel practices, both current and historical, which they believe have allowed religious bias to infect selection board outcomes and led to discriminatory personnel decisions. Specifically, they challenge: (1) the small size of selection boards; (2) the placement of two chaplains on each board, one of whom is either

---

[4] The Court limits its discussion to the factual and legal contentions at issue in this Motion and, in so doing, analyzes Plaintiffs' claims according to the type of alleged violation, rather than the particular numerical scheme in the Consolidated Complaint.

the Chief of Chaplains or one of his or her deputies; and (3) the use of "secret voting" procedures in which board members anonymously indicate their degree of confidence in a candidate, a process Plaintiffs contend "enables each board's chaplains to ensure that a particular candidate will not be promoted, thus increasing the odds for their preferred (and discriminatory) results."   In re Navy Chaplaincy III, 738 F.3d at 428; see also Consol. Compl. ¶ 95(c).

Plaintiffs also take issue with the fact that until 2002, "each selection candidate's three-digit 'faith group identifier' code . . . was prominently displayed throughout the selection board process[,]" which they claim had no purpose other than "to identify a candidate's faith group to the board" for purposes of permitting the chaplain board members "to exercise their individual or faith group prejudice . . . , particularly against Non-liturgical chaplains."   Consol. Compl. ¶¶ 86-87.

Second, Plaintiffs assert that, until 2001, the Navy used religious quotas or "goals" for apportioning chaplain opportunities among the faith group categories.   Consol. Compl. ¶¶ 33-35.   In particular, they claim that between 1986 and 2001, the Navy had a so-called "Thirds Policy" under which it reserved thirty-five percent of chaplain accessions to Liturgical Protestants, thirty-five percent to "Non-liturgical faith

- 8 -

groups," and thirty percent to "Others," including Catholics. Consol. Compl. ¶¶ 33, 35, 43.  They also claim that from 1977 until 2002, Defendants maintained a policy of reserving a set number of selection board seats for Roman Catholic chaplains (the so-called "2 RC" and "1 RC" policies), allegedly for the purpose of "stacking" selection board proceedings in favor of Roman Catholic and Liturgical Protestant chaplains despite their declining numbers in the broader population.  Consol. Compl. ¶¶ 57(e)-(g).

Third, in the "Addendum" to their Consolidated Complaint, the individual chaplain Plaintiffs advance a laundry list of fact-specific claims asserting equal protection and free exercise violations they purportedly suffered while serving as chaplains in the Navy.  These consist of highly individualized allegations that they were, at different points in time and in different command centers: (1) retaliated against, criticized, transferred, or removed from their posts by superior officers based on their faith or the content of their religious teachings; (2) treated differently from Liturgical chaplains with respect to disciplinary issues, promotion, retention, selective early retirement, recall to active duty, fitness reports, and/or employment benefits; (3) made to officiate at Liturgical services; and (4) subjected to general policies that,

- 9 -

while not facially discriminatory, disfavored certain aspects of
their worship traditions.  See, e.g., Consol. Compl. ¶¶ 178-
184(kk) & Addendum A.[5]  They claim that each of the practices,
policies, and procedures they challenge enabled or permitted
other chaplains to discriminate against them, thereby violating
their rights under the First and Fifth Amendments and the
Religious Freedom and Restoration Act ("RFRA"), 42 U.S.C. §
2000bb, et seq.  See generally Consol. Compl. ¶¶ 29-131, 141-
164.

     Plaintiffs seek sweeping injunctive and declaratory relief
that would place this Court in an essentially perpetual
oversight role with respect to the Navy's personnel practices.
Such relief includes both individually-tailored remedies to
repair purported damage to each and every chaplain's career, as
well as what Plaintiffs refer to as "fundamental reform,"
requiring the Navy to adjust its hiring and retention policies
to match religious representation in the greater population.
Mot. at 38.  Their requested remedies include, but are not
limited to:

---

[5] For example, Plaintiffs allege that some "senior chaplains have
insisted on rotating chaplains through . . . services instead of
assigning a chaplain as a 'pastor' for a congregation,
reflecting the liturgical viewpoint that the liturgy satisfies
the congregation's worship need, rather than the Non-liturgical
view that good biblical preaching, music, and praise and worship
comprise the worship experience[.]"  Consol. Compl. ¶ 150(b).

- A judicial declaration voiding "all personnel actions" made regarding Navy chaplains of any denomination since 1977. Consol. Compl. at 119.

- Reinstatement of separated Non-liturgical chaplains to active duty "until such time as they have been reviewed by legally constituted boards." Id. at 111.

- An order requiring the Navy to "correct the records and remove the prejudice from the affected Non-liturgical chaplain's official career file, take other necessary actions to make plaintiffs whole, and take corrective action to preclude further incidents of prejudice." Id. at 118.

- "Special compensation" for the named Plaintiffs "for the expense, stress and hostility they have endured to bring this action[.]" Id. at 120.

- An order invalidating all of the challenged personnel policies and requiring the Navy to "[d]evelop new policies, guidelines, and regulations that[,]" among other things, "officially record the religious preference of all Navy personnel"; "[e]nsure that [Non-liturgical] services receive priority or become the main Christian service when Non-liturgicals constitute a majority"; and adjust the CHC's rank structure to reflect religious preference. Id. at 117-19 (emphasis in original).[6]

- A court-ordered "system of checks and balances" monitoring remedial efforts to ensure that consideration of religious

---

[6]   As other courts have noted, there is an inconsistency between Plaintiffs' claim that the Navy is prohibited from considering religion in its personnel decisions and their simultaneous assertion that the Navy is constitutionally required to consider religion in its personnel decisions by developing a system of proportional representation. See Sturm v. U.S. Navy, No. 99-CV-2272, slip op. at 7 (S.D. Cal. June 18, 2002) ("Sturm Mem. Op. of June 18, 2002") (noting inconsistency between argument that "the First Amendment does not permit the Government to discriminate between denominations" and simultaneous demand "that Non-liturgical Protestants be picked over Liturgical Protestants and Roman Catholics because they purportedly satisfy a higher percentage of service members' religious needs").

considerations is "effectively eliminated" from promotions and career processes, and that future "complaints of religious discrimination are promptly investigated and addressed." Id. at 117-18.

## C.   Defendants' Response to Plaintiffs' Claims

Defendants deny Plaintiffs' allegations in their entirety.

First, they deny that any of the alleged "quota" systems (the so-called "Thirds," "1 RC" and "2 RC" Policies) ever existed. They point out that the Navy's rules specifically require promotion board members to "be nominated without regard to religious affiliation" and prohibit "[e]xclusion from board membership by reason of gender, race, ethnic origin, or religious affiliation[.]" Defs.' Mot. for P. Summ. J. at 5 [Dkt. No. 46-1] (citations omitted) (citing SECNAVINST 1401.3 ¶ 4(a) & Encl. 1 ¶ 1(c)(1)(e)). They point out further that the Chaplain Corps' personnel policies and Guiding Principles, on which chaplains receive yearly training, expressly prohibit religious discrimination of any type and require that personnel decisions be based on merit alone. Opp'n at 24 (citing SECNAVINST 5350.16A ¶ 7). In accordance with these requirements, Defendants maintain that "[i]ndividual accession decisions are made on the basis of qualifications alone" and that the Navy has consistently endeavored to "access[] the best-qualified candidates irrespective of faith group." Defs.' Mot. for P. Summ. J. at 23, 24 (citations omitted).

- 12 -

Second, Defendants claim that, consistent with its policy of nondiscrimination, the Navy has enacted numerous safeguards to prevent discrimination from infecting selection proceedings and to "protect the rights of all to worship or not worship as they choose." Opp'n at 24 (citing SECNAVINST 5351.1, encl. 4). These safeguards include requiring selection board members to "take an oath to perform [their] duties without prejudice or partiality"; instructing them to "ensure that officers are not disadvantaged because of . . . religion"; and imposing on them a duty to report any belief that board results have been tainted by improper influence or bias.   Opp'n at 24 & Ex. 6 (Jan. 23, 2013, Decl. of Commander Jeffrey J. Klinger, USN) ("Klinger Decl.") ¶¶ 26, 27, 29, 59 [Dkt. No. 156-6]; see also Defs'. Mot. for P. Summ. J. at 4 (citing 10 U.S.C. § 613).

