UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                               )
                               )
IN RE: NAVY CHAPLAINCY         )      Case No. 1:07-mc-269 (GK)
                               )
                               )
```

## MEMORANDUM OPINION

Plaintiffs, 65 current and former Non-liturgical Protestant chaplains in the United States Navy, their endorsing agencies, and a fellowship of non-denominational Christian evangelical churches, bring this consolidated action against the Department of the Navy and several of its officials. Plaintiffs allege that Defendants discriminated against Non-liturgical Protestant chaplains on the basis of their religion, maintained a culture of denominational favoritism in the Navy, and infringed on their free exercise and free speech rights.

This matter is before the Court on the parties' Cross-Motions for Partial Summary Judgment. Upon consideration of Defendants' Motion [Dkt. No. 159], Plaintiffs' Opposition and Cross-Motion [Dkt. No. 172], Defendants' Reply and Opposition to the Cross-Motion [Dkt. No. 182], and Plaintiffs' Reply to the Cross-Motion [Dkt. No. 189], and the entire record herein, and for the reasons set forth below, Defendants' Motion shall be **granted** and Plaintiffs' Cross-Motion shall be **denied**.

I.   **BACKGROUND**

   A.   **The Navy Chaplain Corps[1]**

   The Navy employs a corps of chaplains ("Chaplain Corps" or "CHC") whose mission is to provide for the free exercise of religion by members of the Navy, their dependents, and other authorized persons.   In re England, 375 F.3d 1169, 1171 (D.C. Cir. 2004) (citation omitted).   In accordance with this mission, Navy chaplains provide religious education, counseling, and support to sailors and Marines and advise commanders on religious, moral, and ethical issues.   Id.

   "A Navy chaplain's role within the service is 'unique,' involving simultaneous service as clergy or a 'professional representative[]' of a particular religious denomination and as a commissioned naval officer."   Id. (citing OPNAVINST 1730.1, Chaplains Manual 1-2-1-3 (Dep't of the Navy Oct. 3, 1973)).   Chaplains must have a graduate level theology degree or

---

[1] In setting out the disputed and undisputed facts on a motion for summary judgment, a court typically relies on the parties' Statements of Undisputed Material Facts submitted pursuant to Local Civil Rule 7(h).   The parties in this case submitted Rule 7(h) Statements, but instead of setting forth facts related to the timeliness of Plaintiffs' claims (the only issue presented in this Motion), the parties submitted 139 pages of argument on the merits of Plaintiffs' claims.   The Rule 7(h) Statements are therefore of little value for their intended purpose. Accordingly, the Court confines its factual recitation to basic undisputed background information set forth in the Plaintiffs' Consolidated Complaint and prior decisions issued in this case.

equivalent while also meeting the physical and educational requirements applicable to all commissioned officers. Id. In addition, chaplains must be endorsed by a faith-group endorsing agency as qualified to represent that particular faith group within the Chaplain Corps. Id. at 1172.

There are over 100 faith groups recognized by the Department of Defense, which the Navy has grouped into four "faith group categories" consisting of: Roman Catholic, Liturgical Protestant, Non-liturgical Protestant, and Special Worship. In re Navy Chaplaincy, 697 F.3d 1171, 1173 (D.C. Cir. 2012) ("In re Navy Chaplaincy II").

The Liturgical Protestant category includes Protestant denominations that trace their origins to the Protestant Reformation, practice infant baptism, and conduct services according to a prescribed liturgy or order of worship. In re England, 375 F.3d at 1172. This group includes Lutheran, Episcopal, Methodist, and Presbyterian faiths. Id.; Consol. Compl. ¶ 6(b). The Non-liturgical Protestant category includes Protestant denominations that do not follow a formal liturgy and baptize at the "age of reason," including Baptist, Evangelical, Pentecostal, Bible Church, and Charismatic faiths. In re England, 375 F.3d at 1172; Consol. Compl. ¶ 6(c). The Special Worship group includes denominations not covered by the

- 3 -

Protestant and Roman Catholic categories, including Jewish, Hindu, Buddhist, Muslim, Jehovah's Witness, Christian Science, Mormon, and Unitarian faiths. Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 295 n.3 (D.C. Cir. 2006); Consol. Compl. ¶ 6 n.5.

