# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE: NAVY CHAPLAINCY | ) ) ) | Case No. 1: 07-mc-269 (GK) |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT THAT THE DEFENDANTS' POLICY OF PLACING AT LEAST ONE ROMAN CATHOLIC CHAPLAIN ON EVERY SELECTION BOARD UNTIL THE PRACTICE WAS TERMINATED IN FISCAL YEAR 2003 IS UNCONSTITUTIONAL

Plaintiffs respectfully move the Court for an order declaring a Navy Chaplain Corps ("CHC") practice, custom, usage, standard operating procedure ("SOP") and/or policy unconstitutional as a denominational preference. That custom, usage, practice, SOP, and/or policy placed at least one Roman Catholic chaplain as a CHC board member on every CHC selection board for 54 years, from Fiscal Year ("FY") 1949 through FY 2002 (hereafter the "1RC Policy"). "Selection board" in the context of this Motion includes promotion boards and selective early retirement ("SER") boards ("SERBs") that did not require Admirals.[1] The CHC gave no other denomination this reserved selection board seat benefit or privilege.

Plaintiffs' accompanying Memorandum of Points and Authorities and Plaintiffs' Statement of Material Facts as to Which There Is No Genuine Issue in support of this motion demonstrate the 1RC Policy was a denominational preference which harmed these Plaintiffs that is forbidden by the Establishment Clause.

Plaintiffs respectfully request oral argument after briefing is completed.

Respectfully submitted,

---

[1] The Board members for SER have to be one grade/rank above the SERB candidates. The SERB for CHC CAPTs had to be composed of admirals which limited CHC participation to either the Chief or the Deputy; admirals from other branches were the other board members.

June 22, 2017

/S/ Arthur A.  Schulcz, Sr.
ARTHUR A. SCHULCZ, SR.
Attorney for the Plaintiffs
D.C. Bar No. 453402
21043 Honeycreeper Place
Leesburg, VA 20175
703-645-4010
FAX 703-645-4011
art@chaplainscounsel.com

Of Counsel:
Douglas McKusick, Esq.
THE RUTHERFORD INSTITUTE
P.O. Box 7482
Charlottesville, VA 22906-7482
434-978-3888

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| IN RE: NAVY CHAPLAINCY | ) | Case No. 1: 07-mc-269 (GK) |
| | ) | |

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT THAT THE DEFENDANTS' POLICY OF PLACING AT LEAST ONE ROMAN CATHOLIC CHAPLAIN ON EVERY SELECTION BOARD UNTIL IT WAS TERMINATED IN FISCAL YEAR 2003 IS UNCONSTITUTIONAL

This Memorandum of Points and Authorities shows Plaintiffs are entitled to an Order declaring unconstitutional the Navy Chaplain Corps ("CHC") practice, custom, usage, standard operating procedure ("SOP") and/or policy unconstitutional as a denominational preference. That custom, usage, practice, SOP, and/or policy placed at least one Roman Catholic chaplain as a CHC board member on every CHC selection board for 54 years, from Fiscal Year ("FY") 1949 through FY 2002 (hereafter the "1RC Policy"). "Selection board" in the context of this Motion includes promotion boards and selective early retirement ("SER") boards ("SERBs") that did not require Admirals. The CHC gave no other denomination this reserved selection board seat benefit or privilege

Respectfully submitted,

June 22, 2017

/S/ Arthur A.  Schulcz, Sr.
ARTHUR A. SCHULCZ, SR.
Attorney for the Plaintiffs
D.C. Bar No. 453402
21043 Honeycreeper Place
Leesburg, VA 20175
703-645-4010
FAX 703-645-4011
art@chaplainscounsel.com

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The LEGAL STANDARDS OF REVIEW FOR THIS CASE . . . . . . . . . . . . . . . . . . . . . . . . . 3

      Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      Establishment Clause Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.     A 54 YEAR USAGE, CUSTOM, SOP, OR PRACTICE IS A DE FACTO OFFICIAL
       POLICY OR PRACTICE SHOWING INTENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      A.    Precedent Establishes Evidence of the 1 RC Policy Prior to the Established Statue
           of Limitations Period Is Relevant and Appropriate. . . . . . . . . . . . . . . . . . . . . . . . 9

           1.    The Federal Rules of Evidence allow past discriminatory conduct to
               establish a habit, custom, or practice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

           2.    The 54 year practice called the 1 RC policy shows the Navy's and CHC's
               intent to place at least one RC chaplain on every board. . . . . . . . . . . . . . 10

           3.    Prior discriminatory acts are relevant when discrimination is alleged.. . . 15

      B.    Whether the Challenged Practice Is a Custom, Habit, SOP or Policy Is Immaterial
           When Challenged under the Establishment Clause. . . . . . . . . . . . . . . . . . . . . . . . 16

II.    THE 1RC POLICY IS A FORBIDDEN DENOMINATIONAL PREFERENCE.. . . . . . 18

      A.    The 1 RC Policy Is a Denominational Preference on its Face. . . . . . . . . . . . . . . 18

      B.    The 1RC Policy Resulted in Denominational Preferences in CHC Promotions. . 20

III.   THE 1RC POLICY FAILS STRICT SCRUTINY, THE ESTABLISHMENT CLAUSE'S
       NEUTRALITY MANDATE AND OTHER TESTS.. . . . . . . . . . . . . . . . . . . . . . . . . . 22

A.      The 1RC Policy Fails Strict Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

      1.      The 1RC Policy fits the definition and pattern of a denominational
          preference.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

      2.      The 1RC Policy fails strict scrutiny . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

B.      The 1RC Policy Fails the Establishment Clause's Neutrality Mandate and Other
      Tests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

C.      The 1RC Policy Fails the Establishment Clause's Other Tests. . . . . . . . . . . . . . 32

IV.     THE 1RC POLICY ESTABLISHES A FORBIDDEN RELIGIOUS TEST FOR A
      PUBLIC TRUST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

EXHIBIT LIST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

# TABLE OF AUTHORITIES

CASES:

*Adair v. England*, 217 F.Supp.2d 7(D.D.C. 2002).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Allen v. Perry*, 279 F. Supp. 2d 36 (D.D.C. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Americans United for Separation of Church and State v. School District of the City of Grand Rapids*, 718 F.2d 1389, 1400 (6th Cir.1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Anderson v. Laird*, 466 F.2d 283 (D.C. Cir. 1972), *cert denied*, 409 U.S. 1076 (1972) . . . . . . 35

*Barghout v. Bureau of Kosher Meat & Food Control*, 66 F.3d 1337 (4th Cir. 1995). . . . . . . . . 23

Bazemore v. Friday, 478 U.S. 385 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687 (1994). . . . . . . . . . . 24, 30

*Beeck v. Federal Exp. Corp.*, 81 F. Supp.2d 48 (D.D.C. 2000).. . . . . . . . . . . . . . . . . . . . . . . . . 4

*Bonham v. District of Columbia Library Admin.*, 989 F.2d 1242 (D.C. Cir. 1993). . . . . . . . . . . 30

*Brown v. Socialist Workers' 74 Campaign Comm. (Ohio)*, 459 U.S. 87  (1982). . . . . . . . . . . . . 10

*Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S., 753 (1995). . . . . . . . . . . . . . . . 22

*Celotex Corp v. Catrett*, 477 U.S. 317 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290 (D.C. Cir. 2006). . . . . . . . . . 3, 22

*Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 542 (U.S. 1993).. . . . . . . . . 4, 22

*Colo. Christian Univ. v. Weaver*, 534 F.3d 1245 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . 25, 30

*Committee for Public Education v. Nyquist,* 413 U.S. 756, 794 (1973). . . . . . . . . . . . . . . . . . . . 4

*County of Allegheny v. ACLU, Greater Pittsburgh Chap.*, 492 U.S. 573 (1989). . 5, 15, 16, 31, 32

*Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1( 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Hazelwood School District v. United States,* 433 U.S. 299 (1977). . . . . . . . . . . . . . . . . . . . . . . 15

*Gillette v. United States*, 401 U.S. 437 (1971).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Kinsey v. First Reg'l Sec. Inc*, 557 F.2d 830, 839 (D.C. Cir. 1977).. . . . . . . . . . . . . . . . . . . . . . 22

*Harkness v. U.S.,* 727 F.3d 465, 467 (6th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Larkin v. Grendel's Den, Inc.,* 459 U.S. 116 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Larson v. Valente*, 456 U.S. 228 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 8, 18, 23, 25, 26, 33

*Lemon v. Kurtzman*, 403 U.S. 602 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 15, 24, 31, 33

*Loughan v. Firestone Tire & Rubber Co.*, 749 F.2d 1519 (11th Cir. 1985) . . . . . . . . . . . . . . . . . 11

*McCreary County v. ACLU*, 545 US 844 (2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Mellen v. Bunting*, 327 F.3d 355 (4th Cir. Va. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Miller v. Poretsky,* 595 F.2d 780 (D.C.Cir.1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Monterey Mech. Co. v. Wilson*, 125 F.3d 702 (9th Cir. Cal. 1997). . . . . . . . . . . . . . . . . . . . . . . . 30

*Nartowicz, v. Clayton County School District,736* F.2d 646 (11th Cir. 1984). . . . . . . . . . . . . . . 33

*Palmer v. Shultz*, 815 F.2d 84 (D.C. Cir. 1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Rouser v. White*, 630 F. Supp. 2d 1165 (E.D. Cal. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25-27

*Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 307 (2000) .. . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203 (1963). . . . . . . . . . . . . . . . . . . . . . . 17

