# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE: NAVY CHAPLAINCY

Misc. Case No. 07-269 (JDB)

## MEMORANDUM OPINION

More than a decade ago, these consolidated cases were brought by a group of Protestant U.S. Navy chaplains who allege that the Navy has discriminated against them in various ways because of their faith. Though plaintiffs' consolidated complaint runs over one hundred pages and asserts eighteen separate counts, prior rulings in this case have whittled their claims down to nine, six of which are currently before the Court on cross-motions for summary judgment. Each of these claims relates to the so-called "selection boards" that the Navy uses to select chaplains (and all other commissioned officers) for promotion and, in some cases, for involuntary retirement.

Plaintiffs' primary claim is that, until 2002, the Navy maintained an unconstitutional policy of placing at least one Roman Catholic chaplain on every selection board, which resulted in Catholic chaplains being promoted at a disproportionately high rate compared to other religious groups. Plaintiffs also challenge a host of other allegedly unconstitutional selection-board policies and procedures—some of which, plaintiffs claim, continue to this day. Finally, plaintiffs challenge a statute that privileges selection-board deliberations from disclosure in litigation, arguing that it is unconstitutional as applied to their case because it denies them access to information that they need to prove their constitutional claims. To redress these wrongs, plaintiffs—each of whom was either passed over for promotion or selected for early retirement by a board that was allegedly tainted by one or more of the challenged procedures—seek an order directing the Navy to reinstate them to active duty, if necessary, and to convene new, properly constituted selection boards to

reconsider the personnel actions taken against them. Alternatively, plaintiffs ask the Court to permit them to take further discovery to prove their claims.

To a considerable extent, the result in this case is dictated by prior rulings of both the D.C. Circuit and this Court. The legal standards applicable to plaintiffs' challenges to the selection-board policies and procedures were laid out several years ago by the D.C. Circuit in this very litigation. Consequently, there is little left to do here but to apply those standards to the evidence adduced by the parties on summary judgment—which, as explained below, does not even come close to showing the degree of discrimination required for plaintiffs' challenges to succeed. Likewise, this Court has already twice considered and twice rejected plaintiffs' constitutional challenge to the statutory privilege for selection-board proceedings, and plaintiffs offer no persuasive reason to reach a different conclusion this time around. Plaintiffs' motions for summary judgment as to these claims will therefore be denied, and the Navy's will be granted. Finally, because plaintiffs have had ample opportunity to conduct discovery previously in this litigation, and because they would be unlikely to prevail on their claims even if they were permitted to take further discovery, plaintiffs' requests for additional discovery will be denied.

## BACKGROUND

### I.    THE NAVY CHAPLAIN CORPS

The Navy employs a corps of over 800 chaplains to serve the religious needs of service members deployed across the United States and throughout the world. In re England, 375 F.3d 1169, 1171 (D.C. Cir. 2004). In addition to performing religious services, Navy chaplains provide service members with counseling and ethics instruction, and they sometimes advise naval officers on the moral and ethical implications of their decisions. Id. Chaplains have performed these and other important functions aboard U.S. Navy ships since the Founding. Id.

Plaintiffs are thirty-nine Protestant chaplains who belong to denominations that the Navy categorizes as "non-liturgical" because their services do not follow a set liturgy (that is, a prescribed order of worship). Id. at 1172. Protestant denominations falling within this category include Baptism, Evangelicalism, and Pentecostalism; conversely, "liturgical" denominations include Methodism, Lutheranism, and Presbyterianism. Id. At all times relevant to this litigation, for administrative purposes, the Navy treated liturgical Protestants, non-liturgical Protestants, and Roman Catholics as three distinct "faith group categories"; a fourth and final category, "Special Worship," included all other Christian denominations, as well as all other religions. Id. The Navy used these faith group categories to document service members' religious needs and to ensure that those needs were being met.

Although chaplains' religious role within the Navy is unique, chaplains progress through the Navy's promotion system in the same manner as all other commissioned officers. See, e.g., 10 U.S.C. § 624 (describing the promotion process); id. § 638 (providing for the involuntary "selective early retirement" of an officer who has been considered but not selected for a promotion either a certain number of times or after a certain number of years, depending on the officer's rank). To be promoted to the next rank, a chaplain must be recommended by a "selection board." 10 U.S.C. § 611(a). That board must consist of at least five officers, all of whom must rank higher than the candidates under consideration, id. § 612(a)(1), and at least one of whom must be a chaplain, id. § 612(a)(2)(A); see In re England, 375 F.3d at 1172 ("[I]f a selection board is considering chaplains, at least one board member must be a chaplain."). The same requirements apply to a board convened to select chaplains for early retirement. See 10 U.S.C. § 611(b).

The convening of selection boards is further governed by Navy regulations. See id. § 611(c).[1] Initially, during the time frame relevant here, Navy regulations required that each chaplain selection board consist of "five or more" officers, at least one of whom was not a chaplain. SECNAVINST 1401.3, Encl. 1 ¶ 1(c)(1). The Navy would then seek to fill the remaining seats, to the extent practicable, with "a mix of qualified and available chaplains from the different Faith Group Categories." See Decl. of Captain Stephen B. Rock ("Rock Decl.") [ECF No. 281-2] ¶ 8. Beginning in 2003, however, the Secretary of the Navy directed that chaplain selection boards be composed of five non-chaplain officers and two chaplains. See Decl. of Commander James Francis Buckley ("Buckley Decl.") [ECF No. 281-23] ¶ 3. Then, in 2005, the Navy formally amended its regulations to require that "Chaplain Corps boards shall include five [non-chaplain] officers as members, and two members from the Chaplain Corps." SECNAVINST 1401.3A, encl. 1 ¶ 1(c)(1)(f).

Statutory and regulatory requirements also prohibit unlawful discrimination by selection boards (or by those tasked with convening them). For example, by statute, selection board members must swear an oath to fulfill their duties "without prejudice or partiality and having in view both the special fitness of officers and the efficiency of [the Navy]." 10 U.S.C. § 613. Navy regulations further provide that "[e]xclusion from board membership by reason of gender, race, ethnic origin, or religious affiliation is prohibited." SECNAVINST 1401.3 ¶ 4(a); SECNAVINST 1401.3A ¶ 4(a). They also specifically state that members of chaplain selection boards "shall be nominated without regard to religious affiliation." SECNAVINST 1401.3, encl. 1 ¶ (1)(c)(1)(e);

---

[1] The Navy refers to its regulations as "Instructions" from the Secretary of the Navy, abbreviated as "SECNAVINST." The Instructions at issue here are SECNAVINST 1401.3, see Ex. 3 to Def.'s Opp'n to Pls.' Mot. for Summ. J. and Cross-Mot. for Summ. J. ("SECNAVINST 1401.3") [ECF No. 281-3], which was promulgated in December 1989, and SECNAVINST 1401.3A, which superseded SECNAVINST 1401.3 in December 2005, see Ex. 5 to Def.'s Opp'n to Pls.' Mot. for Summ. J. and Cross-Mot. for Summ. J. ("SECNAVIST 140.3A") [ECF No. 317-5]. Both instructions contain three "enclosures," the first of which sets out further provisions applicable to the Navy's selection boards.

SECNAVINST 1401.3A, encl. 1 ¶ (1)(c)(1)(f). Similarly, during the relevant time period, "precepts" addressed to individual selection boards instructed those boards to "ensure that officers are not disadvantaged because of their race, creed, color, gender, or national origin." See, e.g., Precept Convening FY-02 Promotion Selection Board [ECF Nos. 281-20] at C-1.

## II. PROCEDURAL HISTORY

The plaintiffs in this consolidated litigation are a group of non-liturgical Protestant chaplains who claim that they were either denied a promotion or selected for early retirement because of their religious affiliation. See generally Consolidated Compl. ("Compl.") [ECF No. 134] add. A. Over its nearly twenty-year life span, plaintiffs' case has been before the D.C. Circuit at least five times, seen the retirement of two district judges, and generated over a thousand pages of briefing on dispositive motions. Its history is nothing if not complex.

### A. Church of Full Gospel Chaplains v. Danzig and Adair v. Winter

The first two of the three cases consolidated in this action were filed in this district in 1999 and 2000, see Chaplaincy of Full Gospel Churches v. Danzig ("CFGC"), Civil Action No. 99-2945 (D.D.C. filed Nov. 5, 1999); Adair v. Winter, Civil Action No. 00-566 (D.D.C. filed Mar. 17, 2000), and later consolidated before Judge Ricardo Urbina. The plaintiffs—many of whom remain in the litigation to this day—asserted constitutional claims related to the hiring, promotion, and retention of chaplains, see Adair v. England, 183 F. Supp. 2d 31, 55–63 (D.D.C. 2002); the treatment of non-liturgical Protestants within the chaplaincy, see id. at 63–67; and individual alleged instances of constructive discharge and retaliation, see id. at 67. The Navy moved to dismiss their claims for lack of jurisdiction and failure to state a claim, but Judge Urbina denied the motion as to most claims. See id. at 68. Judge Urbina later granted the plaintiffs' motion for class certification, see Adair v. England, 209 F.R.D. 5, 13 (D.D.C. 2002), and the cases proceeded

to discovery, <u>see</u> Aug. 27, 2002 Order, <u>CFGC</u>, ECF No. 119; Aug. 27, 2002 Order, <u>Adair</u>, ECF No. 72.

Soon thereafter, a dispute arose over plaintiffs' request to depose members of prior chaplain selection boards. At the time, a federal statute provided that, "[e]xcept as authorized or required by this section, proceedings of a selection board convened under [10 U.S.C. §] 611(a)"—that is, selection boards for promotions but not for early retirement—"may not be disclosed to any person not a member of the board." 10 U.S.C. § 618(f). Nevertheless, Judge Urbina granted the plaintiffs' motion, concluding that § 618(f) did not apply in litigation because it "does not contain specific language barring discovery" and "because of the circuit's emphasis on providing litigants full access to relevant information." <u>Chaplaincy of Full Gospel Churches v. Johnson</u>, 217 F.R.D. 250, 260 (D.D.C. 2003).[2]

The Navy appealed, and the D.C. Circuit reversed, explaining that "[d]isclosure of selection board proceedings in civil discovery would certainly undermine, if not totally frustrate, the purpose of Section 618(f)." <u>In re England</u>, 375 F.3d at 1178. The D.C. Circuit also rejected plaintiffs' reliance on the Supreme Court's statement in <u>Webster v. Doe</u> that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear," 486 U.S. 592, 603 (1988), explaining that here, plaintiffs "remain free to litigate their discrimination claims and to support them with other evidence." <u>Id.</u> at 1180 n.2. Hence, the court concluded,

---

[2] While plaintiffs' motion to compel was pending before Judge Urbina, plaintiffs filed a motion for a preliminary injunction that "would, among other things, 'require the Navy to separate immediately those chaplains it has allowed to continue on active duty beyond age 60,'" which plaintiffs sought in light of the Navy's allegedly "'well established practice of allowing Catholic . . . chaplains, and only Catholic chaplains,' to remain on active duty beyond mandatory separation age limits." <u>Chaplaincy of Full Gospel Churches v. England</u>, 454 F.3d 290, 296 (D.C. Cir. 2006) (citation omitted). Judge Urbina denied this motion, concluding only that plaintiffs had failed to demonstrate irreparable injury, but the D.C. Circuit reversed, concluding that "the Navy's alleged violation of the Establishment Clause <u>per se</u> constitutes irreparable harm." <u>See id.</u> at 296, 299. On remand, the district court ruled that plaintiffs lacked standing, and this time the D.C. Circuit affirmed, noting that "plaintiffs have conceded that they themselves did not suffer . . . discrimination" but rather argued that "<u>other</u> chaplains" did. <u>In re Navy Chaplaincy</u>, 534 F.3d 756, 758 (D.C. Cir. 2008), <u>aff'g</u> 516 F. Supp. 2d 119 (D.D.C. 2007).

