**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

IN RE: NAVY CHAPLAINCY                    Misc. Action No. 07-269 (JDB)

**MEMORANDUM OPINION**

The first of three cases that make up this consolidated case was filed nearly a quarter century ago.  Now, decades later, before the Court are cross-motions for summary judgment on the one remaining issue: equitable tolling of the statute of limitations.  Pls. Mot. for Summ. J. that Tolling Applies to the Statute of Limitations in this Case [ECF No. 368] ("Pls. Mot. for Summ. J."); Defs. Opp'n to Pls. Mot. & Cross-Mot. for Summ. J. [ECF No. 373] ("Defs. Opp'n & Cross-Mot. for Summ. J.").  All parties agree that the statute of limitations had run by the time the first case was filed.  Plaintiffs—members of the Navy Chaplain Corps—argue that equitable factors warrant tolling the statute of limitations and allowing this case to proceed.  Defendants the United States Navy and the Secretary of the Navy (together, the "Navy") disagree and request that final judgment be entered in their favor based on the untimeliness of plaintiffs' remaining claims.  For the reasons set forth below, the Court will deny plaintiffs' motion to toll the statute of limitations and grant the Navy's motion for summary judgment on the statute of limitations issue.

**Background**

I.   **Statutory Background**

The Navy Chaplain Corps is comprised of approximately 900 active-duty Naval officers whose primary responsibility is to "provide for the free exercise of religion for all members of the Navy and Marine Corps, their dependents, and other authorized persons."  In re England, 375 F.3d 1169, 1171 (D.C. Cir. 2004) (alteration omitted) (quoting Directive No. 1304.19, Appointment of Chaplains for the Military Services ¶ 3 (Dep't of Def. Sept. 18, 1993)); see also Decl. of Barry

1

Black [ECF No. 373-3] ("Black Decl.") ¶ 2.  "A Navy chaplain's role within the service is unique, involving simultaneous service as clergy or a professional representative of a particular religious denomination and as a commissioned naval officer."  In re England, 375 F.3d at 1171 (cleaned up).

At all times relevant to this litigation, the Navy categorized its chaplains according to faith group categories ("FGCs") for administrative purposes.  In re Navy Chaplaincy ("Navy Chaplaincy II"), 323 F. Supp. 3d 25, 30 (D.D.C. 2018), aff'd, No. 19-5204, 2020 WL 11568892 (D.C. Cir. Nov. 6, 2020).  "[T]he Navy treated liturgical Protestants, non-liturgical Protestants, and Roman Catholics as three distinct 'faith group categories'; a fourth and final category, 'Special Worship,' included all other Christian denominations, as well as all other religions."  Id.

Navy chaplains follow the same promotion and retirement system as all other Naval officers.  See In re England, 375 F.3d at 1172.  "That system seeks to manage officers' careers to provide the Navy with the best qualified personnel through three critical personnel decisions: (1) promotion; (2) continuation on active duty; and (3) selective early retirement."  Id.  To be promoted to the next rank, an officer must go before a "selection board," which must recommend the officer for promotion.  See 10 U.S.C. § 611(a).  At all times relevant to this litigation, the selection board had to be comprised of at least five officers, and, for boards considering Navy chaplains, one officer had to be a chaplain.  Id. § 612(a)(1), (a)(2)(A); see In re England, 375 F.3d at 1172.  The promotion board considers an eligible officer's military personnel file and recommends those officers "whom the board . . . considers best qualified for promotion."  10 U.S.C. §§ 615(a)(2), 616(a).  The Secretary of the Navy "reviews the board's recommendations and adopts or modifies the list, and then forwards it to the President through the Chairman of the Joint Chiefs of Staff and the Secretary of Defense."  In re England, 375 F.3d at 1173 (citing 10 U.S.C. § 618(b), (c)).

Each member of a selection board must take an oath to perform his duties "without prejudice or partiality and having in view both the special fitness of officers and the efficiency of [the Navy]." 10 U.S.C. § 613. And members of selection boards are prohibited from "disclos[ing] to any person not a member of the board" "[t]he proceedings of a selection board." Id. § 613a(a). Per the statute,

> [t]he discussions and deliberations of a selection board . . . and any written or documentary record of such discussions and deliberations—(1) are immune from legal process; (2) may not be admitted as evidence; and (3) may not be used for any purpose in any action, suit, or judicial or administrative proceeding without the consent of the Secretary of the military department concerned.

Id. § 613a(b). Thus—by congressional mandate—"[t]he proceedings of selection boards are secret." In re England, 375 F.3d at 1173–74 (quoting Brenner v. United States, 202 Ct. Cl. 678, 686 (Ct. Cl. 1973)).

## II.    Factual Background

### A.    Plaintiffs

Plaintiffs here are Protestant chaplains who fall under the Navy's "non-liturgical Protestant" FGC, so designated because their services do not follow a set liturgy (a prescribed order of worship). See Navy Chaplaincy II, 323 F. Supp. 3d at 30; Pls. Statement of Remaining Remand Pls. & Claims [ECF No. 369] ("Statement of Claims"). Their consolidated complaint— which is over a hundred pages long and contains at least 18 claims, see Consol. Compl. [ECF No. 134], challenges numerous current and historical aspects of the Chaplain Corps' personnel system.

Broadly, the claims at issue here allege that the Navy's use of the FGCs is discriminatory and arbitrary; that the Navy employed religious quotas to apportion chaplains among various faith groups; that various facially neutral policies employed by the Navy "have allowed religious bias to infect selection board outcomes"; and various other free exercise claims of discrimination and

retaliation.  See In re Navy Chaplaincy ("Navy Chaplaincy I"), 69 F. Supp. 3d 249, 253 (D.D.C. 2014) (describing these plaintiffs' claims).