Third, Defendants challenge the statistical findings of Plaintiffs' expert, Dr. Leuba, in their entirety.  See, e.g., Opp'n at 20-23, 26.[7]   They assert that from 1988 until the present, "Non-liturgicals have steadily grown to constitute the largest of the four Faith Group Categories recognized by the

_____

[7] Defendants retained their own expert, Dr. Bernard R. Siskin, Ph.D., whose analysis Plaintiffs have moved to strike under Fed. R. Evid. 702 and 403. See Opp'n, Ex. 2 (Statistical Analysis of Promotions and Early Retirement Selections in the United States Navy Chaplain Corps, Supplemental Report) [Dkt. No. 156-2]; Pls.' Renewed Mot. to Strike [Dkt. No. 169].   The Court does not rely on Dr. Siskin's report to resolve the pending Motion.

Navy for Chaplain Corps personnel management purposes, recently becoming the outright majority of all active duty Chaplains, both overall and at every rank save Rear Admiral." Opp'n at 4.

They claim that "since FY 2002, Non-liturgicals have accessed in greater numbers than any other faith group category[,]" and now constitute 59.9 percent of all Chaplain Corps accessions, "compared to Liturgical Protestants at 26.7 percent, Roman Catholics at 7.2 percent, and Special Worship candidates at 6.3 percent of all accessions, respectively." Id.; see also Decl. of Veronica Berto dated May 20, 2011 ("May 20, 2011, Berto Decl."), Exhibit C [Dkt. No. 156-8]. Moreover, they claim that this representation of Non-liturgical chaplains exceeds "by a significant margin" the overall percentage of Navy personnel that self-identify as belonging to a faith group category within the Non-liturgical category." Opp'n at 26-27 (citing May 20, 2011, Berto Decl., Exs. A & B).[8]

Fourth and finally, and based on the foregoing, Defendants argue that, "[a]t its heart, this consolidated litigation is really a collection of individual employment disputes" in which

---

[8] Specifically, Defendants' analysis found that "Navy personnel who self-identified as belonging to a faith group that would fall within the Non-liturgical Faith Group Category constituted only 13 percent of the Navy as of March 31, 2011[,]" whereas "Non-liturgicals constituted 53 percent of the Chaplain Corps as of FY 2010." Opp'n at 26-27 (citing May 20, 2011, Berto Decl., Exs. A & B).

the proposed class members have only "two principal things in common: (1) they belong to Christian faith groups categorized by the Navy as Non-liturgical for personnel management purposes; and (2) at some point, each sustained one or more adverse personnel decisions, such as failure to promote to the next rank or selection for early retirement." Defs.' P. Mot. to Dismiss at 1 [Dkt. No. 29]. "Beyond that," Defendants argue, Plaintiffs' "individual cases diverge in numerous ways, depending on when and where they served, what their duties were, to whom they reported and by whom they were supervised, and multiple other factors." Id. at 1-2.

### D.   Procedural Background

This consolidated case is composed of three cases filed by the same counsel: Chaplaincy of Full Gospel Churches v. England, Civ. No. 99-2945 ("CFGC"); Adair v. England, Civ. No. 00-566 ("Adair"); and Gibson v. Dep't of Navy, Civ. No. 06-1696 ("Gibson"). CFGC and Adair were filed in this Court on November 5, 1999, and March 17, 2000, respectively, and were consolidated for pretrial purposes on September 26, 2000. [Adair Dkt. No. 21]. Gibson was filed in the Northern District of Florida on April 28, 2006, and was subsequently transferred to this District pursuant to 28 U.S.C. § 1404. See Mem. Order of August 17, 2006, at 1 [Gibson Dkt. No. 1]. On June 18, 2007, the Court

consolidated all three actions, concluding that they raise "substantially similar constitutional challenges to the Navy Chaplaincy program." Mem. Order of June 18, 2007, at 4 [Dkt. No. 11].

On March 26, 2002, the Adair Plaintiffs filed their first Motion for Class Certification, which the Court granted on August 19, 2002 [Dkt. No. 69]. See Adair v. England, 209 F.R.D. 5 (D.D.C. 2002). Four years later, the Adair Plaintiffs moved to vacate the 2002 Class Certification Order, claiming that, as a result of recent "job changes" and other personal circumstances, "they [we]re no longer willing or able to represent or to assume the burdens inherent in representing the class." Pls.' Mot. to Vacate the Aug. 19, 2002, Order Granting Pls.' Mot. to Certify a Class, at 2 [Adair Dkt. No. 156]. On May 30, 2006, the Court granted this Motion.

The parties engaged in more than five years of active discovery between 2002 and 2009, interspersed with collateral litigation and three interlocutory appeals to our Court of Appeals. In 2012, Judge Ricardo Urbina, who had been assigned to this case, retired and it was reassigned to this Court. At the Court's request, on October 3, 2012, Plaintiffs filed a Consolidated Complaint [Dkt. No. 134] comprised of all of the remaining claims at issue.

- 16 -

On December 4, 2012, Plaintiffs filed the instant renewed Motion for Class Certification ("Mot.") [Dkt. No. 147].   On January 23, 2013, Defendants filed their Opposition ("Opp'n") [Dkt. No. 156].   On February 25, 2013, Plaintiffs filed their Reply ("Reply") [Dkt. No. 160].   With permission of the Court, on March 27, 2013, Defendants filed a Sur-Reply ("Sur-Reply") [Dkt. No. 170], and on April 15, 2013, Plaintiffs also filed a Sur-Reply ("Sur-Sur-Reply") [Dkt. No. 178].

## II.  Subject Matter Jurisdiction Over Plaintiffs' Challenge to the "Thirds Policy"

Before reaching the class certification issue, the Court must address a threshold issue left undecided in one of its prior decisions: whether it has subject matter jurisdiction to consider Plaintiffs' challenge to the alleged "Thirds Policy."[9]

The parties dispute whether the Thirds Policy ever existed, but it is undisputed that it has not existed since 2001.  See Consol. Compl. ¶ 35(a)-(b); Pls.' Mot. for P. Summ. J. at 4-5 (policy was "abandoned" in 2001) [Dkt. No. 55].   Our Court of

_____

[9] The Court has an affirmative duty to ensure that it is acting within its jurisdictional limits and may raise the issue sua sponte at any time.  See Fed. R. Civ. P. 12(h)(3) ("If the [district] court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); Evans v. Suter, No. 09-5242, 2010 WL 1632902, at *1 (D.C. Cir. Apr. 2, 2010) ("[A] district court may dismiss . . . sua sponte . . . when, as here, it is evident that the court lacks subject-matter jurisdiction[.]").

Appeals has therefore recognized that, "because the Navy already eliminated the Thirds Policy," and there is no evidence "the Navy will reinstitute it, any injunction or order declaring it illegal would accomplish nothing — amounting to exactly the type of advisory opinion Article III prohibits." Larsen v. U.S. Navy, 525 F.3d 1, 4 (D.C. Cir. 2008) ("Larsen I").

In 2008, Defendants moved to dismiss the Thirds Policy claim, arguing that, under Larsen I, any prospective challenge to the Policy is moot. See Defs.' P. Mot. to Dismiss at 21-22 [Dkt. No. 29-1]. They also argued that Plaintiffs lack standing to challenge the Policy because "each Plaintiff successfully accessed into the Chaplain Corps" and therefore cannot show "that the Navy's past or present accession policies caused them any injury in fact, a requirement of standing." In re Navy Chaplaincy, 850 F. Supp. 2d 86, 109 (D.D.C. 2012) ("In re Navy Chaplaincy II") (citation and quotation marks omitted); see also Defs.' P. Mot. to Dismiss at 19-22.

In response, Plaintiffs did not argue that they suffered a direct injury as a result of the alleged Thirds Policy (presumably because it is undisputed that they all successfully accessed into the Chaplain Corps), but asserted instead that the Policy resulted in an underrepresentation of Non-liturgical Protestants in the Chaplain Corps that limited their ability to

meet their communities' religious needs and increased their workload. See Pls.' Opp'n to Defs.' P. Mot. to Dismiss at 29-30 [Dkt. No. 33].