**B.    The Navy's Personnel System**

Chaplains enter the Navy through a civilian clergy program or a theological student program. Consol. Compl. ¶ 44(c). Thereafter, they are subject to the same personnel system as other naval officers and must be selected for promotion in rank when the needs of the service require. In re England, 375 F.3d at 1172 (citing 10 U.S.C. § 611(a)). If an officer is considered but not selected for a promotion, he or she is said to have "failed of selection." Chaplaincy of Full Gospel Churches, 454 F.3d at 293. After failing of selection on two or more occasions, an officer is subject to involuntary separation, known as "selective early retirement." See 10 U.S.C. § 632(a)-(b). However, the Navy may elect to continue an officer on active duty despite two or more failures of selection as its needs require. See 10 U.S.C. § 632(c)(2).

Each of these decisions regarding a naval officer's career - promotion, selective early retirement, and continuation on active duty - is made by a "selection board" composed of

superior officers who act pursuant to statute and regulations prescribed by the Secretary of Defense. See 10 U.S.C. §§ 611, 612.[2]   Under the current procedures, selection boards are composed of seven members: two chaplains and five other officers.   In re Navy Chaplaincy II, 697 F.3d at 1173.   Each board member takes an oath to perform his or her duties "without prejudice or partiality and having in view both the special fitness of officers and the efficiency of [the Navy]."   10 U.S.C. § 613.

Selection board proceedings are secret and "may not be disclosed to any person not a member of the board, except as authorized or required to process the report of the board."   10 U.S.C. § 614(a).   In furtherance of this mandate, board discussions, deliberations, notes, and records are statutorily immune from legal process and "may not be used for any purpose" in any judicial or administrative proceeding without the consent of the Secretary of the Navy. 10 U.S.C. § 613a.

---

[2] Selection boards operate differently depending on the rank and type of personnel action under consideration. See generally 10 U.S.C. §§ 611, 612. Unless otherwise stated, the Court will use the term "selection board" to refer generically to all boards convened for the purpose of considering a change to a naval officer's employment status.

C.   **Plaintiffs' Claims**

Plaintiffs challenge several current and historical aspects of the CHC's personnel system.  The following is an illustrative sampling of their claims.[3]

First, they contend that the faith group categories recognized by the Navy are discriminatory and arbitrary. Consol. Compl. ¶¶ 33-38.  In particular, they claim that the categories reflect neither religious demographics nor legitimate similarities or differences among the worship traditions represented.

Second, they allege that in the past (but not since at least 2002), the CHC used religious quotas to apportion chaplain opportunities among various faith groups.  Consol. Compl. ¶¶ 33-35.  In particular, they allege that, from 1976 until 1986, Defendants implemented a policy of appointing at least two Roman Catholic chaplains to every career-grade chaplain selection board (the "2 RC Policy") and, from 1986 until 2002, maintained a similar policy of appointing at least one Roman Catholic chaplain to every such board (the "1 RC Policy").  Consol. Compl. ¶¶ 8, 57(e).  According to Plaintiffs, the "1 RC" and "2

---

[3]  Plaintiffs' Consolidated Complaint exceeds 120 pages and asserts eighteen separate counts.  For purposes here, the Court confines its discussion to the claims Defendants contend are time-barred.

RC" Policies were designed to "stack" selection board proceedings against Non-liturgical candidates and in favor of Roman Catholic and Liturgical Protestant chaplains despite their allegedly declining numbers in the broader population. Consol. Compl. ¶¶ 57(e)-(g).[4] Defendants deny that such policies ever existed.