*Torcaso v. Watkins*, 367 U.S. 488 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Heard*, 709 F.3d 413 (5th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*White v. U.S. Catholic Conference,* 1998 WL 429842 *5 (D.D.C. May 22, 1998). . . . . . . . . . . . 10

*Willingham v. Ashcroft*, 226 F.R.D. 57 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Wilkins v. Lehman*, 85-cv-3031 (2/10/87 slip op., S.D. Cal.). . . . . . . . . . . . . . . . . . . . . . . . . . 8, 27

*Zorach v.Clauson*, 343 U.S. 306 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

MISC:

Federal Rule of Evidence 404. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9, 18

Federal Rule of Evidence 406. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

McCormick on Evidence § 195 (2d ed. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

The New Lexicon Webster's Dictionary of the English Language (1988 ed.). . . . . . . . . . . . . . 16

Black's Law Dictionary ( Abridged 5th ed.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18, 20

Dictionary.com.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

en.oxforddictionaries.com/definition/preference. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**INTRODUCTION**

Plaintiffs respectfully move the Court for an order declaring a Navy Chaplain Corps ("CHC") practice, custom, usage, standard operating procedure ("SOP") and/or policy unconstitutional as a denominational preference. That custom, usage, practice, SOP, and/or policy placed at least one Roman Catholic ("RC") chaplain as a CHC board member on every CHC selection board for 54 years, from Fiscal Year ("FY") 1949 through FY 2002 (hereafter the "1RC Policy"). "Selection board" in the context of this Motion includes promotion boards and selective early retirement ("SER") boards ("SERBs") that did not require Admirals.[2] The CHC gave no other denomination this reserved selection board seat benefit or privilege.

The unchallenged result of 54 years of CHC selection boards with a RC chaplain on every board demonstrates on its face the 1RC Policy is a denominational preference. FY 49-02 CHC Active Duty Promotion Board Memberships, Exhibit ("Ex.") 4 and Plaintiffs' Material Facts as to Which There Is No Genuine Issue (the "Facts") 1-26. This Preference violated the Establishment Clause, injuring those plaintiffs who competed for promotions or retention on SERBs during the Statute of Limitations ("SOL") time until the 1RC Policy was discontinued. The Parties Stipulation, ECF NO. 272, provides a list of those plaintiffs who were exposed to the 1RC Policy.

The 1RC Policy also established a religious test for promotion board memberships forbidden by the Constitution's Article VI.

This Motion addresses four questions. First, does the unchallenged evidence in

---

[2] The Board members for SER have to be one grade/rank above the SERB candidates. The SERB for CHC CAPTs had to be composed of admirals which limited CHC participation to either the Chief or the Deputy; admirals from other branches were the other board members.

Defendants' own board records showing that for at least 54 years (FYs 1949-2002), there was always at least one RC chaplain on every CHC selection board constitute a SOP, practice, custom, or policy? The question in the context of the evidence in the Facts 1-26 and precedent produce an unequivocal "Yes".

Second, does the 54 year 1 RC Policy or SOP produce a denominational preference for Roman Catholics? The evidence, precedent and common sense say "Yes".

Third, does the 1RC Policy violate strict scrutiny under the Establishment Clause, that Clause's neutrality mandate, and other Establishment tests? Does the 1RC Policy "send a message to non-adherents [of the Roman Catholic Church] that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *Chaplaincy of Full Gospel Churches ("CFGC") v. England,* 454 F.3d 290, 302 (D.C. Cir. 2006). Again, the evidence and precedent say "Yes". The record shows neither a compelling purpose for this denominational preference nor a narrow tailoring to achieve any such compelling purpose. The fact the Navy and CHC abandoned the 1RC Policy for FY 2003 and all subsequent CHC selection boards proves the 1RC Policy was not closely fitted to achieve a compelling purpose and fails strict scrutiny.

The 1RC Policy violated the Establishment Clause's neutrality mandate by: (1) permitting Catholic chaplains to be promoted at higher rates than non-Catholic chaplains, including plaintiffs; (2) impermissibly advancing the interests of the Roman Catholic Church while prejudicing plaintiffs competing for promotions on these boards; and (3) causing denominational division and strife by making denomination important to a chaplain's standing in the community. A chaplain board member's preference for one of his own kind, regardless of the candidates' records, results in prejudice against those who were not preferred in the Navy's "up or out"

2

promotion system.

The 1RC Policy impermissibly entangled the government and religion, signaled the fusion of governmental and religious power in the hands of one group of denominational representatives,[3] and communicated an unconstitutional message of favoritism and preference for RCs.

Fourth, did the 1RC Policy also establish a religious test for promotion board memberships forbidden by the Constitution's Article VI? "Yes."

### The LEGAL STANDARDS OF REVIEW FOR THIS CASE

### Summary Judgment

Fed. R. Civ. P. 56(c) ("Rule 56") requires judgment on an issue where no material facts are in dispute and the moving party is entitled to judgment as a matter of law. *Beeck v. Federal Exp. Corp.*, 81 F. Supp.2d 48, 51 (D.D.C. 2000). A party has a right to seek such a ruling when it meets Rule 56's conditions for summary judgment. *See Celotex Corp v. Catrett*, 477 U.S. 317, 327 (1986) (summary judgment is not a disfavored procedure).

### Establishment Clause Standards

This case involves an Establishment Clause challenge to the 1 RC Policy, a well established 54 year Navy usage, custom, practice, SOP and/or policy favoring one denomination, Roman Catholic. The Supreme Court has established additional criteria when government matters touch religious issues that involve or implicate the Establishment Clause.

---

[3] "The defining feature of the Chaplain Corps is that each chaplain serves 'as clergy or a professional representative of a particular religious denomination.'" *Harkness v. U.S.,* 727 F.3d 465, 467 (6th Cir. 2013) (citing *In re England*, 375 F. 3d 1169, 1171 (D.C. Cir. 2004) (Chaplains are "unique" naval officers "involving simultaneous service as clergy or a professional representative of a particular religious denomination and as a commissioned naval officer") *cert. denied*, 543 U.S. 1152 (2005)); Fact No. 48.

Courts must carefully examine any practice "challenged on establishment grounds with a view to ascertaining whether [the practice] furthers any of the evils against which that Clause protects." *Committee for Public Education v. Nyquist,* 413 U.S. 756, 794 (1973). Facial neutrality of a practice or law does not end the matter. "Facial neutrality is not determinative. The Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination" because they "forbid[] subtle departures from neutrality, 'religious gerrymanders,' as well as obvious abuses", *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 542 (U.S. 1993) (quoting *Gillette v. U.S.*, 401 U.S. 437, 452 (1971)), including "covert suppression of particular religious beliefs," *id.* (citing *Bowen v. Roy*, 476 U.S. 693, 703 (1986) (opinion of Burger, C. J.)). This requires a searching review of any practice challenged under the Establishment Clause.

> Necessarily the constitutional value at issue is "neutrality."  And as a general matter it is surely true that the Establishment Clause prohibits government from abandoning secular purposes in order to put an imprimatur on one religion, or on religion as such, or **to favor the adherents of any sect or religious organization**.

*Id.* at 450 (citing various precedents) (emphasis added). *See also Larson v. Valente*, 456 U.S. 228, 245 (1982) ("But such equality ["among a multiplicity of sects"] would be impossible in an atmosphere of official denominational preferences").

Examination of a government policy or practice challenged under the Establishment Clause does not stop merely because the policy or practice has an appearance of neutrality. "The Establishment Clause forbids a state to hide behind the application of formally neutral criteria and remain studiously oblivious to the effects of its actions." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 307 (2000) (quoting *Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 777 (1995) (O'Connor, J., concurring in part and concurring in judgment) and citing *Church of Lukumi Babalu Aye, Inc. v. Hialeah,* 508 U.S. 520, 534–535 (1993)).

"The clearest command of the Establishment Clause is that one religious denomination cannot officially be preferred over another." *Larson*, 456 U.S. at 245. The Supreme Court is very clear that "we have expressly required 'strict scrutiny' of practices suggesting 'a denominational preference.'" *County of Allegheny v. ACLU, Greater Pittsburgh Chap.*, 492 U.S. 573, 608-09 (1989) (quoting *Larson,* 456 U.S. at 246); *see Adair v. England*, 217 F.Supp.2d 7, 14-15 (D.D.C. 2002) (citing *County of Allegheny*, *ibid.*). "The pertinent liberty here is protection against government imposition of a state religion or religious preference." *CFGC*, 454 F.3d at 302.

## SUMMARY OF ARGUMENT

This is an easy Establishment Clause case. Plaintiffs challenge a 54 year practice which placed a RC Chaplain on every selection board that did not require admirals, the 1RC Policy.

I.      A continuous practice for 54 years is a de facto policy regardless of how it's labeled. It shows an organization's intent because such a practice could only be a policy with the organization's leadership's consent and support. The length of such a practice is relevant and appropriate in examining whether the 1RC Policy violates the Establishment Clause and shows an organizational custom, habit or practice.

The continuity of that practice also shows intent. Organizations do not permit practices or customs that are contrary to its purposes or objectives and ultimately its leaders determine how long such practices continue. Here, significant occurrences during that 54-year period show the choices were made to continue preferring RCs over other denominations by giving it a reserved seat on each promotion board. This organizational history is relevant when discrimination as a result of that policy is alleged. The Establishment Clause focuses on effect, not terminology.