§ 618(f) "applies to block civil discovery of <u>promotion</u> selection board proceedings in civil litigation." <u>Id.</u> at 1181 (emphasis added). But because the statutory language referred only to "section 611<u>(a)</u>" of Title 10, which governs the convening of promotion boards, while the convening of selective early retirement boards is governed by § 611<u>(b)</u> of that title, the D.C. Circuit remanded for the district court to consider in the first instance whether § 618(f) applied to the proceedings of selective early retirement boards. <u>Id.</u> at 1181–82.

On remand, plaintiffs argued not only that § 618(f) was inapplicable to selective early retirement boards, as the D.C. Circuit had suggested, but also that it was unconstitutional as applied to their discovery requests for promotion board proceedings, because it deprived them of evidence that they needed to prove their constitutional claims. Judge Urbina agreed with plaintiffs as to the first point, <u>see</u> <u>Adair v. Winter</u>, 451 F. Supp. 2d 202, 206 (D.D.C. 2006) (allowing discovery of selective early retirement board proceedings), but not the second, <u>see</u> <u>Adair v. Winter</u>, 451 F. Supp. 2d 210, 212 (D.D.C. 2006) (barring discovery of promotion board proceedings). In his view, § 618(f) was constitutional as applied to plaintiffs both because promotion board proceedings were not essential to their claims, <u>see id.</u> at 217–19, and because in any case there was no "constitutional right of access to evidence essential to establishing constitutional claims," <u>id.</u> at 220.

A little more than a month after Judge Urbina's rulings, Congress enacted the John Warner National Defense Authorization Act, Pub. L. No. 109-364, § 547(a)(2), 120 Stat. 2083, 2216 (2006), which repealed § 618(f) and replaced it with 10 U.S.C. § 613a. Section 613a clarified that "[t]he proceedings of a selection board convened under section . . . 611 . . . of this title may not be disclosed to any person not a member of the board"; by its terms, therefore, the new statute applied to selective early retirement boards. Moreover, § 613a explicitly states that:

> The discussions and deliberations of a selection board . . . and any written or documentary record of such discussions and deliberations—(1) are immune from

> legal process; (2) may not be admitted as evidence; and (3) may not be used for any purpose in any action, suit, or judicial or administrative proceeding without the consent of the Secretary of the military department concerned.

10 U.S.C. § 613a(b). The statute also specifies that it "applies to all selection boards . . . regardless of the date on which the board was convened." Id. § 613a(c). Following the enactment of § 613a, Judge Urbina granted the Navy's motion for reconsideration of his decision allowing discovery of selection-board proceedings, concluding that those materials were no longer discoverable. See In re Navy Chaplaincy, 512 F. Supp. 2d 58, 61 (D.D.C. 2007).

### B.    Gibson v. United States Navy **and** In re Navy Chaplaincy

Earlier in 2006, following what the Navy called a series of "tactical defeats" suffered by plaintiffs in CFGC and Adair,[3] a third case was filed in the Northern District of Florida. See Gibson v. U.S. Navy, Civil Action No. 3:06-187 (N.D. Fla. filed Apr. 28, 2006). The Gibson plaintiffs—again, a group of non-liturgical Protestant chaplains—were represented by the same counsel as the plaintiffs in Adair and CFGC and, according to the Navy, asserted "nearly identical" claims. Aug. 17, 2006 Order at 2, Gibson, ECF No. 33. The Navy successfully moved to transfer Gibson to this Court, see Order, Gibson v. U.S. Navy, Civil Action No. 06-1696 (D.D.C. Sep. 29, 2006), ECF No. 1, and proceedings were later stayed pending the Navy's motion to consolidate the case with Adair and CFGC and a series of appeals related to the Northern District of Florida's transfer order. See Nov. 7, 2006 Min. Order, Gibson (imposing stay); July 3, 2008 Min. Order, In re Navy Chaplaincy (lifting stay). In 2007, the three cases were consolidated and captioned In re Navy Chaplaincy. See June 18, 2007 Mem. Order at 4, Gibson, ECF No. 11 at 4–5.

---

[3] Order at 2, Gibson v. U.S. Navy, Civil Action No. 3:06-187 (N.D. Fla. Aug. 17, 2006), ECF No. 33. According to the Navy, see id., these included the D.C. Circuit's affirmance of Judge Urbina's denial of plaintiffs' motion for a temporary restraining order (which would have barred the Navy from discharging a single plaintiff) and its denial of plaintiffs' request to assign the case to a new district judge. See Adair v. Holderby, No. 06-5074 (D.C. Cir. Apr. 20, 2006) (per curiam) (unpublished), aff'g Adair v. England, 417 F. Supp. 2d 1 (D.D.C. 2006).

In late 2008 and early 2009, once the appeals related to Gibson's transfer were resolved, the parties filed a series of dispositive motions in the newly consolidated cases. While the briefing on these motions was pending, plaintiffs served a new set of discovery requests, which prompted the Navy to request a stay of discovery pending the resolution of the motions. The Court granted this request "informally" in July 2009. See Mem. of P & A in Opp'n to Pls.' Mot. to Lift Disc. Stay ("Navy's Disc. Opp'n") [ECF No. 263] at 9; Case Mgmt. Order #1 at 3 [ECF No. 124].

In 2011, while briefing on the dispositive motions was still pending, plaintiffs moved for a preliminary injunction prohibiting the Navy from implementing three selection-board procedures: "(1) staffing the seven-member selection boards with two chaplains, (2) enabling members to keep their votes secret . . . , and (3) allowing the Chief of Chaplains or his deputy to serve as the selection board president." In re Navy Chaplaincy, 738 F.3d 425, 427 (D.C. Cir. 2013); see Pls.' Mot. for Prelim. Inj. [ECF No. 95]. Judge Urbina denied plaintiffs' motion in January 2012, concluding that plaintiffs lacked standing and that, in any case, they were unlikely to succeed on the merits of their claims. See Jan. 30, 2012 Mem. Op. [ECF No. 108] at 8–12. On appeal, the D.C. Circuit reversed Judge Urbina's determination that plaintiffs lacked standing and remanded for clarification as to whether the district court viewed the insufficiency of the chaplains' claims to be "legal or factual." See In re Navy Chaplaincy, 697 F.3d 1171, 1173, 1180 (D.C. Cir. 2012). On remand, the district court (now Judge Gladys Kessler, see infra) again denied plaintiffs' motion, explaining that plaintiffs' constitutional claims were unlikely to succeed on the merits because plaintiffs had provided no "evidence demonstrating that Defendants intentionally discriminated against them." In re Navy Chaplaincy, 928 F. Supp. 2d 26, 33–37 (D.D.C. 2013). This time, the D.C. Circuit affirmed. See In re Navy Chaplaincy, 738 F.3d at 428.

In early 2012, while plaintiffs' appeal of the preliminary injunction ruling was still pending, Judge Urbina resolved one of the dispositive motions that was then pending in the underlying case, see In re Navy Chaplaincy, 850 F. Supp. 2d 86, 105–117 (D.D.C. 2012) (granting in part and denying in part the Navy's 2008 motion to dismiss on exhaustion, standing, and mootness grounds and for failure to state a claim), and retired soon thereafter. The case was then reassigned to Judge Gladys Kessler.

C.      **Proceedings Before Judge Kessler**

In July 2012, Judge Kessler entered a comprehensive case management order. See Case Mgmt. Order #1. Among other things, the order: (1) directed plaintiffs to file a new, consolidated complaint, see id. at 2; (2) continued the discovery stay, see id. at 3, apparently based on the Navy's representation that it intended to file a motion to dismiss on jurisdictional grounds, see Pls.' Mot. to Lift the Current Disc. Stay for All Remaining Claims ("Pls.' Disc. Mot.") [ECF No. 255]at 5; and (3) directed the parties to file motions on class certification and statute-of-limitations issues, see Case Mgmt. Order #1 at 3. Judge Kessler also denied the pending dispositive motions without prejudice. See July 25, 2012 Minute Order.

Pursuant to Judge Kessler's case management order, plaintiffs filed a 120-page consolidated complaint asserting eighteen separate counts, see Compl. at 28–108,[4] and a motion for class certification, see Pls.' Mot. for Class Certification [ECF No. 147], and the Navy filed a motion for partial summary judgment on statute-of-limitations grounds, see Defs.' Mot. for Partial

---

[4] Judge Kessler would later summarize the claims in the consolidated complaint as follows: (1) a challenge to the Navy's use of faith group categories, (2) allegations that the Navy "used religious quotas to apportion chaplain opportunities among various faith groups," (3) challenges to various selection-board practices, including the three practices challenged in their earlier preliminary injunction motion and an additional practice by which "each selection candidate's three-digit 'faith group identifier' code was prominently displayed throughout the selection board process," and (4) claims "relating to a variety of specific instances, many of which date back as far as the 1970s and 1980s, in which they allegedly suffered discrimination and free exercise harm while serving in the Chaplain Corps." In re Navy Chaplaincy, 69 F. Supp. 3d 249, 253 (D.D.C. 2014).

Summ. J. as to Claims that Accrued Outside the Limitations Period [ECF No 159]. Due to a number of extensions in the briefing schedules on these motions,[5] they were not resolved until September 2014, when Judge Kessler denied plaintiffs' motion for class certification, see In re Navy Chaplaincy, 306 F.R.D. 33, 38 (D.D.C. 2014), and granted defendants' motion for partial summary judgment on statute-of-limitations grounds, see In re Navy Chaplaincy, 69 F. Supp. 3d 249, 251 (D.D.C. 2014). Specifically, Judge Kessler concluded that any claim filed "more than six years after finalization of the policies and personnel actions on which [it was] based" was time-barred. Id. at 256 (citing 28 U.S.C. § 2401(a)). The parties later stipulated that this ruling required the dismissal of twenty-three of the sixty-five individual plaintiffs then in the action, all of whose alleged adverse personnel actions had taken place prior to the applicable six-year statute of limitations cutoff (1993 for the CFGC plaintiffs, 1994 for the Adair plaintiffs, and 2000 for the Gibson plaintiffs). See Status Report [ECF No. 199] at 2 n.1, 4–5. The Court later held that one additional plaintiff, Thomas Rush, fell outside the statute-of-limitations period for similar reasons. See In re Navy Chaplaincy, 170 F. Supp. 3d 21, 44 (D.D.C. 2016).