### B.  Inspector General Reports

Plaintiffs detail numerous investigations conducted by the Inspectors General of the Department of Defense and the Navy into alleged religious bias in the Navy Chaplain Corps.  None of these reports relate to plaintiffs' claims, nor do they focus on the time frame at issue here. Plaintiffs seemingly include these facts in their complaint to demonstrate that the Navy Chaplain Corps suffers more generally from denominational biases and retaliation.[1]

First, in December 1997, Captain J.N. Stafford investigated a claim of discrimination lodged by Chaplain S.M. Aufderheide, alleging religious discrimination and preference in the fiscal year ("FY") 1997 and 1998 chaplain commander selection boards.  See Pls. Corrected Statement of Material Facts as to Which There is No Dispute Concerning Statute of Limitations Tolling [ECF No. 378-2] ("Pls. SMF") ¶ 10; Ex. 2 to Pls. Mot. for Summ. J. [ECF No. 368-5] ("Stafford Report").  Specifically, Aufderheide argued that "due to a division in the Lutheran Faith, his denomination, Lutheran Church-Missouri Synod (LCMS), was not treated impartially by the board." Ex. 4 to Pls. Mot. for Summ. J. [ECF No. 368-7] ("NIG Report") ¶ 1.  The Stafford Report concluded "that the board may have systematically applied a denominational quota system."  Pls. SMF ¶ 10(a) (quoting Stafford Report ¶ 3).  The Naval Inspector General then investigated those allegations of bias, but its investigation "did not vindicate Aufderheide's claim or identify

---

[1] For this reason, the Navy's response to plaintiffs' statement of undisputed material facts focuses primarily on disputing the relevance of the plaintiffs' facts, only occasionally arguing about their accuracy.  See, e.g., Defs. Resp. to Pls. SMF [ECF No. 373-2] at 7 ("The Navy denies that this is an undisputed fact.  The alleged events relating to Lieutenant Commander Aufderheide are not relevant to Plaintiffs' claims as Lieutenant Commander Aufderheide is not a Plaintiff in this action.").  The Court does not place much weight on these facts given that they are disconnected from plaintiffs' personal experiences.  But the equitable tolling arguments focus heavily on the Navy's actions, thus even facts not specifically about plaintiffs could be relevant.  Thus, when plaintiffs' general facts are supported more generally by the record, the Court occasionally relies on them throughout this Opinion.

misconduct."  Pls. SMF ¶ 11; see NIG Report.  As part of that investigation, the Secretary of the Navy "released the board members from their oath not to divulge the proceedings of the board," and thus, "all members . . . were interviewed under oath."  NIG Report ¶ 3.

Aufderheide challenged that finding and requested a Department of Defense Inspector General ("DOD IG") report.  Pls. SMF ¶ 12; Ex. 8 to Pl. Mot. for Summ J. [ECF No. 368-11] ("DOD IG Report").  The DOD IG Report "found some indication that the well recognized shortage of Roman Catholic chaplains may have been a factor in the final selection made" in Aufderheide's board but ultimately "found [the] evidence insufficient to conclude that denomination was the primary consideration—or that any board member openly advocated the need to select Roman Catholics."  DOD IG Report at 3.  The DOD IG thus "concluded that the selection was consistent with law and regulation."  Id.

After considering Aufderheide's claims of error, the DOD IG Report agreed that there was "a procedural error" which may have deprived him of "fair and impartial consideration" by his selection board.  DOD IG Report at 35; accord Pls. SMF ¶ 13.  The error was not a bias towards Roman Catholics or any other religious preference, but that a board member "made adverse comments" outside of the record about Aufderheide that "caused another board member to alter his vote to the detriment" of Aufderheide.  DOD IG Report at 35; see Pls. SMF ¶ 13.  Aufderheide was granted a new review board based on that procedural error and promoted to Commander.  Pls. SMF ¶ 13.

Other IG reports from even later described different irregularities in chaplain promotion selection procedures.  For example, a Navy Inspector General investigation of the FY 2000 chaplain promotion board found that board members may have inappropriately taken into account one non-selectee's "difference in philosophy concerning how women in the Navy should conduct

themselves and represent the gender." Ex. 10 to Pls. Mot. for Summ. J. [ECF No. 368-13] ("Washburn NIG Report") at 1. A different Navy Inspector General report based on the 2009 chaplain promotion board validated a claim of retaliation by a non-selectee. Ex. 14 to Pls. Mot. for Summ. J. [ECF No. 368-17] ("Baker NIG Report"). The Washburn and Baker NIG Reports did not contain allegations of religious discrimination.

## III.    Procedural Background

This consolidated case comprises three cases filed in this District: Chaplaincy of Full Gospel Churches v. Danzig, Civ A. No. 99-2945 (D.D.C., filed Nov. 5, 1999) ("CFGC"); Adair v. Winter, Civ. A. No. 00-566 (D.D.C., filed Mar. 17, 2000) ("Adair"); and Gibson v. United States Navy, Civ. A. No. 06-1696 (N.D. Fla., filed Apr. 28, 2006) ("Gibson"). All three were filed by non-liturgical Christian Navy chaplains and brought by the same counsel. Adair and CFGC were consolidated for pretrial purposes in 2000. Adair was filed as a putative class action in this District and was granted class certification in 2002. See Adair v. England, 209 F.R.D. 5 (D.D.C. 2002).

Following class certification, the cases proceeded to discovery. During discovery, a dispute arose over 10 U.S.C. § 618(f), the precursor to § 613a (discussed above), which prohibited the disclosure of "proceedings of a selection board." See Navy Chaplaincy II, 323 F. Supp. 3d at 31 (describing procedural history). In response to a challenge from plaintiffs, the district court ruled that the statute did not apply in civil litigation, but the D.C. Circuit ultimately reversed the district court, holding that "[d]isclosure of selection board proceedings in civil discovery would certainly undermine, if not totally frustrate, the purpose of Section 618(f)." In re England, 375 F.3d at 1178.[2] On remand, the district court took up the D.C. Circuit's suggestion that § 618(f)

---

[2] Three district court judges have overseen this case: Judge Ricardo Urbina, from 1999 until his retirement in 2012; Judge Gladys Kessler, from 2012 until her retirement in October 2017; and this Court, from October 2017 to the present.

may apply only to <u>selection</u> boards, not early retirement boards, and allowed discovery into retirement board proceedings.  See <u>Adair v. Winter</u>, 451 F. Supp. 2d 210, 218 (D.D.C. 2006).  At the same time, the district court rejected a challenge to § 618(f)'s constitutionality and denied discovery into selection board proceedings.  See <u>id.</u> at 212.