In 2012, the Court addressed these arguments. With respect to standing, it noted that Plaintiffs alleged that the Thirds Policy had limited their ability to meet their communities' religious needs and increased their workload. The Court concluded that this "pleaded factual content, accepted as true, allow[s] the court to draw the reasonable inference that the plaintiff[s] suffered an injury in fact to support standing." In re Navy Chaplaincy II, 850 F. Supp. 2d at 110. Given the procedural posture of the case, however, the Court did not reach whether Plaintiffs satisfied the other elements of standing. Id. at 109-110 (quoting Sierra Club v. EPA, 292 F.3d 895, 898-99 (D.C. Cir. 2002)).

With respect to mootness, the Court noted that the Court of Appeals panel in Larsen I had recently recalled its mandate due to the discovery of new evidence allegedly suggesting the Navy had reinstituted the Thirds Policy. Consequently, the Court denied Defendants' mootness challenge "without prejudice" to future consideration "after the court has ruled on the remanded Larsen matter." Id. at 110 n.11.

The district court in Larsen I has now ruled on the mootness issue. It determined that the challenge to the Thirds Policy remained moot because the newly presented evidence did not "indicate that the Thirds Policy will likely be reenacted." Larsen v. U.S. Navy, 887 F. Supp. 2d 247, 258 (D.D.C. 2012) ("Larsen II"). In this case, too, there is no evidence the Navy will reinstate the alleged Thirds Policy.[10] Consequently, as in Larsen I, any forward looking or declaratory relief that this Court might grant with respect to the alleged Thirds Policy would "accomplish nothing — amounting to exactly the type of advisory opinion Article III prohibits." Larsen I, 525 F.3d at 4. Accordingly, Plaintiffs' claim for declaratory and forward-looking injunctive relief related to the Thirds Policy is moot.

In light of this conclusion, Plaintiffs also cannot demonstrate standing to challenge the Policy. They have

---

[10] The evidence of the Thirds Policy consists largely of a single memorandum from Captain D.K. Muchow to the Chief of Chaplains regarding the annual accessions plan for FY 1987 (the "Muchow Memorandum") [Dkt. No. 55-22]. The Muchow Memorandum states that "[f]aith group mix best meets the needs of the naval service when 35 percent of the Chaplain Corps inventory is liturgical, 35 percent non-liturgical and 30 percent other (Roman Catholic, Jewish, Orthodox)." Id. at 1. However, it makes no reference whatsoever to the existence of any formal Thirds Policy and there is no indication that Muchow's assessment of optimal "faith group mix" reflected the views of the CHC as a whole or pertained to accession goals for any year other than FY 1987. At his deposition, Muchow characterized the Memorandum as merely a "snapshot of where we were" in FY 1987. See Dep. Tr. of Donald K. Muchow at 44:18 [Dkt. No. 47-15].

previously argued that they suffered an Article III injury as a result of the Thirds Policy because it limited their ability to meet the religious needs of Non-liturgical service members and increased their workload. Even assuming, however, that Plaintiffs could prove they were required to work harder than other chaplains as a result of the Policy (as to which there is negligible evidence), and that such an injury is sufficiently concrete and particularized to satisfy Article III, Plaintiffs would still be required to show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA, No. 13-1035, 2014 WL 2219065, at *3 (D.C. Cir. May 30, 2014) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)) (quotation marks and ellipses omitted).

There is no indication that Plaintiffs' increased workload in the past has had any lasting adverse effect. As the District Court for the Southern District of California held in a related case, "'[p]ast exposure to illegal conduct does not in itself show a present case or controversy . . . if unaccompanied by any continuing, present adverse effects.'" Wilkins v. United States, No. 99-CV-1579-IEG (LSP), slip op. at 23 (S.D. Cal. June 29, 2005) ("Wilkins Mem. Op. of June 29, 2005") (quoting Renne

- 21 -

v. Geary, 501 U.S. 312, 320-21 (1991)) (emphasis added)); aff'd,
232 F. App'x 710 (9th Cir. 2007).

Furthermore, there is nothing in the record to suggest that
the limited declaratory and injunctive remedies available in
this Court could provide effective relief for any injuries
Plaintiffs sustained in the past as a result of the alleged
Thirds Policy.   "[W]hile plaintiffs may seek declaratory and
injunctive relief, they may not seek damages because the United
States has not waived sovereign immunity for monetary relief for
unconstitutional acts taken by government employees acting in
their official capacities." Leonard v. U.S. Dep't of Def., No.
13-1571, 2014 WL 1689606, at *3 n.2 (D.D.C. Apr. 30, 2014)
(citing Clark v. Library of Cong., 750 F.2d 89, 102-03 (D.C.
Cir. 1984)).   "The government also has not waived sovereign
immunity for monetary damages resulting from violations of
RFRA." Id. (citing Webman v. Fed. Bureau of Prisons, 441 F.3d
1022, 1026 (D.C. Cir. 2006) ("RFRA does not waive the federal
government's sovereign immunity for damages.")).

Consequently, if Plaintiffs prevailed, they would be
limited to non-monetary relief for any constitutional violations
resulting from the Navy's prior use of the alleged Thirds
Policy.   They have not identified any non-monetary relief that
could remedy the fact that they were required to "expend more

effort" than their Liturgical colleagues a decade or more ago.[11]

Nor have they identified any other injury related to the alleged Thirds Policy that the Court could redress through non-monetary relief.[12]

In sum, because Plaintiffs' request for declaratory and forward-looking relief is moot and the Court is unable to issue any relief for the only injury they claim to have suffered in

---

[11] Plaintiffs do allege that Non-liturgical chaplains are still underrepresented as a result of the alleged "Thirds Policy" and thus suggest that the Court can provide relief for the fact that they continue to shoulder a heavier workload.  See Pls.' Opp'n to Defs.' P. Mot. to Dismiss at 33.  But this contention finds no support in the record. As already noted, as of FY 2010, Non-liturgical Protestants made up more than 50 percent of the Chaplain Corps, whereas in 2011, personnel who self-identified as belonging to a Non-liturgical faith group constituted only 13 percent of the Navy. See May 20, 2011, Berto Decl., Exs. A & B.

[12] Plaintiffs allege that the Thirds Policy "applied" to recruiting and accessions. See Consol. Compl. ¶¶ 35(b), 43; see also Decl. of Commander Timothy J. Demy, CHC, USN ("Demy Decl.") ¶ 4 [Dkt. No. 178-4].  To the extent they suggest it also applied to other personnel decisions, see Consol. Compl. ¶ 43, they have presented no evidence that it did, whereas Defendants have submitted an affidavit clearly stating that "[t]here [we]re no express or implied quotas for promotion based on faith" during the relevant time period.  Affidavit of R.W. Duke at 4, Wilkins v. Lehman, No. 85-3031 (S.D. Cal. Jan. 16, 1986) ("Duke Aff.") [Dkt. No. 172-3].  Similarly, a promotion board precept dated June 23, 1987, states that boards must select officers who "giving due consideration to the needs of the Navy for officers with particular skills, considers best qualified for promotion," a standard to "be applied uniformly" to all candidates.  FY 1988 Promotion Board Precept at 2 [Dkt. No. 160-8].  There is simply no evidence that the alleged Thirds Policy, or any other religious quotas or goals, impacted promotion, retention, or selective early retirement decisions.

the past, Plaintiffs have not established the existence of a "live controversy" pertaining to the Thirds Policy. Therefore, the Court is without jurisdiction to consider it. See Sturm Mem. Op. of June 18, 2002, at 6 ("While Plaintiff may take issue with Defendant's former accession practices, '[w]e are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong.'") (quoting Spencer v. Kemna, 523 U.S. 1, 18 (1998)), aff'd, 76 F. App'x 833 (9th Cir. 2003)).

For these reasons, Plaintiffs' claim related to the Thirds Policy shall be dismissed for lack of subject matter jurisdiction.