Third, Plaintiffs challenge a number of facially neutral personnel practices – both current and historical – that they believe have allowed religious bias to infect selection board outcomes. These include: (1) the small size of selection boards; (2) the placement of two chaplains on each board, one of whom is either the Chief of Chaplains or one of his or her deputies; and (3) the use of "secret confidence voting," in which board members anonymously indicate their degree of confidence in a candidate in 25-degree increments ranging from zero to one hundred. Plaintiffs claim that these practices, taken together, "enable[] each board's chaplains to ensure that a particular candidate will not be promoted, thus increasing the

---

[4] Plaintiffs also originally alleged that, between 1986 and 2000, the Navy employed a so-called "Thirds Policy" under which it reserved roughly one third of chaplain opportunities to Liturgical Protestants, one third to "Non-liturgical faith groups," and one third to "Others," including Catholics. Consol. Compl. ¶¶ 33, 35, 43. However, the Court has recently dismissed that claim for lack of subject matter jurisdiction. See In re Navy Chaplaincy, No. 7-269, 2014 WL 4378781, at *6-9 (D.D.C. Sept. 4, 2014) ("In re Navy Chaplaincy V").

odds for their preferred (and discriminatory) results." In re Navy Chaplaincy, 738 F.3d 425, 428 (D.C. Cir. 2013) ("In re Navy Chaplaincy IV").

Plaintiffs also challenge a practice, which they concede has not existed since 2002, in which "each selection candidate's three-digit 'faith group identifier' code was prominently displayed throughout the selection board process." Consol. Compl. ¶ 86. Plaintiffs contend this practice had no purpose other than "to identify a candidate's faith group to the board" for purposes of permitting the board members "to exercise their individual or faith group prejudice for or against other chaplains or faith groups, particularly against Non-liturgical chaplains." Id. ¶ 87.

Fourth and finally, Plaintiffs seek relief relating to a variety of specific instances, many of which date back as far as the 1970s and 1980s, in which they allegedly suffered discrimination and free exercise harm while serving in the Chaplain Corps. See Addendum 1 to Consol. Compl. ¶¶ 12, 21, 37, 41. These include occasions on which Plaintiffs claim to have been: (1) retaliated against, criticized, and removed from their posts based on the content of their religious teachings; (2) treated differently from Liturgical chaplains with respect to disciplinary issues and employment benefits; (3) required to

officiate at Liturgical services; and/or (4) subjected to general policies that, while not facially discriminatory, disfavored certain aspects of their worship traditions.  See generally id. ¶¶ 1-65.[5]

### D.   Procedural Background

This consolidated case is composed of three cases filed by the same counsel: Chaplaincy of Full Gospel Churches v. England, Civ. No. 99-2945 ("CFGC"); Adair v. England, Civ. No. 00-566 ("Adair"); and Gibson v. Dep't of Navy, Civ. No. 06-1696 ("Gibson").

CFGC and Adair were filed in this Court on November 5, 1999, and March 17, 2000, respectively, and were consolidated for pretrial purposes on September 26, 2000 [Adair Dkt. No. 21]. On April 28, 2006, Plaintiffs' counsel filed Gibson as a separate putative class action in the Northern District of Florida, and that case was subsequently transferred to this District pursuant to 28 U.S.C. § 1404. See Mem. Order, dated August 17, 2006, at 1 [Gibson Dkt. No. 1].  On June 18, 2007,

---

[5] In addition to the above claims, Plaintiffs also contend that Defendants fraudulently concealed "evidence of prejudice and bias in the selection process," and that the statute mandating secrecy in selection board proceedings, 10 U.S.C. § 613a, is unconstitutional as applied to them. See Consol. Compl. ¶¶ 187-203, 218-224.  However, the only specific relief they seek in relation to these claims is the removal of certain impediments to litigating this case.

the Court consolidated all three actions, concluding that they raise "substantially similar constitutional challenges to the Navy Chaplaincy program." Mem. Order, dated June 18, 2007, at 4 [Dkt. No. 11].