**II.**     The overwhelming evidence shows that the 1 RC Policy is a denominational preference on its face and its effect. It is a policy that gave the RC denomination a reserved seat on every promotion board and that privilege or benefit resulted in higher promotion rates for RC Chaplains. Those higher rates came at the expense of plaintiffs, injuring plaintiffs by subjecting them to an unlawful religious preference as well as the deprivation of a fair consideration for promotion.

**III.**     The 1RC Policy as a denominational preference is subject to and fails strict scrutiny. The policy also fails every other Establishment Clause Test. It fails strict scrutiny because it has no compelling governmental interest and it is not narrowly tailored to achieve any such interest. The proof of that is the fact the policy was abandoned after litigation. If the 1RC Policy served a compelling interest, it would have continued despite the litigation. The fact that chaplain board members have been reduced to two, eliminating the reserved seat for RCs, shows the 1RC Policy was not closely fitted to achieve any objective.

The 1RC Policy violates the Establishment Clause's neutrality mandate. Giving one denomination a reserved seat on every selection board is not neutral and the policy did not produce denominationally neutral results.

The 1RC Policy also fails all three of the *Lemon v. Kurtzman*, 403 U.S. 602 (1972) tests. It had no secular purpose, its primary result was to advance RC chaplains and their denomination, and it excessively entangled the government and the RC Church. The objective observer would also conclude that the 54 year history and all of the significant events and results from the policy, including higher promotion rates, indicated the government endorsement for the RC denomination.

**IV.**     The 1RC Policy established a forbidden religious test for CHC board memberships. This

is a violation of the Constitution's Article VI.

## ARGUMENT

**I.**     **A 54 YEAR USAGE, CUSTOM, SOP, OR PRACTICE IS A DE FACTO**
**OFFICIAL POLICY OR PRACTICE SHOWING INTENT**

Before the Court is unchallenged evidence the Navy placed **at least** one RC chaplain

board member on every CHC selection board not requiring Admirals beginning in FY 1949

continuing until FY 2003, several years after this litigation began in November 1999. The phrase

"at least" is emphasized because for two specific time periods there were at least two RCs on

every board (the "2 RC Policy") closely related to the tenure of RC Chiefs of Chaplains (the

"Chiefs"); several times there were three RC chaplain board members.

The few years of CHC board records missing for specific ranks in this 54-year period is

due to the Navy's failure to provide the records. The absence of these records is not material or

relevant. Fed. R. Evid. 404 and 406 address prior acts, custom, and habit, and allow the Court to

assume those missing boards contain either one or two RCs on every missing board depending on

the prevailing practice at the time. The Navy can show no prejudice because it is the cause of the

missing documents.

The Navy has denied the 1RC Policy exists despite its own board membership records'

testimony otherwise and its admission the 2 RC Policy from FY 76-FY 87 was in fact Navy

policy, Fact 16.a. The board membership lists show placing at least one RC chaplain on every

board was SOP, a practice continued year after year until this litigation forced its termination.

That continuation year after year shows it had the blessing of the CHC and approval or validation

7

of the Navy leadership. Other documents in the record show it was not an accident but a conscious decision on the part of the Navy Leadership.

The evidence establishes Bureau of Naval Personnel ("BUPERS") asks CHC detailers to provide chaplains for board memberships. Fact 23.a. Those names were approved by the Chief or Deputy, accepted by BUPERS, and provided in the Precepts for each board. Other documents in the record show 1 RC on every board is not an accident but a conscious decision on the part of the Navy and CHC Leadership.

Official approval of the two periods when there were at least two 2 RC chaplains on every chaplain promotion board is also apparent in the Secretary's approval of the precepts. The first 2RC Policy was from FYs 1954 through 1973 (20 years). Following two years of one RC chaplain on each board in FY 74 and 75, the 2RC Policy was reinstituted with the appointment of Catholic Rear Admiral ("RADM") John J. O'Connor as the Chief of Chaplains. He added one more RC chaplain to the then existing practice of placing at least 1 RC on every board. The 2RC Policy continued until February 1987 when *Wilkins v. Lehman* found (1) the Navy admitted the placing of 2 RCs on every board was a Navy policy and the Navy claimed this was the RC's share, Fact 16.a-b; (2) the purpose of the two Catholics was to protect Catholic interests by ensuring "a certain percentage of chaplains of the Roman Catholic faith are selected for promotion", Fact 16.c; and (3) the 2RC Policy would probably not survive LT Ron Wilkins' Establishment Clause challenge, Facts 16.e.

Despite that clear warning, the Navy returned to the 1 RC policy after agreeing to promote LT Wilkins, who eventually dismissed his suit. The Navy's self-serving terminology to describe its practice before or after *Wilkins* is not important, *see* II *infra*. What is important is the

evidence of the "practice." At the very least, the record shows a *de facto* policy in furtherance of

a Navy and CHC intent that cannot be challenged. Other evidence in the record shows the Navy's

intent to continue the practice of placing at least one RC chaplain on every board through an

unwritten policy of allegedly managing the CHC through the use of faith group clusters

("FGCs"), a practice which preferred RCs above all others as explained below.

A.      **Precedent Establishes Evidence of the 1 RC Policy Prior to the Established
        Statue of Limitations Period Is Relevant and Appropriate**

Precedent is well-established that evidence of Defendants' 54-year continuous 1 RC

Policy prior to the SOL periods is appropriate and relevant. That precedent includes Fed. R. of

Evid. 406 and 404(b).

1.      <u>**The Federal Rules of Evidence allow past discriminatory conduct to
        establish a habit, custom, or practice**</u>

Fed. R. of Evid. 406, "Habit, Routine Practice", specifically addresses the issue of

the relevance of prior acts that demonstrate a habit, custom or practice.

> Evidence of a person's habit or an organization's routine practice may be admitted
> to prove that on a particular occasion the person or organization acted in
> accordance with the habit or routine practice. The court may admit this evidence
> regardless of whether it is corroborated or whether there was an eyewitness.

A defendant's established conduct pre-and post-incident is relevant to whether there is an

established custom, practice, policy, SOP or habit, and is relevant to the issue of intent. In the

context of Rule 406, habit is a person's or organization's practice of handling a particular kind of

situation with a specific type of conduct. Habit is one's regular response to a repeated specific

situation. McCormick on Evidence § 195 (2d ed. 1972). "[H]abit suggests a regular response to a

repeated specific situation that has become semi automatic." *United States v. Heard*, 709 F.3d

413, 453 (5th Cir. 2013) (citations omitted). Rule 406, by its very definition, brings an

organization's regularity of action within the Rule's purview. Fed. R. of Evid. 406 Advisory

Committee Notes, 1972 Proposed Rules.

"Generally, habit evidence is highly persuasive as proof of conduct on a particular

occasion, and its admission depends on the 'degree of regularity of the practice and its

coincidence with the occasion.'" *Loughan v. Firestone Tire & Rubber Co.*, 749 F.2d 1519, 1524

(11th Cir. 1985) (quoting *McCormick on Evidence,* § 195 n. 1). *Brown v. Socialist Workers' 74

Campaign Comm. (Ohio)*, 459 U.S. 87, 100–01 (1982) found "considerable evidence of past

government harassment" was appropriate evidence "suggest[ing] that hostility toward the

[organization] is ingrained and likely to continue."

Plaintiffs' evidence shows unequivocally Defendants had a SOP placing at least one RC

chaplain on every chaplain promotion board from FY 1949 until FY 2003 when the Navy halted

the practice following this litigation's initiation. Facts 1-26 and Ex. 4. The length of this

SOP/policy benefitting a single denomination also produces the "stark" evidence of

denominational preferences for RCs and against Plaintiffs requiring strict scrutiny and is highly

probative of Defendants' intent. The probability of getting one RC on every board for 54-years if

selection for board positions were denominationally neutral is beyond computation.

2.      **The 54-year practice called the 1 RC policy shows the Navy's and
        CHC's intent to place at least one RC chaplain on every board**

"[I]t is settled beyond all question in this Circuit that other acts of discrimination,

identical to the kind of discrimination charged, are admissible under Rule 404(b) to prove motive

or intent." *Allen v. Perry*, 279 F. Supp. 2d 36, 46 (D.D.C. 2003) (citing *Morgan v. Federal Home

Loan Mortgage Corp.,* 197 F.R.D. 12, 16 (D.D.C.2000); *White v. U.S. Catholic Conference,*

1998 WL 429842 *5 (D.D.C. May 22, 1998)); *Miller v. Poretsky,* 595 F.2d 780 (D.C.Cir.1978)

10

(it is well-established "evidence of other acts of discrimination or retaliation similar to the discrimination or retaliation charged have been admitted to show, for example, motive or intent"); *Willingham v. Ashcroft*, 226 F.R.D. 57, 61 (D.D.C. 2005) ("I begin with the premise that prior acts of discrimination or retaliation are relevant to establish motive and intent").

The history of the 1RC Policy demonstrates the exacting and disciplined continuity of the practice defined in terms of a single religion. This is an indication of organizational intent and a practice executing that intent. Defendants have produced no data as to when the 1 RC Policy started.  The earliest produced board records begin in FY 49 and show at least one RC chaplain on every board thereafter until the Navy terminated the practice for FY 03.

The 1RC Policy was the SOP from FY 49-53. It then became the 2RC policy in FY 54-73 and FY 76-86, except for the (a) FY 82 CAPT Board, Facts 10-15, and (b) when there were 3 RC Chaplain board members on the FY 62 CDR and CAPT boards; the FY 64 LCDR, CDR and CAPT boards; FY 68 CDR and CAPT boards; and the FY 73 LCDR and CDR boards. Facts 11.c and d.