In early 2015, the Navy filed another motion to dismiss, this time on standing and other jurisdictional grounds. See Defs.' Mot. to Dismiss on Jurisdictional Grounds [ECF No. 217]. Judge Kessler granted that motion in part and denied it in part in early 2016. See In re Navy Chaplaincy, 170 F. Supp. 3d at 27, 31–46. Specifically, Judge Kessler dismissed: (1) ten distinct claims related to "several of the Navy's alleged policies or practices relating to accession, personnel management, promotions, and career transition," id. at 31; (2) claims alleging a "culture

---

[5] During this period, the parties litigated a dispute over the scope of an exception to the discovery stay that allowed either party to depose "any individuals whose testimony may well be subject to loss if not taken in the very near future," Case Mgmt. Order #1 at 3; see Nov. 29, 2012 Mem. Op. [ECF No. 146] (resolving the dispute in late 2012). The parties were also engaged in litigation over plaintiffs' preliminary injunction motion, which was finally resolved by the D.C. Circuit in December 2013. See In re Navy Chaplaincy, 738 F.3d at 428.

of bias and hostility toward Non-liturgical chaplains," id. at 39; (3) other "claims alleging ad hoc actions against certain Plaintiffs," except for one claim alleging interference with prayer, id. at 40, 44; and (4) certain other individual claims that fell outside the limitations period, see id. at 44–46. The order accompanying Judge Kessler's opinion detailed the nine claims in the consolidated complaint that survived dismissal on jurisdictional and statute-of-limitations grounds:

1. Plaintiffs' challenge to the alleged policy of staffing one Roman Catholic chaplain on each promotion board since November 5, 1993 [six years before CFGC, the earliest of the three consolidated cases, was filed], set forth in Counts 2 and 4;
2. Plaintiffs' challenge to the inclusion of the Chief of Chaplains as president of certain promotion boards since November 5, 1993, set forth in Count 4;
3. Plaintiffs' challenge to the use of procedures employed by promotion boards since November 5, 1993, set forth in Counts 2 and 4;
4. Plaintiffs' challenge to the use of procedures employed by Selective Early Retirement ("SER") boards since November 5, 1993, set forth in Counts 2 and 4;
5. Plaintiffs' constitutional challenge to 10 U.S.C. § 613(a), set forth in Count 16;
6. Plaintiffs' claims under the Religious Freedom Restoration Act, 42 U.S.C. § 2000-bb et seq., set forth in Count 14;
7. Plaintiffs' challenge to the alleged constructive discharge of certain Plaintiffs since November 5, 1993, set forth in Count 11;
8. Plaintiffs' challenge to alleged retaliation against certain Plaintiffs since November 5, 1993, set forth in Count 12;
9. Plaintiffs' challenge to alleged instances of interference with the form of prayer of certain Plaintiffs since November 5, 1993, set forth in Count 9.

March 16, 2016 Order at 4–5 [ECF No. 238].

In November 2016, following a status conference at which plaintiffs asked that the discovery stay be lifted, the Court entered a scheduling order dividing plaintiffs' remaining claims into three groups and continuing the stay. See Nov. 18, 2016 Order [ECF No. 246]. The Court's order directed that, of the nine claims listed in its March 16, 2016 order, the first six would be addressed through summary judgment briefing, with the remaining three to be addressed thereafter. See Pls.' Proposal to Move the Case Forward [ECF No. 245] at 4.[6] Thus, the Court

---

[6] In its separate case management proposal, the Navy indicated an intent to move to sever the remaining individual claims from the consolidated litigation, explaining that "[t]hese claims are inherently fact-specific, and

ordered three rounds of summary judgment briefing: first, as to the constitutionality of 10 U.S.C. § 613a as applied to plaintiffs in this litigation ("Claim 1");[7] second, as to the Navy's alleged policy of placing one Roman Catholic chaplain on every chaplain selection board convened before late 2002, when the Navy began staffing the boards with only two chaplains ("Claim 2");[8] and third, as to plaintiffs' remaining challenges to selection-board procedures, as well as their parallel challenges under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb–1 to – 4 ("Claim 3").[9] See Nov. 18, 2016 Order at 1–2; Pls.' Proposal to Move the Case Forward at 3– 4. The Court also continued the existing discovery stay. See Nov. 18, 2016 Order at 2.

Plaintiffs then filed a memorandum explaining their need for further discovery, see Pls.' Mem. Supporting Limited Disc. [ECF No. 247], but the Court ordered the parties to adhere to its November 2016 schedule, noting that plaintiffs had not requested relief by motion, see Jan. 10, 2017 Order [ECF No. 253]. Plaintiffs then filed a motion to lift the discovery stay in March 2017. See Pls.' Disc. Mot. Later that year, plaintiffs filed another motion—styled as a motion under Federal Rule of Civil Procedure 56(d)—to stay summary judgment briefing until the discovery stay was lifted. See Pls.['] Rule 56(d) Mot. [ECF No. 292]. Both motions are currently pending.

---

litigating them in consolidated fashion would impose unnecessary and counter- productive burden, expense, and delay on the parties and the Court." Def.'s Updated Case Mgmt. Proposal [ECF No. 244] at 7.

[7] See Pls.' Mot. for (1) Summ. J. that 10 U.S.C. § 613(a) [sic] is Unconstitutional as Applied to Pls.' Establishment and Due Process Claims and (2) an Order Directing the Sec'y to Release Selection Bd. Members from their Oath of Secrecy ("Pls.' Claim 1 MSJ") [ECF No. 254]; Def.'s Opp'n to Pls.' Mot. for Summ. J and Cross-Mot. for Summ. J. ("Navy's Claim 1 Opp'n") [ECF No. 260]; Pls.' Reply Mem. of P. & A. to Def.'s Opp'n ("Pls.' Claim 1 Reply") [ECF No. 266]; Pls.' Opp'n/Resp. to Defs.' Cross-Mot. for Summ. J. ("Pls.' Claim 1 Opp'n") [ECF No. 267]; Reply in Supp. of Def.'s Cross-Mot. for Summ. J. ("Navy's Claim 1 Reply") [ECF No. 269].

[8] See Pls.' Mot. for Summ. J. that the Defs.' Policy of Placing at Least One Roman Catholic Chaplain on Every Selection Bd. Until the Practice Was Terminated in Fiscal Year 2003 Is Unconstitutional ("Pls.' Claim 2 MSJ") [ECF No. 276]; Def.'s Opp'n to Pls.' Mot. for Summ. J. and Cross-Mot. for Summ. J. ("Navy's Claim 2 Opp'n") [ECF No. 281]; Pls.' Mem. in Reply to Defs.' Opp'n to Pls.' Summ. J. Mot. ("Pls.' Claim 2 Reply") [ECF No. 291]; Pls.' Opp'n to Def.'s Mot. for Summ. J. ("Pls.' Claim 2 Opp'n") [ECF No. 293]; Reply in Supp. of Defs.' Cross-Mot. for Summ. J. ("Navy's Claim 2 Reply") [ECF No. 298].

[9] See Pls.' Mot. for Summ. J. Concerning Pls.' Phase III Claims Challenging Defs.' Selection Bd. Practices as Unconstitutional ("Pls.' Claim 3 MSJ") [ECF No. 313]; Def.'s Opp'n to Pls.' Mot. for Summ. J. and Cross-Mot. for Summ. J. ("Navy's Claim 3 Opp'n") [ECF No. 317]; Pls.' Reply Mem. in Supp. of Their Mot. for Summ. J. ("Pls.' Claim 3 Reply") [ECF No. 325]; Reply in Supp. of Defs.' Cross-Mot. for Summ. J. ("Navy's Claim 3 Reply") [ECF No. 330].

### D. Proceedings Before This Court

In October 2017, while briefing on the parties' summary judgment and discovery motions was underway, Judge Kessler retired, and this case was reassigned to the undersigned judge. The Court later set a hearing on the pending motions and advised the parties that although it "ha[d] reviewed and taken under advisement [255] plaintiffs' motion to lift the discovery stay," it would "defer ruling on that motion until the motions hearing." Jan. 11, 2018 Order [ECF No. 302].

Plaintiffs thereafter moved to stay summary judgment briefing on Claim 3 (by then, briefing on Claims 1 and 2 was complete) pending the Court's disposition of their motion to lift the discovery stay and their constitutional challenge to 10 U.S.C. § 613a. See Pls.' Rule 56(d) Mot. for a Stay in the Summ. J. Proceedings [ECF No. 303]. The Court denied that motion, construing it as one for reconsideration of its January 2018 order and explaining that, "instead of reopening discovery on the eve of scheduled summary judgment briefing, the Court will consider plaintiffs' specific discovery requests in the context of their motion for additional discovery under Federal Rule of Civil Procedure 56(d)." Mar. 1, 2018 Order [ECR No. 310] at 2.

Plaintiffs then petitioned the D.C. Circuit for a writ of mandamus compelling the Court to stay summary judgment briefing, lift the discovery stay, and address the constitutionality of § 613a, see Navy Chaplain Pls.' Pet. for a Writ of Mandamus, In re Navy Chaplaincy, No. 18-5070 (D.C. Cir. Mar. 14, 2018), but the D.C. Circuit denied the petition, see Order, In re Navy Chaplaincy, No. 18-5070 (D.C. Cir. July 9, 2018). Plaintiffs thereafter filed a motion to submit additional Rule 56(d) declarations. See Pls.' Mot. for Leave to File a Suppl. to Their Mot. to Lift the Stay and Counsel's Rule 56(d) Decls. ("Pls.' Mot. to File Decls.") [ECF No. 328].

A motions hearing was held on July 19, 2018. The pending discovery motions and cross-motions for summary judgment are now fully briefed and ripe for decision.

## **LEGAL STANDARD**

A party is entitled to summary judgment "if [it] shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if a dispute over it might affect the outcome of a suit under the governing law," and "[a]n issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "In determining whether a genuine issue of material fact exists, the court must view all facts, and draw all reasonable inferences, in the light most favorable to the party opposing the motion." Lane v. District of Columbia, 887 F.3d 480, 487 (D.C. Cir. 2018). However, if the movant shows that "there is an absence of evidence to support the nonmoving party's case," judgment should be entered in the movant's favor. Durant v. D.C. Gov't, 875 F.3d 685, 696 (D.C. Cir. 2017) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)), cert. denied sub nom. Durant v. District of Columbia, 138 S. Ct. 2608 (2018).

Under Federal Rule of Civil Procedure 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition" to a summary judgment motion, "the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." The purpose of this rule "is to prevent railroading the non-moving party through a premature motion for summary judgment before [it] has had the opportunity to make full discovery." Kakeh v. United Planning Org., Inc., 537 F. Supp. 2d 65, 71 (D.D.C. 2008) (citation omitted). Thus, although motions under Rule 56(d) "are routinely granted, . . . the rule is not properly invoked to relieve counsel's lack of diligence." Id. (quoting Berkeley v. Home Ins. Co., 68 F.3d 1409, 1414 (D.C. Cir. 1995)). To prevail on a Rule 56(d) motion, the party opposing

summary judgment "must (1) 'outline the particular facts [it] intends to discover and describe why those facts are necessary to the litigation'; (2) 'it must explain' why the nonmoving party could not produce those facts in opposition to the summary judgment motion; and (3) 'it must show that the information is . . . discoverable.'" Moore v. Carson, Civil Action No. 14-2109 (JDB), 2017 WL 1750248, at *5 (D.D.C. May 3, 2017) (quoting Convertino v. U.S. Dep't of Justice, 684 F.3d 93, 99–100 (D.C. Cir. 2012)).

## DISCUSSION

### I.  THE NAVY'S SELECTION BOARD POLICIES AND PROCEDURES

Plaintiffs' central contention in this litigation is that, at various times throughout the 1990s and early 2000s, several Navy policies governing the staffing and proceedings of chaplain selection boards favored liturgical Christians (i.e., Roman Catholics and liturgical Protestants) at the expense of non-liturgical Protestants. Chief among the challenged policies is an alleged practice of placing at least one Catholic chaplain on every selection board convened before late 2002. See Pls.' Claim 2 MSJ at 7–9; Compl. ¶¶ 57(e), (g), 88(g), 90. Plaintiffs also challenge various other procedures governing selection board proceedings, most of which were in place throughout the entire period relevant to this litigation. See Pls.' Claim 3 MSJ at 1–2.

Plaintiffs contend that these policies violate the First Amendment's Establishment Clause, the Fifth Amendment's Equal Protection Clause, and RFRA. They seek, among other things, a declaration that the challenged policies were unlawful, that "all boards using [them]" were "void ab initio," and that the Navy must reconsider any adverse action taken against any plaintiff by one of those boards. Compl. at 111.[10] Plaintiffs also seek an injunction directing the Navy to cease

---

[10] In Dilley v. Alexander, the D.C. Circuit concluded that several plaintiffs who had been denied promotions by unlawfully constituted military selection boards and later discharged from service were "entitled to be reinstated to active duty and to be considered anew by two properly constituted promotion selection boards." 603 F.2d 914, 916

those challenged policies that are still in place, see id. at 112, to establish a "monitor[ing]" and "reporting" system for "claims of denominational preference," id. at 114, and to develop a "fitness report for chaplains" that is based on "objective performance criteria," id.