Shortly after the district court's ruling in <u>Adair</u>, Congress repealed § 618(f) and replaced it with 10 U.S.C. § 613a.  This new statute clarified that "[t]he proceedings of a selection board convened under section . . . 611 . . . of this title," which covers both selection <u>and early retirement boards</u>, "may not be disclosed to any person not a member of the board, except as authorized or required to process the report of the board"; and also that "such discussions and deliberations[] (1) are immune from legal process; (2) may not be admitted as evidence; and (3) may not be used for any purpose in any action, suit, or judicial or administrative proceeding without the consent of the Secretary of the military department concerned."  § 613a; <u>see</u> § 611.  Following the enactment of § 613a, the district court reconsidered its decision allowing discovery into retirement board materials and concluded that such materials were no longer discoverable.  See <u>In re Navy Chaplaincy</u>, 512 F. Supp. 2d 58, 62 (D.D.C. 2007).

Four years after class certification was granted, in May 2006, the Court granted the <u>Adair</u> plaintiffs' motion to vacate the 2002 class certification order.  Min. Order, <u>Adair</u>, Civ. A. No. 00-566 (D.D.C. May 30, 2006); <u>see also</u> <u>In re Navy Chaplaincy</u>, 306 F.R.D. 33, 43 (D.D.C. 2014) (describing procedural history).  In April 2006, <u>Gibson</u> was filed in the Northern District of Florida, asserting claims similar to those in <u>Adair</u>.  <u>Gibson</u> was then consolidated into the <u>Adair</u>/<u>CFGC</u> case, thus creating the consolidated case here.  See Mem. Order, <u>Gibson</u>, Civ. A. No. 06-1696 (D.D.C. June 18, 2007), ECF No. 11.

Following years of discovery, procedural interruptions, and consolidation, plaintiffs filed a consolidated complaint in October 2012.  See Consol. Compl.  The complaint alleges a litany of claims of religious discrimination and arbitrary government action by the Navy.  With the benefit of discovery and one consolidated complaint, both parties moved for summary judgment on statute of limitations grounds for some claims.  See Navy Chaplaincy I, 69 F. Supp. 3d at 255.  Judge Kessler granted summary judgment to the Navy, finding that the six-year statute of limitations in 28 U.S.C. § 2401(a) was a jurisdictional bar to many of plaintiffs' claims.  See id. at 256–60. Although plaintiffs had raised the possibility of equitable tolling, the Court found that it was unable to consider those arguments because § 2401(a)'s statute of limitations "'creates a jurisdictional condition attached to the government's waiver of sovereign immunity' that 'cannot be waived by the parties' and is not subject to equitable extensions."  Id. at 259 (quoting Mendoza v. Perez, 754 F.3d 1002, 1018 (D.C. Cir. 2014)).  The Court also rejected plaintiffs' argument that their claims did not accrue until they "discovered the allegedly discriminatory nature of the practice at issue," holding that "it is discovery 'of the injury, not . . . the other elements of a claim [that] starts the clock.'"  Id. at 257 (alterations in original) (quoting Rotella v. Wood, 528 U.S. 549, 555–56 (2000)).

The parties then engaged in another round of briefing for the remaining claims.  These included claims similar to those which were dismissed on statute of limitations grounds but accrued later, as well as a constitutional challenge to § 613a.  See Navy Chaplaincy II, 323 F. Supp. 3d at 35–36 (describing remaining claims, including challenges to religious staffing, selection board procedures, and claims of retaliation and religious interference).  This Court granted summary judgment to the Navy on all remaining claims on the merits.  Id. at 55–56.  The

D.C. Circuit affirmed that ruling with one minor exception.[3]  See In re Navy Chaplaincy ("Navy Chaplaincy III"), No. 19-5204, 2020 WL 11568892, at *1, 3 (D.C. Cir. Nov. 6, 2020).

However, in the meantime, based on intervening Supreme Court decisions, the D.C. Circuit had overturned its prior precedent holding that the statute of limitations in § 2401 was jurisdictional.  Jackson v. Modly, 949 F.3d 763, 776–78 (D.C. Cir. 2020) ("[W]e hold that § 2401(a)'s time bar is nonjurisdictional and subject to equitable tolling").  The D.C. Circuit thus remanded to this Court the set of claims that had been dismissed on statute of limitations grounds in 2014.  See Navy Chaplaincy III, 2020 WL 11568892, at *3.  It instructed this Court to consider "the merits of the Plaintiffs' fraudulent concealment arguments" to determine whether the statute of limitations should be tolled.  Id.

Hence, now again before the Court are plaintiffs' claims that were originally dismissed in Navy Chaplaincy I: (1) a challenge to the Navy's use of FGCs as arbitrary and discriminatory, see Consol. Compl. ¶¶ 29–39; (2) challenges to policies which, they allege, were designed to stack selection boards with Roman Catholic chaplains, see id. ¶¶ 8, 57(e)–(g); (3) challenges to facially neutral personnel practices related to the composition and voting procedures of selection boards that plaintiffs argue have allowed religious bias to influence selection board decisions, see id. ¶¶ 110–16; (4) a challenge to the Navy's practice of prominently displaying a candidate for selection's "faith group identifier" during the selection board process, see id. ¶¶ 86–87; and (5) a set of "ad hoc" claims covering instances where plaintiffs allegedly suffered discrimination and violations of free exercise rights, including times when they were

> (1) retaliated against, criticized, and removed from their posts based on the content of their religious teachings; (2) treated differently from Liturgical chaplains with respect to disciplinary issues and employment benefits; (3) required to officiate at

---

[3] The D.C. Circuit reversed the Court's ruling that one plaintiff, the Associated Gospel Church, lacked standing.  That plaintiff has since voluntarily dismissed its claims.  See Mar. 8, 2021 Min. Order.

Liturgical services; and/or (4) subjected to general policies that, while not facially discriminatory, disfavored certain aspects of their worship traditions,

Navy Chaplaincy I, 69 F. Supp. 3d at 253–54 (citing Addendum 1 to Consol. Compl. ¶¶ 1–65).