## III. CLASS CERTIFICATION

The Court will now consider Plaintiffs' Motion for Class Certification. Plaintiffs seek to certify a class of up to 2,500 "present and former Non-liturgical Navy chaplains, active duty and Reserve, who were in the Navy or have served in the Navy" between 1976 and the present. Mot. at 3, 7. The proposed class includes, but is not limited to: (1) chaplains whose "careers have been injured, terminated or otherwise adversely affected by the Navy's and the CHC's unlawful bias and prejudice against Non-liturgical chaplains"; (2) chaplains who "saw or experienced the Navy's Non-liturgical bias and left active duty

- 24 -

or retired early rather than endure that bias and prejudice";
and (3) chaplains "who have not yet personally suffered career
injury as a result of the practices and policies challenged here
because manifestation of the injury has been delayed[.]"   Mot.
at 3-5.

### A.   Legal Standard

"The class action is an exception to the usual rule that
litigation is conducted by and on behalf of the individual named
parties only." Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541,
2550 (2011) (citation and quotation marks omitted).   Class
certification is governed by Rule 23 of the Federal Rules of
Civil Procedure.   There are two components to the certification
inquiry: first, each of the four elements of Rule 23(a) must be
met; second, certification of the proposed class must be
appropriate under at least one of the three categories
enumerated in Rule 23(b).   Richards v. Delta Air Lines, Inc.,
453 F.3d 525, 529 (D.C. Cir. 2006).

The proponent of class certification must prove by a
preponderance of the evidence that the requirements of Rule 23
are satisfied.   Wal-Mart, 131 S. Ct. at 2548.   The Supreme
Court has stated that "Rule 23 does not set forth a mere
pleading standard"; rather, "[a] party seeking class
certification must affirmatively demonstrate [its] compliance

with the Rule — that is, [it] must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." Id. at 2551 (emphasis in original).

The trial court must conduct "a rigorous analysis" to ensure that the requirements of Rule 23 have been met. Id. This inquiry may overlap with an appraisal of the merits, for "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question[.]" Id. (citing Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160, (1982)). Rule 23 is not, however, a "license to engage in free-ranging merits inquiries[,]" and merits questions may only be considered to the extent that "they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1194-95 (2013).

## B.   Rule 23(a)

Under Rule 23(a), a plaintiff seeking certification must demonstrate that: (1) the class is so numerous that joinder of all members is impractical; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and

adequately protect the interests of the class. Fed. R. Civ. P. 23(a). These four requirements are commonly referred to as numerosity, commonality, typicality, and adequacy of representation, respectively.

The parties do not dispute that the numerosity requirement is satisfied; therefore, the Court confines its analysis to a discussion of the other three requirements.

### 1.    Commonality

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This requirement was the basis of the Supreme Court's decision in Wal-Mart. Wal-Mart involved a proposed class of current and former female employees who alleged that Wal-Mart had a "strong and uniform 'corporate culture'" that "permit[ted] bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal-Mart's thousands of managers — thereby making every woman at the company the victim of one common discriminatory practice." Wal-Mart, 131 S. Ct. at 2548.

The Supreme Court rejected this theory as a basis for commonality. It explained that the inquiry under Rule 23(a)(2) is not whether class members "have all suffered a violation of the same provision of law[,]" but rather whether "a classwide proceeding [will] generate common answers apt to drive the

- 27 -

resolution of the litigation." Id. at 2551 (emphasis added and citation and internal punctuation omitted). In other words, the class members' claims must depend on a "common contention" that is "of such a nature that it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. (citations omitted).

Quoting a prior decision, the Court observed that:

Conceptually, there is a wide gap between (a) an individual's claim that he [sic] has been denied a promotion . . . on discriminatory grounds, and his [sic] otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claim will share common questions of law or fact and that the individual's claim will be typical of the class claims.

Id. at 2553 (quoting Falcon, 457 U.S. at 157-58 (quotation marks omitted)). The Court acknowledged this gap could theoretically be bridged by "significant proof" that Wal-Mart "operated under a general policy of discrimination." Id. It observed, however, that "Wal-Mart's announced policy forbids sex discrimination," and consequently, the "only corporate policy that the plaintiffs' evidence convincingly establishes is Wal-Mart's 'policy' of allowing discretion by local supervisors over employment matters." Id. at 2553-54. A policy of local

- 28 -

discretion, the Court concluded, did not satisfy the commonality requirement because it "is a policy against having uniform employment practices[,]" and therefore, "demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's." Id. at 2554 (emphasis in original).

In this case, just as in Walmart, Plaintiffs do not allege that the Navy ever had an express policy against the advancement of Non-liturgical Protestants. Instead, they rest their case on an array of individual anecdotes they contend demonstrate a "pervasive pattern of religious preference." Yet the theories of religious discrimination reflected in these individual anecdotes vary widely. Some of the Individual Plaintiffs conclude that they were discriminated against because they believe themselves to be more qualified than chaplains of different faiths who fared better in the Chaplain Corps' personnel system. Others complain of poor fitness reports and unfavorable work assignments issued by their superiors, which they blame on interpersonal disputes combined with religious animosity, retaliation, and/or racial or gender discrimination. Yet others tell extended narratives of local command officers or senior chaplains interfering with their ministry efforts,

prayer, or worship styles for a variety of reasons they attribute to religious hostility.[13]

These diverse circumstances and theories of discrimination undermine Plaintiffs' efforts to establish commonality at the outset. See, e.g., Wal-Mart, 131 S. Ct. at 2557 (plaintiffs could not show commonality because they "held a multitude of different jobs, at different levels of Wal-Mart's hierarchy, for variable lengths of time, in 3,400 stores, sprinkled across 50 states" and were subjected "to a variety of regional policies that all differed"); Garcia v. Johanns, 444 F.3d 625, 632 (D.C. Cir. 2006) ("Establishing commonality for a disparate treatment

---

[13] By way of illustration, one chaplain attributes his non-selection for promotion to rumors spread about his "stability and performance" following a referral for psychiatric evaluation after his "liberal" command Chaplain overheard him telling his wife that his ministry was "truncated by demonic forces personified by Chaplains." Addendum A to Consol. Compl. ¶ 50. Four other chaplains stationed in Naples, Italy contend that they received poor fitness reports from Catholic superior officers for praying "in Jesus name." Id. ¶¶ 5, 10, 18, 62-63. A chaplain stationed in Okinawa, Japan from 1991 until 1993 claims that "his Liturgical Protestant rating chaplain gave him a poor fitness report" for failing "to support his rater's . . . prayer breakfasts" and "preaching that men who call themselves Christians should live as Christians." Consol. Compl. ¶ 184(b). Another chaplain believes his non-promotion was retaliation by a Catholic board member who allegedly accused him of "stealing sheep" after baptizing a woman who asked to be baptized by immersion. Id. ¶ 184(g). Another chaplain resigned after being investigated by the Navy for sexual harassment but attributes the investigation to religious discrimination. Addendum A to Consol. Compl. ¶ 30. Two Hispanic chaplains claim to have suffered a combination of religious and racial discrimination. Id. ¶¶ 40, 54. These types of individualized allegations pervade the Consolidated Complaint.

class is particularly difficult where, as here, multiple decisionmakers with significant local autonomy exist.").

Nevertheless, as our Court of Appeals has emphasized, the commonality requirement is not a predominance requirement and "even a single common question will do." <u>D.L. v. Dist. of Columbia</u>, 713 F.3d 120, 128 (D.C. Cir. 2013) (citing <u>Wal-Mart</u>, 131 S. Ct. at 2556). Therefore, the Court shall consider whether Plaintiffs have identified <u>any</u> common issue of law or fact tying their injuries together.[14]