Approximately six months after Adair was filed, Defendants moved to dismiss a number of Plaintiffs' claims, arguing, as they do in this Motion, that the claims are time-barred. [Adair Dkt. No. 19]. On January 10, 2002, the Court denied that Motion without prejudice, finding that although the claims were time-barred on their face, Plaintiffs alleged facts to support equitable tolling of the limitations period. Adair v. England, 183 F. Supp. 2d 31, 54-55 (D.D.C. 2002) ("Adair I").[6]

Shortly thereafter, the Adair Plaintiffs filed a Motion for Class Certification, which the Court granted on August 19, 2002. See generally Adair v. England, 209 F.R.D. 5 (D.D.C. 2002) ("Adair II"). Approximately one week after Plaintiffs' counsel filed Gibson as a separate putative class action in the Northern District of Florida, however, the Adair Plaintiffs moved to

---

[6] Defendants again raised their statute of limitations defense in 2003, in opposition to the Adair Plaintiffs' Motion to Amend their Complaint, and the Court again rejected it as premature. The Court promised, however, to "reconsider the defendants' argument regarding the statute of limitations if the defendants raise it in a motion for summary judgment after the close of discovery." Adair v. Johnson, 216 F.R.D. 183, 188 n.8 (D.D.C. 2003) ("Adair III").

vacate the Class Certification Order granted by this Court on August 19, 2002, on the basis that they were "no longer willing to represent the putative class." See Adair Pls.' Mot. to Vacate [Class Certification] Order at 1 [Adair Dkt. No. 156]. On May 30, 2006, the Court granted that Motion and then decertified the proposed class in Adair. See Adair Minute Order of May 30, 2006.[7]

Between 2002 and 2009, the parties conducted discovery, interspersed with collateral litigation and three interlocutory appeals to the D.C. Circuit. In 2012, Judge Ricardo Urbina, the District Judge previously assigned to this case, retired and the case was reassigned to the undersigned. At the Court's request, on October 3, 2012, Plaintiffs filed a Consolidated Complaint [Dkt. No. 134] comprised of all the claims at issue in the consolidated case.

On February 22, 2013, Defendants filed the present Motion for Partial Summary Judgment on their statute of limitations defense [Dkt. No. 159]. On April 5, 2013, Plaintiffs filed their Opposition to Defendants' Motion and Cross-Motion for Partial Summary Judgment [Dkt. No. 172]. On May 22, 2013,

---

[7] After Gibson was transferred to this Court, Plaintiffs filed a Renewed Motion for Class Certification, which the Court recently denied in light of the Supreme Court's intervening decision in Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541 (2011). See In re Navy Chaplaincy V, 2014 WL 4378781, at *9-20.

Defendants filed their Reply to the Motion and Opposition to the Cross-Motion [Dkt. No. 182].  On July 1, 2013, Plaintiffs' filed their Reply in support of their Cross-Motion [Dkt. No. 189].

## II.  LEGAL STANDARD

A party may move for summary judgment as to any claim or defense, or part thereof, and the motion should be granted if the movant establishes that there is no genuine dispute as to any material fact and the issue may be resolved as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law[.]"  Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id.

The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified."  Taxpayers Watchdog, Inc., v. Stanley, 819 F.2d 294, 297 (D.C. Cir. 1987).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record," including depositions, documents, affidavits, admissions or other materials, or by "showing that the materials

- 12 -

cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact[.]" Fed R. Civ. P. 56(c)(1). If the movant meets its burden, the opposing party must ·come forward with evidence of specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

In deciding a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). However, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to survive summary judgment. Liberty Lobby, Inc., 477 U.S. at 252. As the Supreme Court stated in Celotex Corp., "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." 477 U.S. at 322.

### III. ANALYSIS

Relying on the six-year statute of limitations set forth in 28 U.S.C. § 2401(a), Defendants argue that many of Plaintiffs' claims are time-barred, having been filed more than six years after finalization of the policies and personnel actions on which they are based.

Plaintiffs agree that their claims are governed by 28 U.S.C. § 2401(a), which provides that a "civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). They argue, however, that their claims did not accrue until they discovered the allegedly discriminatory nature of the CHC's practices and, therefore, that such claims are timely under Section 2401(a). In the alternative, they contend that even if their claims are untimely, the Court should apply equitable tolling doctrines to permit them to proceed.