Following the *Wilkins v. Lehman* February 1987 decision, the Navy abandoned the 2 RC policy but it did not end its "reserved RC seat" practice/policy, *i.e.*, the 1RC Policy, until FY 03 following the *CFGC* and *Adair* litigation. Fact 19-21. The fact the FY 98 LCDR and CDR boards had two RCs was not a new policy, but an indication of the CHC's insensitivity to its perceptions of the misuse of religious power.

The Navy's intent to establish its 1RC policy after *Wilkins* held LT Wilkins would likely win on his challenge to the 2RC Policy is evident in three facts defining the context of that decision. First, in November 1986 prior *Wilkins*, United Methodist ("UM") CDR Wayne

Bouck provided RC RADM McNamara Bouck's study of CHC promotions for the past 10 years and his conclusion the CHC promotion board results reflected the boards' denominational composition. Bouck specifically correlated the decline in UM CAPTs to the decrease of UM participation as board members. He argued if the system was neutral, the denominational percentages at the higher ranks would bear some resemblance to the denominational composition of accessions, asked for proportional representation on boards and challenged the 2 RC Policy. Fact 19. Bouck then forwarded his study to the Navy Secretary in May 1987following RADM McNamara's tepid response (after the *Wilkins* decision). Fact 50. There is no record of any challenge to Bouck's statistics, but the response from the Navy Secretary's office (Mr. Talbot) was "dispose of the Bouck study, decide how best to make the erroneous expectations go away, get on a credible footing on faith group management", Memo to CAPT Muchow from Mr. Talbot, p. 1 Ex. 41. The last comment about "credible footing" suggests Mr. Talbot did not think FGC management was credible in the context of promotion boards as explained by McNamara. RADM McNamara's explanation of his denial of Bouck's request for proportional board representation is hypocritical given RADM McNamara had defended proportional representation for RCs in *Wilkins*, and there is evidence he proposed proportional representation to the Navy.

Second, RADM McNamara's admission he, as Chief, controlled the boards' denominational composition is consistent with all the evidence in the record. CDR Demy, LCDR Wright and CAPT Rock testified they composed board membership lists for the Chief's approval before sending it to BUPERS, Facts 52-55, and the Chiefs would sometimes change the composition without providing an explanation. Demy, ¶¶ 13-14, Fact 52; Rock, Fact 53. RADM McNamara's statement the Chiefs attempted to address denominational considerations through the composition of the boards based on "the needs of the Navy", Fact 51.b, is an admission the

12

board members' denomination mattered and influenced promotions; he does not admit how.

Dr. Harald R. Leuba, PhD, explains "how" in his expert declaration, "One Roman Catholic Chaplain on Each Promotion Board", Ex. 44, applying his expertise in manpower management and analysis[4].

> 9.5.1 More than 80% of the uncertainty in whether one will be promoted to CDR or not, can be explained by the correlation (similarity) between the religious beliefs of the Promotion Board members and the candidate's denomination!

Figure 1 on page 17 shows the RC "cohort" at CDR declines as its representation on promotion boards declines while the "minority" creeds increase their representation by having more success on promotion boards. ¶ 7.9. The statistical significance of the shift is the equivalent to five or six standard deviations. ¶ 7.8.1.

Third, the Navy's past arguments about the need for representation on boards based on FGCs does not pass the smell test. The most obvious proof of this is the Navy abandoned FGC representation in FY 2003. Roman Catholic is one specific denomination which uses the term "Catholic" and who have similar liturgies as well as having a single representative at the top of their hierarchy. The entire FGC ranking is Catholic centric; making RCs a specific FGC and relying on that system for staffing promotion board membership is contrary to SECNAVINST 1401.3, ¶ 5's warning that "selection board representation ... is not to be used to sponsor any single interest," Fact 28, and 1401.3's Enclosure 1, ¶ 1.a(1)(e) command that "Chaplain Corps

---

[4] *See e.g.,* Appendix B, p. 37, where Dr. Leuba provides "a précis to highlight aspects of my experience that demonstrate my bona fides with respect to Personnel Management and Policy issues as they relate to the specific issue my declaration here addresses". This includes expertise in "(1) Statistical Analysis, (2) personnel management and (3) psychology – in the context of US Navy Manpower management". He has worked as a Senior Manpower analyst, and a consultant to several Federal Agencies concerned with measuring (and improving) Employee Performance. "In 1973-74, I was placed on Presidential Executive Interagency Detail to the U.S. Civil Service Commission and was the Leader of the Task Force on Performance Evaluation."

board members shall be nominated without regard to religious affiliation", Fact 29. The unchallenged testimony is that there was always a requirement to place at least one RC on every board. Facts 23-26. There is nothing in the record explaining why "management of the FGC's" somehow translates into a requirement for promotion board membership. The argument it does is an acknowledgment that religion is important in evaluating "ministry" which is supposed to be reflected in the candidates' fitness reports. If some special requirement was necessary for the board's knowledge about FGC's, it could have and should have been included in the Precepts' instructions to ensure uniform knowledge and application by board members. No such instruction is found in any precept.

The FGC system places within the non-liturgical category denominations historically hostile to each other because of doctrinal differences. For example, non-liturgical CFGC CH LCDR Roysden testified his command Chaplin at Pearl Harbor, CAPT Craycroft, told him that charismatic Christians should not be allowed to worship on post and their chaplains should not be allowed the Navy, knowing LCDR Roysden was in fact charismatic. Roysden Deposition Ex. 43), Vol I [138:25-139:7], Vol II [312:22-314:1]. CAPT Craycroft was endorsed by the Christian Churches and Churches of Christ, a non-liturgical denomination, and was on the FY 95 CAPT Board, Ex. 4 at 23. That kind of hostility to a religious grouping should have disqualified him from board membership.

The Navy provided no "reserved board seats" for other major denominations regardless of their size. It did so knowing *Wilkins* had found the guaranteed RC representation on promotion boards was "to ensure that a certain percentage of chaplains of the Roman Catholic faith are selected for promotion", a fact CDR Bouck's statistics bore out. Fact 50, *e.g.*, "Roman Catholics

14

comprised only 24% of the Corps but they now comprise 31.4% of the Chaplain Corps' O-6

community." Rather than assume board membership should be proportional to their accessions

targets based on demographics, the Navy's unsuccessful *Wilkins* argument, Fact No. 16, or

should be randomly distributed, which the CHC specifically rejected, Fact 30, the Navy chose to

highlight one specific denomination with a permanent membership on every board until forced

by litigation to abandon its policy.

### 3.   Prior discriminatory acts are relevant when discrimination is alleged

The Supreme Court has made it clear that prior acts of discrimination are relevant

and therefore admissible when similar acts are currently at issue. "Proof that an employer

engaged in racial discrimination prior to the effective date of Title VII might in some

circumstances support the inference that such discrimination continued, particularly where

relevant aspects of the decision making process had undergone little change." *Hazelwood School*

*District v. United States,* 433 U.S. 299, 309–310, n. 15 (1977). Because religion is one of those

forbidden categories like race and ethnic origin, *Hazelwood's* holding should apply here. The

Supreme Court reemphasized *Hazelwood's* principle in *Bazemore v. Friday*, 478 U.S. 385, 401-

02 (1986).

The Navy had a consistent 54-year practice favoring the Roman Catholic Church that

guaranteed it had at least one representative on every chaplain selection board. This included the

45 years prior to the current SOL which makes that 45 year history highly relevant to whether

this was an official policy, practice, or SOP subject to the Establishment Clause and the

Constitution's Article VI's clear constraints and limitations.

Such a long practice and its accompanying history is definitely indicative of intent and

motive. The 1RC Policy is not an exception or the product of a series of isolated incidents. As shown below, it is the product of choices, design, official approval, and intent to make sure that one specific denomination received a reserved selection board membership in a system that allows one member to manipulate and control the entire selection board process. *See* Fact 46.

### B. Whether the Challenged Practice Is a Custom, Habit, SOP or Policy Is Immaterial When Challenged under the Establishment Clause

Policy is "[t]he basic principles by which a government is guided." http://www.businessdictionary.com/definition/policy.html; "a selected, planned line of conduct in the light of which individual decisions are made and coordination achieved." The New Lexicon Webster's Dictionary of the English Language, p. 777 (1988 ed.); Black's Law Dictionary 603 ( Abridged 5th ed.) ("The general principles by which a government is guided in its management of public affairs").

These general definitions comport with Dr. Luba's experience as a senior level government manpower analyst and manager. "The troops do what the General's inspect" ,¶ 2.4, and because long lasting procedures developed in accomplishing the boss's direction or unit mission, may not have the written direction of a high ranking official, nonetheless become policies because they become the "basic principles by which a government is guided."

6.8   This is my expert opinion:  Whatever is done by persons to whom the duty is assigned, is policy, if (a) the authority that assigned the duty accepted the recommendations "without question" or (b) "suffered and permitted", i.e., tolerated, the continuation of the actions (as "standard operating procedure", [SOP]) after becoming aware of the practice.

6.9   Thus, based on my expertise and experience as an observer and advisor re: how organizations perform, and the CHC's 54-year long record of the practice, it is my formal, expert opinion that the CHC practice of always putting at least one Roman Catholic chaplain on every CHC promotion board, from at least 1949 until FY 2002, and not always putting a Non-Liturgical chaplain on every board, was CHC policy and – by "the buck stops here" – inference, it was SECNAV policy.