The Navy contends that plaintiffs lack Article III standing to assert these claims.[11]  It also contends that plaintiffs have failed to raise a genuine issue of material fact that the challenged policies were facially discriminatory or adopted for a discriminatory purpose, as D.C. Circuit precedent requires.  The Navy therefore seeks summary judgment in its favor.

## A.  Article III Standing

At an "irreducible constitutional minimum," Article III's standing requirement has three elements:

> First . . . is injury-in-fact: A would-be plaintiff must have suffered "an invasion of a legally protected interest" that is (i) "concrete and particularized" rather than abstract or generalized, and (ii) "actual or imminent" rather than remote, speculative, conjectural or hypothetical.  Second is causation: The asserted injury must be "fairly traceable to the challenged action of the defendant."  Third is redressability: It must be "likely that a favorable decision by the court would redress the plaintiff's injury."

In re Navy Chaplaincy, 534 F.3d 756, 759 (D.C. Cir. 2008) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)).  On summary judgment, the plaintiff must establish each of these elements with "specific facts" set out by affidavit or other admissible evidence.  United States v. $17,900 in U.S. Currency, 859 F.3d 1085, 1090 (D.C. Cir. 2017) (quoting Lujan, 504 U.S. at 561). This showing is required "for each claim [the plaintiff] seeks to press and for each form of relief

---

(D.C. Cir. 1979), decision clarified, 627 F.2d 407 (D.C. Cir. 1980).  The court declined to declare the boards "void [a]b initio," however, because such a declaration "would create an untenable situation for the Army with regard to those officers who actually were promoted" by the selection boards in question.  Dilley, 603 F.2d at 921.

[11] The Navy presents the Article III standing issue later in its briefs, as something of an afterthought to its merits discussion.  See Navy's Claim 2 Opp'n at 36–38; Navy's Claim 3 Opp'n at 40–42.  But the Court is not at liberty to "'assum[e]' jurisdiction for the purpose of deciding the merits," Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998), so it will address standing first.

that is sought." <u>Town of Chester v. Laroe Estates, Inc.</u>, 137 S. Ct. 1645, 1650 (2017) (citation omitted).

The Navy contends that plaintiffs lack Article III standing because they have failed to demonstrate that the adverse personnel actions taken against them were the result of the policies they challenge. On the contrary, the Navy argues, plaintiffs' own complaint attributes those actions "to causes entirely independent of the challenged procedures." Navy's Claim 3 Opp'n at 41 (pointing to allegations of "manipulation of the assignment process by senior chaplains," "manipulation of officer service records by unspecific persons," "inaccurate or incomplete fitness reports," and "retaliation, personal animosity, or 'blackballing'" (citations omitted)). Moreover, the Navy claims, even if the plaintiffs' allegations were sufficient to demonstrate causation, plaintiffs have failed to cite any evidence substantiating those allegations. <u>See</u> <u>id.</u> 41. Thus, plaintiffs have failed to carry their burden as to the causation element of standing.

Plaintiffs respond by pointing out—correctly—that "[t]he 'injury in fact' in an equal protection case" alleging unlawful discrimination in a competitive process "is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." Pls.' Claim 3 Reply (quoting <u>Gratz v. Bollinger</u>, 539 U.S. 244, 262 (2003) (citing <u>Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville</u> ("<u>Associated Gen. Contractors</u>"), 508 U.S. 656, 666 (1993)); <u>see</u> <u>Worth v. Jackson</u>, 451 F.3d 854, 859 (D.C. Cir. 2006) (applying this rule in the employment context).[12] Thus, a plaintiff asserting such a claim "need only demonstrate that [he or she] is able and ready" to compete "and that a discriminatory

---

[12] Plaintiffs also cite the D.C. Circuit's 2006 decision in <u>Chaplaincy of Full Gospel Churches</u> for the proposition that the "unconstitutional preference is in itself a constitutional injury." Pls.' Claim 2 Opp'n at 40. But that case held only that "a party alleging a violation of the Establishment Clause per se satisfies the irreparable injury requirement of <u>the preliminary injunction calculus</u>," <u>Chaplaincy of Full Gospel Churches</u>, 454 F.3d at 304 (emphasis added), and it expressly stated that its conclusion "presupposes, of course, that the party has standing to allege such a violation," <u>see</u> <u>id.</u> at 304 n.8. It therefore does not establish that plaintiffs have an injury-in-fact for standing here.

policy prevents [him or her] from doing so on an equal basis." Gratz, 539 U.S. at 262 (quoting Associated Gen. Contractors, 508 U.S. at 666). When a plaintiff alleges such an injury, moreover, "[i]t follows from [the Supreme Court's] definition of 'injury in fact' that [the plaintiff] has sufficiently alleged" that the policy "is the 'cause' of its injury and that a judicial decree directing the [government] to discontinue [the policy] would 'redress' the injury." Associated Gen. Contractors, 508 U.S. at 666 n.5.[13]

Properly framed, therefore, the question here is not whether other factors aside from the allegedly discriminatory policies contributed to plaintiffs' non-promotions or selections for early retirement, see Scahill v. District of Columbia, 271 F. Supp. 3d 216, 228 (D.D.C. 2017) (explaining that "[a] defendant need not be the 'but-for cause' of a plaintiff's injuries" to establish standing), but rather whether a discriminatory Navy policy prevented plaintiffs from competing in those processes "on an equal basis," Gratz, 539 U.S. at 262 (citation omitted); accord Monterey Mech. Co. v. Wilson, 125 F.3d 702, 707 (9th Cir. 1997) (explaining that the plaintiff in this type of equal protection case "need not establish that the discriminatory policy caused it to lose" the benefit sought). Moreover, because courts "must be careful not to decide the questions on the merits" when evaluating standing, the Court "must assume arguendo that the Navy's operation of its [selection boards] favors Catholic chaplains and disfavors non-liturgical Protestant chaplains." In re Navy Chaplaincy, 534 F.3d at 760 (citation and internal quotation marks omitted). Thus, plaintiffs also need not prove that the policies they challenge were discriminatory to establish standing; rather, all they must show is that each plaintiff received an adverse recommendation from a selection board that employed (or was convened pursuant to) the challenged policies.

---

[13] At a minimum, this is true of plaintiffs' equal protection claims. Because plaintiffs' Establishment Clause claims allege the same injury—that plaintiffs were discriminated against based on their religion—the Court concludes that the same theory of Article III standing governs those claims.

When so clarified, Article III's standing requirement is easily satisfied in this case. The Navy does not dispute that each individual plaintiff received an adverse recommendation from a promotion or selective early retirement board convened when at least some of the challenged policies were in place. See, e.g., Compl. add. A ¶ 1 (alleging that one plaintiff, Robert H. Adair, was "selected for early retirement in FY 95"—a fiscal year in which all of the challenged policies were allegedly in place—"by a Selective Early Retirement Board . . . that selected only Non-liturgical chaplains while allowing Liturgical chaplains with inferior records to continue on active duty"). This is sufficient to permit the Court to conclude that plaintiffs have standing. See Fed. R. Civ. P. 56(e) ("If a party fails . . . to properly address another party's assertion of fact . . . , the court may . . . consider the fact undisputed for purposes of the motion."). Indeed, the Court is mindful that this case has been before three district judges and at least five panels of the D.C. Circuit—each of which had an independent obligation to determine its own subject-matter jurisdiction, see Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006)—and that none found standing to be lacking. The Court explicitly confirms the implicit conclusions of these prior courts that plaintiffs have standing and turns now to the merits of plaintiffs' claims.[14]

## B.       Legal Standards

The D.C. Circuit set out the legal standards that govern plaintiffs' Establishment Clause and equal protection claims in a prior decision in this very litigation. See In re Navy Chaplaincy, 738 F.3d at 428–31 (concluding that plaintiffs' challenges to several of the same selection-board

---

[14] The Court also rejects the Navy's argument that two plaintiffs lack standing because they have since received the promotions that they were initially denied. See Navy's Claim 3 Reply at 22. Because the injury at issue is not plaintiffs' failure to be promoted, but rather the alleged unequal treatment by the prior selection boards, see Gratz, 539 U.S. at 262, the fact that these two plaintiffs were later promoted does not obviate the relevant injury for standing purposes. Indeed, as the D.C. Circuit has recognized, the remedy for a servicemember who was improperly not selected for promotion is generally retroactive, and hence these plaintiffs—were they to prevail on the merits—could be eligible for "back pay, allowances and other benefits of constructive service." Dilley, 627 F.2d at 408.

procedures at issue here did not warrant preliminary injunctive relief because they were unlikely to succeed on the merits).  The Court reviews those standards only briefly here.

To evaluate plaintiffs' equal protection claim, the Court must first determine whether the challenged selection-board policy "on its face prefers any religious denomination."  Id. at 428.  If it does, then strict scrutiny applies; if it does not, then for strict scrutiny to apply plaintiffs must show either that the policy was "adopted with discriminatory intent" or that it led to a "pattern of disparate outcomes from which unconstitutional discriminatory intent could be inferred."  Id. at 429.  To imply discriminatory intent on its own, a pattern of disparate outcomes must be "stark," id. (quoting Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977)), which means that it must be on par with the patterns at issue in two illustrative Supreme Court cases: one in which the boundaries of a city were altered so as to remove nearly all of its 400 African American voters but not a single white voter, and another in which a city refused to waive a building ordinance for over 200 Chinese applicants but waived the requirement for all non-Chinese applicants except one.  See id. at 428–30 (first citing Gomillion v. Lightfoot, 364 U.S. 339, 341 (1960); then citing Yick Wo v. Hopkins, 118 U.S. 356, 359 (1886)).  Unless strict scrutiny applies for one of these three reasons, plaintiffs must demonstrate that "the polic[y] lack[s] a rational basis."  Id. at 430.  Otherwise, their equal protection claim fails.

The Establishment Clause inquiry proceeds along similar lines.  The first question is "whether the law facially differentiates among religions."  Id.; accord Trump v. Hawaii, 138 S. Ct. 2392, 2417 (2018) ("[T]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." (citing Larson v. Valente, 456 U.S. 228, 246 (1982))).  If it does, then strict scrutiny applies; if it does not, then the court "proceed[s] to apply the customary three-pronged Establishment Clause inquiry derived from Lemon v.

21

Kurtzman, 403 U.S. 602 (1971)." In re Navy Chaplaincy, 738 F.3d at 430 (citation omitted). Under that test, a law or policy is valid only if it "(1) ha[s] a secular legislative purpose; (2) ha[s] a principal or primary effect that neither advances nor inhibits religion; and (3) [does] not result in excessive entanglement with religion or religious institutions." Id. (citations omitted).

A law or policy has an unconstitutional purpose if "the government acted with the purpose of advancing or inhibiting religion." Agostini v. Felton, 521 U.S. 203, 222–23 (1997). It has an unconstitutional effect if it "appear[s] to endorse religion in the eyes of a 'reasonable observer,' who 'must be deemed aware of the history and context underlying a challenged program.'" In re Navy Chaplaincy, 738 F.3d at 430 (emphasis omitted) (quoting Zelman v. Simmons–Harris, 536 U.S. 639, 655 (2002)).[15] As in the equal protection context, to satisfy the "effects" test with statistical evidence alone, plaintiffs must show a stark pattern of disparate outcomes. See id. at 431 (concluding that "plaintiffs' statistics fail to show government endorsement of particular religions under the reasonable observer test for the same reason that, in the equal protection context, they failed to show intentional discrimination paralleling that of Gomillion or Yick Wo"); see also Harkness v. Sec. of Navy, 858 F.3d 437, 447–451 (6th Cir. 2017) (applying the same standards to nearly identical Establishment Clause claims on summary judgment), cert. denied sub nom. Harkness v. Spencer, No. 17-955, 2018 WL 3013822 (U.S. June 18, 2018).