See generally id. (describing the range of claims at issue); Defs. Opp'n & Cross-Mot. for Summ. J. at 5–6 (same).[4]

After many years of litigation, there are 18 plaintiffs remaining in this case.[5] See Statement of Claims. In line with the D.C. Circuit's remand, plaintiffs now move for summary judgment on the issue of tolling the statute of limitations. See Pls. Mot. for Summ. J.; Pls. Mem. of P. & A. in Supp. of Their Mot. for Summ J. that Tolling Applies to Statute of Limitations in this Case [ECF No. 368-1] ("Pls. Mem. in Supp. of Summ. J."). Plaintiffs' summary judgment motion argues three bases for tolling: (1) the statute of limitations should be equitably tolled because the challenged actions constitute self-concealing fraud and/or the Navy fraudulently concealed the relevant conduct, Pls. Mem. at 21–39; (2) as to the Gibson plaintiffs, the filing of the Adair class action tolled the statute of limitations, id. at 39–44; and (3) plaintiffs suffered "latent" injuries that were not discoverable until within the statute of limitations period, id. at 44.

The Navy opposes all three bases for tolling and has filed a cross-motion for summary judgment. See Defs. Opp'n & Cross-Mot. for Summ. J. Plaintiffs filed a reply in support of their motion and opposition to the Navy's cross-motion, see Pls. Joint Reply in Supp. of Pls. Mot. & in Opp'n to Defs. Opp'n & Cross-Mot. for Summ. J. [ECF No. 377] ("Pls. Reply"), and the Navy

---

[4] Only those claims that fall under these categories and were "based on policies or personnel actions finalized prior to November 5, 1993" for the CFGC plaintiffs; prior to March 17, 1994 for the Adair plaintiffs; and prior to April 28, 2000 for the Gibson plaintiffs were held to be untimely in Navy Chaplaincy I and therefore are before this Court on remand. Sept. 26, 2014 Order [ECF No. 193].

[5] They are Chaplains George Byrum, Patrick Doney, Richard Hamme, William Hatch, Gary Heinke, Robert Hendricks, Samuel D. Kirk, Frank S. Klapach, Jan C. Kohlmann, Timothy D. Nall, Cynthia Prince (for James V. Prince), Thomas Rush, Lloyd Scott, Fred A. Thompson, Jr., Glenn Thyrion, Thomas R. Watson, James M. Weibling, and Chris Xenakis. See Statement of Claims.

filed a reply in support of its motion, see Reply in Supp. of Defs. Opp'n & Cross-Mot. for Summ. J. [ECF No. 380] ("Defs. Reply"). Both motions are thus ripe for decision.

## Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In assessing a motion for summary judgment, the court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52 (1986).

## Analysis

The claims remaining in this case were initially dismissed in 2014 because they were filed outside the six-year statute of limitations. See Navy Chaplaincy I, 69 F. Supp. 3d at 259 ("[A]ll claims of Plaintiffs accruing more than six years before the commencement of each case are time-barred unless a tolling rule applies."). The D.C. Circuit remanded the case to consider equitable tolling arguments—namely, whether some form of fraudulent concealment should toll the statute of limitations and thus allow plaintiffs' claims to proceed. See Navy Chaplaincy III, 2020 WL 11568892, at *3. For the reasons set forth below, plaintiffs have not shown that the Navy fraudulently concealed wrongdoing under any theory, and thus there is no basis for the Court to equitably toll the statute of limitations.

### I. Equitable Tolling

Equitable tolling of a statute of limitations is available "when the plaintiff 'despite all due diligence . . . is unable to obtain vital information bearing on the existence of [her] claim.'" Chung v. Dep't of Just., 333 F.3d 273, 278 (D.C. Cir. 2003) (quoting Currier v. Radio Free Eur., 159 F.3d

1363, 1367 (D.C. Cir. 1998)).  The court's power to equitably toll the statute of limitations "will be exercised only in extraordinary and carefully circumscribed instances." <u>Mondy v. Sec'y of the Army</u>, 845 F.2d 1051, 1057 (D.C. Cir. 1988).

"At least two types of fraudulent behavior toll a statutory period": self-concealing fraud and active concealment.  <u>Hobson v. Wilson</u>, 737 F.2d 1, 34 n.103 (quoting <u>Tomera v. Galt</u>, 511 F.2d 504, 510 (7th Cir. 1975)).  For conduct to amount to self-concealing fraud, the "defendants must engage in some misleading, deceptive or otherwise contrived action or scheme, <u>in the course of committing the wrong</u>, that is designed to mask the existence of a cause of action." <u>Id.</u> at 34.  In those cases, "the fraud goes undiscovered even though the defendant after commission of the wrong does nothing to conceal it and the plaintiff has diligently inquired into its circumstances.  The plaintiffs' due diligence is essential here."  <u>Id.</u> at 34 n.103 (emphasis omitted) (quoting <u>Tomera</u>, 511 F.2d at 510).  A "plaintiff will not be afforded extra time to file without exercising due diligence, and the plaintiff's excuse must be more than a 'garden variety claim of excusable neglect.'"  <u>Battle v. Rubin</u>, 121 F. Supp. 2d 4, 8 (D.D.C. 2000) (quoting <u>Irwin v. Dep't of Veterans Affs.</u>, 498 U.S. 89, 96 (1990)).

In the case of active concealment, "the fraud goes undiscovered because the defendant has taken positive steps after commission of the fraud to keep it concealed."  <u>Hobson</u>, 737 F.2d at 34 n.103 (quoting <u>Tomera</u>, 511 F.2d at 510); <u>see also</u> <u>Johnson v. Long Beach Mortg. Loan Tr. 2001-4</u>, 451 F. Supp. 2d 16, 51 (D.D.C. 2006) ("A statute of limitations may be equitably tolled when the party claiming the protection of the statute of limitations has employed affirmative acts . . . to fraudulently conceal either the existence of a claim or facts forming the basis of a cause of action." (internal quotation marks omitted)).

Thus, the statute of limitations may be tolled due to either fraudulent behavior by defendants in the course of committing the wrong (self-concealing frauds) or conduct after the wrong designed to conceal its existence (active concealment).  See Sprint Commc'ns Co., L.P. v. F.C.C., 76 F.3d 1221, 1226 (D.C. Cir. 1996) ("If the defendant's wrongs are not 'self-concealing (such as frauds),' then the plaintiff must show that the defendant engaged in an act of concealment separate from the wrong itself.").