---

[14] Plaintiffs argue that the Court's 2002 class certification decision in <u>Adair</u>, 209 F.R.D. at 10, is the "law of the case," thereby governing the Court's analysis on this Motion. Sur-Sur-Reply at 6. The <u>Adair</u> Class Certification Order was vacated at Plaintiff's request on May 30, 2006, and is, therefore, no longer "law of the case." <u>Coalition to End Permanent Congress v. Runyon</u>, 979 F.2d 219, 221 n.2 (D.C. Cir. 1992) (once vacated, an opinion is "no longer law of the case") (Silberman, J., dissenting). Furthermore, in light of <u>Wal-Mart</u>, many of the Court's conclusions in <u>Adair</u> are no longer good law. For example, the <u>Adair</u> decision held that, "[i]n determining whether to certify a class, the court should not consider the underlying merits of the plaintiff's claims," and should "accept as true the allegations set forth in the complaint." <u>Adair</u>, 209 F.R.D. at 8. <u>Wal-Mart</u>, however, makes clear that "Rule 23 does not set forth a mere pleading standard" and the "party seeking class certification must affirmatively demonstrate [its] compliance with the Rule - that is, [it] must be prepared to prove that there are <u>in fact</u> . . . common questions of law or fact[.]" <u>Wal-Mart</u>, 131 S. Ct. at 2551 (emphasis in original). Similarly, in <u>Adair</u>, the Court based its commonality finding on Plaintiffs' allegations of "a pervasive pattern" of religious discrimination. <u>Adair</u>, 209 F.R.D. at 10. In <u>Wal-Mart</u>, however, the Supreme Court held that such allegations do not satisfy Rule 23(a)(2) unless there is "significant proof" that the defendant "operated under a general policy of discrimination." <u>Wal-Mart</u>, 131 S. Ct. at 2553. In fact, as our Court of Appeals recently

a.    "Culture" of Denominational Favoritism

Just as in Wal-Mart, Plaintiffs rely heavily on allegations

of a pervasive "culture of prejudice" in the CHC.  Mot. at 16,

37.  They argue that the "common issue in each class member's

individual case is the Navy's systemic and institutionalized

culture of prejudice against Non-liturgical chaplains and the

faith    groups    they    represent,    and    the    resulting    twin

unconstitutional    message    of    favoritism    for    preferred

denominations and prejudice against Plaintiffs' [sic]."  Mot. at

39; see also id. at 5, 14, 15, 28, 29, 31.  They define

"organizational culture" as a "set of common understandings,"

composed    of    shared    "values,"    "assumptions,"    and    "beliefs,"

"around which action is organized."  Mot. at 15-16 (citations

omitted).

Under Wal-Mart, this theory only satisfies the commonality

requirement if the Navy's culture of prejudice is so strong as

to suggest that the Chaplain Corps operated under a "general

---

observed, "Wal-Mart's interpretation of Rule 23(a)(2) has
changed the landscape" of class certification. D.L., 713 F.3d
at 126-27 (citations omitted). Consequently, neither the
Court's 2002 certification order in Adair nor the other pre-Wal-
Mart commonality cases on which Plaintiffs rely are controlling.
See Athridge v. Aetna Cas. & Sur. Co., 604 F.3d 625, 632 (D.C.
Cir. 2010) (noting exception to "law of the case" doctrine where
there is an "intervening change in controlling law").

policy" of discrimination.[15]   Plaintiffs have not come close to satisfying this demanding standard.

First, the Navy's guiding documents clearly and unequivocally seek to promote a culture of tolerance, not bias. For example, the Chaplain Corps' written "Professional Standards" expressly state that the Chaplain Corps "is a religiously impartial governmental organization with no inherent theology of its own" which exists to "empower individual chaplains" to accommodate "the religious requirements of personnel of all faiths."   SECNAVINST 5351.1(5).   The Standards further provide that "[i]t is the policy of the CHC to be equally tolerant of every Service member . . . and other authorized persons irrespective of that individual's religious

---

[15] While Plaintiffs bring their discrimination claims under the First and Fifth Amendments, not Title VII as in Wal-Mart, they fail to offer any other viable theory as to how a class-wide determination of "culture" might resolve an issue central to their claims.   They do not "allege hostile work environment claims under Title VII[.]"   In re Navy Chaplaincy, 850 F. Supp. 2d 86, 116 (D.D.C. 2012) ("In re Navy Chaplaincy II").   They argue vaguely that the Establishment Clause required Defendants to maintain a "denominationally neutral" culture.   Reply at 9. But while they are correct that "[t]he government must be neutral when it comes to competition between sects," Zorach v. Clauson, 343 U.S. 306, 314 (1952), they cite no authority for the proposition that the Government must go beyond a policy of neutrality to, in fact, achieve a denominationally neutral culture.   Consequently, the Court considers Plaintiffs' "culture of prejudice" theory only insofar as it might demonstrate that the Navy operates under a "general policy" of religious discrimination.

beliefs or unbelief" and to endeavor to "accommodate the religious beliefs of all to the fullest possible extent." Id. encl. 2(2), (5) (emphasis added).

Likewise, the Chaplain Corps' Guiding Principles, which "communicate the values that hold the CHC together as an institution and serve as a point of reference for chaplains throughout their careers," state that "[w]e seek to understand cultural and religious values that differ from our own" and "believe the right to exercise our faith is best protected when we protect the rights of all to worship or not worship as they choose." Id., encl. 4.

To prove that a "culture of denominational favoritism" nevertheless exists, Plaintiffs rely primarily on affidavits and deposition testimony in which they and other Non-liturgical chaplains describe particular instances of hostile treatment, retaliation, and/or specific local command officers scheming to suppress, take over, or shut down their Non-liturgical services. See generally Addendum A to Consol. Compl.; Reply at 20-22; Sur-Sur Reply at 2-3.

However, Captain Lyman M. Smith, Executive Assistant to the Chief of Navy Chaplains, has submitted a declaration explaining that "[c]ommanding officers at the local level have ultimate responsibility for providing command religious programs" in each

of the "500 separate geographically dispersed duty assignments"
served by the CHC, and "[n]either the Chief of Chaplains nor the
Chaplain Corps controls the individual command religious
programs which are in place at each duty station."  Supp. Smith
Decl. at 2-3 [Dkt. No. 47-19] (citing OPNAVINSTR 1730.1D).

This decentralized system, combined with clear Guiding
Principles and Professional Standards requiring religious
tolerance and non-discrimination, wholly defeats Plaintiffs'
suggestion that their individual experiences of discrimination
and religious intolerance stem from a "culture of prejudice"
that is common to the class as a whole.  See, e.g., Stastny v.
S. Bell Tel. & Tel. Co., 628 F.2d 267, 279 (4th Cir. 1980)
("Substantial degree of and perhaps almost complete local
autonomy in separate facilities . . . cuts against any inference
for class action commonality purposes."); Garcia v. Veneman, 211
F.R.D. 15, 22 (D.D.C. 2002) (holding in discrimination case that
"[c]ommonality is defeated . . . by the large numbers and
geographic dispersion of the decision-makers").[16]

Plaintiffs also cite to a declaration submitted by Captain
Larry H. Ellis, who refers, without elaboration, to a general
"perception" in the mid-1990s "among non-liturgical chaplains

---

[16]     Indeed, Plaintiffs themselves acknowledge that their
individual experiences do not portray a "culture" so much as "a
series of individual incidents."  Mot. at 16.

that the Chaplain Corps was biased toward liturgical denominations and against non-liturgical chaplains." Aff. of Captain Larry H. Ellis, U.S.N. (Retired) ("Ellis Aff.") ¶ 36 [Dkt. No. 160-6]; see also id. ¶¶ 6, 11. However, neither the Ellis Affidavit, nor the related Ellis Memorandum [Dkt. No. 132-15], suggest that Non-liturgical chaplains' perceptions of religious bias grew out of an organizational culture that is common to the CHC as a whole.[17]

Thus, while Plaintiffs may have suffered individual instances of religious intolerance, there is no evidence to suggest their experiences reflect a culture that is consistent across time and space and common to the entire class. See Dukes

---

[17] In some cases, such perceptions appear to have arisen only after individual chaplains spoke with their endorsing agencies or read documents related to this case and other similar cases. See, e.g., Decl. of Patrick M. Sturm ¶ 4 [Dkt. No. 178-7] (after "talking with my endorser, it became obvious that CFGC chaplains were not being treated fairly in the Navy"); Add. to Consol. Compl. at 22, 23 (only "[a]fter reviewing the issues and evidence related to this action," did "CH Hatch bec[o]me aware [of] the CHC's biased policies"); id. at 26 (prior to reading documents related to this case, CH Hendricks "believed [that the Navy's] promotion system was fair, all records were competitive, and faith group was not important [to promotion]"); id. at 38 ("Prior to [hearing about the allegations in this case]," CH Mak "believed the Navy's . . . promotion system was fair and [that] faith group was not a factor in promotion decisions"); id. at 49 ("CH Quiles thought his non-selection was 'the luck of the draw.' Through one of the co-Plaintiffs, he learned of . . . the injustice done to him."); id. at 67 ("Prior to hearing about th[is] litigation in 2002, CH Watson had no knowledge of the evidence showing religious bias[.]").

v. Wal-Mart Stores, Inc., 964 F. Supp. 2d 1115, 1124 (N.D. Cal. 2013) (concluding on remand from the Supreme Court that, although plaintiffs' anecdotes of discrimination "succeeded in illustrating attitudes of gender bias held by managers at Wal-Mart, they failed to marshal significant proof that intentional discrimination was a general policy affecting the entire class") (emphasis added).