If, as Defendants argue, Plaintiffs' claims accrued when the policies and personnel actions on which they are based became final, many of such claims are barred by the plain language of Section 2401(a). In particular, unless a tolling rule applies, Defendants would be entitled to judgment in their favor on: all CFGC claims based on policies or personnel actions

- 14 -

finalized prior to November 5, 1993; all <u>Adair</u> claims based on policies or personnel actions finalized prior to March 17, 1994; and all <u>Gibson</u> claims based on policies or personnel actions finalized prior to April 28, 2000.  <u>See</u> Defs.' Mem. at 8-11.

Consequently, the Court shall first address the issue of when Plaintiffs' claims accrued for purposes of triggering the six-year limitations period in Section 2401(a).  Then, it shall address Plaintiffs' argument that the limitations period in Section 2401(a) should be equitably tolled.

### A.  Accrual

#### 1.  Plaintiffs' Claims Accrued When the Challenged Policies and Personnel Actions Became Final

In general, a claim accrues when "the plaintiff has a complete and present cause of action" and "can file suit and obtain relief[.]"  <u>Earle v. Dist. of Columbia</u>, 707 F.3d 299, 305 (D.C. Cir. 2012) (citation and quotation marks omitted).

In employment discrimination cases such as this one, this rule yields different results depending on the specific legal theory at issue.  In particular, the Supreme Court has held that a claim challenging a <u>facially neutral employment policy</u> as intentionally discriminatory under Title VII of the Civil Rights Act of 1964, accrues on the date the policy becomes final, not the date it is applied to the plaintiff.  <u>See, e.g.</u>, <u>Lorance v.</u>

AT & T Technologies, Inc., 490 U.S. 900, 905 (1989).   By contrast, a claim challenging a facially discriminatory policy under Title VII accrues when the policy is applied to the plaintiff.   See Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 634 (2007) (citing Bazemore v. Friday, 478 U.S. 385 (1986)), superseded by statute on other grounds, Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5, 42 U.S.C. §2000e-5(e).[8]

In light of these different rules, the Supreme Court has "stressed the need to identify with care the specific employment practice that is at issue" before determining the accrual date for any particular claim.   Id. at 624 (citing Nat'l Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 110-11 (2002)).

In advocating for their respective approaches to accrual, the parties have neither "identif[ied] with care the specific employment practice[s] that [are] at issue" in each claim nor addressed the possibility that different rules apply to

_____

[8] Although Plaintiffs do not rely on Title VII of the Civil Rights Act of 1964, the essence of their claims is that they were discriminated against on the basis of their religion. Therefore, and in the absence of any authority directly on point, the Court relies on accrual principles developed in the Title VII context.   See Veitch v. England, 471 F.3d 124, 127 (D.C. Cir. 2006) (relying on Title VII principles to evaluate former Navy chaplain's constructive discharge claim under the First Amendment).

- 16 -

different claims depending on whether facially neutral or facially discriminatory practices are at issue. Defendants are correct, however, that under any of the rules articulated by the Supreme Court in the controlling cases set forth above, Plaintiffs' claims could accrue no later than the date on which the policies and personnel actions on which they are based became final. *See, e.g.*, *Ledbetter*, 550 U.S. at 637; *Morgan*, 536 U.S. at 112-13; *see also* *Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980) (employment discrimination claim under Title VII and 42 U.S.C. § 1981 accrued at time "the tenure decision was made and communicated to [the plaintiff]"). Therefore, the Court will apply that accrual rule to Plaintiffs' claims.

### 2.   The "Discovery Rule" Does Not Apply

Invoking the "discovery rule" – a variant of the general rule set forth above – Plaintiffs argue that their claims did not accrue until they discovered the allegedly discriminatory nature of the practices at issue. Pls.' Opp'n at 21-22; Pls.' Reply at 17. The discovery rule is most often reserved for tort cases which, unlike this case, involve injuries that are difficult to discover. *See, e.g.*, *Gabelli v. S.E.C.*, 133 S. Ct. 1216, 1221-22 (2013); *Kifafi v. Hilton Hotels Ret. Plan*, 701 F.3d 718, 729 (D.C. Cir. 2012).