The unchallenged testimony of those who worked in the detailing office and the testimony of RADM Holderby, the Chief , all agree, there had to be a RC on every board. Facts 24-26.

The Establishment Clause is designed to prevent the government from acting in any manner except strict religious and denominational neutrality, when its actions and conduct bring it into contact with religion. This is true whether the actions and conduct are through individuals, practices or policies.

> Under the *Lemon* [*v. Kurtzman*, 403 U.S. 602, 612-13 (1972)] analysis, a statute or practice which touches upon religion, if it is to be permissible under the Establishment Clause, must have a secular purpose; it must neither advance nor inhibit religion in its principal or primary effect; and it must not foster an excessive entanglement with religion.

*County of Allegheny*, 492 U.S. at 592 (citing *Lemon op. cit.*). To ensure religious and denominational neutrality, "we have expressly required 'strict scrutiny' of practices suggesting 'a denominational preference' in keeping with the 'unwavering diligence that the Constitution requires' against any violation of the Establishment Clause." *Id*. at 608-09 (citations omitted). *See also Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 205 (1963) (" we hold that the practices at issue and the laws requiring them are unconstitutional under the Establishment Clause"). This rigorous approach is appropriate and required because "[t]he Establishment Clause, at the very least, prohibits government from ... 'making adherence to a religion relevant in any way to a person's standing in the political community.'" *Id*. at 593-94 (quoting *Lynch v. Donnelly*, 465 U.S. 687 (O'Connor, J., concurring)).

The Court's choice of the word "practice" is not an accident, it is a word that covers a policy, SOP, custom or habit: "Practice. Repeated or customary action; habitual performance; a

succession of acts of similar kind; custom; usage." Black's Law Dictionary 611. Fifty-four years

of the "repeated or customary action" of always placing at least one RC chaplain on every board

is a practice which brings it within the scope and reach of the Establishment Clause.

## II.      THE 1RC POLICY IS A FORBIDDEN DENOMINATIONAL PREFERENCE

### A.      The 1 RC Policy Is a Denominational Preference on its Face

"The clearest command of the Establishment Clause is that one religious denomination

cannot officially be preferred over another." *Larson*, 456 U.S. at 245. The 1RC Policy did just

that.

The term "prefer" or the result of its application, "preference", has many applications in

law. To prefer means "to give advantage, priority, or privilege." Black's Law Dictionary 613; "a

practical advantage given to one over others", Dictionary.com; "Favor shown to one person or

thing over another or others", https://en.oxforddictionaries.com/definition/preference; "the act,

fact, or principle of giving advantages to some over others; an advantage that is given to some

people or things and not to others", https://www.merriam-webster.com/dictionary/preference.

The law allows some preferences because they advance important social and national

objectives, *e.g.*, veterans, minorities to address past discrimination, but forbids others absent

compelling government purposes such as in bankruptcy, government contracting, benefit and

education programs, government employment, and in areas that touch on religion. The

Establishment Clause's neutrality mandate bars the Navy from establishing denominational

preferences, either formally or informally. *Larson*, 456 U.S. at 245.

The 1RC Policy is a denominational preference on its face. No other denomination,

regardless of its size within the CHC or nationally, was given similar or even close to similar

18

representation on promotion boards.  Defendants have produced board member lists for 43 CHC

promotion boards from FY 87, after the 1 RC policy was reinstituted following the *Wilkins*

decision, through FY 2002, after which it was abandoned. The statistics below reflect the board

memberships for the four denominations with the largest representation on those 43 boards.

| RC | Southern Baptist | PUSA | ELCA |
|---|---|---|---|
| 45 (105%)(45/43) | 20 (46.5%) | 16 (37.2%) | 15 (34.9%) |

These differences are stark. Some of the Plaintiffs' denominations were never represented

during that time. These same four denominations are found in Tiers I (RC) and II (Southern

Baptist, PUSA, ELCA) in Plaintiffs' chart showing the number of board appearances from FY

1977-2002 shown below. *See* Consolidated Complaint at 37-38, ¶ 50; 50, ¶ 93. Comparison of

the charts demonstrate the same consistent and continuing pattern of denominational preference

in favor of one denomination.

**1977 thru 2002 Denominational Appearance as Promotion Board Members**

(  )= total number of appearances

| Faith Group Cluster → | Roman Catholic | Liturgical Protestant | Non-Liturgical Protestant | Special Worship | % Selected to CDR* |
|---|---|---|---|---|---|
| Tier I -100% | RC (102) | | | | **48.34 %** |
| Tier II - 25 to 40% | | PUSA (43) ELCA (29) UM (21) LMS (15) ABC (12) UCC (10) CC/DC (10) | SB (37) | SDA (11) | **45.07 %** |

| Tier III - 7 to15% 4 to 8 seats in 25 years | | AME (8) RCA (7) EPIS (7) | NBCUS (7) PNBC (7) | J (6) | **36.12 %** |
|---|---|---|---|---|---|
| Tier IV - 0 - 5% 0 to 3 seats in 25 years | 5 Other [Catholic type] (0) | CRC (3) ECCA (3) CME (2) 53 Others(0-2) | BGC (5) GARB (4) CGIC (3) 109 Others (0-2) | LDS (4) ORTH (3) CS (1) 10 Others (0) | **27.00 %** |

 * As reported in Biographies, Chaplain Corps History, Volume X.

Source: the Siskin Conjecture, ¶ 48

The above statistics, based on simple counts of board appearances, show chaplains representing the Roman Catholic Church were given an "advantage, priority, or privilege", Black's Law Dictionary 613, not given to other denominations, specifically a "reserved seat" on every chaplain selection board until the 1 RC Policy was abandoned following this litigation.

As shown in I above, the 1RC Policy was the product of deliberate choices by the CHC leadership, choices that were validated by the Navy leadership in issuing Precepts and defending the policy in court.

**B.       The 1RC Policy Resulted in Denominational Preferences in CHC Promotions**

The clearest evidence of the prejudicial effect of the 1RC Policy on promotions, for Roman Catholics and against Plaintiffs and other non-liturgicals, is the Center for Naval Analysis ("CNA") promotion study, initiated before the litigation began. CNA analyzed promotions from 1972-2000 in response to widespread allegations of promotion inequity and favoritism. Fact 31. CNA reported its statistical analysis in a chart, Ex. 17, providing promotion rates by LCDR, CDR and CAPT. Those rates are reported below for each FGC.

| FGC | LCDR % | CDR % | CAPT % |
|---|---|---|---|
| Roman Catholic | 82.0% | 83.7% | 57.8% |
| Liturgical | 78.5% | 72.0% | 59.1% |
| Non-liturgical | **79.5%** | **69.2%** | **53.3%** |
| Special Worship | 88.6% | 70.0% | 52.0% |

CNA found the Catholic and Non-liturgical promotion rates at CDR were statistically significantly different from each other and when measured against the average promotion rate,[5] CNA Study p. 24 and red highlighted box, Ex. 16. This evidence is undisputed. The Navy paid CNA for this work and it was briefed to the CHC and Navy leadership. The Navy has lodged no protests against CNA for fraudulent work and has never challenged either the underlying data, which it supplied, or CNA's results.

CNA's analysis is in line with the post graduate doctoral work done by CH LCDR Stan McCreary at the Navy Post Graduate School in 1992, Fact 35, and the analysis done by CDR Bouck and submitted to the Secretary of Navy. Facts 49-50. McCreary noted on page 96: "Catholics and Mainline Protestants were in the majority and they selected others like or similar to themselves significantly more often than they selected individuals from different groups." Fact 35.c.

The preference for Catholics shown in promotions has injured plaintiffs in two specific and concrete ways. First, the 1RC Policy "sends a message to non-adherents [of the Roman Catholic Church] that they are outsiders, not full members of the political community, and an

---

[5] CNA improperly measured each group's promotion rate against the overall rate for all FGCs, not groups against each other, the proper standard when examining promotion rates for bias, favored versus disfavored rates, *see Palmer v. Shultz*, 815 F.2d 84, 91 (D.C. Cir. 1987) but CNA still found statistical significance at the 1 in 1000 chance level.

accompanying message to adherents that they are insiders, favored members of the political community." *CFGC,* 454 F.3d at 302.  This is a clear violation of the Establishment Clause, *id*.

Second, promotions are a "zero-sum" exercise and promotions resulting from a preference are literally stolen or taken from those who rightfully should have been selected based on their records. The DODIG found evidence of denominational preference for Catholics on the FY 97 and 98 promotion boards, Facts 38-40, including RADM Holderby's admission a Catholic with a poor record was selected over a Baptist with a much better record. Fact 40.a. The ability of Catholic board members to manipulate the board to advance Catholics is presented in LCDR Paul's testimony concerning RC CH CAPT Madden's boast to a group of officers in San Diego that "there were no Catholics in the zone so ... I went above zone and picked a couple." Fact 42. His actions directly injured several plaintiffs. *See also* Fact 47, other evidence of preference for RCs on CHC promotion boards.