---

[15] The D.C. Circuit did not have the occasion to articulate the legal standards applicable under the third prong of the Lemon test—entanglement—when this case was last before it. See In re Navy Chaplaincy, 738 F.3d at 430 (noting that plaintiffs did not press an entanglement claim). But according to the Navy, see Navy's Claim 2 Opp'n at 44–45, the Court need not consider plaintiffs' entanglement claims because the Supreme Court has "recast" the entanglement inquiry as "simply one criterion relevant to determining a statute's effect." Mitchell v. Helms, 530 U.S. 793, 808 (2000) (citing Agostini, 521 U.S. at 232–33). Although some language from Agostini and later decisions suggests that Agostini's gloss on the Lemon test applies only to claims involving government monetary aid, see, e.g., Mitchell, 530 U.S. at 807 (noting that "in Agostini we modified Lemon for purposes of evaluating aid to schools"); Trinity Lutheran Church of Columbia, Inc. v. Comer, 137 S. Ct. 2012, 2041 n.1 (2017) (stating that "[g]overnment aid that has the 'purpose' or 'effect of advancing or inhibiting religion' violates the Establishment Clause" (emphasis added) (citing Agostini, 521 U.S. at 222–223, 234)), this case is similar to Agostini in that the entanglement alleged—discrimination in favor of certain denominations—manifests as an effect on plaintiffs' careers. Thus, as in Agostini, "it is simplest" to "treat [entanglement] . . . as an aspect of the inquiry into a statute's effect." 521 U.S. at 233.

### C.    The Navy's Alleged "One Roman Catholic" Policy

Plaintiffs first seek summary judgment on their constitutional challenge to the Navy's alleged policy of placing at least one Roman Catholic chaplain on each chaplain selection board convened between 1948 and late 2002. See Pls.' Claim 2 MSJ at 7. Plaintiffs challenge this policy only under the Establishment Clause, not the Equal Protection Clause, see id. at 5–7; as noted above, however, the analysis laid out by the D.C. Circuit is essentially the same under either provision.[16] According to plaintiffs, that policy was facially discriminatory under Larson, see Pls.' Claim 2 MSJ at 18–29, and also fails at each step of the Lemon test, see id. at 29–34. The Navy cross-moves for summary judgment, arguing that plaintiffs have not demonstrated either that the policy existed, see Navy's Claim 2 Opp'n at 16–21, or that it was adopted with discriminatory intent, see id. at 21–35. For the reasons given below, plaintiffs' motion will be denied, and the Navy's will be granted.

### 1.    The Navy's Board-Staffing Policies Were Facially Neutral.

The parties do not dispute that until late 2002, the Navy staffed chaplain selection boards with one or two (or at most three) non-chaplain officers and filled the remaining seats with chaplains. See Decl. of Killian Kagle ("Kagle Decl.") [ECF No. 47-9] at 35–46 (listing the denominational affiliation and faith group category of every member of every promotion selection board convened between 1988 and 2002 and every selective early retirement board convened between 1991 and 2002); SECNAVINST 1401.3, Encl. 1 ¶ 1(c)(1) (providing that "[a]t least one member shall be a [non-chaplain] officer" and that "[t]he remaining members should be

---

[16] Plaintiffs also contend that the policy violates the Constitution's No Religious Test Clause. See U.S. Const., art. VI, cl. 3 ("[N]o religious test shall ever be required as a qualification to any office or public trust under the United States."). The Navy argues that this claim fails because plaintiffs "never contend that a Chaplain must be a Roman Catholic to sit on a selection board." See Navy's Claim 2 Opp'n at 39. Because plaintiffs allege that they were discriminated against because of their religion—not that a particular "religious test" was "required as a qualification" to the chaplaincy—the Court agrees that their claim is better analyzed under the Establishment Clause.

[chaplains]"). The record is also clear that every promotion board convened between 1988 and 2002 had between four and seven chaplains and that, with one exception, at least one of those chaplains was Catholic.[17]  See Kagle Decl. at 35–46.  Plaintiffs contend that this fact alone demonstrates that the Navy had a "policy" of placing at least one Catholic chaplain on every board, and that this policy triggers strict scrutiny because it was facially discriminatory.

The Navy's evidence tells a different story.  According to the Navy, during the relevant time period, chaplain selection boards were staffed with chaplains from a "mix" of faith group categories—including Catholics—as part of a larger effort to ensure selection-board diversity.  See Rock Decl. ¶ 5–8 (testimony of former Navy personnel officer that selection boards "represented, to the extent possible, the different experiences of the many chaplains within the Chaplain Corps," including "east-coast chaplains, west-coast chaplains, Navy chaplains, Marine Corps chaplains, Coast Guard chaplains, and chaplains from each faith-group category").  Thus, of the 202 chaplains staffed on the forty-two chaplain promotion boards convened between 1988 and 2002, sixty-six were liturgical Protestants, sixty-nine were non-liturgical Protestants, forty-eight were Catholic, eighteen fell in the Special Worship faith group category, and one was unknown.  See Kagle Decl. at 35–44.  Similarly, of the twenty-seven chaplains staffed on the twelve selective early retirement boards convened between 1991 and 1998, ten were liturgical Protestants, ten were non-liturgical

---

[17] Plaintiffs also allege that, beginning in 1977, the Navy had a policy of placing two Roman Catholic chaplains on every selection board.  See Compl. ¶ 8 & n.8.  According to plaintiffs, that practice ended in 1986, when plaintiffs' counsel secured a preliminary injunction against the practice from a district court in the Southern District of California, see Prelim. Inj., Wilkins v. Lehman, Civil Action No. 85-3031 (S.D. Cal. Feb. 10, 1986), ECF No. 135-3, and the Navy later settled with the plaintiff in that case, see Compl. ¶ 88(e).  This alleged policy is not at issue here, however, because it falls outside the limitations period established by the Court's 2016 ruling on the Navy's motion to dismiss.  See In re Navy Chaplaincy, 69 F. Supp. 3d at 256.

Protestants, four were Catholic, and two were Special Worship. Id. at 45–46. Among the four faith groups, then, the Navy's policies hardly resulted in outsized representation for Catholics.[18]

The Navy also points to its own regulations, which represent the only written evidence of its board-staffing policies during the relevant time period. Far from directing selection boards (or those responsible for convening them) to discriminate against non-liturgical Protestants, those regulations expressly prohibited discrimination on the basis of religion. See SECNAVINST 1401.3 ¶ 4(a) ("Exclusion from board membership by reason of gender, race, ethnic origin, or religious affiliation is prohibited."); SECNAVINST 1401.3, Encl. 1 ¶ (1)(c)(1)(e) (stating that members of chaplain selection boards "shall be nominated without regard to religious affiliation"). Moreover, a federal statute requires selection board members to swear an oath to act "without prejudice or partiality and having in view both the special fitness of officers and the efficiency of [the Navy]." 10 U.S.C. § 613. These sources all suggest that the Navy's board-staffing policies were nondiscriminatory—at least on their face. See Harkness, 858 F.3d at 447 (concluding that other procedures employed by the Navy's selection boards were not facially discriminatory under Larson, in part because of the Navy's facially neutral regulations).

Plaintiffs offer nothing to rebut this evidence. Instead, they quibble with the applicable legal standard, arguing that the presence of one Catholic on each board triggers strict scrutiny because it "suggest[s] 'a denominational preference.'" Pls.' Claim 2 MSJ at 17 (emphasis added) (quoting County of Allegheny v. ACLU, 492 U.S. 573, 609 (1989) (quoting Larson, 456 U.S. at 246), abrogated on other grounds by Town of Greece v. Galloway, 134 S. Ct. 1811 (2014)). But

---

[18] In response, plaintiffs argue that the Navy's policies "singled out one denomination for an advantage which it gave to no other": "a reserved seat on every selection board." Pls.' Claim 2 MSJ at 26 (emphasis added). Thus, while the selection boards may have been balanced among faith groups, they were not balanced among denominations. See id. at 19–20 (chart purporting to show that, between 1977 and 2002, twice as many selection board members were Roman Catholic as compared to any other denomination). But plaintiffs do not explain why this is the relevant point of comparison for purposes of their Establishment Clause claim—which, after all, alleges discrimination against non-liturgical Protestants as a whole, not against any particular non-liturgical Protestant denomination.

this precise argument was rejected by the Sixth Circuit in <u>Harkness</u>, which concluded—relying in part on the D.C. Circuit's 2013 decision in this case—that "strict scrutiny applies only when the law <u>facially</u> prefers one religion over another." 858 F.3d at 447 (collecting cases and concluding that this approach was "more consistent with both Supreme Court and [Sixth Circuit] precedent"). And in any case, this Court is not free to depart from the legal standards previously articulated by the D.C. Circuit in this litigation. "<u>Larson</u> teaches that, when it is claimed that a denominational preference exists, the initial inquiry is whether the law <u>facially differentiates among religions</u>." <u>In re Navy Chaplaincy</u>, 738 F.3d at 430 (emphasis added) (citing <u>Hernandez v. Comm'r</u>, 490 U.S. 680, 695 (1989)). At most, the presence of one Catholic on each selection board suggests that the Navy's facially neutral board-staffing policies may have resulted in disproportionate representation among denominations. But it does not show the existence of a facially discriminatory policy and so does not trigger strict scrutiny under <u>Larson</u>.[19]

> **2. Plaintiffs Have Not Demonstrated that the Navy's Facially Neutral Board-Staffing Policies Were Adopted for a Discriminatory Purpose.**

Similarly, plaintiffs have failed to raise a genuine issue of material fact that the Navy's facially neutral board-staffing policies were adopted for a discriminatory purpose. Although the record reveals a policy of staffing selection boards with a "mix" of chaplains from different faith group categories, <u>see</u> Rock Decl. ¶¶ 5–8, plaintiffs have pointed to nothing in the record to suggest

---

[19] Plaintiffs' reliance on stray language from <u>County of Allegheny</u> appears to derive from a decision by this Court in 2002, which quoted that same language and then stated that "if the plaintiffs can demonstrate after discovery that some or all of the Navy's policies and practices suggest a denominational preference," strict scrutiny would apply. <u>Adair v. England</u>, 217 F. Supp. 2d 7, 14 (D.D.C. 2002). But as the Court clarified over a decade later—after noting that plaintiffs had "misread[]" its prior statement—it meant that "although policies that <u>explicitly</u> discriminate on the basis of religion are subject to strict scrutiny, such scrutiny should not be applied to policies that do <u>not</u> explicitly discriminate on the basis of religion unless '[P]laintiff[s] can demonstrate after discovery that some or all of the Navy's policies and practices suggest a denominational preference[.]'" <u>In re Navy Chaplaincy</u>, 928 F. Supp. 2d at 35 (citation omitted).

that this policy was intended to benefit any denomination at the expense of another.[20]  On the contrary, the Navy's evidence suggests that the policy was intended to "maximize" a selection board's ability to consider candidates from diverse backgrounds, as well as to "dispel any potential appearance of bias or impropriety."  Id. ¶ 6.  Plaintiffs offer no direct evidence to contravene the asserted secular objectives of the Navy's board-staffing policies.