### A.  Self-Concealing Fraud

Plaintiffs argue that five features of the chaplain promotion board system, when viewed together, demonstrate that it constitutes self-concealing fraud: (1) the system "is designed to keep its board proceedings secret," Pls. Mem. in Supp. of Summ. J. at 23, (2) there is an "almost impenetrable barrier for chaplains seeking to establish selection board misconduct," id. at 24; (3) the system lacks "effective means" to "ensur[e] religious neutrality," id.;[6] (4) the "Navy's consistent denial that there is anything amiss in its selection board procedures," id. at 27, and (5) the Navy violated its duty to disclose impropriety, further keeping the system concealed, id. at 17.

Plaintiffs' first, second, and third points argue that the chaplain system is "self-concealing fraud" because the board selection process is, in its totality, "a scheme which is by its nature unknowable," Pls. Mem. in Supp. of Summ. J. at 23–24 (internal quotation marks omitted), making it "[a]lmost [i]mpossible" for chaplains to discover misconduct, id. at 24–27.  And the "proof of th[ose] assertion[s]," plaintiffs claim, "is that no board member reported obvious misconduct until released from their oath of secrecy so they could provide Inspectors General the information needed for the IG investigations."  Id. at 24 (citing Pls. SMF ¶¶ 45–46).

---

[6] In support of this, plaintiffs point (at various times) to the hierarchy in the selection process that could discourage reporting impropriety out of fear of retaliation, secret ballots, the inability of service members to compare records with each other, and the ability to give a candidate a "zero" score.  See Pls. Mem. in Supp. of Summ. J. at 23–24; id. at 26–27; Pls. Reply at 16.  Plaintiffs do not fully explain why such procedures are fraudulent.

In support of this argument, plaintiffs analogize to a number of cases in which courts have found equitable tolling appropriate when the government's "secret schemes of self-concealing wrongs [we]re exposed."  Pls. Mem. in Supp. of Summ. J. at 8–10, 12–14.  For example, in Hobson, the plaintiffs argued that the FBI's COINTELPRO program was self-concealing fraud. 737 F.2d at 33.  COINTELPRO was a "secret program[]" designed by the FBI to "target[] people who opposed American involvement in the Vietnam War and other related policies" and "people seeking improvement of civil rights for Black people."  Id. at 10.  "Secrecy was of utmost importance to the programs," and memoranda cautioned that "under no circumstances should the existence of the program be made known outside the Bureau and appropriate within-office security should be afforded."  Id. at 11 (internal quotation marks omitted).  When the FBI "recogni[zed] . . . the illegality of the COINTELPRO program," it "merely led to a tightening of security, not termination of the program."  Id.

Under those facts, the D.C. Circuit found that the COINTELPRO program was, in itself, self-concealing fraud.  See Hobson, 737 F.2d at 33–41.  It noted that "[t]he FBI took numerous steps to assure that no aspect of its COINTELPRO program would come to the attention of the public, or, indeed, of anyone outside the FBI.  Steps were also taken to limit knowledge of COINTELPRO operations even among FBI personnel."  Id. at 36.  Because it concluded that there was sufficient evidence that "defendants deliberately constructed schemes of such a kind that plaintiffs would not even suspect that any outsider was meddling in their lawful activities, much less that their constitutional rights were being violated," the D.C. Circuit "decline[d] to hold that insufficient evidence support[ed] the jury's verdict" finding self-concealing fraud.  Id. at 37.

Similarly, in Bowen v. City of New York, 476 U.S. 467 (1986), the Supreme Court affirmed the equitable tolling of the statute of limitations under the self-concealing fraud doctrine

based on a complaint challenging "an unlawful, unpublished policy under which countless deserving [Social Security] claimants were denied benefits." Id. at 473. Because "the full extent of the Government's clandestine policy was uncovered only in the course of [that] litigation," the 60-day statute of limitations did not afford plaintiffs a "reasonable opportunity to learn the facts concerning the cause of action." Id. at 481 (internal quotation marks omitted).

The challenged system here is different from those challenged in Hobson and Bowen in at least three critical respects: (1) it is not a secret, (2) it is not created by the Navy—it is created by Congress—and (3) it does not feature any "misleading, deceptive, or otherwise contrived action or scheme, in the course of committing the wrong, that is designed to mask the existence of a cause of action," Hobson, 737 F.2d at 34.

First, the schemes in Hobson and Bowen were not publicly known until after the fact. The plaintiffs in those cases thus had no way of identifying the actors or policies responsible for their perceived wrongs and were potentially unable to perceive the wrongs at all. See Hobson, 737 F.2d at 11 (describing memorandum instructing that "under no circumstances should the existence of the program be made known outside the Bureau"); Bowen, 476 U.S. at 481 (noting that "the full extent of the Government's clandestine policy was uncovered only in the course of [that] litigation"). The specific policies challenged here—the nondisclosure of board proceedings and selection board procedures, such as the use of secret ballots, see Pls. Reply at 16—are not concealed from the public; they are published in the U.S. Code or Federal Register. Cf. Richards v. Mileski, 662 F.2d 65, 70 (D.C. Cir. 1981) (requiring defendants conceal "not only their involvement, but the very conduct itself" to prove fraudulent concealment).

Of course, by their nature, the challenged procedures are designed to keep some information secret.  But in recognition of that, there are also procedures designed to shine light on such information.  As the government describes:

> Plaintiffs have always had the option of asking the Secretary of the Navy to open an investigation into their boards or to convene a special selection board, a decision which itself is subject to judicial review, see 10 U.S.C. § 628; id. § 1552; making use of the Navy's Inspector General and Hotline Programs, see SECNAVINST 5430.57F ([Ex. 4 to Defs. Opp'n & Cross-Mot. for Summ. J.); SECNAVINST 5370.5A ([Ex. 5 to Defs. Opp'n & Cross-Mot. for Summ. J.); or having the relevant board decisions reviewed by the Board [for] Correction of Naval Records, which is empowered to review "constitutional, statutory and/or regulatory violations," 32 C.F.R. § 723.3(e)(4).