Therefore, Plaintiffs' individual anecdotes and allegations of a "culture of prejudice" do not provide "significant proof" that Defendants "operated under a general policy of discrimination," as required under Wal-Mart. Wal-Mart, 131 S. Ct. at 2553.

### b.   Policies and Practices

Next, Plaintiffs purport to satisfy the commonality requirement by challenging the legality of specific personnel policies and practices that allegedly "result[ed] in denominational preferences in the award of career opportunities[.]" Reply at 11. They do not, however, dispute that the Navy's policies expressly require denominational neutrality and religious tolerance. Instead, they argue that "[e]ach of the challenged practices allows denominational representatives to make subjective judgments for which there is no accountability and no process providing effective guarantees

that denomination does not enter into the decision." Reply at 20.

Insofar as Plaintiffs challenge facially neutral policies, such as secret voting, the small size of selection boards, and the practice of appointing two chaplains to each board, they cannot prevail unless they establish that the policies are motivated by discriminatory intent, lack a rational basis, or "appear to endorse religion in the eyes of a 'reasonable observer[.]'" In re Navy Chaplaincy III, 738 F.3d at 430 (emphasis in original). As our Court of Appeals recently concluded, Plaintiffs either do not allege or have not shown a likelihood of success on the merits as to any of these theories. Id. at 430 ("Given facially neutral policies and no showing of intent to discriminate, . . . [plaintiffs] have not shown [a] likelihood of success [on their Equal Protection claims]."); id. at 431 ("We feel confident that . . . reasonable observers . . . are most unlikely to believe that the policies convey a message of government endorsement.").

For the same reasons, and because Plaintiffs make no further evidentiary showing in this Motion, they also have not presented "significant proof" to support such theories for purposes of the commonality requirement under Rule 23(a)(2).

Therefore, Plaintiffs' attack on facially neutral policies does not infuse Rule 23(a)(2) commonality into their claims.[18]

Plaintiffs also challenge the so-called "1 RC" policy. However, the evidence they have presented to establish the existence of such a policy is negligible. It consists primarily of a chart they prepared reflecting the religious affiliation of promotion board members from 1977 until 2002. See Consol. Compl., Ex. 15 ("Prom. Bd. Chart") [Dkt. No. 132-16]. The chart indicates that, from roughly FY 1987 until FY 2002, each selection board included exactly one Roman Catholic member, except for selection boards in FY 1987 and FY 1998, which included two Roman Catholic members. Prom. Bd. Chart at 5-13.

The source of the information in the chart is unclear and there are significant gaps in the data presented. But even if the Court ignores these deficiencies, the chart does not suggest that Roman Catholics were overrepresented, favored, or treated differently than Non-liturgical board members in selection board appointments. To the contrary, it shows that 75 Non-Liturgical board members served on selection boards from FY 1987 and FY

---

[18] In fact, this Court has already dismissed Plaintiffs' facial challenge to various selection board practices, leaving only the possibility of a challenge "as-applied" to "certain individual chaplains." See In re Navy Chaplaincy II, 850 F. Supp. 2d at 96. By definition, a claim that only applies to "certain individual chaplains" would not support commonality as to the entire class.

2002, while only 48 Roman Catholic board members served during the same time period.  <u>See generally</u> Prom. Bd. Chart at 5-13. Furthermore, at all relevant times, the Navy's regulations specifically prohibited "[e]xclusion from board membership by reason of gender, race, ethnic origin, or religious affiliation."  SECNAVINST 1401.3 ¶ 4(a).

Thus, there is virtually no evidence in the record suggesting the Navy ever, in fact, had a "1 RC" policy, and the mere allegation of such a policy cannot provide a basis for commonality under Rule 23(a)(2).

Finally, Plaintiffs suggest that the Navy's policies are inadequate in a way that affects the class as a whole because, although individual personnel decisions are delegated to the discretion of specific selection boards, that policy of delegation, which Plaintiffs refer to as "denominationalism," fails to protect against individualized instances of discrimination.  <u>See, e.g.</u>, Reply at 10 ("The common theme in all Plaintiffs [sic] challenges is the lack of effective guarantees ensuring religious neutrality in career impacting decisions."); Sur-Sur Reply at 2 ("Denominationalism is the Navy allowing its senior chaplain[s] to exercise their denominational bias without accountability.").

Notwithstanding Plaintiffs' use of the label "denominationalism" to describe the Chaplain Corps' personnel system, their theory of commonality boils down to a complaint that the Chaplain Corps lacks effective protections against discriminatory decision-making by individual chaplains. See Reply at 20 ("Each of these challenged practices allows denominational representatives to make subjective judgments for which there is no accountability and no process providing effective guarantees that denomination does not enter into the decision.").

This theory of commonality is precisely the one rejected by Walmart and its progeny. See Walmart, at 2553-54 ("The only corporate policy that the plaintiffs' evidence convincingly establishes is Wal-Mart's 'policy' of allowing discretion by local supervisors over employment matters."); Bolden v. Walsh Constr. Co., 688 F.3d 898, 893 (7th Cir. 2012) ("Plaintiffs[] . . . contend[] that Walsh has 14 policies that present common questions, but all of these boil down to the policy of affording discretion to each site's superintendent – and Walmart tells us that local discretion cannot support a company-wide class no matter how cleverly lawyers may try to repackage local variability as uniformity.").

In sum, although Plaintiffs repeatedly cite to the alleged existence of unconstitutional "policies and practices" as a basis for class certification, they have not presented "significant proof" of any specific unconstitutional policy or practice that applied to them across the board as a class and produced a common legal injury. Therefore, they may not rely on such policies or practices to satisfy the commonality requirement of Rule 23(a)(2).

### c. Statistical Evidence

In their final effort to establish commonality, Plaintiffs rely on statistical evidence purporting to show religious disparities in personnel outcomes within the CHC.

Statistical disparities alone generally are not proof that any particular plaintiff, much less the class as a whole, has been discriminated against. See, e.g., Bolden, 688 F.3d at 896 ("If [defendant] had 25 superintendents, 5 of whom discriminated . . . , aggregate data would show that black workers did worse than white workers - but that result would not imply that all 25 superintendents behaved similarly, so it would not demonstrate commonality."). Consequently, Plaintiffs' statistical evidence can satisfy the commonality requirement only if it is so stark as to indicate that the CHC "operated under a general policy of discrimination," Wal-Mart, 131 S. Ct. at 2553, or suggest to the

"reasonable observer" that the Navy has endorsed a religious group. In re Navy Chaplaincy III, 738 F.3d at 430.[19]

As this Court has already found, and the Court of Appeals recently affirmed, Plaintiffs' statistical evidence – to the extent it is even statistically significant - "does not remotely approach the stark character" that might satisfy either of these tests. Id. at 429 ("[T]he disparity between 73.3% and 83.3% [promotion rates] does not remotely approach the stark character of the disparities in Gomillion [v. Lightfoot, 364 U.S. 339 (1960)] or Yick Wo [v. Hopkins, 118 U.S. 356 (1886)]."); id. at 431 ("Assuming arguendo that it is proper to see the 'reasonable observer' as a hypothetical person reviewing an array of statistics . . . the figures in this case would not lead him [or her] to perceive endorsement.").

Furthermore, Dr. Leuba, Plaintiffs' expert, has expressly stated that his statistical analysis does not purport to show that discrimination infects every CHC personnel decision, but merely that "some bias will creep in" because he believes that chaplains of different faiths "cannot avoid having their

_____

[19] Because Plaintiffs bring their claims under the First and Fifth Amendments, not Title VII, disparate impact is not sufficient to sustain their claims; our Court of Appeals has held that they must demonstrate intentional discrimination or objective religious endorsement. In re Navy Chaplaincy III, 738 F.3d at 429-30 (citations omitted).

judgment tainted by their beliefs, even when they try to be
denominationally neutral." See Decl. of Harald Leuba, Ph.D.,
dated Sept. 5, 2011 ("Sept. 5, 2011, Leuba Decl.") at 11, 21
[Dkt. No. 99-3].