Even assuming, however, that the "discovery rule" applied to this case, it is discovery "of the injury, not . . . the other elements of a claim [that] starts the clock." Rotella v. Wood, 528 U.S. 549, 555-56 (2000) (emphasis added). There is nothing in this record to suggest Plaintiffs were not on notice of their employment injuries at the time they occurred.[9]

Attempting to avoid this conclusion, Plaintiffs seek to recharacterize their injury, arguing that it "is not the failure of selection," but the "realization that the Navy's decision reflects an official position" that is "based on or tainted with forbidden denominational biases or prejudice." Pls.' Opp'n at 16-17. This argument fails as well.

Our Court of Appeals has expressly rejected the contention that emotional harm "suffered on learning of the government's alleged malfeasance . . . constitute[s] an independent injury" postponing accrual of a claim. Sexton v. United States, 832 F.2d 629, 637 (D.C. Cir. 1987). Therefore, "an employee who discovers, or should have discovered, the injury (the adverse

---

[9] Plaintiffs concede that "[they] knew they had failed of selection" when the selection board decisions were announced. Pls.' Opp'n at 23. By the same token, they also knew when they were assigned to inadequate or unsuitable religious facilities; when they were chastised or disciplined based on the content of their religious teachings; and when they experienced the many other acts of discrimination and Free Exercise violations alleged in their Consolidated Complaint.

employment decision) need not be aware of the unlawful
discriminatory intent behind that act for the limitations clock
to start ticking." Almond v. Unified Sch. Dist. No. 501, 665
F.3d 1174, 1177 (10th Cir. 2011); see also Coppinger-Martin v.
Solis, 627 F.3d 745, 749 (9th Cir. 2010)(same) (citing cases).[10]

In sum, the discovery rule is not applicable to Plaintiffs'
claims and, in any event, leads to precisely the same conclusion
as the general rule: Plaintiffs' claims accrued no later than
the date on which the policies and personnel actions at issue
became final.

### 3.    The "Continuing Violation Doctrine" Does Not Apply

Plaintiffs also urge the Court to apply the "continuing
violation doctrine" to the accrual of their claims. Pls.' Opp'n
at 17.  This doctrine - another variant of the general rule -
stems from judicial recognition that certain events cannot "be
made the subject of a lawsuit when [they] first occur[] . . .
typically because it is only [their] cumulative impact . . .

---

[10] Plaintiffs' related argument, Pls.' Reply at 3, 16, that their
claims did not accrue until they obtained concrete proof of
discrimination is also easily rejected:  accrual does not depend
on the quantum of evidence in a plaintiff's possession.  As the
Supreme Court held in Rotella, such a rule "would undercut every
single policy" in favor of a statute of limitations and "doom
any hope of certainty in identifying potential liability."
Rotella, 528 U.S. at 555-56.

that reveals [their] illegality." Earle, 707 F.3d at 306
(citing Taylor v. FDIC, 132 F.3d 753, 765 (D.C. Cir. 1997);
Morgan, 536 U.S. at 115-16)).

The Supreme Court has made clear, however, that this
doctrine, which is almost exclusively applied to hostile work
environment claims under Title VII, does not apply to
discrimination claims based on specific adverse employment
actions because a "discrete retaliatory or discriminatory act
'occur[s] on the day that it 'happen[s]'" and is "not actionable
if time barred, even when [it is] related to acts alleged in
timely filed charges." Morgan, 536 U.S. at 110-11; see also
Baird v. Gotbaum, 662 F.3d 1246, 1251 (D.C. Cir. 2011).

Plaintiffs do not bring any hostile work environment claims
under Title VII, and they fail to offer any persuasive
explanation as to why the "continuing violation doctrine" is
applicable to their First and Fifth Amendment claims alleging
discriminatory employment decisions and specific free exercise
harms. Their central argument is that evidence of
discrimination could not "come to light" until they performed a
"detailed statistical analysis of the chaplain promotion board
results over long periods of time." Pls.' Opp'n at 18. This is
just a variation of their previously rejected argument that

- 20 -

their claims did not accrue until they discovered evidence of the Navy's alleged discrimination. See supra note 10.