## III.     THE 1RC POLICY FAILS STRICT SCRUTINY, THE ESTABLISHMENT CLAUSE'S NEUTRALITY MANDATE AND OTHER TESTS

"The Establishment Clause prohibits government from abandoning secular purposes ... to favor the adherents of any sect or religious organization." *Gillette v. United States*, 401 U.S. 437, 450 (1971). That Clause also "forbids a State to hide behind the application of formally neutral criteria and remain studiously oblivious to the effects of its actions." *Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S., 753, 777 (1995) (O'Connor, J., concurring in part and concurring in judgment); *see also Church of Lukumi Babalu Aye, Inc. v. Hialeah,* 508 U.S. 520, 534–535 (1993) (making the same point in the Free Exercise Clause context); *Kinsey v. First Reg'l Sec. Inc*, 557 F.2d 830, 839 (D.C. Cir. 1977) (Practices, procedures, policies or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to "freeze"

the status quo of prior discriminatory employment practices) (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 430 (1971)).

### A.    The 1RC Policy Fails Strict Scrutiny

When presented with law, rule, practice or policy as in this case granting a denominational preference, well-established precedents "demand" courts "treat the law as suspect and that we apply strict scrutiny in adjudging its constitutionality." *Larson*, 452 U.S. at 456 (citing other precedents). The practice or policy "must be invalidated unless it is justified by a compelling governmental interest, and unless it is closely fitted to further that interest. *Id*. at 247 (citations omitted).

### 1.    The 1RC Policy fits the definition and pattern of a denominational preference

*Larson* held a "charitable solicitation" statute that imposed specific registration and reporting requirements on certain religious organizations based on the amount solicited from non-members established a denominational preference and violated the Establishment Clause. 456 U.S. at 246-51. There are few cases specifically addressing denominational preferences as blatant as *Larson*. Section II shows the facts of this case establish the 1RC Policy is a denominational preference clearer than *Larson*. The 1RC Policy also fits the fact patterns of other cases that have confronted and found to be denominational preferences.

*Barghout v. Bureau of Kosher Meat & Food Control*, 66 F.3d 1337, 1340 (4th Cir. 1995) reviewed a Baltimore, MD ordinance regulating and criminalizing the fraudulent sale and advertising of "kosher" products. The District Court found the ordinance violated: (1) *Lemon*'s second prong because it advanced a particular religion by protecting Orthodox Judaism's "tenets

and rituals;" and (2) *Lemon's* third prong creating an excessive entanglement of religious and secular authorities because the standard for compliance was religious and excessively involved specific religious organizations in the operation of the ordinance. *Id*. at 1340

Senior Judge Lay filed an opinion, in which Judge Wilkins concurred, holding the ordinance violated the Establishment Clause as applied by *Larkin v. Grendel's Den, Inc.,* 459 U.S. 116 (1982) (joint exercise of power provided a benefit to religion and "the statute created excessive entanglement of religious and secular affairs by 'enmesh[ing] churches in the exercise of substantial governmental powers'") and *Board of Education v. Grumet,* 512 U.S. 687 (1994) (legislature "may not expressly delegate governmental functions to the governing body of a church" or otherwise "identif[y] ... recipients of governmental authority by reference to doctrinal adherence"). *Id*. at 1343. "The Baltimore ordinance at issue here *explicitly* delegates governmental authority to individuals based on their membership in a specific sect of a specific religion", *i.e.*, Orthodox Judaism, "fusing governmental and religious functions." *Id.*

Judge Luttig concurred in the judgment because the ordinance represented a denominational preference to one sect of Judaism

> because it facially favors one sect of a faith over other sects of that faith, in violation of the most fundamental tenet of the Establishment Clause that the imprimatur of the state shall not directly or indirectly be placed upon one religious faith over another or upon one denomination of a faith over another.

*Id*. at 1346. The ordinance defined "fraud by reference to the religious rules of a specific religious denomination." *Id.* at 1349. Even assuming a compelling interest, the ordinance was not narrowly tailored because other options could have satisfied a legitimate government purpose

without reliance on a single sect's interpretation of "kosher". *Id.* Judge Wilkens' concurring opinion agreed with both Judges. *Id.*

*Colo. Christian Univ. v. Weaver*, 534 F.3d 1245 (10th Cir. 2008) found a Colorado law "expressly discriminates *among* religions, allowing aid to "sectarian" but not "pervasively sectarian" institutions, and it does so on the basis of criteria that entail intrusive governmental judgments regarding matters of religious belief and practice." *Id.* at 1258-60 (citing *Larson*, 456 U.S. at 246). It found this discrimination failed strict scrutiny, *id.*, entangled the state in religious matters, and violated the Establishment Clause's neutrality mandate. *Id.* at 1260 and 1267-68.

*Rouser v. White*, 630 F. Supp. 2d 1165 (E.D. Cal. 2009) addressed claims by Wiccan inmates that the California Department of Corrections and Rehabilitation ("CDCR") violated the Establishment Clause by preferring certain denominations in the hiring of chaplains without providing Wiccan chaplains and not providing Wiccans access to sweat lodges, fire pits, storage for their religious articles, and announcements of religious services while providing these services to other religions. *Id.* at 1196. The CDCR moved for summary judgment.

The court applied *Larson* because the plaintiffs showed the specific CDCR actions they challenged manifested a preference for some religions over others, *id.* at 1195-96, and applied strict scrutiny to CDCR's challenged actions in evaluating its summary judgment claim.

> In the strict scrutiny analysis, a state interest must be shown with evidentiary support to be compelling before a court may conclude that this element of the test has been met. *See, e.g., City of Richmond v. Croson,* 488 U.S. 469, 501–502 (1989) (in the context of racial classifications subject to strict scrutiny "simple legislative assurances of good intention cannot suffice" to show a compelling state interest, but rather must be based on evidence); *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 276–77 (1986) (plurality opinion) (same).

*Id.* at 1197.

With the exception of the chaplain hiring policy, CDCR failed to provide evidence showing the claimed state interest in denying the Wiccans accommodation such as sweat lodges, storage for their articles of worship, and other claims. Although CDCR claimed its "current policy [on hiring chaplains] is driven by the needs of the inmate population as a whole" and cost considerations applied, *Rouser* found CDCR had not provided sufficient evidence it had addressed the state prison population's religious needs or hiring a Wiccan chaplain would be unduly expensive. *Id.* The court denied summary judgment of this element. *Id.*

*Rouser* also examined the CDCR's policies to see if they were "closely fitted to the claimed state interest, which required the state to "produce facts to substantiate their assertions", *id.* (citing *Larson,* 456 U.S. at 248–51) and noting *Larson* found "this prong was not met where the state had tendered no evidence to support it." *Rouser* found some evidence supported CDCR's claims but it was insufficient as a matter of law to allow the court to conclude the policy was closely fitted. CDCR "offered no evidence that paid chaplains are not necessary for inmates of other faiths based on similar considerations", *id.* at 1198.

> Additionally, there is evidence that as recently as November 2008, CDCR indicated that it had never analyzed the liturgical needs of a particular inmate faith group to determine whether the paid chaplain positions for these five faith groups were warranted or whether a paid Pagan chaplaincy was warranted.

*Id.* Accordingly the court denied summary judgment as to this element. *Id.*

Just like the cases cited above, the 1RC Policy is on its face a denominational preference. It singled out one denomination for an advantage which it gave to no other denomination, a reserved seat on every selection board, until challenged by this litigation.

## 2.   The 1RC Policy fails strict scrutiny

The 1RC Policy had neither a compelling purpose nor was it narrowly tailored or closely fitted to achieve any such purpose. The fact the Navy abandoned the practice is proof the 1RC Policy fails strict scrutiny. The reduction of chaplain board members to two proves unequivocally there could be no compelling purpose and the twelve years of CHC promotion boards without a RC on every board or a "mix of chaplains" shows chaplains can be and should be evaluated on their record by line officers, as suggested by CNA and others. The abandonment of the 1RC Policy is a validation of Judge Thompson's holding in *Wilkins*, the purpose of placing two RCs on the board was "to ensure that a certain percentage of chaplains of the Roman Catholic faith are selected for promotion", Fact 16.c.

The Navy and CHC have previously tried to justify the 1RC Policy on the grounds the CHC manages its chaplains according to FGCs and, because chaplains within the FGC's are managed differently because of "logistics", an undefined term, a mix of FGC board members is necessary to ensure knowledge of how the different FGC chaplains are used. *See* Rock, Ex. 11 [48:17-54:9]. This defies rationality and is not supported by the hard evidence in the record strict scrutiny requires. *See Rouser v. White*, 630 F. Supp.2d at1197.

Analysis of RADM Holderby's comments to the DODIG concerning composition of CHC promotion boards reveals the real reason a RC chaplain had to be on the board. It was not because of knowledge of how the FGC system applied to RCs, but knowledge of the chaplains so the RC's interest could be defended. This was Judge Thompson's conclusion in *Wilkins*, Fact 16.c.

RADM Holderby explained to the DODIG chaplains had criticized boards made up of predominantly "West Coast" chaplains or "East Coast" chaplains, *i.e.,* chaplains who spend most

27

of their careers on either the East or West coasts. Ex. 12, 21-23. The CHC perceived a majority of chaplains from one of the "Coasts" on a board resulted in more chaplains being promoted who spent most of their time on that particular Coast. *Id.* This perception based on promotion results shows the corruption in the CHC's promotion system. If promotions were based on a chaplain's record, where a chaplain served would not be relevant to whether he/she was promoted. The need to have the "Coasts" represented relates to knowing who the chaplains are and their reputation versus what the record says.

This is illustrated in the DODIG 97-98 investigation. RADM Holderby admitted he campaigned for a Lutheran chaplain from his denomination on the basis of a "devotional" Holderby heard the chaplain give. Holderby NIG (Ex. 45) p.4 (shaded); Holderby DODIG, Ex 12 at 33, lines 7-11. Giving devotionals is not an identified requirement for commander nor is it a skill identified in the precept. It may be important to Lutherans but it's not a stated criteria for promotion at any rank.