Instead, plaintiffs argue (in essence) that the sheer improbability that at least one Catholic would appear on nearly every chaplain selection board during a 54-year period demonstrates that the Navy's placement of Catholics on the boards was intentional.  See, e.g., Pls.' Claim 2 MSJ at 7–9.  But the relevant question for Lemon's purpose prong is not whether the challenged policy was intentional or unintentional; rather, the question here is whether its purpose was specifically to prefer one religion over another.  See Larson, 456 U.S. at 254 (invalidating a Minnesota statute whose legislative history "demonstrated[] that [it] was drafted with the explicit intention of including particular religious denominations and excluding others," including, for example, evidence that legislators "delet[ed] . . . clause[s] . . . for the sole purpose of exempting the [Roman Catholic] Archdiocese from the . . . Act"); Wallace v. Jaffree, 472 U.S. 38, 60 (1985) (invalidating an Alabama school prayer statute where "[t]he legislature enacted [the law] . . . for the sole purpose of expressing the State's endorsement of prayer activities").  Because plaintiffs have offered no direct evidence of any such purpose here, their Establishment Clause claim fails at the purpose prong of the Lemon test.

---

[20] Nor have plaintiffs persuasively addressed the Navy's asserted secular purpose of the faith group categories themselves.  As the Navy explains, "Chaplains in each category were deemed generally capable of meeting the religious needs of personnel encompassed by those categories."  Navy's Claim 2 Opp'n at 24; see id. at 24–25 (explaining that whereas a non-liturgical Protestant chaplain could perform religious services for any service member in that faith group category, the Navy had determined that "Roman Catholic personnel have distinct needs, some of which can be met only by Roman Catholic Chaplains" (citing Rock Decl. ¶ 14)).

### 3. Plaintiffs Have Not Demonstrated that the Navy's Facially Neutral Board-Staffing Policies Had a Sufficient Discriminatory Impact.

Plaintiffs fare no better at <u>Lemon</u>'s effects prong. Here, plaintiffs argue that the Navy's board-staffing policies "gave [Catholic] chaplains a reserved seat for every promotion board which resulted in higher promotion rates for [Catholics] than other denominations." Pls.' Claim 2 MSJ at 34; <u>see</u> Compl. ¶ 57(e) (alleging that the Navy's board-staffing policies "led to a high[er] selection rate for Catholics not based on performance or other legitimate selection criteria"). For this proposition, plaintiffs rely chiefly on a third-party study showing at most a 14.5% differential in the promotion rates of Catholic chaplains as compared to non-liturgical Protestant chaplains. <u>See</u> Ex. 17 to Pls.' Claim 2 MSJ ("Faith Group Promotions") [ECF No. 276-19]. Plaintiffs also rely on the expert declaration of Dr. Harald Leuba, a statistician, who concludes that the differential in promotion rates is statistically significant. <u>See</u> Apr. 6, 2017 Decl. of Harald Leuba [ECF No. 276-46] at 17; <u>Harkness</u>, 858 F.3d at 449 (explaining that a finding of statistical significance "means only that the disparity in promotion decisions was not 'due to chance'" (citing <u>In re Navy Chaplaincy</u>, 738 F.3d at 431)).

But as the D.C. Circuit explained earlier in this litigation, to make out a disparate-impact claim using statistics, a plaintiff must demonstrate a "stark" disparity in outcomes between the classes at issue. <u>In re Navy Chaplaincy</u>, 738 F.3d at 429, 431. The D.C. Circuit previously concluded that plaintiffs were unlikely to succeed on the merits of their disparate-impact claim because their evidence of "a 10% advantage in promotion rates" did not "remotely approach the stark character" necessary to make this showing. <u>Id.</u> at 429. The same is true here. Plaintiffs point to a differential in promotion rates between Catholic and non-liturgical Protestant chaplains that varies, based on the rank in question, between 2.5% (a 79.5% promotion rate for non-liturgical Protestant chaplains at the lieutenant commander rank versus an 82% promotion rate for Catholics)

and 14.5% (a 69.2% promotion rate for non-liturgical Protestants at the commander rank versus an 83.7% promotion rate for Catholics). See Pls.' Claim 2 MSJ at 20–21 (citing a study conducted by the Center for Naval Analysis ("CNA") in 1998); see also Faith Group Promotions. If a 10% disparity does not "remotely approach" the showing necessary to prevail on a disparate-impact claim, then surely a 14.5% disparity is likewise insufficient. Cf. Gomillion, 364 U.S. at 341; Yick Wo, 118 U.S. at 359. Moreover, even if it were sufficient, plaintiffs have offered no evidence that the alleged one-Roman-Catholic policy caused the disparity. See In re Navy Chaplaincy, 738 F.3d at 429 (observing that statistically significant disparities in chaplain promotion rates are potentially influenced by multiple causes).

Hence, plaintiffs have failed to establish that strict scrutiny applies under a disparate-impact theory (or any other theory). And because plaintiffs have likewise failed to establish that the Navy's board-staffing policies lack a rational basis, they have failed to make out their constitutional challenge to the Navy's alleged policy of placing one Catholic chaplain on every chaplain selection board. The Navy is therefore entitled to summary judgment as to that claim.

### D.     Selection-Board Procedures

Next, plaintiffs challenge a set of procedures used by the selection boards themselves, arguing that those procedures unconstitutionally disadvantage non-liturgical Protestant chaplains. See Pls.' Claim 3 MSJ at 1–2. Specifically, plaintiffs challenge the following: (1) the boards' use of secret ballots; (2) the Chief of Chaplains' role as president of the selection boards and involvement in choosing each board's members; (3) the practice whereby a single board member first reviews a candidate's file and only then briefs the full board on the candidate; (4) the practice of allowing board members to discuss a candidate's file before voting; and (5) a prior practice whereby each candidate's denomination was disclosed to the selection board. See id.

The D.C. Circuit previously rejected plaintiffs' motion for a preliminary injunction against the first and second of these practices: secret voting and the Chief of Chaplains' role in convening the selection boards.[21] See In re Navy Chaplaincy, 738 F.3d at 427. The court concluded that: (1) the policies were facially neutral, see id. at 428–29 (explaining that "even if one of the chaplains always serves as board president (as the chaplains allege), the board president . . . must be a person chosen for the board without regard to religious affiliation" and that "the practice of secret voting is neutral on its face"); (2) "the chaplains have presented no evidence of discriminatory intent in the policies' enactment," id. at 429; and (3) plaintiffs' statistical evidence was insufficiently "stark" to raise an inference of discriminatory intent, see id. (rejecting evidence of "a 10% advantage in promotion rates for officers of the same denomination as the Chief of Chaplains"). Plaintiffs' statistics were further undermined by the fact that they had "made no attempt to control for potential confounding factors, such as promotion ratings, education, or time in service." Id.

Little has changed since the D.C. Circuit's decision in 2013. As plaintiffs' counsel conceded at the motions hearing, neither the two policies at issue then nor the three additional policies challenged now—briefing, discussion, and the now-discontinued practice of disclosing chaplain denominations—facially discriminates against any specific denomination, and plaintiffs point to no evidence that they were adopted for a discriminatory purpose. Moreover, save for a new report from Dr. Leuba and two largely inapposite studies, see Pls.' Claim 3 MSJ at 28–33, plaintiffs present no new statistical evidence concerning the challenged policies—and certainly no evidence demonstrating a "stark" disparity in promotion rates on par with Gomillion or Yick Wo.

---

[21] According to the Navy, although "[t]he D.C. Circuit's opinion did not explicitly address the briefing of officers' records," that practice was "challenged as part and parcel of Plaintiffs' argument," so "the constitutionality of that procedure . . . was squarely before the court." Navy's Claim 3 Opp'n at 12 n.4.

Plaintiffs contend that Dr. Leuba's new report accounts, at least, for the "confounding factors" identified by the D.C. Circuit in its review of his prior analysis. See Pls.' Claim 3 MSJ at 28–31. But Dr. Leuba's new report—entitled "Promotions in the U.S. Navy Chaplain Corps Are Not Now, Nor Have They Ever Been, Merit Based, Nor Have They Ever Been Denominationally Neutral[,] Let me Explain Why"—fails to meaningfully respond to the D.C. Circuit's concern that the statistical disparities identified by plaintiffs could have resulted from other factors. See, e.g., Feb. 22, 2018 Decl. of Harald Leuba [ECF No. 313-40] ¶ 75 (concluding that "there is no basis for observing or testing the value or benefit of an additional amount of education"); id. ¶ 94 (acknowledging that Dr. Leuba had not controlled for promotion ratings). Nor are the two new studies cited by plaintiffs of any more than tangential relevance, since neither purports to examine the chaplaincy during the time period at issue in this litigation. See Pls.' Claim 3 MSJ at 31–32 (discussing a study analyzing Methodists in the chaplaincy between 1975 and 1987 and a 1992 PhD dissertation analyzing the relationship between faith group categories and promotion rates). And in any case, none of this new evidence even attempts to argue that plaintiffs' statistical evidence demonstrates a sufficiently stark disparity to support their constitutional claims.

Instead of attempting to show a disparity of the required magnitude, plaintiffs urge this Court to disregard the D.C. Circuit's prior decision in this litigation and to apply instead the standards articulated in Palmer v. Shultz, 815 F.2d 84 (D.C. Cir. 1987), a Title VII case involving a disparity in selection rates between male and female job applicants, see id. at 87, 91–92 (suggesting that a "5% probability of randomness" in disparate outcomes would raise an inference of intentional discrimination under Title VII). But the D.C. Circuit has previously rejected plaintiffs' attempts to rely on Title VII cases involving "statistically significant" disparities, doubting not only that plaintiffs' "statistical evidence properly controlled for confounding

variables," but also that "a court could properly impute a belief in denominational favoritism to the reasonable observer simply on the basis of statistics that might satisfy a plaintiff's Title VII burden." In re Navy Chaplaincy, 738 F.3d at 431. Thus, even if the 14.5% promotion rate disparity identified by plaintiffs were statistically significant, that fact alone would be insufficient to support plaintiffs' constitutional claims. See id. ("[W]hen reasonable observers find that the term ['statistically significant'] means only that there is little likelihood that the 'discrepancy' is due to chance, they are most unlikely to believe that the policies convey a message of government endorsement."); see also Burgis v. New York City Dep't of Sanitation, 798 F.3d 63, 69 (2d Cir. 2015) ("[T]o show discriminatory intent in a[n] . . . Equal Protection case based on statistics alone, the statistics must not only be statistically significant in the mathematical sense, but they must also be of a level that makes other plausible non-discriminatory explanations very unlikely.").

Plaintiffs' specific argument that they have brought a "religious disparate impact" claim—one that requires no proof of discriminatory intent—is similarly misguided. See Pls.' Claim 3 Reply at 18–20. Plaintiffs are correct that under Title VII, a plaintiff may make out a prima facie case of discrimination by presenting "statistical evidence . . . that 'observed, nonrandom disparities' in hiring, firing, or other significant employment decisions 'were caused by a "facially neutral" selection criterion.'" Davis v. District of Columbia, 246 F. Supp. 3d 367, 393 (D.D.C. 2017) (quoting Palmer, 815 F.2d at 114). They are also correct that under this so-called "disparate impact" theory of discrimination, "[p]roof of discriminatory motive . . . is not required." Id. at 392 (quoting Anderson v. Zubieta, 180 F.3d 329, 338 (D.C. Cir. 1999)). But the Supreme Court has repeatedly made clear that this theory of discrimination is not available under the Equal Protection Clause, see City of Cuyahoga Falls v. Buckeye Cmty. Hope Found., 538 U.S. 188, 194 (2003) ("'[P]roof of racially discriminatory intent or purpose is required' to show a violation of the Equal

Protection Clause." (quoting <u>Arlington Heights</u>, 429 U.S. at 265)); <u>Washington v. Davis</u>, 426 U.S. 229, 247 (1976) ("Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious . . . discrimination forbidden by the Constitution."), and plaintiffs offer no reason to reach a different conclusion as to the Establishment Clause. Their attempt to repackage their constitutional claims under a "disparate impact" theory is therefore unavailing.