Defs. Opp'n & Cross-Mot. for Summ. J. at 15 (citations omitted).  Looking at the statutory scheme more broadly, it is clear that it was not designed to conceal evidence of wrongdoing; rather, it was designed to conceal promotion-related discussions while still offering an avenue to challenge and investigate allegations of wrongdoing.[7]

---

[7] Although the Court need not reach the question of due diligence because it finds that there was no self-concealing fraud, the existence of these procedures—and plaintiffs' failure to utilize any of them—likely undermines any claim that they exercised due diligence.  See Battle, 121 F. Supp. 2d at 8 ("[A] plaintiff will not be afforded extra time to file without exercising due diligence, and the plaintiff's excuse must be more than a 'garden variety claim of excusable neglect.'" (quoting Irwin, 498 U.S. at 96)); Hobson, 737 F.2d at 34 n.103 (noting that in the case of self-concealing wrongs, "plaintiffs' due diligence is essential" (internal quotation marks omitted)).  The due diligence standard is a lower standard than notice—even if plaintiffs did not have full facts necessary to form a cause of action, they still must have exercised diligence "in trying to uncover Defendants' wrongdoing."  Sec. Exch. Comm'n v. Brown, 740 F. Supp. 2d 148, 158 (D.D.C. 2010).

Plaintiffs' facts suggest that numerous plaintiffs believed, years before bringing this lawsuit, that religious preference may have played a role in their promotion decisions.  See Defs. Opp'n & Cross-Mot. for Summ. J. at 22–23 (collecting testimony from plaintiffs to that effect).  But they exercised no diligence in investigating those claims.  Plaintiffs' only argument in their opening brief is that "diligence is measured by the efforts taken to bring the case to court once the facts became known."  Pls. Mem. in Supp. of Summ. J. at 21.  But that is not the diligence required—it is diligence to uncover the facts.  In recognition of that, plaintiffs change course in their reply and suggest that "various plaintiffs . . . asked for information from the Detailer or other senior officials as to what was wrong with their records and how they could improve their chances for promotion" and that plaintiffs were correct to rely on the presumption of regularity of board proceedings.  Pls. Reply at 23–24 (citing Pls. SMF ¶ 28).  But asking officials with no knowledge of one's selection board proceedings how, generally, to improve one's record is clearly not an effective way of investigating potential misconduct by the selection board.  And even if, as plaintiffs repeatedly emphasize, the procedures set up to investigate claims of impropriety are difficult, that does not excuse a lack of diligence in trying.  Cf. Commc'ns Vending Corp. of Ariz., Inc. v. FCC, 365 F.3d 1064, 1075 (D.C. Cir. 2004) (declining to toll statute of limitations based on argument that filing a lawsuit before a change in law would have been futile because "[t]he only sure way to determine whether a suit can be maintained is to try it" (internal quotation marks omitted)).  The failure to utilize administrative remedies or otherwise investigate potential wrongdoing is a failure of diligence, which in itself is likely fatal to plaintiffs' self-concealing fraud claim.  See, e.g., Earle v. Dist. of Columbia, Civ. A. No. 06-0072 PLF, 2011 WL 10747169, at *8 (D.D.C. June 29, 2011), aff'd, 707 F.3d 299 (D.C. Cir. 2012) (declining to toll

More importantly, the evidence before the Court does not suggest that "the defendants . . . engage[d] in some misleading, deceptive or otherwise contrived action or scheme, in the course of committing the wrong, that [was] designed to mask the existence of a cause of action."  Hobson, 737 F.2d at 34 (emphasis omitted).  To begin, the primary policy plaintiffs point to—the prohibition on disclosing selection board proceedings—was not created by the Navy; it was created by Congress.[8]  See 10 U.S.C. § 613a.  Thus, when the Navy declined to share details of the selection board proceedings, it was not attempting to "mask the existence" of any alleged discrimination—it was attempting to comply with federal law.

Nor is there any evidence that the statutory scheme was enacted to conceal the existence of any wrongs.  If that were the case, why would Congress and the Navy implement processes to challenge those board proceedings—processes which, as plaintiffs' facts and argument underscore, can be quite effective?  See, e.g., DOD IG Report at 35 (investigating Chaplain Aufderheide's claim of impropriety in chaplain promotion selection process, agreeing it was procedural error, and ordering new selection board); Pls. SMF ¶ 13 (describing how Chaplain Aufderheide was promoted by the newly convened board).  Congress chose to give the Secretary of the Navy the power to release board members from their oath of secrecy.  See 10 U.S.C. § 613a(b)(3).  And when chaplain non-selectees did challenge their promotional boards, the Secretary of the Navy did, in fact, release board members from their oaths and instituted investigations into wrongdoing—thereby removing the structural barrier that plaintiffs claim constituted self-concealing fraud.  See, e.g., Ex. 5 to Pls. Mot. for Summ. J. [ECF No. 368-8] ("Holderby NIG

---

statute of limitations under fraudulent concealment theory because "with reasonable diligence, plaintiff easily could have discovered his rights").

[8] Plaintiffs also suggest that the low promotion rates normalize non-promotion and make it more difficult to challenge a given non-promotion decision.  See Pls. Mem. in Supp. of Summ. J. at 10–11.  But that structure is also created by Congress.

Statement") (describing a conversation during board selection processes that plaintiffs claim shows religious bias).[9]  The existence of these polices belies any suggestion that the promotion process was <u>designed</u> to conceal wrongdoing.

Absent any evidence that the scheme was created in order to conceal wrongdoing, the Court is hesitant to find a basis for equitable tolling in the statutory and regulatory framework set up by Congress and the Navy.  As the government notes, the challenged procedures here are not limited to these plaintiffs—under plaintiffs' theory, there is

> effectively no statute of limitations for any of the millions of service members who may wish to challenge a decision of a military selection board because statutory confidentiality requirements and privacy protections necessarily make it harder for potential plaintiffs to obtain evidence sufficient "to withstand a motion to dismiss."