In fact, Dr. Leuba emphasizes that intentional
discrimination on a promotion board "would be a RARE occasion
indeed" id. at 28, and that he does "not opine that this is
intentional, knowing, denominational discrimination on the part
of the individual chaplains." Statistical Evidence of the
Navy's Religious Preferences, Decl. [of Harald Leuba, Ph.D.]
dated Nov. 11, 2011, at 45 [Dkt. No. 147-10] (emphasis in
original).[20]   Therefore, Plaintiffs' statistical evidence does

---

[20]  Dr. Leuba's analysis also suffers from a series of
methodological flaws, one of which is that he "made no attempt
to control for potential confounding variables" other than
religious denomination, such as "promotion ratings, education,
or time service," that might account for the disparities he
observed. In re Navy Chaplaincy III, 738 F.3d at 429 (observing
that Dr. Leuba's analysis "does little for our analysis" because
"[c]orrelation is not causation") (citation and quotation marks
omitted); see also Sept. 5, 2011, Leuba Decl. at 21 ("The data
show statistical correlation; they do not demonstrate intent or
cause."). This failure renders his analysis of little value in
establishing that faith group membership is, in fact, the cause
of the observed disparities. See Love v. Johanns, 439 F.3d 723,
731 (D.C. Cir. 2006) ("[T]here are countless other, non-
discriminatory explanations for any patterns in the USDA's
lending data. . . . Instead of conducting a relatively simple
statistical analysis (such as a multiple regression) to control
for any or all of these variables, [plaintiffs' expert] simply
reported a series of elementary cross-tabulations, from which it
is impossible – as a statistical matter – to draw meaningful
conclusions.") (citations omitted).

not constitute "significant proof" that intentional religious discrimination or religious endorsement is or was Defendants' "standard practice."

For all of the foregoing reasons, Plaintiffs have not demonstrated the existence of a "common answer to the crucial question why was I disfavored." Wal-Mart, 131 S. Ct. at 2552 (emphasis in original). Consequently, they have not satisfied the commonality requirement of Rule 23(a)(2).

## 2.    Typicality

Plaintiffs also fail to satisfy the typicality requirement of Rule 23(a)(3). This provision requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Like the commonality requirement, it seeks to "measure the degree of interrelatedness between the claims in a class action," but it "is more exacting because it requires sufficient factual and legal similarity between the class representative's claims and those of the class to ensure that the representative's interests are in fact aligned with those of the absent class members." William B. Rubenstein, Newberg on Class Actions § 3:31 (5th ed. 2013). The typicality requirement is satisfied only "if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class

- 45 -

member makes similar legal arguments to prove the defendant's liability." Pigford v. Glickman, 182 F.R.D. 341, 349 (D.D.C. 1998).

As discussed, Plaintiffs have not shown that their claims have even a single question of law or fact in common with any of the absent class members. Consequently, it would be impossible to conclude that their claims "arise from the same course of events" or are otherwise "typical" of the absent class members claims. See Falcon, 457 U.S. at 157-58 n.13 (noting that the "commonality and typicality requirements . . . tend to merge"); Daskalea v. Washington Humane Soc., 275 F.R.D. 346, 358 (D.D.C. 2011) (typicality requirement not met where "members of the proposed class suffered a wide range of deprivations . . . and claim distinct injuries"); Webb v. Merck & Co., Inc., 206 F.R.D. 399, 408 (E.D. Pa. 2002) (analyzing commonality and typicality together and concluding that neither were met because "[p]laintiffs were employed in different states, in different divisions, in different facilities and at different levels within the company hierarchy. . . . In essence, this action is nothing more than a consolidation of 20 accounts of individualized disparate treatment.").

In sum, Plaintiffs have also failed to meet the typicality requirement of Rule 23(a)(3).[21]

### 3.   **Adequacy of Representation**

The final requirement for class certification under Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy requirement is satisfied upon a showing that (1) there is no conflict of interest between the proposed class representative and other members of the class, and (2) the proposed class representative will vigorously prosecute the interests of the class through qualified counsel." Alvarez v. Keystone Plus Constr. Corp., No. 13-602, 2014 WL 1400846, at *6 (D.D.C. Apr. 11, 2014) (citations and quotation marks omitted). "The inquiry into adequacy of representation, in particular, requires the district court's close scrutiny, because the purpose of Rule 23(a)(4) is to ensure due process for absent class members, who generally are bound by a judgment rendered in a class action." Rattray v. Woodbury County, 614 F.3d 831, 835 (8th Cir. 2010).

Defendants argue that Plaintiffs are not adequate representatives because "their paramount interest in this

---

[21] Having concluded as much, the Court need not reach Defendants' challenge to Plaintiffs' "mix and match" theory of typicality. See Opp'n at 41-42.

litigation is the advancement of their collective goal of institutional reform," which is not necessarily aligned with the individual interests of each class member. Opp'n at 45-46. The Court agrees.

By bringing their claims in this Court, where they are limited to declaratory and injunctive relief, rather than in the Court of Federal Claims, where no such limits are present, and by further seeking to certify the class under Rule 23(b)(1) and (b)(2), Plaintiffs are jeopardizing the rights of individual class members to seek the full range of remedies to which they may be entitled. See Wal-Mart, 131 S. Ct. at 2559 (noting "perverse incentives for class representatives to place at risk potentially valid claims for monetary relief" in order to ensure class certification). Plaintiffs' desire for wide-ranging institutional reform therefore may very well be in conflict with the interests of specific class members to obtain individualized and/or monetary relief.

Furthermore, Plaintiffs have repeatedly subordinated the proposed class members' interests in prompt adjudication of their claims to their campaign for institutional reform. For example, rather than expeditiously preparing this case for trial, Plaintiffs filed a series of unsuccessful motions for injunctive relief and related appeals, which have taken years to

resolve.  See Chaplaincy of Full Gospel Churches, 454 F.3d at 295 (describing Plaintiffs' "prolonged series of motions and petitions") (citations omitted).

In 2006, further delaying any prompt adjudication of this lawsuit, Plaintiffs moved this Court to vacate its Order granting class certification.  They acknowledge that one significant reason for that request was to permit their counsel to file Gibson as a new putative class action in a separate jurisdiction and thereby avoid rulings of this Court they perceived as hostile to their quest for institutional reform. See Pl.'s Reply at 27; Pl.'s Opp'n to Defs. Mot. for P. Summ. J. at 30-31 [Dkt. No. 172].[22]

Thereafter, in conjunction with the filing of Gibson, Plaintiffs took further actions that significantly delayed the progress of this case.  For example, after the District Court sitting in the Northern District of Florida granted Defendants' motion to transfer Gibson to this Court, Plaintiffs asked this Court to stay the case while their counsel unsuccessfully appealed the Florida District Court's transfer order to the

---

[22]  Plaintiffs suggest that class decertification was a "logical" step because of the Court's "four-year delay in defining the class[.]"  Pls.' Reply at 27.  Yet there is no indication that Plaintiffs ever asked the Court to define the class or that its failure to do so resulted from anything other than the extensive litigation surrounding other issues in the case, including Plaintiffs' many Motions for injunctive relief.

Court of Appeals for the Eleventh Circuit.  See Gibson Dkt. No. 4.   Thereafter, Plaintiffs filed yet another motion in this Court to transfer Gibson back to the Northern District of Florida, which was also unsuccessful.  See Gibson Dkt. Nos. 5 & 6.  These actions alone set the progress of this case back by approximately two years.

Moreover, in moving for class decertification in this case in 2006, Plaintiffs stated that they were "no longer willing or able to represent or to assume the burdens inherent in representing the class" because of recent changes to their employment status and other life transitions.  See Pls.' Mot. to Vacate Order Granting Pls.' Mot. to Certify Class at 2 [Adair Dkt. No. 156].   Plaintiffs have not explained why, having once abandoned their willingness to represent the class, they are now willing and able, once again, to serve as class representatives.