Furthermore, the continuing violation doctrine applies to "claims that by their nature occur not 'on any particular day' but 'over a series of days or perhaps years[.]'" Mayers v. Laborers' Health & Safety Fund, 478 F.3d 364, 368 (D.C. Cir. 2007) (emphasis added). It does not apply to the cumulative search for evidence to prove a discrete claim. See Rotella, 528 U.S. at 555-56.[11]

In sum, the injuries of which Plaintiffs complain – failure of selection, selective early retirement, and specific instances of free exercise harm - are "discrete," even if they are alleged to have been "undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period." Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135, 157-58 (2d Cir. 2012), cert. denied, 133 S. Ct. 1724 (2013) (citing cases). Accordingly, the "continuing violation doctrine" is inapplicable to the facts of this case.

---

[11] The Court, of course, makes no findings as to the scope of the evidence on which Plaintiffs may rely to support their timely claims. See Chin, 685 F.3d at 150 (noting that the plaintiffs could rely on "data from outside the statute of limitations to prove timely discriminatory acts") (citation omitted).

**B.    Equitable Tolling of the Limitations Period Is Denied**

Having concluded that Plaintiffs' claims accrued no later than when the policies and personnel actions at issue became final, all claims of Plaintiffs accruing more than six years before the commencement of each case are time-barred unless a tolling rule applies.

Plaintiffs advance two discrete arguments related to such tolling. First, they contend that the limitations period for each of the three consolidated cases should be equitably tolled because Defendants "fraudulently concealed" their alleged wrongdoing. Second, they contend that the "class action tolling" doctrine adopted by the Supreme Court in American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974) and Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 349 (1983) should be applied to Gibson, which would toll the limitations period for the Gibson Plaintiffs during the pendency of the Adair class action.

Defendants counter that the Court lacks any authority to extend the limitations period. in Section 2401(a) because compliance with that provision is a "jurisdictional" condition of the Government's waiver of sovereign immunity. They also argue that, even if the Court does have such authority, Plaintiffs fail to present evidence from which a reasonable

juror could conclude that either tolling doctrine applies to the facts of this case.

Our Court of Appeals has "long held," and recently reaffirmed, that Section 2401(a) is unlike a "normal statute of limitations" because it "'creates a jurisdictional condition attached to the government's waiver of sovereign immunity" that "cannot be waived by the parties" and is not subject to equitable extensions. Mendoza v. Perez, 754 F.3d 1002, 1018 (D.C. Cir. 2014) (citing P & V Enters. v. U.S. Army Corps of Eng'rs, 516 F.3d 1021, 1026 (D.C. Cir. 2008) (citing cases)).[12] Under this clear and controlling precedent, a district court lacks any authority to extend the limitations period for claims governed by Section 2401(a). Id.; see also John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 134 (2008) (observing that a "jurisdictional" statute of limitations "forbid[s] a court to consider whether certain equitable considerations

---

[12] The Court of Appeals has acknowledged that it has "recently questioned the continuing viability of this holding in light of recent Supreme Court decisions" holding that statutes of limitations in actions against the Government are subject to the same rebuttable presumption of equitable tolling applicable to suits against private defendants. Mendoza, 754 F.3d at 1018 n.11 (citing P & V Enters., 516 F.3d at 1027 & n.2; Felter v. Kempthorne, 473 F.3d 1255, 1260 (D.C. Cir. 2007)); see also Irwin v. Department of Veterans Affairs, 498 U.S. 89, 95-96 (1990)). However, unless and until the Court of Appeals "resolve[s] this issue," Mendoza, 754 F.3d at 1018, this Court is bound by the law at it currently exists.

- 23 -

warrant   extending   a   limitations   period"). Consequently,

Plaintiffs' claims for equitable tolling shall be **denied.**[13]

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion for Partial

Summary Judgment shall be **granted**, and Plaintiffs' Cross-Motion

shall be **denied.**

September 26, 2014

*Gladys Kessler*
Gladys Kessler
United States District Judge

**Copies to: attorneys on record via ECF**

---

[13] Having so concluded, the Court shall not reach Defendants'
alternative argument that the doctrines of equitable tolling
based on fraudulent concealment and class action tolling are not
properly applied to the facts of this case.