RADM Holderby's DODIG testimony reports the choice for the last selection came down to a chaplain with a very good record versus a Catholic with an inferior record. The chaplain with the better record was not selected. DODIG at 24, Fact 24. There are no requirements for Catholic commanders. The evidence from that investigation also shows a member referenced the need for priests. RC CH CAPT Madden, after his experience on the FY 98 board, boasted in San Diego how he was able to pull down two Catholics from above zone because there were no RC's in zone. Fact 42. This is a blatant example of a RC board member representing the interests of his denomination and why a reserved membership on the boards was important to Catholics.

Chaplains work side-by-side with other chaplains from other denominations and FGCs. Senior chaplains certainly must understand how the FGC system works and how their fellow chaplains are assigned or managed. To claim otherwise to justify a representative for each FGC on the board is absurd. Any significant differences in how chaplains were managed that could affect promotions should have been explained by an enclosure to the Precept. That is the Navy's practice in addressing special considerations for minorities and women. *See* Precept Appendix-C, MINORITY OFFICERS, Fact 41.

As has been stated before, the fallacy of the Navy's FGC argument is exposed by the lack of a chaplain FGC mix on boards after the chaplain board members were reduced to two in FY 2003. This shows the 1RC Policy had neither a compelling purpose nor was it narrowly tailored. Rather, the purpose of the 1 RC Policy was, as Judge Thompson found, to represent and advance the interests of the Roman Catholic Church in the CHC. Fact 16.c.

*Rouser's* last comment about not analyzing religious needs, 630 F. Supp.2d at 1198 is particularly applicable in this case. The CHC admitted in October 1999: "The Chaplain Corps has never conducted an in-depth study of the religious affiliation of members in the Navy and Marine Corps". Fact 42.b. Any argument there was a need for a RC on every board because of the "needs of the Navy" is speculation or fantasy.

> **B.     The 1RC Policy Fails the Establishment Clause's Neutrality Mandate and Other Tests**

The touchstone for any Establishment Clause analysis "is the principle that the 'First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.'" *McCreary County v. ACLU*, 545 US 844, 859-60 (2005) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) and other precedents). This prohibition against

abandoning neutrality "is absolute." *Larson*, 456 U.S. at 246 (quotations omitted). *See also Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 707(1994) ("It is clear that neutrality as among religions must be honored."); *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1258-60 (10th Cir. 2008) (Colorado necessarily and explicitly discriminates among religious institutions, extending scholarships to students at some religious institutions, but not those deemed too thoroughly "sectarian" by governmental officials, violating the neutrality mandate).

The Establishment Clause's neutrality mandate is better understood in the context of the precedent rejecting the concept of a *de minimis* violation of that Clause. "[I]t is no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment. The breach of neutrality that is today a trickling stream may all too soon become a raging torrent. . . ." *Schempp*, 374 U.S. at 225.

*Bonham v. District of Columbia Library Admin.*, 989 F.2d 1242 (D.C. Cir. 1993) remanding a challenge to the public library closing on Easter Sunday back to the District Court, addressed the District Court's statement: "The impact of this Sunday closing … cannot have been consequential in a constitutional sense." *Bonham* emphasized: "To the extent that this passage suggests a de minimis exception to traditional Establishment Clause analysis, it is at odds with existing authority." *Id*. at 1245 (citing numerous precedents including *Schempp*); *see also Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 712 (9th Cir. Cal. 1997) ("The court concludes that there is no de minimis exception for Establishment Clause violations"). "There are no *de minimis* violations of the Constitution--no constitutional harms so slight that the courts

are obliged to ignore them." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 36-37 (2004) (O'Connor, J., concurring).

A government's violation of religious neutrality does not depend on intent. Neutrality is measured by its effect. It forbids favoring or disfavoring of denominations whether by small amounts or large. The 1RC Policy by its very nature is not neutral. It puts the status and approval of the Navy behind one denomination, in effect saying that RC chaplains are so important we must reserve a seat for them on every board. Nothing in the record justifies such an endorsement or granting of such a privilege or honor to one denomination. The 1RC Policy is little different than the Colorado discriminatory program that gave benefits for some religious schools but not to others that *Weaver*, 534 F.3d at 1260, found violated the Establishment Clause's neutrality mandate and therefore was unconstitutional.

A religiously neutral policy in the context of the Establishment Clause means denomination would have no effect on the results. As *County of Allegheny* stated, 492 U.S. at 593-94, religion would have no influence on a person's standing in the relevant community. If the 1 RC Policy was denominationally neutral, it would have no impact on any chaplain's opportunity for promotion. That is not the case. More than 80% of the uncertainty in whether one will be promoted to CDR, can be explained by the correlation (similarity) between the religious beliefs of the Promotion, Leuba, ¶ 9.5.1. This means a RC candidate had a higher probability of being selected because there was a RC on the board. The application of that is  seen in the CNA results, especially as the above zone considerations have now been evaluated: with above zone promotions added, RC promotion rate = 80.8% (63/78) versus the non-Catholic promotion rate of 69.5% (219/315). It is also observable in figure 1 in Doctor Leuba's analysis, p. 17, and examining the post-1RC Policy, see ¶ 7, "Does it

31

Matter?", and Figure 7, p. 24. Answering the question, "whether the pattern of denominations on the Promotion Boards was 'neutral'", his answer is no. ¶¶ 1.4.1.-1.4.3.3.

### C.     The 1RC Policy Fails the Establishment Clause's Other Tests

> Under the *Lemon* analysis, a statute or practice which touches upon religion, if it
> is to be permissible under the Establishment Clause, must have a secular purpose;
> it must neither advance nor inhibit religion in its principal or primary effect; and it
> must not foster an excessive entanglement with religion.

*Allegheny County,* 492 U.S. at 592 (citing *Lemon*). The 1RC Policy violates all three of *Lemon*'s tests. As shown above, given the context and factors surrounding its establishment after *Wilkins* found the 2 RC Policy would likely be found unconstitutional and that court's holding the purpose of the two RC chaplains was to protect RC interests, the 1RC Policy approved by the RC Chief was an obvious second bite at the apple to be able to maintain RC control and influence the boards and who was selected.

Even if it had a secular purpose, the 1RC Policy's principal or primary effect was to advance RC interests by ensuring that RC chaplains were promoted at rates greater than their contemporaries. The CNA data, McCreary's analysis, and the CHC and Navy's response to Bouck's analysis showing the importance of membership on promotion boards in challenging the increase of RC CAPTs at the expense of other denominations all show the 1RC Policy benefited RCs, both chaplains and the church.

This "primary effect" prong must be assessed objectively, in order to measure whether the principal effect of government action "is to suggest government preference for a particular religious view or for religion in general." *Mellen v. Bunting*, 327 F.3d 355, 374 (4th Cir. Va. 2003) (citing *Barghout*, 66 F.3d at 1345). Here, the 1RC Policy clearly "conveys a message of endorsement" for one denomination. *Id.*

32

The 1RC Policy violates *Lemon*'s third prong by impermissibly entangling religion and government. Courts have held the government becomes excessively entangled when "some governmental activity that does not have an impermissible religious effect may nevertheless be unconstitutional, if in order to avoid the religious effect government must enter into an arrangement which requires it to monitor the activity." *Americans United for Separation of Church and State v. School District of the City of Grand Rapids*, 718 F.2d 1389, 1400 (6th Cir.1983). *Nartowicz v. Clayton County School District,* 736 F.2d 646 (11th Cir. 1984) found the announcement of church related or sponsored activities over the schools public address system in conjunction with other announcements "would have the impermissible effect of advancing religion."

*Lemon* invalidated a Rhode Island program that offered aid to sectarian schools but required extensive state evaluation and involvement to ensure state aid was not being used to advance or teach religion. *Lemon* found "comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected" which would "involve excessive and enduring entanglement between state and church." 403 U.S. at 619. The program also required evaluation of financial records to determine expenditures attributable to secular education versus religious activity which was a further entanglement. *Id.* at 620.

The record shows detailers exerted a significant amount of effort and coordination in screening, identifying, and placing chaplains on the list of prospective board members. CAPT Rock testified this was the most difficult part of his job as a detailer. Fact 53. The 1RC Policy was part of that difficult effort. Rather than using random selection of board members which

would have been denominationally neutral, the CHC created a separate list based on at least one RC. There was no written policy, but except for the 1RC Policy, it appears to have changed from Chief to Chief. Ironically, the Navy and CHC denied board membership influenced the results, yet selection on boards was tightly controlled by the Chief and the CHC's efforts to try to balance membership according to geographic and denominational requirements. This speaks volumes as to how important having a friend on the board was. *See* Rock, Ex. 11 [49:23-50:2]; Holderby DODIG [23:14-18]. If promotions were based on the record, those factors would not have been important.

The 1 RC Policy also fails the objective observer test. The objective observer would be aware of: the 54-year practice of always having at least one RC on every board; the history of the 2RC Policy and the *Wilkins* decision; the reinstatement of the 1RC Policy immediately thereafter under a Catholic Chief; the studies by CDR Bouck, CDR McCreary and the CNA Promotion Study; Doctor Leuba's subsequent evaluation of the continuing effects of above zone promotions on RC chaplains' Promotions; the DODIG's investigation and findings of denominational influence on both the 97 and 98 boards and CAPT Stafford's evaluation of the selection of RC chaplains with terrible records; and the 1 RC Policy was abandoned after litigation challenged it. The observer would come to no other conclusion but the 1 RC Policy was in fact an endorsement of the Roman Catholic faith because the power and prestige of the Navy gave RC chaplains a reserved seat for every promotion board which resulted in higher promotion rates for RCs than other denominations until the practice was stopped by litigation.