In sum, plaintiffs' challenges to the selection-board policies at issue here fail for essentially the same reason that plaintiffs previously failed to secure a preliminary injunction against those policies: plaintiffs have failed to demonstrate that the challenged policies either were facially discriminatory, were adopted with discriminatory intent, or had a stark enough disparate impact on non-liturgical Protestant chaplains that discriminatory intent could be inferred. <u>See</u> <u>In re Navy Chaplaincy</u>, 738 F.3d at 428–31. Under the standards previously articulated by the D.C. Circuit, therefore, the Navy is entitled to summary judgment on these claims.

Perhaps recognizing this to be the case, plaintiffs attempt to reframe their claims in various ways. For example, they argue that the Chief of Chaplain's role in choosing selection board members impermissibly "delegate[s] . . . discretionary civic authority to the Chief and other denominational representatives." Pls.' Claim 3 MSJ at 39; <u>see id.</u> at 37–42 (first citing <u>Larkin v. Grendel's Den, Inc.</u>, 459 U.S.116 (1982); and then citing <u>Board of Education v. Grumet</u>, 512 U.S. 687 (1994)). But this Court and the D.C. Circuit have repeatedly rejected this argument. <u>See</u> <u>In re Navy Chaplaincy</u>, 697 F.3d at 1179 (explaining that unlike in <u>Larkin</u>, where "a Massachusetts statute grant[ed] religious institutions an effective veto power over applications for liquor licenses" without requiring any "reasons, findings, or reasoned conclusions," here "Congress and the Secretary of the Navy have articulated secular, neutral standards to guide selection board members in evaluating candidates for promotion"); <u>Adair</u>, 417 F. Supp. 2d at 6 (rejecting plaintiffs'

"assumption" that "the usual rule for a chaplain sitting on a promotion board will be to discriminate against promotion candidates on the basis of religious denomination" (citation omitted)); Adair, 183 F. Supp. 2d at 61–62 (distinguishing Larkin on the ground that chaplains on selection boards act "first and foremost [as] Naval officers . . . evaluating a fellow officer's fitness for promotion," not "private clergy" exercising unchecked discretion); see also Harkness, 858 F.3d at 449–50 (rejecting the same argument on summary judgment). Plaintiffs provide no reason to reach a different conclusion this time around.

Similarly unpersuasive is plaintiffs' argument that the challenged procedures impermissibly "vest[] . . . unbridled discretion in a government official." See Pls.' Claim 3 MSJ at 21–26 (quoting Forsyth Cty. v. Nationalist Movement, 505 U.S. 123, 132–33 (1992)). Even assuming that this theory applies in the Establishment Clause context—Forsyth County, on which plaintiffs chiefly rely, was a free-speech case—plaintiffs have simply not raised a genuine factual issue that the procedures vest anyone with the type of unchecked power at issue in plaintiffs' cited authorities. See Forsyth County, 505 U.S. at 133 (striking down an ordinance that "left [it] to the whim of" a county official to set the fee amount for a public assembly permit, where the official was "not required to rely on any objective factors" or to "provide any explanation" for his "unreviewable" decision). Plaintiffs have not explained how an individual member of a seven-member selection board could exercise such authority, and they do not dispute that the decisions of the selection boards themselves are subject to multiple layers of administrative and judicial review. See 10 U.S.C. § 628(g). Hence, plaintiffs' alternative legal theories also fail, and the Navy is entitled to summary judgment on plaintiffs' challenges to its selection-board procedures.

## II.    PLAINTIFFS' CONSTITUTIONAL CHALLENGE TO 10 U.S.C. § 613a

Plaintiffs also challenge the constitutionality of 10 U.S.C. § 613a's ban on the disclosure of selection board proceedings.  See Pls.' Claim 1 MSJ at 1.  That provision states that "[t]he proceedings of a selection board convened under section . . . 611 . . . of this title may not be disclosed to any person not a member of the board," 10 U.S.C. § 613a(a), and specifically provides that the "discussions and deliberations" of such a board "are immune from legal process," "may not be admitted as evidence," and "may not be used for any purpose in any action, suit, or judicial or administrative proceeding without the consent of the Secretary of the military department concerned," id. § 613a(b).  Plaintiffs allege that § 613a is unconstitutional as applied to them, because it deprives them of evidence needed to prevail on their constitutional challenges to the various selection-board procedures described above.  See Pls.' Claim 1 MSJ at 2.

But plaintiffs have already unsuccessfully challenged § 613a—as well as its statutory predecessor, § 618(f)—several times.  They brought their first challenge after the D.C. Circuit held in 2004 that § 618(f) prohibited the disclosure of selection-board proceedings in litigation.  See In re England, 375 F.3d at 1181.  In 2006, this Court rejected plaintiffs' argument that § 618(f) "bars judicial review of constitutional claims arising out of promotion-board proceedings," explaining that the statute "merely restricts the evidence available to the plaintiffs in support of their claims." Adair, 451 F. Supp. 2d at 215–17.  And in any case, because plaintiffs "challenge the Navy's policies, not simply the alleged impermissible intentions and actions of individual board members," id. at 219, the evidence barred by § 618(f) was not strictly necessary to proving their claims, see id. at 218 (noting that § 618(f) "does not preclude testimony . . . concerning directives, orders, or policies (written or unwritten) communicated to board members that may have been intended to infuse a denominational preference into the promotion selection process").  Finally,

the Court concluded that even if § 618(f) did bar plaintiffs from accessing information necessary to proving their claims, plaintiffs had failed to establish the existence of "a constitutional right of access to evidence essential to establishing constitutional claims, even when that evidence is privileged by statute." Id. at 220. Thus, given "the absence of any precedent recognizing a right to statutorily privileged information in a civil case involving constitutional claims, the thinness of the plaintiffs' legal theory, and the broad deference constitutionally afforded Congress to regulate the Navy," the Court in Adair rejected plaintiffs' challenge to § 618(f). Id. at 222.

Plaintiffs again challenged the constitutionality of the statutory privilege for selection-board proceedings after Congress repealed § 618(f) and enacted § 613a. See In re Navy Chaplaincy, 512 F. Supp. 2d 58, 61 (D.D.C. 2007) (reversing the Court's earlier ruling that plaintiffs could discover selective early retirement board proceedings under § 618(f) and rejecting plaintiffs' argument that "to deny them discovery of [those] proceedings would effectively deny them judicial review of their causes of action by denying them the evidence necessary to vindicate them"). The Court reiterated its earlier conclusion that "'information may be withheld [pursuant to a statutory privilege], even if relevant to the lawsuit and essential to the establishment of plaintiff's claim,' whether statutory or constitutional." Id. (quoting Baldrige v. Shapiro, 455 U.S. 345, 351, 360 (1982)). It then warned: "Whatever wisdom may be associated with the adage 'the third time's the charm,' the plaintiffs are advised to accept this second ruling as conclusive and refrain from testing their luck a third time before this court." Id. at 62.[22]

---

[22] Judge Urbina addressed the constitutionality of § 613a again in 2012, when he denied without prejudice the Navy's 2008 motion to dismiss the affirmative constitutional challenge to the statute that plaintiffs had raised in Gibson. See In re Navy Chaplaincy, 850 F. Supp. 2d at 115. Without citing his 2007 opinion in Adair (which had approved the application of § 613a to selective early retirement board proceedings), Judge Urbina noted that while "[a]t first blush, the court's prior reasoning concerning the constitutionality of § 618(f) would appear to also apply in determining the constitutionality of § 613a," further briefing on the differences between the two statutes might persuade him otherwise. Id. Plaintiffs do not address any such differences here, however.

Plaintiffs have not heeded that admonition, offering no new authority to buttress their third attempt to assert a constitutional right to evidence in support of their constitutional claims. Rather, they argue chiefly that the reasoning underlying Judge Urbina's 2006 and 2007 decisions was undercut in 2013, when this Court—and, later, the D.C. Circuit—held that discriminatory intent was a necessary element of their constitutional claims. See Pls.' Claim 1 MSJ at 2, 12–15 (arguing that "the current law of the case requires Plaintiffs [to] demonstrate intent to discriminate on the part of the chaplain board members"); see also In re Navy Chaplaincy, 738 F.3d at 428–31, aff'g 928 F. Supp. 2d 26 (D.D.C. 2013).

But the reasoning of those prior decisions remains valid here. For one thing, the law concerning the role of intent in equal protection and Establishment Clause challenge was established by Supreme Court precedent well before the early 2000s, so plaintiffs' suggestion that the 2013 decisions of this Court and the D.C. Circuit somehow upset the prevailing legal framework underlying Judge Urbina's earlier decisions is simply unfounded. See, e.g., In re Navy Chaplaincy, 738 F.3d at 429–30 (citing, among other authorities, Larson, Lemon, and Arlington Heights—all Supreme Court cases from the 1970s and 1980s). And even if those decisions had altered the applicable legal framework, that fact still would not undermine the reasons that Judge Urbina actually gave for his decision: that the proceedings of individual selection boards are of limited relevance to plaintiffs' constitutional claims, see Adair, 451 F. Supp. 2d at 217–19, and that in any case plaintiffs have "advanced no coherent theory supporting" an unqualified right of access to information needed to prove such claims, see id. at 220. Because plaintiffs have still not meaningfully addressed these points—which Judge Urbina first articulated over a decade ago— the Navy is entitled to summary judgment on plaintiffs' challenge to the constitutionality of § 613a.

## III.    PLAINTIFFS' REQUESTS FOR ADDITIONAL DISCOVERY

Finally, plaintiffs have filed several motions for additional discovery.  These include plaintiffs' March 2017 motion to lift the discovery stay, see Pls.' Discovery Mot., their September 2017 motion under Federal Rule of Civil Procedure 56(d) to stay summary judgment briefing until the discovery stay was lifted, see Pls.['] Rule 56(d) Mot., and their July 2018 motion seeking leave to file additional declarations, see Pls.' Mot. to File Decls.  For the reasons that follow, plaintiffs' discovery motions will be denied.