Defs. Opp'n & Cross-Mot. for Summ. J. at 17 (quoting Pls. Mem. in Supp. of Summ. J. at 18). Congress's intent in passing § 613a surely was not for it to be used as a basis to indefinitely toll statutes of limitations for all selection board claims.  <u>Cf.</u> <u>Johnson</u>, 451 F. Supp. 2d at 52 (declining to toll statute of limitations as it "surely is contrary to the intention of the legislature in enacting that statute" and "would effectively nullify the one-year limitations period that was enacted by Congress, as virtually every late-filed . . . claim could, under such an interpretation, elude the application of the limitations period through a claimed equitable tolling" (internal quotation marks omitted)).

Plaintiffs' next argument as to why the chaplain selection board process is self-concealing fraud is that the Navy continually defends the propriety of its selection board processes.  Pls. Mem. in Supp. of Summ. J. at 27–29.  For those statements by Navy officials to be relevant to the self-

---

[9]  To the extent plaintiffs rely on the fact that the NIG investigations rejected the conclusion that there was religious bias—but nonetheless were able to investigate and turn up the facts plaintiffs believe support their religious bias claim—that is not particularly relevant to the resolution of the equitable tolling issue.  <u>See, e.g.</u>, Pls. Mem. in Supp. of Summ. J. at 25.  Plaintiffs' facts prove that the IG was able to find and report on the factual bases for plaintiffs' claims; the fact that the Navy decided those facts did not rise to the level of religious bias is irrelevant.

concealing fraud argument, plaintiffs must show that the statements defending the propriety of selection board procedures were somehow themselves fraudulent—that the speakers knew of misconduct and nonetheless used denials to conceal the wrongdoing.  Hobson, 737 F.2d at 34. They have not done so.

To start, this is not a case like Hobson, where the alleged secret scheme and resulting constitutional violations were widely known and acknowledged among the defendants.  Especially given the scant evidence of actual discrimination in individual selection board proceedings, see, e.g., DOD IG Report at 26 (concluding that "denomination may have been a factor" in one FY 1997 board selection but that "no other board members recalled" the one comment suggesting bias), and the limits on disclosure of board proceedings, the Court is unwilling to assume, absent evidence, that any statements made asserting that board proceedings were proper were made with knowledge of impropriety by individual selection boards.  That argument is purely speculative.

With that in mind, the statements on which plaintiffs rely are plainly insufficient.  Plaintiffs first note that the Navy conducted professional training every year during the relevant period, at which the Chief of Chaplains or his Deputy would "respond to questions about promotions."  Pls. Reply at 19; Pls. SMF ¶¶ 20–22.  Although plaintiffs do not have "comments [on] or transcriptions of such presentations," they assert without support that "it's clear [the officials] were not pointing out the errors and promotion mistakes of the boards."  Pls. Reply at 19.  Absent any actual information about these trainings—who spoke, what they said, why they said it, and what they knew about any impropriety at the time—there is no basis for the Court to infer that those trainings were given to conceal any wrongdoing.  Similarly, plaintiffs' reliance on the "oft repeated mantra" by Navy officials that "everyone had an equal opportunity for promotion; promotions were competitive, based on merit as reflected in fitness reports and free of denominational influence;

and the board selected the most competitive chaplains," Pls. Reply at 20 (quoting Pls. SMF ¶ 24), does not establish <u>who</u> made those statements and whether they had any knowledge of their (alleged) falsity. <u>See, e.g.</u>, Decl. of LCDR Mary Helen Spalding, CHC, USN (Ret) [ECF No. 368-19] ¶ 8 (generally describing how at "Basic Course" they were instructed that "the selection process was fair and there were no denominational quotas or factors influencing promotion"). The Court is accordingly unwilling to find that general statements about the fairness of promotional procedures—absent any evidence that such procedures were widely known to be unfair—were made to conceal wrongful conduct.

Plaintiffs' final argument on self-concealing fraud is that the Navy had an affirmative duty to disclose information to them and that its failure to do so constitutes further proof of the self-concealing nature of the scheme. Unless "the defendant has an affirmative duty to disclose the relevant information to the plaintiff," silence does not toll the statute of limitations. <u>Sprint Commc'ns</u>, 76 F.3d at 1226. Plaintiffs argue that the Navy, through its Office of the Detailer, had an obligation to inform chaplains "what they can do to improve their chances next time they're considered." Pls. Mem. in Supp. of Summ. J. at 17. But they point to no "<u>facts</u> indicating . . . that [the Navy's] failure to disclose this information was in violation of any duty, fiduciary or statutory, to disclose it." <u>Sprint Commc'ns</u>, 76 F.3d at 1227 (emphasis added). They cite no statute or regulation requiring that affirmative duty, and even if they could identify such an obligation, it is unlikely that the relevant office would be in possession of such information given the clear statutory directive for board members <u>not</u> to disclose such information. <u>See</u> Defs. Opp'n & Cross-Mot. for Summ. J. at 16–17 (noting that the Navy "in fact had a statutory duty <u>not to disclose</u> such information"). Thus, there is nothing in the record to suggest that the Navy violated any duty to disclose known information.

The chaplain promotion selection process was not a secretive scheme designed to conceal wrongdoing, and it is a far cry from the government schemes courts have previously found to be self-concealing fraud.  Instead, the chaplain promotion process is (and was) a comprehensive scheme with statutory limits on disclosure, which are mitigated by (often effective) processes in place to expose wrongdoing.

### B.  Active Concealment

The statute of limitations may also be tolled if plaintiffs show that "the fraud [went] undiscovered because the defendant [took] positive steps after commission of the fraud to keep it concealed."  Hobson, 737 F.2d at 34 n.103 (quoting Tomera, 511 F.2d at 510); see also Johnson, 451 F. Supp. 2d at 51–52.  While the self-concealing fraud analysis focuses on the fraud itself, the active concealment doctrine requires that "the defendant engaged in an act of concealment separate from the wrong itself."  Sprint Commc'ns, 76 F.3d at 1227.  Relying on comments made by senior Navy officials, plaintiffs argue that the Navy actively concealed its constitutional violations.  See Pls. Mem. in Supp. of Summ. J. at 30–34.  The facts that plaintiffs marshal in support of this theory—which overlap to a degree with their arguments that the Navy's statements concealing board impropriety constituted self-concealing fraud—are ultimately unavailing.