Finally, the Court notes the existence of an entirely different type of conflict of interest.  In the context of this Motion, Plaintiffs have deviated significantly from their original core allegation that the Navy's bias lies against Non-liturgical Protestants as a class.  They now argue that the Navy actually favors certain "liberal" Non-liturgical Protestants, such as Baptists, but disfavors "[t]heologically more conservative" Non-liturgical denominations.  Mot. at 17-18.

Plaintiffs' readiness to draw divisions among members of the proposed class strongly indicates that they cannot be fair and impartial representatives of the class as a whole.  Baptist class members (or those of other "liberal" faiths) might have legitimate concerns that Plaintiffs will not zealously represent their interests.  See Phillips v. Klassen, 502 F.2d 362, 366 (D.C. Cir. 1974) ("Class members whose interests are antagonistic in fact to, or even 'potentially conflicting' with, the interests of the ostensibly representative parties cannot be bound, consistent with the requirements of due process, to an adjudication taken in their name." (quoting Hansberry v. Lee, 311 U.S. 32, 41-42 (1940)).[23]

In sum, Plaintiffs' litigation record, considered in its entirety, raises serious questions as to whether they will properly protect and prioritize the welfare and interests of the class members, especially to the extent such interests diverge from their determination to obtain broad scale institutional reform.  Cf. E. Texas Motor Freight Sys. Inc. v. Rodriguez, 431

---

[23] While the Court acknowledges that some of the named Plaintiffs are themselves Baptist, that fact does not resolve its concerns. Other Baptist chaplains, as well as chaplains of denominations that Plaintiffs consider to be "liberal," may or may not agree with Plaintiffs' view that they are "favored" by the Navy's policies and may, in any event, be concerned that Plaintiffs' counsel will treat them differently from other members of the class.

U.S. 395, 405 (1977) (named plaintiffs' request for relief that was inconsistent with vote of class members and their "failure to protect the interests of class members by moving for certification surely bears strongly on the adequacy of the representation that those class members might expect to receive").

For all of the foregoing reasons, Plaintiffs have not demonstrated that they are adequate class representatives.

### C.  Rule 23(b)

Even assuming Plaintiffs had satisfied the four prerequisites set forth in Rule 23(a), they would still bear the burden of establishing that the class is maintainable under one of the subdivisions of Rule 23(b).  As discussed below, they also fail to meet this burden.

### 1.  Rule 23(b)(1)

Under Rule 23(b)(1), certification is appropriate where requiring the prosecution of separate actions by individual class members would run the risk of establishing "incompatible standards of conduct" for the defendants, Fed. R. Civ. P. 23(b)(1)(A); or where individual adjudications would, "as a practical matter, . . . be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect

their interests." Fed. R. Civ. P. 23(b)(1)(B). Since there is "always some risk" that individual actions may expose a defendant to conflicting judgments on liability, certification under subdivision (b)(1)(A) requires "something more — namely, a legitimate risk that separate actions may establish 'incompatible standards of conduct,'" so as to make individual actions "'impossible or unworkable.'" Daskalea, 275 F.R.D. at 365 (emphasis in original)(citing 2 H. Newberg & A. Conte, Newberg on Class Actions § 4:4 (4th ed. 2002)) and Wal-Mart, 131 S. Ct. at 2558).

The Court finds virtually no risk that prosecuting separate actions by individual class members would establish "incompatible standards of conduct" for Defendants. At least five district courts and two Courts of Appeals have examined Plaintiffs' allegations (or substantially similar ones) over the past decade and none has found the Navy's current policies to be unlawful, much less accepted Plaintiffs' invitation to rewrite such policies in their entirety.[24] Consequently, there is no legitimate risk that maintaining separate actions would establish incompatible standards of conduct for Defendants.

---

[24] See In re Navy Chaplaincy III, 783 F.3d at 429-431, Larsen I, 525 F.3d 1; Larsen II, 887 F. Supp. 2d 247; Larsen v. U.S. Navy, 486 F. Supp. 2d 11 (D.D.C. 2007); Wilkins Mem. Op. of June 29, 2005, aff'd 232 F. App'x 710 (9th Cir. 2007); Sturm Mem. Op. of June 18, 2002, aff'd 76 F. App'x 833 (9th Cir. 2003);

Likewise, separate actions would not impair or impede the ability of nonparties to protect their interests. Quite the contrary: <u>allowing</u> the case to proceed as a class action might have preclusive effect for absent class members, thereby impairing their ability to protect their own interests. <u>Wal-Mart</u>, 131 S. Ct. at 2559 (noting that class certification under Rule 23(b)(2) created possibility "that individual class members' compensatory-damages claims would be precluded by litigation they had no power to hold themselves apart from"). Requiring separate actions, however, will not prevent any absent class member from challenging the Navy's personnel practices or bringing an individual discrimination claim in the future.

Consequently, Plaintiffs have not shown that the proposed class is maintainable under Rule 23(b)(1).

### 2.   Rule 23(b)(2)

Rule 23(b)(2) is satisfied where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2). The "key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted — the notion that the conduct is such that it can be enjoined or declared unlawful only as to all

of the class members or as to none of them." D.L., 713 F.3d at
125 (citing Wal-Mart, 131 S. Ct. at 2557) (quotation marks
omitted).

Rule 23(b)(2) thus "applies only when a single injunction
or declaratory judgment would provide relief to each member of
the class.  It does not authorize class certification when each
individual class member would be entitled to a different
injunction or declaratory judgment against the defendant." Id.
(citing Wal-Mart, 131 S. Ct. at 2557).  Thus, it is not enough
for class plaintiffs to "superficially structure[] their case
around a claim for class-wide injunctive and declaratory relief
. . . if as a substantive matter the relief sought would merely
initiate a process through which highly individualized
determinations of liability and remedy are made; this kind of
relief would be class-wide in name only, and it would certainly
not be final." Jamie S. v. Milwaukee Pub. Sch., 668 F.3d 481,
498-99 (7th Cir. 2012).

As discussed above, Plaintiffs have not identified any
"common harm suffered as a result of a policy or practice that
affects each class member." Id.  Furthermore, the primary
relief they seek under Rule 23(b)(2) is an order declaring the
results of each of their respective selection board proceedings
"void ab initio." Assuming such an order is available under the

case law in this Circuit, it certainly would not constitute "final" relief to the class as a whole. Instead, it would merely initiate a process by which individual chaplains would seek reinstatement, new selection board proceedings, correction of their personnel records, and backpay.

For these reasons, Plaintiffs have not shown that the proposed class is maintainable under Rule 23(b)(2).

### 3.   Rule 23(b)(3)

Finally, Plaintiffs seek certification under Rule 23(b)(3). Certification under this subsection is appropriate where "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  "[T]he predominance inquiry duplicates the commonality analysis in many respects," but is "far more demanding" and delves "further into the relative importance of the common issues to the case." Daskalea, 275 F.R.D. at 368 (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 624 (1997) and Barnes v. District of Columbia, 242 F.R.D. 113, 123 (D.D.C. 2007)).  Ultimately, a class should be certified under Rule 23(b)(3) "only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons

similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." <u>Myers v. Hertz Corp.</u>, 624 F.3d 537, 547 (2d Cir. 2010) (citation and internal punctuation omitted)).

Here, Plaintiffs have failed to demonstrate commonality under Rule 23(a)(2), and therefore, they necessarily fail to satisfy the "far more demanding" requirement of predominance. Furthermore, for all of the many reasons set forth above, class certification would not achieve economies of time, effort, and expense, but instead would exponentially complicate the case; place at risk individual claims of absent class members that may overlap with the allegations in the Consolidated Complaint; and jeopardize Defendants' rights to individualized determinations on myriad fact-specific claims of discrimination and Free Exercise harm.    In sum, Plaintiffs have also failed to demonstrate that the proposed class is maintainable under Rule 23(b)(3).

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion shall be **denied,** and their claim relating to the Thirds Policy shall be **dismissed** for lack of subject matter jurisdiction.


September 4, 2014                    *Gladys Kessler*
                                    Gladys Kessler
                                    United States District Judge

**Copies to: attorneys on record via ECF**

- 58 -