By every measure, the 1 RC Policy is unconstitutional.

## IV.   THE 1RC POLICY ESTABLISHES A FORBIDDEN RELIGIOUS TEST FOR A PUBLIC TRUST

The last phrase of the Constitution's Article VI states, "no religious Test shall be required as a Qualification to any Office or public Trust under the United States." Because of the scope of the First Amendment's Religion Clauses, there are few "religious test" cases.

*Torcaso v. Watkins*, 367 U.S. 488 (1961) challenged the provision of the Maryland Constitution that required a declaration in the belief of God to hold a public office. The plaintiff was denied the office of notary public because he refused to acknowledge a belief in God. *Id*. at 489. The Maryland Court of Appeals rejected his challenge to the oath's requirement. The Supreme Court reversed, holding the Constitution barred such "religious" tests. The Court decisively rejected the Maryland Court of Appeals' argument that *Zorach v.Clauson*, 343 U.S. 306 allowed such a test.

> Nothing decided or written in *Zorach* lends support to the idea the Court there intended to open up the way for government, state or federal, to restore the historically and constitutionally discredited policy of probing religious beliefs by test oaths or limiting public offices to persons who have, or perhaps more properly profess to have, a belief in some particular kind of religious concept.

*Id*. at 494.

*Torcaso* held the Maryland requirement unconstitutional and rejected the concept that the government could use a religious requirement to limit access to a public office or trust.

*Anderson v. Laird*, 466 F.2d 283 (D.C. Cir. 1972), *cert denied*, 409 U.S. 1076 (1972) found the regulations of the nation's Military Academies requiring cadets and midshipmen attend chapel services was unconstitutional. *Anderso*n compared the Academies' regulations to the religious tests struck down by *Torcaso*. It found the *Torcaso* Court held that governmental imposition of this form of religious exercise–profession of belief–was absolutely proscribed by

35

the First Amendment while pointing out *Torcaso* "turns on its holding that the government may not attach unconstitutional conditions to the award of public employment." *Id.* at 292-293.

*Torcaso* addressed a religious test for a public office; here Plaintiffs challenge the imposition of a denominational requirement for membership on a board which will award or deny valuable government benefits in the form of increased rank, pay, and other benefits.

Whether being appointed as a board member is a public office is not relevant. The position involves a public trust bringing the position and duty of a selection board member into the scope of Article VI. It is no defense to say the 1 RC Policy only involved one board membership leaving four or five unreserved seats. That's similar to the "*de minimis* Establishment Clause violation" argument which precedent clearly rejects. A test is a test. Its purpose is toadvance RC interests by keeping some chaplains off a board based on a religious criteria. The record shows no justification for violating Article VI or the First Amendment through a religious preference that benefited only one denomination.

## CONCLUSION

The 1RC Policy placed a RC Chaplain on every CHC selection board for 54-years. The record shows no other denomination received such a "benefit" or privilege. This was an unconstitutional denominational preference which has injured the plaintiffs identified in the Parties' Stipulation. The 1RC Policy fails strict scrutiny, its abandonment shows that it had neither a compelling purpose, nor was fitted to achieve any legitimate compelling purpose. The policy also fails every other Establishment Clause test. Accordingly, the 1 RC Policy should be declared unconstitutional.

Respectfully submitted,

June 22, 2017                              /S/ Arthur A.  Schulcz, Sr.

                                          ARTHUR A. SCHULCZ, SR.

                                          Attorney for the Plaintiffs

                                          D.C. Bar No. 453402

                                          21043 Honeycreeper Place

                                          Leesburg, VA 20175

                                          703-645-4010

                                          FAX 703-645-4011

Of Counsel:                               art@chaplainscounsel.com

Douglas McKusick, Esq.

THE RUTHERFORD INSTITUTE

P.O. Box 7482

Charlottesville, VA 22906-7482

434-978-3888

**EXHIBIT LIST**

| Exhibit No. | Topic or Document Identity |
|---|---|
| 1. | Navy Chaplain Corps promotion board membership lists from fiscal year ("FY") 1949 through FY 88 for most CHC active duty promotion boards produced in *Sturm v. Danzig*, 99cv2272 (S.D.Cal.) discovery, *Sturm* Bates No. 0246 |
| 2. | Chart identifying each CHC active board member's denomination provided in Exhibit 1 for the period FY 1949-76 |
| 3. | Chart identifying the denominational identity of each FY 1977- 2002 chaplain promotion board member based on CHC Biographies |
| 4. | Chart identifying the denominational identity of every CHC board member for every for which Defendants have produced a record, here or in *Sturm*, from FY 49 through FY 2002. |
| 5. | *Wilkins v. Lehman*, 85-cv-3031 (2/10/87 slip op., S.D. Cal.) |
| 6. | Affidavit by CAPT Duke, CHC, USN in *Wilkins* |
| 7. | Deposition of Ronald Wilkins in *Wilkins v. Danzig*, |
| 8. | Selective early retirement boards (SERB) which did not require Admirals |
| 9. | Extract of DODIG Report on CHC 97-98 Boards |
| 10. | CDR Timothy Demy Declaration |
| 11. | CAPT Steve Rock Deposition Extracts |
| 12. | Extracts of Transcript of RADM  Holderby DODIG testimony |
| 13. | Deposition of LCDR Michael Wright |
| 14. | SECNAVINST 1401.3 |
| 15. | CAPT Rock 5/22/06 Declaration |
| 16. | Extracts of the CNA Promotion Study |
| 17. | CNA FGC Promotion Statistics 1972-2000 |
| 18. | CH LCDR Stan McCreary, *A Study of Faith Group Affiliation and Promotions to Captain and Commander in the U.S. Navy Chaplain Corps, in partial fulfillment of the requirements for the Degree of Doctor of Philosophy in Psychology* |
| 19. | Dr. Harald R. Leuba, PhD, *The Siskin Conjecture* |
| 20. | Extract of Dr. Leuba's Siskin Conjecture showing four Tiers and promotion rates |
| 21. | Dr. Harald R. Leuba, Old Warnings |

| | |
|---|---|
| 22. | Dr. Harald R. Leuba, *Failed Course Corrections* |
| 23. | Chart Showing Correlation Between Accession Rates and Promotion Rates for Favored and Disfavored Denominations Not Explained by Chance |
| 24. | Stafford Report |
| 25 | Extract of Stafford's DODIG testimony |
| 26. | Navy Bureau of Personnel Board specialist's 5/28/98 DODIG testimony |
| 27. | App. C, "Minority Officers' FY 98 CHC CDR Precept |
| 28. | FY 97 Board member's NIG Testimony, |
| 29. | LCDR Joseph Paul Deposition (Extract) |
| 30. | NIG investigation of  the FY 2000 CHC CAPT Board ICO CDR Mary Washburn |
| 31. | RADM Black's NIG Testimony re: FY 2000 CHC CAPT board |
| 32. | CDR Washburn's NIG Testimony re: FY 2000 CHC CAPT board |
| 33. | Deposition of Chaplain Klon K. Kitchen Jr. |
| 34. | Declaration of CAPT Floyd Ellison |
| 35. | LCDR Gary Stewart Declaration |
| 36. | OPNAVINST 1730.1 |
| 37. | DODI 1300.21, Code of Conduct Training and Education |
| 38. | CDR Wayne Bouck, *Study of the Selection and Representation of Captains (O-6) According to Faith Group within the Chaplain Corps, United States Navy during FY 75-87*, November 1986 |
| 39. | CDR Wayne Bouck letter to Secretary of Navy, the Honorable John Lehman |
| 40. | 31 Jul 87 Memo from RADM McNamara to Asst Secretary of Navy, M&RA, Re: Chaplain Corps Faith Group Imbalance (Reply to Wayne Bouck) |
| 41. | Memo to CAPT Muchow from Mr. Talbot from the Navy Secretary's office re: the Bouck study |
| 42. | October 1999 Study of the Religious Affiliations in the Dept. of Navy |
| 43. | Extracts from LCDR Roysden Two Day Deposition |
| 44. | Expert Declaration of Dr. Harald Leuba, PhD. |
| 45. | RADM Holderby Testimony to NIG |
| 46. | Declaration of Arthur A. Schulcz, Sr., authenticating exhibits. |

**CERTIFICATE OF SERVICE**

I hereby certify that on June 23, 2017, I electronically filed the foregoing filed the foregoing **Plaintiffs' Motion for Summary Judgment That the Defendants' Policy of Placing at Least One Roman Catholic Chaplain on Every Selection Board until the Practice Was Terminated In Fiscal Year 2003 Is Unconstitutional** with the Clerk of the Court to be served by the Court's CM/ECF system on the following:

Christopher Hall

Andrew E. Carmichael

Attorney, Civil Division

U.S. Department of Justice

20 Massachusetts Ave., NW

Room 7322

Washington, D.C. 20001

 Arthur A. Schulcz, Sr.

ARTHUR A. SCHULCZ, SR.

Counsel for *In e Navy Chaplaincy* Plaintiffs

D.C. Bar No. 453402

21043 Honeycreeper Place

Leesburg VA 20175

703-645-4010