### A.    Plaintiffs' March and September 2017 Rule 56(d) Motions

The March 2017 motion to lift the discovery stay seeks discovery of various materials in support of the challenges to the Navy's selection-board policies.[23]  In support of the challenge to the Navy's alleged one-Roman-Catholic policy, plaintiffs seek the following documents: (1) unredacted copies of two reports prepared by the inspectors general of the Department of Defense and the Navy concerning allegations of religious discrimination by chaplain selection boards in 1997 and 1998 (the "IG reports"), see Pls.' Discovery Mot. at 25–27; (2) documents related to the Navy's alleged decision to stop staffing chaplain selection boards with two Roman Catholic chaplains beginning in 1986 and its decision to staff selection boards with two chaplains and five non-chaplain officers beginning in 2003, see id. at 27–28; (3) documents mentioning the phrase "denominational balancing," id. at 28–29; (4) communications between the Chief of Chaplains and his staff regarding the chief's nominations to chaplain selection boards, see id. at 29–30; and (5) data from various sources regarding the denominational composition of selection boards

---

[23] Because briefing on the parties' cross-motions for summary judgment is now complete, the Court will treat plaintiffs' motion to lift the discovery stay as a motion for additional discovery under Rule 56(d).  See Mar. 1, 2018 Order at 2 ("[I]nstead of reopening discovery on the eve of scheduled summary judgment briefing, the Court will consider plaintiffs' specific discovery requests in the context of their motion for additional discovery under Federal Rule of Civil Procedure 56(d) and in light of the summary judgment briefing on their claims.").

throughout the 1970s, 1980s, and 1990s, see id. at 30–31.[24]  In support of their challenge to the procedures employed by the selection boards themselves, plaintiffs seek (among other things) the results of promotion board proceedings from 2005 to 2016 (including "identification of those seeking promotion as well as those selected"), "Alpha rosters" from 2013 to 2017, and "[c]opies of complaints about [chaplain] board misconduct and all investigations of [such] misconduct from 1993 to the present."  Pls.' Discovery Mot. at 34–36.[25]

Plaintiffs' primary argument in support of their discovery requests is that the Court never formally established a cutoff for discovery.  See id. at 11–15.  The Navy responds that the parties agreed to a nine-month discovery period in 2002 (although this period was admittedly stayed several times and was never formally closed), and that since then plaintiffs have had ample time to obtain the discovery they need.  See Navy's Discovery Opp'n at 1–2; Fed. R. Civ. P. 26(b)(2)(C)(ii) (providing that a court "must" limit discovery where "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action"); Moore, 2017 WL 1750248, at *5 (a party seeking to stay summary judgment pending discovery of additional facts "'. . . must explain' why [it] could not produce those facts in opposition to the summary judgment motion" (quoting Convertino, 684 F.3d at 99–100)).  Moreover, the Navy argues, most of the discovery that plaintiffs now seek is either irrelevant, privileged, or duplicative, and hence cannot support reopening discovery now.

As a brief review of the history of discovery in this litigation demonstrates, the Navy is correct that plaintiffs have had ample time to conduct discovery.  Discovery in CFGC and Adair began in 2002, after the Court resolved the parties' first round of dispositive motions.  See Aug.

---

[24] Plaintiffs also seek certain admissions, depositions of certain witnesses interviewed in the investigations by the inspectors general, and permission to examine certain Chaplain Corps records.  Pls.' Discovery Mot. at 31–33.

[25] Plaintiffs also aver that the discovery sought in connection with the Navy's board-staffing policies is relevant to their challenge to the other selection-board policies.  See Pls.' Discovery Mot. at 32–33.

27, 2002 Order, CFGC, ECF No. 119; Aug. 27, 2002 Order, Adair, ECF No. 72. At the Court's direction, the parties submitted a joint discovery plan that outlined a nine-month discovery period, which would begin in November 2002 and conclude in August 2003. See Status Report at 2, CFGC, ECF No. 121.[26] Despite this agreed-upon discovery cutoff—which apparently was never enforced—discovery continued during the dispute over plaintiffs' motion to compel deposition testimony of selection board members and their subsequent constitutional challenge to 10 U.S.C. § 618(f). See Status Report at 2–3, CFGC, ECF No. 182 (noting that by February 2005, both parties had deposed several additional witnesses); Status Report, CFGC, ECF No. 178 (noting that between November 2002 and January 2004, plaintiffs had served their first round of document requests and deposed six witnesses). The Court stayed discovery "informally" in July 2009, and in mid-2012 Judge Kessler continued the stay based on the Navy's representation that it intended to file a dispositive motion. See Pls.' Discovery Mot. at 5. In January 2018, this Court again continued the discovery stay, advising the parties that it would consider plaintiffs' requests for additional discovery once the parties' summary judgment motions were fully briefed. See Jan. 11, 2018 Order.

In short, discovery in this case—which the parties initially agreed would take only nine months—was open for a period of several years between 2002 and 2009. Plaintiffs are correct that discovery was "conducted on and off" during this period, Pls.' Reply Mem. of P. & A. in Supp. of Pls.' Mot. to Lift the Discovery Stay [ECF No. 268] at 6, and that significant other proceedings took place during that time. They are also correct that they were never formally put on notice that the 2009 discovery stay would later become permanent. See In re Navy Chaplaincy, 287 F.R.D. 100, 102 (D.D.C. 2012) ("Parties must remember that discovery has been stayed only, and no cut-

---

[26] Although this document is not accessible on CFGC's electronic docket, the Navy has provided it here. See Ex. A to Navy's Discovery Opp'n.

off date for its completion has been set. If and when discovery is reopened, Plaintiffs will have their full opportunity to proceed . . . ."). But neither the flurry of collateral proceedings—most of which, it bears mentioning, were initiated by plaintiffs—nor the lack of a formal warning that discovery would not remain open indefinitely excuses plaintiffs' failure to obtain earlier the discovery that they now seek. Indeed, according to the Navy, plaintiffs were able to take—and did in fact take—a substantial amount of discovery between 2002 and 2009.[27] Their failure to take additional discovery then is ultimately their responsibility. See Kakeh, 537 F. Supp. 2d at 71 (Rule 56(d) "is not properly invoked to relieve counsel's lack of diligence" (citation omitted)).

In their September 2017 Rule 56(d) motion, Pls.['] Rule 56(d) Mot. at 2, plaintiffs advance the additional argument that the D.C. Circuit's 2013 ruling that their claims required proof of "intent and specific harm"—as well as its more specific holding that their statistical evidence "had not covered certain factors such as 'education' and 'promotion factors'"—justify their failure to seek certain evidence earlier on. In re Navy Chaplaincy, 738 F.3d at 428–31. This argument is unpersuasive. As already noted, in holding that plaintiffs' claims could be proven using a showing of disparate impact, the D.C. Circuit relied on established Supreme Court case law from as early as 1886. See In re Navy Chaplaincy, 738 F.3d at 428–31 (citing Arlington Heights, Gomillion, and Yick Wo). Any reasonable counsel would have been aware that statistical evidence was at

---

[27] As the Navy explains,

Plaintiffs have served—and received objections and responses to—twenty-five interrogatories, 136 requests for production of documents (to which the Navy responded by producing approximately 9,000 pages of documents), and ninety-one requests for admission. In addition, Plaintiffs have taken seventeen depositions in CFGC and Adair, as well as several more depositions in the related matter of Larsen v. United States Navy, including the depositions of three former Navy Chiefs of Chaplains. Plaintiffs' designated expert, Dr. Harald Leuba, has submitted at least fifteen reports consisting of at least 1,300 pages of argument and analysis in this litigation between 2000 and 2011, and the Navy's expert has submitted nine expert reports or declarations in this or related actions.

See Navy's Discovery Opp'n at 9–10.

least one method of pursuing the equal protection and Establishment Clause claims here, and counsel's failure to thoroughly pursue this evidence when discovery was open more than a decade ago does not provide a reason to reopen discovery now.

The Navy is also correct that many of the materials plaintiffs now seek either are undiscoverable or appear to be of limited probative value. Moore, 2017 WL 1750248, at *5 (explaining that materials sought on a Rule 56(d) motion must be both "discoverable" and "necessary to the litigation" (citation omitted)). For example, plaintiffs seek unredacted copies of the IG reports, which contain information that is not subject to discovery pursuant to 10 U.S.C. § 613a—a statutory privilege that this Court has already upheld as applied here. Other materials— including records of the membership and denominational composition of selection boards convened before 1993, promotion board results from 2007 to 2016, and "Alpha rosters" from 2013 to 2017—are only tangentially relevant to plaintiffs' claims because they pertain to boards convened either before 1993 (the applicable statute-of-limitations cutoff, see In re Navy Chaplaincy, 69 F. Supp. 3d at 256) or after 2006 (when the last of these three consolidated cases was filed). Still other materials sought by plaintiffs are duplicative of discovery already obtained and hence are likewise not necessary to the litigation. See, e.g., Navy's Discovery Opp'n at 19 (noting that plaintiffs request copies of communications between the Chief of Chaplains and his staff, but that plaintiffs have already deposed three former Chiefs of Chaplains).

In sum, plaintiffs have failed to demonstrate that they are entitled to additional discovery under Rule 56(d). Although plaintiffs have "outline[d] the particular facts [they] intend[] to discover," they have failed to explain "why [they] could not produce those facts in opposition to the [Navy's] summary judgment motion" earlier in the litigation. Moore, 2017 WL 1750248, at *5 (citation omitted). Moreover, plaintiffs have failed to show that many of those facts are

"necessary to the litigation" or even discoverable. Id. (citation omitted). Plaintiffs' March and September 2017 motions to lift the discovery stay will therefore be denied, and no further discovery will be permitted.

**B.      Plaintiffs' July 2018 Motion for Leave to Submit Additional Evidence**

Although it is framed as a supplement to their March 2017 discovery motion, plaintiffs' July 2018 motion seeks leave to present additional declarations and other evidence in support of their challenges to the Navy's selection-board policies. See Pls.' Mot. to File Decls. at 1. Plaintiffs appear to claim that this previously uncited evidence provides grounds both to deny the Navy's summary judgment motions and to reopen discovery. See id. at 1–2. In fact, it does neither.

First, the motion cites a declaration by Commander David Gibson, a plaintiff, which recounts his "unsolicited recollection of important events just prior to Plaintiffs['] filing [of] their final summary judgment brief, which "[c]ounsel did not have time to address." Id. at 2. Gibson declares that he heard statements: (1) by one selection board member that his board had "ma[de] room for a Roman Catholic [candidate] when [it] discovered no Catholic had been selected," (2) by another board member that he routinely used the practice of "zeroing out"—that is, a practice whereby one selection board member rates a candidate so low that the candidate is virtually guaranteed not to be selected—to "advance [his] agenda," and (3) by a Navy captain that promotion boards "make selections based on . . . denominational considerations." Id. at 2.

The first and third statements have no apparent connection to any of the challenged selection-board policies, so they are irrelevant. And although the second statement relates to the policy of keeping selection-board votes secret—plaintiffs allege that "zeroing out" is feasible as a tool for religious discrimination only because the alleged discriminator is not required to disclose his or her "zero" vote to the entire board, see Pls.' Claim 3 MSJ at 24 & n.4—nothing about the

statement itself suggests that the speaker's allegedly invidious "agenda" was one of religious discrimination. Nor do the assortment of additional declarations and testimony cited by plaintiffs—most of which was filed in other cases—permit that inference. See id. at 3–4 (discussing statements about "agendas" made by persons other than the speaker referred to in Commander Gibson's declaration). Commander Gibson's declaration therefore does not provide a reason to deny the Navy's summary judgment motion or to reopen discovery here.

The remainder of the evidence cited in plaintiffs' motion is equally unpersuasive. For example, the motion asks the Court to consider evidence that purportedly shows a "culture" within the Navy of discouraging servicemembers from reporting misconduct by their superiors— evidence that includes, among other things, statements made to counsel during a medical appointment with his personal doctor, an Army physician who never responded to counsel's request for a formal declaration. See id. at 4–6. The motion also asks the Court to consider the fact that Rear Admiral Brent Scott, who will be the first member of a certain non-liturgical Protestant denomination to assume the position of Chief of Chaplains, will also be the first Chief of Chaplains not to be promoted to the two-star rank of Rear Admiral (upper half). Id. at 6–7. This evidence is even further afield from the selection-board policies that plaintiffs challenge here.

In sum, plaintiffs' July 2018 discovery motion relies on evidence whose relevance to this case is tangential at best and that, for the most part, could have been presented much earlier in the litigation. Therefore, the motion presents no reason to deny the Navy's summary judgment motion or to reopen discovery, and it will be denied.

## **CONCLUSION**

For the foregoing reasons, plaintiffs' motions for summary judgment as to Claims 1, 2, and 3 will be denied, and the Navy's corresponding cross-motions for summary judgment will be

granted.  Plaintiffs' March 2017, September 2017, and July 2018 discovery motions will also be

denied.  A separate order has been issued on this date.

_____/s/_____

JOHN D. BATES
United States District Judge

Dated:  <u>August 30, 2018</u>