The Court has already addressed the first set of facts on which plaintiffs rely—general comments from Navy leadership about the fairness of the promotion selection process and the lack of religious bias.  See Pls. Mem. in Supp. of Summ. J. at 30–31 (citing Pls. SMF ¶¶ 19–25).  To briefly recap, such comments cannot form the basis for any fraudulent concealment theory because they are far too generalized and provide no indication that the (largely unidentified) speakers had any knowledge of (alleged) wrongdoing.  The second set of facts plaintiffs offer describe slightly more specific comments from Navy officials, which plaintiffs allege constituted active

concealment that denominational prejudice was the reason for their non-selection.  See Pls. Mem. in Supp. of Summ. J. at 30–32 (citing Pls. SMF ¶¶ 26–31).  These facts include:

- A comment from Rear Admiral Muchow to a now-dismissed plaintiff, Chaplain Klon Kitchen, that his non-selection was based on "severe fitness report inflation which confounds selection boards."  Pls. SMF ¶ 27 (cleaned up).

- Comments made in response to three plaintiffs' inquiries about why they were not selected for promotion that "there was nothing wrong with their records," "the boards were fair," and "denomination was not a factor."  Id. ¶ 28.

- Testimony from a non-plaintiff and a study about "widespread distrust of the Chaplain Corps process."  Id.  ¶¶ 29–30.

- Testimony from plaintiff Chaplain James Weibling about (1) a conversation he had with the Detailer about his reasons for non-promotion; (2) a comment he overheard suggesting that the then-Chief of Chaplains was going to "fix" a promotion board for a different chaplain; and (3) a comment from a different Chief of Chaplains assuring Weibling that there was no religious discrimination and that board proceedings were fair.  Decl. of James M. Weibling in Supp. of Pls. Opp'n to Navy's Mot. to Dismiss [ECF No. 368-33] ¶¶ 7, 10, 12; see Pls. SMF ¶ 31.

These statements—while slightly more specific than the first set of statements—are similarly unpersuasive.  Some, like the comments about distrust of the Chaplains Corps or the "fix" for a different chaplain, are not relevant because they do not speak to the Navy's attempts to fraudulently conceal anything.  For other comments, plaintiffs have furnished no evidence they are false—for example, it could certainly be true that "fitness reports are inflated" even if there was also some other reason for non-selection.  And the comments that could be perceived as a general

denial of wrongdoing suffer from the same issues discussed above—even if they overstated the fairness of the proceedings, plaintiffs have not shown that the speakers <u>knew</u> their statements were anything but truthful at the time they were made.   As the Navy notes, if such broad, generic statements rose to the level of fraudulent concealment, that would "effectively treat any denial of wrongdoing as a per se basis for fraudulent concealment, therefore transforming equitable tolling from a 'rare remedy' to a default rule."  Defs. Opp'n & Cross-Mot. for Summ. J. at 20 (quoting <u>Jackson</u>, 949 F.3d at 778).

*     *     *     *     *

In summary, plaintiffs have not met their evidentiary burden at this stage of showing that the Navy fraudulently concealed any wrongdoing, either in the course of committing the alleged wrongs or afterwards in an attempt to conceal it.  The Court thus concludes that the statute of limitations should not be tolled due to fraudulent concealment.[10]

## II.  "Latent Injury" Exception

In certain cases, if a plaintiff's "injuries are latent, as for example after an exposure to toxic chemicals, the right to sue is deemed to accrue when the wrong manifests itself in injury to the plaintiff."  <u>Norwest Bank Minn. Nat'l Ass'n v. FDIC</u>, 312 F.3d 447, 452 n.4 (D.C. Cir. 2002). This is a "limited exception[] to the general rule that the statute of limitations begins to run at the time of the wrong."  <u>Id.</u>

In employment discrimination cases, a cause of action accrues at the time of the injury, which is the "adverse employment decision."  <u>Navy Chaplaincy I</u>, 69 F. Supp. 3d at 258 (internal

---

[10] Because the Court finds that the Navy's actions did not constitute fraudulent concealment, it does not reach the question of whether the plaintiffs were nonetheless on notice, <u>see</u> Pls. Mem. in Supp. of Summ. J. at 34–39; Def. Opp'n & Cross-Mot. for Summ. J. at 21–24, or plaintiffs' argument that the filing of the <u>Adair</u> class action also tolled the statute of limitations for the <u>Gibson</u> plaintiffs (which would only be relevant if the Court found that the <u>Adair</u> class action was timely filed), <u>see</u> Pls. Mem. in Supp. of Summ. J. at 39–43.

23

quotation marks omitted).  Plaintiffs argue that their case is the exception—that their injury occurred "when it [wa]s discovered [that] the decisions affecting promotion and continuation on active duty were based on or tainted with forbidden denominational biases and retaliation," and thus any injury was "latent" until it was discovered years after their non-selection decision.  Pls. Mem. in Supp. of Summ. J. at 44.  This argument has been previously raised and rejected: "[o]ur Court of Appeals has expressly rejected the contention that emotional harm 'suffered on learning of the government's alleged malfeasance constitutes an independent injury' postponing accrual of a claim."  Navy Chaplaincy I, 69 F. Supp. 3d at 257–58 (cleaned up) (quoting Sexton v. United States, 832 F.2d 629, 637 (D.C. Cir. 1987)).  Thus, the Navy Chaplaincy I court determined that "the discovery rule is not applicable to Plaintiffs' claims" and that "Plaintiffs' claims accrued no later than the date on which the policies and personnel actions at issue became final"—a date well outside the six-year statute of limitations for all the claims at issue here.  Id. at 258.

Plaintiffs have not offered any reason to deviate from that prior ruling in this case rejecting their "latent injury" argument.[11]  Hence, the Court reaffirms the conclusion that plaintiffs' claims accrued outside the statute of limitations period, and, for the reasons discussed throughout this Opinion, there is no basis to toll the statute of limitations.

---

[11] Arguably, this issue is not within the limits of remand from the D.C. Circuit in any event.

**Conclusion**

These claims were remanded to this Court to consider whether any equitable doctrines should toll the statute of limitations.  Because the Court concludes that no equitable doctrine applies here, it will grant the Navy summary judgment on statute of limitations grounds on all the claims remaining in the case.  A separate accompanying Order will issue on this date.

_____/s/_____
JOHN D. BATES
United States District Judge

Dated:  August 23, 2023